# CV-09 1207

## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| MARTIN TANKLEFF, ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| v. ) | **09-Civ.** _____ |
| ) | |
| THE COUNTY OF SUFFOLK, ) | **COMPLAINT AND** |
| K. JAMES MCCREADY, NORMAN REIN, ) | **JURY DEMAND** |
| CHARLES KOSCIUK, ROBERT DOYLE, ) | |
| JOHN MCELHONE, JOHN DOE POLICE ) | |
| OFFICERS #1-10, RICHARD ROE ) | **FILED** |
| SUFFOLK COUNTY EMPLOYEES #1-10, ) | IN CLERK'S OFFICE |
| ) | U.S. DISTRICT COURT E.D.N.Y. |
| **Defendants.** ) | |
| ) | ★  MAR 24 2009  ★ |

PLATT, L.

WALL, M.J. LONG ISLAND OFFICE

And when the last law was down, and the Devil turned round on you—where would you hide, Roper, the laws all being flat? This country's planted thick with laws from coast to coast—man's laws, not God's—and if you cut them down—and you're just the man to do it—d'you really think you could stand upright in the winds that would blow then?

*A Man for All Seasons,* (Act One, scene seven)

1

Plaintiff Martin Tankleff, by and through his attorneys, the law firms of Cochran Neufeld & Scheck, LLP, Barket & Angeli, P.C. , and Miller and Chevalier, Chartered, states as follows:

### Introduction

1.  On June 11, 1979, the *National Law Journal* published a front-page article detailing a widespread practice of coercing confessions among the homicide detectives of the Suffolk County Police Department. The article described use of physical force and other improper techniques to pressure suspects to confess, as well as a startling failure to follow up on obvious leads inconsistent with a confession or to seek evidence that might corroborate or refute a confession.

2.  In response to the *National Law Journal* article the Suffolk County Bar Association conducted an extensive investigation that included public hearings. In a report issued in January of 1980 the Bar Association found "serious problems" with the way Suffolk detectives conducted interrogations, the unlawful use of physical force, and a failure to investigate complaints of misconduct internally. It recommended, among other reforms, the videotaping of interrogations.

3.  On December 7, 1986, two *Newsday* reporters analyzed 361 Suffolk County murder cases between 1976 and 1986. The year-long study showed that homicide detectives got confessions in ninety-four percent of those cases. That statistic corroborated the *National Law Journal's* findings.

4.  The *Newsday* reporters compared confession rates in six comparable counties, and found confession rates between 54 and 73 percent in those jurisdictions.

5.  Between 1975 and 1985, the New York Supreme Court, Appellate Division, reversed ten

Suffolk County murder convictions because homicide detectives had used illegal tactics to elicit confessions.

6. As early as 1979, Suffolk County policymakers were aware of a stunning pattern of unlawful behavior in the way homicide detectives obtained and reported confessions.

7. By 1985, Suffolk County Policymakers also were on notice of egregious misconduct by a detective named K. James McCready, who was the lead detective in Martin Tankleff's case.

8. In the early 1980s, a young defendant named Timothy O'Toole challenged the admissibility of his confession on grounds of coercion. O'Toole argued that he confessed only after McCready kicked him in the testicles. The attorney assigned to represent O'Toole at arraignment testified under oath that he had observed severe bruising on and around O'Toole's testicles. McCready denied it.

9. In 1985, Suffolk County police testified against a man named James Diaz whom homicide detectives claimed had confessed to a brutal rape and murder. Diaz refused to sign the confession. McCready testified at the trial that a witness identified Diaz from a photograph in the newspaper. The defense impeached him by showing that no paper had ever published a photo of Diaz. McCready then claimed that he had just assumed the witness had seen a photograph of Diaz. Caught in a lie, and confronted by the trial judge, McCready went on to falsely claim that he showed a photo array to the witness. No photo array was ever documented or reported; and, in fact, the prosecutor had already told the judge that no photo array procedure took place.

10. The detectives claimed that Diaz confessed to the rape and murder and said that he ran out of the house where the crime occurred and discarded a knife in the woods that he

3

used in the murder. Police had recovered a knife in the woods. Ten months after the confession, the victim's husband found a bloody knife in his basement that was determined to be the murder weapon.

11.  Two days after Diaz was acquitted, the trial judge (Stuart Namm) wrote to then-Governor Cuomo and requested a full-fledged investigation into misconduct by Suffolk homicide detectives and prosecutors arising from what he had witnessed in the *Diaz* case, and another highly publicized murder trial involving a defendant named Peter Corso. In April 1989, the New York State Investigation Commission (SIC) issued a report finding "grave shortcomings in the leadership and management" of the Suffolk County Police Department, especially with respect to the conduct of its homicide detectives. That finding included lack of accountability for official misconduct. The report further found that the Suffolk County Police Department engaged in and permitted grossly deficient investigative and management practices, and failed to punish instances of employee misconduct, even when supervisory personnel knew of those instances.

12.  The SIC also found that Detective McCready had committed perjury at the *Diaz* trial.

13.  Yet Suffolk County policy makers stubbornly refused to acknowledge or remedy the "ends justify the means" approach of their detectives despite the clearest notice possible from the press and the judiciary.

14.  The findings of the SIC did not focus on whether Corso, Diaz, or other defendants, like O'Toole, were guilty or innocent, but on laying out in the most forceful terms possible that the Suffolk County homicide division was being allowed to persist in a custom, policy, and practice of coercing confessions, lying to cover up the coercion, and failing to investigate obvious leads because they had the confession.

4

15.   The key point was that unchecked use of these tactics would inevitably lead to the conviction of an innocent.

16.   That is exactly what happened to Martin Tankleff.

### Martin "Marty" Tankleff

17.   As a teenager, plaintiff Martin Tankleff, known as Marty, was prosecuted and convicted of stabbing and bludgeoning his parents to death. He did not commit these brutal and highly publicized crimes. But, as a direct result of gross misconduct by Suffolk County law enforcement officials that violated his constitutional rights, Mr. Tankleff spent over seventeen years in prison.

18.   Mr. Tankleff maintained his innocence at trial and continued to fight to prove his innocence throughout his incarceration. Ultimately, Mr. Tankleff, with the help of a *pro bono* team of lawyers and investigators—who unlike Suffolk County law enforcement lacked grand jury power, the ability to grant immunity, and other governmental investigative tools and resources—unearthed evidence exculpating Mr. Tankleff and pointing to others as the individuals responsible for the murder of his parents.

19.   Mr. Tankleff presented this evidence to the Appellate Division of the New York Supreme Court, Second Department. On December 18, 2007, a panel of that court vacated Mr. Tankleff's conviction on the basis of the newly discovered evidence.

20.   After almost two decades of vigilant persistence, Mr. Tankleff was finally released on December 27, 2007.

21.   On January 2, 2008, Suffolk County District Attorney Thomas Spota announced that he would not retry Mr. Tankleff and would move to dismiss the indictments on January 18. He additionally stated that he would ask for the appointment of a special prosecutor

amidst allegations of conflict of interest.  Prior to D.A. Spota dismissing the indictments, the Attorney General was appointed as a special prosecutor.  Thereafter, the New York Attorney General's Office conducted an independent investigation and moved to dismiss the outstanding indictments in the interest of justice.  On July 22, 2008, Justice Robert W. Doyle of the Supreme Court, Suffolk County, dismissed all charges against Mr. Tankleff.

22. The wrongful conviction of Mr. Tankleff was not accidental.  Defendants Detective K. James McCready, Detective Norman Rein, and other Suffolk County police officers, supervisors and investigators caused Mr. Tankleff's conviction by making him their prime suspect immediately after the crime was reported, fabricating and coercing a false confession that was consistent with their initial and faulty assumptions of how the crime occurred, and then by ignoring and covering up the mounting evidence that both proved the confession false, and incriminated other suspects.

23. Beyond compensating Mr. Tankleff for the more than seventeen years he spent in maximum security state prisons and his continued suffering, this action seeks findings concerning the unlawful Suffolk County policies, practices or customs of conducting unlawful interrogations and investigations and failing to adequately train, supervise and discipline its officers that led defendants to violate his constitutional rights as guaranteed by the First, Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments of the United States Constitution.

## JURISDICTION AND VENUE

24. This Court has jurisdiction pursuant to 28 U.S.C. § 1331, over claims arising under 42 U.S.C. § 1983.

25. Supplemental jurisdiction over Mr. Tankleff's state law claims exists pursuant to 28

U.S.C. § 1367(a).

26. Venue is proper in the Eastern District of New York under 28 U.S.C. § 1391(b), because that is the judicial district in which the claims arose, and in which the defendants resided or conducted business in 1988.

27. Mr. Tankleff has complied with the requirements of New York General Municipal Law Section 50-i by making and serving a notice of claim on the County Attorney of the County of Suffolk on October 10, 2008, within the time required by New York General Municipal Law Section 50-e. More than thirty days have elapsed since the service of that notice.

28. At the request of the County of Suffolk, on December 17, 2008, Mr. Tankleff submitted to a hearing pursuant to New York General Municipal Law Section 50-h.

## JURY DEMAND

29. Pursuant to the Seventh Amendment of the United States Constitution, Mr. Tankleff requests a jury trial on all issues and claims set forth in this Complaint.

## PARTIES

30. Plaintiff Martin Tankleff ("Marty") is an individual residing in Hempstead, New York.

31. Defendant K. James McCready was employed by the Suffolk County Police Department in 1988. At all times relevant to this Complaint, he was a duly appointed and acting police officer of the Suffolk County Police Department with the rank of detective, acting under color of state law, within the scope of his employment, and in his individual capacity pursuant to the statutes, ordinances, regulations, policies, customs and usage of the County of Suffolk and the State of New York.

32. Defendant Norman Rein was employed by the Suffolk County Police Department in

1988. At all times relevant to this Complaint, he was a duly appointed and acting police officer of the Suffolk County Police Department with the rank of detective, acting under color of state law, within the scope of his employment, and in his individual capacity pursuant to the statutes, ordinances, regulations, policies, customs and usage of the County of Suffolk and the State of New York.

33.     Defendant Charles Kosciuk was employed by the Suffolk County Police Department in 1988. At all times relevant to this Complaint, he was a duly appointed and acting police officer of the Suffolk County Police Department with the rank of detective, acting under color of state law, within the scope of his employment, and in his individual capacity pursuant to the statutes, ordinances, regulations, policies, customs and usage of the County of Suffolk and the State of New York.

34.     Defendant Robert Doyle was employed by the Suffolk County Police Department in 1988. At all times relevant to this Complaint, he was a duly appointed and acting police officer of the Suffolk County Police Department with the rank of sergeant, acting under color of state law, within the scope of his employment, and in his individual capacity pursuant to the statutes, ordinances, regulations, policies, customs and usage of the County of Suffolk and the State of New York.

35.     Defendant John McElhone was employed by the Suffolk County Police Department in 1988. At all times relevant to this Complaint, he was a duly appointed and acting police officer of the Suffolk County Police Department with the rank of lieutenant, acting under color of state law, within the scope of his employment, and in his individual capacity pursuant to the statutes, ordinances, regulations, policies, customs and usage of the County of Suffolk and the State of New York.

36.   Defendants John Doe, whose identities are currently unknown, represent those employees
      of the Suffolk County Police Department and the Suffolk County District Attorney's
      Office, acting in their individual capacities, within the scope of their employment, and
      under color of law pursuant to the statutes, ordinances, regulations, policies, customs and
      usage of the County of Suffolk and the State of New York, who conducted the
      investigation that lead to Mr. Tankleff's wrongful conviction.

37.   Defendants Richard Roe, whose identities are currently unknown, represent those
      employees of the Suffolk County Police Department and the Suffolk County District
      Attorney's Office, acting in their individual capacities, within the scope of their
      employment, and under color of law pursuant to the statutes, ordinances, regulations,
      policies, customs and usage of the County of Suffolk and the State of New York, who
      were both personally involved and acted as supervisors over McCready, Rein, and John
      Doe police officers and investigators who conducted the investigation that lead to Mr.
      Tankleff's wrongful conviction.

38.   Defendant County of Suffolk is a body politic and corporate empowered to exercise
      home rule. The Suffolk County Legislature, the County's policymaker, has delegated
      final policymaking authority for the supervision and control of Suffolk County Police to
      the duly appointed Commissioner of the Suffolk County Police Department, currently
      Commissioner Richard Dormer.

## FACTS

39.   On September 7, 1988, Marty Tankleff was a seventeen-year-old high school student
      living with his parents, Arlene and Seymour Tankleff, in Belle Terre, a wealthy suburban
      community in Eastern Long Island. It was to have been the first day of Marty's senior

9

year in high school.

40.   Marty woke up when his alarm went off at 5:35 a.m.  When he got out of bed after 6
      a.m., he found the lights on, the burglar alarms deactivated, and the house unlocked.

41.   Marty walked through the house to his father's study, where he found Seymour Tankleff
      breathing but unconscious, suffering from severe injuries to the neck and head.

42.   Marty immediately called 911.  He followed the operator's instructions for stabilizing his
      father and went looking for his mother.  He found her on the bedroom floor, obviously
      lifeless.

43.   Marty ran next door to his neighbor's house and pounded on the door.

### The Investigation Begins

44.   The first police officers arrived on the scene at approximately 6:15 a.m. with emergency
      medical personnel.  Among the first words out of Marty's mouth were "I know who did
      this.  Jerry Steuerman murdered my parents."

45.   Marty directed officers Crayne and Gallagher to his parents' bodies.

46.   Officers directed Marty to the backseat of a patrol car and cordoned off the crime scene.

47.   Although not scheduled to receive any new assignment that day, at approximately 7:40
      a.m., defendant Detective McCready arrived at the Tankleff house and took command.
      He was the first detective on the on the scene.

48.   McCready spoke briefly with Officers Aki and Gallagher, and then walked through the
      premises.  He observed blood in the study where Marty found Seymour.  He saw
      Arlene's body in the disheveled bedroom, and noted her injuries.  He saw a knife with red
      or pink residue on it on the kitchen counter next to a watermelon.  He also walked into
      Marty's room, where he saw a set of barbells.

49.   McCready then left the house and interviewed Marty at the patrol car.  Marty told

McCready he believed his father's business partner, Jerry Steuerman, was responsible for

the attacks on his parents.  He provided them information suggesting that Steuerman had

a strong motive, means, and an opportunity to carry out the attacks.

50.   Marty was then interviewed by defendants Sergeant Doyle and Detective Rein.  He

repeated his belief that Jerry Steuerman was responsible for the brutal crimes against his

parents.  Later that day, several relatives of the Tankleffs independently voiced their view

to Suffolk County law enforcement that they also believed Steuerman was responsible.

### The Detectives Focus on Marty

51.   By the time he left the scene, lead detective McCready had decided that Marty Tankleff

had attacked his parents.

52.   McCready wanted an opportunity to isolate Marty from his family and interrogate him at

length in order to obtain a confession.

53.   Shortly after 8 a.m., Myron Fox—known to Marty as Uncle Mike, his god-father—

arrived.  Fox, the Tankleff family attorney, intended to pick up Marty and bring him to

Mather Memorial Hospital, where Seymour Tankleff clung to life.  McCready intercepted

Fox, and told him Marty was already on his way.  In fact, detectives were still

interviewing Marty yards away.

54.   Throughout the morning, detectives repeatedly told Tankleff family members and friends

that Marty was on his way to the hospital when in fact he was isolated in police custody,

being interrogated as the prime suspect.

55.   Marty asked defendant McCready to take him to the hospital.  Detectives told him they

would bring him to the hospital, but that they first wanted to take him to Suffolk County

11

Police Headquarters in Yaphank to ask him questions about Jerry Steuerman.

56.     While en route to Police Headquarters, defendant McCready received a radio

transmission asking him to call Suffolk County Police Detective Pfalszgraf, who was at

Mather hospital with the Tankleff family.  McCready drove out of his way to locate a pay

phone to contact Pfalszgraf, who informed McCready that Seymour was being transferred

to Stony Brook University Hospital, and the family was looking for Marty.  Although

McCready and Marty were less than a mile from Mather hospital, McCready did not take

Marty there.  Instead, McCready proceeded to police headquarters.

57.     At the Suffolk County Police headquarters in Yaphank, Detectives McCready and Rein

took Marty into a small, windowless room.  They engaged him in preliminary small talk

about girls and sports.  After gaining his trust, they relentlessly questioned him for a

period of hours without interruption.

58.     Marty was not informed of his *Miranda* rights by Detectives McCready and Rein, nor by

any of their colleagues at this time.  No detective ever told him that he was not under

arrest or that he was free to leave.  In fact, he was never free to leave, and his repeated

requests to go to the hospital to see his father were refused.

59.     Despite his repeated requests to speak to Uncle Mike, that request was also refused.

Detectives never advised Marty of his right to counsel.

60.     Throughout the questioning, teenaged Marty, still in shock at the discovery of the

bloodied and bludgeoned bodies of his parents, was barefoot, and wearing only a

sweatshirt and shorts.

61.     After several hours of questioning about his relationship with his parents and his

discovery of them that morning, McCready and Rein had Marty demonstrate how he had

tried to help his father. Marty obliged.

62. Immediately thereafter, the pace and manner of the interrogation became more aggressive. McCready and Rein confronted Marty with lies they concocted about forensic evidence they said contradicted his version of events.

63. They told him his hair was found in his mother's hand. That was a lie.

64. They told him they had conducted a humidity test that proved he was lying when he said he hadn't showered that morning. That was a lie; there was no such thing as a humidity test.

65. They told him that he showered that morning, suggesting it was done to wash off his parents' blood. That too was a lie; no blood was ever found in Marty's shower, the drain or the plumbing.

66. Though faced with these confusing, false accusations, Marty continued to protest his innocence.

67. Shortly thereafter, McCready left the interrogation room and staged an elaborate lie designed to induce a confession. Within earshot of Marty, McCready faked receiving a phone call, pretended to learn that doctors had revived Seymour Tankleff with a shot of adrenaline, and fabricated a story that Seymour had named Marty as his assailant. In fact, Seymour never regained consciousness.

68. McCready then returned to the interrogation room, shut the door, and told Marty his father had accused Marty of attacking him.

69. Marty was shaken to hear this wild and devastating accusation, but continued to maintain his innocence. He volunteered to take a polygraph test. His offer was refused even though, upon information and belief, Suffolk County had a polygraphist on staff. Instead,

the detectives assured Marty that his own father could not be mistaken in saying Marty was the attacker.

### The So-Called "Confession"

70.  Marty had a very close relationship with his father. Isolated, deprived of food, still in shock from the discovery of his parents, and worn down by hours of interrogation by detectives, McCready's ruse had a powerfully confusing effect on Marty, causing him to distrust his own memory. Marty was then encouraged by the detectives to believe he could have experienced a "black out" and killed his parents without remembering it.

71.  At that point, at 11:54 a.m., Detective McCready claims to have administered *Miranda* warnings for the first time. However, in contradiction to Suffolk's written policy, there is no time written on the *Miranda* rights card documenting when rights were read.

72.  In fact, *Miranda* warnings were not read at that time.

73.  McCready and Rein deliberately did not record or videotape the interrogation after the alleged administration of *Miranda* warnings, despite the fact they knew the Suffolk County Police Department was equipped to do both.

74.  Defendants McCready and Rein knew that in order to ensure that a confession was reliable, the incriminating details – what came after the general "I did it" admission" – should come from the suspect, and should not be supplied by investigators in the form of leading questions. In their zeal to prove their vastly premature theory of Marty's guilt, McCready and Rein rejected their training, put words in Marty's mouth, and later lied about it.

75.  Defendants McCready and Rein confronted Marty with the facts of the crime as they understood them, feeding Marty details for him to repeat back to them in a so-called

"confession."

76. Defendants McCready and Rein had seen that Marty's clothing was not bloody. They suggested to him that he had decided to kill his parents while naked so as not to get blood on his clothes. His will overborne and his grasp of the truth broken, Marty agreed.

77. Defendants McCready and Rein knew that Arlene Tankleff had been bludgeoned repeatedly with a blunt object. They suggested to Marty that he had hit his mother repeatedly with the barbell from his room. His will overborne and his grasp of the truth broken, Marty agreed.

78. Defendants McCready and Rein knew that Arlene Tankleff's throat had been cut and that she had been stabbed. They suggested to Marty that he had run into the kitchen, picked up the watermelon knife from the counter, returned to his mother's room, struggled with her, stabbed her and cut her throat. His will overborne and his grasp of the truth broken, Marty agreed.

79. Defendants McCready and Rein knew that Seymour Tankleff had also been stabbed. They suggested to Marty that he had then run, with the bloody watermelon knife in his hand, to the other end of the house, where he found his father awake in the study and attacked him. His will overborne and his grasp of the truth broken, Marty agreed.

80. Defendants McCready and Rein knew that when police arrived, Marty was not covered in blood, as he would have been if he had committed both murders. Nor did the barbell appear to have blood on it. They suggested to Marty he that he must have showered to wash the blood off his body and the weapons before returning the knife to the kitchen counter and the barbell to his own room. His will overborne and his grasp of the truth broken, Marty agreed.

81.  Ultimately, McCready handwrote a two-and-a-half page narrative statement that fundamentally misrepresented what had happened.  When in fact McCready and Rein had fed Marty key details of the so-called confession, the statement McCready wrote out indicated that those details had originated with Marty, who provided them in narrative form.

82.  This so-called confession, written by McCready, was an outright fabrication.

83.  The statement ended abruptly mid-sentence, when Myron Fox phoned police headquarters, finally learned that Marty had been there all along, and ordered the interrogation to cease.

84.  Marty was never shown the written confession, much less did he sign it.  He repudiated his oral inculpatory statements almost immediately.

85.  At approximately 8:30 p.m., detectives took dried blood samples, saliva samples, hair samples, and fingernail scrapings from Marty pursuant to a search warrant.  Officers also took Marty's clothing, as well as tissues they had observed in his pocket during the interrogation.

86.  Marty was placed under arrest for the murder of his mother and the attempted murder of his father, a charge that was later upgraded to murder when his father died on October 6, 1988.

### The Fabricated Confession Was False

87.  The confession McCready and Rein attributed to Marty was not only fabricated; it was demonstrably false, as the defendants would have known had they investigated rather than rushing to pin the murders on an innocent teenager.

88.  The Suffolk County Crime Lab conducted extensive testing of physical evidence

collected from the crime scene in the days after Marty's arrest. None of the physical evidence connected Marty Tankleff to the murders.

89.  Despite obvious signs of a struggle at the crime scene, Marty's only injury was bruising from a rhinoplasty several days earlier. In September 1988, Seymour Tankleff was 6 foot 2 and approximately 230 pounds, and Arlene Tankleff was 5 foot 11 and approximately 190 pounds. Marty Tankleff was 5 foot 8 and weighed at most 150 pounds.

90.  None of Marty's blood was found in the house, and neither his body nor any of his clothing was covered in blood. He had only spots of blood on him, consistent with helping his father.

91.  McCready and Rein attributed to Marty an admission that he used a barbell from his room and the watermelon knife from the kitchen in the attacks, but the lab found not even the slightest trace of blood on either object. The material that McCready had observed on the knife was watermelon residue.

92.  McCready and Rein attributed to Marty an admission that he washed off his parents' blood in his shower that morning, but no blood was found in the drain of Marty's shower or indeed anywhere in the plumbing anywhere in the house.

93.  McCready and Rein attributed to Marty an admission that he used the watermelon knife from the kitchen to stab his parents. But the sheets in Arlene Tankleff's bedroom bore the imprint of a different bloody knife. This knife was never found, and the imprint was never disclosed by Suffolk County law enforcement to Mr. Tankleff. Defendant Kosciuk and other officers of the Suffolk County Crime Scene Unit covered up this exculpatory imprint.

94.   McCready and Rein attributed to Marty an admission that he cut his mother's throat in her bedroom and then, using the same knife, stabbed his father in the study at the other end of the house, but no blood was found on the vast swath of carpeting between the two rooms.

95.   McCready and Rein attributed to Marty an admission that he was naked and used his bare hands during the attacks, but a bloody "honeycomb" pattern was found on the stains on Arlene's bedding, consistent with latex gloves, and on the light switch in Marty's room. No such gloves were ever found, despite an exhaustive search of the Tankleff residence and its grounds.

## Defendants Ignore Evidence Pointing to Jerry Steuerman

96.   Marty Tankleff told police repeatedly that his father's business partner Jerry Steuerman must have been involved. Other Tankleff family members, too, repeatedly told police that they suspected Jerry Steuerman. From the outset of this case, the Suffolk County police defendants inexplicably refused to conduct any serious investigation of Steuerman.

97.   Jerry Steuerman was Seymour's partner in various business ventures. The partnership was the result of a collateral interest Seymour acquired in Steuerman's bagel stores and racehorses under the terms of a series of loans Seymour made Steuerman at exorbitant interest rates. Steuerman owed Seymour Tankleff $500,000, which Steuerman could not pay, and Seymour was trying to collect. Seymour had a custom of asking Steuerman for money at or after their weekly poker games. A blood-speckled letter from Seymour to Steuerman, sent by certified mail, and demanding immediate payment of a $50,000 note, was found in plain view on Seymour's desk, at the place he was attacked, but the letter was not even noted or recovered by McCready or Rein. Steuerman had a very strong

18

motive to kill the Tankleffs.

98. The night before the assaults, Seymour Tankleff hosted his weekly poker game. Steuerman, a regular player, was in attendance, and he was the last to leave when the game concluded at 3 a.m. on the morning of September 7. When the other players left, Seymour and Steuerman were having a private conversation in the room where Marty found Seymour the next morning. Steuerman had the opportunity to set up a "hit" on the Tankleffs that evening.

99. Steuerman had resorted to violence, either at his own hand or by enforcers, to settle business disputes in the past. For example, he had hired Hell's Angels to "rough up" bagel store employees who were trying to unionize. This information was known to law enforcement (specifically McCready) but not revealed to Marty's trial defense team.

100. Shortly after Marty was arrested, Jerry Steuerman faked his own death, disguised his appearance and fled to California under an assumed name after taking out an insurance policy in his girlfriend's name. Just before Steuerman fled, a newspaper article had reported that Seymour Tankleff was still alive, and might survive the attack. Steuerman's flight would ordinarily be regarded by investigating detectives as powerful evidence showing consciousness of guilt.

101. Nonetheless, Steuerman's disappearance was classified as a missing persons case. Yet when police discovered Steuerman living in a motel in California, it was Suffolk County homicide detectives McCready and Doyle and the assistant district attorney prosecuting Marty Tankleff, Edward Jablonski, not missing persons officers, who flew out to meet with him.

102. McCready never passed along any of the information he obtained from Marty about

Steuerman's business dealings to the detectives who ultimately questioned him.

103.   Suffolk County officials including defendant McCready and assistant district attorney Edward Jablonski spent two days with Steuerman at a hotel in California and ultimately escorted him home to New York.

104.   Steuerman allegedly told police he had faked his own death because the pressure of being named as a suspect in the Tankleff murders was too much for him.

105.   In fact, despite his motive, his opportunity, his history of violence, and his highly suspicious behavior, police officers never considered Jerry Steuerman a suspect.

### Prosecution and Conviction

106.   Marty was arraigned at 10 a.m. on September 8, 1988, on one count of murder and one count of attempted murder.

107.   On September 9, Mr. Tankleff was indicted on charges of Murder in the Second Degree, for the murder of Arlene Tankleff, and Attempted Murder in the Second Degree, for the attempted murder of Seymour Tankleff.

108.   On October 6, Seymour Tankleff died of the head wounds sustained during the attack.

109.   On October 27, Mr. Tankleff was indicted for the murder of his father.

110.   Mr. Tankleff's bail application was originally denied.

111.   He was forced to attend his mother's funeral in handcuffs and shackles, dressed in prison garb.

112.   After approximately a month, Mr. Tankleff was granted bail at a one million dollar bond and five hundred thousand dollars cash.  He was released on bail the day before his father's funeral.

113.   Prior to trial, the defense moved to suppress the confession, which it alleged was coerced,

at a sixteen-day *Huntley* hearing in March 1989. The court denied the defense's motion to suppress the confession, and it was admitted into evidence.

114. Marty's trial began on April 23, 1990, and ended nearly ten weeks later, on June 20, 1990. It was the first trial in New York State to be televised in its entirety.

115. The unsigned confession defendants McCready and Rein attributed to Marty was the lynchpin of the prosecution.

116. Upon information and belief, Detectives McCready and Rein falsely reported to prosecutors that the confession, including key details about use of the knife found in the kitchen and barbells found in Marty's room being the murder weapons, as well as Marty performing the attacks naked and washing blood off himself and the weapons in the shower, all originated from Marty in narrative form and in response to open ended questions. At the suppression hearing and at trial Detectives McCready and Rein again testified at length, falsely, that the details in the confession had originated with Marty in narrative form or in response to open-ended questions.

117. In providing these false reports and testimony about the confession, Detectives McCready and Rein were complaining witnesses who actively instigated, initiated and perpetuated the prosecution of Mr. Tankleff.

118. Upon information and belief, Detectives McCready and Rein met with prosecutors before testifying at the grand jury, pre-trial hearing and trial and provided orally information consistent with their version of events before they testified.

119. McCready falsely testified both at a pretrial hearing and at trial that he didn't know Steuerman and had no motive to steer the investigation away from Steuerman despite obvious evidence of Steuerman's motive and opportunity to set up the murder of the

Tankleffs.

120.  Out of court, too, McCready falsely told prosecutors he did not know Steuerman and had

no motive to steer the investigation away from Steuerman.

121.  On the eighth day of deliberations, a Suffolk County jury found Mr. Tankleff guilty of

first-degree murder of Seymour Tankleff, and second-degree murder of Arlene Tankleff.

Mr. Tankleff was sentenced to two consecutive terms of twenty-five years to life.  He

began serving that sentence in 1990, at the age of 19.

### Post-Conviction

122.  Mr. Tankleff maintained his innocence throughout trial and throughout his incarceration.

His direct appeals were exhausted before the New York Court of Appeals on December

22, 1994.  He subsequently filed a federal *habeas corpus* petition.  Federal habeas was

denied by the Eastern District of New York and the United States Court of Appeals for

the Second Circuit in 1997 and 1998, respectively.  While the Court of Appeals

ultimately denied relief, it unanimously ruled that Mr. Tankleff was unlawfully subjected

to custodial interrogation long before he was provided *Miranda* warnings.

123.  Detectives McCready and Rein unjustly prolonged Mr. Tankleff's suffering by

continuing to conceal their unconstitutional and tortious conduct throughout his

incarceration, despite their knowledge that they had an ongoing duty to come forward

with exculpatory evidence, including the truth: that they coerced and fabricated Mr.

Tankleff's confession.

124.  Nevertheless, Mr. Tankleff continued to fight to prove his innocence.  On October 3,

2003, Mr. Tankleff filed a motion under CPL § 440 seeking vacatur of his conviction on

grounds of newly discovered evidence and actual innocence.

22

125.   A CPL § 440 hearing commenced in July 2004. At that hearing, significant evidence was
       elicited from unrelated sources who testified independently of one another that Joseph
       ("Joey Guns') Creedon, Peter Kent, and Glen Harris had each admitted at various times
       their involvement in the murder of Seymour and Arlene Tankleff.

126.   The defense presented evidence from Karlene Kovacs, who stated that Joseph Creedon,
       an associate of Jerry Steuerman's son Todd, confessed to her that he was involved in the
       Tankleff murders. The defense also presented testimony from Creedon's son, Joseph
       Guarascio, who stated that his father told him about committing the murders with Jerry
       and Todd Steuerman, Peter Kent and Glen Harris, the getaway driver.

127.   Glen Harris swore out an affidavit admitting that he drove the getaway car that evening,
       and describing in detail how the principals ran back to the car covered in blood, and
       discarded a rusty pipe out the window.

128.   The defense also presented the testimony of William "Billy" Ram, who testified that on
       the night before the murders, Joseph Creedon had told him he had been hired to "rough
       up" or "straighten out" a "Jew in the bagel business" who lived in Belle Terre. Creedon
       offered to pay Ram to do the job, but Ram declined. Harris, Kent and Creedon then left
       his house together. The next day, Ram testified, Glen Harris told him "they" did
       something bad and were "going to be in trouble."

129.   Joseph Graydon, another of Creedon's associates, testified that he, too, was solicited by
       Creedon to kill a partner in Strathmore Bagels for a share of $25,000.

130.   Evidence was also presented demonstrating that McCready knew Steuerman and that the
       two had been seen together at Strathmore Bagels before the murders.

131.   The County Court denied the motion on March 17, 2006. Mr. Tankleff appealed.

132.    On December 18, 2007, the Appellate Division of the New York Supreme Court, Second

        Department, unanimously granted the CPL § 440 motion and vacated Mr. Tankleff's

        conviction.

133.    Marty Tankleff was released on December 27, 2007 – seventeen years, two months and

        four days after he entered state prison.

134.    In January 2008, at the request of Suffolk County District Attorney Thomas J. Spota,

        then-Governor Eliot Spitzer appointed Attorney General Andrew Cuomo to serve as a

        special prosecutor charged with investigating the murders of Seymour and Arlene

        Tankleff.

135.    That investigation uncovered additional exculpatory evidence that had never before been

        shared with Mr. Tankleff, including a bloody imprint of a knife on a sheet in Arlene

        Tankleff's room, a knife that did not match the watermelon knife Mr. Tankleff allegedly

        used in the crimes, nor did it match any other knife found in the house.

136.    On June 20, 2008, the Attorney General's Office moved to dismiss the outstanding

        charges against Marty Tankleff pursuant to CPL § 210.40 in the interest of justice.

137.    On July 22, 2008, Justice Robert W. Doyle of the Supreme Court, Suffolk County

        granted that motion and dismissed all charges against Mr. Tankleff.

138.    Mr. Tankleff spent over seventeen years in prison for the murders of his parents, crimes

        he did not commit.

### Suffolk County's Custom, Policy and Practice of Unconstitutional Conduct

139.    The unconstitutional and tortious acts of the defendant officers were not isolated

        incidents.  Upon information and belief, there was a custom, policy, pattern and practice

        in Suffolk County beginning years before the unjust conviction of Mr. Tankleff and

continuing throughout his incarceration, of condoning, encouraging, ratifying and acquiescing in the practice of failing to conduct reasonable criminal investigations, conducting unconstitutional interrogations, fabricating evidence including confessions and evidence supporting probable cause, committing perjury, failing to investigate alibi evidence, coercing confessions, failing to disclose exculpatory evidence and covering up this unconstitutional misconduct. Upon information and belief, Suffolk County Police policymakers were on notice of, but deliberately indifferent to these unconstitutional customs, policies and practices.

140.    By the time of Mr. Tankleff's trial, supervisors and Suffolk County Police policymakers were on notice of, and specifically knew, that defendant McCready lied in order to close homicide cases. On April 24, 1989, the New York State Commission of Investigation found that McCready "knowingly gave false testimony" at prior trial in a homicide case in which he was the lead investigator. Upon information and belief, the Suffolk County Police Department failed to investigate this finding, and never disciplined McCready.

141.    Upon information and belief, the Suffolk County Police Department, and its policymakers, as well as the individual supervisors in this case, failed to train or supervise investigators to ensure they complied with constitutional requirements in eliciting confessions, disclosing favorable evidence to prosecutors, and obtaining probable cause for arrest and for prosecution, and that they did not fabricate evidence or commit perjury.

142.    Upon information and belief, the Suffolk County Police Department, through its final policymakers, failed to adequately screen, supervise, and/or discipline detectives, officers, and investigators.

## DAMAGES

143.    This action seeks damages for the period from September 7, 1988, (the date of Mr.
Tankleff's interrogation and arrest) through the present.  The defendants' unlawful,
intentional, willful, purposeful, deliberately indifferent, reckless, bad-faith and/or
malicious acts, misdeeds and omissions caused Mr. Tankleff to be falsely arrested,
maliciously prosecuted, unfairly tried, wrongfully convicted, and to endure over
seventeen years of wrongful imprisonment.

144.    As a direct and proximate result of the acts of the defendants, the injuries and damages
sustained by Mr. Tankleff from the deprivation of civil rights include: violation of his
clearly established rights under the Fourth, Fifth, Sixth and Fourteenth Amendments to
the United States Constitution; personal injuries; pain and suffering; severe mental
anguish; emotional distress; extreme fear; economic damages including loss of income;
infliction of physical illness and injury resulting from his confinement; inadequate
medical care; humiliation, indignities, and embarrassment; degradation; egregious injury
to reputation; permanent loss of natural psychological development; and restrictions on
all forms of personal freedom and physical liberty including but not limited to diet, sleep,
personal contact, educational opportunity, vocational opportunity, athletic opportunity,
personal fulfillment, sexual activity, family relations, reading, television, movies, travel,
enjoyment, and expression.  As a direct result of his unjust conviction and imprisonment,
many these disabilities will plague Mr. Tankleff for the rest of his life.

145.    All the alleged acts, misdeeds and omissions committed by the individual defendants
described herein for which liability is claimed were done intentionally, willfully,

26

purposefully, knowingly, unlawfully, maliciously, wantonly, recklessly, and/or with bad faith, and said proscribed conduct of the individual defendants meets all of the standards for imposition of punitive damages.

## CAUSES OF ACTION

146. With respect to each cause of action, plaintiff Martin Tankleff incorporates by reference each paragraph of this complaint.

### FEDERAL CLAIMS

### COUNT I:
### 42 U.S.C. § 1983 Malicious Prosecution
### in Violation of the Fourth and Fourteenth Amendments

147. Defendants McCready, Rein and John Doe police officers, acting deliberately and with malice, initiated and took steps to continue the criminal prosecution of Mr. Tankleff, without probable cause or other legal justification, by fabricating or coercing a confession they falsely attributed to Mr. Tankleff, by refusing to investigate other leads, and in reckless disregard of favorable evidence disproving Mr. Tankleff's guilt and incriminating Jerry Steuerman and his henchmen.

148. There was not even arguable probable cause to arrest or prosecute Mr. Tankleff on the basis of the confession falsely attributed to him, and no reasonable officer would have believed there was.

149. The prosecution ultimately terminated in Mr. Tankleff's favor, when his conviction was vacated and the indictments against him were dismissed.

150. The actions of the defendant police officers resulted in the unlawful prolonged detention of Mr. Tankleff and constituted a conscience-shocking failure to investigate the murders of Seymour and Arlene Tankleff.

151.   The actions of the defendant police officers violated Marty Tankleff's clearly established rights under the Fourth and Fourteenth Amendments, and caused his wrongful conviction, seventeen years of imprisonment and all the ongoing injuries and damages set forth above.

## COUNT II:
**42 U.S.C. § 1983 Fabrication of Evidence**
**in Violation of the Fourth and Fourteenth Amendments**

152.   Defendants McCready and Rein deliberately fabricated evidence by feeding to Mr. Tankleff the details of the crime as they understood them, and then misrepresenting to prosecutors in both the handwritten statement and in oral, pretrial communications that were consistent with their later perjurious testimony, that those details had originated with Mr. Tankleff.

153.   In so doing they grossly overstated the both the incriminating value and the reliability of the statement they attributed to Mr. Tankleff.

154.   The so-called confession handwritten by McCready was used against Mr. Tankleff at trial and was the lynchpin of the entire prosecution.

155.   This fabrication of evidence violated Mr. Tankleff's clearly established Fourteenth Amendment rights to a fair trial and not to be deprived of liberty without due process of law.

156.   As a direct and proximate result of individual defendants' fabrications, Mr. Tankleff was wrongfully convicted and suffered the injuries and damages described above.

## COUNT III:
**42 U.S.C. § 1983 Failure to Investigate**
**in Violation of the Fourth and Fourteenth Amendments**

157.   Notwithstanding the fact that no physical or forensic evidence connected Mr. Tankleff to

the murders and the forensic investigation later proved all the incriminating details attributed to Mr. Tankleff in the so-called confession to be false, coupled with the discovery of bloody imprints from a knife and glove which were never found, defendants McCready and Rein refused to acknowledge Mr. Tankleff's innocence or to investigate evidence demonstrating that Jerry Steuerman had the motive, the means, and the opportunity to orchestrate these brutal murders.

158.   McCready lied to prosecutors about not having a prior relationship with Jerry Steuerman and deliberately steered the investigation away from him.

159.   This conscience-shocking failure to investigate obvious and known exculpatory leads deprived Mr. Tankleff of his liberty, in violation of the Fourth and Fourteenth Amendments.

**COUNT IV:**
**42 U.S.C. § 1983 Suppression of Favorable Evidence**
**in Violation of the Fourteenth Amendment**

160.   Defendants McCready and Rein knowingly and deliberately chose not to document or disclose to the prosecutors information that was favorable and material to Mr. Tankleff's defense, including, without limitation, the truth about how they elicited the so-called confession: that the incriminating details had not originated with Mr. Tankleff in narrative form but in fact had been fed to him by detectives.  The truth about how McCready and Rein elicited the so-called confession was material evidence that was favorable to Mr. Tankleff's defense, as it both vitiated the incriminating value of the so-called confession and impeached both detectives' perjurious version of events.

161.   In addition, defendants Kosciuk and McCready, the lead detective, deliberately chose not to disclose to prosecutors evidence that investigators found an imprint of a bloody

knife—a knife other than the watermelon knife that was the murder weapon in the so-called confession—on Arlene Tankleff's sheets.  The watermelon knife McCready and Rein believed Mr. Tankleff used as the murder weapon had no traces of blood on it. Evidence of a different bloody knife, a knife that was not found in the house, was material.

162.    In withholding material exculpatory and impeachment information from the prosecutors, they also deprived Mr. Tankleff's defense team of it in violation of his clearly established Fourteenth Amendment right to a fair trial.

163.    Defendants' suppressions caused Mr. Tankleff's wrongful conviction, as well as all the ongoing injuries and damages set forth above.

### COUNT V:
**42 U.S.C. § 1983 Coercion and Violation of the Right to Counsel**
**in Violation of the Fifth, Sixth and Fourteenth Amendments**

164.    Defendants McCready, Rein and John Doe police officers isolated Marty Tankleff—a barefoot seventeen year-old boy who had awakened to his first day of his senior year in high school to find both parents bludgeoned and stabbed in his own home—from his friends, family and lawyer, deprived him of food, refused his repeated pleas to speak to "Uncle Mike," the family attorney, questioned him for hours, and then, despite his protestations of innocence, engaged in a deliberate course of lies, trickery and deceit in a custodial interrogation that ultimately overbore his will and induced him to adopt detectives' version of events and falsely incriminate himself in violation of his clearly established Fifth Amendment right to be free from compelled self-incrimination.

165.    In depriving Mr. Tankleff of an attorney, defendants violated his clearly established Sixth Amendment right to counsel.

166.    Defendants' coercive and conscience-shocking interrogation tactics generated false and
        unreliable evidence used against Mr. Tankleff at trial, causing his wrongful conviction
        and all the injuries set forth above.

### COUNT VI:
### 42 U.S.C. § 1983 Civil Rights Conspiracy

167.    Defendants McCready, Rein, Doyle, McElhone, John Doe and Richard Roe officers and
        Suffolk County law enforcement officials, acting within the scope of their employment
        and under color of law, agreed among themselves and with others, to act in concert in
        order to deprive Mr. Tankleff of his clearly established Fourth, Fifth, Sixth, Eighth
        and/or Fourteenth Amendment rights, including the right to be free from malicious
        prosecution, the right against compelled self-incrimination, the right to counsel, the right
        not to be deprived of liberty without due process of law, and the right to a fair trial.

168.    Overt acts in furtherance of this conspiracy to violate Mr. Tankleff's civil rights include
        all those acts described above, beginning on September 7, 1988, with the coercive
        interrogation, the calculated decision not to give *Miranda* warnings, the course of
        trickery and lies, and the fabrication of a false confession.

169.    The overt acts Suffolk County authorities took in furtherance of the conspiracy
        continued through trial and after Mr. Tankleff's conviction into post-conviction
        proceedings, with the refusal to investigate obvious leads, the suppression of
        exonerating and impeaching evidence, and the intimidation of known and unknown
        defense witnesses as late as 2007.

170.    Defendants McCready, Rein, Doyle, McElhone, John Doe and Richard Roe officers and
        Suffolk County law enforcement officials acted intentionally in a concerted effort to
        cover up official misconduct by Suffolk County law enforcement officials and ensure

31

Mr. Tankleff's continued unconstitutional imprisonment.

171. As a direct and proximate result of this conspiracy to violate his constitutional rights, Mr. Tankleff was wrongly arrested, indicted, prosecuted and imprisoned, and suffered all the ongoing injuries and damages set forth above.

### COUNT VII:
### 42 U.S.C. § 1983 Supervisory Liability

172. Sergeant Doyle, Lieutenant McElhone and Richard Roe supervisory police officers, acting deliberately, recklessly and under color of law, were, at the relevant times, supervisory personnel with the Suffolk County Police Department with oversight responsibility for training, hiring, screening, instruction, supervision and discipline of McCready, Rein and John Doe police officer defendants who deprived Mr. Tankleff of his clearly established constitutional rights.

173. Defendants Doyle, McElhone, and Richard Roe supervisors were personally involved in both the deprivation of Mr. Tankleff's constitutional rights and in creating or condoning the policy or custom of failing to take preventative and remedial measures to guard against such constitutional deprivations.

174. Defendants Doyle, McElhone, and Richard Roe supervisors were reckless in their failure to supervise defendants McCready and Rein, and either knew or should have known that defendant officers were maliciously prosecuting civilians, deliberately failing to investigate evidence pointing to other leads or suspects, fabricating and coercing confessions, suppressing exculpatory evidence, perjuring themselves as witnesses, and depriving civilians of due process of law.

175. These supervisory defendants knew or in the exercise of due diligence would have known that the conduct of the named and John Doe defendants against Mr. Tankleff was

likely to occur.

176. The failure of these supervisory defendants to train, supervise and discipline the named

individual defendants and John Does amounted to gross negligence, deliberate

indifference or intentional misconduct, which directly caused the injuries and damages

set forth above.

### COUNT VIII:
### 42 U.S.C. § 1983 *Monell* Claim for
### Unconstitutional Custom or Policy And Failure to Supervise and Train

177. The County of Suffolk, by and through its final policymakers, had in force and effect

during the Tankleff investigation and for years beforehand, a policy, practice or custom

of conducting constitutionally inadequate investigations; fabricating inculpatory

evidence; perjury; failing to obtaining probable cause to ensure that suspects would not

be falsely arrested and maliciously prosecuted; suppressing from prosecutors material

information favorable to criminal defendants; failing to follow the duties imposed by

*Brady v. Maryland*; and using unconstitutional interrogation techniques.

178. The County of Suffolk systemically failed adequately to train its police officers,

detectives and investigators to conduct constitutionally adequate investigations; not to

lie about their conduct; to accurately document the manner in which interrogations were

conducted when confessions were elicited; to obtain probable cause to ensure that

suspects would not be falsely arrested and maliciously prosecuted; to disclose to

prosecutors material information favorable to criminal defendants; and to refrain from

unconstitutional interrogation techniques and perjury.

179. The County of Suffolk failed to adequately supervise its police officers, detectives and

investigators in conducting constitutionally adequate investigations; accurately

documenting the manner in which interrogations were conducted when confessions were elicited so that confessions were not fabricated; obtaining probable cause to ensure that suspects would not be falsely arrested and maliciously prosecuted; disclosing to prosecutors material information favorable to criminal defendants; testifying truthfully; and refraining from using unconstitutional interrogation techniques.  Officers knew that in this climate of lax supervision, they were free to deviate from constitutional requirements in these areas.

180.   The County of Suffolk, by and through its final policymakers, failed to adequately discipline their police officers for investigative wrongdoing, though it was foreseeable that constitutional violations of the type Mr. Tankleff suffered would be a predictable result of such failures.

181.   As set forth above, final policymakers for the County of Suffolk had actual or constructive notice of such failures to train, supervise and discipline its employees, and failed to provide training or supervision despite an obvious for such training and supervision, where defendants knew that it was foreseeable that detectives, officers, and investigators would predictably confront these situations and as a result of the failure to train and supervise, constitutional violations would result.

182.   Such failures to train, supervise and discipline, and such unconstitutional municipal customs, practices and/or policies, amounted to deliberate indifference to the constitutional rights of criminal defendants like Mr. Tankleff, and were the moving force behind his false, coerced and fabricated confession, causing his arrest, prosecution, and incarceration, as well as all the ongoing injuries and damages set forth above.

## STATE-LAW CLAIMS

### COUNT IX:
### Malicious Prosecution

183. Defendants McCready, Rein, Doyle and/or John Doe police officers and Richard Roe supervisors, lacking probable cause, nonetheless intentionally, recklessly, and with malice, caused Mr. Tankleff to be arrested, prosecuted, and convicted of murdering his parents.

184. Defendants McCready and Rein were complaining witnesses whose actions initiated or commenced the prosecution, and who took steps to ensure that it continued.

185. Furthermore, the defendant officers intentionally withheld from and misrepresented to prosecutors facts vitiating probable cause against Mr. Tankleff, including but not limited to the fact that Mr. Tankleff's confession was the product of coercion and fabrication, that an imprint of a bloody knife—a knife other than the watermelon knife deemed to have been the murder weapon in the confession attributed to Mr. Tankleff—was found on Arlene Tankleff's sheets, the evidence incriminating Jerry Steuerman and reasons why police had a motive to cover it up.

186. As Mr. Tankleff has maintained for over twenty years, including throughout seventeen years of wrongful conviction, he is innocent of his parents' murders.

187. The prosecution finally terminated in Mr. Tankleff's favor when his conviction was vacated and the charges against him dismissed.

188. As a direct and proximate result of defendants' actions, Mr. Tankleff was wrongly prosecuted, convicted and imprisoned for over seventeen years, and suffered other grievous and continuing damages and injuries set forth above.

## COUNT X:
### False Imprisonment

189. Defendants McCready, Rein, Doyle and/or John Doe police officers and Richard Roe supervisors intended to confine Mr. Tankleff, and, lacking probable cause or any other privilege, curtailed his liberty by arresting him and taking steps to ensure he was imprisoned on the basis of false evidence and without legal justification.

190. Mr. Tankleff was conscious of the confinement, and did not consent to it.

191. As a direct and proximate result of defendants' actions, Mr. Tankleff was wrongly arrested and falsely imprisoned from September 7, 1988, until he was finally released on December 27, 2007, and suffered the other grievous and continuing damages and injuries set forth above.

## COUNT XI:
### Intentional or Negligent Infliction of Emotional Distress

192. The deliberate conduct of defendants McCready and Rein in coercing and fabricating a false confession from a stunned, confused and grieving teenage boy for the murder of his parents, their ensuing refusal to investigate the obvious suspect, and their cover-up of the truth, perpetuated in public statements as recently as 2007, constitutes the intentional infliction of emotional distress.

193. In the alternative, the conduct of defendants McCready and Rein in coercing and fabricating a false confession from a stunned, confused and grieving teenage boy for the murder of his parents, their ensuing refusal to investigate the obvious suspect, and their cover-up of the truth, perpetuated in public statements as recently as 2007, breached a duty of care owed to Mr. Tankleff as a crime victim, as a citizen, and as a crime suspect, which unreasonably endangered his physical safety, or caused him to fear for his own

36

safety, constituting the negligent infliction of emotional distress.

194.   Defendants' conduct, falsely implicating Mr. Tankleff in the murder of his parents and

subjecting him to public stigma to this day notwithstanding the dismissal of charges

against him, caused Mr. Tankleff to suffer ongoing, unimaginable emotional distress and

traumatic psychological sequellae.


**WHEREFORE**, Martin Tankleff prays as follows:

A.   That the Court award compensatory damages to him and against the

defendants, jointly and severally, in an amount to be determined at trial;

B.   That the Court award punitive damages to him, and against all individual

defendants, in an amount to be determined at trial, that will deter such conduct by defendants in

the future;

C.   For a trial by jury;

D.   For pre-judgment and post-judgment interest and recovery of his costs,

including reasonable attorneys' fees pursuant to 42 U.S.C. § 1988 for all 42 U.S.C. § 1983

claims; and

E.   For any and all other relief to which he may be entitled.


Respectfully submitted,

Barry C. Scheck (BS4612)
Deborah L. Cornwall (DC2186)
Emma K. Freudenberger (EF8803)
Cochran Neufeld & Scheck, LLP
99 Hudson Street, Eighth Floor
New York, NY 10013
(212) 965-9081

37

Bruce Barket (BB9906)
Barket & Angeli, P.C.
666 Old Country Rd., Suite 600
Garden City, NY 11530
(516) 745-0101

Barry J. Pollack
Miller & Chevalier, Chartered
655 Fifteenth Street, NW, Suite 900
Washington, D.C.  20005
(202) 626-5830

**Attorneys for Plaintiff Martin Tankleff**

38