UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

RD-6665

MARTIN TANKLEFF,

                          Plaintiff,

                                              **DEFENDANTS'
                                              AFFIRMATION IN
                                              SUPPORT OF MOTION
                                              PURSUANT TO FRCP
                                              RULE 12(c)**

              -against-

                                              **CV09-1207 (JS)(WDW)**

THE COUNTY OF SUFFOLK, K. JAMES
MCCREADY, NORMAN REIN, CHARLES
KOSCIUK, ROBERT DOYLE, JOHN
MCELHONE, JOHN DOE POLICE
OFFICERS #1-10, RICHARD ROE, Suffolk
County Employees #1-10,

                          Defendants.

        Defendants, County of Suffolk,  Retired Detective K. James McCready, Retired Detective

Norman Rein, Retired Detective Charles Kosciuk, Detective Robert Doyle and Retired Detective

Lieutenant John McElhone, by their attorney, Christine Malafi, Suffolk County Attorney, by

Richard T. Dunne, Assistant County Attorney, in the above action submits the following as and

for its Statement of Facts.


**I.      Events at 33 Seaside Drive, Belle Terre, on September 7, 1988 Prior To Plaintiff
          Going to Police Headquarters.**

        1.      At 6:11 a.m. on September 7, 1988, plaintiff placed a 9-1-1 call reporting that he

found his father (hereinafter "Seymour") with blood "gushing" from his neck.  The operator

instructed plaintiff to get a clean towel and hold pressure on where the blood was "gushing" from.

(Exhibit A1 and A2)

1

2.      Emergency Service Dispatcher Patricia Flanagan described plaintiff as "excited" but not "upset".  (Exhibit B, TT[1] pp. 62-72, 83, 86-89)

3.      On the day of the murders, plaintiff had a conversation at the scene with Homicide Detectives Norman Rein and James McCready, where he stated to both Detectives that upon observing Seymour in the office covered with blood and "gagging," he immediately called 9-1-1 from the phone in the *office* and that that was the only thing he touched in that room.   Detectives Rein and McCready also noted that the blood spatter on the phone in the *office* had not been disturbed nor were there any apparent blood prints. (Exhibit B, TT pp. 2836, 3441, 3445-3446) (Exhibit C – McCready Supplemental Report, 9/14/88 p. 2-3)  (Exhibit D - Oral Confession, p.3) (Exhibit R, HH[2] pp. 5-8, 24-30)

4.      On the day of the murders and before the confession part of plaintiff's oral statements to Detectives Rein and McCready, plaintiff stated after observing Seymour covered in blood he called 911 from the phone in the *office* where Seymour's body was located. (Exhibit B, TT pp. 3445-3446) (Exhibit D, Oral Confession, p.3) (Exhibit R, HH pp.5-30)

5.      Two photographs taken by crime scene investigators on the day of the murders, of the phone in the office where Seymour was found showed that the blood spatter on that phone receiver had *not* been disturbed and was intact. (Exhibit E, Trial Exhibits 74-d, 75, photographs)

6.      On the day of the murders and before the confession part of plaintiff's oral statements to Detectives Rein and McCready, plaintiff stated  that he "put a pillow under his father's feet and a towel around his father's throat … He had blood on his hands from his father." (Exhibit B, TT pp. 2836, 3440-3441, 3445-3446)  (Exhibit C – McCready Supplemental Report 9/14/88, pp. 3-4)  (Exhibit D – Oral Confession p.3)  (Exhibit R, HH pp. 5-30)

---

[1] Trial Transcript hereinafter referred to as "TT".
[2] Huntley Hearing Transcript, hereinafter referred to as "HH".

7.      A stand-up photograph of plaintiff was taken at police headquarters on September 7, 1988.  Plaintiff's sweatshirt, shorts and his extremities that are visible.  *No* blood staining, smearing or drops are visible in the photographs.  (Exhibit F, Trial Exhibit #11, photograph of plaintiff)

8.      On the day of the murders and before the confession part of plaintiff's oral statements to Detectives Rein and McCready, plaintiff stated that after he called 911 and gave aid to Seymour he began to search for his mother and opened the door leading to the garage to see if her car was there. (Exhibit B, TT pp. 2836-2837, 3442-3443) (Exhibit C, McCready Supplemental Report, 9/14/88, p. 4)  (Exhibit D, Oral Confession p. 3) (Exhibit R, HH pp. 5-30)

9.      On the day of the murders, Homicide Detective James McCready responded to the home and surveyed the interior of the house which was now a crime scene.  Among his observations, Detective McCready noted that there was *no* blood on the door handle to the garage and the dead bolt on the garage door was *locked* with the key in it.  (Exhibit B, TT pp. 3445-3448) (Exhibit C, McCready Supplemental Report, 9/14/88 p. 4) (Exhibit R, HH pp. 24-30)

10.     A photograph, taken by crime scene investigators on the date of the murders of the dead bolt lock and the handle on the door leading to the garage, shows that there was no blood found on either the dead bolt lock or the handle. (Exhibit B, TT pp. 3445-3450, 4211-4213) (Exhibit G, Photograph)

11.     On the day of the murders, Homicide Detective James McCready observed that a light switch in plaintiff's bedroom was in the "on" position and that there was blood on the north wall at the light switch and on the sheetrock.  (Exhibit B, TT pp. 3446-3451) (Exhibit C, McCready Supplemental Report, 9/14/88 p. 2) (Exhibit R, HH pp. 5-30)

12.     Photographs taken by crime scene investigators on the day of the murders, of the light switch in plaintiff's bedroom, showed blood stains. (Exhibit H, Trial Exhibits 90 and 91, Photographs)

13.    On the day of the murders and before the confession part of plaintiff's oral statements to Detectives Rein and McCready, plaintiff stated he got dressed at 6:10 a.m. and put on shorts *and* a sweatshirt.  (Exhibit B, TT pp. 2616, 2835-2836, 3439) (Exhibit C, McCready Supplemental Report, 9/14/88 p. 5)  (Exhibit D, Confession p.10)

14.    On the day of the murders and before the confession part of plaintiff's oral statements to Detectives Rein and McCready, plaintiff stated he woke up at 5:35 a.m., got out of bed at 6:10 a.m., and left his room at 6:16 a.m.  (Exhibit B, TT pp. 2616, 2835-2836, 3439) (Exhibit D Oral Confession, p.2)

15.    On the day of the murders and before the confession part of plaintiff's oral statements to Detective Rein and Detective McCready, plaintiff stated that he never went *into* his mother's bedroom.  He only went as far as the alarm wall.  He only saw her from the hallway entrance to the bedroom but he stated that he observed Arlene on the ground with her throat cut and he could see she was dead.  He also stated that he did not turn on any lights in that bedroom. (Exhibit B, TT pp. 2818, 2836-2837, 3439-3440, 3442) (Exhibit D, Oral Confession p. 3-4) (Exhibit R, HH pp. 8-30)

16.    On the day of the murders, after plaintiff had been read his rights and waived same, plaintiff drew a diagram of his parents' bedroom showing the layout of the room, Arlene's body as he observed it, and the entranceway which showed the alarm wall.  The alarm wall was an interior wall with the opposite side being the hallway wall. (Exhibit I, sketch of Arlene's room)

17.    Three photographs taken by crime scene investigators on the day of the murders of the master bedroom from the entranceway to the room, with Arlene's body still in place, showed that the cut along her throat was not visible from where plaintiff said he was standing when he *concluded* his mother was dead and that her throat was cut. (Exhibit B, TT pp. 3483-3485) (Exhibit J, Trial Exhibits 7, 8, 9, 10, Photographs)

18.    On the day of the murders and before the confession part of plaintiff's oral statements to Detectives Rein and McCready, plaintiff stated that after observing Arlene in the master bedroom he did not call 911 again to report that discovery, but called his sister from a phone in the kitchen and told her he believed "mom and dad have been murdered."  He then checked on Seymour and then answered his sister's call back in the kitchen and yelled for his sister to "get over to the house."   (Exhibit B, TT pp. 2618-2619, 2837, 3442-3443) (Exhibit C, McCready Supplemental Report, 9/14/88 p. 4)  (Exhibit D, Oral Confession p.4)  (Exhibit R, HH pp. 21-22)

19.    On the day of the murders and before the confession part of plaintiff's Oral Statements to Detectives Rein and McCready, plaintiff stated that he then remembered he was supposed to pick up his friend Mark Perrone on the way to school.  He called Mark's house from the same kitchen phone and spoke to Mark's mother.  His friend Mark called plaintiff back after he spoke with Mark's mother and he answered the phone in the kitchen - now touching that phone for a fourth time. (Exhibit B, TT pp. 2618-2619, 3442-3444; Exhibit R, HH pp. 21-22)

20.    A photograph, taken by crime scene investigators on the day of the murders, of the phone in the kitchen showed that there was *no* blood on that phone.  Plaintiff stated he wiped his hands in his bedroom *after* handling the kitchen phone four separate times.  (Exhibit B, TT pp. 2836-2837, 3444-3448) (Exhibit D, Oral Confession p. 10 (Exhibit K, Trial Evidence 78b, Photo)

21.    On the day of the murders, and before the confession part of plaintiff's oral statements to Detectives Rein and McCready, plaintiff stated that after his sister's call, the next thing he did was go to the house of his neighbor, Martin Hova (hereinafter "Hova"). (Exhibit B, TT p. 2837) (Exhibit D, Oral Confession p. 4)

22.    Hova stated that while in the bathroom of his house, which was next to the Tankleff residence, he heard screaming and that when he went to the front door, he saw plaintiff barefoot and clad in shorts *and* a zip-up sweatshirt.  (Exhibit B, TT pp. 92-94, 100-104)

23.     Hova, Police Officer James Crayne and Police Officer Daniel Gallagher (uniform officers responding to the 911 call) stated that as they arrived at the scene, Hova approached the scene with plaintiff and the plaintiff yelled "somebody murdered my parents" as they all headed into the house.  (Exhibit B, TT pp. 100-104, 248-256, 286-289, 316-317, 324-331, 369-370)

24.     Police Officers Crayne and Gallagher stated that plaintiff was upset or "agitated." They also stated that plaintiff had on shorts *and* a zip up sweatshirt, was barefoot and had blood on his palms, the right side of his face, on his right calf and on his right foot.  (Exhibit B, TT pp. 104-106, 256-259, 318-319, 332-334, 351-359, 372)

25.     Hova also stated that once inside the house he went with Police Officer Crayne and plaintiff into the office where his father was and plaintiff stated "Murder, Murder" plaintiff further stated they "murdered my parents."  When asked by Hova "who did it?", plaintiff stated "my father's business partner, Jerry."  (Exhibit B, TT pp. 104-106, 256-259, 318-319, 332-334, 351-359, 372)

26.     Police Officer Crayne stated that he observed a towel on Seymour's neck.  He noted that the towel was *not* pressed into the neck wounds but was "draped over the neck."  After making this observation, P.O. Crayne applied pressure to the wound in an attempt to stop the bleeding. (Exhibit B, TT pp. 335, 343-344)

27.     On the day of the murders and after having been read his rights and waiving same, plaintiff stated he thought Seymour would die before help got there.  That he got a towel from the linen closet and a pillow from his room and pretended to follow the 911 operator's instructions but really didn't apply the pressure.  (Exhibit B, TT pp. 2897-2898, 3495-3496) (Exhibit C, McCready Supplemental Report, 4/14/88 p. 12)  (Exhibit D, Oral Confession p. 13) (Exhibit R, HH pp. 30-161, 1068-1127)

28.     Police Officer Gallagher also stated that he went to the threshold of the master bedroom.  From the threshold he observed Arlene's head on the floor "partially sticking out from

6

the end of the bed." P.O. Gallagher then approached Arlene but it was not until he stood directly over the body that he saw the extent of her injuries and concluded she was dead. (Exhibit B, TT pp. 259-272, 293-300)

29.     Police Officer Crayne stated that when he tried to rouse Seymour, he asked Seymour who did this. Though Seymour said nothing, plaintiff stated "it was Jerry Steuerman." When Police Officer Gallagher entered the office, plaintiff again stated that "the only person who had the motive to do this was Jerry Steuerman." Plaintiff's demeanor during this exchange was "composed." (Exhibit B, TT pp. 271-277, 320-322, 344-345)

30.     Police Officer Edward Aki (a third uniformed officer responding to the 911 call) stated he arrived at the scene at 6:27 a.m. A few minutes later, Belle Terre Chief Constable Donald Hines, a family friend and colleague of Seymour's on the Belle Terre Police Department, also arrived and both observed plaintiff's brother-in-law Ron Rother arrive at the scene. Rother was observed as being "very upset" and he was crying, "just visibly shaken." (Exhibit B, TT pp. 83, 278-279, 315-316, 347, 375-376, 383-384, 403, 415, 422, 464-466 and 501-502)

31.     Police Officer Aki advised plaintiff and Rother that the house was a crime scene and that both of them, as witnesses, needed to be kept separate. While Police Officer Aki was taking plaintiff to his car, plaintiff asked if he could wash his hands at a spigot on the side of the house. Plaintiff was told it was inadvisable to go near the house. As Police Officer Aki and plaintiff moved toward Police Officer Aki's patrol car, plaintiff stated "that a Jerry Steuerman had done this." (Exhibit B, TT pp. 384-389, 392-395, 403-406)

32.     Police Officer Aki then stated that after plaintiff entered the back seat of his patrol car, Police Officer Aki left the area and plaintiff "was free to move." Soon after plaintiff exited the car and bent down by a puddle and began washing his hands in that puddle. This was observed by both Police Officer Aki and Chief Constable Hines. (Exhibit B, TT pp. 387-389, 392-393, 403-410, 501-504)

33.    Chief Constable Hines stated that after observing plaintiff washing his hands, he and plaintiff made eye contact and they "immediately converged."  Hines then asked plaintiff what happened and plaintiff answered "Jerry Steuerman murdered my mother and my father."  Both then entered Hine's car where in an excited manner, but not crying, plaintiff continued to accuse Steuerman.  Plaintiff stated that Arlene had predicted that Steuerman was going to do something terrible, that Steuerman was the last person to leave the card game, and that Steuerman "killed my mother and father."  Because neither Arlene nor Seymour had ever expressed a fear of Steuerman to Hines, Hines stated "that Seymour was still alive and that should he regain consciousness, the police would be able to verify if Jerry was indeed the perpetrator."  (Exhibit B, TT pp. 410, 504-507, 523-528, 535)

34.    Chief Constable Hines stated that after making the aforementioned statement to plaintiff, plaintiff's demeanor changed.  Hines stated

> "Well up to that time Marty was looking … at the ground, at his feet, at the hood of the car, at something, other than me.  He had his head down.  When I made that statement, he picked his head up and looked directly at me.  His eyes widened, he stopped talking and didn't say a word."  Plaintiff then exited the car.  (Exhibit B, TT pp. 506-507, 526)

35.    A neighbor and friend of Seymour's, John McNamara (hereinafter "McNamara"), stated that he was taking a morning walk in Belle Terre when he came in contact with plaintiff.  This was the first of three conversations he had with plaintiff.  Plaintiff stated to McNamara that his parents had been murdered, that Jerry Steuerman committed the murders; that he discovered them after waking up; and repeated the order of what he did similar to what he told McCready.  (See ¶ #41 and ¶ #42 below)   Plaintiff went on to state that his father was bleeding very heavily and that he, plaintiff, had lifted Seymour from the chair and placed him on the floor.  McNamara then asked plaintiff why he was not *covered* in blood.  Plaintiff looked at McNamara and walked away without responding. (Exhibit B, TT pp. 776-781, 789, 811-812) (Exhibit Y, McCready Supp. Report 10/18/88)

36.     McNamara stated that in his second conversation with plaintiff he again stated that Jerry Steuerman had murdered his parents. McNamara replied that it appeared plaintiff's father was not dead, since the paramedics had placed him in an ambulance and left quickly with the lights on.  Plaintiff then stated he had been sleeping in the nude and that when he woke up he put on his shorts *and* sweatshirt and then repeated the scenario of his actions as he had stated earlier, except he now stated that after checking for his mother's car in the garage, he went out of the house screaming that a murder had been committed.  (Exhibit B, TT pp. 782-783) (Exhibit Y, McCready Supp. Report 10/18/88)

37.     McNamara stated that plaintiff came back a third time and restated the same scenario he had stated earlier with respect to his actions, but this time he stated that after he checked the garage for his mother's car, he went to his mother's bedroom, stood at the *entrance* and saw his mother and then realized she was dead and that he (plaintiff) was too scared to go into the bedroom and he then ran out of the house screaming that a murder had taken place.  (Exhibit B, TT pp. 784-785, 797) (Exhibit Y, McCready Supp. Report 10/18/88)

38.     The Belle Terre Mayor, Vincent Bove (hereinafter "Bove"), a family friend and an attendee at the card game that occurred hours prior to the murders, stated he arrived at the scene around 7:00 a.m. and that plaintiff approached him and stated "somebody murdered my mother and father" and that Jerry Steuerman did it.  Bove responded by asking plaintiff "What makes you say that? … Nothing took place at the card game.  Did you see (Steuerman) do this?"  Plaintiff responded, "No, I didn't see him, but they've been arguing."  (Exhibit B, TT pp. 741-742)

39.     Around this time, while plaintiff was leaning on a police car, Dara Schaeffer, a neighbor and high school student, pulled up to 33 Seaside Drive and asked plaintiff "how's it going?"  Plaintiff replied "last night *someone* killed my mother and tried to kill my father *and* molested me."  Dara noted plaintiff said this with no emotion on his part.  (Exhibit B, TT pp. 550-553) (Exhibit Z, 2 Rein Supp. Reports 2/14/90)

9

40.     Detective Sergeant Robert Doyle of the Suffolk County Police Department's Homicide Bureau received notice of Arlene's murder at approximately 7:05 a.m. on September 7, 1988.  By 7:20 a.m. he had directed Homicide Detectives Robert Anderson, Anthony Lahgezza, Michael Carmody, John Pfalzgraf, K. James McCready and Norman Rein to the scene.  At the scene, Detectives Carmody and Pfalzgraf were redirected to the hospital with Seymour, and Detectives Anderson and Lahgezza were redirected to interview the card players.  (Exhibit B, TT pp. 2602-2608, 2831, 3431) (Exhibit R, HH pp. 969-972)

41.     Detective McCready arrived at the scene at 7:39 a.m. and spoke with Officers Aki and Crayne.  He then entered the house and examined the office and master bedroom where Seymour and Arlene were respectively.  After exiting the house at approximately 7:50 a.m., he then introduced himself to plaintiff and asked what happened.  Chief Constable Hines interrupted them and McCready asked plaintiff to wait in his car while he was briefed by Hines.  McCready then got in his car at about 7:55 a.m. where he observed that plaintiff appeared "excited" and stated "Jerry Steuerman" had done this because he and Seymour had been fighting.  (Exhibit B, TT pp. 3431-3437, 3447, 3519, 3551-3552, 3593, 3599)

42.     While in the car, plaintiff told McCready that he awoke at 5:35 a.m., stayed in bed until about 6:10 a.m. and then "got dressed in a *sweatshirt* and shorts."  Plaintiff then stated he looked into his mother's bedroom which was dark because the drapes were drawn.  Not seeing anyone, he went to the office area where he saw his father bleeding and gagging.  Plaintiff then stated he immediately called 9-1-1 from the phone on the desk in the *office*.  He then stated he opened the garage door and saw his mother's car and then went back to his mother's room.  He saw his mother and then went to the kitchen to call his sister Shari.  (Exhibit B, TT pp. 3437-3439, 3439-3441, 3442-3443) (Exhibit R, HH pp. 8-24)

43.     At this time, McCready observed that the only blood plaintiff had on him was a blood spot on his right calf and a blood spot on his right instep.  McCready then asked if plaintiff

10

had blood on him from helping his father to which plaintiff stated "my hands were covered with blood" and "I washed them in a puddle."  McCready then re-entered the house and observed there were *unsmeared* blood spatters on the office telephone;  *no* blood on the three telephones in or near the kitchen;  and *no* blood on the garage door or the dead bolt lock which was locked. McCready also observed that the drapes in the master bedroom were *open*.  (Exhibit B, TT pp. 3444-3451, 3560-3565) (Exhibit R, HH pp. 24-30)

44.    At approximately 8:00 a.m., Detective Sergeant Robert Doyle arrived at the scene and spoke to the uniformed officers who had responded to the incident location and received a rundown of "what they had."    Doyle then conducted a walk through of the house, and noted that based on the position of Arlene's body, it appeared that there was a struggle.  McCready introduced Doyle to plaintiff.  Doyle noted upon exiting the house, that plaintiff did not appear "upset" or "emotional."  (Exhibit B, TT pp. 2608-2613, 2638, 2652-2654, 2683-2684)

45.    Plaintiff then recounted, for Doyle, the steps he took when he left his bedroom and repeated the scenario he had stated to McCready and McNamara, except he did not mention he went to the garage while searching for his mother.  He did state, however, that he looked into the master bedroom from the *hallway* and could see that Arlene was dead because she was not moving and that her throat was cut.  He also told Doyle that Jerry Steuerman had done this and explained who Jerry Steuerman was. (Exhibit B, TT pp. 2614-2620) (Exhibit R, HH pp. 973-990)

46.    On the day of the murders and after plaintiff had been read his rights and waived same, plaintiff drew a diagram showing a rough layout of the house where he showed that his (plaintiff's) bedroom door is almost directly across from the master bedroom door.  At no time prior to being read his rights and confessing to the murders did plaintiff ever state that he heard anything while he was asleep in his room and the murders were occurring.  (Exhibit C, McCready Supplemental Report, 9/14/88)  (Exhibit D, Oral Confession)  (Exhibit L, Trial Exhibit #168)

47.     While Doyle and McCready were talking to plaintiff, Tankleff family attorney Myron Fox arrived at the scene.   Fox approached them and asked plaintiff, "Marty, are you okay?"   Plaintiff responded, "Yeah, I'm okay" or "fine" and Fox then left.  (Exhibit B, TT p. 2620( (Exhibit R, HH pp. 31-35, 986-988, 1068-1069)

48.     At 8:16 a.m., Detective Norman Rein arrived at the scene and approached Doyle. McCready was at this time approaching Detective Charles Kosciuk, a detective assigned to the crime laboratory.  After Rein spoke to Doyle, Doyle asked the plaintiff to tell Rein what he had told Doyle.  (Exhibit B, TT pp. 2831-2833, 2957-2966)

49.     Rein then spoke with plaintiff who stated that after leaving his bedroom, he went and looked in the master bedroom but did not see either of his parents because the room was dark. Plaintiff then said he looked into the office and saw his father in a chair by the desk.  He described his father as bloody and "gagging" and that his father's throat was cut all around.  Plaintiff next stated he dialed 9-1-1 from his father's *office* phone. (Exhibit B, TT pp. 2835-2836) (Exhibit R, HH pp. 1068-1127)

50.     Plaintiff next told Rein that he followed the operator's instruction and then went to look for his mother.  Plaintiff went to the garage and after seeing his mother's car there, he went back to the master bedroom, looked in, saw his mother and then went into the kitchen and phoned his sister Shari.  Plaintiff next stated he went back to the office and then back into the kitchen to answer the ringing phone which was his sister calling back.  Plaintiff did not mention he used the same phone in the kitchen on a third and fourth occasion at this time.  (Exhibit B, TT pp. 2836-2837) (Exhibit R, HH pp. 1068-1127)


**II.     From Potential Witness to Suspect to the Confession.**

51.     After the aforementioned conversation, Rein walked away from plaintiff and spoke to McCready and Doyle.   Based on the discrepancies in plaintiff's statements to each of them,

(*no* smear of blood splatter on office phone;  *no* blood on the door handle and deadbolt to the garage, the latter of which was locked;  *no* blood on the kitchen phone;  blood *on* the light switch plate and wall in plaintiff's bedroom;  *no* indication from plaintiff that he heard anything before waking up;  that plaintiff was the *only* surviving family member who was present; the claim plaintiff could *see* his mother's throat slashed from the bedroom door),  and plaintiff's "lack of emotion"  and "whole demeanor," Doyle directed McCready to ask plaintiff to accompany him and Rein to Police Headquarters.  (Exhibit B, TT pp. 2625-2627, 2889-2891, 2991-2994, 3456-3457, 3524-3525, 3612, 3627, 3786) (Exhibit R,  HH pp. 991-993, 1077-1080)

52.    At about 8:40 a.m., McCready asked plaintiff to accompany him to Police Headquarters to talk to him further about what he had been telling the detectives and about Jerry Steuerman.  Plaintiff responded "fine" and got into the right front passenger seat unrestrained. The two then left the scene.  (Exhibit B, TT pp. 3458, 3463, 3607-3608) (Exhibit C, McCready Supplemental Report, 9/14/88, p. 6) (Exhibit R, HH pp. 29-30)

53.    Doyle then went into the bathroom near plaintiff's bedroom and observed water droplets in the bathtub and a wet loufah sponge. (Exhibit B, TT pp. 2624, 2735)

54.    While in route to headquarters, McCready got a radio message to contact Detective Pfalzgraf who was at Mather Hospital where Seymour had been taken.  After phoning Pfalzgraf, McCready learned that Seymour had suffered "extensive head injuries" and was being transferred to Stony Brook Hospital.  (Exhibit B, TT pp. 3463-3465, 3609-3610) (Exhibit C, McCready Supplemental Report, 9/14/88, p. 6) (Exhibit D, Oral Confession p. 4) (Exhibit R, HH pp. 41-43)

55.    After getting back into the car, McCready told plaintiff that he (McCready) did not know about any head injury to Seymour (Seymour had been taken to the hospital prior to McCready arriving at the scene), to which plaintiff responded by stating it looked like someone took the handle of a knife and hit Seymour in the back of the head.  After being asked what he meant, plaintiff demonstrated to McCready by bringing his right hand forward in a downward

13

motion three times. (Exhibit B, TT pp. 3465, 3619) (Exhibit C, McCready Supplemental Report, 9/14/88, p. 6) (Exhibit D, Oral Confession p. 4) (Exhibit R, HH pp. 43-45)

56.    After making the aforementioned demonstration, plaintiff asked McCready if it would be possible to have an autopsy done on his mother.  When asked why he wanted an autopsy, plaintiff stated "so that the time of death could be established." (Exhibit R, TT pp. 3466-3467) (Exhibit C, McCready Supplemental Report, 9/14/88, p. 4) (Exhibit D, Oral Confession pp. 4-5) (Exhibit R, HH pp. 43-45.)

57.    McCready and plaintiff then discussed Jerry Steuerman.  McCready had no idea who Steuerman was at this point in the investigation, but knew Doyle would order another team of detectives to interview him.  Doyle had, in fact, instructed Homicide Detectives Robert Anderson and Anthony Laghezza to interview all the card players who were present at a card game that concluded hours before the murders.  Doyle also instructed Anderson and Laghezza to interview Steuerman last.  (Exhibit B, TT pp. 2754-2755, 3466, 3620-3634)  (Exhibit C, McCready Supplemental Report, 9/14/88, p. 6) (Exhibit R, HH pp. 43-45)

58.    McCready arrived at police headquarters with plaintiff at approximately 9:20 a.m. As they were walking toward the rear door of the building, plaintiff dragged his bare right foot in the grass, which was still wet from the dew.   Both then proceed to McCready's office when plaintiff was asked if he wanted a cup of coffee.  Plaintiff indicated he did and McCready gave plaintiff the coffee.  Plaintiff sat in the interview room as McCready waited for Rein to arrive at headquarters. (Exhibit B, TT pp. 3357-3360, 3467-3468, 3573-3576, 3641-3642) (Exhibit C, McCready Supplemental Report, 9/14/88, p. 6) (Exhibit R, HH pp. 45-47)

59.    At approximately 9:40 a.m., Rein and McCready entered the interview room and made "small talk" with plaintiff.  At approximately 9:45 a.m., plaintiff removed three tissues from one of his pockets and placed them on a desk. (Exhibit B, TT pp. 2841-2843, 3005-3006, 3036-

14

3038, 3093, 3469-3470, 3512, 3520) (Exhibit D, Oral Confession p. 1) (Exhibit R, HH pp. 47-50, 1081-1082)

60.     Plaintiff next detailed the business relationship between Seymour and Steuerman, including loans made by Seymour to Steuerman.  Plaintiff stated that if his mother and father were dead, Steuerman would get everything.  Rein asked plaintiff what would happen if Steuerman were arrested and convicted.   Plaintiff answered *he* would own everything because he was inheriting the family business.  Plaintiff admitted that his parents had bequeathed him the Belle Terre house and the family business.  (Exhibit B, TT pp. 2852-2854, 3133, 4170, 4232-4236) (Exhibit D, Oral Confession p. 1) (Exhibit R, HH pp. 30-161, 1068-1127)

61.     Plaintiff then told Rein and McCready about what he did on the evening of September 6, when he returned from the mall, including his interaction with Seymour and Arlene and that he had showered and gone to bed around 11:15 p.m.  Plaintiff also stated that he was adopted and was now an orphan.  Rein then reminded plaintiff that Seymour was still alive to which plaintiff responded, "well, if my father dies, I'm an orphan."  (Exhibit B, TT pp. 2844-2849, 3037-3048, 3055, 3083-3087, 3094-3095, 3113-3116, 3180-3181, 3470-3471, 3654-3657, 3669-3670, 3705) (Exhibit D, Oral Confession p. 1-2) (Exhibit R, HH pp. 30-161, 1068-1127)

62.     Plaintiff next told Rein and McCready that he had surgery two weeks prior, having to now wear glasses because of surgery, and then discussed girls and indicated he didn't have much luck with them.  (Exhibit B, TT pp. 2839-2912, 3456-3672, 3705-3934)  (Exhibit C, McCready Supplemental Report, 9/14/88)  (Exhibit D, Oral Confession) (Exhibit R, HH pp. 30-161, 1068-1127)

63.     Plaintiff next told Rein and McCready that he loved to cook and would sometimes cook for the poker players.  He mentioned his car was a '78 Lincoln Town Car.  He also stated that after eating his dinner he placed his plate in the dishwasher and his glass in the sink.  (Exhibit B,

TT pp. 2839-2912, 3456-3672, 3705-3934) (Exhibit C, McCready Supplemental Report, 9/14/88) (Exhibit D, Oral Confession) (Exhibit R, HH pp. 30-161, 1068-1127)

64.     Plaintiff next told Rein and McCready that, on the night of September 6, he took a shower before going to bed. He put a towel around his waist and one on the pillow so it wouldn't get wet.  He also stated that if he showered before going to bed, he would take another when he woke up.  He sleeps either naked or in his shorts.  (Exhibit B, TT pp. 2839-2912, 3456-3672, 3705-3934)  (Exhibit C, McCready Supplemental Report, 9/14/88)  (Exhibit D, Oral Confession) (Exhibit R, HH pp. 30-161, 1068-1127)

65.     Plaintiff next told Rein and McCready that he was adopted, he loved his niece and nephew, talked about how his father and mother met and described his relationship with various family members.  (Exhibit B, TT pp. 2839-2912, 3456-3672, 3705-3934)  (Exhibit C, McCready Supplemental Report, 9/14/88) (Exhibit D, Oral Confession) (Exhibit R, HH pp. 30-161, 1068-1127)

66.     Plaintiff told Rein and McCready that there was a safe in his linen closet and that his parents always locked the bedroom sliders and screens.  He then discussed his family going through therapy and that now that he was an orphan, he would be staying with either his aunt or Shari.  (Exhibit B, TT pp. 2839-2912, 3456-3672, 3705-3934) (Exhibit C, McCready Supplemental Report, 9/14/88) (Exhibit D, Oral Confession) (Exhibit R, HH pp. 30-161, 1068-1127)

67.     Plaintiff told Rein and McCready about his relationship with his mom; dinner on September 6th ; when she would eat on nights there was a poker game;  her sleeping tendencies; and that on the 6th he went into his mother's bedroom after she showered.  (Exhibit B, TT pp. 2839-2912, 3456-3672, 3705-3934) (Exhibit C, McCready Supplemental Report, 9/14/88) (Exhibit D, Oral Confession) (Exhibit R, HH pp. 30-161, 1068-1127)

68.     Plaintiff next told Rein and McCready about his relationship with his father, plaintiff's aversion to blood; and his father's sleeping habits.  (Exhibit B, TT pp. 2839-2912, 3456-3672, 3705-3934) (Exhibit C, McCready Supplemental Report, 9/14/88) (Exhibit D, Oral Confession) (Exhibit R, HH pp. 30-161, 1068-1127)

69.     Plaintiff next told Rein and McCready about the family maid; telephones in the house; deliveries; and what he (plaintiff) would do when poker night was at their house.  He also discussed his knowledge of the stakes at the poker game.  (Exhibit B, TT pp. 2839-2912, 3456-3672, 3705-3934)  (Exhibit C, McCready Supplemental Report, 9/14/88) (Exhibit D, Oral Confession) (Exhibit R, HH pp. 30-161, 1068-1127)

70.     Plaintiff next told Rein and McCready that his father and Steuerman put on a big act at the poker games.  They pretended to be friends and good business associates, but in fact they hated each other.  He then told them where Steuerman lived and with whom.  (Exhibit B, TT pp. 2839-2912, 3456-3672, 3705-3934) (Exhibit C, McCready Supplemental Report, 9/14/88) (Exhibit D, Oral Confession) (Exhibit R, HH pp. 30-161, 1068-1127)

71.     Plaintiff next told Rein and McCready about his knowledge of his parents being extremely wealthy, his father's business relationships; how his father included plaintiff in all facets of his business dealings and how his father was grooming him for the business world.  (Exhibit B, TT pp. 2839-2912, 3456-3672, 3705-3934) (Exhibit C, McCready Supplemental Report, 9/14/88) (Exhibit D, Oral Confession) (Exhibit R, HH pp. 30-161, 1068-1127)

72.     Plaintiff next told Rein and McCready that he was the primary beneficiary when they (his parents) both died.  He further discussed his understanding of the distribution of family assets and described his father's other business interests.  (Exhibit B, TT pp. 2839-2912, 3456-3672, 3705-3934)  (Exhibit C, McCready Supplemental Report, 9/14/88) (Exhibit D, Oral Confession) (Exhibit R, HH pp. 30-161, 1068-1127)

73.    Plaintiff next told Rein and McCready further details concerning his father's business relationship with Steuerman.  He further stated that if Steuerman were out of the picture, *and* his parents were both dead, he would own it all.  (Exhibit B, TT pp. 2839-2912, 3456-3672, 3705-3934) (Exhibit C, McCready Supplemental Report, 9/14/88) (Exhibit D, Oral Confession) (Exhibit R, HH pp. 30-161, 1068-1127)

74.    Plaintiff next told Rein and McCready about the lights in the driveway, his parents instructions on when and under what circumstances he was to call 9-1-1, and that he should also notify family members in such situations.  (Exhibit B, TT pp. 2839-2912, 3456-3672, 3705-3934) (Exhibit C, McCready Supplemental Report, 9/14/88) (Exhibit D, Oral Confession) ( Exhibit R, HH pp. 30-161, 1068-1127)

75.    Rein and McCready then asked plaintiff to demonstrate how he had administered first aid to Seymour.  Plaintiff demonstrated on Rein.  As this demonstration was occurring, the movement of the sweatshirt allowed McCready to see plaintiff's right shoulder.  McCready observed blood on the shoulder.  At this time, McCready asked plaintiff when he had  last showered and plaintiff replied "last night."   (Exhibit B, TT pp. 2867-2870, 3168-3170, 3177-3179, 3199, 3473-3475) (Exhibit C, McCready Supplemental Report, 9/14/88) (Exhibit D, Oral Confession) (Exhibit R, HH pp. 30-161, 1068-1127)

76.    At around this time, plaintiff made three sketches for Rein and McCready showing how the cars belonging to the card players were parked in the driveway; the general layout of the house showing the office/gym, bedrooms, closets and bathrooms;  where Arlene was in the bedroom when he looked in; and where he was standing when he looked in, which was signified by a line drawn in the bedroom foyer.  (Exhibit I, Trial Exhibit #169) (Exhibit L, Trial Exhibit #168) (Exhibit M, Trial Exhibit #167)

77.    Rein, who had been an Emergency Medical Technician for 31 years, noted plaintiff was calm and not at all indicating any symptoms of shock at the violent death of his mother and

18

attack on his father.  Thereafter, Detective McCready inquired "Aren't you upset?"  "It doesn't look like you cried all day long."  Plaintiff answered "I was cried out before the cops arrived." (Exhibit B, TT pp. 2839-2912, 3456-3672, 3705-3934) (Exhibit C, McCready Supplemental Report, 9/14/88) (Exhibit D, Oral Confession) (Exhibit R, HH pp. 30-161, 1068-1127)

78.    At about 11:15 a.m. some 95 minutes into the questioning, and after having observed blood on plaintiff's shoulder, Rein and McCready became accusatory.  Plaintiff stated that on September 7 he got out of bed at 6:10 a.m., put a towel on and entered the doorway of the master bedroom.  Plaintiff again stated that the room "was dark and that he didn't see anybody." At this point, McCready interrupted and stated that the drapes were *open* and plaintiff was facing a direction where the room should have been illuminated.  Plaintiff responded by saying it was light enough for somebody to see him but that he did not see Arlene.  (Exhibit B, TT pp. 2870-2872, 2941, 3184-3187, 3215, 3476-3478, 3517)  (Exhibit C, McCready Supplemental Report, 9/14/88) (Exhibit D, Oral Confession) (Exhibit R,  HH pp. 30-161, 1068-1127)

79.    McCready then asked plaintiff about the first aid he had administered to Seymour. Plaintiff responded that he was "covered with blood."  Both Rein and McCready then asked plaintiff why he had no blood on his clothes or at least his sleeves.  Plaintiff responded that he had rolled his sleeves up.  McCready said, "but Marty, you have blood on your shoulder."  Plaintiff responded that "before I helped my father, I dropped my sweatshirt around my elbows."  Both Rein and McCready responded that what he was saying was "ridiculous."  (Exhibit B, TT pp. 2875-2876, 3204-3210, 3478-3479, 3767-3771) (Exhibit C, McCready Supplemental Report, 9/14/88) (Exhibit D, Oral Confession)  (Exhibit R, HH pp. 30-161, 1068-1127)

80.    At this point, Rein stated:

"Now, that's absurd, Marty … you .. dropped (the sweatshirt)
around your elbows, making flippers out of your arms,
rendering yourself totally ineffective to give first aid to your father.   Your father
could have been bleeding to death and you're concerned about getting blood on
your clothes?"

19

Plaintiff responded that he "put the sweatshirt on after the police arrived". Both Rein and McCready then reminded Tankleff that he was wearing the sweatshirt when police arrived. (Exhibit B, TT pp. 2876, 3206-3208, 3775) (Exhibit 4, Confession p. 10) (Exhibit R, HH pp. 1068-1127)

81.     Rein and McCready then asked plaintiff to repeat what he had done after rendering first aid to Seymour. Plaintiff reported that he had gone to the garage, opened the garage door and looked for Arlene's car.  McCready then reminded plaintiff that plaintiff had blood on his hands when the police arrived, yet there was *no* blood on the garage door.  Plaintiff did not reply.  When plaintiff  repeated that he had used the kitchen telephone or telephones, McCready responded by stating, "there's no blood on those phones."  Plaintiff did not reply.  McCready then left the room. Plaintiff then repeated that he had cried his "heart out before the cops arrived."  Rein responded by stating, "when you cry, you wipe your eyes and dab your nose, and I don't see any blood on your face."  Plaintiff again did not reply.   (Exhibit B, TT pp. 2877-2881, 2900-2901, 3200, 3227-3232) (Exhibit C, McCready Supplemental Report, 9/14/88) (Exhibit D, Oral Confession) (Exhibit R, HH pp. 30-161, 1069-1127)

82.     Rein then stated to plaintiff that in every excessive bleeding case in which he (Rein) had been involved, he got blood on his clothes, and that he (Rein) found it hard to believe that plaintiff did not have blood on his clothes.  Plaintiff did not reply. (Exhibit B, TT pp. 2882-2886, 3243-3247) (Exhibit R, HH pp. 1068-1127)

83.     At this time, McCready re-entered the room.  Employing a ruse, he told plaintiff that Seymour had regained consciousness and said that plaintiff had "beat and stabbed" him. Plaintiff stated that if his father said that, he did so because he (plaintiff) was the last person his father saw.  Plaintiff said he would take a lie detector test and that whoever did this "needs psychiatric help."  Plaintiff then asked "could I have blacked out and done it?"  "Maybe it wasn't him but another Marty Tankleff that killed them."   "Could I have been possessed?"  "It's starting

to come to me." At this point, McCready read plaintiff his *Miranda* rights. Plaintiff indicated he understood his rights and didn't want to contact a lawyer. He would tell Rein and McCready what happened. He stated, "I need psychiatric help." He knew what happened, but "it felt like it was another person inside of me and did it." (Exhibit B, TT pp. 2882-2886, 3243-3247) (Exhibit C, McCready Supplemental Report, 9/14/88) (Exhibit D, Oral Confession) (Exhibit N, Miranda Card) (Exhibit R, HH pp. 30-161, 1068-1127)

84.     Plaintiff then told Rein and McCready "my mother and father once had a very loving relationship but they have been fighting. I've been caught up in the middle." Plaintiff then stated he wanted to go away to college but that his mother wanted to keep him home under her thumb. (Exhibit B, TT pp. 2839-2912, 3456-3672, 3705-3934) (Exhibit C, McCready Supplemental Report, 9/14/88) (Exhibit D, Oral Confession) (Exhibit R, HH pp. 30-161, 1068-1127)

85.     Plaintiff then stated, "I really resented that my father's partner at the health club was going to have to stay with me when they went on their cruise and when they went to Florida." Rein and McCready then asked plaintiff if he had any other resentments. Plaintiff answered "yeah," he didn't like his crummy old Lincoln and he really wanted a sportier car. Plaintiff also stated that he resented that his parents wouldn't let him play ball and that this past summer his use of the family boat and all-terrain vehicle had been restricted. (Exhibit B, TT pp. 2839-2912, 3456-3672, 3705-3934) (Exhibit C, McCready Supplemental Report, 9/14/88) (Exhibit D, Oral Confession) (Exhibit R, HH pp. 30-161, 1068-1127)

86.     Plaintiff also stated to Rein and McCready that his parents had separated five years ago. Since then, they had not been getting along very well and they were fighting and arguing. Plaintiff also stated he was confused about the future because of the fact he was adopted and his parents might break up. He admitted lying earlier about their relationship. In the past, his mother would side with him about his father's rules, about jobs, and punishment; but lately she was siding

with his father against him.  They were angry because he (plaintiff) hadn't done the list of jobs on the refrigerator.  The last straw was the card table business where he didn't set up the card table. Plaintiff stated that he decided after that business with the poker table, to kill them both.  (Exhibit B, TT pp. 2839-2912, 3456-3672, 3705-3934) (Exhibit C, McCready Supplemental Report, 9/14/88) (Exhibit D, Oral Confession) (Exhibit R, HH pp. 30-161, 1068-1127)

87.     Plaintiff then told Rein and McCready that he set his alarm for 5:35 a.m. and that when it went off, he woke up.  He was naked because he didn't want to leave any blood on his clothing.  He took a dumbbell from his room and went to his mother's bedroom.   He leapt across the bed and hit her on the head with the barbell and his mother was screaming.  He hit her on the head about four or five times.  After a struggle, she fell on the floor.  He said he thought the noise might attract his father or wake him up.  He then ran into the kitchen and found a knife on a counter by the watermelon and took that knife and cut his mother's throat.  She was on her back. He didn't know how many times he stabbed her but he got to her quickly.  She was in pain and calling for help saying "why?" and "help me."  (Exhibit B, TT pp. 2839-2912, 3456-3672, 3705-3934) (Exhibit C, McCready Supplemental Report, 9/14/88) (Exhibit D, Oral Confession) (Exhibit R,  HH pp. 30-161, 1068-1127)

88.     At the time plaintiff was revealing what he did to Arlene, Arlene's body had remained untouched so that forensic investigators could gather physical evidence with minimal risk that any movement of the body would disturb the evidence as it existed.  The Medical Examiner did not roll Arlene onto her stomach, thereby discovering the injuries to the back of her head and back, until 4:00 p.m. on September 8, 1988.  Neither Rein nor McCready had an occasion to view the injuries while at the scene.  (Exhibit B, TT pp. 1625-1627)

89.     Plaintiff then said that he then went to his father's office to kill his father.  Plaintiff went into the office with the knife and dumbbell behind his back.   Plaintiff said he was still naked.  His father was sitting at his desk and that his father was now awake and asking plaintiff

what he was doing.  Plaintiff says he went behind his father and hit him on the head with the dumbbell and knocked him "silly."  He said he then took the knife and slashed his father's throat. He didn't recall how many times he hit or cut his father.  He couldn't believe all the blood. (Exhibit B, TT pp. 2839-2912, 3456-3672, 3705-3934) (Exhibit C, McCready Supplemental Report, 9/14/88) (Exhibit D, Oral Confession) (Exhibit R, HH pp. 30-161, 1068-1127)

90      Plaintiff next said he went to his bathroom, showered and washed off the barbell and the knife.  He put the barbell in his room and the knife back on the counter by the watermelon. He then laid on his bed and thought about what do to next.  He got up at about 6:10 a.m. and went back to the office and saw his father was still alive and "gagging."  He then went to his mother's room to see if his mother was dead.  He called 911 from the phone in his mother's room.  He was instructed by the 911 operator to render first aid.  He thought his father would die before they got there.  He got a towel from the linen closet and a pillow from his room and pulled his father out of the chair and onto the floor and then put the towel on his father's neck.  McCready then asked him how he got blood on his hands.  Plaintiff said he put his hands in the blood to make it look like he gave his father first-aid.  McCready then asked about the blood he had spotted on plaintiff's shoulder.  Plaintiff said he missed the blood on his shoulder when he showered and that he must have "screwed up."  (Exhibit B, TT pp. 2839-2912, 3456-3672, 3705-3934) (Exhibit C, McCready Supplemental Report, 9/14/88) (Exhibit D, Oral Confession) (Exhibit R, HH pp. 30-161, 1068-1127)

91.      Plaintiff also stated that he "pretended to follow the instructions of the 911 operator or emergency operator" and that "he put the towel on his father's neck but really did not apply pressure" and "thought his father would die before the police arrived."  (Exhibit B, TT pp. 2839-2912, 3456-3672, 3705-3934)  (Exhibit C, McCready Supplemental Report, 9/14/88) (Exhibit D, Oral Confession) (Exhibit R, HH pp. 30-161, 1068-1127)

92.    At this point, Rein and McCready asked plaintiff if he would give a written *and* videotaped statement.   Plaintiff agreed. Detective McCready then left the room to obtain a consent form to take forensic evidence from plaintiff, specifically fingernail scrapings and exterior dried blood.  Upon McCready's return, plaintiff signed the consent form. (Exhibit B, TT pp. 2839-2912, 3456-3672, 3705-3934) (Exhibit C, McCready Supplemental Report, 9/14/88)  (Exhibit D, Oral  Confession) (Exhibit R, HH pp. 30-161, 1068-1127) (Exhibit O, Exemplar Consent Form)

93.    After the consent form was executed by plaintiff, Detectives Rein and McCready had members of the identification section take photographs of the plaintiff. (Exhibit B, TT pp. 3503-3504) (Exhibit F, Trial Exhibit 11, Photograph) (Exhibit P, Trial Exhibit 150, Photograph) (Exhibit R, HH pp. 30-161, 1068-1127)

94.  Plaintiff then proceeded to repeat his confession which was written down by McCready.  At 1:22 p.m., before the written confession was complete and prior to taking the videotaped confession, family attorney Fox called police headquarters and directed the detectives to stop their questioning of plaintiff.  At the time of that call, plaintiff had  repeated his statement only to the point where he cut Arlene's  "throat and neck."  Consequently, the written statement was not completed or signed, nor was the videotaped statement ever taken.  (Exhibit B, TT pp. 2839-2912, 3456-3672, 3705-3934)  (Exhibit C, McCready Supplemental Report, 9/14/88) (Exhibit D, Oral Confession) (Exhibit R,  HH pp. 30-161, 1068-1127) (Exhibit Q, Unsigned Written Confession)


**C. Phone Call to Sister Shari Rother.**

95.    Plaintiff then remained in the homicide squad room for the rest of the afternoon and was processed on his arrest.  During this time, plaintiff had made several requests to detectives to allow him to telephone his sister, Shari Rother.  At about 3:32 p.m., Detective Rein placed a

telephone call to Mrs. Rother and left a message on her answering machine.  (Exhibit R, HH pp. 161-166, 1128 – 1132, 1498-1506) (Exhibit S, Prisoner Activity Log)

96.      At about 5:30 p.m., plaintiff made several additional requests to Detective Rein to be permitted to speak to his sister.  At around 6:00 p.m., while plaintiff was reading a Playboy magazine in an interview room, plaintiff again made a request to speak to his sister.  At 6:37 p.m., telephone contact was established with plaintiff's sister, Shari.   Detective Rein overheard plaintiff say to his sister, "I need help.  I need help.  I need help.  I need to see a psychiatrist.  I want to make sure to tell you that I'm sorry for what I did.  I acknowledged to the police that I did it.  I need to see you tonight." (Exhibit B, HH pp. 161-166, 1128 – 1132, 1498-1506)  (Exhibit S, Prisoner Activity Log) (Exhibit B, TT pp. 4693-4695) (Exhibit T, Notice p. 18)


**D.      Evidence at Crime Scene, Seymour's Surgery, and Arlene's Autopsy.**

97.      Detective Sergeant Doyle assigned Detective James Barnes to be the case-scene coordinator at the crime scene.  Detective Barnes examined all the house windows and doors and found no sign of an intrusion.  (Exhibit B, TT 1367-1390, 2633)

98.      At approximately 9:35 a.m., in plaintiff's bathroom, Detective Kosciuk observed water near the bathtub drain, atop one side of the tub, and a wet loufah sponge with a ring of water around it.  Kosciuk then proceeded to plaintiff's bedroom and observed blood on the doorknob, blood on the light switch plate and wall near that switch plate at the room's entrance. On plaintiff's bed, Kosciuk observed towels, one of which was "slightly damp," and a pair of small barbells leaning against a wall.  Maria Vieira, the Tankleff family housekeeper recalled, as a defense witness, that on September 6, 1988, the barbells were lying down.  (Exhibit B, TT pp. 1579-1581, 1695, 1702-1704, 1732-1733, 1762, 1775-1777, 1868-1869, 4394)

99.      At around 4 p.m., Detective Kosciuk entered Seymour's office.  He observed blood patterns and blood pooling that showed Seymour was sitting in his chair behind his desk when he

was hit, in an up and down motion, with a blunt instrument that sent "cast off" blood to the ceiling.  Kosciuk also noted that the blood spatter on the office telephone and attached telephone cord showed that the telephone and telephone cord had *not* been disturbed after having been spattered. (Exhibit B, TT pp. 1633, 1648-1674, 1681, 1821-1824, 1831, 1856, 4393) (Exhibit E, Trial Exhibits, 74d-75)

100.    Kosciuk also noted that spattering around the desk area indicated that a minimum of four blows occurred, one in a north-south direction, two east to west;  with at least one blow causing initial bleeding which resulted in the castoff and spatter. (Exhibit B, TT pp. 1648-1674, 1681-1683)

101.    In the kitchen Kosciuk found a knife next to watermelon rinds in a position different from that described by Bove, who had recounted where he put it after using it at the card game hours earlier.  (Exhibit B, TT pp. 734-740, 1706-1707, 1840) (Exhibit U, Trial Evidence ¶ #'s 96-97)

102.    Vernard Adams, Deputy Suffolk County Medical Examiner, arrived at the scene at around 4:00 p.m.   He examined Arlene's injuries and the blood pooling in the master bedroom. He concluded that Arlene had suffered head injuries, had moved and then had suffered incised injuries.  (Exhibit B, TT pp. 3940-3944, 3967, 4003-4004)

103.    At Stony Brook Hospital, surgeon Doctor George Tyson operated on Seymour.   Dr. Tyson noted that Seymour had sustained several "depressed [skull] fractures," "fracture[s] in which pieces of bone are…driven inward."  He also noted "the size and shape of the … fractures appeared to [have been] produced by a small, pointed blunt object of which a hammer would be a good example."  He also noted that Seymour's neck wound was consistent with having been caused by a knife and that it could have been caused if Seymour had been struggling.  Tyson also opined that whoever had inflicted the head and neck wounds was very angry and that the person

26

who had the strength to lift Seymour from the chair would have had the strength to inflict the wounds.  (Exhibit B, TT pp. 4346-4349, 4359-4365)

104.    On September 8, 1988, Adams performed an autopsy on Arlene.  Adams determined that Arlene had suffered defensive wounds to her hands and forearms and that a sharp blade or blades had caused her incised wounds.  Adams also concluded that a blunt instrument had caused her skull wounds, which included five depressed fractures.  When comparing the fractures with a dumbbell from plaintiff's bedroom, he concluded "the skull fractures [were] consistent with having been caused by the bar."  (Exhibit B, TT pp. 3945, 3954-3957, 3963-3968, 3974-3978, 3989, 4005-4009)


**E.    Jerry Steuerman**

105.    At approximately 9:30 a.m. on September 7, 1988, Gerry Steuerman called Bove.  Bove stated to Steuerman, "I don't know what's happened, but you're being accused of murdering Seymour and Arlene."   Steuerman responded, "Vinny, what the hell are you talking about?"  Bove then handed the phone to a detective, who made an appointment to interview Steuerman later that day.  (Exhibit B, TT pp. 83, 747-748, 904-905, 1084-1085, 3988)

106.    Detective Sergeant Doyle had assigned Homicide Detectives Robert Anderson and Anthony Laghezza to interview each of the regular card players that met with Seymour on a regular basis and specifically, those that were in attendance at the card game that ended hours before the attacks on Arlene and Seymour.  (Exhibit B, TT pp. 2606-2607, 2635)

107.    Vincent Bove told Detectives Anderson and Laghezza that he noticed nothing unusual at the card game and that there were no problems at the game between any of the players including Steuerman and Seymour.  Bove also stated he was unaware of *any* problems between Steuerman and Seymour and that he had no personal knowledge of their business relationship.  (Exhibit B, TT pp. 721-733) (Exhibit V, Anderson Supp. Report, 9/8/88)

108.   Robert Montefusco told Detectives Anderson and Laghezza that he did not observe any problems at the final card game nor was there any problems between any of the players and noted that Seymour was in good spirits.  (Exhibit B, TT pp. 622-625) (Exhibit V, Anderson Supp. Report, 9/8/88)

109.    Albert Raskin told Detectives Anderson and Laghezza that he noticed no problems during the card game and that everything seemed fine throughout the night.  (Exhibit V, Anderson Supp. Report, 9/8/88)

110.    Peter Capobianco told Detectives Anderson and Laghezza that there was no tension between any of the card players that night nor did he recall anything out of the ordinary during the game. (Exhibit V, Anderson Supp. Report, 9/8/88)

111.     Joseph Cerce also indicated that nothing unusual occurred during the card game and that there was no hostility between Steuerman and Seymour.  (Exhibit B, TT pp. 670-68) (Exhibit X, Rein 9/11/88 Supp. Report)

112.    Detectives Anderson and Laghezza  interviewed Steuerman last.  At this time Steuerman knew that plaintiff had accused him of committing the attacks on Arlene and Seymour. Steuerman detailed his business relationship with Seymour and discussed his two year involvement in a "friendly" game of cards with Seymour and other friends and his inability to ever recall there being any problems at the game.  He also stated that he saw plaintiff at the last game and that he (plaintiff) moved a car.  He also recalled that he left the game and got to his daughter's home around 3:15 a.m., and that he had forgotten his house keys.  He stated that his son told him of the attacks on Seymour and Arlene at around 9:00 a.m., after he had arrived at his bagel store at 6:30 a.m.   Steuerman discussed the financial outcome of the card game, talked about plaintiff and talked about Arlene.  At the conclusion of this interview, Detectives Anderson and Laghezza concluded that Steuerman should *not* be considered a suspect.  (Exhibit B, TT pp. 897-905) (Exhibit V, Anderson Supp. Report, 9/8/88)

113.    Detective Rein and McCready interviewed Steuerman on September 10, 1988 where Steuerman recounted details about the weekly poker game and the game on September 6, 1988 and detailed when he went home and where he went.   Steuerman also discussed the relationships within the Tankleff family.  (Exhibit W, Rein Supplemental Report, 9/10/88)

114.    On the day of the murders, Steuerman was living in Old Field with his daughter, Bari Steuerman, and her son.  At around 3:16 a.m., Bari heard knocking on the door and answered that knock expecting it was her father since he often forgot his keys.  It was her father at the door. After letting her father in, she went back to bed and Steuerman went to his room.  She was awakened by Steuerman at around 6:00 a.m. and he soon after left for work.  She also indicated that the ride from Belle Terre to Old Field takes approximately 15 minutes.  (Exhibit B, TT pp. 821-827)

115.    The terms of the various business dealings between Seymour and Steuerman indicated that Steuerman's financial obligations to Seymour survived Seymour's death.  (Exhibit B, TT pp. 1220-1224) (Exhibit V, Anderson Supp. Report, 9/8/88)

116.    On September 14, 1988, Steuerman withdrew $15,000.00 from an account he shared with Seymour, feigned his own death and went to Los Angeles. (Exhibit B, TT pp. 905-906, 1137-1143, 1189-1193)

117.    Steuerman explained that he did this because:

> "My wife… passed away a year before. I was married for
> twenty-nine years… and one of my children was in bad
> legal trouble… and my business was not what it used to be
> and then the murder of Arlene and Seymour, after that and the
> accusations by the j…. it got to me.  I thought everybody would
> be better off just without me. (Exhibit B, TT pp. 907-978,
> 1136-1137, 1151-1156, 1191)

118.    Steuerman took the stand for three days during plaintiff's criminal trial and was exhaustively asked about the details of his business relationship with Seymour and about he

(Steuerman) being the actual perpetrator of the murders of Arlene and Seymour.  This was plaintiff's defense at the trial. (Exhibit B, TT pp. 909-1219)

119.    McCready was cross-examined extensively about the direction of the murder investigation and about his purported "failure" to investigate Steuerman as a suspect. (Exhibit B, TT pp. 3517-3672, 3705-3934)


**F.    The Indictments.**

120.    In September of 1988, plaintiff was indicted by a Suffolk County Grand Jury for the murder of Arlene and the assault on Seymour.

121.    On October 6, 1988, Seymour died from his wounds and plaintiff was thereafter indicted by a Suffolk County Grand Jury on a superseding proceeding, for the murder of Seymour.


**G.    Plaintiff's Activities Prior To and Subsequent to the Murders**

122.    On August 27, 1988, plaintiff had a conversation with Audra Goldschmidt, Stacey Goldschmidt and Danielle Makrides, where he said that if he could "have a hit" on both his parents, "then he could get any car that he wanted."  (Exhibit B, TT pp. 191-193, 201-202, 166-169, 172-178, 4096-4097)

123.    Plaintiff had also bragged to the girls about his wealth and remarked that one day he would have as much money as Debbie Gibson (a pop star from that era).  (Exhibit B, TT pp. 198-199) (Exhibit AA, Rein Supp. Report 4/4/90)

124.    On October 13, 1988, while out on bail, plaintiff called Audra Goldschmidt and stated once he inherits all his parents' money, he would be able to take Audra and her sister out in a limousine. (Exhibit B, TT pp. 171-172, 193-194) (Exhibit AA, Rein Supp. Report 4/4/10)

125.    During the summer of 1988, plaintiff told a friend, a Lance Kirschner, about his annoyance over his parents' insistence that he drive a 1977 blue Lincoln Town Car which he

called a "piece of shit".  Plaintiff also stated that "if his parents weren't alive, he'd be able to get anything he wants."  (Exhibit B, TT pp. 591-598)

126.    On September 4, 1988, Lance Kirschner recalled that Seymour had come to visit one of the bagel stores, Strathmore Bagels in Port Jefferson Station.  He observed Seymour confront plaintiff and demand that they both leave immediately and that he (Seymour) didn't have time for this "fucking bull shit."  After which he stormed out of the store continuing to scream.  Plaintiff just put his head down and walked out while Seymour continued to yell at him.  (Exhibit B, TT pp. 591-598)

127.    On September 6, 1988, Seymour and plaintiff took plaintiff's Lincoln to a Liberty Auto Repair and asked the owner, Peter Cherouvis, to examine the car's exhaust system.  When Seymour and plaintiff returned to the repair shop later that day, Cherouvis indicated that the repairs would be expensive to which Seymour replied, "leave it be."  Plaintiff became "belligerent" and "loud and mad" and responded to Seymour by stating "he (plaintiff) did not want to drive that piece of shit to school" and that he 'wasn't a fucking nigger'."  (Exhibit B, TT pp. 4634-4644, 4662-4672)


**H.    The Stained Bed Sheets in Arlene's Bedroom**

128.    On October 7, 1988, plaintiff's criminal defense attorney, Robert C. Gottlieb wrote to Suffolk County District Attorney Patrick Henry, demanding any and all forensic reports that to that point had not been turned over.  Particularly, Mr. Gottlieb explained that he was being so "insistent" because "we fully intended (sic) to undertake our own analysis if that is necessary." (Exhibit BB and its Attachments)

129.    On October 12, 1988, Assistant District Attorney Edward C. Jablonski, Chief of the Homicide Bureau, responded to Mr. Gottlieb's October 7, 1988 demand.  Mr. Jablonski indicated

that the lab's policy was not to issue partial reports, but in this case, an exception was made. Contained in the enclosed reports was Lab Report Number 988-57483 which included a specific reference to the bed sheets and comforter in issue. (Exhibit BB and its Attachments)

130.    On December 14, 1988, Gottlieb made a motion to suppress and preclude evidence on the basis that he had not received the lab reports for that evidence. In the motion, Mr. Gottlieb acknowledged that he had received seven items, including five separate lab reports which (under lab number 988-57483) specifically referenced the bed sheets and comforter in issue. (Exhibit CC and attachments)

131.    Lab Report Number 988-57483 contained items recovered from the scene of the crime by Detective Charles Kosciuk, and Forensic Scientists Robert Baumann and George Reich. Among the items recovered were a comforter and bed sheet found in the master bedroom near Arlene's body. These items were listed as 25A and 25B in Lab Report Number 988-57483. (Exhibit HH, Lab Report No. 988-57483)

132.    Also contained in Lab Report Number 988-57483 were the results of forensic analysis of the items recovered. The aforementioned comforter and bed sheet (Items 25A and 25B) were examined. The examination revealing the "presence of staining". No impressions of any sort were identified by Forensic Scientist Robert Baumann. (Exhibit HH, Lab Report No. 988-57483, pp. 7-8)

133.    Twenty months after the aforementioned items were turned over to Gottlieb, the trial began. Photographs of item numbers 25A and 25B (under Lab Number 988-57483) were received in evidence as People's Exhibits 37-45, 53, 57, 143-144a. These items of evidence were admitted into evidence with no objection from plaintiff's criminal lawyer, Gottlieb. (Exhibit B, TT pp. 1601-1610, 1631-1633) (Exhibit EE, Trial Evidence Photos 37-45, 53, 57, 143-144a)

134.    During the trial the actual sheets and pillow cases depicted in the aforementioned photos were introduced into evidence as People's Exhibits 132-136. These items of evidence were

admitted into evidence with no objection from plaintiff's criminal attorney, Gottlieb. (Exhibit B, TT pp. 2146-2151) (Exhibit FF, Trial Exhibit List)

135.    Photographs of the blood stains on the sheet and comforter, and the actual items themselves that were introduced during the criminal trial as Exhibits 132-136 were forensically analyzed. The analysis consisted of typing the blood on the evidence and observing a ridge pattern.  The ridge pattern was identified as a pattern that was consistent with a rubber glove.  No other pattern or imprint (including a knife) of any kind was noted.  (Exhibit B, TT pp. 2178-2197, 2442-2459)

136.    At no time during the trial did Gottlieb ever question the forensic scientists with respect to whether Items 25A and 25B in Lab number 988-57483 revealed a knife impression in any way; nor did Mr. Gottlieb call an expert at the trial to suggest that there were any impressions of any kind contained in Items 25A and 25B.  These items were introduced into evidence as photographic exhibits and actual exhibits as People's Exhibits 37-45, 53, 57, 143-144a respectively.  At the time of the criminal trial Mr. Gottlieb had possessed the information relating to these items, and the results of the examinations of these items for twenty months. (Exhibit B, TT pp. 1573-1619, 1620-1882, 2131-2239, 2377-2434, 2435-2486, 2487-2507, 1883-2113) (Exhibit UU, Trial Witness List)

137.    On February 11, 2008, the New York State Police, on behalf of the New York State Attorney General's Office, took into their possession items of evidence that had been collected at the time of the murders from the Suffolk County Criminal Laboratory.  The New York State Police Crime Laboratory Case Receipt Record shows that items identified as bedding were renumbered and listed as item 11.  Attached to that Receipt Record is a handwritten Suffolk County Evidence Recovery Sheet which identifies two items of bedding under Suffolk Laboratory Number 25A and B.  The State Police case receipt record indicates that Suffolk Lab items 25A and B have now been identified as State Item 11 and that they are one and the same.  (Exhibit GG)

138.    On June 13, 2008, State Forensic Scientist Ronald K. Staubro issued a supplemental report describing his examination of state items 11B, a pink bed sheet with stains. (People's Trial Evidence 37-45, 53, 57, 143-144a).    His conclusions state that New York State item 11B (bed sheet) showed the presence of a partial impression pattern which *appears* to be knife-like in design.  He then compared that "apparent" partial impression to the knives recovered from the crime scene and concluded that none of the submitted knives have the same shape or size as the "impression."  (Exhibit HH, State Lab Report 08HL-00399)

139.    Photographs of the subject stains found on the bed sheets in the master bedroom where Arlene was found are depicted in People's Trial Exhibits 37-45, 53, 57, 143-144a.  These photographs depict the blood evidence that Suffolk County forensic Scientist Robert Baumann described as showing the "presence of staining" and State Forensic Scientist Ronald K. Staubro described as "a partial impression pattern which appears to be knife-like in design."  Both the two experts have offered differing expert opinions regarding what is depicted in the aforementioned exhibits.  (Exhibit EE, Trial Exhibits 37-45, 53, 57, 143-144a)


I.    **Forensic Evidence.**

140.    Forensic Serologist Robert Baumann analyzed blood recovered from the crime scene.  Baumann noted that except for a bloodstain on the exterior doorknob to plaintiff's room, there was no blood on the entranceway to any of the rooms.  (Exhibit B, TT pp. 2131, 2152, 2159-2162, 2388-2389, 2424)

141.    Baumann also analyzed evidence from the master bedroom where Arlene was found.  A blood stain on a wall in the bedroom contained a bloodstain consistent only with Seymour's blood.  Baumann also noted that the bed sheets, pillowcases, pillow shams, and Arlene's fingernails contained bloodstains consistent with Arlene's blood and plaintiff's blood. All of the blood in the office was consistent only with Seymour's blood.  Baumann also noted that

Seymour's pants contained a wallet with a $100 bill. (Exhibit B, TT pp. 2176-2204, 2212-2217, 2268-2269, 2297)

142.     An analysis of the towel found at the foot of plaintiff's bed was found to contain blood consistent only with Seymour's blood.  Analysis of the blood stains on the switch plate and some of the stains analyzed in the master bedroom were found to be in a "chain link" or "honeycomb" pattern consistent with a grip area that could be found on latex or rubber gloves used in house cleaning.  No such gloves were found at the scene.  (Exhibit B, TT pp. 1976, 2104, 2258-2261, 2272-2275, 2343-2346, 2354, 2377-2379, 2396, 2412, 2455-2471, 2478, 2845-2846)

143.     Analysis was conducted on the bedding found in Arlene's room and a stain evinced a ridge pattern that was "honeycomb-like," consistent with a rubber glove.  Analysis also reveals that a blood stain on the light switch in plaintiff's room also contained a "honeycombed like" pattern consistent with a rubber glove and consistent with the patterns identified in the evidence analyzed from Arlene's bedroom. (Exhibit B, TT pp. 2272-2276, 2459-2466, 2485-2486)

144.     Baumann also conducted an analysis of the clothes plaintiff was wearing on September 8, 1988.  There were no bloodstains on plaintiff's shorts or under shorts.  There was, however, one slight stain on the *inside* right shoulder of plaintiff's sweatshirt.  The stain tested positive for the presumptive presence of blood but was so small Baumann was unable to conduct any further analysis.  The blood found on plaintiff's shoulder was consistent only with Seymour's blood.  (Exhibit B, TT pp. 2262-2268, 2294)

145.     There was no blood on the barbells, or the kitchen knives or in the traps below the sinks and bathtub loufah.  The loufah sponge did, however, have a five inch slit which was determined to have been caused by a sharp object.  One of the three tissues plaintiff had taken out of his pocket when he began talking to Rein and McCready at Police Headquarters contained blood consistent with *only* Arlene's blood.  (Exhibit B, TT pp. 2218-2237, 2249-2253, 2276-2281, 2305-2307, 2314-2326, 2341, 2398, 2405, 2422-2423, 2433)

146.    Kosciusk invoiced a loufah sponge that was found in plaintiff's bathroom as item 39 under Lab No. 988-57483 and introduced in evidence during the trial as People's Exhibits 88 and 89.  Analysis of that sponge revealed that it contained a 5 inch slit that was identified as a cut. (Exhibit B, TT pp. 2224-2226, 2397-2398) (Exhibit II, Trial Exhibits 88-89)

**J.      Seymour's Autopsy.**

147.    Seymour died on October 6, 1988.  Adams performed an autopsy on Seymour and although the partial healing of Seymour's wounds impaired Adams ability to determine the weapon or weapons that had caused Seymour's death, he was able to conclude that Seymour had suffered blows to the head from a blunt instrument or instruments and that the cause of death was a combination of impact head trauma and incised wounds of the neck. (Exhibit B, TT pp. 3980, 3989, 3995-4001)

**K.      Plaintiff's Post Confession Statements.**

148.    At the criminal trial, plaintiff stated that once he observed Seymour bleeding in the office, he used the *office* phone to call 9-1-1.  (Exhibit B, TT pp. 4115-4116, 4200-4203)

149.    At the criminal trial, plaintiff stated that after placing the 9-1-1 call, he retrieved a pillow from his room and a towel from a closet down a hallway and returned to his father.  After plaintiff couldn't get the chair Seymour was in into a reclined position, he pulled Seymour from the chair and placed him on the floor and, while doing so, got blood on his hands, shoulders and his lower left leg.  (Exhibit B, TT pp. 4117-4119, 4200-4203)

150.    At the criminal trial plaintiff stated that, in his shorts and underwear only, he placed his hands under Seymour to assist him in getting Seymour to the floor and, as a result, got blood on his arms, hands, upper body area, and his feet or leg area but not his shorts. (Exhibit B, TT pp. 4206-4211)

151.    At the criminal trial, plaintiff acknowledged that the photograph taken by him at Police Headquarters did not show any blood stains on the exterior of the shorts and sweatshirt. (Exhibit B, TT  pp. 4221-4222)

152.    At the criminal trial, plaintiff testified that when he first got up, he checked his parents' bedroom and didn't see anyone.  From there he went and discovered Seymour in his office.  After calling 9-1-1 on the *office* phone and moving Seymour to the floor, plaintiff stated he then went to the garage to look for his mother's car.  He turned the garage door handle and opened the door and closed it after he observed Arlene's car in the garage.  (Exhibit B, TT pp. 4119, 4200, 4211-4213)

153.    Plaintiff testified at the criminal trial that when he first woke up, at around 6:05 a.m., he put underwear and shorts on, but not his glasses or contact lenses. (Exhibit G) (Exhibit B, TT pp. 4113, 4189)

154.    At the criminal trial, plaintiff stated that before discovering Seymour in a front office, he had looked into his parents bedroom but "no one was there." (Exhibit B, TT p. 4115)

155.    At the criminal trial, plaintiff testified that after observing Arlene's car in the garage, he went to his parents' bedroom where he saw his mother dead on the floor. (Exhibit B, TT pp. 4120, 4213-4215)

156.    At the criminal trial, plaintiff stated that when he observed Arlene in the master bedroom, he did so from the doorway, looking in at her and only went as far as the alarm wall and that he did not have his glasses on or contacts in due to a surgical procedure a week and a half earlier. (Exhibit B, TT pp. 4120, 4189)

157.    At his criminal trial, plaintiff stated that after observing Arlene, he went to the kitchen and called his sister Shari from a phone in the kitchen informing her that he thought "mom and dad have been murdered."  (Exhibit B, TT pp. 4120-4122, 4215-4217)

158.    At his criminal trial, plaintiff stated that after placing that call to his sister, he went to check on Seymour but then returned to the kitchen to answer an incoming call from his sister. (Exhibit B, TT pp. 4121-4122, 4217-4218)

159.    During plaintiff's criminal trial, plaintiff stated that after answering his sister's return call, he phoned his friend Mark Perrone from the phone in the kitchen.  After speaking to Mark's mother and telling her what happened, he hung up and immediately received a return call from Mark.  Plaintiff instructed Mark not to tell anyone what had happened at school except the principal. (Exhibit B, TT pp. 4122-4128)

160.    During plaintiff's criminal trial, plaintiff stated that after talking to his sister and the Perrones on the phone in the kitchen, he returned to his bedroom and wiped his hands, and *only* his hands, on a towel on his bed.  He then put on a sweatshirt and ran to the house of his neighbor, Hova.  (Exhibit B, TT pp. 4124-4125)

161.    During plaintiff's criminal trial, plaintiff stated he didn't recall turning the light on in his bedroom.  He didn't deny he could have, but he stated he didn't remember. (Exhibit B,  TT p. 4113)

162.    At the criminal trial, plaintiff stated that he did not recall speaking with Hines, McNamara or Bove. (Exhibit B, TT pp. 4129-4131, 4188-4191)

163.    At his criminal trial, plaintiff stated to the jury that what he told Makrides and the Goldschmidts in their conversation was if his "parents weren't around [he] could have any car [that he] wanted."  (Exhibit B, TT pp. 4094-4097)

164.    At his criminal trial, plaintiff admitted that he had told McCready what happened while at the scene as "best he could."  (Exhibit B, TT pp. 4137-4138)

165.    At his criminal trial, plaintiff admitted that he met with Doyle and repeated what happened to Doyle at McCready's request.  (Exhibit B, TT pp. 4134-4135)

38

166.     At his criminal trial, plaintiff admits repeating the story after being asked by Rein as "best I could."  (Exhibit B, TT p. 4148)

167.     At his criminal trial, plaintiff admitted that McCready asked him to go to "Homicide Headquarters."  (Exhibit B, TT p. 4143)

168.     At his criminal trial, plaintiff admitted that while in the car, he told McCready what happened the "best he could."  (Exhibit B, TT p. 4133)

169.     At his criminal trial, plaintiff admitted that while in the car he was told by McCready that Seymour was being moved to Stony Brook and that McCready stated he (McCready) had not known about Seymour's head injuries. (Exhibit B, TT p. 4148)

170.     At his criminal trial, plaintiff admitted that when he saw his mother in the bedroom, he did not have glasses on. (Exhibit B, TT p. 4215)

171.     At his criminal trial, plaintiff admitted that he used the kitchen phone to speak to his sister twice and to call Perrone (a school friend) and acknowledged that the photograph of the phone showed no blood on the phone. (Exhibit B, TT pp. 4216-4219)

172.     At his criminal trial, plaintiff admitted that he wiped his hands on a towel in his bedroom (a photograph of which was entered into evidence as People's Exhibit 35) *after* he used the kitchen phone. (Exhibit B, TT pp. 4219-4221) (Exhibit JJ, Trial Exhibit 35)

173.     At his criminal trial, plaintiff admitted that at Headquarters he spoke to Rein and McCready about Steuerman's business relationship with Seymour; a $400,000 loan Steuerman was paying off to Seymour; a UCC equipment disputed between Steuerman and Seymour; a dispute over the Ronkonkoma store between Steuerman and Seymour; family vacations; his relationships and getting his nose fixed; and the names and phone numbers of various businesses owned by Seymour.  (Exhibit B, TT pp. 4229-4230)

174.    At his criminal trial, plaintiff admitted he told Rein and McCready that he was the primary beneficiary in the will for Seymour's business interests, including the interests Seymour had with Steuerman and the family house. (Exhibit B, TT pp. 4233-4236).

175.    At his criminal trial, plaintiff admitted that he drew the three diagrams asked of him by Rein and McCready, and that he only entered Arlene's room as far as the alarm wall in the bedroom. (Exhibit B, TT pp. 4190, 42124)

176.    At his criminal trial, plaintiff admitted that a stand-up photograph was taken of him at police headquarters and that the photo, People's Exhibit 11, showed no blood on his shorts or sweatshirt. (Exhibit B, TT pp. 4221-4222) (Exhibit F, Trial Exhibit 11)

177.    At his criminal trial, plaintiff admitted he demonstrated on Rein what he did to render first aid to Seymour. (Exhibit B, TT p. 4150)

178.    At his criminal trial, plaintiff admitted that his conversation with  Rein and McCready did not become confrontational until after he performed the first aid demonstration on Rein. (Exhibit B, TT p. 4238)

179.    At his criminal trial, plaintiff admitted to signing the waiver or "rights" card, and identified his signature and date on the waiver or "rights" card, which was entered into evidence as People's Exhibit Number 170. (Exhibit B, TT pp. 4164, 4242-4243) (Exhibit N, the Rights Card)

180.    At his criminal trial, plaintiff admitted offering the substantive parts of his confession and actually uttering the words attributed to him, but added additional comments he claimed were made by McCready that caused him to utter those words. (Exhibit B, TT pp. 4154-4164)

181.    At his criminal trial, plaintiff admitted telling Rein and McCready that "could I – could I have blacked out" or "could I have blacked out."  (Exhibit B, TT p. 4242)

182.    At his criminal trial, plaintiff admitted that he told Rein and McCready that he killed his parents with a barbell and a knife.  (Exhibit B, TT pp. 4239-4240)

183.   At his criminal trial plaintiff admitted, in response to questions from his attorney on direct examination, that he spoke with his sister and that he apologized to her saying he needed psychiatric help and that he needed to see her that night.  He stated, however, that he said those things "because they made me."

184.   At his criminal trial plaintiff claimed, on cross examination by Assistant District Attorney John B. Collins, that after he gave his confession earlier, he was in a room with Rein, McCready and Doyle, and that McCready choked him.  He also claimed that Rein  and Doyle participated in order to get him to say the things he did to his sister.  (Exhibit B, TT pp. 4240-4242)

185.   The first time plaintiff ever claimed he was choked came during the aforementioned cross-examination.  No previous claim of choking had ever been made, nor had Mr. Gottlieb made such a claim in his opening statement, his direct examination of plaintiff or in his closing argument.  Mr. Gottlieb also did not address this claim in his re-direct examination that followed the aforementioned cross-examination.  (Exhibit B, TT pp. 45-57, 4087-4172l, 4247-4250, 4739-4878)

186.   On December 17, 2008, during plaintiff's 50h examination, plaintiff again did not deny, and in fact admitted, that he uttered the words contained in the record of his oral statements to Detectives Rein and McCready and that he signed the Waiver of Rights Card. (Exhibit KK, 50-h Transcript pp. 55-56)

**L.      Procedural  History Regarding Confession**

187.      In June of 1989, after a lengthy Huntley Hearing challenging the  voluntariness of the plaintiff's confession, Trial Judge Alfred C. Tisch ruled that the statements made by plaintiff were voluntarily given;  the inculpatory statements made by plaintiff were done after his rights

were read; and there was a knowing waiver of said rights.  (Exhibit LL, Huntley Hearing Decision)

188.    While simultaneously pursuing a new trial pursuant to New York State Criminal Procedure Law §440.00, plaintiff initiated a series of direct appeals seeking to overturn his conviction after the jury trial.  These appeals primarily asserted that the confession was involuntary.  In 1993 the Appellate Division for the Second Department rejected plaintiff's contention that the confession was not voluntary and held that plaintiff was not in custody until after he was read his *Miranda* warnings and that plaintiff's due process rights were not violated by the actions of the detectives, including their orchestrated ruse which led plaintiff to confess. (Exhibit MM)

189.    Plaintiff appealed the decision of the Second Department -- again claiming his confession was taken improperly -- to the New York State Court of Appeals.  The Court of Appeals again rejected plaintiff's claims, and held that the confession plaintiff gave was voluntary given and that his will was not overborne by the force used by the detectives on September 7, 1988. (Exhibit NN)

190.    Plaintiff next filed a Writ of Habeas Corpus in the Eastern District of New York which again challenged the voluntariness of his confession.  Judge Platt denied the Writ and held that plaintiff was not in custody prior to the Miranda warning being given and that plaintiff's post-Miranda admissions were voluntary.  A Brady claim was also rejected. (Exhibit OO)

191.    Plaintiff next appealed Judge Platt's Decision to the Second Circuit Court of Appeals.  The Court held that the pre-admission statements were taken when plaintiff was in custody which required that Miranda warnings should have been given earlier.  However, the Court found this to be harmless error since the pre-Miranda statements were repeated when plaintiff confessed after having been read his rights.  The Court also rejected plaintiff's claim that

the confession was obtained involuntarily and held that the waiving of rights was done knowingly. They also affirmed the Brady issue as decided by Judge Platt. (Exhibit PP)

192.    In December of 2007, the Appellate Division for the Second Department reversed a trial court decision denying plaintiff's motion for a new trial pursuant to the Criminal Procedure Law §440.00 and held there was sufficient *new* evidence that would entitle plaintiff to a new trial. However, the court refused to address plaintiff's claim that his confession was not voluntarily given, reasoning that the issue concerning that confession had been thoroughly litigated.  This court also expressly rejected plaintiff's claim of actual innocence.  (Exhibit QQ)

193.    The Office of the New York State Attorney General, who had taken over the investigation after the Suffolk County District Attorney's Office referred the case to them in order to remove even the slightest appearance of a conflict of interest, prepared a memorandum of law in support of their application to dismiss the pending indictments against plaintiff in the interests of justice.  (Exhibit WW)

194.    On July 22, 2008, Judge Robert W. Doyle issued a Decision granting the New York State Attorney General's application to dismiss the pending indictments against plaintiff in the interests of justice.  (Exhibit RR).


**M.    New York State SIC Report**

195.    In April of 2006, plaintiff wrote to the New York State Commission of Investigation (SIC) requesting an investigation into the Suffolk County District Attorney's Office and the Suffolk County Police Department's regarding their investigation and prosecution of plaintiff for the murder of his parents. (Exhibit KK, 50-h transcript pp. 102-104) (Exhibit SS)

196.    In December of 2008, the SIC issued a report prepared after conducting an examination of the investigation and prosecution of plaintiff for the murder of his parents.  The SIC found, in part, that the police department and Crime Lab personnel conducted a

"comprehensive, extensive and methodical investigation from beginning to end;"  the procedures used by the Detectives in questioning plaintiff were "proper in all respects," and were within the "confines of the law" and that the confession was not obtained "by way of force or coercion;" the SIC rejected plaintiff's claim that there were similarities between procedures criticized by the SIC in a report issued in 1989 in the investigation and prosecution of plaintiff in this case. (Exhibit SS)

197.    On March 24, 2009, plaintiff filed the subject Summons and Complaint in the United States Courthouse for the Eastern District of New York.  (Exhibit TT)

WHEREFORE, defendants County of Suffolk, Retired Detective  K. James McCready, Retired Detective Norman Rein, retired Detective Charles Kosciuk, Detective Robert Doyle and retired Detective Lieutenant John McElhone, respectfully request that this Court grant this motion pursuant to F.R.C.P. Rule 12(c).

Dated: Hauppauge, New York
        April 6, 2010

Respectfully submitted,

CHRISTINE MALAFI
Suffolk County Attorney
Attorney for Defendants
        COUNTY OF SUFFOLK, K. JAMES
        McCray, NORMAN REIN, CHARLES
        KOSCIUK, ROBERT DOYLE, and JOHN
        MCELHONE
100 Veterans Memorial Highway
Hauppauge, New York 11788
(631) 853-4049

BY:     _____
        Richard T. Dunne (RD / 6665
        Assistant County Attorney