UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| MARTIN TANKLEFF, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| THE COUNTY OF SUFFOLK, | ) No. 09-CV-1207 (JS) (WDW) |
| K. JAMES MCCREADY, NORMAN REIN , | ) |
| CHARLES KOSCIUK, ROBERT DOYLE, | ) |
| JOHN MCELHONE, JOHN DOE POLICE | ) |
| OFFICERS #1-10, RICHARD ROE SUFFOLK | ) |
| COUNTY EMPLOYEES #1-10, | ) |
| | ) |
| Defendants. | ) |
| | ) |

**PLAINTIFF'S MEMORANDUM OF LAW
IN OPPOSITION TO DEFENDANTS'
MOTION PURSUANT TO F.R.C.P. RULE 12(c)**

# TABLE OF CONTENTS

Introduction ............................................................................................................. 1

Facts ....................................................................................................................... 1

Relevant Procedural History ..................................................................................... 4

Argument ................................................................................................................. 5

    I.       Applicable Legal Standards ........................................................................ 5

      A.       Rule 12(c) ....................................................................................... 5

      B.       Conversion to Rule 56(c) Summary Judgment Motion is Unwarranted ............... 7

    II.      The Vacatur of Mr. Tankleff's Conviction Eliminates any Collateral Estoppel Effect of the Judgment and Underlying Findings of Fact and Law ........................... 11

    III.    The Complaint Unquestionably States Plausible Claims for Relief ........................... 14

      A.       The Complaint States a Claim for Malicious Prosecution (Counts I & IX) and False Imprisonment (Count X) ...................................................... 15

         1.       Malicious Prosecution (Counts I & IX) ........................................... 16

           a.       Favorable Termination ........................................................ 16

           b.       Probable Cause ................................................................... 18

           c.       Actual Malice .................................................................... 21

         2.       False Imprisonment (Count X) ...................................................... 22

    IV.    Qualified Immunity .................................................................................. 22

    V.     The Complaint States a Claim for Violation of Mr. Tankleff's 14th Amendment Rights by Failure to Investigate and Suppression of Evidence (Counts III and IV) ................................................................................... 24

      A.       Failure to Investigate .............................................................. 25

      B.       Suppression of Evidence ........................................................... 26

    VI.    The Complaint States a Viable Conspiracy Claim (Count VI) ................................ 30

    VII.   Supervisory Liability is Adequately Pled (Count VII) ......................................... 32

    VIII.  The Complaint States a *Monell* Claim against Suffolk County (Count VIII) ............ 33

    IX.    Count XI States Claims for Intentional & Negligent Infliction of Emotional Distress ........................................................................................... 34

Conclusion .............................................................................................................. 35

## TABLE OF AUTHORITIES

### Federal Cases

*Akins v. Epperly*, 588 F.3d 1178 (8th Cir. 2009) .............................................................. 25

*Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009) .................................................. *passim*

*Banks v. Dretke*, 540 U.S. 668 (2004) .............................................................. 30

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ....................................... 7, 28

*Benn v. Lambert,* 283 F.3d 1040 (9th Cir. 2002) ......................................... 27, 28

*Benzman v. Whitman*, 523 F.3d 119 (2d Cir. 2008) ........................................ 23

*Blissett v. Coughlin*, 66 F.3d 531 (1995) ................................................ 22, 24

*Boyd v. City of New York*, 336 F.3d 72 (2d Cir. 2003) ......................... 19, 20, 21

*Brady v. Maryland*, 373 U.S. 83 (1963) .................................................. *passim*

*Branum v. Clark*, 927 F.2d 698 (2d Cir. 1991) ............................................... 7

*Castro v. United States*, 34 F.3d 106 (2d Cir. 1994) ..................................... 11

*Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158 (2001) ...................... 31

*City of Los Angeles v. Heller*, 475 U.S. 796 (1986) ........................................ 32

*Cleveland v. Caplaw Enters.*, 448 F.3d 518, 521 (2d Cir. 2006) ....................... 5

*Conboy v. AT&T Corp.*, 241 F.3d 242 (2d Cir. 2001) ..................................... 34

*County of Sacramento v. Lewis*, 523 U.S. 833 (1998) ..................................... 25

*Curry v. City of Syracuse*, 316 F.3d 324 (2d Cir. 2003) ............................ 12, 22

*Deshawn E. ex rel. Charlotte E. v. Safir*, 156 F.3d 340 (2d Cir. 1998) ............. 23

*Devereaux v. Abbey*, 263 F.3d 1070 (9th Cir. 2001) ....................................... 23

*Dopico v. Goldschmidt*, 687 F.2d 644 (2d Cir. 1982) ........................................ 8

*Dougherty v. Town of North Hempstead Bd. of Zoning Appeals*,
    282 F.3d 83 (2d Cir. 2002) ............................................................ 10

*Droz v. McCadden*, 580 F.3d 106 (2d Cir. 2009) .................................................................24

*Escalera v. Lunn*, 361 F.3d 737 (2d Cir. 2004) ....................................................................23

*Fabozzi v. Lexington Ins. Co.*, 601 F.3d 88 (2d Cir. 2010) ................................................17

*Fonte v. Bd. of Mgrs. of Cont'l Towers Condo.*, 848 F.2d 24 (2d Cir. 1988) ................6, 8

*Friedl v. City of New York*, 210 F.3d 79 (2d Cir. 2000) ........................................... *passim*

*Global Network Comm'c'ns, Inc. v. City of New York*, 458 F.3d 150 (2d Cir. 2006).....6, 9

*Hayes v. Sweeney*, 961 F. Supp. 467 (W.D.N.Y. 1997) ........................................................23

*Hellstrom v. U.S. Dep't of Veteran's Affairs*, 201 F.3d 94 (2d Cir. 2000) ..........................8

*Hygh v. Jacobs*, 961 F.2d 359 (2d Cir. 1992) ......................................................................17

*International Star Class Yacht Racing Ass'n v. Tommy*
   *Hilfiger U.S.A., Inc.*, 146 F.3d 66 (2d Cir. 1998) ...........................................................6

*Jocks v. Tavernier*, 316 F.3d 128 (2d Cir. 2003) .....................................................14, 16, 34

*Johnson v. Rowley*, 569 F.3d 40 (2d Cir. 2009) .........................................................7, 19, 25

*Kerman v. City of New York*, 374 F.3d 93 (2d Cir. 2004) ...................................................11

*Kogut, et al. v. Nassau County, et al.*, Nos. 06-CV-6695, 06-CV-6720,
   2009 WL 5033937 (E.D.N.Y. Dec. 11, 2009)................................................................14

*Kopec v. Coughlin*, 922 F.2d 152 (2d Cir. 1991) .................................................................6

*Kramer v. Time Warner Inc.*, 937 F.2d 767 (2d Cir. 1991)................................................6

*Limone v. Condon*, 372 F.3d 39 (1st Cir. 2004) .................................................5, 21, 23, 24

*Lowth v. Town of Cheektowaga*, 82 F.3d 563 (2d Cir. 1996)............................................19

*Martin v. County of Nassau*, No. 08-cv-4548, --- F. Supp. 2d ----, 2010 WL 841295

   (E.D.N.Y. Mar. 12, 2010) (Spatt, J.) ...............................................................................5

*McCray v. City of New York*, Nos. 03-CV-9685(DAB), 03-CV-9974(DAB),
   03-CV-10080(DAB), 2007 WL 4352748 (S.D.N.Y. Dec. 7, 2007).........................12, 13

*Migra v. Warren City Sch. Dist. Bd. of Educ.*, 465 U.S. 75 (1984)....................................12

*Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978)..........................................33

*Nat'l Life Ins. Co. v. Solomon*, 529 F.2d 59 (2d Cir. 1975).................................8

*Newsome v. McCabe*, 256 F.3d 747 (7th Cir. 2001)...........................................27

*Pangburn v. Culbertson*, 200 F.3d 65 (2d Cir. 1999)........................................31

*Pearson v. Callahan,* 129 S. Ct. 808 (2009)......................................................22

*Pena v. DePrisco*, 432 F.3d 98 (2d Cir. 2005) ..................................................22

*Rehberg v. Paulk*, 598 F.3d 1268 (11th Cir. 2010)............................................28

*Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123 (2d Cir. 1997) .......................21, 23, 31, 32

*Rothstein v. Carriere*, 373 F.3d 275 (2d Cir. 2004) ..........................................16

*Russo v. City of Bridgeport*, 479 F.3d 196 (2d Cir. 2007)............................25, 26

*S.E.C. v. Chestman*, 861 F.2d 49 (2d Cir. 1988) ................................................9

*S.E.C. v. Oakford Corp.*, 181 F.R.D. 269 (S.D.N.Y. 1998)................................9

*Sheppard v. Beerman*, 18 F.3d 147 (2d Cir. 1994)...........................................11

*Tankleff v. Senkowski*, 135 F.3d 235 (2d Cir. 1998).........................................14

*United States v. Delossantos*, 536 F.3d 155 (2d Cir. 2008)..........................21, 24

*United States v. Diaz*, 922 F.2d 998 (2d Cir. 1990)...........................................29

*United States v. Gil*, 297 F.3d 93 (2d Cir. 2002) ..............................................30

*United States v. Lawson*, 736 F.2d 835 (2d Cir. 1984)......................................12

*United States v. LeRoy*, 687 F.2d 610 (2d Cir. 1982).......................................29

*United States v. Payne*, 63 F.3d 1200 (2d Cir. 1995) ...................................29, 30

*United States v. Rigas*, 583 F.3d 108 (2d Cir. 2009).........................................29

*United States v. Rittweger*, 524 F.3d 171 (2d Cir. 2008)...................................27

*United States v. Torres*, 719 F.2d 549 (2d Cir. 1983) .......................................30

*United States v. Zackson*, 6 F.3d 911 (2d Cir. 1993)..........................................................29

*Walker v. City of New York*, 974 F.2d 293 (2d Cir. 1992).................................................26

*Washington v. Wilmore*, 407 F.3d 274 (4th Cir. 2005).......................................................15

*White v. McKinley,* --- F.3d ----, 2010 WL 1948196 (8th Cir. May 17, 2010).................27

## State Cases

*Cantalino v. Danner*, 96 N.Y.2d 391 (N.Y. 2001) .................................................16, 17, 18

*Church v. N.Y. State Thruway Auth.*, 791 N.Y.S.2d 676
    (N.Y. App. Div. [3d Dep't] 2005) ..................................................................................12

*Colon v. City of New York*, 60 N.Y.2d 78 (1983)........................................................19, 20

*Fischer v. Maloney*, 43 N.Y.2d 553 (1978).......................................................................34

*Kennedy v. McKesson Co.*, 58 N.Y.2d 500 (1983)............................................................34

*People v. Fuentes*, 53 N.Y.2d 892 (1981) ........................................................................13

*People v. Tankleff*, 606 N.Y.S.2d 707 (App. Div. [2d Dep't] 1993) .................................21

*People v. Tankleff*, 848 N.Y.S.2d 286 (N.Y. App. Div. [2d Dep't] 2007) ............... *passim*

*People v. Tankleff*, Indict Nos. 1535-88, 1290-88, slip op.
    (N.Y. Suffolk Cty. Crim. Ct. July 22, 2008) ..................................................................18

*Roman v. Comp USA, Inc.*, 832 N.Y.S.2d 270 (App. Div [2d Dep't] 2007).....................17

*Smith-Hunter v. Harvey*, 95 N.Y.2d 191 (2000)..........................................................16, 18

## Federal Statutes

15 U.S.C. § 1 *et seq.* .........................................................................................................31

18 U.S.C. § 1961 et seq. .....................................................................................................31

42 U.S.C. § 1985................................................................................................................31

## State Statutes

N.Y. Crim. Proc. Law § 710.40(4) ....................................................................................13

v

## Rules

Fed. R. Civ. P. 12(b)(6) ........................................................................................5

Fed. R. Civ. P. 12(c) ............................................................................................5

Fed. R. Civ. P. 15(a)(2) ........................................................................................7

Fed. R. Civ. P. 26(b) ............................................................................................9

Fed. R. Civ. P. 56.............................................................................................7, 8

Fed. R. Civ. P. 56(f)........................................................................................9, 11

Fed. R. Civ. P. 8(d)(3) ........................................................................................34

Fed. R. Civ. P. 9(b) ............................................................................................11

Fed. R. Evid. 201 .................................................................................................6

Local Rule 56.1....................................................................................................7

## Other Authorities

Merriam-Webster Online Dictionary .........................................................7

## INTRODUCTION

In this 42 U.S.C. § 1983 wrongful conviction action, Plaintiff Martin Tankleff ("Marty") alleges that Detectives K. James McCready and Norman Rein, as well as other Suffolk County police officers, acting pursuant to well-established municipal customs and practices, caused his wrongful conviction and more than seventeen years' imprisonment for the murders of his parents, Arlene and Seymour Tankleff. The motion purports to dispose of every one Mr. Tankleff's claims, but the detailed allegations in his well-pleaded Complaint cannot be dismissed as a matter of law. The claims plainly merit complete discovery for Mr. Tankleff to prove the gross violation of his civil rights by Suffolk County and its police officers.

## FACTS

On September 7, 1988, Marty Tankleff awoke to discover his father, Seymour, barely alive, the victim of a vicious stabbing attack. (D.E. 1, Complaint, ¶ 41.) After calling 911 and following instructions to staunch his father's bleeding, Marty went in search of his mother, Arlene, and found her lifeless on the floor of her bedroom from a brutal attack. (*Id.* ¶ 42.) It was to have been the first day of 17-year-old Marty's senior year in high school. (*Id.* ¶ 39.)

Marty told everyone who arrived at the scene – from the first emergency medical responders to Suffolk County Police Department ("SCPD") homicide detectives – that he believed Jerry Steuerman, his father's business partner, was responsible. (*Id.* ¶ 44.) Detective McCready, the first detective on the scene, knew Steuerman, but hid this fact. (*Id.* ¶¶ 119-20, 130) McCready briefly toured the Tankleffs' home when he arrived. (*Id.* ¶ 48.) He immediately isolated Marty from his family and friends, and took him to the police station without any further investigation. (*Id.* ¶ 49, 51.)

1

At the station, McCready and Detective Rein relentlessly interrogated Marty for hours without advising him of his *Miranda* rights. (*Id.* ¶ 57.)  Marty, although in an obvious state of shock and barely dressed, answered their questions to the best of his ability.  (*Id.* ¶¶ 60-61.) McCready and Rein then began to employ a well-established SCPD practice: fabricating a confession through lies, manipulation and coercion.  McCready and Rein first told Marty that the forensic evidence – evidence that did not and could not exist – incriminated him. (*Id.* ¶¶ 62-65.) They told him his hair was found in Arlene's hand (*id.* ¶ 63); a "humidity test" proved he had showered that morning (*id.* ¶ 64); and blood was found in his shower (*id.* ¶ 65).  While confused by these lies, Marty nonetheless continued to assert his innocence.  (*Id.* ¶ 66.)

When these lies failed to elicit a confession, McCready staged a far more elaborate lie, pretending to receive a phone call from the hospital. (*Id.* ¶ 67.) McCready then told Marty a lie that would crush any child who had just found his parents dead and dying: that Seymour named Marty as his attacker. (*Id.* ¶ 68) Marty, unable to reconcile this staggering accusation with his knowledge of his innocence, asked if he could have committed the attacks without realizing it or remembering them. (*Id.* ¶ 70.)  McCready and Rein told him this was possible.  (*Id.*)

Exploiting this opening, McCready and Rein then fabricated a "confession" out of whole cloth, attributing it to Marty by feeding him "facts" about how they believed he committed the murders.  (*Id.* ¶ 74-75.)  They suggested to Marty that he killed his parents while naked to avoid getting blood on his clothes (*id.* ¶ 76); bludgeoned his mother with a barbell from his bedroom (*id.* ¶ 77); stabbed both his parents with a knife from the kitchen (*id.* ¶ 78-79); and showered afterward (*id.* ¶ 80).  Marty then echoed these "facts" back to them, and McCready wrote them down as if they were a confession originating with Marty.  (*Id.* ¶¶ 81-82.)

2

Although consistent with the few facts they knew from their cursory walkthrough of the crime scene, McCready's and Rein's fabrications were not corroborated by a single piece of forensic or physical evidence. (*Id.* ¶ 87.) Rather, the forensic evidence demonstrated that the confession was fabricated. The knife Marty supposedly confessed to using did not contain any traces of blood. (*Id.* ¶ 91.) The same was true of the barbell with which Marty supposedly bludgeoned his mother. (*Id.* ¶ 91.) Though Marty supposedly confessed to showering after the murders, no trace of blood was found in the shower or any drain in the house. (*Id.* ¶ 92.)

McCready and Rein hid the crucial fact that Marty's "confession" originated not with Marty, but with them. And they steadfastly refused to investigate Jerry Steuerman, Seymour Tankleff's business partner who owed him a substantial amount of money. (*Id.* ¶ 97.) This failure was glaring because, in addition to Marty, several of the Tankleffs' other surviving relatives told police they believed Steuerman was behind the attacks. (*Id.* ¶ 50.) Even when Steuerman faked his own death (committing insurance fraud) and fled to California shortly after the murders, SCPD investigators never identified him as a suspect, choosing instead to visit him there before escorting him back to New York to be a witness against Marty. (*Id.* ¶¶ 100-02.)

As a result, Marty Tankleff was wrongfully prosecuted and convicted. He spent the next fifteen years independently investigating his parents' murders from behind bars. (*Id.* ¶¶ 122-32.) Through an investigator, Marty compiled sworn statements and testimony from unrelated sources that Joseph ("Joey Guns") Creedon, Peter Kent, and Glen Harris had been involved in the murders. (*Id.* ¶ 125-28.) An associate of Creedon's testified he had been solicited to murder a business partner of Jerry Steuerman's, an offer he turned down. (*Id.* ¶ 129.) Just as damningly, evidence came out that McCready knew Jerry Steuerman before the murders, despite his claims

otherwise before and during the criminal trial. (*Id.* ¶ 130.)  In light of this newly-discovered evidence, the Second Department unanimously vacated the conviction. (*Id.* ¶ 132.)

After Mr. Tankleff's release, the Attorney General ("AG") was appointed as special prosecutor to investigate his parents' murders. (*Id.* ¶ 134.)  The AG's investigation uncovered additional exculpatory evidence, including a bloody knife-print that did not match the knife identified as the murder weapon in the confession detectives McCready and Rein attributed to Mr. Tankleff. (*Id.* ¶ 135.)  This knife-print had been in the possession of and known to Suffolk County since the SCPD's investigation. (*Id.* ¶¶ 93, 135.)  Given the newly developed evidence undermining Mr. Tankleff's confession and pointing to other perpetrators, the AG moved to dismiss the indictments in the interests of justice. (*Id.* ¶¶ 136-37.)

Mr. Tankleff had spent over seventeen years in prison for crimes he did not commit. (*Id.* ¶ 138.)  This lawsuit seeks to expose why and obtain compensation for Marty for the many years that he was wrongfully imprisoned for the murder of his own parents.

## RELEVANT PROCEDURAL HISTORY

This Complaint was filed on March 24, 2009. (D.E. 1.) On May 26, 2009, this Court held an initial status conference. (D.E. 19; *see also* D.E. 25-1, Transcript of 5/26/2009 Conference before Judge Seybert.)  At that conference, the Court indicated skepticism of a motion to dismiss, noting the Complaint "seems pretty solid" (D.E. 25-1, at 2-3), but defendants stated their intent to file this Rule 12(c) motion (*id.*, at 7-8).  Defendants filed an Answer (D.E. 22) and document discovery began. The parties did not seek depositions at the time.

On September 18, 2009, the parties appeared before the Magistrate for a discovery conference.  At defendants' request, the resulting scheduling order stayed all depositions, except for preservation depositions taken with court permission. (D.E. 26.)  At both subsequent

conferences (on December 11, 2009 and March 24, 2010) the central dispute concerned Mr. Tankleff's third-party subpoena to the AG's Office.  (D.E. 29, 35.)  Still seeking this critical document discovery, Mr. Tankleff did not oppose defendants' requests to continue the stay of depositions, which were granted. (*Id.*) Thus, document discovery continues, and, to date, Mr. Tankleff has taken no depositions and may not do so without the Court's permission.[1] (D.E. 35.)

## ARGUMENT

### I.    Applicable Legal Standards

#### A.    Rule 12(c)

Defendants' motion is styled as a motion "pursuant to Federal Rule of Civil Procedure 12(c) for judgment on the pleadings." (D.E. 38.)   The standard for a Rule 12(c) motion is identical to a Rule 12(b)(6) motion to dismiss:  the Court is not a fact-finder, rather its analysis is purely legal, considering only the facts alleged within the four corners of the complaint, taken as true, and drawing all inferences in the plaintiff's favor.  *See Cleveland v. Caplaw Enters.*, 448 F.3d 518, 521 (2d Cir. 2006); *Martin v. County of Nassau*, No. 08-cv-4548, --- F. Supp. 2d ----, 2010 WL 841295, at *2 (E.D.N.Y. Mar. 12, 2010) (Spatt, J.).  Likewise, because the plaintiff is the master of his Complaint, "[c]ourts must be equally careful . . .  not to permit a defendant to hijack the plaintiff's complaint and recharacterize its allegations so as to minimize his or her liability." *Limone v. Condon,* 372 F.3d 39, 46 (1st Cir. 2004).

Beyond the face of the complaint, the court may only consider "documents attached to the complaint as exhibits or incorporated in the complaint by reference [and] matters of which judicial notice may be taken under Fed. R. Evid. 201." *Kramer v. Time Warner Inc.*, 937 F.2d

---

[1]  Given the progression of the document discovery and the passage of time, if defendants seek another stay of depositions at the June 24, 2010 conference, plaintiff will oppose.

767, 773 (2d Cir. 1991).[2]  It is error to "consider[] affidavits and exhibits submitted by

defendants, or rel[y] on factual allegations contained in legal briefs or memoranda, in ruling on a

[Rule 12] motion to dismiss." *Friedl v. City of New York*, 210 F.3d 79, 83-84 (2d Cir. 2000)

(citing *Kopec v. Coughlin*, 922 F.2d 152, 155 (2d Cir. 1991) and *Fonte v. Bd. of Mgrs. of Cont'l

Towers Condo.*, 848 F.2d 24, 25 (2d Cir. 1988)).

Ignoring this rule, defendants improperly proffer a 197-paragraph affidavit and 49

exhibits selectively culled from the underlying criminal proceedings (D.E. 38-1 & 38-2), grossly

distorting the truth.  Indeed, the *vast* majority of defendants' assertions of so-called undisputed

"facts" are actually one-sided and inaccurate recitations of contested factual disputes.[3]  Their

attempt to sway the Court by selectively quoting from the limited criminal record – when Mr.

Tankleff has not completed documentary discovery and has yet to be granted the right to a single

deposition in this 42 U.S.C. § 1983 wrongful conviction lawsuit – is consistent with their myopic

---

[2] "A court may take judicial notice of a document filed in another court *not for the truth of the matters asserted* in the other litigation, but rather to establish the fact of such litigation and related filings." *Global Network Comm'c'ns, Inc. v. City of New York*, 458 F.3d 150, 157 (2d Cir. 2006) (emphasis added).  Defendants repeatedly cite to judicially filed documents – as well as other documents that are never amenable to judicial notice – for the *truth* of their contents (*e.g.,* D.E. 38-3, Def. Mem., at 15-17; D.E. 38 Exs. B & R (Trial & *Huntley* Transcripts), Exs. C, V-Z (police reports), Ex. LL (*Huntley* opinion)).  *See* Fed. R. Evid. 201; *International Star Class Yacht Racing Ass'n v. Tommy Hilfiger U.S.A., Inc.*, 146 F.3d 66, 70 (2d Cir. 1998) ("Facts adjudicated in a prior case do not meet either test of indisputability contained in Rule 201(b): they are not usually common knowledge, nor are they derived from an unimpeachable source.").  This is plainly improper in a motion on the pleadings; the Court should disregard these extraneous materials.  *See Global Network Comm'c'ns*, 458 F.3d at 157 ("[I]t is clear that the extraneous documents were used not to establish their existence, but rather to provide the reasoned basis for the court's conclusion . . . .  Analysis of such material was therefore not appropriate under the judicial notice exception to the conversion requirement." (quotation omitted)).

[3] As but one example, defendants repeatedly assert that Marty "acknowledged" to his half-sister, Shari Rother, that he told detectives he attacked his parents.  (*See* D.E. 38-1, Aff., ¶ 96; D.E. 38-3, Def. Mem., at 16.)  Defendants notably fail to inform the Court that that Ms. Rother testified that Marty told her that he did so because, "[t]hey *made me* [confess]" (*Tankleff Huntley* hearing tr., 3/28/39, at 12) (emphasis added).  Rother's testimony is consistent with Mr. Tankleff's claim here that his confession was false and unconstitutionally fabricated and coerced by SCPD investigators.  Rother's testimony is also inconsistent with the perjurious criminal trial testimony of McCready and Rein about the Rother conversation and the confession itself.  By illustrating defendants' misrepresentations of fact, Mr. Tankleff does not invite this Court to weigh evidence or apply a summary judgment standard.  *See* Part I.B, *infra*.

view that the now-vacated criminal proceedings should dispose of this action. *See* Part II, *infra*.

Having elected to file a motion for judgment on the pleadings, and recognizing that resolution of

a Rule 56 motion for summary judgment would be premature, *see* Part I.B, *infra*, defendants'

motion must be decided under the operative Rule 12(c) standard, based solely on the allegations

in the complaint, taken as true.  The Court must disregard the extraneous materials defendants

have selectively and misleadingly referenced. *Friedl*, 210 F.3d at 83-84.

"To survive a Rule 12(c) motion, [the] 'complaint must contain sufficient factual matter,

accepted as true, to "state a claim to relief that is plausible on its face."'" *Johnson v. Rowley*,

569 F.3d 40, 44 (2d Cir. 2009) (quoting *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (quoting

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the

plaintiff pleads factual content that allows the court to draw the reasonable inference that the

defendant is liable for the misconduct alleged." *Iqbal*, 129 S. Ct. at 1949; *see also* MERRIAM-

WEBSTER ONLINE DICTIONARY (defining "plausible" as "superficially fair [or] reasonable . . . but

often specious").  As set forth below, the well-pleaded Complaint clears this hurdle.[4]

### B.    Conversion to Rule 56(c) Summary Judgment Motion is Unwarranted

Proffering 49 exhibits and a 197-paragraph affidavit, defendants note they are "cognizant

that the court may treat this as a motion for summary judgment, pursuant to Rule 56.1." (Def.

Br., D.E. 38-3, at 3 of 31.)[5]  Yet "'[w]hen matters outside the pleadings are presented in [Rule 12

papers],' a district court must either 'exclude the additional material and decide the motion on

---

[4] If the Court finds otherwise, it should grant leave to replead additional facts in an amended complaint.
*See Branum v. Clark*, 927 F.2d 698, 704-05 (2d Cir. 1991) ("[T]o the extent that the court dismissed the
complaint pursuant to Rule 12(b)(6), we are troubled by the fact that the dismissal was with prejudice
[because] . . . such a dismissal ordinarily should be accompanied by leave to file an amended
complaint."); *see also* Fed. R. Civ. P. 15(a)(2) (leave should be freely granted).

[5] Local Rule 56.1 applies to "any motion for summary judgment pursuant to Rule 56 of the Federal Rules
of Civil Procedure," not motions for judgment on the pleadings. L.R. 56.1(a).

the complaint alone' or 'convert the motion to one for summary judgment under Fed. R. Civ. P. 56 *and afford all parties the opportunity to present supporting material*.'" *Friedl*, 210 F.3d at 83 (quoting *Fonte*, 848 F.2d at 25) (emphasis added).  These conversion requirements are "strictly enforced," *Friedl*, 210 F.3d at 83, so it is reversible error to consider matters outside the pleadings on a Rule 12 motion without giving the plaintiff notice and an opportunity to marshal opposing evidence: "[v]acatur is required even where the court's ruling simply 'mak[es] a connection not established by the complaint alone' or contains an 'unexplained reference' that 'raises the possibility that it improperly relied on matters outside the pleading in granting the defendant's Rule 12(b) motion.'" *Id.* at 84 (quoting *Fonte,* 848 F.2d at 25).

Pursuant to Rule 56, "summary judgment should only be granted if *after discovery*, the nonmoving party has failed to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof."  *Hellstrom v. U.S. Dep't of Veteran's Affairs*, 201 F.3d 94, 97 (2d Cir. 2000) (emphasis original; quotation omitted); *see also id.* ("The nonmoving party must have had the opportunity to discover information that is essential to his opposition to the motion for summary judgment." (quotation and citations omitted)); *Dopico v. Goldschmidt*, 687 F.2d 644, 654 (2d Cir. 1982) (reversing grant of summary judgment as "premature" where "defendants' assurances that they have submitted the full record will not substitute for the Court's independent consideration of that issue after some opportunity for discovery"); *Nat'l Life Ins. Co. v. Solomon*, 529 F.2d 59, 61 (2d Cir. 1975).

As such, conversion of a Rule 12(c) motion into a Rule 56 motion for summary judgment is only appropriate when the merits are ripe for review, after both sides have had the opportunity to obtain all relevant discovery:

> The conversion requirement of Rule 12(b) thus furthers the policies of both Rules by directing a pretrial motion to the vehicle most appropriate for its resolution,

ensuring that the motion is governed by the rule specifically designed for the fair resolution of the parties' competing interests at a particular stage of the litigation. Moreover, the requirement expressly addresses and solves the major problem that arises when a court considers matters extraneous to a complaint, namely, the lack of notice to the plaintiff that outside matters would be examined.  It deters trial courts from engaging in factfinding when ruling on a motion to dismiss and ensures that when a trial judge considers evidence dehors the complaint, a plaintiff will have an opportunity to contest defendant's relied-upon evidence by submitting material that controverts it.

*Global Network Comm'c'ns*, 458 F.3d at 155 (citations omitted).

Under this test, it would be premature to convert the instant motion and consider it under a summary judgment standard. *See* Fed. R. Civ. P. 56(f) (authorizing court to dismiss or defer ruling on summary judgment motion where non-movant has not yet obtained affidavits, taken depositions or received other discovery). Document discovery is ongoing, and given the stay of depositions, plaintiff has not yet had the opportunity to test defendants' distorted version of events – as reflected in the cold record and testimony from the now-vacated criminal proceedings – in the crucible of cross-examination (D.E. 35). Deposition questioning under the Federal Rules of Civil Procedure is vastly more permissive than questioning in criminal actions. *See* Fed. R. Civ. P. 26(b) (authorizing "discovery regarding any nonprivileged matter relevant to any party's claim"); *cf. S.E.C. v. Chestman*, 861 F.2d 49, 49 (2d Cir. 1988) (contrasting civil discovery with "the more limited scope of discovery in the criminal matter"); *S.E.C. v. Oakford Corp.*, 181 F.R.D. 269, 270 (S.D.N.Y. 1998) ("[W]hile the Federal Rules of Civil Procedure accord broad pretrial discovery to both sides, the Federal Rules of Criminal Procedure . . . narrowly limit the discovery available to the defendant.").

It is axiomatic that the materials produced at the prior criminal proceedings – the police reports and transcripts the County proffers as exhibits – do not provide a full record on which to determine whether there are triable questions of fact about the critical question posed here:  Was

the wrongful conviction of an innocent man caused by affirmative and intentional police misconduct, pursuant to unconstitutional customs of the SCPD? ( D.E. 1, Compl., ¶¶ 17-23.) For example, the cold criminal trial record cannot answer whether the police defendants withheld material exculpatory information (*id.*, Counts I & IV); fabricated the confession by feeding Marty Tankleff non-public facts about the crime he did not know and then deliberately misrepresenting that those facts originated with him (*id.*, Count II); or conspired to frame Marty Tankleff or cover up their entanglement with the true perpetrators (*id.*, Counts III & VI).

Similarly, McCready's prior relationship with Steuerman was unknown to Mr. Tankleff before his conviction because McCready lied to cover it up. (*Id.*, ¶¶ 119-20.) While that relationship came to light during the CPL 440 proceedings, which ultimately led to the vacatur of the conviction and dismissal of all charges, *see People v. Tankleff*, 848 N.Y.S.2d 286 (N.Y. App. Div. [2d Dep't] 2007), in those proceedings Mr. Tankleff was not afforded discovery about the McCready-Steuerman relationship (or any other issue). Given the lack of civil discovery mechanisms in that proceeding, document requests, interrogatories and depositions were unavailable; indeed, Tankleff was not even allowed the more circumscribed discovery typically available in a criminal case pending trial as the judge overseeing the hearing refused to enforce document and testimonial subpoenas, ruling that there is no post-conviction right to them.

Nor does the cold criminal trial record speak to the police defendants' intent in acting as they did, an element pervading all of these civil claims. Motive and intent are indisputably questions of fact, not amenable to judgment on the pleadings where, as here, they have been properly alleged. *See Dougherty v. Town of North Hempstead Bd. of Zoning Appeals*, 282 F.3d 83, 91 (2d Cir. 2002) ("The ultimate question . . . involves a defendant's motive and intent, both difficult to plead with specificity in a complaint.  It is sufficient to allege facts from which [the

pertinent] intent on the part of the defendants reasonably may be inferred." (citations omitted));
*Sheppard v. Beerman*, 18 F.3d 147, 151 (2d Cir. 1994) ("[T]he motive behind Sheppard's
[conduct] is clearly a question of fact. Because this question is in dispute, it was improper for the
district court to answer it on a motion for dismissal on the pleadings." (citation omitted)).[6]

The Federal Rules of Civil Procedure explicitly provide that "[m]alice, intent, knowledge
and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b).  The
Complaint both pleads specific facts from which malice and intent can be easily inferred (*e.g.*,
D.E. 1, ¶ 68 (lying to Marty that his father accused him), ¶¶ 74-81 (fabricating false confession),
¶¶ 116-18 (covering up that the confession was fabricated), ¶¶ 119-20 (concealing that
McCready had motive to steer the investigation away from Jerry Steuerman)), and makes explicit
allegations of malice (*e.g.*, *id.* ¶¶ 147, 167, 174, 183).  It would be error to deny Mr. Tankleff the
opportunity to develop these critical facts through discovery.  *See Sheppard*, 18 F.3d at 151.

Thus, the Rule 12(c) standard must govern this motion for judgment on the pleadings.
The Complaint amply clears the Rule 12(c) hurdle and merits meaningful discovery.

## II.    The Vacatur of Mr. Tankleff's Conviction Eliminates any Collateral Estoppel Effect of the Judgment and Underlying Findings of Fact and Law

Defendants first propose that Mr. Tankleff's claims are barred by collateral estoppel
because he was unsuccessful in challenging the constitutionality of his confession at the criminal
trial and in post-conviction litigation. (D.E. 38-3, Def. Mem., at 3-9.)  This argument might have
some force if only Mr. Tankleff's conviction had not been vacated, but it was vacated.  *Tankleff*,
848 N.Y.S.2d 286.

---

[6] Motive and intent are rarely amenable to pretrial determination.  *See Kerman v. City of New York*, 374
F.3d 93, 116 (2d Cir. 2004) ("[Q]uestions as to whether there was gross negligence, intent, or reckless
disregard are questions of fact to be answered by the jury."); *Castro v. U.S.*, 34 F.3d 106, 112 (2d Cir.
1994) (citing Fed. R. Civ. P. 56(f)).

In New York,[7] "[t]he party seeking application of collateral estoppel bears the burden of showing that the decisive, identical issue was 'necessarily decided' in the prior action, while the party opposing application of the doctrine must demonstrate the absence of a full and fair opportunity to contest the prior determination." *Church v. N.Y. State Thruway Auth.*, 791 N.Y.S.2d 676, 679 (N.Y. App. Div. [3d Dep't] 2005) (citation omitted); *see also Curry v. City of Syracuse*, 316 F.3d 324, 331 (2d Cir. 2003) (same). "In determining whether an issue has been necessarily decided, it must be remembered that it is the *judgment* in the prior action that acts as a bar – neither the verdict of a jury nor the findings of a court in a prior action upon the precise point involved in a subsequent action constitute a bar, unless followed by a judgment based thereon, or into which the verdict or findings entered." *Church* at 679 (quotation omitted).

Defendants' argument fails on the first prong alone for lack of a final judgment. "[I]t is the *judgment* in the prior action that acts as a bar," *id.* (emphasis added), yet Mr. Tankleff's conviction was vacated and the indictments dismissed. "[W]hen no order or final judgment has been entered on a verdict or decision, *or when the judgment is subsequently vacated*, collateral estoppel is inapplicable." *Id.* (emphasis added; citations omitted); *accord U.S. v. Lawson*, 736 F.2d 835, 837 (2d Cir. 1984) ("It has long been established, however, that when a judgment has been reversed and the case remanded for a new trial the effect is to nullify the judgment entirely and place the parties in the position *of no trial having taken place*." (emphasis added)).

In other words, none of the prior findings from Mr. Tankleff's criminal proceedings – not the judgment of conviction nor the underlying facts as determined in pretrial suppression motions, trial or appeal – have any collateral estoppel effect here. Just as in *McCray v. City of New York*, the Central Park Jogger wrongful conviction case, "[g]iven the vacatur of the

---

[7] "[A] federal court must give to a state-court judgment the same preclusive effect as would be given that judgment under the law of the State in which the judgment was rendered." *Migra v. Warren City Sch. Dist. Bd. of Educ.*, 465 U.S. 75, 81 (1984).

judgments of conviction, and the dismissal of charges against [him], the suppression ruling against Plaintiff[] cannot be said to have existed in any legally effective way at the inception of this federal suit." *McCray*, Nos. 03-CV-9685(DAB), 03-CV-9974(DAB), 03-CV-10080(DAB), 2007 WL 4352748, at *11 (S.D.N.Y. Dec. 7, 2007).[8]   The Court need go no further to reject defendants' meritless collateral estoppel defense.

However, it is equally clear that Mr. Tankleff did not get a full and fair opportunity to litigate the issues presented by his civil rights claims.  Specifically, the Second Department found that Mr. Tankleff's own post-conviction investigation of the murders "resulted in a body of new evidence" that had not come to light at the criminal trial – that is, "multiple witnesses who implicated [Joey "Guns"] Creedon and/or Jerry Steuerman" in the murders – and held that "this evidence warrants a new trial." *Tankleff*, 848 N.Y.S.2d at 301, 302.  Moreover,

> At the original trial, the defendant's repudiated confession was the most compelling evidence elicited by the prosecution.  Arguably, it was the linchpin of the prosecution's case. . . .  However, when the evidence presented at the CPL 440 hearing is evaluated against the backdrop of the trial evidence, including the defendant's confession, how the confession was obtained, and the fact that the defendant almost immediately recanted the confession, the newly-discovered evidence is "of such character as to create a probability that had such evidence been received at the trial the verdict would have been more favorable to the defendant" (CPL 440.10[1][g]).

*Id.* at 302-03.  As the Second Department recognized, newly-discovered evidence implicating others in the crime sheds new light on the reliability and truthfulness of Mr. Tankleff's confession, and is therefore directly probative of the tactics used to obtain it.  Defendants make no attempt to show that Mr. Tankleff had a full and fair opportunity to litigate these issues.

---

[8] If Mr. Tankleff had been retried, he could have relitigated the voluntariness of his confession in a pretrial *Huntley* hearing due to the newly discovered pertinent facts as credited by the Second Department in vacating, *Tankleff*, 848 N.Y.S.2d at 302-03. *See People v. Fuentes*, 53 N.Y.2d 892, 894 (1981) (holding that "[a] trial court may reopen a pretrial hearing if it 'is satisfied, upon a showing by the defendant, that additional pertinent facts have been discovered by the defendant which he could not have discovered with reasonable diligence before the determination' of his pretrial application." (citing N.Y. Crim. Proc. Law § 710.40(4)).  If he were not estopped upon remand, he is not collaterally estopped in this civil action.

This Court recently refused to find collateral estoppel in a strikingly similar § 1983 wrongful conviction action brought against Nassau County by exonerees John Kogut, John Restivo and Dennis Halstead.  In *Kogut*, the Nassau County police defendants, like the Suffolk County police defendants here (D.E. 38-3 at 6-9), contended that because the voluntariness of Kogut's confession was litigated before his criminal trial, on direct appeal and on *habeas corpus*, he could not relitigate the issue in a subsequent § 1983 action despite vacatur of the conviction and acquittal upon retrial. *Kogut, et al. v. Nassau County, et al.*, Nos. 06-CV-6695, 06-CV-6720, 2009 WL 5033937, at *10 (E.D.N.Y. Dec. 11, 2009) (attached as Exhibit A). This Court reasoned that, "[s]ince the trial court has discretion to reopen a suppression hearing after an appellate court has remitted the case for a new trial, it should have similar discretion upon the granting of a motion to vacate a judgment of conviction." *Id.,* 2009 WL 5033937, at n.10. Following that logic, this Court ultimately rejected the collateral estoppel defense, holding: "Although the Identical Issue was Necessarily Decided in the Prior Action, a Vacated Judgment Cannot have any Preclusive Effect on Subsequent Proceedings," and thus, because his conviction was vacated, "collateral estoppel does not bar Kogut from relitigating whether [his] confession was voluntary. . . ." *Id.*, 2009 WL 5033937, at *9, *10.[9] The same analysis applies here.

## III.     The Complaint Unquestionably States Plausible Claims for Relief

The only appropriate inquiry at this stage is whether the Complaint "contain[s] sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Iqbal*, 129 S. Ct. at 1949 (quotation omitted). The Complaint alleges that McCready and Rein: took Mr.

---

[9] Likewise, defendants argue that plaintiff cannot relitigate the confession's legality because the Second Circuit held that, while he should have received *Miranda* warnings earlier, this violation did not merit *habeas corpus* relief.  *Tankleff v. Senkowski*, 135 F.3d 235, 244-45 (2d Cir. 1998).  This argument is irrelevant; *Miranda* is a prophylactic evidentiary rule, and its violation is neither necessary nor sufficient to establish a § 1983 action for a fabricated or coerced confession.  *See Jocks v. Tavernier*, 316 F.3d 128, 138 (2d Cir. 2003).

Tankleff into custody and coercively interrogated him long before advising him of his constitutional rights (D.E. 1, Compl., ¶¶ 58-86); intentionally and maliciously fabricated his confession (*id.*, ¶¶ 51-86) by feeding him the "facts" for his "confession," and later, in McCready's written report, pretrial discussions with the prosecutor and again at trial, misrepresented how those facts were elicited to make it appear that Mr. Tankleff had guilty knowledge (*id.* ¶¶ 74-81). The so-called confession is demonstrably false. (*Id.* ¶¶ 87-95.)

As alleged in his Complaint, every detail in Mr. Tankleff's confession originated with McCready and Rein. The Complaint alleges that they fed him the following details: he must have attacked his parents in the nude to avoid getting blood on his clothes (D.E. 1, ¶ 76); he used the barbell from his bedroom to bludgeon his mother (*id.* ¶ 77); and he used the watermelon knife from the kitchen to stab his mother and father (*id.* ¶ 78-79). Although no forensic evidence corroborated these details and, indeed, disproved them – for example, there was not a trace of blood on either the barbell or the knife (*id.* ¶ 91), nor in the shower or any drain in the house (*id.* ¶ 92) – these items were presented as the murder weapons at trial. As alleged, McCready and Rein hid the truth about how they elicited the confession from prosecutors, defense counsel, and the court through the pre-trial, trial, and post-conviction proceedings. (*Id.* ¶ 116-18.)

Taken as true, and drawing all reasonable inferences therefrom, *Iqbal*, 129 S. Ct. at 1949, these specific, factual allegations state a claim that defendants unconstitutionally fabricated Mr. Tankleff's false confession. *See Washington v. Wilmore*, 407 F.3d 274, 283-84 (4th Cir. 2005).

A. **The Complaint States a Claim for Malicious Prosecution (Counts I & IX) and False Imprisonment (Count X)**

As an alternative, defendants attack the sufficiency of allegations underlying the claims of malicious prosecution (D.E. 1, Compl., ¶¶ 147-51, 183-88, Counts I and IX) and false

imprisonment (*id.* ¶¶ 189-91, Counts X).[10] This argument has two fatal flaws: it fundamentally mischaracterizes New York law regarding the favorable termination predicate for a malicious prosecution action, *see Cantalino v. Danner*, 96 N.Y.2d 391, 396 (N.Y. 2001), and it requires the Court to accept their slanted view of the "facts" based on selected extraneous materials that may not be considered in this Rule 12(c) motion. *See Friedl*, 210 F.3d at 83.

### 1. Malicious Prosecution (Counts I & IX)

The Complaint alleges malicious prosecution under both federal (Count I) and state law (Count IX). The federal claim tracks the state law elements: "A malicious prosecution claim under New York law requires the plaintiff to prove: (1) the initiation or continuation of a criminal proceeding against plaintiff; (2) termination of the proceeding in plaintiff's favor; (3) lack of probable cause for commencing the proceeding; and (4) actual malice as a motivation for defendant's actions. Additionally, there must be a post-arraignment seizure for a § 1983 malicious prosecution claim. . . ." *Jocks*, 316 F.3d at 136. Defendants challenge the same three of these elements for both claims: favorable termination, probable cause, and actual malice.

### a. Favorable Termination

In essence, defendants argue that the criminal proceedings did not terminate in Mr. Tankleff's favor because the vacatur and dismissal were not on the basis of actual innocence. (D.E. 38-3, Def. Mem., at 11-13.) Just as their collateral estoppel argument refused to acknowledge the obviously critical fact of the vacatur, this argument ignores the law of favorable termination: "New York law does not require a malicious prosecution plaintiff to prove h[is] innocence, or even that the termination of the criminal proceeding was indicative of innocence. Rather, the plaintiff's burden is to demonstrate a final termination that is *not inconsistent with*

---

[10] Despite defendants' argument (D.E. 38-3 at 10), the Complaint does not allege a claim for false arrest.

innocence." *Rothstein v. Carriere*, 373 F.3d 275, 286 (2d Cir. 2004) (citing *Smith-Hunter v. Harvey*, 95 N.Y.2d 191, 198-99 (2000); *Cantalino*, 96 N.Y.2d at 396) (emphasis added).

Criminal proceedings terminate upon the dismissal of the charging instrument, here, the indictment. *Roman v. Comp USA, Inc.*, 832 N.Y.S.2d 270, 272 (App. Div [2d Dep't] 2007). In Mr. Tankleff's case, the indictment first began to unravel when the Second Department vacated Mr. Tankleff's conviction and remanded for a new trial based on credible new evidence that other men, Joey "Guns" Creedon and Jerry Steuerman, aided by a motley band of criminals – not Mr. Tankleff – murdered his parents.  (D.E. 1, Compl., ¶¶ 124-32); *Tankleff*, 848 N.Y.S.2d at 301, 302.  Upon remand, the AG, who was appointed as special prosecutor, moved to dismiss the indictment.  (D.E. 1, Compl., ¶ 136).  The motion was granted and the indictment dismissed in the interests of justice pursuant to CPL 210.40 on July 22, 2008.  (*Id.* ¶ 137).

Defendants claim that a dismissal in the interest of justice "generally may not be considered a favorable termination." (D.E. 38-3, Def. Mem., at 12.)  But the New York Court of Appeals has explicitly held that a dismissal in the interest of justice is a favorable termination where, as here, "the court's reasons for dismissing the criminal charges were not inconsistent with the innocence of the accused." *Cantalino*, 96 N.Y.2d at 392.[11]  While defendants suggest that the AG's decision not to retry Mr. Tankleff was purely due to the passage of time since the crime, (D.E. 38-3, Def. Mem., at 12), this is simply false.  As the Complaint alleges, crucial new evidence was discovered after his conviction, (D.E. 1, Compl., ¶¶ 122-37), evidence described

---

[11] A now-moot Second Circuit case purported to establish that, "as a matter of [New York] law, [dismissal in the interests of justice] cannot provide the favorable termination required as the basis for a claim of malicious prosecution." *Hygh v. Jacobs*, 961 F.2d 359 (2d Cir. 1992).  The New York Court of Appeals explicitly rejected this view in *Cantalino*. 96 N.Y.2d at 396 (rejecting "a per se rule that a dismissal in the interest of justice can never constitute a favorable termination.").  Federal courts must defer to New York Court of Appeals as the final arbiter on matters of New York law.  *See Fabozzi v. Lexington Ins. Co.*, 601 F.3d 88, 91-92 (2d Cir. 2010).  Thus, *Hygh* is not good law and does not bind this Court.

by the Second Department as "of such character as to create a probability that had such evidence been received at the trial the verdict would have been more favorable to the defendant," *Tankleff*, 848 N.Y.S.2d 302-03 (N.Y. App. Div. [2d Dep't] 2007) (quotation omitted). The AG moved for dismissal, at least in part, because "[t]his new evidence significantly weaken[ed] the case against Tankleff." (Mem. of Law in Support of the People's Motion Pursuant to CPL 240.10 to Dismiss the Indictments (attached as Exhibit B).)[12]

More importantly, the court's reasons for dismissal were wholly consistent with innocence, including: compelling evidence that others committed the murders (D.E. 1, Compl., ¶¶ 125-28); discovery of a bloody knife-print inconsistent with murder weapon referred to in the false confession (*id.*, ¶ 135); the lack of any biological or physical evidence strongly linking him to the crimes (*id.*, ¶¶ 88-95). *See People v. Tankleff*, Indict Nos. 1535-88, 1290-88, slip op. at p. 3 (N.Y. Suffolk Cty. Crim. Ct. July 22, 2008) (attached as Exhibit C).

**b.    Probable Cause**

Defendants next assert that Mr. Tankleff's malicious prosecution claims should be dismissed on the grounds that there was probable cause to arrest and indict him for the murders. (D.E. 38-3, Def. Mem., at 13.) Incredibly, defendants base this argument on what they refer to as "[a]n objective view of the evidence" delineated in their 197-paragraph affidavit. (*Id.* at 15.) In recounting the "facts" supporting probable cause, (*id.* at 15-17), not once do defendants refer

---

[12] The New York Court of Appeals in *Cantalino* enumerated the limited circumstances when a dismissal in the interest of justice fails the "consistent with innocence" test: misconduct by the accused, a compromise with the accused, or mercy toward the accused. 96 N.Y.2d at 395. None of these factors exist here. Defendants mischaracterize the record by claiming that Mr. Tankleff consented to the AG's motion to dismiss as a compromise. (D.E. 38-3, Def. Mem., at 13.) In fact, there was no agreement between the parties; Mr. Tankleff filed his own, separate motion to dismiss the indictment on different grounds. The Court granted the AG's motion and denied Mr. Tankleff's motion as moot. (D.E. 1, Compl., ¶¶ 134-36); *cf. Smith-Hunter*, 95 N.Y.2d at 197 (2000) (describing a dismissal through "compromise" as "a disposition that *requires* the consent of the prosecutor, the accused and the court" (emphasis added)). Mr. Tankleff's consent was not required for the Court to grant the AG's motion to dismiss, and the court's reasons for granting the AG's motion were all consistent with innocence.

to the Complaint, the only source of facts that may – and must – be assumed to be true in a Rule 12(c) motion. *See Friedl*, 210 F.3d at 83. Rather than ignoring the Complaint as defendants do, the Court must accept its factual allegations as true and draw all reasonable inferences therefrom in Mr. Tankleff's favor. *Johnson*, 569 F.3d at 44. Viewed in this light, Mr. Tankleff has unquestionably alleged facts showing that there was not even arguable probable cause to arrest or prosecute him for the murder of his parents, since the only evidence incriminating him – the confession – was manufactured by police, and actually contradicted the physical evidence.

"Probable cause consists of such facts and circumstances as would lead a reasonably prudent person in like circumstances to believe plaintiff guilty." *Colon v. City of New York*, 60 N.Y.2d 78, 82 (1983). Although "[a] presumption of probable cause is created . . . by a grand jury's indictment," "[t]he presumption is rebuttable, and may be overcome by evidence establishing that the police witnesses have not made a complete and full statement of facts . . . that they have misrepresented or falsified evidence . . . or otherwise acted in bad faith." *Boyd v. City of New York*, 336 F.3d 72, 76 (2d Cir. 2003) (citation and quotation omitted). Furthermore, "even when probable cause is present at the time of arrest, evidence could later surface which would eliminate that probable cause," and "the failure to make a further inquiry when a reasonable person would have done so may be evidence of lack of probable cause." *Lowth v. Town of Cheektowaga*, 82 F.3d 563, 571 (2d Cir. 1996) (quotation and citation omitted).

The Complaint alleges detailed facts that, accepted as true, rebut the presumption of probable cause: McCready and Rein fed Mr. Tankleff vivid and incriminating details – details that were consistent with their theory of the crime but actually contradicted the objective physical evidence (D.E. 1, Compl., ¶¶ 74-75); lied about doing so, fabricating evidence by claiming in the handwritten "confession" they attributed to Mr. Tankleff, their reports, pretrial

meetings with the prosecutor and again at trial, that all those incriminating details originated with Mr. Tankleff (*id.* ¶¶ 74, 81-82, 116); deliberately did not investigate whether the objective physical or forensic evidence corroborated the "confession" (*id.* ¶¶ 87-95); and refused to investigate the obvious suspect – Jerry Steuerman, who was the last person to leave the monthly card game in the early hours the morning of the murder and who could not repay the $50,000 loan Seymour Tankleff had called in – had the motive, means and opportunity to kill the Tankleffs (*id.* ¶¶ 96-105). McCready lied to hide his pre-existing relationship with the suspect he was refusing to investigate. (*Id.* ¶¶ 119-20, 130.) No physical or biological evidence connected Mr. Tankleff with the murders; in fact that evidence contradicted his so-called "confession": the knife Marty supposedly confessed to using did not contain any traces of blood connecting it to the murder (*id.* ¶ 91); the same was true of the barbells with which Marty supposedly bludgeoned his mother (*id.* ¶ 91); and though Marty supposedly confessed to showering after the murders, no trace of blood was found in the shower or any drain (*id.* ¶ 92). Thus, the Complaint explicitly alleges facts showing that McCready and Rein did "not ma[k]e a complete and full statement of facts" and "that they [] misrepresented or falsified evidence . . . [and] otherwise acted in bad faith," rebutting the presumption of probable cause. *Boyd*, 336 F.3d at 76 (quotation omitted).

Once the presumption has been rebutted, the question is whether the evidence, as alleged in the Complaint, "would lead a reasonably prudent person in like circumstances to believe plaintiff guilty." *Colon*, 60 N.Y.2d at 82. The only evidence linking him to the murder was the fabricated confession the police defendants induced him to make – by lying to him, tricking him, overbearing his will and feeding him vivid details about how the crime was committed, and then lying to make it appear that he had guilty knowledge. Barely 17-year-old Marty Tankleff awoke

to find his parents bludgeoned. He immediately called 911 and ran to a neighbor's house in a frantic search for help.   There was no corroboration; all the physical and forensic evidence actually contradicted the confession, undermining its reliability even aside from the misconduct that generated it.   *See* FACTS §, *supra* at 1-4; *cf. People v. Tankleff*, 606 N.Y.S.2d 707, 712 (App. Div. [2d Dep't] 1993) ("In view of the absence of any other evidence connecting the defendant to the murders, except for the confession which he disavowed at the trial, the indictments should be dismissed.") (O'Brien, J., dissenting). No reasonably prudent police officer would believe a confession manufactured by police, lacking any independent corroboration, was reliable evidence giving rise to probable cause. *See Limone*, 372 F.3d at 44-45. And all other evidence pointed away from Martin Tankleff and toward another man as the likely culprit. Taken as a whole, Mr. Tankleff's allegations establish that the only fact plausibly connecting him to the murders was his presence in his own home. Without more, this fact cannot establish probable cause as a matter of law.   *See U.S. v. Delossantos*, 536 F.3d 155, 160 n.4 (2d Cir. 2008) ("[A] person's presence at the scene . . . do[es] not, without more, amount to probable cause to arrest.").   The alleged lack of probable cause merits fact discovery.

### c.   Actual Malice

Defendants dispute whether the Complaint alleges the required element of actual malice. (D.E. 38-3, Def. Mem., at 18.) Yet the malicious prosecution claim specifically alleges that defendants acted "deliberately and with malice" (D.E. 1 ¶ 147), and the course of misconduct alleged makes it eminently plausible that defendants McCready and Rein acted with malice in concocting and coercing the confession and then lying about it. In any event, the lack of probable cause "raises an inference of malice." *Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 131 (2d Cir. 1997); *cf. Boyd*, 336 F.3d at 78 ("Once we find an issue of material fact as to probable cause, the

element of malice also becomes an issue of material fact as well."). This inference is further bolstered by McCready's lies that hid the fact that he personally knew the only obvious suspect in the case – a suspect he refused to reasonably investigate. Thus, the Complaint adequately alleges malice, and merits discovery.

### 2.   False Imprisonment (Count X)

"Under New York law, the elements of a false imprisonment or false arrest claim are: (1) the defendant intended to confine the plaintiff, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement and (4) the confinement was not otherwise privileged." *Curry*, 316 F.3d at 335 (quotation omitted). "The defendant has the burden of raising and proving the affirmative defense of probable cause." *Id.* (quotation omitted). Taking the facts and inferences as alleged, there is no question that defendants intended to confine him, he was conscious of the confinement, and he did not consent to it.  (D.E. 1, Compl., ¶¶ 189-90.) Defendants note that "[p]robable cause is a complete defense" to a claim of false imprisonment (D.E 38-3, Def. Mem., at 18), but the Complaint alleges facts proving the lack of probable cause.

## IV.   Qualified Immunity

Defendants' only qualified immunity argument is directed at the malicious prosecution and false imprisonment claims. (D.E. 38-3, at 19-21.)[13]  "A claim of qualified immunity ordinarily involves a two-step inquiry.  First, the court must answer this threshold question: Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?  If a violation could be made out on a favorable view of the parties' submissions, the next, sequential step is to ask whether the right was clearly

---

[13] Defendants do not assert, and so waive, qualified immunity for Counts II (Fabrication), III (Failure to Investigate), IV (Suppression of Evidence), V (Coercion & Violation of Right to Counsel), VI (Conspiracy), or VII (Supervisory Liability). *See Blissett v. Coughlin*, 66 F.3d 531, 538 (2d Cir. 1995).

established." *Pena v. DePrisco*, 432 F.3d 98, 107 (2d Cir. 2005).[14]  "[This] may be asserted in [a

Rule 12 motion] *as long as the defense is based on facts appearing on the face of the complaint.*"

*Benzman v. Whitman*, 523 F.3d 119, 125 (2d Cir. 2008) (emphasis added). However, "[t]he

qualified immunity defense cannot be established on the pleadings alone where an

unconstitutional motive is alleged." *Hayes v. Sweeney*, 961 F. Supp. 467, 477 (W.D.N.Y. 1997).

Defendants do not carry their burden of proving they merit qualified immunity from suit.

The constitutional prohibition on engaging in the conduct alleged in the malicious

prosecution claim was clearly established.  Such acts never merit qualified immunity because, "if

any concept is fundamental to our American system of justice, it is that those charged with

upholding the law are prohibited from deliberately fabricating evidence and framing individuals

for crimes they did not commit. Actions taken in contravention of this prohibition necessarily

violate due process (indeed, we are unsure what due process entails if not protection against

deliberate framing under color of official sanction)." *Limone*, 372 F.3d at 44-45 (citation

omitted).[15]

While it is true that "an arresting officer will still be entitled to qualified immunity from a

suit for damages if he can establish that there was 'arguable probable cause' to arrest," *Escalera

v. Lunn*, 361 F.3d 737, 743 (2d Cir. 2004), "[a]rguable probable cause which establishes

---

[14] In *Pearson v. Callahan*, the Supreme Court gave lower courts the discretion "to determine the order of decisionmaking" for these two prongs, but it did not alter them in substance.  129 S. Ct. 808, 821 (2009).

[15] *See also Deshawn E. ex rel. Charlotte E. v. Safir*, 156 F.3d 340, 346 (2d Cir. 1998) ("[A] § 1983 action may exist under the Fifth Amendment self-incrimination clause if coercion was applied to obtain a waiver of the plaintiffs' rights against self-incrimination and/or to obtain inculpatory statements, and the statements thereby obtained were used against the plaintiffs in a criminal proceeding."); *Ricciuti*, 124 F.3d at 130 ("When a police officer creates false information likely to influence a jury's decision and forwards that information to prosecutors, he violates the accused's constitutional right to a fair trial, and the harm occasioned by such an unconscionable action is redressable in an action for damages under 42 U.S.C. § 1983.").  Specifically, "there is a clearly established constitutional due process right not to be subjected to criminal charges on the basis of false evidence that was deliberately fabricated by the government," *Devereaux v. Abbey*, 263 F.3d 1070, 1074-75 (9th Cir. 2001), even when that fabricated evidence is the defendant's own confession, *Washington*, 407 F.3d at 283-84 (affirming denial of qualified immunity to officer who fabricated plaintiff's confession in 1983).

qualified immunity with respect to a false arrest claim exists [only] when a reasonable police officer in the same circumstances and possessing the same knowledge as the officer in question could have reasonably believed that probable cause existed in the light of well established law." *Droz v. McCadden*, 580 F.3d 106, 109 (2d Cir. 2009) (quotation and emphasis omitted). Yet, as set forth above, the only fact weighing in favor of probable cause to arrest or prosecute Marty Tankleff was his presence at the scene, his own home. Given that it was well-established in 1988 that a person's mere presence at the scene of a crime does not establish probable cause, *see Delossantos*, 536 F.3d at 160 n.4, the question is not even arguable.

No reasonable officer could be reasonably mistaken about whether the coercion, deliberate fabrications and intentional suppressions of evidence that police defendants engaged in to effectuate Mr. Tankleff's arrest and prosecution were lawful. *See Limone*, 372 F.3d at 44-45; cases cited *supra* 26. Defendants make no effort to argue otherwise, and cannot, and thus do not merit qualified immunity any more than they merit dismissal for failure to state a claim.

**V.   The Complaint States a Claim for Violation of Mr. Tankleff's 14th Amendment Rights by Failure to Investigate and Suppression of Evidence (Counts III and IV)[16]**

In Point III, defendants claim they "will demonstrate that they properly disclosed all evidence that they had regarding the bloody sheet.   Therefore, there was no violation of Tankleff's 14th Amendment rights, and Counts III and IV of the complaint must be dismissed." (D.E. 38-3, Def. Mem., at 22.)  As set forth below, this argument ignores both the facts alleged in

---

[16]  Defendants' Point III is entitled "Plaintiff's 14th Amendment rights were not violated and Counts III and IV of Complaint must be dismissed." (D.E. 38-3 at 22.)  But Count II also alleges that they unconstitutionally fabricated evidence by misrepresenting that incriminating facts originated from Mr. Tankleff, not themselves. (D.E. 1, Compl., at p. 28 ¶¶ 152-56.)  Their only argument on this fabrication theory is collateral estoppel. (*See* D.E. 38-3, Def. Mem., Point I, at  3-9.)  Likewise, they raise no other argument regarding the allegation in Count IV that they "failed to disclose the truth about how they elicited the so-called confession." (*Id.* at 21.) By failing to contest it, defendants have waived any challenge to the adequacy of the pleading of Count II, the fabrication claim, or the part of Count IV, the *Brady* claim, *Brady v. Maryland*, 373 U.S. 83, 87 (1963), arising from their suppressing the truth about how they elicited the confession (*see id.*, Point III, 22-26). *See Blissett*, 66 F.3d at 538.

the Complaint and the operative legal standard requiring that those facts must be taken as true on

a Rule 12(c) motion for judgment on the pleadings. *See Johnson*, 569 F.3d at 44. Any factual

disputes, by definition, are not yet ripe for review. *See Friedl*, 210 F.3d at 83-84.

### A.    Failure to Investigate

Count III of the Complaint alleges a violation of his Fourth and Fourteenth Amendment

rights to be free "from a sustained detention stemming directly from the law enforcement

officials' refusal to investigate available exculpatory evidence." *Russo v. City of Bridgeport*, 479

F.3d 196, 208 (2d Cir. 2007). This claim survives a motion for judgment on the pleadings if the

complaint alleges: "(1) that he has a right to be free from continued detention stemming from law

enforcement officials' mishandling or suppression of exculpatory evidence, (2) that the actions

of the officers violated that right, and (3) that the officers' conduct 'shocks the conscience.'" *Id.*

at 205 (quoting *County of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998)); *see also Akins v.*

*Epperly*, 588 F.3d 1178, 1184 (8th Cir. 2009) ("To establish a violation of due process based on

a failure to investigate, [plaintiff] must show that [defendants] intentionally or recklessly failed

to investigate, thereby shocking the conscience.'" (quotation omitted)).

Here, the Complaint alleges that McCready and Rein, aware that the only evidence

linking Mr. Tankleff to the murders – the confession they manufactured and his mere presence at

the scene – did not provide probable cause to prosecute him, nonetheless refused to investigate

Jerry Steuerman, with whom McCready had an undisclosed prior relationship, despite Mr.

Tankleff's repeated allegations; the allegations of other surviving members of the Tankleff

family, Steuerman's faking his death and fleeing to California in disguise and under an assumed

name; and defendants' knowledge that Steuerman had the motive, means and opportunity to

commit the murders as the last man to leave the card game just hours before the murders. (D.E.

1, Compl., ¶¶ 96-105, 157-59 (Count III).)  Indeed, the fact that Mr. Tankleff's own fifteen-year-long investigation "resulted in a body of new evidence," in the form of multiple witnesses, many "unrelated to each other," who implicated Jerry Steuerman and others in the murders, *People v. Tankleff*, 848 N.Y.S.2d at 301 (2d Dept. 2007), is *prima facie* proof that defendants deliberately failed to conduct an adequate investigation in the first instance.  (*See also* D.E. 1, Compl. ¶¶ 44, 50, 96-105, 125-133, 157-159.)  Taking these allegations as true, and drawing all reasonable inferences therefrom, Count III states a claim for relief.  *See Russo*, 479 F.3d at 205-208.

### B.    Suppression of Evidence

Similarly, Count IV indisputably alleges a constitutional *Brady* violation.  "[T]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or punishment, irrespective of the good faith or bad faith of the prosecution," *Brady v. Maryland*, 373 U.S. 83, 87 (1963).  This constitutional prohibition applies to both police and prosecutors . . . ."  *Walker v. City of New York*, 974 F.2d 293, 299 (2d Cir. 1992).  In this claim, Mr. Tankleff alleges that defendants knew, but deliberately withheld, material exculpatory evidence, including: (1) the truth about how they elicited the so-called confession; that the incriminating details had not originated with Mr. Tankleff in narrative form, but in fact had been fed to him by detectives (D.E. 1, Compl., ¶ 160); and (2) Defendants Kosciuk and   McCready "deliberately chose not to disclose to prosecutors evidence that the investigators found an imprint of a bloody knife – a knife other than the watermelon knife that was the murder weapon in the so-called confession – on Arlene Tankleff's bed sheets." (*Id.* ¶¶ 93, 161).[17]

---

[17] Again, defendants do not contest the adequacy of the second *Brady* theory, only whether Mr. Tankleff is collaterally estopped from raising it.  (*See supra* n.10; *see also* D.E. 38-3, Def. Mem., at 21.)

The truth about how the confession was elicited, if disclosed, would have eviscerated its inculpatory value and made it clear that there was no basis to believe Marty Tankleff killed his parents. Likewise, as alleged in the Complaint, since the "watermelon knife McCready and Rein believed Mr. Tankleff used as the murder weapon had no traces of blood on it[, e]vidence of another bloody knife, a knife that was not found in the house, was material." (D.E. 1, Compl., ¶ 161.) Unquestionably, as alleged, these suppressions violate *Brady*. *See White v. McKinley*, --- F.3d ----, 2010 WL 1948196, *5-*6 (8th Cir. May 17, 2010) (affirming $15 million verdict and denial of qualified immunity on *Brady* claim against officer for bad-faith suppression of truth about his personal relationship with complainant); *Newsome v. McCabe*, 256 F.3d 747, 752 (7th Cir. 2001) (holding that "it clearly established in 1979 and 1980 that police could not withhold from prosecutors exculpatory information about fingerprints"); *U.S. v. Rittweger*, 524 F.3d 171, 181 (2d Cir. 2008) ("The fact that the government may have some evidence that a particular defendant is guilty does not negate the exculpatory nature of the testimony of a witness with knowledge that a defendant did not commit the crime as charged."). Again, defendants fail to argue otherwise.

Instead, they contest the facts, claiming that their analysis did not reveal the bloody knife-print and therefore, they satisfied their *Brady* obligations because: (1) Mr. Tankleff's counsel "was actually in possession of the prosecution's blood analysis of the stains" and (2) he could have examined the sheet himself. (D.E. 38-3, Def. Mem., at 24.) First, the Complaint alleges that Suffolk County's formal reports of blood testing conducted on the sheet were affirmatively misleading, since they failed to note the existence of the exculpatory bloody knifeprint they saw on the sheet. (D.E. 1, Compl., ¶¶93, 135.) As a matter of law, this makes out a *Brady* violation. The Ninth Circuit so found in a similar § 1983 action, *Benn v. Lambert*, where the plaintiff:

> knew of the expert's existence but had been supplied with evidence by the state that the experts' view supported the state's theory.  A defendant furnished with such inculpatory evidence by the state is not required to assume that the state has concealed material information and has thereby obligated him to ascertain the *Brady* material on his own.  In the case before us, moreover, the state not only failed to disclose the crucial information about the accidental nature of the fire, but it actually misled the defense by disclosing a part of the experts' findings that, read alone, would lead to a conclusion directly opposite to the one they reached.

283 F.3d 1040, 1062 (9th Cir. 2002).  Likewise, Mr. Tankleff may have been made aware of the existence of a bloody sheet, and the fact that SCPD technicians had conducted testing on it among the hundreds of other items collected from the crime scene, but he was affirmatively misled about the fact that the examination of that sheet yielded exculpatory evidence: the imprint of a bloody knife other than the one police induced him to say was the murder weapon.

In any case, in the context of this Rule 12(c) motion, the Court may not entertain defendants' factual assertion that they did not suppress exculpatory evidence since they were not aware of it  (D.E. 38-3, Def. Mem., at 22 ("neither the detectives, nor the prosecution, ever noted any such evidence")).  The Complaint explicitly alleges that defendants McCready, the lead detective, and Kosciuk, who processed the bloody sheet, knew of and chose not to document or disclose the knife imprint on the sheet, which the AG's office only brought to light in 2008 after reviewing the evidence from the original investigation  (D.E. 1, Compl., ¶¶ 93, 135, 161.)  It is these facts, as alleged in the Complaint, not those contained in "affidavits and exhibits submitted by defendants" or in their "legal briefs or memoranda," that must be accepted as true at this stage.[18]  *Friedl*, 210 F.3d at 83-84 (quotation omitted).

---

[18] Defendants claim that the allegation that Kosciuk and McCready knew of, and chose not to disclose, this evidence, is a "naked assertion" that does not survive *Iqbal* and *Twombly* without "further factual enhancement." (D.E. 38-3, Def. Mem., at 22.)  Yet, the Complaint alleges specific facts supporting the allegation that these officers knew about the undisclosed bloody knifeprint but chose not to disclose it. (D.E. 1, Compl., ¶¶ 93.)  In any event, courts post-*Twombly* and *Iqbal* have acknowledged that intent is better suited to determination after discovery. *Rehberg v. Paulk*, 598 F.3d 1268, 1284 (11th Cir. 2010).

Defendants' legal argument is similarly misguided. They contend that there was no *Brady* violation because Mr. Tankleff's defense counsel could have asked for access to the blood-stained sheet for forensic testing and therefore had the "essential facts permitting him to take advantage of any exculpatory evidence," *U.S. v. LeRoy*, 687 F.2d 610, 618 (2d Cir. 1982) (citations omitted). (*See* D.E. 38-3, Def. Mem. at 23-24.) This argument fundamentally mischaracterizes the "essential facts" exception to the *Brady* doctrine.

The "essential facts" exception was created in the context of witnesses, and the Second Circuit has only ever applied it in this context. *See U.S. v. Rigas*, 583 F.3d 108, 126 (2d Cir. 2009) (applying the "essential facts" exception where the defendant knew of the witness and his role); *U.S. v. Zackson*, 6 F.3d 911, 918-19 (2d Cir. 1993) (applying the "essential facts" exception where defendant knew co-defendant was a cooperating witness and was aware that the scope of his cooperation warranted investigation); *U.S. v. Diaz*, 922 F.2d 998, 1007 (2d Cir. 1990) (applying the "essential facts" exception where defendant knew the witness had relevant knowledge); *LeRoy*, 687 F.2d at 218 (applying the "essential facts" exception where defendant knew the witness had testified at a grand jury). Defendants point to no precedent applying the "essential facts" exception where the police or prosecution knew of exculpatory forensic evidence, withheld that evidence, and was excused from their *Brady* obligation because the defendant could have conducted similar analysis himself.

To the contrary, in the two cases that even approximate Mr. Tankleff's situation, the Second Circuit has held that the exception does not apply. In *United States v. Payne*, 63 F.3d 1200 (2d Cir. 1995), the prosecution failed to produce an affidavit from a witness admitting her role. The Second Circuit rejected the government's argument that because the defendant knew about the witness and the case against her, he could have discovered the affidavit in the public

29

case file.  *Id.* at 1208-09.   Rather, it held that because the government *actually knew* of the

affidavit and defense counsel had no reason to know of its existence, it did not fall within the

"essential facts" exception simply because defense counsel could have discovered the evidence

through his own search.  *Id.*  Similarly, in *United States v. Torres*, 719 F.2d 549 (2d Cir. 1983),

the prosecution withheld a police report corroborating the defendant's version of a police

encounter.  Unquestionably, the defendant knew the underlying facts regarding this encounter,

and only did not know of the report.  *Id.* at 555-56.  The Second Circuit refused to apply the

exception because the jury could have given greater weight to the defense theory knowing the

prosecution had generated the corroborative report.  *Id.*

Here, the Complaint alleges that defendants *actually knew* of the knifeprint but

affirmatively covered it up by creating misleading forensic reports and burying the exculpatory

evidence in reams of pretrial discovery.[19] (D.E. 1, Compl., ¶¶ 93, 135, 161.)  These allegations

adequately state a *Brady* claim.  Defendants' argument for a contrary rule simply has no merit:

> A rule thus declaring "[police] may hide, defendant must seek," is not tenable in a
> system constitutionally bound to accord defendants due process.  Ordinarily, we
> presume that public officials have properly discharged their official duties.
> . . . .
> [Police] represented . . . that the State had held nothing back. . . .  It was not
> incumbent on [the criminal defendant] to prove these representations false; rather,
> [he] was entitled to treat the [police] submissions as truthful.

*Banks v. Dretke*, 540 U.S. 668, 696, 698 (2004).  Burying the truth does not satisfy *Brady*.  *See*

*Payne*, 63 F.3d at 1209; *U.S. v. Gil*, 297 F.3d 93, 106-07 (2d Cir. 2002) (reversing conviction for

*Brady* violation where prosecution delivered exculpatory document "not easily identifiable as a

document of significance, located as it was among reams of documents").

## VI.    The Complaint States a Viable Conspiracy Claim (Count VI)

---

[19] Because the Complaint alleges defendants knew of the knifeprint, their citations to cases on the limits
on the government's duty to conduct its own analysis are inapposite.  (*See* D.E. 38-3, Def. Mem., at 24.)

Next, defendants seek to dismiss the § 1983 civil rights conspiracy claim (Count VI) due to the intracorporate conspiracy doctrine. (D.E. 38-3, Def. Mem., at 25-26.)  In certain contexts, this doctrine prevents members of the same corporate entity from being held liable for a conspiracy limited to members of the entity.  The doctrine arose under the Sherman "Antitrust" Act, 15 U.S.C. § 1 *et seq.*, which was enacted to stop companies with naturally disparate interests from aligning together against competitors; the Act did not apply to conduct between actors in the same corporation.  However, the Supreme Court has never extended this doctrine beyond the antitrust context.  It specifically refused to extend the doctrine to Racketeer Influenced Corrupt Organizations ("RICO") Act conspiracies under 18 U.S.C. § 1961 *et seq.*  *See Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 165, 166 (2001).

Like the distinction between antitrust and racketeering conspiracies, in the civil rights context, there is a distinction between conspiracies alleged pursuant to § 1983 versus § 1985(2) or (3).  In *Hermann v. Moore*, the Second Circuit considered conspiracy claims pursuant to both § 1983 and § 1985(2), but only invoked the intracorporate conspiracy doctrine for the § 1985(2) claim.  576 F.2d 453, 459 (2d Cir. 1978).  Since then, the Second Circuit has not applied the intracorporate conspiracy doctrine to § 1983 claims, but has instead remanded in case after case for further proceedings in § 1983 conspiracies where the only alleged conspirators were agents of the same governmental entity.  *See Pangburn v. Culbertson*, 200 F.3d 65, 72 (2d Cir. 1999); *Ricciuti*, 124 F.3d at 131 (same).  The plaintiff in *Ricciuti* alleged that New York City Transit officials engaged in a § 1983 conspiracy strikingly similar to the one alleged here; the Second Circuit did not apply the intracorporate conspiracy doctrine, but instead remanded for trial: "[t]aking all of plaintiffs' evidence as true, a jury could find that [Transit employee] Lopez knowingly took part with [Transit employee] Wheeler in the distribution of a confession he knew

31

to be false, and that he, together with Wheeler, lied about the circumstances surrounding Daniel Ricciuti's arrest. A jury which so found might rationally infer that Wheeler and Lopez were jointly involved in a common scheme-a conspiracy to ensure that plaintiffs were detained on false charges." *Ricciuti*, 124 F.3d at 131. Just as in Ricciuti, the intracorporate conspiracy doctrine has no impact on the § 1983 conspiracy alleged here.

Even if the intracorporate conspiracy doctrine did otherwise apply, Mr. Tankleff's Complaint specifically alleges that the police defendants "agreed among themselves *and with others*" to violate his constitutional rights. (D.E. 1, Compl., ¶ 167 (emphasis added).) In particular, the Complaint alleges that the SCPD "inexplicably refused to conduct any serious investigation of [Jerry] Steuerman" (*id.* ¶ 96); McCready and Doyle, not missing-persons officers, flew out to meet with Steuerman when he fled following the murder (*id.* ¶ 101); County officials spent two days with Steuerman in California before escorting him home (*id.* ¶ 103); and McCready lied to cover up a preexisting relationship with Steuerman (*id.* ¶¶ 119-20). These allegations support the reasonable inference that SCPD defendants conspired with Steuerman, and possibly others outside the County's employ, unconstitutionally to arrest, prosecute and convict Mr. Tankleff.

## VII. Supervisory Liability is Adequately Pled (Count VII)

Defendants seek to dismiss the supervisory liability claim (Count VII) as "conclusory" and lacking a predicate constitutional violation. (D.E. 38-3, Def. Mem., at 27, 26-28). As set forth above, the Complaint states a claim for numerous underlying constitutional violations by County actors, *see* §§ I-IV, *supra*. *Cf. City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986). Defendants suggest that *Iqbal* either eliminated supervisory liability or heightened its pleading requirements (D.E. 38-3 at 27-28), but by its own terms, *Iqbal* simply reaffirmed well-

established precedent: "Government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of *respondeat superior*," so "a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Iqbal*, 129 S. Ct. at 1948.

In any event, the Complaint plausibly alleges that each supervisory defendant was personally involved in unconstitutional conduct. With respect to defendant Doyle specifically, the Complaint describes his personal involvement in interrogating Mr. Tankleff on the day of the crimes (D.E. 1, Compl., ¶ 50); steering the investigation away from Jerry Steuerman (*id.* ¶ 101); and conspiring to violate Mr. Tankleff's constitutional rights (*id.* ¶ 167). The reasonable inference is that Doyle, along with Lt. McElhone and unidentified supervisory officers, played an active role in the resulting constitutional violations.[20]

## VIII.  The Complaint States a *Monell* Claim against Suffolk County (Count VIII)

Defendants do not and could not reasonably challenge whether the Complaint plausibly alleges unconstitutional policies or practices within the SCPD that were the moving force behind the violation of his constitutional rights. *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690-91 (1978). Paragraphs 1 to 16, 139 to 142 and 177 to 182 of the Complaint allege in detail an egregious and well-established pattern of fabricating and coercing false confessions within the SCPD, and that police routinely lied, both to ensure criminal defendants' convictions and to cover up their own investigative misconduct. (D.E. 1, Compl., ¶¶ 1-16, 139-42, 177-82.)

Rather, defendants' sole basis for moving to dismiss the *Monell* claim is the supposed lack of an underlying constitutional violation. As set forth at length, *supra*, the individual SCPD defendants violated Mr. Tankleff's constitutional rights by maliciously prosecuting him (Count I); fabricating his false confession (Count II); deliberately refusing to investigate Jerry

---

[20] Should the Court find otherwise, plaintiff requests leave to replead. *See Branum*, 927 F.2d at 704-05.

Steuerman, the obvious suspect who had the motive, means and opportunity to commit the murders and who staged his own death before fleeing to California in disguise and under an assumed name (Count III); suppressing and covering up exculpatory evidence, including that they fed him facts about the crime, and the existence of a bloody knifeprint on Arlene Tankleff's sheets that did not match the presumed murder weapon (Count IV); coercing a barely seventeen-year-old Martin Tankleff into confessing (Count V), and conspiring together to do so (Count VI).

## IX.    Count XI States Claims for Intentional & Negligent Infliction of Emotional Distress

Finally, the Complaint alleges both intentional infliction of emotional distress (IIED) and negligent infliction of emotional distress (NIED) (D.E. 1, Compl., ¶¶ 192, 193).  Defendants do not challenge the merits of the IIED claim (D.E. 38-3 at 28-30), only noting that an IIED claim based on conduct related to the malicious prosecution of a plaintiff may be duplicative of a separate claim for malicious prosecution.  *See Fischer v. Maloney*, 43 N.Y.2d 553, 557-58 (1978). However, the elements of malicious prosecution and IIED are not always duplicative; for example, IIED includes no element of "favorable termination," and malicious prosecution has no element of intent to cause, or reckless disregard for, severe emotional distress.  *Compare Jocks*, 316 F.3d at 136, *with Conboy v. AT&T Corp.*, 241 F.3d 242, 248 (2d Cir. 2001).  Plaintiffs may plead in the alternative, and it would be premature to dismiss an emotional distress claim.  *Cf.* Fed. R. Civ. P. 8(d)(3) (authorizing alternative pleading "regardless of consistency.").

Defendants also acknowledge that the Complaint alleges all the elements of a claim for NIED: defendants owed him a duty of care that they breached by causing him to fear for his safety.  *Kennedy v. McKesson Co.*, 58 N.Y.2d 500 (1983).  However, they claim that the allegations of a feared threat to Mr. Tankleff's physical safety are "conclusory." (D.E. 38-3, Def. Mem., at 29.)  In fact, the Complaint alleges that McCready and Rein "caused him to fear

34

for his own safety" during the interrogation (D.E. 1, Compl., ¶ 193), that, as a result of the coercive interrogation tactics that induced Mr. Tankleff to falsely confess, defendants deprived him of his liberty by arresting and incarcerating him (*id.* ¶ 194). It is eminently plausible that this teenager who awakened to find both parents brutally bludgeoned and stabbed would fear for his safety when interrogated by homicide detectives, and, as a result of the false confession, that his safety would actually be endangered when he was arrested, jailed, and imprisoned in a correctional facility with violent adult offenders. His IIED and NIED claims are plainly viable.

## CONCLUSION

For all the foregoing reasons, the Court should reject the extraneous material defendants improperly submit, and deny the Rule 12(c) motion for judgment on the pleadings because the Complaint states ample facts which, taken as true, state viable claims for relief.

Dated: May 18, 2010
      New York, NY

Respectfully submitted,

By: _____
    Barry C. Scheck (BS 4612)
    Deborah L. Cornwall (DC 2186)
    Neufeld Scheck & Brustin, LLP
    99 Hudson Street, Eighth Floor
    New York, NY 10013
    Tel: 212- 965-9081
    Fax: 212-965-9084

    Barry J. Pollack
    Miller & Chevalier
    655 Fifteenth Street, N.W.
    Suite 900
    Washington, D.C. 20005

    Bruce Barket
    Quadrino, Schwartz
    666 Old Country Rd. Suite 600
    Garden City, NY 11530

    *Attorneys for Plaintiff Martin Tankleff*

35

**Certificate of Service**

     I hereby certify that a true and accurate copy of the foregoing PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION PURSUANT TO F.R.C.P. RULE 12(c) was served via ECF on May 18, 2010, upon:

Richard T. Dunne, Esq.
Susan A. Flynn, Esq.
Assistant County Attorneys
Suffolk County Attorney's Office
100 Veterans Memorial Highway
H. Lee Dennison Building
P.O. Box 6100
Hauppauge, NY 11788
richard.dunne@co.suffolk.ny.us
susan.flynn@suffolkcountyny.gov
*Counsel for Defendants*

 

_____
Elizabeth Daniel