# STATE OF NEW YORK
# COMMISSION OF INVESTIGATION

## AN INVESTIGATION OF THE SUFFOLK COUNTY

## DISTRICT ATTORNEY'S OFFICE

## AND POLICE DEPARTMENT

April 1989

270 BROADWAY
NEW YORK, NEW YORK 10007

TEMPORARY COMMISSION OF INVESTIGATION
OF
THE STATE OF NEW YORK


AN INVESTIGATION OF THE SUFFOLK COUNTY
DISTRICT ATTORNEY'S OFFICE
AND POLICE DEPARTMENT


DAVID G. TRAGER
Chairman
EARL W. BRYDGES, JR.
THOMAS J. CULHANE

L. KEVIN SHERIDAN
BERNARD C. SMITH
ALTON R. WALDON, JR.
Commissioners


SUSAN E. SHEPARD
Chief Counsel

THOMAS A. HALLINAN
Chief Investigator

RICHARD C. DADDARIO
Senior Assistant Counsel

RAFFAELA PETROCCIONE
Executive Assistant


Staff for this Investigation:


JOHN J. KENNEDY
Assistant Counsel


ROBERT W. FRANK
JOSEPH A. LYONS*
Special Agents


JOAN M. FLAHERTY
JULIA MINA
CAROL L. STRICKLAND
RACHEL A. WIENER


270 Broadway
New York, New York  10007
APRIL 1989


* Reassigned 9/8/87

## TABLE OF CONTENTS

INTRODUCTION.........................................1

BACKGROUND TO COMMISSION'S INVESTIGATION.............5

    A.  Prior Criticism of the Suffolk County
        District Attorney's Office and Police
        Department.................................6

    B.  Judge Stuart Namm's Complaint..............16

    C.  Broadened Scope of Investigation...........18

SUMMARY OF FINDINGS.................................22

I.   MISCONDUCT AND DEFICIENCIES IN HOMICIDE
     INVESTIGATIONS AND PROSECUTIONS................31

    A.  People v. Diaz.............................31

    B.  People v. Corso............................42

    C.  The Pius Cases.............................49

    D.  Management Failures in Homicide Cases......53

II.  MISCONDUCT AND DEFICIENCIES IN NARCOTICS
     INVESTIGATIONS AND PROSECUTIONS................70

    A.  Disorder in the Narcotics Division.........70

    B.  Kuhn and Gutowski..........................74

    C.  Chief of Detectives Gallagher..............81

    D.  Eason, Savage and Donnelly.................83

III. ILLEGAL WIRETAPS...............................93

    A.  Illegal Eavesdropping by the Suffolk
        County Police Department Known to the
        District Attorney's Office.................93

B. Management Failures Concerning Electronic Surveillance and Pen Registers............110

IV.   ASSISTANT DISTRICT ATTORNEY PERINI AND THE DISTRICT ATTORNEY'S OVERSIGHT ROLE ..........121

V.   FAILURE BY THE DISTRICT ATTORNEY'S OFFICE TO INVESTIGATE AND PUNISH MISCONDUCT BY AGENCY EMPLOYEES AND OTHER LAW ENFORCEMENT PERSONNEL..........................128

   A.   Ira Dubey.................................128

   B.   David Woycik.............................134

   C.   People v. Hansen.........................146

VI.   DEFICIENCIES IN THE OVERSIGHT OF POLICE PERSONNEL ..............................151

   A.   Lack of Personnel Evaluation.............151

   B.   Disproportionate Salary and Overtime......152

   C.   The Skorupski Case and the Failure To Investigate and Punish Police Misconduct................................154

VII.   THE APPOINTMENT OF A SPECIAL DISTRICT ATTORNEY IN THE GALLAGHER CASE........................167

   A.   The Appointment of a Special District Attorney.................................167

   B.   Problems Involving County Law §701........174

RECOMMENDATIONS......................................180

   APPENDIX A -- RESISTANCE AND LITIGATION IN SUFFOLK INVESTIGATION.........................192

   APPENDIX B-- DRAFT LEGISLATION, COUNTY LAW §701..............................197

## INTRODUCTION

In 1960 Suffolk County, covering the eastern portion of Long Island, beginning approximately 45 miles east of Manhattan and adjacent to suburban Nassau County, had a population of 666,784 and no unified police force. Today, with double the population, Suffolk County has a police department which is the 13th largest in the United States, and the County is one of the most populous and fastest growing in New York State.

Covering an area of more than 900 square miles and bordered on the south by the Atlantic Ocean and on the north by Long Island Sound, Suffolk County increased in population between 1940 and 1980 from just under 200,000 persons to approximately one and one-quarter million persons (1,284,000), with the greatest increase having occurred between 1950 (276,000) and 1970 (1,127,000) and with the population having roughly doubled each decade during that period. By the year 2000, it is estimated, Suffolk's population will exceed 1,500,000, ranking it as the third most populated county in the State and the largest outside New York City.

This population is served by a district attorney's office which currently consists of 140

-1-

assistant district attorneys plus a large staff of non-lawyers, including 40 in-house investigators and 50 Suffolk County Police Department detectives detailed to the District Attorney's Office. In 1987 the total number of positions in the Office was 325, with a budget of more than $16 million.* The Suffolk County District Attorney is Patrick Henry, who has served in that Office since 1966, first as an assistant district attorney and, since January 1, 1978, as District Attorney.

Suffolk is also served by a number of police departments, of which the largest is the Suffolk County Police Department, formed in 1960 by consolidating the police departments of the five western Suffolk towns (Huntington, Babylon, Islip, Brookhaven and Smithtown) with six incorporated villages. The Suffolk Police Department provides all police services for this heavily populated and large area. The five eastern towns (Riverhead, Southold, Southampton, Easthampton and Shelter Island), plus 16 villages, retained their own uniformed police departments, principally for patrol purposes, while the County Police Department provides other services, including basic detective services.

---

*Review of the 1988 Operating Budget," Suffolk County Legislature, October 22, 1987, p. 179ff.

In 1987 the Suffolk County Police Department had a budget of $203 million and staff of 3,461, including 2,616 sworn police personnel, of whom approximately 400 were detectives and detective supervisors.* Suffolk now has the fourth largest police department in New York State after the New York City Police Department, the New York State Police and the Nassau County Police. Suffolk also ranks as one of the highest paid departments in the nation.

The Police Commissioner leads the Department, and is appointed by the County Executive, subject to the approval of the County Legislature. The Commissioner serves at the pleasure of the County Executive. Until 1980 the Police Commissioner was appointed by the County Legislature. When the Commission's investigation began in November 1985, the Suffolk Police Commissioner was DeWitt Treder, who was replaced in April 1987, by James Caples, who was, in turn, replaced in March 1988, after a nationwide search, by Daniel Guido. Prior to his appointment, Commissioner Guido had headed several police departments, including Nassau County's.

Concomitant with its population growth, Suffolk is no longer a somewhat isolated and semi-rural

---

* "Annual Report 1987, Suffolk County Police," p. 8.

-3-

area, but faces many of the same crime problems as any major metropolitan region. According to the 1987 Suffolk County Police Annual Report, in 1987 the Suffolk Police reported 26,857 felony and 87,240 misdemeanor incidents, including 36 murders/manslaughters, 182 rapes, 1,228 robberies, 1,000 aggravated assaults, 1,182 felony drug and 676 misdemeanor drug offenses. Also reported were 10,007 burglaries, 25,498 petit larcenies, 28,206 criminal mischief cases, 7,067 driving while intoxicated cases and 6,653 cases of aggravated harassment.

Given its geographic size and the diversity of its economic base, ranging from farms and seaside resorts to aerospace and high technology industries, Suffolk is a complex county with equally large and complex law enforcement problems. Although Suffolk's needs demand the highest standards of professionalism from both its Police Department and District Attorney's Office, the Department -- at least through 1987 -- and the District Attorney's Office have failed to meet the challenges put to them by a county as important as Suffolk has become.

-4-

## BACKGROUND TO COMMISSION'S INVESTIGATION

While the precipitating event for the Commission's extensive investigation of the Suffolk County District Attorney's Office and Police Department was Suffolk County Court Judge Stuart Namm's public criticism, in late 1985, of police and prosecutorial misconduct in two homicide prosecutions (see (B) this section), the impetus for the Commission's investigation of Suffolk law enforcement stretches back much further. From at least the mid-1970's, there have been severe and recurring public criticisms of Suffolk County law enforcement from many quarters: in decisions by the New York State Court of Appeals, in a bar association report, in a grand jury report, in news articles, and in a controversy involving a former district attorney and then police commissioner which necessitated the appointment of a special prosecutor.

This criticism and controversy, unique to any county in New York State with respect to frequency and intensity, formed the backdrop to Judge Namm's allegations.

A.   **Prior Criticism of the Suffolk County
     District Attorney's Office and Police
     Department**

1.   **Court of Appeals Cases (1976–1981)**

Between 1976 and 1981, the New York State
Court of Appeals reversed, or affirmed Appellate Divi-
sion reversals, in eight cases, including six homi-
cides, all tried by the Suffolk County District Attor-
ney's Office and involving confessions by defendants.
By these decisions the Court of Appeals broadened and
strengthened rules in New York State which are highly
favorable to defendants with respect to the right to
counsel and waiver of the right to counsel.*

The primary cause for reversal in these
Suffolk cases, according to judicial analysis, was
failure by the Homicide Division of the Suffolk County
Police Department to follow proper practices in ques-
tioning defendants and seeking confessions.

----

\*   See People v. Hobson, 39 N.Y.2d 479, 384 N.Y.S.2d
419 (1976); People v. Macedonio, 42 N.Y.2d 944, 397
N.Y.S.2d 1002 (1977); People v. Singer, 44 N.Y.2d
241, 405 N.Y.S.2d 17 (1978); People v. Pinzon, 44
N.Y.2d 458, 406 N.Y.S.2d 268 (1978); People v.
Maerling, 46 N.Y.2d 289, 413 N.Y.S.2d 316 (1978),
see also 64 N.Y.2d 134, 485 N.Y.S.2d 23 (1984) and
96 A.D.2d 600, 465 N.Y.S.2d 254 (1983); People v.
Garofolo, 46 N.Y.2d 592, 415 N.Y.S.2d 810 (1979);
People v. Wander, 47 N.Y.2d 724, 417 N.Y.S.2d 245
(1979); People v. Bartolomeo, 53 N.Y.2d 225, 440
N.Y.S.2d 894 (1981), see also 70 N.Y.2d 702 (1987)
and 126 A.D.2d 375, 513 N.Y.S.2d 981 (1987).

-6-

Among the cast of characters in these cases were police personnel who later became important actors in cases known as <u>People v. Corso</u> and <u>People v. Diaz</u> -- cases which became the initial focus of the Commission's investigation.    Detective Dennis Rafferty, who played a key role in the <u>Corso</u> and <u>Diaz</u> cases, also played a role in two of the eight cases which were reversed (<u>Bartolomeo</u> and <u>Maerling</u>); Detective Edward Halverson, an important actor in the <u>Corso</u> case, also played a role in <u>Singer</u>; and even District Attorney Henry himself, during his service as an assistant district attorney, played a small role in both <u>Singer</u> and <u>Maerling</u>.

Representative quotations from these decisions indicate the nature of the criticism being directed at Suffolk law enforcement:

> . . . it is obvious that the defendant's request to remain silent was not scrupulously honored . . ..
> (<u>Wander</u>, 47 N.Y.2d at 726.)

> . . . that good faith efforts are made to locate a defendant who is taken into custody does not absolve the police of their responsibility if their internal procedures are inadequate to keep track of those against whom the restraining hand and the accusing finger of the State come to rest. . . . These principles were ignored in this

instance.   Not only did Detective
Rodriguez and his fellow officers
do nothing to facilitate access by
counsel, but their inaction fore-
closed the possibility of any such
communication.
(Garofolo, 46 N.Y. 2d at 601.)


Thus, in this case, when the defen-
dant's attorney called the general
information number at police de-
partment headquarters, identified
himself and asked to speak with the
defendant and further requested
that there be no questioning, the
police should have been on notice
that an attorney had appeared on
behalf of the defendant then in
custody.
(Pinzon, 44 N.Y.2d at 465.)


By the 1981 Bartolomeo opinion, the Court of
Appeals extended the rule even further:


Knowledge that one in custody is
represented by counsel, albeit on a
separate, unrelated charge, pre-
cludes interrogation in the absence
of counsel and renders ineffective
any purported waiver of the assis-
tance of counsel when such waiver
occurs out of the presence of the
attorney.. . . .  [T]he interrogating
detectives here, with actual knowl-
edge of the outstanding arson
charge against defendant, were
under an obligation to inquire
whether defendant was represented
by an attorney on that charge.
Having failed to make such inquiry,
the officers were chargeable with
what such an inquiry would have

-8-

> disclosed -- namely, that defendant
> did have an attorney acting on his
> behalf.
> (Bartolomeo, 53 N.Y.2d at 232.)

This series of cases arising out of prosecutions by the Suffolk County District Attorney has created significant difficulties for other prosecutors in New York State. This can be seen in the 1988 Legislative Proposals of the New York State Law Enforcement Council which stated: "The Bartolomeo extension of the Hobson rule poses a serious impediment to effective law enforcement" (p. 32).

## 2.   Grand Jury Report (1976)

As long ago as 1976 the Suffolk County Police Department and District Attorney were alerted, in a grand jury report, that allegations of criminal misconduct against members of the Police Department were not handled properly. That report, entitled "Report Number II of the Second Grand Jury of the Special and Extraordinary Trial Term of the Supreme Court," resulted from the work of a special prosecutor appointed by former Governor Nelson A. Rockefeller in the mid-1970's in response to a bitter controversy involving former District Attorney Henry O'Brien and former Police Commissioner Eugene Kelley.

The report criticized the handling of criminal misconduct complaints against members of the Suffolk Police Department:

> . . . In the course of this investigation it was revealed that it had been the 'tradition' of the Suffolk County Police Department 'through the years' to decide in its 'discretion' whether to report to the Office of District Attorney allegations of criminal misconduct concerning members of that Police Department or to conduct departmental disciplinary proceedings and not refer such allegations to the District Attorney's Office.

In its "Findings" section, the report continued:

> The Grand Jury finds that the Suffolk County Police Department had conducted disciplinary proceedings in certain instances involving allegations of criminal misconduct of police officers and did not refer these allegations to the District Attorney of Suffolk County.

Unfortunately, this warning was heeded by neither the Police Department nor District Attorney, and the very same attitude toward complaints of misconduct on the part of law enforcement personnel was seen

-10-

again and again by the Commission in the course of its Suffolk investigation.

### 3.   Suffolk County Bar Association Report on Police Brutality (1980)

On January 11, 1979, a front-page article in The National Law Journal contained allegations of wide-spread use of force by members of the Suffolk County Police Department Homicide Division in order to coerce confessions in murder cases.  In response to this article, as well as the decisions of the New York Court of Appeals and other public criticisms, the Suffolk County Bar Association delegated to its Civil Rights Committee the task of examining allegations of brutality.  After an extensive investigation, which included public hearings and a review of court records and other documents, the Bar Association issued a report which concluded:*

> . . . the Committee believes that sufficient evidence is present to indicate that there is a serious problem with respect to police brutality in Suffolk County and the manner in which such complaints are investigated and resolved (p. 53).

---

*  "Report of the Civil Rights Committee on Allegations of Police Brutality in Suffolk County," Suffolk County Bar Association, January 1980.

With respect to the role of the Suffolk District Attorney's Office, the Bar report charged:

> The District Attorney's Office as it presently operates does not act as an adequate check against police brutality (p. 43).

Further, the 1980 report was pessimistic that the Suffolk County District Attorney's Office would assume its proper oversight role:

> . . . The Committee believes that it would be a strong deterrent to such incidents [of misconduct] if the police are made aware that Assistant District Attorneys will not countenance police misconduct and that such matters will be thoroughly investigated and prosecuted. If this is not made a priority, and in Suffolk County the indication is that it is not, it will be the natural tendency of the Assistant District Attorney to be less than zealous in pursuing matters of police misconduct and the situation will worsen (p. 46).

The Bar Association made a series of recommendations, ranging from a change in the Suffolk County Charter permitting more civilian participation in police disciplinary investigations, to videotaping confessions, to earlier participation by assistant

district attorneys in major felony cases. Few, if any, of these recommendations were instituted by the Suffolk County Police Department or by Mr. Henry even following the Bar Association's report, and the Bar's prophesy that the "situation will worsen," as this Commission's Report will demonstrate, did indeed prove correct.

While undue force and coerced confessions by the Suffolk Police following the time period of the Bar Association's report have not been found by the Commission, other serious misconduct, all in the name of apprehending and convicting lawbreakers, has flourished.

4.   Long Island University Management Report on the Suffolk County Police Department (1986)

In March 1986, then Suffolk County Executive Peter Cohalan requested that Long Island University conduct a management analysis of the Suffolk County Police Department.* This request followed several incidents provoking unfavorable publicity for the Department and resulting in a high-level personnel and administrative shake-up within the Department.

---

* The ensuing report, entitled "The Suffolk County Police Department: A Managerial Analysis," was issued in August 1986.

-13-

The incidents which precipitated the University's report included criticisms by Judge Stuart Namm (<u>see</u> Background, section (B)) and a series of narcotics-related allegations against Suffolk police personnel, including former Chief of Detectives John Gallagher and police officers James Kuhn, Raymond Gutowski, Rebecca Bernard, Brian Merlob and Jose Ingles. (<u>See</u> Chapter II.)

While the Long Island University report made no pretense to being anything more than a quick review of the Department, the conclusions reached were highly critical of the Police Department's management. The report commented:

> The Suffolk County Police Department was found to be a 'reactive' Department rather than an organization that consistently and comprehensively incorporates strategic planning into the organization, staffing, budgeting, coordination and evaluation of the law enforcement services that they provide (p. 11).

Blaming certain features of the Department's contract with the Patrolmen's Benevolent Association, the report found that supervision within the Department had deteriorated:

> . . . The net result has been a
> continuing loss of administrative
> supervision and evaluation and a
> consequent lack of personnel
> accountability in the Department
> (p. 13).

With respect to the Detective Division, the
report concluded:

> The Detective Division has increas-
> ingly adopted its own set of per-
> formance standards for admission
> and promotion, rather than corre-
> lating them to the standards, needs
> and resources of the rest of the
> Department -- sustaining a problem
> that began more than 26 years ago
> when the Detective Division was
> established virtually as an inde-
> pendent entity within the Depart-
> ment (p. 13).

The report contained numerous recommendations
for reform in the areas of organization, planning, per-
sonnel, budgeting, communication and information sys-
tems (pp. 20-23).

These sample criticisms, from the Suffolk
County Bar Association report, the 1976 Grand Jury
Report, the Long Island University report and the New
York Court of Appeals decisions, which are but a few of
many such criticisms made of the District Attorney's
Office and the Suffolk Police Department, demonstrate

that a substantial and reputable body of criticism of the Department and District Attorney's Office existed even before the Commission's investigation began and before any public hearings by the Commission.

B.   **Judge Stuart Namm's Complaint**

The Commission's investigation of the Suffolk County Police Department and District Attorney's Office was initiated following an October 29, 1985, letter from Suffolk County Court Judge Stuart Namm to Governor Mario M. Cuomo, and Judge Namm's public complaints, which came to the Commission's attention.   Judge Namm, who had served six years as a Suffolk District Court Judge and three years as a County Court Judge, asked the Governor to appoint a special prosecutor to pursue allegations of misconduct in two widely publicized Suffolk County murder trials which occurred in 1985 and resulted in acquittals, People v. Corso (Indictment No. 562-84) and People v. Diaz (Indictment No. 1102-84).

Judge Namm, who presided at both jury trials, stated in his request to the Governor:

> In two consecutive highly publicized murder trials, I have witnessed, among other things, such apparent prosecutorial misconduct

-16-

> as perjury, subornation of perjury,
> intimidation of witnesses, spoliation of evidence, abuse of subpoena power and the aforesaid
> attempts to intimidate a sitting
> judge.

Following a preliminary investigation of Judge Namm's allegations, which indicated that there was substance to the allegations, the Commission passed a resolution initiating a formal investigation on January 9, 1986.

The Commission was particularly concerned about Judge Namm's allegations regarding Suffolk County law enforcement because, for several years preceding this investigation, the Commission had received and investigated an unusually large number of complaints regarding misconduct by the Suffolk County Police Department and District Attorney's Office, indeed more than twice as many law enforcement complaints as from any other county in the State. Furthermore, in a prior Commission investigation of Suffolk County District Attorney Patrick Henry, the Commission concluded that Mr. Henry had mishandled an investigation of a charge of misconduct involving his Office. Thus, Judge Namm's allegations seemed an especially important topic to which to devote Commission resources.

-17-

C.    Broadened Scope of Investigation

In the first few months of the Commission's investigation of Judge Namm's allegations, other witnesses and informants came forward or were located by Commission investigators.  A substantial number of these witnesses provided additional information to the Commission regarding misconduct in the Suffolk County Police Department and District Attorney's Office in areas other than the two original homicide cases.

The new information primarily concerned narcotics investigations and prosecutions.  The new allegations included illegal drug usage and related offenses by police officers and the use of illegal wiretaps in drug-related investigations.  In addition, allegations were made that the son of Suffolk County Police Department Chief of Detectives John Gallagher had improperly received lenient treatment in a drug case and that other relatives of public officials had received special consideration in drug cases.

Furthermore, several complaints were made, including one by a former Suffolk assistant district attorney, that neither the Police Department nor the District Attorney's Office saw to it that all employees who were accused of misconduct, or even criminal

-18-

behavior, were properly investigated and punished when warranted.

As a result of these additional allegations, the Commission expanded its investigation to include the new material. However, within months the Commission learned that the United States Attorney for the Eastern District of New York also was investigating certain of the same allegations, and the Commission temporarily suspended its investigation of those areas which might impede the Eastern District's criminal investigation, including the Gallagher matter and certain narcotics-related offenses.

During the course of the Commission's investigation, more than 200 complainants contacted the Commission regarding Suffolk law enforcement matters. While every complaint was given at least a preliminary review, the Commission had to establish priorities based on the seriousness and frequency of certain complaints and their relevance to key issues of law enforcement administration in Suffolk County. As a result, the vast majority of complaints are neither specifically discussed nor cited in this Report. The Commission has chosen, instead, to review in detail certain cases which demonstrate failures in Suffolk

County law enforcement and which help illustrate the needed areas of reform.

The principal areas to be discussed are:

1. misconduct and mismanagement in homicide investigations and prosecutions;

2. illegal wiretapping by police personnel with the knowledge of the District Attorney's Office; and

3. misconduct, mismanagement and lack of oversight in narcotics investigations and prosecutions.

In addition, the Commission here points out how, despite over a decade of warnings -- in the form of court decisions and grand jury and bar association reports -- both the Police Department and the District Attorney's Office continued to ignore or to inadequately investigate and punish employee misconduct.

Related to this, both the Police Department and the District Attorney's Office failed, at least until very recently, to impose any sort of effective management controls and systems of oversight on their members and employees. This attitude, this mind-set, in the Commission's view, goes far toward explaining

how the problems described in this Report were able to occur and to occur on the scale here indicated.

The activities of the Commission in its Suffolk investigation have included interviews of several hundred witnesses; nearly 100 private hearings consisting of sworn testimony; four days of public hearings in Hauppauge, New York, on January 28-29, 1987 and January 13-14, 1988, during which 42 witnesses testified; and the review of tens of thousands of pages of documents, including trial and hearing transcripts, prosecution files, police reports and files, and the files of several hundred Suffolk County Police Department Internal Affairs Division investigations and hundreds more files of Suffolk County Human Rights Commission complaints involving Suffolk law enforcement. These activities have required scores of subpoenas and involved the Commission in 19 different legal proceedings. A complete account of the litigation in the Suffolk investigation is included as Appendix A to this Report.

## SUMMARY OF FINDINGS

Under New York law the district attorney, a popularly elected constitutional officer, functions very much as the chief law enforcement officer within each county.  Although formally independent of control by the district attorney, the various police agencies operating within each county are, as a practical matter, subject to the district attorney's power to decide which cases should be prosecuted and how they should be prosecuted.  Moreover, with respect to certain types of investigative activities such as wiretaps and long-term investigations, e.g., narcotics, public corruption or homicides, the district attorney's office is frequently the lead investigative agency, effectively directing police investigators on a day-to-day basis.  In addition, the district attorney is rightly perceived by the public as ultimately, if not exclusively, responsible for the integrity, if not the efficiency, of the criminal justice system within his county.

At the same time, the heads of the various police agencies, however they may be selected or appointed, also are perceived as, and do have a critical role in, seeing to enforcement of the law efficiently, effectively and with integrity.  Police leadership has a responsibility which it cannot properly

abdicate to others, even to the district attorney's office.

In its investigation of the Suffolk County District Attorney's Office and Police Department, the Commission has found grave shortcomings in the leadership and management of both agencies. While the Commission feels confident that the vast majority of police and prosecutorial personnel in Suffolk are persons of ability, industry and integrity, the conclusion -- based upon the Commission's investigation -- is inescapable that these dedicated men and women, as well as the public, have been shortchanged by their leadership. There has been neither effective management nor accountability, including accountability for official misconduct.

Furthermore, while the Suffolk Police Department, with its new Commissioner and almost entirely new top staff, offers promise for reform, no such promise is yet offered by the District Attorney's Office. Quite the contrary, District Attorney Henry, who most charitably can be described as having ignored the grave and demanding responsibilities of his Office, despite clear danger signals and warnings, has exhibited increasing intransigence as the Commission's investigation uncovered even more serious misconduct. He has

-23-

become increasingly resistant, resorting to vitupera-
tive press statements, and even to litigation, in an
unsuccessful effort to block this very Report. In the
Commission's view, Mr. Henry has shown himself as un-
willing to reform his own Office and to exert proper
authority as the highest law enforcement officer of
Suffolk County.

While literally dozens of cases are cited or
discussed in this Report, the Commission's major goal
is not primarily the prosecution or punishment of
individuals involved, although that must certainly be
part of the process.* The Commission's main goal is
nothing short of a major reform of Suffolk law enforce-
ment, instituting reform which seeks justice and integ-
rity, in place of an attitude of "You do what you've
got to do to arrest and convict"; reform which replaces
professionalism for the slipshod practices of the past;
and instituting a system which ends the practice of
sweeping law enforcement misconduct under the rug, and
replaces it with a policy of investigating any and

_____

* The Commission's statutory duties under §7502 of
  Unconsolidated Laws of New York include investiga-
  tion not only of criminal misconduct, but also of
  ethical misconduct or other improper acts. The
  standard used by the Commission in examining a dis-
  trict attorney's office or a police department is
  much higher than merely whether any personnel are
  guilty of indictable offenses.

-24-

all alleged misconduct in a meaningful way and imposing
punishment as warranted.

This Report does not concern a narrow crimi-
nal investigation and does not point to a single "smok-
ing gun." Instead, the smoking gun in this case is the
day-in, day-out manner in which the Police Department
(through 1987) and the District Attorney, to date, have
conducted the business of law enforcement in Suffolk
County so badly.

The Commission issuing this Report is a sun-
shine agency with the statutory mandate to publicize
its findings. Bi-partisan and composed of six members
having broad law enforcement experience, the Commission
reaches the harsh and sweeping conclusions in this
Report based on overwhelming evidence. In this Report
the Commission shares its findings, the bases for its
findings and its recommendations with government offi-
cials and the public in order to promote desperately
needed changes in Suffolk law enforcement.

Finding 1:

District Attorney Patrick Henry has seriously
failed in his stewardship as chief law enforcement
officer in Suffolk County. District Attorney Henry
must take responsibility for deficiencies in his

-25-

personal decision-making, particularly his tolerance for misconduct. In addition, he must take responsibility for his failure to develop and enforce proper supervisory and management systems in his Office, as well as his long-standing tolerance for inadequacies, improprieties and misconduct in the Suffolk County Police Department as revealed in many cases prosecuted by his Office.

Since the day he entered office on January 1, 1978, Mr. Henry has been on notice of at least two principal areas of Commission concern: improprieties in homicide investigations and prosecutions, through the New York Court of Appeals decisions cited above; and deficiencies in procedures in misconduct investigations, through the previously cited 1976 Grand Jury Report. Despite these longstanding warnings as well as later ones in the forms of the Bar Association report, Judge Namm's criticisms, the Gallagher case, the Commission's evidence regarding illegal wiretapping and other areas as outlined in this Report, Mr. Henry has engaged in stonewalling instead of reform. He has sought "vindication" in the press rather than the promotion of needed substantive change in Suffolk law enforcement.

-26-

Despite clear warnings, Mr. Henry has long tolerated unprofessional standards in investigations by the Suffolk County Police Department, including such key issues as inadequate report writing and documentation, grossly deficient oversight of wiretap operations and lax supervision of narcotics investigations and prosecutions. Deficiencies in the standards enforced by District Attorney Henry have caused significant failures in the entire system of law enforcement in Suffolk County.

Finally, Mr. Henry has had a remarkable tolerance for misconduct by his own staff and by law enforcement personnel in general. He has repeatedly defended assistants in his Office in the face of serious ethical breaches, when, instead, he should be setting the example that misconduct will not be tolerated in law enforcement.

Finding 2:

Detectives and police officers of the Suffolk County Police Department have engaged in illegal wiretapping with the approval of their supervising sergeant and the Bureau Chief of the Narcotics Bureau of the District Attorney's Office. Deficient Police Department management practices, tolerated by the District

Attorney's Office, permitted these crimes to occur and helped to conceal them.

Finding 3:

The Suffolk County Police Department and District Attorney's Office have failed to properly investigate and punish instances of employee misconduct, including criminal conduct, even when these instances were known to supervisory personnel. Both offices failed to establish minimal procedures to insure the investigation and punishment of employee misconduct, and the Police Department had a deliberate policy, at least in cases involving litigation, of not investigating and punishing misconduct at all.

Finding 4:

The Suffolk County Police Department and District Attorney's Office engaged in and permitted improper practices to occur in homicide prosecutions, including perjury, as well as grossly deficient investigative and management practices. Because of credibility problems with prosecution testimony, including police testimony, and other defects in homicide prosecutions, guilty persons may well have been allowed to go free.

Finding 5:

     There has been a pervasive lack of documenta-tion, and defective documentation, in Suffolk Police and District Attorney investigations in areas which the Commission has examined: homicide and narcotics cases, misconduct cases, cases involving pen registers, and investigations by detectives in general. The effect of such lack of documentation has been to harm investiga-tions, conceal misconduct, and prevent plaintiffs in civil actions and defendants in criminal actions from receiving documents which should have been produced in the normal course of conducting effective police work.

Finding 6:

     Prior to the Commission's investigation, and during its early stages, Suffolk narcotics investiga-tions and prosecutions had experienced a breakdown of supervision which permitted drug use by police offi-cers, lack of proper controls on informants, illegal wiretapping, and fraud in obtaining favorable treatment in a narcotics case for the son of the Suffolk Police Chief of Detectives.

     In the final section of this Report, follow-ing its discussion of the factual bases for its

-29-

findings, the Commission presents specific recommendations for reforms, disciplinary actions and criminal referrals.  However, at this point it is appropriate to note that, in managing and administering either a prosecutor's office or a police department, top management's own personal honesty and integrity -- while certainly requirements for holding such positions -- are not enough.  Effective management controls and systems of accountability administered fairly but forcefully also are required.  And, to be most blunt, eternal vigilance is equally required.  This is public service at its highest and most responsible level, where the public is entitled to demand and receive the best from its servants.  Complacency and a comfortable laissez-faire attitude cannot be accepted.  These are the very areas in which the Suffolk County Police Department and District Attorney's Office failed in their responsibility.  And the fault in these matters ultimately lies, according to the Commission's findings, with the past leadership of the Police Department and with the present District Attorney.

-30-

## I.  MISCONDUCT AND DEFICIENCIES IN HOMICIDE INVESTIGATIONS AND PROSECUTIONS

At the Commission's public hearing of January 28, 1987, the Commission's opening statement noted that in both the <u>Diaz</u> and <u>Corso</u> homicide prosecutions the jurors, who acquitted the defendants, in later interviews cited a lack of police credibility, inadequate investigation and other police errors as grounds for their decisions to acquit. On the basis of the evidence developed at that public hearing, and with further investigation, the Commission stated in the opening statement of the January 13, 1988, public hearing that a lack of professionalism by the Suffolk Police Department and District Attorney's Office had led to acquittals in the <u>Diaz</u> and <u>Corso</u> cases, and that these acquittals may have allowed the guilty to go free. The following discussion of those cases expands upon that theme.

### A.    People v. Diaz

Judge Namm presided at the murder trial of <u>People v. Diaz</u>, Indictment No. 1102-84, which was tried before a jury beginning in September 1985. James Diaz, a 22-year-old drifter, was accused of the brutal and highly publicized rape-slaying of Maureen Negus, a 35-year-old nurse and mother of two children, at her

-31-

home in Port Jefferson Station. Following the acquittal of Diaz, jurors were quoted in the press as stating
that they did not believe the People's witnesses,
including police testimony (Commission Public Hearing,
1987, Exhibits 2, 3 and 4).

At the Commission's public hearing on January
28 and 29, 1987, testimony demonstrated that at least
five witnesses for the People in the Diaz case had presented incredible, false or perjurious testimony. In
addition, evidence was presented demonstrating serious
deficiencies with respect to police procedures for
locating evidence at the crime scene, taking notes and
documenting key events in investigations, and, following the trial, in investigating allegations of police
and prosecutorial misconduct in that case.

The principal evidence at trial consisted of
a confession written in Detective Dennis Rafferty's
handwriting and signed by Diaz only on the first page;
testimony by a jailhouse informant named Joseph
Pistone; and a knife, the alleged murder weapon, which
was discovered at the basement site of the murder by
the estranged husband of the deceased 10 months after
the slaying -- approximately 15 feet from where the
body was found. There was also a crucial oral
admission by Diaz that he "never wiped the blood off

-32-

the knife," which alleged statement by Diaz was not disclosed by Detective Rafferty until a pre-trial hearing held shortly after the knife was discovered in the basement.

Testimony regarding this knife played a significant role in undermining the credibility of police witnesses in the trial. The confession allegedly given to Detective Rafferty at Police Headquarters during the first evening Diaz was questioned about the murder was three pages long. Rafferty testified at the Commission's hearing that Diaz signed the first page, containing innocuous identifying information, but refused to sign the other two pages. In this alleged confession, Diaz stated that "he threw the knife into the woods," despite the fact that the knife ultimately offered by the prosecution as the murder weapon was found in the basement (Public Hearing, 1987, Exhibit 12).

In fact, another knife had been found by the police, in the backyard of the deceased's house during the search immediately following the murder. However, despite the fact that several objects and photos were shown to Diaz for identification on the night of his confession, such as a pair of white gloves allegedly used in the crime, and photos of the deceased's house,

which Diaz initialed, neither the knife found in the
yard nor even a picture of that knife was shown to
Diaz -- either to rule it in or out as the murder weap-
on. Detective Rafferty's explanation for his lapse in
not showing Diaz the knife found in the yard was that
Rafferty never believed that this knife was the murder
weapon (Public Hearing, 1987, pp. 193-197).

Ten months after the murder, as the trial of
Diaz approached, the estranged husband of the deceased,
who had moved back into the deceased's house to care
for his two children, discovered a knife, which was
later offered in evidence by the People as the murder
weapon, approximately 15 feet from where the body of
the deceased had been found (Public Hearing, 1987,
pp. 142-151). At the Commission's public hearing,
Robert Genna, the supervisor in the Suffolk County
Crime Laboratory of the Medical Examiner's Office, who
had responded to the crime scene on the day of the
Negus murder, explained this glaring oversight, stating
that he had conducted only a "cursory examination" of
the room where the knife was found, consisting of "just
visually looking around" (Public Hearing, 1987,
p. 115).

After the discovery of this knife, which had
blood residue on it, Detective Rafferty unexpectedly

-34-

testified at a pre-trial hearing that at the time of Diaz's confession Diaz had said that "he never wiped the blood off the knife." This statement had not been included in the written confession, nor in police reports or notes, nor ever previously been told by Rafferty to Barry Feldman, the assistant district attorney handling the case, despite several days of preparation prior to the hearing, and had thus not been previously provided to the defense (Public Hearing, 1987, pp. 197-199).

Feldman was astounded at this revelation, and the issue arose of whether this testimony would be considered a recent fabrication by Rafferty (Public Hearing, 1987, pp. 570-571 and Private Hearing, Feldman, 12/3/86, pp. 45-46). Detective Rafferty conveniently recalled that he had long before told two other assistant district attorneys of Diaz's statement that he had not wiped the blood off the knife. Assistant District Attorneys Steven Wilutis, Chief Trial Prosecutor, and William Keahon, Chief of the Major Offense Bureau, testified at a pre-trial hearing and at trial that Rafferty had told them of this statement nearly a year before Rafferty testified about it at the hearing (Public Hearing, 1987, pp. 571-572). The purpose of this testimony was to answer the argument that Rafferty's

trial testimony was a recent fabrication intended to counter the statement in Diaz's alleged confession that "he threw the knife in the woods." Judge Namm testified at the Commission's public hearing that the testimony of Wilutis and Keahon on this point was not "credible" (p. 44).

In the second instance of false or incredible testimony, a jailhouse informant named Joseph Pistone gave sworn testimony before the Commission that he had perjured himself in the Diaz trial and that two Suffolk police detectives, John Miller and Leon McKenna, had suborned the perjury and coached him (Private Hearing, Pistone, 3/21/86, p. 10). Pistone testified before the Commission that Miller and McKenna had shown him the Diaz "confession" and said "this is how it happened." Pistone, who was in the Suffolk jail on larceny charges and is the son of a New York City police officer, testified at the Diaz trial that Diaz had told him in extensive detail about his murder of Negus; however, before the Commission, Pistone recanted this testimony (Private Hearing, Pistone, 3/21/86, pp. 19-31).

Barry Feldman, the trial prosecutor, testified before the Commission that Pistone was one of five jailhouse informants who were anxious to testify about Diaz. Four were rejected, but Pistone was chosen be-

cause he had "built-in inherent credibility" because he did not ask for a deal (Private Hearing, Feldman, 12/3/86, p. 60). Despite the fact that a polygraph was given to one of the four rejected jailhouse informants, which he failed, no polygraph was requested by Feldman for Pistone (Public Hearing, 1987, pp. 523-530).* Furthermore, there were no notes or reports prepared by the police or district attorney regarding the statements of any of the purported jailhouse informants except Pistone, regarding whom a few pages of notes were made by Detective McKenna, allegedly summarizing Pistone's statements about what Diaz told him (Public Hearing, 1987, p. 526).

In another instance of false testimony by the People's witnesses in the Diaz case, Deputy Director of the County Crime Laboratory Ira Dubey, who was later to plead guilty to giving false testimony about his credentials in more than 20 serious felony trials in Suffolk County, testified falsely about his academic credentials (Public Hearing, 1987, pp. 602-610). Diaz prosecutor Barry Feldman, a personal friend of Dubey, had played the key role in failing to properly

---

* A polygraph administered to Pistone on February 17, 1986, by an independent polygraph expert at the request of the Commission indicated that Pistone lied at the Diaz trial and that his testimony before the Commission containing his recantation was truthful (Public Hearing, 1987, Exhibit 6).

investigate, or to tell the District Attorney, informa-
tion told to Feldman in 1983 by Dubey's supervisor
revealing that Dubey was testifying falsely about his
credentials in criminal cases. Despite his having been
previously provided this information, Feldman allowed
Dubey to again testify falsely about his credentials in
the 1985 Diaz trial. Feldman's explanation for allow-
ing Dubey to so testify was that he presumed Dubey had
obtained the missing academic degree since the 1983
allegations (Public Hearing, 1987, p. 610). (See
Chapter V(A) for a full discussion of the Dubey case.)

The final instance of false testimony in the
Diaz case discussed at the Commission's public hearing
concerned testimony by Detective James McCready regard-
ing his interviews of three railroad workers who placed
Diaz near the scene of the murder close to the day of
its occurrence. In his police report McCready wrote
that the railroad workers recognized Diaz from pictures
in the newspaper (Public Hearing, 1987, Exhibit 17).
In his report McCready made no mention of any mug shots
or identification procedures, and at trial McCready
initially testified that the railroad workers
recognized Diaz from pictures in the newspaper (Public
Hearing, 1987, Exhibit 16) However, after it was
demonstrated by the defense that there had not been any

-38-

pictures of Diaz in the newspaper at the time of the McCready interviews, McCready changed his testimony and, contrary to his police report, said he actually had shown mug shots of Diaz to the railroad workers (Public Hearing, 1987, Exhibit 16).

Between the time of McCready's false testimony regarding the newspaper identification and his corrected testimony about the mug shots, Assistant District Attorney Feldman assured Judge Namm that there was no need for any identification hearing because McCready had not shown mug shots to the railroad workers (Public Hearing, 1987, Exhibit 16 at 532-536). After McCready admitted showing the mug shots, Feldman attempted to explain away his prior incorrect assurance to Judge Namm by claiming that the only discussion he had previously had with McCready on this issue consisted of a very brief conversation on the way to the courtroom when McCready answered, in response to a question by Feldman, that there were "no ID problems" in this case. Feldman's affirmative representation to Judge Namm was based on McCready's brief comment, which later proved to be false (Public Hearing, 1987, p. 586). Even apart from false testimony, false representations or perjury, this was the second time in the trial that Feldman was taken by surprise by the

testimony of his own police witnesses: McCready in this instance, and Rafferty in connection with the "wiping the blood off the knife" statement.

After these four instances of false and/or highly suspect testimony, which were widely reported in the newspapers, Judge Namm spoke to Chief of Detectives John Gallagher and Assistant Chief of Detectives Arthur Feldman about misconduct in the case and the pos- sibility of a police Internal Affairs Division investi- gation; however, none was ever begun. Police Commis- sioner Treder testified at the Commission's hearing that no police investigation was begun because the Com- mission was looking into the Diaz case (Public Hearing, 1987, pp. 943-947).

The Commission's investigation of the Diaz case, however, is no substitute for a proper Suffolk County Police Department Internal Affairs Division investigation. First, the Commission has no power to discipline the officers involved. Moreover, the Police Department may have let the 18-month statute of limi- tations on disciplinary infractions expire (see Patrol- men's Benevolent Association contract, p. 43). Failure to conduct a proper disciplinary investigation in Diaz is inexcusable (see also Chapter VI (C)).

-40-

At the Commission's public hearing, District Attorney Patrick Henry described the cursory extent of his review of the Diaz matter. Henry testified that after talking to prosecutor Feldman and "possibly" reading part of the trial transcript, he decided there was nothing wrong. Henry did not recall any problem in the testimony of Ira Dubey (Public Hearing, 1987, pp. 487-491). In the exchange cited below, District Attorney Henry revealed his blindness to the problems involved in disciplining his employees:

> Q. Did you really expect the trial prosecutor to say maybe he did something wrong in the trial?
>
> A. I think that if he had done something wrong, and coupled with my questioning him on the subject, it would have been obvious that he did something wrong.
> (Public Hearing, 1987, p. 490.)

The Commission believes that in the Diaz trial McCready, Dubey and Pistone all knowingly gave false testimony. In addition, the testimony by Wilutis and Keahon that Rafferty told them that Diaz said that he had never wiped the blood off the knife -- which testimony Judge Namm described as "incredible" -- is indeed highly suspect. However, the failure of the

Police and District Attorney to maintain proper docu-
mentation and to conduct an investigation in a timely
fashion deprives any investigator, including the Com-
mission, of adequate evidence upon which to make a
definitive judgment on this issue. According to state-
ments to the press by jurors following the trial, this
false and doubtful testimony helped free Diaz.

In addition, based upon the jurors' comments,
it is apparent that these verdicts also were signifi-
cantly affected by the failure of police officers to
take notes, record key statements by the defendant and
document other case developments, which allowed doubts
to be raised in the minds of the jurors. Errors such
as the failure to find the murder weapon 15 feet from
the body of the murder victim helped allow the defense
to undermine the credibility of police testimony.
Finally, the failure of the police and the prosecutor's
office to investigate employee misconduct even after
the trial adds to the culpability of both agencies.
These and other deficiencies will be discussed in
Section D of this Chapter under "Management Failures in
Homicide Cases."

### B.   People v. Corso

The other homicide trial occasioning Judge
Namm's allegations of police misconduct was People v.

<u>Corso</u>, Indictment No. 562-84, tried in May 1985, in which Peter Corso was accused of carrying out the 1979 gangland-style execution of a prominent Suffolk County attorney, Archimedes Cervera, in Cervera's law office. Suffolk Police Detective Edward Halverson was original-ly the lead detective on the case, but was replaced in 1982 by Detective Dennis Rafferty after Halverson retired.

After the Corso trial, jurors were quoted as saying that Corso was acquitted partly due to the lack of credibility of the prosecution's lead witness, Michael Orlando, and partly due to the careless and unprofessional investigative methods employed by the Suffolk Police Homicide Division (Public Hearing, 1987, Exhibit 29).*   The careless methods of the police included failures to make proper notes and reports dur-ing the investigation, to preserve important evidence and to take routine steps in corroborating and support-ing the conclusions of their investigation.

In regard to deficient note-taking, Detective Rafferty testified at the Commission's hearing that no

---

* There was a superficial Internal Affairs Division investigation in the <u>Corso</u> case which concluded that some lower-ranking officers had not followed proper procedures.

police reports were submitted by the Suffolk police officers assigned to the case for inclusion in the case file for a period of six months, from June to December 1979, following the murder, despite a substantial amount of active investigative work. Although the Suffolk Police were awaiting information from the FBI regarding informant Orlando, who had information in this case, neither communications with the FBI nor the results of numerous interviews with key witnesses were recorded (Public Hearing, 1987, pp. 677-698).

In addition, although the Commanding Officer of the Homicide Division described Detective Halverson to the Commission as an "extraordinary" detective and "excellent" (Private Hearing, Dunn, 1/5/87, p. 94), Halverson's partner stated that Halverson "didn't write things down" and that he "wrote very little" (Private Hearing, Rafferty, 1/6/87, p. 93). Such a favorable judgment by Homicide's Commanding Officer of a detective who did not take notes is indicative of unprofessional standards of police supervision. Homicide investigations, like other police work, require meticulous note-taking and documentation (Public Hearing, 1987, pp. 635-653).

In fact, the Corso matter is a casebook example of why proper documentation is necessary:

-44-

personnel retire or are reassigned (Halverson himself retired in 1982) and others must continue the investigation; memories fade (the murder took place in 1979 and the prosecution in 1985); and three different assistant district attorneys were assigned to the case at various times who had to then learn the case from an incomplete case file (Private Hearing, Jablonski, 1/16/87, pp. 13-16). Without a complete and well-documented file, detectives, their supervisors and prosecutors could not adequately investigate, manage and prosecute any case.

A second investigative failure which damaged prosecution of the Corso case was police treatment of evidence, including a Sanyo answering machine and an IBM dictaphone machine, both of which belonged to Cervera and were in his office at the time he was killed. Despite the fact that his answering machine tape contained several phone calls concerning Cervera's appointments on the day of the murder, including calls from known organized crime figures, no transcript was ever made of the calls (Public Hearing, 1987, p. 703). In addition, no transcript was made of any of the recorded portions of the IBM dictaphone belts, despite the fact that Cervera was found with a demagnetizer (eraser) in his hand at the time of his death.

Incredibly, Homicide detectives never even listened to the belts themselves, but rather had Cervera's secretary listen, so that she could tell detectives if there were any valuable material on them (Public Hearing, 1987, pp. 704-705).

However, this was only the beginning of the cavalier treatment of these tapes and machines which hurt the credibility of the prosecution's case. Between the time of the murder and the trial, the machines, the belts and tapes -- which were being held as evidence in the Police Property Section -- were auctioned off to highest bidders at a police auction. During the trial itself those tapes and belts were retrieved from the buyers, but by then the tapes had been erased and reused (Private Hearing, Jablonski, 1/16/87, pp. 35-43).

The third area of failure by Suffolk law enforcement in the Corso case was neglect in carrying out and documenting standard investigative steps which should have been taken in the case. For example, after Orlando identified two associates who allegedly accompanied Corso on his way to and from the murder, efforts should have been made to confirm this information and to locate both men. The District Attorney should have directed police investigators to determine whether the

two associates were alive, incarcerated, under indict-
ment or if there was any way to obtain their cooper-
ation or to build a case against them (Public Hearing,
1987, p. 776). No such steps were taken.

Additionally, once the Orlando information
was received, many standard investigative steps, such
as obtaining fingerprint comparisons, securing photos
and showing them to witnesses, requesting telephone
call records and examining organized crime information
from other jurisdictions, either were not pursued fully
or were not pursued at all (Public Hearing, 1987,
pp. 784-785).

Even after Corso's acquittal for murder, ju-
dicial action in regard to Corso and the Cervera murder
was not finished. In December 1987, the Appellate
Division, Second Department, issued an opinion in a
narcotics case against Corso which had arisen at the
time he was arrested for murder, but had been severed
from the murder charge (People v. Corso, 135 A.D.2d
551, 521 N.Y.S.2d 773). While the Court determined
that the Suffolk Police had probable cause to arrest
Corso, this decision contained a brief discussion
of some of the failures in the Cervera murder
investigation.

-47-

Finally, what can only be characterized as a most bizarre judicial proceeding occurred on March 22, 1988, in the case of People v. Corso, Indictment No. 1061-87, concerning a new and unrelated narcotics charge against Corso. On that day, a guilty plea was taken from Corso in a proceeding before Justice George F. X. McInerney on a narcotics charge. At that proceeding Corso stood mute after he was asked by the prosecutor, Raymond Perini, Chief of the Suffolk County District Attorney's Office Narcotics Bureau, whether he had murdered Cervera, with Perini stating on the record that Corso had described in detail how he was paid $15,000 to murder Cervera (Corso Hearing, 3/22/88, p. 20).

In exchange for this "admission," which, even if Corso had assented, was legally useless in prosecuting Corso for murder due to his prior acquittal, the court approved Perini's "package" of recommendations, including that Corso's brother, son and ex-wife be given probationary sentences for their roles in Corso's drug ring, and that Corso, then 66 years old, be sentenced to 12-years-to-life (Corso Hearing, 3/22/88, p. 21). The net result of this "bargain" was that in order to engineer what the District Attorney no doubt believed would somehow "vindicate" the Corso

prosecutors, Perini and the District Attorney gave away far too much, and again allowed the guilty to escape imprisonment.

What this flawed plea bargain further indicated was that the District Attorney still did not understand the nature of the criticism of Corso's homicide prosecution by the Commission and from other sources. The point of this criticism was not that Corso was an innocent man, improperly prosecuted by the District Attorney's Office -- rather, the point was that the habitually defective procedures of the Suffolk Police Department and District Attorney with regard to such things as proper note-taking, evidence handling, and the need for thoroughly professional investigative and prosecutorial methods invited Corso's acquittal of Cervera's murder.

### C.  The Pius Cases

Early in the Commission's investigation, a preliminary review was made of another Suffolk County homicide case which came to the Commission's attention. This was a case involving four homicide convictions in which the victim was John Pius.  However, the Commission decided to await the results of the various legal appeals in the Pius cases which were pending and which

have subsequently been decided. Those appeals have overturned convictions of three of the four defendants in the Pius cases, and the opinions in the reversals highlight some of the systemic problems in Suffolk homicide prosecutions.

For example, in People v. Brensic, 70 N.Y.2d 9, 517 N.Y.S.2d 120 (1987), the Court of Appeals, in reversing Brensic's conviction, criticized the interrogation of a juvenile co-defendant:

> . . . [E]vidence before the court not only failed to establish the reliability of Peter's [Brensic's co-defendant, Peter Quartararo] confession, it suggested quite the contrary, that he had a strong motive to fabricate when he confessed to his mother. Accordingly, the confession was unreliable as a matter of law and should not have been received in evidence.
>
> First, the confession was the product of the custodial questioning of a 15-year-old boy for six and a half hours, without his parents' knowledge, by two police detectives. In the course of this interrogation, Peter gave numerous versions of the events that led to John Pius' death.
>
> *     *     *
>
> Given this substantial evidence that the confession was but one of several, each containing material differences, that it was obtained from a juvenile after lengthy custodial questioning and that it was

> given under circumstances which
> suggest that it was induced by the
> hope of leniency, the confession
> should not have been placed before
> this jury, as evidence of defen-
> dant's guilt (pp. 21, 23).*

As in the post-acquittal attempt by the Suf-
folk County District Attorney to "vindicate" police and
prosecutorial methods by having Peter Corso stand mute
in court in response to a murder accusation, the Suf-
folk District Attorney followed a similarly inappropri-
ate strategy in the retrial of Robert Brensic. On May
18, 1988, Brensic, after having served five years in
state prison on his 25-years-to-life murder sentence,
pleaded guilty to a reduced charge of second-degree
manslaughter, accepting a 4-to-12 year sentence for
which he expected to serve little or no additional
prison time.

However, it was the conditions of Brensic's
plea which indicated the length to which Mr. Henry
would go to "vindicate" the prosecution in the Pius
matter and to try to overcome the charges of police and
prosecutorial improprieties which accompanied those
reversals.

---

* See also People v. Ryan, 134 A.D.2d 300, 520
N.Y.S.2d 528 (2nd Dept. 1987).

The highly favorable conditions of Brensic's plea included an agreement that Brensic would not have to testify against any of his co-defendants; a promise not to object to Brensic's parole; permission for Brensic to be released on his own recognizance and leave the State pending his new sentence; and an agreement by Brensic, the Pius family and the Suffolk County Police and District Attorney and its current and former personnel to drop, or refrain from filing, civil suits in connection with Brensic's involvement with the case.

The Suffolk assistant district attorney handling the case, Timothy Mazzei, made clear the motivation of Mr. Henry's Office in agreeing to Brensic's plea bargain in an interview which appeared in Newsday on May 19, 1988. Thus, Mazzei stated that the Office wanted a guilty plea

> because of all the horrible allegations made against us.... We never had the wrong guys. This was one way to prove to everyone we had the right people.

However, Mazzei's use of this plea as a defense to Suffolk police misconduct and prosecutorial overreaching was totally misguided and improper. Again the District Attorney was seeking a public relations

-52-

coup, rather than appropriate punishment or justice. The essence of the judicial criticism and other public criticism in regard to the Pius cases was not whether the Suffolk authorities "had the right people." The central criticisms concern obtaining and using an unreliable confession, and engaging in faulty and improper police and prosecutorial action, the same criticisms that have been directed at Suffolk by the New York Court of Appeals and others since at least 1976. District Attorney Henry, even at this very late date, still demonstrates his unwillingness to recognize the need for reform in his Office, and instead, seeks some sort of "vindication" in the press.

### D.   Management Failures in Homicide Cases

The Homicide Division of the Suffolk County Police Department, during the period which was the subject of the Commission's investigation, was commanded by a detective lieutenant and was composed of three detective sergeants and 20 experienced detectives divided into three teams, each led by one of the detective sergeants. There were about 40 homicides per year in Suffolk County, but the Homicide Division had additional duties with respect to vehicular and other deaths (Private Hearing, Dunn, 1/5/87, p. 19).

-53-

In both the Police Department and District Attorney's Office, homicide investigators and prosecutors have been considered members of elite units because of the seriousness of the crime and since homicides tend to be high profile cases. Suffolk Homicide Division detectives have been described as the best detectives in the Department (Private Hearing, McGuire, 1/5/87, p. 11), and their behavior may well be considered an indicator of the level of professionalism for all detectives in the Department.

Prior to the Commission's public hearing in January 1987, which considered criticisms of homicide investigations and prosecutions, there was no separate Homicide Bureau in the Suffolk District Attorney's Office. Homicides were handled by the Major Offense Bureau, a unit of six or seven experienced prosecutors who handled other serious felonies as well. In a reshuffling of personnel after the first Commission hearing, Mr. Henry appointed Edward Jablonski, the prosecutor in the Corso case, as the head of the new Homicide Bureau, and a new policy was established whereby assistant district attorneys would report to homicide scenes and become involved as early as possible in the investigation of homicides. While the Commission does not disagree with these changes, they

-54-

were but a weak and superficial response to the pervasive problems existing in Suffolk County with respect to homicide investigations and prosecutions. Some of those problems and their causes are illustrated in the following sections.

### 1. Overreliance on Confessions

From December 7 to 11, 1986, Newsday published a lengthy five-part series on deficiencies and misconduct in Suffolk homicide investigations and prosecutions. The series included a statement that 94 percent of Suffolk homicide prosecutions involved confessions or oral admissions. This figure was confirmed to the Commission by the former Commanding Officer of the Suffolk Police Homicide Division, Detective Lieutenant Robert Dunn, in a private hearing on January 5, 1987 (p. 95).

This is an astonishingly high figure compared to other jurisdictions, so high, in fact, that in and of itself it provokes skepticism regarding Suffolk County's use of confessions and oral admissions.*

---

* For example, in Newsday's study which compared 361 Suffolk homicide defendants from 1975 to 1985 to 700 cases from six other large suburban counties, Suffolk's 94% confession rate far exceeded the 54% to 73% rate in the six other jurisdictions (Newsday, 12/7/86, p. 27).

Moreover, the result of Suffolk's unique incidence of confessions has been for officers to rely on confessions and neglect both routine investigative steps and proper scientific and technical evidentiary practices. The prevailing attitude has been that note-taking, forensic evidence, neighborhood canvasses and crime-scene searches are not important because ulti-mately a defendant will confess. Confessions are of course important, but usually insufficient, and they should not become the nearly exclusive method of devel-oping homicide cases. With Suffolk's methods, the chances of the guilty going free are simply too high.

## 2.   Lack of Reports and Documents

The failure of the Suffolk Police Homicide Division to maintain adequate notes and reports, and the tolerance of Mr. Henry's office for this neglect, shocked the Commission. In the Suffolk County Police Department, officers above the rank of patrolman, and all detectives, have not been required to take notes or keep memo books.* Indeed, the sole judgment as to what

---

\* In the New York City Police Department, the keeping of memo books is required for detectives as well as police officers, and the blank memo books have num-bers which are recorded in department records each time a detective or police officer is issued a new book.

-56-

was to be recorded in written form in an investigation rested with each detective. Thus, Sergeant Kenneth McGuire, the supervisor in the Diaz and Corso cases, testified:

> Q. What was the requirement of the people in your team as to taking notes?
>
> A. Well, the men would take the notes as they pretty much saw fit while they were conducting interviews and stuff.
>
> Q. So the answer is, there was no requirement?
>
> A. There was no specific requirement.
> (Public Hearing, 1987, p. 333.)

Asked how a detective could judge in advance what information might be important later in the investigation, and thus should be recorded, Lieutenant Dunn testified that he was confident detectives could make that determination:

> Q. How does one make that determination early in an investigation, of whether information will be pertinent down the road?
>
> A. It must be dependent on the intuition and the intuitiveness of the detectives.
> (Public Hearing, 1987, p. 732.)

-57-

Related to this practice of not keeping notes or making adequate reports, Suffolk Police personnel do not prepare what they define as "negative reports." Negative reports in Suffolk are those which establish that investigatory leads on suspects, witnesses or evidence are not correct, relevant or important in the ultimate solution of a case. Suffolk does not prepare such reports so as not to "clutter up the case" with material that a "defense counsel could utilize" which were "not specifically important to the immediate investigation" (Private Hearing, Dunn, 1/5/87, p. 75). However, in the real world no detective has sufficient "intuition" to predict what information, positive or negative, will be of value as an investigation unfolds. It may be only in retrospect that two properly documented pieces of information fit together, regardless of how irrelevant they may have initially seemed, and help advance the investigation. If the information is not documented in a report, it is, for practical purposes, lost to the investigation.

After a case is closed, homicide reports and files are not sent for storage at Central Records. This is an open and well-known violation of Suffolk Police Department rules, and is supposedly done for reasons of space and "security" (Dunn, pp. 80-83).

In addition, there is also no sequential numbering of each item within a file and no regular indexing or division of the file according to subject or type of evidence (Dunn, pp. 86-89). Thus, even if a document has been entered in the file, it could later be lost or removed undetected (Dunn, p. 102).

Finally, one crucial stage of an investigation during which Suffolk police personnel produce no written reports is when a case is referred to the District Attorney's Office for prosecution, but while the police detectives who are assigned to the case are still working on the case in cooperation with an assistant district attorney. When investigative steps are taken after referral to the District Attorney, as a matter of express policy, no additional written case reporting need be done by the detectives to their police supervisors (Dunn, pp. 106-109). As a direct result of this deliberate policy, key reports concerning sensitive events which should have been produced were not. For example, in both the Corso and Diaz cases, many key events were not documented following the referral by the police to the District Attorney, in addition to inadequate documentation prior to referral. Thus, not only did police supervisors fail to require necessary documentation, but prosecutors supervising

-59-

investigations and prosecutions also failed to secure proper paperwork.

The failure of the Suffolk Police Department to produce required documentation during investigations was admitted in a memo, dated May 7, 1985, from then Commanding Officer of the Homicide Division, Detective Lieutenant Robert Dunn, to personnel in that Division:

> Departmental and Homicide Squad procedures concerning the documenting of investigative activities in the form of Supplementary reports has been, in many instances, ignored in recent years. While aware of the availability of Police reports via Subpoena and the Freedom of Information Act, our responsibilities to record basic findings (neighborhoods, interviews, etc.) for future reference and investigative cohesiveness have not been suspended.

However, the following quote bluntly recommends keeping reports to less than a minimum in order to thwart defense counsel and gives a disturbing picture of the cast of mind of one Suffolk homicide supervisor. While the supervisor supports the practice of not keeping complete notes in order to bring about "successful prosecutions," in fact, this practice helped allow Diaz and Corso to go free. In a memo from

Detective Sergeant Robert Misegades, then a team super-
visor in the Homicide Division, to Detective Inspector
Albert Holdorff, then Commanding Officer of the Major
Crimes Bureau, dated March 16, 1983, Misegades wrote:

> To the chagrin of the defense coun-
> sel, homicide reports, historical-
> ly, only reflect pertinent data as
> it applies to the successful prose-
> cution of our cases. If our learn-
> ed investigators from the Inspec-
> tional Services Bureau are instru-
> mental in generating new policy so
> be it, but the successful prosecu-
> tion of homicide cases may cease as
> we now enjoy it. Suffice it to say
> that reports need not establish or
> prove our integrity. If reports
> support an investigation without
> losing sight of a successful
> prosecution then they are neces-
> sary. They need not be necessary
> if they will open up areas for
> scrutiny or loopholes in our cases.

Thus, the absence of proper documentation in Suffolk
homicide cases was actually much worse than mere incom-
petence or oversight -- it was part of a conscious
policy, in which the District Attorney's Office acqui-
esced, ignoring inadequate and incomplete files, due to
a blind desire to secure convictions.

Finally, even District Attorney Henry was
eventually forced to admit the failure of proper note-
taking in homicide investigations. At a hearing

-61-

of the Public Safety Committee of the Suffolk Legisla-
ture on August 14, 1987, Mr. Henry testified:

> Q. Let's move on to something
> else. There's been a great deal of
> criticism recently of Homicide
> detectives not taking proper notes
> during the course of their investi-
> gations. You're aware of that, I'm
> sure?
>
> A. Yes, I am.
>
> Q. We have taken testimony from
> other expert witnesses including
> your own chief investigator, George
> Holmes, on the importance of note
> taking. Have you taken a public
> position on the criticism of the
> Homicide Squad on this issue?
>
> A. I think I probably have. If I
> haven't, I will now, and that is
> that there should be more notes
> (pp. 127-128).

### 3.   Inadequate Case Supervision

In addition to permitting inadequate investi-
gative notes and reports, Suffolk Police supervisors
also followed haphazard procedures with regard to case
status reports and case management. There were no reg-
ularly scheduled case meetings on homicides, even on
high profile or difficult cases (Dunn, pp. 14-16).
Thus, officers working on an investigation were not
only deprived of a fully documented case file, but also
lacked the benefit of a regular review of the progress

-62-

of each investigation. Commanding officers claimed familiarity with only a small part of the caseload they ostensibly supervised (Dunn, pp. 20-22). Furthermore, higher-ranking personnel received statistics, but little else except an occasional oral briefing, since there were no written case status reports produced by anyone (Dunn, pp. 23-24). In addition, the assignment of personnel and investigative efforts was not determined in an active manner, nor were cases given higher or lower priority in any rational way, but rather cases merely "peter[ed] out" (Dunn, p. 24).

Thus, priorities were not set, supervision was not exercised, methods were not scrutinized -- as long as there were results -- which in Suffolk only meant "successful prosecutions." Such a weak supervisory system was ripe for the abuses discovered by the Commission.

### 4. Crime Scene Responsibility and Improper Handling of Evidence

The lack of a clear-cut understanding of responsibility for crime scenes was brought out at the Commission's public hearing. Thus, Robert Genna, the supervisor in the Crime Laboratory of the Medical Examiner's Office who had responded to the murder scene in the Diaz case, testified that the Homicide Division of

-63-

the Suffolk Police Department was in charge (Public
Hearing, 1987, p. 131). On the other hand, the former
Commanding Officer of the Homicide Division, Robert
Dunn, testified that the Medical Examiner's Office had
primary responsibility for crime scenes:

> If you are asking me who is in
> charge of the crime scene, the
> County Charter reveals that the
> Medical Examiner's Office is in
> charge of the crime scene, and we
> are subordinate to them. That's a
> matter of County Law (p. 753).

Clearly, they both cannot be correct. How-
ever, the Charter does, in fact, put the Medical Exami-
ner's Office in charge. Whether that responsibility is
properly placed or not is really less important than
ensuring that everyone understands who in fact is in
charge. When a supervisor in the Medical Examiner's
Office does not know that he is in charge, he cannot
take appropriate steps to ensure that evidence is prop-
erly obtained and analyzed.

The careless disregard for physical evidence
in homicide cases by the Suffolk Police was demon-
strated not only by the failure to find the murder
weapon in Diaz and the treatment of the recording
machines and tapes in Corso, but also by the treatment
of a bullet in the homicide case of People v. Hamilton,

-64-

Indictment No. 843-82 (Public Hearing, 1987, pp. 229-246, 715-720). Since the members of the Homicide Division had habitually relied so heavily on confessions, they had far too little concern for physical evidence and diligent, but routine, police work.

In the Hamilton case, only after a confession was ruled inadmissible was a .22 caliber bullet, which had allegedly been found by Detective Rafferty in the pocket of a defendant when he was arrested, produced as evidence. As it turned out, this bullet had the same ejection marks as that produced by the murder weapon, a .22 caliber pistol. Rafferty testified at a pre-trial hearing that he had failed to send this bullet for ballistics tests when it was found on the defendant; instead he had put it, without any label, into the file folder, which the Commanding Officer of the Homicide Division testified at the Commission's hearing constituted a violation of Department Rules and Procedures (Public Hearing, 1987, pp. 755-759). Later, after the confession in the case was ruled inadmissible, the bullet was sent to ballistics and found to match the murder weapon. There were no notes or written references concerning the bullet anywhere prior to the confession being ruled inadmissible.

-65-

Rafferty explained away his failure to send the bullet for tests with two equally damning explanations. First, he claimed never to have had any training in ballistics (Public Hearing, 1987, p. 718) -- astounding for a detective who served 17 years in the Homicide Division. Second, he explained, "every black guy in Amityville has a .22," so he did not think the .22 caliber bullet was important (Rafferty, Private Hearing, p. 129), which just as surely demonstrated how lacking in judgment was this veteran homicide detective.

While Rafferty's convenient talent for producing crucial testimony and evidence at the 11th hour in homicide prosecutions disturbs the Commission, there is a sure remedy to these types of problems in future homicide prosecutions. If proper documentation of events is made close in time to their occurrence, later doubts about the veracity of police reports will be minimized. This is professional police practice and should be demanded of the police by Suffolk prosecutors.*

_____

* Not long after the Commission's hearing, Rafferty was transferred from the Homicide Division to the Robbery Squad, after a 17-year career in Homicide. While Hamilton's conviction for murder and robbery was affirmed (People v. Hamilton, 117 A.D.2d 819, 499 N.Y.S.2d 139 (2nd Dept. 1986)), a disciplinary charge against Rafferty for mishandling the bullet in the Hamilton case was sustained in a Suffolk Police Internal Affairs Division investigation.

## 5.   Inadequate Training

Testimony before the Commission indicated a remarkable lack of training for Suffolk Homicide detectives in regard to even routine investigative techniques. For example, in regard to ballistics and firearms, Detective Rafferty was asked:

> Q. Have you ever had firearms training yourself? Not in shooting them, but impressions left, gunpowder or that sort of thing?
>
> A. No.    Maybe a forty-minute course in some school I went to.
> (Private Hearing, Rafferty, 1/6/87, p. 132.)

and also:

> A.  . . . I'm not really on top of guns and that's probably what got me messed up on that [Hamilton case].
> (Private Hearing, Rafferty, 1/6/87, p. 130.)

Detective Rafferty, one of the most experienced members of the Homicide Division, further testified:

> Q. Doesn't that case [Hamilton] prove if you had training you would have known enough to send it in and gotten the results?

-67-

A. Yes.
(Public Hearing, 1987, pp. 718-719.)

Furthermore, Rafferty's supervisor, Detective Sergeant McGuire, replied with an equally disturbing answer with respect to his own knowledge of blood-related evidence. In response to a series of questions about what the forensic laboratory can tell regarding a stain, McGuire testified:

Q. After they have done that, what can they tell you about the stain?

A. I guess they can tell you if it's blood.

Q. Anything else?

A. Maybe, if it's food.

Q. If it is blood, what else can they tell you about it?

A. I have no idea, sir. I guess they can break it down further, depending maybe on the freshness or whatever.
(Private Hearing, McGuire, 1/5/87, pp. 65-66.)

The blind spot this indicates for this Detective Sergeant, who was a homicide team supervisor for 11 years, is remarkable. McGuire omits even simple items, for example, blood-type, let alone the more

=68=

specialized information that can be gained from the forensic analysis of blood. While the standard to be expected of a detective is not that of a ballistics or forensics expert, nevertheless, police personnel must be aware of what information and analysis the laboratory is capable of providing and what should be observed and obtained at crime scenes and elsewhere for analysis by the crime laboratory.

All of the other failures catalogued in this Report, such as inadequate note-taking and lack of careful supervision, also are indicative in one way or another of the need for increased training.*

---

\* The Commission is heartened by Commissioner Guido's recent public comments that improved training is one of the cornerstones to his planned reforms of the Suffolk Police Department. In an August 1, 1988, interview in Newsday, Commissioner Guido was quoted as saying, "I see training as the key ingredient in effectuating organizational change."

## II. MISCONDUCT AND DEFICIENCIES IN NARCOTICS INVESTIGATIONS AND PROSECUTIONS

### A. Disorder in the Narcotics Division

Before the beginning of the Commission's investigation in November 1985, and in its early stages, narcotics investigations and prosecutions in Suffolk County were described as experiencing a "breakdown in supervision." Around this time, narcotics investigations of a number of Suffolk police officers had reached public attention. These included investigations of uniformed officers Rebecca Bernard, Brian Merlob and Jose Ingles, as well as undercover Narcotics Division officers James Kuhn and Raymond Gutowski.

By March 1986, most of these allegations had become public, and had resulted in extensive and extremely unfavorable publicity for the Police Department and the District Attorney's Office. In addition to the Commission's investigation, which preceded all the other investigations, the Suffolk Police were under the scrutiny of the United States Attorney for the Eastern District of New York, a management team from Long Island University appointed by County Executive Peter Cohalan, and the Public Safety Committee of the Suffolk County Legislature.

Coupled with the intense scrutiny occasioned by these investigations and resulting publicity, at about this time the Police Narcotics Division underwent a rapid change of commanding officers. The long-time commanding officer, Detective Lieutenant Richard Siee, who had served from July 1978, to February 1985, was transferred -- and was given two subsequent promotions before his retirement, despite the fact that most of the allegations of misconduct being examined had occurred during his tenure. He was followed in rapid succession as Commanding Officer of the Narcotics Division by Detective Lieutenant Walton Brennan,* who served less than one year, from February 1985, to January 1986, and then by Detective Lieutenant Walter Cunningham, who served only from January 1986, to May 1986. Cunningham was succeeded by Detective Lieutenant Richard Franzese, who still serves in that position. Thus, within 15 months four different commanding officers had been assigned to supervise the Narcotics Division.

The effect of the crimes and misconduct of the police employees, the resulting public scrutiny and

_____

* Prior to becoming Commanding Officer of the Narcotics Division, Brennan had no experience in narcotics investigations.

bad publicity, coupled with the rapid changes in man-
agement, led Lieutenant Franzese to testify that
"supervision definitely was a problem" in the Narcotics
Division when he arrived (Private Hearing, 11/23/87,
p. 75). More vividly, Detective Lieutenant Robert
Sievers, who was a sergeant in the Narcotics Division
during this period, testified:  "The place was a zoo"
(Private Hearing, 11/30/87, p. 35).

While significant narcotics-related miscon-
duct investigated by the Commission will be discussed
in subsequent sections of this Report, the key events
regarding Rebecca Bernard, Brian Merlob and Jose Ingles
which pre-dated the Commission's investigation, will be
briefly outlined here so that subsequent events can be
understood in their proper context.

In 1984, Suffolk County Police Officer
Rebecca Bernard was acquitted of criminal charges of
selling cocaine. However, in a disciplinary hearing in
April 1986, it was determined that Bernard had violated
Departmental rules based on her narcotics-related
activity, and she was subsequently fired. Part of her
defense was that she was conducting an unauthorized
undercover narcotics investigation in the Brentwood
area and that she had informed Suffolk Police super-
visors about a bar that was a center of narcotics

-72-

activity and about a Suffolk police officer suspected of narcotics activity, Jose Ingles, as early as May 1982. It has been confirmed by the Suffolk Police that she had supplied this information about the bar and Ingles to them in May 1982.

However, an investigation of Ingles for drug-related charges did not begin until 1984. The investigation developed evidence that Ingles and Suffolk Police Officer Brian Merlob both used cocaine and assisted drug dealers by using their positions as police officers to investigate for the dealers potential drug buyers and by acting as bodyguards for drug dealers. The officers were indicted on numerous criminal counts, but were allowed to plead guilty to a single count, Attempted Criminal Facilitation, Second Degree (Penal Law §115.05), a class D felony, on August 30, 1985. As part of their plea agreements, both officers agreed to resign from the Department.

The charges against these three officers rocked the Department and helped set in motion a series of events which led to an investigation by the Commission of other instances of misconduct in the Narcotics Division. Of particular concern to the Commission was the apparent failure of the Suffolk Police to pursue the allegations by Bernard regarding Ingles and others

aggressively until the allegations came to public attention through Bernard's own case, rather than when they were first made by her in 1982.

### B.   Kuhn and Gutowski

In September 1985, Sergeant Joseph Comiskey, the supervisor of an undercover narcotics street team, reported to his superiors that a team consisting of two of his undercover narcotics officers was using cocaine heavily. These two officers, James Kuhn and Raymond Gutowski, were among Comiskey's most productive under-cover officers, having made 86 undercover narcotics cases in their first year in the squad, during which they had become known as Comiskey's "A Team." While the information Comiskey gave to his superiors would be considered sensitive in any police department, this revelation was particularly explosive due to the unfa-vorable narcotics-related publicity the Department had already suffered concerning Bernard, Merlob and Ingles. Furthermore, the Department and District Attorney's Office had just received additional unfavorable public-ity regarding the Corso and Diaz homicide cases, while the election for district attorney, in which Mr. Henry was seeking a third term, was only a few weeks away.

According to Suffolk County Police documents, the allegations made by Sergeant Comiskey of cocaine abuse by Kuhn and Gutowski were known to Chief of Detectives John Gallagher, Inspectional Services Bureau Commanding Officer Donald Jeffers and the Commanding Officer of the Internal Affairs Division, Captain Thomas Murphy, as early as October 3, 1985.* Assistant District Attorney Raymond Perini was briefed by police officials on cocaine abuse by Kuhn and Gutowski on October 9, 1985. However, an Internal Affairs Division case number was not assigned -- and the case was not given to an investigator for full investigation -- until November 6, 1985, the day after Mr. Henry's re-election as District Attorney.**

Furthermore, and again despite the fact that illegal drug use by Kuhn and Gutowski was known to Suffolk Police authorities in September 1985, the two

---

* According to FBI documents, Kuhn and Gutowski's Commanding Officer, Lieutenant Walton Brennan, also knew of the drug abuse allegations on September 23, 1985.

** James Kuhn has testified before the Commission that Sergeant Robert Doyle, then assigned to the Internal Affairs Division, told him that no investigation of Kuhn was being started until after Election Day out of fear that the entire matter would become public knowledge and help Henry's opponent (Private Hearing, 12/23/87, pp. 92-93).

were reassigned from the Narcotics Division to police precincts and permitted to continue serving as police officers. Moreover, despite at least eight interviews of Kuhn by Internal Affairs Division personnel, Internal Affairs documents reveal no investigation of the questions raised by Kuhn as early as December 16, 1985, about the Timothy Gallagher case, nor any attempt to probe beyond Kuhn's cocaine abuse. (See Section C this Chapter.)

However, on February 21, 1986, based on information developed after debriefing Bernard, a Commission investigator contacted Kuhn and Gutowski. The Commission investigator asked Kuhn about three areas: irregularities in the handling of a drug case involving Timothy Gallagher, the son of Suffolk Police Chief of Detectives John Gallagher;* drug activity involving members of the Suffolk County Police Department Narcotics Division; and illegal wiretapping by members of the Suffolk County Police Department.

On that same evening, following his conversation with the Commission investigator, Kuhn, fearing that his partner Gutowski was cooperating with the

---

* Kuhn was the undercover officer who initially bought cocaine from Timothy Gallagher.

Commission, confessed to a Suffolk Police Internal
Affairs Division investigator regarding the three areas
of misconduct about which the Commission had asked.
However, with respect to illegal wiretapping, while
implicating himself and the entire Interdiction Unit of
the Narcotics Division of the Suffolk Police Depart-
ment, Kuhn told Internal Affairs Division investigator
James Maher, "I don't care if I have to do two or three
years in jail, I'm not rolling over on anybody in my
old team" (Private Hearing, Maher, 12/18/87, p. 62).
The information that Kuhn gave to the Internal Affairs
Division that evening in February 1986, regarding rou-
tine illegal wiretapping in the Interdiction Unit was
substantially the same information to which he testi-
fied at a Commission public hearing in January 1988.
(See Chapter III(A).)

Shortly after February 21, 1986, when Kuhn
refused further cooperation with the Internal Affairs
Division or the District Attorney's Office and enrolled
in a drug treatment program, the Suffolk District
Attorney referred the three topics of Commission in-
quiry to the United States Attorney for the Eastern
District of New York (Public Hearing, 1988, pp. 668-
669).

In early 1987, Kuhn and Gutowski were tried and acquitted in federal court of charges of distributing narcotics (United States v. Kuhn and Gutowski, CR 87-00698, E.D.N.Y., Judge Wexler). Following their acquittal, departmental disciplinary charges were reinstituted against them. Added to the departmental charges against Kuhn was a new charge that he had engaged in illegal wiretapping through conversion of a pen register while a member of the Interdiction Unit of the Narcotics Division.

One audio tape which was taken from Kuhn as evidence by the Internal Affairs Division on the evening of February 21, 1986, was subsequently demonstrated by the Suffolk Police to be an illegal recording of telephone conversations of the subject of a Narcotics Division investigation. (Decision in Suffolk County Police Department Disciplinary Proceedings against James Kuhn, Charge #8, Specification #1, 1/20/88.)

Gutowski, rather than standing trial on the departmental charges, agreed to resign. In return the Department agreed to provide a letter stating that his drug abuse arose in the course of his police work and also agreed not to contest his application for a three-quarter disability pension, which the New York State

-78-

and Local Police and Fire Retirement System subsequent-
ly granted.

Kuhn, however, persisted through a lengthy
disciplinary hearing in the summer of 1987 before
former Supreme Court Justice Joseph Corso, following
which virtually all of the disciplinary charges,
including the wiretapping charge, were sustained, and
he was fired in early 1988. After he was fired, Kuhn,
like Gutowski, was awarded a three-quarter disability
pension by the New York State and Local Police and Fire
Retirement System, based on an application which he had
made while his disciplinary charges were pending.

Kuhn and Gutowski's work as undercover
narcotics officers in 1985 produced 86 criminal convic-
tions, 84 of which were the results of plea bargains.
The convictions in the two trials which included testi-
mony by Kuhn and Gutowski were subsequently vacated due
in part to the fact that Kuhn and Gutowski had perjured
themselves when they testified they did not use
narcotics.*

In early 1987, Kuhn's charges regarding the
favored treatment accorded to Chief of Detectives

---

* <u>People v. Diane Roth</u>, Indictment No. 900-85, Supreme
Court, Suffolk County, Justice McInerney; and <u>People
v. Wayne Johnson</u>, Supreme Court, Suffolk County,
Justice Rohl.

Gallagher's son were referred by the United States Attorney for the Eastern District for State prosecution (see Chapters II(C) and VII); the wiretapping allegations were investigated by the Commission, with the initial results presented at a public hearing in January 1988 (see Chapter III).

The Commission believes that the case of Kuhn and Gutowski reveals at least two important failures with respect to narcotics matters. First, supervision in the investigation and prosecution of narcotics cases was lax. Two new and untrained undercover officers, who became heavy narcotics users themselves, made 86 cases in a seven month period during which their cases were replete with careless paperwork, missing police reports and improper handling of narcotics evidence. For example, between January 1, 1985, and September 18, 1985, Kuhn initiated some 71 Central Complaint Numbers for confidential investigations for which he never submitted the required Field Report (PDSC-1053). Furthermore, on a number of occasions Kuhn was issued cash from the Narcotics Special Cash Fund to make undercover purchases of narcotics, and while Kuhn reported expenditures for narcotics purchases in these instances, the narcotics in question were never submitted to the Criminalistics Laboratory as evidence (Decision in Kuhn

Disciplinary case, 1/20/88, especially charges #1 and #3).

Second, there was a gross failure to detect, investigate and punish police misconduct in narcotics matters. Indeed, the Commission, after only a relatively short investigation, was able to unearth criminal allegations regarding the Gallagher case, illegal wiretapping and other misconduct by police personnel in narcotics matters, yet the Internal Affairs Division and the District Attorney's Office totally failed to detect or pursue this misconduct until forced by actual or threatened adverse publicity to do so.

The evidence revealed in the Kuhn and Gutowski matter adds support to two of the conclusions reached by the Commission regarding the Suffolk County Police Department and District Attorney's Office: there has been both a serious failure of proper supervision and a most disturbing willingness to tolerate misconduct by employees unless prodded by public revelation.

### C.   Chief of Detectives Gallagher

One of the matters about which Kuhn was questioned by the Commission was the allegation that Timothy Gallagher had received special treatment in a

narcotics case (People v. Timothy Gallagher, Docket No. 618625-85, District Court, Suffolk Co.) because he was the son of Suffolk County Chief of Detectives John Gallagher.  Kuhn was the undercover officer who bought one-eighth of an ounce of cocaine on November 2, 1984, from a youth whom he later learned was Chief Gallagher's son.  Timothy Gallagher was arrested on November 1, 1985, one year after the sale.  Timothy Gallagher, who did not cooperate with the police, received special consideration as an informant based on a letter, signed by Police Officer Albert Sinram and dated April 3, 1985, falsely stating that Gallagher had helped provide information in six narcotics cases.  The recommendation letter was approved by Sergeant Joseph Comiskey, and a cover letter forwarding it to Raymond Perini, Chief of the Suffolk County District Attorney's Narcotics Bureau, was signed by Walton E. Brennan, Commanding Officer of the Narcotics Section, and Joseph Farnitano, Commanding Officer of the Major Crimes Bureau.

Based on this letter, Timothy Gallagher was allowed to plead guilty on December 6, 1985, to a class A misdemeanor, Criminal Possession of a Controlled Substance, Seventh Degree (Penal Law §220.03), rather than the original charge, Criminal Sale of a Controlled

Substance, Third Degree (Penal Law §220.39(1)), a class B felony. On February 14, 1986, Gallagher was sentenced to a fine of $500 and three years probation.

On February 21, 1986, the Commission asked Kuhn about his knowledge of misconduct in the Timothy Gallagher case. Kuhn then reported this Commission inquiry to Internal Affairs. While Kuhn had previously raised questions about the Gallagher matter which were never pursued by Internal Affairs, it was only after this Commission inquiry that the Gallagher case became one of the three matters referred by the Suffolk County District Attorney to the United States Attorney for the Eastern District of New York. In early 1987, following an extensive investigation of the Gallagher matter, the United States Attorney for the Eastern District decided that while there was evidence of a crime under New York State law, there was no jurisdictional predicate for a federal prosecution and returned the matter to Mr. Henry's Office with the recommendation for a special state prosecutor (see Chapter VII).

### D.  Eason, Savage and Donnelly

The use of Kevin Eason as a narcotics informant for the Suffolk County Police Department Narcotics Division and the Suffolk County District Attorney's

-83-

Narcotics Bureau constitutes evidence of both miscon-
duct and a failure of supervision in narcotics investi-
gations and prosecutions.

Kevin Eason began working as a narcotics
informant for Suffolk undercover narcotics Police
Officer Warren Savage in early 1984, when Eason was a
17-year old high school junior. He continued to serve
as an informant for Savage until late 1986. Eason pro-
vided Savage with introductions to street-level cocaine
sellers from whom Savage would make small purchases of
cocaine. While Eason provided some introductions which
led to arrests and guilty pleas prior to November 1985,
his major informant activity occurred between October
1985, and May 1986, when Eason allegedly provided
Savage and his partner, Police Officer Ellen Donnelly,
with introductions which led to 140 purchases of
cocaine in the Wyandanch/North Amityville area (Public
Hearing, 1988, pp. 575-579). While Eason and the
alleged cocaine sellers were all black, and the areas
being worked were almost exclusively black, Savage and
Donnelly were both white (Public Hearing, 1988,
pp. 520-521). As a result of Eason's activity, a major
drug raid occurred on July 21, 1986, in which 23 people
were arrested. These arrests and others based on
Eason's work between October 1985, and May 1986,

resulted in five narcotics trials at which Eason testi-
fied against five different defendants, one of whom was
acquitted (Public Hearing, 1988, pp. 508-509). In
addition, according to documents supplied to the Com-
mission by the Suffolk District Attorney's Office,
Eason's efforts also resulted in narcotics charges to
which numerous other defendants pleaded guilty.

At the Commission's public hearing in January
1988, Eason testified that officers Savage and Donnelly
urged him to make false identifications in many cases
(Public Hearing, 1988, pp. 370-402) and that he did, in
fact, testify falsely at the five narcotics trials at
which he was a prosecution witness.*

For the purposes of this Report, the central
point regarding Eason, however, is not how often, or

---

\* Eason testified before the Commission under a grant
of immunity. Subsequently, in a hearing on a motion
under §440 of the Criminal Procedure Law seeking to
vacate the convictions in the trials at which Eason
testified, Eason was again granted immunity, upon
the application of District Attorney Henry's Office,
whereupon Eason testified that his testimony before
the Commission was false. In so doing, Eason fur-
ther cast doubt on his credibility (People v.
Watkins, Indictment Nos. 716-86, 764-86, 766-86 and
842-86, Supreme Court, Suffolk County, Justice
McInerney, 1/25/88). Furthermore, beginning shortly
after the Commission's hearing, the District Attor-
ney's Office, knowing that the Commission was seek-
ing to speak with Eason, secreted Eason, prevented
the Commission from speaking with him and removed
him from the State.

when, he lied. The Commission's concern is rather that the Police Department and District Attorney's Office continued to use Eason as an informant, and as a key witness against criminal defendants, when there was overwhelming evidence, known to the police and to Assistant District Attorney Raymond Perini, that Eason was not reliable, and that Eason's relations with Savage and Donnelly were highly suspect.

In this regard, Detective Lieutenant Richard Franzese, the Commanding Officer of the Suffolk Police Narcotics Division, testified before the Commission that he told Perini that Eason lacked credibility and that approximately 30 cases involving Eason as an informant had to be dismissed because they had not been investigated or documented thoroughly or completely. Thus, Franzese testified:

> Q. And what did you discover in a review of these cases, did you form a conclusion as to these cases, any quality thereof?
>
> A. The cases had ostensibly not been either investigated thoroughly or completely or they hadn't been documented completely. The cases in question resulted in twenty-eight dismissals or exceptional clearance.
>
> Q. And were these cases that involved the informant, Kevin Eason?

-86-

A. The majority of them, yes.

Q. Would you state how many involved Mr. Eason?

A. Approximately thirty of them, probably.

* * *

Q. Did you ever during your review of these cases and in your time as Commanding Officer of that Unit, form any opinion as to Kevin Eason's credibility with respect to cases with which he was involved and testified about?

A. Yes.

Q. What opinion did you form?

A. That his credibility was dubious.

Q. What did you base this opinion on?

A. The number of cases that he was involved in that had defects from identifications that he had supplied to the two officers.

Q. Did you ever transmit or relay this opinion to anyone in the District Attorney's Office?

A. Yes.

Q. To whom did you relay this opinion?

A. To Raymond Perini.
(Public Hearing, 1988, pp. 546-547, 554.)

Franzese further testified that, at the direction of then Chief of Detectives Arthur Feldman, he had requested a meeting with Perini at which they would interview Eason. This meeting between Franzese, Perini and Eason occurred in November 1986, after four of the five trials in which Eason testified had been concluded. At the Commission's public hearing Franzese described this meeting as follows:

> Q. Was the issue of [Eason's] credibility as a witness discussed on that occasion?
>
> A. We didn't get very far with the discussion with Mr. Eason. He was hostile and uncooperative and non-committal. The conversation never really had gotten in any of those areas.
> (Public Hearing, 1988, p. 561.)

However, despite Franzese's expressed concern about Eason's credibility, and about Savage and Donnelly, Perini was still not deterred in his reliance on Eason as a prosecution witness.

In addition to Franzese, another officer, Sergeant James R. Maher of the Internal Affairs Division, also informed Perini that Eason had no

credibility.*  Maher had conducted an investigation of
a police officer accused by Eason of drug sales, an
allegation credited by Savage and Donnelly, but dis-
proved after an extensive Internal Affairs investiga-
tion.  Maher testified at a Commission private hearing:

> My feeling and the feeling of my
> bosses was that Kevin [Eason] had
> no credibility.  He told different
> stories every time we talked to
> him.
> (Maher, 12/18/87, p. 46.)

Maher testified that this information was provided to
Perini before Eason ever testified in any Suffolk
narcotics prosecutions (Maher, pp. 34, 46-47).

Notwithstanding these clear warnings, Perini
used Eason as a witness in narcotics prosecutions, and
he approved Eason's continued use as an informant.
Furthermore, Perini personally permitted Eason's con-
tinued use as an informant during an eight-month period
in which Eason was arrested on three different criminal

---

\* Sergeant Robert Sievers, who served under Franzese,
and who supervised Savage and Donnelly from February
1986, to May 1986, told the Commission that he also
had problems with the credibility of Eason, as well
as the credibility of Savage and Donnelly (Private
Hearing, Sievers, 11/20/87, p. 14).

charges which the District Attorney's Office did not prosecute.*

In addition to revealing Perini's continuing use of an informant of dubious credibility, the Eason matter also demonstrates the startling lack of super-vision in the Police Narcotics Division. Police Officers Savage and Donnelly carried out 140 under-cover drug buys in eight months, with Eason providing all the introductions. The work of these officers, which was largely unsupervised, was marked by frequent errors, poor practices and frequent violations of rules and procedures. Thus, in a memorandum, dated June 12, 1986, to Detective Lieutenant Richard Franzese, Detec-tive Sergeant Robert Sievers, who had supervised both Savage and Donnelly beginning on February 10,

---

* On November 21, 1985, Eason was arrested for Reck-lessly Causing Physical Injury (class A mis-demeanor), Suffolk County, District Court (Docket No. 20236-85); on April 29, 1986, Robbery Second Degree (class C felony), Suffolk County, District Court (Docket No. 7215-86); and on May 23, 1986, Grand Larceny (class E felony), Suffolk County, District Court (Docket No. 8740-86). Eason was never represented by counsel on any of these charges, nor was he represented by counsel in a meeting with Raymond Perini during this same time period at which Perini approved of Eason continuing as an informant and promised him "consideration" (Public Hearing, 1988, pp. 453-462). The District Attorney's Office has never pursued prosecution of Eason on these three criminal charges which he allegedly committed during the time he was acting as an informant.

1986, criticized their performance and their relation-
ship with Eason:

> . . . As the two officers [Savage
> and Donnelly] were working the
> 'street level' investigation men-
> tioned above a number of incidents
> occurred that the undersigned in-
> terpreted as indications that their
> police identity was compromised,
> they had become too 'close' to the
> confidential informant [Eason] and
> that they were not in full control
> of the investigation.

Testimony was also presented by Suffolk
Police witnesses that officer Donnelly tasted cocaine
in the presence of other officers in a police precinct
(Public Hearing, 1988, pp. 541-542); that Officer
Donnelly deliberately failed to keep Narcotics Division
informant cards up to date by listing cases in which
information was provided by Eason, contrary to Suffolk
Police Rules and Procedures (Public Hearing 1988, pp.
570-573); that Savage and Donnelly relied solely on
identification information provided by Eason in a sig-
nificant number of cases and failed to obtain other
needed corroborative identification evidence (Public
Hearing, 1988, p. 538); and that deficient identifica-
tion procedures used before and after the July 21,

-91-

1986, narcotics raid resulted in a number of mistaken arrests (Public Hearing, 1988, pp. 472-483).

Finally, Suffolk Police documents indicated that Savage and Donnelly were insubordinate and failed to follow legitimate orders of their supervisors, and that they were characterized as "bizarre" and "aberrant" by supervisors and recommended for psychiatric evaluations (which were never conducted).*

The problems in the investigations and prosecutions involving cases developed by Savage and Donnelly, with the assistance of Eason, are but another example of the lack of supervision and professionalism, and the tolerance for misconduct, exhibited by the Suffolk County Police Department and District Attorney's Office.

---

\* Rather than being vigorously investigated, Police Officer Savage was promoted to detective and transferred from Narcotics in August 1986.