

# AN INVESTIGATION INTO THE PROCEDURES RESULTING IN THE ARREST AND CONVICTION OF MARTIN TANKLEFF FOR THE MURDERS OF SEYMOUR AND ARLENE TANKLEFF

**DECEMBER
2008**

STATE OF NEW YORK
COMMISSION OF INVESTIGATION

AN INVESTIGATION INTO THE PROCEDURES RESULTING IN
THE ARREST AND CONVICTION OF MARTIN TANKLEFF FOR THE
MURDERS OF SEYMOUR AND ARLENE TANKLEFF

ALFRED D. LERNER
Chairman

HENRY J. NAHAL
VINCENT F. NICOLOSI
ROBERT PRICE
GEORGE FRIEDMAN
JOHN P. CAHILL
Commissioners

MARY E.COLLIGAN
Deputy Commissioner/
Chief Counsel

ANTHONY HELLMER
Assistant Commissioner/
Chief Investigator

RAFFAELA PETROCCIONE
Executive Assistant

JEROME LIGHTFOOT
Deputy Chief Investigator

STAFF FOR THIS INVESTIGATION AND REPORT

KENNETH CHRISTOPHERSEN

Senior Special Agent

GERALD LAVIN

Special Agent

DEIRDRE FRAZIER

Secretary to the Chief Counsel

This report is also available on the Internet at www.sic.state.ny.us

# TABLE OF CONTENTS

**EXECUTIVE SUMMARY** ................................................................................................ i

*INTRODUCTION* ....................................................................................................... 1

*THE COMMISSION'S INVESTIGATION* ..................................................... 2

*SUFFOLK COUNTY POLICE DEPARTMENT'S*
*RESPONSE TO THE SCENE AND SUBSEQUENT INVESTIGATION* ..................... 7

*TANKLEFF'S CONFESSION* ......................................................... 11

*CRIME SCENE FORENSIC INVESTIGATION* ................................... 13

*SEYMOUR TANKLEFF'S BUSINESS PARTNER JERARD STEUERMAN* ........... 15

*THE SUFFOLK COUNTY DISTRICT ATTORNEY'S OFFICE* ................................ 17

*FINDINGS AND CONCLUSIONS* ................................................. 20

# EXECUTIVE SUMMARY

In April 2006, Martin Tankleff ("Tankleff") wrote to the New York State Commission of Investigation ("the Commission") requesting an investigation into the Suffolk County District Attorney's ("DA") Office and the Suffolk County Police Department's ("SCPD") conduct regarding their investigation and prosecution of him for the 1988 murders of his parents Seymour and Arlene Tankleff.  Following a nine week trial, Tankleff was convicted in June, 1990 and sentenced to two consecutive, 25-years-to-life prison terms.

Over the past seventeen years, Tankleff appealed his convictions in New York State Appellate Courts and filed a federal habeas corpus petition, all which were unsuccessful.  In addition, he filed various New York State Criminal Procedure Law ("CPL") Article 440 motions[1] also denied by the courts.  In October, 2003, Tankleff filed a new CPL Article 440 motion claiming that there was new evidence that proved other men, at the behest of his father's business partner, actually murdered his parents. In that motion he requested a hearing to present the new evidence.  The DA consented to the motion and the hearing took place between July, 2004 and December, 2005 during which time over thirty witnesses testified.  In March, 2006, the Suffolk County Court denied Tankleff's motion to vacate his convictions.

---

[1] CPL Article 440 contains various grounds upon which a conviction may be vacated or a sentence may be set aside by a reviewing court.

Tankleff then appealed that decision, and the Appellate Division, Second Department ("Appellate Division") agreed to hear the appeal. In December 2007, the Appellate Division vacated Tankleff's convictions, finding that there was sufficient new evidence to warrant a new trial. The DA's Office declined to retry Tankleff and asked then-Governor Spitzer to appoint a special prosecutor. The Governor appointed New York State Attorney General Andrew Cuomo ("OAG") as special prosecutor. After a six-month investigation, the OAG moved to dismiss the indictment in the interest of justice.[2]

The Commission does not take issue with the Appellate Division's decision in directing a new trial, or the decision of the DA or the OAG not to retry Tankleff. Rather, the focus of the Commission's investigation is whether abuses and/or misconduct took place in Tankleff's arrest and prosecution.

Over the course of its investigation, the Commission reviewed the original hearing and trial transcripts and testimony, files, crime scene evidence, the current hearing transcripts and testimony, all the legal briefs filed in the case, and interviewed numerous witnesses from both the trial and the recent hearings. Commission staff reviewed the DA's written report of its investigation regarding the newly discovered evidence and reviewed the OAG's report issued as the special prosecutor. The

---

[2] "After extensive review, the Attorney General has determined that although there is some evidence that the defendant, Martin Tankleff, committed the crimes charged, after 20 years the evidence is insufficient to conclude or to prove beyond a reasonable doubt that he did so." New York State Attorney General's Office, *People v. Martin Tankleff, Memorandum of Law in Support of the People's Motion Pursuant to CPL 210.40 To Dismiss The Indictments,* June 30, 2008, at p. 2.

Commission reviewed SCPD reports, time logs and officer's notes. DA Thomas Spota and members of his staff were also interviewed.

 Based on its investigation, the Commission concludes:

- The Suffolk County Police Department Detectives, Uniformed Police Officers, and Forensic Investigators, as well as the Medical Examiner's Crime Lab personnel conducted a comprehensive, extensive and methodical investigation from beginning to end.

- The procedures employed by the SCPD in questioning Martin Tankleff were proper in all respects, completely within the confines of the law, and the Commission finds that there was no evidence that Tankleff's confession was obtained by way of force or coercion.

- Although DA Spota's initial failure to recuse himself and ask for a special prosecutor cast an unnecessary cloud over the investigation, the Commission, during its inquiry, found no evidence that Spota's office engaged in any improper conduct or engaged in any activity inappropriately prejudicial to Martin Tankleff.

- The Commission rejects Tankleff's contention that there were similarities in the Commission's 1989 investigation of the SCPD and DA's Office and their investigation and prosecution of the Tankleff murders.

*INTRODUCTION*

In 2006, Martin Tankleff wrote to the Commission requesting an investigation into the SCPD and the DA's conduct regarding their investigation and prosecution of the murders of his parents, Arlene and Seymour Tankleff.  Tankleff alleged that lead detective James McCready benefited financially from Tankleff's conviction by entering into a business with Tankleff's half-sister and her husband.  Tankleff stated that during recent hearings, witnesses testified and/or provided sworn affidavits that McCready and Seymour Tankleff's business partner Jerard Steuerman were friends and knew each other before the Tankleff murders.

Tankleff's complaint filed with the Commission further alleged that the DA's Office had a conflict of interest in that DA Spota had represented the SCPD Police Benevolent Association ("PBA") and McCready, both privately, and as a SCPD member. Tankleff contended in his letter to the Commission that DA Spota should have joined in his motion for a special prosecutor, or moved on his own for such an appointment. Tankleff claimed that improprieties engaged in by the SCPD and the DA, in his case, were consistent with problems that existed when the Commission conducted its investigations of these two agencies in 1989.

The Commission investigated all of Tankleff's allegations.  It was not the Commission's objective to solve the murders or to refute or substantiate the People's or the Defendant's case. The Commission's investigation focused on the practices of the SCPD and the DA's Office and whether these two agencies properly conducted their investigations.

*THE COMMISSION'S INVESTIGATION*

In Tankleff's April 19, 2006 letter to the Commission he referenced the Commission's 1989 report titled "An Investigation of the Suffolk County District Attorney's Office and Police Department," which criticized both agencies for engaging in improper investigative procedures.

The Commission examined the SCPD's investigation of the Tankleff murders to ascertain if Tankleff's arrest and prosecution for those murders were consistent with problems that the Commission noted in its 1989 report.  Tankleff further alleged that DA Spota's office engaged in improper conduct in handling CPL Article 440 hearings from 2003-2005.

Shortly after Tankleff's letter to the Commission in April 2006, and prior to the Appellate Division's decision in 2007, the Commission obtained the 1990 trial transcripts, the 2003 CPL Article 440 hearing transcripts and legal briefs filed with both Suffolk County Court and the Appellate Division. In addition, the Commission obtained and reviewed police records, defendant's documents and statements, and interviewed Tankleff family members and several members of the SCPD.

After the Appellate Division rendered its decision in 2007 directing a new trial, the OAG was appointed special prosecutor. The Commission conferred with the OAG and began to interview police witnesses both currently employed, and now retired, who worked on the Tankleff investigation. The Commission interviewed Tankleff's original defense attorneys and assistant district attorneys who handled the trial, the CPL Article 440 hearings, and who argued the case before the Appellate Division.

As a result of Tankleff's allegation that McCready benefited financially by his conviction because McCready entered into a business relationship with his half-sister, Shari Mistretta, the Commission interviewed Mistretta.

According to Mistretta it was her recollection that she first met Detective McCready when he called to interview her within two days after Tankleff was arrested. Mistretta said that McCready interviewed her to gain information about Tankleff's relationship with his parents and other family members.  Mistretta said that she and her husband Ron Rother separated in June 1993.

 Mistretta stated that her husband had a long-time friend named Howard Boughey, a bartender. Boughey, Rother and McCready, who was also a friend of Boughey's, became partners and opened a bar/restaurant in August 1993.  Mistretta said that she and her husband met with Boughey and McCready on one occasion prior to the bar being opened.  Mistretta said that she and her husband did not know McCready prior to the murders and that she has never had any further contact with him. Mistretta was aware of Tankleff's allegation that McCready benefited financially by entering into a business with her.  Mistretta said that this allegation was nothing less than "ludicrous" and further stated that she never had any interest whatsoever in the business.

Ron Rother told the Commission that he had previous experience in the bar business, and that in early 1992 he decided to open a bar/restaurant with Boughey.  Rother said he re-financed his home in 1993 to raise capital for the business.   Boughey was working at a bar in Rocky Point at that time and he and Rother had tried unsuccessfully to purchase it. Still wanting to open a bar,

the two of them found a building in Riverhead which they purchased and eventually opened as a bar/restaurant.  As the cost of the renovations to the building was substantially more than they had expected, they decided to take on an additional partner.  Boughey, who knew that McCready was an experienced contractor, suggested that McCready could be that partner. Rother said that Boughey and McCready constructed and set up the bar/restaurant that opened sometime in 1993. At that time, Ron and Shari Rother were experiencing marital problems and were estranged.  He told the Commission that Shari had no involvement with the business.  Sometime thereafter, Rother sold his interest in the business to McCready's brother.

In his letter to the Commission, Tankleff inferred that his father's business partner, Jerard Steuerman, had known McCready prior to the murders of his parents.   McCready has maintained that he did not know Steuerman prior to the murders.  To refute McCready, Tankleff's defense team obtained statements/affidavits from Leonard Lubrano and William Sullivan that allegedly connected McCready to Steuerman prior to the Tankleff murders.

The Commission interviewed Lubrano and Sullivan. Sullivan told Commission investigators that he was introduced to McCready while he was employed at a licensed premise in the mid to late 1980's.  He said he saw McCready in the bar several times over the next few years and on two of those occasions, he observed McCready speaking to an individual whose name he later learned was "Jerry". Sullivan said he never overheard McCready and Jerry's conversations.[3]

---

[3] When interviewed by the Special Prosecutor in 2008, Sullivan referred to this man only as "Jerry" not Steuerman or Jerry Steuerman.  New York State Attorney General Standard report #IBN 08/002, 6/11/2008.

According to Sullivan, many years later, he viewed a *Court TV* show that led him to believe Tankleff had been wrongly convicted. The *Court TV* reporter said that it would be helpful to Tankleff's case if any viewers could place McCready and Steuerman together. Sullivan waited about a year before contacting Tankleff's defense team. Sullivan stated that he subsequently met with private investigator Jay Salpeter and other members of the team at their office. He said Salpeter was very pushy and aggressive.  Sullivan stated that a woman in the office named Toni[4] encouraged him to identify a person he knew as "Jerry" to be Steuerman. Sullivan said he asked to speak to an attorney, but instead was repeatedly shown video recordings of TV shows dealing with the Tankleff case.  Sullivan stated that Toni asked him about the conversations he witnessed between McCready and Jerry.  Sullivan said that he had never overheard any conversations between them. According to Sullivan, he was surprised when Toni told him that in one of the conversations, McCready and Jerry "were planning a murder". Sullivan was introduced to "Mr. Barket," an attorney, and was handed an affidavit, which had been typed by Toni. He read the affidavit and signed it. Sullivan was uncertain that the individual who he had observed speaking to McCready nineteen years before, was actually Jerry Steuerman.


Commission investigators also interviewed Leonard Lubrano, who testified during the CPL Article 440 hearings that McCready and Steuerman knew each other. Lubrano stated that he and his wife had seen a *Court TV* segment on the Tankleff murders, and he told his wife that he had once seen McCready in Steuerman's bagel store, and that he thought he should contact

---

[4]Martindale Hubbard.com lists "Toni Marie Angeli" as a partner in the law firm of Barket & Angeli P.C., Garden City, New York.

Tankleff's defense team.  He did not contact the defense team until two years later because his wife didn't want him to get involved.


Lubrano said that between 1978 and 1983 he owned a wholesale baked goods business that serviced restaurants and food service companies in the Long Island area.   He first met Jerry Steuerman when he started buying bagels wholesale from Strathmore Bagels, which was owned by Steuerman.  Early one morning between 1978 and 1983, Lubrano was in Strathmore Bagels waiting for his order to be filled when he noticed a well-dressed male customer wearing a Rolex watch.


Years later, Lubrano sold the wholesale bakery business and opened a pizzeria in Rocky Point, New York.  According to Lubrano, sometime between 1983 and 1991, a man wearing a Rolex watch came into his pizzeria.  He said he recognized the individual wearing the watch as the man he had seen in Strathmore Bagels.[5]   He said the man in question owned a contracting business and often came into his restaurant to buy lunch for his work crew.  He later learned that this man was Jim McCready.[6]  According to Lubrano, McCready once mentioned that his crew was doing work at "Strathmore".   Lubrano stated he immediately thought McCready was referring to either Strathmore Bagels or Strathmore Stables, both owned by Steuerman.  Lubrano further stated that it was possible McCready may have been referring to the Strathmore Residential Subdivision, and not to either of Steuerman's businesses. When Commission staff

---

[5] Lubrano told the New York State Attorney General's Office's investigators that he had heard that Jerry Steuerman and Detective McCready knew each other and that he felt this had to be true.  New York State Attorney General Standard Report case #IBN-08-002, *Interview with Leonard Lubrano*, June 11, 2008.

[6] Lubrano told Commission investigators that he had no direct knowledge that McCready and Jerry Steuerman knew each other and that he never saw them speak to each other.

6

interviewed McCready, he stated that his contracting business had in fact renovated at least three homes in the Strathmore subdivision, during the time period that Lubrano mentioned.

The Commission found no concrete evidence to substantiate Lubrano's and Sullivan's statements. The Commission found no evidence that McCready and Steurerman knew one another prior to the Tankleff murder investigation. Vague inferences drawn on innuendo are insufficient to warrant establishing a connection between McCready and Steuerman.

In his letter to the Commission, Tankleff stated that a subject of the Commission's 1989 report, SCPD Detective Walter Warkenthien, now a Suffolk County DA's Investigator, had been assigned by DA Spota to lead the Tankleff re-investigation. Tankleff's allegation regarding Detective Warkenthien is immaterial and without any relevance, inasmuch as Detective Warkenthien retired from the SCPD two years prior to the Tankleff murders.

### *SUFFOLK COUNTY POLICE DEPARTMENT'S*
### *RESPONSE TO THE SCENE AND SUBSEQUENT INVESTIGATION*

On or about 6:10 A.M. on September 7, 1988, Tankleff called 911 and told the dispatcher that his father was gushing blood from the back of his neck.  As the first two police officers arrived at the Tankleff residence at 6:17 A.M., Tankleff ran outside and yelled to the officers that his parents had been murdered and that Jerry Steuerman had murdered them.

Ambulance personnel arrived at 6:25 A.M. and immediately began rendering aid to Seymour Tankleff, who was still alive.  At 6:35 A.M., Tankleff entered the house using a tissue

to open the door and one of the police officers allowed him to answer the telephone in the kitchen. Tankleff picked up the receiver with a tissue and spoke to his sister Shari, who he asked to come to the house. Shortly after his conversation with Shari, her husband Ron Rother, arrived at the house. Rother spoke to Tankleff and they went into Seymour Tankleff's office, where paramedics were aiding him. At that point, a police officer ordered Tankleff and Rother to leave the house.

Upon arriving at the Tankleff home at about 8:00 A.M., SCPD Homicide Squad Detectives Sgt. Robert Doyle, K. James McCready and Norman Rein, assessed the crime scene and found no sign of forcible entry, nor did they observe any physical evidence outside the home indicating that someone had entered. According to McCready's report, he observed blood on a light switch-plate and on a wall in Tankleff's bedroom.[7] On that same day, the detectives interviewed the SCPD uniformed police officers and emergency ambulance personnel who were the first responders to the scene.

Based on the totality of the circumstances that were evident to the detectives, as well as Tankleff's statement that when he awoke he found his parents bloody and injured, the detectives determined that Tankleff was in the house with his parents when they were viciously and violently attacked, and that he was unharmed.

The detectives, based on their years of experience investigating homicides, believed that Tankleff's behavior and demeanor were inconsistent with that of an individual who had just

---

[7] The blood stain on the switch plate and the blood stain on the wall in Martin Tankleff's room were analyzed by the Suffolk county Medical Examiners's Crime Lab and were found to be either consistent with Arlene's blood or with Martin's blood.

observed that his parents had been violently attacked and murdered.  At the very beginning of their investigation, the detectives also determined that some of Tankleff's statements were inconsistent with their observations made at the scene.

Additionally, while at the scene, McCready conferred with Belle Terre Chief Constable Donald Hines, who related a conversation he had earlier that morning with Tankleff.  Hines knew the Tankleff family because Seymour Tankleff was the Commissioner of the Belle Terre Constabulary and Hines had become friendly with the Tankleff family.

The Commission interviewed Hines, who stated that he told McCready that after he arrived at the scene he observed Tankleff walking about in front of his house and offered him a seat in his car.  Hines said that he had told McCready that he asked Tankleff what happened in the house.  Tankleff responded by stating that Steuerman was the last player to leave a card game that ended at about 3:00 A.M. and that Steuerman killed his mother and father.  Hines told Tankleff that his father was still alive and if he regained consciousness the police would be able to verify if Steuerman was the perpetrator.  Hines said that at that point Tankleff's demeanor suddenly changed; his eyes widened, he appeared to be startled, and he stopped talking.  Hines stated that Tankleff then left his car.

At 8:40 A.M., McCready requested that Tankleff accompany him to SCPD headquarters for questioning.  At 9:20 A.M., McCready and Tankleff arrived at headquarters.  Detective Rein arrived shortly thereafter.  Detectives Rein and McCready began interviewing Tankleff at 9:40 A.M., during which time Tankleff spoke to the detectives about a girl, his friends, his car, his

9

personal history and his father's business interests.  According to the detectives, throughout the interview, Tankleff remained calm and unemotional and oddly, never asked about his father's condition.

McCready then left the room and dialed an office phone extension close to the interview room that allowed Tankleff to overhear a feigned conversation he had with a detective at the hospital, who was with a doctor that was attending to Seymour Tankleff.

McCready re-entered the interview room and informed Tankleff that his father had regained consciousness and said that his son Marty, had beaten and stabbed him.  Tankleff responded, "Well if my father said that, it's because I'm the last person he saw."  McCready told Tankleff that his hairs were found in his mother's hand, and that tests proved that a bathroom shower was used that morning, indicating that he might have washed away his parents' blood. Tankleff initially told McCready and Rein that he had not showered that morning.  According to McCready and Rein, Tankleff then began to question himself and stated, "I wonder if I blacked out and committed the attacks?"

At that point, Tankleff requested to take a lie detector test.  His request was denied by Rein, who asked him, "what should we do to a person who did this to your parents?"  Tankleff replied, "whoever did this to them needs psychiatric help."

10

McCready and Rein testified at trial that Tankleff then said: "Could I have blacked out and done it?"  Tankleff answered his own question saying: "It's not likely it's me but it's like another Marty Tankleff that killed them…could I be possessed?...it's coming to me."

According to McCready's supplemental report, at 9:45 A.M., during the interview, three white paper tissues were removed from the right front pocket of Tankleff's sweatshirt. McCready took the tissues as evidence.[8] At 11:54 A.M., McCready advised Tankleff of his *Miranda* rights and Tankleff agreed to continue speaking to the detectives.

### *TANKLEFF'S CONFESSION*

In Tankleff's verbal and unsigned statement, written by McCready,[9] dated September 7, 1988, Tankleff confessed that he attacked his mother first,[10] with a barbell, striking her four or five times on the head, cut her throat with a knife, and stabbed her many times.  Arlene Tankleff was autopsied September 8, 1988.  The Medical Examiner's autopsy report indicates that her death was caused by incised wounds of the neck, involving larynx, carotid artery and jugular vein.  Additionally, blunt impact head trauma was also reported, and she had suffered multiple head fractures.  The Medical Examiner testified that the circular skull fractures were consistent with the size and dimension of a barbell that was recovered by the police at the scene.  There

---

[8] Robert Baumann, Forensic Serologist at the Suffolk County Criminalistics Laboratory analyzed the three paper tissues, two of which contained human blood.  Baumann determined that the blood on one of the tissues was consistent with only Arlene Tankleff's blood.  Blood on a second tissue was consistent only with Martin Tankleff's blood.  Suffolk County Criminalistics Laboratory Report number 988-57698.

[9] Commission staff, some of whom are former homicide investigators, affirm it is common practice for detectives and police officers to write statements for defendants, complainants and witnesses who later sign them when completed.

[10] Medical expert trial testimony concerning blood transference showed that Seymour Tankleff was probably attacked first.  His blood was found in a hallway leading to the master bedroom where Arlene Tankleff was attacked.  The Suffolk County Medical Examiner testified at trial that Arlene Tankleff's head wounds were consistent with those that could have been inflicted by the use of a barbell.  On cross examination, the Medical Examiner said that her head wounds could also have been inflicted by a hammer.

were many stab wounds to her body.  The injuries sustained by Arlene Tankleff could not have been known to the detectives at the time they questioned Tankleff.

Tankleff's defense team has consistently maintained that Tankleff immediately disavowed his confession and that it was coerced by McCready and Rein.   Tankleff testified at his trial that "Detective Rein was very nice, I trusted him."  He also testified that he trusted, but did not like McCready.  On cross-examination, for the first time, Tankleff testified that after he confessed, McCready choked him in front of Rein and Doyle.  However, Tankleff's attorney, Robert Gottlieb, had not elicited the "choking accusation" during the direct examination of Tankleff or his cross- examination of McCready, Rein, or Doyle.

Several newspaper articles have been quoted saying that Tankleff had "immediately recanted" his confession.[11]  The Commission has found no evidence to support that claim.  The Commission's investigation revealed that after confessing to the murders of his parents, Tankleff agreed to have his confession videotaped.  Two Suffolk County Assistant District Attorneys were standing by in the homicide squad room and were prepared to proceed with the videotaping.  At 1:22 P.M., Tankleff's attorney, Myron Fox, called SCPD headquarters and spoke to Detective Sergeant George Horvath.  Fox told Horvath to cease any further questioning of Tankleff.  McCready immediately ended his questioning of Tankleff, and stopped writing the confession.

According to Detective Rein's testimony at trial, at about 6:00 P.M., while still in custody at SCPD headquarters, Tankleff asked Rein if he could speak to his sister, Shari. At 6:35 P.M.,

---

[11]Matthew Chayes, *Neighbors Agree with Tankleff Ruling* , Newsday, December 21, 2007; Kenneth Lovett and Dave Goldiner, *State Opts Not to Retry Marty Tankleff in the Murder of His Parents,* Daily News, June 30, 2008; Bruce Lambert, *Prosecutors Won't Oppose Convicted Killer's* Hearing,  New York Times , May 13, 2004.

Tankleff spoke to Shari by telephone.  Detective Rein was present during this telephone conversation and heard Tankleff say, "I need help, I need help, I need help.  I need to see a psychiatrist.  I want to make sure to tell you that I'm sorry for what I did.  I acknowledged to the police that I did it.  I need to see you tonight."

Tankleff testified that, prior to the call, Rein told him, "You're going to tell your sister that you're sorry, you're going to tell your sister that you need psychiatric help, you're going to tell your sister what you did and you're going to tell your sister that you are really, really sorry."  At the trial, Tankleff admitted that he told Shari that he was sorry and that he needed psychiatric help but that the reason that he confessed was, "because they made me."

### CRIME SCENE FORENSIC INVESTIGATION

The Commission conducted numerous interviews of SCPD officers and Suffolk County Medical Examiner's Office personnel who responded to the crime scene.  The Commission also examined the reports generated by the forensic units that conducted their investigations at the scene.

On September 7, 1988, upon arriving at the Tankleff residence, homicide squad detectives called for specialized forensic units to assist them in their investigation.  The following units responded to the scene and provided their specialized expertise as indicated below:

### SCPD IDENTIFICATION SECTION

- Exterior Photographs
- Exterior Video

13

- Interior Video
- Interior Photographs
- Processed residence for latent fingerprints
- Labeled, Photographed and Invoiced all items taken as evidence from the scene.

*SUFFOLK COUNTY MEDICAL EXAMINER'S CRIME LAB[12]*

- Collected hairs
- Collected blood samples found on articles at the scene
- Collected samples of water found in drain traps in kitchen and bathrooms
- Collected numerous knives
- Collected barbells
- Collected switch plate and section of sheetrock wall stained with blood from Martin Tankleff's room
- Collected bedding, towels, clothing and a loofah sponge from bathroom.
- Analyzed all trace evidence collected at scene

*SCPD EMERGENCY SERVICES UNIT*

- Conducted two separate "grid searches" of grounds surrounding residence
- Searched cliff behind residence
- Searched beach behind residence

*SCPD CRIME SCENE UNIT*

- Searched grounds surrounding residence with metal detectors[13]

*SCPD K-9 UNIT*

The K-9 Unit searched the grounds around the house with "scent dogs" trained to detect the scent of newly disturbed grass, foliage and soil.  The unit searched for weapons, footprints and other evidence which provided negative results.

---

[12] The Crime Lab was unable to identify any evidence collected from Tankleff's home as the murder weapon(s).

[13] In Suffolk County the function of the  Crime Scene Unit, in cases other than homicides, is to gather evidence, photograph crime scenes, dust for latent fingerprints and then submit discovered material to the Suffolk County Criminalistics Laboratory for analysis.  Although the Crime Scene Unit responded to the Tankleff residence, Criminalistic Laboratory personnel took charge of the crime scene, investigated and gathered evidence inside the Tankleff home.  The Crime Scene Unit was assigned to search the exterior areas surrounding the house.

_SCPD AVIATION UNIT_

Took aerial photographs of residence and surrounding area.


_SCPD PROPERTY BUREAU_

Responded to scene and employed "Safes Incorporated" to open Seymour Tankleff's safe to search contents for possible evidence. The contents of the safe were taken and invoiced as evidence. Architectural plans of the residence taken from the safe were used to create a scale model of the house that was used as an exhibit at trial.


In reviewing the manner in which the SCPD conducted its investigation from beginning to end, it is evident that they were careful and methodical in gathering of evidence. That, coupled with Tankleff's confession, resulted in his conviction. Nothing was uncovered by the Commission's investigation to indicate that the SCPD should have done something other then what they did.


**_SEYMOUR TANKLEFF'S BUSINESS PARTNER JERARD STEUERMAN_**

When McCready introduced himself to Tankleff at the crime scene, Tankleff told him that his mother had once told him that Steuerman was going to do something like this. Tankleff also told McCready that, after a lengthy card game, Steuerman was the last of seven to leave his house earlier that morning. At SCPD headquarters, Tankleff told McCready and Detective Rein that Steuerman and his father were in business together and that there had been an ongoing dispute between them.

Tankleff alleged in his trial testimony that, before the murders, Steuerman and Seymour Tankleff's business partnership was troubled. Seymour Tankleff had loaned Steuerman money to build a house in Belle Terre. In return, Steuerman gave Seymour Tankleff an interest in his bagel business and paid him a percentage of its profits. Shortly before the murders, though behind in his payments to Seymour Tankleff, Steuerman purchased another store without including Seymour Tankleff as a partner. Seymour Tankleff was angry and threatened to call in his note. At the time of the murders, Steuerman owed Seymour Tankleff approximately $500,000.00.

On September 7, 1988, at about 9:00 A.M. while at the crime scene, Doyle directed homicide squad Detectives Anderson and Laghazza to interview the seven card players and to interview Steuerman last, which they did. Anderson and Laghazza subsequently interviewed Steuerman at his business, Strathmore Bagels. Both detectives concluded after their interview that they did not consider Steuerman to be a suspect in the assault and murder of Seymour and Arlene Tankleff.

On September 10, 1988, Steuerman was interviewed by McCready and Rein, at Strathmore Bagels. At that time the detectives also interviewed Steuerman's son, Glen, who managed the bagel shop, as well as two other store employees.

One week after the murders, on September 14, 1988, Steuerman's car was found with its engine running and the keys in the ignition, behind a restaurant in Hauppauge, N.Y. Based on available information and evidence at that time, SCPD did not believe Steuerman had been

harmed, and attempted to locate him.  On September 15, 1988, Steuerman's daughter Bari, filed a missing person's report with the SCPD.  The detectives subsequently learned that Steuerman was in California.  McCready, Doyle and Assistant District Attorney Edward Jablonsky flew to California to interview Steuerman. While in California, the detectives conducted an extensive interview with Steuerman in which they learned he was besieged with family and business problems.  Steuerman told them that his life was in ruins and the fact that Tankleff had accused him of murdering his parents, as well as the public's perception that he was involved in the murders, had overwhelmed him.  By leaving Suffolk County he believed he would be able to rebuild his life.

While in California, the detectives persuaded him to accompany them back to New York. Steuerman was not a fugitive and was not under arrest. They believed the circumstances surrounding his flight from Suffolk County created the perception that he was involved in the murders**.**

During Tankleff's trial, Steurerman was called as a witness by the prosecution. He underwent three days of cross-examination by the defense regarding his possible involvement with the murders, including his sudden disappearance and flight, all of which was considered by the jury hearing the case.

### *THE SUFFOLK COUNTY DISTRICT ATTORNEY'S OFFICE*

Tankleff's letter to the Commission expressed his dissatisfaction that DA Spota refused to have a special prosecutor appointed or consent to his motion for a special prosecutor.

Tankleff alleged that, "DA Spota's office engaged in a pattern of misconduct that brings back memories of the 1980's when the Commission investigated that office."

DA Spota was a Suffolk County Assistant District Attorney in the 1970's and early 1980's. Thereafter, he entered private law practice in Suffolk County, representing clients including the Suffolk County Detectives Association and other law enforcement unions. In 2001, he was elected Suffolk County District Attorney.

 While in private practice, DA Spota represented McCready during the Commission's 1989 investigation. After McCready retired from SCPD Spota represented him in a criminal proceeding in which he was found not guilty.

Prior to the 2003 CPL Article 440 hearings, Tankleff's defense counsel expressed his concerns to DA Spota about possible conflicts of interest regarding Spota's prior representation of McCready, and his belief that Spota's firm had represented Jerry Steuerman in the past.  DA Spota felt he had no conflicts, but to assuage defense counsel concerns, stated he would assign a special assistant to oversee the case.  DA Spota then assigned Assistant District Attorney ("ADA") Leonard Lato, a former Assistant United States Attorney, whom he had hired in 2003. DA Spota gave Lato full authority to act independently.  DA Spota stated that he "would erect a wall" between his office and Lato's investigation of the matter.

The Commission interviewed DA Spota and several of his assistants including ADA Lato. Lato told Commission staff that he conducted an investigation to determine the authenticity

of Tankleff's claims of actual innocence and examined all evidence including that which was newly produced. Lato concluded that the majority of the twenty four witnesses brought forward by the defense were unreliable and lacked credibility.  Lato was also of the belief that some people came forward because of the intense media coverage.[14]

After a three-month investigation, Lato concluded that Tankleff's motion was "meritless" and he was not entitled to a hearing, because Tankleff, up to that point, had neither demonstrated "his actual innocence" nor presented "new evidentiary materials" which would establish that anyone other that Tankleff himself, had murdered his parents.[15]  Lato found that much of the evidence would be inadmissible at trial and much of the testimony was untrustworthy.

When a purported participant in the murders came forward with an affidavit that two other men had murdered the Tankleffs, Lato consented to the CPL Article 440 hearing which began in July 2004 and ended in February 2005.  During that time, the purported participant gave various versions of the events, and refused to testify at the hearing without immunity, which Lato refused to bestow.  In March 2006, the Suffolk County Court denied Tankleff's motion to vacate his convictions.

Although the failure of DA Spota to initially recuse himself and ask for a special prosecutor cast an unnecessary cloud over the investigation, the Commission uncovered no

---

[14] In its decision, the Appellate Division rejected the People's assertion in oral argument that intense media coverage played a role in that it prompted individuals to testify falsely, calling it "sheer conjecture and speculation." *People v. Tankleff*, 49 A.D.3d 160, 848 NYS2d 286 (Second Department, 2007) 182.

[15] Suffolk County District Attorney, *Report of the People's Investigation of the Defendant's Claim That "New Evidentiary Materials" Establish His "Actual Innocence"*, December 18, 2003.

evidence of any wrongdoing or any acts committed by anyone in the DA's office that were prejudicial to Tankleff.

### FINDINGS AND CONCLUSIONS

Over the course of its investigation, the Commission reviewed original hearing and trial transcripts, files and crime scene evidence, current hearing transcripts, and legal briefs filed in the case.  The Commission also interviewed numerous witnesses who testified at the recent hearings.  Commission staff also reviewed the DA's written report of its investigation regarding the "newly discovered evidence," defendant's memorandum of law in support of Tankleff's motion to vacate his convictions under CPL Article 440, and the OAG's report issued as the special prosecutor.  The Commission does not take issue with the Appellate Division's decision in directing a new trial, or the decision of the DA or the OAG not to retry Tankleff.  Rather, the focus of the Commission's investigation is whether abuses and/or misconduct took place in Tankleff's arrest and prosecution.

Based on its investigation, the Commission concludes:

- The Suffolk County Police Department Detectives, Uniformed Officers and Forensic Investigators, as well as Medical Examiners Crime Lab personnel conducted a comprehensive, extensive, and methodical investigation from beginning to end.

- The procedures employed by the SCPD in questioning Martin Tankleff were proper in all respects, completely within the confines of the law and the Commission finds that there was no evidence that Tankleff's confession was obtained by way of force or coercion.

- Although DA Spota's initial failure to recuse himself and ask for a special prosecutor cast an unnecessary cloud over the investigation,  the Commission, during its inquiry, found no evidence that Spota's office engaged in any improper conduct or engaged in any activity inappropriately prejudicial to Martin Tankleff**.**

- The Commission rejects Tankleff's contention that there were similarities between the Commission's 1989 investigation of the SCPD and DA's Office, and their investigation and prosecution of the Tankleff murders.