**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK**

_____

MARTIN TANKLEFF,            )

     **Plaintiff,**               )

           **v.**                )

THE COUNTY OF SUFFOLK,      )
K. JAMES MCCREADY, NORMAN REIN ,  )
CHARLES KOSCIUK, ROBERT DOYLE,  )
JOHN MCELHONE, JOHN DOE POLICE  )
OFFICERS #1-10, RICHARD ROE, Suffolk  )
County Employees #1-10,         )

     **Defendants.**            )
_____)

**PLAINTIFF'S RESPONSE TO
DEFENDANTS' STATEMENT OF
MATERIAL FACTS PURSUANT
TO LOCAL RULE 56.1**

**No. 09-CV-1207 (JS)(AYS)**

I.    **Events at 33 Seaside Drive, Belle Terre, on September 7, 1988 Prior to Plaintiff Going to Police Headquarters.[1]**

1.    At 6:11 a.m. on September 7, 1988, plaintiff placed a 9-1-1 call reporting that he found his father (hereinafter "Seymour") with blood "gushing" from his neck. The operator instructed plaintiff to get a clean towel and hold pressure on where the blood was "gushing" from. (Exhibit A1 and A2)

**Response**: Admit that at 6:11 a.m., on September 7, 1988, Marty placed a 911 call. [Defs.'

Exhibit B, TT (Patricia Flanagan) at 69:10–23, 70:21–71:13.] The 911 call transcript details the

following conversation between Marty and the operator:

> MT:    This is Marty Tankleff, 33 Seaside Drive in Belle Terre. I need an ambulance. Emergency.
> 911:    Alright, hold on and I'll connect you.
> MT:    Emergency.
> 911:    I'm connecting you with the ambulance.
> O:    Fire Rescue Center.
> 911:    763.

_____

[1] Plaintiff has preserved the headings as set forth in Defendants' Statement.

1

MT:    I'm at 33 Seaside Drive in Belle Terre.

O:     Wo, wo, wo, I can't hear you, what is it?

MT:    33 Seaside Drive in Belle Terre.

O:     33 Seaside?

MT:    Seaside Drive in Belle Terre, it's off Crooked Oak Road, Belle Terre. Please, my father…

O:     Wo, wo, hold on, I can't write that fast.

MT:    Thirty…

O:     What corner street?

MT:    3, it's off Crooked Oak Road.

O:     Crooked Oak?

MT:    Yes, yes, hurry up.

O:     No, no, no, answer my questions. What's your name?

MT:    Marty Tankleff, I'm his son. He's gushing blood from the back of his neck, he's got a cut.

O:     What's the phone number you are calling me from?

MT:    928-2242.

O:     How old is he?

MT:    He is 62.

O:     What happened to him?

MT:    I don't know, I just woke up and he's in the office, he's gushing blood…please…

O:     Alright, listen to me. Is this a private house?

MT:    Yes, it is.

O:     Alright, now, listen.

MT:    It's a red driveway.

O:     Listen to me. I'm sending you an ambulance, I want you to take a clean towel…

MT:    Yes.

O:     Wrap wherever he's gushing blood from…

MT:    Okay…

O:     Hold pressure on it…

MT:    Okay…

O:     Lay him down if possible…

MT:    Okay…

O:     Get his feet elevated and we'll have someone down there for you.

MT:    Okay.

[Defs.' Exhibit A2. (911 Call Transcript).]

2.    Emergency Service Dispatcher Patricia Flanagan described plaintiff as "excited" but not "upset". (Exhibit B, TT pp. 62–72, 83, 86–89)

**Response**: Deny. The recording of that 911 call, which includes the sound of Marty sobbing, and his repeated and urgent requests for help, is the best evidence to demonstrate Marty's emotional state that morning. [Defs.' Exhibit A1 (911 Call Audio Recording).] In her April 23, 1990 trial testimony, Flanagan testified that she "recall[ed] [Marty] being excited. [She did]n't know about upset, but excited" during his September 7, 1988 911 call. [Defs.' Exhibit B, TT (Patricia Flanagan) at 89:12–16.]

3.     On the day of the murders, plaintiff had a conversation at the scene with Homicide Detectives Norman Rein and James McCready, where he stated to both Detectives that upon observing Seymour in the office covered with blood and "gagging," he immediately called 9-1-1 from the phone in the *office* and that that was the only thing he touched in that room. Detectives Rein and McCready also noted that the blood spatter on the phone in the *office* had not been disturbed nor were there any apparent blood prints. (Exhibit B, TT pp. 2836, 3441, 3445-3446)(Exhibit C – McCready Supplemental Report, 9/14/88 p. 2-3)(Exhibit D – Oral Confession, p.3)(Exhibit R, HH[4] pp. 5-8, 24-30)(Exhibit XX Deposition of Norman Rein p. 76, 77)(Exhibit YY Deposition of Robert Doyle p. 119)(Exhibit ZZ Deposition of Martin Tankleff, October 1 and 2, 2012, p.8).

**Response**: Deny that the cited testimony and exhibits say that Marty stated that the only thing he touched in the office was the phone, or that Detective Rein noted that the blood spatter on the phone in the office had not been disturbed, or that either Detective McCready or Rein noted that there were not *any* apparent blood prints. At his deposition and while looking at a photo of the office phone under a magnifying glass, McCready admitted that there was something that very well could have been smeared blood. [Pl.'s Exhibit 9 (McCready Deposition) at 135:18–136:15.] Admit that on September 7, 1988, Detectives James McCready and Norman Rein and Detective Sergeant Robert Doyle each independently questioned Marty in or near McCready's police car, which was parked in front of 33 Seaside Drive, Belle Terre, New York; at the scene, the investigators asked Marty to tell them what had happened that morning and the previous night at least three separate times. [Defs.' Exhibit B, TT (Marty Tankleff) at 4133:3–4134:24, 4137:16–

3

4138:16.] Marty answered the investigators' questions as best he could; he does not remember all of the questions McCready, Rein, and Doyle asked him. [Defs.' Exhibit ZZ (Tankleff Deposition) at 50.] Admit that McCready and Rein each testified that Marty said that he entered the office and saw his father "bleeding and gagging," [Defs.' Exhibit B, TT (James McCready) at 3441:2–5; Defs.' Exhibit B, TT (Norman Rein) at 2836:3–10; Defs.' Exhibit XX (Rein Deposition) at 76:3–7.] Admit that immediately upon finding his father, Marty called 911 from the phone in the office. Admit that on September 14, 1988, Detective McCready reported that when he went into the house he "observed that there were blood spatterings on the telephone" that "had not been smeared, and there were no apparent blood prints left by TANKLEFF when he used the telephone." [Defs.' Exhibit C (McCready Supp. Report) at 4.] Additionally, the first responders' reports indicate that by the time that they arrived on scene at 6:27 a.m., Seymour was already "mostly covered in dried blood" and that there was dried blood noted on Arlene's scalp and forehead. [Defs.' Exhibit B, TT (Ethel Curley) at 472:4–6, 486:21–25; Pl.'s Exhibit 32 (Prehospital Care Report for Seymour Tankleff) at SCPD001011; Pl.'s Exhibit 33 (Prehospital Care Report for Arlene Tankleff) at SCDA011381.] Note, however, that the phone itself was never preserved for further analysis. [Pl.'s Exhibit 34 (Baumann Serology Log).] Deny the remainder.

4. On the day of the murders and before the confession part of plaintiff's oral statements to Detectives Rein and McCready, plaintiff stated after observing Seymour covered in blood he called 911 from the phone in the *office* where Seymour's body was located. (Exhibit B, TT pp. 3445-3446) (Exhibit D, Oral Confession, p.3)(Exhibit R, HH pp.5-30)(Exhibit YY Deposition of Robert Doyle p. 119)(Exhibit ZZ Deposition of Martin Tankleff p. 8).

**Response**: Admit that, shortly after Marty woke up on the morning of September 7, 1988, he found his father in the office with a cut to the back of his neck. [Defs.' Exhibit A2 (911 Call Transcript).] Marty immediately called 911 from the phone in the office. [Defs.' Exhibit ZZ

(Tankleff Deposition) at 8:16–19.] However, deny that Exhibit B, TT at 3445–3446; Exhibit R,

HH at 5–30; Exhibit YY (Doyle Deposition) at 119; and Exhibit ZZ (Tankleff Deposition) at 8,

so state.

> 5.    Two photographs taken by crime scene investigators on the day of the murders, of the
> phone in the office where Seymour was found showed that the blood spatter on that
> phone receiver had *not* been disturbed and was intact. (Exhibit E, Trial Exhibits 74–d,
> 75, photographs)

**Response**: Deny that the cited photographs support the propositions stated and note that the

phone itself was never preserved for further analysis. [Pl.'s Exhibit 34 (Baumann Serology

Log).]

> 6.    On the day of the murders and before the confession part of plaintiff's oral statements to
> Detectives Rein and McCready, plaintiff stated that he "put a pillow under his father's
> feet and a towel around his father's throat…He had blood on his hands from his father."
> (Exhibit B, TT pp. 2836, 3440–3441, 3445–3446)(Exhibit C – McCready Supplemental
> Report 9/14/88, pp.3–4) (Exhibit D, Oral Confession, p.3)(Exhibit R, HH pp.5–30)

**Response**: Deny that the following cited testimony and exhibits so state: Exhibit B, TT at 2836,

3440–41, 3445–46; Exhibit C (McCready Supp. Report) at 3–4; Exhibit R, HH at 5–30. Admit

that the CPL § 710.130 Notice of Oral Statements reports that Marty allegedly stated: "He put a

pillow under his father's [sic] feet and a towel around his father's [sic] throat. The linen closet's

light was already on, he had blood on his hands from his father." When the first responders

arrived, in response to Marty's 911 call, Suffolk County Police Department Officers Gallagher,

Crayne, and Aki found Marty's father lying on the floor of the office with his feet elevated on a

pillow and a towel applied to his neck wound. [Pl.'s Exhibit 11 (Crayne's Supp. Report); Pl.'s

Exhibit 35 (Gallagher Supp. Report).] Marty, following the 911 operator's instructions, had

gotten a clean towel from the linen closet and a pillow from his room, moved his father from his

chair onto the floor, elevated his father's feet, and applied the towel to his father's neck wound.

[Defs.' Exhibit B, TT (Marty Tankleff) at 4117:4–4119:16.] While attempting to render aid to

his father as instructed by the 911 operator, Marty got his father's blood on him. [Defs.' Exhibit
ZZ (Tankleff Deposition) at 10:8–14.] Suffolk County Police Officer Crayne, one of the first
responders, reported that when he first drove up to 33 Seaside Drive, Marty came running up to
his car; Crayne "noticed on the palm of [Marty's] hands he had some blood and there's also a bit
of blood on the right side of his face." [Pl.'s Exhibit 11 (Crayne's Supp. Report).] At his
deposition, Detective McCready admitted that comparing Marty's account of what took place
that morning to the physical evidence—the description of where the blood was on Marty when
police encountered him that morning—Marty's account and the evidence are consistent. [Pl.'s
Exhibit 9 (McCready Deposition) at 119:25–122:13.]

    At some point after the first responders arrived, the officers separated Marty from his
brother-in-law Ron Rother, who had arrived at the scene to be with Marty, and instructed Marty
to wait alone in the back of a marked police car. [Defs.' Exhibit B, TT (Marty Tankleff) at
4126:16–4129:8.] While sitting in the police car, Marty "started getting very sick. [He] started
gagging and spitting up because [he] had blood on [him]." [Defs.' Exhibit B, TT (Marty
Tankleff) at 4129:9–11.] Marty asked Officer Aki if he could go into the house and wash the
blood off, but Aki said no. [Defs.' Exhibit B, TT (Marty Tankleff) at 4129:12–14.] Marty then
asked if he could wash his hands in a puddle in front of the police car, and Aki permitted him to
do so and gave Marty a tissue or a paper towel from his glove compartment. [Defs.' Exhibit B,
TT (Marty Tankleff) at 4129:11–18.]

    7.    A stand-up photograph of plaintiff was taken at police headquarters on September 7,
        1988. Plaintiff's sweatshirt, shorts and his extremities that are visible. *No* blood staining
        smearing or drops are visible in the photographs. (Exhibit F, Trial Exhibit #11,
        photograph of plaintiff) (Exhibit ZZ Deposition of Martin Tankleff p.33)

**Response**: Admit that four photographs were taken of Marty at or about 12:50 p.m. on
September 7, 1988, at police headquarters. [Pl.'s Exhibit 36 at AG011642.] The photograph

6

attached as Exhibit F depicts seventeen-year-old Marty, only about seven hours after discovering the brutalized bodies of his parents, wearing shorts, a zip-up sweatshirt with no shirt underneath, no shoes, with a blank stare, and he appears to be in shock.  Admit that when asked to review the picture at his deposition, Marty did not see blood stains on his shorts in the picture. [Defs.' Exhibit ZZ (Tankleff Deposition) at 32:12–33:12.]

8.  On the day of the murders and before the confession part of plaintiff's oral statements to Detectives Rein and McCready, plaintiff stated that after he called 911 and gave aid to Seymour he began to search for his mother and opened the door leading to the garage to see if her car was there. (Exhibit B, TT pp. 2836-2837, 3442-3443, 4119)(Exhibit C – McCready Supplemental Report 9/14/88, pp.4) (Exhibit D, Oral Confession, p.3) (Exhibit R, HH pp.5-30)

**Response**: Admit that after Marty called 911 and followed the operator's instructions to help his father, he got scared and ran out of the office to look for his mother. [Defs.' Exhibit ZZ (Tankleff Deposition) at 37:17–22; Defs.' Exhibit B, TT (Marty Tankleff) at 4119:8–18.] After leaving the office, Marty first went to look in the garage; he thought his mother might have gone out. [Defs.' Exhibit ZZ (Tankleff Deposition) at 39:14–40:13.] Marty discovered that his mother had not gone out because her car was still there. [Defs.' Exhibit ZZ (Tankleff Deposition) at 40:3–13.] More than twenty years later, Marty does not remember going in the garage; he does remember looking for his mother and ending up in the master bedroom where he saw his mother's head on the floor. [Defs.' Exhibit ZZ (Tankleff Deposition) at 44:11–18, 47:11–18.] At his deposition in 2011, McCready testified that Marty could have gotten the garage door open without getting blood on it. [Pl.'s Exhibit 9 (McCready Deposition) at 138:6–139:24.] He saw that his mother was not moving, and seemed lifeless. Screaming, Marty ran out of the bedroom, [Defs.' Exhibit B, TT (Marty Tankleff) at 4120:7–21], and ran to kitchen to call his sister. [Defs.' Exhibit B, TT (Marty Tankleff) at 4120:20–4121:2.]

9.     On the day of the murders, Homicide Detective James McCready responded to the home and surveyed the interior of the house which was now a crime scene. Among his observations, Detective McCready noted that there was *no* blood on the door handle to the garage and the dead bolt on the garage door was *locked* with the key in it. (Exhibit B, TT pp. 3445-3448)(Exhibit C – McCready Supplemental Report 9/14/88, pp.4) (Exhibit R, HH pp.5-30)

**Response**: Admit that McCready stated in his September 14, 1988 report and testified that at approximately 7:39 a.m. on September 7, 1988, he responded to 33 Seaside Drive in Belle Terre, [Defs.' Exhibit R, HH (McCready) at A000308:6–24; Defs.' Exhibit C (McCready Supp. Report) at 1], and conducted two walk-throughs of the house that morning. [Defs.' Exhibit R, HH (McCready) at A000309:22–A000310:4, 328:17–19; Defs.' Exhibit C (McCready Supp. Report) at 2, 4.] During his first walk-through, as he went in to each room, McCready was "tr[ying] to mentally get a picture of what this room looked like and tr[ying] to basically reconstruct what [he] might hypothesize as to what might have happened in the room." [Defs.' Exhibit R, HH (McCready) at A000311:6–A000312:3.] McCready reported and testified that during his second walk-through, after having interviewed Marty, he "went to the garage door and observed that there was no blood on the door handle to the garage, and further observed a key in the dead bolt of the garage door. After carefully examining the handle and the dead bolt, [he] found the garage door to be in a locked position." [Defs.' Exhibit C (McCready Supp. Report) at 4.] However, the responders' reports indicate that by the time that they arrived on scene at 6:27 a.m., Seymour was already "mostly covered in dried blood" and that there was dried blood noted on Arlene's scalp and forehead. [Defs.' Exhibit B, TT (Ethel Curley) at 472:4–6, 486:21–25; Pl.'s Exhibit 32 (Prehospital Care Report for Seymour Tankleff); Pl.'s Exhibit 33 (Prehospital Care Report for Arlene Tankleff).] It is undisputed that Marty rendered aid to his father and that in the process of doing so, he got blood on his person. It is also undisputed that there are places and objects that Marty came in contact with after rendering aid to his father that contain no blood even though he

8

had blood on his body; for example: the storm door. [Pl.'s Exhibit 9 (McCready Deposition) at 142:2–6.] Lastly, McCready testified that Marty could have gotten the garage door open without getting blood on it. [Pl.'s Exhibit 9 (McCready Deposition) at 138:6–139:24.]

10. A photograph, taken by crime scene investigators on the date of the murders of the dead bolt lock and the handle on the door leading to the garage, shows that there was no blood found on either the dead bolt lock or the handle. (Exhibit B, TT pp. 3445-3450, 4211, 4213) (Exhibit G, Photograph)

**Response**: Admit that Exhibit G is a photograph of the dead bolt lock and the handle on the door leading to the garage and that there is no blood apparent in the photograph; *see* Plaintiff's response to ¶ 9.

11. On the day of the murders, Homicide Detective James McCready observed that a light switch in plaintiff's bedroom was in the "on" position and that there was blood on the north wall at the light switch and on the sheetrock. (Exhibit B, TT pp. 3446-3451) (Exhibit C, McCready Supplemental Report, 9/14/88 p. 2) (Exhibit R, HH pp. 5-30)

**Response**: Admit that McCready reported and testified that he "looked into the now known bedroom of MARTIN TANKLEFF and observed that his light switch was in an on position, and there was blood on the north wall at the light switch and sheetrock." [Defs.' Exhibit C (McCready Supp. Report) at 2.] Note, however, that McCready testified that the blood smear that was present on Marty's wall near the light switch is indicative of someone groping around looking for a light switch and that it is unlikely that Marty would have done that in his own room. [Pl.'s Exhibit 9 (McCready Deposition) at 147:7–25.]

12. Photographs taken by crime scene investigators on the day of the murders, of the light switch in plaintiff's bedroom, showed blood stains. (Exhibit H, Trial Exhibits 90 and 91, Photographs)

**Response**: Admit.

13. On the day of the murders and before the confession part of plaintiff's oral statements to Detectives Rein and McCready, plaintiff stated he got dressed at 6:10 a.m. and put on shorts and a sweatshirt. (Exhibit B, TT pp. 2616, 2835-2836, 3439) (Exhibit C, McCready Supplemental Report, 9/14/88 p. 5)(Exhibit D, Oral Confession p. 10)

**Response**: Admit that Detective McCready reported and testified that Marty told McCready that he set his alarm for 5:35 a.m. and that he awoke at that time, but lay in bed until approximately 6:10 a.m., and that when he got out of bed, he got dressed in a sweatshirt and shorts. [Defs.' Exhibit B, TT (James McCready) at 3439:10–13.] However, deny that Marty put on a sweatshirt at this point or that he told detectives he put a sweatshirt on at this point. During his deposition, Marty denied telling McCready or Rein that he put a sweatshirt on when he woke up that morning. [Defs.' Exhibit ZZ (Tankleff Deposition) at 230:22–231:4.] Marty testified at trial that he put on a sweatshirt after he got off the phone with Mrs. Perrone and after he wiped his hands on a towel. [Defs.' Exhibit B, TT (Marty Tankleff) at 4123:24–4125:7, Defs.' Exhibit ZZ (Tankleff Deposition) at 18:2–21:8.]

14. On the day of the murders and before the confession part of plaintiff's oral statements to Detectives Rein and McCready, plaintiff stated that he woke up at 5:35 a.m., got out of bed at 6:10 a.m., and left his room at 6:16 a.m. (Exhibit B, TT pp. 2616, 2835-2836, 3439)(Exhibit D Oral Confession, p.2)(Exhibit XX Deposition of Norman Rein p. 74)

**Response**: Admit that Detective Sergeant Doyle reported and testified that Marty told Doyle that he woke up on September 7th at 5:35 a.m., and that he stayed in his room until 6:16 a.m. [Defs.' Exhibit B (Robert Doyle) at 2616:7–16.] Marty testified at his deposition that he does not recall whether or not he told the detectives that he left his room at 6:16 a.m. [Defs.' Exhibit ZZ (Marty Tankleff) at 120:2–8.] At trial, Marty testified that he left his room at about 6:10 a.m. [Defs.' Exhibit B, TT (Marty Tankleff) at 4199:7–9.]

15. On the day of the murders and before the confession part of plaintiff's oral statements to Detective Rein and Detective McCready, plaintiff stated that he never went *into* his mother's bedroom. He only went as far as the alarm wall. He only saw her from the hallway entrance to the bedroom but he stated that he observed Arlene on the ground with her throat cut and he could see she was dead. He also stated that he did not turn on any lights in that bedroom. (Exhibit B, TT pp. 2818, 2836-2837, 3439-3440, 3442)(Exhibit D, Oral Confession p. 3-4)(Exhibit R, HH pp. 8-30)(Exhibit XX Deposition of Norman Rein p. 76,77).

**Response**: Admit that the first time Marty looked into his parents' bedroom he did not go beyond the alarm wall but deny that he *never* did. Deny that Marty said that he observed his mother on the ground with her throat cut from the alarm wall. [Defs.' Exhibit ZZ (Tankleff Deposition) at 48:16–49:8.]

    16.    On the day of the murders, while at the scene plaintiff had conversations with Detectives McCready and Rein, and with Detective Sergeant Doyle. (Exhibit ZZ Deposition of Martin Tankleff p. 50)

**Response**:  Admit.

    17.    Although plaintiff spoke to McCready, Rein and Doyle, he does not remember all their questions. (Exhibit ZZ Deposition of Martin Tankleff p. 50)

**Response**: Admit.

    18.    Plaintiff does not recall recounting for the detectives the steps he took when they asked him questions. (Exhibit ZZ Deposition of Martin Tankleff p. 51)

**Response**: Admit that Marty remembers being questioned by Detectives McCready and Rein and Detective Sergeant Doyle at the scene, and remembers being asked by McCready what had happened and what he had done before police arrived. [Defs.' Exhibit ZZ (Tankleff Deposition) at 50:7–21.] Marty does not remember all of McCready, Rein, and Doyle's questions, and does not recall "recounting for them the steps [he] had taken and answered the questions that they were asking [him]." [Defs.' Exhibit ZZ (Tankleff Deposition) at 50:22–51:5.]

    19.    Plaintiff does not have a specific recollection of indicating to the detectives that he only saw his mother from the hallway, that she was on the ground, that her throat was cut and that he could see that she was dead. (Exhibit ZZ Deposition of Martin Tankleff p. 51)

**Response**: Admit that Marty did *not* indicate to the detectives that he only saw his mother from the hallway, that she was on the ground, that her throat was cut, and that he could see that she was dead. [Defs.' Exhibit ZZ (Tankleff Deposition) at 48:16–22.]

20. Plaintiff does recall answering questions from McCready, Rein and Doyle while at the scene. (Exhibit ZZ Deposition of Martin Tankleff p. 51)

**Response**: Admit.

21. On the day of the murders, plaintiff told the detectives he woke up and looked in his parents' bedroom and didn't see anybody in their bed because the room was dark. (Exhibit ZZ Deposition of Martin Tankleff p. 138, 238)

**Response**: Admit that Marty recalls telling someone that after he left his bedroom on the morning of September 7, 1988, he went and looked in the master bedroom, but did not see anybody in his parents' bed. [Defs.' Exhibit ZZ (Tankleff Deposition) 227:8–228:10.] He did not see either of his parents, at that time, because the room was dark. [Defs.' Exhibit ZZ (Tankleff Deposition) at 138:11–23.]

22. Plaintiff voluntarily drew a diagram of his parents' bedroom showing the layout of the room, Arlene's body as he observed it, and the entranceway which showed the alarm wall. The alarm wall was an interior wall with the opposite side being the hallway wall. (Exhibit I, sketch of Arlene's room)(Exhibit ZZ Deposition of Martin Tankleff p. 211-217)

**Response**: Admit that Marty drew a set of diagrams, including a diagram of his parents' bedroom, at the detectives' request. [Defs.' Exhibit ZZ (Tankleff Deposition) at 217:10–22.]

23. Nobody threatened the plaintiff to make any drawings. (Exhibit ZZ Deposition of Martin Tankleff p. 225-226)

**Response**: Deny that the cited testimony supports the proposition stated. Admit that nobody threatened Marty, "do this or else," to make one of the diagrams, depicting the card players' cars in Marty's driveway on the night of September 6, 1988. [Defs.' Exhibit ZZ (Tankleff Deposition) at 225:15–226:5.]

24. Three photographs taken by crime scene investigators on the day of the murders of the master bedroom from the entranceway to the room, with Arlene's body still in place, showed that the cut along her throat was not visible from where plaintiff said he was standing when he *concluded* his mother was dead and that her throat was cut. (Exhibit B, TT pp. 3483-3485)(Exhibit J, Trial Exhibits 7,8,9,10, Photographs)

**Response**: Admit that three photographs were taken by crime scene investigators on the day of the murders of the master bedroom from the entranceway to the room, with Arlene Tankleff's body still in place in the bedroom. Deny the remainder; *see* Plaintiff's responses to ¶¶ 15, 19.

    25.   Plaintiff did not go into the room and render aid to his mother (Exhibit ZZ Deposition of Martin Tankleff p. 62)

**Response**: Admit that after Marty did not render aid to his mother but deny that he did not go into the room.

    26.   On the day of the murders and before the confession part of plaintiff's oral statements to Detectives Rein and McCready, plaintiff stated that after observing Arlene in the master bedroom he did not call 911 again to report that discovery, but called his sister from a phone in the kitchen and told her he believed "mom and dad have been murdered." He then checked on Seymour and then answered his sister's call back in the kitchen and yelled for his sister to "get over to the house." (Exhibit B, TT pp. 2618-2619, 2837, 3442-3443)(Exhibit C, McCready Supplemental Report, 9/14/88 p. 4)(Exhibit D, Oral Confession p.4)(Exhibit R, HH pp. 21-22)(Exhibit ZZ Deposition of Martin Tankleff p. 63)

**Response:** Admit that Marty did not place a second call to 911 when he understood help to already be on its way. Deny that the following citations so state: Exhibit B, TT (Robert Doyle) at 2618–2619 and 3443, Exhibit R, HH at 21–22 and Exhibit ZZ (Tankleff Deposition) at 63, the subject matter discussed does not pertain to the subject matter at hand. With regard to Exhibit B, TT at 2618–2619, these are transcripts of Sergeant Doyle's testimony and thus do not pertain to what Detectives Rein and McCready said occurred at the crime scene, which is what this statement attempts to address.

    27.   On the day of the murders and before the confession part of plaintiff's Oral Statements to Detectives Rein and McCready, plaintiff stated that he then remembered he was supposed to pick up his friend Mark Perrone on the way to school. He called Mark's house from the same kitchen phone and spoke to Mark's mother. His friend Mark called plaintiff back after he spoke with Mark's mother and he answered the phone in the kitchen – now touching that phone for a fourth time. (Exhibit B, TT pp. 2618-2619, 3442-3444; Exhibit R, HH pp. 21-22)(Exhibit ZZ Deposition of Martin Tankleff p. 63)

**Response**: Admit. Deny that the following citations so state: Exhibit B, TT at 2618–2619,

Exhibit R, HH at 21–22 and Exhibit ZZ at 3.

28.   A photograph, taken by crime scene investigators on the day of the murders, of the phone in the kitchen showed that there was *no* blood on that phone. (Exhibit K, Trial Evidence 78b, Photo)

**Response**: Admit that there is no apparent blood visible in the photo, but the phone was never

chemically tested, so deny that conclusively there was no blood on the kitchen phone. [Pl.'s

Exhibit 37 (Baumann Serology Report); Pl.'s Exhibit 34 (Baumann Serology Log).]

29.   On the day of the murders, and before the confession part of plaintiff's oral statements to Detectives Rein and McCready, plaintiff stated that after his sister's call, the next thing he did was go to the house of his neighbor, Martin Hova (hereinafter "Hova"). (Exhibit B, TT p. 2837)(Exhibit D, Oral Confession p. 4)

**Response**: Admit that after Marty got off the phone with Mrs. Perrone, he went back to his

bedroom, wiped his hands on a towel and then put on a sweatshirt. He then ran next door to his

neighbor's house because he "thought [he] was having a nightmare and [he] just wanted

somebody to help [him]." [Defs.' Exhibit B, TT (Marty Tankleff) at 4123:24–4125:7.]

30.   Hova stated that while in the bathroom of his house, which was next to the Tankleff residence, he heard screaming and that when he went to the front door, he saw plaintiff barefoot and clad in shorts *and* zip-up sweatshirt. (Exhibit B, TT pp. 92-94, 100-104)

**Response**: Admit that Hova so testified. [Defs.' Exhibit B, TT (Martin Hova) at 102:2–14,

103:22–104:9.]

31.   Hova, Police Officer James Crayne and Police Officer Daniel Gallagher (uniform officers responding to the 911 call) stated that as they arrived at the scene, Hova approached the scene with the plaintiff and the plaintiff yelled "somebody murdered my parents" as they all headed into the house. (Exhibit B, TT pp. 100-104, 248-256, 286-289, 316-317, 324-331, 369-370)

**Response:** Admit that they so testified. [Defs.' Exhibit B, TT (Martin Hova) at 104:11–14;

Defs.' Exhibit B, TT (Daniel Gallagher) at 256:9–11; Defs.' Exhibit B, TT (James Crayne) at

331:15–20.]

32. Police Officers Crayne and Gallagher stated that plaintiff was upset or "agitated." They also stated that plaintiff had on shorts *and* a zip up sweatshirt, was barefoot and had blood on his palms, the right side of his face, on his right calf and on his right foot. (Exhibit B, TT pp. 104-106, 256-259, 318-319, 332-334, 351-359, 372)

**Response**: Deny that the cited testimony supports that Police Officer Gallagher stated that Marty appeared upset or agitated, but admit that Police Officer Crayne, at a pre-trial hearing, stated that Marty appeared "agitated" that morning. [Defs.' Exhibit B, TT (James Crayne) at 372:2–7.] Admit that at this time, Marty had on shorts, a zip-up sweatshirt, and was barefoot. Admit that Officers Crayne and Gallagher so testified that Marty had blood on his palms, the right side of his face, on his right calf and on his right foot. [Pl.'s Exhibit 11 (Crayne Supp. Report).] McCready testified that the blood Marty had on his palms, the right side of his face, on his right calf and on his right foot were consistent with the way that Marty demonstrated rendering his father aid to the detectives. [Pl.'s Exhibit 9 (McCready Deposition) at 115:22–116:12.] Deny that citation Exhibit B, TT pp. 104–106 is Hova's testimony so states.

33. Hova also stated that once inside the house he went with Police Officer Crayne and plaintiff into the office where his father was and plaintiff stated "Murder, Murder" plaintiff further stated they "murdered my parents." When asked by Hova "who did it?", plaintiff stated "my father's business partner, Jerry." (Exhibit B, TT pp. 104-106, 256-259, 318-319, 332-334, 351-359, 372)

**Response**: Admit that Hova so testified.

34. Police Officer Crayne stated that he observed a towel on Seymour's neck. He noted that the towel was *not* pressed into the neck wounds but was "draped over the neck." After making this observation, P.O. Crayne applied pressure to the wound in an attempt to stop the bleeding. (Exhibit B, TT pp. 335, 343-344)

**Response**: Admit that Officer Crayne testified at trial that the towel was draped over Seymour's neck, and that he attempted to provide first aid to Seymour, while the officers waited for emergency medical personnel to arrive. Deny that the towel was not pressed into the wounds and deny that Officer Crayne even testified that the towel was not pressed into the neck wounds.

15

Marty's aid to his father did, in fact, help him. Seymour Tankleff, despite the serious injuries that

he suffered, lived for 29 days after being admitted to the hospital. [Pl.'s Exhibit 38 (Seymour

Tankleff's Autopsy Report) at BW001075.]

35.   Police Officer Gallagher also stated that he went to the threshold of the master
      bedroom. From the threshold he observed Arlene's head on the floor "partially sticking
      out from the end of the bed." P.O. Gallagher then approached Arlene but it was not until
      he stood directly over the body that he saw the extent of her injuries and concluded she
      was dead. (Exhibit B, TT pp. 259-272, 293-300)

**Response**: Admit that Gallagher so testified.

36.   Police Officer Crayne stated that when he tried to rouse Seymour, he asked Seymour
      who did this. Though Seymour said nothing, plaintiff stated "it was Jerry Steuerman."
      When Police Officer Gallagher entered the office, plaintiff again stated that "the only
      person who had the motive to do this was Jerry Steuerman." Plaintiff's demeanor during
      this exchange was "composed." (Exhibit B, TT pp. 271-277, 320-322, 344-345)

**Response**: Admit that Crayne testified that when he tried to rouse Seymour, he asked Seymour

who did this. Though Seymour said nothing, Marty stated "it was Jerry Steuerman." [Defs.'

Exhibit B (James Crayne) at 345:5–15.] Admit that Gallagher testified that, at one point, he took

Marty from the office to the kitchen and questioned him about what had happened. [Defs.'

Exhibit B (Daniel Gallagher) at 274:24–275:3.] Marty told him that "he woke up that morning,

the lights were on in the house, the alarm was turned off and he found his father, and he said that

the only person who had motive to do this was Jerry Steuerman." [Defs.' Exhibit B, TT (Daniel

Gallagher) at 275:17–21.] Gallagher was asked at trial whether he observed any "tearing on

[Marty's] eyes" at that point in time, and Gallagher responded, "No. He was composed when I

spoke with him." [Defs.' Exhibit B, TT (Daniel Gallagher) at 276:5–7.]

37.   Police Officer Edward Aki (a third uniformed officer responding to the 911 call) stated
      he arrived at the scene at 6:27 a.m. A few minutes later, Belle Terre Chief Constable
      Donald Hines, a family friend and colleague of Seymour's on the Belle Terre Police
      Department, also arrived and both observed plaintiff's brother-in-law Ron Rother arrive
      at the scene. Rother was observed as being "very upset" and he was crying, "just visibly

shaken." (Exhibit B, TT pp. 83, 278-279, 315-316, 347, 375-376 383-384, 403, 415, 422, 464-466 and 501-502)

**Response**: Admit that Aki and Hines so testified.

38.  Police Officer Aki advised plaintiff and Rother that the house was a crime scene and that both of them, as witnesses, needed to be kept separate. While Police Officer Aki was taking plaintiff to his car, plaintiff asked if he could wash his hands at a spigot on the side of the house. Plaintiff was told it was inadvisable to go near the house. As Police Officer Aki and plaintiff moved toward Police Officer Aki's patrol car, plaintiff stated "that a Jerry Steuerman had done this." (Exhibit B, TT pp. 384-389, 392-395, 403-406)

**Response**: Admit that at some point after the first responders arrived, the officers separated

Marty from his brother-in-law Ron Rother, who had arrived at the scene to be with Marty, and

instructed Marty to wait alone in the back of a marked police car. [Defs.' Exhibit B, TT (Marty

Tankleff) at 4126:16–4129:8.] While sitting in the police car, Marty "started getting very sick.

[He] started gagging and spitting up because [he] had blood on [him]." [Defs.' Exhibit B, TT

(Marty Tankleff) at 4129:9–11.] Marty asked Officer Aki if he could go into the house and wash

the blood off, but Aki said no. [Defs.' Exhibit B, TT (Marty Tankleff) at 4129:12–14.]

39.  Police Officer Aki then stated that after plaintiff entered the back seat of his patrol car, Police Officer Aki left the area and plaintiff "was free to move." Soon after plaintiff exited the car and bent down by a puddle and began washing his hands in that puddle. This was observed by both Police Officer Aki and Chief Constable Hines. (Exhibit B, TT pp. 387-389, 392-393, 403-410, 501-504)

**Response**: Deny that any evidence indicates Marty was "free to move" while seated in the back

of the patrol car. Admit that Marty asked if he could wash his hands in a puddle in front of the

police car, and Aki permitted him to do so and gave Marty a tissue or a paper towel from his

glove compartment. [Defs.' Exhibit B, TT (Marty Tankleff) at 4129:11–18.]

40.  Chief Constable Hines stated that after observing plaintiff washing his hands, he and plaintiff made eye contact and they "immediately converged." Hines then asked plaintiff what happened and plaintiff answered "Jerry Steuerman murdered my mother and my father." Both then entered Hine's car where in an excited manner, but not crying, plaintiff continued to accuse Steuerman. Plaintiff stated that Arlene had

predicted that Steuerman was going to do something terrible, that Steuerman was the last person to leave the card game, and that Steuerman "killed my mother and father." Because neither Arlene nor Seymour had ever expressed a fear of Steuerman to Hines, Hines stated "that Seymour was still alive and that should he regain consciousness, the police would be able to verify if Jerry was indeed the perpetrator." (Exhibit B, TT pp. 410, 504-507, 523-528, 535)

**Response**: Deny that Hines testified that he told Marty that Seymour was still alive and could

regain consciousness because Arlene or Seymour never made a statement to him expressing a

fear of Steuerman. Admit Hines so testified to the rest.

41.  Chief Constable Hines stated that after making the aforementioned statement to plaintiff, plaintiff's demeanor changed. Hines stated,
     "Well up to that time Marty was looking…at the ground, at his feet, at the hood of the car, at something, other than me. He had his head down. When I made that statement, he picked his head up and looked directly at me. His eyes widened, he stopped talking and didn't say a word." Plaintiff then exited the car. (Exhibit B, TT pp. 506-507, 526)

**Response**: Admit that Hines so testified.

42.  Plaintiff does not remember having a conversation with Constable Hines regarding the statements in paragraph 39 above and cannot recall if he said the statements or not. (Exhibit ZZ deposition of Martin Tankleff p. 75)(Exhibit AAA Deposition of Martin Tankleff, July 9, 2013. P.29-30)

**Response**: Object that paragraph 39 does not refer to statements that Marty made. If Defendants

mean to refer to paragraph 41, then admit.

43.  A neighbor and friend of Seymour's, John McNamara (hereinafter "McNamara"), stated that he was taking a morning walk in Belle Terre when he came in contact with plaintiff. This was the first of three conversations he had with plaintiff. Plaintiff stated to McNamara that his parents had been murdered, that Jerry Steuerman committed the murders; that he discovered them after waking up; and repeated the order of what he did similar to what he told McCready. (See P #41 and P #42 below) Plaintiff went on to state that his father was bleeding very heavily and that he, plaintiff, had lifted Seymour from the chair and placed him on the floor. McNamara then asked plaintiff why he was not *covered* in blood. Plaintiff looked at McNamara and walked away without responding. (Exhibit B, TT pp. 776-781, 789, 811-812)(Exhibit Y, McCready Supp. Report 10/18/88)

18

**Response**: Deny. Marty doesn't remember those alleged conversations. [Defs.' Exhibit ZZ

(Tankleff Deposition) at 85:22–86:4; Defs.' Exhibit B, TT (Marty Tankleff) at 4130:12–4131:3.]

Additionally, note that one of the reasons that this case was dismissed by the Attorney General

was because McCready's behavior during the investigation was problematic. His actions

included showing close-up, bloody crime scene photographs to McNamara and telling him that

"Marty did this, we need to let the jury know", "This guy is dangerous", and "Don't tell anyone

that I showed you these." McCready also showed other witnesses crime scene photos. [Pl.'s

Exhibit 39 (McNamara's Statements to the AG) at AG010366; Pl.'s Exhibit 9 (McCready

Deposition) at 379:11–22; Pl.'s Exhibit 40 (AG's Report) at AG016582–AG016583]

Furthermore, McNamara was subsequently convicted of one of the largest frauds in history.

[Pl.'s Exhibit 41"Car Dealer Gets 5 Years for Bilking G.M. of More than $400 Million" NYT

8/10/1996.]

44.   McNamara stated that in his second conversation with plaintiff he again stated that Jerry
      Steuerman had murdered his parents. McNamara replied that it appeared plaintiff's
      father was not dead, since the paramedics had placed him in an ambulance and left
      quickly with the lights on. Plaintiff then stated he had been sleeping in the nude and that
      when he woke up he put on his shorts *and* sweatshirt and then repeated the scenario of
      his actions as he had stated earlier, except he now stated that after checking for his
      mother's car in the garage, he went out of the house screaming that a murder had been
      committed. (Exhibit B, TT pp. 782–783)(Exhibit Y, McCready Supp. Report 10/18/88)

**Response**: Deny. *See* Plaintiff's response to ¶ 43.

45.   McNamara stated that plaintiff came back a third time and restated the scenario he had
      stated earlier with respect to his actions but this time he stated that after he checked the
      garage for his mother's car, he went to his mother's bedroom, stood at the *entrance* and
      saw his mother and then realized she was dead and that he (plaintiff) was too scared to
      go into the bedroom and he then ran out of the house screaming that a murder had taken
      place. (Exhibit B, TT pp. 784–785, 797)(Exhibit Y, McCready Supp. Report 10/18/88)

**Response**: Deny. *See* Plaintiff's response to ¶ 43.

46. Plaintiff does not recall having any conversation with Mr. McNamara outside his house on September 7, 1988. (Exhibit ZZ Deposition of Martin Tankleff p. 85)(Exhibit AAA Deposition of Martin Tankleff, July 9, p. 22, 24)

**Response**: Admit that Marty neither remembers speaking to Mr. McNamara at the crime scene, nor even seeing him there. [Defs.' Exhibit B, TT (Marty Tankleff) at 4130:12–4131:3.]

47. The Belle Terre Mayor, Vincent Bove (hereinafter "Bove"), a family friend and an attendee at the card game that occurred hours prior to the murders, stated he arrived at the scene around 7:00 a.m. and that plaintiff approached him and stated "somebody murdered my mother and father" and that Jerry Steuerman did it. Bove responded by asking plaintiff "What makes you say that? … Nothing took place at the card game. Did you see (Steuerman) do this?" Plaintiff responded, "No, I didn't see him, but they've been arguing." (Exhibit B, TT pp. 741-742)

**Response**: Admit that Bove so testified.

48. Plaintiff recalls having a conversation with Mr. Bove but does not remember the specifics of that conversation. 43. (Exhibit ZZ Deposition of Martin Tankleff p. 90)

**Response**: Admit.

49. Around this time, while plaintiff was leaning on a police car, Dara Schaeffer, a neighbor and high school student, pulled up to 33 Seaside Drive and asked plaintiff "how's it going?" Plaintiff replied "last night *someone* killed my mother and tried to kill my father *and* molested me." Dara noted plaintiff said this with no emotion on his part. (Exhibit B, TT pp. 550-553)(Exhibit Z, 2 Rein Supp. Reports 2/14/90)

**Response**: Deny the substance. Marty told Dara Schaeffer that, "last night they murdered my mother, they murdered my father, and they must have missed me." [Defs.' Exhibit B, TT (Tankleff) at 4131:18–19.] Dara told officers that Marty appeared to be in shock. [Defs.' Exhibit B, TT (Dara Schaeffer) at 573:13–15.]

50. Plaintiff testified at his criminal trial that he told Ms. Schaeffer that "they murdered my mother, they murdered my father, and they must have missed me." (Exhibit B, TT pp 4131).

**Response**: Admit.

51. Detective Sergeant Robert Doyle of the Suffolk County Police Department's Homicide Bureau received notice of Arlene's murder at approximately 7:05 a.m. on September 7, 1988. By 7:20 a.m. he had directed Homicide Detectives Robert Anderson, Anthony

Lahgezza, Michael Carmody, John Pfalzgraf, K. James McCready and Norman Rein to the scene. At the scene, Detectives Carmody and Pfalzgraf were redirected to the hospital with Seymour, and Detectives Anderson and Lahgezza were redirected to interview the card players. (Exhibit B, TT pp. 2602-2608, 2831, 3431)(Exhibit R, HH pp. 969-972)

**Response**: Admit that Doyle so testified and note that Doyle was the supervisor to all six

detectives. [Defs.' Exhibit B, TT at 2602–2608, 2604:8–10.]

52.   Detective McCready arrived at the scene at 7:39 a.m. and spoke with Officer's Aki and Crayne. He then entered the house and examined the office and master bedroom where Seymour and Arlene were respectively. After exiting the house at approximately 7:50 a.m., he then introduced himself to plaintiff and asked what happened. Chief Constable Hines interrupted them and McCready asked plaintiff to wait in his car while he was briefed by Hines. McCready then got in his car at about 7:55 a.m. where he observed that plaintiff appeared "excited" and stated "Jerry Steuerman" had done this because he and Seymour had been fighting. (Exhibit B, TT pp. 3431-3437, 3447, 3519, 3551-3552, 3593, 3599)

**Response**: Admit that McCready so testified.

53.   While in the car, plaintiff told McCready that he awoke at 5:35 a.m., stayed in bed until about 6:10 a.m. and then "got dressed in a sweatshirt and shorts." Plaintiff then stated he looked into his mother's bedroom which was dark because the drapes were drawn. Not seeing anyone, he went to the office area where he saw his father bleeding and gagging. Plaintiff then stated he immediately called 9-1-1 from the phone on the desk in the *office*. He then stated he opened the garage door and saw his mother's car and then went back to his mother's room. He saw his mother and then went to the kitchen to call his sister Shari. (Exhibit B, TT pp. 3437-3439, 3439-3441, 3442-3443)(Exhibit R, HH pp. 8-24)

**Response**: Deny. Marty said that he woke up at 5:35 a.m., which is when his alarm clock was

set. Marty then stayed in bed until around 6:05 a.m. because he was tired. At that point, Marty

got out of bed and got dressed in underwear and shorts. [Defs.' Exhibit B, TT (Marty Tankleff)

at 4112–13.] Marty did not put his glasses on that morning. [Defs.' Exhibit B, TT (Marty

Tankleff) at 4115:2–3.] After getting dressed, he left his room and looked in his parents' room

and didn't see anyone because the room was dark. [Defs.' Exhibit ZZ (Tankleff Deposition) at

138:11–23.] The sunrise on the morning of September 7, 1988 was not until 6:25 a.m. [Defs.'

Exhibit B, TT (James McCready) at 3517:15–17.] Thinking that maybe his parents had already

gotten up, Marty went down the hallway and noticed that all the lights were on and the front door

was open. Marty then went down the hallway into the office. [Defs.' Exhibit B, TT (Marty

Tankleff) at 4115:9–15.] There, he saw his father bleeding on the chair and he rushed over,

shouting, "Dad, dad, dad." Marty immediately called 911 from the phone in the office. After

rendering aid to his father, as per the instructions of the emergency operator, Marty went to go

look for his mother. [Defs.' Exhibit B, TT (Marty Tankleff) at 4115:16–4119:16.] Having not

seen anyone in the bedroom, he went to the garage to see if his mother's car was there. After

finding his mother's car in the garage, Marty went back to the bedroom and saw his mother

"unmoving" and "lifeless." Marty then ran out of the bedroom screaming and called his step-

sister, Shari, to tell her to get over to the house. [Defs.' Exhibit B, TT (Marty Tankleff) at

4119:17–4121:10.]

> 54. At this time, McCready observed that the only blood plaintiff had on him was a blood
> spot on his right calf and a blood spot on his right instep. McCready then asked if
> plaintiff had blood on him from helping his father to which plaintiff stated "my hands
> were covered with blood" and "I washed them in a puddle." McCready then reentered
> the house and observed there were *unsmeared* blood spatters on the office telephone; *no*
> blood on the three telephones in or near the kitchen; and *no* blood on the garage door of
> the dead bolt lock which was locked. McCready also observed that the drapes in the
> master bedroom were *open*. (Exhibit B, TT pp. 3444-3451, 3560-3565) (Exhibit R, HH
> pp. 24-30)

**Response**: Deny that McCready observed unsmeared blood spatters on the office telephone; at

his deposition while looking at a photo of the office phone under a magnifying glass, McCready

admitted that there was something that very well could have been smeared blood. [Pl.'s Exhibit 9

(McCready Deposition) at 135:18–136:15.] Admit the remainder but deny implication that this is

incriminating evidence. The first responder's reports indicate that by the time that they arrived

on scene at 6:27 a.m., Seymour was already "mostly covered in dried blood" and that Arlene had

dried blood on her forehead and scalp. [Defs.' Exhibit B, TT (Ethel Curley) at 472:4–6 and

486:21–25; Pl.'s Exhibit 32 (Prehospital Care Report for Seymour Tankleff); Pl.'s Exhibit 33

(Prehospital Care Report for Arlene Tankleff).] And McCready testified he believed Marty

pulled his father by his feet from the chair to the floor and then subsequently rendered aid, and in

this way assisted his father without getting blood on himself. [Pl.'s Exhibit 9 (McCready

Deposition) at 23:19–26:2.] In addition to that, McCready testified that the blood smear that was

present on Marty's wall near the light switch is indicative of someone groping around looking

for a light switch and that it is unlikely that Marty would have done that in his own room. [Pl.'s

Exhibit 9 (McCready Deposition) at 147:7–148:13.] McCready also testified that Marty could

have gotten the garage door open without getting blood on it. [Pl.'s Exhibit 9 (McCready

Deposition) at 138:6–139:24.] Also note that Marty said that his mother's room was dark and

that the first time he went into the room, it would have been around 6:05 a.m., 20 minutes before

sunrise. [Defs.' Exhibit B, TT at 3517:15–17.]

> 55.  At approximately 8:00 a.m., Detective Sergeant Robert Doyle arrived at the scene and
>      spoke to the uniformed officers who had responded to the incident location and received
>      a rundown of "what they had." Doyle then conducted a walkthrough of the house, and
>      noted that based on the position of Arlene's body, it appeared that there was a struggle.
>      McCready introduced Doyle to plaintiff. Doyle noted upon exiting the house, that
>      plaintiff did not appear "upset" or "emotional." (Exhibit B, TT pp. 2608-2613, 2638,
>      2652-2654, 2683-2684) (Exhibit YY Deposition of Robert Doyle p. 127)

**Response**: Deny that Marty was not upset or emotional after finding his parents' brutalized

bodies. [Defs.' Exhibit A2 911 Audio Recording; Defs.' Exhibit B, TT (Tankleff) at 4131:23–

25.] Witnesses reported seeing Marty in apparent shock. [Defs.' Exhibit B, TT (Dara Schaeffer)

at 573:13–15.] Admit the remainder.

> 56.  Plaintiff then recounted, for Doyle, the steps he took when he left his bedroom and
>      repeated the scenario he had stated to McCready and McNamara, except he did not
>      mention he went to the garage while searching for his mother. He did state, however,
>      that he looked into the master bedroom from the *hallway* and could see that Arlene was

dead because she was not moving and that her throat was cut. He also told Doyle that Jerry Steuerman had done this and explained who Jerry Steuerman was. (Exhibit B, TT pp. 2614-2620)(Exhibit R, HH pp. 973-990)

**Response**: Deny that this occurred as Doyle describes; *see* Plaintiff's response to ¶ 53.

57.  On the day of the murders plaintiff drew a diagram showing a rough layout of the house where he showed that his (plaintiff's) bedroom door is almost directly across from the master bedroom door. (Exhibit C, McCready Supplemental Report, 9/14/88)(Exhibit D, Oral Confession)(Exhibit L, Trial Exhibit #168)

**Response**: Admit that Marty drew a diagram, but deny that this diagram is to scale or an otherwise precise representation of the layout of the house. Deny that Marty's room is directly across from his parents' bedroom. [Pl.'s Exhibit 42 (Diagram of the Tankleff Residence).]

58.  Prior to waking on September 7, 1988 the plaintiff did not hear anything in the house. He heard no cries for help or cries of pain or any cries of anguish. (Exhibit ZZ Deposition of Martin Tankleff p. 288-289)

**Response**: Admit. Any cries for help from his parents' room would not have been heard by Marty, who was sleeping in his room with the door closed, as the undisputed sound expert established. [Pl.'s Exhibit 43 (Schnitta Affidavit) at 7.]

59.  At 8:16 a.m., Detective Norman Rein arrived at the scene and approached Doyle. McCready was at this time approaching Detective Charles Kosciuk, a detective assigned to the crime laboratory. After Rein spoke to Doyle, Doyle asked the plaintiff to tell Rein what he had told Doyle. (Exhibit B, TT pp. 2831-2833, 2957-2966)(Exhibit XX Deposition of Norman Rein p. 72-74)

**Response**: Admit Rein testified at trial that he arrived at the scene around 8:15 a.m., whereupon he approached Detective Doyle. But deny that McCready was at that time approaching Kosciuk, instead Rein further testified that he observed Detective McCready talk to a man named Myron Fox. After reaching Doyle, who was with Marty, Rein testified that he was then introduced to Marty and Doyle asked Marty to tell Rein the story he had told him. [Defs.' Exhibit B, TT (Norman Rein) at 2831–2833, 2957–2966.]

60.  Rein then spoke with plaintiff who stated that after leaving his bedroom, he went and looked in the master bedroom but did not see either of his parents because the room was dark. Plaintiff then said he looked in to the office and saw his father in a chair by the desk. He described his father as bloody and "gagging" and that his father's throat was cut all around. Plaintiff next stated he dialed 9-1-1 from his father's *office* phone. (Exhibit B, TT pp. 2835-2836)(Exhibit R, HH pp. 1068-1127)(Exhibit XX Deposition of Norman Rein p. 76, 77)

**Response**: Admit that Rein so testified.

61.  Plaintiff next told Rein that he followed the operator's instruction and then went to look for his mother. Plaintiff went to the garage and after seeing his mother's car there, he went back to the master bedroom, looked in, saw his mother and then went into the kitchen and phoned his sister Shari. Plaintiff next stated he went back to the office and then back into the kitchen to answer the ringing phone, which was his sister calling back. Plaintiff did not mention he used the same phone in the kitchen on a third and fourth occasion at this time. (Exhibit B, T pp. 2836-2837)(Exhibit R, HH pp. 1068-1127)(Exhibit XX Deposition of Norman Rein p. 76, 77)

**Response**: Admit that Rein so testified.

## II.    From Potential Witness to Suspect to the Confession

62.  After the aforementioned conversation, Rein walked away from plaintiff and spoke to McCready and Doyle. Based on the discrepancies in plaintiff's statements to each of them, (*no* smear of blood splatter on office phone; *no* blood on the door handle and deadbolt to the garage, the latter of which was locked; *no* blood on the kitchen phone; blood *on* the light switch plate and wall in plaintiff's bedroom; *no* indication from plaintiff that he heard anything before waking up; that plaintiff was the *only* surviving family member who was present; the claim plaintiff could *see* his mother's throat slashed from the bedroom door), and plaintiff's "lack of emotion" and "whole demeanor," Doyle directed McCready to asked plaintiff to accompany him and Rein to Police Headquarters. (Exhibit B, TT pp. 2625-2627, 2889-2891, 2991-2994, 3456-3457, 3524-3525, 3612, 3627, 3786)(Exhibit R, HH pp. 991-993, 1077-1080)(Exhibit XX Deposition of Norman Rein p. 74-80)(Exhibit YY Deposition of Robert Doyle p. 252-255 – see in response for comment)

**Response**: Deny. Officers decided almost immediately that Marty was guilty and believed that

Marty's emotional response was not appropriate. [Pl.'s Exhibit 9 (McCready Deposition) 77:20–

24, 93:24–94:4.] Deny that discrepancies existed in Marty's statements; *see* Plaintiff's response

to ¶ 54. [Pl.'s Exhibit 9 (McCready Deposition) at 23:19–26:2, 138:6–139:24, 147:7–148:13; Pl.'s Exhibit 43 (Schnitta Affidavit) at 7.] Admit that Detective Rein testified that around 8:35 a.m. the morning of the murders, he proceeded to have a conversation with McCready and Doyle. Admit that Marty Tankleff was questioned by Detectives Rein, McCready, and Doyle and during these conversations he discussed what had happened that morning. [Defs.' Exhibit B, TT (Marty Tankleff) at 4132:19–4135:25, 4136:14–4138:11.] Deny that Marty was emotionless the whole morning or had an inappropriate demeanor. During the 911 call Marty's sobs are apparent, as are his repeated and urgent requests for help. [Defs.' Exhibit A2 (911 Call Audio Recording).] Witnesses reported that Marty was in apparent shock that morning. [Defs.' Exhibit B, TT (Dara Schaeffer) at 573:13–15.] And Marty himself said the whole morning felt like a nightmare. [Defs.' Exhibit B, TT (Marty Tankleff) at 4131:23–25.]

63. At about 8:40 a.m., McCready asked plaintiff to accompany him to Police Headquarters to talk to him further about what he had been telling the detectives and about Jerry Steuerman. Plaintiff responded "fine" and got into the right front passenger seat unrestrained. The two then left the scene. (Exhibit B, TT pp. 3458, 3463, 3607-3608, 4138, 4228)(Exhibit C, McCready Supplemental Report, 9/14/88, p. 6)(Exhibit R, HH pp. 29-30)

**Response**: Deny. *See* Counterstatement at ¶ 22.

64. Doyle then went into the bathroom near plaintiff's bedroom and observed water droplets in the bathtub and a wet loofah sponge. (Exhibit B, TT pp. 2624, 2735)(Exhibit YY Deposition of Robert Doyle P. 235-236, 375-376)

**Response**: Admit.

65. While in route to headquarters, McCready got a radio message to contact Detective Pfalzgraf who was at Mather Hospital where Seymour had been taken. After phoning Pfalzgraf, McCready learned that Seymour had suffered "extensive head injuries" and was being transferred to Stony Brook Hospital. (Exhibit B, TT pp. 3463-3465, 3609-3610)(Exhibit C, McCready Supplemental Report, 9/14/88, p. 6)(Exhibit D, Oral Confession p. 4)(Exhibit R, HH pp. 41-43)

**Response**: Admit.

66. McCready and plaintiff then discussed Jerry Steuerman. McCready had no idea who Steuerman was at this point in the investigation, but knew Doyle would order another team of detectives to interview him. Doyle had, in fact, instructed Homicide Detectives Robert Anderson and Anthony Laghezza to interview all the card players who were present at a card game that concluded hours before the murders. Doyle also instructed Anderson and Laghezza to interview Steuerman last. (Exhibit B, TT pp. 2754-2755, 3466, 3620-3634)(Exhibit C, McCready Supplemental Report, 9/14/88, p. 6)(Exhibit R, HH pp. 43-45)(Exhibit YY deposition of Robert Doyle p. 111-115)

**Response**: Deny. *See* Counterstatement at ¶¶ 129, 147.

67. McCready arrived at police headquarters with plaintiff at approximately 9:20 a.m. Both then proceed to McCready's office when plaintiff was asked if he wanted a cup of coffee. Plaintiff indicated he did and McCready gave plaintiff the coffee. Plaintiff sat in the interview room as McCready waited for Rein to arrive at headquarters. (Exhibit B, TT pp. 3357-3360, 3467-3468, 3573-3576, 3641-3642)(Exhibit C, McCready Supplemental Report, 9/14/88, p. 6)(Exhibit R, HH pp. 45-47)(Exhibit ZZ Deposition of Martin Tankleff p. 165)

**Response**: Admit that McCready so testified. Admit that Marty had a cup of coffee after arriving at Homicide Headquarters. That cup of coffee was the only thing he had to eat since waking up that morning. [Defs.' Exhibit B, TT (Marty Tankleff) at 4147:20–25.]

68. At approximately 9:40 a.m., Rein and McCready entered the interview room and made "small talk" with plaintiff. At approximately 9:45 a.m., plaintiff removed three tissues from one of his pockets and placed them on a desk. (Exhibit B, TT pp. 2841-2843, 3005-3006, 3036-3038, 3093, 3469,3470, 3512, 3520) (Exhibit D, Oral Confession p. 1)(Exhibit R, HH pp. 47-50, 1081-1082)

**Response**: Admit.

69. Plaintiff told Rein and McCready about some of his father's business dealings and that his father was a retired insurance broker and that his father was partners in a business with Dan Hayes. (Exhibit ZZ Deposition of Martin Tankleff p. 200)

**Response**: Admit that in response to questioning, Marty told Rein and McCready about some of his father's business dealings and that this father was a retired insurance broker and that his

father was partners in a business with Dan Hayes. [Defs.' Exhibit ZZ (Tankleff Deposition) at 200:2–8.]

70.  Plaintiff told Rein and McCready that his father and Jerry Steuerman were partners in horses and that his mother and father each had twenty percent and Jerry Steuerman had 50 percent. (Exhibit ZZ Deposition of Martin Tankleff p. 205)

**Response**: Admit that in response to questioning, Marty told Rein and McCready that his father and Jerry Steuerman were partners in horses and that his mother and father each had twenty percent and Jerry Steuerman had 50 percent. [Defs.' Exhibit ZZ (Tankleff Deposition) at 205:18–23.]

71.  Plaintiff told Rein and McCready that his father and mother were partners in the bagel store and that Jerry and his father were having an ongoing dispute about this father buying into one of Jerry Steuerman's bagel stores. (Exhibit ZZ Deposition of Martin Tankleff p. 206)

**Response**: Admit that in response to questioning, Marty told Rein and McCready that his father and Jerry Steuerman were having an ongoing dispute about his father buying into one of Jerry Steuerman's bagel stores. [Defs.' Exhibit ZZ (Tankleff Deposition) at 205:25–206:11.]

72.  Plaintiff then told Rein and McCready about what he did on the evening of September 6, and that he took a shower that night before going to bed. (Exhibit ZZ Deposition of Martin Tankleff p. 174)

**Response**: Admit that in response to questioning, Marty told Rein and McCready about what he did on the evening of September 6, and that he took a shower that night before going to bed. Deny that "plaintiff then told Rein and McCready;" the cited evidence does not demonstrate the order in which plaintiff was interrogated about the events. [Defs.' Exhibit ZZ (Tankleff Deposition) at 173:17–174:8.]

73.  Plaintiff then told Rein and McCready that his mother slept in the bed closest to the sliding glass doors and that he gave his mother a kiss good night the night before. (Exhibit ZZ Deposition of Martin Tankleff p. 181)

**Response**: Admit that in response to questioning, Marty told Rein and McCready that his mother slept in the bed closest to the sliding glass doors and that he gave his mother a kiss goodnight the night before. Deny that "plaintiff then told Rein and McCready;" the cited evidence does not demonstrate the order in which plaintiff was interrogated about the events. [Defs.' Exhibit ZZ (Tankleff Deposition) at 181:14–25.]

74.   Plaintiff next told Rein and McCready that he had surgery two weeks prior, having to now wear glasses because of surgery, and then discussed girls. (Exhibit B, TT pp. 2839-2912, 3456-3672, 3705-3934)(Exhibit C, McCready Supplemental Report 9/14/88)(Exhibit D, Oral Confession)(Exhibit R, HH pp. 30-161, 1068-1127)(Exhibit ZZ Deposition of Martin Tankleff p. 168)

**Response**: Admit that in response to questioning, Marty told Rein and McCready that he had surgery two weeks prior, having to now wear glasses because of surgery, and discussed girls. Deny that "plaintiff next told Rein and McCready" and that Marty "then discussed girls;" the cited evidence does not demonstrate the order in which plaintiff was interrogated about the events. [Defs.' Exhibit ZZ (Tankleff Deposition) at 168.]

75.   Plaintiff testified at his criminal trial that in September of 1988 he was wearing regular glasses because he had just gotten a nose job. (Exhibit B, TT pp. 4114)

**Response**: Admit. [Defs.' Exhibit B (Marty Tankleff) at 4114:12–19.]

76.   Plaintiff next told Rein and McCready that he loved to cook and would sometimes cook for the poker players. He mentioned his car was `78 Lincoln Town Car. He also stated that after eating his dinner he placed his plate in the dishwasher and his glass in the sink. (Exhibit B, TT pp. 2839-2912, 3456-3672, 3705-3954)(Exhibit C, McCready Supplemental Report, 9/14/88)(Exhibit D, Oral Confession)(Exhibit R, HH pp. 30-161, 1068-1127)(Exhibit ZZ Deposition of Martin Tankleff p. 173)

**Response**: Deny that "plaintiff next told Rein and McCready;" the cited evidence does not demonstrate the order in which plaintiff was interrogated about the events. [Defs.' Exhibit ZZ (Tankleff Deposition) at 173.] Admit remainder. Plaintiff objects to Defendants' non-specific

29

citations of 518 pages in Defs.' Exhibit B, TT and 190 pages in Defs.' Exhibit R, HH on the

grounds that they do not comply with Fed. R. Civ. P. 56(c)(1)(A) or Local Civil Rule 56.1.

77. Plaintiff told Rein and McCready that he was adopted, he loved his niece and nephew, talked about how his father and mother met and described his relationship with various family members. (Exhibit B, TT pp. 2839-2912, 3456-3672, 3705-3934)(Exhibit C, McCready Supplemental Report, 9/14/88)(Exhibit D, Oral Confession)(Exhibit R, HH pp. 30-161, 1068-1127)(Exhibit ZZ Deposition of Martin Tankleff p. 175)

**Response**: Admit. Plaintiff objects to Defendants' non-specific citations of 518 pages in Defs.'

Exhibit B, TT and 190 pages in Defs.' Exhibit R, HH on the grounds that they do not comply

with Fed. R. Civ. P. 56(c)(1)(A) or Local Civil Rule 56.1.

78. Plaintiff could not recall if he told Rein and McCready that his parents always locked the bedroom sliders and screens. (Exhibit ZZ Deposition of Martin Tankleff p. 178)

**Response**: Admit.

79. Plaintiff told Rein and McCready about his relationship with his mom; that he had a loving relationship with his mother, enjoyed taking walks with her and discussing cooking. (Exhibit ZZ Deposition of Martin Tankleff p. 180)

**Response**: Admit.

80. Plaintiff told Rein and McCready about his relationship with his father, plaintiff's aversion to blood; and that he could talk to his father about anything. (Exhibit B, TT p. 2839-2912, 3456-3672, 3705-3934)(Exhibit C, McCready Supplemental Report, 9/14/88)(Exhibit D, Oral Confession)(Exhibit R, HH pp. 30-161, 1068-1127)(Exhibit ZZ Deposition of Martin Tankleff p. 191)

**Response**: Admit. Plaintiff objects to Defendants' non-specific citation of 518 pages in Defs.'

Exhibit B, TT on the grounds that it does not comply with Fed. R. Civ. P. 56(c)(1)(A) or Local

Civil Rule 56.1.

81. Plaintiff told Rein and McCready about the family maid; and told them the names of the people playing in the poker game on the night of September 6, 1988. (Exhibit ZZ Deposition of Martin Tankleff p. 193, 196)

**Response**: Admit.

82.  Plaintiff told Rein and McCready that this father and Steuerman pretended to be good buddies but they did not like each other anymore. (Exhibit ZZ Deposition of Martin Tankleff p. 197)

**Response**: Admit.

83.  Plaintiff told Rein and McCready that he knew a lot about this father's business dealings and that his father was grooming him for the business world. (Exhibit B, TT pp. 2839-2912, 3456-3672, 2705-3934)(Exhibit C, McCready Supplemental Report, 9/14/88)(Exhibit D, Oral Confession)(Exhibit R, HH pp. 30-161, 1068-1127)(Exhibit ZZ Deposition of Martin Tankleff, p. 198)

**Response**: Admit. Plaintiff objects to Defendants' non-specific citations of 518 pages in Defs.' Exhibit B, TT and 190 pages in Defs.' Exhibit R, HH on the grounds that they do not comply with Fed. R. Civ. P. 56(c)(1)(A) or Local Civil Rule 56.1.

84.  Plaintiff told Rein and McCready that he wasn't going to receive anything under his parents will until he was 25 and that he was going to get more than his sister. (Exhibit ZZ Deposition of Martin Tankleff p. 199)

**Response**: Admit.

85.  Rein and McCready then asked plaintiff to demonstrate how he had administered first aid to Seymour. Plaintiff demonstrated on Rein. (Exhibit ZZ Deposition of Martin Tankleff p. 208)

**Response**: Admit.

86.  Up until this demonstration, plaintiff answered the questions that were posed to him in the interrogation room.(Exhibit ZZ Deposition of Martin Tankleff p. 190)

**Response**: Admit.

87.  Up until this demonstration, the plaintiff was not threatened with any physical harm if he refused to answer the questions. (Exhibit ZZ Deposition of Martin Tankleff p. 188-191)

**Response**: Admit that "Nobody put a gun to my head or put me in handcuffs but they took me away from my house, from my family, and took me to Police Headquarters." [Defs.' Exhibit ZZ (Tankleff Deposition) at 191:2–5.]

88.  At around this time, plaintiff made three sketches for Rein and McCready showing how the cars belonging to the card players were parked in the driveway; the general layout of the house showing the office/gym, bedrooms, closets and bathrooms; where Arlene was in the bedroom when he looked in; and where he was standing when he looked in, which was signified by a line drawn in the bedroom foyer. (Exhibit I, Trial Exhibit #169)(Exhibit L, Trial Exhibit #168)(Exhibit M, Trial Exhibit #167)

**Response**: Admit that at the request of the detectives, plaintiff made the drawings, but deny that the drawings are to scale or are otherwise precise representations of the house and crime scene.

89.  Plaintiff admits to making the drawings, but does not recall when he made the drawings. (Exhibit ZZ Deposition of Martin Tankleff p. 211-215)

**Response**: Admit.

90.  Plaintiff made some of the drawings when the interrogation was over and some during. (Exhibit ZZ Deposition of Martin Tankleff p. 214)

**Response**: Admit.

91.  While the plaintiff was demonstrating how he administered first aid to his father, the movement of plaintiff's sweatshirt allowed McCready to see plaintiff's right shoulder. McCready observed blood on the shoulder. At this time, McCready asked plaintiff when he had last showered and plaintiff replied "last night." (Exhibit B, TT pp. 2867-2870, 3168-3170, 3177-3179, 3199, 3473-3475)(Exhibit C, McCready Supplemental Report, 9/14/88)(Exhibit D, Oral Confession)(Exhibit R, HH pp. 30-161, 1068-1127)(Exhibit ZZ Deposition of Martin Tankleff p. 211, 226)

**Response:** Admit.

92.  The plaintiff demonstrated how he administered first aid to his father with Detective Rein portraying his father by sitting in a chair. (Exhibit ZZ Deposition of Martin Tankleff p. 209)

**Response**: Admit.

93.   When the plaintiff demonstrated how he administered first aid to his father he made physical contact with Detective Rein. (Exhibit ZZ Deposition of Martin Tankleff p. 210)

**Response**: Admit.

94.   Plaintiff told Rein and McCready that he never touched his mother that morning. (Exhibit ZZ Deposition of Martin Tankleff p. 230)

**Response**: Admit.

95.   Plaintiff was not wearing a sweatshirt when he got up that morning. (Exhibit ZZ Deposition of Martin Tankleff p. 231)

**Response**: Admit.

96.   The photograph of the plaintiff taken at police headquarters on September 7, 1988 does not show any blood on the plaintiff's shorts and plaintiff acknowledged this during his testimony at the criminal trial. (Exhibit B, TT pp. 4221-4222)

**Response**: Admit.

97.   Rein, who had been an Emergency Medical Technician for 31 years, noted plaintiff was calm and not at all indicating any symptoms of shock at the violent death of his mother and attack on his father.(Exhibit B, TT pp. 2839-2912, 3456-3672, 3705-3934)(Exhibit R, HH pp. 30-161, 1068-1127)(Exhibit XX Deposition of Norman Rein p. 104)

**Response**: Admit that Detective Rein so testified. [Defs.' Exhibit XX (Rein Deposition) at 104:14–25.] Deny that Marty wasn't in shock. [Defs.' Exhibit B, TT (Dara Schaeffer) at 573:13–15.] Marty testified that the day felt like a nightmare. [Defs.' Exhibit B, TT (Tankleff) at 4131:23–25.] Plaintiff objects to Defendants' non-specific citations of 518 pages in Defs.' Exhibit B, TT and 190 pages in Defs.' Exhibit R, HH on the grounds that they do not comply with Fed. R. Civ. P. 56(c)(1)(A) or Local Civil Rule 56.1.

98.   At about 11:15 a.m. some 95 minutes into the questioning, and after having observed blood on plaintiff's shoulder, Rein and McCready became accusatory. (Exhibit XX

33

Deposition of Norman Rein p. 125)(Exhibit B, TT pp. 2870-2872, 2941, 3184-3187, 3215, 3476-3478, 3517)(Exhibit TT, Complaint paragraphs 61-62)

**Response**: Admit that Rein and McCready both testified and reported that they became accusatory around 11:15 a.m., after Marty demonstrated how he had helped his father. Deny this would have been only 95 minutes into the questioning, and that this specifically occurred after McCready observed blood stains on Marty's shoulder.

99. Between 9:40 a.m. and 11:15 a.m. the questioning of the plaintiff was not accusatory and plaintiff answered many questions with long narratives. (Exhibit XX Deposition of Norman Rein p. 124-129)

**Response**: Admit that Rein so testified. [Defs.' Exhibit XX (Rein Deposition) at 125:13–128:14.]

100. Between approximately 11:15 a.m. and 11:54 a.m. the detectives confronted the plaintiff with inconsistencies between what he was telling them and what they had learned at the crime scene.(Exhibit XX Deposition of Norman Rein p. 129-130)

**Response**: Admit that Rein so testified. [Defs.' Exhibit XX (Rein Deposition) at 129:9–30:6.] Deny that there were inconsistencies between what Marty was telling them and what the evidence at the crime scene showed. *See* Plaintiff's response to ¶ 62; *see also* Counterstatement at ¶ 30–35.

101. Between approximately 11:15 a.m. and 11:54 McCready raised his voice and Rein probably raised his voice. (Exhibit XX Deposition of Norman Rein p. 129-130)

**Response**: Admit.

102. At approximately 11:54 Detective McCready entered the room and employing a ruse, he told plaintiff that Seymour had regained consciousness and said that plaintiff had "beat and stabbed" him. Plaintiff stated that if his father said that, he did so because he (plaintiff) helped him that morning. Plaintiff said he would take a lie detector test. (Exhibit ZZ Deposition of Martin Tankleff p. 247-248)

34

**Response**: Admit the substance, but deny the time at which this occurred. *See* Counterstatement

at ¶¶ 36–39.

103. Plaintiff told the detectives that whoever did this "needs psychiatric help." Plaintiff then asked "could I have blacked out and done it?"Maybe it wasn't him but another Marty Tankleff that killed them." (Exhibit B, TT pp. 2882-2886, 3243-3247, 4156)(Exhibit C, McCready Supplemental Report, 9/14/88)(Exhibit D, Oral Confession)(Exhibit R, HH pp. 30-161-1068-1127)

**Response**: Admit that McCready so reported and so testified.

104. Plaintiff does not recall if he made the statements in paragraph 102 above to the detectives or not. (Exhibit AAA Deposition of Martin Tankleff p. 97)

**Response**: Admit.

105. Plaintiff is not sure if he told the detectives "Could I be possessed?" (Exhibit AAA Deposition of Martin Tankleff p. 97)

**Response**: Admit.

106. The rhetorical statement "could I have blacked out" was made by the plaintiff to the detectives and was not suggested to him by the detectives. (Exhibit B, TT p. 4156).

**Response**: Admit.

107. Plaintiff claims the detectives had him believing that he committed the murders. (Exhibit ZZ Deposition of Martin Tankleff p. 259)(Exhibit B, TT p. 4156, 4161)

**Response**: Admit that after the detectives lied to him about his father indicating that he (Marty)

committed the murders, Marty started believing that he'd done it because, "they were saying my

father said I did this. My father never lied to me." [Defs.' Exhibit ZZ (Tankleff Deposition) at

258:25–259:3; Defs.' Exhibit B, TT (Marty Tankleff) at 4156:11–14.]

108. Detective McCready asked the plaintiff "Did you kill your mother and did you hurt your father?" and the plaintiff responded "Yeah I did it." (Exhibit AAA Deposition of Martin Tankleff p. 105)(Exhibit ZZ Deposition of Martin Tankleff p. 258-259)

**Response**: Admit.

109.  After telling the detectives that he killed his mother and hurt his father plaintiff told the detectives that he wanted to go to Florida and he was planning on going to the Wharton School of Business. (Exhibit ZZ Deposition of Martin Tankleff p. 258-259)

**Response**: Admit Marty, at some point during the interrogation, told Rein and McCready that he wanted to go to Florida, and that he was planning on going to the Wharton School of Business. Deny the implied sequence of interrogation topics. [Defs.' Exhibit ZZ (Tankleff Deposition) at 258:25–259:26.]

110.  After telling the detectives that he killed his mother and hurt his father plaintiff told the detectives that he resented that Dan Hayes, his father's business partner in the health and fitness center was going to move into the house to babysit him when his parents went on vacation. (Exhibit ZZ Deposition of Martin Tankleff p. 263-264)

**Response**: Admit that seventeen-year-old Marty, at some point during the interrogation, indicated to McCready and Rein that he initially resented that Dan Hayes was going to move into the house to babysit him when his parents went away on vacation. Deny the implied sequence of interrogation topics. [Defs.' Exhibit ZZ (Tankleff Deposition) at 263:24–264:8.]

111.  Plaintiff indicated to the detectives that he saw his father in his office sleeping in his chair, he was surprised that he wasn't in bed with his mother and that the lights were on. Plaintiff said this to the detectives after it was suggested to him by the detectives. (Exhibit ZZ Deposition of Martin Tankleff p. 266-267)

**Response**: Admit McCready and Rein suggested these details to Marty, and he eventually acquiesced to their statements. [Defs.' Exhibit ZZ (Tankleff Deposition) at 266:18–267:5.]

112.  Plaintiff acquiesced and agreed with a suggestion from the detectives that he hit his mother with a dumbbell and then cut her throat. That she was on her back and he didn't know how many times he had stabbed her, that he had gotten to her quickly and hit her at least four to five times on the head. (Exhibit ZZ Deposition of Martin Tankleff p. 267:6-17)

**Response**: Admit McCready and Rein suggested these details to Marty, and he eventually

acquiesced to their statements. [Defs.' Exhibit ZZ (Tankleff Deposition) at 266:18–267:5.]

113. Plaintiff agreed to whatever the detectives suggested and agreed to the specific
suggestions that the detectives made concerning the wounds that were inflicted on his
mother. (Exhibit AAA Deposition of Martin Tankleff p. 118)

**Response**: Admit that Marty eventually agreed to whatever Detectives McCready and Rein

suggested. [Defs.' Exhibit AAA (Tankleff Deposition) at 118:2–8.]

114. At the point in time when he acquiesced to the statements about the wounds to his
mother the plaintiff did not deny the statement and did not say, no I never did that.
(Exhibit AAA Deposition of Martin Tankleff  p. 118)

**Response:** Deny; *see* Plaintiff's response to ¶ 117.

115. At his deposition on July 9, 2013 in the matter of Tankleff v New York State, plaintiff
was asked the following questions and gave the following answers:
Q:    It says Detective McCready, they suggested to you that he hit your mother with a
dumbbell and then cut her throat. They suggested that to you, you acquiesced; is
that correct?
A:    Yes.
Q:    You did not deny doing that?
A:    Correct.
Q:    And then she was in bed on her back and you didn't know how many times you
stabbed her. You acquiesced to that, is that correct?
A:    Yes.
Q:    You did not deny it?
Mr. Barket: I am sorry. I am trying to keep up. She was in her bed on her back.
Mr. Schwerdt: Is there an objection or something?
Mr. Barket: No, no.
Q:    The other thing was, you got to her quickly, and hit her at least four or five times
in the head. You acquiesced to that; is that correct?
A:    That is correct.
Q:    And you did not deny that?
A:    Correct.
(Exhibit AAA Deposition of Martin Tankleff p. 120-121)

**Response**: Admit [Exhibit AAA Deposition of Martin Tankleff at 120:6–121:8], and in the

interest of completeness, add that the following six lines of the deposition are as follows:

> Q:     But without going through all these things, those three separate things that I just
>        discussed with you that were of this compound question, it is your testimony,
>        those were not your words, those were the detectives'; is that correct?
> A:     That is correct.

[Defs.' Exhibit AAA (Tankleff Deposition) at 121:9–15.]

116.  Immediately following these questions at the deposition on July 9, 2013, plaintiff's
      counsel Mr. Barket said "I am hungry, if that matters" and the lunch recess was taken.
      (Exhibit AAA Deposition of Martin Tankleff p. 121)

**Response**: Admit as factually accurate, but deny that this is relevant evidence for the purposes of

this summary judgment motion. [Defs.' Exhibit AAA (Tankleff Deposition) at 1221:16–17.]

117.  Upon returning from the lunch break, the plaintiff changed his answers to the earlier
      questions and claimed he agreed to the suggestions but only after initially denying them.
      (Exhibit AAA Deposition of Martin Tankleff p. 121-130)

**Response**: Deny that "plaintiff changed his answers." After the lunch recess, plaintiff sought to

clarify what he meant in response to admittedly compound questions when he used the term

acquiesce during his testimony as a way to describe the back and forth he had with Detectives

Rein and McCready. He clarified that he agreed to the suggestions that the detectives said after

saying that he didn't know what they were talking about and that he didn't do anything. [Defs.'

Exhibit AAA (Tankleff Deposition) at 124:3–15.]

118.  After the initial denials, plaintiff agreed to the statements suggested to him by law
      enforcement. (Exhibit AAA Deposition of Martin Tankleff p. 130)

**Response**: Admit that Marty eventually agreed to the statements suggested to him by law

enforcement. [Defs.' Exhibit AAA (Tankleff Deposition) at 130:2–13.]

119.  Plaintiff acquiesced and agreed with a suggestion from the detectives that after his
      mother fell on the floor he ran out and got a knife from the kitchen and cut her throat,

the knife was on the counter next to the watermelon, "she was moving a little bit when he ran out of the bedroom to kill his father, and that his father was still alive in the office." (Exhibit ZZ Deposition of Martin Tankleff p. 268)

**Response**: Admit that Defendants suggested the above fabricated statements to Marty and he eventually acquiesced and agreed. [Defs.' Exhibit ZZ (Tankleff Deposition) at 268:3–13.]

120. Plaintiff acquiesced and agreed with a suggestion from the detectives that his father was sitting at his desk and that his father was now awake and asked what are you doing and the plaintiff was still naked. (Exhibit ZZ Deposition of Martin Tankleff p. 268)

**Response**: Admit that Defendants suggested the above fabricated statements to Marty and he eventually acquiesced and agreed. [Defs.' Exhibit ZZ (Tankleff Deposition) at 268:14–21.]

121. Plaintiff acquiesced and agreed with a suggestion from the detectives that he walked in with a knife and dumbbell behind your back, that he had gotten behind his father and hit him with the barbell first and that his father asked why was he doing this and that he knocked him silly. (Exhibit ZZ Deposition of Martin Tankleff p. 268-269)

**Response**: Admit that Defendants suggested the above fabricated statements to Marty and he eventually acquiesced and agreed. [Defs.' Exhibit ZZ (Tankleff Deposition) at 268–269.]

122. Plaintiff acquiesced and agreed with a suggestion from the detectives that his father's feet were under the desk so he couldn't get up, and that he slashed his father's neck, and that he didn't know how many times he hit or cut him, and that he couldn't believe all the blood. (Exhibit ZZ Deposition of Martin Tankleff p. 269)

**Response**: Admit that Defendants suggested the above fabricated statements to Marty and he eventually acquiesced and adopted their theory. [Defs.' Exhibit ZZ (Tankleff Deposition) at 269:8–17.]

123. Plaintiff acquiesced and agreed with a suggestion from the detectives that he washed off the knife and barbell in the shower, put the barbell back in his bedroom, lay on his bed, thought about what to do next, and got up at about 6:10 a.m. (Exhibit ZZ Deposition of Martin Tankleff p. 269)

**Response**: Admit that Defendants suggested the above fabricated statements to Marty and he eventually acquiesced and agreed. [Defs.' Exhibit ZZ (Tankleff Deposition) at 269:18–270:4.]

124. During the interview with the detectives, the plaintiff claimed that he had nothing to do with the attack on his parents. (Exhibit ZZ Deposition of Martin Tankleff p. 398)

**Response**: Admit that Marty had nothing to do with the attacks on his parents, and repeatedly told both McCready and Rein that he was innocent. [Defs.' Exhibit ZZ (Tankleff Deposition) at 398:13–22.]

125. Plaintiff's protestations of innocence occurred prior to him adopting the position of the detectives that he murdered his parents. (Exhibit ZZ Deposition of Martin Tankleff p. 401)

**Response**: Deny. Throughout his interrogation, Marty continually protested his innocence. "When you asked me earlier about when the questions were, going back and forth during the interrogation process, when I said acquiesce, what was happening was that the detectives would ask a question, and I would say, I don't know what you are talking about; I didn't do anything. And they would once again re-ask the question or make a statement to me, and I would say, well, you know, I don't remember doing anything. I didn't do anything. If you're saying I did something, then I would just acquiesce to what they were saying." [Defs.' Exhibit AAA (Tankleff Deposition) at 124:3–15.]

126. Plaintiff claims he was never read Miranda warnings, but acknowledged that he signed the card and that the signature on the rights card was his. (Exhibit ZZ Deposition of Martin Tankleff p. 251)

**Response**: Admit that Marty was never read his Miranda warnings, but that he signed the card, which does not indicate the time at which it was signed, and that the signature on the card was his. [Defs.' Exhibit ZZ (Tankleff Deposition) at 251: 6–252:6.]

127. When the plaintiff told the detectives "yeah I did it" he did not consider what would happen to him. (Exhibit B, TT p. 4156, 4163-4164)

**Response**: Deny.  Seventeen-year-old Marty, who had no prior experience with the criminal justice system, believed that the interrogation would stop and that the detectives would finally accede to his wish to be taken to the hospital to be with his father. [Pl.'s Exhibit 9 (McCready Deposition) at 228:7–19; Defs.' Exhibit ZZ (Tankleff Deposition) at 152:4–15.] Marty "thought that this was all a nightmare and [he] was going to wake up and it would be all over." [Defs.' Exhibit B, TT (Marty Tankleff) at 4164:3–4.]

128. After having agreed with the statements that he killed his mother and hurt his father, the plaintiff voluntarily signed a consent form to take forensic evidence from plaintiff, specifically fingernail scrapings and exterior dried blood. (Exhibit ZZ Deposition of Martin Tankleff p. 278-279)(Exhibit O, Exemplar Consent Form)

**Response**: Admit that after having acquiesced to suggestions made by detectives that he killed his mother and hurt his father**,** Marty signed a consent form to take forensic evidence from him, specifically fingernail scrapings and exterior dried blood. [Defs.' Exhibit ZZ (Tankleff Deposition) at 278:3–15; Defs.' Exhibit O (Exemplar Consent Form).]

129. After the consent form was executed by plaintiff, Detectives Rein and McCready had members of the identification section take photographs of the plaintiff. (Exhibit B, TT pp. 3503-3504)(Exhibit F, Trial Exhibit 11, Photograph)(Exhibit P, Trial Exhibit 150, Photograph)(Exhibit R, HH pp. 30-161,1068-1127)

**Response**: Admit. Plaintiff objects to Defendants' non-specific citation of 190 pages in Defs.' Exhibit R, HH on the grounds that it does not comply with Fed. R. Civ. P. 56(c)(1)(A) or Local Civil Rule 56.1.

130. At 1:22 p.m., family attorney Fox called the police headquarters and directed the detectives to stop their questioning of plaintiff. (Exhibit B, TT pp. 2839-2912, 3456-3672, 3705-3934)(Exhibit C, McCready Supplemental Report, 9/14/88)(Exhibit D Oral Confession)(Exhibit R, HH pp. 30-161, 1068-1127)(Exhibit Q, Unsigned Written Confession)

**Response**: Admit.  Plaintiff objects to Defendants' non-specific citations of 518 pages in Defs.'

Exhibit B, TT and 190 pages in Defs.' Exhibit R, HH on the grounds that they do not comply

with Fed. R. Civ. P. 56(c)(1)(A) or Local Civil Rule 56.1.

> 131. Plaintiff claims he was choked by Detective McCready later in the day after he had
> made the confession. (Exhibit ZZ Deposition of Martin Tankleff p. 251)(Exhibit AAA
> Deposition of Martin Tankleff p. 106-107)

**Response**: Admit that Marty was shoved against a wall and hands placed on his throat later in

the day after McCready and Rein coerced and fabricated a false confession from him to a crime

he didn't commit. [Defs.' Exhibit AAA (Tankleff Deposition) at 106:21–107:6; Defs.' Exhibit

ZZ (Tankleff Deposition) at 301:20–302:9.]

> 132. Prior to the confession Detective McCready poked his fingers into the plaintiff's chest,
> and Detective Rein had his hand on the plaintiff's back and knee. Other than this, there
> is no evidence in the available record that the plaintiff was physically or verbally
> threatened in any way during his questioning. (Exhibit AAA Deposition of Martin
> Tankleff p. 195-109)(Exhibit B, TT p. 4693)

**Response**: Admit that during their interrogation of Marty and prior to his alleged confession,

Detective McCready poked his fingers into Marty's chest. [Defs.' Exhibit B, TT (Norman Rein)

at 4695:9–10.] Immediately before Detective McCready's faked phone call with the hospital and

the ruse about Marty's father implicating him in the attacks, Detective Rein testified that he was

alone in the interrogation room with Marty. During that time, Rein testified that he pulled his

chair in front of Marty and sat very close to him, face-to-face. Rein admitted that he placed his

hands on Marty's knees. He leaned in, and told Marty that he had worked in rescue work since

he was 18 years old, and, given that experience, he reiterated his refusal to accept Marty's

truthful protestations of innocence, saying "[he couldn't] accept that [Marty] didn't have blood

on [his] clothes." [Defs.' Exhibit B, TT (Norman Rein) at 3245:6–3247:13.] Deny the remainder,

*see* Counterstatement at ¶ 26.

133. Plaintiff's false confession expert, Mr. James Trainum is not aware of any threats of harm made to the plaintiff by the detectives prior to the plaintiff confessing to the crime. (Exhibit MMM Deposition of James Trainum p. 141)

**Response**: Admit.

134. Plaintiff's false confession expert, Mr. James Trainum is not aware of any evidence that the detective impliedly or actually threatened the plaintiff with any inevitable consequences to get him to admit to the crimes. (Exhibit MMM Deposition of James Trainum p. 142-143)

**Response**: Admit.

135. Plaintiff then remained in the homicide squad room for the rest of the afternoon and was processed on his arrest. During this time, plaintiff asked to speak to his sister Shari Rother. (Exhibit KK 50H Examination p. 62)

**Response**: Admit that Marty asked the detectives to allow him to speak to his step-sister a number of times earlier in the day; after the questioning about his parents stopped, Marty remained detained in the homicide squad. That evening, after his attorney had instructed the detectives that Marty was to talk to no one except him, detectives came and got Marty from the interrogation room and said they had his sister on the phone. Unable to continue their interrogation of Marty, detectives attempted to audiotape Marty's phone conversation with his sister, but Shari refused her consent. Detectives remained in the room during Marty's phone conversation with his sister. During that phone call with Shari, Marty recanted his coerced and police-fabricated confession. [Defs.' Exhibit KK (50H Examination) at 62.]

### III.    Phone Call to Sister Shari Rother.

136. Plaintiff spoke to his sister on the telephone and told her he was sorry several times. Plaintiff's sister asked if he had told the police if he was involved, and the plaintiff said yes, they made me. (Exhibit KK 50H Examination p.63)

**Response**: Admit.

### IV.    Evidence at Crime Scene, Seymour's Surgery and Arlene's Autopsy.

137. Detective Sergeant Doyle assigned Detective James Barnes to be the case scene coordinator at the crime scene. Detectives Barnes examined all the house windows and doors and found no sign of an intrusion. (Exhibit B, TT 1367-1390, 2633)

**Response**: Admit that Detective Sergeant Doyle assigned Detective Barnes to be the case scene coordinator at the crime scene. Barnes reported that he had examined all the house windows and doors, and that he had found no sign of an intrusion. [Defs.' Exhibit B, TT (James Barnes) 1367:7; Defs.' Exhibit B, TT (Robert Doyle) at 2633:6–10.] The morning of the murders, when Marty woke up and initially walked through the house, he noticed that the front door was open, the lights in the house were on, and the alarm was not set. [Defs.' Exhibit B, TT (Marty Tankleff) at 4115:9–15.]

138. At approximately 9:35 a.m., on September 7, 1988 in plaintiff's bathroom, Detective Chuck Kosciuk observed water near the bathtub drain, atop one side of the tub, and a wet loofah sponge with a ring of water around it. Kosciuk then proceeded to plaintiff's bedroom and observed blood on the doorknob, blood on the light switch plate and wall near that switch plate at the room's entrance. On plaintiff's bed, Kosciuk observed towels, one of which was "slightly damp," and a pair of small barbells leaning against a wall. Maria Vieira, the Tankleff family housekeeper recalled, as a defense witness, that on September 6, 1988, the barbells were lying down. (Exhibit B, TT pp. 1579-1581, 1695, 1702-1704, 1732-1733, 1762, 1775-1777, 1868-1869, 4394)

**Response:** Admit that Detective Chuck Kosciuk so testified and that Maria Vieira so testified. A set of barbells with a reddish substance on one end was in plain view in Marty's room. [Pl.'s Ex. 1 (Trainum Report) at 24; Pl.'s Ex. 12 (Baumann Deposition) at 163:24–164:6; Pl.'s Ex. 9 (McCready Deposition) at 329:7–331:10.] All of these observations led Defendants to incorrectly conclude that the barbell was used as a weapon during the crimes and that the perpetrator used the shower to clean the "weapons." Note, however, that there was neither blood nor tissue found on the barbells or the kitchen knives, nor in the traps below the sinks, the drains, or the loofah sponge; *see* Counterstatement at ¶¶ 47, 84–85, 87.

139. In the kitchen Kosciuk found a knife next to watermelon rinds in a position different from that described by Bove, who had recounted where he put it after using it at the card game hours earlier. (Exhibit B, TT pp. 734-740, 1706-1707, 1840)(Exhibit U Trial Evidence paragraph #'s 96-97)

**Response:** Admit that Kosciuk and Bove so testified and that these observations led to the Detectives' false conclusion that the watermelon knife was used in the crime; *see* Counterstatement at ¶ 47.

140. Vernard Adams, Deputy Suffolk County Medical Examiner, arrived at the scene at around 4:00 p.m. He examined Arlene's injuries and the blood pooling in the master bedroom. He concluded that Arlene had suffered head injuries, had moved and then had suffered incised injuries. (Exhibit B, TT pp. 3940-3944, 3967, 4003-4004)(Exhibit BBB Deposition of Vernard Adams p. 35)

**Response:** Admit the position of Arlene's body suggested to an initial observer that Arlene had first suffered head injuries, had moved and then had suffered incised injuries. Deny that the substance is true; *see* Counterstatement at ¶¶ 47(e)–(f).

141. At Stony Brook Hospital, surgeon Doctor George Tyson operated on Seymour. Dr. Tyson noted that Seymour had sustained several "depressed [skull] fractures," "fracture[s] in which pieces of bone are…driven inward." He also noted "the size and shape of the…fractures appeared to [have been] produced by a small, pointed blunt object of which a hammer would be a good example." He also noted that Seymour's neck wound was consistent with having been caused by a knife and that it could have been caused if Seymour had been struggling. Tyson also opined that whoever had inflicted the head and neck wounds was very angry and that the person who had the strength to lift Seymour from the chair would have had the strength to inflict the wounds. (Exhibit B, TT pp. 4346-4349, 4359-4365)

**Response:** Deny that George Tyson testified that the wound could have been caused if Seymour had been struggling. Tyson testified at trial that, "Certainly completion of the knife wound in its totality, in my opinion would have been difficult if the patient had been resisting it." [Defs.' Exhibit B, TT (George Tyson) at 4360:16–19.] Admit to the clinical characterization of the

45

wounds on Seymour's skull as "depressed skull fractures." [Defs.' Exhibit B, TT (George Tyson) at 4346:12–14; 4347:7–15] Admit that George Tyson so testified to the remainder.

142. On September 8, 1988, Adams performed an autopsy on Arlene. Adams determined that Arlene had suffered defensive wounds to her hands and forearms and that a sharp blade or blades had caused her incised wounds. Adams also concluded that a blunt instrument had caused her skull wounds, which included five depressed fractures. When comparing the fractures with a dumbbell from plaintiff's bedroom, he concluded "the skull fractures [were] consistent with having been caused by the bar." (Exhibit B, TT pp. 3945, 3954-3957, 3963-3968, 3974-3978, 3989, 4005-4009)

**Response:** Admit that Adams so concluded but deny that there were defensive wounds and that the dumbbells were used to inflict the blunt trauma wounds. [Defs.' Exhibit NNN (Baden Expert Report) at 4–5.]

143. Dr. Adams did not determine the actual number of fractures to Arlene Tankleff's skull until the next day, September 8, 1988 at the autopsy. (Exhibit BBB Deposition of Vernard Adams p. 225)

**Response:** Admit that Dr. Adams so testified. [Defs.' Exhibit BBB (Vernard Adams Deposition) at 225:9–11.]

144. At no time on or after September 8, 1988, up until and throughout the trial of the plaintiff did Dr. Adams ever communicate to any Suffolk County detective or prosecutor in any fashion that he believed that there was no reasonable possibility that the knife recovered from the counter next to the watermelon could have been the murder weapon. (Exhibit CCC Affidavit Mike Carmody, Exhibit DDD Affidavit Robert Doyle, Exhibit EEE Affidavit Charles Kosciuk, Exhibit FFF Affidavit K. James McCready, Exhibit GGG Declaration Norman Rein, Exhibit HHH Deposition John Collins pp. 84-91, Exhibit III Deposition Edward Jablonski[5])

**Response:** Deny that Dr. Adams never communicated to the *Suffolk County Detectives* in any fashion that he believed that there was no reasonable possibility that the knife recovered from the counter next to the watermelon could have been the murder weapon, but admit that Dr. Adams never communicated that belief to the *prosecutor*; *see* Counterstatement at ¶¶ 102–08, 111–17.

145. At or shortly after the arraignment of the plaintiff on the indictment in his criminal matter, plaintiff's attorney Robert Gottlieb received a copy of the statements that were attributed to the plaintiff. (Exhibit JJJ Deposition of Robert Gottlieb pp. 24-26)

**Response:** Admit. [Defs.' Exhibit JJJ (Gottlieb Deposition) at 25:2–8.]

146. After receiving the copy of the statements attributed to the plaintiff. Mr. Gottlieb was aware that the knife recovered next to the watermelon was used in the crimes. (Exhibit JJJ Deposition of Robert Gottlieb pp. 25-26)

**Response:** Admit that after receiving the copy of the statements attributed to Marty, Mr. Gottlieb was aware of the prosecution's theory, which was that the watermelon knife was the murder weapon. [Defs.' Exhibit JJJ (Gottlieb Deposition) at 25–26.]

147. Between the arraignment of the plaintiff and the suppression hearings conducted in the criminal case, Mr. Gottlieb received discovery from the prosecution that included crime scene photographs, lab reports, serology reports, the autopsy reports of both Arlene and Seymour Tankleff and the autopsy photographs. (Exhibit JJJ Deposition of Robert Gottlieb pp. 27-31)

**Response:** Admit that Mr. Gottlieb received discovery from the prosecution that included *some* of the crime scene photographs, the lab reports, serology reports, the autopsy reports of both Arlene and Seymour Tankleff and the autopsy photographs. [Defs.' Exhibit JJJ (Gottlieb Deposition) at 27–31.] Gottlieb does not recall today exactly what discovery he received. [Defs.' Exhibit JJJ (Gottlieb Deposition) at 28:7–8.]

148. Amongst the photographs received by Mr. Gottlieb were photographs of the knife that was recovered by the watermelon. (Exhibit JJJ Deposition of Robert Gottlieb p. 33)

**Response:** Admit.

149. During discovery in the criminal proceeding, Mr. Gottlieb requested to view the physical evidence relating to the crime, including the knife recovered by the watermelon. (Exhibit JJJ Deposition of Robert Gottlieb pp. 34-35)

**Response:** Admit that Mr. Gottlieb requested to physically view evidence that had been recovered from the crime scene. [Defs.' Exhibit JJJ (Gottlieb Deposition) at 34–35.]

150. Mr. Gottlieb does not recall if he requested an opportunity to perform any tests on the evidence. (Exhibit JJJ Deposition of Robert Gottlieb pp. 35)

**Response:** Admit.

151. Mr. Gottlieb does not recall if he hired an expert forensic pathologist to review the autopsy findings, or to review the serology testing, or to review the manner in which the crime scene was processed. (Exhibit JJJ Deposition of Robert Gottlieb pp. 38-41)

**Response:** Admit that Mr. Gottlieb does not recall if he hired an expert forensic pathologist to review the autopsy findings nor if he hired an expert to review the crime scene paperwork and the way the crime scene was processed. [Defs.' Exhibit JJJ (Gottlieb Deposition) at 38:14–19, 39:10–20.] Mr. Gottlieb testified at his deposition that he believes that he hired an expert to review the serology testing, but did not recall specifically at the time of his deposition if he did or did not. [Defs.' Exhibit JJJ (Gottlieb Deposition) at 39:4–8.]

152. Had Mr. Gottlieb hired an expert to make a comparison of the weapons that were claimed to have been used in the crime with the wounds of the victims, and that person gave him an opinion that those weapons could not have been used in the crime, or that there was no reasonable possibility that those weapons could have been used in the crime he would have called that expert at trial and introduced that evidence. (Exhibit JJJ Deposition of Robert Gottlieb pp. 41-42)

**Response:** Admit.

153. During the trial, Mr. Gottlieb called a doctor to talk about the blunt force injuries that were allegedly caused by a barbell and testify that they were more consistent with a hammer. (Exhibit JJJ Deposition of Robert Gottlieb pp. 42)

**Response:** Admit.

154. At the trial Mr. Gottlieb did not call any witness, expert or otherwise to offer evidence in relation to the knife by the watermelon and whether that knife could have been used in the crime. (Exhibit JJJ Deposition of Robert Gottlieb pp. 44)

48

**Response:** Admit.

155. Prior to the trial in the plaintiff's criminal matter, Mr. Gottlieb did not speak to Dr. Vernard Adams and does not recall being denied an opportunity to do so. (Exhibit JJJ Deposition of Robert Gottlieb pp. 45)

**Response:** Admit that Mr. Gottlieb did not speak to Dr. Adams. Mr. Gottlieb, who had been a criminal defense lawyer in Suffolk County for nearly a decade, knew that although the Office of the Suffolk County Medical Examiner should have been independent from the Suffolk County District Attorney's Office, in practice that was not the case. Mr. Gottlieb, as a result of this knowledge, did not speak to Dr. Adams, believing that if he were to do so, he would have been told to speak to the prosecutor on the case, and ultimately referred to the Medical Examiner reports he already had. [Defs.' Exhibit JJJ (Gottlieb Deposition) at 45:2–11; Pl.'s Exhibit 18 (Gottlieb Affidavit).]

156. Mr. Gottlieb was never told by the prosecutor that he could not speak to Dr. Adams without the prosecutor present. (Exhibit JJJ Deposition of Robert Gottlieb pp. 48).

**Response:** Admit that Mr. Gottlieb was never explicitly told that he could not speak to Dr. Adams; *see* Plaintiff's response to ¶ 155.

157. Mr. Gottlieb was never told by Dr. Adams that he would not speak to him without the prosecutor present. (Exhibit JJJ Deposition of Robert Gottlieb pp. 48)

**Response:** Admit that Mr. Gottlieb was never explicitly told that he could not speak to Dr. Adams; *see* Plaintiff's response to ¶ 155.

158. At the trial during cross examination of Dr. Adams, Mr. Gottlieb asked the doctor about the incised wounds to the victims, the direction of the wounds and whether they could be caused by a left or right handed person. (Exhibit JJJ Deposition of Robert Gottlieb p. 56-58)

**Response:** Admit.

159. At the trial during cross examination of Dr. Adams, Mr. Gottlieb asked the doctor if he could determine with a reasonable degree of scientific certainty regarding the blood pooling around the victim's feet, which wounds were inflicted first, if the wounds were defensive wounds, and questions regarding if the wounds could be caused by more than one sharp blade. (Exhibit JJJ Deposition of Robert Gottlieb pp. 58-61)

**Response:** Admit that at the trial during cross-examination of Dr. Adams, Mr. Gottlieb asked the doctor if he could determine with a reasonable degree of scientific certainty which wounds were inflicted first with regards to the neck or the head, if the wounds on the arms fell under the category of defensive wounds, and whether or not the wounds were consistent with more than one sharp blade being used. [Defs.' Exhibit B, TT (Vernard Adams) at 4003:10–4009:6; Defs.' Exhibit JJJ (Gottlieb Deposition) at 58–61.]

160. At no time during his cross examination of Dr. Adams did Mr. Gottlieb ask his opinion on whether the knife by the watermelon could be excluded as the murder weapon. (Exhibit JJJ Deposition of Robert Gottlieb pp. 62)

**Response:** Admit. In his opening statement, the trial prosecutor indicated that Dr. Adams would testify that Arlene Tankleff's wounds were consistent with the watermelon knife. Mr. Gottlieb, believing that Dr. Adams would only testify to that fact, would not have asked a question at trial to which he would have expected an unfavorable answer – this is a basic principle of trial advocacy. As a result, although Mr. Gottlieb was free to ask Dr. Adams whether there was any reasonable possibility that the watermelon knife was used to attack Arlene Tankleff, he would never have done so because based on the opening statements and conferences with the prosecutor, he had never learned anything to suggest that he would have received a favorable answer and he did not want to open the door to harmful testimony. [Pl.'s Exhibit 18 (Gottlieb Affidavit).] Had the prosecution disclosed to him that Dr. Adams had told the detectives that there was no reasonable possibility that the watermelon knife was the murder weapon, he would

50

have asked Dr. Adams about that. Indeed, he would have argued that this was critical

exculpatory evidence. [Pl.'s Exhibit 18 (Gottlieb Affidavit).]

161. At no time during his cross examination of Dr. Adams did Mr. Gottlieb ask the doctor whether there was any reasonable possibility that the knife could be used. (Exhibit JJJ Deposition of Robert Gottlieb pp. 62)

**Response:** Admit; *see* Plaintiff's response to ¶ 160.

162. Mr. Gottlieb had the opportunity to ask the doctor these questions if he wanted to. (Exhibit JJJ Deposition of Robert Gottlieb pp. 62)

**Response:** Admit that Mr. Gottlieb had the opportunity to ask the doctor these questions at trial;

*see* Plaintiff's response to ¶ 160.

163. In 1988 it was the policy of Dr. Adams as well as that of the Chief Medical Examiner of Suffolk County at the time, Dr. Hirsch, that if a defense attorney asked to speak with the medical examiner and look at the entire file, it would have been allowed. (Exhibit BBB Deposition of Vernard Adams p. 197

**Response:** Deny. Admit that Dr. Adams so testified at his deposition. However, it was Mr.

Gottlieb's understanding, based on his nearly ten years of experience, that had he tried to speak

with Dr. Adams he would have been told to speak to the prosecutor on the case, and ultimately

referred to the Medical Examiner reports he already had. [Defs.' Exhibit BBB (Vernard Adams

Deposition) at 197:14–21; Pl.'s Exhibit 18 (Gottlieb Affidavit).]

164. There is no evidence in the available record and plaintiff can produce no facts that Dr. Adams ever told any Suffolk County detective or prosecutor that he believed that there was no reasonable possibility that the knife recovered next to the watermelon in the kitchen could be the murder weapon.

**Response:** Deny that Dr. Adams never told a Suffolk County Detective that there was no

reasonable possibility that the knife recovered next to the watermelon in the kitchen could be the

murder weapon. Admit that Dr. Adams never told a prosecutor that information. *See*

Counterstatement at ¶¶ 102–08, 111–17.

165.  Plaintiff's counsel Barry Scheck spoke to Dr. Adams on the telephone at a point prior to the date of Dr. Adams' deposition, which was August 5, 2014. (Exhibit BBB Deposition of Vernard Adams p. 211)

**Response**: Admit but deny that this is relevant evidence for the purposes of summary judgment.

## V.      Jerry Steuerman

166.  At approximately 9:30 a.m. on September 7, 1988, Jerry Steuerman called Bove. Bove stated to Steuerman, "I don't know what's happened, but you're being accused of murdering Seymour and Arlene." Steuerman responded, "Vinny, what the hell are you talking about?" Bove then handed the phone to a detective, who made an appointment to interview Steuerman later that day. (Exhibit B, TT pp. 83, 747-748, 904-905, 1084-1085, 3988)

**Response:** Admit that Bove so testified.

167.  Detective Sergeant Doyle had assigned Homicide Detectives Robert Anderson and Anthony Laghezza to interview each of the regular card players that met with Seymour on a regular basis and specifically, those that were in attendance at the card game that ended hours before the attacks on Arlene and Seymour. (Exhibit B, TT pp. 2606-2607, 2635)

**Response:** Admit that Detective Sergeant Doyle so testified at trial that he instructed Laghezza and Anderson to interview the card players who were at the Tankleff residence the previous evening. [Defs.' Exhibit B, TT at 2635:17–20.]

168.  Vincent Bove told Detectives Anderson and Laghezza that he noticed nothing unusual at the card game and that there were no problems at the game between any of the players including Steuerman and Seymour. Bove also stated he was unaware of *any* problems between Steuerman and Seymour and that he had no personal knowledge of their business relationship. (Exhibit B, TT pp. 721-733)(Exhibit V, Anderson Supp. Report, 9/8/88)

**Response:** Admit that Bove so testified.

169.  Robert Montefusco told Detectives Anderson and Laghezza that he did not observe any problems at the final card game nor was there any problems between any of the players

and noted that Seymour was in good spirits. (Exhibit B, TT pp. 622-625)(Exhibit V, Anderson Supp. Report, 9/8/88)

**Response:** Admit that Robert Montefusco so testified. However, note that Montefusco observed that around the time all the other card players were leaving the card game, Montefusco observed Jerry Steuerman going back into the house to speak to Seymour. Montefusco never saw Steuerman leave, indicating that Steuerman was the last to leave the card game that night. *See* Counterstatement at ¶¶ 134–35.

170. Albert Raskin told Detectives Anderson and Laghezza that he noticed no problems during the card game and that everything seemed fine throughout the night. (Exhibit V, Anderson Supp. Report, 9/8/88)

**Response:** Admit that Detective Anderson so reported.[Defs.' Exhibit V (Anderson Supp. Report).]

171. Peter Capobianco told Detectives Anderson and Laghezza that there was no tension between any of the card players that night nor did he recall anything out of the ordinary during the game. (Exhibit V, Anderson Supp. Report, 9/8/88)

**Response:** Admit that Detective Anderson so reported. [Defs.' Exhibit V (Anderson Supp Report) at 3.]

172. Joseph Cecere also indicated that nothing unusual occurred during the card game and that there was no hostility between Steuerman and Seymour. (Exhibit B, TT pp. 670-68)(Exhibit X, Rein 9/11/88 Supplemental Report)

**Response:** Admit that Cecere so testified. However, note that Cecere's car was parked at the top of the driveway alongside Steuerman's and as a result of this, had to wait for all the other players to leave before being able to exit the driveway. When Mr. Cecere was finally able to leave, he observed Jerry Steuerman sitting in his car; as Cecere drove away, he never saw Steuerman leave and never saw car lights behind him, thus corroborating Montefusco's account of Jerry

Steuerman being the last to leave the card game that night. *See* Counterstatement at ¶ 136.

[Defs.' Exhibit B, TT (Joseph Cecere) at 670–678.]

173. Detectives Anderson and Laghezza interviewed Steuerman last. At this time Steuerman knew that plaintiff had accused him of committing the attacks on Arlene and Seymour. Steuerman detailed his business relationship with Seymour and discussed his two year involvement in a "friendly" game of cards with Seymour and other friends and his inability to ever recall there being any problems at the game. He also stated that he saw plaintiff at the last game and that he (plaintiff) moved a car. He also recalled that he left the game and got to his daughter's home around 3:15 a.m., and that he had forgotten his house keys. He stated that his son told him of the attacks on Seymour and Arlene at around 9:00 a.m., after he had arrived at his bagel store at 6:30 a.m. Steuerman discussed the financial outcome of the card game, talked about plaintiff and talked about Arlene. At the conclusion of this interview, Detectives Anderson and Laghezza concluded that Steuerman should *not* be considered a suspect. (Exhibit B, TT pp. 897-905)(Exhibit V, Anderson Supp. Report, 9/8/88)

**Response:** Admit that Detective Anderson so reported and that Jerry Steuerman so testified at trial. Note that at the time that Detectives Anderson and Laghezza interviewed Jerry Steuerman, Detectives Rein and McCready had obtained a false confession from Marty, who, in addition to the other four detectives assigned to the case, were supervised by Detective Robert Doyle; *see* Counterstatement at ¶ 147. [Defs.' Exhibit B, TT (Robert Doyle) at 2604:8–10.]

174. Detective Rein and McCready interviewed Steuerman on September 10, 1988 where Steuerman recounted details about the weekly poker game and the game on September 6, 1988 and detailed when he went home and where he went. Steuerman also discussed the relationships within the Tankleff Family. (Exhibit W, Rein Supplemental Report, 9/10/88)

**Response**: Admit that Rein so reported. Note that the investigation into Jerry Steuerman as a potential suspect was cursory at best and wholly inadequate; *see* Counterstatement at ¶¶ 147–50.

175. On the day of the murders, Steuerman was living in Old Field with his daughter, Bari Steuerman, and her son. At around 3:16 a.m., Bari heard knocking on the door and answered that knock expecting it was her father since he often forgot his keys. It was her father at the door. After letting her father in, she went back to bed and Steuerman went to his room. She was awakened by Steuerman at around 6:00 a.m. and he soon

after left for work. She also indicated that the ride from Belle Terre to Old Field takes approximately 15 minutes. (Exhibit B, TT pp. 821-827)

**Response:** Admit that Bari Steuerman so testified. Note that Detectives considered the

uncorroborated testimony of Jerry Steuerman's daughter as his alibi, a fact that is illustrative of

the limited, wholly inadequate investigation of Jerry Steuerman as a suspect; *see*

Counterstatement at ¶ 142. [Pl.'s Exhibit 1 (Trainum Report) at 36.]

176.  The terms of the various business dealings between Seymour and Steuerman indicated that Steuerman's financial obligations to Seymour survived Seymour's death. (Exhibit B, TT pp. 1220-1224)(Exhibit V, Anderson Supp. Report, 9/8/88)

**Response:** Admit that Jerry Steuerman so testified at trial that the financial obligations survived

Seymour's death; however, after Arlene and Seymour's attack, Steuerman stopped honoring

them and ceased his weekly payments of $1500, withdrew $15,000 from a joint account he

shared with Seymour Tankleff, and fled to Los Angeles. [Defs.' Exhibit B, TT (Jerry Steuerman)

at 905:14–906:25, 945:8–10,1138:10–1143:11, 1220–1224; Defs.' Exhibit B, TT (Closing) at

4862:16–21.] Furthermore, Steuerman testified that with Seymour alive, he was unable to start

new business ventures without Seymour's approval and without giving Seymour a portion of the

profits. This was no longer true one Seymour was dead. [Defs.' Exhibit B, TT (Jerry Steuerman)

at 1081:15–25.]

177.  On September 14, 1988, Steuerman withdrew $15,000.00 from an account he shared with Seymour, feigned his own death and went to Los Angeles. (Exhibit B, TT pp. 905-906, 1137-1143, 1189-1193)

**Response:** Admit that on September 14, 1988, one week after the murder of Arlene Tankleff and

the attempted murder of Seymour Tankleff, Steuerman withdrew $15,000.00 from an account he

shared with Seymour, and without telling anyone, feigned his own death, shaved his beard in

order to alter his physical appearance, and, while traveling under a false name, took a bus to

Atlantic City, from Atlantic City to Newark, and then finally from Newark he took a plane to

Los Angeles. [Defs.' Exhibit B, TT (Jerry Steuerman) at 905:14–906:19,945:8–10, 1138:10–

1143:11.]

178. Steuerman explained that he did this because:

> "My wife…passed away a year before. I was married for twenty-nine years…and one of
> my children was in bad legal trouble…and my business was not what it used to be and
> then the murder of Arlene and Seymour, after that and the accusations by the …it got to
> me. I thought everybody would be better off just without me. (Exhibit B, TT pp. 907-
> 978, 1136-1137, 1151-1156, 1191)

**Response:** Admit that Steuerman so testified but deny that this is a reasonable explanation for

Jerry Steuerman's actions.

179. Steuerman took the stand for three days during plaintiff's criminal trial and was
exhaustively asked about the details of his business relationship with Seymour and
about he (Steuerman) being the actual perpetrator of the murders of Arlene and
Seymour. This was plaintiff's defense at the trial. (Exhibit B, TT pp. 909-1219)

**Response:** Admit that Steuerman testified at trial for three days. Deny that this was Marty's

defense; Marty's defense was that he was innocent, that the confession was coerced and false,

and that Steuerman was a likely suspect. [Defs.' Exhibit B, TT (Opening Arguments)] Plaintiff

objects to Defendants' non-specific citation of 300 pages in Defs.' Exhibit B, TT on the grounds

that it does not comply with Fed. R. Civ. P. 56(c)(1)(A) or Local Civil Rule 56.1.

180. McCready was cross-examined extensively about the direction of the murder
investigation and about his purported "failure" to investigate Steuerman as a suspect.
(Exhibit B, TT pp. 3517-3672, 3705-3934)

**Response**: Admit that McCready was cross-examined and this cross-examination included the

topic of his failure to adequately investigate Steuerman as a suspect. Plaintiff objects to

Defendants' non-specific citation of 384 pages in Defs.' Exhibit B, TT on the grounds that it

does not comply with Fed. R. Civ. P. 56(c)(1)(A) or Local Civil Rule 56.1.

## VI.     The Indictments

181. In September of 1988, plaintiff was indicted by a Suffolk County Grand Jury for the murder of Arlene and the assault on Seymour.

**Response:** Object on the basis that no evidence is cited, notwithstanding admit.

182. On October 6, 1988, Seymour died from his wounds and plaintiff was thereafter indicted by a Suffolk County Grand Jury on a superseding proceeding, for the murder of Seymour.

**Response:** Object on the basis that no evidence is cited, notwithstanding admit.

183. Detectives McCready, Rein and Doyle were not complaining witnesses.

**Response:** Object on the basis that no evidence is cited.

184. Detective Rein did not testify in the grand jury.

**Response:** Object on the basis that no evidence is cited.

185. Detective Doyle did not testify in the grand jury.

**Response:** Object on the basis that no evidence is cited.

186. Detective Rein did not initiate the prosecution against the plaintiff.

**Response:** Object on the basis that no evidence is cited.

187. Detective Doyle did not initiate the prosecution against the plaintiff.

**Response:** Object on the basis that no evidence is cited.

## VII.    Forensic Evidence

188. Forensic Serologist Robert Baumann analyzed blood recovered from the crime scene. Baumann noted that except for a bloodstain on the exterior doorknob to plaintiff's room, there was no blood on the entranceway to any of the rooms. (Exhibit B, TT pp. 2131, 2152, 2159-2162, 2388-2389, 2424)

**Response:** Admit that Suffolk County Forensic Serologist Robert Baumann analyzed blood recovered from certain areas of the crime scene and that he noted that there was no blood on the entranceway to any of the rooms. [Defs.' Exhibit B, TT (Robert Baumann) at 2388:24–2389:2.] Admit that Baumann noticed a slight smudge on the exterior doorknob of Plaintiff's bedroom and conducted a presumptive test for the presence of blood, which indicated that blood was present. [Defs.' Exhibit B, TT (Robert Baumann) at 2424:16–18; Pl.'s Exhibit 12 (Baumann Deposition) at 201.] Further note that Baumann was unable to state at his deposition why no confirmatory test was ever ordered, and testified that he would have conducted such a test if he was asked to, assuming sufficient quantities of blood were present. [Pl.'s Exhibit 12 (Baumann Deposition) at 201–202.] Further note that Baumann examined the hallway between Marty's bedroom at one end of the house and the office at the other as carefully and thoroughly as he knew how, and found no blood whatsoever on the light-colored carpet. [Pl.'s Exhibit 12 (Baumann Deposition) at 200–01; Pl.'s Exhibit 42 (Diagram of the Tankleff Residence).]

189. Baumann also analyzed evidence from the master bedroom where Arlene was found. A blood stain on a wall in the bedroom contained a bloodstain consistent only with Seymour's blood. Baumann also noted that the bed sheets, pillowcases, pillow shams, and Arlene's fingernails contained bloodstains consistent with Arlene's blood and plaintiff's blood. All of the blood in the office was consistent only with Seymour's blood. Baumann also noted that Seymour's pants contained a wallet with a $100 bill. (Exhibit B, TT pp. 2176-2204, 2268-2269, 2297)

**Response:** Admit.

190. An analysis of the towel found at the foot of plaintiff's bed was found to contain blood consistent only with Seymour's blood. Analysis of the blood stains on the switch plate and some of the stains analyzed in the master bedroom were found to be in a "chain link" or "honeycomb" pattern consistent with a grip area that could be found on latex or rubber gloves used in house cleaning at the scene. (Exhibit B, TT pp. 1976, 2104, 2258-2261, 2272-2275, 2343-2346, 2354, 2377-2379, 2396, 2412, 2455-2471, 2478, 2845-2846)

**Response:** Admit that an analysis of the towel found at the foot of plaintiff's bed was found to contain blood only consistent with Seymour Tankleff. Admit that analysis of the blood stains on the switch plate and some of the stains analyzed in the master bedroom were found to be in a "chain link" or "honeycomb" pattern consistent with a grip area that could be found on latex or rubber gloves used in house cleaning at the scene. [Pl.'s Exhibit 44 (Genna Report).] Note that no gloves consistent with the crime scene were ever found in the Tankleff residence. [Pl.'s Exhibit 12 (Baumann Deposition) at 36.] Note that two distinctly different fabric patterns were revealed on the bedding in the master bedroom where Arlene Tankleff was assaulted, indicating that two assailants assaulted Arlene Tankleff in her bed. [Pl.'s Exhibit 10 (Palmbach Report) at ¶ 7.]

191. Analysis was conducted on the bedding found in Arlene's room and a stain evinced a ridge pattern that was "honeycomb-like," consistent with a rubber glove. Analysis also reveals that a blood stain on the light switch in plaintiff's room also contained a "honeycombed like" pattern consistent with a rubber glove and consistent with the patterns identified in the evidence analyzed from Arlene's bedroom. (Exhibit B, TT pp. 2272-2276, 2459-2466, 2485-2486)

**Response:** Admit that Suffolk County Crime Scene Researcher Robert Genna testified that the blood stain on Arlene's bedding evinced a ridge pattern that was "a chain-link honeycomb pattern" that was consistent with rubber or fabric gloves but deny that the patterns were definitively consistent with only rubber gloves. [Defs.' Exhibit B, TT (Robert Genna) at 2460:22–25.] *See also* Counterstatement at ¶ 89.

192. Baumann also conducted an analysis of the clothes plaintiff was wearing on September 8, 1988. There were no bloodstains on plaintiff's shorts or under shorts. There was, however, one slight stain on the *inside* right shoulder of plaintiff's sweatshirt. The stain tested positive for the presumptive presence of blood but was so small Baumann was unable to conduct any further analysis. The blood found on plaintiff's shoulder was consistent only with Seymour's blood. (Exhibit B, TT pp. 2262-2268, 2294)

**Response:** Admit.

193. There was no blood on the barbells, or the kitchen knives or in the traps below the sinks and bathtub loofah. The loofah sponge did, however, have a five inch slit which was determined to have been caused by a sharp object. One of the three tissues plaintiff had taken out of his pocket when he began talking to Rein and McCready at Police Headquarters contained blood consistent with *only* Arlene's blood. (Exhibit B, TT pp. 2218-2237, 2249-2253, 2276-2281, 2305-2307, 2314-2326, 2341, 2398, 2405, 2422-2423, 2433)

**Response:** Admit that there was no blood on the barbells, the kitchen knives, the traps below the sinks, drains, or the loofah sponge. Deny that the five inch slit was caused by a sharp object. Marty testified at trial that the loofah sponge came that way. [Defs.' Exhibit B, TT (Tankleff) at 4237:4–8.] Admit that one of the three tissues Marty had taken out of his pocket when he began talking to Rein and McCready at Police Headquarters contained a small amount of blood consistent only with Arlene's blood, but note that, as Detective McCready admitted, given the quantity, that blood could have come from Marty turning on the light switch in his room that morning." [Pl.'s Exhibit 9 (McCready Deposition) 145:3–148:13.]

194. Kosciuk invoiced a loofah sponge that was found in plaintiff's bathroom as item 39 under Lab No. 988-57483 and introduced in evidence during the trial as People's Exhibits 88 and 89. Analysis of that sponge revealed that it contained a 5 inch slit that was identified as a cut. (Exhibit B, TT pp. 2224-2226, 2397-2398)(Exhibit II, Trial Exhibits 88-89)

**Response:** Admit.  See preceding paragraph.

**VIII.   Seymour's Autopsy**

195. Seymour died on October 6, 1988. Adams performed an autopsy on Seymour and although the partial healing of Seymour's wounds impaired Adams ability to determine the weapon or weapons that had caused Seymour's death, he was able to conclude that Seymour had suffered blows to the head from a blunt instrument or instruments and that the cause of death was a combination of impact head trauma and incised wounds of the neck. (Exhibit B, TT pp 3980, 3989, 3995-4001)

**Response:** Admit.

## IX.     Plaintiff's Post Confession Statements

196. At the criminal trial, plaintiff stated that once he observed Seymour bleeding in the
     office, he used the *office* phone to call 9-1-1. (Exhibit B, TT pp. 4115-4116, 4200-4203)

**Response:** Admit.

197. At the criminal trial, plaintiff stated that after placing the 9-1-1 call, he retrieved a
     pillow from his room and a towel form a closet down the hallway and returned to his
     father. After plaintiff couldn't get the chair Seymour was in into a reclined position, he
     pulled Seymour from the chair and placed him on the floor and, while doing so, got
     blood on his hands, shoulders and his lower left leg. (Exhibit B, TT pp. 4117-4119,
     4200-4203)

**Response**: Admit that after calling 911, Marty followed the instructions of the emergency

operator and provided care for his father. Admit that in the process of doing so, Marty got blood

on his hands, shoulders and his lower left leg. [Defs.' Exhibit B, TT (Marty Tankleff) at 4117–

4119, 4200–4203.]

198. At the criminal trial plaintiff stated that, in his shorts and underwear only, he placed his
     hands under Seymour to assist him in getting Seymour to the floor and, as a result, got
     blood on his arms, hands, upper body area, and his feet or leg area but not his shorts.
     (Exhibit B, TT pp. 4206-4211)

**Response:** Admit that at his criminal trial Marty stated that he was wearing shorts and

underwear when he provided medical attention to his father as the 911 operator had instructed

him to do and that in the process, Marty got blood on his arms, hands, upper body area, and his

feet or leg area, but not his shorts. [Defs.' Exhibit B, TT (Marty Tankleff) 4208:6–12, 4210:22–

25.]

199. At the criminal trial, plaintiff acknowledged that the photograph taken by him at Police
     Headquarters did not show any blood stains on the exterior of the shorts and sweatshirt.
     (Exhibit B, TT pp. 4221-4222)

**Response**: Admit.

200. At the criminal trial, plaintiff testified that when he first got up, he checked his parents' bedroom and didn't see anyone. From there he went and discovered Seymour in his office. After calling 9-1-1 on the *office* phone and moving Seymour to the floor, plaintiff state he then went to the garage to look for his mother's car. He turned the garage door handle and opened the door and closed it after he observed Arlene's car in the garage. (Exhibit B, TT pp. 4119, 4200, 4211-4213)

**Response:** Admit the substance. Detective McCready testified that Marty could have opened the garage door without getting blood on the deadbolt. [Pl.'s Exhibit 9 (McCready Deposition) at 138:6–139:24.]

201. Plaintiff testified at the criminal trial that when he first woke up at around 6:05 a.m., he put underwear and shorts on, but not his glasses or contact lenses. (Exhibit G)(Exhibit B, TT pp. 4113, 4189)

**Response:** Admit that Marty testified at his criminal trial that he first woke up around 6:05 a.m. and at that time he put on underwear and shorts. Admit that Marty did not put on his glasses nor his contact lenses because of a surgery he had approximately a week and a half prior. Deny the relevance of Exhibit G to this statement.

202. At the criminal trial, plaintiff stated that before discovering Seymour in a front office, he had looked into his parents' bedroom but "no one was there." (Exhibit B, TT p. 4115)

**Response:** Admit that Marty testified at trial after he left his bedroom on the morning of September 7, 1988, he went and looked in the master bedroom, but did not see anyone. [Defs.' Exhibit B, TT (Marty Tankleff) at 4115:9–15.] He did not see either of his parents, at that time, because the room was dark and he is was looking in the bed, not on the floor. [Defs.' Exhibit ZZ (Tankleff Deposition) at 138:11–23.]

203. At the criminal trial, plaintiff testified that after observing Arlene's car in the garage, he went to his parents' bedroom where he saw his mother dead on the floor. (Exhibit B, TT pp. 4120, 4213-4215)

**Response:** Admit. After observing Arlene's car in the garage, Marty went to his mother's bedroom where he saw his mother on the floor and that she was not moving and seemed lifeless.

[Defs.' Exhibit B, TT (Marty Tankleff) at 4120:7–21**,** 4213–4215.]

> 204. At the criminal trial, plaintiff stated that when he observed Arlene in the master bedroom, he did so from the doorway, looking in at her and only went as far as the alarm wall and that he did not have his glasses on or contacts in due to a surgical procedure a week and a half earlier. (Exhibit B, TT pp. 4120, 4189)

**Response:** Admit.

> 205. At his criminal trial, plaintiff stated that after observing Arlene, he went to the kitchen and called his sister Shari from a phone in the kitchen informing her that he thought "mom and dad have been murdered." (Exhibit B, TT pp. 4120–4122, 4215–4217)

**Response:** Admit.

> 206. At his criminal trial, plaintiff stated that after placing that call to his sister, he went to check on Seymour but then returned to the kitchen to answer an incoming call from his sister. (Exhibit B, TT pp. 4121–4122, 4217–4218)

**Response:** Admit.

> 207. During plaintiff's criminal trial, plaintiff stated that after answering his sister's return call, he phoned his friend Mark Perrone from the phone in the kitchen. After speaking to Mark's mother and telling her what happened, he hung up and immediately received a return call from Mark. Plaintiff instructed Mark not to tell anyone what had happened at school except the principal. (Exhibit B, TT pp. 4122–4128)

**Response:** Admit that Marty testified at trial that, after talking to his sister, he called his best friend Mark Perrone and his mother picked up. Marty told Mrs. Perrone what happened and then hung up. Deny that the cited testimony demonstrates that Marty instructed Mark not to tell anyone at school except the principal about what had happened. [Defs.' Exhibit B, TT (Marty Tankleff) at 4122–4128.]

208. During plaintiff's criminal trial, plaintiff stated that after talking to his sister and the Perrones on the phone in the kitchen, he returned to his bedroom and wiped his hands, and *only* his hands, on a towel on his bed. He then put on a sweatshirt and ran to the house of his neighbor, Hova. (Exhibit B, TT pp. 4124-4125)

**Response:** Admit that Marty testified that after talking to his sister and the Perrones he went to his bedroom, wiped his hands on the towel he had used to take a shower the night before, put on a sweatshirt and ran to Mr. Hova's home. Deny that Marty specifically excluded the possibility that he wiped another part of his body on the towel on his bed. [Defs.' Exhibit B, TT (Marty Tankleff) at 4124–25.]

209. During plaintiff's criminal trial, plaintiff stated he didn't recall turning the light on in his bedroom. He didn't deny he could have, but he stated he didn't remember. (Exhibit B, TT p. 4113)

**Response:** Admit that Marty so testified. However, note that McCready testified that the blood smear that was present on Marty's wall near the light switch is indicative of someone groping around looking for a light switch and that Marty would not have done that in his own room. McCready also testified that Marty could have gotten Arlene's blood on his hands from touching a light switch that already had blood on it. [Pl.'s Exhibit 9 (McCready Deposition) at 147:7–148:13.]

210. At the criminal trial, plaintiff stated that he did not recall speaking with Hines, McNamara or Bove. (Exhibit B, TT pp. 4129-4131, 4188-4191)

**Response:** Admit.

211. At his criminal trial, plaintiff stated to the jury that what he told the Makrides and the Goldschmidts in their conversation was if his "parents weren't around [he] could have any car [that he] wanted." (Exhibit B, TT pp. 4094-4097)

**Response:** Admit.

212. At his criminal trial, plaintiff admitted that he told McCready what happened while at the scene as "best he could." (Exhibit B, TT pp. 4137-4138)

**Response:** Admit.

213. At his criminal trial, plaintiff admitted that he met with Doyle and repeated what happened to Doyle at McCready's request. (Exhibit B, TT p. 4134-4135)

**Response:** Admit.

214. At his criminal trial, plaintiff admits repeating the story after being asked by Rein as "best I could." (Exhibit B, TT p. 4148)

**Response:** Admit.

215. At his criminal trial, plaintiff admitted that McCready asked him to go to "Homicide Headquarters." (Exhibit B, TT p. 4143)

**Response:** Admit that McCready asked Marty to go to Homicide Headquarters and that McCready told him it was to discuss Jerry Steuerman and his father's business interests. Note that Marty asked if he could go to the hospital first and McCready denied his request, saying that he would take him there later. [Defs.' Exhibit B, TT (Marty Tankleff) at 4138:21–4139:2.]

216. At his criminal trial, plaintiff admitted that while in the car, he told McCready what happened the "best he could." (Exhibit B, TT p. 4133)

**Response**: Admit.

217. At his criminal trial, plaintiff admitted that while in the car he was told by McCready that Seymour was being moved to Stony Brook and that McCready stated he (McCready) had not known about Seymour's head injuries. (Exhibit B, TT p. 4148)

**Response:** Admit that while in the car with McCready and before the false confession was produced, McCready told Marty that he just learned from Detective Pfalzgraf that Seymour had head injuries. [Defs.' Exhibit B, TT (Marty Tankleff) at 4145:5–13.]

218. At his criminal trial, plaintiff admitted that when he saw his mother in the bedroom, he did not have glasses on. (Exhibit B, TT p. 4215)

**Response:** Admit.

219. At his criminal trial, plaintiff admitted that he used the kitchen phone to speak to his sister twice and to call Perrone (a school friend) and acknowledged that the photograph of the phone showed no blood on the phone. (Exhibit B, TT pp. 4216-4219)

**Response:** Admit. However, note that the first responders' reports indicate that by the time that they arrived on scene at 6:27 a.m., Seymour was already "mostly covered in dried blood" and that there was "dried blood noted to scalp forehead" on Arlene. [Defs.' Exhibit B, TT (Ethel Curley) at 472:4–6 and 486:21–25; Pl.'s Exhibit 32 (Prehospital Care Report for Seymour Tankleff); Pl.'s Exhibit 33 (Prehospital Care Report for Arlene Tankleff).]

220. At his criminal trial, plaintiff admitted that he wiped his hands on a towel in his bedroom (a photograph of which was entered into evidence as People's Exhibit 35) *after* he used the kitchen phone. (Exhibit B, TT pp. 4219-4221)(Exhibit JJ, Trial Exhibit 35)

**Response:** Admit.

221. At his criminal trial, plaintiff admitted that at Headquarters he spoke to Rein and McCready about Steuerman's business relationship with Seymour; a $400,000 loan Steuerman was paying off to Seymour, a UCC equipment disputed between Steuerman and Seymour; a dispute over the Ronkonkoma store between Steuerman and Seymour; family vacations; his relationships and getting his nose fixed; and the names and phone numbers of various businesses owned by Seymour. (Exhibit B, TT pp. 4229-4230)

**Response:** Admit.

222. At his criminal trial, plaintiff admitted he told Rein and McCready that he was the primary beneficiary in the will for Seymour's business interests, including the interests Seymour had with Steuerman and the family house. (Exhibit B, TT pp. 4233-4236)

**Response:** Admit that Marty so testified.

223. At his criminal trial, plaintiff admitted that he drew the three diagrams asked of him by Rein and McCready, and that he only entered Arlene's room as far as the alarm wall in the bedroom. (Exhibit B, TT pp. 4190, 42124)

66

**Response:** Admit that Marty drew the diagrams and that at the time that he first saw his mother's body, he only entered the bedroom as far as the alarm wall. [Defs.' Exhibit B, TT at 4190:15–16, 4214:9–12.]

224. At his criminal trial, plaintiff admitted that a stand-up photograph was taken of him at police headquarters and that the photo, People's Exhibit 11, showed no blood on his shorts or sweatshirt. (Exhibit B, TT pp. 4221-4222)(Exhibit F, Trial Exhibit 11)

**Response:** Admit.

225. At his criminal trial, plaintiff admitted he demonstrated on Rein what he did to render first aid to Seymour. (Exhibit B, TT p. 4150)

**Response:** Admit.

226. At his criminal trial, plaintiff admitted that his conversation with Rein and McCready did not become confrontational until after he performed the first aid demonstration on Rein. (Exhibit B, TT p. 4238)

**Response:** Admit.

227. At his criminal trial, plaintiff admitted to signing the waiver or "rights" card, and identified his signature and date on the waiver or "rights" card, which was entered into evidence as People's Exhibit Number 170. (Exhibit B, TT pp. 4164, 4242-4243)(Exhibit N, the Rights Card)

**Response**: Admit that Marty signed the waiver and identified his own signature and date on the rights card during trial, which, contrary to policy, does not indicate the time at which it was signed. [Pl.'s Exhibit 46 (Investigative Guide) at 8.]

228. At his criminal trial, plaintiff admitted offering the substantive parts of his confession and actually uttering the words attributed to him, but added additional comments he claimed were made by McCready that caused him to utter those words. (Exhibit B, TT pp. 4154-4164)

**Response**: Deny. Detective McCready fed Marty details of the false confession and Marty acquiesced to his suggestions. Note that the details that McCready fed Marty only reflected

conclusions McCready had arrived at from walking through the crime scene, which were not

supported by the facts of the case as later determined by crime scene experts. *See*

Counterstatement at ¶¶ 47, 71.

229.  At his criminal trial, plaintiff admitted telling Rein and McCready that "could I – could
      I have blacked out" or "could I have blacked out." (Exhibit B, TT p. 4242)

**Response:** Admit that after Detectives McCready and Rein repeatedly denied Marty's truthful

denials and lied to him about his father waking up and saying that Marty had committed the

crimes, Marty asked Detectives Rein and McCready, "Could I have blacked out?" *See*

Counterstatement at ¶ 42.

230.  At his criminal trial, plaintiff admitted that he told Rein and McCready that he killed his
      parents with a barbell and a knife. (Exhibit B, TT pp. 4239-4240)

**Response:** Admit that Marty so testified, but *see* Plaintiff's response to ¶ 228 and *see*

Counterstatement at ¶¶ 43, 47, 71.

231.  At his criminal trial plaintiff admitted, in response to questions from his attorney on
      direct examination, that he spoke with his sister and that he apologized to her saying he
      needed psychiatric help and that he needed to see her that night. He stated, however,
      that he said those things "because they made me."

**Response:**  Admit but object on the basis that Defendants cited no evidence to support this

statement.

232.  At his criminal trial plaintiff claimed, on cross examination by Assistant District
      Attorney John B. Collins, that after he gave his confession earlier, he was in a room
      with Rein, McCready and Doyle, and that McCready choked him. He also claimed that
      Rein and Doyle participated in order to get him to say the things he did to his sister.
      (Exhibit B, TT pp. 4240-4242)

**Response:** Admit that Marty testified at trial on cross-examination by ADA John B. Collins, that

after he gave his confession earlier, he was in a room with Rein, McCready and Doyle, and that

McCready choked him. [Exhibit B, TT (Marty Tankleff) at 4240:11.] Deny that the remainder is

supported by the evidence cited.

233. The first time plaintiff ever claimed he was choked came during the aforementioned
cross-examination. No previous claim of choking had ever been made, nor had Mr.
Gottlieb made such a claim in his opening statement, his direct examination or plaintiff
or in his closing argument. Mr. Gottlieb also did not address this claim in his re-direct
examination that followed the aforementioned cross-examination. (Exhibit B, TT pp.
45-57, 4087-4172, 4247-4250, 4739-4878)

**Response:** Admit that upon cross-examination Marty testified that he was choked after he falsely

confessed and that this was the first time that Marty testified to being choked by Detective

McCready. [Exhibit B, TT (Marty Tankleff) at 4240:11.]

**X.      Procedural History Regarding Confession and 440 Hearing**

234. In June of 1989, after a lengthy Huntley Hearing challenging the voluntariness of the
plaintiff's confession, Trial Judge Alfred C. Tisch ruled that the statements made by
plaintiff were voluntarily given; the inculpatory statements made by plaintiff were done
after his rights were read; and there was a knowing waiver of said rights. (Exhibit LL,
Huntley Hearing Decision)

**Response:** Admit that Judge Tisch so ruled based on the detectives' version of events—and

without the evidence that the confession was fabricated and false, *see* Counterstatement ¶¶ 44–

93, or that the detectives had suppressed exculpatory evidence indicating that the weapon

identified in the confession as the murder weapon was excluded as the murder weapon,

*see* Counterstatement ¶¶ 94–128. Judge Tisch also ruled that the police improperly elicited

statements they claim Marty made to his sister on the telephone later that afternoon, after the

right to counsel had clearly been invoked, and ordered those alleged statements suppressed.

235. While simultaneously pursuing a new trial pursuant to New York State Criminal
Procedure Law §440.00, plaintiff initiated a series of direct appeals seeking to overturn
his conviction after the jury trial. These appeals primarily asserted that the confession
was involuntary. In 1993 the Appellate Division for the Second Department rejected
plaintiff's contention that the confession was not voluntary and held that plaintiff was

not in custody until after he was read his *Miranda* warnings and that plaintiff's due process rights were not violated by the actions of the detectives, including their orchestrated ruse which led plaintiff to confess. (Exhibit MM)

**Response:** Admit, based on the factual record found by Judge Tisch at the Huntley hearing, in a "sharply divided 3-to-2 decision" the Appellate Division so ruled. [Defs.' Exhibit QQ (Appellate Decision) at 3.]

236. Plaintiff appealed the decision of the Second Department – again claiming his confession was taken improperly – to New York State Court of Appeals. The Court of Appeals again rejected plaintiff's claims, and held that the confession plaintiff gave was voluntary given and that his will was not overborne by the force used by the detectives on September 7, 1988. (Exhibit NN)

**Response**: Admit, based on the factual record found by Judge Tisch at the Huntley hearing, the Court of Appeals so ruled.

237. Plaintiff next filed a Writ of Habeas Corpus in the Eastern District of New York which again challenged the voluntariness of his confession. Judge Platt denied the Writ and held that plaintiff was not in custody prior to the Miranda warning being given and that plaintiff's post-Miranda admissions were voluntary. A Brady claim was also rejected. (Exhibit OO)

**Response:** Admit. [Defs.' Exhibit OO, <u>Tankleff v Senkowski</u> at 1.]

238. Plaintiff next appealed Judge Platt's Decision to the Second Circuit Court of Appeals. The Court held that the pre-admission statements were taken when plaintiff was in custody which required that Miranda warnings should have been given earlier. However, the Court found this to be harmless error since the pre-Miranda statements were repeated when plaintiff confessed after having been read his rights. The Court also rejected plaintiff's claim that the confession was obtained involuntarily and held that the waiving of rights was done knowingly. They also affirmed the Brady issue as decided by Judge Platt. (Exhibit PP)

**Response:** Admit that the Second Circuit held that Marty was in custody before he made any incriminating statements, and that the pre-*Mirandized* statements should have been suppressed.

Admit that the Second Circuit found under federal law this error was harmless, but that it noted that under New York state law, this is *not* harmless error.

239.  In December of 2007, the Appellate Division for the Second Department reversed a trial court decision denying plaintiff's motion for a new trial pursuant to the Criminal Procedure Law §440.00 and held there was sufficient *new* evidence that would entitle plaintiff to a new trial. However, the court refused to address plaintiff's claim that this confession was not voluntarily given, reason that the issue concerning the confession had been thoroughly litigated. This court also expressly rejected plaintiff's claim of actual innocence. (Exhibit QQ)

**Response:** Admit, based on new evidence from a number of "*unrelated*" witnesses, each of whom implicated Creedon and/or Jerry Steuerman in the Tankleff murders, the Appellate Division held that Marty was entitled to a new trial. (*See* Counterstatement ¶ 159; Defs.' Ex. QQ (Appellate Decision) at 16.) Admit that the Appellate Division held:

> "At the original trial, the defendant's repudiated confession was the most compelling evidence elicited by the prosecution. Arguably, it was the linchpin of the prosecution's case. The *Miranda* aspects of this case have been extensively litigated and will not be revisited. However, when the evidence presented at the CPL article 440 hearing is evaluated against the backdrop of the trial evidence, including the defendant's confession, how the confession was obtained, and the fact that the defendant almost immediately recanted the confession, the newly-discovered evidence is "of such character as to create a probability that had such evidence been received at the trial the verdict would have been more favorable to the defendant" (CPL 440.10[1][g])." [Defs.' Ex. QQ (Appellate Decision) at 17.]

Admit that while the Appellate Division began its legal analysis with the observation, "It is abhorrent to our sense of justice and fair play to countenance the possibility that someone innocent of a crime may be incarcerated or otherwise punished for a crime which he or she did not commit,"[Defs.' Ex. QQ (Appellate Decision) at 14], after granting a new trial on the basis of newly discovered evidence, the court did not also reverse the trial court's ruling declining to vacate the judgment on the ground of actual innocence, finding that, "The defendant did not establish entitlement to this relief." [Defs.' Ex. QQ (Appellate Decision) at 18.]

/1

240. At his 440 hearing the plaintiff advanced a theory that the murders were actually were committed by Joseph Creedon, Peter Kent and Glen Harris and that one of the weapons used was a metal pipe. (Exhibit TT original complaint paragraphs 125–127)

**Response**: Admit that Marty presented testimony from witnesses that that the murders were actually were committed by Joseph Creedon, Peter Kent and Glen Harris, and that Glenn Harris provided a sworn statement that one of the weapons used was a metal pipe. Deny that Marty advanced a particular theory as to precisely how the attacks on the Tankleffs were carried out; rather, Marty's theory at the 440 hearing was that there was substantial new evidence demonstrating his innocence. [Defs.' Exhibit TT (Original Complaint) ¶ 125.]

241. Glen Harris swore out an affidavit admitting, *inter alia*, that he drove the getaway car and that the principals ran back to the car covered in blood, and discarded a rusty pipe out the window. (Exhibit TT original complaint paragraphs 125–127)

**Response:** Admit.

242. Plaintiff's investigator Jay Saltpeter testified at the 440 hearing and stated that Harris took him to a location where the pipe was discarded and found a rusted 36 inch long cylindrical metal pipe. (Exhibit TT original complaint paragraphs 125–127)(Exhibit QQ People v. Tankleff, A.D.3d 160)

**Response:** Admit that Mr. Saltpeter testified that Harris took him to a location where Harris says the pipe was discarded. Admit that Mr. Salpeter subsequently found a rusted pipe on that property. However, deny that the defense advanced the theory that the pipe Mr. Salpeter found was the pipe that had been used.  [Defs.' Exhibit TT (Original Complaint) ¶¶ 125–127; Defs.' Exhibit QQ (Appellate Decision) at 6.]

243. Joseph Guaracio, Creedon's son testified at the 440 hearing that Creedon told him they had entered the house through a window, and that after the crime Creedon returned to the house through the back door to retrieve a piece of metal pipe. (Exhibit QQ People v. Tankleff, A.D.3d 160)

**Response:** Admit that Joseph testified to the following, as reflected in <u>People v. Tankleff</u>,

A.D.3d 160: that, during a visit with Creedon, he asked, "Dad, did you really do [the Tankleff

murders]?" and, the "seriousness" with which Creedon responded "[y]es, I did it," was "scary.";

that Creedon told him Todd Steuerman and Jerry Steuerman had been waiting outside of the

Tankleff home and signaled Creedon, after which Creedon and Kent entered the house through a

window, while Glenn Harris remained outside; that Creedon had choked Seymour Tankleff with

a bicycle brake-line stripped of the plastic and hit him on the head with a .38 special handgun;

that Peter Kent stabbed Arlene Tankleff; that while inside the Tankleff home, Creedon and Kent

looked into the Marty's room and saw him sleeping; that Creedon and Kent left the Tankleff

home, but Creedon returned through the back door to retrieve a piece of metal pipe; that as

Harris drove them away, Harris threw the pipe out of the car window; that Harris, Creedon, and

Kent then went to a friend's house, where Creedon and Kent burned their own clothing in the

basement; that Creedon is still in touch with Jerry Steuerman; and that "he [Creedon] paid a

hundred thousand dollars [to Detective James McCready] to keep his [Creedon's] name out of

it." [Defs.' Exhibit QQ (Appellate Decision) at 8.]

244. An examination of house windows and doors at the crime scene on September 7, 1988
found no sign of an intrusion. (Exhibit B, TT 1367-1390, 2633)

**Response:** Admit that Officer James Barnes' examination of the house windows and doors at the

crime scene on September 7, 1988 resulted in him concluding that there was no sign of an

intrusion. [Defs.' Exhibit B, TT (James Barnes) 1367–1390.] However, note that Marty testified

that when he woke up and walked through the hallway he noticed that the front door was open.

[Defs.' Exhibit B, TT (Marty Tankleff) at 4115:9–15] Furthermore, Steuerman was still in the

house when the other card players left, and no one saw him leave the property; *see*

Counterstatement at ¶¶ 133–36.

245. Plaintiff's forensic pathology expert, Dr. Michael Baden has determined that the weapon used to cause the injuries to Mr. and Mrs. Tankleff was a hammer not a pipe. (Exhibit NNN Baden Expert Report)

**Response**: Admit. [Exhibit NNN Bader Expert Report ¶ 9.]

246. The office of the New York State Attorney General, who had taken over the investigation after the Suffolk County District Attorney's Office referred the case to them in order to remove even the slightest appearance of a conflict of interest, prepared a memorandum or law in support of their application to dismiss the pending indictments against plaintiff in the interest of justice. (Exhibit WW)

**Response:** Deny. The Suffolk County District Attorney did not refer the case to the Attorney General. The Suffolk County District Attorney announced publicly that he was going to dismiss the case and ask the Governor to appoint a special prosecutor to investigate other suspects. [Pl.'s Exhibit 47 (AG Press Release).] Before the case was dismissed, however, the Governor appointed the Attorney General as a special prosecutor. [Pl.'s Exhibit 48 (ABC7 Article); Pl.'s Exhibit 47 (AG Press Release).] The Attorney General announced he wanted to investigate the case further before deciding whether to pursue a case against Marty or the other suspects. [Pl.'s Exhibit 47 (AG Press Release).] Ultimately, he moved to dismiss the case against Marty and did not seek to prosecute others. [Defs.' Ex. WW (AG Memorandum of Law).]

247. On July 22, 2008, Judge Robert W. Doyle issued a Decision granting the New York State Attorney General's application to dismiss the pending indictments against Plaintiff in the interests of justice. (Exhibit RR)

**Response:** Admit.

248. The charges against the plaintiff were not terminated in a manner favorable to the plaintiff.

**Response:** Deny and note that Defendants provided no citation for this statement.

## XI.    New York State SIC Report

74

249. In April of 2006, plaintiff wrote to the New York State Commission of Investigation (SIC) requesting an investigation into the Suffolk County Police Department's regarding their investigation and prosecution of plaintiff for the murder of his parents. (Exhibit KK, 50-H transcript pp. 102-104)(Exhibit SS)

**Response:** Admit.

250. In December of 2008, the SIC issued a report prepared after conducting an examination of the investigation and prosecution of plaintiff for the murder of his parents. The SIC found, in part, that the police department and Crime Lab personnel conducted a "comprehensive, extensive and methodical investigation from beginning to end;" the procedures used by the Detectives in questioning plaintiff were "proper in all respects," and were within the "confines of the law" and that the confession was not obtained "by way of force or coercion;" the SIC rejected plaintiff's claim that there were similarities between procedures criticized by the SIC in a report issued in 1989 in the investigation and prosecution of plaintiff in this case. (Exhibit SS)

**Response:** Admit that the SIC so found. Deny that the procedures used by the Detectives in questioning plaintiff were "proper in all respects," and were within the "confines of the law" and that the confession was not obtained "by way of force or coercion;" or that the SIC, which relied in part on interviews of the Defendants, based its decision on a complete and accurate account of the process used to obtain the confession.

251. On March 24, 2009, plaintiff filed the subject Summons and Complaint in the United States Courthouse for the Eastern District of New York. (Exhibit TT)

**Response:** Admit.

252. The complaint stated eleven claims, including a federal malicious prosecution against Detective McCready and Rein, a fabrication of evidence claim against McCready and Rein, a failure to investigate claim against McCready and Rein, a suppression of evidence/Brady claim against McCready and Kosciuk, a coercion and violation of right to counsel claim against McCready and Rein, a civil rights conspiracy claim against McCready, Rein, Doyle and McElhone, a supervisory liability claim against Doyle and McElhone, a Monell claim against the County, a State false imprisonment claim against McCready, Rein, and Doyle, a State malicious prosecution claim against McCready, Rein and Doyle, and an intentional or negligent infliction of emotional distress claim against McCready and Rein. (Exhibit TT, original complaint).

**Response:** Deny that this is an undisputed fact material to summary judgment.

253. The defendants moved to dismiss the complaint pursuant to Fed. R. Civ. P. 12(c) and on December 21, 2010 Judge Seybert granted the motion in part and denied it in part. (Exhibit KKK decision dated December 21, 2010)

**Response:** Deny that this is an undisputed fact material to summary judgment.

254. The Court dismissed the claims based on conspiracy, supervisory liability under § 1983, false imprisonment, suppression of exculpatory evidence/Brady, failure to investigate, and intentional or negligent infliction of emotional distress. (Exhibit KKK decision dated December 21, 2010).

**Response:** Deny that the court's legal conclusions are undisputed facts material to summary judgment.

255. The decision of the Court effectively dismissed all claims against defendants Kosciuk and McElhone. (Exhibit KKK decision dated December 21, 2010).

**Response:** Deny, and deny that the court's legal conclusions are undisputed facts material to summary judgment.

256. In dismissing the false imprisonment claim the Court found that there was a substantial amount of evidence to establish probable cause for the plaintiff's initial arrest, independent of the plaintiff's claim that his confession was coerced and that the defendants testified falsely before and during plaintiff's trial. (Exhibit KKK decision dated December 21, 2010).

**Response:** Deny that the court's legal conclusions are undisputed facts material to summary judgment.

257. In determining that probable cause existed for his arrest the Court noted the following facts which were not denied by the plaintiff in reply to the defendants' motion:

- Although Tankleff told the Detectives at the scene that he had used the phone in his father's office to call 9-1-1, the blood spatter on the phone had not been disturbed;

- Although Tankleff told the Detectives at the scene that he rendered aid to his father, who had blood gushing out of his neck wound, no blood was observed on plaintiff's clothing;
- Although Tankleff stated to Detectives at the scene that, after rendering aid to his father, he then checked the garage, there was no blood on the door handle to the garage, or the dead bolt on the garage door, which was locked;
- Tankleff stated to Detectives at the scene that he never entered his mother's bedroom, and observed from the door to the bedroom that her throat had been cut and that she was dead; however, Detectives at the scene could not observe Arlene's injuries until they entered the bedroom and stood directly over her
- Tankleff stated to Detectives at the scene that, after rendering aid to his father, his hands were covered with blood, yet the phones in the kitchen, one of which Tankleff used to speak to his sister and a friend on four occasions, had no blood on them;
- Tankleff stated to Detectives at the scene that, after getting up, he first looked in his mother's bedroom, which was dark because the drapes were drawn, and he did not see anyone. Yet when the Detectives inspected the scene they observed that the drapes in the master bedroom were open;
- Tankleff did not appear upset or emotional [to investigators] at the scene[;]
- Although his bedroom was directly across the hall from the master bedroom, Tankleff never claimed to have heard anything, although it appeared to Detectives at the scene that there had been a struggle in Arlene's bedroom
- Arlene had injuries on the back of her head and back, which could not be observed at the crime scene until after she had been rolled over, which occurred after the Detectives took Tankleff's confession, which injuries were consistent with Tankleff's confession;
- After being arrested, Tankleff was heard telling his sister that he "acknowledged to the police that [he] did it;"
- Examination of the crime scene revealed no sign of an intrusion;
- Blood was observed on the door knob, light switch and wall near that switch in plaintiff's bedroom;
- The blood spatter on the phone in the office where Seymour was found had not been disturbed after the spattering;
- The watermelon knife found in the kitchen was not in the position that the card player, who had used the knife, described having placed it on the evening of the card game;
- Arlene's autopsy results were consistent with Tankleff's confession as to how he killed his mother, and
- Those in attendance at the card game did not observe any problems at the game between any of the players including Steuerman and Seymour

77

(Exhibit KKK decision dated December 21, 2010)

**Response:** Deny that the court's legal conclusions are undisputed facts material to summary judgment.

258. On December 9, 2014, plaintiff requested leave to file an amended complaint adding a Brady claim against defendants McCready, Rein, Doyle and Kosciuk alleging that Dr. Adams told them in 1988 that there was no reasonable possibility the knife recovered by the watermelon could be the murder weapon. (Exhibit LLL, Proposed amended complaint.)

**Response:** Admit that on December 9, 2014, Plaintiff requested leave to file an amended complaint adding a *Brady* claim against defendants McCready, Rein, Doyle and Kosciuk alleging, among other things, that, in substance, Dr. Adams told them in 1988 that there was no reasonable possibility the knife recovered by the watermelon could be the murder weapon. Leave was granted on May 5, 2015. *See* D.E. 157.

259. Although the amended complaint alleged a new claim of suppression of evidence relating to the knife, the first paragraph of this new claim contains a paragraph (164) that restates a claim that was dismissed by the Court on December 21, 2010. (Exhibit LLL, Proposed amended complaint)

**Response:** Deny. As laid out in Plaintiff's successful motion to amend, this claim of suppression is different than that dismissed.

260. On May 5, 2015, Magistrate Judge Anne Y. Shields granted the plaintiff's request for leave to file an amended complaint.[6]

**Response:** Admit.

Dated:  New York, New York
        August 24, 2015

                              Respectfully submitted,


                              NEUFELD SCHECK & BRUSTIN, LLP
                              *Attorneys for Plaintiff Martin Tankleff*


                              **/s/ Emma Freudenberger**_____
                              Barry Scheck
                              Emma Freudenberger
                              Anna Benvenutti Hoffmann
                              99 Hudson Street, 8th Floor
                              New York, NY 10013
                              Tel: (212) 965-9081
                              Fax: (212) 965-9084

                              Barry J. Pollack
                              Miller & Chevalier
                              655 Fifteenth Street, NW
                              Suite 900
                              Washington, DC 20005

                              Bruce A. Barket
                              Barket Marion Epstein & Kearon LLP
                              666 Old Country Road
                              Suite 700
                              Garden City, NY 11530

**<u>Certificate of Service</u>**

I hereby certify that a true and accurate copy of the foregoing Plaintiff's Response to Defendants' Statement of Material Facts Pursuant to Local Rule 56.1 was served via mail with exhibits and email without exhibits on August 24, 2015, upon the following parties:

Brian C. Mitchell, Assistant County Attorney
Dennis M. Brown, Suffolk County Attorney
*Attorneys for Defendants*

H. Lee Dennison Building
100 Veterans Memorial Highway
P.O. Box 6100
Happauge, New York 11788


*<u>/s/ Madhu Srikantha</u>*
Madhu Srikantha
Paralegal
Neufeld Scheck & Brustin, LLP

80