UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

MARTIN TANKLEFF,

                                Plaintiff,

                -against-

THE COUNTY OF SUFFOLK, THERESA
and BRETT MCCREADY, as legal
successors of K. JAMES MCCREADY,
NORMAN REIN, CHARLES KOSCIUK,
ROBERT DOYLE, JOHN MCELHONE,
JOHN DOE POLICE OFFICERS #1-10,
RICHARD ROE, Suffolk County Employees
#1-10,

                           Defendants.

**SUFFOLK COUNTY
DEFENDANTS'
STATEMENT
PURSUANT TO LOCAL
RULE 56.1**

**CV09-1207 (JS)(AYS)**

Defendants, County of Suffolk,  K. James McCready, Norman Rein, Charles

Kosciuk, Robert Doyle and John McElhone, submit the following as and for its Statement

Pursuant to Local Rule 56.1.[1]

### I.      Events at 33 Seaside Drive, Belle Terre, on September 7, 1988 Prior To Plaintiff Going to Police Headquarters.

        1.      At 6:11 a.m. on September 7, 1988, plaintiff placed a 9-1-1 call reporting

that he found his father (hereinafter "Seymour") with blood "gushing" from his neck.

The operator instructed plaintiff to get a clean towel and hold pressure on where the

blood was "gushing" from. (Exhibit A1 and A2)[2]

---

[1] The defendants dispute some of the facts in this Rule 56 statement that are based upon the deposition and trial testimony of the plaintiff Martin Tankleff.  However, for the purposes of this motion only, we do not dispute these facts, as the standard for summary judgment is to view the facts in a light most favorable to the plaintiff.  The defendants submit that even viewing the facts in a light most favorable to the plaintiff, summary judgment is warranted.

[2] For continuity, exhibits supporting this statement pursuant to Local Rile 56.1 are identified by the corresponding letters assigned to the exhibits supporting the defendants' original motion pursuant to F.R.C.P.  12(c).  Newly identified exhibits begin with Exhibits XX.

2.      Emergency Service Dispatcher Patricia Flanagan described plaintiff as "excited" but not "upset".  (Exhibit B, TT[3] pp. 62-72, 83, 86-89)

3.      On the day of the murders, plaintiff had a conversation at the scene with Homicide Detectives Norman Rein and James McCready, where he stated to both Detectives that upon observing Seymour in the office covered with blood and "gagging," he immediately called 9-1-1 from the phone in the *office* and that that was the only thing he touched in that room.   Detectives Rein and McCready also noted that the blood spatter on the phone in the *office* had not been disturbed nor were there any apparent blood prints. (Exhibit B, TT pp. 2836, 3441, 3445-3446)  (Exhibit C – McCready Supplemental Report, 9/14/88 p. 2-3)  (Exhibit D - Oral Confession, p.3)  (Exhibit R, HH[4] pp. 5-8, 24-30) (Exhibit XX Deposition of Norman Rein p. 76, 77) (Exhibit YY Deposition of Robert Doyle p. 119) (Exhibit ZZ Deposition of Martin Tankleff, October 1 and 2, 2012, p. 8).

4.      On the day of the murders and before the confession part of plaintiff's oral statements to Detectives Rein and McCready, plaintiff stated after observing Seymour covered in blood he called 911 from the phone in the *office* where Seymour's body was located. (Exhibit B, TT pp. 3445-3446) (Exhibit D, Oral Confession, p.3) (Exhibit R, HH pp.5-30) (Exhibit YY Deposition of Robert Doyle p. 119) (Exhibit ZZ Deposition of Martin Tankleff p. 8).

5.      Two photographs taken by crime scene investigators on the day of the murders, of the phone in the office where Seymour was found showed that the blood spatter on that phone receiver had *not* been disturbed and was intact. (Exhibit E, Trial Exhibits 74-d, 75, photographs)

---

[3] Trial Transcript hereinafter referred to as "TT".
[4] Huntley Hearing Transcript, hereinafter referred to as "HH".

6.      On the day of the murders and before the confession part of plaintiff's oral statements to Detectives Rein and McCready, plaintiff stated that he "put a pillow under his father's feet and a towel around his father's throat … He had blood on his hands from his father." (Exhibit B, TT pp. 2836, 3440-3441, 3445-3446)  (Exhibit C – McCready Supplemental Report 9/14/88, pp. 3-4)  (Exhibit D – Oral Confession p.3)  (Exhibit R, HH pp. 5-30)

7.      A stand-up photograph of plaintiff was taken at police headquarters on September 7, 1988.  Plaintiff's sweatshirt, shorts and his extremities that are visible.   *No* blood staining, smearing or drops are visible in the photographs.  (Exhibit F, Trial Exhibit #11, photograph of plaintiff) (Exhibit ZZ Deposition of Martin Tankleff p. 33).

8.      On the day of the murders and before the confession part of plaintiff's oral statements to Detectives Rein and McCready, plaintiff stated that after he called 911 and gave aid to Seymour he began to search for his mother and opened the door leading to the garage to see if her car was there. (Exhibit B, TT pp. 2836-2837, 3442-3443, 4119) (Exhibit C, McCready Supplemental Report, 9/14/88, p. 4)  (Exhibit D, Oral Confession p. 3) (Exhibit R, HH pp. 5-30)

9.      On the day of the murders, Homicide Detective James McCready responded to the home and surveyed the interior of the house which was now a crime scene.  Among his observations, Detective McCready noted that there was *no* blood on the door handle to the garage and the dead bolt on the garage door was *locked* with the key in it.  (Exhibit B, TT pp. 3445-3448) (Exhibit C, McCready Supplemental Report, 9/14/88 p. 4) (Exhibit R, HH pp. 24-30)

10.      A photograph, taken by crime scene investigators on the date of the murders of the dead bolt lock and the handle on the door leading to the garage, shows that

there was no blood found on either the dead bolt lock or the handle. (Exhibit B, TT pp. 3445-3450, 4211-4213) (Exhibit G, Photograph)

11.     On the day of the murders, Homicide Detective James McCready observed that a light switch in plaintiff's bedroom was in the "on" position and that there was blood on the north wall at the light switch and on the sheetrock.  (Exhibit B, TT pp. 3446-3451) (Exhibit C, McCready Supplemental Report, 9/14/88 p. 2) (Exhibit R, HH pp. 5-30)

12.     Photographs taken by crime scene investigators on the day of the murders, of the light switch in plaintiff's bedroom, showed blood stains. (Exhibit H, Trial Exhibits 90 and 91, Photographs)

13.     On the day of the murders and before the confession part of plaintiff's oral statements to Detectives Rein and McCready, plaintiff stated he got dressed at 6:10 a.m. and put on shorts and a sweatshirt.  (Exhibit B, TT pp. 2616, 2835-2836, 3439) (Exhibit C, McCready Supplemental Report, 9/14/88 p. 5)  (Exhibit D, Confession p.10)

14.     On the day of the murders and before the confession part of plaintiff's oral statements to Detectives Rein and McCready, plaintiff stated he woke up at 5:35 a.m., got out of bed at 6:10 a.m., and left his room at 6:16 a.m.  (Exhibit B, TT pp. 2616, 2835-2836, 3439) (Exhibit D Oral Confession, p.2)  (Exhibit XX Deposition of Norman Rein p. 74).

15.     On the day of the murders and before the confession part of plaintiff's oral statements to Detective Rein and Detective McCready, plaintiff stated that he never went *into* his mother's bedroom.  He only went as far as the alarm wall.  He only saw her from the hallway entrance to the bedroom but he stated that he observed Arlene on the ground with her throat cut and he could see she was dead.  He also stated that he did not turn on any lights in that bedroom.  (Exhibit B, TT pp. 2818, 2836-2837, 3439-3440, 3442)

(Exhibit D, Oral Confession p. 3-4) (Exhibit R, HH pp. 8-30) (Exhibit XX Deposition of Norman Rein p. 76, 77).

16.     On the day of the murders, while at the scene plaintiff had conversations with Detectives McCready and Rein, and with Detective Sergeant Doyle.   (Exhibit ZZ Deposition of Martin Tankleff p. 50)

17.     Although plaintiff spoke to McCready, Rein and Doyle, he does not remember all their questions.  (Exhibit ZZ Deposition of Martin Tankleff p. 50)

18.     Plaintiff does not recall recounting for the detectives the steps he took when they asked him questions. (Exhibit ZZ Deposition of Martin Tankleff p. 51)

19.     Plaintiff does not have a specific recollection of indicating to the detectives that he only saw his mother from the hall way, that she was on the ground, that her throat was cut and that he could see that she was dead.  (Exhibit ZZ Deposition of Martin Tankleff p. 51)

20.     Plaintiff does recall answering questions from McCready, Rein and Doyle while at the scene.  (Exhibit ZZ Deposition of Martin Tankleff p. 51)

21.     On the day of the murders, plaintiff told the detectives he woke up and looked in his parents' bedroom and didn't see anybody in their bed because the room was dark.  (Exhibit ZZ Deposition of Martin Tankleff p. 138, 238)

22.     Plaintiff voluntarily drew a diagram of his parents' bedroom showing the layout of the room, Arlene's body as he observed it, and the entranceway which showed the alarm wall.  The alarm wall was an interior wall with the opposite side being the hallway wall. (Exhibit I, sketch of Arlene's room) (Exhibit ZZ Deposition of Martin Tankleff p. 211-217)

23.     Nobody threatened the plaintiff to make any drawings. (Exhibit ZZ Deposition of Martin Tankleff p. 225-226)

24.     Three photographs taken by crime scene investigators on the day of the murders of the master bedroom from the entranceway to the room, with Arlene's body still in place, showed that the cut along her throat was not visible from where plaintiff said he was standing when he *concluded* his mother was dead and that her throat was cut. (Exhibit B, TT pp. 3483-3485) (Exhibit J, Trial Exhibits 7, 8, 9, 10, Photographs)

25.     Plaintiff did not go into the room and render aid to his mother (Exhibit ZZ Deposition of Martin Tankleff p. 62)

26.     On the day of the murders and before the confession part of plaintiff's oral statements to Detectives Rein and McCready, plaintiff stated that after observing Arlene in the master bedroom he did not call 911 again to report that discovery, but called his sister from a phone in the kitchen and told her he believed "mom and dad have been murdered."  He then checked on Seymour and then answered his sister's call back in the kitchen and yelled for his sister to "get over to the house."   (Exhibit B, TT pp. 2618-2619, 2837, 3442-3443) (Exhibit C, McCready Supplemental Report, 9/14/88 p. 4) (Exhibit D, Oral Confession p.4)  (Exhibit R, HH pp. 21-22) (Exhibit ZZ Deposition of Martin Tankleff p. 63)

27.     On the day of the murders and before the confession part of plaintiff's Oral Statements to Detectives Rein and McCready, plaintiff stated that he then remembered he was supposed to pick up his friend Mark Perrone on the way to school.  He called Mark's house from the same kitchen phone and spoke to Mark's mother.  His friend Mark called plaintiff back after he spoke with Mark's mother and he answered the phone in the kitchen - now touching that phone for a fourth time. (Exhibit B, TT pp. 2618-2619, 3442-3444; Exhibit R, HH pp. 21-22) (Exhibit ZZ Deposition of Martin Tankleff p. 63)

28.     A photograph, taken by crime scene investigators on the day of the murders, of the phone in the kitchen showed that there was *no* blood on that phone. (Exhibit K, Trial Evidence 78b, Photo)

29.     On the day of the murders, and before the confession part of plaintiff's oral statements to Detectives Rein and McCready, plaintiff stated that after his sister's call, the next thing he did was go to the house of his neighbor, Martin Hova (hereinafter "Hova"). (Exhibit B, TT p. 2837) (Exhibit D, Oral Confession p. 4)

30.     Hova stated that while in the bathroom of his house, which was next to the Tankleff residence, he heard screaming and that when he went to the front door, he saw plaintiff barefoot and clad in shorts *and* a zip-up sweatshirt.  (Exhibit B, TT pp. 92-94, 100-104)

31.     Hova, Police Officer James Crayne and Police Officer Daniel Gallagher (uniform officers responding to the 911 call) stated that as they arrived at the scene, Hova approached the scene with plaintiff and the plaintiff yelled "somebody murdered my parents" as they all headed into the house.  (Exhibit B, TT pp. 100-104, 248-256, 286-289, 316-317, 324-331, 369-370)

32.     Police Officers Crayne and Gallagher stated that plaintiff was upset or "agitated."  They also stated that plaintiff had on shorts *and* a zip up sweatshirt, was barefoot and had blood on his palms, the right side of his face, on his right calf and on his right foot.  (Exhibit B, TT pp. 104-106, 256-259, 318-319, 332-334, 351-359, 372)

33.     Hova also stated that once inside the house he went with Police Officer Crayne and plaintiff into the office where his father was and plaintiff stated "Murder, Murder" plaintiff further stated they "murdered my parents."  When asked by Hova "who did it?", plaintiff stated "my father's business partner, Jerry."  (Exhibit B, TT pp. 104-106, 256-259, 318-319, 332-334, 351-359, 372)

34.     Police Officer Crayne stated that he observed a towel on Seymour's neck. He noted that the towel was *not* pressed into the neck wounds but was "draped over the neck."  After making this observation, P.O. Crayne applied pressure to the wound in an attempt to stop the bleeding. (Exhibit B, TT pp. 335, 343-344)

35.     Police Officer Gallagher also stated that he went to the threshold of the master bedroom.  From the threshold he observed Arlene's head on the floor "partially sticking out from the end of the bed."  P.O. Gallagher then approached Arlene but it was not until he stood directly over the body that he saw the extent of her injuries and concluded she was dead. (Exhibit B, TT pp. 259-272, 293-300)

36.     Police Officer Crayne stated that when he tried to rouse Seymour, he asked Seymour who did this.  Though Seymour said nothing, plaintiff stated "it was Jerry Steuerman."  When Police Officer Gallagher entered the office, plaintiff again stated that "the only person who had the motive to do this was Jerry Steuerman."  Plaintiff's demeanor during this exchange was "composed."  (Exhibit B, TT pp. 271-277, 320-322, 344-345)

37.     Police Officer Edward Aki (a third uniformed officer responding to the 911 call) stated he arrived at the scene at 6:27 a.m.  A few minutes later, Belle Terre Chief Constable Donald Hines, a family friend and colleague of Seymour's on the Belle Terre Police Department, also arrived and both observed plaintiff's brother-in-law Ron Rother arrive at the scene.  Rother was observed as being "very upset" and he was crying, "just visibly shaken."  (Exhibit B, TT pp. 83, 278-279, 315-316, 347, 375-376, 383-384, 403, 415, 422, 464-466 and 501-502)

38.     Police Officer Aki advised plaintiff and Rother that the house was a crime scene and that both of them, as witnesses, needed to be kept separate.  While Police Officer Aki was taking plaintiff to his car, plaintiff asked if he could wash his hands at a

spigot on the side of the house.  Plaintiff was told it was inadvisable to go near the house.

As Police Officer Aki and plaintiff moved toward Police Officer Aki's patrol car,

plaintiff stated "that a Jerry Steuerman had done this."  (Exhibit B, TT pp. 384-389, 392-

395, 403-406)

39.     Police Officer Aki then stated that after plaintiff entered the back seat of

his patrol car, Police Officer Aki left the area and plaintiff "was free to move."  Soon

after plaintiff exited the car and bent down by a puddle and began washing his hands in

that puddle.  This was observed by both Police Officer Aki and Chief Constable Hines.

(Exhibit B, TT pp. 387-389, 392-393, 403-410, 501-504)

40.     Chief Constable Hines stated that after observing plaintiff washing his

hands, he and plaintiff made eye contact and they "immediately converged."  Hines then

asked plaintiff what happened and plaintiff answered "Jerry Steuerman murdered my

mother and my father."  Both then entered Hine's car where in an excited manner, but not

crying, plaintiff continued to accuse Steuerman.  Plaintiff stated that Arlene had predicted

that Steuerman was going to do something terrible, that Steuerman was the last person to

leave the card game, and that Steuerman "killed my mother and father."  Because neither

Arlene nor Seymour had ever expressed a fear of Steuerman to Hines, Hines stated "that

Seymour was still alive and that should he regain consciousness, the police would be able

to verify if Jerry was indeed the perpetrator."  (Exhibit B, TT pp. 410, 504-507, 523-528,

535)

41.     Chief Constable Hines stated that after making the aforementioned

statement to plaintiff, plaintiff's demeanor changed.  Hines stated

> "Well up to that time Marty was looking … at the ground, at his feet, at the hood
> of the car, at something, other than me.  He had his head down.  When I made that
> statement, he picked his head up and looked directly at me.  His eyes widened, he
> stopped talking and didn't say a word."  Plaintiff then exited the car.  (Exhibit B,
> TT pp. 506-507, 526)

42.     Plaintiff does not remember having a conversation with Constable Hines regarding the statements in paragraph 39 above and cannot recall if he said the statements or not.  (Exhibit ZZ Deposition of Martin Tankleff p. 75) (Exhibit AAA Deposition of Martin Tankleff, July 9, 2013, p.29-30)

43.     A neighbor and friend of Seymour's, John McNamara (hereinafter "McNamara"), stated that he was taking a morning walk in Belle Terre when he came in contact with plaintiff.  This was the first of three conversations he had with plaintiff. Plaintiff stated to McNamara that his parents had been murdered, that Jerry Steuerman committed the murders; that he discovered them after waking up; and repeated the order of what he did similar to what he told McCready.  (See ¶ #41 and ¶ #42 below)   Plaintiff went on to state that his father was bleeding very heavily and that he, plaintiff, had lifted Seymour from the chair and placed him on the floor.  McNamara then asked plaintiff why he was not *covered* in blood.  Plaintiff looked at McNamara and walked away without responding. (Exhibit B, TT pp. 776-781, 789, 811-812) (Exhibit Y, McCready Supp. Report 10/18/88)

44.     McNamara stated that in his second conversation with plaintiff he again stated that Jerry Steuerman had murdered his parents. McNamara replied that it appeared plaintiff's father was not dead, since the paramedics had placed him in an ambulance and left quickly with the lights on.  Plaintiff then stated he had been sleeping in the nude and that when he woke up he put on his shorts *and* sweatshirt and then repeated the scenario of his actions as he had stated earlier, except he now stated that after checking for his mother's car in the garage, he went out of the house screaming that a murder had been committed.  (Exhibit B, TT pp. 782-783) (Exhibit Y, McCready Supp. Report 10/18/88)

45.     McNamara stated that plaintiff came back a third time and restated the same scenario he had stated earlier with respect to his actions, but this time he stated that

after he checked the garage for his mother's car, he went to his mother's bedroom, stood at the *entrance* and saw his mother and then realized she was dead and that he (plaintiff) was too scared to go into the bedroom and he then ran out of the house screaming that a murder had taken place.  (Exhibit  B, TT pp. 784-785, 797) (Exhibit Y, McCready Supp. Report 10/18/88)

46.     Plaintiff does not recall having any conversation with Mr. McNamara outside his house on September 7, 1988. (Exhibit ZZ Deposition of Martin Tankleff p. 85) (Exhibit AAA Deposition of Martin Tankleff, July 9, 2013, p.22, 24)

47..    The Belle Terre Mayor, Vincent Bove (hereinafter "Bove"), a family friend and an attendee at the card game that occurred hours prior to the murders, stated he arrived at the scene around 7:00 a.m. and that plaintiff approached him and stated "somebody murdered my mother and father" and that Jerry Steuerman did it.  Bove responded by asking plaintiff "What makes you say that? … Nothing took place at the card game.  Did you see (Steuerman) do this?"   Plaintiff responded, "No, I didn't see him, but they've been arguing."  (Exhibit B, TT pp. 741-742)

48.     Plaintiff recalls having a conversation with Mr. Bove but does not remember the specifics of that conversation. 43.   (Exhibit ZZ Deposition of Martin Tankleff p. 90)

49.     Around this time, while plaintiff was leaning on a police car, Dara Schaeffer, a neighbor and high school student, pulled up to 33 Seaside Drive and asked plaintiff "how's it going?"   Plaintiff replied "last night *someone* killed my mother and tried to kill my father *and* molested me."  Dara noted plaintiff said this with no emotion on his part.  (Exhibit B, TT pp. 550-553) (Exhibit Z, 2 Rein Supp. Reports 2/14/90)

50.     Plaintiff testified at his criminal trial that he told Ms. Schaeffer that "they murder my mother, the murdered my father, and they must have missed me." (Exhibit B, TT pp 4131).

51.     Detective Sergeant Robert Doyle of the Suffolk County Police Department's Homicide Bureau received notice of Arlene's murder at approximately 7:05 a.m. on September 7, 1988.  By 7:20 a.m. he had directed Homicide Detectives Robert Anderson, Anthony Lahgezza, Michael Carmody, John Pfalzgraf, K. James McCready and Norman Rein to the scene.  At the scene, Detectives Carmody and Pfalzgraf were redirected to the hospital with Seymour, and Detectives Anderson and Lahgezza were redirected to interview the card players.  (Exhibit B, TT pp. 2602-2608, 2831, 3431) (Exhibit R, HH pp. 969-972)

52.     Detective McCready arrived at the scene at 7:39 a.m. and spoke with Officers Aki and Crayne.  He then entered the house and examined the office and master bedroom where Seymour and Arlene were respectively.  After exiting the house at approximately 7:50 a.m., he then introduced himself to plaintiff and asked what happened.  Chief Constable Hines interrupted them and McCready asked plaintiff to wait in his car while he was briefed by Hines.  McCready then got in his car at about 7:55 a.m. where he observed that plaintiff appeared "excited" and stated "Jerry Steuerman" had done this because he and Seymour had been fighting.  (Exhibit B, TT pp. 3431-3437, 3447, 3519, 3551-3552, 3593, 3599)

53.     While in the car, plaintiff told McCready that he awoke at 5:35 a.m., stayed in bed until about 6:10 a.m. and then "got dressed in a sweatshirt  and shorts." Plaintiff then stated he looked into his mother's bedroom which was dark because the drapes were drawn.  Not seeing anyone, he went to the office area where he saw his father bleeding and gagging.   Plaintiff then stated he immediately called 9-1-1 from the

phone on the desk in the *office*.  He then stated he opened the garage door and saw his

mother's car and then went back to his mother's room.  He  saw his mother and then went

to the kitchen to call his sister Shari.  (Exhibit B, TT pp. 3437-3439, 3439-3441, 3442-

3443) (Exhibit R, HH pp. 8-24)

54.    At this time, McCready observed that the only blood plaintiff had on him

was a blood spot on his right calf and a blood spot on his right instep.  McCready then

asked if plaintiff had blood on him from helping his father to which plaintiff stated "my

hands were covered with blood" and "I washed them in a puddle."  McCready then re-

entered the house and observed there were *unsmeared* blood spatters on the office

telephone; *no* blood on the three telephones in or near the kitchen;  and *no* blood on the

garage door or the dead bolt lock which was locked.  McCready also observed that the

drapes in the master bedroom were *open*.  (Exhibit B, TT pp. 3444-3451, 3560-3565)

(Exhibit R, HH pp. 24-30)

55.    At approximately 8:00 a.m., Detective Sergeant Robert Doyle arrived at

the scene and spoke to the uniformed officers who had responded to the incident location

and received a rundown of "what they had."    Doyle then conducted a walkthrough of the

house, and noted that based on the position of Arlene's body, it appeared that there was a

struggle.  McCready introduced Doyle to plaintiff.  Doyle noted upon exiting the house,

that plaintiff did not appear "upset" or "emotional."  (Exhibit B, TT pp. 2608-2613, 2638,

2652-2654, 2683-2684) (Exhibit YY Deposition of Robert Doyle p. 127)

56.    Plaintiff then recounted, for Doyle, the steps he took when he left his

bedroom and repeated the scenario he had stated to McCready and McNamara, except he

did not mention he went to the garage while searching for his mother.  He did state,

however, that he looked into the master bedroom from the *hallway* and could see that

Arlene was dead because she was not moving and that her throat was cut.  He also told

Doyle that Jerry Steuerman had done this and explained who Jerry Steuerman was. (Exhibit B, TT pp. 2614-2620) (Exhibit R, HH pp. 973-990)

57.     On the day of the murders  plaintiff drew a diagram showing a rough layout of the house where he showed that his (plaintiff's) bedroom door is almost directly across from the master bedroom door.   (Exhibit C, McCready Supplemental Report, 9/14/88)  (Exhibit D, Oral Confession)  (Exhibit L, Trial Exhibit #168)

58.     Prior to waking on September 7, 1988 the plaintiff did not hear anything in the house.  He heard no cries for help or cries of pain or any cries of anguish.  (Exhibit ZZ Deposition of Martin Tankleff  p. 288-289)

59.     At 8:16 a.m., Detective Norman Rein arrived at the scene and approached Doyle.  McCready was at this time approaching Detective Charles Kosciuk, a detective assigned to the crime laboratory.  After Rein spoke to Doyle, Doyle asked the plaintiff to tell Rein what he had told Doyle.  (Exhibit B, TT pp. 2831-2833, 2957-2966)  (Exhibit XX Deposition of Norman Rein p. 72-74)

60.     Rein then spoke with plaintiff who stated that after leaving his bedroom, he went and looked in the master bedroom but did not see either of his parents because the room was dark.  Plaintiff then said he looked into the office and saw his father in a chair by the desk.  He described his father as bloody and "gagging" and that his father's throat was cut all around.  Plaintiff next stated he dialed 9-1-1 from his father's *office* phone. (Exhibit B, TT pp. 2835-2836) (Exhibit R, HH pp. 1068-1127) (Exhibit XX Deposition of Norman Rein p. 76, 77)

61.     Plaintiff next told Rein that he followed the operator's instruction and then went to look for his mother.  Plaintiff went to the garage and after seeing his mother's car there, he went back to the master bedroom, looked in, saw his mother and then went into the kitchen and phoned his sister Shari.  Plaintiff next stated he went back to the office

and then back into the kitchen to answer the ringing phone which was his sister calling

back.  Plaintiff did not mention he used the same phone in the kitchen on a third and

fourth occasion at this time.  (Exhibit B, TT pp. 2836-2837) (Exhibit R, HH pp. 1068-

1127) (Exhibit XX Deposition of Norman Rein p. 76, 77)

**II.      From Potential Witness to Suspect to the Confession.**

62.     After the aforementioned conversation, Rein walked away from plaintiff

and spoke to McCready and Doyle.   Based on the discrepancies in plaintiff's statements

to each of them,  (*no* smear of blood splatter on office phone; *no* blood on the door

handle and deadbolt to the garage, the latter of which was locked;  *no* blood on the

kitchen phone;  blood *on* the light switch plate and wall in plaintiff's bedroom; *no*

indication from plaintiff that he heard anything before waking up;  that plaintiff was the

*only* surviving family member who was present; the claim plaintiff could *see* his mother's

throat slashed from the bedroom door),  and plaintiff's "lack of emotion"  and "whole

demeanor," Doyle directed McCready to ask plaintiff to accompany him and Rein to

Police Headquarters.  (Exhibit B, TT pp. 2625-2627, 2889-2891, 2991-2994, 3456-3457,

3524-3525, 3612, 3627, 3786) (Exhibit R,  HH pp. 991-993, 1077-1080) (Exhibit XX

Deposition of Norman Rein p. 74-80)  (Exhibit YY Deposition of Robert Doyle p. 252-

255)

63.     At about 8:40 a.m., McCready asked plaintiff to accompany him to Police

Headquarters to talk to him further about what he had been telling the detectives and

about Jerry Steuerman.  Plaintiff responded "fine" and got into the right front passenger

seat unrestrained.  The two then left the scene.  (Exhibit B, TT pp. 3458, 3463, 3607-

3608, 4138, 4228) (Exhibit C, McCready Supplemental Report, 9/14/88, p. 6) (Exhibit R,

HH pp. 29-30)

64.     Doyle then went into the bathroom near plaintiff's bedroom and observed water droplets in the bathtub and a wet loofah sponge. (Exhibit B, TT pp. 2624, 2735) (Exhibit YY Deposition of Robert Doyle p. 235-236, 375-376)

65.     While in route to headquarters, McCready got a radio message to contact Detective Pfalzgraf who was at Mather Hospital where Seymour had been taken.  After phoning Pfalzgraf, McCready learned that Seymour had suffered "extensive head injuries" and was being transferred to Stony Brook Hospital.  (Exhibit B, TT pp. 3463-3465, 3609-3610) (Exhibit C, McCready Supplemental Report, 9/14/88, p. 6) (Exhibit D, Oral Confession p. 4) (Exhibit R, HH pp. 41-43)

66.     McCready and plaintiff then discussed Jerry Steuerman.  McCready had no idea who Steuerman was at this point in the investigation, but knew Doyle would order another team of detectives to interview him.  Doyle had, in fact, instructed Homicide Detectives Robert Anderson and Anthony Laghezza to interview all the card players who were present at a card game that concluded hours before the murders.  Doyle also instructed Anderson and Laghezza to interview Steuerman last.  (Exhibit B, TT pp. 2754-2755, 3466, 3620-3634)  (Exhibit C, McCready Supplemental Report, 9/14/88, p. 6) (Exhibit R, HH pp. 43-45)  (Exhibit YY Deposition of Robert Doyle p. 111-115)

67.     McCready arrived at police headquarters with plaintiff at approximately 9:20 a.m. .  Both then proceed to McCready's office when plaintiff was asked if he wanted a cup of coffee.   Plaintiff indicated he did and McCready gave plaintiff the coffee.  Plaintiff sat in the interview room as McCready waited for Rein to arrive at headquarters. (Exhibit B, TT pp. 3357-3360, 3467-3468, 3573-3576, 3641-3642) (Exhibit C, McCready Supplemental Report, 9/14/88, p. 6) (Exhibit R, HH pp. 45-47) (Exhibit ZZ Deposition of Martin Tankleff p. 165)

68.     At approximately 9:40 a.m., Rein and McCready entered the interview room and made "small talk" with plaintiff.  At approximately 9:45 a.m., plaintiff removed three tissues from one of his pockets and placed them on a desk. (Exhibit B, TT pp. 2841-2843, 3005-3006, 3036-3038, 3093, 3469-3470, 3512, 3520) (Exhibit D, Oral Confession p. 1) (Exhibit R, HH pp. 47-50, 1081-1082)

69.     Plaintiff told Rein and McCready about some of his father's business dealings, and that his father was a retired insurance broker and that his father had numerous other business and investment interests and that his father was partners in a business with Dan Hayes. (Exhibit ZZ Deposition of Martin Tankleff p. 200)

70.     Plaintiff told Rein and McCready that his father and Jerry Steuerman were partners in horses and that his mother and father each had twenty percent and Jerry Steuerman had 50 percent.  (Exhibit ZZ Deposition of Martin Tankleff p. 205)

71.     Plaintiff told Rein and McCready that his father and mother were partners in the bagel store and that Jerry and his father were  having an ongoing dispute about his father buying into one of Jerry Steuerman's bagel stores.  (Exhibit ZZ Deposition of Martin Tankleff p. 206)

72.     Plaintiff then told Rein and McCready about what he did on the evening of September 6, and that he took a shower that night before going to bed. (Exhibit ZZ Deposition of Martin Tankleff p. 174)

73.     Plaintiff then told Rein and McCready that his mother slept in the bed closest to the sliding glass doors, and that he gave his mother a kiss good night the night before.   (Exhibit ZZ Deposition of Martin Tankleff p. 181)

74.     Plaintiff next told Rein and McCready that he had surgery two weeks prior, having to now wear glasses because of surgery, and then discussed girls.  (Exhibit B, TT pp. 2839-2912, 3456-3672, 3705-3934)  (Exhibit C, McCready Supplemental

Report, 9/14/88)  (Exhibit D, Oral Confession) (Exhibit R, HH pp. 30-161, 1068-1127)

(Exhibit ZZ Deposition of Martin Tankleff p. 168)

75.     Plaintiff testified at his criminal trial that I September of 1988 he was

wearing regular glasses because he had just gotten a nose job.  (Exhibit B, TT pp. 4114).

76.     Plaintiff next told Rein and McCready that he loved to cook and would

sometimes cook for the poker players.  He mentioned his car was a '78 Lincoln Town

Car.  He also stated that after eating his dinner he placed his plate in the dishwasher and

his glass in the sink.  (Exhibit B, TT pp. 2839-2912, 3456-3672, 3705-3934) (Exhibit C,

McCready Supplemental Report, 9/14/88) (Exhibit D, Oral Confession) (Exhibit R, HH

pp. 30-161, 1068-1127) (Exhibit ZZ Deposition of Martin Tankleff p. 173)

77.     Plaintiff  told Rein and McCready that he was adopted, he loved his niece

and nephew, talked about how his father and mother met and described his relationship

with various family members.  (Exhibit B, TT pp. 2839-2912, 3456-3672, 3705-3934)

(Exhibit C, McCready Supplemental Report, 9/14/88) (Exhibit D, Oral Confession)

(Exhibit R, HH pp. 30-161, 1068-1127) (Exhibit ZZ Deposition of Martin Tankleff p.

175)

78.     Plaintiff could not recall if he told Rein and McCready that his parents

always locked the bedroom sliders and screens.  (Exhibit ZZ Deposition of Martin

Tankleff p. 178)

79.     Plaintiff told Rein and McCready about his relationship with his mom;

that he had a loving relationship with his mother, enjoyed taking walks with her and

discussing cooking.   (Exhibit ZZ Deposition of Martin Tankleff p. 180)

80.      Plaintiff  told Rein and McCready about his relationship with his father,

plaintiff's aversion to blood;  and that he could talk to his father about anything.  (Exhibit

B, TT pp. 2839-2912, 3456-3672, 3705-3934) (Exhibit C, McCready Supplemental

Report, 9/14/88) (Exhibit D, Oral Confession) (Exhibit R, HH pp. 30-161, 1068-1127)

(Exhibit ZZ Deposition of Martin Tankleff p. 191)

  81. Plaintiff told Rein and McCready about the family maid; and told them the

names of the people playing in the poker game on the night of September 6, 1988.

(Exhibit ZZ Deposition of Martin Tankleff p. 193, 196)

  82. Plaintiff  told Rein and McCready that his father and Steuerman pretended

to be good buddies but they did not like each other anymore.  (Exhibit ZZ Deposition of

Martin Tankleff p. 197)

  83. Plaintiff told Rein and McCready that he knew a lot about his father's

business dealings and that his father was grooming him for the business world.  (Exhibit

B, TT pp. 2839-2912, 3456-3672, 3705-3934) (Exhibit C, McCready Supplemental

Report, 9/14/88) (Exhibit D, Oral Confession) (Exhibit R, HH pp. 30-161, 1068-1127)

(Exhibit ZZ Deposition of Martin Tankleff p. 198).

  84. Plaintiff  told Rein and McCready that he wasn't going to receive anything

under his parents will until he was 25 and that he was going to get more than his sister.

(Exhibit ZZ Deposition of Martin Tankleff p. 199)

  85. Rein and McCready then asked plaintiff to demonstrate how he had

administered first aid to Seymour.  Plaintiff demonstrated on Rein.  (Exhibit ZZ

Deposition of Martin Tankleff p. 208)

  86. Up until this demonstration, plaintiff answered the questions that were

posed to him in the interrogation room. (Exhibit ZZ Deposition of Martin Tankleff p.

190)

87.    Up until this demonstration, the plaintiff was not threatened with any physical harm if he refused to answer the questions.  (Exhibit ZZ Deposition of Martin Tankleff p. 188-191).

88..    At around this time, plaintiff made three sketches for Rein and McCready showing how the cars belonging to the card players were parked in the driveway; the general layout of the house showing the office/gym, bedrooms, closets and bathrooms; where Arlene was in the bedroom when he looked in; and where he was standing when he looked in, which was signified by a line drawn in the bedroom foyer.  (Exhibit I, Trial Exhibit #169) (Exhibit L, Trial Exhibit #168) (Exhibit M, Trial Exhibit #167)

89.    Plaintiff admits to making the drawings, but does not recall when he made the drawings.  (Exhibit ZZ Deposition of Martin Tankleff p. 211-215).

90.    Plaintiff made some of the drawings when the interrogation was over and some during (Exhibit ZZ Deposition of Martin Tankleff p. 214)

91.    While the plaintiff was demonstrating how he administered first aid to his father, the movement of plaintiff's sweatshirt allowed McCready to see plaintiff's right shoulder.  McCready observed blood on the shoulder.  At this time, McCready asked plaintiff when he had  last showered and plaintiff replied "last night."   (Exhibit B, TT pp. 2867-2870, 3168-3170, 3177-3179, 3199, 3473-3475) (Exhibit C, McCready Supplemental Report, 9/14/88) (Exhibit D, Oral Confession) (Exhibit R, HH pp. 30-161, 1068-1127) .  (Exhibit ZZ Deposition of Martin Tankleff p. 211, 226).

92.    The plaintiff demonstrated how he administered first aid to his father with Detective Rein portraying his father by sitting in a chair.  (Exhibit ZZ Deposition of Martin Tankleff p. 209).

93.     When the plaintiff demonstrated how he administered first aid to his father he made physical contact with Detective Rein.  (Exhibit ZZ Deposition of Martin Tankleff p. 210).

94.     Plaintiff told rein and McCready that he never touched his mother that morning.  (Exhibit ZZ Deposition of Martin Tankleff p. 230).

95.     Plaintiff was not wearing a sweatshirt when he got up that morning. (Exhibit ZZ Deposition of Martin Tankleff p. 231)

96.     The photograph of the plaintiff taken at police headquarters on September 7, 1988 does not show any blood on the plaintiff's shorts and plaintiff acknowledged this during his testimony at the criminal trial.  (Exhibit B, TT  pp. 4221-4222)

97.      Rein, who had been an Emergency Medical Technician for 31 years, noted plaintiff was calm and not at all indicating any symptoms of shock at the violent death of his mother and attack on his father.  (Exhibit B, TT pp. 2839-2912, 3456-3672, 3705-3934) (Exhibit R, HH pp. 30-161, 1068-1127) (Exhibit XX Deposition of Norman Rein p. 104).

98.     At about 11:15 a.m. some 95 minutes into the questioning, and after having observed blood on plaintiff's shoulder, Rein and McCready became accusatory. (Exhibit XX Deposition of Norman Rein p. 125) (Exhibit B, TT pp. 2870-2872, 2941, 3184-3187, 3215, 3476-3478, 3517)(Exhibit TT, Complaint paragraphs 61-62).

99.     Between 9:40 am and 11:15 am the questioning of the plaintiff was not accusatory and plaintiff answered many questions with long narratives.   (Exhibit XX Deposition of Norman Rein p. 124-129)

100.     Between approximately 11:15 am and 11:54 am the detectives confronted the plaintiff with inconsistencies between what he was telling them and what they had learned a t the crime scene. (Exhibit XX Deposition of Norman Rein p. 129-130)

101.    Between approximately 11:15 am and 11:54 McCready raised his voice and Rein probably raised his voice. (Exhibit XX Deposition of Norman Rein p. 129-130)

102.    At approximately 11:54 detective McCready entered the room and employing a ruse, he told plaintiff that Seymour had regained consciousness and said that plaintiff had "beat and stabbed" him.  Plaintiff stated that if his father said that, he did so because he (plaintiff) was helped him that morning.  Plaintiff said he would take a lie detector test.  (Exhibit ZZ Deposition of Martin Tankleff p. 247-248).

103.    Plaintiff told the detectives that whoever did this "needs psychiatric help." Plaintiff then asked "could I have blacked out and done it?"  "Maybe it wasn't him but another Marty Tankleff that killed them."  (Exhibit B, TT pp. 2882-2886, 3243-3247, 4156)  (Exhibit C, McCready Supplemental Report, 9/14/88)  (Exhibit D, Oral Confession)  (Exhibit R, HH pp. 30-161, 1068-1127)

104.    Plaintiff does not recall if he made the statements in paragraph 102 above to the detectives or not.   (Exhibit AAA Deposition of Martin Tankleff p. 97).

105.    Plaintiff is not sure if he told the detectives "Could I be possessed?" (Exhibit AAA Deposition of Martin Tankleff p. 97).

106.    The rhetorical statement "could I have blacked out"  was made by the plaintiff to the detectives and was not suggest to him by the detectives.   (Exhibit B, TT p. 4156).

107.    Plaintiff claims the detectives had him believing that he committed the murders.  (Exhibit ZZ Deposition of Martin Tankleff  p. 259) (Exhibit B, TT p. 4156, 4161).

108.    Detective McCready asked the plaintiff "did you kill your mother and did you hurt your father?" and the plaintiff responded "Yeah I did it."   (Exhibit AAA

Deposition of Martin Tankleff p. 105) (Exhibit ZZ  Deposition of Martin Tankleff p. 258-259).

109.    After telling the detectives that he killed his mother and hurt his father plaintiff told the detectives that he wanted to go to Florida and he was planning on going to the Wharton School of Business.  (Exhibit ZZ  Deposition of Martin Tankleff p. 258-259).

110.    After telling the detectives that he killed his mother and hurt his father plaintiff told the detectives that he resented that Dan Hayes, his father's business partner in the health and fitness center, was going to move into the house to babysit him when his parents went on vacation.   (Exhibit ZZ  Deposition of Martin Tankleff p. 263-264).

111.    Plaintiff indicated to the detectives that he saw his father in his office sleeping in his chair, he was surprised that he wasn't in bed with his mother and that the lights were on.   Plaintiff said this to the detectives after it was suggested to him by the detectives.  (Exhibit ZZ  Deposition of Martin Tankleff p. 266- 267).

112.     Plaintiff acquiesced and agreed with a suggestion from the detectives that he hit his mother with a dumbbell and then cut her throat.   That she was on her back and he didn't know how many times he had stabbed her, that he had gotten to her quickly and hit her at least four to five times on the head.   (Exhibit ZZ  Deposition of Martin Tankleff p. 267).

113.    Plaintiff agreed to whatever the detectives suggested and agreed to the specific suggestions that the detectives made concerning the wounds that were inflicted on his mother.  (Exhibit AAA  Deposition of Martin Tankleff p. 118).

114.    At the point in time when he acquiesced to the statements about the wounds to his mother the plaintiff did not deny the statement and did not say, no I never did that.  (Exhibit AAA  Deposition of Martin Tankleff p. 118).

115.    At his deposition on July 9, 2013 in the matter of Tankleff v. New York State, plaintiff was asked the following questions and gave the following answers:

Q.   It says Detective McCready, they suggested to you that he hit your mother with a dumbbell and then cut her throat.  They suggested that to you, you acquiesced; is that correct?

A.   Yes.

Q.   You did not deny doing that?

A.   Correct.

Q.    And then she was in bed on her back, and you didn't know how many times you stabbed her.  You acquiesced to that, is that correct?

A.   Yes.

Q.   You did not deny it?

Mr. Barket:  I am sorry.  I am trying to keep up.   She was in her bed on her

Back.

Mr. Schwerdt:  Is there an objection or something?

Mr. Barket:   No, no.

Q.    The other thing was, you got to her quickly, and hit her at least four or five times in the head.  You acquiesced to that: is that correct?

A.    That is correct.

Q.    And you did not deny that?

A.    Correct

(Exhibit AAA  Deposition of Martin Tankleff p. 120-121).

116.    Immediately following these questions at the deposition on July 9, 2013, plaintiff's counsel Mr. Barket said "I am hungry, if that matters" and the lunch recess was taken.    (Exhibit AAA  Deposition of Martin Tankleff p. 121).

117.   Upon returning from the lunch break, the plaintiff changed his answers to the earlier questions and claimed he agreed to the suggestions but only after initially denying them.  (Exhibit AAA  Deposition of Martin Tankleff p. 121-130).

118.   After the initial denials, plaintiff agreed to the statements suggested to him by law enforcement.  (Exhibit AAA  Deposition of Martin Tankleff p. 130).

119.   Plaintiff acquiesced and agreed with a suggestion from the detectives that after his mother fell on the floor he ran out and got a knife from the kitchen and cut her throat, the knife was on the counter next to the watermelon, "she was moving a little bit when he ran out of the bedroom to kill his father, and that his father was still alive in the office.  (Exhibit ZZ  Deposition of Martin Tankleff p. 268).

120.   Plaintiff acquiesced and agreed with a suggestion from the detectives that his father was sitting at his desk and that his father was now awake and asked what are you doing and the plaintiff was still naked.  Exhibit ZZ  Deposition of Martin Tankleff p. 268).

121.    Plaintiff acquiesced and agreed with a suggestion from the detectives that he walked in with a knife and dumbbell behind your back, that he had gotten behind his father and hit him with the barbell first and that his father asked why was he doing this and that he knock him silly.  (Exhibit ZZ  Deposition of Martin Tankleff p. 268 - 269).

122.   Plaintiff acquiesced and agreed with a suggestion from the detectives that his father's feet were under the desk so he couldn't get up, and that he slashed his father's neck, and that he didn't know how many times he hit or cut him, and that he couldn't believe all the blood.    (Exhibit ZZ  Deposition of Martin Tankleff p. 269).

123.   Plaintiff acquiesced and agreed with a suggestion from the detectives that he washed off the knife and barbell in the shower, put the barbell back in his bedroom,

lay on his bed, thought about what to do next, and got up at about 6:10 a.m.  (Exhibit ZZ Deposition of Martin Tankleff p. 269).

124.    During the interview with the detectives, the plaintiff claimed that he had nothing to do with the attack on his parents.  (Exhibit ZZ  Deposition of Martin Tankleff p. 398).

125.    Plaintiff's protestations of innocence occurred prior to him adopting the position of the detectives that he murdered his parents.  (Exhibit ZZ  Deposition of Martin Tankleff p. 401).

126.    Plaintiff claims he was never read Miranda warnings, but acknowledged that he signed the card and that the  signature on the rights card was his. (Exhibit ZZ Deposition of Martin Tankleff p. 251).

127.    When the plaintiff told the detectives "yeah I did it" he did not consider what would happen to him.   (Exhibit B, TT p. 4156, 4163-4164).

128.    After having agreed with the statements that he killed his mother and hurt his father, the plaintiff  voluntarily signed a consent form to take forensic evidence from plaintiff, specifically fingernail scrapings and exterior dried blood.   (Exhibit ZZ Deposition of Martin Tankleff p. 278-279) (Exhibit O, Exemplar Consent Form)

129.    After the consent form was executed by plaintiff, Detectives Rein and McCready had members of the identification section take photographs of the plaintiff. (Exhibit B, TT pp. 3503-3504) (Exhibit F, Trial Exhibit 11, Photograph) (Exhibit P, Trial Exhibit 150, Photograph) (Exhibit R, HH pp. 30-161, 1068-1127)

130.    At 1:22 p.m,  family attorney Fox called police headquarters and directed the detectives to stop their questioning of plaintiff.   (Exhibit B, TT pp. 2839-2912, 3456-3672, 3705-3934)  (Exhibit C, McCready Supplemental Report, 9/14/88)  (Exhibit D,

Oral Confession)  (Exhibit R,  HH pp. 30-161, 1068-1127) (Exhibit Q, Unsigned Written Confession).

131.    Plaintiff claims he was choked by Detective McCready later in the day after he had made the confession.   (Exhibit ZZ  Deposition of Martin Tankleff p. 251). (Exhibit AAA Deposition of Martin Tankleff p. 106-107).

132.    Prior to the confession Detective McCready poked his fingers into the plaintiff's chest, and Detective Rein had his hand on the plaintiff's back and knee.  Other than this, there is no evidence in the available record that the plaintiff was physically or verbally threatened in any way during his questioning.  (Exhibit AAA Deposition of Martin Tankleff p. 195-109) (Exhibit B, TT p. 4693).

133.    Plaintiff's false confession expert, Mr. James Trainum is not aware of any threats of harm made to the plaintiff by the detectives prior to the plaintiff confessing to the crime.  (Exhibit MMM Deposition of James Trainum p. 141).

134.    Plaintiff's false confession expert, Mr. James Trainum is not aware of any evidence that the detectives impliedly or actually threatened the plaintiff with any inevitable consequences to get him to admit to the crimes.  (Exhibit MMM Deposition of James Trainum p. 142-143).

**C. Phone Call to Sister Shari Rother.**

135.    Plaintiff then remained in the homicide squad room for the rest of the afternoon and was processed on his arrest.  During this time, plaintiff asked to speak to his sister Shari Rother.  (Exhibit KK 50h Examination p.62)

136.    Plaintiff spoke to his sister on the telephone and told her he was sorry several times.  Plaintiff's sister asked if he had told the police if he was involved, and the plaintiff said yes they made me.   (Exhibit KK 50h Examination p.63

**D.     Evidence at Crime Scene, Seymour's Surgery, and Arlene's Autopsy.**

137.    Detective Sergeant Doyle assigned Detective James Barnes to be the case-scene coordinator at the crime scene.  Detective Barnes examined all the house windows and doors and found no sign of an intrusion.  (Exhibit B, TT 1367-1390, 2633)

138.    At approximately 9:35 a.m., on September 7, 1988 in plaintiff's bathroom, Detective Chuck Kosciuk observed water near the bathtub drain, atop one side of the tub, and a wet loofah sponge with a ring of water around it.  Kosciuk then proceeded to plaintiff's bedroom and observed blood on the doorknob, blood on the light switch plate and wall near that switch plate at the room's entrance. On plaintiff's bed, Kosciuk observed towels, one of which was "slightly damp," and a pair of small barbells leaning against a wall.  Maria Vieira, the Tankleff family housekeeper recalled, as a defense witness, that on September 6, 1988, the barbells were lying down.  (Exhibit B, TT pp. 1579-1581, 1695, 1702-1704, 1732-1733, 1762, 1775-1777, 1868-1869, 4394)

139.    In the kitchen Kosciuk found a knife next to watermelon rinds in a position different from that described by Bove, who had recounted where he put it after using it at the card game hours earlier.  (Exhibit B, TT pp. 734-740, 1706-1707, 1840) (Exhibit U, Trial Evidence ¶ #'s 96-97)

140.    Vernard Adams, Deputy Suffolk County Medical Examiner, arrived at the scene at around 4:00 p.m.   He examined Arlene's injuries and the blood pooling in the master bedroom.  He concluded that Arlene had suffered head injuries, had moved and then had suffered incised injuries.  (Exhibit B, TT pp. 3940-3944, 3967, 4003-4004) (Exhibit BBB Deposition of Vernard Adams p. 35).

141.    At Stony Brook Hospital, surgeon Doctor George Tyson operated on Seymour.   Dr. Tyson noted that Seymour had sustained several "depressed [skull] fractures," "fracture[s] in which pieces of bone are…driven inward."  He also noted "the

size and shape of the … fractures appeared to [have been] produced by a small, pointed

blunt object of which a hammer would be a good example."  He also noted that

Seymour's neck wound was consistent with having been caused by a knife and that it

could have been caused if Seymour had been struggling.  Tyson also opined that whoever

had inflicted the head and neck wounds was very angry and that the person who had the

strength to lift Seymour from the chair would have had the strength to inflict the wounds.

(Exhibit B, TT pp. 4346-4349, 4359-4365)

142.    On September 8, 1988, Adams performed an autopsy on Arlene.  Adams

determined that Arlene had suffered defensive wounds to her hands and forearms and that

a sharp blade or blades had caused her incised wounds.  Adams also concluded that a

blunt instrument had caused her skull wounds, which included five depressed fractures.

When comparing the fractures with a dumbbell from plaintiff's bedroom, he concluded

"the skull fractures [were] consistent with having been caused by the bar."  (Exhibit B,

TT pp. 3945, 3954-3957, 3963-3968, 3974-3978, 3989, 4005-4009)

143.    Dr. Adams did not determine the actual number of fractures to Arlene

Tankleff's skull until the next day, September 8, 1988 at the autopsy.   (Exhibit BBB

Deposition of Vernard Adams p. 225)

144.    At no time on or after September 8, 1988, up until and throughout the trial

of the plaintiff did Dr. Adams ever communicate to any Suffolk County detective or

prosecutor in any fashion that he believed that there was no reasonable possibility that the

knife recovered from the counter next to the watermelon could have been the murder

weapon.   (Exhibit CCC Affidavit Mike Carmody, Exhibit DDD Affidavit Robert Doyle,

Exhibit EEE Affidavit Charles Kosciuk, Exhibit FFF Affidavit K. James McCready,

Exhibit GGG Declaration Norman Rein, Exhibit HHH Deposition John Collins pp. 84-91, Exhibit III Deposition Edward Jablonski[5])

145.     At or shortly after the arraignment of the plaintiff on the indictment in his criminal matter, plaintiff's attorney Robert Gottlieb received a copy of the statements that were attributed to the plaintiff.  (Exhibit JJJ Deposition of Robert Gottlieb pp. 24-26)

146.     After receiving the copy of the statements attributed to the plaintiff. Mr. Gottlieb was aware that the knife recovered next to the watermelon was used in the crimes.  (Exhibit JJJ Deposition of Robert Gottlieb pp. 25-26)

147.     Between the arraignment of the plaintiff and the suppression hearings conducted in the criminal case, Mr. Gottlieb received discovery from the prosecution that included crime scene photographs, lab reports, serology reports, the autopsy reports of both Arlene and Seymour Tankleff and the autopsy photographs.   (Exhibit JJJ Deposition of Robert Gottlieb pp. 27-31)

148.     Amongst the photographs received by Mr. Gottlieb were photographs of the knife that was recovered by the watermelon. (Exhibit JJJ Deposition of Robert Gottlieb p. 33)

149.     During discovery in the criminal proceeding, Mr. Gottlieb requested to view the physical evidence relating to the crime, including the knife recovered by the watermelon.    (Exhibit JJJ Deposition of Robert Gottlieb pp. 34-35)

150.     Mr. Gottlieb does not recall if he requested an opportunity to perform any tests on the evidence. (Exhibit JJJ Deposition of Robert Gottlieb pp. 35)

151.     Mr. Gottlieb does not recall if he hired an expert forensic pathologist to review the autopsy findings, or to review the serology testing, or to review the manner in

---

[5] The transcript provided of Mr. Jablonski's deposition does not include page numbers.  The numbers on the Adobe Acrobat reader are pages 104 through 109.

which the crime scene was processed.  (Exhibit JJJ Deposition of Robert Gottlieb pp. 38-41).

152.    Had Mr. Gottlieb hired an expert to make a comparison of the weapons that were claimed to have been used in the crime with the wounds of the victims, and that person gave him an opinion that those weapons could not have been used in the crime, or that there was no reasonable possibility that those weapons could have been used in the crime he would have called that expert at trial an introduced that evidence.  (Exhibit JJJ Deposition of Robert Gottlieb pp. 41-42).

153.    During the trial, Mr. Gottlieb called a doctor  to talk about the blunt force injuries that were allegedly caused by a barbell and testify that they were more consistent with a hammer.   (Exhibit JJJ Deposition of Robert Gottlieb pp. 42).

154.    At the trial Mr. Gottlieb did not call any witness, expert or otherwise, to offer evidence in relation to the knife by the watermelon and whether that knife could have been used in the crime.  (Exhibit JJJ Deposition of Robert Gottlieb pp. 44).

155.    Prior to the trial in the plaintiff's criminal matter, Mr. Gottlieb did not speak to Dr. Vernard Adams and does not recall being denied an opportunity to do so. (Exhibit JJJ Deposition of Robert Gottlieb pp. 45).

156.    Mr. Gottlieb was never told by the prosecutor that he could not speak to Dr. Adams without the prosecutor present.   (Exhibit JJJ Deposition of Robert Gottlieb pp. 48).

157.    Mr. Gottlieb was never told by Dr. Adams that he would not speak to him without the prosecutor present. (Exhibit JJJ Deposition of Robert Gottlieb pp. 48).

158.    At the trial during cross examination of Dr. Adams,  Mr. Gottlieb asked the doctor about the incised wounds to the victims, the direction of the wounds and

whether they could be caused by a left or right handed person.  (Exhibit JJJ Deposition of Robert Gottlieb pp. 56-58).

159.    At the trial during cross examination of Dr. Adams,  Mr. Gottlieb asked the doctor if he could determine with a reasonable degree of scientific certainty regarding blood pooling around the victims feet, which wounds were inflicted first, if the wounds were defensive wounds, and questions regarding if the wounds could be caused by more than one sharp blade.   (Exhibit JJJ Deposition of Robert Gottlieb pp. 58-61).

160.    At no time during his cross examination of Dr. Adams did Mr. Gottlieb ask his opinion on whether the knife by the watermelon could be excluded as the murder weapon.   (Exhibit JJJ Deposition of Robert Gottlieb pp. 62).

161.    At no time during his cross examination of Dr. Adams did Mr. Gottlieb ask the doctor whether there was any reasonable possibility that the knife could be used. (Exhibit JJJ Deposition of Robert Gottlieb pp. 62).

162.    Mr. Gottlieb had the opportunity to ask the doctor these questions if he wanted to.  (Exhibit JJJ Deposition of Robert Gottlieb pp. 62).

163.    In 1988 it was the policy of Dr. Adams, as well as that of the Chief Medical Examiner of Suffolk County at the time, Dr. Hirsch, that if a defense attorney asked to speak with the medical examiner and look at the entire file, it would have been allowed.  (Exhibit BBB Deposition of Vernard Adams p. 197)

164.    There is no evidence in the available record and plaintiff can produce no facts that Dr. Adams ever told any Suffolk County detective or prosecutor that he believed that there was no reasonable possibility that the knife recovered next to the watermelon in kitchen could be the murder weapon.

165.    Plaintiff's counsel Barry Scheck spoke to Dr. Adams on the telephone at a point prior to the date of Dr. Adams deposition which was August 5. 2014.  (Exhibit BBB Deposition of Vernard Adams p. 211)

**E.    Jerry Steuerman**

166.    At approximately 9:30 a.m. on September 7, 1988, Gerry Steuerman called Bove.  Bove stated to Steuerman, "I don't know what's happened, but you're being accused of murdering Seymour and Arlene."   Steuerman responded, "Vinny, what the hell are you talking about?"  Bove then handed the phone to a detective, who made an appointment to interview Steuerman later that day.  (Exhibit B, TT pp. 83, 747-748, 904-905, 1084-1085, 3988)

167.    Detective Sergeant Doyle had assigned Homicide Detectives Robert Anderson and Anthony Laghezza to interview each of the regular card players that met with Seymour on a regular basis and specifically, those that were in attendance at the card game that ended hours before the attacks on Arlene and Seymour.  (Exhibit B, TT pp. 2606-2607, 2635)

168.    Vincent Bove told Detectives Anderson and Laghezza that he noticed nothing unusual at the card game and that there were no problems at the game between any of the players including Steuerman and Seymour.  Bove also stated he was unaware of *any* problems between Steuerman and Seymour and that he had no personal knowledge of their business relationship.  (Exhibit B, TT pp. 721-733) (Exhibit V, Anderson Supp. Report, 9/8/88)

169.  Robert Montefusco told Detectives Anderson and Laghezza that he did not observe any problems at the final card game nor was there any problems between any of the players and noted that Seymour was in good spirits.  (Exhibit B, TT pp. 622-625) (Exhibit V, Anderson Supp. Report, 9/8/88)

170.    Albert Raskin told Detectives Anderson and Laghezza that he noticed no problems during the card game and that everything seemed fine throughout the night. (Exhibit V, Anderson Supp. Report, 9/8/88)

171.    Peter Capobianco told Detectives Anderson and Laghezza that there was no tension between any of the card players that night nor did he recall anything out of the ordinary during the game. (Exhibit V, Anderson Supp. Report, 9/8/88)

172.     Joseph Cerce also indicated that nothing unusual occurred during the card game and that there was no hostility between Steuerman and Seymour.  (Exhibit B, TT pp. 670-68) (Exhibit X, Rein 9/11/88 Supp. Report)

173.    Detectives Anderson and Laghezza  interviewed Steuerman last.  At this time Steuerman knew that plaintiff had accused him of committing the attacks on Arlene and Seymour.   Steuerman detailed his business relationship with Seymour and discussed his two year involvement in a "friendly" game of cards with Seymour and other friends and his inability to ever recall there being any problems at the game.  He also stated that he saw plaintiff at the last game and that he (plaintiff) moved a car.  He also recalled that he left the game and got to his daughter's home around 3:15 a.m., and that he had forgotten his house keys.  He stated that his son told him of the attacks on Seymour and Arlene at around 9:00 a.m., after he had arrived at his bagel store at 6:30 a.m. Steuerman discussed the financial outcome of the card game, talked about plaintiff and talked about Arlene.  At the conclusion of this interview, Detectives Anderson and Laghezza concluded that Steuerman should *not* be considered a suspect.  (Exhibit B, TT pp. 897-905) (Exhibit V, Anderson Supp. Report, 9/8/88)

174.    Detective Rein and McCready interviewed Steuerman on September 10, 1988 where Steuerman recounted details about the weekly poker game and the game on September 6, 1988 and detailed when he went home and where he went.   Steuerman also

discussed the relationships within the Tankleff family.  (Exhibit W, Rein Supplemental Report, 9/10/88)

175.    On the day of the murders, Steuerman was living in Old Field with his daughter, Bari Steuerman, and her son.  At around 3:16 a.m., Bari heard knocking on the door and answered that knock expecting it was her father since he often forgot his keys. It was her father at the door.  After letting her father in, she went back to bed and Steuerman went to his room.  She was awakened by Steuerman at around 6:00 a.m. and he soon after left for work.  She also indicated that the ride from Belle Terre to Old Field takes approximately 15 minutes.  (Exhibit B, TT pp. 821-827)

176.    The terms of the various business dealings between Seymour and Steuerman indicated that Steuerman's financial obligations to Seymour survived Seymour's death.  (Exhibit B, TT pp. 1220-1224) (Exhibit V, Anderson Supp. Report, 9/8/88)

177.    On September 14, 1988, Steuerman withdrew $15,000.00 from an account he shared with Seymour, feigned his own death and went to Los Angeles. (Exhibit B, TT pp. 905-906, 1137-1143, 1189-1193)

178.    Steuerman explained that he did this because:

> "My wife… passed away a year before. I was married for
> twenty-nine years… and one of my children was in bad
> legal trouble… and my business was not what it used to be
> and then the murder of Arlene and Seymour, after that and the
> accusations by the j….   it got to me.  I thought everybody would
> be better off just without me. (Exhibit B, TT pp. 907-978,
> 1136-1137, 1151-1156, 1191)

179.    Steuerman took the stand for three days during plaintiff's criminal trial and was exhaustively asked about the details of his business relationship with Seymour

and about he (Steuerman) being the actual perpetrator of the murders of Arlene and Seymour.  This was  plaintiff's defense at the trial. (Exhibit B, TT pp. 909-1219)

180.     McCready was cross-examined extensively about the direction of the murder investigation and about his purported "failure" to investigate Steuerman as a suspect. (Exhibit B, TT pp. 3517-3672, 3705-3934)

**F.     The Indictments.**

181.     In September of 1988, plaintiff was indicted by a Suffolk County Grand Jury for the murder of Arlene and the assault on Seymour.

182.     On October 6, 1988, Seymour died from his wounds and plaintiff was thereafter indicted by a Suffolk County Grand Jury on a superseding proceeding, for the murder of Seymour.

183.     Detectives McCready, Rein and Doyle were not complaining witnesses.

184.     Detective Rein did not testify in the grand jury.

185.     Detective Doyle did not testify in the grand jury.

186.     Detective Rein did not initiate the prosecution against the plaintiff.

187.     Detective Doyle did not initiate the prosecution against the plaintiff.

**I.     Forensic Evidence.**

188.     Forensic Serologist Robert Baumann analyzed blood recovered from the crime scene.  Baumann noted that except for a bloodstain on the exterior doorknob to plaintiff's room, there was no blood on the entranceway to any of the rooms.  (Exhibit B, TT pp. 2131, 2152, 2159-2162, 2388-2389, 2424)

189.     Baumann also analyzed evidence from the master bedroom where Arlene was found.  A blood stain on a wall in the bedroom contained a bloodstain consistent only with Seymour's blood.  Baumann also noted that the bed sheets, pillowcases, pillow shams, and Arlene's fingernails contained bloodstains consistent with Arlene's blood and

plaintiff's blood.   All of the blood in the office was consistent only with Seymour's

blood.  Baumann also noted that Seymour's pants contained a wallet with a $100 bill.

(Exhibit B, TT pp. 2176-2204, 2212-2217, 2268-2269, 2297)

190.    An analysis of the towel found at the foot of plaintiff's bed was found to

contain blood consistent only with Seymour's blood.  Analysis of the blood stains on the

switch plate and some of the stains analyzed in the master bedroom were found to be in a

"chain link" or "honeycomb" pattern consistent with a grip area that could be found on

latex or rubber gloves used in house cleaning.  No such gloves were found at the scene.

(Exhibit B, TT pp. 1976, 2104, 2258-2261, 2272-2275, 2343-2346, 2354, 2377-2379,

2396, 2412, 2455-2471, 2478, 2845-2846)

191.    Analysis was conducted on the bedding found in Arlene's room and a

stain evinced a ridge pattern that was "honeycomb-like," consistent with a rubber glove.

Analysis also reveals that a blood stain on the light switch in plaintiff's room also

contained a "honeycombed like" pattern consistent with a rubber glove and consistent

with the patterns identified in the evidence analyzed from Arlene's bedroom. (Exhibit B,

TT pp. 2272-2276, 2459-2466, 2485-2486)

192.    Baumann also conducted an analysis of the clothes plaintiff was wearing

on September 8, 1988.  There were no bloodstains on plaintiff's shorts or under shorts.

There was, however, one slight stain on the *inside* right shoulder of plaintiff's sweatshirt.

The stain tested positive for the presumptive presence of blood but was so small

Baumann was unable to conduct any further analysis.  The blood found on plaintiff's

shoulder was consistent only with Seymour's blood.  (Exhibit B, TT pp. 2262-2268,

2294)

193.    There was no blood on the barbells, or the kitchen knives or in the traps

below the sinks and bathtub loofah.  The loofah sponge did, however, have a five inch slit

which was determined to have been caused by a sharp object.  One of the three tissues

plaintiff had taken out of his pocket when he began talking to Rein and McCready at

Police Headquarters contained blood consistent with *only* Arlene's blood.  (Exhibit B, TT

pp. 2218-2237, 2249-2253, 2276-2281, 2305-2307, 2314-2326, 2341, 2398, 2405, 2422-

2423, 2433)

      194.    Kosciuk invoiced a loofah sponge that was found in plaintiff's bathroom

as item 39 under Lab No. 988-57483 and introduced in evidence during the trial as

People's Exhibits 88 and 89.  Analysis of that sponge revealed that it contained a 5 inch

slit that was identified as a cut.  (Exhibit B, TT pp. 2224-2226, 2397-2398) (Exhibit II,

Trial Exhibits 88-89)

**J.**    **Seymour's Autopsy.**

      195.    Seymour died on October 6, 1988.  Adams performed an autopsy on

Seymour and although the partial healing of Seymour's wounds impaired Adams ability

to determine the weapon or weapons that had caused Seymour's death, he was able to

conclude that Seymour had suffered blows to the head from a blunt instrument or

instruments and that the cause of death was a combination of impact head trauma and

incised wounds of the neck. (Exhibit B, TT pp. 3980, 3989, 3995-4001)

**K.**    **Plaintiff's Post Confession Statements.**

      196.    At the criminal trial, plaintiff stated that once he observed Seymour

bleeding in the office, he used the *office* phone to call 9-1-1.  (Exhibit B, TT pp. 4115-

4116, 4200-4203)

      197.    At the criminal trial, plaintiff stated that after placing the 9-1-1 call, he

retrieved a pillow from his room and a towel from a closet down a hallway and returned

to his father.  After plaintiff couldn't get the chair Seymour was in into a reclined

position, he pulled Seymour from the chair and placed him on the floor and, while doing

so, got blood on his hands, shoulders and his lower left leg.  (Exhibit B, TT pp. 4117-4119, 4200-4203)

198.    At the criminal trial plaintiff stated that, in his shorts and underwear only, he placed his hands under Seymour to assist him in getting Seymour to the floor and, as a result, got blood on his arms, hands, upper body area, and his feet or leg area but not his shorts. (Exhibit B, TT pp. 4206-4211)

199.    At the criminal trial, plaintiff acknowledged that the photograph taken by him at Police Headquarters did not show any blood stains on the exterior of the shorts and sweatshirt. (Exhibit B, TT  pp. 4221-4222)

200.    At the criminal trial, plaintiff testified that when he first got up, he checked his parents' bedroom and didn't see anyone.  From there he went and discovered Seymour in his office.  After calling 9-1-1 on the *office* phone and moving Seymour to the floor, plaintiff stated he then went to the garage to look for his mother's car.  He turned the garage door handle and opened the door and closed it after he observed Arlene's car in the garage.  (Exhibit B, TT pp. 4119, 4200, 4211-4213)

201.    Plaintiff testified at the criminal trial that when he first woke up, at around 6:05 a.m., he put underwear and shorts on, but not his glasses or contact lenses. (Exhibit G) (Exhibit B, TT pp. 4113, 4189)

202.    At the criminal trial, plaintiff stated that before discovering Seymour in a front office, he had looked into his parents' bedroom but "no one was there." (Exhibit B, TT p. 4115)

203.    At the criminal trial, plaintiff testified that after observing Arlene's car in the garage, he went to his parents' bedroom where he saw his mother dead on the floor. (Exhibit B, TT pp. 4120, 4213-4215)

204.   At the criminal trial, plaintiff stated that when he observed Arlene in the master bedroom, he did so from the doorway, looking in at her and only went as far as the alarm wall and that he did not have his glasses on or contacts in due to a surgical procedure a week and a half earlier. (Exhibit B, TT pp. 4120, 4189)

205.   At his criminal trial, plaintiff stated that after observing Arlene, he went to the kitchen and called his sister Shari from a phone in the kitchen informing her that he thought "mom and dad have been murdered." (Exhibit B, TT pp. 4120-4122, 4215-4217)

206.   At his criminal trial, plaintiff stated that after placing that call to his sister, he went to check on Seymour but then returned to the kitchen to answer an incoming call from his sister. (Exhibit B, TT pp. 4121-4122, 4217-4218)

207.   During plaintiff's criminal trial, plaintiff stated that after answering his sister's return call, he phoned his friend Mark Perrone from the phone in the kitchen. After speaking to Mark's mother and telling her what happened, he hung up and immediately received a return call from Mark. Plaintiff instructed Mark not to tell anyone what had happened at school except the principal. (Exhibit B, TT pp. 4122-4128)

208.   During plaintiff's criminal trial, plaintiff stated that after talking to his sister and the Perrones on the phone in the kitchen, he returned to his bedroom and wiped his hands, and *only* his hands, on a towel on his bed. He then put on a sweatshirt and ran to the house of his neighbor, Hova. (Exhibit B, TT pp. 4124-4125)

209.   During plaintiff's criminal trial, plaintiff stated he didn't recall turning the light on in his bedroom. He didn't deny he could have, but he stated he didn't remember. (Exhibit B, TT p. 4113)

210.   At the criminal trial, plaintiff stated that he did not recall speaking with Hines, McNamara or Bove. (Exhibit B, TT pp. 4129-4131, 4188-4191)

211.    At his criminal trial, plaintiff stated to the jury that what he told Makrides and the Goldschmidts in their conversation was if his "parents weren't around [he] could have any car [that he] wanted."  (Exhibit B, TT pp. 4094-4097)

212.    At his criminal trial, plaintiff admitted that he had told McCready what happened while at the scene as "best he could."  (Exhibit B, TT pp. 4137-4138)

213.    At his criminal trial, plaintiff admitted that he met with Doyle and repeated what happened to Doyle at McCready's request.  (Exhibit B, TT pp. 4134-4135)

214.    At his criminal trial, plaintiff admits repeating the story after being asked by Rein as "best I could."  (Exhibit B, TT p. 4148)

215.    At his criminal trial, plaintiff admitted that McCready asked him to go to "Homicide Headquarters."  (Exhibit B, TT p. 4143)

216.    At his criminal trial, plaintiff admitted that while in the car, he told McCready what happened the "best he could."  (Exhibit B, TT p. 4133)

217.    At his criminal trial, plaintiff admitted that while in the car he was told by McCready that Seymour was being moved to Stony Brook and that McCready stated he (McCready) had not known about Seymour's head injuries. (Exhibit B, TT p. 4148)

218.    At his criminal trial, plaintiff admitted that when he saw his mother in the bedroom, he did not have glasses on. (Exhibit B, TT p. 4215)

219.    At his criminal trial, plaintiff admitted that he used the kitchen phone to speak to his sister twice and to call Perrone (a school friend) and acknowledged that the photograph of the phone showed no blood on the phone. (Exhibit B, TT pp. 4216-4219)

220.    At his criminal trial, plaintiff admitted that he wiped his hands on a towel in his bedroom (a photograph of which was entered into evidence as People's Exhibit 35) *after* he used the kitchen phone. (Exhibit B, TT pp. 4219-4221) (Exhibit JJ, Trial Exhibit 35)

221.    At his criminal trial, plaintiff admitted that at Headquarters he spoke to Rein and McCready about Steuerman's business relationship with Seymour; a $400,000 loan Steuerman was paying off to Seymour; a UCC equipment disputed between Steuerman and Seymour; a dispute over the Ronkonkoma store between Steuerman and Seymour; family vacations; his relationships and getting his nose fixed; and the names and phone numbers of various businesses owned by Seymour.  (Exhibit B, TT pp. 4229-4230)

222.    At his criminal trial, plaintiff admitted he told Rein and McCready that he was the primary beneficiary in the will for Seymour's business interests, including the interests Seymour had with Steuerman and the family house. (Exhibit B, TT pp. 4233-4236).

223.    At his criminal trial, plaintiff admitted that he drew the three diagrams asked of him by Rein and McCready, and that he only entered Arlene's room as far as the alarm wall in the bedroom. (Exhibit B, TT pp. 4190, 42124)

224.    At his criminal trial, plaintiff admitted that a stand-up photograph was taken of him at police headquarters and that the photo, People's Exhibit 11, showed no blood on his shorts or sweatshirt. (Exhibit B, TT pp. 4221-4222) (Exhibit F, Trial Exhibit 11)

225.    At his criminal trial, plaintiff admitted he demonstrated on Rein what he did to render first aid to Seymour. (Exhibit B, TT p. 4150)

226.    At his criminal trial, plaintiff admitted that his conversation with  Rein and McCready did not become confrontational until after he performed the first aid demonstration on Rein. (Exhibit B, TT p. 4238)

227.    At his criminal trial, plaintiff admitted to signing the waiver or "rights" card, and identified his signature and date on the waiver or "rights" card, which was

entered into evidence as People's Exhibit Number 170. (Exhibit B, TT pp. 4164, 4242-4243) (Exhibit N, the Rights Card)

228.    At his criminal trial, plaintiff admitted offering the substantive parts of his confession and actually uttering the words attributed to him, but added additional comments he claimed were made by McCready that caused him to utter those words. (Exhibit B, TT pp. 4154-4164)

229.    At his criminal trial, plaintiff admitted telling Rein and McCready that "could I – could I have blacked out" or "could I have blacked out."  (Exhibit B, TT p. 4242)

230.    At his criminal trial, plaintiff admitted that he told Rein and McCready that he killed his parents with a barbell and a knife.  (Exhibit B, TT pp. 4239-4240)

231.   At his criminal trial plaintiff admitted, in response to questions from his attorney on direct examination, that he spoke with his sister and that he apologized to her saying he needed psychiatric help and that he needed to see her that night.  He stated, however, that he said those things "because they made me."

232.    At his criminal trial plaintiff claimed, on cross examination by Assistant District Attorney John B. Collins, that after he gave his confession earlier, he was in a room with Rein, McCready and Doyle, and that McCready choked him.  He also claimed that Rein  and Doyle participated in order to get him to say the things he did to his sister. (Exhibit B, TT pp. 4240-4242)

233.    The first time plaintiff ever claimed he was choked came during the aforementioned cross-examination.  No previous claim of choking had ever been made, nor had Mr. Gottlieb made such a claim in his opening statement, his direct examination of plaintiff or in his closing argument.  Mr. Gottlieb also did not address this claim in his

re-direct examination that followed the aforementioned cross-examination.  (Exhibit B, TT pp. 45-57, 4087-4172l, 4247-4250, 4739-4878)

## L.      Procedural  History Regarding Confession and 440 hearing

234.      In June of 1989, after a lengthy Huntley Hearing challenging the voluntariness of the plaintiff's confession, Trial Judge Alfred C. Tisch ruled that the statements made by plaintiff were voluntarily given;  the inculpatory statements made by plaintiff were done after his rights were read; and there was a knowing waiver of said rights.  (Exhibit LL, Huntley Hearing Decision)

235.      While simultaneously pursuing a new trial pursuant to New York State Criminal Procedure Law §440.00, plaintiff initiated a series of direct appeals seeking to overturn his conviction after the jury trial.  These appeals primarily asserted that the confession was involuntary.  In 1993 the Appellate Division for the Second Department rejected plaintiff's contention that the confession was not voluntary and held that plaintiff was not in custody until after he was read his *Miranda* warnings and that plaintiff's due process rights were not violated by the actions of the detectives, including their orchestrated ruse which led plaintiff to confess. (Exhibit MM)

236.      Plaintiff appealed the decision of the Second Department -- again claiming his confession was taken improperly -- to the New York State Court of Appeals.  The Court of Appeals again rejected plaintiff's claims, and held that the confession plaintiff gave was voluntary given and that his will was not overborne by the force used by the detectives on September 7, 1988. (Exhibit NN)

237.      Plaintiff next filed a Writ of Habeas Corpus in the Eastern District of New York which again challenged the voluntariness of his confession.  Judge Platt denied the Writ and held that plaintiff was not in custody prior to the Miranda warning being given

and that plaintiff's post-Miranda admissions were voluntary.  A Brady claim was also rejected. (Exhibit OO)

238.     Plaintiff next appealed Judge Platt's Decision to the Second Circuit Court of Appeals.  The Court held that the pre-admission statements were taken when plaintiff was in custody which required that Miranda warnings should have been given earlier. However, the Court found this to be harmless error since the pre-Miranda statements were repeated when plaintiff confessed after having been read his rights.  The Court also rejected plaintiff's claim that the confession was obtained involuntarily and held that the waiving of rights was done knowingly.  They also affirmed the Brady issue as decided by Judge Platt. (Exhibit PP)

239.     In December of 2007, the Appellate Division for the Second Department reversed a trial court decision denying plaintiff's motion for a new trial pursuant to the Criminal Procedure Law §440.00 and held there was sufficient *new* evidence that would entitle plaintiff to a new trial.  However, the court refused to address plaintiff's claim that his confession was not voluntarily given, reasoning that the issue concerning that confession had been thoroughly litigated.  This court also expressly rejected plaintiff's claim of actual innocence.  (Exhibit QQ)

240.     At his 440 hearing the plaintiff advanced a theory that the murders were actually were committed by Joseph Creedon, Peter Kent and Glen Harris and that one of the weapons used was a metal pipe. (Exhibit TT original complaint paragraphs 125-127)

241.     Glen Harris swore out an affidavit admitting, *inter alia*, that  he drove the getaway car and that  the principals ran back to the car covered in blood, and discarded a rusty pipe out the window.  (Exhibit TT original complaint paragraphs 125-127)

242.     Plaintiff's investigator Jay Salpeter testified at the 440 hearing and stated that Harris took him to a location where the pipe was discarded and found a rusted 36 inch long cylindrical metal pipe. (Exhibit TT original complaint paragraphs 125-127) (Exhibit QQ People v. Tankleff, A.D.3d 160)

243.     Joseph Guaracio, Creedon's son testified at the 440 hearing that Creedon told him they had entered the house through a window, and that after the crime Creedon returned to the house through the back door to retrieve a piece of metal pipe.  (Exhibit QQ People v. Tankleff, A.D.3d 160)

244.     An examination of house windows and doors at the crime scene on September 7, 1988 found no sign of an intrusion. (Exhibit B, TT 1367-1390, 2633)

245.     Plaintiff's forensic pathology expert, Dr. Michael Baden has determined that the weapon used to cause the injuries to Mr. and Mrs. Tankleff was a hammer not a pipe.  (Exhibit NNN Baden Expert Report)

246.     The Office of the New York State Attorney General, who had taken over the investigation after the Suffolk County District Attorney's Office referred the case to them in order to remove even the slightest appearance of a conflict of interest, prepared a memorandum of law in support of their application to dismiss the pending indictments against plaintiff in the interests of justice.  (Exhibit WW)

247.     On July 22, 2008, Judge Robert W. Doyle issued a Decision granting the New York State Attorney General's application to dismiss the pending indictments against plaintiff in the interests of justice.  (Exhibit RR).

248.     The charges against the plaintiff were not terminated in a manor favorable to the plaintiff.

**M.    New York State SIC Report**

249.    In April of 2006, plaintiff wrote to the New York State Commission of
Investigation (SIC) requesting an investigation into the Suffolk County District
Attorney's Office and the Suffolk County Police Department's regarding their
investigation and prosecution of plaintiff for the murder of his parents. (Exhibit KK, 50-h
transcript pp. 102-104) (Exhibit SS)

250.    In December of 2008, the SIC issued a report prepared after conducting an
examination of the investigation and prosecution of plaintiff for the murder of his parents.
The SIC found, in part, that the police department and Crime Lab personnel conducted a
"comprehensive, extensive and methodical investigation from beginning to end;"  the
procedures used by the Detectives in questioning plaintiff were "proper in all respects,"
and were within the "confines of the law" and that the confession was not obtained "by
way of force or coercion;" the SIC rejected plaintiff's claim that there were similarities
between procedures criticized by the SIC in a report issued in 1989 in the investigation
and prosecution of plaintiff in this case. (Exhibit SS)

251.    On March 24, 2009, plaintiff filed the subject Summons and Complaint in
the United States Courthouse for the Eastern District of New York.  (Exhibit TT)

252.    The complaint stated eleven claims, including a federal malicious
prosecution against Detective McCready and Rein, a fabrication of evidence claim
against McCready and Rein, a failure to investigate claim against McCready and Rein, a
suppression of evidence/Brady claim against McCready and Kosciuk, a coercion and
violation of right to counsel claim against McCready and Rein, a civil rights conspiracy
claim against McCready, Rein, Doyle and McElhone, a supervisory liability claim against
Doyle and McElhone, a Monell claim against the County, a State false imprisonment
claim against McCready, Rein, and Doyle, a State malicious prosecution claim against

McCready, Rein and Doyle, and an intentional or negligent infliction of emotional distress against claim against McCready and Rein. (Exhibit TT, original complaint).

253. The defendants moved to dismiss the complaint pursuant to Fed. R. Civ. P. 12 (c) and on December 21, 2010 Judge Seybert granted the motion in part and denied it in part.  (Exhibit KKK decision dated December 21, 2010).

254. The Court dismissed the claims based on conspiracy, supervisory liability under § 1983, false imprisonment, suppression of exculpatory evidence/Brady, failure to investigate, and intentional or negligent infliction of emotional distress.  (Exhibit KKK decision dated December 21, 2010).

255. The decision of the Court effectively dismissed all claims against defendants Kosciuk and McElhone. (Exhibit KKK decision dated December 21, 2010).

256.  In dismissing the false imprisonment claim the Court found that there was a substantial amount of evidence to establish probable cause for the plaintiff's initial arrest, independent of the plaintiff's claim that his confession was coerced and that the defendants testified falsely before and during plaintiff's trial.   (Exhibit KKK decision dated December 21, 2010).

257.  In determining that probable cause existed for his arrest the Court noted the following facts which were not denied by the plaintiff in reply to the defendants' motion:

>  - although Tankleff told the Detectives at the scene that he had used the phone in his father's office to call 9-1-1, the blood spatter on the phone had not been disturbed;
>
> - although Tankleff told the Detectives at the scene that he rendered aid to his father, who had blood gushing out of his neck wound, no blood was observed on plaintiff's clothing;
>
> - although Tankleff stated to Detectives at

the scene that, after rendering aid to his
father, he then checked the garage, there was
no blood on the door handle to the garage, or

the dead bolt on the garage door, which was
locked;

- Tankleff stated to Detectives at the scene
that he never entered his mother's bedroom,
and observed from the door to the bedroom that
her throat had been cut and that she was dead;
however, Detectives at the scene could not
observe Arlene's injuries until they entered
the bedroom and stood directly over her;

- Tankleff stated to Detectives at the scene
that, after rendering aid to his father, his
hands were covered with blood, yet the phones
in the kitchen, one of which Tankleff used to
speak to his sister and a friend on four
occasions, had no blood on them;

- Tankleff stated to Detectives at the scene
that, after getting up, he first looked in his
mother's bedroom, which was dark because the
drapes were drawn, and he did not see anyone.
Yet when the Detectives inspected the scene
they observed that the drapes in the master
bedroom were open;

- Tankleff did not appear upset or emotional
[to investigators] at the scene[;]

- although his bedroom was directly across the
hall from the master bedroom, Tankleff never
claimed to have heard anything, although it
appeared to Detectives at the scene that there
had been a struggle in Arlene's bedroom.

- Arlene had injuries on the back of her head
and back, which could not be observed at the
crime scene until after she had been rolled
over, which occurred after the Detectives took
Tankleff's confession, which injuries were
consistent with Tankleff's confession;

- after being arrested, Tankleff was heard
telling his sister that he "acknowledged to
the police that [he] did it;"

- examination of the crime scene revealed no
sign of an intrusion;

- blood was observed on the door knob, light
switch and wall near that switch in
plaintiff's bedroom;

- the blood spatter on the phone in the office
where Seymour was found had not been disturbed
after the spattering;

- the watermelon knife found in the kitchen
was not in the position that the card player,
who had used the knife, described having
placed it on the evening of the card game;

- Arlene's autopsy results were consistent
with Tankleff's confession as to how he killed
his mother, and

- those in attendance at the card game did not
observe any problems at the game between any
of the players including Steuerman and
Seymour.

(Exhibit KKK decision dated December 21, 2010).

258.  On December 9, 2014, plaintiff requested leave to file an amended

complaint adding a Brady claim against defendants McCready Rein Doyle and Kosciuk

alleging that Dr. Adams told them in 1988 that there was no reasonable possibility the

knife recovered by the watermelon could be the murder weapon.  (Exhibit LLL, Proposed

Amended complaint).

259.    Although the amended complaint alleged a new claim of suppression of

evidence relating to the knife, the first paragraph of this new claim contains a paragraph

(164) that restates a claim that was dismissed by the Court on December 21, 2010.

(Exhibit LLL, Proposed Amended complaint)

260.    On May 5 2015, Magistrate Judge Anne Y. Shields granted the plaintiff's

request for leave to file an amended complaint.[6]

Dated: Hauppauge, New York          Yours, etc.

July 6, 2015                        DENNIS M. BROWN
                                    SUFFOLK COUNTY ATTORNEY
                                    Attorney for Defendants
                                    H. Lee Dennison Building
                                    100 Veterans Memorial Highway
                                    P.O. Box 6100
                                    Hauppauge, New York 11788

                        BY:         */s/ Brian C. Mitchell*
                                    Brian C. Mitchell
                                    Assistant County Attorney


To:  **Anna B. Hoffmann**
     Cochran, Neufeld & Scheck, LLP
     99 Hudson Street
     8th Floor
     New York, NY 10013

     **Barry C. Scheck**
     Cochran, Neufeld & Scheck, LLP
     99 Hudson Street
     8th Floor
     New York, NY 10013

     **Elizabeth S Daniel Vasquez**
     Cochran, Neufeld & Scheck, LLP
     99 Hudson Street
     8th Floor
     New York, NY 10013

     **Bruce A. Barket**
     Barket Marion Epstein & Kearon LLP
     666 Old Country Road
     Suite 700
     Garden City, NY 11530

---

[6] Although Judge Shields granted the plaintiff's motion, the amended complaint has not been served on the defendants. Notwithstanding, the defendants present facts in this Rule 56 statement that relate to the newly added Brady claim.