# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NEW YORK

———————————————————

|  |  |
|---|---|
| **MARTIN TANKLEFF,** | ) |
|  | ) |
| **Plaintiff,** | ) |
| **v.** | ) |
|  | ) |
| **THE COUNTY OF SUFFOLK, THERESA** | ) |
| **and BRETT MCCREADY, as legal** | ) |
| **successors of K. JAMES MCCREADY,** | ) |
| **NORMAN REIN, CHARLES KOSCIUK,** | ) |
| **ROBERT DOYLE, JOHN MCELHONE,** | ) |
| **JOHN DOE POLICE OFFICERS #1-10,** | ) |
| **RICHARD ROE, Suffolk County Employees** | ) |
| **#1-10,** | ) |
|  | ) |
| **Defendants.** | ) |

**No. 09-CV-1207 (JS)(AYS)**

———————————————————

## PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

I

# TABLE OF CONTENTS

I.   Introduction ............................................................................................................ 1

II.  Legal Standard ...................................................................................................... 2

III. Facts ...................................................................................................................... 3

   A.   The notorious Suffolk County Homicide Squad investigates the Tankleff murders ...... 3

   B.   Suffolk County Homicide Squad Detectives quickly suspect and question Marty .......... 4

   C.   Suffolk County Homicide Squad Detectives coerce a false confession from Marty. ...... 5

   D.   Suffolk County Homicide Squad Detectives feed Marty nonpublic details about how they believe the crime was committed, fabricating his false confession. ................................... 6

   E.   Though forensic and medical evidence disproves key details of Marty's "confession," Defendants maintain Marty's guilt and suppress exculpatory evidence .................................... 6

   F.   Defendants suppress the medical examiner's conclusion that the watermelon knife could not have been the murder weapon ................................................................................... 7

   G.   Defendant Detectives also fail to investigate an obvious lead—the involvement of Jerry Steuerman—which would have likely led them to the true perpetrator(s). ............................... 8

IV.  Argument .............................................................................................................. 9

   A.   Defendants coerced Plaintiff's false confession .............................................................. 9

      i.   *As Defendants knew, Marty's characteristics made him particularly vulnerable.* ........ 10

      ii.   *Marty was interrogated in a coercive environment under coercive conditions.* ........ 11

      iii.   *In psychologically manipulating Marty while depriving him of his constitutional rights, the detectives employed coercive interrogation techniques.* .................................... 12

      iv.   *Defendants are not entitled to qualified immunity.* .................................................... 16

   B.   Defendants maliciously prosecuted Plaintiff .................................................................. 20

      i.   *As this Court has never decided this issue, it is not bound by a prior ruling.* .............. 21

      ii.   *As Defendants fabricated evidence and committed other misconduct in order to secure the indictment against Marty, there was no probable cause* ..................................... 22

      iii.   *Favorable termination* ................................................................................................ 28

   C.   Defendants suppressed exculpatory evidence. .............................................................. 31

      i.   *Defendants knew of the exculpatory evidence* .............................................................. 32

      ii.   *The exculpatory evidence was suppressed.* .................................................................. 33

      iii.   *Plaintiff brought the* Brady *claim within the statute of limitations.* .......................... 38

V.   Conclusion ............................................................................................................ 40

## TABLE OF AUTHORITIES

**Cases**

*Ashcraft v. Tennessee*, 322 U.S. 143 (1944) ................................................................. 15

*Atwood v. Town of Ellington*, 468 F. Supp. 2d 340 (D. Conn. 2007) ........................................... 39

*Banks v. Dretke*, 540 U.S. 668 (2004). .......................................................... 34, 35, 37

*Bellissimo v. Mitchell*, 995 N.Y.S.2d 603 (N.Y. App. Div. 2014) ............................................. 28

*Binder & Binder PC v. Barnhart*, 481 F.3d 141 (2d Cir. 2007) ..................................................... 2

*Blackburn v. Alabama,* 361 U.S. 199 (1960) ........................................................... 13, 16

*Boyd v. City of New York*, 336 F.3d 72 (2d Cir. 2003) ............................................... 21, 23, 25, 28

*Cantalino v. Danner*, 754 N.E.2d 164 (2001) .............................................................. 29

*Cf. Ward v. Silverberg*, 652 N.E.2d 914 (1995) ............................................................ 30

*Coleman v. City of New York*, 585 F. App'x 787 (2d Cir. 2014) .................................................. 23

*Colon v. City of New York*, 455 N.E.2d 1248 (N.Y. 1983) ....................................................... 20

*Cox v. County of Suffolk*, 780 F. Supp. 108 (E.D.N.Y. 1991) ...................................................... 25

*D'Angelo v. City of New York*, 929 F. Supp. 129 (S.D.N.Y. 1996) ............................................... 39

*Darata v. N.Y. Cent. Mut. Fire Ins. Co.*, 76 N.Y.2d 659 (1990) .................................................. 21

*Edwards v. Arizona*, 451 U.S. 477 (1981) .............................................................. 10, 18

*Gallegos v. Colorado,* 370 U.S. 49 (1962) .................................................................. 10

*Gannon v. City of New York*, 917 F. Supp. 2d 241 (S.D.N.Y. 2013) ............................................ 21

*Gladden v. Holland*, 366 F.2d 580 (9th Cir. 1966) .......................................................... 12

*Green v. Scully*, 850 F.2d 894 (2d Cir. 1988) ........................................................... 9, 12

*Haley v. Ohio*, 332 U.S. 596 (1948) .............................................................. 10, 11, 12

*Halsey v. Pfeiffer*, 750 F.3d 273 (3d Cir. 2014) ............................................................ 24

*Harlow v. Fitzgerald*, 457 U.S. 800 (1982) ................................................................ 17

*Heck v. Humphrey*, 512 U.S. 477 (1994) ................................................................... 29

*In re Dana Corp.*, 574 F.3d 129 (2d Cir. 2009) ........................................................... 2

*J.D.B. v. North Carolina*, 564 U.S. 261 (2011) .......................................................... 11

*Jackler v. Byrne*, 658 F.3d 225 (2d Cir. 2011) ........................................................... 17

*Jackson v. Denno*, 378 U.S. 368 (1964) ..................................................................... 15

*Jenkins v. City of New York*, 478 F.3d 76 (2d Cir. 2007) ............................................ 25

*Jocks v. Tavernier*, 316 F.3d 128 (2d Cir. 2003) ........................................................ 20

*Kyles v. Whitley*, 514 U.S. 419 (1995) ....................................................................... 37

*Leka v. Portuondo*, 257 F.3d 89 (2d. Cir 2001) .......................................................... 37

*Lewis v. Connecticut Comm'r of Corr.*, 790 F.3d 109 (2d Cir. 2015) .................... 35, 37

*Leyra v. Denno*, 347 U.S. 556 (1954) ........................................................................ 10

*Lowth v. Town of Cheektowaga*, 82 F.3d 563 (2d Cir. 1996) ............................... 20, 23

*Lynumn v. Illinois*, 372 U.S. 528 (1963) .................................................................. 9, 18

*Manganiello v. City of New York*, 612 F.3d 149 (2d Cir. 2010) ................. 17, 20, 23, 27

*McClellan v. Smith*, 439 F.3d 137 (2d Cir. 2006) ....................................................... 22

*McIntosh v. Conway*, 2014 WL 502735 (S.D.N.Y. 2014) ............................................ 36

*Mejia v. City of New York*, 119 F. Supp. 2d 232 (E.D.N.Y. 2000) .......................... 22, 23

*Miller v. Fenton*, 474 U.S. 104 (1985) ....................................................................... 15

*Mincey v. Arizona*, 437 U.S. 385 (1978) .................................................................... 15

*Mitchell v. City of Albany*, No. 08-CV-871, 2010 WL 1235389 (N.D.N.Y. Mar. 31, 2010) ....... 31

*Murphy v. Lynn*, 118 F.3d 938 (2d Cir. 1997) ............................................................ 20

*O'Brien v. Nat'l. Gypsum Co.*, 944 F.2d 69 (2d Cir. 1991) ........................................... 2

*Oliner v. McBride's Indus., Inc.*, 106 F.R.D. 9 (S.D.N.Y. 1985) ........................................... 38, 39

*People v. Anderson*, 42 N.Y.2d 35 (1977)......................................................................... 11, 12

*People v. Bevilacqua*, 45 N.Y.2d 508 (1978) ............................................................................ 11

*People v. Leonard*, 59 A.D.2d 1 (N.Y. App. Div. 1977)........................................................ 12, 13

*People v. Tankleff*, 848 N.Y.S.2d 286 (N.Y. App. Div.  2007) ................................................... 30

*People v. Tankleff*, Indict. Nos. 1535-88, 1290-88 (N.Y. Suffolk Cty. Crim. Ct. July 22, 2008)  30

*Poventud v. City of New York*, 750 F.3d 121 (2d Cir. 2014) ....................................................... 28

*Quartararo v. Mantello*, 715 F. Supp. 449 (E.D.N.Y. 1989) ................................................. 11, 12

*Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123 (2d Cir. 1997)..................................................... 20

*Riscili v. Gibson Guitar Corp.*, 605 F. Supp. 2d 558 (S.D.N.Y. 2009) .................................... 2, 15

*Rule v. Brine, Inc.*, 85 F.3d 1002 (2d Cir. 1996) ..................................................................... 2, 15

*Russo v. City of Bridgeport*, 479 F.3d 196  (2d Cir. 2007)........................................................ 17

*Schneckloth v. Bustamonte*, 412 U.S. 218 (1973).................................................................. 9, 13

*Shih Wei Su v. Filion*, 335 F.3d 119 (2d Cir. 2003).................................................................. 37

*Siewe v. Gonzales*, 480 F.3d 160 (2d Cir. 2007)......................................................................... 3

*Skinner v. Switzer*, 562 U.S. 521 (2011) .................................................................................. 38

*Smith–Hunter v. Harvey*, 95 N.Y.2d 191 (2000) ................................................................. 28, 29

*Spano v. New York*, 360 U.S. 315 (1959) ................................................................................. 10

*St. Germain v. United States*, Nos. 03-CV-8006, 99-CR-339, 2004 WL 1171403 (S.D.N.Y. May

    11, 2004) ............................................................................................................................ 37

*St. Pierre v. Dyer*, 208 F.3d 394 (2d Cir. 2000) ........................................................................ 38

*Torres v. Jones*, 47 N.E.3d 747 (2016)........................................................................ 20, 25, 26

*United States ex rel. Lewis v. Henderson*, 520 F.2d 896 (2d Cir. 1975) ..................................... 11

*United States v. Anderson*, 929 F.2d 96 (2d Cir. 1991) ................................................ 9, 12, 13, 18

*United States v. Bagley*, 473 U.S. 667 (1985) ............................................................. 35

*United States v. Coppa*, 267 F.3d 132 (2d Cir. 2001)................................................... 31

*United States v. Jackson*, 345 F.3d 59 (2d Cir. 2003) ................................................. 36

*United States v. Paulino*, 445 F.3d 211 (2d Cir. 2006)................................................ 36

*United States v. Payne*, 63 F.3d 1200 (2d Cir. 1995) .................................................. 36

*Warney v. State*, 16 N.Y.3d 428 (N.Y. 2011) .............................................................. 15

*Weaver v. Brenner*, 40 F.3d 527 (2d Cir. 1994) .............................................. 9, 14, 17

*White v. White Rose Food*, 128 F.3d 110 (2d Cir. 1997)............................................. 39

*Woods v. Clusen*, 794 F.2d 293 (7th Cir. 1986)........................................................... 11

**Rules**

Federal Rule of Civil Procedure 56 (c) ........................................................................ 2

Federal Rule of Civil Procedure 15(c)......................................................................... 39

Federal Rule of Procedure 15(c)(B)............................................................................. 38

I.    **Introduction**

Defendants concede a jury could find that Defendants McCready, Rein, Doyle, and Kosciuk fabricated a false confession from innocent, barely-17-year-old Marty Tankleff hours after he found his parents beaten and stabbed to death, that they unlawfully fed him details about the way they believed the crimes occurred in order to make the false confession appear reliable, and that they then lied about the way they had procured the confession. Defendants also concede a jury could find that this misconduct was committed pursuant to Suffolk County policy or custom. Nevertheless, in their Partial Motion for Summary Judgment, Defendants argue the same jury could not, as a matter of law, find that the same officers also used coercion to obtain the false and fabricated confession, withheld exculpatory evidence undermining the confession, or lacked probable cause to pursue the prosecution.

Defendants' arguments defy logic and common sense. The evidence shows that, rather than innocent Marty deciding spontaneously to confess to his parents' murders for no reason, Defendants used coercion to get him to admit to the crimes—and then compensated for his lack of knowledge by feeding him details based on what they had observed at the scene. Likewise, given the fabricated false confession and Defendants' intentional failure to investigate the only suspect with motive, who faked his own death and fled the state while Marty's father was still alive (which Defendants subsequently lied to the prosecutor about), there is no question that the existence of probable cause is, at a minimum, a fact for the jury. Finally, Defendants ask this Court to rule that no jury could find the investigating Detectives learned the Medical Examiner had ruled out the murder weapon named in the confession ("the watermelon knife"), even though the Defendants visited the Medical Examiner on the day he made that ruling, and the Defendants *admitted they knew* the watermelon knife could not have inflicted the wounds. In short,

Defendants' arguments are not serious arguments, and the jury must decide Plaintiff's coercion, malicious prosecution, and *Brady* claims alongside his fabrication and *Monell* claims. Defendants' partial summary judgment motion should be denied in full.

## II.   Legal Standard

Summary judgment is improper unless Defendants show there is no genuine issue of material fact and they are entitled to judgment as a matter of law. Fed. R. Civ. P. 56 (c); *Binder & Binder PC v. Barnhart*, 481 F.3d 141, 148 (2d Cir. 2007). In considering Defendants' motion, the Court may not make credibility determinations or weigh the evidence, but instead "is required to draw all factual inferences in favor of, and take all factual assertions in the light most favorable to," Plaintiff. *Rule v. Brine, Inc.*, 85 F.3d 1002, 1011 (2d Cir. 1996) (citations omitted). "[I]t is beyond any doubt that circumstantial evidence alone may suffice to prove adjudicative facts." *O'Brien v. Nat'l. Gypsum Co.*, 944 F.2d 69, 72 (2d Cir. 1991) (citations omitted). Additionally, "if there is any evidence in the record from any source from which a reasonable inference in [Plaintiff's] favor may be drawn, [Defendants] simply cannot obtain a summary judgment." *Binder & Binder PC*, 481 F.3d at 148 (internal citations and quotations omitted).

Since "a jury is free to believe part and disbelieve part of any witness's testimony," "the court considering a summary judgment motion must disregard all evidence favorable to the moving party that the jury is not required to believe." *In re Dana Corp.*, 574 F.3d 129, 152 (2d Cir. 2009) (internal citations and quotations omitted). And particularly in cases where the parties present diametrically opposed versions of facts such that the case may turn on credibility determinations, courts deciding summary judgment must be mindful that a jury "might conclude that [the moving party's] witnesses generally should not be credited, on the theory, *falsus in uno, falsus in omnibus*." *Riscili v. Gibson Guitar Corp.*, 605 F. Supp. 2d 558, 569 (S.D.N.Y. 2009);

*Siewe v. Gonzales*, 480 F.3d 160, 170 (2d Cir. 2007) (explaining that the principle that a witness who testifies falsely to any material matter may be discredited generally is "a natural and instinctive tool of the factfinder, like a carpenter's hammer or plumber's wrench").

### III.    Facts[1]

Viewed in the light most favorable to Plaintiff, the facts establish the following:

### A.  The notorious Suffolk County Homicide Squad investigates the Tankleff murders

In the years leading up to the Tankleff murders, the Suffolk County Police Department (SCPD) had gained notoriety and public scrutiny for their use of confessions in murder cases. For example, reporters analyzed 361 Suffolk County murder cases between 1976 and 1986, showing that Homicide Squad detectives got confessions in an unbelievable 94% of those cases (compared to rates of between 54–73.5% in comparable counties). P. 9. Thus, beginning in the late 1970s and continuing through the 1980s, following numerous reports of beatings and other misconduct, the Suffolk County public, bar, and media were closely scrutinizing SCPD's interrogation procedures, particularly with regard to the way the Homicide Squad was getting confessions. P. 2–3. A State of New York Commission of Investigation report regarding the SCPD noted "grave shortcomings in the leadership and management," especially with respect to the conduct of its Homicide Squad detectives. P. 8.

In response, new SCPD leadership was put in place to reform the department. P. 10–11. After this leadership change, Defendant Detective James McCready was one of very few detectives of the old Homicide Squad who remained. P. 12. The squad's new commander,

---

[1] Defendants fail to provide a narrative summary of the facts or sufficient citations to their Rule 56.1 statements—perhaps because close examination of true facts does not support their argument. Instead, Defendants apparently expect this Court to hunt through Defendants' 50-page Statement of Facts, Plaintiff's 78-page response thereto, and Plaintiff's 45-page Counterstatement of Material Facts, to find support for their arguments.  By contrast, Plaintiff directs the Court to the abundant evidence proving all claims must go to the jury. All factual citations are to paragraphs in Plaintiff's Counterstatement of Material Facts Pursuant to Local Rule 56.1 (abbreviated P.) or to Plaintiff's Response to Defendants' Statement of Material Facts Pursuant to Local Rule 56.1 (abbreviated D.).

Lieutenant McElhone had a "personal sit-down" with McCready during which he made it clear McCready would be transferred or disciplined for any violation of the rules about getting confessions. Pls. Ex. 8 at 40:20–25, 41:5–12, 45:8–46:18; P. 12. For McElhone and the Department, it was imperative to appear that the old interrogation techniques were no longer being practiced. P. 10; Pls. Ex. 8 at 38:7–19.

### B. Suffolk County Homicide Squad Detectives quickly suspect and question Marty

From the moment they learned Marty Tankleff had reported finding his parents' bodies— his father Seymour at one end of the house with a head injury and his throat cut, and his mother Arlene in her bedroom beaten and stabbed—the Suffolk County Homicide Squad led by Detective McCready suspected innocent 17-year-old Marty. P. 15, 17. Defendants deliberately isolated Marty from family and friends, including the family lawyer, and began questioning him almost immediately.  P.21. At the time, Marty, who had just found his parents' bludgeoned and stabbed bodies, was in a state of shock so extreme that he lacked awareness of his surroundings. P. 18.

Having identified Marty as his suspect, Detective McCready refused Marty's repeated requests to go to the hospital to see his dying father; instead, McCready drove Marty to the SCPD Homicide Squad Headquarters to interrogate him until he got a confession. P. 17, 22. Marty did not think he had a choice but to go with McCready. P. 22. A sheltered, barely 17-year-old who had never been arrested, P. 19, and who "was brought up to always believe in trusting cops," P. 33, Marty believed he was going to the police station to help the detectives. Specifically, Marty believed McCready was interested in information about the man Marty and others had already named as the likely perpetrator: Jerry Steuerman. P. 128–29. Marty did not realize McCready's goal was to get him to confess to the attacks himself.

4

### C. Suffolk County Homicide Squad Detectives coerce a false confession from Marty.

McCready took Marty to a small, windowless interrogation room. P. 23.  Neither McCready nor any other detective *Mirandized* Marty before interrogating him; they also denied Marty's repeated requests for counsel. P. 27–29. Marty was effectively confined for five-and-a-half hours, during which time he was separated from his family and interrogated by McCready, Rein, and Sergeant Doyle. P. 21.

The interrogation was relentless; the questions "never seemed to stop" and there were no breaks. P. 24. From the minute he first spoke with the detectives, Marty was questioned almost continuously until he broke. *Id.* After asking background questions about Marty and his family in an attempt to elicit possible motives, D. 76, 77, 79–81, 83; *see also* Pls. Ex. 1 at 26, the detectives became aggressive and accusatory. P. 25–26 . They ignored Marty's repeated protestations of innocence and told him a series of lies intended to overbear his will. P. 25–26, 30, 32, 33, 36. Most egregiously, McCready staged a fake phone call for Marty to overhear and then falsely told Marty his father had woken up from his coma and accused Marty. P. 36–37.

Marty initially resisted even this coercive technique—offering explanations (perhaps Seymour had seen Marty providing aid to him that morning, P. 39), and offering to take a polygraph, P. 40. But the detectives rejected Marty's truthful explanations and repeated their lies until 17-year-old Marty—already psychologically traumatized, separated from counsel and family, not having eaten since the night before, and worn down from hours of relentless questioning—finally began to believe that he might have blacked out and committed the crime. P. 18, 21, 23, 27, 42. His will overborne, he told the detectives "Yeah, I did it." P. 43.

**D. Suffolk County Homicide Squad Detectives feed Marty nonpublic details about how they believe the crime was committed, fabricating his false confession.**

Although the detectives' coercion caused him to falsely admit responsibility, Marty was innocent; he did not kill his parents and he did not know how his parents had come to be murdered, because he was asleep at the time. P. 44. As a result, he repeatedly told detectives that he could not provide details of his parents' murders by stating, for example, "I don't know. I didn't do this." P. 45. Because Marty could not provide any details of the crime, the detectives suggested details based on what they had observed at the crime scene, and Marty acquiesced to their suggestions. P. 52. To cover up that the confession was the product of misconduct and make it appear reliable, the detectives falsely reported that, after he first said "I did it," Marty volunteered a narrative confession. *Id.* In so doing, they falsely reported that the details of the crime contained in Marty's statement originated with Marty. *Id.*[2]

**E. Though forensic and medical evidence disproves key details of Marty's "confession," Defendants maintain Marty's guilt and suppress exculpatory evidence**

Forensic and medical evidence that emerged in the weeks after Marty's interrogation disproved many of the details in Marty's "confession." P. 80–90.[3] Additionally, physical evidence emerged showing that Marty's parents were killed by *two* perpetrators wearing gloves; not by nude Marty acting alone. P. 87–88.

---

[2] All of the details that Detective McCready and Detective Rein claimed Marty volunteered in his "confession" matched the observations they had made and the theory they had formulated during and after their walk-throughs of the crime scene that morning. P. 46–50, 54. But because McCready and Rein falsely represented that Marty had volunteered the details, the prosecution's theory of the case was that Marty's "confession" was reliable and came entirely from Marty. P. 73–79.

[3] For example, the evidence showed that Seymour was attacked *before* Arlene; Arlene lost conscious immediately and did *not struggle* with her attackers; the attackers likely used a *utility-type knife* and could not have used the "watermelon knife" to stab the victims; Marty's barbells could not have caused Arlene or Seymour's small skull fractures and did not have blood on them; that Seymour was *not attacked from behind*; and that there was no trace of blood found in the drain traps of any bathtub, sink, or shower in the Tankleff home—i.e., no indication that bloody weapons were washed in the shower. P. 81–86, 98.

The total lack of corroboration of the details in Marty's "confession," combined with evidence disproving those details, would have suggested to reasonable and experienced homicide detectives that they needed to re-evaluate the evidence of Marty's guilt. P. 90. But the SCPD detectives, who knew their misconduct during Marty's interrogation, if uncovered, would have professional and political ramifications, did not re-evaluate Marty's guilt when confronted with overwhelming evidence that the confession was false. P. 1–11. Instead, Defendants covered up or ignored any evidence that undermined their false confession. That included the medical examiner's conclusion that the watermelon knife was not the murder weapon, and the detectives' intentional failure to investigate the most obvious alternative suspect, Jerry Steuerman— Seymour Tankleff's business partner who faked his own death and fled to California shortly after the crimes.  P. 110, 144–48.

### F. Defendants suppress the medical examiner's conclusion that the watermelon knife could not have been the murder weapon.

The confession stated that Marty attacked his parents with the watermelon knife—which was what Defendants had believed after seeing the knife with what looked like human tissue on it during their walk-throughs of the crime scene. P. 60. But the day *after* Marty's confession, Suffolk County Medical Examiner Dr. Vernard Adams conducted both autopsies and examined the watermelon knife, ultimately concluding there was no "reasonable possibility" the watermelon knife was the murder weapon. P. 96–98. Instead, the wounds were more likely from a utility knife. P. 98. Given that it proved the wrong murder weapon was identified in the confession, this was significant exculpatory evidence. McCready and the other Defendants concealed it from the prosecutors and defense. P. 107, 110–16; *see also* P. 120–27.  As a result, the prosecution argued that Marty killed his parents with the watermelon knife—but the criminal

jury never learned of Dr. Adams' opinion that the watermelon knife is definitively *not* the murder weapon, and therefore that critical aspect of the confession was false. P. 117–19.

### G. Defendant Detectives also fail to investigate an obvious lead—the involvement of Jerry Steuerman—which would have likely led them to the true perpetrator(s).

From the moment first responders arrived, Marty and others told detectives that Jerry Steuerman, Seymour's business partner, was likely behind the murders—including that Steuerman was the only one with motive, and that Marty's mother had stated two weeks earlier she thought Steuerman would "do something terrible." P. 128; *see also* P. 129–31 (multiple other witnesses told detectives Steuerman had threatened Seymour or indicated bad blood). After the crimes, while Seymour was in a coma, Steuerman faked his own death, altered his appearance, and fled to California via a circuitous route using an assumed name. P. 137–38.

There was no mistaking the significance of Steuerman's actions; multiple witnesses had indicated to the detectives that Steuerman had been the last person to leave the Tankleffs' home, just hours before the murders. P. 132–36. Detectives learned Steuerman lied to them about when he left the house, and Steuerman's daughter was his only alibi for the time of the crime. P. 132–33;141. Detectives also knew Steuerman and Seymour had been arguing about a business dispute, that Steuerman owed Seymour several thousand dollars, and that Steuerman, who was badly in debt, could not conduct business without Seymour's approval and without giving Seymour a percentage of the profits—unless Seymour died. P. 140. Finally, the detectives received a tip that Steuerman was financing his son Todd, who was involved in major cocaine dealings. P. 142. Particularly given the lack of evidence corroborating Marty's "confession" and the evidence inconsistent with it, any reasonable detective would have investigated Steuerman.[4]

---

[4] Since Marty's wrongful conviction, new and detailed evidence has emerged about what actually happened to Marty's parents. At least three individuals including Creedon's own son have given sworn testimony that Joseph Creedon, a drug associate of Steuerman's son Todd, confessed to murdering the Tankleffs. P. 158, 159(c), 159(e).

P. 143. But the detectives *never* seriously investigated Steuerman; they conducted only two brief interviews in public places with Steuerman before ruling him out as a suspect shortly after the murders. P. 146–48. And they misrepresented to the prosecution that they had thoroughly investigated Steuerman and ruled him out. P. 150–56.

Because of Defendants' fabrication and coercion of Marty Tankleff's confession, as well as their suppression of exculpatory evidence, Marty spent over 17 years in prison for a crime he did not commit. Jerry Steuerman, who exercised his rights under the Fifth Amendment at his deposition in this case, was never prosecuted. P. 160.

## IV.  Argument

### A.  Defendants coerced Plaintiff's false confession.

Defendants do not dispute the basic standard: whether a confession is coerced is determined by the totality of the circumstances, including broadly "(1) the characteristics of the accused, (2) the conditions of interrogation, and (3) the conduct of law enforcement officials." *Green v. Scully*, 850 F.2d 894, 901–902 (2d Cir. 1988); *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973). "A confession is not voluntary when obtained under circumstances that overbear the defendant's will at the time it is given." *United States v. Anderson*, 929 F.2d 96, 99 (2d Cir. 1991) (citing *Lynumn v. Illinois*, 372 U.S. 528, 534 (1963)).[5] Here, all three

---

Creedon's son testified that Creedon admitted he had choked Seymour and hit him on the head while a man named Peter Kent stabbed Arlene, all at the prompting of Steuerman and Todd, who had signaled Creedon when to enter the house. P. 159(c). A man named Glenn Harris described in detail that he had driven Creedon and Kent to the Tankleff house, and that Creedon and Kent had gone into the house and then come running back to the car 10 to 30 minutes later nervous and winded. P. 158. Harris saw Kent burning his clothes and knew something serious had occurred, but he was on parole and too scared to talk to the police at the time. P. 158.  Creedon told one individual that he "was with someone named 'Steuerman'" at the time of the murders, P. 158, and he told another that he had been at the Tankleffs' home with Steuerman watching a card game and getting "pumped up" the night of the murders, P. 159(b).

[5] The use of a coerced confession against a defendant in a criminal proceeding violates the Fifth Amendment's Self-Incrimination Clause, as incorporated against the states through the Fourteenth Amendment, and thus may serve as a predicate for a 42 U.S.C. § 1983 action. *Weaver v. Brenner*, 40 F.3d 527, 534, 536 (2d Cir. 1994). Contrary to the suggestions of Defendants' Memorandum, Dkt. No. 180-3 at 21–22, Plaintiff does not assert that the violation of his

circumstances compel the conclusion the false confession was coerced: (1) Marty was a vulnerable, naïve teenager who had just experienced serious emotional trauma; (2) he was involuntarily separated from his family, kept from his family attorney, not given food, and relentlessly interrogated in a small windowless room by aggressive detectives; and (3) the detectives repeatedly violated Marty's constitutional rights, ignored his protestations of innocence, refused his repeated requests for counsel, and manipulated him by repeatedly lying.

   ***i.  As Defendants knew, Marty's characteristics made him particularly vulnerable.***

   Marty was a teenager who had just experienced the profound trauma of finding his parents the victims of gruesome deadly attacks. He was in shock, lacked awareness of his surroundings, and believed throughout the day that he was in some sort of nightmare. P. 18, 43; *see also Leyra v. Denno*, 347 U.S. 556, 561 (1954) (emotional exhaustion of adult similarly accused of his parents' murders reduced subject's ability to resist the coercive interrogation). Throughout the interrogation, Marty was experiencing acute stress and psychological instability, which made him more susceptible to the detectives' tactics. *See Spano v. New York*, 360 U.S. 315, 322 (1959) ("history of emotional instability" supports finding of coercion).

   And the entire interrogation must be viewed through the lens of Marty's age of barely 17. As the Supreme Court recently reiterated:

> Addressing the specific context of police interrogation, we have observed that events that "would leave a man cold and unimpressed can overawe and overwhelm a lad in his early teens." *Haley v. Ohio*, 332 U.S. 596, 599 (1948) (plurality opinion); *see also Gallegos v. Colorado*, 370 U.S. 49, 54 (1962) ("[N]o matter how sophisticated," a juvenile subject of police interrogation "cannot be compared" to an adult subject).

---

*Miranda* rights is a separate cause of action; rather, it is evidence of coercion. Additionally, Plaintiff does not assert that Defendants violated his Sixth Amendment right to counsel, but that they violated his right to counsel under the Fifth Amendment, which attaches during a custodial interrogation. *See Edwards v. Arizona*, 451 U.S. 477, 482 (1981) ("*Miranda* . . . declared that an accused has a Fifth and Fourteenth Amendment right to have counsel present during custodial interrogation.").

*J.D.B. v. North Carolina*, 564 U.S. 261, 272–273 (2011); *see also Woods v. Clusen*, 794 F.2d 293, 296–98 (7th Cir. 1986) (holding tactics that might not be coercive for adult overbore will of 16 ½ year old); *Quartararo v. Mantello*, 715 F. Supp. 449, 457–59 (E.D.N.Y. 1989) (weighing heavily that defendant was barely 16 years old in finding confession coerced).

Nor did anything in Marty's background mitigate the effects of his youth. Far from streetwise, Marty had no prior criminal experience or familiarity with police tactics. *See United States ex rel. Lewis v. Henderson*, 520 F.2d 896, 901 (2d Cir. 1975) (defendant's age (22) and "apparently little prior experience with police methods . . . render[ed] him particularly susceptible to police pressure"); *Quartararo*, 715 F. Supp. at 459 (The effect of petitioner's age (just under 16) was "not diluted by any showing that petitioner acted coolly or callously during questioning or that he had past experiences with the police.")

### ii.    *Marty was interrogated in a coercive environment under coercive conditions.*

These characteristics—Marty's youth, psychological and emotional fragility, and inexperience with law enforcement—made him uniquely susceptible to the detectives' coercive tactics. This is particularly true of the detectives' first tactic: intentionally isolating Marty from his family and attorney so that he had neither family nor counsel to advise him. *See Haley,* 332 U.S. at 600–01 (suppressing confession in part because 15 year old was isolated from friend, family, and lawyer); *People v. Anderson*, 42 N.Y.2d 35, 39–41 (1977); *Lewis*, 520 F.2d at 901– 902; *see also People v. Bevilacqua*, 45 N.Y.2d 508, 511 (1978) (suppressing confession from 18 year old who had been intentionally isolated from his mother and his attorney, "two of his most likely avenues of assistance"). Police officers almost immediately separated Marty from his brother-in-law at the scene, and the detectives kept the family lawyer (whom Marty called

"Uncle Mike") from speaking with him—both at the scene, and when Marty asked for him during the interrogation. P. 20, 27, 28.

Marty was effectively confined for five-and-a-half hours, during which time he was separated from his family and interrogated by Detective McCready, Detective Rein, and Sergeant Doyle. P. 21. *See Green*, 850 F.2d at 902 (describing long restraint as a coercive interrogation tactic); *Haley*, 332 U.S. at 599–600 (suppressing as coerced confession from 15 year old interrogated for 5 hours over night); *Quartararo*, 715 F. Supp. at 458–61 (suppressing as coerced confession of not-quite-16 year old interrogated for at least 4 hours). At the police station, his interrogation took place in a small, windowless interrogation room, and he was given nothing to eat aside from a cup of coffee to drink.  *See Anderson*, 42 N.Y.2d at 39–40 (noting coercive effect of "deprivation of food [over] . . . at least three normal meal times"); *People v. Leonard*, 59 A.D.2d 1, 13 (N.Y. App. Div. 1977) (considering that defendant ate only one meal all day in finding his "faculties were impaired," contributing to the overbearing of his will).

### iii.     *In psychologically manipulating Marty while depriving him of his constitutional rights, the detectives employed coercive interrogation techniques.*

Although McCready suspected Marty of murdering his parents, Marty was not *Mirandized* before he was interrogated at the station. P. 29. And McCready prevented Marty from seeing his family attorney, despite Marty asking approximately six times, threatening, "[i]f you want to speak with your Uncle Mike, you're a criminal, we're going to lock you up." P. 27–28; *see Gladden v. Holland*, 366 F.2d 580, 581 (9th Cir. 1966) (suppressing confession because, *inter alia*, "police effectively denied [ ] requests for counsel during the questioning"); *Haley*, 332 U.S. at 600–01 (finding confession coerced based on, *inter alia* "the fact that he had no friend or counsel to advise him, [and] the callous attitude of the police towards his rights"); *Anderson*, 929 F.2d at 100–02 (suppressing confession where, despite the provision of *Miranda* warnings,

12

defendant was tricked into waiving his right to counsel). "A prolonged interrogation of an accused who is ignorant of his rights and who has been cut off from the moral support of friends and relatives is not infrequently an effective technique of terror." *Blackburn v. Alabama,* 361 U.S. 199, 206 (1960).

During the interrogation, Rein raised his voice; McCready screamed and cursed and jammed his finger in Marty's chest. P. 26. Marty repeatedly protested his innocence, P. 25, but the detectives made Marty tell his story 6 to 12 times and refused to accept his truthful account, making him repeat it over and over again because they didn't believe him, *id. See Schneckloth*, 412 U.S. at 226 (listing "repeated and prolonged nature of the questioning" as factor supporting coercion); *Leonard*, 59 A.D.2d at 14 (describing "intensive" questioning in which suspect "was repeatedly told that 'the professionals' could not accept his version of the facts . . . [and] that he was lying" as a factor supporting suppression). Rein told Marty that his story was "absurd" and McCready told Marty that what he was telling them was "ridiculous."[6] P. 26.

The detectives then told Marty a series of three lies that contradicted his true account. *See Anderson*, 929 F.2d at 100 (deliberate false or misleading statements may amount to coercion). McCready challenged Marty's truthful account that he hadn't touched his mother's body, saying "Marty, I can't believe that because your hair's in your mother's hand. How did it get there?" P. 30. This was a lie; Marty's hair was not found in Arlene's hand. P. 30. And McCready accused Marty of lying when he said he didn't shower that morning, saying "Marty, I can't believe that," and "we did a humidity test and we know you took a shower that morning." P. 32. This was another lie; there was no humidity test. *Id.*

---

[6] Though Defendants emphasize that Marty was not beaten, the Supreme Court has for decades "recognized that coercion can be mental as well as physical, and that the blood of the accused is not the only hallmark of an unconstitutional inquisition." *Blackburn*, 361 U.S. at 206.

McCready then executed a third elaborate and coercive lie: He staged a fake phone call for Marty to overhear and told Marty his father had woken up at the hospital and accused Marty of stabbing him. P. 36.[7] The lie was believable; even Rein thought the phone call sounded real and didn't know at that moment that McCready was lying. P. 37. However, this "phone call" and Seymour's accusation of Marty was an entirely fabricated lie; Seymour never woke up and certainly never accused Marty. *Id.*

A reasonable homicide detective, following minimally accepted police practices, would have been aware that presenting this type of false evidence to a juvenile suspect, who had just found his parents' bludgeoned bodies, presented a risk of obtaining a false statement. P. 31, 35, 41. And that is precisely what happened. Marty expressed disbelief, but Detectives insisted his father, who Marty trusted, wouldn't lie about this. P. 39. Marty volunteered to take a polygraph, but detectives refused and insisted Marty confess, telling him, "Well, Marty, you know your father said you did this. We've got your hair in your mother's hand. Just say you did it." P. 40. *See Weaver*, 40 F.3d at 536–37 (presenting suspect with false evidence, repeatedly accusing him of crime, and yelling at him, in the face of consistent denials, would constitute coercion).

Marty felt aghast and stunned, in shock and disbelief. P. 39. Eventually, faced with the lie that his own father had implicated him, the lies about physical evidence implicating him, and the detectives' insistence that Marty confess—and trying to make sense of what felt like a nightmare—Marty asked if he might in fact have blacked out. P. 42. The detectives encouraged

---

[7] McCready did this by leaving the interrogation room, ostensibly to make a phone call, and causing Marty to hear him saying something to the effect of, "Yeah, yeah. Well, that's great." P. 36. McCready then re-entered the interrogation room, turned around to face Marty with his finger pointed at him, and said: "Marty, I just got off the phone with the detective at the hospital and they shot your father full of Adrenalin. You beat and stabbed him, Marty." *Id.* "You did it Marty," said Detective McCready, "and your father said just tell us what we want to hear and help us." *Id.* McCready told Marty that the police had taped the whole conversation with Seymour and that they would play it for Marty later. *Id.*

Marty to believe that he was guilty and to confess, telling him that "there's a Marty inside of you that knows what happened" and that he should "have that Marty tell us what happened." P. 43.

Despite the fact that he had not killed his parents, was not present for their attack, and as a result had no knowledge of what happened to them, Marty began to make a false confession by telling the detectives "Yeah, I did it." P. 43.[8] At this point, the Defendant Detectives fed him gruesome, nonpublic details about how his parents had been murdered; they coerced the traumatized teen into adopting these statements as his own. *See Warney v. State*, 16 N.Y.3d 428, 438 (N.Y. 2011) (Smith, J., concurring) (writing to emphasize the strength of claim where evidence indicates police fed innocent suspect facts "when in fact, the police knew, the corroboration was worthless").

The inquiry into whether a confession was coerced "is not limited to instances in which the claim is that the police conduct was 'inherently coercive,'" *Miller v. Fenton*, 474 U.S. 104, 110 (1985) (quoting *Ashcraft v. Tennessee*, 322 U.S. 143, 154 (1944)), but "applies equally when the interrogation techniques were improper only because, in the particular circumstances of the case, the confession is unlikely to have been the product of a free and rational will," *id.* (citing *Mincey v. Arizona*, 437 U.S. 385, 401 (1978)). Particularly given Marty's personal characteristics that made him susceptible to coercion and the coercive atmosphere of the interrogation, a jury could find that the detectives' interrogation techniques overbore Marty's will and caused him to falsely confess. *Jackson v. Denno*, 378 U.S. 368, 389–90 (1964) ("[T]he efficiency of the rack

---

[8] Defendants repeatedly argue that, where Marty testified he does not remember a specific event, he has not through this evidence met his burden of putting that fact in dispute. *See* Dkt. No. 180-3 at 29. Not only is this argument clearly improper at the summary judgment stage, *see Rule*, 85 F.3d at 1011, Defendants *concede* a jury could find they fabricated the confession and lied about it. *See* Dkt. No. 180-3 at 9 n.1, 17. Certainly a jury could also conclude Defendants' self-serving denials of other misconduct are false as well—especially given Defendants' implausible claim that 17-year-old, innocent Marty spontaneously confessed to brutally murdering his parents without any improper pressure. *See Riscili*, 605 F. Supp. 2d at 569 ("*falsus in uno, falsus in omnibus*").

and the thumbscrew can be matched, given the proper subject, by more sophisticated modes of 'persuasion.'" (quoting *Blackburn*, 361 U.S. at 206)).

Based on these facts, a jury could easily find Defendants used coercion to elicit Marty's false admission to the crimes. Recognizing as much, Defendants attempt to stretch, manipulate, and misrepresent facts as "uncontested" in order to make the interrogation seem less coercive. Defendants' lack of citations to factual support in this section is particularly conspicuous, as the parties' 56.1 statements show that each of these assertions lacks any factual basis or is disputed. For example, Defendants make great efforts to portray the early part of the interrogation as "conversational" and argue that the interrogation did not become "accusatory" until the detectives' suspicions were aroused by observing blood on Marty's shoulder. Dkt. No. 180-3 (Defs. Mem.) at 16. But as would have been clear if Defendants had actually cited to the parties' Statements of Fact, Plaintiff specifically denied that the detectives became accusatory "95 minutes into the questioning, and that this specifically occurred after McCready observed blood stains on Marty's shoulder." D. 98; *see also* Pls. Ex. 1 at 26 ("For a reasonable and experienced homicide detective these [early] general questions were designed to elicit possible motives from Marty."); P. 24 ("From the minute he first spoke with the detectives that morning, Marty was questioned almost continuously until he broke.")[9]

### iv.     *Defendants are not entitled to qualified immunity.*

Defendants are not protected by qualified immunity on Plaintiff's § 1983 coercion claim. "Qualified immunity, an affirmative defense as to which the defendants have the burden of

---

[9] Defendants also repeatedly assert that Marty "voluntarily" answered questions and complied with Detectives' requests, but there is no support for these statements; the 56.1 statements do not state that these actions were taken "voluntarily." *See* Dkt. No. 180-3 at 14–16; *see also* D. 85, 92 (Marty demonstrated how he provided aid to his father; Defendants do not assert he did so voluntarily); D. 86 (stating that "plaintiff answered the questions that were posed to him in the interrogation room" without saying plaintiff did so voluntarily). Marty was in a coercive atmosphere throughout his interrogation, and he was not at the police station voluntarily; he did not think he had a choice about going with Detective McCready to the station. P. 22.

proof, shields officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Jackler v. Byrne*, 658 F.3d 225, 242 (2d Cir. 2011) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)) (internal citation omitted). "Thus, if the law was sufficiently 'clearly established, the immunity defense ordinarily should fail, since a reasonably competent public official should know the law governing his conduct.'" *Jackler*, 658 F.3d at 243 (quoting *Harlow*, 457 U.S. at 818–19). "Whether a defendant officer's conduct was objectively reasonable is a mixed question of law and fact," *Manganiello v. City of New York*, 612 F.3d 149, 164 (2d Cir. 2010) (internal quotation and citation omitted); genuine disputes of material fact preclude summary judgment, *see Russo v. City of Bridgeport*, 479 F.3d 196, 212–13  (2d Cir. 2007).

Defendants do not and cannot argue that Marty's rights were not clearly established at the time of his interrogation. *See, e.g.*, *Weaver*, 40 F.3d at 536 ("[I]t was clearly established in 1989 that criminal suspects had a due process right to be free from official conduct designed to overcome the accused's will and produce an involuntary incriminating statement.") Rather, Defendants argue that it was not clear to the detectives at the time that their conduct would violate that right.  But, Defendants' subjective belief about the propriety of their conduct is irrelevant.  As explained above, the qualified immunity inquiry is one of "objective reasonableness."  Defendants' acts failed to satisfy this standard.

For example, in *Weaver*, the Second Circuit held that officers were not entitled to qualified immunity for a 1989 interrogation with much less coercive characteristics; there, an *adult* suspect with no present manifestation or history of psychological distress was interrogated *in his own home* by officers who were not aggressive and threatened no physical abuse. *See Weaver*, 40 F.3d at 537 ("Since defendants hotly dispute plaintiff's allegations, a factual

determination of their conduct is needed to resolve the issue of qualified immunity.") *see also Anderson*, 929 F.2d at 99 ("A confession is not voluntary when obtained under circumstances that overbear the defendant's will at the time it is given." (citing *Lynumn*, 372 U.S. at 534)) Here, Defendants' actions were less objectively reasonable than the defendants' actions in *Weaver*, which took place at nearly the same time.

Finally, Defendants' own contemporaneous actions demonstrate that they <u>knew</u> they had engaged in misconduct: An officer acting in good faith, who truly believes his conduct has not overborne the suspect's will, would not lie about the true circumstances of the interrogation, as Defendants concede for summary judgment purposes they did.  P. 52, 54, 55, 72, 73. And the detectives' failure to give *Miranda* warnings and refusals to permit Marty to speak with his attorney—in the face of a half-dozen explicit requests—also demonstrate that the detectives knew they were not acting in complete accordance with the law. *See Edwards* 451 U.S. at 482 ("*Miranda* . . . declared that an accused has a Fifth and Fourteenth Amendment right to have counsel present during custodial interrogation."). Because there is clear evidence that Defendants intentionally violated Marty's clearly-established rights during the interrogation, a jury could find that those Defendants were not otherwise acting objectively reasonably in that interrogation.

Both of Defendants' arguments as to why their actions were not objectively unreasonable fail. First, Defendants point out that Plaintiff himself momentarily believed he may have killed his parents; they argue that for this reason it was not unreasonable for the detectives to believe Marty was actually guilty. But the fact that Marty may have momentarily questioned his own innocence is *proof* of coercion—not a defense; that Defendants manipulated a traumatized, innocent teenager into distrusting his own memory on such a central point is vivid evidence that his will was overborne.

Second, Defendants argue that because different courts, a jury, and an investigative body have not found that Marty's confession is coerced, the jury in this case cannot find that the detectives acted objectively unreasonably. But a finding of coercion is based on the totality of the circumstances, and in part because Defendants lied to those tribunals, those bodies heard meaningfully different evidence from what the jury in this case will hear. Even so, many of *those* decisions were very close. *See* D. 234 (*Huntley* decision based only on detectives' version of events without benefit of evidence confession was fabricated and false); D. 235 (on same factual record, a sharply divided 3-to-2 decision affirmed the *Huntley* decision); D. 236; D. 238 (Second Circuit finds detectives violated Marty's rights by failing to *Mirandize* him, but holding the error harmless under federal law). Any one piece of the critical new evidence that this jury will hear— the evidence of Marty's innocence, that the detectives fed non-public facts to Marty as part of the attempt to manipulate him into confession, that detectives *intentionally* withheld exculpatory evidence and details about the likely true perpetrators of the crime, and that the detectives failed seriously to investigate a likely alternative suspect and falsely claimed they did—casts serious doubt on the veracity of the Defendants' version of events and dramatically shifts the picture of the interrogation that the jury will receive.

Moreover, this Court has already rejected Defendants' attempt to argue that Marty is collaterally estopped from arguing that his confession was coerced because of these earlier proceedings and determinations. *See* Motion to Dismiss Order, Dkt. No. 66 at 12 ("[T]he prior proceedings have no preclusive effect as to Plaintiff's claims of coercion or *Miranda* violations."). The question of whether the facts support a finding that Marty's confession was coerced, under the totality of the circumstances and considering the ample evidence in this case, is for the jury to decide.

### B.  Defendants maliciously prosecuted Plaintiff.

Plaintiff's § 1983 and state law malicious prosecution claims require proof of the following elements: (1) initiation or continuation of a criminal proceeding; (2) favorable termination of that proceeding; (3) lack of probable cause; and (4) malice. *Manganiello*, 612 F.3d at 160–161; *Jocks v. Tavernier*, 316 F.3d 128, 136 (2d Cir. 2003); *Lowth v. Town of Cheektowaga*, 82 F.3d 563, 571 (2d Cir. 1996) (citing *Colon v. City of New York*, 455 N.E.2d 1248, 1250 (N.Y. 1983)).

Defendants concede that, if they are not entitled to summary judgment on Plaintiff's coercion claim, the malicious prosecution claim must also be presented to the jury. Setting this aside, Defendants principally contest the existence of probable cause.[10] But where, as here, "the question of . . . probable cause is predominantly factual in nature, as where there is a dispute as to the pertinent events, the existence *vel non* of probable cause is to be decided by the jury." *Murphy v. Lynn*, 118 F.3d 938, 947 (2d Cir. 1997) (citations omitted). Defendants' novel arguments are inconsistent with the governing precedent and ask this Court to simply ignore that Defendants *concede* there is a factual dispute as to whether Defendants fabricated Plaintiff's confession and misrepresented to prosecutors that the narrative of the crime originated with Plaintiff, thus tainting the grand jury process. *But see Torres v. Jones*, 47 N.E.3d 747, 747 (2016) ("[T]he police's transmission of the fabricated evidence can overcome the presumption of probable cause arising from a grand jury's indictment of the plaintiff.").

---

[10] As Defendants implicitly concede by their lack of argument on these issues, there is ample evidence to support the "initiation" and "malice" elements of this claim. Defendants' active role in the prosecution and presentation of false evidence to the prosecutor satisfies the "initiation" element. *See, e.g., Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 130 (2d Cir. 1997) (police officer who fabricated key evidence and forwarded it to the prosecutor "initiated" prosecution). And malice is demonstrated both through the evidence of Defendants' ill will, *see Manganiello*, 612 F.3d at 160, as well as from the lack of probable cause, *see Ricciuti*, 124 F.3d at 131 ("[L]ack of probable cause generally raises an inference of malice sufficient to withstand summary judgment.").

20

  i.  *As this Court has never decided this issue, it is not bound by a prior ruling.*

   Defendants' principal argument loosely resembles a collateral estoppel or law of the case argument: that because "this Honorable Court has already made factual ruling supporting the existence of probable cause[ i]n dismissing the plaintiff's original State false imprisonment claim," it should rely on its prior finding and conclude that Plaintiff cannot show that the Defendants lacked probable cause to *prosecute* Marty. Dkt. No. 180-3 at 28–29. But this Court's 2010 Rule 12(c) ruling was clearly addressed to a completely different legal question, as it pertained to Plaintiff's false imprisonment claim: whether Plaintiff's initial "confinement was not otherwise privileged (i.e., established by probable cause)." Dkt. No. 66 at 29. As this Court noted when Defendants previously tried to make a collateral estoppel argument, a party "seeking to invoke the doctrine of issue preclusion must show (1) 'that the identical issue was necessarily decided in the prior action and is decisive in the present action', and (2) that 'the party to be precluded from relitigating an issue . . . had a full and fair opportunity to contest the prior determination.'" Dkt. No. 66 at 9–10 (quoting *Darata v. N.Y. Cent. Mut. Fire Ins. Co.*, 76 N.Y.2d 659, 664 (1990)). Defendants cannot meet either prong of that standard.

   As the Second Circuit made clear in *Boyd v. City of New York*, probable cause to arrest is different than probable cause to prosecute.  336 F.3d 72, 75–77 (2d Cir. 2003).  For that reason, the court in *Boyd* affirmed the district court's dismissal of the plaintiff's <u>false arrest and false imprisonment</u> claims but held that a fact dispute regarding probable cause to prosecute precluded summary judgment on the plaintiff's <u>malicious prosecution</u> claim. *Id.*; *see also Gannon v. City of New York*, 917 F. Supp. 2d 241, 245 (S.D.N.Y. 2013) ("The Second Circuit clearly distinguished the probable cause necessary to defeat a false arrest claim from that required to defeat a malicious prosecution claim[.]"); *Mejia v. City of New York*, 119 F.

Supp. 2d 232, 254 (E.D.N.Y. 2000) ("[T]he existence, or lack, of probable cause is measured at a different point in time in a malicious prosecution action than a false arrest action[.]").

Here, Marty was arrested in early September and indicted many weeks later—*after* significant exculpatory evidence was discovered. This Court has never ruled on the question of whether Defendants had probable cause to initiate or continue the prosecution. Moreover, when this Court was considering Plaintiff's false imprisonment claim at the Rule 12(c) stage, before the parties had the benefit of discovery, the Court had to rely on "evidence offered at [Plaintiff's] trial"—significant pieces of which are now contested facts.  Dkt. No. 66 at 29.[11] That this Court previously considered a different legal issue, based on different evidence, under a different legal standard should have no bearing on this Court's consideration of whether Defendants are entitled to summary judgment on Plaintiff's malicious prosecution claim.

### ii.    As Defendants fabricated evidence and committed other misconduct in order to secure the indictment against Marty, there was no probable cause

There is no dispute that, in this case, the presumption of probable cause arising from the indictment has been "rebutted by evidence of various wrongful acts on the part of police"—specifically, by the fabrication of Marty's confession. *McClellan v. Smith*, 439 F.3d 137, 145 (2d Cir. 2006).[12]  Yet even though "[t]he existence of probable cause must be determined by

---

[11] For example, and contrary to the evidence introduced at trial, Plaintiff has put forth evidence that he *was* upset at the scene, D. 2, and that he did *not* tell the detectives that he had never entered his mother's bedroom, D. 15. *Compare* Dkt. No. 66 at 29–31.  Plaintiff has further put forth evidence from which a jury could conclude that additional evidence considered by the Court in its 12(c) decision—which at that time had been used to incriminate Plaintiff—is actually exculpatory. As one example, the Court noted that "blood was observed on the door knob, light switch and wall near that switch in plaintiff's bedroom." *Id.* at 30. But Plaintiff has put forth evidence, in the form of McCready's own deposition testimony, that the blood smear is *actually* indicative of someone groping around looking for a light switch—and that it is unlikely that Marty would have done that in his own room. D. 11.

[12] Specifically, Plaintiff can rebut the presumption of probable cause by showing police "failed to make a complete and full statement of facts to the District Attorney,misrepresented or falsified evidence, withheld evidence or otherwise acted in bad faith," *Manganiello*, 612 F.3d at 160-63 (internal quotation and citation omitted); *see also Boyd*, 336 F.3d at 76 (if police "lied in order to secure an indictment," the presumption of probable cause is rebutted); *Haynes v. City of New York*, 815 N.Y.S.2d 143, 146 (N.Y. App. Div. 2006) (presumption of probable cause rebutted by showing that "police failed to make further inquiry when a reasonable

reference to the totality of the circumstances," Defendants argue that no reasonable jury could find that the officers who fabricated the key evidence against Marty lacked probable cause to prosecute him. *Manganiello*, 612 F.3d at 161.

The existence of probable cause is a question of fact, rarely capable of resolution on summary judgment; this is particularly true where, as here, the determination of facts turns largely on credibility judgments. *See Coleman v. City of New York*, 585 F. App'x 787, 789 (2d Cir. 2014) (reversing summary judgment where the district court "impermissibly assessed the credibility of witnesses in finding that, as a matter of law, probable cause existed"). Without citing to support in either party's Statement of Facts, Defendants argue that there was probable cause for the prosecution. But viewing the facts in the light most favorable to Plaintiff, a reasonable jury in this case could conclude that the only evidence that could have provided probable cause to "believe the prosecution could succeed," *Boyd*, 336 F.3d at 77—the confession—was fabricated. Because Defendants knew that evidence was unreliable, and given the totality of the other evidence in the case, a reasonable jury could conclude that there was no probable cause to prosecute.

As "the existence, or lack, of probable cause is measured as of the time the judicial proceeding is commenced," *Mejia*, 119 F. Supp. 2d at 254, the question here is whether it was reasonable to believe Marty's prosecution would succeed at the time he was indicted for murdering his parents. Critically, even if probable cause initially existed, "probable cause [may] dissipate [if the] the groundless nature of the charges [is] made apparent by the discovery of some intervening fact." *Lowth*, 82 F.3d at 571. Even if probable cause somehow existed around

---

person would have done so"). Unsurprisingly, Defendants do not argue that Plaintiff is unable to rebut this presumption. Defendants concede that they are not entitled to summary judgment on Plaintiffs' fabrication claim, and this evidence alone is sufficient to rebut the presumption of probable cause. *See Manganiello*, 612 F.3d at162 ("[A] police officer's fabrication and forwarding to prosecutors of known false evidence works an unacceptable 'corruption of the truth-seeking function of the trial process.'" (quoting *Ricciuti*, 124 F.3d at 130 (2d Cir. 1997))).

the time of Marty's interrogation, a jury could reasonably find that it was vitiated by powerful

later evidence that the statement was not true, and that another perpetrator was likely involved.

Assuming Defendants truly believed Marty's affect was suspicious and that some of the

details in his initial conversations were inconsistent with their observations at the crime scene,

these observations could have provided some basis for Defendants' mistaken initial suspicion of

Marty. But red flags quickly emerged. Defendants learned that most of the key facts in Marty's

confession were false, which should have been no surprise because Defendants *fabricated* that

confession. P. 44–54, 80–90. And exculpatory facts came to light: serological testing on the

watermelon knife and barbell described in the confession came back negative for blood or tissue;

Marty would have had no way to dispose of the murder weapon yet no utility knife was found on

the scene, and the evidence against Steuerman mounted. P. 14, 47(i), 83, 84, 128–49. At this

point, there was no basis for believing Marty's confession was reliable or true—*even* if

Defendants believed that it was produced by tactics that stopped just short of unconstitutional

coercion.

Defendants' main argument against probable cause—which Defendants concede is *only*

relevant should this Court hold that no reasonable jury could find that Marty's confession was

coerced—bizarrely asks this Court to parse the seconds of Marty's interrogation and consider his

words "Yeah, I did it"—but not the remainder of his fabricated statement—in the probable cause

analysis. *See* Dkt. No. 180-3 at 24. This sort of tortured splitting of a fabricated confession into

two parts—one tainted, and one somehow completely untainted—has no support in the law. *See*

*Halsey v. Pfeiffer*, 750 F.3d 273, 305 (3d Cir. 2014) (in deciding whether a confession is coerced,

courts are not permitted to take a "compartmentalized view of the interrogation process in which

a court considers the material events independently or disjunctively rather than as connected

24

episodes in an ongoing process"). Indeed, no court has held that one line in a confession can *support* probable cause when other, fabricated lines in the same confession and physical evidence *rebut* it. *See Cox v. County of Suffolk*, 780 F. Supp. 103, 108 (E.D.N.Y. 1991) (holding defendants not entitled to qualified immunity for malicious prosecution where they unreasonably ignored evidence indicating plaintiff's innocence, despite circumstances that superficially suggested plaintiff had committed crime).

Defendants *concede* that a jury could find they fabricated the confession, and thus a jury could find they *knew* the inculpatory statement did not create probable cause. That is, a jury could conclude that, if Defendants truly believed Marty's assertion of guilt ("Yeah, I did it.") provided probable cause to prosecute because they believed it was not the product of misconduct, *see Boyd*, 336 F.3d at 77, Defendants would not have needed to fabricate his confession. That they did so is strong evidence of the lack of probable cause.

There is ample authority holding that summary judgment is not appropriate where the sole direct inculpatory evidence at the time of prosecution was either fabricated or obtained through defendants' misconduct.[13] For example, in *Torres v. Jones*, the New York Court of Appeals recently reversed summary judgment for police defendants who fabricated a confession, holding that probable cause in the malicious prosecution case was a question for the jury. 47 N.E.3d 747 (2016). In *Torres*, as here, the plaintiff had been interrogated by police and eventually made an inculpatory statement; there was no dispute that Torres signed a confession. *See id.* at 753, 758. But the Court of Appeals noted the critical question was whether the officers should have known the confession could not provide probable cause, given that they had fed her

---

[13] Defendants cannot cite a single case in support of their related argument that the fabricated confession *itself* can provide probable cause for Marty's prosecution. Tainted evidence is excluded from the probable cause analysis at the summary judgment stage. *See Torres*, 47 N.E.3d at 762 (in a malicious prosecution case, probable cause analysis *excludes* the plaintiff's fabricated confession); *Jenkins v. City of New York*, 478 F.3d 76, 93 (2d Cir. 2007) (holding that, in a false arrest case, an unduly suggestive lineup could not form the basis of probable cause).

all the details and pressured her into signing; because there was a dispute of fact regarding the fabrication of this confession, the court considered whether—if the fabricated confession is set aside—there would have been probable cause to prosecute based on the *other* evidence. *See id.* at 765–68.

Given the defendant officers' misconduct, summary judgment was inappropriate even though there was substantial other *undisputed* evidence implicating Torres in the murder: Her necklace had been found in the victim's bedroom; she initially lied to police about knowing the victim; there were signs of a crime of passion; and Torres had both lied to detectives and failed a polygraph. *See id.* at 752–59. The non-confession evidence against Marty is far weaker: the sum total of evidence Defendants cite are minor inconsistencies between Marty's initial truthful statements to police and the evidence, which are attributable to the trauma he had experienced and certainly cannot rise to the level of probable cause to believe the prosecution would succeed.[14] The Defendants knew Marty was a teenager who had just seen the brutalized bodies of his parents; in other words, there was an obvious innocent explanation for minor inconsistencies between Marty's statements and the evidence: he was traumatized.

Additionally, once the results of the forensic testing began to come back inconsistent with Marty's statement, "the detectives' own familiarity with [this] evidence . . . should have given them pause about the reliability of [plaintiff's confession]" because the details in the confession were inconsistent with how the physical evidence indicated the crime had actually occurred. *Torres*, 47 N.E.3d at 765 (noting, for example, "the blood trail from the apartment suggested that the killer had fled down the stairs rather than into the elevator," contrary to the confession).

---

[14] There was no sign of a break-in, and Marty was the only one in the house; Marty told the detectives he had not heard the crime take place; Marty told the detectives that the drapes in his parents' room were drawn when they were actually open; and the detectives did not find blood in places that, in light of Marty's explanation of the morning's events, they expected to find it (including on Marty's clothes, and on the phone in the kitchen). D. 62.

Based on this evidence, a jury could easily find that there was no probable cause to prosecute. As in *Torres*, summary judgment is inappropriate.

A jury could also conclude that probable cause was lacking based on Defendants' egregious misconduct in this case, which shows that Defendants were intent on making a case against Marty but did not believe that the legitimate evidence against him provided probable cause to prosecute. This is precisely what happened in *Manganiello*, where the Second Circuit upheld a malicious prosecution verdict against a homicide investigator:

> In sum, looking at the evidence as a whole, the jury could permissibly infer that Agostini was determined simply to make a case against Manganiello, and that in order to do so Agostini refrained from making inquiry into other possible suspects, ignored evidence that was inconsistent with his belief that Manganiello was guilty, declined to inform the ADA of, or to document, any exculpatory evidence or inconsistencies in the statements of witnesses who agreed to inculpate Manganiello, secured one statement inculpating Manganiello by agreeing not to disclose the witness's known criminal activities to the proper authorities, and included in some of Agostini's own reports supposedly factual statements adverse to Manganiello that were contradicted by persons having first-hand knowledge of the facts. The evidence amply supported the jury's finding that . . . probable cause was lacking.

612 F.3d at 163.

This record supports findings of police misconduct far beyond what the Second Circuit found negated probable cause in *Manganiello*. Here, as described above, a jury could find the detectives targeted an innocent teenager; interrogated him for hours while ignoring his protestations of innocence and requests for counsel; fabricated a confession and misrepresented that it originated with Marty; repeatedly lied to the prosecutor about how they had conducted the investigation, and suppressed exculpatory evidence. The very fact that Defendants found it necessary to engage in such blatant misconduct is an implicit admission they knew it was necessary to prosecute the teenager. There would be no reason to risk so

much by stacking the deck unless they knew they would lose a fair hand. A jury could find that the interrogating detectives' own actions demonstrate that "police knew [they lacked probable cause], but lied in order to secure an indictment." *Boyd*, 336 F.3d at 77. As the Second Circuit has held, summary judgment is inappropriate in this circumstance. *See id.*

In addition, given his glaringly suspicious actions and the incriminating information Marty and others provided, any reasonable detective would have thoroughly investigated the Jerry Steuerman lead. P. 143. Instead, they lied to prosecutors and their own supervisor, claiming they had thoroughly investigated and cleared Steuerman. P. 150–56. This evidence could support a reasonable jury's finding that Defendants lied about their investigation of Steuerman in order to cover up their misconduct in obtaining the confession; thus it supports a finding that Defendants lacked probable cause to prosecute Marty.

### iii.    *Favorable termination*

 "[A]ny final termination of a criminal proceeding in favor of the accused, such that the proceeding cannot be brought again, qualifies as a favorable termination for purposes of a malicious prosecution action." *Poventud v. City of New York*, 750 F.3d 121, 130–31 (2d Cir. 2014) (quoting *Smith–Hunter v. Harvey*, 95 N.Y.2d 191, 195 (2000)). Dismissal of an indictment in the interests of justice is a favorable termination *unless* the circumstances surrounding that dismissal are "*inconsistent* with the innocence of the accused." *Bellissimo v. Mitchell*, 995 N.Y.S.2d 603, 605–06 (N.Y. App. Div. 2014) (emphasis added) (noting that an indictment dismissed out of mercy, when the court believed the defendant to be guilty, was not a favorable termination). This narrow "exception to the general rule" that *any* final termination in the accused's favor is a "favorable termination" does not apply in this case. *See id.*

Defendants argue that plaintiff does not meet the "favorable termination" prong of his malicious prosecution claim because he cannot "produce any evidence beyond that alleged in the complaint which would more strongly establish his actual innocence." Dkt. No. 180-3 at 26. They puzzlingly rely on this Court's Rule 12(c) ruling rejecting this same argument. In so doing, Defendants purport to refer to this Court's analysis of the favorable termination prong of a malicious prosecution claim, but the passage they actually cite is from this Court's rejection of Defendants' argument that Plaintiff's claim was foreclosed under *Heck v. Humphrey*, 512 U.S. 477 (1994). *See* Dkt. No. 66 at 17 (rejecting Defendants' argument but noting that Defendants were not necessarily precluded from raising a *Heck* argument at a later stage of litigation). The Court separately addressed the favorable termination question and denied Defendants' motion to dismiss the malicious prosecution claim on that ground. Dkt. No. 66 at 17–22.

As this Court has already noted, courts have rejected the argument that "a plaintiff must establish her innocence prior to recovery on a malicious prosecution claim." *Id.* at 20 (citing *Smith-Hunter*, 734 N.E. 2d at 755). As this Court recognized, requiring Plaintiff to strongly establish his actual innocence at the summary judgment stage would be inconsistent with that principle and is not the law. But, even if such a showing *were* required, Plaintiff could satisfy that standard; as described at length in this brief, Plaintiff has put forth overwhelming evidence of his innocence.

Moreover, the law is clear that, in determining when dismissal of the indictment "in the interest of justice" constitutes a "favorable termination," courts must engage in a case-specific inquiry and ask whether the "reasons for dismissing the criminal <u>charges</u> were <u>not inconsistent</u> with the innocence of the accused." *Cantalino v. Danner*, 754 N.E.2d 164, 165 (2001) (emphasis added).  Here, a superseding indictment was the charging instrument, and the basis on which the

29

indictments were dismissed was consistent with innocence. The court that dismissed the

indictments explained that, as "the People realistically acknowledge[d, ]the strength of the case

against defendant [was] diminished for several reasons." Dkt. No. 47-3 (*People v. Tankleff*,

Indict. Nos. 1535-88, 1290-88, Slip Op. at 1 (N.Y. Suffolk Cty. Crim. Ct. July 22, 2008)). The

Court embraced the reasoning put forth by the Attorney General, who moved to dismiss the

indictments because the evidence against Marty was insufficient to proceed in good faith with

the case. In its Memorandum of Law in Support of the People's Motion Pursuant to CPL 210.40

to Dismiss the Indictments, the Attorney General noted, for example:

> there is no biological or physical evidence strongly linking the defendant to the
> crimes, even after a renewed set of forensic tests using the most up-to-date
> technology; there is some evidence that others may have committed the killings;
> and there is evidence of problematic conduct on the part of [Detective McCready]
> that could taint the presentation of the prosecution case.

Dkt. No. 47-2 at 4–5 (internal numbering omitted). The Attorney General also acknowledged

that Marty's confession was the principal piece of evidence against him, but cast doubt on its

reliability, noting that "physical evidence contradicts some aspects of the confession, and fails to

corroborate other aspects of the confession, where strong corroboration might have been

expected." *Id.* at 9. And "there is no part of the confession that was corroborated by physical

evidence and that could have been known by only the murderer." *Id.* at 10.[15]

Defendants cannot point to a single case where an indictment dismissed due to evidence

of the accused's innocence and the corresponding weakening of the case against him was *not*

considered a favorable termination. *Cf. Ward v. Silverberg*, 652 N.E.2d 914, 914–15 (1995)

(charges stemming from failure to pay $25 for eyeglass frame repairs were dismissed out of

---

[15] Additionally, though the focus of this inquiry is properly on the court that *finally* ended the prosecution—i.e., the court that dismissed the indictments—it is worth noting that the court that overturned Marty's conviction did so because the new evidence he put forth was "of such character as to create a probability that had such evidence been received at the trial the verdict would have been more favorable to the defendant." *People v. Tankleff*, 848 N.Y.S.2d 286, 301 (N.Y. App. Div. 2007) (quotation omitted).

mercy); *Mitchell v. City of Albany*, No. 08-CV-871, 2010 WL 1235389, at *6 (N.D.N.Y. Mar. 31, 2010) ("[A]bandonment of the underlying criminal prosecution occurred not because of some inaction by the prosecutor that could be inferred as impacting the question of Karen's innocence . . . but because Karen's death made prosecution impossible."). Plaintiff has put forth *overwhelming* evidence of his innocence at this stage, but he is not required to do so.

Here, as the basis for dismissing the indictments was explicitly the weakening of the prosecution's case due largely to evidence of the accused's innocence, the "final termination" of Marty's prosecution was plainly on a ground "not inconsistent with innocence" and thus favorable to Marty.

### C.  Defendants suppressed exculpatory evidence.

To cover up the mounting evidence demonstrating that Plaintiff's confession was false and coerced, Defendants concealed critical exculpatory forensics. At Arlene Tankleff's autopsy, Dr. Adams, the Suffolk County Medical Examiner, concluded there was no "reasonable possibility" that the watermelon knife—the knife identified in the confession—was the murder weapon. P. 98, 103. Although Defendants were aware of Dr. Adams' findings, Defendants unlawfully hid this information from the prosecutor and defense to make the confession appear reliable. *See United States v. Coppa*, 267 F.3d 132, 139 (2d Cir. 2001) (noting *Brady v. Maryland* requires the government "to disclose favorable evidence to the accused where such evidence is 'material' either to guilt or to punishment"). Defendants cannot and do not dispute that a medical examiner's opinion that the murder weapon in the confession was not used to commit the crimes is *Brady* material; instead, they misrepresent the facts and law to argue that summary judgment is warranted.

i.    *Defendants knew of the exculpatory evidence*

Defendants claim that they were not required to disclose Dr. Adams's exculpatory

conclusion because it is beyond dispute, as a factual matter, that they did not know about it. Dkt.

No. 180-3 at 36. That is wholly belied by the record evidence.

Standard SCPD Homicide Squad practice at the time was to have a detective present at

the autopsy, usually taking notes, because only a detective would know whether the information

that came out at autopsy contradicted or confirmed the working theory of the case. P. 93–95.

Doyle was present for Arlene's autopsy, and although Rein denies being present for Arlene's

autopsy, he admits being present at Seymour's; and Prosecutor Collins identified the handwriting

on a diagram drawn at Arlene's autopsy as Rein's. P. 102–04. In addition, every non-Defendant

witness who testified on the topic agreed that, given the way the process worked, Dr. Adams's

conclusion that the watermelon knife was excluded as the murder weapon would have been

relayed to McCready, the lead detective on the case. P. 101–07.

And evidence from the time of the investigation confirms that Dr. Adams's findings were

known to the Defendants—handwritten notes depict wound measurements from Arlene's body

that are inconsistent with the watermelon knife. P. 103. Dr. Adams concluded at the autopsy that

the wounds were most likely inflicted by a utility knife, and those notes contain a drawing of

what appears to be a utility knife. P. 98. According to Dr. Adams, the notes were not his, but

they appeared to be drawn by "someone who was at the autopsy and making a diagram of their

own at the same time I was making my notes." P. 104.

During the autopsy, detectives would typically talk with the medical examiner about

findings during the autopsy as the findings were being made. P. 106. As one would expect, this

conversation would ordinarily include whether wounds were consistent with a particular type of

32

weapon. P. 101. In fact, the very purpose of the interaction between the detectives and the medical examiner was to educate the detectives about the nature of the murder weapon; Dr. Adams testified that, with respect to a homicide investigation, detectives are concerned with "who did it," while medical examiners are concerned with "what did it." Defs. Ex. BBB at 23: 19–21. It defies logic to believe that Dr. Adams failed to relay the precise information that he was expected to provide, to the very people he was expected to provide it—the Defendants.

Indeed, many Defendants themselves confirmed that they knew that the watermelon knife was not used in the crime, and that the true weapon was a utility-type knife, based on the nature of the wounds—i.e., the *same conclusion, based on the same evidence* reached by Dr. Adams. P. 120–27. During a reinvestigation of the crime after Marty's conviction was vacated, Doyle, Pfalzgraf, and Kosciuk told special investigators that they knew a utility-type knife—and not the watermelon knife—was the true weapon. *See* P. 125 (Kosciuk "may have discussed this matter with the Medical Examiner"); P. 126 (based on Arlene's wounds, he believed a small knife was used); P. 127 (Doyle "did not believe that a knife, recovered on a kitchen counter next to a watermelon, was used to inflict the injuries and that a smaller knife, possibly a utility knife, might have been used."). However, these same Defendants incredibly claimed, in affidavits submitted in support of Defendants' motion for summary judgment, that they never learned from Dr. Adams or another member of the Homicide Squad that Dr. Adams believed that there was no reasonable possibility the watermelon knife was the murder weapon. P. 120. Thus there is sufficient evidence for the jury to find that each Defendant knew of this exculpatory evidence.

### ii. *The exculpatory evidence was suppressed.*

Recognizing that their claims of ignorance are dubious in light of the record, Defendants alternatively argue that, despite their concealment of Dr. Adams's findings from the prosecutor

and defense counsel, Plaintiff should still have discovered this information on his own by interviewing or cross-examining Dr. Adams. Dkt. No. 180-3 at 39.

First, summary judgment is precluded on this issue because there is a very clear fact dispute regarding Defendants main argument—that defense counsel could have independently obtained this evidence from Dr. Adams. Though Defendants may now claim that the medical examiner would have shared his conclusions with any defense attorney who inquired, based on Mr. Gottlieb's decade of experience, this was not the case. Gottlieb affirmed that the Office of the Suffolk County Medical Examiner was not truly independent from the Suffolk County District Attorney's Office; if Gottlieb had reached out to the Medical Examiner, he would have been told to speak to the prosecutor on the case and ultimately referred to the Medical Examiner reports he already had. D. 155. This is the type of classic fact dispute regarding an element of Plaintiff's claim that makes summary judgment inappropriate. Furthermore, crediting Gottlieb's version, as the Court must at this stage, this is evidence the Defendants knew they could successfully hide Dr. Adams's exculpatory conclusion, because Gottlieb would not have direct access to Dr. Adams.

Moreover, even if the defense attorney had theoretically been able to obtain the exculpatory information from the medical examiner after it was withheld by the prosecution, the Supreme Court has admonished that this type of "prosecutor may hide, defendant must seek" standard "is not tenable in a system constitutionally bound to accord defendants due process." *Banks v. Dretke*, 540 U.S. 668, 696 (2004).  Before trial, defense attorney Gottlieb requested "all forensic reports" from the prosecutor. Pls. Ex. 53. In response, ADA Jablonski furnished reports and evidence that contained some exculpatory evidence regarding the watermelon knife—but *not* the key exculpatory evidence that the medical examiner had conclusively excluded it as the

34

murder weapon. Pls. Ex. 52. Jablonski stated that he would provide additional reports as he received them, *id.*, and Judge Collins, who took over as ADA in the case, testified that that he would have disclosed Dr. Adams's finding regarding the knife if he had been aware of that evidence, P. 115. But as the key exculpatory evidence was never disclosed to the prosecutor, Plaintiff "cannot be faulted for having relying on th[e] representation" that all exculpatory forensic evidence had been disclosed. *Banks*, 540 U.S. at 693. Indeed, "[t]he more specifically the defense requests certain evidence, thus putting the prosecutor on notice of its value, the more reasonable it is for the defense to assume from the nondisclosure that the evidence does not exist." *United States v. Bagley*, 473 U.S. 667, 682–683 (1985). Gottlieb's request here plainly covered evidence regarding the watermelon knife; the ADAs themselves interpreted it as such.

Accordingly, the *Banks* Court flatly rejected the precise argument made by Defendants. There, the government argued that it had not suppressed exculpatory material because the petitioner could have interviewed the witness who possessed the information.  540 U.S. at 695. The Court disagreed, stating: "Our decisions lend no support to the notion that defendants must scavenge for hints of undisclosed *Brady* material when the prosecution represents that all such material has been disclosed." *Id.* at 695.

Likewise, the Second Circuit has refused to allow a "blame the defense" rationale to absolve the government of its *Brady* obligations. *See Lewis v. Connecticut Comm'r of Corr.*, 790 F.3d 109, 121 (2d Cir. 2015) ("[*Brady*] imposes no duty upon a defendant, who was reasonably unaware of exculpatory information, to take affirmative steps to seek out and uncover such information in the possession of the prosecution . . . .")[16] Thus, in *United States v. Payne*, the

---

[16] District courts in this Circuit have similarly held that that "[p]enalizing [the defendant] for failing to fact check the government's erroneous stipulation" with respect to disclosure of *Brady* material "would turn due process on its head." *United States v. Thomas*, 981 F. Supp. 2d 229, 240 (S.D.N.Y. 2013); *see also Turner v. Schriver*, 327 F.

Second Circuit held that a witness's affidavit was "suppressed," even though it was available in a public court file and the identity of the witness was known to the defendant. 63 F.3d 1200, 1208–09 (2d Cir. 1995). The court explained that, although the defendant theoretically had access to the affidavit and knew some information about the witness, he had no reason to believe that the additional document existed—and thus no obligation under *Brady* to seek it out:

> The government produced for [defendant] a large volume of other materials concerning [the witness]. . . . Included were publicly available court documents . . . . A defendant receiving such documents from the government could reasonably assume that the court files did not include other undisclosed exculpatory and impeachment documents pertaining to [that witness].

*Id.* at 1209; *see also United States v. Jackson*, 345 F.3d 59, 73 (2d Cir. 2003) (evidence pertaining to a nontestifying confidential informant was suppressed as there was no basis to conclude defendants "knew or should have known about these materials or their contents," despite fact that the government had identified the informant to defendants).

The cases cited by Defendants are completely consistent with this principle but utterly unhelpful to Defendants' case. Each involves a defendant who knew about the non-disclosed exculpatory information but chose not to use it, *i.e. United States v. Paulino*, 445 F.3d 211, 225 (2d Cir. 2006), or a situation where non-material information was exclusively in the possession of the medical examiner but was *never disclosed* to law enforcement or the prosecution, *i.e. McIntosh v. Conway*, 2014 WL 502735 (S.D.N.Y. 2014).  That is not the case here.

Plaintiff's defense counsel also could not reasonably be expected to have obtained this material information during cross-examination of Dr. Adams. Given his defense counsel's understanding, consistent with the prosecutor's opening, that the watermelon knife *was* consistent with the wounds, asking Dr. Adams a question that he expected an unfavorable answer

---

Supp. 2d 174, 185 (E.D.N.Y. 2004) (when a prosecutor's representation or practice indicates that all exculpatory information was disclosed, an argument that the defense was "insufficiently diligent" would be "without merit").

to would have been a severely detrimental trial strategy.  The Second Circuit acknowledged this exact point in an analogous scenario. In *Shih Wei Su v. Filion*, the government argued that due diligence required the defense to learn through cross-examination that the government's previous representations about a witness were erroneous. 335 F.3d 119 (2d Cir. 2003). Rejecting that argument, the court observed that "in order to do what the state suggests [Plaintiff] should have done, [Plaintiff] would have been required to assume that the prosecutor had lied. This would involve enormous tactical danger." *Id.* at 128. The court pointed out that because "conscientious counsel *can* rely on prosecutors to live up to their obligations," the plaintiff could not be faulted "for not proceeding in his cross-examination on the assumption that the prosecutor is a liar." *Id.*[17]

The record shows that Defendants Rein, Doyle and McCready—each of whom was unquestionably a member of the prosecutorial team with *Brady* obligations, *see Kyles v. Whitley*, 514 U.S. 419, 437 (1995)—failed to disclose material information that was unknown to the defense. These acts violate *Brady*. *See Banks*, 540 U.S. at 696; *Lewis*, 790 F.3d at 121.

Given the evidence in the record, the jury could infer that (1) at least one detective was present at the autopsy when Dr. Adams excluded the watermelon knife as being the murder weapon; (2) the Defendants, including McCready, all came to know that the watermelon weapon could not have been the murder weapon; (3) Gottlieb reasonably believed he possessed all exculpatory forensic evidence because he made specific request for forensic evidence and was provided with some exculpatory evidence regarding the watermelon knife; (4) the prosecutors themselves did not know of the exculpatory watermelon knife evidence, such that ADA Collins argued the watermelon knife was the murder weapon in his opening statement; and (5)

---

[17] Moreover, proper disclosure of *Brady* material is imperative so that the defense can effectively prepare for trial. *See, e.g.*, *Leka v. Portuondo*, 257 F.3d 89, 103 (2d. Cir 2001); *St. Germain v. United States*, Nos. 03-CV-8006, 99-CR-339, 2004 WL 1171403, at *18 (S.D.N.Y. May 11, 2004).  Allowing the Defendants to conceal *Brady* material pre-trial and thereafter punish Plaintiff for not seeking it out during trial would be contrary to the Court's guidance in *Banks*, 540 U.S. at 696.

Defendants' statements about their knowledge of this exculpatory evidence have been contradictory and inconsistent, such that they are not credible. Thus the jury could conclude that Defendants knew of, and withheld, *Brady* evidence. *See St. Pierre v. Dyer*, 208 F.3d 394, 404 (2d Cir. 2000) ("[I]f there is any evidence in the record from any source from which a reasonable inference could be drawn in favor of the nonmoving party, summary judgment is improper.").

### iii.    *Plaintiff brought the* **Brady** *claim within the statute of limitations.*

Defendants' bare assertion that the statute of limitations has expired on Plaintiff's amended *Brady* claim is simply wrong; it is no basis to grant Defendants summary judgment.

"[A] complaint need not pin plaintiff's claim for relief to a precise legal theory." *Skinner v. Switzer*, 562 U.S. 521, 530 (2011). Thus, although Plaintiff moved to amend his Complaint out of an abundance of caution, and to provide notice of this theory of recovery, he was not required to do so. Count II of Plaintiff's original Complaint alleges that Defendants violated Plaintiff's Fourteenth Amendment right to a fair trial, *see* Dkt. No. 1 at 28; Plaintiff's claim that Defendants withheld *Brady* evidence is also a fair trial claim—it is simply another theory of liability.

The *Brady* claim is timely because it relates back to Plaintiff's timely filed original Complaint. Under Federal Rule of Procedure 15(c)(B), "[a]n amendment to a pleading relates back to the date of the original pleading when . . . the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out—or attempted to be set out—in the original pleading." As this Court noted, "[n]ew allegations contained in an amended pleading will relate back if the allegations amplify the facts alleged in the original pleading or set forth those facts with greater specificity." *Oliner v. McBride's Indus., Inc.*, 106 F.R.D. 9, 12 (S.D.N.Y. 1985) ("Where the new allegations go beyond such amplification, the critical question is whether the original pleading gave the defendant fair notice of the material subsequently raised in the

amended pleading."). This is so even where, as here, the amended pleading alleges a new theory of recovery. Provided the amended pleading is based on the same series of transactions and occurrences alleged in the original pleading, the revised pleading will relate back to the original pleading, even where the revised pleading contains legal theories not included in the original. *See White v. White Rose Food*, 128 F.3d 110, 116 (2d Cir. 1997).

Here, the facts underlying Plaintiff's *Brady* claim merely sets forth more specific details underlying this allegation. *See Atwood v. Town of Ellington*, 468 F. Supp. 2d 340, 350 (D. Conn. 2007) (finding additional cause of action related back to original pleading where discovery yielded more specific facts underlying allegations pled in the original complaint). In addition, each defendant named in Plaintiff's *Brady* claim was a party to the original Complaint, and the Complaint contained a separate cause of action based on Defendants' withholding of material, exculpatory evidence. *See* Dkt. No. 1 at 29 ("COUNT IV: 42 U.S.C. § 1983 Suppression of Favorable Evidence in Violation of the Fourteenth Amendment"). Accordingly, each defendant had "fair notice" of this claim as it is based on the same general conduct alleged in Plaintiff's initial pleading: Defendants covered up information that demonstrated his confession was false. *See* F.R.C.P 15(c); *Oliner*, 106 F.R.D. at 12.

Third and finally, as this Court has stated with respect to § 1983 claims, "to be entitled to summary judgment, defendants must establish that no genuine issue of material fact exists as to whether plaintiff could, with the exercise of reasonable diligence, have been aware of the claim within three years of the filing of this [claim]." *D'Angelo v. City of New York*, 929 F. Supp. 129, 132 (S.D.N.Y. 1996). Defendants have not met that burden. Instead, they merely speculate that Plaintiff became aware of the factual basis of this claim during his counsel's initial conversations with Dr. Adams on some unknown date before Dr. Adams' deposition. There are

39

no facts to support this conjecture. As Plaintiff stated in his motion for leave to file an amended complaint, Plaintiff discovered that Defendants had concealed that evidence during Dr. Adams' deposition on August 5, 2014. *See* Dkt. No. 145 at 2.  There was no reasonable way for Plaintiff to discover this information earlier (which been hidden *even from the trial prosecutor*.) Plaintiff moved to amend his Complaint on December 9, 2014, well within the three-year limitations period for this claim.

## V.    Conclusion

It is beyond dispute that the jury could conclude Marty's wrongful conviction and 17-year incarceration was caused by Defendants' egregious misconduct. At trial, the jury should be permitted to consider, alongside Plaintiff's fabrication and *Monell* claims, Plaintiff's claims that the same Defendants coerced innocent Marty's false confession, maliciously prosecuted him without probable cause, and withheld exculpatory evidence.  Defendants' attempts to muddy the waters by mischaracterizing the evidence or arguing that this Court should view the evidence in their favor must fail; each of Plaintiff's claims is for the jury.

Dated:   New York, New York                    Respectfully submitted,
         August 17, 2016


                                               NEUFELD SCHECK & BRUSTIN, LLP
                                               *Attorneys for Plaintiff Martin Tankleff*

                                               */s/ Emma Freudenberger_____*
                                               Barry Scheck
                                               Emma Freudenberger
                                               Anna Benvenutti Hoffmann
                                               Julia L. Torti
                                               99 Hudson Street, 8th Floor
                                               New York, NY 10013
                                               Tel: (212) 965-9081
                                               Fax: (212) 965-9084

                                               Barry J. Pollack
                                               Miller & Chevalier
                                               655 Fifteenth Street, NW
                                               Suite 900
                                               Washington, DC 20005

                                               Bruce A. Barket
                                               Barket Marion Epstein & Kearon LLP
                                               666 Old Country Road
                                               Suite 700
                                               Garden City, NY 11530


## Certificate of Service

       I hereby certify that a true and accurate copy of the foregoing Plaintiff's Memorandum of
Law in Opposition to Defendants' Motion for Partial Summary Judgment was served on all
counsel of record via ECF on August 17, 2016.



                                               */s/ Madhu Srikantha*
                                               Madhu Srikantha, Paralegal
                                               Neufeld Scheck & Brustin, LLP