## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NEW YORK

—————————————————————— )
)
MARTIN TANKLEFF,                                )
)
    Plaintiff,                              )
)
        v.                                   )
)
THE COUNTY OF SUFFOLK,                          )
K. JAMES MCCREADY, NORMAN REIN ,                )
CHARLES KOSCIUK, ROBERT DOYLE,                  )
JOHN MCELHONE, JOHN DOE POLICE                  )
OFFICERS #1-10, RICHARD ROE, Suffolk            )
County Employees #1-10,                         )
)
    Defendants.                             )
—————————————————————— )

**PLAINTIFF'S
COUNTERSTATEMENT OF
MATERIAL FACTS PURSUANT
TO LOCAL RULE 56.1**

**No. 09-CV-1207 (JS)(AYS)**

## TURMOIL IN THE SCPD HOMICIDE SQUAD

*In the 1980s, allegations of police brutality against the SCPD Homicide Squad steadily increase in number and frequency, prompting inquiries.*

1.    Beginning in the late 1970s, allegations began to surface that detectives in the Suffolk County Police Department ("SCPD") Homicide Squad had been using physical force to extract confessions from suspects. [Pl.'s Ex. 1 (Trainum Report) at 15; Pl.'s Ex. 2 (McElhone 2011 Deposition) at 88:19–90:3.] This was the start of a period of "turmoil" in the SCPD. [Pl.'s Ex. 1 (Trainum Report) at 15; Pl.'s Ex. 2 (McElhone 2011 Deposition) at 22:5–22.]

2.    As a result, on June 11, 1979, the National Law Journal published an article entitled "When Suspects are Abused: Allegations of Beatings, Forced Confessions in a N.Y. Suburb are Widespread; Cases Highlight Perils to Effective Law Enforcement." [Pl.'s Ex. 3 (NLJ Article) at 1, 4–17.] The article described the SCPD's use of physical force and other improper techniques to pressure suspects to confess, as well as a startling failure to follow up on obvious leads inconsistent with a confession or to seek evidence that might corroborate or refute a confession. [Pl.'s Ex. 3 (NLJ Article) at 1–17.] The article concluded that members of the SCPD had engaged in an "apparent pattern of brutality." [Pl.'s Ex. 3 (NLJ Article) at 1; Pl.'s Ex. 4 (SCBA Report) at 2; Pl.'s Ex. 5 (1989 SIC Report) at 11.]

3.  Shortly thereafter, in July 1979, the Civil Rights Committee of the Suffolk County Bar Association ("SCBA") began an investigation into the brutality allegations against the SCPD, and also into the SCPD's reliance on confessions to close cases. [Pl.'s Ex. 1 (Trainum Report) at 15; Pl.'s Ex. 4 (SCBA Report) at 3; Pl.'s Ex. 5 (1989 SIC Report) at 11; *see generally* Pl.'s Ex. 4 (SCBA Report) at 1–54.] Public hearings were held in September 1979. [Pl.'s Ex. 4 (SCBA Report) at 5.] On January 28, 1980, the SCBA issued a report of its investigation. [Pl.'s Ex. 1 (Trainum Report) at 15; Pl.'s Ex. 4 (SCBA Report) at 1–54.] The report concluded that there was a "serious problem in Suffolk County with respect to police brutality . . . . often involving members of minority groups and young persons." [Pl.'s Ex. 4 (SCBA Report) at 6.] This conclusion was based on the reports of the Suffolk County Human Rights Commission, the County agency responsible for referring brutality complaints for investigation, and was further supported by the experience of members of the private bar and the decisions of state and federal courts. [Pl.'s Ex. 4 (SCBA Report) at 6–29.] The report contained a number of recommendations for reform, including that the SCPD "should videotape the questioning of any arrestee in police custody where the crime involved is a felony." [Pl.'s Ex. 4 (SCBA Report) at 39; *see also* Pl.'s Ex. 1 (Trainum Report) at 15; Pl.'s Ex. 5 (1989 SIC Report) at 11–13.]

***SCPD misconduct at high-profile murder trials arouses the ire of a Suffolk County judge, who calls for a full-fledged investigation.***

4.  In September 1985, several SCPD Homicide Squad detectives testified at trial against a man named James Diaz who they claimed had confessed to a brutal rape and murder, but had refused to sign the confession. [Pl.'s Ex. 5 (1989 SIC Report) at 31–42.] For example, Detective K. James McCready testified at the trial that a witness had identified Diaz from a photograph in the newspaper, but, after being impeached by evidence that no paper had published a photograph of Diaz at the time of the supposed identification, then claimed that he had just assumed the witness had seen a photograph of Diaz. [Pl.'s Ex. 5 (1989 SIC Report) at 38–39.] Caught in this lie, Detective McCready went on to falsely claim that he had shown a photo array to the witness, even though no photo array was ever documented or reported, and the prosecutor had already told the judge that no photo array procedure took place. [Pl.'s Ex. 5 (1989 SIC Report) at 39–40.] Detective McCready's conduct was later found to have constituted perjury. [Pl.'s Ex. 5 (1989 SIC Report) at 41–42.]

5.  After another misconduct-riddled murder trial, that of Peter Corso in May 1985, jurors were quoted as saying that Corso was acquitted partly due to the "careless and unprofessional investigative methods" employed by the SCPD Homicide Squad. [Pl.'s Ex. 5 (1989 SIC Report) at 43.]

6.  As a result, on October 19, 1985, after presiding over the Diaz and Corso trials, Suffolk County Court Judge Stuart Namm wrote a letter to Governor Mario Cuomo detailing concerns he had about the SCPD's Homicide Squad detectives and Suffolk County prosecutors, and requesting a full-fledged investigation. [Pl.'s Ex. 1 (Trainum Report) at 15; Pl.'s Ex. 5 (1989 SIC Report) at 16–17; Pl.'s Ex. 6 (Judge Namm Letter) at 1–4.]

***The SIC responds to complaints and conducts an investigation into the SCPD Homicide Squad's practices.***

7.    On January 9, 1986, following Judge Namm's letter, an increase in complaints in general about the SCPD, and numerous public reports regarding SCPD abuses, the State of New York Commission of Investigation ("SIC") opened an investigation into the SCPD, specifically the Homicide Squad. [Pl.'s Ex. 1 (Trainum Report) at 15; Pl.'s Ex. 5 (1989 SIC Report) at 5–21.]

8.    The SIC's resulting report, issued in April 1989, ultimately found that very few of the SCBA's 1980 recommendations had been implemented by the SCPD. [Pl.'s Ex. 1 (Trainum Report) at 15; Pl.'s Ex. 5 (1989 SIC Report) at 12–13.]  Instead, the SIC report noted "grave shortcomings in the leadership and management" of the SCPD, especially with respect to the conduct of its Homicide Squad detectives, including lack of accountability for official misconduct. [Pl.'s Ex. 5 (1989 SIC Report) at 23, 26.] The report further found that the SCPD engaged in and permitted grossly deficient investigative and management practices, and failed to punish instances of employee misconduct, even when supervisory personnel knew of those instances. [Pl.'s Ex. 6 (1989 SIC Report) at 28.]

***Newsday publishes series entitled "The Confession Takers," exposing SCPD Homicide Squad practices with regard to confessions.***

9.    While the SIC investigation was ongoing, from December 7–11, 1986, Newsday published a multi-part series on the SCPD Homicide Squad titled "The Confession Takers." [Pl.'s Ex. 1 (Trainum Report) at 16; Pl.'s Ex. 7 (Newsday Series) at 1–67.] The Newsday series focused on research that suggested the Homicide Squad was over-reliant on confessions. [Pl.'s Ex. 1 (Trainum Report) at 16; Pl.'s Ex. 7 (Newsday Series) at 1–67; Pl.'s Ex. 5 (1989 SIC Report) at 55.] The reporters responsible for the series analyzed 361 Suffolk County murder cases between 1976 and 1986, showing that Homicide Squad detectives got confessions in 94% of those cases. [Pl.'s Ex. 7 (Newsday Series) at 4.] This statistic was particular alarming based on comparisons made by the Newsday reporters to the confession rates in six comparable counties, which had confession rates between 54–73.5%. [Pl.'s Ex. 7 (Newsday Series) at 4.]

***The SCPD attempts damage control, appointing Lieutenant McElhone as the new head of the Homicide Squad.***

10.    In February 1987, in the immediate wake of "The Confession Takers," and while the SIC investigation was still ongoing, Lieutenant John McElhone was assigned as the new head of the SCPD Homicide Squad. [Pl.'s Ex. 1 (Trainum Report) at 16; Pl.'s Ex. 2 (McElhone 2011 Deposition) at 19:25–34:18.] Lieutenant McElhone testified that he was brought in as a result of the turmoil and that he understood that it was necessary, and part of his mandate in being assigned to the unit, to change how the Homicide Squad operated. [Pl.'s Ex. 1 (Trainum Report) at 16; Pl.'s Ex. 2 (McElhone 2011 Deposition) at 109:4–110:15.]

3

11.    A substantial part of the needed changes were focused on how detectives were to take confessions and how they were to report their conduct. [Pl.'s Ex. 1 (Trainum Report) at 16; Pl.'s Ex. 2 (McElhone 2011 Deposition) at 110:16–111:6.] This included an emphasis on note-taking and retention. [Pl.'s Ex. 2 (McElhone 2011 Deposition) at 50:22–51:24, 76:8–16.] Lieutenant McElhone also testified that the detectives "were concerned about what their future was in the homicide squad." [Pl.'s Ex. 1 (Trainum Report) at 16; Pl.'s Ex. 2 (McElhone 2011 Deposition) at 132:5–15.]

12.    Lieutenant McElhone testified that, prior to his assuming command and during his early tenure in the Homicide Squad, a large number of sergeants and detectives retired or were moved commands. Only four detectives with more than a year's experience in the Homicide Squad remained when Lieutenant McElhone took over command. One of those detectives was Detective McCready. [Pl.'s Ex. 1 (Trainum Report) at 16; Pl.'s Ex. 2 (McElhone 2011 Deposition) at 38:12–34, 114:21–116:20.] Upon taking command, Lieutenant McElhone had a "personal sit-down" with Detective McCready. [Pl.'s Ex. 1 (Trainum Report) at 16; Pl.'s Ex. 2 (McElhone 2011 Deposition) at 132:5–15.] Part of the message delivered at this sit-down was that Detective McCready needed to properly keep notes and generate reports. [Pl.'s Ex. 2 (McElhone 2011 Deposition) at 132:16–133:16.]

13.    Lieutenant McElhone testified that it was safe to say that the Homicide Squad had received a great deal of negative criticism prior to his assuming command, particularly with regard to the way the Homicide Squad was getting confessions. [Pl.'s Ex. 8 (McElhone 2014 Deposition) at 25:18–29:12.] Lieutenant McElhone also admitted that problems with regard to note-taking had contributed to the turmoil. [Pl.'s Ex. 2 (McElhone 2011 Deposition) at 110:16–111:6.]

### INNOCENT MARTY TANKLEFF DISCOVERS HIS PARENTS HAVE BEEN BRUTALLY ATTACKED

14.    In the early morning hours of September 7, 1988, at least two gloved intruders brutally attacked Seymour and Arlene Tankleff, bludgeoning them with a hammer and cutting them with a utility knife. The intruders took the murder weapons with them, leaving the lights on and the front door open. [Defs.' Ex. B (TT) (Marty Tankleff) at 4115:9–15; Pl.'s Ex. 10 (Palmbach Report) at 12–13; Defs.' Ex. NNN (Baden Report) at 2–5; Defs.' Ex. BBB (Adams Deposition) at 188:14–22.]

15.    The Tankleffs' son, seventeen-year-old Marty, woke up at around 5:35 a.m. and got out of bed at around 6:00 a.m., on what was supposed to be his first day of senior year in high school. He discovered his father, Seymour, in his office—his throat had been cut and he was hanging on for life. Marty immediately called 911 and followed the operator's instructions. Marty then ran through the house looking for his mother, Arlene, until he discovered her lifeless body on the floor of his parents' bedroom. Shortly thereafter, first responders arrived at the Tankleffs' home and took Seymour to the hospital. [Defs.' Ex. B (TT) (Marty Tankleff) at 4112:12–4120:19; Defs.' Ex. B (TT) (Patricia Flanagan) at 69:10–23, 70:21–71:13; Defs.' Ex. A2 (911 Call Transcript); Defs.' Ex. ZZ (Tankleff Deposition) at 8:16–19, 37:17–22; Pl.'s Ex. 11 (Crayne Report) at 1.]

4

16.     At 7:39 a.m., at the direction of SCPD Homicide Squad Detective Sergeant Robert Doyle, Detective McCready responded to the Tankleffs' home. [Pl.'s Ex. 1 (Trainum Report) at 18; Defs.' Ex. C (McCready Supp. Report) at 1.] Detective McCready, the first SCPD Homicide Squad detective to arrive on the scene, would become the lead detective in the Tankleff murder investigation, assisted by his partner, Detective Norman Rein. [Pl.'s Ex. 1 (Trainum Report) at 18, 23; Defs.' Ex. YY (Doyle Deposition) at 25:14–26:20; Pl.'s Ex. 9 (McCready Deposition) at 69:6–18; Defs.' Ex. XX (Rein Deposition) at 9:6–10:22.] Sergeant Doyle supervised six SCPD Homicide Squad detectives who worked on the case: Detective McCready and Detective Rein, as well as Detective John Pfalzgraf, Detective Michael Carmody, Detective Robert Anderson and Detective Anthony Laghezza. [Defs.' Ex. B (TT) (Robert Doyle) at 2604:8–10.]

17.     Detective McCready was suspicious that Marty had murdered his parents from the moment he spoke to Marty. [Pl.'s Ex. 9 (McCready Deposition) at 77:20–24, 93:24–94:4.] Detective McCready, Detective Rein, and Sergeant Doyle each questioned Marty repeatedly at the scene, then conferred with each other. [Defs.' Ex. B (TT) (Marty Tankleff) at 4132:19–4135:25, 4136:14–4138:11; Defs.' Ex. C (McCready Supp. Report) at 6.] Within approximately an hour of arriving at the scene, Detective McCready brought Marty to the SCPD Homicide Squad Headquarters so that he could be questioned further. [Pl.'s Ex. 1 (Trainum Report) at 22; Defs.' Ex. C (McCready Supp. Report) at 6.]

**DETECTIVE MCCREADY AND DETECTIVE REIN COERCE MARTY'S FALSE "CONFESSION"**

*Marty is shocked and traumatized after discovering his parents' bodies.*

18.     After waking up to discover his father hanging on for life and his mother's unmoving body, Marty, standing outside at the house, felt out of it, like he was having a nightmare. [Defs.' Ex. B (TT) (Marty Tankleff) at 4115:16–25, 4120:11–21, 4131:23–25.] At the time the police were interviewing him on the morning of September 7, Marty was in a state of shock and disbelief, and lacked awareness of his surroundings. [Defs.' Ex. ZZ (Tankleff Deposition) at 293:12–15.]

19.     As Detective McCready and Detective Rein knew, Marty was a 17-year-old boy who was supposed to be starting his first day of senior year in high school and who had never been arrested before. [Pl.'s Ex. 9 (McCready Deposition) at 231:3–20, 228:7–19; Defs.' Ex. XX (Rein Deposition) at 77:19.] As the detectives also knew, Marty was barefoot and wearing only shorts and a zip-up sweatshirt when he was interviewed, and was experiencing a moment of family trauma after discovering his parents' brutalized bodies. [Pl.'s Ex. 9 (McCready Deposition) at 172:21–23, 172:8–11; Defs.' Ex. XX (Rein Deposition) at 77:6–9; Defs.' Ex. B (TT) (Norman Rein) at 2842:18–19, 2962:25–2963:2, 2998:5–19, 3073:4–9, 3182:12–24; Defs.' Ex. B (TT) (James McCready) 3440:14–17, 3643:9–12.]

***Marty is denied access to his family and confined for five-and-a-half hours in a small, windowless interrogation room.***

20.     Before the police arrived, Marty called his sister Shari to tell her, "Get over here. I think mom and dad have been murdered." [Defs.' Ex. B (TT) (Marty Tankleff) at 4121:2–10.] After the police arrived, Ron Rother, Shari's husband and Marty's brother-in-law, appeared at the house, but Marty spent less than five minutes with Ron before a police officer separated the two of them, leaving Marty completely isolated from his family. [Defs.' Ex. B (TT) (Marty Tankleff) at 4127:21–4128:24.]

21.     Marty had begun speaking with the police at 6:17 a.m., when the first responders arrived, and Detective McCready began interviewing Marty at approximately 7:55 a.m.—one hour and 38 minutes later. [Defs.' Ex. B (TT) (Daniel Gallagher) at 252:24–253:3, 256:7–11; Defs.' Ex. B (TT) (James McCready) 3436:10–13.] Excluding that first hour and 38 minutes, beginning at 7:55 a.m., Marty was then effectively confined for five-and-a-half hours, during which time he was separated from his family and interrogated by Detective McCready, Detective Rein, and Sergeant Doyle. [Defs.' Ex. B (TT) (Daniel Gallagher) at 252:24–253:3, 256:7–11; Defs.' Ex. B (TT) (James McCready) 3436:10–13; Defs.' Ex. B (TT) (Marty Tankleff) 4132:7–24, 4133:3–4134:24, 4137:5–4138:9; Pl.'s Ex. 9 (McCready Deposition) at 344:4–345:3; Defs.' Ex. ZZ (Tankleff Deposition) at 50:7–12, 102:23–103:3, 191:2–5.]

22.     Despite Marty's repeated requests to visit his dying father at the hospital, Detective McCready refused to let Marty see Seymour until after Marty came to SCPD Homicide Squad Headquarters. [Defs.' Ex. B (TT) (Marty Tankleff) at 4138:24–4139:2, 4223:13–24; Defs.' Ex. ZZ (Tankleff Deposition) at 152:2–6, 390:16–392:2.] Marty didn't think he had a choice about going with Detective McCready and believed that only by going with Detective McCready to the station would he be able to get to the hospital. [Defs.' Ex. ZZ (Tankleff Deposition) at 142:22–23, 152:7–15; Defs.' Ex. KK (50-H Hearing) at 40:20–41:6.] In their subsequent testimony at trial and in this litigation, Detective McCready and Detective Rein denied refusing to allow Marty to go to the hospital: they claimed that Marty *never* asked to go to the hospital. [Pl.'s Ex. 9 (McCready Deposition) at 176:2–18, 182:3–7; Defs.' Ex. B (TT) (Norman Rein) at 3013:16–19.]

23.     At the station, Marty was taken to a small, windowless interrogation room. [Defs.' Ex. B (TT) (Norman Rein) 3004:13–20; Defs.' Ex. B (TT) (Marty Tankleff) at 4147:5–11.] Before questioning began at the station, Marty had a cup of coffee, but he had not eaten anything since waking up that morning. [Defs.' Ex. B (TT) (Marty Tankleff) at 4147:20–25.]

24.     The detectives' interrogation was relentless; the questions "never seemed to stop" and there were no breaks. [Defs.' Ex. ZZ (Tankleff Deposition) at 388:3–389:18.] From the minute he first spoke with the detectives that morning, Marty was questioned almost continuously until he broke. [Defs.' Ex. ZZ (Tankleff Deposition) at 389:19–390:4].

***Marty repeatedly and consistently tells the detectives he is innocent, and Detective McCready and Detective Rein, refusing to accept Marty's truthful account, become aggressive.***

25.     Marty continued to protest his innocence, telling the detectives that he had nothing to do with the attacks on his parents [Defs.' Ex. ZZ (Tankleff Deposition) at 398:13–15, 401:6–19.] The detectives made Marty tell his story 6 to 12 times and refused to accept his truthful account. [Defs.' Ex. ZZ (Tankleff Deposition) at 401:6–19; Defs.' Ex. KK (50-H Hearing) at 58:22–24.] As the detectives have admitted, they refused to accept Marty's story and made him repeat it over and over again because they didn't believe him. [Pl.'s Ex. 9 (McCready Deposition) at 283:25–285:11; Defs.' Ex. XX (Rein Deposition) at 136:4–17, 142:3–13.]

26.     Detective McCready screamed and cursed at Marty and jammed his finger in Marty's chest, and Detective Rein admitted he "probably raised [his] voice" as well. [Defs.' Ex. KK (50-H Hearing) at 59:15–18; Defs.' Ex. B (TT) (Marty Tankleff) at 4150:20–25, 4154:2–13; Defs.' Ex. XX (Rein Deposition) at 129:9–18.] Detective Rein told Marty that his story was "absurd" and Detective McCready told Marty that what he was telling them was "ridiculous." [Defs.' Ex. XX (Rein Deposition) at 140:21–141:5.]

27.     Detective McCready prevented Marty from seeing his family attorney throughout the interrogation, despite Marty asking to speak with his "Uncle Mike"—whose given name was Myron Fox—approximately six times. [Defs.' Ex. B (TT) (Marty Tankleff) at 4149:18–24, 4245:2–7; Defs.' Ex. ZZ (Tankleff Deposition) at 393:6–21.] Detective McCready knew that Uncle Mike was Marty's family attorney and that if Uncle Mike said he was representing Marty, Detective McCready would have to stop questioning Marty. [Pl.'s Ex. 9 (McCready Deposition) at 168:8–12, 169:3–13.]

28.     Earlier that morning, when Uncle Mike had appeared at the Tankleffs' home, Detective McCready left Marty and Sergeant Doyle and "took off" towards Uncle Mike to speak with him. After a brief conversation, Detective McCready returned to Marty and Uncle Mike drove away without Marty getting to speak with him. [Defs.' Ex. B (TT) (Marty Tankleff) at 4135:6–23, 4136:14–4137:7; Pl.'s Ex. 9 (McCready Deposition) at 169:20–22.] Stunned, Marty had asked where his Uncle Mike was going. [Defs.' Ex. B (TT) (Marty Tankleff) at 4137:4–7.] According to Detective McCready, the fact that Marty was unable to speak at the scene to his family attorney had nothing at all to do with Detective McCready wanting to prevent Marty from "lawyering up." [Pl.'s Ex. 9 (McCready Deposition) at 173:17–22.] However, every time Marty asked during the interrogation to see Uncle Mike, Detective McCready said "If you want to speak with your Uncle Mike, you're a criminal, we're going to lock you up," which scared Marty. [Defs.' Ex. B (TT) (Marty Tankleff) at 4149:10–17, 4150:2–8.] Detective McCready denied having said this. [Pl.'s Ex. 9 (McCready Deposition) at 301:4–301:7.] Indeed, Detective McCready claimed that Marty *never* asked to see his Uncle Mike. [Pl.'s Ex. 9 (McCready Deposition) at 182:3–19.]

29.     At no point did the detectives properly *Mirandize* Marty—it was only *after* the detectives coerced Marty's false confession that Marty was given a rights card, which he signed

without reading or knowing what it was. [Defs.' Ex. B (TT) (Marty Tankleff) at 4164:5–16; Defs.' Ex. ZZ (Tankleff Deposition) at 408:2–12, 250:18–21, 251:22–252:6, 392:3–393:5.] Detective McCready and Detective Rein admitted that, despite Detective McCready's belief about Marty's guilt, no one informed Marty that he was a suspect or read him his *Miranda* warnings when he was first brought to the SCPD Homicide Squad Headquarters and questioned for hours. [Pl.'s Ex. 1 (Trainum Report) at 23, 26; Defs.' Ex. XX (Rein Deposition) at 156:25–157:21; Pl.'s Ex. 9 (McCready Deposition) at 179:7–12.]  Both detectives claimed, however, that Detective McCready read Marty his rights in the precise two minutes before Marty's confession. [Pl.'s Ex. 9 (McCready Deposition) at 301:4–11; Defs.' Ex. XX (Rein Deposition) at 156:16–24, 158:11–12, 159:9–17, 160:3–20.]

***Detective McCready lies to Marty that his mother's hand contained Marty's hair.***

30.    Detective McCready challenged Marty's truthful account that he had discovered his mother's body but not touched her, saying "Marty, I can't believe that because your hair's in your mother's hand. How did it get there?" [Defs.' Ex. B (TT) (Marty Tankleff) at 4151:21–4152:2; Defs.' Ex. KK (50-H Hearing) at 57:2–3, 57:17–58:2; Defs.' Ex. ZZ (Tankleff Deposition) at 407:4–19.] This was a lie, and Marty truthfully said he didn't know how his hair got there. [Defs.' Ex. ZZ (Tankleff Deposition) at 397:9–14; Defs.' Ex. B (TT) (Marty Tankleff) at 4152:3–4.] At his deposition, Detective McCready acknowledged that it was not true that he had found Marty's hair in Arlene's hand, but denied having made this lie to Marty. [Pl.'s Ex. 9 (McCready Deposition) at 220:22–221:6.]

31.    A reasonable and experienced homicide detective, following minimally accepted police practices, would have been aware that presenting this type of false evidence to a juvenile suspect, who had experienced a recent traumatic event, presented a risk of obtaining a false or contaminated statement. [Pl.'s Ex. 1 (Trainum Report) at 26.]

***Detective McCready lies to Marty and tells him that the police know, based on scientific evidence, that he showered that morning.***

32.    Detective McCready accused Marty of lying when he said he didn't shower that morning, saying "Marty, I can't believe that," and "we did a humidity test and we know you took a shower that morning." [Defs.' Ex. B (TT) (Marty Tankleff) at 4152:5–11; Defs.' Ex. KK (50-H Hearing) at 56:20–57:8.] It is undisputed that there was no humidity test. [Pl.'s Ex. 9 (McCready Deposition) at 220:8–21.]

33.    Marty was surprised when Detective McCready said that to him because he knew that he hadn't taken a shower that morning but had taken one the night before, which he told Detective McCready. [Defs.' Ex. B (TT) (Marty Tankleff) at 4152:17–21.] Detective McCready refused to accept Marty's true statement and continued to lie to Marty that the police knew he had showered that morning, despite the fact that Detective McCready knew it was a lie. [Defs.' Ex. B (TT) (Marty Tankleff) at 4152:22–24; Pl.'s Ex. 9 (McCready Deposition) at 220:18–21.] Marty believed what Detective McCready was

8

telling him, because Marty "was brought up to always believe in trusting cops" and Detective McCready was stating that the police knew he had showered that morning as if it were a simple fact. [Defs.' Ex. B (TT) (Marty Tankleff) at 4153:10–15.]

34.   At his deposition, Detective Rein denied that the detectives confronted Marty about the bathtub allegedly being wet that morning. [Defs.' Ex. XX (Rein Deposition) at 130:2–6, 135:8–19, 132:16–133:21.] Detective McCready claimed not to remember whether or not he told this lie to Marty but admitted that he may have done so. [Pl.'s Ex. 9 (McCready Deposition) at 220:8–21.]

35.   A reasonable and experienced homicide detective, following minimally accepted police practices, would have been aware that presenting this type of false evidence to a juvenile suspect, who had experienced a recent traumatic event, presented a risk of obtaining a false or contaminated statement. [Pl.'s Ex. 1 (Trainum Report) at 26.]

***Detective McCready lies to Marty that Seymour has implicated him in the crime.***

36.   After confronting him with the two lies about his hair being found in Arlene's hand and the humidity test, Detective McCready left the room, ostensibly to make a phone call, and Marty heard him saying something to the effect of, "Yeah, yeah. Well, that's great." [Defs.' Ex. B (TT) (Marty Tankleff) at 4154:2–7.] Detective McCready re-entered the interrogation room, and turned around to face Marty, with his finger pointed at him, gesticulating towards Marty. [Defs.' Ex. B (TT) (Marty Tankleff) at 4154:8–10; 4155:3–10.] "Marty," he said, "I just got off the phone with the detective at the hospital and they shot your father full of Adrenalin." [Defs.' Ex. B (TT) (Marty Tankleff) at 4154:10–13.] "You beat and stabbed him, Marty," said Detective McCready. [Defs.' Ex. B (TT) (Marty Tankleff) at 4154:13–14.] "You did it Marty," said Detective McCready, "and your father said just tell us what we want to hear and help us." [Defs.' Ex. B (TT) (Marty Tankleff) at 4154:14–16.] Detective McCready told Marty that the police had taped the whole conversation with Seymour and that they would play it for Marty later. [Defs.' Ex. B (TT) (Marty Tankleff) at 4155:11–18.]

37.   This was a lie—Seymour never woke up and accused Marty of being his attacker. Detective McCready admitted having lied to Marty about Seymour and admits that the point of the ruse was to get Marty to confess, but claimed that it never occurred to him that Marty might be innocent and scared and in shock. [Pl.'s Ex. 9 (McCready Deposition) at 222:8–223:19, 229:13–19.] Detective Rein admitted that Detective McCready told Marty that Seymour had implicated him, that Detective McCready said it emphatically while standing over and pointing at Marty from three feet away, and that even Detective Rein thought the phone call sounded real and didn't know at that moment that Detective McCready was lying. [Defs.' Ex. B (TT) (Norman Rein) at 3249:24–3251:17.]

38.   Marty told Detective McCready and Detective Rein, "I can't believe that," and they said, "Well, why would your father say that?" [Defs.' Ex. B (TT) (Marty Tankleff) at 4155:19–21.]

9

39.     Marty told the detectives that if Seymour had said this, it must be because Marty had been the last person Seymour saw that morning, when Marty helped him. [Defs.' Ex. ZZ (Tankleff Deposition) at 248:3–17.] Marty felt aghast and stunned, in shock and disbelief. [Defs.' Ex. KK (50-H Hearing) at 54:13–17.] The detectives repeatedly told Marty that his father would not lie about this. [Defs.' Ex. B (TT) (Marty Tankleff) at 4155:25– 4156:2.]

40.     Marty volunteered to take a polygraph. [Defs.' Ex. ZZ (Tankleff Deposition) at 248:18– 22, 401:24–402:11, 403:2–22.] At his deposition, Detective McCready admitted that the detectives could have given Marty a polygraph at the time but chose not to. [Pl.'s Ex. 9 (McCready Deposition) at 237:4–8.] Instead, the detectives rebuffed his offer and just insisted that Marty confess, telling him, "Well, Marty, you know your father said you did this. We've got your hair in your mother's hand. Just say you did it." [Defs.' Ex. B (TT) (Marty Tankleff) at 4156:3–7.]

41.     A reasonable and experienced homicide detective, following minimally accepted police practices, would have been aware that the ruse that Marty's father was accusing him of committing the crime, combined with the other techniques that had already been deployed and with the suspect's background, created a serious risk of obtaining a false or contaminated statement. [Pl.'s Ex. 1 (Trainum Report) at 27.]

***Having been told that his father had implicated him, Marty breaks down and accepts the detectives' lies.***

42.     Marty started believing the lies that the detectives were telling him, because "they were saying my father said I did this" and "my father never lied to me." [Defs.' Ex. B (TT) (Marty Tankleff) at 4156:11–14.] The detectives suggested that Marty had committed the murders, and—faced with the lie that his own father had implicated him, the lies about physical evidence implicating him, and the detectives' insistence that Marty confess— Marty asked if he might in fact have blacked out. [Defs.' Ex. KK (50-H Hearing) at 58:16–24; Defs.' Ex. B (TT) (Marty Tankleff) at 4156:7–14.]

43.     The detectives encouraged Marty to believe that he was guilty and to confess, telling him that "there's a Marty inside of you that knows what happened" and that he should "have that Marty tell us what happened." [Defs.' Ex. B (TT) (Marty Tankleff) at 4156:15–19.] Despite the fact that he had not killed his parents, had no memory of killing them, and as a result had no knowledge of what happened to them, Marty told the detectives "Yeah, I did it," because the detectives "had [him] believing that [he] did it" and because it was "what they wanted to hear." [Defs.' Ex. B (TT) (Marty Tankleff) at 4156:19–4157:4, 4088:13–17.] When Marty broke down and told the detectives what they wanted to hear, he did so without considering what the consequences of this false confession would be because, in his shock and trauma, he "thought it was all a nightmare and he was going to wake up and it would be all over." [Defs.' Ex. B (TT) (Marty Tankleff) at 4157:5–7, 4163:25–4164:4.]

**DETECTIVE MCCREADY AND DETECTIVE REIN FABRICATE THE DETAILS OF MARTY'S "CONFESSION"**

*Marty does not know the details of his parents' murders because he is innocent.*

44.   Although the detectives' coercion caused him to falsely admit responsibility for the attack on his parents, Marty was innocent; he did not kill his parents. [Defs.' Ex. BB (TT) (Marty Tankleff) at 4088:13–17, 4156:24–4157:4.] He did not know exactly how his parents had come to be murdered because he was asleep at the time. [Defs.' Ex. ZZ (Tankleff Deposition) at 288:3–290:10.] Furthermore, he was not a trained homicide investigator who was trained to discern details of how a murder had occurred from viewing a crime scene.

45.   As a result, he repeatedly told detectives that he could not provide details of his parents' murders by stating, for example, "I don't know. I didn't do this." [Defs.' Ex. B (TT) (Marty Tankleff) at 4158:22–23; Defs.' Ex. ZZ (Tankleff Deposition) at 401:6–19.]

*During his walk-throughs of the crime scene, Detective McCready makes a number of observations and formulates a theory of how Marty committed the murders.*

46.   While at the crime scene, Detective McCready conducted two walk-throughs of the Tankleffs' home, in addition to talking to Marty several times. [Pl.'s Ex. 1 (Trainum Report) at 18, 21; Defs.' Ex. C (McCready Supp. Report) at 2–5; Pl.'s Ex. 9 (McCready Deposition) at 94:18–95:3.] At that time, Detective McCready was already suspicious that Marty was guilty. [Pl.'s Ex. 9 (McCready Deposition) at 77:20–24, 93:24–94:4.] Detective McCready testified that, during his walk-throughs, he tried to reconstruct in his mind what had happened and that he made mental observations, trying to figure out what took place. [Pl.'s Ex. 1 (Trainum Report) at 23; Pl.'s Ex. 9 (McCready Deposition) at 94:8–95:3; 97:17–99:5.] Detective McCready made observations in Seymour's office, the kitchen, the master bedroom, and Marty's bedroom; he also examined the phones in the office and kitchen, as well as the garage door. [Defs.' Ex. C (McCready Supp. Report) at 2, 4–5.]

47.   During his walk-throughs, also formulated a theory of how Marty committed the murders. [Pl.'s Ex. 1 (Trainum Report) at 18; Pl.'s Ex. 9 (McCready Deposition) at 94:8–95:3, 97:17–99:5.] Describing his process, Detective McCready stated that he "made certain observations about the room and [he] tried to mentally get a picture of what this room looked like and tried to basically reconstruct what [he] might hypothesize as to what might have happened in the room." [Defs.' Ex. R (Huntley Hearing) at 311:9–13.]. According to Detective Rein, Detective McCready was "very skilled" at assessing crime scenes, more so than the average homicide detective. [Defs.' Ex. XX (Rein Deposition) at 11:2–25.] For example, Detective McCready formulated the following theories:

   a)   The Tankleffs' home was a very long ranch-style house. Marty's bedroom was across the hall from the master bedroom, where Arlene's body was found. The office where Seymour was found was on the other end of the house from Marty's

bedroom. [Pl.'s Ex. 1 (Trainum Report) at 23; Pl.'s Ex. 9 (McCready Deposition) at 308:20–309:11.] Based on these observations, an experienced investigator operating on the theory that Marty was guilty would have hypothesized that Marty attacked his mother first, given her geographic proximity to his bedroom. [Pl.'s Ex. 1 (Trainum Report) at 25.] Detective McCready also testified that, "if Marty woke up in the morning and decided to kill his parents, he would have seen his mom first." [Pl.'s Ex. 9 (McCready Deposition) at 309:12–19.]

b) In the office, although Seymour himself had been taken to the hospital, Detective McCready saw blood pooled in the base of Seymour's office chair. As an experienced homicide investigator, Detective McCready took the fact that blood was pooled in the chair to mean that Seymour had been bleeding in that chair for a while. [Pl.'s Ex. 1 (Trainum Report) at 24; Pl.'s Ex. 9 (McCready Deposition) at 101:20–102:4, 106:7–22.] Based on this observation, an experienced investigator operating on the theory that Marty was guilty would have hypothesized that Marty attacked his father while his father was seated in his office chair at his desk. [Pl.'s Ex. 1 (Trainum Report) at 25.]

c) Detective McCready had observed blood spatter in the office, which he testified he knew to occur when someone who has been struck bleeds, and then is struck again. [Pl.'s Ex. 1 (Trainum Report) at 24; Pl.'s Ex. 9 (McCready Deposition) at 132:6–25.] Detective McCready also testified that he had spoken to Detective Pfalzgraf, the SCPD Homicide Squad detective who was at the hospital where Seymour was being treated, and from whom he had learned that Seymour had been both bludgeoned and stabbed. [Pl.'s Ex. 9 (McCready Deposition) at 328:15–22; Defs.' Ex. C (McCready Supp. Report) at 6.] Based on this knowledge, an experienced investigator operating on the theory that Marty was guilty would have hypothesized that Marty attacked his father with both a blunt and a sharp instrument, hitting him on the head and cutting his throat. [Pl.'s Ex. 1 (Trainum Report) at 25.]

d) Detective McCready also had noticed that there was blood spatter on the phone in the office, but that it was not smeared, and that there was no blood on the kitchen phones. [Defs.' Ex. C (McCready Supp. Report) at 4.] As a result, he testified that he had believed that Marty had not used the office phone to call 911, even though Marty had told him that he did during their initial conversation, instead deciding that Marty must have used the phone in the master bedroom to place the 911 call. [Pl.'s Ex. 1 (Trainum Report) at 24; Pl.'s Ex. 9 (McCready Deposition) at 148:23–155:16.]

e) In the master bedroom, after taking all the time he needed to look at Arlene's body fairly closely, Detective McCready could see blood on the sheets and on the wall. [Pl.'s Ex. 1 (Trainum Report) at 24; Pl.'s Ex. 9 (McCready Deposition) at 129:4–130:3.] Based on these observations, an experienced investigator operating on the theory that Marty was guilty would have hypothesized that Marty struggled with his mother in the bedroom. [Pl.'s Ex. 1 (Trainum Report) at

25.] Detective McCready also testified that he remembered, upon viewing the master bedroom, believing that "there was obviously an obvious struggle in there" between Arlene, who was lying face-up, and her attacker. [Pl.'s Ex. 9 (McCready Deposition) at 260:14–261:14.]

f)   In addition to having seen blood on the sheets and on the wall of the master bedroom, Detective McCready knew that Arlene's throat had been cut and knew, because Detective Pfalzgraf had informed him, that Seymour had been bludgeoned as well as stabbed. [Pl.'s Ex. 9 (McCready Deposition) at 132:16–25, 328:12–22; Defs.' Ex. C (McCready Supp. Report) at 6.] It was also obvious that Arlene had an injury to the left side of her head. [Pl.'s Ex. 45 (Arlene Head Photograph); Pl.'s Ex. 9 (McCready Deposition) at 129:4–130:3, 253:10–260:13, 331:11–332:23, 336:2–337:20.] Based on this knowledge, an experienced investigator operating on the theory that Marty was guilty would have hypothesized that, based on the blood spatter in the master bedroom, the injuries visible on Arlene's head, and the report from Detective Pfalzgraf of the types of injuries Seymour had sustained, Marty attacked Arlene with both a blunt and a sharp instrument, hitting her on the head and cutting her throat. [Pl.'s Ex. 1 (Trainum Report) at 25.]

g)   In the kitchen, Detective McCready observed a knife sitting next to a watermelon on the countertop—the "watermelon knife." [Pl.'s Ex. 1 (Trainum Report) at 24; Pl.'s Ex. 9 (McCready Deposition) at 100:6–23; Defs.' Ex. XX (Rein Deposition) at 97:11–98:20.] There was visible pinkish material on the watermelon knife when it was sitting on the countertop. [Pl.'s Ex. 12 (Baumann Deposition) at 139:15–23.] Detective McCready also knew that Arlene had a knife wound, and that both Arlene and Seymour had been stabbed. [Pl.'s Ex. 9 (McCready Deposition) at 252:23–253:5, 328:12–22.] Based on these observations, an experienced investigator operating on the theory that Marty was guilty would have hypothesized that Marty used the watermelon knife visible on the kitchen countertop to stab his parents. [Pl.'s Ex. 1 (Trainum Report) at 25.]

h)   In Marty's bedroom, Detective McCready stood for about a minute and looked around. [Pl.'s Ex. 9 (McCready Deposition) at 98:19–22.] A set of barbells with a reddish substance on them was in plain view. [Pl.'s Ex. 1 (Trainum Report) 24; Pl.'s Ex. 12 (Baumann Deposition) at 163:24–6; Pl.'s Ex. 9 (McCready Deposition) at 329:7–331:10.] Based on this observation, an experienced investigator operating on the theory that Marty was guilty would have hypothesized that Marty used the barbells to bludgeon his parents. [Pl.'s Ex. 1 (Trainum Report) at 25.]

i)   No bloody clothes, gloves, or shoes that could have been worn by the perpetrator, or any weapons obviously covered in blood, were visible anywhere in the Tankleffs' home. [Pl.'s Ex. 34 (Baumann Serology Log) at 1–3; Pl.'s Ex. 37 (Baumann Serology Report) at 1–17; Pl.'s Ex. 9 (McCready Deposition) at 327:4–15.] Nor had Detective McCready observed a large amount of blood on

13

Marty's person. [Defs.' Ex. XX (Rein Deposition) at 85:22–86:14, 102:7–13; Defs.' Ex. B (TT) (Norman Rein) at 3160:2–4; Pl.'s Ex. 10 (Palmbach Report) at 7.] It was also readily apparent to detectives that there was some residual water in the shower and that there was a damp towel in Marty's bedroom. [Defs.' Ex. B (TT) (Charles Kosciuk) at 1579:11–22; Defs.' Ex. YY (Doyle Deposition) at 235:20–237:11.] Based on these facts, an experienced investigator operating on the theory that Marty was guilty would have hypothesized that Marty committed the murders naked, in order to account for the lack of bloody clothing in the house, and then showered himself and the weapons he used off to remove all the blood. [Pl.'s Ex. 1 (Trainum Report) at 25.]

48.    According to Plaintiff's police practices expert James Trainum, as an experienced homicide investigator, Detective McCready's observations "would have relied on his experience as a homicide investigator and familiarity with basic crime scene principles," many of which would not have been possible for a lay person, for example: (1) Detective McCready's knowledge that blood spatter reflected the fact that someone had been struck, bled, and then struck again; (2) Detective McCready's conclusion that pooled blood in Seymour's chair indicated that Seymour had been bleeding in that chair for a while; and (3) Detective McCready's (ultimately erroneous) conclusion that there had been an obvious struggle between Arlene and her attacker. [Pl.'s Ex. 1 (Trainum Report) at 24.] Trainum also noted that, if Detective McCready had formed an opinion as to Marty's guilt within an hour of arriving at the crime scene, this would be an early warning sign for tunnel vision. [Pl.'s Ex. 1 (Trainum Report) at 23.]

49.    While still at the crime scene, Detective McCready had a conversation with Sergeant Doyle and Detective Rein about what he had observed in the Tankleffs' home. [Defs.' Ex. C (McCready Supp. Report) at 6.] For example, they discussed the fact that there was no blood on Marty's clothes, the fact that the blood on the telephone in the office was not smeared, and their perception that Marty had displayed a lack of emotion. [Defs.' Ex. XX (Rein Deposition) at 80:12–24, 85:7–18, 86:4–23, 102:7–18; Pl.'s Ex. 9 (McCready Deposition) at 77:20–24, 93:24–94:4.] Once at the station, Detective McCready and Detective Rein again met and discussed the case, including the physical evidence from the scene. [Pl.'s Ex. 1 (Trainum Report) at 25; Defs.' Ex. XX (Rein Deposition) at 99:17–100:7.] And after Marty's interrogation began, there were a number of calls between detectives at the scene and Detective McCready and Detective Rein at SCPD Homicide Squad Headquarters. [Pl.'s Ex. 8 (McElhone 2014 Deposition) at 217:22–218:3.] Lieutenant McElhone described them as having had an "open channel of communication" between the crime scene, the hospital and Detective McCready and Detective Rein. [Pl.'s Ex. 8 (McElhone 2014 Deposition) at 218:22–219:2.] For example, if Sergeant Doyle had been at the crime scene and made an observation, he would be making sure that Detective McCready and Detective Rein were as informed as him, "if it was pertinent." [Pl.'s Ex. 8 (McElhone 2014 Deposition) at 220:12–19.] Sergeant Doyle himself also indicated that he relayed information from the scene, such as the presence of water in the bathroom, to the detectives at the station. [Defs.' Ex. YY (Doyle Deposition) at 235:20–237:11.]

50.   After Detective McCready left the crime scene to transport Marty to headquarters, Detective Rein remained behind to "look at the scene and get a better perspective of the layout of the property and what might have transpired inside." [Defs.' Ex. XX (Rein Deposition) at 91:17–92:2.] Rein slowly walked around the house for approximately twenty minutes, and looked into the kitchen, the office, and master bedroom, where he had an unobstructed view of Arlene's body. [Defs.' Ex. XX (Rein Deposition) at 94:2–95:18.]

***According to Detective McCready and Detective Rein, Marty gives a detailed narrative confession to killing his parents.***

51.   It was standard practice in SCPD Homicide Squad investigations to withhold details about the crime from the public, so that these nonpublic details could later be used to verify the reliability of any confession by demonstrating the confessor's guilty knowledge. [Pl.'s Ex. 2 (McElhone 2011 Deposition) at 58:6–17.] The detectives on the case understood in 1988 that if a confessing suspect volunteered nonpublic facts about how a crime occurred without suggestion, that would provide independent corroboration of the confession and powerful evidence at trial that the confession was reliable. [Pl.'s Ex. 9 (McCready Deposition) at 21:15–26:21, 24:20–26:16; Defs.' Ex. YY (Doyle Deposition) at 24:16–23.] They also understood in 1988 that feeding details to a suspect about how a crime occurred was a violation of basic police practices. [Defs.' Ex. XX (Rein Deposition) at 32:15–33:19, 53:11–20; Pl.'s Ex. 9 (McCready Deposition) at 24:20–27:3.]

52.   The detectives reported that, after he first said "I did it," Marty began responding to open-ended questions, and volunteered a detailed narrative confession. [Defs.' Ex. XX (Rein Deposition) at 168:12–169:22.] Marty denied doing so, saying that, instead, the detectives suggested each detail to him, and he merely acquiesced to their suggestions. [Defs.' Ex. B (TT) (Marty Tankleff) at 4157:7–23, 4159:8–4161:21; Defs.' Ex. KK (50-H Hearing) at 88:6–15, 89:5–16, 100:9–24, 102:9–13; Defs.' Ex. ZZ (Tankleff Deposition) at 258:25–3, 266:3–270:4.]

53.   The detectives could have taped the interrogation with Marty, but chose not to. [Defs.' Ex. XX (Rein Deposition) at 149:10–12, 150:13–15; Pl.'s Ex. 9 (McCready Deposition) at 182:20–187:19, 288:18–289:4, 302:14–303:22.]

54.   All of the details that Detective McCready and Detective Rein claimed Marty volunteered in his "confession" conveniently matched the observations they had made and the theory they had formulated at the crime scene during and after the walk-throughs. For example, the confession contained the following statements:

   a)   "I asked him what he was wearing. He said he was naked because he didn't want to leave any blood on his clothing." [Pl.'s Ex. 1 (Trainum Report) at 28; Defs.' Ex. C (McCready Supp. Report) at 11; Pl.'s Ex. 9 (McCready Deposition) at 293:22–294:2; Defs.' Ex. XX (Rein Deposition) at 168:18–20.]

b) "I asked him who he killed first. He said he killed his MOM first." [Pl.'s Ex. 1 (Trainum Report) at 28; Defs.' Ex. C (McCready Supp. Report) at 11–12; Pl.'s Ex. 9 (McCready Deposition) at 293:12–15; Defs.' Ex. XX (Rein Deposition) at 206:17–20.]

c) "I asked him what he did to his mother. He said he hit his mother with a dumbbell, then cut her throat." [Pl.'s Ex. 1 (Trainum Report) at 28; Defs.' Ex. C (McCready Supp. Report) at 12; Pl.'s Ex. 9 (McCready Deposition) at 293:16–20, 314:19–21; Defs.' Ex. XX (Rein Deposition) at 182:24–183:4.]

d) "I asked him how many times he hit her. He said he hit her at least four to five times on the head. He wasn't sure. He kept on trying to hit her. She fought with him." [Pl.'s Ex. 1 (Trainum Report) at 28; Defs.' Ex. C (McCready Supp. Report) at 12.]

e) "He said he was afraid his father would wake up, and that after [Arlene] fell on the floor, he ran and got a knife from the kitchen and cut her throat. I asked him where the knife was. He said the knife was on the counter next to the watermelon." [Pl.'s Ex. 1 (Trainum Report) at 28; Defs.' Ex. C (McCready Supp. Report) at 12; Pl.'s Ex. 9 (McCready Deposition) at 314:22–24, 316:5–12; Defs.' Ex. XX (Rein Deposition) at 183:5–10, 195:22–196:8.]

f) "I asked him if she was dead when he left the room. He said, no, she was moving a little bit when he ran out of the bedroom to kill his father. I asked him if his father was still in the office. He said yes, his father was still in the office. He was sitting at his desk." [Pl.'s Ex. 1 (Trainum Report) at 28; Defs.' Ex. C (McCready Supp. Report) at 12; Defs.' Ex. XX (Rein Deposition) at 185:23–25.]

g) "I asked him if he went in [the office] naked. He said he was still naked. I asked him what he did with the knife, and the dumbbell. He said he walked in with the knife and the dumbbell behind his back." [Pl.'s Ex. 1 (Trainum Report) at 28; Defs.' Ex. C (McCready Supp. Report) at 12; Pl.'s Ex. 9 (McCready Deposition) at 294:3–14, 316:13–20, 317:10–18.]

h) "I asked him what he did first, cut his throat, or hit him. He said he got behind his father and hit him with the barbell first." [Pl.'s Ex. 1 (Trainum Report) at 28; Defs.' Ex. C (McCready Supp. Report) at 12; Pl.'s Ex. 9 (McCready Deposition) at 294:11–14, 317:19–21; Defs.' Ex. XX (Rein Deposition) at 186:2–6.]

i) "He volunteered that he 'knocked him silly.'" [Pl.'s Ex. 1 (Trainum Report) at 28; Defs.' Ex. C (McCready Supp. Report) at 12; Defs.' Ex. XX (Rein Deposition) at 186:7–12.]

j) "I asked him how he kept his father from getting out of the chair. He said his father's feet were under the desk so he couldn't get up." [Pl.'s Ex. 1 (Trainum Report) at 28; Defs.' Ex. C (McCready Supp. Report) at 12.]

16

k) "I asked him what he did next and he said he slashed his father's neck. I asked him if he knew how many times he hit, or cut his father. He said he didn't know how many times he hit or cut him. Again, he volunteered that he couldn't believe all the blood." [Pl.'s Ex. 1 (Trainum Report) at 28; Defs.' Ex. C (McCready Supp. Report) at 12.]

l) "I asked him what he did with the knife and the barbell. He said he washed off the knife and the barbell in the shower. I asked him what he did with the barbell and the knife after he washed them off. He said he put the barbell back in his bedroom, and he put the knife on the counter by the watermelon." [Pl.'s Ex. 1 (Trainum Report) at 28; Defs.' Ex. C (McCready Supp. Report) at 12; Defs.' Ex. XX (Rein Deposition) at 195:12–21.]

m) "I asked him what happened when he got up. He said he went back to the office, and saw that his father was still alive. He then went to his mother's room to see if she was dead. He said he called 911 from his mother's room." [Pl.'s Ex. 1 (Trainum Report) at 28; Defs.' Ex. C (McCready Supp. Report) at 12; Defs.' Ex. XX (Rein Deposition) at 189:6–7.]

55. Detective McCready and Detective Rein have both consistently created reports and in testified that each of the details in this "confession" originated with Marty and not with either of them. [Pl.'s Ex. 1 (Trainum Report) at 29; Defs.' Ex. C (McCready Supp. Report) at 10–13; Defs.' Ex. XX (Rein Deposition) at 168:12–169:22.] For example, Detective Rein testified at his deposition that "[they] were allowing him to tell the story" and "didn't color it in any way." [Defs.' Ex. XX (Rein Deposition) at 207:8–18.]

***All of the details in Marty's "confession" conveniently matches observations that the detectives have made at the crime scene during earlier walk-throughs.***

56. Detective McCready and Detective Rein believed at the time of the interrogation that, based on the layout of the house, Marty killed his mother first. [Pl.'s Ex. 9 (McCready Deposition) at 308:15–309:19; Pl.'s Ex. 1 (Trainum Report) at 25.] Marty's "confession" indicated that he had killed his mother first. [Pl.'s Ex. 1 (Trainum Report) at 28; Defs.' Ex. C (McCready Supp. Report) at 11–12; Pl.'s Ex. 9 (McCready Deposition) at 293:12–15; Defs.' Ex. XX (Rein Deposition) at 206:17–20.]

57. Detective McCready and Detective Rein also believed at the time of the interrogation that, based on the blood spatter in the master bedroom, Arlene would have struggled with Marty when he attacked her. [Pl.'s Ex. 9 (McCready Deposition) at 129:4–130:3, 260:14–261:14; Pl.'s Ex. 1 (Trainum Report) at 25; Defs.' Ex. YY (Doyle Deposition) at 127:17–129:9.] Marty's "confession" indicated that he had "fought" with Arlene during the attack. [Pl.'s Ex. 1 (Trainum Report) at 28; Defs.' Ex. C (McCready Supp. Report) at 12.]

58. Detective McCready and Detective Rein also believed at the time of the interrogation that, based on observations of Arlene and the master bedroom, as well as a conversation

with Detective Pfalzgraf, Marty attacked Arlene with both a blunt and a sharp instrument, hitting her on the head and cutting her throat. [Pl.'s Ex. 9 (McCready Deposition) at 129:4–130:3, 132:16–25, 253:10–260:13, 328:12–22, 331:11–332:23, 336:2–337:20; Pl.'s Ex. 1 (Trainum Report) at 25; Pl.'s Ex. 45 (Arlene Head Photograph).] Marty's "confession" indicated that he had hit his mother and then cut her throat. [Pl.'s Ex. 1 (Trainum Report) at 28; Defs.' Ex. C (McCready Supp. Report) at 12; Pl.'s Ex. 9 (McCready Deposition) at 293:16–20, 314:19–21; Defs.' Ex. XX (Rein Deposition) at 182:24–183:4.]

59.  Detective McCready and Detective Rein also believed at the time of the interrogation that, based on the fact that a set of barbells with a reddish substance on them was in plain view in Marty's bedroom, Marty used one of the barbells to bludgeon his parents. [Pl.'s Ex. 9 (McCready Deposition) at 98:19–22, 329:7–331:10; Pl.'s Ex. 12 (Baumann Deposition) at 163:24–164:6; Pl.'s Ex. 1 (Trainum Report) at 24–25.] Marty's "confession" indicated that he had used a barbell to bludgeon his parents. [Pl.'s Ex. 1 (Trainum Report) at 28; Defs.' Ex. C (McCready Supp. Report) at 12; Pl.'s Ex. 9 (McCready Deposition) at 293:16–20, 314:19–21; Defs.' Ex. XX (Rein Deposition) at 182:24–183:4.]

60.  Detective McCready and Detective Rein also believed at the time of the interrogation that, based on observations of Arlene's body and the knowledge that both Arlene and Seymour had been stabbed, Marty had used a knife to stab his parents. [Pl.'s Ex. 1 (Trainum Report) at 25; Pl.'s Ex. 9 (McCready Deposition) at 252:23–253:5.] They also believed at the time of the interrogation, based on the observation of the watermelon knife with a pinkish material on it on the kitchen countertop, that Marty had used this particular knife to stab his parents. [Pl.'s Ex. 1 (Trainum Report) at 25; Pl.'s Ex. 9 (McCready Deposition) at 100:6–23, 328:12–22; Pl.'s Ex. 12 (Baumann Deposition) at 139:15–23.] Marty's "confession" indicated that, afraid Seymour would wake up after he had hit his mother with the barbell, he ran and got the watermelon knife from the kitchen to stab his mother. [Pl.'s Ex. 1 (Trainum Report) at 28; Defs.' Ex. C (McCready Supp. Report) at 12; Pl.'s Ex. 9 (McCready Deposition) at 314:22–24, 316:5–12; Defs.' Ex. XX (Rein Deposition) at 183:5–10, 195:22–196:8.]

61.  Detective McCready and Detective Rein also believed at the time of the interrogation that, based on the blood pooled in Seymour's chair, Marty attacked his father while his father was seated at his desk. [Pl.'s Ex. 9 (McCready Deposition) at 101:20–102:4; Pl.'s Ex. 1 (Trainum Report) at 24–25; Pl.'s Ex. 9 (McCready Deposition) at 106:7–22; Defs.' Ex. XX (Rein Deposition) at 186:16–187:3).] Marty's "confession" indicated that his father had been sitting at his desk when he came into the office. [Pl.'s Ex. 1 (Trainum Report) at 28; Defs.' Ex. C (McCready Supp. Report) at 12; Defs.' Ex. XX (Rein Deposition) at 185:23–25.]

62.  Detective McCready and Detective Rein also believed at the time of the interrogation that, based on the blood spatter in the office and their knowledge that Seymour had been both bludgeoned and stabbed, Marty attacked his father with both a blunt and a sharp instrument, first hitting him on the head and then cutting his throat. [Pl.'s Ex. 1 (Trainum

Report) at 24–25; Pl.'s Ex. 9 (McCready Deposition) at 132:6–25, 328:15–22.] Marty's "confession" indicated that he walked into the office with the knife and barbell, hit his father with the barbell, and then slashed his father's neck. [Pl.'s Ex. 1 (Trainum Report) at 28; Defs.' Ex. C (McCready Supp. Report) at 12; Pl.'s Ex. 9 (McCready Deposition) at 294:3–14, 316:13–20, 317:10–21; Defs.' Ex. XX (Rein Deposition) at 186:2–8.]

63.   Detective McCready and Detective Rein also believed at the time of the interrogation that, based on the fact that there was no blood on the kitchen phones and that the blood spatter on the phone in the office was not smeared, Marty had used the phone in the master bedroom to place the 911 call. [Defs.' Ex. C (McCready Supp. Report) at 4; Pl.'s Ex. 1 (Trainum Report) at 24; Pl.'s Ex. 9 (McCready Deposition) at 148:23–155:16.] Marty's "confession" indicated that he called 911 from the master bedroom. [Pl.'s Ex. 1 (Trainum Report) at 28; Defs.' Ex. C (McCready Supp. Report) at 12; Defs.' Ex. XX (Rein Deposition) at 189:6–7.]

64.   Finally, Detective McCready and Detective Rein believed at the time of the interrogation that, based on the fact that they had not observed any bloody clothes anywhere in the Tankleffs' home and the fact that Marty was not covered in blood, Marty had committed the murders naked. They also believed at the time of the interrogation that, based on these observations as well as the fact that neither the watermelon knife in the kitchen or the barbells in Marty's bedroom were covered in blood, and the fact that the shower and towel were wet, Marty had showered himself and the weapons he used after the murders. [Pl.'s Ex. 1 (Trainum Report) at 25; Defs.' Ex. XX (Rein Deposition) at 85:22–86:14, 102:5–18; Defs.' Ex. B (TT) (Norman Rein) at 3160:17–3161:4; Pl.'s Ex. 34 (Baumann Serology Log) at 1–3; Pl.'s Ex. 37 (Baumann Serology Report) at 1–17; Pl.'s Ex. 9 (McCready Deposition) at 327:4–15.] Marty's "confession" indicated that he had committed the crimes naked because he didn't want to leave any blood on his clothing, and that he had then washed the barbell and knife in the shower and put them back in his bedroom and on the kitchen countertop, respectively. [Pl.'s Ex. 1 (Trainum Report) at 28; Defs.' Ex. C (McCready Supp. Report) at 11–12; Pl.'s Ex. 9 (McCready Deposition) at 293:22–294:2; Defs.' Ex. XX (Rein Deposition) at 168:18–20, 195:12–196:8.]

65.   On the basis of the detectives' representations that Marty had independently offered each of the details in the "confession," which were consistent with the detectives' observations at the crime scene, Marty was arrested and charged with the murder of his mother and the attempted murder of his father. [Pl.'s Ex. 1 (Trainum Report) at 29; Defs.' Ex. R (Huntley Hearing) at 160:17–161:4.]

66.   A week after the interrogation, Detective McCready created a 14-page narrative-form report of the "confession," which was rich in details concerning the verbal exchanges between Detective McCready, Detective Rein, and Marty. In the process of preparing his report, Detective McCready reviewed Detective Rein's notes of the interrogation and had discussions with Rein concerning their respective recollections of the interrogation. [Defs.' Ex. XX (Rein Deposition) at 58:22–60:15.] However, this level of detail is not found in the detectives' handwritten notes. [Pl.'s Ex. 1 (Trainum Report) at 30; Defs.' Ex.

C (McCready Supp. Report) at 11–13; Pl.'s Ex. 50 (McCready Handwritten Notes) at 12–16; *see generally* Pl.'s Ex. 51 (Rein Handwritten Notes) at 1–38.]

67.     Detective McCready acknowledged that Marty's "confession," and his resulting report, only contained information known to the homicide detectives at the time of the interrogation, and did not contain any information not known to them at the time. [Pl.'s Ex. 9 (McCready Deposition) at 341:24–346:23; Pl.'s Ex. 1 (Trainum Report) at 29.] A reasonable and experienced homicide detective would recognize this as a warning sign for a false or contaminated statement, and minimally accepted police practices would require him to evaluate whether the details of the confession matched what he had hypothesized about how the attacks had been committed prior to the interrogation. [Pl.'s Ex. 1 (Trainum Report) at 29.]

68.     Lieutenant McElhone also testified that all the details in the "confession" were consistent with what the detectives had seen. [Pl.'s Ex. 8 (McElhone 2014 Deposition) at 210:25–211:11.] In fact, Detective McCready reported to Lieutenant McElhone that the "details that Marty was volunteering in the course of giving the confession were consistent with what he had seen at the crime scene" [Pl.'s Ex. 8 (McElhone 2014 Deposition) at 207:16–21.] For a reasonable and experienced supervisor, who was aware of the background context in the SCPD Homicide Squad, the fact that Marty's "confession" included only information known to the detectives at the time of the interrogation would be a warning sign, and would require supervisory follow-up. [Pl.'s Ex. 1 (Trainum Report) at 29.]

69.     In contrast, the "confession" does *not* contain details of which the detectives were not aware at the time they interrogated Marty. For example, the detectives did not view Arlene's back at the crime scene, and were unaware that Arlene had been attacked from behind, including cuts in the back of her shoulder and stabs to her back. These details are not in Detective McCready's report of the "confession." [Defs.' Ex. C (McCready Supp. Report) at 11–13; Pl.'s Ex. 9 (McCready Deposition) at 332:24–333:19, 337:15–339:18.]

70.     Detective McCready admitted that the knife, the barbells, the location of the rooms, the blows to Arlene's head and the fact that her throat was cut was all information that was available to the police at the time, and that the information that was not available to him at the time—that Arlene was attacked from behind, that the back of her head was smashed in, that her shoulder was cut in the back, that she was stabbed in the back—is not in the confession. [Pl.'s Ex. 9 (McCready Deposition) at 341:24–342:12, 353:9–355:18.] Similarly, the confession doesn't mention the fact that the killer(s) wore gloves, another fact not known to the detectives at the time of the interrogation. [Pl.'s Ex. 9 (McCready Deposition) at 343:4–10.]

***In fact, Marty did not voluntarily "confess," but rather was fed the narrative details that the detectives had hypothesized during their walk-throughs.***

71.     However, Marty testified that he did not independently volunteer the details in the confession. Instead, Marty testified that he thought he was having a bad nightmare. [Defs.' Ex. B (TT) (Marty Tankleff) at 4157:7.] The detectives were pressing on very

quickly and the tone of the interrogation "wasn't so much questioning" as it was "suggesting" by the detectives. [Defs.' Ex. B (TT) (Marty Tankleff) at 4157:11–14.] Detective McCready made statements such as "Well, you killed your mother first, didn't you?" and when Marty said no, the detectives said "Well, Marty, we don't want to hear no. Just say yes." [Defs.' Ex. B (TT) (Marty Tankleff) at 4157:15–23.] Similarly, the suggestion that Marty had used the watermelon knife came exclusively from the detectives, as did the suggestion that Marty had used a barbell from his room. [Defs.' Ex. B (TT) (Marty Tankleff) at 4159:8–4160:2; Defs.' Ex. KK (50-H Hearing) at 88:6–15, 100:9–24, 102:9–13.] Building on his earlier lie that the detectives knew that Marty had showered that morning, Detective McCready told Marty that he had murdered his parents while naked, and that he had washed off the knife in the shower. Marty acquiesced to both of these false statements. [Defs.' Ex. B (TT) (Marty Tankleff) at 4160:19–4161:21.]

72.   Aside from the "confession" taken from him on September 7, Marty never indicated in any way that he had been involved in his parents' murders. In fact, shortly after his arrest, Marty told his step-sister, Shari Rother, that the detectives "made" him confess, and from that point until the present day has maintained his innocence. [Defs.' Ex. B (TT) (Marty Tankleff) at 4167:16–18; 4171:23–25; Defs.' Ex. KK (50-H Hearing) at 63:18–24; Pl.'s Ex. 1 (Trainum Report) at 31.] Ms. Rother confirmed that Marty had told her that the detectives made him confess. [Defs.' Ex. R (Huntley Hearing) at 1956:8–1957:2.]

73.   It was Lieutenant McElhone's understanding, from Detective McCready and Detective Rein, that Marty had volunteered the narrative details in the "confession." [Pl.'s Ex. 8 (McElhone 2014 Deposition) at 222:24–223:10.] Lieutenant McElhone also testified that, if details in the confession such as using the watermelon knife and barbell, had come from Detective McCready and/or Detective Rein instead of Marty volunteering them, that this would cause him concern as a supervisor about the confession's reliability. [Pl.'s Ex. 8 (McElhone 2014 Deposition) at 223:11–22.] This was because it is a "grossly improper violation of policy and procedure" for detectives to feed details they believe about a crime rather than eliciting details from a suspect. [Pl.'s Ex. 8 (McElhone 2014 Deposition) at 223:23–224:17.] Lieutenant McElhone would have made it clear to SCPD Homicide Squad detectives, including Detective McCready, that he was not going to tolerate any violation of rules, including when it came to getting confessions, and that violations would subject them to "very serious discipline or transfer." [Pl.'s Ex. 8 (McElhone 2014 Deposition) at 44:24–45:6, 45:24–46:18.]

74.   If the detectives fed Marty the details of the "confession," then the interrogation and subsequent reporting of it deviated substantially from minimally accepted police practices. The failure to appropriately conduct an interview and interrogation of Marty, both by feeding him hold-back facts during the interrogation process, and then actively misrepresenting that those facts had originated voluntarily with him, would be an egregious deviation from minimally accepted police practices. In addition, such misrepresentations would make it impossible for prosecutors and the court to adequately analyze the reliability of that statement evidence. [Pl.'s Ex. 1 (Trainum Report) at 29.]

***As a result of the detectives' fabrications that Marty had volunteered the details, the prosecution's theory of the case is that Marty's "confession" is reliable and came entirely from Marty.***

75.     Suffolk County ADA Edward Jablonski, the initial carrying prosecutor, testified that his knowledge of the murder investigation came from SCPD Homicide Squad detectives telling him about the case. [Defs.' Ex. III (Jablonski Deposition) at 30:3–4.] ADA Jablonski "probably" initially learned Marty had made admissions that he was involved from Sergeant Doyle, "who [he] talked to most of the time." [Defs.' Ex. III (Jablonski Deposition) at 95:15–96:5.] However, everything that he knew about Marty's interrogation came from the accounts of Detective McCready and Detective Rein; he never interviewed Marty about his perspective of what had happened. [Defs.' Ex. III (Jablonski Deposition) at 36:4–19.]

76.     ADA Jablonski also believed that the detectives would not have fed Marty information, and that they would have "elicited [the details] as opposed to telling him the answers." [Defs.' Ex. III (Jablonski Deposition) at 42:2–22.] He agreed that Detective McCready's report of the "confession" read as if to indicate that facts were supplied by Marty, not the detectives. [Defs.' Ex. III (Jablonski Deposition) at 65:16–68:9.] He never received any indication from Detective McCready or Detective Rein that the report was inaccurate in any way, and at all times relied on the accuracy of the report. [Defs.' Ex. III (Jablonski Deposition) at 68:10–17.] He also testified that he would have "been upset if [the detectives] were providing those details." [Defs.' Ex. III (Jablonski Deposition) at 44:9–13.] He could not recall any case where detectives had supplied the details, which would have been "counterproductive" and would have stuck out in his mind as highly unusual. [Defs.' Ex. III (Jablonski Deposition) at 47:8–18.]

77.     Similarly, Suffolk County ADA John Collins, the trial prosecutor, testified that his understanding of what had taken place during Marty's interrogation came from Detective McCready and Detective Rein. [Defs.' Ex. HHH (Collins Deposition) at 51:12–17, 61:3–18.] The detectives told him that they asked Marty relatively open-ended questions and Marty provided the details about how he had committed the crimes that were in the "confession," for example the detail that Marty had killed his mother first. [Defs.' Ex. HHH (Collins Deposition) at 54:2–6, 60:14–61:2, 61:19–64:10.] ADA Collins testified that, if the detectives had "asked leading questions and given Marty information about what they knew in order to get him to talk," he would have expected them to note that for him. [Defs.' Ex. HHH (Collins Deposition) at 67:6–12.]

78.     As a result, at trial, the prosecution's theory of the case was that Marty's "confession" was both reliable and had come entirely from Marty. The prosecution argued that Marty's "confession" was reliable because it contained details consistent with how the crime had occurred. For example, in his closing argument, ADA Collins argued that the barbells from Marty's bedroom were consistent with Arlene and Seymour's injuries. [Defs.' Ex. B (TT) (Closing) at 4932:5–7.] ADA Collins also suggested to the jury that Marty's description of inflicting head injuries on Arlene could not have been known by the

detectives at the time of the interrogation. [Defs.' Ex. B (TT) (Closing) at 4936:7–4937:21.]

79.     ADA Collins also emphasized that the "confession" had come entirely from Marty, urging the jury to, when considering the voluntariness of Marty's statements, remember "the wealth of information gotten from the defendant that could have come from nothing other than a willing and cooperative suspect or subject." [Defs.' Ex. B (TT) (Closing) at 4927:20–4928:1.] Similarly, ADA Collins told the jury that "[t]he detectives reported to you (the jury) what was said to them," and that Marty had "[given] the detectives his version of what had, in fact, occurred and what he had, in fact, done to his parents." [Defs.' Ex. B (TT) (Closing) at 4930:20–22, 4933:6–7.]

The defense argued at trial that Marty had been coerced into falsely confessing to the crime. However, in his closing argument, ADA Collins argued that could not be true because the confession included details that Marty had volunteered which corroborated his guilty knowledge: "If they did not get this information from the defendant, then where the heck did it come from? And if they did make it up, then they're two or three of the luckiest sons of guns that ever walked because they came up with consistent weapons, they came up with head injuries to Arlene Tankleff they didn't know about, they came up with transfers of hair that they couldn't possibly have known about at that point in time." [Defs.' Ex. B (TT) (Closing) at 4934:5–14.]

***However, a variety of forensic and medical evidence disproves many of the details in Marty's "confession."***

80.     In the weeks after conducting Marty's "confession," SCPD Homicide Squad detectives began receiving the results from forensic and medical testing. [Pl.'s Ex. 1 (Trainum Report) at 31; Pl.'s Ex. 12 (Baumann Deposition) at 233:18–234:2; Defs.' Ex. XX (Rein Deposition) at 196:25–197:4.] Detective Rein testified that it would have been important to corroborate Marty's "confession" with forensic and medical test results. [Defs.' Ex. XX (Rein Deposition) at 271:8–24.] Not only did this evidence by and large fail to corroborate the details of Marty's "confession," it in fact disproved the detectives' early theory of the crime, and many of the details that Marty had supposedly volunteered to the detectives.

81.     The detail in Marty's "confession" that he killed his mother first was false. Bloodstains on the wall of the master bedroom and on the bed sheets were determined to be consistent with Seymour's blood. No forensic evidence from Arlene was identified or recovered from the office. Plaintiff's crime scene reconstruction expert, Timothy M. Palmbach, determined that, "[t]o a reasonable degree of scientific certainty, the cross-transfer of evidence from the office crime scene to the master bedroom, and corresponding lack of cross-transfer from the master bedroom crime scene to the office, indicate that the attack in the office on Seymour Tankleff occurred *before* the attack on Arlene Tankleff," in contrast to Marty's "confession." [Pl.'s Ex. 10 (Palmbach Report) at 7–8, 10, 12; *see also* Pl.'s Ex. 1 (Trainum Report) at 32.] Suffolk County serologist Robert Baumann agreed that, absent an innocent explanation for the presence of Seymour's blood on the wall and

sheet in the bedroom, the forensic evidence indicated Seymour was attacked before Arlene, and that Seymour's blood ended up in the master bedroom because it was transported in on either a weapon or a body part. [Pl.'s Ex. 12 (Baumann Deposition) at 227:13–230:24.]

82.     The details in Marty's "confession" that Arlene had "fought" with him during the attack and that she was still moving when he left the room to get the knife were false. Plaintiff's expert Dr. Michael M. Baden, forensic pathologist and former Chief Medical Examiner of New York City, determined that Arlene "immediately lost consciousness when first struck by the hammer; there was no evidence at the scene or in the autopsy that she struggled or was able to struggle." Dr. Baden also noted that the lacerations on Arlene's head indicated that she was not moving while she was being struck, and there is no evidence that she made any voluntary movements after the first blow to the head or that she attempted to defend herself. [Defs.' Ex. NNN (Baden Report) at 3, 5–6.] Palmbach also concluded that the evidence indicated to a reasonable degree of scientific certainty that Arlene did not move after she was first attacked on the bed, in direct contrast to Marty's "confession." [Pl.'s Ex. 10 (Palmbach Report) at 12–13.]

83.     The detail in Marty's "confession" that he had stabbed his parents with the watermelon knife was false. The medical examiner who conducted the autopsies on both Arlene and Seymour examined the watermelon knife and concluded that there was no reasonable possibility that it was the murder weapon, and that the weapon was likely a utility knife. [*See* ¶¶ 93–127, *infra*; *see also* Pl.'s Ex. 1 (Trainum Report) at 31–32.] Similarly, Dr. Baden's review of the wound patterns on Arlene's body and the blood patterns in the bedroom led him to conclude that her wounds were not consistent with the watermelon knife. [Defs.' Ex. NNN (Baden Report) at 3–6.] In addition, no serological or other physiological evidence was identified on the watermelon knife, and Palmbach concluded to a reasonable degree of scientific certainty that the lack of forensic evidence on the watermelon knife was inconsistent with Marty's "confession." [Pl.'s Ex. 10 (Palmbach Report) at 12; Pl.'s Ex. 12 (Baumann Deposition) at 144:3–11; *see also* Pl.'s Ex. 1 (Trainum Report) at 32.]

84.     The detail in Marty's "confession" that he had bludgeoned his parents with one of the barbells in plain view in his bedroom was false. There were eleven approximately-one-inch-long lacerations on Arlene's head with underlying smaller depressed circular skull fractures, typical for impacts by a hammer and not consistent with the much larger-faced barbell. Similarly, Seymour had healing scalp lacerations, depressed skull fractures, and lacerations and contusions of the brain consistent with being caused by a hammer, not by a barbell. Based on his review of the autopsy findings, Dr. Baden observed that the blunt force head injuries to Seymour and Arlene "were not caused by the barbell as stated in the confession—the scalp lacerations and circular depressed skull fractures are too small to be caused by the barbell—but are typical for hammer strikes." As a result, Dr. Baden concluded, to a reasonable degree of medical certainty, that Marty's "confession" was not consistent with the autopsy and forensic findings. [Defs.' Ex. NNN (Baden Report) at 2–5.] In addition, no serological or other physiological evidence was identified on the barbells. Baumann tested the barbells for the presence of blood thoroughly and

24

completely—including by disassembling them, using a stereo microscope, and examining the screws, bolts, and bolt holes—and found no blood anywhere. [Pl.'s Ex. 12 (Baumann Deposition) at 165:7–167:9.] Palmbach also concluded to a reasonable degree of scientific certainty that the lack of forensic evidence on the barbells was inconsistent with Marty's "confession." [Pl.'s Ex. 10 (Palmbach Report) at 6, 12–13; *see also* Pl.'s Ex. 1 (Trainum Report) at 32.]

85.    The detail in Marty's "confession" that he was standing behind his father when he hit him with the barbell was false. The bloodstain patterns on the desk, wall, and ceiling in the office—in conjunction with the narrowness of the space behind Seymour's chair—indicated that Seymour was attacked by an assailant who was standing to his side or in front of him. [Pl.'s Ex. 10 (Palmbach Report) at 7, 10–11.]

86.    The detail in Marty's "confession" that he showered after the murders to clean himself and the weapons was false. Water was collected from the drain traps of all of the sinks, bathtubs, and showers in the Tankleffs' home, and no blood or human tissue was identified. [Pl.'s Ex. 10 (Palmbach Report) at 7; Pl.'s Ex. 12 (Baumann Deposition) at 173:4–175:19; *see also* Pl.'s Ex. 1 (Trainum Report) at 31.]

87.    In addition, the fact that Marty's "confession" made no mention of a second perpetrator was incorrect. Palmbach determined—based on analysis of blood transfer/contact patters, blood spatter, and cuts on the desk chair—that Seymour was bludgeoned and stabbed contemporaneously, while seated at his desk. Thus, Palmbach concluded that the assault on Seymour was consistent with having been conducted by more than one assailant. [Pl.'s Ex. 10 (Palmbach Report) at 11.] Palmbach also concluded that, based on evidence of where Arlene was lying and how she was attacked, that the attack on Arlene was also most likely committed by two assailants, and not one. [Pl.'s Ex. 10 (Palmbach Report) at 12.]

88.    Similarly, the fact that Marty's "confession" made no mention of the fact that the perpetrator wore gloves was incorrect. To a reasonable degree of scientific certainty, Palmbach concluded that a number of the transfer patterns and bloodstains on the bedclothes from the master bedroom were consistent with having been made by gloves. This also provided support for the two-perpetrator conclusion. [Pl.'s Ex. 10 (Palmbach Report) at 9, 12; *see also* Trainum Report at 32.]

89.    Detective Rein acknowledged that the barbells in Marty's room tested negative for blood and human tissue, that forensic testing was negative for blood or human tissue in drain in Marty's shower, and that the evidence indicated that Seymour was attacked first. [Defs.' Ex. XX (Rein Deposition) at 196:13–17, 206:21–25, 212:20–213:4.] Detective Rein also testified that, within a couple of days to a week after the murders, he came to the conclusion that Seymour was attacked before Arlene, contrary to the confession, but he could not recall at his deposition what had caused him to reach that conclusion. [Defs.' Ex. XX (Rein Deposition) at 206:16–208:13.] It also became clear to the detectives—*after* Marty's false "confession"—that the watermelon knife could not have been the murder weapon. [*See* ¶¶ 93–127, *infra*; Defs.' Ex. YY (Doyle Deposition) at 297:16–

25

298:9, 303:5–21, 304:7–8, 317:14–318:25; Defs.' Ex. XX (Rein Deposition) at 197:11–198:4.]

90.     A reasonable and experienced homicide detective, following minimally accepted police practices, would have used these forensic and medical conclusions to evaluate their theory of the case. [Pl.'s Ex. 12 (Baumann Deposition) at 284:9–286:3.] The total lack of corroboration of the details in Marty's "confession" would have suggested that the detectives needed to re-evaluate the evidence of Marty's guilt. A legitimate explanation for such a lack of corroboration would be that Marty's "confession" was false, and that he was innocent. A legitimate explanation for the lack of corroboration would *not* simply be that the confessing suspect had lied about all of the details, except his "I did it" admission. [Pl.'s Ex. 1 (Trainum Report) at 31–33.] Given Detective McCready's and Detective Rein's training and knowledge about the necessity of corroboration and the investigative risk of false or contaminated statements, these forensic results should have raised serious red flags with the investigators about the statement they had obtained. A reasonable and experienced homicide detective would regard a confession with almost entirely false facts—which comport with the original, but disproven, police theory of the crime—as evidence of innocence. [Pl.'s Ex. 1 (Trainum Report) at 38–39.]

***Detective McCready never orders a reconstruction of the bedroom, where the forensic evidence contradicted the confession, despite the fact that one was performed in Seymour's office.***

91.     Forensic testing on evidence from the crime scene showed that the account of Arlene's murder contained in the "confession" was contradicted in several key ways. [*See* ¶¶ 82–85, *supra*.] A basic principle of crime scene analysis is that when forensic results come in that contradict the working hypothesis or theory of a case, it is important to re-evaluate that hypothesis based on the new results. [Pl.'s Ex. 12 (Baumann Deposition) at 105:5–16.] SCPD Detective Charles Kosciuk, working as a team with the SCPD Homicide Squad detectives at the crime scene, conducted a crime scene reconstruction based on the forensic evidence gathered from Seymour's office. [Pl.'s Ex. 49 (Kosciuk Deposition) at 33:3–19, 37:5–18, 44:24–47:10, 101:4–03:25.] According to Detective Kosciuk, the purpose of such a reconstruction was to take a hypothesis and see if it could be refuted or confirmed by the forensic evidence. [Pl.'s Ex. 49 (Kosciuk Deposition) at 31:14–32:2.]

92.     Although Detective Kosciuk conducted such a reconstruction based on the evidence found in the office where Seymour was murdered, and although Detective Rein testified that the order of the murders was "something we wanted to know," no homicide detective ever asked Detective Kosciuk or Baumann to do a reconstruction of the master bedroom where Arlene was murdered. [Pl.'s Ex. 49 (Kosciuk Deposition) at 103:13–21; Defs.' Ex. XX (Rein Deposition) at 207:19–23; Pl.'s Ex. 12 (Baumann Deposition) at 280:5–9.] The decision whether or not to conduct a reconstruction was Detective McCready's. [Pl.'s Ex. 12 (Baumann Deposition) at 286:4–24.]

## HOMICIDE SQUAD DETECTIVES SUPPRESS THE MEDICAL EXAMINER'S CONCLUSION THAT THE WATERMELON KNIFE WAS NOT THE MURDER WEAPON

***Dr. Adams conducts the autopsies of Arlene and Seymour, with an SCPD Homicide Squad detective present.***

93.  Suffolk County Medical Examiner Dr. Vernard Adams conducted the autopsies of both Arlene and Seymour. [Defs.' Ex. B (TT) (Vernard Adams) at 3945:4–8, 3993:10–13.] Dr. Adams testified that "it would [be] usual and customary in Suffolk County" for the homicide detectives working on the case to attend the autopsies, and that it was not unusual for them to take notes. [Defs.' Ex. BBB (Adams Deposition) at 40:22–41:8, 42:22–43:9; 54:18–55:1; 189:2–6, 189:21–190:7.]

94.  Lieutenant McElhone agreed that an SCPD detective would have "covered" the autopsies, and that it was important for a detective to be present because a detective, and not the medical examiner, would know whether information that came out during the autopsy contradicted the working theory of the homicide case. [Pl.'s Ex. 8 (McElhone 2014 Deposition) at 91:20–92:24, 93:9–13, 97:1–98:7.]

95.  ADA Collins also testified that it was the practice of the SCPD to attend autopsies, and they would "generally assign a detective, if not more than one, to attend the autopsy," where "most of the time," they would take notes. [Defs.' Ex. HHH (Collins Deposition) at 97:23–98:7.] And ADA Jablonski testified that "a lot of times" a detective was present and that it was desirable to have the homicide detective at the autopsy in case there were "questions that they might have on the case that they've learned so far that maybe the doctor could answer during the autopsy." [Defs.' Ex. III (Jablonski Deposition) at 51:16–24, 164:14–21.]

***Dr. Adams examines the watermelon knife and concludes that there is no reasonable possibility that it was the murder weapon.***

96.  While conducting Arlene's autopsy on September 8, the day after the attacks, Dr. Adams noted a series of four sharp-force wounds on her back, each consisting of a "slash with a corresponding dimple." [Pl.'s Ex. 1 (Trainum Report at 37); *see also* Pl.'s Ex. 13 (Arlene Autopsy Diagram) at 5–11; Pl.'s Ex. 14 (Arlene Autopsy Back View Photograph).] Dr. Adams sketched the distinctive pattern of these wounds, and also sketched a picture of the type of knife he believed would have caused them. [Pl.'s Ex. 13 (Arlene Autopsy Diagram) at 11.] Dr. Adams testified at his deposition that this drawing of a knife with a "projection at the hilt" was meant to represent "what a knife might look like that could cause these kinds of injuries with the small abrasion at the site of the stab wound or cut." [Defs.' Ex. BBB (Adams Deposition) at 185:13–22.] He also testified that, if he were to draw it again, he even "would make the blade shorter." [Defs.' Ex. BBB (Adams Deposition) at 185:20–22; *see also* Pl.'s Ex. 13 (Arlene Autopsy Diagram) at 11.]

97.  In addition to conducting the autopsies, Dr. Adams was given the watermelon knife to examine and compare to the wounds—that is, the knife that the detectives had seen at the crime scene and suspected was the murder weapon, and which *was* identified as the murder weapon in the confession they subsequently took from Marty. [Pl.'s Ex. 1 (Trainum Report) at 31–32; Defs.' Ex. B (TT) (Vernard Adams) at 3954:5–16; Defs.' Ex. BBB (Adams Deposition) at 69:22–70:21, 180:8–15; Pl.'s Ex. 15 (Watermelon Knife Photograph); Pl.'s Ex. 16 (Skull and Barbell Photograph).]

98.  At his deposition, when reviewing his notes from Arlene's autopsy, Dr. Adams testified that there was no "reasonable possibility" that the watermelon knife was the murder weapon. [Defs.' Ex. BBB (Adams Deposition) at 191:22–192:8; 192:22–193:21.] In other words, Dr. Adams excluded the watermelon knife as the murder weapon. He further testified that, "[a]n assailant with that knife should have been penetrating body cavities." [Defs.' Ex. BBB (Adams Deposition) at 192:6–8.] He also testified that, "if [he] had to pick the perfect knife to make these wounds, [he] would pick a utility knife." [Pl.'s Ex. 1 (Trainum Report) at 38; Defs.' Ex. BBB (Adams Deposition) at 188:14–22.]

99.  Dr. Baden agreed that the watermelon knife could *not* have caused the wounds on Arlene's back. [Defs.' Ex. NNN (Baden Report) at 6.] Like Dr. Adams, Dr. Baden found that, "[t]he knife wounds are not consistent with having been inflicted by the blade of the initially suspected watermelon knife." [Defs.' Ex. NNN (Baden Report) at 4.]

100.  In addition, on September 19, Baumann completed serological testing on the watermelon knife and found no serological evidence on the watermelon knife. [Pl.'s Ex. 1 (Trainum Report) at 32; Defs.' Ex. BB (TT) (Robert Baumann) at 2235:23–2238:4.] Based on this finding, Palmbach concluded that the evidence indicated to a reasonable degree of scientific certainty that the watermelon knife was not the instrument used to attack Arlene or Seymour. [Pl.'s Ex. 10 (Palmbach Report) at 12–13.]

***Dr. Adams shares his conclusion regarding the watermelon knife with a SCPD Homicide Squad detective—most likely Detective Rein—who takes notes.***

101.  Dr. Adams was clear that, while he could not remember the exact conversation or words, he would have told detectives at the time of the autopsies of this conclusion: that there was no "reasonable possibility" that the watermelon knife was the murder weapon, and that it was "clearly not a reasonable weapon for the sharp-force wounds." [Defs.' Ex. BBB (Adams Deposition) at 192:22–193:21, 215:11–13; Pl.'s Ex. 1 (Trainum Report) at 38.] Dr. Adams clarified that he understood the word 'consistent' to be equivalent to establishing a reasonable possibility, and the phrase 'no reasonable possibility' to be equivalent to beyond a reasonable doubt. [Defs.' Ex. BBB (Adams Deposition) at 14:14–15:14; 145:23–24.] Dr. Adams testified that, while he couldn't remember his exact words, he "must have communicated" this opinion to SCPD Homicide Squad detectives. [Defs.' Ex. BBB (Adams Deposition) at 191:12–21; *see generally*, 187:20–193:21.] He also agreed that, ordinarily, he would be asked by detectives whether his autopsy findings were consistent with a particular knife, or if they excluded or confirmed that weapon. [Defs.' Ex. BBB (Adams Deposition) at 180:16–181:3.]

28

102.    Despite the general practice of the SCPD Homicide Squad to have a detective present at autopsies, and the significance of this case, no detectives admit to being at Arlene's autopsy. Detective McCready denied being present at either autopsy. [Defs.' Ex. FFF (McCready Affidavit) at 2.] At his deposition, Sergeant Doyle admitted that he "would have to think" he was at Arlene's autopsy, but in a later affidavit, denied being present at Seymour's autopsy and does not recall if he was present at Arlene's autopsy, but admitted that he was at the Medical Examiner's Office on the day of her autopsy. [Defs.' Ex. YY (Doyle Deposition) at 260:16–19; Defs.' Ex. DDD (Doyle Affidavit) at 2.] Detective Carmody, who also worked on the Tankleff case, denied being present at either autopsy, but admitted having a conversation with Dr. Adams at the Medical Examiner's Office the day *after* Arlene's autopsy. [Defs.' Ex. CCC (Carmody Affidavit) at 2.] Detective Kosciuk denied being present at Arlene's autopsy and claims he does not recall if he was present at Seymour's autopsy, but admitted that he was at the Medical Examiner's Office on the day of his autopsy. [Defs.' Ex. EEE (Kosciuk Affidavit) at 2.] Finally, Detective Rein denied being present at Arlene's autopsy but admitted that he was at Seymour's. [Defs.' Ex. GGG (Rein Affidavit) at 2.]

103.    However, a handwritten page of police notes independently documents Dr. Adams' wound measurements from Arlene's autopsy, including the four dimple-and-slash wounds, and includes a drawing of what appears to be a utility-type knife. [Pl.'s Ex. 1 (Trainum Report) at 37; Pl.'s Ex. 17 (Seymour Autopsy Diagram) at 5.] This page of notes, accompanied an autopsy diagram in handwriting identified by ADA Collins as being Detective Rein's. [Defs.' Ex. HHH (Collins Deposition) at 96:25–97:14; *see also* Pl.'s Ex. 17 (Seymour Autopsy Diagram) at 1.] ADA Collins was familiar with handwriting he'd seen over the years, and thought he recognized Detective Rein's handwriting even before seeing his signature. [Defs.' Ex. HHH (Collins Deposition) at 91:13–14, 98:21–99:2.]

104.    Dr. Adams testified when shown these notes that it did not look like his handwriting, but rather looked like it was drawn by "someone who was at the autopsy and making a diagram of their own at the same time I was making my notes" and that it "could be the diagram of a detective attending the autopsy," who was "writing down measurements as I called them out and wrote them down myself." [Defs.' Ex. BBB (Adams Deposition) at 49:3–50:10, 189:2–6, 189:21–190:7; *compare* Pl.'s Ex. 13 (Arlene Autopsy Diagram) at 11 *with* Pl.'s Ex. 17 (Seymour Autopsy Diagram) at 5.]

105.    Dr. Adams also testified that the numbers corresponding to the depths of Arlene's wounds on the police-authored notes matched those on Dr. Adams' own diagram. [Defs.' Ex. BBB (Adams Deposition) at 189:18–20; *compare* Pl.'s Ex. 13 (Arlene Autopsy Diagram) at 11 *with* Pl.'s Ex. 17 (Seymour Autopsy Diagram) at 5.] Dr. Adams explained that the detective's drawing of the knife "has a little end to it at the hilt that would be consistent with making those abrasions that you see on the side of each the four stab wounds on Arlene Tankleff's back." [Defs.' Ex. BBB (Adams Deposition) at 189:7–15 (referring to Pl.'s Ex. 17 (Seymour Autopsy Diagram) at 5).]

106.   Dr. Adams agreed that it was "fair to say from looking at these diagrams and the analysis of the wounds here, that [he] would have been sharing [his opinion that the wounds were made by a utility-type knife] with the detectives, at least one of whom appears to have been making notations in a diagram." [Defs.' Ex. BBB (Adams Deposition) at 191:3–11.] Dr. Adams also agreed that, typically, detectives would talk with the medical examiner about findings during the autopsy as they were being made. [Defs.' Ex. BBB (Adams Deposition) at 41:9–12.]

107.   During a homicide investigation, it would have been customary for detectives to share information about the case with each other. In particular, Detective McCready, as the lead detective on the case, should have been made aware of Dr. Adams' opinion about the watermelon knife by the detective present at the autopsy, and there is no question in Lieutenant McElhone's mind that detectives under his command in the Homicide Squad would have done so. [Pl.'s Ex. 8 (McElhone 2014 Deposition) at 98:8–18, 100:8–101:6, 118:24–120:6.] Baumann also testified that all forensic results were being "filed to Detective McCready" as the lead detective on the case. [Pl.'s Ex. 12 (Baumann Deposition) at 205:14–20.]

***SCPD Homicide Squad detectives know that Dr. Adams' conclusion regarding the watermelon knife was exculpatory information that should have been disclosed.***

108.   A reasonable and experienced homicide detective, following generally accepted police practices, would have understood that Dr. Adams' exclusion of the watermelon knife— the confessed-to murder weapon—as the actual murder weapon was exculpatory information that needed to be clearly and accurately documented and disclosed to the prosecutors on the case. [Pl.'s Ex. 1 (Trainum Report) at 38.] In affidavits submitted in support of Defendants' summary judgment motion, Detective Carmody, Sergeant Doyle, Detective Kosciuk, Detective McCready, and Detective Rein each affirmed that, in 1988, he was aware of his "obligation under *Brady v. Maryland* to disclose exculpatory material" and that, had he "been told, by any source, that Dr. Adams believed that there was no reasonable possibility that the knife recovered from the counter next to the watermelon could have been the murder weapon, [he] would have provided this information … to the prosecutors in the Suffolk County District Attorney's Office." [Defs.' Ex. CCC (Carmody Affidavit) at 3; Defs.' Ex. DDD (Doyle Affidavit) at 3–4; Defs.' Ex. EEE (Kosciuk Affidavit) at 3; Defs.' Ex. FFF (McCready Affidavit) at 3; Defs.' Ex. GGG (Rein Affidavit) at 3–4.]

109.   Lieutenant McElhone also agreed that, if Dr. Adams had concluded that there was no reasonable possibility that the watermelon knife was the murder weapon, the detective at the autopsy would have had an obligation to bring that information to the prosecutor's attention. [Pl.'s Ex. 8 (McElhone 2014 Deposition) at 118:7–18.] This was true because, "if [a] medical examiner made findings that contradicted the working theory of the case in a homicide investigation, it would be important for the detectives to relay that information to the prosecutors right away." [Pl.'s Ex. 8 (McElhone 2014 Deposition) at 95:6–20.] This obligation would have been the detective's, not the medical examiner's, because the detective would be in the better position to know whether information that

30

came out of the autopsy contradicted the working theory of the case. [Pl.'s Ex. 8 (McElhone 2014 Deposition) at 97:21–98:18, 100:8–101:6.]

***However, SCPD Homicide Squad detectives do not document their knowledge of Dr. Adams' conclusion or disclose it to the prosecution or the defense before Marty's trial.***

110.   Dr. Adams' conclusions were not documented in any report by Detective Rein, Detective McCready, Sergeant Doyle, or any other SCPD Homicide Squad members. [Pl.'s Ex. 1 (Trainum Report at 37–38); *see also* Defs.' Ex. CCC (Carmody Affidavit) at 2–3; Defs.' Ex. DDD (Doyle Affidavit) at 2–3; Defs.' Ex. EEE (Kosciuk Affidavit) at 2–3; Defs.' Ex. FFF (McCready Affidavit) at 2–3; Defs.' Ex. GGG (Rein Affidavit) at 2–3.]

111.   Indeed, it was never brought to Lieutenant McElhone's attention that Dr. Adams believed the watermelon knife was not the murder weapon, from any source, nor was he aware at the time of any skepticism as to the watermelon knife. [Pl.'s Ex. 8 (McElhone 2014 Deposition) at 125:8–126:2.]

112.   Lieutenant McElhone also testified that, if he had known that Dr. Adams made the finding that there was no reasonable possibility the watermelon knife was the murder weapon, and that detectives under his command had known of that finding and failed to alert the prosecution, this "would be very troubling" to him. [Pl.'s Ex. 8 (McElhone 2014 Deposition) at 122:6–123:14.] Similarly, if Sergeant Doyle had known of Dr. Adams' conclusion and didn't communicate that fact to the prosecutor, he would "absolutely" have been concerned. [Pl.'s Ex. 8 (McElhone 2014 Deposition) at 140:2–7.] An intentional failure to document and disclose such information would be an egregious violation of minimally accepted police practices. [Pl.'s Ex. 1 (Trainum Report) at 38.]

113.   What is more, Lieutenant McElhone testified that if a confession described the use of a murder weapon that the medical examiner had said was *not* the murder weapon, such a discrepancy would have been a critically important area to explore. [Pl.'s Ex. 8 (McElhone 2014 Deposition) at 112:8–20.] Lieutenant McElhone testified that he would have immediately investigated how that had happened and would have reviewed all the other police work done in connection with the confession. [Pl.'s Ex. 8 (McElhone 2014 Deposition) at 123:15–124:9.] For example, "[o]ne of the things [he] would look at" would be whether Marty had given a false confession. [Pl.'s Ex. 8 (McElhone 2014 Deposition) at 134:14–135:3.] Lieutenant McElhone also agreed that he would "look at everything in the entire case," including questioning Detective McCready and Detective Rein again about how the confession came about. [Pl.'s Ex. 8 (McElhone 2014 Deposition) at 135:4–136:21, 139:14–25.]

114.   ADA Jablonski, the initial carrying prosecutor, never learned from Detective Rein, Dr. Adams, or any other source of Dr. Adams' conclusion regarding the watermelon knife at any time that he was on the case. [Defs.' Ex. III (Jablonski Deposition) at 74:5–18, 166:8–168:16.] In particular, ADA Jablonski denied ever seeing Detective Rein's diagram or notes, denied having knowledge that Dr. Adams thought Arlene's wounds were consistent with a utility knife, denied learning that anything about the autopsy report

31

was inconsistent with the case against Marty or his confession, and denied ever speaking to Dr. Adams regarding the murder weapons. [Defs.' Ex. III (Jablonski Deposition) at 52:22–54:2, 78:6–11, 164:4–6, 168:17–169:22.] ADA Jablonski would have told ADA Collins if he had been aware of any information that the knife was inconsistent with the injuries, and, before turning the case over to ADA Collins, affirmed that he was "unaware of any information that tends to exculpate the defendant." [Defs.' Ex. III (Jablonski Deposition) at 70:17–74:3, 160:2–10.]

115.    Similarly, ADA Collins never learned from Dr. Adams, the police, or anyone else that Dr. Adams did not believe the watermelon knife was the murder weapon. [Defs.' Ex. HHH (Collins Deposition) at 88:9–89:21, 90:19–91:3.] ADA Collins testified that, if he had learned that Dr. Adams had ruled out the watermelon knife, he would "absolutely" have asked him about that at trial, and told defense counsel. [Defs.' Ex. HHH (Collins Deposition) at 89:5–10, 90:5–16.] ADA Collins also testified that he followed the *Brady* rules in his practice as a prosecutor, that he followed his ethical responsibilities while prosecuting Marty's case in particular, and that if he had made a factual assertion to a tribunal which he later discovered to be false, he would have corrected that inaccuracy. [Defs.' Ex. HHH (Collins Deposition) at 36:12–16, 40:8–19.]

116.    Marty's defense counsel at trial, Robert Gottlieb, was not aware of Dr. Adams' conclusion that there was no reasonable possibility that the watermelon knife was the murder weapon until reading Dr. Adams' deposition in this case in preparation for his own, in 2015. [Defs.' Ex. JJJ (Gottlieb Deposition) at 86:14–23.]

***As a result, the criminal jury never learns of Dr. Adams' opinion that the watermelon knife is not the murder weapon***

117.    In his opening statement, ADA Collins told the jury that Dr. Adams would testify that the victims' injuries were "not inconsistent" with having been caused by the watermelon knife. [Defs.' Ex. B (TT) (Opening) at 28:4–9.] ADA Collins made this opening statement because he believed that would be the evidence. [Defs.' Ex. HHH (Collins Deposition) at 84:6–85:13.] During his testimony, Dr. Adams testified merely that the wounds were "caused by a blade that was sharp." [Defs.' Ex. B (TT) (Vernard Adams) at 3953:24–3954:7; *see also* Defs.' Ex. BBB (Adams Deposition) at 174:9–23.] Based on the "very basic principle of trial advocacy … that you do not ask a question to which you expect to receive an unfavorable answer," Marty's defense counsel, Gottlieb, did not ask Dr. Adams any additional questions about the likelihood that the watermelon knife was the murder weapon. [Pl.'s Ex. 18 (Gottlieb Affidavit) at ¶ 9; Defs.' Ex. B (TT) (Vernard Adams) at 4008:14–4009:6, 4035:12–4036:6.]

118.    In addition, the prosecution argued that the details in Marty's confession—which would include the fact that the watermelon knife was the murder weapon—were true and corroborated the veracity of the confession. [*see, e.g.*, Defs.' Ex. B (TT) (Closing) at 4927:20–4928:1, 4930:20–22, 4932:5–7, 4933:21–23.] In particular, in his closing argument, ADA Collins argued: "If [the detectives] did not get this information from the defendant, then where the heck did it come from? And if they did make it up, then they're

two or three of the luckiest sons of guns that ever walked," because the details were corroborated, including the "consistent weapons." [Defs.' Ex. B (TT) (Closing) at 4934:5–14; *see also* Defs.' Ex. HHH (Collins Deposition) at 67:24–68:18.]

119.   Gottlieb's strategy at trial was to attack both the reliability of the confession attributed to Marty and the integrity of the police investigation. The undisclosed evidence that Dr. Adams had excluded the watermelon knife as the murder weapon would have been critically important to this defense. First, had he known of this evidence, Gottlieb would have spent a significant amount of time bringing out before the jury that the government's own expert had concluded that a critical detail in the confession—one of the murder weapons—was false. That this exculpatory evidence came from a government witness would have made it uniquely powerful. Second, Gottlieb would have used the fact that the police had learned of this exculpatory evidence the day after the murders, yet failed to report it, to attack the integrity of the entire police investigation. [Pl.'s Ex. 18 (Gottlieb Affidavit) at ¶ 5–8.]

***Evidence emerges that several SCPD Homicide Squad detectives did not believe that the watermelon knife was the murder weapon at the time of Marty's trial.***

120.   In their affidavits submitted in support of Defendants' motion for summary judgment, Detective Carmody, Sergeant Doyle, Detective Kosciuk, Detective McCready, and Detective Rein all deny learning from either Dr. Adams or another member of the Homicide Squad that Dr. Adams believed that there was no reasonable possibility the watermelon knife was the murder weapon. [Defs.' Ex. CCC (Carmody Affidavit) at 2–3; Defs.' Ex. DDD (Doyle Affidavit) at 2–3; Defs.' Ex. EEE (Kosciuk Affidavit) at 2–3; Defs.' Ex. FFF (McCready Affidavit) at 2–3; Defs.' Ex. GGG (Rein Affidavit) at 2–3.]

121.   However, at his deposition in this case, Sergeant Doyle admitted that at the time of the autopsy—and not before—he formulated an opinion that the watermelon knife was not the murder weapon. [Defs.' Ex. YY (Doyle Deposition) at 317:14–318:4.] In particular, Sergeant Doyle testified that, based on the wound patterns, he believed that the watermelon knife was both too large and too sharp to be the murder weapon, because "it would have had to be a very sharp knife, almost like a razor blade knife, to do that much damage that quickly. And I think the knife by the watermelon is too large for that and I think we would have had a larger wound." [Defs.' Ex. YY (Doyle Deposition) at 298:16–299:9, 303:5–21, 304:7–8.]

122.   Sergeant Doyle also admitted that he "probably" told "every detective in the team and Detective McCready and Detective Rein" that he did not believe the watermelon knife was the murder weapon. [Defs.' Ex. YY (Doyle Deposition) at 300:14–21.] This conversation likely happened "in the totality of all the information that we received after the autopsy." [Defs.' Ex. YY (Doyle Deposition) at 318:12–25.] In any case, Sergeant Doyle agreed that he had not shared his opinion that the watermelon knife was not the murder weapon before detectives began interrogating Marty. [Defs.' Ex. YY (Doyle Deposition) at 318:5–11.] Similarly, Detective Rein testified that he also came to the conclusion that the watermelon knife was the wrong kind of knife to be the murder

33

weapon—sometime on or after the evening of September 8—and that he shared his conclusion with Sergeant Doyle. [Defs.' Ex. XX (Rein Deposition) at 197:11–198:4.]

123.　Detective Carmody's handwritten notes, which indicated that they were from a meeting with Dr. Adams on September 9, the day after Arlene's autopsy, contain the words "clear knife issue." [Pl.'s Ex. 19 (Carmody Handwritten Notes) at 26; Defs.' Ex. BBB (Adams Deposition) at 192:9–21.] Detective Carmody denied at his deposition having any recollection as to what he would have meant by those words, and claimed he did not remember "one way or the other having a meeting with a Dr. Adams on [September 9]." [Pl.'s Ex. 20 (Carmody Deposition) at 68:11–69:11.] However, in an affidavit submitted in support of Defendants' motion for summary judgment, Detective Carmody admitted meeting with Dr. Adams on that date "regarding a knife wound." [Defs.' Ex. CCC (Carmody Affidavit) at 2.] Although he denied any specific recollection of his conversation with Dr. Adams, he claimed he is certain he was never told by Dr. Adams or anyone else that there was no reasonable possibility the watermelon knife was the murder weapon. [Defs.' Ex. CCC (Carmody Affidavit) at 2–3.]

124.　In 2008, after Marty's conviction had been vacated, the SIC re-investigated the Tankleff murders. [Defs.' Ex. SS (2008 SIC Report) at 1.] During the course of the SIC's investigation, several SCPD detectives and officers who had been involved in the original investigation were interviewed, and reports were prepared by special agents. [Pl.'s Ex. 21 (Kosciuk SIC Interview Report) at 1–5; Pl.'s Ex. 22 (Pfalzgraf SIC Interview Report) at 1–5; Pl.'s Ex. 23 (Doyle SIC Interview Report) at 1–7.]

125.　In his SIC interview, Detective Kosciuk said "he did not believe that a knife recovered on the kitchen table was used to cause Seymour's injuries" and that it was his "'gut feeling,' after reviewing Seymour's x-rays, that a 'utility type knife' was used to cause his wounds." [Pl.'s Ex. 21 (Kosciuk SIC Interview Report) at 3.] This opinion was based "on the type of wounds which were long, thin, narrow slashes that he believes were likely caused by a razor-like blade." [Pl.'s Ex. 21 (Kosciuk SIC Interview Report) at 3.] "Additionally, while he was at the morgue, Detective Kosciuk observed small marks (dots) at the start of Seymour's slash wounds that appeared to him to be indicative of marks that could have been left by the handle of a utility-type knife." [Pl.'s Ex. 21 (Kosciuk SIC Interview Report) at 3.]  Detective Kosciuk also stated that he "may have discussed this matter with the Medical Examiner." [Pl.'s Ex. 21 (Kosciuk SIC Interview Report) at 3.]

126.　In his SIC interview, Detective Pfalzgraf, who was with Seymour at the hospital, stated that he was "of the opinion that the cutting instrument used to slash Arlene and Seymour was never recovered." [Pl.'s Ex. 22 (Pfalzgraf SIC Interview Report) at 4.] He also told the SIC that he "saw Arlene Tankleff's body at the scene or viewed photos of her body and recalls that her wounds appeared to be cuts from a very sharp knife like an Exacto knife or razor knife, such as one uses to make fine cuts on wallpaper." [Pl.'s Ex. 22 (Pfalzgraf SIC Interview Report) at 4.]

127. In his SIC interview, Sergeant Doyle "stated that he felt that some sort of knife and bludgeon were used to inflict the injuries to the victims," but that he "did not believe that a knife, recovered on a kitchen counter next to a watermelon, was used to inflict the injuries and that a smaller knife, possibly a utility knife, might have been used." [Pl.'s Ex. 23 (Doyle SIC Interview Report) at 5.] Sergeant Doyle "based his belief on the compression level of the wounds," and further "stated that the police were 'stuck' with the type of knife described by Tankleff in his confession." [Pl.'s Ex. 23 (Doyle SIC Interview Report) at 5.] When asked about this interview at his deposition, while admitting that the rest of it was accurate, Sergeant Doyle claimed that the word "stuck" was a mischaracterization. [Defs.' Ex. YY (Doyle Deposition) at 304:21–306:11.]

## THE SCPD HOMICIDE SQUAD FAILS TO INVESTIGATE AN OBVIOUS ALTERNATE SUSPECT, JERRY STEUERMAN

***From the moment first responders arrive on the scene, Marty and several other people tell SCPD Homicide Squad detectives that Steuerman was the person most likely to have been behind the murders.***

128. From the moment first responders arrived on the scene, Marty and others in and close to the Tankleff family insisted to SCPD Homicide Squad detectives that Jerry Steuerman, Seymour's business partner, was the person most likely to have been behind the murders. [Pl.'s Ex. 11 (Crayne Report) at 1.] Marty told first responders at the scene that "the only person who had the motive to do this was Jerry Steuerman," and that Arlene had told him two weeks earlier that she thought Steuerman would "do something terrible." [Defs.' Ex. B (TT) (Daniel Gallagher) at 275:17–21; Defs.' Ex. B (TT) (Donald Hines) 505:15–23; *see also* Pl.'s Ex. 11 (Crayne Report) at 1; Pl.'s Ex. 1 (Trainum Report) at 18; Pl.'s Ex. 24 (Steuerman Missing Person Report) at 3, 7.] Marty also told Detective McCready at the scene that he believed Steuerman had killed his parents. [Pl.'s Ex. 9 (McCready Deposition) at 165:25–166:13; Defs.' Ex. C (McCready Supp. Report) at 2.] Before taking Marty to SCPD Homicide Squad Headquarters, Detective McCready discussed the fact that Marty told him Steuerman did it with Detective Rein and Sergeant Doyle. [Defs.' Ex. XX (Rein Deposition) at 90:12–91:5.]

129. Marty was not the only person to immediately indicate to SCPD Homicide Squad detectives that Steuerman could have been responsible for the murders. [Defs.' Ex. B (TT) (Closing) at 4858:24–4859:11; Pl.'s Ex. 8 (McElhone 2014 Deposition) at 154:9–16; Pl.'s Ex. 9 (McCready Deposition) at 160:3–16, 166:14–25.] On September 7, Detective Pfalzgraf interviewed Ron Rother, Marty's brother-in-law, at the hospital where Seymour was being treated. Detective Pfalzgraf's handwritten notes of the interview indicate that Mr. Rother told Detective Pfalzgraf that Steuerman had threatened Seymour several weeks earlier. [Pl.'s Ex. 25 (Pfalzgraf Handwritten Notes) at 3; Pl.'s Ex. 1 (Trainum Report) at 35–36; Pl.'s Ex. 9 (McCready Deposition) at 160:6–7, 166:14–25; Defs.' Ex. YY (Doyle Deposition) at 320:24–321:18.] Sergeant Doyle—who Detective Pfalzgraf—agreed that such a threat was an important fact that he would expect to find in Detective Pfalzgraf's documentation of the interview. [Defs.' Ex. YY (Doyle Deposition) at 131:4–133:18; Defs.' Ex. B (TT) (Robert Doyle) at 2604:5–15.] However, despite

being in Detective Pfalzgraf's handwritten notes, this information is not in his supplementary report of his interview with Mr. Rother. [Defs.' Ex. YY (Doyle Deposition) at 134:23–136:16; Pl.'s Ex. 1 (Trainum Report) at 36; Pl.'s Ex. 26 (Pfalzgraf Report) at 1–2.]

130. Myron Fox a.k.a. "Uncle Mike," the Tankleff family's attorney, was also interviewed at the hospital on September 7. Handwritten notes discussing this interview reflect that Mr. Fox stated that there was "bad blood between Steuerman and Seymour." [Pl.'s Ex. 1 (Trainum Report) at 36; Pl.'s Ex. 19 (Carmody Handwritten Notes) at 15; Defs.' Ex. YY (Doyle Deposition) at 147:4–148:10, 319:2–320:13; Pl.'s Ex. 9 (McCready Deposition) at 160:12–16, 166:17–19.] Sergeant Doyle testified that Mr. Fox and Marty had not spoken at the crime scene, and that thus, Mr. Fox's opinion was independent from Marty's opinion that Steuerman must have been involved. [Defs.' Ex. YY (Doyle Deposition) at 320:14–23.] However, once again, this information was not included in the supplementary report prepared regarding the interview with Mr. Fox. [Pl.'s Ex. 1 (Trainum Report) at 36; Pl.'s Ex. 26 (Pfalzgraf Report) at 1–2.]

131. Ron Falbee, a cousin of Marty's who was named executor of Seymour and Arlene's estate and Marty's guardian, testified that he also told at least one detective at the hospital that he believed Steuerman was responsible for the murders. [Pl.'s Ex. 27 (440 Hearing Excerpt) at 161:24–162:24.] Arlene had previously told Falbee that Steuerman had threatened her and Seymour. [Pl.'s Ex. 27 (440 Hearing Excerpt) at 149:24–150:7.]

***Witnesses indicate that Steuerman had been the last person to leave the Tankleffs' home after a card game, just hours before the murders.***

132. On the night of September 6, and continuing into the early hours of September 7, just hours before the murders, Seymour had hosted a weekly card game at his home. Steuerman was one of the participants in the card game present in the Tankleffs' home that night. [Pl.'s Ex. 1 (Trainum Report) at 35; Pl.'s Ex. 24 (Steuerman Missing Person Report) at 3.] Steuerman told SCPD Homicide Squad detectives that he had left the card game between 2:30 and 3:00 a.m., at the same time as all of the other remaining card players. [Defs.' Ex. W (Rein Supp. Report) at 1.]

133. However, detectives learned early on in their investigation that Steuerman had lied to them about when he left the card game. In fact, the SCPD Homicide Squad's investigation revealed that Steuerman was the last of the card players to leave the Tankleffs' home in the early hours of September 7. For example, Robert Montefusco, one of the card players, reported to detectives on September 7 that, after the card players left the house together, Steuerman went back inside the house to speak to Seymour, and Mr. Montefusco never saw Steuerman leave. [Pl.'s Ex. 28 (Anderson Notes) at 1–2.] At approximately 3:00 a.m., although the other card players all went to their cars and drove away, no one saw Steuerman drive away. [Pl.'s Ex. 1 (Trainum Report) at 35; Defs.' Ex. B (TT) (Closing) at 4859:16–17.]

134.   Mr. Montefusco testified that, after the card game broke up around 3:00 a.m., everyone left the house except for himself, Seymour, and Steuerman. Mr. Montefusco also had begun to leave, but turned around to come back and speak to Seymour. However, when Mr. Montefusco got back to the room where the card game had been held, he saw Steuerman speaking to Seymour. The conversation appeared private, so Mr. Montefusco left. [Defs.' Ex. B (TT) (Robert Montefusco) at 663:4–666:13; Defs.' Ex. B (TT) (Closing) at 4859:21–25; *see also* Defs.' Ex. XX (Rein Deposition) at 243:8–245:24; Defs.' Ex. YY (Doyle Deposition) at 154:25–14, 326:3–5; Pl.'s Ex. 9 (McCready Deposition) at 160:17–23.]

135.   Similarly, Joseph Cecere, another one of the card players, testified that his car was parked farthest up the driveway of all the players, such that he had to wait for other cars to leave before he was able to pull his own car out. Mr. Cecere testified that, as he prepared to leave, Steuerman's car was parked next to his, and that he observed Steuerman sitting in the driver's seat of his car. However, instead of pulling out, Steuerman waved to Mr. Cecere to drive around him. Thus, when Mr. Cecere drove away, sometime after 3:00 a.m., Steuerman was still sitting in his car in the driveway. Mr. Cecere did not see Steuerman follow him out of the driveway, and never saw any headlights on any car behind him as he drove away. [Defs.' Ex. B (TT) (Joseph Cecere) at 710:15–713:25; Defs.' Ex. B (TT) (Closing) 4860:1–4860:9; *see also* Defs.' Ex. XX (Rein Deposition) at 240:11–242:9; Defs.' Ex. YY (Doyle Deposition) at 326:6–8; Pl.'s Ex. 9 (McCready Deposition) at 160:17–23; Pl.'s Ex. 1 (Trainum Report) at 35.] Mr. Cecere was the last witness to see Steuerman at the Tankleffs' home. [Pl.'s Ex. 1 (Trainum Report) at 35.]

136.   Mr. Montefusco's and Mr. Cecere's testimony indicating that Steuerman was the last to leave the card game, shortly after 3:00 a.m., was in direct contrast to Steuerman's own account that he had left between 2:30 and 3:00 a.m., *with* all of the remaining card players. [Defs.' Ex. W (Rein Supp. Report) at 1.] Sergeant Doyle knew at the time that Steuerman's account was inconsistent with Mr. Montefusco's and Mr. Cecere's, but did not do anything to follow up on the inconsistency. [Defs.' Ex. YY (Doyle Deposition) at 326:3–327:22.]

***A week after the murders, Steuerman fakes his own death and flees to California.***

137.   A week after the murders, Seymour was still alive and in a coma at the hospital. [Pl.'s Ex. 9 (McCready Deposition) at 414:11–415:16.] Steuerman was aware of this fact, as well as the fact that Marty had publicly accused him of being responsible for the murders. [Defs.' Ex. YY (Doyle Deposition) at 106:20–107:13; Defs.' Ex. B (TT) (Closing) at 4861:8–23.]

138.   On September 14, Steuerman faked his own death by leaving his car running in a parking lot with the doors open and one of his shoes in the car. He altered his appearance by shaving his beard, cutting his hair short, and removing his usual jewelry. He then took a bus from Long Island to Atlantic City and then another bus from Atlantic City to Newark, before flying to California under the assumed name Jay Winston. [Pl.'s Ex. 1 (Trainum Report) at 36; Pl.'s Ex. 24 (Steuerman Missing Person Report) at 3, 9, 22; Pl.'s Ex. 8

(McElhone 2014 Deposition) at 154:17–155:9, 160:13–161:2; Pl.'s Ex. 9 (McCready Deposition) at 214:11–22; Defs.' Ex. YY (Doyle Deposition) at 75:2–76:3; Defs.' Ex. III (Jablonski Deposition) at 128:16–19; Defs.' Ex. B (TT) (Jerry Steuerman) at 905:14–906:19; Defs.' Ex. B (TT) (Closing) 4860:18–4861:7.] Generally, Steuerman "made efforts to make it appear as if he had been abducted or even killed." [Defs.' Ex. III (Jablonski Deposition) at 125:2–14.] Before he left, Steuerman also withdrew $15,000 out of a joint bank account that he shared with Seymour. [Defs.' Ex. B (TT) (Closing) at 4862:16–21; Defs.' Ex. YY (Doyle Deposition) at 171:20–172:8.]

139. The next day, September 15, Steuerman was reported missing by his daughter Bari. [Pl.'s Ex. 1 (Trainum Report) at 36; Pl.'s Ex. 24 (Steuerman Missing Person Report) at 2–3.] SCPD Homicide Squad detectives were summoned to Steuerman's attorney's office where, according to Lieutenant McElhone, "there was a note to be opened in the event that something happened to him" which directed how his assets should be distributed. [Pl.'s Ex. 8 (McElhone 2014 Deposition) at 155:3–9.] Ultimately, given the obvious relationship to the Tankleff murders, it was the SCPD Homicide Squad that conducted the missing person investigation of Steuerman's disappearance. [Pl.'s Ex. 24 (Steuerman Missing Person Report) at 3–4.] Lieutenant McElhone testified that he could think of no other missing person investigation that had been taken over by the Homicide Squad. [Pl.'s Ex. 1 (Trainum Report) at 36; Pl.'s Ex. 2 (McElhone 2011 Deposition) at 228:24–230:25.]

***Additional evidence emerges in the wake of the murders pointing to Steuerman as a likely suspect.***

140. SCPD Homicide Squad detectives also learned early on in the Tankleff murder investigation that Steuerman owed Seymour a "substantial amount of money." [Pl.'s Ex. 8 (McElhone 2014 Deposition) at 161:20–24.] Detective McCready testified that he knew there was a "business dispute" between the two men, and that Steuerman owed Seymour "several thousand dollars." [Pl.'s Ex. 9 (McCready Deposition) at 162:3–14.] Furthermore, Steuerman testified that, with Seymour alive, he was unable to start new business ventures without Seymour's approval and without giving Seymour a portion of the profits. This was no longer true one Seymour was dead. [Defs.' Ex. B (TT) (Jerry Steuerman) at 1081:15–25.] Steuerman later described his resentment of this situation by saying that, not only did Seymour own half the business they shared, but "Tankleff thought he owned half of me." [Pl.'s Ex. 9 (McCready Deposition) at 165:6–14.] Sergeant Doyle also knew that Steuerman owed Seymour money and that the two men had been arguing. [Defs.' Ex. YY (Doyle Deposition) at 93:6–94:17, 174:2–22.] However, despite the fact that SCPD Homicide Squad detectives were aware of the allegations that Steuerman owed Seymour a significant amount of money, a forensic audit of Seymour's business and personal finances was never conducted. [Pl.'s Ex. 1 (Trainum Report) at 35.]

141. SCPD Homicide Squad detectives also knew early on that Steuerman's daughter Bari was his only alibi for the time of the murders. [Pl.'s Ex. 1 (Trainum Report) at 36; Defs.' Ex. W (Rein Supp. Report) at 1–2; Defs.' Ex. V (Anderson Report) at 1.] Steuerman told

detectives that he had forgotten his keys, so that when he arrived home shortly after leaving the card game, his daughter had gotten up to let him in. [Defs.' Ex. W (Rein Supp. Report) at 1–2; Defs.' Ex. V (Anderson Report) at 1–2.] Lieutenant McElhone recognized that an alibi from a family member is suspect; he testified that, in his experience as a homicide detective, when suspects used family members as alibis, he expected them to make sure to have their stories straight by "coordinat[ing] their false alibi with a family member." [Pl.'s Ex. 8 (McElhone 2014 Deposition) at 202:12–21, 204:5–15.]

142.   On September 22, Homicide Squad detectives received an anonymous tip that Steuerman was financing his son Todd, who was involved in major cocaine dealings. [Pl.'s Ex. 1 (Trainum Report) at 36; Pl.'s Ex. 24 (Steuerman Missing Person Report) at 4.] Lieutenant McElhone testified that he had been aware that Steuerman had a son with a criminal record, and that the SCPD had received a tip that Todd was dealing cocaine out of Steuerman's bagel store. [Pl.'s Ex. 8 (McElhone 2014 Deposition) at 162:16–163:18.] Lieutenant McElhone also admitted that, "obviously," the tip regarding Todd's cocaine dealing would have had to be looked at in connection with ruling Steuerman out as a suspect. [Pl.'s Ex. 8 (McElhone 2014 Deposition) at 176:10–21.] Detective McCready had heard that Todd was selling cocaine from the bagel store, and knew that he was eventually arrested and prosecuted. [Pl.'s Ex. 9 (McCready Deposition) at 200:16–22.] Detective Rein and Sergeant Doyle had also heard that Todd was involved in cocaine dealing, and Sergeant Doyle admitted that it was always a possibility that violence would be associated with cocaine dealing. [Defs.' Ex. XX (Rein Deposition) at 229:2–9; Defs.' Ex. YY (Doyle Deposition) at 162:13–166:2.] Furthermore, Detective Rein also admitted that he interviewed one of Steuerman's sons, or possibly both. [Defs.' Ex. XX (Rein Deposition) at 228:23–25.]

***SCPD Homicide Squad detectives decide Steuerman is not a suspect and fail to conduct more than a cursory investigation into him.***

143.   "[G]iven the lack of evidence corroborating the Tankleff confession, a reasonable and experienced investigator would have paid particular attention to any evidence of an obvious, alternate suspect" such as Steuerman. [Pl.'s Ex. 1 (Trainum Report) at 35.] Indeed, failing to adequately investigate such a suspect would be "a serious deviation from minimally accepted police practices." [Pl.'s Ex. 1 (Trainum Report) at 35.] Lieutenant McElhone agreed that the SCPD Homicide Squad had an "obligation to actually take affirmative steps to investigate Steuerman." [Pl.'s Ex. 8 (McElhone 2014 Deposition) at 172:4–14.]

144.   But the SCPD Homicide Squad detectives never did so. Sergeant Doyle testified that the SCPD Homicide Squad *never* considered Steuerman to be a suspect. [Defs.' Ex. YY (Doyle Deposition) at 84:5–8, 111:15–112:12; *see also* Pl.'s Ex. 1 (Trainum Report) at 37.] Likely by the end of the day on September 7, and in any event before September 10, Sergeant Doyle was confident that Marty was the murderer and that Steuerman had not been involved, never changing his mind. [Defs.' Ex. YY (Doyle Deposition) at 122:6–124:15, 126:4–127:16, 166:24–168:11.] Even after learning of Steuerman's

disappearance to California and Todd's involvement with cocaine dealing, Sergeant Doyle never personally believed that Steuerman should be considered a suspect. [Defs.' Ex. YY (Doyle Deposition) at 84:5–8, 85:19–86:12, 90:25–91:8, 166:24–168:11.]

145. Detective McCready also testified that "Jerry Steuerman wasn't a suspect." [Pl.'s Ex. 9 (McCready Deposition) at 175:16–16; *see also* Pl.'s Ex. 1 (Trainum Report) at 37.] More specifically, Detective McCready testified that, "there is no way Jerry Steuerman did this murder or was connected to this murder or hired anybody to do this murder." [Pl.'s Ex. 9 (McCready Deposition) at 215:14–216:23.] Initially, Detective McCready was suspicious of Marty, not Steuerman, and by the end of the day on September 7, Detective McCready was sure it was Marty. [Pl.'s Ex. 9 (McCready Deposition) at 175:23–25, 218:19–219:3.] Steuerman's disappearance to California did not change Detective McCready's mind. [Pl.'s Ex. 9 (McCready Deposition) at 416:3–7.]

146. Consistent with their failure to ever consider Steuerman a suspect, the SCPD Homicide Squad's "investigation" into him was cursory at best. First, on September 7, two SCPD Homicide Squad detectives under Sergeant Doyle's supervision, Detective Anderson and Detective Laghezza, interviewed five of the card players from the night of September 6, including Steuerman at his bagel store. [Pl.'s Ex. 1 (Trainum Report) at 36; Defs.' Ex. B (TT) (Closing) at 4859:11–15; Defs.' Ex. YY (Doyle Deposition) at 114:5–9.] The interview with Steuerman lasted no more than an hour. [Pl.'s Ex. 29 (Anderson Deposition) at 55:24–56:2.] Detective Anderson's report was not solely about Steuerman, and only included a page-and-a-half of discussion of the detectives' interview with Steuerman. [Defs.' Ex. V (Anderson Report) at 4–5; Defs.' Ex. YY (Doyle Deposition) at 113:20–116:4.]

147. In addition, on September 10, Steuerman was interviewed for approximately half an hour at his bagel store by Detective McCready and Detective Rein, and another page-and-a-half-long report was prepared by Detective Rein. [Defs.' Ex. W (Rein Supp. Report) at 1–2; Defs.' Ex. YY (Doyle Deposition) at 116:11–117:11; Pl.' Ex. 9 (McCready Deposition) at 175:12–175:14.] Sergeant Doyle testified that Detective McCready and Detective Rein did not believe that Steuerman was a suspect at the time of their interview. [Defs.' Ex. YY (Doyle Deposition) at 86:3–9.]

148. Based solely on these two brief interviews in public places, SCPD Homicide Squad detectives under Sergeant Doyle's supervision ruled out Steuerman as a suspect in the Tankleff murders. Sergeant Doyle testified that, other than the collective three pages of typed reports on Steuerman, there was no other investigation he was aware of into whether Steuerman should be a suspect. [Defs.' Ex. YY (Doyle Deposition) at 117:12–118:2.] Instead, because Marty had confessed and had survived the attacks, among other reasons which he knew before Steuerman was even interviewed, in Sergeant Doyle's opinion, he was confident that the SCPD Homicide Squad already "had the right person," namely, Marty. [Defs.' Ex. YY (Doyle Deposition) at 118:3–122:9.]

149. SCPD Homicide Squad detectives under Sergeant Doyle's supervision never reconsidered that decision to rule Steuerman out as a suspect or conducted additional

investigation into him as a suspect, even as evidence mounted pointing away from Marty and towards Steuerman's involvement. In particular, the detectives failed to interview all of Seymour's business associates and family members, conduct a forensic audit of Steuerman's business and/or personal finances, investigate Steuerman's business dealings or his business associates, or investigate Steuerman's connections to his son Todd's cocaine dealing or to his son's or his own criminal associates. [Pl.'s Ex. 1 (Trainum Report) at 35–37; Defs.' Ex. YY (Doyle Deposition) at 117:12–118:2.] This was a serious deviation from minimally accepted police practices. [Pl.'s Ex. 1 (Trainum Report) at 35–36.]

***Despite never considering Steuerman a suspect and never seriously investigating him, detectives falsely report to supervisors and prosecutors that they have conducted a thorough investigation and ruled him out.***

150.   Despite only conducting two cursory interviews of Steuerman, SCPD Homicide Squad detectives under Sergeant Doyle's supervision falsely represented that they had thoroughly investigated Steuerman and eliminated him as a suspect. For example, the missing person report prepared after Steuerman's disappearance contained an entry from September 16 which stated that: "Steuerman has been thoroughly questioned and Homicide does not believe he was involved." [Pl.'s Ex. 24 (Steuerman Missing Person Report) at 3; Defs.' Ex. YY (Doyle Deposition) at 89:3–4.] Sergeant Doyle admitted that the terminology "thoroughly questioned" in that report referred to solely the September 7 interview of Steuerman by Detective Anderson and Detective Laghezza and the September 10 interview of Steuerman by Detective McCready and Detective Rein. [Defs.' Ex. YY (Doyle Deposition) at 89:5–10.] However, Sergeant Doyle also admitted that he would not have described these two cursory interviews as constituting "thorough" questioning. [Defs.' Ex. YY (Doyle Deposition) at 89:20–90:16.]

151.   Lieutenant McElhone was also misled about the investigation into Steuerman. [Pl.'s Ex. 1 (Trainum Report) at 16.] Lieutenant McElhone testified that the SCPD Homicide Squad detectives under his supervision had reported to him that they "did look at Steuerman and rule[d] him out as a suspect." [Pl.'s Ex. 8 (McElhone 2014 Deposition) at 165:21–25.] Specifically, Lieutenant McElhone's understanding was that detectives had "thoroughly investigated" Steuerman as a suspect and determined that he was not involved in the murders. [Pl.'s Ex. 8 (McElhone 2014 Deposition) at 167:7–21, 182:23–183:9.] Lieutenant McElhone had been brought in to head the SCPD Homicide Squad in order to clean house after the earlier SCPD scandals regarding coerced and fabricated confessions, including by reducing reliance on confessions to the exclusion of other evidence. [Pl.'s Ex. 2 (McElhone 2011 Deposition) at 109:4–110:25.]

152.   After learning that Steuerman had fled to California, on September 26, Detective McCready, Sergeant Doyle, and ADA Jablonski flew to California to look for Steuerman. [Pl.'s Ex. 24 (Steuerman Missing Person Report) at 4, 25.] Before this trip, ADA Jablonski knew that Steuerman had been spoken to by SCPD Homicide Squad detectives—either from reading reports of interviews or from talking to detectives directly—and that they did not consider Steuerman a suspect. [Defs.' Ex. III (Jablonski

Deposition) at 24:7–18.] In addition, Detective McCready and/or Detective Rein had reported to prosecutors what they alleged had occurred during Marty's confession, including their claim that Marty had supplied the details of the confession. [Defs.' Ex. III (Jablonski Deposition) at 25:22–24, 26:23–27:6, 45:16–46:2.] Based on all of this false information, ADA Jablonski did not question the reasonableness of the conclusion of the SCPD Homicide Squad detectives' conclusion that Steuerman was not involved in the murders. [Defs.' Ex. III (Jablonski Deposition) at 156:10–22.]

153.   ADA Jablonski testified that he "absolutely" did not consider Steuerman to be a suspect, that at the time he went to California, he was "very confident in Mr. Tankleff's guilt … so confident that Mr. Steuerman was in no way, shape or form a suspect," and that he was confident Marty had acted alone.  [Defs.' Ex. III (Jablonski Deposition) at 23:15–24:6, 45:3–14, 126:13–18.]

154.   The purpose of the trip to California was not to investigate Steuerman. Rather, ADA Jablonski testified that he "wanted [Steuerman] to know that we wanted him to come back with [them], [and] that he was not under arrest," because they "had no legal reason to bring him back or anything like that, so he could talk to [them]." [Defs.' Ex. III (Jablonski Deposition) at 22:7–19, 148:2–7.] ADA Jablonski also testified that, when he was in California, he might have told Steuerman that he was not a suspect so that Steuerman would come back with them. [Defs.' Ex. III (Jablonski Deposition) at 157:23–158:6.] ADA Jablonski wanted Steuerman to come back to Suffolk County because his name was being brought up by defense counsel and wanted to "talk to him about what the other side was saying and have him available for trial" and to "have an explanation as to why he left under the circumstances that he left, and in the manner that he left, so that that could be prepared for a trial." [Defs.' Ex. III (Jablonski Deposition) at 23:2–14.]

155.   On September 28, they located Steuerman at a Holiday Inn in Long Beach. [Pl.'s Ex. 1 (Trainum Report) at 37; Pl.'s Ex. 24 (Steuerman Missing Person Report) at 27.] Although ADA Jablonski was involved in the first conversation with Steuerman in California, which he described as lasting approximately 30–60 minutes and involving a "lot of crying and moaning and that's about it," after that it was Detective McCready and Sergeant Doyle who talked to Steuerman at greater length "about coming back and that kind of stuff." [Defs.' Ex. III (Jablonski Deposition) at 145:23–146:6, 150:21–151:3, 151:13–14, 155:6–10.] ADA Jablonski testified that he had relied on Detective McCready and Sergeant Doyle to "report to [him] anything that was of significance" to the Tankleff murders. [Defs.' Ex. III (Jablonski Deposition) at 155:18–22.] On September 30, the investigators, voluntarily accompanied by Steuerman, returned to Suffolk County. [Pl.'s Ex. 24 (Steuerman Missing Person Report) at 27.]

156.   ADA Collins took over the case after Steuerman had faked his death, fled, and returned to the jurisdiction. [Defs.' Ex. HHH (Collins Deposition) at 109:17–25.] He testified that he did an analysis of Steuerman's footprint in connection with the investigation, but did not recall any other specific steps that he took to investigate Steuerman because he knew that ADA Jablonski and SCPD Homicide Squad detectives had taken investigative steps previously. [Defs.' Ex. HHH (Collins Deposition) at 112:4–12.] As a result, ADA Collins

testified that he "tried [his] suspect," namely Marty, because it was his understanding that the "proof did not point to [Steuerman]." [Defs.' Ex. HHH (Collins Deposition) at 117:2–112, 120:9–18.]

***After Marty's conviction, even more evidence implicating Steuerman comes to light.***

157.   In the late 1990s, a private investigator hired by Marty uncovered evidence that Steuerman was connected to a number of his son Todd's criminal associates. The private investigation revealed that one of those associates was a man named Joseph Creedon. [Pl.'s Ex. 1 (Trainum Report) at 37.]

158.   In 2003, Marty filed a petition for rehearing of his case based on newly discovered evidence. This new evidence included a sworn affidavit from a woman named Karlene Kovacs, found among files from the 1990s investigation, in which she had stated that Creedon had confessed to her and her friends that he was involved in the Tankleff murders, that he "was with someone named 'Steuerman,'" and that after the murders they had had to quickly leave to avoid being caught. Marty also provided an affidavit from a man named Glenn Harris, who described in detail that he had driven Creedon and a man named Peter Kent to the Tankleff house, and that Creedon and Kent had gone into the Tankleff house and then come running back to the car 10 to 30 minutes later "nervous and . . . winded." Harris also stated in the affidavit that he had later seen Kent burning his clothes and knew something more serious had occurred, but was on parole and thus too scared to talk to the police. [Defs.' Ex. QQ (Appellate Decision) at 165.]

159.   In 2004, a CPL 440.10 hearing occurred, at which evidence implicating Steuerman continued to surface:

   a)   Creedon testified that he had collected drug money for Steuerman's son Todd, and that in April 1989, Todd had suggested that Creedon speak to his father about "cutting out" Marty's tongue. [Defs.' Ex. QQ (Appellate Decision) at 167–68.] This conversation was bolstered by testimony from retired SCPD Detective Thomas McDermott, who interviewed Creedon on January 4, 1995. In that interview, Creedon stated that Todd wanted Marty's tongue cut out, and that "Jerry Steuerman would pay a lot of money if Creedon did so." [Defs.' Ex. QQ (Appellate Decision) at 174.]. There was also evidence that Todd had offered Creedon $10,000 to commit a murder for hire. [Defs.' Ex. QQ (Appellate Decision) at 168.]

   b)   Kovacs' boyfriend John Guarascio testified that, at an Easter dinner, Creedon had told him that he had been at the Tankleffs' home with Steuerman, that his adrenaline had been flowing, that they had been forced to get rid of their clothes, and that he needed to leave town. [Defs.' Ex. QQ (Appellate Decision) at 168–69.] Guarascio further testified that Creedon said he had been watching a card game and getting "pumped up" that night. [Defs.' Ex. QQ (Appellate Decision) at 169.]

c)   Creedon's son, Joseph Guarascio, testified that Creedon admitted he had choked Seymour and hit him on the head while Kent stabbed Arlene, all at the prompting of Steuerman and Todd, who had signaled Creedon when to enter the house. [Defs.' Ex. QQ (Appellate Decision) at 169–70.]

d)   A man named Gaetano Foti testified that Creedon had admitted to murdering the Tankleffs, and that an SCPD Detective named Robert Trotta testified that Foti had contacted him with this information on October 14, 2003, after Foti heard about the Tankleff case. [Defs.' Ex. QQ (Appellate Decision) at 170, 174–75.]

e)   Another associate of Creedon's, Joseph Graydon, testified that in July or August of 1988, Creedon was offered $25,000 by a partner in Strathmore Bagels to kill the other partner to whom he owed money. The murder was supposed to take place at the bagel store and look like a robbery, but when Creedon and Graydon went on the appointed day, the store was closed. A man named William Ram testified that the night before the Tankleff murders, Creedon offered to pay Ram to "rough up" the partner in a bagel business of someone who had hired Creedon. [Defs.' Ex. QQ (Appellate Decision) at 170.] This partner lived "in an upscale neighborhood, Belle Terre, and was a 'Jew in the bagel business.'" [Defs.' Ex. QQ (Appellate Decision) at 170–71.] The next day, Harris told Ram that "they" had done something bad, when "they" came running out of the house there was blood on them, and that they drove away and then had to burn their clothes. [Defs.' Ex. QQ (Appellate Decision) at 171.]

f)   Bruce Demps, an associate of Todd's, testified that Steuerman had "put a hit on" the Tankleffs because he owed them money. Todd also said that his father had sent someone to murder the Tankleffs. [Defs.' Ex. QQ (Appellate Decision) at 171.]

g)   A cabinet maker, Neil Fischer, testified that he had overheard Steuerman in the spring of 1989 saying that he had killed two people, who Fischer assumed to be the Tankleffs. [Defs.' Ex. QQ (Appellate Decision) at 171.]

h)   The chaplain at Sing Sing, Father Lemmert, testified that Harris had told him that he'd driven to the Tankleff house and waited in the car while Creedon and Kent went into the house, and they returned upset and with blood on them. Harris did not testify himself at the hearing because "other inmates threatened his children." [Defs.' Ex. QQ (Appellate Decision) at 172.]

i)   Leonard Lubrano, a wholesale baker that did business with Steuerman, testified that Detective McCready had said that he was "doing a project for Strathmore Bagels" in the mid-1980s and that he had seen Detective McCready in the bagel shop prior to 1988. [Defs.' Ex. QQ (Appellate Decision) at 172–73.]

j)   Creedon was not a suspect during Marty's trial because, as his defense lawyer testified, he "did not have any information that Creedon had admitted to others

that he had murdered the Tankleffs, or that Harris drove Creedon to the Tankleff residence." [Defs.' Ex. QQ (Appellate Decision) at 173.]

k) Paul Lerner, a social acquaintance of the Tankleffs, testified that in the spring or summer of 1988, Seymour had told him that Steuerman owed him a lot of money and was not making payments on the debt. A few weeks later, Seymour told Lerner that he was going to call in Steuerman's debt, likely putting him out of business. [Defs.' Ex. QQ (Appellate Decision) at 173.]

l) Ron Falbee, the executor of the Tankleff estate and Marty's maternal cousin, testified that Arlene was frightened of Steuerman and that Seymour had told him that his partnership with Steuerman was ending. [Defs.' Ex. QQ (Appellate Decision) at 173.] Falbee also testified that he found an unsigned letter in Seymour's desk dated June 29, 1988, demanding $50,000 from Steuerman based on a 1986 debt owed to the Tankleffs. [Defs.' Ex. QQ (Appellate Decision) at 174.]

160.   Even decades after Marty's conviction, evidence continued to emerge that pointed toward Steuerman's involvement in the Tankleff murders. At his deposition, Steuerman refused to answer questions, invoking his Fifth Amendment right repeatedly, including in response to questions such as "Did you play any role in the murder of either Seymour or Arlene Tankleff?" and "Did you pay anyone any money in connection with the attack on Seymour and Arlene Tankleff?" [*See, e.g.,* Pl.'s Ex. 30 (Jerry Steuerman Deposition) at 11:23–12:2, 13:15–13:19.] After Steuerman retained a lawyer for his son, Todd, Todd also invoked his Fifth Amendment right throughout his deposition. [*See generally* Pl.'s Ex. 31 (Todd Steuerman Deposition).]

Dated:   New York, New York
         August 24, 2015

                                        Respectfully submitted,


                                        NEUFELD SCHECK & BRUSTIN, LLP
                                        *Attorneys for Plaintiff Martin Tankleff*


                                        ***/s/ Emma Freudenberger***_____
                                        Barry Scheck
                                        Emma Freudenberger
                                        Anna Benvenutti Hoffmann
                                        99 Hudson Street, 8th Floor
                                        New York, NY 10013
                                        Tel: (212) 965-9081
                                        Fax: (212) 965-9084

Barry J. Pollack
Miller & Chevalier
655 Fifteenth Street, NW
Suite 900
Washington, DC 20005

Bruce A. Barket
Barket Marion Epstein & Kearon LLP
666 Old Country Road
Suite 700
Garden City, NY 11530

## <u>Certificate of Service</u>

   I hereby certify that a true and accurate copy of the foregoing Plaintiff's Counterstatement of Material Facts Pursuant to Local Rule 56.1 was served via mail with exhibits and email without exhibits on August 24, 2015, upon the following parties:

Brian C. Mitchell, Assistant County Attorney
Dennis M. Brown, Suffolk County Attorney
*Attorneys for Defendants*

H. Lee Dennison Building
100 Veterans Memorial Highway
P.O. Box 6100
Happauge, New York 11788


           ***/s/ Madhu Srikantha***_____
           Madhu Srikantha
           Paralegal
           Neufeld Scheck & Brustin, LLP