Exhibit 1

# Criminal Case Review & Consulting

1639 Potomac Avenue SE
Washington, D.C.  20003

February 9, 2015

Barry Scheck
Neufeld Scheck & Brustin, LLP
99 Hudson Street, 8th Floor
New York, New York 10013

RE:   **Report on the Review of the Suffolk County Police Department Investigation of the Murders of Arlene and Seymour Tankleff, and the Interrogation of Martin Tankleff**

## I.      Qualifications and Experience

I am retired from the Washington, D.C. Metropolitan Police Department ("MPD") after twenty-seven years of service, including seventeen years as a homicide detective. In that time, I personally conducted well over one hundred criminal interrogations. I also was personally involved in dozens of homicide and death investigations. From 1997 to 2010, I was assigned to the MPD Major Case/Cold Case Unit. In that role, I investigated unsolved murders and multiple-victim murders, much of the time as part of a joint MPD and FBI task force. In 2000, I created what became the MPD's Violent Crime Case Review Project and was its director until I retired. As part of my duties in the Major Case/Cold Case Unit, between 2000 and 2010, I also directed the MPD's Violent Criminal Apprehension Program ("ViCAP"). In those roles, I was responsible for the comprehensive review of all homicide cases over three years old, including forensic investigation into those cases. As an MPD detective, I received comprehensive training in proper interrogation techniques from the MPD Training Academy and the FBI Academy. I also completed the Reid Institute basic and advanced interview and interrogation course.

In addition to my experience and training as a detective and investigator, I have taught numerous courses in interrogation and investigation procedure for the MPD homicide school; the Richmond Police Department homicide school; the United States Attorney's Office for the District of Columbia; the Mid-Atlantic Cold Case Homicide Investigator's Association; the Nevada Sheriffs' and Chiefs' Association; Suffolk County, Massachusetts Prosecutor's Office and the Institute for Law Enforcement Administration. These courses, which I have taught since 2008, instruct law enforcement officers, prosecutors and judges on proper interrogation practices and train them to evaluate the reliability of confession evidence and witness statements. Furthermore, I have testified as an expert on police practices before the Ohio and Maryland state legislatures, as well as the Florida Innocence Commission and New York State Justice Task Force. In September 2010, I was one of two experts retained by the United States Department of

Justice to review and evaluate interrogation practices in the New Orleans Police Department. My professional experience also includes serving on the Board of Directors of the Mid-Atlantic Cold Case Homicide Investigator's Association since 2009, and being elected by my peers in 2008 to the Vidocq Society, an elite organization that reviews cold case files for law enforcement agencies throughout the United States. In addition, I have served as chairperson of the FBI's National Violent Criminal Apprehension Project Advisory Board.

Since retiring from the MPD in 2010, I have continued to pursue my interest in interrogation and police practices by serving as a private consultant for law enforcement organizations, attorneys, and other groups. In that capacity, I have been qualified as an expert witness on interrogation and police practice in state courts in Delaware and Florida. In addition, I am a trained volunteer case consultant for the National Organization of Parents of Murdered Children and the National Center for Missing and Exploited Children. Also, in 2011, I consulted with the Police Executive Research Forum on a national survey of eyewitness identification procedures in law enforcement agencies, the results of which were submitted to the National Institute of Justice in 2013.

I have also continued my training and research in the area of interviews and interrogations. In addition to attending various seminars and conferences during which interrogation practices were discussed, I have received training in the PEACE investigative interviewing process used by the police in the United Kingdom. I co-authored an article in the book *Criminal Investigative Failures* where I discussed a false confession I inadvertently obtained in a murder case in 1994,[1] and I authored a peer-reviewed article for *The Police Chief* magazine that discussed the contamination and evaluation of confession evidence.[2]

My qualifications are summarized in greater detail in my résumé, which is attached to this report as Appendix A.

For my work on this report, my understanding is that I will be compensated at a rate of $150.00 per hour, and at a rate of $150 per hour for my sworn testimony plus expenses.

## II.      Consultation Request

The attorneys representing Martin Tankleff requested that I review and evaluate the interviews of Mr. Tankleff conducted on September 7, 1988, by Detective James McCready, Detective Norman Rein, and Detective Sergeant Robert Doyle of the Suffolk County Police Department's Homicide Squad. The purpose of the review was to determine whether or not Detectives McCready and Rein and Detective Sergeant Doyle deviated from their training and accepted police practices in the course of those interviews.

I was also asked to review the Suffolk County Police Department Homicide Squad's investigation into the murders of Seymour and Arlene Tankleff and to identify any other major departures from accepted police practices.

---

[1] James Trainum and Diana Havlin, "A False Confession to Murder in Washington, D.C.", D. Kim Rossmo, *Criminal Investigative Failures,* CRC Press (2008).
[2] James L. Trainum, " 'I Did It' – Confession Contamination and Evaluation," *The Police Chief* 81 (June 2014), Web-only

To assist me in my review, I was provided with the materials that I have listed in Appendix B.

## III.    Summary of Findings

In the years prior to 1988, the Suffolk County Police Department's (SCPD's) Homicide Squad experienced a period of turmoil that resulted in the early retirement or transfer of all but four homicide detectives. This period of turmoil was caused by public scrutiny over the Homicide Squad's interrogation methods and reliance on confessions to close cases. Detective James McCready was one of the four long-tenured homicide detectives remaining in the Squad by 1988. Though the SCPD and the Homicide Squad had publicly worked to reform the Squad, there is evidence that the SCPD investigation into the murders of Arlene and Seymour Tankleff suffered from a series of systematic failures: the failure to properly conduct and document interviews and interrogations; to appropriately investigate the reliability of statement evidence; to legitimately conduct follow up investigation; and to document and disclose exculpatory evidence. These systemic failures are consistent with the policies and practices which had come under public scrutiny in the years before the Tankleff investigation.

### A.  Interview and Interrogation of Martin Tankleff

There is evidence that Detectives James McCready and Norman Rein experienced tunnel vision, verification bias, and noble cause corruption during the Tankleff homicide investigations. Detective  McCready testified that within one hour of arriving at the homicide scene at 33 Seaside Drive, he thought that Martin Tankleff had attacked his parents, and that he invited Martin Tankleff to the Homicide Squad in order to obtain a confession from him.

McCready and his partner Detective Norman Rein knew on the morning of September 7, 1988, that Tankleff was a seventeen-year-old who could be suffering from trauma. There is evidence that McCready and Rein, knowing that Tankleff was in the category of a particularly vulnerable subject, conducted a guilt-presumptive interrogation, in which they both presented Tankleff with false inculpatory evidence and fed Tankleff hold-back facts about the crimes. McCready and Rein, along with supervisor Detective Sergeant Doyle, questioned Tankleff for an approximate aggregate total of five hours and thirty-three minutes. Detectives McCready and Rein reported that the result of that interrogation was a detailed narrative confession.

To subject a vulnerable subject to a lengthy interrogation, in which false inculpatory evidence is presented to that subject, and hold-back facts are fed to that subject, but reported as originating with the subject, is an example of egregious police action. Such conduct is inconsistent with generally accepted police practices, and is known to compromise the reliability of any resulting statement.

There is additional evidence that Detectives McCready and Rein falsely reported that all of the hold-back facts in the detailed narrative confession originated with Tankleff, when they in fact originated with the detectives. This allegation is supported by the crime scene analysis. The crime scene analysis from the time of the original investigation supplemented by additional

analysis conducted in recent years supports the conclusion that many of the incriminating details about how the crimes were committed in the Tankleff narrative confession are false. Further, there is evidence that each of those details was known to and considered by McCready and Rein to be accurate hold-back facts at the time of the interrogation. If McCready and Rein were in fact the source of the hold-back facts about the crimes in the confession, their misrepresentation that Tankleff voluntarily provided those details is an egregious deviation from acceptable police practices. If, instead, McCready and Rein were not the source of the false hold-back facts about the crimes in the confession, the results of the crime scene analysis should have caused a reasonable and experienced investigator to conduct a critical reevaluation of the entire confession. The failure to do so would be a gross deviation from minimally accepted police practices.

## B.  Lack of Investigative Follow Up

Minimally accepted police practices teach that law enforcement's responsibility in criminal investigations goes well beyond the simple development of probable cause. In seeking the truth, a detective must remain objective and open to new information that may challenge their theory of the crime. This responsibility does not end at the moment of the suspect's arrest.

In a case involving statement evidence, such as a confession, this responsibility extends to the investigation of corroborative evidence. Known to experienced detectives since long before 1988, the key protection against false statement evidence is verifying that evidence through corroboration. There is evidence that Detectives McCready and Rein received crime scene analysis results, including forensic and medical evidence, which uniformly failed to corroborate or directly contradicted the Tankleff narrative confession. No reasonable and experienced officer would receive such crime scene analysis results and not recognize that he/she had a serious problem. A reasonable and experienced officer would have an obligation to immediately notify his/her supervisors and the prosecutors of the individual and collective results of the crime scene analysis, and would conduct an appropriate follow up investigation into both any viable alternate suspects or leads *and* the serious evaluation of the confessing subject's innocence. There is evidence that McCready, Rein, and Doyle failed to conduct an appropriate follow up investigation into either Jerry Steuerman, a viable alternative suspect, or to seriously evaluate the accuracy of the confession and Martin Tankleff's innocence. If, in the face of a confession that could not be dependently or independently corroborated, the detectives failed to appropriately consider alternative suspects or to seriously evaluate innocence, these failures were a gross deviation from minimally accepted police practices. Such a deviation would indicate to a reasonable and experienced supervisor that the detectives and supervisors involved may have engaged in serious misconduct in the investigation, interview, and interrogation.

## C.  Failure to Document and Disclose Exculpatory Evidence

Within two days of the attacks on Arlene and Seymour Tankleff, SCPD detectives knew that the watermelon knife, which had been identified in the narrative confession as the murder weapon, was not the murder weapon. By September 9, 1988, Medical Examiner Dr. Vernard Adams had conducted the autopsy on Arlene Tankleff and examined the watermelon knife and the barbells at his laboratory. There is evidence that Dr. Adams  informed Detective Rein, and

that Detective McCready also learned of Dr. Adams' conclusion, that there was no reasonable possibility that the watermelon knife was the murder weapon, and that a utility knife was the most likely sharp-force instrument based on the wound patterns. No supplementary report was created or produced by Detective Rein, McCready, or any other homicide detective documenting their meeting with Dr. Adams, or any information received from Dr. Adams about the wound patterns on Arlene Tankleff or the knife used to attack her. Pre-trial prosecutor Edward Jablonski and trial prosecutor John Collins both testified that they never knew that Dr. Adams had concluded that there was no reasonable possibility that the watermelon knife was the murder weapon. If McCready, Rein, and Doyle intentionally suppressed this information about the watermelon knife and Dr. Adams' opinions from the prosecution, the court, and the defense, that was a gross violation of minimally accepted police practices.

## IV.    Methodology

The evaluation of the interview/interrogation of Mr. Tankleff and of the overall investigation was based on deposition testimony, the above-mentioned documents, my training and experience as described in section one, my knowledge of policies and practices of police agencies around the country, as well as a review of the research and training regarding interviews, interrogations and investigations. The methodology employed is commonly used both for the review of unsolved (cold) cases and other sentinel events (also referred to as investigative failures).[3]

Though the definition depends on the agency, cold cases are cases that have remained unsolved for a specific period of time and/or where all investigative leads have been exhausted. Cases remain unsolved for many reasons, and often those reasons are the same ones behind other types of investigative failures.

Investigative failures, generally, are "…not the result of a single error, nor is it the fault of one operator or one investigative technique."[4] They are the result of several errors. Some errors are the result of a lack of proper training and/or the adherence to good investigative practices. Some are the result of intentional investigative misconduct. Others result from the personal and organization "pitfalls" discussed below. Sentinel event reviews are conducted to identify those causes, how they impacted the investigation, and offer recommendations, including changes in policies and practices, so as to avoid repetitions in the future.

Sentinel event reviews on unsolved cases help identify the systemic reasons the case went unsolved. Despite their utility in identifying investigative failures, sentinel event reviews often do not make solving the unsolved case any easier at a later date. Time is both the cold case investigator's enemy and friend. It is an enemy because witnesses may die, documents may be lost or destroyed, and evidence may deteriorate. Time is a friend because advances in technology may open up new forensic possibilities or relationships between people (i.e., a perpetrator and his girlfriend) may change.[5] In short, in spite of nationwide support, resources, and national forensic databases, solving cold cases relies, to a large degree, on pure luck.

---

[3] Law enforcement sentinel events include wrongful convictions, unsolved cases, "near misses" (a wrongful arrests that did not result in conviction) and what some call "unjust acquittals."
[4] National Institute of Justice, *Mending Justice: Sentinel Event Reviews*, (20014)
[5] Richard H. Walton, *Cold Case Homicides: Practical Investigative Techniques*. CRC Press, (2006), preface

Below are some of the basic concepts and methodologies that were applied in my review:

### A. Crime Scene Analysis[6]

The Association of Crime Scene Reconstruction defines reconstruction as "The process of using the scientific method to gain explicit knowledge of the series of events that surround the commission of a crime through deductive reasoning, inductive reasoning, physical evidence in its contextual setting, and their interrelationships."[7]

The end product of an efficient and thorough crime scene analysis can be used to test and evaluate witness statements, confessions, and theories. "When compared against the reconstruction, either the statement or theory will be supported or some part or all of it will be refuted. Whenever the crime scene analysis is found to be out of sync with a given statement or theory that requires that aspect of the theory to be revised."[8]

Since an effective crime scene analysis is dependent upon evidence, the strengths and weaknesses of the evidence must be evaluated. An investigator must be able to answer the question, "How do we know what we think we know?" To be effective, the crime scene analysis should be a fluid hypothesis, open to change as new evidence and test results become available.

Properly used, a good crime scene analysis provides the investigator with additional avenues of inquiry by which to test the dominant theory. Such avenues may include the suspect's motive, opportunity, and means to commit the crime, as well as additional steps that may be taken to strengthen the results of these inquiries. In addition, a good crime scene analysis establishes baselines against which more subjective evidence, such as witness testimony and confession evidence, can be tested and evaluated.

Since well before 1988, minimally accepted police practices have relied on crime scene analysis to establish explicit and reliable facts about how a crime was committed, to generate investigative leads and fact-based case theories, and to contribute to the critical work of corroborating or refuting more subjective evidence, like statement evidence.

In sentinel event reviews of cold case investigations, applying minimally accepted police practices for a cold case or internal affairs investigator, crime scene analysis is routinely used as a baseline to help identify and evaluate investigative failures, including by establishing explicit and reliable facts about the underlying crime, testing and evaluating case theories, and corroborating or refuting statement evidence from both witnesses and investigators.

### B. Statement Evidence Evaluation

---

[6] In the context of crime scene investigations, the terms "analysis" and "reconstruction" are often used interchangeably.
[7] Association of Crime Scene Reconstruction By-Laws, 2012.
[8] Tom Bevel, Ross M. Gardner, Bloodstain Pattern Analysis with an Introduction to Crime Scene Reconstruction p. 320 (3rd ed. 2008).

Unlike evidence produced through crime scene analysis, statement evidence from witnesses, victims, and suspects is, by nature, subjective and, as such, must be critically evaluated. What is the background of the person providing the statement evidence? How was the evidence obtained? If the evidence were true, what corroboration could the investigator expect to find? What investigation was done to corroborate the evidence? If the evidence is incomplete or refuted by the crime scene analysis, is there a legitimate reason for the omission or false fact, or is the statement evidence potentially unreliable?

Statement evidence evaluation is a three-part process that involves the evaluation of the subject, the interview/interrogation, and the resulting statement evidence.

- First, does the background of the subject offer clues to why they are providing the information? Does it offer insight as to how the information may have been influenced by the tactics or style used by the investigator?

- Second, by what process is the information obtained from the subject by the investigator? Did the style and tactics employed fall within their training? Was the questioning investigative or accusatory in nature? What motivation, if any, did the investigator offer or suggest that led to the subject providing information? Was the questioning leading in nature or did it encourage an open narrative? Did the investigator intentionally or unintentionally feed nonpublic facts to the subject during the questioning?

- Third, an evaluation of the resulting statement evidence incorporates the above two, along with the additional test of corroboration. Did the subject provide information that, based on the crime scene analysis is true and can be shown to have been provided by the subject free of outside contamination? Did the subject provide new information that was unknown to the investigator that can be corroborated?[9]

As discussed in more detail below, it is foundational to acceptable police practices—and has been since long before 1988—that all statement evidence requires investigative skepticism. By 1988, experienced homicide detectives should have been aware that false statements, including false confessions, were a common investigative occurrence and that the existence of red-flags about statement evidence required serious attention and investigative follow-up. The key protection against false statement evidence, known to experienced detectives since long before 1988, is verifying that evidence through corroboration. Case review requires close examination of the existence of evidence corroborating or refuting statement evidence.

### C. Investigative Pitfalls

Any case review must consider the impact of investigative pitfalls – the personal and organizational biases that impact the way data is collected, interpreted, and used.

Among the personal pitfalls are the cognitive biases of tunnel vision and verification bias.

---

[9] Fred E. Inbau, John E. Reid, Joseph P. Buckley & Brian C. Jayne, Criminal Interrogation and Confessions 64 (5th Ed. 2013). Pg 339-362.

- Tunnel vision results from a narrow focus on a limited range of alternatives.[10] An example of tunnel vision would include an investigator becoming so focused on one potential suspect or theory that he becomes closed to alternative suspects or theories.

- Tunnel vision is usually accompanied by verification bias. Verification bias causes the investigator to seek only evidence that confirms his/her theory of the case, and to ignore any evidence that refutes that theory. For example, the investigator may fail to properly search for evidence that might implicate an alternative suspect, and may discount any such evidence, if it comes to light.

Organizational pitfalls include the groupthink bias, as well as organizational agenda.

- Groupthink bias is the reluctance to think critically and challenge the dominant theory. Groupthink can enable and exacerbate verification bias and prevent the exploration of alternative hypotheses.[11]

- Common organizational agendas adopted by police departments include an institutional focus on crime statistics and case closure rates (to promote a real or perceived image of safety and efficiency)[12] and improving community relations through increased customer services.

- When groupthink combines with organizational agendas that focus on case closure and departmental self-image, supervisors may fail to properly oversee investigations and/or conduct appropriate reviews when an investigative failure is uncovered.[13]

Case reviews must consider outside influences that may impact an investigation. High profile cases that receive media attention often can increase the pressure to solve the crime quickly and "…cause a premature focus on a person against whom there is only some evidence"[14] The same is true when an investigative unit becomes the target of media-induced public criticism and scandal resulting from the use of investigational practices that, in the mind of the investigators, produced results desired by both the department and the public.

Law enforcement has been described "…as the 'thin blue line' that protects the law-abiding side of society from the criminal side."[15] One result is that officers "…think of themselves as set apart from normal society."[16] Officers and investigators consider those outside of their profession as "outsiders" who don't understand police work. Obstacles in the form of rules and constitutional considerations get in the way of the guilty being brought to justice. This can lead

---

[10] Rossmo, D. K. Case rethinking: A protocol for reviewing criminal investigations. *Journal of Police Practice and Research*. (2014)

[11] D. Kim Rossmo, *Criminal Investigative Failures,* CRC Press (2008).

[12] John A. Eterno & Eli B. Silverman, *The Crime Numbers Game: Management by Manipulation,* CRC Press (2012)

[13] Rossmo, D. K. Case rethinking: A protocol for reviewing criminal investigations. *Journal of Police Practice and Research*. (2014)

[14] D. Kim Rossmo, *Criminal Investigative Failures,* CRC Press (2008). Pg. 287

[15] Michael Tooley, et. al, The Media, the Public, and the Law Enforcement Community: Correcting Misperceptions, *The Police Chief,* January, 2015

[16] Ibid.

to an environment where "noble cause corruption," the attitude that it is justifiable to "bend the rules" to insure that "justice" is served, is tolerated.[17]

When police officials take corrective action to public outrage over police practices, the average police officer considers those officials to now be on the other side of the 'blue line;' especially when those practices had helped the department meet the goals of the organizational agenda, such as high homicide clearance rate. The result is sometimes open defiance. One example is the recent work slowdown and public displays of disrespect for the mayor by New York officers in response to criticisms over use of force procedures.[18] Another example involves the detectives of the Suffolk County Homicide Squad, who, when brought under public scrutiny by the National Law Journal for a reported 97% confession rate and allegations of the use of questionable interrogation tactics that had led to numerous suppressed confessions, wore t-shirts with "97%" on them to a detectives association picnic.[19]

It has been my experience that because of the above, reform and improvements are often resisted. Or participation in reforms can come in the form of malicious compliance. Usually, in the view of line officers and detectives, outright ignoring of the reform or the developing of underground workarounds occurs. The latter is more acceptable to police officials because the perception of reform remains and the organizational agenda is un-impacted.

In sentinel event reviews of cold case investigations, applying minimally accepted police practices for a cold case or internal affairs investigator, the case review evaluates each potential investigative pitfall. Sentinel event review recognizes that tunnel vision, verification bias, groupthink, and/or noble cause corruption, individually or in combination, are a serious problem and may lead to intentional misconduct on the part of investigators.

### D.  The Phenomenon of False Confessions

Finally, any case review involving statement evidence must also consider the specific phenomenon of false confessions, and what research has revealed about the investigative techniques that may lead to false or fabricated statements.

As a baseline, though there are several schools that teach interrogation tactics to law enforcement in the United States, researchers have identified common themes and approaches among them. These themes and approaches are basically minor variations of The Reid Technique. Developed and taught by the Reid Institute, The Reid Technique is considered by interrogation researchers, law enforcement, and the courts to be the industry standard. Even if an investigator has never received any formal training in interrogation, it is highly likely that Reid-style tactics will be found in their interrogations.

---

[17] D. Kim Rossmo, *Criminal Investigative Failures,* CRC Press (2008). Pg. 287
[18] Vivian Lee, *Life in New York City, Where Arrests Are Down and Tickets Are Rarities*, The New York Times (Jan. 6, 2015), http://www.nytimes.com/2015/01/07/nyregion/life-in-new-york-city-where-arrests-are-down-and-tickets-are-rarities.html.
[19] Thomas J. Maier and Rex Smith, "The Reliance on Confessions Questionable Procedures Taint Murder Defendants' Confessions," *The Confession Takers*, Newsday (Dec. 8, 1986), pg. 5.

Consistent with this training, it was commonly known, long before 1988, that the way police officers conduct an interview or interrogation can impact the reliability of any statement evidence produced in that interview or interrogation. Experienced and reasonable detectives knew in 1988 that false or contaminated statements, and particularly confessions, could occur and had to be guarded against in every interview or interrogation.

Consistent with The Reid Technique and with minimally accepted police practices, officers are trained that an essential protection against false or contaminated confessions is the existence of objective corroboration of the facts contained in the confession. Consistent with minimally accepted police practices, officers are trained to seek out objective corroboration of statements through additional investigation and crime scene analysis, and to continually evaluate the reliability of those statements based on their investigation.

Detective McCready, Detective Rein, Detective Sergeant Doyle, and Lieutenant John McElhone—the Suffolk County Homicide Squad's supervising officer—all acknowledged that a fundamental part of a detective's job in 1988 was to seek out corroboration for confession statements. By 1988, given the history of turmoil surrounding confession-taking methods in the Suffolk County Homicide Squad—as described by Lt. McElhone at his depositions and in more detail below—Suffolk County Homicide Squad detectives should have been particularly attuned to the risk of false or contaminated confessions and the need for objective corroboration of witness or suspect statements.

These minimally accepted police practices of corroborative investigation are in place specifically because the elicitation of a false or contaminated statement is a known risk in police investigations. Experienced and reasonable detectives are aware that this risk is heightened when certain types of particularly vulnerable individuals, including juveniles and persons suffering from recent trauma, are interviewed or interrogated. To date, 27% of the three-hundred seventeen (317) post-conviction DNA exonerations involved a false confession.[20] Further, a check of the National Registry of Exonerations, which tracks exonerations for any reason, reveals that 13% of one-thousand four-hundred nine (1409) exonerations involved a false confession.[21] Indeed, as discussed more fully below, detectives in the Suffolk County Homicide Squad in 1988 were particularly attuned to the risk of eliciting a false or contaminated statement because their Squad had recently faced intense scrutiny over homicide detectives' elicitation of a number of unreliable confessions.

Research into police interrogation training and the tactics leading to both reliable and false confessions has identified several problems – not only concerning specific tactics, but also in how investigations are conducted and the mindset of the investigator.

### i. Tunnel Vision and its Impact on the Investigation.

Tunnel vision is a catch-all term that encompasses several cognitive biases, including verification bias. A recognized psychological/psychosocial phenomenon, tunnel vision is often at play when an investigator focuses an investigation or interrogation on one particular outcome he

---

[20] www.innocenceproject.org

[21] www.law.umich.edu/special/exoneration

believes to be true. Clouded by tunnel vision, the investigator then filters the evidence in the case to fit that outcome. Through verification bias, all information supporting the particular outcome takes on an elevated significance, while information that does not support it is ignored or dismissed as extraneous. The investigator ends up molding the evidence to fit his personal theory, rather than objectively following the evidence in an effort to obtain the truth.

 To prevent tunnel vision, it is crucial that investigations be conducted in an objective manner. An investigator must be neutral and impartial throughout the course of any interrogation, or he risks contaminating the questions he asks and his interpretation of the witness or defendant's responses with his own preconceived theory. Individual pieces of evidence should not become the focus of an investigation to the exclusion of other credible evidence or explanations.

Statement evidence contamination (discussed in detail below) and the unreliable and/or false confessions that result are especially likely to occur in situations where tunnel vision, emotion, and ego are combined, and an investigator is more interested in "making someone pay for [the] crime"[22] than in finding out what actually happened. Investigators should seek the truth, not a particular confession or statement based on their personal theory of the crime or organizational pressures to solve the case. If, instead, an investigator begins to view a case with tunnel vision, he risks losing sight of his role as a truth-seeker and information gatherer. He then often adopts an adversarial role of attempting to build a case against a particular person, rather than an investigative role of gathering facts to determine what actually occurred. It is in these cases where the investigator is more likely to make investigative mistakes or to use problematic interrogation techniques, and, either intentionally or unintentionally, contaminate the resulting confession as described below.

Given these risks, in 1988, reasonable and experienced detectives knew that they had an obligation to guard against tunnel vision, to keep detailed and accurate records of their investigative steps, to truthfully report the way in which interviews and interrogations were conducted, to objectively evaluate new evidence as it came to their attention, and to thoroughly consider whether the evidence in the case corroborated or refuted the statement evidence they had obtained.

During sentinel event reviews, it is recognized that gross deviations from these obligations by the original investigator often indicate the presence of both tunnel vision and noble cause corruption, and are a warning sign for the heightened risk of potential intentional misconduct by that original investigator.

### ii.  The Steps to a False Confession

The research into confirmed false confession cases resulting from police interrogation has identified three steps often present in false confession cases: 1) Interrogation of an innocent person, 2) Use of coercive interrogation tactics, and 3) Contamination of the confession

---

[22] Fred E. Inbau, John E. Reid, Joseph P. Buckley & Brian C. Jayne, Criminal Interrogation and Confessions  (5th ed. 2013) pg 64

evidence.[23] A fourth step, the failure of law enforcement to properly evaluate and corroborate the confession evidence is what moves the confession from the interrogation room to the courtroom.

## 1. Interrogation of an Innocent Person

Especially in the early stages of an investigation, law enforcement is often faced with a surplus of suspects and motives. Often persons are identified as suspects based on what turns out to be incomplete and/or inaccurate information. Even when the evidence appears substantial, a good investigator must be open to the potential for alternative interpretations and even mistakes.

When an innocent person is misidentified as a suspect and undergoes interrogation, they are subjected to a guilt-presumptive process. This process is designed to obtain a confession consistent with what the investigator believes is "the truth."  If the detective is wrong, is experiencing tunnel vision, or intentionally or unintentionally fails to follow minimally accepted police practices to guard against the effects of tunnel vision, the beginning stage for a false confession is set.

Studies have shown that persons who go into a situation believing someone is guilty ask more guilt-presumptive questions that by their nature generate defensive behavior, and that such defensive behavior is then taken by the questioner to be an additional sign of guilt.[24] Moreover, in a guilt-presumptive environment, statements made by the suspect are more likely to be interpreted as inculpatory, and alternative explanations ignored.

## 2. Use of Guilt-Presumptive Interrogation Tactics

According to The Reid Technique, the interrogation should begin with the investigator confronting the suspect with the certainty of their guilt. The investigator should tell the suspect that there is no doubt that they committed the crime, that the investigator has the evidence to prove it, and there is nothing that they can say that will convince them otherwise. All the investigator wants to know is the why.

The investigator will then present the suspect with a justification for why they committed the crime. This justification or "theme" is supposed to provide the suspect with a psychological or moral excuse for their actions. If the suspect does not accept the offered theme, the investigator suggests another and another.

The investigator may present the suspect with real or fictitious evidence to further convince the suspect of the certainty of his guilt.

---

[23] Leo, Richard A. and Drizin, Steven A., The Three Errors: Pathways to False Confession and Wrongful Conviction (2010). G. Daniel Lassiter & Christian Meissner, eds., Police Interrogations and False Confessions: Current Research, Practice, and Policy Recommendations (American Psychological Association, 2010); Univ. of San Francisco Law Research Paper No. 2012-04. Available at SSRN: http://ssrn.com/abstract=1542901
[24] Saul Kassin, Christine Goldstein, Kenneth Savitsky, Behavioral Confirmation in the Interrogation Room:  On the Dangers of Presuming Guilt, *Law and Human Behavior,* Vol. 27, No. 2, April 2003.

Once an admission is made, the investigator then seeks the details about the case that would be known only by the true perpetrator.

While there is disagreement as to the benign nature of The Reid Technique, the Reid Institute and the interrogation researchers are in agreement over several tactics and situations that can potentially cause an innocent person to confess. These include:

- The interrogation of particularly vulnerable persons, including juveniles, and those with cognitive or mental health issues.
- Presenting false evidence in conjunction with any of these listed tactics or situations
- Interrogations lasting a long period of time
- Multiple interrogators
- Any real or implied threats of physical harm
- Any real or implied threat of inevitable consequence
- Any real or implied promise of leniency
- Denial of human needs

In addition, the interview of persons who have suffered recent trauma can produce results that may be incorrectly interpreted as indicative of guilt. Where people are normally expected to be able to provide specific details and information relating to sequence of events, most trauma victims "…often inadvertently provide inaccurate information and details which frequently causes the fact finder to become suspicious of the information provided."[25] "One of the mantras within the criminal justice system is 'inconsistent statements equal a lie.' Nothing could be further from the truth when stress and trauma impact memory, research shows."[26]

An admission and subsequent confession occurs when the suspect reaches one of the following states (or a combination of the two):

- The suspect believes that the short-term benefit of confessing outweighs the long-term consequences.

- The suspect is seeking to escape a real or perceived inevitable consequence and/or receive a real or perceived benefit.

 By 1988, given the history of turmoil surrounding confession-taking methods in the Suffolk County Homicide Squad—as described by Lt. McElhone at his depositions and in more detail below—Suffolk County Homicide Squad detectives should have been particularly aware of the risks attendant with employing guilt-presumptive interrogation tactics, especially when interrogating particularly vulnerable suspects—like juveniles or those suffering trauma—and when combining those tactics with other high-risk techniques—like employing multiple interrogators, conducting lengthy interrogations, or presenting false evidence to the suspect.

---

[25] Russell W. Strand, The Forensic Experiential Trauma Interview  [FETI], http://www.mncasa.org/assets/PDFs/ Forensic%20Trauma%20Interviewing%20Techniques-%20Russell%20Strand.pdf.
[26] Ibid.

### 3. Contamination of the Confession Evidence

A law enforcement best practice in an investigation is to create "hold-back information." This is information about a crime that is kept from the general public and is known only to those in the inner circle of the investigation. It is this information they use to judge not only the reliability of a confession, but witness and informant information as well. The presumption is that if the person in question is unable to accurately provide this information, then they must not have been present at the crime.

To be useful in an investigation, however, a suspect's confession should be based solely on his own personal knowledge. Therefore, in 1988, reasonable and experienced detectives were aware that, when conducting an interview or interrogation, the detective needed to avoid asking leading questions, guard against providing the suspect with information about the crime and/or carefully record every instance in which he did so, and scrupulously report the source of each piece of information in the suspect's statement, whether that source be the suspect or the detective.

Contamination occurs when an investigator provides a suspect with information that the suspect has not himself already shared, does not document that the information originated with the investigator, and then includes that information in the suspect's statements as if the information originated with the suspect. Because the investigator provided the suspect with the information, it is impossible to verify that the suspect's statements are based on his own personal knowledge. Confession evidence that has been contaminated in this way is like any other evidence that is contaminated through improper collection and handling—regardless of its veracity, it becomes unreliable and unverifiable.

To avoid contamination, it is important that the investigator identify and withhold certain information to ensure some details about the crime are known only by the investigators and those with personal knowledge. It is equally important that the investigator avoid revealing the withheld details during an interrogation, such as by asking leading questions, describing the details to the witness, allowing the suspect to view detailed photographs of the crime scene, or sharing information provided by other witnesses. As described below, only by avoiding contamination can a statement be adequately corroborated. Failure to avoid contamination can destroy the reliability of a confession.

Intentionally providing hold-back information to a suspect and then failing to report that the investigator provided that information or actively reporting that the information originated with the suspect when it did not, would be a gross deviation from generally accepted police practices.

### 4. Failure to Corroborate the Confession Evidence

As discussed above, corroboration is one of the most important tools to verify the trustworthiness of a confession statement, and ensure it has not been contaminated. An investigator should corroborate all confessions by verifying independently that facts support the confession. The corroborating facts should be facts which the investigator has not provided to the suspect and which the suspect could not know unless his statement was true. Investigators should ask open-

14

ended questions to allow the suspect to provide the corroborating information and new information to be corroborated. In each case, investigators should attempt to obtain investigative information from a suspect that has the potential for independent corroboration, and that was not known to the investigator. Investigators should be particularly careful to corroborate statements and be alert for potential contamination when a suspect has given multiple accounts of the same event that vary substantially. Such variations, especially when coupled with tunnel vision and problematic interrogation techniques, are the red flags of an unreliable statement.

Finally, it is important that everything in the investigation, including all events and statements made during any interrogation, be recorded in full by audio or video tape, to ensure that the problematic interrogation practices described above are not used in a way that induces or coerces a suspect to give a false confession or facilitates his doing so and/or for instances of an investigative review.

## V.      Background Facts: Suffolk County Police Department Homicide Squad in 1988

Prior to the Tankleff investigation, which began in September of 1988, the Suffolk County Police Department's Homicide Squad had gone through a period of "turmoil."[27]

Specifically, in the late 1970s, allegations came out that homicide detectives had been using physical force to extract confessions from suspects.[28] Shortly thereafter, the Suffolk County Bar Association began an investigation into the brutality allegations against the Suffolk County Police Department, and also into the Department's reliance on confessions to close cases.[29]

In 1980, the Bar Association issued its investigation report;[30] the report contained a number of recommendations for reform, including that the Department begin videotaping interrogations.[31] According to a State Investigation Commission 1989 report, however, very few of those recommendations were implemented by the Department.[32]

In 1985, after presiding over two murder trials involving cases investigated by the Suffolk County Homicide Squad, Judge Stuart Namm wrote a letter to Governor Cuomo, detailing concerns he had about the Suffolk County Police Department's investigations.[33]

Ultimately, on January 9, 1986, following Judge Namm's letter, an increase in complaints in general about the Suffolk County Police Department, and numerous public reports regarding the Department's abuses, the State Investigation Commission opened an investigation into the Department, and specifically the Homicide Squad.[34]

---

[27] Dep. Trans. of Lt. McElhone (Dec. 2, 2011), at 22:5–22.
[28] Dep. Trans. of Lt. McElhone (Dec. 2, 2011), at 88:19–90:3.
[29] SIC 680869-0105–680869-0187.
[30] Ibid.
[31] Ibid. at 0148 ("The Police Department of Suffolk County should videotape the questioning of any arrestee in police custody where the crime involved is a felony.").
[32] State New York Commission of Investigation, *An Investigation of the Suffolk County District Attorney's Office and Police Department*, pg. 12–13.
[33] Ibid, pg. 16.
[34] Ibid., pg. 5–21.

Then, in December 1986, Newsday published a multi-part series on the Suffolk County Homicide Squad titled "The Confession Takers."[35] The series focused on research that suggested the Homicide Squad was over-reliant on confessions in prosecutions, and on what the series defined as a Homicide Squad culture of "do-anything to get a confession," from employing brutality to deception.[36]

Approximately two months later, in February 1987, Lieutenant John McElhone was assigned as the new head of the Suffolk County Homicide Squad.[37] McElhone testified that when he was brought in, as a result of the turmoil, he understood that it was necessary, and part of his mandate in being assigned to the unit, to change how the Homicide Squad operated.[38] A big part of the needed changes were focused on how homicide detectives were to take confessions and how they were to report their conduct.[39]

McElhone testified that prior to his assuming command and during his early tenure in the Squad, a large number of sergeants and detectives retired or were moved commands. Only four detectives with more than a year's experience in the Squad remained in the Squad when McElhone took over command. One of those detectives was James McCready.[40]

McElhone testified that, he "had a personal sit-down with [McCready] . . . . When I went in in '87, I had this discussion with Inspector Murphy, everybody was walking on eggshells, the four remaining, because everybody else is going, here comes a new guy in, this is the second lieutenant in three months, you know, what is going on here, new sergeants are coming in the door every day. So they were concerned about what their future was in the homicide squad."[41]

In conducting a sentinel event review, evaluation of this history of "turmoil" serves a number of essential review purposes, irrespective of the accuracy of the public allegations against the Homicide Squad. Accepting Lt. McElhone's characterizations as true, the Homicide Squad's organizational agenda, at the time of the Tankleff investigation, was focused on correcting its self-image and repairing its public reputation.

According to McElhone, serious public scrutiny of the Homicide Squad's methods—and particularly the Squad's methods in and reliance on obtaining confessions in homicide cases—had resulted in a large number of Homicide Squad members retiring or being transferred. The four remaining detectives, including Detective McCready, were concerned about the future security of their jobs. In 1988, reasonable and experienced supervisors, following minimally accepted police practices, should have been aware that the Homicide Squad's new organizational agenda, combined with detectives' fears about their job security amid allegations of the use of improper methods to obtain confessions in homicide cases, significantly increased the risk that noble cause corruption and the development of underground workarounds could lead to

---

[35] *The Confession Takers*, Newsday (Dec. 1986).
[36] Ibid.
[37] Dep. Trans. of Lt. McElhone (Dec. 2, 2011), at 19:25–24:18.
[38] Dep. Trans. of Lt. McElhone (Dec. 2, 2011), at 109:4–110:15.
[39] Dep. Trans. of Lt. McElhone (Dec. 2, 2011), at 110:16–111:6.
[40] Dep. Trans. of Lt. McElhone (Dec. 2, 2011), at 38:12–24; 114:21–116:20.
[41] Dep. Trans. of Lt. McElhone (Dec. 2, 2011), at 132:5–15.

intentional unconstitutional misconduct by those Homicide Squad detectives. Supervisors' failure to follow up on evidence of such misconduct would be a serious deviation from minimally accepted police practices.

## VI.    Summary of Case

*Undisputed Facts*: At 6:11 a.m. on September 7, 1988, a caller identifying himself as Marty Tankleff called 911, and requested an ambulance to 33 Seaside Drive in Belle Terre, New York.[42] The caller told the dispatcher that his father was "gushing blood from the back of his neck."[43] When asked by the dispatcher what had happened to his father, Marty Tankleff told her that he didn't know, he "just woke up, and [his father was] in the office, he's gushing blood."[44]

The dispatcher gave Marty Tankleff instructions for applying first aid, including laying his father down, putting a pillow under his legs, and applying a clean towel to his neck, and said that help would be their shortly.[45]

The first responding officers were recorded as arriving on the scene at 6:17 a.m.[46] Directed by Marty Tankleff, the officers entered the house and found Seymour Tankleff, Marty's father, in the office, on the eastern end of the house, with severe sharp-force injuries to his neck and blunt-force wounds to his head.[47] Seymour Tankleff was lying on the floor with a pillow underneath his legs and a towel on his neck.[48]

In the master bedroom in the northwest corner of the house, one of the first responding officers also found Arlene Tankleff, Marty's mother, lying face up on the floor next to the northwestern corner of the bed.[49] Mrs. Tankleff also had sharp-force injuries to her neck and torso and blunt-force wounds to her head.[50] The officer determined and emergency medical services later concurred that Mrs. Tankleff appeared to be dead.[51]

At approximately 6:43 a.m., an unconscious Seymour Tankleff was transported from 33 Seaside Drive to Mather Memorial Hospital in serious condition.[52]

Seventeen-year-old Marty Tankleff was uninjured. While his father was transported to the hospital and their home at 33 Seaside Drive was cordoned off as a crime scene, Marty was asked by Suffolk County Police Department officers to wait outside the home.[53]

---

[42] SCDA014399–400.
[43] Ibid.
[44] Ibid.
[45] Ibid.
[46] SCPD000900.
[47] SCDA001361–62; SCDA007934.
[48] Ibid.; Crime Scene Photographs.
[49] Ibid.
[50] Crime Scene Photographs.
[51] SCDA001361–62; SCDA007934.
[52] SCPD000900; SCDA008137.
[53] SCDA007935.

*Detective McCready's Account*: At 7:39 a.m., Detective James McCready arrived at 33 Seaside Drive.[54] He was the first member of the Homicide Squad on the scene.[55] McCready interviewed the first responding officers, and learned that when they arrived at the home that morning, Marty Tankleff ran up to the officers and yelled, "somebody murdered my parents."[56] Tankleff then led the officers into the house, and took one of the officers to his father, while the other went to the other end of the house.[57] McCready also learned that Marty had repeatedly told the first responding officers that his father's business partner Jerry Steuerman was responsible for the attacks.[58]

After speaking to the first responding officers, Detective McCready entered 33 Seaside Drive, and walked through the crime scene.[59] During that walkthrough, McCready examined the scene and the physical evidence and formed a theory of how the crimes had occurred.[60]

Specifically, McCready explained that he walked through the house with a purpose.[61] He was trying to figure out what took place and to observe what he could factually.[62] He went into the office, the master bedroom, Marty's bedroom, and the kitchen, and tried to reconstruct in his mind what could have taken place there, making certain mental observations.[63]

After his first walkthrough, at approximately 7:55 a.m., McCready approached Marty Tankleff, who was sitting on a railroad tie in the driveway.[64] Detective McCready asked Marty to accompany him to his police vehicle.[65] There McCready interviewed Marty for the first time.[66]

## VII.    McCready and Rein's Training

As explained above, though an officer may not have been specifically trained in the "Reid Technique," most officers in the United States follow Reid methods of interrogation with minor variations. Indeed, when questioned regarding the specific training that they each received regarding interviewing and interrogation by September 1988, Detectives James McCready and Norman Rein each indicated that his training comported with the principles underlying what they would come to learn as the Reid Technique or Method.[67]

The training to which they are referring is the Reid Technique of Interview and Interrogation (hereinafter referred to as Reid) offered by John E. Reid & Associates, Inc. As explained above,

---

[54] SCPD000900; SCDA007935.
[55] SCPD000900.
[56] SCDA007934.
[57] Ibid.
[58] Ibid.
[59] Ibid.
[60] Dep. Trans. of Det. McCready (Dec. 11, 2012), at 94:8–95:3, 97:17–99:5.
[61] Ibid.
[62] Ibid.
[63] Ibid.
[64] Dep. Ex. 79 (McCready, Dec. 11, 2012), at pg. 5.
[65] SCDA007935.
[66] Ibid.
[67] Dep. Trans. of Det. Rein (Dec. 10, 2012), at 28:14–35:22; Dep. Trans. of Det. McCready (Dec. 11, 2012), at 20:25–36:8.

it is considered to be the standard for law enforcement interview and interrogation training in the United States as well as for many other countries. The basic training covers interviewing, behavioral analysis and the Reid "9-Step" approach to interrogation. The advanced training goes deeper into all of these topics, offering additional insight and tactical recommendations.

The Reid training differentiates between an interview and an interrogation. "The purpose of an interview is to gather information"[68] while "an interrogation is accusatory"[69] in nature and involves active persuasion designed to get the suspect to admit to the offense that they are believed to have committed.

Reid advocates some precautionary measures for the protection of the innocent. It teaches that "an investigation should be conducted in an objective manner and follow close guidelines with respect to proper interview and interrogation techniques, including reasonable efforts to corroborate confessions."[70]

Reid stresses the importance of the objectivity of the investigator to prevent tunnel vision. "If the investigator interviews the subject with a preconceived expectancy of guilt or innocence, this bias can influence the questions asked during the interview and possibly the interpretation of a subject's behavioral responses to those questions. In essence, with a predisposed expectancy investigators may hear and see only those behaviors that fit their expectations."[71]

Reid strongly advocates that the information-gathering interview take place before a suspect is subjected to an interrogation,[72] even in situations where the suspect is currently under arrest. Some of the reasons include the opportunity for the investigator to develop a rapport with the suspect, and the investigator often learns additional information that would be useful during the interrogation phase.[73] Additionally, since there is "…no guarantee that a guilty suspect will confess during an interrogation…[during the interview he]…may lie about his alibi….the investigator may be able to demonstrate that the statements made during the interview were false and thus provide evidence contributing to the final verdict of guilt."[74]

Prior to conducting an interview with a suspect, Reid teaches that "…the investigator should attempt to become thoroughly familiar with all the known facts and circumstances of the offense."[75] Though some information will be available to the investigator prior to the interview, some will be developed during the interview itself. Examples of the important investigative information that can be developed through the suspect interview includes "…personal background information (for example…financial and social circumstances…), Present physical and mental condition as well as any….Relationship to…crime scene, Incriminating facts or possible motives, Alibi…[and] abilities or opportunities to commit the offense."[76]

---

[68] Fred E. Inbau, John E. Reid, Joseph P. Buckley & Brian C. Jayne, Criminal Interrogation and Confessions 64 (5th Ed. 2013). Pg 4
[69] Ibid, Pg 5
[70] Ibid, Pg 35
[71] Ibid, Pg 57
[72] Ibid, Pg 6
[73] Ibid, Pg 6
[74] Ibid, Pg 6.
[75] Ibid, Pg 10
[76] Ibid, Pg 16-17

Additionally, the investigator should consider and explore the motivations and characteristics of the crime. Is the ransacking of the crime scene an indication of a burglary "gone bad," or someone trying to made a domestic violence murder look like a burglary? Does the crime appear to have been spontaneous or planned? These are all potential areas of inquiry during an interview.[77]

On beginning the interview, Reid teaches that the first goal of the investigator is to establish rapport, followed by an introductory statement. The purpose of the statement is "to clearly identify the issue under investigation."[78] Initial opening questions should be of the type to elicit a narrative response. An example of one such question, designed to evaluate an alibi would be "Tell me everything you did from noon on Friday until you went to bed."[79] It is after the suspect finishes their narrative account that the investigator goes back and asks clarifying questions, which may include direct questions.[80] Direct questions are designed to "…elicit a definite position from the [suspect] in areas that remain unclear or to develop information that was not yet discussed."[81] However, the questioning should continue to be non-accusatory as confrontational questions may result in the suspect offering less information or may produce misleading behavior.[82]

Reid encourages constant note-taking during the interview. It not only prevents the subject from focusing on the responses that prompt infrequent note-taking, but helps to prevent rapid-fire questioning which can "confuse and fluster" an innocent suspect.[83] Reid teaches a system of note-taking that even records pauses in a subject's speech as well as other behavioral aspects that can be used in a later analysis of the interview.

If during the interview the investigator determines that the suspect is being deceptive, then the investigator will go into the interrogation phase. Prior to beginning the interrogation, the investigator is advised to leave the suspect alone in the interrogation room for a brief period of time.[84] On returning the interrogator begins the confrontation process by telling the suspect that the investigation has revealed that there is no doubt that the suspect committed the crime under investigation. The investigator goes on to tell the suspect that now the only thing of interest to the investigator is why the crime was committed. The investigator begins to offer the suspect various moral excuses for why they committed the crime. If the suspect attempts to deny the crime, his denials are cut off by the investigator. At one point, the investigator offers the suspect the "alternative question" – an either/or question where either answer is an admission to the crime. Once the admission is obtained the investigator is then to obtain the details of the crime. After the suspect relates all of the details of the crime to the investigator, the investigator will arrange for the details to be recorded, either electronically or in written form. [85]

---

[77]Ibid, Pg 24
[78] Ibid, Pg. 78
[79] Ibid, Pg 86
[80] Ibid, Pg 92
[81] Ibid, Pg 99
[82] Ibid, Pg 96
[83] Ibid, Pg 5
[84] Ibid, Pg 191
[85] Ibid, Pg 188-189

Once the confession is documented, it must be evaluated for trustworthiness. "For a confession to be considered trustworthy, the admission of criminal involvement must be factual."[86] A "confession is not the end of an investigation."[87]

Reid stresses the need for the proper follow-up and corroboration of confession evidence. Types of corroboration include dependent and independent corroboration.[88] Dependent corroboration takes place when the confession contains details that were not known to the public, but are known by the investigator to be true.[89] Independent corroboration is when the confession contains details that were previously unknown by the investigator, but were later corroborated. In order for either dependent or independent corroboration to take place, meticulous documentation of the interview is required.

Reid teaches that the purpose of an interrogation is to learn the truth. "Unfortunately there are occasions when an innocent suspect is interrogated, and only after the suspect has been accused of committing the crime will his or her innocence become apparent. If the suspect can be eliminated based on his or her behaviors or explanations offered during the interrogation, the interrogation must be considered successful because the truth was learned."[90]

## VIII.   Evaluation of the Interview of Martin Tankleff

### A.   Overview of the Interviews

According to Detective McCready, on Wednesday, September 7, 1988, at approximately 7:55 a.m., Marty Tankleff was asked by Detective McCready to accompany him to McCready's police vehicle.[91] Seated in the police car, McCready asked Marty to tell him everything that had happened the prior evening up to the point that morning when the police arrived at the scene.[92] McCready reported that no one else was present for this portion of the interview.[93]

After talking to Marty, McCready reported that he asked Marty to remain in the vehicle, and McCready walked through the crime scene a second time.[94] When he exited the house, McCready again approached Marty at McCready's vehicle, and saw Detective Sergeant Robert Doyle.[95]

---

[86] Ibid, Pg 348
[87] Ibid, Pg 322
[88] Ibid, Pg 354-355
[89] I always include the caveat "and can be shown to have been provided by the subject without outside contamination"
[90] Fred E. Inbau, John E. Reid, Joseph P. Buckley & Brian C. Jayne, Criminal Interrogation and Confessions 64 (5th ed. 2013), Pg 5.
[91] Dep. Ex. 79 (McCready, Dec. 11, 2012), at pg. 5; SCDA007935.
[92] SCDA007936.
[93] Ibid.
[94] SCDA007937.
[95] SCDA007938.

At that point, McCready reported that he asked Marty to tell Det. Sgt. Doyle his story again.[96] Detective Norman Rein, McCready's partner, also arrived at the scene at approximately this time. McCready reported that Marty was asked to repeat his story for Det. Rein as well.[97]

McCready reported that, at approximately 8:40 a.m., after talking with Det. Sgt. Doyle and Det. Rein, McCready asked Marty to accompany them to Police Headquarters to further discuss the investigation and Jerry Steuerman.[98] McCready reported that Marty agreed, and left the scene with Det. McCready.[99]

McCready reported that he continued to question Marty during the drive to Yaphank.[100] No one other than McCready and Marty was present for this portion of the interview.[101]

On arrival at the Homicide Squad, Marty was placed in an interview room.[102] McCready reported that he waited for Det. Rein to arrive.[103] At approximately 9:40 a.m., Rein returned to the Homicide Squad. According to McCready, he and Rein began the interview of Marty at the Homicide Squad shortly after Rein's arrival.[104] Rein testified that during the interview at the homicide squad, he and McCready both conducted the questioning of Marty, but Rein took all of the notes.[105]

McCready reported that his and Rein's questioning of Marty continued until approximately 1:22 p.m., when Detective Sergeant George Horvath informed the detectives that they had been put on notice by an attorney and had to stop questioning Marty.[106]

Although Det. Sgt. Horvath was present at the Homicide Squad that morning and entered the interview room at least once, Detectives McCready and Rein reported that they and Martin Tankleff were the only individuals present for the questioning. Other than the notes taken by Detective Rein and the beginnings of a statement handwritten by Detective McCready, there was no additional contemporaneous documentation, electronically or otherwise, of the interview.

On September 14, 1988, seven days after the interview, Detective McCready submitted a typed, fourteen-page supplementary report documenting the interview of Marty Tankleff, and including a detailed confession in narrative form, reported as originating from Tankleff.[107]

---

[96] Ibid.
[97] Ibid.
[98] SCDA007939.
[99] Ibid.
[100] Ibid.
[101] Ibid.
[102] Ibid.
[103] Ibid.
[104] Ibid.
[105] Dep. Trans. of Det. Rein (Dec. 10, 2012), at 57:11–58:11.
[106] SCDA007946.
[107] SCDA007934–47.

### B.  Pre-Interview Preparation

According to the SCPD reports and testimony, Detective McCready was the first homicide detective to arrive at 33 Seaside Drive, the first homicide detective to walk through the crime scene, and the first homicide detective to interview Marty Tankleff. Detective Sergeant Doyle testified that, because of these facts, he assigned the homicide investigation to Detective McCready.[108] Det. McCready testified that Det. Sgt. Doyle chose McCready as lead detective instead of the homicide detective who was next in the rotation to be assigned to lead a homicide investigation.[109] As lead detective, McCready and his partner Detective Rein led the interview and interrogation of Marty Tankleff.

Detective McCready testified that he was suspicious of Marty Tankleff very shortly after his arrival at the scene at approximately 7:49 a.m.[110] He explained that he believed Marty's emotional response was inappropriate, which contributed to his suspicion.[111] McCready began treating Marty as a suspect and believed he had murdered his parents before he requested that Marty accompany him back to the Homicide Squad.[112]

If McCready's testimony that within the first hour of his investigation into the Tankleff murders he had formed an opinion as to Martin Tankleff's guilt is true, this early opinion formation would be an early warning sign for tunnel vision. If McCready's testimony is true, then the lead homicide investigator on the Tankleff murders was committed to a particular theory of the crime as early at 8:40 a.m. on September 7, 1988.

McCready had walked through the crime scene at 33 Seaside Drive before conducting the interview of Marty at the Homicide Squad. He testified that during the walkthrough, he tried to reconstruct in his mind what could have taken place in the house, and that he had gone into the office, the master bedroom, Marty's bedroom, and the kitchen and made mental observations.[113] These observations included:

- No bloody clothes, gloves, or shoes that could have been worn by the perpetrator were visible in the Tankleff home;
- 33 Seaside Drive was a very long ranch-style house;[114]
- Martin Tankleff's bedroom was across the hall from the master bedroom, where Arlene Tankleff's body was found;[115]
- The office, where Seymour Tankleff was found, was on the other end of the house from Martin Tankleff's bedroom;[116]

---

[108] Dep. Trans of Det. Sgt. Doyle (Dec. 8. 2011), at 25:14–26:20.
[109] Dep. Trans of Det. McCready (Dec. 11, 2012), at 69:6–18.
[110] Dep. Trans. of Det. McCready (Dec. 11, 2012), at 77:20–24, 93:24–94:7.
[111] Dep. Trans. of Det. McCready (Dec. 11, 2012), at 93:24–94:7.
[112] Dep. Trans. of Det. McCready (Dec. 11, 2012), at 179:4–17.
[113] Dep. Trans. of Det. McCready (Dec. 11, 2012), at 94:8–95:3, 97:17–99:5.
[114] Dep. Trans. of Det. McCready (Dec. 12, 2012), at 308:20–309:8.
[115] Dep. Trans. of Det. McCready (Dec. 12, 2012), at 309:9–11.
[116] Dep. Trans. of Det. McCready (Dec. 12, 2012), at 309:5–8.

- In the master bedroom, McCready looked at Arlene Tankleff's body fairly closely, taking as much time as he wanted. He could see blood on the master bedroom sheets and on the wall;[117]
- McCready determined that, based on his review of the master bedroom, "there was obviously an obvious struggle in there" between Arlene Tankleff and her attacker;[118]
- In the kitchen, McCready observed a knife, which had a red substance on its blade, next to a watermelon on the counter;[119]
- In Martin Tankleff's bedroom a set of barbells were in plain view. These barbells had a reddish substance on them; [120]
- In the office, McCready saw blood pooled in Seymour Tankleff's office chair, which he understood indicated that Seymour Tankleff had been bleeding in that chair for a while;[121]
- He also observed blood spatter, which he testified he knew occurs when someone is struck, bleeds, and then is struck again;[122]
- He saw that the blood spatter on the phone in the office was not smeared. McCready testified the lack of smearing indicated to him that Martin Tankleff had not used that phone to call 911 as Marty had told him. McCready, instead, believed that Marty had used the phone in the master bedroom to place the 911 call.[123]

As an experienced homicide investigator, McCready's observations of the crime scene would have relied on his experience as a homicide investigator and familiarity with basic crime scene principles. Many of the observations McCready made would not have been possible for a lay person. Some examples include the knowledge that the blood spatter in the office and the master bedroom reflected that someone had been struck, bled, and then struck again; McCready's conclusion that the pooled blood in Seymour Tankleff's chair indicated that Seymour Tankleff had been bleeding in that chair for a while; or his erroneous conclusion that the master bedroom scene indicated that there had been an obvious struggle between Arlene Tankleff and her attacker.

In addition to McCready's walkthroughs of the crime scene, before interviewing Martin Tankleff at the Homicide Squad, Detective McCready reported that he spoke by phone with Detective John Pflazgraf. Pflazgraf was at Mather Memorial Hospital, where Seymour Tankleff was being treated. McCready testified that during that call, Pflazgraf told him about the injuries doctors had observed on Seymour Tankleff.[124]

---

[117] Dep. Trans. of Det. McCready (Dec. 11, 2012), at 129:4–130:3.
[118] Dep. Trans. of Det. McCready (Dec. 11, 2012), at 260:14–261:14.
[119] Dep. Trans. of Det. McCready (Dec. 11, 2012), at 100:6–23.
[120] Although at his deposition in 2012, McCready denied having seen the barbells during his walkthroughs, he acknowledged—and the other detectives and crime scene analysts on the scene confirmed—that the barbells were in plain view in Martin Tankleff's room. In addition the barbells had a reddish substance on them, which Suffolk County serologist Robert Baumann described as rust colored and testified may have looked like blood. Dep. Trans. of Baumann (July 18, 2014), at 163:24–164:6.
[121] Dep. Trans. of Det. McCready (Dec. 11, 2012), at 106:7–22.
[122] Dep. Trans. of Det. McCready (Dec. 11, 2012), at 132:6–25.
[123] Dep. Trans. of Det. McCready (Dec. 11, 2012), at 153:2–155:16.
[124] Dep. Trans. of Det. McCready (Dec. 12, 2012), at 328:15–22.

Based on the observations McCready had made, if a reasonable and experienced investigator was operating on the theory that Martin Tankleff had committed the attacks, his training and experience would have supported the following hypotheses:

- Tankleff committed the murders naked, which would account for the lack of bloody clothing in the house;
- Tankleff would have attacked his mother first given her geographic proximity to his bedroom;
- Based on the blood spatter in the master bedroom, the injuries visible on Arlene Tankleff's head, and the report from Pfalzgraf of the types of injuries Seymour Tankleff had sustained, Tankleff would have attacked his mother with both a blunt and a sharp instrument, hitting her on the head and cutting her throat;
- Tankleff would have struggled with his mother in the bedroom;
- Tankleff would have used the watermelon knife visible on the counter in the kitchen to attack his mother and father;
- Tankleff would have used the barbells visible in his bedroom to attack his mother and father;
- Tankleff would have attacked his father while his father was seated in his office chair at his desk;
- Based on the report from Pfalzgraf, Tankleff would have attacked his father with both a blunt and a sharp instrument, hitting him on the head and cutting his throat; and
- Tankleff would have showered himself and the weapons he used off to remove all the blood.

Detective Rein testified that, before beginning their interview of Martin Tankleff at the Homicide Squad, he and McCready met and discussed the case. Specifically, Rein explained that he and McCready discussed the physical evidence from the scene.[125]

### C. Background of the Interview Subject

Detectives McCready and Rein reported that they were aware before interviewing Marty Tankleff that he was seventeen years old. They were also aware that shortly before they interviewed Marty, both of his parents had been attacked; his mother had been killed and his father was in serious condition and unconscious. They knew that Marty had not had any significant contact with his other family members or supportive adults. During the interview, Marty was barefoot and shirtless. He had only had coffee to drink and had not eaten.

Martin Tankleff had been answering questions for officers and detectives, on and off, since 6:17 a.m. He had been speaking with Detectives McCready and Rein, both at the scene and in route to police headquarters, for approximately 1 hour and 40 minutes when the interview at the Homicide Squad began.

---

[125] Dep. Trans. of Det. Rein (Dec. 10, 2012), at 99:17–100:7.

### D. Structure of the Interview

Prior to beginning the interview with Marty Tankleff, and despite Detective McCready's beliefs about Tankleff's guilt and desire to get a confession from him, McCready and Rein reported and testified that they did not inform Marty Tankleff that they considered him to be a suspect, and did not read him his Miranda warnings.

The line of questioning was guilt presumptive, and McCready and Rein reported many of Marty's answers as signs of guilt. McCready and Rein did not report considering alternative explanations.

Detectives McCready and Rein reported that they began their interview with background questions. They reported that they learned from Marty that he had recently had plastic surgery on his nose, which had caused his black eyes. They learned about his parents' strained relationship with each other and the resulting pressure on Marty caused by the strain. They asked him about his relationship to his mother, and then to his father. They reported that they discussed money and his parents' wills with him.

For a reasonable and experienced homicide detective these general questions were designed to elicit possible motives from Marty.

After this portion of the interview, Detectives McCready and Rein reported that they became more confrontational, asking Marty to repeatedly explain minor details of the morning and previous night's events. McCready and Rein questioned Marty repeatedly about how exactly he had administered first aid to his father and how he got his father out of the office chair. They questioned him again about when he had taken a shower the previous night or that morning. And whether he had seen his mother that morning. Marty testified that, when he reaffirmed that he had showered the previous night, the detectives falsely told him that humidity testing had shown he had showered that morning. He further testified that, when he denied seeing his mother, they told him that her bedroom was not dark, that the drapes were open, and that his hair had been found in his mother's hand.

If the detectives did in fact tell Marty that a humidity test had been conducted and his hair had been found in his mother's hand, these were both pieces of false evidence being presented to a juvenile suspect, who had experienced a recent traumatic event. A reasonable and experienced homicide detective, following minimally accepted police practices, would had been aware that such interrogation tactics combined with the suspect's background presented a risk of obtaining a false or contaminated statement.

Next, McCready reported that he left the interrogation room, and staged a fake telephone call within Marty's earshot. The faked call was believable; even Detective Rein testified that he was not sure whether it was real at the time. McCready reported that he then falsely told Marty that his father had been given adrenaline, had come out of his coma, and had said that Marty beat and stabbed him.

This was false. A reasonable and experienced homicide detective, following minimally accepted police practices, would have been aware that this particular interrogation tactic, combined with the other techniques that had already been deployed and with the suspect's background, created a serious risk of obtaining a false or contaminated statement.

The detectives reported that Marty offered an explanation for his father's statement, saying that he had been the last person his father saw. They reported that he offered to take a lie detector test. His offer was not accepted.

Based on their reports and testimony, Detective McCready and Rein exhibited a lack of objectivity, and the resulting tunnel vision and verification bias, combined with their confession focus, resulted, as their training cautioned, in their failure to seriously consider the exculpatory nature of each of these responses. Having used a number of interrogation techniques that elevated the risk of obtaining a false or contaminated statement, a reasonable and experienced homicide detective, following minimally accepted police practices, would have understood that by ignoring the potentially exculpatory nature of each of these responses and pressing forward with a guilt-presumptive interrogation, he further elevated the risk of obtaining an unreliable statement.

Instead of conducting a polygraph examination or fully exploring Marty Tankleff's potentially exculpatory responses, the detectives reported that they asked Marty what they should do to the person who did this to his parents. The detectives reported that they then discussed psychiatric help with Marty, and that Marty suggested he may have blacked out or been possessed. The detectives then reported that Marty stated "it was starting to come to him." McCready reported asking Marty if he knew where he was and that he was talking to two homicide detectives. It was only at this point that McCready reported giving Marty his Miranda warnings.

An internalized or "persuaded" false confession occurs when the interrogation tactics cause an innocent suspect to doubt his memory and become convinced that he did commit the crime, in spite of not having any memory of it.[126] The guilt presumptive questioning combined with the introduction of the false information that his father had identified Marty as his assailant could have accomplished the first step toward an internalized false confession – causing the suspect "…to believe on some level that it is possible for him to have committed the crime." [127]

The next step towards an internalized false confession is for the suspect to account for the memory loss through a blackout, psychological problem or other issue.[128] This can be suggested by the investigator or encouraged if brought up by the suspect.  Such a tactic is considered highly improper.  At no time should an investigator "…make statements designed to convince a suspect who claims to have no recollection of committing the crime that he must be guilty of the offense."[129]

---

[126] Richard A. Leo, Police Interrogations and American Justice, Harvard University Press, (2008), pg. 210
[127] Fred E. Inbau, John E. Reid, Joseph P. Buckley & Brian C. Jayne, Criminal Interrogation and Confessions (5th Ed. 2013). Pg 350.
[128] Ibid.
[129] Ibid. pg. 351

Coupled with the telephone call ruse used by the detectives and Marty Tankleff's background, these reported indications of psychological distress, if they occurred as the detectives reported, would have been serious warning signs for a reasonable and experienced homicide detective, following minimally accepted police practices.

After the Miranda warnings, the detectives reported that Marty began responding to open-ended questions, giving a detailed narrative confession.

### E.  Content of the Narrative Confession

Detectives McCready and Rein reported that Marty Tankleff gave a narrative confession and independently offered a number of details, including:

- "I asked him what he was wearing. He said he was naked because he didn't want to leave any blood on his clothing."
- "I asked him who he killed first. He said he killed his MOM first."
- "I asked him what he did to his mother. He said he hit his mother with a dumbbell, then cut her throat."
- "I asked him how many times he hit her. He said he hit her at least four to five times on the head. He wasn't sure. He kept on trying to hit her. She fought with him."
- "He said he was afraid his father would wake up, and that after she fell on the floor, he ran and got a knife from the kitchen and cut her throat. I asked him where the knife was. He said the knife was on the counter next to the watermelon."
- "I asked him if she was dead when he left the room. He said, no, she was moving a little bit when he ran out of the bedroom to kill his father. I asked him if his father was still in the office. He said yes, his father was still in the office. He was sitting at his desk."
- "I asked him if he went in there [the office] naked. He said he was still naked. I asked him what he did with the knife, and the dumbbell. He said he walked in with the knife and the dumbbell behind his back."
- "I asked him what he did first, cut his throat, or hit him. He said he got behind his father and hit him with the barbell first."
- "He volunteered that he 'knocked him silly.'"
- "I asked him how he kept his father from getting out of the chair. He said his father's feet were under the desk so he couldn't get up."
- "I asked him what he did next and he said he slashed his father's neck. I asked him if he knew how many times he hit, or cut his father. He said he didn't know how many times he hit or cut him. Again, he volunteered that he couldn't believe all the blood."
- "I asked him what he did with the knife and the barbell. He said he washed off the knife and the barbell in the shower. I asked him what he did with the barbell and the knife after he washed them off. He said he put the barbell back in his bedroom, and he put the knife on the counter by the watermelon."
- "I asked him what happened when he got up. He said he went back to the office, and saw that his father was still alive. He then went to his mother's room to see if she was dead. He said he called 911 from his mother's room."

28

McCready acknowledged that the narrative confession only contained information known to the homicide detectives, and did not contain any information not known to them.[130] If this is true, a reasonable and experienced homicide detective in such a situation would recognize this as a warning sign for a false or contaminated statement. Minimally accepted police practices would require him to evaluate whether everything in the narrative confession comported with what he had observed at the crime scene, and also whether the details of the confession matched what he had hypothesized about how the attacks had been committed prior to the interrogation.

Defendants representations that 1) the confession contained details that comported with what was known from the crime scene analysis at the time the statement was taken, and 2) that Marty Tankleff had independently volunteered those details made the confession appear reliable. McCready and Rein both consistently reported to prosecutors, in their reports, and in their testimony that each of the details in the confession originated with Martin Tankleff and not with either of them.

Martin Tankleff testified that he did not independently volunteer the details in the confession; instead, Marty testified that the detectives suggested those details to him and he agreed with what the detectives were saying. If Martin Tankleff's account of the interrogation is accurate, then the interrogation and subsequent reporting of it deviated substantially from minimally accepted police practices. The failure to appropriately conduct an interview and interrogation of Marty, both by feeding him hold-back facts during the interrogation process, and then actively misrepresenting that those facts had originated voluntarily with him would be contrary to minimally accepted police practices and an egregious deviation from those practices during the time of this investigation.

It is a baseline principle of police investigations that investigators may *never* make an intentionally false misrepresentation to prosecutors or the court about evidence, including never falsely reporting who the source of information is in an investigation. If a homicide detective misrepresented that a suspect independently volunteered the details in a confession, when, in fact, those details had originated with the detective, this would a gross deviation from minimally accepted police practices. In addition, the detective's misrepresentation would make it impossible for prosecutors and the court to adequately analyze the reliability of that statement evidence.

For a reasonable and experienced supervisor, who was aware of the background context in the Suffolk County Homicide Squad, the fact that the Tankleff narrative confession included only information known to the police at the time of the interrogation would be a warning sign, and would require supervisory follow up.

On the basis of McCready and Rein's representations that Martin Tankleff had given a narrative confession and had independently offered each of these details which comported with the detectives' observations at the crime scene, Martin Tankleff was arrested and charged with the murder of his mother and the attempted murder of his father.

---

[130] Dep. Trans. of Det. McCready (Dec. 12, 2012), at 341:24–346:23.

### F. Documentation of the Interviews

Martin Tankleff's interactions with the McCready, Rein, and Doyle were documented by notes taken by all three, a written statement that was created by McCready (but purported to be a narrative account created by McCready based on a question-answer exchange between McCready, Rein, and Tankleff), and a comprehensive narrative account created by McCready seven (7) days later in a police supplementary report.[131]

On examination of the notes taken by McCready and Rein during Tankleff's interrogation, it is apparent that McCready took notes during the first portion of the interrogation. Rein took over as sole note taker and covered the more accusatory time, the faked phone call from the hospital, and the confession. The notes primarily record Tankleff's responses and do include the investigators' questions or comments that induced those responses.

McCready's fourteen (14) page report detailing the investigators interactions with Tankleff, the interrogation, and the confession was created seven (7) days after the event. A review of the document reveals it to be in narrative form, rich in details concerning the verbal exchanges between McCready, Rein, and Tankleff. This level of detail is not found in the investigators' notes.

The longer the time between the event and the documentation, the more chance for memory to become faulty. This is especially true when tunnel vision influences the presentation of information in a process known as framing. The format in which the information is framed or presented can distort our perception or interpretation of that information.[132]

McCready describes in his supplemental report the exchange between the investigators and Tankleff after the investigators had lied and said that Tankleff's father became conscious and accused Tankleff of being his assailant. The way the report is written indicates that once Tankleff was confronted with undisputable proof of his guilt, he first tried to suggest that he must have blacked out or was possessed. After that, Tankleff said that it "was staring to come back to him," and began his detailed, narrative confession.[133]

A more impartial record of the interrogation and confession, such as a video or audio recording of the interrogation in its entirety might have created a different perception. One different perception is that the investigators phone call ruse caused Tankleff to doubt his memory and believe that it was possible that he did commit the crime, though he had no memory. The follow-up questions by the detectives planted the suggestion that Tankleff's lack of memory was from a psychological problem. Tankleff then adopted into his confession narrative the incorrect facts that the investigators thought to be true at the time of the interrogation.

The SCPD used video recording equipment to videotape the Tankleff murder scene.[134] This was done to accurately capture all of the details for later analysis, and for presentation to the jury.

---

[131] SCDA001557
[132] D. Kim Rossmo, *Criminal Investigative Failures,* CRC Press (2008)., pg. 14-15
[133] SCDA001557
[134] SCDA001737

30

McCready and Rein had video recording equipment available to create the same sort of impartial record of the interrogation and subsequent confession of Tankleff.[135] They chose not to.

### G. Evaluation of the Statement Evidence

Detectives McCready and Rein testified that they were aware of the basic police principle that corroboration, both dependent and independent, is used to verify the reliability of a confession statement and ensure it has not been contaminated. The need for such corroboration is highlighted in the Suffolk County Police Department's Investigative Guide for Homicide Investigations.[136]

Shortly after Martin Tankleff's arrest, Tankleff recanted the statement, and asserted his innocence.

In the days and weeks after conducting the interview of Martin Tankleff and reporting having obtained a narrative confession, Detectives McCready and Rein began receiving the results from the forensic and medical testing on and conclusions about the physical evidence from 33 Seaside Drive.

A reasonable and experienced homicide investigator, following minimally accepted police practices, would have applied the principles of crime scene analysis and would have used the forensic and medical testing and conclusions to evaluate their theory of the case.

Applying the principles of crime scene analysis, the forensic and medical testing on and conclusions about the physical evidence from 33 Seaside Drive did not corroborate Martin Tankleff's confession:

- First, by September 9, 1988, the search of the crime scene at 33 Seaside Drive had been completed. Crime scene analysts had found no physical or serological evidence in any of the bathrooms at the Tankleff home. This lack of evidence did not corroborate the Tankleff confession. The confession had indicated that Martin Tankleff took a shower after committing the attacks to wash blood from himself and the weapons he used.

- They had also found no blood, blood stains, or human tissue between the master bedroom, where Arlene Tankleff was killed, and the office, where Seymour Tankleff was attacked. This lack of evidence did not corroborate the Tankleff confession. The confession indicated that during the bloody attacks, Martin Tankleff went back and forth between the master bedroom, the kitchen, and the office a number of times.

- By September 9, 1988, SCPD homicide detectives had brought the instruments identified in the confession as the murder weapons to the Medical Examiner's Office. Dr. Vernard Adams, the medical examiner who conducted the autopsy on Arlene Tankleff, examined the watermelon knife and the barbells. Dr. Adams concluded that there was no reasonable possibility that the watermelon knife was the murder weapon. This conclusion suggested

[135] SCDA001569
[136] Suffolk County Police Department Investigative Guide, Investigation-Homicide, Chapter 32, Page 9

that at least one detail in the confession was not correct. The confession indicated that
Martin Tankleff had used the watermelon knife to commit the murders.

- On September 13, 1988, Suffolk County Criminalistics Laboratory Analyst Robert
  Baumann completed serological testing on the barbells. Baumann determined that there
  was no serological evidence on the barbells. This conclusion did not corroborate the
  Tankleff confession. The confession indicated that Martin Tankleff had used the barbells
  to commit the murders.

- On September 19, 1988, Baumann completed serological testing on the watermelon
  knife. Baumann determined that there was no serological evidence on the watermelon
  knife. Like the medical exclusion of the watermelon knife, this conclusion did not
  corroborate the Tankleff confession.

- On October 14, 1988, Baumann had completed serological testing on a bloodstain
  recovered from the eastern wall in the master bedroom, where Arlene Tankleff had been
  killed. Baumann determined that the bloodstain contained Seymour Tankleff's blood. On
  November 8, 1988, Baumann issued his final serological report on his testing of the
  physical evidence in the Tankleff investigation. Baumann reported that Seymour
  Tankleff's blood was also on the fitted bedsheets from the master bedroom. These
  conclusions did not corroborate the Tankleff confession. The confession indicates that
  Martin Tankleff killed Arlene Tankleff *before* Seymour Tankleff, and provides no
  explanation for how Seymour Tankleff's blood could have been left in the master
  bedroom.

- By January 1989, Suffolk County Criminalistics Laboratory Analyst Robert Genna had
  examined the bedding from the master bedroom. Genna had determined that there were a
  number of fabric impressions in blood on the bedding, and that those fabric impressions
  were consistent with gloves. This conclusion did not corroborate the Tankleff confession.
  The confession indicates that Martin Tankleff committed the murders while naked and
  does not indicate that he wore gloves.

- At the time that Detectives McCready and Rein interviewed and interrogated Martin
  Tankleff, detectives were not aware that Arlene Tankleff had sharp-force injuries to her
  back and shoulder.[137] They were also not aware that the attacker(s) had worn gloves.
  None of these details, which were not known to detectives at the time of the
  interrogation, were included in the Tankleff confession. The investigation uncovered no
  independent corroboration for the Tankleff confession.

The total lack of accurate dependent and independent corroboration would have suggested to a
reasonable and experienced homicide detective, who was not under the influence of tunnel
vision, that she needed to reevaluate the evidence of the confessing suspect's guilt. A reasonable
and experienced homicide detective would look for a legitimate explanation for the lack of
accurate dependent and independent corroboration. One such legitimate explanation would be

---

[137] Dep. Trans. of Det. McCready (Dec. 12, 2012), 342:6–12, 343:4–10, 353:9–355:18.

that the confessing suspect's confession was false, and that the suspect was innocent. A legitimate explanation for the lack of corroboration, without further investigation, would not simply be that the confessing suspect had lied about *all* of the details, but was truthful in his "I did it" admission. Such a confession is called "… a 'nonexistent confession' and, appropriately, may not be given much weight as evidence."[138]

A reasonable and experienced homicide detective, following minimally accepted police practices, would evaluate whether the crime scene analysis corroborated Marty Tankleff's guilt, independent of the confession, and would have found that it did not:

- A search of the scene, the surrounding grounds, and the cliffs and beach had uncovered no bloody clothing, shoes, towels, weapons, or gloves;

- The knife used in the murders of Seymour and Arlene Tankleff was never located;

- The gloves used by the attacker(s) were also never located;

- No evidence indicating that Martin Tankleff had cleaned the house to eliminate evidence was ever located; and

- No forensic evidence recovered from the master bedroom scene or the office scene connected Martin Tankleff to the attacks.

Given Detectives McCready and Rein's training and knowledge about the necessity of corroboration and the investigative risk of false or contaminated statements, these forensic results should have raised serious red flags with the investigators about the statement they had obtained.

Contrary to accepted police practices, regarding the details that were not known by detectives at the time of the interrogation, McCready testified that if Marty Tankleff's right to counsel had not been invoked, "we would have waited till we found out what we did find at the scene there and then asked him questions about that." They would have then incorporated that information into the statements.[139]

When faced with a confession that could not be corroborated and was consistently contradicted or refuted by the crime scene evidence, a reasonable and experienced detective should have immediately notified their supervisor and the prosecutor. That notification should have resulted in:
- An independent, impartial, and critical review of the evidence and the confession in which the scientific method of testing the theory, rather than attempting to prove it is utilized.

---

[138] Fred E. Inbau, John E. Reid, Joseph P. Buckley & Brian C. Jayne, Criminal Interrogation and Confessions (5th Ed. 2013). Pg 358.
[139] Dep. Trans. of Det. McCready (Dec. 12, 2012), 358:11–20.

- The creation of a parallel and independent investigation into the alternative suspects. The detectives conducting this investigation must be made aware that they should regard the Tankleff's confession as unreliable for the purpose of their investigation.

A reasonable and experienced detective, acting in good faith, would know that the inability to corroborate the confession is a serious problem and a strong warning sign for the unreliability of that statement. The failure to notify supervisors and prosecutors of the contradiction and refutation of the statement evidence by the crime scene evidence, and the failure to conduct an independent review and a parallel investigation are egregious deviations from minimally accepted police practices.

In a situation where the narrative confession reflected the homicide investigators' working theory of the crime, but that theory and the confession were later contradicted or refuted by the crime scene analysis, a reasonable and experienced detective would recognize the possibility of statement contamination—that he may have intentionally or inadvertently fed hold-back facts to the suspect during the interview or interrogation. A reasonable and experienced detective would recognize that the possibility of statement contamination was even more likely in a situation where the confessing suspect was a member of a particularly vulnerable group and had been presented, more than once, with false evidence during the interrogation. A reasonable and experienced detective, in that situation, should have immediately notified his supervisor and the prosecutor of the possibility of contamination, as well. The failure to do so, combined with the failure to conduct an independent review and a parallel investigation, is an egregious deviation from minimally accepted police practices. Furthermore, for a reasonable and experienced supervisor, the failure of one of her detectives to do any of the above would suggest intentional misconduct.

Once the possibility of a contaminated and unreliable statement comes to light, a reasonable and experienced supervisor must not only examine the statement's contents, but also the tactics used by the detective in obtaining that statement. This task is made more difficult when there is a disagreement between the detective and the interviewee as to what occurred in the interrogation room, and there is no video or audio tape recording of the interrogation. One resource that is available to the supervisor is examination of the practices of the detective exhibited in other interrogations. Like everyone else, detectives are creatures of habit, and once they find a technique that works, they tend use it.

In the Tankleff confession, the detectives allege that it was Tankleff who suggested first that he may have "blacked out" during the murders.[140] Tankleff states that it was the detectives who suggested the "blacked out" theme and then went on to provide him with the details as to how he had committed the murders.[141]

Approximately two and a half (2 ½) months before the Tankleff case, Det. Rein and Det. McCready interrogated Patrick Schoendorf regarding the murder of his wife, Karen Schoendorf. According to a report created by McCready regarding that interrogation and subsequent confession, McCready wrote that just before he confessed, Schoendorf asked the detectives "…if

---

[140] Dep. Trans. of Det.Rein (Dec. 10, 2012), 150:16–151:11.

[141] Dep. Trans. of Martin Tankleff (Oct. 1, 2012), 249:3–250:17; 50-H Dep. of Martin Tankleff (Dec. 17, 2008), 58:16–59:6.

he could have blacked out."[142] Like Tankleff, Schoendorf said that it was the detectives who suggested that he had blacked out and then went on to provide him with the details of the crime.

If it were true that Dets. Rein and McCready had taken a confession containing a question from the suspect of whether he could have blacked out two-and-a-half months prior to the Tankleff confession which contained the same question, the repetition of the volunteered "black out" scenario would be a red flag for a reasonable and experienced supervisor.

## IX.    Lack of Investigative Follow-up

Particularly given the lack of evidence corroborating the Tankleff confession, a reasonable and experienced investigator would have paid particular attention to any evidence of an obvious, alternate suspect. In the Tankleff investigation, there was one: Seymour Tankleff's business partner Jerry Steuerman.

In a serious deviation from minimally accepted police practices, Doyle, McCready, and Rein never conducted a real investigation of Steuerman. Relying on a family member's alibi and two brief interviews, Doyle, McCready, and Rein never truly considered Steuerman a suspect in the murders. In particular, Doyle, McCready, and Rein failed to conduct any investigative follow up into Seymour Tankleff's finances and business matters or into Jerry Steuerman.

### A.  Victims' Background

Though Doyle, McCready, and Rein were aware of the allegations that Jerry Steuerman owed Seymour Tankleff a significant amount of money, a forensic audit of Seymour Tankleff's business and personal finances was never conducted.

All of Seymour Tankleff's business associates and family members were not interviewed.

### B.  Alternative Suspect: Jerry Steuerman

On the night of September 6, 1988 and into the morning of September 7th, Seymour Tankleff hosted a weekly card game at his home. Jerry Steuerman, Seymour Tankleff's business partner, was a participant in the card game, and was present in the Tankleff home that night.

The SCPD Homicide Squad's investigation revealed that Jerry Steuerman was the last of the card players at the Tankleff home in the early morning of September 7, 1988. At 3:00 a.m., most of the card players, including Steuerman, ended the card game and prepared to go home. All of the other remaining card players went to their cars and drove away from 33 Seaside Drive. No one saw Jerry Steuerman leave 33 Seaside Drive. The last witness to see him told detectives that Steuerman was sitting in his car in the driveway when that witness drove away from the house. He never saw Steuerman's headlights follow him out of the driveway or down the road.

On September 7, 1988, Detective Pflazgraf interviewed Ron Rother, Martin Tankleff's brother-in-law, at Mather Memorial Hospital. Plazgraf's notes of the interview indicate that Rother told

---

[142] Dep. Trans. of Det.Rein (Dec. 10, 2012), 153:20-22.

Pfalzgraf that Jerry Steuerman had threatened Seymour Tankleff five or six weeks earlier. This information is not in Pfalzgraf's supplementary report of that interview.

Also on September 7, 1988, Detective Michael Carmody, of the SCPD Homicide Squad, interviewed Myron Fox, the Tankleff family's attorney, at Mather Memorial Hospital. Carmody's notes of the interview reflect that Fox stated that there was "bad blood between Steuerman and Seymour [Tankleff]." That information is not in the Carmody's supplementary report of that interview.

On September 7, 1988, Detectives Anderson and Laghezza interviewed Steuerman at his business. In his supplementary report, Detective Anderson wrote: "Having knowledge of Martin Tankleff's accusations of Jerry Steuerman that he made at the scene on September 7, 1988, it is this officer's opinion and also the opinion of Det. Laghezza, after interviewing Mr. Steuerman, that he should not be considered a suspect in this homicide."[143]

SCPD Homicide Squad detectives did not have a forensic audit conducted on Jerry Steuerman's business and/or personal finances. Detectives did not investigate Steuerman's business dealings or his business associates. Specifically, they also did not investigate Steuerman's connections to his son Todd's cocaine dealing, or to his son's or his own criminal associates.

Citing Steuerman's alibi from his daughter Bari Steuerman, Doyle, McCready, and Rein reported that Steuerman had been cleared as a suspect, and was not involved in the murders.

On September 15, 1988, Steuerman was reported missing.

The Suffolk County Homicide Squad conducted the subsequent missing persons investigation. Lieutenant John McElhone, who was the Homicide Squad supervisor in 1988, testified that he could think of no other missing persons investigation that had been taken over by the Homicide Squad.[144]

Lt. McElhone and the assistant district attorney assigned to the Tankleff murders at the time, Edward Jablonski, both testified that they were told by Doyle, McCready, and Rein that Jerry Steuerman had been investigated and ruled out as a suspect in the Tankleff murders.

The Homicide Squad's investigation determined that Jerry Steuerman had faked his own death on September 14, 1988, and had fled to California under an assumed name. Steuerman left his car running in a parking lot with the doors open. He left one of his shoes in the car. He then went to the Ramada Inn, and altered his appearance. After altering his appearance, Steuerman flew to California under the false name Jay Winston.

During the Homicide Squad's investigation, on September 22, 1988, the detectives received an anonymous tip that Jerry Steuerman was financing his son Todd in major cocaine dealings.

---

[143] SCPD001241.
[144] Dep. Trans. of Lt. McElhone (Oct. 30, 2014), at 228:24–230:25

On September 28, 1988, Detective McCready, Detective Sergeant Doyle, and ADA Jablonski, who had all flown to California, located Jerry Steuerman at the Holiday Inn in Long Beach, California. The detectives questioned Steuerman in his hotel room, and according to Det. Sgt. Doyle spent at least 10 hours talking with Jerry Steuerman over three days. From those conversations with Steuerman, Det. Sgt. Doyle and Det. McCready took six pages of notes. They both testified that they never considered Steuerman a suspect.

In the late 1990s, a private investigator, working for Martin Tankleff, uncovered evidence that through his son Todd, Jerry Steuerman was connected to a number of his son's criminal associates. The private investigation revealed that one of those associates was a man named Joseph Creedon. Investigation into Creedon led to a number of witnesses, unrelated to each other, who reported that Creedon had told them that he had committed the Tankleff murders for Jerry Steuerman. In addition, one of Creedon's associates named Glenn Harris reported that he had driven the car that took Creedon and another man named Peter Kent to the Tankleff house on September 7, 1988. Harris provided other evidence indicating that the men had attacked Arlene and Seymour Tankleff, and further connected Creedon and his actions on September 7, 1988, to Jerry Steuerman.

Unable to access the same resources as law enforcement, the wrongfully convicted, along with their attorneys and investigators, are severely hampered when attempting to conduct follow-up investigations of this kind. They usually do not have access to the raw data, such as unreacted files, or the physical evidence for additional forensic testing. National databases, such as the FBI's National Crime Information Center (NCIC), local and national forensic databases (DNA, fingerprints, and firearms, etc.) are closed to them. The wrongfully convicted, their attorneys, and their investigators do not have access to free behavioral analysis and other services offered by the FBI and other law enforcement agencies. In most cases, they don't have the power of the grand jury and to subpoena.[145] Access to information is often subject to the whim of the agency responsible for the wrongful conviction in the first place.[146]

Therefore, based on the findings of the private investigator, additional investigation by law enforcement using the resources not available to the private investigator is warranted.

## X.    Obligation to Document and Disclose Exculpatory Evidence

As discussed briefly above, by September 9, 1988, Medical Examiner Dr. Vernard Adams had conducted the autopsy on Arlene Tankleff and examined the watermelon knife and the barbells at his laboratory. During the autopsy, Dr. Adams noted a series of four sharp-force wounds on Arlene Tankleff's back. Dr. Adams documented that each of the wounds in this series consisted of a slash with a corresponding dimple.

Police notes in handwriting identified as Detective Rein's independently document Dr. Adams' wound measurements, including the four dimple-and-slash series wounds and include drawings of what appears to be a utility-type knife.

---

[145] Ibid.
[146] Amicus Brief, US Supreme Court, 12-26, Gregg McQuiggin vs Floyd Perkins

No supplementary report was created or produced by Detective Rein, Detective McCready, or any other homicide detective documenting their meeting(s) with Dr. Adams, or any information received from Dr. Adams about the wound patterns on Arlene Tankleff or the knife used to attack her.

At his deposition, Dr. Adams testified that there was no reasonable possibility that the watermelon knife was the murder weapon. He stated that "if [he] had to pick the perfect knife to make these wounds, [he] would pick a utility knife."[147] Although he could not remember the exact words he used during his conversations with the homicide detectives about the watermelon knife, Dr. Adams was confident that he must have communicated to them that there was no reasonable possibility that the watermelon knife was the murder weapon.[148]

None of these conclusions were documented by Detective Rein, Detective McCready, or any other homicide detective. Assistant District Attorneys Jablonski and Collins, who were the two prosecutors assigned to the Tankleff prosecution, and Lieutenant McElhone each testified that they were never told that Dr. Adams had concluded there was no reasonable possibility that the watermelon knife was the murder weapon.

A reasonable and experienced homicide detective, following generally accepted police practices, would have understood that a Medical Examiner's exclusion of a confessed-to murder weapon as the actual murder weapon was exculpatory information. In 1988, he would have known that he had an obligation to clearly and accurately document exculpatory information and disclose that information to the prosecutors on the case.

McCready, Rein, and Doyle each testified that they understood this obligation.

Well before 1988 and after, the failure to clearly and accurately document exculpatory information and the failure to disclose that information to prosecutors clearly violated generally-accepted police customs and practices. An intentional failure to document and disclose such information would be an egregious violation of minimally accepted police practices.

## XI.   Crime Scene Analysis

In addition to the facts from the crime scene analysis conducted at the time of the original Tankleff investigation and detailed above, I have reviewed the facts and findings detailed in crime scene reconstruction expert Timothy M. Palmbach's report, dated February 9, 2015.

Mr. Palmbach's report documents a number of additional forensic facts, which contradict the narrative confession, but which were unknown at the time of the Tankleff prosecution.

If the Palmbach findings are correct, then the Tankleff narrative confession contains uniformly false facts about how the crimes were committed. According to Detective McCready, those same false facts were facts which the police believed to be true at the time of the interrogation. A reasonable and experienced homicide investigator would regard a confession with almost

---

[147] Dep. Trans. of Dr. Adams (Aug. 5, 2014), at 188:14–22.
[148] Dep. Trans. of Dr. Adams (Aug. 5, 2014), at 187:20–193:21.

entirely false facts, which comport with the original, but disproven, police theory of the crime, as evidence of innocence.

If the underlying forensic facts documented above and the forensic facts documented in Mr. Palmbach's report are accurate, then a reasonable and experienced homicide detective would recognize that the case theory needed to be revised, and that a two perpetrator theory needed to be seriously investigated.

James Trainum