# Exhibit 2

1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------x
MARTIN TANKLEFF,

                    Plaintiff,
                                        No. 09CV1207
             -against-                  (JS)(WDW)

THE COUNTY OF SUFFOLK, K. JAMES
McCREADY, NORMAN REIN, CHARLES
KOSCIUK, ROBERT DOYLE, JOHN
MCELHONE, JOHN DOE POLICE
OFFICERS #1-10, RICHARD DOE
SUFFOLK COUNTY EMPLOYEES #1-10,

                    Defendants.
----------------------------------x

                    December 2, 2011
                    10:26 a.m.


Deposition of JOHN McELHONE, taken by

Plaintiff at the offices of Quadrino Schwartz,

666 Old Country Road, Garden City, New York

11530, before Anneliese R. Tursi, a Registered

Professional Reporter and Notary Public within

and for the State of New York.



Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

Case 2:09-cv-01207-JS-AYS   Document 184-2   Filed 08/17/16   Page 2 of 255 PageID #: 3113

Case 2:09-cv-01207-JS-AYS   Document 184-2   Filed 08/17/16   Page 3 of 255 PageID #: 3114

2

A P P E A R A N C E S


NEUFELD SCHECK & BRUSTIN, LLP

Attorneys for Plaintiff

    99 Hudson Street

    New York, New York 10013

BY:   DEBI CORNWALL, ESQ.
      VANESSA BUCH, ESQ.
      212-965-9081
      debi@nsbcivilrights.com


          -and-
QUADRINO SCHWARTZ

    666 Old Country Road

    Garden City, New York 11530

BY:   AMY MARION, ESQ.
      516-745-0101
      bab@quadrinoschwartz.com



ESQUIRE

Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

John McElhone                                    December 2, 2011

3

A P P E A R A N C E S


CHRISTINE MALAFI

SUFFOLK COUNTY ATTORNEY

Attorney for Defendants

        H. Lee Dennison Building

        5th Floor

        100 Veterans Memorial Highway

        Hauppauge, New York 11788

BY:    RICHARD T. DUNNE, ESQ.,
       BRIAN BERGER, ESQ.,
       ASSISTANT COUNTY ATTORNEYS



ESQUIRE

Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

4

1                    J. McELHONE

2              (Plaintiff Exhibit 7, document

3              reflecting resume of John McElhone

4              marked for identification, as of

5              this date.)

6    J O H N   M c E L H O N E,

7         having been first duly sworn by the

8         Notary Public (Anneliese R. Tursi), was

9         examined and testified as follows:

10   EXAMINATION BY MS. CORNWALL:

11        Q.    Good morning, sir.

12        A.    Good morning.

13        Q.    My name is Debi Cornwall.  We met

14   off the record and I'm here today representing

15   the plaintiff in this case, Martin Tankleff,

16   along with my colleague, Vanessa Buch and my

17   colleague Amy Marion.

18              Have you had an opportunity to

19   read the complaint in this case?

20        A.    Yes, I reviewed it.

21        Q.    You understand that you are one of

22   several named defendants in the case?

23        A.    I see that, but I was -- as

24   reading through it I wasn't sure with the

25   decision of Judge Seybert if I was still in it



Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

5

                        J. McELHONE
1
2    or not, but --
3         Q.    But you have had an opportunity to
4    read the complaint?
5         A.    Yes, I have.
6         Q.    You handed me before we started
7    this morning, a document that we have had
8    marked as Exhibit 7.  Do you see that?
9         A.    Yes, ma'am.
10        Q.    What is this?
11        A.    We have a change of commissioners,
12   deputy commissioners, and he asked everyone
13   above the rank of captain to submit a resume.
14             And when I was discussing with Mr.
15   Dunne a series of things that happened through
16   the years with this case, it became clear to
17   me that it probably would be helpful to give
18   him, and even for my own recollection, to just
19   know exactly where I was when certain things
20   were transpiring.  So I thought this might be
21   helpful.
22        Q.    I think this will be.
23             Just for clarification on the
24   record, you said we had a change of
25   commissioners.  You spent your career as an



ESQUIRE

Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

6

1                    J. McELHONE
2    officer and ultimately as a chief in the
3    Suffolk County Police Department?
4           A.    That's correct.
5           Q.    And does Exhibit 7 accurately
6    reflect your assignment and promotion history
7    at the department?
8           A.    Yes, ma'am.
9           Q.    There is some handwriting there at
10   the bottom.
11          A.    Yes.
12          Q.    Is that your handwriting?
13          A.    Yes, ma'am, it is.
14          Q.    Have you ever sat for a civil
15   deposition before?
16          A.    I believe I have, yes.
17          Q.    Has it been a little while?
18          A.    Yes.
19          Q.    You mentioned you have been
20   retired for some time?
21          A.    A little over five years now.
22          Q.    Do you remember the date of your
23   retirement?
24          A.    July 7, 2006.
25          Q.    So you understand at a deposition,



Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

ESQUIRE

Case 2:09-cv-01207-JS-AYS   Document 184-2   Filed 08/17/16   Page 8 of 255 PageID #: 3119

7

1                          J. McELHONE
2    you are sworn as you are in court.  From time
3    to time your attorney may put objections on
4    the record.  As there is no judge here to rule
5    on them, unless there is a claim of privilege
6    which I don't anticipate, you can go ahead and
7    answer the question and there will be a ruling
8    on the objections at a later time.
9         A.    Okay.
10        Q.    First of all, please tell us about
11   your education.
12        A.    I'm a graduate of Hauppauge High
13   School, 1966.  It is on Exhibit 7.  I have an
14   Associate, Applied Science in Criminal Justice
15   from Suffolk Community College.
16             I have a Bachelor of Arts degree
17   in Social Science, Interdisciplinary Social
18   Science degree from Stony Brook, SUNY Stony
19   Brook, and a Master of Professional Studies in
20   Labor Relations from Stony Brook University,
21   also.
22        Q.    Did you receive your Bachelor's
23   degree after joining the course?
24        A.    All of my education came nights
25   and weekends after I became a police officer.



ESQUIRE

Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

8

J. McELHONE

1

2      Q.     So your highest degree is a
3  master's degree?
4      A.     Yes.
5      Q.     And that's a professional -- why
6  did you pursue that degree?
7      A.     I was interested in that area.  As
8  I moved up in management, it was more and more
9  labor relations kind of things going on and
10 Stony Brook offered it on a part-time basis.
11 So it was something that was easy and I
12 enjoyed it.  I like pursuing things.
13     Q.     Fair to say you thought that
14 degree would be helpful to you to the extent
15 you were in a management position in the
16 Suffolk County Police Department?
17     A.     Yes.
18     Q.     And did you find it helpful?
19     A.     Yes, I did.
20     Q.     If you would, referring to your
21 resume as necessary, walk us through the
22 history of your progression as an officer
23 through the ranks at the Suffolk County Police
24 Department from the time that you graduated
25 the academy, if you would.



ESQUIRE

Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

9

                         J. McELHONE

1

2         A.    Okay, I was assigned originally in

3    the Fourth Precinct in Hauppauge.

4         Q.    And that was 1971?

5         A.    May of 1971 when I graduated the

6    academy and I was there for eight years.  I

7    walked the beat.  I drove a scooter.  I worked

8    the front desk and drove a sector car

9    ultimately until I was promoted to sergeant in

10   March of 1979.

11        Q.    Is sergeant the first available

12   position above patrol officer, was it at that

13   time in the Suffolk County Police Department?

14        A.    Sergeant is a supervisory position

15   and it is a statewide exam that you take.

16   There are other -- detective is considered a

17   promotion and that's something that doesn't

18   require a statewide exam.  I wasn't a

19   detective as you can see.

20        Q.    As between detective and sergeant,

21   is one higher in rank?

22        A.    Sergeant is higher than a

23   detective.

24        Q.    So did you become a sergeant

25   before you became a detective?



Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

John McElhone                                December 2, 2011

10

                        J. McELHONE

1

2        A.    I was never a detective.  I became

3    a detective supervisor down the road, the next

4    step.

5        Q.    I interrupted our time line.

6    Let's see if we can bring it out that way.

7        A.    After serving for three years as a

8    patrol sergeant in the Third Precinct in Bay

9    Shore primarily, I was in charge of a squad of

10   officers in patroling the Brentwood, Central

11   Islip area.

12       Q.    And this was between '79 and '82?

13       A.    That's correct.

14       Q.    What was your next change of

15   assignment or promotion?

16       A.    Well, there is a monetary raise,

17   slightly so some consider it a promotion, but

18   it was actually an application not a statewide

19   exam or anything like that where I applied,

20   was interviewed and was assigned as a

21   detective sergeant in April of '82 and

22   assigned to the Second Squad Detectives where

23   I was in charge of a team of detectives

24   covering basically the Huntington area.

25       Q.    As far as you were aware, what



ESQUIRE

Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

11

                    J. McELHONE

1

2    were the criteria for becoming a detective

3    sergeant as opposed to a sergeant which you

4    had been?

5         A.    A good supervisor basically,

6    someone who can work a little more

7    independently out of uniform and not be

8    responding to radio calls to pursue

9    investigations.

10        Q.    At the time you became a detective

11   sergeant, fair to say you had had no personal

12   experience investigating crime as a detective?

13        A.    Not as a detective, but as a

14   police officer you also investigate crime,

15   misdemeanor crimes, you know, hit and runs,

16   anything vehicular.  There is a certain, I

17   guess you could call them minor investigations

18   that were accomplished.

19        Q.    Is it fair to say that what you

20   brought to the role of detective sergeant from

21   the time you were first assigned that post in

22   1982, was really your supervisory skills?

23        A.    Yes, and recommended by the

24   supervisor that I worked for for, by that time

25   I had an 11-year career and a couple of



Case 2:09-cv-01207-JS-AYS   Document 184-2   Filed 08/17/16   Page 13 of 255 PageID #: 3124

John McElhone                                    December 2, 2011

12

1                    J. McELHONE
2  commendations, actually several commendations.
3  There was an interview process where I imagine
4  I impressed them that I could do the job.
5       Q.    Had you investigated felonies
6  personally as of the time you became a
7  detective sergeant?
8       A.    I supervised detectives and that
9  was our sole mission was to investigate
10  felonies.  So as a team sergeant, my team, I
11  would assign a detective to a felony
12  investigation, and assist and supervise it
13  along the way, yes.
14       Q.    And you are referring to your time
15  as a sergeant on the Third Precinct?
16       A.    No, I'm talking about after I was
17  promoted to detective sergeant.
18       Q.    So let me clarify the question.
19  Before you were promoted to detective
20  sergeant, up to and including April 18th of
21  1982 when you were a patrol officer and then a
22  sergeant in the Fourth Precinct and then the
23  Third Precinct, did you personally investigate
24  felonies?
25       A.    No.


ESQUIRE

Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

13

J. McELHONE

1

2          Q.     So you began as a detective

3     sergeant in the second squad?

4          A.     That's correct.

5          Q.     And you were supervising the

6     detectives there?

7          A.     Yes.

8          Q.     And they were obviously

9     investigating serious felonies?

10         A.     Yes.

11         Q.     Did that include homicides?

12         A.     No.

13         Q.     There was a separate homicide

14    squad tasked with investigating those crimes?

15         A.     Yes, that's right.

16         Q.     What was your next promotion or

17    change of assignments, sir?

18         A.     I was transferred back to the

19    Third Squad back to Bay Shore where I was more

20    familiar with the officers and the territory,

21    you might say, and I stayed there for two

22    years and until I was promoted to lieutenant.

23              Again, lieutenant was a statewide

24    exam and I had scored high enough to be

25    promoted to lieutenant and I was back into the



Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

14

1                    J. McELHONE
2    uniform division of the Second Precinct.
3         Q.    You started as a lieutenant in
4    February of 1984?
5         A.    That's correct.
6         Q.    Well, obviously, lieutenant is a
7    promotion over sergeant?
8         A.    Yes.
9         Q.    Did you have at the Second
10   Precinct in your capacity as a lieutenant, a
11   day-to-day involvement in the investigations
12   that your subordinates were running?
13        A.    Well, my subordinates at that time
14   would have been four or five sergeants and a
15   platoon of approximately 40 police officers.
16        Q.    And again, these were --
17        A.    This is more uniform patrol.  It
18   was answering 911 calls, patroling sectors,
19   traffic and anything like that that would come
20   in.
21        Q.    And going back for a moment to
22   your two-years as detective sergeant
23   supervising detectives in the second squad and
24   Third Squad, could you agree that you had
25   daily involvement in their felony



ESQUIRE

Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

15

                    J. McELHONE
1
2    investigations in your capacity as a
3    supervisor?
4         A.    No.  It is a division between the
5    uniform side, and the detective side and as a
6    uniform lieutenant I was in charge of the
7    uniform officers assigned on that particular
8    shift.
9         Q.    And that's when you were a
10   lieutenant between 1984 and 1986 in the Second
11   Precinct and the Third Precinct?
12        A.    That's correct.
13        Q.    Taking a step back earlier in time
14   to the period of time between 1982 and 1984
15   when you were a detective sergeant supervising
16   detectives in the second squad and then the
17   Third Squad, during that period of time would
18   it be fair to say that you had day-to-day
19   involvement in the investigative work your
20   detectives were doing?
21        A.    Absolutely.
22        Q.    So what was your next promotion
23   after lieutenant in 1986?
24        A.    Again, I applied to become a
25   detective lieutenant and a decision that is



ESQUIRE

Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

John McElhone                                    December 2, 2011

16

1                    J. McELHONE

2    made upon the recommendations of your current

3    supervisors and in an interview process and in

4    this time I had two years of experience as a

5    detective sergeant and a track record, if you

6    will, from that and I was promoted to

7    detective lieutenant in charge of Fifth Squad

8    detectives which is primarily Patchogue area,

9    Town of Brookhaven, south side of the Town of

10   Brookhaven.

11        Q.    Again, in this capacity now as the

12   CO of a detective squad, were you personally

13   involved in the felony investigations those

14   detectives were running?

15        A.    It wasn't as close on as it would

16   be as a sergeant.  I was in charge of the

17   entire squad.  I was commanding officer.  I

18   had three detective sergeants -- actually

19   four.  I had a day sergeant also when I was

20   assigned there.  And approximately 22

21   detectives.

22        Q.    Could you describe for us as lay

23   people, the difference between what your job

24   looked like as a sergeant of detectives versus

25   what your responsibilities were once you



ESQUIRE

Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

17

                        J. McELHONE

1
2    became lieutenant or lieutenant CO responsible
3    for detectives?
4         A.    The first thing is my hours
5    changed.  I would be Monday to Friday, 9 to 5
6    on call nights and weekends.  The sergeants
7    are assigned to a team that rotates around the
8    clock, either 9 to 5 or 5 to 1.  At that time
9    it was four days on, two days off.  So there
10   was more of around the clock you would be
11   there on the scene.
12            If something happened at 9 o'clock
13   at night, as a detective sergeant you and your
14   detectives would go out, if it was a major
15   case, you and your detectives would go out and
16   you would be hands-on supervising that
17   particular felony.
18            As the CO you might read about it
19   the next morning.  If it was serious enough,
20   you might get called at home and if it is
21   really serious enough, you might respond also,
22   but it wasn't -- as the oversight wasn't as
23   intense or as scrupulous as you would be with
24   a sergeant hands-on right there.
25        Q.    That's helpful.  Thank you.



Toll Free: 800.944.9454
Facsimile: 212.557.5972

ESQUIRE

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

18

1                         J. McELHONE

2                   And just to clarify, when you say

3       less scrupulous I just want to make sure I

4       understand what you mean by that.

5                   Obviously, as the CO of a squad,

6       it is your ultimate responsibility to

7       supervise the case work of your detectives?

8            A.     Yes.

9            Q.     And you would be careful and

10      scrupulous in doing that work?

11           A.     I would be, yes.

12           Q.     But you were not as involved in

13      every decisions made by your detectives than

14      you would have been as a sergeant?

15           A.     Yes, the minutia or certain

16      details that you might not be totally aware of

17      if they are innocuous enough that they

18      wouldn't come to your attention.

19           Q.     And is that what you mean by less

20      scrupulous --

21           A.     Yes.

22           Q.     -- you weren't as involved in the

23      minutia?

24           A.     That was probably a bad choice of

25      words.  It could be, you know



ESQUIRE

Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

19

1                    J. McELHONE
2         Q.    Because you were a very careful
3    supervisor?
4         A.    Absolutely.
5         Q.    And you took your responsibilities
6    seriously?
7         A.    Absolutely.
8         Q.    And you were vigilant in insuring
9    that those under your command complied with
10   the written policies of the department?
11        A.    Yes.
12        Q.    And were you always equally as
13   vigilant to make sure that those under your
14   command complied with the constitutional
15   rights of suspects?
16        A.    Absolutely.
17        Q.    Did you understand that that was
18   part of your role as CO of a division?
19        A.    That's correct.
20        Q.    Both insuring that detectives
21   complied with written policies and that they
22   scrupulously observed the constitutional
23   rights of suspects?
24        A.    That's correct.
25        Q.    So we discussed briefly your



ESQUIRE

Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

20

```
 1                  J. McELHONE
 2   posting as a detective lieutenant as the CO in
 3   the Fifth Squad.  What came next for you?
 4        A.    Actually, I got a call from the
 5   chief of detectives some time in February of
 6   '87 and he told me that they were going to
 7   make a change in the homicide squad, would I
 8   consider taking over as the CO of homicide
 9   squad.
10        Q.    Who was the chief of the
11   detectives at that time?
12        A.    Arthur Feldman.
13        Q.    Did you know him at that time?
14        A.    Well, I knew, sure, he was my
15   boss.
16        Q.    Tell me what you remember of that
17   phone call?
18        A.    I was in shock, totally.  Of
19   course the answer was yes right away.  It is
20   like the ultimate job for a detective
21   lieutenant or a detective for that matter.
22        Q.    Homicide is the best of the best?
23        A.    Absolutely.
24        Q.    It the most elite department or
25   squad within that accident?
```



ESQUIRE

Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

21

                        J. McELHONE

1

2       A.    You might say that.

3       Q.    Well, you would say that, wouldn't

4  you?

5       A.    Well, there were other people who

6  were well qualified but didn't really want to

7  go there.  But most everybody did want to go

8  there and I was shocked and I immediately said

9  yes.

10      Q.    Fair to say you considered it a

11 significant promotion?

12      A.    Yes.

13      Q.    And you were proud to be offered

14 the post?

15      A.    It wasn't really a promotion.  It

16 was a transfer, but it was a high visibility

17 post and the ultimate investigation.

18      Q.    Did he tell you in that phone call

19 or in any conversations you had with him

20 thereafter, why at that time they were making

21 a change in personnel at the top of homicide?

22      A.    No, he didn't.

23      Q.    Did he tell you why they had

24 chosen you?

25      A.    He didn't.



Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

John McElhone                                    December 2, 2011

22

1                    J. McELHONE
2        Q.    Did he tell you why the outgoing
3   CO was being transferred?
4        A.    He didn't.
5        Q.    Who was the outgoing CO who you
6   replaced?
7        A.    It was Lieutenant Dave Scanlon who
8   was really only briefly assigned there.
9        Q.    Did you ever speak to him about
10  his experience as the CO of homicide?
11       A.    We talked briefly, but it was, you
12  know, he was a person who had been a detective
13  lieutenant in the general service squad for
14  many, many years and I think they brought him
15  in to bring in some stability while the SIC
16  investigation was going on.
17            There was a lot of turmoil in the
18  office and as a matter of fact, the department
19  assigned a deputy inspector which is unusual
20  to be in charge of the homicide squad for a
21  brief period and he brought in Lieutenant
22  Scanlon.
23       Q.    I just want to make sure I
24  understand the role of the deputy inspector in
25  overseeing homicide.



Toll Free: 800.944.9454
Facsimile: 212.557.5972

ESQUIRE

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

John McElhone                                    December 2, 2011

23

1                          J. McELHONE

2              First of all, when was that person

3    brought in?

4         A.    I believe shortly before I was

5    brought in.

6         Q.    After Scanlon or before Scanlon?

7         A.    I think with Scanlon they put a

8    deputy inspector and then he brought in a

9    lieutenant to do more of the day-to-day

10   things.  But for a while there was a bit of a

11   turmoil there with the investigation that was

12   going on.  The deputy inspector was more

13   direct in oversight.

14              When I came in he backed off, he

15   was more of a bureau chief of the major crime

16   bureau and he would oversee myself in

17   homicide, who ever was in narcotics, the arson

18   squad.  He would have more of a role with the

19   major crime COs.

20        Q.    Who was this deputy inspector?

21        A.    Tom Murphy, Thomas Murphy.

22        MS. CORNWALL:  No. 8.

23              (Plaintiff Exhibit 8,

24              organizational chart marked for

25              identification, as of this date.)



ESQUIRE

Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

24

J. McELHONE

1

2    Q.    Mr. McElhone, I'm giving you what
3  we have marked as Exhibit 8 and I'm going to
4  give you a highlighter because I just want to
5  make sure that I understand the chain of
6  command as you are talking about the various
7  departments and the relationship between
8  different divisions.
9    A.    Okay.
10    Q.    Do you recognize generally the
11  form of this organizational chart?
12    A.    Yes.
13    Q.    And this is the organization of
14  the Suffolk County Police Department as it
15  existed in January of '87?
16    A.    Um-hum.
17    Q.    For the record, that's a yes?
18    A.    Yes.
19    Q.    And that's just a month or so
20  before you took command of homicide?
21    A.    That's correct.
22    Q.    So would you find and highlight
23  for me the homicide section.  It is on the
24  lower left there.
25    A.    I have it.



ESQUIRE

Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

25

1                    J. McELHONE
2          Q.    And that was your command?
3          A.    That's right.
4          Q.    Who was your boss while you were
5    the CO of homicide?
6          A.    The major crimes bureau at the
7    time had a Detective Captain Will Ports and a
8    Deputy Inspector Thomas Murphy.
9          Q.    And what, generally speaking, was
10   the role of a deputy inspector?
11         A.    He was the liaison, if you will,
12   between my unit and the chief of detectives.
13         Q.    What did the chief of detectives
14   do?
15         A.    He had overall command of the
16   entire detective division for the County of
17   Suffolk.
18         Q.    So he was who at this time?
19         A.    Arthur Feldman.
20         Q.    And would you highlight that
21   office as well.
22         A.    Okay.
23         Q.    So the chain of command, if I
24   understand correctly, was you as the CO of
25   homicide up to Tom Ports as the head of major



ESQUIRE

Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

John McElhone                                    December 2, 2011

                                                              26
1                    J. McELHONE
2    crimes?
3         A.    Will Ports.
4         Q.    I'm sorry, Will Ports.  Along with
5    Thomas Murphy who was the deputy inspector
6    there?
7         A.    He was Willard Ports.  There was a
8    commanding officer of major crimes which was
9    Tom Murphy and executive officer of major
10   crimes who was Will Ports.  His real name was
11   Willard but he didn't like anybody to call him
12   that.
13        Q.    We can all understand that.
14              And then his boss was Mr. Feldman,
15   the chief of detectives?
16        A.    There was also a deputy chief
17   detectives which was Richard Roberts, too.  So
18   there was a chain of command all the way up.
19        Q.    And above that, who would be next?
20        A.    There is a chief of department or
21   chief inspector they called it in 1987.
22        Q.    And would you highlight that for
23   me.
24        A.    Okay.  That is where the chief of
25   detectives would report to him.



Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

27

                        J. McELHONE
1
2       Q.      And who was the head of that
3   office of the chief inspector at this time?
4       A.      I had worked for Joseph Monteith
5   for so many years.  I always thought he was
6   there, but it was somebody before him.
7               I will have to get back to you on
8   that.
9   (INSERT:)_____
10      Q.      Sure.  And then --
11              MR. DUNNE:  You want to leave a
12          space there?
13              MS. CORNWALL:  Sure.  We will just
14          mark that and see if we can fill that in
15          later.
16              MR. DUNNE:  Sure.
17              MS. CORNWALL:  Thank you, good
18          suggestion.
19      Q.      Next up from there is the
20  commissioner?
21      A.      That's right.
22      Q.      Who was the commissioner as of
23  January '87?
24      A.      Treder.
25      Q.      Had he been in that post for some



ESQUIRE

Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

John McElhone                                    December 2, 2011

28

1              J. McELHONE

2    years?

3         A.    A couple of years before that,

4    yeah.

5         Q.    How long did he stay on?

6         A.    He had left sometime in 1987.  Jim

7    Caples became commissioner and then Dan Guido.

8    And all of that happened while I was in the

9    homicide squad I believe.

10         Q.    Was that all, as far as you

11    understood, in connection with the turmoil

12    engendered by the SIC?

13         A.    I couldn't say.  There was an

14    election, also.  He is appointed.

15    Commissioner Guido is appointed by the

16    incoming county executive, Halpin at the time.

17         Q.    As the CO of homicide division,

18    and we will get back to the rest of your

19    career in just a moment, make sure we

20    understand that, but as the CO homicide, was

21    it part of your responsibility to know and

22    understand the policies with regard to

23    homicide investigation?

24         A.    Yes.

25         Q.    Was the head of major crimes, Mr.



Toll Free: 800.944.9454
Facsimile: 212.557.5972

ESQUIRE

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

John McElhone                                    December 2, 2011

29

                    J. McELHONE
1
2    Ports or Mr. Murphy, did either of those men
3    have any personal responsibility for
4    overseeing the work of homicide detectives?
5         A.    As I mentioned earlier, for a
6    brief time Deputy Inspector Murphy was put
7    directly in charge of the homicide squad.
8         Q.    And that predated your tenure as
9    CO?
10        A.    Yes, that's correct.
11        Q.    So after you took over as CO, is
12   it fair to say that the buck stopped with you
13   when it came to overseeing the work of your
14   homicide detectives?
15        A.    I was the commanding officer,
16   yeah, I was in charge.
17        Q.    Did you have any role in drafting
18   or implementing policies that your homicide
19   detectives were to be carrying out?
20        A.    Yes, initially I did.
21        Q.    We will discuss that a little bit
22   more later on this morning.
23        A.    Okay.
24        Q.    Did the heads of major crimes have
25   any role in changing or implementing homicide



ESQUIRE

Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

John McElhone                               December 2, 2011

30

1                    J. McELHONE
2    investigation policies?
3         A.    We'd discuss it and we would be in
4    agreement or I would be in agreement.  We
5    would agree on the way we would go.
6         Q.    Did you have ultimate authority in
7    that regard or did you need a supervisor to
8    sign-off?
9         A.    I had to get the approval of, I
10   don't know if it was officially a sign-off but
11   I certainly kept them abreast of what we were
12   thinking of doing or what we thought would be
13   wise to do and we would either agree or
14   disagree.
15        Q.    As a good supervisor, you kept the
16   lines of communication open both up the chain
17   and down the chain?
18        A.    Oh, absolutely.  That was a major
19   part of the role.
20        Q.    Did you ever propose any changes
21   to policy that were disapproved by anyone
22   above you in the chain of command?
23        A.    Not that I can recall.
24        Q.    Fair to say you kept them abreast
25   and wanted their buy in, but ultimately you



ESQUIRE

Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

John McElhone                              December 2, 2011

                                                          31

1                    J. McELHONE

2    made the call?

3         A.    Yeah, if they agreed, then we

4    would implement it, yes, absolutely.

5         Q.    And again, you can't think of an

6    instance in which they disagreed with your

7    recommendation?

8         A.    No, I remember having discussions

9    at one point -- in the past homicide squad

10   used to be in charge of fatal accidents and

11   the numbers were increasing dramatically.

12              They decided, wisely I thought, to

13   put it into general service in the various

14   precinct squads.  And at one point there was a

15   push to bring it back into the homicide squad

16   and I resisted and they went along with my

17   suggestion at that point.

18        Q.    And was part of the reason you

19   resisted, case load?

20        A.    Absolutely.

21        Q.    Was another part of the reason you

22   resisted is that there are different

23   considerations in fatal accidents, did you

24   say, fatal car crashes?

25        A.    Yes.



ESQUIRE

Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

32

J. McELHONE

```
 1
 2      Q.     Than in murders?
 3      A.     Yes.
 4      Q.     Different investigative techniques
 5  are brought to bear on those different kinds
 6  of cases?
 7      A.     Yes.
 8      Q.     Different kinds of expertise?
 9      A.     The case load primarily.
10             The expertise wasn't beyond the
11  capability of our detectives, but the case
12  load would have been overwhelming.  I would
13  rather concentrate on what we had to do with
14  homicides, suicides, unexplained deaths.
15      Q.     How many open homicide cases did
16  your department have during your tenure in any
17  given year?
18      A.     Well, a homicide case is open
19  forever.  There is no statute of limitations.
20  So we had cases going back to the late sixties
21  that were still in our office and that if a
22  new lead came in or a new avenue of
23  investigation opened up, we would pursue it.
24  There were a couple of cases that we brought
25  in years after the case had first came in.
```



Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

33

1                      J. McELHONE

2        Q.     Was there any provision for a cold

3   case unit, anything like that at the time?

4        A.     As a matter of fact when I had a

5   change of sergeants in the homicide bureau,

6   Sergeant Robert Doyle came in rather than

7   being a day sergeant which was more

8   administrative, taking care of overtime and

9   things like that, I put him in charge of cold

10  cases.  We called it the extended

11  investigation team and he would review them,

12  and if there was one that looked like it was

13  an avenue or something that was unexplored, we

14  would go through with that, follow through and

15  investigate it.

16       Q.     So leaving aside the older cold

17  cases, how many active and open homicide cases

18  was your department dealing with in 1987,

19  1988?

20       A.     I don't have the exact number.

21       Q.     Can you give me an estimate based

22  on your experience.  Was it more than ten in a

23  given year?

24       A.     I would say it is more than ten.

25       Q.     Was it more than 20 in a given



Toll Free: 800.944.9454
Facsimile: 212.557.5972

ESQUIRE

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

34

1                       J. McELHONE

2    year?

3         A.     Again, I don't know exactly what

4    you are talking about.  I came in in '87.

5    There were 86 cases that were still going to

6    trial.  There were 86 cases, 85 cases.  We

7    were reinvestigating or trying the Pius case

8    which went back to 1979.

9              It is fluid.  There is not really

10   a number I can put on it.

11        Q.     Did the department have a

12   mechanism for tracking homicides that had been

13   reported in which there was not yet an arrest

14   or a conviction?

15        A.     If it was recent within a couple

16   of years, usually the lead detective was still

17   there so we had a list of open cases,

18   absolutely.

19        Q.     And was there some central

20   location where that list was kept?

21              And the reason why I'm asking is

22   I'm thinking ahead to whether there is a piece

23   of paper that would help us answer this

24   question if we looked in the right place.

25        A.     There was an open cases list.  It



ESQUIRE

Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

35

1                    J. McELHONE
2   was kept in homicide but I believe a copy was
3   made available to the CO of the major crimes
4   bureau.
5              ^  MS. CORNWALL:  So just for the
6         record, I haven't seen it in the
7         discovery.
8              MR. DUNNE:  I didn't see that
9         either.  That's the first time I'm
10        hearing it.  Just one -- you are not
11        talking about the cards?
12             THE WITNESS:  No, no.  There was a
13        report, I don't know if it was annually
14        or twice a year that we would generate.
15             MR. DUNNE:  Would I be accurate to
16        call it an annual open case list?
17             THE WITNESS:  Open case list.
18             MR. DUNNE:  I will do a search for
19        that.
20             MS. CORNWALL:  Thank you.
21        A.    The reason for that, occasionally
22   you would get a call from another jurisdiction
23   and say somebody says they know something
24   about a stabbing in Huntington, and we would
25   look at our open cases and, oh, we got one



ESQUIRE

Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

36

                    J. McELHONE
1

2  from a few years ago, go to the file, pull out

3  the case and when we got back to whoever was

4  supplying the information, sometimes it was a

5  member of the public calling and saying I know

6  something about a stabbing in Huntington, for

7  an example, and you would first look in the

8  open case list and say, oh, yeah, had one

9  five, six years ago like that, the detective

10 may be retired or may be there and then we

11 would put him in touch with the person with

12 the information on it.

13            ^  MS. CORNWALL:  So, Rich, we

14       would just formally be asking for that

15       list for '84 through '89.

16            MR. DUNNE:  Sure.  I will take a

17       look for that.

18            THE WITNESS:  Call Jerry at the

19       squad.

20            MR. DUNNE:  Yes.

21       Q.    Let's turn back to Exhibit 7, your

22 resume.

23            So how long were you the CO of the

24 homicide section?

25       A.    Two years.



ESQUIRE

Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

Case 2:09-cv-01207-JS-AYS   Document 184-2   Filed 08/17/16   Page 38 of 255 PageID #: 3149

                                                                    37

 1                    J. McELHONE
 2          Q.     What was your next promotion or
 3    change of rank?
 4          A.     Actually captain is again a
 5    statewide exam.  I scored high enough to be
 6    made captain but they wanted to keep me in
 7    homicide for another little while so I was a
 8    detective captain for a month and stayed in
 9    homicide.  So just about two years, make it
10    around two years I was there.
11          Q.     You made captain in January '89?
12          A.     Yes.
13          Q.     And completed your two year stint
14    in homicide in February 18, 1989?
15          A.     That's right.
16          Q.     And what was your next --
17          A.     After captain there is no longer a
18    statewide exam, a list, if you will, a civil
19    service list.  There was a lot of people
20    retiring and there was an opening in the
21    Second Precinct for deputy inspector which was
22    the executive officer, No. 2 in command of
23    that precinct.
24          Q.     You say there were a lot of people
25    retiring in early 1989?



Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

John McElhone                                    December 2, 2011

38

                        J. McELHONE

1

2       A.     Yes, Commissioner Guido had come

3   in somewhere in '88 and why I remember that

4   directly is usually they make four or five

5   captains off the list, and I was like 15 or 16

6   or something, and they got to me and passed

7   me.  So there was a lot of captains and above

8   had retired I think with the new commissioner

9   coming in, and, you know, maybe they didn't

10  feel like they were going to be part of the

11  team or whatever.

12      Q.     Fair to say you had a similar

13  experience when you took over at homicide,

14  there was a great deal of turnover within that

15  department during your tenure there or before

16  your tenure there?

17      A.     Yes.

18      Q.     In fact, it was almost a mass

19  exodus of detectives out of that unit in

20  connection with the turmoil that was going on

21  in the mid '80s?

22      A.     That might be too strong a word,

23  but there was a lot of people retiring or

24  moving to other commands.

25      Q.     We'll get back to that as well.



Toll Free: 800.944.9454
Facsimile: 212.557.5972

ESQUIRE

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

John McElhone                                    December 2, 2011

39

                          J. McELHONE

1

2              So you became a deputy inspector

3       of the Second Precinct.

4              A.    Yes.

5              Q.    And what were your

6       responsibilities there?

7              A.    I was the second in command of the

8       entire precinct of the patrol division

9       primarily.

10             Q.    More of an administrative

11      position?

12             A.    Yes.

13             Q.    And your next transfer or change

14      of post?

15             A.    I came back to major crimes bureau

16      in the detective division, as you can see

17      oversight over homicide, narcotics, everybody

18      that would be in the major crimes section.

19      I'm not quite sure that when I came back -- I

20      am quite sure that narcotics was not under my

21      purview.  They had their own -- the

22      organizational chart might have changed.  I

23      don't know if you have that back here.

24             Q.    For the record, Exhibit 8 does

25      have a second page and a third page.



ESQUIRE

Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

40

                        J. McELHONE
1
2               Do you recognize the second page
3    as the chart as of September 21st of '87 there
4    at the bottom?
5          A.    Okay.
6          Q.    And the third page has been
7    represented to us as the chart as of May 31st
8    of 1988.
9          A.    All right.
10         Q.    These are the three charts we have
11   been provided for this time period.
12         A.    Okay.
13         A.    In '89, November of '89 to the end
14   of the year in '89 I was the executive officer
15   in the major crimes bureau.  The commanding
16   officer major crimes bureau was Arthur Houde,
17   H-O-U-D-E.  He was a full inspector.
18         Q.    And what was your next posting
19   after that?
20         A.    Basically, I was still on the
21   chief of detectives office but now my, I was
22   in charge of or I was the number two man in
23   command of the detectives in the various
24   precincts, the general service bureau they
25   called it at that time.



Toll Free: 800.944.9454
Facsimile: 212.557.5972

ESQUIRE

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

41

                        J. MCELHONE
1
2       Q.      And after that in 1991?
3       A.      I was the commanding officer of
4  the Third Precinct in Bay Shore.
5       Q.      For how long?
6       A.      A little over a year.
7       Q.      And then?
8       A.      Then I was made deputy chief of
9  detectives, a post I had for five years.
10      Q.      And that is within the chief of
11  detectives office?
12      A.      Yes.
13      Q.      On the sort of the middle of the
14  page highlighted on the left of the first page
15  of Exhibit 8 on the top there you highlighted?
16      A.      Yes.
17      Q.      And how long were you there?
18      A.      Five years.
19      Q.      And thereafter?
20      A.      I was the assistant chief in
21  patrol which is a promotion and I was there I
22  guess almost six years, yeah, six years, I was
23  the number two man in command of all of the
24  uniform forces in the police department.
25      Q.      And your next change of assignment



ESQUIRE

Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

42

1                        J. McELHONE

2    after your five years as chief of patrol?

3           A.     In March Commissioner Dormer was

4    assigned.  He was promoted to chief of patrol,

5    chief of all the uniform services in the

6    police department.  In October of that year he

7    moved me over to support services.

8           Q.     Can you just indicate where

9    support services is on this?

10          A.     On the '87 chart it would be

11   headquarters, but they changed the name to

12   support services.

13                 And then I retired in July of '06.

14          Q.     Thank you very much.

15                 Is it fair to say, Mr. McElhone,

16   that although you personally did not

17   investigate felonies on the ground as a

18   detective, during the course of your career

19   supervising detectives, you became very

20   familiar with investigative techniques?

21          A.     Yes.

22          Q.     Investigative policy?

23          A.     Yes.

24          Q.     Constitutional rights of suspects?

25          A.     Absolutely.



ESQUIRE

Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

John McElhone                                      December 2, 2011

43

1                        J. McELHONE
2         Q.      Would you agree that that was part
3    of your role to know those things in order to
4    effectively supervise detectives under your
5    command?
6         A.      Yes.
7         Q.      And specifically within the
8    homicide unit?
9         A.      That's correct.
10        Q.      I would like to talk to you now
11   about what some of those generally accepted
12   investigative practices were back in 1988.
13   All right?
14        A.      Okay.
15        Q.      Would you agree that a fundamental
16   goal of homicide investigation or any felony
17   investigation is to uncover reliable evidence?
18        A.      Yes.
19        Q.      And that was true in 1988?
20        A.      Absolutely.
21        Q.      Would you agree that an officer
22   should always be assessing the reliability of
23   information and evidence that comes to his
24   attention?
25        A.      Yes.



ESQUIRE

Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

44

1                     J. McELHONE

2       Q.    That was part of the detective's

3  job in 1988, wasn't it?

4       A.    Yes.

5       Q.    Was it also a fundamental part of

6  the job in 1988, as now, to seek out

7  corroboration?

8       A.    Yes.  If it is available, you

9  would also look for that.

10      Q.    And for the record, what is

11 corroboration?

12      A.    Physical evidence or another

13 witness who will support what one person would

14 say, what another witness would say or what a

15 theory might be.

16      Q.    Fair to say a detective's job was

17 to seek out objective evidence?

18      A.    Yes.

19      Q.    See if there was forensic

20 evidence?

21      A.    Yes.

22      Q.    Even in 1988?

23      A.    Oh, absolutely.

24      Q.    And look for corroboration in the

25 form of objective evidence, forensic evidence



Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

45

1                     J. McELHONE
2    or physicial evidence?
3         A.    Yes, if it is available.
4         Q.    Would you agree that it was very
5    important in 1988 as it would be now, for
6    detectives to keep an open mind during an
7    investigation?
8         A.    Yes.
9         Q.    To follow all investigative leads?
10        A.    Yes.
11        Q.    To remain objective at all times?
12        A.    Yes.
13        Q.    And was it part of your role as a
14   supervisor to insure that those under your
15   command followed those generally accepted
16   practices?
17        A.    Yes.  Again, not day to day, hour
18   to hour, but as commanding officer, yes, it
19   would be something I would definitely be
20   concerned with.
21        Q.    Was it also part of the duty of a
22   detective and supervisory officer that if it
23   came about after an arrest, new evidence
24   emerged calling into question whether that
25   arrest was of a guilty person or not --



Toll Free: 800.944.9454
Facsimile: 212.557.5972

ESQUIRE

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

46

1                    J. McELHONE

2    withdrawn.  Let me start over again.

3              In the event that an arrest was

4    made and additional evidence came to light

5    after that arrest that raised a question about

6    whether the guilty person had been arrested,

7    did officers have an obligation to follow that

8    new evidence objectively and fairly, wherever

9    it might lead?

10        A.    If it was bona fide new evidence,

11   it would be explored, absolutely.

12        Q.    Even after an arrest?

13        A.    Yes.

14        Q.    And that was clear to you in 1988?

15        A.    Yes.

16        Q.    That was part of a detective's

17   role?

18        A.    Yes.

19        Q.    And part of your role as a

20   supervisor in a homicide division was to make

21   sure that those leads were followed?

22        A.    Detective would come to his

23   supervisor, explain to him what new avenue had

24   come to his attention and then that decision

25   would be made, okay, let's explore that or



ESQUIRE

Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

John McElhone                           December 2, 2011

47

1                    J. McELHONE
2    meet with them or examine the veracity of the
3    person or the evidence that's being offered.
4         Q.    And the new evidence or new lead
5    should be followed after an arrest even if it
6    might show the detective had engaged in
7    misconduct?
8         A.    It would be explored, not by that
9    detective, by a supervisor or internal affairs
10   or somebody like that.
11        Q.    And other leads inconsistent with
12   an arrest had to be followed even if they
13   might prove embarrassing to the department,
14   right?
15        A.    Yes.
16        Q.    Even if it might prove
17   embarrassing to the DA's office?
18        A.    Yes.
19        Q.    Even if it might reflect poorly on
20   your own supervision?
21        A.    Yes.
22        Q.    That was just part of the job?
23        A.    Again, if it is a bona fide area
24   that has to be explored, it would be explored,
25   no question.



ESQUIRE

Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

John McElhone                                   December 2, 2011

48

1                        J. McELHONE

2        Q.     Following a lead wherever it leads

3   you?

4        A.     Exactly.

5        Q.     Even if following a new lead could

6   result in civil liability to the department,

7   it was still the detective and supervisor's

8   role to see it through?

9        A.     Again, at that point you would not

10  have the detective investigating that.  That

11  would be something that someone of a higher

12  rank, probably internal affairs or a boss, a

13  very high level would be looking at.

14       Q.     And what was the reason why, if

15  new information emerged casting doubt on a

16  detective's conduct, you would assign that

17  lead to someone other than that detective?

18       A.     Yes.

19       Q.     What was the thinking behind that?

20       A.     Well, he couldn't be objective if

21  he is looking at something that would cause

22  him or potentially cause him embarrassment or

23  a problem down the line.

24       Q.     If he is looking out for himself

25  instead of the case?



ESQUIRE

Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

Case 2:09-cv-01207-JS-AYS  Document 184-2  Filed 08/17/16  Page 50 of 255 PageID #: 3161

49

J. McELHONE

1

2      A.     Again that would be something that

3  even the minute it came in, it would be

4  referred immediately to a supervisor and then

5  a decision would be made who would follow-up

6  on that.

7      Q.     And one of the most important

8  things for a homicide detective was to remain

9  objective?

10     A.     Yeah, any investigator.

11     Q.     Now I'm going to ask you some

12 questions about documentation.  Again, back in

13 1988.

14            It was understood by officers

15 within the homicide unit in 1988 that accurate

16 documentation was critically important?

17     A.     Absolutely.

18     Q.     It could refresh an officer's

19 memory later on when there was often a gap in

20 time between the investigation and the time

21 they might be asked to testify?

22     A.     Yes.

23     Q.     So in that connection, note-taking

24 was the very foundation of a good

25 investigation, wasn't it?



ESQUIRE

Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

50

                    J. McELHONE
1
2        A.    That's correct.
3        Q.    And an investigator who keeps
4   accurate, comprehensive and chronological
5   notes will not only properly coordinate his
6   investigation, but will structure the
7   strongest case possible for presentation in
8   court.  That was true, right?
9        A.    Yes.
10        Q.    Why are accurate, contemporaneous
11   notes important?
12        A.    As you just mentioned, it is
13   something that you will have to refresh your
14   recollection later down the line if this
15   investigation is extended, if a detective is
16   retired or resigned somewhere, someone can
17   pick up the case and know exactly what was
18   done, what hasn't been done and it would be
19   something that would be, give you a road map,
20   if you will, to where we have been and where
21   we are going.
22        Q.    Was there any written policy or
23   requirement in place under your command in
24   1988 in the homicide unit that detectives take
25   notes?



Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

Case 2:09-cv-01207-JS-AYS   Document 184-2   Filed 08/17/16   Page 52 of 255 PageID #: 3163

51

J. McELHONE

1
2          A.     From the day I was assigned in '87
3     it was clear to them that there would be notes
4     taken on every investigation, that they remain
5     a part of the case and it would be something
6     that with the supervisor would be looking for
7     in each and every instance.
8          Q.     When you say remain part of the
9     case, you mean those notes had to be retained?
10         A.     Yes, absolutely.
11         Q.     And included in a case file?
12         A.     Yes.
13         Q.     And when you say from the time you
14     took command it was made known to them, you
15     made it clear, didn't you?
16         A.     Absolutely.
17         Q.     Because you understood how
18     important notes were?
19         A.     Yes.
20         Q.     And accurate documentation?
21         A.     Yes.
22         Q.     And retaining documentation in a
23     case file?
24         A.     That's correct.
25         Q.     Likewise, police reports



ESQUIRE

Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

52

                        J. McELHONE

1

2    themselves had to be accurate?

3          A.     Yes.

4          Q.     Had to be thorough?

5          A.     Yes.

6          Q.     Had to be complete?

7          A.     Yes.

8          Q.     And had to accurately reflect what

9    had happened as reflected in the note, right?

10         A.     Correct.

11         Q.     And of course you made sure

12   officers under your command understood those

13   facts?

14         A.     Yes.

15         Q.     And what was expected of them?

16         A.     Yes.

17         Q.     Were there written policies in

18   effect with regard to the accuracy and

19   retention of police reports under your

20   command?

21         A.     I don't recall if I wrote any of

22   them, but it was clear from our rules and

23   procedures and from, we provided training very

24   early in '87 we had a seminar provided by a

25   man named Vernon Geberth, a retired member of



ESQUIRE

Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

53

                           J. McELHONE
1
2    the NYPD wrote several volumes on homicide
3    investigation.  And we had a one-week
4    presentation attended by everyone in the
5    command, and also most of the DAs, if not all
6    of the DAs in the homicide bureau.  And
7    clearly we hit that about five different times
8    about note-taking and other scene
9    considerations that you had to be taking.
10        Q.    Is it fair to say that prior to
11   your taking command, there had been some
12   serious questions raised about whether
13   homicide detectives were taking adequate or
14   accurate records?
15        A.    Yes.
16        Q.    And did you see it as part of your
17   role to make a change in that regard?
18        A.    Absolutely.
19        Q.    Was it understood by homicide
20   detectives under your command that it was
21   critically important for them to accurately
22   convey to prosecutors information that they
23   gathered, whether it was helpful to a
24   prosecution or helpful to a suspect?
25        A.    Yes.



ESQUIRE

Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

54

J. McELHONE

1

2    Q.    In particular, were officers aware

3    of the Brady v. Maryland case giving suspects

4    a constitutional right of access to

5    information that might help their defense?

6    A.    I didn't know they worded it that

7    way, but I know what you are talking about,

8    Brady cases, exculpatory information.  And

9    definitely all of that was made available to

10    the DAs that would be assigned to the case.

11    Q.    As a matter of policy, Brady

12    material was turned over by the police?

13    A.    That is throughout the police

14    department not just homicide squad.

15    Q.    Is it part of your obligation as

16    CO of homicide to make sure that officers

17    fulfilled their Brady obligations?

18    A.    Yes.

19    Q.    And that they understood them?

20    A.    Yes.

21    Q.    So it was understood not only by

22    homicide detectives but throughout the

23    department in 1988 that any information,

24    whether oral or written, that came to an

25    officer's attention that was helpful to a



ESQUIRE

Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

Case 2:09-cv-01207-JS-AYS   Document 184-2   Filed 08/17/16   Page 56 of 255 PageID #:
3167

55

1                  J. McELHONE

2    criminal defendant, had to be disclosed to a

3    prosecutor.

4          A.    That was becoming very, very

5    acutely aware.

6          Q.    And you made sure of it?

7          A.    Yes.

8          Q.    With regard to questioning

9    suspects also, would you agree that it was

10   still critically important to constantly be

11   assessing the reliability of information that

12   came out during an interrogation?

13         A.    I don't understand your question.

14         Q.    It was a bad question.  Let me ask

15   it again.

16               We talked earlier about how

17   important it was for homicide officers and any

18   officer investigating a felony to be assessing

19   the reliability of information?

20         A.    Yes.

21         Q.    Did that apply equally to

22   information that came out during an

23   interrogation?

24         A.    Yes.

25         Q.    Was it equally as important in an



Toll Free: 800.944.9454
Facsimile: 212.557.5972

ESQUIRE

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

56

1               J. McELHONE
2    interrogation for an officer to keep an open
3    mind?
4         A.    Yes.
5         Q.    Particularly during an
6    interrogation, was it important for officers
7    to listen to everything said with an objective
8    mind and not to jump to conclusions before all
9    the facts were in?
10        A.    That would be very important.
11        Q.    The goal in an interrogation, was
12   it not, was to elicit a reliable confession,
13   right?
14        A.    That's correct.
15        Q.    Were you aware of the phenomenon
16   of false confessions as a general matter in
17   1988?
18        A.    I have heard of it, yes.
19        Q.    So you were aware when you assumed
20   command of the homicide unit that sometimes
21   innocent people can confess to crimes they
22   didn't commit?
23        A.    I've heard that happening, yeah.
24        Q.    And you have heard of that
25   happening as a general matter as of the time



Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

John McElhone                                    December 2, 2011

57

                              J. McELHONE
1
2    you took command in 1988?

3          A.     Yes.

4          Q.     You knew it was something to watch

5    out for?

6          A.     Yes.

7          Q.     Did you also understand in 1988

8    that there were certain kinds of suspects who

9    had to be treated with special care in an

10   interrogation?

11         A.     Juveniles who had their own set of

12   rules, if that's what you are talking about.

13   Each one is individually different and a good

14   detective would understand that.  Approaches

15   would change bearing on who you were

16   interrogating.

17         Q.     But certainly juveniles needed to

18   be treated with super care?

19         A.     Yes.

20         Q.     And you and your detectives

21   understood that?

22         A.     Throughout the department.  If a

23   uniform cop knows if someone is under 16, they

24   go to the juvenile room.  The parents have to

25   be called.



ESQUIRE

Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

58

1                    J. McELHONE
2          Q.    Would you agree that the goal of
3    interrogation is to learn what the suspect
4    knows?
5          A.    Yes.
6          Q.    In that connection isn't it true
7    that the Suffolk County Police Department as
8    with most departments across the country by
9    1988, made it a practice of holding back
10   certain details about a crime from the press
11   and the public when reporting a homicide?
12         A.    Yes.
13         Q.    And the reason for doing that was,
14   in part, to be able to assess the information
15   that a suspect provides in interrogation,
16   right?
17         A.    That's correct.
18         Q.    Was it understood in 1988 by you
19   and your officers in the homicide department
20   that it was critically important during an
21   interrogation to use open-ended questions?
22         A.    At times.  There are other times
23   you might, as you are closing in on
24   interrogation, that you will more directly
25   confront someone.



Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

ESQUIRE

59

                        J. McELHONE
1
2        Q.     Leaving aside confronting someone
3    with guilt, let me be a little bit more
4    specific.
5              Was it understood by you and the
6    detectives under your command in 1988 that it
7    was critically important for a detective never
8    to supply information about the crime to a
9    suspect that the suspect has not already told
10   you about?
11       A.     Never is a very strong word.
12   There might be something you would do, but if
13   it is all you had, you would want to hold it
14   back.
15       Q.     Because you want the suspect to
16   offer you guilty knowledge?
17       A.     Yes.
18       Q.     And if a police officer transmits
19   those nonpublic details in the phrasing of the
20   question, you can't assess whether that is
21   guilty knowledge or not when the suspect gives
22   it back to you?
23       A.     That's correct.
24       Q.     And that's one of the most
25   important ways to assess the reliability of a



ESQUIRE

Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

Case 2:09-cv-01207-JS-AYS  Document 184-2  Filed 08/17/16  Page 61 of 255 PageID #: 3172

                                                              60

1                    J. McELHONE
2    confession, right?
3         A.    If they express something that
4    only you know and he knew, the murderer would
5    know, yes, that would be very important.
6         Q.    As a result, was it understood by
7    you and the detectives under your command in
8    1988 that, as important as it was not to feed
9    or leak nonpublic information to the suspect
10   in the way you are asking the question, it was
11   equally important to accurately document how a
12   confession was elicited?
13        A.    Yes.
14        Q.    So, for example, if an officer did
15   provide nonpublic information to a suspect in
16   the form of the question, that should be
17   documented for those who are going to be
18   assessing the reliability of the confession
19   later on?
20        A.    I would agree with that, but I
21   don't know what you are talking about
22   document.  You wouldn't interrupt the flow
23   that you have going in conversation if you
24   will with a suspect to write everything down,
25   but immediately right afterwards or if there



Toll Free: 800.944.9454
Facsimile: 212.557.5972

ESQUIRE

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

61

1                    J. McELHONE

2    is a second person involved, they would note

3    that.

4          Q.    Would you agree that a confession

5    in which a suspect provides nonpublic

6    information about a crime in response to an

7    open-ended question is much more reliable

8    evidence of guilt than a confession in which

9    police gave the suspect nonpublic facts in the

10   phrasing of the question?

11         A.    I would agree with that.

12         Q.    Because if the police feed or leak

13   information of a nonpublic nature, you just

14   don't know whether the suspect had the guilty

15   knowledge or whether they learned it from the

16   police?

17         A.    Again, that is not absolute,

18   though.  There might be a time you take a

19   fingerprint, for example.  You wouldn't tell

20   the public we have a fingerprint on that, but

21   if you have a suspect there and he is denying

22   anything, you go, well, why do we have your

23   fingerprint on the scene.

24              You supply nonpublic information

25   but you are also guiding the interrogation



ESQUIRE

Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

John McElhone                                    December 2, 2011

                                                                    62

1                        J. McELHONE
2    into the area you want to take it.
3          Q.      So there might be some categories
4    of information you can use to confront --
5          A.      To let the suspect know that --
6          Q.      You've got something on him?
7          A.      That I had something, yeah.  You
8    wouldn't be here if I didn't.
9          Q.      Even in situations where you might
10   confront a suspect with evidence, whether you
11   you have the evidence or not, by the way,
12   right?
13         A.      That's correct.
14         Q.      You can lie.
15         A.      Yeah.
16         Q.      You still are holding back some
17   critical details so that you can assess the
18   reliability of what you are getting from the
19   suspect?
20         A.      That would be a very good tactic.
21         Q.      And it is a critically important
22   tactic if you are going to be able to assess
23   the reliability of an ultimate confession?
24         A.      Yes.
25         Q.      And these were generally accepted


ESQUIRE

Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

63

```
 1              J. McELHONE
 2   practices in 1988?
 3        A.    Again, you are talking about
 4   homicide detectives.  There's general service
 5   detectives.  They have a track record, you can
 6   know that they know what they are doing, yeah.
 7        Q.    And you took it upon yourself to
 8   make sure that the detectives in the homicide
 9   unit under your command understood this in
10   particular, right?
11        A.    Yes.
12        Q.    Particularly amid all the turmoil
13   that was going on at the time?
14        A.    Again, we provided training from
15   that seminar that I talked to you about.  We
16   had the Reid School of interviewing and
17   interrogation come to the department several
18   times, and many, if not all, of the detectives
19   attended that course; another four-day course
20   I believe.
21        Q.    And one of the elements of the
22   Reid School training is, in fact, holding back
23   certain information and -- from the press and
24   the public, holding it back during an
25   interrogation so that if the suspect offers it
```



Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

64

                    J. McELHONE
1
2    during the questioning, you know that is
3    evidence of guilty knowledge?
4         A.    Again, you are presuming that we
5    have something that we are holding back.
6    Sometimes you don't really have much more than
7    what was out there, but it depends on each
8    case, but if you have something you would not
9    divulge it, if you definitely wanted to find
10   out if that person had some knowledge of that
11   case by having that piece of information that
12   wasn't publicly available.
13        Q.    Would you agree that even after a
14   confession is elicited it, it remains
15   important to assess the reliability of that
16   confession?
17        A.    Try to corroborate whatever
18   details you have, absolutely.
19        Q.    A detective's job is not done once
20   there is a confession, is that fair to say?
21        A.    No.
22        Q.    Why is corroboration of a
23   confession important?
24        A.    It makes the confession much more
25   reliable.  They tell you a detail that you



ESQUIRE

Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

Case 2:09-cv-01207-JS-AYS   Document 184-2   Filed 08/17/16   Page 66 of 255 PageID #: 3177

65

1                    J. McELHONE
2    come to learn later gets supported by another
3    piece of independent evidence.
4          Q.    Would you agree that it was part
5    of your role as the CO of homicide to insure
6    that confessions your detectives elicited were
7    reliable?
8          A.    Again, that's an area where the
9    sergeant is there on the scene and, again I'm
10   talking to the sergeant or the detective
11   later.
12                Yeah, if something troubled me
13   about what was going on there, I would
14   definitely address it, but otherwise I would
15   rely on what the sergeant was telling me and
16   what the detective was telling me.
17         Q.    Is it fair to say that given the
18   turmoil that was going on between '85 through
19   '87 when you took command, into 1988, you, as
20   the commanding officer of homicide, paid
21   particular attention to the reliability of
22   confessions?
23         A.    I reviewed the case, all of the
24   cases and if there was a confession in the
25   case, I would look for corroborating evidence



ESQUIRE

Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

Case 2:09-cv-01207-JS-AYS Document 184-2 Filed 08/17/16 Page 67 of 255 PageID #: 3178

66

1                      J. McELHONE
2    or talk to the detective, talk to the
3    sergeant, yes.
4          Q.     And direct the detective and the
5    sergeant to continue investigating even after
6    a confession?
7          A.     If it wasn't evident, yeah,
8    certainly
9          Q.     Any solid lead should be pursued?
10         A.     Absolutely.
11         Q.     Even if inconsistent with the
12   confession?
13         A.     Absolutely.
14         Q.     Did you see it as part of your
15   role in that connection to be asking yourself
16   and your subordinates, is this a reliable
17   confession?
18         A.     I would rely on -- usually a
19   confession is one on one.
20         Q.     Or two on one?
21         A.     Or two on one.
22                And I would rely on their
23   assessment of it, what do you think, you know,
24   absolutely, they would tell me, he only knew
25   something that they, you know, that we know



ESQUIRE

Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

67

                        J. McELHONE

1
2   and they don't know, the public, being not
3   publicly available.
4            So, yeah, I would talk to them and
5   pretty much rely on what their instincts are,
6   their tenure of having successfully or
7   unsuccessfully interrogated subjects.
8        Q.    So because you are not in the room
9   during the interrogation, you are forced to
10  rely on the after-the-fact reporting of the
11  detective who elicited the confession?
12       A.    Well, in '87 we had a procedure
13  that the subject confessed in writing, orally
14  first, then in writing, we would videotape it.
15  We would call the assistant district attorney
16  from the homicide bureau would come down and
17  he would sit down with the detective and the
18  suspect, and we would again go through the
19  confession and videotape that.
20           So I did review and I think we had
21  several of them where I reviewed the tapes of
22  the videotaped confessions, and, again, was a
23  method to assess the reliability of that
24  confession.
25       Q.    One value of videotaping a



Toll Free: 800.944.9454
Facsimile: 212.557.5972

ESQUIRE

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

68

                        J. McELHONE
1
2    confession is you know that the suspect
3    actually said it, right?
4          A.     Yes.
5          Q.     It is hard for a suspect who sees
6    himself on videotape confessing to say that
7    never happened, right?
8          A.     Right.
9          Q.     However, you didn't have any
10   practice in place during your tenure requiring
11   the interrogation itself to be videotaped, did
12   you?
13         A.     Until we obtain the consent of the
14   person who made the confession, the defendant,
15   we didn't videotape.
16         Q.     So there was no requirement that
17   the questions leading up to the confession be
18   documented on video?
19         A.     Unless they consented, it wouldn't
20   be on video.
21         Q.     But they are never asked for
22   consent to video until after they have already
23   confessed, orally and in writing?
24         A.     That's correct.
25         Q.     And that was the case in 1988?



ESQUIRE

Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

John McElhone                                    December 2, 2011

69

                            J. McELHONE

1

2         A.      Yes.

3         Q.      And as we discussed earlier, in

4    order to accurately assess whether a

5    confession is reliable, you really need to

6    know how it was generated, what the questions

7    were and how the answers were elicited, right?

8              MR. DUNNE:  I will object to the

9         form.  But go ahead, answer.

10        A.      I would have a written confession

11   at that point that I would be reading through,

12   that, along with the discussion I would have

13   with the detective or the detective sergeant,

14   would convince me it was a reliable

15   confession.

16        Q.      So you are really relying on the

17   reporting of your detective to tell you how it

18   went down?

19        A.      I'm second up in the chain, yes.

20        Q.      So because you need to rely on the

21   officer to accurately report to you, it is

22   important that the officers under your command

23   be truthful?

24        A.      I had to trust them.

25        Q.      You had to trust them?



ESQUIRE

Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

70

                        J. McELHONE

1

2        A.      Yes.

3        Q.      And you mentioned one of the

4   things that you relied on in deciding whether

5   you can trust them is their track record of

6   taking accurate confessions?

7        A.      Yes.

8        Q.      And presumably also their track

9   record of honoring constitutional rights of

10  suspects?

11       A.      Yes.

12       Q.      That would include Miranda rights

13  to counsel?

14       A.      Yes.

15       Q.      Advising them of their right to

16  counsel?

17       A.      Absolutely.

18       Q.      Not putting words in their mouths?

19       A.      Yes.

20       Q.      Accurately documenting if the

21  police leak or feed nonpublic information?

22  You are relying on them to do that?

23       A.      Yes.

24       Q.      And if it had come to your

25  attention that any of the detectives under



ESQUIRE

Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

Case 2:09-cv-01207-JS-AYS Document 184-2 Filed 08/17/16 Page 72 of 255 PageID #: 3183

71

                    J. McELHONE

1
2    your command hadn't always been scrupulous and
3    honest, you would need to pay even more close
4    attention in a case where they elicited a
5    confession, wouldn't you?
6          A.    It would have to be addressed,
7    yes.
8          Q.    It would be much harder to rely on
9    them to truthfully report, there is no problem
10   with this confession, he did it, right?
11         A.    Yes.
12         Q.    So with a confession, one of the
13   things that you did and that you required your
14   detectives and the sergeant to do in assessing
15   the reliability, was to look for independent
16   corroboration?
17         A.    Yes.
18         Q.    You always wanted to ask if the
19   confession was consistent with the known
20   objective evidence?
21         A.    Yes.
22         Q.    You would also ask whether the
23   confession leads you to any new evidence,
24   right?
25         A.    Yes.



ESQUIRE

Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

Case 2:09-cv-01207-JS-AYS   Document 184-2   Filed 08/17/16   Page 73 of 255 PageID #: 3184

72

                      J. McELHONE

1
2        Q.    You would ask whether the
3   confession included true information that,
4   while known to the police, couldn't have been
5   known to anyone else except the perpetrator?
6        A.    If that was available, yes.
7        Q.    As a supervisor you would have
8   been concerned if your homicide detectives
9   were feeding or leaking nonpublic information
10  to a suspect during an interrogation, wouldn't
11  you?
12       A.    Again, as I pointed out earlier,
13  there might be times in that interview,
14  interrogation that you might want to present
15  the fact to let them know that you know what
16  was going on.
17            I gave you a hypothetical on a
18  fingerprint.  There are times you might, if
19  the person is just stonewalling, going I
20  wasn't there, well, whatever, you might want
21  to just give them some little piece of
22  information to let them know you are on the
23  right track, you are here for a reason.  It is
24  not an absolute, you know, you would never
25  provide some little piece of information just



Toll Free: 800.944.9454
Facsimile: 212.557.5972

ESQUIRE

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

John McElhone                                  December 2, 2011

73

1                    J. McELHONE
2   to let someone know that you know they were
3   there.
4           Q.    You know they were there?
5           A.    Yes.
6           Q.    Because you have evidence that
7   they were there?
8           A.    Yes.
9           Q.    However, you wouldn't, for
10  example, expose, in a hypothetical case where
11  the killer left a calling card, the ace of
12  spades on the body, right, that's a critical
13  detail?  Okay.  That's the kind of thing you
14  would want to hold back to see if you get out
15  of the suspect, right?
16          A.    Yes.
17          Q.    It is not the kind of thing that
18  an innocent person could guess had happened
19  unless it were made public, right?
20          A.    Right.
21          Q.    So that's the kind of detail that
22  the police department would hold back in part
23  to be able to assess the reliability of a
24  confession, right?
25          A.    Yes.



ESQUIRE

Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

74

                        J. McELHONE

1

2       Q.      Because it was known in 1988 and

3   earlier that sometimes innocent people confess

4   to things they didn't do, right?

5       A.      That's a phenomenon in criminal

6   justice circles that that does happen, yes.

7       Q.      And you and your subordinates in

8   the homicide department understood that it was

9   part of your role to guard against false

10  confessions?

11      A.      Yes.

12      Q.      In fact, allegations about false

13  confessions having been taken by homicide

14  detectives were part of what was creating the

15  turmoil in the mid '80s?

16      A.      Yes.

17      Q.      So when you said earlier that you

18  relied on homicide detectives in assessing the

19  reliability of a confession, you would rely on

20  them to accurately tell you how the

21  interrogation went?

22      A.      Yes.

23      Q.      You would rely on them to take

24  accurate notes?

25      A.      Yes.



ESQUIRE

Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

75

                        J. McELHONE

1

2          Q.    You would rely on them to tell you

3     if they inadvertently or intentionally fed or

4     leaked nonpublic information, right?

5          A.    I would rely on them.  I don't

6     know if it would come out right away.  It

7     might be something we would talk about later.

8          Q.    Because you would continue

9     investigating even after a confession?

10         A.    After reading the confession, if

11    things had to be corroborated if there was

12    other evidence that had to be explored, yes.

13         Q.    Was it also part of your

14    responsibility as CO to authorize arrests?

15         A.    No.

16         Q.    Was it part of your responsibility

17    to review the circumstances of arrests?

18         A.    Yes.

19         Q.    And is it fair to say that it was

20    part of your responsibility to review each

21    case in which a homicide detective elicited a

22    confession under your command?

23         A.    Yes.

24              MS. CORNWALL:  Let's take a

25         five-minute break.



Toll Free: 800.944.9454
Facsimile: 212.557.5972

ESQUIRE

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

                                                              76

 1                    J. McELHONE

 2              MR. DUNNE:  Sure.

 3              (Recess:  11:37-11:45 a.m.)

 4    BY MS. CORNWALL:

 5         Q.    I just what to clarify a couple of

 6    things that you mentioned in our first session

 7    this morning.

 8              Do you remember we spoke about it

 9    being clear to the homicide detectives when

10    you took command, the importance of taking and

11    keeping accurate notes and reports?

12         A.    Yes.

13         Q.    And you said it was clear to them.

14    How was it made clear to them?

15         A.    Again, verbally from me, daily by,

16    from their sergeants.

17              Again, they were new sergeants

18    that were involved here.  Bob Misegades was

19    still there from years, but Bob Doyle, Kevin

20    Cronin, Bill Pepper, they were all sergeants I

21    worked with in my career and they were all

22    very clear and the message was given out from

23    me through them.

24              And also again this homicide

25    seminar we had in-house where we brought them



Toll Free: 800.944.9454
Facsimile: 212.557.5972

ESQUIRE

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

77

                    J. McELHONE
1
2    in from New York City and, you know, he
3    hammered on it every couple of days, you know,
4    every day.
5         Q.    Now, you said that you worked with
6    Sergeants Cronin, Pepper and Doyle --
7         A.    Yes.
8         Q.    -- previously in other units?
9         A.    Actually, Pepper and Cronin in the
10   Third Squad detectives.  Doyle, we were cops
11   together in the Fourth but we just had a
12   passing, we knew who each other were.  He had
13   a good reputation in the department.  That's
14   why I brought him in.
15        Q.    What was his reputation in the
16   department?
17        A.    He had just finished a very
18   intense case with Scott Caroll, that serial
19   burglary 1 suspect where he was entering homes
20   and raping women, and I think he set a
21   precedent in the state with a voice ID, very
22   thorough, very good detective sergeant.
23        Q.    And you mentioned you brought him
24   in?
25        A.    Yes.



ESQUIRE

Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

John McElhone                              December 2, 2011

78

                        J. McELHONE
1
2       Q.    So fair to say it was your
3   decision that he be --
4       A.    Yeah.  Again, the I. concurred,
5   the Inspector Murphy, and I think even Chief
6   Feldman, we all agreed that would be a great
7   thing.
8       Q.    And did you also bring in Cronin
9   and Pepper?
10      A.    Cronin was there already.  We had
11  worked together.
12            And Sergeant Pepper was a
13  detective sergeant.  He and I were on
14  different teams in the Third but we overlapped
15  quite a bit so I knew of him.  I think he was
16  only there for about a year.  I think
17  Inspector Murphy brought him in when he
18  assumed command of the homicide bureau for
19  that tumultuous period during '85.
20      Q.    So Sergeant Pepper was already in
21  homicide when you --
22      A.    Yes, but previously maybe a year.
23      Q.    Sergeant Doyle is the one you
24  brought in of the four --
25      A.    Yes.



ESQUIRE

Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

John McElhone                                    December 2, 2011

79

1                            J. McELHONE
2          Q.      -- based on his reputation?
3          A.      Later down the line Mr. Gotties
4    retired.  Doyle took team 3 and I brought in
5    Sergeant Horvath, George Horvath was the
6    fourth sergeant.  And I, again, I had a lot of
7    latitude who would fit and I had to get
8    approval, but they pretty much gave me my
9    choice all the time.
10         Q.      And you brought Doyle in based on
11   his reputation?
12         A.      Yes.
13         Q.      And your belief that he was very
14   thorough?
15         A.      Yes.
16         Q.      And a very good investigator?
17         A.      Yes.
18         Q.      And supervisor?
19         A.      Probably the best out there at the
20   time.
21         Q.      And why did you bring in Horvath?
22         A.      We worked together in the second
23   precinct.  He had come into the Fifth Squad
24   where I was working previously.  I think we
25   almost passed each other there.  But a



ESQUIRE

Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

80

```
1                      J. McELHONE
2     willingness to want to come up there, and a,
3     you know, another good worker I thought.
4          Q.    When you said you made it clear to
5     the detectives in homicide when you came on
6     board that they needed to be taking accurate
7     notes and reports, was there some kind of
8     squad-wide sit-down when you took over in
9     which you talked about the mission and how
10    things might change?
11         A.    Well, I think we used the opening
12    of that training seminar that I think I said
13    it was only a week after I got there that
14    happened, by that time I had gotten to sit
15    down and have a brief conversation with most
16    of the them and then at the beginning of that
17    said we had everybody come in, there is an
18    overtime consideration, but you can change it
19    to tour for training which is one of the
20    contract provisions, so I could get everybody
21    into one room.  And we did it the day that we
22    had Vernon Geberth there to present a one week
23    school on homicide investigation.
24         Q.    Did you have a role in making sure
25    that training seminar took place?
```



ESQUIRE

Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

John McElhone                                    December 2, 2011

81

                        J. McELHONE

1

2        A.      I think that was already put in

3    place when I got there.  One of the first

4    conversations I had with Inspector Murphy was,

5    I had this set up, we can do it next week and

6    I just went from there.

7                What I did set up was, I met with

8    the medical examiner, Charles Hirsch, and he

9    has also a background in academia.  He likes

10   to teach, as well as be the medical examiner.

11   And we arranged to have a once-a-month session

12   where he would sit down with the whole squad

13   and present, one month would be on stabbing

14   wounds, one month would be on shooting, one

15   month would be on sex crimes.  And from his

16   perspective what the medical examiner sees and

17   what we should expect to see on our scenes.

18   It was very helpful.

19       Q.      Was that part of your goal to

20   educate homicide detectives?

21       A.      Training was a very big part of

22   what I thought we should do, formal training.

23   Most of the them heard it before from

24   somewhere else, but it is coming from our

25   medical examiner, coming from an outside



Toll Free: 800.944.9454
Facsimile: 212.557.5972

ESQUIRE

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

John McElhone                                    December 2, 2011

                                                              82

1                        J. McELHONE
2       source and from that it became, I think a
3       little bit more emphasis put on it.
4            Q.    Is it fair to say that before you
5       took command, training for homicide detectives
6       was basically on the job?
7            A.    Basic investigators course that
8       the academy provides, but by the time you get
9       to homicide, again you have a track record,
10      you have, you know --
11           Q.    You mentioned the track record
12      earlier and I believe you said one of the
13      things that you looked at to decide how much
14      you could rely on a detective to accurately
15      report whether a confession was reliable was
16      their track record of successful confessions
17      in the past?
18           A.    Yes.
19           Q.    What is a successful confession?
20           A.    Were they able to elicit a
21      confession in a legally accepted manner.
22           Q.    Was part of your thinking about
23      whether the track record was, of taking
24      successful confessions, whether they were
25      reliable confessions?



ESQUIRE

Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

83

1                        J. McELHONE

2          A.     Yes.

3          Q.     Whether they were true confessions

4     as opposed to false confessions?

5          A.     I don't recall ever encountering a

6     false confession in the police department.

7          Q.     Never?

8          A.     Never.

9          Q.     So when you agreed earlier that

10    you were familiar with the phenomenon of false

11    confessions, what was your understanding of

12    this issue?

13         A.     From training that I had received.

14    I went to the FBI academy in 1987.  I was

15    there for three months and I had a forensics

16    course and one of them was on death

17    investigation and there was talk and

18    discussion about false confessions in and

19    around the country, basically.  Investigators

20    from around the world, actually.  My roommate

21    was from Northern Ireland, but, you know,

22    there was discussion of false confessions at

23    that point, the phenomenon that exists.

24         Q.     And was that something you were

25    looking at in determining whether a detective



ESQUIRE

Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

84

1                    J. McELHONE
2    had been successful in eliciting a confession?
3         A.    If I had heard anything like that
4    or saw one like that, yeah, I would have been
5    very concerned about that.
6         Q.    Or if, for example, a confession
7    could not be corroborated, that would cause
8    you some concern?
9         A.    Again, you know, we are not CSI.
10   We don't always have all the information.  So,
11   you know, a lot of times certain things can't
12   be corroborated, you know, they have to be, or
13   they are corroborated generally time-wise or,
14   you know.
15        Q.    What is general corroboration,
16   what do you mean by that?
17        A.    Well, it wouldn't be as specific
18   as, you know, that the ace of spades as you
19   pointed out or anything like that.  You don't
20   have cases like that very often, if at all,
21   you know.
22        Q.    But certainly detectives should
23   always have been seeking out corroboration,
24   right?
25        A.    To the point you are in an



Toll Free: 800.944.9454
Facsimile: 212.557.5972

ESQUIRE

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

John McElhone                                December 2, 2011

85

                        J. McELHONE
1
2    interrogation, you probably have enough, you
3    have enough to make reasonable cause to
4    believe you wouldn't have the person in
5    custody.  At that point you have certain
6    evidence that leads you to believe that this
7    person has committed the crime.  So that part
8    you would have.
9         Q.    And as we --
10        A.    I don't know if any of it would be
11   publicly available at that point.
12        Q.    And you agreed earlier, did you
13   not, that even after a confession is elicited
14   it is important to continue investigating?
15        A.    Yes, there are avenues that have
16   to be -- or weapon used or whatever, it has to
17   be followed up.
18        Q.    It is important to continue
19   investigating, can the confession be
20   corroborated?
21        A.    Yes.
22        Q.    Are there open leads to be
23   followed?
24        A.    As a result of that confession,
25   yes.



ESQUIRE

Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

86

1                    J. McELHONE

2        Q.    Either as a result of or

3    inconsistent with, right, that still had to be

4    pursued?

5        A.    Yes.

6        Q.    So you always had to explore

7    whether a confession could be corroborated.

8    It wasn't always possible to get corroboration

9    but you always had to look for some?

10       A.    I agree.

11       Q.    And would you have had a concern

12   if a confession was inconsistent with the

13   objective evidence?

14       A.    Yes.

15       Q.    You would have a concern about the

16   reliability of that confession, right?

17       A.    Yes.

18       Q.    And it would prompt you to seek

19   out or to insure that the detective and the

20   sergeant kept investigating, right?

21       A.    Tried to explore why the

22   inconsistency, yes.

23       Q.    That's when corroboration becomes

24   all the more important?

25       A.    Yes.



Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

Case 2:09-cv-01207-JS-AYS   Document 184-2   Filed 08/17/16   Page 88 of 255 PageID #: 3199

87

```
 1                    J. McELHONE
 2        Q.    And following open leads becomes
 3   all the more important?
 4        A.    Yes.
 5        Q.    Because if your confession is not
 6   reliable, you may have a guilty person still
 7   on the loose?
 8        A.    That's possible.
 9        Q.    And that's one of the worst
10   nightmares that could face a police
11   department?
12        A.    Sure.
13        Q.    Is the false confession and the
14   arrest of an innocent person for a crime they
15   didn't commit?
16        A.    That would be correct.
17        Q.    I would like to turn now to ask
18   you a little bit about this period of turmoil
19   that you referred to that predated your
20   assuming command of the homicide unit, all
21   right?
22        A.    All right.
23        Q.    In the '70s, the late '70s, you
24   were a patrol officer?
25        A.    Yes.
```



ESQUIRE

Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

88

                        J. McELHONE
1
2        Q.    You lived in Suffolk County during
3   your entire career, I take it?
4        A.    Yes.
5        Q.    Are you a Newsday reader?
6        A.    Yes.
7        Q.    Do you read the New York Times?
8        A.    Occasionally.
9        Q.    Were you a Newsday reader in the
10  '80s?
11       A.    Yes.
12       Q.    Do you have a subscription?
13       A.    Yes.
14       Q.    It comes every day?
15       A.    To this day.
16       Q.    And occasionally you read the
17  Times?
18       A.    Yes.
19       Q.    So were you aware of the
20  allegations that came out in the late 1970s
21  that homicide detectives had been using
22  physical force to extract confessions?
23       A.    Through the newspaper as you point
24  out and media accounts, yes, I'm aware of
25  that.



ESQUIRE

Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

89

                        J. McELHONE
1
2       Q.      You were aware of those
3  allegations?
4       A.      Yes.
5       Q.      And you were aware that criminal
6  suspects were alleging they had been beaten
7  up --
8       A.      Yes.
9       Q.      -- in interrogation rooms?
10      A.      Um-hum.
11      Q.      And if that had happened, that
12  would have been a serious concern, obviously,
13  right?
14      A.      Yeah.
15      Q.      You were aware in the late '70s of
16  the allegations of phone booking, that
17  homicide detectives and others had used phone
18  books to beat suspects so they wouldn't leave
19  marks?  Are you aware of those allegations?
20      A.      I might have read that somewhere.
21      Q.      Maybe in Newsday?
22      A.      Yeah, probably.
23      Q.      And that's a very serious
24  allegation?
25      A.      Um-hum.



ESQUIRE

Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

90

1                    J. McELHONE

2        Q.     That's a yes, just for the record?

3        A.     Yes, I'm sorry.

4        Q.     Were you aware that the, that

5   these allegations going back to the late '70s

6   were serious enough that the Suffolk County

7   Bar Association did an investigation?

8        A.     I had heard about that as a patrol

9   officer.  You know, people are talking about

10  what's going on and reading the paper, yeah, I

11  had heard about it.

12       Q.     Did that cause you any concern as

13  a member of this department?

14       A.     Personally, no.  I knew --

15       Q.     It didn't have anything to do with

16  you?

17       A.     Yes, but it was something we

18  weren't all very proud of, we always felt like

19  people were looking over their shoulder at us.

20       Q.     And if those things had been going

21  on, that would be a serious problem?

22       A.     Yes.

23       Q.     Were you aware that in late 1985

24  Judge Stuart Namm wrote a letter to

25  then-Governor Cuomo asking for the appointment



ESQUIRE

Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

John McElhone                                    December 2, 2011

91

                        J. McELHONE
1
2    of an independent commission to investigate
3    whether Suffolk County detectives had
4    committed perjury?
5         A.    I was aware that a letter was
6    written by Judge Namm, yeah.  I think I
7    learned about it when I was assigned to the
8    homicide squad, I was provided a copy of it,
9    look at that allegation, whatever.
10             MS. CORNWALL:  Can we mark that as
11        9, please.
12                  (Plaintiff Exhibit 9, letter
13                  from Judge Stuart Namm to Governor
14                  Cuomo marked for identification, as
15                  of this date.)
16        Q.    Showing you what's been marked as
17   Exhibit 9, do you recognize that as Judge
18   Namm's letter to Governor Cuomo from late 1985
19   asking for the appointment of an independent
20   investigative body?
21        A.    I don't recall it being this many
22   pages, but, yes, I'm aware of that letter was
23   written.  I'm sure this is it.
24        Q.    Now, you said I believe that you
25   were actually provided a copy of it for the



ESQUIRE

Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

John McElhone                                    December 2, 2011

92

                              J. McELHONE
1
2    first time when you assumed command of
3    homicide, is that right?
4         A.    Yes.
5         Q.    That was in February of 1987?
6         A.    Yes.
7         Q.    Who gave you the copy?
8         A.    Inspector Murphy, Tom Murphy.
9         Q.    Do you remember the context?
10        A.    No.  We were talking about the SIC
11   commission was investigating and this was the
12   impetus of them coming to investigate
13   narcotics and homicide primarily, but other
14   aspects of the department and then were
15   talking about with the shortcomings that were
16   detailed in this letter and in the SIC report.
17              I don't think I had the report
18   then in '87.  I don't know if it was written
19   at that point but I saw it at some time later.
20              MS. CORNWALL:  This will be 10.
21              (Plaintiff Exhibit 10,
22              Resolution of the State of New York
23              Commission of Investigation
24              authorizing an investigation into
25              the Suffolk County Police



ESQUIRE

Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

93

1                    J. McELHONE
2              Department and others, adopted as
3              of January 9th of '86 marked for
4              identification, as of this date.)
5         Q.    See if we can help with the time
6    line a little bit.  I'm handing you Exhibit
7    10.
8         A.    Okay.
9         Q.    Which is the Resolution of the
10   State of New York Commission of Investigation
11   authorizing an investigation into the Suffolk
12   County Police Department and others, adopted
13   as of January 9th of '86.
14        A.    Um-hum.
15        Q.    Does that refresh your
16   recollection of when the actual investigation
17   was authorized and that it began sometime
18   thereafter?
19        A.    Yes.
20        Q.    So the hearings themselves, the
21   SIC hearings had been going on before you
22   assumed command of homicide.  Were you aware
23   of that?
24        A.    They were initiated obviously in
25   '86.  I was not assigned there then.



ESQUIRE

Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

94

1                    J. McELHONE
2        Q.    As a Newsday reader, the public
3    hearings were reported in Newsday, you became
4    aware of what was going on?
5        A.    Yes.
6        Q.    And there was talk around the
7    department, right?
8        A.    Exactly.
9        Q.    This was a big deal?
10       A.    Yes.
11       Q.    Were you also aware that in
12   December of 1986 Newsday ran a series called
13   The Confession Takers?
14       A.    Yes.
15       Q.    Did you read that --
16       A.    Yeah.
17       Q.    -- when the paper came out?
18       A.    Yes.
19       Q.    And was there talk about that in
20   the department?
21       A.    Yeah, a bit.
22       Q.    In December of '86 you were --
23       A.    In the Fifth Squad.
24       Q.    -- in the Fifth Squad as a
25   detective lieutenant CO?



ESQUIRE

Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

95

1                    J. McELHONE

2        A.    Yes.

3        Q.    This was just predating your

4   taking over as commanding officer of homicide?

5        A.    That's correct.

6        Q.    And remind me when you got the

7   phone call from, was it Captain Feldman?

8        A.    Chief.

9        Q.    Chief Feldman, thank you.

10       A.    About a week before I was

11   assigned.  So it would be somewhere around

12   middle of February I guess.

13       Q.    Of 1987?

14       A.    Yes.

15       Q.    Just a month or two after The

16   Confession Takers series came out?

17       A.    Okay.

18                    (Plaintiff Exhibit 11, copy of

19                    The Confession Takers newspaper

20                    story marked for identification, as

21                    of this date.)

22       Q.    I'm handing you a copy of The

23   Confession Takers and I'm just going to ask

24   you some questions to refresh your memory

25   about some of the things that were reported in



Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

96

                    J. McELHONE

1

2    the series that you read about when they were

3    published.  And I'm happy to give you page

4    numbers if you would like to follow along.

5         A.    Okay.

6         Q.    On the very first page it reports

7    that Newsday had done a year long study

8    finding that suspects made incriminating

9    statements in 94 percent of homicide cases

10   since 1975.  Do you see that?

11        A.    Yes, I do.

12        Q.    And it goes on to say that experts

13   believe that percentage of confessions is

14   unparalleled around the country.

15        A.    Um-hum.

16        Q.    Were you aware when you took over

17   the homicide unit of its extraordinarily high

18   confession rate?

19        A.    From this article, yeah.

20        Q.    From the article you were aware of

21   it?

22        A.    Yeah.

23        Q.    And is this something that you

24   talked about with Chief Feldman or inspector,

25   Detective Inspector Murphy in connection with



ESQUIRE

Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

97

```
 1                      J. McELHONE
 2  taking over?
 3          A.    No.
 4          Q.    Further down on the first page,
 5  Newsday reports, quote:
 6               "In more than a quarter of the
 7          cases in the past five years, the
 8          detectives testified that suspects gave
 9          only oral statements making it difficult
10          to corroborate the police accounts.  In
11          others, police testified that suspects
12          made oral statements implicating
13          themselves in ways that went beyond
14          their signed statements.  In nine cases
15          police offered confessions that suspects
16          refused to sign."
17               Do you see that?
18          A.    Yes.
19          Q.    And you read that when it was
20  published, right?
21          A.    I presume, yeah.
22          Q.    As a supervisor, given the
23  importance you placed on accurate and thorough
24  documentation, would it have caused you
25  concern later on when you were the CO of
```



**ESQUIRE**

Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

John McElhone                                    December 2, 2011

                                                                    98

                          J. McELHONE

1        homicide, if police were alleging that

2        suspects made additional statements above and

3        beyond what was in the signed confession?

4            A.    I would want to see it documented

5        somewhere, absolutely.

6            Q.    And in a case where you have a

7        suspect who is confessing, signing their name

8        saying this is my confession, would it cause

9        you concern if police are attributing

10       additional incriminating statements to that

11       suspect that didn't get reduced to writing in

12       the written confession?

13           A.    I would want to see it documented,

14       yes.

15           Q.    When you say documented, what do

16       you mean?

17           A.    At least in their notes, but

18       sometimes, and I remember a couple of

19       occasions we would go and take another

20       confession from somewhere after they have

21       thought about it or maybe somebody else has

22       approached them to say, how come, you know,

23       what about, where did you put the gun, where

24       did you leave the knife.  And then they will



Toll Free: 800.944.9454
Facsimile: 212.557.5972

ESQUIRE

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

John McElhone                            December 2, 2011

99

                    J. McELHONE

1

2     add that and take another confession or an

3     addendum or you would report it somewhere.

4           Q.    In a case where you don't have a

5     second confession, in a case where you have

6     one written confession signed by a cooperating

7     suspect --

8           A.    Um-hum.

9           Q.    By which I mean a suspect who is

10    cooperative in an interrogation and admits

11    their guilt and signs a full confession?

12          A.    Um-hum.

13          Q.    Would it cause you any concern if

14    police attribute other incriminating

15    statements to that suspect that the suspect

16    didn't acknowledge by signing it?

17          A.    I would question how that came to

18    be and make sure that it was documented and,

19    you know, passed along to the district

20    attorney's office.

21          Q.    Well, of what value is a police

22    note or a police report saying the suspect

23    told me X, if the suspect has signed a

24    detailed confession that doesn't include fact

25    X?



Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

ESQUIRE

John McElhone                                    December 2, 2011

100

1                        J. McELHONE

2          A.    There are instances, as I pointed

3    out before, that after thinking about it

4    awhile, a person is in our custody a while

5    longer, other information will come out and

6    decision has got to be made, do you have it

7    written, reduced to writing and have him sign

8    it or a lot of times a uniform officer taking

9    him to court or something else where something

10   comes out, an additional admission that now I

11   would like to see reduced to writing,

12   incorporated, discuss the circumstances where

13   it was given and then include it in the case.

14         Q.    And if a suspect makes an

15   admission, your ideal situation is that the

16   suspect signs a confession acknowledging

17   guilt?

18         A.    That would be ideal and go to a

19   video, that would be perfect.

20         Q.    And going to video.

21               So in a situation where you have a

22   cooperative suspect who is giving it all up

23   and signing a confession, but where that

24   confession is inconsistent with the forensic

25   facts, for example, and then a police officer



ESQUIRE

Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

101

1                    J. McELHONE

2      produces some time later a note or a report

3      claiming that that suspect made an

4      incriminating statement resolving the

5      discrepancy with the evidence, does that cause

6      a concern for you?

7                    MR. DUNNE:   Is this a

8           hypothetical?

9           A.    I think you have taken three steps

10     there.

11                   MS. CORNWALL:   Yes, it is.

12          A.    But what you said I would agree

13     with you.

14          Q.    It would be a concern?

15          A.    Initially the confession was

16     corroborated; now it is not.

17          Q.    It was not corroborated.

18          A.    Was not corroborated, now we have

19     new information that is corroborated?

20          Q.    That is only in a police report

21     but you don't have the suspect signing off on

22     it?

23          A.    That could happen.

24          Q.    That could happen.  Would it cause

25     you a concern --



ESQUIRE

Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

102

J. McELHONE

1

2    A.    I would definitely pursue it a
3    little further and say how did that happen and
4    what were the circumstances and incorporate
5    that into whatever we used to memorialize that
6    statement.
7    Q.    You should also continue to be
8    assessing the reliability --
9    A.    Yeah.
10   Q.    -- of information that comes to
11   your attention, right?
12   A.    Yes.
13   Q.    On the second page of The
14   Confession Takers, there is a quote from John
15   Buonora who was chief felony prosecutor for
16   Suffolk County, saying that the emphasis on
17   confessions leads homicide detectives to
18   overlook other evidence, and he is quoted as
19   saying:
20        "Their success rate is probably
21        not as good as it should be because of
22        their reliance solely on the confession
23        and the lack of methodical detective
24        work."
25        Do you agree with the



ESQUIRE

Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

103

1                     J. McELHONE
2    characterization that the homicide unit had an
3    overreliance on confessions in 1987 to '89?
4          A.    No.
5          Q.    Was it your experience that
6    homicide detectives were equally thorough in
7    pursuing objective evidence, forensic
8    evidence, physical evidence, as they were
9    obtaining confessions?
10         A.    Yes.
11         Q.    Was it your experience that
12   homicide detectives would pursue independent
13   evidence vigorously even if it contradicted a
14   confession?
15         A.    I was sure they would do that.
16         Q.    Well, that's what they should have
17   done, right?
18         A.    Yes.
19         Q.    Well, they didn't do it in every
20   case, did they?
21         A.    Well, you are talking about '85.
22         Q.    I'm asking in your tenure.
23         MR. DUNNE:  Let's clarify the
24         record.  Exhibit 11 refers to an article
25         identified as December of '86.



ESQUIRE

Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

John McElhone                    December 2, 2011

104

1                J. McELHONE

2           MS. CORNWALL:  Correct.

3           MR. DUNNE:  And that also is the

4      quote from Mr. Buonora.  Okay.

5      Q.    Did you see it as part of your job

6  when you took over the homicide unit in 1987

7  to make sure that detectives were not as

8  reliant on confessions as they had been

9  previously?

10      A.    I never downgraded confessions.

11  It is a very important part of any criminal

12  case.  If it was legally obtained, I stressed

13  on it, it had to be legally obtained, that we

14  would not take it to the exclusion of any

15  other theory or evidence, but it was certainly

16  something I never discouraged.  It was to me

17  the mark of a perfect case, a good case, you

18  had physical evidence, you have a suspect.

19  You have a legally obtained confession and

20  hopefully it went to as far as a videotaped

21  confession and then it was like all you could

22  ask for.

23      Q.    So a perfect case would include

24  both a confession and corroboration?

25      A.    Yes.



Toll Free: 800.944.9454
Facsimile: 212.557.5972

ESQUIRE

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

105

J. McELHONE

1

2     Q.     Did you take it as part of your
3 role to increase the focus on corroboration,
4 independent objective evidence, without
5 denigrating confessions?

6     A.     Specifically when I came on board,
7 I put more emphasis on the detective sergeants
8 in everything.

9     Q.     How so?

10     A.     When we went to a scene, I would
11 try to get to as many as I possibly could,
12 they would go to everyone.  If the lead
13 detective, for whatever reason, for interview
14 or interrogation, had to be removed from the
15 scene, the sergeant would then make sure that
16 another detective was assigned to recover
17 every piece of evidence that was possibly
18 there.  Other detectives in the team would go
19 out and interview witnesses if there were,
20 neighborhood canvasses or something, we had a
21 team there and if you needed more, one of the
22 reasons I was at the scene I will get you more
23 staff, you know, we're not going to overlook
24 anything.  This is a homicide case.

25     Q.     So under your command, officers



ESQUIRE

Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

106

1                    J. McELHONE
2    certainly shouldn't have been relying on
3    confessions to the exclusion of other
4    evidence?
5         A.    Not to the exclusion of other
6    evidence, no.  It is a package.  The whole
7    scene, all the physical evidence and if
8    obtainable, obviously a confession.
9         Q.    Further down on the second page of
10   this December 1986 Newsday report, there is a
11   reference to:
12            "Appeals court having struck down
13        ten suspect convictions because
14        confessions were improperly obtained
15        which was more reversals than from
16        Nassau and Westchester combined.
17        Defendants were acquitted or charges
18        were dismissed in 12 other cases where
19        questions were raised about the
20        credibility of police testimony, the
21        handling of physical evidence or the use
22        of inmates who provided testimony about
23        jailhouse confessions."
24            When you took over homicide were
25   you aware that so many homicide cases had been



ESQUIRE

Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

107

                        J. McELHONE

1

2    overturned based on problems in the

3    confessions?

4         A.    I actually wasn't.  From reading

5    this article I remember that there were a

6    number of them.  I didn't know that there was

7    that number even.

8         Q.    But when you assumed command, you

9    were aware that there had been some number?

10        A.    Yes.

11        Q.    Of reversals?

12        A.    Yes.

13        Q.    In homicide cases?

14        A.    Yes.

15        Q.    Because of problems in the way the

16   confessions were elicited?

17        A.    Yes.

18        Q.    And was that a concern of yours?

19        A.    Certainly.

20        Q.    As a result did you put additional

21   emphasis on the importance of taking a

22   reliable confession?

23        A.    Yes.  We had a training in that

24   area at the police academy, all detectives go

25   through a one-week course and part of that is



Toll Free: 800.944.9454
Facsimile: 212.557.5972

ESQUIRE

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

108

J. McELHONE

1
2   the right to counsel and Miranda and all of
3   the legal portions of that.  And then much
4   like with Dr. Hirsch where mentioned he came
5   in once a month to train everybody on a couple
6   of those sessions, I remember Mark Cohen
7   specifically from the DA's office and others
8   would come in and talk about Miranda because
9   it was evolving, as you know, too, in that
10  period about pending cases and lawyers and,
11  you know, a defendant who has a lawyer in one
12  case, but now he is a suspect in a murder, can
13  we, can't we.  That was one of the reasons why
14  also in the scene, this is something Ed
15  Jablonski, the head of the homicide bureau in
16  the DA's office, and I put together right on
17  the very first day, one of his DAs was going
18  to respond to every scene.  And so if there
19  was a question do we need a search warrant to
20  go further, is there a pending case here where
21  we can't talk to the suspect, they were
22  plugged in.  They were almost like a lead
23  detective, ADA was assigned from the scene.
24      Q.    So it sounds like you instituted a
25  number of pretty significant changes in how



Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

Case 2:09-cv-01207-JS-AYS   Document 184-2   Filed 08/17/16   Page 110 of 255 PageID #: 3221

1                    J. McELHONE

2    the department operated?

3         A.    The homicide squad, yes.

4         Q.    Is it fair to say you thought that

5    was necessary as a change from how things

6    operated before you took over?

7         A.    It was a necessary and pretty much

8    a mandate from when I got assigned there from

9    Inspector Murphy and others that we are going

10   to work much closer with the DA's office, make

11   sure that Dr. Hirsch, the ME is plugged in,

12   and there was cooperation, I think maybe

13   Scanlon was a little bit brusk in not talking

14   to these people and it was something that we

15   wanted to do, to adopt.

16        Q.    I would like to understand more

17   about this mandate that came to you from

18   Murphy and possibly also from Chief of

19   Detectives Feldman when you took over --

20        A.    Um-hum.

21        Q.    -- we just started talking about

22   the reversal of convictions in homicide cases

23   for the problems and the legality of how the

24   confessions were obtained.  We talked about

25   the SIC starting its public hearings and



Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

110

                    J. McELHONE

1
2    investigation of the narcotics and homicide
3    bureaus?
4         A.    Um-hum.
5         Q.    And problems with confessions and
6    perjury by officers, we're looking at The
7    Confession Takers story with its allegations
8    that you read about that just predated your
9    taking over.
10             Is it fair to say that the mandate
11   that you got really was a direct result of
12   this tumult and turmoil going on in the
13   department?
14        A.    I would say, yeah, that's a fair
15   assessment.
16        Q.    And a big part of the turmoil and
17   the tumult was focused on how homicide
18   detectives were taking confessions and how
19   they were reporting on their conduct?
20             MR. DUNNE:  Object to the form of
21        the question, but go ahead and answer it
22        as best you can.
23        A.    That was one part of it, yes.
24        Q.    That was a big part of?
25        A.    There was -- yeah, note-taking,



ESQUIRE

Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

111

1                    J. McELHONE

2    reliance on the confession to the exclusion of

3    physical evidence, these were certainly areas

4    that doesn't, can't go on, certainly not a

5    good investigation if you have done any of

6    that.

7         Q.    And there were serious allegations

8    out there predating your command of homicide

9    that officers had been perjuring themselves

10   about what they had done to get confessions

11   you were aware of those allegations, weren't

12   you?

13        A.    From what Newsday was reporting

14   the allegation was out there.  I had no

15   personal knowledge of anything.

16        Q.    But those are very, very serious

17   allegations?

18        A.    Perjury is a felony.  They should

19   be arrested.

20        Q.    And so if it came to your

21   attention that any detective under your

22   command had committed perjury in the past,

23   that officer should not be on the force,

24   right?

25        A.    I don't think -- yes, if it was a



Toll Free: 800.944.9454
Facsimile: 212.557.5972

ESQUIRE

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

John McElhone                          December 2, 2011

112

                    J. McELHONE

1

2   perjury situation.

3        Q.    Lying under oath about something

4   material --

5        A.    Yeah.

6        Q.    -- would be perjury?

7        A.    Yes.

8        Q.    And if that came to your attention

9   you shouldn't allow --

10       A.    It would be a serious concern I

11  would have.

12       Q.    You really shouldn't allow that

13  detective to be out investigating right?

14       A.    It would be a very serious concern

15  I would have.

16       Q.    Well, you certainly couldn't rely

17  on them to accurately report what they had

18  done if they had been lying about what they

19  did under oath in the past, right?

20       A.    That's correct.

21       Q.    And that's critically important

22  for you as a CO to be able to rely on your

23  detectives to tell the truth about what they

24  have done?

25       A.    Yes.



ESQUIRE

Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

113

J. McELHONE

1
2      Q.     Let's go through and list the
3  detectives who were in homicide as
4  investigators when you started there.
5      A.     I can't do that from memory.
6      Q.     First of all, you made a reference
7  to teams earlier?
8      A.     Yes.
9      Q.     How many teams were there?
10     A.     Three.
11     Q.     And what was this format?
12     A.     It was much like general service
13 that I explained early when I was a detective
14 sergeant.  There were four days of 9 to 5s,
15 two days off, four days of 5 to 1s, two days
16 off, and the other team would obviously be
17 doing the two days off during the interim.
18     Q.     And how many detectives were
19 assigned to homicide during your tenure there?
20     A.     It fluctuated.  It was 20 to 25
21 probably.
22            We had the Richard Angelo case.
23 He was the nurse who was killing his patients
24 in Good Samaritan Hospital and that was a very
25 intensive case.  We ended up exhuming like 23



Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

John McElhone                                        December 2, 2011

114

```
 1              J. McELHONE
 2   bodies to see if they were poisoned by him.
 3   It took on a life of its own, so I imported a
 4   couple of other detectives at that point, too,
 5   to just work --
 6         Q.    For that case?
 7         A.    -- on that case.  So that is why
 8   it is fluid.  And others were retiring, and
 9   others were coming in, you know.
10         Q.    Let's see if we can identify as
11   many as we can.  Detectives who were in
12   homicide when you joined in '87, who do you
13   remember being there?
14         A.    I'd have to -- I want to make sure
15   I'm accurate, too, because as I said there
16   were people come in in '88 and '87 and there
17   was a period of time I was in charge of major
18   crimes as deputy inspector and I had seen so
19   many there, but I'm not sure if they were
20   there at that time.
21         Q.    Let's try it this way.  You agreed
22   earlier there was an exodus, if not a mass
23   exodus, of detectives out of homicide?
24         A.    A lot of people I knew who were
25   there, were no longer there, yes.
```



ESQUIRE

Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

115

                    J. McELHONE
1
2      Q.     Was any of this old guard who had
3   been around before you joined, still there in
4   homicide when you took over?
5      A.     In my estimation there were three
6   or four.
7      Q.     Who were those?
8      A.     Jackie Miller, John Miller, Jim
9   McCready, Bill Donohue and Mike Ryan.  Those
10  four probably had the longest tenure there
11  when I walked in the door.  Everyone else was
12  rather new or brand new.
13     Q.     So these four, Miller, McCready
14  Donohue and Ryan were part of the old guard?
15     A.     Old guard is your word.
16     Q.     Fair to say -- what would you call
17  it?
18     A.     The most experienced.
19     Q.     The most experienced.  They had
20  been in the homicide unit throughout the
21  turmoil?
22     A.     Yes.
23     Q.     And stayed on?
24     A.     Yes.
25     Q.     Did all four of them stay on



ESQUIRE

Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

John McElhone                              December 2, 2011

116

1                    J. McELHONE

2    through your tenure at homicide?

3          A.    I believe Mike Ryan retired about

4    a year later.

5                Jack Miller transferred over to

6    the intelligence section.

7                I think Jimmy and Bill were there

8    throughout my tenure.  I'm not sure.

9          Q.    So is it fair to say, other than

10   these four, all of the other detectives who

11   made up the 20 or 25 --

12         A.    To the best of my recollection.

13               Again, it is almost like Sergeant

14   Pepper.  I think they were within a year of me

15   getting there.  They were -- as other

16   people -- there were a lot of retirements, so

17   they were replaced either by Inspector Murphy

18   or maybe even Bob Dunn who was the lieutenant

19   during that period, but they were relatively

20   new.

21         Q.    Did you consider it part of your

22   role in assuming command to familiarize

23   yourself with the track records of these four

24   officers who had been in homicide for so long?

25         A.    I relied on the information I was



ESQUIRE

Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

117

                    J. McELHONE
1
2    given from Inspector Murphy or from Lieutenant
3    Scanlon or the bosses, the sergeants that were
4    there.
5         Q.    And what kind of information were
6    they providing you?
7         A.    Well, one of my first questions
8    when I got there, anybody here that has to
9    leave.
10             And Inspector Murphy said no,
11   pretty much everyone who had to leave was gone
12   now, and it would be my decision if I wanted
13   to transfer somebody out or transfer people
14   in, you know, who would come in.
15        Q.    And what did you mean when you
16   asked Inspector Murphy is there anyone who
17   needs to go?
18        A.    From the SIC report, from internal
19   affairs, I believe they were doing
20   investigations into this matter, from the DAs
21   office -- I hadn't been there.  I had been
22   down in the Fifth Squad working Brookhaven
23   cases.  So, you know, tell me what's going on,
24   is there something pending in the DA's office
25   or internal affairs or something that would



Toll Free: 800.944.9454
Facsimile: 212.557.5972

ESQUIRE

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

Case 2:09-cv-01207-JS-AYS   Document 184-2   Filed 08/17/16   Page 119 of 255 PageID #: 3230

118

                        J. McELHONE
1
2    make them not a suitable candidate to stay in
3    homicide squad.
4          Q.     When you are referring to this
5    matter, are you referring to the allegations
6    of homicide detectives coercing confessions
7    fabricating evidence or committing perjury?
8          A.     Whatever --
9          Q.     That was the matter --
10         A.     Whatever the reason would be, they
11   would tell me he's not a good candidate to
12   stay.
13         Q.     And specifically this was in the
14   context of the SIC investigation which was
15   investigating allegations that homicide
16   detectives had coerced confessions, fabricated
17   evidence and perjured themselves, right?
18         A.     That would have been part of it or
19   other reasons, you know, what's the history
20   here, I'm coming in cold.
21                I never worked in headquarters
22   before.  I was always out in the precincts.
23   So now I'm coming up to headquarters, is there
24   an internal affairs case I should be aware of,
25   is there -- the DAs office investigating -- I



Toll Free: 800.944.9454
Facsimile: 212.557.5972

ESQUIRE

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

119

                    J. McELHONE
1
2    think at the time the SIC, the county
3    legislature was looking at it.  I mean, it was
4    crazy; it was a crazy time.
5          Q.    It must have been a crazy time.
6          A.    Yeah, it was.  And I'm coming in
7    cold.
8                So tell me, does anybody here have
9    to go before we start implementing the way we
10   are going to go from here on forward.
11         Q.    Was this one conversation you had
12   with Inspector Murphy?
13         A.    Yeah, we talked almost daily now.
14   We're both in headquarters and he is in charge
15   of the bureau and homicide is a very visible
16   area.  He would stop by every day, what's
17   going on, talk.
18         Q.    So you were really relying on him
19   to fill you in on whether you had any problem
20   officers?
21         A.    At that point initially when I
22   took over.  After that I would ascertain
23   myself or through my sergeants, do we have any
24   problems.
25         Q.    Right.  And like you said one of



Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

120

1                    J. McELHONE
2      the things you later relied on was your
3      officers' track records of success?
4             A.     Um-hum.
5             Q.     So you had to be familiar with
6      their track records of interrogations, taking
7      reliable confessions and making good cases in
8      order to do that, right?
9             A.     I presumed basically that they
10     were in homicide squad and they were in
11     homicide squad for that many years that they
12     were capable of doing that.  And if there was
13     no negative that was being reported to me that
14     there is a problem with so-and-so, then I had
15     to go with that.
16            Q.     I just want to make sure I'm
17     understanding you.  You said you presumed,
18     they have been on the job all this time,
19     unless somebody tells me there is a problem, I
20     assume they are okay and that they are good
21     cops?
22            A.     I haven't heard anything to the
23     contrary, and again to get to the point where
24     you are a homicide detective, you have already
25     been a detective, now you are selected to go



Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

121

1                      J. McELHONE
2    to the homicide squad and making cases.
3         Q.    Were you aware that Jim McCready
4    was specifically identified as the subject of
5    perjury and fabrication of evidence
6    allegations before the SIC?
7         A.    I did not.  I know he was
8    mentioned in that report.  Perjury was never
9    mentioned.
10        Q.    Is this the first that you are
11   hearing of this?
12        A.    I reviewed the SIC report and I
13   referred to the incident I think you are
14   talking about, just in preparation for this,
15   but....
16        Q.    Let's just take a minute.
17              So you did prepare for today's
18   deposition?
19        A.    I reviewed.
20        Q.    Tell me everything you reviewed.
21        A.    The SIC report, the final report.
22        Q.    The 1989 report I'm going to show
23   you a copy of it.  We will have it marked.
24              (Plaintiff Exhibit 12, 1989
25              SIC report marked for



Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

John McElhone                                    December 2, 2011

                                                              122

1                        J. McELHONE

2              identification, as of this date.)

3         Q.    When you say you reviewed the SIC

4    report, are you referring to what we have now

5    marked as Exhibit 12?

6         A.    Yes.

7         Q.    Any particular sections of it you

8    paid closer attention to in your preparation

9    for the deposition?

10        A.    Certainly the ones dealing with

11   the homicide squad.

12        Q.    Had you ever read the report

13   before?

14        A.    No.  Excerpts of it I think and

15   discussions again with my bosses at the time

16   or with other people, other officers.

17        Q.    What else did you look at to

18   prepare for your deposition, if anything?

19        A.    I reviewed the case on the Arlene

20   and Seymour Tankleff, the police department

21   report.

22        Q.    You say you reviewed the police

23   department report on the case?

24        A.    Reports, the case file.

25        Q.    You looked at the case file?



ESQUIRE

Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

                                                                    123

1                         J. McELHONE

2           A.     Yes.

3           Q.     Did you go to the department and

4     look at the original case file?

5           A.     No, I was supplied by Mr. Dunne.

6           Q.     You looked at a copy of the case

7     file?

8           A.     Yes.

9           Q.     Of the murder investigation?

10          A.     Yes.

11                 MR. DUNNE:  A portion of it.

12          Q.     Which portion did you look at?

13          A.     Supplementary reports and the

14    offense reports, the official reports that you

15    would expect in a homicide case.

16          Q.     Did that review refresh your

17    recollection about the case?

18          A.     Again, yeah, there were certain

19    aspects of it that over time I had forgotten

20    about, yeah.

21          Q.     Anything else other than the SIC

22    report and some Suffolk County Police

23    Department reports of the Tankleff homicide

24    investigation that you looked at?

25          A.     A couple of the hearings that were



ESQUIRE

Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

124

1                    J. McELHONE
2    involved in this civil action, I don't know, a
3    50H and a 440 -- I'm not an attorney so just a
4    quick reading through it.  By the time I'm
5    done, I have a cardboard box sitting on the
6    floor in my dining room.
7         Q.    Welcome to our lives.
8               So you read Mr. Tankleff's
9    testimony in the 50h hearing?
10        A.    Very brief.
11        Q.    You skimmed through that?
12        A.    Yes.
13        Q.    When you say 440, did you read a
14   transcript of a postconviction hearing in
15   which a number of people testified back in the
16   first decade of the 2000s?
17             MR. DUNNE:  2004 or 2005.
18        A.    Yeah, I looked at -- I don't
19   recall seeing minutes of the testimony or
20   anything, but I got familiar with the cast of
21   characters there.
22             MR. DUNNE:  It was your demand.
23        By counsel, I showed him your demand
24        listing the names when you made the
25        request for their files, I gave him a



ESQUIRE

Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

125

                        J. McELHONE
1
2          copy of your demand for the list of
3          names.  That's what he is referring to.
4          Q.    So you looked at a discovery
5    demand that we've made familiarizing yourself
6    with the list of alternate suspects in the
7    case --
8          A.    Yes.
9          Q.    -- whose names came out in
10   connection with the postconviction proceeding?
11         A.    Yes.
12         Q.    Did you review any of the
13   underlying material from the postconviction
14   proceedings?
15         A.    No.
16         Q.    You didn't read those transcripts?
17         A.    No.
18         Q.    Any of the briefing?
19         A.    No.
20         Q.    How about the Second Department's
21   opinion vacating Mr. Tankleff's conviction,
22   did you read that?
23         A.    I think I did.  Is that one of the
24   little things -- yeah, I guess so.
25         Q.    Was that the first time you had



ESQUIRE

Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

126

1                         J. McELHONE

2    read that opinion?

3         A.     Yes.

4         Q.     But you have obviously been aware

5    of it previous?

6         A.     Following the paper like you said

7    earlier, Channel 12, Newsday and whatever I

8    was aware that these people had surfaced and

9    ended up with the Attorney General coming in

10   again and the SIC coming in again.

11        Q.     So you are familiar, generally

12   speaking, with the entire life of the criminal

13   case?

14        A.     The process over the last 20

15   years, yes.

16        Q.     And even after you transferred out

17   of homicide, even after your retirement, fair

18   to say you have continued to learn about the

19   progress of the case?

20        A.     From public means, yeah.

21        Q.     Other than the materials we have

22   talked about already, did you look at anything

23   else to prepare for your deposition?

24        A.     No.

25        Q.     When you had this conversation



ESQUIRE

Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

127

1                    J. McELHONE

2    with Detective Inspector Murphy --

3         A.     Deputy Inspector Murphy.

4         Q.     Deputy Inspector.  I will get it

5    right at the end of the day.

6                 -- about whether you had any

7    homicide detectives who needed to go --

8         A.     Yes.

9         Q.     -- to the best of your knowledge

10   what was he relying on in reporting back to

11   you?

12        A.     Well, he had assumed command of

13   the homicide squad for several months before I

14   got there, and from his personal day-to-day

15   dealings, I know he was, he had a background

16   in narcotics investigation.  So he was

17   following the SIC hearings and things much

18   more closely than I was, you know, so we were

19   going pretty much by that and he had

20   conversations with the district attorney's

21   office at that point and the chief of

22   detectives which way we wanted to go.

23        Q.     Did you learn either from him or

24   from any other source when you assumed command

25   that Detective Jim McCready was alleged to



Toll Free: 800.944.9454
Facsimile: 212.557.5972

ESQUIRE

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

128

1                    J. McELHONE
2    have fabricated a police report in a homicide
3    case?
4          A.    I was told his deficiency was
5    note-taking.  That he had made a mistake in a
6    case and it was pretty much because he didn't
7    take adequate or any notes at the time he was
8    doing it.
9          Q.    So then is it fair to say that you
10   did not learn he was accused of having
11   fabricated a police report?
12         A.    No, I didn't know that.
13         Q.    Were you made aware from Deputy
14   Inspector Murphy or any other source that
15   Detective McCready had been accused of
16   perjuring himself in connection with that same
17   case?
18         A.    I knew there was a mistake made in
19   that case.  That's the way it was portrayed to
20   me.  And it was something that was definitely
21   attributable to his failure to take adequate
22   or any notes at that time.
23              MR. DUNNE:  I'm just going to
24         raise an objection to the supposition
25         about a false report.  We may have a



ESQUIRE

Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

129

1                    J. McELHONE

2          difference on what we are interpreting,

3          but the answer stands.  I just want to

4          note that for the record.

5          Q.     Tell me everything -- withdrawn.

6     Had you ever worked with Jim McCready before

7     taking over in homicide?

8          A.     We were patrol officers in the

9     Fourth Precinct in the late '70s.

10         Q.     How long did you overlap

11    approximately?

12         A.     Maybe six months, a year.  Well,

13    actually, we were one squad apart.  In uniform

14    there was 22 squads.  So four days a week we

15    would be on the same shift together.

16         Q.     So you had an acquaintance with

17    him?

18         A.     Yeah, see him in the precinct, you

19    know, occasionally we would back each other up

20    on a call.  At the time I was in the patrol

21    car in Lake Ronkonkoma and he was more like in

22    the Islip area of Ronkonkoma and I knew of

23    him.

24         Q.     And other than your acquaintance

25    with him from that period of time, what else



ESQUIRE

Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

John McElhone                                    December 2, 2011

                                                                    130

1                        J. McELHONE

2    did you know about him when you assumed

3    command?

4          A.    Had a reputation for being a very

5    good detective, very tenacious.

6          Q.    And this reputation came from

7    where?

8          A.    Other detectives, other bosses.

9          Q.    Very good detective, very thorough

10   did you say?

11         A.    I said very tenacious.

12         Q.    Very tenacious, what does that

13   mean to you?

14         A.    When he got ahold of a case, he

15   pursued it vigorously.  He tried to put a lot

16   of effort into doing whatever he could to

17   resolve the case.

18         Q.    To close the case --

19         A.    Yes.

20         Q.    -- with an arrest?

21               Right?

22         A.    To resolve the case.

23         Q.    And that means arrest someone?

24         A.    Find out who was responsible for

25   the murder and make an arrest, sure.



ESQUIRE

Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

131

                              J. McELHONE

1

2        Q.      And as far as you learned from

3   Deputy Inspector Murphy, the only allegation

4   out there about Jim McCready was that he had

5   made a mistake with respect to note-taking?

6        A.      Yes.

7        Q.      If you had been told or learned

8   that Detective McCready was alleged to have

9   committed perjury, that would have been a

10   serious concern for you, right?

11        A.      Yes, the allegation, if it was

12   sustained and convicted, I don't think he

13   would have been there.

14        Q.      If you had been made aware that

15   the allegation had been publicly made about

16   him that he had committed perjury, lied under

17   oath, you would have personally kept him on a

18   very short leash, right?

19            MR. DUNNE:  Object to the form of

20        the question.

21            Go ahead and answer that as best

22        you can.

23        A.      If I had known that I would be a

24   little bit more concerned and I would pass

25   that along to his immediate supervisor and



Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

John McElhone                                    December 2, 2011

132

                              J. McELHONE

1

2    say, hey, keep an eye on Jim, make sure --

3         Q.    You'd make sure he was watched

4    like a hawk?

5         A.    As a matter of fact, I had a

6    personal sit-down with him and the four people

7    I mentioned to you.  When I went in in '87, I

8    had this discussion with Inspector Murphy,

9    everybody was walking on eggshells, the four

10   remaining, because everybody else is going,

11   here comes a new guy in, this is the second

12   lieutenant in three months, you know, what is

13   going on here, new sergeants are coming in the

14   door every day.  So they were concerned about

15   what their future was in the homicide squad.

16        So I sat down with Jim and I told

17   him, you know, you've got to take notes, I

18   know that was one of your problems there.  And

19   he didn't offer up any other explanation that

20   you are asking.  You know, you have to do what

21   you got to do and we're going to do a more

22   team concept here, you are going to work for

23   your sergeant directly, no freelancing, no "I

24   got an idea, let me go pursue this."  And I

25   had the same conversation with Bill Donohue,


ESQUIRE

Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

133

                     J. McELHONE
1
2    Jackie Miller and Mike Ryan was actually more
3    of the day man at that point, he was reduced
4    to pretty much doing administrative tasks.  I
5    don't know if we had to have that talk.
6         Q.    So one of the messages you gave to
7    Jim McCready was you got to take notes?
8         A.    Yes.
9         Q.    You got to take thorough,
10   accurate, contemporaneous notes?
11        A.    Exactly.
12        Q.    You got to keep them?
13        A.    Yes.
14        Q.    You got to do the same with your
15   report?
16        A.    Yes.
17        Q.    You also give him the message you
18   can't be going off on your own, you got to
19   communicate with your team.
20        A.    Yes.
21        Q.    You got to keep your supervisor in
22   the loop?
23        A.    Yes.
24        Q.    You can't be a lone ranger out
25   there?



ESQUIRE

Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

134

1                    J. McELHONE

2         A.    Exactly.

3         Q.    Did you ask him if he had been the

4    subject of any investigations?

5         A.    No.

6         Q.    Did you ask him if he was the

7    subject of any SIC hearings?

8         A.    No.

9         Q.    Did you ask him if he testified?

10        A.    No.  I had known from Inspector

11   Murphy his name was mentioned.  I don't know

12   if he testified or not.  To this date I don't

13   know if he testified or not.  But it was the

14   way it was explained to me, it was a serious

15   mistake but it was all attributable to his

16   failure to take notes and made a mistake then

17   when he was testifying and that, you know, he

18   thought he did something when he didn't do

19   something, and that had he taken enough notes,

20   he would have certainly remembered that.

21        Q.    You understood it was a serious

22   mistake, but nothing more?

23        A.    Yeah.

24        Q.    And you didn't ask either him or

25   Deputy Inspector Murphy if there was any more



Toll Free: 800.944.9454
Facsimile: 212.557.5972

ESQUIRE

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

135

1               J. McELHONE
2    serious allegation out there about Jim
3    McCready?
4          A.    I asked overall, over the whole
5    squad, is there anyone there that shouldn't be
6    here right now, is there anyone there with an
7    internal affairs case pending or something
8    going on in the DA's office or the SIC.
9               And he said no, it is pretty -- it
10   has been taken care of at that point.  People
11   who had to leave, left.
12         Q.    So you were told by Deputy
13   Inspector Murphy as of February of 1987 or
14   so --
15         A.    Um-hum.
16         Q.    -- there were no open
17   investigations either by the SIC, the DA,
18   internal affairs of McCready?
19         A.    I didn't -- I wasn't that
20   specific.
21              Again, going back into what I said
22   earlier, is there anybody here that has to go.
23   Because ,again I was under the -- I was never
24   in headquarters before.  All I was getting was
25   from the newspapers or what was said on



Toll Free: 800.944.9454
Facsimile: 212.557.5972

ESQUIRE

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

John McElhone                                    December 2, 2011

136

1                        J. McELHONE

2    television or scuttlebutt from people walking

3    by.  So I wasn't sure on any of the others

4    that were still there, or maybe somebody was

5    only there for a short term who has a domestic

6    problem who shouldn't be there or a drinking

7    problem that shouldn't be there.  That is

8    something a new commanding officer would ask

9    of anybody, you know, who do I have to look

10   out for, you know.

11        Q.    If a detective had fabricated

12   information on a police report, that officer

13   needs to go, right?

14        A.    An out-and-out fabrication, yes.

15        Q.    If an officer lied under oath,

16   that officer needs to go, right?

17        A.    If, in a case if it is not a

18   mistake, yeah, it would be a problem.

19        Q.    An officer who in the past had

20   lied under oath, has no business interrogating

21   a suspect, right?

22        A.    If he is in the squad, he

23   shouldn't be interrogating a suspect.

24        Q.    Well, an officer who has lied

25   under oath shouldn't be on the squad at all,



ESQUIRE

Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

John McElhone                                    December 2, 2011

137

                            J. McELHONE
 1
 2   right?
 3        A.    If it is a perjury case, yes.
 4        Q.    An officer who has fabricated a
 5   police report shouldn't be on your squad at
 6   all?
 7        A.    Out-and-out fabrication, you are
 8   correct, should not be there.
 9        Q.    And you don't want that officer
10   interrogating a suspect?
11        A.    Wouldn't be in the squad.  He
12   wouldn't be interrogating.
13        Q.    Did you satisfy yourself that
14   there was no question about whether Jim
15   McCready had made a mistake or intentionally
16   lied?
17        A.    I never directly asked him about
18   it.  I was told that there was no one there
19   that had a problem that didn't -- that
20   shouldn't be there.  So I went in with that
21   premise.
22        Q.    Did you press either Jim McCready
23   directly or Deputy Inspector Murphy on the
24   nature of this mistake?
25        A.    No.



ESQUIRE

Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

138

                        J. McELHONE

1

2        Q.    You took him at his word?

3        A.    I wasn't aware of it actually

4   until I read the entire report here preparing

5   for this.

6        Q.    You weren't aware of what until

7   you read the report?

8        A.    That he made a mistake in

9   identification process and I think it was the

10  Diaz case.

11       Q.    So all you knew from your

12  conversations with McCready and Murphy was

13  that he made a mistake in connection with

14  note-taking?

15       A.    A mistake that was directly

16  attributable to his failure to take adequate

17  notes or any notes in that situation.

18            MS. CORNWALL:  I think now is a

19       good time for a lunch break.

20            MR. DUNNE:  Okay.

21            (Lunch recess:  12:50 p.m.)

22

23

24

25



Toll Free: 800.944.9454
Facsimile: 212.557.5972

ESQUIRE

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

139

1                       J. McELHONE

2            A F T E R N O O N   S E S S I O N

3                       1:55 p.m.

4    J O H N   M c E L H O N E,

5            having been previously duly sworn, was

6            examined and testified further as

7            follows:

8    CONTINUED EXAMINATION

9    BY MS. CORNWALL:

10           Q.    So we spoke this morning, Mr.

11   McElhone, about some of the fundamentals of

12   investigation.  Do you remember those

13   questions?

14           A.    Um-hum.

15           Q.    And giving those answers

16   generally?

17           A.    Yes.

18           Q.    I would like to ask you a couple

19   more questions about basic investigative

20   practice.

21           A.    Okay.

22           Q.    -- in 1988.  One of the things

23   that detectives under your command did, both

24   in the other squads and in homicide, was

25   identification procedures.  Right?



ESQUIRE

Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

140

1                        J. McELHONE

2          A.     Um-hum.  Yes.

3          Q.     Either involving, showing

4    photographs or live subjects --

5          A.     Lineups.

6          Q.     -- to a witness in a lineup.

7          A.     Yes.

8          Q.     And would you agree that it was

9    critically important that any time an officer

10   conducted an identification procedure with a

11   witness or a victim of crime, that the fact

12   that the procedure was done, be documented in

13   a report?

14         A.     Yes, I would.

15         Q.     And was it also standard procedure

16   that detectives were to avoid engaging in

17   procedures that were unduly suggestive?

18         A.     Yes.

19         Q.     Meaning, procedures that would

20   telegraph to the victim or witness, this is

21   the suspect we want you to pick.  Right?

22         A.     That would be improper.

23         Q.     That would be improper and

24   detectives in 1985 and on, were well aware of

25   that, right?



Toll Free: 800.944.9454
Facsimile: 212.557.5972

ESQUIRE

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

John McElhone                                    December 2, 2011

141

                        J. McELHONE

1

2        A.      '82 when I was a detective

3   sergeant, certainly.

4        Q.      And likewise, in the event that an

5   officer conducted an unduly suggestive ID

6   procedure, they still had to document that

7   procedure in a report, right?

8        A.      Yes.

9        Q.      Because the fact that the

10  procedure was unduly suggestive is an

11  important factor in assessing whether the ID

12  is reliable?

13       A.      That's correct.

14       Q.      And one of the specific rules

15  about ID procedures was, was it not, that

16  there were limits on when you could show a

17  single photo to a victim or witness, right?

18  Showing a single photo, unless there was an

19  exigent circumstance, was unduly suggestive,

20  right?

21       A.      Exigent circumstances are

22  confirmatory if you think somebody already

23  knows who you are talking about.  You might

24  say I want to be sure this is the person.

25       Q.      But only when you have evidence



Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

John McElhone                                          December 2, 2011

142

                              J. McELHONE
1
2      that the person knows the suspect already?
3              A.      Yes, yes.
4              Q.      Generally speaking, unless it is
5      immediately after a crime, or a victim is in a
6      hospital, the proper course is to prepare a
7      photo array or a photo spread, right?
8              A.      Depending on the circumstances,
9      that would be the ideal situation.
10             Q.      And under what circumstances would
11     it be acceptable not to prepare a photo spread
12     if you are going to do an ID procedure that is
13     not immediately after a crime or to a victim
14     in a hospital?
15             A.      When you wouldn't want to do it?
16             As I said before, if you just want
17     confirmation that this is the person you are
18     already talking about, that this person knows
19     who they are identifying as John Doe, this is
20     the John Doe you are talking about.
21             Q.      And hypothetically, if an officer
22     is going to do an ID procedure with a witness
23     and has not yet spoken with that witness,
24     doesn't yet know whether the witness knows the
25     suspect or not, the appropriate procedure



ESQUIRE

Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

143

1                    J. McELHONE

2    would be to prepare a photo array or a photo

3    spread, right?

4         A.    That would be the ideal situation.

5         Q.    You wouldn't go without with just

6    a mugshot of somebody unless you already knew

7    that the witness knew the suspect, right?

8         A.    That would be correct.

9         Q.    Otherwise, it would be an unduly

10   suggestive identification procedure?

11        A.    If you are identifying an unknown

12   subject by only showing one photo, that would

13   be improper.

14        Q.    And until you have good reason to

15   believe that the suspect is known to the

16   witness, you have to use a photo array, photo

17   spread?

18        A.    That would be the ideal situation.

19        Q.    That would be the appropriate

20   procedure?

21        A.    Yes.

22        Q.    And if a witness provides

23   information that is documented in a police

24   report and the police officer later learns

25   that information is inaccurate, would you



ESQUIRE

Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

144

```
 1                  J. McELHONE
 2    agree the officer had in 1985 and onward, a
 3    Brady obligation to document the inconsistent
 4    information?
 5            MR. DUNNE:  I'll object to the
 6        form.  Go ahead and try to answer it as
 7        best you can.
 8        A.    Can you repeat that again.
 9        Q.    Sure.  Let me do it a little
10    differently.
11            In a case where a witness makes a
12    statement that is documented in a police
13    report?
14        A.    Okay.
15        Q.    And upon further investigation the
16    detective learns that an important element of
17    the statement is wrong or inconsistent?
18        A.    Inconsistent, uncorroborated.
19        Q.    Inconsistent with the objective
20    evidence.
21        A.    Okay.
22        Q.    That officer has an obligation to
23    document the inconsistency, right?
24        A.    Yes.
25        Q.    It is Brady material?
```



ESQUIRE

Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

145

1                          J. McELHONE

2          A.      Yeah.

3          Q.      And that was true in '85, '86,

4     '87, '88, right?

5          A.      Sure.

6          Q.      Please take a look at what we have

7     marked as Exhibit 13.

8                          (Plaintiff Exhibit 13, January

9                          29th, 1987 article from The New

10                         York Times entitled Suffolk Police

11                         Are Described As Deficient marked

12                         for identification, as of this

13                         date.)

14         Q.      This is a January 29th, 1987

15    article from The New York Times entitled

16    Suffolk Police Are Described As Deficient.  Do

17    you see that?

18         A.      Yes.

19         Q.      And it is an article reporting on

20    the progress of the state commission of

21    investigation, the first day of the public

22    hearings, right?

23         A.      Okay.

24         Q.      Do you see that in the first two

25    paragraphs?



ESQUIRE

Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

146

1                    J. McELHONE

2        A.    In the second paragraph, starts

3    "in the first day of public hearings"?

4        Q.    Yes.

5        A.    Okay.

6        Q.    So let's just read it together.

7             The first two paragraphs the

8    articles say, do they not, quote:

9             "The chairman of the state

10        commission of investigation said today

11        that the Suffolk County Police

12        Department had displayed a, quote,

13        startling lack of professionalism.  End

14        quote.  A 14-month investigation, he

15        said he found evidence of perjury and

16        fabrication of evidence by the police.

17        In the first day of public hearings on

18        charges of corruption and mismanagement

19        in criminal justice agencies here, the

20        commission chairman David G. Trager also

21        said the problems in the department

22        were, quote, shamefully tolerated by the

23        district attorneys office."  End quote.

24             Did I read those paragraphs

25    accurately?



ESQUIRE

Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

147

                        J. McELHONE
1

2          A.     Yes.

3          Q.     As you sit here today, you were

4    aware of these allegations on the eve of your

5    taking command of homicide, weren't you?

6          A.     Yes.

7          Q.     Did you read this story back then

8    when it was published?

9          A.     I don't recall.  It was such an

10   avalanche of material around that time.

11         Q.     There was an avalanche of material

12   reporting on allegations of perjury and

13   fabrication of evidence by the Suffolk County

14   detectives at that time, right?

15         A.     Those allegations were being made,

16   yes.

17         Q.     In an avalanche of news reports,

18   to use your words?

19         A.     Yes.

20         Q.     And you were well aware of them on

21   the eve of your taking command of homicide?

22         A.     Yes.

23         Q.     And once you learned you were to

24   be taking command of homicide, these

25   allegations became of particular importance to



ESQUIRE

Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

148

```
1                      J. McELHONE
2    you, right?
3         A.     Yes.
4         Q.     Because they would be your
5    problem?
6         A.     Talked about in my command.
7         Q.     Right.  Turning to the second
8    page, the third paragraph, second sentence
9    reports, quote:
10               "But Mr. Trager added, the top
11          management of these agencies must be
12          held accountable for creating the
13          atmosphere allowing misconduct first to
14          occur, and second, to go unpunished."
15          End quote.
16               Do you see that?
17         A.     Yes.
18         Q.     Do you agree that for the Suffolk
19    County Police Department it is the
20    responsibility of top management to create an
21    atmosphere where misconduct is not allowed?
22         A.     Yes.
23         Q.     Do you agree that it is the
24    responsibility of top management at the SCPD
25    to make sure that misconduct is punished?
```



ESQUIRE

Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

John McElhone                              December 2, 2011

149

1                    J. McELHONE
2         A.    Yes.
3         Q.    And as the CO of homicide when you
4    assumed command after this story was
5    published, would you agree you're part of that
6    top management?
7         A.    Middle to top, yeah.  I'm part of
8    the management team.
9         Q.    And you would agree, would you
10   not, that it was part of your job to create an
11   atmosphere in which misconduct was not
12   allowed?
13        A.    That's correct.
14        Q.    Do make sure misconduct did not go
15   unpunished?
16        A.    Yes.
17        Q.    And therefore to identify
18   misconduct when it happened?
19        A.    Yes.
20        Q.    It was part of your job when you
21   took command to identify problem officers,
22   right?
23        A.    Define problem officers.
24        Q.    What was a problem officer for
25   you?



Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

ESQUIRE

150

1                        J. McELHONE

2           A.      Different categories:  obnoxious,

3     hard to get along with.  You know, you are

4     dealing with human personalities here.

5           Q.      Sir, when you had the meeting with

6     Deputy Inspector Murphy and you asked him did

7     any of the holdover officers need to go --

8           A.      Right.

9           Q.      -- you were asking about whether

10    you had a problem officer on your hands,

11    right?

12          A.      More serious than that.  Not

13    personality problems like I just described.

14          Q.      And that's what we are here today

15    talking about, more serious problems --

16          A.      Yes.

17          Q.      -- not personality differences.

18          A.      Right.  That's what I was asking

19    about.

20                  Are they under suspicion, are they

21    being investigated by internal affairs, is

22    there something in the SIC report which I

23    hadn't read which would indicate that somebody

24    has to go or discussions with the District

25    Attorney's office that someone has to go.



Toll Free: 800.944.9454
Facsimile: 212.557.5972

ESQUIRE

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

151

                         J. McELHONE
1
2        Q.      That was important information for
3   you to know about those under your command?
4        A.      Certainly.
5        Q.      Particularly those officers who
6   were in homicide during the years leading up
7   to your taking command during which time the
8   avalanche of allegations about perjury and
9   fabrication were being reported?
10       A.      Yes.
11       Q.      You said earlier it was a crazy
12  time.
13       A.      Yes.
14       Q.      Between '85 and '87 when you --
15       A.      There was a lot of movement of
16  people, there was a lot of press reports about
17  problems with the police department and
18  Confession Takers and all of that was -- every
19  day you could read something about it.
20       Q.      And there was talk within the
21  department too, wasn't there?
22       A.      Yes.
23       Q.      A lot of concern?
24       A.      Yeah.
25       Q.      What was the talk in the



ESQUIRE

Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

John McElhone                                        December 2, 2011

152

                          J. McELHONE
1
2      department while these investigations were
3      going on, these reports are being made?
4           A.    Some of it was that we thought it
5      was a witch hunt in certain areas, and others
6      were that, you know, that they have uncovered
7      some problems here that we have to address.
8           Q.    Which camp are you in?
9           A.    I took them all on a balance type
10     thing.
11          Q.    Well, did you believe there was a
12     witch hunt or did you believe --
13               MR. DUNNE:  No, I think he was
14          distinguishing between sections of it, I
15          don't think it is an either/or.
16               MS. CORNWALL:  Let me ask and we
17          will clarify the answer.
18          A.    You are talking about the entire
19     atmosphere at the time.
20          Q.    Okay.
21          A.    I remember that the county
22     legislature jumped in to form some kind of
23     committee to call people into and I remember
24     that there were some people with axes to grind
25     with the police department that weren't



Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

John McElhone                                    December 2, 2011

153

1                         J. McELHONE
2     really, didn't sound like they were legitimate
3     that they were just a forum for people to come
4     forward and criticize the department.
5          Q.     Given your reading the avalanche
6     of allegations in the press and your awareness
7     of the public hearings in the SIC and the
8     other entities investigating the department,
9     did you believe there was some basis for
10    concern, or did you, too, believe it was all a
11    witch hunt?
12         A.     No, it was not all a witch hunt.
13    There was cause for concern.
14         Q.     And specifically was there cause
15    for concern that homicide detectives had been
16    coercing confessions?
17         A.     When jurors were being polled and
18    said they did not believe police witnesses,
19    that was certainly an area I was concerned
20    about.
21         Q.     That was a very serious concern?
22         A.     Yes, yes.
23         Q.     And when sitting judges are making
24    allegations that detectives have committed
25    perjury before them in testimony, that is also



ESQUIRE

Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

John McElhone                                    December 2, 2011

154

1                    J. McELHONE

2    a very serious concern?

3            A.      Absolutely.

4            Q.      That's not a witch hunt?

5            A.      No.

6            Q.      And if it had come to your

7    attention when you assumed command of homicide

8    that a sitting judge had made allegations of

9    perjury against any one of the officers still

10   in homicide when you took over, you should

11   have taken a very close look at that

12   allegation, right?

13           A.      Yes.

14           Q.      And you should have investigated?

15           A.      I wouldn't reinvestigate it.  If

16   he is still in homicide and I was told that

17   nobody really had to leave at that point

18   because whatever allegations were made, were,

19   I assumed, investigated and cleared, then it

20   would be more of a telling their supervisor,

21   like, you used the term short leash before,

22   keep an eye on Jim or Jack or whoever it would

23   have been.

24           Q.      And you were relying on Deputy

25   Inspector Murphy?



ESQUIRE

Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

John McElhone                                    December 2, 2011

155

1                        J. McELHONE

2          A.     He was previously assigned there

3     just before I got there.

4          Q.     And how long was his tenure there?

5          A.     I don't think it was that long,

6     maybe less than a year, but several months

7     before I got there.

8          Q.     And you were also relying on the

9     self-reporting of the four holdover officers

10    to tell you if they had been accused of

11    anything or if there were any problems?

12         A.     I didn't ask them.  I just wanted

13    to make clear that I have been told at this

14    point there is no reason to ask any of you to

15    leave, but I want to make it clear to you that

16    now that I'm the CO, we are going to have

17    training, we are going to have the sergeants

18    being a very lead role in all homicide cases,

19    there will be note-taking, scrupulously taking

20    notes on everything that is done and we're

21    going to do it by the book.

22         Q.     Now, if you believed there was no

23    cause for concern about investigative

24    misconduct by any of the four holdovers, why

25    do you need to tell them any of those things.



ESQUIRE

Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

John McElhone                                    December 2, 2011

156

1                    J. McELHONE
2   I was told that they are walking on eggshells.
3   All of the rest of their peers during that
4   period have been asked to leave or left on
5   their own or have been transferred out and at
6   this point they are walking on eggshells?
7        Q.    What did that mean to you, when
8   you heard they are walking on eggshells?
9        A.    They are not sure of what their
10  career status was with the police department
11  at that point.  So I wanted to make it clear
12  to them that I have been told that there is
13  not a problem, that you won't be leaving
14  unless I ask you to leave and that this is
15  what we are going to do from this day forward.
16       Q.    What reaction did you get from
17  Detective Miller when you had this sit-down
18  with him?
19       A.    With all of them I can't remember
20  exactly what it was, but they were all right
21  on board, no problem, absolutely.
22       Q.    Same reaction from McCready?
23       A.    Yes.
24       Q.    Same reaction from Ryan?
25       A.    Yes.



ESQUIRE

Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

157

                         J. McELHONE
1
2        Q.    Same reaction from Donohue?
3        A.    Yes.
4        Q.    They are on board?
5        A.    Absolutely.
6        Q.    And you didn't ask anyone of the
7   four of them if they had ever been accused of
8   perjury for example?
9        A.    No.
10       Q.    You didn't ask any one of the four
11  of them whether they had ever been accused of
12  fabricating evidence?
13       A.    No.
14       Q.    Withholding Brady material?
15       A.    I wasn't in internal affairs at
16  that point.  I was their commanding officer
17  just letting them know that I have been told
18  there is not a problem, that your tenure here
19  is safe as long as you do things the way I'm
20  going to do them from here on.
21       Q.    Let's time out for a moment.
22             You just said you weren't internal
23  affairs?
24       A.    Right.
25       Q.    But it was your job as the new



ESQUIRE

Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

158

1                    J. McELHONE
2    commanding officer of homicide with a mandate
3    to clean up the department, to make sure you
4    didn't have problem officers?
5            A.    Not the department.
6            Q.    The squad?
7            A.    Yes.
8            Q.    You had a mandate to clean up?
9            A.    Not to clean it up.  At this point
10   people who had to leave had left.  We have a
11   training session coming on board this week, we
12   are going to go forward with the homicide
13   squad with the personnel that are here, unless
14   I had a problem with them, and we're going to
15   train them, we are going to work with the DA
16   closely, we're going to -- the sergeants are
17   going to take the lead in all homicide cases,
18   they will assign lead detectives, they will
19   assign scene people, and there will be no
20   running off on your own to pursue something.
21           Q.    I want to be very clear that I'm
22   understanding you.
23                 It was not only internal affairs
24   who had an interest in investigating
25   investigative misconduct by homicide



ESQUIRE

Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

159

1                       J. McELHONE

2    detectives, right?  That mattered to you too?

3          A.    It could have.  It could have been

4    any way.  That's why I asked the question I

5    did from the CO of major crime bureau, is

6    there a problem with anybody here.  I wasn't

7    focusing directly on the four that were there

8    for the longest.  If somebody was there for a

9    year, might have had a problem.

10         Q.    Anyone who is a holdover?

11         A.    Yes, and it didn't have to be

12   criminal or perjurist.  It could have been, he

13   is lazy or he has taken a lot of sick time or

14   something like that.  I was looking for an

15   assessment, what's the staff you are giving me

16   here and where do I proceed from here.

17         Q.    And it was critically important

18   that you knew you could rely on the

19   representations your homicide detectives made

20   to you?

21         A.    My new boss made the first

22   representation.  After that I made my own

23   decisions.

24         Q.    So fair to say you completely

25   relied on your boss's assessment of the four



ESQUIRE

Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

160

1                    J. McELHONE

2    holdovers?

3         A.    Yes.  He came from, he is very

4    well-respected by me and others and he had

5    experience hands-on with that squad for months

6    before I got there.

7         Q.    So while you considered it part

8    your role to know if you had any problem

9    officers?

10        A.    Yes.

11        Q.    You were satisfied with what you

12   heard from Deputy Inspector Murphy?

13        A.    That's correct.

14        Q.    And you looked no further?

15        A.    I had no reason to.

16        Q.    If something came to your

17   attention, a plausible allegation that any one

18   of your homicide detectives had engaged in

19   investigative misconduct, you should have

20   investigated that personally, right?

21        A.    Yes.

22        Q.    And you would have?

23        A.    There is a procedure with everyone

24   in the police department, from beat cop on up.

25   If a civilian makes a complaint or anyone



Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

ESQUIRE

John McElhone                                    December 2, 2011

161

1                          J. McELHONE
2        makes a complaint, it is recorded, it is given
3        a number, it is forwarded, you run it by
4        internal affairs.  It might be something
5        serious enough where they want to devote full
6        energy to do it.  If not, they kick it down to
7        the command level basically and it would be
8        brought to my attention.  I might handle it
9        personally or I might give it to one of my
10       sergeants who was day-to-day supervision over
11       the detectives there and they would have to
12       interview the detective, get a report from him
13       about the incident and it is all handed back
14       to me and up to internal affairs,
15       substantiated, unsubstantiated, cleared.
16            Q.    Did you ever hear of an internal
17       affairs investigation of a homicide detective
18       that was substantiated?
19            A.    I never did, no.
20            Q.    Internal affairs -- I'm sorry,
21       that's during your entire career, right?
22            A.    Homicide detective?  No, I never
23       did.
24            Q.    Never heard of a substantiated
25       internal affairs --



Toll Free: 800.944.9454
Facsimile: 212.557.5972

ESQUIRE

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

162

1                    J. McELHONE

2        A.    I would only for the two years I

3   was there as deputy chief or anything like

4   that.

5        Q.    But during your 3-1/2 decades on

6   the force, is it fair to say you are not, as

7   you sit here today, aware of any internal

8   affairs case against a homicide detective that

9   has been substantiated?

10       A.    Correct.

11       Q.    Now, internal affairs

12  investigations can take a number of years to

13  go from complaint to conclusion, right?

14       A.    I imagine so.

15       Q.    Well, that's your experience as a

16  commanding officer who is aware of

17  investigations pending against officers within

18  your command, right?

19       A.    There is actually an 18-month

20  statute of limitations for internal discipline

21  in all of the contracts between the unions and

22  the police department.  So anything that went

23  more than that would really be, I guess when

24  they initiate the complaint, they can take as

25  long as they have to to investigate it, but I



Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

163

                    J. McELHONE
1
2     have never heard of anything taking a couple
3     of years.
4          Q.    So an investigation needs to be
5     initiated within 18 months of the alleged
6     misconduct?
7          A.    Yes.
8          Q.    And then would be investigated
9     sometime thereafter?
10         A.    Right.
11         Q.    So if a complaint, investigation
12    is initiated 18 months after the conduct,
13    could very easily be more than a couple of
14    years before you have a result?
15         A.    It would be an internal affairs
16    type case, because as a CO we wouldn't get
17    cases that went that far.  It would have been
18    more, officer was rude or detective was, you
19    know, did something improper that was not
20    serious enough to go through a long
21    investigation with the internal affairs
22    section.
23         Q.    Mr. McElhone, given that internal
24    affairs investigations can take some time and
25    given your testimony earlier that it was



ESQUIRE

Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

John McElhone                                December 2, 2011

                          J. McELHONE

1

2       important for you to know that you could rely

3       on your detectives to accurately report their

4       conduct to you, you wouldn't just leave it to

5       internal affairs if it came to your attention

6       that there was an allegation of serious

7       investigative misconduct by a homicide

8       detective, would you?

9               MR. DUNNE:  I'm objecting to the

10          form of that question.  That is more of

11          an allegation.  But go ahead and try and

12          answer that as best you could.

13          A.    I don't know that I would know the

14      details of it.  I would expect, and I think

15      this happened in other occasions that on its

16      face it would be serious enough an allegation

17      that they're going, you know, while we are

18      investigating this I think it would be better

19      to reassign that detective to either a day job

20      where he is not taking in new cases, or maybe

21      even another squad.

22              I know it has happened in patrol

23      many times that way.

24          Q.    So the pendency of an internal

25      affairs investigation wouldn't stop you --



Toll Free: 800.944.9454
Facsimile: 212.557.5972

ESQUIRE

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

John McElhone                                    December 2, 2011

165

                    J. McELHONE
1
2        A.     I would not investigate while they
3   are investigating.
4        Q.     But you would still make sure you
5   can rely on the word of an officer?
6             MR. DUNNE:   I'm going to object.
7        What does that mean?  He just said he is
8        not doing an investigation, I don't
9        understand the question.
10            MS. CORNWALL:   You can state an
11       objection if you have one.
12            MR. DUNNE:   Right.
13       A.     Could you repeat the question.
14       Q.     You testified earlier it is
15  important for you to be able to rely on the
16  truthfulness of detectives, right?
17       A.     Yes.
18       Q.     If you had cause to question
19  whether you could rely on the word of an
20  officer, wouldn't you take steps, isn't it
21  your job to take steps to determine whether
22  that officer is trustworthy?
23       A.     Yes.  I'd either talk to the
24  officer or talk to his boss for sure.
25       Q.     And that's completely independent



ESQUIRE

Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

166

1                   J. McELHONE

2    of any internal affairs investigation?

3         A.    Yes.

4         Q.    That may or may not be?

5         A.    Sure.

6         Q.    You testified earlier I believe

7    that officers felt in homicide as though

8    people were looking over their shoulders.  Do

9    you recall?

10        A.    There was a media scrutiny for

11   sure.  There was certainly departmental

12   scrutiny, yeah.

13        Q.    Did you feel that way?

14        A.    I just got there.  I didn't feel

15   that way.  I knew it was a very visible

16   position even before the controversy.

17        Q.    And with the avalanche of

18   allegations and the avalanche of critical

19   press making these allegations about systemic

20   misconduct in the homicide bureau, fair to say

21   you were under some pressure?

22             MR. DUNNE:  I'm going to object to

23        the form of the question.  Go ahead and

24        answer that as best you can.

25        A.    It comes with the territory.  I



Toll Free: 800.944.9454
Facsimile: 212.557.5972

ESQUIRE

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

167

                        J. McELHONE
1
2   knew what I was getting into.
3           Q.    So you did feel some pressure?
4           A.    Nothing extraordinary, but I knew
5   whatever I did was being looked at and
6   whatever the squad did was being looked at.
7           Q.    Being looked at by the media?
8           A.    Yes.
9           Q.    Being looked at by the SIC which
10  was still going on?
11          A.    I didn't feel that.  I think they
12  were looking at past events and what they did
13  and looked at, they did and looked at.
14          Q.    Past events, including conduct by
15  officers who were still on the force when you
16  took command, right?
17          A.    Yes.
18          Q.    You knew you would be subjected to
19  scrutiny by the Suffolk County legislature
20  which had its own hearings going on?
21          A.    Again they were looking into past
22  details.  I didn't feel pressure from that.
23          Q.    You felt no pressure from that?
24          A.    No.
25          Q.    How about the US Attorney



Toll Free: 800.944.9454
Facsimile: 212.557.5972

ESQUIRE

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

168

                    J. McELHONE
1
2    investigation that was ongoing?
3         A.    I'm not even aware of that.
4         Q.    Turning back to Exhibit 9, the
5    letter from Judge Namm that prompted the
6    formation of the SIC.
7         A.    Um-hum.
8         Q.    Turning to the second page, the
9    third full paragraph says, quote:
10             "In two consecutive highly
11        publicized murder trials, I have
12        witnessed, among other things, such
13        apparent prosecutorial misconduct as
14        perjury, subornation of perjury,
15        intimidation of witnesses, foliation of
16        evidence, abuse of subpoena power and
17        the aforesaid attempt to intimidate a
18        sitting judge."
19             Namm at the time was a sitting
20    judge, right?
21        A.    Um-hum.  Yes.
22        Q.    And he goes on to say that members
23    of the -- in the next paragraph it says:
24             "As this letter was being drafted,
25        the defendant, James Diaz, was acquitted



ESQUIRE

Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

169

                        J. McELHONE

1

2       of murder and rape.  Members of the

3       jury, as did the jury in the Peter Corso

4       case, the previous murder trial, have

5       publicly and openly criticized the

6       Suffolk County Police Department, the

7       manner in which they conducted their

8       investigation and the manner in which

9       the case was prosecuted by the Suffolk

10      County District Attorney's Office."

11           Do you see that?

12      A.    Yes, ma'am.

13      Q.    And you knew when you assumed

14 command, a year and a half or so later, that a

15 sitting judge had alleged homicide detectives

16 had committed perjury?

17      A.    That second -- the first paragraph

18 you read said prosecutorial misconduct is

19 perjury.

20      Q.    Well, prosecutors don't testify,

21 right?  They put on the case.

22      A.    Okay.

23      Q.    And they put on homicide

24 detectives to testify?

25      A.    Yes.



ESQUIRE

Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

170

1                    J. McELHONE

2        Q.    In homicide cases?

3        A.    Um-hum.

4        Q.    So you were aware, were you not,

5   that a sitting judge had alleged homicide

6   detectives had committed perjury?

7        A.    Yes.

8        Q.    You were aware of the allegation,

9   right?

10       A.    Yes.

11       Q.    Which you had to take very

12   seriously if any officer was still under

13   your -- was still in the homicide unit when

14   you took over in 1987?

15       A.    I would be concerned by then,

16   yeah.

17            MS. CORNWALL:  Let's mark this.

18                (Plaintiff Exhibit 14,

19            February 2, 1987 New York Times

20            article entitled Long Island Trial

21            is Scrutinized Two Years After

22            Verdict marked for identification,

23            as of this date.)

24       Q.    We've marked as Exhibit 14, a

25   February 2 of 1987 New York Times article


ESQUIRE

Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

171

1                    J. McELHONE
2    entitled Long Island Trial is Scrutinized Two
3    Years After Verdict.  Do you see that?
4            A.    Yes.
5            Q.    And if you take a minute to review
6    the piece, it is about the 1985 trial of James
7    Diaz, right?
8            A.    Yes.
9            Q.    The same case Judge Namm had
10   referred to in his letter to the governor
11   alleging that there had been perjury in trials
12   before him, right?
13           A.    If that's what it says, yes.
14           Q.    Well, take your time and look.
15           A.    Okay.
16           Q.    And make sure that you are
17   confident that the trial of James Diaz
18   referred to in the 1987 story is the James
19   Diaz case that Judge Namm was referring to
20   that he was so concerned about that he wrote
21   to the governor asking for an independent
22   investigation of perjury in the police
23   department.
24                 It is a story referring to an
25   acquittal of James Diaz in a 1985 trial,



ESQUIRE

Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

172

                        J. McELHONE
1
2    right?
3         A.    Yes.
4         Q.    And the SIC in 1987 is holding
5    public hearings about the police conduct
6    during that trial and investigation, right?
7         A.    Right.
8         Q.    And toward the bottom of the
9    second page of the exhibit, the piece reports,
10   quote:
11              "The judge, Stuart Namm, not only
12         questioned the credibility of the
13         informer, but also said he found a,
14         quote, good part of the testimony,
15         unquote, from the police detectives to
16         be, quote, not credible."  End quote.
17              Do you see that?
18         A.    Yes.
19         Q.    This is Judge Stuart Namm, a
20   sitting judge, alleging that detectives --
21         A.    He didn't use the perjury word.
22         Q.    He didn't use the perjury word
23   there in this particular quote, did he?
24         A.    No.
25         Q.    But that's what he is talking



Toll Free: 800.944.9454
Facsimile: 212.557.5972

ESQUIRE

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

173

                         J. McELHONE
1
2    about, right?
3         A.    He said it was not credible and I
4    believe jurors also said they had problems
5    believing what the detectives were saying.
6         Q.    Right.  And this is a news story
7    that came out within a couple of weeks before
8    you assumed command, February 2?
9         A.    January 30th, yes.
10        Q.    February 2 of 1987?
11        A.    I see the byline.  It says
12   Hauppauge, January 30th.
13        Q.    Within a couple of weeks?
14        A.    Yes.
15        Q.    So the conduct of the Diaz
16   investigation and trial, was a live issue
17   still when you took command?
18             MR. DUNNE:  For whom?
19        A.    Yeah.
20             MR. DUNNE:  For whom?
21        Q.    And because a sitting judge is
22   accusing homicide detectives, who are still on
23   the force now under your command, of
24   fabrication and evidence of perjury, that is a
25   problem you need to look into, right?



ESQUIRE

Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

174

                    J. McELHONE

1

2        A.    Not necessarily.  He is talking

3   about, he is making -- I knew he wrote a

4   letter to the state.  I knew SIC was coming

5   down and having hearings.  I knew this

6   credibility question was in question.

7             I went -- I had a job to do.  I

8   worked for the police department.  I went to

9   my new boss on my new assignment and said is

10  there anything here I have to do.  He didn't

11  say you have to investigate everything these

12  guys have ever done.  He didn't say -- he told

13  me everybody who had to leave is gone.  The

14  guys you have now, we won't have a problem.

15            I said, okay, I went with that and

16  then I was going to make my own assessment on

17  my tenure of anything that happened along the

18  line.

19       Q.    With your education and your

20  experience and your -- the seriousness with

21  which you took your posting, that's really all

22  you did?

23            MR. DUNNE:  I will object to the

24       form.  I'd ask you to restate the

25       question.  I'm objecting to the form of



Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

175

                    J. McELHONE

1       that so that we can get an answer.

2               MS. CORNWALL:  You don't get to

3       pick the form of my question.  You get

4       to make your objection and leave it at

5       that.

6               Please answer the question.

7               MR. DUNNE:  It is an improper

8       question.

9   A.      No one gave me any information or

10  any cause to investigate any of the officers

11  that I was taking command of for one day.

12      Q.      This news story didn't give you

13  pause?

14      A.      I don't recall reading the Times

15  on this one.  Again, there was an avalanche of

16  these things.

17      Q.      There was an avalanche.

18      A.      There was spurious ones, there was

19  serious ones.  I was trying to wade through it

20  like everybody else was, and the easiest way,

21  and most direct way was for me to look my boss

22  in the eye and say, is there anybody here I

23  have to worry about, is there any problems

24  here I have to, before I start sitting down



Toll Free: 800.944.9454
Facsimile: 212.557.5972

ESQUIRE

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

176

1                    J. McELHONE

2    with them, we move them along somewhere.

3         Q.    And were you aware that McCready

4    was one of the --

5         A.    I heard his name was mentioned.

6         Q.    May I finish the question, please.

7         A.    Certainly.

8         Q.    Thank you.  You heard that

9    McCready's name had been mentioned in

10   connection with perjury allegations from the

11   Diaz trial?

12        A.    I did not hear perjury

13   allegations.

14        Q.    You never heard --

15        A.    No.

16        Q.    -- McCready and allegations of

17   perjury in the same breath?

18        A.    No.

19        Q.    What did you hear about him?

20        A.    It was part of The Confession

21   Takers syndrome where they were focusing

22   solely on confessions that there was a serious

23   lack of note-taking, of possibly shortcuts in

24   the criminal investigation.  And that was

25   going to stop with McCready or anybody else



# ESQUIRE

Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

177

1                    J. McELHONE
2    that was in the detective squad at that time.
3         Q.    Where did you hear that about him,
4    from whom?
5         A.    From the various reports of the
6    news media and from my boss and from the
7    detective division in general, I was still a
8    lieutenant in charge of a squad, if there was
9    the homicide in the Fifth Squad, there would
10   be a homicide detective and a team coming in
11   and they we would talk about it in case there
12   was something locally that we could contribute
13   to their investigation?
14        Q.    So you heard about Detective
15   McCready from before you joined homicide?
16        A.    Yeah, that he was one of the names
17   that was mentioned in the SIC investigation.
18        Q.    As someone who relied too much on
19   confessions?
20        A.    It was kind of a lump them
21   altogether with the whole group that was up
22   there was doing that.
23        Q.    But McCready, in particular, was
24   someone who came to your attention as relying
25   too much on confessions?



ESQUIRE

Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

178

1                    J. McELHONE

2          A.     He was one of the names that was

3     involved with the other ones that were

4     Rafferty and all the other names that were

5     involved with that SIC investigation.

6          Q.     And specifically the SIC

7     investigation of the Diaz case?

8          A.     I heard that -- I don't remember

9     hearing his name attributed to that one.  It

10    was more Rafferty with the second knife thing

11    that troubled me when I heard that.

12         Q.     So you were aware that there were

13    allegations against Detective Rafferty?

14         A.     Yes.

15         Q.     Explain your understanding of the

16    second knife thing, if you would.

17         A.     From news reports again I found

18    out that there was a -- there was one knife

19    recovered in the homicide investigation and

20    several days or maybe weeks later, the

21    ex-husband moves back into the house and he

22    finds a knife discarded in the den that should

23    have been recovered with a good crime scene.

24    And one of the things that came out of that

25    was a finger-pointing between the lab and the



ESQUIRE

Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

179

J. McELHONE

1 homicide squad, that homicide squad -- the lab
2 through the ME's office is responsible for the
3 crime scene.  And the lab people said, no, we
4 process it for physical evidence.  We don't
5 really search the scene.

7              And because of that, one of the
8 first things I did when I came on board again
9 with the lab, with the DA and homicide bureau,
10 we had several sit-downs on who was actually
11 going to do what in crime scenes.  And that
12 second knife theory was something we
13 addressed.  Homicide squad will be responsible
14 for the entire crime scene search.  ID and the
15 ME's office will be responsible for the body
16 and any processing of serology or other
17 physical evidence at the scene.
18       Q.    Was Detective Rafferty still in
19 homicide when you joined?
20       A.    No.
21       Q.    Why did he leave?
22       A.    I couldn't tell you.
23       Q.    Was it in connection with the SIC
24 allegations?
25       A.    I'm sure that was a factor, but I


ESQUIRE

Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

John McElhone                                    December 2, 2011

180

                        J. McELHONE
1
2    don't know for sure.
3         Q.    How did you learn about the whole
4    second knife thing to be able to make policy
5    changes as a result of that?
6         A.    I remember reading it in the paper
7    and then we discussed when I came on board
8    with the lab people saying, you know, that
9    let's not point fingers at each other.  Let's
10   decide right now how we are going to address
11   crime scenes.
12        Q.    You learned about the second knife
13   problem from reading the newspaper?
14        A.    Yeah, that's probably right; my
15   best recollection.
16        Q.    Any other sources within the
17   department?
18        A.    No.
19        Q.    Did you investigate further within
20   the department what had happened with the
21   second knife thing and Rafferty?
22        A.    That was history as far as I was
23   concerned at that point.  My concern was from
24   this day forward how are we going to handle
25   crime scenes.  We are not going to point



ESQUIRE

Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

181

                    J. McELHONE
1
2    fingers at each other, who is going to be
3    responsible for what aspect of the
4    investigation.
5         Q.    So I want to make sure I'm
6    understanding accurately.  Your main concern
7    about the second knife thing in the Diaz case,
8    was the fact that the murder weapon had not
9    been recovered initially during the initial
10   crime scene search?
11        A.    That was certainly a concern.
12        Q.    Were you aware that a knife had
13   been collected originally?
14        A.    From the newspaper account.
15        Q.    And were you aware that detectives
16   elicited a confession from Mr. Diaz?
17        A.    Again, that was in the article at
18   the time.
19        Q.    You were made aware of it in the
20   newspaper?
21        A.    Yes.
22        Q.    And you were aware from the
23   reporting that the confession said he had
24   thrown the knife into the woods and a knife
25   had been found in the woods?



Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

182

                        J. McELHONE
1
2        A.    If that was in the article, that's
3   where I would get that information.  I didn't
4   question anybody or talk to anybody at that
5   point.  I'm not even sure where I was working
6   at that point when that case went down.
7        Q.    And that some months later the
8   knife was found inside the house?
9        A.    I remember reading that.
10        Q.    And that was inconsistent with the
11   confession that had been elicited from Mr.
12   Diaz, right?
13        A.    Yes.
14        Q.    And if that had happened under
15   your command, I understand it didn't but if it
16   had happened during an investigation in your
17   command, that would be a serious concern of
18   yours, wouldn't it?
19        A.    Certainly.
20        Q.    That the confession was
21   inconsistent with the physical evidence?
22        A.    That, and the sloppy crime scene
23   search where he didn't uncover it in the first
24   place.
25        Q.    But the sloppy crime scene search



ESQUIRE

Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

John McElhone                                    December 2, 2011

183

1                          J. McELHONE
2      wouldn't have been your only concern, would
3      it?
4            A.    No, it wouldn't.  The two of them
5      would be troubling.
6            Q.    You would be concerned with the
7      reliability of a confession, right?
8            A.    Sure.
9            Q.    If you have a cooperating suspect
10     who is telling you everything he did in a
11     murder and what he did with the weapon, that's
12     inconsistent with the evidence, you've got to
13     ask yourself if it happened under your
14     command, is this a reliable confession or is
15     it a false confession?
16               MR. DUNNE:  Object to the form of
17           that.
18               Go ahead and answer that.
19           A.    Your hypothetical that you are
20     getting the exact and total truth from a
21     suspect is not always what happens.  Very
22     frequently they will hold something back and
23     just tell you what they think they can tell
24     you and get away with.
25               But I would be concerned if there



Toll Free: 800.944.9454
Facsimile: 212.557.5972

ESQUIRE

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

184

                              J. McELHONE

1    was any aspect of any confession that had a

2    direct piece of evidence that pointed against

3    the reliability of that confession.

4         Q.    So if this confession, if this

5    investigation had happened under your tenure

6    and there is a confession that indicates "I

7    threw the knife in the woods" and months later

8    a bloody knife is actually found inside the

9    house, wouldn't you question whether the

10   confession was true or false?

11        A.    I would question.

12        Q.    And that would be part of your

13   role as the CO?

14        A.    Yeah.  Did the defendant lie, did

15   the detective lie, how did it happen that we

16   had misinformation on this.

17        Q.    And you need to make sure the

18   investigation continued, right?

19        A.    Certainly.

20        Q.    So let's take a look at the Diaz

21   confession.  Have you ever seen it before?

22        A.    Never have.

23                    (Plaintiff Exhibit 15, Diaz

24                    confession marked for



ESQUIRE

Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

John McElhone                                    December 2, 2011

185

1              J. McELHONE
2              identification, as of this date.)
3        Q.    Let's see if we can make out the
4    handwritten script.
5              Looking to the bottom of the first
6    page, six lines from the bottom, the
7    confession says, quote:
8              "I also have been sleeping in the
9        Long Island Rail Road cars east of the
10       Port Jefferson railroad station."
11             Do you see that?
12       A.    Yes.
13       Q.    And then it goes on to say:
14             "On June 8th of 1984 I've been
15       sleeping in the railroad."
16       A.    Um-hum.
17       Q.    On the second page it goes into
18   detail about entering the victim's house and
19   attacking her and at the very bottom of the
20   second page it says:
21             "I was scared and when I finished,
22       I ran out the back door into the woods.
23       I threw my gloves in the woods.  I also
24       threw the knife in the woods."
25       A.    Um-hum.



ESQUIRE

Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

186

                    J. McELHONE

1

2          Q.     And there is no signature at the

3    end.

4          A.     Okay.

5          Q.     And Detective Rafferty's name is

6    at the bottom along with the name of Detective

7    James Cassidy as the officers who are

8    interrogating him.

9          A.     I see that.

10         Q.     Cassidy was not still on the

11   homicide squad when you joined, was he?

12         A.     No.

13         Q.     When did he leave?

14         A.     I couldn't tell you.

15         Q.     Why did he leave?

16         A.     I couldn't tell you.

17         Q.     Also something to do with the SIC

18   investigation?

19         A.     I don't know.

20                    (Plaintiff Exhibit 16,

21                    supplementary report from

22                    investigation dated June 27, 1984

23                    marked for identification, as of

24                    this date.)

25         Q.     The Diaz case related to the rape



Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

187

1                    J. McELHONE
2     and murder of Maureen Negus, right?
3          A.    Yes.
4          Q.    You recall that?
5          A.    Yes.
6          Q.    So what I'm showing you, Exhibit
7     16 is a supplementary report from that
8     investigation.  Do you see that?
9          A.    Yes.
10         Q.    And it is a report prepared by
11    whom?
12         A.    James McCready.
13         Q.    And what is the date on the
14    report?
15         A.    June 27, 1984.
16         Q.    Please take a moment and read the
17    whole report to yourself and let me know when
18    you are done.
19         A.    Okay.  Okay, I finished.
20         Q.    All right.  So in this report it
21    is a report of an interview with three
22    individuals?
23         A.    Employees of the railroad.
24         Q.    Employees of the railroad, right?
25         A.    Um-hum.



ESQUIRE

Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

188

J. McELHONE

1

2      Q.    And is there any indication in

3   Detective McCready's report that you just

4   read, that he showed any photograph to any of

5   those three railroad employees?

6      A.    No.

7      Q.    No documentation that there was

8   any ID procedure done, right?

9      A.    The third paragraph, it said he,

10  too, saw the photo of Diaz.  But it doesn't

11  say how that occurred.

12     Q.    So he, too, saw the photo of Diaz,

13  is referring, is it not, back to the second

14  paragraph, Butch Schumel, S-C-H-U-M-E-L, who

15  according to Detective McCready's report,

16  stated that he saw the newspaper containing a

17  photograph of James Diaz and recognized him as

18  being a person who slept in the railroad cars?

19     A.    Yes.

20     Q.    So there is nothing in this report

21  reflecting that Detective McCready did any ID

22  procedure with these witnesses?

23     A.    No.

24     Q.    Nothing to suggest he did a photo

25  array?



ESQUIRE

Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

189

                        J. McELHONE
1
2        A.    The very last paragraph, another
3   sweeper in Coram positively identified Diaz as
4   being on the train.   There is no reference as
5   to how that was done.
6        Q.    So if there was had been a photo
7   array, that should have been documented?
8        A.    It would have added clarity to
9   that sentence.
10        Q.    If there were a single photo
11   showing, that certainly should have been
12   documented?
13        A.    Then it would have clarified that
14   sentence of how he was identified.
15        Q.    Well, as you testified earlier,
16   any time there is any ID procedure conducted,
17   it has to be documented in a report, right?
18        A.    Yes.
19        Q.    And it would be procedure to
20   document it in the report?
21        A.    Yes, this is significant part of
22   the investigation.
23        Q.    It is.
24        A.    Yes.
25        Q.    So if the report is to be accurate



Toll Free: 800.944.9454
Facsimile: 212.557.5972

ESQUIRE

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

190

1                         J. McELHONE
2    and thorough, it has to make reference to the
3    fact of any ID procedure that's done, right?
4          A.    Yes.   It would be a significant
5    portion of the investigation.
6          Q.    Now, according to the report, none
7    of these people was in the hospital when they
8    were interviewed, right?
9          A.    I didn't see that in the report,
10   no.
11         Q.    And the identification of the
12   suspect Diaz by railroad workers would, if
13   accurate, corroborate that part of the
14   confession where Diaz says he slept on the
15   railroad trains?
16         A.    Yes.
17         Q.    So that's why this report might be
18   important to the investigation?
19         A.    Yes.
20         Q.    To corroborate a confession?
21         A.    Yes.
22         Q.    Because a homicide detective
23   should always be seeking out corroboration?
24         A.    It sounds like two of the
25   witnesses did say it was Diaz, they recognized



Toll Free: 800.944.9454
Facsimile: 212.557.5972

ESQUIRE

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

John McElhone                                    December 2, 2011

191

1                    J. McELHONE

2    him.  But it doesn't say if it was a photo

3    spread or -- one says it was from the paper.

4         Q.    One says it was from the paper and

5    the other one says it was also -- he also

6    recognized Diaz, right?

7         A.    Mr. Koerick in the very last

8    paragraph says he positively identified Diaz

9    as being on the train, No. 2 west.  He thought

10   he was taller but he saw him when he was

11   seated.

12        Q.    So you are referring to Koerick?

13        A.    Yes, the very last paragraph.

14              (Discussion off the record.)

15        Q.    Please take a look at what we will

16   mark as Exhibit 17.

17                   (Plaintiff Exhibit 17, excerpt

18                   of Detective McCready's testimony

19                   from the Diaz trial marked for

20                   identification, as of this date.)

21        Q.    This is an excerpt of Detective

22   McCready's testimony from the Diaz trial?

23        A.    Okay.

24        Q.    Bottom of page 466, line 17 -- are

25   you with me?



ESQUIRE

Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

192

                              J. McELHONE

1

2        A.    Yes.

3        Q.    "Question:  Did Mr. Koerick make

4        an identification of Mr. Diaz, did he

5        tell you that he made an identification

6        of Mr. Diaz as a result of a photograph

7        in the paper?

8              "Answer:  Yes."

9        A.    I see that.

10       Q.    "Question:  So both Schmel and

11       Koerick told you that?

12             "Answer:  Yes."

13       A.    Yes.

14       Q.    Do you see that?

15       A.    I do.

16       Q.    Thank you.  That was a portion of

17  Detective's McCready's testimony at the

18  criminal trial that the ID of Koerick was also

19  from the photograph in the newspaper?

20       A.    Yes.

21       Q.    And that was based on interviews

22  conducted on June 26?

23       A.    Okay.

24       Q.    Do you see that in the report?

25       A.    I see that in the report, yes.



Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

193

J. McELHONE

1

2      Q.    And the report is typed up and

3  signed the next day?

4      A.    I actually -- let me see.  Yes.

5  The 27th, yes.

6      Q.    So the report is indicating that

7  two of these three witnesses recognized Diaz

8  from a photograph in the newspaper?

9      A.    Yes.

10      Q.    And there is no indication in this

11  report that McCready did any photo ID

12  procedure whatsoever with any of these three?

13      A.    You are correct, there is no

14  indication.

15      Q.    If he had done any photo ID

16  procedure, it should have been in the report?

17      A.    Yes.

18      Q.    And certainly based on what you

19  know just from reading the report, there would

20  be no justification for bringing them a single

21  photo before he had met with them, right?

22      A.    No, there wouldn't be.

23      Q.    And certainly from the 26th to the

24  27th, whether or not you take notes, you don't

25  forget in one day, if you have done an ID



Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

194

1                        J. McELHONE
2    procedure with a witness?
3         A.    I can't speak for the detective,
4    but I wouldn't think so, no.
5         Q.    You wouldn't think so, right?
6         A.    Right.
7         Q.    He is not a very good detective if
8    he forgets something that material in one day?
9              MR. DUNNE:  Object to the form of
10         the question.
11              Go ahead and answer the best you
12         can.
13         A.    I don't know the context of what
14    was going on that day so I can't really
15    comment.  I would expect him to do that.
16         Q.    You would expect any detective to
17    remember for a 24-hour period, having shown
18    photographs or a photograph to a witness --
19         A.    Yes.
20         Q.    -- whether or not he took notes of
21    it, right?
22         A.    Again, that's speculation.
23         Q.    I'm sorry, sir.  You don't have to
24    write -- any detective, in fact, any patrol
25    officer, doesn't need to write down a note to



ESQUIRE

Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

Case 2:09-cv-01207-JS-AYS   Document 184-2   Filed 08/17/16   Page 196 of 255 PageID #: 3307

195

1                    J. McELHONE
2    remind himself the next day that he did an ID
3    procedure, does he?
4          A.    Shouldn't have to.
5          Q.    Yeah.  You are not going to forget
6    that in 24 hours, right?
7          A.    Shouldn't have to.
8                MR. DUNNE:  I will object to the
9          forms of those questions.
10               Obviously, the answers stand.
11         Q.    Looking at the exhibit which is
12   volume II of III, I believe that is Exhibit
13   17 -- no, it is going to be 18.
14               (Discussion off the record.)
15               MS. CORNWALL:  Could you mark
16         that, please.
17                    (Plaintiff Exhibit 18,
18               additional excerpt of Detective
19               McCready's testimony from the Diaz
20               trial, pages 500 to 502 marked for
21               identification, as of this date.)
22               MS. CORNWALL:  18 is an additional
23         excerpt of Detective McCready's
24         testimony from the Diaz trial, pages 500
25         to 502.



Toll Free: 800.944.9454
Facsimile: 212.557.5972

ESQUIRE

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

196

1                    J. McELHONE
2          Q.    On page 500, the second page of
3     the exhibit he is asked at line 6:
4                    "Did you show Koerick your mugshot
5          of Diaz?
6                    "Answer:  Yes, I did."
7                    That's an unduly suggestive ID
8     procedure, isn't it?
9          A.    If Mr. Koerick did not know Mr.
10    Diaz, obviously it would be.
11         Q.    And that is an unduly suggestive
12    ID procedure that was not documented in
13    Detective McCready's report, Exhibit 16,
14    right?
15                   MR. DUNNE:  Objection.  Now we
16         have to get some clarification.  He gave
17         a qualified answer and you are
18         assuming --
19                   MS. CORNWALL:  Fine.  Stop
20         coaching.
21                   MR. DUNNE:  I'm not coaching.
22         That is not accurate.  Your question is
23         not accurate based on the last answer.
24         Q.    Sir, could you answer the
25    question?



Toll Free: 800.944.9454
Facsimile: 212.557.5972

ESQUIRE

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

John McElhone                              December 2, 2011

197

1                    J. McELHONE

2        A.     Could you repeat it for me.

3        Q.     It is an unduly suggestive ID

4   procedure, right?

5        A.     If Mr. Koerick did not know Mr.

6   Diaz, then it would be.

7        Q.     And it is an ID procedure that was

8   not documented in Detective McCready's report?

9        A.     Well, actually I pointed out to

10  you there was no reference at all on how

11  Koerick knew it was Diaz, but we looked at his

12  testimony where he said it was from the

13  newspaper.

14       Q.     So that's information that should

15  have been in the report, if he showed a

16  mugshot?

17       A.     Yeah.

18       Q.     Yeah.

19              Is there anything in Exhibit 16,

20  Detective McCready's report, reflecting that

21  James Diaz's photograph had never been

22  published in the paper?

23       A.     No.

24       Q.     If that were the case and

25  Detective McCready knew it, it should have



ESQUIRE

Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

198

                           J. McELHONE
1
2    been documented in a report, right?
3          A.     Yes.
4          Q.     That would be Brady material?
5          A.     Yes.
6          Q.     It would undermine the reliability
7    of his report?
8          A.     It would correct it for sure.
9          Q.     It would call into question the ID
10   of these witnesses?
11         A.     Well, again, they say they
12   positively knew it.  It might have been like a
13   confirmatory, oh, yeah, that's Jimmy Diaz
14   that's who we are talking about.  So, again,
15   there is no context to say how that happened.
16         Q.     But you would have to ask some
17   questions?
18         A.     It would need to be explained.
19         Q.     Because the report says that two
20   of those three people --
21         A.     Knew it was him.
22         Q.     -- had seen his photograph in the
23   newspaper, right?
24         A.     Well, one says it in the report,
25   and the other one says it in the testimony.



ESQUIRE

Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

199

1                          J. McELHONE

2          Q.     So if it came to Detective

3    McCready's attention that there had been no

4    such photograph in the newspaper, that's

5    inconsistent with what's reported.  Right?

6          A.     Yes.

7          Q.     And that needs to be documented

8    and disclosed?

9          A.     Yes.

10          Q.     Prior to trial?

11          A.     Yes.

12          Q.     And if that information came to

13    his attention, it would undermine the

14    corroboration he had been trying to put

15    together of the confession?

16          A.     They are still speaking of him

17    being in railroad cars.  It would undermine

18    who was actually sleeping, was this the man

19    who was sleeping in the railroad cars.

20          Q.     Would you agree that if, if, an

21    unduly suggestive identification procedure led

22    them to identify Diaz, the corroboration of

23    the confession would be undermined?

24          A.     Mr. Diaz, if he is unknown to

25    these people, and you are looking at a witness



ESQUIRE

Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

200

                        J. McELHONE
1
2  to identify the person you have seen sleeping
3  in the railroad cars, then there should have
4  been a photo spread.
5              If it is a, oh, yeah, Jimmy Diaz,
6  that guy, he sleeps in the car all the time,
7  and you are confirming this is the Jimmy Diaz
8  you are talking about, one photo wouldn't have
9  been a problem.  But it should be documented.
10        Q.     It should be documented?
11        A.     Yes.
12        Q.     And there should be a fair, rather
13  than unduly suggestive, display to any
14  witness?
15        A.     Again, if it is confirmatory you
16  are not concerned so much with suggestive.
17  You want to make sure you are talking about
18  the same person when you are taking statements
19  or taking --
20        Q.     Is it your testimony that for a
21  confirming ID, you can be as suggestive as you
22  like?
23        A.     If you are just trying to verify
24  we are talking about the same person, it is
25  not a criminal suspect, neither of these three



ESQUIRE

Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

John McElhone                                December 2, 2011

201

1                    J. McELHONE
2    are criminal suspects, yeah, it would be all
3    right.
4          Q.    The concern about suggestiveness
5    is suggesting to the witnesses who your
6    suspect is, right?
7          A.    Um-hum.
8          Q.    The concern is that in displaying
9    the suspect photograph you are telegraphing to
10   the witness who you think, who you want them
11   to ID, right?  It doesn't matter if the
12   witnesses are suspects.
13         A.    Okay.
14         Q.    You agree?
15         A.    I suppose.
16         Q.    That's a yes?
17         A.    Yes.  You are asking me to comment
18   on cases --
19         Q.    Thank you, sir.  There is no
20   question pending.
21         A.    Okay.
22               MR. DUNNE:  Can we get a copy of
23         this, of 18?
24               MS. CORNWALL:  Take this one.
25         Q.    Take a look at Exhibit 18.  At



ESQUIRE

Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

202

1                        J. McELHONE
2     page 501, again, McCready's testimony at the
3     Diaz trial.  At line 3:
4                  "Question:  That was why you went
5           up there to place Diaz in the railroad
6           yard?
7                  "Answer:  Yes.
8                  "Question:  So the first time
9           could be an accident, but you showed
10          this guy this picture?
11                 "Answer:  Right.
12                 "Question:  And you couldn't use
13          this fellow in court?
14                 "Answer:  Right.
15                 "Question:  Because you only
16          showed him this one picture?
17                 "Answer:  Right."
18                 Do you see that?
19     A.     Yes.
20     Q.     So based on this testimony,
21     McCready registered it was a problem for him
22     to have shown a single photo to the witness?
23     A.     Yes.
24     Q.     Thank you.  If you had been made
25     aware that in a homicide case Detective



Toll Free: 800.944.9454
Facsimile: 212.557.5972

ESQUIRE

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

John McElhone                                    December 2, 2011

203

1              J. McELHONE

2    McCready used what he considered to be an

3    unduly suggestive ID procedure with a witness,

4    would you have had a concern?

5              A.    Yes.

6              MR. DUNNE:   And I will just note

7         my objection to the form of that

8         question.  Obviously, the answer stands.

9         Q.    If you had been made aware that

10   Detective McCready failed to document what you

11   considered to be an unduly suggestive ID

12   procedure, would you have had a concern?

13             A.    Yes.

14        Q.    If you had known that Detective

15   McCready failed to document Brady material

16   that would undermine the corroboration of a

17   confession, would you have had a concern?

18             A.    Yes.

19             MR. DUNNE:   Again, I will object

20        to the form.  The answer will obviously

21        stand.

22        Q.    And you are aware that this is the

23   case that prompted Judge Namm to write to the

24   governor to ask for an independent

25   investigation?



ESQUIRE

Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

204

1                    J. McELHONE

2          A.    I thought there were a couple,

3    but --

4          Q.    This is one of them, right?

5          A.    Yes.

6          Q.    Let's turn back to the SIC report,

7    Exhibit 12.  At pages 38 to 39, the findings.

8    Quote:

9              "The final instance of false

10         testimony in the Diaz case discussed at

11         the commission's public hearing

12         concerned testimony by Detective James

13         McCready regarding his interviews of

14         three railroad workers who placed Diaz

15         near the scene of the murder close to

16         the day of its occurrence.  In his

17         police report, McCready wrote that the

18         railroad workers recognized Diaz from

19         pictures in the newspaper."

20              Do you see that?

21         A.    Yes.

22         Q.    And later on it says:

23              "In his report McCready made no

24         mention of any mugshot or identification

25         procedures, and at trial McCready



ESQUIRE

Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

205

J. McELHONE

1
2    initially testified that the railroad
3    workers recognized Diaz from pictures in
4    the newspaper.  However, quote-unquote,
5    after it was demonstrated by the defense
6    that there had not been any picture of
7    Diaz in the newspaper at the time of the
8    McCready interviews, McCready changed
9    his testimony and contrary to his police
10   report, said he actually had shown
11   mugshots of Diaz to the railroad
12   workers."
13        Do you see that?
14   A.    Yes.
15   Q.    If you had been aware that
16   McCready engaged in this conduct, you would
17   have been very concerned, right?
18   A.    Yes.
19        MR. DUNNE:  Objection to the form
20        of the question.
21        The answer stands.
22   Q.    You would have been concerned that
23   he had testified falsely?
24   A.    That there was a failure to
25   document, obviously, and he testified



ESQUIRE

Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

206

1                    J. McELHONE
2    incorrectly, I would say.
3          Q.    And inaccurately, right?
4          A.    Inaccurately, incorrectly, yeah.
5          Q.    McCready was on the force as a
6    holdover in the homicide unit when you took
7    over?
8          A.    Yes.
9          Q.    Does it cause you concern now to
10   learn that he testified at the trial that the
11   witnesses had ID'd Diaz from photograph in the
12   newspaper, when in fact McCready knew that
13   wasn't possible?
14              MR. DUNNE:  Well, I'm going to
15         object to that question.  It assumes
16         something that is not established for
17         this witness, but go ahead and try to
18         answer that question.
19         A.    I don't know what Jim knew at the
20   time, if it was a mistake or how he came to
21   that conclusion to testify that way.
22         Q.    You are assuming that he made a
23   mistake, aren't you, sir?
24         A.    Yes.
25         Q.    It is hard for you to acknowledge



Toll Free: 800.944.9454
Facsimile: 212.557.5972

ESQUIRE

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

207

                              J. McELHONE

1

2    the possibility that he intentionally

3    testified to something that wasn't true?

4              MR. DUNNE:  I'll object to the

5         form.

6              Go ahead and answer that as best

7         you can.

8         A.   I don't believe that would have

9    happened, no.

10        Q.   Why not?

11        A.   I've never found him to be other

12   than forthright.  He could be sloppy, he could

13   take shortcuts as I mentioned earlier, but I

14   never knew him to outright lie to anybody.

15        Q.   Take a look at page 41 of the SIC

16   report finding, quote:

17             "The commission believes that in

18        the Diaz trial, McCready, Dubey and

19        Pistone all knowingly gave false

20        testimony."

21        A.   That was their belief.

22        Q.   That doesn't cause you any

23   concern?

24        A.   Again, I didn't see this when I

25   took over the homicide squad.  I was relying



Toll Free: 800.944.9454
Facsimile: 212.557.5972

ESQUIRE

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

208

1                    J. McELHONE

2    primarily on what I was told and when I looked

3    at it now, it does, but, again, it is their

4    conclusion.

5         Q.    When you look at it now, it does

6    cause you concern about the possibility that

7    McCready committed perjury, right?

8         A.    Yes, if that's what their

9    conclusion is.  I don't know how they came to

10   that conclusion.

11        Q.    And likewise, reading Judge Namm's

12   letter asking for the formation of the SIC in

13   1985 referring to perjury in the James Diaz

14   trial, knowing now that McCready was one of

15   the officers who testified, doesn't that also

16   cause you concern that McCready in fact was

17   someone who committed perjury in a homicide

18   case?

19        A.    Again, it never came to my

20   attention that it was a perjury situation.  It

21   was told to me that it was documentation,

22   note-taking and a sloppy mistake.

23        Q.    And that was enough for you at the

24   time?

25        A.    I had to go with the information I



Toll Free: 800.944.9454
Facsimile: 212.557.5972

ESQUIRE

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

John McElhone                                    December 2, 2011

                                                                209

1                    J. McELHONE

2    had.

3          Q.    And you didn't dig deeper?

4          A.    No.

5          Q.    But now as you sit here today so

6    many years later and you have seen his report

7    and you have seen portions of his testimony,

8    you have seen Judge Namm's letter, a sitting

9    judge accusing officers, including McCready,

10   of perjury, and you have seen findings of the

11   SIC that he did commit perjury, as you sit

12   here today, are you concerned that Detective

13   McCready committed perjury?

14               MR. DUNNE:  Objection.

15         A.    In this case --

16               MR. DUNNE:  Objection to the form

17         of the question.  Go ahead.

18         A.    In this case?  I'm concerned that

19   a very big mistake was made.  Whether it was

20   something he forgot or something he didn't

21   note right or what the circumstances are, you

22   know, you would have to ask him.  I don't

23   know.

24         Q.    It is really hard for you to

25   acknowledge the possibility that it is



Toll Free: 800.944.9454
Facsimile: 212.557.5972

ESQUIRE

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

210

1              J. McELHONE
2    anything other than a mistake, isn't it?
3         A.    It is, yes.
4         Q.    Given the tumult and the turmoil
5    that the department was facing and that you,
6    the pressure you were facing as you took over
7    the homicide department, it would have been
8    disastrous to acknowledge that a homicide
9    officer had committed perjury, wouldn't it?
10             MR. DUNNE:  Objection to the form
11        of the question.
12        A.    That was not my decision to make.
13   It was --
14        Q.    You didn't want to know about it
15   if it happened?
16        A.    I did not know the circumstances
17   of what the SIC was looking to at that time --
18        Q.    And you didn't want to know, did
19   you?
20        A.    And I talked to my boss who said
21   there wasn't a problem with the staff who was
22   there, and I went with that --
23        Q.    Is that --
24        A.    Had I known now I would have
25   investigated further with Jimmy and found out



Toll Free: 800.944.9454
Facsimile: 212.557.5972

ESQUIRE

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

John McElhone                                    December 2, 2011

211

                    J. McELHONE
1
2    how that happened, explain to me and let me
3    understand how that could have happened.
4         Q.    Tell me how you would have
5    investigated if you had known then what we
6    have gone through today?
7              MR. DUNNE:  Objection again to the
8         form of that question.  Go ahead.
9         A.    I would try to get the testimony
10   that you just showed me, how the SIC came to
11   their conclusion that it was perjury and then
12   talked to Jimmy about it.
13        Q.    Anything else you would have done
14   to investigate, looking at the underlying
15   data, looking at the testimony and talking to
16   him?
17        A.    That would probably be as far as
18   it went, that I would make my determination if
19   he stayed in the homicide squad or they
20   transferred him some place else.
21        Q.    Would you take him at his word
22   that it was a mistake if he told you it was a
23   mistake?
24        A.    By that time I would have the
25   information you just showed me and would have



Toll Free: 800.944.9454
Facsimile: 212.557.5972

ESQUIRE

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

212

                         J. McELHONE
1
2   to dovetail what I'm reading and what he is
3   saying.
4        Q.    And if you found an inconsistency
5   between the evidence before you and what a
6   homicide detective told you, what do you do?
7             MR. DUNNE:  Objection to the form.
8        Go ahead.
9        A.    At that point I would have
10  probably had him moved to another command.
11       Q.    Because you can't rely on the word
12  of someone who is not telling you the truth?
13       A.    Yes, it is too sensitive an area.
14       Q.    Especially given the tumult at the
15  time?
16       A.    No, any time in homicide squad the
17  veracity of the detectives is extremely
18  important.
19       Q.    And if they lie about one thing,
20  you can't trust them any more?
21       A.    Well, yes.
22             MR. DUNNE:  Again, objection.
23             MS. CORNWALL:  Let's take a quick
24       break and then we got one more hour
25       before you have to go.



ESQUIRE

Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

John McElhone                                December 2, 2011

213

1                    J. McELHONE
2              MR. DUNNE:  Sure.
3              (Recess:  3:17-3:31 p.m.)
4    BY MS. CORNWALL:
5         Q.    Mr. McElhone, we talked earlier
6    about identification procedures.  Do you
7    recall that?
8         A.    Yes.
9         Q.    And one reason why an ID might be
10   barred from evidence at trial is if it was
11   elicited by means of an unduly suggestive ID
12   procedure, right?
13        A.    Yes.
14        Q.    Separate and apart from unduly
15   suggestive procedures, wasn't it true back in
16   1985 and in the '80s, that police officers had
17   to inform prosecutors that there had been an
18   ID procedure?
19        A.    Sure.
20        Q.    And if no notice was given as
21   early as the arraignment, you couldn't use
22   that ID at trial?
23        A.    I can't comment to the timeliness
24   of it, but it would have to be notified, sure.
25        Q.    They would have to be notified



ESQUIRE

Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

John McElhone                          December 2, 2011

214

                    J. McELHONE
 1
 2    certainly before trial, right?
 3         A.    Yes.
 4         Q.    To give the defense an
 5    opportunity --
 6         A.    To have the hearing.
 7         Q.    -- to have the Wade hearings?
 8         A.    Yes.
 9         Q.    And to explore the circumstances
10    of the ID procedure, right?
11         A.    Yes.
12         Q.    And explore the methods used by
13    police to elicit that ID, right?
14         A.    Yes.
15         Q.    So if police conducted an ID
16    procedure and didn't give notice about it,
17    that would be a problem?
18         A.    Yes.
19         Q.    Now, in the testimony that we
20    reviewed before the break, notwithstanding the
21    fact that there was no record in Detective
22    McCready's report that he'd shown a mugshot,
23    he was able to remember that fact by the time
24    of trial.  Right?
25         A.    What was the question?



ESQUIRE

Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

215

                          J. McELHONE
1
2        Q.    There was no reference to having
3   displayed a mugshot in McCready's report,
4   right?
5        A.    There wasn't, no.
6        Q.    And that's a report dated June
7   27th of 1984, right?
8        A.    Okay.
9        Q.    Regarding interviews he did the
10   day before?
11        A.    Three railroad workers, yes.
12        Q.    But by the time he testified at
13   the trial --
14             MR. DUNNE:   I don't see a date
15        either.
16        Q.    I don't either, but by the time he
17   testified in the trial, in or about October of
18   1985 when Diaz was acquitted and Namm wrote
19   his letter --
20        A.    Um-hum.
21        Q.    -- McCready was able to remember
22   that he had, in fact, shown mugshots to these
23   witnesses.   Right?
24        A.    That's what the document
25   indicates, yes.



ESQUIRE

Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

216

                        J. McELHONE
1
2       Q.      That's what his sworn testimony
3  indicates?
4       A.      Yes.
5       Q.      So that's not a note-taking
6  mistake, is it?
7       A.      No, that's factual error.
8       Q.      That cannot be attributed to the
9  lack of note-taking?
10      A.      Well, I think that might be part
11  of it.
12      Q.      But he was able to remember
13  without having notes to benefit him, that he
14  had actually shown the mugshot?
15      A.      That's what is indicated there,
16  yes.
17      Q.      That's what he testified to?
18      A.      Okay.
19      Q.      So you can't blame the lack of
20  notes for his failure to give notice about the
21  ID procedure, right?
22      A.      You can draw that conclusion.
23      Q.      What other conclusion would you
24  draw?
25      A.      I was, again, the whole thing



Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

217

                          J. McELHONE
1
2    about note-taking was what I was told was the
3    problem when McCready was mentioned in there
4    that had he taken adequate notes, mistakes
5    wouldn't have been made, had he made an
6    adequate report, mistakes wouldn't have been
7    made and there wouldn't have been a problem.
8    And I went with that information from the day
9    I took over at the homicide squad.
10        Q.    So leaving aside what you were
11   told back then --
12        A.    Okay.
13        Q.    -- that there was a note-taking
14   error, okay?
15        A.    Um-hum.
16        Q.    Based on what you have looked at
17   today, McCready's report, excerpts of
18   McCready's testimony --
19        A.    Yes.
20        Q.    -- findings by Judge Namm and the
21   SIC that McCready gave false testimony?
22        A.    Inaccurate testimony.
23        Q.    No, their findings were that he
24   committed perjury.
25        A.    Well, that's their findings.



ESQUIRE

Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

John McElhone                                    December 2, 2011

218

                        J. McELHONE

1

2        Q.    You have seen that today, right?

3              MR. DUNNE:  It is their findings

4        as he said.

5        A.    The findings of the SIC

6   commission.

7        Q.    You are aware of those findings

8   now?

9        A.    Today, yes, I am.

10       Q.    Based on everything you have seen

11  today, sir, this was not a note-taking

12  mistake, was it?

13             MR. DUNNE:  Object to the form of

14       the question.

15             Go ahead and answer that as best

16       you can.

17       A.    With all the information I have in

18  front of me now, no, there is other mistakes

19  here, there are obvious glaring mistakes in

20  his testimony.

21       Q.    Like what?

22       A.    He testified inaccurately and he

23  corrected his testimony and that testimony

24  wasn't substantiated with any kind of report

25  or notes.



Toll Free: 800.944.9454
Facsimile: 212.557.5972

ESQUIRE

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

219

                        J. McELHONE

1

2       Q.      And those are serious errors?

3       A.      Yes.

4       Q.      Serious misstatements of fact?

5       A.      Yes.

6       Q.      And it is important to you to

7   characterize them as a mistake as opposed to

8   an intentional misstatement of fact, right?

9               MR. DUNNE:  I'll object to the

10          form of the question.

11      A.      That's the only conclusion I can

12  reach at this point without exploring it

13  further.

14      Q.      What would it take for you to

15  acknowledge the real possibility that McCready

16  deliberately lied?

17              MR. DUNNE:  Objection to the form.

18      A.      It is possible.  Anything is

19  possible.

20      Q.      What would it take?

21      A.      But on the paperwork I'm looking

22  at here now, and the experience I have with

23  the detective, it is a mistake.  I don't know

24  that it would be something that he would

25  intentionally do to mislead anybody.



ESQUIRE

Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

220

1                     J. McELHONE
2          Q.    What evidence would you need to
3     come to the conclusion that it was more than a
4     mistake?
5          A.    Talk to the three people involved,
6     talk to Jim involved, and if it is a lie, it
7     is a lie.
8          Q.    So if any one of these three
9     witnesses came forward, for example, and said
10    I never told him I'd seen a photograph --
11         A.    I have no idea who James Diaz was
12    until McCready showed me a picture.
13         Q.    If they said that, that might
14    convince you he was lying?
15         A.    Yes.
16         Q.    If any one of these witnesses came
17    forward and said I never told McCready I saw
18    Diaz's picture in the newspaper, would that
19    convince you that McCready was lying?
20         A.    Certainly a mistake at that point.
21              MR. DUNNE:  Objection to the form,
22         but the answer stands.
23         Q.    I'm sorry, the answer was?
24         A.    Certainly a mistake at that point.
25         Q.    Well, we are already at mistake.



ESQUIRE

Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

John McElhone                                    December 2, 2011

221

                        J. McELHONE
1
2    I'm asking you what more would convince you
3    that it was worse than a mistake.  Here is the
4    question.
5              If any one of these three
6    witnesses said now or then, in fact, I never
7    stated that I saw a newspaper containing a
8    photograph of James Diaz --
9         A.    Again, that would be a mistake
10   that would have to be investigated, how did
11   that happen, Jim.  Did they say I saw it in
12   the newspaper, meaning they read the article
13   or did they say I saw his picture, or you
14   know, it is semantics, it gets into a whole
15   thing there.
16        Q.    I think we are missing one piece
17   here.  Take a look, if you would, please, at
18   Exhibit 17 and turn to page, the last page of
19   the exhibit, transcript page 467.  Do you have
20   it?
21        A.    Yes.
22        Q.    Okay.  So the question is from the
23   court:
24              The 26th being June 26th, 1984.
25              "Question:  Of '84.



ESQUIRE

Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

222

                            J. McELHONE
1
2               "Answer:  Right."
3               Do you see that at the top there?
4       A.      Correct, yes.
5       Q.      "Question:  The date of your
6       report?
7               "Answer:  Yes.
8               "Question:  Now on June the 26th
9       of 1984, there was no picture in the
10      paper, is that correct?
11              "Answer:  To my knowledge there
12      was no picture in the paper.
13              "Question:  You said you checked
14      that day?
15              "Answer:  I checked later that
16      day.
17              "Question:  Are you talking about
18      the time you are talking to these guys,
19      after you talked to these people?
20              "Answer:  No.  There was just as
21      far as -- no, there was never any
22      picture until the 28th of whatever date
23      you mentioned there."
24              Do you see that there?
25      A.      Yes.



Toll Free: 800.944.9454
Facsimile: 212.557.5972

ESQUIRE

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

223

1                    J. McELHONE

2        Q.    So that's McCready under oath

3    saying there was no photograph ever published

4    of Diaz in the newspaper until after he

5    interviewed these three people.  Okay?

6        A.    Okay.

7        Q.    So this is the premise.  That

8    there never had been a photograph in the

9    newspaper before he interviewed these

10   witnesses.  I'm going to ask you a question

11   about what evidence you might need to make the

12   conclusion that McCready lied in his report.

13   Okay.  That's going to be the question.

14          If one of these three witnesses

15   came forward, now that we know that there was

16   no photograph in the newspaper, if Schumel or

17   Koerick says I never told Detective McCready I

18   had seen Diaz's photo in the newspaper, would

19   you then be able to conclude that McCready

20   intentionally lied?

21          MR. DUNNE:  Objection to the form.

22   Go ahead.

23       A.    Again, on its face it is a

24   mistake, it is a huge mistake.

25       Q.    It is a huge mistake?



Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

224

                    J. McELHONE

1

2        A.     It would have to be explored and

3   investigated.

4        Q.     Sir, all I'd like to know is under

5   what circumstances, what proof would it take

6   for you to conclude that McCready lied?

7               MR. DUNNE:  Again, objection, but

8        go ahead.

9        A.     I would want a fuller

10  investigation.  People make mistakes.  People

11  are under pressure when they are testifying in

12  court.  Was he mistaken, was he thinking about

13  another case, I don't know what the situation

14  was.  I didn't ask him about it.

15       Q.     I understand that.

16       A.     I didn't have any of this

17  information until you have given it to me now.

18  You are asking me hypothetically.

19       Q.     I am.

20       A.     Again, it is something that would

21  be immediately explored by me.  It would be

22  something I would look into.  I would talk to

23  him.  I would try to talk to the witnesses,

24  try to figure out if there is some motive or

25  other reason that he would do that that would



Toll Free: 800.944.9454
Facsimile: 212.557.5972

ESQUIRE

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

John McElhone                                    December 2, 2011

225

1                        J. McELHONE
2      substantiate that he did it deliberately to
3      mislead someone, but I would --
4           Q.    Well, couldn't it be one operating
5      theory if you were investigating this that
6      Detective McCready's motive was to corroborate
7      a confession?
8           A.    That might be one of the motives.
9           Q.    Now, if the witnesses say this
10     report is wrong, I never said that, wouldn't
11     that enable you to conclude that Detective
12     McCready deliberately wrote a false report?
13               MR. DUNNE:  I'm objecting to the
14          form of the question.
15               Go ahead and answer it as best you
16          can.
17          A.    Again, this is why it would be
18     important to take notes or in this case, I
19     would take a written statement, a sworn
20     written statement that I have now been shown a
21     photo by Detective McCready and I know that to
22     be James Diaz, the man who was sleeping in the
23     railroad cars at the time.  That would be a
24     great way to go.
25          Q.    It would have been?



ESQUIRE

Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

226

                          J. McELHONE

1

2        A.     Yes.

3        Q.     But he didn't take that route?

4        A.     He didn't take notes, he didn't

5    take a statement.  He made a quick report and

6    as we know now, it was inaccurate.

7        Q.     How do you know it was a quick

8    report?

9        A.     I'm just saying it is a half a

10   page on three different witnesses.

11       Q.     Sir, can you give me a yes or no

12   answer to the following question.

13              If Schumel or Koerick came forward

14   under oath and said I never told Detective

15   McCready that I saw James Diaz's photo in the

16   newspaper, would that be enough for you to

17   conclude that this report was intentionally

18   false?

19              MR. DUNNE:  Again, I will object

20         to the question.

21              Go ahead and answer it as best you

22         can.

23       A.     Again, it would be -- I would

24   be --

25       Q.     With respect, sir, it is a yes or



Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

227

1                    J. McELHONE

2    no question.

3              MR. DUNNE:  Unless he can't answer

4         that yes or no.

5         Q.    Would that be enough evidence for

6    you?

7         A.    That would be no.  It would be

8    enough to indicate that a further

9    investigation would have to be taken.

10        Q.    Tell me what evidence would you

11   need?

12        A.    Prior cases, prior complaints of

13   this type of --

14        Q.    So you'd need a demonstrated

15   history of fabrications --

16        A.    That would help substantiate

17   something that is coming up at this point.  It

18   could very well be a mistake.  I don't know.

19        Q.    You really want to believe it is a

20   mistake?

21        A.    Possible.

22              MR. DUNNE:  Again, this is --

23        A.    I'm saying it is a possibility.

24        Q.    Well, we know it is a mistake.

25        A.    I've done a lot of civilian



ESQUIRE

Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

John McElhone                              December 2, 2011

228

1                    J. McELHONE
2   complaints.  I've done a lot --
3       Q.    The question is is it an
4   intentional fabrication?
5       A.    How can I tell you that.  I would
6   need more information to say it was
7   intentional.
8       Q.    And what information would
9   convince you that it was intentional?
10      A.    I think I have answered that.
11      Q.    I think you have not answered
12  that.  I'm asking you to tell me what it would
13  take specifically.
14      A.    I would have to have a
15  preponderance of the evidence that he did it
16  intentionally.
17      Q.    And what would that evidence have
18  to look like given what we looked at today?
19      A.    It would be interviews with the
20  people he alleges he talked to.  And it would
21  be --
22      Q.    And what would they need to tell
23  you for you to believe it --
24      A.    I didn't do -- I didn't say.
25      Q.    So if Schumel or Koerick comes



ESQUIRE

Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

229

                        J. McELHONE

1

2    forward under oath and said I never said that,

3    that would be a enough to convince you he

4    lied?

5         A.    That's a step in the process and

6    then go back to McCready and go how did this

7    happen, how come they are saying no and you

8    are saying yes and you wrote the report on it.

9         Q.    And if he gives you an explanation

10   that is inconsistent with theirs, you are

11   going to go with him, aren't you?

12        A.    I don't think so.  I guess I would

13   go as far as I could with that investigation

14   and if there was still a cloud about it, in my

15   position as lieutenant, I can't fire him.  I

16   can initiate discipline or ask that he be

17   transferred.  It would be one of those two

18   things.

19        Q.    And if you interviewed one of

20   these witnesses and any one of them said I

21   never said that --

22        A.    That would be definitely a start

23   into that direction, yes.

24        Q.    Is that enough of a concern for

25   you that you would initiate transfer?



ESQUIRE

Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

John McElhone                                    December 2, 2011

230

1                    J. McELHONE

2          A.     It would be a concern.

3          Q.     Enough of a concern?

4          A.     Again, then I would talk to Jim

5    and see if there is any other kind of logical

6    explanation or anything I can offer up.

7          Q.     Sir, do you believe that an

8    officer who had fabricated a report is going

9    to be honest with you when you have a sit-down

10   with him?

11               MR. DUNNE:  I'm objecting to the

12        form of the question, it assumes things

13        that aren't established.

14               But go ahead and answer that as

15        best you can.

16         A.     I would take it into

17   consideration.  There might be some kind of

18   explanation.

19         Q.     Leaving aside Detective McCready

20   as a general matter.  If you suspect an

21   officer of lying deliberately on a report in

22   testimony, can you rely on their word in a

23   sit-down?

24         A.     No, but that would be part of the

25   investigation.



ESQUIRE

Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

231

                         J. McELHONE

1

2        Q.     Like any other investigation --

3        A.     Right.

4        Q.     -- you need corroboration, right?

5        A.     Yes.

6        Q.     You need independent objective

7    evidence?

8        A.     That would be helpful.  If it

9    exists, that would be very helpful.

10        Q.     And in this scenario that we are

11   talking about now, the three railroad workers

12   who are not even witnesses to the crime --

13        A.     Independent.

14        Q.     -- would be independent and

15   objective witnesses?

16        A.     Yes.

17        Q.     If they told you I never said

18   that, I can't imagine why Detective McCready

19   would have written that down because I never

20   said it, would that be enough for you to

21   believe that he deliberately made it up?

22        A.     Again --

23             MR. DUNNE:  Objection.

24        A.     -- you are taking a leap at the

25   very end.  It would be enough for me to say



Toll Free: 800.944.9454
Facsimile: 212.557.5972

ESQUIRE

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

232

1                      J. McELHONE
2    this is totally inaccurate, I don't know what
3    the motive was unless he has explained that to
4    me or it wouldn't matter what the motive was,
5    it is inaccurate, you can't go with that.
6         Q.    Other than talking to these
7    witnesses, what else would you do to
8    investigate whether Detective McCready
9    knowingly wrote a false report or knowingly
10   testified falsely?
11        A.    Again, I would look into his
12   background and see if there were other cases
13   like that, anything in internal affairs had
14   any kind of complaint to that.  If any of his
15   former supervisors had a situation where he
16   was doing something like that.  That would all
17   be --  you have to do a very complete
18   investigation when you are talking about a
19   person's career and talking about a
20   person's --
21        Q.    As you do when someone's liberty
22   is at stake at homicide investigation, right?
23        A.    Absolutely.  Again, you have
24   switched from an employee to a suspect.  The
25   burden of proof in those situations, a



ESQUIRE

Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

233

1                    J. McELHONE
2  reasonable cause to believe that the crime was
3  committed and this person committed the crime.
4  So it is a different standard of proof.
5       Q.    You mentioned one of the things
6  you would look at in doing a thorough
7  investigation of whether a detective had
8  deliberately lied in an official
9  communication, a report or testimony, is
10  whether there have been complaints against him
11  in the past?
12       A.    Yes.
13       Q.    And one of the places you would
14  look for that is internal affairs?
15       A.    Yes.
16       Q.    And if there have been similar
17  complaints about that officer in the past, you
18  would weigh that on the side of more likely to
19  be lying as opposed to mistake --
20       A.    Correct.
21       Q.    -- when you are balancing the
22  evidence, right?
23       A.    Yes.
24       Q.    So if, for example, you were
25  investigating this scenario with this



Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

ESQUIRE

234

1                        J. McELHONE

2    information and trying to determine whether

3    Detective McCready intentionally made false

4    statements, if you found he had been alleged

5    to have made false statements in the past,

6    that would raise a concern for you?

7            A.    Yes.

8            Q.    It would weigh on the side of

9    finding that he had lied again, right?

10           A.    Yes.

11           Q.    And you understood when you took

12   over as the CO of homicide that an officer's

13   history on the force, past complaints was

14   critically important for your ability to know

15   you can rely on him, right?

16           A.    Yeah, his track record.

17           Q.    Ms. McElhone, have you ever before

18   been interviewed by any investigative

19   agency -- I'm not talking about your lawyer

20   here -- about the Tankleff case?

21           A.    No.

22           Q.    Did the Attorney General's office

23   ever interview you?

24           A.    No.

25           Q.    Did the SIC ever interview you?



ESQUIRE

Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

235

                              J. McELHONE
1
2        A.      No.
3        Q.      You didn't testify in the Tankleff
4   matter at any time previously to today?
5        A.      I did not.
6        Q.      Did you ever give a sworn
7   statement to anyone in connection with Marty
8   Tankleff?
9        A.      No.
10       Q.      Other than your counsel here, have
11  you spoken to anybody about this lawsuit?
12       A.      My wife.
13       Q.      Okay.
14       A.      That's about it.  I'm retired for
15  five years, so it is not something that I talk
16  about.
17       Q.      When is the last time you spoke to
18  detective, now retired, McCready?
19       A.      At Doyle's retirement party, about
20  a year or two years ago.
21       Q.      And that's after this complaint
22  was filed, was it?
23       A.      I don't know.  I guess.
24       Q.      Did you talk to him about the
25  Tankleff case?



Toll Free: 800.944.9454
Facsimile: 212.557.5972

ESQUIRE

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

John McElhone                                    December 2, 2011

                                                                 236

                              J. McELHONE

1

2          A.      No.

3          Q.      Did the subject come up at the

4    retirement party?

5          A.      No, it was just very brief.  I

6    hadn't seen him in years.  I know he is living

7    in North Carolina or some place down south.

8          Q.      How is he looking?

9          A.      Not so good.

10         Q.      Really, what's going on with him?

11         A.      He looks a lot older, unlike me.

12         Q.      Unlike you, spring chicken.

13                 Was he physically well?

14         A.      He appeared to, you know, he was

15   at a retirement gig and having a good old

16   time.

17         Q.      Having a drink in his hand?

18         A.      I don't remember that part, but --

19         Q.      When is the last time you saw

20   Norman Rein?

21         A.      I don't know if he was even at

22   Bob's.  It has been quite a while since I've

23   seen Norman.

24         Q.      Since you retired have you spoken

25   to him about the case?



ESQUIRE

Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

John McElhone                                December 2, 2011

237

1                    J. McELHONE

2        A.    No.

3        Q.    When is the last time you spoke to

4   him?

5        A.    I couldn't tell you honestly.

6        Q.    And how about Robert Doyle, when

7   is the last time you spoke to him?

8        A.    I actually met him at the office

9   of Mr. Dunne here.

10       Q.    When was that?

11       A.    When was that, last week?

12             Yeah.

13       Q.    Who else was at that meeting?

14       A.    Just Mr. Dunne, Bob Doyle and

15   myself.

16       Q.    How long was that meeting?

17       A.    A couple of hours, two, three.

18       Q.    Was there any other meeting at

19   which you were present with Detective Rein?

20       A.    Never with Detective Rein.

21             MR. DUNNE:  You meant Doyle.

22       Q.    I'm sorry, was there any other

23   meeting where you and Mr. Doyle met either

24   alone or with anyone else.

25       A.    No, once before with Mr. Dunne



ESQUIRE

Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

John McElhone                                    December 2, 2011

238

1                     J. McELHONE

2     present, the day of the earthquake because we

3     had to leave early.   The fifth floor was

4     shaking.

5          Q.     How long was that meeting?

6          A.     Two, three hours.

7               MR. DUNNE:   It got cut short.

8          A.     It had to be continued last week.

9          Q.     And did you and Mr. Doyle both

10    review the same documents we were referring to

11    earlier in those meetings?

12         A.     I don't know what Bob was

13    reviewing.   It was more of a discussion and a,

14    you know, we were provided documents and I did

15    most of the reading at home.

16         Q.     And did you speak to him about the

17    allegations in the complaint?

18         A.     Not really.

19         Q.     Did you speak to him about the

20    evidence?

21         A.     I think it was just a rehash of

22    what his role was during the Tankleff case,

23    what my role was, and no, just that,

24    basically.

25         Q.     Did you talk to him about Jimmy



Toll Free: 800.944.9454
Facsimile: 212.557.5972

ESQUIRE

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

John McElhone                                    December 2, 2011

239

                              J. McELHONE

1

2     McCready?

3          A.     No, not really, other than it came

4     up when we rehashed the investigation who did

5     what and who was where, as best we can recall

6     20 some odd years later.

7          Q.     How is Doyle doing?

8          A.     Fine.

9          Q.     In good health?

10         A.     Good health.

11         Q.     When you say you were rehashing

12    the case, what does that mean?

13         A.     Just informal discussion, you

14    know.

15         Q.     Of?

16         A.     How long were you at the scene,

17    how long was I at the scene.  I really

18    couldn't recall and actually going through the

19    records that were provided to me to review, I

20    didn't see myself logging in and logging out

21    so I'm going basically on my memory which was,

22    I was at the scene a couple of times.  I think

23    we had the scene two or three days.

24         Q.     And you were there on the very

25    first day?



ESQUIRE

Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

240

J. McELHONE

1

2        A.     Yes.

3        Q.     What time did you get there?

4        A.     I don't know exactly, but as soon

5   as I was informed I was on my way.  Marty was

6   no longer there.  Doyle was.  I met him in

7   front of the scene and I was getting a

8   briefing from him right there.  I would say

9   8:30 in the morning, something like that.

10       Q.     How long were you at the scene?

11       A.     Several hours that day.  I think I

12  went back the following day for a couple of

13  hours.

14       Q.     Now, we spent quite a bit of time

15  talking about the Diaz case and the

16  allegations about Detective McCready.

17       A.     Um-hum.

18       Q.     Would you agree with that

19  assessment?

20       A.     Yes.

21       Q.     You testified earlier that you

22  went with what you were told by Deputy

23  Inspector Murphy with respect to the holdover

24  detectives, including McCready?

25       A.     Yes.



ESQUIRE

Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

John McElhone                                    December 2, 2011

241

                           J. McELHONE

1
2        Q.     Why did you just go with what you
3   were told?
4        A.     I had no other evidence to think
5   otherwise.
6        Q.     Now that you have seen some other
7   evidence, do you, would you reconsider that
8   decision if you had it to do again?
9              MR. DUNNE:  I'm objecting to the
10        form of the question.
11             Go ahead.
12        A.     It would be worth more, it would
13   be more in the discussion phase that I had
14   with him, you know, how did that happen and
15   particularly the ID procedure that you said,
16   would certainly be a glaring example of why
17   you can't just go out there on your own and
18   why you have to make sure it is accurate.
19        Q.     Well, you have to make sure that
20   all of your documentation is accurate?
21        A.     Right.
22        Q.     People are relying on it.
23        A.     Yeah, absolutely.
24        Q.     Based on what you have seen today
25   just in the last couple of hours, are you



ESQUIRE

Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

242

                    J. McELHONE

1

2  concerned that all you heard was that there

3  was a note-taking problem but nothing more?

4           MR. DUNNE:  Objection to the form

5       of the question.  Go ahead.

6       A.    I'm surprised it wasn't an

7  internal affairs case or there wasn't some

8  type of further inquiry to determine was there

9  a perjurous act or was this a mistake.  I

10  don't know why that wasn't undertaken by

11  either the department or the District Attorney

12  or somebody else but aside from that --

13       Q.    Aside from whether the department

14  undertook to investigate, my question is

15  whether, knowing what you know now and having

16  looked at some additional data from the Diaz

17  case, does it in retrospect concern you that

18  all Deputy Inspector Murphy told you was

19  McCready had a problem with note-taking but

20  that's it?

21       A.    I don't even know if --

22           MR. DUNNE:  Object to the form of

23       the question.

24           Go ahead.

25       A.    I had had heard that that was the



ESQUIRE

Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

243

                    J. McELHONE
1   problem.  I'm not sure if that was from
2   Murphy.  I just got from him that, no, there
3   is nothing outstanding you had to worry about
4   with any of the people there.  The people that
5   had to leave are gone, the people you have now
6   are okay, but that will be up to you to
7   determine down the line.  So that's what I
8   went with.
9       Q.     And if that is all that Deputy
10  Inspector Murphy told you, given what you know
11  now, does that concern you?
12      A.     Yeah, maybe he didn't have all of
13  the details at that point, or, you know, he
14  had already made a conclusion that it was a
15  mistake and not a problem.
16      Q.     Did you ask him if he
17  investigated?
18      A.     I did not.
19      Q.     So who were the detectives who had
20  to go?
21      A.     I couldn't tell you.  Before I got
22  there apparently they were gone.
23      Q.     Rafferty was one of them?
24      A.     I would say, yes.



ESQUIRE

Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

244

1                      J. McELHONE

2        Q.      Cassidy?

3        A.      I guess.

4        Q.      Who were two of the officers who

5   elicited the confession in the Diaz case?

6        A.      Yes.

7        Q.      That was at issue in Namm's letter

8   and the SIC investigation, right?

9        A.      Yes.

10        Q.      Anyone else?

11        A.      I can't comment.  I don't know.

12        Q.      You have no idea?

13        A.      No.

14        Q.      As it turns out there were some

15   loose ends with regard to at least Detective

16   McCready, right?

17              MR. DUNNE:  Object to the form.

18        Is that a question or statement?

19        A.      From what you are showing me now,

20   there was more information that I didn't have.

21        Q.      That you should have known?

22        A.      It would have been nice to have.

23        Q.      If you had known then what you

24   learned today from reviewing McCready's report

25   and testimony in the Diaz case, fair to say



ESQUIRE

Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

245

                    J. McELHONE

1

2   you would have not simply relied on his word

3   when reporting about his investigative

4   tactics?

5                MR. DUNNE:  Again, objection to

6        the form of the question for the third

7        time, but go ahead, you can answer that.

8        A.    I would have in our discussion

9   early on in my tenure, I would have had a much

10  more in-depth discussion with him to find out

11  what was going on there.

12       Q.    And what would that discussion

13  have looked like?

14       A.    How did that happen, you know, how

15  could that be that you would make an egregious

16  error like that and while under oath on trial.

17  I would have to find out what he had to say.

18       Q.    And what answer would convince you

19  that there was nothing more to worry about?

20       A.    I don't know.

21       Q.    What answer would convince you

22  there is more investigation to be done?

23       A.    If I had doubt at that point, I

24  would have just moved out and transferred and

25  forwarded onto maybe internal affairs or



Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

ESQUIRE

246

```
 1                 J. McELHONE
 2   wherever else it would have to go after that.
 3        Q.    But if he gives you a good
 4   explanation and looks you in the eye, would
 5   that be good enough for you?
 6        A.    No, it had to be a little bit more
 7   than that.
 8        Q.    Like what?
 9        A.    Something that would make sense,
10   that would be a little bit logical, that he
11   was confused with another case, that -- I
12   don't know what it would be.
13        Q.    If you are coming to someone to
14   investigate whether or not they lied in a
15   police report or in testimony, how can you
16   rely on their word in a meeting about their
17   intent by definition?
18              MR. DUNNE:  Object to the form.
19              Go ahead.
20        A.    There would have to be a good
21   explanation.  We are in hypothetical land here
22   as I keep saying.  But I would give him the
23   benefit of an explanation.  That's what I'm
24   trying to say.  You don't just get an
25   accusation and come down -- they have an
```



ESQUIRE

Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

247

1                    J. McELHONE

2      expression in internal affairs:  The facts

3      before the axe.  You know, to just have

4      somebody make a complaint and then fire the

5      cop, until you investigate it, until you get,

6      you know, some kind of corroboration,

7      substantiation, something like that.

8           Q.    And the same would apply for a

9      homicide investigation, right?  You want the

10     facts before the axe?

11          A.    You definitely have to have the

12     facts to establish reasonable cause that a

13     crime has been committed and this person has

14     committed the crime.

15          Q.    And you want to keep an open mind

16     until all the facts are in?

17          A.    Certainly.

18               MS. CORNWALL:  Let's just go off

19          the record for one minute.

20               (Recess:  4:02-4:05 p.m.)

21               MS. CORNWALL:  We will conclude

22          questioning for the day at this point,

23          reserving the balance of our court

24          ordered 14 hours for additional sessions

25          to be scheduled.



Toll Free: 800.944.9454
Facsimile: 212.557.5972

ESQUIRE

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

248

1               J. McELHONE

2               MR. DUNNE:  Sure.  And we will

3          work it out.

4               (Time noted:  4:06 p.m.)

5               (Total on-the-record time:  4 hrs.

6          10 mins.)

7

8          _____

9          JOHN McELHONE

10

11    Subscribed and sworn to before me

12    this _____ day of _____, 2010.

13

14    _____

15

16

17

18

19

20

21

22

23

24

25



Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

C E R T I F I C A T E

STATE OF NEW YORK     )

                            : ss.

COUNTY OF NEW YORK    )


              I, ANNELIESE R. TURSI, a

Registered Professional Reporter and Notary

Public within and for the State of New York,

do hereby certify:

              That the witness whose deposition

is hereinbefore set forth, was duly sworn by

me and that such deposition is a true record

of the testimony given by the witness.

              I further certify that I am not

related to any of the parties to this action

by blood or marriage, and that I am in no way

interested in the outcome of this matter.

              IN WITNESS WHEREOF, I have

hereunto set my hand this _____ day of

_____, 2011.



              _____
              ANNELIESE R. TURSI, RPR



Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

John McElhone                                    December 2, 2011

250

## DEPOSITION ERRATA SHEET


Esquire Deposition Assignment No. 324226

Case Caption:  Tankleff v. Suffolk COunty


### DECLARATION UNDER PENALTY OF PERJURY

    I declare under penalty of perjury that

I have read the entire transcript of my

deposition taken in the captioned matter or

the same has been read to me, and the same is

true and accurate, save and except for changes

and/or corrections, if any, as indicated by me

on the DEPOSITION ERRATA SHEET hereof, with

the understanding that I offer these changes

as if still under oath.

    Signed on the_____day of

_____,20____

_____
    JOHN McELHONE



Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

John McElhone                                    December 2, 2011
                                                                    251
                    DEPOSITION ERRATA SHEET

Page No. _____   Line No._____   Change to:_____

_____

Reason for change:_____

Page No. _____   Line No._____   Change to:_____

_____

Reason for change:_____

Page No. _____   Line No._____   Change to:_____

_____

Reason for change:_____

Page No. _____   Line No._____   Change to:_____

_____

Reason for change:_____

Page No. _____   Line No._____   Change to:_____

_____

Reason for change:_____

Page No. _____   Line No._____   Change to:_____

_____

Reason for change:_____

Page No. _____   Line No._____   Change to:_____

_____

Reason for change:_____

SIGNATURE:_____DATE:_____
             JOHN McELHONE



Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

ESQUIRE

John McElhone                                    December 2, 2011

DEPOSITION ERRATA SHEET

Page No. _____   Line No._____   Change to:_____

_____

Reason for change:_____

Page No. _____   Line No._____   Change to:_____

_____

Reason for change:_____

Page No. _____   Line No._____   Change to:_____

_____

Reason for change:_____

Page No. _____   Line No._____   Change to:_____

_____

Reason for change:_____

Page No. _____   Line No._____   Change to:_____

_____

Reason for change:_____

Page No. _____   Line No._____   Change to:_____

_____

Reason for change:_____

Page No. _____   Line No._____   Change to:_____

_____

Reason for change:_____

SIGNATURE:_____DATE:_____
            JOHN McELHONE



Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

John McElhone                                          December 2, 2011

253

December 2, 2011

                        I N D E X

EXAM BY                                    PAGE

Ms. Cornwall                                 4


                      E X H I B I T S

  FOR IDENTIFICATION                       PAGE

  Plaintiff Exhibit 7, document            4
  reflecting resume of John McElhone

  Plaintiff Exhibit 8, organizational      23
  chart

  Plaintiff Exhibit 9, letter from         91
  Judge Stuart Namm to Governor Cuomo

  Plaintiff Exhibit 10, Resolution of      92
  the State of New York Commission of
  Investigation authorizing an
  investigation into the Suffolk
  County Police Department and
  others, adopted as of January 9th
  of '86

  Plaintiff Exhibit 11, copy of The        95
  Confession Takers newspaper story

  Plaintiff Exhibit 12, 1989 SIC           121
  report

  Plaintiff Exhibit 13, January 29th,      145
  1987 article from The New York
  Times entitled Suffolk Police Are
  Described As Deficient

  Plaintiff Exhibit 14, February 2,        170
  1987 New York Times article
  entitled Long Island Trial is
  Scrutinized Two Years After Verdict



ESQUIRE

Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

John McElhone                                    December 2, 2011
254

                        E X H I B I T S

    FOR IDENTIFICATION                              PAGE

    Plaintiff Exhibit 15, Diaz            184
    confession

    Plaintiff Exhibit 16, supplementary   186
    report from investigation dated
    June 27, 1984

    Plaintiff Exhibit 17, excerpt of      191
    Detective McCready's testimony from
    the Diaz trial

    Plaintiff Exhibit 18, additional      195
    excerpt of Detective McCready's
    testimony from the Diaz trial,
    pages 500 to 502




              REQUESTS FOR PRODUCTION

              PAGE        LINE

               35           5
               36          13


         INFORMATION TO BE PROVIDED

              PAGE        LINE

               27           9



ESQUIRE

Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com