# Exhibit 3

# LAW JOURNAL

©1979 The National Law Journal

VOL. 1—NO. 39    PRICE $1.50    *The Weekly Newspaper for the Profession*

# When Suspects Are Abused

*Allegations of Beatings, Forced Confessions In a N.Y. Suburb Are Widespread; Cases Highlight Perils To Effective Law Enforcement*

By RAFAEL ABRAMOVITZ
Special to The National Law Journal



RIVERHEAD, N.Y. — William Rupp confessed to a murder he did not commit.

Roland Smith confessed to a robbery that had not occurred.

Both men claim that between their arrests and confessions they were subjected to prolonged beatings while handcuffed and in the custody of the Suffolk County (N.Y.) Police Department.

Theirs are two of many strikingly similar allegations of physically coerced confessions lodged in recent years against some members of the 2,500-person police force that patrols this county's semi-rural, middle-income suburb of New York City.

The criminal charges against both Mr. Smith and Mr. Rupp have been dropped, in Mr. Rupp's case only after the real culprit turned up. Both Mr. Smith and Mr. Rupp are suing the police for damages.

Their cases are examples of an apparent pattern of brutality in some police units, which can be traced back for almost a decade. The National Law Journal has confirmed the pattern through court records and interviews with dozens of lawyers, prosecutors and law enforcement officials.

These sources have disclosed more than 30 court cases involving similar accusations of police brutality to extract confessions. In four of these cases, attorneys say their clients have passed lie detector tests to support their accusations against the police.

Indeed, a case against actions by Suffolk police officers can be supported by the following statistics:

*Continued on page 14*

## HIGHLIGHTS

### Panther Raid Lawyers Seek $513,000    p. 3

TWO RADICAL Chicago lawyers who got by on $75 a week in the longest federal court trial in history are seeking $513,000 in fees for winning an appeal in the case, a damage suit by Black Panthers over a 1969 police raid that ended with two Panther leaders

---

**Air**

**Claim**

**Rule**

*Illinois Bi* 
*Suits over* 
*Seek Puni*

By JOSEPH R.
National Law Journal Sta

CHICAGO — A linois legislature damages in sui worst air disa creasing potent

Currently, I handful of oth such damages i

If passed, th portant elemen the May 27 cra Flight 191 here to be applied ir The bill's fate passed the Illi vote 10 days be

The measu provision maki

# Cops Cut Corners on Due Process

Continued from page 1

- In 27 of the 28 Suffolk County murder indictments obtained last year, the accused had incriminated himself either orally or in writing. That 97 percent confession rate is astonishingly high when compared with rates in other jurisdictions.

- In the last three years, one attorney has negotiated out of court settlements in six cases where persons alleged they were brutalized during interrogations by Suffolk County police. The settlements totaled $52,000. (See sidebar, page 14.) Other attorneys claim they settled many similar cases, but they declined to supply specifics. Also, in one case that went to trial, a man arrested by Suffolk police for drunken driving was awarded $190,000 for permanent injuries he sustained while in police lockup.

- Since June 30, 1977, at least six Suffolk County criminal convictions have been overturned by the state's highest court because of improper police tactics. (See story, page 14.) Although New York law makes it almost impossible for an appeals court to challenge a confession once it has passed a suppression hearing, the Court of Appeals found in all six cases that the defendants' constitutional rights had been violated during suspiciously long periods of police questioning without presence of blacks, whites and Hispanics.

Suffolk Police Commissioner Donald J. Dillowrth was unavailable for commment. Deputy Commissioner Petersen said that while there may be isolated instances of police brutality in the county, there is no pattern of such activity.

Arthur Penny, spokesman for District Attorney Patrick Henry, said Mr. Henry would have no comment on any cases of police brutality or coerced confessions prior to his taking office in 1978.

On alleged brutality since 1978, Mr. Penny said the district attorney would not comment on whether investigations were in progress.

Interviews with past and present county law enforcement officials confirm that these tactics have been widely known or suspected among public officials here for years. Yet to date



there is no evidence that anyone has conducted or even called for an outside investigation of the police or their methods of interrogation.

What's happening in Suffolk points modifications in its scope, police and prosecutors have reverted to their pre-*Miranda* "compulsion" of topping off an investigation with a successful confession.

The experts say that some agencies, like the Suffolk police, have sought to assure confessions by cutting corners through overly aggressive questioning methods that trample personal liberties. And where such situations occur, they say, there is often a tendency by prosecutors to look the other way.

Such is the case in this county of 1.3 million people and a strong local government long known for its aggressive pursuit of crime. Several former local prosecutors told The National Law Journal, in tape-recorded interviews, that they and their colleagues routinely heard and ignored repeated stories of unprovoked brutality against suspects held for questioning.

Such methods are indisputably illegal. Why, then, have prosecutors permitted them to continue?

One former high-ranking member of the Suffolk district attorney's office, suggests that some prosecutors have developed an almost incestuous relationship with the police. Police and assistant district attorneys "drink together and go out to view the bodies together," he said. "They feel they are on the same team . . . and forget their

---

plain of, and fi
of, having been

Allegations
use illegal me
are not new.
In 1976, N
Arthur V. Gras
action on beha
alleged beating
of due process.
Continued on p

## 6 Brut
## Since '
## By Suf

SUFFOLK CC
than $50,000 ir
last three yea
claimed they
while undergo

In addition,
broken while
driving charg
00 by a jury in
seat, in Decer
County /
Packman cau
wrong to inte
as an admis
county. But M
explain the co
fering the cas
Below are
tled cases.

Case 2:09-cv-01207-JS-AYS Document 184-3 Filed 08/17/16 Page 4 of 16 PageID #: 3370

Also, in one case that went to trial, a man arrested by Suffolk police for drunken driving was awarded $190,000 for permanent injuries he sustained while in police lockup.

• Since June 30, 1977, at least six Suffolk County criminal convictions have been overturned by the state's highest court because of improper police tactics. (See story, page 14.) Although New York law makes it almost impossible for an appeals court to challenge a confession once it has passed a suppression hearing, the Court of Appeals found in all six cases that the defendants' constitutional rights had been violated during suspiciously long periods of police questioning without presence of counsel.

• The number of complaints against the Suffolk police for the use of undue force is sharply on the rise. According to Deputy Police Commissioner Charles S. Peterson, 46 complaints were forwarded to internal affairs division in 1977, 59 last year and 60 during the first five months of this year.

In most of the cases settled out of court or reversed on appeal, there has been a similarity in the type of torture allegedly employed: beatings administered with telephone books used as a cushion to avoid leaving telltale bruises, blackjacks used on the sole of the feet and other sensitive areas, kicks and punches to the genitals.

The alleged victims have included



Interviews with past and present county law enforcement officials confirm that these tactics have been widely known or suspected among public officials here for years. Yet to date there is no evidence that anyone has conducted or even called for an outside investigation of the police or their methods of interrogation.

What's happening in Suffolk points to what criminal law experts say is an increasingly troubling problem within law enforcement systems still reeling from *Miranda*-type restrictions on the pursuit and handling of criminal suspects.

"There was a two- or three-year hiatus in the confession rate after *Miranda* because police were unsure of the ruling and were reluctant to louse up a good case with an illegal confession," said former Senate Watergate committee chief counsel Sam Dash. Mr. Dash now heads the Georgetown University Law Center's Institute for Criminal Law Procedure.

However, he added, because of increased police sophistication in dealing with *Miranda* and a series of court

sive pursuit of crime. Several former local prosecutors told The National Law Journal, in tape-recorded interviews, that they and their colleagues routinely heard and ignored repeated stories of unprovoked brutality against suspects held for questioning.

Such methods are indisputably illegal. Why, then, have prosecutors permitted them to continue?

One former high-ranking member of the Suffolk district attorney's office, suggests that some prosecutors have developed an almost incestuous relationship with the police. Police and assistant district attorneys "drink together and go out to view the bodies together," he said. "They feel they are on the same team . . . and forget their relationship as officers of the court."

Another former prosecutor recalls one instance where he himself kept silent and prosecuted a man whom he knew had been "beaten to a pulp, beaten for hours" by homicide detectives.

Still another former prosecutor, James J. Cruise, said that in his experience, "I've come across many cases where there's very little to connect a defendant with a particular incident of crime, except the alleged admission and/or oral statements."

High-ranking members of the Suffolk County Sheriff's Department, who asked not to be identified, say that prisoners handed over to their custody by the county police frequently com-

SUFFOLK COUN than $50,000 in set last three years t claimed they wer while undergoing

In addition, a n broken while in c driving charge wa 00 by a jury in Riv seat, in December

County Att Packman caution wrong to interpre as an admission county. But Mr. P explain the count fering the cash se

Below are liste tled cases, the an the settlement an tion of the brutal contained in cour case, the plaint Arthur Graseck:

• *Crite v. Barr* $18,000.

"Plaintiff was ment of the statio police officers] ar to an overhead p ficer then "pro plaintiff on the h jack, while other plaintiff in the st Throughout the be asked to confess crimes. When trousers were rer kicked and punche Plaintiff was hit feet with a cord, ficers] continue otherwise abuse placed a revolver an threatened to k confess."

• *Mills v. Suf* settled for $5,000.

"The plaintiff third precinct st custody of a dete

---

### Decisions in Suffolk Co. Cases Define Rights

# Police Conduct Led to 7 Reversals in 3 Years

IN THE LAST three years, the New York State Court of Appeals, the state's highest court, has overturned six homicide convictions and one burglary conviction in Suffolk County because confessions were taken in the absence of counsel.

lawyer had not been able to reach him while he was being held by, and confessing to, the Suffolk police. "Once a person has been taken into custody, the burden is on the police to keep track of him and to establish and maintain procedures which will insure that an attorney

## Decisions in Suffolk Co. Cases Define Rights

# Police Conduct Led to 7 Reversals in 3 Years

IN THE LAST three years, the New York State Court of Appeals, the state's highest court, has overturned six homicide convictions and one burglary conviction in Suffolk County because confessions were taken in the absence of counsel.

In so doing, the court has defined when criminal suspects' right to counsel begins in New York. The cases also led to the reported warning by one Court of Appeals judge to the Suffolk district attorney that all convictions with confessions would be closely scrutinized by the high court.

In the lead case, *People v. Hobson*, 39 NY 2d 479, decided May 4, 1976, Chief Judge Charles D. Breitel ruled that "once a lawyer has entered a criminal proceeding representing a defendant in connection with charges under investigation, a defendant in custody may not waive his right to counsel in the absence of counsel."

On June 30, 1977, the court in a memorandum decision overturned another Suffolk murder conviction on the basis of the *Hobson* rule. *People v. Macedonia*, 42 NY 2d 944.

**The Singer Case**

In *People v. Singer*, 44 NY 2d 241, April 6, 1978, Judge Sol Wachtler, writing for the court, ordered suppressed a confession taken in 1974 in the absence of counsel. Counsel, he found, had been retained in 1971 in the initial stages of the investigation of the murder case and had never been discharged. Judge Wachtler also questioned the three-year delay in prosecution of the case.

A month later, Judge Wachtler, in *People v. Pinzon*, 44 NY 2d 458, overturned a conviction for criminally negligent homicide on the basis that the defendant's lawyer had not been able to reach him while he was being held by, and confessing to, the Suffolk police. "Once a person has been taken into custody, the burden is on the police to keep track of him and to establish and maintain procedures which will insure that an attorney representing him may communicate with him and with officials responsible for the investigation, without unreasonable delay," the judge said.

In December 1978, Judge Jacob Fuchsberg threw out another murder conviction. *People v. Maerling*, 46 NY 2d 289. The jailhouse confession was not spontaneous, the judge said, and therefore did not fall within a recognized *Hobson* exception. Further, he ruled, a declaration against penal interest made by a deceased witness was too unreliable to have been admitted at trial.

**Two Cases This Year**

This year, the court has reversed two other Suffolk convictions, again because attorneys were missing at the time the suspect confessed.

On April 3, in *People v. Garofolo*, 46 NY 2d 592, Judge Fuchsberg again commented on an attorney's difficulties in finding a client in police custody. "We now make explicit what was implied in *Pinzon*," Judge Fuchsberg said. "Good faith efforts made [by the police] to locate a defendant who is taken into custody does not absolve the police of their responsibility if their internal procedures are inadequate to keep track of those against whom the restraining hand and accusing finger of the state have come to rest.".

And in *People v. Wander*, decided April 24, the court in a memorandum decision overturned a burglary and larceny conviction because the defendant's "right to remain silent was not scrupulously honored."

N JOURNAL  Monday, June 11, 1979

## Process

odifications in its scope, police and rosecutors have reverted to their pre-Miranda "compulsion" of topping off n investigation with a successful confession.

The experts say that some agencies, like the Suffolk police, have ought to assure confessions by cutting orners through overly aggressive questioning methods that trample personal liberties. And where such situations occur, they say, there is often a ndency by prosecutors to look the her way.

Such is the case in this county of 1.3 illion people and a strong local overnment long known for its aggressive pursuit of crime. Several former cal prosecutors told The National aw Journal, in tape-recorded interews, that they and their colleagues utinely heard and ignored repeated ories of unprovoked brutality against uspects held for questioning.

Such methods are indisputably illegal. Why, then, have prosecutors ermitted them to continue?

One former high-ranking member ' the Suffolk district attorney's office, iggests that some prosecutors have eveloped an almost incestuous lationship with the police. Police and ssistant district attorneys "drink gether and go out to view the bodies gether," he said. "They feel they are the same team . . . and forget their lationship as officers of the court."

Another former prosecutor recalls e instance where he himself kept lent and prosecuted a man whom he ew had been "beaten to a pulp, aten for hours" by homicide detectives.

Still another former prosecutor,

plain of, and frequently exhibit signs of, having been abused.

Allegations that the Suffolk police use illegal methods of interrogation are not new.

In 1976, Nassau County lawyer Arthur V. Graseck Jr. brought a class action on behalf of 18 defendants who alleged beatings and other violations of due process.

Continued on page 16

### 6 Brutality Suits Since '76 Settled By Suffolk Co.

SUFFOLK COUNTY paid out more than $50,000 in settlements over the last three years to six persons who claimed they were beaten by police while undergoing interrogations.

In addition, a man whose hip was broken while in custody on a drunk driving charge was awarded $190,000 by a jury in Riverhead, the county seat, in December 1978.

County Attorney Howard Packman cautions that it would be wrong to interpret each settlement as an admission of guilt by the county. But Mr. Packman refused to explain the county's motives in offering the cash settlements.

Below are listed each of the settled cases, the amount and year of the settlement and a brief description of the brutality allegations as contained in court papers. In each case, the plaintiff's lawyer was Arthur Graseck:

• *Crite v. Barry*, 1978, settled for $18,000.

"Plaintiff was taken to the base-



Monday, June 11, 19



ısnip as officers of the court."
ther former prosecutor recalls
stance where he himself kept
nd prosecuted a man whom he
1ad been "beaten to a pulp,
for hours" by homicide detec-

another former prosecutor,
J. Cruise, said that in his ex-
:e, "I've come across many
vhere there's very little to con-
lefendant with a particular inci-
crime, except the alleged ad-
1 and/or oral statements."
1-ranking members of the Suf-
unty Sheriff's Department, who
not to be identified, say that
:rs handed over to their custody
county police frequently com-

## Rights

### in 3 Years

) reach him while he was be-
to, the Suffolk police. "Once
ito custody, the burden is on
)f him to establish and
1 will insure that an attorney
municate with him and with
.e investigation, without un-
lge said.
e Jacob Fuchsberg threw out
.. People v. Maerling, 46 NY
ession was not spontaneous,
efore did not fall within a
tion. Further, he ruled, a
nterest made by a deceased
e to have been admitted at

 reversed two other Suffolk
 attorneys were missing at
ssed.
larofolo, 46 NY 2d 592, Judge
nted on an attorney's dif-
in police custody. "We now
implied in Pinzon," Judge
aith efforts made [by the
nt who is taken into custody
)f their responsibility if their
iadequate to keep track of
straining hand and accusing
me to rest."
r, decided April 24, the court
ι overturned a burglary and
the defendant's "right to re-
lously honored."

the settlement and a brief descrip-
tion of the brutality allegations as
contained in court papers. In each
case, the plaintiff's lawyer was
Arthur Graseck:

• *Crite v. Barry*, 1978, settled for $18,000.

"Plaintiff was taken to the basement of the stationhouse by [several police officers] and was handcuffed to an overhead pipe. . . ." The officer then "proceeded to strike plaintiff on the head with a blackjack, while other officers punched plaintiff in the stomach and sides. Throughout the beating plaintiff was asked to confess to a number of crimes. When he refused, his trousers were removed and he was kicked and punched in the groin . . . Plaintiff was hit on the soles of his feet with a cord, while [several officers] continued to punch and otherwise abuse him. One detective placed a revolver to plaintiff's head an threatened to kill him if he did not confess."

• *Mills v. Suffolk County*, 1976, settled for $5,000.

"The plaintiff was driven to the third precinct stationhouse in the custody of a detective and three officers . . . he was handcuffed to a chair with his hands behind his back. . . . [He] was beaten by the detective during questioning . . . threatened with assault to his genitals if he did not make a confession. . . . The assaults sustained by the plaintiff included . . . blows on the shins and collar bone with a blackjack . . . blows about the head with a book and closed fists."

• *Oquendo v. Suffolk County*, 1978, settled for $15,000.

"Assaults directly to the eyes, mouth, back, legs and other parts of the body . . . claimant vomited blood on two occasions after the police beat him."

• *Phillie v. Suffolk County*, 1979, settled for $10,000. Plaintiff's legs were "driven over by police car while in custody." Suffered a fractured ankle.

• *Mulligan v. Suffolk County*, 1977, settled for $2,000.

Plaintiff alleged he was grabbed by throat and had his head beaten against a wall.

• *Vocht v. Suffolk County*, 1979, settled for $2,100.



# Widespread Allegations Of Brutality

*Continued from page 14*

Although Judge Jack B. Weinstein of the U.S. District Court for the Eastern District of New York threw the case out on technical grounds, he did issue this finding:

"During the period from 1970 to the present, there have been a substantial number of cases where excessive physical force was used by some Suffolk police officers in arresting suspects, in questioning them to obtain oral admissions and in punishing persons thought by some police officers to be showing what police officers considered a lack of respect or cooperation at the time of the arrest or questioning." *Coleman v. Klein*, 73 Civ 1857.

Mr. Graseck handled six brutality cases known to have been settled in the last three years. A spokesman for the County Attorney, Howard Packman, would not explain why the county had settled any of the cases, but said it would be a mistake to assume a settlement is an admission of guilt.

In almost all of the instances of alleged brutality examined by The National Law Journal, the violence was said to occur during the questioning of suspects in major crimes. Most frequently cited were members of the 55-man homicide unit.

### 'A Joke'

Eric Naiburg, a Suffolk County defense attorney with extensive experience in criminal law, says local lawyers consider criminal confessions in Suffolk "almost a joke."

"There's always an admission," he said. "We have detectives that, as soon as we know [they're] on the case, we know there is an oral admission."

Said former Suffolk County District Attorney Henry O'Brien, now in



Some crime suspects have claimed they were b( the Suffolk County Police.

the Pius investigation is similar to that condemned by the state Court of Appeals in *People v. Garofolo*, 46 NY 2d 592, where a conviction was overturned because a lawyer was not able to contact a client being held by the police for questioning.

Either Suffolk County police brutality is on the rise or its victims are getting bolder in making brutality complaints.

Deputy Police Commissioner Peterson said that while 46 such complaints were forwarded to the department's internal affairs division for investigation in 1977, there were 59 the following year and 60 for the first five

that "90 per are unfound
Outside Suffolk poli( tant to polic
Philip Bc director of t Rights Com civil rights ( "no coopera police in tr; of brutality.
The gro complaints three years rero, the p( sion monito

ing of suspects in major crimes. Most frequently cited were members of the 55-man homicide unit.

### 'A Joke'

Eric Naiburg, a Suffolk County defense attorney with extensive experience in criminal law, says local lawyers consider criminal confessions in Suffolk "almost a joke."

"There's always an admission," he said. "We have detectives that, as soon as we know [they're] on the case, we know there is an oral admission."

Said former Suffolk County District Attorney Henry O'Brien, now in private practice, "I feel frustrated. I don't think there's anything to be done to change things. The homicide squad has a lock on things."

Indeed, the county's 97 percent confession rate demonstrates the peculiar success the homicide officers have had in eliciting incriminating statements from suspects in custody.

New York City's Bronx County, for example, has a 35 percent confession rate in homicides. In that county, confessions are frequently videotaped to show they were not coerced.

A random sample of 63 homicide arrests in the city's Kings County (Brooklyn) in 1978 showed that only 20 percent involved confessions.

### Isolating the Suspect

In their vigorous pursuit of confessions, the Suffolk police have occasionally gone to unusual lengths to isolate a suspect for questioning.

Just last month, during an investigation into the murder of a 13-year-old, Smithtown, L.I., boy, John Pius, the homicide squad allegedly pulled in off the street and questioned several area teenagers for long hours while the youth's parents frantically telephoned around town to learn of their children's whereabouts.

There is a growing concensus among local defense attorneys and prosecutors that the rights of the youths may have been so seriously compromised that the chances of successful prosecution have been jeopardized. As of last week, no charges had been filed against any of the youngsters.

The police procedure criticized in condemned by the state Court of Appeals in *People* v. *Gorder*, 9 of 16 PageID#: 592, where a conviction was overturned because a lawyer was not able to contact a client being held by the police for questioning.

Either Suffolk County police brutality is on the rise or its victims are getting bolder in making brutality complaints.

Deputy Police Commissioner Peterson said that while 46 such complaints were forwarded to the department's internal affairs division for investigation in 1977, there were 59 the following year and 60 for the first five months of this year.

Mr. Peterson was unwilling to speculate on why the increase occurred or to discuss the disposition of any of the complaints. But he estimated are unfounded. Outside ag Suffolk police tant to police.

Philip Borr director of the Rights Comm civil rights gr "no cooperati police in trac of brutality.

The group complaints t three years. I rero, the poli sion monitor t investigation tough the cas

According mission spok

## William Maerling

AT 4 A.M. on Valentine's Day 1973, Suffolk Coun Police surrounded the Staten Island Home of Willia Maerling, 39.

They knocked at the door, then arrested M Maerling, a stocky, illiterate father of eight, for tl murder of a reputed Suffolk bookie.

By 4:30 the following afternoon, the police hel Mr. Maerling's confession. It was three pages lon; in the handwriting of one of the interrogating o ficers. Just above the signature, the document saic "I have read this [statement]." The "I hav read" was crossed out and replaced with, "Th statement has been read to me."

The police were later to claim that the confessio was voluntary.

At a hearing to determine the admissibility of hi confession, Mr. Maerling testified about his treat ment in police custody.

"I wasn't there for two seconds . . . and the nex thing I know, Detective R. . . . started picking up telephone book and started beating me over the hea with it. The next detective did the same thing. The all I know is they started to make me strip. They kep me nude for the majority of the day, handcuffe behind."

He claimed that he had been systematicall beaten and kicked for hours, at times lying sprawle naked on the floor while a number of officers beat th soles of his feet with blackjacks. One detective, h said, had threatened to extinguish a lighted cigarett

Case 2:09-cv-01207-JS-AYS   Document 184-3   Filed 08/17/16   Page 10 of 16 PageID #: 3376

ment's internal affairs division for investigation in 1977, there were 39 the following year and 60 for the first five months of this year.

Mr. Peterson was unwilling to speculate on why the increase occurred or to discuss the disposition of any of the complaints. But he estimated three years. But according to Mr. Borrero, the police don't let the commission monitor the department's internal investigation of the charges, or look tough the case files afterwards.

According to a Human Rights Commission spokesman, the police have Suffolk chapter of the American Civil Liberties Union, claiming he was being harassed by the department.

In the complaint, taken over the phone by an ACLU staffer, the

Continued on page 17

## William Maerling: A Recurring Story

AT 4 A.M. on Valentine's Day 1973, Suffolk County Police surrounded the Staten Island Home of William Maerling, 39.

They knocked at the door, then arrested Mr. Maerling, a stocky, illiterate father of eight, for the murder of a reputed Suffolk bookie.

By 4:30 the following afternoon, the police held Mr. Maerling's confession. It was three pages long, in the handwriting of one of the interrogating officers. Just above the signature, the document said: "I have read this [statement]." The "I have read" was crossed out and replaced with, "This statement has been read to me."

The police were later to claim that the confession was voluntary.

At a hearing to determine the admissibility of his confession, Mr. Maerling testified about his treatment in police custody.

"I wasn't there for two seconds . . . and the next thing I know, Detective R. . . . started picking up a telephone book and started beating me over the head with it. The next detective did the same thing. Then all I know is they started to make me strip. They kept me nude for the majority of the day, handcuffed behind."

He claimed that he had been systematically beaten and kicked for hours, at times lying sprawled naked on the floor while a number of officers beat the soles of his feet with blackjacks. One detective, he said, had threatened to extinguish a lighted cigarette in his ear but had failed when the burning end accidentally fell off.

And then came the moment of final persuasion, according to Mr. Maerling.

He said one of the detectives "tied a piece of paper to my [penis]. Him and two detectives picked me up and held me over this cutting machine in the file room and started cutting off the paper."

He said that at that point he agreed to sign any document they gave him.

At the hearing, the police officers denied it all. The judge believed the police, and the confession was admitted at Mr. Maerling's trial.

Primarily on the weight of that document, he was convicted of felony murder Jan. 8, 1974: In December 1978, the state Court of Appeals reversed the conviction, however, because a second confession was taken in the absence of counsel.

Two weeks ago his new attorney, Sara Halbert, arranged for Mr. Maerling to take a lie detector test about the circumstances surrounding his allegedly coerced confession. The test was administered by New York City polygraph expert Nat Laurendi, who has done extensive work for numerous law enforcement agencies here and abroad.

According to Mr. Laurendi, the test indicated Mr. Maerling wasn't lying when he claimed to have been beaten and tortured prior to his confession.

The Suffolk District Attorney's office has also given Mr. Maerling a lie detector test. A prosecutor told Mrs. Halbert that it was inconclusive.

THE NATIONAL LAW JOURNAL                                               Monday, June 11, 1979



... have claimed they were beaten in this building, headquarters of the homicide squad of ... lice.

Photos by Robert M. Klein

... similar to that ... /Court of Ap- ... *ofolo*, 46 NY 2d ... ion was over- ... was not able ... ng held by the

... ounty police ... or its victims ... aking brutality

Commissioner ... le 46 such com- ... d to the depart- ... division for in- ... ere were 59 the ... for the first five

that "90 percent of such allegations" are unfounded.

Outside agencies have found the Suffolk police to be stubbornly reluctant to police their own members.

Philip Borrero, assistant executive director of the Suffolk County Human Rights Commission, a publicly funded civil rights group, says the group had "no cooperation whatsoever" from the police in tracking down alleged cases of brutality.

The group forwarded 57 brutality complaints to the police in the last three years. But according to Mr. Borrero, the police don't let the commission monitor the department's internal ...

substantiated so far thee cases the three cases, the commission has no knowledge of any disciplinary action taken. A third officer has said to have been transferred to another division and "a notation was made in in his file."

### A Thwarted Leak?

There was evidence that an "insider" was ready to blow the whistle on brutality last February.

At that time a veteran of the Suffolk police force filed a complaint with the Suffolk chapter of the American Civil Liberties Union, claiming he was being harassed by the department.

Case 2:09-cv-01207-JS-AYS   Document 184-3   Filed 08/17/16   Page 12 of 16 PageID #: 3378

ave claimed they were beaten in this building, headquarters of the homicide squad of ice.

Photos by Robert M. Klein

imilar to that /Court of Apolo, 46 NY 2d n was over- was not able ʒ held by the

unty police or its victims king brutality

ommissioner 46 such com- to the department- livision for in- e were 59 the r the first five

unwilling to icrease occur- oosition of any he estimated

that "90 percent of such allegations" are unfounded.

Outside agencies have found the Suffolk police to be stubbornly reluctant to police their own members.

Philip Borrero, assistant executive director of the Suffolk County Human Rights Commission, a publicly funded civil rights group, says the group had "no cooperation whatsoever" from the police in tracking down alleged cases of brutality.

The group forwarded 57 brutality complaints to the police in the last three years. But according to Mr. Borrero, the police don't let the commission monitor the department's internal investigation of the charges, or look tough the case files afterwards.

According to a Human Rights Commission spokesman, the police have substantiated so far thee cases the three cases, the commission has no knowledge of any disciplinary action taken. A third officer has said to have been transferred to another division and "a notation was made in in his file."

### A Thwarted Leak?

There was evidence that an "insider" was ready to blow the whistle on brutality last February.

At that time a veteran of the Suffolk police force filed a complaint with the Suffolk chapter of the American Civil Liberties Union, claiming he was being harassed by the department.

In the complaint, taken over the phone by an ACLU staffer, the

Continued on page 17

## m Maerling: A Recurring Story

itine's Day 1973, Suffolk County le Staten Island Home of William

t the door, then arrested Mr. illiterate father of eight, for the l Suffolk bookie.

ving afternoon, the police held ession. It was three pages long. of one of the interrogating of- e signature, the document said: ls [statement]." The "I have out and replaced with, "This read to me."

ter to claim that the confession

ermine the admissibility of his rling testified about his treatly.

two seconds . . . and the next ve R. . . . started picking up a arted beating me over the head ctive did the same thing. Then ed to make me strip. They kept jority of the day, handcuffed

he had been systematically hours, at times lying sprawled le a number of officers beat the blackjacks. One detective, he o extinguish a lighted cigarette in his ear but had failed when the burning end accidentally fell off.

And then came the moment of final persuasion, according to Mr. Maerling.

He said one of the detectives "tied a piece of paper to my [penis]. Him and two detectives picked me up and held me over this cutting machine in the file room and started cutting off the paper."

He said that at that point he agreed to sign any document they gave him.

At the hearing, the police officers denied it all. The judge believed the police, and the confession was admitted at Mr. Maerling's trial.

Primarily on the weight of that document, he was convicted of felony murder Jan. 8, 1974. In December 1978, the state Court of Appeals reversed the conviction, however, because a second confession was taken in the absence of counsel.

Two weeks ago his new attorney, Sara Halbert, arranged for Mr. Maerling to take a lie detector test about the circumstances surrounding his allegedly coerced confession. The test was administered by New York City polygraph expert Nat Laurendi, who has done extensive work for numerous law enforcement agencies here and abroad.

According to Mr. Laurendi, the test indicated Mr. Maerling wasn't lying when he claimed to have been beaten and tortured prior to his confession.

The Suffolk District Attorney's office has also given Mr. Maerling a lie detector test. A prosecutor told Mrs. Halbert that it was inconclusive.

Case 2:09-cv-01207-JS-AYS   Document 184-3   Filed 08/17/16   Page 13 of 16 PageID #: 3379

# When Suspects Are Abused

*Continued from page 16*

policeman said he had been present on several occasions when suspects were brutalized by police. He implied that he was willing to share the information with the ACLU in exchange for its assistance.

The ACLU staffer took notes on the call and then forwarded the matter for investigation.

But the police officer, whose name is being withheld on request, proved uncooperative when questionned by



The National Law Journal about the complaint. While he admitted having made the allegations, he said they were merely a "ploy" to interest the ACLU in his problems.

In some of the brutality cases that have been settled and those still in litigation, there is evidence that confessions were coerced.

In June 1976, after William Rupp confessed to a murder that everyone now agrees he did not commit — the charges against him were dropped and another man was tried and convicted — Mr. Rupp had to be hospitalized for two days and three nights.

Roland Smith contends that when he was in police custody in 1976, police beat him so severely in the groin, where he had had a recent operation, that he made up and signed a confession to a completely fictitious robbery.

A court evidently agreed.

In one of the rare instances where a Suffolk confession was thrown out by a trial judge for coercion, Suffolk County Court Judge Harry Seidell said the

the last four years, compared with the six in 18 months for Suffolk.

The entire State of California reported only 12 such reversals during the identical 18 month period.

### The Police's Undoing?

According to Mr. Chase, the attorney for William Rupp in his $1 million suit against the Suffolk police, "The Rupp case may well prove the undoing of the homicide squad."

He thinks that in this instance he will be able "to convince a jury that third-degree, police-state methods are employed in Suffolk County to extract confessions and admissions and that far from being unique, [the case] is an example of an on-going process."

In the Rupp case, he said, "They beat a confession out of an innocent man. The confession had the victim beaten to death. The coroner's report said he had been strangled."

Mr. Chase noted that authorities began investigating the error only after he pointed it out to them.

"That scares me," he said. "An innocent man might have been sentenced for life in prison."

"It makes me wonder about the others," he said.



An American Civil last February when ing to talk about b

## Case Was 'Solved' . . Th

## When the Wrong

ON MARCH 1, 1975, Walter Wallace, 69, disappeared from his home in Patchogue, Suffolk County.

The circumstances seemed suspicious. Mr. Wallace was to have been the chief prosecution witness against a man named Joseph Gurrier, who had been arrested on charges of burglarizing Mr. Wallace's home.

More than a year later, the elderly man's body turned up at the bottom of a cesspool. Within a week after the discovery of the body, a fifth precinct policeman contacted William Rupp, 23, a former neighbor of Mr. Wallace's who had a record of minor

two days and three nights. Roland Smith contends that when he was in police custody in 1976, police beat him so severely in the groin, where he had had a recent operation, that he made up and signed a confession to a completely fictitious robbery.

A court evidently agreed.

In one of the rare instances where a Suffolk confession was thrown out by a trial judge for coercion, Suffolk County Court Judge Harry Seidell said the police "knew that the alleged confession . . . was false and that the defendant confessed to a crime which had never been committed."

Justice Seidell further noted that "after obtaining the confession of this defendant, the defendant was taken to Smithtown General Hospital . . . for emergency treatment. It is undisputed that the defendant was mentally and physically coerced into admitting and executing a signed confession while being detained."

In New York state, confessions are routinely tested in a so-called "Huntley hearing," where police and the defendant are called to testify whether the confession was voluntary.

Generally, the Huntley hearing involves the word of the defendant against the word of several police officers. Claims of brutality are very infrequently sustained at a Huntley hearing.

At a Huntley hearing, a judge determines before trial whether a confession is voluntary and therefore can be admitted into evidence. Because this is a finding of fact, it can be reversed on appeal only for clear abuse. Most often, therefore, defense lawyers who lose a Huntley hearing challenge the confession on appeal on due process grounds — such as denial of right to counsel.

Like the confession rate for murder indictments, Suffolk County's record on such reversals seems suspiciously high when compared with other jurisdictions.

In 1978, for example, the state Court of Appeals didn't reverse any convictions in Bronx County for improperly obtained confessions. The Bronx has about the same population as Suffolk.

In Nassau County, there were five reversals on improper confessions in

ON MARCH 1, 1975, Walter Wallace, 69, disappeared from his home in Patchogue, Suffolk County.

The circumstances seemed suspicious. Mr. Wallace was to have been the chief prosecution witness against a man named Joseph Gurrier, who had been arrested on charges of burglarizing Mr. Wallace's home.

More than a year later, the elderly man's body turned up at the bottom of a cesspool. Within a week after the discovery of the body, a fifth precinct policeman contacted William Rupp, 23, a former neighbor of Mr. Wallace's who had a record of minor criminal convictions in Suffolk County.

The officer asked Mr. Rupp to stop by the police station to discuss something unimportant.

Mr. Rupp, a laborer in a roofing firm, obeyed. To his astonishment, he was immediately whisked away to the police department's homicide unit. There, detectives began to question him about the Wallace murder.

A Quick Collar

The following day police had Mr. Rupp's signed confession. When Mr. Rupp was brought into court for arraignment — his first moments out of police custody — he shouted to the judge that he'd been brutalized by homicide detectives and said he'd confessed only to stop the beating.

Mr. Rupp spent the next three nights and two days in a Suffolk hospital, undergoing treatment for bruises about the head and neck. On May 10, he was indicted for the Wallace murder. Alex Chase, who had been practicing criminal law in Suffolk County for almost 20 years, was appointed to represent him.

Mr. Rupp told his lawyer that during his police questioning he'd been repeatedly beaten in an unusual manner by four homicide detectives. He claimed they had placed a "thin yellow telephone book" on the top of his head and then repeatedly struck it with a large chunk of concrete. Once, he said, the phone book had slipped and the concrete raked his scalp.

Mr. Rupp's peculiar allegation did not surprise Mr. Chase. He had heard almost identical stories from other clients who spent time in the Suffolk police lockup.

Two things, however, did impress Mr. Chase:

First, doctors at the hospital had found pieces of gravel imbedded in Mr. Rupp's scalp. And second, there appeared to be certain blatant discrepancies between the alleged confession and the medical examiner's report.

The six-page confession had described the murder as a beating, but the coroner had declared the cause of death to be strangulation. Also, inexplicably, nowhere in the confession was there a mention of the curious method by which the body had been disposed.

THE NATIONAL LAW JOURNAL 17

## Are Abused

st four years, compared with the 18 months for Suffolk.
e entire State of California ed only 12 such reversals during entical 18 month period.

### olice's Undoing?

:ording to Mr. Chase, the at- for William Rupp in his $1 mil- uit against the Suffolk police, Rupp case may well prove the ig of the homicide squad."
 thinks that in this instance he e able "to convince a jury that legree, police-state methods are yed in Suffolk County to extract sions and admissions and that m being unique, [the case] is an ole of an on-going process."
the Rupp case, he said, "They confession out of an innocent The confession had the victim to death. The coroner's report e had been strangled."
. Chase noted that authorities investigating the error only e pointed it out to them.
hat scares me," he said. "An in- it man might have been iced for life in prison."
makes me wonder about the ," he said.

An American Civil Liberties Union staffer took these notes on the phone last February when a Suffolk police officer called in and said he was willing to talk about brutality. The officer later withdrew the offer.

## Case Was 'Solved' . . . Then Real Killer Appeared

## When the Wrong Man Confesses

N MARCH 1, 1975, Walter Wallace, 69, disappeared om his home in Patchogue, Suffolk County.
The circumstances seemed suspicious. Mr. Wal- ce was to have been the chief prosecution witness ;ainst a man named Joseph Gurrier, who had been rested on charges of burglarizing Mr. Wallace's me.
More than a year later, the elderly man's body rned up at the bottom of a cesspool. Within a week ter the discovery of the body, a fifth precinct liceman contacted William Rupp, 23, a former

"Besides," recalled Mr. Chase, "the talk on the street was that the cops had beaten the confession out of the wrong guy."
Mr. Chase contacted the district attorney's office and took his findings to John Buonora, the chief of the trial bureau.

### A Little Mistake

On June 3, William Rupp and his lawyer celebrated by ripping up the murder indictment in front of the Suffolk County Jail. Armed with the dis-

# When the Wrong Man Confesses

ON MARCH 1, 1975, Walter Wallace, 69, disappeared from his home in Patchogue, Suffolk County.

The circumstances seemed suspicious. Mr. Wallace was to have been the chief prosecution witness against a man named Joseph Gurrier, who had been arrested on charges of burglarizing Mr. Wallace's home.

More than a year later, the elderly man's body turned up at the bottom of a cesspool. Within a week after the discovery of the body, a fifth precinct policeman contacted William Rupp, 23, a former neighbor of Mr. Wallace's who had a record of minor criminal convictions in Suffolk County.

The officer asked Mr. Rupp to stop by the police station to discuss something unimportant.

Mr. Rupp, a laborer in a roofing firm, obeyed. To his astonishment, he was immediately whisked away to the police department's homicide unit. There, detectives began to question him about the Wallace murder.

## A Quick Collar

The following day police had Mr. Rupp's signed confession. When Mr. Rupp was brought into court for arraignment — his first moments out of police custody — he shouted to the judge that he'd been brutalized by homicide detectives and said he'd confessed only to stop the beating.

Mr. Rupp spent the next three nights and two days in a Suffolk hospital, undergoing treatment for bruises about the head and neck. On May 10, he was indicted for the Wallace murder. Alex Chase, who had been practicing criminal law in Suffolk County for almost 20 years, was appointed to represent him.

Mr. Rupp told his lawyer that during his police questioning he'd been repeatedly beaten in an unusual manner by four homicide detectives. He claimed they had placed a "thin yellow telephone book" on the top of his head and then repeatedly struck it with a large chunk of concrete. Once, he said, the phone book had slipped and the concrete raked his scalp.

Mr. Rupp's peculiar allegation did not surprise Mr. Chase. He had heard almost identical stories from other clients who spent time in the Suffolk police lockup.

Two things, however, did impress Mr. Chase:

First, doctors at the hospital had found pieces of gravel imbedded in Mr. Rupp's scalp. And second, there appeared to be certain blatant discrepancies between the alleged confession and the medical examiner's report.

The six-page confession had described the murder as a beating, but the coroner had declared the cause of death to be strangulation. Also, inexplicably, nowhere in the confession was there a mention of the curious method by which the body had been disposed.

"Besides," recalled Mr. Chase, "the talk on the street was that the cops had beaten the confession out of the wrong guy."

Mr. Chase contacted the district attorney's office and took his findings to John Buonora, the chief of the trial bureau.

## A Little Mistake

On June 3, William Rupp and his lawyer celebrated by ripping up the murder indictment in front of the Suffolk County Jail. Armed with the discrepancies Mr. Chase had supplied and with certain other information, the district attorney had moved to dismiss the indictment.

And that same day, a grand jury in Riverhead indicted Joseph Gurrier for the murder of Walter Wallace. Mr. Gurrier, who has since been convicted, was the fellow against whom the murder victim had been scheduled to testify.

Police never offered any explanation of why it had taken so long to build a case against Mr. Gurrier.

Mr. Chase is now suing the police for $1 million on behalf of Mr. Rupp. He is charging that the police not only brutalized his client, but that they also ignored exculpatory evidence when he was charged.

According to the complaint, dated April 29, 1977, the exculpatory information included "the medical examiner's report indicating a different cause of death, the recantation of a written statement of an alleged co-conspirator, and a polygraph examination of the [alleged co-conspirator] exonerating the plaintiff."

## Sworn Testimony

Last August, William Rupp was examined under oath by an attorney for the firm that underwrites the county's insurance. The following are excerpts from the questioning:

Q: Aside from striking you on the head, did they strike you on any other part of the body at the time?

A: Well, after a while I bent my head — you know, because I couldn't take it any more. They got me in the back of the neck and stuff . . . one guy put a bullet between my fingers and squeezed . . .

Q: How many occasions would you say altogether you were struck while you were in that room? . . . How often?

A: More than a hundred times . . . .

Q: Over how long a period of time during the six hours were you struck?

A: Almost — well, you know they would do it for a while. Then I passed out. Then they put a little water on my head, wait half an hour, do it again.

Then, toward the end of the questioning:

Q: Do you have any present complaints with respect to the injuries you claim you sustained as a result of these incidents?

A: I still get headaches and I fear the cops a lot, too.