# Exhibit 4

# Suffolk County Bar Association



## REPORT OF THE
## CIVIL RIGHTS COMMITTEE
## ON ALLEGATIONS OF
## POLICE BRUTALITY IN SUFFOLK COUNTY

E. Thomas Boyle, Chairman

Kathleen A. Carlsson,
Saul Friedberg,
Erick F. Larsen,
John J. Ciarelli,
Edward V. Esteve,
Gary N. Weintraub,
Frederick K. Hackett,
Robert A. Margolin,
Warren H. Richmond, III,
Steven M. Behar,
Bernard Burton,
Frederick J. Damski,
Joseph R. Mulé

SIC 680869-0105

# The Suffolk County Bar Association



**Frederic Block**
**President**

**Vincent J. Hand**
**President-Elect**

**Richard C. Cahn**
**First Vice President**

**Gustave Fishel III**
**Second Vice President**

**Joshua Pruzansky**
**Secretary**

**John P. Bracken**
**Treasurer**

Please address all correspondence
to Association office at
**Suite 406**
**4175 Veterans Memorial Highway**
**Ronkonkoma, New York 11779**

981-1600

Sandra L. Lewis
**Executive Secretary**

THE FOLLOWING RESOLUTION WAS DULY
ADOPTED BY THE BOARD OF DIRECTORS OF
THE SUFFOLK COUNTY BAR ASSOCIATION
BY A VOTE OF 10 TO 1 AT A SPECIAL
MEETING HELD AT 4175 VETERANS MEMORIAL
HIGHWAY, RONKONKOMA, NEW YORK, ON
JANUARY 28, 1980 AT 7:00 P.M.

WHEREAS, the Board of Directors of the Suffolk County
Bar Association having reviewed the report of the Civil
Rights Committee relative to the allegations of police
brutality in Suffolk County and having received the un-
animous recommendation of the officers of the Associa-
tion; and due deliberation having been had, it is

RESOLVED that the report of the Civil Rights Committee
of the Suffolk County Bar Association relative to the
allegations of police brutality in this County be and
the same hereby is adopted and approved for public re-
lease, and

IT IS FURTHER RESOLVED that the said report is commended
to the attention of the public, the County Executive, the
District Attorney, Police Commissioner, the Sheriff of
Suffolk County, the Presiding Officer and Minority Leader
of the Suffolk County Legislature and the U. S. Attorney
for the Eastern District of New York to the end that
action may speedily be taken by the appropriate governmental
authorities to redress the problem highlighted by the re-
port with a view toward implementing its recommendations.

SIC 680869-0106

INDEX

I.   Introduction                                    . . . . . .        1

     A.  National Law Journal Article  . . . . . .                      2

     B.  Task Delegated to the Civil Rights Committee                   3

     C.  The Difficulty in Establishing Police
         Brutality                          . . . . . .                 4

     D.  Public Hearings                    . . . . . .                 5

II.  A Problem Exists in Suffolk County With Respect
     to Police Brutality                    . . . . . .                 6

     A.  The Involvement of the Suffolk County Human
         Rights Commission in Police Brutality . .                     6

         1.  Brief History              . . . . . .                    6

         2.  Findings of Human Rights Commission -
             Pattern of Brutality       . . . . . .                    9

     B.  Experience of Members of Private Bar  . .                    11

     C.  Rising Number of Police Complaints According
         to Suffolk County Police Statistics   . .                    15

     D.  Civil Actions Resulting from Physical Abuse
         by Members of the Suffolk County Police
         Department                      . . . . . .                  18

     E.  Federal Class Action - Police Brutality
         Suffolk County                  . . . . . .                  19

     F.  The Smith  and Rupp Cases       . . . . . .              22 , 27

     G.  Seven Reversals by Court of Appeals . . .                   28

-i-

SIC 680869-0107

III. Existing Procedures for Handling Complaints of Police Abuse, Deficiencies in Such Procedures and Recommendations . . . . . . .   30

   A. Suffolk County Police Department   . . .   31

      1. Existing Procedures . . . . . . . .   31

      2. Deficiencies and Recommendations . .   32

         a) Civilian Participation in Police Discipline   . . . . . . . .   32

         b) Training in Minority Customs and Attitudes   . . . . . . .   35

         c) Term of Police Commissioner  . .   36

         d) Increased Availability of Complaint Forms . . . . . . . .   37

         e) More Stringent Sanctions . . . .   37

         f) Minority Recruitment . . . . . .   39

         g) Video-Taped Custodial Questioning   39

         h) Rubber-Lined Cuffs  . . . . . .   40

         i) Inspection Unit Investigators Should Not Assist County Attorney . . . . .   41

   B. District Attorney's Office   . . . . .   41

      1. Existing Procedures   . . . . . .   41

      2. Deficiencies and Recommendations . .   43

         a) Assistant District Attorney Present During Custodial Questioning . .   43

         b) Instruction and Assignment of a Single Assistant   . . . . . .   44

SIC 680869-0108

c)   Creation of Separate Investigation
Unit          . . . . . . . .          44

d)   Priority Concern - Police Brutality     45

e)   Amendment to County Charter . .     46

C.   FBI and United States Attorney  . . . .     46

1.   Procedures - United States Attorney..     46
2.   Procedures - FBI.....................     47
3.   Deficiencies and Recommendations  .     48

a)   Incomplete Investigation. . . .     48

D.   Suffolk County Human Rights Commission     49

1.   Procedure       . . . . . . . .     49

2.   Deficiencies and Recommendations  .     49

a)   Investigatory Powers  . . . . .     49

b)   Investigation of Unsworn Complaints     50

c)   County-Wide Jurisdiction  . . .     51

E.   Suffolk County Bar Association  . . . .     51

1.   Procedures and Deficiencies . . . .     51

2.   Recommendations     . . . . . . . .     51

a)   Creation of Specialized Panel
of Attorneys      . . . . . . . .     51

b)   Efforts to Implement Recommendations
Herein        . . . . . . . .     53

Conclusion                  . . . . . . . .     53

Committee Vote              . . . . . . . .     55

Appendix Index            . . . . . . . .     56

-iii-

SIC 680869-0109

I.  <u>INTRODUCTION</u>

In these times of rapidly increasing crime -
especially violent crime - our police play an ever
increasing role in protecting our lives and property.
In relying on the police, however, we must be constantly
vigilant never to lose sight of the rights guaranteed to
our citizens suspected of, or arrested for, such crimes.
Every person - rich or poor - regardless of the gravity
of the offense, is entitled to fair treatment - free
from bodily harm - along with all the other constitu-
tional rights provided under the Constitutions of the
United States and the State of New York.

The power to terminate a person's liberty by
taking him or her into custody for the purpose of charging
such person with a criminal offense is the most awesome and
extreme power that government has over its citizens.  In
this respect no public officer has more power and authority
than the police officer.  History has repeatedly shown us
the evils that flow from an attitude and course of conduct
by persons in government who consider themselves above or
beyond the law.*

_____

* It is thus for good reason that our laws impose on police officers
higher standards of discipline, character and fitness than pertain
to other civil service employees.  Matter of <u>Alfieri v. Murphy</u>, 38
N.Y.2d 976, 384 N.Y.S.2d 157 (1976).  The   position of peace officer
is traditionally regarded as requiring a high degree of sensitivity
and trust.  <u>Matter of Carmen v. Kirwan</u>, 44 A.D.2d 613, 353 N.Y.S.2d
64 (Third Dep't. 1974).

-1-

SIC 680869-0110

A.  National Law Journal Article

The inquiry by the Civil Rights Committee into police brutality in Suffolk County was occasioned by an article published in the National Law Journal on June 11, 1979.  The article,* written by  Rafael Abramovitz, is entitled "When Suspects are Abused; Allegations of Beatings, Forced Confessions in a N.Y. Suburb are Wide-spread."  It concludes that an "apparent pattern" of police beatings of suspects by members of the Suffolk County Police Department** exists in Suffolk County.

---

 *  A copy of the article is annexed hereto as
    Exhibit "A".

**  The Suffolk County Police Department covers the 5
    western towns of Suffolk County with the exception
    of some of the villages within those towns, most of
    which maintain their own police force.  The 5 eastern
    towns of Suffolk County have retained their police
    forces.

-2-

SIC 680869-0111

B. Task Delegated to the Civil Rights Committee

In July, 1979, the Officers and Directors of the Suffolk County Bar Association, delegated to the Civil Rights Committee of the Bar Association the task of examining the allegations of police brutality in Suffolk County and reporting its findings and recommendations to the Bar Association. More specifically, the Civil Rights Committee was requested to report on three main issues:

1) Is there "validity" to the complaints of police brutality in Suffolk County that the National Law Journal Article addresses,and, if so, do such complaints warrant further Bar Association activity;

2) Are procedures presently followed by the Police Department, the District Attorney's office and the United States Attorney's office adequate for rendering a proper, fair and impartial determination of issues involving police brutality in Suffolk; and

3) What, if any, role can the Bar Association play in this area.

-3-

SIC 680869-0112

C.   The Difficulty in Establishing Police Brutality

The problem of police brutality is a difficult one to address.  From the police perspective the persons who make complaints of physical beating are most often persons arrested on criminal charges who have made an oral or written admission to the crime which the prosecutor intends to use in the criminal prosecution. Since establishment of the beating would be grounds for suppression of the confession, the accused has much to gain by claiming police brutality and such claims are often viewed with skepticism by the courts and by prosecutors.  In addition, those making such complaints often have extensive criminal records which tends to further undermine credibility.

The accused, therefore, has a heavy burden to establish that he was beaten.  Making matters even more difficult, most of these incidents arise while the accused is in police custody and there seldom are any civilian witnesses present.  Instead, the only witnesses are usually police officers who are hardly inclined to step forward and testify on behalf of the accused.  Thus,

-4-

SIC 680869-0113

concrete evidence to support the defendant's contention is usually lacking and it therefore comes down to a sharp conflict of proof, with the testimony of the police invariably prevailing over that of the defendant. Where, however, there is concrete evidence, such as an independent witness to verify the defendant's assertions, a wide divergence in police testimony, or serious unexplained injuries to the defendant occurring while in custody, a defendant's chances of prevailing on this issue before a court or a jury are greatly increased.

D.  <u>Public Hearings</u>

To develop information and ascertain the facts, the Committee conducted public hearings in the County Legislative Auditorium in Hauppauge on September 17th and 24th, 1979. Invitations were sent out to the public and to those agencies and officials having information relevant to the issues. Speakers included representatives of the Suffolk County District Attorney's office, the Suffolk County Police Department, the Suffolk County Human Rights Commission, the FBI, Civil Liberties, the Legal Aid Society, the NAACP, EOC and Union Hispanica. Members of the private bar and individuals with personal experiences also appeared and participated.*

---

\* Annexed herto is a list of persons who addressed the Committee. Any one present wishing to express his or her views was afforded the opportunity to do so. This list is marked "B."

SIC 680869-0114

II.      A PROBLEM EXISTS IN SUFFOLK COUNTY WITH RESPECT
         TO POLICE BRUTALITY

         There are several factors which point to what

appears to be a serious problem in Suffolk  County with

respect to police brutality.   Incidents too numerous to

mention were brought to the attention of the Committee.

The number of complaints filed, according to civilian and

police sources, has steadily risen - often at an alarming

rate.  The Suffolk County Human Rights Commission - since

1972 the County agency responsible for referring such com-

plaints to the Police Commissioner for investigation -

reported that a pattern of brutality exists among "the

poor and the powerless" or those perceived as such, often

involving members of minority groups and young persons.  This

conclusion is supported by experiences of members of the

practicing bar, and further support can be found in the

decisions of our state and federal courts.

    A.   The Involvement of the Suffolk County Human Rights
         Commission in Police Brutality

         1.  Brief History

         The Human Rights Commission was created by resol-

ution of the then existing Board of Supervisors in 1963.


                              -6-

The enacting legislation empowered the Human Rights Commission to conduct studies in the field of human relationships in the County.  In 1970, the Suffolk County Legislature extended the Human Rights Commission's jurisdiction - by Resolution 281 of 1970 - to create the Commission structure in its present form, and authorizing it to foster mutual respect and understanding among social, ethnic and religious groups, to make studies of such human relationships and to inquire into incidents of tension and conflict among such groups.

In 1972 County Executive Management Order 19-1972 was promulgated, which established procedures for handling citizen complaints of police misconduct against members of the Suffolk County Police Department.*  This resolution authorized the Human Rights Commission to screen and refer such complaints.  It provides that the Commission

_____

\*  There is no provision on a County level for handling complaints arising on the East end of the County where the Suffolk County Police Department is not involved or in incorporated villages throughout the County.  This is a deficiency which should be rectified, discussed _infra_ at 51.

-7-

SIC 680869-0116

take a statement from the complainant under oath and then forward it to the Suffolk County Police Department for investigation. More specifically, Executive Management Order* 19-1972 states that:

> 1) All complaints involving allegations of force by members of the Suffolk County Police Department - whether processed through the Human Rights Commission or not - must be in writing and sworn to by the victim;
>
> 2) The sworn complaint and any supporting documents must be personally filed with the office of the Police Commissioner.** A copy of the complaint must thereafter be served on the County Executive's office, together with admission of service on behalf of the Police Commissioner;

---

\* County Executive Management Order No. 19-1972 is annexed hereto as "C."

\*\* Personal service on the Police Commissioner's office is a purposeless confrontation to a victim of alleged police brutality and likely to discourage the filing of such complaints. While this may be minimized in those situations where the complaint is processed through the Human Rights Commission, which can and does effect such service, it nonetheless leaves other victims responsible for seeing that personal service is made. Discussed infra at 37.

-8-

SIC 680869-0117

3)   Thereafter the Police Commissioner
shall initiate an investigation.

4)   The Police Commissioner's decision,
in writing, following completion of
the investigation, shall be transmitted
to the County Executive, the complainant
and to the Human Rights Commission
(where involved).

2.   <u>Findings of Human Rights Commission -
Pattern of Brutality.</u>

Based on its statistics back to 1972, the Human
Rights Commission reported to the Committee that their
evidence indicates that police misconduct is a serious
and continuing problem in Suffolk and that there is an
apparent pattern; to wit:

> "The victims are usually
> poor and powerless, or are
> perceived in that light.
> Often they are members of
> minority groups*, or they
> are youth."

Supporting this claim, Commission statistics reflect
that 75% of all police complaints funneled through Human
Rights occurred in the First Precinct (Babylon, Wyandanch,
Amityville) and the Third Precinct (Bay Shore, Brentwood,

---

* Members of three minority organizations agreed that police
misconduct is a serious and continuing problem in their
communities.  Such representatives were Antonio Cotter,
Union Hispanica;   Don Price, EOC; and Ken Anderson, NAACP.

-9-

SIC 680869-0118

Central Islip) - areas containing the County's largest
minority and poverty level population.*  The Commission
further reports that while Blacks make up approximately
7% of the County's population and account for 22.8% of
the arrests, approximately 50% of all complaints against
members of the Suffolk County Police are from black
citizens.  In 85% - 90% of the cases, the complainant
is reportedly from a poverty or low working class eco-
nomic level.

    The Human Rights Commission further claimed that
the Suffolk County Police Department has an administrative
policy and/or practice whereby ineffective police officers and/
or those who are being subtly disciplined are assigned to high
crime areas, such as the First and Third Precincts, where
most of the minority groups are located.  Thus, according
to the Commission, persons in those areas often see the
worst, rather than the best members of the Suffolk County
Police Department.

_____

*   These two precincts accounted for only 37% of the
    arrests (First Precinct 16%, Third Precinct 21%)
    in the county police district during the first 10
    months of 1979.

    The police representative confirmed that the
    majority of police misconduct complaints arise
    in the First and Third Precincts.

                        -10-

SIC 680869-0119

The Commission also reported that approximately 40% of all complaints of police beatings between 1972 and the present involve persons under the age of 25.

The Commission reports that since August 1972, when it began referring police complaints to the Suffolk County Police Commissioner - of the 311 complaints referred, approximately 3% resulted in departmental disciplinary action and the remaining balance of 97% were returned as unfounded or without sufficient cause for any disciplinary action.

B.  Experience of Members of  Private Bar.

Several attorneys practicing in Suffolk County have confirmed this pattern among the young and members of minority groups arrested on minor offenses, such as harassment, disorderly conduct and traffic offenses. They reported that such persons often complained of being roughed up, handcuffed with the cuffs tightened around the wrists in a manner that restricts blood circulation, and of the police striking their heads against the sides of the patrol car or being thrown face down on the ground.  Paul FitzMorris, an attorney, stated that he actually witnessed such acts but did not intervene for fear of some reprisal.  Another incident was personally witnessed by Ms. Guanil, Chairperson of the Human Rights Commission , who resides

-11-

SIC 680869-0120

in the Hispanic community in Brentwood.  She too stated that fear of reprisal often discourages witnesses from complaining.  Mr. FitzMorris further stated that in numerous cases there were hospital records which verified such injuries.

Paul FitzMorris provided first hand information with respect to the attitude of certain police officers. Mr. FitzMorris stated that two years ago he personally brought to the attention of the Police Department information* that a "responsible senior officer" committed a crime in the attorney's presence.  Affidavits supporting this allegation were provided to the Police Department.  The attorney stated that he has never received a response, even though he made further written inquiry to the Deputy Commissioner.

Mr. FitzMorris expressed similar complaints with respect to complaints of police misconduct turned over to the District Attorney.

---

*  FitzMorris stated that for a period of several months
   after making such charges he received anonymous tele-
   phone calls in which the person on the other end would
   hang up.  FitzMorris stated that the Internal Affairs
   detective involved in this case - who had an unlisted
   number - also received similar calls.  The last
   of the 6-8 phone calls occurred on the same night that
   the windshield of FitzMorris' car was smashed while
   parked in his driveway.  The police investigated but
   made no arrests.

-12-

SIC 680869-0121

He also asserted that invariably when a victim is injured by a police officer he is charged with resisting arrest or assault third degree. This pattern of charges was confirmed by the experience of other counsel. Where the injury is serious, Assault 2d degree - a felony carrying, upon conviction, a mandatory prison term of 3 to 7 years - may also be charged. The existence of such charges very often discourages an accused from making a complaint since to do so would reduce chances of resolving the case without a trial.

John Middlemiss, attorney in charge of the Legal Aid Society of Suffolk County, stated that there was no pattern of police brutality in the County and that existing procedures seemed adequate. Mr. Middlemiss stated that this position was not based on his own familarity in this area, but instead on the answers to a questionnaire addressed to the staff attorneys in the criminal division, prior to appearing at the hearings. Despite the Committee's oral and written request, Mr. Middlemiss has failed to make the completed questionnaire available to the Committee.* Arthur Keesler, Esq., an attorney with the criminal division of Legal Aid for approximately 10 years, and a member of the private criminal bar before that, contradicted

---

\* By letter, dated October 12, 1979, Mr. Middlemiss informed the Committee that "no useful purpose would be served by revealing documents forwarded to me [Middlemiss] at my specific request."

-13-

SIC 680869-0122

this position and stated that the questionnaire was not given serious consideration by most staff counsel, there being no explanation of the purpose of the information. Mr. Keesler stated that the questionnaire came in a pay envelope. The questionnaire was expected to be filled in and returned the following day. The questions were: is there a pattern of police brutality - are existing procedures adequate - and how can procedures be improved. Mr. Keesler stated that he and most other attorneys he spoke to answered "yes" to the question of whether a pattern of brutality exists in Suffolk and "no" to whether existing procedures were adequate.

Without the materials on which Mr. Middlemiss' position is based and faced with a contradiction by an attorney on the Legal Aid staff actively engaged in criminal practice in this County, and bearing in mind the manner in which the information was elicited, the Committee is reluct- ant to place great reliance on Mr. Middlemiss' statement.*

_____

* We further note that the statement of Mr. Middlemiss is contradicted by every member of the private bar who appeared at the hearings.

-14-

SIC 680869-0123

C.  Rising Number of Police Complaints According to
    Suffolk County Police Statistics

     Records of the Suffolk County Police Depart-
ment reflect an increasing number of citizen complaints
against its members.  Statistics supplied by Inspector
Siegel of the Internal Affairs Unit* are as follows
with respect to complaints involving undue force:

    1975    -    88

    1976    -    43**

    1977    -    51

    1978    -    93

    1979    -    (as of Sept.) 86

---

*   The National Law Journal article, which quoted
    Deputy Commissioner Petersen as  its  source, re-
    ports different - generally lower statistics -
    than those presented at the hearings by Inspector
    Siegel.  The article states the following figures:

        1977    -    46

        1978    -    59

        1979    -    (5 months) 60

**  The reason for the dramatic decline of police brutality
    complaints between 1975 and 1976 is not known.  The
    Committee notes that the class action suit on Suffolk
    police brutality was tried in the federal court (E.D.N.Y.)
    in July, 1976, discussed infra at  19-21

-15-

SIC 680869-0124

Inspector Siegel presented statistics regarding dis-
ciplinary action in undue force cases for the years
1978 and 1979. Those figures reflect that 5 cases
resulted in disciplinary action with respect to the
1978 complaints and none in 1979. While there are
undoubtedly more police contacts as population and
crime increase in Suffolk, as the Police Department
representative, Inspector Siegel, pointed out, the
Committee is not satisfied that this factor accounts
for the steady and disturbing increase in the number
of citizen complaints involving undue force, especially
since, during this period there was not a doubling of
either the crime rate or the population in these areas.*

According to Inspector Siegel of the Suffolk
County Police Department, there has been one indictment
returned against a member of the Department involving

_____

* While Human Rights Commission statistics were not
provided back through 1976 involving citizen complaints
solely of undue force, their records for recent years
reflect a similar consistent increase in the total
number of overall citizen complaints (including
physical abuse) against members of the Suffolk County
Police over the same period:

> 1976  -  38
> 1977  -  44
> 1978  -  94
> 1979  -  103 (to date of compilation,
>             August-September, 1979)

-16-

excessive use of physical force.*

The Committee further believes that the number of complaints filed may not reflect the number of incidents which could give rise to such complaints.**  There was testimony at the hearing that most of these police confrontations occur,as the Commission described,between "the poor and the powerless" or those perceived as such.  Many may be ignorant of the available forms of redress and still others may be reluctant, for fear of reprisals, or because of the time required to be spent or because of the perceived futility, to pursue complaints against the police.

The police representative, Inspector Siegel, in charge of internal affairs,  candidly stated that police attitudes - from the commanding officer level to the rank and file - need  improvement in the area of the use of undue force.  With commendable candor, Inspector Siegel also acknowledged room for improving existing police procedures for handling such complaints,

---

\*     The spokesman for the District Attorney's office con-
       firmed this.  That case resulted in a not guilty verdict.

\*\*    This is not to suggest that all such complaints are valid.

-17-

while maintaining, however, that such procedures were adequate.

D.   Civil Actions Resulting from Physical Abuse by Members of the Suffolk County Police Department

The Committee has confirmed the settlements reached in those cases specifically referred to in the Abramovitz article.*  What the Committee finds particularly disturbing is that neither the Suffolk County Police Department nor the District Attorney's office apparently undertook any investigation and/or disciplinary action following the settlements in these cases.**  The same is true with respect to the $190,000 jury verdict in the Quigley case.

---

*     These are:  Crite v. Barry - $18,000 (1978)
               Mills v. Suffolk County - $5,000 (1976)
               Oquendo v. Suffolk County - $15,000 (1978)
               Phillie v. Suffolk County - $10,000 (1979)
               Mulligan v. Suffolk County - $2,000
               Vocht v. Suffolk County -    $2,000 (1979)

The above cases were handled by Arthur Graseck, Esq. The case involving the $190,000 jury verdict in favor of a man arrested for DWI and subsequently physically mistreated in the precinct lock-up was handled by Peter Reilly, Esq., and is presently on appeal before the Appellate Division.

**  In addition to the above, the Committee has been apprised of at least one other civil action which has been settled by the County arising out of a physical abuse complaint by a person taken into custody on criminal charges (handled by Phillip Murphy, Esq., and settled for $9,000).

In addition the Committee has been apprised of numerous other cases which are presently pending in federal and state courts involving claims of physical abuse.

-18-

SIC 680869-0127

E.   Federal Class Action - Police Brutality Suffolk
     County

In 1976 a class action was filed in the federal
court in Brooklyn by counsel for the NAACP Legal Defense
Fund and Arthur Graseck, Esq. on behalf of 18 defendants
alleging beatings and other due process violations by
the members of the Suffolk County Police Department.
The case - Coleman v. Klein, 73 Civ. 1857 - was tried
before Judge Weinstein.  The case was dismissed on
July 21, 1976, by Judge Weinstein after several days
of testimony by the plaintiffs.  The dismissal was not
on the merits, but rather was based on the Supreme
Court decision in Rizzo v. Goode, 423 U.S. 362(1976), which held that
principles of federalism prevent the federal court
from injecting itself into the internal affairs of a
state agency, there the police department of the
City of Philadelphia.  Constrained to dismiss under
the Rizzo decision at the end of the plaintiff's
case, Judge Weinstein nonetheless made certain fac-
tual findings.*  Such findings, inter alia, are
that a substantial number of cases were established
where the Suffolk police used excessive force, that
there was evidence of racist remarks by Suffolk
police officers and that police internal discipline
in police brutality cases is lax.  More specifically,

---

* Such findings were necessarily tentative since the Court granted
  the defense motion to dismiss at the end of the plaintiffs' case -
  before the Court heard the defendant's case.

-19-

SIC 680869-0128

Judge Weinstein stated that:

(1)   During the period from 1970 to the present, there have been a substantial number of cases where excessive physical force was used by some Suffolk County officers in arresting suspects, in questioning them to obtain oral admissions, and in punishing persons thought by some police officers to be showing what police officers considered a lack of respect or cooperation at the time of the arrest or questioning.   These incidents included whites, blacks and Hispanics.

(2)   [D]uring the same period there have been a substantial number of cases where racial epithets were used by Suffolk County police officers against members of the black and Hispanic communities.

(3)   [P]rior to the tenure of the present County Executive, John V.N. Klein, Commissioner Eugene R. Kelly, and Inspector William L. Mc Bride, attempts to discipline the police force to prevent brutality were lax.   County Executive Klein has attempted to use his limited powers over the Suffolk County Human Rights Commission and the Suffolk Police Department to improve methods of handling complaints of police brutality and to insure proper investigation and discipline.

Police Commissioner Kelly and Inspector McBride have, during the last few years, devoted substantial efforts to improve relations with the minority groups of Suffolk County, individual complainants and the Suffolk County Human Rights Commission.

(4)   [W]hile the present situation is appreciably improved, substantial segments of the minority communities in Suffolk County feel abused by the Police Department with respect to the activities of some of the policemen, and lack confidence that their complaints will be fairly investigated, and that police officers found guilty of abuse will be prosecuted.

-20-

SIC 680869-0129

(5) [T]here is a lack of prompt, adequate and dispassionate investigation of charges at the local level, and in Inspector McBride's office in internal disciplinary procedures, and in prompt reports to the complainants of the results of these investigations. Some complainants are discouraged from filing complaints and others fear to do so because of concern over retribution by some members of the police force.

Decision* of Judge Weinstein, dated July 21, 1976 at 3-5 annexed hereto as Exhibit "D".

Based on the information available to the Committee, it appears that a serious problem still exists with respect to the excessive use of physical force and lax discipline of such conduct. It further appears that the remedial efforts noted in Judge Weinstein's decision have not appreciably ameliorated this problem, nor has the minority community's distrust of the fairness with which such complaints are investigated changed to any material degree.

———————————————

* The Court further found that there was no policy by supervising officials in Suffolk County e.g. the County Executive, to violate the plaintiffs' constitutional rights.

-21-

SIC 680869-0130

F.   The Smith and Rupp Cases

The National Law Journal article refers to two cases wherein defendants in police custody were forced by the Suffolk County Police to confess to crimes they never committed:  William Rupp to murder and Roland Smith to a robbery that never occurred.

The Committee has looked into both cases.

1.   The Roland Smith Case

The case of Roland Smith involves a defendant arrested in Bay Shore (Third Precinct, Suffolk County Police Department) on a marihuana possession charge.  According to Judge Seidell's written opinion* the accused was taken into custody at approximately 11:45 p.m. on April 5th and thereafter was intermittently interrogated by detectives at the Third and at the Fourth Precincts during the entire day of April 6, 1977.  The defendant was not brought before the Court until April 7, 1977. The Court found that during the period that the defendant was in custody at the Third Precinct he was physically coerced** into admitting and signing a confession

---

\* Annexed hereto as Exhibit "E".

\*\* The police representative, Inspector Siegel, stated that Internal Affairs has never substantiated a coerced confession obtained by a Suffolk County police detective. According to John Mullen, Esq., Chief Assistant District Attorney, all adverse Huntley findings are referred to the Suffolk County Police Department for investigation.

SIC 680869-0131

to a crime which had never occurred.   In addition, the Court
suppressed two robbery confessions obtained at the Fourth
Precinct on April 6, 1977.   One confession resulted from
interrogation before taking the defendant to Smithtown
Hospital at 5:50 p.m. and one following his discharge at
7:18 p.m.   Upon discharge from the hospital, the defendant
was not taken to Court but rather back to the Fourth Pre-
cinct for further interrogation.

The following excerpts are findings of fact from
Judge Seidell's decision:

> Linda Smith informed detective Forrest that
> she knew that the defendant had committed a robbery
> at a Seven-Eleven store.  She was not charged with
> the commission of any crime and she left the precinct
> at approximately 1:30 a.m.
>
> The defendant was then given his MIRANDA warnings
> and defendant stated that he knew all about his
> rights since he had been arrested numerous times
> before.
>
> The defendant denied being involved in any robbery.
> Detective Forrest then called Linda Smith and requested
> that she return to the precinct.  Linda Smith then
> returned to the precinct and was allowed to speak to
> her ex-husband alone.  Linda Smith informed the de-
> fendant that if he did not confess to the Seven-Eleven
> Store robbery, she would be arrested and charged with
> possession of narcotics and that their son would be
> placed in a child protection agency.
>
> The defendant was then again interrogated about
> the robbery and after using mental and psychological
> coercion and physical force upon this defendant, the
> defendant then signed a written confession, claiming
> that he committed a robbery on July 1, 1976 at a
> Seven-Eleven store on Ronkonkoma Avenue in Ronkokoma.

-23-

SIC 680869-0132

This signed statement was executed about 5:30 a.m.
Detective Forrest went off duty about 9:30 a.m. and
the defendant was still hand-cuffed to a desk with
bruises on his face and wrist and track-marks on his
arm.

On April 6, 1977 at approximately 11:00 a.m. Det-
ective Robert Harris was called by the Third precinct
to interrogate this defendant.  Detective Harris knew
the defendant approximately four years prior to this
date.

The defendant had not been arraigned on the active
warrants, the possession of narcotics, nor the al-
leged robbery.

Detective Harris then arrived at the Third precinct
at about 11:45 a.m. and questioned the defendant
regarding a robbery of a Seven-Eleven store in October
of 1976.  After reading the confession of this defend-
ant regarding the July 1, 1976 robbery, Detective Harris
then decides to transport this defendant to the Fourth
precinct for further interrogation.  This defendant
still has not been arraigned at the District Court
for the charges for which he was arrested.

Detective Harris knew that this defendant had serious
mental reservation about being locked-up in a station
house jail.  At about 12:05 p.m. the defendant is now
in custody in the Fourth precinct.

Detective Harris knew that the alleged confession
obtained from the defendant in the third precinct
was false and that the defendant confessed to a
crime which had never been committed.

The defendant was lodged in the fourth precinct
jail at times during the interrogation without any
clothes on since it was known that this defendant
had mental problems and had the tendency to self-
inflict injuries upon his person.

After constant interrogation, knowing the defendant
had not slept from the time he was arrested, the police
authorities, through detective Harris, then obtained
a written confession from this defendant, confessing
to a robbery at the Seven-Eleven store on Lake Shore

-24-

SIC 680869-0133

Road sometime early in October of 1976.  All through
the interrogation of this defendant it was visibly
clear that he was suffering from the physical injuries
sustained while in custody in the third precinct.

After obtaining the confession of this defendant,
the defendant was taken to Smithtown General Hospital
at approximately 5:50 p.m. for emergency treatment.
The defendant was examined at the hospital and his
injuries were diagnosed as multiple abrasions and he
was discharged at approximately 7:18 p.m.

The defendant was then brought back to the fourth
precinct, still not having been arraigned on any
charges and detective Raymond Richmond of the fifth
squad visits the fourth precinct to interrogate this
defendant.

After a lengthly interrogation of this defendant
regarding an alleged robbery at the MacArthur Motel
on November 26, 1976, this defendant still, without
any sleep, admits orally that he attempted to rob the
MacArthur Motel on or about November 26, 1976.  All fur-
ther interrogation of this defendant is finally terminated.

On April 7, 1977 the defendant is _finally_ transferred
from the fourth precinct to the District Court for
arraignment on all charges, including the outstanding
warrants.

Detectives Harris and Richmond had given the defend-
ant his MIRANDA warnings prior to their interrogation
at the fourth precinct. (_Emphasis_ _in_ _original_)

The Court went on to hold:

It is undisputed that the defendant was mentally
and physically coerced into admitting and executing
a signed confession while being detained at the third
precinct.  Hence, any admissions or statements made
to detective Forrest at the third precinct is hereby
suppressed.  _People v Woodson_ 385 NYS 2d 998.

The defendant was interrogated at the third precinct
from approximately 11:45 p.m. of April 5, 1977 until
about 12:00 noon of April 6, 1977 without being ar-
raigned.  The defendant was transported to the fourth

-25-

SIC 680869-0134

precinct and further interrogated without being arraigned
until the morning of April 7, 1977 at the Suffolk
District Court.  This defendant was clearly denied his
constitutional right of being brought before a local
criminal court without "unnecessary delay" and denied
due process.  The Court rejects the argument that the
failure to arraign the defendant was due to a breakdown
of the computer at the police station.  People v.
Malinski 292 NY 360; People v Holder 358 NYS 2d 54.

The defendant was subjected to continuous interrogation
from the moment he was arrested on April 5, 1977 in vio-
lation of his constitutional rights.  Leyra v Denno
347 U.S. 556;  People v. Jennings 40 A.D. 2d 357.
(Emphasis in original)
The People have failed to prove beyond a reasonable
doubt that the confession and admissions made by this
defendant in the fourth precinct were voluntary or that
there was a break in the casual connection between the
first involuntary statement and the subsequent confession
and admissions People v Valerius 31 N.Y. 2d 51.

Smith has filed a civil action in the federal court.

According to the civil complaint the beating  lasted approx-

imately five hours and included punches to the midsection,

punches in the area of the kidneys  and to the face, kicks to

the groin, application of extreme pressure to the wrists

with handcuffs, and banging Smith's  head against the floor.

There is no evidence that the police officers in-

volved have been disciplined, notwithstanding Judge Seidell's

written findings of abuse.

Subsequent to the institution of the civil liti-

gation, Mr. Smith reported that he has been harassed,

along with other members of his family, including his

-26-

SIC 680869-0135

present wife and father-in-law.  This harassment allegedly takes the form of telephone calls, as many as twenty a week, which are anonymous and include statements such as "you'll not live to spend one penny of any of the money that you get from this law suit."  Additionally, the family has been called up at various times throughout the night and morning with questions about the location of the vehicle owned by his father-in-law and operated by Smith and indicating that it was involved in a hit-and-run accident.

Smith is now a CETA employee working with the County in its Department of Environmental Control and alleges that he has been harassed by the police who call him down on various occasions to answer questions about crimes committed in his neighborhood.  Also, on one occasion he allegedly discovered five dead cats located in front of the County truck which he uses on his job.

2.  William Rupp Case

The Committee is aware of allegations of a coerced confession in the William Rupp murder case.  The indictment was dismissed on the District Attorney's motion on the ground that the defendant was not involved in the charge.  Because of counsel's expression of concern with respect to a civil action which is pending and the lack of sufficient information we make no further comment.

-27-

G.   Seven Reversals by Court of Appeals

      The seven cases* cited in the National Law
Journal article concerning Court of Appeals reversals of
convictions in Suffolk County have been examined.  The
cases form a very strong line establishing the absolute
right to counsel.  They make a boiler plate rule that once
an attorney calls the police number and requests to
speak to his client, who is in custody, the police cannot
question that arrestee any further.  The only time that
an arrestee's right to counsel can be waived is if such
waiver is undertaken in his attorney's presence.

---

* People v Wander, 47 N.Y.2d 724, 417 N.Y.S.2d 245 (1979)
reversing, 61 A.D.2d 1037, 403 N.Y.S.2d 111 (Second Dept.
1978)

People v Garofolo, 46 N.Y.2d 592, 415 N.Y.S.2d 810 (1979)
reversing, 62 A.D.2d 1181, 403 N.Y.S.2d 608 (Second Dept. 1978)

People v Maerling, 46 N.Y.2d 289, 413 N.Y.S.2d 316 (1978)
reversing, 52 A.D.2d 758, 382 N.Y.S.2d 214 (Second Dept. 1976)

People v Pinzon, 44 N.Y.2d 458, 406 N.Y.S.2d 268, 377 N.E. 2d
721 (1978) reversing, 52 A.D.2d 638, 382 N.Y.S.2d 563 (Second
Dept. 1976)

People v Singer, 44 N.Y.2d 241, 405 N.Y.S.2d 17 (1978) reversing,
54 A.D.2d 915, 387 N.Y.S.2d 911 (Second Dept. 1976)

People v Macedonio, 42 N.Y.2d 944, 397 N.Y.S.2d 1002 (1977)
reversing, 53 A.D.2d 809, 385 N.Y.S.2d 694 (Second Dept. 1976)

People v Hobson, 39 N.Y.2d 479, 384 N.Y.S.2d 419 (1976) revers-
ing, 47 A.D.2d 716, 366 N.Y.S.2d 1003 (Second Dept. 1975)

-28-

SIC 680869-0137

Five of the cases cited in the article involved homicides.  Of these, the recorded decisions (both Appellate Division and Court of Appeals) indicate that allegations of physical abuse were raised in four cases.  In the <u>Singer case</u> the Court of Appeals decision notes that the defendant claims he was beaten with a phone book.  In <u>Pinzon</u> the Second Department decision notes that the trial court found no evidence to support the defendant's claim that he had been beaten.  In <u>Maerling</u> the Court of Appeals decision notes that the defendant claimed that he was beaten. In <u>Wander</u> the Appellate Division opinion, while not deciding the coercion issue because of overwhelming evidence of guilt, noted that the confession "may have been coerced."

The Court of Appeals did not reverse on the issue of coerced confessions, which, generally speaking, is an issue of fact which cannot be raised in the Court of Appeals.  The cases do reflect, however, that counsel and family have not been afforded access to suspects taken into custody on criminal charges in Suffolk County.

-29-

SIC 680869-0138

III.  EXISTING PROCEDURES FOR HANDLING COMPLAINTS
      OF POLICE ABUSE, DEFICIENCIES IN SUCH PRO-
      CEDURES AND RECOMMENDATIONS

        This is not the first time that a question has been
raised as to the adequacy of the manner in which police
complaints are handled in Suffolk County.  Special Pro-
secutor, Mr. Hoey, and his successor, the late Mr. Scotti,
appointed by Governor Rockefeller in 1975 and 1976, respect-
ively, also looked into this issue.  With Mr. Scotti as its
counsel, a special grand jury in 1976 made the following
recommendations* with respect to deficiencies in procedures:

        a)  All allegations of criminal misconduct by

        members of the Suffolk County Police Department

        which result in an internal investigation by the

        Department should be referred to the District

        Attorney.**

        b)  The District Attorney's office should make a

        determination - based on a review of the police

        file - whether the Police Department recommendation

        of criminal prosecution or administrative action

        is appropriate in a particular case.

        _____

         *  The report of the special grand jury is annexed hereto
            as "F".

        **  This does not apply to the five eastern towns or to
            villages in Suffolk County that maintain their own
            police force.

SIC 680869-0139

While the special grand jury making this recommendation further recommended that appropriate legislation be enacted on the County level to implement its findings, the County Legislature has never done so.

According to police and district attorney spokesmen the special grand jury recommendations are followed pursuant to an informal agreement between the two agencies. This agreement, however, is not binding on either party and could be abandoned at will.*

A.  Suffolk County Police Department

1.  Existing Procedures.  Complaints of police misconduct in the Suffolk County Police are referred to the internal affairs unit.  From there an investigation is carried out which reportedly consists generally in at least interviewing all parties involved.**

The difficulty with this procedure is that when faced with conflicting versions of what occurred the police internal affairs unit invariably favors the police substantiated version and the complaint is reported as unfounded with generally no further

---

*   It was the special grand jury's finding that the police department was referring such cases to the District Attorney on a selective basis that led to the recommendation for legislation.


**  The police, however, are not required to respond under oath, although the complainant is.

-31-

SIC 680869-0140

follow-up by the District Attorney's office.*

   2.   Deficiencies and Recommendations

      a)   Civilian Participation in Police Discipline

         There are several problems with the existing procedure.

It is not perceived by the public as a fair determination, but

rather a one-sided one wherein the police will almost always

prevail.  This is so notwithstanding the fact that the decision

in a given case may be an appropriate and impartial one.  The

public is skeptical - and rightly so - of the ability of any

group or profession to discipline its own members.**  Secondly,

and equally important, the basis of the results of such proce-

edings*** are not made public, which further reinforces the public's

---

   *  This is probably the only area of law enforcement where
      diametrically opposed versions of what occurred invariably
      do not result in grand jury presentation.  C.P.L. 190.65
                                                    sub. div. (1)

  **  This led the Appellate Division to place non-lawyers on
      the grievance committee.  Similar changes have been ad-
      vanced or are under study in the medical profession.  The
      police are subject to the same bias and partiality in dis-
      ciplining their own.

 ***  The Human Rights Commission states that the County Execu-
      tive's interpretation of Management Order 19-1972 is that
      a complainant has the right to meet with police authorities
      to obtain further details with respect to a disposition.  It
      is reported, however, that the police interpret this nar-
      rowly and additional information is meager.

      The Committee believes that additional confrontation with
      police should not be necessary to obtain such information,
      discussed infra at 37.  We are advised that the police
      report to a complainant routinely states simply that "no
      substantiation for complaint can be found" or "the officer
      acted within the limits and scope of his authority."

-32-

SIC 680869-0141

preconceived notions of one-sidedness and eliminates scrutiny by complainants, other interested persons and the press.

Accordingly, the Committee, as a principal recommendation, recommends the establishment of the Law Enforcement Appeal Panel [LEAP].

The Board of LEAP would be comprised of thirteen members; seven members would be appointed by the Police Commissioner of Suffolk County with concurrence by the County Executive.  No more than three of these appointees shall be active members and/or employees of a police department during their term of appointment.  Six civilian members would be appointed by the County Executive, one residing in each precinct.  LEAP would be provided with subpoena powers and authorized to conduct hearings on complaints of police misconduct.  Its jurisdiction would  be county-wide.

LEAP would function in the following manner: LEAP, upon receipt of a complaint, would investigate the incident utilizing the services of its own independent staff.  Thereafter a report delineating the results of the investigation would be made.*  In those cases

_____

* The Committee believes that 30 days should provide sufficient time for this purpose.

-33-

SIC 680869-0142

which LEAP determines to be baseless, it shall, in writing,
advise the police officer and complainant and, at the request
of the police officer, shall make such finding public.   In
those cases which are not baseless, at the request of either
party, LEAP shall conduct a hearing* and thereafter make
findings and recommendations.   These recommendations shall be
transmitted to the Police Commissioner and to the District
Attorney.   In those cases where police discipline is recom-
mended the Police Commissioner, not later than 120 days, shall
advise what,if any, disciplinary action has been taken.

  Since LEAP's establishment involves an amendment
to the Suffolk County Charter, the Committee refers this
matter to the Charter Revision Commission for its consideration.

-----

\*  The Committee believes that the hearings should not
be public but that the findings and recommendations
should be made public if adverse to the police officer.
Both sides should be entitled to appear with counsel
and must be afforded an opportunity to be heard.   A
transcript of the hearing should be maintained as a
permanent record.

SIC 680869-0143

The Committee further recommends the formation of local police community advisory boards at the six precincts within the county police district.  The purpose of such boards would be to improve relations between the police and the local community.

b)  <u>Training in Minority Customs and Attitudes</u>

Human Rights Commission observers report that in areas with large Black and Hispanic populations, the police are "indifferent to or misunderstand minority group aspirations, attitudes and customs."  The Committee believes that police training should involve intensive cultural sensitivity to Black and Hispanic problems and mores, especially for those to be assigned to minority communities.  The minority population of Suffolk County is steadily expanding.  Much of this increase is attributable to persons moving out from the "inner city" areas of New York City.  This increases the need for cultural sensitivity training by the police to better understand the attitudes, problems and mores of these new residents. The Committee sees an inadequate response to this inner-city migration by Suffolk Police.  This can only add to the tension that already exists in these communities.

-35-

SIC 680869-0144

c)   <u>Term of Police Commissioner</u>

The Police Commissioner's term - by County charter - extends beyond that of the County Executive.  Presently the Suffolk County charter provides for a 6 year term for the Police Commissioner.  The term of office of the County Executive is 4 years.  The Commissioner is appointed by the County Executive, subject to confirmation by the County Legislature. The Committee believes that the Police Commissioner should be more responsive to the public - something which at present appears lacking.  Under the present system, the Commissioner's responsiveness  is directed to the persons under his command. Such persons, through the PBA, exert pressures on the Commissioner which are not adequately counter balanced by the needs of the citizenry with regard to police discipline. The lack of accountability to the public contributes to the present lenient discipline of Suffolk County police officers in complaints involving physical abuse.

The Suffolk County Charter Revision Commission is presently considering amendments to the Charter.  The Committee recommends that the Revision Commission consider whether co-extensive terms would better serve the public's interest and further consider whether the Police Commissioner's term of service should be at the pleasure of the County Executive.

-36-

SIC 680869-0145

d)  <u>Increased Availability of Complaint Forms.</u>

Complaint forms must be made more readily available.*
A person should not have to return to the precinct where the
police officer accused of criminal misconduct works in order
to obtain a complaint form.  Nor should personal service of
the complaint be required.  This too creates unneeded confron-
tation which serves to discourage a person from pursuing such
matters.  Similarly, the information provided to the complain-
ant concerning the disposition of the complaint should be
more detailed; such information should be routinely
provided rather than only upon personal demand - as is the
present procedure.

e)  <u>More Stringent Sanctions.</u>

The Committee heard testimony involving the com-
plaint that a police officer engaged in forcible sodomy with
a woman in custody in a police patrol car.  The Committee
was informed by the woman's counsel that the police
officer was permitted to plead to the reduced charge of con-
duct unbecoming a police officer and that the Police Depart-
ment punished this police officer with a 30 day suspension and

_____

*  In addition, the police should make the public aware
   that telephone and letter complaints will be accepted
   and investigated, as Inspector Siegel stated at the
   hearings.

-37-

a one year probationary status following a hearing.*  We are informed that it is undisputed that this act occurred inside a marked Suffolk County Police car and that the Suffolk County Police officer at the time was on a tour of duty, armed and in full uniform.  The Committee finds that the punishment meted out in this instance was wholly inadequate.**  A police officer who engages in such conduct should not be retained on the force.

The Committee recommends revision of that portion of the Suffolk County Charter which provides that, short of outright dismissal, the most severe punishment that can be meted out to a police officer is a 30 day suspension without pay. This provision does not allow adequate scope to impose appropriate discipline in many cases.  Suspension for a period of greater than 30 days might well be warranted in a situation where absolute dismissal would seem too harsh.  The charter should be amended to provide for suspension up to a period of 1 year.

---

\*  The police have refused to divulge the specific acts which the officer admitted.  However, it would appear that, at the very least, it involved participation in sexual activities, in a patrol car, during a tour of duty.

\*\*  The woman is pursuing her civil remedies in a suit which is now pending in the federal court.

-38-

SIC 680869-0147

f)   Minority Recruitment

The majority of the complaints of police abuse come from the more propulated areas of the County - the Babylon - Wyandanch area (1st Precinct) 40%; the Bay Shore-Brentwood area (3rd Precinct) 35%.  These areas are the ones most heavily populated by such minority groups as Blacks and Hispanics.  There must be minority recruitment to ease tensions in these areas.  The Suffolk County Police Department is 99% white male.  The Police Department representative stated that minority representation on the Suffolk County Police force consists of 5 Black policemen and 5 women police officers (all white).*  The Human Rights Commission representative stated that total minority representation does not exceed 25.  A serious effort must be made to recruit minorities to the force.

g)   Video-Taped Custodial Questioning

The Police Department of Suffolk County should video-tape the questioning of any arrestee in police custody where the crime involved is a felony.  Such statements would be entitled to greater credence whereas those that are not would be subject to greater scrutiny.

Such a requirement should not prove unduly burdensome to the police from a practical point of view as it is anticipated that some videotape equipment (for the purposes

---

*   The Suffolk County Police reportedly have received a federal grant of $265,650.00 to recruit minorities.

-39-

SIC 680869-0148

of video arraignments*) is expected to be available in every precinct house in Suffolk County by the 1st of April, 1980.

The Committee is informed that this proposal has met with successful implementation in Bronx County, where there reportedly was not as much equipment available at the inception of the program.

### h)   Rubber-lined cuffs.

The Police Department should be urged to explore the possibility of equipping all handcuffs with rubber coverings over that part of the handcuffs which make contact with an arrestee's wrist.

In many instances testified to before this Committee, an arrestee complained that the handcuffs used were too tight and that they bruised his wrists.  We are informed that a great number of the claims received by the County Attorney's office involve injury caused by the policeman's use of handcuffs.  The placement of rubber tubing over most of the area of the handcuffs would avoid such injuries.  Moreover, it would also eliminate a factor which may predispose a person to complain about other - less onerous - aspects of treatment in police custody.

---

\* The Committee believes that the proposed practice of two-way video arraignments is a desirable one.

-40-

SIC 680869-0149

i)   Internal Affairs Unit Investigators' Involve-
ment in the Defense of Civil Actions

An intolerable conflict exists through the current practice of using police investigators from the Suffolk County Police internal affairs unit to conduct police administrative prosecution investigations as well as investigations relating to the defense of police brutality suits in which the Police Department and/or the County of Suffolk is a party defendant. The sole responsibility of officers assigned to the internal affairs unit should be to investigate complaints of police wrongdoing for internal disciplinary action and/or criminal prosecution by the District Attorney.  To assign police officers from the same unit to defend the police in civil actions creates a conflict which distorts the units real purpose. Accordingly, the Committee recommends that police officers other than those in the internal affairs unit be assigned to the defense of civil actions.

B.   District Attorney's Office

1.   Existing Procedures

The Suffolk County District Attorney's office may become involved in the investigation of police brutality complaints by a complainant coming directly to the office.  In such cases, the District Attorney's office takes a statement from the complainant and then refers the file to the police internal affairs unit for further investigation.  The District

-41-

SIC 680869-0150

Attorney may also become involved where the complaint is
related to an ongoing criminal prosecution.  For example,
where claims of brutality have been alleged by a criminal
defendant as part of a motion to suppress a confession or
results of a search, the prosecutor will inquire into the
facts underlying the incident in order to respond to the
motion.  A similar inquiry takes place where claims of
brutality are directed against a police officer whose testi-
mony is needed before the Grand Jury in order to obtain a
criminal indictment.  In such cases, the prosecutor evaluates
whether there exists sufficient cause to suspect that the
officer himself committed a criminal act in relation to the
incident.  If sufficient cause is found to exist, the officer
will be required to execute a waiver of immunity pursuant to
CPL Section 190.45 prior to testifying.

Where the complaint is related to an ongoing
criminal prosecution, the inital inquiry will be conducted
by the Assistant District Attorney assigned to the case who
will interview the police personnel involved.  If the situation
warrants it, a more complete investigation may be requested;
however, that investigation rarely, if ever, is conducted
by the District Attorney's office.  Instead, the matter is
referred to the Police Department internal affairs unit.  That
unit will investigate the matter internally and report back

-42-

to the Assistant District Attorney in charge of the Indictment Bureau.   The head of the Indictment Bureau then reviews the inspection file and, if satisfied that the officer involved was not guilty of misconduct, the matter will be closed.   Where misconduct is indicated, the matter is again referred back to the Police Department for disciplinary action.   If it is felt that still further information is required, the Police Department again will be requested to provide same.

2.   Deficiencies and Recommendations

The District Attorney's office as it presently operates does not act as an adequate check against police brutality.

a)   Assistant District Attorney Present During Custodial Questioning

The District Attorney is very seldom involved in the early stages of stationhouse custody where most allegations of brutality arise.   The District Attorney's office should become involved in major criminal cases at the earliest possible juncture.*   The presence of an Assistant District Attorney at the time of interrogation - at least with respect to major felonies - would act as a powerful deterrent to police abuse and would also ensure that all relevant legalities are met.

This too constitutes one of the Committee's principal recommendations.

———————————

* The Committee is advised that virtually every other prosecutor's office in the metropolitan area follows the recommended procedure.

-43-

SIC 680869-0152

Such a practice would have the additional benefit of aiding in the successful prosecution of a case to counter unfounded claims by the defense.

### b) Instruction and Assignment of a Single Assistant

In most cases, an Assistant District Attorney addresses the problem of police brutality in the context of an ongoing criminal prosecution, where the focus is on that prosecution and not on the issue of brutality.  Since the brutality issue is an obstacle to a successful prosecution, the tendency may be to ignore or disprove the brutality.  In such instances an Assistant District Attorney must be mindful of his ultimate duty which is to administer justice.  Should this conflict with his duty to obtain a conviction, the latter must yield.  All assistants should be so advised.  The Committee further recommends that a single experienced Assistant District Attorney be assigned total responsibility for the screening, investigation and prosecution of all police brutality complaints. Institutionalizing the District Attorney's involvement in matters of police brutality in this manner, would give a legitimacy and moral force to its commitment in this area.  Moreover, it would involve the office on a regular ongoing basis in a uniform way and assist less experienced prosecutors in this difficult area.

### c) Creation of Separate Investigation Unit

In referring matters of police brutality to the Police Department for investigation, the District Attorney

-44-

substantially reduces the likelihood of an impartial invest-
igation of the charges.  Regardless of the individual integrity
of the police officials conducting the investigation, they are
simply too close to the situation to be able to do so impartially.
Considerations such as the reputation of the Department, personal
relationships with the officers involved, or superiors, and civil
liability of the individual and/or the County, are inseparably
intertwined with the analysis of the incident.  In a matter so
serious as a criminal prosecution against a law enforcement
officer, the investigation should be conducted by investigators
assigned to the District Attorney's office.  The District Attorney's
office has its own staff of trained investigators who are inde-
pendent of the Police Department and who are accountable to
the District Attorney.  A separate unit should be established for
investigation of police complaints rather than referring such
matters to the internal affairs unit of the Police Department.

    d)  <u>Priority Concern - Police Brutality</u>

    The District Attorney and Police Department in
Suffolk County, as in all counties, work together closely
in the prosecution of crime.  Assistant District Attorneys are
in daily contact with police officers and detectives and a strong
working relationship develops.  The District Attorney must
impress upon his assistants that notwithstanding this close
relationship, the curbing of police misconduct is a priority

-45-

SIC 680869-0154

item.   The Committee believes that it would be a strong deterrent to such incidents if the police are made aware that Assistant District Attorneys will not countenance police misconduct and that such matters will be thoroughly investigated and prosecuted.   If this is not made a priority, and in Suffolk County the indication is that it is not, it will be the natural tendency of the Assistant District Attorney to be less than zealous in pursuing matters of police misconduct and the situation will worsen.*

        e)   Amendment to County Charter

The Committee recommends that the County Legislature amend the County Charter to require that the Suffolk County Police Department refer to the District Attorney all complaints involving police brutality and other allegations of police misconduct, as originally recommended by the special grand jury.

      C.   United States Attorney and FBI

        1.   United States Attorney Procedures
Despite written requests for information, the United States Attorney's office for the Eastern District has not provided same.   The Committee had requested information relating to office procedures for handling police brutality complaints and the number of such cases from Suffolk and other

---

\* Though the District Attorney's Office of Suffolk County has assured this Committee on numerous occasions that it is presently in the process of preparing a directive to the professional staff of the District Attorney's Office informing all Assistant District Attorneys that allegations of police brutality and police misconduct must be reported to (footnote continued on next page)

-46-

SIC 680869-0155

counties.   The United States Attorney's office was the only law enforcement agency invited which declined to appear at the hearings.   Accordingly, it is impossible to comment on their procedures.

2.   Procedures FBI

The procedures followed in police brutality complaints, according to the FBI spokesman, Agent John Hanlon, are as follows:   upon receipt of a police brutality complaint from a victim, or from his counsel, the FBI interviews the complainant and witnesses to the incident and then prepares an investigation report which is then forwarded to the local United States Attorney's office and to the Civil Rights Section of the FBI in Washington, D.C.

In police brutality complaints this report also includes a review of the complainant's arrest record.   While the FBI stated that they invariably make contact with the local law enforcement agency involved in complaints of this kind, the police officer involved is interviewed by the FBI only if the agency involved is willing to make such person available for interview and the accused police officer is willing to submit to such an interview.

The decision on whether to commence a civil or criminal prosecution is made by the United States Attorney

---

footnote continued from page 46
a single administrator in the District Attorney's Office, a copy of that directive has not been supplied to the Committee as of the date of the publication of this report.

-47-

SIC 680869-0156

and/or the Department of Justice based on this report or any further investigative reports which the FBI may be requested to provide.

It appears that to date no federal prosecution - civil or criminal - has been initiated in the federal courts arising out of a complaint involving police brutality occurring in Suffolk County.

3.   Deficiencies and Recommendations

a)   Incomplete Investigation

It appears from the information provided to the Committee that the FBI's investigation of complaints of police brutality are often one-sided since they do not include an interview with the accused police officer unless both the police officer involved, and the agency by whom he is employed, are willing.  An investigation which does not minimally include an interview of the police officer involved, in the Committee's opinion, does not constitute a professional and thorough investigation.

It is difficult to understand that following the procedure outlined above - which does not routinely include an interview of the policeman alleged to have committed the violation, but does include a statement by the alleged victim - no indictment or civil complaint appears to have been prosecuted by the federal government arising out of Suffolk County.

-48-

SIC 680869-0157

The Committee recommends that complaints involving police brutality be investigated as thoroughly and professionally as other criminal and civil matters falling within the jurisdiction of the FBI.  Such an investigation should minimally include the interview of the local police officer or officers involved in the complaint, along with the complainant and any other witnesses.

    D.   <u>Suffolk County Human Rights Commission</u>

      1. <u>Procedure</u>

As discussed in detail, supra at 6-8, the Suffolk County Human Rights Commission is merely a referral agency which funnels complaints to the Suffolk County Police Department for the latter's investigation and determination.

      2. <u>Deficiencies and Recommendations</u>

        a)  <u>Investigatory Powers</u>

The Commission, as it presently exists, is powerless to deal with police brutality; nonetheless, it is perceived by complainants as the appropriate agency to turn to for redress.  This mistaken perception by the public leads to further mistrust of government and further tension.  The Committee's primary recommendation is LEAP and local police advisory boards made up in part by civilians.  It is recommended that LEAP be provided with subpoena powers and be authorized to conduct hearings.

-49-

If this recommendation is not adopted the Committee believes that the Human Rights Commission of Suffolk County should no longer be simply a referral agent for such complaints.   It should be empowered to conduct its own investigations in the area of undue force, since such cases involve a claim of deprivation of civil rights, i.e. the due process right of every citizen to be protected from harm by those acting under color of State and/or local law.   The broadened powers should include the authority to conduct hearings and subpoena witnesses, as is presently done by its Nassau County counterpart.   The Commission, based on its findings, should be empowered to make disciplinary recommendations to the Police Commissioner.   In appropriate cases, the Suffolk County Human Rights Commission should be empowered to make direct referrals to the District Attorney.

b)   <u>Investigation of Unsworn Complaints</u>

The Commission should be authorized to accept complaints by mail or telephone, as well as anonymous complaints for purposes of at least preliminary investigation.*

———————————————

* This is existing procedure of the Civilian Police Review
  Board in New York City.

-50-

SIC 680869-0159

c)  County-Wide Jurisdiction

The jurisdiction of the Commission should be ex-
tended to include police complaints arising in the East End
towns and in villages throughout the County.

E.   Suffolk County Bar Association

1.   Procedures and Deficiencies

Other than the individual efforts made by a few
attorneys - some tremendous efforts - the Bar Association and
its members have failed to respond to the problem of police
brutality in Suffolk County.  Several persons appearing at the
hearings expressed frustration and difficulty in locating
counsel willing to undertake such a case.  In some cases such
efforts were futile.  This difficulty was undoubtedly increased
by the former practice of the Lawyer Referral Service to solicit
the names of those not willing to undertake such cases, rather
than establishing this as a separate category and encouraging
counsel to participate.

2.   Recommendations

a) Creation of Specialized Panel of Attorneys

Members of the Bar Association should be encouraged
to handle cases involving complaints of police abuse.  In
particular, the Bar Referral Service should list this as
a separate area and a comprehensive list of counsel willing
and competent to undertake such cases should be available to
the public.

-51-

SIC 680869-0160

The Committee is informed that currently police brutality complaints are referred to the category of cases designated "Human Rights".*   We are informed that this category is serviced by only three attorneys.**   In addition, under the category "Miscellaneous", one attorney has specifically volunteered to handle police brutality cases and such referrals are also made to that person.  This makes up the sum total of attorneys available to the public, through the Lawyers Referral Service, for handling police brutality complaints.  Greater participation must be encouraged by the Bar Association in this difficult and complex area of practice.  This will ensure a wider choice of counsel and also serve to increase the effectiveness of those attorney's practicing in this area.  As recently adopted by the Board of Directors, counsel accepting referrals in the area of police brutality should be required to attend special instruction by the Suffolk County Academy of Law to enable them to better serve the client.

---

\* Although there is a Civil Rights category, police misconduct cases are not so assigned.  This too, however, has a relatively small list of volunteer counsel.

\*\* Two of whom are also listed under numerous other categories.

-52-

SIC 680869-0161

b)   <u>Efforts to Implement Recommendations Herein</u>

The Committee further believes that the Bar

Association should pursue the recommendations made herein

in an effort to implement them.

<u>CONCLUSION</u>

For the reasons set forth above, although severely

limited by the lack of any investigative powers, the Committee

believes that sufficient evidence is present to indicate that

there is a serious problem with respect to police brutality

in Suffolk County and the manner in which such complaints are

investigated and resolved.  The vast majority of police brutal-

ity claims arise in the First and Third Precincts  - areas

with heavy minority concentrations.  While the problem is

more acute  in those areas our conclusion is not so limited.

The problem is one that appears to exist throughout the entire

area served by the Suffolk County Police Department.*  The Com-

mittee accordingly urges the Bar Association of Suffolk

County to endorse the findings and recommendations made

herein.

The Committee further believes that inquiry in this

critical area must be pursued by those agencies with the power

to compel enforcement.  In this regard, the Committee is aware

_____

* Insufficient information prevents the Committee from
  making any conclusion  with respect to town and village
  police departments in Suffolk County.

-53-

SIC 680869-0162

of the current investigation by Department of Justice as well
as the expressed interest of the United States House of Repre-
sentatives to conduct hearings on this issue.  The Committee
stands ready to cooperate with these, and any other agencies,
in attempting to improve this condition.

Dated:  Smithtown, New York
        January 16, 1980

                        Respectfully submitted,

                        E. THOMAS BOYLE
                        Chairman

-54-

SIC 680869-0163

Vote - Report of the Civil Rights Committee on Allegations
     of Police Brutality in Suffolk County:

In Favor                                    Opposed

1.  E. Thomas Boyle, Esq.                   1.  John J. Ciarelli, Esq.

2.  Kathleen A. Carlsson, Esq.              2.  Erick F. Larsen, Esq.

3.  Warren H. Richmond, III, Esq.

4.  Frederick K. Hackett, Esq.

5.  Robert A. Margolin, Esq.

6.  Saul Friedberg, Esq.

7.  Stephen M. Behar, Esq.

8.  Frederick J. Damski, Esq.

9.  Joseph R. Mulé, Esq.

10.  Bernard Burton, Esq.*

11.  Gary N. Weintraub, Esq.*

12.  Edward V. Esteve


*  This vote does not indicate a formal position with respect to
   any issue which comes before him as a member of the Suffolk
   County Charter Revision Commission pursuant to a recommendation
   made herein.

-55-

SIC 680869-0164

## INDEX TO APPENDIX

<u>EXHIBIT</u>

A 1-4    National Law Journal article, dated June 11, 1979
         by Rafael Abramovitz

B 1-2    Schedule of Speakers at Committee Hearings

C 1-2    County Executive Management Order No. 19-1972

D 1-8    Opinion of Judge Weinstein in <u>Coleman</u> <u>v</u> <u>Klein</u>,
         73 C 1857 (E.D.N.Y. 1976)

E 1-4    Opinion of Judge Seidell in <u>People</u> <u>v</u> <u>Roland</u> <u>Smith</u>,
         Indictment Nos.909 and 917 of 1977 (County Court,
         Suffolk County 1978)

F 1-3    Report Number II of the Second Grand Jury of the
         Special and Extraordinary Trial Term of the
         Supreme Court

SIC 680869-0165

Case 2:09-cv-01207-JS-AYS   Document 184-4   Filed 08/17/16   Page 63 of 84 PageID #: 3445

*Law Office Management Section—Pages 24-31*

# THE NATIONAL LAW JOURNAL

©1979 The National Law Journal

VOL. 1 —NO. 39    PRICE $1.50    *The Weekly Newspaper for the Profession*    MONDAY, JUNE 11, 1979

## When Suspects Are Abused

*Allegations of Beatings, Forced Confessions In a N.Y. Suburb Are Widespread; Cases Highlight Perils To Effective Law Enforcement*

By Rafael Abramovitz
Special to The National Law Journal

RIVERHEAD, N.Y. — William Rupp confessed to a murder he did not commit.

Roland Smith confessed to a robbery that had not occurred.

Both men claim that between their arrests and confessions they were subjected to prolonged beatings while handcuffed and in the custody of the Suffolk County (N.Y.) Police Department.

Theirs are two of many strikingly similar allegations of physically coerced confessions lodged in recent years against some members of the 2,300-person police force that patrols this county's semi-rural, middle-income suburb of New York City.

The criminal charges against both Mr. Smith and Mr. Rupp have been dropped, in Mr. Rupp's case only after the real culprit turned up. Both Mr. Smith and Mr. Rupp are suing the police for damages.

Their cases are examples of an apparent pattern of brutality in some police units, which can be traced back for almost a decade. The National Law Journal has confirmed the pattern through court records and interviews with dozens of lawyers, prosecutors and law enforcement officials.

These sources have disclosed more than 30 court cases involving similar accusations of police brutality to extract confessions. In four of these cases, attorneys say their clients have passed lie detector tests to support their accusations against the police.

Indeed, a case against actions by Suffolk police officers can be supported by the following statistics:
*Continued on page 14*



## Air Crash Claims: New Rule Ahead?

*Illinois Bill Would Let Suits over DC-10 Disaster Seek Punitive Damages*

By Joseph R. Tybor
National Law Journal Staff Reporter

CHICAGO – A bill pending in the Illinois legislature could permit punitive damages in suits filed in the nation's worst air disaster, significantly increasing potential recoveries.

Currently, Illinois, like all but a handful of other jurisdictions, bars such damages in wrongful death suits.

If passed, the bill could add an important element to plaintiffs' claims in the May 27 crash of American Airlines Flight 191 here. Illinois law is expected to be applied in suits over the disaster. The bill's fate is uncertain, though it passed the Illinois House by a 131-13 vote 10 days before the fatal crash.

The measure, which contains a provision making it applicable to all suits pending at the time the act becomes law, would allow a jury to award punitive damages where misconduct which caused the death is shown to be "willful and wanton." Tort experts say that could be a hard standard to meet in the American Airlines crash suits.

**Change in Tort Law**

The sponsor of the bill, Rep. Peg McDonnell Breslin, and others said the crash could have "quite an impact" around the country in overturning the entrenched rule against awarding punitive damages in wrongful death actions.

That's a change in the law plaintiffs' tort lawyers have been seeking for years.

"If ever a case lends itself to changing the traditional rule, this is it," said Robert J. Glenn of Philip H. Corboy Associates, P.C., the Chicago firm that
*Continued on page 11*

### HIGHLIGHTS

**Panther Raid Lawyers Seek $513,000    p. 3**

TWO RADICAL Chicago lawyers who got by on $75 a week in the longest federal court trial in history are seeking $513,000 in fees for winning an appeal in the case, a damage suit by Black Panthers over a 1969 police raid that ended with two Panther leaders dead.

**Death of a Law Clinic: Study Shows Why p. 3**

TOO MANY salaries, too much equipment, too little fee collection and a fateful court decision killed the 39th Street Legal Clinic in Philadelphia, a new study shows. The clinic was an American Bar Association experiment.

**More Fuel in Feud Over Exclusionary Rule p. 5**

A SECOND government study has concluded that the exclusionary rule hasn't had much effect on prosecutions. The U.S. Law Enforcement Assistance Administration-financed study of State and local crime cases backs up an earlier study of federal court criminal cases.

**Plus:**

ESTATE PLANNING by Moore...........p. 32
LABOR by Levin...........................p. 33

Index Continued p. 2



## *The Remarkable Mr. Fish*

By Gene Weingarten
National Law Journal Staff Reporter

AMARILLO, Tex. — S.E. Fish is 102 years old. His law practice isn't what it used to be.

Reluctantly, at the urging of his family, the courtly little Texan began easing into semi-retirement last month. He moved into a smaller office, sold off much of his law library and began to accept only those cases that appeal to him.

It wasn't an easy decision for Mr. Fish, believed to be America's oldest practicing attorney. He really likes to work.

He has been at it for better than 70 years, ever since he set up practice here in the Texas panhandle in 1909. In those days Amarillo was part of the wild west. Gunslingers swag-
*Continued on page 11*

### Legal Rate of Interest

WHAT IS the "legal" rate of interest imposed by statute in most states absent a written agreement specifying a particular rate? State-by-State, the biweekly comparison of key statutes, finds the prevailing rate varies from 5 to 8 percent, with 6 percent the most common. See pages 18-19.

EXHIBIT
A-1

SIC 680869-0166

# Cops Cut Corners on Due Process

*Continued from page 1*

• In 27 of the 28 Suffolk County murder indictments obtained last year, the accused had incriminated himself either orally or in writing. That 97 percent confession rate is astonishingly high when compared with rates in other jurisdictions.

• In the last three years, one attorney has negotiated out of court settlements in six cases where persons alleged they were brutalized during interrogations by Suffolk County police. The settlements totaled $52,000. (See sidebar, page 14.) Other attorneys claim they settled many similar cases, but they declined to supply specifics. Also, in one case that went to trial, a man arrested by Suffolk police for drunken driving was awarded $190,000 for permanent injuries he sustained while in police lockup.

• Since June 30, 1977, at least six Suffolk County criminal convictions have been overturned by the state's highest court because of improper police tactics. (See story, page 14.) Although New York law makes it almost impossible for an appeals court to challenge a confession once it has passed a suppression hearing, the Court of Appeals found in all six cases that the defendants' constitutional rights had been violated during suspiciously long periods of police questioning without presence of counsel.

• The number of complaints against the Suffolk police for the use of undue force is sharply on the rise. According to Deputy Police Commissioner Charles S. Peterson, 46 complaints were forwarded to internal affairs division in 1977, 59 last year and 60 during the first five months of this year.

In most of the cases settled out of court or reversed on appeal, there has been a similarity in the type of torture allegedly employed: beatings administered with telephone books used as a cushion to avoid leaving telltale bruises, blackjacks used on the sole of the feet and other sensitive areas, kicks and punches to the genitals.

The alleged victims have included

blacks, whites and Hispanics.

Suffolk Police Commissioner Donald J. Dilworth was unavailable for comment. Deputy Commissioner Petersen said that while there may be isolated instances of police brutality in the county, there is no pattern of such activity.

Arthur Penny, spokesman for District Attorney Patrick Henry, said Mr. Henry would have no comment on any cases of police brutality or coerced confessions prior to his taking office in 1978.

On alleged brutality since 1978, Mr. Penny said the district attorney would not comment on whether investigations were in progress.

Interviews with past and present county law enforcement officials confirm that these tactics have been widely known or suspected among public officials here for years. Yet to date



there is no evidence that anyone has conducted or even called for an outside investigation of the police or their methods of interrogation.

What's happening in Suffolk points to what criminal law experts say is an increasingly troubling problem within law enforcement systems still reeling from *Miranda*-type restrictions on the pursuit and handling of criminal suspects.

"There was a two- or three-year hiatus in the confession rate after *Miranda* because police were unsure of the ruling and were reluctant to issue up a good case with an illegal confession," said former Senate Watergate committee chief counsel Sam Dash. Mr. Dash now heads the Georgetown University Law Center's Institute for Criminal Law Procedure.

However, he added, because of increased police sophistication in dealing with *Miranda* and a series of court

modifications in its scope, police and prosecutors have reverted to their pre-*Miranda* "compulsion" of topping off an investigation with a successful confession.

The experts say that some agencies, like the Suffolk police, have sought to assure confessions by cutting corners through overly aggressive questioning methods that trample personal liberties. And where such situations occur, they say, there is often a tendency by prosecutors to look the other way.

Such is the case in this county of 1.3 million people and a strong local government long known for its aggressive pursuit of crime. Several former local prosecutors told The National Law Journal, in tape-recorded interviews, that they and their colleagues routinely heard and ignored repeated stories of unprovoked brutality against suspects held for questioning.

Such methods are indisputably illegal. Why, then, have prosecutors permitted them to continue?

One former high-ranking member of the Suffolk district attorney's office, suggests that some prosecutors have developed an almost incestuous relationship with the police. Police and assistant district attorneys "drink together and go out to view the bodies together," he said. "They feel they are on the same team . . . and forget their relationship as officers of the court."

Another former prosecutor recalls one instance where he himself kept silent and prosecuted a man whom he knew had been "beaten to a pulp, beaten for hours" by homicide detectives.

Still another former prosecutor, James J. Cruise, said that in his experience, "I've come across many cases where there's very little to connect a defendant with a particular incident of crime, except the alleged admission and/or oral statements."

High-ranking members of the Suffolk County Sheriff's Department, who asked not to be identified, say that prisoners handed over to their custody by the county police frequently com-

plain of, and frequently exhibit signs of, having been abused.

Allegations that the Suffolk police use illegal methods of interrogation are not new.

In 1976, Nassau County lawyer Arthur V. Graseck Jr. brought a class action on behalf of 18 defendants who alleged beatings and other violations of due process.

*Continued on page 16*

---

## 6 Brutality Suits Since '76 Settled By Suffolk Co.

SUFFOLK COUNTY paid out more than $50,000 in settlements over the last three years to six persons who claimed they were beaten by police while undergoing interrogations.

In addition, a man whose hip was broken while in custody on a drunk driving charge was awarded $190,000 by a jury in Riverhead, the county seat, in December 1978.

County Attorney Howard Packman cautions that it would be wrong to interpret each settlement as an admission of guilt by the county. But Mr. Packman refused to explain the county's motives in offering the cash settlements.

Below are listed each of the settled cases, the amount and year of the settlement and a brief description of the brutality allegations as contained in court papers. In each case, the plaintiff's lawyer was Arthur Graseck:

• *Crits v. Barry*, 1978, settled for $18,000.

"Plaintiff was taken to the basement of the stationhouse by [several police officers] and was handcuffed to an overhead pipe. . . . One officer then 'proceeded to strike plaintiff on the head with a blackjack, while other officers punched plaintiff in the stomach and sides. Throughout the beating plaintiff was asked to confess to a number of crimes. When he refused, his trousers were removed and he was kicked and punched in the groin . . . Plaintiff was hit on the soles of his feet with a cord, while [several officers] continued to punch and otherwise abuse him. One detective placed a revolver to plaintiff's head an threatened to kill him if he did not confess."

• *Mille v. Suffolk County*, 1976, settled for $5,000.

"The plaintiff was driven to the third precinct stationhouse in the custody of a detective and three officers . . . he was handcuffed to a chair with his hands behind his back . . . [He] was beaten by the detective during questioning . . . threatened with assault to his genitals if he did not make a confession. . . . The assaults sustained by the plaintiff included . . . blows on the shins and collar bone with a blackjack . . . blows about the head with a book and closed fists."

• *Oquendo v. Suffolk County*, 1978, settled for $15,000.

"Assaults directly to the eyes, mouth, back, legs and other parts of the body . . . claimant vomited blood on two occasions after the police beat him."

• *Phillie v. Suffolk County*, 1979, settled for $10,000. Plaintiff's legs were "driven over by police car while in custody." Suffered a fractured ankle.

• *Mulligan v. Suffolk County*, 1977, settled for $2,000.

Plaintiff alleged he was grabbed by throat and had his head beaten against a wall.

• *Vochl v. Suffolk County*, 1979, settled for $3,100.

---

## Decisions in Suffolk Co. Cases Define Rights

### Police Conduct Led to 7 Reversals in 3 Years.

IN THE LAST three years, the New York State Court of Appeals, the state's highest court, has overturned six homicide convictions and one burglary conviction in Suffolk County because confessions were taken in the absence of counsel.

In so doing, the court has defined when criminal suspects' right to counsel begins in New York. The Court of Appeals also tied to the reported warning by one Court of Appeals judge to the Suffolk district attorney that all convictions with confessions would be closely scrutinized by the high court.

In the lead case, *People v. Hobson*, 39 NY 2d 479, decided May 4, 1976, Chief Judge Charles D. Breitel ruled that "once a lawyer has entered a criminal proceeding representing a defendant in connection with charges under investigation, a defendant in custody may not waive his right to counsel in the absence of counsel."

On June 30, 1977, the court in a memorandum decision overturned another Suffolk murder conviction on the basis of the *Hobson* rule. *People v. Maccdonia*, 40 NY 2d 244.

**The Singer Case**

In *People v. Singer*, 44 NY 2d 241, April 6, 1978, Judge Sol Wachtler, writing for the court, ordered suppressed a confession taken in 1974 in the absence of counsel. Counsel, he found, had been retained in 1971 in the initial stages of the investigation of the murder case and had never been discharged. Judge Wachtler also questioned the three-year delay in prosecution of the case.

A month later, Judge Wachtler, in *People v. Pinzon*, 44 NY 2d 458, overturned a conviction for criminally negligent homicide on the basis that the defendant's

lawyer had not been able to reach him while he was being held by, and confessing to, the Suffolk police. "Once a person has been taken into custody, the burden is on the police to keep track of him and to establish and maintain procedures which will insure that an attorney representing him may communicate with him and with officials responsible for the investigation, without unreasonable delay," the judge said.

In December 1978, Judge Jacob Fuchsberg threw out another murder conviction. *People v. Maerling*, 46 NY 2d 240. The jailhouse confession was not spontaneous, the judge said, and therefore did not fall within a recognized *Hobson* exception. Further, he ruled, a declaration against penal interest made by a deceased witness was too unreliable to have been admitted at trial.

**Two Cases This Year**

This year, the court has reversed two other Suffolk convictions, again because attorneys were missing at the time the suspect confessed.

On April 3, in *People v. Garofolo*, 46 NY 2d 592, Judge Fuchsberg again commented on an attorney's difficulties in finding a client in police custody. "We now make explicit what was implied in *Pinzon*," Judge Fuchsberg said. "Good faith efforts made [by the police] to locate a defendant who is taken into custody does not absolve the police of their responsibility if their internal procedures are inadequate to keep track of those against whom the restraining hand and accusing finger of the state have come to rest."

And in *People v. Wander*, decided April 24, the court overturned a burglary and larceny conviction because the defendant's "right to remain silent was not scrupulously honored."

SIC 680869-0167

Case 2:09-cv-01207-JS-AYS   Document 184-4   Filed 08/17/16   Page 65 of 84 PageID #: 3447

# Widespread Allegations Of Brutality

*Continued from page 14*

Although Judge Jack B. Weinstein of the U.S. District Court for the Eastern District of New York threw the case out on technical grounds, he did issue this finding:

"During the period from 1970 to the present, there have been a substantial number of cases where excessive physical force was used by some Suffolk police officers in arresting suspects, in questioning them to obtain oral admissions and in punishing persons thought by some police officers to be showing what police officers considered a lack of respect or cooperation at the time of the arrest or questioning." *Coleman v. Klein, 72 Civ 1857.*

Mr. Graseck handled six brutality cases known to have been settled in the last three years. A spokesman for the County Attorney, Howard Packman, would not explain why the county had settled any of the cases, but said it would be a mistake to assume a settlement is an admission of guilt.

In almost all of the instances of alleged brutality examined by The National Law Journal, the violence was said to occur during the questioning of suspects in major crimes. Most frequently cited were members of the 55-man homicide unit.

## 'A Joke'

Eric Naiburg, a Suffolk County defense attorney with extensive experience in criminal law, says local lawyers consider criminal confessions in Suffolk "almost a joke."

"There's always an admission," he said. "We have detectives that, as soon as we know [they're] on the case, we know there is an oral admission."

Said former Suffolk County District Attorney Henry O'Brien, now in private practice, "I feel frustrated. I don't think there's anything to be done to change things. The homicide squad has a lock on things."

Indeed, the county's 97 percent confession rate demonstrates the peculiar success the homicide officers have had in eliciting incriminating statements from suspects in custody.

New York City's Bronx County, for example, has a 35 percent conviction rate in homicides. In that county, confessions are frequently videotaped to show they were not coerced.

A random sample of 63 homicide arrests in the city's Kings County (Brooklyn) in 1978 showed that only 20 percent involved confessions.

## Isolating the Suspect

In their vigorous pursuit of confessions, the Suffolk police have occasionally gone to unusual lengths to isolate a suspect for questioning.

Just last month, during an investigation into the murder of a 13-year-old, Smithtown, L.I., boy, John Pius, the homicide squad allegedly pulled in off the street and questioned several area teenagers for long hours while the youth's parents frantically telephoned around town to learn of their children's whereabouts.

There is a growing consensus among local defense attorneys and prosecutors that the rights of the youths may have been so seriously compromised that the chances of successful prosecution have been jeopardized. As of last week, no charges had been filed against any of the youngsters.

The police procedure criticized in

the Pius investigation is similar to that condemned by the state ,Court of Appeals in *People v. Ganglie, 16 NY 2d 392,* where a conviction was overturned because a lawyer was not able to contact a client being held by the police for questioning.

Either Suffolk County police brutality is on the rise or its victims are getting bolder in making brutality complaints.

Deputy Police Commissioner Peterson said that while 46 such complaints were forwarded to the department's internal affairs division for investigation in 1977, there were 59 the following year and 60 for the first five months of this year.

Mr. Peterson was unwilling to speculate on why the increase occurred or to discuss the disposition of any of the complaints. But he estimated that "90 percent of such allegations" are unfounded.

Outside agencies have found the Suffolk police to be stubbornly reluctant to police their own members.

Phillip Dorerro, assistant executive director of the Suffolk County Human Rights Commission, a publicly funded civil rights group, says the group had "no cooperation whatsoever" from the police in tracking down alleged cases of brutality.

The group forwarded 87 brutality complaints to the police in the last three years. But according to Mr. Borrero, the police don't let the commission monitor the department's internal investigation of the charges, or look through the case files afterward.

According to a Human Rights Commission spokesman, the police have

substantiated so far thee cases of the three cases, the commission has no knowledge of any disciplinary action taken. A third officer has said to have been transferred to another division and "a notation was made in in his file."

## A Thwarted Leak?

There was evidence that an "insider" was ready to blow the whistle on brutality last February.

At that time a veteran of the Suffolk police force filed a complaint with the Suffolk chapter of the American Civil Liberties Union, claiming he was being harassed by the department.

In the complaint, taken over the phone by an ACLU staffer, the

*Continued on page 17*



Some crime suspects have claimed they were beaten in this building, headquarters of the homicide squad of the Suffolk County Police.
*Photos by Robert M. Klein*

---

## William Maerling: A Recurring Story

AT 4 A.M. on Valentine's Day 1973, Suffolk County Police surrounded the Staten Island home of William Maerling, 39.

They knocked at the door, then arrested Mr. Maerling, a stocky, illiterate father of eight, for the murder of a reputed Suffolk bookie.

By 4:30 the following afternoon, the police held Mr. Maerling's confession. It was three pages long, in the handwriting of one of the interrogating officers. Just above the signature, the document said:

"I have read this [statement]." The "I have read" was crossed out and replaced with, "This statement has been read to me."

The police were later to claim that the confession was voluntary.

At a hearing to determine the admissibility of his confession, Mr. Maerling testified about his treatment in police custody.

"I wasn't there for two seconds . . . and the next thing I know, Detective H. . . . started picking up a telephone book and started beating me over the head with it. The next detective did the same thing. Then all I know is they started to make me strip. They kept me nude for the majority of the day, handcuffed behind."

He claimed that he had been systematically beaten and kicked for hours, at times lying sprawled naked on the floor while a number of officers beat the soles of his feet with blackjacks. One detective, he said, had threatened to extinguish a lighted cigarette

in his ear but had failed when the burning end accidentally fell off.

And then came the moment of final persuasion, according to Mr. Maerling.

He said one of the detectives "tied a piece of paper to my [penis]. Him and two detectives picked me up and held me over this cutting machine in the file room and started cutting off the paper."

He said that at that point he agreed to sign any document they gave him.

At the hearing, the police officers denied it all. The judge believed the police, and the confession was admitted at Mr. Maerling's trial.

Primarily on the weight of that document, he was convicted of felony murder Jan. 8, 1974. In December 1976, the state Court of Appeals reversed the conviction, however, because a second confession was taken in the absence of counsel.

Two weeks ago his new attorney, Sara Halbert, arranged for Mr. Maerling to take a lie detector test about the circumstances surrounding his allegedly coerced confession. The test was administered by New York City polygraph expert Nat Laurendi, who has done extensive work for numerous law enforcement agencies here and abroad.

According to Mr. Laurendi, the test indicated Mr. Maerling wasn't lying when he claimed to have been beaten and tortured prior to his confession.

The Suffolk District Attorney's office has also given Mr. Maerling a lie detector test. A prosecutor told Mrs. Halbert that it was inconclusive.

—C

---

A—3

SIC 680869-0168

THE NATIONAL LAW JOURNAL

# When Suspects Are Abused

Continued from page 16

policeman said he had been present on several occasions when suspects were brutalized by police. He implied that he was willing to share the information with the ACLU in exchange for its assistance.

The ACLU staffer took notes on the call and then forwarded the matter for investigation.

But the police officer, whose name is being withheld on request, proved uncooperative when questioned by



The National Law Journal about the complaint. While he admitted having made the allegations, he said they were merely a "ploy" to interest the ACLU in his problems.

In some of the brutality cases that have been settled and those still in litigation, there is evidence that confessions were coerced.

In June 1976, after William Rupp confessed to a murder that everyone now agrees he did not commit — the charges against him were dropped and another man was tried and convicted — Mr. Rupp had to be hospitalized for two days and three nights.

Roland Smith contends that when he was in police custody in 1976, police beat him so severely in the groin, where he had had a recent operation, that he made up and signed a confession to a completely fictitious robbery. A court evidently agreed.

In one of the rare instances where a Suffolk confession was thrown out by a trial judge for coercion, Suffolk County Court Judge Harry Seidell said the police "knew that the alleged confession . . . was false and that the defendant confessed to a crime which had never been committed."

Justice Seidell further noted that "after obtaining the confession of this defendant, the defendant was taken to Smithtown General Hospital . . . for emergency treatment. It is undisputed that the defendant was mentally and physically coerced into admitting and executing a signed confession while being detained."

In New York state, confessions are routinely tested in a so-called "Huntley hearing," where police and the defendant are called to testify whether the confession was voluntary. Generally, the Huntley hearing involves the word of the defendant against the word of several police officers. Claims of brutality are very infrequently sustained at a Huntley hearing.

At a Huntley hearing, a judge determines before trial whether a confession is voluntary and therefore can be admitted into evidence. Because this is a finding of fact, it can be reversed on appeal only for clear abuse. Most often, therefore, defense lawyers who lose a Huntley hearing challenge the confession on appeal on due process grounds — such as denial of right to counsel.

Like the confession rate for murder indictments, Suffolk County's record on such reversals seems suspiciously high when compared with other jurisdictions.

In 1978, for example, the state Court of Appeals didn't reverse any convictions in Bronx County for improperly obtained confessions. The Bronx has about the same population as Suffolk. In Nassau County, there were five reversals on improper confessions in

the last four years, compared with the six in 18 months for Suffolk.

The entire State of California reported only 13 such reversals during the identical 18 month period.

**The Police's Undoing?**

According to Mr. Chase, the attorney for William Rupp in his $1 million suit against the Suffolk police, "The Rupp case may well prove the undoing of the homicide squad."

He thinks that in this instance he will be able "to convince a jury that third-degree, police-state methods are employed in Suffolk County to extract confessions and admissions and that far from being unique, [the case] is an example of an on-going process."

In the Rupp case, he said, "They beat a confession out of an innocent man. The confession had the victim beaten to death. The coroner's report said he had been strangled."

Mr. Chase noted that authorities began investigating the error only after he pointed it out to them.

"That scares me," he said. "An innocent man might have been sentenced for life in prison."

"It makes me wonder about the others," he said.



An American Civil Liberties Union staffer took these notes on the phone last February when a Suffolk police officer called in and said he was willing to talk about brutality. The officer later withdrew the offer.

---

## Case Was 'Solved' . . . Then Real Killer Appeared

# When the Wrong Man Confesses

ON MARCH 1, 1975, Walter Wallace, 69, disappeared from his home in Patchogue, Suffolk County.

The circumstances seemed auspicious. Mr. Wallace was to have been the chief prosecution witness against a man named Joseph Gurrier, who had been arrested on charges of burglarizing Mr. Wallace's home.

More than a year later, the elderly man's body turned up at the bottom of a cesspool. Within a week after the discovery of the body, police contacted policeman William Rupp, 23, a former neighbor of Mr. Wallace's who had a record of minor criminal convictions in Suffolk County.

The officer asked Mr. Rupp to stop by the police station to discuss something unimportant.

Mr. Rupp, a laborer in a roofing firm, obeyed. To his astonishment, he was immediately whisked away to the police department's homicide unit. There, detectives began to question him about the Wallace murder.

**A Quick Collar**

The following day police had Mr. Rupp's signed confession. When Mr. Rupp was brought into court for arraignment — his first moments out of police custody — he shouted to the judge that he'd been brutalized by homicide detectives and said he'd confessed only to stop the beating.

Mr. Rupp spent the next three nights and two days in a Suffolk hospital, undergoing treatment for bruises about the head and neck. On May 10, he was indicted for the Wallace murder. Alex Chase, who had been practicing criminal law in Suffolk County for almost 20 years, was appointed to represent him.

Mr. Rupp told his lawyer that during his police questioning he'd been repeatedly beaten in an unusual manner by four homicide detectives. He claimed they had placed a "thin yellow telephone book" on the top of his head and then repeatedly struck it with a large chunk of concrete. Once, he said, the phone book had slipped and the concrete raked his scalp.

Mr. Rupp's peculiar allegation did not surprise Mr. Chase. He had heard almost identical stories from other clients who spent time in the Suffolk police lockup.

Two things, however, did impress Mr. Chase:

First, doctors at the hospital had found pieces of gravel imbedded in Mr. Rupp's scalp. And second, there appeared to be certain blatant discrepancies between the alleged confession and the medical examiner's report.

The six-page confession had described the murder as a beating, but the coroner had declared the cause of death to be strangulation. Also, inexplicably, nowhere in the confession was there a mention of the curious method by which the body had been disposed.

"Besides," recalled Mr. Chase, "the talk on the street was that the cops had beaten the confession out of the wrong guy."

Mr. Chase contacted the district attorney's office and took his findings to John Buonora, the chief of the trial bureau.

**A Little Mistake**

On June 3, William Rupp and his lawyer celebrated by ripping up the murder indictment in front of the Suffolk County Jail. Armed with the discrepancies Mr. Chase had supplied and with certain other information, the district attorney had moved to dismiss the indictment.

And that same day, a grand jury in Riverhead indicted Joseph Gurrier for the murder of Walter Wallace. Mr. Gurrier, who has since been convicted, was the fellow against whom the murder victim had been scheduled to testify.

Police never offered any explanation of why it had taken so long to build a case against Mr. Gurrier.

Mr. Chase is now suing the police for $1 million on behalf of Mr. Rupp. He is charging that the police not only brutalized his client, but that they also ignored exculpatory evidence when he was charged.

According to the complaint, dated April 29, 1977, the exculpatory information included "the medical examiner's report indicating a different cause of death, the recantation of a written statement of an alleged co-conspirator, and a polygraph examination of the [alleged co-conspirator] exonerating the plaintiff."

**Sworn Testimony**

Last August, William Rupp was examined under oath by an attorney for the firm that underwrites the county's insurance. The following are excerpts from the questioning:

Q: Aside from striking you on the head, did they strike you on any other part of the body at the time?

A: Well, after a while I bent my head — you know, because I couldn't take it any more. They got me in the back of the neck and stuff . . . one guy put a bullet between my fingers and squeezed . . .

Q: How many occasions would you say altogether you were struck while you were in that room? . . . How often?

A: More than a hundred times . . .

Q: Over how long a period of time during the six hours were you struck?

A: Almost — well, you know they would do it for a while. Then I passed out. Then they put a little water in my head, wait half an hour, do it again.

Then, toward the end of the questioning:

Q: Do you have any present complaints with respect to the injuries you claim you sustained as a result of these incidents?

A: I still get headaches and I fear the cops a lot, too.

A-4

# The Suffolk County Bar Association



## CIVIL RIGHTS COMMITTEE PUBLIC HEARINGS

SEPTEMBER 24, 1979
1:00 P.M. - 9:00 P.M.
Legislative Auditorium - Hauppauge

### SCHEDULE OF SPEAKERS

| TIME | NAME | ORGANIZATION |
|------|------|--------------|
| 1:00 p.m. | John Hanlon | Federal Bureau of Investigation |
| 1:30 p.m. | Linda Margolin, Esq. | Civil Liberties Union |
| 2:00 p.m. | John Mullen, Esq. | District Attorney's Office |
| 2:30 p.m. | Shirley McGee | (self) |
| 3:00 p.m. | Eugene Greaves | Suffolk Co. PBA President |
| 3:30 p.m. | Donnie Price | Economic Opportunities Council |
| 4:00 p.m. | Lynne A. Kramer, Esq. | Clients |
| 4:30 p.m. | Arthur Graseck, Esq. | Attorney |
|  | Jacob Leverich |  |
| 5:00 p.m. | Jabar Abdul Karim | Coordinator, Black United Front |
| 5:30 p.m. | John Middlemiss, Esq. | Legal Aid Society of Suffolk County |
| 6:00 p.m. | Rafael Abramovitz, Esq. | Wrote article in National Law Journal |
| 6:30 p.m. | Henry O'Brien, Esq. | Former District Attorney |
| 7:00 p.m. | Jody Adams | (self) |
| 7:30 p.m. | James Fisher | (self) |
| 8:00 p.m. | Sarah Halbert, Esq. | Attorney |
| 8:30 p.m. | Paul Enrico, Esq. | Attorney |

EXHIBIT
B-1

# The Suffolk County Bar Association



SCHEDULED SPEAKERS FOR SEPTEMBER 17, 1979
CIVIL RIGHTS HEARINGS

| TIME | NAME | ORGANIZATION |
|------|------|--------------|
| 9:30 a.m. | SILVERSTEIN, SAMUEL | (Self) Started an organization on prison reform |
| 10:00 a.m. | JOHNSTON, HENRY | Executive Director Suffolk Co. Human Rights Commission |
| 10:30 a.m. | GREAVES, EUGENE | Suffolk County PBA |
| 11:00 a.m. | SIEGEL, ERNEST | Inspector - Internal Affairs Suffolk Co. Police Dept. |
| 11:30 a.m. | GUANIL, ELIZABETH | Chairperson Suffolk Co. Human Rights Commission |
| 12:00 noon | FITZMORRIS, PAUL | Attorney |
| 12:30 p.m. | WERBA, MARIE | (Self) |
| 12:45 | DONELLY, THOMAS J. | (Self) |
|  | ROSS, ELLEN | (Self) Social Worker |

B-2

SIC 680869-0171

# COUNTY OF SUFFOLK



### John V. N. Klein
**COUNTY EXECUTIVE**
**August 31, 1972**

COUNTY EXECUTIVE
MANAGEMENT ORDER NO. 19-1972

SUFFOLK COUNTY HUMAN RIGHTS COMMISSION AND STAFF
AND MR. JOHN L. BARRY, POLICE COMMISSIONER

2M:    JOHN V. N. KLEIN, SUFFOLK COUNTY EXECUTIVE

BJECT:    ALLEGATION OF USE OF UNDUE FORCE — SUFFOLK COUNTY POLICE PERSONNEL

---

Effective immediately, the following procedures shall pertain to the initiation
and disposition of all complaints against members of the Suffolk County Police
Department alleging the use of undue force by such personnel:

1. Any allegation of the use of undue force whether processed
   through the Human Rights Commission or otherwise, shall be
   reduced to writing and signed under oath by the alleged
   victim of the use of such undue force.

2. The executed original of such complaint shall then be
   personally filed with the office of the Police Commissioner
   together with any and all related documents pertaining to
   the allegation. The Police Commissioner or his staff at
   the time of personal delivery of such complaint to his
   office shall execute and deliver to the person filing such
   complaint a written receipt specifying the documents
   received as well as the date and time. Simultaneously, a
   copy of the complaint and a copy of all such supporting
   documents shall be filed with the Office of the County
   Executive at Hauppauge, together with a copy of the receipt
   signed by or on behalf of the Police Commissioner.

3. Upon receipt of a complaint filed in conformity with
   this order, the Police Commissioner shall initiate an
   investigation of the matter under established police
   procedures for such inquiries.

EXHIBIT

C-1

SIC 680869-0172

Management Order No. 19-1972                                    August 31, 1972
To:  Suffolk County Human Rights Commission and Staff           Page 2
     and Mr. John L. Barry, Police Commissioner

4.    Upon conclusion of the investigation by the Police
      Department, and upon the completion of a determination
      by the Police Commissioner with respect to such case, a
      copy of such decision, in writing, shall be simultaneously
      forwarded to the complainant, the County Executive and
      the Human Rights Commission if said Commission acted
      on behalf of the complainant in filing the complaint.

Upon the receipt of a complaint filed in accordance with the above directives,
the Police Commissioner may require of the complainant additional or supplementary
statements in writing.

No County official, employee, department or agency possessing copies of any
complaint of the use of undue force and/or any supplemental supporting documents
shall with respect thereto release to anyone other than the Human Rights Commission,
the Police Department or the County Executive the name, address, or substance of
the complaint or supporting documents without the prior written authorization of the
complainant.

The Police Commissioner shall reduce to writing for distribution to any interested
party the specific procedures employed by the Suffolk County Police Department in
the investigation and disposition of complaints of the use of undue force once properly
filed.

The Human Rights Commission and staff shall file with the Police Commissioner
immediately, in accordance with the procedures outlined above, all complaints which
the Commission now considers pending before the Suffolk County Police Department
reportedly filed by the Commission or its staff between January 1, 1970, and the date
of this Executive Order.

                                        John V. N. Klein, Suffolk County Executive

NK:mrj

                                C-2

SIC 680869-0173

2

Appearances:

       CHARLES WILLIAMS III, ESQ.
       ARTHUR GRASECK, ESQ.
       Attorneys for Plaintiffs


       LEONARD WEXLER, ESQ.
       28 Manor Road
       Smithtown, New York
       Attorney for Defendants

D-2

SIC 680869-0174

THE COURT:  This constitutes my opinion in the case.

After presentation of the plaintiffs' case, the defendants have moved to dismiss the case. Based only on the evidence presented by the plaintiffs, and without having heard the defendants' witnesses, plaintiffs have established, prima facie, the following facts:

One, during the period from 1970 to the present there have been a substantial number of cases where excessive physical force was used by some Suffolk police officers in arresting suspects, in questioning them to obtain oral admissions, and in punishing persons thought by some police officers to be showing what the police officers considered lack of respect or cooperation at the time of arrest or questioning.

These incidents included whites, blacks and Hispanics.

Two, during the same period there have been a substantial number of cases where racial epithets were used by Suffolk police officers against members of the black and Hispanic community.

Three, prior to the tenure of the present County Executive, John V. N. Klein, Commissioner

D-3

4

Eugene R. Kelly, and Inspector William L. McBride,
attempts to discipline the police force to prevent
brutality were lax.   County Executive Klein has
attempted to use his limited powers over the Suffolk
Human Rights Commission and the Suffolk Police
Department to improve methods of handling complaints
of police brutality and to insure proper investi-
gation and discipline.

Police Commissioner Kelly and Inspector
McBride have during the last few years devoted sub-
stantial efforts to improve processing of complaints
and to improve relations with the minority groups
of Suffolk County, individual complainants, and the
Suffolk County Human Rights Commission.

Four, while the present situation is appreciabl
improved, substantial segments of the minority
communities in Suffolk County feel abused by the
Police Department with respect to the activities of
some of the policemen, and lack confidence that their
complaints will be fairly investigated, and that
police officers found guilty of abuse will be
prosecuted.

Five, there is a lack of prompt, adequate and
dispassionate investigation of charges at the local
level, and in Inspector McBride's office, in internal

D-4

SIC 680869-0176

5

disciplinary procedures, and in prompt reports to the complainants of the results of these investigations. Some complainants are discouraged from filing complaints and others fear to do so because of concern over retribution by some members of the police force.

Six, the proposed "Statement of Policy regarding police contacts with the public" of Police Commissioner Kelly and the Draft of Amendments to Chapter 5 of the Police Department, County of Suffolk or an equivalent would improve the situation by making clear to the public and to the members of the Police Department that the Suffolk County policy is to avoid excessive use of force, abuse and disrespect to civilians, and that serious efforts would be made and will be made to enforce this policy.

This proposed statement will be marked by the Court Clerk as a Court Exhibit at this time.

THE CLERK: Court Exhibit 3.

THE COURT: And made a part of this set of oral findings.

Seven, there is no policy on the part of the supervising officials in Suffolk County to violate the constitutional rights of plaintiffs. I am going to repeat that.

There is no policy, no policy on the part of

D-5

SIC 680869-0177

supervising officials in Suffolk County to violate

the constitutional rights of plaintiffs.  The

frequency of the complaints indicate that they cannot

be dismissed, however, as rare and isolated instances

All of these above findings of fact would,

of course, be subject to revision should defendants'

witnesses testify.

For the purposes of the motion to dismiss, the

plaintiffs' case must, under the law, be interpreted

in a way most favorable to the plaintiffs' contention

The following constitutes the applicable law:

The leading and controlling decision is that

of the Supreme Court of the United States in Rizzo

versus Goode, reported at 46 L.Ed., 2nd, 561; a

1976 case.  In that case, the factual pattern establi

after a full trial was stronger than the one in this

case.  Some 250 witnesses involving some 40 incidents

testified in that case.

In one year alone the District Court found

16 incidents in Philadelphia where police officers

violated citizens' constitutional rights.  Based on

those findings of fact, the District Court and the

Court of Appeals approved a comprehensive program

for dealing adequately with civilian complaints.

The Supreme Court disapproved the order of the

D-6

SIC 680869-0178

7

District Court and stated among the other things the following, at 46 L.Ed., 2nd, page 573 to 575, and I am now quoting,

"On the facts of this [Rizzo] case, not only is this novel claim quite at odds with the settled rule that in federal equity cases 'The nature of the violation determines the scope of the remedy,'" from Swann, "Important considerations of federalism are additional factors weighing against it."

I continue to quote, "The principles of federalism which plays such an important part in governing the relationship between federal courts and state governments, though initially expounded and perhaps entitled to their greatest weight in cases where it was sought to enjoin a criminal prosecution in progress, have not been limited either to that situation or indeed to a criminal proceeding itself.

"We think these principles likewise have applicability where injunctive relief is sought not against the judicial branch of state government, but against those in charge of an executive branch of an agency of state or local governments such as respondents here."

I continue to quote, "Contrary to the District Court's flat announcement that a federal court's

D-7

SIC 680869-0179

8

legal power to 'supervise the functioning of the police department,' it is the foregoing cases and principles that must govern consideration of the type of injunctive relief granted here. when it injected itself by injunctive decree in the internal disciplinary affairs of this state agency, the District Court departed from these precepts."

Then the Supreme Court said, "For the foregoing reasons the judgment of the Court of Appeals which affirmed the decree of the District Court is reversed."

Dissenting from that decision, were Mr. Justice Blackmun, Mr. Justice Brennan and Mr. Justice Marshall. The majority of the Supreme Court, of course, controll. the decisions in this Court.

Under the applicable law there is no alternative but dismissal. Defendants' motion to dismiss is granted with no costs or disbursements.

This constitutes the findings of fact and law by the District Court under the applicable rules of civil procedure. It is so ordered, and a final judgment will be entered by the clerk.

\* \* \* \*

D-8

SIC 680869-0180

COUNTY COURT, SUFFOLK COUNTY                    Indictment Nos: 909-77; 917-77

THE PEOPLE OF THE STATE OF          BY    SEIDELL     J.
NEW YORK,

              VS                    DATED       March 22,   19 78
ROLAND SMITH,
              Defendant.


HON. PATRICK HENRY                       SIBEN & SIBEN
District Attorney, Suffolk County        Attorneys For Defendant
BRUCE A. SIKORA, ESQ., Of Counsel        ROBERT E. QUINLAN, ESQ., Of Counsel
Criminal Courts Building                 90 East Main Street
Riverhead, New York  11901               Bay Shore, New York  11706

        This defendant is charged with robbery in the first degree under
indictment no. 909-77 and attempted robbery in the first degree under in-
dictment no. 917-77.

        The defendant moves for suppression of admissions and confessions made
to police authorities, claiming that said admissions and confessions were not
made voluntarily.

        The People have the burden of proving beyond a reasonable doubt that
the defendant's admissions and confessions were made voluntarily.

        The Suppression Hearing commenced on March 13, 1978.

        The People called as witnesses detectives Thomas Forrest, Robert Harris
Raymond Richmond and stipulated to testimony of Linda Smith.  The defendant
testified in his own behalf.  The People called as a rebuttal witness, detectiv
Gustov Carbonell.

        I make the following findings of fact:

        On April 5, 1977 detective Thomas Forrest received a telephone call
from Linda Smith informing the detective that there were outstanding warrants
against her and Roland Smith.  The detective then verified that there were
outstanding warrants and called Linda Smith back and was informed by her that
she would be driving a 1972 Dodge in the vicinity of Main Street in Bay Shore
that evening.

        Detectives Forrest and Gustov Carbonell then drove to Bay shore in an
unmarked car and waited.  Detective Forrest subsequently saw a 1972 Dodge at
about 11:30 p.m. proceeding on Main Street.  He saw a female driving the car an
a male passenger waving his arms in the car.

        Detective Forrest stopped the car and requested identification from the
driver.  Roland Smith produced a license and registration.  The male passenger
gave his identification as one James Allen.  A bottle was observed on the floor
of the car.  The defendant said that it was his and was placed under arrest for
possession of marijuana.  The defendant and Linda Smith were then taken to the
third precinct at approximately 11:45 p.m.  At the precinct a social security
card was found on the defendant, indicating that he was Roland Smith and the
defendant finally admitted his true identity.  The defendant had four active
warrants and was also charged with possession of narcotics.

                              EXHIBIT
                                E-1

COUNTY· COURT, SUFFOLK COUNTY                    Indictment Nos: 909-77; 917-77

PEOPLE OF THE STATE OF                  BY   SEIDELL   J.

        VS                              DATED      March 22,    19 78

ROLAND SMITH,
              Defendant.

                              Page #2

Linda Smith informed detective Forrest that she knew that the defendant had committed a robbery at a Seven-Eleven store.  She was not charged with the commission of any crime and she left the precinct at approximately 1:30 a.m.

The defendant was then given his MIRANDA warnings and defendant stated that he knew all about his rights since he had been arrested numerous times before.

The defendant denied being involved in any robbery.  Detective Forrest then called Linda Smith and requested that she return to the precinct.  Linda Smith then returned to the precinct and was allowed to speak to her ex-husband alone.  Linda Smith informed the defendant that if he did not confess to the Seven-Eleven store robbery, she would be arrested and charged with possession of narcotics and that their son would be placed in a child protection agency.

The defendant was then again interrogated about the robbery and after using mental and psychological coercion and physical force upon this defendant, the defendant then signed a written confession, claiming that he committed a robbery on July 1, 1976 at a Seven-Eleven store on Ronkonkoma Avenue in Ronkonkoma.

This signed statement was executed about 5:30 a.m.  Detective Forrest went off duty about 9:30 a.m. and the defendant was still hand-cuffed to a desk with bruises on his face and wrist and track-marks on his arm.

On April 6, 1977 at approximately 11:00 a.m. Detective Robert Harris was called by the third precinct to interrogate this defendant.  Detective Harris knew the defendant approximately four years prior to this date.

The defendant had not been arraigned on the active warrants, the possession of narcotics, nor the alleged robbery.

Detective Harris then arrived at the third precinct at about 11:45 a.m. and questioned the defendant regarding a robbery of a Seven-Eleven store in October of 1976.  After reading the confession of this defendant regarding the July 1, 1976 robbery, Detective Harris then decides to transport this defendant to the fourth precinct for further interrogation.  This defendant still has not been arraigned at the District Court for the charges for which he was arrested.

Detective Harris knew that this defendant had serious mental reservation about being locked-up in a station house jail.  At about 12:05 p.m. the defendant is now in custody in the fourth precinct.

                              E-2

COUNTY COURT, SUFFOLK COUNTY          Indictment Nos: 909-77; 917-77

PEOPLE OF THE STATE OF            BY   SEIDELL      J.

                    VS            DATED       March 22,      19 78
ROLAND SMITH,
                    Defendant.

                              Page #3

        Detective Harris knew that the alleged confession obtained from the
defendant in the third precinct was false and that the defendant confessed
to a crime which had never been committed.

        The defendant was lodged in the fourth precinct jail at times during
the interrogation without any clothes on since it was known that this defendant
had mental problems and had the tendency to self-inflict injuries upon his
person.

        After constant interrogation, knowing the defendant had not slept from
the time he was arrested, the police authorities, through detective Harris,
then obtained a written confession from this defendant, confessing to a robbery
at the Seven-Eleven store on Lake Shore Road sometime early in October of 1976.
All through the interrogation of this defendant it was visibly clear that he
was suffering from the physical injuries substained while in custody in the
third precinct.

        After obtaining the confession of this defendant, the defendant was
taken to Smithtown General Hospital at approximately 5:50 p.m. for emergency
treatment.  The defendant was examined at the hospital and his injuries were
diagnosed as multiple abrasions and he was discharged at approximately 7:18 p.m

        The defendant was then brought back to the fourth precinct, still not
having been arraigned on any charges and detective Raymond Richmond of the
fifth squad visits the fourth precinct to interrogate this defendant.

        After a lengthly interrogation of this defendant regarding an alleged
robbery at the MacArthur Motel on November 26, 1976, this defendant still, with-
out any sleep, admits orally that he attempted to rob the MacArthur Motel on or
about November 26, 1976.  All further interrogation of this defendant is
finally terminated.

        On April 7, 1977 the defendant is finally transferred from the fourth
precinct to the District Court for arraignment on all charges, including the
outstanding warrants.

        Detectives Harris and Richmond had given the defendant his MIRANDA
warnings prior to their interrogation at the fourth precinct.

                              E-3

COUNTY  COURT, SUFFOLK COUNTY                  Indictment Nos: 909-77; 917-77

PEOPLE OF THE STATE OF            BY     SEIDELL     J.
K,

                VS                DATED        March 22,      1978

ROLAND SMITH,
                Defendant.

                              Page #4

Conclusions Of Law:  Under C.P.L. Sec. 60.45 a confession is inadmiss-
able if involuntarily made.  A confession is involuntary when obtained by
physical or mental coercion or in violation of defendant's contitutional rights

     The People bear the burden of proving beyond a reasonable doubt that
the admissions or confessions are made voluntarily.  People v Harrington 332
NYS 2d 789.  Sec. 120.90 and sec. 140.20 of C.P.L. provide that an arrested
person must be brought before a local criminal court "without unnecessary delay
Unnecessary delay in arraignment is only one of the factors to be considered
with respect to voluntariness of admissions or confessions.  People v Johnson
49 A.D. 2d 663.

     It is undisputed that the defendant was mentally and physically coerced
into admitting and executing a signed confession while being detained at the
third precinct.  Hence, any admissions or statements made to detective Forrest
at the third precinct is hereby suppressed.  People v Woodson 385 NYS 2d 998.

     The defendant was interrogated at the third precinct from approximately
11:45 p.m. of April 5, 1978 until about 12:00 noon of April 6, 1978 without
being arraigned.  The defendant was transported to the fourth precinct and
further interrogated without being arraigned until the morning of April 7, 1978
at the Suffolk District Court.  This defendant was clearly denied his constitu-
tional right of being brought before a local criminal court without "unnecessar
delay" and denied due process.  The Court rejects the argument that the failure
to arraign the defendant was due to a breakdown of the computer at the police
station.  People v Malinski 292 NY 360; People v Holder 358 NYS 2d 54.

     The defendant was subjected to continuous interrogation from the moment
he was arrested on April 5, 1978 in violation of his constitutional rights.
Leyra v Denno 347 U.S. 556; People v Jennings 40 A.D. 2d 357.

     The People have failed to prove beyond a reasonable doubt that the
confession and admissions made by this defendant in the fourth precinct were
voluntary or that there was a break in the casual connection between the first
involuntary statement and the subsequent confession and admissions People v
Valerius 31 NY 2d 51.

     The defendant's motion for suppression is hereby granted in all
respects.

     This memorandum constitutes the decision and order of this Court.

Dated: March 23, 1978

                          E-4                    J.C. HARRY E. SEIDE

SIC 680869-0184

SUPREME COURT OF THE STATE OF
NEW YORK:   COUNTY OF SUFFOLK                    x

                                                :

PEOPLE OF THE STATE OF NEW YORK                 :

                                                :    REPORT NUMBER II OF THE
                                                     SECOND GRAND JURY OF THE
         -against-                              :    SPECIAL AND EXTRAORDINARY
                                                     TRIAL TERM OF THE SUPREME
                                                :    COURT
         John Doe
                                                :

                                                :

_____ x


TO:      The Honorable Harold Birns
         Justice of the Supreme Court


         The second Grand Jury of the Special and Extraordinary
Trial Term of the Supreme Court, State of New York, in and for
the County of Suffolk, conducted an investigation to ascertain
whether the crime of Official Misconduct, a violation of §195.00
of the Penal Law, State of New York, had been committed.  In the
course of this investigation it was revealed that it had been the
"tradition" of the Suffolk County Police Department "through the
years" to decide in its "discretion" whether to report to the
Office of District Attorney allegations of criminal misconduct
concerning members of that Police Department or to conduct depart-
mental disciplinary proceedings and not refer such allegations to
the District Attorney's Office.


         It was further revealed, according to the testimony, that as a
result of a conference in March of 1976 held by representatives of

                              EXHIBIT
                               F-1

of the Office of the District Attorney of Suffolk County, the
Suffolk County Police Department and the Office of the State
Special Prosecutor for Suffolk County, there was an understand-
ing that, thereafter, the Suffolk County Police Department would
refer to the District Attorney of Suffolk County "all allegations
of criminal misconduct on the part of a police officer which re-
sult in an internal investigation by the Suffolk County Police
Department."

## FINDINGS

1.   The Grand Jury finds that the Suffolk County Police Department
had conducted disciplinary proceedings in certain instances in-
volving allegations of criminal misconduct of police officers and
did not refer these allegations to the District Attorney of Suffolk
County.

2.   The Grand Jury finds that the March 1976 agreement referred
to above is not binding upon the Suffolk County Police Department
and may be terminated by the police department at will.

## RECOMMENDATION

The Grand Jury believes that it would be in the interest of
the administration of justice to require legally the Suffolk County
Police Department to refer to the District Attorney of Suffolk

F-2

SIC 680869-0186

County any information which provides a basis for probable cause to believe a crime has been committed by a member of the police department. Accordingly, the Grand Jury recommends that the Legislature of Suffolk County consider the advisability of enacting legislation designed to attain this objective.

### SUBMISSION

The Grand Jury requests that copies of this report be forwarded to:

1. The Presiding Officer of the Suffolk County Legislature.

2. The District Attorney of Suffolk County.

3. The Police Commissioner of Suffolk County.

Respectfully Submitted,

Francis G. Smith
Foreman, Second Grand Jury
of the Special and Extraordinary
Trial Term of the Supreme Court

F-3

SIC 680869-0187