Exhibit 5-1

# STATE OF NEW YORK
# COMMISSION OF INVESTIGATION

## AN INVESTIGATION OF THE SUFFOLK COUNTY

## DISTRICT ATTORNEY'S OFFICE

## AND POLICE DEPARTMENT

April 1989

270 BROADWAY
NEW YORK, NEW YORK 10007

TEMPORARY COMMISSION OF INVESTIGATION
OF
THE STATE OF NEW YORK


AN INVESTIGATION OF THE SUFFOLK COUNTY
DISTRICT ATTORNEY'S OFFICE
AND POLICE DEPARTMENT


DAVID G. TRAGER                 L. KEVIN SHERIDAN
    Chairman                    BERNARD C. SMITH
EARL W. BRYDGES, JR.            ALTON R. WALDON, JR.
THOMAS J. CULHANE                  Commissioners


SUSAN E. SHEPARD                THOMAS A. HALLINAN
  Chief Counsel                   Chief Investigator

RICHARD C. DADDARIO             RAFFAELA PETROCCIONE
  Senior Assistant Counsel        Executive Assistant


Staff for this Investigation:


JOHN J. KENNEDY
Assistant Counsel


ROBERT W. FRANK
JOSEPH A. LYONS*
Special Agents


JOAN M. FLAHERTY
JULIA MINA
CAROL L. STRICKLAND
RACHEL A. WIENER


270 Broadway
New York, New York  10007
APRIL 1989


* Reassigned 9/8/87

## TABLE OF CONTENTS

INTRODUCTION........................................1

BACKGROUND TO COMMISSION'S INVESTIGATION..............5

    A.  Prior Criticism of the Suffolk County
       District Attorney's Office and Police
       Department...................................6

    B.  Judge Stuart Namm's Complaint..............16

    C.  Broadened Scope of Investigation..........18

SUMMARY OF FINDINGS..................................22

  I.  MISCONDUCT AND DEFICIENCIES IN HOMICIDE
     INVESTIGATIONS AND PROSECUTIONS...............31

    A.  People v. Diaz.............................31

    B.  People v. Corso............................42

    C.  The Pius Cases.............................49

    D.  Management Failures in Homicide Cases......53

 II.  MISCONDUCT AND DEFICIENCIES IN NARCOTICS
     INVESTIGATIONS AND PROSECUTIONS...............70

    A.  Disorder in the Narcotics Division.........70

    B.  Kuhn and Gutowski..........................74

    C.  Chief of Detectives Gallagher..............81

    D.  Eason, Savage and Donnelly.................83

III.  ILLEGAL WIRETAPS...............................93

    A.  Illegal Eavesdropping by the Suffolk
       County Police Department Known to the
       District Attorney's Office.................93

B.   Management Failures Concerning Electronic
      Surveillance and Pen Registers...........110

IV.   ASSISTANT DISTRICT ATTORNEY PERINI AND THE
      DISTRICT ATTORNEY'S OVERSIGHT ROLE ..........121

V.    FAILURE BY THE DISTRICT ATTORNEY'S OFFICE
      TO INVESTIGATE AND PUNISH MISCONDUCT BY
      AGENCY EMPLOYEES AND OTHER LAW
      ENFORCEMENT PERSONNEL........................128

      A.   Ira Dubey................................128

      B.   David Woycik............................134

      C.   People v. Hansen........................146

VI.   DEFICIENCIES IN THE OVERSIGHT OF
      POLICE PERSONNEL ...........................151

      A.   Lack of Personnel Evaluation............151

      B.   Disproportionate Salary and Overtime.....152

      C.   The Skorupski Case and the Failure
           To Investigate and Punish Police
           Misconduct..............................154

VII.  THE APPOINTMENT OF A SPECIAL DISTRICT ATTORNEY
      IN THE GALLAGHER CASE.......................167

      A.   The Appointment of a Special District
           Attorney................................167

      B.   Problems Involving County Law §701........174

RECOMMENDATIONS....................................180

      APPENDIX A -- RESISTANCE AND LITIGATION IN
      SUFFOLK INVESTIGATION.......................192

      APPENDIX B-- DRAFT LEGISLATION,
      COUNTY LAW §701.............................197

## INTRODUCTION

In 1960 Suffolk County, covering the eastern portion of Long Island, beginning approximately 45 miles east of Manhattan and adjacent to suburban Nassau County, had a population of 666,784 and no unified police force. Today, with double the population, Suffolk County has a police department which is the 13th largest in the United States, and the County is one of the most populous and fastest growing in New York State.

Covering an area of more than 900 square miles and bordered on the south by the Atlantic Ocean and on the north by Long Island Sound, Suffolk County increased in population between 1940 and 1980 from just under 200,000 persons to approximately one and one-quarter million persons (1,284,000), with the greatest increase having occurred between 1950 (276,000) and 1970 (1,127,000) and with the population having roughly doubled each decade during that period. By the year 2000, it is estimated, Suffolk's population will exceed 1,500,000, ranking it as the third most populated county in the State and the largest outside New York City.

This population is served by a district attorney's office which currently consists of 140

-1-

assistant district attorneys plus a large staff of non-lawyers, including 40 in-house investigators and 50 Suffolk County Police Department detectives detailed to the District Attorney's Office.  In 1987 the total number of positions in the Office was 325, with a budget of more than $16 million.*  The Suffolk County District Attorney is Patrick Henry, who has served in that Office since 1966, first as an assistant district attorney and, since January 1, 1978, as District Attorney.

Suffolk is also served by a number of police departments, of which the largest is the Suffolk County Police Department, formed in 1960 by consolidating the police departments of the five western Suffolk towns (Huntington, Babylon, Islip, Brookhaven and Smithtown) with six incorporated villages. The Suffolk Police Department provides all police services for this heavily populated and large area.  The five eastern towns (Riverhead, Southold, Southampton, Easthampton and Shelter Island), plus 16 villages, retained their own uniformed police departments, principally for patrol purposes, while the County Police Department provides other services, including basic detective services.

---

*"Review of the 1988 Operating Budget," Suffolk County Legislature, October 22, 1987, p. 179ff.

In 1987 the Suffolk County Police Department had a budget of $203 million and staff of 3,461, including 2,616 sworn police personnel, of whom approximately 400 were detectives and detective supervisors.* Suffolk now has the fourth largest police department in New York State after the New York City Police Department, the New York State Police and the Nassau County Police. Suffolk also ranks as one of the highest paid departments in the nation.

The Police Commissioner leads the Department, and is appointed by the County Executive, subject to the approval of the County Legislature. The Commissioner serves at the pleasure of the County Executive. Until 1980 the Police Commissioner was appointed by the County Legislature. When the Commission's investigation began in November 1985, the Suffolk Police Commissioner was DeWitt Treder, who was replaced in April 1987, by James Caples, who was, in turn, replaced in March 1988, after a nationwide search, by Daniel Guido. Prior to his appointment, Commissioner Guido had headed several police departments, including Nassau County's.

Concomitant with its population growth, Suffolk is no longer a somewhat isolated and semi-rural

---

\* "Annual Report 1987, Suffolk County Police," p. 8.

area, but faces many of the same crime problems as any major metropolitan region. According to the 1987 Suffolk County Police Annual Report, in 1987 the Suffolk Police reported 26,857 felony and 87,240 misdemeanor incidents, including 36 murders/manslaughters, 182 rapes, 1,228 robberies, 1,000 aggravated assaults, 1,182 felony drug and 676 misdemeanor drug offenses. Also reported were 10,007 burglaries, 25,498 petit larcenies, 28,206 criminal mischief cases, 7,067 driving while intoxicated cases and 6,653 cases of aggravated harassment.

Given its geographic size and the diversity of its economic base, ranging from farms and seaside resorts to aerospace and high technology industries, Suffolk is a complex county with equally large and complex law enforcement problems. Although Suffolk's needs demand the highest standards of professionalism from both its Police Department and District Attorney's Office, the Department -- at least through 1987 -- and the District Attorney's Office have failed to meet the challenges put to them by a county as important as Suffolk has become.

## BACKGROUND TO COMMISSION'S INVESTIGATION

While the precipitating event for the Commission's extensive investigation of the Suffolk County District Attorney's Office and Police Department was Suffolk County Court Judge Stuart Namm's public criticism, in late 1985, of police and prosecutorial misconduct in two homicide prosecutions (see (B) this section), the impetus for the Commission's investigation of Suffolk law enforcement stretches back much further. From at least the mid-1970's, there have been severe and recurring public criticisms of Suffolk County law enforcement from many quarters: in decisions by the New York State Court of Appeals, in a bar association report, in a grand jury report, in news articles, and in a controversy involving a former district attorney and then police commissioner which necessitated the appointment of a special prosecutor.

This criticism and controversy, unique to any county in New York State with respect to frequency and intensity, formed the backdrop to Judge Namm's allegations.

### A. Prior Criticism of the Suffolk County District Attorney's Office and Police Department

#### 1. Court of Appeals Cases (1976-1981)

Between 1976 and 1981, the New York State Court of Appeals reversed, or affirmed Appellate Division reversals, in eight cases, including six homicides, all tried by the Suffolk County District Attorney's Office and involving confessions by defendants. By these decisions the Court of Appeals broadened and strengthened rules in New York State which are highly favorable to defendants with respect to the right to counsel and waiver of the right to counsel.*

The primary cause for reversal in these Suffolk cases, according to judicial analysis, was failure by the Homicide Division of the Suffolk County Police Department to follow proper practices in questioning defendants and seeking confessions.

---

\* See People v. Hobson, 39 N.Y.2d 479, 384 N.Y.S.2d 419 (1976); People v. Macedonio, 42 N.Y.2d 944, 397 N.Y.S.2d 1002 (1977); People v. Singer, 44 N.Y.2d 241, 405 N.Y.S.2d 17 (1978); People v. Pinzon, 44 N.Y.2d 458, 406 N.Y.S.2d 268 (1978); People v. Maerling, 46 N.Y.2d 289, 413 N.Y.S.2d 316 (1978), see also 64 N.Y.2d 134, 485 N.Y.S.2d 23 (1984) and 96 A.D.2d 600, 465 N.Y.S.2d 254 (1983); People v. Garofolo, 46 N.Y.2d 592, 415 N.Y.S.2d 810 (1979); People v. Wander, 47 N.Y.2d 724, 417 N.Y.S.2d 245 (1979); People v. Bartolomeo, 53 N.Y.2d 225, 440 N.Y.S.2d 894 (1981), see also 70 N.Y.2d 702 (1987) and 126 A.D.2d 375, 513 N.Y.S.2d 981 (1987).

Among the cast of characters in these cases were police personnel who later became important actors in cases known as People v. Corso and People v. Diaz -- cases which became the initial focus of the Commission's investigation.   Detective Dennis Rafferty, who played a key role in the Corso and Diaz cases, also played a role in two of the eight cases which were reversed (Bartolomeo and Maerling); Detective Edward Halverson, an important actor in the Corso case, also played a role in Singer; and even District Attorney Henry himself, during his service as an assistant district attorney, played a small role in both Singer and Maerling.

Representative quotations from these decisions indicate the nature of the criticism being directed at Suffolk law enforcement:

> . . . it is obvious that the defendant's request to remain silent was not scrupulously honored . . ..
> (Wander, 47 N.Y.2d at 726.)

> . . . that good faith efforts are made to locate a defendant who is taken into custody does not absolve the police of their responsibility if their internal procedures are inadequate to keep track of those against whom the restraining hand and the accusing finger of the State come to rest. . . . These principles were ignored in this

instance.   Not only did Detective
Rodriguez and his fellow officers
do nothing to facilitate access by
counsel, but their inaction fore-
closed the possibility of any such
communication.
(Garofolo, 46 N.Y. 2d at 601.)


Thus, in this case, when the defen-
dant's attorney called the general
information number at police de-
partment headquarters, identified
himself and asked to speak with the
defendant and further requested
that there be no questioning, the
police should have been on notice
that an attorney had appeared on
behalf of the defendant then in
custody.
(Pinzon, 44 N.Y.2d at 465.)


By the 1981 Bartolomeo opinion, the Court of
Appeals extended the rule even further:


Knowledge that one in custody is
represented by counsel, albeit on a
separate, unrelated charge, pre-
cludes interrogation in the absence
of counsel and renders ineffective
any purported waiver of the assis-
tance of counsel when such waiver
occurs out of the presence of the
attorney.. . . . [T]he interrogating
detectives here, with actual knowl-
edge of the outstanding arson
charge against defendant, were
under an obligation to inquire
whether defendant was represented
by an attorney on that charge.
Having failed to make such inquiry,
the officers were chargeable with
what such an inquiry would have

-8-

> disclosed -- namely, that defendant
> did have an attorney acting on his
> behalf.
> (Bartolomeo, 53 N.Y.2d at 232.)

This series of cases arising out of prosecu-
tions by the Suffolk County District Attorney has
created significant difficulties for other prosecutors
in New York State.  This can be seen in the 1988 Legis-
lative Proposals of the New York State Law Enforcement
Council which stated:  "The Bartolomeo extension of the
Hobson rule poses a serious impediment to effective law
enforcement" (p. 32).

## 2.  Grand Jury Report (1976)

As long ago as 1976 the Suffolk County Police
Department and District Attorney were alerted, in a
grand jury report, that allegations of criminal miscon-
duct against members of the Police Department were not
handled properly. That report, entitled "Report Number
II of the Second Grand Jury of the Special and Extraor-
dinary Trial Term of the Supreme Court," resulted from
the work of a special prosecutor appointed by former
Governor Nelson A. Rockefeller in the mid-1970's in
response to a bitter controversy involving former Dis-
trict Attorney Henry O'Brien and former Police Commis-
sioner Eugene Kelley.

The report criticized the handling of criminal misconduct complaints against members of the Suffolk Police Department:

> . . . In the course of this investigation it was revealed that it had been the 'tradition' of the Suffolk County Police Department 'through the years' to decide in its 'discretion' whether to report to the Office of District Attorney allegations of criminal misconduct concerning members of that Police Department or to conduct departmental disciplinary proceedings and not refer such allegations to the District Attorney's Office.

In its "Findings" section, the report continued:

> The Grand Jury finds that the Suffolk County Police Department had conducted disciplinary proceedings in certain instances involving allegations of criminal misconduct of police officers and did not refer these allegations to the District Attorney of Suffolk County.

Unfortunately, this warning was heeded by neither the Police Department nor District Attorney, and the very same attitude toward complaints of misconduct on the part of law enforcement personnel was seen

-10-

again and again by the Commission in the course of its Suffolk investigation.

### 3. Suffolk County Bar Association Report on Police Brutality (1980)

On January 11, 1979, a front-page article in The National Law Journal contained allegations of widespread use of force by members of the Suffolk County Police Department Homicide Division in order to coerce confessions in murder cases. In response to this article, as well as the decisions of the New York Court of Appeals and other public criticisms, the Suffolk County Bar Association delegated to its Civil Rights Committee the task of examining allegations of brutality. After an extensive investigation, which included public hearings and a review of court records and other documents, the Bar Association issued a report which concluded:*

> . . . the Committee believes that sufficient evidence is present to indicate that there is a serious problem with respect to police brutality in Suffolk County and the manner in which such complaints are investigated and resolved (p. 53).

---

* "Report of the Civil Rights Committee on Allegations of Police Brutality in Suffolk County," Suffolk County Bar Association, January 1980.

With respect to the role of the Suffolk District Attorney's Office, the Bar report charged:

> The District Attorney's Office as it presently operates does not act as an adequate check against police brutality (p. 43).

Further, the 1980 report was pessimistic that the Suffolk County District Attorney's Office would assume its proper oversight role:

> . . . The Committee believes that it would be a strong deterrent to such incidents [of misconduct] if the police are made aware that Assistant District Attorneys will not countenance police misconduct and that such matters will be thoroughly investigated and prosecuted. If this is not made a priority, and in Suffolk County the indication is that it is not, it will be the natural tendency of the Assistant District Attorney to be less than zealous in pursuing matters of police misconduct and the situation will worsen (p. 46).

The Bar Association made a series of recommendations, ranging from a change in the Suffolk County Charter permitting more civilian participation in police disciplinary investigations, to videotaping confessions, to earlier participation by assistant

-12-

district attorneys in major felony cases. Few, if any, of these recommendations were instituted by the Suffolk County Police Department or by Mr. Henry even following the Bar Association's report, and the Bar's prophesy that the "situation will worsen," as this Commission's Report will demonstrate, did indeed prove correct.

While undue force and coerced confessions by the Suffolk Police following the time period of the Bar Association's report have not been found by the Commission, other serious misconduct, all in the name of apprehending and convicting lawbreakers, has flourished.

### 4. Long Island University Management Report on the Suffolk County Police Department (1986)

In March 1986, then Suffolk County Executive Peter Cohalan requested that Long Island University conduct a management analysis of the Suffolk County Police Department.*  This request followed several incidents provoking unfavorable publicity for the Department and resulting in a high-level personnel and administrative shake-up within the Department.

---

* The ensuing report, entitled "The Suffolk County Police Department: A Managerial Analysis," was issued in August 1986.

The incidents which precipitated the University's report included criticisms by Judge Stuart Namm (see Background, section (B)) and a series of narcotics-related allegations against Suffolk police personnel, including former Chief of Detectives John Gallagher and police officers James Kuhn, Raymond Gutowski, Rebecca Bernard, Brian Merlob and Jose Ingles. (See Chapter II.)

While the Long Island University report made no pretense to being anything more than a quick review of the Department, the conclusions reached were highly critical of the Police Department's management.    The report commented:

> The Suffolk County Police Department was found to be a 'reactive' Department rather than an organization that consistently and comprehensively incorporates strategic planning into the organization, staffing, budgeting, coordination and evaluation of the law enforcement services that they provide (p. 11).

Blaming certain features of the Department's contract with the Patrolmen's Benevolent Association, the report found that supervision within the Department had deteriorated:

-14-

> . . . The net result has been a
> continuing loss of administrative
> supervision and evaluation and a
> consequent lack of personnel
> accountability in the Department
> (p. 13).

With respect to the Detective Division, the
report concluded:

> The Detective Division has increas-
> ingly adopted its own set of per-
> formance standards for admission
> and promotion, rather than corre-
> lating them to the standards, needs
> and resources of the rest of the
> Department -- sustaining a problem
> that began more than 26 years ago
> when the Detective Division was
> established virtually as an inde-
> pendent entity within the Depart-
> ment (p. 13).

The report contained numerous recommendations
for reform in the areas of organization, planning, per-
sonnel, budgeting, communication and information sys-
tems (pp. 20-23).

These sample criticisms, from the Suffolk
County Bar Association report, the 1976 Grand Jury
Report, the Long Island University report and the New
York Court of Appeals decisions, which are but a few of
many such criticisms made of the District Attorney's
Office and the Suffolk Police Department, demonstrate

that a substantial and reputable body of criticism of the Department and District Attorney's Office existed even before the Commission's investigation began and before any public hearings by the Commission.

### B.   Judge Stuart Namm's Complaint

The Commission's investigation of the Suffolk County Police Department and District Attorney's Office was initiated following an October 29, 1985, letter from Suffolk County Court Judge Stuart Namm to Governor Mario M. Cuomo, and Judge Namm's public complaints, which came to the Commission's attention. Judge Namm, who had served six years as a Suffolk District Court Judge and three years as a County Court Judge, asked the Governor to appoint a special prosecutor to pursue allegations of misconduct in two widely publicized Suffolk County murder trials which occurred in 1985 and resulted in acquittals, People v. Corso (Indictment No. 562-84) and People v. Diaz (Indictment No. 1102-84).

Judge Namm, who presided at both jury trials, stated in his request to the Governor:

> In two consecutive highly publicized murder trials, I have witnessed, among other things, such apparent prosecutorial misconduct

as perjury, subornation of perjury,
intimidation of witnesses, spoli-
ation of evidence, abuse of sub-
poena power and the aforesaid
attempts to intimidate a sitting
judge.

Following a preliminary investigation of
Judge Namm's allegations, which indicated that there
was substance to the allegations, the Commission passed
a resolution initiating a formal investigation on Janu-
ary 9, 1986.

The Commission was particularly concerned
about Judge Namm's allegations regarding Suffolk County
law enforcement because, for several years preceding
this investigation, the Commission had received and in-
vestigated an unusually large number of complaints
regarding misconduct by the Suffolk County Police
Department and District Attorney's Office, indeed more
than twice as many law enforcement complaints as from
any other county in the State. Furthermore, in a prior
Commission investigation of Suffolk County District
Attorney Patrick Henry, the Commission concluded that
Mr. Henry had mishandled an investigation of a charge
of misconduct involving his Office. Thus, Judge Namm's
allegations seemed an especially important topic to
which to devote Commission resources.

-17-

## C.  Broadened Scope of Investigation

In the first few months of the Commission's investigation of Judge Namm's allegations, other witnesses and informants came forward or were located by Commission investigators.  A substantial number of these witnesses provided additional information to the Commission regarding misconduct in the Suffolk County Police Department and District Attorney's Office in areas other than the two original homicide cases.

The new information primarily concerned narcotics investigations and prosecutions.  The new allegations included illegal drug usage and related offenses by police officers and the use of illegal wiretaps in drug-related investigations.  In addition, allegations were made that the son of Suffolk County Police Department Chief of Detectives John Gallagher had improperly received lenient treatment in a drug case and that other relatives of public officials had received special consideration in drug cases.

Furthermore, several complaints were made, including one by a former Suffolk assistant district attorney, that neither the Police Department nor the District Attorney's Office saw to it that all employees who were accused of misconduct, or even criminal

behavior, were properly investigated and punished when
warranted.

As a result of these additional allegations,
the Commission expanded its investigation to include
the new material.  However, within months the Commis-
sion learned that the United States Attorney for the
Eastern District of New York also was investigating
certain of the same allegations, and the Commission
temporarily suspended its investigation of those areas
which might impede the Eastern District's criminal
investigation, including the Gallagher matter and cer-
tain narcotics-related offenses.

During the course of the Commission's inves-
tigation, more than 200 complainants contacted the Com-
mission regarding Suffolk law enforcement matters.
While every complaint was given at least a preliminary
review, the Commission had to establish priorities
based on the seriousness and frequency of certain com-
plaints and their relevance to key issues of law
enforcement administration in Suffolk County.  As a re-
sult, the vast majority of complaints are neither
specifically discussed nor cited in this Report.  The
Commission has chosen, instead, to review in detail
certain cases which demonstrate failures in Suffolk

County law enforcement and which help illustrate the needed areas of reform.

The principal areas to be discussed are:

1. misconduct and mismanagement in homicide investigations and prosecutions;

2. illegal wiretapping by police personnel with the knowledge of the District Attorney's Office; and

3. misconduct, mismanagement and lack of oversight in narcotics investigations and prosecutions.

In addition, the Commission here points out how, despite over a decade of warnings -- in the form of court decisions and grand jury and bar association reports -- both the Police Department and the District Attorney's Office continued to ignore or to inadequately investigate and punish employee misconduct.

Related to this, both the Police Department and the District Attorney's Office failed, at least until very recently, to impose any sort of effective management controls and systems of oversight on their members and employees. This attitude, this mind-set, in the Commission's view, goes far toward explaining

how the problems described in this Report were able to occur and to occur on the scale here indicated.

The activities of the Commission in its Suffolk investigation have included interviews of several hundred witnesses; nearly 100 private hearings consisting of sworn testimony; four days of public hearings in Hauppauge, New York, on January 28-29, 1987 and January 13-14, 1988, during which 42 witnesses testified; and the review of tens of thousands of pages of documents, including trial and hearing transcripts, prosecution files, police reports and files, and the files of several hundred Suffolk County Police Department Internal Affairs Division investigations and hundreds more files of Suffolk County Human Rights Commission complaints involving Suffolk law enforcement. These activities have required scores of subpoenas and involved the Commission in 19 different legal proceedings. A complete account of the litigation in the Suffolk investigation is included as Appendix A to this Report.

## SUMMARY OF FINDINGS

Under New York law the district attorney, a
popularly elected constitutional officer, functions
very much as the chief law enforcement officer within
each county. Although formally independent of control
by the district attorney, the various police agencies
operating within each county are, as a practical mat-
ter, subject to the district attorney's power to decide
which cases should be prosecuted and how they should be
prosecuted. Moreover, with respect to certain types of
investigative activities such as wiretaps and long-term
investigations, e.g., narcotics, public corruption or
homicides, the district attorney's office is frequently
the lead investigative agency, effectively directing
police investigators on a day-to-day basis. In addi-
tion, the district attorney is rightly perceived by the
public as ultimately, if not exclusively, responsible
for the integrity, if not the efficiency, of the crim-
inal justice system within his county.

At the same time, the heads of the various
police agencies, however they may be selected or
appointed, also are perceived as, and do have a criti-
cal role in, seeing to enforcement of the law effi-
ciently, effectively and with integrity. Police lead-
ership has a responsibility which it cannot properly

-22-

abdicate to others, even to the district attorney's office.

In its investigation of the Suffolk County District Attorney's Office and Police Department, the Commission has found grave shortcomings in the leadership and management of both agencies. While the Commission feels confident that the vast majority of police and prosecutorial personnel in Suffolk are persons of ability, industry and integrity, the conclusion -- based upon the Commission's investigation -- is inescapable that these dedicated men and women, as well as the public, have been shortchanged by their leadership. There has been neither effective management nor accountability, including accountability for official misconduct.

Furthermore, while the Suffolk Police Department, with its new Commissioner and almost entirely new top staff, offers promise for reform, no such promise is yet offered by the District Attorney's Office. Quite the contrary, District Attorney Henry, who most charitably can be described as having ignored the grave and demanding responsibilities of his Office, despite clear danger signals and warnings, has exhibited increasing intransigence as the Commission's investigation uncovered ever more serious misconduct. He has

-23-

become increasingly resistant, resorting to vituperative press statements, and even to litigation, in an unsuccessful effort to block this very Report. In the Commission's view, Mr. Henry has shown himself as unwilling to reform his own Office and to exert proper authority as the highest law enforcement officer of Suffolk County.

While literally dozens of cases are cited or discussed in this Report, the Commission's major goal is not primarily the prosecution or punishment of individuals involved, although that must certainly be part of the process.* The Commission's main goal is nothing short of a major reform of Suffolk law enforcement, instituting reform which seeks justice and integrity, in place of an attitude of "You do what you've got to do to arrest and convict"; reform which replaces professionalism for the slipshod practices of the past; and instituting a system which ends the practice of sweeping law enforcement misconduct under the rug, and replaces it with a policy of investigating any and

---

* The Commission's statutory duties under §7502 of Unconsolidated Laws of New York include investigation not only of criminal misconduct, but also of ethical misconduct or other improper acts. The standard used by the Commission in examining a district attorney's office or a police department is much higher than merely whether any personnel are guilty of indictable offenses.

all alleged misconduct in a meaningful way and imposing
punishment as warranted.

This Report does not concern a narrow crimi-
nal investigation and does not point to a single "smok-
ing gun." Instead, the smoking gun in this case is the
day-in, day-out manner in which the Police Department
(through 1987) and the District Attorney, to date, have
conducted the business of law enforcement in Suffolk
County so badly.

The Commission issuing this Report is a sun-
shine agency with the statutory mandate to publicize
its findings. Bi-partisan and composed of six members
having broad law enforcement experience, the Commission
reaches the harsh and sweeping conclusions in this
Report based on overwhelming evidence. In this Report
the Commission shares its findings, the bases for its
findings and its recommendations with government offi-
cials and the public in order to promote desperately
needed changes in Suffolk law enforcement.

Finding 1:

District Attorney Patrick Henry has seriously
failed in his stewardship as chief law enforcement
officer in Suffolk County. District Attorney Henry
must take responsibility for deficiencies in his

-25-

personal decision-making, particularly his tolerance for misconduct. In addition, he must take responsibility for his failure to develop and enforce proper supervisory and management systems in his Office, as well as his long-standing tolerance for inadequacies, improprieties and misconduct in the Suffolk County Police Department as revealed in many cases prosecuted by his Office.

Since the day he entered office on January 1, 1978, Mr. Henry has been on notice of at least two principal areas of Commission concern: improprieties in homicide investigations and prosecutions, through the New York Court of Appeals decisions cited above; and deficiencies in procedures in misconduct investigations, through the previously cited 1976 Grand Jury Report. Despite these longstanding warnings as well as later ones in the forms of the Bar Association report, Judge Namm's criticisms, the Gallagher case, the Commission's evidence regarding illegal wiretapping and other areas as outlined in this Report, Mr. Henry has engaged in stonewalling instead of reform. He has sought "vindication" in the press rather than the promotion of needed substantive change in Suffolk law enforcement.

Despite clear warnings, Mr. Henry has long tolerated unprofessional standards in investigations by the Suffolk County Police Department, including such key issues as inadequate report writing and documentation, grossly deficient oversight of wiretap operations and lax supervision of narcotics investigations and prosecutions. Deficiencies in the standards enforced by District Attorney Henry have caused significant failures in the entire system of law enforcement in Suffolk County.

Finally, Mr. Henry has had a remarkable tolerance for misconduct by his own staff and by law enforcement personnel in general. He has repeatedly defended assistants in his Office in the face of serious ethical breaches, when, instead, he should be setting the example that misconduct will not be tolerated in law enforcement.

Finding 2:

Detectives and police officers of the Suffolk County Police Department have engaged in illegal wiretapping with the approval of their supervising sergeant and the Bureau Chief of the Narcotics Bureau of the District Attorney's Office. Deficient Police Department management practices, tolerated by the District

Attorney's Office, permitted these crimes to occur and helped to conceal them.

## Finding 3:

The Suffolk County Police Department and District Attorney's Office have failed to properly investigate and punish instances of employee misconduct, including criminal conduct, even when these instances were known to supervisory personnel. Both offices failed to establish minimal procedures to insure the investigation and punishment of employee misconduct, and the Police Department had a deliberate policy, at least in cases involving litigation, of not investigating and punishing misconduct at all.

## Finding 4:

The Suffolk County Police Department and District Attorney's Office engaged in and permitted improper practices to occur in homicide prosecutions, including perjury, as well as grossly deficient investigative and management practices. Because of credibility problems with prosecution testimony, including police testimony, and other defects in homicide prosecutions, guilty persons may well have been allowed to go free.

-28-

Finding 5:

There has been a pervasive lack of documenta-
tion, and defective documentation, in Suffolk Police
and District Attorney investigations in areas which the
Commission has examined: homicide and narcotics cases,
misconduct cases, cases involving pen registers, and
investigations by detectives in general. The effect of
such lack of documentation has been to harm investiga-
tions, conceal misconduct, and prevent plaintiffs in
civil actions and defendants in criminal actions from
receiving documents which should have been produced in
the normal course of conducting effective police work.

Finding 6:

Prior to the Commission's investigation, and
during its early stages, Suffolk narcotics investiga-
tions and prosecutions had experienced a breakdown of
supervision which permitted drug use by police offi-
cers, lack of proper controls on informants, illegal
wiretapping, and fraud in obtaining favorable treatment
in a narcotics case for the son of the Suffolk Police
Chief of Detectives.

In the final section of this Report, follow-
ing its discussion of the factual bases for its

findings, the Commission presents specific recommenda-
tions for reforms, disciplinary actions and criminal
referrals.  However, at this point it is appropriate to
note that, in managing and administering either a
prosecutor's office or a police department, top manage-
ment's own personal honesty and integrity -- while
certainly requirements for holding such positions --
are not enough.  Effective management controls and sys-
tems of accountability administered fairly but force-
fully also are required.  And, to be most blunt,
eternal vigilance is equally required.  This is public
service at its highest and most responsible level,
where the public is entitled to demand and receive the
best from its servants.  Complacency and a comfortable
laissez-faire attitude cannot be accepted.  These are
the very areas in which the Suffolk County Police
Department and District Attorney's Office failed in
their responsibility.  And the fault in these matters
ultimately lies, according to the Commission's find-
ings, with the past leadership of the Police Department
and with the present District Attorney.