# Exhibit 5-2

## I.  MISCONDUCT AND DEFICIENCIES IN HOMICIDE
##     INVESTIGATIONS AND PROSECUTIONS

At the Commission's public hearing of January 28, 1987, the Commission's opening statement noted that in both the Diaz and Corso homicide prosecutions the jurors, who acquitted the defendants, in later interviews cited a lack of police credibility, inadequate investigation and other police errors as grounds for their decisions to acquit. On the basis of the evidence developed at that public hearing, and with further investigation, the Commission stated in the opening statement of the January 13, 1988, public hearing that a lack of professionalism by the Suffolk Police Department and District Attorney's Office had led to acquittals in the Diaz and Corso cases, and that these acquittals may have allowed the guilty to go free. The following discussion of those cases expands upon that theme.

### A.   People v. Diaz

Judge Namm presided at the murder trial of People v. Diaz, Indictment No. 1102-84, which was tried before a jury beginning in September 1985. James Diaz, a 22-year-old drifter, was accused of the brutal and highly publicized rape-slaying of Maureen Negus, a 35-year-old nurse and mother of two children, at her

-31-

home in Port Jefferson Station.  Following the acquit-
tal of Diaz, jurors were quoted in the press as stating
that they did not believe the People's witnesses,
including police testimony (Commission Public Hearing,
1987, Exhibits 2, 3 and 4).

At the Commission's public hearing on January
28 and 29, 1987, testimony demonstrated that at least
five witnesses for the People in the Diaz case had pre-
sented incredible, false or perjurious testimony.  In
addition, evidence was presented demonstrating serious
deficiencies with respect to police procedures for
locating evidence at the crime scene, taking notes and
documenting key events in investigations, and, follow-
ing the trial, in investigating allegations of police
and prosecutorial misconduct in that case.

The principal evidence at trial consisted of
a confession written in Detective Dennis Rafferty's
handwriting and signed by Diaz only on the first page;
testimony by a jailhouse informant named Joseph
Pistone; and a knife, the alleged murder weapon, which
was discovered at the basement site of the murder by
the estranged husband of the deceased 10 months after
the slaying -- approximately 15 feet from where the
body was found.  There was also a crucial oral
admission by Diaz that he "never wiped the blood off

-32-

the knife," which alleged statement by Diaz was not
disclosed by Detective Rafferty until a pre-trial hear-
ing held shortly after the knife was discovered in the
basement.

Testimony regarding this knife played a sig-
nificant role in undermining the credibility of police
witnesses in the trial. The confession allegedly given
to Detective Rafferty at Police Headquarters during the
first evening Diaz was questioned about the murder was
three pages long. Rafferty testified at the Commis-
sion's hearing that Diaz signed the first page, con-
taining innocuous identifying information, but refused
to sign the other two pages. In this alleged confes-
sion, Diaz stated that "he threw the knife into the
woods," despite the fact that the knife ultimately
offered by the prosecution as the murder weapon was
found in the basement (Public Hearing, 1987, Exhibit
12).

In fact, another knife had been found by the
police, in the backyard of the deceased's house during
the search immediately following the murder. However,
despite the fact that several objects and photos were
shown to Diaz for identification on the night of his
confession, such as a pair of white gloves allegedly
used in the crime, and photos of the deceased's house,

-33-

which Diaz initialed, neither the knife found in the yard nor even a picture of that knife was shown to Diaz -- either to rule it in or out as the murder weapon. Detective Rafferty's explanation for his lapse in not showing Diaz the knife found in the yard was that Rafferty never believed that this knife was the murder weapon (Public Hearing, 1987, pp. 193-197).

Ten months after the murder, as the trial of Diaz approached, the estranged husband of the deceased, who had moved back into the deceased's house to care for his two children, discovered a knife, which was later offered in evidence by the People as the murder weapon, approximately 15 feet from where the body of the deceased had been found (Public Hearing, 1987, pp. 142-151). At the Commission's public hearing, Robert Genna, the supervisor in the Suffolk County Crime Laboratory of the Medical Examiner's Office, who had responded to the crime scene on the day of the Negus murder, explained this glaring oversight, stating that he had conducted only a "cursory examination" of the room where the knife was found, consisting of "just visually looking around" (Public Hearing, 1987, p. 115).

After the discovery of this knife, which had blood residue on it, Detective Rafferty unexpectedly

-34-

testified at a pre-trial hearing that at the time of Diaz's confession Diaz had said that "he never wiped the blood off the knife." This statement had not been included in the written confession, nor in police reports or notes, nor ever previously been told by Rafferty to Barry Feldman, the assistant district attorney handling the case, despite several days of preparation prior to the hearing, and had thus not been previously provided to the defense (Public Hearing, 1987, pp. 197-199).

Feldman was astounded at this revelation, and the issue arose of whether this testimony would be considered a recent fabrication by Rafferty (Public Hearing, 1987, pp. 570-571 and Private Hearing, Feldman, 12/3/86, pp. 45-46). Detective Rafferty conveniently recalled that he had long before told two other assistant district attorneys of Diaz's statement that he had not wiped the blood off the knife. Assistant District Attorneys Steven Wilutis, Chief Trial Prosecutor, and William Keahon, Chief of the Major Offense Bureau, testified at a pre-trial hearing and at trial that Rafferty had told them of this statement nearly a year before Rafferty testified about it at the hearing (Public Hearing, 1987, pp. 571-572). The purpose of this testimony was to answer the argument that Rafferty's

trial testimony was a recent fabrication intended to counter the statement in Diaz's alleged confession that "he threw the knife in the woods." Judge Namm testified at the Commission's public hearing that the testimony of Wilutis and Keahon on this point was not "credible" (p. 44).

In the second instance of false or incredible testimony, a jailhouse informant named Joseph Pistone gave sworn testimony before the Commission that he had perjured himself in the Diaz trial and that two Suffolk police detectives, John Miller and Leon McKenna, had suborned the perjury and coached him (Private Hearing, Pistone, 3/21/86, p. 10). Pistone testified before the Commission that Miller and McKenna had shown him the Diaz "confession" and said "this is how it happened." Pistone, who was in the Suffolk jail on larceny charges and is the son of a New York City police officer, testified at the Diaz trial that Diaz had told him in extensive detail about his murder of Negus; however, before the Commission, Pistone recanted this testimony (Private Hearing, Pistone, 3/21/86, pp. 19-31).

Barry Feldman, the trial prosecutor, testified before the Commission that Pistone was one of five jailhouse informants who were anxious to testify about Diaz. Four were rejected, but Pistone was chosen be-

cause he had "built-in inherent credibility" because he did not ask for a deal (Private Hearing, Feldman, 12/3/86, p. 60). Despite the fact that a polygraph was given to one of the four rejected jailhouse informants, which he failed, no polygraph was requested by Feldman for Pistone (Public Hearing, 1987, pp. 523-530).* Furthermore, there were no notes or reports prepared by the police or district attorney regarding the statements of any of the purported jailhouse informants except Pistone, regarding whom a few pages of notes were made by Detective McKenna, allegedly summarizing Pistone's statements about what Diaz told him (Public Hearing, 1987, p. 526).

In another instance of false testimony by the People's witnesses in the Diaz case, Deputy Director of the County Crime Laboratory Ira Dubey, who was later to plead guilty to giving false testimony about his credentials in more than 20 serious felony trials in Suffolk County, testified falsely about his academic credentials (Public Hearing, 1987, pp. 602-610). Diaz prosecutor Barry Feldman, a personal friend of Dubey, had played the key role in failing to properly

---

* A polygraph administered to Pistone on February 17, 1986, by an independent polygraph expert at the request of the Commission indicated that Pistone lied at the Diaz trial and that his testimony before the Commission containing his recantation was truthful (Public Hearing, 1987, Exhibit 6).

-37-

investigate, or to tell the District Attorney, informa-
tion told to Feldman in 1983 by Dubey's supervisor
revealing that Dubey was testifying falsely about his
credentials in criminal cases. Despite his having been
previously provided this information, Feldman allowed
Dubey to again testify falsely about his credentials in
the 1985 Diaz trial. Feldman's explanation for allow-
ing Dubey to so testify was that he presumed Dubey had
obtained the missing academic degree since the 1983
allegations (Public Hearing, 1987, p. 610). (See
Chapter V(A) for a full discussion of the Dubey case.)

The final instance of false testimony in the
Diaz case discussed at the Commission's public hearing
concerned testimony by Detective James McCready regard-
ing his interviews of three railroad workers who placed
Diaz near the scene of the murder close to the day of
its occurrence. In his police report McCready wrote
that the railroad workers recognized Diaz from pictures
in the newspaper (Public Hearing, 1987, Exhibit 17).
In his report McCready made no mention of any mug shots
or identification procedures, and at trial McCready
initially testified that the railroad workers
recognized Diaz from pictures in the newspaper (Public
Hearing, 1987, Exhibit 16). However, after it was
demonstrated by the defense that there had not been any

pictures of Diaz in the newspaper at the time of the McCready interviews, McCready changed his testimony and, contrary to his police report, said he actually had shown mug shots of Diaz to the railroad workers (Public Hearing, 1987, Exhibit 16).

Between the time of McCready's false testimony regarding the newspaper identification and his corrected testimony about the mug shots, Assistant District Attorney Feldman assured Judge Namm that there was no need for any identification hearing because McCready had not shown mug shots to the railroad workers (Public Hearing, 1987, Exhibit 16 at 532-536). After McCready admitted showing the mug shots, Feldman attempted to explain away his prior incorrect assurance to Judge Namm by claiming that the only discussion he had previously had with McCready on this issue consisted of a very brief conversation on the way to the courtroom when McCready answered, in response to a question by Feldman, that there were "no ID problems" in this case. Feldman's affirmative representation to Judge Namm was based on McCready's brief comment, which later proved to be false (Public Hearing, 1987, p. 586). Even apart from false testimony, false representations or perjury, this was the second time in the trial that Feldman was taken by surprise by the

testimony of his own police witnesses: McCready in this instance, and Rafferty in connection with the "wiping the blood off the knife" statement.

After these four instances of false and/or highly suspect testimony, which were widely reported in the newspapers, Judge Namm spoke to Chief of Detectives John Gallagher and Assistant Chief of Detectives Arthur Feldman about misconduct in the case and the possibility of a police Internal Affairs Division investigation; however, none was ever begun. Police Commissioner Treder testified at the Commission's hearing that no police investigation was begun because the Commission was looking into the Diaz case (Public Hearing, 1987, pp. 943-947).

The Commission's investigation of the Diaz case, however, is no substitute for a proper Suffolk County Police Department Internal Affairs Division investigation. First, the Commission has no power to discipline the officers involved. Moreover, the Police Department may have let the 18-month statute of limitations on disciplinary infractions expire (see Patrolmen's Benevolent Association contract, p. 43). Failure to conduct a proper disciplinary investigation in Diaz is inexcusable (see also Chapter VI (C)).

-40-

At the Commission's public hearing, District Attorney Patrick Henry described the cursory extent of his review of the Diaz matter.  Henry testified that after talking to prosecutor Feldman and "possibly" reading part of the trial transcript, he decided there was nothing wrong.  Henry did not recall any problem in the testimony of Ira Dubey (Public Hearing, 1987, pp. 487-491).  In the exchange cited below, District Attorney Henry revealed his blindness to the problems involved in disciplining his employees:

> Q.  Did you really expect the trial prosecutor to say maybe he did something wrong in the trial?
>
> A.  I think that if he had done something wrong, and coupled with my questioning him on the subject, it would have been obvious that he did something wrong.
> (Public Hearing, 1987, p. 490.)

The Commission believes that in the Diaz trial McCready, Dubey and Pistone all knowingly gave false testimony.  In addition, the testimony by Wilutis and Keahon that Rafferty told them that Diaz said that he had never wiped the blood off the knife -- which testimony Judge Namm described as "incredible" -- is indeed highly suspect.  However, the failure of the

Police and District Attorney to maintain proper documentation and to conduct an investigation in a timely fashion deprives any investigator, including the Commission, of adequate evidence upon which to make a definitive judgment on this issue. According to statements to the press by jurors following the trial, this false and doubtful testimony helped free Diaz.

In addition, based upon the jurors' comments, it is apparent that these verdicts also were significantly affected by the failure of police officers to take notes, record key statements by the defendant and document other case developments, which allowed doubts to be raised in the minds of the jurors. Errors such as the failure to find the murder weapon 15 feet from the body of the murder victim helped allow the defense to undermine the credibility of police testimony. Finally, the failure of the police and the prosecutor's office to investigate employee misconduct even after the trial adds to the culpability of both agencies. These and other deficiencies will be discussed in Section D of this Chapter under "Management Failures in Homicide Cases."

### B.   People v. Corso

The other homicide trial occasioning Judge Namm's allegations of police misconduct was People v.

Corso, Indictment No. 562-84, tried in May 1985, in which Peter Corso was accused of carrying out the 1979 gangland-style execution of a prominent Suffolk County attorney, Archimedes Cervera, in Cervera's law office. Suffolk Police Detective Edward Halverson was original-ly the lead detective on the case, but was replaced in 1982 by Detective Dennis Rafferty after Halverson retired.

After the Corso trial, jurors were quoted as saying that Corso was acquitted partly due to the lack of credibility of the prosecution's lead witness, Michael Orlando, and partly due to the careless and unprofessional investigative methods employed by the Suffolk Police Homicide Division (Public Hearing, 1987, Exhibit 29).*  The careless methods of the police included failures to make proper notes and reports dur-ing the investigation, to preserve important evidence and to take routine steps in corroborating and support-ing the conclusions of their investigation.

In regard to deficient note-taking, Detective Rafferty testified at the Commission's hearing that no

---

* There was a superficial Internal Affairs Division investigation in the Corso case which concluded that some lower-ranking officers had not followed proper procedures.

-43-

police reports were submitted by the Suffolk police officers assigned to the case for inclusion in the case file for a period of six months, from June to December 1979, following the murder, despite a substantial amount of active investigative work. Although the Suffolk Police were awaiting information from the FBI regarding informant Orlando, who had information in this case, neither communications with the FBI nor the results of numerous interviews with key witnesses were recorded (Public Hearing, 1987, pp. 677-698).

In addition, although the Commanding Officer of the Homicide Division described Detective Halverson to the Commission as an "extraordinary" detective and "excellent" (Private Hearing, Dunn, 1/5/87, p. 94), Halverson's partner stated that Halverson "didn't write things down" and that he "wrote very little" (Private Hearing, Rafferty, 1/6/87, p. 93). Such a favorable judgment by Homicide's Commanding Officer of a detective who did not take notes is indicative of unprofessional standards of police supervision. Homicide investigations, like other police work, require meticulous note-taking and documentation (Public Hearing, 1987, pp. 635-653).

In fact, the Corso matter is a casebook example of why proper documentation is necessary:

personnel retire or are reassigned (Halverson himself retired in 1982) and others must continue the investigation; memories fade (the murder took place in 1979 and the prosecution in 1985); and three different assistant district attorneys were assigned to the case at various times who had to then learn the case from an incomplete case file (Private Hearing, Jablonski, 1/16/87, pp. 13-16). Without a complete and well-documented file, detectives, their supervisors and prosecutors could not adequately investigate, manage and prosecute any case.

A second investigative failure which damaged prosecution of the Corso case was police treatment of evidence, including a Sanyo answering machine and an IBM dictaphone machine, both of which belonged to Cervera and were in his office at the time he was killed. Despite the fact that his answering machine tape contained several phone calls concerning Cervera's appointments on the day of the murder, including calls from known organized crime figures, no transcript was ever made of the calls (Public Hearing, 1987, p. 703). In addition, no transcript was made of any of the recorded portions of the IBM dictaphone belts, despite the fact that Cervera was found with a demagnetizer (eraser) in his hand at the time of his death.

Incredibly, Homicide detectives never even listened to
the belts themselves, but rather had Cervera's sec-
retary listen, so that she could tell detectives if
there were any valuable material on them (Public Hear-
ing, 1987, pp. 704-705).

However, this was only the beginning of the
cavalier treatment of these tapes and machines which
hurt the credibility of the prosecution's case. Be-
tween the time of the murder and the trial, the
machines, the belts and tapes -- which were being held
as evidence in the Police Property Section -- were auc-
tioned off to highest bidders at a police auction.
During the trial itself those tapes and belts were
retrieved from the buyers, but by then the tapes had
been erased and reused (Private Hearing, Jablonski,
1/16/87, pp. 35-43).

The third area of failure by Suffolk law
enforcement in the Corso case was neglect in carrying
out and documenting standard investigative steps which
should have been taken in the case. For example, after
Orlando identified two associates who allegedly accom-
panied Corso on his way to and from the murder, efforts
should have been made to confirm this information and
to locate both men. The District Attorney should have
directed police investigators to determine whether the

-46-

two associates were alive, incarcerated, under indict-
ment or if there was any way to obtain their cooper-
ation or to build a case against them (Public Hearing,
1987, p. 776). No such steps were taken.

Additionally, once the Orlando information
was received, many standard investigative steps, such
as obtaining fingerprint comparisons, securing photos
and showing them to witnesses, requesting telephone
call records and examining organized crime information
from other jurisdictions, either were not pursued fully
or were not pursued at all (Public Hearing, 1987,
pp. 784-785).

Even after Corso's acquittal for murder, ju-
dicial action in regard to Corso and the Cervera murder
was not finished. In December 1987, the Appellate
Division, Second Department, issued an opinion in a
narcotics case against Corso which had arisen at the
time he was arrested for murder, but had been severed
from the murder charge (People v. Corso, 135 A.D.2d
551, 521 N.Y.S.2d 773). While the Court determined
that the Suffolk Police had probable cause to arrest
Corso, this decision contained a brief discussion
of some of the failures in the Cervera murder
investigation.

Finally, what can only be characterized as a most bizarre judicial proceeding occurred on March 22, 1988, in the case of People v. Corso, Indictment No. 1061-87, concerning a new and unrelated narcotics charge against Corso. On that day, a guilty plea was taken from Corso in a proceeding before Justice George F. X. McInerney on a narcotics charge. At that proceeding Corso stood mute after he was asked by the prosecutor, Raymond Perini, Chief of the Suffolk County District Attorney's Office Narcotics Bureau, whether he had murdered Cervera, with Perini stating on the record that Corso had described in detail how he was paid $15,000 to murder Cervera (Corso Hearing, 3/22/88, p. 20).

In exchange for this "admission," which, even if Corso had assented, was legally useless in prosecuting Corso for murder due to his prior acquittal, the court approved Perini's "package" of recommendations, including that Corso's brother, son and ex-wife be given probationary sentences for their roles in Corso's drug ring, and that Corso, then 66 years old, be sentenced to 12-years-to-life (Corso Hearing, 3/22/88, p. 21). The net result of this "bargain" was that in order to engineer what the District Attorney no doubt believed would somehow "vindicate" the Corso

-48-

prosecutors, Perini and the District Attorney gave away far too much, and again allowed the guilty to escape imprisonment.

What this flawed plea bargain further indicated was that the District Attorney still did not understand the nature of the criticism of Corso's homicide prosecution by the Commission and from other sources. The point of this criticism was not that Corso was an innocent man, improperly prosecuted by the District Attorney's Office -- rather, the point was that the habitually defective procedures of the Suffolk Police Department and District Attorney with regard to such things as proper note-taking, evidence handling, and the need for thoroughly professional investigative and prosecutorial methods invited Corso's acquittal of Cervera's murder.

### C.   The Pius Cases

Early in the Commission's investigation, a preliminary review was made of another Suffolk County homicide case which came to the Commission's attention. This was a case involving four homicide convictions in which the victim was John Pius. However, the Commission decided to await the results of the various legal appeals in the Pius cases which were pending and which

-49--

have subsequently been decided. Those appeals have overturned convictions of three of the four defendants in the Pius cases, and the opinions in the reversals highlight some of the systemic problems in Suffolk homicide prosecutions.

For example, in People v. Brensic, 70 N.Y.2d 9, 517 N.Y.S.2d 120 (1987), the Court of Appeals, in reversing Brensic's conviction, criticized the interrogation of a juvenile co-defendant:

> . . . [E]vidence before the court not only failed to establish the reliability of Peter's [Brensic's co-defendant, Peter Quartararo] confession, it suggested quite the contrary, that he had a strong motive to fabricate when he confessed to his mother. Accordingly, the confession was unreliable as a matter of law and should not have been received in evidence.
>
> First, the confession was the product of the custodial questioning of a 15-year-old boy for six and a half hours, without his parents' knowledge, by two police detectives. In the course of this interrogation, Peter gave numerous versions of the events that led to John Pius' death.
>
>                    *       *       *
>
> Given this substantial evidence that the confession was but one of several, each containing material differences, that it was obtained from a juvenile after lengthy custodial questioning and that it was

> given under circumstances which
> suggest that it was induced by the
> hope of leniency, the confession
> should not have been placed before
> this jury, as evidence of defen-
> dant's guilt (pp. 21, 23).*

As in the post-acquittal attempt by the Suf-
folk County District Attorney to "vindicate" police and
prosecutorial methods by having Peter Corso stand mute
in court in response to a murder accusation, the Suf-
folk District Attorney followed a similarly inappropri-
ate strategy in the retrial of Robert Brensic.  On May
18, 1988, Brensic, after having served five years in
state prison on his 25-years-to-life murder sentence,
pleaded guilty to a reduced charge of second-degree
manslaughter, accepting a 4-to-12 year sentence for
which he expected to serve little or no additional
prison time.

However, it was the conditions of Brensic's
plea which indicated the length to which Mr. Henry
would go to "vindicate" the prosecution in the Pius
matter and to try to overcome the charges of police and
prosecutorial improprieties which accompanied those
reversals.

---

* See also People v. Ryan, 134 A.D.2d 300, 520
N.Y.S.2d 528 (2nd Dept. 1987).

The highly favorable conditions of Brensic's plea included an agreement that Brensic would not have to testify against any of his co-defendants; a promise not to object to Brensic's parole; permission for Brensic to be released on his own recognizance and leave the State pending his new sentence; and an agreement by Brensic, the Pius family and the Suffolk County Police and District Attorney and its current and former personnel to drop, or refrain from filing, civil suits in connection with Brensic's involvement with the case.

The Suffolk assistant district attorney handling the case, Timothy Mazzei, made clear the motivation of Mr. Henry's Office in agreeing to Brensic's plea bargain in an interview which appeared in <u>Newsday</u> on May 19, 1988.  Thus, Mazzei stated that the Office wanted a guilty plea

> because of all the horrible allegations made against us.. . . We never had the wrong guys. This was one way to prove to everyone we had the right people.

However, Mazzei's use of this plea as a defense to Suffolk police misconduct and prosecutorial overreaching was totally misguided and improper.  Again the District Attorney was seeking a public relations

coup, rather than appropriate punishment or justice. The essence of the judicial criticism and other public criticism in regard to the Pius cases was not whether the Suffolk authorities "had the right people." The central criticisms concern obtaining and using an unreliable confession, and engaging in faulty and improper police and prosecutorial action, the same criticisms that have been directed at Suffolk by the New York Court of Appeals and others since at least 1976. District Attorney Henry, even at this very late date, still demonstrates his unwillingness to recognize the need for reform in his Office, and instead, seeks some sort of "vindication" in the press.

### D. Management Failures in Homicide Cases

The Homicide Division of the Suffolk County Police Department, during the period which was the sub-ject of the Commission's investigation, was commanded by a detective lieutenant and was composed of three detective sergeants and 20 experienced detectives divided into three teams, each led by one of the detec-tive sergeants. There were about 40 homicides per year in Suffolk County, but the Homicide Division had additional duties with respect to vehicular and other deaths (Private Hearing, Dunn, 1/5/87, p. 19).

-53-

In both the Police Department and District Attorney's Office, homicide investigators and prosecutors have been considered members of elite units because of the seriousness of the crime and since homicides tend to be high profile cases. Suffolk Homicide Division detectives have been described as the best detectives in the Department (Private Hearing, McGuire, 1/5/87, p. 11), and their behavior may well be considered an indicator of the level of professionalism for all detectives in the Department.

Prior to the Commission's public hearing in January 1987, which considered criticisms of homicide investigations and prosecutions, there was no separate Homicide Bureau in the Suffolk District Attorney's Office. Homicides were handled by the Major Offense Bureau, a unit of six or seven experienced prosecutors who handled other serious felonies as well. In a reshuffling of personnel after the first Commission hearing, Mr. Henry appointed Edward Jablonski, the prosecutor in the Corso case, as the head of the new Homicide Bureau, and a new policy was established whereby assistant district attorneys would report to homicide scenes and become involved as early as possible in the investigation of homicides. While the Commission does not disagree with these changes, they

-54-

were but a weak and superficial response to the per-
vasive problems existing in Suffolk County with respect
to homicide investigations and prosecutions.   Some of
those problems and their causes are illustrated in the
following sections.

### 1.   Overreliance on Confessions

From December 7 to 11, 1986, <u>Newsday</u> publish-
ed a lengthy five-part series on deficiencies and mis-
conduct in Suffolk homicide investigations and prosecu-
tions.   The series included a statement that 94 percent
of Suffolk homicide prosecutions involved confessions
or oral admissions.   This figure was confirmed to the
Commission by the former Commanding Officer of the
Suffolk Police Homicide Division, Detective Lieutenant
Robert Dunn, in a private hearing on January 5, 1987
(p. 95).

This is an astonishingly high figure compared
to other jurisdictions, so high, in fact, that in and
of itself it provokes skepticism regarding Suffolk
County's use of confessions and oral admissions.*

---

*   For example, in <u>Newsday's</u> study which compared 361
    Suffolk homicide defendants from 1975 to 1985 to 700
    cases from six other large suburban counties,
    Suffolk's 94% confession rate far exceeded the 54%
    to 73% rate in the six other jurisdictions (<u>Newsday</u>,
    12/7/86, p. 27).

Moreover, the result of Suffolk's unique incidence of confessions has been for officers to rely on confessions and neglect both routine investigative steps and proper scientific and technical evidentiary practices.  The prevailing attitude has been that note-taking, forensic evidence, neighborhood canvasses and crime-scene searches are not important because ultimately a defendant will confess.  Confessions are of course important, but usually insufficient, and they should not become the nearly exclusive method of developing homicide cases.  With Suffolk's methods, the chances of the guilty going free are simply too high.

## 2.   Lack of Reports and Documents

The failure of the Suffolk Police Homicide Division to maintain adequate notes and reports, and the tolerance of Mr. Henry's office for this neglect, shocked the Commission.  In the Suffolk County Police Department, officers above the rank of patrolman, and all detectives, have not been required to take notes or keep memo books.*  Indeed, the sole judgment as to what

---

* In the New York City Police Department, the keeping of memo books is required for detectives as well as police officers, and the blank memo books have numbers which are recorded in department records each time a detective or police officer is issued a new book.

was to be recorded in written form in an investigation
rested with each detective. Thus, Sergeant Kenneth
McGuire, the supervisor in the _Diaz_ and _Corso_ cases,
testified:

> Q. What was the requirement of the
> people in your team as to taking
> notes?
>
> A. Well, the men would take the
> notes as they pretty much saw fit
> while they were conducting inter-
> views and stuff.
>
> Q. So the answer is, there was no
> requirement?
>
> A. There was no specific require-
> ment.
> (Public Hearing, 1987, p. 333.)

Asked how a detective could judge in advance
what information might be important later in the
investigation, and thus should be recorded, Lieutenant
Dunn testified that he was confident detectives could
make that determination:

> Q. How does one make that deter-
> mination early in an investigation,
> of whether information will be per-
> tinent down the road?
>
> A. It must be dependent on the
> intuition and the intuitiveness of
> the detectives.
> (Public Hearing, 1987, p. 732.)

Related to this practice of not keeping notes or making adequate reports, Suffolk Police personnel do not prepare what they define as "negative reports." Negative reports in Suffolk are those which establish that investigatory leads on suspects, witnesses or evidence are not correct, relevant or important in the ultimate solution of a case. Suffolk does not prepare such reports so as not to "clutter up the case" with material that a "defense counsel could utilize" which were "not specifically important to the immediate investigation" (Private Hearing, Dunn, 1/5/87, p. 75). However, in the real world no detective has sufficient "intuition" to predict what information, positive or negative, will be of value as an investigation unfolds. It may be only in retrospect that two properly docu-mented pieces of information fit together, regardless of how irrelevant they may have initially seemed, and help advance the investigation. If the information is not documented in a report, it is, for practical pur-poses, lost to the investigation.

After a case is closed, homicide reports and files are not sent for storage at Central Records. This is an open and well-known violation of Suffolk Police Department rules, and is supposedly done for reasons of space and "security" (Dunn, pp. 80-83).

In addition, there is also no sequential numbering of each item within a file and no regular indexing or division of the file according to subject or type of evidence (Dunn, pp. 86-89). Thus, even if a document has been entered in the file, it could later be lost or removed undetected (Dunn, p. 102).

Finally, one crucial stage of an investigation during which Suffolk police personnel produce no written reports is when a case is referred to the District Attorney's Office for prosecution, but while the police detectives who are assigned to the case are still working on the case in cooperation with an assistant district attorney. When investigative steps are taken after referral to the District Attorney, as a matter of express policy, no additional written case reporting need be done by the detectives to their police supervisors (Dunn, pp. 106-109). As a direct result of this deliberate policy, key reports concerning sensitive events which should have been produced were not. For example, in both the Corso and Diaz cases, many key events were not documented following the referral by the police to the District Attorney, in addition to inadequate documentation prior to referral. Thus, not only did police supervisors fail to require necessary documentation, but prosecutors supervising

investigations and prosecutions also failed to secure proper paperwork.

The failure of the Suffolk Police Department to produce required documentation during investigations was admitted in a memo, dated May 7, 1985, from then Commanding Officer of the Homicide Division, Detective Lieutenant Robert Dunn, to personnel in that Division:

> Departmental and Homicide Squad procedures concerning the document-ing of investigative activities in the form of Supplementary reports has been, in many instances, ig-nored in recent years. While aware of the availability of Police re-ports via Subpoena and the Freedom of Information Act, our responsi-bilities to record basic findings (neighborhoods, interviews, etc.) for future reference and investiga-tive cohesiveness have not been suspended.

However, the following quote bluntly recom-mends keeping reports to less than a minimum in order to thwart defense counsel and gives a disturbing pic-ture of the cast of mind of one Suffolk homicide super-visor. While the supervisor supports the practice of not keeping complete notes in order to bring about "successful prosecutions," in fact, this practice help-ed allow Diaz and Corso to go free.  In a memo from

Detective Sergeant Robert Misegades, then a team super-
visor in the Homicide Division, to Detective Inspector
Albert Holdorff, then Commanding Officer of the Major
Crimes Bureau, dated March 16, 1983, Misegades wrote:

> To the chagrin of the defense coun-
> sel, homicide reports, historical-
> ly, only reflect pertinent data as
> it applies to the successful prose-
> cution of our cases. If our learn-
> ed investigators from the Inspec-
> tional Services Bureau are instru-
> mental in generating new policy so
> be it, but the successful prosecu-
> tion of homicide cases may cease as
> we now enjoy it. Suffice it to say
> that reports need not establish or
> prove our integrity. If reports
> support an investigation without
> losing sight of a successful
> prosecution then they are neces-
> sary. They need not be necessary
> if they will open up areas for
> scrutiny or loopholes in our cases.

Thus, the absence of proper documentation in Suffolk
homicide cases was actually much worse than mere incom-
petence or oversight -- it was part of a conscious
policy, in which the District Attorney's Office acqui-
esced, ignoring inadequate and incomplete files, due to
a blind desire to secure convictions.

Finally, even District Attorney Henry was
eventually forced to admit the failure of proper note-
taking in homicide investigations. At a hearing

-61-

of the Public Safety Committee of the Suffolk Legislature on August 14, 1987, Mr. Henry testified:

> Q. Let's move on to something else. There's been a great deal of criticism recently of Homicide detectives not taking proper notes during the course of their investigations. You're aware of that, I'm sure?
>
> A. Yes, I am.
>
> Q. We have taken testimony from other expert witnesses including your own chief investigator, George Holmes, on the importance of note taking. Have you taken a public position on the criticism of the Homicide Squad on this issue?
>
> A. I think I probably have. If I haven't, I will now, and that is that there should be more notes (pp. 127-128).

### 3. Inadequate Case Supervision

In addition to permitting inadequate investigative notes and reports, Suffolk Police supervisors also followed haphazard procedures with regard to case status reports and case management. There were no regularly scheduled case meetings on homicides, even on high profile or difficult cases (Dunn, pp. 14-16). Thus, officers working on an investigation were not only deprived of a fully documented case file, but also lacked the benefit of a regular review of the progress

-62-

of each investigation. Commanding officers claimed
familiarity with only a small part of the caseload they
ostensibly supervised (Dunn, pp. 20-22). Furthermore,
higher-ranking personnel received statistics, but lit-
tle else except an occasional oral briefing, since
there were no written case status reports produced by
anyone (Dunn, pp. 23-24). In addition, the assignment
of personnel and investigative efforts was not deter-
mined in an active manner, nor were cases given higher
or lower priority in any rational way, but rather cases
merely "peter[ed] out" (Dunn, p. 24).

Thus, priorities were not set, supervision
was not exercised, methods were not scrutinized -- as
long as there were results -- which in Suffolk only
meant "successful prosecutions." Such a weak super-
visory system was ripe for the abuses discovered by the
Commission.

### 4. Crime Scene Responsibility and Improper Handling of Evidence

The lack of a clear-cut understanding of
responsibility for crime scenes was brought out at the
Commission's public hearing. Thus, Robert Genna, the
supervisor in the Crime Laboratory of the Medical Exam-
iner's Office who had responded to the murder scene in
the Diaz case, testified that the Homicide Division of

-63-

the Suffolk Police Department was in charge (Public
Hearing, 1987, p. 131). On the other hand, the former
Commanding Officer of the Homicide Division, Robert
Dunn, testified that the Medical Examiner's Office had
primary responsibility for crime scenes:

> If you are asking me who is in
> charge of the crime scene, the
> County Charter reveals that the
> Medical Examiner's Office is in
> charge of the crime scene, and we
> are subordinate to them. That's a
> matter of County Law (p. 753).

Clearly, they both cannot be correct. How-
ever, the Charter does, in fact, put the Medical Exami-
ner's Office in charge. Whether that responsibility is
properly placed or not is really less important than
ensuring that everyone understands who in fact is in
charge. When a supervisor in the Medical Examiner's
Office does not know that he is in charge, he cannot
take appropriate steps to ensure that evidence is prop-
erly obtained and analyzed.

The careless disregard for physical evidence
in homicide cases by the Suffolk Police was demon-
strated not only by the failure to find the murder
weapon in _Diaz_ and the treatment of the recording
machines and tapes in _Corso_, but also by the treatment
of a bullet in the homicide case of _People v. Hamilton_,

Indictment No. 843-82 (Public Hearing, 1987, pp. 229-246, 715-720). Since the members of the Homicide Division had habitually relied so heavily on confessions, they had far too little concern for physical evidence and diligent, but routine, police work.

In the Hamilton case, only after a confession was ruled inadmissible was a .22 caliber bullet, which had allegedly been found by Detective Rafferty in the pocket of a defendant when he was arrested, produced as evidence. As it turned out, this bullet had the same ejection marks as that produced by the murder weapon, a .22 caliber pistol. Rafferty testified at a pre-trial hearing that he had failed to send this bullet for ballistics tests when it was found on the defendant; instead he had put it, without any label, into the file folder, which the Commanding Officer of the Homicide Division testified at the Commission's hearing constituted a violation of Department Rules and Procedures (Public Hearing, 1987, pp. 755-759). Later, after the confession in the case was ruled inadmissible, the bullet was sent to ballistics and found to match the murder weapon. There were no notes or written references concerning the bullet anywhere prior to the confession being ruled inadmissible.

Rafferty explained away his failure to send the bullet for tests with two equally damning explanations. First, he claimed never to have had any training in ballistics (Public Hearing, 1987, p. 718) -- astounding for a detective who served 17 years in the Homicide Division. Second, he explained, "every black guy in Amityville has a .22," so he did not think the .22 caliber bullet was important (Rafferty, Private Hearing, p. 129), which just as surely demonstrated how lacking in judgment was this veteran homicide detective.

While Rafferty's convenient talent for producing crucial testimony and evidence at the 11th hour in homicide prosecutions disturbs the Commission, there is a sure remedy to these types of problems in future homicide prosecutions. If proper documentation of events is made close in time to their occurrence, later doubts about the veracity of police reports will be minimized. This is professional police practice and should be demanded of the police by Suffolk prosecutors.*

_____

* Not long after the Commission's hearing, Rafferty was transferred from the Homicide Division to the Robbery Squad, after a 17-year career in Homicide. While Hamilton's conviction for murder and robbery was affirmed (People v. Hamilton, 117 A.D.2d 819, 499 N.Y.S.2d 139 (2nd Dept. 1986)), a disciplinary charge against Rafferty for mishandling the bullet in the Hamilton case was sustained in a Suffolk Police Internal Affairs Division investigation.

5.  **Inadequate Training**

Testimony before the Commission indicated a remarkable lack of training for Suffolk Homicide detectives in regard to even routine investigative techniques. For example, in regard to ballistics and firearms, Detective Rafferty was asked:

> Q. Have you ever had firearms training yourself? Not in shooting them, but impressions left, gunpowder or that sort of thing?
>
> A. No.   Maybe a forty-minute course in some school I went to.
> (Private Hearing, Rafferty, 1/6/87, p. 132.)

and also:

> A.  . . . I'm not really on top of guns and that's probably what's got me messed up on that [Hamilton case].
> (Private Hearing, Rafferty, 1/6/87, p. 130.)

Detective Rafferty, one of the most experienced members of the Homicide Division, further testified:

> Q. Doesn't that case [Hamilton] prove if you had training you would have known enough to send it in and gotten the results?

A. Yes.
(Public Hearing, 1987, pp. 718-719.)

Furthermore, Rafferty's supervisor, Detective Sergeant McGuire, replied with an equally disturbing answer with respect to his own knowledge of blood-related evidence. In response to a series of questions about what the forensic laboratory can tell regarding a stain, McGuire testified:

Q. After they have done that, what can they tell you about the stain?

A. I guess they can tell you if it's blood.

Q. Anything else?

A. Maybe, if it's food.

Q. If it is blood, what else can they tell you about it?

A. I have no idea, sir. I guess they can break it down further, depending maybe on the freshness or whatever.
(Private Hearing, McGuire, 1/5/87, pp. 65-66.)

The blind spot this indicates for this Detective Sergeant, who was a homicide team supervisor for 11 years, is remarkable. McGuire omits even simple items, for example, blood-type, let alone the more

=68=

specialized information that can be gained from the forensic analysis of blood. While the standard to be expected of a detective is not that of a ballistics or forensics expert, nevertheless, police personnel must be aware of what information and analysis the laboratory is capable of providing and what should be observed and obtained at crime scenes and elsewhere for analysis by the crime laboratory.

All of the other failures catalogued in this Report, such as inadequate note-taking and lack of careful supervision, also are indicative in one way or another of the need for increased training.*

---

\* The Commission is heartened by Commissioner Guido's recent public comments that improved training is one of the cornerstones to his planned reforms of the Suffolk Police Department. In an August 1, 1988, interview in Newsday, Commissioner Guido was quoted as saying, "I see training as the key ingredient in effectuating organizational change."

## II. MISCONDUCT AND DEFICIENCIES IN NARCOTICS INVESTIGATIONS AND PROSECUTIONS

### A. Disorder in the Narcotics Division

Before the beginning of the Commission's investigation in November 1985, and in its early stages, narcotics investigations and prosecutions in Suffolk County were described as experiencing a "breakdown in supervision." Around this time, narcotics investigations of a number of Suffolk police officers had reached public attention. These included investigations of uniformed officers Rebecca Bernard, Brian Merlob and Jose Ingles, as well as undercover Narcotics Division officers James Kuhn and Raymond Gutowski.

By March 1986, most of these allegations had become public, and had resulted in extensive and extremely unfavorable publicity for the Police Department and the District Attorney's Office. In addition to the Commission's investigation, which preceded all the other investigations, the Suffolk Police were under the scrutiny of the United States Attorney for the Eastern District of New York, a management team from Long Island University appointed by County Executive Peter Cohalan, and the Public Safety Committee of the Suffolk County Legislature.

Coupled with the intense scrutiny occasioned by these investigations and resulting publicity, at about this time the Police Narcotics Division underwent a rapid change of commanding officers. The long-time commanding officer, Detective Lieutenant Richard Siee, who had served from July 1978, to February 1985, was transferred -- and was given two subsequent promotions before his retirement, despite the fact that most of the allegations of misconduct being examined had occurred during his tenure. He was followed in rapid succession as Commanding Officer of the Narcotics Division by Detective Lieutenant Walton Brennan,* who served less than one year, from February 1985, to January 1986, and then by Detective Lieutenant Walter Cunningham, who served only from January 1986, to May 1986. Cunningham was succeeded by Detective Lieutenant Richard Franzese, who still serves in that position. Thus, within 15 months four different commanding officers had been assigned to supervise the Narcotics Division.

The effect of the crimes and misconduct of the police employees, the resulting public scrutiny and

---

* Prior to becoming Commanding Officer of the Narcotics Division, Brennan had no experience in narcotics investigations.

bad publicity, coupled with the rapid changes in man-
agement, led Lieutenant Franzese to testify that
"supervision definitely was a problem" in the Narcotics
Division when he arrived (Private Hearing, 11/23/87,
p. 75). More vividly, Detective Lieutenant Robert
Sievers, who was a sergeant in the Narcotics Division
during this period, testified: "The place was a zoo"
(Private Hearing, 11/30/87, p. 35).

While significant narcotics-related miscon-
duct investigated by the Commission will be discussed
in subsequent sections of this Report, the key events
regarding Rebecca Bernard, Brian Merlob and Jose Ingles
which pre-dated the Commission's investigation, will be
briefly outlined here so that subsequent events can be
understood in their proper context.

In 1984, Suffolk County Police Officer
Rebecca Bernard was acquitted of criminal charges of
selling cocaine. However, in a disciplinary hearing in
April 1986, it was determined that Bernard had violated
Departmental rules based on her narcotics-related
activity, and she was subsequently fired. Part of her
defense was that she was conducting an unauthorized
undercover narcotics investigation in the Brentwood
area and that she had informed Suffolk Police super-
visors about a bar that was a center of narcotics

-72-

activity and about a Suffolk police officer suspected of narcotics activity, Jose Ingles, as early as May 1982. It has been confirmed by the Suffolk Police that she had supplied this information about the bar and Ingles to them in May 1982.

However, an investigation of Ingles for drug-related charges did not begin until 1984. The investigation developed evidence that Ingles and Suffolk Police Officer Brian Merlob both used cocaine and assisted drug dealers by using their positions as police officers to investigate for the dealers potential drug buyers and by acting as bodyguards for drug dealers. The officers were indicted on numerous criminal counts, but were allowed to plead guilty to a single count, Attempted Criminal Facilitation, Second Degree (Penal Law §115.05), a class D felony, on August 30, 1985. As part of their plea agreements, both officers agreed to resign from the Department.

The charges against these three officers rocked the Department and helped set in motion a series of events which led to an investigation by the Commission of other instances of misconduct in the Narcotics Division. Of particular concern to the Commission was the apparent failure of the Suffolk Police to pursue the allegations by Bernard regarding Ingles and others

-73-

aggressively until the allegations came to public attention through Bernard's own case, rather than when they were first made by her in 1982.

### B.    Kuhn and Gutowski

In September 1985, Sergeant Joseph Comiskey, the supervisor of an undercover narcotics street team, reported to his superiors that a team consisting of two of his undercover narcotics officers was using cocaine heavily. These two officers, James Kuhn and Raymond Gutowski, were among Comiskey's most productive under-cover officers, having made 86 undercover narcotics cases in their first year in the squad, during which they had become known as Comiskey's "A Team." While the information Comiskey gave to his superiors would be considered sensitive in any police department, this revelation was particularly explosive due to the unfa-vorable narcotics-related publicity the Department had already suffered concerning Bernard, Merlob and Ingles. Furthermore, the Department and District Attorney's Office had just received additional unfavorable public-ity regarding the Corso and Diaz homicide cases, while the election for district attorney, in which Mr. Henry was seeking a third term, was only a few weeks away.

-74-

According to Suffolk County Police documents, the allegations made by Sergeant Comiskey of cocaine abuse by Kuhn and Gutowski were known to Chief of Detectives John Gallagher, Inspectional Services Bureau Commanding Officer Donald Jeffers and the Commanding Officer of the Internal Affairs Division, Captain Thomas Murphy, as early as October 3, 1985.* Assistant District Attorney Raymond Perini was briefed by police officials on cocaine abuse by Kuhn and Gutowski on October 9, 1985. However, an Internal Affairs Division case number was not assigned -- and the case was not given to an investigator for full investigation -- until November 6, 1985, the day after Mr. Henry's re-election as District Attorney.**

Furthermore, and again despite the fact that illegal drug use by Kuhn and Gutowski was known to Suffolk Police authorities in September 1985, the two

---

* According to FBI documents, Kuhn and Gutowski's Commanding Officer, Lieutenant Walton Brennan, also knew of the drug abuse allegations on September 23, 1985.

** James Kuhn has testified before the Commission that Sergeant Robert Doyle, then assigned to the Internal Affairs Division, told him that no investigation of Kuhn was being started until after Election Day out of fear that the entire matter would become public knowledge and help Henry's opponent (Private Hearing, 12/23/87, pp. 92-93).

were reassigned from the Narcotics Division to police precincts and permitted to continue serving as police officers. Moreover, despite at least eight interviews of Kuhn by Internal Affairs Division personnel, Internal Affairs documents reveal no investigation of the questions raised by Kuhn as early as December 16, 1985, about the Timothy Gallagher case, nor any attempt to probe beyond Kuhn's cocaine abuse. (See Section C this Chapter.)

However, on February 21, 1986, based on information developed after debriefing Bernard, a Commission investigator contacted Kuhn and Gutowski. The Commission investigator asked Kuhn about three areas: irregularities in the handling of a drug case involving Timothy Gallagher, the son of Suffolk Police Chief of Detectives John Gallagher;* drug activity involving members of the Suffolk County Police Department Narcotics Division; and illegal wiretapping by members of the Suffolk County Police Department.

On that same evening, following his conversation with the Commission investigator, Kuhn, fearing that his partner Gutowski was cooperating with the

---

* Kuhn was the undercover officer who initially bought cocaine from Timothy Gallagher.

Commission, confessed to a Suffolk Police Internal Affairs Division investigator regarding the three areas of misconduct about which the Commission had asked. However, with respect to illegal wiretapping, while implicating himself and the entire Interdiction Unit of the Narcotics Division of the Suffolk Police Department, Kuhn told Internal Affairs Division investigator James Maher, "I don't care if I have to do two or three years in jail, I'm not rolling over on anybody in my old team" (Private Hearing, Maher, 12/18/87, p. 62). The information that Kuhn gave to the Internal Affairs Division that evening in February 1986, regarding routine illegal wiretapping in the Interdiction Unit was substantially the same information to which he testified at a Commission public hearing in January 1988. (See Chapter III(A).)

Shortly after February 21, 1986, when Kuhn refused further cooperation with the Internal Affairs Division or the District Attorney's Office and enrolled in a drug treatment program, the Suffolk District Attorney referred the three topics of Commission inquiry to the United States Attorney for the Eastern District of New York (Public Hearing, 1988, pp. 668-669).

In early 1987, Kuhn and Gutowski were tried and acquitted in federal court of charges of distributing narcotics (United States v. Kuhn and Gutowski, CR 87-00698, E.D.N.Y., Judge Wexler). Following their acquittal, departmental disciplinary charges were reinstituted against them. Added to the departmental charges against Kuhn was a new charge that he had engaged in illegal wiretapping through conversion of a pen register while a member of the Interdiction Unit of the Narcotics Division.

One audio tape which was taken from Kuhn as evidence by the Internal Affairs Division on the evening of February 21, 1986, was subsequently demonstrated by the Suffolk Police to be an illegal recording of telephone conversations of the subject of a Narcotics Division investigation. (Decision in Suffolk County Police Department Disciplinary Proceedings against James Kuhn, Charge #8, Specification #1, 1/20/88.)

Gutowski, rather than standing trial on the departmental charges, agreed to resign. In return the Department agreed to provide a letter stating that his drug abuse arose in the course of his police work and also agreed not to contest his application for a three-quarter disability pension, which the New York State

-78-

and Local Police and Fire Retirement System subsequent-
ly granted.

Kuhn, however, persisted through a lengthy
disciplinary hearing in the summer of 1987 before
former Supreme Court Justice Joseph Corso, following
which virtually all of the disciplinary charges,
including the wiretapping charge, were sustained, and
he was fired in early 1988. After he was fired, Kuhn,
like Gutowski, was awarded a three-quarter disability
pension by the New York State and Local Police and Fire
Retirement System, based on an application which he had
made while his disciplinary charges were pending.

Kuhn and Gutowski's work as undercover
narcotics officers in 1985 produced 86 criminal convic-
tions, 84 of which were the results of plea bargains.
The convictions in the two trials which included testi-
mony by Kuhn and Gutowski were subsequently vacated due
in part to the fact that Kuhn and Gutowski had perjured
themselves when they testified they did not use
narcotics.*

In early 1987, Kuhn's charges regarding the
favored treatment accorded to Chief of Detectives

---

* <u>People v. Diane Roth</u>, Indictment No. 900-85, Supreme
Court, Suffolk County, Justice McInerney; and <u>People
v. Wayne Johnson</u>, Supreme Court, Suffolk County,
Justice Rohl.

Gallagher's son were referred by the United States Attorney for the Eastern District for State prosecution (see Chapters II(C) and VII); the wiretapping allegations were investigated by the Commission, with the initial results presented at a public hearing in January 1988 (see Chapter III).

The Commission believes that the case of Kuhn and Gutowski reveals at least two important failures with respect to narcotics matters. First, supervision in the investigation and prosecution of narcotics cases was lax. Two new and untrained undercover officers, who became heavy narcotics users themselves, made 86 cases in a seven month period during which their cases were replete with careless paperwork, missing police reports and improper handling of narcotics evidence. For example, between January 1, 1985, and September 18, 1985, Kuhn initiated some 71 Central Complaint Numbers for confidential investigations for which he never submitted the required Field Report (PDSC-1053). Furthermore, on a number of occasions Kuhn was issued cash from the Narcotics Special Cash Fund to make undercover purchases of narcotics, and while Kuhn reported expenditures for narcotics purchases in these instances, the narcotics in question were never submitted to the Criminalistics Laboratory as evidence (Decision in Kuhn

Disciplinary case, 1/20/88, especially charges #1 and
#3).

Second, there was a gross failure to detect,
investigate and punish police misconduct in narcotics
matters. Indeed, the Commission, after only a rela-
tively short investigation, was able to unearth crimi-
nal allegations regarding the Gallagher case, illegal
wiretapping and other misconduct by police personnel in
narcotics matters, yet the Internal Affairs Division
and the District Attorney's Office totally failed to
detect or pursue this misconduct until forced by actual
or threatened adverse publicity to do so.

The evidence revealed in the Kuhn and
Gutowski matter adds support to two of the conclusions
reached by the Commission regarding the Suffolk County
Police Department and District Attorney's Office:
there has been both a serious failure of proper super-
vision and a most disturbing willingness to tolerate
misconduct by employees unless prodded by public
revelation.

### C.   Chief of Detectives Gallagher

One of the matters about which Kuhn was ques-
tioned by the Commission was the allegation that
Timothy Gallagher had received special treatment in a

-81-

narcotics case (<u>People v. Timothy Gallagher</u>, Docket No. 618625-85, District Court, Suffolk Co.) because he was the son of Suffolk County Chief of Detectives John Gallagher. Kuhn was the undercover officer who bought one-eighth of an ounce of cocaine on November 2, 1984, from a youth whom he later learned was Chief Gallagher's son. Timothy Gallagher was arrested on November 1, 1985, one year after the sale. Timothy Gallagher, who did not cooperate with the police, received special consideration as an informant based on a letter, signed by Police Officer Albert Sinram and dated April 3, 1985, falsely stating that Gallagher had helped provide information in six narcotics cases. The recommendation letter was approved by Sergeant Joseph Comiskey, and a cover letter forwarding it to Raymond Perini, Chief of the Suffolk County District Attorney's Narcotics Bureau, was signed by Walton E. Brennan, Commanding Officer of the Narcotics Section, and Joseph Farnitano, Commanding Officer of the Major Crimes Bureau.

Based on this letter, Timothy Gallagher was allowed to plead guilty on December 6, 1985, to a class A misdemeanor, Criminal Possession of a Controlled Substance, Seventh Degree (Penal Law §220.03), rather than the original charge, Criminal Sale of a Controlled

Substance, Third Degree (Penal Law §220.39(1)), a class B felony. On February 14, 1986, Gallagher was sentenced to a fine of $500 and three years probation.

On February 21, 1986, the Commission asked Kuhn about his knowledge of misconduct in the Timothy Gallagher case. Kuhn then reported this Commission inquiry to Internal Affairs. While Kuhn had previously raised questions about the Gallagher matter which were never pursued by Internal Affairs, it was only after this Commission inquiry that the Gallagher case became one of the three matters referred by the Suffolk County District Attorney to the United States Attorney for the Eastern District of New York. In early 1987, following an extensive investigation of the Gallagher matter, the United States Attorney for the Eastern District decided that while there was evidence of a crime under New York State law, there was no jurisdictional predicate for a federal prosecution and returned the matter to Mr. Henry's Office with the recommendation for a special state prosecutor (see Chapter VII).

### D. Eason, Savage and Donnelly

The use of Kevin Eason as a narcotics informant for the Suffolk County Police Department Narcotics Division and the Suffolk County District Attorney's

-83-

Narcotics Bureau constitutes evidence of both miscon-
duct and a failure of supervision in narcotics investi-
gations and prosecutions.

Kevin Eason began working as a narcotics
informant for Suffolk undercover narcotics Police
Officer Warren Savage in early 1984, when Eason was a
17-year old high school junior. He continued to serve
as an informant for Savage until late 1986. Eason pro-
vided Savage with introductions to street-level cocaine
sellers from whom Savage would make small purchases of
cocaine. While Eason provided some introductions which
led to arrests and guilty pleas prior to November 1985,
his major informant activity occurred between October
1985, and May 1986, when Eason allegedly provided
Savage and his partner, Police Officer Ellen Donnelly,
with introductions which led to 140 purchases of
cocaine in the Wyandanch/North Amityville area (Public
Hearing, 1988, pp. 575-579). While Eason and the
alleged cocaine sellers were all black, and the areas
being worked were almost exclusively black, Savage and
Donnelly were both white (Public Hearing, 1988,
pp. 520-521). As a result of Eason's activity, a major
drug raid occurred on July 21, 1986, in which 23 people
were arrested. These arrests and others based on
Eason's work between October 1985, and May 1986,

resulted in five narcotics trials at which Eason testi-
fied against five different defendants, one of whom was
acquitted (Public Hearing, 1988, pp. 508-509). In
addition, according to documents supplied to the Com-
mission by the Suffolk District Attorney's Office,
Eason's efforts also resulted in narcotics charges to
which numerous other defendants pleaded guilty.

At the Commission's public hearing in January
1988, Eason testified that officers Savage and Donnelly
urged him to make false identifications in many cases
(Public Hearing, 1988, pp. 370-402) and that he did, in
fact, testify falsely at the five narcotics trials at
which he was a prosecution witness.*

For the purposes of this Report, the central
point regarding Eason, however, is not how often, or

---

* Eason testified before the Commission under a grant
of immunity. Subsequently, in a hearing on a motion
under §440 of the Criminal Procedure Law seeking to
vacate the convictions in the trials at which Eason
testified, Eason was again granted immunity, upon
the application of District Attorney Henry's Office,
whereupon Eason testified that his testimony before
the Commission was false. In so doing, Eason fur-
ther cast doubt on his credibility (People v.
Watkins, Indictment Nos. 716-86, 764-86, 766-86 and
842-86, Supreme Court, Suffolk County, Justice
McInerney, 1/25/88). Furthermore, beginning shortly
after the Commission's hearing, the District Attor-
ney's Office, knowing that the Commission was seek-
ing to speak with Eason, secreted Eason, prevented
the Commission from speaking with him and removed
him from the State.

when, he lied. The Commission's concern is rather that the Police Department and District Attorney's Office continued to use Eason as an informant, and as a key witness against criminal defendants, when there was overwhelming evidence, known to the police and to Assistant District Attorney Raymond Perini, that Eason was not reliable, and that Eason's relations with Savage and Donnelly were highly suspect.

In this regard, Detective Lieutenant Richard Franzese, the Commanding Officer of the Suffolk Police Narcotics Division, testified before the Commission that he told Perini that Eason lacked credibility and that approximately 30 cases involving Eason as an informant had to be dismissed because they had not been investigated or documented thoroughly or completely. Thus, Franzese testified:

> Q. And what did you discover in a review of these cases, did you form a conclusion as to these cases, any quality thereof?
>
> A. The cases had ostensibly not been either investigated thoroughly or completely or they hadn't been documented completely. The cases in question resulted in twenty-eight dismissals or exceptional clearance.
>
> Q. And were these cases that involved the informant, Kevin Eason?

A. The majority of them, yes.

Q. Would you state how many involved Mr. Eason?

A. Approximately thirty of them, probably.

* * *

Q. Did you ever during your review of these cases and in your time as Commanding Officer of that Unit, form any opinion as to Kevin Eason's credibility with respect to cases with which he was involved and testified about?

A. Yes.

Q. What opinion did you form?

A. That his credibility was dubious.

Q. What did you base this opinion on?

A. The number of cases that he was involved in that had defects from identifications that he had supplied to the two officers.

Q. Did you ever transmit or relay this opinion to anyone in the District Attorney's Office?

A. Yes.

Q. To whom did you relay this opinion?

A. To Raymond Perini.
(Public Hearing, 1988, pp. 546-547, 554.)

Franzese further testified that, at the direction of then Chief of Detectives Arthur Feldman, he had requested a meeting with Perini at which they would interview Eason. This meeting between Franzese, Perini and Eason occurred in November 1986, after four of the five trials in which Eason testified had been concluded. At the Commission's public hearing Franzese described this meeting as follows:

> Q. Was the issue of [Eason's] credibility as a witness discussed on that occasion?
>
> A. We didn't get very far with the discussion with Mr. Eason. He was hostile and uncooperative and non-committal. The conversation never really had gotten in any of those areas.
> (Public Hearing, 1988, p. 561.)

However, despite Franzese's expressed concern about Eason's credibility, and about Savage and Donnelly, Perini was still not deterred in his reliance on Eason as a prosecution witness.

In addition to Franzese, another officer, Sergeant James R. Maher of the Internal Affairs Division, also informed Perini that Eason had no

credibility.* Maher had conducted an investigation of
a police officer accused by Eason of drug sales, an
allegation credited by Savage and Donnelly, but dis-
proved after an extensive Internal Affairs investiga-
tion. Maher testified at a Commission private hearing:

> My feeling and the feeling of my
> bosses was that Kevin [Eason] had
> no credibility. He told different
> stories every time we talked to
> him.
> (Maher, 12/18/87, p. 46.)

Maher testified that this information was provided to
Perini before Eason ever testified in any Suffolk
narcotics prosecutions (Maher, pp. 34, 46-47).

Notwithstanding these clear warnings, Perini
used Eason as a witness in narcotics prosecutions, and
he approved Eason's continued use as an informant.
Furthermore, Perini personally permitted Eason's con-
tinued use as an informant during an eight-month period
in which Eason was arrested on three different criminal

---

\* Sergeant Robert Sievers, who served under Franzese,
and who supervised Savage and Donnelly from February
1986, to May 1986, told the Commission that he also
had problems with the credibility of Eason, as well
as the credibility of Savage and Donnelly (Private
Hearing, Sievers, 11/20/87, p. 14).

charges which the District Attorney's Office did not prosecute.*

In addition to revealing Perini's continuing use of an informant of dubious credibility, the Eason matter also demonstrates the startling lack of supervision in the Police Narcotics Division. Police Officers Savage and Donnelly carried out 140 undercover drug buys in eight months, with Eason providing all the introductions. The work of these officers, which was largely unsupervised, was marked by frequent errors, poor practices and frequent violations of rules and procedures. Thus, in a memorandum, dated June 12, 1986, to Detective Lieutenant Richard Franzese, Detective Sergeant Robert Sievers, who had supervised both Savage and Donnelly beginning on February 10,

----

* On November 21, 1985, Eason was arrested for Recklessly Causing Physical Injury (class A misdemeanor), Suffolk County, District Court (Docket No. 20236-85); on April 29, 1986, Robbery Second Degree (class C felony), Suffolk County, District Court (Docket No. 7215-86); and on May 23, 1986, Grand Larceny (class E felony), Suffolk County, District Court (Docket No. 8740-86). Eason was never represented by counsel on any of these charges, nor was he represented by counsel in a meeting with Raymond Perini during this same time period at which Perini approved of Eason continuing as an informant and promised him "consideration" (Public Hearing, 1988, pp. 453-462). The District Attorney's Office has never pursued prosecution of Eason on these three criminal charges which he allegedly committed during the time he was acting as an informant.

1986, criticized their performance and their relation-
ship with Eason:

> . . . As the two officers [Savage
> and Donnelly] were working the
> 'street level' investigation men-
> tioned above a number of incidents
> occurred that the undersigned in-
> terpreted as indications that their
> police identity was compromised,
> they had become too 'close' to the
> confidential informant [Eason] and
> that they were not in full control
> of the investigation.

Testimony was also presented by Suffolk
Police witnesses that officer Donnelly tasted cocaine
in the presence of other officers in a police precinct
(Public Hearing, 1988, pp. 541-542); that Officer
Donnelly deliberately failed to keep Narcotics Division
informant cards up to date by listing cases in which
information was provided by Eason, contrary to Suffolk
Police Rules and Procedures (Public Hearing 1988, pp.
570-573); that Savage and Donnelly relied solely on
identification information provided by Eason in a sig-
nificant number of cases and failed to obtain other
needed corroborative identification evidence (Public
Hearing, 1988, p. 538); and that deficient identifica-
tion procedures used before and after the July 21,

1986, narcotics raid resulted in a number of mistaken arrests (Public Hearing, 1988, pp. 472-483).

Finally, Suffolk Police documents indicated that Savage and Donnelly were insubordinate and failed to follow legitimate orders of their supervisors, and that they were characterized as "bizarre" and "aberrant" by supervisors and recommended for psychiatric evaluations (which were never conducted).*

The problems in the investigations and prosecutions involving cases developed by Savage and Donnelly, with the assistance of Eason, are but another example of the lack of supervision and professionalism, and the tolerance for misconduct, exhibited by the Suffolk County Police Department and District Attorney's Office.

---

* Rather than being vigorously investigated, Police Officer Savage was promoted to detective and transferred from Narcotics in August 1986.

-92-