# Exhibit 5-3

## III. ILLEGAL WIRETAPS

### A. Illegal Eavesdropping by the Suffolk County Police Department Known to the District Attorney's Office

Testimony heard by the Commission at its January 1988, public hearing presented not only a shocking picture of illegal wiretapping by the Interdiction Unit of the Suffolk Police Department with the approval of the Bureau Chief of the District Attorney's Narcotics Bureau, but also an absence of even rudimentary management controls on electronic eavesdropping which allowed this criminal behavior to occur. The evidence presented at this public hearing demonstrated that the management of the Police Department had neither the will, nor the mechanisms, to prevent or detect illegal wiretapping in the Interdiction Unit.

### 1. Legal Background

At the Commission's public hearing in January 1988, testimony was offered by one current and two former members of the Suffolk County Police Department that the Suffolk County Police Department and District Attorney's Office had engaged in illegal wiretapping

through the conversion of "pen registers" to illegal use.*

A legal wiretap requires an order from a judge and is governed by stringent rules imposed by New York State and federal law specifying exactly what can and must be done in conducting the wiretap.**  There are severe criminal penalties for illegal wiretapping, which under federal law is a felony, and which at the time of the incidents discussed in this Report was punishable by a maximum of a $10,000 fine and not more than five years in prison (see 18 U.S.C. §2511).  Under New York law this crime is a class E felony, with a maximum of four years imprisonment (see Penal Law §250.05).

Until recently the use of a pen register has not required an order from a judge, and has not been

---

\* A legal wiretap intercepts and records actual audio conversations to and from a target phone, while a legal pen register is limited to providing only the outgoing telephone numbers dialed from a target phone.  "The term 'pen register' means a device which records or decodes electronic or other impulses which identify the numbers dialed or otherwise transmitted on the telephone line to which such device is attached . . . ." 18 U.S.C. §3127 (3).  A pen register can be converted or modified to become a full-blown wiretap by the mere addition of a speaker or tape recorder.

\*\* See 18 U.S.C. §§2510-2519 and New York Penal Law §§250.00-250.10 and Criminal Procedure Law 700.05-700.70.

subject to regulation in New York State.   While the
Attorney General or District Attorney must be the
applicant on a wiretap, with respect to pen registers,
different jurisdictions, and even different agencies
within the same jurisdiction, have followed different
practices:   some voluntarily obtained judicial orders;
some utilized search warrants; and some used no
initiating legal process.

Recent federal legislation has prescribed
rules for pen registers on the federal level and man-
dated that the states pass legislation governing pen
registers or else face their proscription (see 18
U.S.C. §§3121-3127).   In December 1988, New York adopt-
ed legislation which for the first time established
statutory procedures regarding the application for, and
operation of, pen registers (Laws of 1988, Ch. 744,
art. 705).   The statute provides for the issuance of
judicial orders authorizing the use of pen registers,
includes a requirement for "reasonable suspicion" that
a designated crime "has been, is being, or is about to
be committed" for their issuance, and further sets a
time limit on how long they can be used.   Furthermore,
the statute limits the applicant to a district attor-
ney, the New York State Attorney General or the

Director of the New York State Organized Crime Task Force, or any of their assistants.

During the period examined by the Commission, the Suffolk County District Attorney's Office voluntarily applied for orders from a judge for pen register authorizations. It was through these legal limited pen register operations that Suffolk Police personnel illegally intercepted telephone conversations.

## 2. Use of Pen Registers in Suffolk County

The Suffolk County Police Department and District Attorney have reported to the Commission that between 1981 and 1986 more than 50 pen registers were installed, of which 17 were operated by the Interdiction Unit of the Narcotics Division of the Police Department in narcotics investigations. With respect to other units of the Police Department, three pen registers were also used by the Internal Affairs Division, two of which were operated in the basements of the private homes of police officers.

Both pen registers and wiretaps for the Suffolk Police were installed by the Special Investigations Section of the Intelligence Division of the Police Department; the District Attorney's Office used both the Special Investigations Section for

installation and several of its own civilian employees who had the same capability (Public Hearing, 1988, p. 192). There were three officers and a sergeant in the Special Investigations Section of the Police Department during the period under Commission review, from 1981 to early 1988.

The Interdiction Unit, which actually conducted and monitored wiretap and pen register operations, was one of five units of the Police Narcotics Division. The purpose of the Interdiction Unit was to investigate major drug cases, primarily through the use of electronic surveillance. The Interdiction Unit had between 7 and 11 members, including a sergeant, during the period (1982 to 1984) in which the Commission discovered evidence of illegal eavesdropping. Some officers from this Unit have since retired from the Department, and James Kuhn has been fired. Except for Detective Albert Coletto, who remains in the Interdiction Unit, all the rest are in new units, and some have been promoted. The sergeant from that era, Donald Risener, retired on February 10, 1986, and the lieutenant (Commanding Officer of the Narcotics Division) to whom Risener reported, Richard Siee, retired in March 1988.

The locations (or "plants") of both legal and illegal pen registers and wiretaps run by the

-97-

Interdiction Unit were almost always in private houses rented for that purpose by the Suffolk Police. Rarely were government facilities used (Public Hearing, 1988, p. 132).

Management and oversight of wiretaps and pen registers conducted by the Interdiction Unit was ceded by the Suffolk Police to the Chief of the Narcotics Bureau of the District Attorney's Office, Raymond Perini, who in fact controlled the unit. Thus, Lieutenant Siee testified at the Commission's Public Hearing in January 1988:

> As long as it's understood we are talking about the Interdiction Unit. There are other units in the section for which I had responsibility, and I maintained a closer overview, but in the area of electronic surveillance, and the law specifically says it is the District Attorney who is the applicant, and therefore, he is responsible for the case development and ultimate prosecution (p. 320).

More succinctly, Siee said of the Interdiction Unit:

> They answered to the District Attorney's Office.
> (Siee, Private Hearing, 12/29/87, p. 100.)

According to Perini's own testimony, "the supervision is delegated to me" on narcotics related wiretaps, which is in conformity with statutory requirements (Public Hearing, 1988, p. 622). With regard to pen registers, Perini or his assistants prepared the applications, and were sometimes even the applicants, for all the pen register orders which Perini submitted for court approval (Public Hearing, 1988, pp. 618, 627-629).

Testimony by Lieutenant Siee, who supervised the Interdiction Unit, which was the Unit that staffed the wiretap and pen register operations, also demonstrated that Perini assumed oversight responsibility for pen registers, as well as wiretaps (Public Hearing, 1988, pp. 316-322). Furthermore, Sergeant Risener, of the Interdiction Unit, testified that it was the practice of Interdiction Unit personnel to provide information to Perini or his assistants to obtain pen register orders and to keep Perini's Bureau informed as to the evidence obtained in each case (Public Hearing, 1988, pp. 140-141). In regard to wiretaps and pen registers, the sergeant testified: "I'm sure he was aware of the results of everything. He was the Bureau Chief" (Public Hearing, 1988, p. 131).

### 3. Kuhn and Russo Testimony Concerning Illegal Wiretapping

At the Commission's January 1988, public hearing two former members of the Interdiction Unit, James Kuhn and Joseph Russo, testified, under a grant of immunity for eavesdropping offenses conferred by the Commission, that the Interdiction Unit had regularly modified pen registers, through the addition of tape recorders and/or speakers, to engage in illegal wiretapping. Both men testified that this was done with the knowledge of Sergeant Risener, as well as with the knowledge of the Bureau Chief of the District Attorney's Narcotics Bureau, Raymond Perini. Their testimony was that all members of the Unit were aware of this illegal wiretapping and all engaged in it.

Kuhn testified that, while he was in the Interdiction Unit between 1981 and 1984, he and other members of his Unit routinely used modified pen register devices to illegally intercept telephone conversations of drug suspects (Public Hearing, 1988, pp. 88-118). Kuhn testified that "the accepted explanation for Interdiction was you got to do what you got to do to catch them. . . . The whole team did it, yes, sir" (Public Hearing, 1988, p. 96).

Kuhn also testified that on two different occasions during an investigation for which he was the

coordinator he personally reported conversations to Perini from an illegal wiretap using a pen register. Kuhn testified that Perini knew these conversations were illegally recorded because Perini had applied for this pen register order only days before and that on one occasion Perini told Kuhn to be sure to get rid of the tape (Public Hearing, 1988, pp. 100-105).

In addition, Kuhn supplied to the Commission seven audio tapes of conversations illegally intercepted from pen registers. These included conversations of relatives, friends and the attorney of the subject of an Interdiction Unit narcotics investigation.

One of these tapes contained recordings of an ironic blunder by the Suffolk Police officers who were engaged in the illegal wiretapping. After a series of illegally intercepted conversations of the subject's telephone, which the Commission has been able to date and identify, there follows a 14-minute recorded portion of the tape containing the voices of the illegal wiretappers recorded at the plant where the pen register was being monitored.* At the end of this

---

* Experts testified before the Commission that there were numerous technical ways that such conversations could be accidentally recorded in such a set-up (Public Hearing, 1988, pp. 46-48).

14-minute portion of the tape, Angelo Carrion, a member of the Interdiction Unit at that time, is heard to say, "We didn't turn off the speaker." The tape then reverts to additional illegally recorded conversations, which can be placed by internal evidence as following close in time after the conversations recorded before the accidentally recorded voices of the Interdiction Unit members.

In a written analysis of this audio tape done for the Commission by an independent audio expert often relied on by the federal government, who was not informed of the nature of the recording, the expert reported:

> . . . Apparently two males were aware of the recording of themselves along with at least one other male since toward the end of this recording after the other(s) have left one comments to the other about the speaker being loud and that they did not want the others to hear the sounds that would indicate that the conversation was being tape recorded.

The expert's report also confirms that the tape contains recorded telephone calls at the beginning and end, interrupted by a live 14-minute recorded

-102-

portion, and that the tape is continuous with no editing, intentional over-recording, or erasure.

Kuhn identified the voices of Interdiction Unit members Joseph Brock, Andrew Nimmo, Angelo Carrion and James Kevins as speakers appearing on the live portion of the tape.

Joseph Russo, a former Suffolk County Police Officer who was forced to retire from the Suffolk Police Department after 17 years in the Narcotics Division after he was investigated for suspected drug sales, also testified about illegal wiretapping at the Commission's public hearing on January 13, 1988. Russo testified that from 1981 through 1983, while he was in the Interdiction Unit, he and other members of that Unit routinely used modified pen registers to illegally intercept telephone conversations (Public Hearing, 1988, pp. 50-88). Russo testified that all members of the Unit participated:

> Q. Was there anyone of your col-
> leagues or anyone from your squad,
> who refused to take part in the
> practice of listening in on the pen
> register?
>
> A. No. Everyone knew, if you
> didn't you were gone.
> (Private Hearing, 11/6/87, p. 107.)

Russo also testified that in one case for which he was the coordinator, where a pen register installed in the suite of offices of the Suffolk Police Chief of Detectives had been used to illegally record conversations, he had discussed and played tapes of the illegal wiretaps for Raymond Perini on seven different occasions (Public Hearing, 1988, pp. 72-80). Russo testified that these tapes were played in Perini's office and that on at least one occasion, in response to a direction from Perini to "take care of all those tapes," Russo told Perini "not to worry" and that the tapes "would be destroyed." Two days later, Sergeant Risener, his supervisor, also asked Russo if he "got rid of those tapes" (Public Hearing, 1988, pp. 75-77).

Russo also testified about the accidental tape recording provided by Kuhn and identified the officers overheard. In this regard Russo testified:

> Q.  Could you recognize the voices of any of the people you heard on that tape?
>
> A.  Yes, I do.
>
> Q.  Could you name them please?
>
> A.  Andy Nimmo, Angelo Carrion and Paul Dessert. But there were other voices that I did not recognize at the time.

\*    \*    \*

Q.  Mr. Russo, is there any ques-
tion in your mind that these were
overheard conversations which were
illegally recorded in the course of
the [deleted] investigation?

A.  No.

Q.  Is there any question in your
mind that the muffled conversation
of the names you mentioned were
officers who were recorded in the
room while the illegal operation
was under way?

A.  That's correct.
(Public Hearing, 1988, pp. 84, 86.)

In attempting to determine who was present in
the plant on the day in question, and during other
specifically dated illegal interceptions known to the
Commission, the Commission examined the attendance
sheets for the Interdiction Unit.  However, six former
members of the Interdiction Unit testified that
attendance sheets were deliberately not maintained in
an accurate manner in the Interdiction Unit.  They
contended that even if Suffolk County Police Department
records indicated that police officer "X" of the
Interdiction Unit worked on a certain day, that, in
fact, might not be true.  They added that Sergeant
Risener would make sure that the official records of
work days conformed to contract provisions, even though
his subordinates might not have worked the hours or

-105-

days he reported.  In their testimony the Interdiction Unit members advised the Commission not to take their attendance records seriously (Private Hearings: 2/9/88, Dessert, Brock, Coletto, Laskowski; 2/10/88, Nimmo, Kevins).  This contrasts with the testimony of Sergeant Risener, who contended that he kept accurate attendance records for his Unit (Private Hearing, Risener, 10/29/87, pp. 51-53).

The Rules and Procedures of the Suffolk County Police Department (Chapter 3 -- Absence and Attendance) require accurate records, and each officer must swear to and sign a copy of his attendance record once a year.  Nonetheless, the Commission believes that the attendance records for the Interdiction Unit most likely are false, based on corroborating testimony of other credible witnesses.  If this is in fact the case, this lapse in recordkeeping is simply additional proof of deliberate misconduct and improper management in the Police Department.

Finally, a partial record of Interdiction Unit attendance at the plants was obtained by the Commission from the so-called "line sheets" that are prepared in connection with legal wiretaps, listing each call, the officer who monitored the call, and other information.  These records are ordinarily sealed

-106-

pursuant to eavesdropping orders and are not intended or available for police attendance purposes. However, according to the witnesses before the Commission, legal wiretaps were almost always conducted at the same loca- tion and on the same days as illegal wiretaps through pen registers, as was the case with the pen register in which the accidental, 14-minute recording occurred. Based on the line sheets, the members of the Interdic- tion Unit who worked at the plant on the same day as the illegal wiretapping, when the accidental 14-minute recording occurred, were Kevins, Russo, Nimmo, Carrion, Coletto and Laskowski, most of whom were identified on the accidentally recorded tape by Kuhn and Russo.

### 4. Sloan Testimony Concerning Illegal Wiretapping

The third police witness who testified to illegal wiretapping by the Suffolk Police Department and District Attorney's Office was Detective Lieutenant George Sloan, a 25-year veteran of the Department and the Commanding Officer of the Sex Crimes Unit.* Sloan, who appeared without immunity, testified that in 1983, while he was in the Internal Affairs Division, he was

---

\* Sloan retired in the spring of 1988, following the Commission's public hearing.

assigned to investigate Joseph Russo in relation to the allegation that Russo was involved with his brother-in-law, Mark Falk, in the sale of cocaine.*

In the course of the Falk/Russo investigation, a pen register was installed in the basement of Sloan's residence upon the approval and the court application of Raymond Perini, Chief of the Narcotics Bureau in the District Attorney's Office, who was helping to supervise the investigation.** Sloan was assisted in the investigation by Sergeant James Thompson of the Suffolk County Police Department. Prior to the Falk/Russo investigation, Sloan had never used a pen register, nor did he know what a pen register was (Public Hearing, 1988, pp. 240-245).

---

\* It was as a result of police actions in this investigation that Joseph Russo's wife, Maureen Falk (Russo), the sister of Mark Falk, filed a federal action under 42 U.S.C. 1983 against Sloan, Falk v. Sloan (CV85-2938), E.D.N.Y, which is pending, alleging misconduct in the manner in which she was treated during the investigation.

\*\* Although a pen register order was obtained by Perini, neither the Police nor the District Attorney's Office have been able to produce a copy of the application that was submitted for the Falk pen register order. Copies of every other application were turned over to the Commission by the Suffolk County District Attorney upon subpoena. Perini's explanation for his Office's failure to produce the Falk application was: "I don't know where it is. I found copies of the order. I cannot find the application" (Public Hearing, 1988, p. 640).

Detective John Lechmanski, a member of the Special Investigations Section of the Suffolk County Police Department, who installed the pen register in Sloan's basement, also testified at the Commission's public hearing on January 13, 1988. Lechmanski had been installing electronic equipment for the Suffolk County Police Department for 21 years. Lechmanski testified that on his own initiative he provided Sloan with a tape recorder and instructed Sloan how to connect the tape recorder to the pen register in order to convert the pen register to a full-blown wiretap (Public Hearing, 1988, pp. 199-235). Lechmanski testified that this was the only occasion on which he showed any personnel of the Suffolk Police Department how to convert a pen register into a wiretap (Public Hearing, 1988, p. 215).

Lieutenant Sloan testified that Sergeant Thompson later connected the pen register to a tape recorder, converting the pen register to an illegal wiretap, and urged Sloan to monitor the phone of Mark Falk on this illegal wiretap (Public Hearing, 1988, pp. 255-257). Sloan testified that he disconnected the wiretap as soon as Thompson left (Private Hearing, 11/30/87, pp. 70-72). Shortly thereafter, according to Sloan, after a breakfast meeting at the Sea Coral Diner

in Hauppauge, Perini asked Sloan what he was hearing on the pen register (Public Hearing, 1988, pp. 259-261).

In their testimony before the Commission, Perini and Thompson both denied that they either converted the pen register to a wiretap or asked Sloan what he was hearing on the pen register, just as Perini also denied the allegations of Russo and Kuhn. In addition, Thompson specifically accused Sloan of lying and in his testimony made reference to Sloan's having been "admitted for psychiatric care on several occasions" (Public Hearing, 1988, p. 300; see also id., p. 308), apparently referring to and misrepresenting an instance in which Sloan had voluntarily sought treatment for alcohol abuse at a residential center. The fact that Sloan, a detective lieutenant with 25 years service and an unblemished record, came forward without immunity with this testimony, which could well have damaged his police career and his position as a defendant in the Falk case, lends great credence to his description of these events.

## B. Management Failures Concerning Electronic Surveillance and Pen Registers

Testimony was presented before the Commission by numerous police personnel indicating management

failures in at least four areas which helped permit illegal wiretapping to occur:

1. failure in case review and oversight;
2. weakness in inspections;
3. lack of proper recordkeeping and controls; and
4. lack of training.

## 1. Failure in Case Review and Oversight

Detective Lieutenant Richard Siee, the Commanding Officer of the Suffolk County Police Narcotics Division, which included the Interdiction Unit, from 1978 to 1985, exercised virtually no oversight over the operations of the Interdiction Unit. In effect, he abdicated control over the Interdiction Unit to Raymond Perini, Chief of the District Attorney's Narcotics Bureau.

Siee testified that in his seven years as commanding officer he had not reviewed wiretap or pen register applications and orders (Public Hearing, 1988, p. 316), and that he provided little review or control of Interdiction Unit cases. He provided no input into deciding whether electronic surveillance was appropriate in a given investigation, and little monitoring of the progress of investigations using electronic surveillance once they were in operation (Public

-111-

Hearing, 1988, pp. 316-322). This was in spite of the fact that he was the direct line supervisor, above Sergeant Risener, of the men in the Interdiction Unit who were engaged in one of the most sensitive activities in the entire police department.

Admitting his lack of knowledge and oversight, Siee testified that he believed a "subpoena" was needed for a pen register (Private Hearing, Siee, 12/29/87, p. 58), and admitted that he had seen a pen register "only once," and then it was not in operation (Siee, p. 51). Siee rarely reviewed written reports of Interdiction cases, and required no written progress reports, but rather relied on conversations in which Sergeant Risener would give him an "overview" (Public Hearing, 1988, pp. 322-325 and Siee, p. 54).

Siee's management amounted to gross neglect. While the District Attorney has the responsibility for applying for electronic surveillance authorizations and meeting legal requirements, the Police Department cannot thereby abandon supervisory responsibility for its personnel involved in investigations utilizing wiretaps and pen registers. The Interdiction Unit should operate under the strictest supervision, yet it was functioning virtually without supervisory control above the rank of sergeant. Furthermore, this lack of

supervision by Commanding Officer Siee was allowed to continue undisturbed by the higher levels of command in the Suffolk County Police Department.

## 2.   Weakness in Inspections

One of the most effective means of preventing or detecting illegal wiretapping as it was carried out in Suffolk would have been to have had frequent unannounced inspections of the plants conducted by knowledgeable and conscientious supervisors. This the Suffolk Police Department did not do.

Sergeant Risener testified that the lieutenants who were the Commanding Officers of the Narcotics Division visited the plant locations from "every two weeks" to "never" (Public Hearing, 1988, pp. 132-133), and other supervisors visited only rarely (Private Hearing, Risener, 10/29/87, p. 54). Moreover, Lieutenant Siee testified that, even if he were to observe it, he could not determine if equipment was being used properly and according to court order (Public Hearing, 1988, pp. 327, 332). Siee did not think electronic surveillance orders were kept at the plants (Siee, p. 59), and he never asked Interdiction Unit personnel to show him orders for the operation of electronic eavesdropping equipment (Public Hearing, 1988,

pp. 327-328).   Furthermore, no police personnel above Sergeant Risener had keys to the wiretap plants, so they were unable to let themselves in, or go there to inspect the set-up and equipment when the plant was not in operation (Siee, p. 73).

Since the Commanding Officer of the Interdiction Unit took almost no steps to inspect the plants in a serious way, and, by his own admission, would not have recognized misconduct even if he saw it, members of the Unit were essentially unsupervised.   Frequent visits by superiors, unannounced and at odd and varying hours, demands to see electronic surveillance orders and inspection of the equipment to see if it was being used in conformity with the court orders, among other activities, could have provided a substantial deterrent to and check against illegal wiretapping.

### 3.   Lack of Proper Recordkeeping and Controls

The absence of recordkeeping by the Interdiction Unit was at times so extreme as to encourage the belief that accurate records and a paper trail, which could help determine responsibility for misconduct, were avoided.

-114-

## a)   Pen Register Tapes and Reports

The content of Interdiction Unit case files regarding the use of pen registers was meager. Actual paper tapes of pen register number printouts were routinely discarded -- frequently after no analysis or only a casual glance. Even when numbers were checked and allegedly analyzed, the results would be kept haphazardly on yellow sheets and then discarded (Public Hearing, 1988, pp. 127-130). Furthermore, no Coles Directory was even kept at the plants. The Coles Directory is a standard investigative tool, a so-called reverse telephone directory, which lists telephone numbers in sequence so that one can determine the name and address of a subscriber whose phone number is known, which is the situation with pen register printouts. Testimony was offered that a call was made to Police Headquarters in Yaphank to have the Coles Directory checked there whenever a subscriber had to be identified (Private Hearing, Risener, 10/29/87, pp. 63-65). However, since pen registers can generate a great many telephone numbers, such a cumbersome system would strongly discourage the systematic checking of telephone numbers from pen register tapes.

The Interdiction Unit's lack of interest in, and cumbersome system with regard to, pen register-

generated phone numbers and paper tapes is consistent with the testimony indicating that the actual purpose of the pen registers in that Unit was to illegally overhear conversations. The failure of the Interdiction Unit to maintain a written record and a paper trail of telephone numbers obtained from pen registers helped the members of the Unit to conceal that they were using illegally heard conversations, not telephone numbers, to obtain leads in their investigations. The failure of Suffolk police personnel to maintain proper records, which helped to conceal misconduct, has also been demonstrated in the Homicide and Narcotics Bureaus, and has been a pervasive and serious problem revealed throughout the Commission's investigation.

### b) Controls on Electronic Eavesdropping Equipment

There was little effort by the Suffolk Police Department to maintain adequate written records to keep track of the responsibility for highly sensitive and valuable electronic eavesdropping equipment, including pen registers. No inventory was kept of equipment being used by different teams and units (Siee, p. 76), and no receipt was signed by the member of a team or unit receiving the eavesdropping equipment (Public Hearing, 1988, pp. 193-195). Once the equipment was

delivered to the plant, where also no receipt was signed, there was no system there to control responsibility for the equipment (Risener, p. 59). Many police departments keep rigid control -- requiring, at a minimum, signing in and out -- with regard to equipment which is of little value and not sensitive. It is thus surprising that Suffolk County had lax controls over sensitive equipment worth approximately $4,000 per unit (Public Hearing, 1988, p. 193).

### c)  Attendance Records

As described in Chapter III (A)(3) attendance records of the members of the Interdiction Unit were kept in a deliberately falsified manner by Sergeant Risener, with the acquiescense of his men. There were no valid sign-in sheets kept at the plants and the records provided to the Department were not correct as to who worked on different days and times, so that no one knew the actual schedule of the members of the Interdiction Unit except Sergeant Risener. Lieutenant Siee testified that he had no reason to believe Risener did not keep accurate attendance records, although, in fact, Risener did not (Siee, p. 85). Risener's system violated Department policy and the Patrolmen's Benevolent Association contract, and also gave Risener

-117-

the opportunity to dispense favors and rewards as he saw fit. This gave Risener another tool to reward, control and encourage conformity with illegal wiretapping and other misconduct by his subordinates.

### 4.   Lack of Training

Virtually all of the police officers who were assigned to the Interdiction Unit for major drug opera- tions using wiretaps and pen registers lacked adequate experience or training. Indeed, police management de- scribed many of these officers as being "green" (Siee, p. 67). At most, their specialized narcotics training consisted of a two-week federal Drug Enforcement Administration school, covering the entire range of narcotics investigation, which often did not begin until long after their assignment to the Interdiction Unit had begun, and which Siee stated might have only "glossed over" wiretaps (Siee, p. 48).*

---

\* A grand jury report which touched on eavesdropping and training was issued on October 28, 1988 (Hon. Alfred Tisch, Suffolk County Court) in a matter con- cerning allegations of illegal wiretapping by the Riverhead Town Police. At page 22, that report stated:

(Footnote continued on next page)

Siee, who served seven years as the command-
ing officer supervising the Unit conducting wiretaps,

---

(Footnote continued from previous page)

165. There has been no formal
instruction on the crime of
Eavesdropping at the Suffolk
County Police Academy either
in lesson plans or as part of
the cirriculum [sic] since
the Department was formed in
1960.

166. There has been no formal
training on the crime or law
of Eavesdropping in advanced
in service programs at the
Academy since at least 1970.

Relevant recommendations in the grand jury report
included:

### ADMINISTRATIVE ACTION

#### I.

It is recommended that recruit
training for all department
employees include N.Y.S. Penal Law
§250.05, Eavesdropping, and related
areas.

#### II.

It is recommended that advanced in
service training for Department
employees include Penal Law
§250.05, Eavesdropping, and related
areas.

#### III.

It is recommended that all
examinations for supervisory
personnel include questions on
N.Y.S. Penal Law §250.05,
Eavesdropping, and related areas.

-119-

testified that he had never read the federal wiretap statute and did not recall whether the men in the Unit were required to read either the federal or State wiretapping statutes (Public Hearing, 1988, p. 315). Never in their careers in the Interdiction Unit were members provided with lectures or written training materials or guidelines, except on the issue of minimization, and that was done because proof of such formal attention to minimization might be needed when the District Attorney's Office appeared before a judge authorizing electronic surveillance or on a motion to suppress.

In sum, almost all that the members of the Interdiction Unit knew about wiretapping was learned on the job from Sergeant Risener, who was the direct over-seer, and one of the principal architects, of the illegal wiretapping.

As a final word on the pervasive management failures in the Interdiction Unit, long tolerated by Lieutenant Siee and his superiors, Sergeant Risener testified: "I don't think we received direction from anybody" (Public Hearing, 1988, p. 164). This absence of proper oversight allowed illegal wiretapping to occur.

-120-

## IV. ASSISTANT DISTRICT ATTORNEY PERINI AND THE DISTRICT ATTORNEY'S OVERSIGHT ROLE

An important figure whose name has appeared recurrently throughout the Commission's investigation into misconduct and mismanagement in both the District Attorney's Office and the Police Department is Assistant District Attorney Raymond Perini, who until very recently served as Chief of the Narcotics Bureau in the Suffolk County District Attorney's Office.

Mr. Perini joined the Suffolk District Attorney's Office in 1976, after serving as an assistant district attorney since 1973 in the Kings County District Attorney's Office. Although there was no separate Narcotics Bureau in the Suffolk District Attorney's Office in 1976 (narcotics prosecution was then part of the Rackets Bureau), Perini's first assignment and major responsibility in the Suffolk District Attorney's Office was narcotics investigations and prosecutions, for which he was delegated primary responsibility. When in 1984 a separate Narcotics Bureau was formally established by District Attorney Henry, Perini was named its first Chief, and the Bureau grew to include six assistant district attorneys and three secretaries serving under him. In this position, Perini's immediate supervisor was then Chief Assistant District

-121-

Attorney David Freundlich, who in turn reported directly to Mr. Henry. According to Mr. Perini, his Bureau prosecuted "to fruition" approximately 1,200 to 1,500 felony drug cases per year, including trying approximately 40 to 60 felony drug cases each year.

The Narcotics Bureau under Perini was responsible for narcotics-related wiretaps, including wiretap applications and supervision of court-authorized wiretaps. In addition, Perini's Bureau also undertook responsibility for obtaining court authorizations for pen registers in narcotics cases. Also, the Commission's public and private hearings established that, as might be expected, Mr. Perini exercised on a day-to-day basis at least some level of responsibility for and supervision over police officers assigned to narcotics investigations, particularly with respect to the monitoring and supervision of wiretaps, but also extending to the use of informants and other routine police work.

The turmoil and misconduct in narcotics investigations and prosecutions, described in Chapter II of this Report, and the illegal wiretapping, described in Chapter III, occurred under the supervision of Raymond Perini, in his role as Chief of the Narcotics Bureau of the Suffolk County Police Department, a position he left on March 13, 1989.

-122-

Based on the results of its investigation, the Commission is forced to conclude that Perini knowingly allowed, and indeed condoned, illegal wiretapping by the Interdiction Unit and condoned what he assumed to be illegal wiretapping in Lieutenant Sloan's investigation of Officer Russo. This finding is supported not only by the testimony of Kuhn and Russo, but also by that of Lieutenant Sloan, a 25-year veteran of the force. In addition, in a number of critical respects, the testimony of all three of these witnesses, all of whom provided detailed, highly specific testimony against Perini, was corroborated by compelling independent evidence, especially the Interdiction Unit tape provided to the Commission by Kuhn, the evidence provided to the Commission concerning the operation of the Interdiction Unit, and, finally, the testimony of Detective Lechmanski concerning his having shown Lieutenant Sloan how to convert the pen register installed in Sloan's basement to a wiretap. Although in their testimony before the Commission both Perini and Thompson denied the allegations of involvement in illegal wiretapping made against them, the Commission finds that these denials are not credible.

In here making public its findings with respect to what it has concluded was Perini's direct

-123-

and continuing involvement in illegal wiretapping activities, the Commission is cognizant and would indeed caution the reader that the Commission is not a criminal court or jury. It has no power or authority to make any formal finding of guilt or innocence of any crime. That is the proper role of the criminal justice system, where an accused is entitled to and has available to him all the procedural and substantive protections there provided, including the right of cross-examination and the standard of proof beyond a reasonable doubt. However, the Commission is a "sunshine" agency, with statutory duty and responsibility to publicly report its findings, especially concerning governmental misconduct and illegality, where it believes, as is here the case, that this is in the public's interest, where it will serve to demonstrate the need for reform or to deter future misconduct. In this regard there can be no immunity from criticism or other special rule for government officials, however prominent or powerful or high-ranking, including district attorneys or their assistants, or for attorneys generally or any other class of persons. Indeed, it should be noted, one of the specific reasons for the establishment of this very Commission by the New York State Legislature was to serve as a check on misconduct and

corruption in law enforcement. (See, e.g., In Re Di Brizzi, 303 N.Y. 206 (1951); 1953 McKinney's Session Laws, Ch. 887, pp. 1776, 1867, 1871-1873 (Recommendations from First Report of the New York State Crime Commission); and 1958 McKinney's Session Laws, pp. 1792-1794 (Message of the Governor).)

Beyond the question of what the Commission has concluded concerning Perini's knowing involvement in illegal wiretapping activities, the Commission has also concluded that, at the very least, Perini was guilty of gross negligence with respect to the discharge of his de facto, apparently freely accepted by him, responsibility for day-to-day supervision of the Suffolk Police Department's Narcotics Division, including the Interdiction Unit. Further, the Commission believes that even in his role as prosecutor, Perini was irresponsible and grossly unprofessional.

Chapter III of this Report describes a virtually unsupervised Interdiction Unit, with inadequate inspections, poor training, poor documentation and control of equipment and no meaningful supervisory control above the rank of sergeant. Additional witnesses and police personnel have also testified before the Commission about misconduct in the investigation and prosecution of narcotics cases. Perini used testimony from an

unreliable informant* to secure numerous narcotics con-
victions and he allowed certain undercover narcotics
officers to make a tremendous number of cases which his
Bureau then prosecuted. These included 86 criminal
convictions based on the work of officers James Kuhn
and Raymond Gutowski, and 140 narcotics buys by
Officers Warren Savage and Ellen Donnelly, despite many
obvious violations of proper police procedures in the
work of these officers (see Chapter II(B) and (D)).

---

* For an example of Perini's allowing false testimony
to stand in a narcotics prosecution, see People
v. Pelchat, 62 N.Y.2d 97, 476 N.Y.S.2d 79 (1984), a
narcotics prosecution by the Suffolk County District
Attorney's Office in which the New York Court of
Appeals reversed the conviction and dismissed the
indictment. In that case Perini allowed a guilty
plea to be taken to an indictment which was based on
"mistaken" testimony of a police officer before a
grand jury, even though Perini knew the grand jury
testimony was mistaken when he took the plea. The
police officer had informed the prosecutor that,
contrary to his grand jury testimony, he actually
had never observed the defendant engage in criminal
conduct. Regarding the Suffolk prosecutor, the Court
of Appeals wrote (62 N.Y.2d at 108):

> Just as he could not sit by and
> permit a trial jury to decide a
> criminal action on evidence known
> to be false, he could not permit a
> proceeding to continue on an
> indictment which he knew rested
> solely upon false evidence . . . .

However, Perini allowed just such false testimony to
stand without intervention.

Furthermore, Perini approved of lenient treatment in a drug case for the son of then Suffolk Chief of Detectives, John Gallagher, based on fraudulent documents. Perini's failure to properly supervise and review the fraudulent material submitted to him in such a sensitive case amounted to malfeasance in office and should have been reason enough for him to be fired by Mr. Henry. (See Chapters II(C) and VII.) However, rather than punish Perini, District Attorney Patrick Henry never wavered in his protection of Mr. Perini. Indeed, Henry in fact joined with Perini in seeking to block the Commission's work, including attempting to prevent the publication of this very Report. (See Appendix A.)

What this investigation has revealed concerning Mr. Perini presents the startling, but thankfully rare, example of what can occur through the misuse and abuse of the tremendous power of a prosecutor, especially in an office in which the district attorney fails to properly supervise and control his assistants.