Exhibit 5-4

## V. FAILURE BY THE DISTRICT ATTORNEY'S OFFICE TO INVESTIGATE AND PUNISH MISCONDUCT BY AGENCY EMPLOYEES AND OTHER LAW ENFORCEMENT PERSONNEL

One of the most disturbing findings of the Commission has been the systematic failure of the District Attorney's Office to investigate and take appropriate action where it has uncovered or been informed of misconduct by its own employees and other law enforcement personnel. The Commission does not base this finding on isolated instances of cases "falling through the cracks," but rather the Commission has discovered gross dereliction in not investigating known, credible and easily verifiable allegations of misconduct.

### A. Ira Dubey

In a December 10, 1986, article in Newsday, it was charged that Ira Dubey, former Deputy Director of the Suffolk County Crime Laboratory, who had testified as an expert witness for the prosecution in dozens of Suffolk homicide and other felony trials, had repeatedly testified falsely concerning his academic credentials. The specifics of the allegations were that Dubey claimed a Master's degree in forensic science, which he had never received, and a Bachelor's degree

-128-

from Rensselaer Polytechnic Institute, when in fact his Bachelor's degree was from a different institution.

Newsday's revelation led to the appointment of Pierre G. Lundberg as a Special District Attorney on December 17, 1986, to investigate Dubey's conduct. Mr. Lundberg's investigation eventually led to Dubey's pleading guilty to three counts of Perjury in the Third Degree, class A misdemeanors, on April 14, 1987 (People v. Dubey, Indictment No. W376/87, Suffolk County Court, Judge Rohl), and admitting on the record that he had lied about his credentials in at least 20 other Suffolk prosecutions.

As it turns out, however, the very same allegations which formed the basis for the investigation and prosecution of Dubey had been reported to Suffolk County Assistant District Attorney Barry Feldman, then Deputy Chief of the Trial Bureau, and the prosecutor in the Diaz case, in October 1983, three years earlier (Chapter I (A)). Feldman discussed the allegations with Suffolk County Assistant District Attorney Steven Wilutis, the Chief Trial Prosecutor, who was also a witness in the Diaz case (Chapter I (A)). Dubey, both before and after this time, performed forensic work on many cases prosecuted by Feldman and Wilutis, including the Diaz case. These allegations were made by Andrew

-129-

Varanelli, Chief of the Crime Laboratory, to Dr. Sidney Weinberg, the Chief Medical Examiner, who conveyed them to Feldman by telephone.

In an April 22, 1987, letter supplied to the Commission by Special District Attorney Lundberg, Mr. Lundberg reported that "Wilutis and Feldman considered Dubey to be professionally helpful to the District Attorney's Office and, in Feldman's case, also a personal friend." Feldman and Wilutis never reduced to writing the allegations that were made to them about Dubey, failed to tell the District Attorney of the allegations, and, after an investigation which consisted merely of a cursory review of four transcripts involving equivocal testimony by Dubey about his academic degrees, Wilutis and Feldman, to quote Lundberg's letter, "unilaterally terminated their investigation." Feldman later acknowledged that while he knew that Dubey did not have a Master's degree, he believed that Dubey had not testified falsely (Public Hearing, 1987, pp. 608-610).

However, Wilutis and Feldman did even more than unilaterally terminate their "investigation." On April 11, 1984, six months after the allegations were made by Varanelli about Dubey, Wilutis wrote a

confidential memorandum to Patrick Henry praising Dubey and criticizing Varanelli. Wilutis wrote:

> Suffolk County is most fortunate to have one of the nation's foremost serologists in . . . Ira Dubey. . . . He is an extremely bright and articulate witness. His credentials are impressive. . . For some reason, which I can only assume to be professional jealousy, Mr. Varanelli has, within the past month ordered that Mr. Dubey will no longer handle all homicide crime scene searches and scientific evaluations, as he has in the past; instead, all forensic scientists in the lab will handle murder cases on a rotating basis.
> (Quoted in People v. Morales, Indictment No. 251-84, Decision after CPL 440.10 hearing, June 20, 1988, Suffolk County Court, Judge Namm.)

Furthermore, at the Commission's public hearing on January 29, 1987, Feldman, when asked why he permitted Dubey to testify falsely concerning his credentials in the Diaz case, on October 7, 1985, long after he, Feldman, knew of the allegations against Dubey, testified:

> . . . I thought we had put this whole issue to bed. I had no reason to think that he misrepresented. . . . I had no reason to think that in the two subsequent years

-131-

that he might not have gotten his
Master's degree.

Q.  Did you ask?

A.  No.
(Public Hearing, 1987, p. 610.)


It was not until three years after Feldman
and Wilutis killed the allegations against Feldman's
friend and their star forensic witness, Ira Dubey, that
the Dubey matter was properly investigated and prose-
cuted and Dubey's perjury conviction obtained by a spe-
cial prosecutor following Newsday's revelation.  The
Commission concludes that Feldman and Wilutis, because
of their personal and professional relations with
Dubey, improperly protected and defended him in the
face of serious criminal charges, which in fact proved
to be true.

Section DR7-102(B)(2) of the Code of Profes-
sional Responsibility states that "a lawyer who
receives information clearly establishing that a person
other than his client has perpetrated a fraud upon a
tribunal shall promptly reveal the fraud to the tribu-
nal." In the Commission's view, Feldman and Wilutis
plainly failed to live up to this standard.

Feldman and Wilutis, as high-ranking repre-
sentatives of the District Attorney's Office, took it

-132-

upon themselves to investigate serious criminal charges against a personal friend and helpful prosecution witness in many cases they themselves had prosecuted. They failed to tell the District Attorney of the allegations, and then "exonerated" Dubey based on a cursory, totally inadequate investigation. The Dubey matter, in fact, ultimately required a special prosecutor, but Feldman and Wilutis blatantly ignored the obvious conflicts inherent in their investigating Dubey. The Commission is referring the misconduct in this matter by Feldman and Wilutis, who have both subsequently left the Suffolk District Attorney's Office, to the New York State Grievance Committee for the 10th Judicial District, which considers disciplinary complaints against attorneys for the counties of Nassau and Suffolk.

Finally, it should be noted, in February 1987, after Feldman's misconduct and incompetence in the Dubey and _Diaz_ matters had been discussed by the Commission with District Attorney Henry, with the Commission recommending that Feldman be fired, Henry refused. Instead, Henry gave Feldman a lateral transfer to the position of Bureau Chief of the East End Bureau, based in Southampton. By this action, Henry again demonstrated his unwillingness to take even

-133-

minimal steps to show that misconduct in his Office would not be tolerated.

### B.   David Woycik

Another example of the improper manner in which allegations of employee crimes and misconduct were handled by the Suffolk County District Attorney is to be found in the case of David Woycik. During the summer of 1987, the Public Safety Committee of the Suffolk County Legislature conducted an investigation of law enforcement activities in Suffolk County and held six days of public hearings, of which the Woycik matter was one subject. That investigation revealed that in 1982 Suffolk County Police Officer Theodore Adamchak had related a story to Patrick Leis, Bureau Chief of the District Court Bureau of the Suffolk District Attorney's Office, and to others in the District Attorney's Office, regarding a subordinate of Leis, Assistant District Attorney David Woycik. That story was later recounted in a written statement given by Adamchak to then Detective Sergeant Alan Rosenthal of the District Attorney's Squad. In Adamchak's statement he said that after he testified in a Driving While Intoxicated trial which Woycik was prosecuting, Woycik handed Adamchak an attorney's business card with

-134-

Woycik's name and a telephone number on it. Woycik told Adamchak that if Adamchak made any arrests and could refer anyone to him, he would then "refer them to Spota and we would all make some money." Woycik mentioned the figure of $100 but Adamchak did not know if Woycik meant Adamchak would get the full $100 or share the $100 (Suffolk Legislative Hearing, 8/13/87, pp. 32-46).*

Following Rosenthal's taking Adamchak's written statement, Rosenthal took a similar statement from Suffolk Police Officer William Brown. In that statement Brown recounted that Woycik had asked Brown, while Brown was processing an arrestee in a Driving While Intoxicated case, if Brown was aware that various law firms paid a percentage of their legal fees to officers who referred cases to them. According to Brown, Woycik went on to say that detectives had been referring cases to lawyers for 30 percent of the fee. Woycik told Brown that if he would refer cases to the firm of Sullivan and Spota, there would be remuneration for Brown (Suffolk Legislative Hearing, 8/13/87, pp. 30-32).

_____

* Adamchak was later expelled from the Suffolk County Patrolmen's Benevolent Association for his testimony before the Suffolk Legislature, becoming the first member expelled in the union's history.

-135-

The "Sullivan and Spota" firm mentioned was composed of Gerard Sullivan and Thomas Spota, both former Chief Trial Prosecutors in the Suffolk County District Attorney's Office. Spota then and now has also served as legal counsel to the Detectives' Association of the Suffolk County Police Department.

The investigation of Adamchak's 1982 allegations was assigned to then Assistant District Attorney James O'Rourke, Bureau Chief of the Special Investigation Unit, who reported directly to District Attorney Henry. Subsequently, in April 1984, O'Rourke left the District Attorney's Office and sublet office space from Sullivan and Spota. He joined that firm as a partner in April 1985 (Suffolk Legislative Hearing, 9/3/87, p. 129).*

Rosenthal, who had assisted O'Rourke in the Woycik investigation, testified at the Suffolk Legislative Hearing that the Woycik matter was a very unusual case, and that many important investigative steps were taken in that case which confirmed the basic allegations of Adamchak. However, Rosenthal admitted that

---

* Upon O'Rourke's resignation in April 1984, as Bureau Chief of the Special Investigation Unit, which handled political corruption, Henry did not appoint a successor and allowed the Unit to disband. However, Henry resurrected the Unit on November 13, 1987.

these steps could not be determined from the file.  For example, the file did not indicate when the case was assigned; the substance of a telephone call which was made to the Sullivan and Spota firm by O'Rourke, which supposedly exonerated them; the date of entry to the case of an attorney for Woycik; what steps were taken to talk to other police officers about possible referral fees offered to them, or any legal memoranda regarding what crimes might have been committed by Woycik. Rosenthal testified the file might warrant a "C or an F" grade (Suffolk Legislative Hearing, 8/13/87, p. 134). He also testified regarding the written statement he took from Adamchak: "If he [the committee investigator] were to take a statement like this from a witness, you would either fire him, not pay him or throw the statement at him. It is not complete enough" (Suffolk Legislative Hearing, 8/13/87, p. 110).

O'Rourke testified at the hearing that in the course of this investigation he never examined Woycik's personnel file because it would contain only "administrative nonsense" (Suffolk Legislative Hearing, 9/3/87, p. 29). In fact, however, the personnel file revealed other disturbing and possibly relevant facts regarding Woycik: that Gerard Sullivan had recommended Woycik for employment in the District Attorney's Office; that

Woycik had applied for a gun permit to use in a part-
time job with a vending company suspected by the Suf-
folk Police of organized crime connections; and that
Woycik had "lost" his assistant district attorney's
identification and badge and not reported this loss for
10 months.

The District Attorney's investigation showed
that the business card given to Adamchak by Woycik
listed a telephone number and the address of the law
office of Sullivan and Spota. O'Rourke testified he
relied on a telephone call to Sullivan and Spota before
absolving them of any suspicion of misconduct.
O'Rourke also testified that when he asked Sullivan and
Spota why Assistant District Attorney Woycik had a
telephone listing at their office, they simply replied
that Woycik was planning to leave the District Attor-
ney's Office, rent office space from them, and "hit the
ground running." Furthermore, they informed O'Rourke,
Woycik had already referred one civil case to them in
which a settlement was expected in the near future.
However, they denied knowledge of any offers or pay-
ments to police officers for referral fees  (Suffolk
Legislative Hearing, 9/3/87, pp. 119-121).

After their cursory investigation, Rosenthal
and O'Rourke concluded that the approaches for referral

-138-

fees were limited to Police Officers Adamchak and Brown. Neither Rosenthal, who was then assigned to the District Attorney's Squad, nor his superiors in the District Attorney's Office reported this investigation to the Internal Affairs Division of the Suffolk County Police Department.

At the conclusion of the investigation, in January 1983, O'Rourke decided that there was no prosecutable crime by Woycik and that instead a letter should be sent to the Grievance Committee. However, John Mullin, now a Suffolk District Court Judge, who was then First Assistant District Attorney, overruled even that step, and District Attorney Henry approved that final decision (Suffolk Legislative Hearing, 9/3/87, p. 123). At the time of the Suffolk Legislature's hearing on the Woycik matter, Mark Cohen, Chief Law Assistant in the District Attorney's Office, still maintained that there should have been a letter sent to the Grievance Committee (Suffolk Legislative Hearing, 8/13/87, p. 270). O'Rourke thought that a request for the appointment of a special district attorney would have been appropriate if the Woycik allegations were known while Woycik was still in the District Attorney's Office (Suffolk Legislative Hearing, 9/3/87, p. 124).

-139-

District Attorney Henry testified at the leg-
islative hearing that the Woycik investigation occurred
right after Woycik had already been fired for placing
an attorney advertisement in the Yellow Pages. At that
hearing Henry continued to maintain that no letter to
the Grievance Committee was called for. Nonetheless,
Henry testified:

> Q. Do not the allegations in the
> official statements of Officers
> Brown and Adamchak, if believed,
> indicate that a member of your
> office attempted to corrupt at
> least two members of the Suffolk
> County Police Department, is that
> correct?
>
> A. Yes.
>
> Q. And also --
>
> A. [Interposing] And I do believe
> it. I believe these two state-
> ments.
> (Suffolk Legislative Hearing,
> 8/14/87, pp. 128-129.)

However, Henry not only approved the decision not to
send a letter to the Grievance Committee, but he also
approved of the quality of the Woycik investigation
itself:

> . . . I have no quarrel with the
> extensiveness of the investigation
> as I understand it, but certainly

-140-

> the documentation of the investiga-
> tion is lacking.
> (Suffolk    Legislative    Hearing,
> 8/14/87, p. 128.)

Based on the superficial nature of the Woycik
investigation, and a review of the possible criminal
offenses involved, the explanations as to why there
were no prosecutable crimes in the Woycik matter, let
alone a Grievance Committee letter, are disturbing.
Moreover, the attitude displayed by Patrick Leis, then
Chief of the District Court Bureau, and now an Acting
Supreme Court Justice in Suffolk, is revealing of the
attitude displayed by the District Attorney's Office
regarding the Woycik allegations. When Adamchak took
his allegations to Leis about Woycik, who was one of
Leis's subordinates, Leis took no notes and made no
memorandum of the complaint, but rather referred
Adamchak to Mr. O'Rourke's Bureau.  When Leis checked
on the allegations three weeks later, he learned they
were being investigated.

In addition, when Leis appeared before the
Suffolk Legislature in 1987, he testified that since
Adamchak's allegations referred to possible referral
fees in "civil" cases, rather than "criminal" cases,
that it was an "ethical" matter, and not a "criminal"
matter.

Q. So, what you're telling us, if officer Adamchak had told you that the kickbacks related to the criminal cases instead of civil negligence cases, you would have treated the matter differently?

A. We're talking kickbacks in criminal cases, you're talking about a man who is committing a crime, either one of my assistants or Adamchak or someone. And I would have absolutely treated it differently. You're talking criminal activity, yes.

Q. And what would you have done differently?

A. I would have gone directly to the District Attorney and I would have an investigation commenced immediately and would have checked on a daily basis. There would have probably been some undercover work, all kinds of things. This would have been a serious situation, . . . (Suffolk Legislative Hearing, 8/13/87, pp. 52-53.)

However, at the time Adamchak complained to Leis, there was no way that Leis could have determined that no criminal violations had occurred, whether there were referral fees offered on either civil or criminal cases (see, for example, Judiciary Law §§479, 481, 482, 491 and Penal Law Article 200 - Bribery Involving Public Servants and Related Offenses). Thus, his explanation of his understanding of the gravity of the matter reveals that his perception was both faulty and premature.

Although there were no legal memoranda in the Woycik file, a decision was made by O'Rourke, approved by Henry and Mullin, that there were no prosecutable crimes by Woycik. Whether there were no prosecutable crimes or not may be debatable, but without a thorough investigation, such a conclusion was totally irresponsible.

In the Commission's view, the key point about this incident is not the misconduct of David Woycik, which was reprehensible, unethical and possibly criminal, but rather what this incident says about how Mr. Henry's Office responded to misconduct. Mr. Henry's Office's failures in the Woycik case include the deplorable state of the Woycik file, the superficial nature of the investigation, the failure to inform Police Department management or the Internal Affairs Division of the incident, the failure to prosecute Woycik or even send a letter to the Grievance Committee, and the conflicts and interrelationships between the District Attorney's Office, including among O'Rourke and Spota and Sullivan, which allowed Spota and Sullivan to be exonerated by a mere telephone call in which they denied any improprieties.

In addition to revealing how the District Attorney's Office failed to properly investigate and

-143-

punish serious employee misconduct, the Woycik matter
also demonstrated a serious systemic defect in the
operation of that Office. On May 6, 1987, the Commis-
sion requested District Attorney Henry's Office to pro-
vide the file of any misconduct investigation concern-
ing David Woycik, which the Commission already knew
existed, of which it had a partial copy, and which was
prior to any action by the Suffolk Legislature.   The
Commission was told that there was no District Attorney
file concerning misconduct by Woycik, but the Commis-
sion was given his personnel file, which contained no
hint of the advertisement or the reason for his
"resigning" from the Office, nor any hint of the Woycik
referral fee investigation.  Only after the Suffolk
Legislature's Public Safety Committee decided to pre-
sent the Woycik case at a public hearing, and after the
Committee had informed District Attorney Henry that
they knew such an investigation had occurred and pro-
vided the District Attorney with additional known
details, was the District Attorney's file on the Woycik
incident located and provided to the Committee and to
the Commission.

    Memory, however, should not be the method to
be relied on to locate records regarding investigations
of employee misconduct.  Complete files, and the

retrievability of files, are crucial to investigating cases of misconduct, to analyzing them as to type and who is accused, to checking records in the future for personnel decisions on such things as promotion or firing, and for answering requests in the future from outside agencies or potential employers.

The Suffolk District Attorney reported to the Commission in an October 6, 1987 letter that allegations of District Attorney's Office employee misconduct, except for criminal convictions, are not placed in an employee's personnel file, but rather are kept in the file of the criminal case in which the misconduct was alleged to have occurred or are kept in the office of the District Attorney's Chief Investigator. How patterns of misconduct are discerned, how the record of each assistant district attorney is reviewed, or how complete responses to outside agencies and employers are made at a later date, is not clear. In sum, the District Attorney's Office has not employed care or diligence with respect to maintaining a proper record of allegations and investigations of misconduct.

While the Commission will make a referral to the Grievance Committee of Woycik's misconduct (see Recommendations, F(2)), the Commission also agrees with the conclusion of the Suffolk Public Safety Com-

-145-

mittee in the Woycik matter. As the Committee wrote in its final report:

> The manner in which the Suffolk County District Attorney's Office conducted a potentially serious corruption case involving an alleged kick-back scheme between an Assistant District Attorney, police officers from the County Police Department, and a prominent criminal defense law firm in Suffolk County comprised of former high-ranking members of the Suffolk County District Attorney's Office does not inspire confidence in the ability of that office to conduct an aggressive, thorough, comprehensive investigation of what is generally viewed as the most serious of potential corruption, i.e., the erosion and undermining of public confidence in our criminal law enforcement community through efforts to bribe or influence police officers.

> In particular, the procedures utilized by the District Attorney's Office leave a great deal to be desired.*

## C. People v. Hansen

At the Commission's public hearing in January 1987, a former Suffolk assistant district attorney, Steven Burton, testified regarding a case he had

___

* "Report of the Suffolk County Public Safety Committee's Investigation Into Law Enforcement Activity Within the County of Suffolk" (1987), p. 28.

-146-

prosecuted, <u>People v. Hansen</u> (Docket Numbers 1955352 and 1955353, Suffolk County District Court, Judge Colaneri), a 1981 prosecution for Driving While Intoxicated. Burton testified that during the trial, Police Officer Walter Matejovic, a breathalyzer technician with the Suffolk County Police Highway Patrol Bureau, who was a witness in the <u>Hansen</u> case, came to Burton and admitted that he had testified falsely and submitted fabricated evidence in the case.

Matejovic explained to Burton that he had lost the original certified breathalyzer test kit carton and had asked for and received a forged box from another member of his unit. Matejovic admitted to Burton and to other police personnel that at the <u>Hansen</u> trial Matejovic had knowingly testified falsely that the forged carton was the original carton. Matejovic said that he was reporting this to Burton because Matejovic feared the original evidence, which Matejovic had lost, had been found by, and was then in the possession of, the defendant (Public Hearing, 1987, pp. 354-360).

Burton, a new assistant district attorney who had been admitted to the bar for only a few months, talked to his Bureau Chief, Robert Folks, Chief of the District Court Bureau, and sent him a memo, dated March

12, 1981, outlining this incident. Folks told Burton to seek a dismissal, which Burton did, by reporting the incident to the trial judge and requesting a dismissal in the interest of justice. Burton sent a confirming memo to Folks along with the forged carton, which was given to Burton by the court, and the original carton, which Burton had received from Hansen's defense counsel (Public Hearing, 1987, pp. 360-369).

Richard Sperl, who had been the supervising sergeant of the Breathalyzer Test Section at the time of the Hansen case, testified at the Commission's public hearing that Matejovic himself had told Sperl about his forgery and false testimony (Public Hearing, 1987, pp. 379-383). Police Officer James McCarthy, of the Breathalyzer Section, testified that he had provided the forged evidence to Matejovic (Private Hearing, McCarthy, 1/21/87, pp. 26-34).

Robert Folks, who was an Assistant United States Attorney in the Southern District of New York at the time of his testimony before the Commission, appeared at two private hearings and at the public hearing. At his first private hearing, Folks claimed not to recall the Hansen matter (Folks, 1/6/87); at the second private hearing, Folks had some recollection of the incident, including a conversation with Mr. Henry

about it (Folks, 1/15/87). At the public hearing, how-
ever, Folks was able to provide more detail about the
incident, and remembered reporting the false testimony
and fabricated evidence personally to Mr. Henry (Public
Hearing, 1987, pp. 416-419, 432-433).

During his appearance at the public hearing,
Henry could not recall speaking to Folks about this
matter, denied receiving any documents from Folks, and
stated that no investigation of this matter had ever
been undertaken by his Office (Public Hearing, 1987,
pp. 502-504). Moreover, Mr. Henry's Office was never
able to produce any documents to establish that this
matter was ever investigated by that Office, and appar-
ently the matter was never reported by the District
Attorney's Office to police supervisors or to the
Internal Affairs Division of the Suffolk Police Depart-
ment, and no Police Department disciplinary investiga-
tion was ever conducted (Public Hearing, 1987, Exhibit
53, and pp. 397-399, 407-435, 502-504).

Following the Commission's hearing, Mr. Henry
requested the appointment of a Special District Attor-
ney to investigate the Hansen matter, as well as the
Gallagher matter (see Chapter VII). In February 1988,
a grand jury declined to indict Walter Matejovic for
criminal offenses in the Hansen matter. Despite

extensive investigation by the Special District Attor-
ney and, prior to his appointment, by the Commission, a
number of relevant items of evidence were never
located. Thus, neither the transcript nor the report-
er's notes for the day of the Hansen trial at which
Matejovic testified could ever be found. Furthermore,
the fabricated breathalyzer evidence presented at the
trial could not be located. Finally, the Special Dis-
trict Attorney was never able to determine who in the
District Attorney's Office either prevented or failed
to authorize a full examination of the Hansen miscon-
duct at the time it occurred. The absence of this evi-
dence and/or the failure to explain its absence by the
District Attorney and the police personnel involved is
but one element of the Hansen matter that concerns the
Commission.

The Hansen case demonstrates once again the
continuing pattern of failure on the part of both the
District Attorney's Office and the Police Department to
conduct proper investigations of allegations of employ-
ee misconduct. As a result of such failure, Matejovic
and McCarthy, both admittedly involved in the fabrica-
tion of false evidence and perjury, were never punished
for their conduct in this incident.

-150-

## VI. DEFICIENCIES IN THE OVERSIGHT OF POLICE PERSONNEL

The Commission has determined that misconduct, improprieties and poor management were characteristic of the oversight and control of police personnel by the Suffolk County Police Department. Problems ranged from deficiencies in routine management functions, such as personnel evaluation and overtime rules, to the disastrous failure in the procedures employed by the Department in the investigation and punishment of police misconduct. The net result was a department not under proper management control.

### A.  Lack of Personnel Evaluation

The Commission found that there was no process of regular, written evaluation by supervisors of personnel in the Homicide Division, or elsewhere in the Department. Written personnel evaluations are a standard part of management practices in well-managed organizations to assist in personnel development and as a tool for motivating and monitoring personnel. Detective Sergeant Kenneth McGuire, who was the team leader in both the Corso and Diaz cases, testified at the Commission's hearing about the lack of personnel evaluations:

Q. Did you do any personnel evalu-
ations of the men who worked under
you?

A. I have done that, yes.

Q. Were you doing that when you
retired in March of 1986?

A. No. They had gotten away from
it.

Q. What do you mean 'they had got-
ten away from it'?

A. Maybe five or six years ago we
had to do periodic reports, and
then we just didn't have to submit
them anymore.

Q. So there was no written evalua-
tion of men in your squad which was
submitted above you to your super-
visors?

A. Not for the last couple of
years while I was on the job.
(Public Hearing, 1987, pp. 339-340.)

Suffolk Police Department management cannot forego such

an important tool as regular, written personnel evalua-

tions.


B.   **Disproportionate Salary and Overtime**

The total salary and overtime for the jobs

performed by the Suffolk Police Homicide detectives and

supervisors was extraordinarily high. Their high sala-

ries, greatly boosted by overtime, provided a strong

economic incentive for detectives to remain in Homi-

cide.

Detective Rafferty testified before the Commission that he regularly logged 1200 hours of overtime per year while in Homicide and Detective Sergeant McGuire testified that he earned $15,000 in overtime in his final year on the force (Public Hearing, 1987, p. 303). Part of the desirability for a great deal of overtime is that pensions can be greatly increased depending on the salary earned near the end of one's career, which was the case with certain Homicide personnel whose earnings are listed below. In sum, the Department did not take adequate steps to monitor and control overtime (Suffolk Legislative Hearing, 6/29/87, p. 22; 6/30/87, pp. 194-225).

Reference to the Suffolk County payroll records presents a fuller picture of the total annual salaries (including overtime and other payments) for Homicide Division personnel, many of whom are discussed in this Report:

### 1986

| | |
|---|---|
| Detective Lieutenant Robert M. Dunn Commanding Officer | $97,118 |
| Detective Sergeant Kenneth W. McGuire | 80,966 |
| Detective Sergeant Robert F. Misegades | 71,745 |
| Detective Leon E. McKenna | 70,931 |
| Detective Sergeant Richard A. Jensen | 62,900 |
| Detective Kevin J. McCready | 60,409 |
| Detective John F. Miller | 55,739 |

### 1985

| | |
|---|---|
| Detective Robert C. Amato | $89,158 |
| Detective John F. Miller | 69,880 |
| Detective Walter Warkenthien | 67,748 |
| Detective Anthony Palumbo | 65,231 |
| Detective Dennis W. Rafferty | 63,388 |

By comparison, Police Commissioner Treder was paid $85,727 in 1985, less than one of the detectives in the Homicide Division.

While the image of the elite Homicide Division was matched by high salaries paid to its members, it was not, unfortunately, accompanied by a high degree of professionalism in their performance.

### C. The Skorupski Case and the Failure to Investigate and Punish Police Misconduct

At the Commission's January 1987, public hearing, testimony was given regarding the case of Joseph Skorupski. Testimony was presented that in 1985, when Skorupski was 17 years old, he was mistaken by Suffolk Police personnel for a suspect in a series of rapes and robberies, and was stopped, a shotgun fired near him, and a gun barrel placed in his mouth while he was threatened with death and beaten by the apprehending officers (Public Hearing, 1987, pp. 810-834).

Following this incident, the doctor who examined Skorupski at the hospital called the Commanding Officer of the unit which mistakenly apprehended Skorupski to complain about the use of excessive force. Despite the call, the only aspect of the incident investigated by the Suffolk Police Department was the shotgun discharge, and only because the Department had a rule that all weapon discharges had to be investigated. According to testimony by Suffolk Police Commissioner DeWitt Treder, no Internal Affairs Division disciplinary investigation was ever conducted of the excessive force allegations relative to Joseph Skorupski, despite the fact that several supervisory personnel in the Police Department had full knowledge of the incident, including the fact that Skorupski had to be treated at the hospital shortly after he was stopped by the Suffolk Police (Public Hearing, 1987, pp. 934-943).

Following the public hearing, on February 4, 1987, Judge John Bartels dismissed Skorupski's federal civil suit against Suffolk County and the Police Department (Skorupski v. County of Suffolk, 652 F. Supp. 690 (E.D.N.Y. 1987)). Based on testimony at the Commission's hearing, which led to further Commission investigation including extensive review of Internal

-155-

Affairs Division statistics and documents, it appeared that certain claims made in affidavits submitted in the Skorupski case by the Suffolk County Police Department falsely described and misrepresented the Department's actual practices with regard to investigations of police misconduct.

In particular, two affidavits by Inspector Robert Snow, Commanding Officer of the Inspectional Services Bureau (which included the Internal Affairs Division), dated August 1 and September 2, 1986, contained inaccurate and incomplete statistics and statements regarding complaints of police misconduct made to the Suffolk Police Department in the years 1981-1985, greatly understating the number of complaints and falsely asserting that all were investigated. Subsequent private hearings by the Commission with Snow, and with Robert Kearon, Assistant Deputy Commissioner for Legal Affairs of the Suffolk County Police Department, who prepared the Snow affidavits, revealed not only misleading affidavits, but also improper practices with respect to many types of police misconduct investigations.

While the affidavits stated that all allegations of misconduct were investigated, in fact, during the two and one-half year period between October 1983

-156-

and May 1986, the Suffolk Police, with the cooperation of then County Attorney Martin Bradley Ashare, had a deliberate policy of not investigating for disciplinary purposes complaints regarding matters in which there was also litigation against the County or Police Department or police personnel or in which a notice of claim pursuant to General Municipal Law §50-e had been filed. Furthermore, even after the termination of any litigation, no disciplinary investigations of those cases were conducted.

Suffolk's system for misconduct cases allowed two different Suffolk Police Department units to investigate misconduct incidents. If there was no litigation, the Internal Affairs Division, given certain conditions and in the best of circumstances, might investigate allegations of police misconduct for disciplinary purposes. Internal Affairs, based at Police Headquarters, had assigned to it approximately 20 police personnel, principally sergeants and lieutenants, and was commanded by an inspector.

However, if litigation was involved, the Claims Investigation Unit handled the investigation, with the sole aim of developing evidence to be used by the Police Department and County in the defense of that litigation, not for disciplinary purposes. The Claims

-157-

Investigation Unit was composed of five police officers assigned to the County Attorney's Office. If an Internal Affairs Division investigation had been started, but litigation ensued, the Internal Affairs Division disciplinary investigation was halted and the case file forwarded to the County Attorney to assist in the defense of the civil litigation. However, even if the litigation terminated, cases were not sent back to Internal Affairs for a disciplinary investigation (Private Hearing, Snow, 5/1/87, pp. 26-44, 64-68).

By Suffolk's own confused and fragmentary statistics, almost 100 allegations of undue force and other serious misconduct by the police which occurred between 1983 and 1986 were never investigated for disciplinary purposes (see Hearing before Judge Bartels in Skorupski v. County of Suffolk, Civ. No. 86-0219, E.D.N.Y., 6/23/87).*

The failure to disclose the Department's policy of not investigating any cases involving

---

\* In 1986, during the early stages of the Commission's investigation, and following a decision in the case of Fiacco v. City of Rensselaer, N.Y., 783 F.2d 319 (2d Cir. 1986), an upstate New York case which demonstrated to Suffolk that the system of non-investigation they had adopted would not survive judicial scrutiny, the Suffolk policy was changed, so that at least in theory even cases involving litigation would be investigated for disciplinary purposes.

litigation for disciplinary purposes was not the only misleading aspect of the Snow affidavits filed in the Skorupski case, nor the only defective element of the Suffolk Police Department's disciplinary practices. Other procedures, or the absence of procedures, also resulted in many other allegations of undue force and misconduct not being investigated, documented, reviewed or punished properly.

For example, in addition to complaints of police misconduct made to the Suffolk Police Internal Affairs Division, and theoretically investigated by Internal Affairs, civilian complaints of police misconduct could also be logged and investigated at the precinct level using the Civilian Complaint Report form (PDCS-1300), with the possible imposition of local "command discipline" (Snow, pp. 17-25, 119). When the affidavits were submitted in the Skorupski case, Snow failed to include these cases in his statistics, in part because until May 1986, there was no Department policy or procedure which required Civilian Complaint Reports filed in the precincts, or their results, to be forwarded to the Internal Affairs Division. Thus, as Snow later acknowledged, there was some unknown number of cases involving police misconduct, filed on Civilian Complaint forms at the precincts from 1981-1986, about

which the Commander of the Internal Affairs Division knew nothing. How many such cases existed, whether they all were investigated, and the number of disciplinary sanctions imposed were all unknown to Snow and thus not included in his affidavits (Snow, pp. 20-22).

At a private hearing before the Commission, Snow testified that it was desirable that a police officer's direct supervisor investigate that police officer when there were allegations of misconduct (Snow, pp. 76-80). However, the Commission has reviewed a number of Suffolk precinct misconduct investigations in which, for example, a superior officer investigated a subordinate in his command. Not surprisingly, in some of those cases the superior officer himself could have been found to be at fault or guilty of misconduct in his supervision of the subordinate, which failure of supervision then gave rise to the incident of misconduct. In effect, Snow approved -- and the Department approved -- a policy pursuant to which superior officers investigated their own actions, in a terribly flawed procedure for misconduct investigations.

Finally, a third category of complaints made to Internal Affairs, labeled "alerts," involved allegedly less serious cases which were referred by the Internal Affairs Division to the precincts for

investigation. Not only did the Police Department have no written guidelines as to what was not "serious," but in actual practice an accurate determination is almost impossible at the initial complaint stage. In any such case the Commanding Officer of Internal Affairs had the power to decide whether to send the case to the precinct for investigation or to have the Internal Affairs Division investigate it. However, prior to 1986, if the case was referred to the precinct, the precinct was not required to report back to Internal Affairs the result of its investigation (Snow, pp. 69-80). Furthermore, cases investigated and punished at the precinct level were required by the Suffolk County Police Department Rules and Procedures (§5/6.31) to be expunged from the files after 24 to 36 months, thus further burying such cases.

In a third affidavit to Judge Bartels, dated May 12, 1987, after the Commission's findings were brought to the attention of the Court and became public, Snow admitted omitting from his first two affidavits any information regarding allegations of misconduct characterized as "alert" cases. However, he did provide statistics for one year, 1984, indicating that for that one year alone his original affidavit failed to mention 60 allegations of misconduct and 16 unknown

-161-

cases "missing from the files." Of the 60 allegations of misconduct which had been referred to the precincts, and never followed up by the Internal Affairs Division, "8 involved some sort of criminal conduct, 22 alleged harassment, one alleged property damage and 29 alleged undue force." Snow was only able to ascertain the results in 19 of the 29 alerts alleging some degree of force (Snow Affidavit, 5/12/87).

Clearly, not only were Snow's first two affidavits, which were prepared by Robert Kearon, false and misleading, but also the procedures of the Suffolk Police for investigating misconduct were a travesty, which ensured that a substantial number of cases would not be investigated and allowed a large, but unknown, number of other cases to be buried in the precincts, without review by Internal Affairs.

After an examination of Inspector Snow in a proceeding before Judge Bartels on June 23, 1987, Judge Bartels reversed his decision of February 1987, and brought Suffolk County and the Police Department back into the Skorupski action as defendants. In the Court's oral decision it indicated that Snow's affidavits regarding misconduct investigations by the Suffolk Police were not consistent with his testimony and were misleading (Skorupski v. County of Suffolk, Hearing,

-162-

6/23/87, pp. 67-71). In June 1988, after the trial had commenced, Suffolk County settled the Skorupski litigation by agreeing to pay $80,000 to Joseph Skorupski.

With regard to the misleading affidavits which were prepared by Robert Kearon, who still serves as Assistant Deputy Commissioner of Legal Affairs of the Suffolk Police, Kearon could hardly claim ignorance of investigative procedure involving misconduct by the Suffolk Police and County Attorney's Office. Prior to assuming his police post in 1986, Kearon had served in the Torts Division of the Suffolk County Attorney's Office, first as Deputy Bureau Chief and later as Chief of that Division. When he first joined the Police Department, Kearon had even retained his title as Chief of the County Attorney's Torts Division. Kearon, at the least, prepared and submitted misleading and erroneous affidavits to the Court. Even if ignorance were to be accepted as excusing these actions, the conclusion is inescapable that Kearon's conduct in the Skorupski case was below acceptable professional standards.

The Commission is referring this matter to the Grievance Committee for the 10th Judicial District for the Committee's consideration of whether Kearon violated DR7-102(A)(6) of the Code of Professional

Responsibility, which states, "In his representation of a client, a lawyer shall not . . . participate in the creation or preservation of evidence when he knows or it is obvious that the evidence is false" (see Recommendations, F(3)).

The Suffolk County Police Department's irresponsible behavior with regard to misconduct investigations was neither recent nor due to lack of notice of the shortcomings of the Department's procedures and practices. The Suffolk County Bar Report of 1981 treated deficiencies in Suffolk Police Department misconduct investigations in considerable detail (see Background, A(3)), and, even earlier, the 1976 Grand Jury Report also provided the Department with notice of the need to reform its procedures in misconduct investigations (see Background, A(2)). However, the Department did not take that path and in fact gave up investigating for disciplinary purposes any litigated cases at all. The reaction of the Department toward the Bar Report and charges of deficient misconduct investigations, and its defensive attitude which prevented reforms of the improper practices in the Internal Affairs Division, is summed up well in a memo dated April 1, 1981, from then Deputy Police Commissioner Charles F. Peterson to then Police Commissioner Donald J. Dilworth:

Subject: Meeting with Allen Smith, Assistant County Attorney, New Head of Torts Bureau.

1. Federal Court Awards:

   We discussed this. I told him it was my view, not that the Officers were necessarily acting improperly, but that,

   (a) The Bar Association of Suffolk County has succeeded in poisoning the minds of prospective jurors for the personal gain of lawyers, and

   (b) It is my belief that the Eastern District is a hostile Federal Court, and that all local law enforcement is suffering because of it.

2. Records Retention.

   . . . We discussed the fact that Philadelphia makes no investigation into Brutality arrests, except by use of Patrol Sergeants. The records are promptly destroyed.

   . . . we are allowing greedy lawyers to beat us over the head with our own records.

This is not only a blind denial of existing problems, but a favorable comment by the then second highest-ranking supervisor in the Suffolk Police Department about a better method of covering up misconduct. The consistent policy in misconduct

-165-

investigations, homicide investigations, and elsewhere in the Department and District Attorney's Office where the Commission has looked, has been a policy of creating as few documents as possible, even absolutely necessary and legitimate documents, in order to avoid possible future criticism by concealing misconduct and to avoid proper discovery in litigation.* This is an unacceptable policy in both the Police Department and District Attorney's Office.

---

\* Not surprisingly, this attitude and practice has not gone unnoticed by the courts. Thus, for example, in <u>Mercy v. County of Suffolk</u>, 93 F.R.D. 520 (E.D.N.Y. 1982) then District Judge George C. Pratt stated (at page 523):

> . . . In this court's experience, of the many different police departments who have appeared as defendants, Suffolk County has been one of the most reluctant to cooperate in . . . disclosures.

> \*    \*    \*

> [T]he court's discovery order has been willingly accepted and complied with by Nassau County, and no one there has complained that it has resulted in less candor during internal affairs investigations. Yet, Suffolk County has not only opposed the discovery order and its related search for the truth, but in doing so it has retained outside counsel, at considerable expense to the county, to prepare briefs and appear for oral argument. The net result is an expenditure of more time and yet further expense to the taxpayers of Suffolk County who in the end must pay the bill.

## VII. THE APPOINTMENT OF A SPECIAL DISTRICT ATTORNEY IN THE GALLAGHER CASE

### A. The Appointment of a Special District Attorney

Following the Commission's January 1987 public hearing, at the suggestion of Lawrence T. Kurlander, the Governor's then Director of Criminal Justice, on February 20, 1987, representatives of the Commission met with Mr. Henry in an effort to resolve questions raised at the public hearing and to bring about needed reforms. Those in attendance were Mr. Henry, accompanied by Mark Cohen, then Chief of the Appeals Bureau of the Suffolk County District Attorney's Office, and Commissioners Trager and Culhane (who joined the meeting in progress), accompanied by Commission counsel. While both Mr. Henry and the Commissioners agreed that the discussions held during that meeting were to be kept confidential, Mr. Henry subsequently breached that agreement, in litigation seeking, inter alia, to block the publication of this Report, there offering a fragmentary and misleading report of what had transpired at the meeting. This compels the Commission to offer a full account of that meeting.

Mr. Henry opened the meeting by stating: "I probably can't run again." He also indicated his

preference for the early appointment of a special district attorney in the case of People v. Hansen (see Chapter V(C)). Furthermore, Mr. Henry described certain reforms he had just instituted in the Suffolk County District Attorney's Office regarding homicide prosecutions and in the Major Offense Bureau, and he stated that Assistant District Attorney Barry Feldman, the prosecutor in the Diaz case, had been removed as Bureau Chief of the Felony Trial Bureau and reassigned as Bureau Chief of the East End Bureau.

Chairman Trager stated that if there was any question of Mr. Henry's personal misconduct, as opposed to poor management, he would not have agreed to meet with Mr. Henry. Chairman Trager stated that Mr. Henry "wasn't watching the store," and as the leading law enforcement official in the County, he should take the lead in helping reform the Police Department and his own Office.

Chairman Trager also stated that Assistant District Attorney Feldman should be publicly fired based on his actions in the Diaz case and the Dubey matter. He further stated that, based on Assistant District Attorney Perini's behavior in the Gallagher case, Perini should also be fired. Chairman Trager

urged Henry to seek a special district attorney in both the Hansen matter and the Gallagher matter.

In response to Chairman Trager's comments regarding the accusations against Perini, Henry stated that it was impossible that Perini was guilty of any misconduct in the Gallagher case. Henry further stated that it was probably not appropriate for him to suggest a name to Justice Thomas Stark, the Supervising Judge for the Criminal Courts of Suffolk County, who would appoint the special district attorney in Gallagher and Hansen. Since the necessity for a special district attorney was occasioned by possible misconduct in Henry's own Office, and thus there was a possible conflict of interest on his part, he felt he should not recommend a replacement for himself. Chairman Trager agreed with this position, and it was then agreed that the Commission would be notified when an application was to be made. Henry assured the Commissioners that he would notify the Commission prior to making an application for a special district attorney in the Hansen and Gallagher matters.

Finally, Mr. Henry stated that in his opinion Police Commissioner Treder had been a weak Commissioner and not up to the job, and that David Freundlich,

-169-

Henry's First Assistant, should be appointed Suffolk County Police Commissioner.

Despite Mr. Henry's assurances, on May 29, 1987, the Suffolk County District Attorney's Office, without notice to the Commission, appeared before Justice Stark and requested the appointment of a special district attorney in the Hansen and Gallagher matters. The application with respect to the Gallagher matter failed to state that Perini could be a target in the case. Similiarly, the application in the Hansen matter neglected to inform the Court that several officials in the District Attorney's Office, including Mr. Henry himself, were accused of having roles in the failure to investigate possible crimes by police personnel. As a result, these applications, made without any notice to the Commission, deprived the Court of important information the Commission would have supplied regarding both the Hansen and Gallagher matters that was relevant to the selection of a special district attorney.

On May 29, 1987, Justice Stark designated Harvey Arnoff as Special District Attorney. Arnoff had very limited criminal law experience, having served less than one year as an assistant district attorney in Suffolk County in the early 1970's. In June 1987, Arnoff informed Commission Assistant Counsel John

Kennedy that he intended to have designated as an investigator to assist him in his role as Special District Attorney a Suffolk County Police Department detective assigned to the Suffolk County District Attorney's Squad. Kennedy questioned the appropriateness of such an appointment in light of the allegations made with respect to the District Attorney's Office. Nevertheless, Arnoff retained that detective, John Scott, as his investigator.

In part based upon this action by Arnoff, in a letter dated June 16, 1987, to Justice Stark, the Commission requested reconsideration of Arnoff's appointment as Special District Attorney. In that letter, the Commission outlined its concerns regarding Arnoff's independence, experience and judgment, including his hiring an investigator from the very Office he was investigating.

Following the Commission's letter to the Court, Arnoff sent a letter to the Commission accusing it of seeking to "thwart, delay and obfuscate" his investigation. He also accused the Commission of "character assassination," saying that it made a "gratuitous attack" on his "character and reputation." Arnoff vigorously defended his choice of an investigator from the District Attorney's staff.

Also following the Commission's June 16, 1987, letter to the Court, the Commission received a copy of a letter from District Attorney Henry to the Court, dated June 23, 1987. Mr. Henry's letter described the Commission's letter as "shocking and disappointing." Mr. Henry offered a strong endorsement of Arnoff, stating that, "based on our knowledge of Mr. Arnoff's reputation, we anticipate only a fair, thorough and vigorous investigation and have every expectation that Mr. Arnoff will fulfill his mandate."

On August 24, 1987, Justice Stark revoked the appointment of Arnoff as Special District Attorney in the Hansen and Gallagher matters, and on September 8, 1987, Justice Stark appointed Stephen P. Scaring as Special District Attorney in Hansen and Gallagher.

Thereafter, in October 1987, former Suffolk County Police Department Sergeant Joseph Comiskey pled guilty to a class E felony, Offering a False Instrument for Filing, in the Gallagher matter, and began cooperating with the prosecution. In February 1988, former Chief of Detectives Gallagher and Police Officer Albert Sinram were indicted under Suffolk County Indictment Number 139/88 for Offering a False Instrument for Filing in the First Degree (class E felony-Gallagher), Tampering With Physical Evidence (class E felony-

-172-

Gallagher), Conspiracy in the Fifth Degree (class A misdemeanor-Gallagher) and Official Misconduct (class A misdemeanor-Gallagher and Sinram). Gallagher is the highest ranking official of the Suffolk Police ever indicted for a crime. The charges against Gallagher and Sinram alleged in sum and substance that the defendants prepared and filed with the Suffolk County District Attorney's Office falsified police forms for the purpose of obtaining a probationary sentence for Gallagher's son, Timothy, on a pending narcotics conviction. Specifically, it was alleged that the forms falsely claimed that Timothy Gallagher had cooperated with the police by providing information leading to narcotics arrests, when in fact he had never performed such a role.

On July 6, 1988, Supreme Court Justice Kenneth K. Rohl declared the appointment of Special District Attorney Scaring null and void and dismissed the indictment against Gallagher and Sinram. Justice Rohl reasoned that the order removing the first Special District Attorney, Arnoff, was caused by improper interference by the Commission in writing to Justice Stark concerning Arnoff's fitness to be the Special District Attorney. Special District Attorney Scaring appealed this order to the Appellate Division, which

reversed Judge Rohl, declaring that the dismissal of the Gallagher and Sinram indictment was improper, and stating that there was no impropriety by the Commission, contrary to what the Appellate Division characterized as the "gratuitous comments" by Judge Rohl (People v. Gallagher, 533 N.Y.S.2d 554, 556 (2nd Dept. 1988), reversing 140 Misc.2d 281, 531 N.Y.S.2d 970 (Sup. Ct., Suff. Co., 1988)). After the New York Court of Appeals denied leave to appeal, the Gallagher case was reassigned to a Suffolk County Court Judge and Gallagher and Sinram are now awaiting trial.

### B.   Problems Involving County Law §701

The problems inherent in the use of County Law §701 for the appointment of a Special District Attorney are clearly demonstrated in the Gallagher and Hansen matters.*

---

*  County Law §701 reads as follows:

> Whenever the district attorney of any county and his assistant, if he has one, shall not be in attendance at a term of any court of record, which he is by law required to attend, or is disqualified from acting in a particular case to discharge his duties at a term of any court, a superior criminal court in the county wherein the action is triable may, by order appoint some attorney at law having

(Footnote continued on next page)

-174-

This section requires the appointment of a special district attorney be made by a judge of a local superior criminal court and also requires that an attorney appointed as special district attorney either have an office or reside in the county. However, despite the intended purpose of County Law §701 of resolving conflicts in prosecutions and allowing objective and aggressive pursuit of allegations of misconduct which may touch the district attorney's own office, because of this statute's provisions relating

---

(Footnote continued from previous page)

an office in or residing in the county, to act as special district attorney during the absence, inability or disqualification of the district attorney and his assistant; but such appointment shall not be made for a period beyond the adjournment of the term at which made. Where, however, an appointment is required under this section for a particular case because of the disqualification of the district attorney, the appointment may be made for all purposes, including disposition. The special district attorney so appointed shall possess the powers and discharge the duties of the district attorney during the period for which he shall be appointed. The board of supervisors of the county shall pay the necessary disbursements of, and a reasonable compensation for, the services of the person so appointed and acting, as certified by the presiding judge or justice. The provisions of this section shall also apply to a county wholly contained within a city.

-175-

to who shall make such appointments and who may be thus appointed, in fact the statute has major deficiencies in the case of disqualification of the district attorney.

First, given the local nature of the application and appointing process and the web of existing friendships and relationships in law enforcement, it is sometimes difficult to have a truly aggressive and objective local prosecutor appointed.

Second, even if a qualified local attorney is appointed, he still faces impossible conflicts. Local criminal defense attorneys constantly rely on a relationship of trust and confidence between themselves and the district attorney's office to negotiate pleas and represent the interests of their criminal clients. Accordingly, for a special district attorney to investigate and aggressively prosecute members of the district attorney's own office offers the distinct risk of upsetting the delicate and important relationships existing between the defense lawyer/special district attorney and the district attorney's office. The perception of such a risk could restrain the eagerness of a special district attorney's investigation and prosecution due to the appointee's understandable concerns regarding his law practice and livelihood, as well as

concern regarding the best interests of his current and future private criminal clients. The Grand Jury Report in the Tawana Brawley case in Dutchess County addressed this very point. That Report stated:

> To be effective, Special District Attorneys must have a working knowledge of the Penal Law and Criminal Procedure Law, and must be experienced in handling criminal cases. These criteria virtually dictate that a Special District Attorney must be an active, practicing criminal defense attorney. However, any such attorney who resides in the county in which the matter requiring investigation arises is almost certain to be already representing clients being prosecuted by the District Attorney. . . . In cases where the disqualification of the District Attorney is based on a possible connection between the District Attorney or an Assistant District Attorney and the matter being investigated (as occurred here), the Special District Attorney will be placed in an untenable position. He will be required to investigate potentially criminal acts by a prosecutor who is likely, at the same time, to be prosecuting some of his clients. The Special District Attorney's duty to his clients could jeopardize his effectiveness as a prosecutor and, conversely, his role as a prosecutor could prove inimical to the interests of his clients (pp. 5-6).

These criticisms of County Law §701 as it applies in the situation of disqualification of the district attorney are in the Commission's view entirely well taken. Moreover, what occurred in the Gallagher and Hansen matters graphically illustrates the nature of the problem.

In Gallagher and Hansen, District Attorney Patrick Henry's Office prepared the application for appointment of a special district attorney, which did indicate that members of Mr. Henry's Office might be material witnesses in those cases. However, these applications failed to indicate that members of Mr. Henry's Office might in fact be targets for criminal prosecution. This application was made without notice and without opportunity for the investigating agency in Hansen (the Commission) or in Gallagher (the Eastern District), who referred the cases to Henry, to be heard before the appointment was made.

The first appointee, Mr. Arnoff, had served in the Suffolk District Attorney's Office for less than a year in the early 1970's and had conducted primarily a civil practice since that time. His relationship to Henry, Perini or others in the District Attorney's Office, if any, is not known to this day. However, Arnoff's conflict in terms of the District Attorney's

-178-

Office became undeniable when he hired as his investi-
gator a Suffolk County Police detective who was a long-
time member of the District Attorney's Squad. As
stated by the Appellate Division, Second Department, in
People v. Gallagher (533 N.Y.S.2d at 556):

> Arnoff's decision to appoint a
> detective from the same office that
> he would be investigating created
> the same conflict of interest which
> had precipitated the initial dis-
> qualification of the Suffolk County
> District Attorney.

As the Commission has noted, there are seri-
ous problems with respect to the appointment of special
district attorneys under the present County Law §701.
The Gallagher and Hansen matters underscore how serious
these problems are. Included in the Recommendations
section of this Report is the Commission's recommenda-
tion for amending County Law §701 to address these
problems (see Recommendations, E, and Appendix B). The
Commission is hopeful that the Legislature will give
careful consideration to this proposal.