# Exhibit 7

# THE CONFESSION TAKERS

Newsday, December 1986

For more than a decade, Suffolk County's system of investigating murder cases has been marked by an extraordinary reliance on gaining confessions - a practice that has contributed to claims of civil-rights abuses, mishandling of evidence and repeated questions about the validity of police testimony.

A year-long Newsday study has found that police said suspects made incriminating statements in 94 percent of the more than 300 murder cases since 1975 - a rate that experts believe is without parallel in the country. Prosecutors and police say this is evidence of superior police work. "We were the best," said former homicide squad commander Al Holdorff.

But others, including former prosecutors, say the high rate reflects a system based more on interrogation than on investigation. At its worst, the Suffolk system has depended on confessions that violate the rights of suspects, substitute for extensive detective work, conflict with other evidence and strain the credibility of the county's cases in court. At times, the confession - normally the strongest piece of evidence available in a murder case - has become the weakest link.

In fact, Newsday found, accused killers in Suffolk are less likely to be convicted of the top murder charge than in other suburban areas, and, if convicted, are given shorter sentences.

Serious questions have been raised about many of the statements obtained from suspects - by higher courts that ruled Suffolk authorities violated the suspects' right to consult lawyers, by defendants who claimed they were beaten by detectives, and by judges and juries who disbelieved the confessions.

In more than a quarter of the cases in the past five years, the detectives testified that suspects gave only oral statements - making it difficult to corroborate the police accounts. In others, police testified that suspects made oral statements implicating themselves in ways that went beyond their signed statements. In nine cases, police offered confessions that suspects refused to sign.

And when confessions were challenged or absent, Suffolk authorities frequently used a "snitch" - a prisoner who agreed to testify to an alleged "jailhouse confession" made by the defendant. In return for such testimony, prosecutors recommend a lenient sentence for the snitch, a practice some experts suggest invites perjury.

So much emphasis is put on obtaining some form of confession that other kinds of investigation are given short shrift, and cases frequently founder if the statements are challenged successfully in court. Physical evidence has often been shelved for months, and sometimes never analyzed. Despite repeated warnings that failure to test evidence was hurting murder prosecutions, the crime lab has been understaffed and poorly equipped for nearly a decade, according to county officials and a review of county documents. In one case, the lab accidentally discarded a victim's brain tissue, weakening the district attorney's case. The man's wife was sentenced to nine weekends in jail for second-degree assault. "I had to

1

dance to get what I got," said former prosecutor James J. O'Rourke.

Suffolk arrests suspects in nine out of 10 murder cases and convicts nearly nine out of 10 accused killers of a crime. But the district attorney allows defendants to plead to substantially reduced charges in many cases. Challenges to confessions, flaws in the handling of physical evidence and other weaknesses help make Suffolk prosecutors more willing to make such bargains than are their counterparts in Nassau and Westchester. In many of those bargains, the prosecutors recommend - and judges impose - relatively short sentences.

John Buonora, formerly the county's chief felony prosecutor, said the emphasis on confessions leads homicide detectives to overlook other evidence. "Their success rate is probably not as good as it should be, because of their reliance solely on the confession and the lack of methodical detective work," he said.

But homicide detectives are proud of their approach. "My concern is that it seems that it's bad if you got 94 percent," Det. Sgt. Robert Misegades said. "I think it's fantastic. I am disappointed personally that we got a six percent failure rate."

The zeal of Suffolk detectives has been reflected in their ability to obtain a confession in nearly every murder case, racking up a rate of incriminating statements that is 50 percent higher than in Nassau and nearly twice as high as in Westchester.

According to court records reviewed by Newsday, suspects who spoke and read only Spanish signed confessions written entirely in English. One suspect's interrogation began moments after he was stabbed in the back by the murder victim's girlfriend. Another suspect, Christine Wingate, confessed after she was escorted out of a hospital, under sedation and still dressed in a patient's gown.

"All they need is a dead body and a confession," said Henry O'Brien, Suffolk district attorney from 1974 to 1978. "Everything is geared toward confessions and admissions. . . . They don't want to do the work on the harder cases."

In Suffolk, as in other jurisdictions, murder defendants routinely recant confessions and ask judges to rule that they were taken illegally.

Trial judges have allowed hundreds of Suffolk confessions into evidence, over the objections of defense lawyers. But appeals courts have struck down 10 Suffolk convictions because confessions were improperly obtained - more reversals than from Nassau and Westchester combined. Defendants were acquitted or charges were dismissed in 12 other cases where questions were raised about the credibility of police testimony, the handling of physical evidence or the use of inmates who provided testimony about "jailhouse confessions." In another six cases, charges were dismissed due to insufficient evidence. Dozens of other cases have ended in plea bargains to significantly lesser charges.

In the Wingate case, for example, the defendant disputed the written and oral confessions and later pleaded guilty to a reduced charge with no admission of wrongdoing after the medical examiner couldn't say for sure whether the death was a murder.

And now some former officials say they have doubts about some confessions produced by detectives, particularly because of Suffolk's high rate.

2

"When it's this high here and much lower elsewhere, you have perjury somewhere," said former Suffolk Deputy Police Commissioner Charles Peterson, a lawyer who spent 21 years on the New York City police force before coming to Suffolk.

Last year, the concern over Suffolk cases reached the jury room. In a series of highly publicized murder trials, juries set free an alleged mob hitman accused of killing a prominent lawyer, a drifter charged with stabbing and sexually abusing a nurse and a teenager who was accused of kicking a dying friend and dragging his body into the woods in the midst of a drug orgy after another youth had stabbed him. In each case, jurors questioned the performance of Suffolk authorities. "If someone close to me was murdered," one angry juror said after freeing the man accused of killing the nurse, "I'd rather have a small-town police department investigate it than have the Suffolk homicide squad, with all its resources."

In the same case, County Court Judge Stuart Namm said in court, "a perjurer was brought before this court with an open eye by the prosecutor...and there have been other perjurers." The judge's charges prompted a State Investigation Commission probe of Suffolk cases that is still in progress.

The investigation comes at a time when the success rate of Suffolk murder prosecutions has slipped. In the past two years, 23 percent of murder defendants were convicted as charged, compared to 38 percent during the preceding nine-year period. In Nassau, roughly half are convicted as charged and, in Westchester, the rate is even higher.

"The last two years were disastrous," said Thomas Spota, formerly Suffolk's chief trial prosecutor and now the lawyer for the Suffolk County Detectives Association.

Criminal-justice experts warn that reliance on questionable confessions produces cases so weak that prosecutors often settle for lenient plea bargains rather than risk losing trials. "The trend is to move toward greater use of the forensic evidence and away from the confession," said Richard Ward, a University of Illinois criminology professor and former New York City detective. "The research shows that if you have crime lab evidence, you're more inclined to get a conviction to the charge." Top officials of Suffolk's criminal justice system - the nation's 10th largest - say the system is basically sound. "We're not doing anything wrong," said District Attorney Patrick Henry. `We're not laughing up our sleeves, abusing somebody's rights or abusing the system. We take our responsibilities very seriously." Said Police Commissioner DeWitt Treder: "It's a professional, working criminal justice system that works." Henry characterized last year's failed murder prosecutions as "unfortunate" and "somewhat isolated,
" not reflecting the usual record of his office. "There's no pattern there.
. . . It was out of the ordinary," he said.

But while publicly defending the system, officials have been making some significant changes. After years of county reports warning of a breakdown in the lab, officials have taken steps to cut the backlog of evidence awaiting lab tests and to improve the county's ability to analyze physical evidence. Treder shuffled the leadership of the homicide squad; retirements and transfers have led to a turnover of one-third of the

3

squad's detectives since the beginning of last year. Prosecutors now are expected to go to the scene of murders to advise police. For the first time, Suffolk has followed other jurisdictions in obtaining equipment to videotape some confessions.

   Newsday set out a year ago to determine how well the Suffolk system works in murder cases. The study was based on a review and computer analysis of the cases of 361 Suffolk homicide defendants between 1975 and 1985 and more than 700 cases from six other jurisdictions in five states. Of the 361 cases, confession data was available in court records for 348. More than 300 officials, lawyers, detectives, defendants, judges, jurors, outside experts and relatives of victims were interviewed. The study revealed:

   Suffolk's 94 percent rate of obtaining incrimi- nating statements from murder defendants is far above the rate that experts say is typical nationally and the rates Newsday found in other large suburban counties, which range from 54 to 73.5 percent. Even in the cases where experts say confessions are hardest to get - those involving suspects with prior criminal records and those in which the suspect and the victim were strangers - Suffolk obtains incriminating statements from more than 90 percent of the accused. "The whole thing hinges around everybody confessing," said retired homicide detective Richard Zito.

   Suffolk prosecutors have made frequent use of jailhouse snitches. Such testimony has surfaced against 32 defendants over the past decade, 28 since 1980. Most of the snitches were released sooner in exchange for their testimony - and several committed felony crimes during the time they would have been imprisoned. Such deals are controversial. Joseph A. Ball, a prominent California lawyer who helped draft ethical standards for the American Bar Association, said: "It seems to me a bargain being made in return for perjury."

   In the last 10 years, 47 murder suspects have claimed in court that they were beaten by Suffolk detectives. Three-quarters of those claims were made before 1980, the year the Suffolk County Bar Association issued a report that concluded that "a serious problem" of brutality existed in the Suffolk County Police Department. Most of the claims were filed by suspects held by police for more than six hours without a lawyer. Suffolk criminal court judges have given little credence to the brutality allegations, and only once has a civil jury found that homicide detectives beat a suspect. The detectives were not disciplined in that case.

   Suffolk's crime lab has been crippled by staff shortages and lack of equipment. Sloppy crime-scene procedures have occasionally ruined evidence; other material has spoiled while awaiting tests. In some cases, the delay in analyzing evidence can last for six months; some cases are closed before the evidence is ever analyzed. Experts say the lack of attention to physical evidence goes hand-in-hand with the emphasis on seeking confessions. "Without the forensic sciences, you then have a need for a confession," said University of Chicago law professor Albert Alschuler. State-of-the-art scientific equipment has been delayed out of fear that it would be damaged by lab conditions. For a time, mushrooms grew from cracks in the crime lab floor.

   The homicide squad - an elite corps - has been able to shape cases, make or break the careers of prosecutors and operate independently of

4

higher-ups. "The homicide squad worked pretty much on its own, like its own special force over the years," said Charles Newell, former chief of the district attorney's appeals bureau. Homicide detectives say they weren't required to follow such generally accepted police procedures as taking notes on cases - prompting criticism from judges.

Despite the high confession rate, those Newsday Photo by John Paraskevas - Henry O'Brien, former Suffolk district attorney charged in homicide cases, if convicted, generally face lower minimum sentences than in Nassau or Westchester. In the past five years, suspects charged with murder, once convicted, have been given average sentences of 13.5 years in Suffolk, compared to 15.9 years in Nassau and 15.8 years in Westchester. The sentence disparities appear in part to result from a pattern of lenient plea bargaining because of weak cases in Suffolk.

Suffolk has only recently begun to institute safeguards common elsewhere - and still lags behind similar jurisdictions. Until this year, prosecutors were largely shut out of homicide cases until suspects were brought into court, and they still are usually not present for questioning. Suffolk detectives only began videotaping some interrogations after the question became an issue in last year's district attorney race. "There are no safeguards, other than the integrity of the detectives themselves," said Gerard Sullivan, formerly chief trial prosecutor.

The flaws in Suffolk's system have been highlighted by a slide in the success rate of murder prosecutions in the county over the past two years:

In April, 1985, James Troiano was found not guilty of charges that he had participated in the stabbing of another teenager during a drug-fest around a bonfire in Northport. One of the reasons jurors gave for the verdict was that they doubted the two conflicting written confessions produced by detectives.

Three months later, accused mobster Peter Corso was acquitted of the 1979 gangland-style slaying of prominent Brentwood lawyer Archimedes Cervera, prompting a judge to attack Suffolk authorities for "gross negligence" in the case. The judge faulted police for failing to take notes on meetings with federal agents, ignoring leads and auctioning off the telephone-answering machine from Cervera's office, which contained a tape from the day of his slaying.

And in October, drifter James Diaz was found not guilty of the stabbing death of Maureen Negus, a Port Jefferson Station nurse. Jurors interviewed afterwards expressed doubts about the testimony of homicide detectives.

District Attorney Henry, who was elected to a third term last year, blamed the acquittals on a combination of politics and his willingness to seek indictments in cases that weren't air-tight. "It could strike the average person as odd, the fact that we've had a good record up until an election year," he said. Henry, a Republican, has noted that Namm, who heard the Diaz and Corso cases, was a Democrat. Namm has denied any political motive. Henry said he was proud of having proceeded with the cases: "I'd rather see them indicted, try them and see them acquitted than never even charged in the first place."

But Newsday's study found that the acquittals were not the only recent breakdowns in the Suffolk's murder-prosecution machinery. Almost two-thirds of those charged with murder since the beginning of 1984 were given plea-bargains to reduced charges in Suffolk, while one-third of the

5

defendants in Nassau and less than one-third in Westchester were allowed plea-bargains.

In October, 1985, two alleged Colombo crime family soldiers charged with what the chief of detectives called "a professional hit job" in Cold Spring Harbor got plea bargains that resulted in jail terms of 3-to-6 years for one and six months for the other. Suffolk prosecutors said they accepted the lesser pleas after their main witness proved inconsistent in a Nassau case - and they had virtually no other evidence.

And in November, 1985, a man facing a maximum of life imprisonment for stabbing another man to death outside a Sag Harbor tavern was sentenced to 1 1/3-to-4 years after a jury found him not guilty of murder or manslaughter and convicted him instead of a lesser charge, criminally negligent homicide. His written confession could not be used at the trial; the judge ruled that homicide detectives had obtained it by violating the defendant's right to counsel.

The roots of last year's failures, however, stretch back through the terms of two district attorneys and three police commissioners. "The emphasis on confessions is something historical in Suffolk, not of recent vintage," said Sullivan, who became a prosecutor in the early 1970s and helped shape policies on murder prosecution.

Peterson said the emphasis on confessions affects the outcome of Suffolk cases in court: "The DA realizes that all he has is the confession and so he plea-bargains rather than get zilch," he said.

The Newsday study found that one out of every five persons accused of murder in Suffolk between 1975 and 1985 - 67 suspects facing life in prison for what state law defines as an "A-1" felony - won plea-bargains to "C" felonies or below, which carry a maximum penalty of 5 to 15 years. Such plea bargains appear to account, at least in part, for the shorter sentences in Suffolk cases. In the past five years, 29 percent of accused murderers in Suffolk received similar pleas, compared to 18 percent in Nassau and 3 percent in Westchester.

In an interview, Henry noted that judges, not prosecutors, are responsible for sentencing. "It's a combination of plea-bargaining, probation recommendations and judges' decisions," the district attorney said. He denied that there is a pattern of weak cases leading to lenient plea bargains.

Henry said that he could not explain the lower sentences in Suffolk: "We believe that any disparity is statistically insignificant in terms of the actual time any prisoner serves and is more reflective of the sentencing policies of individual judges than anything else."

To examine the role of judges, Newsday looked at the 151 cases in the past five years where Suffolk, Nassau and Westchester murder defendants have been found guilty as charged at a trial. Those are the cases where sentences are not influenced by plea bargains made by the district attorney's office. A comparison of sentences in such cases shows that Suffolk judges, left to their own discretion, impose sentences as long - or longer - than in the other two counties. In Suffolk, the average minimum in such cases is 26.8 years, compared to 26.0 years in Nassau and 23.7 years in Westchester.

But a lesser proportion of defendants are actually convicted of the top count of murder in Suffolk compared to the other counties - and so

6

Suffolk's overall average is lower.

Of those charged with murder and ultimately found guilty of some crime, 44 percent in Suffolk are convicted of second-degree murder - the highest murder count possible in most cases. That compares to 55 percent in Nassau and 56 percent in Westchester. Unlike Nassau, Suffolk indicts the vast majority of homicide defendants for second-degree murder. That contributes to the county's tendency to engage in more plea bargaining. Nevertheless, Suffolk convicts fewer people of the top charge, an "A" felony that carries a minimum 15 years-to-life sentence.

With lenient plea bargains come shorter sentences. Suffolk murder defendants have pleaded guilty to such crimes as attempted manslaughter (sentence: 1 1/2-to-4 1/2 years), hindering prosecution (sentence: 6 months) and reckless endangerment (sentence: probation).

Some critics say the low sentences are a direct result of murder cases being weakened by the reliance on confessions. "When you rely on oral statements or jailhouse confessions over a period of time," said Peterson, the former top cop who is now a defense lawyer, "your investigative skills atrophy - you lose the other skills."

After years of taking confessions at face value, Suffolk juries have become increasingly skeptical. "Jurors today are much more sophisticated than they used to be," said Stephen Scaring, an active Long Island defense lawyer who was Nassau's chief homicide prosecutor in the 1970s. "They are willing to accept the idea that cops lie."

The veracity of police testimony is at the heart of the controversy about last year's acquittal of Diaz, a 21-year-old drifter who was accused of the rape and stabbing death of Negus, a 35-year-old mother of two, in her Port Jefferson Station home in 1984.

Shortly after the killing and before Diaz was arrested, police found a kitchen knife in the woods behind Negus' home. In a confession written at the time of his arrest, Diaz admitted the killing. "When I finished, I ran out the back door . . . [and] threw the knife in the woods," an unsigned portion of the confession said. The knife discovered in the woods, defense lawyers would later note, had no bloodstains on it.

But nine months later, Negus' former husband, playing ping-pong in the basement of the house where she died, noticed another knife. It was under a stack of wood just a few feet from where the body of Maureen Negus had been discovered. And it was stained with her blood. Before the trial, the lead detective on the case, Dennis Rafferty, added a new detail that not only was missing from the written confession, but also from detectives' notes and other papers filed earlier in the case by the prosecutor. Rafferty testified that he had asked Diaz "if he wiped the blood off that knife before he threw it away. And he said no, he didn't."

Defense attorney Paul Gianelli, a former chief assistant district attorney, contended in his summation that police added to their account of Diaz' statement to make it conform with the surprise discovery of the murder weapon in the basement several months after the killing. Law-enforcement officials have said the reason the detail had not emerged earlier was that Rafferty and Diaz had talked for several hours and that it was impossible to put down in writing everything the defendant had been saying. Rafferty declined to be interviewed.

After five days of deliberation, the jurors found Diaz not guilty. "It

7

was a very difficult thing it all came down to - the Suffolk County homicide squad lied to us," a juror said at the time.

Jurors also have occasionally doubted the testimony of the jailhouse snitches often used by Suffolk prosecutors in tough cases. The snitches are prisoners facing unrelated charges who testify in return for reductions in their sentences.

In July, 1982, a jury in Riverhead acquitted John Myer of a charge that he had deliberately run down and killed Lawrence Makofske with his car after Makofske discovered Myer having an affair with his wife. At Myer's trial, a Suffolk County Jail prisoner, Robert Bittner, testified that Myer had once boasted to him in jail, "I put the pedal to the metal and I nailed the mutt."

Bittner was facing a sentence of 4-to-8 years in prison for an armed robbery of the Hauppauge Holiday Inn. Despite the acquittal, prosecutors convinced a judge to cut Bittner's sentence in half.

Defense lawyer Sidney Dworet said he believes Bittner made up his story of the conversation. And the prosecutor, Dennis Sweeny, now in private practice, said the trial convinced him that using jailhouse snitches is risky business for a prosecutor. While he said he believed Bittner's account, he now thinks using the snitch didn't help his case.

"Some of them are like rug merchants," Sweeny explained in a recent interview, discussing deals with snitches in general. "The price for the commodity is set until you show an interest - and then, suddenly, the price goes up."

Jurors' doubts about Suffolk policies in murder cases came after a period in which state appeals courts displayed similar suspicions. Nine Suffolk murder convictions were overturned in five years. The decisions in Suffolk cases added restrictions on police statewide - and, because of unconstitutional interrogations by Suffolk detectives, allowed some defendants to walk free.

Eugene Grant was one of those who walked. For two years following the 1977 shotgun-slaying of John Wendehorst, the night manager of a Bay Shore restaurant, police were stymied - until Grant, a former employee, confessed to the murder. He said he shot Wendehorst after the victim refused to give him a salary advance. Rather than face life in prison for murder, Grant pleaded guilty to a lesser charge and received a minimum sentence of seven years in prison. But the State Court of Appeals ruled that Suffolk homicide detectives had illegally detained him during his interrogation - and ordered Grant freed after he had served only 2 1/2 years.

"Nine years ago it happened, but to me, it's always yesterday," said Giovanna Wendehorst, the victim's widow. "I don't understand how a person like Eugene Grant could be released. They said it was a matter of technicalities."

In the string of appeals-court rulings on Suffolk cases between 1977 and 1982, the issue facing judges was whether suspects who confessed to murders had voluntarily accompanied police for questioning and whether they had been deprived of their rights to counsel. The names of several Suffolk cases are familiar to New York law students and criminal attorneys: Hobson, Macedonio, Pinzon, Maerling, Singer, Garofolo, Bartolomeo. Decisions on those cases gave New York the toughest right-to-counsel law in the nation.

In their handling of murder suspects, Suffolk au- thorities repeatedly

seemed to challenge the higher-court rulings - and usually lost.

"There was a significant resistance on the part of Suffolk County Police to follow precedents - as though we were writing in the sand," said one judge who sat on the Court of Appeals at the time.

Indeed, Suffolk police and prosecutors had determined that the courts were wrong and that they would fight.

"The police department, with the encouragement of the district attorney's office at the time, took an aggressive stance," recalled Vincent Malito, who as chief of the district attorney's appeals bureau argued several of the Suffolk cases before the Court of Appeals. "The philosophy was, `Let's see how far we can go.' . . ."

Retired homicide detective Richard Zito said that his colleagues were even less inclined than prosecutors to accept the court rulings. "Every time one of those decisions came along, we faced a choice," he said. "We could knuckle under to decisions . . . or we could fight and come up with a way to get around it."

But others in law-enforcement question Suffolk's strategy.

"Push the court?" said Nassau District Attorney Denis Dillon incredulously. "You wouldn't give that advice to a client if you were in private practice. I don't think it's right for a prosecutor, either."

And the results were far from what Suffolk hoped for. Police now cannot question a suspect who has a lawyer on another major case - even if the suspect says he doesn't want the lawyer present.

"For prosecutors, they set the law backwards," said Robert Pitler, former chief of appeals in the Manhattan district attorney's office, referring to Suffolk officials. "These laws have expanded the rights of criminals . . . [and] protected career criminals."

Suffolk's struggle with the courts now has abated on each side, judges and prosecutors say. The rules expanding suspects' rights to lawyers have been relaxed slightly by more recent decisions. And Malito notes that key prosecutors whom he described as "aggressive" have left the district attorney's staff, apparently altering the office's approach toward the court.

Suffolk's handling of homicide cases, however, remains unchanged in some ways. Detectives have claimed that all but three of the 64 defendants indicted for homicides in Suffolk in 1984 and 1985 gave a statement to police indicating their guilt. Most of the 1986 cases have yet to come to court and records are not available on how many incriminating statements were obtained.

But the years of conflict with the higher courts have left some lasting questions.

The man who had to argue Suffolk's cases before the Court of Appeals now says he often "didn't believe" detectives' testimony in murder cases. Charles Newell, Malito's predecessor as chief of the district attorney's appeals bureau, said, "When I looked at the facts in some of the cases, they didn't comport to what I knew to be human experience."

Newell recalls a 1977 incident in the book-lined chambers of the state's then chief judge, Charles Breitel, who was familiar with the Suffolk cases involving allegations of police abuses. The prosecutor recalled sitting anxiously as the judge, behind a large wooden desk, chain-smoked cigarettes and silently reviewed legal papers Newell had

9

submitted in response to the appeal of one Suffolk murder conviction. Newell would defend many of the celebrated Suffolk cases - and often would find himself on the losing end. He recalled being afraid that the chief judge would ask him a question he didn't know the answer to. Finally, Breitel looked up.

"Tell me, Mr. Newell," the judge said. "Who runs Suffolk County? A vigilante committee?" NEXT: The Confessions. ***************************

People vs. William Rupp
Police persuade a 23-year-old Blue Point man to sign a statement in 1976 confessing that he beat an elderly neighbor to death with his fists. But an

autopsy shows the victim was strangled. Rupp is released after a month in jail, and the real killer is convicted. Later, a civil jury awards Rupp damages on his claim that detectives put a telephone book on his head and hit it with a concrete brick to make him confess. Juror Maria Falese, who voted to award Rupp civil damages in his suit against police: "We didn't really believe the police. They got up there one after the other and said the same thing. It was almost as if they had gotten together . . . We had seen some photographs of bruises he had sustained."
***************************

People vs. James Diaz
A 21-year-old drifter is charged with the rape and stabbing death of a nurse in her Port Jefferson Station home. In the confession, the suspect says he threw the knife in the woods. Police find a weapon in the woods; it has no bloodstains. But months later, the victim's former husband finds a knife in the basement. Authorities concede it is the real murder weapon - and is stained with her blood. At the trial, the prosecution calls a prisoner who testifies to Diaz' "jailhouse confession." The judge calls the prisoner a "pathological liar" and the jury acquits Diaz. Presiding Judge Stuart Namm: "If this defendant is guilty, I want him convicted . . . But by God, if he is not guilty of this charge, he should not be convicted, and it's not important enough to have perjurers come in this court to ensure that somebody is convicted of murder.' ***************************

People vs. Douglas
Johnson A 21-year-old Bay Shore man is charged with killing a 15-year-old girl. At trial, the prosecution calls Gilberto Lugo, a prisoner who testifies Johnson confessed to him in jail. Lugo and the prosecutor say in court there had been no discussion of leniency in return for testimony. Johnson is convicted. Weeks after the trial, Lugo is freed at the district attorney's request, and his lawyer says there was an "understandling" that the charge would be reduced. Juror John O'Shaunnessy: "The perception of the jury was that there was fairly obviously an opportunity for a person like Lugo to concoct a story for his own good. Even if he is telling absolutely the gospel, there seems a temptation to use his testimony as a bargain . . . The DA's credibility should not be tied to a person in a jail cell, serving time." ***************************

People vs. James Troiano

An 18-year-old East Northport youth is charged with taking part in the murder of a Northport teenager during a drug fest in the village woods in June, 1984. Police produce two written statements from Troiano taken on the day of his arrest: only in the second statement does Troiano allegedly admit his guilt. At trial in 1985, a jury acquits Troiano of murder. Juror Violet Carbone: "He was a bad boy but he was not charged correctly. It was not second-degree murder. He definitely should have gotten some punishment but not what he was on trial for . . . Videotaping could have helped. . . . There's a lot of things you can see in a person's facial expressions. And that would have helped in this case." *****************************

How Study Was Done
   Newsday's study of Suffolk homicide cases, by reporters Thomas J. Maier and Rex Smith, began in November, 1985. Maier and Smith compiled a list of 361 people charged with homicide from 1975 through 1985. Names were obtained from court records, Freedom of Information requests to the district attorney's office and newspaper reports.
   The reporters then reviewed case files in the county clerk's office in Riverhead. Among those records were: indictments, statements from suspects, transcripts of court hearings, arrest records, and documents concerning appeals to higher courts.
   Information from the records was supplemented by interviews with prosecutors, detectives, defendants, defense lawyers, judges and jurors. A six-page questionnaire including up to 78 pieces of information was completed on each case. The data was fed into a computer, which was used to prepare a statistical profile of Suffolk cases and to spot patterns. Reporter Lou Dolinar assisted with the computer study.
   A similar analysis was prepared on more than 700 homicide cases in Nassau and Westchester counties, Bergen County, N.J., and suburbs of Chicago, Los Angeles and Washington, D.C. The results were used as a basis for interviews with detectives, law professors, prosecutors, defense lawyers, victims' families, defendants and top officials of Suffolk's criminal justice system. More than 300 people were interviewed.
   John Paraskevas was the photographer. Reporter Ann Nowak reviewed files and prepared the analysis of homicide cases in the four out-of-state jurisdictions. Leigh Ann Mooney assisted with research.
***************************

DA Disputes Finding on Sentences
   The results of Newsday's study were presented to District Attorney Patrick Henry, Police Commissioner DeWitt Treder and their top aides during interviews in recent weeks.
   Henry's office later asked to review the information Newsday used in computing the average minimum sentences of Suffolk defendants, which showed that persons convicted in Suffolk homicide cases are given lesser sentences on average than those in Nassau and Westchester. A Newsday reporter met with Chief Trial Prosecutor Steven Wilutis and Chief Law Assistant Mark Cohen to verify the information, which was taken from court files.
   At the suggestion of the Suffolk prosecutors, Newsday then included in

its comparison not only the sentences imposed for the homicide charges themselves but also those imposed for associated crimes, such as a rape committed in conjunction with a murder. The comparison sug- gested by the prosecutors, like the original Newsday computation, showed that murderers sentenced in Suffolk courts are given less time than their counterparts in Nassau or Westchester.

   Henry's office then asked Newsday to turn over the data gathered from publicly available court files in Nassau and Westchester counties - and verified by prosecutors' offices. Newsday declined. Cohen then issued the following statement in Henry's name:

   "We have no way of checking Newsday's Westchester and Nassau figures because we have been refused access to that information. We know that Newsday's initial Suffolk figures were corrected only after we reviewed them.

   "In any event, we believe that any disparity is statistically insignificant in terms of the actual time any prisoner serves and is more reflective of the sentencing policies of individual judges than anything else." *******************************

Inside the Homicide Files Key Findings of the Study Suffolk homicide detectives obtain a greater rate of statements in murder cases than comparable jurisdictions around the country. Percentage of statements obtained by detectives in murder cases Suffolk County 93% Nassau County 67% Westchester County 57% Orange County, Calif. 58% Bergen County, N.J. 59% DuPage County, Ill. 73% Montgomery County, Md. 54%

   Homicide defendants in Suffolk are more likely to be charged with the heaviest murder charge.

   Percentage of defendants charged with second-degree murder Suffolk

   96% Nassau 88% Westchester 63% Suffolk defendants are less likely to be convicted on the original charge. Percentage of homicide defendants convicted as charged Suffolk 39% Nassau 46% Westchester 61%

   Minimum sentences in Suffolk are generally lower.

   Average minimum sentences for defendants originally charged with second-degree murder Suffolk

   13.5 years Nassau 15.9 years Westchester

   15.8 years A note on the statistics Comparisons between Suffolk and other police departments are based on a study of homicide cases between 1981 and 1985. On average, 91 percent of the total of 902 cases were analyzed.

Story
Headline: Homicide Squad: An Elite Group Working in `World Unto Their Own'

Byline: By Rex Smith
Day: Sunday  ID: 30470
Edition: NASSAU AND SUFFOLK  Section: NEWS
Page: 28  Date: Dec 07, 1986
Caption: Photo - Homicide detectives in shirts noting percent of cases in 1978 in which they obtained statements. Newsday Cover Color Photo by John

Paraskevas - Portion of a confession signed by Christine Wingate, which she later disputed in court

Cover: The Confession Takers. Suffolk police come up with incriminating statements in 94% of their homicide cases. But their emphasis on getting such statements has led to questions about police conduct and has weakened cases. Newsday Cover Color Photo by John Paraskevas - Portion of a confession signed by Christine Wingate, which she later disputed in court

Corrections:

Other Editions:


Text:

KEYWORD-HIT

The men who work at solving murders in Suffolk are imaginative: A detective fakes a heart ailment and is hospitalized for three days to get information out of the murder suspect in the next bed. To obtain the suspect's photo, other detectives stage a "birthday party" in the hospital room and take snapshots of him arm-wrestling the detective.

The detectives are dedicated: They sometimes sleep on their desks in police headquarters, eating fast food and doughnuts for days on end until they crack a murder case - and then they reward themselves with steak dinners before going home.

They are proud: One detective brags that he and his partners are "incredibly intelligent, incredibly perceptive," and says police brass are jealous. "I don't doubt that we are the best," says another.

And they are cool: Facing cross-examination in court about whether he follows departmental rules, a homicide detective shrugs. "The police department has many, many rules," he says.

They are also controversial. In the late 1970s, the 24-man Suffolk County Police Homicide Squad was the target of brutality allegations. In the early 1980s, it was the subject of critical decisions by appeals courts. Now defense lawyers and some former prosecutors criticize the squad's practices and it has become the focus of a probe by the State Investigations Commission.

The squad has changed over the past decade because of retirements and transfers, but there has been one constant: homicide is the elite unit in the police department. "They were a world unto their own," said John Buonora, formerly Suffolk's chief felony prosecutor. "When you're a young assistant DA, you're taught that those are the big, macho guys who you should be seen with, dealing with life and death."

And Smithtown defense lawyer Jack Toomey, who has represented Suffolk police officers, describes the homicide detectives as "almost princes of the county, who go anywhere, do anything."

If they are different from other people, the detectives say - even different from other cops - it is partly because their daily work is filled with the makings of other people's nightmares: the scent of decayed corpses, the sight of a parent's horror-struck face upon learning of a child's murder, the recognition of lives shattered by the surrender to brutal impulses.

"Every case is painful," said Bob Dunn, who was the homicide squad's commander and later its chief of investigations until his retirement this

13

year. "There's a certain anger and frustration in dealing with a murdered person that colors your behavior. The young detectives come in and say they'll be objective, unbiased in their approach to the job. But there's that certain case that pushes you over the edge - the young child who is missing for so long, and then you find her brutally murdered. You become personally involved in it."

"Homicide, it's different," said Robert Amato, a homicide detective from 1981 until his retirement this year. "The amount of time that you willingly spend on a case . . . I was away from my family for many holidays, and my kids would say, `Who are you?' But the gratification when you brought a case home was worth it all, especially when it was someone that needed to be caught."

Over the past decade, 78 detectives have served on the homicide squad - all male, virtually all white, most in their 30s and 40s. A review of court documents and interviews with several of the detectives produce the image of a tightly knit police unit that is committed to its mission and proud of its successes.

Some say the homicide detectives are distinguished by their zeal to win a case - even if it means stretching the rules. "In my mind," said retired homicide detective Richard Zito, "the end justifies the means. Now, as far as anybody else knowing what I did? Not really. Because I kept most of my stuff to myself."

And Dennis Rafferty, a slim man with piercing eyes who is known for his skill in obtaining confessions, told people during his 16 years on the squad that he was, after all, "doing God's work."

On the wall of the squad's offices in police headquarters, a sign hangs. "Thou Shalt Not Kill," it says. The detectives speak of their job almost as a calling.

"Homicide - that's the place to go if you're good," said William Pepper, who was a homicide detective for five years in the late-1970s and rejoined the squad last year as a sergeant. He added: "I love to put people in jail for it."

"I don't care what else I do with my life. There'll be nothing to compare with that work," said Edward Halverson, who ran a restaurant, a burglar-alarm business and a private security firm on the side and preferred his radio-equipped Cadillac to police sedans. He spent more than half of his 20-year police career in the homicide squad. It was Halverson who lay in a bed at Smithtown General Hospital for three days in 1974 to gain information about James Siena, a suspect in the stabbing death of 16-year-old Amy Iguchi of Asharoken. Halverson cooked up a scheme to get Siena's fingernail scrapings, hoping the lab might find bits of skin that would match the girl's rare blood type. "I went out and got the best-looking nurse we had there," Halverson recalled. "I said, `I want you to come down and give me a manicure. Use one of those plastic dishes. And when you're finished with me, I want you to make sure you wipe the thing clean, and then I want you to go over and give him a manicure. And I'm going to flirt wit
h you, stuff like that.' "

Although the lab was unable to make a clear match, Halverson's hospital ploy was successful. When Siena was discharged, Halverson noticed blood stains on his clothing and tipped off other detectives. Siena was arrested

as he left the hospital, before he could change the clothing - and the blood matched that of the victim. Siena subsequently confessed, and he was convicted of murder. A story that has become part of homicide squad lore is that Siena told his interrogators: "If you think I'm crazy, you should see the guy who was next to me in the hospital." Halverson still recalls his stay in the hospital with relish. "Now that was really an interesting case," he said.

Prosecutors with experience in other counties often remark on the extra hours that Suffolk homicide detectives put in - attending autopsies, for example, and sitting through every day of a trial. Suffolk detectives, who investigate the county's roughly three-dozen murders annually, can be more thorough than New York City detectives who handle that city's 1,400 murders each year.

The extra hours prove financially rewarding. Last year, the salaries of homicide detectives, including overtime, ranged from $51,638 to $70,469, according to county records. Thirteen of the detectives made more than $15,000 each in overtime.

"But after a certain point, the fact that you'd be paid time-and-a-half don't mean ----," said Amato. More important, he said, was the satisfaction of an arrest and the gratitude of the victims' families.

Because of the intense emotions generated by the crime of murder, law-enforcement professionals say, there is a certain mystique that attaches to those who investigate it. Detectives say that even police brass are sometimes susceptible to it. And in Suffolk it has provided an opportunity for the squad to gain some independence from "the higher-ups." Explained Amato: "We weren't so answerable for everything we did."

The squad's independence is revealed in a story told by detectives about a dispute over standby pay - extra money for being called out in the middle of the night. When several homicide detectives were unable to respond to a scene one early-morning in 1982 - just as the police department announced it wanted to discontinue standby pay - police brass threatened to transfer every no-show out of the squad. But the higher-ups backed off their threat in the face of a solid front from the homicide squad.

Another example started in the early 1970s, when the police department moved into new headquarters in Yaphank. For a decade, the homicide squad remained in its main office in Hauppauge, 18 miles west of its supervisors. The detectives finally were ordered to move to Yaphank because, then Deputy Police Commissioner Charles Peterson said, "whenever you're closer to the castle, you have more supervision." But Suffolk law-enforcement officials say that was only the most visible distance between the homicide squad and police brass - that another gulf was just as wide. "They were isolated from the rest of the command. I just don't think there was any oversight over this squad," said Buonora.

As questions have been raised about the squad's effectiveness, homicide detectives have sometimes complained that too little remains of what they believe set their squad apart. "It is a dedication," said Sgt. William Pepper, who has worn a badge for almost 23 years. "It's losing it, I think. Police work is becoming more and more a nine-to-five job."

If the enthusiasm is fading, some of the legends linger. Police buffs still recall Rafferty's dramatic testimony of how a dying man, lying in a

hospital bed and unable to speak, identified his killer by squeezing Rafferty's hand - once for yes, twice for no. They remember interrogation sessions in the steamy boiler room of the police building in Hauppauge, and a detective who noted a suspected killer's admission on the back of a matchbook.

"You give me the worst detective in the whole county, and he will peak out in homicide," Halverson said. "He'll do the best job he is capable of doing . . . It's the ultimate of police work."


Headline: SUFFOLK HOMICIDE/The Reliance on Confessions Questionable Procedures Taint Murder Defendants' Confessions. The Court's Rules For Confessions - see end of text
Byline: By Thomas J. Maier and Rex Smith
Day: Monday  ID: 30273
Edition: NASSAU AND SUFFOLK  Section: NEWS
Page: 05  Date: Dec 08, 1986
Caption: 1) Newsday Photo by John Paraskevas - Brian Biggs confessed to a murder after being questioned in this boiler room; eventually, his confession was ruled inadmissible. 2) Newsday Photo by John Paraskevas - Suffolk Police Commissioner DeWitt Treder, who has denied any misconduct by homicide detectives
Cover: Questionable Tactics In Murder Cases. Series Continues
Corrections:
Other Editions:


Text:
KEYWORD-HIT

Cleveland Gerald was illiterate. Luis Reyes was mentally retarded. Natividad Santiago Ortiz spoke virtually no English.

But like most murder suspects in Suffolk County, each signed a confession after interrogation by Suffolk homicide detectives. After the confessions were upheld by judges, all three men were convicted.

A year-long Newsday study has found that 94 percent of the murder defendants in Suffolk between 1975 and 1985 allegedly made incriminating statements. None of the other six suburban counties studied by Newsday has a rate close to Suffolk's. Their rates range from 54 percent in Montgomery County, Maryland, to 74 percent in DuPage County, Ill.

Outside experts expressed surprise at the Suffolk figure. University of Chicago law professor Albert Alschuler, a former federal prosecutor, described the 94 percent admission rate as "astonishing . . . simply incredible." Gerald M. Caplan, former director of the federal government's National Institute of Justice, said that the rate is "much too high" and added, "If I was the police commissioner and there was a 94 percent confession rate, I'd get the internal affairs department to see what's wrong."

Suffolk detectives say they are more successful than police elsewhere at convincing suspects to talk because they try harder. "If you don't try for it," said Robert Misegades, a homicide detective sergeant, "then obviously you're going to come up short."

But increasingly judges, juries and even former prosecutors have voiced

16

suspicion about some of the confessions.

Newsday's review of 326 statements in murder cases taken by police since 1975 raises questions about Suffolk's approach.

Some confessions have been found inadmissible by higher courts because suspects had been denied the right to a lawyer or because they had been arrested improperly.

Some conflict with other evidence or were taken from people whose competence was in question.

Some have been repudiated by defendants, who alleged that detectives beat or threatened them to extract confessions.

And virtually all the statements are difficult to corroborate because detectives often take no notes of interrogations and until recently resisted videotaping, a technique commonly used in other areas to buttress prosecution cases.

"Why should I take notes?" asked retired homicide detective Richard Zito. "So that somebody can look at it and find something wrong, or something misworded?"

Suffolk judges have generally allowed the state- ments taken from suspects to be used as evidence in murder trials. And Suffolk police deny any misconduct by homicide detectives. "If there was anything that was being done that shouldn't have been done here, even when I was the chief inspector, I would have put a stop to it," said Police Commissioner DeWitt Treder. "Would we wink and look the other way, and say `Hey, guys, let's get around this thing a certain way?' " Treder shook his head. "I've been in this business for 31 years, and that would be unconscionable for me. I would not allow anything like that to happen."

Homicide detectives resent any implication that such things happen. And they are proud of their record in the interrogation room. When the National Law Journal published an article stating that 97 percent of Suffolk homicide defendants indicted in 1978 had confessed to their crimes, detectives literally covered themselves with pride. The article said there were widespread allegations that some members of the Suffolk police force physically coerced confessions. The homicide squad responded by showing up at a detectives association picnic wearing T-shirts with "97%" emblazoned on the chests.

To Misegades - a cop for 23 years, a homicide sergeant since 1977 - the fact that 94 percent of defendants made a statement to police "means we have a failure rate of six percent."

Over the past decade, 10 Suffolk murder convictions have been reversed by higher courts because of improper police actions involving interrogations - more reversals than from Nassau and Westchester combined. Defendants were acquitted or had their charges dismissed in 12 other cases where questions were raised about the credibility of police testimony, the handling of physical evidence or the use of inmates who provided testimony about "jailhouse confessions." In another six cases, charges were dismissed because of insufficient evidence. And in a number of cases, prosecutors have accepted pleas substantially below the original murder charge because of disputed confessions.

One of the 10 reversals by appellate courts involved the arrests of Brian Biggs, Christopher Gibbons and Garold Chang, who were taken from their Yonkers apartment by eight Suffolk detectives on Jan. 8, 1979 - a

night that everybody concerned would remember as so cold that melting snow from a previous storm had frozen back into ice on the streets. Each of the Yonkers men was bundled into a separate car and given his rights. Then the convoy drove 58 miles to the county homicide squad office in Hauppauge. Once there, Gibbons and Chang were taken to interrogation rooms. Biggs was questioned in the boiler room.

After nearly 14 hours of questioning, police charged the three men with the murder of a suspected drug dealer whose body was found near Heckscher State Park in East Islip. The detectives obtained signed confessions from all three suspects.

At a pre-trial hearing, detectives testified that the three came to Hauppauge voluntarily. Detectives said that Biggs was questioned in the boiler room because of a lack of space.

But the defendants said the detectives burst into their apartment with guns drawn, handcuffed them and forced to come to Hauppauge. Once inside the homicide squad's office, they said, they were ordered to strip and tortured into confessing.

"I screamed out," Biggs testified. He said a detective placed two telephone books on his head and struck them with a hollow iron cane. "And I said, `I already told you what happened, what I know what happened," Biggs testified. "And he didn't believe me and he had his gun up my ear and I told him to shoot me. He had his gun there for a period of time and then after, he took his gun away from my head."

State Supreme Court Justice Joseph R. Corso found that the three defendants' allegations of brutality were "generally vague, inconsistent, riddled with contradictions and very often incredible." He said the confessions could be used at trial.

Instead, all three men pleaded to reduced charges - but the case didn't end there. While agreeing that the defendants' accounts were too inconsistent to support a brutality charge, an appeals court reversed the conviction because of what it ruled an illegal arrest when the men were taken from the Yonkers apartment. The court said that Biggs was under "an implied threat" to come along, so that police could obtain a confession, and that he "was in fact `in custody' from the moment he was placed in the police car in Yonkers . . . Every action they took was intended to place the suspects in a solitary, custodial setting and atmosphere designed to extract damaging admissions from them."

Once the confessions were ruled inadmissible, the charges against Biggs and Gibbons were dropped and they were freed. Chang had already left the country.

In cases like the Biggs case, New York courts have defined precise rules under which interrogations can take place. But there is one key rule that homicide detectives must follow if they expect a judge to rule that the confession was taken legally and allow prosecutors to use it at trial: Police must be able to prove that the statement was made voluntarily, after the suspect knowingly gave up his right to remain silent and have a lawyer present.

Eventually the responsibility of deciding whether police met such tests falls to a judge. And sometimes the decisions are difficult:

In 1980, Luis Reyes signed a written confession to the stabbing of the chef at a Wheatley Heights restaurant. Reyes was diagnosed by a defense

18

psychiatrist as mentally retarded with, an IQ between 50 and 70. The psychiatrist concluded that Reyes "could not fully grasp the meaning, nor the nuances, of verbal or written communication that were presented to him and which he signed with alleged knowledge . . ." But a prosecution psychiatrist said Reyes could understand what was going on, and State Supreme Court Justice George F.X. McInerney allowed the confession to be used at Reyes' trial. Reyes is now serving a 25-years-to-life sentence for murder.

Detectives said that Donald Kersch orally admitted the stabbing death of Ronald Hartwell, 26, outside a Sag Harbor tavern in December, 1984. But Kersch had a lawyer on a pending drug possession charge - and detectives had not contacted the lawyer before interrogating him. That made the confession inadmissible. Kersch was found not guilty of murder and manslaughter charges and guilty of the lesser charge of criminally negligent homicide. He was given the maximum 1 1/3-to-4-year prison sentence - and was eligible for parole within three months.

Natividad Santiago Ortiz could read no English. Louis Rodriguez, the homicide detective who interrogated him about the stabbing death of 19-year-old Donna Lupton outside a Greenport bar in 1982, could not write Spanish. So Rodriguez wrote the confession in English and, he testified later, "recited somewhat in Spanish what I was writing in English as I went along." Ortiz signed the confession. Later he claimed that Rodriguez had introduced himself not as a detective, but as an interpreter, and that he didn't realize what he was signing. Rodriguez said Ortiz did know what he was signing. County Court Judge Harry Seidell allowed the confession to be used at Ortiz' trial. Ortiz was convicted of murder and is serving a 25-years-to-life sentence. His appeal is pending.

In 1983, a judge was asked to rule on the admissibility of the written confession of a 30-year-old man who had shot his brother-in-law to death outside a Central Islip bar. In a ruling, County Court Judge Stuart Namm concluded that Cleveland Gerald was illiterate, mentally retarded and "unable to read his rights" which were listed on his confession. But Namm noted that Gerald, who had an IQ of 68, was able to hold down a job and function in day-to-day life. The judge ruled that the defendant was "able to knowingly, intelligently and voluntarily waive these rights." Gerald was convicted by a jury of manslaughter, and Namm sentenced him to 5-to-15 years in prison. His appeal is pending.

Last year, Anthony Swiggett signed a confession in which he related details of the stabbing death of his wife in Central Islip. The confession, which misspelled Swiggett's name, conflicted with the physical evidence. "Mae and I were fighting for the knife," the confession read. "I pushed Mae against the wall of the house. The knife stuck in Mae's chest." He said that as the fight continued, he stabbed her in the back. An autopsy later revealed the back wounds but no chest wound. Detectives testified that they simply wrote down what Swiggett told them, and that they didn't realize the actual stab wounds conflicted with the confession. Judge Rudolph Mazzei did not deal with the discrepancy, but blocked prosecutors from introducing the confession at trial because the detectives who questioned Swiggett had violated Swiggett's right to a lawyer. The jury found that Swiggett was not guilty of murder, but it did convict him of the lesser charge of manslaughter. He is serving a 10-to-20-year prison sentence.

Rules laid down by New York courts are designed to ensure that confessions are voluntary and not gained by coercion. Police cannot refuse to allow a suspect to call family members, for example, nor can family be kept away from a suspect who is in custody. If a suspect asks for a lawyer, questioning must stop. If a lawyer calls a police precinct and says that the suspect should not be questioned, the interrogation cannot proceed.

A factor that many homicide detectives prefer to avoid in an interrogation is the entry of a lawyer. No experienced defense lawyer, police say, would allow his client to be questioned. William Pepper, a homicide squad detective sergeant, theorized that one reason Suffolk detectives are able to gain confessions is because most murder suspects in the county are poor. "If you're dealing with an affluent society, you're going to have more no-confession cases, because of the big bucks. They all have attorneys," Pepper said.

But detectives are allowed, for example, to deceive suspects to gain a confession. John Eulo, a Kings Park teenager who was convicted of manslaughter in the 1980 shooting death of his girlfriend, Mary O'Shea, at first claimed that the victim had shot herself in the temple. O'Shea lay in

an irreversible coma as Eulo was questioned, but detectives told him that she was going to live, and would be able to give her version of what happened. Eulo admitted that he shot her.

"Why can't we lie and trick them a bit? They lie and trick us," said Zito, a homicide detective for five years, until a heart attack in 1982 forced his retirement.

The best part of the job, some detectives say, is the moment when a suspect begins to confess - better even than hearing the word "guilty" from a jury foreman. They have varying styles when they confront suspects.

"Some detectives are better interrogators than others," said Robert Amato, who spent five years in the homicide squad and retired last year. "Some guys could get Mickey Mouse to admit he jaywalked, you know, because they're good interrogators."

Edward Halverson, who retired in 1982 after 12 years in the homicide squad, stresses the importance of building rapport with a suspect.

"Somewhere down the line, if you don't make a friend, forget about it," he said, "If the guy doesn't relate to you, and you can't sit down and talk with the guy on a one-to-one basis, there's no way this guy is going to confess anything to you . . .

"And the best part about the whole thing," Halverson added, "is that deep down, believe it or not, most men want to do it. They want to talk about it."

Mention interrogations to a Suffolk homicide detective, and they are almost sure to bring up Louis Rodriguez and Dennis Rafferty, two detectives whose skills in the interrogation room were near-legend during their 16 years in the squad. Neither works on murder cases anymore: Rodriguez retired in January and Rafferty moved to the robbery squad in April.

"Dennis Rafferty is a very fine interrogator, probably one of the sharpest detectives they've got in the police department today," Halverson said. "And certainly he can go through a guy like Grant took Richmond." Although Ulysses S. Grant never captured Richmond during the Civil War,

20

many share Halverson's assessment of Rafferty.

Rafferty once told an interviewer that he prefers to place suspects in an armless chair, so they can't relax or fall asleep during lengthy interrogations. He said he likes to be above the suspect, in a position of strength, but near enough to move closer during intense interrogations.

Rodriguez, according to Zito, "was Van Gogh painting a picture" during interrogations. "I tell you, I sat and watched him put his hand on guys' heads like this, and he was very paternal," Zito said, making a stroking motion. "If it was a young man, he'd sit on the edge of the desk and hold the kid. He'd have body contact, pat the kid's head, hold him on the knee, and he'd say, `Son, I've got kids your age.' "

Amato had his own technique. "I always liked to appeal to a guy's masculinity, and get them to be man enough to admit they made a mistake, and that worked for me throughout my career," he said.

Zito, a tall man, said his physical demeanor sometimes helped him win a confession. "Maybe I was intimidating by my size, and the fact that I shouted sometimes," he said.

Suffolk detectives say they respect the border between persuasion, which courts allow, and coercion, which can prompt a judge to throw out a confession. They say interrogation sessions sometimes require toughness, but not brutality.

But over the last decade, 47 Suffolk murder suspects have complained of brutality by police during their arrest and interrogation. Only seven of these complaints have been filed since 1980, the year a Suffolk County Bar Association report concluded that brutality was "a serious problem" among Suffolk police.

"Is it brutality to take somebody and grab him by the back of the neck and jam him into a chair? Yeah, I've done that," Zito said. "Maybe we were rough, but maybe we weren't the baddest guys in the world."

Defendants have claimed worse: that detectives beat them with fists, struck them with telephone books so as to leave no marks and squeezed their testicles while wearing rubber gloves. But the brutality allegations have been given little credence by Suffolk judges, and only once in a murder case has such a claim resulted in a judgment against the police. That was in the case of William Rupp, who was awarded $35,000 in damages by a court after a jury concluded detectives had beaten him with a chunk of concrete to extract a confession to a murder it was later revealed he didn't commit.

At the pre-trial hearing in the Biggs case, the staff physician at the Suffolk County Jail, Dr. Robert Carlen, testified the results of such brutality may not be visible to a judge. "In my experience," Carlen, testifying for the defense, said, "the cops sometimes beat people up in subtle and hard-to-detect ways." Carlen declined to be interviewed for this series.

Police officials have denied all assertions of brutality. Court records show defendants usually have withdrawn the brutality allegations in sworn court statements, often as a condition of plea bargains.

One tool that police and prosecutors elsewhere use to combat allegations of brutality and coercion in questioning is videotape - so a judge and jury can see the defendant's condition at the time of questioning. The results, prosecutors say, have been spectacular.

Bronx District Attorney Mario Merola introduced videotaping of murder

confessions in 1974, and Nassau County has videotaped the confessions of more than 60 murder defendants since 1983. Bronx prosecutors say they have never lost a murder case involving a videotaped confession. Perhaps nowhere is taping statements more extensive than in Orange County, a suburban county of Los Angeles.

"Generally speaking, we don't talk to criminal defendants without a videotape going, and the police definitely don't talk to them without an audio tape going," said Bryan Brown, deputy district attorney in Orange County. Law-enforcement officials were at first wary of the taping, Brown said, believing it would inhibit suspects from talking.

"But these tapes have been great for us," he said. With videotapes, Brown said, prosecutors can combat fake insanity defenses and claims of police brutality. Defendants have sometimes re-enacted the crime in front of the camera - notably a homicide suspect in 1982 who demonstrated cutting off his victim's head and placing it into a shopping bag before burying it. In some interrogation rooms, the camera is hidden, so defendants don't know they are being taped.

Yet until this year, Suffolk authorities continued to resist the use of videotape. Former Assistant District Attorney Vincent Malito, who headed the Suffolk district attorney's appeals bureau for five years, said he pushed for videotaping confessions, but met resistance from detectives. "A lot of things are allowed in interrogation that a jury wouldn't like to see," he said.

After three major homicide acquittals last year, Henry ordered video equipment for the homicide squad offices in Yaphank. Four of this year's homicide defendants have been taped. Police say most suspects decline to be videotaped.

Even before widespread use of videotaping in interrogations, Suffolk detectives had been pressed by defense lawyers on their frequent failure to take notes of interrogations or other investigative work. The lack of notes has been raised by defense lawyers in at least 15 murder trials since 1975, sometimes with significant success. Defense lawyers distinguish between the practice of some agencies, such as the FBI, whose agents summarize notes in reports and then destroy their original notes, and the practice of some Suffolk detectives who don't take notes.

Amato, who retired from the homicide squad last year, said that detectives routinely destroy notes before cases go to trial - since any notes that remain in a case file can be used by a defense lawyer. "The less you take, the better off you are," Amato said.

Not all police share that view. Det. Sgt. Vernon Geberth of the New York City Police Department, who teaches homicide-investigation techniques for his own department and the FBI, wrote in his book, "Practical Homicide Investigation," that "note-taking is of the utmost importance . . . essential to any good homicide investigation."

The lack of notes is sometimes crucial in cases where there are no written admissions. Of the 326 admissions claimed by Suffolk authorities during the past decade, 77 were either not signed by the suspect or were not even written. Instead, police testified that the defendants had orally admitted the crime, but refused to sign a statement.

Newsday's study found that oral admissions have accounted for a significant proportion of cases in recent years. Between 1975 and 1980, 20

percent of the Suffolk murder cases included testimony that defendants had orally indicated guilt. That figure rose to 27 percent from 1981 to 1985.

And even in one-third of the cases that did have written statements, police testified that the defendant had made oral admissions that went further than what was written. In some cases, those oral statements were the key pieces of evidence used by prosecutors in their efforts to clinch murder convictions.

Experts say oral admissions are prone to manipulation by police. In Texas, for example, police testimony about oral statements is considered so suspect that they can be used at a trial only if they are tape recorded, under specific provisions set by state law.

New York's acceptance of oral statements is more typical of national standards. But University of Texas law professor Michael Sharlot said Texans' suspicion grew from a 19th-Century incident in which a Swedish immigrant was charged with a murder based upon an alleged oral admission to an officer. At his trial, the judge discovered the Swede spoke no English and that the officer spoke no Swedish.

Some Suffolk defense lawyers claim that by making a suspect's confession so central to Suffolk murder prosecutions, officials have created a climate that is ripe for what police call the "righteous lie" - a stretching of the truth to convict someone who they are convinced is guilty.

As the Philadelphia district attorney in the 1950s, Samuel Dash, who later was counsel to the Senate Watergate committee, confronted the problem of police perjury. "I think that certain very zealous police officers . . . have no moral problem in lying about a confession," Dash said in a recent interview, "because of what they claim are stupid rules."

Jacob Fuchsberg, a former New York Court of Appeals judge, said in an interview, "I've seen many cases that if the police had followed the rules, they could have had the case. But by overreaching, the whole case was destroyed."

Zito pondered the question of the "righteous lie" during a lengthy interview in the living room of his North Shore home. Do detectives lie about the confessions they report taking, he was asked, or the circumstances of interrogations and arrests?

The ex-cop thought for a moment. Then he answered, slowly: "Could you, in clear conscience . . . expect a homicide detective or a guy who has dedicated his life to police work itself, could you expect them, after busting their asses to bring a guy in, to let a case go down? No way. They'd fight tooth and nail. They'd shoot it out with you . . ."

Zito began to speak faster. "Let's say that during the course of a murder investigation, you make a boo-boo, that the Supreme Court or somebody else has labeled wrong. I'll be honest with you. In 99 percent of the instances, it's very innocuous and not harmful to the investigation. However, you can't bring that out - because it ruins credibility . . .

"It boils down to the same thing," Zito said, thumping the top of a coffee table to emphasize his words. "What is everybody interested in? . . . Ask any one of the parents or friends of anybody who's been murdered what their feelings are on it. They'll tell you to forget Miranda and every other goddamn ruling that's ever come down from the Supreme Court - and burn the bastard right there." NEXT: The Jailhouse Snitch ****** The

23

Court's Rules For Confessions You have the right to remain silent. Anything you say can be used against you in court. You have the right to the presence of an attorney. If you cannot afford a lawyer, one will be appointed prior to any questioning if you so desire.

These are the four statements police are required to make to people who are charged with a crime and taken into custody.

Police officers must swear under oath that the suspect understood and waived these four rights before a confession can be used as evidence. If there is any evidence of police coercion, the statement may become unusable in court.

These four rules are based on a landmark decision by the U.S. Supreme Court 20 years ago that reversed the robbery conviction of an Arizona man, Ernest Miranda, because he was not adequately advised of his constitutional right against self-incrimination.

In the majority opinion, then-Chief Justice Earl Warren said that the police practice of questioning suspects without these warnings on rights "is at odds with one of our nation's most cherished principles - that the individual may not be compelled to incriminate himself." The guarantee against self-incrimination is contained in the Fifth Amendment to the U.S. Constitution. Warren argued that any police policy relying heavily on confessions poses an inherent danger to basic constitutional rights. He also suggested that this practice could also lead to lazy detective work and an underemphasis of physical evidence.

Today, the Miranda decision - which caused a firestorm of debate when it became the law of the land in 1966 - remains nearly as controversial. One of its sharpest critics - U.S. Attorney General Edwin Meese - contends that Miranda has unduly hurt police efforts to solve crimes, particularly difficult investigations like murder cases. Meese says an accused person can be protected from coerced confessions by videotaping police interrogations. Aides say Meese hopes to soon propose alternatives to the Miranda warnings.

Other experts say, however, that the Miranda rules have had a positive effect. "It's not hurt law enforcement but has actually helped by forcing police officers to go and get good evidence to convict people in the court," says Leonard Levy, a Pulitzer Prize-winning expert on the Fifth Amendment. "There is a new breed of police who are more efficient at getting evidence, and don't have to beat up a suspect to get a confession. They do their job with a much greater respect for the law."

Some experts, like University of Michigan law professor Yale Kamisar, say Miranda protections against involuntary confessions will remain weak without safeguards such as mandatory videotaping. "I urge videotaping and think it's incredible we don't require at this stage to have a videotape of the whole proceedings to see if the defendant is confused," says Kamisar. When it comes to finding out what was said at the police station, Kamisar says: "I want to know the whole thing."

Headline: `I Didn't Think I Had Anything to Hide'
Byline: By Thomas J. Maier
Day: Monday  ID: 30272
Edition: NASSAU AND SUFFOLK  Section: NEWS

Page: 28  Date: Dec 08, 1986
Caption: Newsday Photo - ROTC cadet James Savino, center, leaves county jail after posting bail; he was eventually cleared of murder charges in Thomas Fitzgerald's death
Cover: Questionable Tactics In Murder Cases. Series Continues
Corrections:
Other Editions:

Text:
KEYWORD-HIT
   It began with a pledging ceremony. Thomas Fitzgerald refused to call ROTC cadet James Savino "comrade."
   So Savino, who was pledging Fitzgerald to an elite military fraternity, took a knife and began poking on a ceremonial wooden plaque hanging from Fitzgerald's neck.
   Suddenly, the plaque swung away.
   Savino looked at Fitzgerald in horror. "My God, did that go in?," he cried out. Fitzgerald collapsed into the sand - a thin but fatal wound in his chest.
   "Just as I said `comrade,' I didn't feel the resistance of the wood," Savino would later recall. "I saw that the point of it had gone through his jacket and had pierced his skin."
   Savino and Fitzgerald were taking part in a Pershing Rifles ceremony on Indian Island, a sliver of sand and underbrush in the Great South Bay. The 1976 incident would lead to a murder charge and, ultimately, to Savino's acquittal after a highly publicized trial.
   In the ceremony, Fitzgerald, a 20-year-old Queens College student, was playing the role of a captured American prisoner of war. And Savino, then 21, was acting as a Soviet lieutenant, test- ing the resolve of Fitzgerald and a dozen other pledges to the elite Pershing Rifles.
   By the accounts of a dozen ROTC students who witnessed the killing, it was a tragic, senseless accident. Suffolk authorities called it murder.
   After several hours of questioning, detectives obtained what they said was a written confession from Savino, stating that he was angered by Fitzgerald during an ordeal of reckless hazing.
   But the grand jury chose not to indict Savino for murder and instead charged him with criminally negligent homicide. And in 1978, nearly a year and half after the incident, Savino was found innocent. Now 31, Savino recalls how detectives obtained his "confession," and remembers the impact of his trial.
   "I was in there for hours with them," Savino says of the Suffolk homicide-squad interrogation. "I didn't think I had anything to hide. I told them everything. I told them the utter, absolute truth. They took it. They twisted it. They raked me over the coals. And they ruined everything that I had spent my whole life building."
   Savino says there was no physical coercion. Instead, "they would say things, get me to say `yeah' and then write down the things they had said, not what I had said," he says.
   At the trial, Homicide Det. Thomas Gill testified that Savino's written statement, was as "close as possible to what Mr. Savino was saying." But key portions of the Savino statement were challenged as incomplete. And

25

there was no tape recording to verify the police account.

Gill acknowledged on the stand he had heard Savino say the stabbing was an accident. But Gill said the written statement had been taken by another detective who was questioning Savino.

Gill, now retired, did not return a reporter's calls and prosecutor Nicholas Negosh declined to be interviewed.

"There were too many people who had witnessed that he said it was an accident," says Savino's defense lawyer, Harold Borg. "He told the police that it was an accident and they kept it out of the statement for whatever reason." For years after the trial, Savino's family struggled to pay legal bills in excess of $10,000. "It's the most harrowing thing you could imagine," Savino says of his trial. "It's like you can live or die according to the moves of a game of chess that's being played by the prosecutor and the defense attorney. It's your life at stake, and there's nothing you can do."


Headline: An Innocent Man Who Was Made to `Confess' to Murder
Byline: By Thomas J. Maier
Day: Monday  ID: 30271
Edition: NASSAU AND SUFFOLK  Section: NEWS
Page: 26  Date: Dec 08, 1986
Caption: Newsday Photo by John Paraskevas - Edward Halverson, a detective in the case
Cover: Questionable Tactics In Murder Cases. Series Continues
Corrections:
Other Editions:


Text:
KEYWORD-HIT

William Rupp was beaten with telephone books, struck in the head with a concrete brick, made to sign a four-page confession, and forced to spend a month in jail for a murder he didn't commit.

That was what Rupp said at a civil trial in 1981, and the jury found in his favor. He was awarded $53,000, a sum later reduced by a judge to $35,000.

The award was made "so that the police department knows that we do not condone beatings for a confession," said Maria Falese, one of the jurors in the March, 1981, case. "So that people like Billy will know that we will back them up if something like that is done."

Suffolk District Attorney Patrick Henry called the jury award a travesty. The detectives denied the charges. Law-enforcement officials say none of the detectives accused of assaulting Rupp were ever disciplined by the Suffolk police department. And the county's former top felony prosecutor, John Buonora, said recently that his role in freeing Rupp hurt his career in Suffolk law enforcement.

In fact, Buonora said some homicide detectives didn't want to let Rupp go. "There was a reluctance to face up to the fact that they may have the wrong man - a closed-mindedness to the fact they had made a mistake." Rupp was arrested in May, 1976, for the murder of 69-year-old Walter Wallace, whose remains were found at the bottom of a Patchogue cesspool by a man

trying to clear a sewer pipe. The body was discovered 14 months after Wallace - a small, frail man with an English accent who lived alone on a pension - had disappeared from the area.

Police had been told by neighbors that Wallace often entertained young people in his home. They questioned Rupp, then a 23-year-old unemployed stock clerk, who was one of Wallace's occasional drinking buddies.

"I took the confession from this guy," recalled retired detective Edward Halverson, whose signature is on Rupp's written statement. "I sat and talked to the guy. The guy gave me the exact story that I put down there. I've got secretaries working there, the boss right there. I mean, you've got them right there, you think you're going to brutalize the guy? This guy was the biggest piece of cake you've ever seen in your life. I mean, this guy gave me the whole story."

But years later, Rupp told a civil jury that he only confessed after being held for more than 20 hours and being beaten by homicide detectives.

On the stand, he gave this account:

He was picked up at his mother's home shortly before 8 p.m. and driven to the homicide-squad offices in Hauppauge. He was ordered to strip, then brought to a filing room, where he was handcuffed while sitting naked in a chair. In the course of questioning, he was punched and beaten on the head with telephone books.

He said the police also placed the phone books on his head and smashed the books with concrete curbing blocks. The books fell off his head and one of the detectives "came down with the curbing and whacked me across the head and it started bleeding." Rupp said he was questioned into the early morning hours of the next day. "Most of the questions I couldn't answer because I didn't have nothing to say, because I didn't know what to say, I couldn't answer them."

By afternoon, Rupp signed the confession. "This was already written up and they came to me with a mirror. My face was all blown up, dried blood, . . . and the guy put the mirror in front of my face, `Look at your face, man,' he says. `We can hold you for seventy-two hours,' he says. `This is what they did to you in one day,' he says, `Can you imagine what they are going to do to you in seventy-two hours?' "

Rupp was treated at the jail and later at Central Suffolk Hospital. He was still in jail when police started hearing reports that Joseph Guerrier - who had been indicted in a burglary at Wallace's home the month before the murder - had been heard boasting that the wrong man had been arrested.

Meanwhile, Buonora said, the autopsy showed that Wallace had been strangled about the neck - a finding at variance with Rupp's written "confession," which said he had beaten Wallace to death.

Guerrier would later admit that he had strangled Wallace with a dog leash. He pleaded guilty to murder and was sentenced to 15 years to life.

Buonora says the Rupp charge was similar to other Suffolk murder cases that hinged on confessions. "The Rupp case was exemplary in that they thought they had a confession and that was it - case closed - without any corroborative evidence," Buonora says. "And in years gone by, the juries didn't seem to care, and they felt the guy was guilty without looking at the overall job of law-enforcement."

Although some detectives were among the first to recognize the injustice, Buonora said, others resented his decision to drop the murder

27

charge. "Every once in a while, the wrong guy is arrested, and you look
better if you admit you have the wrong man and that justice is done," said
Buonora, who served under three district attorneys, including Henry. "The
police could have taken that attitude. But their attitude which permeated
things from day one was that they were upset about looking bad."

   After Rupp's release, Buonora said, his own position was undercut by
homicide detectives. "The perception was that I made the homicide squad
look bad, and that was the beginning of the end." Buonora left the district
attorney's office in 1980.

   As a result of the Rupp case and others in which brutality was alleged,
a Suffolk Bar Association committee was created in 1979 to look into police
practices. All the changes suggested by the committee - including
videotaping of interrogations of all felony suspects and having prosecutors
present during questioning - were resisted at the time by Suffolk
authorities, says E. Thomas Boyle, the group's chairman. In the past year,
Suffolk police have videotaped confessions for the first time.

   District Attorney Henry had made his view of the case known right after
the jury's verdict: "I think that it is a travesty of a system of
jurisprudence when they allow a despicable person like Rupp to get one
penny of the taxpayer's money for injuries he never received."

   Rupp, now married, still remembers his interrogation. "It was painful,
real painful," says Rupp, a barrel-chested man with a bushy red beard,
whose eyes squint as he recalls his ordeal. "It was like being in a torture
chamber."


Headline: A Statement Taken After Sedation
Byline: By Thomas J. Maier
Day: Monday  ID: 30136
Edition: NASSAU AND SUFFOLK  Section: NEWS
Page: 29  Date: Dec 08, 1986
Caption: Newsday Photo by Cliff De Bear - The body of Brian McCabe is
removed from a Northport house in June, 1984
Cover: Questionable Tactics In Murder Cases. Series Continues
Corrections: CLARIFICATION-Steven Zimmer, the prosecutor in the Christine
Wingate case described in the Newsday series on the prosecution of
homicides in Suffolk County, left the Suffolk district attorney's office in
July. A story in Monday's editions did not indicate if Zimmer was still
with the office. (12/10/86 NS)
Other Editions:

Text:
KEYWORD-HIT At 6:30 a.m. on June 29, 1984, a Northport Village police
officer answered a call about a disturbance at a house on Scudder Avenue.
Outside on the porch was Christine Wingate, dressed in jeans and a red
sleeveless sweatshirt.

   Inside was the body of her boyfriend, Brian McCabe. He was dead of a
gunshot wound.

   Wingate was crying hysterically and hyperventilating. She was taken to
the emergency room of Huntington Hospital and sedated with Valium. As her

28

family sat in the waiting room, Suffolk homicide detectives arrived. Police said she agreed to questioning.

Wingate was abruptly discharged. Wearing only a hospital gown and cotton panties in the light rain, she was taken out the hospital's back door by detectives to a nearby car. She was driven to police headquarters in Yaphank.

Before her parents could get a lawyer to stop the interrogation, police said, Wingate had confessed.

In her written police statement, Wingate, then 35, says that she and McCabe, 30, came home from a night of bar-hopping and got into an argument. She said the gun went off when she tried to take it away from McCabe, who threatened to kill himself.

I had nothing to confess to, Wingate said in a recent interview. She says she was still in shock and feeling drugged when she signed a written statement prepared by homicide detectives. I naively told them how Brian was killed. I was so broken-hearted about Brian being dead, it didn't really occur to me that I was facing a murder charge.

To back up the murder charge, however, police would later testify about other comments Wingate allegedly made - not included in her signed statement - in which she referred to McCabe as a snake and admitted that she deliberately shot him. None of Wingate's comments was taped.

When Wingate went to court months later, several problems emerged for the prosecution, including the fact that the medical examiner could not say if McCabe had been murdered or committed suicide.

Eventually, the murder case was bargained down to criminally negligent homicide. In January, Wingate was sentenced to probation, with no jail time and no admission of wrongdoing. Her plea acknowledges that she admitted guilt only to avoid the risk of trial. Despite the agreement, however, Wingate's lawyer and the prosecutor in the case still differ strongly on the reasons for the plea.

The use of the Wingate statement in evidence would have opened up a can of worms for the homicide squad about their conduct, says Wingate's lawyer, Leonard Tartamella.

Prosecutor Steven Zimmer rejects that claim. Zimmer notes that Suffolk County Court Judge Harry Seidell, after a lengthy pretrial hearing, found that Wingate's confession to police was legal. That's the important thing, he says. We did go through the hearings, and the judge did uphold the confessions and said there was no wrongdoing by the police. [CORRECTION-CLARIFICATION-Steven Zimmer, the prosecutor in the Christine Wingate case described in the Newsday series on the prosecution of homicides in Suffolk County, left the Suffolk district attorney's office in July. A story in Monday's editions did not indicate if Zimmer was still with the office. (12/10/86 NS)]

In his decision, Seidell said that Wingate's statements were made voluntarily and that there was no evidence that police hindered her or her parents from contacting a lawyer while she was in custody.

Though both sides say the confession was critical, Zimmer says he offered a plea because of the lack of physical evidence against Wingate. We didn't have gunpowder on her hand - even though the type of gun it was wouldn't have given any - and the wound was consistent with a suicide as well as a homicide. It was my recommendation to take the plea. The police

29

wanted to go to trial. They felt she was guilty.

But Tartamella says a jury would have taken a different view of the police testimony and wheth- er Wingate - while hysterical and under sedation - could have said anything coherent to detectives. As proof, he points to police testimony that Wingate lifted her hospital gown during questioning and exposed her breasts to the two male detectives. If it was tape-recorded, there would have been no room for their lies, Wingate says now. She says that during her interrogation, she was sick and repeatedly threw up. After several hours, she was in a state of fatigue, she says, and signed the written statement prepared by police without reading it.

Zimmer disagrees. If the police wanted to do a job on her, they would have made up a statement that she was mad at him and wanted to blow him away, Zimmer says. But that wasn't done, which shows that the police took her statement as it was and she signed it.

More than two years after the incident, Wingate says she's still trying to put her shattered life together. Temporarily, it totally ruined my life, whatever could be ruined was ruined, she says. It's been more difficult than I thought it'd be starting all over again. It's like taking your first step.


Headline: An `Understanding' on Deal for Testimony
Byline: By Thomas J. Maier
Day: Tuesday  ID: 30092
Edition: HOME  Section: NEWS
Page: 33  Date: Dec 09, 1986
Caption: Newsday Photo by John Paraskevas - Evidence presented in the case, including a map Lugo said Johnson drew for him
Cover:
Corrections:
Other Editions:


Text:
KEYWORD-HIT

The evidence against Douglas Johnson was considerable. Footprints at

the scene matched his shoes, and strands found on the 15-year-old murder victim's chest matched Johnson's hair type.

There was also a written confession that police said Johnson, 21, had

given them. It quoted him admitting that he raped Donna Rozier of Bay Shore and smashed her skull with a cement block in a trailer truck near the South Shore Mall. But the prosecution wasn't taking any chances. At the trial in December, 1984, it also produced a snitch.

The witness, Gilberto Lugo, 28, was awaiting trial on a felony charge of assaulting his brother-in-law with a gun. He testified that he and Johnson met in jail when Lugo was using cards to tell "the future and the past." Lugo told Johnson he could see that Johnson had a girlfriend and had hurt her. "I didn't see nothing," Lugo testified. But he said he usually picked that subject while telling fortunes because everyone had girlfriends and women often feel hurt.

30

Johnson, he said, turned pale.

Soon afterward, Lugo testified, Johnson told him: "I kill a girl." He said Johnson told him how he strangled and raped Rozier, who was found when a passer-by spotted her white-stockinged feet sticking out from a mattress in the abandoned truck.

Prosecutor Barry Feldman assured the judge and jury that there was no deal to permit a reduction in the pending felony charge against Lugo for his testimony. Lugo testified that there was no trade-off.

"Was there any discussion with your attorney, did anybody talk to you or your attorney about any deals or anything like that?"

"No, sir," said Lugo.

In his summation, Feldman would drive home the point: "Did you hear one word of testimony regarding a deal that was made with Gilberto Lugo? We submit to you if anything, you heard directly the opposite. That there were no deals. There were no promises. No assurances. There was no nothing. What does he stand to gain by testifying here? There isn't a case where you can now consider, hey, he's being offered a two years on an assault. He's being offered six months. He's getting a walk.

"Nobody lowered his bail. Nobody gave him any special consideration. Nobody gave him any promise. He told you quite frankly, we submit to you, and it's reasonable to believe he hopes, he originally was hoping he was going to cooperate with the police, he might get something out of it. He's been told up and down from today to Sunday - he's not getting anything, he's receiving nothing. And he still came in and he still testified. So you can't infer and you can't speculate, and you can't guess out of thin air that he must be getting something. All the testimony in this case is directly to the opposite. There were no deals. He's not expecting anything at this point. Zilch."

The jury would convict Johnson, who was sentenced last year to a maximum term of 25 to life. But a few weeks after Johnson's trial, Lugo's felony assault charge was reduced to a misdemeanor, and he was released from jail. At Lugo's hearing, assistant district attorney John

The jury would convict Johnson, who was sentenced last year to a maximum term of 25 to life. But a few weeks after Johnson's trial, Lugo's felony assault charge was reduced to a misdemeanor, and he was released from jail. At Lugo's hearing, assistant district attorney John Ammerman recommended that Lugo be sentenced to time served and put on probation. "The main reason for this is the defendant did testify for the people in the murder case of People v. Doug Johnson, in which he did greatly aid the People in obtaining a conviction . . ." Ammerman said.

In an interview, Lugo's lawyer, Victor Velazquez, said there was "an understanding" that his client's testimony would be taken into account. "As far as we were concerned, there was no actual deal," said Velazquez. "There was an understanding that there would be some considerations. It's a matter of semantics. I think it was clear that Mr. Feldman was making no promises as to what he [Lugo] would get. But it was obvious to everyone involved that he was testifying in the hope that he would get some type of consideration . . .

"It was an understanding that they'd do something for him. Never a specific what they would do for him - just that they would do something for him," said Velazquez. "I would be surprised if it was not expressed to the

31

jury that he was testifying and that one of the factors for testifying was the hope that he would get some consideration for his testimony."

Feldman said last week that he discussed the issue with Velazquez before Lugo took the stand. But he said Lugo had no reason to have anything other than hope about favorable treatment, and that Lugo testified he wished for such treat- ment. He said, "That was the understanding with his attorney - that we were not offering him anything definite."

Feldman added, "He can honestly hope for some consideration, because it would be unrealistic for him to expect otherwise." He said he used Lugo because the prisoner produced a map he said Johnson drew for him of the area around the murder scene. It had Johnson's fingerprints, Feldman said. He described it as "very significant" evidence of the truth of Lugo's account.

Jury foreman John O'Shaughnessy said recently that the jury had strong doubts about Lugo and ignored his testimony in convicting Johnson. "The perception of the jury was that there was fairly obviously an opportunity for a person like Lugo to concoct a story for his own good," said O'Shaughnessy, who said the panel depended on other evidence to convict. "Even if he is telling absolutely the gospel, there seems a temptation to use his testimony as a bargain. It lessens the credibility of the district attorney's office. The DA's credibility should not be tied to a person in a jail cell, serving time. . . . I felt this way, and so did many of my peers in the room."


Headline: Hearings Eyed On Use of Confessions
Byline: By Rick Brand
Day: Tuesday  ID: 30085
Edition: HOME  Section: NEWS
Page: 37  Date: Dec 09, 1986
Caption:
Cover:
Corrections:
Other Editions:

Text:
KEYWORD-HIT

Presiding Officer Gregory Blass (R-Jamesport) yesterday called on the county legislature's public safety committee to hold "extensive hearings" on the police department's reliance on confessions in murder cases and to seek power for the committee to subpoena witnesses.

In a press conference, Blass asked the committee to call on current and past police and prosecution officials to appear at hearings in the wake of a Newsday series exploring Suffolk County's system of investigating murder cases. That system, the series said, has been marked by an extraordinary reliance on gaining confessions, a practice that has contributed to claims of civil rights abuses, mishandling of evidence and repeated questions about the validity of police testimony.

Blass said he would also submit a resolution at today's legislative meeting in Hauppauge to give the committee power to subpoena witnesses.

"There's no point to police officials beating their chests concerning the number of confessions they obtain in murder cases if those confessions fail to stand up in court," said Blass. " . . . In other words, people guilty of serious crimes may not be getting the punishment they deserve."

However, Legis. Michael O'Donohoe (C-E. Northport), committee chairman, said it is "premature" to call immediate hearings, and the committee does not have the resources to carry out the kind of investigation Blass is proposing.

William McKean, police spokesman, would not comment directly on Blass' statement but said, "It is our history to cooperate with all government agencies."

Suffolk Police Commissioner DeWitt Treder had no immediate comment on the series. But, in a statement, Treder said he "would offer an appraisal of those portions of the story that pertain to the homicide squad" when the series is completed. "These comments will be somewhat limited due to the fact that certain homicide squad cases have been under review by the New York State Investigations Commission since February of this year," the statement said.


Headline: Suffolk Homicide/ The Jailhouse `Snitches' Bargaining for Inmate Testimony: Murder Confessions for a Price
Byline: By Thomas J. Maier and Rex Smith
Day: Tuesday  ID: 30008
Edition: NASSAU AND SUFFOLK  Section: NEWS
Page: 07  Date: Dec 09, 1986
Caption: Newsday Photo by John Paraskevas-An officer makes his rounds in the Suffolk County Jail in Riverhead. Prosecutors have used jailhouse confessions to help convict murder defendants
Cover: Suffolk Homicide/The Jailhouse `Snitches' > Bargaining for Inmates' Testimony
Corrections:
Other Editions:


Text:
Joseph Pistone stood in the hallway of the gray-flecked cellblock on line with the other men waiting to take a shower or use the telephone. Pistone was outside James Diaz' cell, when Diaz leaned through the bars. In a quiet voice, Diaz admitted stabbing a 35-year-old nurse in her Port Jefferson Station home with a kitchen knife and then raping her as she was dying.

Pistone would later give that account in court. He would testify that he was amazed. He was 17, a New York City detective's son with a prior criminal record who was in the Suffolk County jail serving time for possessing a stolen car and awaiting trial on another theft charge. He barely knew Diaz, a 21-year-old drifter awaiting trial for second-degree murder. But Pistone insisted that he was the only prisoner in the busy hallway who heard Diaz describe the killing of Maureen Negus - who lived alone with her two sons in a small Cape Cod.

Snitches have provided Suffolk authorities with another means of getting a confession from a suspect - even after the suspect is arraigned and given a lawyer. In 11 cases, Suffolk prosecutors have resorted to

snitches when police were unable to get confessions - or when higher courts had ruled that admissions had been illegally obtained. In other snitch cases, like the Diaz trial, a confession taken by police was allowed into evidence but its credibility was under attack by the defense.

In three murder cases, "jailhouse snitches" who testified under oath for the district attorney's office later said that parts of their testimony were false. Two of these inmates - including Joseph Pistone - made these claims in recent interviews with Newsday. The other inmate said in a letter found in his apartment that he lied at trial, but later said his recantation was false.

Six jailhouse snitches who were freed early in return for their testimony were later convicted of more crimes, including attempted murder, armed robbery, burglary and other felonies. All of the crimes took place during the time these inmates would have been in jail if convicted as charged and not given deals.

Despite some highly publicized failures, the practice of using snitches has generally worked for the prosecution in Suffolk. Three of every four accused killers incriminated by snitches have been convicted as charged, a rate much higher than average for all Suffolk murder cases. But as the use of snitches has increased, some Suffolk juries, defense lawyers and at least one judge have expressed suspicions that some of these inmates may be lying.

Officials in other jurisdictions say they use snitches only infrequently. According to available court records and interviews, Nassau prosecutors have used snitches seven times in homicide cases since 1980. ************** A Con Artist Takes the Stand On Nov. 18, 1982, Joseph Warshawsky, who was awaiting trial on a first-degree grand larceny charge in an extortion case, testified as a "snitch" in a Suffolk County murder trial.

Warshawsky claimed that Vincenzo Rao had told him in the Suffolk County Jail that he had ordered the murder of a Central Islip man. Rao would be convicted. Here is part of the cross examination of Warshawsky by defense attorney Michael Premisler:

Q. . . . most of your life you spent earning a living as a con artist in one way or another?

A. I would say so, yes.

Q. And that's true of today - your lifestyle today, until today? Still true [that] you make your life as a con artist?

A. Yes. I don't hurt people . . .

Q. Mr. Warshawsky, you lied in the past to help yourself, is that right?

A. That's true.

Q. Okay. And, as a matter of fact, you are not adverse to lying to help yourself?

A. That's true.

Q. Okay. And you will lie in the future to help yourself if that is necessary . . . ?

A. That's true.

Q. Okay . . . And if it were to help you to lie here, you would lie right now?

A. No.

34

Headline: An `Understanding' on Deal for Testimony
Byline: By Thomas J. Maier
Day: Tuesday  ID: 29943
Edition: HOME  Section: NEWS
Page: 33  Date: Dec 09, 1986
Caption: Newsday Photo by John Paraskevas - Evidence presented in the case, including a map Lugo said Johnson drew for him
Cover:
Corrections:
Other Editions:

Text:
KEYWORD-HIT
   The evidence against Douglas Johnson was considerable. Footprints at the scene matched his shoes, and strands found on the 15-year-old murder victim's chest matched Johnson's hair type.
   There was also a written confession that police said Johnson, 21, had given them. It quoted him admitting that he raped Donna Rozier of Bay Shore and smashed her skull with a cement block in a trailer truck near the South Shore Mall. But the prosecution wasn't taking any chances. At the trial in December, 1984, it also produced a snitch.
   The witness, Gilberto Lugo, 28, was awaiting trial on a felony charge of assaulting his brother-in-law with a gun. He testified that he and Johnson met in jail when Lugo was using cards to tell the future and the past. Lugo told Johnson he could see that Johnson had a girlfriend and had hurt her. I didn't see nothing, Lugo testified. But he said he usually picked that subject while telling fortunes because everyone had girlfriends and women often feel hurt.
   Johnson, he said, turned pale.
   Soon afterward, Lugo testified, Johnson told him: I kill a girl. He said Johnson told him how he strangled and raped Rozier, who was found when a passer-by spotted her white-stockinged feet sticking out from a mattress in the abandoned truck.
   Prosecutor Barry Feldman assured the judge and jury that there was no deal to permit a reduction in the pending felony charge against Lugo for his testimony. Lugo testified that there was no trade-off.
   Was there any discussion with your attorney, did anybody talk to you or your attorney about any deals or anything like that?
   No, sir, said Lugo.
   In his summation, Feldman would drive home the point: Did you hear one word of testimony regarding a deal that was made with Gilberto Lugo? We submit to you if anything, you heard directly the opposite. That there were no deals. There were no promises. No assurances. There was no nothing. What does he stand to gain by testifying here? There isn't a case where you can now consider, hey, he's being offered a two years on an assault. He's being offered six months. He's getting a walk.
   Nobody lowered his bail. Nobody gave him any special consideration. Nobody gave him any promise. He told you quite frankly, we submit to you,

35

and it's reasonable to believe he hopes, he originally was hoping he was going to cooperate with the police, he might get something out of it. He's been told up and down from today to Sunday - he's not getting anything, he's receiving nothing. And he still came in and he still testified. So you can't infer and you can't speculate, and you can't guess out of thin air that he must be getting something. All the testimony in this case is directly to the opposite. There were no deals. He's not expecting anything at this point. Zilch.

  The jury would convict Johnson, who was sentenced last year to a maximum term of 25 to life. But a few weeks after Johnson's trial, Lugo's felony assault charge was reduced to a misdemeanor, and he was released from jail. At Lugo's hearing, assistant district attorney John Ammerman recommended that Lugo be sentenced to time served and put on probation. The main reason for this is the defendant did testify for the people in the murder case of People v. Doug Johnson, in which he did greatly aid the People in obtaining a conviction . . . Ammerman said.

  In an interview, Lugo's lawyer, Victor Velazquez, said there was an understanding that his client's testimony would be taken into account. As far as we were concerned, there was no actual deal, said Velazquez. There was an understanding that there would be some considerations. It's a matter of semantics. I think it was clear that Mr. Feldman was making no promises as to what he [Lugo] would get. But it was obvious to everyone involved that he was testifying in the hope that he would get some type of consideration . . .

  It was an understanding that they'd do something for him. Never a specific what they would do for him - just that they would do something for him, said Velazquez. I would be surprised if it was not expressed to the jury that he was testifying and that one of the factors for testifying was the hope that he would get some consideration for his testimony.

  Feldman said last week that he discussed the issue with Velazquez before Lugo took the stand. But he said Lugo had no reason to have anything other than hope about favorable treatment, and that Lugo testified he wished for such treat- ment. He said, That was the understanding with his attorney - that we were not offering him anything definite.

  Feldman added, He can honestly hope for some consideration, because it would be unrealistic for him to expect otherwise. He said he used Lugo because the prisoner produced a map he said Johnson drew for him of the area around the murder scene. It had Johnson's fingerprints, Feldman said. He described it as very significant evidence of the truth of Lugo's account.

  Jury foreman John O'Shaughnessy said recently that the jury had strong doubts about Lugo and ignored his testimony in convicting Johnson. The perception of the jury was that there was fairly obviously an opportunity for a person like Lugo to concoct a story for his own good, said O'Shaughnessy, who said the panel depended on other evidence to convict. Even if he is telling absolutely the gospel, there seems a temptation to use his testimony as a bargain. It lessens the credibility of the district attorney's office. The DA's credibility should not be tied to a person in a jail cell, serving time. . . . I felt this way, and so did many of my peers in the room.

36

Headline: SUFFOLK HOMICIDE / The Jailhouse `Snitches' Inmate Saves Trial, Then Recants Twice
Byline: By Thomas J. Maier
Day: Tuesday  ID: 29940
Edition: NASSAU AND SUFFOLK  Section: NEWS
Page: 32  Date: Dec 09, 1986
Caption: Newsday Photo by George Argeroplos-The prosecution's file on Rudolph Hoff, convicted of a 24-year-old murder of a Lindenhurst housewife

Cover:
Corrections:
Other Editions:

Text:
A man and his young son walking to church spotted the woman's nude body in tall grass lying next to a shrub oak near Pinelawn cemetery. She was identified as Kathryn Ann Damm, a 53-year-old Lindenhurst housewife. Police said she had been sexually mutilated.

   Detectives believed that Damm's killer had picked her up at a local bar, raped and mutiliated her. Then he left her bleeding to death in the open field. Several suspects were questioned but no arrest was made. The murder was discovered on Oct. 3, 1954. It would remain unsolved for a quarter of a century.

   The break came in the form of an anonymous tip in January, 1979. A woman phoned the Suffolk homicide squad twice. The caller said she had dated a man named John Hoff, who told her that he had hurt a woman in 1954 when she resisted him, and that the woman had died.

   A week later, Rudolph John Hoff, a 54-year-old Freeport carpenter, was arrested for Damm's murder. He was convicted the following year in what was called the longest-standing case in U.S. history to go to trial and result in a guilty verdict.

   But in getting the conviction, Suffolk prosecutors relied on the testimony of a convicted armed robber who said Hoff had admitted the murder to him in jail.

   Following a pre-trial hearing, Judge Robert W. Doyle had ruled that Suffolk homicide detectives had taken Hoff's confession illegally. He said they should have contacted Hoff's lawyer before questioning him. The judge also said he would bar as too vague testimony by a pathologist that linked the Damm murder to a 1970 rape-mutilation. Hoff had been convicted of assault in the 1970 case. Without the confession and the medical examiner's testimony, then-prosecutor Thomas Spota said Hoff probably could not be convicted.

   Enter Joseph Indell: a 27-year-old inmate of the Suffolk County Jail. Indell, an admitted cocaine addict who had previously been convicted of armed robbery, was awaiting a sentence for attempted burglary. Indell told police that Hoff - after a quarter-century of silence - had admitted killing Kathryn Ann Damm.

   Indell said on the stand that the confession came as he walked into Hoff's cell and found him on the toilet. "I was standing there, and he got up off the toilet bowl and put his hands in the air and he said, `The broad

37

was a no good teaser.' " Indell testified that Hoff then gave a graphic description of the murder.

In return for Indell's testimony, the Suffolk district attorney's office agreed to drop the burglary charge for which the snitch was facing a 2-to-4 year sentence. Indell was freed after Hoff's conviction.

Both prosecutor Steve Wilutis and defense lawyer Johnathen Boxer still differ sharply about Indell's credibility. "His testimony in my opinion had the ring of truth to it," says Wilutis, who took the case when Spota left the district attorney's office. "Whether the jury discounted it all together, or counted it a little, you don't know in these cases."

Boxer says it was incredible that Hoff, after such a long silence, would make such a damaging admission to a prisoner he barely knew. "Miraculously, when they had no case, Indell came from out of the blue," Boxer says. "Personally, I couldn't believe it because Hoff was a secretive and careful man who spoke to no one."

When he was sentenced to life, Hoff was even more vehement about Indell's testimony. "It goes to show that the only way the Suffolk district attorney's office can obtain a conviction is by the game of `Let's Make a Deal'," he told the court.

In March, 1981, four months after Hoff's trial, Indell broke into the Patchogue home of Lorraine Schordine. "I heard steps upstairs," Schordine said in a recent interview. "I could see his leg, this Joe, in the hall. He was holding on to my pocketbook." Schordine said she ordered Indell to give it back to her and he screamed, "Get out of my way or you're dead." He raced out of the house, holding the pocketbook containing $250 and credit cards.

Days later, police arrested Indell and found a type-written letter to the FBI in his apartment. In it, Indell claimed he deliberately lied at the Hoff trial to gain his freedom. "Mr. Wilutis told me everything I testified to at the Hoff trial," the letter said. "I testified and after my testimony I was released."

A special court hearing was held in February, 1982, in the Hoff case to consider Indell's letter. But at the hearing, the district attorney's office submitted a statement in which Indell said that he really did tell the truth at Hoff's trial. "I wrote that letter to cover myself," the letter read. "I am now stating that . . . I told the truth in my testimony against John Rudolph Hoff. I am sorry and apologize for causing any problems that I might have caused by writing the letter."

Hoff's conviction was affirmed both at that special hearing and on appeal.

For burglarizing Schordine's home, Indell was sentenced to 2 to 4 years in jail - the same sentence he had faced before cutting a deal with Suffolk prosecutors. But that was of little comfort to Schordine, who feels Indell shouldn't have been released in the first place.

"I guess it's good for the police in solving their crimes," she says. "But I think if they're in jail, they should stay in jail."

Headline: Suffolk Homicide / The Jailhouse `Snitches' Dealing for Inmate Testimony: Murder Confessions With a Price. SEE END OF TEXT FOR SIDEBAR - A

Con Artist Takes the Stand
Byline: By Thomas J. Maier and Rex Smith
Day: Tuesday  ID: 29939
Edition: NASSAU AND SUFFOLK  Section: NEWS
Page: 07  Date: Dec 09, 1986
Caption: 1) Newsday Photo by John Paraskevas-A guard makes his rounds in
the Suffolk County Jail in Riverhead. Prosecutors have used jailhouse
confessions to help convict murder defendants. 2) Newsday Photo by John
Paraskevas-Steven Wilutis, Suffolk's chief trial prosecutor
Cover: SUFFOLK HOMICIDE / The Jailhouse `Snitches' > Bargaining for
Inmates' Testimony
Corrections:
Other Editions:

Text:
Joseph Pistone stood in the hallway of the gray-flecked cellblock on line
with the other men waiting to take a shower or use the telephone. Pistone
was outside James Diaz' cell, when Diaz leaned through the bars. In a quiet
voice, Diaz admitted stabbing a 35-year-old nurse in her Port Jefferson
Station home with a kitchen knife and then raping her as she was dying,
Pistone would later testify.

   Pistone says he was amazed. He was 17, a New York City detective's son
with a prior criminal record who was in the Suffolk County jail serving
time for possessing a stolen car and awaiting trial on another theft
charge. He barely knew Diaz, a 21-year-old drifter awaiting trial for
second-degree murder. But Pistone insists that he was the only prisoner in
the busy hallway who heard Diaz describe the killing of Maureen Negus - who
lived alone with her two sons in a small Cape Cod.

   "He said he was standing in the kitchen and that the lady walked
upstairs from the basement," Pistone would recall on the witness stand at a
pretrial hearing. "She got scared when she seen him . . . and he told me
that he stabbed her in the chest with a knife." There was more. "He dragged
her down the stairs into the basement and he told me that he put a towel
over her so he wouldn't get any blood on himself . . ."

   A few days later, Pistone called his lawyer, William Breuer of Queens.
He told him two accused killers had confessed their crimes to him. He said
he wanted to meet with police. Breuer would testify at the hearing that his
client saw "a chance to rat on somebody" in hopes of reducing his jailtime
and that Pistone was "evasive and . . . has difficulty in admitting his own
guilt." He set up the meeting but warned Pistone about the penalties for
committing perjury.

   "You better be certain of what you're talking about," the lawyer said
he told Pistone. "You can't play games."

   Pistone took the stand anyway - and his testi- mony led the judge and
defense lawyer to accuse him of lying. Pistone's role in the trial not only
would contribute to Diaz's acquittal but also would spotlight a growing
practice of Suffolk authorities - making deals with inmates in return for
their testimony in murder cases.

   Suffolk prosecutors used jailhouse snitches to provide evidence in 28
murder cases since 1980 - five times as many as in the preceding five
years. In return for their testimony, the snitches usually got prosecutors

to drop the charges against them or to recommend reduced sentences for those with pending charges. After winning their freedom by testifying, some snitches were arrested for further crimes.

Jurors in several cases have questioned the practice of using snitches. "It lessens the credibility of the DA's office," said John O'Shaunnessy, foreman of a jury that heard testimony from a snitch. "The DA's credibility should not be tied to a person in a jail cell, serving time . . ."

Many prosecutors and legal experts outside Suffolk say the frequent use of snitches invites perjury. They are especially critical of the practice of offering deals to snitches in return for testimony. "I've always thought it was questionable," says Joseph Ball, a member of the American Bar Association committee that composed ethical standards for prosecutors. "It seems to me a bargain being made in return for perjury."

Even the Suffolk prosecutors who have relied on snitches say they do so with reluctance. Says chief trial prosecutor Steven Wilutis: "Sometimes, as we say in summations, you have to use a little fish, a person who is in there for petty larceny or burglary third, to catch a big fish, to get a murderer. It's not a nice business. It's something that I don't like, not any more than I like dealing with these people. But it's a fact of life that you've got to live with."

A Newsday study of Suffolk homicide cases since 1975 found that:

Snitches have provided Suffolk authorities with another means of getting a confession from a suspect - even after the suspect is arraigned and given a lawyer. In 11 cases, Suffolk prosecutors have resorted to snitches when police were unable to get confessions - or when higher courts had ruled that admissions had been illegally obtained. In other snitch cases, like the Diaz trial, a confession taken by police was allowed into evidence but its credibility was under attack by the defense.

In three murder cases, "jailhouse snitches" who testified under oath for the district attorney's office later said that parts of their testimony were false. Two of these inmates - including Joseph Pistone - made these claims in recent interviews with Newsday. The other inmate said in a letter found in his apartment that he lied at trial, but later said his recantation was false.

Six jailhouse snitches who were freed early in return for their testimony went on to commit more crimes, including attempted murder, armed robbery, burglary and other felonies. All of the crimes took place during the time these inmates would have been in jail if convicted as charged and not given deals.

Despite some highly publicized failures, the practice of using snitches has generally worked for the prosecution in Suffolk. Three of every four ac- cused killers incriminated by snitches have been convicted as charged, a rate much higher than average for all Suffolk murder cases.. But as the use of snitches has increased, some Suffolk juries, defense lawyers and at least one judge have expressed suspicions that these inmates may be lying.

Officials in other jurisdictions say they use snitches only infrequently. According to available court records and interviews, Nassau prosecutors have used snitches seven times since 1980.

District Attorney Patrick Henry defends using snitches and rejects any suggestion of wrongdoing. "No prosecutor in my office, as far as I'm concerned, would ever knowingly put perjured testimony into evidence,"

Henry said early this year. "It is one of the vilest allegations one can make of any professional prosecutor."

According to inmates, homicide detectives and Suffolk's top prosecutors, the county jail is a beehive of snitchery, its cells buzzing with incriminating statements.

"I don't think a significant case goes by in Suffolk County and probably in many other jurisdictions where you don't have an offer from someone in jail," says Henry. Former Suffolk Homicide Det. Robert Amato says: "I think they talk very openly in jail and what they say to other inmates can be relied upon."

The result is that snitching has become a well-developed practice in Suffolk, with its own rules and key players.

"If a fellow had information to make a deal, he'd tell Sal," recalls Donald Dilworth, who oversaw the jail as county sheriff and later became Suffolk police commissioner. Sal is Sal Romano, the jail warden. "And he'd get in contact with the detectives and they would then go and interview the inmate as discreetly as they could," Dilworth said.

Offers to snitch come in via telephone calls and letters from prisoners, visits from defense lawyers and Suffolk's Legal Aid office, and

through the jail's own grapevine. Some snitches have been used by prosecutors in more than one murder case. Prisoner John Kramer testified

about hearing a jailhouse confession from murderer Ronald DeFeo in the 1975 "Amityville Horror" trial. Three years later, he was back on the witness stand as a prosecution witness in another murder trial.

Prosecutors question prospective snitches at the jail and at the district attorney's office. If they decide to put a snitch on the stand, authorities sometimes will house the prisoner in a motel near the Riverhead courts or question him in an empty courtroom as a dry run for the trials.

Some Suffolk lawyers actively seek deals for their clients, while others express some concern about the practice. Edward Elliott, who heads the Suffolk Legal Aid Society's Riverhead office, argued with a client who was willing to snitch in a Suffolk murder case last year. "First off, I didn't believe it," says Elliott of the inmate's story. "Secondly it was inconceivable that it could occur. And if it had gone to a hearing, I would have testified that I didn't believe him. I didn't want to be a part of suborning perjury." The inmate decided not to testify.

Former Suffolk District Attorney Henry O'Brien, now a lawyer in private practice, says that the use of snitches "has become institutionalized" in difficult prosecutions. "It's like the confessions, but they use it only in weak cases," says O'Brien. But O'Brien is reluctant to criticize the practice. It is difficult for a prosecutor to resist using all evidence that is available, O'Brien says. "I never had to address snitches as an issue," says O'Brien, of his term as district attorney. "But I'm sure I wouldn't say no. How could you say no?"

Some defense lawyers question whether inmates frequently confess their crimes in jail, particularly since several say they emphatically warn clients never to discuss their case with other inmates. But authorities say boredom, braggadocio, and the will- ingness to ignore lawyers' instructions lead to jailhouse confessions. According to snitches, the admissions come

41

in a variety of places.

Three years ago, an inmate testified that John Calcaterra, while in a sheriff's van coming back from court with 16 other prisoners, talked freely about how he hid the missing gun he used to kill a West Islip man.

A prisoner testified in 1981 that John Abdullah admitted killing a 13-year-old Babylon girl, as the two inmates sat around in their cellblock sipping homemade wine and smoking a few joints.

And, a year earlier, a prisoner recalled how Rudolph Hoff - who was silent for 25 years about his murder of a Lindenhurst woman - began a long soliloquy of his guilt while on the toilet.

All three inmates who testified about these confessions got deals that resulted in their freedom. And their evidence helped convict Abdullah, Calcaterra and Hoff as charged. All three defendants were sent away for long prison terms.

But in several cases, questions have been raised about the accuracy of snitch testimony.

When inmate Joseph Indell was arrested for burglary three months after testifying against Hoff, police found a letter to the FBI in which Indell claimed to have given testimony that the prosecutor suggest- ed to him. He said in the letter that the prosecutor handed him two sheets of paper with a "full statement and confession on it. He then told me that that would be what I'd have to say in court." At a later hearing, Indell said he really did tell the truth in his original testimony against Hoff.

And in a recent Newsday interview, Pistone, the snitch in the Diaz case, says that he lied when he told the jury there was no deal with the DA's office for his testimony. Pistone said he recently repeated that claim in secret testimony to state investigators probing the handling of Suffolk murder cases.

Despite what he told the jury, Pistone now says that prosecutor Feldman had promised to reduce his pending charge for stealing a motorcycle. Feldman reneged, Pistone says, when Diaz was acquitted and the controversy about his testimony developed. Asked directly about a prior deal with the DA's office, Pistone said: "Verbally, there was, but not on paper."

Feldman denied Pistone's claim. "He had nothing to gain through his testimony," Feldman said, since he said Pistone had been offered a misdemeanor plea to a pending charge of possession of a stolen motorcycle before he became a snitch. Feldman said he used Pistone because his testimony was "either corroborated by the physical evidence or the confession to the detectives." He also said Pistone's account of the jailhouse confession included several things "which an outsider would have no reason to know" - among them the alleged use of a towel during the murder.

Pistone sticks by his account of Diaz' jailhouse confession. "This is the story that Diaz told me," Pistone says. "If I was making it up, they would have caught it."

Pistone was called to the stand after questions were raised by the defense about the statement police said they took from Diaz. In that statement, most of which Diaz refused to sign, he allegedly said he took the knife he used to kill Negus and threw it in the woods near the house. Police recovered a knife in the woods. But the confession was clouded by the discovery of a second knife - with Negus' blood still on it - in the

basement of her home. It was found by her former husband, who discovered it accidently while he was playing ping-pong.

When Pistone got on the stand, however, his testimony proved to be a liability for the prosecution.

Pistone testified that Diaz told him he became aroused when he spotted Negus hanging laundry on a backyard clothesline, and her dress "lifted up and he seen her rear end." The defense called this impossible because Negus was found wearing an ankle-length housedress.

Diaz' lawyer also cited a handwriting expert who reported that initials on the back of crime scene photos were not in Diaz' handwriting. During interrogations, detectives routinely ask suspects to initial photographs that may be used in evidence. Pistone testified that he saw Diaz, who is lefthanded, in his cell practicing writing the alphabet with his right-hand.

With the jury out of the courtroom, Suffolk County Court Judge Stuart Namm questioned Pistone and called him a "pathological liar." The judge said, "If this defendant is guilty, I want him convicted . . . But by God, if he is not guilty of this charge, he should not be convicted, and it's not important enough to have perjurers come in this court to ensure that somebody is convicted of murder." When the jurors returned, he ordered them to disregard Pistone's testimony about the handwriting.

Feldman and his boss, District Attorney Patrick Henry, denied that there had been perjury. "We categorically deny it," Feldman said in court. "It didn't happen and we resent the implications that there's any corruption."

In October, 1985, the jury acquitted Diaz of murder. Juror Nicholas Menchise said of Pistone's testimony: "Hedidn't strike me as being credible.There may have been some shades of truth. But, in effect, I really did not believe him."

When to use snitches - and whether to provide deals for their freedom - is a vexing question for prosecutors. Legal experts agree that prosecutors are duty-bound not to misrepresent any agreements with witnesses in court. In most Suffolk cases, prosecutors disclose the nature of the agreement they have made with the snitch in return for his testimony.

Henry says his prosecutors carefully check out each inmate's story before making deals for testimony. But his top homicide prosecutor, Wilutis, says there is little they can do to guarantee that a snitch is telling the truth.

"There are no safeguards that you can use," said Wilutis. "In real life, how many times do you know if someone is lying or not? You use your experience." Wilutis underlines that he would never knowingly place a liar on the stand. But, he says, if a would-be snitch "seems credible to me, and it seems like he's not lying - let the jury decide how much weight they are going to put on it."

One of his predecessors, Gerard Sullivan - who infrequently used snitches while overseeing Suffolk homicide prosecutions - takes a somewhat different view. "If a prosecutor has suspicions about it, he ought not to use it," says Sullivan. "That is not to say, `I don't know if it's true, but I'll put it on and let the jury decide.' When any prosecutor puts on a witness, there's an unspoken vouching for the witness."

Some out-of-state prosecutors say they usually avoid the use of

43

snitches fearing it can hurt a case in the eyes of the jury. "With a snitch, there's such a motive for him to lie," says prosecutor Brian Telander, head of the criminal division in Du Page County, Ill., a suburb of Chicago. "To throw a dirty kind of witness into a case is usually not considered very professional. It kind of taints the case."

The practice of striking deals not only has raised some ethical questions, but also has allowed some convicted criminals to return to the street and commit further crimes.

In 1980, R. Bates - a Suffolk inmate with 12 prior convictions, including some felonies - helped bolster the prosecution's case against Robert "Cowboy Bob" Donald, a 32-year-old Riverhead man accused of shooting a 63-year-old woman in July, 1979.

Police said Donald intended to kill another man during a struggle over a gun. During their struggle, the gun went off and struck Ethel Carter, who was sitting in a lawn chair several yards away. Police obtained some incriminating oral statements from Donald, but he would not sign a written confession. Bates was called at the trial to testify about admissions relating to Donald's intent to kill during the shooting incident. He said Donald told him about the crime while they were sitting at a table in the jail tier.

In return, Suffolk prosecutor Wilutis promised to sharply reduce all pending charges against Bates - who had already pleaded guilty in a bargain that was to result in a 4-to-8-year sentence for the night burglary of a Copiague home. On the stand, Bates also admitted stealing 100 coats from a local coat factory, breaking into a Fish `N Chips restaurant, and burglarizing other neighborhood homes and stores.

Despite Bates' testimony, the jury convicted Donald of the lesser charge of manslaughter, rather than murder. Wilutis was true to his bargain, recommending to a judge that Bates be allowed to go free with a plea to reduced charges.

Standing before the sentencing judge, Wilutis noted Bates' long criminal history and said that "it is not in the public's interest" to set him free. But he added, "It is essential to the prosecution of crime and in the public's interest to have informants come forward and testify against more serious and dangerous criminals than themselves. Three months after being set free, according to the police account, Bates walked into a Copiague gas station along Sunrise Highway with a loaded pistol. He ordered 19-year-old attendant, Lee Savinetti, to turn over all the money. When the teenager fumbled with the cash register, Bates fired twice. One bullet lodged in the attendant's head, nearly killing him.

What Savinetti remembers next is waking up days later in the hospital, after doctors had to remove a small portion of his skull. For months, he would undergo physical therapy. Meanwhile, Suffolk police arrested Bates and charged him with attempted murder and attempted armed robbery. Bates denied committing the crime, but was convicted.

But it wasn't until after Bates' conviction for attempted murderthat Savinetti and his family learned through the grapevine how Bates had gotten out of jail early.

"When I found out, I wasn't too happy," says Savinetti, who is now 26 and has memory lapses that have hurt his ability to keep jobs. "I wanted to know did he testify against a mass murderer or something so he could get

44

out like this?"

For the past five years, while serving a 12-to-25-year prison sentence, Bates has stated that he lied at the trial - something that the Suffolk district attorney's office strongly denies.

"The prosecutor - Steve Wilutis - certain things, he wanted me to lie," Bates said in a recent interview. "I had guilt in me that I was doing wrong. But I kept the guilt in me because the district attorney made an agreement with me."

Says Wilutis: "Our position was and is that Bates was telling the truth at the trial, and that he lied after he got caught in a bad crime . . . lied to protect himself."

Bates says that he told Wilutis during their first talk that Donald said the shooting was an accident. He claims that Wilutis told him to say that Donald meant to commit murder when the gun went off.

"He said he was shooting at this guy and missed, and hit the lady by accident," Bates says, recalling Donald's jailhouse conversation. "I told him [prosecutor Wilutis] what had happened, confirming what he told me in the jail, word for word. And then he changed it up, and said, `Say that.' We went over rehearsals a few times."

Wilutis acknowledges going over the testimony with Bates but says he was merely preparing the witness for trial - a legally accepted technique - and not suggesting that he change his story.

In a sworn affidavit in September, 1980, Bates said: "The Assistant District Attorney who prosecuted the case did allow me to testify to a testimony he knew to be false and fabricated on its face. . . . At the time of this unjust act, I was desperate for my freedom and I use Mr. Donald as a passport to my freedom."

Using the affidavit as evidence that perjured testimony had been used at the trial, Donald's Legal Aid lawyer asked for a reversal of his conviction. In a January, 1984, decision, however, State Supreme Court Justice Paul D'Amaro refused to conduct a hearing on Bates' recantation - because Bates, realizing he might be charged with perjury, had refused to repeat the claim that he had testified falsely.

A state appellate panel upheld Donald's conviction and found that Bates' recantation was inherently suspect.

Bates will not be eligible for release from prison until 1994. The man his testimony helped imprison, Robert Donald, was released last year after serving the minimum sentence.

As for the shooting of Savinetti, Wilutis said: "I feel bad that it happened, I feel horrible about that. But I don't feel any responsibility for that."

Despite the controversy surrounding the use of a snitch in the Diaz case and others, both Henry and Wilutis say that snitches will continue to be used when necessary.

But one person who has changed his view of the practice is Bates.

Citing his own example, Bates says that inmates simply can't be trusted to tell the truth when offered a deal. Says Bates: "There ought to be a law against it because some guys would lie just to get free." NEXT: The Crime Lab. A Con Artist Takes the Stand On Nov. 18, 1982, Joseph Warshawsky, who was awaiting trial on a first-degree grand larceny charge in an extortion case, testified as a "snitch" in a Suffolk County murder trial.

45

Warshawsky claimed that Vincenzo Rao had told him in the Suffolk County Jail that he had ordered the murder of a Central Islip man. Rao would be convicted. Here is part of the cross examination of Warshawsky by defense attorney Michael Premisler:

Q. . . . most of your life you spent earning a living as a con artist in one way or another?

A. I would say so, yes.

Q. And that's true of today - your lifestyle today, until today? Still true [that] you make your life as a con artist?

A. Yes. I don't hurt people . . .

Q. Mr. Warshawsky, you lied in the past to help yourself, is that right?

A. That's true.

Q. Okay. And, as a matter of fact, you are not adverse to lying to help yourself?

A. That's true.

Q. Okay. And you will lie in the future to help yourself if that is necessary . . . ?

A. That's true.

Q. Okay . . . And if it were to help you to lie here, you would lie right now?

A. No.


Headline: SUFFOLK HOMICIDE/The Handling of Evidence Unexamined Clues and an Unsolved Case
Byline: By Rex Smith
Day: Wednesday  ID: 29927
Edition: NASSAU AND SUFFOLK  Section: NEWS
Page: 33  Date: Dec 10, 1986
Caption:
Cover:
Corrections:
Other Editions:


Text:
KEYWORD-HIT

On a December afternoon in 1982, a newspaper carrier rang the doorbell at the East Northport home of 50-year-old Marlene Ferguson. When he got no answer, he peered through a window - and saw her body on the floor. The youngster rushed across the street to a neighbor.

"I tried the door and it was open," the neighbor, Ernie Oechslin recalled recently. "She was laying in a pool of blood."

Suffolk homicide detectives and forensic investigators from the medical examiner's office arrived. Detectives found no indication that a crime had been committed: Ferguson's money and jewelry were in place, and there were no signs of forced entry.

Police also learned that two years earlier, she suffered an aneurysm, leaving her in a coma for six months. Police said the blood appeared to have come from the woman's nose and mouth, and a physician's assistant from the medical examiner's office said this was "not inconsistent" with

46

stroke-related death. He list- ed the cause of death as "apparent natural." The next day, Dr. Jose Fernandez of the Suffolk County Medical Examiner's office was performing a routine autopsy. At 1:30 p.m., he made a startling discovery - a bullet hole hidden beneath the thick black hair on the back of the victim's head.

Police listed Marlene Ferguson's death as a "homicide."

Detectives rushed back to Ferguson's home. But there was nothing to show that a murder had taken place. A precinct detective had suggested that the family clean up the blood before the victim's daughter arrived at the home.

"There was no sinister motive in the cleaning," Det. Lt. Hans Dara, then commander of the Suffolk homicide squad, said at the time. "The family wanted to return the house to as normal a condition as possible. But a variety of potential evidence may have been lost: footprints, fingerprints, hair lint, soil, fibers."

Four years later, the murder remains unsolved.

To Gerard Sullivan, formerly Suffolk's chief trial prosecutor and now a lawyer in private practice, the case spotlighted the mistake of sending physician's assistants, rather than pathologists with medical degrees, to the scenes of such deaths. "PA's are unsophisticated and inexperienced," he said.

But Dr. Charles Hirsch, Suffolk's chief medical examiner, said recently the use of physician assistants was "a stroke of genius" on the part of his predecessor, Dr. Sidney Weinberg. "They do the best routine death investigations," Hirsch said.

"All of us have made mistakes," Hirsch said, referring to the failure to spot the bullet hole. "It's very easy for me to understand how that could be overlooked. None of us is comfortable with such errors, but you can't expect anybody to be perfect. I can't guarantee that it won't happen again."

But the neighbor who found Ferguson's body said he doesn't understand how it could occur. "They made a big mistake. They didn't see she had a hole in her head," Oechslin said. "They came back the next day, barricaded the house and that's when they started doing things. It was terrible."


Headline: SUFFOLK HOMICIDE/The Handling of Evidence Cases Falter on Trail of Errors From Murder Site to Crime Lab
Byline: By Thomas J. Maier and Rex Smith
Day: Wednesday  ID: 29907
Edition: NASSAU AND SUFFOLK  Section: NEWS
Page: 07  Date: Dec 10, 1986
Caption: 1) Photo - Varanelli. 2) Newsday Photo by John Paraskevas - Det. Sgt. Al Della Penna inspects a gun at the Suffolk crime laboratory
Cover:
Corrections:
Other Editions:

Text:
KEYWORD-HIT

47

Neighbors discover an East Northport woman lying in a pool of blood in her kitchen. A medical examiner's aide concludes she died of natural causes. But the next day, an autopsy reveals a bullet wound in the back of her head. Detectives return to her house, but it is too late. Relatives have cleaned up the scene, destroying potential clues. Four years later, the murder remains unsolved. * * *

An Eatons Neck woman is strangled in her bed. Within hours, police charge her husband with the murder. They say he admits the crime, even squeezing a detective's hand to show how he did it. But the confession is unwritten and unrecorded. Authorities fail to dust the house for fingerprints or photograph windows and doors to document whether or not an intruder broke into the house as the defense would claim in court. The jury in the 1977 trial finds the husband not guilty. * * *

An East Hampton shipping clerk is stabbed to death in an argument outside a local tavern. Police arrest a 28-year-old man and search his apartment without finding the murder weapon. They plan to come back with a police dog to finish the search. But in the meantime, the suspect's girlfriend finds a knife under a Christmas tree in the living room. A member of the jury that finds him guilty of reduced charges says the jury felt that "the police department didn't do a very good job in investigating the case." * * *

The trail of errors in Suffolk County's handling of homicide cases often runs from the murder scene to the crime lab.

Cases have faltered - and in some instances collapsed - because authorities have failed to properly collect and analyze physical evidence. Detectives and crime-lab personnel have clashed at murder scenes, police have overlooked weapons, authorities have neglected to take fingerprints, and evidence has been lost or shelved without testing.

In many cases, experts and former Suffolk law-enforcement officials say, the absence of strong physical evidence has been a key factor prompting Suffolk prosecutors to offer plea-bargains rather than risk acquittal at trial.

"The research shows that if you have crime-lab evidence, you're more inclined to get a conviction to the charge," said Richard Ward, a University of Illinois criminology professor and former New York City detective. "If there's crime-lab evidence, the defense attorney cops out, and you can get convictions earlier."

Suffolk authorities deny that they have given short shrift to physical evidence. They say that crime-lab problems have been isolated and are being addressed. "We put high premiums on all evidence," Chief of Detectives Arthur Feldman said. "Physical evidence, witness identifications - every piece of evidence that will possibly get you further into a successful prosecution - is important to us. And we will try in all cases whatever we can legally try to get a confession, which is excellent evidence when you go to trial."

But some former prosecutors suggest that the county relies so heavily on obtaining confessions that physical evidence is often ignored or given scant attention. "I felt there was not enough effort made to find other evidence beyond the confession and obvious eyewitnesses - not enough emphasis on the crime lab and crime-scene analysis," said John Buonora, Suffolk's top felony prosecutor for five years until 1979.

48

And Dr. Sidney Weinberg, who headed the Suffolk medical examiner's office for all but a few months from its creation in 1960 until last year, said police were often disinterested in physical evidence. "This was a breed of cops from the old school. The laboratory was something to confirm what they already - knew. They were not looking for something from the lab that would help them gain a clue."

Scores of interviews and a review of case files and internal county documents show:

Evidence has been overlooked at murder scenes. Until this year, detectives and crime-lab investigators did not follow the procedures outlined by experts for handling murder scenes. "People got there and kind of did their own thing," said Dr. Charles Hirsch, who became Suffolk's chief medical examiner last year. "Nobody was in charge. There was no direction to it."

The crime laboratory, a division of the medical examiner's office, has a backlog that officials say threatens effective prosecution. Evidence in two-thirds of the death investigations referred to the lab in 1983 and 1984 was never completely analyzed. Said Vincent Crispino, who became the Suffolk lab's director last year: "I lose sleep over the concern that, by the time we get around to analyzing a case, its evidentiary value may be lost. . . . If it's not looked at for months, then the investigation is at a dead end."

Evidence intended for use at murder trials has sometimes been ruined because of laboratory conditions. In 1979, a water-main burst and drenched all firearms evidence for that year's cases. The medical examiner's office was so damp at one point that mushrooms grew from cracks in the lab floor, and ventilation was so poor that fumes from firearms-testing sometimes left employees ill. As a result, equipment purchases have been delayed pending completion of a 90,000-square-foot building, which is now scheduled for occupancy next fall - two years behind schedule and $5.5 million over the original construction budget.

Detectives and prosecutors, relying on defendants' statements to win convictions, sometimes ignored physical evidence for months, until a trial date neared. In some instances, detectives had so little communication with the lab that scientists didn't know that cases they were working on already had been plea-bargained and closed.

The problems involving physical evidence begin even before it reaches the crowded rooms of the county's understaffed crime lab in Hauppauge. A review of more than 300 homicide case files and interviews with dozens of present and former law-enforcement officials reveal that Suffolk murder cases have been plagued for years by problems that began as soon as police arrived at the scene.

Law-enforcement manuals lay out specific procedures to follow when police find a body: The crime lab first checks for physical evidence and the crime scene is photographed. Next the medical examiner surveys the body. Only then do homicide detectives begin their examination of the scene - checking the body for identification, for instance.

Pierce Brooks, a former Los Angeles Police Department homicide captain who solved the famous "Onion Field" case and has served as chief of police in three cities, is now a consultant to police departments around the country. "Say we look in the door, and the room is a bloodbath," Brooks

49

said. "The homicide team closes the door and waits until the crime lab gets there. The coroner waits, we wait, until the crime lab dusts for prints and looks for fibers. That's the rule if you want to do it right. You don't go pulling around the evidence or touching the body."

But for many years, according to lab officials and detectives, Suffolk murder scenes were handled exactly as Brooks said they shouldn't be - detectives first, followed by the medical examiner and, finally, the crime-lab scientists. Robert Amato, who retired last year after five years as a homicide detective, said that while "there are no hard and fast rules," detectives always have been first to probe the scene.

The danger of such a system, according to Andrew Varanelli, the crime-lab director from 1977 until last year, is that homicide detectives might spoil a crime scene. "They get what is a fever," Varanelli said. "They want to see the body and go out and get the guy. And in that fever, they sometimes jeopardize evidence needlessly."

Varanelli said that such activity at crime scenes can destroy crucial

physical evidence. "Once the murder scene has been changed, it can hurt the case, which may depend on fibers or human hairs," he said. "Those can be lost if the body is rolled over in a disorganized way." Varanelli, who was replaced last year as crime lab director, is suing to regain his job. County officials won't discuss his ouster because of the lawsuit but he said he be- lieves he was removed because of conflicts with detectives and prosecutors.

Critics of Suffolk's handling of crime scenes point to the murder of Harriet Lok Chee, who was strangled sometime before dawn on April 27, 1977, as her three young children lay sleeping in their Eatons Neck home. Suffolk County police charged her husband, Victor, a 57-year-old restaurateur, with the crime.

The prosecution's case at the trial six months later revolved around police testimony that Lok Chee had confessed orally. But Lok Chee took the stand to maintain his innocence and deny the police account. And detectives testified that they they had no written confession, no tape-recordings and no notes of Lok Chee's interrogation. The one detective who claimed to have taken notes said he had thrown them away.

The jury also learned that there was virtually no physical evidence in the case: The house had not been dusted for fingerprints, nor had police taken pictures of the home to record whether or not windows or doors had been broken by an intruder. The defense produced photos taken by its own investigator showing a break in a back window.

The jury found Lok Chee not guilty.

"Basic detective work was not done," said Steven Scaring, formerly Nassau County's top murder prosecutor, who defended Lok Chee. "They were too confident they would get a jury to buy the oral confession - again, without doing the basics." Edward Flaherty, who prosecuted the case, attributed the acquittal to Scaring's "effective cross-examination" of the detectives who were sent to the murder scene.

Some officials say that, in some ways, Suffolk's system is superior to that of other counties because the scientists who will eventually analyze physical evidence actually go to the scene to help collect it. In most New York law-enforcement systems, including Nassau and Westchester, evidence

50

collection usually is the job of technicians, and scientists do not leave the lab.

But other authorities say that failures at the crime scene result from confusion and conflict over responsibilities. In 1977, the Suffolk crime lab was transferred from the police departmemnt to the medical examiner's office and placed under civilian control. The county police identification unit still goes to most scenes of lesser crimes and to every murder scene to "dust" for fingerprints and take photographs. But the responsibility for examining the scene for physical evidence - such as stray bul lets, hairs or blood spatter - now falls under the medical examiner's office.

An example of conflict between detectives and crime-lab personnel was given by Varanelli, the former crime-lab director, who said Suffolk detectives often showed little concern for the proper gathering of physical evidence. He cited the murder of Eve Wilkowitz, whose body was found in a vacant lot near her Bay Shore apartment in March, 1980. At the scene, he said, he had to keep a detective from disturbing the body. "I was picking up hairs off the body and we had a confrontation because [the detective] wanted to look for identification."

After a series of meetings earlier this year between police and crime-lab officials, new procedures were inaugurated to ensure that crime scenes are not disturbed until lab workers have gathered evidence. "Instead of having six homicide detectives go in," Crispino said, "we want to have just one senior detective go in there and reduce the possibility of contaminating the scene."

But when evidence is brought to the lab, problems persist. County documents obtained by Newsday reveal a pattern of neglect of lab staffing and funding stretching back nine years.

And despite recent improvements, officials acknowledge that Suffolk's crime lab still lacks sufficient staff and equipment needed to put it on a par with the nation's top crime labs.

In 1978, the year after the lab came under civilian control, Weinberg

sought to increase its staff by five. But the request was rebuffed by county budget officials to save money.

In a memo to Weinberg on Aug. 3, 1979, Varanelli warned that the lab atmosphere "is causing degradation of evidence." The next month, overhead pipes burst and drenched all the weapons held by the laboratory as evidence - twice. Wrote Varanelli, "Several cases, two of which are homicides, were irreparably tainted."

Nor did matters soon improve. In April, 1980, Varanelli wrote to Weinberg that "most, if not all, of 1979 serological evidence is useless for any worthwhile examinations . . . lost due to our conditions."

In April, 1981, Varanelli described the backlogs and staff shortages as creating "an unmanageable situation."

The same month, Steven Wilutis, then deputy chief of the district attorney's major offense bureau, warned Varanelli in a letter that lab backlogs presented "a critical problem." Wilutis cited murder cases in which lab analysis had not been done six months after the homicide. The law requires that reports on physical evidence used by prosecutors be turned over to the defense for analysis. Wilutis' letter said that Suffolk judges

51

were threatening to block the prosecution from using evidence because it had not been analyzed and given to defense lawyers.

Despite the repeated warnings and complaints, the medical examiner's staff was slashed by one-sixth in 1982 as part of county budget cuts. The warnings continued. In 1983, the legislature said that backlogs in the crime lab were "growing serious enough to jeopardize the work of the police, district attorney and the courts." Last year, budget analysts said inattention to the lab was "costing the criminal justice system and every taxpayer in the county dearly."

Weinberg blamed the staff shortages on low salaries and delays in authorizing hiring. "We were for years understaffed, never got the money, never got the people," Weinberg said. "And as a result, there were a lot of complaints, a lot of backlogging, a lot of problems - no question about it."

Weinberg said that roughly one-fifth of the crime lab staff positions remained open, year after year. "I don't know why," Weinberg said, in a recent interview. "Believe me, they knew about it in the right places, but maybe I wasn't forceful enough to get what was needed at that time."

Chief Deputy County Executive Frank R. Jones, who said he attended every meeting at which Weinberg discussed his department with top county officials, said that County Executive Peter F. Cohalan was unaware of problems in the lab and that Weinberg never mentioned his need for additional staff. "Never once did he say to us that the lab has fallen on hard times," Jones said. "Yes, we left vacant positions to help with budget problems. But that applied across-the-board to everybody. And if he had come in and said, `I need those positions filled,' he would have gotten them."

Jones said that Weinberg, a longtime friend of the county executive's father, "absolutely got everything he wanted from Peter Cohalan . . . and it used to drive me crazy."

No one disputes, however, that the limited staff was unable to keep up with the number of cases requiring analysis. "It is my impression that the people who worked here were excellent people," Chief Medical Examiner Hirsch observed, in a recent interview. "There was simply too much work to accomplish with the people and equipment available."

In 1983, for example, the medical examiner's office completed only 35 percent of the 297 homicide, suicide and death investigations referred to it. Although precise figures for this year are not available, Crispino said he doubts the backlog has been substantially reduced.

"To this day, there are murder cases that have gone unreviewed because there were no people to staff it," said Varanelli.

District Attorney Patrick Henry said that Varanelli's assertion "could be" true in cases involving plea-bargains. "If a defendant pleads guilty before tests are completed, whether it's a homicide case or a drug case or anything else, you're not going to necessarily test the [evidence] - it's academic," Henry said.

Carl Muller, the detective lieutenant who heads the Nassau County Police crime lab, said that the low case-completion rate in Suffolk was surprising - and that his lab completes all the murder cases it receives. "All the T's are crossed and the I's are dotted about three to four months after a case comes in," Muller said. Since the Nassau homicide squad office

is just a few doors away from the lab in police headquarters, he added, investigators often seek immediate lab analysis of critical evidence, and can get oral reports on lab findings.

Crispino said he was concerned that evidence proving a person innocent might be neglected because of the backlog. "If the lab can provide some information in a tough case - like the race of the [person whose] hairs [are] found at the scene - it might help the investigation," Crispino said. "But if it's not looked at for months, then the investigation is at a dead end."

Last year, citing a vacancy rate of 22 percent among the approved positions on the medical examiner's staff, the legislature's budget office described staffing as "a chronic problem . . . the culprit" that was causing "serious backlogs" in the crime lab. The serology section - particularly important in homicide investigations because that is where fluids such as blood and semen are analyzed - completed less than one-fourth of its 1984 cases.

Nassau officials say they have not encountered the problems that beset Suffolk's crime lab. The Nassau police department's crime lab handles about 40 percent fewer cases overall than Suffolk's - a difference officials attribute largely to Suffolk's greater involvement in narcotics prosecution. But the two labs have about the same number of working staffers, roughly two dozen.

So short-handed was the Suffolk staff, former prosecutors and lab officials say, that mistakes were sometimes critical. Former Assistant District Attorney James J. O'Rourke recalled the case of Janice Lopez, accused in 1978 of stabbing her husband in the head during a domestic argument. When her husband died, Lopez was charged with manslaughter.

But before a full pathology report had been completed, the medical examiner's office accidentally discarded remains of Augustine Lopez' brain. Gregory Carman, the lawyer defending Janice Lopez, pressed O'Rourke to produce either the pathology report - which he knew was incomplete - or to give a defense pathologist the brain fragments - which Carman knew were missing.

Lacking the evidence, O'Rourke could offer only a plea-bargain favorable to Lopez: She was allowed to plead guilty to second-degree assault, with a sentence of nine weekends in the county jail. "I had to dance to get what I got," O'Rourke said in an interview, shaking his head.

As the lab backlog grew in the late-1970s, the threat to criminal justice was compounded by the lab's physical problems. Ventilation was so poor in the lab, housed in the basement of a Hauppauge office building, that fragile physical evidence was endangered.

Dr. Leo DalCortivo, the chief of laboratories in the medical examiner's office, recalled that the air was so moist that soil samples sprouted vegetation if left on a lab table overnight and mushrooms grew from crevices in the floor. "We had a steam delivery pipe fail," DalCortivo said, "that not only flooded the library, but also wiped out a $200,000 mass spectrophotometer."

At the same time, the lab failed to keep up with techonological advances in criminalistics. "Without properly functioning equipment, the productivity of forensic sceintists is greatly diminished," the country legislature's budget review office said in one report, referring to the

53

Suffolk lab's equipment as "antiquated." DalCortivo was more blunt. "Equipment was non-existent," he said. "We were in a state of confusion."

In 1981, plans finally began to move ahead for a new medical examiner building, including vastly expanded space for the crime lab. Officials decided to delay purchases of sophisticated new equipment, worrying that it might be damaged by conditions in the old building if installed there.

But the new building, first estimated to cost $13.5 million and be ready for occupancy in the fall of 1985, is still under construction. It now is expected to cost more than $19 million, and Hirsch does not expect to move in until next fall.

Hirsch and Crispino note that with approval from county officials and increased salaries, they have been able to hire several new scientists. Staff morale is improving, the case backlog is being whittled away, they say, and the lab's darkest days are behind.

This fall, Crispino notes, the lab bought $260,000 in new hardware, including the latest bullet comparison microscopes and infrared equipment to identify chemical traces. Computers are being set up in the medical examiner's office to aid in tracking cases and setting priorities for scientific review. The Police Department's investigation section is readying a $2-million automated fingerprint system - equipment which was twice rejected by the county legislature before it finally won approval, and which other counties, including Nassau, have had for several years. It will give Suffolk capabilities for reviewing and identifying thousands of fingerprints within minutes.

But the crime lab expects to handle 7,340 cases this year, up more than 25 percent from the 5,834 cases it handled in 1980, when the working staff was only slightly smaller. And in a report issued in October, the Budget Review Office pointed to five vacancies in the 25-person lab staff, blaming the continuing staff shortage for the fact that only 35 percent of the serology cases were completed in 1985 - better than the 1984 record, Crispino noted, but still "alarmingly low."

Even if the lab's backlog is erased, however, some officials predict that little will change in the way murder cases are handled in Suffolk - until attitudes toward physical evidence change. Weinberg said that homicide detectives and prosecutors traditionally have displayed little interest in physical evidence, often failing to pursue cases that were pending in the crime laboratory until shortly before trial.

"I'm not trying to absolve the lab or myself of guilt here," Weinberg said, "but the response you get is directly proportional to the interest that the other person is showing. There would be a specimen down there, and then you really didn't hear from the guy."

And a number of former prosecutors say a change in the attitudes of homicide detectives is crucial - because juries are becoming more skeptical when the only evidence is an unrecorded confession.

Peter Mayer, former deputy chief of the district attorney's major offense bureau, said that Suffolk detectives have considered physical evidence secondary in homicide cases since the 1960s. "They thought the best way to prosecute a murder defendant was to have inculpatory testimony," Mayer said. "That's basically because the juries in this county always believed the cop. And the biggest point I can make is that this is no longer true. We don't have juries willing to believe the word of anyone

carte blanche, and law enforcement is just catching up to that." NEXT:
Safeguards and Supervision


Headline: SUFFOLK HOMICIDE/The Handling of Evidence Records Show Expert
Misstated Credentials
Byline: By Thomas J. Maier
Day: Wednesday  ID: 29904
Edition: NASSAU AND SUFFOLK  Section: NEWS
Page: 07  Date: Dec 10, 1986
Caption: Newsday Photo by Bob Luckey - Ira DuBey, ex-deputy director of the
crime lab
Cover:
Corrections:
Other Editions:

Text:
KEYWORD-HIT
   For years, Ira DuBey testified as an expert witness for the prosecution
in dozens of Suffolk murder and other felony trials. Prosecutors say DuBey,
then deputy director of the county crime lab, was a convincing witness
whose testimony helped win convictions in a number of tough cases.
   His license plate even attested to his expertise: "FORENSIC."
   But Newsday has learned that DuBey, now head of the Maryland State
Police crime lab, testified inaccurately about his credentials in some
trials in 1979 and 1980 and that two Suffolk prosecutors, who were warned
of questions about DuBey's credentials three years later, did not disclose
the information to the district attorney.
   DuBey claimed at least three times to hold a master's degree in
forensic science, according to court transcripts. In fact, he never
obtained the degree because he did not complete his thesis.
   Last week, Newsday asked the district attorney's office for comment on
DuBey's testimony. Mark Cohen, chief law assistant to District Attorney
Patrick Henry, said Thursday that the reporter's call "was the first time
that this office was made aware of any alleged specific difficulty in
connection with Mr. DuBey's credentials. In any event, we are certain that
the specific prosecutors handling the various cases at the time had no
knowledge of any of the discrepancies that are now being alleged. We are
reviewing each of these cases very carefully to determine what action, if
any, will be taken."
   Later in the day, Cohen said he had learned that prosecutors Steven
Wilutis and Barry Feldman had been informed by the medical examiner in late
1983 that DuBey had not earned the master's degree. After the call from
then-Suffolk medical examiner Dr. Sidney Weinberg, "Wilutis and Feldman
reviewed transcripts of whatever trials they could determine he had
testified in; they could not find any indication he had testified falsely,"
Cohen said. They decided to take no action and did not inform their boss,
Henry, according to Cohen. Weinberg said he learned of the discrepancy from
DuBey's then-supervisor, Andrew Varanelli.
   Feldman said he talked with DuBey about the issue and DuBey told him he
had completed all the coursework for the degree. "It seemed to me

55

reasonable in the way he explained it," he recalled.

Newsday reviewed transcripts of three homicide trials that state DuBey told juries that he had a master's degree.

In interviews, DuBey said he never lied about his credentials. He says transcripts of murder trials were in error in quoting him as saying he had a master's degree. "It may be hard to believe, but it is [true]," says DuBey. "If you go through those transcripts, you're going to find a lot more errors."

At the 1979 trial of David Coleman, accused killer of a 14-year-old Lake Ronkonkoma girl, the prosecutor called DuBey to the stand.

"What degrees do you hold?" asked the prosecutor.

DuBey replied, according to the transcript: "Master's degree in forensic science and a bachelor's degree in biology."

On one occasion, DuBey not only was quoted as claiming a master's but also as incorrectly describing his undergraduate education. "I have a bachelor's degree in biology from Rensselaer Polytech Institute, master's degree in forensic science from the City University of New York," DuBey is quoted as testifying at the 1979 trial of Gregory LaSusa, a tavern bouncer who fatally stabbed a threatening patron. Though he attended prestigious Rensselaer, DuBey actually got his biology degree from Long Island University's C.W. Post campus, school records show.

Describing his credentials at a murder trial, DuBey testified that: "I've taken advanced courses in criminalistics and forensic serology at St. John's University, the University of Connecticut, Drew University and at the University of New Haven." He made such a claim, for example, at the 1983 trial of Timothy P. O'Toole, who was convicted of killing a Sayville barmaid.

Registrars at those schools say they have no record of DuBey ever attending a course. DuBey explains that his "courses" were seminars - ranging from one to several days in length - that were held by professional groups in buildings at these campuses.

Peter DeForest, of CUNY's John Jay College of Criminal Justice, was DuBey's teacher for his master's degree coursework. DeForest said he was surprised when Maryland officials told him that DuBey said on his application form that he had a master's degree. "I told them that he didn't have the degree, and when I spoke to Ira about it, he said that he had honestly thought he'd be finished with the degree when he had applied for the job about eight months earlier," DeForest says.

DuBey said that while he never misled Maryland officials or Suffolk juries, he would attempt to "maximize" his credentials when on the stand. "I don't think [the credentials] ever went beyond its limits," says DuBey, who oversees a 42-member staff at the Maryland crime lab. "If you don't maximize your credentials, I think you're not being in the real world if you say that. You're always trying to maximize yourself. Doesn't everybody try and do that?"

DuBey is listed as having a master's degree in the annual membership directory of the American Academy of Forensic Sciences. The organization said members provide a list of their credentials.

Experts say inaccurate testimony about credentials could lead to reversal of convictions. In legal circles, when a person lies about his credentials under oath "that's perjury, no two ways about it," says Abraham

Abramovsky, professor of criminal law from Fordham University. "If you have a close case, an appeals court will see if it could sway a jury and will probably reverse it."

Many Suffolk prosecutors praise DuBey's ability to make the most of his testimony. "What you're looking for in a forensic witness is flexibility: Can he make his testimony match the specific circumstances of the crime at trial," explains former prosecutor James J. O'Rourke. "Ira always could do that. He was a quick prep and he was unbelievable on the witness stand." Prosecutors say DuBey's testimony about blood stains was crucial in gaining the conviction of O'Toole.

Weinberg said he counted DuBey as a friend and valued his scientific expertise. But the revelation of DuBey's inaccurate testimony troubles him, he said. "You can't help but wonder," Weinberg said, "if a guy does that, how far does he go?"

Headline: Suffolk Homicide/The Handling of Evidence Elsewhere, Cases Are Made by Work in the Lab
Byline: By Rex Smith
Day: Wednesday  ID: 29835
Edition: NASSAU AND SUFFOLK  Section: NEWS
Page: 31  Date: Dec 10, 1986
Caption: Newsday Photo by John Paraskevas-Nassau Det. George Pierce with evidence from the Goldberg case. Paint from the killer's motorcycle was linked to paint chips found on tree trunk near where body was discovered.
Cover:
Corrections:
Other Editions:

Text:
In the end, jurors said, their decision came down to paint chips on a tree stump, blood stains on a poncho and bite marks on the young victim's body.

Prosecutors and police cite the conviction of Warren Bass in May, 1985, by a Nassau County Court jury as proof that successful murder cases need not depend upon confessions.

Bass, a senior at the State University of New York's Old Westbury campus, was charged with raping and murdering 19-year-old Heidi Goldberg of Jericho in June, 1984. He gave no statement to police. But he was linked to the Goldberg murder by a strong web of circumstantial evidence.

Forensic experts found a paint chip from Bass' motorcycle on a tree stump near the body. Blood matching Goldberg's rare blood type stained a poncho owned by Bass. Bite marks on the victim's body matched Bass' teeth. And an elastic band found around Goldberg's neck was determined to be a strap used to hold fetal heart monitors onto the abdomens of women in labor. Bass' wife had used such a monitor shortly before the killing.

Police brought the stump, the motorcycle and the other physical evidence into the courtroom. The jury foreman said the combination of evidence left no doubt in the jury's mind. Convicted of murder, Bass is serving a 37 1/2-years-to-life prison sentence.

The Bass case is one of at least 18 Nassau cases between 1981 and 1985 in which defendants have been convicted of murder at trial without

testimony about any incriminating statement by the defendant, either from police or from a jailhouse snitch. Newsday's study found that virtually every case in Suffolk resulting in a murder conviction after trial involves use of incriminating statements.

Prosecutors in other jurisdictions increasingly depend upon evidence from crime scenes to win murder convictions. Such prosecutions, they say, hinge on well-functioning crime labs.

"With a lab backlog, it's not going to work," said Bryan Brown, deputy district attorney in Orange County, Calif., a suburb of Los Angeles. "You're not going to have the criminalistics investigation that we're able to have here. If your crime laboratories get bogged down, then what happens is you leave a lot of evidence on the table, so to speak. That evidence can be of incredible value."

Orange County officials point to the arrest last year of the "Nightstalker" killer - a man suspected of killing 16 people and assaulting 21 others in California. Using a portable laser examining device, the Orange County Sheriff's crime lab found fingerprints on a Toyota stolen from the scene of one murder. The device accents microscopic particles of hair and fiber and fingerprint residue that would not be visible otherwise.

In August of last year, that fingerprint information was fed into an automated system designed to match fragments of fingerprints against voluminous fingerprint files. A suspect was quickly identified. Mug shots were immediately distributed to the news media. Within hours, the suspect was captured. He is awaiting trial.

Suffolk County authorities say they have no plans to purchase equipment to give the county the laser technology that led to the capture of the "Nightstalker." An automated computer system similar to that used in Orange County and more than two dozen other police jurisdictions finally was approved for purchase last year by the Suffolk County Legislature, which had twice before rejected it. It is expected to be operational in Suffolk police headquarters this month. Nassau has had automated fingerprint technology for two years.

But law-enforcement experts say that sophisticated equipment is sometimes less important than imagination. The key evidence linking Alvin Harry of Jamaica, Queens, to the 1982 murder of prominent attorney Leon Stern of Roslyn Harbor was a screwdriver that Nassau police found in the trunk of the car Harry was driving when he was arrested. Forensic scientists matched markings on the tip of the screwdriver to gouges left in the heavy wooden doors of Stern's home, which had been pried open by the killers. Harry and another defendant were convicted of murder and are serving life terms.

Other crime labs, however, have not been immune to some backlogs. "I can't think of a crime lab in the country that's not overloaded," said Larry Ragle, director of the Orange County lab. Both his lab and Suffolk's handle more than 5,000 cases a year. But Ragle's staff gives priority to cases that have been awaiting analysis for a month - while officials say that Suffolk murder cases often are not analyzed for several months.

Suffolk officials point to the Orange County lab as one of the country's best. It boasts a scanning electron microscope that can magnify objects to 100,000 times their size and analyze energy levels from X-rays to detect gunpowder resin. The lab's budget includes money to hire

specialists, such as a physical anthropologist who can help identify skeletonized bones.

   Ragle traces his lab's development to a crisis. After complaints from an Orange County judge about lab backlogs in 1972, Ragle said, officials allocated extra money for new equipment and dramatically increased the size of the lab staff.

   Since then, Orange County officials have depended on the crime lab to produce key evidence in many cases - such as a murder that turned on pinpoint-sized drops of the killer's blood on a kitchen table, and a case in which imprints taken from a victim's skin yielded carpet fibers that led to the murderer.

   Such experiences have led Orange County prosecutors to depend upon the lab. It has become, Brown said, "the foundation to keep you going."


Headline: SUFFOLK HOMICIDE/Supervising the Cases Lacking Safeguards, Detectives Get Great Leeway to Shape Cases
Byline: By Thomas J. Maier and Rex Smith
Day: Thursday  ID: 29564
Edition: NASSAU AND SUFFOLK  Section: NEWS
Page: 07  Date: Dec 11, 1986
Caption: 1) Newsday Photo by David L. Pokress - Barry Grennan, Nassau County's chief homicide prosecutor. 2) Newsday Photo by Thomas R. Koeniges - Suffolk police officer outside Hauppauge building where Archimedes Cervera was killed in 1979 3) Newsday Photo by John Paraskevas - Politicians and officials of the Patrolmen's Benevolent Association at the recent ribbon-cutting ceremony for the new PBA offices in Ronkonkoma. From left, State Sens. Kenneth LaValle (R-Port Jefferson) and James Lack (R-East Northport), PBA Secretary Peter Marsala, Legis. Patrick Mahoney (R-West Islip), PBA President Michael Mahoney, Deputy Suffolk Executive Howard DeMartini and Suffolk Controller Joseph R. Caputo.
Cover:
Corrections:
Other Editions:

Text:
KEYWORD-HIT

   Paul Roussillon says he was a young prosecutor on the rise - until he crossed the Suffolk homicide squad. After a veteran detective said the young prosecutor didn't pay him enough respect, Roussillon was demoted.

   Frances Sclafani had been an assistant district attorney for four years when she came to the notice of a homicide detective. His good word to the then-district attorney won her a promotion.

   John Buonora was the county's top felony prosecutor - until he moved to dismiss a murder indictment against a man he was convinced was innocent. That "made the homicide squad look bad," Buonora said. It was "the beginning of the end" of his prosecutorial career.

   The power to shape careers is a visible manifestation of the strong influence wielded by homicide detectives in Suffolk County. A Newsday study has found that their clout goes far beyond that. They are given extraordinary leeway to shape cases - at times, in ways that weaken murder

59

prosecutions and contribute to claims of civil rights abuses.

Safeguards used in other jurisdictions as a check on police conduct are lacking in Suffolk. Judges, defense lawyers, legislators and top police officials generally have failed to raise questions about Suffolk's practice of gaining a confession in nearly every murder case.

And the district attorney's office, which elsewhere oversees the shaping of murder cases, is widely perceived as being subservient to the homicide squad.

Prosecutors allow detectives to control homicide investigations. Until this year, assistant district attorneys rarely visited Suffolk murder scenes. Suffolk lacks an agency - such as a public defender's office - that could act as a watchdog to expose abuses. And some former law enforcement officials in Suffolk say that judges, who can find fault with police conduct, generally don't.

Former Deputy Police Commissioner Charles Peterson said that detectives "believe the judges are in league with them." Added Peterson: "And they are."

Judges acknowledge the perception of such bias but say that it is untrue and that they take pains to be impartial. Suffolk Administrative Judge Arthur Cromarty said the system works as a check on abuse. "We have safeguards against that - pretrial hearings and cross-examination," he said. "And if a defense attorney is worth his salt, he's going to make sure police did what they say they did. Police wrongdoing in all jurisdictions has been exposed by these hearings."

But others suggest that even if judges are vigilant they become involved in the process too late to prevent abuses.

That is a role some say prosecutors should fill.

Nassau County's chief homicide prosecutor, Barry Grennan, said he became convinced after watching Suf-folk homicide prosecutions for more than a decade that "the tail is wagging the dog" in Suffolk. "The prime difference between Nassau and Suffolk is that the DA in Suffolk is presented with a package by the detective - and if there are problems in the case, he's stuck with it," Grennan said. Newsday's study found that Nassau County convicts a greater percentage of homicide defendants of the original charge facing them than Suffolk - and Nassau defendants generally get higher sentences.

"What I object to," said Suffolk County Attorney Martin Bradley Ashare, "is the nexus of power for the police being the district attorney's office." The danger, Ashare said, is that the relationship could blur lines of authority in the police department.

Former Police Commissioner Donald Dilworth said that in the late 1970s he ceded some supervision of the homicide squad to the district attorney's office because ultimately murder cases wind up in the hands of prosecutors who have to present them in court. But some former prosecutors say that instead of the district attorney's office controlling the police, the reverse happened.

"As prosecutors, we were not the ones calling the shots," said Buonora. "You couldn't express dissatisfaction with a cop's work. The climate was such that you couldn't do that."

Former Assistant District Attorney Salvatore Alamia, who left the prosecutor's office in 1979 and is now in private practice, said that "the

Newsday / David L. Pokress

homicide squad worked to such a status that everyone became subservient to them, even the DA's office."

District Attorney Patrick Henry and top police officials say that the Suffolk homicide squad is properly supervised. Henry describes homicide detectives as "part of the team" that includes his assistants. The officials say that a close relationship between police and prosecutors in Suffolk results in smoother investigation and prosecution. Said Chief of Detectives Arthur Feldman: "We work extremely closely with the prosecutors, from the time of the initial investigation right through the prosecution."

But Newsday found that the relationship between the homicide squad and the district attorney's office is different in Suffolk than in other counties, including Nassau.

Paul Roussillon said that he learned the hard way about the relationship between prosecutors and homicide detectives in Suffolk County.

Roussillon became an assistant Suffolk district attorney in 1973, starting out prosecuting misdemeanor cases in the District Court Bureau. Within a few years, he was routinely handling felony crimes. But in 1979, as he argued a motor vehicle fatality case before a Riverhead jury, Roussillon got word of his demotion.

His mistake, Roussillon was told, was that he had not properly dealt with a veteran homicide detective working on the case.

"He felt that I didn't accord him the amount of respect he was entitled to be accorded as a member of the homicide squad," Roussillon recalled. "It was my understanding that something was said to the hierarchy in the office. Before the trial was over, I was told that I was being transferred to the District Court Bureau, handling misdemeanor crimes. That's where I had started out." Roussillon is now in private practice.

Buonora was chief trial assistant - the office's top felony prosecutor - in 1976 when he moved to dismiss murder charges against William Rupp, who later convinced a civil jury that he had been beaten until he confessed to a homicide he didn't commit. Moving to free Rupp was "the beginning of the end" of his prosecutorial career, Buonora said.

"The perception was that I had made the homicide squad look bad," he said. Others who were prosecutors at the time say that homicide detectives believed Buonora had abandoned them. When a new Major Offense Bureau was created in 1978, Buonora was passed over for appointment as its chief, and

instead was named head of the District Court Bureau. He entered private practice in 1980.

Henry denies that the transfers of Roussillon and Buonora had anything

to do with the homicide squad. Roussillon was shifted, Henry said in a prepared statement, "based on the need at that time for experienced trial assistants" in the District Court Bureau. Buonora's move was "simply a lateral transfer based upon his administrative skills," the statement said.

Sometimes homicide detectives have helped the careers of prosecutors. Former District Attorney Henry O'Brien, recalled that when he was district attorney, a homicide detective came to him with words of high praise for Sclafani, a young prosecutor who had joined the district attorney's staff four years before. "He was her rabbi," O'Brien said, referring to the detective. O'Brien responded by promoting Sclafani to the felony trial

bureau.

"I definitely felt that the homicide squad was more powerful than the police commissioner," said O'Brien, who was defeated by Patrick Henry in his bid for re-election in 1979. "That attitude, that perception, isn't going to fade away overnight . . . It's terribly alluring to a young assistant DA. They look up to the homicide detectives."

In Nassau and Westchester, prosecutors historically have become involved in cases as soon as a homicide is discovered - to guard against legal missteps by police in such areas as seizure of evidence or interrogations. "That way," Grennan said, "when the cop makes an arrest, the DA and the cop are in agreement."

The involvement of a prosecutor early in a case, Nassau District Attorney Denis Dillon said, helps ensure that suspects are charged appropriately. Between 1981 and 1985, 96 percent of Suffolk homicide defendants were charged with the top charge of second-degree murder, compared with 88 percent of Nassau defendants and 63 percent in Westchester. "There's a tendency for police to overcharge if no DA is on the scene," Dillon said.

In Nassau, at least one of the senior prosecutors in the district attorney's office goes to the murder scene. When the prosecutor arrives, he is briefed by the senior detective on the scene and is walked through it. If a defendant is in custody, the police and prosecutor discuss the appropriate charge. If there is no suspect, they discuss what legal steps need to be taken. "I can have a telephone search warrant within 15 minutes," Grennan says.

The prosecutor is nearby during the police interrogation and can be consulted on questions that arise concerning the suspect's rights, according to Nassau prosecutors.

"It's a matter of control over the investigation and the reports," said Peterson, formerly Suffolk's deputy police commissioner. "The best person to oversee it is the assistant DA."

An active role for Suffolk prosecutors in supervising police was uncommon until early this year, when Henry set up a rotating on-call schedule for prosecutors in his major offense bureau. "The cases were handled by the cops . . . from the time they find the deceased to the arrest," said Peter Mayer, a former Suffolk homicide prosecutor. "They'd come to you with a package."

Henry said he had made "no changes - modifications, perhaps," this year in the way his staff initially handles murders. Henry and Chief of Detectives Arthur Feldman noted that prosecutors often were called by telephone in the past when detectives had a question about what to do at a murder scene. His assistants, Henry said, "didn't just sit back and wait until everything was handed to them on a silver platter."

But a different view is given by Buonora, who worked under five district attorneys in Suffolk and Queens. "I think that a judgment was made in the past that the less the DA knew about the case, the better it was," Buonora said. In Queens, Buonora said, he routinely went to crime scenes and police precinct headquarters. "But out here, there was a conscious effort that that was the kind of thing that didn't happen. . . . I felt that, as a gut reaction, what we didn't know wouldn't hurt us," Buonora said.

Henry noted that defendants can expose any possible excesses committed by law-enforcement officials in hearings and trials. But some defense lawyers question whether Suffolk murder defendants - most of whom are unable to afford to hire their own lawyers - have the means to raise such questions.

The Suffolk Legal Aid Society - which Henry said employs "among the best-qualified defense attorneys in the county" - represents most criminal suspects at trial. But under an informal agreement struck between Legal Aid and the Suffolk County Bar Association 20 years ago, Legal Aid does not represent accused murderers.

While public defender offices elsewhere have challenged law-enforcement practices that courts have found objectionable, the informal prohibition against Suffolk Legal Aid taking an active hand in murder defense makes that unlikely here, officials say.

"We can't interfere in the individual case of another attorney," said John Middlemiss, the society's attorney-in-charge. "If we started to be assigned murder cases, then we would see where the problems are." But that is not likely. In fact, Legal Aid's existence was threatened last year in the county legislature when an effort to replace the society with a public defender's office narrowly failed.

Accused killers generally are represented by a court-assigned lawyer, drawn from a list of roughly two-dozen Suffolk lawyers who have agreed to do that kind of work. Many of Suffolk's most-sought-after criminal lawyers, however, refuse to take such assignments - in part because the fees are so low. A study issued last year by the state Defenders Association found that New York ranks 45th among states in hourly fees paid to assigned-counsel lawyers.

"They do not pay me enough for my professional services," said Mayer, who is in private practice but refuses to participate in the assigned-counsel program. "The result of this system is that you don't have the best criminal lawyers. The appellate courts don't care as long as a warm body is standing next to a defendant."

Van Zwisohn, executive director of the New York Coalition for Criminal Justice, said that the assigned-counsel program "stinks" and is "a poor substitute for a properly funded public defender office." Added Zwisohn: "The public defender can provide backup services, investigative services, sentencing advocacy and research beyond the individual attorney - who is not being well-paid - can provide." Such an independent office, he said "can find systemic abuses."

Ultimately, legal experts note, oversight of criminal justice becomes a job for judges and juries. Judges must choose between the police and defendant's versions of what happened during an interrogation and arrest. And if a judge finds that police violated a defendant's rights during questioning, the judge can rule that an incriminating statement cannot be used as evidence at the trial.

But Newsday's study found that while incriminating statements have been obtained in 94 percent of the Suffolk homicide cases between 1975 and 1985, judges have suppressed such statements in less than 5 percent of the cases.

Prosecutors and police said that indicates Suffolk detectives are doing their job properly. Some lawyers and former officials, however, say that it indicates that Suffolk judges are shirking their role as reviewers of

police conduct.

Robert Quinlan, a defense lawyer who until recently was president of the Suffolk Criminal Bar Association, said that peer pressure keeps judges from questioning the validity of admissions and suppressing their use at trial. "To suppress a confession is quite an act by a judge," Quinlan said. "It can earn you ostracism from other judges." Frequently, a murder case will collapse if a statement from the defendant is suppressed.

Judges concede that they find it difficult to rule against police when questions of fact arise, but they say the problem goes beyond what other judges will think of them.

"It is difficult for a judge to question a police officer," said Suffolk Surrogate Judge Ernest Signorelli, who presided over murder trials as a county court judge until 1976. "You assume you have a law-enforcement official whose sole purpose is to protect the community from offenders, and you assume he did an honest and competent job . . . and you hesitate in questioning his tactics or his motives."

But O'Brien said that creates "an atmosphere where the police can do no wrong."

For several years in the late-1970s, State Supreme Court Justice Thomas Stark, the supervising judge of Suffolk criminal courts, presided at every murder trial in the county. That job in recent years expanded to a seldom-changing pool of three judges - and this year, to a rotating system in which homicide cases are distributed to additional judges.

Defense lawyers have criticized Suffolk's tradition of leaving murder cases to a small number of judges who, the lawyers say, favor the prosecution. In an interview, Stark said that he was aware of concerns that some judges have been pro-prosecution. "I don't honestly believe that I've ever indicated to the juries anything like that, but I've been accused of it," he said.

State Supreme Court Justice Arthur Cromarty, Suffolk's administrative judge, said that the perception of a prosecution bias among the judges - which he doesn't believe exists - was one reason he distributed the murder cases more widely this year.

For much of the past decade, Suffolk's handling of murder cases - and its law enforcement system generally - has operated without substantial scrutiny from the legislature and county executive. In part, that is because law enforcement has an unusual degree of political clout in Suffolk.

The Suffolk Patrolmen's Benevolent Association, which represents rank-and-file police officers, offers politicians both money and votes. Its mailing list of 14,000 is a potent force in campaigns, and the union contributed more than $22,000 to candidates in last year's county elections - more than any other local single-interest group.

The union president is Michael Mahoney. His brother, Patrick Mahoney, is a Republican county legislator who, until this year, chaired the legislature's Public Safety Committee - which oversees the police. Patrick Mahoney said his role does not conflict with his brother's post. "I'm going to support law enforcement in any case, whether my brother is president of the PBA or not," he said.

Patrick Mahoney, formerly a detective and head of the detectives association, said police have political clout beyond their numbers. "It's

not one cop, one vote. One cop swings six or seven votes here."

Legis. Sondra Bachety (D-Deer Park), a Public Safety Committee member, said the legislature is reluctant to confront such a powerful political mass. "Law enforcement is a sacred cow," Bachety said. "But the problem is, on the Public Safety Committee, we don't have any documentation, ever." The committee does not probe police policies deeply, she said, because legislators "are afraid of what they might find. We are not an oversight committee, in my opinion."

That problem was underscored by John V.N. Klein, who was Suffolk County executive from 1971 to 1979 and a county legislator and town official before that. "The difficulty is in the legislative branch," said Klein, in a recent interview. "Committee chairmen have had a tendency to become advocates for the department over which they had jurisdiction. The chairman of the Public Safety Committee soon fell into the habit of referring to the police department as `us' and `we.' So instead of providing oversight, they were providing advocacy."

In the absence of oversight from either government or the legal community, abuses in the system can wreck murder cases. One of the cases cited by critics of Suffolk's system is the investigation of the murder of Brentwood lawyer Archimedes Cervera.

On June 16, 1979, Cervera was found shot to death in his law office.

Five months after the murder, Suffolk District Attorney Henry and homicide detectives were told by the FBI that a federal informant could identify Peter Corso as the paid killer. Corso, then 58, had a long criminal history and was the subject of a chapter in "Prince of the City," a best-selling book about drug dealing and police corruption.

But the FBI asked Suffolk not to use the informant until a federal corruption probe was completed. Edward Halverson, lead detective in the case, agreed.

But detectives say the inquiry continued. The next month, Halverson and Robert Dunn, a detective lieutenant then assigned to Henry's rackets bureau, flew to Fort Lauderdale. Dunn, now retired, had been a homicide detective and later would become the homicide squad commander. They were accompanied by a man both described as a friend - Patrick Henry.

Their signed vouchers listed the purpose of the trip as "confidential homicide investigation." Halverson, now retired, says that he needed to speak to a lawyer in Florida who represented a potential suspect other than Corso.

In a recent interview, Henry said he made the trip for two reasons - the Cervera murder and the Southwest Sewer District corruption probe. The district attorney said there were indications that the lawyer for the potential murder suspect might not talk to the detectives but that he would only talk to a prosecutor, "and that's why I went."

"I know he [Henry] was on an investigation," Halverson said, referring to the sewer probe. "I thought since I was talking to a lawyer, it would be very advantageous from my standpoint to have Pat Henry down there." The three stayed from Dec. 16 through 19 at the Sheraton Yankee Clipper in Fort Lauderdale. Halverson and Dunn talked with the lawyer for one hour on the second day of the trip, Halverson said. "I hit pay dirt. I got everything I wanted," he said.

But Halverson did not take notes, though he did file a report about the

trip - one of the few police reports he kept during the long investigation. Halverson's lack of note-taking while interviewing key suspects would later haunt the prosecution's case.

Henry said he did not meet with the lawyer because the attorney did talk readily with Halverson and Dunn. Henry refused to say what he did in Florida as part of the sewer district probe. Dunn declined to be interviewed. "I wasn't basking in the sun," Henry said. "We certainly didn't eat high on the hog, if you check the expense voucher." Vouchers show that the trip's cost was $957.

For four years, the case remained dormant.

Then Suffolk police questioned the FBI informant, Michael Orlando, a schoolteacher turned mob hitman, in connection with a robbery in a Patchogue home. Orlando offered to testify against Corso in the murder case. Corso was then arrested, interrogated and charged with the murder of Archimedes Cervera.

But the trial did not turn out as the district attorney's office had planned.

The prosecution hinged on an incriminating statement police said they obtained from Corso and on the testimony of Orlando, who said Corso admitted the crime to him while the two were chatting in a Manhattan bar.

In pre-trial hearings and at the trial, police and prosecutors admitted that some detectives had not taken notes and that investigators had failed to follow leads, had not dusted portions of the crime scene for fingerprints and had not properly safeguarded the physical evidence. In fact, jurors learned, the police department had accidentally auctioned off the telephone answering machine in Cervera's office, which contained a tape made on the day of the murder.

Juror Joseph Bassi said, "Some of the cops had no notes. It seemed like they were on vacation. I don't know why they would not have any notes on a murder case . . . I wouldn't say the police were lying. But they spoke a little gray to protect themselves for the reports and notes they didn't have . . . A little bit of the notes, a little bit of the other problems, but that selling off of the telephone answering machine was the clincher."

Corso was acquitted. And Judge Stuart Namm, who presided over the trial, said, "There is an aura, which permeates the facts of this case, which makes it difficult - indeed impossible - to give credence to the testimony of the police officers involved."

The judge wrote in an opinion issued after the trial: "Based on the totality of the evidence presented: the non-existence of reports and memoranda; the evasive nature of the testimony of the investigating detectives . . . and the almost cavalier attitude of the police in their testimony before this court; this court cannot as a matter of law conclude that there existed sufficient probable cause to arrest Peter Corso on April 3, 1984."

Namm's criticisms in the Corso case and others last year led to a state probe of Suffolk's handling of homicide cases that is still pending. The State Investigation Commission has yet to disclose its findings.

But Newsday's study of a decade of Suffolk homicide cases has shown that the Corso case is an extreme example of some of the problems that run through the system: the use of incriminating statements without backup notes or tapes in nearly every case, the lack of attention to physical

evidence, the use of a snitch, and the failure of prosecutors to oversee
the investigation.

   Henry defends the prosecution's handling of the Corso case and said he
does not believe that it exposed any need for change. "We're willing to
proceed with prosecution, perhaps sometimes where other people would be a
little more hesitant or reluctant or timid. The Corso case is an example of
that. I'd rather see them indicted, try them and see them acquitted than
never even charged in the first place. Some jurisdictions never even would
have arrested that fellow. We took a chance. We knew it wasn't an airtight
case."