# Exhibit 8

Case 2:09-cv-01207-JS-AYS   Document 184-12   Filed 08/17/16   Page 2 of 318 PageID #: 3749

JOHN MCELHONE                                    October 30, 2014
MARTIN TANKLEFF vs. SUFFOLK COUNTY                            1

1

2  UNITED STATES DISTRICT COURT
   EASTERN DISTRICT OF NEW YORK
3
   ----------------------------------------
4
   MARTIN TANKLEFF,
5

6              Plaintiff,

7

8       vs.      Case No. 09-cv-1207

9

10  THE COUNTY OF SUFFOLK, K. JAMES McCREADY,
    NORMAN REIN, CHARLES KOSCIUK, ROBERT DOYLE,
11  JOHN McELHONE, JOHN DOE POLICE OFFICERS
    #1-10, RICHARD DOE SUFFOLK COUNTY EMPLOYEES
12  #1-10,

13

14              Defendants.

15  ----------------------------------------

16

17

18

19       DEPOSITION OF JOHN McELHONE

20        THURSDAY, OCTOBER 30, 2014

21          10:00 a.m.

22

23

24

25  Reported by:  Adrienne M. Mignano, RPR
            Job Number:  227414

1

2

3

4                    October 30, 2014

5                    10:00 a.m.

6                    Garden City, New York

7

8          Deposition of JOHN McELHONE, held

9   at 666 Old Country Road, Garden City, New

10  York, pursuant to Notice, before Adrienne M.

11  Mignano, a Notary Public of the State of New

12  York.

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2    A P P E A R A N C E S:

3

4    NEUFELD SCHECK & BRUSTIN, LLP

5    Attorneys for Plaintiff

6           99 Hudson Street

7           New York, New York 10013

8    BY:     EMMA FREUDENBERGER, ESQ.

9           ELIZABETH DANIEL VASQUEZ, ESQ.

10

11

12   DENNIS M. BROWN

13   SUFFOLK COUNTY ATTORNEY

14   Attorneys for Defendants

15          H. Lee Dennison Building

16          Fifth Floor

17          100 Veterans Memorial Highway

18          Hauppauge, New York  11788

19   BY:     BRIAN C. MITCHELL, ESQ.

20

21

22

23

24

25

1

2

3        IT IS HEREBY STIPULATED AND AGREED, by

4    and between the attorneys for the respective

5    parties herein, that filing and sealing of

6    the transcript be waived, and the same are

7    hereby waived.

8        IT IS FURTHER STIPULATED AND AGREED

9    that all objections, except as to the form

10   of the question, shall be reserved to the

11   time of the trial.

12       IT IS FURTHER STIPULATED AND AGREED

13   that the within deposition may be sworn to

14   and signed before any officer authorized to

15   administer an oath, with the same force and

16   effect as if signed and sworn to before the

17   Court.

18

19

20

21

22

23

24

25

Case 2:09-cv-01207-JS-AYS   Document 184-12   Filed 08/17/16   Page 6 of 318 PageID #: 3753

JOHN MCELHONE                                    October 30, 2014
MARTIN TANKLEFF vs. SUFFOLK COUNTY                           5

```
1
2   J-O-H-N   M-c-E-L-H-O-N-E, called as a
3       witness, having been duly sworn
4       by a Notary Public, was examined and
5       testified as follows:
6   EXAMINATION BY
7   MS. FREUDENBERGER:
8       Q     Good morning, Chief McElhone.
9       A     Good morning.
10      Q     You had your deposition taken in
11  this case about three years ago, correct?
12      A    That's correct.
13      Q    All right.
14            And have you had your deposition
15  taken at any point since that -- since --
16      A    No.
17      Q    -- November of 2011, I think?
18          Okay.
19          I'm sure you remember the rules,
20  but generally speaking, I'm asking you
21  questions, you're answering under oath.
22          If any of my questions are
23  unclear at any point in time, let me know
24  and I'll be happy to rephrase the
25  question.
```

1              McElhone

2         If you answer the question, I'm

3    going to assume that you understood it.

4         Sound fair?

5    A    All right.

6    Q    If you want to take a break at

7    any point in time, just let me know and

8    we'll go ahead and do that.

9    A    Okay.

10   Q    If there is a question pending,

11   answer it before we break?

12   A    Okay.

13   Q    Do you have any health

14   conditions at all that might impact your

15   ability to give complete truthful answers

16   here today?

17   A    No.

18   Q    Are you taking any medication?

19   A    No.

20   Q    And remind me what you have been

21   doing since your retirement.

22   A    I was talking to my counsel.  I

23   umpire school baseball.  I work around my

24   home.  I visit my four granddaughters and

25   my two children.  Take it kind of easy.

```
 1              McElhone
 2   I'm totally retired.
 3         Actually I did -- for four
 4   months I did work for a private
 5   investigator.  I was bored.  One winter, I
 6   think it was in 2007, and for a couple of
 7   months, I was working for Frank Shea with
 8   Alpha Investigtions, Alpha Group.
 9      Q     How do you spell Shea?
10      A     S-H-E-A.
11      Q     And where is Mr. Shea's
12   operation based out of?
13      A     It is either Farmingdale or
14   north Amityville.  Right on Route 110 by
15   the Southern State Parkway.
16      Q     You did that for about four
17   months?
18      A     Yes.  Probably more like three.
19   January to late March when baseball season
20   started.
21      Q     What kind of cases were you
22   investigating?
23      A     I was overseeing three or four
24   private investigators.  It was the gamut.
25   There were undercover people who were
```

1            McElhone

2    doing more matrimonial kind of, things and

3    there were a couple of retired New York

4    City police officers who were

5    investigating prior accidents and other

6    things like that.  It was the whole gamut

7    of what you would expect.

8       Q      And why did you stop doing that?

9       A      I was tethered to a desk and a

10   computer screen and that's not why I

11   retired.  So it was boredom or tedium.  I

12   went back to boredom.

13      Q      I understand.

14            Any other professional work, any

15   other professional work you received

16   compensation for since your retirement?

17      A      No.

18      Q      What about volunteer work?

19      A      I'm active in my church.  I'm a

20   lector and I'm on the finance board.  If

21   they are doing a bazaar or a fair, I guess

22   you call it security work, but it is just

23   making sure that everything goes well.

24      Q      Any volunteer work outside of

25   the church?

Case 2:09-cv-01207-JS-AYS   Document 184-12   Filed 08/17/16   Page 10 of 318 PageID #: 3757

1            McElhone

2     A     Not that I can think of, no.

3     Q     Do you have family in law

4   enforcement?

5     A     No.  A cousin actually who is

6   police officer for the SUNY system out in

7   Southampton, Stony Brook.  It's actually

8   my godson.

9     Q     Other than your godson and

10   yourself, no one else in the family is in

11   law enforcement, correct?

12     A     No.  My brother was an assistant

13   district attorney, but now he is in

14   private practice.

15     Q     Since your deposition in 2011 --

16     A     December of 2011.

17     Q     December of 2011, tell me

18   everybody you have spoken with about this

19   case.

20          MR. MITCHELL:  Objection to

21     form.

22          You can answer.

23     A     I mentioned to people that I am

24   still being deposed and involved in a

25   lawsuit with this case, but I've never

1           McElhone

2   gotten into the details with anyone.

3       Q     Who have you mentioned the fact

4   of the case to?

5       A     Family members.  Obviously my

6   wife, and I can't remember anybody.  Just

7   casually, if they say what are you doing,

8   I'm still involved in a lawsuit on the

9   Tankleff case.

10      Q     And did you tell your wife you

11  were coming here for a continuation of

12  your deposition today?

13      A     Yes.

14      Q     What did you tell her about it?

15      A     It was a continuation from

16  something that we started a couple of

17  years ago.

18      Q     I assume that you spoke with

19  your counsel.  You're being represented by

20  Mr. Mitchell today, right?

21      A     Briefly, yes.

22      Q     When was your last conversation

23  with Mr. Mitchell?

24      A     Was it Monday or --

25          MR. MITCHELL:  I'd say I don't

1          McElhone

2     remember.  Sometime in the last week

3     or so.

4     A     Last week I guess it was.  I

5     actually stopped by to get my copy of the

6     deposition, and we spent about an hour

7     together one day last week.

8     Q     Any other in-person meetings

9     with Mr. Mitchell between your 2011

10    deposition and today?

11    A     No.

12    Q     How about phone conversations?

13    A     No.

14    Q     When is the last time that you

15    spoke with Sergeant Doyle?

16    A     I couldn't tell you for sure.

17    Probably socially in the last year or so.

18    Q     On what social occasion did you

19    see Sergeant Doyle?

20    A     I'm surmising, I can't give you

21    a specific, but I do see him like at

22    holiday parties, Superior Officers

23    Association for a retirement party

24    somewhere.

25    Q     Okay.

1          McElhone

2          So you actually remember seeing

3  him at a retired police officers function?

4      A      Within the last three years I

5  have seen Bob Doyle, but it would be

6  something socially.  It wouldn't be

7  something like pick up the phone and

8  arrange to meet with him.

9      Q      So it would be at an organized

10  social gathering?

11     A      Yes.

12     Q      And do you go to a holiday party

13  every year?

14         MR. MITCHELL:  I object to the

15     form.

16         You can answer.

17     A      Yeah, most years.  When I first

18  retired, I would still go to --

19         MR. MITCHELL:  Just answer the

20     question.  She asked if you go every

21     year.

22     A      Yes, I go every year.

23     Q      So you have probably seen

24  Sergeant Doyle at every holiday party

25  since 2011?

1         McElhone

2         MR. MITCHELL:  Objection.  Most

3    of the time I will say you can answer.

4    A    It's fair to say most years I do

5    go.  There are times I'm away and other

6    times that I might not see Bob.  These

7    things are large, 7,500 people there

8    sometimes.

9    Q    What was the last conversation

10   you had -- what is the last time you

11   actually remember interacting with

12   Sergeant Doyle?

13        MR. MITCHELL:  Object to form.

14        You can answer.

15   A    I can't -- what do you mean by

16   interacting?

17   Q    I mean being in the same room.

18   A    Saying hello, how are you doing,

19   what are you doing?

20   Q    Having any kind of interactions

21   with him where you were speaking to

22   Sergeant Doyle and he was speaking to you.

23   A    Probably in the last year or

24   two, tops.

25   Q    And let's start with the first

Case 2:09-cv-01207-JS-AYS   Document 184-12   Filed 08/17/16   Page 15 of 318 PageID #: 3762

JOHN MCELHONE                                          October 30, 2014
MARTIN TANKLEFF vs. SUFFOLK COUNTY                                    14

```
 1            McElhone
 2   of those occasions.
 3            What did you say to Sergeant
 4   Doyle and what did he say to you?
 5            MR. MITCHELL:  Object to the
 6      form.
 7            You can answer.
 8      A    It's social.  I'm retired, he is
 9   retired, what are you doing with yourself,
10   have you seen so and so.
11      Q    When is the last conversation
12   that you had with Sergeant Doyle about
13   this case in any way?
14      A    In 2011, when I was giving a
15   deposition, I know he was giving a
16   deposition, and that was -- I think prior
17   to that Rich Dunn was the attorney, and we
18   had a meeting where all three of us were
19   in the same room.
20      Q    And before that meeting, had you
21   talked about the case with Doyle?
22            MR. MITCHELL:  Outside of the
23      presence of counsel?
24            MS. FREUDENBERGER:  Outside the
25      presence of counsel.
```

Case 2:09-cv-01207-JS-AYS   Document 184-12   Filed 08/17/16   Page 16 of 318 PageID #: 3763

JOHN MCELHONE                                    October 30, 2014
MARTIN TANKLEFF vs. SUFFOLK COUNTY                              15

1              McElhone

2      A    No.

3      Q    What is the last time, when was

4   the last time that you saw Detective

5   McCready?

6      A    At Sergeant Doyle's retirement

7   party.

8      Q    When was that, if you recall?

9      A    It was before the last

10  deposition so I don't know, whenever he

11  retired.

12     Q    And have you spoken to Detective

13  McCready since your last deposition?

14     A    No.

15     Q    Okay.

16          What about Norman Ryan?

17     A    Haven't seen him.

18     Q    Have you spoken to him since

19  December of 2011?

20     A    No.

21     Q    You mentioned stopping by

22  counsel's office to pick up a copy of your

23  last deposition transcript.

24          Did you review that transcript?

25     A    Yes.

1          McElhone

2     Q     How much time have you spent

3  reviewing it?

4     A     Couple hours probably.  Read it

5  the first time and read it again

6  yesterday.

7     Q     You read it closely?

8     A     Yeah.

9     Q     What other documents have you

10  reviewed in preparation for your testimony

11  today?

12     A     Before the 2011 deposition --

13          MR. MITCHELL:  She said in

14     preparation of today.

15     A     Yes, I had these articles, the

16  440 exam.  There were supplementary

17  reports from the original homicide

18  investigation.

19     Q     Would it be accurate to say that

20  you reviewed the exhibits to the 440

21  proceedings?

22     A     I don't think I had the

23  exhibits.  I think I had like an overall

24  narrative of what went on.  440 is to the

25  Federal Court or is that to state court?

1              McElhone

2    I'm not sure.  I'm probably using the term

3    wrong.

4        Q     Maybe we can -- I'm actually not

5    allowed to answer your questions.

6              MS. FREUDENBERGER:  Brian, do

7          you know what documents he is

8          referring to?

9              MR. MITCHELL:  I do not.

10       Q     So you reviewed documents that

11   you understood were connected to the 440

12   proceedings in this case, correct?

13       A     Yes.

14       Q     And when I say 440 proceedings,

15   do you understand that to mean Marty

16   Tankleff's post conviction proceedings?

17       A     Yes.

18       Q     In other words, the court

19   proceeding that led to the vacatur of

20   Marty's conviction and the dismissal of

21   all the indictments against him?

22       A     I don't believe there was enough

23   there to say all of that.  It was more of

24   a condensation of who the new evidence was

25   concerning.

1          McElhone

2     Q     But you do understand of course

3   that pursuant to those proceedings,

4   Mr. Tankleff's conviction was vacated and

5   the indictments against him for the

6   murders of his parents were dismissed?

7     A     Yes.

8     Q     And your understanding is that

9   you reviewed documents that were prepared

10  in connection with those post conviction

11  proceedings?

12    A     Yes.

13    Q     And what about the documents you

14  reviewed signaled to you that they were

15  connected to the 440 proceedings in some

16  way?

17    A     They were a synopsis of the

18  three people that had come forward saying

19  that they might have been involved.  They

20  were more the investigative report of I

21  guess Mr. Salpeter and Harris and Creedon

22  and whoever, Kent I think is the third

23  name that were involved.

24    Q     So you reviewed investigative

25  reports concerning the roles that Creedon,

JOHN MCELHONE                                      October 30, 2014
MARTIN TANKLEFF vs. SUFFOLK COUNTY                           19

1              McElhone

2    Kent and Harris may have made in the

3    Tankleff attacks and murders.

4         Is that fair to say?

5    A    Yes.  And I'm not quite sure

6    what the document was.  It wasn't a

7    thorough total investigative report.  It

8    was a synopsis of who they were and what

9    was said.

10   Q    So you weren't actually -- I'm

11   just trying to figure out what -- you

12   weren't actually reviewing investigative

13   reports, you were reviewing a synopsis of

14   the substance of investigative reports; is

15   that correct?

16   A    I guess that would be more

17   accurate.

18   Q    In that set of materials that

19   you are describing, was there any

20   information -- did the synopsis you're

21   describing contain any information

22   unrelated to Peter Kent, Joseph Creedon

23   and Glenn Harris?

24   A    No.  I'm not sure I understand

25   what you're asking.

JOHN MCELHONE                                    October 30, 2014
MARTIN TANKLEFF vs. SUFFOLK COUNTY                          20

1            McElhone

2       Q     I'm just asking you if you

3   reviewed information aside from the

4   information that pertained to the roles

5   that Creedon, Kent and Harris might have

6   played in the crimes?

7       A     Not in that document.  As I

8   mentioned earlier, I did review

9   supplementary reports from the original

10  homicide investigation.

11      Q     So you reviewed the synopsis of

12  what Creedon, Kent and Harris had to say

13  about their roles in the crimes, right?

14      A     Yes.

15      Q     And then you also reviewed

16  supplemental reports from the original

17  police investigation into the Tankleff

18  attacks back in 1988?

19      A     Yes.

20      Q     And about how many pages of

21  police reports would you say you reviewed?

22      A     20, 25.

23      Q     Did you review any notes, any

24  police notes?

25      A     No.

1          McElhone

2     Q     Have you at any point in time

3  since say the mid-90s review the missing

4  person's file on Jerry Steuerman?

5     A     I did review a -- there was one

6  report on that, that Norman Rein wrote I

7  believe on a meeting we had with

8  Steuerman's attorney in Smithtown when I

9  was still the CO of the homicide squad,

10  and maybe one or two other pages, very

11  short synopsis of what was going on in

12  that missing person.

13     Q     And those were actual

14  supplemental reports?

15     A     Yes.

16          MR. MITCHELL:  Was that

17     something that you reviewed?  I just

18     lost track of when you reviewed it.

19          MS. FREUDENBERGER:  I'm going to

20     ask him.

21          MR. MITCHELL:  Okay.

22     Q     And in addition to the missing

23  person's report, the supplemental reports

24  from the original homicide investigation,

25  and the synopsis of what Creedon, Kent and

1              McElhone

2    Harris had to say about their roles in the

3    crimes, are there other documents that you

4    have reviewed in connection with this

5    civil litigation at any point in time?

6        A     No.

7        Q     And are those three categories

8    of documents that you just described, the

9    synopsis and the supplemental reports, did

10   you review those documents in between your

11   2011 deposition and today?

12       A     Yes.

13       Q     When did you review them?

14       A     Last week.

15       Q     Have there been any other

16   documents provided to you that you have

17   not reviewed?

18       A     No.

19       Q     Did you review the complaint in

20   this case?

21       A     Excuse me?

22       Q     Did you review our complaint in

23   the civil case?

24       A     Yes.

25       Q     When was the last time you

Case 2:09-cv-01207-JS-AYS   Document 184-12   Filed 08/17/16   Page 24 of 318 PageID #: 3771

JOHN MCELHONE                                October 30, 2014
MARTIN TANKLEFF vs. SUFFOLK COUNTY                        23

1          McElhone

2   looked at that?

3      A     That was before the last

4   deposition of 2011.

5      Q     How long did you spend reviewing

6   that, would you say?

7      A     An hour or two.

8      Q     Enough to familiarize yourself

9   with the allegations?

10      A     Yes.

11      Q     Chief McElhone, do you have any

12   understanding of any of the deposition

13   testimony that's been given in this civil

14   case, leaving aside your own testimony,

15   from any source at all?

16          MR. MITCHELL:  Object to the

17      form.

18          You can answer.

19      A     I think I know the names of the

20   people that have been deposed, but I don't

21   know anything about what they have said.

22      Q     So you have no understanding of

23   what any witness said under oath other

24   than yourself?

25      A     Right.

1          McElhone

2     Q    Other than your wife and your

3  lawyer, anybody else you have spoken to

4  about this case since your deposition in

5  2011?

6     A    No.

7     Q    Have you talked to your kids

8  about it?

9     A    Not that I can recall.  If

10  anything, it would be a casual oh, yeah,

11  I'm still involved with that case, I have

12  to give a deposition.  No substance.

13     Q    I'm not going to go over much of

14  what you covered in your last deposition,

15  but I do want to quickly ask some

16  follow-up questions about your period of

17  time when you assumed command of the

18  homicide squad.

19     A    Okay.

20     Q    You assumed command of the

21  homicide squad relatively close in time to

22  the Tankleff murders, correct?

23     A    I was the commander when it

24  happened.

25     Q    But you had only been the

1          McElhone

2    commander for -- you were commander for

3    how many months before the Tankleff

4    murders?

5      A     About a year-and-a-half.  It was

6    February of '87 I was assigned and the

7    murder was September of '88.

8      Q     So about 18 months?

9      A     Yes.

10     Q     You were brought in after a

11   period of relative turmoil in the

12   department.

13         Is that fair to say?

14         MR. MITCHELL:  Object to the

15     form.

16         You can answer.

17     A     Fair to say.

18     Q     In particular, the homicide

19   squad in particular had received a great

20   deal of negative criticism prior to your

21   assuming command, correct?

22         MR. MITCHELL:  Object to the

23     form.

24         You can answer.

25     A     Yes.

```
1              McElhone
2      Q     Including from the SIC
3   investigation, the confession taker
4   series, right?
5      A     That's correct.
6      Q      In other words, prior to you
7   assuming command, the homicide squad had
8   really been under a barrage of criticism
9   for, among other things, breaking the
10  rules when it came to confessions; is that
11  accurate?
12          MR. MITCHELL:  Object to the
13     form.
14          You can answer.
15     A     I know Newsday did a series
16  about the confession takers.
17     Q      And so there had been a great
18  deal of criticism, high profile criticism,
19  in the media for the way the homicide
20  squad was getting confessions, correct?
21          MR. MITCHELL:  Object to the
22     form.
23          You can answer.
24     A     Yes.
25     Q     Allegations that the homicide
```

Case 2:09-cv-01207-JS-AYS   Document 184-12   Filed 08/17/16   Page 28 of 318 PageID #: 3775

JOHN MCELHONE                                          October 30, 2014
MARTIN TANKLEFF vs. SUFFOLK COUNTY                                   27

1              McElhone

2    squad was using illegal tactics to get

3    confusions, correct?

4         MR. MITCHELL:  Objection.

5         You can answer.

6    A    These were newspaper reports.

7    Q    There were public high profile

8    allegations that detectives in the

9    homicide squad were using improper and

10   illegal tactics to obtain confessions,

11   correct?

12   A    I think it was more that the

13   focus was entirely on getting confessions

14   and ignoring or giving short shrift to

15   physical evidence or other means of

16   obtaining convictions.

17   Q    Well, in the course -- weren't

18   some of the allegations in the course

19   of --

20        MS. FREUDENBERGER:  Withdrawn.

21   Q    The allegations also included

22   that by focusing, as you say, exclusively

23   on confessions, detectives were cutting

24   corners when it came to the procedures

25   used to get confessions.

JOHN MCELHONE                                    October 30, 2014
MARTIN TANKLEFF vs. SUFFOLK COUNTY                              28

```
 1          McElhone
 2      Would that be fair to say?
 3      MR. MITCHELL:  Object to the
 4   form.
 5      You can answer.
 6   A    That would be the scope of what
 7  Newsday and other people were saying at
 8  the time, yes.
 9   Q    So there had been allegations
10  prior to you assuming command of the
11  homicide squad that detectives were using
12  improper means to get confessions.
13      Fair to say?
14   A    Or focusing exclusively on that
15  and not doing basic detective work.
16   Q    Both, right?
17   A    Yes.
18   Q    And those criticisms weren't
19  limited to one series of newspaper
20  articles, they came from various sources?
21   A    There was SIC, State
22  Investigation Commission, was looking into
23  these.  There was a county legislature had
24  put together hearings on this group too.
25  There was a couple of things going on,
```

1              McElhone

2    yes.

3       Q    In other words, there were

4    allegations that the homicide squad --

5    there were allegations from a number of

6    sources which included that the homicide

7    squad was using improper tactics to get

8    confessions, correct?

9       A    Yes.

10      Q    Shortly prior to you assuming

11   command of the homicide squad?

12      A    Yes.

13      Q    Chief McElhone, you were brought

14   in after there had been a relatively quick

15   high turnover of detectives in the

16   homicide squad, correct?

17           MR. MITCHELL:  Objection.

18           You can answer.

19      Q    I think you described in your

20   last day of deposition an exodus?

21      A    There was a lot of turnover just

22   before I got there.

23      Q    In other words, your

24   predecessors had cleaned house, to put it

25   colloquially?

1           McElhone

2     A     Some detectives decided to

3  retire.  There was an unrelenting pressure

4  on them.  And others were asked to

5  transfer or to leave.

6     Q     And some detectives were

7  encouraged to retire, correct?

8     A     Yes.  I don't have direct

9  knowledge of that.

10    Q     That was your understanding?

11    A     That was the assumption and --

12  yes.

13    Q     Fair to say you had a reputation

14  as a by-the-book kind of supervisor?

15        MR. MITCHELL:  Object to the

16    form.

17        You can answer.

18    A     I was an effective supervisor.

19  I was in charge of the Fifth Squad

20  detectives, and we were one of the busiest

21  squads, so I was looked at it as an

22  effective boss.

23    Q     And part of being an effective

24  boss was adhering to the policies,

25  policies and procedures?

1              McElhone

2     A     Yes.

3     Q     You were known for being the

4   kind of supervisor that enforced the

5   rules?

6          MR. MITCHELL:  Object to the

7     form.

8          You can answer.

9     A     Among other things, yes.

10     Q     And among other things, you had

11   a reputation back in 1987 when you assumed

12   command of the homicide squad for ensuring

13   that the detectives below you followed the

14   rules, correct?

15     A     Yes.

16     Q     And that was something that you

17   took seriously?

18     A     Oh, yes.

19     Q     And you pride yourself on that

20   reputation?

21     A     Absolutely.

22     Q     And did you understand that one

23   of the reasons that you were brought in to

24   run the homicide squad was because you had

25   a reputation for ensuring that detectives

JOHN MCELHONE                                    October 30, 2014
MARTIN TANKLEFF vs. SUFFOLK COUNTY                            32

1              McElhone

2    below you followed the rules?

3       A      Among other things.

4       Q      Among other things.  Okay.

5              And so it was your understanding

6    that one reason that you were brought in

7    to run the homicide squad was to make sure

8    that the detectives below you followed

9    strictly the department's policies and

10   procedures when it came to getting

11   confessions among other things?

12             MR. MITCHELL:  Object to the

13      form.

14             You can answer.

15      A      Again, that was part of it.  No

16   one told me this is why you're coming in

17   to clean house or be a by-the-book, to use

18   your words, kind of guy.  The chief called

19   me up and said, we're making the change in

20   homicide, we would like you to come up.

21      Q      But you must have had an

22   understanding given everything that was

23   going on at the time about why you were

24   there?

25      A      I knew it would be a pretty

1              McElhone

2    important part of the job that I was

3    assuming.

4       Q     In other words, you understood

5    that it was going to be a particularly

6    part of your job to make sure that

7    detectives below you followed the rules

8    when it came to, among other things,

9    getting confessions, correct?

10      A     Correct.

11      Q     I gather that you also

12   understood --

13           MS. FREUDENBERGER:  Well,

14      withdrawn.

15      Q     The homicide squad when you took

16   control had a little bit of an image

17   problem.

18           Fair to say?

19           MR. MITCHELL:  Objection to

20      form.

21           You can answer.

22      A     In certain circles, I guess,

23   yes.

24      Q     Following the public criticism

25   from multiple sources about, among other

1              McElhone

2    things, the way that the homicide squad

3    was getting confessions, would it be fair

4    to say that the homicide squad had

5    something of an image problem when you

6    took command?

7         MR. MITCHELL:  Object to form.

8            You can answer.

9    A     In public circles, yes, it was

10   something.  I'm sure that there were

11   suspicions, if nothing else.

12   Q     And public perception is very

13   important to police work, correct?

14        MR. MITCHELL:  Object to the

15    form.

16            You can answer.

17   A     Yes.

18   Q     In other words, unlike other

19   professions, like law or medicine, what

20   the public thinks of you does not

21   necessarily impact your ability to do your

22   job, but in --

23        MS. FREUDENBERGER:  I gather you

24     don't dispute those, Brian?

25        MR. MITCHELL:  Your analogy, I'm

Case 2:09-cv-01207-JS-AYS  Document 184-12  Filed 08/17/16  Page 36 of 318 PageID #: 3783

JOHN MCELHONE                                    October 30, 2014
MARTIN TANKLEFF vs. SUFFOLK COUNTY                            35

1            McElhone

2      not sure.  I'm sure there are plenty

3      of places, it's the law part.  I'm

4      sort of making a joke here.

5            MS. FREUDENBERGER:  I understand

6      the joke.  Let me finish the question.

7            So I'll withdraw.

8      Q      Unlike other professions, like

9   law or medicine, a police department's

10  ability to effectively do their job can

11  depend on their perception by the

12  community, correct?

13     A      Inasmuch as we need cooperation

14  from the public to provide information to

15  support us in our investigations, in our

16  daily work, yes, that's very important.

17     Q      There are all sorts of reasons

18  why having the public not trust the police

19  department makes it more difficult for the

20  police department to do its work, correct?

21     A      Yes.

22     Q      Including the homicide squad,

23  correct?

24     A      Yes.

25     Q      So in addition to your

1           McElhone

2   understanding that you were coming in to

3   make sure that rules in the homicide --

4   that the homicide detective were following

5   the rules, you also understood that you

6   were coming in to give the perception that

7   the rules within the homicide squad were

8   going to be strictly enforced.

9       Fair to say?

10      MR. MITCHELL:  I object to form.

11      You can answer.

12   A    Again, I didn't have a sit-down

13   conversation with this is the reason

14   you're being brought in.  I assumed that

15   this would be a very important part of my

16   new responsibilities.

17   Q    And you understood that a part

18   of your new responsibilities was fixing

19   the public image of the homicide squad,

20   correct?

21   A    Wherever I worked, I thought

22   that would be an important thing to do.

23   Q    Here in particular, given the

24   amount of public criticism that the

25   homicide squad had just received, you

Case 2:09-cv-01207-JS-AYS   Document 184-12   Filed 08/17/16   Page 38 of 318 PageID #: 3785

JOHN MCELHONE                                    October 30, 2014
MARTIN TANKLEFF vs. SUFFOLK COUNTY                           37

1          McElhone

2    understood it was materially important for

3    you to repair the image of the homicide

4    squad when it came to following department

5    policies and procedures, correct?

6          MR. MITCHELL:  Object to the

7      form.

8          You can answer.

9      A    I was one person.  I was the

10   commanding officer.  That would be a very

11   important part.  I don't know that my

12   direct application of what I did every day

13   would be the magic bullet to remove any

14   suspicions from the homicide squad, but it

15   was something that I wanted to make sure

16   everything was done correctly and properly

17   and also as effectively as we could do.

18   It is a very important job.

19     Q    Of course.

20          And as the commanding officer of

21   the homicide squad, you were in many ways

22   the face of the homicide squad, correct?

23     A    Publicly I did a lot of the

24   press releases and wrote most of the press

25   releases and dealt with Newsday almost

1            McElhone

2    every day, sure.

3        Q      So communicating with the press

4    was an important part of your job

5    responsibilities?

6        A      Yes.

7        Q      And so when you came in to

8    assume command of the homicide squad in

9    1987, you understood when you assumed

10   command of the homicide squad in 1987 that

11   one important part of your role was going

12   to be to assure the public and the press

13   by giving the perception that under your

14   tenure, the detectives in the homicide

15   squad were going to be expected and

16   required to follow the rules when it came

17   to getting confessions, among other

18   things, correct?

19       A      Yes.

20       Q      And that was generally

21   understood within your command, correct?

22           MR. MITCHELL:  Object to the

23       form.

24           You can answer.

25       Q      Chief McElhone, you described at

1          McElhone

2    the first day of your deposition --

3          MS. FREUDENBERGER:  Well,

4      withdrawn.

5      Q     When you assumed command, there

6    were a number of detectives that had

7    already left the squad, correct?

8      A     Yes.

9      Q     And there were a few detectives

10   that had been with the homicide squad for

11   a relatively long period of time

12   throughout the period of public criticism

13   who stayed on, correct?

14     A     Yes.

15     Q     I think there were four in

16   particular?

17     A     Might have been more than four,

18   four or five, not much more.

19     Q     And Detective McCready was one

20   of those detectives from the old guard who

21   stayed on.

22          Fair to say?

23          MR. MITCHELL:  Objection to

24      form.

25          You can answer.

1          McElhone

2     A     Again, "old guard" is your

3   words.  They were experienced and they

4   were there.

5     Q     All right.

6          Well, Detective McCready was one

7   of the detectives who had been with the

8   homicide squad during the period of time

9   that Newsday and other sources were

10   criticizing, who stayed on even after

11   other detectives had been asked to leave,

12   correct?

13     A     That's correct.

14     Q     In other words, McCready had

15   been around during the period of time when

16   the homicide squad was being criticized

17   for their work.

18          Fair to say?

19     A     Fair to say.

20     Q     And in the first day of your

21   deposition, you described having -- I

22   think you called it a sit-down with the

23   detectives who had been with the squad

24   throughout the 80s and stayed on?

25     A     That's correct.

1        McElhone

2    Q    In other words, you sat down --

3        MS. FREUDENBERGER:  Well,

4    withdrawn.

5    Q    In other words, you sat, you had

6    individual meetings with those four or

7    five detectives who had been there during

8    that period of turmoil and stayed on,

9    including Detective McCready, shortly

10   after you assumed command of the squad,

11   correct?

12   A    Correct.

13   Q    And it sounds to me, correct me

14   if I'm wrong, that you made a couple of

15   things clear in those meetings.  One, that

16   those detectives didn't need to be

17   worrying about their jobs every day, that

18   they were going to get a fresh start; is

19   that correct?

20   A    Correct.

21   Q    That you were going to treat

22   them fairly, correct?

23   A    That's correct.

24   Q    That you weren't going to look

25   at them any differently than any of the

JOHN MCELHONE                                          October 30, 2014
MARTIN TANKLEFF vs. SUFFOLK COUNTY                              42

1              McElhone

2   new detectives who were coming in to join

3   the squad, correct, insofar as job

4   security was concerned?

5      A    Yes.

6      Q    And, in fact, I gather from your

7   hesitation, correct me if I'm wrong, that

8   you did intend to supervise those

9   detectives a little more carefully,

10  correct?

11     A    That, and I expected more of

12  them as being there as long as they had

13  been.  They were the senior people and we

14  would expect them to perform better than

15  someone I'm just bringing in, to be a bit

16  of a mentor in certain cases.

17     Q    And, in particular, did you

18  expect them to demonstrate to the other

19  new detectives that they were carefully

20  following the rules when it came to

21  conducting homicide investigations,

22  including when it came to getting

23  confessions?

24     A    That would be part of it, but

25  most of that I put on the sergeant's back.

1           McElhone

2    The sergeants are there every day with

3    them.

4        Q     But you certainly made it clear

5    to the sargeants that they -- when it came

6    to these more experienced detectives who

7    had been there for a long period of time

8    and had stayed on, the sergeants needed to

9    make sure that those detectives were

10   setting an example by closely following

11   the rules, including when it came to

12   getting confessions, correct?

13       A     Correct.

14       Q     And I gather in the sit-down

15   meetings, you made clear to those four or

16   five detectives, including Detective

17   McCready, that you expected him to closely

18   hew to the department's policies and

19   procedures, including when it came to

20   getting confessions, correct?

21       A     Correct.

22       Q     And so in addition to assuring

23   those detectives, including Detective

24   McCready, that they didn't need to be

25   worrying about job security every day, you

1               McElhone

2    also made clear that if they so much as

3    put a toe out of line, you were not going

4    to hesitate to transfer them or otherwise

5    recommend discipline, correct?

6        A    I don't think I was that heavy

7    about it at that point, but I think the

8    understanding was there that this is the

9    way we're going to run things now.  There

10   will be no freelancing.  Supervisors will

11   be in charge of all the investigations,

12   and you'll follow all of the rules, yes.

13       Q    In other words, you made clear

14   to Detective McCready that he wasn't

15   allowed to go out on his own without

16   clearing things with his supervisor,

17   correct?

18       A    Correct.

19       Q    And you also made clear to him

20   that when it came to confessions, he was

21   expected to strictly follow the rules,

22   correct?

23       A    Right.

24       Q    And in addition, you made clear

25   that you were not going to -- well, did

| | |
|---|---|
| 1 | McElhone |
| 2 | you make clear to him that you as the |
| 3 | commander of the homicide squad was not |
| 4 | going to tolerate any violation of rules, |
| 5 | including when it came to getting |
| 6 | confessions? |
| 7 | A    Yes. |
| 8 | Q    And certainly the detectives |
| 9 | under your command understood that under |
| 10 | your tenure, you would not hesitate to |
| 11 | discipline or transfer out of the homicide |
| 12 | squad detectives who were not following |
| 13 | the rules, including when it came to |
| 14 | getting confessions, correct? |
| 15 | MR. MITCHELL:  Objection to |
| 16 | form. |
| 17 | You can answer. |
| 18 | A    Yes.  Clear from me and also |
| 19 | from what had transpired for several |
| 20 | months leading up to this date obviously. |
| 21 | They saw what was going on.  It wasn't |
| 22 | going to be tolerated by the department in |
| 23 | general as well as me. |
| 24 | Q    So, in other words, the |
| 25 | detectives in the homicide squad |

1          McElhone

2   understood that any violation of the rules

3   when it came to elicit how confessions

4   were taken was going to subject them to

5   very serious discipline or transfer,

6   correct?

7      A    Yes, that's fair to say.

8      Q    Even more so in this period of

9   time in 1987, 1988, 1989 than perhaps

10  earlier in the decade before this broad

11  criticism, fair?

12     A    Fair.

13     Q    And no doubt in your mind you

14  got that message across, correct?

15     A    Correct.

16     Q    Including to Detective McCready,

17  correct?

18     A    Yes.

19         MS. FREUDENBERGER:  Do we have

20     the first day of Chief McElhone's

21     deposition marked yet?  Let's go ahead

22     and mark this.  Let's go ahead and

23     mark this McElhone 13.

24         (Whereupon, Transcript of Chief

25     McElhone's Deposition, was marked as

1          McElhone

2     McElhone Exhibit 13 for

3     identification, as of this date.)

4   BY MS. FREUDENBERGER:

5     Q     I think you mentioned that

6   another area that the department had come

7   under criticism for was crime scene

8   processing?

9     A     I don't recall saying that.  It

10   was narcotics and homicide I know was a

11   problem.

12     Q     Had there been criticism of the

13   way that crime scene evidence was gathered

14   and received in crime scene

15   investigations?

16     A     It was portrayed to me more of

17   confusion of who would search a crime

18   scene.  That was something that was ironed

19   out.

20     Q     And, in fact, the confusion over

21   whose role it was to search crime scenes

22   had caused problems for the department in

23   homicide cases in the past, correct?

24     A     That's my understanding.

25     Q     The DA's case in particular?

1              McElhone

2     A     Again, that's my understanding.

3   I wasn't involved in that case.

4     Q     I understand that you weren't

5   there.

6           And you said that got ironed out

7   pretty quickly after you took command,

8   correct?

9     A     We clearly delineated.  Actually

10  when I came on board, there was a number

11  of things that we sat down and put

12  together.

13    Q     I will get there.

14          One of the things that you did

15  to address that confusion, as you termed

16  it, was to educate the homicide detectives

17  about what their role was when it came to

18  crime scenes, correct?

19    A     Basically that was with the

20  sergeants and myself.  We let everyone

21  know what the responsibilities were, yes.

22    Q     And you also I think spoke with

23  Dr. Hirsch, the medical examiner at the

24  time, correct?

25    A     That's correct.

Case 2:09-cv-01207-JS-AYS   Document 184-12   Filed 08/17/16   Page 50 of 318 PageID #: 3797

JOHN MCELHONE                                    October 30, 2014
MARTIN TANKLEFF vs. SUFFOLK COUNTY                              49

1          McElhone

2     Q     You, in fact, brought him in to

3  train the homicide detectives, correct?

4     A     Yes.

5     Q     You did monthly trainings?

6     A     That's correct.

7          MS. FREUDENBERGER:  Let's just

8   take a quick break because my pen is

9   leaking.

10          (Thereupon, a recess was taken,

11    and then the proceedings continued as

12    follows:)

13  BY MS. FREUDENBERGER:

14     Q     So Chief McElhone, we were

15  talking about crime scenes.

16          Fair to say it was a priority of

17  yours when you assumed control of the

18  homicide squad in 1987 to clear up any

19  confusion among the homicide detectives

20  about what their role was when it came to

21  crime scenes, correct?

22     A     Correct.

23     Q     And there are a whole variety of

24  ways that crime scene evidence is

25  important to homicide investigations.

1              McElhone

2         Fair to say?

3    A     Yes.

4    Q     The appearance of a crime scene

5    can give detectives important information

6    right away as to how a crime may have

7    occurred, correct?

8    A     Correct.

9    Q     And there are all sorts of ways

10   that detectives can use what they learn

11   from a crime scene right away to

12   expeditiously solve homicides.

13        Fair to say?

14   A     It should give them a direction

15   early on, yes.

16   Q     And there had been to your

17   knowledge a serious problem with the way

18   the crime scene was handled in the Diaz

19   case, correct?

20   A     Yes.

21   Q     And in particular, that was a

22   confession case, right?

23   A     Again, my information from that

24   comes from reading the paper.

25   Q     I understand.

JOHN MCELHONE                                October 30, 2014
MARTIN TANKLEFF vs. SUFFOLK COUNTY                        51

1             McElhone

2         Let me be clear for the record:

3    I'm only asking you about your

4    understanding back in 1987 when you took

5    command of the homicide squad, your

6    understanding of what had happened in the

7    Diaz case.  I'm not asking you to testify

8    about the Diaz case.  Just your

9    understanding of what had happened.

10            So my understanding, and let me

11   know if it is inconsistent with your

12   understanding in any way, is that a

13   confession had been taken in the Diaz

14   case?

15   A    Right.

16   Q    And in that confession, the

17   suspect had volunteered discarding the

18   murder weapon --

19       MS. FREUDENBERGER:  Well,

20       withdrawn.

21   Q    Diaz was a stabbing case; is

22   that your understanding?

23   A    That's my understanding.

24   Q    And the suspect gave a

25   confession, correct; was that your

Case 2:09-cv-01207-JS-AYS   Document 184-12   Filed 08/17/16   Page 53 of 318 PageID #: 3800

JOHN MCELHONE                                    October 30, 2014
MARTIN TANKLEFF vs. SUFFOLK COUNTY                          52

1              McElhone

2    understanding.

3       A     Yes.

4       Q     And in that confession, he

5    described committing the stabbing with a

6    knife, correct?

7       A     Yes.

8       Q     And then he described discarding

9    the knife in the woods, correct?

10      A     Yes.

11      Q     And subsequently a knife -- the

12   knife used in -- the knife which would be

13   the knife used in the murder was found in

14   the garage of his home?

15      A     Somewhere in his home.

16      Q     In other words, what he

17   described doing with the murder weapon was

18   not consistent with what the crime scene

19   evidence showed, correct?

20      A     It would lead to you believe

21   that, yes.

22      Q     And one of the reasons that that

23   was a problem, I gather, is that there was

24   insufficient evidence -- there was

25   insufficient information about what the

Case 2:09-cv-01207-JS-AYS   Document 184-12   Filed 08/17/16   Page 54 of 318 PageID #: 3801

JOHN MCELHONE                                          October 30, 2014
MARTIN TANKLEFF vs. SUFFOLK COUNTY                                    53

1          McElhone
2  crime scene showed early on to allow the
3  detectives to assess the reliability of
4  the confession as it was taking place.
5  Would you agree?
6          MR. MITCHELL:  Objection to the
7     form.
8          You can answer.
9     A    I'm not sure I understand the
10  question.
11    Q    It was a bad question.  I'll
12  rephrase it.
13         One of the problems in the Diaz
14  case was that the detectives didn't know
15  that the murder weapon was actually in the
16  suspect's home in time to ask him about it
17  during his confession when he told them he
18  had done something else with the murder
19  weapon, correct?
20    A    That would be fair to say, yes.
21    Q    In the victim's home, is what I
22  mean.
23    A    Yes.
24    Q    That doesn't change your answer,
25  correct?

1           McElhone

2    A    Yes.

3    Q     So my understanding is that one

4    of the lessons learned from the Diaz

5    homicide was that information about what a

6    crime scene showed had to be identified as

7    early on as possible in a homicide

8    investigation so that, among other

9    reasons, when detectives were taking a

10   confession, they had enough information to

11   identify inconsistencies between the

12   suspect's story and what the evidence

13   showed, correct?

14         MR. MITCHELL:  Objection to

15     form.

16         You can answer.

17   A    That being one important aspect

18   of it, sure.  Although there is also

19   physical evidence that's lost in there.

20   Q     That's another reason to

21   carefully process crime scenes to make

22   sure that all physical evidence is

23   gathered so that it can be tested,

24   correct?

25   A    Correct.

1              McElhone

2      Q     And I take it you addressed

3   those problems in a number of ways when

4   you assumed command of the homicide squad

5   in 1987, correct?

6      A     The problem when I took command

7   in 1987 was the finger pointing between

8   the medical examiner's lab and the police

9   department.

10      Q     So you understood it had to be

11   clearly delineated who was doing what when

12   it came to crime scenes, correct?

13      A     That's correct.

14      Q     Okay.

15              And I think you testified at

16   your last deposition that when you took

17   command of the homicide squad, it was

18   decided that the homicide squad would be

19   responsible for the entire crime scene

20   search; is that correct?

21      A     The scene would be homicide

22   squad; the body would be the medical

23   examiner's office.

24      Q     So while the medical examiner's

25   office would be responsible for conducting

1              McElhone

2    any -- for processing crime scene

3    evidence, in other words, for conducting

4    any seriological testing that needs to be

5    performed on the physical evidence, it was

6    the homicide squad's responsibility to

7    actually identify that evidence for

8    collection, correct?

9        A     There was a three person

10   walk-through at every crime scene.  This

11   is one of the things that we put into

12   place immediately.  It would be the lead

13   detective from homicide squad; it would be

14   a detective from the identification

15   bureau, which is the police department;

16   and it would be a representative of the

17   lab, the medical examiner's lab.

18            They would walk through the

19   crime scene together.  They would

20   identify, okay, we have to make sure we

21   video all of this.  We need a photo of

22   that.  I see blood ever here, the lab

23   says, okay, I will focus on that.  And

24   then they would all back out and then the

25   entire crime scene is videotaped.

1          McElhone

2          At that point after the

3    videotaping is done, then each individual

4    member of that group would assume their

5    responsibility.  The lab would recover

6    seriological evidence and physical

7    evidence; the detectives would search the

8    rest of the crime scene; and the ID people

9    would photograph whatever was being

10   recovered.

11       Q    And so, again, the homicide

12   squad was responsible for actually making

13   sure that --

14          MS. FREUDENBERGER:  Well,

15       withdrawn.

16       Q    I just want to focus right now

17   on the homicide detective's

18   responsibilities when it came to crime

19   scenes.

20       A    Okay.

21       Q    So leave aside the

22   identification unit and the medical

23   examiner's roles.

24       A    Crime lab.

25       Q    The crime lab's role.

1          McElhone

2          And let's start with the

3    trainings that you organized.  So one

4    thing that you did when you started was to

5    organize monthly training with Dr. Hirsch

6    for the homicide detectives, correct?

7       A    Among others, yes.

8       Q    And those would be on individual

9    particular -- each session would be on an

10   individual particular topic?

11      A    That's correct.

12      Q    And I gather one of the purposes

13   for those trainings was to make sure, help

14   educate homicide detectives so they would

15   understand the way that items of physical

16   evidence may have been used to commit a

17   crime, correct?

18      A    Among others, yes.

19      Q    In other words, you wanted to

20   make sure when your homicide detectives

21   showed up at the crime scene, they were

22   able to quickly and efficiently identify

23   objects that may have been used in crimes,

24   correct?

25      A    Among other aspects, sure.

1              McElhone

2       Q     And you made sure they were

3   trained to do so, correct?

4       A     Yes.

5       Q     And time is very important in

6   homicide investigations, correct?

7       A     Yes.

8       Q     And so a goal in any homicide

9   investigation is to identify as quickly as

10  possible physical evidence that may give

11  clues as to how a crime occurred, correct?

12             MR. MITCHELL:  Objection to

13       form.

14             You can answer.

15      A     Yes.

16      Q     Including potential murder

17  weapons, correct?

18      A     Yes.

19      Q     And you trained your homicide

20  detectives to do that as quickly as

21  possible?

22      A     I personally didn't do it, but I

23  arranged for training.

24      Q     So you made sure they were

25  trained from the moment they arrived at a

1              McElhone

2    scene to identify physical evidence at a

3    crime scene that might indicate how a

4    crime occurred, correct?

5        A    Yes.

6        Q    Including identifying items that

7    were used to commit the homicide right

8    away, correct?

9        A    Yes.

10       Q    And one reason for that is so

11   that detectives can identify and

12   expeditiously follow up on any leads,

13   correct?

14       A    That's important, yes.

15       Q    It's also important that in a

16   case where there may be a suspect who is

17   going to be interrogated that the lead

18   detectives know enough about what the

19   evidence shows regarding how the crime may

20   have been committed to conduct an

21   effective interrogation?

22           MR. MITCHELL:  Objection to the

23     form.

24           You can answer.

25       A    Ideally, yes.

1               McElhone

2       Q      You talked, and we can go over

3  this again if we need to, but you talked

4  in the first day of your deposition about

5  the importance of corroborating a

6  suspect's admission during an

7  interrogation with physical evidence,

8  correct?

9       A      Correct.

10      Q      And obviously an order for --

11             MS. FREUDENBERGER:  Withdrawn.

12      Q      Well, one important principle

13  experienced detectives understand is

14  that --

15             MS. FREUDENBERGER:  Withdrawn.

16      Q      One basic principle of

17  interrogations is that an admission of

18  guilt on its own is not especially

19  powerful if it can't be corroborated,

20  correct?

21             MR. MITCHELL:  Object to the

22    form.

23             You can answer.

24      A      An admission in the beginning

25  opens the door to a further discussion and

Case 2:09-cv-01207-JS-AYS   Document 184-12   Filed 08/17/16   Page 63 of 318 PageID #: 3810

1              McElhone

2    corroboration as you've pointed out, yes.

3        Q      Admission on its own is a

4    starting point not an ending point; is

5    that correct?

6        A      That is correct, yes.

7        Q      And it is important, one reason

8    that it is important for detectives to be

9    able to immediately be able to assess what

10   a crime scene shows about how the crime

11   may have been committed is so that if they

12   go on to do an interrogation, they can

13   test the reliability of the information

14   that the suspect is giving them, correct?

15       A      If they have that information,

16   yes, that's very important.

17       Q      So homicide detectives need to

18   be able to quickly develop the theory of a

19   crime based on the actual evidence

20   apparent to them in order to test whether

21   a suspect's admission is reliable,

22   correct?

23       A      You used the word "theory".  I

24   don't think at that point you're already

25   on a theory, but it is just a surveil,

1            McElhone

2    survey of the scene to see what went on,

3    get a feeling for how this might have

4    occurred and go forward from there.

5        Q     A hypothesis would be a better

6    word?

7        A     Probably hypothesis would be a

8    better word.

9        Q     And in particular, a homicide

10   detective needs to know what the evidence

11   at a crime scene shows right away so

12   that --

13           MS. FREUDENBERGER:  Well,

14      withdrawn.

15       Q     If an interrogation is ongoing

16   and a suspect says, you know, I

17   decapitated her with a chain saw, and the

18   homicide detective hasn't seen a chain saw

19   at the crime scene, that would signal

20   that, one, either the admission was not

21   reliable or, two, that more work needed to

22   be done at the crime scene.

23           Fair to say.

24           MR. MITCHELL:  Object to form.

25           You can answer.

1             McElhone

2     A     Yes.

3     Q     And so you made sure --

4         MS. FREUDENBERGER:  Withdrawn.

5     Q     Another training you arranged

6  for your homicide detectives was you had

7  Vernon Geberth come in and do a seminar?

8     A     Yes.

9     Q     And Vernon Geberth is a

10  well-respected homicide instructor now,

11  correct?

12     A     Yes.

13     Q     Or at least was back in 1988?

14     A     I believe he testified at the

15  SIC, and that was one of the reasons that

16  Inspector Murphy at the time reached out

17  to him and arranged for a one-week seminar

18  by Mr. Geberth.

19     Q     And he was known as an authority

20  on homicide investigations back in the

21  late 80s, correct?

22     A     I guess so, yes.

23     Q     That's why you brought him in?

24     A     Actually, Inspector Murphy had

25  already made contact with him before I got

Case 2:09-cv-01207-JS-AYS   Document 184-12   Filed 08/17/16   Page 66 of 318 PageID #:
3813

1                McElhone

2    there, but, yes, that was in the first

3    couple of days that I was there.

4        Q      And did all the detectives in

5    the homicide squad attend that seminar?

6        A      Yes.

7        Q      I'm going to read you a

8    paragraph from Mr. Geberth's book.

9           Are you familiar with this book,

10   Practical Homicide Investigation?

11       A      Actually, I think that is a

12   later volume.  I have the smaller brown

13   one that he provided everybody at the

14   time.

15       Q      And so you're familiar with some

16   of his writings on homicide

17   investigations.

18          Fair to say?

19       A      In his earlier book that I have

20   at home.

21       Q      This is the third edition.

22          MR. MITCHELL:  Do you know when

23      that was printed?

24          MS. FREUDENBERGER:  We can mark

25      it too.

1           McElhone

2        1996.

3        MR. MITCHELL:  Thank you.

4     Q     And this is from -- I'm not sure

5   what chapter number it is.  It is the

6   chapter on "Supervision and management in

7   the homicide investigation".

8     A     Okay.

9     Q     On page 805, he says, "The scope

10   of the search is easily determined by a

11   theory or hypothesis arrived at by the

12   detective supervisor and investigators

13   based upon their initial observations of

14   the scene.  This theory which is

15   provisional is based upon simple

16   assumptions of how and why the homicide

17   occurred.  Remember anything and

18   everything can be evidence."

19          And so is this principle

20   articulated in the paragraph I just read

21   consistent with how your homicide

22   detectives were being trained?  In other

23   words, were your homicide detectives

24   trained consistent with what Mr. Geberth

25   says to formulate a theory or hypothesis

1           McElhone

2    based upon their initial observations at a

3    homicide scene?

4           MR. MITCHELL:  Object to the

5      form.

6           You can answer.

7      A     It is case dependent.  Certain

8    scenes, you would have a body that is

9    laying in the woods for months, and what

10   kind of hypothesis can you make from that

11   other than probably dumped here.  So it is

12   very limited and it is case dependent, but

13   you are certainly -- your initial

14   appearance at the scene and your

15   observations are very important at the

16   beginning.

17     Q     For all sorts of reasons,

18   correct?

19     A     Yes.

20     Q     Including that they can give you

21   a theory about how a crime actually

22   occurred, correct?

23     A     It could.

24     Q     And let's talk specifically

25   about the Tankleff homicide scene.

1              McElhone

2         Obviously their bodies were not

3    found in the woods, correct?

4    A    Correct.

5    Q    They were found in the home?

6    A    Well, Seymour was removed at the

7    time.

8    Q    The bodies were found within the

9    home, correct?

10   A    Yes.

11   Q    And Seymour was alive at the

12   time that first responders arrived at the

13   scene, correct?

14   A    Yes.

15   Q    And he was subsequently

16   transported to the hospital, correct?

17   A    Yes.

18   Q    But not until detectives and

19   representatives of the crime lab had a

20   chance to actually observe the body,

21   correct.

22        MR. MITCHELL:  Which body are

23     you talking about?

24        MS. FREUDENBERGER:  Seymour.

25   A    Absolutely not.

1              McElhone

2    Q    I stand corrected.  That's

3  correct.

4         Seymour's body was taken to the

5  hospital before?

6    A    Rather quickly.

7         MR. MITCHELL:  He was alive so

8    he was taken.  I get what you're

9    saying, his body and the rest of him

10   too.

11        MS. FREUDENBERGER:  I mean no

12    disrespect to Seymour Tankleff.

13   Q    The appropriate sequence of

14  events was that the first responders

15  arrived, and then within a short period of

16  time, Mr. Tankleff was transported to -- I

17  get the two hospitals confused -- but he

18  was transported to Mather Hospital.

19        Is that consistent with your

20  understanding?

21   A    Yes.

22   Q    But going back to the Tankleff

23  crime scene, the assaults on the Tankleffs

24  occurred in their home, correct?

25   A    Yes.

1          McElhone

2     Q     And so it was a contained indoor

3  area?

4     A     Yes.

5     Q     And insofar as anyone knew, by

6  the time that homicide arrived on the

7  scene, there was no suggestion that the

8  crime scene had been contaminated,

9  correct?

10    A     We hoped not.  If there was EMS

11 people, police officers would have

12 responded, and we tried to train them if

13 you can save a life, you save a life.  If

14 not, preserve the scene, back out, and let

15 us process it.

16    Q     And there was no indication that

17 this crime scene had not been preserved,

18 correct?

19    A     As much as what I just

20 described, there was activity by the first

21 arriving uniformed officers and ambulance

22 people, and then at that point hopefully,

23 it was taped off.

24    Q     But you had no indication that

25 those first responders and ambulance

1              McElhone

2    people had not followed their training

3    when it came to doing the best --

4    everything they couldn't when it came to

5    preserving the crime scene?

6      A      That's correct.

7      Q      Insofar as homicide

8    investigations were concerned, this was an

9    ideal crime scene in terms of being able

10   to draw inferences and create a hypothesis

11   based on what was visible at the scene,

12   correct?

13          MR. MITCHELL:  Objection to the

14     form.

15          You can answer.

16     A      I don't know about ideal, but it

17   was better than a body in the woods.

18     Q      It was pretty much as good as it

19   gets when it comes to homicide crime

20   scenes and being able to draw inferences

21   or hypotheses based on what the evidence

22   shows, correct?

23          MR. MITCHELL:  Object to the

24     form.

25          You can answer.

Case 2:09-cv-01207-JS-AYS   Document 184-12   Filed 08/17/16   Page 73 of 318 PageID #: 3820

1              McElhone

2      A     There was still that earlier

3  activity that was involved by Martin

4  Tankleff surviving and walking around and

5  doing whatever he did in the house and

6  then the first responders.  It wasn't

7  quite ideal, but I had no reason to

8  believe it wasn't preserved as well as

9  could be expected.

10     Q     And in addition to being

11 preserved, it was the kind of crime scene

12 that --

13           MS. FREUDENBERGER:  Well,

14    withdrawn.

15     Q     The Tankleffs also lived in an

16 affluent area, correct?

17     A     Yes.

18     Q     They had a relatively large

19 house, correct?

20     A     Yes.

21     Q     And you may remember this from

22 the trial, I'm not sure, they had -- they

23 actually had a cleaning staff, correct?

24     A     I remember it from some reports

25 that I read, yes.

JOHN MCELHONE                                    October 30, 2014
MARTIN TANKLEFF vs. SUFFOLK COUNTY                              73

1           McElhone

2      Q     And as domestic residences go,

3   it was a fairly clean house, correct?

4           MR. MITCHELL:  Object to the

5      form.

6           You can answer.

7      A     I was actually there.  I

8   wouldn't say it was clean.  It was big and

9   it was a nice home.

10     Q     But it was the kind of crime

11  scene where -- that you trained your

12  homicide detectives, they would be able to

13  find valuable evidence that would give

14  them indications of how the crime was

15  committed, correct?

16     A     Again, I point to ideally if

17  we're not involved with something that has

18  to be handled expeditiously and right

19  away, we would have a three-person

20  walk-through.  We would videotape, we

21  would photograph, we would recover

22  evidence.  And then we would be able from

23  that to form some kind of a theory.

24     Q     Right.

25           But this case was a little

1          McElhone

2   different, right?

3       A     Yes.  He survived, we had a

4   surviving witness.  He began telling a

5   story.  The detective was trying to verify

6   that story.

7       Q     So had you a suspect?

8       A     No, not a suspect.  At that

9   point, we had a surviving witness, and the

10   first responders.

11      Q     Fair enough.

12          So you had a surviving witness

13   right away who, as you said, had survived

14   the attack?

15      A     Apparently.

16      Q     And certainly everybody was open

17   to the possibility that Marty may have had

18   something to do with the crimes, correct?

19      A     You said everybody.  I don't

20   know who you're talking about.

21      Q     That's a good point.

22          Either way, the early homicide

23   detectives on the scene understood that

24   Marty was going to be a critical witness

25   whether he had anything to do with the

1              McElhone

2    murders or not, correct?

3       A    Yes.

4       Q    It was very important to speak

5    with Marty as quickly as possible and find

6    out what he knew?

7       A    Yes.

8       Q    And also to be able to assess

9    the accuracy as the detectives spoke with

10   him, correct?

11      A    Correct.

12      Q    And so for that reason, it was

13   very important for detectives to be able

14   to walk around and make efficient quick

15   and accurate observations about what the

16   evidence at the scene showed, correct?

17      A    Cursory inspections would be all

18   that we expected at that point.  We'd

19   still want to process that scene, you want

20   to keep it as pristine as possible.  We

21   wanted to verify certain things that he

22   had learned from interviewing the

23   surviving witness, and we wanted to check

24   and verify, get a lay of the land as well.

25      Q    That sounds like you told me a

1          McElhone

2    couple of things.

3          One thing is that you told me it

4    was important to verify the information

5    that Marty was giving, correct?

6      A    Yes.

7      Q    And that's something the

8    detectives were trained to understand even

9    before they met Marty, correct?

10     A    Are we talking specifically in

11   this case or what?

12     Q    I'm talking about this case, but

13   I'm talking about general principles of

14   homicide investigation.

15         So, in other words, the

16   detectives under your command were trained

17   that they needed to carefully observe what

18   the crime scene showed even before

19   interviewing Marty, correct?

20     A    In certain cases.  Each case

21   depended.  Priorities change.  If one

22   detective responds and he has a chance to

23   interview a living witness, that would

24   probably take priority over the crime

25   scene.

1          McElhone

2     Q     But Marty wasn't going anywhere,

3   right?

4     A     Right.  We want to contain him

5   and find out what he has to say.

6     Q     Well, you're not suggesting --

7          MS. FREUDENBERGER:  Withdrawn.

8     Q     Maybe we can short circuit this

9   a little bit.

10         You're not suggesting that it

11  would have been improper for McCready to

12  do a walk-through of the crime scene

13  before he spoke to Marty?

14    A     No.

15    Q     It is your understanding that

16  that's what he did, correct?

17    A     Yes.

18         Did you say before he talked

19  Marty?

20    Q     Yes.

21    A     I'm not sure at what point he

22  did the walk-through.  It was my

23  understanding that after he talked to

24  Marty, he wanted to verify some of the

25  things that he said.

Case 2:09-cv-01207-JS-AYS   Document 184-12   Filed 08/17/16   Page 79 of 318 PageID #: 3826

1           McElhone

2      Q    You understand that McCready

3  didn't multiple walk the crime scene?

4      A    I don't know about multiple.  I

5  know he did a walk-through.

6      Q    We can mark this and you can go

7  through it if you like.

8           McCready documents in his

9  14-page investigative report that he did

10  an initial walk-through of the crime scene

11  before he ever spoke with Marty.

12         Do you dispute that?

13      A    No, that was in his report.

14      Q    And that certainly was

15  consistent with McCready's training,

16  correct?

17      A    Yes.

18      Q    Now, take a look at -- I'm going

19  to show you some testimony from Detective

20  McCready, and just read to me, if you

21  will.

22         MS. FREUDENBERGER:  We should go

23     ahead and mark this.  I'm sure it's

24     been marked in another deposition.

25     Let's mark it and I'll direct the

1         McElhone

2    witness to a particular excerpt.

3         (Whereupon, Testimony of

4    Detective McCready, was marked as

5    McElhone Exhibit 14 for

6    identification, as of this date.)

7  BY MS. FREUDENBERGER:

8    Q    Chief McElhone, take a look at

9  this deposition testimony.  I'll represent

10  to you that this is deposition testimony

11  given by Detective McCready in the civil

12  case on December 11th of 2012, and it

13  concerns his walk-throughs of the Tankleff

14  crime scene before he -- before he left

15  the crime scene that morning with Marty

16  Tankleff?

17    A    Okay.

18    Q    And just read to yourself page

19  97, line 17 to 99, line 5.

20         (Witness reviewing document)

21         What McCready describes is

22  consistent with the except I read from

23  Mr. Geberth's book, correct?

24         MR. MITCHELL:  Objection to the

25    form.

1          McElhone

2        You can answer.

3    A     Yes.  Surveying the scene might

4  develop a hypothesis from that point.

5    Q     And so assuming McCready's

6  testimony is accurate that he did, in

7  fact, investigate the scene and develop a

8  hypothesis about what may have occurred,

9  he was acting in accordance with his

10  training, correct?

11    A     Yes.

12    Q     And going back to the crime

13  scene for a second, the Tankleff homicide

14  scene was a contained crime scene,

15  correct?

16    A     The door was unlocked, I

17  believe, but it was all within the home.

18    Q     Does the door being unlocked

19  make it not a contained crime scene?  Was

20  it or was it not?

21    A     Your definition of contained may

22  be different than mine.

23    Q     What is your definition of

24  contained?

25    A     As it developed, all of the

1           McElhone

2    evidence and all of the information we

3    obtained was from inside the house.

4        Q     So whether or not it was

5    immediately apparent, it eventually became

6    apparent that the crime scene was a

7    contained crime scene?

8        A     Yes.

9        Q     And the police were on the scene

10   relatively close to the attacks, correct?

11       A     Well, to the phone call.

12       Q     And Seymour was still alive at

13   the time that the police arrived?

14       A     Yes.

15       Q     So does that signal to you that

16   the police were on the scene relatively

17   close in time of the attacks?

18       A     No, I can't draw a conclusion

19   from that.

20       Q     Did you come to an understanding

21   about Arlene Tankleff's time of death?

22       A     No.

23       Q     But you did come to understand

24   that by the time --

25           MS. FREUDENBERGER:  Well,

1           McElhone

2     withdrawn.

3     Q     You were aware that there was

4     a -- you're aware today as you sit here

5     that there was a poker game at the

6     Tankleff residence the night before the

7     attacks, correct?

8     A     Yes.

9     Q     And Seymour Tankleff was seen

10    alive as late as three in the morning,

11    correct?

12    A     Yes.

13    Q     On the morning of the crimes?

14    A     Yes.

15    Q     And the first responders got to

16    the scene at approximately 6:17 in the

17    morning, correct?

18    A     That sounds about right.

19    Q     So around about 3 hours and 15

20    minutes after Seymour Tankleff was last

21    seen alive, correct?

22    A     Correct.

23    Q     So would that tell you that the

24    police arrived at the crime scene

25    relatively close in time, within 3 hours

1              McElhone

2    and 15 minutes of the attacks?

3      A      Within 3 hours and 15 minutes,

4    yes.

5      Q      And probably actually within

6    less time given the 911 call and the time

7    it took to respond, correct?

8      A      I can't make that assumption.

9      Q      Regardless, unlike a case where

10   somebody is shot in a public place or a

11   body is discarded in the woods, there are

12   actually a limited number of people who

13   had entered and exited the crime scene by

14   the time the first responders arrived.

15             Would that be fair to say?

16     A      That would be my understanding,

17   yes.

18     Q      And Arlene Tankleff's body was

19   still in the location where she had been

20   murdered, correct?

21     A      Correct.

22     Q      So for all of those reasons,

23   that made this homicide scene the kind of

24   homicide scene where detectives understood

25   that they were going to be able to find

1           McElhone

2     evidence that would give them clues as to

3     how the crime was committed?

4        A     That would be our goal.

5        Q     As crime scenes go, this was a

6     dream crime scene in being able to gather

7     evidence and make determinations based on

8     what the evidence showed, correct?

9           MR. MITCHELL:  Object to the

10        form.

11           You can answer.

12        Q     Better than most would you say?

13           MR. MITCHELL:  I object to the

14        form.

15           You can answer.

16        A     It presented limited problems, I

17     would say.

18        Q     Presented limited problems?

19        A     Yes.

20        Q     In other words, you understood

21     when you arrived at the Tankleff homicide

22     scene on the morning of September 7th that

23     as homicide scenes go, this one was likely

24     to pose only limited problems, if that,

25     when it came to the detective's ability to

1          McElhone

2    draw conclusions based on the crime scene

3    evidence.

4          Fair to say?

5          MR. MITCHELL:  Object to the

6     form.

7          You can answer.

8     A     I wouldn't say that anybody can

9    draw conclusions at that point.  That was

10   one of the things that I would want them

11   not to do to get focused in on one

12   particular area and to exclude any others.

13   It would be -- like I said, the crime

14   scene presented limited problems at that

15   point.

16    Q     All right.  I actually asked you

17   a different question though.

18    A     Okay.

19    Q     My question is about your

20   understanding of the crime scene when you

21   arrived at the house on the morning of

22   September 7th.

23          And you understand from looking

24   at this crime scene, given that it was a

25   contained scene, that the police had been

1          McElhone

2    on the scene within three hours of the

3    attacks, that there were a limited number

4    of people to your knowledge who had

5    entered and exited the house in those

6    three hours between the attacks and when

7    the police arrived, and the fact that

8    Arlene Tankleff's body was in the place

9    where she was murdered, when it came to

10   the homicide detective's ability to learn

11   information about how the crimes occurred

12   from the scene itself, this was the kind

13   of crime scene as opposed to a public

14   homicide or a body found in the woods from

15   which the detectives were likely to be

16   able to glean information about how the

17   crimes took place.

18          Fair to say.

19          MR. MITCHELL:  Object to the

20     form.

21          You can answer.

22     A    I'm having trouble with your

23   questions that go for three paragraphs

24   there.

25          I agree with you to the point --

1                McElhone

2      Q     In that case -- actually, don't

3   answer the question, I'll just ask you

4   another question?

5           MS. FREUDENBERGER:  I'll

6       withdraw the question.

7      Q     It sounds like what you're

8   saying is that you don't understand the

9   question; is that correct?

10          MR. MITCHELL:  Just wait, John.

11      Don't speak please.

12          This is for the record, so the

13      record is clear, because she is

14      fabulous, but I don't think she is

15      that good.  I'm just saying that he

16      started his answer, my position is he

17      should be allowed to finish his

18      answer.  If you want to withdraw your

19      question, fine.  You have withdrawn

20      the question.

21          MS. FREUDENBERGER:  I'll

22      withdraw the question.

23      Q     I'll ask a different question

24   now that you told me you don't understand

25   my question.

1          McElhone

2          MR. MITCHELL:  Only one person

3     can talk at a time.  Am I right about

4     that one?

5     Q     There are all sorts of different

6     sorts of crime scenes, correct?

7     A     Correct.

8     Q     And some are better than others

9     when it comes to the information you can

10    glean from them, correct?

11    A     Correct.

12    Q     And homicides that happen in

13    public places present problems when it

14    comes to deducing information from them,

15    correct?

16    A     There is always a chance of

17    contamination, right.  What's not involved

18    in the homicide could be in a public place

19    so they drove in the wrong direction,

20    sure.

21    Q     So as far as crime scenes go,

22    there were various features of this crime

23    scene that made it the kind of crime scene

24    where detectives were likely to be able to

25    get valuable information from the crime

1            McElhone

2    scene, correct.

3         MR. MITCHELL:  Object to the

4     form.

5         You can answer.

6     A    At some point, there would be

7    information available to the detectives,

8    yes.

9     Q    Because of the features of this

10    crime scene that we have described,

11    correct?

12    A    Fingerprints, we could recover

13    blood evidence, we can look at is there a

14    forcible entry or not.  All of those

15    things would eventually or quickly be

16    learned from the scene, yes.

17    Q    And in other words, you

18    understood that on the morning of

19    September 7th, that as we discussed

20    because there was a contained crime scene,

21    because the police were on the scene

22    within approximately three hours of the

23    attacks, because there were a limited

24    number of people who had entered and

25    exited the scene, because Arlene

1            McElhone

2   Tankleff's body appeared to be undisturbed

3   in the place where she had been murdered,

4   this was a crime scene as opposed to say a

5   homicide in a public place from which

6   detectives were likely to be able to glean

7   valuable information?

8      A     At some point, yes, I do.

9      Q     And you understood that when you

10  arrived at the house on September 7, 1988,

11  correct?

12     A     Yes.

13     Q     I think you testified at the

14  last day of your deposition that another

15  change you made to the homicide squad in

16  1987 was to encourage the detectives to

17  work more closely and collaboratively with

18  the medical examiner's office; is that

19  correct?

20     A     The entire squad was going to do

21  it that way, yes.

22     Q     Including the detectives?

23     A     Oh, absolutely.

24     Q     And was that another reason why

25  you had Dr. Hirsch come in to do trainings

1          McElhone

2   with the detectives?

3    A    Yes.

4    Q    So they would be comfortable

5   interacting with members of the medical

6   examiner's team?

7    A    Yes.

8    Q    And because detectives actually

9   do need to work closely with the medical

10  examiner's office in the course of an

11  average homicide investigation, correct?

12   A    The medical examiner's office

13  has two prongs.  There is the medical

14  examiners that do the autopsies of the

15  body, and the crime lab that comes under

16  the direction of the medical examiner.  So

17  more often with the crime lab than with

18  the MEs themselves, but we work closely

19  with both.  It is a team effort.

20   Q    And, for example, you would send

21  a detective to the medical examiner's

22  office for autopsies, correct?

23   A    We covered the autopsies, yes.

24   Q    And in this case, that was

25  Detective Ryan, correct?

1          McElhone

2    A    I don't know who it was.

3    Q    But you wouldn't dispute that

4  Detective Ryan was sent to cover the

5  autopsy?

6    A    I don't know.  Someone would

7  cover the autopsy.

8    Q    You have me reason to think it

9  was not Detective Ryan?

10   A    No.

11        MR. MITCHELL:  Do you know if it

12   was Detective Ryan?

13        THE WITNESS:  No.

14   Q    Do you know who it is one way or

15  the other?

16   A    I don't, no.

17   Q    Would you have known back in

18  1988?

19   A    It wouldn't have been terribly

20  important.  As long as it was covered.  It

21  would probably be brought to my attention

22  if no one covered it.  Otherwise, I would

23  assume that someone from my team covered

24  it.

25   Q    My question is:  In 1988, would

1             McElhone

2    you have known who the detective was who

3    covered the autopsies in the Tankleff

4    case?

5        A    I might have.

6        Q    You don't know one way or the

7    other?

8        A    No.

9        Q    In any event, as you said, it

10   was important for a detective to cover the

11   autopsies in any homicide investigation,

12   correct?

13       A    Correct.

14       Q    And I gather there are a couple

15   of reasons for that.

16            For a variety of reasons, it is

17   important to make sure that the detectives

18   in a homicide investigation are fully

19   aware of the medical examiner's findings

20   on autopsy, correct?

21       A    Yes.

22       Q    And one reason for that is that

23   you want to make sure that detectives are

24   able to integrate information from the

25   medical examiner into the prosecution,

Case 2:09-cv-01207-JS-AYS  Document 184-12  Filed 08/17/16  Page 95 of 318 PageID #: 3842

JOHN MCELHONE                              October 30, 2014
MARTIN TANKLEFF vs. SUFFOLK COUNTY                      94

1          McElhone

2   correct?

3      A     Correct.

4      Q     And because there is obviously a

5   difference in terms of evidentiary value

6   between what a homicide detective might

7   determine by looking at a body and what a

8   medical examiner is able to determine by

9   looking at a body, correct?

10      A     Correct.  And there is also a

11   written report eventually that we get from

12   the medical examiner, but sometimes they

13   take weeks, so if there is information, I

14   would like to get important information

15   right away.

16      Q     You want to get important

17   information right away so you can follow

18   up on it, correct?

19      A     Yes.

20      Q     And if you're able to get

21   information from the medical examiner that

22   contradicts your working theory of the

23   case, that would be important for the

24   detectives to know, correct?

25      A     Yes.

1           McElhone

2      Q    Because that information would

3    need to be followed up on carefully,

4    correct?

5      A    Correct.

6      Q    And also if you -- and obviously

7    this is not always the case, but if

8    information, if the medical examiner made

9    findings that contradicted the working

10   theory of the case in a homicide

11   investigation, it would be important for

12   the detectives to relay that information

13   to the prosecutors right away, correct?

14         MR. MITCHELL:  Objection to the

15     form.

16         You can answer.

17     A    Yes.

18     Q    Because that information could

19   be important Brady material, correct?

20     A    You have to know about it, yes.

21     Q    It can take weeks for a medical

22   examiner to issue a report, correct?

23     A    Sometimes, yes.

24     Q    And so detectives, homicide

25   detectives can't rely on the medical

1              McElhone

2    examiner to bring information that

3    contradicts their working theory of the

4    case to the prosecutor's attention; that

5    obligation falls to the homicide

6    detectives, correct?

7         MR. MITCHELL:  Objection to the

8      form.

9         You can answer.

10     A     Yes.

11     Q     One reason for that is that a

12   medical examiner is not going to be privy

13   to the same amount of information about an

14   investigation as the homicide detective,

15   correct?

16     A     In most cases.

17     Q     In most cases, the medical

18   examiner doesn't know what findings are

19   significant to the investigation and how,

20   correct?

21        MR. MITCHELL:  I object to the

22     form.

23        You can answer.

24     A     No, it wouldn't.

25     Q     That's correct?

JOHN MCELHONE                                                October 30, 2014
MARTIN TANKLEFF vs. SUFFOLK COUNTY                                        97

1              McElhone

2      A     A lot of times, the same ME was

3  at the scene at the time that we removed

4  the body so he had certain information at

5  that point.

6      Q     Right, clearly.

7              But, again, as you say, the

8  homicide detectives generally work more

9  closely with the crime lab prong of the

10 medical examiner's office than the medical

11 examiner, correct?

12     A     Correct.

13     Q     And a medical examiner is not

14 necessarily going to be kept up to date

15 about all the details of a homicide

16 investigation as they progress, correct?

17             MR. MITCHELL:  Object to the

18     form.

19             You can answer.

20     A     Not necessarily, no.

21     Q     In other words, a homicide

22 detective, the homicide detective and not

23 the medical examiner is the person who is

24 going to know whether information comes

25 out of autopsy that contradicts the

JOHN MCELHONE                                    October 30, 2014
MARTIN TANKLEFF vs. SUFFOLK COUNTY                            98

```
 1          McElhone
 2   working theory of the homicide case,
 3   correct?
 4          MR. MITCHELL:  Objection to
 5     form.
 6          You can answer.
 7     A     Yes.
 8     Q     And it is not necessarily the
 9   medical examiner's obligation to bring
10   exculpatory information that comes out at
11   the autopsy to the prosecutor's attention,
12   correct?
13     A     To the homicide detective, it
14   would be done, yes.
15     Q     It is the homicide's detective
16   obligation not the medical examiner's
17   obligation, correct?
18     A     Correct.
19     Q     And you made sure -- you talked
20   about the importance of disclosing Brady
21   material at the last day of your
22   deposition.
23          Do you remember that?
24     A     Could you repeat that?
25     Q     Do you remember at the last day
```

1              McElhone

2    of your deposition discussing Brady

3    material?

4        A    Exculpatory material, yes.

5        Q    Exculpatory material.

6              And you understood obviously

7    back in the late 80s that police officers

8    had an obligation to disclose exculpatory

9    information?

10       A    I don't know about in writing.

11       Q    To disclose, to document and

12   disclose to the prosecution exculpatory

13   information, correct?

14       A    Correct.

15       Q    And that would include any

16   information that contradicted the working

17   theory of the prosecution, correct?

18            MR. MITCHELL:  I object to the

19       form.

20            You can answer.

21       A    Well, working theory --

22       Q    We can move on.  I actually

23   agree it is a vague question.

24            MR. MITCHELL:  Are you

25       withdrawing the question?

1    McElhone

2    MS. FREUDENBERGER:  I'm

3    withdrawing the question.

4    We did go over Brady

5    obligations; again, it was covered at

6    your last deposition so I'm trying to

7    save time.

8    Q    And the detectives in your squad

9    were trained.  At least by the time of

10   this investigation in 1988, that they

11   couldn't rely on the medical examiner to

12   report exculpatory information from an

13   autopsy to the prosecution, correct?

14   MR. MITCHELL:  Objection.

15   A    I don't remember that particular

16   part of the training.  If it came to their

17   attention through being at the autopsy,

18   they would make that information available

19   to the lead detective and to the

20   prosecutor.

21   Q    And they had an obligation to

22   make that information available both to

23   the lead detective and the prosecutor,

24   correct?

25   A    Yes.

1           McElhone

2      Q      And there's no question in your

3   mind that the detectives under your

4   command understood that obligation,

5   correct?

6      A      Yes.

7      Q      Obviously, you're aware that

8   Marty Tankleff confessed to the attacks on

9   his parents, correct?

10     A      Correct.

11     Q       And he confessed to both

12  bludgeoning them and cutting their throats

13  with a knife; is that accurate?

14     A      That's correct.

15     Q       And you understand that the

16  weapon that Marty Tankleff described using

17  to slit his parents throats was a knife

18  that was recovered from the kitchen

19  counter next to a watermelon, correct?

20     A      Correct.

21     Q      If I refer to that knife as the

22  watermelon knife, you'll understand what I

23  mean?

24     A      Yes.

25     Q      I'm going to show you some

Case 2:09-cv-01207-JS-AYS   Document 184-12   Filed 08/17/16   Page 103 of 318 PageID #: 3850

JOHN MCELHONE                                      October 30, 2014
MARTIN TANKLEFF vs. SUFFOLK COUNTY                            102

1              McElhone

2   testimony from Bernard Adams, the medical

3   examiner who conducted the Tankleff

4   autopsies.

5          Had you worked with Dr. Adams

6   prior to the Tankleff homicides?

7      A    I knew of him, yes.

8      Q    Had you worked with him?

9      A    I'm not directly involved in any

10  of the cases.  At symposium where

11  Dr. Hirsch was giving his training, I knew

12  of him.  I believe maybe once or twice I

13  have directly called him on a case.  I

14  don't remember.

15     Q    So you had worked with him, but

16  not closely prior to 1988?

17     A    Right.

18     Q    I'm going to go ahead --

19         MS. FREUDENBERGER:  Why don't we

20     mark Adam's deposition transcript at

21     well.

22     Q    And I've indicated on the pages

23  for clarity the excerpts that I would like

24  you to read to yourself, sir, which is

25  191, line 22 to page 193, line 21 of the

1            McElhone

2    August 5, 2014 deposition of Bernard Adams

3    in this case.

4            (Whereupon, Deposition

5       Transcript of Bernard Adams, was

6       marked as McElhone Exhibit 15 for

7       identification, as of this date.)

8    BY MS. FREUDENBERGER:

9       Q    Just read that excerpt to

10   yourself, please.

11           (Witness reviewing document)

12           Now, what Dr. Adams appears to

13   be saying from this testimony is that he

14   determined that the autopsy -- that it's

15   not a reasonable possibility that the

16   watermelon knife was the weapon used to

17   murder the Tankleffs, and that he must

18   have communicated to the detectives at the

19   autopsy that the watermelon knife was

20   excluded as the murder weapon.

21           That is in substance what Adams

22   appears to be saying in this excerpt,

23   correct?

24           MR. MITCHELL:  I object to the

25      form.

1        McElhone

2       You can answer.

3    A    I don't think he is quite being

4  that strong about it.  He said he doesn't

5  think it is a reasonable possibility.  He

6  is not excluding anything at this point.

7    Q    Well, the question is:  The

8  question on page 192 is, "It would be fair

9  to exclude that?"  And the answer is, "I

10  would agree that it is not a reasonable

11  possibility."

12       MR. MITCHELL:  I object to the

13    form.  The document speaks for itself.

14       On that point, I don't know if

15    Dr. Adams made any corrections.  If

16    you notice, there is a question and

17    then I object.

18       MS. FREUDENBERGER:  Can we do

19    this after?

20       MR. MITCHELL:  No, because it

21    goes to --

22       MS. FREUDENBERGER:  It doesn't.

23    Whether Adams made corrections to his

24    deposition --

25       MR. MITCHELL:  I don't think you

Case 2:09-cv-01207-JS-AYS  Document 184-12  Filed 08/17/16  Page 106 of 318 PageID #: 3853

JOHN MCELHONE                                    October 30, 2014
MARTIN TANKLEFF vs. SUFFOLK COUNTY                        105

1           McElhone

2      read it correctly.  I'm playing nice

3      here.  I think the part you're talking

4      about -- I'm just talking about the

5      way you read the question.  I don't

6      know if it is Dr. Adams' answer or

7      Mr. Schecht's question.

8           MS. FREUDENBERGER:  I read the

9      question and then I read the answer.

10      I think it was clear.  If it is not

11      clear, that's fine.

12           MR. MITCHELL:  I understand.  I

13      thought you were --

14           MS. FREUDENBERGER:  We can talk.

15      Adams is going to come in and testify

16      for himself.

17           MR. MITCHELL:  I'm talking about

18      the form of your question.

19           MS. FREUDENBERGER:  I

20      understand, but I'm taking the issue

21      off the table.

22      Q     Let me ask you this, Chief

23  McElhone:  Have you -- had you worked

24  with?

25           MS. FREUDENBERGER:  Sorry,

1          McElhone

2      withdrawn.

3      Q      John Collins was the prosecutor

4  who prosecuted Marty Tankleff for the

5  murders of his parents, correct?

6      A      I'm not sure.

7      Q      You didn't testify at

8  Mr. Tankleff's trial, correct?

9      A      No.

10      Q      Any idea why that was?

11          MR. MITCHELL:  I'm sorry, what

12      was your question?

13      A      After I left the homicide squad.

14  I'm not sure.

15      Q      Any idea why that was?

16      A      Oh, why.  I'm sorry, I thought

17  you said when that was.

18      Q      I said any idea why that was?

19      A      That I didn't testify?

20          MR. MITCHELL:  Wait, wait, wait.

21      I object.

22          You can answer.  Go ahead.

23      A      I was never called.

24      Q      And I gather -- are you aware

25  that John Collins is now a judge?

1              McElhone

2    A     Yes.

3    Q     I gather you have worked with

4  Judge Collins over the course of your

5  career?

6    A     As an ADA, not as a judge.

7    Q     As an ADA, you have worked with

8  Judge Collins?

9    A     Yes, very close.

10   Q     Any reason to doubt his

11  integrity?

12   A     John Collins?

13   Q     Yes.

14   A     No.

15   Q     Any reason to doubt his honesty?

16   A     None.

17   Q     He has a reputation as an honest

18  man with a great deal of integrity.

19        Fair to say.

20        MR. MITCHELL:  Object to form.

21        You can answer.

22   A     My opinion, yes.

23   Q     And, in fact, wouldn't you agree

24  with that, having worked with him over the

25  course of your career, that that is, in

1                    McElhone

2    fact, his reputation in the legal

3    community in Suffolk County?

4        A    I can't speak for the legal

5    community, but personally I know him to be

6    a very honest, very forthright individual.

7        Q    But you're not sure what his

8    reputation is publicly?

9        A    No.

10       Q    Now, I will represent to you

11   that we don't have a transcript, it

12   happened yesterday, but your counsel is

13   free to contradict me.

14            Yesterday at his deposition in

15   this case, Judge Collins testified that he

16   was never made aware that Dr. Adams had

17   concluded there was no reasonable

18   possibility that the watermelon knife was

19   the instrument used to murder the

20   Tankleffs, and if that fact had been

21   brought to his -- that finding from

22   Dr. Adams had been brought to his

23   attention, he would have disclosed that

24   information to the defense attorney and

25   brought that information out at

Case 2:09-cv-01207-JS-AYS   Document 184-12   Filed 08/17/16   Page 110 of 318 PageID #: 3857

JOHN MCELHONE                                    October 30, 2014
MARTIN TANKLEFF vs. SUFFOLK COUNTY                            109

1          McElhone

2   Mr. Tankleff's trial, which he did not.

3          So I'm representing to you --

4          MS. FREUDENBERGER:  Brian, we do

5     agree that's an accurate

6     characterization of Judge Collins'

7     testimony?

8          MR. MITCHELL:  No.

9          MS. FREUDENBERGER:  You would

10     not agree to that?

11          MR. MITCHELL:  No.

12          MS. FREUDENBERGER:  All right.

13     Q     Now, if my representation of the

14   testimony is accurate, and --

15          MS. FREUDENBERGER:  Well,

16     withdrawn.

17     Q     If Dr. Adams, the medical

18   examiner had made a finding in 1988 or

19   1989, between the point in time of Marty

20   Tankleff's confession and the trial, that

21   there was no reasonable possibility that

22   the watermelon knife, which Mary described

23   in his confession using to murder his

24   parents, was, in fact, the murder weapon,

25   that finding would have directly

1              McElhone

2    contradicted an important aspect of

3    Mr. Tankleff's confession, correct?

4         MR. MITCHELL:  Object to the

5      form.

6         You can answer.

7      A    If that was transmitted to a

8    detective two days after this confession,

9    it would have contradicted that knife.

10     Q    Well, let's just start with the

11   findings.

12        If Adams did make that finding

13   that there was no reasonable possibility

14   that the watermelon knife was used to

15   commit the murders, that finding from

16   Dr. Adams would have directly contradicted

17   one way Marty described committing the

18   murders in his confession, correct.

19        MR. MITCHELL:  Object to the

20      form.

21        You can answer.

22     A    If that was conveyed, yes.

23     Q    Let's leave aside convey.  Let's

24   just stick with the finding.

25        If Marty said I killed my

1           McElhone

2    parents with a watermelon knife and that

3    wasn't used, Dr. Adams' finding would

4    directly contradict one aspect of Marty's

5    confession, correct?

6       A    Yes.

7       Q    And one very significant aspect

8    of Marty Tankleff's confession, correct?

9           MR. MITCHELL:  Objection to

10      form.

11          You can answer.

12      A    It would be significant, yes.

13      Q    And so given that contradiction

14   on a significant issue, if Adams did, in

15   fact, make a finding that there was no

16   reasonable possibility that the watermelon

17   knife was used to kill the Tankleffs, that

18   contradiction with Marty's confession

19   would have to be both documented and

20   thoroughly explored, correct?

21          MR. MITCHELL:  Object to the

22      form.

23          You can answer.

24      A    Yes, Dr. Adams would have to

25   document that in the autopsy report, and

1          McElhone

2   it would be related to the prosecutor,

3   yes.

4     Q     And the detectives in addition

5   would have an obligation to document --

6          MS. FREUDENBERGER:  Well,

7     withdrawn.

8     Q     The detectives would have an

9   obligation to look into why it was that

10  the confession describes using a murder

11  weapon that the medical examiner has said

12  would not be the murder weapon, correct?

13         MR. MITCHELL:  Objection to

14    form.

15         You can answer.

16    A     That would be an area that would

17  have to be explored.

18    Q     A critically important area to

19  explore, correct?

20    A     Yes.

21    Q     Okay.

22         And certainly if that finding

23  were, in fact, made, it would

24  constitute -- in the context of this

25  investigation, it would constitute Brady

Case 2:09-cv-01207-JS-AYS   Document 184-12   Filed 08/17/16   Page 114 of 318 PageID #: 3861

JOHN MCELHONE                                    October 30, 2014
MARTIN TANKLEFF vs. SUFFOLK COUNTY                          113

```
 1              McElhone

 2   information that would have to be related

 3   to the prosecutor, correct?

 4        MR. MITCHELL:  Objection to the

 5     form.

 6          You can answer.

 7     A     I'm not an attorney, but we

 8   would make it known to the district

 9   attorney.

10     Q     You're not an attorney, but on

11   of homicide detective's obligations is to

12   understand -- well, is to have a working

13   enough, thorough enough understanding of

14   what constitutes exculpatory information

15   to be able to make judgments about what

16   they are obligated under the law to

17   disclose to the prosecution, correct?

18     A     We disclose everything to the

19   prosecutors.  We work very closely

20   together.

21     Q     What I'm asking is a little

22   different.  I'm talking about Brady

23   obligations.

24          You understood in 1988 that

25   police officers, investigators had an
```

1              McElhone

2    obligation to disclose particular

3    categories of information to the

4    prosecution, correct?

5        A    As I said, we disclose all of

6    our information to the prosecutor.

7        Q    I understand that was the policy

8    in the homicide squad.

9        A    He can sort out what's Brady and

10   what's opinion, which I think in this case

11   is what we're looking at.

12       Q    But you don't have an obligation

13   as a homicide detective to give all

14   information to the prosecutor.  I

15   understand you're saying that was the

16   homicide squad's policy, but you only have

17   a legal -- Brady was a legal obligation,

18   correct?

19       A    Yes.

20       Q    A legal obligation incumbent on

21   police officers, correct?

22       A    Yes.

23       Q    And that legal obligation only

24   applies to some information gathered in a

25   homicide investigation, correct?

1          McElhone

2          MR. MITCHELL:  Object to the

3      form.

4          You can answer.

5      A      Again, I wouldn't want to be the

6  person to say this is Brady, this is not

7  Brady.  We bring it to the attorney's

8  attention.

9      Q      You know, I think I understand

10  what you're saying.

11          It sounds to me like what you're

12  saying is that your policy was any time

13  anything even could be considered Brady,

14  you handed it over, correct?

15      A      Yes.

16      Q      And you trained your detectives

17  to take a very liberal view of Brady

18  evidence, correct?

19      A      Yes.

20      Q      If something conceivably could

21  be exculpatory, you would give it to the

22  prosecutors and let them make the

23  determination, correct?

24      A      Yes.

25      Q      Certainly you understood that

Case 2:09-cv-01207-JS-AYS  Document 184-12  Filed 08/17/16  Page 117 of 318 PageID #: 3864

JOHN MCELHONE                                    October 30, 2014
MARTIN TANKLEFF vs. SUFFOLK COUNTY                          116

1              McElhone

2    any information that was arguably

3    exculpatory had to be given to the

4    prosecution, correct?

5       A    Yes.

6       Q    And the detectives under your

7    command understood that, correct?

8       A    Yes.

9       Q    It is a basic principle of

10   criminal investigations?

11      A    Yes.

12      Q    So no question in your mind that

13   if Adams had made a finding that the

14   watermelon knife described in Marty's

15   confession could not have been the murder

16   weapon, but there was no reasonable

17   possibility that the watermelon knife

18   could have been the murder weapon, that

19   would have constituted Brady information

20   that the detectives under your command

21   would have been obligated to give to the

22   prosecutor, correct?

23           MR. MITCHELL:  Objection to the

24      form.

25           You can answer.

1          McElhone

2     Q     If he made that finding.

3     A     If he made that finding, I would

4   expect to find it in his written report

5   that we would certainly make part of the

6   case file.  That would be disclosed to the

7   defense, district attorney, everyone.

8     Q     But you just told me a minute

9   ago that the detectives under your command

10  could not rely on the medical examiner --

11    A     They could rely on it.  They

12  didn't want to wait two or three weeks for

13  it.

14    Q     Let's be clear, because that

15  sounds like something that contradicts

16  what you told me a few minutes ago.

17          You told me a few minutes ago

18  that the detectives under your command had

19  an obligation to turn over exculpatory

20  information that came out of the autopsy

21  to the prosecutor, and could not rely on

22  the medical examiner to discharge that

23  obligation for them, correct?  That's what

24  you said under oath a few minutes ago?

25    A     Yes.

1            McElhone

2       Q      And so the fact that a medical

3   examiner is doing a report down the line

4   does not take care of the detectives --

5            MS. FREUDENBERGER:  Well,

6       withdrawn.

7       Q      So given that testimony which

8   you just gave, in this case, if Dr. Adams

9   did make a finding that there was no

10  reasonable possibility that the watermelon

11  knife was the knife used to murder the

12  Tankleffs, the detective at the autopsy

13  had an obligation to bring that to the

14  prosecution's attention, correct?

15            MR. MITCHELL:  Objection to the

16      form.

17            You can answer.

18      A      Yes.

19      Q      And if it came to -- and you

20  also mentioned that the detective at the

21  autopsy had an obligation to transmit any

22  exculpatory findings or any findings --

23            MS. FREUDENBERGER:  Withdrawn.

24      Q      I think you also told me that in

25  that situations where a medical examiner

1          McElhone

2   made a finding that contradicted the

3   working theory, the homicide's working

4   theory of the case, that in addition to

5   having an obligation to disclose that

6   finding to the prosecutor, the detective

7   at the autopsy had an obligation to

8   disclose that finding to lead detective,

9   correct?

10      A    Yes.

11      Q    And in this case, the lead

12  detective was Detective McCready, correct?

13      A    Yes.

14      Q    And so if Adams did, in fact,

15  make a finding that there was no

16  reasonable possibility that the watermelon

17  knife was the knife used to murder the

18  Tankleffs, that is a fact that given the

19  way that the homicide squad worked,

20  Detective McCready would have been aware

21  of as well as the detective present at the

22  autopsy, correct?

23          MR. MITCHELL:  If that was.

24          MS. FREUDENBERGER:  If Adams did

25      make that finding.

Case 2:09-cv-01207-JS-AYS   Document 184-12   Filed 08/17/16   Page 121 of 318 PageID #: 3868

JOHN MCELHONE                                          October 30, 2014
MARTIN TANKLEFF vs. SUFFOLK COUNTY                              120

1          McElhone

2     A     Yes.

3          MR. MITCHELL:  Wait.  Objection

4     to the form.

5          You can answer.

6     A     Yes.

7     Q     And if, in fact, it had come to

8  either the attention of the detective at

9  the autopsy or Detective McCready's

10  attention that the medical examiner,

11  Dr. Adams, had determined there was no

12  reasonable possibility that the watermelon

13  knife was the knife used to murder the

14  Tankleffs, and neither the detective at

15  the autopsy nor Detective McCready

16  disclosed that finding to the prosecution,

17  that would be a grossly improper departure

18  from policy and procedure, correct?

19          MR. MITCHELL:  I object to the

20     form.

21          You can answer.

22     A     If that finding is as definitive

23  as he says now, it should have been in his

24  report.  It would have been an easy

25  transfer of information.

1          McElhone

2     Q    Okay, but --

3     A    To answer your question:  Yes,

4  if it was that definitive and that strong

5  and strongly conveyed to the detective, it

6  would have got back to Detective McCready

7  and should have gotten to the ADA.

8     Q    And if Detective McCready and

9  the detective at the autopsy both failed

10  to communicate that finding to the

11  prosecution, that would be a gross

12  departure from policy and procedure,

13  correct?

14          MR. MITCHELL:  Object to the

15     form.

16          You can answer.

17     A    It would be a departure,

18  absolutely.

19     Q    It would be a very serious

20  departure from policy and procedure,

21  correct?

22     A    As I go back to tell you,

23  whatever we have, we share with the

24  district attorney.  Whatever we have, this

25  is how we have it, this is where it's

1           McElhone

2    documented.

3       Q     These are homicide cases, very

4    serious cases, correct?

5       A     Absolutely.

6       Q     And if a detective failed to

7    turn over to the prosecutor the fact that

8    the medical examiner had determined the

9    weapon described in a suspect's confession

10   couldn't have been used to commit the

11   crime the way the suspect describes, and

12   the detectives didn't turn that

13   information over to the prosecution, are

14   you not willing to say that would be a

15   gross departure from policy and procedure?

16          MR. MITCHELL:  Object to the

17      form.

18          You can answer.

19      A     Yes, it would be.

20      Q     And if it had come to your

21   attention that Adams made this finding

22   that there is no reasonable possibility

23   the watermelon knife could have been used

24   to commit the crimes the way that Marty

25   Tankleff's confession describes, and the

```
 1              McElhone
 2    detectives under your command had learned
 3    of that finding and failed to communicate
 4    it to the prosecution, I take it that that
 5    would be extraordinary troubling to you as
 6    the commander of the homicide unit,
 7    correct?
 8         MR. MITCHELL:  Objection to
 9      form.
10           You can answer.
11      A    If I had known it was
12    exculpatory information that was not
13    disclosed, yes, it would be very troubling
14    to me.
15      Q    You would, I assume, immediately
16    investigate or direct the appropriate
17    authorities to investigate how that could
18    have happened, correct?
19      A    Yes.
20      Q    And I gather that also would
21    cause you, if it came to your attention
22    that that had, in fact, transpired, to
23    look very carefully at all of the other
24    police work that had been done in
25    connection with the confession in this
```

1          McElhone

2  case, correct?

3          MR. MITCHELL:  Object to the

4      form.

5          You can answer.

6      A    I would review everything, yes.

7      Q    And you would review it very

8  carefully and critically, correct?

9      A    Yes.

10      Q    And certainly you never

11  disclosed to or reported to --

12          MS. FREUDENBERGER:  Withdrawn.

13      Q    Well, certainly you never

14  reported to any of the prosecutors

15  involved in the Tankleff homicide that

16  Dr. Adams had made a finding that there

17  was no reasonable possibility that the

18  watermelon knife was used to murder the

19  Tankleffs, correct?

20      A    I did not.

21      Q    And I gather if it was brought

22  to your attention that Dr. Adams made a

23  finding that there was no possibility that

24  the watermelon knife had been used to

25  murder the Tankleffs, you would have

1         McElhone

2    disclosed that in the prosecution,

3    correct?

4         MR. MITCHELL:  Objection to

5     form.

6         You can answer.

7     A    Yes.

8     Q    And it never came to your

9    attention that Dr. Adams made a finding

10   that there was no possibility that the

11   watermelon knife was used to murder the

12   Tankleffs?

13    A    No.

14    Q    From any source?

15    A    No.

16    Q    Did you ever hear any skepticism

17   from any source that the watermelon knife

18   might not have been the knife used to

19   murder the Tankleffs?

20        MR. MITCHELL:  Objection to

21     form.

22        You can answer.

23    A    Not that I can recall, no.

24    Q    Did Sergeant Doyle ever express

25   that to you?

1              McElhone

2      A     Not that I can recall.

3      Q     Is that the kind of thing that

4   you probably would have remembered today

5   given that it was the murder weapon

6   described in the confession?

7           MR. MITCHELL:  Objection to the

8      form.

9           You can answer.

10     A     Yes, I would remember if it was

11  definitively said that this was not the

12  knife.  You know, there was other theories

13  out there.  There was other theories that

14  we talked about, but I don't recall

15  anything about the knife.

16     Q     And you worked closely with

17  Doyle, correct?

18     A     Yes.

19     Q     Particularly right when -- well,

20  you actually brought Doyle in when you

21  took control of the homicide squad,

22  correct?

23     A     That's right.

24     Q     And you brought him in because

25  you believed that he was an excellent

1              McElhone

2    supervisor, correct?

3      A    Yes.

4      Q    And you believed that he had a

5    great deal of integrity, correct?

6      A    Yes.

7      Q    You believe he was skilled to

8    manage homicides detectives, right?

9      A    Yes.

10     Q    And Doyle was the primary

11   supervisor on this investigation, correct?

12     A    That's correct.

13     Q    He was supervising the

14   day-to-day work in the investigation?

15     A    Uh-huh.

16     Q    So if Doyle, for whom you

17   appeared to have a great deal of respect

18   and who was actively involved in the

19   day-to-day supervision of the

20   investigation, had come to you and said,

21   hey, I have doubts about whether the

22   watermelon knife was used to murder the

23   Tankleffs as the Marty Tankleff's

24   confession describes, that's the kind of

25   thing you would remember, correct?

1              McElhone

2        MR. MITCHELL:  Objection to

3    form.

4        You can answer.

5    A    Yes.

6    Q    And you would have directed

7  further investigation, correct?

8    A    As far as we can go, yeah.

9    Q    So that never happened?

10        MR. MITCHELL:  Object to the

11    form.

12        You can answer.

13    A    No.

14    Q    Chief McElhone, we spoke earlier

15  about some of your obligations or some of

16  your responsibilities when it came to

17  communicating with the press.

18        Do you remember that?

19    A    Yes.

20    Q    In your experience, in a major

21  investigation, there is generally one

22  person who is the police department's

23  spokesperson concerning that

24  investigation.

25        Would that be a fair way to

Case 2:09-cv-01207-JS-AYS   Document 184-12   Filed 08/17/16   Page 130 of 318 PageID #: 3877

JOHN MCELHONE                                         October 30, 2014
MARTIN TANKLEFF vs. SUFFOLK COUNTY                              129

1              McElhone

2    characterize your role in this

3    investigation?

4              (Discussion held off the record)

5    BY MS. FREUDENBERGER:

6         Q     Going back a minute to the

7    watermelon knife.

8              If it had come to your attention

9    that Adams had made a finding that there

10   was no reasonable possibility that the

11   watermelon knife was the weapon used to

12   murder the Tankleffs, that's

13   information --

14             MS. FREUDENBERGER:  Well, you

15        know what, withdrawn.

16        Q     You were aware of the phenomenon

17   of false confessions by 1988, correct?

18        A     Yes.

19        Q     In other words, you knew that

20   sometimes people admit to crimes they

21   haven't committed, correct?

22        A     Yes.

23        Q     And you also understood that

24   particular categories of people were more

25   at risk for giving false confessions,

1            McElhone

2    correct?

3        MR. MITCHELL:  Object to the

4     form.

5            You can answer.

6     A     I think they would be more

7    likely in certain cases.

8     Q     And people with intellectual

9    disabilities are more likely to give false

10    confessions, correct?

11        MR. MITCHELL:  Objection to

12     form.

13            You can answer.

14     A     Yes.

15     Q     Juveniles are more likely to

16    give false confessions, correct?

17        MR. MITCHELL:  Objection to

18     form.

19            You can answer?

20     A     If they were under 16, their

21    parents would be present.

22     Q     If juveniles are under 16, there

23    are rules that govern their interrogation,

24    correct?

25     A     Yes.

1          McElhone

2     Q    And you understood one reason

3  for those rules is that juveniles are at a

4  higher risk for giving false confessions;

5  is that correct?

6     A    I'm not sure if that is the

7  reason, but it sounds reasonable.

8     Q    You had heard in 1988 that

9  juveniles were at a greater risk than

10 adults for giving false confessions?

11    A    I don't recall.  I don't have a

12 list of exactly who it would be, but the

13 phenomenon was out there.

14    Q    But the phenomenon was out

15 there?

16    A    Yes.

17    Q    And if it had come to your

18 attention that the medical examiner had

19 made a finding that there was no

20 reasonable possibility that the watermelon

21 knife, the murder weapon described in

22 Marty Tankleff's confession, had been used

23 to commit the crime, that is a fact that

24 would suggest to you that you at least had

25 to explore whether Marty Tankleff had

Case 2:09-cv-01207-JS-AYS   Document 184-12   Filed 08/17/16   Page 133 of 318 PageID #: 3880

JOHN MCELHONE                                          October 30, 2014
MARTIN TANKLEFF vs. SUFFOLK COUNTY                              132

1              McElhone
2    given a false confession, correct?
3           MR. MITCHELL:  Objection to
4      form.
5           You can answer.
6      A     Or was not the knife used or
7    discarded or gotten rid of.  There are a
8    number of scenarios on that.
9      Q     There are a number of reasons
10   that you would have to look very closely
11   at the confession in this case if Adams
12   had made that finding, correct?
13     A     I would have to look at the
14   whole thing --
15          MR. MITCHELL:  Wait.  Object to
16     the form.
17          You can answer.  Go ahead and
18     answer.
19     Q     You don't have to take a close
20   look at the whole investigation, correct?
21     A     Yes, exactly.
22     Q     And one thing you would have to
23   look at is whether there was a possibility
24   that Marty Tankleff had given a false
25   confession, correct?

1          McElhone

2     A     That would be one of the things

3   if that happened, yes.

4     Q     If Adams had made that finding

5   that there was no reasonable possibility

6   that the watermelon knife was used to kill

7   the Tankleffs as Marty's confession

8   described, you would have to -- because of

9   that finding, you would have to look

10  carefully at whether Marty Tankleff had

11  given a false confession, correct?

12         MR. MITCHELL:  Objection to the

13     form.

14         You can answer.

15    A     That would be one of the things

16  that I would look at.  First thing I would

17  look at is --

18    Q     Can you answer my question

19  first?

20         MR. MITCHELL:  Let him finish

21     his answer.

22         MS. FREUDENBERGER:  I will, but

23  I want to make sure he answers the

24  question.

25         MR. MITCHELL:  Let him finish

Case 2:09-cv-01207-JS-AYS  Document 184-12  Filed 08/17/16  Page 135 of 318 PageID #: 3882

JOHN MCELHONE                                        October 30, 2014
MARTIN TANKLEFF vs. SUFFOLK COUNTY                              134

1          McElhone

2     the answer.  You keep interrupting his

3     answer.

4          MS. FREUDENBERGER:  I don't want

5     to move to strike it.  I'm trying to

6     make sure we have a clear answer to my

7     question.

8          MR. MITCHELL:  Let him finish

9     and he will give you a clear answer.

10         MS. FREUDENBERGER:  Could you

11     read back the question and answer

12     please.

13         (Record read)

14    Q    If Adams had, in fact, made a

15    finding that there was no reasonable

16    possibility that the watermelon knife was

17    used to kill the Tankleffs as Marty's

18    confession described, you would have to

19    look at whether Marty had given a false

20    confession, correct?  You would have to

21    look into whether Marty had given a false

22    confession, correct?

23         MR. MITCHELL:  Objection to the

24     form.

25         You can answer.

1          McElhone

2     A    That would be one of the things

3   that I would look at.

4     Q    And that finding, if Adams did

5   in fact make it and it came to your

6   attention, would require you to look

7   carefully into the reliability of Marty

8   Tankleff's confession, correct?

9          MR. MITCHELL:  Object to the

10     form.

11          You can answer.

12     Q    Among other things.

13     A    I would review the whole thing,

14   yes.

15     Q    And you would review -- you

16   would review all of the police work that

17   had been done in the case to date to make

18   sure that you didn't have an innocent

19   suspect on your hands, correct?

20          MR. MITCHELL:  Object to the

21     form.

22          You can answer.

23     A    I would let the district

24   attorney know that we had this fact and we

25   would look at everything in the entire

JOHN MCELHONE                                      October 30, 2014
MARTIN TANKLEFF vs. SUFFOLK COUNTY                            136

```
 1            McElhone
 2  case, yes.
 3      Q     Including all of the police work
 4  that had been done in the case, correct?
 5      A     Yes.
 6      Q     And you would pay particular
 7  attention, I gather, to the process by
 8  which the confession came about, correct?
 9      A     I had already known how that
10  came about, but I would look at it again,
11  yes.
12      Q     And you would certainly question
13  the two detectives that had been involved
14  in taking the confession, McCready and
15  Ryan, correct?
16      A     Yes.
17      Q     And specifically you would
18  undertake to question them again about the
19  process they used throughout Marty
20  Tankleff's interrogation, correct?
21      A     Yes.
22      Q     I think you just mentioned that
23  you had already gone through the process
24  of questioning McCready and Ryan about how
25  the confession came about in this case; is
```

1            McElhone

2  that correct?

3      A    No.  You said if I had learned

4  of Dr. Adams' definitive findings, would I

5  have done that.

6      Q    I think you said I had already

7  done that.

8      A    I had knew how that confession

9  came to be, absolutely.

10      Q    If had you learned that Adams

11  had made a finding that the watermelon

12  knife couldn't have been used to kill the

13  Tankleffs, I assume, and correct me if I'm

14  wrong, that you would have looked

15  carefully and with some skepticism at what

16  McCready and Ryan had told you about how

17  the confession came about, correct?

18            MR. MITCHELL:  Objection to the

19      form.

20            You can answer.

21      A    In that case, my first

22  skepticism would be with Dr. Adams.  I

23  have been through numerous stabbing cases

24  and I have yet to find an ME anywhere who

25  would say, oh, that's definitely the

JOHN MCELHONE                                    October 30, 2014
MARTIN TANKLEFF vs. SUFFOLK COUNTY                         138

1           McElhone

2    knife.  It is not a bullet that gets

3    matched to a gun.

4           You have discussions where it

5    could be you have other expert evidence

6    and say, it could have been a glass

7    bottle, it could have been a razor, it

8    could have been anything.  But my very

9    first problem would have been call Dr.

10   Adams, and ask how can you be so sure, all

11   the training I have had and all the

12   experience with these rarely, unless there

13   is blood on the knife or fingerprints on

14   the knife, can you really make that

15   determination?  And then all of this would

16   be certainly broiled up and brought to

17   everyone's attention at that point.

18      Q    And as you say, it is rare for a

19   medical examiner to be able to say

20   definitively, I know this was the knife if

21   there was no blood on it, correct?

22      A    Yes.

23      Q    If though Adams did make the

24   finding, if you learned -- you're the

25   commander of the homicide squad, and you

1           McElhone

2   learned that Adams had made a finding that

3   it couldn't be the watermelon knife and

4   communicated that to the detectives and

5   the detectives had failed to disclose that

6   to the prosecutor, I gather you would have

7   revisited carefully and with some

8   skepticism McCready and Ryan's accounts of

9   how the confession came into being.

10          Is that fair?

11          MR. MITCHELL:  Objection to

12     form.

13          You can answer.

14     A    If I wasn't aware of it and the

15   sergeant wasn't aware of it, I would be

16   very concerned and I would look at the

17   whole case.

18     Q    Including in particular the

19   process that McCready and Ryan described

20   as to how the process came into being,

21   correct?

22          MR. MITCHELL:  Objection to

23     form.

24          You can answer.

25     A    Yes.

1          McElhone

2     Q     And by the way, if the sergeant

3  had been aware of that finding and hasn't

4  communicated it to the prosecutor, that

5  would cause you equal, if not additional

6  concern, correct?

7     A     Absolutely.

8     Q     Because in your role as

9  commander of the homicide squad, you have

10  to depend on the sergeant below you who is

11  supervising the day-to-day of the homicide

12  investigation to make sure that the

13  homicide squad's policies and procedures

14  are rigorously followed, correct?

15     A     Absolutely.

16     Q     Now, Chief McElhone, you

17  understand as soon as the Tankleff murders

18  happened that the investigation into their

19  attacks was going to be very high profile,

20  correct?

21          MR. MITCHELL:  Objection to the

22     form.

23          You can answer.

24     A     Yes.

25     Q     It was a case that was certain

JOHN MCELHONE                                    October 30, 2014
MARTIN TANKLEFF vs. SUFFOLK COUNTY                            141

1              McElhone

2  to attract significant media attention,

3  correct?

4     A    Yes.

5     Q    Certain to attract a great deal

6  of public scrutiny, correct?

7          MR. MITCHELL:  Object to the

8     form.

9          You can answer.

10    A    Yes.

11    Q    And Marty becoming a suspect in

12 his parents' death made the investigation

13 even more sensitive, correct?

14         MR. MITCHELL:  I object to the

15    form.

16         You can answer.

17    A    That added to it.  It was a

18 horrific crime in an upscale neighborhood.

19    Q    But certainly the Tankleffs' son

20 being the primary suspect --

21    A    He was arrested.

22    Q    -- in their attacks, it ensured

23 that the case would receive even more

24 media attention than it was already bound

25 to receive.

1              McElhone

2         Is that fair to say?

3         MR. MITCHELL:  I object to the

4     form.

5         You can answer.

6     A    I can't speak to the media.

7 There was a lot of media attention,

8 because of the nature of the crime and

9 where it was.

10    Q    And I assume you understood that

11 there was likelihood that Marty would

12 retain very experienced criminal defense

13 counsel, correct?

14        MR. MITCHELL:  Objection to the

15    form.

16        You can answer.

17    A    At some point, yes.

18    Q    Given just Marty's means alone,

19 it was likely that Marty was going to

20 retain a criminal defense lawyer who was

21 going to take the case very seriously,

22 correct?

23        MR. MITCHELL:  Object to the

24    form.

25        You can answer.

JOHN MCELHONE                                    October 30, 2014
MARTIN TANKLEFF vs. SUFFOLK COUNTY                            143

```
 1              McElhone
 2     A     That was a very dim concern of
 3   mine at that point, in fact no concern of
 4   mine actually at that point.  The case was
 5   what it was.
 6     Q     I'm not asking whether it was of
 7   concern to you.  I'm asking if you
 8   realized that it was likely that the
 9   17-year-old very affluent kid who was
10   accused and arrested for murdering his
11   parents was going to retain a defense
12   lawyer who was going to pursue the defense
13   very doggedly?
14              MR. MITCHELL:  Object to the
15      form.
16              You can answer.
17     A     Any homicide case that goes to
18   trial usually has a very dogged defense
19   attorney.  So it occurred to me that they
20   would probably get a good one, one of the
21   better ones.
22     Q     So the investigation would also
23   receive additional attention from Marty's
24   defense attorney, correct, that was
25   apparent to you?
```

1          McElhone

2          MR. MITCHELL:  Object to the

3     form.

4          You can answer.

5     A     I don't know what the defense

6  attorney would do.

7     Q     I'm just asking whether you

8  expected back in 1988 that this homicide

9  investigation in particular was going to

10  receive a lot of scrutiny from a lot of

11  different angles.

12          Is that fair to say?

13     A     Most of ours did, but, yes,

14  okay.

15     Q     This one in particular though,

16  correct?

17     A     I had Richard Angelo who killed

18  20 people.  You know, I had high profile

19  cases all over the place.

20     Q     Fair enough.

21     A     It didn't cause me a concern one

22  way or the other.

23     Q     So you were actually very

24  experienced with working with the press in

25  sensitive high profile homicide cases,

1          McElhone

2   correct?

3      A     Around that time, I had 18

4   months in, yeah, I would say that's fair

5   to say.

6      Q     And one reason that there is one

7   point person in the homicide investigation

8   who communicates with the press is to make

9   sure that the message coming from the

10   police department about a sensitive high

11   profile homicide investigation is

12   controlled, correct?

13          MR. MITCHELL:  Objection to the

14      form.

15          You can answer.

16      A     Yes.  But pre-arrest, I would be

17   the person, and post-arrest, it is now the

18   district attorney's call.  So we don't

19   make any press conferences or anything

20   after that.

21      Q     So pre-arrest, it is you

22   speaking with the press, but nobody else

23   from the police department?

24      A     Police department speaking for

25   the police department.  In this case, I'm

Case 2:09-cv-01207-JS-AYS  Document 184-12  Filed 08/17/16  Page 147 of 318 PageID #: 3894

JOHN MCELHONE                                    October 30, 2014
MARTIN TANKLEFF vs. SUFFOLK COUNTY                         146

1              McElhone

2    not sure if it was me or it could have

3    been the chief or something.  I'm not

4    sure.

5        Q    In any event, it is one high

6    ranking supervisor that communicates with

7    the press pre-arrest, correct?

8        A    Yes.

9             I should say post-arraignment,

10   then the DA takes over after that.

11       Q    Okay.

12            And so my point is simply up

13   until the point in time when the DA takes

14   over, the reason that there is one person

15   from the police department speaking to the

16   press is so that the message -- the

17   information released to the press and the

18   message coming from the police department

19   can be controlled, correct?

20            MR. MITCHELL:  Objection to the

21     form.

22            You can answer.

23       A    Yes.

24       Q    You don't want different

25   detectives out there talking to reporters

Case 2:09-cv-01207-JS-AYS   Document 184-12   Filed 08/17/16   Page 148 of 318 PageID #: 3895

JOHN MCELHONE                                              October 30, 2014
MARTIN TANKLEFF vs. SUFFOLK COUNTY                              147

1              McElhone

2    without one higher up being able to

3    control what's being said, correct?

4        A    Correct.

5        Q    And then once the DA's office

6    takes over speaking with the press, you

7    said that happens after arraignment,

8    correct?

9        A    Uh-huh.

10       Q    And at that point, the police

11   department stops speaking to the press;

12   there's a policy on that?

13       A    Yes.

14       Q    And what you've just described

15   having one person speaking with the press

16   up to arraignment, and then having the

17   police department stop speaking with the

18   press after arraignment, that was Suffolk

19   County Police Department policy at the

20   time of the Tankleff murder investigation,

21   correct?

22       A    Yes.

23       Q    And this case was unusual.

24   We'll get more into this in a minute.

25             This case was unusual in that

Case 2:09-cv-01207-JS-AYS  Document 184-12  Filed 08/17/16  Page 149 of 318 PageID #: 3896

JOHN MCELHONE                                          October 30, 2014
MARTIN TANKLEFF vs. SUFFOLK COUNTY                           148

1              McElhone

2    there was a subsequent missing person's

3    investigation that the homicide squad also

4    was involved in, correct?

5        A      Yes.

6        Q      And that was the investigation

7    into the disappearance of Jerry Steuerman,

8    correct?

9        A      Correct.

10       Q      And there was a determination

11   made that missing persons was permitted to

12   communicate with the press regarding the

13   missing person's investigation, correct?

14       A      Correct.

15       Q      But other than the

16   communications coming from the District

17   Attorney's office and the communications

18   from the missing persons unit, the only

19   other person authorized to speak with the

20   press about any aspect of the Tankleffs

21   homicide in a related investigation was

22   you, correct?

23       A      Actually in 1988, Commissioner

24   Guido had come on board in early 1988 and

25   he had a public information bureau around

1              McElhone

2    the clock.  I think we had Lieutenant

3    Kiley, and I think he had a sergeant and a

4    couple of other police officers working

5    for them.  They would certainly be able to

6    do it.

7           But in a homicide case, they

8    would probably call upstairs to us and say

9    this is the question, do you want me to

10   answer it or can you answer it?  An ADA is

11   a little bit different.

12   Q    Okay.  I understand.

13         But other than the public

14   information bureau that Guido instituted,

15   the missing persons unit --

16   A    They were the lead in that.

17   Q    -- the District Attorney's

18   office and yourself, nobody else from

19   Suffolk County Police Department was

20   authorized to speak with the press about

21   the Tankleff homicides or related

22   investigations, correct?

23         MR. MITCHELL:  Object to the

24   form.

25         You can answer.

Case 2:09-cv-01207-JS-AYS   Document 184-12   Filed 08/17/16   Page 151 of 318 PageID #: 3898

JOHN MCELHONE                                      October 30, 2014
MARTIN TANKLEFF vs. SUFFOLK COUNTY                          150

```
 1          McElhone
 2   A     Not that I'm aware of, no.
 3        MR. MITCHELL:  When you want to
 4   take a break, just let me know.
 5        MS. FREUDENBERGER:  Let me
 6   finish a couple more questions about
 7   this topic.
 8        MR. MITCHELL:  How long do you
 9   think you're going to be?
10        MS. FREUDENBERGER:  Let me look
11   at my outline.
12        MR. MITCHELL:  Only because I
13   thought you only had 2 hours and 50
14   minutes.  We were at 4:10 the last
15   time.
16        MS. FREUDENBERGER:  But we got
17   14 hours from the court.
18        MR. MITCHELL:  For him?
19        MS. FREUDENBERGER:  Yes.  I'm
20   not going to go 14 hours, but --
21        MR. MITCHELL:  I didn't realize
22   that.  I thought we had seven hours
23   with him.
24        MS. FREUDENBERGER:  Let me
25   finish this line of questioning.
```

1          McElhone

2      Q     Given the sensitive and high

3   profile nature of this investigtion and

4   given your experience dealing with the

5   press and high profile homicide cases by

6   the time of the Tankleff homicides, I

7   assume, correct me if I'm wrong, that you

8   were very careful when it came to the

9   information that you disseminated to the

10  press in connection with this

11  investigation, correct?

12     A     Yes.

13     Q     In other words, you were very

14  careful not to reveal any information to

15  the press until you were completely

16  satisfied concerning its reliability,

17  correct?

18     A     Frequently at the scene when it

19  is first happening, I don't have all that

20  information so it would be very cursory.

21     Q     That is a good point and I'll

22  phrase the question differently.

23          You were very careful not to

24  reveal any information to the press in

25  this case unless you were absolutely

1               McElhone

2    certain you had no doubts concerning that

3    information's reliability?

4       A    I wasn't testifying when I'm

5    talking to the press so it is not beyond a

6    reasonable doubt.  And I might be

7    answering a question, and every once in a

8    while, I would stumble and someone would

9    ask me something and I'd say, oh, I wish I

10   hadn't of said that.

11      Q    I think we all do that.

12              But for a variety of reasons,

13   you were careful not to affirmatively

14   offer any information to the press if you

15   had any doubts about its reliability.

16              Would that be fair to say?

17      A    Yes, that would be fair to say.

18      Q    In other words, you made sure

19   that you were satisfied before you gave

20   information to the press that that

21   information was reliable to the best of

22   your ability, correct?

23      A    That's correct.

24      Q    Did the department have a policy

25   in place at the time of the Tankleff

1             McElhone

2   murder investigation concerning press

3   releases when they were issued?

4       A     It wasn't hard and fast.  It

5   was, again, Commissioner Guido had a very

6   open policy with the press.  He believed

7   let's keep them off our back, let's give

8   them everything we can when we can.  The

9   only policy was an investigative area, if

10  it was an homicide squad, narcotics squad,

11  whatever, they would be responsible for

12  the contents of the press release.

13      Q     I understand.

14            And when exactly did Guido take

15  office?

16      A     I would guess first of January

17  '88, right after the election of '87.

18            MS. FREUDENBERGER:  Off the

19      record.

20            (Thereupon, a recess was taken,

21      and then the proceedings continued as

22      follows:)

23  BY MS. FREUDENBERGER:

24      Q     Chief McElhone, although Arlene

25  Tankleff was pronounced dead at the scene

1          McElhone

2 on September 7, 1988, Seymour Tankleff did

3 not die from his injuries right away,

4 correct?

5     A     Right.

6     Q     He survived for a number of

7 weeks?

8     A     Correct.

9     Q     And both Marty Tankleff and some

10 of his family members expressed to members

11 of the homicide squad early on in the

12 investigation that they believed

13 Mr. Tankleff's business partner Jerry

14 Steuerman was involved in the attacks,

15 correct?

16     A     Yes.

17     Q     And on September 14, 1988,

18 approximately a week after the attacks on

19 the Tankleffs, Jerry Steuerman faked his

20 own death and fled the jurisdiction,

21 correct?

22     A     I'm not sure if that is the

23 exact date, but yes.

24     Q     But Jerry Steuerman did fake his

25 own death and flee the jurisdiction while

Case 2:09-cv-01207-JS-AYS   Document 184-12   Filed 08/17/16   Page 156 of 318 PageID #: 3903

JOHN MCELHONE                                    October 30, 2014
MARTIN TANKLEFF vs. SUFFOLK COUNTY                          155

 1            McElhone

 2   Seymour Tankleff was still alive, correct?

 3       A     I think his car was found

 4   running and abandoned and then we were all

 5   summoned to his attorney's office where

 6   there was a note to be opened in the event

 7   that something happened to him, and it was

 8   kind of disbursing his assets at that

 9   point.

10       Q     Right.  In other words, you

11   understood that Jerry Steuerman -- we can

12   go through it all if we need to, but you

13   understood that Jerry Steuerman

14   deliberately took steps to make it appear

15   that when he fled the jurisdiction, he had

16   been either kidnapped or murdered,

17   correct?

18            MR. MITCHELL:  Object to the

19       form.

20            You can answer.

21       A     Or it could have been a suicide.

22   It was open at that point.  We had no idea

23   what was really going on with him.

24       Q     Fair enough.

25       A     But either way, Jerry Steuerman

1            McElhone

2    had taken steps to make his disappearance

3    look like he had died in some manner or

4    another, correct?

5            MR. MITCHELL:  I object to the

6      form.

7            You can answer.

8      A     I don't know what he was

9    thinking.  It was an open investigation at

10   that point.  Was he kidnapped, did he

11   commit suicide, somebody killed him, or

12   did he just flee?  Rather quickly, we kind

13   of figured on he's just out on a trip.

14     Q     I'm asking you.  It wasn't just

15   like he just picked up and decided to go

16   on vacation, right?

17     A     No, no.

18     Q     In other words --

19     A     It was under crazy

20   circumstances.

21     Q     He took particular steps to

22   ensure that it appeared that his leaving

23   the jurisdiction looked like he had either

24   been kidnapped or killed, correct?

25           MR. MITCHELL:  Object to the

1          McElhone

2    form.

3         You can answer.

4    Q    You understood that he had taken

5  steps to deliberately make it look that

6  way?

7         MR. MITCHELL:  Object to the

8    form.

9         You can answer.

10   A    I think that is was his

11 intention.  As I said, I don't think we

12 went with that theory very long.

13   Q    But, for example, he had altered

14 his appearance before he left, correct?

15   A    I learned of that later, yes.

16   Q    And he had left his car running

17 with I believe a sneaker in front of it?

18   A    I don't remember that part.

19   Q    You remember his car was found

20 running?

21   A    I think it was the following

22 day.  We were summoned to the attorney's

23 office where he had this letter.

24   Q    He had left a letter with his

25 lawyer, Mike Grundfast, and had given him

1           McElhone

2   instructions that it should only be

3   opened --

4       A     If something happens to me.

5       Q     If something happened to him,

6   right.

7           The police department determined

8   relatively quickly, as you say, that, in

9   fact, Steuerman had staged his own

10   disappearance, correct?

11       A     It took a little while, but it

12   was just a theory at that point.

13       Q     At what point did your theory --

14   well, at some point, you began operating

15   on a theory that he was still alive and

16   had taken steps to make it appear like he

17   had --

18       A     First thing we did was put phone

19   traps on people he would contact.  So we

20   certainly thought at that point he was

21   alive and he would make some kind of

22   contact.

23       Q     So at some point, your theory

24   became he is alive, he deliberately made

25   it look like something happened to him and

1            McElhone

2    he left the jurisdiction, correct?

3        A      If it was a legitimate

4    kidnapping, one of these people would be

5    contacted so it would be the first logical

6    step.

7        Q      Okay.

8            At what point in time did the

9    police department determine that or did

10   the police department's theory become that

11   Jerry Steuerman was, in fact, alive?

12       A      I believe it was a phone call to

13   his girlfriend at the time, where there

14   was just a one word message that she took

15   to mean that he was alive.

16       Q      He used a code word, correct,

17   pistacio?

18       A      Yes, pistacio.  And through

19   that, we were able to trace that it came

20   from Los Angeles and that he --

21       Q      Right.  But I gather that --

22          MR. MITCHELL:  I know you know

23       his answer.  Let him finish.

24       Q      Finish your answer.

25       A      I thought I did.

1              McElhone

2       Q     But prior to the pistacio phone

3    call, for lack of a better way of putting

4    it, I gather the working theory in the

5    police department was already that he was

6    still alive, correct?

7       A     Yes.  It is a very public place.

8    There was no witness to see him dragged

9    off Veterans Highway there.

10      Q     And, in fact, the police

11   interviewed --

12            MS. FREUDENBERGER:  Withdrawn.

13      Q     In fact, homicide detectives

14   interviewed a clerk at the hotel where he

15   had a habit of frequenting, correct?

16      A     Yes.

17      Q     And that clerk reported to the

18   detectives that he had -- that he had

19   checked out of the hotel after altering

20   his appearance, correct?

21      A     That's right, yes.

22      Q     And specifically he shaved his

23   facial hair and took off all his signature

24   jewelry, correct?

25      A     I remember that he had shaved

1            McElhone

2    off a beard or whatever and his hair.

3        Q      And I gather you also learned

4    close in time --

5            MS. FREUDENBERGER:  Well,

6        withdrawn.

7        Q      You were present at the initial

8    meeting at Mike Grunfast's office where

9    the letter Steuerman had left his children

10   was opened, correct?

11       A      Yes.

12       Q      And to your knowledge, was that

13   the first meeting of police personnel at

14   Mike Grunfast's office?

15       A      Yes.

16       Q      And at some point close in time

17   to that meeting --

18           MS. FREUDENBERGER:  Well,

19       withdrawn.

20       Q      Actually before that meeting,

21   the homicide squad had learned that Jerry

22   Steuerman owed Seymour Tankleff a

23   substantial amount of money, correct?

24       A      I believe, yes.

25       Q      And Jerry Steuerman's son, Todd,

1              McElhone

2    was an individual who was known to the

3    Suffolk County Police Department, correct?

4         MR. MITCHELL:  Just time, around

5      when?

6         MS. FREUDENBERGER:  Fair point.

7         MR. MITCHELL:  Back then?

8      Q     Well, prior to the meeting in

9    Mike Grunfast's office, in fact, Jerry

10   Steuerman's son, Todd, was an individual

11   known to the Suffolk County Police

12   Department?

13     A     Not to me individually, but I

14   knew he had a son, who had a problem, that

15   he was arrested once before.

16     Q     You knew he had a son with a

17   criminal record, correct?

18     A     Yes.

19     Q     And close in time to that

20   meeting at Mike Grunfast's office, the

21   police department received a tip that Todd

22   Steuerman was, in fact, dealing cocaine

23   out of his father's bagel store, correct?

24         MR. MITCHELL:  Object to the

25      form.

1                McElhone

2            You can answer.

3       A     I remember seeing that in my

4    review, but I don't remember it actually

5    happening at that point.

6       Q     But you don't dispute that

7    happening; you just don't remember

8    learning that information at the time?

9       A     No.

10           MR. MITCHELL:  I'm sorry, I

11      didn't hear your question.

12      Q     You don't dispute that

13   happening; you just don't remember

14   learning that information at the time as

15   you sit here today?

16           MR. MITCHELL:  Thank you.

17      Q     Correct?

18      A     Correct.

19           MS. FREUDENBERGER:  Let's go

20      ahead and mark the missing person's

21      file.

22           (Whereupon, Missing Person's

23      File, was marked as McElhone Exhibit

24      16 for identification, as of this

25      date.)

1              McElhone

2    BY MS. FREUDENBERGER:

3       Q     Maybe we can short circuit this.

4              You understood early on based

5    only on Marty Tankleff telling homicide

6    detectives that he believed Steuerman was

7    behind his father's murder, his family

8    members telling detectives they believed

9    Steuerman was behind his parents' murder,

10   and the fact that Steuerman owed Seymour

11   Tankleff a substantial amount of money,

12   that Steuerman was somebody who at a

13   minimum had to be considered and ruled out

14   as a suspect in the attacks on the

15   Tankleffs; would you agree?

16      A     No.

17      Q     No?

18      A     No.  I know he was offered up by

19   Martin right from the get-go.

20      Q     And the family members?

21      A     There was division in the

22   family.  Some didn't believe it was Marty

23   at all and some we're going along with why

24   don't you look at this guy.

25              And what was the third part of

1          McElhone

2    it?

3      Q      Third part was he owed money.

4      A      He owed money.  Obviously they

5    were business partners, they were involved

6    in business.  He owed him money.

7      Q      You understand from your career

8    as a detective and high ranking supervisor

9    that owing money is in some cases a motive

10   for murder, correct?

11     A      In some cases.

12     Q      And so just based on the

13   information the police had, not on the

14   information that was later developed, but

15   based on the information that the police

16   had, Steuerman at a minimum had to be

17   looked at and ruled out as a suspect,

18   correct?

19     A      I believe it had already

20   happened.

21     Q      So your understanding was that

22   Steuerman -- was that the homicide squad

23   did look at Steuerman and rule him out as

24   a suspect, correct?

25     A      That's correct.

1           McElhone

2      Q     That's what the detectives under

3   your command reported to you, correct?

4      A     Yes.

5      Q     That's what Sergeant Doyle

6   reported to you, correct?

7      A     Yes.

8      Q     I think the word in the report

9   was that Steuerman had been thoroughly

10  questioned and looked at and ruled out as

11  a suspect.

12          Is that in substance generally

13  what was reported to you?

14     A     He was at the card game.  He had

15  offered up an alibi that he had forgot his

16  keys, had to knock on his daughter's door

17  to let him in.  That was a very strong

18  alibi at that point.

19     Q     Do me a favor and listen to my

20  question carefully.

21          All I'm asking you right now is

22  that Doyle and others under your command

23  reported to you that homicide had looked

24  at Jerry Steuerman carefully and ruled him

25  out as a suspect, correct?

1            McElhone

2    A     At that point, yes.

3    Q     And they had done that

4  thoroughly, correct?

5    A     As thoroughly as it could be

6  done, yes.

7    Q     And so by the time that

8  Steuerman went missing, your understanding

9  from Sergeant Doyle and others in the

10  homicide squad was that the homicide squad

11  had thoroughly investigated Jerry

12  Steuerman as a suspect and determined that

13  he had not been involved in any way in the

14  Tankleff attacks, correct?

15    A     To that point, that was my

16  information, right.

17    Q     At that time when Jerry

18  Steuerman went missing, that's what Doyle

19  and others under your command had reported

20  to you, correct?

21    A     Correct.

22    Q     And obviously you trusted Doyle

23  that when he said homicide had thoroughly

24  investigated Steuerman as a suspect that,

25  in fact, it happened, correct?

Case 2:09-cv-01207-JS-AYS   Document 184-12   Filed 08/17/16   Page 169 of 318 PageID #: 3916

JOHN MCELHONE                                    October 30, 2014
MARTIN TANKLEFF vs. SUFFOLK COUNTY                          168

1              McElhone

2     A     That we had eliminated him as a

3    suspect.

4     Q     And investigated him thoroughly

5    before doing so, correct?

6     A     The word "thoroughly" is causing

7    me hesitation.  As well as could be

8    expected at that point.  It is a week

9    after the homicide at that point.  He

10   wasn't there that night other than the

11   card game.

12    Q     Of course it was a week after

13   the homicide, but obviously, if there is

14   somebody who has been named by some family

15   members of the deceased as a possible

16   player in the attacks, and you know that a

17   substantial amount of money is owed, which

18   in some circumstances can be a motive for

19   murder, you have to as thoroughly as is

20   feasible look at that person as a suspect,

21   correct?

22    A     Correct.

23    Q     And certainly that was true of

24   Jerry Steuerman under these circumstances,

25   correct?

Case 2:09-cv-01207-JS-AYS  Document 184-12  Filed 08/17/16  Page 170 of 318 PageID #: 3917

JOHN MCELHONE                                October 30, 2014
MARTIN TANKLEFF vs. SUFFOLK COUNTY                        169

1           McElhone

2    A    Correct.

3    Q    And the fact that Marty Tankleff

4  was under arrest doesn't change homicide's

5  obligation to thoroughly investigate other

6  suspects that come up, correct?

7    A    Again your word "thoroughly".  I

8  don't know how far you want to go with

9  that.

10   Q    As thoroughly as possible under

11 the circumstances.

12   A    Yes.

13   Q    In fact, I'm sure you're

14 familiar with the concept of tunnel

15 vision?

16   A    Television?

17   Q    Tunnel vision, yes.

18   A    Yes.

19   Q    Tell me what tunnel vision means

20 to you.

21        MR. MITCHELL:  Objection to the

22    form.

23        You can answer.

24   A    You have an theory and idea in

25 mind and you eliminate any other

1          McElhone

2    possibilities and you pursue that.

3       Q    And tunnel vision is a widely

4    understood concept in policing?

5       A    Absolutely.

6       Q    And it is very important and it

7    is an important principle in any homicide

8    investigation to avoid tunnel vision at

9    all costs, correct?

10      A    Correct.

11      Q    The last thing you want to do is

12   ignore important evidence because it

13   contradicts your working theory of a

14   crime, correct?

15      A    Correct.

16      Q    That's the sort of behavior that

17   can cause innocent people to be wrongly

18   convicted and guilty people to go free,

19   correct?

20          MR. MITCHELL:  Object to the

21      form.

22          You can answer.

23      A    That would be a big problem,

24   yes.

25      Q    And so for that reason and

Case 2:09-cv-01207-JS-AYS   Document 184-12   Filed 08/17/16   Page 172 of 318 PageID #: 3919

JOHN MCELHONE                                    October 30, 2014
MARTIN TANKLEFF vs. SUFFOLK COUNTY                              171

1          McElhone

2   others, it was important to investigate

3   Steuerman as a suspect as thoroughly as

4   possible notwithstanding Marty's arrest,

5   correct?

6          MR. MITCHELL:  Objection to the

7     form.

8          You can answer.

9     A    Yes.

10    Q    And you understood from Doyle

11  and others under your command that that

12  had happened prior to Steuerman even going

13  missing, correct?

14    A    Correct.

15    Q    And as the commander of the

16  homicide squad, it is not your

17  responsibility to go back and redo the

18  work that detectives and sergeants under

19  your command have already done, correct?

20    A    Correct.

21    Q    One of the reasons that the

22  chain of command works is that you rely on

23  the sergeants below you to make sure that

24  the detectives below them are doing their

25  work thoroughly and documenting it

```
1           McElhone
2   accurately, correct?
3     A    Correct.
4     Q    And so when I say "investigated
5   Steuerman as thoroughly as possible", I
6   take it you would agree that the
7   detectives and sergeant under your command
8   had an obligation to actually take
9   affirmative steps to investigate
10  Steuerman, correct?
11          MR. MITCHELL:  Object to the
12     form.
13          You can answer.
14    A    Yes.
15    Q    In other words, it would have
16  been improper to simply say, you know
17  what, the case against Marty looks pretty
18  good, I'm sure this guy didn't have
19  anything to do with it, and not do
20  anything affirmative to investigate him,
21  correct?
22          MR. MITCHELL:  Objection to the
23     form.
24          You can answer.
25    A    Correct.
```

1              McElhone

2      Q     It was important to question

3   Steuerman thoroughly, correct?

4      A     Yes.

5      Q     It was important to look into

6   Steuerman's finances, correct?

7      A     At some point.

8      Q     It was important to look at

9   Steuerman's close family members and

10   associates, particularly after the

11   information about Todd came to light,

12   correct?

13          MR. MITCHELL:  Objection to

14     form.

15          You can answer.

16     A     I don't know how far we would go

17   with that, but there would be something

18   out there.

19     Q     Something that homicide would

20   have to look at, correct?

21     A     To a degree.

22     Q     To some degree, correct?

23     A     To some degree.

24     Q     And certainly given Todd

25   Steuerman's criminal record and --

1           McElhone

2           MS. FREUDENBERGER:  Withdrawn.

3      Q    Let's actually take a look at --

4  if you would, do you see the numbers on

5  the bottom right-hand corner of that

6  document?

7      A    Yes.

8      Q    If you would just take a look at

9  page SCDA3203.

10     A    I have AGs here.  What is it?

11     Q    All right.  If you don't mind, I

12  can find it just very easily.

13          So I'm going to direct your

14  attention to the entry dated 9-22-88 on

15  page AG5380 of the marked copy, and it is

16  the highlighted paragraph starting

17  "Anonymous male caller".

18          Let me know when you have read

19  that.

20     A    Okay.

21          (Witness reviewing document)

22          Okay.

23     Q    So given this -- assuming that

24  homicide did receive this tip as it is

25  reflected on this document, obviously for

Case 2:09-cv-01207-JS-AYS   Document 184-12   Filed 08/17/16   Page 176 of 318 PageID #: 3923

JOHN MCELHONE                                    October 30, 2014
MARTIN TANKLEFF vs. SUFFOLK COUNTY                           175

1              McElhone

2    ten different reasons, Jerry Steuerman's

3    connections with his son Todd are

4    something that would have to be at a

5    minimum looked into by homicide before

6    Steuerman is ruled out as a suspect,

7    correct?

8        A    This is a call that was in

9    response to the missing person's report,

10   but it was forwarded to Sergeant Pepper of

11   homicide.  It would have been passed to

12   Doyle and he would have looked at it, yes.

13       Q    And you expected that this tip

14   would be looked into carefully given the

15   seriousness of allegations there, correct?

16       A    Again, it is an anonymous call.

17   It is information that Todd was arrested

18   for drug use and drug dealing or whatever,

19   and it would be something else to discuss

20   a missing person case.

21       Q    Well, just to be clear, I'm not

22   talking about the missing person's case.

23   I'm talking about the thorough

24   investigation that had to be done to rule

25   Steuerman out as a suspect.

1          McElhone

2          This doesn't say that Todd had a

3    record for dealing cocaine.  It states

4    that his father was there with him,

5    correct, that he had a very tight

6    relationship with his father, and that

7    their last business venture they were

8    working on together was a whorehouse,

9    correct?

10   A     That's what it says here, yes.

11   Q     And so no doubt in your mind

12   that this is -- the information contained

13   in this tip had to be thoroughly

14   investigated in connection with ruling

15   Steuerman out as a suspect, correct?

16         MR. MITCHELL:  Objection to the

17     form.

18         You can answer.

19   A     It has to be looked at

20   obviously, yes.

21   Q     And if this information -- you

22   mentioned that maybe this was information

23   that the police department already had.

24   If homicide had not already had this

25   information, you would expect them to look

1              McElhone

2   at it carefully and reconsider whether

3   Steuerman should be treated as a suspect

4   notwithstanding the results of the earlier

5   investigation, correct?

6          MR. MITCHELL:  Object to the

7     form.

8          You can answer.

9     A    It would be is there enough

10  there to overcome what originally you

11  ruled him out as a suspect, his alibi.

12    Q     You would have to look at

13  whether this situation had overcame what

14  had ruled him out as a suspect?

15    A     It could be background on what

16  we're dealing with.

17    Q     It could be, in other words,

18  this could be important for a lot of

19  different reasons, correct?

20    A     Yes.

21    Q     And one reason it could be

22  important is that it required detectives

23  to look at it and reconsider whether

24  Steuerman should be treated as a suspect.

25          Fair to say?

1              McElhone

2         MR. MITCHELL:  I object to the

3      form.

4         You can answer.

5    A    I don't know if there is enough

6   information there to overcome the

7   original.

8         MS. FREUDENBERGER:  Brian, can

9      you stop looking at that for a second?

10      We just inadvertently marked the wrong

11      copy of the document.  I apologize.

12         MR. MITCHELL:  Okay.  I didn't

13      see anything good.

14         (Witness reviewing document)

15    Q    You have now looked at the

16   document.  I can read it to you if we need

17   to.

18         In other words, even though --

19   even after your Sergeant had reported to

20   you that Steuerman had been thoroughly

21   investigated and ruled out as a suspect,

22   this anonymous tip from your perspective

23   was important for homicide to investigate

24   for several reasons, including that if the

25   information had panned out, it could be

Case 2:09-cv-01207-JS-AYS Document 184-12 Filed 08/17/16 Page 180 of 318 PageID #: 3927

JOHN MCELHONE                                      October 30, 2014
MARTIN TANKLEFF vs. SUFFOLK COUNTY                      179

1          McElhone

2    cause for reconsidering whether Steuerman

3    was ruled out as a suspect, correct?

4          MR. MITCHELL:  I object to the

5      form.

6          You can answer.

7      A    It is something that would have

8    to be addressed, have to be looked at.

9      Q    Notwithstanding the fact that

10   Steuerman had already been ruled out as a

11   suspect, correct?

12     A    Right.

13     Q    And, again, I gather Doyle

14   reported to you that that did, in fact,

15   happen?

16     A    I don't recall.

17     Q    But certainly this tip isn't the

18   kind of thing that you would let go.

19   Somebody below you in the chain of command

20   must have reported to you that this

21   information was investigated, correct?

22     A    Not to me directly.  It would

23   have been reported to Sergeant Doyle we

24   looked at that.

25     Q    And Doyle would have informed

JOHN MCELHONE                                    October 30, 2014
MARTIN TANKLEFF vs. SUFFOLK COUNTY                          180

1           McElhone

2   you that this had been looked into?

3      A    If it was germane.  To me, an

4   anonymous caller on a well-publicized case

5   for anybody in the world to see said could

6   have been the bagel guy, you know, it

7   didn't really -- it wasn't hard evidence

8   there that would have caused me a lot of

9   problems with it.

10     Q    You already said it would have

11  had to be investigated?

12     A    Yes.

13     Q    All I'm asking you now is:  You

14  must have had some assurance from somebody

15  below you at the time that it was, in

16  fact, looked at?

17     A    Okay, yes.

18     Q    And if you found out that, in

19  fact -- I'm not suggesting you did -- but

20  if you found out that, in fact, Steuerman

21  had never been considered as a suspect --

22         MS. FREUDENBERGER:  Withdrawn.

23     Q    If it came to your attention in

24  the course of this homicide investigation

25  that --

1          McElhone

2          MS. FREUDENBERGER:  Withdrawn.

3     Q     If it came to your attention

4   that, in fact, the reports you were

5   getting from those below you in the chain

6   of command that Steuerman had been

7   thoroughly investigated and ruled out as a

8   suspect were false, and, in fact, homicide

9   had never considered Steuerman as a

10  suspect, that is a fact I take it that

11  would cause you great concern, correct?

12         MR. MITCHELL:  Object to the

13     form.

14         You can answer.

15    A     I would be concerned that you

16  could rule out anybody in that early stage

17  of the investigation.

18    Q     Particularly anybody whom you

19  knew had been named as a possible suspect

20  by some family members and --

21    A     By the defendant.

22    Q     And some family members?

23    A     Okay.  Some of them, not

24  directly to me, but I had read some --

25    Q     Well, you knew, as you already

1              McElhone

2    told me, that some of Marty Tankleff's

3    family members had reported to the police

4    that Jerry Steuerman was behind the

5    murders, correct; you did know that?

6        A    Yes, published reports.  Nothing

7    evidentiary.

8        Q    You learned that information

9    from some sources, correct?

10       A    Correct.

11       Q    So given that information, given

12   that Steuerman owed Seymour Tankleff a

13   substantial amount of money, and given the

14   information known to the police about Todd

15   Steuerman's connection to serious crime,

16   you would agree that if your sergeant and

17   the detectives below him were reporting to

18   you that they had looked at this

19   individual and never considered him

20   whether he was a suspect or not, or never

21   looked into him as a suspect, that would

22   cause you great concern, correct?

23       A    I would be concerned, yes.

24       Q    And just to be crystal clear, it

25   was reported to you from those below you

1           McElhone

2    in the chain of command that Jerry

3    Steuerman had been considered as a suspect

4    and ruled out on the attacks on the

5    Tankleffs, correct?

6           MR. MITCHELL:  I object to the

7       form.

8           You can answer.

9    A    Yes.

10          MS. FREUDENBERGER:  The food is

11      here so let's take a break.

12          (Thereupon, a recess was taken,

13       and then the proceedings continued as

14       follows:)

15    A F T E R N O O N   S E S S I O N

16       (Time noted:   2:31 p.m.)

17    J-O-H-N   M-c-E-L-H-O-N-E, resumed and

18       testified as follows:

19    EXAMINATION BY (Cont'd.)

20    MS. FREUDENBERGER:

21    Q    Chief McElhone, you assumed

22    command of the homicide squad in February

23    of 1987; is that right?

24    A    Yes, correct.

25    Q    And as commander of the homicide

1              McElhone

2    squad, you had a number of administrative

3    responsibilities in addition to your

4    participation in active homicide

5    investigations, correct?

6       A    Yes.

7       Q    And my guess, correct me if I'm

8    wrong, is that those administrative

9    responsibilities took up even more time

10   given the relative turmoil that department

11   had been in prior to you assuming command

12   of the unit.

13           Would that be fair to say?

14           MR. MITCHELL:  Objection to

15      form.

16           You can answer.

17      A    I don't think it was an

18   inordinate amount of time.

19      Q    But a new chief came in in

20   January of '88?

21      A    New commissioner.

22      Q    New commissioner?

23      A    And a new chief, yes, you're

24   right.

25      Q    So there was some significant

1           McElhone

2    turnover in the higher branches of the

3    police department early on in your tenure,

4    correct?

5        A     Well, it would have been about a

6    year into it.

7        Q     So shortly before the Tankleff

8    murders, there was a new commissioner

9    coming in, a new chief coming in, and you

10   yourself were relatively new, correct?

11          MR. MITCHELL:  Objection to the

12      form.

13          You can answer.

14       A     At that point, I had been there

15   nine months, and by the time the Tankleff

16   case came in, I would have been there a

17   year-and-a-half.

18       Q     And so was there work you were

19   involved in to facilitate the transition

20   in leadership that were going on?

21       A     Not really, no.

22       Q     What about the SIC hearings, did

23   the public hearings start shortly after

24   Marty's arrest?

25       A     They were before.

1              McElhone

2      Q     The public hearings too?

3      A     Yes.  1986, I believe.

4      Q     Was there still -- I think the

5   dates -- I'll represent to you that the

6   dates as we have them are January 20 and

7   29th of 1987, and January 13th and 14th of

8   1988.

9           Does that sound plausible to

10  you?

11     A     I don't remember 1988, but I

12  guess so.

13          MR. MITCHELL:  If you don't

14     know, don't guess.

15     Q     Was there still fallout from

16  those hearings going on at the time of the

17  Tankleff investigation?

18          MR. MITCHELL:  Object to the

19     form.

20          You can answer.

21     A     Not within the homicide squad.

22     Q     So there was no work for you to

23  be doing in connection with the SIC

24  hearings at that time?

25     A     No.

Case 2:09-cv-01207-JS-AYS   Document 184-12   Filed 08/17/16   Page 188 of 318 PageID #: 3935

JOHN MCELHONE                                          October 30, 2014
MARTIN TANKLEFF vs. SUFFOLK COUNTY                                  187

1          McElhone

2      Q     And you mentioned that there

3   were a number of high profile, other high

4   profile cases that you were involved in

5   prior to Marty's case.

6          Was the angel of death

7   investigation one that you referred to?

8      A     Yes.

9      Q     And that was -- that

10  investigation was still going on by

11  September of 1988, wasn't it?

12     A     Yes.

13     Q     And did that take up a portion

14  of your time?

15     A     Oh, sure.

16     Q     A relatively substantial portion

17  of your time?

18     A     I had to bring in a couple of

19  extra detectives just to work on that

20  case.

21     Q     And you were even more activity

22  involved in that case than you were in the

23  Tankleff homicide case?

24     A     No, that's not right.  Actually,

25  when they made the arrest of Richard

Case 2:09-cv-01207-JS-AYS   Document 184-12   Filed 08/17/16   Page 189 of 318 PageID #: 3936

JOHN MCELHONE                                    October 30, 2014
MARTIN TANKLEFF vs. SUFFOLK COUNTY                          188

1              McElhone

2    Angelo, I was at the FBI Academy.  When I

3    came home, we were going to the point of

4    discovering other bodies, basically

5    exhuming people that he might have

6    injected and killed.

7        Q     But you were involved in that

8    while the Tankleff investigation was going

9    on?

10       A     Yes.

11       Q     And there were other homicide

12   investigations going on parallel to the

13   Tankleff investigation that you had

14   supervisory responsibilities in connection

15   with, correct?

16       A     Yes.

17       Q     So in other words, on like

18   Sargeant Doyle, you didn't have the time

19   to supervise the day-to-day of this

20   investigation, correct?

21       A     Correct.

22       Q     And that wasn't your role,

23   correct?

24       A     No.

25       Q     Other than administrative

1             McElhone

2   responsibilities and some responsibilities

3   in connection with active homicide

4   investigations, tell me what your other

5   responsibilities as commander of the

6   homicide squad were.

7       A     An overall command of all of the

8   people assigned.  That includes discipline

9   and what team they were in, monitoring

10  overtime, the expenses, equipment that was

11  assigned to the homicide squad.

12      Q     So you had personnel

13  responsibilities, correct?

14      A     Yes.  I guess I was the primary

15  liaison between the District Attorney's

16  homicide bureau and the homicide squad,

17  also with the medical examiner,

18  Dr. Hirsch, and the lab, Vin Crispino was

19  the head of the lab.  I would be the

20  primary liaison with that.

21            We touched on press relations

22  early on.  I would be dealing with press

23  inquiries pretty much exclusively unless

24  it was post-arraignment like we said

25  earlier.

JOHN MCELHONE                                         October 30, 2014
MARTIN TANKLEFF vs. SUFFOLK COUNTY                    190

1          McElhone

2          Keep the chief and the

3    commissioner appraised of activities and

4    significant happenings in the homicide

5    squad.  Also with the sergeants on the

6    individual cases, review their cases,

7    review their paperwork, discuss with them

8    tactical things, how we might approach

9    this case or that case.

10         Q     So although you were available

11   as a resource to sergeants and had

12   supervisory responsibility in individual

13   cases, your actual involvement in the

14   investigation of particular homicides was

15   by design rather limited, correct?

16         A     Yes.  Oversight.

17         Q     And would it be fair to say with

18   a sergeant like Doyle, whom you knew and

19   trusted, you made sure he was keeping you

20   informed of all the critical developments

21   you were aware of, but when it came to the

22   nitty-gritty of the day-to-day, you waited

23   for him to come to you?

24         A     That would be a fair assessment.

25         Q     And you understood that he would

JOHN MCELHONE                                      October 30, 2014
MARTIN TANKLEFF vs. SUFFOLK COUNTY                           191

1            McElhone

2    do so if anything significant transpired

3    in the investigation that you needed to be

4    made aware of, correct?

5      A    Correct.

6      Q    In other words, you trusted

7    Doyle to do that?

8      A    Absolutely.

9      Q    On this investigation as on all

10   others, correct?

11     A    Yes.

12     Q    On the Tankleff investigation,

13   Doyle had direct supervisory authority

14   over the detectives working on the case,

15   correct?

16     A    Correct.

17     Q    He had obligation to sign off on

18   their reports, correct?

19     A    Correct.

20     Q    When signing off, I'm going by

21   what I know from other police departments,

22   correct me if I'm wrong, when a sergeant

23   signs off on a detective's report, he is

24   signing off on the fact that the

25   information contained in the report is to

1              McElhone

2     the best of his knowledge complete and

3     accurate, correct?

4              MR. MITCHELL:  Object to the

5        form.

6              You can answer.

7        A     Correct.

8        Q     So in other words, in signing

9     his name to another detective's report,

10    Doyle was verifying that he had spoken

11    with that detective, correct?

12       A     Not necessarily, but it would

13    be -- that it was correct and accurate as

14    I said earlier.

15       Q     And complete too, in other

16    words, he was verifying that all of the

17    information that detectives had --

18             MS. FREUDENBERGER:  Withdrawn.

19       Q     Let's just talk about a report

20    of an interview.

21             If Doyle was signing off in this

22    case on a report of an interview, by

23    signing off on the report authored by one

24    of the detectives, Doyle was verifying

25    that he -- that the report contained all

1              McElhone

2    of the pertinent information gathered from

3    that interview, correct?

4        A    Correct.

5        Q    I mean he had an obligation to

6    determine, in fact, before he would sign

7    that report that the report did contain

8    all the pertinent information from that

9    interview, correct?

10       A    Correct.

11       Q    And you trusted him to do that

12   without you going back and talking to

13   detectives and checking their notes and

14   things like that, correct?

15       A    Exactly.

16       Q    It sounded earlier, and correct

17   me if I'm wrong, that you are pretty sure

18   as you sit here today that Jerry Steuerman

19   was not involved in the attacks on the

20   Tankleffs; is that right, or are you not

21   sure?

22       A    No, I'm sure that he was not.

23       Q    So other than your -- other than

24   the reports that you received from those

25   below you in the chain of command that

1              McElhone

2    they investigated Steuerman as a suspect

3    and ruled him out, tell me the other

4    reasons that you believe Steuerman was not

5    involved.

6       A     He was on the stand for three

7    days, cross examined vigorously.  There

8    was nothing that ever came out of that

9    that differed from what we understood and

10   what we had verified during our

11   investigation.

12      Q     But he wasn't obviously a

13   defendant in the case when he was on the

14   stand, correct?

15      A     No.

16      Q     And Marty Tankleff's criminal

17   defense lawyer didn't have all the

18   resources that a district attorney or a

19   police department has to conduct

20   investigations, correct?

21           MR. MITCHELL:  Objection to

22      form.

23           You can answer.

24      A     I don't know if that is correct

25   or not, whatever he had and whatever he

1            McElhone

2    needed as far as resources.

3        Q     Well, for example, criminal

4    defense attorneys don't have subpoena

5    power, correct?

6            MR. MITCHELL:  Objection to the

7        form.

8            You can answer if you know.

9        A    I don't know.

10       Q     You don't know whether criminal

11   defense attorneys have subpoena power?

12       A    I thought they did.

13       Q     In criminal cases, okay.

14           They don't have the power to

15   offer witnesses plea deals, correct?

16       A    Correct.

17       Q     Or cooperation agreements,

18   correct?

19       A    Correct.

20       Q     So one reason that you don't

21   believe that Steuerman was involved in the

22   crime is because you didn't feel that he

23   was proven -- that any involvement on his

24   part was proven in the three days he was

25   on the stand in Marty's trial, correct?

1          McElhone

2          MR. MITCHELL:  Objection to the

3      form.

4          You can answer.

5      A      That was in addition to what you

6   asked me earlier.  When we ruled him out

7   in the homicide squad through his alibi

8   and through other discussions that we had

9   with him, through finding him in

10   California, spending two days with him

11   where they were bringing him home, he was

12   thoroughly investigated.

13      Q      And so when you say "we", you're

14   referring to work that the homicide squad

15   did, correct?

16      A      Yes.

17      Q      Not work you were necessarily

18   individually involved in?

19      A      I was CO, so I was kept up to

20   date.

21      Q      Primarily by Sargeant Doyle,

22   correct?

23      A      Correct.

24      Q      And so it sounds like the

25   primary reason you don't believe Jerry

1              McElhone

2    Steuerman was involved was because of the

3    reports you were getting from Sargeant

4    Doyle about the investigative work that he

5    and others developed to rule Steuerman out

6    as a suspect, correct?

7       A     That's part of it.  But also

8    there was the crime scene itself.  The

9    confession.

10      Q     I --

11            MR. MITCHELL:  Let him finish

12      his answer.  He wasn't done and then

13      you can go one by one.

14            MS. FREUDENBERGER:  I want to

15      take them one by one.

16            MR. MITCHELL:  That's fine.

17      Continue your answer.

18      Q     Are you still answering the

19   question?

20      A     Yes, I understand.  It was also

21   what we were able to ascertain from the

22   crime scene investigation, from the

23   confession, from the blood evidence,

24   through the totality of the case,

25   Steuerman wasn't there.

1          McElhone

2     Q     So now let's go back and go

3   through one by one the reasons that you

4   have just given me.

5          One reason that you have given

6   me is the crime scene.  What about the

7   crime scene causes you to believe that

8   Steuerman was not involved in the Tankleff

9   homicides?

10    A     It was the type of scene that

11  you wouldn't expect a stranger to come in

12  and commit the murders.  He was there

13  until 3 o'clock.  According to other

14  people, friends if you will, that they

15  were cordially playing a card game.  He

16  left.  He was alibied by his daughter

17  coming home at 3:15, and the crime scene

18  had to happen after that.

19          There was the blood evidence.

20  It was the inconsistency of Marty's

21  statements.

22    Q     Let's stick with the crime scene

23  for a second.

24          You said it is the kind of scene

25  that you didn't expect a stranger to come

1          McElhone

2    into.

3          Jerry Steuerman wasn't a

4    stranger of the Tankleffs obviously.  He

5    was in their house at 3 a.m.

6      A     Yes.

7      Q     So what is it about not

8    expecting a stranger in the crime scene

9    that leads to you believe that Jerry

10   Steuerman wasn't involved?

11     A     He was already home at 3:15,

12   when probably anywhere between there and

13   6:11 I think it is that the police are

14   called that the crime happened, so he

15   wouldn't be there.  The door I believe was

16   unlocked.  There was no forced entry.

17   There was nothing taken from the crime

18   scene.  There was no burglary.

19     Q     Well, wouldn't all of those

20   facts suggest that it was somebody that

21   was known to the Tankleffs?

22     A     Probably a family member who was

23   undisturbed during this terrible attack.

24     Q     Or Jerry Steuerman who had been

25   there at 3 o'clock that morning and was

```
 1              McElhone
 2    last to leave the house, correct?
 3         MR. MITCHELL:  Objection to the
 4      form.
 5           You can answer?
 6      A     What would that do for him?
 7    Because he was in the house?
 8      Q     You've told me the fact that the
 9    door was unlocked and it didn't appear
10    like a stranger had come into the home
11    suggest to you that Jerry Steuerman wasn't
12    involved.  And Jerry Steuerman wasn't a
13    stranger.  He was there at 3 o'clock in
14    the morning that morning, so I'm confused
15    about what about the crime scene suggested
16    to you that Steuerman wasn't involved?
17      A     It didn't indicate -- it
18    indicated to me that there was somebody
19    inside the house and we knew Jerry
20    Steuerman had gone home.  So that's the
21    one point I was making on that.
22      Q     Couldn't Jerry Steuerman have
23    left the door unlocked when he left?
24         MR. MITCHELL:  Objection to the
25      form.
```

Case 2:09-cv-01207-JS-AYS  Document 184-12  Filed 08/17/16  Page 202 of 318 PageID #: 3949

JOHN MCELHONE                                    October 30, 2014
MARTIN TANKLEFF vs. SUFFOLK COUNTY                            201

1          McElhone

2        You can answer.

3    A     Possibly.

4    Q     And the way you knew Jerry

5  Steuerman had gone home was because of his

6  alibi?

7    A    Right.

8    Q     And his alibi was his daughter?

9    A    Right.  And before that, I think

10  the people at the card game said they had

11  all left together, and he was the last one

12  to leave with the next to last person.

13    Q     So it sounds like you said two

14  different things there:  That the people

15  at the card game said he was the last to

16  leave and some said he was the next to

17  last to leave?

18    A     I think it was the next to last

19  guy said he and Jerry were the last to

20  leave, and shortly thereafter his daughter

21  provided that alibi that he had to knock

22  on the door to get in.

23    Q     The guy that said he was the

24  last to leave said that Jerry was still

25  there?

Case 2:09-cv-01207-JS-AYS   Document 184-12   Filed 08/17/16   Page 203 of 318 PageID #: 3950

JOHN MCELHONE                                    October 30, 2014
MARTIN TANKLEFF vs. SUFFOLK COUNTY                          202

1              McElhone

2      A     I thought they were leaving

3   almost together, that Jerry was right

4   behind him.

5      Q     So in your mind, Jerry's alibi

6   was corroborated by the fact that somebody

7   had seen him leave the card game; is that

8   correct?

9      A     That was his alibi and finished

10  up with his daughter saying he arrived 10

11  or 15 minutes later.

12     Q     And certainly in the course of

13  your career as a detective and supervisor,

14  you would agree that people sometimes get

15  their family members as false alibis,

16  would you not?

17     A     Yes.

18     Q     And Jerry Steuerman's alibi,

19  part of his alibi was his daughter Bari,

20  correct?

21     A     Correct.

22     Q     So if you learned, in fact, that

23  none of the other card players had seen

24  Jerry Steuerman leave the Tankleffs' house

25  and drive away that night, that might have

Case 2:09-cv-01207-JS-AYS   Document 184-12   Filed 08/17/16   Page 204 of 318 PageID #: 3951

JOHN MCELHONE                                          October 30, 2014
MARTIN TANKLEFF vs. SUFFOLK COUNTY                                  203

1          McElhone

2    caused you to -- that would cause you to

3    question his daughter's alibi; is that

4    correct?

5          MR. MITCHELL:  Object to the

6     form.

7          You can answer.

8     A     It wouldn't have been a major

9    question.  Everybody agreed that it was

10    around 3 o'clock that the game broke up,

11    and his daughter remembers him knocking on

12    the door around a quarter after.

13    Q     So what made you convinced that

14    the daughter's alibi was reliable?

15    A     The detectives that interviewed

16    her, and it was almost immediately, it was

17    the next day that they talked him.

18    Q     If I committed a crime and I was

19    going to get a family member to provide a

20    false alibi, presumably I would coordinate

21    with them so we would have the same story?

22          MR. MITCHELL:  Objection to the

23     form.

24          You can answer.

25    A     Yes.

Case 2:09-cv-01207-JS-AYS  Document 184-12  Filed 08/17/16  Page 205 of 318 PageID #: 3952

JOHN MCELHONE                                    October 30, 2014
MARTIN TANKLEFF vs. SUFFOLK COUNTY                          204

1              McElhone

2     Q    That's sort of how it works?

3     A    In your scenario, that's how it

4  works.

5     Q    It's not just my scenario.

6  You're familiar from your decorated career

7  as a police officer that suspects often

8  get family members to provide false

9  alibis.  So in those situations, you would

10  expect them to coordinate their false

11  alibi with a family member, correct?

12         MR. MITCHELL:  Objection to the

13    form.

14         You can answer.

15     A    If that was the case, yes.

16     Q    In other words, the fact that

17  Jerry Steuerman's story was consistent

18  with his daughter's story is not

19  sufficient to give you confidence that his

20  daughter's alibi is credible, correct?

21         MR. MITCHELL:  Objection to the

22    form.

23         You can answer.

24     A    I was satisfied that the alibi

25  was correct, and it didn't match with what

1          McElhone

2    we were looking at at the crime scene.

3        Q     So tell me then how it -- and

4    before we do, you didn't interview Bari

5    Steuerman about the alibi, did you?

6        A     No.

7        Q     And you didn't interview Jerry

8    Steuerman about the alibi, right?

9        A     No.

10       Q     You were relying on information

11   reported up the chain of command that made

12   its way to you, correct?

13       A     Right.

14       Q     You were relying again on

15   determinations that the detectives below

16   you had made, not on personal assessments,

17   correct?

18       A     Yes.

19       Q     What is it about the crime scene

20   that didn't match Jerry Steuerman?

21       A     They matched what Marty Tankleff

22   had told detectives either in the

23   interview or in the statement.  That he

24   had woke up, turned on the light, however

25   he had blood on that light switch.  All

```
 1              McElhone
 2   the physical evidence that was involved.
 3   He had used the telephone when he found
 4   his father, and the telephone had blood
 5   spatter on it, and the wire to the
 6   telephone had blood spatter on it
 7   indicating it was never touched.
 8          So there was enough evidence
 9   showing there was a big problem with
10   Marty's version of the story until he
11   ultimately confessed to what he had done
12   which further solidified any suspicion you
13   might have had on Steuerman at that time.
14   Q    All right.
15          So first detectives believed
16   that some of the evidence that they
17   observed at the crime scene contradicted
18   the story that Marty gave them initially,
19   correct?
20   A    Correct.
21   Q    Once Marty confessed, he
22   confessed in ways that matched what
23   detectives had seen at the crime scene
24   that morning, correct?
25   A    No.  There was a big problem
```

Case 2:09-cv-01207-JS-AYS   Document 184-12   Filed 08/17/16   Page 208 of 318 PageID #: 3955

JOHN MCELHONE                                    October 30, 2014
MARTIN TANKLEFF vs. SUFFOLK COUNTY                            207

1              McElhone

2     with that.  He was talking about using the

3     telephone.

4        Q     No, no, I'm not being clear.

5              I'm talking about once McCready

6     and Ryan finally got the confession, Marty

7     described committing the crimes in ways

8     that were consistent with what McCready

9     and Ryan had already observed at the crime

10    scene that morning, correct?

11       A     I don't know that Ryan observed

12    anything.

13       Q     You're right.

14       A     McCready I believe made a

15    cursory observation.

16       Q     But McCready reported to you

17    that the details that Marty was

18    volunteering in the course of giving the

19    confession were consistent with what he

20    had seen at the crime scene, correct?

21       A     Yes.

22       Q     And you had observed some

23    evidence yourself as well, correct?

24       A     Later on in the day I was in the

25    house, if that's what you're talking

1            McElhone

2   about.

3       Q     In other words, it was

4   important -- it was important to the

5   detectives --

6          MS. FREUDENBERGER:  Well,

7    withdrawn.

8       Q     I understand your answer whether

9   Ryan was ever at the crime scene, so we'll

10   just stick with McCready.

11          One of the things that convinced

12   you that Marty's confession was reliable

13   was that McCready reported to you that the

14   way that Marty was describing committing

15   the crimes was corroborated by what

16   McCready had seen in the house that

17   morning.

18          Fair to say?

19       A     Are you at the confession point?

20       Q     I'm at the confession point,

21   yes.

22       A     Parts of it, yes.

23       Q     For example, Marty described

24   bludgeoning his father with a barbell,

25   correct?

1            McElhone

2    A    Yes.

3    Q    And McCready reported to you

4  that he had seen a barbell in Marty's

5  room?

6    A    He didn't report that to me.

7    Q    But there were other details in

8  the confession that McCready did relate to

9  you that were consistent with what was in

10 the house that morning?

11   A    I think it was more reviewing a

12 supplementary report at that time and

13 since then.  He recounted the blood on the

14 light switch, the blood on the telephone,

15 et cetera.

16   Q    Now I think we're talking past

17 each other again.

18        It sounds like there are two

19 things that were important to you about

20 the crime scene.  One is the

21 contradictions --

22        MS. FREUDENBERGER:  Well,

23    withdrawn.

24   Q    So Marty told two stories to the

25 police, right?

1              McElhone

2    A    Correct.

3    Q    First he told the story that

4    morning in which he denied committing the

5    crimes, correct?

6    A    I believe he was throwing it all

7    on Mr. Steuerman at that point.

8    Q    So when Marty gave his first

9    account to police that morning, he

10   described waking up and unexpectedly

11   finding his parents dead, correct?

12   A    In sum and substance, yes.

13   Q    Some of the information that's

14   seen in the house contradicted Marty's

15   story, correct?

16   A    Correct.

17   Q    But then -- and the fact that

18   there were contradictions between Marty's

19   story and what detectives had seen in the

20   house indicated to those members of the

21   homicide squad who were present and

22   discussing it that Marty's story was not

23   reliable, correct?

24   A    Yes.

25   Q    But then subsequently when Marty

1          McElhone

2   admitted to committing the crimes and

3   described committing them, the converse

4   was true, right:  He was describing an

5   account that was consistent with what

6   detectives had seen in the house, correct?

7       A    Yes.

8       Q    And that's what indicated to the

9   detectives that Marty's story was

10  reliable, correct?

11      A    Correct.

12      Q    Because if Marty had given

13  another story admitting to the crimes and

14  that story didn't match up with what

15  detectives had seen in the house, then he

16  wouldn't necessarily have been arrested,

17  correct?  Or at least you would have had

18  to continue investigating?

19      A    Yes, we would have continued

20  investigating.  At that point, we were

21  precluded when we were put on notice,

22  there was certainly areas that we would

23  have liked to explore further.

24      Q    Of course.  And there are always

25  areas that you want to explore further,

```
 1              McElhone

 2   correct?

 3      A     Correct.

 4      Q     There was enough by the time --

 5   the detectives came back from

 6   interrogation, they had enough by the time

 7   that they were precluded from questioning

 8   Marty further, that was consistent with

 9   what they had seen at the scene to justify

10   relying on the confession and going

11   forward with Marty's arrest, correct?

12      A     Along with all of the other

13   physical evidence.

14      Q     Along with all of the other

15   evidence, correct?

16      A     All the physical evidence.

17      Q     Correct?

18      A     Yes.

19      Q     So you mentioned that one of the

20   ways that Marty's first story was --

21         MS. FREUDENBERGER:  Withdrawn.

22      Q     One of the details in Marty's

23   first story that the detectives believed

24   was contradicted by the crime scene was

25   that he described calling 911 from the
```

1             McElhone

2    phone in his father's office, correct?

3       A    Yes.

4       Q    And the detectives believed that

5    the blood on the phone cord would have

6    looked different if Marty had, in fact,

7    placed that call from his father's office,

8    correct?

9       A    Correct.

10      Q    And another detail in Marty's

11   first story that was contradicted by what

12   detectives observed at the crime scene was

13   the absence of blood on Marty, correct?

14      A    That was, yeah.

15      Q    And the absence of blood on the

16   door knob to the garage door where Marty

17   claimed to have gone to check and see if

18   his mother's car was there also was

19   contradicted by what the detectives had

20   seen at the crime scene?

21      A    Yes, there was no blood on it.

22      Q    And the detectives believed that

23   the absence of blood on that door

24   contradicted Marty's story, correct?

25      A    Yes.

1              McElhone

2       Q     And those contradictions and

3   others between what was observed at the

4   scene and what Marty was telling the

5   detectives are what indicated to the

6   detectives that Marty's story wasn't

7   truthful, correct?

8       A     Correct.

9       Q     And by contrast, when Marty gave

10  his confession later that day, he

11  described details that were consistent

12  with the evidence at the crime scene,

13  correct?

14      A     Yes.

15      Q     He described -- well, he

16  described using a knife next to the

17  watermelon on the kitchen counter,

18  correct?

19      A     Correct.

20      Q     And detectives had, in fact,

21  observed a knife next to the watermelon on

22  the kitchen counter, correct?

23      A     Yes.

24      Q     And, in fact, that knife

25  actually had what was later determined to

Case 2:09-cv-01207-JS-AYS Document 184-12 Filed 08/17/16 Page 216 of 318 PageID #: 3963

JOHN MCELHONE                                    October 30, 2014
MARTIN TANKLEFF vs. SUFFOLK COUNTY                          215

1            McElhone

2   be watermelon, a pinkish substance visible

3   on it, correct?

4       A    I guess so.

5            MR. MITCHELL:  Do you know?  It

6   is a figure of speech.  If you know,

7   say it.  If you don't, don't.

8       A    No.

9       Q    You do know that when McCready

10  and others went into the house on the

11  morning of September 7th, they saw a knife

12  next to a watermelon with a pinkish

13  substance on it, correct?

14      A    Yes.

15      Q    And Marty described using a

16  barbell to bludgeon his parents.  And

17  whether McCready told you he had seen it

18  or not, there was a barbell clearly

19  visible in Marty's room, correct?

20      A    Yes.

21      Q    And Marty described in the

22  confession showering off the blood on him

23  and on the murder weapons, correct?

24      A    I don't recall if that was in

25  the confession.

1          McElhone

2     Q     And also Marty described a

3  struggle with his mother, which was

4  consistent with what the detectives at the

5  crime scene that morning believed the

6  scene in the mother's bedroom showed,

7  correct?

8     A     I don't know.

9     Q     Let's take a look at Doyle's

10  testimony on that.  Let's look at page --

11  take a look, if you would, at page 127 of

12  Robert Doyle's December 8, 2011

13  deposition, line 17 through 129, line 5.

14          (Whereupon, Deposition

15      Transcript of Robert Doyle, December

16      8, 201, was marked as McElhone Exhibit

17      17 for identification, as of this

18      date.)

19  BY MS. FREUDENBERGER:

20     Q     By the way, you got to the crime

21  scene on the 7th of September just before

22  McCready left with Marty to go to police

23  headquarters, correct?

24     A     I believe so.

25     Q     And you were briefed by Doyle

```
 1              McElhone
 2   when you got there?
 3      A     Yes.
 4      Q     And then you continued -- at
 5   some point, you did a walk-through at the
 6   crime scene, correct?
 7      A     After the initial walk-through
 8   and it began processing, not before the
 9   video and the photographs.
10      Q     But you did actually enter the
11   Tankleffs' home on the 7th of September
12   and walk around?
13      A     Yes, I did.
14      Q     Did you do that with Doyle?
15      A     Probably, but I can't recall.
16      Q     The detectives had a cell phone
17   at the crime scene that morning, correct?
18      A     I believe I had the only car
19   phone there.  Maybe someone else did.
20   They were relatively new and very few of
21   them were in the department in 1988.
22      Q     But there were a number of calls
23   back and forth between detectives at the
24   scene and McCready and Ryan at
25   headquarters after they had begun
```

1          McElhone

2   interrogating Marty, correct?

3      A    Yes.

4      Q    And during those phone calls,

5   McCready and Ryan were letting Doyle and

6   yourself and others at the scene know what

7   was happening in the interrogation with

8   Marty, correct?

9      A    Yes.  I think it was more the

10  sergeant, Sergeant Horvath who might have

11  been -- if they are in the interrogation

12  room, I don't think they would be

13  interrupting to call us for too much

14  stuff.

15     Q    But either way, information was

16  being relayed between the detectives who

17  were still at the crime scene and McCready

18  and Ryan at headquarters?

19     A    And also that we had detectives

20  at Stony Brook Hospital where Mr. Tankleff

21  had been brought to.

22     Q    But there was an open channel of

23  communication between the crime scene, the

24  hospital, and McCready and Ryan at

25  headquarters, correct?

1          McElhone

2     A     Yes.

3     Q     And who -- was it you or was it

4   Doyle speaking with Horvath at

5   headquarters while McCready and Ryan were

6   interrogating Marty?

7     A     It was probably both of us.

8     Q     And either you or Doyle, whoever

9   was speaking indirectly with McCready and

10  Ryan through Sergeant Horvath, were

11  communicating additional information

12  gathered at the crime scene as it was

13  collected and noted and observed, correct?

14    A     No.  It was more to get what was

15  coming out of the interrogation.  At that

16  point, I probably hadn't been in yet.

17    Q     What do you mean it hadn't been

18  in yet?

19    A     Into the house yet.  I was

20  waiting, as I said, for the videotaping,

21  it was a rather large home, and processing

22  to begin.

23    Q     But Doyle had been in the house,

24  correct?

25    A     I don't know.

1          McElhone

2      Q    If Doyle says he was, you

3   wouldn't dispute that?

4      A    No.

5      Q    You don't know one way or the

6   other whether Doyle was communicating to

7   McCready and Ryan what he had observed at

8   the crime scene, correct?

9      A    Right.

10     Q    He could have been; he might not

11  have been?

12     A    That is a good answer.

13     Q    If Doyle had been at the crime

14  scene and made observations of what he had

15  seen, he would be making sure that

16  McCready and Ryan were informed as he was,

17  correct?

18     A    If it was pertinent, yes.

19     Q    There would be no reason not to

20  have -- well, you would want McCready and

21  Ryan to know as much information as

22  possible while they are interrogating

23  Marty, correct?

24     A    I don't know how much would be

25  available at that point.  It was a rather

1              McElhone

2    extensive crime scene search.  I think

3    they kept it a couple of days.

4       Q     But you would want them to know

5    everything that was known to the

6    detectives on the scene so that they could

7    either use it in the interrogation of

8    Marty or test the reliability of what

9    Marty was telling them?

10      A     If it was pertinent, yes.

11      Q     And when you say "pertinent",

12   you mean if the information at the scene

13   gave indicia of how the crimes may have

14   been committed, correct?

15      A     Correct.

16      Q     This is Doyle's testimony marked

17   McElhone 17, and if you would read what I

18   have bracketed, page 127, line 17 through

19   page 129, line 5.

20           (Witness reviewing document)

21      A     Okay.

22      Q     Does that section of testimony

23   that you just read refresh your

24   recollection that at least Doyle believed

25   on the morning of September 7th that the

1              McElhone

2    crime scene in Arlene Tankleff's bedroom

3    indicated that she had struggled with her

4    assailant defensively during the attack

5    from a standing position?

6       A    Yes.

7       Q    And as far as you knew on the

8    7th, that was consistent with what the

9    crime scene in the master bedroom showed,

10   correct?

11      A    Yes.

12      Q    And you testified at the last

13   day of your deposition, I'm happy to show

14   it to you if you would like to see it,

15   that you learned how information about the

16   process through which Marty's confession

17   was elicited from talking to McCready and

18   Ryan about how it happened and reading

19   their report, correct?

20      A    Reading their report at some

21   point later.  There probably was a brief

22   discussion about it.

23      Q    Okay.

24          And I gather you were satisfied

25   from reading the report and from whatever

1            McElhone

2   oral communications you had that the

3   information in Marty's confession, which

4   tracked what detectives had observed at

5   the crime scene, was volunteered by Marty

6   and not by the detectives, correct?

7            MR. MITCHELL:  Object to the

8      form.

9            You can answer.

10     A     Yes, I was satisfied.

11     Q     And obviously if the details in

12  the confession, like using the barbell and

13  using the knife and the struggle with his

14  mother, had come from McCready and Ryan

15  rather than Marty independently

16  volunteering them, that would cause you

17  concern as a supervisor about the

18  reliability of his confession, correct?

19           MR. MITCHELL:  Objection to the

20     form.

21           You can answer.

22     A     Yes, it would.

23     Q     Because it is improper for

24  detectives to feed a suspect details they

25  believe to be true about a crime rather

Case 2:09-cv-01207-JS-AYS Document 184-12 Filed 08/17/16 Page 225 of 318 PageID #: 3972

JOHN MCELHONE                                  October 30, 2014
MARTIN TANKLEFF vs. SUFFOLK COUNTY                          224

1              McElhone

2    than eliciting -- rather than having those

3    details originate with the suspect,

4    correct?

5         MR. MITCHELL:  Objection to the

6       form.

7           You can answer.

8    A    Yes.

9    Q    To feed a suspect details about

10   the crime that the detectives believed to

11   be true would be a grossly improper

12   violation of policy and procedure,

13   correct?

14        MR. MITCHELL:  Objection to the

15      form.

16          You can answer.

17   A    Yes, it would.

18   Q    In this case, if the details in

19   Marty's confession, like the knife and the

20   barbell and the struggle with his mother,

21   had come from McCready and Ryan instead of

22   coming from Marty, that would be

23   completely inappropriate, correct?

24   A    Correct.

25   Q    And would cause you as a

JOHN MCELHONE                                    October 30, 2014
MARTIN TANKLEFF vs. SUFFOLK COUNTY                            225

1              McElhone

2    supervisor a great deal of concern about

3    the reliability of the confession,

4    correct?

5       A    Yes.

6       Q    Pursuant to policy and

7    procedure, if McCready and Ryan had

8    improperly fed Marty details about the way

9    the crime had occurred, they certainly

10   would have had an obligation to document

11   that fact and report it to their

12   supervisors and the prosecution, correct?

13      A    If they did that?

14      Q    Yes.

15      A    Would they document it

16   somewhere?

17      Q    Would they have had an

18   obligation to document and disclose it to

19   their supervisors and to the prosecutor?

20      A    Yes.

21      Q    And obviously McCready and Ryan

22   never reported to you that they had done

23   that in this case, correct?

24      A    They did not, no.

25      Q    And actually Doyle never

1            McElhone

2    reported to that you the details in the

3    confession came from McCready and Ryan and

4    not Marty, correct.

5            MR. MITCHELL:  Objection to the

6       form.

7            You can answer.

8     A    No.

9     Q    I want to go back to Steuerman

10    now.

11           Was there anything other than

12    Marty's confession -- I think even more

13    direct than that.

14           Was there anything other than

15    the information that came from Marty,

16    Jerry Steuerman's alibi comprised of

17    whatever the poker player said and his

18    daughter, and the fact that the

19    information gleaned from the crime scene

20    supported Marty's, corroborated Marty's

21    confession, and most important the reports

22    from those below you that they had

23    investigated Steuerman as a suspect and

24    ruled him out, anything else that

25    contributes to your belief as you sit here

1              McElhone

2    today that Jerry Steuerman didn't

3    participate in these crimes?

4       A    Again, as I mentioned, he was

5    cross examined for three days on the stand

6    and no other evidence has ever come

7    forward to indicate anything different.

8       Q    Well, that's not really true,

9    right?

10      A    Are you talking about that

11   anonymous caller?

12      Q    No.  I'm talking about, whether

13   you credited or not, the admissions that

14   Creedon, Harris and Kent made at various

15   points in time are new information,

16   certainly weren't known to the homicide

17   detectives investigating the Tankleff

18   murders back in the late 80s, correct?

19          MR. MITCHELL:  Objection to the

20      form.

21          You can answer.

22      A    Correct.

23      Q    So that is new evidence that's

24   come forward linking Jerry Steuerman to

25   the crimes whether you believe it or not?

1             McElhone

2        A     I don't recall Jerry Steuerman's

3   involvement with those three.

4        Q     So you never heard that, in

5   fact, it was Jerry Steuerman who hired

6   those three to carry out the murders on

7   the Tankleffs?

8        A     I heard that was a theory that

9   was espoused by, I guess, the defense

10  here, but not that -- no, I haven't.

11       Q     Back in the late 80s, homicide

12  was just -- talking about the

13  organizational structure of the Suffolk

14  County Police Department -- homicide was

15  within the major crimes bureau, correct?

16       A     Correct.

17       Q     And obviously the detective

18  division as well?

19       A     Yes.

20       Q     So in terms of the chain of

21  command, homicide fell under the office of

22  the chief of detectives, correct?

23       A     Through the major crime bureau.

24       Q     And missing persons fell under

25  the juvenile and missing persons section?

1           McElhone

2     A     I'm not quite sure who their

3  bureau chief was.  Was there a bureau

4  above them?

5     Q     They weren't under the office of

6  the chief of detectives missing persons,

7  correct?

8     A     You know, I'm not quite sure.  I

9  know they made detective shortly

10 thereafter, and maybe then they were not

11 chief detectives.  If you have a chart, I

12 could help you out.

13    Q     I have a chart, but it doesn't

14 matter.

15          When did you leave the homicide

16 squad?

17    A     February of 1989.

18    Q     Where did you go from there?

19    A     I was promoted to captain.  I

20 stayed about a month, month-and-a-half to

21 break in my successor, and then I went to

22 the Second Precinct as the executive

23 officer, Huntington, New York.

24    Q     So for the approximately two

25 years that you were in charge of the

1              McElhone

2    homicide squad, how many missing persons

3    investigations other than the missing

4    person's investigation into Jerry

5    Steuerman was homicide actively involved

6    in?

7        A    I can't recall any others, but

8    there are incidents where if it is a very

9    suspicious circumstance, we will either

10   shadow it or pick it up.

11       Q    But you can't think of any

12   others as you sit here today?

13       A    No.  Obvious drowning cases, one

14   that's usual, somebody sees somebody go

15   into the water in, say, Smith's Point, and

16   technically they're missing, but we know

17   after a day or two what's going to happen,

18   and we'll maybe pick it up early and wait

19   for the inevitable or never get an answer.

20       Q    As you sit here today, can you

21   think of any specific missing persons

22   investigation that homicide was actively

23   involved in during the two years that you

24   were commander of the homicide squad?

25       A    No, I can't recall.

1            McElhone

2       Q     Who made the decision that

3    homicide was going to stay involved in

4    this missing persons investigation?

5       A     I certainly had a hand in it,

6    but I had to talk with my superiors and

7    others within the department, and we

8    talked with the homicide district

9    attorney's bureau, and they were concerned

10   so we decided we would handle it.

11           But actually it was more of a

12   we'll do the investigative part of it, but

13   missing persons will handle press

14   conferences, and as you showed me, their

15   phone number was broadcast if anybody has

16   any information regarding what happened to

17   Jerry Steuerman, blah, blah, blah.

18      Q     But homicide was doing the

19   investigation?

20      A     Yes.  If it came to an

21   interview, we were going to do it.

22      Q     What were the factors that went

23   into that decision?

24      A     Pretty much the name recognition

25   of Mr. Steuerman, the ominous letter that

1              McElhone

2    he left with his attorney to be opened in

3    case something happens to me, and there

4    was a couple of other circumstances like

5    that.

6        Q     What are the other couple

7    circumstances like that that you are

8    referring to?

9        A     Just the way the car was left

10   running in a very public place.  People he

11   would have contacted, his daughter every

12   day and she hadn't heard from him.

13       Q     So in other words, is your

14   testimony that homicide stepped in on this

15   missing persons investigation because it

16   looked like Jerry Steuerman may have been

17   the victim of a homicide?

18       A     That's possible.

19       Q     Is that why homicide got

20   involved?

21       A     There were a couple of factors

22   going on.  Of course, there was the very

23   public Jerry Steuerman being offered up by

24   Newsday and family members and Marty

25   initially as the real killer, the suspect.

1          McElhone

2      Q     So what about the name

3   recognition as you termed it would cause

4   homicide to get involved?

5      A     Well, you knew at some point

6   there was going to be a trial and a

7   hearing, and he could very well be someone

8   that they would want to talk to.  As I

9   mentioned earlier, we put him on the stand

10  for three days for defense counsel to find

11  out what they had to find out.

12     Q     So in other words, you knew that

13  Steuerman might be an important --

14  Steuerman might actually be important to

15  Marty's defense, correct?

16     A     Well, he was a person of

17  interest in this case, sort of offered up

18  by the defense people.  We had looked at

19  him already.  We had that call from

20  missing persons that he might have been

21  doing drugs with his son and that might be

22  the reason for his disappearance.

23     Q     But it sounds like --

24     A     There were enough questions that

25  we thought -- and we were already familiar

```
 1            McElhone
 2   with Mr. Steuerman from having been in,
 3   what was it a week or eight days.  So it
 4   was current, rather than have to tell
 5   anyone cold from missing persons, we would
 6   take it from there.
 7       Q    And it sounds like what you're
 8   saying is that one reason that homicide
 9   stepped in is because homicide believed
10   that Steuerman might actually be somebody
11   who Marty's defense would want an
12   opportunity to question and explore,
13   correct?
14       A    That was certainly one of our
15   thoughts, yes.
16       Q    So in a sense, homicide was
17   actually looking out for Marty's interests
18   in making sure Steuerman was recovered and
19   making him available to the defense,
20   correct?
21       A    That's your statement.
22       Q    I'm asking you.  I don't care
23   about my statements, I'm asking you.
24       A    He was a person of interest to
25   use the term that everybody is using now.
```

```
 1              McElhone
 2   He was current in our case.  He wasn't a
 3   suspect at this point.  We had Marty
 4   arrested, as I mentioned earlier.  We had
 5   ruled him out earlier as a suspect from
 6   the initial day of the murder, but there
 7   was enough questions swirling around him,
 8   so let's get to the bottom of this and
 9   figure out what happened.
10       Q    Okay.  But what I want to know,
11   because it sounded like this is what
12   you're telling me, and maybe it is not, so
13   I want to make sure I understand.
14           Was one reason that homicide got
15   involved in the efforts to locate Jerry
16   Steuerman to make sure that Marty's
17   defense was able to have a fair
18   opportunity to explore whether Steuerman
19   was involved?
20       A    As it turned out, that's exactly
21   what happened, but I knew it was a concern
22   of Mr. Jablonsky's and ours that this
23   man's name is going to be bantered about
24   back and forth so let's put it to rest and
25   find them.
```

1          McElhone

2     Q     So what I'm trying to get at is

3  the nature of your concern.

4          Was one of your concerns that

5  homicide had already had an opportunity to

6  consider him a suspect and ruled him out,

7  and Marty's defense hadn't yet had the

8  opportunity so you wanted to make sure he

9  was available to them.

10         Was this a concern of yours or

11  was it not?

12    A     I wasn't really concerned about

13  Marty's defense as much as that this would

14  be an issue in any given trial or anything

15  that would transpire in the future.  So

16  let's have him present, let's find out

17  what happened here in the off chance that

18  this could be a suicide or a kidnap

19  investigation.

20    Q     So if it turned out to be a

21  suicide or a homicide or a kidnapping

22  investigation, then those would be good

23  reasons for homicide to be investigating

24  anyway, correct?

25    A     Sure.

1            McElhone

2     Q    That's not the kind of

3   missing -- missing persons doesn't have

4   the resources to thoroughly investigate

5   kidnappings, homicides, correct?

6     A    No.

7     Q    But homicide does, right?

8     A    Yes.

9     Q    And in addition, you understood

10  that Marty's defense was likely going to

11  involve trying to pin this on Steuerman

12  and it was going to make the homicide

13  prosecution harder if Steuerman wasn't

14  available to rebut that defense, correct?

15           MR. MITCHELL:  Objection.

16           You can answer.

17    A    That really wasn't my concern.

18  He was a person of interest.  Somebody

19  that had been mentioned from the very

20  first day, that as you mentioned family

21  members were talking about.  I think even

22  the press at that point still liked to

23  bring in but what about this guy.  So it

24  was something that would have to be

25  resolved.  The best way to resolve this

1              McElhone

2    was to find him and bring him back.

3        Q     Obviously, if he went to trial

4    and Marty's defense was Steuerman did this

5    and Steuerman had faked his own death and

6    fled the jurisdiction and was nowhere to

7    be found, that would have looked -- that

8    would have made Marty's defense stronger

9    and the prosecution's case harder?

10       A     You're the defense attorney.  I

11   guess so.

12       Q     And that was your concern in

13   going out and trying to track down

14   Steuerman?

15       A     No.  It was to resolve the issue

16   what's going on here.  This is the same

17   fellow that's being offered up as the man

18   who did it publicly and by the defense at

19   this point, and it was under suspicious

20   circumstances.  We had the letter with his

21   attorney, he hasn't contacted family

22   members, his car was left running in a

23   public parking lot.

24       Q     I hear what you are saying.  It

25   had to be resolved and it wasn't clear

1              McElhone

2    exactly what had happened.

3          You're not telling me that it

4    never came up in any of the conversations

5    about homicide getting involved in the

6    missing persons investigation that it was

7    going to make it much harder for this

8    prosecution if Jerry Steuerman had faked

9    his own death and disappeared by the time

10   that Marty's defense stood up at trial and

11   said Jerry Steuerman did it and Marty

12   Tankleff didn't?  Of course it did, right?

13   I don't want to put words in your mouth.

14   Tell me.

15      A    My thought was never to provide

16   the defense with a better witness.  This

17   just had to be resolved.  This is somebody

18   who is in the case from day one, from the

19   mouth of the defendant from the very first

20   time we talked to him to at this point

21   between the newspaper and family members.

22   And couple that with the circumstances of

23   his disappearance, it was something that

24   we wanted to resolve.  It wasn't that, oh,

25   this will make our prosecution better or

1            McElhone

2    the defense better at any given point.

3      Q    Okay.

4            But it would have looked

5    terrible for the prosecution if Marty was

6    saying Steuerman did this and Steuerman

7    faked his own death and was nowhere to be

8    found, correct?

9      A    I suppose it would.

10     Q    And that was one reason, among

11   others, that homicide got involved to try

12   find Steuerman and track him down,

13   correct?

14     A    No, that was never my intention.

15     Q    Is that one issue that came up

16   in the conversations about homicide

17   getting involved in the missing persons

18   investigation?

19     A    No, not that I recall.

20     Q    Not that you recall.

21           Nobody ever said, hey, you know

22   what, it's going to look bad for the

23   prosecution if Steuerman faked his own

24   death and isn't around at the time of

25   trial?

1            McElhone

2     A     When we did track him to

3   California, I know Mr. Jablonsky wanted to

4   come along from the district attorney's

5   office.  Perhaps that was his thought of

6   the thing.

7     Q     But that never occurred to

8   anybody in the police department?

9     A     Not really.  Let's find this

10  guy, let's resolve this disappearance,

11  this mysterious disappearance only a week

12  after this murder, and we did.  We found

13  him and brought him back, and the defense

14  had him on the stand for three days.

15    Q     And nobody ever spoke a word

16  about the fact that it would make your

17  case look better if Jerry Steuerman was

18  here after having fled the jurisdiction

19  after faking his own death?

20    A     Not to me once.

21    Q     Not once?

22    A     Not once.

23    Q     And it never crossed your mind?

24    A     No.

25    Q     Really?

1           McElhone

2      A    Really.  I'm under oath.

3      Q    Believe me I know.

4           You didn't go out to California

5   with Doyle, McCready and Jablonsky, did

6   you?

7      A    No.

8      Q    And you understood that Doyle

9   and McCready had thoroughly questioned

10  Steuerman out in California on the way

11  back, correct?

12     A    Yeah.

13     Q    And I gather they reported to

14  you that Steuerman had adequately

15  explained his disappearance and absence?

16     A    Under his state of mind.  It was

17  kind of an irrational thought to get away

18  from all of the pressures that he had felt

19  at the time.

20     Q    But you never spoke with -- have

21  you ever interviewed Steuerman directly?

22     A    No.

23     Q    So you're relying on McCready's

24  and Doyle's report?

25     A    Yes.  They spent a lot of time

Case 2:09-cv-01207-JS-AYS  Document 184-12  Filed 08/17/16  Page 244 of 318 PageID #: 3991

JOHN MCELHONE                                      October 30, 2014
MARTIN TANKLEFF vs. SUFFOLK COUNTY                            243

1            McElhone

2   with him, a long plane ride back, and they

3   were thoroughly convinced that there was

4   nothing more to it than him being flighty.

5      Q     And they represented to you that

6   they had seriously explored again whether

7   he could have been involved in the crimes,

8   correct?

9      A     Yes, exactly.  What are you

10  doing out here; what the heck is going on.

11     Q     And they told you that they had

12  reconsidered actually whether he should be

13  considered a suspect in the case because

14  of his disappearance, correct?

15     A     No, they didn't say that to me.

16     Q     They didn't say that to you?

17     A     No.

18     Q     I understand they didn't tell

19  you that he should be considered a

20  suspect, but they reported to you that

21  they had reconsidered in the course of

22  interviewing him whether he should be

23  looked at as a suspect and concluded he

24  should not?

25     A     That was already a conclusion

Case 2:09-cv-01207-JS-AYS   Document 184-12   Filed 08/17/16   Page 245 of 318 PageID #: 3992

JOHN MCELHONE                                    October 30, 2014
MARTIN TANKLEFF vs. SUFFOLK COUNTY                          244

1          McElhone

2   before, but this recent event did nothing

3   more to change their opinion.  As a matter

4   of fact, it reinforced it because they had

5   so much time talking with him about all

6   this stuff.

7      Q     So they actually revisited all

8   of the potential areas of concern with

9   Steuerman and were even more convinced

10  after he faked his own death that he had

11  nothing to do with the crimes?

12     A     They had two days with him or at

13  least a day-and-a-half.  They were in each

14  other's company.  Everybody was very free

15  with discussion on anything that came

16  along.

17     Q     That's what McCready and Doyle

18  reported to you, that everybody was free

19  with discussion?

20     A     Yes.

21     Q     During the time that they spent

22  with Steuerman on the way back?

23     A     If anybody had any doubt, they

24  were reinforced.

25     Q     That's what McCready and Doyle

1              McElhone

2    said to you?

3       A    Sum and substance.

4       Q    Sum and substance, they reported

5    to you we have explored everything, if

6    there were ever any doubts about whether

7    he was involved now after faking his own

8    death and fleeing to California, and us

9    going out there to track him down, we are

10   absolutely certain he had nothing to do

11   with the crimes?

12      A    Yes.

13      Q    That's what McCready and Doyle

14   reported to you when they got back from

15   California, correct?

16      A    Yes.

17           MS. FREUDENBERGER:  Let me just

18      talk to these guys for a few minutes.

19           MR. MITCHELL:  Sure.  You want

20      us to walk out.

21           MS. FREUDENBERGER:  Sure.

22           (Thereupon, a recess was taken,

23      and then the proceedings continued as

24      follows:)

25           MS. FREUDENBERGER:  So McElhone

1          McElhone

2     16 is now the correct version of the

3     missing person's file.

4  BY MS. FREUDENBERGER:

5     Q     Chief McElhone, would you

6  confirm that this appears to the missing

7  person investigation file on Jerry

8  Steuerman?

9     A     It's a combination.  It's a

10  missing person file, some authored by

11  missing persons people and some authored

12  by homicide squad.

13     Q     And no reason to dispute the

14  authenticity of any of the documents

15  contained in that file?

16     A     No.

17     Q     Fall of 1988, it was a busy time

18  for the homicide squad?

19     A     1988 was a very busy year.

20     Q     And you sent two experienced

21  detectives to California along with the

22  prosecutor to track down a missing person,

23  correct?

24          MR. MITCHELL:  Object to the

25     form.

1          McElhone

2       You can answer.

3    A    A detective and his supervisor.

4    Q    Excuse me, a detective and a

5  supervisor?

6    A    Yes.

7    Q    How many sergeants did you have

8  supervising the detectives in the homicide

9  squad at that time?

10   A    Four.

11   Q    So you sent, at this busy time

12 in the fall of 1988, you sent one of your

13 four homicide sergeants to California

14 along with a homicide detective and an

15 assistant district attorney to track down

16 a missing person, correct?

17   A    Correct.

18   Q    A missing person who at this

19 time wasn't actually missing, he had been

20 located, correct?

21   A    There was a phone call with

22 pistacio that led us to believe that this

23 was him for sure, and we were able to

24 track down some of his aliases that he was

25 using checking into hotels.  But we didn't

1              McElhone

2    have him cold right there, we had to look.

3         Q     And Jerry Steuerman actually

4    used aliases fairly regularly, correct?

5         A    Yes.

6         Q     Detective Carmody actually

7    tracked down somebody traveling under one

8    of Jerry Steuerman's aliases from San

9    Francisco to LA who bought a plane ticket,

10   a one-way ticket all in cash, correct?

11        A    Yes.

12        Q     And the working theory was that

13   that was, in fact, Jerry Steuerman,

14   correct?

15        A    I guess so.

16        Q     And he was alive?

17        A    I haven't reviewed this, yes.

18        Q     And at the point where you sent

19   one of your four homicide sergeants and a

20   homicide detective with the district

21   attorney to track down Jerry Steuerman, a

22   missing person, your testimony is that he

23   was not a suspect, he was simply a person

24   of interest in your investigation,

25   correct?

1          McElhone

2      MR. MITCHELL:  Object to the

3   form.

4          You can answer.

5    A     As well as a missing person

6  under suspicious circumstances.

7    Q     Well, were you going out to

8  track him down because he was a person of

9  interest in your investigation or because

10 he was a missing person under suspicious

11 circumstances?

12      MR. MITCHELL:  Object to the

13   form.

14          You can answer.

15   A     An equal amount of both.

16   Q     So it was equally important to

17 you that he was a missing person under

18 suspicious circumstances as the fact that

19 he was playing a role in your

20 investigation, correct?

21   A     Correct.

22   Q     And neither one of those things

23 was more important than the other?

24   A     No.  I think one absent the

25 other wouldn't have been a problem.

```
1              McElhone
2       Q     So even if he had been involved
3    in your investigation, just because he was
4    a missing person under suspicious
5    circumstances, you might have sent one of
6    your four sergeants, a homicide detective
7    and a DA out to track him down?
8              MR. MITCHELL:  Object to the
9       form.
10             You can answer.
11      A     No.
12      Q     No.  Okay.
13      A     If his name wasn't involved in
14   our case at all and he wasn't somebody
15   that we already interviewed, no.
16      Q     No way you would have sent one
17   of your sergeants. a detective and a DA to
18   track him down because he was a missing
19   person?
20      A     I can't send the DA anywhere.
21      Q     Jablonsky sent himself and you
22   sent McCready and Doyle?
23      A     Yes.
24             MR. MITCHELL:  Objection to the
25      form.
```

1           McElhone

2      Q     You wouldn't have done that if

3   Steuerman was a missing person under

4   suspicious circumstances?

5      A     If it was Joe Blow?

6      Q     Right.

7      A     Probably not.

8      Q     Is there any chance?

9      A     I think we would need a little

10  bit more.  If we're getting threatening

11  phone calls or something like that, we

12  might just enlist the aid of whatever

13  police agency is in California to try and

14  locate and make sure he is okay.

15     Q     Like the LAPD?

16     A     Yes.

17     Q     And the LAPD is probably

18  equipped to track down missing persons?

19     A     I believe so, sure.

20     Q     You mentioned that you sent

21  them -- you sent McCready and Doyle out to

22  get Steuerman because this had to be

23  resolved, you wanted to resolve the whole

24  thing, correct?

25     A     Yes.

1                McElhone

2        Q      Once you figured out Steuerman

3    was alive, what was left to be resolved?

4        A      Interview him, under what set of

5    circumstances happened here.  Was he

6    forced to go out there, was there

7    something else involved.  So we had to

8    talk to him.

9        Q      What in particular were you

10   concerned about?

11       A      I don't know.  It was a mystery.

12   That's why we had to resolve it.

13       Q      It was a mystery?

14       A      Yes, certainly bizarre

15   circumstances.

16       Q      And obviously one possibility

17   that crossed everybody's mind was that

18   maybe Jerry Steuerman did have something

19   to do with this crime and that's why he

20   faked his own death and fled the

21   jurisdiction while Seymour Tankleff was

22   still alive, correct?

23              MR. MITCHELL:  Objection to the

24       form.

25              You can answer.

1            McElhone

2     A     Other people might have thought

3  that.

4     Q     That is certainly something that

5  came up in conversations, correct?

6     A     Not that I was involved in.

7     Q     None that you even heard about?

8     A     No.

9     Q     So you never heard anybody say

10  anything about, hey, you know what,

11  Seymour Tankleff was expected to die and

12  he is still alive and Jerry Steuerman

13  faked his own death and fled the

14  jurisdiction, maybe he was involved?

15     A     The press was running wild with

16  that kind of stuff.  Sure, the

17  scuttlebutt, you know, general public

18  might have been there, but nobody within

19  the homicide squad was thinking he is the

20  real killer.

21     Q     Nobody in the homicide squad was

22  even considering that possibility?

23     A     Not that I'm aware of, no.

24     Q     In retrospect, do you think

25  somebody in the homicide squad should have

Case 2:09-cv-01207-JS-AYS   Document 184-12   Filed 08/17/16   Page 255 of 318 PageID #: 4002

JOHN MCELHONE                                         October 30, 2014
MARTIN TANKLEFF vs. SUFFOLK COUNTY                              254

```
 1          McElhone
 2  considered that possibility?
 3          MR. MITCHELL:  Objection to the
 4    form.
 5          You can answer.
 6      A    No.  At that point, we cleared
 7  him as a suspect.  This new incident
 8  raised questions on what the heck is going
 9  on here, could there be something else?
10  35 years of police work, you never say
11  never to anything, so that's resolve this.
12      Q    You wouldn't say never to the
13  possibility that somebody who owed a guy
14  money, had ties to known criminals, close
15  family ties to known criminals, and faked
16  his own death when the victim of a very
17  serious assault was still alive weeks
18  after the assault, and fled the
19  jurisdiction, could conceivably have been
20  involved?  35 years of police work might
21  tell you that is something that you have
22  to consider, correct?
23          MR. MITCHELL:  Object to the
24    form.
25          You can answer.
```

1          McElhone

2     A     You never say never to anything.

3     Q     Would 35 years of police work

4  suggest to you that maybe that is

5  something that you should consider under

6  these circumstances?

7          MR. MITCHELL:  Object to the

8     form.

9          You can answer.

10     A     Again, we go back to the

11  circumstances of the crime.  There is

12  ample evidence and there was -- it was

13  admitted to by the defendant at this

14  point.  There was no question in our mind

15  that maybe Jerry Steuerman came in and

16  killed him or had other people come in and

17  kill him.

18     Q     I'm not suggesting you should

19  have let Marty out of jail.  I'm asking as

20  a very experienced investigator whether

21  you felt that after Steuerman faked his

22  own death while Seymour was still alive

23  and fled the jurisdiction, combined with

24  the fact that he owed Seymour a

25  substantial amount of money, and that he

1               McElhone

2   had been reportedly involved in drug

3   enterprises with his son who had an arrest

4   history, perhaps you should look into

5   whether he might have been involved in the

6   crime?

7           MR. MITCHELL:  Object to the

8     form.

9           You can answer.

10      Q    Based on your policing

11  experience, did you believe that this was

12  a possibility to at least consider?

13          MR. MITCHELL:  Object to the

14    form.

15          You can answer.

16      A    My decision, and it was only --

17  had to be concurred with my superior

18  officers, at this point was there enough

19  questions here that we have to figure out

20  what's going on.  So let's investigate

21  this more thoroughly than a missing

22  person's case.

23      Q    And that was one of the

24  possibilities were you investigating,

25  correct?

1          McElhone

2     A     That he was involved in this

3  case?

4     Q     Yes.

5     A     No.

6     Q     And when you sent one of your

7  four homicide sergeants out with a

8  homicide detective and the district

9  attorney during this busy time for the

10  Suffolk County homicide squad to LA to

11  recover Jerry Steuerman, rather than

12  asking the LAPD to track Steuerman down

13  and confirm that he was, in fact, alive,

14  it never once crossed your mind that you

15  were in any way doing anything to protect

16  your case, correct?

17          MR. MITCHELL:  Object to the

18     form.

19          You can answer.

20     A     We were going to resolve any

21  kind of doubts.  We were going to find out

22  what's going on.

23     Q     What kind of doubts were those?

24     A     Why did he do it.  Is he alive

25  first of all.  Why would he decide to flee

1          McElhone

2    at this point.  Maybe somebody was

3    threatening him.  I don't know.  Maybe

4    somebody involved in the periphery of this

5    case.  There was way too many questions.

6       Q     Was one of those questions you

7    were trying to resolve whether Jerry

8    Steuerman had anything to do with this

9    crime?

10      A     No, not at that point.

11      Q     And the reason you weren't

12   trying to resolve that question at this

13   point is because it had been thoroughly

14   investigated and resolved by those below

15   you according to Sargeant Doyle, correct?

16      A     Correct.

17      Q     Just two more things before we

18   leave.

19          Chief McElhone, could you take a

20   look at the document Bates stamped SCDA

21   8421 and 8422 and confirm for me whether

22   these are press releases issued under your

23   name on September 7, 1988.

24          (Witness reviewing documents)

25      A     I don't know about the

1           McElhone

2    handwritten portion about the police

3    commissioner of Belle Terre.  I think that

4    was something that was added.

5           MS. FREUDENBERGER:  Let's go

6      ahead and mark these and then I'll ask

7      you some questions about it.

8      A     I never put a byline like Belle

9    Terre, New York.

10          (Whereupon, Press Release dated

11     September 7, 1988 at 11:30 a.m., was

12     marked as McElhone Exhibit 18 for

13     identification, as of this date.)

14          (Whereupon, Press Release dated

15     September 7, 1988, was marked as

16     McElhone Exhibit 19 for

17     identification, as of this date.)

18   BY MS. FREUDENBERGER:

19     Q     Let's start with McElhone 18.

20   This is a press release dated the 7th of

21   September 1988 at 11:30 a.m.

22     A     Yes.

23     Q     And at the time, it says "News

24   release" and appears to be on Suffolk

25   County PD's letterhead, correct?

1          McElhone

2     A     Yes.

3     Q     And at the bottom it says,

4  "Authority Detective Lieutenant John

5  McElhone, homicide squad"?

6     A     Right.

7     Q     And you believe that the police

8  commissioner of the Village of Belle Terre

9  was handwritten at the end of the first

10 paragraph before you approved the release

11 of the press release?

12    A     Yes.  There is nothing else

13 after that.

14    Q     Otherwise, does this appear to

15 be an accurate reflection of a press

16 release you issued on September 7, 1988 at

17 11:30 a.m.?

18    A     From the overall look of this

19 and the syntax involved, I think this was

20 generated by our public information

21 officer obviously with my consent.  I

22 never put a byline like Belle Terre, New

23 York in there.  But it is accurate.

24    Q     And then take a look at 19, if

25 you will.

1          McElhone

2        Is that your signature at the

3   bottom of this document?

4      A    Yes.

5      Q    And is this an accurate copy of

6   a press release issued under your name on

7   September 7, 1988?

8      A    The number on the top, what is

9   that SCDA, is that the district attorney's

10  office?

11     Q    That's just our tracking

12  mechanism.

13

14        (Continued on the following

15         page to include the jurat.)

16

17

18

19

20

21

22

23

24

25

1              McElhone

2    A     Otherwise, yes.

3          MS. FREUDENBERGER:  That's all

4    I've got.  Thank you very much.

5          (Time noted:  4:05 p.m.)

6

7

8          _____

9              JOHN McELHONE

10

11   Subscribed and sworn to

12   before me this      day

13   of            , 2014.

14   _____

15

16

17

18

19

20

21

22

23

24

25



1

2  --------------- I N D E X ----------------

3  WITNESS        EXAMINATION BY      PAGE

4  JOHN McELHONE

5           MS. FREUDENBERGER        5

6

7  --------------- EXHIBITS ----------------

8  McELHONE                  FOR ID.

9  13  Transcript of Chief McElhone's     46
       Deposition

10
    14   Testimony of Detective McCready     79
11
    15  Deposition Transcript of Bernard    103
12      Adams

13  16  Missing Person's File              163

14  17  Deposition Transcript of Robert    216
        Doyle, December 8, 201
15
    18  Press Release dated September 7,   259
16      1988 at 11:30 a.m.

17  19  Press Release dated September 7,   259
        1988

18

19

20

21

22

23

24

25

Case 2:09-cv-01207-JS-AYS   Document 184-12   Filed 08/17/16   Page 265 of 318 PageID #: 4012

JOHN MCELHONE                                     October 30, 2014
MARTIN TANKLEFF vs. SUFFOLK COUNTY                         264

1

2          C E R T I F I C A T E

3  STATE OF NEW YORK )

4                : SS

5  COUNTY OF NEW YORK)

6

7          I, Adrienne M. Mignano, a

8  Registered Professional Reporter and Notary

9  Public within and for the State of New York,

10  do hereby certify:

11          That JOHN McELHONE, the

12  witness whose deposition is hereinbefore set

13  forth, was duly sworn by me and that such

14  deposition is a true record of the testimony

15  given by the witness.

16          I further certify that I am

17  not related to any of the parties to this

18  action by blood or marriage, and that I am

19  in no way interested in the outcome of this

20  matter.

21          IN WITNESS WHEREOF, I have

22  hereunto set my hand this 10th day of

23  November 2014.

24  _____

25          ADRIENNE M. MIGNANO

1

2          DEPOSITION ERRATA SHEET

3       Our Assignment No. 227414

4    Case Caption:   MARTIN TANKLEFF

5               vs.

6            THE COUNTY OF SUFFOLK et al.

7

8    DECLARATION UNDER PENALTY OF PERJURY

9

10      I declare under penalty of perjury
     that I have read the entire transcript

11   of my deposition taken in the captioned

12   matter or the same has been read to me,

13   and the same is true and accurate, save

14   and except for changes and/or corrections,

15   if any, as indicated by me on the

16   DEPOSITION ERRATA SHEET hereof, with the

17   understanding that I offer these changes

18   as if still under oath.

19

20
     SIGNATURE_____DATE:_____

21         JOHN McELHONE

22

23   Subscribed and sworn to on the ____ day of
     _____, 20__ before me,

24   _____
     Notary Public,

25    in and for the State of _____

1

2          DEPOSITION ERRATA SHEET

3   Page No._____Line No._____Change
    to:_____
4   Reason for
    change:_____
5

6   Page No._____Line No._____Change
    to:_____
7   Reason for
    change:_____
8

9   Page No._____Line No._____Change
    to:_____
10  Reason for
    change:_____
11

12  Page No._____Line No._____Change
    to:_____
13  Reason for
    change:_____
14

15  Page No._____Line No._____Change
    to:_____
16  Reason for
    change:_____
17

18  Page No._____Line No._____Change
    to:_____
19  Reason for
    change:_____
20

21  Page No._____Line No._____Change
    to:_____
22  Reason for
    change:_____
23

24  SIGNATURE:_____DATE:_____
            JOHN McELHONE
25

Case 2:09-cv-01207-JS-AYS   Document 184-12   Filed 08/17/16   Page 268 of 318 PageID #: 4015

JOHN MCELHONE                                        October 30, 2014
MARTIN TANKLEFF vs. SUFFOLK COUNTY                              267

1

2          DEPOSITION ERRATA SHEET

3
     Page No._____Line No._____Change
4    to:_____
     Reason for
5    change:_____

6
     Page No._____Line No._____Change
7    to:_____
     Reason for
8    change:_____

9
     Page No._____Line No._____Change
10   to:_____
     Reason for
11   change:_____

12
     Page No._____Line No._____Change
13   to:_____
     Reason for
14   change:_____

15
     Page No._____Line No._____Change
16   to:_____
     Reason for
17   change:_____

18
     Page No._____Line No._____Change
19   to:_____
     Reason for
20   change:_____

21
     Page No._____Line No._____Change
22   to:_____
     Reason for
23   change:_____

24
     SIGNATURE:_____DATE:_____
25        JOHN McELHONE

---
**1**
---

**10**
  202:10

**110**
  7:14

**11:30**
  259:11,21
  260:17

**11th**
  79:12

**127**
  216:11
  221:18

**129**
  216:13
  221:19

**13**
  46:23
  47:2

**13th**
  186:7

**14**
  79:5
  150:17,20
  154:17

**14-page**
  78:9

**14th**
  186:7

**15**
  82:19
  83:2,3
  103:6
  202:11

**16**
  130:20,22
  163:24
  246:2

**17**
  79:19
  216:13,17
  221:17,18

**17-year-old**
  143:9

**18**
  25:8
  145:3
  259:12,19

**19**
  259:16
  260:24

**191**
  102:25

**192**
  104:8

**193**
  102:25

**1986**
  186:3

**1987**
  31:11
  38:9,10
  46:9
  49:18
  51:4
  55:5,7
  90:16
  183:23
  186:7

**1988**
  20:18
  46:9
  64:13
  90:10
  92:18,25
  100:10
  102:16
  109:18
  113:24
  129:17
  131:8

**144:8**
**148:23,24**
**154:2,17**
**186:8,11**
**187:11**
**217:21**
**246:17,19**
**247:12**
**258:23**
**259:11,**
**15,21**
**260:16**
**261:7**

**1989**
  46:9
  109:19
  229:17

**1996**
  66:2

---
**2**
---

**2**
  150:13

**20**
  20:22
  144:18
  186:6

**2007**
  7:6

**201**
  216:16

**2011**
  5:17
  9:15,16,
  17 11:9
  12:25
  14:14
  15:19
  16:12
  22:11
  23:4 24:5
  216:12

**2012**
  79:12

**2014**
  103:2
  262:13

**21**
  102:25

**22**
  102:25

**25**
  20:22

**29th**
  186:7

**2:31**
  183:16

---
**3**
---

**3**
  82:19,25
  83:3
  198:13
  199:5,25
  200:13
  203:10

**35**
  254:10,20
  255:3

**3:15**
  198:17
  199:11

---
**4**
---

**440**
  16:16,20,
  24 17:11,
  14 18:15

**4:05**
  262:5

**4:10**
  150:14

---
**5**
---

**5**
  79:19
  103:2
  216:13
  221:19

**50**
  150:13

---
**6**
---

**6:11**
  199:13

**6:17**
  82:16

---
**7**
---

**7**
  90:10
  154:2
  258:23
  259:11,15
  260:16
  261:7

**7,500**
  13:7

**7th**
  84:22
  85:22
  89:19
  215:11
  216:21
  217:11
  221:25
  222:8
  259:20

JOHN MCELHONE
MARTIN TANKLEFF vs. SUFFOLK COUNTY

October 30, 2014
Index: 8..AG5380

| | | | |
|---|---|---|---|
| **8** | 199:5<br>259:11,21<br>260:17 | **accuracy**<br>75:9 | **Adams**<br>102:2,5<br>103:2,5, | 143:23<br>219:11 |

**8**
216:12,16

**805**
66:9

**80s**
40:24
64:21
99:7
227:18
228:11

**8421**
258:21

**8422**
258:21

**87**
25:6
153:17

**88**
25:7
153:17
184:20

**9**

**9-22-88**
174:14

**911**
83:6
212:25

**97**
79:19

**99**
79:19

**A**

**a.m.**

**abandoned**
155:4

**ability**
6:15
34:21
35:10
84:25
86:10
152:22

**absence**
213:13,
15,23
242:15

**absent**
249:24

**absolutely**
31:21
68:25
90:23
121:18
122:5
137:9
140:7,15
151:25
170:5
191:8
245:10

**Academy**
188:2

**accidents**
8:5

**accordance**
80:9

**account**
210:9
211:5

**accounts**
139:8

**accurate**
16:19
19:17
26:11
75:15
80:6
101:13
109:5,14
192:3,13
260:15,23
261:5

**accurately**
172:2

**accused**
143:10

**acting**
80:9

**active**
8:19
184:4
189:3

**actively**
127:18
230:5,22

**activities**
190:3

**activity**
70:20
72:3
187:21

**actual**
21:13
62:19
190:13

**ADA**
107:6,7
121:7
149:10

**Adam's**
102:20

Adams
102:2,5
103:2,5,
12,21
104:15,23
105:15
108:16,22
109:17
110:12,16
111:14,24
116:13
118:8
119:14,24
120:11
122:21
124:16,22
125:9
129:9
132:11
133:4
134:14
135:4
137:10,22
138:10,23
139:2

**Adams'**
105:6
111:3
137:4

**added**
141:17
259:4

**addition**
21:22
35:25
43:22
44:24
72:10
112:4
119:4
184:3
196:5
237:9

**additional**
140:5

143:23
219:11

**address**
48:15

**addressed**
55:2
179:8

**adequately**
242:14

**adhering**
30:24

**administrative**
184:2,8
188:25

**admission**
61:6,17,
24 62:3,
21 63:20

**admissions**
227:13

**admit**
129:20

**admitted**
211:2
255:13

**admitting**
211:13

**adults**
131:10

**affirmative**
172:9,20

**affirmatively**
152:13

**affluent**
72:16
143:9

**AG5380**
174:15

agency
  251:13

agree
  53:5
  86:25
  99:23
  104:10
  107:23
  109:5,10
  164:15
  172:6
  182:16
  202:14

agreed
  203:9

agreements
  195:17

AGS
  174:10

ahead
  6:8
  46:21,22
  78:23
  102:18
  106:22
  132:17
  163:20
  259:6

aid
  251:12

aliases
  247:24
  248:4,8

alibi
  166:15,18
  177:11
  196:7
  201:6,8,
  21 202:5,
  9,18,19
  203:3,14,
  20
  204:11,

20,24
205:5,8
226:16

alibied
  198:16

alibis
  202:15
  204:9

alive
  68:11
  69:7
  81:12
  82:10,21
  155:2
  158:15,
  21,24
  159:11,15
  160:6
  248:16
  252:3,22
  253:12
  254:17
  255:22
  257:13,24

allegations
  23:9
  26:25
  27:8,18,
  21 28:9
  29:4,5
  175:15

allowed
  17:5
  44:15
  87:17

Alpha
  7:8

altered
  157:13

altering
  160:19

ambulance
  70:21,25

Amityville
  7:14

amount
  36:24
  96:13
  161:23
  164:11
  168:17
  182:13
  184:18
  249:15
  255:25

ample
  255:12

analogy
  34:25

angel
  187:6

Angeles
  159:20

Angelo
  144:17
  188:2

angles
  144:11

anonymous
  174:17
  175:16
  178:22
  180:4
  227:11

answering
  5:21
  152:7
  197:18

answers
  6:15
  133:23

apologize
  178:11

apparent

62:20
81:5,6
143:25

Apparently
  74:15

appearance
  50:4
  67:14
  157:14
  160:20

appeared
  90:2
  127:17
  156:22

appears
  103:12,22
  246:6
  259:24

application
  37:12

applies
  114:24

appraised
  190:3

approach
  190:8

approved
  260:10

approximate
ly
  82:16
  89:22
  154:18
  229:24

area
  47:6 70:3
  72:16
  85:12
  112:16,18
  153:9

areas

211:22,25
244:8

arguably
  116:2

Arlene
  81:21
  83:18
  86:8
  89:25
  153:24
  222:2

arraignment
  147:7,16,
  18

arrange
  12:8

arranged
  59:23
  64:5,17

arrest
  169:4
  171:4
  185:24
  187:25
  212:11
  256:3

arrested
  141:21
  143:10
  162:15
  175:17
  211:16
  235:4

arrived
  59:25
  66:11
  68:12
  69:15
  70:6
  81:13
  82:24
  83:14
  84:21

85:21
86:7
90:10
202:10

**arriving**
70:21

**articles**
16:15
28:20

**articulated**
66:20

**ascertain**
197:21

**aspect**
54:17
110:2
111:4,7
148:20

**aspects**
58:25

**assailant**
222:4

**assault**
254:17,18

**assaults**
69:23

**assess**
53:3 62:9
75:8

**assessment**
190:24

**assessments**
205:16

**assets**
155:8

**assigned**
25:6
189:8,11

**assistant**
9:12

247:15

**associates**
173:10

**Association**
11:23

**assume**
6:3 10:18
38:8 57:4
92:23
123:15
137:13
142:10
151:7

**assumed**
24:17,20
31:11
36:14
38:9 39:5
41:10
49:17
55:4
183:21

**assuming**
25:21
26:7
28:10
29:10
33:3 80:5
174:23
184:11

**assumption**
30:11
83:8

**assumptions**
66:16

**assurance**
180:14

**assure**
38:12

**assuring**
43:22

**attack**
74:14
199:23
222:4

**attacks**
19:3
20:18
81:10,17
82:7 83:2
86:3,6
89:23
101:8
140:19
141:22
154:14,18
164:14
167:14
168:16
183:4
193:19

**attend**
65:5

**attention**
92:21
96:4
98:11
100:17
108:23
115:8
118:14
120:8,10
122:21
123:21
124:22
125:9
129:8
131:18
135:6
136:7
138:17
141:2,24
142:7
143:23
174:14
180:23

181:3

**attorney**
9:13
14:17
21:8
108:24
113:7,9,
10 117:7
121:24
135:24
143:19,24
144:6
194:18
232:2
238:10,21
247:15
248:21
257:9

**attorney's**
115:7
145:18
148:17
149:17
155:5
157:22
189:15
231:9
241:4
261:9

**attorneys**
195:4,11

**attract**
141:2,5

**August**
103:2

**authenticit
y**
246:14

**authored**
192:23
246:10,11

**authorities**
123:17

**authority**
64:19
191:13
260:4

**authorized**
148:19
149:20

**autopsies**
91:14,22,
23 93:3,
11 102:4

**autopsy**
92:5,7
93:20
97:25
98:11
100:13,17
103:14,19
111:25
117:20
118:12,21
119:7,22
120:9,15
121:9

**average**
91:11

**avoid**
170:8

**aware**
82:3,4
93:19
101:7
106:24
108:16
119:20
129:16
139:14,15
140:3
150:2
190:21
191:4
253:23

**B**

**back**
8:12
20:18
31:11
42:25
51:4
56:24
64:13,20
69:22
70:14
80:12
92:17
99:7
121:6,22
129:6
134:11
144:8
153:7
162:7
171:17
193:12
198:2
212:5
217:23
226:9
227:18
228:11
235:24
238:2
241:13
242:11
243:2
244:22
245:14
255:10

**background**
177:15

**bad**
53:11
240:22

**bagel**
162:23

180:6

**bantered**
235:23

**barbell**
208:24
209:4
215:16,18
223:12
224:20

**Bari**
202:19
205:4

**barrage**
26:8

**baseball**
6:23 7:19

**based**
7:12
62:19
66:13,15
67:2
71:11,21
84:7 85:2
164:4
165:12,15
256:10

**basic**
28:15
61:16
116:9

**basically**
48:19
188:4

**Bates**
258:20

**bazaar**
8:21

**beard**
161:2

**bedroom**
216:6

222:2,9

**began**
74:4
158:14
217:8

**begin**
219:22

**beginning**
61:24
67:16

**begun**
217:25

**behavior**
170:16

**belief**
226:25

**believed**
126:25
127:4
153:6
154:12
164:6,8
206:15
212:23
213:4,22
216:5
221:24
224:10
234:9

**Belle**
259:3,8
260:8,22

**Bernard**
102:2
103:2,5

**big**
73:8
170:23
206:9,25

**bit**
33:16
42:15

77:9
149:11
251:10

**bizarre**
252:14

**blah**
231:17

**blood**
56:22
89:13
138:13,21
197:23
198:19
205:25
206:4,6
209:13,14
213:5,13,
15,21,23
215:22

**Blow**
251:5

**bludgeon**
215:16

**bludgeoning**
101:12
208:24

**board**
8:20
48:10
148:24

**Bob**
12:5 13:6

**bodies**
68:2,8
188:4

**body**
55:22
67:8
68:20,22
69:4,9
71:17
83:11,18

86:8,14
90:2
91:15
94:7,9
97:4

**book**
65:8,9,19
79:23

**bored**
7:5

**boredom**
8:11,12

**boss**
30:22,24

**bottle**
138:7

**bottom**
174:5
235:8
260:3
261:3

**bought**
248:9

**bound**
141:24

**bracketed**
221:18

**Brady**
95:19
98:20
99:2
100:4
112:25
113:22
114:9,17
115:6,7,
13,17
116:19

**branches**
185:2

**break**

Case 2:09-cv-01207-JS-AYS   Document 184-12   Filed 08/17/16   Page 274 of 318 PageID #: 4021

JOHN MCELHONE                                          October 30, 2014
MARTIN TANKLEFF vs. SUFFOLK COUNTY            Index: breaking..case

6:6,11
49:8
150:4
183:11
229:21

**breaking**
26:9

**Brian**
17:6
34:24
109:4
178:8

**briefed**
216:25

**Briefly**
10:21

**bring**
96:2 98:9
115:7
118:13
187:18
237:23
238:2

**bringing**
42:15
196:11

**broad**
46:10

**broadcast**
231:15

**broiled**
138:16

**broke**
203:10

**Brook**
9:7
218:20

**brother**
9:12

**brought**
25:10

29:13
31:23
32:6
36:14
49:2
64:23
92:21
108:21,
22,25
124:21
126:20,24
138:16
218:21
241:13

**brown**
65:12

**bullet**
37:13
138:2

**bureau**
56:15
148:25
149:14
189:16
228:15,23
229:3
231:9

**burglary**
199:18

**busiest**
30:20

**business**
154:13
165:5,6
176:7

**busy**
246:17,19
247:11
257:9

**by-the-book**
30:14
32:17

**byline**
259:8
260:22

___

**C**

___

**California**
196:10
241:3
242:4,10
245:8,15
246:21
247:13
251:13

**call**
8:22
81:11
83:6
138:9
145:18
149:8
159:12
160:3
175:8,16
213:7
218:13
233:19
247:21

**called**
5:2 32:18
40:22
102:13
106:23
199:14

**caller**
174:17
180:4
227:11

**calling**
212:25

**calls**
217:22
218:4
251:11

**captain**
229:19

**car**
155:3
157:16,19
213:18
217:18
232:9
238:22

**card**
166:14
168:11
198:15
201:10,15
202:7,23

**care**
118:4
234:22

**career**
107:5,25
165:7
202:13
204:6

**careful**
151:8,14,
23 152:13

**carefully**
42:9,19
54:21
76:17
95:3
123:23
124:8
133:10
135:7
137:15
139:7
166:20,24
175:14
177:2

**Carmody**
248:6

**carry**

228:6

**case**
5:11
9:19,25
10:4,9
14:13,21
17:12
22:20,23
23:14
24:4,11
47:25
48:3
50:19,22
51:7,8,
14,21
53:14
60:16
67:7,12
73:25
76:11,12,
20 79:12
83:9 87:2
91:24
93:4
94:23
95:7,10
96:4 98:2
102:13
103:3
108:15
114:10
117:6
118:8
119:4,11
124:2
132:11
135:17
136:2,4,
25 137:21
139:17
140:25
141:23
142:21
143:4,17
145:25
147:23,25

149:7
151:25
172:17
175:20,22
180:4
185:16
187:5,20, 22,23
190:9
191:14
192:22
194:13
197:24
204:15
224:18
225:23
232:3
233:17
235:2
238:9
239:18
241:17
243:13
250:14
256:12
257:3,16
258:5

**cases**
7:21
42:16
47:23
76:20
96:16,17
102:10
122:3,4
130:7
137:23
144:19,25
151:5
165:9,11
187:4
190:6,13
195:13
230:13

**cash**
248:10

**casual**
24:10

**casually**
10:7

**categories**
22:7
114:3
129:24

**caused**
47:22
180:8
203:2

**causing**
168:6

**cell**
217:16

**cetera**
209:15

**chain**
63:17,18
171:22
179:19
181:5
183:2
193:25
205:11
228:20

**chance**
68:20
76:22
88:16
236:17
251:8

**change**
32:19
53:24
76:21
90:15
169:4
244:3

**channel**
218:22

**chapter**
66:5,6

**characteriz ation**
109:6

**characteriz e**
129:2

**charge**
30:19
44:11
229:25

**chart**
229:11,13

**check**
75:23
213:17

**checked**
160:19

**checking**
193:13
247:25

**chief**
5:8  23:11
29:13
32:18
38:25
46:20,24
49:14
79:8
105:22
128:14
140:16
146:3
153:24
183:21
184:19,23
185:9
190:2
228:22
229:3,6, 11  246:5
258:19

**children**
6:25
161:9

**church**
8:19,25

**circles**
33:22
34:9

**circuit**
77:8
164:3

**circumstanc e**
230:9

**circumstanc es**
156:20
168:18,24
169:11
232:4,7
238:20
239:22
249:6,11, 18  250:5
251:4
252:5,15
255:6,11

**City**
8:4

**civil**
22:5,23
23:13
79:11

**claimed**
213:17

**clarity**
102:23

**clean**
32:17
73:3,8

**cleaned**
29:24

**cleaning**
72:23

**clear**
41:15
43:4,15
44:2,13, 19,24
45:2,18
49:18
51:2
87:13
105:10,11
117:14
134:6,9
175:21
182:24
207:4
238:25

**cleared**
254:6

**clearing**
44:16

**clerk**
160:14,17

**clock**
149:2

**close**
24:21
81:10,17
82:25
107:9
132:19
161:4,16
162:19
173:9
254:14

**closely**
16:7
43:10,17
90:17
91:9,18
97:9
102:16
113:19

Case 2:09-cv-01207-JS-AYS   Document 184-12   Filed 08/17/16   Page 276 of 318 PageID #: 4023

JOHN MCELHONE                                          October 30, 2014
MARTIN TANKLEFF vs. SUFFOLK COUNTY          Index: clues..conducting

126:16
132:10

clues
59:11
84:2

cocaine
162:22
176:3

code
159:16

cold
234:5
248:2

collaborati
vely
90:17

collected
219:13

collection
56:8

Collins
106:3,25
107:4,8,
12 108:15

Collins'
109:6

colloquiall
y
29:25

combination
246:9

combined
255:23

comfortable
91:4

command
24:17,20
25:21
26:7
28:10

29:11
31:12
34:6
38:8,10,
21 39:5
41:10
45:9 48:7
51:5
55:4,6,17
76:16
101:4
116:7,20
117:9,18
123:2
166:3,22
167:19
171:11,
19,22
172:7
179:19
181:6
183:2,22
184:11
189:7
193:25
205:11
228:21

commander
24:23
25:2 45:3
123:6
138:25
140:9
171:15
183:25
189:5
230:24

commanding
37:10,20

Commission
28:22

commissione
r
148:23
153:5

184:21,22
185:8
190:3
259:3
260:8

commit
58:16
60:7
110:15
122:10,24
131:23
156:11
198:12

committed
60:20
62:11
73:15
84:3
129:21
203:18
221:14

committing
52:5
110:17
207:7
208:14
210:4
211:2,3

communicate
121:10
123:3
148:12

communicate
d
103:18
139:4
140:4

communicate
s
145:8
146:6

communicati
ng
38:3

128:17
219:11
220:6

communicati
on
218:23

communicati
ons
148:16,17
223:2

community
35:12
108:3,5

company
244:14

compensatio
n
8:16

complaint
22:19,22

complete
6:15
192:2,15

completely
151:15
224:23

comprised
226:16

computer
8:10

conceivably
115:20
254:19

concept
169:14
170:4

concern
140:6
143:2,3,7
144:21
181:11

182:22
223:17
225:2
235:21
236:3,10
237:17
238:12
244:8

concerned
42:4 71:8
139:16
181:15
182:23
231:9
236:12
252:10

concerns
79:13
236:4

concluded
108:17
243:23

conclusion
81:18
243:25

conclusions
85:2,9

concurred
256:17

condensatio
n
17:24

conditions
6:14

conduct
60:20
194:19

conducted
102:3

conducting
42:21
55:25

JOHN MCELHONE
MARTIN TANKLEFF vs. SUFFOLK COUNTY

October 30, 2014
Index: conferences..conversation

56:3

**conferences**
145:19
231:14

**confessed**
101:8,11
206:11,
21,22

**confession**
26:3,16
50:22
51:13,16,
25 52:4
53:4,17
54:10
109:20,23
110:3,8,
18 111:5,
8,18
112:10
116:15
122:9,25
123:25
126:6
127:24
131:22
132:2,11,
25 133:7,
11
134:18,
20,22
135:8
136:8,14,
25 137:8,
17 139:9
197:9,23
207:6,19
208:12,
19,20
209:8
212:10
214:10
215:22,25
222:16
223:3,12,

18 224:19
225:3
226:3,12,
21

**confessions**
26:10,20
27:10,13,
23,25
28:12
29:8
32:11
33:9 34:3
38:17
42:23
43:12,20
44:20
45:6,14
46:3
129:17,25
130:10,16
131:4,10

**confidence**
204:19

**confirm**
246:6
257:13
258:21

**confused**
69:17
200:14

**confusion**
47:17,20
48:15
49:19

**confusions**
27:3

**connected**
17:11
18:15

**connection**
18:10
22:4
123:25

151:10
176:14
182:15
186:23
188:14
189:3

**connections**
175:3

**consent**
260:21

**considered**
115:13
164:13
180:21
181:9
182:19
183:3
243:13,19
254:2

**consistent**
52:18
66:21,24
69:19
78:15
79:22
204:17
207:8,19
209:9
211:5
212:8
214:11
216:4
222:8

**constitute**
112:24,25

**constituted**
116:19

**constitutes**
113:14

**Cont'd**
183:19

**contact**
64:25

158:19,22

**contacted**
159:5
232:11
238:21

**contained**
70:2
80:14,19,
21,24
81:7
85:25
89:20
176:12
191:25
192:25
246:15

**contaminated**
70:8

**contamination**
88:17

**contents**
153:12

**context**
112:24

**continuation**
10:11,15

**continue**
197:17
211:18

**continued**
49:11
153:21
183:13
211:19
217:4
245:23
261:14

**contradict**
108:13

111:4

**contradicted**
95:9
99:16
110:2,9,
16 119:2
206:17
210:14
212:24
213:11,
19,24

**contradiction**
111:13,18

**contradictions**
209:21
210:18
214:2

**contradicts**
94:22
96:3
97:25
117:15
170:13

**contrast**
214:9

**contributes**
226:25

**control**
33:16
49:17
126:21
147:3

**controlled**
145:12
146:19

**conversation**
10:22
13:9
14:11

Case 2:09-cv-01207-JS-AYS Document 184-12 Filed 08/17/16 Page 278 of 318 PageID #: 4025

JOHN MCELHONE                                          October 30, 2014
MARTIN TANKLEFF vs. SUFFOLK COUNTY        Index: conversations..correct

36:13

conversations
11:12
239:4
240:16
253:5

converse
211:3

convey
110:23

conveyed
110:22
121:5

convicted
170:18

conviction
17:16,20
18:4,10

convictions
27:16

convinced
203:13
208:11
243:3
244:9

cooperation
35:13
195:17

coordinate
203:20
204:10

copy
11:5
15:22
174:15
178:11
261:5

cord
213:5

cordially

198:15

corner
174:5

corners
27:24

correct
5:11,12
9:11
17:12
19:15
24:22
25:21
26:5,20
27:3,11
29:8,16
30:7
31:14
33:9,10
34:13
35:12,20,
23 36:20
37:5,22
38:18,21
39:7,13
40:12,13,
25 41:11,
12,13,19,
20,22,23
42:3,7,10
43:12,13,
20,21
44:5,17,
18,22
45:14
46:6,14,
15,17
47:23
48:8,18,
24,25
49:3,6,
21,22
50:7,8,19
51:25
52:6,9,19
53:19,25

54:13,24,
25 55:5,
12,13,20
56:8
58:6,11,
17,24
59:3,6,
11,17
60:4,8,13
61:8,9,20
62:5,6,
14,22
64:11,21
67:18,22
68:3,4,9,
13,16,21
69:3,24
70:9,18
71:6,12,
22 72:16,
19,23
73:3,15
74:18
75:2,10,
11,16
76:5,9,19
77:16
78:16
79:23
80:10,15
81:10
82:7,11,
17,21,22
83:7,20,
21 84:8
87:9
88:6,7,
10,11,15
89:2,11
90:11,19
91:11,22,
25 93:12,
13,20
94:2,3,9,
10,18,24
95:4,5,
13,19,22

96:6,15,
20,25
97:11,12,
16 98:3,
12,17,18
99:13,14,
17
100:13,24
101:5,9,
10,14,19,
20 103:23
106:5,8
110:3,18
111:5,8,
20
112:12,19
113:3,17
114:4,18,
21,25
115:14,
18,23
116:4,7,
22 117:23
118:14
119:9,12,
22 120:18
121:13,21
122:4
123:7,18
124:2,8,
19 125:3
126:17,22
127:2,5,
11,12,25
128:7
129:17,21
130:2,10,
16,24
131:5
132:2,12,
20,25
133:11
134:20,22
135:8,19
136:4,8,
15,20
137:2,13,

17 138:21
139:21
140:6,14,
20 141:3,
6,13
142:13,22
143:24
144:16
145:2,12
146:7,19
147:3,4,
8,21
148:4,8,
9,13,14,
22 149:22
151:7,11,
17
152:22,23
154:4,8,
15,21
155:2,17
156:4,24
157:14
158:10
159:2,16
160:6,15,
20,24
161:10,23
162:3,17,
23
163:17,18
165:10,
18,24,25
166:3,6,
25 167:4,
14,20,21,
25 168:5,
21,22,25
169:2,6
170:9,10,
14,15,19
171:5,13,
14,19,20
172:2,3,
10,21,25
173:3,6,
12,20,22

175:7,15
176:5,9,
15 177:5,
19 179:3,
11,21
181:11
182:5,9,
10,22
183:5,24
184:5,7
185:4,10
188:15,
20,21,23
189:13
190:15
191:4,5,
10,15,16,
18,19,22
192:3,7,
11,13
193:3,4,
9,10,14,
16
194:14,
20,24
195:5,15,
16,18,19,
25
196:15,
22,23
197:6
200:2
202:8,20,
21 203:4
204:11,
20,25
205:12,17
206:19,
20,24
207:10,
20,23
208:25
210:2,5,
11,15,16,
23 211:6,
10,11,17
212:2,3,

11,15,17
213:2,8,
9,13,24
214:7,8,
13,18,19,
22 215:3,
13,19,23
216:7,23
217:6,17
218:2,8,
25
219:13,24
220:8,17,
23
221:14,15
222:10,19
223:6,18
224:4,13,
23,24
225:4,12,
23 226:4
227:18,22
228:15,
16,22
229:7
233:15
234:13,20
236:24
237:5,14
240:8,13
242:11
243:8,14
245:15
246:2,23
247:16,
17,20
248:4,10,
14,25
249:20,21
251:24
252:22
253:5
254:22
256:25
257:16
258:15,16
259:25

**corrected**
69:2

**corrections**
104:15,23

**correctly**
37:16
105:2

**corroborated**
61:19
202:6
208:15
226:20

**corroborating**
61:5

**corroboration**
62:2

**costs**
170:9

**counsel**
6:22
10:19
14:23,25
108:12
142:13
233:10

**counsel's**
15:22

**counter**
101:19
214:17,22

**county**
28:23
108:3
147:19
149:19
162:3,11
228:14
257:10
259:25

**couple**
7:6 8:3
10:16
16:4
28:25
41:14
65:3 76:2
93:14
149:4
150:6
187:18
221:3
232:4,6,
21 239:22

**court**
16:25
17:18
150:17

**cousin**
9:5

**cover**
92:4,7
93:10

**covered**
24:14
91:23
92:20,22,
23 93:3
100:5

**crazy**
156:19

**create**
71:10

**credible**
204:20

**credited**
227:13

**Creedon**
18:21,25
19:22
20:5,12
21:25
227:14

**crime**
47:7,13,
14,17,21
48:18
49:15,21,
24 50:4,
6,11,18
52:18
53:2
54:6,21
55:12,19
56:2,10,
19,25
57:8,18,
24,25
58:17,21
59:11
60:3,4,19
62:10,19
63:11,19,
22 67:21
68:19
69:23
70:8,17
71:5,9,19
72:11
73:10,14
76:18,24
77:12
78:3,10
79:14,15
80:12,14,
19 81:6,7
82:24
83:13
84:3,5,6
85:2,13,
20,24
86:13
88:6,21,
22,23,25
89:10,20
90:4
91:15,17
97:9
122:11
131:23

JOHN MCELHONE
MARTIN TANKLEFF vs. SUFFOLK COUNTY

October 30, 2014
Index: crimes..death

141:18
142:8
170:14
182:15
195:22
197:8,22
198:6,7,
17,22
199:8,14,
17 200:15
203:18
205:2,19
206:17,23
207:9,20
208:9
209:20
212:24
213:12,20
214:12
216:5,20
217:6,17
218:17,23
219:12
220:8,13
221:2
222:2,9
223:5,25
224:10
225:9
226:19
228:23
252:19
255:11
256:6
258:9

crimes
20:6,13
22:3
58:23
74:18
82:13
86:11,17
122:24
129:20
207:7
208:15

210:5
211:2,13
221:13
227:3,25
228:15
243:7
244:11
245:11

criminal
116:10
142:12,20
162:17
173:25
194:16
195:3,10,
13

criminals
254:14,15

Crispino
189:18

critical
74:24
190:20

critically
112:18
124:8

criticism
25:20
26:8,18
33:24
36:24
39:12
46:11
47:7,12

criticisms
28:18

criticized
40:16

criticizing
40:10

cross
194:7

227:5

crossed
241:23
252:17
257:14

crystal
182:24

current
234:4
235:2

cursory
75:17
151:20
207:15

cutting
27:23
101:12

_____

D

_____

DA
146:10,13
250:7,17,
20

DA'S
47:25
147:5

daily
35:16

date
45:20
47:3 79:6
97:14
103:7
135:17
154:23
163:25
196:20
216:18
259:13,17

dated
174:14

259:10,
14,20

dates
186:5,6

daughter
198:16
201:8,20
202:10,19
203:11
226:18
232:11

daughter's
166:16
203:3,14
204:18,20

day
11:7
29:20
37:12
38:2 39:2
40:20
41:17
43:2,25
46:20
61:4
90:14
98:21,25
157:22
203:17
207:24
214:10
222:13
230:17
232:12
235:6
237:20
239:18
262:12

day-and-a-
half
244:13

day-to-day
127:14,19
140:11

188:19
190:22

days
65:3
110:8
194:7
195:24
196:10
221:3
227:5
233:10
234:3
241:14
244:12

dead
153:25
210:11

deal
25:20
26:18
107:18
127:5,17
141:5
225:2

dealing
151:4
162:22
175:18
176:3
177:16
189:22

deals
195:15

dealt
37:25

death
81:21
141:12
154:20,25
187:6
238:5
239:9
240:7,24
241:19

JOHN MCELHONE
MARTIN TANKLEFF vs. SUFFOLK COUNTY

October 30, 2014
Index: decade..detective

244:10
245:8
252:20
253:13
254:16
255:22

**decade**
46:10

**decapitated**
63:17

**deceased**
168:15

**December**
9:16,17
15:19
79:12
216:12,15

**decide**
257:25

**decided**
30:2
55:18
156:15
231:10

**decision**
231:2,23
256:16

**decorated**
204:6

**deducing**
88:14

**defendant**
181:21
194:13
239:19
255:13

**defense**
108:24
117:7
142:12,20
143:11,
12,18,24

144:5
194:17
195:4,11
228:9
233:10,
15,18
234:11,19
235:17
236:7,13
237:10,14
238:4,8,
10,18
239:10,16
240:2
241:13

**defensively**
222:4

**definition**
80:21,23

**definitive**
120:22
121:4
137:4

**definitively**
126:11
138:20

**degree**
173:21,
22,23

**deliberately**
155:14
157:5
158:24

**delineated**
48:9
55:11

**demonstrate**
42:18

**denied**
210:4

**department**
25:12
35:19,20
37:4
45:22
47:6,22
55:9
56:15
145:10,
23,24,25
146:15,18
147:11,
17,19
149:19
152:24
158:7
159:9
160:5
162:3,12,
21 176:23
184:10
185:3
194:19
217:21
228:14
231:7
241:8

**department's**
32:9 35:9
43:18
128:22
159:10

**departments**
191:21

**departure**
120:17
121:12,
17,20
122:15

**depend**
35:11
140:10

**depended**

76:21

**dependent**
67:7,12

**deposed**
9:24
23:20

**deposition**
5:10,14
9:15
10:12
11:6,10
14:15,16
15:10,13,
23 16:12
22:11
23:4,12
24:4,12,
14 29:20
39:2
40:21
46:21,25
55:16
61:4
78:24
79:9,10
90:14
98:22
99:2
100:6
102:20
103:2,4
104:24
108:14
216:13,14
222:13

**describes**
79:21
112:10
122:11,25
127:24

**describing**
19:19,21
208:14
211:4

**design**
190:15

**desk**
8:9

**detail**
213:10

**details**
10:2
97:15
207:17
209:7
212:22
214:11
223:11,24
224:3,9,
18 225:8
226:2

**detective**
15:4,12
28:15
36:4
39:19
40:6 41:9
43:16,23
44:14
46:16
56:13,14
63:10,18
66:12
74:5
76:22
78:19
79:4,11
91:21,25
92:4,9,12
93:2,10
94:6
96:14
97:22
98:13,15
100:19,23
110:8
114:13
118:12,20
119:6,8,

JOHN MCELHONE
MARTIN TANKLEFF vs. SUFFOLK COUNTY

October 30, 2014
Index: detective's..disclose

12,20,24
120:8,9,
14,15
121:5,6,
8,9 122:6
165:8
192:11
202:13
228:17
229:9
247:3,4,
14 248:6,
20 250:6,
17 257:8
260:4

**detective's**
57:17
84:25
86:10
113:11
191:23
192:9

**detectives**
27:8,23
28:11
29:15
30:2,6,20
31:13,25
32:8 33:7
38:14
39:6,9,20
40:7,11,
23 41:7,
16 42:2,
9,19
43:6,9,
16,23
45:8,12,
25 48:16
49:3,19
50:5,10
53:3,14
54:9 57:7
58:6,14,
20 59:20
60:11,18

61:13
62:8,17
64:6 65:4
66:22,23
68:18
73:12
74:23
75:9,13
76:8,16
83:24
86:15
88:24
89:7
90:6,16,
22 91:2,8
93:17,23
94:24
95:12,24,
25 96:6
97:8
100:8
101:3
103:18
112:4,8
115:16
116:6,20
117:9,18
118:4
122:12
123:2
127:8
136:13
139:4,5
146:25
160:13,18
164:6,8
166:2
171:18,24
172:7
177:22
182:17
187:19
191:14
192:17,24
193:13
203:15
205:15,22

206:15,23
208:5
210:19
211:6,9,
15 212:5,
23 213:4,
12,19,22
214:5,6,
20 216:4
217:16,23
218:16,19
221:6
223:4,6,
24 224:10
227:17
228:22
229:6,11
246:21
247:8

**determination**
115:23
138:15
148:10

**determinations**
84:7
205:15

**determine**
94:7,8
159:9
193:6

**determined**
66:10
103:14
120:11
122:8
158:7
167:12
214:25

**develop**
62:18
80:4,7

**developed**

80:25
165:14
197:5

**developments**
190:20

**Diaz**
50:18
51:7,8,
13,21
53:13
54:4

**die**
154:3
253:11

**died**
156:3

**differed**
194:9

**difference**
94:5

**differently**
41:25
151:22

**difficult**
35:19

**dim**
143:2

**direct**
30:8
37:12
78:25
123:16
174:13
191:13
226:13

**directed**
128:6

**direction**
50:14
88:19

91:16

**directly**
102:9,13
109:25
110:16
111:4
179:22
181:24
242:21

**disabilities**
130:9

**disappearance**
148:7
156:2
158:10
233:22
239:23
241:10,11
242:15
243:14

**disappeared**
239:9

**disbursing**
155:8

**discarded**
83:11
132:7

**discarding**
51:17
52:8

**discharge**
117:22

**discipline**
44:5
45:11
46:5
189:8

**disclose**
99:8,11,
12

JOHN MCELHONE
MARTIN TANKLEFF vs. SUFFOLK COUNTY

October 30, 2014
Index: disclosed..early

113:17,18
114:2,5
119:5,8
139:5
225:18

disclosed
108:23
117:6
120:16
123:13
124:11
125:2

disclosing
98:20

discovering
188:4

discuss
175:19
190:7

discussed
89:19

discussing
99:2
210:22

discussion
61:25
129:4
222:22
244:15,19

discussions
138:4
196:8

dismissal
17:20

dismissed
18:6

dispute
34:24
78:12
92:3
163:6,12
220:3

246:13

disrespect
69:12

disseminated
151:9

district
9:13
113:8
117:7
121:24
135:23
145:18
148:16
149:17
189:15
194:18
231:8
241:4
247:15
248:20
257:8
261:9

division
164:21
228:18

document
19:6 20:7
79:20
99:11
103:11
104:13
111:25
112:5
174:6,21,
25
178:11,
14,16
221:20
225:10,
15,18
258:20
261:3

documented

111:19
122:2

documenting
171:25

documents
16:9
17:7,10
18:9,13
22:3,8,
10,16
78:8
246:14
258:24

dogged
143:18

doggedly
143:13

domestic
73:2

door
61:25
80:16,18
166:16
199:15
200:9,23
201:22
203:12
213:16,23

doubt
46:13
107:10,15
152:6
176:11
244:23

doubts
127:21
152:2,15
245:6
257:21,23

Doyle
11:15,19
12:5,24
13:12,22

14:4,12,
21 125:24
126:17,20
127:10,16
166:5,22
167:9,18,
22 171:10
175:12
179:13,
23,25
188:18
190:18
191:7,13
192:10,
21,24
196:21
197:4
216:15,25
217:14
218:5
219:4,8,
23 220:2,
6,13
221:24
225:25
242:5,8
244:17,25
245:13
250:22
251:21
258:15

Doyle's
15:6
216:9,12
221:16
242:24

dragged
160:8

draw
71:10,20
81:18
85:2,9

dream
84:6

drive
202:25

drove
88:19

drowning
230:13

drug
175:18
256:2

drugs
233:21

duly
5:3

dumped
67:11

Dunn
14:17

—————

E

earlier
20:8
46:10
65:19
72:2
128:14
177:4
189:25
192:14
193:16
196:6
233:9
235:4,5

early
50:15
53:2 54:7
74:22
148:24
154:11
164:4
181:16
185:3

189:22
230:18

easily
66:10
174:12

easy
6:25
120:24

edition
65:21

educate
48:16
58:14

effective
30:18,22,
23 60:21

effectively
35:10
37:17

efficient
75:14

efficiently
58:22

effort
91:19

efforts
235:15

election
153:17

elicit
46:3

elicited
222:17

eliciting
224:2

eliminate
169:25

eliminated
168:2

EMS
70:10

encourage
90:16

encouraged
30:7

end
260:9

ending
62:4

enforced
31:4 36:8

enforcement
9:4,11

enlist
251:12

ensure
156:22

ensured
141:22

ensuring
31:12,25

enter
217:10

entered
83:13
86:5
89:24

enterprises
256:3

entire
55:19
56:25
90:20
135:25

entry
89:14
174:14
199:16

equal
140:5
249:15

equally
249:16

equipment
189:10

equipped
251:18

espoused
228:9

event
93:9
146:5
155:6
244:2

events
69:14

eventually
81:5
89:15
94:11

everybody's
252:17

everyone's
138:17

evidence
17:24
27:15
47:13
49:24
52:19,24
54:12,19,
22 56:3,
5,7 57:6,
7 58:16
59:10
60:2,19
61:7
62:19
63:10
66:18

71:21
73:13,22
75:16
81:2
84:2,7,8
85:3
89:13
115:18
138:5
170:12
180:7
197:23
198:19
206:2,8,
16 207:23
212:13,
15,16
214:12
227:6,23
255:12

evidentiary
94:5
182:7

exact
154:23

exam
16:16

EXAMINATION
5:6
183:19

examined
5:4 194:7
227:5

examiner
48:23
91:16
93:25
94:8,12,
21 95:8,
22 96:2,
12,18
97:11,13,
23 100:11
102:3

109:18
112:11
117:10,22
118:3,25
120:10
122:8
131:18
138:19
189:17

examiner's
55:8,23,
24 56:17
57:23
90:18
91:6,10,
12,21
93:19
97:10
98:9,16

examiners
91:14

excellent
126:25

excerpt
79:2
103:9,22

excerpts
102:23

exclude
85:12
104:9

excluded
103:20

excluding
104:6

exclusively
27:22
28:14
189:23

exculpatory
98:10
99:4,5,8,

JOHN MCELHONE
MARTIN TANKLEFF vs. SUFFOLK COUNTY

October 30, 2014
Index: Excuse..fall

| | | | |
|---|---|---|---|
| 12 100:12 | 168:8 | **expressed** | 164:10 | 12 49:16 |
| 113:14 | 175:13 | 154:10 | 167:25 | 50:2,13 |
| 115:21 | 253:11 | **extensive** | 169:3,13 | 53:20 |
| 116:3 | | 221:2 | 179:9,14 | 63:23 |
| 117:19 | **expecting** | **extra** | 180:16, | 65:18 |
| 118:22 | 199:8 | 187:19 | 19,20 | 74:11 |
| 123:12 | **expeditious** | **extraordina** | 181:4,8, | 83:15 |
| **Excuse** | **ly** | **ry** | 10 191:24 | 85:4 |
| 22:21 | 50:12 | 123:5 | 193:6 | 86:18 |
| 247:4 | 60:12 | | 200:8 | 104:8 |
| **executive** | 73:18 | ——————— | 202:6,22 | 107:19 |
| 229:22 | **expenses** | **F** | 204:16 | 128:25 |
| **Exhibit** | 189:10 | ——————— | 210:17 | 139:10 |
| 47:2 79:5 | **experience** | | 213:6 | 142:2 |
| 103:6 | 128:20 | **fabulous** | 214:20,24 | 144:12,20 |
| 163:23 | 138:12 | 87:14 | 225:11 | 145:4 |
| 216:16 | 151:4 | **face** | 226:18 | 152:16,17 |
| 259:12,16 | 256:11 | 37:22 | 228:5 | 155:24 |
| **exhibits** | **experienced** | **facial** | 241:16 | 162:6 |
| 16:20,23 | 40:3 43:6 | 160:23 | 244:4 | 177:25 |
| **exhuming** | 61:13 | **facilitate** | 248:13 | 184:13 |
| 188:5 | 142:12 | 185:19 | 249:18 | 190:17,24 |
| **exited** | 144:24 | **fact** | 255:24 | 208:18 |
| 83:13 | 246:20 | 10:3 42:6 | 257:13 | 235:17 |
| 86:5 | 255:20 | 47:20 | **factors** | **fairly** |
| 89:25 | **expert** | 49:2 80:7 | 231:22 | 41:22 |
| **exodus** | 138:5 | 86:7 | 232:21 | 73:3 |
| 29:20 | **explained** | 107:23 | **facts** | 248:4 |
| **expect** | 242:15 | 108:2,20 | 199:20 | **fake** |
| 8:7 | **explore** | 109:24 | **failed** | 154:24 |
| 42:14,18 | 112:19 | 111:15 | 121:9 | **faked** |
| 117:4 | 131:25 | 112:23 | 122:6 | 154:19 |
| 176:25 | 211:23,25 | 118:2 | 123:3 | 238:5 |
| 198:11,25 | 234:12 | 119:14,18 | 139:5 | 239:8 |
| 204:10 | 235:18 | 120:7 | **fair** | 240:7,23 |
| **expected** | **explored** | 122:7 | 6:4 8:21 | 244:10 |
| 38:15 | 111:20 | 123:22 | 13:4 19:4 | 252:20 |
| 42:11 | 112:17 | 131:23 | 25:13,17 | 253:13 |
| 43:17 | 243:6 | 134:14 | 28:2,13 | 254:15 |
| 44:21 | 245:5 | 135:5,24 | 30:13 | 255:21 |
| 72:9 | **express** | 143:3 | 33:18 | **faking** |
| 75:18 | 125:24 | 158:9 | 34:3 36:9 | 241:19 |
| 144:8 | | 159:11 | 39:22 | 245:7 |
| | | 160:10,13 | 40:18,19 | **fall** |
| | | 162:9,22 | 46:7,11, | |

JOHN MCELHONE
MARTIN TANKLEFF vs. SUFFOLK COUNTY

246:17
247:12

**fallout**
186:15

**falls**
96:5

**false**
129:17,25
130:9,16
131:4,10
132:2,24
133:11
134:19,21
181:8
202:15
203:20
204:8,10

**familiar**
65:9,15
169:14
204:6
233:25

**familiarize**
23:8

**family**
9:3,10
10:5
154:10
164:7,20,
22 168:14
173:9
181:20,22
182:3
199:22
202:15
203:19
204:8,11
232:24
237:20
238:21
239:21
254:15

**Farmingdale**
7:13

**fast**
153:4

**father**
176:4,6
206:4
208:24

**father's**
162:23
164:7
213:2,7

**favor**
166:19

**FBI**
188:2

**feasible**
168:20

**features**
88:22
89:9

**February**
25:6
183:22
229:17

**fed**
225:8

**Federal**
16:25

**feed**
223:24
224:9

**feel**
195:22

**feeling**
63:3

**fell**
228:21,24

**fellow**
238:17

**felt**
242:18

255:21

**figure**
19:11
215:6
235:9
256:19

**figured**
156:13
252:2

**file**
21:4
117:6
163:21,23
246:3,7,
10,15

**finally**
207:6

**finance**
8:20

**finances**
173:6

**find**
73:13
75:5 77:5
83:25
117:4
137:24
174:12
233:10,11
235:25
236:16
238:2
240:12
241:9
257:21

**finding**
108:21
109:18,25
110:12,
15,24
111:3,15
112:22
116:13

117:2,3
118:9
119:2,6,
8,15,25
120:16,22
121:10
122:21
123:3
124:16,23
125:9
129:9
131:19
132:12
133:4,9
134:15
135:4
137:11
138:24
139:2
140:3
196:9
210:11

**findings**
93:19
95:9
96:18
110:11
118:22
137:4

**fine**
87:19
105:11
197:16

**finger**
55:7

**fingerprint
s**
89:12
138:13

**finish**
35:6
87:17
133:20,25
134:8

150:6,25
159:23,24
197:11

**finished**
202:9

**fixing**
36:18

**fled**
154:20
155:15
238:6
241:18
252:20
253:13
254:18
255:23

**flee**
154:25
156:12
257:25

**fleeing**
245:8

**flighty**
243:4

**focus**
27:13
56:23
57:16

**focused**
85:11

**focusing**
27:22
28:14

**follow**
38:16
44:12,21
60:12
94:17

**follow-up**
24:16

**food**

183:10

**forced**
199:16
252:6

**forcible**
89:14

**forgot**
166:15

**form**
9:21
12:15
13:13
14:6
23:17
25:15,23
26:13,22
28:4
30:16
31:7
32:13
33:20
34:7,15
36:10
37:7
38:23
39:24
45:16
53:7
54:15
59:13
60:23
61:22
63:24
67:5
71:14,24
73:5,23
79:25
84:10,14
85:6
86:20
89:4
95:15
96:8,22
97:18
98:5

99:19
103:25
104:13
105:18
107:20
110:5,20
111:10,22
112:14
113:5
115:3
116:24
118:16
120:4,20
121:15
122:17
123:9
124:4
125:5,21
126:8
128:3,11
130:4,12,
18 132:4,
16 133:13
134:24
135:10,21
137:19
139:12,23
140:22
141:8,15
142:4,15,
24 143:15
144:3
145:14
146:21
149:24
155:19
156:6
157:2,8
162:25
169:22
170:21
171:7
172:12,23
173:14
176:17
177:7
178:3

179:5
181:13
183:7
184:15
185:12
186:19
192:5
194:22
195:7
196:3
200:4,25
203:6,23
204:13,22
223:8,20
224:6,15
226:6
227:20
246:25
249:3,13
250:9,25
252:24
254:4,24
255:8
256:8,14
257:18

**formulate**
66:25

**forthright**
108:6

**forward**
18:18
63:4
212:11
227:7,24

**forwarded**
175:10

**found**
52:13
68:3,5,8
86:14
155:3
157:19
180:18,20
206:3

238:7
240:8
241:12

**Francisco**
248:9

**Frank**
7:7

**free**
108:13
170:18
244:14,18

**freelancing**
44:10

**frequenting**
160:15

**Frequently**
151:18

**fresh**
41:18

**FREUDENBERG
ER**
5:7 14:24
17:6
21:19
27:20
33:13
34:23
35:5 39:3
41:3
46:19
47:4
49:7,13
51:19
57:14
61:11,15
63:13
64:4
65:24
68:24
69:11
72:13
77:7
78:22

79:7
81:25
87:5,21
100:2
102:19
103:8
104:18,22
105:8,14,
19,25
109:4,9,
12,15
112:6
118:5,23
119:24
124:12
129:5,14
133:22
134:4,10
150:5,10,
16,19,24
153:18,23
160:12
161:5,18
162:6
163:19
164:2
174:2
178:8
180:22
181:2
183:10,20
192:18
197:14
208:6
209:22
212:21
216:19
245:17,
21,25
246:4
259:5,18
262:3

**friends**
198:14

**front**
157:17

JOHN MCELHONE
MARTIN TANKLEFF vs. SUFFOLK COUNTY

October 30, 2014
Index: fully..hand

fully
    93:18

function
    12:3

future
    236:15

---

G

game
    82:5
    166:14
    168:11
    198:15
    201:10,15
    202:7
    203:10

gamut
    7:24 8:6

garage
    52:14
    213:16

gather
    33:11
    34:23
    42:6
    43:14
    52:23
    58:12
    84:6
    93:14
    106:24
    107:3
    123:20
    124:21
    136:7
    139:6
    159:21
    160:4
    161:3
    179:13
    222:24
    242:13

gathered
    47:13
    54:23
    114:24
    193:2
    219:12

gathering
    12:10

gave
    51:24
    118:8
    152:19
    206:18
    210:8
    214:9
    221:13

Geberth
    64:7,9,18
    66:24

Geberth's
    65:8
    79:23

general
    45:23
    76:13
    253:17

generally
    5:20
    38:20
    97:8
    128:21
    166:12

generated
    260:20

germane
    180:3

get-go
    164:19

girlfriend
    159:13

give
    6:15

11:20
24:12
36:6
50:5,14
59:10
67:20
73:13
84:2
114:13
115:21
116:21
130:9,16
134:9
153:7
204:19

giving
    14:14,15
    27:14
    38:13
    62:14
    76:5
    102:11
    129:25
    131:4,10
    207:18

glass
    138:6

glean
    86:16
    88:10
    90:6

gleaned
    226:19

Glenn
    19:23

goal
    59:8 84:4

godson
    9:8,9

good
    5:8,9
    71:18
    74:21

87:15
143:20
151:21
172:18
178:13
220:12
236:22

govern
    130:23

granddaught
ers
    6:24

great
    25:19
    26:17
    107:18
    127:5,17
    141:5
    181:11
    182:22
    225:2

greater
    131:9

gross
    121:11
    122:15

grossly
    120:17
    224:11

group
    7:8 28:24
    57:4

Grundfast
    157:25

Grunfast's
    161:8,14
    162:9,20

guard
    39:20
    40:2

guess
    8:21 11:4

18:21
19:16
33:22
64:22
153:16
184:7
186:12,14
189:14
215:4
228:9
238:11
248:15

Guido
    148:24
    149:14
    153:5,14

guilt
    61:18

guilty
    170:18

gun
    138:3

guy
    32:18
    164:24
    172:18
    180:6
    201:19,23
    237:23
    241:10
    254:13

guys
    245:18

---

H

habit
    160:15

hair
    160:23
    161:2

hand

231:5

**handed**
115:14

**handle**
231:10,13

**handled**
50:18
73:18

**hands**
135:19

**handwritten**
259:2
260:9

**happen**
88:12
179:15
198:18
230:17

**happened**
24:24
51:6,9
108:12
123:18
128:9
133:3
140:18
155:7
158:5,25
165:20
167:25
171:12
199:14
222:18
231:16
235:9,21
236:17
239:2
252:5

**happening**
151:19
163:5,7,
13 218:7

**happenings**
190:4

**happy**
5:24
222:13

**hard**
153:4
180:7

**harder**
237:13
238:9
239:7

**Harris**
18:21
19:2,23
20:5,12
22:2
227:14

**head**
189:19

**headquarters**
216:23
217:25
218:18,25
219:5

**health**
6:13

**hear**
125:16
163:11
238:24

**heard**
131:8
228:4,8
232:12
253:7,9

**hearing**
233:7

**hearings**
28:24
185:22,23

186:2,16,
24

**heavy**
44:6

**heck**
243:10
254:8

**held**
129:4

**hesitate**
44:4
45:10

**hesitation**
42:7
168:7

**hew**
43:18

**hey**
127:21
240:21
253:10

**high**
26:18
27:7
29:15
140:19
144:18,25
145:10
146:5
151:2,5
165:8
187:3

**higher**
131:4
147:2
185:2

**highlighted**
174:16

**Highway**
160:9

**hired**

228:5

**Hirsch**
48:23
58:5
90:25
102:11
189:18

**history**
256:4

**holiday**
11:22
12:12,24

**home**
6:24
52:14,15
53:16,21
65:20
68:5,9
69:24
73:9
80:17
188:3
196:11
198:17
199:11
200:10,20
201:5
217:11
219:21

**homicide**
16:17
20:10
21:9,24
24:18,21
25:18
26:7,19,
25 27:9
28:11
29:4,6,
11,16
31:12,24
32:7,20
33:15
34:2,4

35:22
36:3,4,7,
19,25
37:3,14,
21,22
38:8,10,
14 39:10
40:8,16
42:21
45:3,11,
25 47:10,
23 48:16
49:3,18,
19,25
51:5
54:5,7
55:4,17,
18,21
56:6,13
57:11,17
58:6,14,
20 59:6,
8,19 60:7
62:17
63:9,18
64:6,10,
20 65:5,
10,16
66:7,16,
21,23
67:3,25
70:6
71:7,19
73:12
74:22
76:14
80:13
83:23,24
84:21,23
86:10,14
88:18
90:5,15
91:11
93:11,18
94:6
95:10,24
96:5,14

JOHN MCELHONE                                          October 30, 2014
MARTIN TANKLEFF vs. SUFFOLK COUNTY          Index: homicide's..important

97:8,15,
21,22
98:2,13
106:13
113:11
114:8,13,
16,25
119:19
122:3
123:6
124:15
126:21
138:25
140:9,11,
13 143:17
144:8,25
145:7,11
148:3,21
149:7
151:5
153:10
154:11
160:13
161:21
164:5
165:22
166:23
167:10,23
168:9,13
170:7
171:16
173:19
174:24
175:5,11
176:24
178:23
180:24
181:8
183:22,25
184:4
186:21
187:23
188:11
189:3,6,
11,16
190:4
196:7,14

210:21
227:16
228:11,
14,21
229:15
230:2,5,
22,24
231:3,8,
18
232:14,
17,19
233:4
234:8,9,
16 235:14
236:5,21,
23 237:7,
12 239:5
240:11,16
246:12,18
247:8,13,
14
248:19,20
250:6
253:19,
21,25
257:7,8,
10 260:5

homicide's
98:15
119:3
169:4

homicides
50:12
88:12
102:6
127:8
149:21
151:6
190:14
198:9
237:5

honest
107:17
108:6

honesty
107:15

hoped
70:10

horrific
141:18

Horvath
218:10
219:4,10

hospital
68:16
69:5,18
218:20,24

hospitals
69:17

hotel
160:14,19

hotels
247:25

hour
11:6 23:7

hours
16:4
82:19,25
83:3
86:2,6
89:22
150:13,
17,20,22

house
29:24
32:17
72:5,19
73:3 81:3
85:21
86:5
90:10
199:5
200:2,7,
19 202:24
207:25
208:16

209:10
210:14,20
211:6,15
215:10
219:19,23

Huntington
229:23

hypotheses
71:21

hypothesis
63:5,7
66:11,25
67:10
71:10
80:4,8

_____

I
_____

ID
57:8

idea
106:10,
15,18
155:22
169:24

ideal
71:9,16
72:7

ideally
60:25
73:16

identificat
ion
47:3
56:14
57:22
79:6
103:7
163:24
216:17
259:13,17

identified

54:6

identify
54:11
56:7,20
58:22
59:9
60:2,11

identifying
60:6

ignore
170:12

ignoring
27:14

illegal
27:2,10

image
33:16
34:5
36:19
37:3

immediately
56:12
62:9 81:5
123:15
203:16

impact
6:14
34:21

importance
61:5
98:20

important
33:2
34:13
35:16
36:15,22
37:2,11,
18 38:4,
11 49:25
50:5
54:17
59:5

Case 2:09-cv-01207-JS-AYS   Document 184-12   Filed 08/17/16   Page 291 of 318 PageID #: 4038

JOHN MCELHONE                                          October 30, 2014
MARTIN TANKLEFF vs. SUFFOLK COUNTY          Index: improper..Inspector

60:14,15
61:12
62:7,8,16
67:15
75:4,13
76:4
92:20
93:10,17
94:14,16,
23  95:11,
19  110:2
112:18
170:6,7,
12  171:2
173:2,5,8
177:18,22
178:23
208:4
209:19
226:21
233:13,14
249:16,23

improper
27:9
28:12
29:7
77:11
120:17
172:16
223:23
224:11

improperly
225:8

in-person
11:8

inadvertent
ly
178:10

inappropria
te
224:23

incident
254:7

incidents
230:8

include
99:15
261:15

included
27:21
29:6

includes
189:8

including
26:2
35:22
41:9
42:22
43:11,16,
19,23
45:5,13
46:16
59:16
60:6
67:20
90:22
136:3
139:18
178:24

inconsisten
cies
54:11

inconsisten
cy
198:20

inconsisten
t
51:11

incumbent
114:20

independent
ly
223:15

indicating
206:7

indication
70:16,24

indications
73:14

indicia
221:13

indictments
17:21
18:5

indirectly
219:9

individual
41:6  57:3
58:8,10
108:6
162:2,10
182:19
190:6,12

individuall
y
162:13
196:18

indoor
70:2

inevitable
230:19

inferences
71:10,20

information
19:20,21
20:3,4
35:14
50:5,23
52:25
54:5,10
62:13,15
76:4  81:2
86:11,16
88:9,14,
25  89:7
90:7
93:24

94:13,14,
17,21
95:2,8,
12,18
96:2,13
97:4,24
98:10
99:9,13,
16
100:12,
18,22
108:24,25
113:2,14
114:3,6,
14,24
116:2,19
117:20
120:25
122:13
123:12
129:13
146:17
148:25
149:14
151:9,14,
20,24
152:14,
20,21
163:8,14
165:13,
14,15
167:16
173:11
175:17
176:12,
21,22,25
178:6,25
179:21
182:8,11,
14  191:25
192:17
193:2,8
205:10
210:13
218:15
219:11
220:21

221:12
222:15
223:3
226:15,19
227:15
231:16
260:20

information
's
152:3

informed
179:25
190:20
220:16

initial
66:13
67:2,13
78:10
161:7
217:7
235:6

initially
206:18
232:25

injected
188:6

injuries
154:3

innocent
135:18
170:17

inordinate
184:18

inquiries
189:23

inside
81:3
200:19

inspections
75:17

Inspector

| | | | | |
|---|---|---|---|---|
| 64:16,24 | interrogate d | investigate | 97:16 | 42:21 |
| **instituted** | 60:17 | 80:7 | 100:10 | 44:11 |
| 149:14 | **interrogati ng** | 123:16,17 | 112:25 | 47:15 |
| **instruction s** | 218:2 | 169:5 | 114:25 | 49:25 |
| 158:2 | 219:6 | 171:2 | 127:11, 14,20 | 59:6 |
| **instructor** | 220:22 | 172:9,20 | 128:7,21, 24 129:3 | 64:20 |
| 64:10 | **interrogati on** | 178:23 | 132:20 | 65:17 |
| **instrument** | 60:21 | 237:4 | 140:12,18 | 71:8 |
| 108:19 | 61:7 | 256:20 | 141:12 | 116:10 |
| **insufficien t** | 62:12 | **investigate d** | 143:22 | 149:22 |
| 52:24,25 | 63:15 | 167:11,24 | 144:9 | 184:5 |
| **integrate** | 130:23 | 168:4 | 145:7,11 | 188:12 |
| 93:24 | 136:20 | 172:4 | 147:20 | 189:4 |
| **integrity** | 212:6 | 176:14 | 148:3,6, 13,21 | 194:20 |
| 107:11,18 | 218:7,11 | 178:21 | 151:11 | 230:3 |
| 127:5 | 219:15 | 179:21 | 153:2 | **investigati ve** |
| **intellectua l** | 221:7 | 180:11 | 154:12 | 18:20,24 |
| 130:8 | **interrogati ons** | 181:7 | 156:9 | 19:7,12, 14 78:9 |
| **intend** | 61:17 | 194:2 | 170:8 | 153:9 |
| 42:8 | **interruptin g** | 196:12 | 175:24 | 197:4 |
| **intention** | 134:2 | 226:23 | 177:5 | 231:12 |
| 157:11 | 218:13 | 258:14 | 180:24 | **investigato r** |
| 240:14 | **interview** | **investigati ng** | 181:17 | 7:5 |
| **interacting** | 76:23 | 7:22 8:5 | 186:17 | 255:20 |
| 13:11,16 | 192:20,22 | 211:18,20 | 187:7,10 | **investigato rs** |
| 91:5 | 193:3,9 | 227:17 | 188:8,13, 20 190:14 | 7:24 |
| **interaction s** | 205:4,7, 23 231:21 | 236:23 | 191:3,9, 12 194:11 | 66:12 |
| 13:20 | 252:4 | 256:24 | 197:22 | 113:25 |
| **interest** | **interviewed** | **investigati on** | 230:4,22 | **investigtio n** |
| 233:17 | 160:11,14 | 16:18 | 231:4,19 | 151:3 |
| 234:24 | 203:15 | 20:10,17 | 232:15 | **Investigtio ns** |
| 237:18 | 242:21 | 21:24 | 236:19,22 | 7:8 |
| 248:24 | 250:15 | 26:3 | 239:6 | **involve** |
| 249:9 | **interviewin g** | 28:22 | 240:18 | 237:11 |
| **interests** | 75:22 | 54:8 59:9 | 246:7 | **involved** |
| 234:17 | 76:19 | 65:10 | 248:24 | 9:24 10:8 |
| | 243:22 | 66:7 | 249:9,20 | 18:19,23 |
| | | 76:14 | 250:3 | 24:11 |
| | | 91:11 | **investigati ons** | |
| | | 93:11,18 | 35:15 | |
| | | 95:11 | | |
| | | 96:14,19 | | |

Case 2:09-cv-01207-JS-AYS   Document 184-12   Filed 08/17/16   Page 293 of 318 PageID #: 4040

JOHN MCELHONE                                          October 30, 2014
MARTIN TANKLEFF vs. SUFFOLK COUNTY              Index: involvement..kill

48:3 72:3
73:17
88:17
102:9
124:15
127:18
136:13
148:4
154:14
165:5
167:13
185:19
187:4,22
188:7
193:19
194:5
195:21
196:18
197:2
198:8
199:10
200:12,16
206:2
230:5,23
231:3
232:20
233:4
235:15,19
239:5
240:11,17
243:7
245:7
250:2,13
252:7
253:6,14
254:20
256:2,5
257:2
258:4
260:19
**involvement**
190:13
195:23
228:3
**ironed**
47:18

48:6
**irrational**
242:17
**issue**
95:22
105:20
111:14
236:14
238:15
240:15
**issued**
153:3
258:22
260:16
261:6
**items**
58:15
60:6

_____

J

**J-o-h-n**
5:2
183:17
**Jablonsky**
241:3
242:5
250:21
**Jablonsky's**
235:22
**jail**
255:19
**January**
7:19
153:16
184:20
186:6,7
**Jerry**
21:4
148:7
154:13,
19,24

155:11,
13,25
159:11
161:21,25
162:9
166:24
167:11,17
168:24
175:2
182:4
183:2
193:18
196:25
199:3,9,
24
200:11,
12,19,22
201:4,19,
24 202:3,
18,24
204:17
205:7,20
226:16
227:2,24
228:2,5
230:4
231:17
232:16,23
235:15
239:8,11
241:17
246:7
248:3,8,
13,21
252:18
253:12
255:15
257:11
258:7
**Jerry's**
202:5
**jewelry**
160:24
**job**
33:2,6

34:22
35:10
37:18
38:4 42:3
43:25
**jobs**
41:17
**Joe**
251:5
**John**
87:10
106:3,25
107:12
260:4
262:9
**join**
42:2
**joke**
35:4,6
**Joseph**
19:22
**judge**
106:25
107:4,6,8
108:15
109:6
**judgments**
113:15
**jurat**
261:15
**jurisdictio
n**
154:20,25
155:15
156:23
159:2
238:6
241:18
252:21
253:14
254:19
255:23

**justify**
212:9
**juvenile**
228:25
**juveniles**
130:15,22
131:3,9

_____

K

_____

**keeping**
190:19
**Kent**
18:22
19:2,22
20:5,12
21:25
227:14
**keys**
166:16
**kid**
143:9
**kidnap**
236:18
**kidnapped**
155:16
156:10,24
**kidnapping**
159:4
236:21
**kidnappings**
237:5
**kids**
24:7
**Kiley**
149:3
**kill**
111:17
133:6
134:17

JOHN MCELHONE
MARTIN TANKLEFF vs. SUFFOLK COUNTY

October 30, 2014
Index: killed..left

137:12
255:17

**killed**
110:25
144:17
156:11,24
188:6
255:16

**killer**
232:25
253:20

**kind**
6:25 7:21
8:2 13:20
30:14
31:4
32:18
67:10
72:11
73:10,23
83:23
86:12
88:23
126:3
127:24
155:8
156:12
158:21
179:18
198:24
237:2
242:17
253:16
257:21,23

**kitchen**
101:18
214:17,22

**knew**
32:25
70:5 75:6
102:7,11
129:19
137:8
162:14,16

181:19,25
190:18
200:19
201:4
222:7
233:5,12
235:21

**knife**
52:6,9,
11,12,13
101:13,
17,21,22
103:16,19
108:18
109:22
110:9,14
111:2,17
116:14,17
118:11
119:17
120:13
122:23
124:18,24
125:11,
17,18
126:12,15
127:22
129:7,11
131:21
132:6
133:6
134:16
137:12
138:2,13,
14,20
139:3
214:16,
21,24
215:11
223:13
224:19

**knob**
213:16

**knock**
166:16

201:21

**knocking**
203:11

**knowledge**
30:9
50:17
86:4
161:12
192:2

_____

L

_____

**LA**
248:9
257:10

**lab**
55:8
56:17,22
57:5,24
68:19
91:15,17
97:9
189:18,19

**lab's**
57:25

**lack**
160:3

**land**
75:24

**LAPD**
251:15,17
257:12

**large**
13:7
72:18
219:21

**late**
7:19
64:21
82:10
99:7
227:18

228:11

**law**
9:3,11
34:19
35:3,9
113:16

**lawsuit**
9:25 10:8

**lawyer**
24:3
142:20
143:12
157:25
194:17

**lay**
75:24

**laying**
67:9

**lead**
52:20
56:12
60:17
100:19,23
119:8,11
149:16

**leadership**
185:20

**leading**
45:20

**leads**
60:12
199:9

**leaking**
49:9

**learn**
50:10
86:10

**learned**
54:4
75:22
89:16

123:2
137:3,10
138:24
139:2
157:15
161:3,21
182:8
202:22
222:15

**learning**
163:8,14

**leave**
30:5
40:11
57:21
110:23
200:2
201:12,
16,17,20,
24 202:7,
24 229:15
258:18

**leaving**
23:14
156:22
202:2

**lector**
8:20

**led**
17:19
247:22

**left**
39:7
79:14
106:13
157:14,
16,24
159:2
161:9
198:16
200:23
201:11
216:22
232:2,9

JOHN MCELHONE
MARTIN TANKLEFF vs. SUFFOLK COUNTY

October 30, 2014
Index: legal..making

| | | | | |
|---|---|---|---|---|
| 238:2 | 84:16,18, | 166:10,23 | 88:23 | 37:15 |
| 252:3 | 24 85:14 | 175:5,12, | 90:15 | 43:9 45:2 |
| **legal** | 86:3 | 14 176:19 | 95:8 | 54:21 |
| 108:2,4 | 89:23 | 178:15 | 98:19 | 56:20 |
| 114:17, | 190:15 | 179:8,24 | 104:15,23 | 58:13,20 |
| 20,23 | **linking** | 180:2,16 | 108:16 | 67:10 |
| **legislature** | 227:24 | 182:18,21 | 109:18 | 75:14 |
| 28:23 | **list** | 213:6 | 112:23 | 80:19 |
| **legitimate** | 131:12 | 232:16 | 116:13 | 83:8 84:7 |
| 159:3 | **listen** | 233:18 | 117:2,3 | 93:17,23 |
| **lessons** | 166:19 | 238:7 | 119:2 | 100:18,22 |
| 54:4 | **litigation** | 240:4 | 122:21 | 110:12 |
| **letter** | 22:5 | 243:23 | 124:16,22 | 111:15 |
| 157:23,24 | **lived** | **Los** | 125:9 | 113:8,15 |
| 161:9 | 72:15 | 159:20 | 129:9 | 115:22 |
| 231:25 | **living** | **lost** | 131:19 | 117:5 |
| 238:20 | 76:23 | 21:18 | 132:12 | 118:9 |
| **letterhead** | **locate** | 54:19 | 133:4 | 119:15,25 |
| 259:25 | 235:15 | **lot** | 134:14 | 133:23 |
| **letting** | 251:14 | 29:21 | 137:11 | 134:6 |
| 218:5 | **located** | 37:23 | 139:2 | 135:5,17 |
| **liaison** | 247:20 | 97:2 | 141:12 | 138:14,23 |
| 189:15,20 | **location** | 142:7 | 148:11 | 140:12 |
| **liberal** | 83:19 | 144:10 | 152:18 | 145:8,19 |
| 115:17 | **logical** | 177:18 | 158:24 | 155:14 |
| **Lieutenant** | 159:5 | 180:8 | 187:25 | 156:2 |
| 149:2 | **long** | 238:23 | 190:19 | 157:5 |
| 260:4 | 23:5 | 242:25 | 191:4 | 158:16,21 |
| **life** | 39:11 | | 203:13 | 171:23 |
| 70:13 | 42:12 | _____ | 205:11,16 | 235:13,16 |
| **light** | 43:7 | | 207:14 | 236:8 |
| 173:11 | 92:20 | **M** | 220:14 | 237:12 |
| 205:24,25 | 150:8 | | 227:14 | 239:7,25 |
| 209:14 | 157:12 | **M-c-e-l-h-** | 229:9 | 241:16 |
| **likelihood** | 243:2 | **o-n-e** | 231:2 | 251:14 |
| 142:11 | **looked** | 5:2 | 238:8 | **makes** |
| **limited** | 23:2 | 183:17 | **magic** | 35:19 |
| 28:19 | 30:21 | **made** | 37:13 | **making** |
| 67:12 | 137:14 | 19:2 | **major** | 8:23 |
| 83:12 | 156:23 | 41:14 | 128:20 | 32:19 |
| | 165:17 | 43:4,15 | 203:8 | 35:4 |
| | | 44:2,13, | 228:15,23 | 57:12 |
| | | 19,24 | **make** | 200:21 |
| | | 59:2,24 | 32:7 33:6 | 220:15 |
| | | 64:3,25 | 36:3 | 234:18,19 |
| | | 83:23 | | |

**male**
174:17

**man**
107:18
238:17

**man's**
235:23

**manage**
127:8

**management**
66:6

**manner**
156:3

**March**
7:19

**mark**
46:22,23
65:24
78:6,23,
25 102:20
163:20
259:6

**marked**
46:21,25
78:24
79:4
103:6
163:23
174:15
178:10
216:16
221:16
259:12,15

**Martin**
72:3
164:19

**Marty**
17:15
74:17,24
75:5
76:5,9,19
77:2,13,

19,24
78:11
79:15
101:8,16
106:4
109:19
110:17,25
111:8
122:24
127:23
131:22,25
132:24
133:10
134:19,21
135:7
136:19
141:11
142:11,19
154:9
164:5,22
169:3
172:17
182:2
194:16
205:21
206:18,21
207:6,17
208:14,23
209:24
210:8,25
211:12
212:8
213:6,13,
16 214:4,
9 215:15,
21 216:2,
22 218:2,
8 219:6
220:23
221:8,9
223:5,15
224:22
225:8
226:4,15
232:24
235:3
239:11

240:5
255:19

**Marty's**
17:20
111:4,18
116:14
133:7
134:17
142:18
143:23
171:4
185:24
187:5
195:25
198:20
206:10
208:12
209:4
210:14,
18,22
211:9
212:11,
20,22
213:10,24
214:6
215:19
222:16
223:3
224:19
226:12,20
233:15
234:11,17
235:16
236:7,13
237:10
238:4,8
239:10

**Mary**
109:22

**master**
222:9

**match**
204:25
205:20
211:14

**matched**
138:3
205:21
206:22

**material**
95:19
98:21
99:3,4,5

**materially**
37:2

**materials**
19:18

**Mather**
69:18

**matrimonial**
8:2

**matter**
229:14
244:3

**Mccready**
15:5,13
39:19
40:6,14
41:9
43:17,24
44:14
46:16
77:11
78:2,8,20
79:4,11,
21
119:12,20
120:15
121:6,8
136:14,24
137:16
139:8,19
207:5,8,
14,16
208:10,
13,16
209:3,8
215:9,17
216:22

217:24
218:5,17,
24 219:5,
9 220:7,
16,20
222:17
223:14
224:21
225:7,21
226:3
242:5,9
244:17,25
245:13
250:22
251:21

**Mccready's**
78:15
80:5
120:9
242:23

**Mcelhone**
5:8 6:1
7:1 8:1
9:1 10:1
11:1 12:1
13:1 14:1
15:1 16:1
17:1 18:1
19:1 20:1
21:1 22:1
23:1,11
24:1 25:1
26:1 27:1
28:1
29:1,13
30:1 31:1
32:1 33:1
34:1 35:1
36:1 37:1
38:1,25
39:1 40:1
41:1 42:1
43:1 44:1
45:1
46:1,23
47:1,2

JOHN MCELHONE                                    October 30, 2014
MARTIN TANKLEFF vs. SUFFOLK COUNTY        Index: Mcelhone's..medical

| | | | | |
|---|---|---|---|---|
| 48:1 | 119:1 | 166:1 | 213:1 | 16,19 |
| 49:1,14 | 120:1 | 167:1 | 214:1 | 260:1,5 |
| 50:1 51:1 | 121:1 | 168:1 | 215:1 | 261:1 |
| 52:1 53:1 | 122:1 | 169:1 | 216:1,16 | 262:1,9 |
| 54:1 55:1 | 123:1 | 170:1 | 217:1 | |
| 56:1 57:1 | 124:1 | 171:1 | 218:1 | **Mcelhone's** |
| 58:1 59:1 | 125:1 | 172:1 | 219:1 | 46:20,25 |
| 60:1 61:1 | 126:1 | 173:1 | 220:1 | |
| 62:1 63:1 | 127:1 | 174:1 | 221:1,17 | **means** |
| 64:1 65:1 | 128:1,14 | 175:1 | 222:1 | 27:15 |
| 66:1 67:1 | 129:1 | 176:1 | 223:1 | 28:12 |
| 68:1 69:1 | 130:1 | 177:1 | 224:1 | 142:18 |
| 70:1 71:1 | 131:1 | 178:1 | 225:1 | 169:19 |
| 72:1 73:1 | 132:1 | 179:1 | 226:1 | |
| 74:1 75:1 | 133:1 | 180:1 | 227:1 | **mechanism** |
| 76:1 77:1 | 134:1 | 181:1 | 228:1 | 261:12 |
| 78:1 | 135:1 | 182:1 | 229:1 | **media** |
| 79:1,5,8 | 136:1 | 183:1,21 | 230:1 | 26:19 |
| 80:1 81:1 | 137:1 | 184:1 | 231:1 | 141:2,24 |
| 82:1 83:1 | 138:1 | 185:1 | 232:1 | 142:6,7 |
| 84:1 85:1 | 139:1 | 186:1 | 233:1 | |
| 86:1 87:1 | 140:1,16 | 187:1 | 234:1 | **medical** |
| 88:1 89:1 | 141:1 | 188:1 | 235:1 | 48:23 |
| 90:1 91:1 | 142:1 | 189:1 | 236:1 | 55:8,22, |
| 92:1 93:1 | 143:1 | 190:1 | 237:1 | 24 56:17 |
| 94:1 95:1 | 144:1 | 191:1 | 238:1 | 57:22 |
| 96:1 97:1 | 145:1 | 192:1 | 239:1 | 90:18 |
| 98:1 99:1 | 146:1 | 193:1 | 240:1 | 91:5,9, |
| 100:1 | 147:1 | 194:1 | 241:1 | 12,13,16, |
| 101:1 | 148:1 | 195:1 | 242:1 | 21 93:19, |
| 102:1 | 149:1 | 196:1 | 243:1 | 25 94:8, |
| 103:1,6 | 150:1 | 197:1 | 244:1 | 12,21 |
| 104:1 | 151:1 | 198:1 | 245:1,25 | 95:8,21, |
| 105:1,23 | 152:1 | 199:1 | 246:1,5 | 25 96:12, |
| 106:1 | 153:1,24 | 200:1 | 247:1 | 17 97:10, |
| 107:1 | 154:1 | 201:1 | 248:1 | 13,23 |
| 108:1 | 155:1 | 202:1 | 249:1 | 98:9,16 |
| 109:1 | 156:1 | 203:1 | 250:1 | 100:11 |
| 110:1 | 157:1 | 204:1 | 251:1 | 102:2 |
| 111:1 | 158:1 | 205:1 | 252:1 | 109:17 |
| 112:1 | 159:1 | 206:1 | 253:1 | 112:11 |
| 113:1 | 160:1 | 207:1 | 254:1 | 117:10,22 |
| 114:1 | 161:1 | 208:1 | 255:1 | 118:2,25 |
| 115:1 | 162:1 | 209:1 | 256:1 | 120:10 |
| 116:1 | 163:1,23 | 210:1 | 257:1 | 122:8 |
| 117:1 | 164:1 | 211:1 | 258:1,19 | 131:18 |
| 118:1 | 165:1 | 212:1 | 259:1,12, | 138:19 |
| | | | | 189:17 |

medication
  6:18

medicine
  34:19
  35:9

meet
  12:8

meeting
  14:18,20
  21:7
  161:8,13,
  17,20
  162:8,20

meetings
  11:8
  41:6,15
  43:15

member
  57:4
  199:22
  203:19
  204:11

members
  10:5 91:5
  154:10
  164:8,20
  168:15
  173:9
  181:20,22
  182:3
  202:15
  204:8
  210:20
  232:24
  237:21
  238:22
  239:21

mentioned
  9:23 10:3
  15:21
  20:8 47:5
  118:20
  136:22
  176:22

187:2
212:19
227:4
233:9
235:4
237:19,20
251:20

mentor
  42:16

MES
  91:18

message
  46:14
  145:9
  146:16,18
  159:14

met
  76:9

mid-90s
  21:3

Mike
  157:25
  161:8,14
  162:9,20

mind
  46:13
  101:3
  116:12
  169:25
  174:11
  176:11
  202:5
  241:23
  242:16
  252:17
  255:14
  257:14

mine
  80:22
  143:3,4

minimum
  164:13
  165:16

175:5

minute
  117:8
  129:6
  147:24

minutes
  82:20
  83:2,3
  117:16,
  17,24
  150:14
  202:11
  245:18

missing
  21:3,12,
  22 148:2,
  11,13,18
  149:15
  163:20,22
  167:8,18
  171:13
  175:9,20,
  22
  228:24,25
  229:6
  230:2,3,
  16,21
  231:4,13
  232:15
  233:20
  234:5
  237:3
  239:6
  240:17
  246:3,6,
  10,11,22
  247:16,
  18,19
  248:22
  249:5,10,
  17 250:4,
  18 251:3,
  18 256:21

Mitchell
  9:20

10:20,23,
25 11:9
12:14,19
13:2,13
14:5,22
16:13
17:9
21:16,21
23:16
25:14,22
26:12,21
27:4 28:3
29:17
30:15
31:6
32:12
33:19
34:7,14,
25 36:10
37:6
38:22
39:23
45:15
53:6
54:14
59:12
60:22
61:21
63:24
65:22
66:3 67:4
68:22
69:7
71:13,23
73:4
79:24
84:9,13
85:5
86:19
87:10
88:2 89:3
92:11
95:14
96:7,21
97:17
98:4
99:18,24

100:14
103:24
104:12,
20,25
105:12,17
106:11,20
107:20
109:8,11
110:4,19
111:9,21
112:13
113:4
115:2
116:23
118:15
119:23
120:3,19
121:14
122:16
123:8
124:3
125:4,20
126:7
128:2,10
130:3,11,
17 132:3,
15
133:12,
20,25
134:8,23
135:9,20
137:18
139:11,22
140:21
141:7,14
142:3,14,
23 143:14
144:2
145:13
146:20
149:23
150:3,8,
12,18,21
155:18
156:5,25
157:7
159:22

JOHN MCELHONE                                              October 30, 2014
MARTIN TANKLEFF vs. SUFFOLK COUNTY            Index: moment..Norman

162:4,7,
24
163:10,16
169:21
170:20
171:6
172:11,22
173:13
176:16
177:6
178:2,12
179:4
181:12
183:6
184:14
185:11
186:13,18
192:4
194:21
195:6
196:2
197:11,16
200:3,24
203:5,22
204:12,21
215:5
223:7,19
224:5,14
226:5
227:19
237:15
245:19
246:24
249:2,12
250:8,24
252:23
254:3,23
255:7
256:7,13
257:17

**moment**
59:25

**Monday**
10:24

**money**

161:23
164:11
165:3,4,
6,9
168:17
182:13
254:14
255:25

**monitoring**
189:9

**month**
229:20

**month-and-
a-half**
229:20

**monthly**
49:5 58:5

**months**
7:4,7,17
25:3,8
45:20
67:9
145:4
185:15

**morning**
5:8,9
79:15
82:10,13,
17 84:22
85:21
89:18
199:25
200:14
206:24
207:10
208:17
209:10
210:4,9
215:11
216:5
217:17
221:25

**mother**
216:3

223:14
224:20

**mother's**
213:18
216:6

**motive**
165:9
168:18

**mouth**
239:13,19

**move**
99:22
134:5

**multiple**
33:25
78:3,4

**murder**
25:7
51:18
52:13,17
53:15,18
59:16
103:17,20
108:19
109:23,24
112:10,12
116:15,18
118:11
119:17
120:13
124:18,25
125:11,19
126:5
127:22
129:12
131:21
147:20
153:2
164:7,9
165:10
168:19
215:23
235:6
241:12

**murdered**
83:20
86:9 90:3
155:16

**murdering**
143:10

**murders**
18:6 19:3
24:22
25:4 75:2
106:5
110:15,18
140:17
182:5
185:8
198:12
227:18
228:6

**Murphy**
64:16,24

**mysterious**
241:11

**mystery**
252:11,13

—————

**N**

—————

**named**
168:14
181:19

**names**
23:19

**narcotics**
47:10
153:10

**narrative**
16:24

**nature**
142:8
151:3
236:3

**necessarily**
34:21
97:14,20
98:8
192:12
196:17
211:16

**needed**
43:8
63:21
76:17
191:3
195:2

**negative**
25:20

**neighborhoo
d**
141:18

**News**
259:23

**Newsday**
26:15
28:7
37:25
40:9
232:24

**newspaper**
27:6
28:19
239:21

**nice**
73:9
105:2

**night**
82:6
168:10
202:25

**nitty-
gritty**
190:22

**Norman**
15:16

JOHN MCELHONE
MARTIN TANKLEFF vs. SUFFOLK COUNTY

October 30, 2014
Index: north..obtain

| | | | | |
|---|---|---|---|---|
| 21:6 | ——————— | 128:10 | 100:14 | 116:21 |
| **north** | O | 130:3 | 111:9 | **obligation** |
| 7:14 | ——————— | 132:15 | 112:13 | 96:5 |
| **Notary** | **oath** | 135:9,20 | 113:4 | 98:9,16, |
| 5:4 | 5:21 | 141:7,14 | 116:23 | 17 99:8 |
| **note** | 23:23 | 142:3,23 | 118:15 | 100:21 |
| 155:6 | 117:24 | 143:14 | 120:3 | 101:4 |
| **noted** | 242:2 | 144:2 | 123:8 | 112:5,9 |
| 183:16 | **object** | 149:23 | 125:4,20 | 114:2,12, |
| 219:13 | 12:14 | 155:18 | 126:7 | 17,20,23 |
| 262:5 | 13:13 | 156:5,25 | 128:2 | 117:19,23 |
| **notes** | 14:5 | 157:7 | 130:11,17 | 118:13,21 |
| 20:23,24 | 23:16 | 162:24 | 132:3 | 119:5,7 |
| 193:13 | 25:14,22 | 170:20 | 133:12 | 169:5 |
| **notice** | 26:12,21 | 172:11 | 134:23 | 172:8 |
| 104:16 | 28:3 | 177:6 | 137:18 | 191:17 |
| 211:21 | 30:15 | 178:2 | 139:11,22 | 193:5 |
| **notwithstan** | 31:6 | 179:4 | 140:21 | 225:10,18 |
| **ding** | 32:12 | 181:12 | 142:14 | **obligations** |
| 171:4 | 34:7,14 | 183:6 | 145:13 | 100:5 |
| 177:4 | 36:10 | 186:18 | 146:20 | 113:11,23 |
| 179:9 | 37:6 | 192:4 | 169:21 | 128:15 |
| **November** | 38:22 | 203:5 | 171:6 | **observation** |
| 5:17 | 61:21 | 223:7 | 172:22 | 207:15 |
| **number** | 63:24 | 246:24 | 173:13 | **observation** |
| 29:5 39:6 | 67:4 | 249:2,12 | 176:16 | **s** |
| 48:10 | 71:23 | 250:8 | 184:14 | 66:13 |
| 55:3 66:5 | 73:4 | 254:23 | 185:11 | 67:2,15 |
| 83:12 | 84:9,13 | 255:7 | 194:21 | 75:15 |
| 86:3 | 85:5 | 256:7,13 | 195:6 | 220:14 |
| 89:24 | 86:19 | 257:17 | 196:2 | **observe** |
| 132:8,9 | 89:3 | | 200:3,24 | 68:20 |
| 154:6 | 96:21 | **Objection** | 203:22 | 76:17 |
| 184:2 | 97:17 | 9:20 13:2 | 204:12,21 | **observed** |
| 187:3 | 99:18 | 27:4 | 223:19 | 206:17 |
| 217:22 | 103:24 | 29:17 | 224:5,14 | 207:9,11, |
| 231:15 | 104:12,17 | 33:19 | 226:5 | 22 213:12 |
| 261:8 | 106:21 | 39:23 | 227:19 | 214:3,21 |
| **numbers** | 107:20 | 45:15 | 237:15 | 219:13 |
| 174:4 | 110:4,19 | 53:6 | 250:24 | 220:7 |
| **numerous** | 111:21 | 54:14 | 252:23 | 223:4 |
| 137:23 | 115:2 | 59:12 | 254:3 | **obtain** |
| | 120:19 | 60:22 | **objects** | 27:10 |
| | 121:14 | 71:13 | 58:23 | |
| | 122:16 | 79:24 | **obligated** | |
| | 124:3 | 95:14 | 113:16 | |
| | | 96:7 98:4 | | |

Case 2:09-cv-01207-JS-AYS   Document 184-12   Filed 08/17/16   Page 301 of 318 PageID #: 4048

JOHN MCELHONE                                          October 30, 2014
MARTIN TANKLEFF vs. SUFFOLK COUNTY          Index: obtained..participate

obtained
81:3

obtaining
27:16

Obvious
230:13

occasion
11:18

occasions
14:2

occurred
50:7
59:11
60:4 63:4
66:17
67:22
69:24
80:8
86:11
143:19
225:9
241:7

offer
152:14
195:15

offered
164:18
166:15
232:23
233:17
238:17

office
15:22
55:23,25
90:18
91:10,12,
22 97:10
147:5
148:17
149:18
153:15
155:5
157:23

161:8,14
162:9,20
213:2,7
228:21
229:5
241:5
261:10

officer
9:6
37:10,20
204:7
229:23
260:21

officers
8:4 11:22
12:3
70:11,21
99:7
113:25
114:21
149:4
256:18

ominous
231:25

one-way
248:10

one-week
64:17

ongoing
63:15

open
74:16
153:6
155:22
156:9
218:22

opened
155:6
158:3
161:10
232:2

opens
61:25

operating
158:14

operation
7:12

opinion
107:22
114:10
244:3

opportunity
234:12
235:18
236:5,8

opposed
86:13
90:4

oral
223:2

order
61:10
62:20

organizatio
nal
228:13

organize
58:5

organized
12:9 58:3

original
16:17
20:9,16
21:24
178:7

originally
177:10

originate
224:3

other's
244:14

outline
150:11

overcame
177:13

overcome
177:10
178:6

overseeing
7:23

Oversight
190:16

overtime
189:10

owed
161:22
164:10
165:3,4,6
168:17
182:12
254:13
255:24

owing
165:9

————————

P

p.m.
183:16
262:5

pages
20:20
21:10
102:22

panned
178:25

paper
50:24

paperwork
190:7

paragraph
65:8
66:20
174:16

260:10

paragraphs
86:23

parallel
188:12

parents
18:6
101:9,17
106:5
109:24
111:2
130:21
143:11
210:11
215:16

parents'
141:12
164:9

parking
238:23

Parkway
7:15

part
30:23
32:15
33:2,6
35:3
36:15,17
37:11
38:4,11
42:24
100:16
105:3
117:5
157:18
164:25
165:3
195:24
197:7
202:19
231:12

participate
227:3

JOHN MCELHONE
MARTIN TANKLEFF vs. SUFFOLK COUNTY

October 30, 2014
Index: participation..plausible

participati
on
  184:4

parties
  11:22

partner
  154:13

partners
  165:5

Parts
  208:22

party
  11:23
  12:12,24
  15:7

passed
  175:11

past
  47:23
  209:16

pay
  136:6

PD'S
  259:25

pen
  49:8

pending
  6:10

people
  7:25 9:23
  13:7
  18:18
  23:20
  28:7
  42:13
  57:8
  70:11,22
  71:2
  83:12
  86:4
  89:24

129:20,24
130:8
144:18
158:19
159:4
170:17,18
188:5
189:8
198:14
201:10,14
202:14
232:10
233:18
246:11
253:2
255:16

Pepper
  175:10

perception
  34:12
  35:11
  36:6
  38:13

perform
  42:14

performed
  56:5

period
  24:16
  25:11
  39:11,12
  40:8,15
  41:8 43:7
  46:8
  69:15

periphery
  258:4

permitted
  148:11

person
  21:12
  37:9 56:9
  88:2

97:23
115:6
128:22
145:7,17
146:14
147:15
148:19
168:20
175:20
201:12
233:16
234:24
237:18
246:7,10,
22
247:16,18
248:22,23
249:5,8,
10,17
250:4,19
251:3

person's
  21:4,23
  148:2,13
  163:20,22
  175:9,22
  230:4
  246:3
  256:22

personal
  205:16

personally
  59:22
  108:5

personnel
  161:13
  189:12

persons
  148:11,18
  149:15
  228:24,25
  229:6
  230:2,21
  231:4,13

232:15
233:20
234:5
237:3
239:6
240:17
246:11
251:18

perspective
  178:22

pertained
  20:4

pertinent
  193:2,8
  220:18
  221:10,11

Peter
  19:22

phenomenon
  129:16
  131:13,14

phone
  11:12
  12:7
  81:11
  158:18
  159:12
  160:2
  213:2,5
  217:16,19
  218:4
  231:15
  247:21
  251:11

photo
  56:21

photograph
  57:9
  73:21

photographs
  217:9

phrase

151:22

physical
  27:15
  54:19,22
  56:5 57:6
  58:15
  59:10
  60:2 61:7
  206:2
  212:13,16

pick
  12:7
  15:22
  230:10,18

picked
  156:15

pin
  237:11

pinkish
  215:2,12

pistacio
  159:17,18
  160:2
  247:22

place
  53:4
  56:12
  83:10
  86:8,17
  88:18
  90:3,5
  144:19
  152:25
  160:7
  232:10

places
  35:3
  88:13

plane
  243:2
  248:9

plausible

JOHN MCELHONE
MARTIN TANKLEFF vs. SUFFOLK COUNTY

October 30, 2014
Index: played..pre-arrest

186:9

played
20:6

player
168:16
226:17

players
202:23

playing
105:2
198:15
249:19

plea
195:15

plenty
35:2

point
5:15,23
6:7 21:2
22:5 44:7
57:2
62:4,24
70:22
73:16
74:9,21
75:18
77:21
80:4
85:9,15
86:25
89:6 90:8
97:5
104:6,14
109:19
138:17
142:17
143:3,4
145:7
146:12,13
147:10
151:21
155:9,22
156:10
158:12,

13,14,20,
23 159:8
161:16
162:6
163:5
166:18
167:2,15
168:8,9
173:7
185:14
188:3
200:21
208:19,20
210:7
211:20
217:5
219:16
220:25
222:21
230:15
233:5
235:3
237:22
238:19
239:20
240:2
248:18
254:6
255:14
256:18
258:2,10,
13

pointed
62:2

pointing
55:7

points
227:15

poker
82:5
226:17

police
8:4 9:6
12:3

20:17,21,
24 34:13
35:9,18,
20 55:8
56:15
70:11
81:9,13,
16 82:24
85:25
86:7
89:21
99:7
113:25
114:21
123:24
128:22
135:16
136:3
145:10,
23,24,25
146:15,18
147:10,
17,19
149:4,19
158:7
159:9,10
160:5,10
161:13
162:3,11,
21
165:13,15
176:23
182:3,14
185:3
191:21
194:19
199:13
204:7
209:25
210:9
216:22
228:14
241:8
251:13
254:10,20
255:3
259:2

260:7

policies
30:24,25
32:9 37:5
43:18
140:13

policing
170:4
256:10

policy
114:7,16
115:12
120:18
121:12,20
122:15
147:12,19
152:24
153:6,9
224:12
225:6

portion
187:13,16
259:2

portrayed
47:16

pose
84:24

position
87:16
222:5

possibiliti
es
170:2
256:24

possibility
74:17
103:15
104:5,11
108:18
109:21
110:13
111:16
116:17

118:10
119:16
120:12
122:22
124:17,23
125:10
129:10
131:20
132:23
133:5
134:16
252:16
253:22
254:2,13
256:12

Possibly
201:3

post
17:16
18:10

post-
arraignment
146:9
189:24

post-arrest
145:17

potential
59:16
244:8

power
195:5,11,
14

powerful
61:19

Practical
65:10

practice
9:14

pre-arrest
145:16,21
146:7

Precinct
  229:22

precluded
  211:21
  212:7

predecessors
  29:24

preparation
  16:10,14

prepared
  18:9

presence
  14:23,25

present
  88:13
  119:21
  130:21
  161:7
  210:21
  236:16

presented
  84:16,18
  85:14

preserve
  70:14

preserved
  70:17
  72:8,11

preserving
  71:5

press
  37:24
  38:3,12
  128:17
  144:24
  145:8,19,
  22 146:7,
  16,17
  147:6,11,
  15,18
  148:12,20

149:20
151:5,10,
15,24
152:5,14,
20 153:2,
6,12
189:21,22
231:13
237:22
253:15
258:22
259:10,
14,20
260:11,15
261:6

pressure
  30:3

pressures
  242:18

pretty
  32:25
  48:7
  71:18
  172:17
  189:23
  193:17
  231:24

pride
  31:19

Primarily
  196:21

primary
  127:10
  141:20
  189:14,20
  196:25

principle
  61:12,16
  66:19
  116:9
  170:7

principles
  76:13

printed
  65:23

prior
  8:5 14:16
  25:20
  26:6
  28:10
  29:10
  102:6,16
  160:2
  162:8
  171:12
  184:11
  187:5

Priorities
  76:21

priority
  49:16
  76:24

pristine
  75:20

private
  7:4,24
  9:14

privy
  96:12

problem
  33:17
  34:5
  47:11
  50:17
  52:23
  55:6
  138:9
  162:14
  170:23
  206:9,25
  249:25

problems
  47:22
  53:13
  55:3
  84:16,18,

24 85:14
88:13
180:9

procedure
  120:18
  121:12,20
  122:15
  224:12
  225:7

procedures
  27:24
  30:25
  32:10
  37:5
  43:19
  140:13

proceeding
  17:19

proceedings
  16:21
  17:12,14,
  16 18:3,
  11,15
  49:11
  153:21
  183:13
  245:23

process
  54:21
  70:15
  75:19
  136:7,19,
  23
  139:19,20
  222:16

processing
  47:8 56:2
  217:8
  219:21

professional
  8:14,15

professions

34:19
35:8

profile
  26:18
  27:7
  140:19
  144:18,25
  145:11
  151:3,5
  187:3,4

progress
  97:16

promoted
  229:19

prong
  97:9

prongs
  91:13

pronounced
  153:25

properly
  37:16

prosecuted
  106:4

prosecution
  93:25
  99:12,17
  100:13
  113:17
  114:4
  116:4
  120:16
  121:11
  122:13
  123:4
  125:2
  225:12
  237:13
  239:8,25
  240:5,23

prosecution's

118:14
238:9

**prosecutor**
100:20,23
106:3
112:2
113:3
114:6,14
116:22
117:21
119:6
122:7
139:6
140:4
225:19
246:22

**prosecutor's**
96:4
98:11

**prosecutors**
95:13
113:19
115:22
124:14

**protect**
257:15

**proven**
195:23,24

**provide**
35:14
203:19
204:8
239:15

**provided**
22:16
65:13
201:21

**provisional**
66:15

**public**
5:4 27:7
33:24

34:9,12,
20 35:14,
18 36:19,
24 38:12
39:12
83:10
86:13
88:13,18
90:5
141:6
148:25
149:13
160:7
185:23
186:2
232:10,23
238:23
253:17
260:20

**publicly**
37:23
108:8
238:18

**published**
182:6

**purposes**
58:12

**pursuant**
18:3
225:6

**pursue**
143:12
170:2

**put**
28:24
29:24
42:25
44:3
48:11
56:11
158:18
211:21
233:9
235:24

239:13
259:8
260:22

**putting**
160:3

———————

**Q**

———————

**quarter**
203:12

**question**
5:25 6:2,
10 12:20
35:6
53:10,11
85:17,19
87:3,4,6,
9,19,20,
22,23,25
92:25
99:23,25
100:3
101:2
104:7,8,
16 105:5,
7,9,18
106:12
116:12
121:3
133:18,24
134:7,11
136:12,18
149:9
151:22
152:7
163:11
166:20
173:2
197:19
203:3,9
234:12
255:14
258:12

**questioned**

166:10
242:9

**questioning**
136:24
150:25
212:7

**questions**
5:21,22
17:5
24:16
86:23
150:6
233:24
235:7
254:8
256:19
258:5,6
259:7

**quick**
29:14
49:8
75:14

**quickly**
24:15
48:7
58:22
59:9,20
62:18
69:6 75:5
89:15
156:12
158:8

———————

**R**

———————

**raised**
254:8

**ranking**
146:6
165:8

**rare**
138:18

**rarely**
138:12

**razor**
138:7

**reached**
64:16

**read**
16:4,5,7
65:7
66:20
72:25
78:20
79:18,22
102:24
103:9
105:2,5,
8,9
134:11,13
174:18
178:16
181:24
221:17,23

**reading**
50:24
222:18,
20,25

**real**
232:25
253:20

**realize**
150:21

**realized**
143:8

**reason**
32:6
36:13
54:20
60:10
62:7 72:7
75:12
90:24
92:8
93:22

96:11
107:10,15
131:2,7
145:6
146:14
170:25
177:21
195:20
196:25
198:5
220:19
233:22
234:8
235:14
240:10
246:13
258:11

**reasonable**
103:15
104:5,10
108:17
109:21
110:13
111:16
116:16
118:10
119:16
120:12
122:22
124:17
129:10
131:7,20
133:5
134:15
152:6

**reasons**
31:23
35:17
52:22
54:9
64:15
67:17
83:22
93:15,16
132:9
152:12

171:21
175:2
177:19
178:24
194:4
198:3
236:23

**rebut**
237:14

**recall**
15:8 24:9
47:9
125:23
126:2,14
131:11
179:16
215:24
217:15
228:2
230:7,25
240:19,20

**receive**
141:23,25
143:23
144:10
174:24

**received**
8:15
25:19
36:25
47:14
162:21
193:24

**recent**
244:2

**recess**
49:10
153:20
183:12
245:22

**recognition**
231:24
233:3

**recollectio**
**n**
221:24

**recommend**
44:5

**reconsider**
177:2,23

**reconsidere**
**d**
243:12,21

**reconsideri**
**ng**
179:2

**record**
51:2
87:12,13
129:4
134:13
153:19
162:17
173:25
176:3

**recounted**
209:13

**recover**
57:5
73:21
89:12
257:11

**recovered**
57:10
101:18
234:18

**redo**
171:17

**refer**
101:21

**referred**
187:7

**referring**
17:8

196:14
232:8

**reflected**
174:25

**reflection**
260:15

**refresh**
221:23

**regularly**
248:4

**Rein**
21:6

**reinforced**
244:4,24

**relate**
209:8

**related**
112:2
113:2
148:21
149:21

**relations**
189:21

**relationshi**
**p**
176:6

**relative**
25:11
184:10

**relay**
95:12

**relayed**
218:16

**release**
153:12
259:10,
14,20,24
260:10,
11,16
261:6

**released**
146:17

**releases**
37:24,25
153:3
258:22

**reliability**
53:3
62:13
135:7
151:16
152:3,15
221:8
223:18
225:3

**reliable**
62:21
63:21
152:21
203:14
208:12
210:23
211:10

**rely**
95:25
100:11
117:10,
11,21
171:22

**relying**
205:10,14
212:10
242:23

**remember**
5:19 10:6
11:2 12:2
13:11
66:17
72:21,24
98:23,25
100:15
102:14
126:10
127:25

JOHN MCELHONE
MARTIN TANKLEFF vs. SUFFOLK COUNTY

October 30, 2014
Index: remembered..review

128:18
157:18,19
160:25
163:3,4,
7,13
186:11

**remembered**
126:4

**remembers**
203:11

**remind**
6:20

**remove**
37:13

**removed**
68:6  97:3

**repair**
37:3

**repeat**
98:24

**rephrase**
5:24
53:12

**report**
18:20
19:7
21:6,23
78:9,13
94:11
95:22
100:12
111:25
117:4
118:3
120:24
166:8
175:9
191:23,25
192:9,19,
22,23,25
193:7
209:6,12
222:19,

20,25
225:11
242:24

**reported**
124:11,14
160:17
166:3,6,
13,23
167:19
178:19
179:14,
20,23
182:3,25
205:11
207:16
208:13
209:3
225:22
226:2
242:13
243:20
244:18
245:4,14

**reportedly**
256:2

**reporters**
146:25

**reporting**
182:17

**reports**
16:17
18:25
19:13,14
20:9,16,
21 21:14,
23 22:9
27:6
72:24
181:4
182:6
191:18
193:24
197:3
226:21

**represent**
79:9
108:10
186:5

**representation**
109:13

**representative**
56:16

**representatives**
68:19

**represented**
10:19
243:5

**representing**
109:3

**reputation**
30:13
31:11,20,
25 107:17
108:2,8

**require**
135:6

**required**
38:16
177:22

**residence**
82:6

**residences**
73:2

**resolve**
237:25
238:15
239:24
241:10
251:23
252:12
254:11
257:20

258:7,12

**resolved**
237:25
238:25
239:17
251:23
252:3
258:14

**resource**
190:11

**resources**
194:18
195:2
237:4

**respect**
127:17

**respond**
83:7

**responded**
70:12

**responders**
68:12
69:14
70:25
72:6
74:10
82:15
83:14

**responds**
76:22

**response**
175:9

**responsibilities**
36:16,18
38:5
48:21
57:18
128:16
184:3,9
188:14
189:2,5,

13

**responsibility**
56:6  57:5
171:17
190:12

**responsible**
55:19,25
57:12
153:11

**rest**
57:8  69:9
235:24

**results**
177:4

**resumed**
183:17

**retain**
142:12,20
143:11

**retire**
30:3,7

**retired**
7:2  8:3,
11 12:3,
18 14:8,9
15:11

**retirement**
6:21  8:16
11:23
15:6

**retrospect**
253:24

**reveal**
151:14,24

**review**
15:24
20:8,23
21:3,5
22:10,13,
19,22

124:6,7
135:13,
15,16
163:4
190:6,7

**reviewed**
16:10,20
17:10
18:9,14,
24 20:3,
11,15,21
21:17,18
22:4,17
248:17

**reviewing**
16:3
19:12,13
23:5
79:20
103:11
174:21
178:14
209:11
221:20
258:24

**revisited**
139:7
244:7

**Rich**
14:17

**Richard**
144:17
187:25

**rid**
132:7

**ride**
243:2

**right-hand**
174:5

**rigorously**
140:14

**risk**

129:25
131:4,9

**Robert**
216:12,15

**role**
38:11
47:21
48:17
49:20
57:25
129:2
140:8
188:22
249:19

**roles**
18:25
20:4,13
22:2
57:23

**room**
13:17
14:19
209:5
215:19
218:12

**Route**
7:14

**rule**
165:23
175:24
181:16
197:5

**ruled**
164:13
165:17
166:10,24
175:6
177:11,14
178:21
179:3,10
181:7
183:4
194:3
196:6

226:24
235:5
236:6

**rules**
5:19
26:10
31:5,14
32:2 33:7
36:3,5,7
38:16
42:20
43:11
44:12,21
45:4,13
46:2
130:23
131:3

**ruling**
176:14

**run**
31:24
32:7 44:9

**running**
155:4
157:16,20
232:10
238:22
253:15

**Ryan**
15:16
91:25
92:4,9,12
136:15,24
137:16
139:19
207:6,9,
11 208:9
217:24
218:5,18,
24 219:5,
10 220:7,
16,21
222:18
223:14

224:21
225:7,21
226:3

**Ryan's**
139:8

_____

**S**

**S-h-e-a**
7:10

**Salpeter**
18:21

**San**
248:8

**Sargeant**
188:18
196:21
197:3
258:15

**sargeants**
43:5

**sat**
41:2,5
48:11

**satisfied**
151:16
152:19
204:24
222:24
223:10

**save**
70:13
100:7

**SCDA**
258:20
261:9

**SCDA3203**
174:9

**scenario**
204:3,5

**scenarios**
132:8

**scene**
47:7,13,
14,18
49:24
50:4,11,
18 52:18
53:2 54:6
55:19,21
56:2,10,
19,25
57:8
58:21
60:2,3
62:10
63:2,11,
19,22
66:14
67:3,14,
25 68:13
69:23
70:7,8,
14,17
71:5,9,11
72:11
73:11
74:23
75:16,19
76:18,25
77:12
78:3,10
79:14,15
80:3,7,
13,14,19
81:6,7,9,
16 82:16,
24 83:13,
23,24
84:6,22
85:2,14,
20,24,25
86:2,12,
13 88:23
89:2,10,
16,20,21,

JOHN MCELHONE
MARTIN TANKLEFF vs. SUFFOLK COUNTY

October 30, 2014
Index: scenes..shrift

25 90:4
97:3
151:18
153:25
197:8,22
198:6,7,
10,17,22,
24 199:8,
18 200:15
205:2,19
206:17,23
207:10,20
208:9
209:20
212:9,24
213:12,20
214:4,12
216:5,6,
21 217:6,
17,24
218:6,17,
23 219:12
220:8,14
221:2,6,
12 222:2,
9 223:5
226:19

scenes
47:21
48:18
49:15,21
54:21
55:12
57:19
67:8
71:20
84:5,23
88:6,21

Schecht's
105:7

school
6:23

scope
28:6 66:9

screen
8:10

scrutiny
141:6
144:10

scuttlebutt
253:17

search
47:17,21
55:20
57:7
66:10
221:2

season
7:19

section
221:22
228:25

security
8:22 42:4
43:25

sees
230:14

seminar
64:7,17
65:5

send
91:20
250:20

senior
42:13

sense
234:16

sensitive
141:13
144:25
145:10
151:2

September
25:7
84:22

85:22
89:19
90:10
154:2,17
187:11
215:11
216:21
217:11
221:25
258:23
259:11,
15,21
260:16
261:7

sequence
69:13

sergeant
11:15,19
12:24
13:12,22
14:3,12
15:6
125:24
139:15
140:2,10
149:3
166:5
167:9
172:7
175:10
178:19
179:23
182:16
190:18
191:22
218:10
219:10

sergeant's
42:25

sergeants
43:2,8
48:20
171:18,23
190:5,11
247:7,13

248:19
250:6,17
257:7

series
26:4,15
28:19

seriologica
l
56:4 57:6

seriousness
175:15

session
58:9

set
19:18
252:4

setting
43:10

Seymour
68:6,11,
24 69:12
81:12
82:9,20
154:2
155:2
161:22
164:10
182:12
252:21
253:11
255:22,24

Seymour's
69:4

shadow
230:10

share
121:23

shaved
160:22,25

Shea
7:7,9

Shea's
7:11

short
21:11
27:14
69:15
77:8
164:3

shortly
29:10
41:9
185:7,23
201:20
229:9

shot
83:10

show
78:19
101:25
222:13

showed
52:19
53:2
54:6,13
58:21
75:16
76:18
84:8
216:6
222:9
231:14

showering
215:22

showing
206:9

shows
60:19
62:10
63:11
71:22

shrift
27:14

JOHN MCELHONE
MARTIN TANKLEFF vs. SUFFOLK COUNTY

October 30, 2014
Index: SIC..squad

| | | | | |
|---|---|---|---|---|
| SIC | 226:25 | 161:25 | Southampton | 11:6 16:2 |
| 26:2 | 230:12,20 | 162:10, | 9:7 | 242:25 |
| 28:21 | | 14,16 | Southern | 244:21 |
| 64:15 | sit-down | 175:3 | 7:15 | spoke |
| 185:22 | 36:12 | 233:21 | spatter | 10:18 |
| 186:23 | 40:22 | 256:3 | 206:5,6 | 11:15 |
| sign | 43:14 | sort | speak | 48:22 |
| 191:17 | situation | 35:4 | 75:4 | 75:9 |
| 193:6 | 177:13 | 114:9 | 87:11 | 77:13 |
| signal | situations | 170:16 | 108:4 | 78:11 |
| 63:19 | 118:25 | 204:2 | 142:6 | 128:14 |
| 81:15 | 204:9 | 233:17 | 148:19 | 241:15 |
| signaled | skepticism | sorts | 149:20 | 242:20 |
| 18:14 | 125:16 | 35:17 | speaking | spoken |
| signature | 137:15,22 | 50:9 | 5:20 | 9:18 |
| 160:23 | 139:8 | 67:17 | 13:21,22 | 15:12,18 |
| 261:2 | skilled | 88:5,6 | 145:22,24 | 24:3 |
| significant | 127:7 | sound | 146:15 | 192:10 |
| 96:19 | slit | 6:4 186:9 | 147:6,11, | spokesperso |
| 111:7,12, | 101:17 | sounded | 15,17 | n |
| 14 141:2 | smaller | 193:16 | 219:4,9 | 128:23 |
| 184:25 | 65:12 | 235:11 | speaks | squad |
| 190:4 | Smith's | sounds | 104:13 | 21:9 |
| 191:2 | 230:15 | 41:13 | specific | 24:18,21 |
| signing | Smithtown | 75:25 | 11:21 | 25:19 |
| 191:20,24 | 21:8 | 82:18 | 230:21 | 26:7,20 |
| 192:8,21, | sneaker | 87:7 | specificall | 27:2,9 |
| 23 | 157:17 | 115:11 | y | 28:11 |
| signs | social | 117:15 | 67:24 | 29:4,7, |
| 191:23 | 11:18 | 131:7 | 76:10 | 11,16 |
| simple | 12:10 | 196:24 | 136:17 | 30:19 |
| 66:15 | 14:8 | 201:13 | 160:22 | 31:12,24 |
| simply | socially | 209:18 | speech | 32:7 |
| 146:12 | 11:17 | 233:23 | 215:6 | 33:15 |
| 172:16 | 12:6 | 234:7 | spell | 34:2,4 |
| 248:23 | solidified | source | 7:9 | 35:22 |
| sir | 206:12 | 23:15 | spend | 36:7,19, |
| 102:24 | solve | 125:14,17 | 23:5 | 25 37:4, |
| sit | 50:12 | sources | spending | 14,21,22 |
| 82:4 | son | 28:20 | 196:10 | 38:8,10, |
| 163:15 | 141:19 | 29:6 | spent | 15 39:7, |
| 193:18 | | 33:25 | | 10 40:8, |
| | | 40:9 | | 16,23 |
| | | 182:9 | | 41:10 |
| | | | | 42:3 |

JOHN MCELHONE                                          October 30, 2014
MARTIN TANKLEFF vs. SUFFOLK COUNTY          Index: squad's..stories

45:3,12,
25 49:18
51:5
55:4,17,
18,22
56:13
57:12
65:5
90:15,20
100:8
106:13
114:8
119:19
126:21
138:25
140:9
148:3
153:10
154:11
161:21
165:22
167:10
171:16
183:22
184:2
186:21
189:6,11,
16 190:5
196:7,14
210:21
229:16
230:2,24
246:12,18
247:9
253:19,
21,25
257:10
260:5

squad's
56:6
114:16
140:13

squads
30:21

stabbing

51:21
52:5
137:23

staff
72:23

stage
181:16

staged
158:9

stamped
258:20

stand
69:2
194:6,14
195:25
227:5
233:9
241:14

standing
222:5

start
13:25
41:18
58:2
110:10
185:23
259:19

started
7:20
10:16
58:4
87:16

starting
62:4
174:16

state
7:15
16:25
28:21
242:16

statement
205:23

234:21

statements
198:21
234:23

states
176:3

stay
231:3

stayed
39:13,21
40:10,24
41:8 43:8
229:20

step
159:6

stepped
232:14
234:9

steps
155:14
156:2,21
157:5
158:16
172:9

Steuerman
21:4
148:7
154:14,
19,24
155:11,
13,25
158:9
159:11
161:9,22
162:22
164:6,9,
10,12
165:16,
22,23
166:9,24
167:8,12,
18,24
168:24

171:3,12
172:5,10
173:3
175:6,25
176:15
177:3,24
178:20
179:2,10
180:20
181:6,9
182:4,12
183:3
193:18
194:2,4
195:21
197:2,5,
25 198:8
199:3,10,
24
200:11,
12,16,20,
22 201:5
202:24
205:5,8,
20 206:13
210:7
226:9,23
227:2,24
228:5
230:5
231:17,25
232:16,23
233:13,14
234:2,10,
18
235:16,18
237:11,13
238:4,5,
14 239:8,
11 240:6,
12,23
241:17
242:10,
14,21
244:9,22
246:8
248:3,13,

21 251:3,
22 252:2,
18 253:12
255:15,21
257:11,12
258:8

Steuerman's
21:8
161:25
162:10
173:6,9,
25 175:2
182:15
202:18
204:17
226:16
228:2
248:8

stick
110:24
198:22
208:10

Stony
9:7
218:20

stood
239:10

stop
8:8
147:17
178:9

stopped
11:5

stopping
15:21

stops
147:11

store
162:23

stories
209:24

JOHN MCELHONE
MARTIN TANKLEFF vs. SUFFOLK COUNTY

October 30, 2014
Index: story..suspect

story
 54:12
 74:5,6
 203:21
 204:17,18
 206:10,18
 210:3,15,
 19,22
 211:9,13,
 14
 212:20,23
 213:11,24
 214:6

stranger
 198:11,25
 199:4,8
 200:10,13

strictly
 32:9 36:8
 44:21

strike
 134:5

strong
 104:4
 121:4
 166:17

stronger
 238:8

strongly
 121:5

structure
 228:13

struggle
 216:3
 223:13
 224:20

struggled
 222:3

stuff
 218:14
 244:6
 253:16

stumble
 152:8

subject
 46:4

subpoena
 195:4,11

Subscribed
 262:11

subsequent
 148:2

subsequentl
 y
 52:11
 68:15
 210:25

substance
 19:14
 24:12
 103:21
 166:12
 210:12
 215:2,13
 245:3,4

substantial
 161:23
 164:11
 168:17
 182:13
 187:16
 255:25

successor
 229:21

sufficient
 204:19

Suffolk
 108:3
 147:18
 149:19
 162:3,11
 228:13
 257:10
 259:24

suggest
 131:24
 199:20
 200:11
 255:4

suggested
 200:15

suggesting
 77:6,10
 180:19
 255:18

suggestion
 70:7

suicide
 155:21
 156:11
 236:18,21

sum
 210:12
 245:3,4

summoned
 155:5
 157:22

SUNY
 9:6

superior
 11:22
 256:17

superiors
 231:6

supervise
 42:8
 188:19

supervising
 127:13
 140:11
 247:8

supervision
 66:6
 127:19

supervisor

30:14,18
 31:4
 44:16
 66:12
 127:2,11
 146:6
 165:8
 202:13
 223:17
 225:2
 247:3,5

supervisors
 44:10
 225:12,19

supervisory
 188:14
 190:12
 191:13

supplementa
l
 20:16
 21:14,23
 22:9

supplementa
ry
 16:16
 20:9
 209:12

support
 35:15

supported
 226:20

suppose
 240:9

surmising
 11:20

surveil
 62:25

survey
 63:2

Surveying
 80:3

survived
 74:3,13
 154:6

surviving
 72:4
 74:4,9,12
 75:23

suspect
 51:17,24
 60:16
 62:14
 63:16
 74:7,8
 122:11
 135:19
 141:11,20
 164:14
 165:17,24
 166:11,25
 167:12,24
 168:3,20
 171:3
 175:6,25
 176:15
 177:3,11,
 14,24
 178:21
 179:3,11
 180:21
 181:8,10,
 19
 182:20,21
 183:3
 194:2
 197:6
 223:24
 224:3,9
 226:23
 232:25
 235:3,5
 236:6
 243:13,
 20,23
 248:23
 254:7

Case 2:09-cv-01207-JS-AYS  Document 184-12  Filed 08/17/16  Page 313 of 318 PageID #: 4060

JOHN MCELHONE                                          October 30, 2014
MARTIN TANKLEFF vs. SUFFOLK COUNTY                    Index: suspect's..ten

suspect's
  53:16
  54:12
  61:6
  62:21
  122:9

suspects
  169:6
  204:7

suspicion
  206:12

suspicions
  34:11
  37:14

suspicious
  230:9
  238:19
  249:6,10,
  18 250:4
  251:4

swirling
  235:7

switch
  205:25
  209:14

sworn
  5:3
  262:11

symposium
  102:10

synopsis
  18:17
  19:8,13,
  20 20:11
  21:11,25
  22:9

syntax
  260:19

system
  9:6

——————————
        T
——————————

table
  105:21

tactical
  190:8

tactics
  27:2,10
  29:7

taker
  26:3

takers
  26:16

takes
  146:10,13
  147:6

taking
  6:18 53:4
  54:9
  105:20
  136:14

talk
  67:24
  88:3
  105:14
  192:19
  231:6
  233:8
  245:18
  252:8

talked
  14:21
  24:7
  61:2,3
  77:18,23
  98:19
  126:14
  203:17
  231:8
  239:20

talking

6:22
49:15
68:23
74:20
76:10,12,
13 105:3,
4,17
113:22
146:25
152:5
175:22,23
193:12
207:2,5,
25 209:16
222:17
227:10,12
228:12
237:21
244:5

Tankleff
  10:9 19:3
  20:17
  24:22
  25:3
  67:25
  69:12,16,
  22 72:4
  79:13,16
  80:13
  82:6,9,20
  84:21
  93:3
  101:8,16
  102:3,6
  106:4
  124:15
  131:25
  132:24
  133:10
  140:17
  147:20
  149:21
  151:6
  152:25
  153:25
  154:2,9

155:2
161:22
164:5,11
167:14
169:3
182:12
185:7,15
186:17
187:23
188:8,13
191:12
198:8
205:21
218:20
227:17
239:12
252:21
253:11

Tankleff's
  17:16
  18:4
  81:21
  83:18
  86:8 90:2
  106:8
  109:2,20
  110:3
  111:8
  122:25
  127:23
  131:22
  135:8
  136:20
  154:13
  182:2
  194:16
  222:2

Tankleffs
  69:23
  72:15
  103:17
  108:20
  111:17
  118:12
  119:18
  120:14

124:19,25
125:12,19
127:23
129:12
133:7
134:17
137:13
148:20
154:19
164:15
183:5
193:20
199:4,21
228:7

Tankleffs'
  141:19
  202:24
  217:11

taped
  70:23

team
  91:6,19
  92:23
  189:9

technically
  230:16

tedium
  8:11

telephone
  206:3,4,6
  207:3
  209:14

Television
  169:16

telling
  74:4
  164:5,8
  214:4
  221:9
  235:12
  239:3

ten
  175:2

Case 2:09-cv-01207-JS-AYS   Document 184-12   Filed 08/17/16   Page 314 of 318 PageID #: 4061

JOHN MCELHONE                                        October 30, 2014
MARTIN TANKLEFF vs. SUFFOLK COUNTY          Index: tenure..time

tenure
  38:14
  45:10
  185:3

term
  17:2
  234:25

termed
  48:15
  233:3

terms
  71:9 94:5
  228:20

Terre
  259:3,9
  260:8,22

terrible
  199:23
  240:5

terribly
  92:19

test
  62:13,20
  221:8

tested
  54:23

testified
  5:5 55:15
  64:14
  90:13
  108:15
  183:18
  222:12

testify
  51:7
  105:15
  106:7,19

testifying
  152:4

testimony
  16:10

23:13,14
78:19
79:3,9,10
80:6
102:2
103:13
109:7,14
118:7
216:10
221:16,22
232:14
248:22

testing
  56:4

tethered
  8:9

theories
  126:12,13

theory
  62:18,23,
  25 66:11,
  14,25
  67:21
  73:23
  94:22
  95:10
  96:3 98:2
  99:17,21
  119:3,4
  157:12
  158:12,
  13,15,23
  159:10
  160:4
  169:24
  170:13
  228:8
  248:12

thing
  36:22
  58:4 76:3
  126:3
  127:25
  132:14,22

133:16
135:13
158:18
170:11
179:18
241:6
251:24

things
  8:2,6
  13:7 26:9
  28:25
  31:9,10
  32:3,4,11
  33:8 34:2
  38:18
  41:15
  44:9,16
  48:11,14
  56:11
  75:21
  76:2
  77:25
  85:10
  89:15
  133:2,15
  135:2,12
  190:8
  193:14
  201:14
  208:11
  209:19
  249:22
  258:17

thinking
  156:9
  253:19

thinks
  34:20

thought
  36:21
  105:13
  106:16
  150:13,22
  158:20
  159:25

195:12
202:2
233:25
239:15
241:5
242:17
253:2

thoughts
  234:15

threatening
  251:10
  258:3

three-
person
  73:19

throats
  101:12,17

throwing
  210:6

ticket
  248:9

ticket all
  248:10

ties
  254:14,15

tight
  176:5

time
  5:23 6:7
  11:14
  13:3,10
  15:3,4
  16:2,5
  21:2
  22:5,25
  24:17,21
  28:8
  32:23
  39:11
  40:8,15
  43:7 46:9
  48:24

53:16
59:5
64:16
65:14
68:7,12
69:16
70:6
81:13,17,
21,24
82:25
83:6,14
88:3 97:3
100:7,9
109:19
115:12
145:3
146:13
147:20
150:15
151:6
152:25
159:8,13
161:4,16
162:4,19
163:8,14
167:7,17
180:15
183:16
184:9,18
185:15
186:16,24
187:14,17
188:18
206:13
209:12
212:4,6
227:15
239:9,20
240:24
242:19,25
244:5,21
246:17
247:9,11,
19 257:9
259:23
262:5

**times**
13:5,6
97:2

**tip**
162:21
174:24
175:13
176:13
178:22
179:17

**today**
6:16
10:12,20
11:10
16:11,14
22:11
82:4
126:4
163:15
193:18
227:2
230:12,20

**Todd**
161:25
162:10,21
173:11,24
175:3,17
176:2
182:14

**toe**
44:3

**told**
32:16
53:17
75:25
76:3
87:24
117:8,16,
17 118:24
137:16
182:2
200:8
205:22
209:24

**210:3**
215:17
243:11

**tolerate**
45:4

**tolerated**
45:22

**top**
261:8

**topic**
58:10
150:7

**tops**
13:24

**total**
19:7

**totality**
197:24

**totally**
7:2

**touched**
189:21
206:7

**trace**
159:19

**track**
21:18
238:13
240:12
241:2
245:9
246:22
247:15,24
248:21
249:8
250:7,18
251:18
257:12

**tracked**
223:4
248:7

**tracking**
261:11

**train**
49:3
70:12

**trained**
59:3,19,
25 66:22,
24 73:11
76:8,16
100:9
115:16

**training**
58:5
59:23
64:5 71:2
78:15
80:10
100:16
102:11
138:11

**trainings**
49:5
58:3,13
90:25

**transcript**
15:23,24
46:24
102:20
103:5
108:11
216:15

**transfer**
30:5 44:4
45:11
46:5
120:25

**transition**
185:19

**transmit**
118:21

**transmitted**
110:7

**transpire**
236:15

**transpired**
45:19
123:22
191:2

**transported**
68:16
69:16,18

**traps**
158:19

**traveling**
248:7

**treat**
41:21

**treated**
177:3,24

**trial**
72:22
106:8
109:2,20
143:18
195:25
233:6
236:14
238:3
239:10
240:25

**trip**
156:13

**trouble**
86:22

**troubling**
123:5,13

**true**
168:23
211:4
223:25
224:11
227:8

**trust**

35:18

**trusted**
167:22
190:19
191:6
193:11

**truthful**
6:15
214:7

**tunnel**
169:14,
17,19
170:3,8

**turmoil**
25:11
41:8
184:10

**turn**
117:19
122:7,12

**turned**
205:24
235:20
236:20

**turnover**
29:15,21
185:2

**type**
198:10

—————————

U

—————————

**Uh-huh**
127:15
147:9

**ultimately**
206:11

**umpire**
6:23

**unclear**
5:23

JOHN MCELHONE
MARTIN TANKLEFF vs. SUFFOLK COUNTY

October 30, 2014
Index: undercover..waking

undercover
  7:25
understand
  8:13
  17:15
  18:2
  19:24
  31:22
  35:5 48:4
  50:25
  53:9
  58:15
  61:13
  76:8 78:2
  81:23
  85:23
  87:8,24
  101:15,22
  105:12,20
  113:12
  114:7,15
  115:9
  140:17
  149:12
  153:13
  165:7
  197:20
  208:8
  235:13
  243:18
understanding
  18:8
  23:12,22
  30:10
  32:5,22
  36:2 44:8
  47:24
  48:2
  51:4,6,9,
  10,12,22,
  23 52:2
  54:3
  69:20
  77:15,23
  81:20

83:16
85:20
113:13
165:21
167:8
understood
  6:3 17:11
  33:4,12
  36:5,17
  37:2
  38:9,21
  45:9 46:2
  55:10
  74:23
  83:24
  84:20
  89:18
  90:9 99:6
  101:4
  113:24
  115:25
  116:7
  129:23
  131:2
  142:10
  155:11,13
  157:4
  164:4
  170:4
  171:10
  190:25
  194:9
  237:9
  242:8
undertake
  136:18
undisturbed
  90:2
  199:23
unexpectedly
  210:10
uniformed
  70:21

unit
  57:22
  123:6
  148:18
  149:15
  184:12
unlike
  34:18
  35:8 83:9
unlocked
  80:16,18
  199:16
  200:9,23
unrelated
  19:22
unrelenting
  30:3
unusual
  147:23,25
upscale
  141:18
upstairs
  149:8
usual
  230:14

    V

vacated
  18:4
vacation
  156:16
vacatur
  17:19
vague
  99:23
valuable
  73:13
  88:25
  90:7

variety
  49:23
  93:16
  152:12
venture
  176:7
verified
  194:10
verify
  74:5
  75:21,24
  76:4
  77:24
verifying
  192:10,
  16,24
Vernon
  64:7,9
version
  206:10
  246:2
Veterans
  160:9
victim
  232:17
  254:16
victim's
  53:21
video
  56:21
  217:9
videotape
  73:20
view
  115:17
vigorously
  194:7
Village
  260:8
Vin

189:18
violation
  45:4 46:2
  224:12
visible
  71:11
  215:2,19
vision
  169:15,
  17,19
  170:3,8
visit
  6:24
volume
  65:12
volunteer
  8:18,24
volunteered
  51:17
  223:5
volunteering
  207:18
  223:16

    W

wait
  87:10
  106:20
  117:12
  120:3
  132:15
  230:18
waited
  190:22
waiting
  219:20
waking
  210:10

JOHN MCELHONE
MARTIN TANKLEFF vs. SUFFOLK COUNTY

October 30, 2014
Index: walk..work

**walk**
56:18
75:14
78:3
217:12
245:20

**walk-through**
56:10
73:20
77:12,22
78:5,10
217:5,7

**walk-throughs**
79:13

**walking**
72:4

**wanted**
37:15
58:19
75:21,23
77:24
236:8
239:24
241:3
251:23

**water**
230:15

**watermelon**
101:19,22
103:16,19
108:18
109:22
110:14
111:2,16
116:14,17
118:10
119:16
120:12
122:23
124:18,24
125:11,17
127:22

129:7,11
131:20
133:6
134:16
137:11
139:3
214:17,21
215:2,12

**ways**
37:21
49:24
50:9 55:3
206:22
207:7
212:20

**weapon**
51:18
52:17
53:15,19
101:16
103:16,20
109:24
112:11,12
116:16,18
122:9
126:5
129:11
131:21

**weapons**
59:17
215:23

**week**
11:2,4,7
22:14
154:18
168:8,12
234:3
241:11

**weeks**
94:13
95:21
117:12
154:7
254:17

**well-publicized**
180:4

**well-respected**
64:10

**whorehouse**
176:8

**widely**
170:3

**wife**
10:6,10
24:2

**wild**
253:15

**winter**
7:5

**wire**
206:5

**withdraw**
35:7
87:6,18,22

**withdrawing**
99:25
100:3

**withdrawn**
27:20
33:14
39:4 41:4
51:20
57:15
61:11,15
63:14
64:4
72:14
77:7 82:2
87:19
106:2
109:16
112:7
118:6,23

124:12
129:15
160:12
161:6,19
174:2
180:22
181:2
192:18
208:7
209:23
212:21

**witnesses**
195:15

**woke**
205:24

**woods**
52:9 67:9
68:3
71:17
83:11
86:14

**word**
62:23
63:6,8
159:14,16
166:8
168:6
169:7
241:15

**words**
17:18
26:6
29:3,23
32:18
33:4
34:18
40:3,14
41:2,5
44:13
45:24
52:16
56:3
58:19
66:23

76:15
84:20
89:17
97:21
129:19
151:13
152:18
155:10
156:18
172:15
177:17
178:18
188:17
191:6
192:8,16
204:16
208:3
232:13
233:12
239:13

**work**
6:23 7:4
8:14,15,18,22,24
28:15
34:13
35:16,20
40:17
63:21
90:17
91:9,18
97:8
113:19
123:24
127:14
135:16
136:3
171:18,25
185:18
186:22
187:19
196:14,17
197:4
254:10,20
255:3

**worked**
  36:21
  102:5,8,
  15 105:23
  107:3,7,
  24 119:19
  126:16

**working**
  7:7 94:22
  95:9 96:3
  98:2
  99:16,21
  113:12
  119:3
  144:24
  149:4
  160:4
  170:13
  176:8
  191:14
  248:12

**works**
  171:22
  204:2,4

**world**
  180:5

**worrying**
  41:17
  43:25

**writing**
  99:10

**writings**
  65:16

**written**
  94:11
  117:4

**wrong**
  17:3
  41:14
  42:7
  88:19
  137:14
  151:7

  178:10
  184:8
  191:22
  193:17

**wrongly**
  170:17

**wrote**
  21:6
  37:24

———————————

**Y**

———————————

**year**
  11:17
  12:13,21,
  22 13:23
  185:6
  246:19

**year-and-a-half**
  25:5
  185:17

**years**
  5:11
  10:17
  12:4,17
  13:4
  229:25
  230:23
  254:10,20
  255:3

**yesterday**
  16:6
  108:12,14

**York**
  8:3
  229:23
  259:9
  260:23