# Exhibit 9-1

🗋 **ORIGINAL**

1

UNITED STATES DISTRICT COURT NEW YORK
FOR THE EASTERN DISTRICT OF NEW YORK
-------------------------------------------X

MARTIN TANKLEFF,

               Plaintiff,

  -against-

THE COUNTY OF SUFFOLK, K. JAMES McCREADY,
NORMAN REIN, CHARLES KOSCIUK, ROBERT DOYLE,
JOHN McLELHONE, JOHN DOE POLICE OFFICERS
#1-10, RICHARD ROE SUFFOLK COUNTY EMPLOYEES
#1-10,

               Defendants.

-------------------------------------------X

               666 Old Country Road
               Garden City, New York

               December 11, 2012
               11:29 a.m.

    DEPOSITION of K. JAMES McCREADY, one of

the Defendants herein, taken by the

Plaintiff, pursuant to Federal Rules of

Civil Procedure and Notice, held at the

above-mentioned time and place, before Dolly

Fevola, Notary Public of the State of New

York.

1                                                          2

2      A P P E A R A N C E S :

3

4      BARKET, MARION EPSTEIN & KEARON, LLP
               Attorneys for the Plaintiff
               666 Old Country Road
5              Garden City, New York 11530
       BY:     BRUCE BARKET, ESQ.
6              AMY MARION, ESQ.

7      NEUFELD SCHECK & BRUSTIN, LLP
               Attorneys for the Plaintiff
8              99 Hudson Street, Eighth Floor
               New York, New York 10013
9      BY:     EMMA FREUDENPERGER, ESQ.

10

11     MILLER & CHEVALIER CHARTERED
               Attorneys for the Plaintiff
               655 Fifteenth Street, NW, Suite 900
12             Washington D.C. 20005
       BY:     BARRY J. POLLACK, ESQ.
13

14     SUFFOLK COUNTY DEPARTMENT OF LAW
               Attorneys for the Defendants
15             H. Lee Dennison Building
               Hauppauge, New York
16     BY:     RICHARD T. DUNNE, ESQ.

17

       ALSO PRESENT:
18

       KATHY PASCHAL, Videographer
19

       MARTIN TANKLEFF, Plaintiff
20

       ROBERT DOYLE
21

       NORMAN REIN
22

23

24

25

3

STIPULATIONS

IT IS HEREBY STIPULATED AND AGREED, by and among counsel for the respective parties hereto, that the filing, sealing and certification of the within deposition shall be and the same are hereby waived;

IT IS FURTHER STIPULATED AND AGREED that all objections, except as to form of the question, shall be reserved to the time of the trial;

IT IS FURTHER STIPULATED AND AGREED that the within deposition may be signed before any Notary Public with the same force and effect as if signed and sworn to before the Court.

*        *        *

4

THE VIDEOGRAPHER:  This is reel number one of the deposition of K. James McCready in the matter of Martin Tankleff versus the County of Suffolk and others.  The United States District Court for the Eastern District of New York.

The deposition is being held at 666 Old Country Road, Garden City, at Barket, Marion, Epstein & Kearon on December 11, 2012, at approximately 11:29 a.m.

My name is Kathy Paschal, the videographer from Pro Video Productions located in Nesconset, New York.  The court reporter today is Dolly E. Fevola, an associate in for Fevola Reporting and Transcription Inc.

Will counsel please introduce themselves and state the parties you represent.

MR. BARKET:  Bruce Barket for the Plaintiff, Martin Tankleff.

```
1                        K. James McCready           5

2              MR. POLLACK:  Barry Pollack on

3         behalf of Mr. Tankleff.

4              MS. FREUDENPERGER:  Emma

5         Freudenperger also on behalf of Mr.

6         Tankleff.

7              MR. DUNNE:  Richard T. Dunne on

8         behalf of the County of Suffolk and

9         individually named defendants

10         including the next witness, retired

11         Detective McCready.

12              THE VIDEOGRAPHER:  Will the

13         court reporter please swear in the

14         witness.

15     K.  J A M E S  M c C R E A D Y, after

16    having been first duly sworn by a Notary

17    Public of the State of New York, was

18    examined and testified as follows:

19    EXAMINATION BY

20    MR. BARKET:

21              Q    State your name for the record,

22    please?

23              A    K. James McCready.

24              Q    State your address, please.

25              A    30 Yaphank, Yaphank, New York.
```

1               K. James McCready          6

2          MR. BARKET:  Good morning, Mr.

3      McCready.

4          THE WITNESS:  Good morning.

5          MR. BARKET:  I'm going to ask

6      you a series of questions.  If, at

7      any time, the question is not clear

8      or if for whatever reason you don't

9      understand, ask me to rephrase it.

10     If you don't ask, we're all going to

11     assume that you understood the

12     question the way I asked.

13         Q    Did you prepare or review any

14     material in preparation for your deposition

15     today?

16         A    Yes.

17         Q    What was that?

18         A    Some reports, notes.  I don't

19     know.  Photos, my court testimony, I

20     believe.  Yeah.

21         Q    Let's go through it.  The

22     supplemental reports are reports that were

23     prepared at or about the time of this

24     investigation by you or other members of

25     your team?

K. James McCready                7

2      A      Yes.

3      Q      And those you're referring to

4   are the notes you took concerning this

5   investigation?

6      A      Yes, and some of Norman's notes

7   and some other notes.  Whatever I could get

8   my hands on.

9      Q      And you said you reviewed your

10  trial testimony?

11     A      Yes.

12     Q      How about your hearing

13  testimony?  You testified at a pretrial

14  hearing; is that right?

15     A      Yes.

16     Q      Did you review that testimony?

17     A      I don't remember reviewing

18  that.

19     Q      You said you looked at

20  photographs.  I'm assuming you mean crime

21  scene photographs?

22     A      Yes.

23     Q      By the way, you gave a number

24  of media interviews in connection with this

25  case; is that correct?

1                    K. James McCready        8

2          A     Yes.

3          Q     Did you review the media, look

4    at the media interviews --

5          A     No.

6          Q     -- tapes of the media

7    interviews?

8          A     No.

9          Q     You sat through the deposition

10   yesterday and this morning of your, I guess,

11   your former partner Norman Rein?

12         A     Yes.

13         Q     You did not have to do that,

14   right?

15         A     What?

16         Q     You didn't have to do that?

17         A     No.

18         Q     You chose to do that?

19         A     Well, actually, I thought I was

20   going to go first but as I pointed out the

21   other day, I need hearing aides and I was

22   hoping to get them before I actually sat

23   down here.  I'm supposed to pick them up

24   today.

25         Q     Can you hear me okay now?

K. James McCready                    9

A     I can hear you but I have to really pay attention.

Q     Hopefully I'll keep your interest and speak loudly.  By the way, you all get paid as part of the contract with the police department so you're being paid some kind of salary or compensation for testifying today; is that right?

A     Yes.

Q     That's through the contract the police department has with the County?

A     Yes.

Q     Could you tell me your general employment history.  Were you a Suffolk County police officer for a number of years?

A     Well, I'll start at the very beginning.  October 24, 1969, I was appointed to the New York City Police Department.  I think in April 24, 1970, I was appointed to the Suffolk County Police Department.  I worked in various -- worked in the Second Precinct.  I worked in the narcotics squad.  I worked anticorruption bureau, rackets bureau.  I made detective

K. James McCready          10

2    while I was in the Fourth Precinct and I

3    went to the Sixth Precinct and from the

4    Sixth Precinct I was transferred into the

5    homicide squad.

6            Q    When did you enter the homicide

7    squad?

8            A    March of 1980.

9            Q    Okay.  Is it correct that yours

10   was the fastest promotion to homicide in the

11   history of the Suffolk County Police

12   Department?

13           A    Yes.

14           Q    I saw somewhere or a quote from

15   you that this was the best job in the world,

16   being a homicide detective?

17           A    Yes, it is.

18           Q    You liked what you did?

19           A    Yes.

20           Q    You're good at it?

21           A    Yes.

22           Q    I understand that you've worked

23   over 300 homicides?

24           A    Close to that.  Not as the lead

25   detective but...

K. James McCready          11

1
2       Q     Two hundred murders, lead
3   detective on 60; is that right?
4       A     I believe so.  I'm not sure.
5       Q     Do you have a -- favorite might
6   not be the right word, but do you have one
7   of those 60 or 300 that sticks out as being
8   particularly memorable to you?
9       A     Yes.
10      Q     Tell us about it.
11      A     Patty Finn.  She was a young
12  lady, West Sayville, and she was brutally
13  stabbed, raped and stabbed 37 times.  We had
14  a very viable suspect -- I don't remember
15  his name right now -- and I believe he was
16  wanted in connection with, a serial killer,
17  18 other murders across the country.
18            I got a lead that he had gotten
19  on a bus and that he was going to Colorado.
20  My partner at that time was Bill Mahoney.
21  We literally chased him across country for
22  12 days.  We finally caught up with him in a
23  place called Pacific County in the state of
24  Washington.
25            The Sheriff and the district

K. James McCready          12

attorney of that county -- it was a very

small little town -- actually apprehended

him and then I was able to interview him and

he looked real good as a suspect the only

problem was he did not do it.  He did the

other 18, but he did not do mine.

So needless to say, I felt a

little awkward coming back with my tail

between my legs so to speak, but if he

didn't do it he wasn't going to jail for it.

That always stuck out in my mind.

Q     You ever eventually find the

individual who committed that murder?

A     Yes.

Q     You solved the case?

A     Yes.

Q     Did you receive any awards in

the course of your duties as a police

officer?

A     I think 17 separate awards.

Q     Any that stick out in your

mind?

A     Well, Silver Shield Award given

by the PBA and the Combat Cross.

K. James McCready     13

1

2          Q     What's a Combat Cross for?

3          A     Combat Cross is you engage in a

4    gun battle with an adversary and you win.

5          Q     I guess you really want to get

6    that award if you're in a gun battle.  You

7    also had -- You come from a police family;

8    is that right?

9          A     Yes.  As far as we can trace,

10   our family goes back to 1854 in the State of

11   New York.

12         Q     You don't just trace your

13   family back to 1854, you trace your family

14   back in law enforcement that long?

15         A     That's what I'm saying.  The

16   earliest records the city police have begin

17   in 1854.  That's as far back as we can trace

18   it under Murphy and McSweeney, Family part.

19         Q     So your dad was on the job as a

20   police officer?

21         A     My dad became a police officer

22   when he was 36, just about 37.  He managed

23   to get on because he had seven years

24   military time and in those days they

25   deducted military time from your age under

1    29 and he was going to be 37 in December of

2    1957 and he was appointed in September -- I

3    think September 14th of 1957 -- to the

4    Huntington Town Police Department.

5         Q    Do you have brothers that were

6    also police officers?

7         A    Yes, three brothers.

8         Q    I saw reference someplace your

9    name is James McCready or Kevin James

10   McCready?

11        A    My real name is Kevin James

12   McCready, however, I don't know what

13   happened but I was -- my birth certificate

14   is Kevin.  My baptism certificate is James.

15   And up until I started collecting Social

16   Security three years ago my social security

17   card had James K. McCready so I had to get

18   that switched.

19             But yeah, my dad was one of the

20   original 10 homicide detectives in the

21   County.  They formed that in 1963.  I was

22   the next one to go to homicide.  My brother

23   Gene came into homicide.  My brother Tommy

24   was an arson detective.  My brother Kevin

K. James McCready          15

got hurt on the job, early on in the job.

He got out on a disability.

    Q    Okay.  You said you were in

narcotics.  When were you in narcotics?

    A    I think 1972.  '72 and '73 I

think it was.  I don't know if you know who

Dennis Wustenhoff (phonetic) is God rest his

soul.  Dennis Wustenhoff took my place in

narcotics squad.  He was subsequently

murdered.

    Q    I'm sorry.  Sorry.  And you

were also in rackets?

    A    Yes.

    Q    Rackets being investigating

organized crime?

    A    Yes.

    Q    I want to talk to you a little

bit about your training in confessions.

    Part of your job as a detective

is interviewing suspects; is that right?

    A    Is what?

    Q    Interviewing suspects.

    A    Sure.

    Q    You need to know how to do

K. James McCready                16

2        that?

3                A      Yeah.

4                Q      You don't get to homicide if

5        you're not capable of interviewing

6        individuals you believe are involved in

7        serious crimes?

8                A      Right.

9                Q      And I guess you heard the

10       discussion yesterday about the confession

11       takers and the SIC?

12               A      Yes.

13               Q      You remember all that?

14               A      Yes.

15               Q      There was a comment that was

16       made by Detective Rein in response to a

17       question that the confession rate in Suffolk

18       at the time was between 90 and 95 percent,

19       solving homicides with confessions or

20       entertaining confessions or admissions

21       during homicide investigations, and he

22       made -- pointed to a comment that was made

23       by, I guess, a colleague of yours that what

24       that means is that there is a five to

25       six percent failure rate?

K. James McCready          17

          A     I don't know who made that

comment.  That's idiotic.  Bad thing to say.

          Q     Why is that?

          A     Because whether we have a

95 percent confession rate, which I quite

frankly was not aware of that, we were doing

a good job.  I know I've always been very

careful not to overstep my bounds.

          As a matter of fact, Mr.

Gianelli, who I'm sure you're aware of, used

to cross-examine me at various times about

the fact that I studied the law.  I mean I

had always thought that maybe one day when I

left the police department I might go on and

become an attorney.  Specifically, I wanted

to be a prosecutor, but I got my nephew to

do that now.

          Q     He works in the Suffolk County

DA's office?

          A     Yes.

          Q     And which is he, the son of

which brother?

          A     He's the son of my brother

Gene.  Name is Sean.

K. James McCready          18

Q     Okay.  In taking confessions, this is not just something you wander in and start talking to people, you have some training on this, yes?

A     Well, we went to a couple of schools on it, but I forget, a couple of seminars and whatnot.  But I think getting people to talk is an art that not all people have.  You know, I try to be able to converse with anybody on any level if I have to, you know.

Q     My point is that when part of your skill set as a detective, particularly a homicide detective, is you need to be able to do just that, you need to be able to talk to individuals, get them to talk, and you need to understand where your boundaries are, right?

A     Yes, certainly.

Q     You studied the law.  So it's not just you wander in and start talking to somebody and you get them to quote/unquote confess.  This is actually a skill set that you have, yes?

1                          K. James McCready          19

2              A     Yes.

3              Q     It's an important skill set for

4      a homicide detective, yes?

5              A     Yes.

6              Q     It's something that you

7      trained, you went to school for, you

8      practiced through the course of your career,

9      and then over time with experience you

10     became good at it?

11             A     Yes.

12             Q     And it's actually fairly

13     serious business, no?

14             A     Very what?

15             Q     Fairly serious business.

16             A     Certainly it is.

17             Q     You're questioning somebody who

18     you think is involved in a murder; sometimes

19     the confession is the only evidence you're

20     going to end up getting?

21             A     Sometimes, yes.

22             Q     And if you don't do your job

23     well in that room, somebody who is guilty of

24     a serious crime could walk out of the room

25     and commit more crimes?

K. James McCready          20

1
2         A     Yes.
3         Q     That's certainly one of the
4    things you think about because of concern?
5         A     Yes.
6         Q     I take it you're proud of what
7    you did as a police officer?
8         A     Yes.
9         Q     That you, over the course of
10   your career, probably made hundreds, if not
11   thousands, of arrests; is that right?
12        A     Hundreds, not thousands.
13        Q     And that's, for the most part,
14   tabling individuals off the street who
15   committed a serious crime, they're being
16   punished for the crime they committed,
17   right?
18        A     Yes.
19        Q     And you stop them from
20   committing other crimes, right?
21        A     Yes.
22        Q     Again, it's something you did,
23   you were good at, and you're proud of, yes?
24        A     Yes.
25        Q     You said something about the

K. James McCready          21

Reid technique.  Let me ask you some

questions if I can about that.

          By the way, this is a phrase

that I've heard in police, "did he go for

it."  Have you ever heard of that phrase?

          A     Yes.

          Q     What does that refer to?

          A     Did he confess.

          Q     It's a question that's asked

among detectives in the course of examining

individuals, "did he go for it," did he

confess?

          A     Yes.

          Q     In the course of taking an

individual's confession or interviewing

them, would you agree with the statement

that you want to develop information that

could be corroborated by a further

investigation?

          A     Yes.

          Q     You knew about that back in

1988 as well, right --

          A     Yes?

          Q     -- when you were doing this.

1                    K. James McCready      22

2    The fact that the suspect may or may not say

3    yeah, I did it or yes, I'm guilty, that does

4    not end the interviewing process with the

5    suspect; does it?

6            A    No.

7            Q    In some ways that really is

8    when it begins, right?

9            A    Yes.

10           Q    Person says, okay, I did it and

11   then you want to find out how?  You want to

12   know the details of it.  You want to find

13   out the motive, develop information from

14   that?

15           A    Yes.

16           Q    In some cases you want to find,

17   for example, firearms, you want to get the

18   firearms off the street?

19           A    Yes.

20           Q    Sometimes individuals -- a

21   victim, their body may not have been

22   discovered, you want to find out where the

23   body is?

24           A    Yes.

25           Q    If a person had accomplices,

K. James McCready          23

1
2    you want to find out if they had accomplice?

3          A     Yes.

4          Q     You want to be able to continue

5    to question them and continue to get

6    information from them?

7          A     Yes.

8          Q     Is it fair to say that -- and I

9    don't mean this in a derogatory sense, but

10   at a core level what you do is you convince

11   the individual that it's in their best

12   interest to speak to you, right?

13         A     Basically, yes.

14         Q     But it's really not in their

15   best interest to speak to you?

16         A     Well, it depends on their

17   psyche, I think, at the time.  You know, a

18   lot of people like to get things off their

19   chest.

20         Q     They do but you'd agree with

21   me, and you studied some law, that an

22   individual sitting in a room with two

23   homicide detectives being questioned about a

24   homicide, their best interest, their legal

25   interest, is to say nothing and talk to a

K. James McCready                    24

1

2    lawyer?  Talking to you is not something

3    that is going to help them?

4            A    That's true.

5            Q    And part of what you're able to

6    do, part of what you're trained to do is

7    convince them that although they are

8    confessing to a murder and it means they're

9    going to go to prison for a long time, that

10   it's really in their interest to do this?

11           A    Yes.

12           Q    And again, I don't mean this in

13   a derogatory sense, but you see there is a

14   form of deception there, right?

15           A    Yes.

16           Q    I mean at a core level you have

17   to convince the person to do the opposite of

18   what they should be doing, fair?

19           A    Yes.

20           Q    Part of the Reid technique, do

21   you recall that it was to not give the

22   individual information but to get

23   information from them?

24           A    Yes.

25           Q    And that presents a little bit

K. James McCready          25

of a problem for -- not a problem but a

little bit of -- I guess it's part of the

skill set you need as a homicide detective.

Here's what I mean and tell me

if you agree with this.  Before you go to

interview a suspect you want to gather as

much information you can about the crime to

use it in the course of interviewing the

individual, true?

          A     Yes.

          Q     You don't want to walk in there

knowing nothing about the crime, you just

ask questions?

          A     Right.

          Q     Before the interview takes

place or the interrogation takes place, you

want to make sure you have as much

information in your head about what went on?

          A     Yes.

          Q     With that information, you want

to use that to extract information from the

suspect, correct?

          A     Yes.

          Q     You don't want to feed them

K. James McCready          26

1

2    what you have and have them regurgitate it

3    to you; do you?

4          A    No.

5          Q    So that's tricky; isn't it?

6          A    Yes.

7          Q    Because it's tempting to say,

8    come on, we know what happened here.  You

9    know, tell us the person was shot three

10   times, you found the body, you're asking him

11   how many times was the person shot and --

12         A    No, I would not tell them that.

13         Q    You want to get that

14   information from them even though you have

15   it yourself, right?

16         A    Yes.

17         Q    You want to see if they know?

18         A    Yes.

19         Q    That's part of the skill that

20   you employ as a homicide detective?

21         A    Yes.

22         Q    And so you don't ask or you

23   should not ask leading questions; true, for

24   the most part?

25         A    Maybe for the most part.  You

K. James McCready          27

1

2    don't ask questions where you're going to be

3    feeding them information.

4         Q     Right.  So when we say leading

5    questions, I think we both know what that

6    means because, for the record, I guess it

7    means where the question contains the

8    answer.  So rather than asking what's the

9    weather like today, which would be a

10   non-leading question, I would say, have you

11   seen the snowfall today.  It contains the

12   answer in the question.

13        A     Yes, I understand.

14        Q     Now, is it also true that you

15   know as you're interviewing these suspects

16   that if they confess, and if there is a

17   prosecution, you're going to be asking

18   questions about that later on?

19        A     Yes.

20        Q     You know that prosecutors are

21   going to ask you questions?

22        A     Certainly.

23        Q     And defense attorneys are going

24   to ask you questions?

25        A     Certainly.

K. James McCready                    28

2      Q    And in 1988 you had been

3   through that a number of different times;

4   hadn't you?

5      A    Yes.

6      Q    And you were aware of the

7   scrutiny that the Newsday series confession

8   takers had placed on the Suffolk County

9   homicide squad?

10     A    Yes.

11     Q    And you were aware of the

12  scrutiny that the special investigation or

13  state investigation commission placed on the

14  homicide squad?

15     A    Yes.

16     Q    You were aware that the state

17  investigation commission did a whole

18  investigation of what was taking place in

19  Suffolk and offered some criticism?

20     A    Yes.

21     Q    Just curiously, were they fair

22  criticism?

23     A    Well, quite frankly, not having

24  had anything to do with that particular

25  investigation that you're talking about, I

1                              K. James McCready        29

2    remember I called to testify and never even

3    interviewed nothing to do with that.

4           Q     With the state investigation

5    commission?

6           A     That's right.

7           Q     Were you represented by anybody

8    during the course of that investigation?

9           A     Pardon me?

10          Q     Were you represented by an

11   attorney during the course of that

12   investigation?

13          A     Not -- The first statement

14   state investigation?

15          Q     Right.

16          A     No.

17          Q     Mr. Spota, Thomas Spota, did

18   not represent you during the course of that?

19          A     Not that I'm aware of.

20          Q     Did he represent the Detective

21   Association?

22          A     Oh, yes, he did.  I guess he

23   did but I have never had a conversation with

24   Thomas Spota about that.

25          Q     Okay.  You know who he is,

K. James McCready                    30

2     obviously, right?

3          A     Of course.

4          Q     And another thing that the Reid

5     technique taught you was to not use police

6     language like sexual assault, things like

7     that.  You let the suspect's own words be

8     used, correct?

9          A     Yes.

10         Q     Now, Mr. Rein was asked this

11    yesterday and I think that you've commented

12    on this before, but you're generally aware

13    of a phenomenon of false confessions, yes?

14         A     Yes.

15         Q     You know that that's occurred

16    during the course of interrogations where

17    individuals will say they committed a crime

18    when, in fact, it turns out they didn't?

19         A     Yes.

20         Q     And we don't dispute that that

21    goes on, right, that there are times

22    individuals sit down in a room with homicide

23    detectives and say, yes, I committed a

24    brutal murder, or a murder, or other serious

25    crime, and further investigation reveals

K. James McCready          31

2    that that information was false?

3           A    I guess so.  It never happened

4    to me so I don't know.

5           Q    As far as you know?

6           A    Yeah.

7           Q    Right, there is no case that we

8    can go back to absent this one for the time

9    being?  There is no case we can go back to

10   with you and you would say yeah, I was

11   involved in taking a statement and it turns

12   out the person that was confessing to the

13   crime was absolutely innocent?  That never

14   happened to you?

15          A    No.

16          Q    You're sure of that?

17          A    Absolutely.

18          Q    Did Reid teach you that some

19   people would be more vulnerable to giving

20   false confessions than other people with low

21   IQ, people who are emotionally distressed?

22   Did you learn that?

23          A    I don't recall that.

24          Q    Would you agree with me

25   generally that an individual who's being

K. James McCready                32

2   interviewed by two seasoned homicide

3   detectives is going to be perhaps more

4   vulnerable to a false confession if they

5   don't have an intelligence level of the

6   average person?

7            MR. DUNNE:  I object to the

8       form of that.  Go ahead and answer

9       the question.

10      A    What's that?

11           MR. DUNNE:  Go ahead and answer

12      the question.

13      A    I don't know.  I don't have an

14   opinion one way or the other.

15      Q    As a matter of common sense,

16   wouldn't you think that it would be easier

17   for someone who is not so smart to kind of

18   give a false confession to somebody who's

19   very intelligent?

20      A    No.

21           MR. DUNNE:  Again, I'll object

22      to the form.

23      A    No.

24      Q    How about somebody who is

25   emotionally upset or distressed?

1                     K. James McCready      33

2          A     No.  Well, how can I phrase

3      this?  Not necessarily.  Not necessarily.

4          Q     Not necessarily but it makes

5      them -- My question wasn't everybody who is

6      emotionally distressed doesn't automatically

7      give a false confession.  What I asked was,

8      would you agree with me that somebody who

9      emotionally distressed is more susceptible

10     to that kind of phenomenon?

11         A     I'm having a little difficulty

12     hearing because I'm trying to anticipate

13     something that I'm trying to...

14         Q     You can do whatever you like

15     but the best thing to do is answer the

16     question I'm asking.

17         A     What I'm trying to tell you is

18     that I don't necessarily agree with all of

19     that.

20         Q     You don't have to.  How about

21     somebody who is younger rather than more

22     mature, would you agree with me that they

23     are more likely to provide a confession that

24     was false?

25         A     Again, I think it would be all

K. James McCready          34

on the individual basis.  I don't think it's

necessarily applicable to any particular --

You can't say like a 14-year-old is more apt

to confess than a 24-year-old.  I don't

think that's necessarily true.

Q     So your testimony is that

intelligence against emotional stability,

distress and age, have nothing to do with an

individual's susceptibility to providing a

false confession?

A     I'm not saying that.  What I'm

saying is that you have to take each case on

an individual basis.  That's what I'm

saying.  Take each case on an individual

basis.

Q     Would you agree with me that

those factors that I just listed are factors

that you would look at when looking for

individuals that are likely or more likely

to give a false confession?

A     Yes.  Say that again.

Q     Would you agree with me that

those are factors that you want to take into

account when assessing whether or not an

K. James McCready                    35

individual is likely to give a false

confession?

          A     I guess so.

          Q     Of course it does, right?

          A     Yes.

          Q     I mean just your own experience

when you were younger, you know, peer

pressure meant a lot more to you than it did

when you got more mature, yes?

          A     Yes.

          Q     Which is a natural part of

growing up and becoming an adult?

          A     Sure.

          Q     Did you have a practice of

being careful with interrogation techniques

when you're interrogating individuals who

were emotionally distressed, unintelligent

or young?

          A     My interrogation technique was

always appropriate to whatever the

circumstances were.

          Q     Okay.  Did you pay any special

attention when you were interrogating

individuals who perhaps had a low IQ or were

K. James McCready          36

emotionally distraught?

        A     Yeah, I guess.

        Q     How about when you're
interrogating teenagers as opposed to
adults?

        A     Again, it's all on an
individual basis.

        Q     I need to ask you some
questions but let me ask this first.  Sorry.

              The reports you prepared in
connection with the Martin Tankleff case --

        A     Yes.

        Q     -- those were prepared by -- I
guess the ones you prepared were prepared by
you; is that right?

        A     Yes.

        Q     The one thing and I think we
have this from yesterday.

              MR. BARKET:  Do we have

              yesterday's exhibits?  I don't want

              to remark the same things.  I'm

              looking for the supplemental report,

              the three-page supplemental report.

              MR. POLLACK:  I'll find it for

1                    K. James McCready        37

2           you.

3                    MR. DUNNE:  It's 59.

4           Q    I'm going to show you what's

5    been marked as 59 and I'm going to ask you

6    some questions about it.  Could you take a

7    look at that.

8           A    Yes.

9           Q    That's the supplemental report.

10   That's basically a summary of your

11   investigation from September 7th of 1988; is

12   that right?

13          A    Yes.

14          Q    Now, there's a date at the

15   upper left-hand corner, September 14, 1988?

16          A    Date of report.

17          Q    I'm not sure I follow.

18          A    That's the date I wrote it.

19          Q    You wrote the report a week

20   later?

21          A    Yeah.

22          Q    Okay.  Did you have notes that

23   were made contemporaneous?

24          A    Yeah, you have all the notes.

25   You have everything.

K. James McCready                38

Q    Did you type this yourself?

A    No.

Q    You write it up and hand it in so the secretary types it for you?

A    Yes.

Q    And you review and sign off on it?

A    That's right.  That's why when you see a couple of mistakes, you see my initials.

Q    That's you reviewing the typos?

A    Yes.

Q    You give to your supervisor who is Detective Sergeant Doyle?

A    Yes.

Q    He was here today too?

A    Yes.

Q    And he was here yesterday?

A    Yes.

Q    Everybody agrees to it.  You agree it's accurate and sign off?

A    Yes.

Q    So this report was completed on the 14th but it represents a kind of --

K. James McCready                    39

1

2          A      Synopsis.

3          Q      Of everything that took place

4    and different notes; is that true?

5          A      Yes.

6          Q      Okay.

7                 MR. BARKET:  I don't know if

8                 this has been marked and I don't

9                 think I have an extra copy right

10                now, but I'll mark it and then we'll

11                have to make a copy of it later.

12                      (Whereupon, Plaintiff's Exhibit

13                79 was marked for identification.)

14         Q      Mr. McCready, I want to show

15   you what's been marked as Plaintiff's

16   Exhibit 79.  I'm going to ask you if you

17   recognize those as being your notes?

18         A      Yes.

19         Q      That's your handwriting?

20         A      Yes.

21         Q      There is several pages.  Just

22   thumb through it and make sure they are all

23   your notes.

24         A      (Complying.)

25         Q      You're free to read this if you

K. James McCready                40

1    want.  I just want you to make sure they're

2    your notes?

3

4         A    They appear to be my notes.

5         Q    Let's just set those aside for

6    a second and we'll come back to them as we

7    need to.  I can make a copy for Mr. Dunne in

8    the meantime.

9              One of the things that I wanted

10   to ask you about in terms of your ability to

11   interrogate suspects and obtain

12   confessions -- How could I phrase this?

13             Do you understand the power

14   that you possess as an individual when

15   you're doing this?

16        A    Do I what?

17        Q    Do you understand the power

18   that you possess in conducting these

19   interrogations?

20        A    I don't know.  I would not call

21   it a power.

22        Q    Well, it's certainly a unique

23   skill set; isn't it?

24        A    Yes, it's a skill.

25        Q    And it's unique.  Not everybody

K. James McCready          41

could sit in a room and convince everybody

that it's in their best interest to confess

to a homicide?

     A    Probably correct.

     Q    And you were particularly good

at it, which means you were good at your

job, right?

     A    Yes.

     Q    And so in that sense -- can I

overstate this -- it's sort of a gift; isn't

it?  You said people are born with the

ability to get people to talk?

     A    It depends on the individual;

in their own personal experiences also.

     Q    Sure.  And it's not just a

conversation you're having with the suspect,

it's actually a technique that you employ as

part of your job and you get these

individuals to admit to you crimes that they

engaged in?

     A    Yeah.

     Q    I guess you do it when you're

interrogating somebody, you do it with

somebody you either suspect has committed a

K. James McCready          42

1   crime or you believe has committed a crime,

2   right?

3

4        A     Yes.

5        Q     You would not use this

6   technique on anybody who you did not think

7   had anything to do with the crime; would

8   you?

9        A     Not necessarily, no.

10        Q     I'm curious about how you

11   govern yourself.

12        A     You're curious as to how I

13   govern myself?

14        Q     How you govern yourself.

15   You're sitting in a room with a suspect and

16   your suspicions may be true, you may have

17   great gut instincts but they are not

18   perfect; are they?

19        A     No, nobody is perfect.

20        Q     I'm curious as to how you

21   govern yourself to get people to confess to

22   crimes and when do you simply sit their and

23   interview somebody to find out information?

24   How do you draw distinction between those

25   two?

K. James McCready        43

1

2       A     I don't think I ever have.  I

3  just try to be me, that's all.  I don't

4  pretend to be somebody I'm not.

5       Q     Right, but being you in

6  different context.  You don't talk to people

7  in restaurants the way you talk to them in

8  an interrogation room; do you?

9       A     No, but it depends on the

10 situation too.  I mean, you know, I've had

11 conversations, I'd say, with people in

12 restaurants that were similar, if you will,

13 to doing an interrogation.

14      Q     In what way?

15      A     Well, I mean you ever get in a

16 bar fight?

17      Q     I'll take the fifth.

18      A     Well --

19      Q     I mean I guess I started on

20 this road I have to finish it a little bit.

21            How does a bar fight -- What

22 are the parallels between a bar fight and

23 interrogation of a suspect?

24      A     Well, what I'm getting at is

25 I've had bar fights, all right, and the most

K. James McCready          44

recent one a guy cleaned my clock.  That was

about -- I don't know how many years ago --

it was because of a conversation I was

having with him with regard to his son and

it was almost an interrogation of the

father.

    Q     And I guess that's exactly what

I was asking you, that at times you actually

employ this technique, you begin to

interrogate people.  And so my question to

you is not in the bar fight context but in

the context of your job.  When you're

interviewing individuals, sometimes you're

just interviewing witnesses, right, you're

not interrogating them?

    A     Right.

    Q     Other times you literally are

interrogating suspects?

    A     Right.

    Q     How do you decide?

    A     Well, I don't know what you're

getting at.  If a guy is a suspect, if he's

a witness, he's a witness.

    Q     Well, they don't come with

K. James McCready          45

labels.  The people do not arrive with

little name cards that say "suspect" or

"witness."  Who gets to decide if they are

suspect or witness?

     A    It depends at what point in

time.  They can become -- They're a witness

to begin with then they become a suspect.

     Q    Who decides that?

     A    Generally, the individual

because based on what he says, his demeanor

and his answer to certain questions, things

of that nature, then he goes from being a

witness to becoming a suspect.

     Q    In whose mind?

     A    In my mind.

     Q    So it's your judgement?

     A    Yes.

     Q    So an individual that you're

interviewing that you think is a witness,

you interview one way; an interview or

interrogation of someone you believe is a

suspect is an interrogation and you go about

it a different way, yes?

     A    Yes.

K. James McCready                    46

2       Q    And that's part of what you're

3   trained to do as a detective, right?

4       A    Yes.

5       Q    Those kinds of judgements are

6   part of your job; aren't they?

7       A    Yes.

8       Q    You're talking to somebody and

9   you're trained and you're experienced and

10  you're supposed to able to discern that, who

11  is just a witness and who is potentially

12  involved in this crime?

13      A    Right.

14      Q    And based upon those judgments

15  that you make you then interact with the

16  individual differently; true?

17      A    Yes.

18      Q    Now, you mentioned the bar

19  fight so let me -- part of the little

20  checklist they give us as lawyers to ask at

21  deposition is prior arrests, so I'm assuming

22  that some of the bar fights you were in

23  resulted in arrests?

24      A    In arrests?

25      Q    Yes.

K. James McCready          47

1     A     Yes.

2     Q     How many times?

3     A     Two.

4     Q     What was the most recent one?

5     A     Down Little River, South

6  Carolina.  The guy that cleaned my clock got

7  locked up.

8     Q     He cleaned your clock.  I

9  thought the winner gets arrested, the loser

10  goes to the hospital.  You lost and got

11  arrested?

12     A     I lost; he got arrested.

13     Q     Oh, okay.  Were you arrested?

14     A     I didn't arrest him.  I

15  couldn't arrest him.

16     Q     Did you get arrested?

17     A     No.

18     Q     I'm asking you about instances

19  where you, yourself, were charged with a

20  crime.

21     A     The only time I was charged

22  with anything was over Shuckman (phonetic),

23  and that wasn't over a bar fight, that was

24  over him -- Well, why don't we get right

K. James McCready                48

1    down to the nitty gritty, right, with Mr.

2    Shuckman, all right, because you're going to

3    ask me a million questions about it anyway.

4    

5         Q     I'm actually --

6         A     I might as well tell you the

7    whole story from beginning to end.

8         Q     Go ahead.  Sure.

9         A     It was St. Patrick's day.  I

10   had been at the St. Patrick's Day Parade

11   with the grand marshall who's the sheriff of

12   Suffolk County at the time, Pat Mahoney, and

13   with the supervisor of the Town of

14   Brookhaven who was John Powell at the time,

15   myself and the undersheriff, Eddie Morris;

16   the reason being that we were all together,

17   was I was asked by the St. Patrick's Day

18   committee from Rocky Point to see if I could

19   raise money for the United States Marines

20   who were staying at Danford's Inn down in

21   Port Jeff.

22              All their food was given to

23   them but the rooms had to be paid for so I

24   went to the SOA Detectives Association and

25   the PBA and I got donations from them; said

K. James McCready        49

1      that we could pay for the marines' rooms.

2                As a result of that, I was

3      invited by Pat Mahoney and other people to

4      join them Friday night before St. Patty's

5      Day at, you know, a festival park that they

6      were having for all the marines.

7                The day of the parade, after

8      everything was all finished and said and

9      done and over with, I went to, you know,

10     Harry's.  Then, Harry's Bar & Grill on

11     Broadway in Rocky Point -- I'm tying

12     pictures in my mind that's all -- and at

13     that time I was separated.  I was living

14     around the corner and -- Garland Road

15     (phonetic) -- I owned a house over there.

16     So I went to Harry's and a guy -- I don't

17     know who he was at the time -- when I went

18     up to the door it was a guy named Teddy.  I

19     come to find out his name is Teddy, Teddy

20     DeLuca.  I never knew Teddy's full name

21     until all this stuff happened -- he was at

22     the door kind of like a bouncer and the

23     place was crowded and they were selective

24     about who they were going to let in the door

1                    K. James McCready        50

2     and whatnot.

3              As I was going in the door,

4     this guy Shuckman comes up, pushes me to the

5     side and bolts in to the bar.  I didn't say

6     anything.  I didn't do anything.  He's in

7     the bar and he starts bothering some other

8     customers and whatnot and the bartender,

9     Bob, who was a retired New York City

10    detective, threw him out of the bar.  Again,

11    I was not involved in it at all.

12              After Shuckman went outside,

13    however, he started -- he slowly stole a

14    banner off the front of the bar.  A bunch of

15    people went out looking for him and I did

16    not.  They went out looking for him and they

17    could not find him and they came back.  A

18    short while later somebody pointed out to me

19    that he was across the street.

20              At that time, I owned a corner

21    of strip stores, strip stores, four or five

22    stores there on the corner, and he's

23    throwing rocks and behind me was -- I forget

24    the name of that place, they since tore it

25    down.  There is another bar and they had

K. James McCready          51

like an antique phone booth outside.

Shuckman took rocks and threw them through

the glass at these old phone booths,

whatnot, and about that time I saw the light

come on, timed lights on the back of the

building in case burglars come up, you know,

the lights come on.

     Q     Motion detectors?

     A     Right.  I saw the lights come

on and I saw him behind my building so I

said, oh.  The next thing I know he throws a

rock through the window in one of my stores

so I went outside of Harry's, I got in my

Jeep, and I drove as though I was leaving

and as I got up to where Shuckman was I

threw the Jeep in park and got out and I

grabbed him and he took me and knocked me

over a log or something to the ground and

took off running.

          I took off chasing him.  I

chased him from there all the way down to

the gas station down by the elementary

school there in Rocky Point.

          As I was chasing him to the gas

K. James McCready          52

1
2    station, this guy Teddy DeLuca comes driving
3    up and I'm in my Jeep and Shuckman runs into
4    the gas station there.  Well, the guy in the
5    gas station called the police.  The
6    attendant called the police and uniformed
7    cars came down.
8              They got Shuckman and they
9    asked me what I wanted to do.  Do I want him
10   locked up or what, and I said no.  I said it
11   was St. Patty's Day, we'll let him go.  He's
12   going to bring me back the banner or flag or
13   whatever it was he was supposed to give that
14   back to me, part of the deal for me not
15   having him locked up.
16             To make a long story short,
17   we're walking down the road and now the cops
18   had left.  The uniform guys left.  We're
19   walking down the road now all of a sudden he
20   gets antsy and he wants to fight.  We get in
21   a fight.  And what happened was, you've seen
22   hockey fights where the guy's Jersey comes
23   off and they fight.
24        Q    Sure.
25        A    His jersey comes off.  I

1                      K. James McCready        53

2       knocked him on the ground.  He went to kick

3       me in the balls.

4              Q      In the groin or the balls,

5       okay.

6              A      So I grabbed his foot and with

7       that I grabbed his pants.  What he had on

8       was basically sweatshirt and sweatpants,

9       that's it.  No underwear.  And when I

10      grabbed them, I pulled them off so now I had

11      him for about up to here and so I said,

12      look, I'm not putting up with this shit.  I

13      said, you want your clothes, you'll get your

14      clothes back when you bring me the flag.

15      And I left him in the street there.

16                     Last time I saw him he was

17      running down the road with two garbage can

18      covers on him, one in the front and one in

19      the back.  So I went back to Harry's and had

20      a couple of more beers and I went home.

21             Q      How did you end up getting

22      arrested for that?

23             A      Mr. Catterson, you know him?

24             Q      I --

25             A      James Catterson?

K. James McCready                54

Q      You're referring to James Catterson, he's a DA at this time?

A      James Catterson decides that I robbed this guy when I took his clothes. They indicted me for assault and robbery. It cost me $17,000 for Mr. Spota to represent me.

Q      You actually were represented by two lawyers at the time, Mr. Spota and Billy Keahon?

A      Billy Keahon was pro bono through Teddy DeLuca.

Q      He was charged also?

A      What's that?

Q      Mr. DeLuca was charged also?

A      Yeah.

Q      What was he charged with?

A      Same thing.  Because we were -- it was the three of us walking down the street.

So one thing leads to another and they indicted me so I had to go out to county attorney's office out there and I surrendered myself to -- I forget which

K. James McCready          55

detective investigator was or whatever and

we went to trial.  And when we got to trial

and the people presented their case, they

failed to present a prima facia case and as

a result the case was immediately dismissed

by -- I forget the judge's name.

     Q    Pitts?

     A    Yeah, that's it Pitts.  He

dismissed the case.  That was the end of it.

     Q    Was that the only time you've

ever been charged with a crime?

     A    Yeah.

     Q    You were not charged with

assault down in the Carolinas?

     A    Assault in the Carolinas?

     Q    Yeah, were you charged with any

kind of crime in North Carolina or South

Carolina?

     A    No.

     Q    Do you have any prior losses --

     A    Oh, wait a minute.  Wait a

minute.  Hold on.  It's a misdemeanor.  No,

it's a crime.  I guess it's a crime.  I

don't know.  I got charged with a DUI.

K. James McCready                    56

1

2        Q      Oh, okay.

3        A      It was dismissed.

4        Q      It was dismissed, okay.  Just

5  to go since you mentioned it, were you

6  drinking the night you had the problem with

7  Mr. Shuckman?

8        A      Shuckman?

9        Q      Yes.

10        A      Yeah, but I wasn't loaded or

11  anything.

12        Q      Prior lawsuits, have you ever

13  been involved in any prior lawsuits?

14              Mr. Shuckman sued you as a

15  result, right?

16        A      I don't remember him suing me.

17  I don't think so.

18        Q      Any other lawsuits that you

19  have been involved in?

20        A      I'm trying to remember.  I

21  don't remember.  You know, I was like in

22  this case being Defendant or whatever but I

23  don't remember what it was about.  I don't

24  remember who the hell it was.

25        Q      Have you been involved in any

K. James McCready                57

1

2     other litigation of any sort?  Divorces,

3     civil lawsuits, bankruptcy, anything like

4     that?

5              A    Oh, I've had -- well, and I'm

6     sure you're going to get to this too so I

7     might as well tell you this right now.

8              Q    I'm not sure to what you're

9     referring to but go right ahead.

10             A    You're going to start asking me

11    about Shari Rother, Ronnie Rother, the

12    restaurant and all that stuff out there.  So

13    you want to know the truth?  I had to file

14    personal bankruptcy by the time I got done

15    with that stupid restaurant out there.

16             Q    You're referring to the

17    restaurant you went into business with with

18    Mr. -- is it Ron Rother?

19             A    Ronald Rother.

20             MR. BARKET:  The videographer

21             tells me that I should stop right

22             around now so I'll do that.  We'll

23             take a break.

24             THE VIDEOGRAPHER:  We're off

25             record at 12:22 p.m.

K. James McCready          58

1
2          (At this time, a brief recess
3     was taken.)
4          THE VIDEOGRAPHER:  Tape 2.
5     We're back on record at 12:32 p.m.
6     You may proceed.
7          Q    I just want to kind of took a
8     poll on our break and I got to a couple of
9     areas I wanted to ask you about; one that
10    you mentioned.  The one that you mentioned
11    was you said among the awards received you
12    received something from the Emerald Society?
13         A    Yes, Emerald Society award for
14    valor.
15         Q    How many individuals received
16    that?
17         A    There is only two to my
18    knowledge; me and Jimmy Hughes, the vice
19    president of the Dix Association.
20         Q    What did you receive it for?
21         A    I killed a guy in a bank
22    robbery.
23         Q    Was that the same shooting that
24    you spoke about earlier?
25         A    Yes.

K. James McCready          59

1

2      Q      What year did that take place,

3  by the way?

4      A      June 9, 1975.

5      Q      Were you a police officer then

6  or detective?

7      A      Police officer.

8      Q      Another thing that somebody

9  asked is what was the interrogation you were

10  doing in the bar of the father, just out of

11  curiosity?

12          MR. DUNNE:  I'll object for the

13          purpose of the record but I want to

14          hear the answer too.

15      A      What happened was the kid

16  was -- the mother and father were separated.

17  Their son who was in his thirties or

18  whatever, I was doing construction work for

19  his mother and I actually got the job

20  through him and he wanted -- if the job was

21  $100, he wanted me to charge his mother a

22  150 and give him $50 back.  I wouldn't do it

23  so we got in an argument and as a result of

24  that argument every time I saw this kid he

25  would break my shoes.

K. James McCready                60

So one night in this particular
place, Pat & Mike's down in South Carolina
down there, I happened to go into the
bathroom as he was coming out and, you know,
he says -- made some snide remark and
whatnot.  I just let it slide and I went in
and I came back out and I see him exiting
the building so I went over to the window.
I'm looking out the window because I know
what kind of kid he is, he would scratch my
car or do something like that or whatever.
He knew what I drove so I was watching him
to make sure he didn't do anything to my car
and that's when his father came up to me and
says to me, what are you looking at?  And I
told him, some dirt bag out there might
damage my car or whatever.  Well, that's my
son, you know.  I said, really, well your
son is a piece of shit.  So anyway --

Q    He didn't react well to that?

A    No.  So what happened was he
said to me, listen, Marty's coming right
back.  He said, why don't we go outside and
I'll get his ass straightened out because I

K. James McCready          61

```
 1                          K. James McCready          61
 2   explained to him, I said he's been breaking
 3   my balls and all this stuff.  Excuse my
 4   language.
 5          Q     You said Marty's coming right
 6   back?  The kid's name was Marty?
 7          A     What's that?
 8          Q     Did you say Marty?  The kid's
 9   name is Marty?
10          A     Yes, Marty Palermo -- Paterno
11   rather.  And the funny thing is his father's
12   name was Joe, Joe Paterno, not the same guy.
13                So anyway, the old man he looks
14   outside and he says, oh here he comes now.
15   So he opens the door like he's going to hold
16   the door for me, right, and I come walking
17   out the door.  He blind-sided me upside my
18   head.  Holy God, I thought I had gone to the
19   count and he proceeded to pummel me.
20          Q     How long ago was that?
21          A     Let me think.  I'm 65 now so
22   it's seven years ago.
23          Q     Okay.  Let me move from the
24   entertainment section, if I can.  People
25   want to know this so we asked.  To some
```

K. James McCready                62

1
2  questions about -- You retired from the
3  police department when in 19 --
4       A    October 24, 1989.
5       Q    1989.  And the robbery arrest
6  was in 1991; is that right?
7       A    Yeah.
8       Q    Right after the start of the
9  first Gulf war, right?
10      A    What's that?
11      Q    Right after the start of the
12 first Gulf war?
13      A    I guess so.
14      Q    So you had been out of the
15 police department for two years?
16      A    Yes.
17      Q    You said something about -- At
18 that point, were you in business with Ron
19 Rother or not yet?
20      A    We had already gotten --
21      Q    You had already --
22      A    I got rid of him -- See, I
23 didn't bring him into that.
24      Q    We'll talk about that later.
25 You were already out of that business?

                          K. James McCready        63

1

2        A      Yes.

3        Q      And you said you owned a store

4   or two or strip mall; what was it?

5        A      I had a number of friends of

6   mine investors, friends of mine who were

7   investors we bought this little strip mall

8   across the street from Harry's Bar and the

9   corner of Broadway and I forget the name of

10  the other street and renovated the building.

11       Q      What was the name of the

12  business, the strip mall?

13       A      We had no business at that

14  time.  It's just I had a business name but I

15  was McCready and Associates but there was

16  nothing on paper.  You know, I was the guy

17  doing everything.  I had people working for

18  me.

19       Q      I don't follow.  It was when

20  you say it was a strip mall, I think of a

21  pizza place, a deli.

22       A      That's what it was.  There was

23  a deli; there was an office upstairs.  There

24  was a deli downstairs on the corner; there

25  was a fishing store, fishing tackle and

1                          K. James McCready        64

2      equipment store on the end.  I forget what

3      the other two were.  It's changed now.

4              Q     It was in Rocky Point?

5              A     What's that?

6              Q     It was in Rocky Point?

7              A     Yeah.

8              Q     And if I understand you

9      correctly, you owned the stores then you

10     rented to individual businesses?

11             A     Right.

12             Q     Okay.  And did you do the

13     construction work as well?

14             A     I did the construction work.

15             Q     Did you still have a

16     construction business at that time?

17             A     Do I still have one now?

18             Q     Did you still have it at that

19     time?

20             A     Oh, yes.

21             Q     Okay.  You said you had some

22     other investors?

23             A     Yeah.

24             Q     Who were they?

25             A     Jimmy Keating.  What was Fred's

K. James McCready                65

1    last name again?  He's a dentist.  I'll

2    think of it.  They were friends and

3    neighbors.

4    

5         Q    And how did that business go as

6    opposed to the bar with Rother?

7         A    Oh, that went pretty good.  We

8    were all making money on it.  Then when the

9    economy went down on us we sold the

10   building.  I had a couple of rental houses,

11   I sold them.  The last rental house I had I

12   had held the mortgage on it for a nice young

13   fellow and he got married and had a baby and

14   then he did some work on the house himself

15   and he screwed up the electrical on it and

16   he set the house on fire.  I ended up I

17   collected on the balance on the mortgage.

18        Q    Where was that house?

19        A    In Sound Beach.

20        Q    And it was in your name, you

21   said, the rental property but the mortgage

22   was to you or the deed was to you?

23        A    Yes.  There were two houses

24   there so I refinanced through Marine Midland

25   Bank and I sold one off and then I was able

K. James McCready          66

-- This guy, I think he was like 19 at the
time, he didn't have the wear with all to
get a mortgage so I said, I'll tell you what
I'll do, I'll hold the mortgage for you.  He
gave me $10,000 down and I held the $65,000
mortgage for him and then I guess it was '96
when the house burned down and then I got --
I don't know -- $32,000 out of it and that's
when I moved to South Carolina.

    Q      When you retired, did you
retire or did you go out on three quarters?

    A      No, I retired.

    Q      Just so that we know,
three quarters, officers are injured they
can get three quarters of their salary?

    A      Yeah, I know.

    Q      You know, I think I know, but
we want everybody to know.  They get
three quarters of their salary for life tax
free --

    A      That's right.

    Q      -- if they are injured.  But
you simply retired -- You retired?

    A      Right.

1

2      Q    How long were you on the job?

3      A    Twenty years to the day.

4      Q    Twenty years to the day?

5  Including the time in the City?

6      A    Yeah.  I bought that City time.

7  You know, it's six months.  It was cheap

8  when I got on Suffolk County at the time to

9  do that.

10     Q    Okay.  Let's talk a little bit

11  about this particular investigation.  How

12  did you all work assignments then?  Do you

13  guys use the term squealing or catching

14  cases?

15     A    No, no.  This is a mistake on

16  my part.  For a number of years I always

17  thought that I had standby the night of this

18  murder and sometimes I've got a lot of

19  things on my mind and I forget things.

20          To make a long story short, it

21  wasn't me.  I didn't have the standby, Mike

22  Carnegie had the standby.  And apparently

23  Mike was notified of the homicide and I

24  guess Mike in turn notified Sergeant Doyle

25  and he then called me because of my

```
1                      K. James McCready       68

2      proximity to the area to go handle the

3      scene.  That's what my assignment was

4      originally was to handle the scene.

5                  I was at my -- We just moved my

6      shop.  We were moving from one part of

7      Girodyne (phonetic) to another.  We were

8      moving the shop and before I went to work on

9      a 9:00 to 5:00 I'd go over -- I live right

10     around the corner from there -- I'd just go

11     over to the shop every morning, get my guys

12     going, send them on their way and then I'd

13     go off to work.

14          Q    Was that a scheduled work day

15     for you or were you supposed to be off that

16     day?

17          A    No, it was a scheduled workday.

18          Q    Scheduled workday for you?

19          A    Yes.

20          Q    And proximity, how far was your

21     business from Belle Terre?

22          A    Well, I lived in Head of the

23     Harbor.  The business was basically in St.

24     James, which is right next door, and then

25     from Girodyne there it's on 25A and I'm
```

K. James McCready          69

1    going to say it's -- if I'm hurrying, I

2    probably made that I'm going to say 12 to

3    15 minutes.  I didn't think it even took me

4    that long.  I'm not sure.

5         Q    But when you were heading there

6    you thought it was you were assigned to

7    investigate this case?  As you're heading to

8    the --

9         A    No, no, no.  For some reason

10   over the years I had forgotten this.

11   Carmody was originally assigned to the case,

12   but in view of the way things developed in

13   the case, Sergeant Doyle decided to turn the

14   case over to me and that's why when we went

15   to California, I went -- me, Doyle and Eddie

16   Deblasi (phonetic) went to California to

17   retrieve Steuerman.

18        Q    Let me back up a little bit.  I

19   want to ask you a few questions about --

20   you're at work that day and you get a page

21   or you had beepers in the PBA?

22        A    He beeped me, didn't he?  He

23   beeped me.

24        Q    You're referring to Sergeant

1                    K. James McCready        70

2    Doyle?

3            A    Yes.

4            Q    Okay.

5            A    He beeped me to call him at

6    home.  I called him at home and he told me,

7    go to the address, and then when I got there

8    I didn't know where the hell I was going.

9    And it might have been Leahy, he was a

10   uniformed sergeant there, but for some other

11   reason I thought it was somebody else who

12   had given me the directions.

13           Q    What was the conversation you

14   had with Detective Sergeant Doyle?

15           A    Basically, that we had a

16   homicide and he wanted me to cover the scene

17   and he gave me the address to the scene.

18           Q    Did he tell you anything else?

19           A    Not that I remember.  Not that

20   I recall right now.  Very possibly may have.

21   For some reason -- I don't know.  I'm not a

22   hundred percent on this, but for some reason

23   I might have known -- he might have said

24   something to me about a card game because I

25   know when I was on my way there I was

K. James McCready          71

1

2    thinking to myself, oh, that's happened

3    before where card games people run high

4    stake card games and guys come in and stick

5    them up.

6         Q    Let me stop you for a second

7    there and ask you, as you're driving there,

8    you're thinking this is a card game?

9         A    I'm not sure.  For whatever

10   reason, I'm not sure.

11        Q    And you think that Detective

12   Sergeant Doyle told you that this was a card

13   game?

14        A    I don't remember.  But I'm just

15   saying in my head it seems to me for some

16   reason --

17        Q    Let me stop you and maybe I can

18   refresh your memory a little bit because

19   there's a couple of news clips that I wanted

20   to show you.

21             Do you remember giving an

22   interview to a reporter back in 1990 for

23   Channel 12 News?  You sat down with an

24   interviewer with him about a half hour and

25   talked about the case?

1                    K. James McCready        72

2          A     Doug Geed?

3          Q     Well, Doug Geed you did later

4    on but no, back in 1990?

5          A     I don't know.  I don't

6    remember.

7          Q     Okay.  You remember giving an

8    interview to Doug Geed?

9          A     Yes.

10          Q     You remember telling Doug Geed

11    that as you're driving there that you

12    understood that this was some kind of card

13    game and that's all you knew about the case?

14          A     Maybe I did, but for some

15    reason I had that in my head.  I don't know

16    where I got that from.  It only could have

17    come from Doyle.

18          Q     So your testimony is that if

19    you knew about the card game Detective

20    Sergeant Doyle is the person that had to

21    tell you about it because you didn't talk to

22    anybody else?

23          A     That's what I'm thinking.

24    Unless Leahy told me that.  I'm not sure.

25    For whatever reason, I thought it was going

K. James McCready          73

2    to be a stick up of card game or something

3    like that.

4         Q    A stick up of a card game?

5         A    Yeah.

6         Q    So people come in the house?

7         A    Yeah, people come in.  There's

8    a lot of bad guys out there.  They find out

9    you have a high stakes card game going

10    they'll come in and stick you up and rob

11    you.

12         Q    How many murder investigations

13    were there in Belle Terre?

14         A    Murder investigations in Belle

15    Terre?  I don't know.  I have no idea.

16         Q    That you were involved in?

17         A    It's only one that I'm aware

18    of.

19         Q    That's a fairly affluent

20    community, correct?

21         A    Yes.

22         Q    It's kind of a part of Port

23    Jefferson sort of but it's a private

24    community, very wealthy, right on the north

25    shore in the bluff of Long Island Sound?

K. James McCready          74

A      Yes.

Q      And actually from Marty's house, the Tankleff house.  It was literally on the bluffs but you had a cliff off his backyard and Long Island sound and even on a reasonably clear day you could see Connecticut?

A      Yes.

Q      Once you arrive there, how soon did you suspect Marty was involved in this?

A      Not until -- He told me, you know, I asked him what happened and he explained to me everything.  I would have to refresh my memory but I'm guessing that I became suspicious of him after Sergeant Doyle and Norman Rein spoke to him.

Q      Is it fair to say he was a suspect in your mind almost immediately?

A      No, not almost immediately.

Q      Let me, not almost immediately? An hour later, half hour later?

A      Let me look at my -- I gotta look at my 84 report.

Q      Your 84 reports?

K. James McCready                  75

A     Yes.

Q     There's a number at the top

just tell us what number that is.

Fifty-nine?

A     Yeah, I'm trying to think.  You

got the scene log, the crime scene log, who

got there at what time?

Q     I may but let me ask -- I think

we do in here someplace actually, but let me

ask a few questions.

Do you remember giving an

interview to Erin Moriarty of 48 Hours?

A     Yes.

Q     You remember telling her that

you believe Marty was involved in this

almost immediately after you arrived?

A     I guess.  I might have said

that, yes.

Q     Were you interviewed by the

Probation Department after Marty was

convicted?

A     No.

Q     No?

A     Not that I'm aware of.  Not

K. James McCready          76

1
2     that I remember.  I don't think so.

3              Q     I'm going to show you what's

4     been marked as Plaintiff's Exhibit 63 and on

5     the first page it says, statement of

6     complainant/victim, and it says, the

7     complainant Detective McCready, formally of

8     the Suffolk County Police Department

9     Homicide Squad and now retired, was

10    contacted on 8/10/90.  Detective McCready

11    stated that on the date of the offense the

12    defendant was found at the residence, and it

13    continues.

14              Just take a look at that

15    paragraph.  Does that refresh your memory

16    that you, in fact, were interviewed by the

17    Probation Department in connection with

18    their investigation of Marty after the

19    conviction?

20              A     I read that.  I don't remember

21    saying that.

22              Q     You do remember being

23    interviewed by the Probation Department?

24              A     I do now, yes.

25              Q     According to the probation

K. James McCready                77

1   officer -- if I could just have that back,

2   I'm going to read it -- it says that,

3   according to Detective McCready the

4   investigation focused on the defendant

5   immediately because --

6          A    No, it doesn't say almost

7   immediately?

8          Q    This says immediately.

9          A    Oh, does it?

10         Q    Because of his demeanor and his

11  inappropriate response particularly in

12  regard to the finding of his parents dead

13  and dying.

14              You don't dispute that you said

15  that to the Probation Department back in

16  1990; are you?

17         A    I may very well have said it,

18  yes.

19         Q    So is it correct that you had

20  suspicions at the very least of Marty as

21  soon as you arrived at the scene?

22         A    I had some suspicions, yes,

23  based on the information I was getting, yes.

24         Q    And part of this -- I mean

K. James McCready          78

there are three people in the house; one is

deed; one is dying and one is walking around

outside fine?

    A    Right.

    Q    And so you immediately thought

domestic teenage kid --

    A    No.

    Q    -- parents.  No?

    A    No, that's not what I thought.

    Q    Did you have a reaction to his

emotional; if you will?

    A    Well, I found his emotional

demeanor was like -- as a matter of fact, I

think I used the words in the courtroom.  If

that were me in that situation, I would have

been a box of rocks.  I think that's exactly

what I said in court.  I always felt that

his emotional -- inappropriate emotional

response is what I always termed it with

regard to him.

    Q    You know what's curious about

that, you thought that his responses at that

time were, I guess, he didn't appear to be

upset to you?

K. James McCready          79

A     That's right.

Q     He was casual?

A     Right.

Q     And you described him as simply answering questions and as if nothing had happened; is that right?

A     Yes.

Q     And did you ever listen to his 911 tape?

A     Yes.

Q     He sounds pretty excited there; doesn't he?

        MR. DUNNE:  I'll object to the
        form but go ahead and answer that.

A     Yes.

Q     And did you talk to the neighbors who described Marty as running out of the house in shorts and bare feet screaming "murder, murder"?

A     Yes, Morty Goldman --

Q     Right.  And you talked to the police officers who first arrived at the scene who described Marty as screaming, "murder, they murdered my parents"?

K. James McCready                    80

2    A    I don't remember them telling

3    me that but it's possible.  I don't know.

4    Q    Well, how do you account for

5    the difference in the descriptions between

6    Marty and the 911 tape, Marty with his

7    neighbor, Marty with the police, and what

8    you say Marty was like to you?

9    A    Because we're talking about a

10   time frame here.  What are we looking at, an

11   hour and a half and he's all over it

12   already?  He's finished?  He's all cried

13   out?  Give me a break.

14   Q    But you're saying he's all over

15   it.  He has family and, actually, not only

16   his family but the family to the victim --

17   He was adopted, right?

18   A    Yes.

19   Q    And the biological family, the

20   brothers, the sisters, the nieces, the

21   nephews, the aunts, even his stepsister at

22   the time all supported Marty; didn't they?

23   A    Initially, yes.

24   Q    Except for his stepsister, they

25   all do to this day, correct?

K. James McCready     81

A     And Ronnie Rother.

Q     Well, Ronnie Rother is the stepsister's husband?  The guy who, forgive me, but beat you out of some money, right?

A     No, he didn't beat me out of money.

Q     I thought he stole $18,000 from you, no?

A     Well, we weren't sure.  I could not prove it.

Q     But you suspected him of doing that?

A     Yes.

Q     So all the other individuals who knew him best when they spoke to him afterwards they all found his emotional response to be appropriate?

A     I don't think so.

MR. DUNNE:  I'll object to the form of the question.  Go ahead.

A     I don't know that for a fact.

Q     Well, sure you do.  You spoke to --

MR. DUNNE:  No, Bruce.

K. James McCready          82

1

2          Q     Sorry.  You spoke to Ron's

3    family, right?

4          A     Yes.

5          Q     I think you described as having

6    a meeting in the kitchen at 33 Seaside Drive

7    with the family members just a few days

8    after the crime happened, right?

9          A     Yes.

10         Q     And you note that the family

11   followed this case all the way through the

12   trial, right?

13         A     Uh-huh.  Yes.

14         Q     And all of them, Ron Falbee

15   took him into his house, had him live with

16   him?

17         A     Right after --

18         Q     After Shari and him had a

19   split, right?

20         A     Yes.

21         Q     And, in fact, Shari right after

22   the crime for several months took him into

23   her house, right?

24         A     Yes.

25         Q     And he went to the funeral of

K. James McCready          83

his father?

     A    What's that --

     Q    He went to his father's

funeral?

     A    Yes, I believe he did.

     Q    And did it ever raise any

questions in your mind why it was that the

individuals who knew him best thought that

his emotional response was appropriate and

was consistent and that it was you who

thought somehow it was flat?

     A    Right.

     MR. DUNNE:  I'll object to the

    form.  Go ahead.

     A    No, especially after I got a

phone call from Shari Rother and Ronnie

Rother with regard to him no longer living

in the house, and Detective Rein and I went

over there and spoke to her and I told her,

as I've told everybody, I said, don't

necessarily believe me.  Do yourself a

favor, you ask him the questions, you ask

him this, you ask him that, and see what you

think.  And Ronnie Rother chirped up, we

K. James McCready          84

1    already did and we didn't like his answers.

3         And that's why again, remember,

4    he confessed to her that he did this, that

5    he killed his mother and father.  He told

6    Shari Rother that.

7         Q    When was that?  Just at the

8    police station?

9         A    On that telephone call that he

10   made from our office.

11        Q    We'll talk about that in a bit.

12        After the telephone call he

13   made from your office, after he supposedly

14   confessed to you, Shari took him into her

15   home, yes?

16        A    Yes.

17        Q    At some point after that, Shari

18   became aware of the fact that she was

19   essentially left out of the Will entirely;

20   is that true?

21        A    I don't know.

22        Q    Well, at some point after she

23   had found out she was left out of the Will

24   and she learned that if Marty was convicted

25   of the murder he couldn't collect his

K. James McCready                85

2  portion and should we get his portion of the

3  Will?

4       A     That's not what she told me

5  when we were at the house.

6       Q     I'm not asking what she told

7  you at the house.  I'm asking if you knew

8  that after Shari learned that she was cut

9  out of the Will and that if Marty was

10  convicted of the crime is that -- excuse me,

11  withdrawn -- that after Shari learned that

12  she was out of the Will and that if Marty

13  was convicted of a crime he couldn't collect

14  his portion it would go to her, was it after

15  that that Shari kicked him out of the house,

16  if you know?

17       A     No.  I don't think one thing

18  had anything to do with the other.

19       Q     Sequence-wise, whether what was

20  in her mind maybe no one will ever know but

21  sequence-wise I'm correct, right?  Shari

22  took him into the house after he supposedly

23  confessed to her, after he supposedly

24  confessed to you, then she found out that

25  she was cut out of the Will, then she found

1                         K. James McCready        86

2      out that if Marty was convicted he couldn't

3      collect his part, she would get it, then she

4      kicked him out of the house.  So the

5      chronology that I just gave you is accurate;

6      is it not?

7             A     I don't know that for a fact.

8             Q     Let me leave Shari aside and

9      whatever problem she had with the Will and

10     let's talk about the entire rest of the

11     family.

12                  Every brother, every cousin,

13     every niece, every nephew to a person

14     supported Martin Tankleff from the moment he

15     was arrested until as we sit here today; is

16     that true?

17            A     I guess so.

18            Q     Is it possible that your view

19     of his emotional response that day while

20     understandable maybe was born of a lack of

21     understanding or lack of knowledge of how

22     Marty interacts, how his demeanor is.

23                  MR. DUNNE:  I'm going to object

24            to the form of the question.  Go

25            ahead and answer that as best you

K. James McCready          87

1    can.

2

3         A     Wait, wait.  Repeat the

4    question.

5         Q     Sure.  Did you ever consider

6    the possibility that you and, I guess,

7    Detective Rein's view that his emotional

8    response was inappropriate was just a

9    mistake; that you just didn't know this kid

10   well enough to understand how he'd react to

11   the situation?

12              MR. DUNNE:  Same objection.  Go

13         ahead.

14        A     No, because it wasn't just me.

15   It wasn't just Detective Rein.  I mean even

16   Don Hines knew there was something wrong.

17   And then when -- especially when Hines told

18   him that his father wasn't dead, he gave

19   Hines a look of like shock that he wasn't

20   dead and then he exits out of Hines's car.

21        Q     I guess as we all sit around

22   and there's verbal communication and there's

23   nonverbal communication, right?

24        A     Yes.

25        Q     You understand people can say

K. James McCready          88

1  one thing and they also have nonverbal cues,

2  they look away, they react in a certain way,

3  somebody has a look of quote/unquote shock,

4  right?

5          A     Yes.

6          Q     Is it fair to say that those

7  nonverbal cues, the interpretations of them,

8  are somewhat subjective?

9          A     I guess, yeah.

10         Q     Right.  So that when you're

11 looking at somebody and you see a person

12 like Marty and you think his response is

13 flat, it's inappropriate in some ways, is it

14 possible that you just don't understand him

15 and you don't see what's going on inside of

16 him?

17             MS. DUNNE:  I'll object to the

18         form of the question.  Go ahead.

19         Q     Did you ever consider that

20 possibility at least?

21         A     Well, as we say anything is

22 possible but all I know is that kid right

23 there (pointing) killed his mother and

24 father.

K. James McCready          89

    Q     Well, with all due respect, I
understand what you believe.  I'm assuming
I'm taking you at your word here, but you
don't know it; do you?

    A     I don't know it?

    Q     You don't know it.  You can't
know it.  You weren't there.

    A     I wasn't there.

    Q     You believe it based upon your
investigation, based upon your interview or
interrogation of him, based upon your
experience and so forth, you think he killed
his parents?

    A     Yes.  And believe me, if he
didn't -- if he was innocent, we wouldn't be
here today.  He would never have gone to
jail.  You don't lock up innocent people.

    Q     Didn't you get locked up?

    A     What's that?  Yes.

    Q     Weren't you innocent?

    A     Yes.

    Q     Just as a conceptual matter,
innocent people do get arrested and charged
for crime they didn't commit, yes?

K. James McCready          90

2    MR. BARKET:  I would object to

3    the line of questioning.  Go ahead.

4    A    You're absolutely correct.

5    However --

6    Q    People actually --

7    A    Let me tell you this.  First of

8    all, no police officer came and arrested me,

9    all right.  They presented whatever evidence

10   they supposedly had to a grand jury and

11   whatever and they indicted me, okay.  So I

12   went to them and I surrendered myself to

13   them, all right.  I had nothing to hide at

14   all.

15   Q    I'm not saying you did, Mr.

16   McCready, what I'm saying to you, as a

17   conceptual matter, you and I can agree that

18   our system, while good, is not perfect,

19   right?

20   A    Yes.

21   Q    The police officers while well

22   meaning sometimes maker errors?

23   A    Yes.

24   Q    That not every person who's

25   ever been arrested is guilty, you're not

1
2     saying that, right?

3          A     No.

4          Q     You know that individuals are

5     indicted when they're innocent, right?

6          A     Yes.

7          Q     Or that police officers arrest

8     individuals when they're innocent, right?

9          A     Right.

10         Q     Maybe for good reasons, maybe

11    not for such good reasons --

12         A     You're quite correct there and

13    everybody is innocent until proven guilty

14    and 12 people convicted him.  I didn't

15    convict him, 12 people convicted him.

16         Q     And you're not saying that only

17    guilty people get convicted, are you?

18         A     What is that?

19         Q     You're not suggesting that only

20    guilty people get convicted, right?  You

21    understand that the system is good but not

22    perfect.

23         A     I know.

24         Q     We can just agree that we can

25    go through the history that innocent people

K. James McCready          92

2    are wrongly arrested, are wrongly indicted

3    and at times wrongly convicted?

4         A    I guess it's happened, yes,

5    it's happened but it didn't in this case.

6         Q    Again, that's your view.

7    You're entitled to it and we're going to

8    explore the reasons why you think it but

9    it's your view, correct?

10        A    Yes.

11        Q    And we can agree that Marty was

12   a suspect in your mind, really, right away.

13   As soon as you began to talk to him you

14   thought there was something wrong here?

15        A    I don't know what to say here.

16   I mean everybody is --

17        Q    Well, you told the probation

18   officer --

19        A    I wasn't thinking like that

20   back then.  He put himself into a position

21   of making me suspicious of him, all right,

22   by his words and deeds and actions, all

23   right, and that's when I became suspicious

24   of him.  That doesn't mean that, you know --

25   just because I'm suspicious of him, I'm not

K. James McCready          93

going to throw a set of handcuffs on him and

lock him up right away.  You still gotta

investigate him.

          And that was the whole thing

here.  I wanted to talk to him.  I wanted to

glean as much information as I could from

him and then our investigation was ongoing

at the scene and everything, at that point

in time, and then we -- Well, we discovered

other aspects of stuff later on in this

case.

          Anyway, yeah, I guess, I'm

suspicious of him.  I was suspicious of him.

          Q     Right away?

          A     Pretty close.  Alright, I'll

give you that, what the hell.

          Q     Well, you gave it to a

probation officer, you gave it to Erin

Moriarty?

          A     You're making it sound like I

walked up to the scene and said he's guilty.

That's not what I did.

          Q     No, you walked up to the scene

and you spoke to him and you thought his

2  emotional response was inappropriate and

3  that made you suspicious right away?

4          A    Pretty much so.

5          Q    Okay.  Then you did a

6  walk-thru; is that right?

7          A    Yes.

8          Q    And this isn't just kind of a

9  stroll through the house.  You're a trained

10  investigator, you're an experienced homicide

11  detective.  You're walking through the house

12  with a purpose, yes?

13          A    Yes.

14          Q    And you're trying to figure out

15  what took place, observe what you can

16  factually and so forth, right?

17          A    Yes.

18          Q    And so you took one walk-thru

19  initially, correct?

20          A    Yes.

21          Q    And then you had a conversation

22  with Marty, right --

23          A    Yes.

24          Q    -- according to you.  And then

25  you went back in and took another walk-thru;

K. James McCready          95

1
2      is that right?

3              A     Yes.

4              Q     By the way, the notes that we

5      have that we marked before, I think there

6      were 79 as I recall, these are the notes

7      that you said that you took at the time.

8      There is times here 7:39 to 7:45 and that

9      goes all the way through, right?

10             A     Yes.

11             Q     Is there some process --

12             A     Wait.

13             Q     -- is there some process in

14     your squad at that time where you had to

15     hand in your notes on the day every day?

16     Were they time stamped at all?

17             A     No.

18             Q     So the copies of the notes that

19     we have here to know for sure when they were

20     actually created is dependant upon you

21     telling us, I took these notes

22     contemporaneous with the events, right?

23             A     Yes.

24             Q     There's not a requirement for

25     you to turn your notes in to your supervisor

1                       K. James McCready        96

2      at the end of the day who then logs them in

3      so he can maintain them?

4            A     No.

5            Q     No process like that.  You kept

6      your own notebook; is that true?

7            A     Yes.  This is not my

8      handwriting on here, these numbers.

9            Q     It's not your handwriting?

10           A     No.

11           Q     Were they your notes?

12           A     They're my notes.  That's not

13     my handwriting here.

14           Q     Let's just back up again

15     because I -- The 79 consists of a -- it

16     looks like a steno pad; is that right?

17           A     Yeah.  It was a -- Yeah.

18           Q     And then, it has --

19           A     No, not steno pad.  It's a

20     notebook about that wide.

21           Q     Like a reporter's notebook?

22           A     Yes.

23           Q     Then at the bottom it has on

24     the first page A1 and then at 7:39 to 7:45

25     and then 7:45 to 7:55.  Those time sequences

K. James McCready          97

1

2      those are not yours?

3            A      No.

4            Q      Okay.  That's good to know.

5      Thank you.

6                  As you walk through the house,

7      is it correct that you try to make a picture

8      of what took place in the rooms and

9      reconstruct what happened?

10           A      What do you mean make a

11     picture?

12           Q      A mental picture?

13           A      Well, I couldn't possibly --

14     All I could do was see what I could see.  I

15     couldn't make any assumptions as to what

16     happened.

17           Q      Well, is it true that as you

18     entered the office you stood there for

19     15-30 seconds and you made certain

20     observations about the room --

21           A      Yeah.

22           Q      -- and tried to mentally get a

23     picture of what this room looked like and

24     tried to basically reconstruct what I might

25     hypothesize as to what might have happened

K. James McCready        98

1    in the room; is that true?

2         A    Yes.

3         Q    So that when you first walked

4    into the room in the office you looked at

5    it.  You weren't just there to kind of see

6    what the decorating was.  You were trying to

7    reconstruct in your mind what could have

8    taken place in terms of the attack on

9    Marty's father; is that true?

10        A    Yes.

11        Q    And you also did the same thing

12   when you walked into the master bedroom

13   where his mother was still there, right?

14        A    Yes.

15        Q    And you also did the same thing

16   when you walked into his room?

17        A    Yes.

18        Q    In fact, you stood in his room

19   for about a minute and looked around; is

20   that right?

21        A    Yes.

22        Q    And you walked into the house

23   and went into the kitchen as well; is that

24   correct?

K. James McCready          99

1

2          A     Yes.

3          Q     And you made certain mental

4    observations, right?

5          A     Yes.

6          Q     For example, in Marty's room

7    you noticed there was blood on the light

8    switch?

9          A     Yes.

10         Q     So you figured that somebody

11   who had either turned on or turned off the

12   light switch had blood on their hands,

13   correct?

14         A     Yes.

15         Q     You saw the blood on the

16   telephone in Marty's father's office,

17   correct?

18         A     Yes.

19         Q     You saw that there was no blood

20   on the phones in the kitchen and in the

21   master bedroom, right?

22         A     I don't recall the master

23   bedroom.

24         Q     You don't recall a phone in the

25   master bedroom?

K. James McCready      100

1

2          A     There was a phone but I'm

3    trying to remember whether there was blood

4    on that or not.  I don't think there was.

5    I'm not sure.

6          Q     You went in the kitchen, you

7    observed the kitchen, correct?

8          A     Yeah.

9          Q     And there was a knife next to

10   the watermelon in the kitchen?

11         A     Yes.

12         Q     And you observed that?

13         A     You have that picture?

14         Q     I do.

15         A     Can I see it?

16         Q     Sure, but let me finish my line

17   of questions if I can.

18         A     Okay.

19         Q     There is a knife next to the

20   watermelon, right?

21         A     Yes.

22         Q     And you observed that?

23         A     Yes.

24         Q     And then you went back out and

25   you spoke to Marty?

K. James McCready     101

2    A    Yes.

3    Q    And he gave you some

4  information, correct?

5    A    Yes.

6    Q    By the way, at that point in

7  time, did he tell you how he held his

8  father?  Did you ask him what took place,

9  what went on?

10    A    I don't recall.

11    Q    Take a look at your notes and

12  see if -- Take a look at 79 and see if that

13  helps you.

14    A    Yes, here (indicating).

15    Q    I can finish up this area if I

16  can.

17          Marty told you --

18    A    Yeah, that's right, he did.  He

19  told me he moved him to the floor.

20    Q    At this point in time, you had

21  observed the father's office, correct?

22    A    Yes.

23    Q    And you could see the chair,

24  correct?

25    A    Yes.

K. James McCready     102

Q    And you could see on the chair
there was blood on the chair, correct?

A    I believe so.

Q    There's actually pooling of
blood at the base of the chair; wasn't
there?

A    I don't recall.  I have to see
the pictures.

MR. BARKET:  Let's come back
after lunch and we'll do the
photographs after lunch.

THE VIDEOGRAPHER:  Going off
the record at 1:15 p.m.

(At this time, a recess was
taken in order to accommodate a
lunch.)

THE VIDEOGRAPHER:  We're back
on the record at 2:08 p.m.  Tape 3.
You may proceed.

CONTINUED EXAMINATION BY

MR. BARKET:

Q    Before we broke you asked to
see a picture of the -- I guess you all at
the trial described it as the watermelon

K. James McCready        103

1
2      knife; you remember that?

3              A    Yes.

4                  MR. BARKET:  Can we just have

5              this marked as number 80, please.

6                  (Whereupon, Plaintiff's Exhibit

7              80 was marked for identification.)

8              Q    You just wanted to see the

9      knife that was next to the watermelon?

10             A    Yes.  I wanted to satisfy my

11     own curiosity about something that's all.

12             Q    What was that?

13             A    I remember Bovet (phonetic), I

14     think he testified that it was in a

15     different position than it was, than where

16     he left it.  It's all right.  Thanks.

17             Q    While we're doing that, I just

18     kind of want to show you -- get some general

19     sense of the house.

20                 MR. BARKET:  Can we have this

21             marked as 81.

22                 (Whereupon, Plaintiff's Exhibit

23             81 was marked for identification.)

24             Q    Mr. McCready, I'm going to show

25     you what's been marked as Plaintiff's

```
1                    K. James McCready      104
2    Exhibit 81 which is a photograph of a model.
3    Do you recognize that?
4         A    Yes.  I forget where I saw it.
5         Q    Am I correct to say it's a
6    photograph of a model that was made up for
7    the criminal trial that lays out the
8    Tankleff residence to scale?
9              You recognize it?  Can I -- Let
10   me help orient you, if I can.  Here is the
11   front entrance right here (indicating).
12        A    Okay.
13        Q    Okay.  And then the master
14   bedroom is here (indicating)?
15        A    Right.
16        Q    The office and gymnasium are
17   over here (indicating)?
18        A    Right.
19        Q    Marty's bedroom is there
20   (indicating).  The bathroom is there
21   (indicating).  The linen closet and so
22   forth.  Does that help?
23        A    Yeah.
24        Q    Okay.  Great.  One of the
25   things, I think, that you -- Let me do it
```

K. James McCready          105

1    this way if I can.

2                Marty told you on a number of

3    different occasions prior to him making any

4    kind of supposed admission that he held his

5    father and provided first aid to his father;

6    is that right?

7         A    Yes.

8         Q    That he had called 911 and that

9    he, pursuant to the instructions they gave

10   him, took him out the chair, lied him down

11   on the floor, elevated his feet and put a

12   towel around the wound on his neck; is that

13   right.

14        A    Yes.

15        Q    And, in fact, there's not any

16   dispute that that look place; is that right?

17        A    What?

18        Q    There's not any dispute that

19   took place?  His father was actually found

20   in that position, correct?

21        A    That's right.

22        Q    And you know that his father

23   was about 250 pounds, correct?

24        A    Yes.

K. James McCready          106

Q    And he was in the office chair
and I said to you the office chair had blood
pooled in it; do you remember that?

A    Yes.

Q    You had some time to think
about it over lunch.  Do you remember that
that's actually the case that the office
chair actually had blood pooled in it
indicating that Mr. Tankleff had been
bleeding in the chair for a while?

A    Had been what?

Q    Bleeding.

A    I guess so.

Q    You made -- Those were part of
the observations that you made; wasn't it,
when you were there?

A    Yes.

Q    So you actually could see the
office chair that Marty's father -- that
Marty found his father in, right?

A    Right.

Q    And in either scenario, whether
we accept Marty's version that he helped his
father and didn't have anything to do with

K. James McCready        107

the attacks on his parents or what you all

seem to believe is that he actually did have

something to do with the attacking of his

parents, we can agree that his father was

found not in the chair but on the floor,

pillow underneath his feet, towel under his

neck, true?

     A      I have to accept that because

obviously he was gone by the time I got

there.

     Q      Right, but you don't have any

reason to doubt the emergency medical

technicians who were at the scene who

described that as being true, right?

     A      Right.

     Q      And we also can agree, I think,

that that act of talking his father from the

chair and putting him on the floor took

place after the 911 call?

     A      Yes.

     Q      Right.  Whether you think that

Marty was involved with the attack or not

there is no indication that he somehow

rendered the first aid --

K. James McCready      108

2    A    Well --

3    Q    That the 911 operator gave

4    him --

5    A    Let me sat this.

6    Q    Let me finish my question.

7    A    Okay.

8    Q    There's no indication that he

9    rendered the first aid that the 911 operator

10   instructed him to render prior to speaking

11   to the 911 operator, right?

12   A    No.  Right.

13   Q    Okay.  So that what we know

14   happened is that Marty moved his father from

15   the chair to the floor and rendered the

16   first aid.  We agree on that, yes?

17   A    Yeah.

18   Q    Okay.  Now, you indicated that

19   somehow he should have had blood on his

20   clothing if he had rendered the first aid

21   the way he described?

22   A    Yes.

23   Q    Well, wouldn't it be true that

24   he should have blood on his clothing if he

25   rendered the first aid under your scenario?

1                          K. James McCready        109

2                MR. DUNNE:  I'm sorry, what

3       scenario?

4          Q      If Marty had --

5          A      Not necessarily.  Let me see

6       something.  Is that the chair?

7          Q      We'll get to the chair.  Just

8       finish this line of questioning.

9                We know that Marty called 911

10      and that about five minutes later the police

11      officers arrived, right?

12         A      Yeah.

13         Q      So he had very limited time to

14      do whatever it is that he was going to do

15      between the 911 call and the arrival of the

16      police officers, correct?

17         A      Right.

18         Q      He did not have time to take a

19      shower, did he, between those two times; did

20      he?

21         A      No.

22         Q      And there is no indication that

23      he did, right?

24         A      Well, I don't know.

25         Q      There is no indication he took

K. James McCready        110

1  a shower between 6:11 when the 911 call was

2  made and 6:17 when the police arrived,

3  right?

4  A     That's right.

5  Q     His hair wasn't wet, there was

6  no indication at all, correct?

7  A     Right.

8  Q     So whenever Marty showered it

9  was sometime before 6:11 when he called 911,

10 true?

11 A     Right.

12 Q     And according to your version

13 of this, if you will, that Marty called 911

14 and that they told him to go ahead and

15 render some kind of first aid and that under

16 your version as a quote/unquote "cover-up,"

17 he pretended to render that first aid,

18 right?

19 A     Yes.

20 Q     And so that he took his father

21 out of the chair, put him on the floor,

22 raised his feet, put the towel around his

23 neck?

24 A     Yes.

K. James McCready      111

Q     Then after that he called his
sister, right?

A     Yes.

Q     And after that he left the
house?

A     Yes.

Q     Okay.  And one of the things
that you've pointed to as kind of
repeatedly, I think, as evidence or
suspicious is that Marty didn't have any
blood on the sweatshirt that he had on?

A     Yes.

Q     Well, is it fair to say that
whether he rendered the first aid as part of
trying to help his father and he was
innocent or if he rendered the first aid as
part of the coverup he didn't have that
sweatshirt on when he rendered the first
aid?

A     I don't know that.  I don't
know that he rendered first aid.  I wanted
to look at that picture for a reason.

Q     Sure, sure.  And I'll give it
to you.  I just want to finish this kind of

K. James McCready        112

1        thought that we have.

2                        Whether we call it first aid or

3        moving his father from the chair to the

4        floor, elevating his feet, and putting the

5        towel around his neck, that physical

6        activity, whatever way you characterize it,

7        coverup, first aid, that took place, right?

8            A        Yes.

9        Q        That when that took place,

10       whether it was a coverup or first aid, we

11       can agree that Marty did not have that

12       sweatshirt on at that time; is that true?

13           A        Wait a minute.  Run that by me

14       again.

15       Q        Sure.  The sweatshirt had

16       absolutely no blood on it; did it?

17           A        No, no.

18       Q        So that we know that when Marty

19       moved his father from the chair to the

20       floor, elevated his feet, put the towel on,

21       he didn't have the sweatshirt on because if

22       he had the sweatshirt on you would have

23       expected to see blood on it, correct?

24           A        I don't know that that's

K. James McCready          113

1
2     actually the scenario.  I don't know for a
3     fact that he lifted his father out of the
4     chair.

5          Q     How did his father get out of
6     the chair?

7          A     I think he grabbed him by his
8     feet and pulled him out.  That's what I
9     think.

10         Q     Oh, he grabbed him by his feet,
11    pulled him out of the chair?

12         A     Yeah, onto the floor.

13         Q     And he had is sweatshirt on?

14         A     Yeah.

15         Q     Oh, I see.  So he didn't have
16    any blood on him at all according to your
17    theory?

18         A     Well, I don't know that he got
19    any blood on him.  I know there was blood
20    spots on him.  As a matter of fact, he wiped
21    two of them off when I had noticed on his
22    leg when he was sitting in the police car.

23              MS. BARKET:  As long as we're

24         looking at it, can we have this

25         marked as Plaintiff's Exhibit 82,

K. James McCready      114

1      please.

2              (Whereupon, Plaintiff's Exhibit

3      82 was marked for identification.)

4      Q    So you're saying that what

5  could have happened -- this is not in the

6  confession, of course, right?

7      A    No.

8      Q    What's in the confession is

9  that he moved him from the chair and did

10  what he did, right?

11     A    Right.

12     Q    There's nothing about pulling

13  him from the feet or any such thing, right?

14     A    That's right.

15     Q    So we don't really know if that

16  happened or not but we're asking you to

17  theorize so you're theorizing.

18     A    Right.

19     Q    So your theory is that Marty

20  somehow got him out of the chair by pulling

21  him by his feet and not getting any blood on

22  the sweatshirt he was wearing and then

23  propped up his feet and put the towel around

24  his neck; is that what you're saying?

K. James McCready          115

     A     Yes.

     Q     Let's just go with the theory
that Marty helped him out of the chair the
way Marty described it for a moment, okay.

     A     Uh-hum.

     Q     So the father was facing
forward in the chair and the chair was swung
around to the left; is that true?

     A     I don't remember.

     Q     You don't remember looking at
the office where the --

     A     Yeah, I know but I can't
orientate the chair from this photograph.

          MR. BARKET:   Let's do it this
          way.  Let's mark this as 83.

          (Whereupon, Plaintiff's Exhibit
          83 was marked for identification.)

     Q     You can see here what we're
referring to, right?

     A     Yes.

     Q     So that the chair was swung to
the left and then Marty would have
approached his father from the father's left
with Marty's right hand going around his

K. James McCready          116

2  father's back and his left arm going

3  underneath his legs?

4        A     Yeah.

5        Q     That's what he did.  That's

6  what Marty says he did, right?

7        A     Yes.

8        Q     So if he had actually done what

9  he said he did, wouldn't you expect to see

10  blood on the right side of Marty and on his

11  left arms?

12        A     Yes.

13        Q     Okay.  Where was the blood on

14  Marty according to the police officers?  Is

15  it true that the blood on Marty was on the

16  right side of his face -- officer noticed

17  that -- the blood was on his right shoulder,

18  on the palms of his hands, on his left

19  forearm and on his right calf and his right

20  instep?  Isn't that where the blood was on

21  Marty when he walked out of the house

22  screaming "murder, somebody's murdered my

23  parents," according to the police officers?

24        A     Yes.

25        Q     So that's exactly where you

K. James McCready        117

1                      

2     would expect to see the blood on Marty if he

3     had done precisely what he said he did,

4     right?  And that was all his father's blood,

5     it wasn't his mother's blood?

6           A    I could swear the blood

7     underneath his shirt was the mother's blood.

8           Q    Don't swear to that.  It's his

9     father's blood, trust me.

10         A    Oh yeah, whatever.  I still

11    think it's a possibility --

12         Q    Well, it's not just a

13    possibility.  Under that scenario that's

14    exactly where -- Marty had blood on him in

15    the exact spots you would expect to see the

16    blood if he removed his father from the

17    chair exactly the way he said he removed it,

18    that's correct; isn't it?

19         A    I don't think so.

20         Q    You don't think so?

21         A    No.

22         Q    What's incorrect about it?  How

23    did he get blood on the right side of his

24    face if he wasn't helping his father?

25         A    I don't know.  I wasn't there.

K. James McCready      118

1

2        Q     How did he get blood on his

3    left forearm and the palms of his hands if

4    he wasn't helping his dad?

5        A     I don't know I wasn't there.

6        Q     How did he get blood on his

7    right calf and his right instep?

8        A     I don't know.

9        Q     You can't think of a scenario

10   where he murdered his father and somehow

11   smeared blood all over his body in just that

12   way; can you?

13       A     Well, I'm not saying that that

14   couldn't have been possible, but I don't

15   know.  I would have loved to be there when

16   Seymour was there but unfortunately he

17   wasn't.  However --

18       Q     Well, you have people to talk

19   to about what Seymour looked like; don't

20   you.  In fact.  You all went out and

21   interviewed the people at the scene.  You

22   talked to the officers who arrived there.

23       A     Yeah, I know.

24       Q     And Marty didn't have blood on

25   his hands.  Marty had blood on the palms of

K. James McCready      119

1    his hands according to the police officer;

2    isn't that right?

3         A    I don't recall.

4         Q    You don't recall testimony of

5    what the original officers had to say?

6         A    I don't recall right now.  I

7    remember I think it was a key, a key that

8    said he washed his hands in the puddle

9    outside.

10        Q    I'm not talking about when he

11   cleaned the blood off his hands.  I'm

12   talking about what the officer said where

13   the officer said the blood was.

14              MR. BARKET:  Can I have this --

15        it's page --

16        A    I don't know what they

17   testified to.  I wasn't in the courtroom,

18   obviously.

19        Q    Obviously, you don't know what

20   they testified to because you weren't there

21   but you spoke to these individuals; didn't

22   you?

23        A    Yes.

24        Q    These are trained police

```
1                        K. James McCready      120

2    officers, right?

3              A    Yes.

4              Q    You're a trained detective.

5    It's a homicide scene.

6              MR. BARKET:  Can I have this

7         marked, please, as 84.

8              (Whereupon, Plaintiff's Exhibit

9         84 was marked for identification.)

10             Q    Could you take a look at Page

11   332.  It's Police Officer Crayne, I think is

12   how you say it, and down at line 18 -- well,

13   line 16, do you recall any other

14   conversations about this person at the time?

15   Answer.  Yes.  I notice in the palm of his

16   hands he had some blood there.  I noticed

17   also a little blood on the right side of his

18   face.  There was also a bit of bruises

19   underneath his eyes.

20             You don't doubt that's what

21   Officer Crayne testified to and that's what

22   he observed, right?  There's no reason to

23   doubt that; is there?

24             A    What's that?

25             Q    There's no reason to doubt
```

1                    K. James McCready       121

2    Officer Crayne's testimony --

3            A    No.

4            Q    -- the credibility of it or the

5    accuracy of it?

6            A    No.

7            Q    And obviously he got that blood

8    on him moving his dad, right?

9            A    I guess so.

10           Q    So he could not have gotten

11   that blood on him on the right side of his

12   face by pulling his father out of the chair

13   by his feet?

14           A    How do you think he got the

15   blood on the right side of his face?  Why

16   couldn't he have pulled his father off the

17   chair, gotten him on the floor and when he

18   pretended to do the first aid he got blood

19   on him and mistakenly went like that

20   (indicating).

21           Q    So he got blood on his hands

22   while rendering first aid, mistakenly

23   touched his face, his right shoulder, his

24   right calf, his right instep and his left

25   forearm.  That's your testimony?  That's

1                         K. James McCready          122

2    your theory of what happened here?

3           A     I don't know what happened.

4           Q     What you do know is what Marty

5    told you, right?

6           A     Yes.

7           Q     And you took Marty's account of

8    what took place and if we compare it to the

9    physical evidence that we have, the blood

10   that we know was on him from the police

11   officers, those two things are consistent;

12   aren't they?

13          A     Yes.

14          Q     Now, I want to move to, if I

15   can, the -- Let me just ask a couple of

16   questions if I can about Arlene.

17                When you walked up to her on

18   the second walk-thru, this was after you

19   spoke to Marty, right?

20          A     Yes.

21          Q     One of the things that you

22   noticed, by the way, was that Arlene's room,

23   the room where Arlene Tankleff was, the

24   master bedroom had three sets of windows in

25   it; is that right?

K. James McCready        123

1

2          A     Yes.

3          Q     And two of them had curtains

4    drawn, correct?

5          A     Yes.

6          Q     One had a gap of about

7    three feet where the curtains were open;

8    true?

9          A     Yes.

10          Q     And at the time that you saw

11    this sometime after 8 o'clock in the

12    morning, light was coming through there,

13    yes?

14          A     Yes.

15          Q     And I think that we can agree

16    that sunrise on that day was 6:25 in the

17    morning; is that right?

18          A     Yes.

19          Q     So the 20 or 30 minutes before

20    sunrise it would be somewhat light perhaps

21    but it's not a bright sunny day at that

22    point in time?

23          A     Well, I remember that morning

24    specifically it was a bright sunny day.

25          Q     Well, it wasn't a bright sunny

K. James McCready        124

1  day before the bright sun came up, right?

2          A    Well, what I'm saying is when I

3  was in the morning, I got up early, I think

4  it was about 10 after 6:00 that I get up and

5  when I looked out my window it was a nice

6  day.

7          Q    We can argue about many things.

8  You're not asserting that the sun came up

9  for you before it came up for everybody

10  else, obviously?

11          A    No, but I know when just

12  because it says that sunrises officially at

13  6:25 doesn't mean it's not light at

14  6 o'clock in the morning.

15          Q    Well, without going through the

16  weather charts that there's actually a

17  sequence that plays out every day.

18              MR. DUNNE:  But he used the

19          term light.

20          Q    There wasn't sunlight there was

21  some light at that point in time at say 6:00

22  or 6:10 but the sun hadn't risen yet, right?

23          A    Right.

24          Q    We can agree on that.  So when

1                        K. James McCready        125

2    you went in there looking for Arlene's body

3    because you knew it was there, you found her

4    pretty easily, right?

5            A      Yes.

6            Q      At that point in time we can

7    agree it was bright sun, correct?

8            A      Yeah.

9            Q      When Marty first woke up and

10   got up out of his bed and began to walk

11   through his house the sun had not risen yet;

12   had it?

13           A      No.

14           Q      And at that point in time you

15   weren't in the bedroom; were you?

16           A      No.

17           Q      That bedroom actually faces

18   Long Island Sound, correct?

19           A      Yes.

20           Q      Actually faces the north, yes?

21           A      Yes.

22           Q      And in September the sun rises

23   -- I don't mean to be facetious -- but the

24   sun rises in the east in September as

25   opposed to June where it actually rises in

K. James McCready          126

the northeast or December arises in the

southeast, right?

          A     I guess.

          Q     And so the window that Marty's

mother's bedroom faced was not where the sun

was rising, it was on the east side of the

house, not on the north side where the

window was facing; true?

          A     Right.

          Q     So whatever the lighting was at

that point in time Marty says to you, I

looked in the bedroom for my parents and I

didn't see them, correct?

          A     Yes.

          Q     That's what he says.  And

obviously -- well, not obviously but is it

fair to say that Marty, when looking for his

parents in the bedroom, would have been

looking to the right up at the headboard

where the pillows were?

          A     Possibly, yes.

          Q     Sure, because that's where you

would expect to find your parents if they

hadn't been murdered the night before?

K. James McCready        127

1

2        A      Oh, yes.

3        Q      If you woke up and you're an

4   innocent teenager and you wake up and you're

5   looking for your parents and you don't know

6   that your mother's throat's been slit and

7   she's down at the foot of the bed with just

8   her head exposed, you're not looking there,

9   you're looking up to the right to the

10  headboard where the pillows were, right?

11       A      Right.

12       Q      It's still not sunrise,

13  whatever the lighting conditions were they

14  were, he looks there doesn't see them and

15  then he begins to go through the rest of the

16  house?

17       A      There's only one little problem

18  with that.  The television was on and that

19  emanates an awful lot of light.

20       Q      How do you know?

21       A      What?

22       Q      What was the show?

23       A      I don't know.

24       Q      What was going on?

25       A      I didn't watch it.

K. James McCready          128

    Q     It was 1988.  Did they have

cable?  Was it fuzz?  Was it MTV?

    A     I don't know.

    Q     How much light did that

emanate?

    A     When I looked in there, I could

see the television was on and everything --

Granted, I had more light than he did, but

the television was on and I leave the

television on in my bed every night and

there's plenty of light that is emanated

from it.

    Q     You're saying it's unreasonable

for an individual to walk into the room

before sunrise, look over to the head of the

bed where he would expect to find his

parents, not see them there, turn around and

leave and not notice the mother's head at

the foot of the bed down behind on the other

side of the bed?  That's an unreasonable

thing in your mind?

    A     I think it is, yes.

    Q     You're entitled to your view.

And in your mind if that unreasonable and

K. James McCready          129

1  somehow evidence of his guilt of murder,

2  you're entitled to that view.

3        In any event, when you went

4  back into the room and you walked over to

5  her, you actually had a chance to look at

6  her fairly closely; didn't you?

7        A    Yes.

8        Q    And nobody was rushing you?

9  There wasn't a time limit.  You took as much

10 time as you wanted to take to view Arlene,

11 to view the scene; true?

12       A    Yes.

13       Q    And part of what you were doing

14 is what you described earlier, was just

15 trying to get together a scenario in your

16 mind about what potentially took place,

17 right?  And you could see the blood on the

18 sheets?  You could see the blood on the

19 wall, right?

20       A    Yes.

21       Q    And you could see, of course,

22 Arlene who was dead lying face up --

23       A    Yes.

24       Q    -- with her head slightly

K. James McCready          130

2  tilted to the right; you remember that?

3          A     Yes.

4          Q     Okay.  And at that point in

5  time you left and began to have a further

6  conversation with Marty; is that right?

7          A     Yes.

8          Q     And before you did that you

9  went in and you saw the telephone in the

10  office; is that true?

11         A     Yes.

12         Q     And you said that the telephone

13  in the office had blood on it and that none

14  of it was smeared in your view?

15         A     Yes.

16         Q     Is that right?

17         A     Yes.

18         Q     Did you have any kind of device

19  to help you examine the phone?

20         A     No.

21         Q     Magnifying glass?

22         A     No.

23         Q     Anything like that?

24         A     No.

25         Q     Where was the blood on the

K. James McCready     131

phone?

      A    I have to look at the picture again but I'm pretty sure it's right across the top of the handle on the phone.

      Q    Right across the top?

      A    Well, on the top.

      Q    Is it fair to say there was specs of blood?

      A    Yeah.

      Q    Were the specs of blood wet or dry?

      A    Were they what?

      Q    Wet or dry?

      A    I don't recall at this time.

      Q    You recall Ethel Kerley testifying that the blood in the father's room was dry; that literally the blood -- dried clumps of bloods in his hair.

           Do you remember her testifying to that or telling you that?

      A    Who?

      Q    Ethel Kerley, the EMT person who arrived first who saw Marty's mom's throat cut?

K. James McCready          132

1

2        A       Uh-hum.

3        Q       You're not disputing her

4  testimony in that regard?

5        A       No.

6        Q       You also observed, I think, the

7  blood spatter around the room; didn't you?

8        A       Yes.

9        Q       That the blood on the phone

10  didn't come from dripping but looked like it

11  was sprayed there from his father's --

12        A       Spattered.

13        Q       Spattered.  Being struck,

14  right?

15        A       Yes.

16        Q       And so, just again, I'm sure

17  you know there's some -- you know, that when

18  someone is struck and they bleed and they're

19  struck again and an object is swung back and

20  forth the blood is literally sprayed off the

21  individual and cast off from the weapon and

22  it creates blood spatter around the room and

23  that's what you saw on the phone, some specs

24  of blood splatter; is that right?

25        A       Yes.

K. James McCready          133

MR. BARKET:  Could we have

these two marked as 85 and 86.

(Whereupon, Plaintiff's

Exhibits 85 and 86 were marked for

identification.)

Q    Could you take a look at what's

been marked as Plaintiff's Exhibits 85 and

86 and I'm going to ask you if that's the

telephone that you observed on September 7,

1988 in the office where Martin Tankleff's

father was found?

A    Yes.

Q    And you see the little specs of

blood on it, right?

A    Yes.

Q    And by the way, the photographs

that we're going through, these are all

police photographs that were reproduced for

Mr. Gottlieb back in '88-'89 for the trial;

is that right?

A    Yes.

Q    So all these photographs that

we're going through they were not taken by

defense experts, they were taken by police

K. James McCready          134

1   officers in the course of the investigation?

2

3          A     Yes.

4          Q     I want to ask you something

5   about what you expected to see and then

6   we'll talk about what's actually there.

7                Are you suggesting that if

8   there is dry blood on the phone and somebody

9   without any moisture or blood on their hands

10  picks it up and uses it for about a minute

11  that the blood spatter, the dried blood

12  spatter, has to have ben smudged?

13         A     What I am saying is even from

14  this photograph the blood does not look like

15  it was that dry to me.  Usually blood turns

16  into real dark brown when it's dry.

17         Q     I don't know what the lighting

18  was for the photograph.  I didn't take the

19  picture but I don't want to go backwards in

20  our examination here.  We just agreed the

21  blood was dry.  Ethel Kerley described the

22  blood being dry, that the spatter on the

23  phone was dry; is that fair?  We're not

24  backtracking it; are we?

25         A     No, I'm not.

K. James McCready          135

Q    So assuming that the blood was dry the way Kerley said it was and the way you said it was, if there is dry blood on the phone, somebody without moisture on their hands, without blood on their hands, picks up the phone and uses it briefly, would you automatically expect that blood to be smeared?

A    No.

Q    It may not be smeared, right?

A    Yeah.

Q    In point of fact, if you look at the 911, the numbers that Marty would have dialed, they don't have any blood on them at all; do they?

A    No.

Q    Now, here is where the magnifying glass comes in.  I want you to take a look at these pictures with the magnifying glass and look at the base of the phone, the handset down at the bottom on each side, and tell me if you don't see what appears to be smeared blood there.

A    I can't tell what that is.

K. James McCready        136

Q    There is something there; isn't

there?

A    I don't know.

Q    Looks like smeared blood;

doesn't it?  I'm talking about the base of

the handset.

A    I know.  I know.  You're

talking about the sides of the phone.

Q    Right.

A    I don't know.

Q    That very well could be smeared

blood even through that photograph, right?

A    It could be.  I don't know

though.  I can't tell from this.

Q    You obviously didn't take a

close examination of the phone that day with

magnifying glasses or anything of the sort;

did you?

A    No.

Q    Okay.  So is it fair to say

that A, there could be smeared blood on that

phone, right?

A    Could be.  Yeah.

Q    And B, that even if there is

1                              K. James McCready      137

2      not smeared blood that would not necessarily

3      mean that Marty did not use it because the

4      dried blood wouldn't necessarily have

5      smeared, correct?

6                 A      Possibly, yes.

7                 Q      Now, the next thing that I want

8      to talk to you about is the doorknob.

9                 A      Yes.

10                Q      Okay.  You know which doorknob

11     we're talking about, right?

12                A      Yeah.

13                Q      The garage.

14                A      The garage.

15                Q      Because Marty says that after

16     he found his father, after he called 911 and

17     after he rendered first aid to his father,

18     he went looking for his mother, right?

19                A      Yes.

20                Q      And that he opened the garage

21     door, right?

22                A      Right.

23                Q      And then closed it and kept

24     looking for his mother until he found her in

25     the bedroom, correct?

K. James McCready          138

1

2      A      Right.

3      Q      Now, at that point in time you

4  went looking for blood on that door, right?

5      A      Yes.

6      Q      Interesting, going back to what

7  Officer Crayne said that Marty had blood not

8  on his fingertips but on the palms of his

9  hands --

10     A      Yes.

11     Q      -- how do you think that might

12  have happened?

13     A      How that might have happened?

14     Q      Yeah.

15     A      I don't know.

16     Q      Well, if Marty had blood on his

17  hands from helping his father off the chair,

18  elevated his feet with the pillow, and then

19  the last thing he did is take a towel with

20  his fingers extended and put it down on his

21  father's neck, could some of the blood that

22  might have been on Marty's fingers come off

23  on the towel?

24     A      Yes.

25     Q      Could?

K. James McCready        139

    A    Yes.

    Q    So that would explain while he

helped his father and there's blood on the

palms but not on fingers, right?

    A    Yes.

    Q    And the key that you turned, I

think, if I recall your testimony, you

turned it with a pen or something?

    A    Yeah.

    Q    What if Marty turned it with

his fingertips where there wasn't blood,

would you expect to see blood there?

    A    No.

    Q    Push the handles down on the

door with his fingers, pulled it back,

closed it, turned the lock, you wouldn't

expect to see any blood at all; would you?

    A    Not necessarily, no.

    Q    And is it true that even if he

had blood on his hands it would not

necessarily mean that everything he touched

thereafter would have blood on it; would it?

    A    Not necessarily, no.

    Q    Of course not.  And we know in

K. James McCready        140

this case, as a matter of fact, that

everything he touched after he rendered aid

to his father didn't have blood on it; don't

we?

MR. DUNNE:  No, I'm going to

object to the conclusionary portion

of that.

MR. BARKET:  Let me ask it in a

factual way.

Q    We know that after he touched

his father, whether it was quote/unquote as

some kind of coverup or some kind of simply

rendering first aid the way he said, that he

did other things after that, right?

A    Yes.

Q    Called his sister?

A    Yes.

Q    Picked up the telephone?

A    Yes.

Q    Was there blood on the phone?

A    No.

Q    Well, why would you expect to

see blood on the doorknob and the key but

not on the phone?  It's just possible that

K. James McCready        141

1    when somebody has blood on them it doesn't

2    mean that their hands are literally covered

3    with blood.

4    

5         A    I understand that.

6         Q    He didn't stick his hands in

7    paint and covered it completely?

8         A    I understand.

9         Q    It means that he had some blood

10   on his hands and all that it means when he

11   touches the next thing and he doesn't leave

12   a blood trace is the spot on his hands that

13   had the blood didn't come into contact with

14   whatever it was that he was picking up,

15   right?

16        A    Right.

17        Q    It's a very simple explanation;

18   isn't it?

19        A    It's plausible.

20        Q    It's more than plausible.  We

21   actually know what happened here because we

22   know that Marty rendered first aid and we

23   know he made the phone call to his sister

24   and there's no blood on the phone, right?

25        A    Right.

```
 1                    K. James McCready      142
 2          Q     And we also know that he went
 3     out through a storm door; don't we?
 4          A     Yes.
 5          Q     Blood on the storm door?
 6          A     No.
 7          Q     He didn't become like some
 8     character out of Star Trek and beam himself
 9     through the door; did he?  He had to open
10     the door with his hands and walk through,
11     correct?
12          A     I guess.
13          Q     Of course, right, there was no
14     other way to get out of the house.
15          A     Okay.  I don't know -- Why did
16     he use a tissue to go back into the house
17     when he left the police officer?
18          Q     I don't know.  Somebody should
19     have asked him.
20          A     What?
21          Q     Did you ask him?  Mr. Dunne
22     could have asked him.  Somebody could have
23     asked him.  There's a trial, we'll ask him.
24     You can ask your attorney to ask him.  Did
25     you ask him that day?
```

K. James McCready          143

1

2        A     I don't remember asking him

3    that.

4        Q     I'm sorry?

5        A     I don't remember asking him

6    that.

7        Q     Did any police officers that

8    you know of ask him that day?

9        A     I don't know.

10        Q     Marty told you he was sickened

11    by blood; didn't he?

12        A     Something like that, I think.

13        Q     Well, something like that.  He

14    told you that when he went in to see his

15    father who had some type of procedure in the

16    hospital he was actually sickened by the

17    site of blood.

18        A     I'll take your word for it.

19        Q     Well, I mean you were there.

20    Do you remember that?  We have notes on it

21    and so forth?

22        A     I know but I'll give you that.

23    Yeah.

24        Q     He actually said it.  It's in

25    your report, right?

K. James McCready        144

2        A      Yeah.

3        Q      So that a young teenager who

4   finds his parents that way, who has to

5   render first aid to his father, who is

6   revolted by the site of blood is going to do

7   some things to get the blood off of him;

8   isn't he?

9        A      Yes.

10       Q      He asked the police officer

11  could he go back in the house and wash his

12  hands.  He was told no.  And he asked to

13  wash them in a puddle and he was told yes,

14  right?

15       A      I guess.

16       Q      So he cleaned the blood on his

17  hands off, right?

18       A      Yes.

19       Q      And then as he's going back and

20  forth through the house, I guess before that

21  or after that, it's not clear, he used a

22  tissue, right?

23       A      Yeah.

24       Q      Does that tell you anything

25  other than he used a tissue?

1

2          A      No.

3          Q      There's actually three tissues

4    found in his pocket, right?

5          A      Yes.

6          Q      One of them had his blood on

7    it, right?

8          A      Had what?

9          Q      Had his blood on it.

10         A      I don't recall.

11         Q      One of them had his blood on

12   it, one of them had nothing and one of them

13   hd a small amount of his mother's blood,

14   right?

15         A      Yes.

16         Q      So he has his mother's blood on

17   a tissue inside of his pocket.  How did that

18   happen if he murdered his mom?

19         A      If he what?

20         Q      If he murdered his mom.

21   According to your theory, how did he end up

22   with blood on the tissue?

23                MR. DUNNE:  I object to the

24         form of the question.  Go ahead and

25         answer.

1                     K. James McCready        146

2          A     I don't know.

3          Q     Well, we know that he took a

4    shower according to your account, right?

5          A     Right.

6          Q     After the murders, right?

7          A     Yes.

8          Q     And that the shower was

9    thorough enough, at least as to the weapons,

10   according to your account, as to completely

11   clean off any forensic trace of anything,

12   right?

13         A     Yes.

14         Q     And that he has a tissue in his

15   pocket with his mother's blood on it.  That

16   had to get there after the murders, right?

17   He did not kill his mother with the

18   sweatshirt on; did he?

19         A     With a what?

20         Q     He didn't kill the mother while

21   wearing that sweatshirt; did he?

22         A     Not that I'm aware of.

23         Q     There was blood on the doorknob

24   of Marty's room; wasn't there?

25         A     I think there was.  I'm not

1                    K. James McCready      147

2    sure.

3          Q     His mother's blood on the

4    doorknob, right?

5          A     I don't know.  I don't

6    remember.

7          Q     Mother's blood on the light

8    switch in Marty's room, correct?

9          A     I think so, yes.

10         Q     And there's actually blood

11   there that was actually smeared up the wall

12   by the light switch, correct?

13         A     Yes.

14         Q     You ever walk into a room where

15   you don't know where the light switch is and

16   you grope on the wall looking for it?

17         A     Sure.

18         Q     You ever walk in a room where

19   you know where the light switch is and you

20   turn it on?

21         A     Yes.

22         Q     So Marty who lived there is not

23   likely to be groping for a light switch in

24   his own room; is he?

25         A     No.

K. James McCready    148

Q    So when Marty woke up that
morning and flicked on his light, could he
have gotten some of the blood that was on
the slight switch on his hand?

MR. DUNNE:  I object to the
form but go ahead.

A    Could he have gotten what?

Q    Some of the blood that was on
the light switch on his hand when he turned
on the light?

A    Is that scenario possible, yes,
of course.

Q    There's a few things that Mr.
Pollack asked Mr. Rein about and I want to
give you the same opportunity, that
according to your account of this, Marty
called 911 after having woken up at 5:35 in
the morning, attacked his mother, attacked
his father, noticed that his father was
still alive and called 911 anyway, right?

A    Yes.

Q    Okay.  And according to you he
had to have done this from the bed.  He
couldn't have done it from the phone in the

K. James McCready          149

1 office, right?

2          A     Called 911?

3          Q     Right.

4          A     Right.

5          Q     Because you had that scenario

6 where that phone in that office was not

7 touched so Marty's call had to have taken

8 place someplace else, right?  Guilty or

9 innocent, according to you, he couldn't have

10 called from the office, right?

11          A     I don't believe he did.

12          Q     No.  So according to your

13 account he called from his mother's room; is

14 that right?

15          A     Yes.

16          Q     Okay.  So he's making a 911

17 call seven feet from his butchered mother,

18 fainting excitement and stress the way you

19 hear him on the 911 call, begging, please,

20 please, I need an ambulance, and he doesn't

21 mention his mother.  That's your account,

22 right?

23          A     Right.

24          Q     How do you explain that?

1                    K. James McCready        150

2          A     How did I explain it?

3          Q     Yeah.   What would possess

4    Marty, assuming he did the things that you

5    think he did, make the 911 call from one

6    room next to the parent that's right across

7    the hall from him where you would expect --

8    everybody would expect he would have walked

9    across the hall, seen his mother laying on

10   the floor in the bright light, whatever it

11   was, TV set in that room, picked up the

12   phone and said, oh, my God, my mother has

13   been attacked.   That would be a fairly

14   logical simple thing for the guilty person

15   to do; yes?

16              MR. DUNNE:   I'm going to object

17          to I think there was a question but

18          the form of it.   Go ahead.

19          Q     How do you explain the fact

20   that he's calling from one room -- he's

21   calling from one room and right near the

22   injury of his parent who is across the house

23   120 feet away?

24          A     I don't understand what you're

25   trying to say here.

1                    K. James McCready      151

2              Q    I'm asking you what possible --

3    Did you ask Marty, why did you call from

4    that room?

5              A    I don't remember.  Whatever I

6    did.

7              Q    But we know that you thought

8    that he couldn't have called from the

9    office, right, that was your view of things?

10             A    Right.

11             Q    So the 911 call had to have

12   come from someplace else.  It couldn't have

13   come from the office, right?

14             A    Right.

15             Q    By the way, at the time that

16   you all are speaking with Marty, you have

17   not heard the 911 call; have you?

18             A    No.

19             Q    You don't know what was said.

20   You don't know what took place?

21             A    No.

22             Q    It's later on that we find out

23   that this 911 call is a panicked teenager

24   talking only about his father, right?

25             A    Right.

K. James McCready        152

2    Q    But in the confession that you

3    say he gave you in his own words he doesn't

4    say he used the phone that he says he used,

5    he says he uses a phone that you say he used

6    in the bedroom and talks about the body in

7    the office?

8         A    Yes.

9         Q    Did that raise any concerns

10   with you that maybe this account that you

11   were acquiring from this teenager who just

12   found his parents maybe wasn't true?

13        A    No.

14        Q    It did not raise any concerns

15   for you?

16        A    No.

17        Q    After the fact?  After you hear

18   the 911 call, after you know that it's the

19   father he's describing, didn't you go back

20   and say, geez, that doesn't make a lot of

21   sense that he would have been calling from

22   the mother's room describing the father's

23   injury and not describing the mother.  Never

24   raised any concern with you?

25        A    No.

K. James McCready       153

2    Q    Did it ever raise a concern to

3    you that that account of which phone was

4    used was something that was in your mind and

5    then somehow came out of Marty's mouth?

6         MR. DUNNE:  Objection to the

7         form but go ahead.

8    A    No.

9    Q    But in your head he couldn't

10   have used the office phone, right?

11   A    I didn't think he did, no.

12   Q    Right.  And so the account that

13   Marty gives reflects your account or your

14   thinking at the time?

15   A    No, the account he gives me

16   reflects what he told us at the time.

17   Q    And look, it's a conversation

18   that took place 20-somewhat years ago.  I

19   know you took some notes about it, but we

20   have a court reporter here who writes

21   everything down because we can't remember

22   what was said exactly, right?  You guys

23   didn't have a court reporter there; did you?

24   A    No.

25   Q    So what was said, you have your

K. James McCready        154

1

2    view of it; Marty has his view of it, right?

3          A    Yes.

4          Q    I'm not going to comment one

5    way or the other on whose is accurate?

6          A    Yes.

7          Q    But it is true that at the time

8    that you're saying that Marty tells you he

9    used the phone other than the office phone

10   that reflects your thinking at the time that

11   he did not use the office phone; true?

12         A    Yeah.

13         Q    And that's kind of what I meant

14   by from your head out of his mouth.

15         A    No, it's not true.

16         Q    Well, you're saying you didn't

17   suggest to him that he used another phone,

18   you just let him tell you which phone he

19   used.

20         A    Yes.

21         Q    And then it was coincidence

22   because he said that he was using a phone --

23   that he wasn't using the phone that you

24   didn't think he used, right?

25         A    Well, if want to call it a

K. James McCready          155

1     coincidence or not but that's what happened.

2          Q    Well, again, according to you.

3     Because Marty's account of this has always

4     been different than that, right?  Marty said

5     you suggested to him that he used the other

6     phone; did that happen?

7          A    No.

8          Q    It was not that you said to

9     him, Hey, Marty, you couldn't have used the

10    phone in the office because I looked at it

11    for a few seconds and I didn't see smears.

12    You had to use a different phone.  Which

13    phone did you use, and how about your

14    mother's phone?  That didn't happen?

15         A    No.

16         Q    The 911 call, one of the things

17    that you do when you're confronting Marty --

18    and there's this period of time where you do

19    some small talk with him, as you all

20    described it, and then you get to a part

21    where you're confronting him and one of the

22    things you confront him with is that he

23    didn't compress the wounds; is that right?

24         A    Yeah.

                    K. James McCready        156

2          Q     And you actually write in your

3    supplemental report that he did not compress

4    the wound the way the 911 operator told you

5    to.

6          A     Yes.

7          Q     Now, September 14th, a week

8    later, by that point in time you had heard

9    the 911 call; hadn't you?

10         A     Yes.

11         Q     So did Marty use the words

12   according to you that the 911 operator told

13   me to compress the wound?

14         A     Yes.

15         Q     He did?

16         A     Yeah.

17         Q     Well, take a look at your notes

18   from your original interview of him and --

19   What number is that?

20         A     Seventy-nine.

21         Q     And show me where it says that

22   the 911 operator -- Those are the notes you

23   say you took that morning, right?

24         A     Yes.

25         Q     The notes reflect the fact

1                    K. James McCready      157
2    that he --
3            A     What page is that?
4            Q     I don't know if we have page
5    numbers but I put an asterisk next to it
6    where it says, 911 call, phone office, linen
7    closet, towel, his room and pillow.  Those
8    are the notes that you supposedly took while
9    Marty was telling you what happened at 33
10   Seaside Drive; is that right?
11           A     What's that?
12           Q     Those are the notes that you
13   supposedly took at 33 Seaside Drive; is that
14   correct?
15           A     Yes.  Yeah.
16           Q     Okay.  It doesn't say that he
17   told you to compress the wound; does it?
18           A     I didn't write it in here but
19   he told me that.
20           Q     Well, compress the wound, that
21   sounds like a word that a 17-year-old would
22   use?
23           A     Actually, I think the word was
24   apply pressure.
25           Q     That's the word that the

K. James McCready        158

2  operator used?

3          A    Yes.

4          Q    On the 911 call?

5          A    Right.

6          Q    What I'm asking you is, you

7  described an account in your supplemental

8  report that you challenged Marty by saying,

9  ah-ha, that's very good, Marty, but you

10  didn't do what the 911 operator told you to

11  do which was put pressure or compress the

12  wound, and I'm asking you how did you know

13  what the 911 operator said to him if you

14  hadn't listened to the call before you wrote

15  up the report, and you're saying that Marty

16  told it to you.

17              MR. DUNNE:  The notes or the

18          report?

19              MR. BARKET:  The notes.

20              MR. DUNNE:  Right, not the

21          report, the notes.

22          Q    The report that was a week

23  later says Marty told us about it.

24          A    I don't know why I didn't write

25  it in here, but I didn't write it down.

K. James McCready          159

2    Q    Okay.  But you're saying Marty

3    told it to you?

4    A    Yeah.

5    Q    It wasn't something where you

6    wrote up the report a week later, it wasn't

7    something you put it in that you learned

8    from listening to the 911 tape, right?

9    A    No.

10    Q    That was something you learned

11    from Marty according to you?

12    A    Yes.

13    Q    Now, you had a number of people

14    tell you or police officers that they

15    thought that Jerry Steuerman was involved in

16    this, correct?

17    A    Yes.

18    Q    Who?

19    A    That Jerry Steuerman was

20    involved in it?

21    Q    Who said that to you or to

22    another police officer?

23    A    Jerry Steuerman, I don't know

24    if they thought he was involved in it or

25    thought he might be capable of doing it.  I

K. James McCready          160

don't remember.

     Q    Well, let's see.  Marty certainly said it, correct?

     A    Yeah, Marty.

     Q    Ron Rother said it, right?

     A    Yes.

     Q    Pfalzgraf at the hospital while you were taking Marty to the police precinct or headquarters?

     A    Yeah, I guess so.

     Q    Michael Fox did, right?

     A    I don't know if he said that to me directly.

     Q    To another police officer?

     A    He might have.  I don't know.

     Q    And you heard the account that was reviewed today with Mr. Pollack and Mr. Rein that two of the poker players said, in essence, that Jerry Steuerman was the last person to see Marty's father before he was attacked?

     A    Yes.

     MR. DUNNE:  I'll object to the form of that.  Did you answer that?

K. James McCready          161

1
2          The answer stands.

3          A     Yes.

4          Q     And, in point of fact, they did

5     have a bitter fight over money over the

6     course of some period of time; did they, Mr.

7     Tankleff and Mr. Steuerman?

8          A     I don't -- Well, let me put it

9     to you like this.  From my understanding

10     now --

11          Q     Not your understanding now.

12     I'm asking you if at the time did you

13     understand from a variety of people that, in

14     fact, there was a bitter dispute between

15     Tankleff and Steuerman over the money that

16     Steuerman owed Tankleff?

17          A     No.

18               MR. DUNNE:  I'll object to the

19          form of the question and the

20          characterization.  The answer

21          stands.

22          A     No.

23          Q     There was no dispute?

24          A     I didn't say there was no

25     dispute.

K. James McCready          162

2   Q    It wasn't bitter?

3   A    What I'm saying is that it was

4   a business dispute, okay.  And what I'm

5   saying is it wasn't -- I don't believe it

6   was over the money.  It was over what

7   Steuerman was going to use the equipment for

8   that he had the UCC on and my understanding

9   is that Seymour wanted a piece of that

10  action and Jerry said no and Seymour was

11  upset about that.

12  Q    Didn't Steuerman owe Tankleff

13  several thousand dollars?

14  A    Yes, he did.

15  Q    And wasn't Tankleff demanding

16  payment of that?

17  A    That what?

18  Q    Wasn't Tankleff demanding

19  payment of that money?

20  A    I don't know that he was

21  demanding payment.  He might have been

22  demanding payment yes, however --

23  MR. DUNNE:  Let him finish.

24  MR. BARKET:  Sorry.

25  A    However, for Jerry Steuerman to

1

2    kill Seymour and Arlene doesn't make the

3    debt go away.

4         Q    And Jerry Steuerman knew that?

5         A    What's that?

6         Q    Jerry Steuerman knew that?

7         A    No, I know that.

8         Q    Right, but all I'm concerned

9    with is what was in Steuerman's mind?

10         A    I don't know.  He was all

11    messed up.

12              MR. DUNNE:  The objection is

13         obvious, but go ahead.

14         Q    You're saying to me that

15    legally speaking that you would still owe a

16    debt to the estate, right, if you owe a

17    debt.  If you kill the people the debt

18    doesn't disappear, it moves from Seymour to

19    his wife to the estate, right?

20         A    Right.

21         Q    Do you know how the estate was

22    settled with that debt?

23         A    No.

24         Q    Did you learn that it was

25    settled for pennies on the dollar?

K. James McCready        164

2    A    I don't know.

3    Q    In the course of this kind of

4    legal analysis of whether or not the debt

5    continued to exist, did you ever consider

6    the possibility that while the estate would

7    be technically owed the debt, to sue for it

8    and collect on it would be almost impossible

9    because there wouldn't be any witnesses on

10   the plaintiff side, they're dead?

11            MR. DUNNE:  I'm going to

12        object.  That's more like

13        testifying.  Is that a question?

14            MR. BARKET:  Yes, that's a

15        question.

16            MR. DUNNE:  What is the

17        question?

18   A    Did I consider that?  No.

19   Q    Did you consider the fact that

20   the estate's debt that supposedly they could

21   collect they would have trouble collecting

22   it because the chief witnesses for the

23   estate were both dead?

24   A    No.

25   Q    It didn't enter your mind and

K. James McCready        165

you never asked Steuerman what he knew about

whether the debt would continue or not?

         A    I don't recall talking to him

about that.

         Q    Is it correct that what

Steuerman said was, not only did he owe him

half the business, "Tankleff thought he

owned half of me;" do you remember that

quote?

         A    Yes.

         Q    That sounds pretty bitter to me

how about to you?

         A    Yeah.

         MR DUNNE:  I'll object to the

         form of the question.  The answer

         stands.

         Q    If I understand where Steuerman

sits in this, he's the last person to see

Marty's father before he's attacked.

There's an ongoing dispute over money,

business, and over whether or not Tankleff

owns "half of Steuerman;" is that right?

         A    Yes.

         Q    And that you arrive at the

K. James McCready        166

1

2  scene and within an hour or two you're told

3  by three different family members; the

4  family attorney, the son-in-law and the son,

5  that they all think that Steuerman was

6  involved in this?

7        MR. DUNNE:  Told him or he knew

8     that or should have known?

9     Q     Told the police that.

10    A     The only one that said anything

11  to me about it was him.

12    Q     Martin Tankleff?

13    A     Yeah.

14    Q     But you know that Rother said

15  it to Pfalzgraf; don't you?

16    A     I know now.

17    Q     And you know that Fox said it

18  to Pfalzgraf as well, right?

19    A     Right.

20    Q     So my summary of Steuerman's

21  situation is, we have this dispute, we have

22  him being the last person seen with Mr.

23  Tankleff before the attack, and we have

24  multiple people pointing to him, right?

25    A     Yes.

K. James McCready          167

1
2          Q     Okay.  You understand what the
3     phrase "lawyering up" means; don't you?
4          A     What?
5          Q     The phrase "lawyering up," what
6     does it mean?
7          A     It means get counsel to
8     represent you.
9          Q     Any questioning stops at that
10    point in time?
11         A     That's right.
12         Q     And part of what goes on in all
13    investigations in dealing with suspects is
14    dealing with this particular rule in New
15    York that prevents any questioning after the
16    individual says that they are represented by
17    a lawyer or a lawyer says that, right?
18         A     Right.
19         Q     Michael Fox, was he a lawyer?
20         A     Yes.
21              MR. BARKET:  Why don't we stop
22         here.
23              THE VIDEOGRAPHER:  Going off
24         the record at 3:05 p.m.
25              (At this time, a brief recess

1                    K. James McCready      168

2           was taken.)

3                  THE VIDEOGRAPHER:  Beginning of

4           Tape 4.  Back on record at 3:15 p.m.

5           You may proceed.

6    CONTINUED EXAMINATION BY

7    MR. BARKET:

8           Q     We left off with Mr. Fox is a

9    lawyer and you knew he was a lawyer because

10   Marty told you that he was his uncle and the

11   family business lawyer of some sort?

12          A     Yes.

13          Q     And at some point in time

14   you're speaking to Marty -- By the way, at

15   the point in time when Mr. Fox arrives, by

16   then Marty is certainly a suspect in this;

17   isn't he?

18          A     Yes.

19          Q     You had done your walk-thru,

20   all the things that you and Mr. Rein said

21   you observed?

22          A     I'm very suspicious of him,

23   yes.

24          Q     Right.  And you want to

25   continue to speak to him, right?

1                    K. James McCready      169

2          A     Pardon me?

3          Q     You wanted to continue to speak

4     to him, correct?

5          A     Yes.

6          Q     And, in fact, when Mr. Fox

7     shows up, if he says to you, I'm Marty's

8     lawyer, questioning stops, right?

9          A     Yes, if he said that, that

10    would have happened.

11         Q     Right.  Questioning would have

12    to stop, right?

13         A     Yes.

14         Q     So when he shows up you run

15    over to greet him; is that right?

16         A     I walked over to him.

17         Q     Why did you go over to him?

18         A     Because I think -- I'm not

19    sure.  I think Sergeant Doyle was talking to

20    Marty at the time.  I believe he was.  And I

21    walked over to him and introduced myself and

22    we had a brief conversation and he asked me,

23    you know, I explained to him that we're

24    interviewing Marty and that -- I remember

25    him saying something about -- oh, I asked

K. James McCready          170

1   him what he wanted me to do with Marty when

2   we were finished with him and he asked me to

3   bring him to the hospital.

4       Q     Did you tell him you were going

5   to bring him to the headquarters?

6       A     I don't know if I told him at

7   that point or not.  I forget.

8       Q     Did you tell him that Marty was

9   a suspect in the murder of his parents?

10      A     No.

11      Q     Did you tell him that you were

12  highly suspicious of some of the things that

13  Marty said?

14      A     No.

15      Q     You told him that Marty was

16  giving you the information that he had?

17      A     Yeah, I told him that he was

18  giving us information, yes.

19      Q     And was there some interaction

20  between Marty and Michael Fox?

21      A     I'm not sure if he said, Hi

22  Uncle Mike or something like that.  I forget

23  exactly.

24      Q     There was some account that was

1                        K. James McCready        171

2      given, maybe it was from one of the other

3      witnesses, but something along the lines of

4      that he came over and said to Marty, are you

5      okay and Marty said, yeah, I'm fine, and

6      that was it?

7           A      I really don't recall right

8      now.  I know I think what it was when I was

9      talking to Marty, Marty was saying something

10     about Fox, about his Uncle Mike was the

11     lawyer for his father's businesses or

12     whatever, and that he knew all about

13     Steuerman.  And then he said to me -- he

14     said, as a matter of fact, that's him right

15     there now coming over.

16          Q      You know what I'm wondering

17     about?  I'm wondering why it is that Uncle

18     Mike and Marty didn't, if they saw each

19     other and you didn't prevent them from

20     speaking, why is it they didn't have a more

21     in-depth conversation?

22               MR. DUNNE:  Really?  Objection.

23          You want him to speculate to their

24          mind?

25               MR. BARKET:  No, no.  I guess

1                          K. James McCready        172

2              that's not fair; is it?

3                    I'll ask in a way that maybe it

4              can answer some questions.

5              Q     Uncle Mike was a close friend

6    of the Tankleff family, yes?

7              A     Yes.

8              Q     He arrives at the scene where

9    his close friend was brutally attacked and

10   his wife murdered, right?

11             A     Yes.

12             Q     The young man that you're

13   questioning refers to Mike as Uncle Mike,

14   right?

15             A     Yes.

16             Q     And, in fact, it turns out

17   that -- I don't know if you knew this at the

18   time, but did you learn later that Uncle

19   Mike was Marty's Godfather?

20             A     No, I didn't know that.

21             Q     And at this moment of family

22   trauma, fair to say, right?

23             A     Yes.

24             Q     That the interaction between

25   these two individuals, the surviving son and

K. James McCready        173

the uncle, "Uncle Mike", sounds like they

saw each other at a ball game.  That's what

your testimony is?

        MR. DUNNE:  I object to the

      form of that.

    A   Let me explain this.  I'll tell

you right now, if Uncle Mike wanted to go

over and talk to that kid, we would have

more than allowed him to talk to him.  I

didn't ask him if he wanted to talk to the

kid.  He didn't say he wanted to talk to

him.  Had he asked me, had he said I want to

go talk to him or whatever, I would have let

him talk to him.  I had no problem with

that.

    Q   So the fact that these two

individuals didn't have any conversation,

had nothing at all to do with you wanting to

prevent Marty from being quote/unquote

"lawyering up," right?

    A   No.

    Q   You wouldn't have cared if

Uncle Mike had said, stop talking to this

kid?

K. James McCready       174

1
2      A      Oh, I would have cared if he
3   said that.  If he was going to say that, he
4   would have said it right there and then to
5   me, whether he's standing next to him or
6   10 feet away from him.  But that's not what
7   he did.  He came up and introduced himself,
8   told me he was a business lawyer for
9   Seymour.  He gave me his card and never
10  asked to speak to the kid.
11      Q      Was it at this point in time
12  that Sergeant Doyle says, time to move.
13  Let's get him out of here, referring to
14  Marty?
15      A      No.  No.  I don't even know if
16  Norman was there yet when that occurred.
17      Q      Why?  Why would you take Marty
18  from the scene to headquarters and not to
19  the hospital?
20      A      Because we wanted to talk to
21  him more.
22      Q      About what?
23      A      About everything.
24      Q      Well, what do you mean about
25  everything?

1                    K. James McCready      175

2           A      About what happened, the

3     murders.  You know, you don't just talk to

4     somebody for a half hour and say, okay, go

5     ahead to the hospital.

6           Q      Isn't that what you did with

7     Jerry Steuerman?

8           A      What?

9           Q      Isn't' that what you did with

10    Jerry Steuerman?

11          A      No.

12          Q      I thought you had a half hour

13    conversation with him at his restaurant?

14          A      I did.

15          Q      And you let him go on his way?

16          A      Jerry Steuerman wasn't a

17    suspect.

18          Q      Oh, I see.  I see, so Marty was

19    a suspect.  You weren't going to chat with

20    him and let him go.  You wanted to bring

21    Marty back to the precinct because you

22    thought he committed the murders?

23          A      I didn't know for sure if he

24    committed the murders.  I was suspicious of

25    him, yes.

```
 1                    K. James McCready      176

 2          Q    So you wanted to bring him back

 3     to the precinct.  And Marty was, according

 4     to you, not asking to go to the hospital

 5     with his dad?

 6          A    No.

 7          Q    He was like, sure, I'll go to

 8     the precinct, never mentioned the hospital?

 9     That's your testimony?

10          A    That's right.

11          Q    You're sure of that, right?

12          A    Yes.

13          Q    It's not that Marty was saying,

14     I want to go the hospital and you're saying

15     I'll bring you there afterwards, but let's

16     talk about Steuerman more at the present?

17          A    Marty never said anything to me

18     about going to the hospital.  The only one

19     that mentioned the hospital was Mike Fox

20     when he said, when you're done with him

21     would you bring him to the hospital.  I said

22     yeah.

23          Q    Did you tell Marty that you

24     wanted to go back to the hospital or

25     headquarters to talk about Jerry Steuerman
```

K. James McCready          177

1   some more?

2        A    I wanted to talk to him about

4   everything, Jerry Steuerman included.

5        Q    What you wanted to talk to him

6   about and what you told Marty may or may not

7   have been two different things?

8        A    I don't remember the exact

9   language that I used, but I wanted to keep

10   discussing this case.

11        Q    You certainly didn't tell him I

12   wanted to bring you back to headquarters

13   because I think you committed these crimes?

14        A    No.

15        Q    So you told him something other

16   than what was going on inside your head?

17        A    I told him that I wanted to

18   continue talking to him about the murder

19   investigation.

20        Q    In fact, you wanted to

21   interrogate him about it, right?  You

22   thought he was involved in the murders?

23        A    I didn't know if it would ever

24   get to an interrogation at that point.

25        Q    You thought he was involved in

1                    K. James McCready        178

2      the murders; didn't you?

3              A      I was suspicious of him, yes.

4              Q      And you wanted to get a

5      confession from him?

6              A      I didn't know if he'd give me a

7      confession or not.

8              Q      Well, none of us can see the

9      future.  We all want things and sometimes we

10     get them and sometimes we don't.  You wanted

11     a confession; didn't you?

12             A      I wanted a confession after he

13     confessed, yes.

14             Q      The point of bringing him back

15     to the precinct, putting him in an

16     interrogation room, sitting him down with

17     you and Rein going through the sequence of

18     things the way you did was to get a

19     confession from him, right?

20             A      It was down the road if that

21     occurred because of him confessing, yes,

22     then it's to get the confession.  I didn't

23     know whether he was going to confess to this

24     or not.

25             Q      Sure.  You couldn't have known

K. James McCready     179

what was going to happen in the future but

remember we spoke earlier about kind of how

you treat people, suspect witness. This

point Marty is a suspect; isn't he?

     A     Yes.

     Q     He's being treated as a suspect

by you, correct?

     A     Yes.

     Q     You don't tell him that, of

course, right?

     A     No.

     Q     But in your mind this is a kid

I want to interrogate. I want to know what

happened. You think he killed his parents,

right?

     A     Yes.

     Q     And you want him to -- It's

your job. We talked about this before.

Your job is to get confessions from people

that are guilty, right?

     A     Yes.

     Q     And you were going back to the

precinct or headquarters to do your job and

interrogate this kid and get a confession

K. James McCready          180

2     from him?

3          A    Yes. But again, even though I

4     was suspicious of him, I don't know whether

5     or not he actually did the murder because --

6     I'm not saying that Jerry Steuerman at that

7     point in time wasn't a viable suspect also,

8     but as it turned out Jerry left and got home

9     at 3:16 in the morning so he had to act

10    pretty quick to do that murder if he left

11    the house at 3 o'clock.

12          Q    Who is his alibi?

13          A    His daughter.

14          Q    That's it?

15          A    Well --

16          Q    In the course of your dealings

17    as a police officer and investigator, have

18    you ever seen a false alibi by a family

19    member?

20          A    Yes.

21          Q    So I'm going to stick with what

22    happened with Marty and we'll get to Jerry

23    in a little bit. I promise you we'll talk

24    about him some more.

25          As we go through this, it was

1

2      the decision of the police department,

3      whether it be Sergeant Doyle, Detective Rein

4      or you to bring Marty back to that precinct,

5      correct?

6            A     Yes.

7            Q     It was the decision that you

8      all made to put him into a room, correct?

9            A     Yes.

10           Q     It was a decision you all made

11     to have yourself and Detective Rein in that

12     room with him, yes?

13           A     Yes.

14           Q     It was a decision you made

15     about how the questioning would unfold,

16     correct?

17           A     I guess you could say that.

18           Q     Sure.  You directed the

19     questioning; didn't you?

20           A     Well, we both did.

21           Q     And I think Detective Rein said

22     the first thing he did was engage in some

23     small talk because you wanted to get him

24     speaking, get the idea of you asking

25     questions and him answering them?

1                          K. James McCready       182

2             A     Right.

3             Q     Did Marty during the course of

4    this say, I want to see my Uncle Mike.  I

5    want a lawyer.  I want to go to the

6    hospital?

7             A     No.

8             Q     Well, he says flat out that

9    happened.  You say flat out it didn't,

10   right?

11            A     Who said that?

12            Q     Marty says that.

13            A     No, I don't care what he says.

14            Q     You don't believe that?

15            A     No.  He did not say that and

16   that did not happen.

17            Q     According to you?

18            A     It didn't happen, period,

19   alright.

20            Q     Well, you know there was a way

21   that we could have found out what happened

22   in that room; wasn't there?  We wouldn't

23   have to have this argument now?

24            A     What was that?

25            Q     You could have recorded it;

K. James McCready          183

1    couldn't you?

2          A    Well, we had a procedure with

3    regard to that, okay.  The procedure was you

4    get an oral, you get a written, and then you

5    have a district attorney come in, assistant

6    district attorney come in and they

7    videotape.

8          Q    You're telling me that there is

9    a procedure in the Suffolk County police

10   department in 1988 that prevented you from

11   recording the conversation you had with

12   Marty from 9:40 until 1:20 that day?

13         A    No, I'm not saying that, but

14   what I'm telling you is that was what the

15   procedure was.

16         Q    This is the part where I don't

17   understand this because you're a seasoned

18   detective by that point in time, right?

19         A    Yes.

20         Q    You understand how the system

21   works; don't you?

22         A    Yeah.

23         Q    You know if you get a

24   confession from somebody that the person may

K. James McCready     184

1   very well end up having a lawyer saying,

2   hey, geez, he beat it out of me, he tricked

3   it out of me, he lied, I demand a lawyer,

4   all this nonsense?

5       A    Yes.

6       Q    And you end up having to go

7   through these hearings; don't you?

8       A    Right.

9       Q    And the whole hearing is

10  whether or not the confessions are

11  admissible or not admissible, right?

12      A    Right.

13      Q    You have it within your power

14  auto eliminate that process by pushing play

15  on a recording of the interrogation, right?

16      A    Well --

17      Q    Is that true?

18      A    Let me tell.  You're absolutely

19  right but that's not what our procedure was,

20  what can I tell you.

21      Q    Your procedure, what you did

22  that day, leaving aside the procedure, is

23  you have a choice to make.  You say to

24  yourselves, we can get more evidence of what

K. James McCready          185

1    actually takes place here or we can set this

2    up so it's our word against the Defendant's

3    word?

4    MR. DUNNE:  Objection to the

5    form of the question.  Go ahead and

6    answer that as best you can.

7    A    What I'm saying to you is I

8    don't disagree with what you're saying, but

9    I'm telling you that it wasn't our procedure

10   at that time, you know.

11   Q    The procedure for the police

12   department was to get less evidence?

13   MR. DUNNE:  No, objection to

14   the form.

15   A    No.

16   Q    Wouldn't recording of the

17   interrogation provide more evidence?

18   A    Certainly.

19   Q    And you didn't do anything

20   wrong; did you?

21   A    No.

22   Q    And if there is a recording we

23   would have proved it absolutely, right?

24   A    Yes.

K. James McCready          186

1
2          Q     All the claims that Marty made

3     about you feeding him things and everything

4     that went on would have been disproven by

5     this recording, right?  So that every

6     Defendant who's ever made a claim like that

7     they could be disproven by simply, here's

8     the recording, here's what I said, right?

9          A     Yes.

10         Q     And this is 1988, not 1948, you

11    all had tape recorders; didn't you?

12         A     Yes.

13         Q     Is it true that the reason you

14    don't record this is that if you record it

15    you have to be cautious about what you say.

16    You have to watch the words that you use.

17    The recording would inhibit your

18    interrogation techniques?

19         A     Possibly, yes.

20         Q     So that the decision to record

21    and not to record is not just based on what

22    Rein said on what it does for the Defendant,

23    you don't want to have your own technique

24    inhibited.  You don't want to be watching

25    your words, cautious of your language, while

1                    K. James McCready      187

2    you're interrogating a suspect; do you?

3              MR. DUNNE:  Objection to form.

4         Go ahead and answer.

5         A    I would -- Actually, I wouldn't

6    have had any objection to that; however,

7    that's not what our procedure was at the

8    time.

9         Q    I'm asking you if one of the

10   reasons why you don't record interrogation

11   is because if you did, you, Detective

12   McCready, would have to watch your words.

13   You would have to be cautious of what you

14   said; is that true?

15             MR. DUNNE:  Objection to the

16             form of the question.  Go ahead.

17        A    Yes.  Yes.  What can I tell

18   you, yes.  I'm being recorded right now.

19   It's not bothering me.

20        Q    Me neither.

21        A    Okay.

22        Q    For what it's worth.  And we

23   have a court reporter here and you know what

24   won't happen at the end of this?

25        A    What?

K. James McCready      188

1

2        Q    We won't dispute what was said

3    because it's recorded.

4             MR. DUNNE:  Counsel, that's

5         colloquy.  Let's get the facts.

6        Q    Did you know Joe Creedon at or

7    about this time?

8        A    I never ever in my life ever

9    met Joe Creedon.

10       Q    Did you investigate him?

11       A    No.

12       Q    Did your team investigate him?

13       A    Did what?

14       Q    Did your team investigate him?

15       A    Not that I'm aware of.

16       Q    Did you tell Erin Moriarty when

17   she was asking you about Creedon that your

18   team investigated Creedon?

19       A    Not that I'm aware of.

20            MR. BARKET:  We're going to

21        mark an exhibit and then cue it up.

22            Let's mark this 87.

23            (Whereupon, Plaintiff's Exhibit

24        87, video tape, was marked for

25        identification.)

1                         K. James McCready      189

2                  (At this time, video is being

3              played.)

4                  MR. BARKET:  Mr. McCready is

5              saying he can't hear it.  Can you

6              walk across?

7                  (Video continues to be played.)

8         A    Can we stop the tape.  I didn't

9    say my team investigated Joe Creedon.  I

10   said there were six people in my squad who

11   all agreed that he was the murderer.  Nobody

12   in our squad investigated Joe Creedon.

13                 MR. BARKET:  Okay.  We'll

14             continue on.  You can turn that off

15             for now.

16        Q    Just to be clear, Joe Creedon

17   is a name that's come up throughout the

18   course of this case; isn't it?

19        A    Yes.

20        Q    It wasn't something that came

21   up just recently when Marty's conviction was

22   reversed and he was exonerated, right?

23        A    No, no.

24        Q    It was back in 1990 before the

25   trial he came forward and said that Jerry

1                    K. James McCready      190

2      Steuerman had offered him money to cut out

3      Marty Tankleff's tongue, right?

4           A     That's what I hear or words

5      that that effect, whatever.  I have no idea.

6      I never spoke to Joey Creedon.  I wouldn't

7      know Joey Creedon if I tripped on him.

8      Well, I've seen him now.  I've seen his

9      picture anyway.

10          Q     Right.  But back in 1990 Joe

11     Creedon is telling Bob Gottlieb, Marty's

12     lawyer, who's telling the court and the DA's

13     office that Steuerman is offering money to

14     have quote/unquote Marty's tongue cut out of

15     his mouth.

16               Did you do anything with that?

17     Did you investigate it?

18          A     No.

19          Q     Do you know a person by the

20     name of Carl Klein?

21          A     Who?

22          Q     Carl Klein.

23          A     Carl Klein?

24          Q     Yes.

25          A     No.

K. James McCready          191

Q      Skippy Dwyer?

A      No.

Q      Never heard of Skippy Dwyer?

A      No.

Q      Gambino Associates, "no
thumbs," literally?

A      No.

Q      Sal Scala?  "Fat Sally Scala"?

A      Not that I recall.

Q      You were in rackets, right?

A      Yeah.

Q      You don't remember him being a
captain of the Gambino crime family, lived
out in Fort Salonga?

A      I don't remember that.  That's
a long time ago.

Q      Ronnie Diconta (phonetic)?

A      No.

Q      When did you first learn that
Steuerman's son was selling cocaine from the
bagel store?

A      I didn't learn that, somebody
else did.  I heard that but I didn't know
that.

1                    K. James McCready      192

2          Q     I want to give you a chance to

3     respond specifically to some allegations

4     that were made about you, and I'm not asking

5     the questions because I believe or

6     disbelieve them but part of my job.

7          A     Not to worry.

8          Q     Do you know who Don Hayes is,

9     right?

10         A     Yeah.

11         Q     Dan or Don?

12         A     Dan, I think it is.

13         Q     Dan Hayes.  He's the individual

14    who was in business with Marty's father at

15    the gym, right?

16         A     Right.

17         Q     And the individual who would

18    come and stay with Marty when the parents

19    went on vacation, right?

20         A     Right.

21         Q     He's reported that you were

22    taking money from Steuerman at the time to

23    protect the bagel store, the drug business?

24         A     He's full of shit.  And I'm

25    telling you this right now, I never stepped

K. James McCready          193

1

2    foot in that bagel store, Jerry's bagel

3    store, until after this murder.  I did not

4    know Jerry Steuerman before this murder, did

5    not know Joey Creedon before this murder,

6    did not know that other moron Kent, or

7    whatever his name is, before this murder.

8    Never met any of them except Steuerman after

9    the murder.

10          Q     He also reports -- And again, I

11   don't want to own it or disown it, I'm just

12   here to ask the questions so you can respond

13   to them.

14                He also reports that recently

15   you were still coming up to Long Island to

16   do collections work, as he put it, for

17   organized crime figures.

18          A     Wait a minute.  This guy make

19   this shit up?

20                MR. DUNNE:  Just answer the

21          question.

22          A     I never heard such a bunch of

23   bullshit in my life.

24          Q     I'm not saying it's true, it's

25   not true.  I'm just giving you a chance.

1                          K. James McCready        194

2      It's information that's in the public

3      record.  I want to ask you about it.  You

4      can respond anyway you like.

5              A     No, it's bullshit.  It's all

6      lies.

7              Q     But it's not a lie that

8      Steuerman's son ended up getting arrested

9      and prosecuted for selling drugs out of the

10     bagel store, right?

11             A     I really don't know.  I heard

12     that happened.  I'm not sure.  I think I met

13     him once, the kid.  I'm not even sure if he

14     was there when we brought Jerry back from

15     California.

16             Q     Well, at the time that this was

17     going on, so 1988, you were in the homicide

18     squad, right?

19             A     Yes.

20             Q     Okay.  So part of your function

21     wouldn't have been to police narcotics.  I

22     mean if you saw it going on, you'd stop it

23     but that's not --

24             A     Sure, right.

25             Q     You're investigating murders?

1                          K. James McCready      195

2           A     Yeah.

3           Q     Again, don't --

4           A     I know.

5           Q     -- don't get mad at me or do

6      but?

7           A     -- I just can't believe that

8      you're that gullible that you believe this

9      stuff.

10          Q     I'm not staying I believe it.

11     I'm saying that there's questions, you get

12     to answer them, we move on.

13                Where were your brothers

14     assigned then?

15          A     My brother Gene was in

16     homicide; Tommy was in arson; Kevin was off

17     the job.

18          Q     Okay.  Did one of your brothers

19     end up getting arrested and prosecuted?

20          A     Yes.

21          Q     Which one was that?

22          A     Kevin.

23          Q     Sorry.  What happened with him?

24          A     He abused his medication and

25     ran into some young lady and killed her in a

K. James McCready          196

car accident.

     Q    When was that?

     A    I actually don't recall, I really don't. I know he did -- I think he did six years for it.

     Q    I'm sorry. I'm sure that must have been hard for you and your family, I really am.

           In 1988 to 1990, were any of the McCready brothers, if you will, any of you, involved in narcotics enforcement?

     A    No.

     Q    You're sure of that?

     A    Yeah. Oh, you're getting us mixed up with Dennis McCready?

     Q    I'm not getting you mixed up with anybody. I'm looking to --

     A    There was a guy in narcotics named Dennis McCready but he was no relation of mine.

     Q    He was in narcotics at the time?

     A    I don't know, but I know he was in narcotics squad. And he didn't do it

```
1                      K. James McCready      197
2    either.
3         Q     Didn't do what?
4         A     Whatever you're accusing me of
5    doing.
6         Q     I'm not accusing you of
7    anything.  I could not be clearer about
8    that.  I'm asking questions.  If I was
9    accusing you, I wouldn't be shy about saying
10   it.  I'm just asking you questions about
11   what went on.
12              Whether you were involved in
13   narcotics or not, is it fair to say that the
14   drug trade back in the late eighties kind of
15   exploded with crack; do you remember that?
16        A     I guess.
17        Q     That crack came on the scene in
18   the mid-eighties and between the
19   mid-eighties and early nineties we had
20   literally an explosion of drug trafficking,
21   homicide, violence, because of crack and
22   cocaine?
23        A     I guess it's fair to say.
24        Q     It was kind of a different time
25   if you remember it, right?
```

K. James McCready        198

1

2      A     Yes.

3      Q     And were you aware of any

4  prominent lawyers that were involved in

5  narcotics back then?

6      A     No.

7      Q     Again, it's not me I'm just

8  asking the questions, right?

9      A     Yeah.

10      Q     Didn't Tommy Spota have a

11  partner who passed away of a drug overdose?

12      A     Tom Spota?  Not that I'm aware

13  of.

14      Q     How about Billy Keahon, the

15  lawyer, didn't he have some problem with

16  narcotics?

17      A     I'm not sure.  I think he might

18  have been smoking grass or something like

19  that.  I'm not sure.

20      Q     Well, at the time that your

21  criminal trial was going on in front of

22  Arthur Pitts -- Is that right?

23      A     Yeah.

24      Q     -- he was involved in a fairly

25  serious car accident himself; wasn't he?

K. James McCready        199

A     Could have been.  I'm not sure.

Q     Bill Keahon was involved in a
very serious car accident?

A     It could have been, I'm not
sure.

Q     It involved alcohol and/or
drugs?

A     I believe so.  I'm not sure.

Q     Were you aware that in addition
to representing you that Tom Spota had
previously represented Steuerman's family?

A     No.

Q     The other thing -- and I guess
I'll continue on this, give you a chance to
respond to things -- Joe Creedon made
admissions to a number of individuals,
according to the public record and the
hearings, you're aware of that, right?  Joe
Creedon bragged about committing this
murder?

A     Oh, yeah.

Q     There's not any dispute about
that, right?

A     I read about it but he didn't

1                        K. James McCready        200

2    do it.

3            Q    Well, I understand that's your

4    view, but you have somebody here who is

5    connected -- Did you know, for example, that

6    he admitted doing collections work for Todd

7    Steuerman's drug trade?

8            A    I don't know.

9            Q    You didn't know that?

10           A    No.

11           Q    You're just learning it now for

12   the first time?

13           A    I don't know.  I've heard so

14   much about him I don't remember half the

15   stuff that I heard about him.

16           Q    Well, we do know that

17   Steuerman's son was selling cocaine from the

18   bagel store, right?

19           A    I had heard that, yes.

20           Q    He actually got arrested and

21   prosecuted for that, right?

22           A    I heard that.

23           Q    And you're saying that you

24   didn't know that Creedon was doing

25   collections work for him?

K. James McCready          201

1

2       A      No.

3       Q      You didn't know that.  Did you

4  know that Jerry Steuerman had hired somebody

5  to -- a motorcycle gang to kind of rough up

6  some employees in a business dispute?

7       A      I think I know that story, and

8  I think that's just what it is.  It's a

9  story.  I think Jerry made the whole thing

10  up to be honest with you.

11       Q      In addition to the other

12  information that we have about Jerry

13  Steuerman, we know that his son is selling

14  drugs out of the bagel store that he's

15  operating and that he's one step removed

16  from this guy Creedon who says that Jerry

17  was offering him money to hurt Marty.  And

18  we know that Creedon has admitted in court

19  under oath that he was collecting drug money

20  for Todd.  Does this information add to your

21  view of the Tankleff case at all?

22       A      No.  The only thing that adds

23  to this case, the headache of -- because

24  it's all bullshit, all right.  He's full of

25  shit.  I know he's full of shit, the whole

K. James McCready          202

```
 1                      K. James McCready       202

 2    world knows he's full of shit.

 3          Q     But when you say "he" who is

 4    he?

 5          A     Creedon.

 6          Q     Well, he's not full of shit.  I

 7    mean he's under oath and I think Todd got

 8    convicted of selling cocaine, right?

 9    Creedon says he collected money.  The fact

10    that somebody sells drugs and has a

11    collector that's not shocking to you; is it?

12          A     That somebody -- No, that's not

13    shocking to me but when --

14          Q     That kind of violence goes on

15    all the time?

16          A     But my point is --

17                MR. DUNNE:  Let him finish.

18          A     His involvement in this case.

19          Q     But, you know, it's just not

20    somebody who's shooting his mouth off in the

21    street.  This is a guy who is connected to

22    Steuerman's son with violent criminal

23    conduct of collecting money for drug trade

24    in the late eighties and early nineties.

25          A     Yes.
```

1                          K. James McCready        203

2                  MR. DUNNE:  Go ahead.

3          Q     And so when you say he's just

4     shooting his mouth off about the murder,

5     does the fact that he is so closely

6     connected to Steuerman, does that add

7     anything to your view of whether or not his

8     admission to his bragging may have some

9     validity?

10                 MR. DUNNE:  I'm going to object

11            to the form of the question and the

12            colloquy before it.  Go ahead.

13         A     No.

14         Q     Would the fact that -- If I

15    were to add in that another individual came

16    forward and has made multiple admissions

17    that he too was involved in the murder of

18    the Tankleffs with Joe Creedon, would that

19    matter to you?

20         A     Which clown is this now?

21         Q     Well, clown or not, we have

22    several of them.

23                 MR. DUNNE:  Note my objection

24            to the form of the last couple of

25            questions.  Go ahead.

FEVOLA REPORTING & TRANSCRIPTION INC.  (631) 724-7576

K. James McCready      204

Q     We have several of them.  But
the fact is that you're aware of the record
from the 440 here, right, that led to
Marty's reversal of conviction and the
exoneration; you're aware of that record,
right?

MR. DUNNE:  I object to the
exoneration part.

MR. BARKET:  He's sitting over
here but go ahead.  You can
characterize it any which way you
want.

Q     You know the regard that took
place here, right?

A     They said they'd give him a new
trial, alright.  And all I know because of
the change in the law we couldn't retry him,
alright.

Q     What stopped you from retrying
him?

A     Because I think he was
convicted on the difference of human life
murder on his mother.

Q     Only to his mother.

K. James McCready       205

1

2        A     What?

3        Q     Only to his mother.  He could

4    have been prosecuted for his father if they

5    thought they he did it.

6              I'm not supposed to give you

7    information.  Count that as a free bit of

8    information.

9              MR. DUNNE:  But you're assuming

10             that that's the reason why they

11             chose not to do it but anyway --

12        Q     Let's go back to the question.

13   You're saying that the fact that Jerry

14   Steuerman had the dispute, that other people

15   thought he was involved, that he was the

16   last person to be seen with Marty's father

17   before he got attacked doesn't mean that

18   Jerry did it, you don't think he did it.

19             Now I'm asking you to add some

20   more facts into it, things that are actually

21   facts.  Todd, his son, is selling drugs,

22   cocaine, out of the bagel store.  You say,

23   oh, that doesn't matter, I still don't think

24   Jerry did it.  Now I'm asking you to add in

25   more facts, which is Creedon who says he's

1                   K. James McCready      206

2     collecting money for Todd Steuerman.  He

3     swore to it under oath at the hearing.

4     You're saying that doesn't matter.  Now I'm

5     asking you to add more facts to it, that

6     Creedon as been boasting about committing

7     this murder for a decade and you're saying

8     that doesn't matter.  Now I'm adding more

9     facts, that other people that Creedon was

10    involved with at the time, that he committed

11    crimes with, they too are saying, look, we

12    did this and here is how it happened, and

13    I'm asking you if that matters to you?

14              MR. DUNNE:  Again, I'm going to

15          object to the entire set of colloquy

16          and questions.  Go ahead and answer.

17          A     Absolutely not.

18          Q     Okay.

19          A     What was the term -- I think I

20    read it somewhere.  Oh, Judge Braslow,

21    "nefarious scoundrels."  You've got a pretty

22    damn good list of them right there.

23          Q     That's the people that would be

24    involved in a brutal murder of family to

25    protect somebody's business interest like

1                    K. James McCready        207

2    Jerry Steuerman, right?  You wouldn't --

3                MR. DUNNE:  Objection to the

4         form.

5         Q     You wouldn't get alibis, you'd

6    get nefarious scoundrels to be involved in

7    the murders.

8                MR. DUNNE:  Object to the form

9         on multiple grounds but go ahead.

10        Q     I mean it just kind of begs the

11   question, is there anything that would

12   change your view?

13        A     No.

14        Q     Nothing?

15        A     No.

16        Q     No matter what evidence came

17   forward your view is going to always be that

18   you got it right, that Martin Tankleff is

19   guilty no matter what?

20        A     Absolutely.

21        Q     One of the things that came up

22   from Creedon is that his son reported that

23   Creedon admitted it to him in kind of a

24   bizarre bragging to his son -- I guess

25   that's what criminals do -- look how tough I

K. James McCready          208

am, I was involved in the Tankleff murders.
You're aware of that, right?

          A     Yes.

          Q     And in fact, his son reports
that Creedon reported -- I'm not saying, I'm
not saying it's true.  I'm just asking the
question -- that you were given money -- I
think the figure was $100,000 -- to keep
Creedon out of it, his name out of it?

          A     I've heard that.

          Q     Is that true?

          A     And supposedly he was paid
$50,000 to do the murder.

          Q     Well, where did that come from
because you've said that before.  You've
said that on a couple of television shows
that he was supposedly paid $50,000?

          A     I don't know.  I don't know.
Somebody came up with that.  As a matter of
fact, that's why I had to laugh when -- what
was it, Dr. Phil, whatever, I was being
facetious.  He asked me something about that
and I said, yeah, right.  I said, so that
means he took a $50,000 loss.  It cost him

```
1                           K. James McCready      209

2     $50,000 to do the murder now if I got

3     100,000.  I being facetious.

4          Q    Without being facetious, I'm

5     just going to ask you flat out because I

6     kind of have to, but I really do want to ask

7     you this.  Did you receive any money from

8     Joe Creedon?

9          A    Are you out of your mind?

10         Q    I'm just asking the questions.

11         A    The answer is no.

12         Q    Did you receive any money from

13    Jerry Steuerman?

14         A    No.

15         Q    Did you know Jerry Steuerman

16    before these murders?

17         A    No.

18         Q    Jerry Steuerman the person who

19    told you about the card game?

20         A    What's that?

21         Q    You said before that there was

22    information -- you had information that this

23    was a card game on route to the murders.

24    Did you get the --

25         A    I could swear I had that, yes.
```

K. James McCready       210

1

2        Q       Did Jerry Steuerman tell you

3   about the card game?

4        A       No.

5        Q       Is that how you knew it was a

6   card game because you knew Jerry Steuerman?

7        A       No.  I think I may -- I thought

8   it might have come through --

9        Q       Did you have a chance to talk

10  to Sergeant Doyle over the break?

11       A       Yeah, but we didn't talk about

12  that.

13       Q       Did you talk about this?

14       A       No.

15       Q       You do know there is a

16  person --

17               MR. DUNNE:  Wait.  Finish the

18          answer.

19       A       I don't know where I got it

20  from.  But I'm telling you it was not

21  through Steuerman.  I thought it came from

22  Sergeant Doyle and I'm not sure.  For

23  whatever reason it seems to me like I knew

24  about the card game, that it was a card game

25  or something.

```
 1                      K. James McCready      211
 2            Q    This is a --
 3            A    I don't know where or how I got
 4     that information.
 5            Q    This is a high stakes poker
 6     game.  Several thousand dollars got traded
 7     every week, right?
 8            A    Right.
 9            Q    Or every month, whatever the
10     poker game was and it involved prominent
11     people in the community, right?
12            A    Yes.
13            Q    And this was a community where
14     you worked, right?
15            A    Yes, but I didn't know any of
16     them.
17            Q    There's a person by the name of
18     Lenny Lombrano who's testified that he saw
19     you and Jerry Steuerman together and that
20     you guys had business dealings together.
21            A    I wouldn't know him if I
22     tripped over him.
23            Q    Lenny Lombrano or Jerry
24     Steuerman?
25            A    I didn't know Jerry Steuerman
```

K. James McCready          212

 1

 2    then and I still don't know who Lombrano is.

 3          Q     Okay.  Well, there is another

 4    individual, William Sullivan, who ran a bar.

 5    I think it's called Kerrington's.  Are you

 6    familiar with that?  It's a bar you went to?

 7          A     Yes.

 8          Q     He worked there at the time as

 9    a host or maitre' d or assistant manager and

10    he says that he saw you and Steuerman there

11    together on several occasions.

12          A     He's mistaken.  I've never been

13    there; not with Jerry Steuerman.  I think

14    the last time I was in that place was --

15    Jerry -- the assistant district attorney

16    that retired.  As a matter of fact, I think

17    he died now.  I think he's been dead a long

18    time.

19          Q     There's another individual

20    Kirsten Stanton who said -- Kirsten Stanton,

21    she's a student in a class that you gave a

22    speech to shortly after the conviction of

23    Marty, and she reports in an affidavit that

24    you said that Jerry Steuerman is the nicest

25    guy in the world, that you've known him for

K. James McCready      213

1
2       years and that he couldn't have been
3       involved in that.
4               A       (Laughing.)  I don't know where
5       these people come out of the woodwork.
6               Q       I don't know where they come
7       out the woodwork either, but Steuerman owned
8       the bagel store in a community that you
9       lived and worked in, right?
10              A       Yes.
11              Q       He's involved in a high stakes
12      poker game with other prominent people in
13      the community, yes?
14              A       Yes.
15              Q       A pizza guy, a bar owner and a
16      student all say that you know him or knew
17      him before the murders?
18              A       I don't care what they say.
19      And by the way, I'll take a polygraph exam
20      on that if you'd like.
21              Q       Well, I'll tell you what, if
22      you'll credit Marty's polygraph that he
23      passed, I'll give you one on that issue,
24      how's that?  Is that a deal?
25              A       No.

K. James McCready     214

Q     Because he took a polygraph
after you wouldn't let him and he passed.
Does that mean anything to you?

MR. DUNNE:  Objection.  Guys
enough with the colloquy.  Get to
the questions.

Q     Did you do any investigation of
Jerry Steuerman at all back in 1988 other
than talk to him in his bagel store?

A     Well, we went out to California
and picked him up.

Q     Oh, right.  And all the things
that raise suspicion about Steuerman, I
literally forgot about that.  One of the
things is that the guy fakes his own death,
right?

A     Yeah.

Q     Changes his appearance and
flees under an assumed name after emptying
out a bank account?

A     You're right.

Q     That coupled with other things
falls into the category, no matter what you
think Marty did this?

K. James McCready      215

1

2          A     Did you see Jerry Steuerman on

3     the witness stand for three days?

4          Q     I'm not supposed to answer

5     questions but sure, I'll do it.

6               MR. DUNNE:  Would you like me

7          to object on your behalf?

8          Q     I've gone through the trial,

9     yes.  I know what he said.

10         A     Alright, but you didn't see his

11    face.

12         Q     No, I did.  I actually did.

13    You're not the only videotape I've seen.

14         A     Well, I'm going to tell you

15    right now there is no way Jerry Steuerman

16    did this murder or was connected to this

17    murder or hired anybody to do this murder.

18         Q     Because why?

19         A     Because Jerry Steuerman didn't

20    do it.

21         Q     Well, no, I get the conclusion.

22    The why part is, why do you say that?

23         A     Because I interviewed him and

24    Sergeant Doyle interviewed him at great

25    length and I'm telling you that the man that

1                              K. James McCready        216

2      I spoke to is a nefarious scoundrel, I will

3      say.  I know kids that he cheated out of

4      money in the bagel store.  As a matter fact,

5      when I went to California to get him, I made

6      him give me ten bucks to give back to one of

7      the kids that he stole ten bucks from.

8             Q     Sorry, I'm not supposed to

9      laugh but, okay.

10                  Look, you trust your judgement,

11     right?

12            A     Yes, I do.

13            Q     You trust your gut and it

14     really may be right 90 percent of the time

15     but would you grant me that it ain't

16     perfect?

17            A     Oh, I'm not perfect.

18            Q     So when you say that I know

19     Jerry Steuerman didn't do this because,

20     although he's a nefarious scoundrel, and he

21     was the last to see Marty's parents alive,

22     he's connected to Creedon and drugs and all

23     this other stuff, at some point does your

24     gut yield to the evidence?

25                  MR. DUNNE:  I will object to

K. James McCready     217

1  
2          the form of the question.  Go ahead.

3          A     What you have is a bunch of

4  bullshit from a bunch of morons, alright.

5  Don't get me going there either about what

6  your investigator did with some of these

7  witnesses.

8          Q     Get going with it.  What are

9  you referring to?

10          A     Some of those witnesses weren't

11  paid money?

12          Q     I get to ask questions and

13  answer questions.

14                Are you aware that witnesses

15  are allowed to be reimbursed for travel?

16  You got paid to come up here today?

17          A     Yes.

18          Q     You got paid to get put up in a

19  hotel?

20          A     Yes.

21          Q     You actually got paid money for

22  your wages for today, right?

23          A     Yes, I'm up here representing.

24          Q     Let's just move from you, a

25  retired detective, if you were a civilian

1                    K. James McCready      218

2    witness that lost time from a job at a State

3    proceeding, are you aware that it would be

4    appropriate for the attorney to pay for the

5    travel, pay for the accommodations and pay

6    for the lost wages; is that fair?

7           A    More than fair.  You're right.

8           Q    Okay.  So the individuals that

9    you say are, whatever you described them,

10   you've never spoken to any of them; have

11   you?

12          A    No.

13          Q    Have you read their testimony?

14          A    No.

15          Q    And you certainly never

16   investigated any of these allegations back

17   in 1988; did you?

18          A    No.

19          Q    Four hours, four-and-a-half

20   hours after you arrived at the scene you, in

21   your view, solved this case by the ruse

22   phone call that you made to Marty Tankleff?

23          A    Well, that prompted him.

24          Q    And ever since then, no matter

25   what the evidence is, no matter what took

1                    K. James McCready     219

2     place, your view is that Marty did this?

3           A     Yes.

4                 MR. DUNNE:  I'll object to the

5           form of the question.  Obviously the

6           answer stands.

7           Q     Didn't Marty tell you that

8     there was people that could corroborate the

9     business troubles between Tankleff and

10    Steuerman?

11          A     There were people that could

12    corroborate?

13          Q     Yeah.

14          A     Steuerman told us all about it.

15    He wasn't hiding it.

16          Q     How about Julie Mutchuler

17    (phonetic), do you know her?

18          A     I think she works at the store.

19          Q     Right.  That was a name that

20    Marty gave you that morning to say speak to

21    Julie.  She knows how bitter the fights are.

22    Did you ever talk to her about the fights?

23          A     No.

24          Q     Didn't Marty's father's maid

25    tell you all that there was a screaming

K. James McCready        220

match on the phone between Steuerman and

Tankleff the day of the murder,

September 6th?  When I say tell you, I mean

tell the police.

    A   I don't recall that.  Is it

possible, yes.

    Q   I want to talk to you a bit

about the lie or lies you told to Marty.

         Marty says that you told him

that you conducted some kind of humidity

test and that you could tell that he had

taken a shower, not the night before, but

that morning.  Did you say that to him?

    A   I may have.  I don't remember

right now.  I may have because I remember

talking about the shower.

    Q   You tell him there was a

humidity test that you took?  Was that true?

Was there such a humidity test?

    A   No.

    Q   Marty says that you told him

that you found his hair in his mother's

hand?

    A   No.

K. James McCready          221

1    Q    Did you say that to him?

2    A    No.

3    Q    And, of course, that was not

4  true, right?

5    A    No.

6    Q    None of Marty's hair was in

7  Arlene's hands?

8    A    No.  I would never say

9  something like that.  You know why?

10    Q    No.  Go ahead and tell me.

11    A    What if the hair in her hands

12  was your hair?  I would look pretty silly,

13  wouldn't I, if I tell him -- It's like

14  telling a burglar, I know you broke into the

15  place because we got your fingerprints.

16  Well, the burglar knew damn well he was

17  wearing gloves so how the hell did I get his

18  fingerprints.  You never tell anybody

19  something like that.

20    Q    You never tell anybody

21  something like -- You don't lie about

22  physical evidence that you have that

23  implicates them?  That's not one of the lies

24  you would tell?

1              K. James McCready      222

2              MR. DUNNE:  Objection to the

3         form of the question.  Go ahead.

4         Q     Whether or not you would tell

5    that lie, you're saying you didn't.  Marty

6    says you did, you're saying you didn't?

7         A     No, I didn't.

8         Q     Okay.  But you did make up this

9    ruse about being pumped with adrenalin and

10   so forth, right?

11        A     Yes.

12        Q     Now, obviously, at this point

13   in time, you're subjectively -- By this

14   point in time you subjectively believed that

15   Marty committed this murder, right?

16        A     Yes.

17        Q     So you're running a ruse or

18   some trickery or deceit which you think

19   you're allowed to do in order to get the

20   guilty -- in your mind this "guilty person"

21   to confess, right?

22        A     Yes.

23        Q     The purpose of doing this is to

24   force him to tell you that he did this?

25        A     Yes.

K. James McCready     223

1

2      Q     That's why you're telling him

3  this lie?

4      A     Yes.

5      Q     And you're doing that because

6  you believe he was guilty and you had spent

7  a couple of hours with him and you hadn't

8  been able to get him to confess by

9  confronting him with other facts or things,

10  right?

11     A     Yeah.

12          MR. DUNNE:  I object to the

13          form of the question but the answer

14          stands.

15     Q     As you were doing this, did you

16  consider the possibility that maybe you were

17  just wrong, that maybe the kid was just

18  scared, confused, in shock?

19     A     No.

20     Q     So before Marty said he did it,

21  you were convinced he did it?

22     A     I was pretty damn sure he did

23  it at that point, yes, but we still didn't

24  have enough.

25     Q     Probable cause to lock him up.

K. James McCready          224

1

2          A     Right, yeah.

3          Q     You wanted that probable cause,

4     you wanted that admission, you wanted that

5     confession?

6          A     Yes.

7          Q     So you were trying to figure

8     out ways to do it, right?

9          A     Yes.

10         Q     And the way you came up with

11    was this ruse about his father saying that

12    he did it?

13         A     Yes, because he would not have

14    known if his father came out of a coma or

15    not.

16         Q     Well, this is -- I don't want

17    to say just another day at the office for

18    you, but this is another day at work for

19    you, right?

20         A     Yes.

21         Q     You've done these kinds of

22    things before over and over again, correct?

23         A     Yes.

24              MR. DUNNE:  Well, I'm going to

25         object because I don't know what

K. James McCready          225

"things" are.

Q      What was the guy Schoendorf

(phonetic)?  Didn't you give him some kind

of ruse to get him to go for it, if you

will?

A      I don't remember trying to use

any ruse on him.  What I specifically

remember about Schoendorf was that he had

told us that he had not come home that day

so he couldn't possibly have done it.

But being a carpenter, on a

kitchen table was a ruler, a tape, you know,

tape ruler, you know, and it was still in

the package and it was purchased at --

ironically, I named my company after this --

Nassau Suffolk Lumbar over in Smithtown, so

I managed to go over to Smithtown and found

out that -- I believe they got a copy of the

receipt and I'm not sure if that had the

time on it or not.  I don't remember all of

that.  But how did the ruler get in the

house if he didn't come home?  You

understand where I'm getting at?

Q      Did you say something to him

```
1                       K. James McCready      226

2     about finding firearm?  Was his wife shot?

3              A     FDR?

4              Q     Yes.

5              A     His wife was shot, yes.

6              Q     Did you tell him you found

7     residue on his arms?

8              A     I don't remember.

9              Q     Okay.  And in any event, as

10    you're questioning Marty, this is not your

11    first rodeo so to speak, right?

12             A     Right.

13             Q     You've questioned suspects

14    before?

15             A     Yes.

16             Q     You know what you're doing.

17    You're trying to extract a confession from

18    the kid.  You think he did it and you're

19    doing what you have to do to get the

20    confession, right?

21             A     Yes.

22             Q     How was he supposed to react?

23    Let's just assume for a second that he was

24    innocent.

25                   MR. DUNNE:  I'm going to object
```

K. James McCready          227

2      to the form of the question but go

3      ahead.

4           Q    How would an innocent person

5      react to this?

6           A    As I said in court, if I were

7      him -- Ronnie Rother was crying.

8           Q    No, no, no.

9           A    Wait a minute.  Let me finish

10     my answer.

11          Q    I don't mean the crying.

12               MR. DUNNE:  Let him finish.

13          Q    How would react to his lie

14     about his father, that's my question.

15          A    How did he --

16          Q    How would an innocent person --

17     Assume for a second that Marty is innocent.

18     Not how he would act, his demeanor or

19     crying.  How would he react to the lie?

20          A    If that were me sitting there

21     and being accused of something I didn't do,

22     I'd be all over whoever was asking me the

23     questions or whatever screaming, yelling and

24     ranting and raving saying, I didn't do it

25     and no way.  I mean --

1

2          Q    Well, let's back up for a

3     second and take it one step at a time and

4     see if we can look at it from a teenager's

5     point of view who's found both his parents

6     in the house; one dead, brutally, and the

7     other brutally attacked and dieing.  You

8     know that Marty was never in a precinct

9     before under those circumstances, right?

10         A    I don't know.  I guess not.  I

11    don't know.

12         Q    You would know if he had been,

13    right?

14         A    Well, he had prior arrest or

15    something?

16         Q    Right.

17         A    Sure.

18         Q    He had none of that, right?

19         A    No.

20         Q    This for you is work.  You do

21    it all the time.  This is a squad room that

22    you live and breathe in every day, right?

23         A    Yes.

24         Q    So you have a teenage boy.  His

25    parents have been found the way they have

K. James McCready          229

1

2   been found.  You're questioning him for

3   several hours now, right?  The questioning

4   started around 8:30 at the scene and

5   continued now until 11:45, 11:50 at the

6   precinct, right?

7          A     Yes.

8          Q     You confronted him with what

9   you think are inconsistencies; something

10  about the shower, blood on his shoulder,

11  things like that, right?

12         A     Yes.

13         Q     And then you step out and you

14  make this fake phone call and you come back

15  and you tell him, in essence, we got you

16  now.  Your father says you did it, pumped

17  him full of adrenalin, he said you're the

18  one who attached him, yes?

19         A     Yes.

20         Q     Assume for the time being that

21  he believes you, right.  That it never

22  occurs to him that you would be lying about

23  such a thing and that, of course, it would

24  never occur to him that his father would be

25  lying about that.  And just for the time

1                    K. James McCready      230

2      being, just for now, assume he's innocent.

3      How would an innocent person react to that?

4                    MR. DUNNE:  I'm going to object

5               on numerous grounds on that but go

6               ahead and answer as best you can.

7               Certainly the form is improper.

8           A    I wouldn't care what you said

9      to me.  If I didn't do it, I didn't do it.

10          Q    Did you think about the

11     possibility that what you were doing is

12     making Marty doubt his own reality?

13          A    No.

14          Q    But when you tell him that his

15     father said he did it --

16          A    Right.

17          Q    -- and if he did, how would he

18     put that together with the fact that he has

19     no memory of it?

20                   MR. DUNNE:  On numerous grounds

21              that's an improper question but for

22              the purpose of now try and answer

23              that as best you can.  I'll pr serve

24              that for later.

25          A    If I didn't do a crime such

K. James McCready        231

1    as --

2         Q    Not you.  Seventeen-year-old

3    boy --

4              MR. DUNNE:  Bruce, Bruce, let

5         him finish his answer.

6         A    Seventeen-year-old boy, my ass.

7    I was in the United States Army when I was

8    17 years old so --

9         Q    Life is different for you.

10        A    I don't like describing him as

11   a little teenage boy.

12        Q    But wasn't he?  Wasn't he a

13   teenage boy?

14        A    Yes.

15        Q    He was starting his first day

16   of high school.  He wasn't in the Marines.

17   He was a spoiled kid who lives on the north

18   shore of Long Island?

19        A    First day of his senior year.

20        Q    Right.

21        A    Yeah.

22        Q    His activity wasn't in the

23   Marines.  He's was boating, going on his ATV

24   and hanging out with his friends.  He finds

K. James McCready        232

1    his parents that way and then he's in the

2    homicide squad.  How does that person react?

3

4                MR. DUNNE:  I'm objecting.

5           Wait.  Jimmy, hold on a second.  Let

6           me make the record.

7                I'm objecting on numerous

8           grounds to the propriety of that

9           question.  It is Federal deposition.

10          Go ahead, Jimmy, you can answer.

11     Q    How does he react?  He just

12   continues to deny it?  Calls you a liar?

13   Calls his dad a liar?

14     A    Yes.

15     Q    You don't think that it's even

16   possible that it would -- that kind of

17   information given to an innocent boy in that

18   circumstance would make him doubt his own

19   memory?

20     A    No.

21     Q    You don't think that it's even

22   possible that him saying or you suggesting,

23   whichever way it was, could I have done it

24   and blacked out was him trying to reconcile

25   two irreconcilable facts, that he had no

1                    K. James McCready    233

2    memory of committing this crime and that

3    you're telling him his father said he did

4    it?

5              MR. DUNNE:  Again, I'm

6         objecting to the form of the

7         question for the same reasons as

8         previously stated.

9         Q     That never occurred to you when

10   you asked the question?

11        A     I believe now, okay, that he

12   was using steroids.  I think they were

13   affecting him.  I believe that now, I didn't

14   know that then.

15             MR. BARKET:  Okay.  We'll pick

16        up the steroids after.

17             THE VIDEOGRAPHER:  Going off

18        record at 4:18 p.m.

19             (At this time, a brief recess

20        was taken.)

21             THE VIDEOGRAPHER:  Beginning of

22        Tape 5.  We're back on record at

23        4:32 p.m. You may proceed.

24   CONTINUED EXAMINATION BY

25   MR. BARKET:

1                      K. James McCready      234

2          Q    I think we were cut off because

3     of the tape.  Just maybe the court reporter

4     could read back the last question, which is

5     lengthy, as I recall, and then the beginning

6     of the answer.

7                (Whereupon, the requested

8                portion was read back by the court

9                reporter.)

10                MR. DUNNE:  We'll take that up

11               when we come back.

12                MR. BARKET:  Okay.  We'll take

13               that up when we come back.

14          Q    Before we get to the steroids,

15     I kind of want to go back to the question

16     that I asked which is, it didn't occur to

17     you in telling that kind of lie that you

18     might cause someone to doubt their own

19     memory?

20          A    No.

21          Q    Now, in point of fact, Marty's

22     initial response to this was to try and

23     explain it, right?  To say, well, my father

24     may be saying that because I was the last

25     person to treat him before the police got

K. James McCready          235

1    there, right?

2         A    Yes.

3         Q    And then, I think it was Rein

4    who suggested to him, no, that he was

5    unconscious, that couldn't have happened,

6    something along those lines?

7         A    I don't remember Norm saying

8    anything like that about being unconscious.

9    I remember --

10        Q    You continued to press the

11   point though, right?

12        A    Right.

13        Q    And then he offered to take a

14   polygraph, right?

15        A    What's that?

16        Q    Then he offered to take a

17   polygraph?

18        A    I don't know what point in time

19   he offered to do that.

20        Q    Didn't he offer --

21        A    I forget what point in time it

22   is.  Maybe I can find it here.

23        Q    That's actually worth looking

24   at for a second.  Let's go to your

```
 1                          K. James McCready      236
 2      supplemental report which I think is -- you
 3      just have to give the number.
 4              A      Fifty-nine.
 5              Q      Fifty-nine.  Looking at Page 10
 6      of 14, bottom paragraph where you write, he
 7      said he would take a lie detector test.  We
 8      then asked --
 9              A      Wait a minute.  Where is it?
10              Q      I don't want to rush you.
11                     MR. DUNNE:  Point it out to
12              him.
13                     MR. BARKET:  I did.  I thought
14              I was doing that.
15              Q      One Page 10 about 10 lines up
16      from the bottom.
17              A      Ten lines up from the bottom.
18                     MR. DUNNE:  Or nine.
19              A      Due to the fact that he was
20      given adrenalin and then once out of his
21      comatose state he said that he, Marty, had
22      stabbed him.
23                     Yes, I see it.  He said he
24      would take a lie detector test.  That's when
25      he said it, yes.
```

K. James McCready          237

1

2          Q     Did you give him one?

3          A     No.

4          Q     Did you have the facility to

5    give him a lie detector or polygraph?

6          A     Yes.

7          Q     You chose not to?

8          A     Yes.

9          Q     Again, this was a room in the

10   context in which you ran the show, right?

11         A     Yes.

12         Q     Nobody was in that room unless

13   you said they could go in there?

14         A     Pretty much.  Well, if the

15   sergeant wanted to come in he could come in.

16         Q     He would come in.  And point in

17   fact, if he wanted to come in he could, but

18   the sergeant was going to leave it to your

19   discretion as to what to do in that room,

20   right?

21         A     Yes.

22         Q     There was -- And once you tell

23   him this lie Marty's first reaction is what

24   I said before is that his father may have

25   been saying that because he was the last

K. James McCready          238

person to treat his dad before the police

arrived, right?

          A     Yes.

          Q     And then he said he would take

a lie detector, correct?

          A     Yes.

          Q     So he's still, even in the face

of this lie, even in the face of the fact

that you're telling him his father has named

him as the "murderer" or "attacker," he's

still saying he didn't do it in trying to

reconcile what his father said with what his

memory is?

               MR. DUNNE:  No, I'm objecting

          to the form of that but go ahead.

          A     Well, you know -- What's the

word I'm looking for?  He's still at that

point, I guess, in a state of denial.

          Q     But -- Sorry, finish your

answer.

          A     Because the next thing he says

we asked him, you know, what should we do to

the person that did this and he said they

needed -- they needed to have psychiatric

K. James McCready          239

1   help.  We asked him if he needed psychiatric

2   help.  He then asked if he could have

3   blacked out and done it.  We asked him what

4   he thought, he said maybe it was not him but

5   another Marty Tankleff.

6           That's what I'm getting at

7   about the steroids.  That's what I'm saying.

8   I don't think that's necessarily incorrect

9   what he said there because it probably

10  wasn't his normal Marty Tankleff, but if

11  he's suffering from roid rage I think that's

12  a very distinct possibility.

13      Q    There's a couple of things I

14  want to talk to you about and the roid rage

15  is part of it, but the first thing is you

16  say that he's still in a state of denial.

17  That's an opinion that you're offering at

18  that time, right?

19      A    Yes.

20      Q    It could just be that he's

21  saying that he didn't do it because he

22  actually didn't do it?

23          MR. DUNNE:  Objection to the

24          form but go ahead.

K. James McCready          240

2          A      I think he's just trying to --

3          Q      Right, but that's a value

4    judgement you're making.  It's an

5    assessment.  It's an opinion.  It's not

6    fact, right?

7          A      Right.

8          Q      So when you say that he's still

9    in a state of denial that tells us a lot of

10   what you think at the time, right?

11         A      Yes.

12         Q      You think he's guilty of

13   murder?

14         A      Yes.

15         Q      He hasn't said it to you yet.

16   He hasn't admitted anything to you yet, but

17   you think that's what happened here, right?

18         A      Yes.

19         Q      You have not gotten any

20   forensics back yet, you haven't spoken to

21   any witnesses hardly at all.  The entire

22   time this investigation has been going on

23   the only person you've spoken to is Marty

24   and you're convinced at 11:50 or 11:45 that

25   morning that Marty did this, right?

K. James McCready        241

1

2        A      Yes.

3        Q      And you're doing what you have

4    to do to get him to say he did it?

5        A      I'm trying to, yes.

6        Q      Now, you didn't give him a lie

7    detector test, right?

8        A      No.

9        Q      You then offered up this

10   suggestion that Marty was on steroids.  I

11   mean you just did it now so I want to talk

12   about that a little bit, not that you did it

13   to Marty at the time.  And Detective Rein

14   did this too.

15              We all are professionals,

16   right?  You're a police officer, I'm a

17   lawyer.  We don't just say things, right?

18       A      Right.

19       Q      We don't just make accusations

20   and conclusions.  There needs to be evidence

21   to support it, right?

22       A      Right.

23       Q      Where did the evidence come

24   from that Marty was on steroids?

25       A      I didn't think we had any but

K. James McCready          242

1    what we did know --

2    

3         Q    Now.  Where does it come from

4    now?

5         A    Well, we know that he was

6    stealing steroids from the gym over there.

7         Q    No, we don't; do we?

8         A    I know he was ordering them,

9    and I know --

10        Q    Well, who told you he was

11   ordering them?

12        A    I think it was Dan Hayes.

13        Q    Is that the same person who

14   said that you were collecting money from

15   Steuerman and is still on the take with the

16   mob; that Dan Hayes?

17        A    Yes.

18        Q    Well, I don't want to compare

19   the two but are we going to believe the

20   steroids and disbelieve the cop on the take

21   or maybe Dan Hayes is just not a reliable

22   reporter of the facts?

23             MR. DUNNE:  I'm objecting again

24        on numerous grounds.  Go ahead.

25        Q    That's the information you

1                              

2  have?  How would you feel if we all went

3  around and said, you're on take with the

4  Lucchese crime family because Dan Hayes said

5  so?

6                MR. DUNNE:  Again, objection.

7          Bruce, that's not a question that's

8          going to --

9                MR. BARKET:  Sorry.  Sorry.

10         I'll withdraw it.

11       Q    The fact that Dan Hayes said

12  something doesn't make it so; does it?

13       A    No, it doesn't make it so.

14       Q    And he's told just flagrant

15  lies about you, correct?

16       A    Yes, he has.

17       Q    Okay.  So the fact that --

18       A    But he also told us that he

19  discussed the steroids with Seymour.

20       Q    Well, unfortunately, Seymour is

21  not around to ask that.

22       A    I realize that.

23       Q    Anybody can say they discussed

24  anything with Seymour and we'll never know

25  if that's true or not.

1                                K. James McCready     244

2                    So there's no blood test that

3          indicates that he had steroids on him,

4          right?

5                A     No.

6                Q     And point of fact, what Dan

7          Hayes says is not that Marty was stealing

8          steroids, it's that he caught Marty ordering

9          supplements and that they never made their

10         way to Marty, right?

11               A     I don't remember right off the

12         top.

13               Q     Well, you're the one who's kind

14         of making this accusation based on what

15         Hayes tells you.

16                    MR. DUNNE:  Objection to the

17               colloquy there.  Go ahead.

18               Q     Isn't it true that what Hayes

19         reports is he caught Marty ordering

20         supplements, not steroids, took them from

21         him before he ever got them and the kid

22         never got the steroids or supplements,

23         sorry.  Thank you.

24               A     I don't know that he got them

25         or he didn't get them.

1                           K. James McCready    245

2          Q     But then why would you offer up

3     this blatant --

4          A     Because --

5          Q     Why would you offer up and

6     Detective Rein that Marty was on steroids

7     when the only evidence of it is something

8     that Hayes said 20 years ago when Hayes is

9     the same person calling you a dirty cop?

10              MR. DUNNE:  Objection to the

11         form of the question.  Go ahead.

12         A     Because Marty, what I'm saying

13    to you today, okay, is that that is -- I

14    think that's very important in terms of --

15    actually, it would be in terms of his

16    defense that he had been using steroids.

17         Q     Speaking as someone who

18    occasionally engages in criminal defense

19    work, I'll ask if maybe it's better to let

20    the defense attorneys do the defense

21    attorney stuff because steroid defense is

22    not a good one for Marty because he never

23    took them, there's no blood work.  He's

24    saying he didn't do it.

25              MR. BARKET:  My objection to

1                          K. James McCready        246

2              the recent exchange there but the

3              record should be clear to what I'm

4              objecting to.

5         Q    I'm asking you questions about

6    this.  You're saying you thought he was on

7    steroids and the only evidence that you have

8    of that, the only evidence in the planet is

9    something that Hayes told some police

10   officer 24 years ago; is that right?

11        A    Yes.

12        Q    There is no blood test, there

13   is no other witnesses, no other

14   corroboration.  It's the flagrant mere

15   allegations from Hayes, right?

16        A    Yes.

17        Q    And the allegation isn't even

18   that he gave Marty steroids, saw Marty

19   taking them, it's that he found Marty

20   ordering some kind of supplement that he

21   took from Marty before he got them.

22             MR. DUNNE:  Objection.  I don't

23             know that you've established that

24             that's his perspective.

25        Q    Is that your memory of it?

```
 1                         K. James McCready      247

 2              A     Yes.

 3              Q     Yes?

 4              A     Yes.

 5              Q     Okay.  So can we kind of put to

 6    bed the steroids?

 7                    MR. DUNNE:  No.  Objection to

 8              the form of that.  Come on, Bruce,

 9              you know better.

10              Q     Now, I want to talk to you a

11    little bit about the small talk, if you

12    will, that you all engaged in.  I think it

13    kind of starts around Page 6, if you will,

14    of your supplemental report.  I don't know

15    if there is a specific line?

16              A     Yeah.  Yes.

17              Q     Actually, it's the second full

18    paragraph.

19              A     Yes.

20              Q     Excuse me.  The interview of

21    Martin Tankleff began with small talk

22    between Martin and myself and Detective

23    Rein.

24                    You talked about the surgery,

25    right?
```

K. James McCready          248

1

2          A       Yes.

3          Q       You asked him about high school

4    and girls, correct?

5          A       Yes.

6          Q       And you also asked him about

7    cars, correct?

8          A       About what?

9          Q       His car, what kind of car he

10   drives?

11         A       Yes.

12         Q       And he told you about the car?

13         A       Yes.

14         Q       Now, in the course of

15   discussing with him girls and high school,

16   did you talk to him at all about sports?

17         A       No, not that I recall.  There

18   was something about --

19         Q       I'm talking now just about this

20   phase of small talk that you were discussing

21   with him.  You talked about his family.  You

22   learned that he was adopted then, right?

23         A       Right.

24         Q       You talked about going to

25   college?

K. James McCready          249

1

2          A     Yes.

3          Q     Talked about his ATV and his

4     boat?

5          A     Yes.

6          Q     Yes?

7          A     Yes.

8          Q     And if -- I mean am I right

9     that Marty in the course of this small talk

10    is telling you that obviously he lives where

11    he lives, right, which is a very exclusive

12    residence?

13         A     He what?

14         Q     He lives where he lives, very

15    exclusive residence?

16         A     Yeah.

17         Q     Not only in Belle Terre but

18    kind of "the" spot in Belle Terre where you

19    have this house overlooking the sound and

20    Connecticut and so forth, right?

21         A     Yes.

22         Q     Not oceanfront but sound front

23    right?

24         A     Yes.

25         Q     He has a Lincoln that's his,

K. James McCready          250

1

2     right?

3          A     Yes.

4          Q     He has a boat that he has

5     access to, right?

6          A     Well, that was a bone of

7     contention with him and his father about the

8     boat.

9          Q     We'll talk about the

10    contentious part of it, but he has a boat

11    that he has access to, whether it's limited

12    or not, he has a boat.  An ATV he has access

13    to?

14         A     I believe so.

15         Q     That's not such a bad life; is

16    it?

17         A     No.

18         Q     He told you about how his

19    parents met, yes?

20         A     Yes.

21         Q     Said that there was an affair?

22         A     Yes.

23         Q     He talked about their

24    relationship with each other and with him?

25         A     Yes.

K. James McCready        251

1

2      Q    Now, at some point, you begin

3   to ask him questions about what happened

4   that day, right?

5      A    Yes.

6      Q    And he tells you that he

7   showered the night before, correct?

8      A    Yes.

9      Q    And he tells you that he used

10  two towels after the shower; is that right?

11     A    I believe so.

12     Q    And he tells you that he used

13  one for his head and one he put around his

14  waist when he got out of the shoulder; is

15  that right?

16     A    Yes.

17     Q    When you went into his room and

18  you looked around, did you see towels?

19     A    I don't recall.  I don't know

20  if I have it here.  I think I wrote down --

21  It may be in my notes.

22          No, I don't have any notes on

23  that.

24     Q    Let's just see if we can

25  refresh your memory a bit.

K. James McCready          252

 1          MR. BARKET:  Can I have these

 2      two pictures marked, please.

 3          (Whereupon, Plaintiff's

 4      Exhibits 88 through 90 were marked

 5      for identification.)

 6      Q    Can you take a look at what's

 7  been marked as Plaintiff's Exhibit 88

 8  through 90, and I guess if you start with 90

 9  I'll see if that refreshes your memory of

10  that being Marty's bed and bedroom and the

11  towels on it?

12      A    Yeah.  Yes.

13      Q    Okay.  So he told you that

14  there was two -- and so Marty told you that

15  he had two towels from the night before and,

16  in fact, there were two towels found in his

17  room where he said they were, right?

18      A    Yes.

19      Q    Okay.  And when you were in

20  Marty's room, you looked around; didn't you?

21      A    Yes.

22      Q    And by the time you were doing

23  the second walk-thru, you knew that the

24  parents had been brutally attacked, right?

1                    K. James McCready      253

2          A     Yes.

3          Q     You knew that there was a knife

4    wound on the mother at least, right?

5          A     Yes.

6          Q     And you knew that -- Did you

7    know that the father had been bludgeoned at

8    that point in time?

9          A     No.

10         Q     Did you know that the mother

11   had been bludgeoned?

12         A     No, I didn't know she was

13   bludgeoned at that point in time.

14         Q     You didn't see the bruises on

15   the side on her head and her ear almost

16   chopped off?

17         A     No.  I didn't see any wounds to

18   the back of her head.

19         Q     I know that you all said the

20   back, but we'll go through the autopsy in a

21   little bit, maybe tomorrow.

22               Do you know that the wounds in

23   her head were on the top of her head, on the

24   front of her head, and I believe the left

25   side of hear head and that one of them

K. James McCready        254

2    actually almost literally took off a piece

3    of her ear it was such a severe hit?

4            A     No, I don't recall that.

5            Q     You don't recall that?

6            A     No.

7            Q     You all think it was the back

8    of the head that she was hit on only.

9    Right?

10           A     What's that?

11           Q     You all think she was hit in

12   the back of head?

13           A     No.

14               MR. DUNNE:  Objection to form

15           but go ahead.

16           A     I don't know.  I looked at her

17   but I don't touch the bodies.  I just looked

18   at her, but I don't recall exactly.  You

19   know, I remember the biggest thing I

20   remember is a big gash on her.  It looked

21   like, you know, like a big long gash.

22               MR. BARKET:  Let's do this.

23           Mark this as 91.

24               (Whereupon, Plaintiff's Exhibit

25           91 was marked for identification.)

1                    K. James McCready        255

2              MR. BARKET:  This is 92.  This

3         is 93 and this is 94.

4              (Whereupon, Plaintiff's

5         Exhibits 92 through 94 were marked

6         for identification.)

7         Q    I want to show -- You recognize

8    these photographs, right?

9         A    Yeah.

10        Q    Sure.  You recall actually

11   seeing them and you recall the pictures

12   themselves, right?

13        A    Yeah.

14        Q    You were at this scene?

15        A    Yeah, but I wasn't there when

16   these pictures were taken.

17        Q    But you observed what the

18   pictures depict and you looked at these

19   pictures before.

20             Now, at the time that you were

21   there, no one prevented you from looking at

22   the left side of her head; did they?

23        A    No, but I didn't --

24        Q    No one prevented you from

25   seeing the portion of her ear that was

1                    K. James McCready        256

2      smashed off, right?

3           A     Nobody prevented me from seeing

4      anything but --

5                 MR. DUNNE:  Let him finish.

6           A     These photos are taken with

7      flash and everything else.  I, mean, you

8      know, I could see but it wasn't as clear as

9      these photographs are.

10          Q     I thought it was bright light,

11     perfectly light, TV set --

12                MR. DUNNE:  No, Bruce, he

13          qualified it with the flash.

14          A     You could see her clearly but I

15     couldn't see the detail of her injuries in

16     terms of -- and besides, I thought there was

17     another photo where -- I don't know where

18     that picture is.  I remember a big gash.

19          Q     Well, you would agree with me

20     in looking at it -- and we're looking now at

21     93 -- the most obvious injury there is to

22     the left side of her head.  It has blood and

23     it's obviously --

24          A     Yeah, but --

25                MR. DUNNE:  I'm objecting to

K. James McCready          257

the form.  That's your

characterization of what you're

looking at in the picture.

Q     I'm asking if you would agree

with me about the characterization.  You're

not saying to me that you're looking at

these pictures --

A     I'm not sure what I'm seeing

here because --

Q     You don't think that's

obviously injuries to the left side of her

head?

A     Oh, I see this here

(indicating), but I can't see what was

actually over there (indicating).

Q     You can't see it in the

photograph because you can't bend around.

It's not three dimensional but at the time

you were able to look at her, right?

A     Yes, but I don't recall seeing

it.

Q     You don't recall seeing that

her head was smashed in on the left side?

A     No.

K. James McCready        258

2    Q    I mean Rein, I think, said the

3    same thing.  I don't know if he observed it

4    or not but you're there and you're telling

5    us, really, that you didn't know that she

6    was bludgeoned in the head after looking at

7    her in person?

8         MR. DUNNE:  I think he asked

9         and answered that.

10   Q    Is that what you're saying?

11   A    I didn't notice.

12   Q    Maybe you just -- Did you

13   forget what it was and now that you're

14   looking at the pictures you remember that

15   she actually had her head smashed in?

16   A    No.  I didn't notice.  I didn't

17   make note of it at the time and I don't --

18   Q    Whether you made note --

19   A    From what I saw, I only thought

20   that she was stabbed, cut, whatever.

21   Q    Well, whether you made note of

22   it or not, the information; i.e., literally,

23   the victim was available to you to see,

24   correct?

25   A    At what?

K. James McCready     259

1

2       Q     The time that you were in the

3  room this information, the facts about her

4  head being hit on the left side, that was

5  available to you.  You could have seen it

6  whether you say you did or didn't see it?

7       A     I didn't see it.

8            MR. DUNNE:  Objection to the

9       form and he's answered the question

10      four times now.

11           MR. BARKET:  He's saying he

12      didn't see it.

13           MR. DUNNE:  Right.

14      A     I just remember the slashes or

15  whatever.  I didn't know exactly what -- And

16  as I said, I don't go touching, moving

17  bodies.  We don't do that.

18      Q     Neither does a photographer,

19  right?

20      A     Right, but I didn't know about

21  any head injuries.

22      Q     Well, I've heard your testimony

23  and I heard Rein's testimony in that and

24  I've read Sergeant Doyle's testimony that

25  he --

1                    K. James McCready        260

2              MR. DUNNE:  Do we have a

3         question?

4         Q     -- is not sure.  What I'm

5    asking you is that nothing prevented you

6    from observing the injuries that are clearly

7    depicted in these photographs, right?

8              MR. DUNNE:  And he already

9         answered that.

10        A     I didn't see it.  What am I

11   going to tell you?  I didn't notice.  I

12   didn't realize that there was blunt force or

13   however you want to phrase it injuries.

14        Q     In the bedroom, when you looked

15   around -- I want to show you the photographs

16   of the bedroom.  What do you recall from the

17   bedroom?  The bed, yes?

18        A     Yeah.

19        Q     The --

20        A     Oh, that obviously there was an

21   obvious struggle in there.

22        Q     No, no, no, I'm talking about

23   Marty's bedroom.

24        A     Yeah, I don't --

25        Q     Well, you actually -- Let me go

1                    K. James McCready      261

2    back to the obvious struggle.  Obvious

3    struggle between whom and where?

4           A     In this room, in the master

5    bedroom.

6           Q     Between Arlene Tankleff and her

7    attacker or attackers?

8           A     Yes.

9           Q     And as it turns out she had

10   some defensive wounds on her arms, correct?

11          A     Yes.

12          Q     And her knuckles were bruised

13   as well, right?

14          A     I believe so.

15          Q     She was, I think, 5'10,

16   191 pounds; is that what the autopsy said?

17          A     I'll have to take your word for

18   it.  I don't know.

19                MR. DUNNE:  Bruce, you have a

20          breaking point at some point?  I'm

21          getting close.  If you're going to

22          go into the autopsy that's probably

23          going to be lengthy, right?

24                MR. BARKET:  That's okay.  Let

25          me wrap this up.

```
1                    K. James McCready        262

2          Q     Actually, 5'6, 191 pounds?

3          A     Okay.

4          Q     Marty didn't have a single

5    scratch on him; did he?

6          A     Not that I'm aware of, no.

7          Q     You actually examined him?

8          A     Right.

9          Q     And had pictures taken of him,

10   right?

11         A     Yes.

12               MR. BARKET:  And could I have

13         these two marked, please.

14               (Whereupon, Plaintiff's

15         Exhibits 95 and 96 were marked for

16         identification.)

17         Q     I want to show you these two

18   pictures.  This is Marty at the headquarters

19   after you all interrogated him, right?

20         A     Yes.

21         Q     Looking at his face there,

22   would it be fair to say that that's kind of

23   a quintessential "deer in the headlights"

24   look?

25               MR. DUNNE:  Objection to the
```

```
 1                        K. James McCready        263

 2            form of that question.

 3       Q     Look at Marty's face.

 4       A     Which one?  Which picture?

 5  This one (indicating)?

 6       Q     Yeah.

 7       A     What about him?

 8       Q     Does he look stunned or shocked

 9  to you there?

10       A     Yes.

11       Q     How about the other pictures,

12  does he looked stunned or shocked?

13       A     Well, it seem to me he always

14  looked like that.

15       Q     That's the way you observed him

16  at the time when you pulled up?

17       A     What's that?

18       Q     That's the way you observed him

19  at 8:30 in the morning when you pulled up,

20  that same blank expression?

21       A     He had the same blank

22  expression on his face at the trial.  It

23  didn't change.  I mean he's still got it

24  right now.

25            MR. BARKET:  Okay.  Thanks.
```

K. James McCready          264

2      We're good.

THE VIDEOGRAPHER:  We're off

record at 5:05 p.m.

(Time noted:  5:05 p.m.)

_____
K. JAMES McCREADY

Subscribed and sworn to before me

this \_\_\_ day of _____, 2013.

_____
NOTARY PUBLIC

265

## INDEX

### INDEX TO TESTIMONY

                                                    **Page**

Examination by Mr. Barket            5


### EXHIBITS

| **Plaintiff's** | **Description** | **Page** |
|---|---|---|
| Exhibit 79 | Notes | 39 |
| Exhibit 80 | Photograph | 103 |
| Exhibit 81 | Photograph | 103 |
| Exhibit 82 | Photograph | 114 |
| Exhibit 83 | Photograph | 115 |
| Exhibit 84 | Crayne Testimony | 120 |
| Exhibits 85-86 | Photographs | 133 |
| Exhibit 87 | Videotape | 188 |
| Exhibits 88-90 | Photographs | 252 |
| Exhibit 91 | Photograph | 254 |
| Exhibits 92-94 | Photographs | 255 |
| Exhibits 95-96 | Photographs | 262 |

266

ERRATA SHEET FOR THE TRANSCRIPT OF:
Case Name:  Martin Tankleff vs
The County of Suffolk
Deposition Date: December 11, 2012
Witness:  K. James McCready

CORRECTIONS

PG    LN    NOW READS    SHOULD READ    REASON FOR

___    ___    _____    _____    _____

___    ___    _____    _____    _____

___    ___    _____    _____    _____

___    ___    _____    _____    _____

___    ___    _____    _____    _____

___    ___    _____    _____    _____

___    ___    _____    _____    _____

___    ___    _____    _____    _____

___    ___    _____    _____    _____

___    ___    _____    _____    _____

___    ___    _____    _____    _____

___    ___    _____    _____    _____

___    ___    _____    _____    _____

                    _____
                          Signature


Subscribed and sworn to before me
this_____ day of _____, 2013.

_____
        (NOTARY PUBLIC)

267

## CERTIFICATION

I, DOLLY FEVOLA, a Notary Public in
and for the State of New York, do hereby certify:

THAT the witness whose testimony is herein
before set forth, was duly sworn by me; and

THAT the within transcript is a true record
of the testimony given by said witness.

I further certify that I am not related,
either by blood or marriage, to any of the parties
to this action; and

THAT I am in no way interested in
the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto
set my hand this 17th day of January, 2013.


_____

DOLLY FEVOLA

# #

#1-10 [2] – 1:8, 1:9

# $

$10,000 [1] – 66:6
$100 [1[ – 59:21
$100,000 [1] – 208:9
$17,000 [1] – 54:7
$18,000 [1] – 81:8
$32,000 [1] – 66:9
$50 [1] – 59:22
$50,000 [4] – 208:14, 208:18, 208:25, 209:2
$65,000 [1] – 66:6

# '

'72 [1] – 15:6
'73 [1] – 15:6
'88-'89 [1] – 133:20
'96 [1] – 66:7

# 1

10 [6] – 14:21, 124:5, 174:6, 236:5, 236:15
100,000 [1] – 209:3
10013 [1] – 2:8
103 [2] – 265:11, 265:12
11 [3] – 1:14, 4:12, 266:3
114 [1] – 265:13
115 [1] – 265:14
11530 [1] – 2:5
11:29 [2] – 1:15, 4:13
11:45 [2] – 229:5, 240:24
11:50 [2] – 229:5, 240:24
12 [5] – 11:22, 69:3, 71:23, 91:14, 91:15
120 [2] – 150:23, 265:15
12:22 [1] – 57:25
12:32 [1] – 58:5
133 [1] – 265:16
14 [2] – 37:15, 236:6
14-year-old [1] – 34:4
14th [3] – 14:4, 38:25, 156:7
15 [1] – 69:4
15-30 [1] – 97:19
150 [1] – 59:22

16 [1] – 120:13
17 [2] – 12:21, 231:9
17-year-old [1] – 157:21
17th [1] – 267:15
18 [3] – 11:17, 12:7, 120:12
1854 [3] – 13:10, 13:13, 13:17
188 [1] – 265:17
19 [2] – 62:3, 66:2
191 [2] – 261:16, 262:2
1948 [1] – 186:10
1957 [2] – 14:3, 14:4
1963 [1] – 14:22
1969 [1] – 9:18
1970 [1] – 9:20
1972 [1] – 15:6
1975 [1] – 59:4
1980 [1] – 10:8
1988 [12[ – 21:23, 28:2, 37:11, 37:15, 128:2, 133:11, 183:11, 186:10, 194:17, 196:10, 214:9, 218:17
1989 [2] – 62:4, 62:5
1990 [6] – 71:22, 72:4, 77:17, 189:24, 190:10, 196:10
1991 [1[ – 62:6
1:15 [1] – 102:14
1:20 [1] – 183:13

# 2

2 [1] – 58:4
20 [2] – 123:19, 245:8
20-somewhat [1] – 153:18
20005 [1] – 2:12
2012 [3[ – 1:14, 4:12, 266:3
2013 [3] – 264:12, 266:24, 267:15
24 [4[ – 9:18, 9:20, 62:4, 246:10
24-year-old [1] – 34:5
250 [1] – 105:24
252 [1] – 265:18
254 [1] – 265:19
255 [1] – 265:20
25A [1] – 68:25
262 [1] – 265:21
29 [1] – 14:2
2:08 [1] – 102:19

# 3

3 [2] – 102:19, 180:11
30 [2] – 5:25, 123:19
300 [2] – 10:23, 11:7
31 [1] – 1:19
33 [3] – 82:6, 157:9, 157:13
332 [1] – 120:11
36 [1] – 13:22
37 [3] – 11:13, 13:22, 14:2
39 [1] – 265:10
3:05 [1] – 167:24
3:15 [1] – 168:4
3:16 [1] – 180:9

# 4

4 [1] – 168:4
440 [1] – 204:4
48 [1] – 75:13
4:18 [1] – 233:18
4:32 [1] – 233:23

# 5

5 [2] – 233:22, 265:6
5'10 [1] – 261:15
5'6 [1] – 262:2
59 [2] – 37:3, 37:5
5:00 [1] – 68:9
5:05 [2] – 264:4, 264:5
5:35 [1] – 148:18

# 6

6 [2] – 124:15, 247:13
60 [2] – 11:3, 11:7
63 [1] – 76:4
65 [1] – 61:21
655 [1] – 2:11
666 [3] – 1:12, 2:4, 4:10
6:00 [2] – 124:5, 124:22
6:10 [1] – 124:23
6:11 [2] – 110:2, 110:10
6:17 [1] – 110:3
6:25 [2] – 123:16, 124:14
6th [1] – 220:4

# 7

7 [1] – 133:10
79 [6] – 39:13, 39:16, 95:6, 96:15, 101:12, 265:10
7:39 [2] – 95:8, 96:24
7:45 [3] – 95:8, 96:24, 96:25
7:55 [1] – 96:25
7th [1] – 37:11

# 8

8 [1] – 123:11
8/10/90 [1] – 76:10
80 [3] – 103:5, 103:7, 265:11
81 [4] – 103:21, 103:23, 104:2, 265:12
82 [3] – 113:25, 114:4, 265:13
83 [3] – 115:16, 115:18, 265:14
84 [5] – 74:24, 74:25, 120:7, 120:9, 265:15
85 [3] – 133:3, 133:5, 133:8
85-86 [1] – 265:16
86 [3] – 133:3, 133:5, 133:9
87 [3] – 188:22, 188:24, 265:17
88 [2] – 252:5, 252:8
88-90 [1] – 265:18
8:30 [2] – 229:4, 263:19

# 9

9 [1[ – 59:4
90 [5] – 16:18, 216:14, 252:5, 252:9
900 [1] – 2:11
91 [3] – 254:23, 254:25, 265:19
911 [34] – 79:10, 80:6, 105:9, 107:20, 108:3, 108:9, 108:11, 109:9, 109:15, 110:2, 110:10, 110:14, 135:14, 137:16, 148:18, 148:21, 149:3, 149:17, 149:20, 150:5, 151:11, 151:17,

151:23, 152:18, 155:17, 156:4, 156:9, 156:12, 156:22, 157:6, 158:4, 158:10, 158:13, 159:8
92 [2] – 255:2, 255:5
92-94 [1] – 265:20
93 [2] – 255:3, 256:21
94 [2] – 255:3, 255:5
95 [3] – 16:18, 17:6, 262:15
95-96 [1] – 265:21
96 [1] – 262:15
99 [1] – 2:8
9:00 [1] – 68:9
9:40 [1] – 183:13

# A

a.m [2] – 1:15, 4:13
A1 [1] – 96:24
ability [2] – 40:10, 41:13
able [10] – 12:4, 18:10, 18:15, 18:16, 23:4, 24:5, 46:10, 65:25, 223:8, 257:20
above-mentioned [1] – 1:21
absent [1] – 31:8
absolutely [8] – 31:13, 31:17, 90:4, 112:17, 184:19, 185:24, 206:17, 207:20
abused [1[ – 195:24
accept [2] – 106:24, 107:9
access [3] – 250:5, 250:11, 250:12
accident [3] – 196:2, 198:25, 199:4
accommodate [1] – 102:16
accommodations [1] – 218:5
accomplice [1] – 23:2
accomplices [1] – 22:25
according [21] – 76:25, 77:4, 94:24, 110:13, 113:16, 116:14, 116:23, 119:2, 145:21, 146:4, 146:10, 148:17, 148:23, 149:10, 149:13, 155:3, 156:12, 159:11, 176:3,

182:17, 199:18
account [18] - 34:25, 80:4, 122:7, 146:4, 146:10, 148:17, 149:14, 149:22, 152:10, 153:3, 153:12, 153:13, 153:15, 155:4, 158:7, 160:17, 170:25, 214:21
accuracy [1] - 121:5
accurate [3] - 38:22, 86:5, 154:5
accusation [1] - 244:14
accusations [1] - 241:19
accused [1] - 227:21
accusing [3] - 197:4, 197:6, 197:9
acquiring [1] - 152:11
act [3] - 107:18, 180:9, 227:18
action [2] - 162:10, 267:11
actions [1] - 92:22
activity [2] - 112:7, 231:23
add [6] - 201:20, 203:6, 203:15, 205:19, 205:24, 206:5
adding [1] - 206:8
addition [2] - 199:10, 201:11
address [3] - 5:24, 70:7, 70:17
adds [1] - 201:22
admissible [2] - 184:12
admission [3] - 105:5, 203:8, 224:4
admissions [3] - 16:20, 199:17, 203:16
admit [1] - 41:20
admitted [4] - 200:6, 201:18, 207:23, 240:16
adopted [2] - 80:17, 248:22
adrenalin [3] - 222:9, 229:17, 236:20
adult [1] - 35:13
adults [1] - 36:6
adversary [1] - 13:4
affair [1] - 250:21
affecting [1] - 233:13
affidavit [1] - 212:23
affluent [1] - 73:19

afterwards [2] - 81:17, 176:15
age [2] - 13:25, 34:9
ago [8] - 14:17, 44:3, 61:20, 61:22, 153:18, 191:17, 245:8, 246:10
agree [22] - 21:17, 23:20, 25:6, 31:24, 33:8, 33:18, 33:22, 34:17, 34:23, 38:22, 90:17, 91:24, 92:11, 107:5, 107:17, 108:16, 112:12, 123:15, 124:25, 125:7, 256:19, 257:5
agreed [2] - 134:20, 189:11
AGREED [3] - 3:3, 3:8, 3:12
agrees [1] - 38:21
ah-ha [1] - 158:9
ahead [39] - 32:8, 32:11, 48:8, 57:9, 79:15, 81:21, 83:15, 86:25, 87:13, 88:19, 90:3, 110:15, 145:24, 148:7, 150:18, 153:7, 163:13, 175:5, 185:6, 187:4, 187:16, 203:2, 203:12, 203:25, 204:11, 206:16, 207:9, 217:2, 221:11, 222:3, 227:3, 230:6, 232:10, 238:16, 239:25, 242:24, 244:17, 245:11, 254:15
aid [22] - 105:6, 107:25, 108:9, 108:16, 108:20, 108:25, 110:16, 110:18, 111:15, 111:17, 111:20, 111:22, 112:3, 112:8, 112:11, 121:18, 121:22, 137:17, 140:3, 140:14, 141:22, 144:5
aides [1] - 8:21
ain't [1] - 216:15
alcohol [1] - 199:7
alibi [2] - 180:12, 180:18
alibis [1] - 207:5
alive [2] - 148:21,

216:21
allegation [1] - 246:17
allegations [3] - 192:3, 218:16, 246:15
allowed [3] - 173:10, 217:15, 222:19
almost [9] - 44:6, 74:19, 74:20, 74:21, 75:17, 77:7, 164:8, 253:15, 254:2
alright [6] - 93:16, 182:19, 204:17, 204:19, 215:10, 217:4
ALSO [1] - 2:17
ambulance [1] - 149:21
amount [1] - 145:13
AMY [1] - 2:6
analysis [1] - 164:4
AND [3] - 3:3, 3:8, 3:12
answer [34] - 27:8, 27:12, 32:8, 32:11, 33:15, 45:12, 59:14, 79:15, 86:25, 120:15, 145:25, 160:25, 161:2, 161:20, 165:16, 172:4, 185:7, 187:4, 193:20, 195:12, 206:16, 209:11, 210:18, 215:4, 217:13, 219:6, 223:13, 227:10, 230:6, 230:22, 231:6, 232:10, 234:6, 238:21
answered [3] - 258:9, 259:9, 260:9
answering [2] - 79:6, 181:25
answers [1] - 84:2
anticipate [1] - 33:12
anticorruption [1] - 9:24
antique [1] - 51:2
antsy [1] - 52:20
anyway [8] - 48:4, 60:20, 61:13, 93:13, 148:21, 190:9, 194:4, 205:11
appear [2] - 40:4, 78:24
appearance [1] - 214:19
applicable [1] - 34:3
apply [1] - 157:24
appointed [3] - 9:19,

9:21, 14:3
apprehended [1] - 12:3
approached [1] - 115:24
appropriate [4] - 35:21, 81:18, 83:10, 218:4
April [1] - 9:20
apt [1] - 34:4
area [2] - 68:2, 101:15
areas [1] - 58:9
argue [1] - 124:8
argument [3] - 59:23, 59:24, 182:23
arises [1] - 126:2
Arlene [6] - 122:16, 122:23, 129:11, 129:23, 163:2, 261:6
Arlene's [3] - 122:22, 125:2, 221:8
arm [1] - 116:2
arms [3] - 116:11, 226:7, 261:10
Army [1] - 231:8
arrest [5] - 47:15, 47:16, 62:5, 91:7, 228:14
arrested [14] - 47:10, 47:12, 47:13, 47:14, 47:17, 53:22, 86:15, 89:24, 90:8, 90:25, 92:2, 194:8, 195:19, 200:20
arrests [4] - 20:11, 46:21, 46:23, 46:24
arrival [1] - 109:15
arrive [3] - 45:2, 74:10, 165:25
arrived [9] - 75:17, 77:22, 79:23, 109:11, 110:3, 118:22, 131:24, 218:20, 238:3
arrives [2] - 168:15, 172:8
arson [2] - 14:25, 195:16
art [1] - 18:9
Arthur [1] - 198:22
Article [1] - 1:19
aside [3] - 40:5, 86:8, 184:23
aspects [1] - 93:11
ass [2] - 60:25, 231:7
assault [4] - 30:6, 54:6, 55:15, 55:16
asserting [1] - 124:9
assessing [1] - 34:25
assessment [1] -

240:5
assigned [3] - 69:7, 69:12, 195:14
assignment [1] - 68:3
assignments [1] - 67:12
assistant [3] - 183:6, 212:9, 212:15
associate [1] - 4:18
Associates [2] - 63:15, 191:6
Association [3] - 29:21, 48:24, 58:19
Assume [1] - 227:17
assume [4] - 6:11, 226:23, 229:20, 230:2
assumed [1] - 214:20
assuming [6] - 7:20, 46:21, 89:3, 135:2, 150:4, 205:9
assumptions [1] - 97:15
asterisk [1] - 157:5
attached [1] - 229:18
attack [3] - 98:9, 107:23, 166:23
attacked [9] - 148:19, 150:13, 160:22, 165:20, 172:9, 205:17, 228:7, 252:25
attacker [2] - 238:11, 261:7
attackers [1] - 261:7
attacking [1] - 107:4
attacks [1] - 107:2
attendant [1] - 52:6
attention [2] - 9:3, 35:24
attorney [10] - 12:2, 17:16, 29:11, 142:24, 166:4, 183:6, 183:7, 212:15, 218:4, 245:21
attorney's [1] - 54:24
Attorneys [4] - 2:4, 2:7, 2:11, 2:14
attorneys [2] - 27:23, 245:20
ATV [3] - 231:24, 249:3, 250:12
aunts [1] - 80:21
auto [1] - 184:15
automatically [2] - 33:6, 135:8
autopsy [3] - 253:20, 261:16, 261:22
available [2] - 258:23,

259:5
**average** [1] - 32:6
**Award** [1] - 12:24
**award** [2] - 13:6, 58:13
**awards** [3] - 12:18, 12:21, 58:11
**aware** [23] - 17:7, 17:11, 28:6, 28:11, 28:16, 29:19, 30:12, 73:17, 75:25, 84:18, 146:22, 188:15, 188:19, 198:3, 198:12, 199:10, 199:19, 204:3, 204:6, 208:3, 217:14, 218:3, 262:6
**awful** [1] - 127:19
**awkward** [1] - 12:9

## B

**baby** [1] - 65:13
**backtracking** [1] - 134:24
**backwards** [1] - 134:19
**backyard** [1] - 74:6
**bad** [3] - 17:3, 73:8, 250:15
**bag** [1] - 60:17
**bagel** [11] - 191:22, 192:23, 193:2, 194:10, 200:18, 201:14, 205:22, 213:8, 214:10, 216:4
**balance** [1] - 65:17
**ball** [1] - 173:3
**balls** [3] - 53:3, 53:4, 61:3
**bank** [2] - 58:21, 214:21
**Bank** [1] - 65:25
**bankruptcy** [2] - 57:3, 57:14
**banner** [2] - 50:14, 52:12
**baptism** [1] - 14:15
**Bar** [2] - 49:11, 63:8
**bar** [18] - 43:16, 43:21, 43:22, 43:25, 44:12, 46:18, 46:22, 47:24, 50:5, 50:7, 50:10, 50:14, 50:25, 59:10, 65:6, 212:4, 212:6, 213:15
**bare** [1] - 79:19
**barket** [1] - 265:6
**Barket** [2] - 4:11, 4:24
**BARKET** [43] - 2:3,

2:5, 4:24, 5:20, 6:2, 6:5, 36:20, 39:7, 57:20, 90:2, 102:10, 102:22, 103:4, 103:20, 113:23, 115:15, 119:15, 120:6, 133:2, 140:9, 158:19, 162:24, 164:14, 167:21, 168:7, 171:25, 188:20, 189:4, 189:13, 204:10, 233:15, 233:25, 234:12, 236:13, 243:9, 245:25, 252:2, 254:22, 255:2, 259:11, 261:24, 262:12, 263:25
**Barry** [1] - 5:2
**BARRY** [1] - 2:12
**bartender** [1] - 50:8
**base** [3] - 102:6, 135:21, 136:6
**based** [8] - 45:11, 46:14, 77:24, 89:10, 89:11, 89:12, 186:21, 244:14
**basis** [4] - 34:2, 34:14, 34:16, 36:8
**bathroom** [2] - 60:5, 104:20
**battle** [2] - 13:4, 13:6
**Beach** [1] - 65:19
**beam** [1] - 142:8
**beat** [3] - 81:5, 81:6, 184:3
**became** [5] - 13:21, 19:10, 74:16, 84:18, 92:23
**become** [4] - 17:16, 45:7, 45:8, 142:7
**becoming** [2] - 35:13, 45:14
**bed** [10] - 125:10, 127:7, 128:11, 128:17, 128:20, 128:21, 148:24, 247:6, 252:11, 260:17
**bedroom** [20] - 98:13, 99:21, 99:23, 99:25, 104:14, 104:19, 122:24, 125:15, 125:17, 126:6, 126:13, 126:19, 137:25, 152:6, 252:11, 260:14, 260:16, 260:17, 260:23, 261:5

**beeped** [3] - 69:23, 69:24, 70:5
**beepers** [1] - 69:22
**beers** [1] - 53:20
**began** [4] - 92:13, 125:10, 130:5, 247:21
**begging** [1] - 149:20
**begin** [4] - 13:16, 44:10, 45:8, 251:2
**beginning** [5] - 9:18, 48:7, 168:3, 233:21, 234:5
**begins** [2] - 22:8, 127:15
**begs** [1] - 207:10
**behalf** [4] - 5:3, 5:5, 5:8, 215:7
**behind** [3] - 50:23, 51:11, 128:20
**believes** [1] - 229:21
**Belle** [5] - 68:21, 73:13, 73:14, 249:17, 249:18
**ben** [1] - 134:12
**bend** [1] - 257:18
**best** [12] - 10:15, 23:11, 23:15, 23:24, 33:15, 41:3, 81:16, 83:9, 86:25, 185:7, 230:6, 230:23
**better** [2] - 245:19, 247:9
**between** [17] - 12:10, 16:18, 42:24, 43:22, 80:5, 109:15, 109:19, 110:2, 161:14, 170:21, 172:24, 197:18, 219:9, 220:2, 247:22, 261:3, 261:6
**big** [3] - 254:20, 254:21, 256:18
**biggest** [1] - 254:19
**Bill** [1] - 11:20
**bill** [1] - 199:3
**Billy** [3] - 54:11, 54:12, 198:14
**biological** [1] - 80:19
**birth** [1] - 14:14
**bit** [16] - 15:19, 24:25, 25:3, 43:20, 67:10, 69:19, 71:18, 84:11, 120:18, 180:23, 205:7, 220:8, 241:12, 247:11, 251:25, 253:21
**bitter** [5] - 161:5, 161:14, 162:2, 165:12, 219:21

**bizarre** [1] - 207:24
**blacked** [2] - 232:24, 239:4
**blank** [2] - 263:20, 263:21
**blatant** [1] - 245:3
**bleed** [1] - 132:18
**bleeding** [2] - 106:11, 106:13
**blind** [1] - 61:17
**blind-sided** [1] - 61:17
**blood** [124] - 99:7, 99:12, 99:15, 99:19, 100:3, 102:3, 102:6, 103:7, 106:9, 108:19, 108:24, 111:12, 112:17, 112:24, 113:16, 113:19, 114:22, 116:10, 116:13, 116:15, 116:17, 116:20, 117:2, 117:4, 117:5, 117:6, 117:7, 117:9, 117:14, 117:16, 117:23, 118:2, 118:6, 118:11, 118:24, 118:25, 119:12, 119:14, 120:16, 120:17, 121:7, 121:11, 121:15, 121:18, 121:21, 122:9, 129:18, 129:19, 130:13, 130:25, 131:9, 131:11, 131:17, 131:18, 132:7, 132:9, 132:20, 132:22, 132:24, 133:15, 134:8, 134:9, 134:11, 134:14, 134:15, 134:21, 134:22, 135:2, 135:4, 135:6, 135:8, 135:15, 135:24, 136:5, 136:13, 136:22, 137:2, 137:4, 138:4, 138:7, 138:16, 138:21, 139:4, 139:12, 139:13, 139:18, 139:21, 139:23, 140:4, 140:21, 140:24, 141:2, 141:4, 141:9, 141:12, 141:13, 141:24, 142:5, 143:11, 143:17, 144:6, 144:7,

144:16, 145:6, 145:9, 145:11, 145:13, 145:16, 145:22, 146:15, 146:23, 147:3, 147:7, 147:10, 148:4, 148:9, 229:10, 244:2, 245:23, 246:12, 256:22, 267:10
**bloods** [1] - 131:19
**bludgeoned** [4] - 253:7, 253:11, 253:13, 258:6
**bluff** [1] - 73:25
**bluffs** [1] - 74:5
**blunt** [1] - 260:12
**boasting** [1] - 206:6
**boat** [5] - 249:4, 250:4, 250:8, 250:10, 250:12
**boating** [1] - 231:24
**Bob** [2] - 50:9, 190:11
**bodies** [2] - 254:17, 259:17
**body** [6] - 22:21, 22:23, 26:10, 118:11, 125:2, 152:6
**bolts** [1] - 50:5
**bone** [1] - 250:6
**bono** [1] - 54:12
**booth** [1] - 51:2
**booths** [1] - 51:3
**born** [2] - 41:12, 86:20
**bothering** [2] - 50:7, 187:19
**bottom** [5] - 96:23, 135:22, 236:6, 236:16, 236:17
**bought** [2] - 63:7, 67:6
**bouncer** [1] - 49:23
**boundaries** [1] - 18:18
**bounds** [1] - 17:9
**Bovet** [1] - 103:13
**box** [1] - 78:17
**boy** [6] - 228:24, 231:4, 231:7, 231:12, 231:14, 232:17
**bragged** [1] - 199:20
**bragging** [2] - 203:8, 207:24
**Braslow** [1] - 206:20
**break** [5] - 57:23, 58:8, 59:25, 80:13, 210:10
**breaking** [2] - 61:2, 261:20
**breathe** [1] - 228:22
**brief** [4] - 58:2,

167:25, 169:22, 233:19

briefly [1] - 135:7
bright [7] - 123:21, 123:24, 123:25, 124:2, 125:7, 150:10, 256:10
bring [11] - 52:12, 53:14, 62:23, 170:4, 170:6, 175:20, 176:2, 176:15, 176:21, 177:12, 181:4
bringing [1] - 178:14
Broadway [2] - 49:12, 63:9
broke [2] - 102:23, 221:15
Brookhaven [1] - 48:14
brother [7] - 14:23, 14:24, 14:25, 17:23, 17:24, 86:12, 195:15
brothers [6] - 14:6, 14:8, 80:20, 195:13, 195:18, 196:11
brought [1] - 194:14
brown [1] - 134:16
Bruce [8] - 4:24, 81:25, 231:5, 243:7, 247:8, 256:12, 261:19
BRUCE [1] - 2:5
bruised [1] - 261:12
bruises [2] - 120:18, 253:14
BRUSTIN [1] - 2:7
brutal [2] - 30:24, 206:24
brutally [5] - 11:12, 172:9, 228:6, 228:7, 252:25
bucks [2] - 216:6, 216:7
building [5] - 51:7, 51:11, 60:9, 63:10, 65:10
Building [1] - 2:15
bullshit [4] - 193:23, 194:5, 201:24, 217:4
bunch [4] - 50:14, 193:22, 217:3, 217:4
bureau [2] - 9:25
burglar [2] - 221:15, 221:17
burglars [1] - 51:7
burned [1] - 66:8
bus [1] - 11:19
business [23] - 19:13, 19:15, 57:17, 62:18, 62:25, 63:12, 63:13, 63:14, 64:16, 65:5, 68:21, 68:23, 162:4, 165:8, 165:22, 168:11, 174:8, 192:14, 192:23, 201:6, 206:25, 211:20, 219:9
businesses [2] - 64:10, 171:11
but.. [1] - 10:25
butchered [1] - 149:18
BY [8] - 2:5, 2:9, 2:12, 2:16, 5:19, 102:21, 168:6, 233:24

**C**

cable [1] - 128:3
calf [3] - 116:19, 118:7, 121:24
California [3] - 69:16, 69:17, 194:15, 214:11, 216:5
capable [2] - 16:5, 159:25
captain [1] - 191:14
car [11] - 60:12, 60:14, 60:18, 87:20, 113:22, 196:2, 198:25, 199:4, 248:9, 248:12
card [18] - 14:18, 70:24, 71:3, 71:4, 71:8, 71:12, 72:12, 72:19, 73:2, 73:4, 73:9, 174:9, 209:19, 209:23, 210:3, 210:6, 210:24
cards [1] - 45:3
care [3] - 182:13, 213:18, 230:8
cared [2] - 173:23, 174:2
career [2] - 19:8, 20:10
careful [2] - 17:9, 35:16
Carl [2] - 190:20, 190:22
carl [1] - 190:23
Carmody [1] - 69:12
Carnegie [1] - 67:22
Carolina [5] - 47:7, 55:18, 55:19, 60:3, 66:10
Carolinas [2] - 55:15, 55:16
carpenter [1] - 225:12

cars [2] - 52:7, 248:7
Case [1] - 266:2
case [30] - 7:25, 12:16, 31:7, 31:9, 34:13, 34:15, 36:12, 51:7, 55:4, 55:5, 55:6, 55:10, 56:22, 69:8, 69:12, 69:14, 69:15, 71:25, 72:13, 82:11, 92:5, 93:12, 106:8, 140:2, 177:10, 189:18, 201:21, 201:23, 202:18, 218:21
cases [2] - 22:16, 67:14
cast [1] - 132:21
casual [1] - 79:3
catching [1] - 67:13
category [1] - 214:24
Catterson [4] - 53:23, 53:25, 54:3, 54:4
caught [3] - 11:22, 244:8, 244:19
cautious [3] - 186:15, 186:25, 187:13
certain [4] - 45:12, 88:3, 97:19, 99:3
certainly [12] - 18:20, 19:16, 20:3, 27:22, 27:25, 40:22, 160:4, 168:16, 177:11, 185:19, 218:15, 230:7
certificate [2] - 14:14, 14:15
certification [1] - 3:6
CERTIFICATION [1] - 267:2
certify [2] - 267:4, 267:9
chair [32] - 101:23, 102:2, 102:3, 102:6, 105:11, 106:2, 106:3, 106:9, 106:11, 106:20, 107:6, 107:19, 108:15, 109:6, 109:7, 110:22, 112:4, 112:20, 113:4, 113:6, 113:11, 114:10, 114:21, 115:4, 115:8, 115:14, 115:22, 117:17, 121:12, 121:17, 138:17
challenged [1] - 158:8
chance [5] - 129:6, 192:2, 193:25,

199:15, 210:9
change [3] - 204:18, 207:12, 263:23
changed [1] - 64:3
changes [1] - 214:19
Channel [1] - 71:23
character [1] - 142:8
characterization [3] - 161:20, 257:3, 257:6
characterize [2] - 112:7, 204:12
charge [1] - 59:21
charged [10] - 47:20, 47:22, 54:14, 54:16, 54:18, 55:12, 55:14, 55:17, 55:25, 89:24
CHARLES [1] - 1:7
CHARTERED [1] - 2:10
charts [1] - 124:17
chased [2] - 11:21, 51:22
chasing [2] - 51:21, 51:25
chat [1] - 175:19
cheap [1] - 67:7
cheated [1] - 216:3
checklist [1] - 46:20
chest [1] - 23:19
CHEVALIER [1] - 2:10
chief [1] - 164:22
chirped [1] - 83:25
choice [1] - 184:24
chopped [1] - 253:16
chose [3] - 8:18, 205:11, 237:7
chronology [1] - 86:5
circumstance [1] - 232:18
circumstances [2] - 35:22, 228:9
City [7] - 1:13, 2:5, 4:10, 9:19, 50:9, 67:5, 67:6
city [1] - 13:16
civil [1] - 57:3
Civil [1] - 1:20
civilian [1] - 217:25
claim [1] - 186:6
claims [1] - 186:2
class [1] - 212:21
clean [1] - 146:11
cleaned [5] - 44:2, 47:7, 47:9, 119:12, 144:16
clear [6] - 6:7, 74:7, 144:21, 189:16, 246:3, 256:8
clearer [1] - 197:7

clearly [2] - 256:14, 260:6
cliff [1] - 74:5
clips [1] - 71:19
clock [3] - 44:2, 47:7, 47:9
close [6] - 10:24, 93:16, 136:17, 172:5, 172:9, 261:21
closed [2] - 137:23, 139:17
closely [1] - 129:7, 203:5
closet [2] - 104:21, 157:7
clothes [3] - 53:13, 53:14, 54:5
clothing [2] - 108:20, 108:24
clown [2] - 203:20, 203:21
clumps [1] - 131:19
cocaine [5] - 191:21, 197:22, 200:17, 202:8, 205:22
coincidence [2] - 154:21, 155:2
colleague [1] - 16:23
collect [5] - 84:25, 85:13, 86:3, 164:8, 164:21
collected [2] - 65:17, 202:9
collecting [6] - 14:16, 164:21, 201:19, 202:23, 206:2, 242:14
collections [3] - 193:16, 200:6, 200:25
collector [1] - 202:11
college [1] - 248:25
colloquy [5] - 188:5, 203:12, 206:15, 214:6, 244:17
Colorado [1] - 11:19
coma [1] - 224:14
comatose [1] - 236:21
Combat [2] - 12:25, 13:2
combat [1] - 13:3
coming [7] - 12:9, 60:5, 60:23, 61:5, 123:12, 171:15, 193:15
comment [4] - 16:15, 16:22, 17:3, 154:4
commented [1] - 30:11
commission [3] -

5

28:13, 28:17, 29:5
commit [2] - 19:25, 89:25
committed [12] - 12:14, 20:15, 20:16, 30:17, 30:23, 41:25, 42:2, 175:22, 175:24, 177:13, 206:10, 222:15
committee [1] - 48:18
committing [4] - 20:20, 199:20, 206:6, 233:2
common [1] - 32:15
communication [2] - 87:22, 87:23
community [6] - 73:20, 73:24, 211:11, 211:13, 213:8, 213:13
company [1] - 225:16
compare [2] - 122:8, 242:18
compensation [1] - 9:8
complainant [1] - 76:7
complainant/victim [1] - 76:6
completed [1] - 38:24
completely [2] - 141:7, 146:10
complying [1] - 39:24
compress [6] - 155:24, 156:3, 156:13, 157:17, 157:20, 158:11
conceptual [2] - 89:23, 90:17
concern [3] - 20:4, 152:24, 153:2
concerned [1] - 163:8
concerning [1] - 7:4
concerns [2] - 152:9, 152:14
conclusion [1] - 215:21
conclusionary [1] - 140:7
conclusions [1] - 241:20
conditions [1] - 127:13
conduct [1] - 202:23
conducted [1] - 220:11
conducting [1] - 40:18
confess [10] - 18:24, 21:9, 21:13, 27:16, 34:5, 41:3, 42:21, 178:23, 222:21,

223:8
confessed [5] - 84:4, 84:14, 85:23, 85:24, 178:13
confessing [3] - 24:8, 31:12, 178:21
confession [27] - 16:10, 16:17, 17:6, 19:19, 21:16, 28:7, 32:4, 32:18, 33:7, 33:23, 34:11, 34:21, 35:3, 114:7, 114:9, 152:2, 178:5, 178:7, 178:11, 178:12, 178:19, 178:22, 179:25, 183:25, 224:5, 226:17, 226:20
confessions [9] - 15:19, 16:19, 16:20, 18:2, 30:13, 31:20, 40:12, 179:20, 184:11
confront [1] - 155:23
confronted [1] - 229:8
confronting [3] - 155:18, 155:22, 223:9
confused [1] - 223:18
connected [5] - 200:5, 202:21, 203:6, 215:16, 216:22
Connecticut [2] - 74:8, 249:20
connection [4] - 7:24, 11:16, 36:12, 76:17
consider [6] - 87:5, 88:20, 164:5, 164:18, 164:19, 223:16
consistent [2] - 83:11, 122:11
consists [1] - 96:15
construction [4] - 59:18, 64:13, 64:14, 64:16
contact [1] - 141:13
contacted [1] - 76:10
contains [2] - 27:7, 27:11
contemporaneous [2] - 37:23, 95:22
contention [1] - 250:7
contentious [1] - 250:10
context [4] - 43:6, 44:12, 44:13, 237:10
continue [8] - 23:4, 23:5, 165:3, 168:25, 169:3, 177:18,

189:14, 199:15
continued [3] - 164:5, 229:5, 235:11
CONTINUED [3] - 102:21, 168:6, 233:24
continues [3] - 76:13, 189:7, 232:12
contract [2] - 9:6, 9:11
conversation [12] - 29:23, 41:17, 44:4, 70:13, 94:21, 130:6, 153:17, 169:22, 171:21, 173:18, 175:13, 183:12
conversations [2] - 43:11, 120:14
converse [1] - 18:11
convict [1] - 91:15
convicted [12] - 75:22, 84:24, 85:10, 85:13, 86:2, 91:14, 91:15, 91:17, 91:20, 92:3, 202:8, 204:23
conviction [4] - 76:19, 189:21, 204:5, 212:22
convince [4] - 23:10, 24:7, 24:17, 41:2
convinced [2] - 223:21, 240:24
cop [2] - 242:20, 245:9
copies [1] - 95:18
cops [1] - 52:17
copy [4] - 39:9, 39:11, 40:7, 225:19
core [2] - 23:10, 24:16
corner [7] - 37:15, 49:15, 50:20, 50:22, 63:9, 63:24, 68:10
correct [55] - 7:25, 10:9, 25:23, 30:8, 41:5, 73:20, 77:20, 80:25, 85:21, 90:4, 91:12, 92:9, 94:19, 97:7, 98:25, 99:13, 99:17, 100:7, 101:4, 101:21, 101:24, 102:3, 104:5, 105:21, 105:24, 109:16, 110:7, 112:24, 117:18, 123:4, 125:7, 125:18, 126:14, 137:5, 137:25, 142:11, 147:8, 147:12, 157:14, 159:16, 160:4, 165:6, 169:4, 179:8, 181:5, 181:8,

181:16, 224:22, 238:6, 243:15, 248:4, 248:7, 251:7, 258:24, 261:10
CORRECTIONS [1] - 266:5
correctly [1] - 64:9
corroborate [2] - 219:8, 219:12
corroborated [1] - 21:19
corroboration [1] - 246:14
cost [2] - 54:7, 208:25
counsel [4] - 3:4, 4:21, 167:7, 188:4
count [2] - 61:19, 205:7
country [2] - 11:17, 11:21
Country [3] - 1:12, 2:4, 4:10
County [15] - 4:5, 5:8, 9:12, 9:16, 9:21, 10:11, 11:23, 14:22, 17:19, 28:8, 48:12, 67:8, 76:8, 183:10, 266:3
COUNTY [3] - 1:7, 1:8, 2:14
county [2] - 12:2, 54:24
couple [12] - 18:6, 18:7, 38:10, 53:20, 58:8, 65:10, 71:19, 122:15, 203:24, 208:17, 223:7, 239:14
coupled [1] - 214:23
course [28] - 12:19, 19:8, 20:9, 21:11, 21:15, 25:9, 29:8, 29:11, 29:18, 30:3, 30:16, 35:5, 114:7, 129:22, 134:2, 139:25, 142:13, 148:13, 161:6, 164:3, 179:11, 180:16, 182:3, 189:18, 221:4, 229:23, 248:14, 249:9
Court [2] - 3:16, 4:7
COURT [1] - 1:2
court [12] - 4:17, 5:13, 6:19, 78:18, 153:20, 153:23, 187:23, 190:12, 201:18, 227:6, 234:3, 234:8
courtroom [2] - 78:15,

119:18
cousin [1] - 86:12
cover [2] - 70:16, 110:17
cover-up [1] - 110:17
covered [2] - 141:3, 141:7
covers [1] - 53:18
coverup [4] - 111:18, 112:8, 112:11, 140:13
crack [3] - 197:15, 197:17, 197:21
Crayne [4] - 120:11, 120:21, 138:7, 265:15
Crayne's [1] - 121:2
created [1] - 95:20
creates [1] - 132:22
credibility [1] - 121:4
credit [1] - 213:22
Creedon [28] - 188:6, 188:9, 188:17, 188:18, 189:9, 189:12, 189:16, 190:6, 190:7, 190:11, 193:5, 199:16, 199:20, 200:24, 201:16, 201:18, 202:5, 202:9, 203:18, 205:25, 206:6, 206:9, 207:22, 207:23, 208:6, 208:10, 209:8, 216:22
cried [1] - 80:12
crime [30] - 7:20, 15:16, 19:24, 20:15, 20:16, 25:8, 25:13, 30:17, 30:25, 31:13, 42:2, 42:7, 46:12, 47:21, 55:12, 55:18, 55:24, 75:7, 82:8, 82:22, 85:10, 85:13, 89:25, 191:14, 193:17, 230:25, 233:2, 243:4
crimes [7] - 16:7, 19:25, 20:20, 41:20, 42:22, 177:13, 206:11
criminal [4] - 104:7, 198:21, 202:22, 245:18
criminals [1] - 207:25
criticism [2] - 28:19, 28:22
cross [1] - 17:12
Cross [3] - 12:25,

13:2, 13:3
cross-examine [1] - 17:12
crowded [1] - 49:24
crying [3] - 227:7, 227:11, 227:19
cue [1] - 188:21
cues [2] - 88:2, 88:8
curiosity [2] - 59:11, 103:11
curious [4] - 42:10, 42:12, 42:20, 78:22
curiously [1] - 28:21
curtains [2] - 123:3, 123:7
customers [1] - 50:8
cut [7] - 85:8, 85:25, 131:25, 190:2, 190:14, 234:2, 258:20

**D**

D.C [1] - 2:12
DA [1] - 54:3
DA's [2] - 17:20, 190:12
dad [8] - 13:19, 13:21, 14:20, 118:4, 121:8, 176:5, 232:13, 238:2
damage [1] - 60:18
damn [3] - 206:22, 221:17, 223:22
Dan [9] - 192:11, 192:12, 192:13, 242:12, 242:16, 242:21, 243:4, 243:11, 244:6
Danford's [1] - 48:20
dark [1] - 134:16
Date [1] - 266:3
date [4] - 37:14, 37:16, 37:18, 76:11
daughter [1] - 180:13
days [4] - 11:22, 13:24, 82:7, 215:3
dead [8] - 77:13, 87:18, 87:20, 129:23, 164:10, 164:23, 212:17, 228:6
deal [2] - 52:14, 213:24
dealing [2] - 167:13, 167:14
dealings [2] - 180:16, 211:20
death [1] - 214:16
Deblasi [1] - 69:17

debt [9] - 163:3, 163:16, 163:17, 163:22, 164:4, 164:7, 164:20, 165:3
decade [1] - 206:7
deceit [1] - 222:18
December [5] - 1:14, 4:12, 14:2, 126:2, 266:3
deception [1] - 24:14
decide [2] - 44:21, 45:4
decided [1] - 69:14
decides [2] - 45:9, 54:4
decision [5] - 181:2, 181:7, 181:10, 181:14, 186:20
decorating [1] - 98:7
deducted [1] - 13:25
deed [2] - 65:22, 78:3
deeds [1] - 92:22
deer [1] - 262:23
Defendant [3] - 56:22, 186:6, 186:22
defendant [2] - 76:12, 77:5
Defendant's [1] - 185:3
defendants [1] - 5:9
Defendants [3] - 1:10, 1:18, 2:14
defense [7] - 27:23, 133:25, 245:16, 245:18, 245:20, 245:21
defensive [1] - 261:10
deli [3] - 63:21, 63:23, 63:24
DeLuca [4] - 49:21, 52:2, 54:13, 54:16
demand [1] - 184:4
demanding [4] - 162:15, 162:18, 162:21, 162:22
demeanor [5] - 45:11, 77:11, 78:14, 86:22, 227:18
denial [3] - 238:19, 239:17, 240:9
Dennis [4] - 15:8, 15:9, 196:16, 196:20
Dennison [1] - 2:15
dentist [1] - 65:2
deny [1] - 232:12
department [8] - 9:7, 9:12, 17:15, 62:3, 62:15, 181:2, 183:11, 185:13
DEPARTMENT [1] -

2:14
Department [9] - 9:20, 9:22, 10:12, 14:5, 75:21, 76:8, 76:17, 76:23, 77:16
dependant [1] - 95:20
depict [1] - 255:18
depicted [1] - 260:7
deposition [8] - 3:6, 3:13, 4:3, 4:9, 6:14, 8:9, 46:21, 232:9
DEPOSITION [1] - 1:17
Deposition [1] - 266:3
depth [1] - 171:21
derogatory [2] - 23:9, 24:13
described [13] - 79:5, 79:18, 79:24, 82:5, 102:25, 107:15, 108:21, 115:5, 129:15, 134:21, 155:21, 158:7, 218:9
describing [4] - 152:19, 152:22, 152:23, 231:11
Description [1] - 265:9
descriptions [1] - 80:5
detail [1] - 256:15
details [1] - 22:12
Detective [20] - 5:11, 16:16, 29:20, 38:15, 70:14, 71:11, 72:19, 76:7, 76:10, 77:4, 83:19, 87:7, 87:15, 181:3, 181:11, 181:21, 187:11, 241:13, 245:6, 247:22
detective [19] - 9:25, 10:16, 10:25, 11:3, 14:25, 15:20, 18:14, 18:15, 19:4, 25:4, 26:20, 46:3, 50:10, 55:2, 59:6, 94:11, 120:4, 183:19, 217:25
Detectives [1] - 48:24
detectives [5] - 14:21, 21:11, 23:23, 30:23, 32:3
detector [5] - 236:7, 236:24, 237:5, 238:6, 241:7
detectors [1] - 51:9
develop [2] - 21:18, 22:13
developed [1] - 69:13
device [1] - 130:18

dialed [1] - 135:15
Diconta [1] - 191:18
died [1] - 212:17
dieing [1] - 228:7
difference [2] - 80:5, 204:23
different [12] - 28:3, 39:4, 43:6, 45:24, 103:15, 105:4, 155:5, 155:13, 166:3, 177:7, 197:24, 231:10
differently [1] - 46:16
difficulty [1] - 33:11
dimensional [1] - 257:19
directed [1] - 181:18
directions [1] - 70:12
directly [1] - 160:14
dirt [1] - 60:17
dirty [1] - 245:9
disability [1] - 15:3
disagree [1] - 185:9
disappear [1] - 163:18
disbelieve [2] - 192:6, 242:20
discern [1] - 46:10
discovered [2] - 22:22, 93:10
discretion [1] - 237:19
discussed [2] - 243:19, 243:23
discussing [3] - 177:10, 248:15, 248:20
discussion [1] - 16:10
dismissed [4] - 55:6, 55:10, 56:3, 56:4
disown [1] - 193:11
disproven [2] - 186:4, 186:7
dispute [14] - 30:20, 77:15, 105:17, 105:19, 161:14, 161:23, 161:25, 162:4, 165:21, 166:21, 188:2, 199:23, 201:6, 205:14
disputing [1] - 132:3
distinct [1] - 239:13
distinction [1] - 42:24
distraught [1] - 36:2
distress [1] - 34:9
distressed [5] - 31:21, 32:25, 33:6, 33:9, 35:18
district [4] - 11:25, 183:6, 183:7, 212:15
DISTRICT [2] - 1:2, 1:2

District [2] - 4:7, 4:8
divorces [1] - 57:2
Dix [1] - 58:19
DOE [1] - 1:8
dollar [1] - 163:25
dollars [2] - 162:13, 211:6
DOLLY [2] - 267:3, 267:19
Dolly [2] - 1:22, 4:18
domestic [1] - 78:7
Don [3] - 87:16, 192:8, 192:11
donations [1] - 48:25
done [12] - 49:10, 57:14, 116:8, 117:3, 148:24, 148:25, 168:19, 176:20, 224:21, 225:11, 232:23, 239:4
door [15] - 49:19, 49:23, 49:25, 50:3, 61:15, 61:16, 61:17, 68:24, 137:21, 138:4, 139:16, 142:3, 142:5, 142:9, 142:10
doorknob [5] - 137:8, 137:10, 140:24, 146:23, 147:4
doubt [7] - 107:13, 120:20, 120:23, 120:25, 230:12, 232:18, 234:18
doug [1] - 72:2
Doug [3] - 72:3, 72:8, 72:10
down [32] - 8:23, 30:22, 47:6, 48:2, 48:20, 50:25, 51:22, 51:23, 52:7, 52:17, 52:19, 53:17, 54:20, 55:15, 60:3, 60:4, 65:9, 66:6, 66:8, 71:23, 105:11, 120:12, 127:7, 128:20, 135:22, 138:20, 139:15, 153:21, 158:25, 178:16, 178:20, 251:20
downstairs [1] - 63:24
Doyle [16] - 38:15, 67:24, 69:14, 69:16, 70:2, 70:14, 71:12, 72:17, 72:20, 74:17, 169:19, 174:12, 181:3, 210:10, 210:22, 215:24
DOYLE [1] - 1:7

Doyle's [1] - 259:24
Dr [1] - 208:22
draw [1] - 42:24
drawn [1] - 123:4
dried [3] - 131:19, 134:11, 137:4
drinking [1] - 56:6
dripping [1] - 132:10
Drive [3] - 82:6, 157:10, 157:13
drives [1] - 248:10
driving [3] - 52:2, 71:7, 72:11
drove [2] - 51:15, 60:13
drug [7] - 192:23, 197:14, 197:20, 198:11, 200:7, 201:19, 202:23
drugs [6] - 194:9, 199:8, 201:14, 202:10, 205:21, 216:22
dry [11] - 131:12, 131:14, 131:18, 134:8, 134:15, 134:16, 134:21, 134:22, 134:23, 135:3, 135:4
due [2] - 89:2, 236:19
DUI [1] - 55:25
duly [2] - 5:16, 267:6
dUNNE [1] - 158:17
Dunne [3] - 5:7, 40:7, 142:21
DUNNE [84] - 2:16, 5:7, 32:7, 32:11, 32:21, 37:3, 59:12, 79:14, 81:20, 81:25, 83:14, 86:23, 87:12, 88:18, 109:2, 124:19, 140:6, 145:23, 148:6, 150:16, 153:6, 158:20, 160:24, 161:18, 162:23, 163:12, 164:11, 164:16, 165:15, 166:7, 171:22, 173:5, 185:5, 185:14, 187:3, 187:15, 188:4, 193:20, 202:17, 203:2, 203:10, 203:23, 204:8, 205:9, 206:14, 207:3, 207:8, 210:17, 214:5, 215:6, 216:25, 219:4, 222:2,

223:12, 224:24, 226:25, 227:12, 230:4, 230:20, 231:5, 232:4, 233:5, 234:10, 236:11, 236:18, 238:15, 239:24, 242:23, 243:6, 244:16, 245:10, 246:22, 247:7, 254:14, 256:5, 256:12, 256:25, 258:8, 259:8, 259:13, 260:2, 260:8, 261:19, 262:25
during [6] - 16:21, 29:8, 29:11, 29:18, 30:16, 182:3
duties [1] - 12:19
Dwyer [2] - 191:2, 191:4
dying [2] - 77:14, 78:3

E

ear [3] - 253:15, 254:3, 255:25
earliest [1] - 13:16
early [4] - 15:2, 124:4, 197:19, 202:24
easier [1] - 32:16
easily [1] - 125:4
east [2] - 125:24, 126:7
EASTERN [1] - 1:2
Eastern [1] - 4:8
economy [1] - 65:9
Eddie [2] - 48:15, 69:16
effect [2] - 3:15, 190:5
Eighth [1] - 2:8
eighties [4] - 197:14, 197:18, 197:19, 202:24
either [7] - 41:25, 99:11, 106:23, 197:2, 213:7, 217:5, 267:10
electrical [1] - 65:15
elementary [1] - 51:23
elevated [3] - 105:12, 112:21, 138:18
elevating [1] - 112:5
eliminate [1] - 184:15
emanate [1] - 128:6
emanated [1] - 128:12
emanates [1] - 127:19
Emerald [2] - 58:12, 58:13

emergency [1] - 107:13
Emma [1] - 5:4
EMMA [1] - 2:9
emotional [10] - 34:8, 78:12, 78:13, 78:19, 81:17, 83:10, 86:19, 87:7, 94:2
emotionally [6] - 31:21, 32:25, 33:6, 33:9, 35:18, 36:2
employ [3] - 26:20, 41:18, 44:10
employees [1] - 201:6
EMPLOYEES [1] - 1:8
employment [1] - 9:15
emptying [1] - 214:20
EMT [1] - 131:23
end [12] - 19:20, 22:4, 48:7, 53:21, 55:10, 64:2, 96:2, 145:21, 184:2, 184:7, 187:24, 195:19
ended [2] - 65:16, 194:8
enforcement [2] - 13:14, 196:12
engage [2] - 13:3, 181:22
engaged [2] - 41:21, 247:12
engages [1] - 245:18
enter [2] - 10:6, 164:25
entered [1] - 97:18
entertaining [1] - 16:20
entertainment [1] - 61:24
entire [3] - 86:10, 206:15, 240:21
entirely [1] - 84:19
entitled [3] - 92:7, 128:24, 129:3
entrance [1] - 104:11
Epstein [1] - 4:11
EPSTEIN [1] - 2:3
equipment [2] - 64:2, 162:7
Erin [3] - 75:13, 93:19, 188:16
ERRATA [1] - 266:2
errors [1] - 90:22
especially [2] - 83:16, 87:17
ESQ [5] - 2:5, 2:6, 2:9, 2:12, 2:16
essence [2] - 160:20, 229:15
essentially [1] - 84:19

established [1] - 246:23
estate [5] - 163:16, 163:19, 163:21, 164:6, 164:23
estate's [1] - 164:20
Ethel [3] - 131:16, 131:23, 134:21
event [2] - 129:4, 226:9
events [1] - 95:22
eventually [1] - 12:13
evidence [17] - 19:19, 90:9, 111:10, 122:9, 129:2, 184:25, 185:13, 185:18, 207:16, 216:24, 218:25, 221:23, 241:20, 241:23, 245:7, 246:7, 246:8
exact [2] - 117:15, 177:8
exactly [9] - 44:8, 78:17, 116:25, 117:14, 117:17, 153:22, 170:24, 254:18, 259:15
exam [1] - 213:19
EXAMINATION [4] - 5:19, 102:21, 168:6, 233:24
Examination [1] - 265:6
examination [2] - 134:20, 136:17
examine [2] - 17:12, 130:19
examined [2] - 5:18, 262:7
examining [1] - 21:11
example [3] - 22:17, 99:6, 200:5
except [3] - 3:9, 80:24, 193:8
exchange [1] - 246:2
excited [1] - 79:12
excitement [1] - 149:19
exclusive [2] - 249:11, 249:15
excuse [3] - 61:3, 85:10, 247:20
exhibit [1] - 188:21
Exhibit [21] - 39:12, 39:16, 76:4, 103:6, 103:22, 104:2, 113:25, 114:3, 115:17, 120:8, 188:23, 252:8, 254:24, 265:10,

265:11, 265:12, 7
265:13, 265:14, 265:15, 265:17, 265:19
exhibits [1] - 36:21
Exhibits [9] - 133:5, 133:8, 252:5, 255:5, 262:15, 265:16, 265:18, 265:20, 265:21
EXHIBITS [1] - 265:8
exist [1] - 164:5
exiting [1] - 60:8
exits [1] - 87:20
exonerated [1] - 189:22
exoneration [2] - 204:6, 204:9
expect [11] - 116:9, 117:2, 117:15, 126:24, 128:17, 135:8, 139:13, 139:18, 140:23, 150:7, 150:8
expected [2] - 112:24, 134:5
experience [3] - 19:9, 35:7, 89:13
experienced [2] - 46:9, 94:10
experiences [1] - 41:15
experts [1] - 133:25
explain [6] - 139:3, 149:25, 150:2, 150:19, 173:7, 234:23
explained [3] - 61:2, 74:14, 169:23
explanation [1] - 141:17
exploded [1] - 197:15
explore [1] - 92:8
explosion [1] - 197:20
exposed [1] - 127:8
expression [2] - 263:20, 263:22
extended [1] - 138:20
extra [1] - 39:9
extract [2] - 25:22, 226:17
eyes [1] - 120:19

F

face [13] - 116:16, 117:24, 120:18, 121:12, 121:15, 121:23, 129:23,

215:11, 238:8, 238:9, 262:21, 263:3, 263:22
faced [1] - 126:6
faces [2] - 125:17, 125:20
facetious [4] - 125:23, 208:23, 209:3, 209:4
facia [1] - 55:5
facility [1] - 237:4
facing [2] - 115:7, 126:9
fact [47] - 17:10, 17:13, 22:2, 30:18, 76:16, 78:14, 81:22, 82:21, 84:18, 86:7, 98:19, 105:16, 113:3, 113:20, 118:20, 135:13, 140:2, 150:19, 152:17, 156:25, 161:4, 161:14, 164:19, 169:6, 171:14, 172:16, 173:17, 177:20, 202:9, 203:5, 203:14, 204:3, 205:13, 208:5, 208:21, 212:16, 216:4, 230:18, 234:21, 236:19, 237:17, 238:9, 240:6, 243:11, 243:17, 244:6, 252:17
factors [3] - 34:18, 34:24
facts [10] - 188:5, 205:20, 205:21, 205:25, 206:5, 206:9, 223:9, 232:25, 242:22, 259:3
factual [1] - 140:10
factually [1] - 94:16
failed [1] - 55:5
failure [1] - 16:25
fainting [1] - 149:19
fair [17] - 23:8, 24:18, 28:21, 74:18, 88:7, 111:14, 126:18, 131:8, 134:23, 136:21, 172:2, 172:22, 197:13, 197:23, 218:6, 218:7, 262:22
fairly [6] - 19:12, 19:15, 73:19, 129:7, 150:13, 198:24
fake [1] - 229:14

fakes [1] - 214:16
Falbee [1] - 82:14
falls [1] - 214:24
false [11] - 30:13, 31:2, 31:20, 32:4, 32:18, 33:7, 33:24, 34:11, 34:21, 35:2, 180:18
familiar [1] - 212:6
family [25] - 13:7, 13:10, 13:13, 13:18, 80:15, 80:16, 80:19, 82:3, 82:7, 82:10, 86:11, 166:3, 166:4, 168:11, 172:6, 172:21, 180:18, 191:14, 196:8, 199:12, 206:24, 243:4, 248:21
far [4] - 13:9, 13:17, 31:5, 68:20
fastest [1] - 10:10
fat [1] - 191:9
father [64] - 44:7, 59:10, 59:16, 60:15, 83:2, 84:5, 87:18, 88:25, 98:10, 101:8, 105:6, 105:20, 105:23, 106:20, 106:21, 106:25, 107:5, 107:18, 108:14, 110:21, 111:16, 112:4, 112:20, 113:3, 113:5, 115:7, 115:24, 117:16, 117:24, 118:10, 121:12, 121:16, 133:12, 137:16, 137:17, 138:17, 139:4, 140:4, 140:12, 143:15, 144:5, 148:20, 151:24, 152:19, 160:21, 165:20, 192:14, 205:4, 205:16, 224:11, 224:14, 227:14, 229:16, 229:24, 230:15, 233:3, 234:23, 237:24, 238:10, 238:13, 250:7, 253:7
father's [14] - 61:11, 83:4, 99:16, 101:21, 115:24, 116:2, 117:4, 117:9, 131:17, 132:11, 138:21, 152:22, 171:11, 219:24

favor [1] - 83:23
favorite [1] - 11:5
FDR [1] - 226:3
Federal [1] - 232:9
feed [1] - 25:25
feeding [2] - 27:3, 186:3
feet [17] - 79:19, 105:12, 107:7, 110:23, 112:5, 112:21, 113:8, 113:10, 114:14, 114:22, 114:24, 121:13, 123:7, 138:18, 149:18, 150:23, 174:6
fellow [1] - 65:13
felt [2] - 12:8, 78:18
festival [1] - 49:6
FEVOLA [2] - 267:3, 267:19
Fevola [3] - 1:22, 4:18, 4:19
few [5] - 69:20, 75:11, 82:7, 148:14, 155:12
Fifteenth [1] - 2:11
fifth [1] - 43:17
fifty [3] - 75:5, 236:4, 236:5
fifty-nine [3] - 75:5, 236:4, 236:5
fight [10] - 43:16, 43:21, 43:22, 44:12, 46:19, 47:24, 52:20, 52:21, 52:23, 161:5
fights [5] - 43:25, 46:22, 52:22, 219:21, 219:22
figure [3] - 94:14, 208:9, 224:7
figured [1] - 99:10
figures [1] - 193:17
file [1] - 57:13
filing [1] - 3:5
finally [1] - 11:22
fine [2] - 78:4, 171:5
fingerprints [2] - 221:16, 221:19
fingers [4] - 138:20, 138:22, 139:5, 139:16
fingertips [2] - 138:8, 139:12
finish [14] - 43:20, 100:16, 101:15, 108:6, 109:8, 111:25, 162:23, 202:17, 210:17, 227:9, 227:12, 231:6, 238:20, 256:5

finished [3] - 49:9, 80:12, 170:3
Finn [1] - 11:11
fire [1] - 65:16
firearm [1] - 226:2
firearms [2] - 22:17, 22:18
first [42] - 5:16, 8:20, 29:13, 36:10, 62:9, 62:12, 76:5, 79:23, 90:7, 96:24, 98:4, 105:6, 107:25, 108:9, 108:16, 108:20, 108:25, 110:16, 110:18, 111:15, 111:17, 111:19, 111:22, 112:3, 112:8, 112:11, 121:18, 121:22, 125:9, 131:24, 137:17, 140:14, 141:22, 144:5, 181:22, 191:20, 200:12, 226:11, 231:16, 231:20, 237:23, 239:16
fishing [2] - 63:25
five [3] - 16:24, 50:21, 109:10
flag [2] - 52:12, 53:14
flagrant [2] - 243:14, 246:14
flash [2] - 256:7, 256:13
flat [5] - 83:12, 88:14, 182:8, 182:9, 209:5
flees [1] - 214:20
flicked [1] - 148:3
Floor [1] - 2:8
floor [11] - 101:19, 105:12, 107:6, 107:19, 108:15, 110:22, 112:5, 112:21, 113:12, 121:17, 150:10
focused [1] - 77:5
follow [2] - 37:17, 63:19
followed [1] - 82:11
follows [1] - 5:18
food [1] - 48:22
foot [4] - 53:6, 127:7, 128:20, 193:2
FOR [3] - 1:2, 266:2, 266:6
force [3] - 3:14, 222:24, 260:12
forearm [1] - 116:19, 118:3, 121:25

forensic [1] - 146:11
forensics [1] - 240:20
forget [12] - 18:7, 50:23, 54:25, 55:7, 63:9, 64:2, 67:19, 104:4, 170:8, 170:23, 235:22, 258:13
forgive [1] - 81:4
forgot [1] - 214:15
forgotten [1] - 69:11
form [40] - 3:9, 24:14, 32:8, 32:22, 79:15, 81:21, 83:15, 86:24, 88:19, 145:24, 148:7, 150:18, 153:7, 160:25, 161:19, 165:16, 173:6, 185:6, 185:15, 187:3, 187:16, 203:11, 203:24, 207:4, 207:8, 217:2, 219:5, 222:3, 223:13, 227:2, 230:7, 233:6, 238:16, 239:25, 245:11, 247:8, 254:14, 257:2, 259:9, 263:2
formally [1] - 76:7
formed [1] - 14:22
former [1] - 8:11
Fort [1] - 191:15
forth [9] - 89:13, 94:16, 104:22, 132:20, 143:21, 144:20, 222:10, 249:20, 267:6
forward [4] - 115:8, 189:25, 203:16, 207:17
four [3] - 50:21, 218:19, 259:10
Four [1] - 218:19
four-and-a-half [1] - 218:19
Fourth [1] - 10:2
Fox [6] - 160:12, 166:17, 167:19, 170:21, 171:10, 176:19
fox [3] - 168:8, 168:15, 169:6
frame [1] - 80:10
frankly [2] - 17:7, 28:23
Fred's [1] - 64:25
free [3] - 39:25, 66:21, 205:7
FREUDENPERGER

]2] - 2:9, 5:4
**Freudenperger** [1] - 5:5
**Friday** [1] - 49:5
**friend** [2] - 172:5, 172:9
**friends** [4] - 63:5, 63:6, 65:3, 231:25
**front** [6] - 50:14, 53:18, 104:11, 198:21, 249:22, 253:24
**full** [8] - 49:21, 192:24, 201:24, 201:25, 202:2, 202:6, 229:17, 247:17
**function** [1] - 194:20
**funeral** [2] - 82:25, 83:5
**funny** [1] - 61:11
**FURTHER** [2] - 3:8, 3:12
**future** [2] - 178:9, 179:2
**fuzz** [1] - 128:3

**G**

**Gambino** [2] - 191:6, 191:14
**game** [18] - 70:24, 71:8, 71:13, 72:13, 72:19, 73:2, 73:4, 73:9, 173:3, 209:19, 209:23, 210:3, 210:6, 210:24, 211:6, 211:10, 213:12
**games** [2] - 71:3, 71:4
**gang** [1] - 201:5
**gap** [1] - 123:6
**garage** [3] - 137:13, 137:14, 137:20
**garbage** [1] - 53:17
**Garden** [3] - 1:13, 2:5, 4:10
**Garland** [1] - 49:15
**gas** [4] - 51:23, 51:25, 52:4, 52:5
**gash** [3] - 254:20, 254:21, 256:18
**gather** [1] - 25:7
**Geed** [4] - 72:2, 72:3, 72:8, 72:10
**geez** [2] - 152:20, 184:3
**Gene** [3] - 14:24, 17:25, 195:15
**general** [2] - 9:14,

103:18
**generally** [3] - 30:12, 31:25, 45:10
**Gianelli** [1] - 17:11
**gift** [1] - 41:11
**girls** [2] - 248:4, 248:15
**Girodyne** [2] - 68:7, 68:25
**given** [8] - 12:24, 48:22, 70:12, 171:2, 208:8, 232:17, 236:20, 267:8
**glass** [4] - 51:4, 130:21, 135:19, 135:21
**glasses** [1] - 136:18
**glean** [1] - 93:7
**gloves** [1] - 221:18
**God** [3] - 15:8, 61:18, 150:12
**Godfather** [1] - 172:19
**Goldman** [1] - 79:21
**gotta** [2] - 74:23, 93:3
**Gottlieb** [2] - 133:20, 190:11
**govern** [4] - 42:11, 42:13, 42:14, 42:21
**grabbed** [6] - 51:18, 53:6, 53:7, 53:10, 113:7, 113:10
**grand** [2] - 48:11, 90:10
**grant** [1] - 216:15
**Granted** [1] - 128:9
**grass** [1] - 198:18
**great** [3] - 42:17, 104:24, 215:24
**greet** [1] - 169:15
**Grill** [1] - 49:11
**gritty** [1] - 48:2
**groin** [1] - 53:4
**grope** [1] - 147:16
**groping** [1] - 147:23
**ground** [2] - 51:19, 53:2
**grounds** [5] - 207:9, 230:5, 230:20, 232:8, 242:24
**growing** [1] - 35:13
**guess** [43] - 8:10, 13:5, 16:9, 16:23, 25:3, 27:6, 29:22, 31:3, 35:4, 36:3, 36:15, 41:23, 43:19, 44:8, 55:24, 62:13, 66:7, 67:24, 75:18, 78:24, 86:17, 87:6, 87:21, 88:10, 92:4, 93:13, 102:24,

106:14, 121:9, 126:4, 142:12, 144:15, 144:20, 160:11, 171:25, 181:17, 197:16, 197:23, 199:14, 207:24, 228:10, 238:19, 252:9
**guessing** [1] - 74:15
**guilt** [1] - 129:2
**guilty** [15] - 19:23, 22:3, 90:25, 91:13, 91:17, 91:20, 93:22, 149:9, 150:14, 179:21, 207:19, 222:20, 223:6, 240:12
**Gulf** [2] - 62:9, 62:12
**gullible** [1] - 195:8
**gun** [2] - 13:4, 13:6
**gut** [3] - 42:17, 216:13, 216:24
**guy** [22] - 44:2, 44:23, 47:7, 49:17, 49:19, 50:4, 52:2, 52:4, 54:5, 58:21, 61:12, 63:16, 66:2, 81:4, 193:18, 196:19, 201:16, 202:21, 212:25, 213:15, 214:16, 225:3
**guys** [8] - 52:18, 67:13, 68:11, 71:4, 73:8, 153:22, 211:20, 214:5
**gym** [2] - 192:15, 242:6
**gymnasium** [1] - 104:16

**H**

**hair** [6] - 110:6, 131:19, 220:23, 221:7, 221:12, 221:13
**half** [10] - 71:24, 74:22, 80:11, 165:8, 165:9, 165:23, 175:4, 175:12, 200:14, 218:19
**hall** [2] - 150:7, 150:9
**hand** [8] - 37:15, 38:4, 95:15, 115:25, 148:5, 148:10, 220:24, 267:15
**handcuffs** [1] - 93:2
**handle** [3] - 68:2, 68:4, 131:5

**handles** [1] - 139:15
**hands** [25] - 7:8, 99:12, 116:18, 118:3, 118:25, 119:2, 119:9, 119:12, 120:16, 121:21, 134:9, 135:6, 138:9, 138:17, 139:21, 141:3, 141:6, 141:10, 141:12, 142:10, 144:12, 144:17, 221:8, 221:12
**handset** [2] - 135:22, 136:7
**handwriting** [4] - 39:19, 96:8, 96:9, 96:13
**hanging** [1] - 231:25
**Harbor** [1] - 68:23
**hard** [1] - 196:8
**hardly** [1] - 240:21
**Harry's** [6] - 49:11, 49:17, 51:14, 53:19, 63:8
**Hauppauge** [1] - 2:15
**Hayes** [14] - 192:8, 192:13, 242:12, 242:16, 242:21, 243:4, 243:11, 244:7, 244:15, 244:18, 245:8, 246:9, 246:15
**hd** [1] - 145:13
**head** [28] - 25:19, 61:18, 71:15, 72:15, 127:8, 128:16, 128:19, 129:25, 153:9, 154:14, 177:16, 251:13, 253:15, 253:18, 253:23, 253:24, 253:25, 254:8, 254:12, 255:22, 256:22, 257:13, 257:24, 258:6, 258:15, 259:4, 259:21
**Head** [1] - 68:22
**headache** [1] - 201:23
**headboard** [2] - 126:20, 127:10
**heading** [2] - 69:6, 69:8
**headlights** [1] - 262:23
**headquarters** [7] - 160:10, 170:6, 174:18, 176:25,

177:12, 179:24, 262:18
**hear** [8] - 8:25, 9:2, 59:14, 149:20, 152:17, 189:5, 190:4, 253:25
**heard** [17] - 16:9, 21:5, 21:6, 151:17, 156:8, 160:17, 191:4, 191:24, 193:22, 194:11, 200:13, 200:15, 200:19, 200:22, 208:11, 259:22, 259:23
**hearing** [6] - 7:12, 7:14, 8:21, 33:12, 184:10, 206:3
**hearings** [2] - 184:8, 199:19
**held** [6] - 1:21, 4:9, 65:12, 66:6, 101:7, 105:5
**hell** [4] - 56:24, 70:8, 93:17, 221:18
**help** [7] - 24:3, 104:10, 104:22, 111:16, 130:19, 239:2, 239:3
**helped** [3] - 106:24, 115:4, 139:4
**helping** [3] - 117:24, 118:4, 138:17
**helps** [1] - 101:13
**hereby** [2] - 3:7, 267:4
**HEREBY** [1] - 3:3
**herein** [2] - 1:18, 267:5
**hereto** [1] - 3:5
**hereunto** [1] - 267:14
**Hi** [1] - 170:22
**hide** [1] - 90:13
**hiding** [1] - 219:15
**high** [7] - 71:3, 73:9, 211:5, 213:11, 231:17, 248:3, 248:15
**highly** [1] - 170:13
**himself** [5] - 65:14, 92:20, 142:8, 174:7, 198:25
**Hines** [3] - 87:16, 87:17, 87:19
**Hines's** [1] - 87:20
**hired** [2] - 201:4, 215:17
**history** [3] - 9:15, 10:11, 91:25
**hit** [4] - 254:3, 254:8, 254:11, 259:4
**hockey** [1] - 52:22
**hold** [4] - 55:23,

61:15, 66:5, 232:5
holy [1] - 61:18
home [7] - 53:20, 70:6, 84:15, 180:8, 225:10, 225:23
homicide [28] - 10:5, 10:6, 10:10, 10:16, 14:21, 14:23, 14:24, 16:4, 16:21, 18:15, 19:4, 23:23, 23:24, 25:4, 26:20, 28:9, 28:14, 30:22, 32:2, 41:4, 67:23, 70:16, 94:10, 120:5, 194:17, 195:16, 197:21, 232:3
Homicide [1] - 76:9
homicides [2] - 10:23, 16:19
honest [1] - 201:10
hopefully [1] - 9:4
hoping [1] - 8:22
hospital [14] - 47:11, 143:16, 160:8, 170:4, 174:19, 175:5, 176:4, 176:8, 176:14, 176:18, 176:19, 176:21, 176:24, 182:6
host [1] - 212:9
hotel [1] - 217:19
hour [7] - 71:24, 74:22, 80:11, 166:2, 175:4, 175:12
hours [4] - 218:19, 218:20, 223:7, 229:3
Hours [1] - 75:13
house [38] - 49:16, 65:11, 65:14, 65:16, 65:18, 66:8, 73:6, 74:4, 78:2, 79:19, 82:15, 82:23, 83:19, 85:5, 85:7, 85:15, 85:22, 86:4, 94:9, 94:11, 97:6, 98:23, 103:19, 111:6, 116:21, 125:11, 126:8, 127:16, 142:14, 142:16, 144:11, 144:20, 150:22, 180:11, 225:23, 228:6, 249:19
houses [2] - 65:10, 65:23
Hudson [1] - 2:8
Hughes [1] - 58:18
hum [2] - 115:6, 132:2
human [1] - 204:23
humidity [3] - 220:11,

220:19, 220:20
hundred [2] - 11:2, 70:22
hundreds [2] - 20:10, 20:12
Huntington [1] - 14:5
hurrying [1] - 69:2
hurt [2] - 15:2, 201:17
husband [1] - 81:4
hypothesize [1] - 97:25

I

i.e [1] - 258:22
idea [3] - 73:15, 181:24, 190:5
identification [12] - 39:13, 103:7, 103:23, 114:4, 115:18, 120:9, 133:6, 188:25, 252:6, 254:25, 255:6, 262:16
idiotic [1] - 17:3
immediately [9] - 55:6, 74:19, 74:20, 74:21, 75:17, 77:6, 77:8, 77:9, 78:6
implicates [1] - 221:24
important [2] - 19:3, 245:14
impossible [1] - 164:8
improper [2] - 230:7, 230:21
IN [1] - 267:14
in-depth [1] - 171:21
inappropriate [5] - 77:12, 78:19, 87:8, 88:14, 94:2
Inc [1] - 4:20
included [1] - 177:4
including [2] - 5:10, 67:5
inconsistencies [1] - 229:9
incorrect [2] - 117:22, 239:9
INDEX [2] - 265:2, 265:3
indicated [1] - 108:18
indicates [1] - 244:3
indicating [5] - 104:14, 104:17, 106:10, 257:15, 263:5
indicating) [6] - 101:14, 104:11,

104:20, 104:21, 121:20, 257:16
indication [5] - 107:24, 108:8, 109:22, 109:25, 110:7
indicted [5] - 54:6, 54:23, 90:11, 91:5, 92:2
individual [25] - 12:14, 23:11, 23:22, 24:22, 25:10, 31:25, 34:2, 34:14, 34:15, 35:2, 36:8, 40:14, 41:14, 45:10, 45:19, 46:16, 64:10, 128:15, 132:21, 167:16, 192:13, 192:17, 203:15, 212:4, 212:19
individual's [2] - 21:16, 34:10
individually [1] - 5:9
individuals [22] - 16:6, 18:17, 20:14, 21:12, 22:20, 30:17, 30:22, 34:20, 35:17, 35:25, 41:20, 44:14, 58:15, 81:15, 83:9, 91:4, 91:8, 119:22, 172:25, 173:18, 199:17, 218:8
information [30] - 21:18, 22:13, 23:6, 24:22, 24:23, 25:8, 25:19, 25:21, 25:22, 26:14, 27:3, 31:2, 42:23, 77:24, 93:7, 101:4, 170:17, 170:19, 194:2, 201:12, 201:20, 205:7, 205:8, 209:22, 211:4, 232:17, 242:25, 258:22, 259:3
inhibit [1] - 186:17
inhibited [1] - 186:24
initial [1] - 234:22
initials [1] - 38:11
injured [2] - 66:15, 66:23
injuries [5] - 256:15, 257:12, 259:21, 260:6, 260:13
injury [3] - 150:22, 152:23, 256:21
Inn [1] - 48:20
innocent [19] - 31:13, 89:16, 89:18, 89:21, 89:24, 91:5, 91:8,

91:13, 91:25, 111:17, 127:4, 149:10, 226:24, 227:4, 227:16, 227:17, 230:2, 230:3, 232:17
inside [3] - 88:16, 145:17, 177:16
instances [1] - 47:19
instep [3] - 116:20, 118:7, 121:24
instincts [1] - 42:17
instructed [1] - 108:10
instructions [1] - 105:10
intelligence [2] - 32:5, 34:8
intelligent [1] - 32:19
interact [1] - 46:15
interaction [2] - 170:20, 172:24
interacts [1] - 86:22
interest [8] - 9:5, 23:12, 23:15, 23:24, 23:25, 24:10, 41:3, 206:25
interested [1] - 267:12
interesting [1] - 138:6
interpretations [1] - 88:8
interrogate [5] - 40:11, 44:11, 177:21, 179:14, 179:25
interrogated [1] - 262:19
interrogating [7] - 35:17, 35:24, 36:5, 41:24, 44:16, 44:19, 187:2
interrogation [17] - 25:17, 35:16, 35:20, 43:8, 43:13, 43:23, 44:6, 45:22, 45:23, 59:9, 89:12, 177:24, 178:16, 184:16, 185:18, 186:18, 187:10
interrogations [2] - 30:16, 40:19
interview [12] - 12:4, 25:7, 25:16, 42:23, 45:21, 71:22, 72:8, 75:13, 89:11, 156:18, 247:20
interviewed [8] - 29:3, 32:2, 75:20, 76:16, 76:23, 118:21, 215:23, 215:24
interviewer [1] - 71:24

interviewing [11] - 10
15:21, 15:23, 16:5, 21:16, 22:4, 25:9, 27:15, 44:14, 44:15, 45:20, 169:24
Interviews [3] - 7:24, 8:4, 8:7
introduce [1] - 4:21
introduced [2] - 169:21, 174:7
investigate [6] - 69:8, 93:4, 188:10, 188:12, 188:14, 190:17
investigated [4] - 188:18, 189:9, 189:12, 218:16
investigating [2] - 15:15, 194:25
investigation [23] - 6:24, 7:5, 21:20, 28:12, 28:13, 28:17, 28:18, 28:25, 29:4, 29:8, 29:12, 29:14, 30:25, 37:11, 67:11, 76:18, 77:5, 89:11, 93:8, 134:2, 177:19, 214:8, 240:22
investigations [4] - 16:21, 73:12, 73:14, 167:13
investigator [4] - 55:2, 94:10, 180:17, 217:6
investors [3] - 63:6, 63:7, 64:22
invited [1] - 49:4
involved [33] - 16:6, 19:18, 31:11, 46:12, 50:11, 56:13, 56:19, 56:25, 73:16, 74:11, 75:16, 107:23, 159:15, 159:20, 159:24, 166:6, 177:22, 177:25, 196:12, 197:12, 198:4, 198:24, 199:3, 199:7, 203:17, 205:15, 206:10, 206:24, 207:6, 208:2, 211:10, 213:3, 213:11
involvement [1] - 202:18
IQ [2] - 31:21, 35:25
ironically [1] - 225:16
irreconcilable [1] - 232:25
IS [3] - 3:3, 3:8, 3:12
Island [5] - 73:25,

74:6, 125:18,
193:15, 231:19
isn't' [1] - 175:9
issue [1] - 213:23
IT [3] - 3:3, 3:8, 3:12

**J**

jail [2] - 12:11, 89:18
James [12] - 4:4, 5:23,
14:10, 14:12, 14:15,
14:18, 53:25, 54:2,
54:4, 68:24, 266:4
JAMES [3] - 1:7, 1:17,
264:9
January [1] - 267:15
Jeep [3] - 51:15,
51:17, 52:3
Jeff [1] - 48:21
Jefferson [1] - 73:23
Jerry [43] - 159:15,
159:19, 159:23,
160:20, 162:10,
162:25, 163:4,
163:6, 175:7,
175:10, 175:16,
176:25, 177:4,
180:6, 180:8,
180:22, 189:25,
193:4, 194:14,
201:4, 201:9,
201:12, 201:16,
205:13, 205:18,
205:24, 207:2,
209:13, 209:15,
209:18, 210:2,
210:6, 211:19,
211:23, 211:25,
212:13, 212:15,
212:24, 214:9,
215:2, 215:15,
215:19, 216:19
Jerry's [1] - 193:2
Jersey [1] - 52:22
jersey [1] - 52:25
Jimmy [4] - 58:18,
64:25, 232:5, 232:10
job [20] - 10:15, 13:19,
15:2, 15:20, 17:8,
19:22, 41:8, 41:19,
44:13, 46:6, 59:19,
59:20, 67:2, 179:19,
179:20, 179:24,
192:6, 195:17, 218:2
Joe [12] - 61:12,
188:6, 188:9, 189:9,
189:12, 189:16,
190:10, 199:16,
199:19, 203:18,

209:8
Joey [3] - 190:6,
190:7, 193:5
John [1] - 48:14
JOHN [2] - 1:8
join [1] - 49:5
Judge [1] - 206:20
judge's [1] - 55:7
judgement [3] - 45:17,
216:10, 240:4
judgements [1] - 46:5
judgments [1] - 46:14
Julie [2] - 219:16,
219:21
June [2] - 59:4, 125:25
jury [1] - 90:10

**K**

Kathy [1] - 4:14
KATHY [1] - 2:18
Keahon [4] - 54:11,
54:12, 198:14, 199:3
Kearon [1] - 4:11
KEARON [1] - 2:3
Keating [1] - 64:25
keep [3] - 9:4, 177:9,
208:9
Kent [1] - 193:6
kept [2] - 96:5, 137:23
Kerley [4] - 131:16,
131:23, 134:21,
135:3
Kerrington's [1] -
212:5
Kevin [6] - 14:10,
14:12, 14:15, 14:25,
195:16, 195:22
key [4] - 119:8, 139:7,
140:24
kick [1] - 53:2
kicked [2] - 85:15,
86:4
kid [17] - 59:15, 59:24,
60:11, 78:7, 87:9,
88:23, 173:9,
173:12, 173:25,
174:10, 179:13,
179:25, 194:13,
223:17, 226:18,
231:18, 244:21
kid's [2] - 61:6, 61:8
kids [2] - 216:3, 216:7
kill [4] - 146:17,
146:20, 163:2,
163:17
killed [6] - 58:21, 84:5,
88:24, 89:13,
179:15, 195:25

killer [1] - 11:16
kind [42] - 9:8, 32:17,
33:10, 38:25, 49:23,
55:18, 58:7, 60:11,
72:12, 73:22, 94:8,
98:6, 103:18, 105:5,
110:16, 111:9,
111:25, 130:18,
140:13, 154:13,
164:3, 179:3,
197:14, 197:24,
201:5, 202:14,
207:10, 207:23,
209:6, 220:11,
225:4, 232:16,
234:15, 234:17,
244:13, 246:20,
247:5, 247:13,
248:9, 249:18,
262:22
kinds [2] - 46:5,
224:21
Kirsten [2] - 212:20
kitchen [7] - 82:6,
98:24, 99:20, 100:6,
100:7, 100:10,
225:13
Klein [3] - 190:20,
190:22, 190:23
knife [5] - 100:9,
100:19, 103:2,
103:9, 253:3
knocked [2] - 51:18,
53:2
knowing [1] - 25:13
knowledge [2] -
58:18, 86:21
known [5] - 70:23,
166:8, 178:25,
212:25, 224:14
knows [2] - 202:2,
219:21
knuckles [1] - 261:12
KOSCIUK [1] - 1:7

**L**

labels [1] - 45:2
lack [2] - 86:20, 86:21
lady [2] - 11:12,
195:25
language [4] - 30:6,
61:4, 177:9, 186:25
last [14] - 53:16, 65:2,
65:11, 138:19,
160:20, 165:19,
166:22, 203:24,
205:16, 212:14,
216:21, 234:4,

234:24, 237:25
late [2] - 197:14,
202:24
laugh [2] - 208:21,
216:9
laughing [1] - 213:4
LAW [1] - 2:14
law [6] - 13:14, 17:13,
18:21, 23:21, 166:4,
204:18
Law [1] - 1:20
lawsuits [4] - 56:12,
56:13, 56:18, 57:3
lawyer [16] - 24:2,
167:17, 167:19,
168:9, 168:11,
169:8, 171:11,
174:8, 182:5, 184:2,
184:4, 190:12,
198:15, 241:17
lawyering [3] - 167:3,
167:5, 173:21
lawyers [3] - 46:20,
54:10, 198:4
laying [1] - 150:9
lays [1] - 104:7
lead [3] - 10:24, 11:2,
11:18
leading [3] - 26:23,
27:4, 27:10
leads [1] - 54:22
Leahy [2] - 70:9, 72:24
learn [5] - 31:22,
163:24, 172:18,
191:20, 191:23
learned [6] - 84:24,
85:8, 85:11, 159:7,
159:10, 248:22
learning [1] - 200:11
least [4] - 77:21,
88:21, 146:9, 253:4
leave [5] - 86:8,
128:10, 128:19,
141:11, 237:18
leaving [2] - 51:15,
184:23
led [1] - 204:4
Lee [1] - 2:15
left [28] - 17:15, 37:15,
52:18, 53:15, 84:19,
84:23, 103:16,
111:5, 115:9,
115:23, 115:24,
116:2, 116:11,
116:18, 118:3,
121:24, 130:5,
142:17, 168:8,
180:8, 180:10,
253:24, 255:22,
256:22, 257:12,

257:24, 259:4        11
left-hand [1] - 37:15
leg [1] - 113:22
legal [2] - 23:24, 164:4
legally [1] - 163:15
legs [2] - 12:10, 116:3
length [1] - 215:25
lengthy [2] - 234:5,
261:23
Lenny [2] - 211:18,
211:23
less [1] - 185:13
level [4] - 18:11,
23:10, 24:16, 32:5
liar [2] - 232:12,
232:13
lie [15] - 194:7, 220:9,
221:22, 222:5,
223:3, 227:13,
227:19, 234:17,
236:7, 236:24,
237:5, 237:23,
238:6, 238:9, 241:6
lied [2] - 105:11, 184:4
lies [4] - 194:6, 220:9,
221:24, 243:15
life [6] - 66:20, 188:8,
193:23, 204:23,
231:10, 250:15
lifted [1] - 113:3
light [23] - 51:5, 99:7,
99:12, 123:12,
123:20, 124:14,
124:20, 124:22,
127:19, 128:5,
128:9, 128:12,
147:7, 147:12,
147:15, 147:19,
147:23, 148:3,
148:10, 148:11,
150:10, 256:10,
256:11
lighting [3] - 126:11,
127:13, 134:17
lights [3] - 51:6, 51:8,
51:10
likely [5] - 33:23,
34:20, 35:2, 147:23
limit [1] - 129:10
limited [2] - 109:13,
250:11
Lincoln [1] - 249:25
line [6] - 90:3, 100:16,
109:8, 120:12,
120:13, 247:15
linen [2] - 104:21,
157:6
lines [4] - 171:3,
235:7, 236:15,
236:17

list [1] - 206:22
listed [1] - 34:18
listen [2] - 60:23, 79:9
listened [1] - 158:14
listening [1] - 159:8
literally [11] - 11:21, 44:18, 74:4, 131:18, 132:20, 141:3, 191:7, 197:20, 214:15, 254:2, 258:22
litigation [1] - 57:2
live [3] - 68:9, 82:15, 228:22
lived [4] - 68:22, 147:22, 191:14, 213:9
lives [5] - 231:18, 249:10, 249:11, 249:14
living [2] - 49:14, 83:18
LLP [2] - 2:3, 2:7
LN [1] - 266:6
loaded [1] - 56:10
located [1] - 4:16
lock [4] - 89:18, 93:3, 139:17, 223:25
locked [4] - 47:8, 52:10, 52:15, 89:19
log [3] - 51:19, 75:7
logical [1] - 150:14
logs [1] - 96:2
Lombrano [3] - 211:18, 211:23, 212:2
look [35] - 8:3, 34:19, 37:7, 53:12, 74:23, 74:24, 76:14, 87:19, 88:3, 88:4, 101:11, 101:12, 105:17, 111:23, 120:10, 128:16, 129:6, 131:3, 133:7, 134:14, 135:13, 135:20, 135:21, 153:17, 156:17, 206:11, 207:25, 216:10, 221:13, 228:4, 252:7, 257:20, 262:24, 263:3, 263:8
looked [20] - 7:19, 12:5, 97:23, 98:5, 98:20, 118:19, 124:6, 126:13, 128:7, 132:10, 155:11, 251:18, 252:21, 254:16, 254:17, 254:20,

255:18, 260:14, 263:12, 263:14
looking [32] - 34:19, 36:23, 50:15, 50:16, 60:10, 60:16, 80:10, 88:12, 113:24, 115:11, 125:2, 126:18, 126:20, 127:5, 127:8, 127:9, 137:18, 137:24, 138:4, 147:16, 196:18, 235:24, 236:5, 238:18, 255:21, 256:20, 257:4, 257:7, 258:6, 258:14, 262:21
looks [4] - 61:13, 96:16, 127:14, 136:5
loser [1] - 47:10
loss [1] - 208:25
losses [1] - 55:21
lost [4] - 47:11, 47:13, 218:2, 218:6
loudly [1] - 9:5
loved [1] - 118:15
low [2] - 31:20, 35:25
Lucchese [1] - 243:4
Lumbar [1] - 225:17
lunch [4] - 102:11, 102:12, 102:17, 106:7
lying [3] - 129:23, 229:22, 229:25

## M

mad [1] - 195:5
magnifying [4] - 130:21, 135:19, 135:21, 136:18
Mahoney [3] - 11:20, 48:12, 49:4
maid [1] - 219:24
maintain [1] - 96:3
maitre' [1] - 212:9
maker [1] - 90:22
mall [4] - 63:4, 63:7, 63:12, 63:20
man [3] - 61:13, 172:12, 215:25
managed [2] - 13:22, 225:18
manager [1] - 212:9
March [1] - 10:8
Marine [1] - 65:24
Marines [3] - 48:19, 231:17, 231:24
marines [1] - 49:7
marines' [1] - 49:2

MARION [2] - 2:3, 2:6
Marion [1] - 4:11
mark [5] - 39:10, 115:16, 188:21, 188:22, 254:23
marked [27] - 37:5, 39:8, 39:13, 39:15, 76:4, 95:5, 103:5, 103:7, 103:21, 103:23, 103:25, 113:25, 114:4, 115:18, 120:7, 120:9, 133:3, 133:5, 133:8, 188:24, 252:3, 252:5, 252:8, 254:25, 255:5, 262:13, 262:15
marriage [1] - 267:10
married [1] - 65:13
marshall [1] - 48:11
MARTIN [2] - 1:4, 2:19
Martin [10] - 4:5, 4:25, 36:12, 86:14, 133:11, 166:12, 207:18, 247:21, 247:22, 266:2
Marty [161] - 61:6, 61:8, 61:9, 61:10, 74:11, 75:16, 75:21, 76:18, 77:21, 79:18, 79:24, 80:6, 80:7, 80:8, 80:22, 84:24, 85:9, 85:12, 86:2, 86:22, 88:13, 92:11, 94:22, 100:25, 101:17, 105:3, 106:21, 107:23, 108:14, 109:4, 109:9, 110:9, 110:14, 111:11, 112:12, 112:19, 114:20, 115:4, 115:5, 115:23, 116:6, 116:10, 116:14, 116:15, 116:21, 117:2, 117:14, 118:24, 118:25, 122:4, 122:19, 125:9, 126:12, 126:18, 130:6, 135:14, 137:3, 137:15, 138:7, 138:16, 139:11, 141:22, 143:10, 147:22, 148:2, 148:17, 150:4, 151:3, 151:16, 153:13, 154:2, 154:8, 155:5, 155:10, 155:18,

156:11, 157:9, 158:8, 158:9, 158:15, 158:23, 159:2, 159:11, 160:3, 160:5, 160:9, 168:10, 168:14, 168:16, 169:20, 169:24, 170:2, 170:9, 170:14, 170:16, 170:21, 171:4, 171:5, 171:9, 171:18, 173:20, 174:14, 174:17, 175:18, 175:21, 176:3, 176:13, 176:17, 176:23, 177:6, 179:5, 180:22, 181:4, 182:3, 182:12, 183:13, 186:2, 190:3, 192:18, 201:17, 212:23, 214:25, 218:22, 219:2, 219:7, 219:20, 220:9, 220:10, 220:22, 222:5, 222:15, 223:20, 226:10, 227:17, 228:8, 230:12, 236:21, 239:6, 239:11, 240:23, 240:25, 241:10, 241:13, 241:24, 244:7, 244:8, 244:10, 244:19, 245:6, 245:12, 245:22, 246:18, 246:19, 246:21, 249:9, 252:15, 262:4, 262:18
Marty's [39] - 60:23, 61:5, 74:3, 98:10, 99:6, 99:16, 104:19, 106:20, 106:24, 115:25, 122:7, 126:5, 131:24, 138:22, 146:24, 147:8, 149:8, 153:5, 155:4, 160:21, 165:20, 169:7, 172:19, 189:21, 190:11, 190:14, 192:14, 204:5, 205:16, 213:22, 216:21, 219:24, 221:7, 234:21, 237:23, 252:11, 252:21, 260:23, 263:3
master [7] - 98:13,

99:21, 99:22, 99:25, 12
104:13, 122:24,
261:4
match [1] - 220:2
material [1] - 6:14
matter [22] - 4:4, 17:10, 32:15, 78:14, 89:23, 90:17, 113:20, 140:2, 171:14, 203:19, 205:23, 206:4, 206:8, 207:16, 207:19, 208:20, 212:16, 214:24, 216:4, 218:24, 218:25, 267:13
matters [1] - 206:13
mature [2] - 33:22, 35:10
McCready [24] - 1:7, 1:17, 4:4, 5:11, 5:23, 6:3, 14:10, 14:11, 14:13, 14:18, 39:14, 63:15, 76:7, 76:10, 77:4, 90:16, 103:24, 187:12, 189:4, 196:11, 196:16, 196:20, 264:9, 266:4
McLELHONE [1] - 1:8
McSweeney [1] - 13:18
mean [36] - 7:20, 17:13, 23:9, 24:12, 24:16, 25:5, 35:7, 43:10, 43:15, 43:19, 77:25, 87:15, 92:16, 92:24, 97:10, 124:14, 125:23, 137:3, 139:22, 141:3, 143:19, 167:6, 174:24, 194:22, 202:7, 205:17, 207:10, 214:4, 220:4, 227:11, 227:25, 241:11, 249:8, 256:7, 258:2, 263:23
meaning [1] - 90:22
means [10] - 16:24, 24:8, 27:6, 27:7, 41:7, 141:9, 141:10, 167:3, 167:7, 208:25
meant [2] - 35:9, 154:13
meantime [1] - 40:8
media [4] - 7:24, 8:3, 8:4, 8:6
medical [1] - 107:13
medication [1] - 195:24

13

**meeting** [1] - 82:6
**member** [1] - 180:19
**members** [3] - 6:24, 82:7, 166:3
**memorable** [1] - 11:8
**memory** [11] - 71:18, 74:15, 76:15, 230:19, 232:19, 233:2, 234:19, 238:14, 246:25, 251:25, 252:10
**mental** [2] - 97:12, 99:3
**mentally** [1] - 97:22
**mention** [1] - 149:22
**mentioned** [7] - 1:21, 46:18, 56:5, 58:10, 176:8, 176:19
**mere** [1] - 246:14
**messed** [1] - 163:11
**met** [4] - 188:9, 193:8, 194:12, 250:19
**Michael** [3] - 160:12, 167:19, 170:21
**mid** [2] - 197:18, 197:19
**mid-eighties** [2] - 197:18, 197:19
**Midland** [1] - 65:24
**might** [20] - 11:5, 17:15, 48:6, 57:7, 60:17, 70:9, 70:23, 75:18, 97:24, 97:25, 138:11, 138:13, 138:22, 159:25, 160:16, 162:21, 198:17, 210:8, 234:18
**Mike** [15] - 67:21, 67:23, 67:24, 170:23, 171:10, 171:18, 172:5, 172:13, 172:19, 173:2, 173:8, 173:24, 176:19, 182:4
**Mike's** [1] - 60:3
**military** [2] - 13:24, 13:25
**MILLER** [1] - 2:10
**million** [1] - 48:4
**mind** [21] - 12:12, 12:23, 45:15, 45:16, 49:13, 67:19, 74:19, 83:8, 85:20, 92:12, 98:8, 128:22, 128:25, 129:17, 153:4, 163:9, 164:25, 171:24, 179:13, 209:9,

222:20
**mine** [4] - 12:7, 63:6, 196:21
**minute** [8] - 55:22, 55:23, 98:20, 112:14, 134:10, 193:18, 227:9, 236:9
**minutes** [3] - 69:4, 109:10, 123:19
**misdemeanor** [1] - 55:23
**mistake** [2] - 67:15, 87:9
**mistaken** [1] - 212:12
**mistakenly** [2] - 121:19, 121:22
**mistakes** [1] - 38:10
**mixed** [2] - 196:16, 196:17
**mob** [1] - 242:16
**model** [2] - 104:2, 104:6
**moisture** [2] - 134:9, 135:5
**mom** [2] - 145:18, 145:20
**mom's** [1] - 131:24
**moment** [3] - 86:14, 115:5, 172:21
**money** [24] - 48:19, 65:8, 81:5, 81:7, 161:5, 161:15, 162:6, 162:19, 165:21, 190:2, 190:13, 192:22, 201:17, 201:19, 202:9, 202:23, 206:2, 208:8, 209:7, 209:12, 216:4, 217:11, 217:21, 242:14
**month** [1] - 211:9
**months** [2] - 67:7, 82:22
**Moriarty** [3] - 75:13, 93:20, 188:16
**morning** [17] - 6:2, 6:4, 8:10, 68:11, 123:12, 123:17, 123:23, 124:4, 124:15, 148:3, 148:19, 156:23, 180:9, 219:20, 220:14, 240:25, 263:19
**moron** [1] - 193:6
**morons** [1] - 217:4
**Morris** [1] - 48:15
**mortgage** [6] - 65:12, 65:17, 65:21, 66:4,

66:5, 66:7
**Morty** [1] - 79:21
**most** [8] - 20:13, 26:24, 26:25, 43:25, 47:5, 256:21
**mother** [21] - 59:16, 59:19, 59:21, 84:5, 88:24, 98:14, 137:18, 137:24, 146:17, 146:20, 148:19, 149:18, 149:22, 150:9, 150:12, 152:23, 204:24, 204:25, 205:3, 253:4, 253:10
**mother's** [14] - 117:5, 117:7, 126:6, 127:6, 128:19, 145:13, 145:16, 146:15, 147:3, 147:7, 149:14, 152:22, 155:15, 220:23
**motion** [1] - 51:9
**motive** [1] - 22:13
**motorcycle** [1] - 201:5
**mouth** [5] - 153:5, 154:14, 190:15, 202:20, 203:4
**move** [5] - 61:23, 122:14, 174:12, 195:12, 217:24
**moved** [6] - 66:10, 68:5, 101:19, 108:14, 112:20, 114:10
**moves** [1] - 163:18
**moving** [5] - 68:6, 68:8, 112:4, 121:8, 259:16
**MR** [121] - 4:24, 5:2, 5:7, 5:20, 6:2, 6:5, 32:7, 32:11, 36:20, 36:25, 37:3, 39:7, 57:20, 59:12, 79:14, 81:25, 83:14, 86:23, 87:12, 90:2, 102:10, 102:22, 103:4, 103:20, 109:2, 115:15, 119:15, 120:6, 124:19, 133:2, 140:6, 140:9, 145:23, 148:6, 150:16, 153:6, 158:17, 158:19, 158:20, 160:24, 161:18, 162:23, 162:24, 163:12, 164:11, 164:14, 165:15, 166:7, 167:21, 168:7,

171:22, 171:25, 173:5, 185:5, 185:14, 187:3, 187:15, 188:4, 188:20, 189:4, 189:13, 193:20, 202:17, 203:2, 203:10, 203:23, 204:8, 204:10, 205:9, 206:14, 207:3, 207:8, 210:17, 214:5, 215:6, 216:25, 219:4, 222:2, 223:12, 224:24, 226:25, 227:12, 230:4, 230:20, 231:5, 232:4, 233:5, 233:15, 233:25, 234:10, 234:12, 236:11, 236:13, 238:15, 239:24, 242:23, 243:6, 243:9, 244:16, 245:10, 245:25, 246:22, 247:7, 252:2, 254:14, 254:22, 255:2, 256:5, 256:12, 256:25, 258:8, 259:8, 259:11, 259:13, 260:2, 260:8, 261:19, 261:24, 262:12, 262:25, 263:25
**MS** [3] - 5:4, 88:18, 113:23
**MTV** [1] - 128:3
**multiple** [3] - 166:24, 203:16, 207:9
**murder** [37] - 12:14, 19:18, 24:8, 30:24, 67:18, 73:12, 73:14, 79:20, 79:25, 84:25, 116:22, 129:2, 170:10, 177:18, 180:5, 180:10, 193:3, 193:4, 193:5, 193:7, 193:9, 199:21, 203:4, 203:17, 204:24, 206:7, 206:24, 208:14, 209:2, 215:16, 215:17, 220:3, 222:15, 240:13
**murdered** [8] - 15:11, 79:25, 116:22, 118:10, 126:25, 145:18, 145:20,

172:10     13
**murderer** [2] - 189:11, 238:11
**murders** [15] - 11:2, 11:17, 146:6, 146:16, 175:3, 175:22, 175:24, 177:22, 178:2, 194:25, 207:7, 208:2, 209:16, 209:23, 213:17
**Murphy** [1] - 13:18
**must** [1] - 196:7
**Mutchuler** [1] - 219:16

### N

**Name** [1] - 266:2
**name** [26] - 4:14, 5:21, 11:15, 14:10, 14:12, 17:25, 45:3, 49:20, 49:21, 50:24, 55:7, 61:6, 61:9, 61:12, 63:9, 63:11, 63:14, 65:2, 65:20, 189:17, 190:20, 193:7, 208:10, 211:17, 214:20, 219:19
**named** [5] - 5:9, 49:19, 196:20, 225:16, 238:10
**narcotics** [12] - 9:24, 15:5, 15:10, 194:21, 196:12, 196:19, 196:22, 196:25, 197:13, 198:5, 198:16
**Nassau** [1] - 225:17
**natural** [1] - 35:12
**nature** [1] - 45:13
**near** [1] - 150:21
**necessarily** [16] - 33:3, 33:4, 33:18, 34:3, 34:6, 42:9, 83:22, 109:5, 137:2, 137:4, 139:19, 139:22, 139:24, 239:9
**neck** [6] - 105:13, 107:8, 110:24, 112:6, 114:25, 138:21
**need** [9] - 8:21, 15:25, 18:15, 18:16, 18:18, 25:4, 36:9, 40:7, 149:21
**needed** [3] - 238:25, 239:2
**needless** [1] - 12:8

14

**needs** [1] – 241:20
**nefarious** [4] – 206:21, 207:6, 216:2, 216:20
**neighbor** [1] – 80:7
**neighbors** [2] – 65:4, 79:18
**nephew** [2] – 17:17, 86:13
**nephews** [1] – 80:21
**Nesconset** [1] – 4:16
**NEUFELD** [1] – 2:7
**never** [31] – 29:2, 29:23, 31:3, 31:13, 49:21, 89:17, 152:23, 165:2, 174:9, 176:8, 176:17, 188:8, 190:6, 191:4, 192:25, 193:8, 193:22, 212:12, 218:10, 218:15, 221:9, 221:19, 221:21, 228:8, 229:21, 229:24, 233:9, 243:24, 244:9, 244:22, 245:22
**new** [1] – 204:16
**NEW** [2] – 1:2, 1:2
**New** [15] – 1:13, 1:23, 2:5, 2:8, 2:15, 4:8, 4:17, 5:17, 5:25, 9:19, 13:11, 50:9, 167:14, 267:4
**news** [1] – 71:19
**News** [1] – 71:23
**Newsday** [1] – 28:7
**next** [13] – 5:10, 14:23, 51:12, 68:24, 100:9, 100:19, 103:9, 137:7, 141:11, 150:6, 157:5, 174:5, 238:22
**nice** [2] – 65:12, 124:6
**nicest** [1] – 212:24
**niece** [1] – 86:13
**nieces** [1] – 80:20
**night** [9] – 49:5, 56:6, 60:2, 67:17, 126:25, 128:11, 220:13, 251:7, 252:16
**nine** [5] – 75:5, 156:20, 236:4, 236:5, 236:18
**nineties** [2] – 197:19, 202:24
**nitty** [1] – 48:2
**nobody** [5] – 42:19, 129:9, 189:11, 237:12, 256:3
**non** [1] – 27:10

**non-leading** [1] – 27:10
**none** [4] – 130:13, 178:8, 221:7, 228:18
**nonsense** [1] – 184:5
**nonverbal** [3] – 87:23, 88:2, 88:8
**Norm** [1] – 235:8
**normal** [1] – 239:11
**Norman** [3] – 8:11, 74:17, 174:16
**NORMAN** [1] – 1:7
**Norman's** [1] – 7:6
**North** [1] – 55:18
**north** [4] – 73:24, 125:20, 126:8, 231:18
**northeast** [1] – 126:2
**Notary** [4] – 1:22, 3:14, 5:16, 267:3
**NOTARY** [2] – 264:16, 266:25
**note** [5] – 82:10, 203:23, 258:17, 258:18, 258:21
**notebook** [3] – 96:6, 96:20, 96:21
**noted** [1] – 264:5
**notes** [32] – 6:18, 7:4, 7:6, 7:7, 37:22, 37:24, 39:4, 39:17, 39:23, 40:3, 40:4, 95:4, 95:6, 95:15, 95:18, 95:21, 95:25, 96:11, 96:12, 101:11, 143:20, 153:19, 156:17, 156:22, 156:25, 157:8, 157:12, 158:17, 158:19, 158:21, 251:21, 251:22
**Notes** [1] – 265:10
**nothing** [12] – 23:25, 25:13, 29:3, 34:9, 63:16, 79:6, 90:13, 114:13, 145:12, 173:19, 207:14, 260:5
**notice** [5] – 120:15, 128:19, 258:11, 258:16, 260:11
**noticed** [6] – 99:7, 113:21, 116:16, 120:16, 122:22, 148:20
**notified** [2] – 67:23, 67:24
**NOW** [1] – 266:6
**number** [14] – 4:3,

7:23, 9:16, 28:3, 63:5, 67:16, 75:3, 75:4, 103:5, 105:3, 156:19, 159:13, 199:17, 236:3
**numbers** [3] – 96:8, 135:14, 157:5
**numerous** [4] – 230:5, 230:20, 232:7, 242:24
**NW** [1] – 2:11

**O**

**o'clock** [3] – 123:11, 124:15, 180:11
**oath** [3] – 201:19, 202:7, 206:3
**object** [30] – 32:7, 32:21, 59:12, 79:14, 81:20, 83:14, 86:23, 88:18, 90:2, 132:19, 140:7, 145:23, 148:6, 150:16, 160:24, 161:18, 164:12, 165:15, 173:5, 203:10, 204:8, 206:15, 207:8, 215:7, 216:25, 219:4, 223:12, 224:25, 226:25, 230:4
**objecting** [7] – 232:4, 232:7, 233:6, 238:15, 242:23, 246:4, 256:25
**objection** [23] – 87:12, 153:6, 163:12, 171:22, 185:5, 185:14, 187:3, 187:6, 187:15, 203:23, 207:3, 214:5, 222:2, 239:24, 243:6, 244:16, 245:10, 245:25, 246:22, 247:7, 254:14, 259:8, 262:25
**objections** [1] – 3:9
**observations** [3] – 97:20, 99:4, 106:16
**observe** [1] – 94:15
**observed** [12] – 100:7, 100:12, 100:22, 101:21, 120:22, 132:6, 133:10, 168:21, 255:17, 258:3, 263:15, 263:18
**observing** [1] – 260:6

**obtain** [1] – 40:11
**obvious** [5] – 163:13, 256:21, 260:21, 261:2
**obviously** [15] – 30:2, 107:10, 119:19, 119:20, 121:7, 124:11, 126:17, 136:16, 219:5, 222:12, 249:10, 256:23, 257:12, 260:20
**occasionally** [1] – 245:18
**occasions** [2] – 105:4, 212:11
**occur** [2] – 229:24, 234:16
**occurred** [4] – 30:15, 174:16, 178:21, 233:9
**occurs** [1] – 229:22
**oceanfront** [1] – 249:22
**October** [2] – 9:18, 62:4
**OF** [4] – 1:2, 1:7, 2:14, 266:2
**offense** [1] – 76:11
**offer** [3] – 235:21, 245:2, 245:5
**offered** [6] – 28:19, 190:2, 235:14, 235:17, 235:20, 241:9
**offering** [3] – 190:13, 201:17, 239:18
**office** [31] – 17:20, 54:24, 63:23, 84:10, 84:13, 97:18, 98:5, 99:16, 101:21, 104:16, 106:2, 106:3, 106:8, 106:20, 115:12, 130:10, 130:13, 133:11, 149:2, 149:7, 149:11, 151:9, 151:13, 152:7, 153:10, 154:9, 154:11, 155:11, 157:6, 190:13, 224:17
**Officer** [4] – 120:11, 120:21, 121:2, 138:7
**officer** [22] – 9:16, 12:20, 13:20, 13:21, 20:7, 59:5, 59:7, 77:2, 90:8, 92:18, 93:19, 116:16, 119:2, 119:13,

119:14, 142:17, 144:10, 159:22, 160:15, 180:17, 241:16, 246:10
**OFFICERS** [1] – 1:8
**officers** [16] – 14:7, 66:15, 79:23, 90:21, 91:7, 109:11, 109:16, 116:14, 116:23, 118:22, 119:6, 120:2, 122:11, 134:2, 143:7, 159:14
**officially** [1] – 124:13
**Old** [3] – 1:12, 2:4, 4:10
**old** [5] – 51:4, 61:13, 231:3, 231:7, 231:9
**once** [4] – 74:10, 194:13, 236:20, 237:22
**one** [73] – 1:17, 4:3, 11:6, 14:20, 14:23, 17:14, 20:3, 31:8, 32:14, 36:18, 40:9, 44:2, 45:21, 47:5, 51:13, 53:18, 54:22, 58:9, 58:10, 60:2, 64:17, 65:25, 68:6, 73:17, 78:2, 78:3, 85:17, 85:20, 88:2, 94:18, 104:24, 111:8, 122:21, 123:6, 127:17, 145:6, 145:11, 145:12, 150:5, 150:20, 150:21, 154:4, 155:17, 155:22, 166:10, 171:2, 176:18, 187:9, 195:18, 195:21, 201:15, 207:21, 213:23, 214:15, 216:6, 221:24, 228:3, 228:6, 229:18, 236:15, 237:2, 244:13, 245:22, 251:13, 253:25, 255:21, 255:24, 263:4, 263:5
**ones** [1] – 36:15
**ongoing** [2] – 93:8, 165:21
**open** [2] – 123:7, 142:9
**opened** [1] – 137:20
**opens** [1] – 61:15
**operating** [1] – 201:15
**operator** [9] – 108:3,

108:9, 108:11,
156:4, 156:12,
156:22, 158:2,
158:10, 158:13
opinion [3] - 32:14,
239:18, 240:5
opportunity [1] -
148:16
opposed [3] - 36:5,
65:6, 125:25
opposite [1] - 24:17
oral [1] - 183:5
Order [1] - 1:21
order [2] - 102:16,
222:19
ordering [5] - 242:8,
242:11, 244:8,
244:19, 246:20
organized [2] - 15:16,
193:17
orient [1] - 104:10
orientate [1] - 115:14
original [3] - 14:21,
119:6, 156:18
originally [2] - 68:4,
69:12
outcome [1] - 267:13
outside [7] - 50:12,
51:2, 51:14, 60:24,
61:14, 78:4, 119:10
overdose [1] - 198:11
overlooking [1] -
249:19
overstate [1] - 41:11
overstep [1] - 17:9
owe [4] - 162:12,
163:15, 163:16,
165:7
owed [2] - 161:16,
164:7
own [13] - 30:7, 35:7,
41:15, 96:6, 103:11,
147:24, 152:3,
186:23, 193:11,
214:16, 230:12,
232:18, 234:18
owned [6] - 49:16,
50:20, 63:3, 64:9,
165:9, 213:7
owner [1] - 213:15
owns [1] - 165:23

## P

p.m [10] - 57:25, 58:5,
102:14, 102:19,
167:24, 168:4,
233:18, 233:23,
264:4, 264:5

Pacific [1] - 11:23
package [1] - 225:15
pad [2] - 96:16, 96:19
Page [6] - 120:10,
236:5, 236:15,
247:13, 265:4, 265:9
page [7] - 36:24,
69:21, 76:5, 96:24,
119:16, 157:3, 157:4
pages [1] - 39:21
paid [9] - 9:6, 9:7,
48:23, 208:13,
208:18, 217:11,
217:16, 217:18,
217:21
paint [1] - 141:7
Palermo [1] - 61:10
palm [1] - 120:15
palms [5] - 116:18,
118:3, 118:25,
138:8, 139:5
panicked [1] - 151:23
pants [1] - 53:7
paper [1] - 63:16
Parade [1] - 48:10
parade [1] - 49:8
paragraph [3] - 76:15,
236:6, 247:18
parallels [1] - 43:22
pardon [2] - 29:9,
169:2
parent [2] - 150:6,
150:22
parents [23] - 77:13,
78:9, 79:25, 89:14,
107:2, 107:5,
116:23, 126:13,
126:19, 126:24,
127:5, 128:18,
144:4, 152:12,
170:10, 179:15,
192:18, 216:21,
228:5, 228:25,
232:2, 250:19,
252:25
park [2] - 49:6, 51:17
part [36] - 9:6, 13:18,
15:20, 18:13, 20:13,
24:5, 24:6, 24:20,
25:3, 26:19, 26:24,
26:25, 35:12, 41:19,
46:2, 46:6, 46:19,
52:14, 67:16, 68:6,
73:22, 77:25, 86:3,
106:15, 111:15,
111:18, 129:14,
155:21, 167:12,
183:17, 192:6,
194:20, 204:9,
215:22, 239:16,

250:10
particular [5] - 28:24,
34:3, 60:2, 67:11,
167:14
particularly [4] - 11:8,
18:14, 41:6, 77:12
parties [3] - 3:4, 4:22,
267:10
partner [3] - 8:11,
11:20, 198:11
Paschal [1] - 4:14
PASCHAL [1] - 2:18
passed [3] - 198:11,
213:23, 214:3
Pat [3] - 48:12, 49:4,
60:3
Paterno [2] - 61:10,
61:12
Patrick's [3] - 48:9,
48:10, 48:17
Patty [1] - 11:11
patty's [1] - 49:5
Patty's [1] - 52:11
pay [6] - 9:3, 35:23,
49:2, 218:4, 218:5
payment [4] - 162:16,
162:19, 162:21,
162:22
PBA [3] - 12:25, 48:25,
69:22
peer [1] - 35:8
pen [1] - 139:9
pennies [1] - 163:25
people [49] - 18:4,
18:9, 23:18, 31:19,
31:20, 31:21, 41:12,
41:13, 42:21, 43:6,
43:11, 44:11, 45:2,
49:4, 50:15, 55:4,
61:24, 63:17, 71:3,
73:6, 73:7, 78:2,
87:25, 89:18, 89:24,
90:6, 91:14, 91:15,
91:17, 91:20, 91:25,
118:18, 118:21,
159:13, 161:13,
163:17, 166:24,
179:4, 179:20,
189:10, 205:14,
206:9, 206:23,
211:11, 213:5,
213:12, 219:8,
219:11
percent [5] - 16:18,
16:25, 17:6, 70:22,
216:14
perfect [6] - 42:18,
42:19, 90:18, 91:22,
216:16, 216:17
perfectly [1] - 256:11

perhaps [3] - 32:3,
35:25, 123:20
period [3] - 155:19,
161:6, 182:18
person [35] - 22:10,
22:25, 24:17, 26:9,
26:11, 31:12, 32:6,
72:20, 86:13, 88:12,
90:24, 120:14,
131:23, 150:14,
160:21, 165:19,
166:22, 183:25,
190:19, 205:16,
209:18, 210:16,
211:17, 222:20,
227:4, 227:16,
230:3, 232:3,
234:25, 238:2,
238:24, 240:23,
242:13, 245:9, 258:7
personal [2] - 41:15,
57:14
perspective [1] -
246:24
Pfalzgraf [3] - 160:8,
166:15, 166:18
PG [1] - 266:6
phase [1] - 248:20
phenomenon [2] -
30:13, 33:10
Phil [1] - 208:22
phone [45] - 51:2,
51:4, 83:17, 99:24,
100:2, 130:19,
131:2, 131:5, 132:9,
132:23, 134:8,
134:23, 135:5,
135:7, 135:22,
136:9, 136:17,
136:23, 140:21,
140:25, 141:23,
141:24, 148:25,
149:7, 150:12,
152:4, 152:5, 153:3,
153:10, 154:9,
154:11, 154:17,
154:18, 154:22,
154:23, 155:7,
155:11, 155:13,
155:14, 155:15,
157:6, 218:22,
220:2, 229:14
phones [1] - 99:20
phonetic [9] - 15:8,
47:23, 49:16, 68:7,
69:17, 103:13,
191:18, 219:17,
225:4
photo [1] - 256:17
photograph [7] -

104:2, 104:6,
115:14, 134:14,
134:18, 136:13,
257:18
Photograph [5] -
265:11, 265:12,
265:13, 265:14,
265:19
photographer [1] -
259:18
photographs [10] -
7:20, 7:21, 102:12,
133:17, 133:19,
133:23, 255:8,
256:9, 260:7, 260:15
Photographs [4] -
265:16, 265:18,
265:20, 265:21
photos [2] - 6:19,
256:6
phrase [7] - 21:4,
21:6, 33:2, 40:12,
167:3, 167:5, 260:13
physical [3] - 112:6,
122:9, 221:23
pick [2] - 8:23, 233:15
picked [3] - 140:19,
150:11, 214:12
picking [1] - 141:14
picks [2] - 134:10,
135:7
picture [13] - 97:7,
97:11, 97:12, 97:23,
100:13, 102:24,
111:23, 131:3,
134:19, 190:9,
256:18, 257:4, 263:4
pictures [13] - 49:13,
102:9, 135:20,
252:3, 255:11,
255:16, 255:18,
255:19, 257:8,
258:14, 262:9,
262:18, 263:11
piece [3] - 60:20,
162:9, 254:2
pillow [3] - 107:7,
138:18, 157:7
pillows [2] - 126:21,
127:10
pitts [1] - 55:8
Pitts [2] - 55:9, 198:22
pizza [2] - 63:21,
213:15
place [31] - 1:22,
11:23, 15:9, 25:17,
28:18, 39:3, 49:24,
50:24, 59:2, 60:3,
63:21, 94:15, 97:8,
98:9, 101:8, 105:17,

105:20, 107:20, 112:8, 112:10, 122:8, 129:17, 149:9, 151:20, 153:18, 185:2, 204:15, 212:14, 219:2, 221:16
placed [2] - 28:8, 28:13
plaintiff [1] - 164:10
Plaintiff [7] - 1:5, 1:19, 2:4, 2:7, 2:11, 2:19, 4:25
Plaintiff's [19] - 39:12, 39:15, 76:4, 103:6, 103:22, 103:25, 113:25, 114:3, 115:17, 120:8, 133:4, 133:8, 188:23, 252:4, 252:8, 254:24, 255:4, 262:14, 265:9
planet [1] - 246:8
plausible [2] - 141:19, 141:20
play [1] - 184:15
played [2] - 189:3, 189:7
players [1] - 160:19
plays [1] - 124:18
plenty [1] - 128:12
pocket [3] - 145:4, 145:17, 146:15
point [47] - 18:13, 45:6, 62:18, 84:17, 84:22, 93:9, 101:6, 101:20, 123:22, 124:22, 125:6, 125:14, 126:12, 130:4, 135:13, 138:3, 156:8, 161:4, 167:10, 168:13, 168:15, 170:8, 174:11, 177:24, 178:14, 179:5, 180:7, 183:19, 202:16, 216:23, 222:12, 222:14, 223:23, 228:5, 234:21, 235:12, 235:19, 235:22, 236:11, 237:16, 238:19, 244:6, 251:2, 253:8, 253:13, 261:20
Point [5] - 48:18, 49:12, 51:24, 64:4, 64:6
pointed [4] - 8:20, 16:22, 50:18, 111:9

pointing [2] - 88:24, 166:24
poker [4] - 160:19, 211:5, 211:10, 213:12
police [54] - 9:7, 9:12, 9:16, 12:19, 13:7, 13:16, 13:20, 13:21, 14:7, 17:15, 20:7, 21:5, 30:5, 52:5, 52:6, 59:5, 59:7, 62:3, 62:15, 79:23, 80:7, 84:8, 90:8, 90:21, 91:7, 109:10, 109:16, 110:3, 113:22, 116:14, 116:23, 119:2, 119:25, 122:10, 133:19, 133:25, 142:17, 143:7, 144:10, 159:14, 159:22, 160:9, 160:15, 166:9, 180:17, 181:2, 183:10, 185:12, 194:21, 220:5, 234:25, 238:2, 241:16, 246:9
POLICE [1] - 1:8
Police [6] - 9:19, 9:21, 10:11, 14:5, 76:8, 120:11
poll [1] - 58:8
Pollack [3] - 5:2, 148:15, 160:18
POLLACK [3] - 2:12, 5:2, 36:25
polygraph [6] - 213:19, 213:22, 214:2, 235:15, 235:18, 237:5
pooled [2] - 106:4, 106:9
pooling [1] - 102:5
Port [2] - 48:21, 73:22
portion [6] - 85:2, 85:14, 140:7, 234:8, 255:25
position [3] - 92:20, 103:15, 105:21
possess [3] - 40:14, 40:18, 150:3
possibility [6] - 87:6, 88:21, 117:11, 117:13, 164:6, 223:16, 230:11, 239:13
possible [11] - 80:3, 86:18, 88:15, 88:23, 118:14, 140:25,

148:12, 151:2, 220:7, 232:16, 232:22
possibly [6] - 70:20, 97:13, 126:22, 137:6, 186:19, 225:11
potentially [2] - 46:11, 129:17
pounds [3] - 105:24, 261:16, 262:2
Powell [1] - 48:14
power [4] - 40:13, 40:17, 40:21, 184:14
pr [1] - 230:23
practice [1] - 35:15
Practice [1] - 1:20
practiced [1] - 19:8
precinct [9] - 160:9, 175:21, 176:3, 176:8, 178:15, 179:24, 181:4, 228:8, 229:6
Precinct [4] - 9:23, 10:2, 10:3, 10:4
precisely [1] - 117:3
preparation [1] - 6:14
prepare [1] - 6:13
prepared [5] - 6:23, 36:11, 36:14, 36:15
PRESENT [1] - 2:17
present [2] - 55:5, 176:16
presented [2] - 55:4, 90:9
presents [1] - 24:25
president [1] - 58:19
press [1] - 235:11
pressure [3] - 35:9, 157:24, 158:11
pretend [1] - 43:4
pretended [2] - 110:18, 121:18
pretrial [1] - 7:13
pretty [12] - 65:7, 79:12, 93:16, 94:4, 125:4, 131:4, 165:12, 180:10, 206:21, 221:13, 223:22, 237:14
prevent [2] - 171:19, 173:20
prevented [1] - 183:11, 255:21, 255:24, 256:3, 260:5
prevents [1] - 167:15
previously [2] - 199:12, 233:8
prima [1] - 55:5
prison [1] - 24:9

private [1] - 73:23
Pro [1] - 4:15
pro [1] - 54:12
probable [2] - 223:25, 224:3
Probation [4] - 75:21, 76:17, 76:23, 77:16
probation [3] - 76:25, 92:17, 93:19
problem [8] - 12:6, 25:2, 56:6, 86:9, 127:17, 173:15, 198:15
procedure [11] - 143:15, 183:3, 183:4, 183:10, 183:16, 184:20, 184:22, 184:23, 185:10, 185:12, 187:7
proceed [4] - 58:6, 102:20, 168:5, 233:23
proceeded [1] - 61:19
proceeding [1] - 218:3
process [5] - 22:4, 95:11, 95:13, 96:5, 184:15
Productions [1] - 4:16
professionals [1] - 241:15
prominent [3] - 198:4, 211:10, 213:12
promise [1] - 180:23
promotion [1] - 10:10
prompted [1] - 218:23
property [1] - 65:21
propped [1] - 114:24
propriety [1] - 232:8
prosecuted [4] - 194:9, 195:19, 200:21, 205:4
prosecution [1] - 27:17
prosecutor [1] - 17:17
prosecutors [1] - 27:20
protect [2] - 192:23, 206:25
proud [2] - 20:6, 20:23
prove [1] - 81:11
proved [1] - 185:24
proven [1] - 91:13
provide [2] - 33:23, 185:18
provided [1] - 105:6
providing [1] - 34:10
proximity [2] - 68:2, 68:20
psyche [1] - 23:17

psychiatric [2] - 238:25, 239:2
public [2] - 194:2, 199:18
PUBLIC [2] - 264:16, 266:25
Public [4] - 1:23, 3:14, 5:17, 267:3
puddle [2] - 119:9, 144:13
pulled [7] - 53:10, 113:8, 113:11, 121:16, 139:16, 263:16, 263:19
pulling [3] - 114:13, 114:21, 121:12
pummel [1] - 61:19
pumped [2] - 222:9, 229:16
punished [1] - 20:16
purchased [1] - 225:15
purpose [4] - 59:13, 94:12, 222:23, 230:22
pursuant [2] - 1:19, 105:10
push [1] - 139:15
pushes [1] - 50:4
pushing [1] - 184:15
put [17] - 92:20, 105:12, 110:22, 110:23, 112:21, 114:24, 138:20, 157:5, 158:11, 159:7, 161:8, 181:8, 193:16, 217:18, 230:18, 247:5, 251:13
putting [4] - 53:12, 107:19, 112:5, 178:15

## Q

qualified [1] - 256:13
quarters [4] - 66:12, 66:15, 66:16, 66:20
questioned [2] - 23:23, 226:13
questioning [13] - 19:17, 90:3, 109:8, 167:9, 167:15, 169:8, 169:11, 172:13, 181:15, 181:19, 226:10, 229:2, 229:3
questions [39] - 6:6, 21:3, 25:14, 26:23,

16

27:2, 27:5, 27:18, 27:21, 27:24, 36:10, 37:6, 45:12, 48:4, 62:2, 69:20, 75:11, 79:6, 83:8, 83:23, 100:17, 122:16, 172:4, 181:25, 192:5, 193:12, 195:11, 197:8, 197:10, 198:8, 203:25, 206:16, 209:10, 214:7, 215:5, 217:12, 217:13, 227:23, 246:5, 251:3
quick [1] - 180:10
quintessential [1] - 262:23
quite [3] - 17:6, 28:23, 91:12
quote [2] - 10:14, 165:10
quote/unquote [6] - 18:23, 88:4, 110:17, 140:12, 173:20, 190:14

**R**

rackets [4] - 9:25, 15:13, 15:15, 191:11
rage [2] - 239:12, 239:15
raise [6] - 48:19, 83:7, 152:9, 152:14, 153:2, 214:14
raised [2] - 110:23, 152:24
ran [3] - 195:25, 212:4, 237:10
ranting [1] - 227:24
raped [1] - 11:13
rate [3] - 16:17, 16:25, 17:6
rather [3] - 27:8, 33:21, 61:11
raving [1] - 227:24
react [10] - 60:21, 87:10, 88:3, 226:22, 227:5, 227:13, 227:19, 230:3, 232:3, 232:11
reaction [2] - 78:11, 237:23
read [9] - 39:25, 76:20, 77:3, 199:25, 206:20, 218:13, 234:4, 234:8, 259:24
READ [1] - 266:6

READS [1] - 266:6
real [3] - 12:5, 14:12, 134:16
reality [1] - 230:12
realize [2] - 243:22, 260:12
really [16] - 9:3, 13:5, 22:7, 23:14, 24:10, 60:19, 92:12, 114:16, 171:7, 171:22, 194:11, 196:5, 196:9, 209:6, 216:14, 258:5
reason [17] - 6:8, 48:16, 69:10, 70:11, 70:21, 70:22, 71:10, 71:16, 72:15, 72:25, 107:13, 111:23, 120:22, 120:25, 186:13, 205:10, 210:23
REASON [1] - 266:6
reasonably [1] - 74:7
reasons [5] - 91:10, 91:11, 92:8, 187:10, 233:7
receipt [1] - 225:20
receive [4] - 12:18, 58:20, 209:7, 209:12
received [3] - 58:11, 58:12, 58:15
recent [3] - 44:2, 47:5, 246:2
recently [2] - 189:21, 193:14
recess [4] - 58:2, 102:15, 167:25, 233:19
recognize [4] - 39:17, 104:3, 104:9, 255:7
reconcile [2] - 232:24, 238:13
reconstruct [3] - 97:9, 97:24, 98:8
record [24] - 5:21, 27:6, 57:25, 58:5, 59:13, 102:14, 102:19, 167:24, 168:4, 186:14, 186:20, 186:21, 187:10, 194:3, 199:18, 204:3, 204:6, 232:6, 233:18, 233:22, 246:3, 264:4, 267:7
recorded [3] - 182:25, 187:18, 188:3
recorders [1] - 186:11
recording [7] - 183:12, 184:16,

185:17, 185:23, 186:5, 186:8, 186:17
records [1] - 13:16
reel [1] - 4:2
refer [1] - 21:8
reference [1] - 14:9
referring [8] - 7:3, 54:2, 57:9, 57:16, 69:25, 115:20, 174:13, 217:9
refers [1] - 172:13
refinanced [1] - 65:24
reflect [1] - 156:25
reflects [3] - 153:13, 153:16, 154:10
refresh [4] - 71:18, 74:15, 76:15, 251:25
refreshes [1] - 252:10
regard [7] - 44:5, 77:13, 78:21, 83:18, 132:4, 183:4, 204:14
regurgitate [1] - 26:2
Reid [4] - 21:2, 24:20, 30:4, 31:18
reimbursed [1] - 217:15
REIN [1] - 1:7
Rein [19] - 8:11, 16:16, 30:10, 74:17, 83:19, 87:15, 148:15, 160:19, 168:20, 178:17, 181:3, 181:11, 181:21, 186:22, 235:4, 241:13, 245:6, 247:23, 258:2
Rein's [2] - 87:7, 259:23
related [1] - 267:9
relation [1] - 196:20
relationship [1] - 250:24
reliable [1] - 242:21
remark [2] - 36:22, 60:6
remember [63] - 7:17, 11:14, 16:13, 29:2, 56:16, 56:20, 56:21, 56:23, 56:24, 70:19, 71:14, 71:21, 72:6, 72:7, 72:10, 75:12, 75:15, 76:2, 76:20, 76:22, 80:2, 84:3, 100:3, 103:2, 103:13, 106:4, 106:7, 115:10, 115:11, 119:8, 123:23, 130:2, 131:20, 143:2, 143:5, 143:20,

147:6, 151:5, 153:21, 160:2, 165:9, 169:24, 177:8, 179:3, 191:13, 191:16, 197:15, 197:25, 200:14, 220:15, 220:16, 225:7, 225:9, 225:21, 226:8, 235:8, 235:10, 244:11, 254:19, 254:20, 256:18, 258:14, 259:14
removed [3] - 117:16, 117:17, 201:15
render [4] - 108:10, 110:16, 110:18, 144:5
rendered [12] - 107:25, 108:9, 108:15, 108:20, 108:25, 111:15, 111:17, 111:19, 111:22, 137:17, 140:3, 141:22
rendering [2] - 121:22, 140:14
renovated [1] - 63:10
rental [3] - 65:10, 65:11, 65:21
rented [1] - 64:10
repeat [1] - 87:3
repeatedly [1] - 111:10
rephrase [1] - 6:9
report [17] - 36:23, 36:24, 37:9, 37:16, 37:19, 38:24, 74:24, 143:25, 156:3, 158:8, 158:15, 158:18, 158:21, 158:22, 159:6, 236:2, 247:14
reported [3] - 192:21, 207:22, 208:6
reporter [9] - 4:17, 5:13, 71:22, 153:20, 153:23, 187:23, 234:3, 234:9, 242:22
reporter's [1] - 96:21
Reporting [1] - 4:19
reports [10] - 6:18, 6:22, 36:11, 74:25, 193:10, 193:14, 208:5, 212:23, 244:19
represent [5] - 4:23, 29:18, 29:20, 54:8, 167:8

represented [5] - 29:7, 29:10, 54:9, 167:16, 199:12
representing [2] - 199:11, 217:23
represents [1] - 38:25
reproduced [1] - 133:19
requested [1] - 234:7
requirement [1] - 95:24
reserved [1] - 3:10
residence [4] - 76:12, 104:8, 249:12, 249:15
residue [1] - 226:7
respect [1] - 89:2
respective [1] - 3:4
respond [4] - 192:3, 193:12, 194:4, 199:16
response [10] - 16:16, 77:12, 78:20, 81:18, 83:10, 86:19, 87:8, 88:13, 94:2, 234:22
responses [1] - 78:23
rest [3] - 15:8, 86:10, 127:15
restaurant [4] - 57:12, 57:15, 57:17, 175:13
restaurants [2] - 43:7, 43:12
result [4] - 49:3, 55:6, 56:15, 59:23
resulted [1] - 46:23
retire [1] - 66:12
retired [10] - 5:10, 50:9, 62:2, 66:11, 66:13, 66:24, 76:9, 212:16, 217:25
retrieve [1] - 69:18
retry [1] - 204:18
retrying [1] - 204:20
reveals [1] - 30:25
reversal [1] - 204:5
reversed [1] - 189:22
review [4] - 6:13, 7:16, 8:3, 38:7
reviewed [2] - 7:9, 160:18
reviewing [2] - 7:17, 38:12
revolted [1] - 144:6
RICHARD [2] - 1:8, 2:16
Richard [1] - 5:7
rid [1] - 62:22
risen [2] - 124:23, 125:11
rises [3] - 125:22,

125:24, 125:25
rising [1] - 126:7
River [1] - 47:6
Road [4] - 1:12, 2:4, 4:10, 49:15
road [5] - 43:20, 52:17, 52:19, 53:17, 178:20
rob [1] - 73:10
robbed [1] - 54:5
robbery [3] - 54:6, 58:22, 62:5
ROBERT [1] - 1:7
rock [1] - 51:13
rocks [3] - 50:23, 51:3, 78:17
Rocky [5] - 48:18, 49:12, 51:24, 64:4, 64:6
rodeo [1] - 226:11
ROE [1] - 1:8
roid [2] - 239:12, 239:15
Ron [4] - 57:18, 62:18, 82:14, 160:6
Ron's [1] - 82:2
Ronald [1] - 57:19
Ronnie [7] - 57:11, 81:2, 81:3, 83:17, 83:25, 191:18, 227:7
room [47] - 19:23, 19:24, 23:22, 30:22, 41:2, 42:15, 43:8, 97:20, 97:23, 98:2, 98:5, 98:17, 98:19, 99:6, 122:22, 122:23, 128:15, 129:5, 131:18, 132:7, 132:22, 146:24, 147:8, 147:14, 147:18, 147:24, 149:14, 150:6, 150:11, 150:20, 150:21, 151:4, 152:22, 157:7, 178:16, 181:8, 181:12, 182:22, 228:21, 237:9, 237:12, 237:19, 251:17, 252:18, 252:21, 259:3, 261:4
rooms [3] - 48:23, 49:2, 97:8
Rother [15] - 57:11, 57:18, 57:19, 62:19, 65:6, 81:2, 81:3, 83:17, 83:18, 83:25, 84:6, 160:6, 166:14, 227:7

rough [1] - 201:5
route [1] - 209:23
rule [1] - 167:14
ruler [2] - 225:13, 225:14, 225:22
Rules [1] - 1:20
run [3] - 71:3, 112:14, 169:14
running [4] - 51:20, 53:17, 79:18, 222:17
runs [1] - 52:3
ruse [6] - 218:21, 222:9, 222:17, 224:11, 225:5, 225:8
rush [1] - 236:10
rushing [1] - 129:9

S

Sal [1] - 191:9
salary [3] - 9:8, 66:16, 66:20
Sally [1] - 191:9
Salonga [1] - 191:15
sat [4] - 8:9, 8:22, 71:23, 108:5
satisfy [1] - 103:10
saw [21] - 10:14, 14:9, 51:5, 51:10, 51:11, 53:16, 59:24, 99:15, 99:19, 104:4, 123:10, 130:9, 131:24, 132:23, 171:18, 173:3, 194:22, 211:18, 212:10, 246:18, 258:19
Sayville [1] - 11:12
Scala [2] - 191:9
scale [1] - 104:8
scared [1] - 223:18
scenario [9] - 106:23, 108:25, 109:3, 113:2, 117:13, 118:9, 129:16, 148:12, 149:6
scene [23] - 7:21, 68:3, 68:4, 70:16, 70:17, 75:7, 77:22, 79:24, 93:9, 93:22, 93:24, 107:14, 118:21, 120:5, 129:12, 166:2, 172:8, 174:18, 197:17, 218:20, 229:4, 255:14
SCHECK [1] - 2:7
scheduled [3] - 68:14, 68:17, 68:18

Schoendorf [2] - 225:3, 225:9
school [5] - 19:7, 51:24, 231:17, 248:3, 248:15
schools [1] - 18:7
scoundrel [2] - 216:2, 216:20
scoundrels [2] - 206:21, 207:6
scratch [2] - 60:11, 262:5
screaming [5] - 79:20, 79:24, 116:22, 219:25, 227:23
screwed [1] - 65:15
scrutiny [2] - 28:7, 28:12
sealing [1] - 3:5
Sean [1] - 17:25
Seaside [3] - 82:6, 157:10, 157:13
seasoned [2] - 32:2, 183:18
Second [1] - 9:23
second [10] - 40:6, 71:6, 122:18, 226:23, 227:17, 228:3, 232:5, 235:25, 247:17, 252:24
seconds [2] - 97:19, 155:12
secretary [1] - 38:5
section [1] - 61:24
Security [1] - 14:17
security [1] - 14:17
see [72] - 24:13, 26:17, 38:10, 48:18, 60:8, 74:7, 83:24, 88:12, 88:16, 97:14, 98:6, 100:15, 101:12, 101:23, 102:2, 102:8, 102:24, 103:8, 106:19, 109:5, 112:24, 113:15, 115:19, 116:9, 117:2, 117:15, 126:14, 127:14, 128:8, 128:18, 129:18, 129:19, 129:22, 133:14, 134:5, 135:23, 139:13, 139:18, 140:24, 143:14, 155:12, 160:3, 160:21, 165:19, 175:18, 178:8, 182:4, 215:2, 215:10, 216:21,

228:4, 236:23, 251:18, 251:24, 252:10, 253:14, 253:17, 256:8, 256:14, 256:15, 257:14, 257:15, 257:17, 258:23, 259:6, 259:7, 259:12, 260:10
See [1] - 62:22
seeing [6] - 255:11, 255:25, 256:3, 257:9, 257:21, 257:23
seem [2] - 107:3, 263:13
selective [1] - 49:24
selling [6] - 191:21, 194:9, 200:17, 201:13, 202:8, 205:21
sells [1] - 202:10
seminars [1] - 18:8
send [1] - 68:12
senior [1] - 231:20
sense [6] - 23:9, 24:13, 32:15, 41:10, 103:19, 152:21
separate [1] - 12:21
separated [2] - 49:14, 59:16
September [9] - 14:3, 14:4, 37:11, 37:15, 125:22, 125:24, 133:10, 156:7, 220:4
sequence [4] - 85:19, 85:21, 124:18, 178:17
sequence-wise [2] - 85:19, 85:21
sequences [1] - 96:25
sergeant [3] - 70:10, 237:15, 237:18
Sergeant [15] - 38:15, 67:24, 69:14, 69:25, 70:14, 71:12, 72:20, 74:16, 169:19, 174:12, 181:3, 210:10, 210:22, 215:24, 259:24
serial [1] - 11:16
series [2] - 6:6, 28:7
serious [8] - 16:7, 19:13, 19:15, 19:24, 20:15, 30:24, 198:25, 199:4
serve [1] - 230:23
set [14] - 18:14, 18:24, 19:3, 25:4, 40:5, 40:23, 65:16, 93:2,

150:11, 185:2, 206:15, 256:11, 267:6, 267:15
sets [1] - 122:24
settled [2] - 163:22, 163:25
seven [3] - 13:23, 61:22, 149:18
seventeen [2] - 231:3, 231:7
seventeen-year-old [2] - 231:3, 231:7
seventy [1] - 156:20
seventy-nine [1] - 156:20
several [8] - 39:21, 82:22, 162:13, 203:22, 204:2, 211:6, 212:11, 229:3
severe [1] - 254:3
sexual [1] - 30:6
Seymour [10] - 118:16, 118:19, 162:9, 162:10, 163:2, 163:18, 174:9, 243:19, 243:20, 243:24
shall [2] - 3:6, 3:10
Shari [12] - 57:11, 82:18, 82:21, 83:17, 84:6, 84:14, 84:17, 85:8, 85:11, 85:15, 85:21, 86:8
SHEET [1] - 266:2
sheets [1] - 129:19
Sheriff [1] - 11:25
sheriff [1] - 48:11
Shield [1] - 12:24
shirt [1] - 117:7
shit [8] - 53:12, 60:20, 192:24, 193:19, 201:25, 202:2, 202:6
shock [3] - 87:19, 88:4, 223:18
shocked [2] - 263:8, 263:12
shocking [2] - 202:11, 202:13
shoes [1] - 59:25
shooting [3] - 58:23, 202:20, 203:4
shop [3] - 68:6, 68:8, 68:11
shore [2] - 73:25, 231:19
short [3] - 50:18, 52:16, 67:20
shortly [1] - 212:22
shorts [1] - 79:19
shot [4] - 26:9, 26:11,

226:2, 226:5
SHOULD [1] - 266:6
shoulder [4] - 116:17, 121:23, 229:10, 251:14
show [12] - 37:4, 39:14, 71:20, 76:3, 103:18, 103:24, 127:22, 156:21, 237:10, 255:7, 260:15, 262:17
shower [8] - 109:19, 110:2, 146:4, 146:8, 220:13, 220:17, 229:10, 251:10
showered [2] - 110:9, 251:7
shows [3] - 169:7, 169:14, 208:17
Shuckman [11] - 47:23, 48:3, 50:4, 50:12, 51:3, 51:16, 52:3, 52:8, 56:7, 56:8, 56:14
shy [1] - 197:9
SIC [1] - 16:11
sickened [2] - 143:10, 143:16
side [19] - 50:5, 116:10, 116:16, 117:23, 120:17, 121:11, 121:15, 126:7, 126:8, 128:21, 135:23, 164:10, 253:15, 253:25, 255:22, 256:22, 257:12, 257:24, 259:4
sided [1] - 61:17
sides [1] - 136:9
sign [2] - 38:7, 38:22
Signature [1] - 266:21
signed [2] - 3:13, 3:15
silly [1] - 221:13
Silver [1] - 12:24
similar [1] - 43:12
simple [2] - 141:17, 150:14
simply [5] - 42:22, 66:24, 79:5, 140:13, 186:7
single [1] - 262:4
sister [3] - 111:3, 140:17, 141:23
sisters [1] - 80:20
sit [5] - 30:22, 41:2, 42:22, 86:15, 87:21
site [2] - 143:17, 144:6
sits [1] - 165:19
sitting [6] - 23:22,

42:15, 113:22, 178:16, 204:10, 227:20
situation [4] - 43:10, 78:16, 87:11, 166:21
six [4] - 16:25, 67:7, 189:10, 196:6
Sixth [2] - 10:3, 10:4
skill [7] - 18:14, 18:24, 19:3, 25:4, 26:19, 40:23, 40:24
skippy [1] - 191:2
Skippy [1] - 191:4
slashes [1] - 259:14
slide [1] - 60:7
slight [1] - 148:5
slightly [1] - 129:25
slit [1] - 127:6
slowly [1] - 50:13
small [8] - 12:3, 145:13, 155:20, 181:23, 247:11, 247:21, 248:20, 249:9
smart [1] - 32:17
smashed [3] - 256:2, 257:24, 258:15
smeared [11] - 118:11, 130:14, 135:9, 135:11, 135:24, 136:5, 136:12, 136:22, 137:2, 137:5, 147:11
smears [1] - 155:12
Smithtown [2] - 225:17, 225:18
smoking [1] - 198:18
smudged [1] - 134:12
snide [1] - 60:6
snowfall [1] - 27:11
SOA [1] - 48:24
Social [1] - 14:16
social [1] - 14:17
Society [2] - 58:12, 58:13
sold [3] - 65:9, 65:11, 65:25
solved [2] - 12:16, 218:21
solving [1] - 16:19
someone [5] - 32:17, 45:22, 132:18, 234:18, 245:17
someplace [4] - 14:9, 75:10, 149:9, 151:12
sometime [2] - 110:10, 123:11
sometimes [8] - 19:18, 19:21, 22:20, 44:14, 67:18, 90:22,

178:9, 178:10
somewhat [2] - 88:9, 123:20
somewhere [2] - 10:14, 206:20
son [18] - 17:22, 17:24, 44:5, 59:17, 60:19, 60:20, 166:4, 172:25, 191:21, 194:8, 200:17, 201:13, 202:22, 205:21, 207:22, 207:24, 208:5
son-in-law [1] - 166:4
soon [3] - 74:10, 77:22, 92:13
Sorry [1] - 238:20
sorry [13] - 15:12, 36:10, 82:2, 109:2, 143:4, 162:24, 195:23, 196:7, 216:8, 243:9, 244:23
sort [5] - 41:11, 57:2, 73:23, 136:18, 168:11
soul [1] - 15:9
sound [4] - 74:6, 93:21, 249:19, 249:22
Sound [3] - 65:19, 73:25, 125:18
sounds [4] - 79:12, 157:21, 165:12, 173:2
South [4] - 47:6, 55:18, 60:3, 66:10
southeast [1] - 126:3
spatter [5] - 132:7, 132:22, 134:11, 134:12, 134:22
spattered [2] - 132:12, 132:13
speaking [7] - 108:10, 151:16, 163:15, 168:14, 171:20, 181:24, 245:17
special [2] - 28:12, 35:23
specific [1] - 247:15
specifically [4] - 17:16, 123:24, 192:3, 225:8
specs [4] - 131:9, 131:11, 132:23, 133:14
speculate [1] - 171:23
speech [1] - 212:22
spent [1] - 223:6
splatter [1] - 132:24
split [1] - 82:19

spoiled [1] - 231:18
spoken [3] - 218:10, 240:20, 240:23
sports [1] - 248:16
spot [2] - 141:12, 249:18
Spota [8] - 29:17, 29:24, 54:7, 54:10, 198:10, 198:12, 199:11
spots [2] - 113:20, 117:15
sprayed [2] - 132:11, 132:20
squad [13] - 9:24, 10:5, 10:7, 15:10, 28:9, 28:14, 95:14, 189:10, 189:12, 194:18, 196:25, 228:21, 232:3
Squad [1] - 76:9
squealing [1] - 67:13
St [6] - 48:9, 48:10, 48:17, 49:5, 52:11, 68:23
stabbed [4] - 11:13, 236:22, 258:20
stability [1] - 34:8
stake [1] - 71:4
stakes [3] - 73:9, 211:5, 213:11
stamped [1] - 95:16
stand [1] - 215:3
standby [3] - 67:17, 67:21, 67:22
standing [1] - 174:5
stands [5] - 161:2, 161:21, 165:17, 219:6, 223:14
Stanton [2] - 212:20
Star [1] - 142:8
start [7] - 9:17, 18:4, 18:22, 57:10, 62:8, 62:11, 252:9
started [4] - 14:16, 43:19, 50:13, 229:4
starting [1] - 231:16
starts [2] - 50:7, 247:13
state [10] - 4:22, 11:23, 28:13, 28:16, 29:4, 29:14, 236:21, 238:19, 239:17, 240:9
State [7] - 1:23, 5:17, 5:21, 5:24, 13:10, 218:2, 267:4
statement [4] - 21:17, 29:13, 31:11, 76:5
States [3] - 4:7, 48:19,

231:8
STATES [1] - 1:2
station [5] - 51:23, 52:2, 52:4, 52:5, 84:8
stay [1] - 192:18
staying [2] - 48:20, 195:10
stealing [2] - 242:6, 244:7
steno [2] - 96:16, 96:19
step [3] - 201:15, 228:3, 229:13
stepped [1] - 192:25
stepsister [2] - 80:21, 80:24
stepsister's [1] - 81:4
steroid [1] - 245:21
steroids [18] - 233:12, 233:16, 234:14, 239:8, 241:10, 241:24, 242:6, 242:20, 243:19, 244:3, 244:8, 244:20, 244:22, 245:6, 245:16, 246:7, 246:18, 247:6
Steuerman [60] - 69:18, 159:15, 159:19, 159:23, 160:20, 161:7, 161:15, 161:16, 162:7, 162:12, 162:25, 163:4, 163:6, 165:2, 165:7, 165:18, 165:23, 166:5, 171:13, 175:7, 175:10, 175:16, 176:16, 176:25, 177:4, 180:6, 190:2, 190:13, 192:22, 193:4, 193:8, 201:4, 201:13, 203:6, 205:14, 206:2, 207:2, 209:13, 209:15, 209:18, 210:2, 210:6, 210:21, 211:19, 211:24, 211:25, 212:10, 212:13, 212:24, 213:7, 214:9, 214:14, 215:2, 215:15, 215:19, 216:19, 219:10, 219:14, 220:2, 242:15
Steuerman's [8] - 163:9, 166:20,

19

191:21, 194:8, 199:12, 200:7, 200:17, 202:22
stick [7] - 12:22, 71:4, 73:2, 73:4, 73:10, 141:6, 180:21
sticks [1] - 11:7
still [21] - 64:15, 64:17, 64:18, 93:3, 98:14, 117:10, 127:12, 148:21, 163:15, 193:15, 205:23, 212:2, 223:23, 225:14, 238:8, 238:12, 238:18, 239:17, 240:8, 242:15, 263:23
STIPULATED [3] - 3:3, 3:8, 3:12
STIPULATIONS [1] - 3:2
stole [3] - 50:13, 81:8, 216:7
stood [2] - 97:18, 98:19
stop [9] - 20:19, 57:21, 71:6, 71:17, 167:21, 169:12, 173:24, 189:8, 194:22
stopped [1] - 204:20
stops [2] - 167:9, 169:8
store [15] - 63:3, 63:25, 64:2, 191:22, 192:23, 193:2, 193:3, 194:10, 200:18, 201:14, 205:22, 213:8, 214:10, 216:4, 219:18
stores [5] - 50:21, 50:22, 51:13, 64:9
storm [2] - 142:3, 142:5
story [5] - 48:7, 52:16, 67:20, 201:7, 201:9
straightened [1] - 60:25
Street [2] - 2:8, 2:11
street [8] - 20:14, 22:18, 50:19, 53:15, 54:21, 63:8, 63:10, 202:21
stress [1] - 149:19
strip [6] - 50:21, 63:4, 63:7, 63:12, 63:20
stroll [1] - 94:9
struck [3] - 132:13,

132:18, 132:19
struggle [3] - 260:21, 261:2, 261:3
stuck [1] - 12:12
student [2] - 212:21, 213:16
studied [3] - 17:13, 18:21, 23:21
stuff [8] - 49:22, 57:12, 61:3, 93:11, 195:9, 200:15, 216:23, 245:21
stunned [2] - 263:8, 263:12
stupid [1] - 57:15
subjective [1] - 88:9
subjectively [2] - 222:13, 222:14
Subscribed [2] - 264:11, 266:23
subsequently [1] - 15:10
sudden [1] - 52:19
sue [1] - 164:7
sued [1] - 56:14
suffering [1] - 239:12
SUFFOLK [3] - 1:7, 1:8, 2:14
Suffolk [15] - 4:6, 5:8, 9:15, 9:21, 10:11, 16:17, 17:19, 28:8, 28:19, 48:12, 67:8, 76:8, 183:10, 225:17, 266:3
suggest [1] - 154:17
suggested [2] - 155:6, 235:5
suggesting [3] - 91:19, 134:7, 232:22
suggestion [1] - 241:10
suing [1] - 56:16
Suite [1] - 2:11
Sullivan [1] - 212:4
summary [2] - 37:10, 166:20
sun [8] - 124:2, 124:9, 124:23, 125:7, 125:11, 125:22, 125:24, 126:6
sunlight [1] - 124:21
sunny [3] - 123:21, 123:24, 123:25
sunrise [4] - 123:16, 123:20, 127:12, 128:16
sunrises [1] - 124:13
supervisor [3] - 38:14, 48:13, 95:25
supplement [1] -

246:20
supplemental [8] - 6:22, 36:23, 36:24, 37:9, 156:3, 158:7, 236:2, 247:14
supplements [3] - 244:9, 244:20, 244:22
support [1] - 241:21
supported [2] - 80:22, 86:14
supposed [9] - 8:23, 46:10, 52:13, 68:15, 105:5, 205:6, 215:4, 216:8, 226:22
supposedly [9] - 84:13, 85:22, 85:23, 90:10, 157:8, 157:13, 164:20, 208:13, 208:18
surgery [1] - 247:24
surrendered [2] - 54:25, 90:12
surviving [1] - 172:25
susceptibility [1] - 34:10
susceptible [1] - 33:9
suspect [28] - 11:14, 12:5, 22:2, 22:5, 25:7, 25:23, 41:17, 41:25, 42:15, 43:23, 44:23, 45:3, 45:5, 45:8, 45:14, 45:23, 74:11, 74:19, 92:12, 168:16, 170:10, 175:17, 175:19, 179:4, 179:5, 179:7, 180:7, 187:2
suspect's [1] - 30:7
suspected [1] - 81:12
suspects [7] - 15:21, 15:23, 27:15, 40:11, 44:19, 167:13, 226:13
suspicion [1] - 214:14
suspicions [3] - 42:16, 77:21, 77:23
suspicious [13] - 74:16, 92:21, 92:23, 92:25, 93:14, 94:3, 111:11, 168:22, 170:13, 175:24, 178:3, 180:4
swear [4] - 5:13, 117:6, 117:8, 209:25
sweatpants [1] - 53:8
sweatshirt [11] - 53:8, 111:12, 111:19, 112:13, 112:16, 112:22, 112:23,

113:13, 114:23, 146:18, 146:21
switch [9] - 99:8, 99:12, 147:8, 147:12, 147:15, 147:19, 147:23, 148:5, 148:10
switched [1] - 14:19
swore [1] - 206:3
sworn [5] - 3:15, 5:16, 264:11, 266:23, 267:6
swung [3] - 115:8, 115:22, 132:19
synopsis [1] - 39:2
system [3] - 90:18, 91:21, 183:21

**T**

table [1] - 225:13
tabling [1] - 20:14
tackle [1] - 63:25
tail [1] - 12:9
takers [2] - 16:11, 28:8
talks [1] - 152:6
Tankleff [32] - 4:5, 4:25, 5:3, 5:6, 36:12, 74:4, 86:14, 104:8, 106:10, 122:23, 161:7, 161:15, 161:16, 162:12, 162:15, 162:18, 165:8, 165:22, 166:12, 166:23, 172:6, 201:21, 207:18, 208:2, 218:22, 219:9, 220:3, 239:6, 239:11, 247:21, 261:6, 266:2
TANKLEFF [2] - 1:4, 2:19
Tankleff's [2] - 133:11, 190:3
Tankleffs [1] - 203:18
Tape [3] - 102:19, 168:4, 233:22
tape [10] - 58:4, 79:10, 80:6, 159:8, 186:11, 188:24, 189:8, 225:13, 225:14, 234:3
tapes [1] - 8:6
taught [1] - 30:5
tax [1] - 66:20
teach [1] - 31:18
team [5] - 6:25, 188:12, 188:14,

188:18, 189:9
technically [1] - 164:7
technicians [1] - 107:14
technique [8] - 21:2, 24:20, 30:5, 35:20, 41:18, 42:6, 44:10, 186:23
techniques [2] - 35:16, 186:18
Teddy [5] - 49:19, 49:20, 52:2, 54:13
Teddy's [1] - 49:21
teenage [4] - 78:7, 228:24, 231:12, 231:14
teenager [4] - 127:4, 144:3, 151:23, 152:11
teenager's [1] - 228:4
teenagers [1] - 36:5
telephone [7] - 84:9, 84:12, 99:16, 130:9, 130:12, 133:10, 140:19
television [5] - 127:18, 128:8, 128:10, 128:11, 208:17
tempting [1] - 26:7
ten [3] - 216:6, 216:7, 236:17
term [3] - 67:13, 124:20, 206:19
termed [1] - 78:20
terms [5] - 40:10, 98:9, 245:14, 245:15, 256:16
Terre [5] - 68:21, 73:13, 73:15, 249:17, 249:18
test [8] - 220:12, 220:19, 220:20, 236:7, 236:24, 241:7, 244:2, 246:12
testified [7] - 5:18, 7:13, 103:14, 119:18, 119:21, 120:21, 211:18
testify [1] - 29:2
testifying [4] - 9:9, 131:17, 131:20, 164:13
testimony [19] - 6:19, 7:10, 7:13, 7:16, 34:7, 72:18, 119:5, 121:2, 121:25, 132:4, 139:8, 173:4, 176:9, 218:13, 259:22, 259:23,

259:24, 267:5, 267:8
TESTIMONY [1] - 265:3
Testimony [2] - 1:20, 265:15
THAT [3] - 267:5, 267:7, 267:12
THE [15] - 1:2, 1:7, 4:2, 5:12, 6:4, 57:24, 58:4, 102:13, 102:18, 167:23, 168:3, 233:17, 233:21, 264:3, 266:2
themselves [2] - 4:22, 255:12
theorize [1] - 114:18
theorizing [1] - 114:18
theory [5] - 113:17, 114:20, 115:3, 122:2, 145:21
thereafter [1] - 139:23
thinking [6] - 71:2, 71:8, 72:23, 92:19, 153:14, 154:10
thirties [1] - 59:17
Thomas [2] - 29:17, 29:24
thorough [1] - 146:9
thousand [2] - 162:13, 211:6
thousands [2] - 20:11, 20:12
three [16] - 14:8, 14:17, 26:9, 36:24, 54:20, 66:12, 66:15, 66:16, 66:20, 78:2, 122:24, 123:7, 145:3, 166:3, 215:3, 257:19
three-page [1] - 36:24
threw [3] - 50:10, 51:3, 51:17
throat [1] - 131:25
throat's [1] - 127:6
throughout [1] - 189:17
throw [1] - 93:2
throwing [1] - 50:23
throws [1] - 51:12
thumb [1] - 39:22
thumbs [1] - 191:7
tilted [1] - 130:2
timed [1] - 51:6
tissue [6] - 142:16, 144:22, 144:25, 145:17, 145:22, 146:14
tissues [1] - 145:3
TO [1] - 265:3
to.. [1] - 33:13

today [13] - 4:17, 6:15, 8:24, 9:9, 27:9, 27:11, 38:17, 86:15, 89:17, 160:18, 217:16, 217:22, 245:13
Todd [4] - 200:6, 201:20, 202:7, 206:2
todd [1] - 205:21
together [6] - 48:16, 129:16, 211:19, 211:20, 212:11, 230:18
Tom [2] - 198:12, 199:11
Tommy [3] - 14:24, 195:16, 198:10
tomorrow [1] - 253:21
tongue [2] - 190:3, 190:14
took [48] - 7:4, 15:9, 39:3, 51:3, 51:18, 51:20, 51:21, 54:5, 58:7, 69:4, 82:15, 82:22, 84:14, 85:22, 94:15, 94:18, 94:25, 95:7, 95:21, 97:8, 101:8, 105:11, 105:20, 107:19, 109:25, 110:21, 112:8, 112:10, 122:7, 122:8, 129:10, 129:17, 146:3, 151:20, 153:18, 153:19, 156:23, 157:8, 157:13, 204:14, 208:25, 214:2, 218:25, 220:19, 244:20, 245:23, 246:21, 254:2
top [6] - 75:3, 131:5, 131:6, 131:7, 244:12, 253:23
tore [1] - 50:24
touch [1] - 254:17
touched [5] - 121:23, 139:22, 140:3, 140:11, 149:8
touches [1] - 141:11
touching [1] - 259:16
tough [1] - 207:25
towel [9] - 105:13, 107:7, 110:23, 112:6, 112:21, 114:24, 138:19, 138:23, 157:7
towels [5] - 251:10, 251:18, 252:12, 252:16, 252:17

Town [2] - 14:5, 48:13
town [1] - 12:3
trace [6] - 13:9, 13:12, 13:13, 13:17, 141:12, 146:11
trade [3] - 197:14, 200:7, 202:23
traded [1] - 211:6
trafficking [1] - 197:20
trained [7] - 19:7, 24:6, 46:3, 46:9, 94:9, 119:25, 120:4
training [2] - 15:19, 18:5
TRANSCRIPT [1] - 266:2
transcript [1] - 267:7
Transcription [1] - 4:20
transferred [1] - 10:4
trauma [1] - 172:22
travel [2] - 217:15, 218:5
treat [3] - 179:4, 234:25, 238:2
treated [1] - 179:7
Trek [1] - 142:8
trial [14] - 3:11, 7:10, 55:3, 82:12, 102:25, 104:7, 133:20, 142:23, 189:25, 198:21, 204:17, 215:8, 263:22
tricked [1] - 184:3
trickery [1] - 222:18
tricky [1] - 26:5
tried [2] - 97:22, 97:24
tripped [2] - 190:7, 211:22
trouble [1] - 164:21
troubles [1] - 219:9
true [42] - 24:4, 25:10, 26:23, 27:14, 34:6, 39:4, 42:16, 46:16, 84:20, 86:16, 96:6, 97:17, 98:2, 98:10, 107:8, 107:15, 108:23, 110:11, 112:13, 115:9, 116:15, 123:8, 126:9, 129:12, 130:10, 139:20, 152:12, 154:7, 154:11, 154:15, 184:18, 186:13, 187:14, 193:24, 193:25, 208:7, 208:12, 220:19, 221:5, 243:25, 244:18, 267:7

trust [3] - 117:9, 216:10, 216:13
truth [1] - 57:13
try [5] - 18:10, 43:3, 97:7, 230:22, 234:22
trying [18] - 33:12, 33:13, 33:17, 56:20, 75:6, 94:14, 98:7, 100:3, 111:16, 129:16, 150:25, 224:7, 225:7, 226:17, 232:24, 238:12, 240:2, 241:5
turn [6] - 67:24, 69:14, 95:25, 128:18, 147:20, 189:14
turned [8] - 99:11, 139:7, 139:9, 139:11, 139:17, 148:10, 180:8
turns [5] - 30:18, 31:11, 134:15, 172:16, 261:9
TV [2] - 150:11, 256:11
Twenty [2] - 67:3, 67:4
two [31] - 11:2, 23:22, 32:2, 42:25, 47:4, 53:17, 54:10, 58:17, 62:15, 63:4, 64:3, 65:23, 109:19, 113:21, 122:11, 123:3, 133:3, 160:19, 166:2, 172:25, 173:17, 177:7, 232:25, 242:19, 251:10, 252:3, 252:15, 252:16, 252:17, 262:13, 262:17
tying [1] - 49:12
type [2] - 38:2, 143:15
types [1] - 38:5
typos [1] - 38:12

**U**

UCC [1] - 162:8
uh-hum [2] - 115:6, 132:2
uncle [2] - 168:10, 173:2
Uncle [10] - 170:23, 171:10, 171:17, 172:5, 172:13, 172:18, 173:2, 173:8, 173:24, 182:4
unconscious [2] - 235:6, 235:9
under [11] - 13:18,

13:25, 107:7, 108:25, 110:16, 117:13, 201:19, 202:7, 206:3, 214:20, 228:9
underneath [4] - 107:7, 116:3, 117:7, 120:19
undersheriff [1] - 48:15
understandable [1] - 86:20
understood [2] - 6:11, 72:12
underwear [1] - 53:9
unfold [1] - 181:15
unfortunately [2] - 118:16, 243:20
uniform [1] - 52:18
uniformed [2] - 52:6, 70:10
unintelligent [1] - 35:18
unique [2] - 40:22, 40:25
UNITED [1] - 1:2
United [3] - 4:6, 48:19, 231:8
unless [2] - 72:24, 237:12
unreasonable [3] - 128:14, 128:21, 128:25
up [102] - 8:23, 11:22, 14:16, 19:20, 35:13, 38:4, 47:8, 49:19, 50:4, 51:7, 51:16, 52:3, 52:10, 52:15, 53:11, 53:12, 53:21, 60:15, 65:15, 65:16, 69:19, 71:5, 73:2, 73:4, 73:10, 83:25, 89:18, 89:19, 93:3, 93:22, 93:24, 96:14, 101:15, 104:6, 110:17, 114:24, 122:17, 124:2, 124:4, 124:5, 124:9, 124:10, 125:9, 125:10, 126:20, 127:3, 127:4, 127:9, 129:23, 134:10, 135:7, 140:19, 141:14, 145:21, 147:11, 148:2, 148:18, 150:11, 158:15, 159:6, 163:11, 167:3, 167:5, 169:7, 169:14, 173:21,

21

174:7, 184:2, 184:7, 185:3, 188:21, 189:17, 189:21, 193:15, 193:19, 194:8, 195:19, 196:16, 196:17, 201:5, 201:10, 207:21, 208:20, 214:12, 217:16, 217:18, 217:23, 222:8, 223:25, 224:10, 228:2, 233:16, 234:10, 234:13, 236:15, 236:17, 241:9, 245:2, 245:5, 261:25, 263:16, 263:19
upper [1] - 37:15
upset [3] - 32:25, 78:25, 162:11
upside [1] - 61:17
upstairs [1] - 63:23
uses [3] - 134:10, 135:7, 152:5

**V**

vacation [1] - 192:19
validity [1] - 203:9
valor [1] - 58:14
value [1] - 240:3
variety [1] - 161:13
various [2] - 9:22, 17:12
verbal [1] - 87:22
version [3] - 106:24, 110:13, 110:17
versus [1] - 4:5
viable [2] - 11:14, 180:7
vice [1] - 58:18
victim [3] - 22:21, 80:16, 258:23
video [2] - 188:24, 189:2
Video [2] - 4:15, 189:7
Videographer [1] - 2:18
VIDEOGRAPHER [11] - 4:2, 5:12, 57:24, 58:4, 102:13, 102:18, 167:23, 168:3, 233:17, 233:21, 264:3
videographer [2] - 4:15, 57:20
Videotape [1] - 265:17
videotape [2] - 183:8,

215:13
view [21] - 69:13, 86:18, 87:7, 92:6, 92:9, 128:24, 129:3, 129:11, 129:12, 130:14, 151:9, 154:2, 200:4, 201:21, 203:7, 207:12, 207:17, 218:21, 219:2, 228:5
violence [2] - 197:21, 202:14
violent [1] - 202:22
vs [1] - 266:2
vulnerable [2] - 31:19, 32:4

**W**

wages [2] - 217:22, 218:6
waist [1] - 251:14
Wait [1] - 232:5
wait [10] - 55:22, 87:3, 95:12, 112:14, 193:18, 210:17, 227:9, 236:9
waived [1] - 3:7
wake [1] - 127:4
walk [15] - 19:24, 25:12, 94:6, 94:18, 94:25, 97:6, 122:18, 125:10, 128:15, 142:10, 147:14, 147:18, 168:19, 189:6, 252:24
walk-thru [6] - 94:6, 94:18, 94:25, 122:18, 168:19, 252:24
walked [12] - 93:22, 93:24, 98:4, 98:13, 98:17, 98:23, 116:21, 122:17, 129:5, 150:8, 169:16, 169:21
walking [6] - 52:17, 52:19, 54:20, 61:16, 78:3, 94:11
wall [3] - 129:20, 147:11, 147:16
wander [2] - 18:3, 18:22
wants [1] - 52:20
war [2] - 62:9, 62:12
wash [2] - 144:11, 144:13
washed [1] - 119:9
Washington [2] -

2:12, 11:24
watch [3] - 127:25, 186:16, 187:12
watching [2] - 60:13, 186:24
watermelon [4] - 100:10, 100:20, 102:25, 103:9
ways [3] - 22:7, 88:14, 224:8
wealthy [1] - 73:24
weapon [1] - 132:21
weapons [1] - 146:9
wear [1] - 66:3
wearing [3] - 114:23, 146:21, 221:18
weather [2] - 27:9, 124:17
week [5] - 37:19, 156:7, 158:22, 159:6, 211:7
West [1] - 11:12
wet [3] - 110:6, 131:11, 131:14
whatnot [5] - 18:8, 50:2, 50:8, 51:5, 60:7
WHEREOF [1] - 267:14
whichever [1] - 232:23
whole [6] - 28:17, 48:7, 93:5, 184:10, 201:9, 201:25
wide [1] - 96:20
wife [4] - 163:19, 172:10, 226:2, 226:5
William [1] - 212:4
win [1] - 13:4
window [6] - 51:13, 60:9, 60:10, 124:6, 126:5, 126:9
windows [1] - 122:24
winner [1] - 47:10
wiped [1] - 113:20
wise [2] - 85:19, 85:21
withdraw [1] - 243:10
withdrawn [1] - 85:11
witness [15] - 5:10, 5:14, 44:24, 45:4, 45:5, 45:7, 45:14, 45:20, 46:11, 179:4, 215:3, 218:2, 267:5, 267:8
Witness [1] - 266:4
WITNESS [2] - 6:4, 267:14
witnesses [9] - 44:15, 164:9, 164:22, 171:3, 217:7, 217:10, 217:14,

240:21, 246:13
woke [3] - 125:9, 127:3, 148:2
woken [1] - 148:18
wondering [2] - 171:16, 171:17
woodwork [2] - 213:5, 213:7
word [10] - 11:6, 89:4, 143:18, 157:21, 157:23, 157:25, 185:3, 185:4, 238:18, 261:17
words [9] - 30:7, 78:15, 92:22, 152:3, 156:11, 186:16, 186:25, 187:12, 190:4
workday [2] - 68:17, 68:18
works [3] - 17:19, 183:22, 219:18
world [3] - 10:15, 202:2, 212:25
worry [1] - 192:7
worth [2] - 187:22, 235:24
wound [7] - 105:13, 156:4, 156:13, 157:17, 157:20, 158:12, 253:4
wounds [4] - 155:24, 253:17, 253:22, 261:10
wrap [1] - 261:25
write [6] - 38:4, 156:2, 157:18, 158:24, 158:25, 236:6
writes [1] - 153:20
written [1] - 183:5
wrongly [2] - 92:2, 92:3
wrote [5] - 37:18, 37:19, 158:14, 159:6, 251:20
Wustenhoff [2] - 15:8, 15:9

**Y**

Yaphank [2] - 5:25
year [4] - 59:2, 231:3, 231:7, 231:20
years [16] - 9:16, 13:23, 14:17, 44:3, 61:22, 62:15, 67:3, 67:4, 67:16, 69:11, 153:18, 196:6, 213:2, 231:9, 245:8,

246:10
yelling [1] - 227:23
yesterday [5] - 8:10, 16:10, 30:11, 36:19, 38:19
yesterday's [1] - 36:21
yield [1] - 216:24
YORK [2] - 1:2, 1:2
York [15] - 1:13, 1:23, 2:5, 2:8, 2:15, 4:8, 4:17, 5:17, 5:25, 9:19, 13:11, 50:9, 167:15, 267:4
young [6] - 11:11, 35:19, 65:12, 144:3, 172:12, 195:25
younger [2] - 33:21, 35:8
yourself [8] - 26:15, 38:2, 42:11, 42:14, 42:21, 47:20, 83:22, 181:11
yourselves [1] - 184:25

22