# Exhibit 9-3

**ORIGINAL**                                        268

UNITED STATES DISTRICT COURT NEW YORK
FOR THE EASTERN DISTRICT OF NEW YORK
--------------------------------------------X

MARTIN TANKLEFF,

                    Plaintiff,

     -against-

THE COUNTY OF SUFFOLK, K. JAMES McCREADY,
NORMAN REIN, CHARLES KOSCIUK, ROBERT DOYLE,
JOHN McLELHONE, JOHN DOE POLICE OFFICERS
#1-10, RICHARD ROE SUFFOLK COUNTY EMPLOYEES
#1-10,

                    Defendants.

--------------------------------------------X


                         666 Old Country Road
                         Garden City, New York


                         December 12, 2012
                         11:30 a.m.

     CONTINUED EXAMINATION BEFORE TRIAL of K.

JAMES MCCREADY, one of the Defendants

herein, taken by the Plaintiff, pursuant to

Federal Rules of Civil Procedure and Notice,

held at the above-mentioned time and place,

before Dolly Fevola, Notary Public of the

State of New York.

269

A P P E A R A N C E S :


BARKET, MARION EPSTEIN & KEARON, LLP
        Attorneys for the Plaintiff
        666 Old Country Road
        Garden City, New York 11530
BY:     BRUCE BARKET, ESQ.
        AMY MARION, ESQ.

NEUFELD SCHECK & BRUSTIN, LLP
        Attorneys for the Plaintiff
        99 Hudson Street, Eighth Floor
        New York, New York 10013
BY:     EMMA FREUDENPERGER, ESQ.


MILLER & CHEVALIER CHARTERED
        Attorneys for the Plaintiff
        655 Fifteenth Street, NW, Suite 900
        Washington D.C. 20005
BY:     BARRY J. POLLACK, ESQ.


SUFFOLK COUNTY DEPARTMENT OF LAW
        Attorneys for the Defendants
        H. Lee Dennison Building
        Hauppauge, New York
BY:     RICHARD T. DUNNE, ESQ.


ALSO PRESENT:

KATHY PASCHAL, Videographer

MARTIN TANKLEFF, Plaintiff

ROBERT DOYLE

NORMAN REIN

270

## STIPULATIONS

IT IS HEREBY STIPULATED AND AGREED, by and among counsel for the respective parties hereto, that the filing, sealing and certification of the within deposition shall be and the same are hereby waived;

IT IS FURTHER STIPULATED AND AGREED that all objections, except as to form of the question, shall be reserved to the time of the trial;

IT IS FURTHER STIPULATED AND AGREED that the within deposition may be signed before any Notary Public with the same force and effect as if signed and sworn to before the Court.

*       *       *

1

2          THE VIDEOGRAPHER:  This is Disk

3     6 of the continuation of the

4     deposition of K. James McCready in

5     the matter of Martin Tankleff versus

6     the County of Suffolk and the United

7     States District Court for the

8     Eastern District of New York.

9          This deposition is being held

10    at Barket, Marion, Epstein and

11    Kearon at 666 Old Country Road,

12    Garden City, New York on December

13    the 12, 2012 at approximately 11:33

14    a.m.

15          My name is Kathy Paschal, the

16    videographer from Pro Video

17    Productions located in Nesconset,

18    New York, and I attest to record

19    these proceedings fairly and

20    accurately.

21          The court reporter today is

22    Dolly Fevola, an associate with

23    Fevola Reporting & Transcription

24    Inc., located in Smithtown, New

25    York.

272

1

2          Will counsel please introduce

3      yourselves and state the parties you

4      represent.

5          MR. BARKET:  I'm Bruce Barket

6      for Martin Tankleff.

7          MR. POLLACK:  Barry Pollack on

8      behalf of Martin Tankleff.

9          MS. FREUDENPERGER:  Emma

10     Freudenperger for Martin Tankleff.

11         MR. DUNNE:  Richard T. Dunne on

12     behalf of the County of Suffolk and

13     the individually named detectives.

14         THE VIDEOGRAPHER:  Will the

15     court reporter please swear in the

16     witness.

17         MR. BARKET:  This is a

18     continuation.

19         THE VIDEOGRAPHER:  Yes,

20     alright.  He's already sworn in.

21     Please proceed.

22     CONTINUED EXAMINATION BY

23     MR. BARKET:

24         MR. BARKET:  Thank you.  Good

25     morning, Mr. McCready.

K. J. McCready          273

    THE WITNESS:  Morning.

    Q    I want to ask some questions,
if I can, about kind of the details of the
interrogation.

         Is there a difference in your
mind between an interview and an
interrogation or are they different?

    A    Well, usually an interview
rolls into an interrogation depending on
what happens.

    Q    So at some point in time, was
Martin Tankleff being interrogated by you
and Detective Rein?

    A    Yes.

    Q    Okay.  Were you taking notes
during that process?

    A    No.  Norman was taking the
notes.

    Q    Okay.  Did you use his notes
then to prepare the supplemental report?

    A    Did I what?

    Q    Use his notes to prepare the
supplemental report?

    A    Yes.

                              K. J. McCready        274

1          Q     If we can take a look at the

2    notes that we marked yesterday, do you have

3    them right here?  I think they're

4    Plaintiff's 77.  No.

5          A     Seventy-nine.

6          Q     Seventy-nine, sorry.

7          A     Yes.

8          Q     These are your notes, you said?

9          A     Yes.

10         Q     I want to refer you to one of

11   the pages and I guess somebody labeled it.

12   It says A15 at the bottom.  Take a look at

13   that.

14         A     (Complying.)

15         Q     That seems to contain

16   information that you all say was acquired

17   from Marty during this

18   interview/interrogation; am I right about

19   that?

20         A     Yes, that says started at 9:40.

21   That's when we got to the headquarters.

22         Q     Right.  Well, it has in there,

23   security, paranoid, save the turkey?

24         A     I'm sorry, what?

K. J. McCready          275

1

2        Q    I'm just reading from the page.

3        A    Which page?

4        Q    A15.

5        A    Oh, okay.

6        Q    This looks like information

7    that you all say you acquired from Marty

8    during the period of time he was being

9    interrogated at the headquarters, right?

10       A    Yes, yes.

11       Q    I've used the word precinct,

12   it's actually not a precinct, right?

13       A    No.

14       Q    The homicide squad is in police

15   headquarters in Yaphank?

16       A    Yes.

17       Q    If you turn to A16, it has,

18   sees blood, father sleeps, mother other

19   side, poker game, information about the

20   will.  This is all information that was

21   acquired during the course of this

22   interrogation, yes?

23       A    Yes.  Well, yes, during, yes.

24       Q    Okay.  So you did take some

25   notes about it?

K. J. McCready                276

2    A    Yes.

3    Q    Or these are notes --

4    A    No, you're correct.

5    Q    -- or these notes notes that

6    you wrote up afterwards to kind of write

7    down what you did as quickly as you could?

8    A    No, this is during when we were

9    interviewing him.

10   Q    Okay.  I don't see any notes

11   here from you concerning what happened once

12   you began to confront Marty, as we've

13   described it, with what you all thought were

14   inconsistencies.

15   A    That's right.  That's Norman

16   kept those notes.

17   Q    Was that a decision that you

18   guys made to do it that way?

19   A    I don't know how we arrived at

20   it, actually.  I think it was probably

21   because I was doing most of the questioning.

22   I'm not a hundred percent on that.

23   Q    Okay.  But at some point in

24   time as you began to confront Marty, you

25   stopped writing anything down?

K. J. McCready          277

 2        A     Pardon me?

 3        Q     You stopped writing down

 4   things?

 5        A     Yeah, until the conversation we

 6   had with Shari on the phone.

 7        Q     Well, you wrote that down but

 8   that was sometime later, right?

 9        A     Right.

10        Q     Okay.  By the way, that

11   conversation you wanted to record?

12        A     Pardon me?

13        Q     That conversation you all

14   wanted to record?

15        A     Yes.

16        Q     And you actually tried to but

17   Shari wouldn't let you?

18        A     That's correct.

19        Q     Okay.  If I can refer to Rein's

20   notes, I take it you used those to prepare

21   your supplemental report?

22        A     Yes.

23        Q     So those are actually, I think,

24   71 -- 60, 61 and 62.  I want to refer you to

25   a part of that.

K. J. McCready          278

2          Did I understand that Mr. Rein

3    or then Detective Rein was some kind of --

4    Excuse me one second -- then Detective Rein

5    was some kind or had been an emergency

6    medical technician of some sort?

7          A    Yes.

8          Q    What was he?

9          A    I don't know to be honest with

10   you.  I know he was involved in the fire

11   department, I believe.

12         Q    So he had some emergency

13   medical training?

14         A    I guess.

15         Q    So he would have been familiar

16   with language that's used by medical

17   personnel?

18         A    Probably.

19         Q    Marty, of course, had no such

20   training, right, that we're aware of?

21         A    I have no idea.

22         Q    You're not aware of any

23   training that the 17-year-old had, right?

24         A    No.

25         Q    Now, you guys claim that you

K. J. McCready          279

wrote these notes up contemporaneous with

when Marty was speaking to you, right?

    A    Yes.

    Q    And obviously Detective Rein

testified that he tried to write down what

Marty was saying?

    A    Yes.

    Q    And that it was important to

use Marty's words, not the words of what was

in your mind, but to use what was coming out

of his mouth, right?

    A    Right.

    Q    I want to show you what's been

marked as Plaintiff's Exhibit 61 and I want

to refer you to the bottom of the page

there, and if you recall, yesterday we had

some discussion about whether or not Marty

told you about what the 911 operator told

him or whether or not you listened to the

tape and then wrote down what the 911

operator said.  You remember those

questions?  You remember talking about that

yesterday?

    A    You got me confused here.

K. J. McCready          280

2    Q    Sorry, that was a confusing

3  question.  Withdrawn.

4         Do you remember yesterday we

5  spoke about whether or not Marty told you

6  that the operator told him to put pressure

7  on his father's neck wound?

8    A    Yes.

9    Q    Okay.  And you said that you

10 knew about those instructions, not because

11 you had listened to the tape but because

12 that's what Marty said to you, right?

13   A    Yes.

14   Q    Okay.  And Marty told you

15 that -- I guess, according to you -- during

16 the course of this interview where Rein was

17 writing notes, yes?

18   A    Yes.

19   Q    And yesterday I showed you your

20 notes and I said, show me where Marty said,

21 put the pressure on the wound, and you said,

22 well, I just did not write it down, but he

23 said it; do you remember that?

24   A    I didn't write it down.  Norman

25 wrote it down.

K. J. McCready          281

Q     What did Norman write down?
Can you read that about what he wrote down?

A     Instructions is abbreviated.
Instruction 911 operator, put father on
floor, et cetera.  Compress wound with
towel, elevate feet.

Q     So your testimony is that
Martin Tankleff used the word "compress
wound"?

A     Yeah.

Q     That's the word he used --

A     Yes.

Q     -- when he was talking to you?

A     Yes.

Q     That's not Detective Rein's
language, something that he wrote down
afterwards being an EMT, that's something
that the 17-year-old high school student
said?

MR. DUNNE:  I object to the
form of that.  It's calling for
someone's state of mind but if you
know.

A     He's repeating what the 911

K. J. McCready          282

1

2    operator told hem, as far as I know.  I

3    don't know what the 911 operator told him

4    exactly.  I have a good idea.  I don't

5    recall all the exact words.  I haven't heard

6    that tape in 25 years or whatever.

7        Q    But at the time you had written

8    your supplemental report on the 14th of

9    September, you actually had heard the tape

10   and relatively close in time to when you

11   wrote the report, right?

12       A    I don't know when I heard that

13   tape.  I'm not sure if I heard that tape

14   until we got to the trial.

15       Q    Well, yesterday you told us

16   that you heard it before the 14th, now

17   you're saying you don't know?

18       A    I don't remember saying that

19   yesterday.

20       Q    Well, it's a good thing we have

21   a court reporter.  One of our memory is bad

22   but that's all right.

23            At this point, you're saying

24   that you don't think you heard the 911 tape

25   until the trial?

K. J. McCready          283

2    A    Yeah.  Or the hearing or at

3    some point in time.

4    Q    As a homicide detective, you

5    would not have listened to the 911 tape

6    shortly after the crime happened?

7    A    Not necessarily, no.

8    Q    Do you remember one way or the

9    other?

10    A    I don't recall right now.

11    Q    Okay.  Thank you.

12    A    Okay.

13    Q    You have your supplemental

14    report there?

15    A    Yes.

16    Q    I think it's 69, actually.

17    Now, as you're interviewing Martin and he's

18    telling you what took place, is there a

19    reason why you, when he tells you something,

20    you don't simply accept what he says and you

21    challenge him on it or ask him questions on

22    it over and over again?

23    A    I think you're going to have to

24    rephrase that question.

25    Q    Sure.  Martin had told you all

K. J. McCready          284

2    several times what took place the morning

3    that he woke up, right?

4          A    Yes.

5          Q    And you asked him to repeat it

6    several times?

7          A    Yes.

8          Q    And in the interview process

9    you asked him to go over and over it a

10   couple of different times, right?

11         A    Yes.  Yes.  Some things, yes.

12         Q    Right.  And you actually had

13   him give a demonstration at certain points?

14         A    Yes.

15         Q    Is there a reason why you asked

16   him to repeat the same events over and over

17   again?

18         A    With regard to demonstration,

19   it was because it seemed impossible to me

20   that he didn't get blood on that sweatshirt

21   based on what he was telling us.  And then

22   the ridiculous attempt he made -- first he

23   pulled his sleeves up and then he pulled his

24   shoulders down.  It was ridiculous what he

25   was demonstrating to us.

K. J. McCready                285

Q     Well, that was probably the fourth or fifth time you had asked him what happened after the 911 operator call.  What I'm asking you is, why are you asking him to go over the same material again and again? Is it that you did not believe him?

A     No, I didn't believe him.

Q     Is that why you kept asking questions?

A     Certainly.

Q     So as a homicide detective you're not required to simply accept what somebody says to you.  If you don't believe them, you are allowed to inquire further and ask them more questions about it, obviously, right?

A     Sure.

Q     Okay.  Let's go back a second to your supplemental report and if we can go to Page 3, please.

A     (Complying.)

Q     Down at the bottom one, two, three, four lines from the bottom where it says, he was instructed by the 911 operator.

K. J. McCready          286

A     Yes.

Q     Well, you wrote down he was
instructed by the 911 operator to get a
clean towel, apply pressure to the wound
area, to lay his father down and elevate his
feet?

A     Yes.

Q     Well, the 911 operator -- and
we can play the tape if you'd like -- but
the 911 operator says put pressure on the
wound.  The word that she uses is pressure;
do you know that?

A     No, I don't know that.

Q     Why didn't you write down
compress the wound the way that Rein did?

A     I don't know.  I mean some -- a
lot of this is the sum and substance of what
he said.  I don't know exactly why but
that's what he said.

Q     You're certain that the
supplemental report is a product of what
Marty said, not information that you
gathered later on?

A     Right.

1                          K. J. McCready        287

2          Q      You discussed with Marty the

3     terms of his parents Will; is that right or

4     his dad's Will?

5          A      At some point in time, yes.   I

6     don't remember that.

7          Q      Take a look at Page 8 --

8          A      Page 8.

9          Q      -- of your supplemental report.

10         A      Yes.

11         Q      It says, we had discussions

12    about money.

13         A      Yes.

14         Q      And then it says, he knew he

15    was the primary beneficiary if they would

16    both die.

17         A      Yes.

18         Q      Didn't he also say something

19    along the lines that his sister would only

20    get a small amount of money?

21         A      Yes.

22         Q      Did he tell you that he

23    actually wasn't going to be the beneficiary

24    until he turned 25, that the money would be

25    put in trust until then?

K. J. McCready          288

2       A    I don't remember him telling me

3  that at all.

4       Q    Well, he clearly --

5       A    I've heard that since then, but

6  I have no recollection of him saying it that

7  morning.

8       Q    He clearly had some

9  understanding of his father's estate and the

10  Will and what would happen, right?

11       A    Yes.

12       Q    You're saying he just didn't

13  tell you the part about him not collecting

14  the money until he is 25?

15       A    I don't remember him saying

16  that. Possibly he did, but I don't remember

17  him saying that.

18       Q    Okay. You obviously did not

19  write down every single thing that Martin

20  said, correct?

21       A    Correct.

22       Q    This is, as you put it, is the

23  sum and substance of what he said. You did

24  the best you could but you all elected not

25  to record this conversation so we don't have

K. J. McCready          289

a verbatim transcript of what was said,

true?

         A     That's correct.

               MR. DUNNE:  I'll object to the

         form of that question.

         A     I told you before that was not

our procedure at the time.  Had it been our

procedure, we would have done that.

         Q     All right.  Now, as far as the

ruse goes, the thing with his father, we

talked about that a little bit yesterday but

regardless of what Marty or an innocent

person could or would have done in any

circumstances, it worked here; didn't it?

The ruse worked?

         A     Yes.

         Q     You, in essence, got Marty to

begin to speak to you about the crime in

your view, right?

         A     Yes.

         Q     And it began with him wondering

out loud whether or not he could have

blacked out, whether or not he could have

been possessed, literally whether or not he

K. J. McCready          290

2  could have done it without remembering,

3  correct?

4         A    Yes.

5         Q    I don't mean this in a physical

6  sense but mentally, you beat him, you broke

7  him?

8              MR. DUNNE:  I'm going to object

9         to the form of the question.

10        A    I don't like the word "beat."

11        Q    But but --

12        A    No, we did our job and we did

13  it properly.

14        Q    We talked about this for a

15  while yesterday.  Part of your job, in your

16  view --

17        A    Is to try to get him to roll

18  over, yes.

19        Q    And you did it here, right?

20        A    Yes.

21        Q    You literally convinced him

22  that it was in his best interest to tell you

23  about the crime --

24        A    Yes.

25        Q    -- rather than continue to

K. J. McCready          291

deny?

     A    Yes.

     Q    Right?

     A    Yes.

     Q    And then he began to give you details about the crime, right?

     A    Yes.

     Q    Now, you've had instances, haven't you, where individuals have minimized their role in a homicide, right?

     A    Much like Marty tried to do many times. He kept inflecting things and trying to minimize things. That's the normal occurrence in any --

     Q    We'll talk about what Marty did in a second, but just generally speaking, you've had instances where people have offered false defense claims, right? Yes, I killed him but I only killed him because I thought he was going to kill me, right?

     A    Yes.

     Q    People have offered up false explanations of being under some kind of mental strain or stress, right?

K. J. McCready                292

2    A    Yes.

3    Q    People have offered up all

4 kinds of "it was an accident" is probably

5 something that frequently happens, right?

6    A    Yes.

7    Q    "I shot him but I didn't mean

8 to shoot him," something along those lines?

9    A    Yes.

10    Q    So you have all kinds of

11 instances where people minimize their

12 involvement in a crime and the minimization

13 offers some kind of defense; self defense,

14 accident, mistake, things like that, right?

15    A    Yes.

16    Q    In Marty's particular case, he

17 told you, according to you, that he planned

18 to commit the murder, right?

19    A    Yes.

20    Q    He told you, according to you,

21 that he set his alarm clock early so he

22 would get up to commit the murder, correct?

23    A    Yes.

24    Q    He told you that he selected a

25 weapon to commit the murder, correct?

K. J. McCready          293

A     Yes.

Q     He said that he thought about it ahead of time and decided to kill both of his parents, right, according to you?

A     Yes.

Q     According to you, that he looked around and surveyed the house and saw where his parents were and then decided to go forward with his plan, right?

A     Yes.

Q     And according to you Marty selected his mother to be the first victim, correct?

A     According to Marty.

Q     And according to Marty he attacked his mother and beat her with a barbell and cut her throat and stabbed her a number of times, right?

A     Yes.

Q     And then after he murdered his mother or attacked his mother -- naked by the way -- according to him he said he did this naked because he didn't want to get blood on his clothing, right?

K. J. McCready          294

2      A     Yes.

3      Q     According to you Marty says he

4  walked down the hallway with the intent to

5  kill his father, right?

6      A     Yes.

7      Q     And when he got down to where

8  his father was, he hid the barbell and the

9  knife behind his back, right?

10     A     Yes.

11     Q     And according to you he went

12 around the back of his father and beat his

13 father and slashed his neck, correct?

14     A     Yes.

15     Q     And then tried to cover it up

16 by calling 911 and pretending to be panicked

17 and pretending to offer his father first

18 aid, right?

19     A     Yeah.

20     Q     So what defense did Marty build

21 into that?

22     A     What defense did he --

23     Q     What was the minimization?

24 What was the self defense?  Where was the

25 accident?  Where was the mistake?

K. J. McCready          295

2  A    What he did was when he ran

3  around the neighborhood screaming and

4  yelling about his parents being murdered and

5  trying to convince everybody like he's the

6  poor innocent little boy here, which he was

7  not and he's not, that's how he is

8  minimizing it.

9  All his acting and his role of

10  being grieved and cried out in five minutes

11  or whatever.  He didn't even cry when he was

12  convicted.  There's a picture of him in the

13  newspaper, front page of Newsday, where he

14  was, oh, looking like this, he didn't have a

15  tear coming out of his eye.

16  Q    You're not suggesting that he

17  was not upset that he got convicted of

18  killing off his parents and that he was

19  going to spend the rest of his life in

20  prison, are you?

21  A    Let me tell you something, if I

22  were wrongly convicted, I would be balling

23  my eyes out.

24  Q    I mean, I saw an interview of

25  you someplace where you said that you cry.

K. J. McCready          296

2    A    I do.

3    Q    Some people cry, right?

4    A    Yes.

5    Q    Some people don't.  You're not

6    saying that Marty when he got convicted

7    wasn't upset, right?  When he got convicted,

8    you're not suggesting he wasn't upset, are

9    you?

10    A    I don't know if he was upset or

11    what he was, but to me he was a big act in

12    the courtroom there when he did that with

13    that face.

14    Q    It was an act, okay.

15         In any event, let me get back

16    to the --

17    A    Go ahead.

18    Q    The minimization that I thought

19    we were talking about is what somebody does

20    when they offer up the confession.  They

21    just don't come out and say yeah, I did it.

22    They offer the confession along with an

23    excuse or defense?

24    A    Well, that's when he starts to

25    say, could I have blacked out, could I have

```
 1                         K. J. McCready        297

 2     been possessed.

 3           Q    But after that, according to

 4     you, he says well, no, I remember it and

 5     here's what happened, right?

 6           A    Yes.

 7           Q    So as he's telling you,

 8     according to you, the details of what took

 9     place, he's not offering any minimization.

10     He's not offering any defense.  He's telling

11     you, according to you, I thought about it, I

12     decided to do it and I did it?

13           A    Yes.

14           Q    And here's how I did it,

15     according to you.

16           A    Yes.

17           Q    And there is not one single

18     thing in there in the confession part of

19     this that could be used as a defense; is

20     there?

21           A    No.

22           Q    So you literally broke him

23     mentally.  You got him to spill the whole

24     thing without any defense, any excuse, any

25     nonsense?
```

K. J. McCready                298

       A     Yes.

       Q     Right?

       A     However, what he told us was
not necessarily all true.  We don't know
that, that's why we go back and try to
corroborate the confession later on.  We
don't -- I've had many confessions where
they never tell you a hundred percent of the
truth and then you go back and find out
well, this isn't truth.

             The guy who rapes and kills a
girl, whatever, he admits to raping her
vaginally but then he won't tell you about
that he did her anally also.  There's all
sorts of things that happen like that.

       Q     Right, well, here Marty doesn't
seem to have -- if you're account is
correct -- Marty doesn't have seemed to have
held back at all; has he?

       A     We didn't finish the
confession, did we?  We were put on notice
so there's a whole bunch of other questions
we would have liked to have asked him.

             MR. DUNNE:  Objection.

1          K. J. McCready        299

2          Q     There was nothing stopping you

3     from asking the questions as he was telling

4     the story; was there?

5          A     No, but as we were writing it

6     down, as he went over it again, as we asked

7     him questions, I was writing it down.

8          Q     We just talked about the fact

9     that if somebody is telling you something

10    and you don't think it's true that you're

11    free to challenge them on it and tell them

12    it's nonsense and so forth?

13         A     Yes.

14         Q     So Marty's oral statements

15    began around five of 12:00, correct?

16         A     Yes.

17         Q     You were not put on notice,

18    according to you, until sometime after

19    1 o'clock?  I think 1:22.

20         A     1:22.

21         Q     So that gave you an hour and

22    25 minutes or so to challenge Marty's

23    account if you didn't believe it, right?

24         A     Yes.

25         Q     And at any point when he's

K. J. McCready          300

telling you that he decided to kill his

parents the night before, that he went and

got a barbell, that he got a kitchen knife,

that he beat and stabbed his father and

mother, at any point did you say to him,

hey, Marty, I don't believe that.  That's

not true.  That could not have happened?

     A    Not that I recall.

     Q    And just to go through this in

some detail, it may take a minute or two,

but it's probably worth doing.

         Did Marty say to you that he

wanted a lawyer during the course of this?

     A    No.

     Q    Did Marty say, I want to call a

lawyer.  I want to talk to my Uncle Mike?

     A    No.

     Q    Did you tell Marty that if he

wants to speak to a lawyer that he's a

criminal?

     A    That what?

     Q    That he's a criminal.  That if

he wants a lawyer that means he's a

criminal?

K. J. McCready          301

2      A    I advised him of his rights and

3  had him sign a rights card.

4      Q    Did you tell Marty that if he

5  wanted to speak to a lawyer he's a criminal?

6      A    No, I read him his rights.  He

7  knew what his rights where.

8      Q    You said you read him his

9  rights at some point after you did this

10  ruse, correct?

11      A    Yes.

12      Q    Marty says that didn't happen?

13      A    I don't care what he said.

14  That's his handwriting on the rights card.

15  He signed it.

16      Q    Is there a time on the rights

17  card?

18      A    No.  That was my fault.

19      Q    Is there a time anywhere, a

20  stamp, a notation of when it was done?

21      A    Yes, it's in Detective Rein's

22  notes.

23      Q    Right, but those aren't stamped

24  either, right?

25      A    Stamped?

K. J. McCready                302

2    Q    Stamped.  We don't have any
3    contemporaneous note that we can say you
4    turned your notes in.  Here's the notes I
5    had that day.  We don't know other than you
6    telling us.

7         I'm not saying we should
8    believe you or we shouldn't but other than
9    you telling us we don't know when the rights
10   card was signed; do we?

11   A    You don't know.  I know it.
12   Detective Rein knows it.  It was written
13   that day.

14   Q    But when you're preparing
15   reports you know that this is all going to
16   court and it's subject to challenge by
17   attorneys and by courts and by prosecutors
18   and defense lawyers, right?

19   A    Certainly.

20   Q    So at the end of the day what
21   happened in that interview room, we have two
22   choices.  We can believe you, right?

23   A    Yes.

24   Q    And Detective Rein?

25   A    Yes.

K. J. McCready                303

1

2      Q     Or we can believe Marty; is

3  that fair?

4      A     You believe who you want to

5  believe and I'll believe who I want to

6  believe.

7      Q     I understand but everybody gets

8  to make that choice; don't they?

9      A     Yes, they do.

10      Q     And that choice is something

11  that you decided to do by setting this up in

12  a way where it was going to be your word

13  against the suspect's word, right?

14      A     I didn't set it up.  That's the

15  way it worked out.

16      Q     You didn't bring a court

17  stenographer in to record what was being

18  said; did you?

19      A     No.

20      Q     We said this several times.

21  You didn't record this, correct?

22      A     No.

23      Q     Now, Marty says to us, and I

24  think to courts and so forth when he's

25  testified, that what happened was when you

K. J. McCready          304

1

2     all asked him for the details he said, "I

3     don't know.  I didn't do this."  Is that

4     true?

5          A    No, he's a liar.

6          Q    Again, I understand your view

7     and other people can have different views.

8     Rather than --

9          A    You asked me if it was true; I

10    said no, he's a liar.

11         Q    Okay.  Well, what I was going

12    to suggest to you is that the part no, it's

13    not true is probably a sufficient answer to

14    my question.  If you want to refer to Marty

15    as a liar, you can but really --

16         A    He didn't tell the truth.  He

17    didn't tell the truth in the court.

18         Q    Okay.  So we could go back and

19    forth, right?  I mean people could say that

20    you're lying and you can say that Marty is

21    lying.  I don't want to get into that kind

22    of name calling.  I want to ask questions

23    about what happened, okay?

24         A    I understand.  Let me put it to

25    you like this then.  There are 12 jurors in

K. J. McCready          305

that courtroom who listened to every word

that I said, that Detective Rein said, all

the other witnesses said, and even what he

said when he took the stand with Mr.

Gottlieb, and they convicted him of murder,

alright.

  Q Alright.  And we can go back

and forth because then four judges listened

to the whole thing again and decided that he

deserved a new trial.  The attorney

general's office looked at the whole thing

again and decided not to retry.

   I understand that the 12 jurors

believed you, but you understand, don't you,

that other people get to make an independent

judgement of this?

  A My understanding is that

nobody's saying that he's innocent, they

just said give him a new trial.  Nobody said

he didn't do it.  They just said give him a

new trial.

   MR. DUNNE:  I got the

   clarification.  It's here on record

   here.  Just, you know --

K. J. McCready                 306

2      Q    You understand people get to

3  make their own judgement about who is

4  telling the truth here --

5      A    Of course.

6      Q    -- so you can have your own

7  view; other people are going to have theirs.

8  What I want to ask you is what actually

9  happened and then you're saying that

10  something didn't happen, just tell me that.

11      Marty says that -- right at the

12  beginning here on Page 11 -- Marty says that

13  when you asked him what happened his

14  response was, "I don't know.  I don't

15  remember doing this."

16      A    That's what Marty says.

17      Q    And you're saying that's not

18  true; is that right?

19      A    That's right.

20      Q    Then when you asked him, how

21  did he do it, who did he kill first, is it

22  true that Marty said, "I don't know.  I

23  don't have any memory of this.  I don't know

24  what took place."  Did he say that?

25      A    No.

K. J. McCready                 307

Q    He says that you told him,
look, we know you killed your mother first,
just say that.

A    How would I know that?

Q    Actually, we'll come back to
that in a minute but for right now what I
want to just do is ask you, did you tell
him, "we know you killed your mother first,
just tell us that's what you did"?

A    No.

Q    He says that when you asked him
what weapons were used that you told him --
excuse me.  That when you asked him what
weapons were used he said, "I don't know.  I
didn't do this.  I don't have any memory of
it."  Did he say that?

A    No.

Q    He says that when you were
asking him about this you told him, "we know
that you used the barbells in your room and
just tell us that."  Did you say that to
him?

A    No.

Q    He says that you told him that

K. J. McCready          308

2  you knew that the watermelon knife was used.

3  Did you tell him that?

4          A    No.

5          Q    He says that all of the details

6  in here, all of the details in here were

7  more than suggested, were literally told to

8  him by you and Detective Rein and that he

9  simply adopted and said, "I guess so.  If

10  that's what you want to hear, I guess that's

11  what I did."

12          A    No.

13          Q    That did not happen?

14          A    No.

15          Q    You're certain of that?

16          A    Yes.

17          Q    We talked before about the

18  layout of the house, right?

19          A    Yes.

20          Q    Now, you know how big the house

21  is, right?

22          A    Yeah.

23          Q    And if we can take a look at

24  what was marked as Plaintiff's Exhibit 81,

25  we knew that the murders occurred at some

K. J. McCready          309

1
2     point after say 3 o'clock and before 6:11 or
3     so, correct?
4          A     Yes.
5          Q     And you know that the father
6     was found at the other end of a very long
7     ranch-style house, right?
8          A     Yes.
9          Q     That Marty's room is literally
10    across the hall from his mother, correct?
11         A     Yes.
12         Q     So that if Marty woke up in the
13    morning and decided to kill his parents, he
14    would have seen his mom first, right?
15         A     Yes.
16         Q     And that's something you knew
17    when you were doing this interrogation,
18    right?
19         A     Yes.
20         Q     Okay.  Thanks.  By the way, did
21    you participate in a sound test in the
22    house?
23         A     Yes.
24         Q     Tell us about that if you
25    would.

K. J. McCready     310

2    A    I had one detective stood at

3   one end down in the office area and I stood

4   in the other and we both yelled at the top

5   of our lungs and couldn't hear each other.

6        Q    Didn't one of you stand in the

7   master bedroom and one of you stand in

8   Marty's room and do the same thing?

9        A    Yes.

10       Q    And you couldn't hear there

11  either, could you?

12       A    Yes, you could.

13       Q    You could?

14       A    Yeah.

15       Q    Your testimony is that you

16  actually could hear somebody yelling from

17  the master bedroom and Marty's room?

18       A    Yes.

19       Q    Not that you couldn't hear?

20       A    No, we could hear.

21       Q    Was there testimony at the

22  trial from experts, if you know, that did

23  literally a sound test between those two

24  rooms?

25       A    I don't know.  I'm not familiar

K. J. McCready       311

1

2       with that.

3               Q    Okay.  Let me ask this.

4       According to the confession Marty

5       supposedly -- Oh, by the way, the 5:35, when

6       you went into Marty's room, didn't you push

7       the alarm clock dial to see what time the

8       alarm was set for?

9               A    No.

10              Q    Did Detective Rein do that?

11              A    Not that I'm aware of.

12              Q    Did Detective Sergeant Doyle?

13              A    Not that I'm aware.

14              Q    The alarm clock was there,

15      right?

16              A    I don't know.  I don't

17      remember.

18              Q    You don't remember seeing the

19      alarm clock?

20              A    No.

21              Q    In any event, the confession

22      says that Marty woke up at 5:35, right?

23              A    That's what he told us.

24              Q    He actually told you initially

25      that he woke up at 5:35 and laid in bed for

K. J. McCready          312

a while then got up and went about the house

and found his parents, right?

     A    Right.

     Q    But during the time we'll call

the interrogation phase or the confession

phase, he said he woke up at 5:35 and got a

barbell and went to kill his parents with

it, correct?

     A    You have the written --

     Q    The written?

     A    Yeah, the written confession.

         MR. DUNNE:  You mean the typed?

         MR. BARKET:  No, I think he

    means --

         THE WITNESS:  The handwritten.

         MR. BARKET:  Yeah, I actually

    do.

         MR. DUNNE:  I was not sure.

         MR. BARKET:  Can we have this

    marked, please, as an exhibit.

         (Whereupon, Plaintiff's Exhibit

    97 was marked for identification.)

     Q    Here's a copy of the written.

When you say the written part of it, what

K. J. McCready        313

this is is a -- The handwriting is yours; is

that correct?

    A     Yes.

    Q     And that you're writing out

something for Marty to sign, right?

    A     Yes.

    Q     But you didn't get all the way

through it, a lawyer called the squad and

said you have to stop questioning now and

you had to stop questioning?

    A     Yes.

    Q     So I was asking you about what

Marty supposedly said about what he did

after 5:35, alright.  You have the written

statement there.  If you need to refer to it

feel free.

            MR. DUNNE:  I'm sorry, after

        5:35?

            MR. BARKET:  Yeah, after 5:35.

        He woke up at 5:35.

    Q     He woke up at 5:35 and

according to you he got a barbell from the

weights that he has in his room, right?

    A     Yes.

K. J. McCready          314

Q      And that according to you he went and looked for both of his parents, correct?

A      I believe he went and looked and saw his father sleeping in the chair.

Q      Initially, according to you, he went to look for his parents in the bedroom but only saw his mother there, right?

A      That's what he initially said.

Q      Then he went to the other side of the house and found his father sleeping in the chair, right?

A      Yes.

Q      And then decided to kill his mother first and went back and attacked her, according to you?

A      Yes.

Q      That he attacked her with the barbell initially and cut her throat?

A      Yes.

Q      And then she was screaming and so he went to the kitchen to get a knife?

A      Yes.

Q      Well, if he cut her throat

K. J. McCready          315

1

2   initially, why would he have to go back to

3   the kitchen and get a knife?

4        A    No, he did not cut her throat

5   initially.  He whacked her with the barbell.

6        Q    Well, I'm reading from the

7   continuation report, the supplemental report

8   of Page 12.  Is this what you wrote,

9   "Initially, he was surprised" -- and I'm

10  reading from the top of the page, one line

11  down -- "initially he was surprised that he

12  wasn't in bed with his mother and that the

13  lights were on.  I asked him what he did to

14  his mother.  He said he hit his mother with

15  a dumbbell then cut her throat.  I asked him

16  how his mother was lying in bed.  He said

17  she was in bed on her back.  He was asked

18  how many times he stabbed her.  He said he

19  didn't know how many times he stabbed her.

20  He volunteered that he got to her quickly."

21        And then later it says, "she

22  fought with him.  He said she was in pain

23  calling for help saying, why, and help me."

24  And then it goes on to say that he ran in to

25  get a knife from the kitchen.

K. J. McCready          316

2      A      Yes.

3      Q      Are those the things that Marty

4  told you in the order he told them to you?

5      A      Not necessarily.  That's the

6  sum and substance of what he told us.

7      Q      So they are not in the correct

8  order there?

9      A      I said not necessarily.  I mean

10 he told us both things.  He ran to the

11 kitchen to get the knife after he hit her

12 with the barbell.

13     Q      Okay.  And then after he

14 attacked his mother he went down the hallway

15 naked carrying the weapons that he just

16 used?

17     A      Yes.

18     Q      Those weapons would have had to

19 have blood on them, no?

20     A      Yes.

21     Q      In fact, the knife, whatever

22 was used to cut Mrs. Tankleff's throat, they

23 say nearly decapitated but it was a deep

24 neck wound; wasn't it?

25     A      Yes.

K. J. McCready                317

Q     There would have been a
tremendous amount of blood associated with
that, correct?

A     Yes.

Q     And the beating about her head
that would have also been a tremendous
amount of bleeding or blood, right?

A     Yes.

Q     And Marty is naked.  He doesn't
have any clothing to absorb the blood that
would have gotten on him, correct?

A     Yes.

Q     So you're saying that Marty's
naked, carrying two bloody weapons, walked
the length of the house, and then walked
into his father's room, correct?

A     Yes.

Q     And then he walked around
behind his father and beat and stabbed him?

A     Yes.

Q     So now the weapons would have
both the mother's blood on it and the
father's blood on it, correct?

A     Possibly, yes.

K. J. McCready          318

Q     When you say possibly, is there anyway --

A     Because I don't know what he did in between. I don't know. He never told us. I don't know what he did when he went from the bedroom to the father's office. He could have done anything at that point in time. He might have had a towel with him or something. I don't know.

Q     Here's the thing. We can all sit around and fantasize and speculate and make up scenarios of what he could have done, but the only thing we have is his account now, and it's been that way since he left your presence in that room that he didn't do this, and your account of what he supposedly told you?

A     Yes.

Q     So what he supposedly told you is that he walked naked from one end of the house to the other carrying two weapons dripping with blood, right?

A     Yes, but as I said before, you don't always get a hundred percent out of

K. J. McCready          319

these guys.  I don't think I've ever had --

Q     You think that there was some
part of that that was minimizing Marty's
role according to you.  That somehow him
walking naked with two weapons dripping with
his mother's blood to go attack his father
somehow was minimizing things?

          MR. DUNNE:  I'm objecting to
          the form of that last exchange.  Go
          ahead.

     A     I don't know.  Anything is
possible.

     Q     Of course anything is possible
but we're kind of stuck with the things that
we can prove or the things that people told
us, right?  We're not allowed to sit here in
any setting and make up stuff.

          MR. DUNNE:  I'm objecting to
          the colloquy here.  You can continue
          the questions.

     Q     Marty told you that he walked
dripping with blood from one end of the
house to attack his father?

     A     Where does it say he's dripping

K. J. McCready          320

with blood.

Q     Wouldn't the weapons have to
have blood on them?

A     They might have blood on them,
it doesn't mean dripping with blood.  If it
was dripping with blood, I think we would
have found blood when we searched.

Q     If Marty had done what you said
he said he did, right?

A     That doesn't mean that the
thing was dripping with blood.

Q     It means it's possible that the
knife and the barbell didn't have blood on
them or it was not dripping off?

MR. DUNNE:  I object.  He
    offered an answer to that and you've
    already commented on the answer he
    gave you for that.

Q     In any event, Marty is walking
carrying the two weapons having not told you
that he somehow cleaned them off before he
attacked his father with them, right?  He
didn't tell you that?

A     No.

K. J. McCready          321

2    Q    And, in fact, you found nothing

3    in the house at all indicating that he

4    cleaned off those weapons with his mother's

5    blood on them; did you?  There's no towel?

6         A    No.

7         Q    Then he says he walked to the

8    other end of the house and attacked his

9    father with the same two weapons?

10        A    Yes.

11        Q    If what his confession is is

12   true, he is now walking back to the other

13   end of the house to take a shower carrying

14   weapons, still naked, with the blood of his

15   mother and his father on him, right?  That's

16   what the confession says; doesn't it?

17        A    Yeah, but --

18        Q    That's your account of things,

19   yes?

20        A    Yes, that's what happened.

21   That's what he told us, yes.

22        Q    Okay.  And then he showers,

23   correct?

24        A    Yes.

25        Q    And then he returns the knife

K. J. McCready                    322

next to the watermelon, right?

     A    Yes.

     Q    And somehow the knife then gets watermelon on it, right?

     A    Yes.

     Q    So we know that that literally had watermelon on it, right?

     A    I do now.

     Q    At the time, it just was a pinkish substance, correct?  We didn't know what it was when you were taking Marty's confession?

     A    I don't remember first time I saw that knife.

     Q    And then you go back, he goes back, and he lies down for a bit, correct?

     A    Yes.

     Q    According to you that's what he said he did, right?

     A    Yes.

     Q    And thought about what to do, right?

     A    Yes.

     Q    And then wakes up and calls

1                            K. J. McCready        323

2       911, right?

3               A      Yes.

4               Q      So that the timing for this

5       would have been about -- say 9:35 so about

6       to 6:11 so about 36 minutes or so?

7               A      Yes.

8               Q      So in 36 minutes Marty did all

9       of these things and erased any forensic

10      trace to him and being involved in this

11      crime?

12              A      Yes.

13              Q      Did Marty have some kind of

14      training in forensics that you're aware of?

15              A      I have no idea.  I only told

16      you what he told us about taking a shower

17      and washing his stuff off.

18              Q      You all searched the drain;

19      didn't you?

20              A      Yes.

21              Q      And you searched the drain

22      because you know from your experience in

23      investigating homicides that the drain has

24      all kinds of material in it and traps in it

25      that can collect things so when you wash

K. J. McCready        324

1  something off it gets trapped in the drain?

2       A    Unless there is something in

3  that drain then it might catch the blood,

4  but if there is nothing in that drain that's

5  going to wash right away.

6       Q    Wouldn't there still be traces

7  of hair, or flesh, or blood on the traps of

8  the drain?

9       A    No.  In the trap?  Why would

10 there be?

11      Q    Why did you search for it?

12      A    Because it's a good thing to

13 do.

14      Q    Okay.  And you found nothing?

15      A    We searched for it to

16 corroborate what he had told us.

17      Q    And you found nothing?

18      A    Yes.

19      Q    So when you went -- After you

20 took this statement from Marty and you went

21 out to try and corroborate the things that

22 you say he told you, it turns out that the

23 knife had no traces of blood or tissue on

24 it, correct?

K. J. McCready          325

A     That's correct.

Q     Turns out that in all likelihood his father was killed first, not his mother, correct?

A     I don't know.

Q     Well, there's blood from the father in the room where the mother was, but no blood from the mother in the room where the father was, true?

A     Yes.

Q     So in all likelihood his father was beaten and stabbed first and his blood was transferred to the mother's room, correct?

A     That's a possibility.

Q     And you analyzed the barbells as well and you found no traces of blood or hair or human tissue in the barbell, correct?

A     Correct.

Q     And nothing in the drain, correct?

A     Correct.

Q     And the blood that was found on

1                          K. J. McCready        326

2        Marty, we talked about yesterday, was his

3        father's blood, right, on the shoulders?

4        You checked that out overnight?

5              A     No.

6              Q     So --

7              A     I took your word for it.

8              Q     Thanks.  So when you went out

9        to corroborate the details of how these

10       murders supposedly took place, none of it

11       matched?

12             A     It wasn't the first time;

13       probably won't be the last time.

14             Q     Well, whether it was the first

15       time or the last time, this time none of it

16       matched, correct?

17             A     Correct.

18             Q     You all searched -- and I say

19       you all, I mean the police searched the

20       yard, correct?

21             A     Yes.

22             Q     You searched the cliff,

23       correct?

24             A     Yes.

25             Q     You searched the house,

K. J. McCready          327

1

2       correct?

3             A     Yes.

4             Q     You searched every -- You

5       looked at every possible weapon in the

6       house; every hammer, every instrument that

7       could possibly be used as a weapon, every

8       knife, correct?

9             A     I believe so.

10            Q     None of that, nothing in the

11      house, nothing outside, nothing on the

12      bluffs, nothing anywhere had any traces of

13      Arlene Tankleff's blood or Seymour

14      Tankleff's blood; is that right?

15            A     That's correct.

16            Q     So as far as corroborating what

17      he supposedly told you, there is nothing to

18      corroborate, correct?

19            A     No.

20            Q     No, there is not anything to

21      corroborate.  I am correct about that, yes?

22            A     Yes.

23            Q     As far as what information was

24      available to you at the time that you were

25      taking this confession from Marty, the

K. J. McCready          328

1
2      information was available to you -- and when
3      I say to you I mean to you or police
4      officers with whom you had contact, okay.
5                    You had the ability to see the
6      layout of the house, correct?
7             A    Yes.
8             Q    You could see that Marty's room
9      was right across from his mother's room,
10     correct?
11            A    Yes.
12            Q    You knew that Arlene Tankleff's
13     throat was cut, yes?
14            A    Yes.
15            Q    You knew because you called
16     Pfalzgraf, I think, that the father was
17     attacked and bludgeoned and cut, right?
18            A    I knew that from Pfalzgraf,
19     yes.
20            Q    Because he told you about it,
21     right?
22            A    Yes.
23            Q    So the details of the
24     confession that are here is all information
25     that was -- Let me finish.  You also knew

K. J. McCready          329

about the knife; didn't you?  The knife was

out there for you to see, whether or not you

remember seeing it or not, it was not hidden

from your view, right?

      A    No.

      Q    The barbells that were in his

room they were in plain site; were they not?

      A    I didn't see any barbells.

      Q    I didn't ask if you saw them, I

asked if they were in plain sight?

      A    I don't know.  I don't know

where they were.

      Q    In any event, you were in

Marty's bedroom -- I'll show you pictures in

a second -- nobody stopped you from looking

around, right?

      A    No.

      Q    You could see whatever you

could see, yes?

      A    Yes.

      Q    In fact, you're not just there,

as we talked about yesterday, wandering

through, you're there specifically to look

for evidence of a crime, right?

K. J. McCready          330

2    A    Yes.

3    Q    You're one of the more seasoned

4    homicide detectives, correct?

5    A    Yes.

6    Q    And you're doing your job which

7    you're good at?

8    A    Yes.

9    Q    Same thing when you're in the

10   kitchen looking around in the kitchen,

11   correct?

12   A    Yes.

13           MR. BARKET:  Could we have this

14           marked, please, as 98.

15           (Whereupon, Plaintiff's Exhibit

16           98 was marked for identification.)

17   Q    Could you take a look at what's

18   been marked as Plaintiff's Exhibit 98.

19   A    Yes.

20   Q    Do you recognize that?

21   A    I recognize the photograph now.

22   I see the barbells down here (indicating).

23   Q    Right.

24   A    I don't remember seeing --

25   taking note of that that morning.

K. J. McCready          331

2    Q    Whether you recall or not

3    making a note of it, the barbells were there

4    in plain sight for you and any other police

5    officer or detective who wandered through to

6    see, yes?

7          A    I guess so.

8          Q    And take your time, look at it

9    as long as you'd like.

10         A    Go ahead.

11         Q    We spoke yesterday about Arlene

12   Tankleff's wounds and you indicated that you

13   went in and you observed the body, correct?

14         A    Yes.

15         Q    Now, again, this is not the

16   first time you've observed a body at a scene

17   of a murder; is it?

18         A    No.

19         Q    You have training at this?  You

20   have experience with this?

21         A    Right.

22         Q    I think you said you were

23   involved in almost 300 homicides?

24         A    Yes.

25         Q    In this house, there is the

K. J. McCready          332

2    blood stains in the father's room, correct?

3         A    Yes.

4         Q    And at the time you were doing

5    the walk-thru the other evidence is the dead

6    body of Arlene there, correct?

7         A    Yes.

8         Q    In fact, in terms of evidence

9    in the house, really Arlene's body is the

10   most important thing there; isn't it?

11             MR. DUNNE:  I'll object to the

12        characterization but go ahead and

13        answer that.

14        A    Yes, I guess.

15        Q    Sure.  You know that there's

16   two people that have been attacked.  There's

17   no obvious -- There's a dead body.  You're

18   looking at the dead body, right?

19        A    Right.

20        Q    You said you examined it

21   closely enough to see the wound cut on her

22   throat, correct?

23        A    Yes.

24        Q    And, of course, the

25   photographers who's just taking pictures of

K. J. McCready          333

2  her, they're not moving her around before

3  they take the pictures, right?

4         A    Right.

5         Q    They obviously take the

6  pictures just as you find the person and

7  then later on when the medical examiner

8  comes she's moved, correct?

9         A    Yes.

10         Q    So you can see what the

11  pictures depict, the front of her face, her

12  chest and so forth, right?

13         A    Yes.

14         Q    You couldn't see her back;

15  could you?

16         A    No.

17         Q    You couldn't see the back of

18  her head or her back, correct?

19         A    No.

20         Q    And we've talked a little bit

21  about where the blows were on her head and

22  remember yesterday I said to you that part

23  of her left ear was actually smashed off?

24         A    Yes.

25              MR. BARKET:  Can I have this

K. J. McCready          334

marked.

(Whereupon, Plaintiff's Exhibit 99 was marked for identification.)

MR. DUNNE:  This is an autopsy photo if I recall, correct.

MR. BARKET:  Yes, it is.  Why don't we do this one while we're at it.

(Whereupon, Plaintiff's Exhibits 100 through 105 marked for identification.)

Q    Have you seen the autopsy photographs?

A    No.

Q    You never looked at them?

A    No.

Q    Okay.  Let's do that.

MR. DUNNE:  101 and 102.

MR. BARKET:  Mr. Dunne, you've seen the autopsy photographs, I take it?

MR. DUNNE:  I have, yes.

MR. BARKET:  You recognize these as the autopsy photographs?

1                              K. J. McCready      335

2                    MR. DUNNE:  Yes, I do.

3              Q    Let's start off with 100.  Take

4    a look at that.  You see what's depicted

5    there?

6              A    Sure.

7              Q    That's Arlene's head shaven,

8    correct?

9              A    Yes.

10             Q    With a number of head wounds,

11   correct?

12             A    Right.

13             Q    One being almost on her

14   forehead in the top, correct?

15             A    Yes.

16             Q    Several being on the left side

17   of her head, correct?

18             A    Yes.

19             Q    And one with her ear, clearly,

20   a piece of it missing from a blow, correct?

21             A    Yes.

22             Q    And, in addition to that, you

23   know that there were wounds in the back of

24   her head as well, 102, right?

25             A    Yes.

K. J. McCready                    336

    Q    So when you're in the room --
and I showed you pictures yesterday of
Arlene -- you're free, and so was, I guess,
Detective Sergeant Doyle or anybody else who
went there, to examine her and look at her,
and you said you noticed her throat cut?

    A    Yes.

    Q    And whether you recall seeing
it or not, there's nothing preventing you
from seeing the obvious wounds to the left
side and the top of her head; was there?

            MR. DUNNE:  I'm going to object
        to the form of the question on a
        number of grounds but go ahead and
        answer it as best you can.

    A    No.  As I pointed out to you
yesterday, that picture is taken with a
flash.  I did not see that.

    Q    Well, when you say it was taken
with a flash, I thought you said the
lighting conditions in the room were
excellent?

    A    I said the lighting in that
room was fine, that he should have been able

K. J. McCready          337

2  to see his mother when he originally --

3       Q    But you, as a trained homicide

4  detective, should not have been able to see

5  that her ear was missing, that her head was

6  smashed in?

7            MR. DUNNE:  I'm going to

8            object, Counselor.  We went through

9            this for about 15 minutes here

10           today.  I mean it's on the record.

11      Q    In any event, the information

12  there about her head wounds was available to

13  you; wasn't it?

14      A    When?

15      Q    At the time that you were

16  looking at her and at the time that you were

17  interrogating Marty.

18      A    We didn't know what all her

19  wounds were.  I don't think we found that

20  out until 5 or 6 o'clock that night.

21      Q    Well, you didn't know about the

22  wounds in the back before 5 or 6 o'clock

23  that night, right?

24      A    I didn't know about -- The only

25  thing I observed, to me, is it looked like

K. J. McCready          338

someone had just slashed her throat.

    Q   The confession says,
interestingly, the confession says that he
hit her about the head but it doesn't say
anything about any wounds to her back,
right?

    A   No.

    Q   Or to the back of her head,
correct?

    A   No.

    Q   Clearly, what was not available
to you at the time that you were
interrogating Marty is the wounds that she
ended up being true that she had on her
back, right?

    A   No.

    MR. DUNNE:  I object to the
    form.  Go ahead.

    Q   You didn't know when you were
interrogating Marty that her back was slit
open; did you?

    A   No.

    Q   You didn't know when you were
interrogating Marty that her back -- she had

K. J. McCready        339

been stabbed; did you?

     A    That she had been what?

     Q    Stabbed in the back.

     A    No, only what he told me that he stabbed her.

     Q    He didn't tell you he stabbed her in the back even according to you.

     A    No, oh, no.

     Q    The confession, according to you, only talks about blows to the head and her throat cut, right?

     A    Yes.

     Q    Because at the time that you interrogated him you hadn't seen, nor had any of the police officers seen the wounds on her back; had you?

     A    Not that I'm aware of.

          THE VIDEOGRAPHER:  Off the record at 12:35 p.m.

          (At this time, a brief recess was taken.)

          THE VIDEOGRAPHER:  Beginning of Tape 7.  We're back on record at 12:55 p.m.  You may proceed.

K. J. McCready          340

        Q    Could I show you some autopsy

photographs?  I'm referring now to 103, 104

and 105.

        A    Yes.

             MR. BARKET:  You've seen these

        before, right?

             MR. DUNNE:  I have, yes.

        They're our autopsy photographs.

        Q    As it turns out, Arlene

Tankleff had her right shoulder, if you

will, was severely cut, correct?

        A    Yes.

        Q    Kind of like from her middle of

her back going one way or the other but all

the way across her shoulder, and she had

several puncture wounds on her back as well,

correct?

        A    Yes.

        Q    And we know from the autopsy

report that there were actually blows to the

back of her head as well, correct?

        A    Yes.

        Q    None of those details, which

would have only been known to the killer,

K. J. McCready          341

2    are in the confession; are they?

3         A    Not the specific wounds but the

4    fact that he stabbed her, it's in here.

5         Q    But what's in there is the

6    information that was available to police at

7    the time you're taking interrogation?

8         A    Well, it was available to him.

9    He's the one who did it.  He told us.

10        Q    According to you.  We talked

11   about this yesterday, and I think we talked

12   about it with Detective Rein, that you're

13   looking for information that would only have

14   been known to the killer.  You don't want

15   the confession to be a reflection of what

16   the police knew at the time; do you?

17        A    No, I want to know --

18        Q    But isn't it true that that's

19   largely what we have here.  We have a

20   confession that reflects information that

21   was available to you, Detective Rein,

22   Sergeant Doyle.

23        A    No.

24        Q    The knife, the barbells, the

25   location of the rooms, the blows to her head

K. J. McCready          342

2   and her throat cut, was all information that

3   was available to the police at the time,

4   right?  I'm right about that; aren't I?

5          A    Yes, to a certain extent, yes.

6          Q    And the information that was

7   not available to you, that she was attacked

8   from the rear, that the back of her head was

9   smashed in, that her shoulder was cut in the

10  back, that she was stabbed in the back,

11  that's not in the confession; is it?

12         A    No.

13         Q    And the smudges -- the blood

14  smudged on Marty's bedroom wall that turned

15  out to be gloved prints; didn't it?

16         A    Not that I'm aware of.

17         Q    You're not aware that the

18  smudge marks there had a pattern that

19  indicated that somebody was wearing gloves?

20         A    Not that I'm aware of.

21         Q    Okay.  You really don't know,

22  even as you sit here now, that the testimony

23  at the trial was that there was gloved-like

24  print on the wall next to the switch or

25  below the switch in Marty's room?  You're

K. J. McCready        343

2   not aware of that?

3          A     I don't remember that.

4          Q     Okay.  Well, in any event,

5   we'll find out a little later if I'm right

6   about that, but that's not in the confession

7   either; is it?

8          A     What's not?

9          Q     The killer wore gloves.

10         A     No.

11         Q     So what we have is a confession

12  that contains information that was available

13  to the police at the time and no information

14  that was not available to the police at the

15  time.

16              MR. DUNNE:  I'm going to object

17         to the form of that, but you answer

18         that as best you can.

19         A     I don't know in retrospect

20  where -- I mean it's been a long time since

21  I thought about this, but I don't know how

22  much further we would have kept going with

23  the written portion of his confession

24  because we were stopped, so I could not -- I

25  was precluded from asking him anything

                              K. J. McCready          344

2   further, even during the written, if I

3   wanted to continue that written.

4        Q    You had Marty from 7:40 until

5   1:20, right?

6        A    Right.

7        Q    So that's how many hours?  Is

8   that almost six hours, five hours and

9   40 minutes?

10       A    Yes.

11       Q    You questioned him at the scene

12  repeatedly, right?

13       A    Yes.

14       Q    You had Sergeant Doyle question

15  him.  You had Detective Rein question him,

16  right?

17       A    Yes.

18       Q    You brought him back to

19  headquarters, correct?

20       A    Yes.

21       Q    You isolated him, right?

22       A    Yes.

23       Q    Put him in a room, right?

24       A    Yes.

25       Q    You questioned him for several

K. J. McCready                345

2    hours in that room, correct?

3         A    Yes.

4         Q    Your excuse now for not getting

5    other details from him is you didn't have

6    enough time with him?

7              MR. DUNNE:  I'm going to object

8         to the form of the question and the

9         characterizations contained in

10        there, but you go ahead and answer

11        that.

12        A    What I'm saying is, I don't

13   know what would have transpired had we had

14   more time with him.  We may have developed

15   that as we went along.  I don't know that

16   because we were put on notice.  We could not

17   talk to him anymore.

18        Q    You're not suggesting that

19   after the body was turned over you could

20   have asked him about the stab wounds in the

21   back; are you?

22        A    We could have if he hadn't been

23   lawyered up.

24        Q    Okay.  But the confession that

25   you say he gave you once you did the ruse

K. J. McCready                    346

and kind of broke him, he told you readily

what, according to you, what happened, yes?

        A    Yes.

        Q    And it was, I think, Rein said

yesterday that it was in the form of a

narrative according to you all, right?

        A    Yes, but as I pointed out to

you earlier and on several occasions, they

don't always tell you a hundred percent of

what happened or the truth.

        Q    How is it that what supposedly

Marty said was only information that you

all, the police, knew about?  How did that

happen?  How did the minimization and the

lies that he supposedly told you only

contain information that you knew?

                MR. DUNNE:  Stop for a second.

        I'm going to again object to the

        content and the form of the

        question.  Go ahead and answer that.

        A    He told us what he told us.

What can I tell you?

        Q    One of the process -- Do you

all have a process of how you -- the order

K. J. McCready          347

in which you do things, you take orals, take

a written, take a videotape?

        A     Yes.

        Q     And that's the process that you

go through, right?

        A     Yes.

        Q     You do the orals first and then

when you're satisfied with the orals you

take the written; is that right?

        A     Yes.

        Q     And then once you take the

written, you're satisfied with that, you do

the videotaping?

        A     Yes.

        Q     And you bring in a prosecutor

for the videotape?

        A     Yes.

        Q     You did at the time anyway?

        A     Yes.

        Q     I notice that you didn't take a

written statement from Marty about what took

place, according to him, for the first four

or five times he went through this, right?

                You didn't reduce to writing

K. J. McCready          348

him waking up, finding his parents, calling

911, helping his father and so forth, right?

    A    No.

    Q    When he was telling you, I

guess, over and over again what happened

that morning, that was not reduced to

writing?

    A    No.

    Q    Why not?

    A    Because it was in our notes so

it is in writing.  I mean but it's not a lot

of that other stuff that he told us and

whatnot.  That wouldn't be in the form of a

statement.

    Q    Why wouldn't you take a written

statement from somebody who's telling you

what happened when they woke up in the

morning and say, okay, here's your

statement.  Just like you were planning to

have Marty sign this thing that you were

writing out for him, referring to

Plaintiff's Exhibit 97, right?  You were

planning to have him sign this, yes?

    A    Yes.

K. J. McCready        349

Q    Certainly, when you were writing it you left spots for him to initial, yes?

A    Yes.

Q    So why didn't you take a statement when he was telling you, I woke up, I think Jerry Steuerman did this. My father -- I found my father. Why didn't you take a written statement then?

A    Because that's not our procedure to do it that way.

Q    What do you mean that's not your procedure?

A    We take notes.

Q    Why didn't you write down this part. This is all -- this stuff is all inculpatory. It's all, I did it. When he said, I did it, you did not write that down?

A    Because that's the confession. These are the notes.

Q    Is it that you didn't believe him the first time?

A    No.

MR. DUNNE: Again, I'm going to

K. J. McCready          350

2    object.  He answered the question.

3        Q    I get to ask another question.

4    Did you not believe him so you did not want

5    to write down the exculpatory information?

6        A    What are you talking about?

7        Q    At some point you decided to

8    reduce what Marty was telling you orally?

9        A    Right.

10       Q    Not simply take a written --

11   take whatever notes you all said were taken.

12   But at some point you said, I'm not just

13   going to write down on a pad what he said.

14   I'm going to write out a written statement

15   as to what he's saying so he can sign it.

16            By the way, when he signs it,

17   he swears to it; doesn't he?

18       A    Yes.

19       Q    That's part of the process?

20       A    Yes.

21       Q    A notary comes in asking him to

22   swear to tell the truth and you have him

23   sign it, correct?

24       A    We were notaries at the time.

25       Q    Okay, and that's fine.

K. J. McCready          351

So if you had completed this
you would have actually had him swear to the
truth of this, correct?

         A    Yes.

         Q    What I'm asking is, why when
he's telling you other things, before he
begins to make what you call admissions, why
are those things not committed to writing
and he swears to those?

         A    Because they are only notes.
It's not a statement.  I'm not taking a
statement from him at that point in time.

         Q    I know that you're not.  I'm
not being clear, I'm sorry.

              I know that you're not taking a
statement there.  What I'm asking you is,
why don't you?

         A    There is no reason to do that.
We have the notes.

         Q    But you have the notes of this
too.

         A    I have the notes of that.  I
have the notes of all the other stuff.  The
non-inculpatory stuff, we have all the

K. J. McCready          352

notes.

Q     But why do you not reduce the
non-inculpatory statements to a written
statement, to a written statement that he
would sign and swear to the truth of?

A     Because we just don't do that.
That's not -- We don't do that.

Q     Is it that you did not believe
what he was saying before that?

A     I didn't believe initially.  As
I read my report, you'll see that when we
get to the point we didn't believe him and
when I pulled the ruse on him, as you call
it, that's when he rolled over.

Q     Right.  What would you call it?
I called it a ruse.  Do you have another
name for it?

A     No.  Well, you know, a lot of
people would call it trickery and deceit but
it's -- I don't know.  It's a ruse.

Q     It is what it is, right?

A     Yeah.

Q     You lied to him and --

A     Yes.

K. J. McCready          353

2      Q    -- and what happened happened.

3   I guess at some point you decide to move

4   from the orals that he was giving you that

5   supposedly Rein is writing down to, okay, we

6   have the orals now let's reduce the orals to

7   a written statement, correct?

8      A    Yes.

9      Q    As far as you got -- You got

10  pretty far into this, right?  You got to the

11  part where it says, "I hit her four or five

12  times in the head.  She fought with me.  I

13  went to the kitchen, got a knife.  I ran

14  back with the knife.  I cut her throat.  I

15  don't know how many times but I stabbed her

16  also; mostly I cut her throat and neck,"

17  right?

18      A    Isn't that what that autopsy

19  shows.

20      Q    It shows the wounds.  This

21  reflects wounds to her?

22          MR. DUNNE:  Well, objection to

23          the characterization.  The evidence

24          will speak for itself.

25      Q    Does it say in here, I stabbed

K. J. McCready          354

2    her in the back.  I cut her shoulder.  I hit

3    her in the back of the head?

4          A    No.

5          Q    Okay.  It reflects what was at

6    least visible on Arlene as she was lying

7    before she was turned over?

8                MR. DUNNE:  I'm objecting to

9          the form of that question.  That's a

10         characterization of evidence.  The

11         evidence will speak for itself.  You

12         can answer the question as best you

13         can.

14         A    Say the question again.

15               (The requested portion was read

16         back by the court reporter.)

17         Q    The written statement reflects

18    what was visible on Arlene as she was lying

19    there, whether you remember seeing it or

20    not, true?

21               MR. DUNNE:  My objection stands

22         again to that question as stated but

23         go ahead.

24         A    I think that encompasses, based

25    on the fact -- Let me see that a second,

K. J. McCready          355

2  please.

3          Q    Sure.

4          A    When he says, I stabbed at her

5  also.  Again, he didn't tell us that he

6  stabbed her in the back.  He stabbed at her.

7          Q    You didn't know that she had

8  been stabbed in the back when you were

9  talking to him; did you?

10          A    Did I know it?

11          Q    Right.

12          A    No.

13          Q    No police officer knew; did

14  they?

15          A    Not that I'm aware of.

16          Q    It was not visible to any

17  police officer; was it?

18          A    Not that I'm aware of.

19          Q    What I'm asking you about -- to

20  get back to my line of questioning, which is

21  that you got pretty far into this.  You're

22  writing this down for him to swear to,

23  right?

24          A    Yes.

25          Q    So you made a decision to go

K. J. McCready          355

please.

Q      Sure.

A      When he says, I stabbed at her

also.  Again, he didn't tell us that he

stabbed her in the back.  He stabbed at her.

Q      You didn't know that she had

been stabbed in the back when you were

talking to him; did you?

A      Did I know it?

Q      Right.

A      No.

Q      No police officer knew; did

they?

A      Not that I'm aware of.

Q      It was not visible to any

police officer; was it?

A      Not that I'm aware of.

Q      What I'm asking you about -- to

get back to my line of questioning, which is

that you got pretty far into this.  You're

writing this down for him to swear to,

right?

A      Yes.

Q      So you made a decision to go

K. J. McCready                356

from the orals to the written and you're

writing it out and you're writing it down as

he's telling it to you, correct?

    A   Yes.

    Q   You're not challenging?

    A   We're questioning him again,

asking him questions.

    Q   But you're not challenging him

at all, you're not saying, I don't believe

this, I don't believe that; are you?

    A   No, not at that point.

    Q   Okay.  So what's happening, and

this is kind of -- what's happening is after

he makes these oral admissions, you're then

documenting what it is, what you believe to

be his inculpatory statements, right?

    A   Yes.

    Q   You're going to write it out

for him, right?

    A   Yes.

    Q   And then you're going to

videotape him saying the same things?

    A   Yes.

    Q   So what we'll end up with and

1                           K. J. McCready        357

2      you've done this hundreds of times, right?

3              A     Yes.

4              Q     You have a set of orals, right?

5              A     Uh-hum.

6              Q     You have whatever notes you

7      have on the orals.  You can testify to the

8      orals, right?  Then you have a written

9      statement, right?  And that's going to

10     reflect -- What was in the orals but it will

11     be written out in the first person, correct?

12             A     Yes.

13             Q     First person being Marty

14     Tankleff, I did this and I did that, right?

15             A     Yes.

16             Q     And then you're going to have a

17     videotape that's going to repeat what was in

18     the written statement and what was in the

19     orals?

20             A     Yes.

21             Q     So when you're saying that you

22     didn't know what was going to come had you

23     had more time with him --

24             A     I don't know.

25             Q     -- nothing would have come of

1

2    it, you would have just repeated what was in

3    the orals or what was in the written?

4          MR. DUNNE:  I'm going to object

5          to the form and the suggestions.  Go

6          ahead answer the question part of

7          that.

8        A    If we were not put on notice,

9    we could have had Marty there for 24 hours

10    and kept talking to him.

11        Q    What would you have done with

12    him after you had taken a written statement

13    from him?

14        A    Well, we would have waited till

15    we found out what we did find at the scene

16    there and then asked him questions about

17    that.

18        Q    And then that would have been

19    incorporated into the statements?

20        A    Most definitely.

21        Q    Okay.  All right.

22          MR. BARKET:  I think that's a

23          good spot to break.  We'll come back

24          after lunch.

25          THE VIDEOGRAPHER:  Going off

K. J. McCready          359

1    the record at 1:11 p.m.

2            (At this time, a recess was

3    taken in order to accommodate a

4    lunch.)

5            THE VIDEOGRAPHER:  Back on

6    record at 2:06 p.m.  You may

7    proceed.

8  CONTINUED EXAMINATION BY

9  MR. BARKET:

10           Q    Good afternoon, Detective.  Mr.

11  McCready, sorry.

12           A    Detective is fine.

13           Q    Okay.  I want to -- I just ask

14  you, you said there are six people on your

15  team or were six people on your team at that

16  time?

17           A    Seven counting the sergeant.

18           Q    Okay.  Who were they?

19           A    Norman, myself, Bob was the

20  sergeant, John Pfalzgraf, Mike Carmedi,

21  Bobby Anderson, and I forgot who -- Maybe

22  somebody knows.

23           MR. BARKET:  Anybody refresh

24           his memory?  I don't want to leave a

                          K. J. McCready        360

2       blank for just this.

3           A    Tony Ligaza, that's right.

4           Q    Thanks.  At the time Detective

5  Rein was your partner, right?

6           A    Yes.

7           Q    Was he your partner till you

8  retired?

9           A    Yes.

10          Q    Who was your partner before

11 that?

12          A    Bill Mahoney.

13          Q    In homicide, right?

14          A    Yes.

15          Q    How about before that?

16          A    In homicide?

17          Q    Yes.

18          A    Tommy Gill.

19          Q    Anybody else as a partner in

20 homicide?

21          A    Not that I remember.

22          Q    I'm going to ask you some

23 questions, if I can, about the Diaz case.

24 Do you remember that?

25          A    Yes.

1                      K. J. McCready      361

2          Q    Okay.  Just to -- Again, like I

3    said yesterday, I'm not making allegations,

4    I'm asking you about them.

5          A    Okay.

6          Q    And so I want to do that, kind

7    of to lay the background.  That was a murder

8    case?  Diaz was charged with murder?

9          A    Yes.

10         Q    And at some point in time you

11   were involved in interviewing witnesses; is

12   that right?

13         A    Yes, not witnesses to the

14   murder but witnesses.

15         Q    Witnesses, right.

16         A    Yes.

17         Q    I guess Judge Nan ended up

18   concluding, right, that he believed that you

19   had committed perjury in some fashion; is

20   that right?

21              MR. DUNNE:  I'll object to the

22         form.  I'm not sure that's correct

23         but for our purposes, go ahead.

24         A    Well, as you pointed out,

25   everybody is entitled to believe what they

```
 1                    K. J. McCready      362

 2   want to believe, but I did not commit

 3   perjury.

 4        Q    I want to lay the foundation

 5   and then we'll get into the details of it.

 6             I think Judge Nan concluded

 7   that he did not find your testimony credible

 8   in some regard; is that right?

 9        A    That's right.

10        Q    And as a result of that, in

11   part and some other things, there was a

12   referral made to the State Investigation

13   Commission?

14        A    Yes.

15        Q    And they actually did an

16   investigation.  And again, just to lay the

17   background, they also concluded that you

18   were -- I think they actually used the

19   term -- Well --

20             MR. DUNNE:  They did.

21        Q    They actually used the term

22   perjury in connection with your testimony

23   there?

24        A    I know they did, but I don't

25   care what they think.
```

K. J. McCready          363

Q    In that instance, you had a judge and an independent State investigative body saying that you committed perjury in the course of testifying in a murder case?

A    That's correct.

Q    Now, let's talk a little about the details of what happened there.  And correct me if anything I say is wrong, of course, but you were interviewing some witnesses, some --

A    Railroad workers.

Q    Railroad workers.  And there was some question, was there not, about how they identified Mr. Diaz, right?

A    Yes.

Q    Okay.  And if I understand it correctly, you initially reported to the DA's office and testified that they identified him from a newspaper article that contained Mr. Diaz's photograph; is that right?

A    That's correct.

Q    And you knew at the time that part of your job as a detective is to

K. J. McCready          364

1

2    conduct identification procedures, right?

3          A     Yes.

4          Q     And unlike what they -- and

5    identification procedures is something you

6    need to be trained to do, right?

7          A     Yes.

8          Q     Unlike what they do on TV, you

9    just don't show a Polaroid to somebody and

10   say, is this the guy and they say yes.

11   There is actually processes you have to go

12   through.

13         A     Yes, but there is --

14         Q     Well, there's some training

15   involved in this, yes?

16         A     Yes.

17         Q     And part of what happens is, if

18   there are identification procedures, I think

19   this was true even in the eighties, you have

20   to give -- not you but law enforcement, the

21   DA's office specifically, has to give notice

22   of those identification procedures to the

23   defense?

24         A     With regard to Wade situation,

25   I would think so.  I don't necessarily think

K. J. McCready          365

so in a confirmation identification process.

     Q    Okay.  You're actually correct,
right, that there are some instances where
you do a line-up or a photo pack where
you're showing a photograph of an individual
that's not known to the person and asking
him to identify them.  Those have to be
notified -- Those procedures have to be --

     A    Right.

     Q    -- noticed.  The defense has to
be given notice of them, right?

     A    Yes.

     Q    But if you're just showing a
picture to confirm that you're both talking
about the same person and the witness knows
the individual, then you don't?

     A    Right.

     Q    Right.  So what happened here
was, I guess you reported and ended up
testifying, that the witnesses had
identified Mr. Diaz from newspaper
photographs, right?

     A    That was my belief at one
point, yes.

K. J. McCready         366

1

2      Q    Okay.  So that's what you

3  testified to, right?

4      A    Yes.

5      Q    And then, when it became

6  apparent that there was no newspaper

7  photographs ever published of the

8  individual, you came back and testified that

9  that was a mistake, right?

10      A    Yes.

11      Q    And that what, in fact, had

12  happened is you had shown them a single

13  picture of Mr. Diaz and they identified him

14  from that picture?

15      A    Yes, they did.  Let me go back

16  a little bit here.  What happened was they

17  told me that they saw him in the newspaper.

18  Now, you both know when you assume something

19  you make an ass out of you and me, right, so

20  my mistake was I assumed that they saw his

21  picture in the paper.

22          When I spoke to them about it,

23  they said they saw him in the newspaper

24  when, in fact, they actually only saw his

25  name in the newspaper but they knew him.

K. J. McCready          367

1

2          And I showed them one

3    photograph of Diaz and I said, is this the

4    guy you're talking about and they all three

5    said yes.

6          Q     Okay.  When you testified

7    initially, did you testify that they had

8    identified -- Did you testify about that

9    single photograph that you showed to them or

10   did you just tell the court about the

11   newspaper?

12         A     I did yes, I did.  I turned

13   around and told them.

14         Q     Well, no, initially, before it

15   was discovered that the photographs weren't

16   in the paper --

17         A     No.

18         Q     -- did you tell the court about

19   the single photograph?

20         A     No.

21         Q     So that what happened was --

22   and I think we all agree on kind of the

23   sequence here -- is that you testified that

24   the witnesses identified the individual from

25   a newspaper photograph, yes?

1                        K. J. McCready        368

2              A    Yes.

3              Q    But initially you didn't tell

4    the court about the photograph that you

5    showed them, correct?

6              A    No.

7              Q    When you say no, I'm wrong or

8    I'm correct that you did not do that?

9              A    No, no, I did that.  Yeah.

10             Q    Let me back up again, sorry.

11   That initially you told the court only about

12   the newspaper identification?

13             A    Right.

14             Q    You did not tell them, the

15   court, about the single photograph you

16   showed the witness initially; am I correct?

17             A    Right.

18             Q    And then it was discovered that

19   the newspaper did not have a photograph in

20   it, true?

21             A    Yes.

22             Q    And then you went back to court

23   and testified that you said, I actually did

24   show them a single photograph, correct?

25             A    Yes.

1                           K. J. McCready      369

2          Q     And your testimony is that that

3     was confirmatory, right?

4          A     Yes.

5          Q     Not that you were trying to

6     hide an improper identification procedure?

7          A     No, I was not.

8          Q     And you would agree with me

9     that kind of cutting corners or fooling with

10    identification procedures would be quite a

11    problem; wouldn't it?

12               MR. DUNNE:  I'll object to the

13          form of the question but go ahead

14          and answer that.

15          A     That would have been a problem

16    had it been a Wade issue, but it wasn't.

17    Like you said, it was a confirmatory

18    identification.  Once the railroad workers

19    knew him from him sleeping on the train so

20    it's like me if I go back to Hauppauge and

21    somebody says, do you know Bruce Barket?  I

22    said yeah, I just recently met him.  Oh, is

23    that him?  Yeah, that's him.

24          Q     Oh, I'm just curious why didn't

25    you just tell the court about that if it was

K. J. McCready          370

just a regular old --

         A      I wasn't asked until after --

till Mr. Gianelli asked me.

         Q      Nobody asked you if you had

shown a single photograph to the witnesses?

         A      No.

         Q      And it kind of moved to the

general, for a moment anyway, I may come

back to the details, but what I was saying

is identification testimony is fairly

important testimony, right?

         A      Yes.

         Q      And often times you have

witnesses who don't know an individual or

only have seen them once or twice and you

have to do these identification procedures,

right?

         A      Yes.

         Q      And in those cases it really is

a problem to show a single photograph to a

witness; isn't it?

               MR. DUNNE:  I'll object to the

         form of the question but go ahead.

               MR. BARKET:  Actually, he's

K. J. McCready        371

1    right.  Let me withdraw the

2    question.

3         Q    It's improper -- you know it to

4    be improper to show a single photograph to a

5    witness who is a stranger to a suspect;

6    don't you?

7         A    It only depends if it's a --

8    Bruce Barket did the murder and you show

9    them one photograph of Bruce Barket.  That

10   would be improper.  But if I showed him five

11   photographs and said, which one is the guy

12   you're talking about, and they say that guy,

13   then it's part of a Wade issue and therefore

14   that becomes a valid photo spread and et

15   cetera, et cetera, et cetera.

16        Q    And then, I think we're saying

17   the same thing.  And the reason why it would

18   be improper to show the single photograph of

19   the suspect to a witness is that it ends up

20   suggesting to the witness that the

21   perpetrator is the person in the photograph

22   and the perpetrator -- excuse me.

23             Let me start again.  The reason

24   why it would be improper to show a single

K. J. McCready        372

witness a single photograph to a witness is
that it is suggestive; is that right?
That's the phrase that's used?

    A    Yes.

    Q    Right.  We want the witness to
tell us what they remember and who they
think committed the crime, right?

    A    Well, see this is where you and
I are going to have a little problem because
they didn't witness any crime.

    Q    Well, whatever they are a
witness to.

    A    They're a witness to him
sleeping on the railroad train that was it.

    Q    Okay.  But I'm not talking
about that case in particular.  I'm talking
generally.

    A    Oh, yeah, fine.

    Q    The reason why it's improper to
do that is because we don't want the witness
to make an identification based upon a
suggestion by the police officer, right?

    A    Right.  Well, especially if
they're a witness to the crime.

K. J. McCready                  373

Q    Right.  And you don't want to
show a single photograph because it would
end up tainting the witness's testimony --
they might end up -- Is that true?

A    Yes.  It could be in a
situation that I'm talking about with regard
to you or somebody witnessing you do a crime
and I only show them one picture, that's
wrong.  That's improper.

Q    And we agree.

A    They didn't witness any crime.

Q    Well, actually, the prohibition
against showing a single photograph to a
witness applies whether or not the person
witnessed a crime or is identifying the
subject in the courtroom for some other
reason, right?

A    No.  No.  I don't think so.  I
don't believe that's the case.

Q    Okay.  Well, you think that if
a witness is going to come into the
courtroom and identify the Defendant and
say, I saw the Defendant do X, even if X
wasn't a crime, that you can then suggest to

K. J. McCready        374

the witness who the Defendant is?

A    Like I said, this was a
confirmatory identification.  They knew him.

Q    And I'm not disputing that
right now.  We're not talking about that.
I'm talking generally speaking, right, you
said we agree that it would be improper to
show a single photograph to a witness,
right?

A    It depends on the
circumstances.

Q    Say a witness who's a stranger
to the suspect?

A    Yes.

Q    That would be improper.  And
the reason why it would be improper is that
the witness may end up making identification
of the Defendant not based upon their
independent memory but based upon the single
photograph a police officer showed them?

A    Yes, but they've had --

Q    We're not talking Diaz, just
generally speaking.

A    Oh, right, yes.

```
                              K. J. McCready        375
 1
 2        Q     That's true?
 3        A     Yeah.
 4        Q     For a police officer -- I'm not
 5   saying you did this or frankly didn't do it,
 6   I wasn't there -- but for a police officer
 7   to engage in that kind of improper conduct
 8   it would be a serious misstep by the officer
 9   or detective; would you agree?
10             MR. DUNNE:  I'll object to the
11         form of the question but go ahead
12         and answer that.
13        A     Yes.
14        Q     That making sure --
15        A     We're not talking about the
16   Diaz case here.
17        Q     Correct.  I'm not saying you
18   did or didn't do anything improper.
19        A     Right.
20        Q     But conducting identification
21   procedures and showing witnesses
22   photographs, lying about that would be an
23   egregious act of misconduct by an officer;
24   would you agree?
25             MR. DUNNE:  I'll object to the
```

K. J. McCready                    376

1

2          form but go ahead.

3          A      Yes.

4          Q      And it would be -- I mean just

5   to draw an analogy, it would be just as bad

6   about lying about how you obtained a

7   confession from a suspect.

8                MR. DUNNE:   Again, I object to

9          the form of the question.

10         A      No.   You're talking apples and

11  onions here.   In a Wade situation, I would

12  have done a photo spread.   What we're

13  talking about is a confirmation ID here and

14  it has nothing to do -- there is no

15  comparison between a confirmation

16  identification and a confession.

17         Q      Not saying that there is.   I'm

18  saying that if a detective or police officer

19  were to lie --

20         A      Yes.

21         Q      -- about how they conducted an

22  identification procedure, that act of lying

23  about eyewitness identification would be

24  just as bad as lying about a confession?

25                MR. DUNNE:   I'm going to object

K. J. McCready        377

to the form.  That's kind of a

suggestive statement.

        A     That would be common sense,

yes.

        Q     Of course, right?

        A     Yes.

        Q     You don't want detectives lying

about how they are conducting important

parts of an investigation?

        A     That's right.

        Q     Be it how they take confessions

or how they do identification procedures?

        A     That's right.

        Q     If a detective is willing to

lye about one, you might think they are

lying about the other?

        A     Yes, you can draw an inference

but that's not --

        Q     You're saying that's not what

you did with Diaz?

        A     No.

        Q     Okay.  In the course of your

preparation for Diaz and the testimony, did

any prosecutor ever ask you if you showed a

K. J. McCready       378

1

2    single photograph to a witness?

3          A     No.

4          Q     One of the things that I want

5    to talk to you about, and I think that --

6    Crime scene photographs and showing those to

7    witnesses.

8          A     Yes.

9          Q     Did you do that in the Martin

10   Tankleff case?

11         A     I may very well have.

12         Q     When we're talking about crime

13   scene photographs, I'm talking about some of

14   the kind of rather graphic pictures of the

15   mother or the blood.  Did you show those

16   kinds of pictures to civilian witnesses in

17   this case?

18         A     I may have.

19         Q     Well, the attorney general's

20   office who conducted the investigation after

21   Marty's case was reversed, after his

22   conviction was reversed, indicated that in a

23   memo to the court, and one of the reasons

24   why they decided not to go forward with any

25   prosecution of Martin Tankleff, specifically

K. J. McCready          379

1    sited misconduct on your part in showing

2    photographs to witnesses; do you remember

3    that?

4          MR. DUNNE:  I'll object to the

5             form of that.  Go ahead and answer

6             that.

7          A    I remember that but they're

8    wrong.  I mean we use photographs all the

9    time in investigative tools.

10          Now, I was asked why did I show

11    McNamara photographs.  To be honest with

12    you, I don't remember.  I don't remember.  I

13    don't know what the question was or what the

14    situation was, but showing a crime scene

15    photo to an individual there's nothing wrong

16    with that.  We use them as investigative

17    tools.  But I don't know what I was trying

18    to glean from maybe Mr. McNamara or

19    whatever.  I don't remember that whole

20    conversation with McNamara about that.  It

21    was so insignificant, I don't remember.

22          Q    Well, also, Dan Hayes reports

23    that you showed him a crime scene photograph

24    just before his testimony in the criminal

K. J. McCready          380

1   trial as well.  You brought him into the

2   evidence room and showed him crime scene

3   photographs; is that true?

4         A    Not that I'm aware of.  I don't

5   remember showing him.  The only one I

6   remember showing photographs to is McNamara

7   and I would be dammed if I could remember

8   why.

9         Q    Well, the graphic photographs,

10  some of which we've looked at here, and all

11  of us, I guess, except for the court

12  reporter who understandably is kind of

13  revolted by them, what possible

14  investigative tool could you think of for

15  showing McNamara --

16        A    I don't remember.  If I

17  remembered, I'd tell you.

18        Q    Can you think of any proper

19  reason for doing that?

20              MR. DUNNE:  I'll object to the

21              characterization in the question but

22              go ahead and answer.

23        A    I don't know why I showed him

24  the photograph.

1                       K. J. McCready        381

2          Q     There were -- Did you show

3    crime scene photographs to any of the

4    Tankleff family?

5          A     Not that I remember.

6          Q     Shari Rother?

7          A     Not that I remember.

8          Q     Ron Rother?

9          A     Not that I remember.

10         Q     There were some civilian

11   witnesses who testified about statements

12   that Marty had made over the course of the

13   summer.  Apparently, Marty was bragging

14   about his wealth; is that right?

15         A     Yes.

16         Q     There were a couple of girls,

17   right, who had said he was kind of bragging

18   about how rich he would be or how rich his

19   parents were; something like that?

20         A     Yeah, words to that effect.

21   That he would be rich if his parents were

22   dead or something like that.

23         Q     Actually, and they testified to

24   something along those lines that Marty was

25   saying, if my parents weren't around I could

K. J. McCready                382

1

2    have any car I wanted or any house I wanted

3    or something like that?

4           A     Yeah, something like that.

5    Yes.

6           Q     Did you show those girls crime

7    scene photographs?

8           A     Not that I remember.

9           Q     Let's just take it out of the

10   Martin Tankleff case for a second, and I

11   want you to assume two things.  A, that

12   there are graphic pictures and B, that the

13   witness had nothing to do with the crime

14   scene.  In other words, they didn't witness

15   the crime, there was no need to show them

16   crime scene photographs to document or have

17   them testify about where things happened.

18                Can you think of any legitimate

19   reason why you would show crime scene

20   photographs to civilian witnesses?

21                MR. DUNNE:  I object again to

22           the parameters of the question.

23           Q     Not McNamara.  I know you say

24   you don't remember McNamara.  I'm saying

25   generally is there any or legitimate reason

K. J. McCready          383

1

2    for doing that?

3              MR. DUNNE:  I object to the

4         form of the last two questions.  Go

5         ahead, Detective.

6         A    We use crime scene photographs

7    as investigative tools.

8         Q    How?

9         A    It depends on the

10   circumstances.  I don't know.  It depends --

11   I don't remember why I showed McNamara that

12   photograph.  What do you think I run around,

13   hey guys, look at this, look at this.  No,

14   you don't do that.

15        Q    No, I guess the implication

16   from the attorney general's office is that

17   you're using it to push the witnesses to

18   color their testimony in a way that would be

19   helpful to the prosecution to get them on

20   your side.

21             MR. DUNNE:  Again, is that a

22        question or a statement?

23             MR. BARKET:  That's a question.

24             MR. DUNNE:  Well, is the

25        question did you do that?

```
 1                          K. J. McCready      384

 2            Q     Is that the motivation for

 3     doing that?

 4            A     No.

 5            Q     Did you show pictures to the

 6     civilian witnesses and say to them, look

 7     what this kid did; look what we have to say

 8     to them, your testimony is important, we

 9     have to put this murderer away?

10            A     No.

11            Q     You're certain of that?

12            A     Absolutely certain.

13            Q     You're as certain about that as

14     you are about the way the confession was

15     taken?

16            A     Yes.

17            Q     If we were to find out that you

18     were not being truthful about showing the

19     crime scene photographs to the civilians,

20     should we also doubt your word about how the

21     confession was taken?

22                  MR. DUNNE:  Objection.  C'mon

23            Bruce, that's not a fair question.

24            That's for the purpose of eliciting

25            facts.
```

K. J. McCready          385

1

2      Q    It's reported that you showed

3   crime scene photographs to a number of

4   different civilian witnesses and you're

5   saying the only person you remember is

6   McNamara?

7      A    The only one I remember showing

8   it to was McNamara.

9      Q    But you said you did this as a

10  matter of routine, you used crime scene

11  photographs?

12          MR. DUNNE:  Again, I object to

13          the characterization of the

14          question.  Go ahead and answer that.

15     A    We use crime scene photographs

16  as investigative tools.

17     Q    I guess I'm asking you -- Look,

18  give me any or give us any legitimate reason

19  for showing crime scene photographs to

20  witnesses?

21          MR. DUNNE:  I object to the

22          form of the question.  Go ahead.

23     A    I don't know how many times I

24  gotta tell you.  It depends on what's going

25  on.  We use them as investigative tools.

K. J. McCready          386

1  Now, I don't remember why I used that

2  particular photograph or what photographs I

3  even showed McNamara but the bottom line is

4  I don't run around showing pictures just for

5  the hell of showing pictures.

6  

7       Q    This isn't just me asking these

8  questions, and the attorney general's office

9  wrote this and I'm going to ask you if you

10  read this.

11            "The behavior of one of the

12  detectives in the case, Detective James

13  McCready, retired, was problematic in this

14  case.  The evidence that we have collected

15  shows that he showed crime scene photographs

16  to witnesses when there was no legitimate

17  law enforcement reason for doing so."

18            Can you --

19       A    You know, that's the attorney

20  general's office, right?

21       Q    Yes.

22       A    I'll be honest with you, I

23  don't give a damn what they think.  That's

24  what they think.  They have no idea.  They

25  weren't there.  They weren't shown the

```
 1                      K. J. McCready       387

 2   photographs.  I think -- You don't want to

 3   know what I think.

 4        Q    Well, I just asked you what you

 5   thought.  Whether I want to know or not,

 6   feel tree to answer.

 7        A    That's not what I'm talking

 8   about, not with regards to that question.

 9   I'm talking what I think about some other

10   things, that's all.

11        Q    Look, I mean you had a job to

12   do back then, right?

13        A    Yes.

14        Q    You had a job to do, you

15   thought Marty Tankleff killed his parents,

16   right?

17        A    Yes.

18        Q    And you thought that if you had

19   shown crime scene photographs to individuals

20   you would have done so in furtherance of

21   your investigation in the prosecution of

22   this case; is that right?

23        A    Yes.

24        Q    You were doing it because you

25   thought it would help the case, yes?
```

K. J. McCready        388

A    I don't know why.  I don't
know.  Whoever said I showed them
photographs, I think I would remember it but
I don't remember.  The only one I remember
showing photographs to is McNamara.

Q    That's not the question.  The
question I asked you was, if you were doing
it, and I guess you were at least to
McNamara, you were doing it because you
thought it would help the prosecution of
Marty Tankleff, right?

MR. DUNNE:  Again, I object to
the form of the question but go
ahead.

A    I don't know whether it would
have helped or hurt, but obviously I don't
remember why McNamara -- why he wanted to
see something.  I don't remember why I
showed it to him.

Q    You said before that you
weren't just showing photographs.

A    Right, but I don't remember the
back and forth between me and McNamara or
why the crime scene photographs even came

K. J. McCready          389

1  up.

2          If I had had photographs, I

3  might have even asked Marty to initial some

4  of them.

5          Q      That would have been a

6  legitimate --

7          A      That's something if he didn't

8  get lawyered up, as I said before, if we had

9  him for 24 hours we could have confirmed

10  more and more and more.

11          Q      You would have gathered more

12  information and put more information into

13  the confession?

14          A      I would have tried to elicit

15  more information from him but I couldn't.

16          Q      At the point in time that you

17  were taking the oral statements, you were

18  done taking the orals, right?  Nobody

19  interrupted?

20          A      Up to that point.

21          Q      Nobody interrupted you.  Nobody

22  stopped you from questioning further at that

23  point?

24          A      No.

K. J. McCready          390

1

2          Q    You were done with the orals

3    and you decided to move to -- let me finish

4    my question -- you were done with the orals

5    and you decided to move from the oral

6    statements, move from that phase to writing

7    out the written statements?

8          A    Yes.

9          Q    So it's the written statement

10   that was interrupted, not the oral

11   statement, correct?

12         A    Right.

13         Q    I want to go back to the crime

14   scene photographs if I can.  It also says in

15   here -- I'm reading from the attorney

16   general's memo to the court dismissing the

17   case against Marty Tankleff, and I want you

18   to comment on this.

19              "Detective McCready acted alone

20   when he showed photographs to others.  Based

21   upon our investigation, no other law

22   enforcement representative with whom we met

23   from either the Suffolk County Police

24   Department or the Suffolk County District

25   Attorney's office was aware that Detective

```
 1                        K. J. McCready        391

 2     McCready had engaged in such a behavior and

 3     all of them stated that it was improper.

 4                   Detective McCready himself

 5     recognized that it was improper.  He told

 6     one witness that he was behaving improperly

 7     even as he showed the photographs to that

 8     witness."

 9                   There's two parts of that that

10     I want to ask you about.  The first part is

11     that according to the attorney general's

12     office, that fellow police officers and

13     people at the DA's office agreed that you

14     showing these photographs was improper.

15                   I'll give you a chance to

16     respond to that.

17          A     I don't know who you're talking

18     about.  I don't have no idea who you're

19     talking about.  The only person I remember

20     showing a photograph to is McNamara and I

21     don't remember why.

22          Q     I'm not talking about McNamara.

23     I'm talking about the attorney general's

24     office having interviewed people from the

25     Suffolk County Police Department, other
```

K. J. McCready        392

members of your squad, other members of the

District Attorney's office.  They said they

didn't know you were doing it and that doing

so was improper.

          MR. DUNNE:  I'm going to object

     to the form.

     Q    Do you have a comment on that?

     A    No, I have no comment.  I have

no idea.

     Q    They also said that when they

asked you about it you had recognized that

it was improper.

     A    I what?

     Q    That you said it was improper.

You agreed that it was improper to do.

     A    I don't remember saying that to

them.

     Q    Did you tell McNamara that as

you were showing him the photographs that

you shouldn't be doing this but that you

were doing it anyway?

     A    I don't remember saying that at

all, no.

     Q    And as you sit here now, can

K. J. McCready          393

1   you offer up any legitimate purpose for

2   showing crime scene photographs to a

3   civilian witness?

4              MR. DUNNE:  Other than what's

5         he's already been asked?

6        A    With respect to this case?

7        Q    Any case.

8        A    I told you we use them as

9   investigative tools.

10       Q    I understand that, but what I'm

11  gathering from reading the attorney

12  general's report is that the investigative

13  tool or technique that you're employing is

14  to gain -- push the witnesses further into

15  the prosecution's corner by showing them the

16  horror of the crime and accusing the

17  Defendant of it?

18       A    No.

19       Q    Because --

20       A    I didn't do that.

21       Q    Other than that, other than

22  doing it for that reason, what possible

23  reason would you have to show graphic

24  photographs to civilian witnesses?

K. J. McCready        394

1

2        A     Didn't I answer that five times

3    already?

4        Q     You said that you do it for law

5    enforcement reasons.

6        A     Yes.

7        Q     You have not given me or us any

8    reason.

9        A     Well, it depends on the

10   purpose.  I have no idea.

11       Q     Name one.  Any.

12       A     Okay.  Let's say there was

13   another person in the house with Marty that

14   night, right, and they came in and they saw

15   Arlene laying the way she was, whatever, I

16   might show them that photograph and say, is

17   this what you saw.  And if they say yes,

18   it's again confirmatory-type situation.

19       Q     Was McNamara in the house?

20       A     I don't know.  I don't

21   remember.

22       Q     Was Dan Hayes in the house?

23       A     No, not that I know.

24       Q     Were the girls that Marty was

25   bragging to about his parents wealth in the

K. J. McCready          395

house?

    A    No.

    Q    We'll talk just about McNamara.
Forget what actually happened, can you think
of any legitimate reason why you would have
done it?

    A    I don't remember.  If I
remembered, I would be glad to tell you.

    Q    But it is fair to say that you
were in the process of helping the
prosecution build a case against a person
that you arrested when you were showing
these photographs, correct?  You did not --

    A    Yes.

    Q    Right.  I mean whatever the
reason was it had to be to further the
investigation --

    A    Right.

    Q    -- or the prosecution?

    A    Whatever.  Or to jog their
memory about something.  I don't remember.

    Q    Same thing with Diaz that you
weren't just out interviewing railroad
workers, you were out trying to build a case

1                      K. J. McCready      396

2    against Diaz, right?

3           A    Yes, yes.

4           Q    And the same way you kind of

5    engage in whatever you do with respect to

6    interrogations.  You're just not sitting

7    around asking questions, you're trying to

8    build a case against a person who you think

9    committed a crime?

10              MR. DUNNE:  I object to the

11         form.  Go ahead.

12         A    Yes.

13              MR. BARKET:  I dare say that in

14         my mind I'm done, but my mind does

15         not control so can we take a

16         five-minute break.

17              MR. DUNNE:  Sure.

18              THE VIDEOGRAPHER:  Off the

19         record at 2:40 p.m.

20              (At this time, a brief recess

21         was taken.)

22              THE VIDEOGRAPHER:  Beginning of

23         Tape 8.  Back on the record at 3:05

24         p.m.  You may proceed.

25    CONTINUED EXAMINATION BY

K. J. McCready          397

MR. BARKET:

Q    Detective, do you know Shari Rother?

A    Shari Rother?

Q    Yeah.

A    Yeah.

Q    How did you meet her?

A    After he murdered her parents.

Q    Are you saying you did not know Ms. Rother prior to the murder of Marty's parents?

A    No.

Q    And how about Ronald Rother, did you know him before that?

A    No.

Q    Did you eventually go into business with Ron Rother?

A    Yes.

Q    We talked about this briefly yesterday.

A    Yes.

Q    Was some of the money that Ron put up from that the proceeds of the Estate of Tankleff?

K. J. McCready          398

A     Not that I'm aware of.

Q     Sorry.  Just one second.  Was

there a Mr. or Detective Genna that

testified; do you remember?

A     Bob Genna?

Q     Yes.

A     Sure.

Q     Who is he?

A     Right now, I think he's the

head of the lab, crime lab.

Q     Okay.  And I asked you

yesterday whether or not you recall -- well,

maybe it was this morning -- whether or not

you recall that the smudges or the blood on

the wall near the switch, light switch in

Marty's room was a glove-like print; do you

remember that?

A     Yes.

Q     I want to refer you to the

testimony of -- is it Detective Genna or Mr.

Genna?

MR. DUNNE:  No, he's a

civilian.

Q     So Mr. Genna or Dr. Genna, at

K. J. McCready          399

pages 2460, I'm just going to read this from

line 8.

"Q.   What was the pattern you

found in that particular location?

A.   It was a chain-like

honeycomb pattern.

Q.   Did there come a point in

time, Mr. Genna, after identifying

these particular patterns on these

six items to which you just

referred, that you drew any

conclusion with respect to the

origin of those patterns which you

are able to discern this chain-like

or honeycomb pattern to which you're

referring?

A.   Yes.

Q.   Would you please tell us

what your conclusions and opinions

are to a reasonable degree of

scientific certainty with respect to

the origin of those particular

chain-like or honeycomb-type

patterns?

K. J. McCready          400

A.    Yes.  My conclusion was
that the patterns were consistent
with the type of pattern that you
commonly find on the grip areas of
the fingers or the palm area of a
glove, either a fabric or a rubber
glove."

You can take a look at it yourself.
Does that refresh your memory that the blood
smear on the wall in Marty's room came from
a gloved or a glove-like print?

You don't remember it from 20 years
ago?  You don't remember?

A     No.

Q     Point of fact, it was not only
the wall, I think the sheets in Marty's room
also had a similar pattern -- excuse me, the
sheets in Marty's parents bedroom where
Arlene was also had a similar pattern.

A     I'm not aware of that.  That's
the first I've ever heard that.

Q     Anything to do with the
glove-like prints or on the sheets as well?

A     No, not on the sheets.

K. J. McCready        401

1

2          Q      Did you hear or did you become

3    aware or ever see a knife print on the

4    sheets?

5          A      No.  Now, I'm aware at this

6    time that some moron up in the State lab or

7    whatever claims that there's a knife print

8    or something on the sheet, but I don't know

9    if that's necessarily correct.

10         Q      Well, when you say some moron

11   up in the State police lab, let's just break

12   it down a little bit.

13                In 2008, a special prosecutor

14   was appointed in this case, right?  You know

15   that?

16         A      Yes.

17         Q      Thomas Spota stepped aside and

18   he allowed the attorney general's office to

19   conduct the investigation; you remember

20   that?

21         A      Yes.

22         Q      And the governor agreed,

23   removed him as a prosecutor, and appointed

24   the attorney general's office, right?

25         A      Right.

2    Q    And just so we're clear, Thomas

3  Spota is the same Thomas Spota that is now

4  the current district attorney and who was

5  your lawyer back in 1991 or '92 when you

6  were on trial?

7    A    Yes.

8    Q    And that the attorney general's

9  office along with the State police conducted

10  an investigation following their appointment

11  as a prosecutor in this case, right?

12    A    Yes.

13    Q    And they took all the evidence

14  and reviewed it and somebody from the State

15  crime lab, State police, looked at the

16  sheets from Marty Tankleff's mother's room

17  and --

18    A    Right.

19    Q    -- indicated that there was a

20  knife pattern on those sheets; you know

21  that, right?

22    A    Well, yes.

23    Q    All right.  So now, I know you

24  were just being flippant.  You don't know

25  the individual who performed that test; do

K. J. McCready          403

you?

    A    No.

    Q    You don't know if that person

is an expert in bloodstain patterns, what

his training or her training or experience

is; do you?

    A    No.

    Q    So when you said that person is

a moron, you were just being a little

flippant and a little sarcastic?

    A    Yes.

    Q    It might be a highly-skilled

investigator who found a knife-like print,

right?

    MR. DUNNE:  I object to the

    form but go ahead.

    A    Excuse me.  Might be.

    Q    Might be.  And, of course, you

also know, and I guess it would be fair to

say the person might be a "moron" you just

don't know who it is.

    A    Might be.

    Q    Might be.  And, of course, we

do know that the knife-like print was

K. J. McCready          404

2    compared to every single knife in the

3    Tankleff residence, right?

4              MR. DUNNE:  Again, I object to

5         the form --

6         A    I didn't know.

7         Q    You didn't know that?

8              MR. DUNNE:  I'm going to object

9         to the form and the characterization

10        of the question.  Go ahead.

11        A    I didn't know.

12        Q    And you didn't know that part

13   of their analysis was not only that they

14   found the knife print on the sheet, but that

15   they compared it to every knife in the house

16   and it didn't match a single knife in the

17   Tankleff residence?

18        A    I didn't know that was their

19   opinion.

20        Q    Assuming that's true, that

21   would indicate that whoever committed this

22   crime used that knife and then took it from

23   the residence, right?

24              MR. DUNNE:  Again, I'm going to

25        object to --

K. J. McCready        405

1

2      A    I don't know.

3           MR. DUNNE:  -- that on many

4      grounds but go ahead and answer

5      that.

6           A    I don't know.  Well, I don't

7      agree with their findings so therefore I

8      can't agree with that.

9           Q    It's interesting that you say

10     you don't agree with their findings because

11     we just got done talking about you have no

12     idea who the person is who made these

13     findings.

14          A    I don't.

15          Q    There's no reason to suspect

16     that the lab technician, or the criminalist,

17     or the blood spatter or whatever, the expert

18     that looked at this, this is not somebody

19     that Martin Tankleff hired; is it?

20          A    No.

21          Q    This is somebody with the State

22     police, right?

23          A    Yes.

24          Q    And because that evidence that

25     they found is somewhat inconsistent with

K. J. McCready          406

1

2    Marty's guilt, you just dismiss it and call

3    the person a moron?

4              MR. DUNNE:  I'm going to object

5         to the characterization in the

6         question.  Go ahead and answer that

7         as best you can.

8              A     No, no.  I'll tell you what, I

9    spoke too fast on that because I've had

10   conversations with other experts about that

11   particular opinion and they don't agree with

12   that opinion; so that's all I'm going to

13   say.  That's all I have to say.

14             Q     What expert have you spoken to?

15             A     Bob Genna.

16             Q     Bob.  You spoke to Bob Genna.

17   When did you speak to Mr. Genna, Bob Genna?

18             A     Last Friday night.

19             Q     Last Friday night.  Today is

20   Wednesday.  Last Friday was December 7th?

21             A     Yes.

22             Q     And you spoke to him in the

23   context of you were talking about the Martin

24   Tankleff case?

25             A     I asked him one question.

K. J. McCready          407

Q      Where were you when the
conversation took place?

A      At the Detective's Association
Christmas party.

Q      Okay.  For Suffolk, I take it,
right?

A      Yes.

Q      And did you have a longer
conversation with him?  Was it just one
question about the Tankleff case?

A      The only thing I said to him, I
said, what's this nonsense about this blood
print, or knife, whatever on the sheet, and
he disagreed with their findings.

Q      Did you put it to him that way,
what's the deal with this nonsense?

A      Yeah.

Q      What was his reaction?  What
did he say to you?

A      He doesn't agree with their
opinion.

Q      Is that what he said, I don't
agree with their opinion?

A      Yes.

K. J. McCready          408

1

2      Q     That's all he said?

3      A     Yeah.

4      Q     Which opinion; that there was a

5   knife print or that the knife print didn't

6   match any of the knives in the house?

7      A     I didn't get into a lengthy

8   discussion about it, all right.  I just

9   mentioned it to him and that's what he said

10  to me.

11     Q     Well, even before you spoke to

12  Mr. Genna, you described it as nonsense?

13     A     Right.

14     Q     Why?

15     A     Because I felt like they were

16  making things up up there.

17     Q     You thought that the State

18  police were making things up?

19     A     Yeah.

20     Q     This kind of reminds me of our

21  conversation yesterday where you said --

22         MR. DUNNE:  Can we just ask a

23      question.  I object to the colloquy.

24         MR. BARKET:  Sure.

25     Q     You recall yesterday saying

K. J. McCready        409

that no evidence would ever change your view

that Marty killed his parents?

        A     That's right.

        Q     So that any evidence that

indicates he's innocent has to be nonsense?

                MR. DUNNE:  I object to the

                characterization in the question.

                That's not what he said.

        A     That's not what I said.

                MR. DUNNE:  Go ahead and answer

                that.

        Q     Would you agree with me that if

the knife print was there and it was

inconsistent with every knife in the house,

meaning the knife that was used had to be

taken out of the house, that that would be

some evidence that somebody else was

involved in this besides Martin Tankleff?

                MR. DUNNE:  I'll object to the

                form of the question.  Go ahead,

                Detective.

        A     No.  To me, what that would

mean, if there was another knife involved,

that he disposed of the knife somewhere, not

K. J. McCready        410

that somebody else took it out of the house.

Q    In the 30 minutes that he had

from 5:35 to 6:11, 36 minutes, we now add in

that he somehow disposed of the knife in a

way that it was never found?

A    I'm not saying he disposed of

the knife.

MR. DUNNE:  Jimmy, hold on a

second.  I have to object to the

suppositions in that question but

you answered that question as he

posed it.

A    What I'm saying is that

anything is possible.  I still, as I pointed

out many times today, I still don't believe

that he gave us a hundred percent of the

truth about this whole thing so that could

be one of the things.  It would have been

nice if we had found a knife outside if

that, in fact, was a murder weapon or

something.

Q    Did you even consider the

possibility?  I mean just kind of

objectively just step back a second.

1                    K. J. McCready      411

2          MR. DUNNE:  Again, I'm going to

3     object to the characterization and

4     the colloquy.

5          MR. BARKET:  Let me finish my

6     question and you can object to it.

7     Q     Did you even consider the

8  possibility?  I mean you're a human, Rein is

9  human, everybody makes mistakes, that you

10  just made a mistake here?  Do you consider

11  that possible?

12     A     I didn't do --

13          MR. DUNNE:  I need to put my

14     objection to the form of the

15     question on record.  Go ahead.

16     A     I didn't make any mistakes.

17     Q     I didn't ask you if you did or

18  didn't.  I got the fact that you don't think

19  you did.  What I'm asking you is, did you

20  even consider that maybe you got this wrong?

21     A     Consider what?

22     Q     That Marty is innocent.

23     A     No, he's not innocent.

24     Q     It never, in your wildest

25  dreams, creeping conscious anywhere, thought

K. J. McCready        412

Jeeze, with all this other evidence, all

these other things, that maybe, you know, we

made a mistake here?

        MR. DUNNE:  I'll object to the

        form of the question.  Go ahead,

        Detective, and answer that.

      A    Absolutely not.  He's as guilty

today as he was then.

      Q    Or as not guilty today as he

was then depending on our view, right?

        MR. DUNNE:  Counsel, you know

        the parameters.  You know better.

      Q    Am I right about that?

Whatever happened back then happened?

      A    He did it.

      Q    You weren't there; I wasn't

there.

      A    But he did it.  You know, when

I get up in the morning I shave my face.

When I look at the guy in the mirror on that

side, I like that guy.  I don't know if he

could do the same thing.

      Q    Well, you know, I guess we can

ask him when it's his turn, right?

1                               K. J. McCready        413

2               MR. DUNNE:  I've concluded that

3          examination.

4          Q     You're comfortable with the

5     work you did here?

6          A     Yes.

7          Q     You think you put a guilty

8     person in prison?

9          A     Yes.

10         Q     And that, if anything -- Did

11    you make any mistakes in this investigation?

12         A     I don't know.  I don't know.  I

13    don't know.  Not that I can think of right

14    now.

15         Q     Did you ever -- You gave some

16    interviews to a number of media outlets.

17    Did you tell Erin Moriarty that you were

18    better than a polygraph at detecting when

19    people lie?

20         A     No, I told her -- I said I

21    would like to think that I was better than a

22    polygraph.

23         Q     Kind of the same thing, right?

24              MR. DUNNE:  Well, Counsel, come

25         on.  That's the answer.

K. J. McCready       414

2      Q      Why would you like to think

3   that you're better than a polygraph at

4   determining whether individuals are lying?

5      A      Because I think I am.  And a

6   polygraph you can't use it in a criminal

7   case.  It's not reliable.

8      Q      Is that why you didn't give

9   Marty one?

10      A      No.

11      Q      When Steuerman fled to

12   California, did you go out --

13      A      Yes.

14      Q      -- to bring him back.  Why did

15   you go out there?

16      A      Out to Steuerman?

17      Q      Yeah, why did you go get him?

18      A      Because he faked his own death

19   and all that stuff.

20      Q      So what?

21      A      And he's a witness in this

22   case.

23      Q      So who else went with you?

24      A      Detective Sergeant Doyle and Ed

25   Jabloski, assistant district attorney.

K. J. McCready        415

Q   How long were you in California for?

A   I don't remember.  I'm thinking three, four to five days.

Q   And the purpose was to bring Mr. Steuerman back?

A   Yes.

Q   I mean this wasn't about the time of the trial, this was much closer to the time of the murders, right?

A   Yes, it was right after the murder.

Q   In fact, Mr. Tankleff was still in a coma in the hospital alive, right?

A   Yes, yes.

Q   I don't suppose you said to Mr. Steuerman when you saw him that Seymour was pumped full of adrenalin, came out of his coma, and said that Steuerman attacked him; did you?

A   Did I say that?

MR. DUNNE:  I object to the form of the question.

A   No, I didn't say that.

K. J. McCready       416

1

2       Q    I guess that I've heard you

3   comment that Steuerman wasn't a suspect, was

4   never a suspect, and that he just made your

5   case more difficult by fleeing; is that

6   right?

7       A    Yes.

8       Q    So the information that has

9   come to light about Steuerman since the

10  murders does not cause you to question

11  whether or not he was a suspect or perhaps

12  actually involved, it simply makes the

13  prosecution or made the prosecution of Marty

14  more difficult for you?

15      MR. DUNNE:  I'll object to the

16      form of the question.  Go ahead and

17      answer that.

18      A    No, I don't think it made it

19  that more difficult for us.  I think it just

20  brought a lot of grief and aggravation onto

21  Steuerman himself because he did pull that

22  act.

23      Q    Okay.

24      (Continued on next page to

25      include jurat.)

K. J. McCready          417

MR. BARKET:  Thank you.  I

appreciate your time.

THE WITNESS:  You're quite

welcome.

THE VIDEOGRAPHER:  It's 3:24.

This concludes the day's deposition.

We're off record at 3:24 p.m.

(Time noted:  3:24 p.m.)

_____
          K. JAMES McCREADY

Subscribed and sworn to before me

this ___ day of _____, 2013.

_____
NOTARY PUBLIC

418

## INDEX

### INDEX TO TESTIMONY

|                              |      | Page |
| ---------------------------- | ---- | ---- |
| Examination by Mr. Barket    |      | 4    |

### EXHIBITS

| Plaintiff's          | Description        | Page |
| -------------------- | ------------------ | ---- |
| Exhibit 97           | Written Confession | 312  |
| Exhibit 98           | Photograph         | 330  |
| Exhibit 99           | Photograph         | 334  |
| Exhibits 100-105     | Photographs        | 334  |

419

ERRATA SHEET FOR THE TRANSCRIPT OF:
Case Name:  Martin Tankleff vs The County of
Suffolk
Deposition Date:  December 12, 2012
Witness:  K. James McCready

CORRECTIONS

PG   LN    NOW READS    SHOULD READ    REASON FOR

___  ___  _____  _____  _____

___  ___  _____  _____  _____

___  ___  _____  _____  _____

___  ___  _____  _____  _____

___  ___  _____  _____  _____

___  ___  _____  _____  _____

___  ___  _____  _____  _____

___  ___  _____  _____  _____

___  ___  _____  _____  _____

___  ___  _____  _____  _____

___  ___  _____  _____  _____

___  ___  _____  _____  _____

___  ___  _____  _____  _____

                    _____
                              Signature


Subscribed and sworn to before me
this_____ day of _____, 2013.

_____
         (NOTARY PUBLIC)

420

## CERTIFICATION

I, DOLLY FEVOLA, a Notary Public in
and for the State of New York, do hereby certify:

THAT the witness whose testimony is herein
before set forth, was duly sworn by me; and

THAT the within transcript is a true record
of the testimony given by said witness.

I further certify that I am not related,
either by blood or marriage, to any of the parties
to this action; and

THAT I am in no way interested in
the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto
set my hand this 30th day of January, 2013.


DOLLY FEVOLA

# #

**#1-10** [2] - 268:8, 268:9

**'** 

**'92** [1] - 402:5

# 1

**1** [1] - 299:19
**100** [2] - 334:11, 335:3
**100-105** [1] - 418:13
**10013** [1] - 269:8
**101** [1] - 334:19
**102** [2] - 334:19, 335:24
**103** [1] - 340:3
**104** [1] - 340:3
**105** [2] - 334:11, 340:4
**11** [1] - 306:12
**11530** [1] - 269:5
**11:30** [1] - 268:15
**11:33** [1] - 271:13
**12** [6] - 268:14, 271:13, 304:25, 305:14, 315:8, 410:3
**12:00** [1] - 299:15
**12:35** [1] - 339:20
**12:55** [1] - 339:25
**14th** [2] - 282:8, 282:16
**15** [1] - 337:9
**17-year-old** [2] - 278:23, 281:19
**1991** [1] - 402:5
**1:11** [1] - 359:2
**1:20** [1] - 344:5
**1:22** [2] - 299:19, 299:20

# 2

**20** [1] - 400:13
**20005** [1] - 269:12
**2008** [1] - 401:13
**2012** [3] - 268:14, 271:13, 419:3
**2013** [3] - 417:16, 419:24, 420:15
**24** [2] - 358:9, 389:10
**2460** [1] - 399:2
**25** [4] - 282:6, 287:24, 288:14, 299:22
**2:06** [1] - 359:7
**2:40** [1] - 396:19

# 3

**3** [2] - 285:21, 309:2
**30** [1] - 410:3
**300** [1] - 331:23
**30th** [1] - 420:15
**312** [1] - 418:10
**330** [1] - 418:11
**334** [2] - 418:12, 418:13
**36** [3] - 323:6, 323:8, 410:4
**3:05** [1] - 396:23
**3:24** [3] - 417:6, 417:8, 417:9

# 4

**4** [1] - 418:6
**40** [1] - 344:9

# 5

**5** [2] - 337:20, 337:22
**5:35** [10] - 311:5, 311:22, 311:25, 312:7, 313:15, 313:19, 313:20, 313:21, 313:22, 410:4

# 6

**6** [3] - 271:3, 337:20, 337:22
**60** [1] - 277:24
**61** [2] - 277:24, 279:15
**62** [1] - 277:24
**655** [1] - 269:11
**666** [3] - 268:12, 269:4, 271:11
**69** [1] - 283:16
**6:11** [3] - 309:2, 323:6, 410:4

# 7

**7** [1] - 339:24
**71** [1] - 277:24
**77** [1] - 274:5
**7:40** [1] - 344:4
**7th** [1] - 406:20

# 8

**8** [4] - 287:7, 287:8,
396:23, 399:3
**81** [1] - 308:24

# 9

**900** [1] - 269:11
**911** [15] - 279:19, 279:21, 281:5, 281:25, 282:3, 282:24, 283:5, 285:4, 285:25, 286:4, 286:9, 286:11, 294:16, 323:2, 348:3
**97** [3] - 312:23, 348:23, 418:10
**98** [4] - 330:14, 330:16, 330:18, 418:11
**99** [3] - 269:8, 334:4, 418:12
**9:35** [1] - 323:5
**9:40** [1] - 274:21

# A

**a.m** [2] - 268:15, 271:14
**A15** [2] - 274:13, 275:4
**A16** [1] - 275:17
**abbreviated** [1] - 281:4
**ability** [1] - 328:5
**able** [3] - 336:25, 337:4, 399:15
**above-mentioned** [1] - 268:20
**absolutely** [2] - 384:12, 412:8
**absorb** [1] - 317:11
**accept** [2] - 283:20, 285:13
**accident** [3] - 292:4, 292:14, 294:25
**accommodate** [1] - 359:4
**according** [30] - 280:15, 292:17, 292:20, 293:5, 293:7, 293:12, 293:15, 293:16, 293:23, 294:3, 294:11, 297:3, 297:8, 297:11, 297:15, 299:18, 311:4, 313:23, 314:2, 314:7, 314:17, 319:5, 322:19, 339:8,

**account** [5] - 298:18, 299:23, 318:15, 318:17, 321:18
**accurately** [1] - 271:20
**accusing** [1] - 393:17
**acquired** [3] - 274:17, 275:7, 275:21
**act** [5] - 296:11, 296:14, 375:23, 376:22, 416:22
**acted** [1] - 390:19
**acting** [1] - 295:9
**action** [1] - 420:11
**add** [1] - 410:4
**addition** [1] - 335:22
**admissions** [2] - 351:8, 356:15
**admits** [1] - 298:13
**adopted** [1] - 308:9
**adrenalin** [1] - 415:19
**advised** [1] - 301:2
**afternoon** [1] - 359:11
**afterwards** [2] - 276:6, 281:18
**aggravation** [1] - 416:20
**ago** [1] - 400:14
**agree** [13] - 367:22, 369:8, 373:11, 374:8, 375:9, 375:24, 405:7, 405:8, 405:10, 406:11, 407:21, 407:24, 409:13
**agreed** [3] - 391:13, 392:16, 401:22
**AGREED** [3] - 270:3, 270:8, 270:12
**ahead** [32] - 293:4, 296:17, 319:11, 331:10, 332:12, 336:15, 338:19, 345:10, 346:21, 354:23, 358:6, 361:23, 369:13, 370:24, 375:11, 376:2, 379:6, 380:23, 383:5, 385:14, 385:22, 388:15, 396:11, 403:17, 404:10, 405:4, 406:8, 409:11, 409:21, 411:15, 412:6, 416:16
**aid** [1] - 294:18

**alarm** [5] - 292:21, 311:7, 311:8, 311:14, 311:19
**alive** [1] - 415:15
**allegations** [1] - 361:3
**allowed** [3] - 285:15, 319:17, 401:18
**almost** [3] - 331:23, 335:13, 344:8
**alone** [1] - 390:19
**alright** [4] - 272:20, 305:7, 305:8, 313:15
**ALSO** [1] - 269:17
**amount** [3] - 287:20, 317:3, 317:8
**AMY** [1] - 269:6
**anally** [1] - 298:15
**analogy** [1] - 376:5
**analysis** [1] - 404:13
**analyzed** [1] - 325:17
**AND** [3] - 270:3, 270:8, 270:12
**Anderson** [1] - 359:22
**answer** [23] - 304:13, 320:17, 320:18, 332:13, 336:16, 343:17, 345:10, 346:21, 354:12, 358:6, 369:14, 375:12, 379:6, 380:23, 385:14, 387:6, 394:2, 405:4, 406:6, 409:11, 412:7, 413:25, 416:17
**answered** [2] - 350:2, 410:12
**anyway** [4] - 318:3, 347:19, 370:9, 392:22
**apparent** [1] - 366:6
**apples** [1] - 376:10
**applies** [1] - 373:15
**apply** [1] - 286:5
**appointed** [2] - 401:14, 401:23
**appointment** [1] - 402:10
**appreciate** [1] - 417:3
**area** [3] - 286:6, 310:3, 400:6
**areas** [1] - 400:5
**Arlene** [10] - 327:13, 328:12, 331:11, 332:6, 336:4, 340:10, 354:6, 354:18, 394:15, 400:20
**Arlene's** [2] - 332:9, 335:7

arrested [1] - 395:13
arrived [1] - 276:19
article [1] - 363:20
aside [1] - 401:17
ass [1] - 366:19
assistant [1] - 414:25
associate [1] - 271:22
associated [1] - 317:3
Association [1] - 407:4
assume [2] - 366:18, 382:11
assumed [1] - 366:20
assuming [1] - 404:20
attack [2] - 319:7, 319:24
attacked [11] - 293:17, 293:22, 314:16, 314:19, 316:14, 320:23, 321:8, 328:17, 332:16, 342:7, 415:20
attempt [1] - 284:22
attest [1] - 271:18
attorney [14] - 305:11, 378:19, 383:16, 386:8, 386:19, 390:15, 391:11, 391:23, 393:12, 401:18, 401:24, 402:4, 402:8, 414:25
Attorney's [2] - 390:25, 392:3
Attorneys [4] - 269:4, 269:7, 269:11, 269:14
attorneys [1] - 302:17
autopsy [8] - 334:5, 334:13, 334:21, 334:25, 340:2, 340:9, 340:20, 353:18
available [11] - 327:24, 328:2, 337:12, 338:12, 341:6, 341:8, 341:21, 342:3, 342:7, 343:12, 343:14
aware [18] - 278:20, 278:22, 311:11, 311:13, 323:14, 339:18, 342:16, 342:17, 342:20, 343:2, 355:15, 355:18, 380:5, 390:25, 398:2, 400:21, 401:3, 401:5

## B

background [2] - 361:7, 362:17
bad [3] - 282:21, 376:5, 376:24
balling [1] - 295:22
barbell [10] - 293:18, 294:8, 300:4, 312:8, 313:23, 314:20, 315:5, 316:12, 320:14, 325:19
barbells [7] - 307:21, 325:17, 329:7, 329:9, 330:22, 331:3, 341:24
barket [1] - 418:6
BARKET [26] - 269:3, 269:5, 272:5, 272:17, 272:23, 272:24, 312:14, 312:17, 312:20, 313:20, 330:13, 333:25, 334:7, 334:20, 334:24, 340:6, 358:22, 359:10, 359:24, 370:25, 383:23, 396:13, 397:2, 408:24, 411:5, 417:2
Barket [5] - 271:10, 272:5, 369:21, 371:9, 371:10
Barry [1] - 272:7
BARRY [1] - 269:12
based [8] - 284:21, 354:24, 372:22, 374:19, 374:20, 390:20
beat [6] - 290:6, 290:10, 293:17, 294:12, 300:5, 317:20
beaten [1] - 325:13
beating [1] - 317:6
became [1] - 366:5
become [1] - 401:2
becomes [1] - 371:15
bed [4] - 311:25, 315:12, 315:16, 315:17
bedroom [7] - 310:7, 310:17, 314:8, 318:7, 329:15, 342:14, 400:19
BEFORE [1] - 268:16
began [5] - 276:12, 276:24, 289:22, 291:6, 299:15

begin [1] - 289:19
beginning [3] - 306:12, 339:23, 396:22
begins [1] - 351:8
behalf [2] - 272:8, 272:12
behaving [1] - 391:6
behavior [2] - 386:11, 391:2
behind [2] - 294:9, 317:20
belief [1] - 365:24
below [1] - 342:25
beneficiary [2] - 287:15, 287:23
best [6] - 288:24, 290:22, 336:6, 343:18, 354:12, 406:7
better [4] - 412:13, 413:18, 413:21, 414:3
between [5] - 273:7, 310:23, 318:5, 376:15, 388:24
big [2] - 296:11, 308:20
bill [1] - 360:12
bit [5] - 289:12, 322:17, 333:20, 366:16, 401:12
blacked [2] - 289:24, 296:25
blank [1] - 360:2
bleeding [1] - 317:8
blood [41] - 275:18, 284:20, 293:25, 316:19, 317:3, 317:8, 317:11, 317:23, 317:24, 318:23, 319:7, 319:23, 320:2, 320:4, 320:5, 320:6, 320:7, 320:8, 320:12, 320:14, 321:5, 321:14, 324:4, 324:8, 324:24, 325:7, 325:9, 325:13, 325:18, 325:25, 326:3, 327:13, 327:14, 332:2, 342:13, 378:15, 398:15, 400:10, 405:17, 407:13, 420:10
bloodstain [1] - 403:5
bloody [1] - 317:15
blow [1] - 335:20

blows [4] - 333:21, 339:11, 340:21, 341:25
bludgeoned [1] - 328:17
bluffs [1] - 327:12
Bob [6] - 359:20, 398:6, 406:15, 406:16, 406:17
Bobby [1] - 359:22
body [8] - 331:13, 331:16, 332:6, 332:9, 332:17, 332:18, 345:19, 363:4
bottom [5] - 274:13, 279:16, 285:23, 285:24, 386:4
boy [1] - 295:8
bragging [3] - 381:13, 381:17, 394:25
break [3] - 358:23, 396:16, 401:11
brief [2] - 339:21, 396:20
briefly [1] - 397:20
bring [4] - 303:16, 347:16, 414:14, 415:6
broke [3] - 290:8, 297:22, 346:2
brought [3] - 344:18, 380:2, 416:20
Bruce [5] - 272:5, 369:21, 371:9, 371:10, 384:23
BRUCE [1] - 269:5
BRUSTIN [1] - 269:7
build [4] - 294:20, 395:12, 395:25, 396:8
Building [1] - 269:15
bunch [1] - 298:23
business [1] - 397:18
BY [7] - 269:5, 269:9, 269:12, 269:16, 272:22, 359:9, 396:25

## C

c'mon [1] - 384:22
California [2] - 414:12, 415:2
car [1] - 382:2
card [4] - 301:3, 301:14, 301:17, 302:10
care [2] - 301:13,

362:25
Carmedi [1] - 359:21
carrying [5] - 316:15, 317:15, 318:22, 320:21, 321:13
case [28] - 292:16, 360:23, 361:8, 363:5, 372:17, 373:20, 375:16, 378:10, 378:17, 378:21, 382:10, 386:12, 386:14, 387:22, 387:25, 390:17, 393:7, 393:8, 395:12, 395:25, 396:8, 401:14, 402:11, 406:24, 407:11, 414:7, 414:22, 416:5
Case [1] - 419:2
cases [1] - 370:20
catch [1] - 324:4
certain [7] - 284:13, 286:21, 308:15, 342:5, 384:11, 384:12, 384:13
certainly [3] - 285:11, 302:19, 349:2
certainty [1] - 399:22
certification [1] - 270:6
CERTIFICATION [1] - 420:2
certify [2] - 420:4, 420:9
cetera [4] - 281:6, 371:16
chain [3] - 399:6, 399:15, 399:24
chain-like [3] - 399:6, 399:15, 399:24
chair [2] - 314:6, 314:13
challenge [4] - 283:21, 299:11, 299:22, 302:16
challenging [2] - 356:6, 356:9
chance [1] - 391:15
change [1] - 409:2
characterization [9] - 332:12, 353:23, 354:10, 380:22, 385:13, 404:9, 406:5, 409:8, 411:3
characterizations [1] - 345:9
charged [1] - 361:8
CHARLES [1] - 268:7
CHARTERED [1] -

269:10
checked [1] - 326:4
chest [1] - 333:12
CHEVALIER [1] - 269:10
choice [2] - 303:8, 303:10
choices [1] - 302:22
Christmas [1] - 407:5
circumstances [3] - 289:15, 374:12, 383:10
City [3] - 268:13, 269:5, 271:12
Civil [1] - 268:19
civilian [8] - 378:16, 381:10, 382:20, 384:6, 385:4, 393:4, 393:25, 398:24
civilians [1] - 384:19
claim [1] - 278:25
claims [2] - 291:19, 401:7
clarification [1] - 305:24
clean [1] - 286:5
cleaned [2] - 320:22, 321:4
clear [2] - 351:15, 402:2
clearly [4] - 288:4, 288:8, 335:19, 338:12
cliff [1] - 326:22
clock [4] - 292:21, 311:7, 311:14, 311:19
close [1] - 282:10
closely [1] - 332:21
closer [1] - 415:10
clothing [2] - 293:25, 317:11
collect [1] - 323:25
collected [1] - 386:14
collecting [1] - 288:13
colloquy [3] - 319:20, 408:23, 411:4
color [1] - 383:18
coma [2] - 415:15, 415:20
comfortable [1] - 413:4
coming [2] - 279:11, 295:15
comment [4] - 390:18, 392:8, 392:9, 416:3
commented [1] - 320:18
Commission [1] - 362:13

commit [4] - 292:18, 292:22, 292:25, 362:2
committed [6] - 351:9, 361:19, 363:4, 372:8, 396:9, 404:21
common [1] - 377:4
commonly [1] - 400:5
compared [2] - 404:2, 404:15
comparison [1] - 376:15
completed [1] - 351:2
complying [2] - 274:15, 285:22
compress [3] - 281:6, 281:9, 286:16
concerning [1] - 276:11
concluded [3] - 362:6, 362:17, 413:2
concludes [1] - 417:7
concluding [1] - 361:18
conclusion [2] - 399:13, 400:2
conclusions [1] - 399:20
conditions [1] - 336:22
conduct [3] - 364:2, 375:7, 401:19
conducted [3] - 376:21, 378:20, 402:9
conducting [2] - 375:20, 377:9
confession [32] - 296:20, 296:22, 297:18, 298:7, 298:22, 311:4, 311:21, 312:6, 312:12, 321:11, 321:16, 322:13, 327:25, 328:24, 338:3, 338:4, 339:10, 341:2, 341:15, 341:20, 342:11, 343:6, 343:11, 343:23, 345:24, 349:20, 376:7, 376:16, 376:24, 384:14, 384:21, 389:14
Confession [1] - 418:10
confessions [2] - 298:8, 377:12
confirm [1] - 365:15
confirmation [3] -

365:2, 376:13, 376:15
confirmatory [4] - 369:3, 369:17, 374:4, 394:18
confirmatory-type [1] - 394:18
confirmed [1] - 389:10
confront [2] - 276:12, 276:24
confused [1] - 279:25
confusing [1] - 280:2
connection [1] - 362:22
conscious [1] - 411:25
consider [5] - 410:23, 411:7, 411:10, 411:20, 411:21
consistent [1] - 400:3
contact [1] - 328:4
contain [2] - 274:16, 346:17
contained [2] - 345:9, 363:21
contains [1] - 343:12
contemporaneous [2] - 279:2, 302:3
content [1] - 346:20
context [1] - 406:23
continuation [3] - 271:3, 272:18, 315:7
continue [3] - 290:25, 319:20, 344:3
Continued [1] - 416:24
CONTINUED [4] - 268:16, 272:22, 359:9, 396:25
control [1] - 396:15
conversation [8] - 277:5, 277:11, 277:13, 288:25, 379:21, 407:3, 407:10, 408:21
conversations [1] - 406:10
convicted [6] - 295:12, 295:17, 295:22, 296:6, 296:7, 305:6
conviction [1] - 378:22
convince [1] - 295:5
convinced [1] - 290:21
copy [1] - 312:24
corner [1] - 393:16
corners [1] - 369:9
correct [84] - 276:4,

277:18, 288:20, 288:21, 289:4, 290:3, 292:22, 292:25, 293:14, 294:13, 298:19, 299:15, 301:10, 303:21, 309:3, 309:10, 312:9, 313:3, 314:4, 316:7, 317:4, 317:12, 317:17, 317:24, 321:23, 322:11, 322:17, 324:25, 325:2, 325:5, 325:15, 325:20, 325:21, 325:23, 325:24, 326:16, 326:17, 326:20, 326:23, 327:2, 327:8, 327:15, 327:18, 327:21, 328:6, 328:10, 330:4, 330:11, 331:13, 332:2, 332:6, 332:22, 333:8, 333:18, 334:6, 335:8, 335:11, 335:14, 335:17, 335:20, 338:10, 340:12, 340:18, 340:22, 344:19, 345:2, 350:23, 351:4, 353:7, 356:4, 357:11, 361:22, 363:6, 363:9, 363:23, 365:3, 368:5, 368:8, 368:16, 368:24, 375:17, 390:11, 395:14, 401:9
CORRECTIONS [1] - 419:5
correctly [1] - 363:18
corroborate [6] - 298:7, 324:17, 324:22, 326:9, 327:18, 327:21
corroborating [1] - 327:16
Counsel [1] - 413:24
counsel [3] - 270:4, 272:2, 412:12
Counselor [1] - 337:8
counting [1] - 359:18
Country [3] - 268:12, 269:4, 271:11
County [6] - 271:6, 272:12, 390:23, 390:24, 391:25,

419:2
COUNTY [3] - 268:7, 268:8, 269:14
couple [2] - 284:10, 381:16
course [14] - 275:21, 278:19, 280:16, 300:14, 306:5, 319:14, 332:24, 363:5, 363:10, 377:6, 377:23, 381:12, 403:19, 403:24
Court [2] - 270:16, 271:7
COURT [1] - 268:2
court [17] - 271:21, 272:15, 282:21, 302:16, 303:16, 304:17, 354:16, 367:10, 367:18, 368:4, 368:11, 368:15, 368:22, 369:25, 378:23, 380:12, 390:16
courtroom [4] - 296:12, 305:2, 373:17, 373:23
courts [2] - 302:17, 303:24
cover [1] - 294:15
credible [1] - 362:7
creeping [1] - 411:25
cried [1] - 295:10
Crime [1] - 378:6
crime [40] - 283:6, 289:19, 290:23, 291:7, 292:12, 323:11, 329:25, 372:8, 372:11, 372:25, 373:8, 373:12, 373:16, 373:25, 378:12, 379:15, 379:24, 380:3, 381:3, 382:6, 382:13, 382:15, 382:16, 382:19, 383:6, 384:19, 385:3, 385:10, 385:15, 385:19, 386:15, 387:19, 388:25, 390:13, 393:3, 393:17, 396:9, 398:11, 402:15, 404:22
criminal [6] - 300:21, 300:23, 300:25, 301:5, 379:25, 414:6
criminalist [1] - 405:16

cry [3] - 295:11, 295:25, 296:3
curious [1] - 369:24
current [1] - 402:4
cut [17] - 293:18, 314:20, 314:25, 315:4, 315:15, 316:22, 328:13, 328:17, 332:21, 336:7, 339:12, 340:12, 342:2, 342:9, 353:14, 353:16, 354:2
cutting [1] - 369:9

D

D.C [1] - 269:12
DA's [3] - 363:19, 364:21, 391:13
dad's [1] - 287:4
dammed [1] - 380:8
damn [1] - 386:23
Dan [2] - 379:23, 394:22
dare [1] - 396:13
Date [1] - 419:3
day's [1] - 417:7
days [1] - 415:5
dead [4] - 332:5, 332:17, 332:18, 381:22
deal [1] - 407:17
death [1] - 414:18
decapitated [1] - 316:23
deceit [1] - 352:20
December [4] - 268:14, 271:12, 406:20, 419:3
decide [1] - 353:3
decided [13] - 293:4, 293:9, 297:12, 300:2, 303:11, 305:10, 305:13, 309:13, 314:15, 350:7, 378:24, 390:3, 390:5
decision [2] - 276:17, 355:25
deep [1] - 316:23
Defendant [5] - 373:23, 373:24, 374:2, 374:19, 393:18
Defendants [3] - 268:10, 268:17, 269:14
defense [13] - 291:19,

292:13, 294:20, 294:22, 294:24, 296:23, 297:10, 297:19, 297:24, 302:18, 364:23, 365:11
definitely [1] - 358:20
degree [1] - 399:21
demonstrating [1] - 284:25
demonstration [2] - 284:13, 284:18
Dennison [1] - 269:15
deny [1] - 291:2
Department [2] - 390:24, 391:25
department [1] - 278:11
DEPARTMENT [1] - 269:14
depict [1] - 333:11
depicted [1] - 335:4
deposition [5] - 270:6, 270:13, 271:4, 271:9, 417:7
Deposition [1] - 419:3
described [2] - 276:13, 408:12
Description [1] - 418:9
deserved [1] - 305:11
detail [1] - 300:11
details [13] - 273:4, 291:7, 297:8, 304:2, 308:5, 308:6, 326:9, 328:23, 340:24, 345:5, 362:5, 363:8, 370:10
detecting [1] - 413:18
Detective [27] - 273:14, 278:3, 278:4, 279:5, 281:16, 301:21, 302:12, 302:24, 305:3, 308:8, 311:10, 311:12, 336:5, 341:12, 341:21, 344:15, 359:11, 360:4, 383:5, 386:12, 390:19, 390:25, 391:4, 398:4, 398:21, 409:22, 412:7
detective [12] - 283:4, 285:12, 310:2, 331:5, 337:4, 359:13, 363:25, 375:9, 376:18, 377:15, 397:3,

414:24
Detective's [1] - 407:4
detectives [4] - 272:13, 330:4, 377:8, 386:12
determining [1] - 414:4
developed [1] - 345:14
dial [1] - 311:7
Diaz [12] - 360:23, 361:8, 363:15, 365:22, 366:13, 367:3, 374:23, 375:16, 377:21, 377:24, 395:23, 396:2
Diaz's [1] - 363:21
die [1] - 287:16
difference [1] - 273:6
different [4] - 273:8, 284:10, 304:7, 385:4
difficult [3] - 416:5, 416:14, 416:19
disagreed [1] - 407:15
discern [1] - 399:15
discovered [2] - 367:15, 368:18
discussed [1] - 287:2
discussion [2] - 279:18, 408:8
discussions [1] - 287:11
Disk [1] - 271:2
dismiss [1] - 406:2
dismissing [1] - 390:16
disposed [3] - 409:25, 410:5, 410:7
disputing [1] - 374:5
DISTRICT [2] - 268:2, 268:2
district [2] - 402:4, 414:25
District [4] - 271:7, 271:8, 390:24, 392:3
document [1] - 382:16
documenting [1] - 356:16
DOE [1] - 268:8
DOLLY [2] - 420:3, 420:19
Dolly [2] - 268:21, 271:22
done [17] - 289:9, 289:14, 290:2, 301:20, 318:8, 318:14, 320:9, 357:2, 358:11, 376:12, 387:20,

389:19, 390:2, 390:4, 395:7, 396:14, 405:11
doubt [1] - 384:20
down [35] - 276:7, 276:25, 277:3, 277:7, 279:6, 279:21, 280:22, 280:24, 280:25, 281:2, 281:3, 281:17, 284:24, 285:23, 286:3, 286:6, 286:15, 288:19, 294:4, 294:7, 299:6, 299:7, 310:3, 315:11, 316:14, 322:17, 330:22, 349:16, 349:19, 350:5, 350:13, 353:5, 355:22, 356:3, 401:12
Doyle [5] - 311:12, 336:5, 341:22, 344:14, 414:24
DOYLE [2] - 268:7, 269:20
Dr [1] - 398:25
drain [8] - 323:18, 323:21, 323:23, 324:2, 324:4, 324:5, 324:9, 325:22
draw [2] - 376:5, 377:18
dreams [1] - 411:25
drew [1] - 399:12
dripping [8] - 318:23, 319:6, 319:23, 319:25, 320:6, 320:7, 320:12, 320:15
duly [1] - 420:6
dumbbell [1] - 315:15
DUNNE [72] - 269:16, 272:11, 281:21, 289:5, 290:8, 298:25, 305:23, 312:13, 312:19, 313:18, 319:9, 319:19, 320:16, 332:11, 334:5, 334:19, 334:23, 335:2, 336:13, 337:7, 338:18, 340:8, 343:16, 345:7, 346:18, 349:25, 353:22, 354:8, 354:21, 358:4, 361:21, 362:20, 369:12,

370:23, 375:10, 375:25, 376:8, 376:25, 379:5, 380:21, 382:21, 383:3, 383:21, 383:24, 384:22, 385:12, 385:21, 388:13, 392:6, 393:5, 396:10, 396:17, 398:23, 403:16, 404:4, 404:8, 404:24, 405:3, 406:4, 408:22, 409:7, 409:11, 409:20, 410:9, 411:2, 411:13, 412:5, 412:12, 413:2, 413:24, 415:23, 416:15
Dunne [2] - 272:11, 334:20
during [10] - 273:17, 274:18, 275:8, 275:21, 275:23, 276:8, 280:15, 300:14, 312:5, 344:2

E

ear [3] - 333:23, 335:19, 337:5
early [1] - 292:21
EASTERN [1] - 268:2
Eastern [1] - 271:8
Ed [1] - 414:24
effect [2] - 270:15, 381:20
egregious [1] - 375:23
Eighth [1] - 269:8
eighties [1] - 364:19
either [6] - 301:24, 310:11, 343:7, 390:23, 400:7, 420:10
elected [1] - 288:24
elevate [2] - 281:7, 286:6
elicit [1] - 389:15
eliciting [1] - 384:24
emergency [2] - 278:5, 278:12
Emma [1] - 272:9
EMMA [1] - 269:9
EMPLOYEES [1] - 268:8
employing [1] - 393:14
EMT [1] - 281:18

encompasses [1] - 354:24
end [11] - 302:20, 309:6, 310:3, 318:21, 319:23, 321:8, 321:13, 356:25, 373:4, 373:5, 374:18
ended [3] - 338:15, 361:17, 365:20
ends [1] - 371:20
enforcement [4] - 364:20, 386:17, 390:22, 394:5
engage [2] - 375:7, 396:5
engaged [1] - 391:2
entitled [1] - 361:25
EPSTEIN [1] - 269:3
Epstein [1] - 271:10
erased [1] - 323:9
Erin [1] - 413:17
ERRATA [1] - 419:2
especially [1] - 372:24
ESQ [5] - 269:5, 269:6, 269:9, 269:12, 269:16
essence [1] - 289:18
Estate [1] - 397:24
estate [1] - 288:9
et [4] - 281:6, 371:15, 371:16
event [6] - 296:15, 311:21, 320:20, 329:14, 337:11, 343:4
events [1] - 284:16
eventually [1] - 397:17
evidence [14] - 329:25, 332:5, 332:8, 353:23, 354:10, 354:11, 380:3, 386:14, 402:13, 405:24, 409:2, 409:5, 409:18, 412:2
exact [1] - 282:5
exactly [2] - 282:4, 286:19
EXAMINATION [4] - 268:16, 272:22, 359:9, 396:25
examination [1] - 413:3
Examination [1] - 418:6
examine [1] - 336:6
examined [1] - 332:20
examiner [1] - 333:7
excellent [1] - 336:23

except [2] - 270:9, 380:12
exchange [1] - 319:10
exculpatory [1] - 350:5
Excuse [1] - 278:4
excuse [7] - 296:23, 297:24, 307:14, 345:4, 371:23, 400:18, 403:18
Exhibit [10] - 279:15, 308:24, 312:22, 330:15, 330:18, 334:3, 348:23, 418:10, 418:11, 418:12
exhibit [1] - 312:21
EXHIBITS [1] - 418:8
Exhibits [2] - 334:11, 418:13
experience [3] - 323:22, 331:20, 403:6
expert [3] - 403:5, 405:17, 406:14
experts [2] - 310:22, 406:10
explanations [1] - 291:24
extent [1] - 342:5
eye [1] - 295:15
eyes [1] - 295:23
eyewitness [1] - 376:23

F

fabric [1] - 400:7
face [3] - 296:13, 333:11, 412:20
fact [13] - 299:8, 316:21, 321:2, 329:22, 332:8, 341:4, 354:25, 366:11, 366:24, 400:16, 410:21, 411:18, 415:14
facts [1] - 384:25
fair [4] - 303:3, 384:23, 395:10, 403:20
fairly [2] - 271:19, 370:11
faked [1] - 414:18
false [2] - 291:19, 291:23
familiar [2] - 278:15, 310:25
family [1] - 381:4

fantasize [1] - 318:12
far [7] - 282:2, 289:10, 327:16, 327:23, 353:9, 353:10, 355:21
fashion [1] - 361:19
fast [1] - 406:9
father [27] - 275:18, 281:5, 286:6, 289:11, 294:5, 294:8, 294:12, 294:13, 294:17, 300:5, 309:5, 314:6, 314:12, 317:20, 319:7, 319:24, 320:23, 321:9, 321:15, 325:4, 325:8, 325:10, 325:12, 328:16, 348:3, 349:9
father's [7] - 280:7, 288:9, 317:17, 317:24, 318:7, 326:3, 332:2
fault [1] - 301:18
Federal [1] - 268:19
feet [2] - 281:7, 286:7
fellow [1] - 391:12
felt [1] - 408:15
FEVOLA [2] - 420:3, 420:19
Fevola [3] - 268:21, 271:22, 271:23
Fifteenth [1] - 269:11
fifth [1] - 285:3
filing [1] - 270:5
findings [4] - 405:7, 405:10, 405:13, 407:15
fine [4] - 336:25, 350:25, 359:13, 372:19
fingers [1] - 400:6
finish [4] - 298:21, 328:25, 390:3, 411:5
fire [1] - 278:10
first [21] - 284:22, 293:13, 294:17, 306:21, 307:3, 307:9, 309:14, 314:16, 322:14, 325:4, 325:13, 326:12, 326:14, 331:16, 347:8, 347:23, 349:23, 357:11, 357:13, 391:10, 400:22
five [3] - 295:10, 299:15, 344:8, 347:24, 353:11,

371:11, 394:2, 396:16, 415:5
five-minute [1] - 396:16
flash [2] - 336:19, 336:21
fled [1] - 414:11
fleeing [1] - 416:5
flesh [1] - 324:8
flippant [2] - 402:24, 403:11
floor [1] - 281:6
Floor [1] - 269:11
following [1] - 402:10
fooling [1] - 369:9
FOR [3] - 268:2, 419:2, 419:6
force [1] - 270:14
forehead [1] - 335:14
forensic [1] - 323:9
forensics [1] - 323:14
forget [1] - 395:5
forgot [1] - 359:22
form [35] - 270:9, 281:22, 289:6, 290:9, 319:10, 336:14, 338:19, 343:17, 345:8, 348:6, 346:20, 348:14, 354:9, 358:5, 361:22, 369:13, 370:24, 375:11, 376:2, 376:9, 377:2, 379:6, 383:4, 385:22, 388:14, 392:7, 396:11, 403:17, 404:5, 404:9, 409:21, 411:14, 412:6, 415:24, 416:16
forth [8] - 299:12, 303:24, 304:19, 305:9, 333:12, 348:3, 388:24, 420:6
forward [2] - 293:10, 378:24
fought [2] - 315:22, 353:12
foundation [1] - 362:4
four [5] - 285:24, 305:9, 347:23, 353:11, 415:5
fourth [1] - 285:3
frankly [1] - 375:5
free [3] - 299:11, 313:17, 336:4
frequently [1] - 292:5
FREUDENPERGER [2] - 269:9, 272:9

Freudenperger [1] - 272:10
Friday [3] - 406:18, 406:19, 406:20
front [2] - 295:13, 333:11
full [1] - 415:19
FURTHER [2] - 270:8, 270:12
furtherance [1] - 387:20

G

gain [1] - 393:15
game [1] - 275:19
Garden [3] - 268:13, 269:5, 271:12
gathered [2] - 286:24, 389:12
gathering [1] - 393:12
general [1] - 370:9
general's [12] - 305:12, 378:19, 383:16, 386:8, 386:20, 390:16, 391:11, 391:23, 393:13, 401:18, 401:24, 402:8
generally [5] - 291:17, 372:18, 374:7, 374:24, 382:25
Genna [12] - 398:4, 398:6, 398:21, 398:22, 398:25, 399:9, 406:15, 406:16, 406:17, 408:12
Gianelli [1] - 370:4
Gill [1] - 360:18
girl [1] - 298:13
girls [3] - 381:16, 382:6, 394:24
given [3] - 365:12, 394:7, 420:8
glad [1] - 395:9
glean [1] - 379:19
glove [5] - 398:17, 400:7, 400:8, 400:12, 400:24
glove-like [3] - 398:17, 400:12, 400:24
gloved [3] - 342:15, 342:23, 400:12
gloved-like [1] - 342:23
gloves [2] - 342:19, 343:9

5

6

gotta [1] - 385:24
Gottlieb [1] - 305:6
governor [1] - 401:22
graphic [4] - 378:14, 380:10, 382:12, 393:24
grief [1] - 416:20
grieved [1] - 295:10
grip [1] - 400:5
grounds [2] - 336:15, 405:4
guess [19] - 274:12, 278:14, 280:15, 308:9, 308:10, 331:7, 332:14, 336:4, 348:6, 353:3, 361:17, 365:20, 380:12, 383:15, 385:17, 388:9, 403:20, 412:24, 416:2
guilt [1] - 406:2
guilty [3] - 412:8, 412:10, 413:7
guy [7] - 298:12, 364:10, 367:4, 371:12, 371:13, 412:21, 412:22
guys [4] - 276:18, 278:25, 319:2, 383:13

## H

hair [2] - 324:8, 325:19
hall [1] - 309:10
hallway [2] - 294:4, 316:14
hammer [1] - 327:6
hand [1] - 420:15
handwriting [2] - 301:14, 313:2
handwritten [1] - 312:16
Hauppauge [2] - 269:15, 369:20
Hayes [2] - 379:23, 394:22
head [19] - 317:6, 333:18, 333:21, 335:7, 335:10, 335:17, 335:24, 336:12, 337:5, 337:12, 338:5, 338:9, 339:11, 340:22, 341:25, 342:8, 353:12, 354:3, 398:11

headquarters [4] - 274:22, 275:9, 275:15, 344:19
hear [7] - 308:10, 310:5, 310:10, 310:16, 310:19, 310:20, 401:2
heard [9] - 282:5, 282:9, 282:12, 282:13, 282:16, 282:24, 288:5, 400:22, 416:2
hearing [1] - 283:2
held [3] - 268:20, 271:9, 298:20
hell [1] - 386:6
help [4] - 315:23, 387:25, 388:11
helped [1] - 388:17
helpful [1] - 383:19
helping [2] - 348:3, 395:11
hem [1] - 282:2
hereby [2] - 270:7, 420:4
HEREBY [1] - 270:3
herein [2] - 268:18, 420:5
hereto [1] - 270:5
hereunto [1] - 420:14
hid [1] - 294:8
hidden [1] - 329:4
hide [1] - 369:6
high [1] - 281:19
highly [1] - 403:13
highly-skilled [1] - 403:13
himself [2] - 391:4, 416:21
hired [1] - 405:19
hit [5] - 315:14, 316:11, 338:5, 353:11, 354:2
hold [1] - 410:9
homicide [9] - 275:14, 283:4, 285:12, 291:11, 330:4, 337:3, 360:13, 360:16, 360:20
homicides [2] - 323:23, 331:23
honest [3] - 278:9, 379:12, 386:22
honeycomb [3] - 399:7, 399:16, 399:24
honeycomb-type [1] - 399:24
horror [1] - 393:17
hospital [1] - 415:15

hour [1] - 299:21
hours [6] - 344:7, 344:8, 345:2, 358:9, 389:10
house [29] - 293:8, 308:18, 308:20, 309:7, 309:22, 312:2, 314:12, 317:16, 318:22, 319:24, 321:3, 321:8, 321:13, 326:25, 327:6, 327:11, 328:6, 331:25, 332:9, 382:2, 394:13, 394:19, 394:22, 395:2, 404:15, 408:6, 409:15, 409:17, 410:2
Hudson [1] - 269:8
hum [1] - 357:5
human [3] - 325:19, 411:8, 411:9
hundred [5] - 276:22, 298:9, 318:25, 346:10, 410:17
hundreds [1] - 357:2
hurt [1] - 388:17

## I

ID [1] - 376:13
idea [8] - 278:21, 282:4, 323:15, 386:24, 391:18, 392:10, 394:10, 405:12
identification [23] - 312:23, 330:16, 334:4, 334:12, 364:2, 364:5, 364:18, 364:22, 365:2, 368:12, 369:6, 369:10, 369:18, 370:11, 370:17, 372:22, 374:4, 374:18, 375:20, 376:16, 376:22, 376:23, 377:13
identified [6] - 363:15, 363:20, 365:22, 366:13, 367:8, 367:24
identify [2] - 365:8, 373:23
identifying [2] - 373:16, 399:9
implication [1] - 383:15

important [5] - 279:9, 332:10, 370:12, 377:9, 384:8
impossible [1] - 284:19
improper [20] - 369:6, 371:4, 371:5, 371:11, 371:19, 371:25, 372:20, 373:10, 374:8, 374:16, 374:17, 375:7, 375:18, 391:3, 391:5, 391:14, 392:5, 392:13, 392:15, 392:16
improperly [1] - 391:6
IN [1] - 420:14
Inc [1] - 271:24
include [1] - 416:25
inconsistencies [1] - 276:14
inconsistent [2] - 405:25, 409:15
incorporated [1] - 358:19
inculpatory [4] - 349:18, 351:25, 352:4, 356:17
independent [3] - 305:16, 363:3, 374:20
INDEX [2] - 418:2, 418:3
indicate [1] - 404:21
indicated [4] - 331:12, 342:19, 378:22, 402:19
indicates [1] - 409:6
indicating [1] - 321:3
indicating) [1] - 330:22
individual [7] - 365:6, 365:17, 366:8, 367:24, 370:15, 379:16, 402:25
individually [1] - 272:13
individuals [3] - 291:10, 387:19, 414:4
inference [1] - 377:18
inflecting [1] - 291:13
information [23] - 274:17, 275:6, 275:19, 275:20, 286:23, 327:23, 328:2, 328:4, 337:11, 341:6, 341:13, 341:20,

342:2, 342:6, 343:12, 343:13, 346:13, 346:17, 350:5, 389:13, 389:16, 416:8
initial [2] - 349:4, 389:4
innocent [6] - 289:13, 295:6, 305:19, 409:6, 411:22, 411:23
inquire [1] - 285:15
insignificant [1] - 379:22
instance [1] - 363:2
instances [4] - 291:9, 291:18, 292:11, 365:4
instructed [2] - 285:25, 286:4
instruction [1] - 281:5
instructions [2] - 280:10, 281:4
instrument [1] - 327:6
intent [1] - 294:4
interest [1] - 290:22
interested [1] - 420:12
interesting [1] - 405:9
interestingly [1] - 338:4
interrogated [3] - 273:13, 275:9, 339:15
interrogating [4] - 337:17, 338:14, 338:21, 338:25
interrogation [7] - 273:5, 273:8, 273:10, 275:22, 309:17, 312:6, 341:7
interrogations [1] - 396:6
interrupted [3] - 389:20, 389:22, 390:10
interview [5] - 273:7, 273:9, 280:16, 284:8, 295:24, 302:21
interview/
    interrogation [1] - 274:19
interviewed [1] - 391:24
interviewing [5] - 276:9, 283:17, 361:11, 363:10, 395:24
interviews [1] - 413:16
introduce [1] - 272:2

investigating [1] - 323:23

Investigation [1] - 362:12

investigation [9] - 362:16, 377:10, 378:20, 387:21, 390:21, 395:18, 401:19, 402:10, 413:11

investigative [9] - 363:3, 379:10, 379:17, 380:15, 383:7, 385:16, 385:25, 393:10, 393:13

investigator [1] - 403:14

involved [8] - 278:10, 323:10, 331:23, 361:11, 364:15, 409:19, 409:24, 416:12

involvement [1] - 292:12

IS [3] - 270:3, 270:8, 270:12

isolated [1] - 344:21

issue [2] - 369:16, 371:14

IT [3] - 270:3, 270:8, 270:12

items [1] - 399:11

itself [2] - 353:24, 354:11

## J

Jabloski [1] - 414:25

James [2] - 271:4, 386:12

james [1] - 419:4

JAMES [3] - 268:7, 268:17, 417:13

January [1] - 420:15

Jeeze [1] - 412:2

Jerry [1] - 349:8

Jimmy [1] - 410:9

job [6] - 290:12, 290:15, 330:6, 363:25, 387:11, 387:14

jog [1] - 395:21

JOHN [2] - 268:8

John [1] - 359:21

Judge [2] - 361:17, 362:6

judge [1] - 363:3

judgement [2] -

305:17, 306:3

judges [1] - 305:9

jurat [1] - 416:25

jurors [2] - 304:25, 305:14

## K

KATHY [1] - 269:18

Kathy [1] - 271:15

KEARON [1] - 269:3

Kearon [1] - 271:11

kept [5] - 276:16, 285:9, 291:13, 343:22, 358:10

kid [1] - 384:7

kill [8] - 291:21, 293:4, 294:5, 300:2, 306:21, 309:13, 312:8, 314:15

killed [7] - 291:20, 307:3, 307:9, 325:4, 387:15, 409:3

killer [3] - 340:25, 341:14, 343:9

killing [1] - 295:18

kills [1] - 298:12

kind [25] - 273:4, 276:6, 278:3, 278:5, 291:24, 292:13, 304:21, 319:15, 323:13, 340:14, 346:2, 356:14, 361:6, 367:22, 369:9, 370:8, 375:7, 377:2, 378:14, 380:13, 381:17, 396:4, 408:20, 410:24, 413:23

kinds [4] - 292:4, 292:10, 323:24, 378:16

kitchen [8] - 300:4, 314:23, 315:3, 315:25, 316:11, 330:10, 353:13

knife [40] - 294:9, 300:4, 308:2, 314:23, 315:3, 315:25, 316:11, 316:21, 320:14, 321:25, 322:4, 322:15, 324:24, 327:8, 329:2, 341:24, 353:13, 353:14, 401:3, 401:7, 402:20, 403:14, 403:25, 404:2, 404:14,

404:15, 404:16, 404:22, 407:14, 408:5, 409:14, 409:15, 409:16, 409:24, 409:25, 410:5, 410:8, 410:20

knife-like [2] - 403:14, 403:25

knives [1] - 408:6

known [3] - 340:25, 341:14, 365:7

knows [3] - 302:12, 359:23, 365:16

KOSCIUK [1] - 268:7

## L

lab [6] - 398:11, 401:6, 401:11, 402:15, 405:16

labeled [1] - 274:12

laid [1] - 311:25

language [2] - 278:16, 281:17

largely [1] - 341:19

last [7] - 319:10, 326:13, 326:15, 383:4, 406:18, 406:19, 406:20

LAW [1] - 269:14

law [4] - 364:20, 386:17, 390:21, 394:4

lawyer [7] - 300:14, 300:17, 300:20, 300:24, 301:5, 313:9, 402:5

lawyered [2] - 345:23, 389:9

lawyers [1] - 302:18

lay [4] - 286:6, 361:7, 362:4, 362:16

laying [1] - 394:15

layout [2] - 308:18, 328:6

least [2] - 354:6, 388:9

leave [1] - 359:25

Lee [1] - 269:15

left [5] - 318:16, 333:23, 335:16, 336:11, 349:3

legitimate [7] - 382:18, 382:25, 385:18, 386:16, 389:7, 393:2, 395:6

length [1] - 317:16

lengthy [1] - 408:7

liar [3] - 304:5, 304:10, 304:15

lie [2] - 376:19, 413:19

lied [1] - 352:24

lles [2] - 322:17, 346:16

life [1] - 295:19

Ligaza [1] - 360:3

light [2] - 398:16, 416:9

lighting [2] - 336:22, 336:24

lights [1] - 315:13

likelihood [2] - 325:4, 325:12

line [5] - 315:10, 355:20, 365:5, 386:4, 399:3

line-up [1] - 365:5

lines [4] - 285:24, 287:19, 292:8, 381:24

listened [5] - 279:20, 280:11, 283:5, 305:2, 305:9

literally [7] - 289:25, 290:21, 297:22, 308:7, 309:9, 310:23, 322:7

LLP [2] - 269:3, 269:7

LN [1] - 419:6

located [2] - 271:17, 271:24

location [2] - 341:25, 399:5

look [18] - 274:2, 274:13, 287:7, 307:3, 308:23, 314:8, 329:24, 330:17, 331:8, 335:4, 336:6, 383:13, 384:6, 384:7, 387:11, 400:9, 412:21

Look [1] - 385:17

looked [10] - 293:8, 305:12, 314:3, 314:5, 327:5, 334:16, 337:25, 380:11, 402:15, 405:18

looking [6] - 295:14, 329:16, 330:10, 332:18, 337:16, 341:13

looks [1] - 275:6

loud [1] - 289:23

lunch [2] - 358:24, 359:5

lungs [1] - 310:5

lye [1] - 377:16

lying [12] - 304:20,

304:21, 315:16, 354:6, 354:18, 375:22, 376:6, 376:22, 376:24, 377:8, 377:17, 414:4

## M

Mahoney [1] - 360:12

Marion [1] - 271:10

MARION [2] - 269:3, 269:6

marked [11] - 274:3, 279:15, 308:24, 312:21, 312:23, 330:14, 330:16, 330:18, 334:2, 334:4, 334:11

marks [1] - 342:18

marriage [1] - 420:10

Martin [15] - 271:5, 272:6, 272:8, 272:10, 273:13, 281:9, 283:17, 283:25, 288:19, 378:9, 378:25, 382:10, 405:19, 406:23, 409:19

MARTIN [2] - 268:4, 269:19

martin [1] - 419:2

Marty [80] - 274:18, 275:7, 276:12, 276:24, 278:19, 279:3, 279:7, 279:18, 280:5, 280:12, 280:14, 280:20, 286:23, 287:2, 289:13, 289:18, 291:12, 291:16, 293:12, 293:15, 293:16, 294:3, 294:20, 296:6, 298:17, 298:19, 300:7, 300:13, 300:16, 300:19, 301:4, 301:12, 303:2, 303:23, 304:14, 304:20, 306:11, 306:12, 306:16, 306:22, 309:12, 311:4, 311:22, 313:6, 313:14, 316:3, 317:10, 319:22, 320:9, 320:20, 323:8, 323:13, 324:21, 326:2, 327:25, 337:17, 338:14,

338:21, 338:25, 344:4, 346:13, 347:22, 348:21, 350:8, 357:13, 358:9, 381:12, 381:13, 381:24, 387:15, 388:12, 389:4, 390:17, 394:13, 394:24, 402:16, 409:3, 411:22, 414:9, 416:13

Marty's [22] - 279:10, 292:16, 299:14, 299:22, 309:9, 310:8, 310:17, 311:6, 317:14, 319:4, 322:12, 328:8, 329:15, 342:14, 342:25, 378:21, 397:11, 398:17, 400:11, 400:17, 400:19, 406:2

master [2] - 310:7, 310:17

match [2] - 404:16, 408:6

matched [2] - 326:11, 326:16

material [2] - 285:6, 323:24

matter [3] - 271:5, 385:10, 420:13

McCready [10] - 268:7, 271:4, 272:25, 359:12, 386:13, 390:19, 391:2, 391:4, 417:13, 419:4

MCCREADY [1] - 268:17

McLELHONE [1] - 268:8

McNamara [20] - 379:12, 379:19, 379:21, 380:7, 380:16, 382:23, 382:24, 383:11, 385:6, 385:8, 386:4, 388:6, 388:10, 388:18, 388:24, 391:20, 391:22, 392:19, 394:19, 395:4

mean [23] - 286:17, 290:5, 292:7, 295:24, 304:19, 312:13, 316:9, 320:6, 320:11, 326:19, 328:3,

337:10, 343:20, 348:12, 349:13, 376:4, 379:9, 387:11, 395:16, 409:24, 410:24, 411:8, 415:9

meaning [1] - 409:16

means [3] - 300:24, 312:15, 320:13

media [1] - 413:16

medical [4] - 278:6, 278:13, 278:16, 333:7

meet [1] - 397:8

members [2] - 392:2

memo [2] - 378:23, 390:16

memory [7] - 282:21, 306:23, 307:16, 359:25, 374:20, 395:22, 400:10

mental [1] - 291:25

mentally [2] - 290:6, 297:23

mentioned [2] - 268:20, 408:9

met [2] - 369:22, 390:22

middle [1] - 340:14

might [13] - 318:9, 320:5, 324:4, 373:5, 377:16, 389:4, 394:16, 403:13, 403:18, 403:19, 403:21, 403:23, 403:24

Mike [2] - 300:17, 359:21

MILLER [1] - 269:10

mind [5] - 273:7, 279:11, 281:23, 396:14

minimization [5] - 292:12, 294:23, 296:18, 297:9, 346:15

minimize [2] - 291:14, 292:11

minimized [1] - 291:11

minimizing [3] - 295:8, 319:4, 319:8

minute [3] - 300:11, 307:7, 396:16

minutes [8] - 295:10, 299:22, 323:6, 323:8, 337:9, 344:9, 410:3, 410:4

mirror [1] - 412:21

misconduct [2] -

375:23, 379:2

missing [2] - 335:20, 337:5

misstep [1] - 375:8

mistake [6] - 292:14, 294:25, 366:9, 366:20, 411:10, 412:4

mistakes [3] - 411:9, 411:16, 413:11

mom [1] - 309:14

moment [1] - 370:9

money [5] - 287:12, 287:20, 287:24, 288:14, 397:23

Moriarty [1] - 413:17

morning [10] - 272:25, 273:2, 284:2, 288:7, 309:13, 330:25, 348:7, 348:19, 398:14, 412:20

moron [5] - 401:6, 401:10, 403:10, 403:21, 406:3

most [3] - 276:21, 332:10, 358:20

mostly [1] - 353:16

mother [22] - 275:18, 293:13, 293:17, 293:22, 300:6, 307:3, 307:9, 309:10, 314:9, 314:16, 315:12, 315:14, 315:16, 316:14, 321:15, 325:5, 325:8, 325:9, 337:2, 378:15

mother's [8] - 317:23, 319:7, 321:4, 325:14, 328:9, 402:16

motivation [1] - 384:2

mouth [1] - 279:12

move [4] - 353:3, 390:3, 390:5, 390:6

moved [2] - 333:8, 370:8

moving [1] - 333:2

MR [96] - 272:5, 272:7, 272:11, 272:17, 272:23, 272:24, 281:21, 289:5, 290:8, 298:25, 305:23, 312:13, 312:14, 312:17, 312:19, 312:20, 313:18, 313:20, 319:9, 319:19, 320:16, 330:13, 332:11, 333:25,

334:5, 334:7, 334:19, 334:20, 334:23, 334:24, 335:2, 336:13, 337:7, 338:18, 340:6, 340:8, 343:16, 345:7, 346:18, 349:25, 353:22, 354:8, 354:21, 358:4, 358:22, 359:10, 359:24, 361:21, 362:20, 369:12, 370:23, 370:25, 375:10, 375:25, 376:8, 376:25, 379:5, 380:21, 382:21, 383:3, 383:21, 383:23, 383:24, 384:22, 385:12, 385:21, 388:13, 392:6, 393:5, 396:10, 396:13, 396:17, 397:2, 398:23, 403:16, 404:4, 404:8, 404:24, 405:3, 406:4, 408:22, 408:24, 409:7, 409:11, 409:20, 410:9, 411:2, 411:5, 411:13, 412:5, 412:12, 413:2, 413:24, 415:23, 416:15, 417:2

MS [1] - 272:9

murder [13] - 292:18, 292:22, 292:25, 305:6, 331:17, 361:7, 361:8, 361:14, 363:5, 371:9, 397:11, 410:21, 415:13

murdered [3] - 293:21, 295:4, 397:9

murderer [1] - 384:9

murders [4] - 308:25, 326:10, 415:11, 416:10

## N

naked [8] - 293:22, 293:24, 316:15, 317:10, 317:15, 318:21, 319:6, 321:14

Name [1] - 419:2

name [5] - 271:15,

304:22, 352:18, 366:25, 394:11

named [1] - 272:13

Nan [2] - 361:17, 362:6

narrative [1] - 346:7

near [1] - 398:16

nearly [1] - 316:23

necessarily [6] - 283:7, 298:5, 316:5, 316:9, 364:25, 401:9

neck [4] - 280:7, 294:13, 316:24, 353:16

need [4] - 313:16, 364:6, 382:15, 411:13

neighborhood [1] - 295:3

Nesconset [1] - 271:17

NEUFELD [1] - 269:7

never [6] - 298:9, 318:5, 334:16, 410:6, 411:24, 416:4

NEW [2] - 268:2, 268:2

new [3] - 305:11, 305:20, 305:22

New [11] - 268:13, 268:22, 269:5, 269:8, 269:15, 271:8, 271:12, 271:18, 271:24, 420:4

Newsday [1] - 295:13

newspaper [11] - 295:13, 363:20, 365:22, 366:6, 366:17, 366:23, 366:25, 367:11, 367:25, 368:12, 368:19

next [3] - 322:2, 342:24, 416:24

nice [1] - 410:20

night [8] - 300:3, 337:20, 337:23, 394:14, 406:18, 406:19

nine [2] - 274:6, 274:7

nobody [6] - 305:20, 329:16, 370:5, 389:19, 389:22

nobody's [1] - 305:19

non [2] - 351:25, 352:4

non-inculpatory [2] - 351:25, 352:4

none [4] - 326:10, 326:15, 327:10,

340:24

nonsense [6] - 297:25, 299:12, 407:13, 407:17, 408:12, 409:6

normal [1] - 291:15

NORMAN [2] - 268:7, 269:21

norman [1] - 359:20

Norman [4] - 273:18, 276:15, 280:24, 281:2

notaries [1] - 350:24

Notary [3] - 268:21, 270:14, 420:3

notary [1] - 350:21

NOTARY [2] - 417:20, 419:25

notation [1] - 301:20

note [3] - 302:3, 330:25, 331:3

noted [1] - 417:9

notes [30] - 273:16, 273:19, 273:20, 273:23, 274:3, 274:9, 275:25, 276:3, 276:5, 276:10, 276:16, 277:20, 279:2, 280:17, 280:20, 301:22, 302:4, 348:11, 349:15, 349:21, 350:11, 351:11, 351:20, 351:21, 351:23, 351:24, 352:2, 357:6

nothing [16] - 299:2, 321:2, 324:5, 324:15, 324:18, 325:22, 327:10, 327:11, 327:12, 327:17, 336:10, 357:25, 376:14, 379:16, 382:13

Notice [1] - 268:19

notice [7] - 298:22, 299:17, 345:16, 347:21, 358:8, 364:21, 365:12

noticed [2] - 336:7, 365:11

notified [1] - 365:9

NOW [1] - 419:6

number [5] - 293:19, 335:10, 336:15, 385:3, 413:16

NW [1] - 269:11

O

o'clock [4] - 299:19, 309:2, 337:20, 337:22

object [43] - 281:21, 289:5, 290:8, 320:16, 332:11, 336:13, 337:8, 338:18, 343:16, 345:7, 346:19, 350:2, 358:4, 361:21, 369:12, 370:23, 375:10, 375:25, 376:8, 376:25, 379:5, 380:21, 382:21, 383:3, 385:12, 385:21, 388:13, 392:6, 396:10, 403:16, 404:4, 404:8, 404:25, 406:4, 408:23, 409:7, 409:20, 410:10, 411:3, 411:6, 412:5, 415:23, 416:15

objecting [3] - 319:9, 319:19, 354:8

objection [5] - 298:25, 353:22, 354:21, 384:22, 411:14

objections [1] - 270:9

objectively [1] - 410:25

observed [3] - 331:13, 331:16, 337:25

obtained [1] - 376:6

obvious [2] - 332:17, 336:11

obviously [5] - 279:5, 285:16, 288:18, 333:5, 388:17

occasions [1] - 346:9

occurred [1] - 308:25

occurrence [1] - 291:15

OF [4] - 268:2, 268:7, 269:14, 419:2

offer [4] - 294:17, 296:20, 296:22, 393:2

offered [4] - 291:19, 291:23, 292:3, 320:17

offering [2] - 297:9, 297:10

offers [1] - 292:13

office [17] - 305:12,

310:3, 318:8, 363:19, 364:21, 378:20, 383:16, 386:8, 386:20, 390:25, 391:12, 391:13, 391:24, 392:3, 401:18, 401:24, 402:9

officer [10] - 331:5, 355:13, 355:17, 372:23, 374:21, 375:4, 375:6, 375:8, 375:23, 376:18

OFFICERS [1] - 268:8

officers [3] - 328:4, 339:16, 391:12

often [1] - 370:14

Old [3] - 268:12, 269:4, 271:11

old [1] - 370:2

once [5] - 276:11, 345:25, 347:12, 369:18, 370:16

one [40] - 268:17, 274:11, 278:4, 282:21, 283:8, 285:23, 297:17, 310:2, 310:3, 310:6, 310:7, 315:10, 318:21, 319:23, 330:3, 334:8, 335:13, 335:19, 340:15, 341:9, 346:24, 365:24, 367:2, 371:10, 371:12, 373:9, 377:16, 378:4, 378:23, 380:6, 385:7, 386:11, 388:5, 391:6, 394:11, 398:3, 406:25, 407:10, 410:19, 414:9

onions [1] - 376:11

open [1] - 338:22

operator [11] - 279:19, 279:22, 280:6, 281:5, 282:2, 282:3, 285:4, 285:25, 286:4, 286:9, 286:11

opinion [6] - 404:19, 406:11, 406:12, 407:22, 407:24, 408:4

opinions [1] - 399:20

oral [5] - 299:14, 356:15, 389:18, 390:5, 390:10

orally [1] - 350:8

orals [18] - 347:2,

347:8, 347:9, 353:4, 353:6, 356:2, 357:4, 357:7, 357:8, 357:10, 357:19, 358:3, 389:19, 390:2, 390:4

order [4] - 316:4, 316:8, 346:25, 359:4

origin [2] - 399:14, 399:23

originally [1] - 337:2

outcome [1] - 420:13

outlets [1] - 413:16

outside [2] - 327:11, 410:20

overnight [1] - 326:4

own [3] - 306:3, 306:6, 414:18

P

p.m [8] - 339:20, 339:25, 359:2, 359:7, 396:19, 396:24, 417:8, 417:9

pack [1] - 365:5

pad [1] - 350:13

page [7] - 275:2, 275:3, 279:16, 287:8, 295:13, 315:10, 416:24

Page [6] - 285:21, 287:7, 306:12, 315:8, 418:4, 418:9

pages [2] - 274:12, 399:2

pain [1] - 315:22

palm [1] - 400:6

panicked [1] - 294:16

paper [2] - 366:21, 367:16

parameters [2] - 382:22, 412:13

paranoid [1] - 274:24

pardon [2] - 277:2, 277:12

parents [21] - 287:3, 293:5, 293:9, 295:4, 295:18, 300:3, 309:13, 312:3, 312:8, 314:3, 314:8, 348:2, 381:19, 381:21, 381:25, 387:15, 394:25, 397:9, 397:12, 400:19, 409:3

part [15] - 277:25, 288:13, 290:15, 297:18, 304:12,

312:25, 319:4, 333:22, 349:17, 350:19, 353:11, 358:6, 362:11, 363:25, 364:17, 371:14, 379:2, 391:10, 404:12

participate [1] - 309:21

particular [7] - 292:16, 372:17, 386:3, 399:5, 399:10, 399:23, 406:11

parties [3] - 270:4, 272:3, 420:10

partner [4] - 360:5, 360:7, 360:10, 360:19

parts [2] - 377:10, 391:9

party [1] - 407:5

Paschal [1] - 271:15

PASCHAL [1] - 269:18

pattern [8] - 342:18, 399:4, 399:7, 399:16, 400:4, 400:18, 400:20, 402:20

patterns [5] - 399:10, 399:14, 399:25, 400:3, 403:5

people [19] - 291:18, 291:23, 292:3, 292:11, 296:3, 296:5, 304:7, 304:19, 305:16, 306:2, 306:7, 319:16, 332:16, 352:20, 359:15, 359:16, 391:13, 391:24, 413:19

percent [5] - 276:22, 298:9, 318:25, 346:10, 410:17

performed [1] - 402:25

perhaps [1] - 416:11

period [1] - 275:8

perjury [4] - 361:19, 362:3, 362:22, 363:4

perpetrator [2] - 371:22, 371:23

person [19] - 289:14, 333:6, 357:11, 357:13, 365:7, 365:16, 371:22, 373:15, 385:5, 391:19, 394:13, 395:12, 396:8, 403:4, 403:9,

403:21, 405:12,
406:3, 413:8
personnel [1] - 278:17
Pfalzgraf [3] - 328:16,
328:18, 359:21
PG [1] - 419:6
phase [3] - 312:6,
312:7, 390:6
phone [1] - 277:6
photo [5] - 334:6,
365:5, 371:15,
376:12, 379:16
photograph [29] -
330:21, 363:21,
365:6, 367:3, 367:9,
367:19, 367:25,
368:4, 368:15,
368:19, 368:24,
370:6, 370:21,
371:5, 371:10,
371:19, 371:22,
372:2, 373:3,
373:14, 374:9,
374:21, 378:2,
379:24, 380:25,
383:12, 386:3,
391:20, 394:16
Photograph [2] -
418:11, 418:12
photographers [1] -
332:25
Photographs [1] -
418:13
photographs [45] -
334:14, 334:21,
334:25, 340:3,
340:9, 365:23,
366:7, 367:15,
371:12, 375:22,
378:6, 378:13,
379:3, 379:9,
379:12, 380:4,
380:7, 380:10,
381:3, 382:7,
382:16, 382:20,
383:6, 384:19,
385:3, 385:11,
385:15, 385:19,
386:3, 386:15,
387:2, 387:19,
388:4, 388:6,
388:22, 388:25,
389:3, 390:14,
390:20, 391:7,
391:14, 392:20,
393:3, 393:25,
395:14
phrase [1] - 372:4
physical [1] - 290:5
picture [7] - 295:12,

338:16, 365:15,
366:13, 366:14,
366:21, 373:9
pictures [12] - 329:15,
332:25, 333:3,
333:6, 333:11,
336:3, 378:14,
378:16, 382:12,
384:5, 386:5, 386:6
piece [1] - 335:20
pinkish [1] - 322:11
place [8] - 268:20,
283:18, 284:2,
297:9, 306:24,
326:10, 347:23,
407:3
plain [3] - 329:8,
329:11, 331:4
Plaintiff [6] - 268:5,
268:18, 269:4,
269:7, 269:11,
269:19
Plaintiff's [10] - 274:5,
279:15, 308:24,
312:22, 330:15,
330:18, 334:3,
334:10, 348:23,
418:9
plan [1] - 293:10
planned [1] - 292:17
planning [2] - 348:20,
348:24
play [1] - 286:10
point [23] - 273:12,
276:23, 282:23,
283:3, 287:5,
299:25, 300:6,
301:9, 309:2, 318:9,
350:7, 350:12,
351:13, 352:13,
353:3, 356:12,
361:10, 365:25,
389:17, 389:21,
389:24, 399:8,
400:16
pointed [4] - 336:17,
346:8, 361:24,
410:15
points [1] - 284:13
poker [1] - 275:19
Polaroid [1] - 364:9
Police [2] - 390:23,
391:25
police [24] - 275:14,
326:19, 328:3,
331:4, 339:16,
341:6, 341:16,
342:3, 343:13,
343:14, 346:14,
355:13, 355:17,

372:23, 374:21,
375:4, 375:6,
376:18, 391:12,
401:11, 402:9,
402:15, 405:22,
408:18
POLICE [1] - 268:8
POLLACK [2] -
269:12, 272:7
Pollack [1] - 272:7
polygraph [4] -
413:18, 413:22,
414:3, 414:6
poor [1] - 295:6
portion [2] - 343:23,
354:15
posed [1] - 410:13
possessed [2] -
289:25, 297:2
possibility [3] -
325:16, 410:24,
411:8
possible [8] - 319:13,
319:14, 320:13,
327:5, 380:14,
393:23, 410:15,
411:11
possibly [4] - 288:16,
317:25, 318:2, 327:7
precinct [2] - 275:11,
275:12
precluded [1] - 343:25
preparation [1] -
377:24
prepare [3] - 273:21,
273:23, 277:20
preparing [1] - 302:14
presence [1] - 318:16
PRESENT [1] - 269:17
pressure [5] - 280:6,
280:21, 286:5,
286:11, 286:12
pretending [2] -
294:16, 294:17
pretty [2] - 353:10,
355:21
preventing [1] -
336:10
primary [1] - 287:15
print [12] - 342:24,
398:17, 400:12,
401:3, 401:7,
403:14, 403:25,
404:14, 407:14,
408:5, 409:14
prints [2] - 342:15,
400:24
prison [2] - 295:20,
413:8
Pro [1] - 271:16

problem [4] - 369:11,
369:15, 370:21,
372:10
problematic [1] -
386:13
Procedure [1] -
268:19
procedure [6] - 289:8,
289:9, 349:12,
349:14, 369:6,
376:22
procedures [9] -
364:2, 364:5,
364:18, 364:22,
365:9, 369:10,
370:17, 375:21,
377:13
proceed [4] - 272:21,
339:25, 359:8,
396:24
proceedings [1] -
271:19
proceeds [1] - 397:24
process [8] - 273:17,
284:8, 346:24,
346:25, 347:5,
350:19, 365:2,
395:11
processes [1] -
364:11
product [1] - 286:22
Productions [1] -
271:17
prohibition [1] -
373:13
proper [1] - 380:19
properly [1] - 290:13
prosecution [8] -
378:25, 383:19,
387:21, 388:11,
395:12, 395:20,
416:13
prosecution's [1] -
393:16
prosecutor [5] -
347:16, 377:25,
401:13, 401:23,
402:11
prosecutors [1] -
302:17
prove [1] - 319:16
PUBLIC [2] - 417:20,
419:25
Public [3] - 268:21,
270:14, 420:3
published [2] - 366:7
pull [1] - 416:21
pulled [3] - 284:23,
352:14
pumped [1] - 415:19

puncture [1] - 340:17 10
purpose [4] - 384:24,
393:2, 394:10, 415:6
purposes [1] - 361:23
pursuant [1] - 268:18
push [3] - 311:6,
383:17, 393:15
put [18] - 280:6,
280:21, 281:5,
286:11, 287:25,
288:22, 298:22,
299:17, 304:24,
344:23, 345:16,
358:8, 384:9,
389:13, 397:24,
407:16, 411:13,
413:7

Q

questioned [2] -
344:11, 344:25
questioning [6] -
276:21, 313:10,
313:11, 355:20,
356:7, 389:23
questions [16] - 273:3,
279:23, 283:21,
285:10, 285:16,
298:23, 299:3,
299:7, 304:22,
319:21, 356:8,
358:16, 360:23,
383:4, 386:8, 396:7
quickly [2] - 276:7,
315:20
quite [2] - 369:10,
417:4

R

railroad [5] - 363:12,
363:13, 369:18,
372:15, 395:24
ran [4] - 295:2,
315:24, 316:10,
353:13
ranch [1] - 309:7
ranch-style [1] - 309:7
rapes [1] - 298:12
raping [1] - 298:13
rather [3] - 290:25,
304:8, 378:14
reaction [1] - 407:19
READ [1] - 419:6
read [7] - 281:3,
301:6, 301:8,
352:12, 354:15,
386:10, 399:2

readily [1] - 346:2
reading [5] - 275:2, 315:6, 315:10, 390:15, 393:12
READS [1] - 419:6
really [4] - 304:15, 332:9, 342:21, 370:20
rear [1] - 342:8
reason [19] - 283:19, 284:15, 351:19, 371:18, 371:24, 372:20, 373:18, 374:17, 380:20, 382:19, 382:25, 385:18, 386:17, 393:23, 393:24, 394:8, 395:6, 395:17, 405:15
REASON [1] - 419:6
reasonable [1] - 399:21
reasons [2] - 378:23, 394:5
recently [1] - 369:22
recess [3] - 339:21, 359:3, 396:20
recognize [3] - 330:20, 330:21, 334:24
recognized [2] - 391:5, 392:12
recollection [1] - 288:6
record [17] - 271:18, 277:11, 277:14, 288:25, 303:17, 303:21, 305:24, 337:10, 339:20, 339:24, 359:2, 359:7, 396:19, 396:23, 411:15, 417:8, 420:7
reduce [4] - 347:25, 350:8, 352:3, 353:6
reduced [1] - 348:7
refer [7] - 274:11, 277:19, 277:24, 279:16, 304:14, 313:16, 398:20
referral [1] - 362:12
referred [1] - 399:12
referring [3] - 340:3, 348:22, 399:17
reflect [1] - 357:10
reflection [1] - 341:15
reflects [4] - 341:20, 353:21, 354:5, 354:17
refresh [2] - 359:24,

400:10
regard [4] - 284:18, 362:8, 364:24, 373:7
regardless [1] - 289:13
regards [1] - 387:8
regular [1] - 370:2
REIN [2] - 268:7, 269:21
Rein [19] - 273:14, 278:2, 278:3, 278:4, 279:5, 280:16, 286:16, 302:12, 302:24, 305:3, 308:8, 311:10, 341:12, 341:21, 344:15, 346:5, 353:5, 360:5, 411:8
Rein's [3] - 277:19, 281:16, 301:21
related [1] - 420:9
relatively [1] - 282:10
reliable [1] - 414:7
remember [81] - 279:22, 279:23, 280:4, 280:23, 282:18, 283:8, 287:6, 288:2, 288:15, 288:16, 297:4, 306:15, 311:17, 311:18, 322:14, 329:4, 330:24, 333:22, 343:3, 354:19, 360:21, 360:24, 372:7, 379:3, 379:8, 379:13, 379:20, 379:22, 380:6, 380:7, 380:8, 380:17, 381:5, 381:7, 381:9, 382:8, 382:24, 383:11, 385:5, 385:7, 386:2, 388:4, 388:5, 388:18, 388:19, 388:23, 391:19, 391:21, 392:17, 392:23, 394:21, 395:8, 395:22, 398:5, 398:18, 400:13, 400:14, 401:19, 415:4
remembered [2] - 380:18, 395:9
remembering [1] - 290:2
reminds [1] - 408:20
removed [1] - 401:23
repeat [3] - 284:5, 284:16, 357:17

repeated [1] - 358:2
repeatedly [1] - 344:12
repeating [1] - 281:25
rephrase [1] - 283:24
report [14] - 273:21, 273:24, 277:21, 282:8, 282:11, 283:14, 285:20, 286:22, 287:9, 315:7, 340:21, 352:12, 393:13
reported [3] - 363:18, 365:20, 385:2
reporter [5] - 271:21, 272:15, 282:21, 354:16, 380:13
Reporting [1] - 271:23
reports [2] - 302:15, 379:23
represent [1] - 272:4
representative [1] - 390:22
requested [1] - 354:15
required [1] - 285:13
reserved [1] - 270:10
residence [3] - 404:3, 404:17, 404:23
respect [4] - 393:7, 396:5, 399:13, 399:22
respective [1] - 270:4
respond [1] - 391:16
response [1] - 306:14
rest [1] - 295:19
result [1] - 362:10
retired [2] - 360:8, 386:13
retrospect [1] - 343:19
retry [1] - 305:13
returns [1] - 321:25
reversed [2] - 378:21, 378:22
reviewed [1] - 402:14
revolted [1] - 380:14
rich [3] - 381:18, 381:21
Richard [1] - 272:11
RICHARD [2] - 268:8, 269:16
ridiculous [2] - 284:22, 284:24
rights [6] - 301:2, 301:3, 301:6, 301:7, 301:9, 301:14, 301:16, 302:9
Road [3] - 268:12, 269:4, 271:11
ROBERT [2] - 268:7, 269:20

ROE [1] - 268:8
role [3] - 291:11, 295:9, 319:5
roll [1] - 290:17
rolled [1] - 352:15
rolls [1] - 273:10
Ron [3] - 381:8, 397:18, 397:23
Ronald [1] - 397:14
room [27] - 302:21, 307:21, 309:9, 310:8, 310:17, 311:6, 313:24, 317:17, 318:16, 325:8, 325:9, 325:14, 328:8, 328:9, 329:8, 332:2, 336:2, 336:22, 336:25, 342:25, 344:23, 345:2, 380:3, 398:17, 400:11, 400:17, 402:16
rooms [2] - 310:24, 341:25
Rother [7] - 381:6, 381:8, 397:4, 397:5, 397:11, 397:14, 397:18
routine [1] - 385:10
rubber [1] - 400:7
Rules [1] - 268:19
run [2] - 383:12, 386:5
ruse [7] - 289:11, 289:16, 301:10, 345:25, 352:14, 352:17, 352:21

S

sarcastic [1] - 403:11
satisfied [2] - 347:9, 347:13
save [1] - 274:24
saw [14] - 293:8, 295:24, 314:6, 314:9, 322:15, 329:10, 366:17, 366:20, 366:23, 366:24, 373:24, 394:14, 394:17, 415:18
scenarios [1] - 318:13
scene [24] - 331:16, 344:11, 358:15, 378:6, 378:13, 379:15, 379:24, 380:3, 381:3, 382:7, 382:14, 382:16,

382:19, 383:6, 384:19, 385:3, 385:10, 385:15, 385:19, 386:15, 387:19, 388:25, 390:14, 393:3
SCHECK [1] - 269:7
school [1] - 281:19
scientific [1] - 399:22
screaming [2] - 295:3, 314:22
sealing [1] - 270:5
search [1] - 324:12
searched [9] - 320:8, 323:18, 323:21, 324:16, 326:18, 326:19, 326:22, 326:25, 327:4
seasoned [1] - 330:3
second [10] - 278:4, 285:19, 291:17, 329:16, 346:18, 354:25, 382:10, 398:3, 410:10, 410:25
security [1] - 274:24
see [23] - 276:10, 311:7, 328:5, 328:8, 329:3, 329:9, 329:19, 329:20, 330:22, 331:6, 332:21, 333:10, 333:14, 333:17, 335:4, 336:19, 337:2, 337:4, 352:12, 354:25, 372:9, 388:19, 401:3
seeing [6] - 311:18, 329:4, 330:24, 336:9, 336:11, 354:19
seem [1] - 298:18
sees [1] - 275:18
selected [2] - 292:24, 293:13
self [2] - 292:13, 294:24
sense [2] - 290:6, 377:4
September [1] - 282:9
sequence [1] - 367:23
Sergeant [5] - 311:12, 336:5, 341:22, 344:14, 414:24
sergeant [2] - 359:18, 359:21
serious [1] - 375:8
set [6] - 292:21, 303:14, 311:8, 357:4, 420:6, 420:15

11

12

setting [2] - 303:11, 319:18
seven [1] - 359:18
Seventy [2] - 274:6, 274:7
Seventy-nine [2] - 274:6, 274:7
several [7] - 284:2, 284:6, 303:20, 335:16, 340:17, 344:25, 346:9
severely [1] - 340:12
Seymour [2] - 327:13, 415:18
shall [2] - 270:6, 270:10
Shari [5] - 277:6, 277:17, 381:6, 397:3, 397:5
shave [1] - 412:20
shaven [1] - 335:7
SHEET [1] - 419:2
sheet [3] - 401:8, 404:14, 407:14
sheets [7] - 400:17, 400:19, 400:24, 400:25, 401:4, 402:16, 402:20
shoot [1] - 292:8
shortly [1] - 283:6
shot [1] - 292:7
SHOULD [1] - 419:6
shoulder [4] - 340:11, 340:16, 342:9, 354:2
shoulders [2] - 284:24, 326:3
show [23] - 279:14, 280:20, 329:15, 340:2, 364:9, 368:24, 370:21, 371:5, 371:9, 371:19, 371:25, 373:3, 373:9, 374:9, 378:15, 379:11, 381:2, 382:6, 382:15, 382:19, 384:5, 393:24, 394:16
showed [20] - 280:19, 336:3, 367:2, 367:9, 368:5, 368:16, 371:11, 374:21, 377:25, 379:24, 380:3, 380:24, 383:11, 385:2, 386:4, 386:15, 388:3, 388:20, 390:20, 391:7
shower [2] - 321:13, 323:16

showers [1] - 321:22
showing [23] - 365:6, 365:14, 373:14, 375:21, 378:6, 379:2, 379:15, 380:6, 380:7, 380:16, 384:18, 385:7, 385:19, 386:5, 386:6, 386:6, 388:22, 391:14, 391:20, 392:20, 393:3, 393:16, 395:13
shown [4] - 366:12, 370:6, 386:25, 387:19
shows [3] - 353:19, 353:20, 386:15
side [6] - 275:19, 314:11, 335:16, 336:12, 383:20, 412:22
sight [2] - 329:11, 331:4
sign [7] - 301:3, 313:6, 348:21, 348:24, 350:15, 350:23, 352:6
Signature [1] - 419:21
signed [4] - 270:13, 270:15, 301:15, 302:10
signs [1] - 350:16
similar [2] - 400:18, 400:20
simply [5] - 283:20, 285:13, 308:9, 350:10, 416:12
single [20] - 288:19, 297:17, 366:12, 367:9, 367:19, 368:15, 368:24, 370:6, 370:21, 371:5, 371:19, 371:25, 372:2, 373:3, 373:14, 374:9, 374:20, 378:2, 404:2, 404:16
sister [1] - 287:19
sit [4] - 318:12, 319:17, 342:22, 392:25
site [1] - 329:8
sited [1] - 379:2
sitting [1] - 396:6
situation [5] - 364:24, 373:7, 376:11, 379:15, 394:18
six [4] - 344:8, 359:15, 359:16, 399:11

skilled [1] - 403:13
slashed [2] - 294:13, 338:2
sleeping [4] - 314:6, 314:12, 369:19, 372:15
sleeps [1] - 275:18
sleeves [1] - 284:23
slit [1] - 338:21
small [1] - 287:20
smashed [3] - 333:23, 337:6, 342:9
smear [1] - 400:11
Smithtown [1] - 271:24
smudge [1] - 342:18
smudged [1] - 342:14
smudges [2] - 342:13, 398:15
someone [1] - 338:2
someplace [1] - 295:25
sometime [2] - 277:8, 299:18
somewhat [1] - 405:25
somewhere [1] - 409:25
sorry [8] - 274:7, 274:25, 280:2, 313:18, 351:15, 359:12, 368:10, 398:3
sort [1] - 278:6
sorts [1] - 298:16
sound [2] - 309:21, 310:23
spatter [1] - 405:17
speaking [4] - 279:3, 291:17, 374:7, 374:24
special [1] - 401:13
specific [1] - 341:3
specifically [3] - 329:24, 364:21, 378:25
speculate [1] - 318:12
spend [1] - 295:19
spill [1] - 297:23
spoken [1] - 406:14
spot [1] - 358:23
Spota [3] - 401:17, 402:3
spots [1] - 349:3
spread [2] - 371:15, 376:12
squad [3] - 275:14, 313:9, 392:2
stab [1] - 345:20
stabbed [18] - 293:18,

300:5, 315:18, 315:19, 317:20, 325:13, 339:2, 339:4, 339:6, 339:7, 341:4, 342:10, 353:15, 353:25, 355:4, 355:6, 355:8
stains [1] - 332:2
stamp [1] - 301:20
stamped [3] - 301:23, 301:25, 302:2
stand [3] - 305:5, 310:6, 310:7
stands [1] - 354:21
start [2] - 335:3, 371:24
started [1] - 274:21
starts [1] - 296:24
State [11] - 268:22, 362:12, 363:3, 401:6, 401:11, 402:9, 402:14, 402:15, 405:21, 408:17, 420:4
state [2] - 272:3, 281:23
statement [23] - 313:16, 324:21, 347:22, 348:15, 348:17, 348:20, 349:7, 349:10, 350:14, 351:12, 351:13, 351:17, 352:5, 353:7, 354:17, 357:9, 357:18, 358:12, 377:3, 383:22, 390:9, 390:11
statements [8] - 299:14, 352:4, 356:17, 358:19, 381:11, 389:18, 390:6, 390:7
STATES [1] - 268:2
States [1] - 271:7
stenographer [1] - 303:17
step [1] - 410:25
stepped [1] - 401:17
Steuerman [9] - 349:8, 414:11, 414:16, 415:7, 415:18, 415:20, 416:3, 416:9, 416:21
still [5] - 321:14, 324:7, 410:15, 410:16, 415:14
STIPULATED [3] - 270:3, 270:8, 270:12
STIPULATIONS [1] -

270:2
stood [2] - 310:2, 310:3
stop [3] - 313:10, 313:11, 346:18
stopped [5] - 276:25, 277:3, 329:16, 343:24, 389:23
stopping [1] - 299:2
story [1] - 299:4
strain [1] - 291:25
stranger [2] - 371:6, 374:13
Street [2] - 269:8, 269:11
stress [1] - 291:25
stuck [1] - 319:15
student [1] - 281:19
stuff [7] - 319:18, 323:17, 348:13, 349:17, 351:24, 351:25, 414:19
style [1] - 309:7
subject [2] - 302:16, 373:17
Subscribed [2] - 417:15, 419:23
substance [4] - 286:18, 288:23, 316:6, 322:11
sufficient [1] - 304:13
Suffolk [7] - 271:6, 272:12, 390:23, 390:24, 391:25, 407:6, 419:3
SUFFOLK [3] - 268:7, 268:8, 269:14
suggest [2] - 304:12, 373:25
suggested [1] - 308:7
suggesting [4] - 295:16, 296:8, 345:18, 371:21
suggestion [1] - 372:23
suggestions [1] - 358:5
suggestive [2] - 372:3, 377:3
Suite [1] - 269:11
sum [3] - 286:18, 288:23, 316:6
summer [1] - 381:13
supplemental [9] - 273:21, 273:24, 277:21, 282:8, 283:13, 285:20, 286:22, 287:9, 315:7
suppose [1] - 415:17
supposedly [9] -

311:5, 313:14,
318:18, 318:20,
326:10, 327:17,
346:12, 346:16,
353:5
suppositions [1] -
410:11
surprised [2] - 315:9,
315:11
surveyed [1] - 293:8
suspect [8] - 371:6,
371:20, 374:14,
376:7, 405:15,
416:3, 416:4, 416:11
suspect's [1] - 303:13
swear [5] - 272:15,
350:22, 351:3,
352:6, 355:22
swears [2] - 350:17,
351:10
sweatshirt [1] -
284:20
switch [4] - 342:24,
342:25, 398:16
sworn [5] - 270:15,
272:20, 417:15,
419:23, 420:6

### T

tainting [1] - 373:4
talks [1] - 339:11
TANKLEFF [2] -
268:4, 269:19
Tankleff [24] - 271:5,
272:6, 272:8,
272:10, 273:13,
281:9, 340:11,
357:14, 378:10,
378:25, 381:4,
382:10, 387:15,
388:12, 390:17,
397:25, 404:3,
404:17, 405:19,
406:24, 407:11,
409:19, 415:14,
419:2
Tankleff's [6] -
316:22, 327:13,
327:14, 328:12,
331:12, 402:16
tape [9] - 279:21,
280:11, 282:6,
282:9, 282:13,
282:24, 283:5,
286:10
Tape [2] - 339:24,
396:23
team [2] - 359:16

tear [1] - 295:15
technician [2] - 278:6,
405:18
technique [1] - 393:14
term [2] - 362:19,
362:21
terms [2] - 287:3,
332:8
test [3] - 309:21,
310:23, 402:25
testified [11] - 279:6,
303:25, 363:19,
366:3, 366:8, 367:6,
367:23, 368:23,
381:11, 381:23,
398:5
testify [4] - 357:7,
367:7, 367:8, 382:17
testifying [2] - 363:5,
365:21
TESTIMONY [1] -
418:3
testimony [17] - 281:8,
310:15, 310:21,
342:22, 362:7,
362:22, 369:2,
370:11, 370:12,
373:4, 377:24,
379:25, 383:18,
384:8, 398:21,
420:5, 420:8
THAT [3] - 420:5,
420:7, 420:12
THE [15] - 268:2,
268:7, 271:2,
272:14, 272:19,
273:2, 312:16,
339:19, 339:23,
358:25, 359:6,
396:18, 396:22,
417:6, 419:2
theirs [1] - 306:7
therefore [2] - 371:14,
405:7
they've [1] - 374:22
thinking [1] - 415:4
Thomas [3] - 401:17,
402:2, 402:3
three [3] - 285:24,
367:4, 415:5
throat [14] - 293:18,
314:20, 314:25,
315:4, 315:15,
316:22, 328:13,
332:22, 336:7,
338:2, 339:12,
342:2, 353:14,
353:16
timing [1] - 323:4
tissue [2] - 324:24,

325:19
TO [1] - 418:3
today [8] - 271:21,
337:10, 406:19,
410:16, 412:9,
412:10
Tommy [1] - 360:18
Tony [1] - 360:3
took [13] - 283:18,
284:2, 297:8, 305:5,
306:24, 324:21,
326:7, 326:10,
347:22, 402:13,
404:22, 407:3, 410:2
tool [2] - 380:15,
393:14
tools [6] - 379:10,
379:18, 383:7,
385:16, 385:25,
393:10
top [4] - 310:4,
315:10, 335:14,
336:12
towel [4] - 281:7,
286:5, 318:9, 321:5
trace [1] - 323:10
traces [4] - 324:7,
324:24, 325:18,
327:12
train [2] - 369:19,
372:15
trained [2] - 337:3,
364:6
training [8] - 278:13,
278:20, 278:23,
323:14, 331:19,
364:14, 403:6
transcript [2] - 289:2,
420:7
TRANSCRIPT [1] -
419:2
Transcription [1] -
271:23
transferred [1] -
325:14
transpired [1] - 345:13
trap [1] - 324:10
trapped [1] - 324:2
traps [2] - 323:24,
324:8
tree [1] - 387:6
tremendous [2] -
317:3, 317:7
trial [11] - 270:11,
282:14, 282:25,
305:11, 305:20,
305:22, 310:22,
342:23, 380:2,
402:6, 415:10
TRIAL [1] - 268:16

trickery [1] - 352:20
tried [5] - 277:16,
279:6, 291:12,
294:15, 389:15
true [21] - 289:3,
298:5, 299:10,
300:8, 304:4, 304:9,
304:13, 306:18,
306:22, 321:12,
325:10, 338:15,
341:18, 354:20,
364:19, 368:20,
373:5, 375:2, 380:4,
404:20, 420:7
trust [1] - 287:25
truth [10] - 290:10,
298:11, 304:16,
304:17, 306:4,
346:11, 350:22,
351:4, 352:6, 410:18
truthful [1] - 384:18
try [3] - 290:17, 298:6,
324:22
trying [6] - 291:14,
295:5, 369:5,
379:18, 395:25,
396:7
turkey [1] - 274:24
turn [2] - 275:17,
412:25
turned [6] - 287:24,
302:4, 342:14,
345:19, 354:7,
367:12
turns [3] - 324:23,
325:3, 340:10
TV [1] - 364:8
twice [1] - 370:16
two [13] - 285:23,
300:11, 302:21,
310:23, 317:15,
318:22, 319:6,
320:21, 321:9,
332:16, 382:11,
383:4, 391:9
type [3] - 394:18,
399:24, 400:4
typed [1] - 312:13

### U

uh-hum [1] - 357:5
Uncle [1] - 300:17
under [1] - 291:24
understandably [1] -
380:13
United [1] - 271:6
UNITED [1] - 268:2
unless [1] - 324:3

unlike [2] - 364:4,
364:8
up [46] - 276:6, 279:2,
284:3, 284:23,
291:23, 292:3,
292:22, 294:15,
296:20, 303:11,
303:14, 309:12,
311:22, 311:25,
312:2, 312:7,
313:21, 313:22,
318:13, 319:18,
322:25, 338:15,
345:23, 348:2,
348:18, 349:8,
356:25, 361:17,
365:5, 365:20,
368:10, 371:20,
373:4, 373:5,
374:18, 389:2,
389:9, 389:21,
393:2, 397:24,
401:6, 401:11,
408:16, 408:18,
412:20
upset [4] - 295:17,
296:7, 296:8, 296:10
uses [1] - 286:12

### V

vaginally [1] - 298:14
valid [1] - 371:15
verbatim [1] - 289:2
versus [1] - 271:5
victim [1] - 293:13
Video [1] - 271:16
Videographer [1] -
269:18
VIDEOGRAPHER [10]
- 271:2, 272:14,
272:19, 339:19,
339:23, 358:25,
359:6, 396:18,
396:22, 417:6
videographer [1] -
271:16
videotape [4] - 347:3,
347:17, 356:23,
357:17
videotaping [1] -
347:14
view [7] - 289:20,
290:16, 304:6,
306:7, 329:5, 409:2,
412:11
views [1] - 304:7
visible [3] - 354:6,
354:18, 355:16

13

14

volunteered [1] - 315:20
vs [1] - 419:2

## W

Wade [4] - 364:24, 369:16, 371:14, 376:11
waited [1] - 358:14
waived [1] - 270:7
wakes [1] - 322:25
waking [1] - 348:2
walk [1] - 332:5
walk-thru [1] - 332:5
walked [7] - 294:4, 317:15, 317:16, 317:19, 318:21, 319:22, 321:7
walking [3] - 319:6, 320:20, 321:12
wall [5] - 342:14, 342:24, 398:16, 400:11, 400:17
wandered [1] - 331:5
wandering [1] - 329:23
wants [2] - 300:20, 300:24
wash [2] - 323:25, 324:6
washing [1] - 323:17
Washington [1] - 269:12
watermelon [4] - 308:2, 322:2, 322:5, 322:8
wealth [2] - 381:14, 394:25
weapon [4] - 292:25, 327:5, 327:7, 410:21
weapons [13] - 307:13, 307:15, 316:15, 316:18, 317:15, 317:22, 318:22, 319:6, 320:3, 320:21, 321:4, 321:9, 321:14
wearing [1] - 342:19
Wednesday [1] - 406:20
weights [1] - 313:24
welcome [1] - 417:5
whacked [1] - 315:5
whatnot [1] - 348:14
WHEREOF [1] - 420:14
whole [6] - 297:23, 298:23, 305:10,

305:12, 379:20, 410:18
wildest [1] - 411:24
willing [1] - 377:15
withdraw [1] - 371:2
withdrawn [1] - 280:3
Witness [1] - 419:4
witness [31] - 272:16, 365:16, 368:16, 370:22, 371:6, 371:20, 371:21, 372:2, 372:6, 372:11, 372:13, 372:14, 372:21, 372:25, 373:12, 373:15, 373:22, 374:2, 374:9, 374:13, 374:18, 378:2, 382:13, 382:14, 391:6, 391:8, 393:4, 414:21, 420:5, 420:8
WITNESS [4] - 273:2, 312:16, 417:4, 420:14
witness's [1] - 373:4
witnessed [1] - 373:16
witnesses [23] - 305:4, 361:11, 361:13, 361:14, 361:15, 363:11, 365:21, 367:24, 370:6, 370:15, 375:21, 378:7, 378:16, 379:3, 381:11, 382:20, 383:17, 384:6, 385:4, 385:20, 386:16, 393:15, 393:25
witnessing [1] - 373:8
woke [9] - 284:3, 309:12, 311:22, 311:25, 312:7, 313:21, 313:22, 348:18, 349:7
wondering [1] - 289:22
word [10] - 275:11, 281:9, 281:12, 286:12, 290:10, 303:12, 303:13, 305:2, 326:7, 384:20
words [5] - 279:10, 282:5, 381:20, 382:14
wore [1] - 343:9
workers [4] - 363:12, 363:13, 369:18, 395:25

worth [1] - 300:12
wound [9] - 280:7, 280:21, 281:6, 281:10, 286:5, 286:12, 286:16, 316:24, 332:21
wounds [15] - 331:12, 335:10, 335:23, 336:11, 337:12, 337:19, 337:22, 338:6, 338:14, 339:16, 340:17, 341:3, 345:20, 353:20, 353:21
write [13] - 276:6, 279:6, 280:22, 280:24, 281:2, 286:15, 288:19, 349:16, 349:19, 350:5, 350:13, 350:14, 356:19
writing [17] - 276:25, 277:3, 280:17, 299:5, 299:7, 313:5, 347:25, 348:8, 348:12, 348:22, 349:3, 351:9, 353:5, 355:22, 356:3, 390:6
written [31] - 282:7, 302:12, 312:10, 312:11, 312:12, 312:24, 312:25, 313:15, 343:23, 344:2, 344:3, 347:3, 347:10, 347:13, 347:22, 348:16, 349:10, 350:10, 350:14, 352:4, 352:5, 353:7, 354:17, 356:2, 357:8, 357:11, 357:18, 358:3, 358:12, 390:7, 390:9
Written [1] - 418:10
wrongly [1] - 295:22
wrote [11] - 276:6, 277:7, 279:2, 279:21, 280:25, 281:3, 281:17, 282:11, 286:3, 315:8, 386:9

## Y

Yaphank [1] - 275:15
yard [1] - 326:20
years [2] - 282:6, 400:13
yelled [1] - 310:4
yelling [2] - 295:4,

310:16
yesterday [22] - 274:3, 279:17, 279:24, 280:4, 280:19, 282:15, 282:19, 289:12, 290:15, 326:2, 329:23, 331:11, 333:22, 336:3, 336:18, 341:11, 346:6, 361:3, 397:21, 398:13, 408:21, 408:25
YORK [2] - 268:2, 268:2
York [11] - 268:13, 268:22, 269:5, 269:8, 269:15, 271:8, 271:12, 271:18, 271:25, 420:4
yourself [1] - 400:9
yourselves [1] - 272:3

MARTIN TANK KEFF being duly sworn
deposes and says that I am 17 years
old having been born on August 9th,
1971 in Brooklyn N.Y. I live at #33
Seaside Drive Belle Terre. I'm a
Senior in Port Jeff High School.
I have been advised of my Rights
As follows.

I know that I have the Right to
Remain Silent.

I know that Anything I say can and
Will be USED Against me in a Court of
Law. — I know that I have the
Right to have an Attorney Present
Before or during any Questioning —
I Know that if I cannot afford to hire
An Attorney one will be furnished for
me Free of charge. —

I understand each of the Rights
Detective McCrary has explained
To me. — I do not want to
Contact an Attorney — Having
My Rights in Mind I want to tell
Detectives McCrary and Reid what
happened to my Parents this Morning.
Yesterday I went to the
Mall Shopping. I was supposed to be

PLAINTIFF'S
EXHIBIT
47

home early enough To Set up the (Bar)
Table for my Father and his Friends.
When I got home About 9:10 pm my
mother was mad at me because I
didn't do i't. my Father Punished me
Mostly But my Mother had been Siding
with my Father which. I was Angry
because my Father's Partner Del Hays
was going To stay with me when they
went To Florida in October, They Ruined
my summer by not letting me use The Boat
As much As I wanted. They wanted me
To drive The Crummy old directola. They
were Fighting Alot and Taking it out on
me. When my mother Sided with my
Father About the Carb Table I was
really mad, I decided I wanted To
Kill them Both, I Set my Alarm for
5:35 To make Sure I would be up before
them, I decided To use The Barbell
when I went To Bed, when I got up I
was surprised To see that The lights still
on. when I looked in my Francis's Room
my mother was there. she was Sleeping.
I went down To the office and Saw
my Father Sleeping in the Chair. I
decided To Kill my Mother First, I Ran
Across the Bed. I got To her Quick.



I hit her 4 or 5 Times on the head. She fought me. I went to the Kitchen and got a Knife. I ran back with the Knife. I cut her throat. I don't know how many Times but I stabbed at her also. Mostly I cut at her throat and neck. I left to

1322 D/Sgt Horvath states
Atty Myron Fox Called - Nothing Further

PLAINTIFF'S
EXHIBIT
98
DF 12/12/12



**PLAINTIFF'S EXHIBIT**

98

DF 12/12/12





PLAINTIFF'S
EXHIBIT

99

OF 12/2/12





PLAINTIFF'S
EXHIBIT
100
OF 12/3/12





PLAINTIFF'S
EXHIBIT

101
OF D 12/2/12





PLAINTIFF'S
EXHIBIT
102
OF 12/2/12





PLAINTIFF'S EXHIBIT
103
ΔF 12/2/12





PLAINTIFF'S
EXHIBIT
104
DF 12/2/12





PLAINTIFF'S
EXHIBIT
105
OF 12/2/2