# Exhibit 10

**Expert Report of
Timothy M. Palmbach
Crime Scene Reconstruction**

**Re: Martin Tankleff**

| | |
|---|---|
| **Nature of Incident:** | Stabbing and bludgeoning of Arlene and Seymour Tankleff |
| **Date of Incident:** | September 7, 1988 |
| **Location of Incident**: | 33 Seaside Drive<br>Belle Terre, New York |
| **Parties Involved:** | Victim 1: Arlene Tankleff |
| | Victim 2: Seymour Tankleff |
| | Assailant(s): Unknown |
| **Contacted by:** | Barry Scheck<br>Neufeld Scheck & Brustin, LLP |
| **Date of Report**: | February 9, 2015 |

## ITEMS REVIEWED

1. On October 29, 2013, I conducted in-person examinations of some of the items of physical evidence preserved in this case. I visited the office of the Attorney General of New York in White Plains and examined the following items: pillow cases recovered from the master bedroom (Lab Item No. 5, 6 & 20), sheets recovered from the master bedroom (Lab Item No. 4 & 25b), and a comforter recovered from the master bedroom (Lab Item No. 25a).

2. On October 29, 2013, I photographed some of the items of physical evidence preserved in this case. I visited the office of the Attorney General of New York in White Plains and photographed the following items: pillow cases recovered from the master bedroom (Lab Item No. 5, 6 & 20), sheets recovered from the master bedroom (Lab Item No. 4 & 25b), and a comforter recovered from the master bedroom (Lab Item No. 25a).

3. On June 24, 2014, I conducted in-person examinations of some of the items of physical evidence preserved in this case. I visited the Suffolk County Police Department's

Property Bureau and the Suffolk County Medical Examiner's Office and examined the following items: the nightgown recovered from Arlene Tankleff's body, (Inventory 88016930, CC# 88-0461042, Item #1 – Negligee (1 piece)), the barbells (Lab. Item No. 42a and 42b), and the "watermelon knife" (Lab Item No. 43).

4. On June 24, 2014, I took photographs of some of the items of physical evidence preserved in this case. I visited the Suffolk County Police Department's Property Bureau and the Suffolk County Medical Examiner's Office and photographed the following items:  the nightgown recovered from Arlene Tankleff's body, (Inventory 88016930, CC# 88-0461042, Item #1 – Negligee (1 piece)), the barbells (Lab. Item No. 42a and 42b), and the "watermelon knife" (Lab Item No. 43).

5. Materials from Suffolk County's Division of Medical-Legal Investigations and Forensic Science's Criminalistics Laboratory:
   a. Worksheets and charts(AG 43, AG 201–4, AG 212, AG 217–31, AG 225–7, AG 259–60, AG 286–88, AG 291–300, AG 603–9, AG 681–2, AG 10813, AGP 723, BDNA 3546–8, SCDA 8668–8672, SCDA 10682–4, SCDA 10956, SCDA 10962, SCDA 15824–8, SCDA 15830–4, SCDA 15836–44 & SCDA 15846–74)
   b. Finger Print Reports (AG 7237 & SCDA 8385)
   c. Supplementary Reports (AG 9444–5)
   d. Crime Lab Reports (BDA 3530–3540, BDNA 3549–45 & BDNA 3549–62)
   e. Evidence Receipts (AG 429, AG 3172, AG 3174, AG 12413, AG 12760–4 & AG 15084)
   f. Request for Evidence Analysis (AG 12412)
   g. Notes and diagrams (SCDA 2851–63, SCDA 1845–9, SCDA 1838–44)
   h. Additional notes and diagrams by Det. Charles Kosciuk
   i. Autopsy materials regarding Arlene Tankleff (AG 8818–45, AG 11589–603, BW 1292–1302, BW 1307–8, BW 1317, BW 1328–50, SCDA 10745, SCDA 16105–23 & SCDA 16157–74)
   j. Autopsy materials regarding Seymour Tankleff (AG 8942–59 & BW 1085)

6. Materials from University Hospital of the State University of New York at Stony Brook:
   a. Health records regarding Seymour Tankleff (AG 8960–77 & BW 1160–2)

7. Materials from Suffolk County's Police Department:
   a. Statements attributed to Marty Tankleff (AG 12707– 9 & BDNA 430–42)
   b. Releases signed by Marty Tankleff (SCDA 11679–80)
   c. Supplementary Reports (BW 3358, SCDA 1557–70, SCDA 7906–7911, SCDA 7934–7911, SCDA 8216, SCDA 8221–5, SCPD 1361–3, SCPD 1571–2, SCPD 1736–9, SCPD 1938–40 & SCPD 2479–80)
   d. Identification Reports (SCPD 1187–99)
   e. Notes (SCDA 2699–716, SCDA 3571–86 & SCDA 15882–40)
   f. Evidence Receipts (SCDA 2945)
   g. Evidence Analysis Request (SCDA 10657)
   h. Material Submission Form (SCPD 1189)
   i. Video Recording Log (SCDA 8368)
   j. Diagrams (SCDA 450–2 & SCDA 4969)

8. Materials from the New York State Police Forensic Investigation Center:
    a. Latent Print Report (AG 13604–5)
    b. Trace Evidence Report (AG 13494–6)
    c. Serology Case Reports (AG 13469–79, 13548–59)
    d. Supplemental Reports (AG 13453–6, AG 13467–8, AG13488–9, AG 13490–1, AG 13532–6 & AGP 92–7)
    e. Biological Case Reports (AG 13457–66, AG 13521–31 & AG 13480–87)
    f. Trace Evidence Reports (AG 14731, AG 14735–40 & AG 14757–60)
    g. Chain of Custody Report (AG 14937–67 & AG 69–70)
    h. Correspondence (AG 13608 & AG 13572–6)
    i. Disk marked "Tankleff CD #1" with a copy of all materials in bulk (AG 14761–935 & AG 18256–19506)

9. The trial testimony from the 1990 criminal trial from *State v. Tankleff* of:
    a. P.O Daniel Gallagher (BW 6818–6896)
    b. P.O. James Crayne (BW 3359–3405)
    c. P.O. Edward Aki (BW 322–359)
    d. Ethel Curley (BW 4535–4617)
    e. Det. Charles Kosciuk (BW 11993–12303)
    f. Susan Ryan (BW 18101–18332)
    g. Robert Baumann (BW 640–1070)
    h. Robert Genna (BW 7025–7078)
    i. Charles Wagner (BPC 4054–4074)
    j. Det. David Schaffer (BW 18658–18729)
    k. Vernard Adams (BW 98–236)
    l. Bonnie Schnitta-Israel (BW 18779–18807)
    m. Richard Bisbing (BW 2570–2601)

10. In addition to the photographs I took in this case, I have examined photographs taken in this case by:
    a. The Suffolk County Medical Examiner's Office
    b. The Suffolk County Police Department's Identification Section
    c. Ron Smith & Associates

## INTRODUCTION:

1. The attorneys representing Martin Tankleff requested that I review and evaluate the bloodstain patterns and forensic evidence collected from 33 Seaside Drive, Belle Terre, New York, during the investigation of the attacks on Arlene and Seymour Tankleff on September 7, 1988. The purpose of the review was to conduct a crime scene reconstruction of the attacks on the Tankleffs based on the crime scenes, bloodstain patterns, and forensic evidence.

2. In addition, I was asked to review the narrative confession to the murders of Seymour and Arlene Tankleff, which was attributed to Martin Tankleff, and to evaluate whether the confession was corroborated by or was inconsistent with the crime scene reconstruction.

3.  In rendering my findings and conclusions, I have relied on the materials specified above, together with my education, knowledge, training, and experience.

4.  Based on my knowledge, experience, and review of the above-listed materials, to a reasonable degree of scientific certainty, I am of the opinion that:

    a.  The evidence collected and documented from the murders of Seymour and Arlene Tankleff, including the bloodstain patterns, location of the hair evidence, and nature of the wounds found on both victims, supports the conclusion that the murders were not committed by a single perpetrator, but instead involved two or more perpetrators.

    b.  The forensic reconstruction of the attacks on Arlene and Seymour Tankleff contradicts the narrative confession in significant ways.

**EXPERIENCE AND QUALIFICATIONS:**

5.  I am currently an Associate Professor and the Chair of the Forensic Science Department at the University of New Haven, as well as a Fellow, Instructor, and Executive Director for the Henry C. Lee Institute of Forensic Science.

6.  I earned a M.S. Forensic Science – Criminalistics degree in 1985, and my dual bachelor of science degrees in chemistry and in forensic science in 1982, from the University of New Haven.

7.  From 1982 to 2004, I served as a member of the Connecticut State Department of Public Safety, retiring as a Major and the Director and Commanding Officer for The Division of Scientific Services.

8.  I have published widely in the field of forensic science and crime scene reconstruction, and am currently a fellow within the General Section of the American Academy of Forensic Sciences, among other professional organizations, including the International Association for Bloodstain Pattern Analysts.

9.  My qualifications to give expert testimony in this case, as well as the publications I authored over the previous ten years, are set forth in full in my curriculum vitae, attached as Exhibit A.

10. In my career, I have responded to the scenes of violent deaths, including multiple homicides; conducted approximately 300 crime scene reconstructions or blood stain analyses, including in cases involving stabbings and bludgeoning; and have testified as an expert in crime scene reconstruction and blood stain analysis in state and federal courts in approximately 30 cases.

11. In the past four years, I have been retained as an expert in crime scene reconstruction, blood spatter pattern interpretation, and crime scene processing & procedures and have been deposed or testified at trial in a number of civil and criminal cases, a complete list of which is attached as Exhibit B.

12. For my work on this report, my understanding is that I will be compensated at a rate of $150.00 per hour.

**BACKGROUND FACTS FROM REVIEW OF MATERIALS:**

13. Martin Tankleff called 911 on the morning of September 7, 1988, at 6:11 a.m.

14. Police records indicate that the first responding officer arrived at 33 Seaside Drive on the morning of September 7, 1988, at 6:17 a.m.

15. Seymour Tankleff was found in the office of the Tankleff home at 33 Seaside Drive with serious blunt-force injuries to his head, and sharp-force injuries to his neck.

16. The office was located at the eastern end of the Tankleff home, and measured 22 feet 3 inches by 31 feet 9 inches.

17. The evidence indicates that Seymour Tankleff was attacked in the office.

18. Arlene Tankleff's body was found in the master bedroom of the Tankleff home at 33 Seaside Drive. Mrs. Tankleff had suffered serious blunt-force injuries to her head and sharp-force injuries to her neck, upper torso, and back.

19. The master bedroom was located in the northwest corner of the Tankleff home, and measured 17 feet by 15 feet.

20. The evidence indicates that Arlene Tankleff was attacked and killed in the master bedroom.

21. The narrative confession presented by Suffolk County Detectives James McCready and Norman Rein as having originated with Martin Tankleff described the events of the early morning of September 7, 1988, as follows:

> "We [, Detectives McCready and Rein,] then asked [Martin Tankleff] what time he did this. He said he set his alarm for 5:35. When it went off, he woke up. I asked him what he was wearing. He said he was naked because he didn't want to leave any blood on his clothing. I asked him who he killed first. He said he killed his MOM first. I asked him where his father was. He said he saw that his father was in his office sleeping in his chair. Initially, he was surprised that he wasn't in bed with his mother, and that the lights were on. I asked him what he did to his mother. He said he hit his mother with a dumbbell, then cut her throat. I asked him how his mother was laying in bed. He said she was in bed on her back. He was asked how many times he stabbed her. He said he didn't know how many times he stabbed her. He volunteered that he got to her quickly. I asked him how many times he hit her. He said he hit her at least four to five times on the head. He wasn't sure. He kept on trying to hit her. She fought with him. He said she was in pain, calling for help, saying "why?" and "Help me." He said he was afraid his father would wake up, and that after she fell on the floor, he ran and got a knife from the kitchen and cut her throat. I asked him where the knife was. He said the

knife was on the counter next to the watermelon. I asked him if she was dead when he left the room. He said, no, she was moving a little bit when he ran out of the bedroom to kill his father.

I asked him if his father was still in the office. He said yes, his father was still in the office. He was sitting at his desk. He said his father was awake now and asked, "what are you doing?" I asked him if he went in there naked. He said he was still naked. I asked him what he did with the knife, and the dumbbell. He said he walked in with the knife and the dumbbell behind his back. I asked him what he did first, cut his throat, or hit him. He said he got behind his father and hit him with the barbell first. I asked him if his father fought him like his mother did. He said his father asked him why he was doing this. He volunteered that he "knocked him silly." I asked him how he kept his father from getting out of the chair. He said his father's feet were under the desk so he couldn't get up. I asked him what he did next and he said he slashed his father's neck. I asked him if he knew how many times he hit, or cut his father. He said he didn't know how many times he hit or cut him. Again, he volunteered that he couldn't believe all the blood. I asked him what he did with the knife and the barbell. He said he washed off the knife and the barbell in the shower. I asked him what he did with the barbell and the knife after he washed them off. He said he put the barbell back in his bedroom, and he put the knife on the counter by the watermelon. I then asked him what he did next. He said that he went in and laid down on his bed. He said he thought about what to do next, and got up again at 6:10 a.m. I asked him what happened when he got up. He said he went back to the office, and saw that his father was still alive. He then went to his mother's room to see if she was dead. He said he called 911 from his mother's room."

(SCPD007944–45)

22. There are 36 minutes between 5:35 a.m., the time at which the narrative confession indicates Martin Tankleff got up, and 6:11 a.m., the time at which Martin Tankleff called 911.

23. No serological or other physiological evidence was detected, identified, or recovered on the barbells, Suffolk County ("SC") Lab Item No. 42A & 42B, which were identified in the confession as the bludgeoning instrument, and were collected from the crime scene by Suffolk County police officers and/or Suffolk County Criminalistics Laboratory personnel.

24. No serological or other physiological evidence was detected, identified, or recovered on the watermelon knife, SC Lab Item No. 43, which was identified in the confession as the stabbing instrument, and was collected from the crime scene by Suffolk County police officers and/or Suffolk County Criminalistics Laboratory personnel.

25. There was no blood, blood transfers or human tissue in the hallway between the master bedroom, where Arlene Tankleff was murdered, and the office, where Seymour Tankleff was murdered.

26. There was no blood or human tissue detected, identified, or recovered from any of the bathrooms at 33 Seaside Drive.

27. On September 7 and 8, 1988, Suffolk County Detective Charles Kosciuk and Suffolk County Forensic Analyst Robert Baumann collected water from the drain traps of all the sinks, bathtubs, and showers in the Tankleff home. No blood was detected, identified, or recovered from any of the traps and drains.

28. On September 7, 1988, and in the days immediately following, Suffolk County law enforcement comprehensively searched the house at 33 Seaside Drive, and the surrounding grounds and beach cliffs.

29. Suffolk County law enforcement did not identify or recover any bloodstained clothing, shoes, or gloves that could have been worn by the perpetrator(s), or any bloodstained blunt instruments or sharp instruments inside or in the vicinity of 33 Seaside Drive.

30. Detective Kosciuk stated that, in the crime scene in Seymour Tankleff's office, there were roughly 24 inches of space between the back of Mr. Tankleff's desk chair and the filing-cabinet desk on the west wall. (Kosciuk Dep. Tr. at 410:15–13:5).

31. A cast-off bloodstain pattern results from blood drops being released from an object due to that object's rapid deceleration. (SWGSTAIN and IABPA terminology). These patterns are consistent with originating from a bloody blunt force weapon in motion. There were cast-off patterns observed on the ceiling in the office area, in a location above the desk. One of the cast-off patterns is consistent with a bloody object moving in a northerly direction. The other cast-off pattern is consistent with a bloody object moving in a north-easterly direction. An additional cast-off pattern was located on the sliding door trim, on the north wall, located at a height above the desk. All of these cast-off patterns are consistent with having been created by an assailant swinging a bloody object overhead, while located in a position to the south of the desk and chair.

32. There was impact spatter located on the eastern edge of the desk, adjacent to the chair. Impact spatter is a bloodstain pattern created when blood receives a blow or force resulting in the random dispersion of smaller drips of blood. (IABPA terminology). This impact bloodstain pattern is consistent with having originated from impacts to Seymour's bleeding head while seated in the chair adjacent to the desk. On the upper back of the chair there are two lacerations adjacent to the upper most bloody transfer pattern. There is an additional transfer pattern below these lacerations. Further, there are additional impact blood spatters in the area immediately adjacent to the lacerations.

33. Seymour Tankleff had blunt force trauma to the back of his head with associated skull fractures. In addition, there was a 6 ½ inch incised wound located on the left side and central part of the back of Seymour's neck. An additional incised wound was located on the front of Seymour's neck.

34. Detective Kosciuk and Forensic Analyst Baumann identified a bloodstain on the east wall of the master bedroom, where Arlene Tankleff's body was found, and numbered that stain Item No. 3.

35. The bloodstain marked as Item No. 3 was located 5'2" from the south wall and 5' up from the floor on the east wall of the master bedroom.

36. Officers placed an evidence tag and ruler next to Item No. 3, and took photographs. I have reviewed photographs of Item No. 3.

37. Kosciuk, a bloodstain pattern analyst, determined that Item No. 3 was cast-off. As explained above, this would indicate that Item No. 3 was created by the blood drop being released from a bloody object in motion.

38. Forensic Analyst Baumann conducted conventional serological testing on Item No. 3, and determined that the bloodstain found on the wall in the master bedroom was consistent with Seymour Tankleff's blood.

39. Forensic Analyst Baumann examined the fitted bed sheets from the master bedroom, SC Item No. 4S & 4N.

40. Baumann determined that Stain No. S-3 on Item No. 4N was an oval spot amidst medium velocity blood spatter.

41. 'Medium velocity blood spatter' was an older term that has been replaced by the term, 'Medium Velocity Impact Spatter Medium Velocity Impact Spatter is defined as a bloodstain that is caused by a medium velocity impact/force to a blood source. A blood drop described as an oval drop is most likely a Passive Drop, which is defined as bloodstain drop(s) created or formed by the force of gravity acting alone. (IABPA terminology). Passive drops frequently occur when blood drips from a wound or off of a bloody object.

42. Baumann conducted conventional serological testing on Stain No. S-3 on Item No. 4N and determined that the oval spot was consistent with Seymour Tankleff's blood.

43. No forensic evidence from Arlene Tankleff was identified or recovered in the office; in particular, none of Arlene Tankleff's blood or bloody hair was identified or recovered in the office.

44. Though, in 1989, Suffolk County Forensic Analyst Susan Ryan had conducted microscopic hair comparison on a bloody clump of hair, labeled Lab Item No. 27A, found on Seymour Tankleff's desk, and determined that Item No. 27A was consistent with Arlene Tankleff's hair, mitochondrial DNA testing conducted by Mitotyping Technologies in 2001 revealed that this conclusion was erroneous, and Item No. 27A was actually Seymour Tankleff's hair.

45. Suffolk County Forensic Analyst Robert Genna also examined the bedclothes collected by law enforcement from the master bedroom at 33 Seaside Drive, including Lab Item Nos. 4S and 4N, 5, 6, 20, and 25A.

46. Genna determined that there were numerous transfer patterns in the bloodstains on the bedclothes.

47. A Transfer/Contact Pattern is a bloodstain pattern created when a wet, bloody surface comes in contact with a second surface. A recognizable image of all or a portion of the original surface may be observed in the pattern. (IABPA terminology).

48. Genna examined a number of those transfer patterns and determined that they were consistent with having been made by a glove.

49. In 2013, Ron Smith & Associates conducted chemical enhancements on the bloodstains on the bedclothes, including Lab Item Nos. 4S and 4N, 5, 6, 20, and 25A.

50. I have reviewed the photographs taken by Ron Smith & Associates analysts of the results of those chemical enhancements.

51. In addition, New York State Police Analyst Robert Stanbro examined the bedclothes collected by law enforcement from the master bedroom at 33 Seaside Drive, specifically including Lab Item No. 4N.

52. New York State Police Analyst Stanbro determined that examination of the bedsheet showed the presence of a partial imprint pattern, which appears to be knifelike in design.

53. I have reviewed the bedsheets and the partial imprint pattern identified by Stanbro.

54. Crime scene photographs taken on September 7, 1988, by law enforcement depict a lock of hair on the northwestern corner of the bed in the master bedroom, which Kosciuk and Baumann marked Lab Item No 19.

55. The clump of hair identified as Lab Item No. 19 is consistent with a clump of hair that had been cut by a sharp instrument, as evidenced by the straight line across one end of the clump. This clump of hair was located on the northeast corner of the bed. This clump of hair is consistent with having originated from Arlene Tankleff while she was still on the bed. There was a pooling of blood in this same northeast corner of the bed.

56. My independent review of the bedding recovered by law enforcement from the master bedroom at 33 Seaside Drive revealed sharp-force defects in the bedding. One cut was located on the top (eastern) edge of flat sheet, in a location north of the center. An additional cut was observed on the top (eastern) edge of the comforter in the approximate center.

57. There was a lack of elongated blood drops or downward flow pattern on the front of Arlene Tankleff's night gown. Had she been standing during any portion of the assaults, after bleeding from the head and neck region began, elongated drops and flow patterns would be expected on the night gown.

58. At autopsy, it was determined that Arlene Tankleff had numerous blunt impact trauma injuries to the head, located on the top center and left side of her skull. In addition there were incised wounds located on the back of her neck, upper back, left side of her back, and front of her left shoulder. There was an additional incised wound on the front of her neck, as well as stab wounds of the left and right forearms.

59. Medium Velocity Impact Spatter was located on the sheets and pillow cases located in the northeast corner of the bed. These patterns are consistent with having originated from the blunt force trauma wounds to Arlene Tankleff's head, and with those blunt force trauma wounds having been inflicted while she was still on the bed. However, this would require the back and left side of her head to be exposed while she was on the bed.

60. There were no bloody swipe marks located along the east or northeastern edge of the bedding. A swipe pattern is defined as the transfer of blood from a moving source onto an unstained surface. (IABPA terminology). Thus, there was no indication of movement or rolling over of Arlene once the bleeding began, while she was still on the bed.

61. Review of the physical evidence and crime scene photographs and analysis of the blood stain patterns in the master bedroom reveal a complete lack of evidence suggesting that the assailant[s] ever placed the blunt force instrument down during their attacks. Had a bloody blunt force instrument been placed on the bedding it would have created a transfer/contact pattern.

**CONCLUSIONS:**

62. To a reasonable degree of scientific certainty, the cross-transfer of evidence from the office crime scene to the master bedroom, and corresponding lack of cross-transfer from the master bedroom crime scene to the office, indicate that the attack in the office on Seymour Tankleff occurred *before* the attack on Arlene Tankleff. Item No. 3 was identified as a cast-off blood stain pattern on the east wall of the master bedroom, above the head of the bed. Subsequently this blood sample was determined to be consistent with Seymour Tankleff's blood. Thus, some object containing liquid blood from Seymour must have been transferred from the office to the master bedroom, and placed in motion in the area of the bed. Further, the oval blood drop identified on the north fitted sheet, and subsequently shown to be consistent with Seymour's blood, is consistent with having originated from a bloody object that was held above the bed in the master bedroom.

63. To a reasonable degree of scientific certainty, the limited amount of space behind Seymour Tankleff's desk chair would not have been a sufficient amount of space for an assailant to stand in order to generate the amount of force necessary to cause the blunt force impact wounds to Seymour Tankleff's head and skull, as well as the corresponding cast-off patterns. Notes from crime scene investigators indicate that there was 24 inches of space between the desk chair and furniture behind the desk. However, as evidenced by the presence of elongated blood drops on the face of the desk drawers, which faced the wall behind the desk, it is unlikely that the desk chair was located fully under or in the desk opening for the chair, thus further reducing available space behind the chair.

64. To a reasonable degree of scientific certainty, the bloodstain patterns on the desk, north wall, and ceiling in the office combined with the narrowness of the space behind the office chair indicates that Seymour Tankleff was attacked with the blunt instrument by an assailant who was not standing behind Mr. Tankleff, but was standing to Mr. Tankleff's side or in front of him. There were cast-off patterns located on the ceiling and north wall of the office. All of these cast-off patterns are consistent with having been created by an

assailant swinging a bloody object overhead, while located in a position to the side of or south of the desk and chair.

65. To a reasonable degree of scientific certainty, Seymour Tankleff was assaulted with a blunt force weapon and sharp cutting instrument in a fairly short time frame, while seated in his desk chair. The location of bloody transfer/contact patterns, medium velocity impact spatter, and sharp instrument cutting defects on the upper portion of the desk chair back are consistent with the blunt force and cutting instruments assault occurring contemporaneously while Seymour was still seated relatively upright, and then in a short period of time beginning to slide downward. Thus, the assault on Seymour Tankleff is consistent with having been conducted by more than one assailant.

66. To a reasonable degree of scientific certainty, based on the observed bloodstain patterns, lack of bloody swipe patterns on the northeast corner of the bed, hair evidence, and the wound patterns on Arlene Tankleff's head, Mrs. Tankleff was lying on her stomach in the bed when she was initially attacked, not on her back. Based on the scene observations, as well as the injury locations, Arlene was lying on her stomach or right side with the left side of her face and head, as well as her back, facing upward and exposed.

67. To a reasonable degree of scientific certainty, based on the bloodstain pattern evidence, the clean edge on the clump of hair marked Lab Item No. 19, the sharp force defects revealed in my examination of the bedding, and the wound patterns on Arlene Tankleff's body, Mrs. Tankleff was contemporaneously attacked with both a blunt instrument and a sharp instrument while lying on the bed. The cast-off pattern on the east wall above the bed, and the oval blood drop on the bedding are consistent with having originated from a bloody blunt force object located above the bed, just south of where Arlene was lying. Also, the medium velocity impact spatter on the bedding indicates that the blunt force trauma to Arlene's head occurred while she was located on the bed. The sharp force defects in the bedding, the clean edge on the clump of hair marked Lab Item No. 19, and the wound patterns on Arlene Tankleff's back indicate that the sharp force trauma to Arlene Tankleff's back also occurred while she was located on the bed. Further, the lack of bloody transfer contact patterns in the northeast corner of the bed, and the relatively small amount of pooling indicate that there was little to no movement during the initial assault on the bed, and that Arlene was quickly transferred to an area adjacent to the north side of the bed.

68. To a reasonable degree of scientific certainty, based on the observed blood stain patterns on the carpeted floor adjacent to the north side of the bed, and the presence of a large laceration on the front of Arlene's neck, Arlene Tankleff was dragged or lifted from the bed very soon after the initial assault with the blunt force instrument and cutting instrument. The blood pooling pattern located on the floor adjacent to the northeast corner of the bed, vertical drip pattern on the carpet, and lack of bloody swipe patterns on the carpet indicate that Arlene's body was lifted, repositioned, and deposited by the northwest corner of the bed, where it was located by investigators. The largest area of blood pooling was located below Arlene's head region in the final position at the northwest corner of the bed. Given the serious nature of her wounds, she had to be positioned in this final location very soon after the heavy bleeding commenced.

69. To a reasonable degree of scientific certainty, based on the evidence that Arlene Tankleff was lying on her stomach in the bed when she was first attacked, the evidence that she was attacked with both a blunt instrument and a sharp instrument while lying on the bed, the rapid nature of the attack revealed by the blood patterns, and the complete lack of evidence indicating that the blunt instrument was ever laid down during the attacks, the attack on Arlene Tankleff was most likely committed by two perpetrators, and not one.

70. To a reasonable degree of scientific certainty, the chemical enhancement of fabric patterns on the bedding, conducted by Ron Smith and Associates revealed several fabric-like patterns that are consistent with bloody contact transfers. The overall size and morphology of these enhanced patterns are consistent with fabric gloves. In addition, two distinctly different fabric patterns were revealed. This is a further indication that two assailants assaulted Arlene Tankleff in her bed.

71. To a reasonable degree of scientific certainty and based on my years of experience examining crime scenes, the lack of forensic evidence between the master bedroom and the office, in the bathrooms, and on the barbells and the watermelon knife, and the absence of bloodstained clothing, shoes, blunt instruments, sharp instruments, or gloves inside or in the vicinity of 33 Seaside Drive are inconsistent with the narrative confession, its details, and its 36-minute timeline. If the barbells and watermelon knife had been used as weapons in the assault the complete lack of blood, tissue and any trace amounts of those materials is unlikely, and would likely only be possible with extensive disassembly and cleaning. Thus, substantial time and effort would have been necessary to destroy or successfully secrete both the blunt force and cutting instruments, as well as 2 pairs of gloves, blood stained clothing and cleaning implements.

72. The narrative confession attributed to Martin Tankleff is inconsistent with the crime scene reconstruction in the following ways:

   a. The evidence indicates to a reasonable degree of scientific certainty, as explained above, that Seymour Tankleff was attacked *before* Arlene Tankleff. The narrative confession indicates that Arlene Tankleff was attacked and killed first.

   b. The evidence indicates to a reasonable degree of scientific certainty, as explained above, that Arlene Tankleff was attacked while lying on her stomach or her right side on the northern side of the bed. The narrative confession indicates that Arlene Tankleff was attacked while lying on her back.

   c. The evidence indicates to a reasonable degree of scientific certainty, as explained above, that Arlene Tankleff was attacked with both a sharp-force and a blunt-force instrument while lying on the bed. The narrative confession indicates that Arlene Tankleff was first attacked with the blunt-force instrument on the bed, and was only attacked with the sharp-force instrument later, when she was off the bed and on the floor.

   d. The evidence indicates to a reasonable degree of scientific certainty, as explained above, that Arlene Tankleff did not move after she was first attacked on the bed.

The narrative confession indicates that Arlene Tankleff fought with her attacker, and was still moving when he left the room.

e.  The evidence indicates to a reasonable degree of scientific certainty, as explained above, that the watermelon knife was not the instrument used to attack Arlene Tankleff or Seymour Tankleff. The narrative confession indicates that Arlene Tankleff and Seymour Tankleff were attacked with the watermelon knife.

f.  The evidence indicates to a reasonable degree of scientific certainty, as explained above, that the barbells were not the instrument used to attack Arlene Tankleff or Seymour Tankleff. The narrative confession indicates that Arlene Tankleff and Seymour Tankleff were attacked with the barbells.

g.  The evidence indicates to a reasonable degree of scientific certainty, as explained above, that the perpetrator who attacked Seymour Tankleff with a blunt instrument was standing to the side or south of Seymour Tankleff's desk chair. The narrative confession indicates that the perpetrator was standing behind or east of Seymour Tankleff's desk chair.

h.  The evidence indicates to a reasonable degree of scientific certainty, as explained above, that Seymour Tankleff's desk chair was not located fully under or in the desk opening for the chair at the time that Seymour Tankleff was attacked with the blunt instrument. The narrative confession indicates that Seymour Tankleff's feet were under the desk, so that he could not get up when the perpetrator attacked him.

i.  The evidence indicates to a reasonable degree of scientific certainty, as explained above, that the perpetrators who attacked Arlene and Seymour Tankleff were wearing gloves. The narrative confession indicates that the perpetrator was naked and does not mention gloves.

j.  The evidence indicates to a reasonable degree of scientific certainty, as explained above, that Seymour and Arlene Tankleff were attacked quickly and contemporaneously by two perpetrators with a blunt instrument and a sharp instrument. The narrative confession indicates that a single perpetrator committed the attacks and alternated between using a blunt instrument and a sharp instrument during the attacks.

Timothy M. Palmbach

# Exhibit A

*Curriculum Vitae*

## Timothy M. Palmbach

Chair & Associate Professor
Forensic Science Department
Executive Director
Henry Lee Institute of Forensic Science
University of New Haven
300 Boston Post Road
West Haven, CT 06516
tpalmbach@newhaven.edu
Phone No. (203) 932-7116
Fax No. (203) 931-6073

**EDUCATION:**

Juris Doctor - May 1998
University of Connecticut School of Law
Hartford, CT

M.S. Forensic Science – 1985
Criminalistics Concentration
University of New Haven
New Haven, CT

B.S. Chemistry – 1982
University of New Haven
New Haven, CT

B.S. Forensic Science- 1982
University of New Haven
New Haven, CT

**PROFESSIONAL EMPLOYMENT:**

**Academic:**

**Associate Professor & Chair**
**Forensic Science Department**
Sept. '04-present (Director until Aug. 2007)
University of New Haven
West Haven, CT 06516
- Responsible for both Undergraduate and Graduate level programs in Forensic Science; including faculty

supervision, academic program and curriculum development, general department administration
- Academic Advisor for both Undergraduate and Graduate students
- Courses of Instruction (Undergraduate and Graduate):
  - Advanced Crime Scene and Pattern Analysis
  - Crime Scene Analysis
  - Physical Analysis and Lab
  - Advanced Criminalistics I
  - Forensic Seminar
  - Introduction to Forensic Science
  - (Honors) Criminal Inv. And Society
- Previous Academic Appointments (All within Forensic Science Program at UNH):
  - Practitioner-in-Residence (Aug. '00 – Sept. '04)
  - Adjunct Instructor ('84-85, '92-00)

- Previous Academic Appointment at Central CT State University
  - Adjunct Instructor for Dept. of Criminology – Physical Evidence

**International Doctorate Program**
Partnership Universities: University of Verona (Italy) and University of New Haven
Conferring title of Doctor of Philosophy in Forensic Sciences
PhD Teaching staff Committee member and Supervisor of International Doctorate program at University of New Haven

**Professional:**

**Director & Commanding Officer (Major)**
June '00 – Sept. '04
Division of Scientific Services
Department of Public Safety – State of Connecticut
278 Colony Street
Meriden, CT 06451

- Division Head: Oversee affairs of the Division which encompasses;
  - Forensic Science Laboratory
  - Controlled Substances & Toxicology Laboratory
  - Computer Crime & Electronic Evidence Unit
- Supervised Laboratory Crime Scene Reconstruction Unit

- Actively involved in crime scene analysis and crime scene reconstruction

**Department of Public Safety**
State of Connecticut
Nov. '82 – Sept. '04
Assignments:

- 2000-2004    Director & Commanding Officer for Division of Scientific Services
- 1998-2000    Chief of Staff for Department of Public Safety
- 1997-1998    Assistant Director, Forensic Science Laboratory
- 1986-1997    Major Crime Unit
- 1982-1984    Trooper and Resident Trooper

**Henry C. Lee Institute of Forensic Science at University of New Haven**
**Executive Director**
1998-present

- Fellow
- Instructor:
  - Shooting Incident Reconstruction
  - Blood Stain Analysis
  - Principles of Reconstruction
  - Crime Scene Procedures
  - Cold Case Investigations
  - Death Investigation
  - New Technologies in Forensic Science
  - Expert Testimony
  - Advances in DNA Technology for Attorneys

**Forensic Research & Training Center**
Meriden, CT
Member, Forensic Consultant and Expert Witness
Dr. Henry C. Lee- President

- Forensic Expert Consultation
- Crime Scene Analysis and Reconstruction
- Examination of Physical Evidence
- Court Testimony
- Research and publication

**Private Consultant/Expert Witness:**  Crime Scene and Shooting Incident Reconstruction, Crime Scene Reconstruction, Blood Stain Analysis

Palmbach – October 2014

**CERTIFICATIONS &**
**PROF. AFFILIATIONS:**

**American Academy of Forensic Scientists**
Fellow- General Section
**International Association for Identification**
Member
**Senior Crime Scene Analyst**
Certified by International Association of Identification
**International Association of Blood Spatter Analysts**
Member
**Professional Certifications:**
Member (Retired) - Connecticut Bar Association
Member - CT United Stated District Court Bar Association

**FORENSIC INVESTIGATIVE**
**TEAMS / BOARDS:**

**Trafficking in Persons Assessment and Investigative Team:**
**Physical Evidence – DNA Collection Team Member**
Conducted in Costa Rica, August 2013
In conjunction with Global Sentry Group (NGO)

**Trafficking in Persons Assessment and Investigative Team:**
**Physical Evidence – DNA Collection Team Member**
Conducted in Nepal, September 2013
In conjunction with Global Sentry Group, and Tiny Hands
International - Nepal (NGO's)

**State of Connecticut Crime Lab Working Group**
Gubernatorial appointment to study issues and concerns regarding
Division of Scientific Services Laboratories
2111 -12

**Forensic Science Education Programs Accreditation**
**Commission**
2008-2014 Appointed as Academic Commissioner
Feb. 2012 – 2014 Chair of Commission

**Investigation into the Execution of Hannah Ocuish, 1786**
**Mashantucket Pequot Tribe member**
2008

Palmbach – October 2014

**"Great Inca Rebellion", National Geographic Inquiry into Perhaps Oldest Documented Gunshot Wound in the Americas**
Lima, Peru
2006-07

**Investigation into March 19, 2004 shooting incident involving Taiwan President Chen and Vice President Lu**
2004
Team Members:  Dr. Henry Lee, Dr. Cyril Wecht, Mr. Michael Haag

**Connecticut Advisory Commission on Wrongful Conviction**
Appointed to Commission in March 2004 - present

**Fatality Review Board for Persons with Disabilities:**
2002- 2008, 2011- present
State of Connecticut – Governor's Appointment

**Child Fatality Review Panel:**
1998- 2000
State of Connecticut- DPS Commissioner's Designee

**Identifying Burial Site of Princess Pocahontas:**
1999
Team Members: Dr. Henry Lee, Dr. Michael Baden, Dr. Peter Dean, Dr. Bill Bass, Attorney Linda Kenney, Major Tim Palmbach, Esq.

**Investigation into Death of Douglas Scott – Australian Aboriginal Prisoner:**
2000
Team Members: Dr. Henry Lee, Dr. Michael Baden, Dr, Cyril Wecht, Dr. Peter Dean, Attorney Linda Kenney, Major Tim Palmbach, Esq.

**The Scientific Quest for the Boston Strangler – Who Killed Mary A. Sullivan – 2000 & Exhumation of Richard Delsalvo - 2001**
Team Members: Professor James Starrs, Dr. Michael Baden, Dr. Todd Fenton, Dr. George Stephens, Dr. John McDowell, Dr. Bruce Goldberger, Dr. David Benjamin, Dr. Walter Rowe, Dr. David Foran, Attorney Elaine Whitfield Sharp, Major Tim Palmbach, Esq.

**COURTROOM TESTIMONY:**     Testified in State and/or Federal courts in Connecticut, Illinois, North Carolina, Kentucky, Pennsylvania, Massachusetts, New Jersey, New York, California
Criminal and Civil Cases

Qualified as an Expert Witness in:
- Crime Scene Processing & Procedures
- Shooting Incident Reconstruction
- Blood Spatter Pattern Interpretation
- Digital Enhancement of Forensic Photographs

**PUBLICATIONS:**

Palmbach, T. "Mia's Story: How DNA Analysis Could Have Changed Her Life." Available from http://www.promega.com/resource/profiles-in-dna/2014/mias-story-how-dna-analysis-could-have-changed-her-life/

Davison, H., Palmbach,T. "An Experimental Study to Quantify Error Rates Resulting from Measurement Deviation in Area of Origin Reconstructions of Blunt Force Impact Patterns," J. Forensic Re Crime Stud 1:1-12 (2014)

Lee, H., Palmbach, T., Andelinovic, S., Primorac, D. "Collection and Preservation of Physical Evidence", Forensic DNA Applications – An Interdisciplinary Perspective, edited by D. Primorac and M. Schanfield, CRC Press, January 28, 2014.

Palmbach, T., Blom, J., Hoynes, E., Primorac, D., Gaboury, M., "Utilizing DNA Analysis to Combat the World Wide Plague of Present Day Slavery – Trafficking in Persons," Croat Med J., 2013: 54:dol.10.3325/cmj.2013.54.

Palmbach, T., "Crime Scene Investigation and Examination, Collection and Chain of Evidence," Encyclopedia of Forensic Science, Edited by Siegel & Saukko, Academic Press, 2013.

F. Bortolotti,  M.Trevisan, R. Micciolo, L. Canal, A. Vandoros, T. Palmbach, F. Tagliaro, "Re-assessment of the cut-off levels of Carbohydrate Deficient Transferrin for automated immunoassay and multi-capillary electrophoresis for application in a forensic context", Clinica Chimica Acta 416 (2013) 1-4.

J.Pascali, F. Bortolotti, D. Sorio, M. Ivanova, T. Palmbach, F. Tagliaro. "Improved Capillary Electrophoresis Determination of Carbohydrate-Deficient Transferrin  Including on-line Immunosubtraction", Medicine, Science and the Law 2011: 00: 1-6.

Rubino, F. Bortolotti, D. Sorio, A. Bertaso, T. Palmbach, F. Tagliaro. "Stability and Reproducibility Studies for Carbohydrate Deficient Transferrin Analysis Using Capillary Electrophoresis", Submitted to Forensic Science International, Elsevier Publishing, 2011.

Palmbach, T.
"Education and Accreditation in Forensic Science", Encyclopedia of Forensic Sciences 2nd Edition, edited by J. Siegel and M. Houck, Elsevier Publishing, submitted 2011.

Palmbach, T.
*CSI-Generation Juries* in Investigating CSI: An Unauthorized Look Inside the Crime Labs of Las Vegas, Miami and New York, edited by Don Cortez, Benbella Books, 2006.

Lee, H., Palmbach, T.
*Crime Scene Management* in Forensic Science an Law: Investigative Applications in Criminal, Civil, and Family Justice, edited by Cyril H. Wecht, John T. Rago, Taylor & Francis, 2006.

Palmbach, T.
*Crime Scene Investigation and Examination, Collection and Chain of Evidence* in Encyclopedia of Forensic and Legal Medicine, edited by Jason-Payne James, Carol Henderson, Tracey Corey, and Roger Byrd, Oxford, Elsevier, 2005.

H. Miller Coyle, C.-L. Lee, W.-Y. Lin, H. C. Lee and T. M. Palmbach**.** *Forensic botany:using plant evidence to aid in forensic death investigation* Croatian Medical Journal 46(4): 606-612, 2005

Palmbach, T.
*Legal Considerations for Acceptance of New Forensic Methods in Court* in Forensic Botany: Principles and Applications to Criminal Casework, edited by Heather Miller Coyle, Florida, CRC Press, 2004.

Lee, H., Palmbach, T., Buturla, J.
*Scene Investigation: The Role of Law Enforcement and Forensic Scientists* in Forensic Aspects of Chemical and Biological Terrorism, edited by Cyril H. Wecht Arizona, Lawyers & Judges Publishing, 2004.

Karazulas, C., Palmbach, T., Lee, H.
*Digital Enhancement of Sub-Quality Bite mark Photographs* J Forensic Science 2001; 46(4):954-958.

Lee, H., Palmbach, T., Miller, M.
*Henry Lee's Crime Scene Handbook* New York, Academic Press, 2001.

**EDITORIAL BOARDS:**

Journal of Human Trafficking
New to Routledge in 2015

Journal of Forensic Research and Criminal Studies (JFRCS)
JScholar

Investigative Sciences Journal (JIS)

**RESEARCH PROJECTS & GRANTS:**

"Advanced Uses of Ultralite ALS System for Forensic Applications"
Grant received from CAO Group Inc., Sandy Utah.
2006 – 2008
Projector Director

"The Henry C. Lee Institute of Forensic Science Evidence Response Training
Center"
NIJ grant 2009-DI-BX-KJ031 awarded 2009
Key Project Member

**PROFESSIONAL
PRESENTATIONS:**

- October 2014
  International Symposium on Human Identification
  Fighting Trafficking in Persons with the Aid of DNA Technologies

- September 2014
  Global Identity Summit
  Rapid DNA Panel – Using Rapid DNA for TIP Investigations

- July 2014
  Poland National Police Headquarters
  "Using DNA Analysis to Assist With Investigation of Human
  Trafficking Cases"

- May 2014
  Bode-East: Annual DNA Technical Workshop
  "Human Trafficking: A Global Problem"

- April 2014
  Bode-West: Annual DNA Technical Workshop
  "Human Trafficking: A Global Problem"

Palmbach – October 2014

- February 2014
  American Academy of Forensic Sciences
  Annual Meeting – Plenary Session
  "Forensic Science Education and Mentorship: Our Path Forward"

- February 2014
  Life Technologies
  "Utilizing DNA to Combat Human Trafficking"

- October 2013
  International Symposium on Human Identification; Global
  Alliance for Rapid DNA Analysis Workshop
  "Using Raid DNA in TIP Investigations"

- September 2013
  Presentation to Attorney General Training Session, Nepal
  Utilization of Forensic Science and DNA in Human Trafficking
  Investigations"

- June 2013
  International Society for Applied Biological Sciences: 8th ISABS
  Conference
  "Leveraging the Power of DNA Analysis in the War on Human
  Trafficking"

- April 2013
  University of Verona, Department of Public Health and
  Community Medicine
  "Combating Human Trafficking with Science and Medicine"

- June 2011
  International Society for Applied Biological Sciences: 7th ISABS
  Conference
  "A Retrospective Analysis of Cold Case Investigations"

- April 2010
  Arnold Markle Annual Symposium
  "Scientific Aspects of Shooting Incident Reconstruction"

- June 2009
  NJSP Adv. Homicide Investigation Conference
  Princeton University, NJ
  "Reconstruction of Shooting Incidents"

- May 2009
  Forensic Science Training for Capital Litigators
  Sponsored by BJA and NCSTL, Tampa, FL
  "Pattern Evidence: Fingerprints, Shoe Prints, Bitemarks, and Fracture Matches"

- May 2009
  Forensic Science Training for Capital Litigators
  Sponsored by BJA and NCSTL, Tampa, FL
  "Crime Scene Overview: Collection, Packaging, Blood Stain, and Reconstruction"

- February 2009
  AAFS Annual Meeting
  Denver, CO
  Lectured at Student Academy

- November 2008
  NEAFS Annual Meeting, White Plains, NY
  Workshop: "Overview of Chemical Enhancement and Alternate Light Source Methods"

- November 2008
  NEAFS Annual Meeting, White Plains, NY
  Educator's Forum: "Teaching Reconstruction"

- March 2008
  Arnold Markle Symposium
  "Researching the Case of Little Hannah"

- February 2008
  AAFS Annual Meeting, Washington D.C.
  Lecture to Student Academy

- February 2008
  The Innocence Project – Cordozza School of Law
  New York, NY
  "Understanding the Value of Blood and Blood Stain Evidence in Case Reviews"

- January 2008
  Yale University, Department of Anthropology
  "History and Forensic Science Collide, and a Shot Perhaps One of the First, is Heard Throughout the Americas"

Palmbach – October 2014

- January 2008
  George Mason University, Virginia
  "Shooting Scene Reconstruction Methods"

- November 2007
  Northeastern Assoc. of Forensic Scientists
  Annual Meeting, Saratoga, NY
  Panel Member: Daubert Criteria – Crime Scene Reconstruction

- June 2007
  Annual NJSP Adv. Homicide Investigation Conference
  Princeton University, NJ
  "Scientific Methods Associated with Bloodstain Analysis"

- May 2007
  University of Verona, Dept. of Medicine & Public Health
  Verona, Italy
  "Crime Scene Reconstruction"

- Feb. 2007
  AAFS Annual Meeting
  San Antonio, TX
  "The Role of the Forensic Scientist in Controversial Politically
  Charged Death Investigations Internationally"

- Jan. 2007
  NYC Bar Association- Criminal Defense Attorneys Conference
  New York, NY
  "Issues Related to Crime Scene Reconstruction"

- Jan 2007
  Federal Prosecutors Meeting
  New Orleans, LA
  "Scientific Issues Associated with Blood Stain Analysis"

- June 2005
  Annual NJSP Adv. Homicide Investigation Conference
  Princeton University, NJ
  "Blood Stain Pattern Analysis"

- Feb. 2005
  AAFS Annual Meeting
  New Orleans, LA
  "Chair – Workshop #18: "Shooting Reconstruction"

Palmbach – October 2014

- Feb. 2005
  National Assoc. of Criminal Defense Lawyers
  New Orleans, LA
  "Attacking Blood Patterns and Crime Scene Analysis"

- Nov. 2004
  Armed Forces Institute of Pathology
  Rockville, MD
  "Scene Investigation"

- March 2004
  Arnold Markle Annual Symposium
  Ledyard, CT
  "Using Forensic Science to Solve Cold Cases"

- Jan. 2004
  FBI National Academy Assoc. – N.E. Chapter
  Burlington, VT
  "Role of Forensic Science in Investigations"

- Nov. 2003
  Northeast Assoc. of Forensic Scientists
  Pittsfield, MA
  "Drafting a Shooting Reconstruction Report"

- Sept. 2003
  New Jersey State Prosecutors Association
  Atlantic City, NJ
  "New Technologies in Forensic Science"

- Sept. 2003
  3rd Annual European-American School in Forensic Genetics
  Zagreb, Croatia
  "Organizing and Managing a Government DNA Laboratory"

- Aug. 2003
  Sheriff Harry Lee's Homicide Investigation Seminar
  Metairie, LA
  "New Technologies in Forensic Science"

- Aug. 2003
  Pfizer Corp. Educators Training Workshop
  Meriden, CT
  "Crime Scene Procedures"

Palmbach – October 2014

- June 2003
  Annual NJSP Adv. Homicide Investigation Conference
  Princeton University, NJ
  "Blood Stain Pattern Analysis"

- June 2003
  Bergen County Prosecutors – HCL Institute Workshop
  Bergen, NJ
  "Bloodstain Analysis Basic School"

- June 2003
  Connecticut Bar association Meeting
  New Haven, CT
  "Computer Crime Units"

- June 2003
  Southeast Law Enforcement Annual Conference
  Lawrenceburg, TN
  "Bloodstain Analysis Workshop"

- March 2003
  Pfizer Corp. Educators Conference
  Groton, CT
  "Crime Scene Applications for Educators"

- June 2002
  9th Annual NJSP Adv. Homicide Investigation Conference
  Princeton University, NJ
  "Blood Stain Pattern Analysis"

- June 2002
  Southeast Law Enforcement Training Seminar
  Lawrenceburg, TN
  "Reconstruction of Shooting Incidents"

- February 2002
  American Academy of Forensic Sciences
  "Suspect in the Deaths of Eighteen Prostitutes Convicted of
  Murder Using Lucis Digital Enhancement Software and Adobe
  Photoshop Software"

- February 2002
  American Academy of Forensic Sciences
  Multidisciplinary Symposium "Social and Legal Issues Associated
  with Police Involved Shooting Incidents through Forensic
  Investigation & Shooting Scene Reconstruction"

Palmbach – October 2014

- January 2002
  Lectures provided to Ministry of Interior – Republic of Croatia and
  Croatian National Police Academy
  "Advances in Forensic Science and Crime Scene Reconstruction"

- November 2001
  New England Division of IAI
  "Shooting Reconstruction"

- October 2001
  Criminal Justice Educators Association of New York State
  Keynote Speaker – "Advances in Forensic Science"

- August 2001
  Jefferson Parish Sheriff's Office, Louisiana
  "Investigation and Reconstruction of Police Involved Shooting
  Incidents"

- May 2001
  Rhode Island State Prosecutors & Newport Police Conference
  Held at Salva Regina University
  "Advances in Forensic Science"

- March 2001
  People's Republic of China – Beijing and Shanghai
  Lectures to Law Enforcement Officials and Training Officers
  "New Technologies in Forensic Science; Shooting Incident
  Reconstruction"

- October 2000
  American Criminal Justice Association – LAE Region IV
  Conference
  "Forensic Science – Today and Tomorrow"

- September 2000
  Public Security Ministry Conference
  Chengdu, People's Republic of China
  "Explosive Scene Investigation & Reconstruction"

- June 2000
  Harvard Associates in Police Science, Atlantic City, NJ
  "Reconstruction of Officer Involves Shooting Scenes"

- June 2000
  Connecticut Bar Association Annual Meeting, New Haven, CT
  "DNA – Its Development, Use and Impact on the Criminal Justice System"

- May 2000
  FRENZY- Forensic Sciences & Crime Scene Technology, D.C.
  "Tele-forensics: The Remote Incident Response Breakthrough"

- Jan. 2000
  American Academy of Forensic Science 52nd Annual Meeting, NV
  "New Technologies in the 21st Century – Forensic Laboratories"

- April '99
  Tri-State IAI Annual Meeting, Mystic, CT
  "Computer Enhancement of Bitemark Photographs"

- March '99
  1999 Arnold Markle Symposium, New Haven, CT
  "Computer Enhancement of Bitemark Photographs"

- Jan. '99
  Singapore Institute of Forensic Science and Medicine
  "Crime Scene Management and Reconstruction"

- March '98
  POST Training
  Meriden, CT
  "Advanced Homicide Investigation"

# Exhibit B

**Testimony List for:**

**Timothy M. Palmbach**

**<u>2003- 2014:</u>**

1)      State of North Carolina v. Michael Iver Peterson
        01-CRS-24821
        2003

2)      Love (Russ) v. City of Chicago, et al. – C4098 and
        Lewis v. City of Chicago, et al. – 99L6348
        2003

3)      United States of America v. Kevin Burden, et al.
        U.S. District Court of Connecticut
        3:00CR263(JC4)
        2003

4)      Dashner v. City of Bethlehem, et al.
        No. 99-CV-2124
        2003

5)      Letty Marie Scott and Nathan William Scott v.
        Attorney General for the Northern Territory of Australia
        Video Deposition to Supreme Court of the Northern Territory at Darwin
        2004

6)      Commonwealth of Kentucky v. Lucas Goodrum
        CR 45, RCr. 7.02
        2005

7)      Megargee/Taylor v. County of Tulare et al
        U.S. District Court eastern District
        No. 1:06-CV-00684-LJO-GSA
        Deposition May 29, 2008
        Testimony October 16, 2008

8)      Alan Hirschfield v. San Diego Unified Port District, et al
        U.S.D.C. Case # 08-CV 2103 BTM (NLS)
        Deposition April 2010

9)      William A. Snyder v. State of Alabama
        Circuit Court of Talladega Alabama
        CC96-132 – Motion for new trial
        Testimony: June 30, 2010

As of August 2010

Testimony List of T. Palmbach
Page 2 of 2

10)   State of North Carolina v. Michael Segal
      Superior Court Lincoln County, North Carolina
      Testimony: August 17, 2010

11)   Guizan v. Solomon, et al.
      Civil Action No. 3:09-cv-1436 (JBA)
      Deposition: Oct. 18, 2011

12)   State of New Jersey v. Chad Walder
      Superior Court of NJ – Bergen County
      Indictment No. S-1482-08
      Deposition: March 29, 2011
      Trial Testimony: Nov. 10, 2011

13)   State of North Carolina v. Michael Iver Peterson
      File No. 01-CRS-24821
      Superior Court, Durham, NC
      Motion for new trial
      Testimony: Dec. 07, 2011

14)   Disla v. City of New York
      Superior Court, Bronx County, NY
      Index No. 22450-6
      Testimony: May 16, 2012

As of August 2010