# Exhibit 20

**Page 1**

1                                                    1

2      UNITED STATES DISTRICT COURT NEW YORK
       FOR THE EASTERN DISTRICT OF NEW YORK
3      ----------------------------------------X

4      MARTIN TANKLEFF,

5                          Plaintiff,

6        -against-

7      THE COUNTY OF SUFFOLK, K. JAMES McCREADY,
       NORMAN REIN, CHARLES KOSCIUK, ROBERT DOYLE,
8      JOHN McLELHONE, JOHN DOE POLICE OFFICERS
       #1-10, RICHARD ROE SUFFOLK COUNTY EMPLOYEES
9      #1-10,

10                         Defendants.

11     ----------------------------------------X

12

13                     666 Old Country Road
                       Garden City, New York

14
                       April 14, 2014
15                     9:30 a.m.

16         DEPOSITION of MIKE CARMODY, a Non-Party

17     Witness herein, taken by the Plaintiff,

18     pursuant to Federal Rules of Civil Procedure

19     and Notice, held at the above-mentioned time

20     and place, before Dolly Fevola, Notary

21     Public of the State of New York.

22

23

24

25

FEVOLA REPORTING & TRANSCRIPTION INC. (631) 724-7576

**Page 2**

1
2      A P P E A R A N C E S :

3

NEUFELD SCHECK BRUSTIN, LLP
4          Attorneys for the Plaintiff
           666 Old Country Road
5          Garden City, New York 11530
BY:    BARRY POLLACK, ESQ.
6          BRUCE BARKET, ESQ.

7

8      SUFFOLK COUNTY DEPARTMENT OF LAW
           Attorneys for the Defendants
9          H. Lee Dennison Building
           Hauppauge, New York
10     BY:    BRIAN MITCHELL, ESQ.

11

ALSO PRESENT:
12
MARTIN TANKLEFF
13

14
15
16
17
18
19
20
21
22
23
24
25

FEVOLA REPORTING & TRANSCRIPTION INC. (631) 724-7576

**Page 3**

1
2              STIPULATIONS

3      IT IS HEREBY STIPULATED AND AGREED, by

4      and among counsel for the respective parties

5      hereto, that the filing, sealing and

6      certification of the within deposition shall

7      be and the same are hereby waived;

8      IT IS FURTHER STIPULATED AND AGREED that

9      all objections, except as to form of the

10     question, shall be reserved to the time of

11     the trial;

12     IT IS FURTHER STIPULATED AND AGREED that

13     the within deposition may be signed before

14     any Notary Public with the same force and

15     effect as if signed and sworn to before the

16     Court.

17          *     *     *

18

19

20

21

22

23

24

25

FEVOLA REPORTING & TRANSCRIPTION INC. (631) 724-7576

**Page 4**

1              M. Carmody

2      M I C H A E L  C A R M O D Y, after

3      having been first duly sworn by a Notary

4      Public of the State of New York, was

5      examined and testified as follows:

6      EXAMINATION BY

7      MR. POLLACK:

8          Q      State your name for the record,

9      please?

10         A      Mike Carmody.

11         Q      State your address, please.

12         A      30 Yaphank Avenue.

13              MR. MITCHELL:  And just for the

14     record, in the event there comes a

15     time that if you try the case and

16     you want the retired Detective

17     Carmody, we'll agree to produce him.

18              MR. POLLACK:  Mr Carmody, my

19     name is Barry Pollack and I

20     represent the Plaintiff, Martin

21     Tankleff.

22              At any point during the

23     deposition, if I ask you a question

24     and you don't understand it, let me

25     know and I will rephrase the

FEVOLA REPORTING & TRANSCRIPTION INC. (631) 724-7576

5

M. Carmody

1  question for you.  If you don't ask
2  me to do so, I'll assume that you
3  understood the question.  Does that
4  make sense?
5         THE WITNESS:  Yes, it does.
6     **Q**  I'd like to start by going back
7  to September of 1988.  At that point, how
8  long had you been a homicide detective for
9  Suffolk County.
10    **A  Approximately 20 years.**
11    **Q**  How did you first hear of the
12 incident at the Tankleff residence?
13    **A  I received a phone call at**
14 **home.**
15    **Q**  Received a phone call from
16 whom?
17    **A  I believe it was from Sergeant**
18 **Doyle.**
19    **Q**  I'm going to mark this as
20 Exhibit Carmody 1.
21         (Whereupon, Plaintiff's
22         Exhibit, Carmody 1, was marked for
23         identification.)
24    **Q**  Mr Carmody, go ahead and take

6

M. Carmody

1  as much time as you need, but I've handed
2  you what we marked as Carmody Exhibit 1 and
3  my first question is just going to be
4  whether or not you recognize these notes?
5     **A  It looks like my handwriting.**
6  **You want me to read all this?**
7     **Q**  Take as much time just to flip
8  through it and see if you can verify if
9  those are, in fact, your notes.
10    **A  Okay.  These are my notes, a**
11 **copy.**
12    **Q**  And when were these notes
13 taken?
14    **A  Taken?  You mean when I wrote**
15 **them?**
16    **Q**  Yes, when did you originally
17 write these notes?  Were these
18 contemporaneous notes you took on the date
19 of the Tankleff incident?
20    **A  Yes.**
21    **Q**  That date was early morning
22 September 7, 1988?
23    **A  Yes, sir.**
24    **Q**  So these notes would have been

7

M. Carmody

1  taken on that date?
2     **A  Yes.**
3     **Q**  And if you look at the first
4  page you had indicated a moment ago that you
5  thought you initially heard of the incident
6  from a phone call from Detective Doyle.
7  Does this change your recollection on that
8  at all?
9     **A  Yes.**
10    **Q**  Go ahead and tell us what your
11 current recollection is.
12    **A  My notes indicate that I**
13 **received a call from the duty officer,**
14 **Sergeant -- looks like -- Seits.**
15    **Q**  What do you recall you learned
16 in that phone call?
17    **A  Just that there was a possible**
18 **homicide at 33 Seaside Drive, Belle Terre.**
19    **Q**  What did you do as a result of
20 receiving that phone call?
21    **A  Got dressed and headed out to**
22 **pick up my partner, John Pfalzgraf, at his**
23 **residence in Lindenhurst.**
24    **Q**  Okay.  And did you speak to

8

M. Carmody

1  anyone else at that point?
2     **A  Not that I recall, sir.**
3         MR. POLLACK:  Mark this as
4  Carmody 2.
5         (Whereupon, Plaintiff's
6         Exhibit, Carmody 2, was marked for
7         identification.)
8     **Q**  Mr. Carmody), it's several
9  pages.  So Carmody 2 is an excerpt from
10 testimony from Detective Sergeant Doyle and
11 I want to just refer you to the page that
12 has 2604 at the top upper right-hand corner.
13    **A  Okay.**
14    **Q**  And if you look at the answer
15 that he gives on lines 23 and 24, he says, I
16 received a call from Detective Carmody at
17 approximately 7:05 a.m.
18         Does that refresh your
19 recollection as to whether or not you spoke
20 to Detective Sergeant Doyle that morning?
21    **A  No.**
22    **Q**  You don't recall that
23 conversation at all?
24    **A  I could have called him.  I**

9

M. Carmody

2 **probably did, but I don't remember.**
3     **Q**   Okay. What do you recall doing
4 after you picked up Detective Pfalzgraf?
5     **A**   **We went to Mather Hospital.**
6     **Q**   Why did you go to Mather
7 Hospital?
8     **A**   **I was instructed to go there.**
9     **Q**   By whom?
10     **A**   **Again, I believe it was**
11 **Sergeant Doyle. I don't know at what point**
12 **we spoke, but I know I was instructed to go**
13 **there with John.**
14     **Q**   Okay. Now, how did assignments
15 work in terms of which detective would be
16 the lead detective on any homicide
17 investigation as it came in?
18     **A**   **Generally, it was the detective**
19 **that would be on call on the team for that**
20 **particular day.**
21     **Q**   And were you on call that
22 particular day?
23     **A**   **No.**
24     **Q**   Mr Carmody, let me read to you
25 an excerpt from testimony from Detective

10

M. Carmody

2 McCready, and I'm going to ask if that
3 refreshes your recollection in any way.
4     And I'm sorry, I'm reading from
5 his cross-examination at Page 3525, which is
6 DW013905.
7     What generally occurs is, if a
8 homicide occurs, we had basically a batter
9 order and the next person up for a murder
10 would be assigned the particular case.
11     Now, that rule does not hold
12 hard and fast. Originally, Detective
13 Carmody was going to be the assigned officer
14 on this case; however, strictly due to the
15 fact that I was the first detective on the
16 scene, the knowledge that I gained while I
17 was on the scene, Detective Sergeant Doyle
18 took it upon himself to reassign so to speak
19 the case to me.
20     Based on that testimony, do you
21 recall whether or not it was your turn so to
22 speak when the Tankleff homicide arose?
23     **A**   **No, sir.**
24     **Q**   It does not refresh your
25 recollection one way or the other?

11

M. Carmody

2     **A**   **Not at all.**
3     **Q**   Okay. You don't have any
4 current knowledge of why it is that
5 Detective McCready was assigned to be the
6 lead detective on the Tankleff homicides?
7     **A**   **No, sir.**
8     **Q**   What do you recall doing when
9 you arrived at Mather Hospital?
10     **A**   **I spoke to a detective there.**
11     **Q**   You recall which detective?
12     **A**   **I believe it was Robert Olin, I**
13 **believe. I believe he was a sixth squad**
14 **detective.**
15     **Q**   And what do you recall learning
16 in the course of that conversation?
17     **A**   **Just that the victim, Mr.**
18 **Seymour Tankleff, had been brought into the**
19 **hospital with severe head injury and he told**
20 **me that his throat was cut.**
21     **Q**   Do you recall anything else
22 that you learned in that conversation?
23     **A**   **No.**
24     **Q**   Was Detective Pfalzgraf with
25 you for that conversation?

12

M. Carmody

2     **A**   **I don't recall.**
3     **Q**   What do you recall doing next
4 after that initial conversation with the
5 detective?
6     **A**   **I believe I remember going into**
7 **the emergency room and I spoke to Dr. Roth**
8 **and I also spoke to a patrolman. That would**
9 **have been Eames.**
10     **Q**   For the conversation with Dr.
11 Roth, was Detective Pfalzgraf with you?
12     **A**   **I don't recall.**
13     **Q**   What about the conversation
14 with Patrolman Eames?
15     **A**   **Again, I don't recall.**
16     **Q**   Anyone else that you recall
17 speaking to at the hospital?
18     **A**   **The ambulance crew people.**
19     **Q**   And what did you learn in the
20 course of your conversation with the
21 ambulance crew?
22     **A**   **Basically, that they were**
23 **dispatched a little after 6:00 a.m. in the**
24 **morning to 33 Seaside Drive, Belle Terre.**
25     **Upon their arrival, they were**

13

M. Carmody

1  met by a young man who was outside the
2  house, I believe they told me.  They entered
3  the house with him, they went to the room
4  where the father had been or was, and they
5  administered aid to him, one of the
6  ambulance people.  I believe her name was
7  Curley, I believe.  The young man who I
8  believe was Mr. Tankleff told her that his
9  mother was in another part of the house and
10  she went to that part of the house to tend
11  to the mother.  She checked the body out and
12  she was nonresponsive.
13       I recall her telling me that
14  Mr. Tankleff was by the bedroom door that
15  led -- by the bedroom door by the entrance
16  door and asked several times if she was
17  alive or if she was dead rather.  That is as
18  much as I remember.
19       MR. POLLACK:  Let's mark this
20       as Carmody 3.
21       (Whereupon, Plaintiff's
22       Exhibit, Carmody 3, was marked for
23       identification.)
24       **Q**  Mr. Carmody, take as much time

14

M. Carmody

1  as you need but my initial question is, do
2  you recognize this as a supplemental report
3  that you prepared?
4       **A   Yes, it is.**
5       **Q**   And when did you prepare this
6  report?
7       **A   On the eighth of September,**
8  **1988.**
9       **Q**   And it is relaying events of
10  the previous day, the 7th?
11      **A   Yes, sir.**
12      **Q**   And did you use the notes that
13  are in Carmody Exhibit 1 in the preparation
14  of this report, Carmody Exhibit 3?
15      **A   At this time, I don't recall**
16  **but more than likely did.**
17      **Q**   That would be your typical
18  practice?
19      **A   It would.**
20      **Q**   And I'm going to ask you to
21  take a look at Page 3 of the supplemental
22  report in the first partial paragraph about
23  half to three quarters of the way down it
24  says, Ms. Curley noted dry blood in the

15

M. Carmody

1  scalp area of the victim's head and hair.
2  She described the victim's condition as
3  unresponsive and that she was breathless,
4  pale, red pupil was dilated and the eyelid
5  was open.
6       She also noted that the victim
7  was wearing a light blue nightgown with dry
8  blood on the front.
9       Do you recall learning that
10  information on the 7th at Mather Hospital
11  from Ethel Curley of the hospital crew?
12      **A   This does refresh my**
13  **recollection somewhat, yes.**
14      **Q**   And what significance did it
15  have to you the fact that there was dry
16  blood on the scalp area of Arlene Tankleff
17  or dry blood on the front of her nightgown?
18      MR. MITCHELL:  I object to the
19      form.  You can answer.
20      **Q**   What significance, if any, did
21  it have to you?
22      **A   The significance it would have**
23  **to me would be that it was there a while.**
24      **Q**   What does that mean to you as a

16

M. Carmody

1  homicide detective?
2       **A   Well, that something happened**
3  **to her earlier on.  I would think that dry**
4  **blood would indicate that something happened**
5  **much earlier than when she arrived there.**
6       **Q**   When you say much earlier, are
7  you able to give any definition to that in
8  terms of how much earlier?  Does that mean
9  five minutes earlier, an hour earlier,
10  several hours earlier?
11      **A   I couldn't.  Just that if**
12  **something, in my own mind as a detective, if**
13  **someone came to the scene and said that**
14  **there was dry blood and they were just**
15  **dispatched there, one would expect to see**
16  **wet blood.**
17      **Q**   So the fact that it's dry would
18  suggest to you the assault occurred sometime
19  earlier than when the ambulance crew
20  arrived?
21      **A   Yes.**
22      **Q**   In that last paragraph there is
23  a description from Ms. Curley of the
24  condition of Seymour Tankleff when she

17

M. Carmody

1 arrived and, again, probably about
2 three quarters of the way down that
3 paragraph it says, "a towel was around the
4 victim's neck and dry blood noted on his
5 forehead and arms.  Clumps of blood were
6 noted on the floor and chest area of the
7 victim.  Also, dry and fresh blood were
8 observed on the floor around the body."
9         Does that refresh your
10 recollection of getting that description
11 from Ms. Curley about Seymour Tankleff?
12     **A    Yes.**
13     Q    Again, what significance, if
14 any, did you attach as a homicide detective
15 to that description?  What was significant
16 to you about that description?
17         MR. MITCHELL:  I object to the
18     form.  You can answer.
19     Q    If anything?
20     **A    Pretty much the same as with**
21 **Arlene Tankleff, that something happened**
22 **much earlier.**
23         MR. MITCHELL:  Can I just make
24     one clarification on the record.

18

M. Carmody

1 What's been marked as Carmody 3
2 there's some -- what looks like pen
3 marks or just written marks circling
4 around those written phrases and can
5 you clarify, do you recall,
6 Detective, if you made those marks?
7         THE WITNESS:  I did not make
8     those circles.
9         MR. MITCHELL:  Barry, do you
10     know who made the marks?
11         MR. POLLACK:  I don't but I
12     certainly accept that they were not
13     in the original and that they were
14     made at some point during the
15     litigation.
16         MR. MITCHELL:  Okay.  Thank
17     you.
18     Q    Now, you also indicated,
19 Detective Carmody, that you spoke to Dr.
20 Roth, correct?
21     **A    Yes, sir.**
22     Q    And who was Dr. Roth?
23     **A    He was the attending physician**
24 **at the hospital.**

19

M. Carmody

1     Q    Let me have you look at Carmody
2 1.  Those are your notes?
3     **A    Yes, sir.**
4     Q    If you look at the second page
5 that has at the bottom 4/5/09, are these
6 notes that you took in conjunction with your
7 discussion with Dr. Roth that morning at
8 Mather Hospital?
9     **A    Yes.**
10     Q    At the top it says Dr. Robert
11 Roth?
12     **A    Yes, sir.**
13     Q    And if you could read to me
14 those next three lines?
15     **A    "Slash throat.  Front deep."  I**
16 **have back -- I don't recall what I was**
17 **trying to say here.  B-A-C-K. It looks like**
18 **B-A-C-K.  I would assume that was -- I'm**
19 **assuming that it was probably something to**
20 **the head injury to the back of the head**
21 **because right under that I have written,**
22 **"depressed skull fracture to back of head."**
23     Q    And then what's that next line?
24     **A    Brown matter.  The doctor had**

20

M. Carmody

1 **told me that that he witnessed brown matter**
2 **coming from the skull fracture of the**
3 **injuries to the head which was not a good**
4 **sign, and then he feared that Mr. Seymour**
5 **was not going to make it.**
6     Q    Now, in your supplemental
7 report, if you look at the first page of
8 that report in the second paragraph, you say
9 that the Dr. Roth stated the victim was
10 brought into the emergency room with a
11 depressed skull fracture in the back of the
12 head and a deep laceration of the throat
13 which he described as almost completely
14 around the victim's neck.
15     **A    Yes.**
16     Q    He also stated that brown
17 matter was coming from the head wound
18 indicative of a serious head injury which he
19 feared the victim would not be able to
20 survive?
21     **A    Yes.**
22     Q    And you note that Dr. Roth had
23 been a personal friend of the victim and
24 knew him for about 15 years.  And then you

21

M. Carmody

1
2  say, the undersigned was unable to observe
3  the victim's wounds due to the fact that
4  they were completely bandaged?
5      **A**  Yes.
6      **Q**  Is that consistent with your
7  recollection that you were not able to view
8  yourself Seymour Tankleff's wounds?
9      **A**  Yes.
10     **Q**  You say, however, Dr. Roth
11 stated that he felt the head injury was
12 caused by a hammer-type injury because of
13 the circular shaped depression of the skull?
14     **A**  Yes, sir.
15     **Q**  Now, if you go back to your
16 notes, did your notes say anything
17 reflecting anything about a hammer-type
18 instrument?
19     **A**  No.
20     **Q**  As you sit here today, do you
21 recall Dr. Roth using the phrase
22 hammer-type?
23     **A**  Yes.
24     **Q**  Why would you not have
25 reflected that in your notes?

22

M. Carmody

1
2      MR. MITCHELL:  I object to the
3  form.  You can answer.
4      **A**  I can't answer that.  I don't
5  **know.**
6      **Q**  But you have recollection today
7  that Dr. Roth used verbatim the phrase
8  "hammer-type"?
9      **A**  Yes.
10     **Q**  You said that you did not
11 recall whether or not Detective Pfalzgraf
12 was there for that conversation?
13     **A**  Correct.
14     MR. POLLACK:  Mark tis as
15 Carmody 4.
16     (Whereupon, Plaintiff's Exhibit
17 Carmody 4, was marked for
18 identification.)
19     **Q**  Okay.  I'm going to ask you, Mr
20 Carmody, is Carmody Exhibit 4 Detective
21 Pfalzgraf's supplemental report of the
22 events of September 7, 1988?
23     **A**  It looks like it.
24     **Q**  Did you, at any point during
25 the course of your investigation, have the

23

M. Carmody

1
2  opportunity to review Detective Pfalzgraf's
3  supplemental report?
4      **A**  No, I did not.
5      **Q**  Did you discuss with him his
6  preparation of this report?
7      **A**  No.
8      **Q**  So you both independently just
9  created your own reports without getting
10 input from the other?
11     **A**  To my best recollection, yes.
12     **Q**  Okay.  I'll have you look at
13 the third paragraph.  It says, Dr. Robert
14 Roth was attending to Mr. Tankleff in the
15 emergency room.  He stated that his throat
16 was slashed almost completely around his
17 neck.  He also had severe depressed skull
18 fracture to the back of the skull.
19     Does that refresh your
20 recollection as to whether or not Detective
21 Pfalzgraf was there for the conversation
22 that you had with Dr. Roth?
23     **A**  No.
24     **Q**  Does it seem to be reflecting
25 the same conversation?

24

M. Carmody

1
2      MR. MITCHELL:  I object to the
3  form.  You can answer.
4      **A**  It may have.  Detective
5  **Pfalzgraf may have been there.**
6      **Q**  When you heard Dr. Roth surmise
7  that Seymour Tankleff was assaulted with a
8  hammer-type instrument, was that a
9  significant observation to you as a homicide
10 detective?
11     MR. MITCHELL:  Objection to
12 form.  You can answer.
13     **A**  Would you repeat that, please.
14     **Q**  Sure.  When you heard Dr. Roth
15 say that he believed that the assault was
16 caused by a hammer-type instrument or the
17 assaultant used a hammer-type instrument,
18 was the fact that Dr. Roth made that
19 statement of significance to you as a
20 homicide detective?
21     MR. MITCHELL:  Objection to
22 form.  You can answer.
23     **A**  Yes.
24     **Q**  Why was it significant to you?
25     **A**  I had handled a case prior to

25

M. Carmody

2 that in Bay Shore where a husband had killed
3 his wife with a hammer, very similar, and
4 that's why it stuck in my mind. He said
5 that it was because it was a circular
6 depression that appeared to be like a
7 hammer-type wound. He did not say it was a
8 hammer, he just said it appeared to be that
9 type of form or an instrument that was
10 circular.
11    Q    Did you discuss with Detective
12 Pfalzgraf the fact that you believe that Dr.
13 Roth's statement about a hammer-type
14 instrument was significant?
15    A    I may have but I don't recall.
16 I don't have any recollection.
17       MR. POLLACK: Let's go ahead
18 and mark that Carmody 5.
19       (Whereupon, Carmody Exhibit 5
20 was marked for identification.)
21    Q    Mr Carmody, I'll give you
22 another exhibit here. Do you recall being
23 interviewed in 2008 by the State of New York
24 Commission of Investigation --
25    A    Yes.

26

M. Carmody

2    Q    -- with respect to the Tankleff
3 case?
4    A    Yes, sir.
5    Q    And on the first page in the
6 last paragraph about the middle of the
7 paragraph it says, both Carmody and the
8 doctor concluded that Tankleff had suffered
9 blunt force trauma to his head caused by
10 hammer-type object.
11       According to Carmody, he had
12 previously investigated a Bay Shore case
13 where a husband used a hammer to murder his
14 wife and her injuries were identical to
15 Tankleffs.
16       Now, you indicated earlier you
17 were not able to see Seymour Tankleff's
18 wounds.
19    A    Correct.
20    Q    How is it that you concluded
21 that Seymour Tankleff's wounds were
22 identical to the those of the victim in the
23 Bay Shore case that you had previously
24 investigated?
25       MR. MITCHELL: I object to the

27

M. Carmody

2 form, the form of the question in
3 that the phrase "identical" is in a
4 memorandum from a gentleman named
5 Kenneth Christopherson.
6       MR. POLLACK: I get the
7 speaking objection.
8    Q    Do you recall making this
9 statement to the State Investigation
10 Commission?
11    A    I would never say identical. I
12 know that because --
13    Q    What do you believe you said?
14    A    Appeared to be like a
15 hammer-type blow or something consistent to
16 that, something round, circular. That's not
17 my -- That would not be -- I would not say
18 exactly. That might be this gentlemen's
19 interpretation of what I relayed to him.
20    Q    So what you believe you relayed
21 to him was that you concluded that Seymour
22 Tankleff's wound was consistent with the
23 victim?
24    A    They were similar.
25    Q    Similar to the victim in the

28

M. Carmody

2 Bay Shore case?
3    A    Yes, because the one I had
4 handled in Bay Shore was circular also.
5    Q    So my question is, how did you
6 reach the conclusion that they were similar
7 if you had not been able to see Seymour
8 Tankleff's wounds?
9    A    I had seen the X-rays. The
10 doctor showed me X-rays.
11    Q    When did that occur?
12    A    At that time, he had them on
13 the screen and he showed me the injury, the
14 X-ray injury. It looked similar to the one
15 that I had seen years earlier.
16    Q    Looked similar to the X-ray you
17 had seen earlier? Had you seen an X-ray in
18 the Bay Shore case?
19    A    I believe I did.
20    Q    And so you looked at an X-ray
21 that Dr. Roth showed you of Seymour and that
22 X-ray looked to you similar to the X-ray you
23 had seen in the Bay Shore case?
24    A    Yes.
25    Q    Your contemporaneous notes

29

1    M. Carmody
2  reflect having seen an X-ray?
3      **A    No.**
4      **Q**    Does your supplemental report
5  reflect having seen an X-ray?
6      **A    No, I don't think it does.**
7      **Q**    If you were basing your
8  conclusion as to the similarity of the
9  injuries on your examination of the X-ray,
10 why do neither of your notes or the
11 supplemental report even reflect the fact
12 that you had seen an X-ray?
13     MR. MITCHELL:  I object to the
14 form.  You can answer.
15     **A    I can't answer why I didn't put**
16 **a note.**
17     **Q**    Did you inform Detective
18 Sergeant Doyle about the information that
19 you had learned from your conversation with
20 Dr. Roth?
21     **A    I don't recall now speaking to**
22 **him but I'm sure I did.  I'm sure I relayed**
23 **to him what I had talked to Dr. Roth about.**
24     MR. POLLACK:  Mark this as
25 Carmody 6.

30

1    M. Carmody
2      (Whereupon, Plaintiff's
3      Exhibit, Carmody 6, was marked for
4      identification.)
5      **Q**    Mr Carmody, this is simply an
6  excerpt from a deposition that was taken of
7  Detective Sergeant Doyle, and I'm going to
8  look starting with Page 268 in the upper
9  right-hand corner.
10     Detective Doyle is showing your
11 supplemental report and the question says,
12 if you look at the second paragraph it says,
13 "At 8:30 hours the undersigned entered the
14 hospital's emergency room and interviewed
15 Dr. Robert Roth and Dr. Roth stated that the
16 victim was brought into the emergency room
17 with a depressed skull fracture to the back
18 of the head and a deep laceration of the
19 throat which he describes as extending
20 almost completely around the victim's neck."
21     And then, the paragraph goes
22 onto say, it says, "Dr. Roth stated that he
23 felt that the head injury was caused by a
24 hammer-type instrument because of the
25 circular shape depression of the skull."

31

1    M. Carmody
2      Now, is that something that Dr.
3  Roth said to you, that Dr. Roth stated that
4  he felt the injury was caused by a
5  hammer-type instrument?
6      MR. MITCHELL:  Objection to
7      form.
8      **A    No, he did not say it was a**
9  **hammer-type instrument.  He said it had the**
10 **appearance of a hammer-type blow because of**
11 **the circular depression of the skull.**
12     **Q**    Okay.
13     **A    He did not say it was a hammer.**
14     **Q**    All right.
15     **A    He just said it appeared to be**
16 **like a hammer-type injury.**
17     **Q**    Okay.  My question did not say
18 that he said it was a hammer.
19     **A    Right, okay.**
20     **Q**    My question was, you recall Dr.
21 Roth stating that -- Well, let me do it this
22 way.
23     Your supplemental report has
24 this sentence:  "Dr. Roth stated he felt the
25 head injury was caused by a hammer-type

32

1    M. Carmody
2  instrument because of the circular shaped
3  depression of the skull."
4      Is that your recollection that
5  Dr. Roth indicated that he felt that the
6  head injury was caused by a hammer-type
7  instrument?
8      MR. MITCHELL:  Objection to
9      form.  You can answer.
10     **A    If that's what my report said,**
11 **then that's more accurate than what I could**
12 **tell you today.  That's what he felt.**
13     **Q**    Had you already come to the
14 conclusion that you thought that the
15 injuries were consistent with a hammer-type
16 instrument before Dr. Roth voiced the same
17 thing?
18     **A    Absolutely not.**
19     **Q**    You came to that conclusion
20 after Dr. Roth said it?
21     **A    I'm a little confused here.**
22 **Repeat that again.**
23     **Q**    You, yourself, came to the
24 conclusion that you believe that the injury
25 was caused by a hammer-type instrument; is

**33**

M. Carmody

1 
2 that not correct?
3     A   No.  I said appearance of a
4 hammer-type blow, but it did not have to be
5 a hammer because it had the circular
6 depression.
7     Q   Okay.  So help me out here.
8 I'm a little confused.  You, yourself, you
9 came to the conclusion that the wound
10 appeared to have been caused by a
11 hammer-type instrument?
12     A   Something similar.
13     Q   Something similar to a
14 hammer-type?
15     A   Something that was round that
16 hit him in the head, circular.
17     Q   Okay.  So you only came to the
18 conclusion it was something round and
19 circular.  You did not come to the
20 conclusion that it was a hammer-type
21 instrument?
22     A   That it possibly could be.  It
23 was very consistent with what I had seen
24 earlier.
25     Q   So you came to the conclusion

FEVOLA REPORTING & TRANSCRIPTION INC. (631) 724-7576

**34**

M. Carmody

1 
2 that it was very consistent with it being a
3 hammer-type instrument?
4     A   Sure.
5     Q   And my question is, did you
6 come to that conclusion before Dr. Roth gave
7 you his conclusion?
8     A   I don't recall.
9     Q   Go back to Page 268 of the
10 Doyle deposition when you spoke to either
11 Detective Pfalzgraf or Carmody:
12     "Q.  Did they relay to you all
13     the information that I just read
14     from that report?
15     A.  Yes.
16     Q.  And when, to the best of
17     your recollection, was that
18     information relayed to you?
19     A.  Sometime early that
20     morning.
21     Q.  When you say early, what do
22     you mean by that?
23     A.  9:00 - 9:30.
24     Q.  Do you recall around 9:00
25     or 9:30 speaking with Detective

FEVOLA REPORTING & TRANSCRIPTION INC. (631) 724-7576

**35**

M. Carmody

1 
2 Sergeant Doyle?"
3     A   This is on Page 269?
4     Q   It starts at 268 and carries
5 over to 269.
6     A   I see that.
7     MR. MITCHELL:  Your question
8 is, obviously, does that portion of
9 Detective Doyle's deposition refresh
10 his recollection if he called at
11 9:00 or 9:30 or you're just asking
12 if he called at 9:00 or 9:30?
13     Q   My question is, do you recall
14 speaking to Detective Sergeant Doyle that
15 morning?
16     MR. MITCHELL: I object to the
17 form.  You can answer.
18     MR. POLLACK:  What is
19 objectionable about the form of the
20 question, do you recall whether or
21 not you spoke to Detective Doyle?
22     MR. MITCHELL:  That question
23 itself combined with the question
24 before.
25     MR. POLLACK:  It's not combined

FEVOLA REPORTING & TRANSCRIPTION INC. (631) 724-7576

**36**

M. Carmody

1 
2 with anything.  The pending question
3 is, do you recall speaking to
4 Detective Sergeant Doyle that
5 morning?
6     MR. MITCHELL:  So you're
7 withdrawing the previous question?
8     MR. POLLACK:  That's the only
9 pending question.
10     MR. MITCHELL:  I'm not trying
11 to play games.  I'm saying, are you
12 withdrawing the previous question or
13 is it a two-part question that was
14 interrupted with my objection,
15 because all I'm saying is if you
16 were asking, does that portion of
17 the deposition refresh his
18 recollection, that, I don't object
19 to.  If you're asking him the
20 pending question, then on that
21 simple question, I don't object.
22     MR. POLLACK:  Great.
23     MR. MITCHELL:  I'm asking you
24 to clarify for the record.
25     MR. POLLACK:  I asked a simple

FEVOLA REPORTING & TRANSCRIPTION INC. (631) 724-7576

37

M. Carmody

1
2 question to which Mr. Mitchell does
3 not object.
4   Q   The question is, do you recall
5 speaking to Detective Sergeant Doyle that
6 morning?
7   A   No.
8   Q   Okay.  You don't recall one way
9 or the other?
10   A   I probably did but I don't
11 recall now.  And that does not refresh my
12 recollection.
13   Q   When you say you probably did,
14 what is that based on?  That would have been
15 your practice?
16   A   Of course.
17   Q   And based on your practice,
18 would you have advised him of the
19 information that you learned from Dr. Roth?
20   A   Yes.
21   Q   Do you recall speaking to a
22 family member at the hospital, Ron Rother?
23   A   No, sir.
24   Q   Do you recall meeting a Ron
25 Rother at the hospital?

FEVOLA REPORTING & TRANSCRIPTION INC. (631) 724-7576

38

M. Carmody

1
2   A   No.
3   Q   Do you recall meeting any
4 members of the Tankleff family at the
5 hospital?
6   A   No.
7   Q   Were you and Detective
8 Pfalzgraf together at the hospital or did
9 you separate at some point and do separate
10 interviews?
11   A   I believe we separated.
12   Q   Did Detective Pfalzgraf report
13 to you that he had had a conversation with
14 a family member by the name of Ron Rother?
15   A   He may have but I don't recall.
16   Q   Do you recall Detective
17 Pfalzgraf telling you that Mr. Rother had
18 told him that Seymour Tankleff had reported
19 that Jerry Steuerman had threatened him five
20 or six weeks earlier?
21     MR. MITCHELL:  I object to the
22 form.  You can answer.
23   A   No, I don't recall that.
24   Q   Do you recall learning from any
25 source of information that Seymour Tankleff

FEVOLA REPORTING & TRANSCRIPTION INC. (631) 724-7576

39

M. Carmody

1
2 had said that Jerry Steuerman had threatened
3 him a few weeks prior to the attack?
4   A   No, sir.
5   Q   At any point in the
6 investigation, did you review Detective
7 Pfalzgraf's notes from his interviews at the
8 hospital?
9   A   I don't recall.
10   Q   Would that have been part of
11 your practice at the time?
12   A   No, not necessarily.
13   Q   What about reviewing your
14 partner's supplemental reports?  Would that
15 have been part of your practice?
16   A   Not always, no.
17   Q   Okay.  When you say "not
18 always," what would determine whether or not
19 you would review your partner's notes?
20   A   If it was a case that we
21 detectives are on together, I would be more
22 interested in his reports but, in this case,
23 we were assisting on another lead
24 detective's case so I wouldn't have that
25 much interest in that genre.

FEVOLA REPORTING & TRANSCRIPTION INC. (631) 724-7576

40

M. Carmody

1
2   Q   Would it have been your
3 practice if you did interviews for which
4 Detective Pfalzgraf was not present, would
5 it have been your practice to give him some
6 sort of summary of what you learned in those
7 interviews, whether or not it's in writing
8 or orally?
9   A   Could you rephrase that?  I'm
10 sorry.
11   Q   Sure.  In a case in which you
12 were not lead detective?
13   A   Yes.
14   Q   And you were working with
15 Detective Pfalzgraf, if you did an interview
16 for which he was not present, after the
17 interview would you tell him what you
18 learned in the interview?
19   A   I really can't answer that
20 because it would depend on circumstances.
21   Q   You don't recall one way or the
22 area whether you and Detective Pfalzgraf
23 shared the information that you had learned
24 from various people at the hospital with
25 each other?

FEVOLA REPORTING & TRANSCRIPTION INC. (631) 724-7576

41

M. Carmody

1
2    **A    We may have a little bit but I**
3    **don't recall.**
4          MR. MITCHELL:  Do me a favor,
5    as Mr. Pollack just said, clarify it
6    when you do those answers one way or
7    the other or I don't recall, one way
8    or the other, just so it's clear.
9    **A    I don't recall one way or the**
10   **other.**
11         **Q    Did you learn from any source**
12   that Mr. Rother had stated that he believed
13   that Jerry Steuerman was involved in the
14   attack on the Tankleffs?
15         MR. MITCHELL:  I object to the
16   form.
17   **A    No.**
18         **Q    Do you recall learning from any**
19   source that any family member or anyone else
20   had expressed the view that Jerry Steuerman
21   might have been involved in the attacks?
22   **A    Not that I recall.**
23         **Q    And so I take it then you don't**
24   recall telling Detective Sergeant Doyle that
25   you had learned at the hospital that someone

42

M. Carmody

1
2    believed that Steuerman might be involved?
3    **A    I don't recall ever saying**
4    **that.**
5          **Q    Look at the Doyle deposition**
6    transcript and I'm going to start at Page
7    320 at the very bottom, the upper right-hand
8    corner.
9    **A    Okay.**
10         **Q    "Q. And did Carmody or**
11   Pfalzgraf also then tell you that
12   Ronald Rother had been spoken to at
13   the hospital?
14         A. Yes, I believe so.
15         Q. And that Ronald Rother had
16   told Carmody and Pfalzgraf that
17   Steuerman was reneging on debt and
18   that the business was turning bad.
19   He may have said something in that
20   vain, and so that would be the third
21   person who had suggested that
22   Steuerman might have had some
23   involvement in this?
24         A. Correct."
25   My question is simply whether reviewing that

43

M. Carmody

1
2    testimony refreshes your recollection on
3    whether or not you relayed to Detective
4    Sergeant Doyle information that had come
5    from Ronald Rother?
6    **A    No, it doesn't.**
7          MR. POLLACK:  I'm going to mark
8    this as Carmody 7.
9          (Whereupon, Plaintiff's
10   Exhibit, Carmody 7, was marked for
11   identification.)
12         **Q    My first question, Mr Carmody,**
13   again, take as much time as you need,
14   simply, do you recognize these as being
15   notes that you took or a copy of notes that
16   you took?
17   **A    These are my handwriting.  I**
18   **don't even recall these.  They are my notes.**
19         **Q    Putting aside what you**
20   presently remember, you recognize those as
21   being your notes?
22   **A    It's my handwriting, yes.**
23         **Q    Can you tell from looking at**
24   the notes when these notes were taken?
25   **A    No, I don't have a date on it.**

44

M. Carmody

1
2    There is no date on here.  One says 9/19/88.
3          **Q    What page is that?**
4    **A    Page 2823.  September 19, 1988.**
5          MR. MITCHELL:  Just for
6    clarification, it actually says
7    9/19/88.
8          **Q    Mr Carmody, would it be your**
9    practice to have a notebook that you would
10   use for a particular investigation?
11   **A    Yes --**
12         **Q    So --**
13   **A    -- it would.**
14         **Q    So events that occurred in that**
15   particular investigation you would take
16   notes in one place?  In other words, you
17   would have one notebook for the Tankleff
18   investigation and a different notebook for
19   any other investigations that you had
20   ongoing at the same time?
21   **A    Yes, that would be true.**
22         **Q    These notes appear to pertain**
23   to the Tankleff investigation?
24   **A    Yes, they do.**
25         **Q    Would you understand them to be**

45

M. Carmody

1
2 in the sequence in which they were taken?
3     A   What was that?  Could you
4 repeat that?
5     Q   Are they in the order in which
6 they were taken?  In other words, the first
7 page of these notes would have been taken
8 before the 10th page of these notes and the
9 10th page of these notes would have been
10 taken before the last page of these notes?
11     A   I can't say by looking at this.
12 I really can't, sorry.
13     Q   Okay.  However, one of the
14 notes indicates specifically that it was
15 taken on September 18, 1988?
16     A   Yes.  I believe 19th.
17     Q   Okay, thank you.
18         Let me have you turn to Page
19 2844 at the bottom.
20     A   Okay.
21     Q   My question is, can you tell
22 from either the pages before or the pages
23 after it when the page that appears at 2844,
24 when those notes were taken?
25     A   No, sir.

46

M. Carmody

1
2     Q   At the bottom of 2844, can you
3 read to me these last three lines.
4     A   "From John.  Bad blood between
5 Steuerman and Seymour."
6     Q   And would "John" be John
7 Pfalzgraf?
8     A   Yes.
9     Q   Would Steuerman be Jerry
10 Steuerman?
11     A   Yes.
12     Q   And Seymour would be Seymour
13 Tankleff?
14     A   Yes.
15     Q   Does this refresh your
16 recollection as to whether or not at some
17 point you learned from Detective
18 Pfalzgraf -- Well, let me do it this way.
19         Do you recall learning from
20 Detective Pfalzgraf, at some point, that he
21 had learned that there was bad blood between
22 Jerry Steuerman and Seymour Tankleff?
23     A   No.
24     Q   Does this note indicate to you
25 that you did learn that fact at some point

47

M. Carmody

1
2 from John Pfalzgraf?
3     A   Yes.
4     Q   You just don't recall?
5     A   Correct.
6     Q   Do you recall having
7 discussions with anybody working on the
8 Tankleff investigation about whether or not
9 there was bad blood between Jerry Steuerman
10 and Seymour Tankleff?
11     A   No.
12     Q   If you move forward a few pages
13 to 2847, could you read to me the last line
14 of that page?
15     A   Steuerman and Monti -- looks
16 like Fusco, F-U-S-C-O, last to leave.
17     Q   Do you know what that is a
18 reference to?
19     A   I believe they were the last to
20 leave the house.
21     Q   Who did you learn that
22 information from?
23     A   According to my notes, from
24 J.P., which would be John Pfalzgraf.
25     Q   Do you recall discussing with

48

M. Carmody

1
2 John Pfalzgraf the fact that Jerry Steuerman
3 was at the house into the early morning
4 hours -- at the Tankleff house -- into the
5 early morning hours of September 7, 1988?
6     A   No, no independent recollection
7 now.
8     Q   Do you recall discussing that
9 fact with anyone or learning that fact from
10 anyone?
11     A   Again, I may have but I don't
12 recall.
13     Q   Do you recall taking any steps
14 in your investigation based on an
15 understanding that there was bad blood
16 between Steuerman and Tankleff and that
17 Steuerman was at the house in the early
18 morning hours that day?
19         MR. MITCHELL:  I object to the
20     form.  You can answer.
21     A   No.
22     Q   Do you recall a gentleman by
23 the name of Myron Fox being at Mather
24 Hospital that morning?
25     A   No, sir.

49

M. Carmody

1
2     Q   Do you recall speaking to
3  anyone who was a lawyer that had represented
4  Seymour Tankleff in various business deals?
5     A   **No, sir.**
6     Q   Do you recall Detective
7  Pfalzgraf telling you that he had spoken to
8  a lawyer for the Tankleff family at the
9  hospital?
10    A   **No, sir, I don't recall that.**
11    Q   Or a lawyer that had
12  represented Seymour in various business
13  deals?
14    A   **No.**
15    Q   Do you recall learning at any
16  point that Mr. Fox had said that Jerry
17  Steuerman was supposed to make a substantial
18  payment to Seymour Tankleff in the near
19  future?
20    A   **No, sir.**
21    Q   Do you recall Mr. Fox offering
22  to provide paperwork related to that debt?
23    A   **No.**
24    Q   Do you recall informing
25  Detective Sergeant Doyle that morning that

50

M. Carmody

1
2  Mr. Fox believed that Mr. Steuerman was
3  involved in the Tankleff attacks?
4     A   **No.**
5     Q   Go ahead and look at Doyle's
6  deposition transcript starting at Page 319.
7     A   **Okay.**
8     Q   Starting in the middle of the
9  page:
10        "Q. Do you recall getting a
11        report from the hospital that we
12        talked about this morning either
13        from Carmody or Pfalzgraf?
14        A. Yes.
15        Q.  Did whoever gave you that
16        report tell you that they
17        interviewed Myron Fox at the
18        hospital?
19        A. Yes, I believe they did.
20        Q.  Did they tell you that
21        Myron Fox had told them that Jerry
22        Steuerman owed Tankleff money, Mr.
23        Seymour Tankleff?
24        A. Yes.
25        Q. And it was coming to him

51

M. Carmody

1
2  shortly?
3        A. I believe that's true.
4        Q.  And that based on that, Mr.
5  Fox believed that Mr. Steuerman
6  might have a motive to commit
7  murders?
8        A. I don't know specifically if
9  he said that, that he had a motive
10  to commit murders.
11        Q. Did he convey to Pfalzgraf
12  or Carmody, to your understanding,
13  that he believed that Steuerman
14  might have been involved?
15        A. To my understanding in so
16  many words, yes."
17        Does that refresh your
18  recollection as to whether or not you
19  informed Detective Sergeant Doyle that you
20  had learned from Myron Fox that Steuerman
21  might have been involved in the Tankleff
22  murders?
23    A   **No.**
24    Q   Again, just to be clear, you
25  don't recall one way or the other?

52

M. Carmody

1
2     A   **One way or the other what?**
3     Q   In other words, you may have
4  relayed that information to Detective Doyle
5  and you just don't recall?
6     A   **I don't ever remember relaying**
7  **anything to Detective Sergeant Doyle about**
8  **this subject matter.**
9     Q   I want to make sure I
10  understand that.  Are you saying that you
11  didn't or simply that you don't recall it?
12    A   **I have to say I don't recall.**
13  **I probably didn't because I don't recall at**
14  **all.**
15    Q   Okay.
16    A   **It does not even at all ring a**
17  **bell to me.**
18    Q   Do you recall knowing that
19  information, forgetting for a moment whether
20  or not you relayed it to Detective Doyle?
21    A   **No.**
22    Q   You don't recall that at all?
23    A   **No, I don't.**
24    Q   Is it something that you think
25  you would recall had you known it?

53

M. Carmody

1
2    MR. MITCHELL:  I object to the
3  form.  You can answer.
4    A   I might have.  I don't recall.
5    Q   Okay.  You do not recall at any
6  point learning that Myron Fox had indicated
7  his view that Steuerman might be involved in
8  the Tankleff murders?
9    A   No.
10    Q   And you don't recall at any
11  point learning that Ronald Rother had
12  indicated in his view that Steuerman might
13  be involved in the Tankleff murders?
14    A   No, I don't recall it.
15    Q   At some point that morning, did
16  you speak with Detective McCready?
17    A   What morning, sir?
18    Q   I'm sorry, the morning of
19  September 7, 1988 from Mather Hospital?
20    A   I don't recall speaking to him.
21    Q   Do you know whether or not
22  Detective Pfalzgraf spoke with McCready from
23  the hospital?
24    A   No, I don't.  I do not.
25    Q   Did Detective Pfalzgraf relay

54

M. Carmody

1
2  to you that Detective McCready viewed Martin
3  Tankleff as being a person of interest in
4  the investigation or words to that effect?
5    MR. MITCHELL:  I object to the
6  form.  You can answer.
7    A   Not that I recall, sir.
8    Q   Do you recall Detective
9  Pfalzgraf telling you that Martin Tankleff
10  was a person of interest or words to that
11  effect?
12    A   He may have but I don't recall.
13    Q   Do you recall learning that
14  from any source while you were at Mather
15  Hospital?
16    A   No.
17    Q   Did you tell anyone that Martin
18  Tankleff was a person of interest or words
19  to that effect?
20    A   No.
21    MR. POLLACK:  Why don't we take
22  just a brief break.
23    (At this time, a brief recess
24  was taken.  Time noted:  10:28.)
25    Q   Mr. Carmody, what did you do

55

M. Carmody

1
2  after you finished at Mather Hospital on
3  September 7th?
4    A   We went to the house, the
5  Tankleff house.
6    Q   And what did you do at the
7  Tankleff house?
8    A   John and I assisted in any way
9  we could.  Crime Scene was there and they
10  were doing all kinds of things, collecting
11  evidence, taking photos.
12    Q   Did you enter the house?
13    A   Yes, sir.
14    Q   Did you have the opportunity to
15  observe Arlene Tankleff's body?
16    A   Yes.
17    Q   And how much time did you spend
18  with Arlene Tankleff's body?
19    A   I don't recall.
20    Q   Go to your interview, the
21  report of your interview with the State of
22  New York Commission of Investigation.
23    A   Okay.
24    Q   On the second page, the second
25  full paragraph it says, "according to

56

M. Carmody

1
2  Carmody, although he did not examine
3  Seymour's body wounds, Arlene's injuries
4  consisted of long and narrow deep slashes
5  that he believes were caused by a razor-type
6  knife."
7    Do you recall saying that or
8  words to that effect to the Investigation
9  Commission?
10    A   I might have said that, yes.
11    Q   Was that based on your
12  examination of Arlene Tankleff's body at the
13  scene of the examination you just described?
14    A   Yes.
15    Q   Based on that examination, did
16  you conclude that you believe that cuts were
17  caused by a razor-type knife?
18    A   I believe they were something
19  very sharp.
20    Q   Do you recall discussing that
21  conclusion with anybody else?
22    A   I may have discussed it with
23  John Pfalzgraf.
24    Q   Anyone else?
25    A   I may or may not have.  I don't

57

M. Carmody

1
2  recall.
3      Q   Specifically, do you recall
4  whether you discussed that conclusion with
5  Detective Sergeant Doyle?
6      A   I don't recall that, sir.
7      Q   Okay.  In that same paragraph
8  it says, "Carmody surmised that the murders
9  occurred long before being reported to the
10  police because the blood on Seymour's chair
11  was dry and had already coagulated and did
12  not appear to be fresh."
13      Do you recall examining
14  Seymour's chair?
15      A   Yes.  I remember being in the
16  room and seeing the chair.
17      Q   And do you remember seeing dry
18  coagulated blood?
19      A   Yes.
20      Q   And that is consistent with
21  what you learned from Ethel Curley at Mather
22  Hospital that there was dry blood on both of
23  them?
24      MR. MITCHELL:  I object to the
25      form.  You can answer.

FEVOLA REPORTING & TRANSCRIPTION INC. (631) 724-7576

58

M. Carmody

1
2      A   Yes.
3      Q   Did you discuss your conclusion
4  from that, that the attacks occurred long
5  before being reported to the police with
6  anyone else?
7      A   Could you repeat that?
8      Q   Sure.  Did you discuss your
9  conclusion that the attacks had occurred
10  long before being reported to the police
11  with anyone else?
12      A   I may or may not have, but I
13  don't recall.  It was too long ago.
14      Q   Okay.  Did you consider your
15  conclusion that the wounds, the cuts on
16  Arlene Tankleff was caused by a razor-type
17  knife, did you consider that to be a
18  significance to the investigation?
19      MR. MITCHELL:  I object to the
20      form.  You can answer.
21      A   In my mind, it appeared that it
22  was something like that.  I mean I could not
23  say conclusively that it was, but it
24  appeared to be a very sharp type of a knife.
25      Q   And you had been a homicide

FEVOLA REPORTING & TRANSCRIPTION INC. (631) 724-7576

59

M. Carmody

1
2  detective for 20 years?
3      A   No, not for 20 years.
4      Q   I'm sorry, how long had you
5  been a homicide detective?
6      A   At that time?  About five years
7  because I went into Homicide, I believe, in
8  around 1983.
9      Q   You had a fair amount of
10  experience in examining wounds, yes?
11      A   Not too much prior to Homicide.
12  You know, I had seen murder scenes but never
13  in that detail.
14      Q   Okay.  But at this point you
15  had five years of experience as a homicide
16  detective?
17      A   Yes.
18      Q   You had examined wounds in any
19  number of homicide cases?
20      A   Yes, I had.
21      Q   Based on these wounds, you drew
22  the conclusion about the characteristics of
23  a likely murder weapon, correct?
24      A   In my own mind, yes.
25      Q   And was that conclusion of some

FEVOLA REPORTING & TRANSCRIPTION INC. (631) 724-7576

60

M. Carmody

1
2  significance to you in the investigation of
3  this case?
4      MR. MITCHELL:  I object to the
5      form.  You can answer.
6      A   Not to me personally, no.
7      Q   You didn't think it was
8  important that based on the wounds you
9  thought it was a razor-type knife?
10      MR. MITCHELL:  I object to the
11      form.  You can answer.
12      A   I believe that was the
13  conclusion of most of the detectives that
14  were there, that it was something sharp.
15      Q   What makes you believe that
16  most of the detectives there believed that
17  it was something sharp like a razor-type
18  knife?
19      A   Because the wounds were very
20  clear and defined.  They were not jagged or
21  anything.  It was long slits.
22      Q   I understand that that was your
23  conclusion based on your observation, but a
24  moment ago you said you believe that that
25  was the conclusion of all of the detectives

FEVOLA REPORTING & TRANSCRIPTION INC. (631) 724-7576

---

**61**

M. Carmody

2 that were there.
3         My question is, what makes you
4 believe that the other detectives made the
5 same observation and reached the same
6 conclusions?
7     **A   Well, I have to correct myself**
8 **if I said all.  It may have been -- I know**
9 **John and I both felt that it was done by a**
10 **very sharp object, and we even mentioned to**
11 **each other about possibly a box cutter or**
12 **something to that effect.**
13     Q   So you do recall discussing it
14 with Detective Pfalzgraf?
15     **A   Vaguely, yes.**
16     Q   And you recall specifically
17 discussing with Detective Pfalzgraf it might
18 have been a box cutter?
19     **A   I mentioned that, yes.**
20     Q   And did he express any
21 disagreement with that or any agreement with
22 that?
23     **A   Not that I recall.**
24     Q   What about your conclusion that
25 the attacks occurred long before being

---

**62**

M. Carmody

2 reported to the police?  Was that a
3 conclusion that you attached some
4 significance to in the course of this
5 investigation?
6         MR. MITCHELL:  I object to the
7     form.  You can answer.
8     **A   I think it is significant to**
9 **the case, yes.**
10     Q   And was it your practice when
11 you learned information that you believed
12 significant to the case to relay that to
13 other detectives working the case?
14     **A   In some cases it would be.  I**
15 **don't recall whether I did or did not on**
16 **this case.**
17     Q   I understand that you don't
18 recall whether you did or did not in this
19 case, my question is based on your general
20 practice.
21         Is that something you believe
22 you would have conveyed to someone else on
23 the scene?
24         MR. MITCHELL:  I object to the
25     form.  You can answer.

---

**63**

M. Carmody

2     **A   Most likely I would.**
3     Q   Approximately how long did you
4 spend at the crime scene on September 7th?
5     **A   Probably there most of the day.**
6 **The whole day.**
7     Q   Where did you go after you
8 concluded your work at the crime scene?
9     **A   I don't recall.  I don't**
10 **remember if at the end of the day we left**
11 **and went back home and then came back the**
12 **next day.  I know we spent a considerable**
13 **amount of time then.**
14     Q   Do you recall at any point on
15 September 7th learning that Detective
16 McCready and Detective Rein had reported
17 that Martin Tankleff had made admissions to
18 them about his involvement in the murders?
19     **A   At this time, today, I don't**
20 **recall but I'm sure I did.  Or more than**
21 **likely did.**
22     Q   Do you recall later in that day
23 being present when Mr. Martin Tankleff had a
24 conversation with Shari Rother?
25     **A   Could you repeat that, sir.**

---

**64**

M. Carmody

2     Q   Sure.  Do you recall going back
3 to police headquarters at some point that
4 day?
5     **A   No, I don't.**
6     Q   Do you recall being present
7 when Mr. Martin Tankleff had a conversation
8 with his half sister or stepsister, Shari
9 Rother, a telephone conversation?
10     **A   No.**
11     Q   You don't recall anything about
12 such a conversation?
13     **A   Could you clarify that?**
14 **Conversation concerning what?**
15     Q   Sure.  After Mr. Tankleff's
16 interview or interrogation with Detectives
17 Rein and McCready were concluded, at some
18 point he had a telephone call with Shari
19 Rother, his stepsister or half sister of
20 his, do you recall being present when that
21 phone call took place?
22     **A   No, sir.**
23     Q   Do you recall learning anything
24 about that phone call?
25     **A   I don't recall whether I did or**

---

---

65

M. Carmody

1  
2 didn't.
3    Q   At some point, did you learn
4 that Jerry Steuerman was missing?
5    A   Yes, I remember at some point
6 in the investigation they were looking for
7 him.
8    Q   Do you recall, at any point,
9 meeting with Myron Fox, an attorney in his
10 office?
11    A   No, sir.  I don't recall that.
12    Q   Do you recall learning that
13 Detective McCready and Detective Rein stated
14 that Martin Tankleff had said that he had
15 used a knife that was on the kitchen counter
16 as the sharp instrument in the attacks?
17    A   I may have but I don't recall
18 independently here now.
19    Q   At any point, did you examine
20 that knife?
21    A   I don't recall examining any
22 knife at all.
23    Q   You were at the crime scene on
24 September 7th, we already discussed that?
25    A   Yes.

---

66

M. Carmody

1  
2    Q   You came back on September 8th?
3    A   I believe I did.  I'm not even
4 sure of that.
5    Q   Okay.  Mr Carmody, I'm going to
6 read to you an excerpt from a supplemental
7 report written by Detective James Barnes and
8 it says, "at 8:35 hours on September 8,
9 1988, the undersigned returned to the scene
10 at 33 Seaside Drive to continue with the
11 investigation.  The undersigned was joined
12 by Detective Schaefer from Identification,
13 Police Officer Mongan from Identification,
14 Detective Sergeant Robert Doyle, Detectives
15 Pfalzgraf and Carmody from the Homicide
16 Squad, Detective Charles Kosciuk from the
17 laboratory also returned with Robert Bauman
18 from the Crime Lab and the scene was
19 examined again for any other trace evidence
20 relating to this crime.
21        He then describes a search of
22 the scene conducted with a metal detector
23 and people repelling down the cliffs.
24        Does that refresh your
25 recollection as to whether you were there on

---

67

M. Carmody

1  
2 September 8th?
3    A   Very vaguely.  It was 26 years
4 ago.
5    Q   On September 8th, did you
6 believe that the murder weapons had been
7 recovered already?
8    A   I don't recall.
9    Q   Do you recall that a knife was
10 taken from the garage as evidence on
11 September 8th?
12    A   No, sir, I don't.
13    Q   Do you recall that Ethel
14 Curley, the emergency person, reported had
15 that she had found a Swiss Army knife at the
16 scene?
17    A   I don't recall that.
18    Q   Do you recall that one of the
19 things that the emergency services section
20 was looking for when it was repelling down
21 the bluffs were something that might
22 potentially be the murder weapon?
23    A   Not really, sir.
24    Q   Do you recall that a potential
25 murder weapon was one of the things they

---

68

M. Carmody

1  
2 were looking for with metal detectors?
3    A   I believe it might have been.
4    Q   Go to your notes that start
5 with the number 2830 at the bottom.  If you
6 go to the very last page it says at the top,
7 the very last page of that at the top,
8 "Friday, FRI, 9/9/88.  At lab.  Met with Dr.
9 Adams regarding the knife wound."
10    A   Apparently so.
11    Q   You don't recall one way or the
12 other having a meeting in the lab with a Dr.
13 Adams on the 9th?
14    A   I really don't.
15    Q   Your next statement says,
16 "clear knife issue."  Do you recall what was
17 the clear knife issue?
18    A   No, sir, I don't know what I
19 meant there.
20    Q   And then there's two drawings
21 of two different shapes.  Are those knife
22 shapes?
23    A   They appear to be.
24    Q   Was there a concern that the
25 wounds upon examination by Dr. Adams,

69

M. Carmody

1
2  medical examiner's office, did not match the
3  purported murder weapon that was referenced
4  in the statements taken by McCready and
5  Rein?
6          MR. MITCHELL:  I object to
7      form.
8      **A    Sir, I don't know what it**
9  **means.  I could not say one way or the other**
10 **what it meant.  I don't even remember why I**
11 **even drew those shapes.**
12     Q    Do you recall Detective
13 Pfalzgraf, at any point, expressing to you
14 his view that the knife that Martin Tankleff
15 told McCready and Rein he had used was
16 inconsistent with the wounds?
17     **A    I don't recall ever having that**
18 **type of conversation.**
19     Q    Did you ever come to a
20 conclusion one way or the other whether the
21 knife referenced in Martin Tankleff's
22 statements to Rein and McCready was, in
23 fact, the murder weapon?
24     **A    No, I don't recall.**
25     Q    Do you recall discussing that

70

M. Carmody

1
2  with anyone?
3      **A    No, I don't.**
4      Q    Do you recall at some point in
5  the investigation being present for an
6  interview of three girls, a pair of sisters,
7  Audra Goldschmidt and her sister, and then a
8  third girl named Daniella McCreedies.
9      **A    No, sir, I don't.**
10     Q    These were three girls that
11 Martin Tankleff had a conversation with
12 about buying a new car or something to that
13 effect.
14     **A    No, sir, I don't recall that at**
15 **all.**
16     Q    Do you recall being present
17 when any potential witnesses in the case
18 were interviewed other than the interviews
19 that you participated at Mather Hospital on
20 September 7th?
21     **A    No.**
22     Q    Do you recall crime scene
23 photos being shown to any witnesses?
24     **A    No, sir, I don't.**
25     Q    Go ahead and look at your

71

M. Carmody

1
2  interview with the State Commission of
3  Investigation.
4      **A    Okay.**
5      Q    On the last page, Page 3, in
6  that first paragraph, halfway through the
7  paragraph, you say -- well, the report
8  reflects that you said that after Tankleff
9  verbally admitted to murdering his parents,
10 he agreed to have his confession videotaped;
11 however, the police were precluded from
12 completing the written statement once they
13 were put on notice by Myron Fox, the
14 Tankleffs family attorney, to cease any
15 further questioning of Martin Tankleff.
16 Consequently, detectives were precluded from
17 confronting Tankleff on a number of issues;
18 i.e., the type and location of the weapons
19 used.
20         Do you recall learning at some
21 point that at some point during the McCready
22 and Rein's interrogation of Martin Tankleff
23 they were put on notice to cease any further
24 questioning?
25         MR. MITCHELL:  I object to the

72

M. Carmody

1
2      form.  You can answer.
3      **A    Could you reclarify that for**
4  **me?  I'm sorry because I was reading this.**
5      Q    No problem.  Did you learn at
6  some point that during the interrogation of
7  Martin Tankleff by Detectives Rein and
8  McCready, that at some point an attorney put
9  them on notice that they needed to cease
10 that interrogation?
11     **A    I apparently did, yes.  I knew**
12 **that they were put on notice.**
13     Q    And is it your view that as a
14 result the detectives were precluded from
15 learning additional information about the
16 type and location of the weapons used?
17         MR. MITCHELL:  I object to the
18     form.  You can answer.
19     **A    I don't recall to be honest**
20 **with you.  I know that once an attorney gets**
21 **involved they had to stop.  They could not**
22 **go any further.  The next step would have**
23 **been a signed confession.**
24     Q    Right.  But you do recall
25 giving an interview to the State Commission

73

M. Carmody

1
2  of Investigation in 2008?
3       A   I remember speaking to them,
4  yes.
5       Q   Do you recall whether you
6  expressed a view to them that because the
7  detectives interrogating Mr. Tankleff were
8  put on notice this precluded further
9  inquiries about the weapons?
10      A   That, I don't recall.  I don't
11  know what my motivation for saying that was.
12      Q   Okay.  Did you have questions
13  as to whether the weapons that were
14  indicated in the account that McCready and
15  Rein took from Martin Tankleff really were
16  the murder weapons?
17          MR. MITCHELL:  I object to the
18  form.  You can answer.
19      A   Can you reclarify?
20      Q   Sure.  You understood, did you
21  not, that in the interrogation of Martin
22  Tankleff, McCready and Rein identified a
23  particular knife as being the knife that was
24  used?
25      A   I believe so, yes.

74

M. Carmody

1
2       Q   And did you have questions as
3  to whether or not that really was the knife
4  that was used?
5       A   No, not that I recall.
6       Q   Why would Rein and McCready had
7  needed more information about the type and
8  location of the weapons if the knife
9  that they had learned about really was the
10  murder weapon?
11          MR. MITCHELL:  I object to the
12  form.  You can answer.
13      A   I really don't recall.
14      Q   You can go back to your notes
15  that start with page 2830.
16      A   I'd just like to clarify
17  something because this is the first time I'm
18  seeing this.  I don't ever recall telling
19  them anything about the type and location of
20  the weapons used.  I remember speaking to
21  them and telling them they were precluded to
22  go any further because they were put on
23  notice, but I never recall talking to them
24  about the weapons.
25      Q   You don't recall saying that

75

M. Carmody

1
2  that was something that you wish you could
3  have gotten more information about from the
4  Defendant?
5       A   I don't know why that man wrote
6  this or whoever wrote this report because
7  that's something I would not really say.
8       Q   So you don't believe you said
9  it and you have no idea why he would have
10  put that in the report?
11      A   I have no idea.  That part of
12  it, no.
13      Q   Okay.  Go ahead and go to your
14  notes that begin with 2830 at the bottom.
15      A   Okay.
16      Q   Towards the middle of that page
17  it says, "bed sheets bloody.  Handprint or
18  footprint."
19          Did I read that correctly?
20      A   Yes.
21      Q   What was the source of that
22  information?
23      A   I really don't recall.  I think
24  it had something to do with the bed sheet on
25  the mother's bed.  I don't recall now.

76

M. Carmody

1
2       Q   Do you recall who you would
3  have learned that information from?  Did
4  you, yourself, ever examine the bed sheets?
5       A   Not that I recall, sir.  I was
6  there and I was looking at them, but I don't
7  recall.  I vaguely remember something about
8  a discussion about a handprint and/or a
9  footprint.  That's about it.
10      Q   Okay.  Well, let me ask first.
11  Did you, yourself, see the bed sheets in the
12  master bedroom when you did your examination
13  of the crime scene on September 7th?
14      A   Yes, I saw them.  They were
15  there, yes.
16      Q   And do you recall whether you
17  noticed that there was a bloody handprint or
18  footprint?
19      A   I very well may but I don't
20  recall now.
21      Q   And you have some recollection
22  of some discussion about that?
23      A   Not really.  Just based on
24  these notes that there was some discussion
25  about a print, a footprint or handprint.

77
M. Carmody

1  **It's very vague.**
2  **It's very vague.**
3      Q   So I guess that's my question.
4  From looking at these notes, do you think
5  they are reflecting your own observation or
6  do you think they are reflecting some
7  conversation that you had with somebody?
8      **A   It could have been either or.**
9  **I really don't know.  I don't remember.**
10     Q   Okay.  You said a second ago
11 that looking at these notes suggests to you
12 there was a conversation about it?
13     **A   I don't recall saying there was**
14 **a conversation.  I don't recall saying that.**
15     Q   Okay.  You don't know one way
16 or the other from looking at these notes
17 whether this is reflecting a conversation or
18 reflecting your own personal observation?
19     **A   That's correct.**
20     Q   But one way or another, whether
21 from your own personal observation or from
22 somewhere else, you did learn that there was
23 a bloody handprint or footprint on the bed
24 sheets?
25         MR. MITCHELL:  I object to the

78
M. Carmody

2  form.  You can answer.
3      **A   It appears that way based on my**
4  **notes.**
5      Q   Do you remember discussing that
6  fact with anybody?
7      **A   No, sir, I don't.**
8      Q   Was that fact of any
9  significance to you in your investigation of
10 the crime?
11         MR. MITCHELL:  I object to the
12 form.  You can answer.
13     **A   Again, I don't know what I was**
14 **thinking then or what I would have thought.**
15     Q   Did you undertake any follow-up
16 investigation of the bloody handprint or
17 footprint?
18         MR. MITCHELL:  I object to the
19 form.  You can answer.
20     **A   Not that I recall, sir.**
21     Q   Do you know if any follow-up
22 investigation was done?
23     **A   No, I don't.**
24     Q   If you can go back to the
25 report of your interview with the State

79
M. Carmody

1  Investigation Commission.
3      **A   Okay.**
4      Q   The last paragraph on the last
5  page, Page 3, it says, beginning with the
6  second sentence, Carmody strongly believes
7  that an investigation should be commenced
8  into the actions of the Appeals judges in
9  this case.  Carmody said -- and then it has
10 in quotations "for them to have handed down
11 such a ridiculous decision, someone had
12 gotten to them."
13         Let me ask you, first of all,
14 in your interview in July of 2008, did you,
15 in fact, make statements to that effect?
16     **A   I don't recall making a**
17 **statement to that effect.**
18     Q   Do you believe you did?
19     **A   I would never use the word**
20 **"scoundrels."**
21     Q   And "scoundrels" appears in
22 this report in quotations?
23     **A   It does and that's a word I**
24 **would never use, that I know.**
25     Q   Okay.

80
M. Carmody

2      **A   I find this preposterous.  I**
3  **don't ever recall saying anything like that**
4  **to them.**
5      Q   You find this account of what
6  you said preposterous?
7      **A   This paragraph?**
8      Q   Yes.
9      **A   I find it very preposterous.**
10     Q   Because you don't believe that
11 you made the statement that is in quotation
12 marks there?
13     **A   That's correct.**
14     Q   Or any statement to that
15 effect?
16     **A   I would not say that.**
17     Q   And you have no idea why the
18 author of this report would have put that in
19 there?
20     **A   I really don't.  This is the**
21 **first time I've ever seen this report.**
22     Q   I understand that.
23         Do you believe or did you
24 believe that there ought to be an
25 investigation into the actions of the

81

M. Carmody

1 Appeals judges?

3     **A**  I have no opinion one way or

4 **the other on something like that.**

5     Q  Have you held the opinion that

6 their decision was ridiculous?

7     **A**  I don't recall ever saying that

8 **either. I did not agree with the decision**

9 **at all. I don't ever recall saying**

10 **ridiculous.**

11     Q  Did you hold the view or have

12 you held the view that somebody must have

13 gotten to the Appeals Court judges?

14     **A**  That, I would never say. I

15 **don't even know how they came up with that.**

16 **I don't even know who wrote this. I don't**

17 **even know who wrote this report. Kenneth**

18 **Christopherson?**

19     Q  What is it about the Appeals

20 decision that you disagree with?

21     MR. MITCHELL: Objection to

22  form. You can answer.

23     **A**  I don't even know -- That's

24 **what I don't understand. I don't know what**

25 **the Appeals decision was.**

82

M. Carmody

2     Q  Maybe I misunderstood. I

3 thought a moment ago you said that you did

4 not agree with it?

5     **A**  I did not agree that they

6 **granted his appeal and I don't remember what**

7 **I was even referring to, to let him out of**

8 **jail or whatever it was. I don't recall.**

9     Q  Do you have any understanding

10 of what the basis was for their decision?

11     **A**  No.

12     Q  You simply did not agree with

13 the result, but you don't know one way or

14 the other what reasoning?

15     **A**  I didn't agree with the result,

16 **right, you're correct. That's exactly.**

17     Q  Did you believe that the

18 Tankleff murders were a crime of passion?

19     **A**  I thought that it was a crime

20 **of rage.**

21     Q  And explain, what does that

22 mean to you?

23     **A**  The viciousness of the crime.

24 **And my training and my experience was that**

25 **this was done by someone very closely**

83

M. Carmody

2 **related to the victims because of the**

3 **overkill.**

4     Q  What do you mean by the

5 overkill?

6     **A**  The slashing of the throats,

7 **the viciousness of the crime, the nature of**

8 **the injuries, multiple injuries.**

9     Q  Okay. So the fact that the

10 attacks appeared to be vicious and there

11 were multiple injuries suggests to you that

12 the person who committed the crimes knew the

13 victims?

14     **A**  To me, yes, very closely.

15     Q  In your experience as a

16 homicide detective, you had never seen a

17 vicious attack with multiple injuries where

18 the perpetrator was not a close relative of

19 the victim or close to the victim?

20     MR. MITCHELL: Objection to

21  the form. You can answer.

22     **A**  In cases like this, no, I

23 **haven't. Sometimes you would see -- Like,**

24 **if someone was involved in a fight with**

25 **another person, that would be different, but**

84

M. Carmody

2 **it's something like this where it involves**

3 **parents and a house and this overkill, as I**

4 **call it, with the numerous injuries.**

5     **I find it that it would be my**

6 **own conclusion that it was done by somebody**

7 **very closely related to the victims.**

8     Q  When you say related, you mean

9 as in a relative or somebody who had a close

10 relationship with the victim?

11     **A**  Generally, somebody that is

12 **very closely related like a lover or a**

13 **family member, somebody that had very close**

14 **contact with those victims.**

15     Q  What about somebody who had

16 known the victims for years and had a number

17 of business dealings with the Tankleffs?

18     MR. MITCHELL: Objection to

19  form. You can answer.

20     **A**  I can't answer that.

21     Q  Did you do anything in the

22 course of this investigation to investigate

23 the possibilities that Jerry Steuerman might

24 be involved in the Tankleff murders?

25     **A**  What is that question?

85

M. Carmody

1
2  Q   Did you do anything in the
3  course of this investigation to investigate
4  the possibility that Jerry Steuerman might
5  be involved in the Tankleff murders?
6      A   No.
7      Q   Are you aware of any
8  investigation that was done by others
9  working the Tankleff murders into the
10  possibility that Jerry Steuerman might be
11  involved in the murders?
12     A   Not that I recall.
13         MR. POLLACK:  I don't think I
14     have anything else, Mr. Carmody, but
15     let me speak with Mr. Barket here.
16         (At this time, a brief recess
17     was taken.)
18     Q   Go to the notes that start with
19  4508.
20     A   (Complying.)
21     Q   If you could go to Page 4514.
22     A   Yes, sir.
23     Q   Are these the notes of your
24  interviews of the ambulance crew that you
25  conducted at Mather Hospital?

86

M. Carmody

1
2      A   Yes, sir.
3      Q   And apparently they started at
4  8:56 a.m.?
5      A   It looks that way, yes.
6      Q   If you go to the bottom of the
7  page it references Ethel Curley?
8      A   Yes, sir.
9      Q   And on the next page there are
10  notes that start, dispatched at 6:11?
11     A   Yes.
12     Q   Do you know who you're getting
13  that information from?  Was that from Ms.
14  Curley?
15     A   I could not say if it was from
16  her, but it was from one of the ambulance
17  people.
18     Q   Do you remember talking to all
19  three of these individuals that are listed
20  on the prior page?
21     A   Yes.  I remember speaking to
22  all of them.
23     Q   Together or separately?
24     A   I think they were all together.
25  They were all standing there.

87

M. Carmody

1
2      Q   So whoever was speaking, all
3  three of them were present?
4      A   It's very possible.  I can't
5  recall exactly but it's possible.
6      Q   Do you recall there being any
7  disagreements where the speaker said
8  something and one of the others corrected or
9  had a different view?
10     A   No, sir, I don't recall that.
11     Q   Did you understand the
12  information being relayed to be information
13  that all three of them agreed with?
14     A   Yes.
15     Q   On 4515, in the middle of the
16  page it says, "at scene about 6:24 hours.
17  Young male in driveway waiting for
18  ambulance."  And then, can you read what it
19  says after that?
20     A   "White male, early twenties,
21  dark hair, thin build, white T-shirt, boxer
22  shorts.  Unknown shoes."  I guess unknown if
23  he was wearing shoes.  "Did notice blood on
24  said person."
25     Q   And --

88

M. Carmody

1
2      A   "Police officers on scene."
3      Q   You're good.  Stop there.
4      A   Okay.
5      Q   And the individual that's being
6  described here, did you come to the
7  understanding that that individual is Martin
8  Tankleff?
9      A   Yes, sir.
10         MR. POLLACK:  Mr. Carmody,
11     that's all I have for you.  I thank
12     you for your participation today.
13         THE WITNESS:  You're very
14     welcome, sir.
15         (Whereupon, the deposition of
16     Mr. Carmody was concluded.)
17         (Time noted:  11:25 a.m.)
18
19
                        _____
20                      MIKE CARMODY
21
22     Subscribed and sworn to before me
23     this ____ day of _____, 2014.
24
                        _____
25  NOTARY PUBLIC

**89**

**INDEX**

**INDEX TO TESTIMONY**

**Page**

Examination by Mr. Pollack     5

**EXHIBITS**

| Plaintiff's | Description | Page |
|---|---|---|
| Carmody 1 | Notes | 5 |
| Carmody 2 | Excerpt from Testimony | 8 |
| Carmody 3 | Supplemental Report | 13 |
| Carmody 4 | Supplemental Report | 22 |
| Carmody 5 | Document | 25 |
| Carmody 6 | Excerpt from Testimony | 30 |
| Carmody 7 | Notes | 43 |

**91**

CERTIFICATION

I, DOLLY FEVOLA, a Notary Public in and for the State of New York, do hereby certify:

THAT the witness whose testimony is herein before set forth, was duly sworn by me; and

THAT the within transcript is a true record of the testimony given by said witness.

I further certify that I am not related, either by blood or marriage, to any of the parties to this action; and

THAT I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 2nd day of May, 2014.

_____

DOLLY FEVOLA

**90**

ERRATA SHEET FOR THE TRANSCRIPT OF:
Case Name:  Martin Tankleff vs The County of
Suffolk.  K. James McCready, et al
Deposition Date:  April 14, 2014
Witness:   Mike Carmody

CORRECTIONS

| PG | LN | NOW READS | SHOULD READ | REASON FOR |
|---|---|---|---|---|
| __ | __ | _____ | _____ | _____ |
| __ | __ | _____ | _____ | _____ |
| __ | __ | _____ | _____ | _____ |
| __ | __ | _____ | _____ | _____ |
| __ | __ | _____ | _____ | _____ |
| __ | __ | _____ | _____ | _____ |
| __ | __ | _____ | _____ | _____ |
| __ | __ | _____ | _____ | _____ |
| __ | __ | _____ | _____ | _____ |
| __ | __ | _____ | _____ | _____ |
| __ | __ | _____ | _____ | _____ |
| __ | __ | _____ | _____ | _____ |
| __ | __ | _____ | _____ | _____ |

_____
Signature

Subscribed and sworn to before me
this_____ day of _____, 2014.

_____
(NOTARY PUBLIC)

# #

**#1-10** [2] - 1:8, 1:9

# 1

**1** [6] - 5:21, 5:23, 6:3, 14:14, 19:3, 89:10
**10:28** [1] - 54:24
**10th** [2] - 45:8, 45:9
**11530** [1] - 2:5
**11:25** [1] - 88:17
**13** [1] - 89:13
**14** [2] - 1:14, 90:3
**15** [1] - 20:25
**18** [1] - 45:15
**19** [1] - 44:4
**1983** [1] - 59:8
**1988** [9] - 5:8, 6:23, 14:9, 22:22, 44:4, 45:15, 48:5, 53:19, 66:9
**19th** [1] - 45:16

# 2

**2** [4] - 8:5, 8:7, 8:10, 89:11
**20** [3] - 5:11, 59:2, 59:3
**2008** [3] - 25:23, 73:2, 79:14
**2014** [5] - 1:14, 88:23, 90:3, 90:24, 91:15
**22** [1] - 89:14
**23** [1] - 8:16
**24** [1] - 8:16
**25** [1] - 89:15
**26** [1] - 67:3
**2604** [1] - 8:13
**268** [3] - 30:8, 34:9, 35:4
**269** [2] - 35:3, 35:5
**2823** [1] - 44:4
**2830** [2] - 68:5, 74:15, 75:14
**2844** [3] - 45:19, 45:23, 46:2
**2847** [1] - 47:13
**2nd** [1] - 91:15

# 3

**3** [8] - 13:21, 13:23, 14:15, 14:22, 18:2, 71:5, 79:5, 89:13
**30** [2] - 4:12, 89:16

**319** [1] - 50:6
**320** [1] - 42:7
**33** [3] - 7:19, 12:24, 66:10
**3525** [1] - 10:5

# 4

**4** [4] - 22:15, 22:17, 22:20, 89:14
**4/5/09** [1] - 19:6
**43** [1] - 89:17
**4508** [1] - 85:19
**4514** [1] - 85:21
**4515** [1] - 87:15

# 5

**5** [5] - 25:18, 25:19, 89:6, 89:10, 89:15

# 6

**6** [3] - 29:25, 30:3, 89:16
**666** [2] - 1:12, 2:4
**6:00** [1] - 12:23
**6:11** [1] - 86:10
**6:24** [1] - 87:16

# 7

**7** [7] - 6:23, 22:22, 43:8, 43:10, 48:5, 53:19, 89:17
**7:05** [1] - 8:18
**7th** [8] - 14:11, 15:11, 55:3, 63:4, 63:15, 65:24, 70:20, 76:13

# 8

**8** [2] - 66:8, 89:12
**8:30** [1] - 30:13
**8:35** [1] - 66:8
**8:56** [1] - 86:4
**8th** [4] - 66:2, 67:2, 67:5, 67:11

# 9

**9/19/88** [2] - 44:2, 44:7
**9/9/88** [1] - 66:8
**9:00** [4] - 34:23, 34:24, 35:11, 35:12
**9:30** [5] - 1:15, 34:23,
34:25, 35:11, 35:12
**9th** [1] - 68:13

# A

**a.m** [5] - 1:15, 8:18, 12:23, 86:4, 88:17
**able** [5] - 16:8, 20:20, 21:7, 26:17, 28:7
**above-mentioned** [1] - 1:19
**absolutely** [1] - 32:18
**accept** [1] - 18:13
**according** [2] - 47:23, 55:25
**According** [1] - 26:11
**account** [2] - 73:14, 80:5
**accurate** [1] - 32:11
**action** [1] - 91:11
**actions** [2] - 79:8, 80:25
**Adams** [3] - 68:9, 68:13, 68:25
**additional** [1] - 72:15
**address** [1] - 4:11
**administered** [1] - 13:6
**admissions** [1] - 63:17
**admitted** [1] - 71:9
**advised** [1] - 37:18
**ago** [6] - 7:5, 58:13, 60:24, 67:4, 77:10, 82:3
**agree** [4] - 4:17, 81:8, 82:4, 82:5, 82:12, 82:15
**AGREED** [3] - 3:3, 3:8, 3:12
**agreed** [2] - 71:10, 87:13
**agreement** [1] - 61:21
**ahead** [6] - 5:25, 7:11, 25:17, 50:5, 70:25, 75:13
**aid** [1] - 13:6
**al** [1] - 90:3
**alive** [1] - 13:18
**almost** [3] - 20:14, 23:16, 30:20
**ALSO** [1] - 2:11
**ambulance** [7] - 12:18, 12:21, 13:7, 16:20, 85:24, 86:16, 87:18
**amount** [2] - 59:9, 63:13
**AND** [3] - 3:3, 3:8,

3:12

# A

**answer** [34] - 8:15, 15:20, 17:19, 22:3, 22:4, 24:3, 24:12, 24:22, 29:14, 29:15, 32:9, 35:17, 38:22, 40:19, 48:20, 53:3, 54:6, 57:25, 58:20, 60:5, 60:11, 62:7, 62:25, 72:2, 72:18, 73:18, 74:12, 78:2, 78:12, 78:19, 81:22, 83:21, 84:19, 84:20
**answers** [1] - 41:6
**appeal** [1] - 82:6
**Appeals** [5] - 79:8, 81:2, 81:13, 81:19, 81:25
**appear** [3] - 44:22, 57:12, 68:23
**appearance** [1] - 31:10, 33:3
**appeared** [4] - 25:6, 25:8, 27:14, 31:15, 33:10, 58:21, 58:24, 83:10
**April** [2] - 1:14, 90:3
**area** [4] - 15:2, 15:17, 17:7, 40:22
**Arlene** [6] - 15:17, 17:22, 55:15, 55:18, 56:12, 58:16
**Arlene's** [1] - 56:3
**arms** [1] - 17:6
**Army** [1] - 67:15
**arose** [1] - 10:22
**arrival** [1] - 12:25
**arrived** [4] - 11:9, 16:6, 16:21, 17:2
**aside** [1] - 43:19
**assault** [2] - 16:19, 24:15
**assaultant** [1] - 24:17
**assaulted** [1] - 24:7
**assigned** [3] - 10:10, 10:13, 11:5
**assignments** [1] - 9:14
**assisted** [1] - 55:8
**assisting** [1] - 39:23
**assume** [2] - 5:3, 19:19
**assuming** [1] - 19:20
**attach** [1] - 17:15
**attached** [1] - 62:3
**attack** [3] - 39:3, 41:14, 83:17
**attacks** [7] - 41:21, 50:3, 58:4, 58:9, 61:25, 65:16, 83:10

**attending** [2] - 18:24, 23:14
**attorney** [4] - 65:9, 71:14, 72:8, 72:20
**Attorneys** [2] - 2:4, 2:8
**Audra** [1] - 70:7
**author** [1] - 80:18
**Avenue** [1] - 4:12
**aware** [1] - 85:7

# B

**B-A-C-K** [2] - 19:18, 19:19
**bad** [5] - 42:18, 46:4, 46:21, 47:9, 48:15
**bandaged** [1] - 21:4
**BARKET** [1] - 2:6
**barket** [1] - 85:15
**Barnes** [1] - 66:7
**BARRY** [2] - 4:19, 18:10
**Barry** [2] - 4:19, 18:10
**based** [13] - 10:20, 37:14, 37:17, 48:14, 51:4, 56:11, 56:15, 59:21, 60:8, 60:23, 62:19, 76:23, 78:3
**basing** [1] - 29:7
**basis** [1] - 82:10
**batter** [1] - 10:8
**Bauman** [1] - 66:17
**Bay** [7] - 25:2, 26:12, 26:23, 28:2, 28:4, 28:18, 28:23
**bed** [6] - 75:17, 75:24, 75:25, 76:4, 76:11, 77:23
**bedroom** [3] - 13:15, 13:16, 76:12
**begin** [1] - 75:14
**beginning** [1] - 79:5
**believes** [2] - 56:5, 79:6
**bell** [1] - 52:17
**Belle** [2] - 7:19, 12:24
**best** [2] - 23:11, 34:16
**between** [4] - 46:4, 46:21, 47:9, 48:16
**bit** [1] - 41:2
**blood** [19] - 14:25, 15:9, 15:17, 15:18, 16:5, 16:15, 16:17, 17:5, 17:6, 17:8, 46:4, 46:21, 47:9, 48:15, 57:10, 57:18, 57:22, 87:23, 91:10
**bloody** [4] - 75:17, 76:17, 77:23, 78:16

**blow** [3] - 27:15, 31:10, 33:4
**blue** [1] - 15:8
**bluffs** [1] - 67:21
**blunt** [1] - 26:9
**body** [6] - 13:12, 17:9, 55:15, 55:18, 56:3, 56:12
**bottom** [7] - 19:6, 42:7, 45:19, 46:2, 68:5, 75:14, 86:6
**box** [2] - 61:11, 61:18
**boxer** [1] - 87:21
**break** [1] - 54:22
**breathless** [1] - 15:4
**BRIAN** [1] - 2:10
**brief** [3] - 54:22, 54:23, 85:16
**brought** [3] - 11:18, 20:11, 30:16
**brown** [3] - 19:25, 20:2, 20:17
**BRUCE** [1] - 2:6
**BRUSTIN** [1] - 2:3
**build** [1] - 87:21
**Building** [1] - 2:9
**business** [4] - 42:18, 49:4, 49:12, 84:17
**buying** [1] - 70:12
**BY** [3] - 2:5, 2:10, 4:6

---

## C

**car** [1] - 70:12
**Carmody** [61] - 4:10, 4:17, 4:18, 5:21, 5:23, 5:25, 6:3, 8:5, 8:7, 8:9, 8:10, 8:17, 9:24, 10:13, 13:21, 13:23, 13:25, 14:14, 14:15, 18:2, 18:20, 19:2, 22:15, 22:17, 22:20, 25:18, 25:19, 25:21, 26:7, 26:11, 29:25, 30:3, 30:5, 34:11, 42:10, 42:16, 43:8, 43:10, 43:12, 44:8, 50:13, 51:12, 54:25, 56:2, 57:8, 66:5, 66:15, 79:6, 79:9, 85:14, 88:10, 88:16, 89:10, 89:11, 89:13, 89:14, 89:15, 89:16, 89:17, 90:4
**CARMODY** [2] - 1:16, 88:20
**carries** [1] - 35:4
**Case** [1] - 90:2
**case** [23] - 4:15, 10:10, 10:14, 10:19, 24:25, 26:3, 26:12, 26:23, 28:2, 28:18, 28:23, 39:20, 39:22, 39:24, 40:11, 60:3, 62:9, 62:12, 62:13, 62:16, 62:19, 70:17, 79:9
**cases** [3] - 59:19, 62:14, 83:22
**caused** [12] - 21:12, 24:16, 26:9, 30:23, 31:4, 31:25, 32:6, 32:25, 33:10, 56:5, 56:17, 58:16
**cease** [3] - 71:14, 71:23, 72:9
**certainly** [1] - 18:13
**certification** [1] - 3:6
**CERTIFICATION** [1] - 91:2
**certify** [2] - 91:4, 91:9
**chair** [3] - 57:10, 57:14, 57:16
**change** [1] - 7:8
**characteristics** [1] - 59:22
**CHARLES** [1] - 1:7
**Charles** [1] - 66:16
**checked** [1] - 13:12
**chest** [1] - 17:7
**Christopherson** [2] - 27:5, 81:18
**circles** [1] - 18:9
**circling** [1] - 18:4
**circular** [11] - 21:13, 25:5, 25:10, 27:16, 28:4, 30:25, 31:11, 32:2, 33:5, 33:16, 33:19
**circumstances** [1] - 40:20
**City** [2] - 1:13, 2:5
**Civil** [1] - 1:18
**clarification** [2] - 17:25, 44:6
**clarify** [5] - 18:6, 36:24, 41:5, 64:13, 74:16
**clear** [5] - 41:8, 51:24, 60:20, 68:16, 68:17
**cliffs** [1] - 66:23
**close** [3] - 83:18, 83:19, 84:9, 84:13
**closely** [4] - 82:25, 83:14, 84:7, 84:12
**clumps** [1] - 17:6
**coagulated** [2] - 57:11, 57:18
**collecting** [1] - 55:10
**combined** [2] - 35:23,

---

**coming** [3] - 20:3, 20:18, 50:25
**commenced** [1] - 79:7
**Commission** [7] - 25:24, 27:10, 55:22, 56:9, 71:2, 72:25, 79:2
**commit** [2] - 51:6, 51:10
**committed** [1] - 83:12
**completely** [4] - 20:14, 21:4, 23:16, 30:20
**completing** [1] - 71:12
**Complying** [1] - 85:20
**concern** [1] - 68:24
**concerning** [1] - 64:14
**conclude** [1] - 56:16
**concluded** [6] - 26:8, 26:20, 27:21, 63:8, 64:17, 88:16
**conclusion** [25] - 28:6, 29:8, 32:14, 32:19, 32:24, 33:9, 33:18, 33:20, 33:25, 34:6, 34:7, 56:21, 57:4, 58:3, 58:9, 58:15, 59:22, 59:25, 60:13, 60:23, 60:25, 61:24, 62:3, 69:20, 84:6
**conclusions** [1] - 61:6
**conclusively** [1] - 58:23
**condition** [2] - 15:3, 16:25
**conducted** [2] - 66:22, 85:25
**confession** [2] - 71:10, 72:23
**confronting** [1] - 71:17
**confused** [2] - 32:21, 33:8
**conjunction** [1] - 19:7
**consequently** [1] - 71:16
**consider** [2] - 58:14, 58:17
**considerable** [1] - 63:12
**consisted** [1] - 56:4
**consistent** [7] - 21:6, 27:15, 27:22, 32:15, 33:23, 34:2, 57:20
**contact** [1] - 84:14
**contemporaneous** [1] - 6:19, 28:25
**continue** [1] - 66:10

---

**conversation** [24] - 8:24, 11:16, 11:22, 11:25, 12:4, 12:10, 12:13, 12:20, 22:12, 23:21, 23:25, 29:19, 38:13, 63:24, 64:7, 64:9, 64:12, 64:14, 69:18, 70:11, 77:7, 77:12, 77:14, 77:17
**convey** [1] - 51:11
**conveyed** [1] - 62:22
**copy** [2] - 6:12, 43:15
**corner** [3] - 8:13, 30:9, 42:8
**correct** [11] - 18:21, 22:13, 26:19, 33:2, 42:24, 47:5, 59:23, 61:7, 77:19, 80:13, 82:16
**corrected** [1] - 87:8
**CORRECTIONS** [1] - 90:5
**correctly** [1] - 75:19
**counsel** [1] - 3:4
**counter** [1] - 65:15
**Country** [2] - 1:12, 2:4
**County** [2] - 5:10, 90:2
**COUNTY** [3] - 1:7, 1:8, 2:8
**COURT** [1] - 1:2
**Court** [2] - 3:16, 81:13
**created** [1] - 23:9
**crew** [5] - 12:18, 12:21, 15:12, 16:20, 85:24
**crime** [12] - 55:9, 63:4, 63:8, 65:23, 66:20, 70:22, 76:13, 78:10, 82:18, 82:19, 82:23, 83:7
**Crime** [1] - 66:18
**crimes** [1] - 83:12
**cross** [1] - 10:5
**cross-examination** [1] - 10:5
**Curley** [9] - 13:8, 14:25, 15:12, 16:24, 17:12, 57:21, 67:14, 86:7, 86:14
**current** [2] - 7:12, 11:4
**cut** [1] - 11:20
**cuts** [2] - 56:16, 58:15
**cutter** [1] - 61:11, 61:18

---

## D

2

**Daniella** [1] - 70:8
**dark** [1] - 87:21
**date** [5] - 6:19, 6:22, 7:2, 43:25, 44:2
**Date** [1] - 90:3
**dead** [1] - 13:18
**dealings** [1] - 84:17
**deals** [2] - 49:4, 49:13
**debt** [2] - 42:17, 49:22
**decision** [6] - 79:11, 81:6, 81:8, 81:20, 81:25, 82:10
**deep** [4] - 19:16, 20:13, 30:18, 56:4
**Defendant** [1] - 75:4
**Defendants** [2] - 1:10, 2:8
**defined** [1] - 60:20
**definition** [1] - 16:8
**Dennison** [1] - 2:9
**DEPARTMENT** [1] - 2:8
**Deposition** [1] - 90:3
**DEPOSITION** [1] - 1:16
**deposition** [10] - 3:6, 3:13, 4:23, 30:6, 34:10, 35:9, 36:17, 42:5, 50:6, 88:15
**depressed** [4] - 19:23, 20:12, 23:17, 30:17
**depression** [6] - 21:13, 25:6, 30:25, 31:11, 32:3, 33:6
**described** [4] - 15:3, 20:14, 56:13, 88:6
**describes** [2] - 30:19, 66:21
**Description** [1] - 89:9
**description** [4] - 16:24, 17:11, 17:16, 17:17
**detail** [1] - 59:13
**Detective** [64] - 4:16, 7:7, 8:11, 8:17, 8:21, 9:4, 9:25, 10:12, 10:17, 11:5, 11:24, 12:11, 18:7, 18:20, 22:11, 22:20, 23:2, 23:20, 24:4, 25:11, 29:17, 30:7, 30:10, 34:11, 34:25, 35:9, 35:14, 35:21, 36:4, 37:5, 38:7, 38:12, 38:16, 39:6, 40:4, 40:15, 40:22, 41:24, 43:3, 46:17, 46:20,

49:6, 49:25, 51:19,
52:4, 52:7, 52:20,
53:16, 53:22, 53:25,
54:2, 54:8, 57:5,
61:14, 61:17, 63:15,
63:16, 65:13, 66:7,
66:12, 66:14, 66:16,
69:12
**detective** [20] - 5:9,
9:15, 9:16, 9:18,
10:15, 11:6, 11:10,
11:11, 11:14, 12:5,
16:2, 16:13, 17:15,
24:10, 24:20, 40:12,
59:2, 59:5, 59:16,
83:16
**detective's** [1] - 39:24
**Detectives** [3] - 64:16,
66:14, 72:7
**detectives** [9] - 39:21,
60:13, 60:16, 60:25,
61:4, 62:13, 71:16,
72:14, 73:7
**detector** [1] - 66:22
**detectors** [1] - 68:2
**determine** [1] - 39:18
**different** [4] - 44:18,
68:21, 83:25, 87:9
**dilated** [1] - 15:5
**disagree** [1] - 81:20
**disagreement** [1] -
61:21
**disagreements** [1] -
87:7
**discuss** [4] - 23:5,
25:11, 58:3, 58:8
**discussed** [3] - 56:22,
57:4, 65:24
**discussing** [7] -
47:25, 48:8, 56:20,
61:13, 61:17, 69:25,
78:5
**discussion** [4] - 19:8,
76:8, 76:22, 76:24
**discussions** [1] - 47:7
**dispatched** [3] -
12:23, 16:16, 86:10
**DISTRICT** [2] - 1:2, 1:2
**doctor** [3] - 19:25,
26:8, 28:10
**Document** [1] - 89:15
**DOE** [1] - 1:8
**DOLLY** [2] - 91:3,
91:19
**Dolly** [1] - 1:20
**done** [5] - 61:9, 78:22,
82:25, 84:6, 85:8
**door** [3] - 13:15,
13:16, 13:17
**down** [5] - 14:24, 17:3,

66:23, 67:20, 79:10
**DOYLE** [1] - 1:7
**Doyle** [25] - 5:19, 7:7,
8:11, 8:21, 9:11,
10:17, 29:18, 30:7,
30:10, 34:10, 35:2,
35:14, 35:21, 36:4,
37:5, 41:24, 42:5,
43:4, 49:25, 51:19,
52:4, 52:7, 52:20,
57:5, 66:14
**Doyle's** [2] - 35:9,
50:5
**Dr** [35] - 12:7, 12:10,
18:20, 18:23, 19:8,
19:11, 20:10, 20:23,
21:10, 21:21, 22:7,
23:13, 23:22, 24:6,
24:14, 24:18, 25:12,
28:21, 29:20, 29:23,
30:15, 30:22, 31:2,
31:3, 31:20, 31:24,
32:5, 32:16, 32:20,
34:6, 37:19, 68:8,
68:12, 68:25
**drawings** [1] - 68:20
**dressed** [1] - 7:22
**drew** [2] - 59:21, 69:11
**Drive** [3] - 7:19, 12:24,
66:10
**driveway** [1] - 87:17
**dry** [12] - 14:25, 15:8,
15:16, 15:18, 16:4,
16:15, 16:18, 17:5,
17:8, 57:11, 57:17,
57:22
**due** [2] - 10:14, 21:3
**duly** [2] - 4:3, 91:6
**during** [5] - 4:22,
18:15, 22:24, 71:21,
72:6
**duty** [1] - 7:14
**DW013905** [1] - 10:6

---

## E

**Eames** [2] - 12:9,
12:14
**early** [7] - 6:22, 34:19,
34:21, 48:3, 48:5,
48:17, 87:20
**EASTERN** [1] - 1:2
**effect** [10] - 3:15, 54:4,
54:11, 54:19, 56:8,
61:12, 70:13, 79:15,
79:17, 80:15
**eighth** [1] - 14:8
**either** [6] - 34:10,
45:22, 50:12, 77:8,

81:8, 94:02
**emergency** [7] - 12:7,
20:11, 23:15, 30:14,
30:16, 67:14, 67:19
**EMPLOYEES** [1] - 1:8
**end** [1] - 63:10
**enter** [1] - 55:12
**entered** [2] - 13:3,
30:13
**entrance** [1] - 13:16
**ERRATA** [1] - 90:2
**ESQ** [3] - 2:5, 2:6,
2:10
**et** [1] - 90:3
**Ethel** [4] - 15:12,
57:21, 67:13, 86:7
**event** [1] - 4:14
**events** [3] - 14:10,
22:22, 44:14
**evidence** [3] - 55:11,
66:19, 67:10
**exactly** [3] - 27:18,
82:16, 87:5
**EXAMINATION** [1] -
4:6
**Examination** [1] - 89:6
**examination** [7] -
10:5, 29:9, 56:12,
56:13, 56:15, 68:25,
76:12
**examine** [3] - 56:2,
65:19, 76:4
**examined** [3] - 4:5,
59:18, 66:19
**examiner's** [1] - 69:2
**examining** [3] - 57:13,
59:10, 65:21
**except** [1] - 3:9
**Excerpt** [2] - 89:11,
89:16
**excerpt** [4] - 8:10,
9:25, 30:6, 66:6
**Exhibit** [12] - 5:21,
5:23, 6:3, 8:7, 13:23,
14:14, 14:15, 22:16,
22:20, 25:19, 30:3,
43:10
**exhibit** [1] - 25:22
**EXHIBITS** [1] - 89:8
**expect** [1] - 16:16
**experience** [4] -
59:10, 59:15, 82:24,
83:15
**explain** [1] - 82:21
**express** [1] - 61:20
**expressed** [2] - 41:20,
73:6
**expressing** [1] - 69:13
**extending** [1] - 30:19
**eyelid** [1] - 15:5

---

## F

**fact** [17] - 6:10, 10:15,
15:16, 16:18, 21:3,
24:18, 25:12, 29:11,
46:25, 48:2, 48:9,
69:23, 78:6, 78:8,
79:15, 83:9
**fair** [1] - 59:9
**family** [7] - 37:22,
38:4, 38:14, 41:19,
49:8, 71:14, 84:13
**fast** [1] - 10:12
**father** [1] - 13:5
**favor** [1] - 41:4
**feared** [2] - 20:5,
20:20
**Federal** [1] - 1:18
**felt** [7] - 21:11, 30:23,
31:4, 31:24, 32:5,
32:12, 61:9
**Fevola** [1] - 1:20
**FEVOLA** [2] - 91:3,
91:19
**few** [2] - 39:3, 47:12
**fight** [1] - 83:24
**filing** [1] - 3:5
**finished** [1] - 55:2
**first** [15] - 4:3, 5:12,
6:4, 7:4, 10:15,
14:23, 20:8, 26:5,
43:12, 45:6, 71:6,
74:17, 76:10, 79:13,
80:21
**five** [4] - 16:10, 38:19,
59:6, 59:15
**flip** [1] - 6:8
**floor** [2] - 17:7, 17:9
**follow** [2] - 78:15,
78:21
**follow-up** [2] - 78:15,
78:21
**follows** [1] - 4:5
**footprint** [6] - 75:18,
76:9, 76:18, 76:25,
77:23, 78:17
**FOR** [3] - 1:2, 90:2,
90:6
**force** [2] - 3:14, 26:9
**forehead** [1] - 17:6
**forgetting** [1] - 52:19
**form** [37] - 3:9, 15:20,
17:19, 22:3, 24:3,
24:12, 24:22, 25:9,
27:2, 29:14, 31:7,
32:9, 35:17, 35:19,
38:22, 41:16, 48:20,
53:3, 54:6, 57:25,
58:20, 60:5, 60:11,

62:7, 62:25, 69:7,
72:2, 72:18, 73:18,
74:12, 78:2, 78:12,
78:19, 81:22, 83:21,
84:19
**forth** [1] - 91:6
**forward** [1] - 47:12
**Fox** [11] - 48:23,
49:16, 49:21, 50:2,
50:17, 50:21, 51:5,
51:20, 53:6, 65:9,
71:13
**fracture** [5] - 19:23,
20:3, 20:12, 23:18,
30:17
**fresh** [2] - 17:8, 57:12
**FRI** [1] - 68:8
**Friday** [1] - 68:8
**friend** [1] - 20:24
**front** [3] - 15:9, 15:18,
19:16
**full** [1] - 55:25
**FURTHER** [2] - 3:8,
3:12
**Fusco** [1] - 47:16
**FUSCO** [1] - 47:16
**future** [1] - 49:19

---

## G

**gained** [1] - 10:16
**games** [1] - 36:11
**garage** [1] - 67:10
**Garden** [2] - 1:13, 2:5
**general** [1] - 62:19
**generally** [3] - 9:18,
10:7, 84:11
**genre** [1] - 39:25
**gentleman** [2] - 27:4,
48:22
**gentlemen's** [1] -
27:18
**girl** [1] - 70:8
**girls** [2] - 70:6, 70:10
**given** [1] - 91:8
**Goldschmidt** [1] -
70:7
**granted** [1] - 82:6
**great** [1] - 36:22
**guess** [2] - 77:3, 87:22

---

## H

**hair** [2] - 15:2, 87:21
**half** [3] - 14:24, 64:8,
64:19
**halfway** [1] - 71:6
**hammer** [31] - 21:12,

21:17, 21:22, 22:8, 24:8, 24:16, 24:17, 25:3, 25:7, 25:8, 25:13, 26:10, 26:13, 27:15, 30:24, 31:5, 31:9, 31:10, 31:13, 31:16, 31:18, 31:25, 32:6, 32:15, 32:25, 33:4, 33:5, 33:11, 33:14, 33:20, 34:3
**hammer-type** [25] - 21:12, 21:17, 21:22, 22:8, 24:8, 24:16, 24:17, 25:7, 25:13, 26:10, 27:15, 30:24, 31:5, 31:9, 31:10, 31:16, 31:25, 32:6, 32:15, 32:25, 33:4, 33:11, 33:14, 33:20, 34:3
**hand** [4] - 8:13, 30:9, 42:7, 91:15
**handed** [2] - 6:2, 79:10
**handled** [2] - 24:25, 28:4
**handprint** [6] - 75:17, 76:8, 76:17, 76:25, 77:23, 78:16
**handwriting** [3] - 6:6, 43:17, 43:22
**hard** [1] - 10:12
**Hauppauge** [1] - 2:9
**head** [16] - 11:19, 15:2, 19:21, 19:23, 20:4, 20:13, 20:18, 20:19, 21:11, 26:9, 30:18, 30:23, 31:25, 32:6, 33:16
**headed** [1] - 7:22
**headquarters** [1] - 64:3
**hear** [1] - 5:12
**heard** [3] - 7:6, 24:6, 24:14
**held** [3] - 1:19, 81:5, 81:12
**help** [1] - 33:7
**HEREBY** [1] - 3:3
**hereby** [2] - 3:7, 91:4
**herein** [2] - 1:17, 91:5
**hereto** [1] - 3:5
**hereunto** [1] - 91:14
**himself** [1] - 10:18
**hit** [1] - 33:16
**hold** [2] - 10:11, 81:11
**home** [2] - 5:15, 63:11
**Homicide** [3] - 59:7, 59:11, 66:15
**homicide** [14] - 5:9,

7:19, 9:16, 10:8, 10:22, 16:2, 17:15, 24:9, 24:20, 58:25, 59:5, 59:15, 59:19, 83:16
**homicides** [1] - 11:6
**honest** [1] - 72:19
**Hospital** [12] - 9:5, 9:7, 11:9, 15:11, 19:9, 48:24, 53:19, 54:15, 55:2, 57:22, 70:19, 85:25
**hospital** [16] - 11:19, 12:17, 15:12, 18:25, 37:22, 37:25, 38:5, 38:8, 39:8, 40:24, 41:25, 42:13, 49:9, 50:11, 50:18, 53:23
**hospital's** [1] - 30:14
**hour** [1] - 16:10
**hours** [7] - 16:11, 30:13, 48:4, 48:5, 48:18, 66:8, 87:16
**house** [13] - 13:3, 13:4, 13:10, 13:11, 47:20, 48:3, 48:4, 48:17, 55:4, 55:5, 55:7, 55:12, 84:3
**husband** [2] - 25:2, 26:13

## I

**i.e** [1] - 71:18
**idea** [3] - 75:9, 75:11, 80:17
**identical** [4] - 26:14, 26:22, 27:3, 27:11
**Identification** [2] - 66:12, 66:13
**identification** [7] - 5:24, 8:8, 13:24, 22:18, 25:20, 30:4, 43:11
**identified** [1] - 73:22
**important** [1] - 60:8
**IN** [1] - 91:14
**incident** [3] - 5:13, 6:20, 7:6
**inconsistent** [1] - 69:16
**independent** [1] - 48:6
**independently** [2] - 23:8, 65:18
**INDEX** [2] - 89:2, 89:3
**indicate** [3] - 7:13, 16:5, 46:24
**indicated** [7] - 7:5, 18:19, 26:16, 32:5,

53:6, 53:8, 53:14
**indicates** [1] - 45:14
**indicative** [1] - 20:19
**individual** [2] - 88:5, 88:7
**individuals** [1] - 86:19
**inform** [1] - 29:17
**information** [20] - 15:11, 29:18, 34:13, 34:18, 37:19, 38:25, 40:23, 43:4, 47:22, 52:4, 52:19, 62:11, 72:15, 74:7, 75:3, 75:22, 76:3, 86:13, 87:12
**informed** [1] - 51:19
**informing** [1] - 49:24
**initial** [2] - 12:4, 14:2
**injuries** [10] - 20:4, 26:14, 29:9, 32:15, 56:3, 83:8, 83:11, 83:17, 84:4
**injury** [13] - 11:19, 19:21, 20:19, 21:11, 21:12, 28:13, 28:14, 30:23, 31:4, 31:16, 31:25, 32:6, 32:24
**input** [1] - 23:10
**inquiries** [1] - 73:9
**instructed** [2] - 9:8, 9:12
**instrument** [17] - 21:18, 24:8, 24:16, 24:17, 25:9, 25:14, 30:24, 31:5, 31:9, 32:2, 32:7, 32:16, 32:25, 33:11, 33:21, 34:3, 65:16
**interest** [4] - 39:25, 54:3, 54:10, 54:18
**interested** [2] - 39:22, 91:12
**interpretation** [1] - 27:19
**interrogating** [1] - 73:7
**interrogation** [5] - 64:16, 71:22, 72:6, 72:10, 73:21
**interrupted** [1] - 36:14
**interview** [11] - 40:15, 40:17, 40:18, 55:20, 55:21, 64:16, 70:6, 71:2, 72:25, 78:25, 79:14
**interviewed** [4] - 25:23, 30:14, 50:17, 70:18
**interviews** [6] - 38:10, 39:7, 40:3, 40:7,

70:18, 85:24
**investigate** [2] - 84:22, 85:3
**investigated** [2] - 26:12, 26:24
**investigation** [24] - 9:17, 22:25, 39:6, 44:10, 44:15, 44:18, 44:23, 47:8, 48:14, 54:4, 58:18, 60:2, 62:5, 65:6, 66:11, 70:5, 78:9, 78:16, 78:22, 79:7, 80:25, 84:22, 85:3, 85:8
**Investigation** [7] - 25:24, 27:9, 55:22, 56:8, 71:3, 73:2, 79:2
**investigations** [1] - 44:19
**involved** [13] - 41:13, 41:21, 42:2, 50:3, 51:14, 51:21, 53:7, 53:13, 72:21, 83:24, 84:24, 85:5, 85:11
**involvement** [2] - 42:23, 63:18
**involves** [1] - 84:2
**IS** [3] - 3:3, 3:8, 3:12
**issue** [2] - 68:16, 68:17
**issues** [1] - 71:17
**IT** [3] - 3:3, 3:8, 3:12
**itself** [1] - 35:23

## J

**J.P** [1] - 47:24
**jagged** [1] - 60:20
**jail** [1] - 82:8
**JAMES** [1] - 1:7
**James** [2] - 66:7, 90:3
**Jerry** [14] - 38:19, 39:2, 41:13, 41:20, 46:9, 46:22, 47:9, 48:2, 49:16, 50:21, 65:4, 84:23, 85:4, 85:10
**John** [11] - 7:23, 9:13, 46:4, 46:6, 47:2, 47:24, 48:2, 55:8, 56:23, 61:9
**JOHN** [2] - 1:8
**joined** [1] - 66:11
**judges** [3] - 79:8, 81:2, 81:13
**July** [1] - 79:14

## K

**Kenneth** [2] - 27:5, 81:17
**killed** [1] - 25:2
**kinds** [1] - 55:10
**kitchen** [1] - 65:15
**knife** [21] - 56:6, 56:17, 58:17, 58:24, 60:9, 60:18, 65:15, 65:20, 65:22, 67:9, 67:15, 68:9, 68:16, 68:17, 68:21, 69:14, 69:21, 73:23, 74:3, 74:8
**knowing** [1] - 52:18
**knowledge** [2] - 10:16, 11:4
**known** [2] - 52:25, 84:16
**Kosciuk** [1] - 66:16
**KOSCIUK** [1] - 1:7

## L

**Lab** [1] - 66:18
**lab** [2] - 68:8, 68:12
**laboratory** [1] - 66:17
**laceration** [2] - 20:13, 30:18
**last** [12] - 16:23, 26:6, 45:10, 46:3, 47:13, 47:16, 47:19, 68:6, 68:7, 71:5, 79:4
**LAW** [1] - 2:8
**lawyer** [3] - 49:3, 49:8, 49:11
**lead** [4] - 9:16, 11:6, 39:23, 40:12
**learn** [7] - 12:19, 41:11, 46:25, 47:21, 65:3, 72:5, 77:22
**learned** [7] - 7:16, 11:22, 29:19, 37:19, 40:6, 40:18, 40:23, 41:25, 46:17, 46:21, 51:20, 57:21, 62:11, 74:9, 76:3
**learning** [15] - 11:15, 15:10, 38:24, 41:18, 46:19, 48:9, 49:15, 53:6, 53:11, 54:13, 63:15, 64:23, 65:12, 71:20, 72:15
**leave** [2] - 47:16, 47:20
**led** [1] - 13:16
**Lee** [1] - 2:9

**left** [1] - 63:10
**light** [1] - 15:8
**likely** [4] - 14:17, 59:23, 63:2, 63:21
**Lindenhurst** [1] - 7:24
**line** [2] - 19:24, 47:13
**lines** [3] - 8:16, 19:15, 46:3
**listed** [1] - 86:19
**litigation** [1] - 18:16
**LLP** [1] - 2:3
**LN** [1] - 90:6
**location** [4] - 71:18, 72:16, 74:8, 74:19
**look** [12] - 7:4, 8:15, 14:22, 19:2, 19:5, 20:8, 23:12, 30:8, 30:12, 42:5, 50:5, 70:25
**looked** [4] - 28:14, 28:16, 28:20, 28:22
**looking** [9] - 43:23, 45:11, 65:6, 67:20, 68:2, 76:6, 77:4, 77:11, 77:16
**looks** [7] - 6:6, 7:15, 18:3, 19:18, 22:23, 47:15, 86:5
**lover** [1] - 84:12

## M

**male** [2] - 87:17, 87:20
**man** [3] - 13:2, 13:8, 75:5
**mark** [7] - 5:20, 8:4, 13:20, 22:14, 25:18, 29:24, 43:7
**marked** [9] - 5:23, 6:3, 8:7, 13:23, 18:2, 22:17, 25:20, 30:3, 43:10
**marks** [5] - 18:4, 18:7, 18:11, 80:12
**marriage** [1] - 91:10
**Martin** [18] - 4:20, 54:2, 54:9, 54:17, 63:17, 63:23, 64:7, 65:14, 69:14, 69:21, 70:11, 71:15, 71:22, 72:7, 73:15, 73:21, 88:7, 90:2
**MARTIN** [2] - 1:4, 2:12
**master** [1] - 76:12
**match** [1] - 69:2
**Mather** [12] - 9:5, 9:6, 11:9, 15:11, 19:9, 48:23, 53:19, 54:14, 55:2, 57:21, 70:19,

85:25
**matter** [5] - 19:25, 20:2, 20:18, 52:8, 91:13
**McCready** [18] - 1:7, 10:2, 11:5, 53:16, 53:22, 54:2, 63:16, 64:17, 65:13, 69:4, 69:15, 69:22, 71:21, 72:8, 73:14, 73:22, 74:6, 90:3
**McCreedies** [1] - 70:8
**McLELHONE** [1] - 1:8
**mean** [8] - 6:15, 15:25, 16:9, 34:22, 58:22, 82:22, 83:4, 84:8
**means** [1] - 69:9
**meant** [2] - 68:19, 69:10
**medical** [1] - 69:2
**meeting** [4] - 37:24, 38:3, 65:9, 68:12
**member** [4] - 37:22, 38:14, 41:19, 84:13
**members** [1] - 38:4
**memorandum** [1] - 27:4
**mentioned** [3] - 1:19, 61:10, 61:19
**met** [2] - 13:2, 68:8
**metal** [2] - 66:22, 68:2
**middle** [4] - 26:6, 50:8, 75:16, 87:15
**might** [17] - 27:18, 41:21, 42:2, 42:22, 51:6, 51:14, 51:21, 53:4, 53:7, 53:12, 56:10, 61:17, 67:21, 68:3, 84:23, 85:4, 85:10
**Mike** [2] - 4:10, 90:4
**MIKE** [2] - 1:16, 88:20
**mind** [4] - 16:13, 25:4, 58:21, 59:24
**minutes** [1] - 16:10
**missing** [1] - 65:4
**misunderstood** [1] - 82:2
**Mitchell** [1] - 37:2
**MITCHELL** [45] - 2:10, 4:13, 15:19, 17:18, 17:24, 18:10, 18:17, 22:2, 24:2, 24:11, 24:21, 26:25, 29:13, 31:6, 32:8, 35:7, 35:16, 35:22, 36:6, 36:10, 36:23, 38:21, 41:4, 41:15, 44:5, 48:19, 53:2, 54:5, 57:24, 58:19, 60:4,

60:10, 60:24, 62:24, 69:6, 71:25, 72:17, 73:17, 74:11, 77:25, 78:11, 78:18, 81:21, 83:20, 84:18
**moment** [4] - 7:5, 52:19, 60:24, 82:3
**money** [1] - 50:22
**Mongan** [1] - 66:13
**Monti** [1] - 47:15
**morning** [17] - 6:22, 12:1, 12:24, 19:8, 34:20, 35:15, 36:5, 37:6, 48:3, 48:5, 48:18, 48:24, 49:25, 50:12, 53:15, 53:17, 53:18
**most** [4] - 60:13, 60:16, 63:2, 63:5
**mother** [2] - 13:10, 13:12
**mother's** [1] - 75:25
**motivation** [1] - 73:11
**motive** [2] - 51:6, 51:9
**move** [1] - 47:12
**MR** [61] - 4:13, 4:18, 8:4, 13:20, 15:19, 17:18, 17:24, 18:10, 18:12, 18:17, 22:2, 22:14, 24:2, 24:11, 24:21, 25:17, 26:25, 27:6, 29:13, 29:24, 31:6, 32:8, 35:7, 35:16, 35:18, 35:22, 35:25, 36:6, 36:8, 36:10, 36:22, 36:23, 36:25, 38:21, 41:4, 41:15, 43:7, 44:5, 48:19, 53:2, 54:5, 54:21, 57:24, 58:19, 60:4, 60:10, 62:6, 62:24, 69:6, 71:25, 72:17, 73:17, 74:11, 77:25, 78:11, 78:18, 81:21, 83:20, 84:18, 85:13, 88:10
**multiple** [3] - 83:8, 83:11, 83:17
**murder** [11] - 10:9, 26:13, 59:12, 59:23, 67:6, 67:22, 67:25, 69:3, 69:23, 73:16, 74:10
**murdering** [1] - 71:9
**murders** [12] - 51:7, 51:10, 51:22, 53:8, 53:13, 57:8, 63:18, 82:18, 84:24, 85:5, 85:9, 85:11
**must** [1] - 81:12

**Myron** [7] - 48:23, 50:17, 50:21, 51:20, 53:6, 65:9, 71:13

## N

**name** [5] - 4:8, 4:19, 13:7, 38:14, 48:23
**Name** [1] - 90:2
**named** [2] - 27:4, 70:8
**narrow** [1] - 56:4
**nature** [1] - 83:7
**near** [1] - 49:18
**necessarily** [1] - 39:12
**neck** [4] - 17:5, 20:15, 23:17, 30:20
**need** [3] - 6:2, 14:2, 43:13
**needed** [2] - 72:9, 74:7
**NEUFELD** [1] - 2:3
**never** [7] - 27:11, 59:12, 74:23, 79:19, 79:24, 81:14, 83:16
**NEW** [2] - 1:2, 1:2
**new** [1] - 70:12
**New** [8] - 1:13, 1:21, 2:5, 2:9, 4:4, 25:23, 55:22, 91:4
**next** [8] - 10:9, 12:3, 19:15, 19:24, 63:12, 68:15, 72:22, 86:9
**nightgown** [2] - 15:8, 15:18
**Non** [1] - 1:16
**Non-Party** [1] - 1:16
**nonresponsive** [1] - 13:13
**NORMAN** [1] - 1:7
**NOTARY** [2] - 88:25, 90:25
**Notary** [4] - 1:20, 3:14, 4:3, 91:3
**note** [3] - 20:23, 29:16, 46:24
**notebook** [3] - 44:9, 44:17, 44:18
**noted** [6] - 14:25, 15:7, 17:5, 17:7, 54:24, 88:17
**Notes** [2] - 89:10, 89:17
**notes** [44] - 6:5, 6:10, 6:11, 6:13, 6:18, 6:19, 6:25, 7:13, 14:13, 19:3, 19:7, 21:16, 21:25, 28:25, 29:10, 39:7, 39:19, 43:15, 43:18, 43:21,

43:24, 44:16, 44:22, 45:7, 45:8, 45:9, 45:10, 45:14, 45:24, 47:23, 68:4, 74:14, 75:14, 76:24, 77:4, 77:11, 77:16, 78:4, 85:18, 85:23, 86:10
**Notice** [1] - 1:19
**notice** [7] - 71:13, 71:23, 72:9, 72:12, 73:8, 74:23, 87:23
**noticed** [1] - 76:17
**NOW** [1] - 90:6
**number** [4] - 59:19, 68:5, 71:17, 84:16
**numerous** [1] - 84:4

## O

**object** [31] - 15:19, 17:18, 22:2, 24:2, 26:10, 26:25, 29:13, 35:16, 36:18, 36:21, 37:3, 38:21, 41:15, 48:19, 53:2, 54:5, 57:24, 58:19, 60:4, 60:10, 61:10, 62:6, 62:24, 69:6, 71:25, 72:17, 73:17, 74:11, 77:25, 78:11, 78:18
**objection** [9] - 24:11, 24:21, 27:7, 31:6, 32:8, 36:14, 81:21, 83:20, 84:18
**objectionable** [1] - 35:19
**objections** [1] - 3:9
**observation** [6] - 24:9, 60:23, 61:5, 77:5, 77:18, 77:21
**observe** [2] - 21:2, 55:15
**observed** [1] - 17:9
**obviously** [1] - 35:8
**occur** [1] - 28:11
**occurred** [6] - 16:19, 44:14, 57:9, 58:4, 58:9, 61:25
**occurs** [2] - 10:7, 10:8
**OF** [4] - 1:2, 1:7, 2:8, 90:2
**offering** [1] - 49:21
**office** [2] - 65:10, 69:2
**officer** [2] - 7:14, 10:13
**Officer** [1] - 66:13
**OFFICERS** [1] - 1:8
**officers** [1] - 88:2
**Old** [2] - 1:12, 2:4

6

**Olin** [1] - 11:12
**once** [2] - 71:12, 72:20
**one** [28] - 10:25, 13:6, 16:16, 17:25, 28:3, 28:14, 37:8, 40:21, 41:6, 41:7, 41:9, 44:2, 44:16, 44:17, 45:13, 51:25, 52:2, 67:18, 67:25, 68:11, 69:9, 69:20, 77:15, 77:20, 81:3, 82:13, 86:16, 87:8
**ongoing** [1] - 44:20
**open** [1] - 15:6
**opinion** [2] - 81:3, 81:5
**opportunity** [2] - 23:2, 55:14
**orally** [1] - 40:8
**order** [2] - 10:9, 45:5
**original** [1] - 18:14
**originally** [2] - 6:17, 10:12
**ought** [1] - 80:24
**outcome** [1] - 91:13
**outside** [1] - 13:2
**overkill** [3] - 83:3, 83:5, 84:3
**owed** [1] - 50:22
**own** [7] - 16:13, 23:9, 59:24, 77:5, 77:18, 77:21, 84:6

**P**

**page** [24] - 7:5, 8:12, 19:5, 20:8, 26:5, 44:3, 45:7, 45:8, 45:9, 45:10, 45:23, 47:14, 50:9, 55:24, 68:6, 68:7, 71:5, 74:15, 75:16, 79:5, 86:7, 86:9, 86:20, 87:16
**Page** [14] - 10:5, 14:22, 30:8, 34:9, 35:3, 42:6, 44:4, 45:18, 50:6, 71:5, 79:5, 85:21, 89:4, 89:9
**pages** [4] - 8:10, 45:22, 47:12
**pair** [1] - 70:6
**pale** [1] - 15:5
**paperwork** [1] - 49:22
**paragraph** [15] - 14:23, 16:23, 17:4, 20:9, 23:13, 26:6, 26:7, 30:12, 30:21, 55:25, 57:7, 71:6, 71:7, 79:4, 80:7
**phrases** [1] - 18:5
**physician** [1] - 18:24
**pick** [1] - 7:23
**picked** [1] - 9:4
**place** [3] - 1:20, 44:16, 64:21
**Plaintiff** [4] - 1:5, 1:17, 2:4, 4:20
**Plaintiff's** [7] - 5:22, 8:6, 13:22, 22:16, 30:2, 43:9, 89:9
**play** [1] - 36:11
**point** [29] - 4:22, 5:8, 8:2, 9:11, 18:15, 22:24, 38:9, 39:5, 46:17, 46:20, 46:25, 49:16, 53:6, 53:11, 53:15, 59:14, 63:14, 64:3, 64:18, 65:3, 65:5, 65:8, 65:19, 69:13, 70:4, 71:21, 72:6, 72:8
**POLICE** [1] - 1:8
**police** [7] - 57:10, 58:5, 58:10, 62:2, 64:3, 71:11, 88:2
**Police** [1] - 66:13
**POLLACK** [19] - 2:5, 4:7, 4:18, 8:4, 13:20, 18:12, 22:14, 25:17, 27:6, 29:24, 35:18, 35:25, 36:8, 36:22, 36:25, 43:7, 54:21, 85:13, 88:10
**Pollack** [2] - 4:19, 41:5, 89:6
**portion** [2] - 35:8, 36:16
**possibilities** [1] - 84:23
**possibility** [2] - 85:4, 85:10
**possible** [3] - 7:18, 87:4, 87:5
**possibly** [2] - 33:22, 61:11
**potential** [2] - 67:24, 70:17
**potentially** [1] - 67:22
**practice** [10] - 14:19, 37:15, 37:17, 39:11, 39:15, 40:3, 40:5, 44:9, 62:10, 62:20
**precluded** [5] - 71:11, 71:16, 72:14, 73:8, 74:21
**preparation** [2] - 14:14, 23:6
**prepare** [1] - 14:6
**prepared** [1] - 14:4
**preposterous** [3] - 80:2, 80:6, 80:9
**PRESENT** [1] - 2:11
**present** [8] - 40:4, 40:16, 63:23, 64:6, 64:20, 70:5, 70:16, 87:3
**presently** [1] - 43:20
**pretty** [1] - 17:21
**previous** [3] - 14:11, 36:7, 36:12
**previously** [2] - 26:12, 26:23
**print** [1] - 76:25
**problem** [1] - 72:5
**Procedure** [1] - 1:18
**produce** [1] - 4:17
**provide** [1] - 49:22
**PUBLIC** [2] - 88:25, 90:25
**Public** [4] - 1:21, 3:14, 4:4, 91:3
**pupil** [1] - 15:5
**purported** [1] - 69:3
**pursuant** [1] - 1:18
**put** [9] - 29:15, 71:13, 71:23, 72:8, 72:12, 73:8, 74:22, 75:10, 80:18
**putting** [1] - 43:19

**Q**

**quarters** [2] - 14:24, 17:3
**questioning** [2] - 71:15, 71:24
**questions** [2] - 73:12, 74:2
**quotation** [1] - 80:11
**quotations** [2] - 79:10, 79:22

**R**

**rage** [1] - 82:20
**rather** [1] - 13:18
**ray** [10] - 28:14, 28:16, 28:17, 28:20, 28:22, 29:2, 29:5, 29:9, 29:12
**rays** [2] - 28:9, 28:10
**razor** [5] - 56:5, 56:17, 58:16, 60:9, 60:17
**razor-type** [5] - 56:5, 56:17, 58:16, 60:9, 60:17
**reach** [1] - 28:6
**reached** [1] - 61:5
**READ** [1] - 90:6
**read** [9] - 6:7, 9:24, 19:14, 34:13, 46:3, 47:13, 66:6, 75:19, 87:18
**reading** [2] - 10:4, 72:4
**READS** [1] - 90:6
**really** [13] - 40:19, 45:12, 67:23, 68:14, 73:15, 74:3, 74:9, 74:13, 75:7, 75:23, 76:23, 77:9, 80:20
**REASON** [1] - 90:6
**reasoning** [1] - 82:14
**reassign** [1] - 10:18
**received** [4] - 5:14, 5:16, 7:14, 8:17
**receiving** [1] - 7:21
**recess** [2] - 54:23, 85:16
**reclarify** [2] - 72:3, 73:19
**recognize** [4] - 6:5, 14:3, 43:14, 43:20
**recollection** [2] - 7:8, 7:12, 8:20, 10:3, 10:25, 15:14, 17:11, 21:7, 22:6, 23:11, 23:20, 25:16, 32:4, 34:17, 35:10, 36:18, 37:12, 43:2, 46:16, 48:6, 51:18, 66:25, 76:21
**record** [5] - 4:8, 4:14, 17:25, 36:24, 91:7
**recovered** [1] - 67:7
**red** [1] - 15:5
**refer** [1] - 8:12
**reference** [1] - 47:18
**referenced** [2] - 69:3, 69:21
**references** [1] - 86:7
**referring** [1] - 82:7
**reflect** [3] - 29:2, 29:5, 29:11
**reflected** [1] - 21:25
**reflecting** [6] - 21:17, 23:24, 77:5, 77:6, 77:17, 77:18
**reflects** [1] - 71:8
**refresh** [11] - 8:19, 10:24, 15:13, 17:10, 23:19, 35:9, 36:17, 37:11, 46:15, 51:17, 66:24
**refreshes** [2] - 10:3, 43:2
**phrase** [3] - 21:21,
**phrases** [1] - 18:5
**parents** [2] - 71:9, 84:3
**part** [6] - 13:10, 13:11, 36:13, 39:10, 39:15, 75:11
**partial** [1] - 14:23
**participated** [1] - 70:19
**participation** [1] - 88:12
**particular** [6] - 9:20, 9:22, 10:10, 44:10, 44:15, 73:23
**parties** [2] - 3:4, 91:10
**partner** [1] - 7:23
**partner's** [2] - 39:14, 39:19
**Party** [1] - 1:16
**passion** [1] - 82:18
**patrolman** [1] - 12:8
**Patrolman** [1] - 12:14
**payment** [1] - 49:18
**pen** [1] - 18:3
**pending** [3] - 36:2, 36:9, 36:20
**people** [5] - 12:18, 13:7, 40:24, 66:23, 86:17
**perpetrator** [1] - 83:18
**person** [9] - 10:9, 42:21, 54:3, 54:10, 54:18, 67:14, 83:12, 83:25, 87:24
**personal** [2] - 20:24, 77:18, 77:21
**personally** [1] - 60:6
**pertain** [1] - 44:22
**Pfalzgraf** [34] - 7:23, 9:4, 11:24, 12:11, 22:11, 23:21, 24:5, 25:12, 34:11, 38:8, 38:12, 38:17, 40:4, 40:15, 40:22, 42:11, 42:16, 46:7, 46:18, 46:20, 47:2, 47:24, 48:2, 49:7, 50:13, 51:11, 53:22, 53:25, 54:9, 56:23, 61:14, 61:17, 66:15, 69:13
**Pfalzgraf's** [3] - 22:21, 23:2, 39:7
**PG** [1] - 90:6
**phone** [5] - 5:14, 5:16, 7:7, 7:17, 7:21, 64:21, 64:24
**photos** [1] - 55:11, 70:23

regarding [1] - 68:9
Rein [10] - 63:16, 64:17, 65:13, 69:5, 69:15, 69:22, 72:7, 73:15, 73:22, 74:6
REIN [1] - 1:7
Rein's [1] - 71:22
related [6] - 49:22, 83:2, 84:7, 84:8, 84:12, 91:9
relating [1] - 66:20
relationship [1] - 84:10
relative [2] - 83:18, 84:9
relay [3] - 34:12, 53:25, 62:12
relayed [8] - 27:19, 27:20, 29:22, 34:18, 43:3, 52:4, 52:20, 87:12
relaying [2] - 14:10, 52:6
remember [18] - 9:2, 12:6, 13:19, 43:20, 52:6, 57:15, 57:17, 63:10, 65:5, 69:10, 73:3, 74:20, 76:7, 77:9, 78:5, 82:6, 86:18, 86:21
reneging [1] - 42:17
repeat [5] - 24:13, 32:22, 45:4, 58:7, 63:25
repelling [2] - 66:23, 67:20
rephrase [2] - 4:25, 40:9
report [28] - 14:3, 14:7, 14:15, 14:23, 20:8, 20:9, 22:21, 23:3, 23:6, 29:4, 29:11, 30:11, 31:23, 32:10, 34:14, 38:12, 50:11, 50:16, 55:21, 66:7, 71:7, 75:6, 75:10, 78:25, 79:22, 80:18, 80:21, 81:17
Report [2] - 89:13, 89:14
reported [7] - 38:18, 57:9, 58:5, 58:10, 62:2, 63:16, 67:14
reports [2] - 23:9, 39:14, 39:22
represent [1] - 4:20
represented [2] - 49:3, 49:12
reserved [1] - 3:10
residence [2] - 5:13,

7:24
respect [1] - 26:2
respective [1] - 3:4
result [4] - 7:20, 72:14, 82:13, 82:15
retired [1] - 4:16
returned [2] - 66:9, 66:17
review [3] - 23:2, 39:6, 39:19
reviewing [2] - 39:13, 42:25
RICHARD [1] - 1:8
ridiculous [3] - 79:11, 81:6, 81:10
right-hand [2] - 8:13, 30:9, 42:7
ring [1] - 52:16
Road [2] - 1:12, 2:4
Robert [6] - 11:12, 19:11, 23:13, 30:15, 66:14, 66:17
ROBERT [1] - 1:7
ROE [1] - 1:8
Ron [3] - 37:22, 37:24, 38:14
Ronald [4] - 42:12, 42:15, 43:5, 53:11
room [7] - 12:7, 13:4, 20:11, 23:15, 30:14, 30:16, 57:16
Roth [31] - 12:7, 12:11, 18:21, 18:23, 19:8, 19:12, 20:10, 20:23, 21:10, 21:21, 22:7, 23:14, 23:22, 24:6, 24:14, 24:18, 28:21, 29:20, 29:23, 30:15, 30:22, 31:3, 31:21, 31:24, 32:5, 32:16, 32:20, 34:6, 37:19
Roth's [1] - 25:13
Rother [12] - 37:22, 37:25, 38:14, 38:17, 41:12, 42:12, 42:15, 43:5, 53:11, 63:24, 64:9, 64:19
round [3] - 27:16, 33:15, 33:18
rule [1] - 10:11
Rules [1] - 1:18

S

saw [1] - 76:14
scalp [2] - 15:2, 15:17
Scene [1] - 55:9
scene [16] - 10:16,

10:17, 18:25, 56:13, 62:23, 63:4, 63:8, 65:23, 66:9, 66:18, 66:22, 67:16, 70:22, 76:13, 87:16, 88:2
scenes [1] - 59:12
Schaefer [1] - 66:12
SCHECK [1] - 2:3
scoundrels [2] - 79:20, 79:21
screen [1] - 28:13
sealing [1] - 3:5
search [1] - 66:21
Seaside [3] - 7:19, 12:24, 66:10
second [2] - 19:5, 20:9, 30:12, 55:24, 77:10, 79:6
section [1] - 67:19
see [7] - 6:9, 16:16, 26:17, 28:7, 35:6, 76:11, 83:23
seeing [3] - 57:16, 57:17, 74:18
seem [1] - 23:24
Seits [1] - 7:15
sense [1] - 5:5
sentence [2] - 31:24, 79:6
separate [2] - 38:9
separated [1] - 38:11
separately [1] - 86:23
September [19] - 5:8, 6:23, 14:8, 22:22, 44:4, 45:15, 48:5, 53:19, 55:3, 63:4, 63:15, 65:24, 66:2, 66:8, 67:2, 67:5, 67:11, 70:20, 76:13
sequence [1] - 45:2
Sergeant [19] - 5:18, 7:15, 8:11, 8:21, 9:11, 10:17, 29:18, 30:7, 35:2, 35:14, 36:4, 37:5, 41:24, 43:4, 49:25, 51:19, 52:7, 57:5, 66:14
serious [1] - 20:19
services [1] - 67:19
set [2] - 91:6, 91:15
several [3] - 8:9, 13:17, 16:11
severe [2] - 11:19, 23:17
Seymour [22] - 11:18, 16:25, 17:12, 20:5, 21:8, 24:7, 26:17, 26:21, 27:21, 28:7, 28:21, 38:18, 38:25, 46:5, 46:12, 46:22,

47:10, 49:4, 49:12, 49:18, 50:23
Seymour's [3] - 56:3, 57:10, 57:14
shall [2] - 3:6, 3:10
shape [1] - 30:25
shaped [2] - 21:13, 32:2
shapes [3] - 68:21, 68:22, 69:11
shared [1] - 40:23
Shari [3] - 63:24, 64:8, 64:18
sharp [6] - 56:19, 58:24, 60:14, 60:17, 61:10, 65:16
SHEET [1] - 90:2
sheet [1] - 75:24
sheets [4] - 75:17, 76:4, 76:11, 77:24
shirt [1] - 87:21
shoes [2] - 87:22, 87:23
Shore [7] - 25:2, 26:12, 26:23, 28:2, 28:4, 28:18, 28:23
shortly [1] - 51:2
shorts [1] - 87:22
SHOULD [1] - 90:6
showed [2] - 28:10, 28:13, 28:21
showing [1] - 30:10
shown [1] - 70:23
sign [1] - 20:5
Signature [1] - 90:21
signed [3] - 3:13, 3:15, 72:23
significance [9] - 15:15, 15:21, 15:23, 17:14, 24:19, 58:18, 60:2, 62:4, 78:9
significant [6] - 17:16, 24:9, 24:24, 25:14, 62:8, 62:12
similar [5] - 25:3, 27:24, 27:25, 28:6, 28:14, 28:16, 28:22, 33:12, 33:13
similarity [1] - 29:8
simple [2] - 36:21, 36:25
simply [5] - 30:5, 42:25, 43:14, 52:11, 82:12
sister [3] - 64:8, 64:19, 70:7
sisters [1] - 70:6
sit [1] - 21:20
six [1] - 38:20
sixth [1] - 11:13

skull [10] - 19:23, 20:3, 20:12, 21:13, 23:17, 23:18, 30:17, 30:25, 31:11, 32:3
slash [1] - 19:16
slashed [1] - 23:16
slashes [1] - 56:4
slashing [1] - 83:6
slits [1] - 60:21
someone [6] - 16:14, 41:25, 62:22, 79:11, 82:25, 83:24
sometime [2] - 16:19, 34:19
sometimes [1] - 83:23
somewhat [1] - 15:14
somewhere [1] - 77:22
sorry [6] - 10:4, 40:10, 45:12, 53:18, 59:4, 72:4
sort [1] - 40:6
source [5] - 38:25, 41:11, 41:19, 54:14, 75:21
speaker [1] - 87:7
speaking [14] - 12:17, 27:7, 29:21, 34:25, 35:14, 36:3, 37:5, 37:21, 49:2, 53:20, 73:3, 74:20, 86:21, 87:2
specifically [4] - 45:14, 51:8, 57:3, 61:16
spend [2] - 55:17, 63:4
spent [1] - 63:12
spoken [2] - 42:12, 49:7
Squad [1] - 66:16
squad [1] - 11:13
standing [1] - 86:25
start [6] - 5:7, 42:6, 68:4, 74:15, 85:18, 86:10
started [1] - 86:3
starting [2] - 30:8, 50:6, 50:8
starts [1] - 35:4
State [11] - 1:21, 4:4, 4:8, 4:11, 25:23, 27:9, 55:21, 71:2, 72:25, 78:25, 91:4
statement [8] - 24:19, 25:13, 27:9, 68:15, 71:12, 79:17, 80:11, 80:14
statements [3] - 69:4, 69:22, 79:15

**STATES** [1] - 1:2
**stating** [1] - 31:21
**step** [1] - 72:22
**steps** [1] - 48:13
**stepsister** [2] - 64:8, 64:19
**Steuerman** [28] - 38:19, 39:2, 41:13, 41:20, 42:2, 42:17, 42:22, 46:5, 46:9, 46:10, 46:22, 47:9, 47:15, 48:2, 48:16, 48:17, 49:17, 50:2, 50:22, 51:5, 51:13, 51:20, 53:7, 53:12, 65:4, 84:23, 85:4, 85:10
**STIPULATED** [3] - 3:3, 3:8, 3:12
**STIPULATIONS** [1] - 3:2
**stop** [2] - 72:21, 88:3
**strictly** [1] - 10:14
**strongly** [1] - 79:6
**stuck** [1] - 25:4
**subject** [1] - 52:8
**Subscribed** [2] - 88:22, 90:23
**substantial** [1] - 49:17
**suffered** [1] - 26:8
**Suffolk** [2] - 5:10, 90:3
**SUFFOLK** [3] - 1:7, 1:8, 2:8
**suggest** [1] - 16:19
**suggested** [1] - 42:21
**suggests** [2] - 77:11, 83:11
**summary** [1] - 40:6
**Supplemental** [2] - 89:13, 89:14
**supplemental** [11] - 14:3, 14:22, 20:7, 22:21, 23:3, 29:4, 29:11, 30:11, 31:23, 39:14, 66:6
**supposed** [1] - 49:17
**surmise** [1] - 24:6
**surmised** [1] - 57:8
**survive** [1] - 20:21
**Swiss** [1] - 67:15
**sworn** [5] - 3:15, 4:3, 88:22, 90:23, 91:6

**T**

**T-shirt** [1] - 87:21
**Tankleff** [62] - 4:21, 5:13, 6:20, 10:22, 11:6, 11:18, 13:9,

13:15, 15:17, 16:25, 17:12, 17:22, 23:14, 24:7, 26:2, 26:8, 38:4, 38:18, 38:25, 44:17, 44:23, 46:13, 46:22, 47:8, 47:10, 48:4, 48:16, 49:4, 49:8, 49:18, 50:3, 50:22, 50:23, 51:21, 53:8, 53:13, 54:3, 54:9, 54:18, 55:5, 55:7, 58:16, 63:17, 63:23, 64:7, 65:14, 69:14, 70:11, 71:8, 71:15, 71:17, 71:22, 72:7, 73:7, 73:15, 73:22, 82:18, 84:24, 85:5, 85:9, 88:8, 90:2
**TANKLEFF** [2] - 1:4, 2:12
**Tankleff's** [10] - 21:8, 26:17, 26:21, 27:22, 28:8, 55:15, 55:18, 56:12, 64:15, 69:21
**Tankleffs** [4] - 26:15, 41:14, 71:14, 84:17
**team** [1] - 9:19
**telephone** [2] - 64:9, 64:18
**tend** [1] - 13:11
**terms** [2] - 9:15, 16:9
**Terre** [2] - 7:19, 12:24
**testified** [1] - 4:5
**TESTIMONY** [1] - 89:3
**testimony** [6] - 8:11, 9:25, 10:20, 43:2, 91:5, 91:8
**Testimony** [2] - 89:12, 89:16
**THAT** [3] - 91:5, 91:7, 91:12
**THE** [6] - 1:2, 1:7, 5:6, 18:8, 88:13, 90:2
**thin** [1] - 87:21
**thinking** [1] - 78:14
**third** [3] - 23:13, 42:20, 70:8
**threatened** [2] - 38:19, 39:2
**three** [9] - 14:24, 17:3, 19:15, 46:3, 70:6, 70:10, 86:19, 87:3, 87:13
**throat** [5] - 11:20, 19:16, 20:13, 23:15, 30:19
**throats** [1] - 83:6
**tis** [1] - 22:14
**TO** [1] - 89:3

**today** [10] - 20:9, 22:6, 32:12, 63:19, 88:12
**together** [4] - 38:8, 39:21, 86:23, 86:24
**took** [7] - 6:19, 10:18, 19:7, 43:15, 43:16, 64:21, 73:15
**top** [4] - 8:13, 19:11, 68:6, 68:7
**towards** [1] - 75:16
**towel** [1] - 17:4
**trace** [1] - 66:19
**training** [1] - 82:24
**transcript** [3] - 42:6, 50:6, 91:7
**TRANSCRIPT** [1] - 90:2
**trauma** [1] - 26:9
**trial** [1] - 3:11
**true** [3] - 44:21, 51:3, 91:7
**try** [1] - 4:15
**trying** [2] - 19:18, 36:10
**turn** [2] - 10:21, 45:18
**turning** [1] - 42:18
**twenties** [1] - 87:20
**two** [3] - 36:13, 68:20, 68:21
**two-part** [1] - 36:13
**type** [37] - 21:12, 21:17, 21:22, 22:8, 24:8, 24:16, 24:17, 25:7, 25:9, 25:13, 26:10, 27:15, 30:24, 31:5, 31:9, 31:10, 31:16, 31:25, 32:6, 32:15, 32:25, 33:4, 33:11, 33:14, 33:20, 34:3, 56:5, 56:17, 58:16, 58:24, 60:9, 60:17, 69:18, 71:18, 72:16, 74:7, 74:19
**typical** [1] - 14:18

**U**

**unable** [1] - 21:2
**under** [1] - 19:22
**undersigned** [4] - 21:2, 30:13, 66:9, 66:11
**understood** [2] - 5:4, 73:20
**undertake** [1] - 78:15
**UNITED** [1] - 1:2
**unknown** [2] - 87:22
**unresponsive** [1] - 15:4

**up** [6] - 7:23, 9:4, 10:9, 78:15, 78:21, 81:15
**upper** [2] - 8:13, 30:8, 42:7

**V**

**vague** [1] - 77:2
**vaguely** [3] - 61:15, 67:3, 76:7
**vain** [1] - 42:20
**various** [3] - 40:24, 49:4, 49:12
**verbally** [1] - 71:9
**verbatim** [1] - 22:7
**verify** [1] - 6:9
**vicious** [2] - 83:10, 83:17
**viciousness** [2] - 82:23, 83:7
**victim** [13] - 11:17, 15:7, 17:8, 20:10, 20:20, 20:24, 26:22, 27:23, 27:25, 30:16, 83:19, 84:10
**victim's** [6] - 15:2, 15:3, 17:5, 20:15, 21:3, 30:20
**victims** [2] - 83:2, 83:13, 84:7, 84:14, 84:16
**videotaped** [1] - 71:10
**view** [10] - 21:7, 41:20, 53:7, 53:12, 69:14, 72:13, 73:6, 81:11, 81:12, 87:9
**viewed** [1] - 54:2
**voiced** [1] - 32:16
**vs** [1] - 90:2

**W**

**waiting** [1] - 87:17
**waived** [1] - 3:7
**weapon** [6] - 59:23, 67:22, 67:25, 69:3, 69:23, 74:10
**weapons** [9] - 67:6, 71:18, 72:16, 73:9, 73:13, 73:16, 74:8, 74:20, 74:24
**wearing** [2] - 15:8, 87:23
**weeks** [2] - 38:20, 39:3
**welcome** [1] - 88:14
**wet** [1] - 16:17
**WHEREOF** [1] - 91:14

**white** [2] - 87:20, 87:21
**whole** [1] - 63:6
**wife** [2] - 25:3, 26:14
**wish** [1] - 75:2
**withdrawing** [2] - 36:7, 36:12
**Witness** [2] - 1:17, 90:4
**WITNESS** [4] - 5:6, 18:8, 88:13, 91:14
**witness** [2] - 91:5, 91:8
**witnessed** [1] - 20:2
**witnesses** [2] - 70:17, 70:23
**word** [2] - 79:19, 79:23
**words** [8] - 44:16, 45:6, 51:16, 52:3, 54:4, 54:10, 54:18, 56:8
**wound** [5] - 20:18, 25:7, 27:22, 33:9, 68:9
**wounds** [14] - 21:3, 21:8, 26:18, 26:21, 28:8, 56:3, 58:15, 59:10, 59:18, 59:21, 60:8, 60:19, 68:25, 69:16
**write** [1] - 6:18
**writing** [1] - 40:7
**written** [5] - 18:4, 18:5, 19:22, 66:7, 71:12
**wrote** [5] - 6:15, 75:5, 75:6, 81:16, 81:17

**X**

**X-ray** [10] - 28:14, 28:16, 28:17, 28:20, 28:22, 29:2, 29:5, 29:9, 29:12
**X-rays** [2] - 28:9, 28:10

**Y**

**Yaphank** [1] - 4:12
**years** [9] - 5:11, 20:25, 28:15, 59:2, 59:3, 59:6, 59:15, 67:3, 84:16
**YORK** [2] - 1:2, 1:2
**York** [9] - 1:13, 1:21, 2:5, 2:9, 4:4, 25:23, 55:22, 91:4

FEVOLA REPORTING & TRANSCRIPTION INC. (631) 724-7576

**young** [3] - 13:2, 13:8, 87:17

**yourself** [5] - 21:8, 32:23, 33:8, 76:4, 76:11