# Exhibit 21



## STATE OF NEW YORK
## COMMISSION OF INVESTIGATION

**MEMORANDUM**   July 21, 2008

To : Anthony Hellmer, Chief Investigator

From : Kenneth F. Christophersen, Special Agent

File Number :

Subject : C – 118-06 Martin Tankleff Investigation

**Interview of Charles Kosciuk**

On Thursday, July 17, 2008, S/A Gerald Lavin and I interviewed Suffolk County Police Department ("SCPD") retired Detective Charles Kosciuk at his home, 8 Woodcutters Path, St. James, New York, relative to the Tankleff Investigation.

### BACKGROUND

Kosciuk began his career with the SCPD in 1967. He previously served in the United States Army and because of his military experience and because the department was short on chemists, he was assigned to the SCPD Crime Laboratory (Chemistry Section) handling controlled substances. According to Kosciuk, during that period drugs were readily available and the drug problem in Suffolk County had escalated. In 1974, he was assigned to the laboratory's Firearms Section. He added that he has received extensive training and attended numerous training classes throughout his career both in firearms and crime scene investigations and although his salary was paid by the SCPD, he worked under the Medical Examiner's Office which had a separate budget.

Kosciuk stated that on September 7, 1988, he received a telephone call at his Port Jefferson home to respond directly to the Tankleff residence in Belle Terre for a homicide investigation. He said case numbers CC#88461-042 and Lab #998-57483 were assigned to this investigation. Kosciuk referred to copies of his reports that indicated that he arrived at the crime scene at 9:22 a.m., and was logged in by Police Officer Aki, shield # 3705.

---

Number of Copies :

Distribution :

**C-118-06 (I) Complaint of Martin Tankleff**
| | |
|---|---|
| 2-Chair/Comm. | 1-A/C Nowicki |
| 1-C/C Colligan | 1-S/A Christophersen |
| 1-C/I Hellmer | 1-S/A Sheehan |
| 1-D/C/I Lightfoot | 1-LA Rodriguez |
| 1-S/A Lavin | 1- Duplicate file |

C- 118-06-#49 (I)

1

SIC 398304-0276

## AREA OBSERVATION

Kosciuk stated that upon arriving at the scene, he met with Detective James McCready, the lead detective in this case. He also observed Martin Tankleff who McCready had asked to remain seated in his department vehicle which was parked in front of the residence. Kosciuk described the Tankleff residence as being a large ranch with little grass in the front portion of the house but a grassy area was observed to the side and the rear of the home. Kosciuk stated that he and McCready first walked around the perimeter of the house on the grassy area in the side and rear towards a berm. He added that the rear of the Tankleff residence overlooked the Long Island Sound with a steep drop leading down to the water. Kosciuk added that dew covered the grassy area around the side and rear of the house and there were no signs of any traffic or footprints observed. Kosciuk stated that he observed a "highly polished marble or terrazzo floor" inside the dwelling leading from the rear entrance. He stated that he clearly saw that there were no shoe prints or bare footprints on the marble floor. Kosciuk adamantly disagreed with the premise that muddy footprints were found inside the crime scene, as alleged by the Tankleff defense team.

## CRIME SCENE

Kosciuk stated that he waited for personnel from the SCPD Identification Unit to arrive before entering the crime scene because they were responsible for taking videos and still photos of the entire scene. He added that Seymour Tankleff had already been transported to the hospital. Kosciuk stated that while he was waiting for the identification unit personnel to arrive, he was approached by Myron Fox who introduced himself as Tankleff's family attorney and offered his business card. Kosciuk said that he did not accept the card and referred Fox to speak to Detective McCready. Kosciuk did not recall the particulars, but he later learned, through the "grape vine," that Fox was caught "dumping paperwork," in connection with this case.

According to Kosciuk, members of the Identification Unit including Dave Shaffer, Sergeant Feeney and a female civilian named Mergon ("Maggie") arrived at the scene and set up their cameras. Kosciuk stated that he entered with them through the front door in order not to disturb the crime scene. He stated that they first took videos of the entire crime scene and concluded by taking still photos ending at 11:31 a.m. Subsequently, laboratory members photographed and assigned tag numbers to each item of evidence collected. He added that all evidence was segregated throughout the crime scene and laboratory tags were placed on items numbered one (1) to forty four (44). He added that Bob Genna, the Crime Lab's director, was present at the scene and "did forensics" on the interior walls and all related matter.

Kosciuk explained that the Identification Unit dusted for fingerprints and only tagged items where fingerprints were found while the Lab personnel placed

2

numbered tags on everything found. Additionally, Kosciuk said that he used "Auto Sketch," a computerized drafting program, to prepare diagrams and sketches of the crime scene. The diagrams identified the items recovered and the location where they were found. Kosciuk stated that architectural plans for the Tankleff residence were found inside the home and those plans were used to make a model. Kosciuk explained that recovered items were brought to the Lab for trace evidence analysis before being returned to the Identification Unit. All items were logged, packaged and when necessary refrigerated. According to Kosciuk, Lab personnel checked every window and door including the rear sliding doors and discovered that they were locked and there and no visible breaks. He thought that the garage doors were closed and possibly power operated. Kosciuk used the front door only to enter and exit the crime scene.

Kosciuk stated that he took into consideration that Seymour's desk and chair had been moved, possibly by medical personnel, prior to his arrival at the scene. He stated that he spent a lot of time examining Seymour's office area. He observed blood spatter on the desk and on the ceiling above the desk consistent with blows originating from behind the chair area. He stated that it was obvious from the blood staining on the desk and chair that the attack occurred from behind the chair. He added that although there was blood spatter on the ceiling, it was insufficient to do a "string indicator" to determine the direction and range of the blows. He explained that when determining the number of blows administered, "you would always have to add one since the first blow would not produce any blood spatter." Additionally, if the victim was moving during the attack, then a crisscross spatter of blood might be observed on the ceiling. Kosciuk recalled finding lose hairs on top of Seymour's desk.

Kosciuk said he did not believe that a knife recovered on the kitchen table was used to cause Seymour's injuries. He said Tankleff admitted to McCready that he used the knife that was on top of a table next to the watermelon. It is Kosciuk's "gut feeling," after reviewing Seymour's x-rays, that a "utility type knife" was used to cause his wounds. He bases his opinion on the type of wounds which were long, thin, narrow slashes that he believes were likely caused by a razor-like blade. Additionally, while he was at the morgue, Kosciuk observed small marks (dots) at the start of Seymour's slash wounds that appeared to him to be indicative of marks that could have been left by the handle of a utility-type knife. He stated that he may have discussed this matter with the Medical Examiner, Dr. Dawson. Kosciuk also observed two nicks on the upper right and left side of Seymour's high back desk chair. Kosciuk further believes that the high back chair would have blocked any blood from getting onto the assailant. He also believes that Seymour was able to survive because his head dropped down, pressing against his neck which helped to close his wounds.

Kosciuk said, he recalled seeing blood stains on the east wall in the master bedroom and on the bedsheets and the pillowcases. Blood stains were also observed at the foot of Arlene and Seymour's bed and on a magazine on top of a

SIC 398304-0278

table at the foot of the bed. Loose hairs that were collected from Arlene's hands, shoulder, and body and her pillow cases were submitted for trace evidence analysis. He added that what he thought to be blood, on a window in the rear of the house, proved to be a red decking stain. Kosciuk stated that he supervised the lab's activities at the scene and was accompanied by Forensic Scientist Dan Burhan, who handled trace evidence, George Reise from the firearms section, and Robert Bauman, a forensic serologist, who did blood analysis. Additionally, he recalled seeing numerous homicide detectives at the scene including Detectives McElhone, Anderson, Laghezza, Burnes, Rein and McCready. He recalled that detectives performed a practical sound test to determine the degree of sounds from locations throughout the house.

Kosciuk recalled that three (3) vials of blood and some dry blood samples were received from Detective Pfalzgraf at the scene and he believes that Bauman may have taken them to the lab for further analysis. Kosciuk could not state definitely how the vials were obtained but he believes it was probably Seymour's blood.

## CRIME LABORATORY EVIDENCE RECOVERY REPORT

Kosciuk referred to the Evidence Recovery handwritten report identifying items collected, the times recovered, their locations, etc. Kosciuk was asked about a possible knife imprint that was recently discovered by Martin Tankleff on Arlene's bedsheet. He stated that nothing was overlooked and when bloody clothing or material is wrapped or overlapped, it is possible to leave an imprint that could appear to be an impression made by a knife.

Kosciuk stated that all of the plumbing drains in the household were examined and samples of water were taken for further examination. Water was collected from the drain traps in the kitchen sink and from the sink on the north kitchen wall along with traps from two sinks in the master bathroom. Samples were taken from all drains and traps. Several traps were "frozen" and a hacksaw was used to cut the copper pipes and elbows in the crawl space beneath the floor to obtain samples. He added that laboratory tests of these items were quite sensitive and several swabs were taken which proved to be negative for blood. Kosciuk explained that as blood dries, it becomes harder to remove. He stated that he may have learned from McCready that Tankleff admitted that he had showered in which case fresh blood and water would have mixed. He added that if enough water passed through the pipes and drains, any blood trace evidence could have been washed away. Analysis showed that blood was not detected in any of the items examined. Additionally, Kosciuk reported finding a loofah that appeared to have been slit with a sharp knife or blade.

4

Kosciuk referred to blood found on a light switchplate located in Martin Tankleff's bedroom. He stated that this item was photographed and a nearby section of the wall was cut out for further examination. He added that Genna said that there was a pattern imprinted on the switch plate which was taken for further analysis. Kosciuk recalled seeing a dumbbell set of free weights on the floor in Tankleff's bedroom. He stated that the dumbells were separated on the floor and he could not recall if their inner collars were attached to the bars. No blood was found on these items.

Kosciuk conducted his investigation at the crime scene from September 7th through September 9th when his examination was completed. He stated that he testified for three days during the trial and accounted for every item that was taken from the crime scene.

SIC 398304-0280