# Exhibit 22



## STATE OF NEW YORK
### COMMISSION OF INVESTIGATION

# MEMORANDUM

July 22, 2008

To : Anthony Hellmer, Chief Investigator

From : Gerald Lavin, Special Agent

File Number : C-118-06 Tankleff

Subject : Interview Detective John Pfalzgraf S.C.P.D. (Retired)

On Friday, July 18, 2008, Special Agent Kenneth Christophersen and I were present at the residence of retired Suffolk County Police Department Detective John Pfalzgraf, 33 Roosevelt Boulevard, Massapequa, N.Y. Pfalzgraf was interviewed regarding his knowledge of the investigation of the murders of Arlene and Seymour Tankleff, in 1988.

Det. Pfalzgraf became a Suffolk County Police Department (SCPD) Police Officer on 10/24/1968; upon graduation from the Police Academy he was assigned to Patrol duties in the 1st Precinct. In 1973, Pfalzgraf was assigned to investigative duties as a police officer. In 1981 he was promoted to detective, assigned to the 1st Precinct Detective Squad. He was assigned to the Homicide Squad in 1983 where he remained until his retirement in 1991. Presently he works for G.E.I.C.O. insurance as a fraud investigator.

When interviewed, Pfalzgraf, from memory, without his investigative reports, said the following:

On the morning of 9/7/88, he was called and told to respond to a home in Belle Terre, Suffolk County, to assist with a homicide investigation. Upon arrival at the crime scene, the home of Seymour and Arlene Tankleff home, 33 Seaside Lane, Belle Terre, he observed a young man, later identified to him to be Martin Tankleff, sitting on a car. He saw that other SCPD detectives were present. He believes that Detective Sgt. Doyle and Detectives Jim McCready and Norman Rein were those already at the scene. As per SCPD protocol, he did not enter the crime scene at this time and remained outside.

---

Number of Copies :

Distribution :

**C-118-06 (I) Complaint of Martin Tankleff**

| | |
|---|---|
| 2-Chair/Comm. | 1-A/C Nowicki |
| 1-C/C Colligan | 1-S/A Christophersen |
| 1-C/I Hellmer | 1-S/A Sheehan |
| 1-D/C/I Lightfoot | 1-LA Rodriguez |
| 1-S/A Lavin | 1- Duplicate file |

C-118-06 #48 (I)

1

SIC 398304-0281

Mather Hospital – Myron Fox:

D/Sgt. Doyle informed Pfalzgraf that the severely injured male victim, Seymour Tankleff, had been removed to Mather Hospital by the rescue squad. Doyle told Pfalzgraf to respond to the hospital to further the investigation. When he arrived at Mather Hospital he discovered that several family members were present. One of them, Myron Fox approached Pfalzgraf and introduced himself as Marty's uncle and "Tankleff family attorney." Pfalzgraf, aware that Marty was a potential suspect talked to Fox, to "soothe him," to make him comfortable with the situation. He informed Fox that Marty had gone to police headquarters to help with the investigation. He said that, at this time, Fox did "not put us on notice," thus permitting the investigators to interview Marty about the incident.

During an earlier interview, Crime Lab Det. Kosciuk informed Commission investigators that, while processing the crime scene, he had received vials of blood from Det. Pfalzgraf. Kosciuk could not recall the circumstances surrounding the collection of the blood in the vials. Pfalzgraf was asked if he came into possession of any vials of blood while at the hospital. He apologized and said he was unable to recall everything he did almost twenty years ago. He said that the reports he prepared should contain this information.

The Crime Scene:

*Crime Scene Procedures*: Pfalzgraf said, in 1988 the SCPD had already instituted "very thorough crime scene procedures." He said that if you were not in charge of the scene you didn't go in unless assigned. He said that the SCPD Identification section would process the scene in a very methodical manner, room by room. First, the ID section went in and video-taped the scene. Second, the ID section took still photos of the scene and then the scene would be processed further.

*Arelene Tankleff*: Pfalzgraf said that he later returned to the crime scene. Though uncertain, he said he "may have seen" Arlene next to a bed, with multiple stab wounds.

*Emergency Service Search*: Pfalzgraf said he was involved in the search conducted by officers from SCPD Emergency Services (ESU). At the rear of the Tankleff backyard was a steep cliff-like embankment, too steep for persons to walk up or down. It was necessary to call upon emergency services officers to search for any evidence that might have been hidden or thrown over the cliff. The ESU officers rappelled down the cliff to conduct a search for evidence. Pfalzgraf was present to witness this search. No evidence was discovered as a result of this search. Officers also searched the beach and waters below the cliff. Additionally, in an effort to find a murder weapon or other evidence, ESU conducted a search on the east side of the house which was overgrown with ivy or pachysandra vines. No evidence was discovered in this area.

2

*Blood Evidence in Plumbing*: Pfalzgraf was present and watched while Suffolk crime lab personnel checked all the plumbing fixture traps and pipes for blood evidence. Samples were taken for analysis.

*Morgue:* Pfalzgraf did not recall visiting the morgue to view Arlene's body or autopsy.

*Canvasses:* Though he believed canvasses were conducted, Pfalzgraf did not recall personally conducting any of them.

*Movie Recording*: Pfalzgraf was asked if he participated in a canvass of video rental stores for a film that portrayed a male who killed girls while naked to avoid contaminating himself with blood evidence. He said he recalled that detectives had done a canvass for this video, but he didn't recall being involved in this step of the investigation.

Interrogation Procedures:

Pfalzgraf said that by 1988, because of a prior Commission investigation, the SCPD established interrogation operating guidelines/procedures.

*Two Hour Rule*: Prior to 1988, some SCPD interrogations had been criticized. There had been allegations of the mistreatment of suspects in order to elicit confessions. By 1988, the SCPD instituted a two hour rule, a guideline to be followed when interrogating suspects. If a team of detectives did not elicit a confession within two hours, another team of detectives would continue the interrogation.

*Video Taping:* as a result of the above mentioned allegations, the SCPD obtained video cameras and equipment and began making video recordings of confessions.

*General Interrogation Procedures:* Pfalzgraf said that by 1988 the Homicide Squad conducted "very professional" interrogations. Detectives received training in interrogation methods and many read additional material on their own. He described the basic procedures in use by the Homicide Squad in 1988:

> A. Members of the Homicide had discussed and used the Reid Technique to interrogate their subjects in which the interrogator has to find a reason for the defendant to confess. The interrogator had to find a religious, moral, or other reason he believed would overcome the suspect's resistance to confess.

> B. Elicit a verbal confession from the suspect. Pfalzgraf explained that, at this stage, the suspect's confession usually contained inconsistencies, and misinformation.

3

SIC 398304-0283

C. First written confession. He said this first written confession often contained inconsistencies, misinformation and the suspect often held back information from the interrogators.

D. Interrogators review and refine the written confession with the suspect until he gives them a full, truthful and accurate account of the facts.

E. The suspect gives a video-taped confession.

Pfalzgraf said Homicide Squad Detectives received much in-service training and regularly attended schools and courses related to their investigative duties.

Persons Related to the Tankleff Investigation:

Pfalzgraf was asked about a number of persons associated with the investigation into the Tankleff case; he said the following:

*Shari Rother-* Pfalzgraf did not recall if he saw Shari Rother or her husband Ron Rother at Mather hospital. However, he said that he could identify her; he knew he had seen her at either the crime scene, the hospital or had seen news photos of her. He came to know that Shari wished Marty to be guilty, she wanted the proceeds from the estate.

*Joseph Creedon-* He said he did not know or know of Creedon in 1988.

*Peter Kent-* Pfalzgraf said he did not know or know of Kent in 1988.

*Glen Harris-* He said he did not know or know of Harris in 1988.

*Jay Salpeter-* Pfalzgraf said he does not know private investigator Salpeter nor has Salpeter ever contacted him.

Miscellaneous:

*Murder Weapon:* Pfalzgraf is of the opinion that the cutting instrument used to slash Arlene and Seymour was never recovered. He said he saw Arlene Tankleff's body at the scene or viewed photos of her body and recalls that her wounds appeared to be cuts from a very sharp knife like an Exacto knife or razor knife, such as one uses to make fine cuts on wallpaper.

*Dets. Rein & McCready:* Pfalzgraf said he saw Marty in police headquarters after he had been brought there to be interrogated. He was asked if Marty was abused during the interrogation. He said Det. Norman Rein, who was on the interrogation team with McCready "would never do anything wrong" or allow any improper conduct by others working with him.

4

SIC 398304-0284

*Letter to Court TV:* Pfalzgraf wrote a letter to court TV in which he complained that they misrepresented the facts in the Tankleff case. He said many of his former homicide detectives are sickened by the way the media portrayed the events surrounding the Tankleff case.

5

SIC 398304-0285