Exhibit 23



**STATE OF NEW YORK**
**COMMISSION OF INVESTIGATION**

## MEMORANDUM          July 30, 2008

To :          **Anthony Hellmer, Chief Investigator**

From :        **Kenneth F. Christophersen, Special Agent**

File Number :  **C – 118-06 Martin Tankleff Investigation**

Subject :     **Interview of Detective Sergeant Robert Doyle**

On Tuesday, July 29, 2008, Deputy Chief Investigator Jerome Lightfoot and I interviewed Suffolk County Police Department ("SCPD") Detective Sergeant Robert Doyle relative to SCPD's investigation into the murders of Seymour and Arlene Tankleff.

**BACKGROUND**

Doyle stated that he began his career with SCPD in 1977, and was assigned to uniform patrol in the fourth precinct. In 1978, he was transferred to the Highway Patrol Unit. He was subsequently promoted to sergeant while assigned to the Narcotics Bureau and later became a patrol supervisor in the sixth precinct. He also worked in the Internal Affairs Unit, Crime Control Unit, Third Squad detectives and was the Commanding Officer of the Electronic Training Unit. In 1987, he was assigned to the Homicide Squad and he is currently the Commanding Officer of the Major Case Investigation Unit.

**NOTIFICATION**

According to Doyle, on September 7, 1998, he was notified at home by Homicide Squad Detective Mike Carmody, who was on standby, of a report of a homicide that occurred inside the Tankleff residence in Belle Terre, New York. Doyle explained that as the supervising homicide sergeant, he would not be notified for suicide cases, accidental deaths, etc., unless they involved someone of importance. Typically, these types of investigations were handled by the detective on standby. However, he said that he would be notified whenever a murder or

Number of Copies :

| COMPLAINTS | 1 S/A Lawin |
|---|---|
| 1-Chair./Comm. | 1 S/A Sheehan |
| 1-C/C Colligan | 1-A/C Nowicki |
| 1-C/I Hellmer | 1-S/A Christophersen |
| 1-D/C/I Lightfoot | 1-L/A Rodriguez |
| 9-Extra's | 1-Duplicate File |

1

C 118.06.50 (E)

arson death occurred. He added that "some people are under the misimpression that the "squeal detective" was supposed to be the lead detective."[1] Doyle stated that he tried to balance the manner in which homicide cases were assigned and who would be designated the lead detective. Doyle stated that based on the upscale location of this homicide, he knew that this case would attract a lot of attention. After notifying Detective K James McCready, Doyle contacted Detective Norman Rein at his home. He stated that McCready was the first homicide detective to arrive at the scene, followed shortly thereafter by Rein and he considered both to be excellent detectives. According to Doyle, McCready saved a cop's life who was wounded during a shooting involving a bank robbery. McCready shot and killed the perpetrator during a firefight. Doyle had high praise for Detective Rein who he considered to be the best detective that he has worked with during his entire law enforcement career and he wanted Rein assigned to this investigation. Ultimately, he decided how homicide cases were assigned.

**CRIME SCENE**

According to Doyle, he recalled that on the day of this investigation, the sky was clear and the weather conditions were perfect, "similar to September 11, 2001." After being notified, Doyle said that he began calling detectives and supervisors from the various units to respond to the crime scene. He stated that McCready, who personally owned a construction business in Flower Field Industrial Center in Suffolk County, would meet early each morning with his workers to discuss the day's job assignments. Consequently, McCready's close proximity enabled him to be the first detective to arrive at the scene, followed by Doyle and Detective Norman Rein. According to Doyle, upon arriving at the scene he saw McCready talking to Martin Tankleff outside the residence which he described as an extended "L shaped ranch with a million dollar view overlooking the Long Island Sound." Doyle said, at the rear of the residence was a steep cliff that descended down to the water.

Doyle said that he spoke to McCready who advised that there were two victims involved, Seymour Tankleff who had been transported to a hospital, and his wife Arlene who was found dead inside the master bedroom. Doyle said that he and McCready did a "walk through" and viewed the entire house. He stated that there was a lot of blood in the office area and on Seymour's chair. Doyle added that Detective Rein also did a complete examination of the crime scene. Doyle did not recall seeing any mud on the floor inside the house. He added that a crime scene **perimeter was established** and yellow tape was placed from the street in front of the scene to around the back of the house bordering the Long Island Sound.

Doyle stated that he had no prior knowledge or dealings with any of the Tankleffs and his first impression of Martin Tankleff was that of "a seventeen

---

[1] Squeal detective – a term commonly referred to the assigned case detective.

SIC 398304-0270

year old kid who appeared to be stoic and never shed a tear or asked about his father's condition." Doyle stated that Tankleff spoke very exactingly and "matter of fact" about his father's business partner, Jerry Steuerman, and their relationship. Tankleff accused Steuerman of committing the murders. When Doyle asked Tankleff why he did not wake-up his mother to assist his father, Tankleff replied that he thought that she went out to buy a container of milk. Doyle mused over Tankleff's reply and thought it highly unlikely, at that early morning hour, that his mother would travel to buy milk.

According to Doyle, after viewing the crime scene, it became clear to him that Martin Tankfeff's bedroom was in close proximity to the master bedroom where Arlene could be clearly seen from the doorway. He questioned why Tankleff was the only uninjured person in the household and it was obvious to him that this was not a burglary and the house had not been ransacked. Martin seemed to be focusing on Steuerman only and Doyle found his behavior to be odd for someone whose parents were viciously beaten. After comparing notes with what Tankleff had told McCready and Rein, and finding some differences in his story, he requested that Tankleff be taken to police headquarters for further questioning.

Doyle stated that while he was at the scene, Myron Fox, Seymour's business attorney, introduced himself and said that he took care of Seymour's business. Fox asked Tankleff, "Marty are you ok?" Tankleff responded by saying, "yeah Uncle Mike" after which Fox left the area.

According to Doyle, he felt that Seymour wanted Marty to realize that he had to work for his money. Doyle stated that there was a long list of chores that Marty had to do around the house. Doyle said that he even had to clean the gunite swimming pool walls. Additionally, many of the high school students, from the Belle Terre area, drove new cars while Marty was angry because he was stuck with having to drive an old Lincoln to school. Doyle stated that Tankleff was questioned in the interview room which was located inside the general homicide squad area. He added that Lt. John McElhone was the commanding officer of the Homicide Squad and although he is now retired, Doyle suggested that he could be helpful in providing information regarding this case.

With respect to communications, Doyle said, at that time the detectives only had pagers and communicated via police radios from outside the Tankleff house. He added that they did not have a command bus at that time and a command post was not established. He further explained that non-sensitive telephone calls were made from neighbor's telephones while public pay telephones, which were located a distance from the scene, were used to make sensitive calls. Doyle further stated that police chiefs were disturbed with the communications system and as a result of this investigation; he was the first SCPD supervisor to be issued a cell phone. He added that within weeks of this investigation, all SCPD supervisors were equipped with cell phones.

3

Doyle stated that prior to doing a detailed examination of the scene, personnel from the Identification Section first took **videos** of the entire crime scene. Subsequently, **still photos** were also taken. Doyle added that this investigation occurred prior to DNA technology and he conferred with supervisors from the Crime Laboratory and the Identification Section, who responded to the scene, and discussed how to systematically search and collect all trace evidence. All evidence collected was photographed, bagged, tagged, and logged as to how it was collected. Doyle praised the lab personnel for their professionalism. He added that the Identification Unit personnel had the expertise **to photograph** and examine the scene for **latent fingerprints** and they only handled cases involving homicides and bank robberies. Doyle stated that he also had **latent fingerprint examiners** respond to the scene. Doyle stated that he held an initial meeting with the supervisors and detectives to discuss their investigative goals. Doyle also assigned Detective James Barnes to coordinate activities at the crime scene and to report directly to him. He added that he did not conduct many interviews because he felt that it would impede on his supervisory duties. Additionally, Doyle said that he dispatched teams of detectives to do an extensive **door to door canvass** of the surrounding area. A **crime scene log** was established, identifying the date, time of arrival and departure of every individual at the scene. Doyle was unsure if Polaroid pictures were taken at the scene. Meetings were held every morning and evening to discuss the case's progress and uniform personnel were used to maintain the crime scene at the end of each day. He stated that every technique was employed and he thought that **luminol** was also used.

According to Doyle, **metal detectors and K-9 dogs** were used to search for weapons and other evidence. Doyle believes that **divers** were also used to search the Long Island Sound for any weapons and a "throwing distance" was calculated, from the rear of the Tankleff residence to the water below, to determine the water area to be searched. A department helicopter was used to take extensive **aerial photos** of the scene. Doyle stated that personnel from the Emergency Service Unit (ESU) rappelled down the steep incline behind the residence to setup a grid search for any evidence, weapons, etc. This process was done over a period of two days after which a second independent search team was used to conduct a grid search of the incline. According to Doyle, the police department used every available resource during this investigation and money was no object. He added that the district attorney's office paid $5,000 to create a **model** of the Tankleff residence. He added that the model, which was used, as an exhibit during the trial, was equipped with a removable roof that enabled the jury to visualize the location of every room.

Doyle stated that he conferred with Suffolk County Assistant District Attorney (ADA) Edward Jablonski, Chief of the Homicide Bureau and ADA Tim Mazzei and informed them of the details of the case.

4

SIC 398304-0272

Doyle stated that he felt that some sort of knife and bludgeon were used to inflict the injuries to the victims. Doyle did not believe that a knife, recovered on a kitchen counter next to a watermelon, was used to inflict the injuries and that a smaller knife, possibly a utility knife, might have been used. He based his belief on the compression level of the wounds. He stated that the police were "stuck" with the type of knife described by Tankleff in his confession.

## MEDICAL EXAMINER

Doyle stated that he thought Dr. Dawson, from the Suffolk County Medical Examiner's Office, may have pronounced Arlene Tankleff dead later in the afternoon. He said that they had to clear the area around her before the medical examiner ("ME")could conduct his examination. He explained that the ME examined Arlene's fingernails for trace evidence and inspected her body for wounds. Her body temperature and the ambient room temperature were taken. Doyle stated that it appeared that she received blows to the head and sharp knife wounds to the neck and she probably "bled out." Defensive wounds were visible on both of her arms. Doyle believed that the television in the master bedroom was on when she was found and the drapes were open. Doyle stated that he did not revisit the crime scene on the following day, to ascertain the natural light in the master bedroom. Marty claimed that it was too dark to see his mother in the master bedroom when he awoke. Doyle stated that sunrise came early and a reexamination of the photos showed that Arlene's head was visible from the doorway leading into the master bedroom.

## JERRY STEUERMAN

After Doyle learned that a card game was held at Tankleff's home on the evening prior to the murders, he assigned teams of detectives to interview the participants. Doyle stated that he assigned Detectives Anderson and Laghezza to interview Jerry Steuerman, one of the card players. According to Doyle both detectives interviewed Steuerman extensively and were confident that he was not involved with the murders. Subsequently, Steuerman disappeared and his car was found unoccupied with the engine running behind a restaurant in Hauppauge, New York. Doyle added that Steuerman's son Glenn later filed a missing person's report with SCPD and hired Private Investigator Bo Dietl to find his father. According to Doyle, Steuerman's disappearance turned into a "red herring" and damaged the case. Doyle stated that the homicide squad assumed the responsibility for the missing person's investigation because Steuerman was an important witness. He stated that a number of pen registers were setup on several telephones which subsequently proved helpful in identifying Steuerman's whereabouts. Doyle was subsequently notified by Steuerman's girlfriend who advised him that Steuerman had called her and identified himself by using the code word "Pistachio" which was their favorite flavor ice cream. Doyle stated that by using the telephone numbers obtained from the pen registers, they were able to trace Steuerman to the Gallery Hotel in California. Doyle contacted the Hotel and

5

confirmed that Steuerman was a registrant. According to Doyle, he, accompanied by McCready and Jablonski flew to California to locate and return Steuerman to New York. After interviewing the hotel manager, Doyle learned that Steuerman had "skipped out" and did not pay for two day's lodging. Doyle was able to obtain the telephone numbers of telephone calls made by Steuerman from the hotel which ultimately led them to his whereabouts. According to Doyle, the fact that Jablonski accompanied them to California was not unusual, as ADA's would often go along to conduct interviews and handle legal matters.

Upon locating Steuerman, Doyle said that he and McCready interviewed him thoroughly about his sudden disappearance. Doyle stated that Steuerman explained why he left New York, and flew to California. He stated that he was depressed after the death of his wife and the fact that he was cheating on her while she was sick. According to Doyle, Steuerman was also under a lot of pressure, from his girlfriend, to marry her. Steuerman was also upset with the loss of his friend Seymour and the fact that some of his friends were beginning to think that he was involved with the murders. Steuerman felt that the negative news coverage of him was hurting his business.

According to Doyle, Steuerman did not conceal his identity, as was previously believed and he openly talked to passengers on his flight to California and to others in California about how he was being tortured by the media and how he was being falsely accused of murdering his business partner. Doyle stated that they were able to locate passengers and others who Steuerman had spoken to explaining his situation. Doyle did not agree that Seymour and Steuerman were considered to be arch enemies as described by the defense and questioned, if that were the case, why would Seymour invite Steuerman into his house to play cards. Doyle reminded us that Steuerman had testified during the trial and was cross-examined by the defense for "three solid days" and his testimony was found to be believable.

Doyle said, he knew that Tankleff's defense team had hired Private Investigator Jay Salpeter for their investigation. He said, he previously had contact with Salpeter on another case but he could not recall the particulars. Doyle stated that he knew Joe Creedon whose name came up when he worked cases in the sixth precinct squad. He stated that Creedon was a street thug who was a "big man" as long as he had a gun. Doyle found it hard to believe that "Joey Guns Creedon" would commit the Tankleff murders "by using knives and blunt instruments instead of a gun." Doyle spoke about a case when Steuerman's son Todd shot Creedon in the arm over a drug deal. He mused over the fact that Creedon, who was supposed to be such a tough guy, would not retaliate. Doyle does not know Glenn Harris or Peter Kent, the others alleged by the defense to have committed the murders.

Doyle was unaware of any listening devices being recovered from the crime scene. He said that they did not tear down the walls to search for any

6

SIC 398304-0274

devices, as alleged by Salpeter to have been placed in the Tankleff home. He said he does not know Private Investigator Laura Donaghy who allegedly "planted" the listening devices. He added, that based on the thoroughness of the investigation conducted at the scene, he believes that the crime scene search unit would have discovered any listening devices.

Doyle stated that after the State Investigation Commission's report in the 1980's, that was critical of the SCPD, there was a mass exodus of detectives from the homicide squad. He stated that he was assigned to the homicide squad to help restructure the system. He added that he attended the New York City Police Department's Homicide course and other courses given regarding the "Reid Technique" for conducting interviews and interrogations. He stated that other changes were instituted and every new homicide detective has to attend courses on homicide investigations. Additionally, homicide detectives learned techniques by attending ongoing monthly seminars that were held by Dr. Hirsh from the Medical Examiner's Office.

Doyle does not think that he would have done anything different regarding this investigation. He explained that the detectives were under time restraints and because Tankleff's attorney put them on notice to cease questioning Martin Tankleff they were precluded from probing further with respect to the weapons used and their possible location. He added that the police had to proceed with the information that was offered by Tankleff. Doyle firmly believes that Martin Tankleff was responsible for the murders of his parents and it was unfortunate that his interrogation was cut short.

7