# Exhibit 27

People v. Tankleff                    144

But you need to talk to
Mr. Tankleff about that, and I'm leaving
it up to you gentlemen to do that.
Okay?

MR. POLLACK:  Yes, your Honor.

THE COURT:  So, I was going to end
it there.

I appreciate the comments of
counsel, but I was going to leave it
there for -- and I didn't take it as any
disrespect.  It's just that I expected
Mr. Pollack and Mr. Barket here
yesterday because you're officers of the
Court, I expected you both here whether
Mr. Tankleff appeared or not.

MR. BARKET:  I'm sorry, Judge.

THE COURT:  Apology's accepted.

Let's go forward.

MR. POLLACK:  Thank you, your
Honor.

THE CLERK:  Sir, please, stand and
raise your right hand.

(Whereupon, the witness complied
with the request of the Clerk of the

```
 1                    People v. Tankleff              145

 2             Court.)

 3    R O N   F A L B E E ,          the Witness herein,

 4             having been first duly sworn by the

 5             Clerk of the Court, was examined and

 6             testified as follows:

 7                  THE CLERK:  Please, be seated.

 8                  (Whereupon, the witness complied

 9             with the request of the Clerk of the

10             Court.)

11                  THE CLERK:  Please give us your

12             full name, spelling your last name, and

13             your town of residence.

14                  THE WITNESS:  Ron Falbee, F as in

15             Frank, A-L, B as in boy, E-E.

16                  And town of residence is Westbury,

17             New York.

18                  THE COURT:  Good afternoon, sir.

19             Go forward, please.

20                  THE WITNESS:  Good afternoon, your

21             Honor.

22                  MR. POLLACK:  Thank you, your

23             Honor.

24    DIRECT EXAMINATION

25    BY MR. POLLACK:
```

1

2      Q      Mr. Falbee, how are you related to the

3    Tankleffs?

4      A      I'm Marty's cousin.  I was nephew to

5    Arlene and Seymore.

6      Q      Specifically, were you related to Arlene

7    or Seymore?

8      A      I was related to Arlene.  My mother is

9    Arlene's sister.

10     Q      Mr. Falbee, did the Tankleffs in their

11   will provide any particular role for you?

12     A      Yes.  They provided that my wife and I

13   be Marty's legal guardians.  They also provided

14   that I be the executor of the estate.

15     Q      And did you fulfill those roles after

16   the death of the Tankleffs?

17     A      I did.

18     Q      And, in fact, did Marty Tankleff come

19   and live with you for a period of time pending his

20   trial?

21     A      Yes, he did.

22     Q      Mr. Falbee, I'd like to direct your

23   attention to the year 1988 to the months leading

24   up to the murders of the Tankleffs, and I'd like

25   to ask you if during that time frame you had any

1

2    conversations with Seymore Tankleff about his

3    business relationship with Jerry Steuerman?

4        A        Several times or a few times during the

5    holiday during '88 and actually even later, '87, I

6    talked to Seymore about what I -- or I heard from

7    Seymore about his relationship with Jerry

8    Steuerman, yes.

9        Q        What do you recall about those

10   conversations?

11                MR. LATO:  Objection.  I understand

12               that -- I'm just making a hearsay

13               objection even though I know your Honor

14               is allowing it.  I just don't want it to

15               bee deemed a waiver in the future, so I

16               am making the objection.

17                THE COURT:  I'm going to overrule

18               your objection but I understand it.  I

19               just want to hear what Mr. Falbee has to

20               say.

21                Go forward.

22                THE WITNESS:  Okay.

23       A        Can you repeat the question?

24       Q        Absolutely, Mr. Falbee.

25                My question was:  What do you recall, in

1
2    the months leading up to the Tankleffs's murders,

3    about conversations that Seymore Tankleff had with

4    you about his business relationship with

5    Mr. Steuerman?

6        A      Seymore basically conveyed that the --

7    his relationship with Jerry Steuerman had a

8    deterioration, it was slowly deteriorating over

9    time.

10            I remember -- I thought it started

11   sometime in '87 and it just seemed to get the --

12   it started like little problems.

13            In the beginning they had a great

14   relationship.  I mean it appears that, you know, a

15   great partnership.

16            But once you got into late '87, '88, all

17   of a sudden we started hearing little things that

18   were happening between the partnership, and

19   Seymore was getting more and more disenchanted

20   with the partnership.  And it just seemed to

21   become a snowball until it got culminating in my

22   last -- the last time I got to talk to Seymore

23   about it was at a reunion, family reunion in July

24   of '88.  And there, it seemed to be almost out of

25   control.

1

2       Q       Okay.

3               Tell us about the family gathering in

4       the summer of 1988, specifically with respect to

5       the relationship with Jerry Steuerman.

6       A       Well, we had -- my wife, my children,

7       had gone out to Seymore and Arlene's for this

8       family reunion.  My -- some of our relatives were

9       in from California, my mother was there, my sister

10      was there, so it was, you know, pretty much the

11      whole family, or close to the whole family on

12      my -- on Arlene's side was there.

13              And I remember, when we got there, and

14      we -- we went into the kitchen where Arlene was,

15      and when we entered the -- the kitchen, we heard

16      Seymore having a very angry, loud, aggressive

17      conversation on the phone.  And it -- it was very

18      unlike Seymore.  It was very unlike how I've ever

19      seen Seymore before.

20              And I -- we -- I don't know as -- as I

21      said to Arlene or it was just a look, I just

22      looked at her like what's up, you know, what's

23      going on?

24              And her response to me and my wife was,

25      "That son of a bitch Steuerman," and proceeded to

1

2    go on to tell us that their relationship had --

3    they were having a great deal of problems with

4    Steuerman, that he had threatened them, that she

5    was -- she was getting fearful, she was getting

6    very frightened of -- of the relationship and --

7    and what he was going to do.

8        Q     After Mr. Tankleff concluded his phone

9    conversation, did you have any discussion with him

10   about his relationship with Jerry Steuerman?

11       A     Very short discussion.  I don't even

12   remember the points of it.  I don't think he told

13   me exactly what was going -- you know, in other

14   words, what was causing this argument.  But it was

15   a very -- it was a very -- you know, it was Jerry,

16   we're having problems, we're getting out of the

17   deal, you know, so on -- we're breaking up the

18   partnership, and that was about it.  And then it

19   was dropped and we had a family reunion.  You

20   know?

21       Q     Did you specifically recall him saying

22   that he was going to break up the partnership?

23       A     Yeah.  The partnership was ending, it

24   was over, and he -- he had put up with enough

25   and -- and he was trying to get out of the

1

2    partnership.

3         Q    Did he say anything about the debt that

4    Mr. Steuerman owed to him?

5         A    I don't believe in that -- in that

6    instance, no.

7         Q    Mr. Falbee, after the attacks on Mr. and

8    Mrs. Tankleff, I take it that for some period of

9    time thereafter, the house was sort of designated

10   as a crime scene and was off limits to the family?

11        A    Correct.

12        Q    When were you first able to get back to

13   get into the house after it was no longer a crime

14   scene?

15        A    Some weeks after the murders.  I

16   don't -- I can't tell you whether it was one week,

17   two weeks, three weeks, I just -- I don't

18   remember.

19        Q    Okay.

20             How long was it in relation to when it

21   was no longer a crime scene?

22        A    Oh, it was immediately.  It was -- it

23   was -- we were given the keys, we got a call --

24   actually, I think Mike Fox got the call and he

25   called me and we went down to the house and walked

1

2    through it.  So we were -- it was immediate.

3         Q    Okay.

4              So whatever period of time the police

5    had during which they secured the premises,

6    searched the premises, whatever it is that they

7    did, you and Mr. Fox were the first family members

8    to get into the house?

9         A    I believe so, yes.

10        Q    And was there a safe in the house?

11        A    Yes, there was.

12        Q    And did you review the contents of the

13   safe?

14        A    Yes.  The police had drilled open the

15   safe and we -- when we went in, we went to look at

16   this safe, yeah.

17        Q    Were there documents that the police had

18   left behind?

19        A    Yes.

20        Q    Specifically, were there any documents

21   that touched upon the business relationship

22   between Jerry Steuerman and Mr. and Mrs. Tankleff?

23        A    Yes.  We found some notes in Arlene's

24   handwriting that basically laid out some of the

25   problems that they were having.

Ron Falbee - Direct                153

1
2       We also -- we found some of the actual

3       notes that Jerry Steuerman had signed.  Monetary

4       notes.

5               MR. POLLACK:  I would like to hand

6       up, if I might, a document that will be

7       marked as -- I have no idea what. --

8               MR. BARKET:  I have some idea.  One

9       second.  Sorry.  Twenty-four.  Is that

10      right?

11              THE COURT OFFICER:  Yes.

12              THE COURT:  All right.  This is

13      defendant's --

14              MR. POLLACK:  Defendant's 24.

15              THE COURT:  All right.  Defendant's

16      24 marked for identification.

17              (Whereupon, the above-referred-to

18      Note was marked as Defendant's Exhibit

19      24 for identification as of this date.)

20              THE COURT OFFICER:  Defendant's 24

21      marked for identification only.

22              THE COURT:  Thank you.

23              Please show the witness.

24              THE COURT OFFICER:  Being shown to

25      the witness.

```
 1
 2                    (Whereupon, the aforementioned item
 3                was handed to the witness for
 4                examination.)
 5      A     Yeah.
 6      Q     Mr. Falbee, do you recognize the
 7   document that's been marked as Exhibit Number 24?
 8      A     Yes, I do.
 9      Q     Is that a true and correct copy of one
10   of the documents that you found in the safe?
11      A     Yes, it is.
12      Q     And do you recognize the handwriting on
13   this document?
14      A     Yes, it's my Aunt Arlene's.
15      Q     And does this document reference a
16   series of -- a series of complaints, including
17   some of the ones that you had spoken to Seymore
18   Tankleff about in the preceding months?
19      A     Yes, it does.
20      Q     In addition to reviewing the consents of
21   the safe, did you have the opportunity to look in
22   the office or study where Seymore Tankleff was
23   found after the attacks?
24      A     Yes, we did.  I did.
25      Q     And, specifically, did you look at his
```

```
 1                    Ron Falbee - Direct              155

 2    desk in that office?

 3         A    Yes.

 4         Q    Can you describe what the desktop looked

 5    like when you saw it?

 6         A    Well, it -- there was -- there was blood

 7    on it.  There were a lot of papers on it.  There

 8    was blood on it.  It was a -- some of the papers

 9    were askewed and then there were stacks of papers.

10         Q    I show you a document that we will mark

11    as number twenty-five.

12                    (Whereupon, the above-referred-to

13               Demand Note was marked as Defendant's

14               Exhibit 25 for identification as of this

15               date.)

16               THE COURT:  Defendant's 25 marked

17               for identification only.

18               THE COURT OFFICER:  Defendant's 25

19               marked for identification only, being

20               shown to the witness.

21               THE COURT:  Okay.

22                    (Whereupon, the aforementioned item

23               was handed to the witness for

24               examination.)

25         A    Yeah, I recognize the document.
```

1
2       Q     Mr. Falbee, you said you recognize

3    Defendant's Number 25.   Where did you find

4    Defendant's 25?

5       A     Upper left-hand corner of Seymore's

6    desk.

7       Q     Was it underneath any other papers or -

8    was it out in the open?

9       A     Sitting on top.

10               MR. POLLACK:  Your Honor, I would

11               like to move twenty-four and twenty-five

12               into evidence.

13               THE COURT:  Thank you.

14               Please show them to Mr. Lato.

15               THE COURT OFFICER:  Yes, your

16               Honor.

17               THE COURT:  After you review them,

18               Mr. Lato, any objection?

19               We'll do twenty-four first, please.

20               (Whereupon, the aforementioned

21               items were handed to Mr. Lato for

22               examination.)

23       A     There was, actually --

24               THE COURT:  Sir, just hold up for

25               one second; okay?

1

2          THE WITNESS:  Oh, I'm sorry.  Yeah.

3          MR. LATO:  With respect to

4     twenty-four, your Honor, that's the

5     first note, the writing that Mr. Falbee

6     has identified as Arlene's, Arlene

7     Tankleff.

8          Although I understand that the

9     Court will probably allow the document

10    based upon the relaxation of rules here,

11    if this were a trial, I would object on

12    two grounds.

13         One, in terms of -- that this is

14    being offered for the truth, this is a

15    hearsay document.

16         Two, the problem is there's no

17    relevance the way I see it because

18    there's no evidence that Jerry Steuerman

19    was aware of what Arlene had said.

20    These are just her notes and would not

21    contribute to a motive to commit the

22    crime.  So that would be my objection as

23    to twenty-four.

24         With respect to twenty-five, it

25    would be principally the same

1

2        objections.  Presumably, they would be

3        offered for the truth.

4            We also have an authentication

5        problem here because although it says

6        Very truly yours, Seymore Tankleff, from

7        a typewriter of course, if the witness

8        could, say, identify the type face,

9        because this is not like it is today,

10       that would be sufficient to authenticate

11       the documents having come from

12       Mr. Tankleff.  But the document isn't

13       signed, so there would be an

14       authentication problem as far as

15       identifying this as having come from

16       Mr. Tankleff.

17           But, once again, it's hearsay

18       there's no evidence that Jerry Steuerman

19       ever got it even though this was sent

20       Certified Mail.

21           I believe that Mr. Gottlieb tried

22       to introduce this at the trial and was

23       unsuccessful, so we also have the law of

24       the case which, again, this Court is now

25       bound by.  But Judge Tisch did rule that

Ron Falbee - Direct                    159

1
2    he was not going to allow this into
3    evidence, and I think Mr. Steuerman
4    testified he never saw this document so
5    it becomes irrelevant.
6         So, those are my objections.
7         THE COURT:  I'm going to allow it
8    into evidence subject to your
9    objections, Mr. Lato.
10        These documents do definitely have
11   evidentiary problems but I will allow
12   them into evidence for whatever weight
13   they may give to the defendant's cause.
14        MR. BARKET:  Thank you, your Honor.
15        (Whereupon, the above-referred-to
16   Items were marked and received as
17   Defendant's Exhibit 24 and Defendant's
18   Exhibit 25 in evidence, respectively, as
19   of this date.)
20        THE COURT OFFICER:  Defendant's 24
21   and 25 marked and received into
22   evidence.
23        MR. POLLACK:  If you could hand,
24   Defendant's 25 back to the witness,
25   please?

Ron Falbee - Direct                    160

1

2          THE COURT OFFICER:  Defendant's 25.

3          (Whereupon, the aforementioned item

4      was handed to the witness for

5      examination.)

6      Q    Mr. Falbee, you said that number

7   twenty-five was sitting out in the open on

8   Mr. Tankleff's desk?

9      A    Right.

10     Q    I take it, it's not a document the

11  police had taken with them --

12     A    No.

13     Q    -- it was there when you went in?

14          Can you describe -- there are several

15  pages to it.  Can you describe what number

16  twenty-five is?

17     A    Well, it's -- it's, basically, a copy of

18  a letter to Jerry Steuerman requesting the demand

19  payment in the sum of fifty thousand dollars on

20  one of the notes that -- that Jerry owed Seymore.

21  It's a receipt for Certified Mail, it's the --

22  it's -- it's both receipts, sending in and coming

23  from, and it's a copy of the note.

24     Q    Okay.

25          Now, the note itself is from when?

Ron Falbee - Direct                    161

2    A    The -- the note itself is from '86.

3    Q    Okay.

4    A    All right?

5    Q    The letter demanding that the note be

6    paid is dated when?

7    A    June 29, 1988.

8    Q    It is sitting out on Seymore Tankleff's

9    desk when you searched the office?

10   A    Correct.

11   Q    Now, Mr. Falbee, you said that you were

12   the executor of the estate?

13   A    Correct.

14   Q    You were Marty's legal guardian?

15   A    That's correct.

16   Q    Marty Tankleff lived with you prior to

17   the trial?

18   A    Correct.

19   Q    And you had reviewed documents that were

20   at the crime scene.

21        At any point --

22        Well, let me -- let me -- let me first

23   ask about the day of the attacks.

24        On the day of the attacks, did you tell

25   anyone that you had information about who you

1

2    believed might be responsible?

3        A     Yes.

4        Q     Who did you tell?

5        A     Police -- I -- I gather they were

6    detectives.  I don't know.  You know, they

7    identified themselves as police. -- I don't know

8    names.  But as we were in the hospitals and as we

9    were, you know -- we were all congregated

10   together, we moved from one hospital to the other,

11   and as we came up with these detectives, I mean

12   they did ask, you know -- you know, do you know

13   anybody that could be responsible for something

14   like this, and we gave them Jerry Steuerman's

15   name, yes.

16       Q     Specifically, you -- you told at least

17   one detective that you believed --

18       A     At least one, yeah.

19       Q     -- that you believed that Jerry

20   Steuerman was the person responsible?

21       A     Correct.

22       Q     And you heard other family members do

23   the same?

24       A     Absolutely.

25       Q     At any time after that, did anybody from

```
 1                    Ron Falbee - Direct          163

 2      law enforcement interview you at all?

 3           A     No.

 4                     MR. POLLACK:  I don't have any

 5                further questions.

 6                     Thank you.

 7                     THE COURT:  Any cross?

 8                     MR. LATO:  Yes, your Honor.

 9                     THE COURT:  Go forward.

10                     MR. LATO:  May I just have sixty

11                seconds, please?

12                     THE COURT:  All right.

13      CROSS-EXAMINATION

14      BY MR. LATO:

15           Q     Good afternoon, Mr. Falbee.

16           A     Good afternoon.

17           Q     Sir, you testified just a few moments

18      ago that -- let me just see if I can get this

19      correct, sir -- with respect to Exhibit 24, about

20      a note that is in Arlene Tankleff's testimony; do

21      you recall that?

22           A     Correct.

23           Q     Do you recall about a year ago that the

24      District Attorney's Office in Hauppauge

25      investigated Warkenthien and I interviewed you at
```

Ron Falbee - Cross                    164

the D.A.'s office?

          A     A year ago Friday.

          Q     All right.

                And then there is you and other members

of the family; correct?

          A     Right.  It was after we requested

that --

          Q     Yes.

          A     Okay.

          Q     Now, do you recall whether at that

meeting you actually told us about Exhibit 24,

this note from Arlene?

          A     I don't recall.

          Q     Now, did you give this note, Exhibit 24,

to Mr. Gottlieb prior to Martin Tankleff's trial?

          A     I did.

          Q     And did you sit throughout that trial?

          A     Every day.

          Q     And do you recall whether there was any

attempt to introduce this document?

          A     I don't recall.

          Q     Now, Mr. Falbee, as executor of the

Tankleffs's estate, you became familiar with their

assets; correct?

1

2        A       Correct.

3        Q       And you became aware of moneys that they

4    owed, for instance, mortgages and so forth?

5        A       Correct.

6        Q       And you became aware of moneys owed to

7    them by others; correct?

8        A       Correct.

9        Q       Including Mr. Jerry Steuerman?

10       A       Oh, yes.

11       Q       Now, would it be fair to say, however,

12   that you, at the time, were unfamiliar with Jerry

13   Steuerman's assets; correct?

14       A       At a point in time -- I'm not quite sure

15   I understand your question.

16              I did -- while being executor of the

17   estate, we did go after Jerry Steuerman and we

18   found out that Jerry Steuerman had absolutely

19   nothing in his name.  So I was aware that he had

20   no personal assets to attach.

21       Q       All right.  Because the estate was

22   being -- I guess during the probate and so forth,

23   there was some disagreement as to how much

24   Mr. Steuerman owed and you became aware of his

25   assets; is that how it happened?

1

2    A    Yes.    There was a tremendous amount of

3    litigation with Mr. Steuerman, yeah.

4    Q    Now, were you able to discover, during

5    the administration of the estate, whether the

6    fifty thousand dollars reflected in Exhibit 25 was

7    ever repaid?

8    A    No, I don't believe it was.

9    Q    Well, you're saying you don't believe --

10   A    A --

11   Q    -- do you know one way or the other?

12   A    I don't know.

          We eventually settled with Mr. Steuerman

13

14   on many, many issues.

15   Q    You do know, however, that

16   Mr. Steuerman -- I'm sorry -- Mr. Steuerman owed

17   money to the Tankleffs at the time the Tankleffs

18   were killed; correct?

19   A    He owed a lot of money, yes.

20   Q    He owed far more than fifty thousand

21   dollars; correct?

22   A    Absolutely.

23   Q    As you stated, there was a settlement of

24   some kind between Mr. Steuerman and the Tankleffs?

25   A    And the estate.

1                    Ron Falbee - Cross              167

2          Q     And the estate?

3          A     Yes.

4          Q     Is it fair to say, as part of the

5     settlement, Shari Rother, later Shari Mistretta,

6     got one of the bagel stores; correct?

7          A     I believe that was part of the deal.

8          Q     That bagel store was worth several

9     hundred thousand dollars; is that correct?

10         A     I can't answer that.

11         Q     Is that because there's some kind of a

12    confidentiality?

13         A     No.  I can't answer because I simply

14    don't recall.

15         Q     But --

16         A     There was a lot of litigation.  It

17    involved a lot of different areas with Jerry

18    Steuerman and it kind of all got wrapped up into

19    one, and then it got wrapped up with distributions

20    and so on and so forth.  So it got a little

21    complicated.

22         Q     When you say that Jerry Steuerman was

23    broke, it would be fair to say he had no liquid

24    assets; correct?

25         A     He had nothing in his name.

Ron Falbee - Cross                168

1

2     Q      Moneys you could actually get ahold of;

3     is that what you meant?

4     A      Anything we could get ahold of.  He

5     didn't have a car in his name.

6     Q      Well, with respect to assets, for

7     instance, for settlement of the estate, to settle

8     means he had to give you something; correct?

9     A      Right.  And it was the stores we

10    controlled.  We still had a partnership with him,

11    we still had ownership of the stores, so we

12    stopped sales of stores, things like that.  We

13    eventually got Jerry to sit down at a table and go

14    through some things.

15    Q      Well, that's what I was getting at with

16    the liquid assets.

17           In other words, the Tankleffs had part

18    ownership of some of Mr. Steuerman's stores;

19    correct?

20    A      Correct.

21    Q      And he had the other part; correct?

22    A      Correct.

23    Q      The part that he had was worth some

24    money; correct?

25    A      Correct.

1

2      Q      So, when the estate -- during the

3      administration of the estate, one of the

4      settlements, or the settlement with Jerry

5      Steuerman was he had to actually sell off some of

6      his assets; correct?

7      A      Yeah.  It was -- it was -- the whole

8      thing was more or less a barter.  It was bartered

9      out.

10     Q      Do you recall, in terms of the barter,

11     about how much Jerry Steuerman's property was

12     worth --

13     A      No, I don't.

14     Q      Was it six figures?

15     A      Yeah.

16     Q      All right.  And so we know it was over a

17     hundred thousand dollars.  Could it have been over

18     two hundred thousand dollars?

19     A      Could have been.

20     Q      Over three hundred thousand?

21     A      Could have been.

22     Q      Could it have been as high as five, six

23     seven hundred thousand dollars --

24     A      I don't think so.

25     Q      Somewhere in the range of three hundred

1

2      thousand would be a fair --

3          A     I really don't know. You know, it's a

4      guess.

5          Q     All right.

6                Now, would it be fair to say, however,

7      that the fifty thousand dollars that is part of

8      Exhibit 25, the debt that Jerry Steuerman owed to

9      them, to the Tankleffs, was not exonerated by

10     their death; correct?

11         A     No, it wasn't.

12         Q     So, whatever debt Jerry Steuerman owed,

13     whether it was fifty thousand dollars or more,

14     basically, now Jerry Steuerman owed the estate;

15     correct?

16         A     Correct.

17         Q     Now, would it be fair to say that in

18     terms of the will, as executor, that among others,

19     Martin Tankleff and Shari Rother were

20     beneficiaries; correct?

21         A     Correct.

22         Q     Is it fair to say that prior to the

23     murders, are you aware whether Shari was fighting

24     with Seymore about the will?

25         A     (No response)

1

2     Q      Fighting may be too strong a word.

3            That they had sum discussions of how

4     much she was getting --

5     A      Prior to the deaths?

6     Q      Yes.

7     A      I don't believe that Shari had any idea

8     of what was in the wills.

9     Q      Were the wills changed at all prior to

10    the final will that went into place; do you

11    recall?

12    A      I don't recall.  I know that the will

13    that I -- that I eventually became executor of was

14    the -- the terms of it were the same terms as when

15    Seymore asked me to be executor.

16           In other words, when I sat down, had a

17    meeting, he asked me to be executor, so on and so

18    forth, we went over the terms of the will.  And

19    they were the same terms with the will we ended up

20    with so --

21    Q      Do you recall when the final will was

22    enacted, what year that was?

23    A      No.

24    Q      Was it, say, more than a year prior to

25    the murders?

Ron Falbee - Cross                    172

    A    It was more than a year, yes.

    Q    Would it be fair to say that while
Seymore and Arlene were alive, they could have
changed that will, substituted a new will;
correct?

    A    They could have.

    Q    Would it be fair to say that at any time
they could have left more to Marty and less to
Shari if they so chose?

    A    Well, they actually did, but I mean --

    Q    What I'm saying is they could have given
him still more?

    A    I don't know.  He -- he took a pretty
big case in that will, I mean --

    Q    All right.  Well, then would it be fair
to say that they could have changed it at any
point and given less to Marty and more to Shari if
they so chose?

    A    I guess they could have, yes.  I mean
they could have changed the will any way they
wanted to, you know?

    Q    Right.

         If they wanted to, they could have made
Marty the sole beneficiary; correct?

1                    Ron Falbee - Cross            173

2        A    Well, yeah, if they wanted to, yes, they

3    could have.

4        Q    Would it be fair to say that the will

5    that you basically were the executor for, the

6    primary beneficiary was Marty?

7        A    Yes.

8        Q    Now, have you paid Mr. Jay Salpeter in

9    this case to be an investigator?

10       A    Yes.

11       Q    And how much have you paid to date, if

12   you recall?

13                 MR. POLLACK:  Objection.

14                 Relevance.

15                 THE COURT:  Overruled.

16                 Cross-examination.  It's

17                 appropriate.

18       A    I don't really know.  I know that a lot

19   of work that Jay's doing for us is pro bono.  We

20   did give him -- I did give him a retainer in the

21   beginning and I don't -- I don't know.

22       Q    Well, do you have some, for instance,

23   range?  In other words, is it more than ten

24   thousand dollars?

25       A    I don't think so.

Ron Falbee - Cross                    174

2      Q      Well, did you -- would it be fair to say

3  that Mr. Salpeter, as far as you know, charged you

4  for certain fees to get witnesses here and so

5  forth?

6      A      Yeah.  He -- he -- he has requested that

7  we -- or he has asked if we would reimburse for

8  travel expenses for some witnesses and -- and

9  whatnot.

10     Q      So, have you paid for the travel and

11  arrangements for, say, Joseph Graydon?

12     A      I don't know.  I'm assuming yeah, if --

13  if -- if Jay needed it and he asked for it, yeah,

14  we would do that.

15     Q      And that would also be true of Billy Ram

16  who came up here from Florida; correct?

17     A      Uh-huh.

18     Q      Do you know, for instance, who paid for

19  Glen Harris's cell phone?

20     A      I have no clue.

21     Q      Do you have any idea how much those

22  expenses or fees were?

23     A      No.

24     Q      Mr. Falbee, would it be fair to say

25  that, as was Mr. Seymore Tankleff, you, yourself,

are a businessman; correct?

    A.   Correct.

    Q   Would it be fair to say that in doing business over the years, you've had business disputes; correct?

    A.   I'm thinking.

        Yes.

    Q   Have you ever taken legal action with respect to a business matter against someone who you had a dispute with?

    A   No.

    Q   Has anyone ever taken legal action against you?

    A   Possibly against one of my corporations.

    Q   Would it be fair to say, though, that business disputes can actually ruin friendships if people are friends; correct?

    A   Oh, I'd say they could, yes.

    Q   But it would also be fair to say that most disputes are resolved without the need to, you know, basically pay lawyers; correct?

    A   Sometimes.

    Q   In other words, they're worked out sometimes?

```
 1                      Ron Falbee - Cross          176

 2        A       Sometimes, yeah.

 3        Q       All right.  Lawyers take money; correct,

 4   if you want to use them?

 5        A       Excuse me?

 6        Q       Lawyers take money if you want to work

 7   it out?

 8        A       Lawyers would love to take your money.

 9        Q       And lawsuits take time; correct?

10        A       They do take time.

11        Q       In a criminal justice system, you want

12   to work out a dispute, it can take years; correct?

13        A       Uh-huh.

14        Q       With respect to Exhibit 24, this is the

15   note previously introduced, do you have a copy of

16   that, sir?

17                      MR. LATO:  Exhibit 24, if it can

18                just be shown to the witness.

19                      (Whereupon, the aforementioned item

20                was handed to the witness for

21                examination.)

22                      THE COURT OFFICER:  Defendant's 24.

23        Q       Mr. Falbee, if you can, look at the next

24   to last paragraph.

25                      (Whereupon, the witness complied
```

1       Ron Falbee - Cross        177

2              with the request of Mr. Lato.)

3       Q    And, again, I just received this, so,

4    please, correct me if I'm wrong.

5              Would it be fair to say that Arlene is

6    writing that Seymore settled for half the amount

7    for the month of May; am I reading that correctly,

8    sir?

9       A    That would appear, yeah.

10      Q    So it appears that Seymore basically

11   settled, he took half of what he really was

12   entitled to; correct?

13      A    Correct.

14      Q    Now --

15              MR. POLLACK:

16              MR. LATO:  If the witness can,

17           please, be shown Exhibit 25?

18              (Whereupon, the aforementioned item

19           was handed to the witness for

20           examination.)

21              THE COURT OFFICER:  Defendant's 25

22           in evidence.

23      Q    Do you have that, Mr. Falbee?

24      A    Uh-huh.

25      Q    Now, would it be fair to say that the

1                    Ron Falbee - Cross          178

2    date of this letter which is unsigned is June 29th

3    of 1988; correct?

4         A    Yeah.  I think this is just a -- you

5    know, this is one of those fashioned copies that

6    you --

7         Q    A carbon copy --

8         A    -- you sign the originals, you know?

9    This is what mine used to look like.

10        Q    This is about a little over two months

11   before the murders; correct?

12        A    Correct.

13        Q    Now, as executor of the estate, do you

14   recall coming across any type of follow-up letter

15   for this from Seymore to Jerry or from Jerry to

16   Seymore?

17        A    I don't recall any, no.

18        Q    Do you recall any letter, canceled check

19   or anything else showing whether Jerry paid or did

20   not pay the fifty thousand dollars?

21        A    I don't recall.

22        Q    Do you recall coming across any

23   documents showing whether Seymore changed his mind

24   and basically agreed to give Jerry more time or

25   somehow settled?

Ron Falbee - Cross                    179

2    A    No, I don't.

3    Q    Did you have any conversations with

4  Seymore whether or not he tried to work something

5  out with Jerry with respect to this particular

6  debt?

7    A    Not with respect to this, no.

8    Q    Did you come across anything in going

9  over the papers that showed that Seymore Tankleff

10 actually took legal action against Jerry Steuerman

11 with respect to this fifty thousand dollars?

12   A    I don't re -- I don't recall whether I

13 did or I didn't, no.

14   Q    If you look at Exhibit 25, the letter,

15 Seymore actually threatens that unless he's paid

16 immediately, he's going to take all legal steps

17 necessary to collect the same; do you see that,

18 sir?

19   A    Uh-huh.

20   Q    Would it be fair to say, as far as you

21 know, you don't know one way or the other whether

22 Seymore ever took any legal steps between the day

23 of the letter and the day of the murders?

24   A    I don't know for a fact.

25        I do know -- since you asked -- I do

1

2      recall seeing -- I don't have the letter and --

3      and I don't even -- I do recall seeing something

4      where Seymore was going after the horses if Jerry

5      didn't pay.

6              Now, I can't tell you whether that was a

7      follow-up to this or just something else.  But

8      they owned horses together and I do remember a

9      letter that Seymore had sent to Jerry Steuerman

10     and it happened to do with a repaying of something

11     where he was going to attach the horses.

12         Q    So, then, it would be fair to say, sir,

13     that --

14         A    Which -- which, incidentally, I didn't

15     think was a big deal; all right?  Until Mike Fox

16     turned around to me and said Jerry loves his

17     horses.  So I mean that kind of made it a big deal

18     I guess.

19         Q    So, would it be fair to say then,

20     Mr. Falbee, that Seymore and Jerry had more than

21     one business transaction or relationship; correct?

22         A    Oh, that would be fair to say.

23         Q    All right.

24              They had bagel stores, that would be

25     one; correct?

Ron Falbee - Cross                 181

2      A     No, they had a few.

3      Q     I'm sorry.  Bagel stores, plural, that

4   was one such interest --

5      A     Okay.  Correct.

6      Q     Okay.

7            Horses would be another; correct?

8      A     Correct.

9      Q     And there were other, basically,

10   businesses that they had together; correct?  Or

11   business relationship, I should say?

12     A     Yeah.  I mean originally Seymore lent

13   him money for the house, and it goes on and on and

14   on, you know?

15     Q     Would it be fair to say that Seymore,

16   Arlene and Jerry and Jerry's wife were also

17   friends?

18     A     At a point in time, yes.

19     Q     Would it be fair to say that despite

20   their business disputes, they stayed friends for

21   the most part; correct?

22     A     Not at the end.

23     Q     Well, at the end, Jerry still played

24   cards with Seymore; correct?

25     A     Correct.

Ron Falbee - Cross                    182

1

2     Q     And, in fact, both of the murders -- I

3  should say before the letter, which is Exhibit 25,

4  and after the letter, they played cards on a

5  regular basis; correct?

6     A     Correct.

7     Q     And they played cards on September 6th

8  of 1988; correct?

9     A     Yes.

10     Q     Just hours before the murders; correct?

11     A     Yes.

12     Q     Now, the card game they were playing was

13  poker; correct?

14     A     Correct.

15     Q     And they were playing for money;

16  correct?

17     A     Correct.  I guess.

18     Q     And this wasn't, as far as you know,

19  nickels and dimes; correct?

20     A     No, it was a -- I understand it was a

21  healthy game.

22     Q     And by a healthy game, are we talking

23  about any given hundreds or thousands of dollars

24  could change hands?

25     A     I don't know for sure.  I never played

1    with them.

2         Q     It would be a fair statement, however,

3    that Seymore invited Jerry over even though Jerry

4    was in arrears to Seymore on other matters;

5    correct?

6         A     I think it was a group game, the same

7    guys always got together.  And I think that

8    Seymore did not take the action of not allowing

9    Jerry to attend.  I don't -- I'm not so sure it

10   was an invitation.  I'm just -- I think this was a

11   poker group, they got together and these same guys

12   played poker.

13        Q     Well, as far as know --

14        A     And Jerry happened to be a member of

15   that group.

16        Q     Okay.

17              But as far as you know, though, because

18   this was Seymore's house, at any time he could

19   have barred Jerry from entering and playing poker;

20   correct?

21        A     Sure, he could.

22        Q     Would it be basically fair to say, since

23   this was for money and it was a healthy game,

24   Seymore was allowing Jerry to come over and

Ron Falbee - Cross                184

2    gamble?

3        A      Uh-huh.

4        Q      And there's nothing that you came

5    across, in speaking to Seymore Tankleff prior to

6    the murders, where Seymore said, basically, you

7    can't play poker because you owe me fifty thousand

8    dollars?

9        A      No.

10       Q      And --

11       A      I also know that Jerry used to give him

12   payments when he came over to play poker.  So, in

13   other words, he would come over to play poker and

14   he would also make a payment to Seymore.  Cash

15   payments.

16       Q      But you're not aware of anything where,

17   say, at a given card game, you know, the night of

18   the murder or a week or two before, where Seymore

19   would say something like you can't raise me a

20   hundred dollars because you owe me fifty thousand

21   dollars?

22       A      No.  Well, I wasn't there, I don't know.

23   But I doubt it.

24       Q      Now, you said that -- earlier, sir, that

25   after the murders, you told people you presumed

Ron Falbee - Cross                185

2    were detectives that Jerry Steuerman may have

3    committed the murder?

4         A     Correct.

5         Q     Or murders, I should say.

6            Well, actually, at the time it was the

7    murder because Seymore was still alive.

8         A     Yes.

9         Q     I'm sorry.

10           Would it be fair to say that it was

11    approximately a year and a half between the

12    murders and the actual trial; correct?

13         A     Correct.

14         Q     In that period of time, you were

15    following the investigation, or Marty's defense,

16    you were heavily involved in that; correct?

17         A     From Marty's defense, yes.

18         Q     Would it be fair to say that you had a

19    number of conversations with Robert Gottlieb,

20    Marty's attorney; correct?

21         A     Yes, sir.

22         Q     Are you aware, sir, that Mr. Gottlieb

23    had basically hired a private investigator;

24    correct?

25         A     Yes.

```
 1                    Ron Falbee - Cross          186

 2        Q      To help with Marty's defense?

 3        A      Yes.

 4        Q      And you said that at no time in that

 5   year and a half period did the detectives ever

 6   come to interview you; correct?

 7        A      Correct.

 8        Q      Did you ever write any letters to the

 9   Suffolk County Police Department telling them your

10   version of events?

11        A      Nope.

12        Q      Did you ever write a letter to the

13   District Attorney's Office saying would you,

14   please, come interview me?

15        A      Uh, last year we did.

16        Q      No.  I mean between the murders and the

17   trial.

18        A      I don't recall whether we did or not.

19   We might have.  I don't -- I don't recall.

20        Q      Are you aware, sir, whether you asked

21   Mr. Gottlieb basically to arrange a meeting with

22   the detectives; do you know whether or not that

23   happened?

24        A      No.

25        Q      Would it be fair to say that you sat at
```

Ron Falbee - Cross                  187

2    the trial every day; correct?

3         A     Yes.  I was responsible for bringing

4    Marty to the trial.

5         Q     Would it be fair to say, sir, that you

6    did not testify at that trial; correct?

7         A     I did not.

8         Q     As far as you know, Mr. Gottlieb did put

9    on some witnesses; correct?

10        A     Correct.

11        Q     Just not you?

12        A     I don't know why he didn't put on any

13   family or very few family.

14                    MR. LATO:  Nothing further.

15                    THE COURT:  Any redirect?

16                    MR. POLLACK:  Yes, your Honor.

17             Thank you.

18                    THE COURT:  Go forward, sir.

19   REDIRECT EXAMINATION

20   BY MR. POLLACK.

21        Q     I want to start, Mr. Falbee, with a

22   question that Mr. Lato had asked you about the

23   family's willingness to pay certain expenses in

24   conjunction with this hearing.

25        A     Yeah.

Ron Falbee - Redirect                    188

1

2      Q      I think that Mr. Lato in one of his

3   questions used the words fees that were paid to

4   witnesses.

5              As far as you're aware, has any witness

6   been paid for their testimony as opposed to simply

7   being reimbursed for expenses that they have

8   incurred?

9      A      No, not at all.  I mean the -- Mr. Ram,

10  I believe -- I believe that was an issue because

11  he was going to actually lose income for the time

12  he was up here.  And there was a lot of discussion

13  on it, how would it look and so on and so forth.

14  And I think it was decided the man's entitled to

15  his pay, he was going to be out of work for two

16  days.

17     Q      So, in other words, after consulting

18  with the lawyers, you decided that was

19  appropriate, that he could be reimbursed for lost

20  wages; is that correct?

21     A      Yes.

22     Q      Okay.

23            However, he was not paid any -- he

24  didn't benefit financially by testifying?

25     A      Not at all.

Ron Falbee - Redirect                189

Q      Nor did any witness that you're aware of?

A      Not that I know of.

Q      Now, turning back to the issue of the estate, Mr. Lato asked you some questions about moneys that were owed after the debts now to the estate of Jerry Steuerman.

A      Correct.

Q      Without trying to quantify the exact dollar amount, is it fair to say that Mr. Seymore -- that Mr. Steuerman did not ultimately end up paying the estate everything that he had owed the Tankleffs during their lifetime?

A      I think that's a fair statement.

Q      Now, during Seymore's lifetime, under whatever arrangement Mr. Steuerman had with Seymore Tankleff, could Mr. Steuerman open up some new business venture without giving a piece of it to Mr. Tankleff?

A      No.  No.  My uncle's deal was fifty/fifty partners in everything.  That's just how my uncle worked.

Q      Okay.

```
 1                    Ron Falbee - Redirect          190
 2              After Seymore Tankleff died, do you know
 3         whether Mr. Steuerman was able to open up new
 4         businesses without giving a percentage of that
 5         business to the Tankleff estate? _
 6             A     Oh, absolutely, yes.  Strathmore Bagel
 7         exploded after Seymore died. -I mean there was
 8         tremendous growth in that company.
 9             Q     Now, on Exhibit 25, which was the demand
10         note, Mr. Lato had asked about whether or not you
11         remember seeing any follow-up correspondence after
12         Mr. Tankleff had demanded payment of that
13         particular note; do you recall being asked that?
14             A     Yes, I do.
15             Q     Okay.
16                   Now, as a businessman, I'm assuming
17         you're aware that not only might people follow up
18         with correspondence, but sometimes people follow
19         up with conversations?
20             A     Sure.
21             Q     Now, when you saw Exhibit 25, that
22         letter demanding that Mr. Steuerman pay
23         Mr. Tankleff, you saw it, it was out on the desk
24         not covered by any other papers; is that right?
25             A     Yeah.  That's why I can tell you exactly
```

1    Ron Falbee - Redirect          191

2    where it was.  I was so surprised to see it.

3              And to be honest, I thought -- I

4    remember like little splatters of blood on it.  I

5    don't know if after fifteen years it's dried up or

6    whatever.

7              I was rather surprised to find it.  And

8    because at the time I think the -- the police had

9    made a statement that -- that basically said that

10   there were no financial problems between Jerry

11   Steuerman and Seymore Tankleff.  I said, well, how

12   did they miss this, you know, sitting on the desk?

13        Q    Okay.

14        A    So that's why I remembered it, because

15   it was so contrary to what everybody was telling

16   us.

17              MR. POLLACK:  May I approach the

18         witness, your Honor?  Or may I have the

19         document back?  Either way.

20              THE COURT:  Yeah, you can have the

21         document back.

22              MR. POLLACK:  Thank you, your

23         Honor.

24              (Whereupon, the aforementioned item

25         was handed to Mr. Pollack for

1 
2        examination.)

3           THE COURT:   Okay.

4    Q    Now, you had sort of described the type

5 of paper that we're -- that it's on --

6    A    I think they used to call it an onion

7 skin or something like that.

8    Q    Okay.

9         Even today, Mr. Falbee, do you see

10 various small dots --

11    A    Yeah, I saw them.

12    Q    -- on that onion skin?

13    A    Yeah, I saw that when I was looking at

14 it.

15    Q    You distinctly recall, when you saw it

16 originally, it had blood on it?

17    A    It appeared to have -- you know, not

18 heavy but like spray or -- or, you know, very

19 light spray where it just caught the document

20 because it was sitting on top.

21    Q    Okay.

22         Now, it was sitting on top when you saw

23 it, that was after the police had been there for a

24 couple weeks; right?

25    A    Correct.

1                    Ron Falbee - Redirect        193

2        Q    The fact that there was blood on it

3   would indicate that it was out at the time that

4   Mr. Tankleff was murdered?

5        A    It would seem to me, yeah.

6                    MR. POLLACK:  Nothing further.

7                    THE COURT:  Recross?

8   RECROSS-EXAMINATION

9   BY MR. LATO:

10       Q    Mr. Falbee, just with respect to

11  redirect, moneys or fees paid to Billy Ram, you

12  said that Mr. Ram said that he was out money for a

13  couple of days, lost work?

14       A    Yeah.  In other words, he was going

15  to -- he was going to lose income if he came up

16  here for two days, and we agreed to -- you know,

17  what is his income for two days, and we needed to

18  make him whole.

19       Q    Do you recall what that amount was to

20  make him whole?

21       A    No, I don't.

22       Q    Do you know whether it was --

23       A    I -- five, six, seven hundred a day.

24  I -- I don't know.  I'm not sure exactly what it

25  was.  Five hundred dollars.

1

2      Q     Would you be able to find out between

3   now and, say, the end of the proceeding?

4      A     Possibly.

5            MR. LATO:  Your Honor, I am going

6            to ask, if there are any records, that

7            they be produced.

8      Q     Do you know how he was paid; was it in

9   cash --

10     A     I do not know.

11     Q     Did the money come from you directly to

12  Mr. Ram or just to Mr. Salpeter first?

13     A     It went to Mr. Salpeter first.

14     Q     And then he decided basically whatever

15  method; correct?

16     A     Correct.

17     Q     And how did you get the money to

18  Mr. Salpeter, was it by check, Western Union, et

19  cetera?

20     A     By check, I believe.

21           MR. LATO:  Nothing further.

22           THE COURT:  All right.

23           You're excused Mr. Falbee.  Thank

24           you, sir.

25           THE WITNESS:  Thank you.