Exhibit 29

1                                                    1

2        UNITED STATES DISTRICT COURT NEW YORK
         FOR THE EASTERN DISTRICT OF NEW YORK
3        ------------------------------------------X

4        MARTIN TANKLEFF,

5                        Plaintiff,

6           -against-

7        THE COUNTY OF SUFFOLK, K. JAMES McCREADY,
         NORMAN REIN, CHARLES KOSCIUK, ROBERT DOYLE,
8        JOHN McLELHONE, JOHN DOE POLICE OFFICERS
         #1-10, RICHARD ROE SUFFOLK COUNTY EMPLOYEES
9        #1-10,

10                       Defendants.

11       ------------------------------------------X

12
                                666 Old Country Road
13                              Garden City, New York

14
                                June 17, 2014
15                              10:05 p.m.

16          DEPOSITION of ROBERT J. ANDERSON, a

17       Non-Party Witness herein, taken by the

18       Plaintiff, pursuant to Federal Rules of

19       Civil Procedure and Notice, held at the

20       above-mentioned time and place, before Dolly

21       Fevola, Notary Public of the State of New

22       York.

23

24

25

1                                                              2

2       A P P E A R A N C E S :

3

        BARKET MARION EPSTEIN & KEARON, LLP
4               Attorneys for the Plaintiff
                666 Old Country Road
5               Garden City, New York 11530
        BY:     BRUCE BARKET, ESQ.
6               POLLACK, ESQ.

7

        SUFFOLK COUNTY DEPARTMENT OF LAW
8               Attorneys for the Defendants
                H. Lee Dennison Building
9               Hauppauge, New York
        BY:     BRIAN MITCHELL, ESQ.
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                                                      3

2                        STIPULATIONS

3          IT IS HEREBY STIPULATED AND AGREED, by

4     and among counsel for the respective parties

5     hereto, that the filing, sealing and

6     certification of the within deposition shall

7     be and the same are hereby waived;

8          IT IS FURTHER STIPULATED AND AGREED that

9     all objections, except as to form of the

10    question, shall be reserved to the time of

11    the trial;

12         IT IS FURTHER STIPULATED AND AGREED that

13    the within deposition may be signed before

14    any Notary Public with the same force and

15    effect as if signed and sworn to before the

16    Court.

17                    *       *       *

18

19

20

21

22

23

24

25

```
 1                          R. Anderson            4

 2        R O B E R T  J.  A N D E R S O N, after

 3    having been first duly sworn by a Notary

 4    Public of the State of New York, was

 5    examined and testified as follows:

 6    EXAMINATION BY

 7    MR. BARKET:

 8             Q     State your name for the record,

 9    please?

10             A     Robert J. Anderson.

11             Q     State your address, please.

12             A     30 Yaphank Avenue, Yaphank, New

13    York 11980.

14                 MR. BARKET:  Good morning.

15                 THE WITNESS:  Good morning.

16                 MR. BARKET:  I'm going to ask

17             you a series of questions.  If you

18             don't understand the question,

19             please indicate that.  If you answer

20             the question, we're all going to

21             assume that you understood it; is

22             that fair?

23             A     Sure.

24             Q     Have you been deposed before?

25             A     Yes.
```

R. Anderson                          5

1

2          Q     In what context?

3          A     Most likely in reference to a

4     homicide case, but I don't recall

5     specifically which one.

6          Q     Well, normally in a homicide

7     case, you mean it was a civil case that

8     followed the homicide case?

9          A     I don't remember.

10          Q     You sat down in a room similar

11     to this and were asked questions about a

12     case that you were involved in?

13          A     Yes, I think so.

14          Q     When was that?

15          A     I don't know.  I don't remember

16     anything about it.  It's just generally I

17     think I've been deposed before.

18          Q     Ever been a party to a civil

19     lawsuit?

20          A     When you say party, I mean when

21     you're a party, you're specifically named?

22          Q     Yes.

23          A     And when it's a Notice of Claim

24     are you considered a party?

25                MR. MITCHELL:  No.

```
                              R. Anderson                6
1
2            A     Not yet.  So I have to say no.
3            Q     You were employed as a Suffolk
4     County police officer, yes?
5            A     Yes, 34 years.
6            Q     Could you tell me when you
7     started?
8            A     1970 of August, I believe it
9     was.
10           Q     At some point, you were in the
11    homicide squad; is that correct?
12           A     Yes.
13           Q     When did you receive that
14    assignment?
15           A     In 1985.
16           Q     When did you retire?
17           A     In 2004.
18           Q     Kind of on the side, were you
19    in the homicide squad?  Were you there
20    during the confession takers piece from
21    Newsday?
22                 MR. MITCHELL:  I object to the
23           form.  You can answer.
24           A     I went into the squad in April.
25    I'm quite sure it was April of 1985, and at
```

R. Anderson                    7

1
2    that time that investigation or series of
3    articles in the newspaper was taking place.
4            Q     Okay.
5            A     I was new in the squad.
6            Q     Where did you work before that?
7            A     I spent five years in the First
8    Squad Detectives, which is in Bay Shore.
9    Prior to that, I spent 10 years in the First
10   Precinct, Babylon township.
11           Q     As a detective?
12           A     No.  In the 10 years as a
13   police officer in the First Precinct,
14   five years as a detective in Bay Shore, and
15   then 19 years in Homicide.
16           Q     When did you first meet
17   Detective James McCready?
18           A     The first time would be when I
19   got into the Homicide Squad, 1985.
20           Q     And moving forward a little bit
21   to 1988, how did the Homicide Squad work?
22   How were cases assigned?  Were there
23   partners, teams, what have you?
24           A     Well, we worked in the team
25   concept.  We had three teams, and basically

R. Anderson                8

1

2    if there was a new homicide, usually, not

3    always but usually, the whole team would

4    break out, go to the scene.  There would be

5    assigned a lead detective and another

6    detective to work in conjunction with him

7    throughout the case, and then it would be

8    specific assignments given out to other team

9    members.

10        Q    And who would decide which team

11   got assigned which homicide?

12        A    Well, it would be the team that

13   was working that shift.  We also had the

14   1:00 a.m. to 9:00 a.m. standbys where

15   usually you were working the day tour for

16   those standby assignments and that whole

17   team would be on standby or one specific

18   detective would be on standby and, if need

19   be, he would call the supervisor and the

20   supervisor would call the whole team out.

21        Q    So are you familiar with Marty

22   Tankleff's case, the Tankleff murders?

23        A    Yes.

24        Q    Who was up for that murder, if

25   you will?  Which team?

R. Anderson                9

1

2    A    Well, I think we had the 1:00

3    to 9:00 standbys.  Who specifically had the

4    standby, it might have been McCready, I'm

5    not sure.  One of our team members would

6    have had the standby.

7         Q    Was McCready on your team?

8         A    Yes.

9         Q    Were you a part of his team?

10        A    Well, you have a team sergeant

11   and then you have the detectives assigned to

12   that team.

13        Q    Who was the sergeant?

14        A    Doyle.

15        Q    When you say you had the 1:00

16   to 9:00 standby --

17        A    Yes.

18        Q    -- that means if a call came in

19   between 1 o'clock in the morning and

20   9 o'clock in the morning, whoever was on

21   standby would be assigned that case?

22        A    Yes, from the duty officer.

23             MR. MITCHELL:  Yes.

24        Q    You don't know who was on

25   standby that date, December 7, 1988?

                              R. Anderson        10

1

2          A     Actually, I don't recall, no.

3          Q     Was there a record kept of

4     that?

5          A     Of who had the standby?

6          Q     Right.

7          A     I suppose.  I really don't

8     know.

9          Q     Okay.  When were you first

10    notified about the murders?

11         A     I think it was shortly after

12    7:00 a.m.

13         Q     How were you notified?

14         A     Phone call from Doyle, I'm

15    quite sure.

16         Q     When you say you're quite sure,

17    do you recall?

18         A     Usually that procedure that

19    would be the procedure.  I don't

20    specifically remember speaking to him on the

21    phone, but I think it's safe enough to say

22    that he called me at home.

23         Q     What did he ask you to do?

24         A     He asked me to respond; that

25    they had a double homicide in Belle Terre.

```
 1                        R. Anderson        11

 2    I believe he gave me the address and asked

 3    me to respond to the scene.

 4         Q    Did he say double homicide at

 5    that point?

 6         A    I'm pretty sure he did.

 7    Actually, no.  I think he said we had a

 8    homicide and another person was not dead as

 9    of yet.

10         Q    Okay.

11              MR. BARKET:  Could I have this

12              marked as an exhibit, please, this

13              pack of material.

14              (Whereupon, Plaintiff's Exhibit

15              1 was marked for identification.)

16         Q    It looks like it's 19 pages of

17    handwritten notes.  Could you take a look at

18    what's been marked as Plaintiff's Exhibit 1.

19         A    (Complying.)  It looks like my

20    notes on September 7, 1988.

21         Q    The handwriting is yours, yes?

22         A    Yes, it is.

23         Q    So on the first page it has

24    some information.

25              (Whereupon Barry Pollack has
```

R. Anderson                    12

1

2          entered the deposition suite.)

3          Q      The top number here is

4    88-461042.  Is that some kind of number

5    that's assigned to the case?

6          A      Yes, the central complaint

7    number.

8          Q      And where would that have come

9    from?  Where would you have gotten that

10   number from?

11         A      I would have gotten it from

12   someone at the scene.

13         Q      And when is that generated?

14         A      That's generated out of

15   headquarters when a call goes out to the

16   uniform command.

17         Q      Below, it has a couple of

18   different names; Seymour, Arlene and Marty

19   Tankleff.  It looks like it's ages.  Seymour

20   is 62; Arlene is 54.

21         A      Yes.

22         Q      And then you have Marty's date

23   of birth.  Where did you that from?

24         A      Probably one of the detectives

25   at the scene.  It could have been Doyle.  I

R. Anderson                13

1    don't recall.

3          Q    Okay.  Next page, you have

4    listed two police officers as the first

5    officers at the scene?

6          A    Right.

7          Q    James -- can't quite read

8    that -- Crane?

9          A    I don't know if it's coin or

10   crane.  I think it might have been a coin.

11   I'm not sure.

12         Q    Daniel Gallagher?

13         A    Yes.

14         Q    You spoke to them yourself?

15         A    I don't recall.

16         Q    Take a look at this.  It looks

17   like you have some information here that

18   appears to have been from them, but you tell

19   me.

20         A    I don't recall who gave it to

21   me.  It could have been the detective or the

22   police officer.  I'm not sure.

23         Q    As you're making these notes,

24   are you trying to document what happened?

25   This is for yourself?  What purpose?

R. Anderson                14

1

2          A     Just to get some general

3     information as to what happened.  Sure, for

4     myself, yes.

5          Q     Wouldn't you want to know who

6     was conveying information to you?

7                MR. MITCHELL:  I object to the

8                form.  You can answer.

9          A     I'm sure I knew at the time,

10    but as I sit here now, I don't recall.

11         Q     Right.  Is there anything in

12    the notes that would indicate who conveyed

13    this information to you?

14         A     No.  I don't think so, no.

15         Q     So it would have come from

16    either the officers at the scene or one of

17    the detectives who was there ahead of you?

18         A     Yes, it could have been.

19         Q     When did you write this down;

20    do you recall?

21         A     As it was being given to me.

22         Q     Was that at the scene or could

23    that have been later on?

24         A     No, that's at the scene.

25         Q     How do you know that?

R. Anderson                    15

1

2          A     Because they're my initial

3     notes and that's what I do when I get to the

4     scene.  I record whatever information is

5     available.

6          Q     Okay.  If you go to page -- and

7     on the bottom right it looks like there's

8     some kind of stamp.  The first page.

9          A     Let me see that one.

10         Q     It says, AG 012623.

11         A     Oh yeah.

12         Q     So it's a sequential number.

13         A     Okay.

14         Q     It goes from 234 or 43.  So go

15    to 25.

16         A     Okay.

17         Q     It says, "Marty woke up early

18    and noticed the alarm was off."  And then

19    you have in parenthesis, "key in alarm."

20         A     Yes.  I have that down here,

21    yes.

22         Q     What does that mean?

23         A     It means, I guess, someone told

24    me the key was in the alarm.

25         Q     What do you mean the key was in

1                      R. Anderson         16

2    the alarm?

3              A    I guess this is an alarm key.

4    I didn't see it.  I don't know.

5              Q    Could it mean there's a key-in;

6    like, a punch-in alarm?

7                   MR. MITCHELL:  Objection to the

8              form.  You can answer.

9              A    I have no idea.

10             Q    Okay.  All lights were on?

11             A    Yes.

12             Q    And then it says, "I'm the only

13   one person who would have motive to do

14   this," and it says Marty with a semicolon at

15   the beginning of that paragraph.  Is this

16   information you're receiving from Marty?

17             A    No.

18             Q    Did you speak to him at all?

19             A    I did not.

20             Q    So this would have been

21   something that someone was telling you about

22   what he said?

23             A    Yes.

24             Q    Now, on Page 26 it says, "Marty

25   was emotional."  In parenthesis it says, "no

R. Anderson                    17

1

2      tears."  And there is a word that follows up

3      that I can't read.

4              A     "Running around."

5              Q     What did that refer to that

6      sentence, if you will?

7              A     That he wasn't in a stationary

8      position.  He was moving around from person

9      to person or around the area.

10             Q     Okay.  Who did you get this

11     information from; do you know?

12             A     Yeah, once again, I don't

13     recall.

14             Q     It says Marty was emotional but

15     I guess no tears means he was not crying?

16             A     Yes.

17             Q     So somebody described to you as

18     somebody being emotional and running around

19     but not crying?

20             A     Yes.

21             Q     Here it says -- I think this

22     says, "Marty, you're not telling me a whole

23     lot."  What's that?

24             A     What page?

25             Q     26 still.  Marty asked Police

R. Anderson                18

1

2    Officer Coyne or whatever his name is what

3    his father's condition was.  Answer.  "He's

4    alive.  He's breathing."  "Marty, you're not

5    telling me a whole lot."

6              Is that Marty saying you're not

7    telling me a whole lot or is that somebody

8    saying to Marty you're not telling me a

9    whole lot?

10         A    The latter, someone saying to

11   Marty, you're not telling me a whole lot.

12         Q    Who said that to Marty?

13         A    I don't know.

14         Q    Why did you make a note of

15   that?

16         A    Because that's information that

17   was provided at the scene.

18         Q    Somebody gave you kind of what

19   they said to Marty, but not what Marty said

20   to them?

21         A    Well, they're saying that Marty

22   is not telling them a whole lot so, yeah, I

23   guess so.

24         Q    Do you know who that came from?

25         A    No, I don't.

                              R. Anderson        19

1

2          Q     Could you read that paragraph

3     and tell me if I'm reading it correctly.

4     Marty asked PO -- something -- what his

5     father's condition was.  Answer.  He's

6     alive.  He's breathing -- Marty -- you're

7     not telling me a whole lot.

8          A     Okay.

9          Q     In that context, that's a

10    conversation about Marty asking the officer

11    about his father's condition?

12         A     Yes.

13         Q     Are you sure that this is not

14    Marty saying to the officer, you're not

15    telling me a whole lot about my dad's

16    condition?

17               MR. MITCHELL:  I object to the

18          form.  You can answer.

19         A     No.

20         Q     You're not sure?

21         A     No, the question was, do I

22    think that that's Marty saying to the

23    officer or a detective or someone that

24    you're not telling me a whole lot, that's

25    your question?

R. Anderson                    20

1

2      Q     Yeah.

3      A     No, my impression is that's

4   what was said to Marty by either the police

5   officer or a detective, but in this case, in

6   the context of that paragraph, it looks like

7   it would be Police Officer Coyne.

8      Q     Well, actually, the way you

9   have it written here, you have Marty, and

10  then the next phrase is, asked officer what

11  Marty says his father's condition is, and

12  then you have answer.  And then you give the

13  answer, he's alive.  He's breathing.  And

14  then you have Marty with another dash the

15  same way you did in the first part of it,

16  and then you have a response.  It seems like

17  it would flow.  Marty asked the officer what

18  his father's condition was.  Answer.  He's

19  alive.  He's breathing.  Marty you're not

20  telling me a whole lot.

21     A     Yeah, I don't know.  I don't

22  know what to say.

23     Q     Doesn't that seem like how it

24  flows from reading this?

25           MR. MITCHELL:  Objection to

R. Anderson                21

1
2              form.  You can answer.
3              A     I really don't know.  It's a
4       note taken a long time ago.  At that time, I
5       probably knew but as I sit here now, I
6       don't.
7              Q     Below it has, Marty blood on
8       shoulder, right side of face?
9              A     Yes.
10             Q     Okay.  And he's wearing shorts.
11             A     Yes.
12             Q     Is that something you observed?
13             A     I observed him at the scene and
14      he was wearing shorts, and when I got there
15      he was sitting on the hood or trunk of a
16      vehicle.
17             Q     Okay.  Was he wearing anything
18      besides shorts?
19             A     I don't think so, but I don't
20      know.  I don't recall.
21             Q     Well, if he was wearing
22      something else besides shorts, you would
23      have noted it?
24             MR. MITCHELL:  I object to the
25             form.  You can answer.

R. Anderson                22

1

2          A     I really don't recall if he was

3    or not.  If I would have noted it?  See, it

4    could have been what another detective or

5    officer is telling me or it's not

6    necessarily what I observed.

7          Q     When you observed him, he was

8    sitting on the hood of the far car.  Was he

9    wearing anything besides shorts?

10         A     I recall shorts.  I don't

11   recall a top.  It's possible or not.

12         Q     Could this also be information

13   you received from officers at the scene?

14         A     It could have been an officer

15   or the detective.

16         Q     All of this seems to have come

17   from, at the least, ultimately from the

18   officers who initially showed up there, yes?

19              MR. MITCHELL:  I object to the

20         form.

21         Q     Whether it came through a

22   detective or not, the initial information

23   about where Marty took the officers, how he

24   greeted them, things like that, all came

25   from them, yes?

                              R. Anderson          23

1

2              MR. MITCHELL:  I object to the

3         form.  You can answer.

4         A     All came from them being the

5    officers at the scene --

6         Q     Right.

7         A     -- or detectives?

8         Q     No, the officers at the scene

9    were the ultimate source of the information?

10        A     Much of it probably was, yeah.

11        Q     Then you have 27 entitled is

12   the page Neighborhood and you have some

13   names.  Is this information you got from

14   these people directly or is this information

15   that was conveyed to you about what these

16   people said to somebody else?

17        A     I believe I interviewed this

18   neighbor.

19        Q     And that's Dominic Francis?

20        A     Let me just read it a moment.

21   I think it's an interview I did.

22        Q     Okay.  It indicates Arlene

23   wanted a divorce?

24        A     Yeah, that's what she told me.

25        Q     And Seymour a sick man.  That

R. Anderson                    24

1

2    means physically?  It meant physically, yes,

3    bleeding ulcers, artery problems, so forth?

4         A    Yes.

5         Q    Okay.  And then it describes

6    Marty as a good kid -- something -- always

7    working on cars.  What's that word before

8    "always."  I'm looking at Page 28 now,

9    sorry.

10        A    Good kid.  Has friends.  Always

11   working on cars.

12        Q    Okay.  Now, if you turn to Page

13   29, you have a list of card partners?

14        A    Yes.

15        Q    And in addition to the names,

16   addresses, phone numbers, date of birth,

17   there are some check marks here.  What is

18   that for?

19        A    I believe I checked them off

20   after I interviewed them, I would say.

21        Q    Did you conduct these

22   interviews by yourself or with someone else?

23        A    With someone else.

24        Q    Who was that?

25        A    Detective Anthony Ligase.

```
1                        R. Anderson          25

2             Q     Is he still alive?

3             A     Yes.

4             Q     Is he well physically; do you

5      know?

6             A     No.

7             Q     What's the matter with him?

8             A     He has pancreatic cancer and he

9      has kidney failure and he's on dialysis and

10     on chemotherapy.

11            Q     Does he live locally?

12            A     He lives in Suffolk County.

13            Q     Okay.  Were you assigned to

14     interview the card players?

15            A     Yes, I was.

16            Q     And who asked you to do that?

17            A     Doyle.

18            Q     And when did you conduct the

19     interviews?

20            A     On that date, same day.

21            Q     September 7th?

22            A     Yes.

23            Q     Okay.

24                  MR. BARKET:  Could I have this

25            marked as number 2.
```

R. Anderson                26

1

2          (Whereupon, Plaintiff's Exhibit

3      2 was marked for identification.)

4          Q    Plaintiff's Exhibit 2, that's

5      the supplemental report on the interview of

6      the card players; is that right?

7          A    I'm sorry.  Yes, it is.

8          Q    Take a look at it.  If I

9      understand what happens correctly, is that

10     you take notes when you're doing the

11     interview and then go back and prepare a

12     supplemental report?

13         A    Yes.

14         Q    When is the supplemental report

15     prepared off of the notes?

16         A    This was done -- It was started

17     the next day on the 8th.  I don't know when

18     I actually completed it though.

19         Q    Would there be a date on here

20     someplace as to when it would be completed?

21         A    No.

22         Q    At what point in time did you

23     learn that Marty supposedly confessed to

24     these crimes?

25         A    I've thought about that and I

R. Anderson                    27

1      just don't recall when I actually was told

2      that he confessed.  I just can't place that.

3            Q      Was it some point during the

4      day of September 7th?

5            A      Probably.  Probably.

6            Q      Okay.  And at what point during

7      the day did you interview the card players

8      or start to interview card players?

9            A      On the 7th.  What point in the

10     day?

11           Q      Yes, what time?

12           A      I did not stay long at the

13     scene.  I did the neighborhood interview.  I

14     spent some time gathering their addresses,

15     researching that, and I don't know when I

16     started.  It probably might have been

17     towards the afternoon.  I really don't

18     recall the specific time.

19           Q      Where would you have gotten the

20     addresses from?

21           A      I think that Mr. Bove helped me

22     out with some of those.  The other ones we

23     could have possibly done motor vehicle

24     checks to get their addresses.  I'm not

R. Anderson                28

1

2    really sure.  I recall Mr. Bove helping us

3    out with them because he was the mayor of

4    Belle Terre and he knew these people.

5          Q    Was he there at the scene?

6          A    Yes.

7          Q    The phone numbers would have

8    come from where, do you know?

9          A    Well, for the report purposes I

10   actually got them from the individuals.

11         Q    Right, but at the beginning of

12   this starting at Pages 29 and 30, it looks

13   like this is the list with the addresses

14   that you went back and checked off, yes?

15         A    Yeah.

16         Q    So that's the list you made

17   before you went out to interview them and

18   then you went out to interview them based on

19   the list and checked them off as you went?

20         A    Yeah, and I could have added

21   additional information into my notes as I

22   spoke to them.

23         Q    Did you?

24         A    Yeah, I'm sure I did.

25         Q    What time did you interview Mr.

R. Anderson                29

1

2    Bove, if you recall?

3         A    I do not recall.

4         Q    In here it has a reference,

5    both in the reports and notes, that

6    watermelon on counter Vinny cut a piece with

7    a knife on his way out?

8         A    Yes.

9         Q    There is no other reference in

10   here that I saw to food or what they ate or

11   what they didn't eat.

12             How did that come up with Mr.

13   Bove?

14        A    He just told me what he did,

15   what his actions was when he got to the

16   scene, when he left the scene, and just part

17   of the conversation when I interviewed him.

18        Q    You know, as you sit here now,

19   that Marty supposedly told McCready that he

20   killed his parents with a knife that was on

21   the counter next to the watermelon?

22        A    That Marty killed his parents?

23        Q    That's what Marty said to

24   McCready according to McCready.

25             MR. MITCHELL:  I object to the

R. Anderson                30

1

2          form.  You can answer.

3                   MR. BARKET:  Let me start

4          again.  I withdraw the question.

5          Q     Are you aware, as you sit here

6     now, that according to Detective McCready

7     Marty confessed to the murders?

8                   MR. MITCHELL:  I object to the

9          form.  You can answer.

10         A     Yes.

11         Q     And that one of the things that

12    Marty supposably said was that he used a

13    kitchen knife that was on the counter next

14    to the watermelon?

15         A     I don't recall that.

16         Q     As you sit here now you don't?

17         A     I don't recall that.

18         Q     Do you recall anything about

19    Marty's confession?

20         A     The only thing I recall is that

21    he confessed and an attorney entered the

22    picture and it was shut down, that's all.

23         Q     So I guess what I'm asking you

24    is that, is that something you asked

25    specifically about, the watermelon on the

R. Anderson                    31

1

2       counter did anyone use that knife?

3              A     No, I would not ask that

4       specifically.

5              Q     You might if you were told

6       previously that Marty said he used that

7       knife to kill his parents?

8                     MR. MITCHELL:  I object to the

9                form.  You can answer.

10             A     Yeah, but that's not the way

11      that would have gone.  I simply asked Mr.

12      Bove what did he do, what could he tell me

13      about the players of the card game, and he

14      added that with no prompting from me.

15             Q     Did you learn any information

16      about who might have been involved in this

17      from either Marty himself, from the

18      detectives, from talking to Marty or from

19      any other witnesses or relatives?

20             A     About who may have been

21      involved or accused at that time besides

22      Marty?

23             Q     Sure.  When you first got a

24      there, Marty was not accused; was he?

25             A     No.

                              R. Anderson              32

1

2          Q     Did anybody tell you that he

3    was a suspect or person of interest or

4    anything like that?

5          A     No.

6          Q     So at some point in time, did

7    someone tell you that someone else may have

8    been involved?

9          A     Yes.

10         Q     Who was that?

11         A     Jerry Steuerman.

12         Q     Who told you that?

13         A     Who told me?  It could have

14   been Sergeant Doyle, one of the detectives

15   at the scene, saying that Marty was blaming

16   Jerry Steuerman for this.

17         Q     What do you mean blaming?

18               MR. MITCHELL:  I object to the

19         form.  You can answer.

20         A     Saying that Steuerman did this,

21   killed his parents.

22         Q     Well, you used the phrase

23   blaming.  Is that what was told to you or is

24   that a phrase that you used now?

25         A     Probably just a phrase I used

R. Anderson                    33

1

2    now.

3            Q    Did you know at the time that

4    their actually were several relatives of the

5    Tankleffs that indicated that the likely

6    suspect or person who would have a motive to

7    do this was Steuerman?

8                    MR. MITCHELL:  I object to the

9            form.

10           A    From other relatives?

11           Q    Yes.

12           A    No.

13           Q    Ron Rother?

14           A    Not aware of that.

15           Q    Ron Falby?

16           A    No.

17           Q    You did not learn that other

18    individuals had "blamed" Steuerman?

19           A    I did not.

20           Q    Okay.  Did you ask Bove what

21    Steuerman was wearing?

22           A    I don't think I did.

23           Q    Okay.  Was Steuerman a suspect

24    or at least a person that you wanted to

25    speak to in connection with this?

R. Anderson          34

1

2          A     Yes.

3          Q     Okay.  So obviously, did you

4   see the scene, the crime scene?  Did you

5   walk in?

6          A     Briefly, yes.

7          Q     You saw that there was

8   obviously quite a bit of blood?

9          A     Yes.

10         Q     From your experience as a

11  detective, it's certainly possible that

12  whoever was involved in this would have

13  gotten some blood on them?

14         A     Yes.

15         Q     It's actually more than

16  possible whoever committed these crimes had

17  to have blood from the victims on their

18  person or clothing, yes?

19              MR. MITCHELL:  I object to the

20         form.  You can answer.

21         A     I really can't say.  Is it

22  possible?  Yes, a lot of things are

23  possible.

24         Q     Is it likely?

25              MR. MITCHELL:  I object to the

R. Anderson                    35

1

2          form.  You can answer.

3              A     I don't know.  I don't know in

4     this situation.

5              Q     What do you mean you don't know

6     in this situation?

7              A     I mean it's possible that a

8     person could not get blood on them too, but

9     I can't answer that question.  I don't know.

10             Q     You don't know whether or not

11    somebody who was at the scene of where

12    Arlene was killed and where Seymour was

13    killed, you don't know whether or not it's

14    likely that those individuals or individual

15    would have blood from the victims on them

16    after committing that act?

17             A     It's possible they could and

18    remotely possible that maybe they could not.

19    Maybe they didn't.

20             Q     Okay.  Did you ask anyone what

21    Steuerman was wearing?

22             A     I don't recall if I did.

23             Q     Did you ask Steuerman what

24    Steuerman was wearing?

25             A     I don't think so.

R. Anderson                    36

1

2        Q    I guess then you did not ask to

3   see the clothing that he was wearing?

4        A    No.

5        Q    Could you turn to Page 37 of

6   Plaintiff's Exhibit 1.

7        A    Yup.

8        Q    This is your interview with

9   Steuerman?

10       A    Yes, it is.

11       Q    Where did this interview take

12  place?

13       A    At his business, one of the

14  bagel stores in East Setauket.

15       Q    What time did it take place?

16       A    I don't recall.

17       Q    Do you know in what sequence

18  you did the interviews?

19       A    Yes.  Steuerman was the last

20  one.

21       Q    So if you had interviewed the

22  rest of the people during the day, this had

23  to be later on in the afternoon?

24       A    Yes.

25       Q    What was he wearing at that

R. Anderson                    37

1   time?

2

3          A     Other than casual clothing, I

4   don't recall.

5          Q     On Page 38 it says, "unknown

6   what Seymour was wearing."  Why are you

7   asking about what Seymour was wearing?

8          A     I don't recall why.

9          Q     Actually, I think there was a

10  reference to that in Bove's interview as

11  well about what Seymour was wearing?

12         A     It's possible it was concerning

13  jewelry, things of that nature, that was or

14  was not still with the body.  That's the

15  only reason I can think of why I would ask

16  that.

17         Q     At the time that you were

18  interviewing Steuerman, you knew of the

19  allegations, at least by Marty, that he was

20  involved or could have been involved with

21  the murders, yes?

22         A     Yes.

23         Q     On Page 38 it says, "unknown

24  what Seymour was wearing," and then a

25  separate notation about jewelry.  "Heavy

                              R. Anderson                 38

1

2     bracelet, watch, unknown what else."

3          A     Yes.

4          Q     That seems to be two separate

5     questions, what he was wearing in clothing

6     and what kind of jewelry he had on.

7          A     Possibly.

8          Q     So what was the purpose in

9     asking what the clothing was?

10               MR. MITCHELL:  I object to the

11               form.  You can answer.

12         A     Once again, I think, you know,

13    probably because of the jewelry issue.

14         Q     Well, if you go back to Bove's

15    interview and take a look at -- the

16    supplemental report is easy to read.  It's

17    on Page 11 of that, the same sequence,

18    AG009211, it says, "when asked to recall

19    what Seymour was wearing, he thought he had

20    on a white shirt with laces but was not

21    sure."

22         A     Okay.

23         Q     It seems like you're at least

24    eliciting information about the clothing?

25               MR. MITCHELL:  From Bove.

R. Anderson                    39

1

2        Q     From Bove here, right?

3              MR. MITCHELL:  I object to the

4        form.  You can answer.

5        A     Yes.

6        Q     Do you recall why you would

7   have been doing that?

8              MR. MITCHELL:  From Bove.

9              MR. BARKET:  From Bove.

10       A     Once again, I think it was just

11  about the jewelry issue.  I don't recall

12  other than that.  I don't recall.

13       Q     Okay.  Going back to Page 38 of

14  the notes --

15       A     Yup.

16       Q     -- it says, "Arlene was

17  watching TV."  Where?

18       A     I don't know.

19       Q     Did you ask him where?

20       A     I don't remember.

21       Q     But that's something he told

22  you that Arlene was watching TV, last seen

23  at 2030 -- that would be 10:30 at night; is

24  that right?

25       A     No, 8:30.

R. Anderson                    40

1

2          Q     -- when they ate.  Unknown when

3     she went to bed.

4          A     Yes.

5          Q     Was her TV in the card room?

6          A     I don't recall.

7          Q     Was she watching TV in the card

8     room?

9          A     I don't know.

10         Q     You do know that she was found

11    in her bedroom, right?

12         A     Yes.

13         Q     Do you know whether or not the

14    television in her bedroom was on?

15         A     I may have known, but I don't

16    recall.

17         Q     Here on Page 39 it says, "Jerry

18    last car to leave.  Last saw Seymour in card

19    room."  That came from Steuerman himself?

20         A     Thirty-eight or 39, you said?

21         Q     Thirty-nine.

22         A     Yes.

23         Q     On Page 40 you have a notation

24    here that Steuerman said Arlene disliked

25    men.

```
1                          R. Anderson        41

2          A     Yes, that's what he told me.

3          Q     How did that come up?

4          A     I have to assume I asked a

5     question.  I was asking him questions about

6     Arlene and what she was doing at the time

7     and, you know, I don't remember the specific

8     question, but it was concerning Arlene.

9          Q     Then your notes end on Page 41?

10         A     Yes.

11         Q     There's a line here in a

12    supplemental report on Page 9214.  The last

13    thing you write in here says, "having

14    knowledge of Marty Tankleff's accusations of

15    Jerry Steuerman he made at the scene on

16    September 7, 1988, it is this officer's

17    opinion and also the opinion of Detective

18    Ligase, after interviewing Mr. Steuerman

19    that he should not be considered a suspect

20    in the homicide."

21         A     Yes.

22         Q     What was that based upon?

23         A     It was based upon Martin

24    Tankleff's statements and observations at

25    the scene that I had of him where he was
```

```
1                          R. Anderson        42

2      approaching people who came to the scene

3      such as one of the neighbors -- I believe

4      his name was McNamara -- and he said to

5      McNamara that Marty had lifted his father, I

6      believe, from a desk and placed him on the

7      floor and Mr. McNamara said to him, then why

8      aren't you covered with blood, and Marty

9      said nothing and walked away.

10                     He also said something to

11     Constable Heinz.  He accused Jerry Steuerman

12     at the scene to the Constable and I believe

13     Constable Heinz said to him that when

14     Seymour -- if Seymour comes to he will be

15     able to verify whether Jerry Steuerman did

16     it or not, and there was no response from

17     Marty with that.

18                     Also, Detectives McCready and

19     Rein had some observations at the scene that

20     didn't add up with Marty Tankleff.  And

21     specifically there was one incident where

22     the blood spattering on the telephone -- and

23     I don't recall the exact conversation that

24     they had with Marty on that -- but it

25     indicated that Marty picked up the
```

R. Anderson                    43

1    telephone, I think, and that there were no

2    smears of the blood spattering on the

3    telephone that the lab eventually

4    discovered.

5              And the other thing that was

6    significant at the scene that did not look

7    good for Marty was his point of observation

8    of his mother's body in the bedroom where he

9    described some injuries that you would not

10   be able to see from his point of

11   observation, that only someone that was

12   close up or had something to do with the

13   body could have noticed that.

14             Also, what did I base my

15   conclusion on Steuerman?  Overkill at the

16   scene.  What stands out to me at the scene

17   is that gaping wound in Arlene Tankleff's

18   neck.  I would describe that as overkill.

19   Of course, I did not see Seymour Tankleff.

20             Also, my interview of the card

21   players where they all said that there were

22   absolutely no problems, no one had anything

23   negative to say about Jerry Steuerman.

24             Also, the fact that Jerry

R. Anderson                    44

1

2    Steuerman's daughter alibied him that he had

3    arrived home at approximately 3:15 a.m. and

4    all the card players said they all left

5    together except for one party that left

6    earlier.  They all left together at

7    3:00 a.m. and it was about a 15-minute ride

8    from the Tankleff residence to where Jerry

9    Steuerman was staying at his daughter's

10   house in Old Field.  Within that 15 minutes,

11   someone could not create that havoc at that

12   crime scene and get home in 15 minutes.

13              He had to ring the doorbell to

14   get in.  His daughter had to let him in

15   because he did not have his keys, and also

16   basically the demeanor of Jerry Steuerman

17   when I spoke to him.  I had no bad vibes.

18   He was still shocked about the murders.  And

19   there's just no bad feelings I got from him

20   at that time.

21              And then, subsequently I

22   learned that Marty Tankleff had confessed.

23        Q    That's pretty good from

24   20 years later and not remembering some

25   parts of your notes.  You have that down

R. Anderson                45

1    pretty well.

2           MR. MITCHELL:  Wait.  I object

3        to the form.  Is that a question?

4           MR. BARKET:  No, just an

5        observation.

6           MR. MITCHELL:  I ask that it be

7        stricken from the record.

8        Q    Let me go back.  When you were

9    interviewing Jerry Steuerman, you did not

10   know -- Did you interview his daughter at

11   that point?

12       A    I don't recall if I spoke to

13   her or one of the other detectives.

14       Q    Okay.  Nobody described -- I

15   guess Jerry Steuerman did not describe any

16   difficulty between him and Mr. Tankleff.

17       A    No.

18       Q    So he did not tell you about

19   the -- what was the statement at the trial?

20   He thinks he owned half -- He owned half of

21   my business, he thinks he owned half of me,

22   that sentiment did not come out to you?

23       A    No.

24           MR. MITCHELL:  No.  I object to

1                         R. Anderson          46

2              the form.  I'm putting an objection

3              on the record to the form of your

4              question.  I appreciate that he

5              answered it, but his question about

6              the statement at the trial I'm

7              objecting to the form.  The witness

8              has already answered.

9         Q    Do you recall that?  You know

10    what I'm referring to that at some point

11    during the trial Steuerman said, "he thought

12    he owned half of me"?

13        A    No, I don't.

14        Q    Did Mr. Steuerman tell you

15    about the loans that were made by Mr.

16    Tankleff to him and the repayment schedule?

17        A    No.

18        Q    Did he tell you about the

19    demands that were being made by Mr. Tankleff

20    on him to repay the loans?

21        A    He did not.

22        Q    Did he tell you about the

23    interest that was being charged?

24        A    No.

25        Q    Did he tell you that he was

R. Anderson                    47

1

2       supposed to make these payments in cash at

3       the card games?

4              A     No.

5              Q     Did he tell you that he and

6       Arlene had been fighting -- Mr. Steuerman

7       and Arlene had been fighting over the course

8       of the summer?

9              A     Mr. Steuerman and Arlene?

10             Q     Yes.

11             A     No.

12             Q     So nobody at the card game gave

13      you any indication at all that there was any

14      difficulties between Mr. Steuerman and Mr.

15      Tankleff?

16             A     Absolutely none whatsoever.

17             Q     Had you learned of an ongoing

18      bitter dispute over hundreds of thousands of

19      dollars between Mr. Steuerman and Mr.

20      Tankleff, would that have affected your view

21      of Mr. Steuerman as a suspect?

22                   MR. MITCHELL:  I object to the

23             form.  You can answer.

24             A     Well, I'd like to add that when

25      I was assigned to interview the card

R. Anderson          48

1    players, it was merely a preliminary

2    interview, not to get into that depth that

3    you gathered whatever specific facts would

4    be helpful into the investigation at the

5    time, knowing for well that anyone with

6    significant information would be

7    re-interviewed by McCready and Rein.

8              So as far as the business

9    dealings with Seymour Tankleff and Jerry

10   Steuerman, certainly, if Jerry Steuerman

11   brought it up, I would have reported it and

12   it would have been followed through in more

13   detail, probably, the next day or so.

14        Q     Right.  My question wasn't what

15   you would have done had you asked the

16   questions and the subject had come up.  My

17   question was, had you learned of this

18   information, would that have affected your

19   view of Mr. Steuerman as a suspect?

20              MR. MITCHELL:  I object to the

21        form.  You can answer.

22        A     At that point, I don't think

23   so.

24        Q     If you had learned at that

R. Anderson                    49

1

2      point in time that virtually every detail in

3      the confession that Marty gave was false,

4      turned out not to be accurate from who was

5      killed first to the weapons that were

6      supposably used, would that have affected

7      your view of Steuerman as a suspect?

8                     MR. MITCHELL:  I object to the

9             form.  You can answer.

10            A    I'm not sure of the question

11     that you're asking me.

12            Q    You said one of the reasons why

13     you did not consider Steuerman a suspect is

14     because Marty confessed?

15            A    That was one of them, yes.

16            Q    I'm asking about that.  Knowing

17     now that many, if not all, of the details in

18     the confession turned out to be false, would

19     that affect your view of Steuerman as a

20     suspect?

21                    MR. MITCHELL:  I object to the

22            form.

23            A    No, I would still not consider

24     him a suspect.

25            Q    You mentioned Steuerman's

R. Anderson                    50

1

2    demeanor.  You know shortly after the

3    attacks and before Seymour passed away,

4    Steuerman, if I'm not mistaken, faked his

5    own death, emptied out a couple of bank

6    accounts, took out an insurance policy and

7    fled to California under a false name.

8          A     Was that before Tankleff's

9    death?  Before Seymour's death?

10         Q     Yes.

11         A     I'm aware of the fact that he

12   fled under those circumstances.

13         Q     Would you consider -- I mean

14   didn't not pick up any bad vibes from him?

15   Clearly, that conduct would raise some

16   suspicion about the person; wouldn't it?

17         A     I would say no because

18   Steuerman had to be there for the interview.

19   He had to be able to get a feeling for

20   speaking to this guy.  He did a really

21   stupid thing.  I guess his nerves got the

22   best of him with all the accusations that

23   were going around being dragged through the

24   pavers so I don't know.

25         Q     What accusations?  The only

R. Anderson                    51

1

2     person that had accused him that you know of

3     was Marty Tankleff who confessed and charged

4     with the murder?

5            A      Did it not come out in public?

6            Q      I don't know.  Did it come out

7     in public?

8            A      I assume it did.

9            Q      So just assume for the time

10    being that Steuerman is stone cold

11    absolutely completely innocent, he knows

12    that the police have arrested the son, that

13    the son had confessed, and the police were

14    fully confident that he had committed the

15    crime, what pressure is there on some

16    murderer making an accusation?  I don't

17    follow the pressure on Steuerman.

18                  MR. MITCHELL:  I object to the

19           form.  You can answer.

20           A      I don't know what you're really

21    asking me.

22           Q      You're saying that Steuerman

23    felt pressure because of the allegations

24    that were being made by somebody who was a

25    confessed murderer.  How much pressure could

                              R. Anderson                    52

1

2    that bring to bear on an innocent person?

3                    MR. MITCHELL:  Objection to the

4           form.

5           A    I can't taken that.

6           Q    You said that Steuerman did not

7    give you bad vibes, right?  You mentioned a

8    moment ago, you had to be there for the

9    interview.  Which interview are you

10   referring to?

11          A    The one and only interview that

12   I had with him.

13          Q    Okay.  So you said after that

14   you had to be there for the interview.  He

15   did a really stupid thing.  Did you

16   interview him after he went to the

17   California?

18          A    No.

19          Q    Did you go out to California

20   with the people that went to pick him up?

21          A    No.

22          Q    So you had to be there for the

23   interview meaning the interview you

24   conducted with him on September 7th?

25          A    Yes.

R. Anderson                53

1

2          MR. MITCHELL:  You asked that

3     already twice.

4          Q    So the reference to "he did a

5     really stupid thing," that's a reference to

6     him fleeing?

7          A    Yes.

8          Q    And why do you categorize that

9     as a "really stupid thing"?

10          A    Because he had nothing to hide.

11     In my opinion, he's not the murderer.

12     Martin Tankleff was the murderer, so he did

13     a stupid thing.

14          Q    But your opinion is based upon

15     facts that you know when you form the

16     opinion, right?

17          A    Yes.

18          Q    So if those facts change,

19     doesn't that subject your opinion to also

20     possibly changing?

21          MR. MITCHELL:  I object to the

22     form.

23          A    Is that a hypothetical?

24          Q    No.

25          A    It sounds like a hypothetical

R. Anderson                    54

1     question.

3          Q    You can call it whatever you

4     want.  You can answer it, please.

5               MR. MITCHELL:  I object to it

6               again.  You can answer.

7          A    Say it again.

8               MR. BARKET:  Can you read it

9               back.

10              (Whereupon, the requested

11              portion was read back by the court

12              reporter.)

13         A    Possibly, yes.

14         Q    Okay.  So I guess what I'm

15    doing here is kind of going back through the

16    reasons that you gave for excluding Jerry

17    Steuerman as a suspect --

18         A    Right.

19         Q    -- and saying, in hindsight,

20    looking back with new facts, new

21    information, does your view of Steuerman as

22    a suspect change?

23         A    No.

24         Q    And one of the things that you

25    gave me as a reason was Steuerman's

R. Anderson                55

1

2      interview, the vibe you got from him at the

3      time, right?

4              A     Yes.

5              Q     I guess that was a good vibe or

6      nothing bad?

7              A     Nothing suspicious at all

8      concerning the homicide.

9              Q     Two weeks later when he faked

10     his death and fled and did all that, that

11     certainly was suspicious; wasn't it?

12             A     Not in our view.  I mean

13     someone looking from the outside in, yes,

14     it's suspicious, but I mean I don't want to

15     sit here and say Jerry Steuerman was a nut

16     because he was kind of nutty like that.  You

17     just had to know Jerry Steuerman.

18                   Did you ever meet Jerry

19     Steuerman?

20             Q     Did you?

21             A     Once.

22             Q     Just during that interview?

23             A     Yes.

24             Q     How long did that interview

25     take?

R. Anderson                    56

1

2          A     Probably no more than an hour.

3          Q     So from that interview you

4     formed an opinion as kind of nutty and this

5     is typical, no big deal?

6          A     I didn't think it was nutty

7     during that interview, but you have to admit

8     that's a pretty stupid nutty thing to do if

9     you're an innocent person.  That's my only

10    point.

11         Q     It depends on where you start.

12    If you assume he's innocent and then you're

13    like, you have nothing to hide, but you gave

14    me his demeanor as one of the reasons why

15    you thought he was innocent.

16         A     Yes.  It was nothing suspicious

17    that he told me during that interview.

18         Q     So look at this objectively for

19    a second.  Objectively speaking, an

20    individual who is a suspect, or at least a

21    possible suspect in a murder, who fakes his

22    death, empties bank accounts and flees,

23    that's suspicious activity; isn't it?

24              MR. MITCHELL:  I object to the

25         form.  He can answer.

R. Anderson                   57

2      A      According to his opinion, he

3  could not take the pressure anymore.

4      Q      Not according to his opinion,

5  objectively speaking that conduct is

6  suspicious; is it not?

7      A      Yes, from a person outside

8  looking in, in this case it would be

9  suspicious.

10     Q      You said, "it was not

11  suspicious to us."  Who is "us," the

12  detectives?

13     A      I think so.

14     Q      The people on your team?

15     A      Yes, I think so.

16     Q      The people that arrested Marty

17  Tankleff?

18     A      Yes.

19     Q      The people that took his

20  confession?

21     A      Well, I can't answer for them.

22  I believe so though.

23     Q      Okay.  Who interviewed his

24  daughter?

25     A      I don't recall.

                              R. Anderson              58

1

2          Q     Was there any attempt made at

3    all to kind of verify what she said; looking

4    at the alarm, looking at the keys, asking

5    her, for example, what clothing her father

6    was wearing when he got home?

7          A     I don't know because I don't

8    know who did that follow-up interview of

9    her.

10         Q     But you did not ask Steuerman

11   what he was wearing, right?

12         A     I don't recall if I did.

13               MR. BARKET:  Off the record.

14               (At this time, a brief recess

15         was taken.)

16         Q     When I asked you before when --

17   you did not make a note in your notes about

18   Steuerman not being a suspect; it's not in

19   the handwritten notes?

20         A     I didn't make a note that he's

21   not a suspect in my notes?

22         Q     Right.

23         A     No, I didn't.

24         Q     But in the supplemental report

25   you did?

R. Anderson                    59

1
2          A     Yes.

3          Q     When did you form the opinion

4    that he should not be considered a suspect?

5          A     After the completion of all the

6    interviews, his being the last, and after

7    reporting back to the squad that day,

8    probably.

9          Q     When you say "reporting back to

10   the squad," you went out interviewing him

11   knowing about the allegations that he was

12   involved?

13         A     Right.

14         Q     And then, came back and spoke

15   to other people and then formed your

16   opinion?

17         A     Yes.

18         Q     The thing that you listed off

19   here, McNamara, Heinz, so forth, how many of

20   those did you know at the time that you drew

21   your conclusion?

22         A     Know personally?

23         Q     Yeah, that you were aware of

24   whether you knew personally or somebody told

25   you about them?

R. Anderson                    60

1

2          A     I met them at the scene.  I saw

3     them at the scene, I believe.  Bove was at

4     the scene.

5          Q     Well, McNamara, there is no

6     mention of McNamara at the scene, no mention

7     of Heinz at the scene, no mention of the

8     blood spatter did not add up, the idea of

9     the mother's body, no mention of the

10    daughter's alibi.  Which of these things

11    were you aware of at the time that you made

12    this conclusion?

13         A     All of them.

14         Q     All of them.  So just curious,

15    how did you remember -- Actually, there is

16    nine different things that you gave us.  How

17    did you remember these from 23 years ago?

18              MR. MITCHELL:  I object to the

19         form.

20         Q     Excuse me, 26 years ago.

21         A     Well, I was asked to come here

22    and give a deposition so I reviewed my

23    notes, my supplemental report, and knowing

24    full well that you're going to ask me about

25    why I did not consider Steuerman a suspect.

                           R. Anderson              61

1   I got some quiet time, I thought about it,

2   thought back, and what I remember is what I

3   remember.

4        Q    Okay.  Do you know where you

5   learned about this conversation that

6   McNamara supposedly had with Marty because

7   it's not in your notes that you reviewed.

8        A    No, I would have learned that

9   at the scene.

10        Q    How would you have remembered

11   that from 26 years ago?

12             MR. MITCHELL:  I object to the

13             form.  You can answer.

14        A    Because those two specific

15   things stuck in my mind.

16        Q    There's nothing in your notes

17   about McCready and Rein's observations about

18   something not adding up; blood spatter on

19   the phone?  You just remembered that too?

20        A    Yes.

21        Q    Nothing in your notes about the

22   observation of the mother's body and seeing

23   injuries that he could not see, that's just

24   something that you remember from 26 years

R. Anderson                    62

1

2       ago as well?

3              A     Yes.

4              Q     The overkill at the scene, you

5       saw the scene.  You didn't see Mr. Tankleff,

6       but you saw Mrs. Tankleff?

7              A     Yes.

8              Q     Nothing in your notes about

9       overkill or any reference to that, that's

10      obviously something you recall?

11             A     Yes, definitely recall that.

12             Q     Nothing in your notes about

13      Marty's confession but obviously you knew he

14      did confess, right, you recall that?

15             A     Yes.

16             Q     And you said something about

17      interview of the card players and that they

18      all left together or something to that

19      effect?

20             A     Yes.

21             Q     Could you turn to Page 34 of

22      the handwritten notes.  I think it's the --

23      Who is Robert?

24             A     Montefusco.

25             Q     Turn to Page 33, if you will,

R. Anderson                63

1
2    first.  That's Robert Montefusco?  He was
3    one of the card players?
4           A    Yes.
5           Q    It says here, by the way,
6    "Arlene reading paper in living room where
7    TV is."
8           A    Yes.
9           Q    That's the last he saw of her?
10          A    Apparently, yes.
11          Q    No problems during the game?
12   Robert left at 3 o'clock.  Shortly after
13   walked out with Vinny Bove and it says with
14   who?  Al who?
15          A    Raskin, Joe Cecare, Frank
16   Olivetti and Jerry Steuerman.
17          Q    Who's Peter -- What's that?
18          A    Capabianco.
19          Q    Left early.
20          A    Yes.
21          Q    The next line says, "Jerry
22   Steuerman went back in to speak to Seymour,
23   did not see Jerry leave"?
24          A    Correct.
25          Q    So they did not actually leave

R. Anderson                    64

1
2    all together?
3           A     Well, actually the consensus of
4    opinion from all of the card players was
5    that they did leave together.
6           Q     Well, I don't know about the
7    consensus of opinion, but you wrote down,
8    "Jerry Steuerman went back in to speak to
9    Seymour and did not see Jerry leave."  This
10   is according to Mr. Montefusco, yes?
11          A     Yes.
12          Q     According to Montefusco they
13   all walked out together but then Jerry went
14   back in?
15          A     Yes.  As I was taking the notes
16   from Montefusco this is what he told me.  My
17   routine, generally, when I do interviews, is
18   take their personal information and do a
19   general area of questions and get that down
20   in my notes, and I like to put the notes
21   aside and I like to concentrate on the
22   conversation so I can remember.
23               So speaking with Mr.
24   Montefusco, he was not really sure if Jerry
25   went back in, Jerry Steuerman went back in.

R. Anderson                65

1

2    Q    Are you kidding me, Detective?

3         MR. MITCHELL:  Wait.  Wait.

4    Let him finish his answer.  No, no,

5    no.

6         MR. BARKET:  Finish the answer.

7         MR. MITCHELL:  He's going to

8    finish his answer and then you can

9    ask him a question.

10        MR. BARKET:  Sure.

11        MR. MITCHELL:  I'm going to ask

12   that you not make comments.

13        MR. BARKET:  You're absolutely

14   right, Brian, I'm sorry.

15        MR. MITCHELL:  Go ahead.

16   Answer.

17   A    So I put that down in my notes

18   because that's what he said, and then later

19   on in the interview he saw Jerry go --

20   Apparently, Steuerman's car was the last one

21   up on the driveway.  The situation was where

22   the cars were all pulled into the driveway

23   blocking one another.  Steuerman's car was

24   the last one to leave from what I gathered

25   from these interviews.

R. Anderson                66

1
2          Montefusco was behind him.  He

3    thought Jerry went back to go into the house

4    and then he was not sure if he actually went

5    in is what I'm trying to say.  He did not

6    actually see him go in.  There is more to

7    it.

8          Q    I'm sure.  Go ahead.

9          A    That was in my notes, but if

10   you notice it's not in my supplemental

11   report because at the time, at the end of

12   the interview, he was not sure if he went

13   back in.

14         Q    I have to focus back on the

15   thing that you said at the beginning of this

16   which is that you take notes about what the

17   person says and then you put the notes aside

18   and you want to remember what the person

19   said so you just talk to them.

20         A    Yes.

21         Q    So if I understand what you're

22   saying correctly is that what is written

23   down is not everything that the person said?

24         A    Well --

25         Q    And in this case not even the

R. Anderson                    67

1

2    most important things?

3              A     Well, in this case, I did the

4    supplemental report, started it the next day

5    so the conversation were fresh in my mind.

6              Q     Well, where in the supplemental

7    report it says, you know, did it indicate

8    that Mr. Montefusco said, you know, I said

9    that Jerry Steuerman went back in to speak

10   to Seymour, but I'm really not sure.  Maybe

11   he just went to move his car or something.

12   Where is that written down anywhere, either

13   in the supplemental report or in the notes?

14             A     I didn't see it.  It's not in

15   there.

16             Q     Not in there at all?

17             A     No.

18             Q     So it's not even in there that

19   it's unsure.  Nowhere written that he is

20   unsure as to what happened; is it?

21             A     No, not actually.

22             Q     So before, when I was asking

23   you about the conversation with Marty and

24   the police officer about how his father was,

25   you couldn't recall where the information

R. Anderson                    68

1

2    came from, what was said about it, whether

3    it was a reference to Marty saying you're

4    not telling me a lot or the officer saying

5    to Marty, you're not telling me a lot,

6    right?  You recall that set of questions?

7         A    Yes.

8         Q    This, you can see what you've

9    written down, there is no reference in your

10   notes at all to this uncertainty or anything

11   of the like, but you're saying that you

12   remember that from 26 years ago?

13             MR. MITCHELL:  Objection to the

14        form.  You can answer.

15        A    Yes, it was my personal

16   interview of another person.  The

17   information at the scene I could have got

18   collectively from any number of people; the

19   detectives, the police officers or whomever.

20        Q    But the interview at the scene

21   you were talking to somebody and writing

22   down what somebody was telling you?

23             MR. MITCHELL:  Objection.

24        Q    It's the same thing, right?

25        A    You don't usually -- Not

```
 1                      R. Anderson            69

 2      necessarily put down who told you what.  I

 3      mean, you collectively gather any

 4      information on your first arrival on the

 5      scene.

 6            Q    You're a homicide detective

 7      investigating a double homicide in this

 8      neighborhood and you don't write down who

 9      told you the information that you're writing

10      down?

11                 MR. MITCHELL:  I object to the

12            form.  You can answer.

13            A    Not always, no.

14            Q    Okay.  In this case, you

15      actually did write down who told you what.

16      Mr. Montefusco told you that Steuerman went

17      back inside.  That's accurate, right?

18            A    Yes.

19            Q    It's not that you've written

20      down something that he did not say?

21            A    That's the first thing he said

22      about that.

23            Q    And that's the only thing

24      you've written on that topic, yes?

25            A    Yes.
```

R. Anderson                    70

1

2      Q     Could I show you what I'd like

3      to have marked as 3.

4                  (Whereupon, Plaintiff's Exhibit

5            3 was marked for identification.)

6      Q     Could you take a look at this.

7      Let me gather up the other ones.  I gave you

8      the marked exhibits.

9      A     That's that and this is this

10     (indicating).

11     Q     Right.  This is actually

12     Detective McCready's supplemental report

13     covering his case.  Do you recognize that?

14     A     Well, I see it's McCready's

15     name is on the report, yes.

16     Q     Okay.  What I want to ask you

17     is, do you recognize the handwriting that's

18     on pages -- I guess starting at Page 4, 5,

19     6.

20               MR. MITCHELL:  What's the Bates

21          number?

22               MR. BARKET:  It's AG004772

23          through 785.

24     A     What page now are you talking

25     about?

```
 1                         R. Anderson          71

 2            Q     Look through 77 first.  On the

 3      upper right-hand corner it says, Defendant

 4      still seated in car.  Told J.P. and not M.T.

 5      going to -- something?

 6            A     I don't see that.

 7            Q     Here.  Right there

 8      (indicating).

 9            A     The handwritten notes.

10            Q     Do you recognize the

11      handwriting?

12            A     No.

13            Q     Do you know McCready's

14      handwriting or would you know it?

15            A     No, I wouldn't.

16            Q     Do you know John Collins's

17      handwriting?

18            A     No.

19            Q     Could you just turn through

20      these pages and see if you recognize any of

21      this handwriting.  Take your time.

22            A     (Complying.)

23                  No, I don't.

24            Q     Okay.

25                  MR. MITCHELL:  Bruce, if you
```

R. Anderson                    72

1
2          know, the document that you marked

3          as 3, is a document that appears to

4          be Detective McCready's supplemental

5          report; am I right?

6               MR. BARKET:  Yes.

7               MR. MITCHELL:  With obviously a

8          great deal of handwriting notes.  It

9          seems to be many of the pages.  Is

10         that a document that was provided to

11         you, if you know, by the Attorney

12         General's office?

13              MR. BARKET:  It's got an AG --

14         what looks like an AG stamp on it,

15         but I don't know.

16              MR. MITCHELL:  Okay.  I'm only

17         asking because I know there was an

18         exchange of discovery before I came

19         on the case and I'm just asking, do

20         you know if we provided you that

21         document?  And you may not.  I

22         probably should know whether or not

23         I did or not but I don't.

24              MR. BARKET:  I don't know if

25         you provided it to us as well or if

R. Anderson                    73

1
2        you, being Suffolk County, gave it
3        to the AG.
4            MR. MITCHELL:  Fair enough.
5            MR. BARKET:  I don't know where
6        it came from.  I saw it and frankly
7        I was curious about it.
8            MR. MITCHELL:  Okay.  Again,
9        fair to say you don't know the
10       source of the writing because if you
11       do know the source of the writing I
12       ask that you tell me who the source
13       of the writing is.
14           MR. BARKET:  Yeah.  Well, it's
15       a matter for another day.
16           MR. MITCHELL:  It's not.  If
17       you know the source of the
18       writing --
19           MR. BARKET:  It's a deposition
20       of a non-party witness, not for me
21       to answer questions.
22           MR. MITCHELL:  You marked it as
23       an exhibit.  If you know the source
24       of the writing, I don't mind you
25       asking him all the questions you

R. Anderson                                              74

1
2      want, but at this point, just tell

3      me who the source of the writing is

4      if you know who the source of the

5      writing is.

6          MR. BARKET:  I'm done.  Thank

7      you.

8          MR. MITCHELL:  Is your answer

9      you do know the source of the

10     writing?  I'm asking you to tell my

11     right now who the source of the

12     writing is.

13         MR. BARKET:  I'm not trying to

14     give you a hard time.

15         MR. MITCHELL:  You're not.  I'm

16     asking a simple question that has to

17     do with the exhibit that you've

18     marked because I have to know what

19     objection I'm going to put on the

20     record.

21         MR. BARKET:  What objection?

22         MR. MITCHELL:  It's based on

23     your answer that you give me I may

24     make a certain objection.

25         MR. BARKET:  Then I'm really

1                          R. Anderson            75

2        not going to answer the question.

3        No offense to you.

4             MR. MITCHELL:  You don't offend

5        me.

6             MR. BARKET:  I'm not trying to

7        give you a hard time, but I'm not

8        here to answer questions about the

9        exhibits.  My job is to ask them.

10             MR. MITCHELL:  Fair enough.  I

11        want to make this record.  I

12        appreciate that it's your position

13        that you're not here to answer

14        questions about the exhibits, but

15        you did mark the exhibit and it has

16        writing in it and so whether you

17        like it or not, and you're not

18        offending me, is that if you do know

19        who the source of the writing is

20        that you tell me.

21             MR. BARKET:  You think I should

22        tell you?

23             MR. MITCHELL:  Yes.  First

24        thing is yes.  And two, if you know

25        that the source of the writing is a

R. Anderson                76

1

2          source that has happened post the

3          beginning of the litigation, then

4          you don't have a good faith basis to

5          ask the questions that you did of

6          the witness.

7               MR. BARKET:  Suppose, I'm not

8          saying this happened, suppose

9          McCready took his supplemental

10         report at some point and marked it

11         all up?

12              MR. MITCHELL:  Listen, you're

13         not giving me a hard time.  If the

14         source of the writing is a person

15         who is either a member of your

16         office or your investigator or an

17         Attorney General's investigator and

18         you know it, we're wasting a lot of

19         time and so that would be my

20         objection.

21              That being said, we will

22         address it with the court.  At some

23         point, I'll write him a letter and

24         ask you to reveal that information.

25              MR. BARKET:  I asked one

R. Anderson          77

1

2      question.  Do you recognize the

3      writing?  He said no.  I don't think

4      we wasted too much time with that.

5           MR. MITCHELL:  Fair enough.

6      You win.

7           MR. BARKET:  Thanks for coming

8      in.

9           MR. MITCHELL:  Okay.

10          (Time noted:  12:10 p.m.)

11

12

13

14      _____
              ROBERT J. ANDERSON

15

16      Subscribed and sworn to before me

17      this ___ day of _____, 2014.

18

19

20

21      _____
        NOTARY PUBLIC

22

23

24

25

78

**INDEX**

**INDEX TO TESTIMONY**

**Page**

Examination by Mr. Barket          5

**EXHIBITS**

| **Plaintiff's** | **Description** | **Page** |
|---|---|---|
| Exhibit 1 | Handwritten Notes | 12 |
| Exhibit 2 | Supplemental Report | 27 |
| Exhibit 3 | Supplemental Report | 71 |

79

ERRATA SHEET FOR THE TRANSCRIPT OF:
Case Name:  Martin Tankleff vs
The County of Suffolk
Deposition Date:  June 17, 2014
Witness:  Robert J. Anderson


                     CORRECTIONS

PG    LN    NOW READS    SHOULD READ    REASON FOR

__    __    _____    _____    _____

__    __    _____    _____    _____

__    __    _____    _____    _____

__    __    _____    _____    _____

__    __    _____    _____    _____

__    __    _____    _____    _____

__    __    _____    _____    _____

__    __    _____    _____    _____

__    __    _____    _____    _____

__    __    _____    _____    _____

__    __    _____    _____    _____

__    __    _____    _____    _____

__    __    _____    _____    _____


                  _____
                            Signature


Subscribed and sworn to before me
this_____ day of _____, 2014.

_____
          (NOTARY PUBLIC)

80

CERTIFICATION

I, DOLLY FEVOLA, a Notary Public in
and for the State of New York, do hereby certify:

THAT the witness whose testimony is herein
before set forth, was duly sworn by me; and

THAT the within transcript is a true record
of the testimony given by said witness.

I further certify that I am not related,
either by blood or marriage, to any of the parties
to this action; and

THAT I am in no way interested in
the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto
set my hand this 12th day of July, 2014.


_____
DOLLY FEVOLA

**#**

**#1-10** [2] - 1:8, 1:9

**0**

**012623** [1] - 15:10

**1**

**1** [5] - 9:19, 11:15, 11:18, 36:6, 78:11
**10** [2] - 7:9, 7:12
**10:05** [1] - 1:15
**10:30** [1] - 39:23
**11** [1] - 38:17
**11530** [1] - 2:5
**11980** [1] - 4:13
**12** [1] - 78:11
**12:10** [1] - 77:10
**12th** [1] - 80:15
**15** [2] - 44:10, 44:12
**15-minute** [1] - 44:7
**17** [2] - 1:14, 79:3
**19** [2] - 7:15, 11:16
**1970** [1] - 6:8
**1985** [3] - 6:15, 6:25, 7:19
**1988** [4] - 7:21, 9:25, 11:20, 41:16
**1:00** [3] - 8:14, 9:2, 9:15

**2**

**2** [4] - 25:25, 26:3, 26:4, 78:12
**20** [1] - 44:24
**2004** [1] - 6:17
**2014** [5] - 1:14, 77:17, 79:3, 79:24, 80:15
**2030** [1] - 39:23
**23** [1] - 60:17
**234** [1] - 15:14
**25** [1] - 15:15
**26** [6] - 16:24, 17:25, 60:20, 61:12, 61:25, 68:12
**27** [2] - 23:11, 78:12
**28** [1] - 24:8
**29** [2] - 24:13, 28:12

**3**

**3** [5] - 63:12, 70:3, 70:5, 72:3, 78:13

**30** [2] - 4:12, 28:12
**33** [1] - 62:25
**34** [2] - 6:5, 62:21
**37** [1] - 36:5
**38** [3] - 37:5, 37:23, 39:13
**39** [2] - 40:17, 40:20
**3:00** [1] - 44:7
**3:15** [1] - 44:3

**4**

**4** [1] - 70:18
**40** [1] - 40:23
**41** [1] - 41:9
**43** [1] - 15:14

**5**

**5** [2] - 70:18, 78:6
**54** [1] - 12:20

**6**

**6** [1] - 70:19
**62** [1] - 12:20
**666** [2] - 1:12, 2:4

**7**

**7** [3] - 9:25, 11:20, 41:16
**71** [1] - 78:13
**77** [1] - 71:2
**785** [1] - 70:23
**7:00** [1] - 10:12
**7th** [4] - 25:21, 27:5, 27:10, 52:24

**8**

**88-461042** [1] - 12:4
**8:30** [1] - 39:25
**8th** [1] - 26:17

**9**

**9** [1] - 9:20
**9214** [1] - 41:12
**9:00** [3] - 8:14, 9:3, 9:16

**A**

**a.m** [5] - 8:14, 10:12,

44:3, 44:7
**able** [3] - 42:15, 43:11, 50:19
**above-mentioned** [1] - 1:20
**absolutely** [4] - 43:23, 47:16, 51:11, 65:13
**according** [6] - 29:24, 30:6, 57:2, 57:4, 64:10, 64:12
**accounts** [2] - 50:6, 56:22
**accurate** [2] - 49:4, 69:17
**accusation** [1] - 51:16
**accusations** [3] - 41:14, 50:22, 50:25
**accused** [4] - 31:21, 31:24, 42:11, 51:2
**act** [1] - 35:16
**action** [1] - 80:11
**actions** [1] - 29:15
**activity** [1] - 56:23
**add** [3] - 42:20, 47:24, 60:8
**added** [2] - 28:20, 31:14
**adding** [1] - 61:19
**addition** [1] - 24:15
**additional** [1] - 28:21
**address** [3] - 4:11, 11:2, 76:22
**addresses** [5] - 24:16, 27:15, 27:21, 27:25, 28:13
**admit** [1] - 56:7
**affect** [1] - 49:19
**affected** [3] - 47:20, 48:19, 49:6
**afternoon** [2] - 27:18, 36:23
**AG** [4] - 15:10, 72:13, 72:14, 73:3
**AG004772** [1] - 70:22
**AG009211** [1] - 38:18
**ages** [1] - 12:19
**ago** [7] - 21:4, 52:8, 60:17, 60:20, 61:12, 62:2, 68:12
**AGREED** [2] - 3:3, 3:8, 3:12
**ahead** [3] - 14:17, 65:15, 66:8
**AI** [1] - 63:14
**alarm** [7] - 15:18, 15:19, 15:24, 16:2, 16:3, 16:6, 58:4
**alibi** [1] - 60:10
**alibied** [1] - 44:2
**alive** [5] - 18:4, 19:6,

20:13, 20:19, 25:2
**allegations** [3] - 37:19, 51:23, 59:11
**AND** [3] - 3:3, 3:8, 3:12
**ANDERSON** [2] - 1:16, 77:14
**Anderson** [1] - 4:10
**anderson** [1] - 79:4
**answer** [43] - 4:19, 6:23, 14:8, 16:8, 18:3, 19:5, 19:18, 20:12, 20:13, 20:18, 21:2, 21:25, 23:3, 30:2, 30:9, 31:9, 32:19, 34:20, 35:2, 35:9, 38:11, 39:4, 47:23, 48:22, 49:9, 51:19, 54:4, 54:6, 56:25, 57:21, 61:14, 65:4, 65:6, 65:8, 65:16, 68:14, 69:12, 73:21, 74:8, 74:23, 75:2, 75:8, 75:13
**answered** [2] - 46:5, 46:8
**Anthony** [1] - 24:25
**appreciate** [2] - 46:4, 75:12
**approaching** [1] - 42:2
**April** [2] - 6:24, 6:25
**area** [2] - 17:9, 64:19
**Arlene** [14] - 12:18, 12:20, 23:22, 35:12, 39:16, 39:22, 40:24, 41:6, 41:8, 43:18, 47:6, 47:7, 47:9, 63:6
**arrested** [2] - 51:12, 57:16
**arrival** [1] - 69:4
**arrived** [1] - 44:3
**artery** [1] - 24:3
**articles** [1] - 7:3
**aside** [2] - 64:21, 66:17
**assigned** [7] - 7:22, 8:5, 8:11, 9:11, 9:21, 12:5, 25:13, 47:25
**assignment** [1] - 6:14
**assignments** [2] - 8:8, 8:16
**assume** [5] - 4:21, 41:4, 51:8, 51:9, 56:12
**ate** [2] - 29:10, 40:2
**attacks** [1] - 50:3
**attempt** [1] - 58:2
**Attorney** [2] - 72:11,

76:17
**attorney** [1] - 30:21
**Attorneys** [2] - 2:4, 2:8
**August** [1] - 6:8
**available** [1] - 15:5
**Avenue** [1] - 4:12
**aware** [5] - 30:5, 33:14, 50:11, 59:23, 60:11

**B**

**Babylon** [1] - 7:10
**bad** [5] - 44:17, 44:19, 50:14, 52:7, 55:6
**bagel** [1] - 36:14
**bank** [2] - 50:5, 56:22
**BARKET** [31] - 2:3, 2:5, 4:7, 4:14, 4:16, 11:11, 25:24, 30:3, 39:9, 45:5, 54:8, 58:13, 65:6, 65:10, 65:13, 70:22, 72:6, 72:13, 72:24, 73:5, 73:14, 73:19, 74:6, 74:13, 74:21, 74:25, 75:6, 75:21, 76:7, 76:25, 77:7
**Barket** [1] - 78:6
**Barry** [1] - 11:25
**base** [1] - 43:15
**based** [5] - 28:18, 41:22, 41:23, 53:14, 74:22
**basis** [1] - 76:4
**Bates** [1] - 70:20
**Bay** [2] - 7:8, 7:14
**bear** [1] - 52:2
**bed** [1] - 40:3
**bedroom** [3] - 40:11, 40:14, 43:9
**beginning** [4] - 16:15, 28:11, 66:15, 76:3
**behind** [1] - 66:2
**Belle** [2] - 10:25, 28:4
**below** [2] - 12:17, 21:7
**best** [1] - 50:22
**between** [4] - 9:19, 45:17, 47:14, 47:19
**big** [1] - 56:5
**birth** [2] - 12:23, 24:16
**bit** [2] - 7:20, 34:8
**bitter** [1] - 47:18
**blamed** [1] - 33:18
**blaming** [3] - 32:15, 32:17, 32:23
**bleeding** [1] - 24:3
**blocking** [1] - 65:23

1

**blood** [12] - 21:7, 34:8, 34:13, 34:17, 35:8, 35:15, 42:8, 42:22, 43:3, 60:8, 61:19, 80:10
**body** [5] - 37:14, 43:9, 43:14, 60:9, 61:23
**bottom** [1] - 15:7
**bove** [2] - 27:22, 28:2
**Bove** [10] - 29:2, 29:13, 31:12, 33:20, 38:25, 39:2, 39:8, 39:9, 60:3, 63:13
**Bove's** [2] - 37:10, 38:14
**bracelet** [1] - 38:2
**break** [1] - 8:4
**breathing** [4] - 18:4, 19:6, 20:13, 20:19
**Brian** [1] - 65:14
**BRIAN** [1] - 2:9
**brief** [1] - 58:14
**briefly** [1] - 34:6
**bring** [1] - 52:2
**brought** [1] - 48:12
**Bruce** [1] - 71:25
**BRUCE** [1] - 2:5
**Building** [1] - 2:8
**business** [3] - 36:13, 45:22, 48:9
**BY** [3] - 2:5, 2:9, 4:6

## C

**California** [3] - 50:7, 52:17, 52:19
**cancer** [1] - 25:8
**capabianco** [1] - 63:18
**car** [6] - 22:8, 40:18, 65:20, 65:23, 67:11, 71:4
**card** [17] - 24:13, 25:14, 26:6, 27:8, 27:9, 31:13, 40:5, 40:7, 40:18, 43:21, 44:4, 47:3, 47:12, 47:25, 62:17, 63:3, 64:4
**cars** [3] - 24:7, 24:11, 65:22
**case** [16] - 5:4, 5:7, 5:8, 5:12, 8:7, 8:22, 9:21, 12:5, 20:5, 57:8, 66:25, 67:3, 69:14, 70:13, 72:19
**Case** [1] - 79:2
**cases** [1] - 7:22
**cash** [1] - 47:2

**casual** [1] - 37:3
**categorize** [1] - 53:8
**Cecare** [1] - 63:15
**central** [1] - 12:6
**certain** [1] - 74:24
**certainly** [3] - 34:11, 48:11, 55:11
**certification** [1] - 3:6
**CERTIFICATION** [1] - 80:2
**certify** [2] - 80:4, 80:9
**change** [2] - 53:18, 54:22
**changing** [1] - 53:20
**charged** [2] - 46:23, 51:3
**CHARLES** [1] - 1:7
**check** [1] - 24:17
**checked** [3] - 24:19, 28:14, 28:19
**checks** [1] - 27:25
**chemotherapy** [1] - 25:10
**circumstances** [1] - 50:12
**City** [2] - 1:13, 2:5
**civil** [2] - 5:7, 5:18
**Civil** [1] - 1:19
**Claim** [1] - 5:23
**clearly** [1] - 50:15
**close** [1] - 43:13
**clothing** [7] - 34:18, 36:3, 37:3, 38:5, 38:9, 38:24, 58:5
**coin** [2] - 13:9, 13:10
**cold** [1] - 51:10
**collectively** [2] - 68:18, 69:3
**Collins's** [1] - 71:16
**coming** [1] - 77:7
**command** [1] - 12:16
**comments** [1] - 65:12
**committed** [2] - 34:16, 51:14
**committing** [1] - 35:16
**complaint** [1] - 12:6
**completed** [2] - 26:18, 26:20
**completely** [1] - 51:11
**completion** [2] - 59:5
**Complying** [2] - 11:19, 71:22
**concentrate** [1] - 64:21
**concept** [1] - 7:25
**concerning** [3] - 37:12, 41:8, 55:8
**conclusion** [3] - 43:16, 59:21, 60:12

**condition** [6] - 18:3, 19:5, 19:11, 19:16, 20:11, 20:18
**conduct** [4] - 24:21, 25:18, 50:15, 57:5
**conducted** [1] - 52:24
**confess** [1] - 62:14
**confessed** [9] - 26:23, 27:3, 30:7, 30:21, 44:22, 49:14, 51:3, 51:13, 51:25
**confession** [6] - 6:20, 30:19, 49:3, 49:18, 57:20, 62:13
**confident** [1] - 51:14
**conjunction** [1] - 8:6
**connection** [1] - 33:25
**consensus** [2] - 64:3, 64:7
**consider** [4] - 49:13, 49:23, 50:13, 60:25
**considered** [5] - 5:24, 41:19, 59:4
**Constable** [3] - 42:11, 42:12, 42:13
**context** [3] - 5:2, 19:9, 20:6
**conversation** [7] - 19:10, 29:17, 42:23, 61:6, 64:22, 67:5, 67:23
**conveyed** [2] - 14:12, 23:15
**conveying** [1] - 14:6
**corner** [1] - 71:3
**correct** [2] - 6:11, 63:24
**CORRECTIONS** [1] - 79:5
**correctly** [3] - 19:3, 26:9, 66:22
**counsel** [1] - 3:4
**counter** [4] - 29:6, 29:21, 30:13, 31:2
**Country** [2] - 1:12, 2:4
**County** [4] - 6:4, 25:12, 73:2, 79:3
**COUNTY** [3] - 1:7, 1:8, 2:7
**couple** [2] - 12:17, 50:5
**course** [2] - 43:20, 47:7
**court** [2] - 54:11, 76:22
**COURT** [1] - 1:2
**Court** [1] - 3:16
**covered** [1] - 26:24
**covering** [1] - 70:13
**Coyne** [2] - 18:2, 20:7

**Crane** [1] - 13:8
**crane** [1] - 13:10
**create** [1] - 44:11
**crime** [3] - 34:4, 44:12, 51:15
**crimes** [2] - 26:24, 34:16
**crying** [2] - 17:15, 17:19
**curious** [2] - 60:14, 73:7
**cut** [1] - 29:6

## D

**dad's** [1] - 19:15
**Daniel** [1] - 13:12
**dash** [1] - 20:14
**Date** [1] - 79:3
**date** [9] - 9:25, 12:22, 24:16, 25:20, 26:19
**daughter** [4] - 44:2, 44:14, 45:11, 57:24
**daughter's** [2] - 44:9, 60:10
**dead** [1] - 11:8
**deal** [2] - 56:5, 72:8
**dealings** [1] - 48:10
**death** [5] - 50:5, 50:9, 55:10, 56:22
**December** [1] - 9:25
**decide** [1] - 8:10
**Defendant** [1] - 71:3
**Defendants** [2] - 1:10, 2:8
**definitely** [1] - 62:11
**demands** [1] - 46:19
**demeanor** [4] - 44:16, 50:2, 56:14
**Dennison** [1] - 2:8
**DEPARTMENT** [1] - 2:7
**deposed** [2] - 4:24, 5:17
**DEPOSITION** [1] - 1:16
**deposition** [5] - 3:6, 3:13, 12:2, 60:22, 73:19
**Deposition** [1] - 79:3
**depth** [1] - 48:3
**describe** [2] - 43:19, 45:16
**described** [3] - 17:17, 43:10, 45:15
**describes** [1] - 24:5
**Description** [1] - 78:10
**desk** [1] - 42:6

**detail** [2] - 48:14, 49:2
**details** [1] - 49:17
**detective** [14] - 7:11, 7:14, 8:5, 8:6, 8:18, 13:21, 19:23, 20:5, 22:4, 22:15, 22:22, 24:25, 34:11, 69:6
**Detective** [7] - 7:17, 30:6, 41:17, 65:2, 70:12, 72:4
**detectives** [9] - 9:11, 12:24, 14:17, 23:7, 31:18, 32:14, 45:14, 57:12, 68:19
**Detectives** [2] - 7:8, 42:18
**dialysis** [1] - 25:9
**different** [2] - 12:18, 60:16
**difficulties** [1] - 47:14
**difficulty** [1] - 45:17
**directly** [1] - 23:14
**discovered** [1] - 43:5
**discovery** [1] - 72:18
**disliked** [1] - 40:24
**dispute** [1] - 47:18
**DISTRICT** [2] - 1:2, 1:2
**divorce** [1] - 23:23
**document** [5] - 13:24, 72:2, 72:3, 72:10, 72:21
**DOE** [1] - 1:8
**dollars** [1] - 47:19
**DOLLY** [2] - 80:3, 80:19
**Dolly** [1] - 1:20
**Dominic** [1] - 23:19
**done** [4] - 26:16, 27:24, 48:16, 74:6
**doorbell** [1] - 44:13
**double** [3] - 10:25, 11:4, 69:7
**down** [17] - 5:10, 14:19, 15:20, 30:22, 44:25, 64:7, 64:19, 65:17, 66:23, 67:12, 68:9, 68:22, 69:2, 69:8, 69:10, 69:15, 69:20
**DOYLE** [1] - 1:7
**Doyle** [5] - 9:14, 10:14, 12:25, 25:17, 32:14
**dragged** [1] - 50:23
**drew** [1] - 59:20
**driveway** [2] - 65:21, 65:22
**duly** [2] - 4:3, 80:6
**during** [9] - 6:20, 27:4, 27:7, 36:22, 46:11,

55:22, 56:7, 56:17, 63:11
**duty** [1] - 9:22

# E

**early** [2] - 15:17, 63:19
**East** [1] - 36:14
**EASTERN** [1] - 1:2
**easy** [1] - 38:16
**eat** [1] - 29:11
**effect** [2] - 3:15, 62:19
**eight** [1] - 40:20
**either** [6] - 14:16, 20:4, 31:17, 67:12, 76:15, 80:10
**eliciting** [1] - 38:24
**emotional** [3] - 16:25, 17:14, 17:18
**employed** [1] - 6:3
**EMPLOYEES** [1] - 1:8
**emptied** [1] - 50:5
**empties** [1] - 56:22
**end** [2] - 41:9, 66:11
**entered** [2] - 12:2, 30:21
**entitled** [1] - 23:11
**EPSTEIN** [1] - 2:3
**ERRATA** [1] - 79:2
**ESQ** [3] - 2:5, 2:6, 2:9
**eventually** [1] - 43:4
**exact** [1] - 42:23
**Examination** [1] - 78:6
**EXAMINATION** [1] - 4:6
**examined** [1] - 4:5
**example** [1] - 58:5
**except** [2] - 3:9, 44:5
**exchange** [1] - 72:18
**excluding** [1] - 54:16
**excuse** [1] - 60:20
**exhibit** [4] - 11:12, 73:23, 74:17, 75:15
**Exhibit** [9] - 11:14, 11:18, 26:2, 26:4, 36:6, 70:4, 78:11, 78:12, 78:13
**EXHIBITS** [1] - 78:9
**exhibits** [3] - 70:8, 75:9, 75:14
**experience** [1] - 34:10

# F

**face** [1] - 21:8
**fact** [2] - 43:25, 50:11
**facts** [4] - 48:4, 53:15, 53:18, 54:20

**failure** [1] - 25:9
**fair** [5] - 4:22, 73:4, 73:9, 75:10, 77:5
**faith** [1] - 76:4
**faked** [2] - 50:4, 55:9
**fakes** [1] - 56:21
**Falby** [1] - 33:15
**false** [3] - 49:3, 49:18, 50:7
**familiar** [1] - 8:21
**far** [2] - 22:8, 48:9
**father** [3] - 42:5, 58:5, 67:24
**father's** [5] - 18:3, 19:5, 19:11, 20:11, 20:18
**Federal** [1] - 1:18
**feelings** [1] - 44:19
**felt** [1] - 51:23
**FEVOLA** [2] - 80:3, 80:9
**Fevola** [1] - 1:21
**Field** [1] - 44:10
**fighting** [2] - 47:6, 47:7
**filing** [1] - 3:5
**finish** [3] - 65:4, 65:6, 65:8
**First** [3] - 7:7, 7:9, 7:13
**first** [15] - 4:3, 7:16, 7:18, 10:9, 11:23, 13:4, 15:8, 20:15, 31:23, 49:5, 63:2, 69:4, 69:21, 71:2, 75:23
**five** [2] - 7:7, 7:14
**fled** [3] - 50:7, 50:12, 55:10
**fleeing** [1] - 53:6
**flees** [1] - 56:22
**floor** [1] - 42:7
**flow** [1] - 20:17
**flows** [1] - 20:24
**focus** [1] - 66:14
**follow** [2] - 51:17, 58:8
**follow-up** [1] - 58:8
**followed** [2] - 5:8, 48:13
**follows** [2] - 4:5, 17:2
**food** [1] - 29:10
**FOR** [3] - 1:2, 79:2, 79:6
**force** [1] - 3:14
**form** [36] - 3:9, 6:23, 14:8, 16:8, 19:18, 21:2, 21:25, 22:20, 23:3, 30:2, 30:9, 31:9, 32:19, 33:9, 34:20, 35:2, 38:11,

39:4, 45:4, 46:2, 46:3, 46:7, 47:23, 48:22, 49:9, 49:22, 51:19, 52:4, 53:15, 53:22, 56:25, 59:3, 60:19, 61:14, 68:14, 69:12
**formed** [2] - 56:4, 59:15
**forth** [3] - 24:3, 59:19, 80:6
**forward** [1] - 7:20
**Francis** [1] - 23:19
**Frank** [1] - 63:15
**frankly** [1] - 73:6
**fresh** [1] - 67:5
**friends** [1] - 24:10
**full** [1] - 60:24
**fully** [1] - 51:14
**FURTHER** [2] - 3:8, 3:12

# G

**Gallagher** [1] - 13:12
**game** [3] - 31:13, 47:12, 63:11
**games** [1] - 47:3
**gaping** [1] - 43:18
**Garden** [2] - 1:13, 2:5
**gather** [2] - 69:3, 70:7
**gathered** [2] - 48:4, 65:24
**gathering** [1] - 27:15
**general** [2] - 14:2, 64:19
**General's** [2] - 72:12, 76:17
**generally** [2] - 5:16, 64:17
**generated** [2] - 12:13, 12:14
**given** [3] - 8:8, 14:21, 80:8
**great** [1] - 72:8
**greeted** [1] - 22:24
**guess** [11] - 15:23, 16:3, 17:15, 18:23, 30:23, 36:2, 45:16, 50:21, 54:14, 55:5, 70:18
**guy** [1] - 50:20

# H

**half** [4] - 45:21, 45:22, 46:12
**hand** [2] - 71:3, 80:15

**handwriting** [7] - 11:21, 70:17, 71:11, 71:14, 71:17, 71:21, 72:8
**Handwritten** [1] - 78:11
**handwritten** [4] - 11:17, 58:19, 62:22, 71:9
**hard** [3] - 74:14, 75:7, 76:13
**Hauppauge** [1] - 2:9
**havoc** [1] - 44:11
**headquarters** [1] - 12:15
**heavy** [1] - 37:25
**Heinz** [4] - 42:11, 42:13, 59:19, 60:7
**held** [1] - 1:19
**helped** [1] - 27:22
**helpful** [1] - 48:5
**helping** [1] - 28:2
**HEREBY** [1] - 3:3
**hereby** [2] - 3:7, 80:4
**herein** [2] - 1:17, 80:5
**hereto** [1] - 3:5
**hereunto** [1] - 80:14
**hide** [2] - 53:10, 56:13
**himself** [2] - 31:17, 40:19
**hindsight** [1] - 54:19
**home** [4] - 10:22, 44:3, 44:12, 58:6
**homicide** [14] - 5:4, 5:6, 5:8, 6:11, 6:19, 8:2, 8:11, 10:25, 11:4, 11:8, 41:20, 55:8, 69:6, 69:7
**Homicide** [3] - 7:15, 7:19, 7:21
**hood** [2] - 21:15, 22:8
**hour** [1] - 56:2
**house** [2] - 44:10, 66:3
**hundreds** [1] - 47:18
**hypothetical** [2] - 53:23, 53:25

# I

**idea** [2] - 16:9, 60:8
**identification** [3] - 11:15, 26:3, 70:5
**important** [1] - 67:2
**impression** [1] - 20:3
**IN** [1] - 80:14
**incident** [1] - 42:21
**INDEX** [2] - 78:2, 78:3
**indicate** [3] - 4:19,

14:12, 67:7
**indicated** [2] - 33:5, 42:25
**indicates** [1] - 23:22
**indicating** [2] - 70:10, 71:8
**indication** [1] - 47:13
**individual** [2] - 35:14, 56:20
**individuals** [3] - 28:10, 33:18, 35:14
**information** [26] - 11:24, 13:17, 14:3, 14:6, 14:13, 15:4, 16:16, 17:11, 18:16, 22:12, 22:22, 23:9, 23:13, 23:14, 28:21, 31:15, 38:24, 48:7, 48:19, 54:21, 64:18, 67:25, 68:17, 69:4, 69:9, 76:24
**initial** [2] - 15:2, 22:22
**injuries** [1] - 43:10, 61:24
**innocent** [5] - 51:11, 52:2, 56:9, 56:12, 56:15
**inside** [1] - 69:17
**insurance** [1] - 50:6
**interest** [2] - 32:3, 46:23
**interested** [1] - 80:12
**interview** [38] - 23:21, 25:14, 26:5, 26:11, 27:8, 27:9, 27:14, 28:17, 28:18, 28:25, 36:8, 36:11, 37:10, 38:15, 43:21, 45:11, 47:25, 48:3, 50:18, 52:9, 52:11, 52:14, 52:16, 52:23, 55:2, 55:22, 55:24, 56:3, 56:7, 56:17, 58:8, 62:17, 65:19, 66:12, 68:16, 68:20
**interviewed** [6] - 23:17, 24:20, 29:17, 36:21, 48:8, 57:23
**interviewing** [4] - 37:18, 41:18, 45:10, 59:10
**interviews** [6] - 24:22, 25:19, 36:18, 59:6, 64:17, 65:25
**investigating** [1] - 69:7
**investigation** [2] - 7:2, 48:5
**investigator** [2] - 76:16, 76:17

3

**involved** [8] - 5:12, 31:16, 31:21, 32:8, 34:12, 37:20, 59:12
**IS** [3] - 3:3, 3:8, 3:12
**issue** [2] - 38:13, 39:11
**IT** [3] - 3:3, 3:8, 3:12

**J**

**J.P** [1] - 71:4
**JAMES** [1] - 1:7
**James** [2] - 7:17, 13:7
**Jerry** [29] - 32:11, 32:16, 40:17, 41:15, 42:11, 42:15, 43:24, 43:25, 44:8, 44:16, 45:10, 45:16, 48:10, 48:11, 54:16, 55:15, 55:17, 55:18, 63:16, 63:21, 63:23, 64:8, 64:9, 64:13, 64:24, 64:25, 65:19, 66:3, 67:9
**jewelry** [5] - 37:13, 37:25, 38:6, 38:13, 39:11
**job** [1] - 75:9
**Joe** [1] - 63:15
**John** [1] - 71:16
**JOHN** [2] - 1:8
**July** [1] - 80:15
**June** [2] - 1:14, 79:3

**K**

**KEARON** [1] - 2:3
**kept** [1] - 10:3
**key** [5] - 15:19, 15:24, 15:25, 16:3, 16:5
**key-in** [1] - 16:5
**keys** [2] - 44:15, 58:4
**kid** [2] - 24:6, 24:10
**kidding** [1] - 65:2
**kidney** [1] - 25:9
**kill** [1] - 31:7
**killed** [6] - 29:20, 29:22, 32:21, 35:12, 35:13, 49:5
**kind** [9] - 6:18, 12:4, 15:8, 18:18, 38:6, 54:15, 55:16, 56:4, 58:3
**kitchen** [1] - 30:13
**knife** [5] - 29:7, 29:20, 30:13, 31:2, 31:7
**knowing** [4] - 48:6, 49:16, 59:11, 60:23

**knowledge** [1] - 41:14
**known** [1] - 40:15
**knows** [1] - 51:11
**KOSCIUK** [1] - 1:7

**L**

**lab** [1] - 43:4
**laces** [1] - 38:20
**last** [7] - 36:19, 39:22, 40:18, 41:12, 59:6, 63:9, 65:20, 65:24
**latter** [1] - 18:10
**LAW** [1] - 2:7
**lawsuit** [1] - 5:19
**lead** [1] - 8:5
**learn** [2] - 26:23, 31:15, 33:17
**learned** [6] - 44:22, 47:17, 48:18, 48:25, 61:6, 61:9
**least** [5] - 22:17, 33:24, 37:19, 38:23, 56:20
**leave** [1] - 40:18, 63:23, 63:25, 64:5, 64:9, 65:24
**Lee** [1] - 2:8
**left** [7] - 29:16, 44:4, 44:5, 44:6, 62:18, 63:12, 63:19
**letter** [1] - 76:23
**lifted** [1] - 42:5
**Ligase** [2] - 24:25, 41:18
**lights** [1] - 16:10
**likely** [4] - 5:3, 33:5, 34:24, 35:14
**line** [2] - 41:11, 63:21
**list** [4] - 24:13, 28:13, 28:16, 28:19
**listed** [2] - 13:4, 59:18
**listen** [1] - 76:12
**litigation** [1] - 76:3
**live** [1] - 25:11
**lives** [1] - 25:12
**living** [1] - 63:6
**LLP** [1] - 2:3
**LN** [1] - 79:6
**loans** [2] - 46:15, 46:20
**locally** [1] - 25:11
**look** [8] - 11:17, 13:16, 26:8, 38:15, 43:7, 56:18, 70:6, 71:2
**looking** [6] - 24:8, 54:20, 55:13, 57:8, 58:3, 58:4
**looks** [8] - 11:16,

11:19, 12:19, 13:16, 15:7, 20:6, 28:12, 72:14

**M**

**M.T** [1] - 71:4
**man** [1] - 23:25
**MARION** [1] - 2:3
**mark** [1] - 75:15
**marked** [12] - 11:12, 11:15, 11:18, 25:25, 26:3, 70:3, 70:5, 70:8, 72:2, 73:22, 74:18, 76:10
**marks** [1] - 24:17
**marriage** [1] - 80:10
**MARTIN** [1] - 1:4
**Martin** [3] - 41:23, 53:12, 79:2
**marty** [1] - 18:4
**Marty** [60] - 8:21, 12:18, 15:17, 16:14, 16:16, 16:24, 17:14, 17:22, 17:25, 18:6, 18:8, 18:11, 18:12, 18:19, 18:21, 19:4, 19:6, 19:10, 19:14, 19:22, 20:4, 20:9, 20:11, 20:14, 20:17, 20:19, 21:7, 22:23, 24:6, 26:23, 29:19, 29:22, 29:23, 30:7, 30:12, 31:6, 31:17, 31:18, 31:22, 31:24, 32:15, 37:19, 41:14, 42:5, 42:8, 42:17, 42:20, 42:24, 42:25, 43:8, 44:22, 49:3, 49:14, 51:3, 57:16, 61:7, 67:23, 68:3, 68:5
**Marty's** [3] - 12:22, 30:19, 62:13
**material** [1] - 11:13
**matter** [3] - 25:7, 73:15, 80:13
**mayor** [1] - 28:3
**McCready** [12] - 1:7, 7:17, 9:4, 9:7, 29:19, 29:24, 30:6, 42:18, 48:8, 61:18, 76:9
**McCready's** [4] - 70:12, 70:14, 71:13, 72:4
**McELHONE** [1] - 1:8
**McNamara** [7] - 42:4, 42:5, 42:7, 59:19, 60:5, 60:6, 61:7

**mean** [12] - 5:7, 5:20, 15:22, 15:25, 16:5, 32:17, 35:5, 35:7, 50:13, 55:12, 55:14, 69:3
**meaning** [1] - 52:23
**means** [4] - 9:18, 15:23, 17:15, 24:2
**meant** [1] - 24:2
**meet** [2] - 7:16, 55:18
**member** [1] - 76:15
**members** [2] - 8:9, 9:5
**men** [1] - 40:25
**mention** [4] - 60:6, 60:7, 60:9
**mentioned** [3] - 1:20, 49:25, 52:7
**merely** [1] - 48:2
**met** [1] - 60:2
**might** [5] - 9:4, 13:10, 27:17, 31:5, 31:16
**mind** [3] - 61:16, 67:5, 73:24
**minutes** [2] - 44:10, 44:12
**mistaken** [1] - 50:4
**MITCHELL** [61] - 2:9, 5:25, 6:22, 9:23, 14:7, 16:7, 19:17, 20:25, 21:24, 22:19, 23:2, 29:25, 30:8, 31:8, 32:18, 33:8, 34:19, 34:25, 38:10, 38:25, 39:3, 39:8, 45:3, 45:7, 45:25, 47:22, 48:21, 49:8, 49:21, 51:18, 52:3, 53:2, 53:21, 54:5, 56:24, 60:18, 61:13, 65:3, 65:7, 65:11, 65:15, 65:15, 68:13, 69:11, 70:20, 71:25, 72:7, 72:16, 73:4, 73:8, 73:16, 73:22, 74:8, 74:15, 74:22, 75:4, 75:23, 76:12, 77:5, 77:9
**moment** [2] - 23:20, 52:8
**Montefusco** [8] - 62:24, 63:2, 64:10, 64:12, 64:16, 64:24, 67:8, 69:16
**montefusco** [1] - 66:2
**morning** [4] - 4:14, 4:15, 9:19, 9:20
**most** [2] - 5:3, 67:2
**mother's** [3] - 43:9, 60:9, 61:23
**motive** [2] - 16:13,

33:6

**motor** [1] - 27:24
**move** [1] - 67:11
**moving** [2] - 7:20, 17:8
**MR** [88] - 4:14, 4:16, 5:25, 6:22, 9:23, 11:11, 14:7, 16:7, 19:17, 20:25, 21:24, 22:19, 23:2, 25:24, 29:25, 30:3, 30:8, 31:8, 32:18, 33:8, 34:19, 34:25, 38:10, 38:25, 39:3, 39:8, 39:9, 45:3, 45:5, 45:7, 45:25, 47:22, 48:21, 49:8, 49:21, 51:18, 52:3, 53:2, 53:21, 54:5, 54:8, 56:24, 58:13, 60:18, 61:13, 65:3, 65:6, 65:7, 65:10, 65:11, 65:13, 65:15, 68:13, 68:23, 69:11, 70:20, 70:22, 71:25, 72:6, 72:7, 72:13, 72:16, 72:24, 73:4, 73:5, 73:8, 73:14, 73:16, 73:19, 73:22, 74:6, 74:8, 74:13, 74:15, 74:21, 74:22, 74:25, 75:4, 75:6, 75:10, 75:21, 75:23, 76:7, 76:12, 76:25, 77:5, 77:7, 77:9
**murder** [3] - 8:24, 51:4, 56:21
**murderer** [4] - 51:16, 51:25, 53:11, 53:12
**murders** [3] - 8:22, 10:10, 30:7, 37:21, 44:18

**N**

**name** [5] - 4:8, 18:2, 42:4, 50:7, 70:15
**Name** [1] - 79:2
**named** [1] - 5:21
**names** [3] - 12:18, 23:13, 24:15
**nature** [1] - 37:13
**necessarily** [2] - 22:6, 69:2
**neck** [1] - 43:19
**need** [1] - 8:18
**negative** [1] - 43:24
**neighbor** [1] - 23:18
**neighborhood** [2] -

4

27:14, 69:8
**Neighborhood** [1] - 23:12
**neighbors** [1] - 42:3
**nerves** [1] - 50:21
**new** [4] - 7:5, 8:2, 54:20
**NEW** [2] - 1:2, 1:2
**New** [7] - 1:13, 1:21, 2:5, 2:9, 4:4, 4:12, 80:4
**Newsday** [1] - 6:21
**newspaper** [1] - 7:3
**next** [8] - 13:3, 20:10, 26:17, 29:21, 30:13, 48:14, 63:21, 67:4
**night** [1] - 39:23
**nine** [2] - 40:21, 60:16
**nobody** [2] - 45:15, 47:12
**non** [1] - 73:20
**Non** [1] - 1:17
**non-party** [1] - 73:20
**Non-Party** [1] - 1:17
**none** [1] - 47:16
**normally** [1] - 5:6
**NORMAN** [1] - 1:7
**Notary** [4] - 1:21, 3:14, 4:3, 80:3
**NOTARY** [2] - 77:21, 79:25
**notation** [2] - 37:25, 40:23
**note** [4] - 18:14, 21:4, 58:17, 58:20
**noted** [3] - 21:23, 22:3, 77:10
**notes** [33] - 11:17, 11:20, 13:23, 14:12, 15:3, 26:10, 26:15, 28:21, 29:5, 39:14, 41:9, 44:25, 58:17, 58:19, 58:21, 60:23, 61:8, 61:17, 61:22, 62:8, 62:12, 62:22, 64:15, 64:20, 65:17, 66:9, 66:16, 66:17, 67:13, 68:10, 71:9, 72:8
**Notes** [1] - 78:11
**nothing** [10] - 42:9, 53:10, 55:6, 55:7, 56:13, 56:16, 61:17, 61:22, 62:8, 62:12
**Notice** [2] - 1:19, 5:23
**notice** [1] - 66:10
**noticed** [2] - 15:18, 43:14
**notified** [2] - 10:10, 10:13

**NOW** [1] - 79:6
**nowhere** [1] - 67:19
**number** [8] - 12:3, 12:4, 12:7, 12:10, 15:12, 25:25, 68:18, 70:21
**numbers** [2] - 24:16, 28:7
**nut** [1] - 55:15
**nutty** [4] - 55:16, 56:4, 56:6, 56:8

## O

**o'clock** [3] - 9:19, 9:20, 63:12
**object** [28] - 6:22, 14:7, 19:17, 21:24, 22:19, 23:2, 29:25, 30:8, 31:8, 32:18, 33:8, 34:19, 34:25, 38:10, 39:3, 45:3, 45:25, 47:22, 48:21, 49:8, 49:21, 51:18, 53:21, 54:5, 56:24, 60:18, 61:13, 69:11
**objecting** [1] - 46:7
**objection** [10] - 16:7, 20:25, 46:2, 52:3, 68:13, 68:23, 74:19, 74:21, 74:24, 76:20
**objections** [1] - 3:9
**objectively** [3] - 56:18, 56:19, 57:5
**observation** [4] - 43:8, 43:12, 45:6, 61:23
**observations** [3] - 41:24, 42:19, 61:18
**observed** [4] - 21:12, 21:13, 22:6, 22:7
**obviously** [5] - 34:3, 34:8, 62:10, 62:13, 72:7
**OF** [4] - 1:2, 1:7, 2:7, 79:2
**offend** [1] - 75:4
**offending** [1] - 75:18
**offense** [1] - 75:3
**office** [2] - 72:12, 76:16
**Officer** [2] - 18:2, 20:7
**officer** [14] - 6:4, 7:13, 9:22, 13:22, 19:10, 19:14, 19:23, 20:5, 20:10, 20:17, 22:5, 22:14, 67:24, 68:4
**officer's** [1] - 41:16
**OFFICERS** [1] - 1:8
**officers** [9] - 13:4,

13:5, 14:16, 22:13, 22:18, 22:23, 23:5, 23:8, 68:19
**Old** [3] - 1:12, 2:4, 44:10
**Olivetti** [1] - 63:16
**once** [4] - 17:12, 38:12, 39:10, 55:21
**one** [26] - 5:5, 8:17, 9:5, 12:24, 14:16, 15:9, 16:13, 30:11, 32:14, 36:13, 36:20, 42:3, 42:21, 43:23, 44:5, 45:14, 49:12, 49:15, 52:11, 54:24, 56:14, 63:3, 65:20, 65:23, 65:24, 76:25
**ones** [2] - 27:23, 70:7
**ongoing** [1] - 47:17
**opinion** [13] - 41:17, 53:11, 53:14, 53:16, 53:19, 56:4, 57:2, 57:4, 59:3, 59:16, 64:4, 64:7
**outcome** [1] - 80:13
**outside** [2] - 55:13, 57:7
**overkill** [4] - 43:16, 43:19, 62:4, 62:9
**own** [1] - 50:5
**owned** [4] - 45:21, 45:22, 46:12

## P

**p.m** [2] - 1:15, 77:10
**pack** [1] - 11:13
**Page** [17] - 16:24, 24:8, 24:12, 36:5, 37:5, 37:23, 38:17, 39:13, 40:17, 40:23, 41:9, 41:12, 62:21, 62:25, 70:18, 78:4, 78:10
**page** [7] - 11:23, 13:3, 15:6, 15:8, 17:24, 23:12, 70:24
**Pages** [1] - 28:12
**pages** [4] - 11:16, 70:18, 71:20, 72:9
**pancreatic** [1] - 25:8
**paper** [1] - 63:6
**paragraph** [3] - 16:15, 19:2, 20:6
**parenthesis** [2] - 15:19, 16:25
**parents** [4] - 29:20, 29:22, 31:7, 32:21
**part** [3] - 9:9, 20:15,

29:16
**parties** [2] - 3:4, 80:10
**partners** [2] - 7:23, 24:13
**parts** [1] - 44:25
**party** [5] - 5:18, 5:20, 5:21, 5:24, 44:5, 73:20
**Party** [1] - 1:17
**passed** [1] - 50:3
**pavers** [1] - 50:24
**payments** [1] - 47:2
**people** [11] - 23:14, 23:16, 28:4, 36:22, 42:2, 52:20, 57:14, 57:16, 57:19, 59:15, 68:18
**person** [19] - 11:8, 16:13, 17:8, 17:9, 32:3, 33:6, 33:24, 34:18, 35:8, 50:16, 51:2, 52:2, 56:9, 57:7, 66:17, 66:18, 66:23, 68:16, 76:14
**personal** [2] - 64:18, 68:15
**personally** [2] - 59:22, 59:24
**Peter** [1] - 63:17
**PG** [1] - 79:6
**phone** [5] - 10:14, 10:21, 24:16, 28:7, 61:20
**phrase** [4] - 20:10, 32:22, 32:24, 32:25
**physically** [3] - 24:2, 25:4
**pick** [2] - 50:14, 52:20
**picked** [1] - 42:25
**picture** [1] - 30:22
**piece** [2] - 6:20, 29:6
**place** [5] - 1:20, 7:3, 27:3, 36:12, 36:15
**placed** [1] - 42:6
**Plaintiff** [3] - 1:5, 1:18, 2:4
**Plaintiff's** [7] - 11:14, 11:18, 26:2, 26:4, 36:6, 70:4, 78:10
**players** [11] - 25:14, 26:6, 27:8, 27:9, 31:13, 43:22, 44:4, 48:2, 62:17, 63:3, 64:4
**PO** [1] - 19:4
**point** [17] - 6:10, 11:5, 26:22, 27:4, 27:7, 27:10, 32:6, 43:8, 43:11, 45:12, 46:10, 48:23, 49:2, 56:10,

74:2, 76:10, 76:23
**POLICE** [1] - 1:8
**Police** [2] - 17:25, 20:7
**police** [9] - 6:4, 7:13, 13:4, 13:22, 20:4, 51:12, 51:13, 67:24, 68:19
**policy** [1] - 50:6
**Pollack** [1] - 11:25
**POLLACK** [1] - 2:6
**portion** [1] - 54:11
**position** [2] - 17:8, 75:12
**possible** [10] - 22:11, 34:11, 34:16, 34:22, 34:23, 35:7, 35:17, 35:18, 37:12, 56:21
**possibly** [4] - 27:24, 38:7, 53:20, 54:13
**post** [1] - 76:2
**Precinct** [2] - 7:10, 7:13
**preliminary** [1] - 48:2
**prepare** [1] - 26:11
**prepared** [1] - 26:15
**pressure** [5] - 51:15, 51:17, 51:23, 51:25, 57:3
**pretty** [4] - 11:6, 44:23, 45:2, 56:8
**previously** [1] - 31:6
**problems** [3] - 24:3, 43:23, 63:11
**Procedure** [1] - 1:19
**procedure** [2] - 10:18, 10:19
**prompting** [1] - 31:14
**provided** [4] - 18:17, 72:10, 72:20, 72:25
**PUBLIC** [2] - 77:21, 79:25
**Public** [4] - 1:21, 3:14, 4:4, 80:3
**public** [2] - 51:5, 51:7
**pulled** [1] - 65:22
**punch** [1] - 16:6
**punch-in** [1] - 16:6
**purpose** [2] - 13:25, 38:8
**purposes** [1] - 28:9
**pursuant** [1] - 1:18
**put** [5] - 64:20, 65:17, 66:17, 69:2, 74:19
**putting** [1] - 46:2

## Q

**questions** [12] - 4:17,

5:11, 38:5, 41:5, 48:17, 64:19, 68:6, 73:21, 73:25, 75:8, 75:14, 76:5
**quiet** [1] - 61:2
**quite** [5] - 6:25, 10:15, 10:16, 13:7, 34:8

## R

**raise** [1] - 50:15
**Raskin** [2] - 63:15
**re** - 48:8
**re-interviewed** [1] - 48:8
**READ** [1] - 79:6
**read** [7] - 13:7, 17:3, 19:2, 23:20, 38:16, 54:8, 54:11
**reading** [3] - 19:3, 20:24, 63:6
**READS** [1] - 79:6
**really** [14] - 10:7, 21:3, 22:2, 27:18, 28:2, 34:21, 50:20, 51:20, 52:15, 53:5, 53:9, 64:24, 67:10, 74:25
**reason** [2] - 37:15, 54:25
**REASON** [1] - 79:6
**reasons** [3] - 49:12, 54:16, 56:14
**receive** [1] - 6:13
**received** [1] - 22:13
**receiving** [1] - 16:16
**recess** [1] - 58:14
**recognize** [5] - 70:13, 70:17, 71:10, 71:20, 77:2
**record** [9] - 4:8, 10:3, 15:4, 45:8, 46:3, 58:13, 74:20, 75:11, 80:7
**refer** [1] - 17:5
**reference** [9] - 5:3, 29:4, 29:9, 37:10, 53:4, 53:5, 62:9, 68:3, 68:9
**referring** [2] - 46:10, 52:10
**Rein** [2] - 42:19, 48:8
**REIN** [1] - 1:7
**Rein's** [1] - 61:18
**related** [1] - 80:9
**relatives** [3] - 31:19, 33:4, 33:10
**remember** [13] - 5:9, 5:15, 10:20, 39:20, 41:7, 60:15, 60:17,

61:3, 61:4, 61:25, 64:22, 66:18, 68:12
**remembered** [2] - 61:11, 61:20
**remembering** [1] - 44:24
**remotely** [1] - 35:18
**repay** [1] - 46:20
**repayment** [1] - 46:16
**report** [16] - 26:5, 26:12, 26:14, 28:9, 38:16, 41:12, 58:24, 60:23, 66:11, 67:4, 67:7, 67:13, 70:12, 70:15, 72:5, 76:10
**Report** [2] - 78:12, 78:13
**reported** [1] - 48:12
**reporter** [1] - 54:12
**reporting** [2] - 59:7, 59:9
**reports** [1] - 29:5
**requested** [1] - 54:10
**researching** [1] - 27:16
**reserved** [1] - 3:10
**residence** [1] - 44:8
**respective** [1] - 3:4
**respond** [2] - 10:24, 11:3
**response** [2] - 20:16, 42:16
**rest** [1] - 36:22
**retire** [1] - 6:16
**reveal** [1] - 76:24
**reviewed** [2] - 60:22, 61:8
**RICHARD** [1] - 1:18
**ride** [1] - 44:7
**right-hand** [1] - 71:3
**ring** [1] - 44:13
**Road** [2] - 1:12, 2:4
**robert** [2] - 4:10, 63:12
**Robert** [3] - 62:23, 63:2, 79:4
**ROBERT** [3] - 1:7, 1:16, 77:14
**ROE** [1] - 1:8
**Ron** [2] - 33:13, 33:15
**room** [5] - 5:10, 40:5, 40:8, 40:19, 63:6
**Rother** [1] - 33:13
**routine** [1] - 64:17
**Rules** [1] - 1:18
**running** [2] - 17:4, 17:18

## S

**safe** [1] - 10:21
**sat** [1] - 5:10
**saw** [9] - 29:10, 34:7, 40:18, 60:2, 62:5, 62:6, 63:9, 65:19, 73:6
**scene** [42] - 8:4, 11:3, 12:12, 12:25, 13:5, 14:16, 14:22, 14:24, 15:4, 18:17, 21:13, 22:13, 23:5, 23:8, 27:14, 28:5, 29:16, 32:15, 34:4, 35:11, 41:15, 41:25, 42:2, 42:12, 42:19, 43:7, 43:17, 44:12, 60:2, 60:3, 60:4, 60:6, 60:7, 61:10, 62:4, 62:5, 68:17, 68:20, 69:5
**schedule** [1] - 46:16
**sealing** [1] - 3:5
**seated** [1] - 71:4
**second** [1] - 56:19
**see** [17] - 15:9, 16:4, 22:3, 34:4, 36:3, 43:11, 43:20, 61:24, 62:5, 63:23, 64:9, 66:6, 67:14, 68:8, 70:14, 71:6, 71:20
**seeing** [1] - 61:23
**seem** [1] - 20:23
**semicolon** [1] - 16:14
**sentence** [1] - 17:6
**sentiment** [1] - 45:23
**separate** [2] - 37:25, 38:4
**September** [5] - 11:20, 25:21, 27:5, 41:16, 52:24
**sequence** [2] - 36:17, 38:17
**sequential** [1] - 15:12
**Sergeant** [1] - 32:14
**sergeant** [2] - 9:10, 9:13
**series** [2] - 4:17, 7:2
**set** [3] - 68:6, 80:6, 80:15
**Setauket** [1] - 36:14
**several** [1] - 33:4
**Seymour** [18] - 12:18, 12:19, 23:25, 35:12, 37:6, 37:7, 37:11, 37:24, 38:19, 40:18, 42:14, 43:20, 48:10, 50:3, 63:22, 64:9,

67:10
**Seymour's** [1] - 50:9
**shall** [2] - 3:6, 3:10
**SHEET** [1] - 79:2
**shift** [1] - 8:13
**shirt** [1] - 38:20
**shocked** [1] - 44:18
**Shore** [2] - 7:8, 7:14
**shortly** [3] - 10:11, 50:2, 63:12
**shorts** [6] - 21:10, 21:14, 21:18, 21:22, 22:9, 22:10
**SHOULD** [1] - 79:6
**shoulder** [1] - 21:8
**show** [1] - 70:2
**showed** [1] - 22:18
**shut** [1] - 30:22
**sick** [1] - 23:25
**side** [2] - 6:18, 21:8
**Signature** [1] - 79:21
**signed** [2] - 3:13, 3:15
**significant** [2] - 43:7, 48:7
**similar** [1] - 5:10
**simple** [1] - 74:16
**simply** [1] - 31:11
**sit** [6] - 14:10, 21:5, 29:18, 30:5, 30:16, 55:15
**sitting** [2] - 21:15, 22:8
**situation** [3] - 35:4, 35:6, 65:21
**smears** [1] - 43:3
**someone** [12] - 12:12, 15:23, 16:21, 18:10, 19:23, 24:22, 24:23, 32:7, 43:12, 44:11, 55:13
**someplace** [1] - 26:20
**son** [2] - 51:12, 51:13
**sorry** [3] - 24:9, 26:7, 65:14
**sounds** [1] - 53:25
**source** [14] - 23:9, 73:10, 73:11, 73:12, 73:17, 73:23, 74:3, 74:4, 74:9, 74:11, 75:19, 75:25, 76:2, 76:14
**spatter** [2] - 60:8, 61:19
**spattering** [2] - 42:22, 43:3
**speaking** [5] - 10:20, 50:20, 56:19, 57:5, 64:23
**specific** [6] - 8:8, 8:17, 27:19, 41:7, 48:4,

61:15
**specifically** [7] - 5:5, 5:21, 9:3, 10:20, 30:25, 31:4, 42:21
**spent** [3] - 7:7, 7:9, 27:15
**squad** [6] - 6:11, 6:19, 6:24, 7:5, 59:7, 59:10
**Squad** [3] - 7:8, 7:19, 7:21
**stamp** [2] - 15:8, 72:14
**standby** [9] - 8:16, 8:17, 8:18, 9:4, 9:6, 9:16, 9:21, 9:25, 10:5
**standbys** [2] - 8:14, 9:3
**stands** [1] - 43:17
**start** [3] - 27:9, 30:3, 56:11
**started** [4] - 6:7, 26:16, 27:17, 67:4
**starting** [2] - 28:12, 70:18
**State** [5] - 1:21, 4:4, 4:8, 4:11, 80:4
**statement** [2] - 45:20, 46:6
**statements** [1] - 41:24
**STATES** [1] - 1:2
**stationary** [1] - 17:7
**stay** [1] - 27:13
**staying** [1] - 44:9
**steuerman** [1] - 41:18
**Steuerman** [57] - 32:11, 32:16, 32:20, 33:7, 33:18, 33:21, 33:23, 35:21, 35:23, 35:24, 36:9, 36:19, 37:18, 40:19, 40:24, 41:15, 42:11, 42:15, 43:16, 43:24, 44:9, 44:16, 45:10, 45:16, 46:11, 46:14, 47:6, 47:9, 47:14, 47:19, 47:21, 48:11, 48:20, 49:7, 49:13, 49:19, 50:4, 50:18, 51:10, 51:17, 51:22, 52:6, 54:17, 54:21, 55:15, 55:17, 55:19, 58:10, 58:18, 60:25, 63:16, 63:22, 64:8, 64:25, 67:9, 69:16
**Steuerman's** [5] - 44:2, 49:25, 54:25, 65:20, 65:23
**still** [6] - 17:25, 25:2,

6

7

37:14, 44:18, 49:23, 71:4

**STIPULATED** [3] - 3:3, 3:8, 3:12

**STIPULATIONS** [1] - 3:2

**stone** [1] - 51:10

**stores** [1] - 36:14

**stricken** [1] - 45:8

**stuck** [1] - 61:16

**stupid** [6] - 50:21, 52:15, 53:5, 53:9, 53:13, 56:8

**subject** [2] - 48:17, 53:19

**Subscribed** [2] - 77:16, 79:23

**subsequently** [1] - 44:21

**Suffolk** [4] - 6:3, 25:12, 73:2, 79:3

**SUFFOLK** [3] - 1:7, 1:8, 2:7

**suite** [1] - 12:2

**summer** [1] - 47:8

**supervisor** [2] - 8:19, 8:20

**supplemental** [14] - 26:5, 26:12, 26:14, 38:16, 41:12, 58:24, 60:23, 66:10, 67:4, 67:6, 67:13, 70:12, 72:4, 76:9

**Supplemental** [2] - 78:12, 78:13

**supposably** [2] - 30:12, 49:6

**suppose** [3] - 10:7, 76:7, 76:8

**supposed** [1] - 47:2

**supposedly** [3] - 26:23, 29:19, 61:7

**suspect** [18] - 32:3, 33:6, 33:23, 41:19, 47:21, 48:20, 49:7, 49:13, 49:20, 49:24, 54:17, 54:22, 56:20, 56:21, 58:18, 58:21, 59:4, 60:25

**suspicion** [1] - 50:16

**suspicious** [8] - 55:7, 55:11, 55:14, 56:16, 56:23, 57:6, 57:9, 57:11

**sworn** [5] - 3:15, 4:3, 77:16, 79:23, 80:6

## T

**takers** [1] - 6:20

**TANKLEFF** [1] - 1:4

**Tankleff** [18] - 8:22, 12:19, 42:20, 43:20, 44:8, 44:22, 45:17, 46:16, 46:19, 47:15, 47:20, 48:10, 51:3, 53:12, 57:17, 62:5, 62:6, 79:2

**Tankleff's** [5] - 8:22, 41:14, 41:24, 43:18, 50:8

**Tankleffs** [1] - 33:5

**team** [14] - 7:24, 8:3, 8:8, 8:10, 8:12, 8:17, 8:20, 8:25, 9:5, 9:7, 9:9, 9:10, 9:12, 57:14

**teams** [2] - 7:23, 7:25

**tears** [2] - 17:2, 17:15

**telephone** [3] - 42:22, 43:2, 43:4

**television** [1] - 40:14

**Terre** [2] - 10:25, 28:4

**testified** [1] - 4:5

**testimony** [2] - 80:5, 80:8

**TESTIMONY** [1] - 78:3

**THAT** [3] - 80:5, 80:7, 80:12

**THE** [4] - 1:2, 1:7, 4:15, 79:2

**thinks** [2] - 45:21, 45:22

**thirty** [2] - 40:20, 40:21

**thirty-eight** [1] - 40:20

**thirty-nine** [1] - 40:21

**thousands** [1] - 47:18

**three** [1] - 7:25

**throughout** [1] - 8:7

**TO** [1] - 78:3

**together** [6] - 44:5, 44:6, 62:18, 64:2, 64:5, 64:13

**took** [4] - 22:23, 50:6, 57:19, 76:9

**top** [2] - 12:3, 22:11

**topic** [1] - 69:24

**tour** [1] - 8:15

**towards** [1] - 27:18

**township** [1] - 7:10

**TRANSCRIPT** [1] - 79:2

**transcript** [1] - 80:7

**trial** [4] - 3:11, 45:20, 46:6, 46:11

**true** [1] - 80:7

**trunk** [1] - 21:15

**trying** [4] - 13:24, 66:5, 74:13, 75:6

**turn** [5] - 24:12, 36:5, 62:21, 62:25, 71:19

**turned** [2] - 49:4, 49:18

**TV** [5] - 39:17, 39:22, 40:5, 40:7, 63:7

**twice** [1] - 53:3

**two** [5] - 13:4, 38:4, 55:9, 61:15, 75:24

**typical** [1] - 56:5

## U

**ulcers** [1] - 24:3

**ultimate** [1] - 23:9

**ultimately** [1] - 22:17

**uncertainty** [1] - 68:10

**under** [2] - 50:7, 50:12

**understood** [1] - 4:21

**uniform** [1] - 12:16

**UNITED** [1] - 1:2

**unknown** [4] - 37:5, 37:23, 38:2, 40:2

**unsure** [2] - 67:19, 67:20

**up** [19] - 8:24, 15:17, 17:2, 22:18, 29:12, 41:3, 42:20, 42:25, 43:13, 48:12, 48:17, 50:14, 52:20, 58:8, 60:8, 61:19, 65:21, 70:7, 76:11

**upper** [1] - 71:3

## V

**vehicle** [2] - 21:16, 27:24

**verify** [2] - 42:15, 58:3

**vibe** [2] - 55:2, 55:5

**vibes** [3] - 44:17, 50:14, 52:7

**victims** [2] - 34:17, 35:15

**view** [6] - 47:20, 48:20, 49:7, 49:19, 54:21, 55:12

**Vinny** [2] - 29:6, 63:13

**virtually** [1] - 49:2

**vs** [1] - 79:2

## W

**wait** [3] - 45:3, 65:3

**waived** [1] - 3:7

**walk** [1] - 34:5

**walked** [3] - 42:9, 63:13, 64:13

**wasted** [1] - 77:4

**wasting** [1] - 76:18

**watch** [1] - 38:2

**watching** [3] - 39:17, 39:22, 40:7

**watermelon** [4] - 29:6, 29:21, 30:14, 30:25

**weapons** [1] - 49:5

**wearing** [18] - 21:10, 21:14, 21:17, 21:21, 22:9, 33:21, 35:21, 35:24, 36:3, 36:25, 37:6, 37:7, 37:11, 37:24, 38:5, 38:19, 58:6, 58:11

**weeks** [1] - 55:9

**whatsoever** [1] - 47:16

**WHEREOF** [1] - 80:14

**white** [1] - 38:20

**whole** [13] - 8:3, 8:16, 8:20, 17:22, 18:5, 18:7, 18:9, 18:11, 18:22, 19:7, 19:15, 19:24, 20:20

**win** [1] - 77:6

**withdraw** [1] - 30:4

**Witness** [2] - 1:17, 79:4

**WITNESS** [2] - 4:15, 80:14

**witness** [5] - 46:7, 73:20, 76:6, 80:5, 80:8

**witnesses** [1] - 31:19

**woke** [1] - 15:17

**word** [2] - 17:2, 24:7

**wound** [1] - 43:18

**write** [5] - 14:19, 41:13, 69:8, 69:15, 76:23

**writing** [16] - 68:21, 69:9, 73:10, 73:11, 73:13, 73:18, 73:24, 74:3, 74:5, 74:10, 74:12, 75:16, 75:19, 75:25, 76:14, 77:3

**written** [7] - 20:9, 66:22, 67:12, 67:19, 68:9, 69:19, 69:24

**wrote** [1] - 64:7

## Y

**Yaphank** [2] - 4:12

**years** [12] - 6:5, 7:7, 7:9, 7:12, 7:14, 7:15, 44:24, 60:17, 60:20, 61:12, 61:25, 68:12

**YORK** [2] - 1:2, 1:2

**York** [7] - 1:13, 1:22, 2:5, 2:9, 4:4, 4:13, 80:4

**yourself** [3] - 13:14, 13:25, 24:22

**yup** [2] - 36:7, 39:15