# Exhibit 49-1



1                            ORIGINAL                    1

2       UNITED STATES DISTRICT COURT NEW YORK
        FOR THE EASTERN DISTRICT OF NEW YORK
3       ------------------------------------------X

4       MARTIN TANKLEFF,

5                        Plaintiff,

6          -against-

7       THE COUNTY OF SUFFOLK, K. JAMES McCREADY,
        NORMAN REIN, CHARLES KOSCIUK, ROBERT DOYLE,
8       JOHN McLELHONE, JOHN DOE POLICE OFFICERS
        #1-10, RICHARD ROE SUFFOLK COUNTY EMPLOYEES
9       #1-10,

10                       Defendants.

11      ------------------------------------------X

12
                             666 Old Country Road
13                           Garden City, New York

14
                             October 2, 2013
15                           10:00 a.m.

16          DEPOSITION of CHARLES KOSCIUK, Defendant

17      herein, taken by the Plaintiff, pursuant to

18      Federal Rules of Civil Procedure and Notice,

19      held at the above-mentioned time and place,

20      before Dolly Fevola, Notary Public of the

21      State of New York.

22

23

24

25



FEVOLA REPORTING & TRANSCRIPTION INC. (631) 724-7576

2

A P P E A R A N C E S :


NEUFELD SCHECK BRUSTIN, LLP
        Attorneys for the Plaintiff
        666 Old Country Road
        Garden City, New York 11530
BY:     BARRY SCHECK, ESQ.
        ELIZABETH DANIEL VASQUEZ, ESQ.
        BRUCE BARKET, ESQ.



SUFFOLK COUNTY DEPARTMENT OF LAW
        Attorneys for the Defendants
        H. Lee Dennison Building
        Hauppauge, New York
BY:     BRIAN MITCHELL, ESQ.


STATE OF NEW YORK
OFFICE OF THE ATTORNEY GENERAL
        Attorneys for the State of New York
        (In unrelated matter)
        120 Broadway
        New York, New York 10271-0332
BY:     JOSEPH TIPALDO, ESQ.



ALSO PRESENT:

MARTIN TANKLEFF

PERRY FINKELSTEIN, Videographer

3

STIPULATIONS

　　IT IS HEREBY STIPULATED AND AGREED, by
and among counsel for the respective parties
hereto, that the filing, sealing and
certification of the within deposition shall
be and the same are hereby waived;

　　IT IS FURTHER STIPULATED AND AGREED that
all objections, except as to form of the
question, shall be reserved to the time of
the trial;

　　IT IS FURTHER STIPULATED AND AGREED that
the within deposition may be signed before
any Notary Public with the same force and
effect as if signed and sworn to before the
Court.

　　　　　　*　　　　*　　　　*

C. Kosciuk                4

1

2          THE VIDEOGRAPHER:  This is Reel

3    Number 1 of the deposition of

4    Charles Kosciuk in the matter of

5    Martin Tankleff versus the County of

6    Suffolk and others in the United

7    States District Court for the

8    Eastern District of New York.

9          The deposition is being held at

10   666 Old Country Road, Garden City,

11   New York on October the 2nd, 2013,

12   at approximately 10:14 a.m.

13         My name is Kathy Pascal, the

14   videographer from Pro Video

15   Productions, located in Nesconset,

16   New York.  The court reporter is

17   Dolly Fevola in association with

18   Fevola Reporting and Transcription.

19         Will counsel please introduce

20   themselves and state the parties you

21   represent.

22         MR. SCHECK:  Barry Scheck,

23   Neufeld, Scheck, Brustin, LLP for

24   the Plaintiff, Martin Tankleff.

25   With me is Elizabeth Daniel Vasquez.

C. Kosciuk                    5

1         MR. MITCHELL:  For the County

2    of Suffolk, Dennis M. Brown, Suffolk

3    County, by Brian Mitchell, Assistant

4    District Attorney.

5         MR. TIPALDO:  Assistant

6    Attorney General Joseph Tipaldo for

7    the State of New York.

8         THE VIDEOGRAPHER:  Will the

9    court reporter please swear in the

10   witness.

11   C H A R L E S   K O S C I U K, after

12   having been first duly sworn by a Notary

13   Public of the State of New York, was

14   examined and testified as follows:

15   (By The Reporter)

16        Q    Please state your name for the

17   record.

18        A    Charles M. Kosciuk.  8

19   Woodcutters Path, St. James, New York 11780.

20   EXAMINATION BY

21   MR. SCHECK:

22        MR. SCHECK:  Good morning, Mr.

23   Kosciuk.  Do I have that right?

24        THE WITNESS:  Kosciuk.

C. Kosciuk                    6

1

2          MR. MITCHELL:  Barry, I'm

3          terribly sorry.  Can we mark his

4          address confidential?

5          MR. SCHECK:  No problem.  I'm

6          really bad with names.

7          Q    Mr. Kosciuk, have you ever been

8    deposed before in a civil case?

9          A    In a civil case, yes.

10          Q    Can you tell us about that?

11    When was that?

12          A    It was a while back.  It was a

13    motor vehicle accident.  What year?  I would

14    have to guess.  I don't remember.

15          Q    Were you involved in an

16    accident?

17          A    No, no, no.  I was the expert.

18          Q    I see.  And you were the expert

19    for the Plaintiff, the Defendant?

20          A    For neither.  Suffolk County

21    reconstructed the case and I don't know who

22    I was for, I was just called in to testify.

23          Q    I got you.  Now, could you tell

24    us a little bit about how you prepared for

25    this deposition?

C. Kosciuk                    7

1

2          MR. MITCHELL:  I object to the

3     form.  You can answer.

4          MR. SCHECK:  You can answer.

5     A     On Monday I met Brian Mitchell

6  at his office and we reviewed some

7  photographs and we went over some of the

8  court testimony.

9          Q     So the court testimony being

10  your court testimony?

11         A     Yes.

12         Q     What other testimony, if you

13  recall?

14         A     That was it.

15         Q     Okay.  And prior to -- And what

16  photographs, if you recall, did you review?

17         A     Scene photographs.

18         Q     So those would be some of the

19  photographs of where Seymour Tankleff was

20  found in his office?

21         A     Of his office, yes.  I was not

22  there when he was found in his office.

23         Q     No, no, of where he was found

24  in his office, right?

25         A     Correct.

C. Kosciuk                           8

1

2       Q     And some of the crime scene

3    photos as to where Arlene Tankleff was

4    found?

5       A     Yes.

6       Q     And also, did you review the

7    photograph of that model that had been made

8    of the entire Tankleff residence for

9    purposes of the trial?

10       A     No.

11       Q     Okay.

12             (Whereupon, Plaintiff's Exhibit

13             1 was marked for identification.)

14       Q     Looking at Plaintiff's

15    Exhibit 1 for identification, do you

16    remember this to be a photograph of a model

17    that was created for purposes of the trial

18    of the Tankleff residence at the time of the

19    murders?

20       A     Yes, I do.

21       Q     Okay.  We'll come back and

22    review this.  I just wanted to make sure you

23    remembered that.

24             Prior to talking with Mr.

25    Mitchell and reviewing your trial testimony,

1                           C. Kosciuk               9

2    I take it, yes --

3              A     Yes.

4              Q     -- and these photographs, when

5    was the last time before that that you

6    discussed this case with anyone that you

7    recall?

8              A     Way back.  As far as a legal

9    person?

10             Q     Anyone.  Let's just start with

11   anyone.

12             A     I did receive a call maybe a

13   year ago about the County was being sued and

14   I think I was named in the suit, and I did

15   get a subpoena and then the County took care

16   of that subpoena.

17             Q     Okay.

18             A     That was it.

19             Q     Right.  And before that, do you

20   remember talking with reporters?

21             A     No.

22             Q     Investigators?  Anybody?

23             A     No, nobody.

24             Q     Have you been following Mr.

25   Tankleff's post conviction motions that led

                          C. Kosciuk                10

1

2    to his conviction being vacated?

3         A     No.

4         Q     Did you discuss with any of

5    your old colleagues at the Suffolk County

6    Police Department anything about this case

7    while those post conviction motions were

8    going on?

9         A     Not really, no.

10        Q     When did you retire by the way?

11        A     2002.  The end of July 2002.

12        Q     What did you do after you

13   retired?

14        A     I still do motor vehicle

15   accident reconstruction privately.

16        Q     Do you have your own firm or

17   are you affiliated with somebody?

18        A     I work with another person.

19        Q     You work with what?

20        A     Another person.

21        Q     And who is that?

22        A     Bob Genna of the crime lab.

23        Q     Oh, so you work with Mr. Genna?

24        A     Yes.

25        Q     And he is still working at the

C. Kosciuk                11

Suffolk County Crime Lab?

      A     Yes.

      Q     What is his position?

      A     He's the director.

      Q     How does that work?  How does

he wind up hiring you to do reconstruction?

      A     Originally at the laboratory

that was my function when I retired and then

we continued that when I retired and we only

handle civil cases at this time.

      Q     When you say "we" you mean --

      A     Him and I.

      Q     And do you do this for the

County of Suffolk?

      A     No.

      Q     So Mr. Genna -- Is this a

profit-making entity?

      A     Yes.

            MR. MITCHELL:  I object to the

      form.  You can answer.

      Q     Does it have a name?  Is it

incorporated?

      A     You know, I have no idea what

that name is if he does have a name.

C. Kosciuk                    12

1

2      Q     Is it a partnership?

3      A     What I mostly do is I mostly

4   respond to the scene with him.  We collect

5   the physical evidence, measurements, and I

6   do reconstruction and he goes over the

7   reconstruction and he takes care of all the

8   testimony and all the attorneys involved.  I

9   have very little contact outside of the

10  scene itself.

11     Q     Are you paid by the County of

12  Suffolk?

13     A     No.

14     Q     So this is something that Mr.

15  Genna does for private attorneys and

16  automobile accident cases for the most part?

17     A     That's correct.

18     Q     Do you know if he is hired by

19  the Plaintiffs or the Defendants?

20     A     Either side, I assume.

21     Q     Either side.  Do you advertise

22  under any particular name?

23     A     No.

24     Q     How do people get to know

25  to call you guys?

<pre>
 1                    C. Kosciuk          13

 2         A     Word of mouth.

 3         Q     Word of mouth?

 4         A     Yes.

 5         Q     Would we find you in the Yellow

 6  Pages or anything?

 7         A     No.

 8         Q     Do you know if it is a

 9  partnership or an incorporated entity?

10         A     I can't answer that.

11         Q     Do you know how much money per

12  year you've been making on this?

13         A     I would say, yes, about $30,000

14  a year.

15         Q     And are the two of you

16  fifty/fifty partners, you and Mr. Genna?

17         A     No.

18         Q     What's the percentage?

19         A     There is no percentage.  I get

20  paid per case and he takes care of mostly

21  everything else.  He actually pays me.

22         Q     I see, right.  Are you paid by

23  the hour?

24         A     No, per case.

25         Q     How much would you get, let's
</pre>

C. Kosciuk                14

1   say, per case?

2          A     Just $1500.

3          Q     I see.  Would this involve

4   responding to the scene of an accident and

5   actually doing measurements and taking

6   photographs?  Tell me what you do.

7          A      We more or less said it's

8   respond to the scene, documenting the scene,

9   photographing the scene, taking

10  measurements, measuring the crush of the

11  vehicles, trying to determine the final rest

12  of the vehicles, and then coming back and

13  reconstructing it, drawing a scale diagram

14  of the scene, and then performing a

15  reconstruction to try to determine how the

16  accident happened, speeds of the accident,

17  and then I turn all the mathematics and the

18  diagrams over to him.

19         Q     Right.  Do you actually write

20  reports for him?

21         A     Do I?  No.

22         Q     You just tell him or you do

23  this verbally?

24         A      I do the mathematical portion

1

2    and the diagramming and I turn that all over

3    to him.

4         Q    I see.  But you wouldn't write

5    a report saying, in my judgement this is

6    what happened at the accident?

7         A    I might not write it, I might

8    verbally tell him.

9         Q    Just tell him?

10        A    Yes.

11        Q    Okay.  And so you've been doing

12   this for how long with Mr. Genna?  Since you

13   retired?

14        A    How long have we been doing it?

15        Q    Yes.

16        A    Since 1983.

17        Q    And you said you retired in --

18        A    2002, July.

19        Q    Oh, I see.  So from 1983

20   through 2002 you and Mr. Genna were doing

21   reconstruction together and testifying?

22        A    Right.

23        Q    As private consultants,

24   correct?

25        A    Yes.

C. Kosciuk                16

1

2      Q     And was there anyone else that

3  worked this entity which, I guess, you're

4  not sure if it's a public corporation or a

5  partnership?

6      A     Is there anyone else involved?

7  No, just he and I.

8      Q     Just the two of you.  Do you

9  have a name for this entity?

10     A     No, I don't have it.

11     Q     Okay.  Do you know if he does?

12     A     I can't answer that.

13     Q     Now, during the course of --

14  Since you retired in 2002, Mr. Genna is

15  still working at Suffolk County, correct?

16     A     Yes.

17     Q     And his position is?

18     A     Director.

19     Q     Director of Crime Lab?

20     A     That's correct.

21     Q     It's Bob, right?

22     A     Bob Genna.

23     Q     Has he kept you abreast of

24  what's been going on in the Tankleff case,

25  whether it's the post conviction criminal

C. Kosciuk                    17

1

2    proceeding or the civil case?

3         A     Not really, no.

4         Q     Okay.  You did, however, meet

5    with the State Investigation Commission?

6         A     Yes, I did.

7         Q     Can you tell us about that?

8         A     I just remember them coming to

9    the house and asking me questions about the

10   case, yes.  I don't remember how many years

11   ago, but it was several years ago.

12        Q     Okay.  You remember ever

13   talking to the attorney general's office

14   other than -- Do you know Mr. Tipaldo, Joe

15   Tipaldo, the attorney sitting here?

16             MR. TIPALDO:  I'll stipulate we

17        never met.

18        Q     What about Bob Schwerdt from

19   the attorney general's office?

20        A     The name does not ring a bell.

21        Q     There were other people from

22   the attorney general's office that were

23   involved in the case.

24        A     I just remember two gentlemen

25   coming to the house.

C. Kosciuk                18

1

2      Q     You don't remember if they were

3  from the attorney general's office or the

4  State Investigation?

5      A     No.

6      Q     And they asked you questions,

7  right?

8      A     Yes, they did.

9      Q     I'm going to review that

10  interview with you in a while.

11      A     Sure.

12      Q     Did you review that with Mr.

13  Mitchell before you came here to testify?

14      A     No.

15      Q     Okay.  We'll review that in a

16  few minutes.

17             Now, did you know, by the way,

18  Jerry Steuerman?

19      A     No.

20      Q     Tod Steuerman?

21      A     No.

22      Q     Seymour Tankleff?

23      A     No.

24      Q     Arlene Tankleff?

25      A     No.

C. Kosciuk                          19

1

2          Q      Marty Tankleff?

3          A      No.

4          Q      Just out of sheer curiosity,

5     Darcy or Barry Steuerman?

6          A      No.

7          Q      An individual named Glen

8     Harris?

9          A      No.

10         Q      Peter Kent?

11         A      No.

12         Q      Joey Creedon?

13         A      No.

14         Q      Billy Glass?

15         A      No.

16         Q      William Glass?

17         A      No.

18         Q      Do you recall when you did the

19    crime scene in this case there were people

20    you were told that had attended a card game

21    the night before the murders?

22              MR. MITCHELL:  I object to the

23         form.

24         Q      The night of the murders, I

25    should say.

C. Kosciuk                    20

1

2      A    I don't believe we discussed

3  anything as far as who was at the house that

4  night with the crime lab anyway.

5      Q    Okay.  Now, so let's talk a

6  little bit about have you ever read any

7  books or articles about this case?

8      A    No.

9      Q    No?

10      A    Maybe in Newsday as I was

11  testifying.  Probably back then I did; since

12  then, no.

13      Q    So I guess this matter has not

14  been much concern to you one way or the

15  other?

16      A    Actually, in the laboratory

17  once we finish it's hard to follow.

18      Q    You move on to the next?

19      A    Exactly, just move on to the

20  next case.

21      Q    Could you tell us a little bit

22  about how you first came to work at the

23  Suffolk Police Department and something

24  about your professional history?

25      A    How did I come about?

C. Kosciuk          21

2    Q    Yeah.

3    A    Actually, I was going to school

4  and working at Hazeltien Manufacturing and

5  studying.  I was actually studying to be a

6  vocational teacher in mechanical technology

7  and --  It's a long story -- my

8  father-in-law ended up buying a deli for his

9  brother-in-law, got a job and had nobody to

10  run the deli and he elected me to run the

11  deli.  As I was running the deli, the police

12  officers used to come in and say, take the

13  test, take the test.  Even though I wanted

14  to be a teacher, I ended up taking the test

15  and going on the job in '67.

16    Q    When you say going on the

17  job --

18    A    I passed the test and was

19  accepted into the academy.

20    Q    By 1971, you made detective,

21  right?

22    A    That's correct.

23    Q    And so what did you do between

24  1967 and '71?

25    A    I was in a patrol in the Second

C. Kosciuk                22

Precinct which is the Town of Huntington.

Q     Then what?

A     Then in about the end of 1971 I
was assigned to the laboratory.  And from
there I performed drug analysis for about
four-and-a-half years, then I was assigned
to a firearms section until about 1983 where
we got a request from the DA's office to
start an accident investigation unit and Bob
Genna, and I did start that unit and ever
since then, from '83 until I retired, I was
doing accident reconstruction.

From the first day I was
assigned to the crime lab I was going on
crime scenes, which is a separate section of
the laboratory.  The members of the
laboratory from each section is assigned to
be on standby.  We get a time for crime
scene analysis and reconstruction if we get
calls from Homicide.

Q     You started at the lab when, in
'71?

A     '67.

Q     Oh.

C. Kosciuk          23

1

2          A     Oh, not in the lab.  In the PD,

3     '67 in the lab, the end of '71.

4          Q     I thought so.  When you were

5     working as a patrolman and through your

6     career, did you have partners that you

7     worked with?

8          A     As a patrolman, yes, I did.

9          Q     Do you remember who your

10    partners were, as best you can remember?

11         A     I do remember a couple of them.

12    Jerry Castelnetto -- gosh -- O'Hara I

13    remember, Marty Johs, that's about it.

14               I was in that precinct a short

15    time then I was assigned to a police

16    vehicle, a sector 207, and that you operate

17    by yourself so you don't have anybody with

18    you.

19         Q     Okay.  Now, did you ever work

20    any cases prior to the Tankleff

21    investigation with Detective McCready?

22         A     I'm sure I did, yes.

23         Q     Quite a number?

24         A     I can't answer the number.  I

25    can't answer that.

C. Kosciuk          24

1

2      Q      Right.

3      A      I don't know a number.

4      Q      Right.  Well, let's see if --

5  I'm not holding you to any particular

6  number, but when did you first, if you best

7  can recall, start dealing with Detective

8  McCready?

9              MR. MITCHELL:  I object to the

10             form.  You can answer.

11     A      I can't answer that.  I don't

12  know.

13     Q      Well --

14     A      I don't even know when he went

15  into Homicide, when he started Homicide.  I

16  know I was in the lab ahead of him being in

17  Homicide.

18     Q      Right.  So would it be fair to

19  say that your interactions with Detective

20  McCready began when he was a detective doing

21  homicide cases and you were working at the

22  lab working crime scenes?

23     A      Repeat that, please.

24     Q      Sure.  Would it be fair to say

25  that your relationship with Detective

C. Kosciuk                    25

1

2  McCready began when you were working at the

3  lab sometime after 1971 and he began doing

4  homicides?

5          A    Yes.

6          Q    And so do you remember ever

7  working with him other than on a homicide

8  case at a crime scene?

9          A    No.

10         Q    And what about Detective Rein?

11         A    It would be the same thing.

12 Through Homicide at scenes that would be our

13 relationship.

14         Q    Detective Doyle?

15         A    The same.

16         Q    Detective Pfalzgraf?

17         A    The same.

18         Q    You knew them to be homicide

19 detectives?

20         A    That's correct.

21         Q    Now, about when did you first

22 begin to do homicides after you got to the

23 lab in 1971?

24         A    Oh, about six months after I

25 got into the laboratory.

C. Kosciuk                    26

1

2        Q      What would you do when you

3    responded to a homicide?

4        A      I was being trained by other

5    personnel within the laboratory.

6        Q      Who were you being trained by?

7        A      At that time, Lieutenant

8    Sullivan.  At that time, I believe he was a

9    sergeant.  Detective Balanski, Detective

10   Mike Mahoney.  All the other members that

11   were on the crime scene.  You would be the

12   third person responding.  That's what I was,

13   the third person responding as I was

14   learning.

15       Q      What about Ira Dubey?

16       A      At the crime scene?

17       Q      Did you ever work with him?

18       A      Yes, definitely.

19       Q      When were you working with him?

20       A      When he came into the

21   laboratory.  He was assigned to the

22   laboratory and then he was also on the crime

23   scenes and yes, I did work with him.

24       Q      For about how many years, if

25   you can recall?

```
                              C. Kosciuk            27
1
2         A     I don't know how many years.
3         Q     There came a time that it was
4    discovered that Mr. Dubey had not been
5    truthful about his qualifications; do you
6    recall that?
7              MR. MITCHELL:  I object to the
8         form.
9              MR. TIPALDO:  I object.
10             MR. MITCHELL:  You can answer.
11        A     I do.
12        Q     And was that a surprise to you?
13             MR. MITCHELL:  I object to the
14        form.  You can answer.
15        A     Yes.
16        Q     Tell me why.
17             MR. MITCHELL:  I object to the
18        form.  You can answer.
19        A     Because the understanding that
20   I had was that he was testifying and the
21   defense was calling him "Doctor," but he
22   never corrected it.  And that's about the
23   best I can -- and then he got into trouble
24   with that.  That's all I can...
25        Q     But in terms of interacting
```

C. Kosciuk                28

1

2    with him, you found him to be a competent

3    and knowledgeable guy?

4           A    Yes.

5           Q    Was he, in any way, involved in

6    mentoring or training you?

7           A    No.

8           Q    Who was involved in mentoring

9    or training you with respect to crime scene

10   reconstruction and blood spatter?

11          A    I mentioned several other

12   people in the laboratory already but outside

13   the lab?

14          Q    Let's start inside and outside.

15   Tell us all the people that helped train and

16   mentor you in blood spatter analysis and

17   crime scene reconstruction.

18          A    I sought outside education in

19   that area and that would have been Dr. Pete

20   Pizzola and Dr. DeForest who were affiliated

21   with John Jay College of Criminal Justice

22   and also at the Northeast Association of

23   Forensic Scientists where they had crime

24   scene reconstruction courses.

25          Q    Did you attend classes at John

C. Kosciuk                    29

1

2    Jay?

3              A      No, these were seminars.

4              Q      So you would go to seminars

5    that were being taught by Pete Pizzola and

6    Peter DeForest?

7              A      Right.

8              Q      And the Suffolk County would

9    send you to these seminars?

10             A      That's right.

11             Q      About how many a year, if you

12   recall?  If they were yearly, I should not

13   assume.

14             A      It was not a year.  It was a

15   seminar so it was like a weekend or a day,

16   so some are completely dedicated to

17   bloodstain pattern analysis.

18             Q      You mentioned in 1983 was when

19   you first started putting together a

20   reconstruction and crime scene unit with Bob

21   Genna, right, you said that?

22             A      No.

23             Q      Reconstruction?

24             A      That was for accident

25   investigation.

1                          C. Kosciuk          30

2          Q     Oh, I thought -- I'm sorry.  I

3    misunderstood you.

4          A     There was always a crime scene

5    investigation unit with the laboratory prior

6    to me even getting to the laboratory.

7          Q     What about reconstruction?  How

8    would you define what reconstruction is?

9          A     The reconstruction would be the

10   blood spatter analysis, the documentation of

11   any like, footprints, tire tracks and

12   directionality of the movement of vehicles

13   and stuff like that.

14         Q     And when did you start doing

15   reconstruction at the Suffolk County Crime

16   Lab?

17         A     Accident reconstruction?

18         Q     Any kind, whether it's accident

19   reconstruction or reconstruction of the

20   crime scene.

21         A     About 1973, '74.

22         Q     You started what first, doing

23   accident reconstruction?

24         A     No, crime scenes.

25         Q     What would you start doing in

1
2    '73, '74?

3         A    Identifying evidence,

4    documenting the evidence, drawing the scene,

5    recovering the evidence.

6         Q    Other than documenting the

7    scene, recovering evidence and drawing it,

8    right, is there something else that you

9    would say is involved in crime scene

10   reconstruction?

11             MR. MITCHELL:  I object to the

12        form.  You can answer.

13        A    Can you rephrase that?

14        Q    Sure.  Would you agree with me

15   that in terms of what is known as crime

16   scene reconstruction that part of the job is

17   to attempt to create a hypothesis about how

18   the crime might have occurred?

19             MR. MITCHELL:  I object the

20        form.  You can answer.

21        Q    Is that true?

22        A    Yes.

23        Q    And then create a hypothesis

24   and try to test it against the objective

25   facts as you learn them; fair enough?

1                              C. Kosciuk          32

2          A     True.

3          Q     And so you may go to a crime

4    scene, you make measurements, and then

5    certain items of evidence are sent out for

6    testing, correct?

7          A     Right.

8          Q     And then you see whether or not

9    you would, let's say, identify blood on

10   various items that you recover from a crime

11   scene, correct?

12         A     At the scene?

13         Q     No, no, that were recovered

14   from the crime scene.

15         A     Okay.  Can you rephrase it.

16         Q     Sure.  In the process of doing

17   reconstruction and creating a hypothesis as

18   to how the crime might have occurred, that's

19   an ongoing process; isn't it?

20         A     Yes.

21         Q     And so -- and you correct me

22   where I'm wrong about this in terms of my

23   understanding -- so in your job starting,

24   you said, in 1973 when you started crime

25   scene reconstruction?

                              C. Kosciuk          33

1

2        A     Yes.

3        Q     Part of what would happen is

4   that you would document the scene, you would

5   make measurements, photograph items as part

6   of it, right?

7        A     Actually not.  In Suffolk

8   County the responsibility of the crime

9   laboratory is to handle the evidence.  The

10  identification section was responsible,

11  which is another unit run by the police

12  department at that time also, is to dust,

13  photograph and videotape the scene.

14       Q     Isn't there an interaction

15  between the people in charge of doing

16  reconstruction, the homicide detectives at a

17  crime scene, and the people from the

18  identification unit?  Do they work together?

19       A     Sure, it's a team.

20       Q     And so it would be -- Now,

21  let's just take responding to the crime

22  scene in this case; do you recall that?

23       A     Yes.

24       Q     In terms of working that crime

25  scene -- First of all, as you recall, who

C. Kosciuk                34

1

2     was in charge of it when you arrived?

3                MR. MITCHELL:  I object to the

4           form.  You can answer.

5           A     I know Detective Sergeant Doyle

6     was there and I assume the homicide sergeant

7     at that time he was.

8           Q     What about Detective McCready?

9           A     Was he in charge of it?  I

10    can't answer that.

11          Q     As far as you knew Doyle was in

12    charge of the scene; is that right?

13          A     As being senior officer, yes.

14          Q     You don't know what the

15    relationship is between McCready and Doyle

16    with respect to who was in charge of the

17    overall case?

18          A     No.

19          Q     Okay, but with homicide

20    detective who was in charge of the overall

21    investigation it would be part of the

22    process for him or her to discuss matters

23    with the detective that was in charge of the

24    crime scene?

25                MR. MITCHELL:  I object to the

C. Kosciuk                35

1
2    form.  You can answer.

3            A     I'm sorry, can you restate

4    that.

5            Q     Here's what I'm trying to get

6    at.  We were talking about the process of

7    reconstruction; you recall that?

8            A     Right.

9            Q     You were saying that the

10   identification unit is the one that comes in

11   videotapes the scene, takes photographs,

12   does dusting for prints, correct?

13           A     Correct.

14           Q     Right.  Now, wouldn't there be

15   an interaction between the homicide

16   detectives in charge of the scene and people

17   such as yourself from the crime lab that

18   were in charge of reconstruction as to what

19   to take pictures of?

20           A     Actually, everybody at the

21   scene has input into what to take pictures

22   of.

23           Q     Thank you.  So the people from

24   the identification unit, the homicide

25   detectives at the crime scene, and yourself

C. Kosciuk                    36

1    as the --

2             A     Crime lab.

3             Q     -- crime lab reconstruction

4    person --

5             A     Yes.

6             Q     -- ordinarily would get

7    together and you would discuss and make

8    judgments about what different items at a

9    crime scene ought to be photographed; is

10   that true?

11            A     Yes.

12            Q     And how they should be

13   photographed, correct?

14            A     No.

15            Q     Well --

16            A     I have no input on how they

17   should be photographed.

18            Q     And you did not have any input

19   as to how they should be done in 1988?

20            A     No.

21            Q     Wouldn't you agree with me that

22   the way that a photograph is taken of blood

23   spatter at a scene is important for purposes

24   of reconstruction?

C. Kosciuk                    37

1
2         MR. MITCHELL:  I object to the
3    form.  You answer.
4         A    Yes.
5         Q    Because one of the things that
6    you were doing in this case, I take it, was
7    trying to reconstruct, as best you could,
8    what happened based on the blood spatter
9    that you would see at the scene, correct?
10        A    That's correct.
11        Q    And part of that analysis is
12   looking at, let's say, the blood spatter on
13   the ceiling in the office of Seymour
14   Tankleff; you recall that?
15        A    Yes.
16        Q    That was something that you
17   testified about?
18        A    Yes.
19        Q    Now, in order to take pictures
20   of the bloodstains on the ceiling where Mr.
21   Tankleff was found, are you telling us that
22   you were not in charge of telling the
23   identification people how those photographs
24   should be taken?
25             MR. MITCHELL:  I object to the

C. Kosciuk                     38

1

2      form.  You can answer.

3             Q     I'm just asking if you know?

4             A     I did direct them to take

5      photographs of the ceiling and I placed the

6      ruler against the ceiling, but I'm not

7      looking through the lens so I don't know

8      what they are actually capturing.

9             Q     Let me ask you more directly.

10     Would it be fair to say that when taking

11     photographs of a bloodstain, wouldn't it be

12     the best practice to both have a ruler and

13     to take the photograph of the stain from a

14     90-degree angle?

15            MR. MITCHELL:  I object to the

16            form.  You can answer.

17            A     In my opinion, yes.

18            Q     Right.  But that wasn't done

19     with the stains on the ceiling; was it?

20            MR. MITCHELL:  I object to the

21            form.  You can answer.

22            A     At the time, I didn't realize

23     what was actually going to be produced but

24     apparently it was not.

25            Q     So now, just out of curiosity,

C. Kosciuk                    39

1

2      at the time, did you know that the proper

3      way to take photographs of bloodstains such

4      as those on the ceiling was to do it at a

5      90-degree angle?  Did you know that then?

6                   MR. MITCHELL:  I object to the

7             form.  You can answer.  It's

8             assuming that that is correct.  I

9             don't know that he said that's the

10            correct manner.

11                  MR. SCHECK:  I think he did say

12            yes to that but --

13                  MR. MITCHELL:  I think he said

14            not quite as tight.  He can answer

15            the question.

16                  MR. SCHECK:  Sure.

17                  MR. MITCHELL:  Go ahead.

18      Q      Are you confused at this point?

19      A      A little bit.

20      Q      Let me -- I know that Mr.

21      Mitchell didn't mean that in an

22      ill-intentioned way so let me just go back.

23                  So the best practice is to take

24      a photograph of a bloodstain from a

25      90-degree angle; isn't that right?

1                          C. Kosciuk              40

2          A      Through education, yes.

3    Developed that way, yes.  As time went on,

4    yes.

5          Q      And the reason for that is

6    you're taking it either -- I'm pointing to

7    the ceiling here because we're talking about

8    a ceiling stain.

9          A      Normal to the surface.

10         Q      Normal to the surface because

11   you want to take it a straight up and down

12   shot because that gives you the best

13   opportunity to make a judgement about the

14   direction of, let's say, the tails on the

15   stain or something like that, correct?

16         A      Sure.

17         Q      And so, what I'm asking, if you

18   can remember is, were you aware in 1988 when

19   you worked this crime scene that that was

20   indeed the best practice to take the

21   photographs of the blood spatter from a

22   90-degree angle, if you can recall?

23         A      I don't recall plus I don't

24   recall when the photographer was taking it.

25   I can't picture that in my mind.  The only

C. Kosciuk                    41

1  thing I have is the results that we have

2  before us.

3       Q    Right.  But even in looking --

4  you just looked at these photographs -- you

5  would agree with me that -- and we'll go

6  over them later -- that the photographs of

7  the bloodstains on the ceiling they are not

8  taken from a 90-degree angle?

9       A    They look like yes, no, they

10  were not.

11            MR. MITCHELL:  I just object to

12            the form of your question because

13            you said he just looked at the

14            photographs.  There has been no

15            testimony that he looked at these

16            photographs that you talked about in

17            the ceiling.  That's all I'm saying.

18            You assumed in your question that he

19            has testified today that he looked

20            at the photographs of the

21            bloodstains on the ceiling.  That's

22            my objection.

23            MR. SCHECK:  Sure.  I was under

24            the impression --

C. Kosciuk                    42

1
2          MR. MITCHELL:  He very well may
3      have.
4          MR. SCHECK:  -- that he
5      indicated that he looked at
6      photographs with you in preparation
7      for his testimony.
8          MR. MITCHELL:  I guess you're
9      assuming.
10          MR. SCHECK:  I did ask him
11      about that one in particular but it
12      doesn't matter because your
13      recollection is that the photograph
14      of the bloodstain on the ceiling was
15      not taken from a 90-degree angle,
16      fair enough?
17      A    Yes, quite obvious.
18      Q    And by the way, and we're going
19  to review them in a second, but the
20  photographs of the Arlene Tankleff crime
21  scene where her body was found, right, there
22  weren't rulers being placed at different
23  places on the sheets near where the body was
24  when those pictures were taken?
25      A    To the best of my recollection

C. Kosciuk                 43

1   there was a ruler.  Our tag has a ruler in

2   the photos.

3       Q    We'll look at some of them and

4   you'll tell me.

5           Now, just to get back to what

6   we were talking about, the seminars that you

7   would take from Peter Pizzola, Peter

8   DeForest, who else would give them?

9       A    That was it.  They also gave a

10  crime scene reconstruction seminar.  I can't

11  remember where it was, but it was with the

12  Northeast Association of Forensic

13  Scientists.

14      Q    Is this the Williams Homicide

15  Academy or something different?

16      A    I'm not familiar with that.

17      Q    So the Northeast Association of

18  Forensic Scientists would sometimes --

19  that's a voluntary professional association?

20      A    That's correct.

21      Q    Criminalists in the --

22      A    Northeast.

23      Q    -- in the northeast.  And so,

24  by the way, would your personnel file have a

C. Kosciuk                    44

1

2      list of all the different seminars you

3      attended?

4              A      Yes.

5              Q      And that's something that

6      should be in there and if they're not in

7      there --

8              A      Yes.

9              Q      -- in your personnel file of

10     the different seminars that you attended,

11     was that kept in a list anywhere --

12             A      I have no idea what's in my

13     personnel file.

14             Q      In the lab, would a list be

15     kept of the number of different seminars

16     that you attended?

17             A      They should be, yes.

18             Q      And who would keep that?

19             A      I can't answer that but someone

20     at the laboratory has that file.

21             Q      Would Bob Genna be the best

22     person to ask about that?

23             A      Yes.

24             Q      Now, so getting back to your

25     understanding of crime scene reconstruction,

C. Kosciuk                45

2    certainly, and this would be true in 1988,

3    is that you look at all the evidence that

4    you can get, right, from documenting the

5    scene and then you try to create hypotheses

6    of how the crime might have occurred; fair

7    enough?

8          A    Yes.

9          Q    And that hypothesis can be

10   what's -- It's a falsifiable hypothesis; is

11   that true?  You've heard that term before?

12         A    No.

13         MR. MITCHELL:  I object to the

14         form but he answered.

15         Q    Well, as part of reconstruction

16   you have a hypothesis and then you will look

17   at other objective evidence that is derived

18   from testing items that are taken at the

19   scene to see whether the hypotheses are

20   confirmed or not confirmed; fair enough?

21         A    Can you give me an example?

22         Q    Sure.  You may collect an item

23   from a crime scene thinking that it is a

24   murder weapon, correct?

25         A    Yes.

1                           C. Kosciuk              46

2          Q     Based on -- And then, when it's

3     taken back to the crime lab, whether it's

4     let's say a knife, it would be taken apart

5     and looked at and tested for the presence of

6     blood, correct?

7          A     Yes.

8          Q     And so that would be objective

9     evidence that would go towards confirming or

10    not confirming a hypothesis about how the

11    crime occurred?

12         A     Not really because the knife in

13    question that you take apart might not have

14    had the blood on it.

15         Q     But that's evidence?

16         A     But it was the murder weapon.

17         Q     Right.  That could be then you

18    would have to have an alternative hypothesis

19    about why the blood is no longer on the

20    weapon; is that right?

21         A     Okay.

22         Q     Is that a yes?

23         A     Yes.

24         Q     So in terms of reconstruction,

25    as new evidence comes in you have to -- you

C. Kosciuk                    47

can confirm the hypothesis, you can refute

the hypothesis, or sometimes you have to

change the hypothesis; would that be fair

enough?

     A    Okay.  I think you're going a

little further than -- My reconstruction

deals with just the scene.  After that, we

really don't get into total reconstruction

of the homicide.

     Q    Would your part of the

reconstruction also deal with looking at,

let's say, weapons recovered from the scene

and wounds that were photographed and

documented at the time of, let's say, an

autopsy?

     A    No.

     Q    Okay.  Now, what about you

recover something from a crime scene that

appears to have blood on it and then you do

subsequent serology testing to see whether

blood is present or not.  Would that be

something that might change a hypothesis for

the purpose of reconstruction?

     MR. MITCHELL:  I object to the

C. Kosciuk                    48

1

2         form.  You can answer.

3              A     Let me say this.  In the crime

4    lab in Suffolk County Crime Laboratory, it's

5    composed of say six to seven different

6    forte.  At that time that we're speaking of

7    in '88, I was an accident reconstructionist

8    although I had expertise in the analysis of

9    drugs and of firearms.  From about

10   1974-and-a-half to '83, I was a firearms

11   expert and that was my dealings in the

12   laboratory plus crime scene reconstruction

13   or crime scene -- let's say --

14   reconstruction going out to the scene,

15   recovering the evidence and bringing the

16   evidence back to the laboratory.

17              If there was firearms involved

18   and I was at the scene, that would have been

19   my weapon and I would have analyzed the

20   weapon.  Blood trace evidence would all go

21   to different sections within the laboratory

22   and there would be different experts.

23              Q     In 1988, who, at the Suffolk

24   County Laboratory, was the expert in blood

25   spatter analysis?

C. Kosciuk                          49

1
2      A      I guess it would be Bob Genna

3    and myself at that time.

4      Q      And you testified at the

5    Tankleff trial about the blood spatter

6    analysis?

7      A      Yes.

8      Q      And that the crime scene in

9    this case you were the person that was

10   charged with the blood spatter analysis?

11     A      I don't recall doing a

12   reconstruction at the scene of the blood

13   spatter.

14     Q      But to your knowledge, did

15   anyone do that?

16     A      No, not to my knowledge.

17     Q      And subsequent to just working

18   the scene and documenting it, did anybody

19   look at all the evidence and try to do a

20   reconstruction of the blood spatter?

21     A      I looked at the spatter at the

22   Tankleff scene, at the Tankleff office, and

23   determined the directionality of the

24   castoff, if that's what you would call a

25   reconstruction.

C. Kosciuk                    50

1

2     Q     Is that what you would call

3     reconstruction?

4     A     No, I just determine the

5     directionality of the blows and based on the

6     stain in the ceiling.

7     Q     Would you call that blood

8     spatter analysis?

9     A     I would just call it analysis

10    of the castoff and determine the angles.

11    Q     Based on all of your learnings

12    in this field now, would it be fair to say

13    that blood spatter analysis is what is known

14    as crime scene reconstruction?

15    A     At this time and date, yes.

16    Q     In 1988, was blood spatter

17    analysis also known, to the best of your

18    knowledge, as part of something that was

19    known as crime scene reconstruction?

20    A     Not really.  I know that Dr.

21    Perzola was doing a lot of research as far

22    as the projection of blood and the blood

23    dynamics.  There was a fairly new doctor,

24    Dr. MacDonell in Connecticut was also doing

25    research in that area.  It was a new field.

C. Kosciuk                    51

Not until about 1997 did the reconstruction

field and bloodstain pattern analysis

develop.

     Q     As far as you're concerned?

     A     Well, yeah, as far as I'm

concerned.

     Q     Now, you mentioned Dr. Herbert

MacDonell.  Are you familiar with his book

Flight Characteristics of Bloodstain

Evidence?

     A     Yes.

     Q     Did you read that book?

     A     I did.

     Q     When did you read that book?

     A     When we started getting

involved in bloodstain patterning.

     Q     So that would be when?

     A     Sometime in the seventies.  I

don't remember what date.

     Q     That book was published in

1975, right?

     A     Yes.

     Q     Have you ever gone into the lab

and created blood spatter yourself?

1                                    C. Kosciuk              52

2             A       Yes.

3             Q       And tell us about that.

4             A       I've done at the crime lab high

5      velocity blood spatter looking at both the

6      projected blood and the blow back from a

7      muzzle, muzzle to garment distance

8      determination, the size of the caliber to

9      the blood spatter analysis, both the

10     projected blood and the blow back.

11            Q       When did you --

12            A       -- the velocity.

13            Q       When and where did you do that

14     yourself?

15            A       In the crime laboratory.

16            Q       Would you do that -- Do you

17     remember the first time you did that?

18            A       You're asking for a date?

19            Q       Yeah.  What period of time were

20     you doing that?

21            A       Probably around when we were

22     attending those courses.

23            Q       So that would be when?

24            A       In the early -- I guess it was

25     early eighties or early seventies, somewhere

C. Kosciuk                    53

1    in there.  I can't exactly remember.

2          Q    So, in other words, you went in

3    the lab yourself and would fire weapons and

4    create high velocity blood spatter?

5          A    Yes.

6          Q    Using what?  Animals?

7          A    Hand guns.  Oh, yes.

8          Q    Pigs?

9          A    Oh, no, no.  Sponges no live

10   animals.  Sometimes we used horse blood as

11   the liquid agent.

12         Q    And when you say "we," it's

13   yourself and Bob Genna?

14         A    Well, Bob was involved in some

15   of -- The testing, because I was in

16   firearms, I dealt with that.  I can't recall

17   if Bob was there or not at the time.  We did

18   do testing at the lab, shoe prints and

19   blood, we did some of that.

20         Q    When you say "we," if you can

21   tell me who else besides yourself.

22         A    Probably Bob Genna and myself

23   and some of the people from the trace

24   evidence section.

C. Kosciuk                54

1

2       Q     Do you remember who that might

3  be?

4       A     Don Dolan I believe at that

5  time.

6       Q     Now, can you define blood from

7  the perspective of a blood pattern analyst?

8              Does that question make any

9  sense to you?

10      A     No.  Can you rephrase that.

11      Q     Sure.  I mean are you familiar

12  with how blood spatter experts would define

13  blood?

14      A     Not really.

15      Q     Have you ever heard a

16  definition of a non-Newtonian viscoelastic

17  fluid?  Have you ever heard that kind of

18  phrase?

19      A     Yes, I did.

20      Q     That the blood would be -- you

21  would be studying the behavior of blood as

22  fluid; how it responds to different forces;

23  fair enough?

24      A     Yes.

25      Q     And does it have more or less

C. Kosciuk                    55

1    energy than a drop of water or a drop of

2    milk; do you know, blood?

3            A    More or less energy?

4            Q    Yes.

5            A    Is it being propelled?  I can't

6    answer your question because I don't

7    understand it.

8            Q    Well, in terms of the

9    properties of blood and when it's being

10   propelled, all right, does it have more or

11   less energy than let's say a drop of water;

12   do you know?

13           A    I would say of the same volume

14   the blood would have the more energy.

15           Q    What about milk?

16           A    I don't know the density of

17   milk compared to blood.

18           Q    Would part of the blood spatter

19   analysis have to do with coagulation of

20   blood?

21               MR. MITCHELL:  I object to the

22          form.  You can answer.

23           A    Would blood spatter analysis --

24           Q    Yes.

C. Kosciuk                    56

1

2          A      Yes.

3          Q      And drying?

4          A      Yes.

5          Q      And changes over time?

6          A      Yes.

7          Q      Okay.  And can you distinguish

8   for us between a swipe, a wipe and a smear?

9          A      At this time, no.  I would be

10  guessing.

11         Q      You recognize those as terms

12  that are used in blood spatter analysis?

13         A      Yes, I do.

14         Q      Okay.  Now, I think you

15  reviewed your testimony here at the trial,

16  right?

17         A      Parts of it, yes.

18         Q      And did you review the part

19  where you were talking about low velocity

20  blood spatter, medium velocity blood spatter

21  and high velocity blood spatter?

22                MR. MITCHELL:  I object to the

23         form.

24         A      I don't remember reviewing it.

25         Q      Okay.  How would you define low

1                        C. Kosciuk            57

2      velocity blood spatter?

3              A     If my memory serves me

4      correctly, below 5 feet per second would be

5      low velocity or the force of gravity.

6      Medium would be from 5 to about 25 feet per

7      second, and high velocity would be about or

8      somewhere in the area of over 100 feet per

9      second.

10             Q     Would it be fair to say that

11     medium velocity blood spatter is caused by

12     the affect of blunt instruments?

13                   MR. MITCHELL:  I object to the

14             form.  You can answer.

15             A     Can you rephrase the question?

16             Q     Can you describe the -- Would

17     you expect to see medium velocity blood

18     spatter being caused by the affect of blunt

19     instruments on a blood source?

20             A     Yes.

21             Q     And that's the kind of thing

22     that you were analyzing in 1988 when you

23     went to crime scenes?

24             A     Yes.

25             Q     You would be looking for medium

C. Kosciuk                    58

velocity blood spatter, yes?

A     Yes.

Q     And you would be -- And if you
saw it, you would be creating hypotheses for
reconstructing purposes about the
possibility of a blunt instrument being used
against a blood source at a scene?

Is that a confusing question
for you?

A     Other questions are coming to
my mind.  If I only saw medium spatter blood
would I rule out any other instrument or a
blunt instrument, is that what you're asking
me?

Q     No, but I'll get back to that.
We can look at your testimony at 1651, line
14, I'll read you the question and answer
and see if this helps you.

"Q.  You say that the high
velocity spatter is consistent with
gunshots.  The medium velocity and
lower velocity spatter to which
you're referring to, what type of
motion or injuries cause that type

```
1                          C. Kosciuk              59

2            of spatter?

3                    A.   That type of spatter can be

4            caused by blunt instruments."

5            A      Right, medium and low.  You

6      said before only medium.  But even --

7      There's a point where with a blunt

8      instrument that you can actually cause or

9      slide into the higher velocity area.  It

10     would fall out of a medium velocity.

11                  In other words, the bloodstain

12     pattern or the bloodstain -- there could be

13     individual patterns that are much smaller

14     than like 4 millimeters which would fall

15     into the medium velocity range.

16           Q      Now, getting back to your work

17     in 1988 in the Tankleff crime scene, do you

18     recall when you got there?

19           A      That morning, yes.

20           Q      About when?

21           A      Shortly after 8 o'clock.

22           Q      And by the way, how do you know

23     that?

24           A      I remembered because I

25     responded from home.
```

C. Kosciuk                    60

1

2          Q     And when you got there, tell us

3     what happened as best you can recall?

4          A     What happened what?

5          Q     What you did and what you

6     recall seeing?

7          A     I went to the scene and I got

8     there about 8 o'clock.  Detective McCready

9     was there and I sat and waited for the rest

10    of the crime scene to respond.  I checked in

11    with the officer at the blocked-off Tankleff

12    driveway.

13         Q     When you say Detective McCready

14    was there, where exactly did you meet him?

15         A     I can't answer that.  I don't

16    remember exactly where I met him.  Did he

17    come to me; did I go to him?  I can't

18    remember.

19         Q     When you encountered him, did

20    he tell you that he had done a walk-through

21    of the crime scene yet?

22         A     No.

23         Q     Do you know if he had done a

24    walk-through of the crime scene yet?

25         A     No.

C. Kosciuk                61

2    Q    Subsequent to that what, if

3  anything, did he tell you about the crime

4  scene as best you can recall?

5    A    Other than Mr. Tankleff was

6  removed, and that there was a victim in one

7  of the bedrooms.

8    Q    To the best of your

9  recollection, what happened next after you

10  spoke to Detective McCready and he told you

11  that Seymour Tankleff had been removed and

12  there was another victim in the bedroom?

13    A    Well, after speaking to him he

14  went about his business.  I sat in my car

15  and waited for the crime laboratory to

16  respond, and then we had to wait for the

17  identification section to respond

18  coordinating with, I guess, Detective

19  Sergeant Doyle, how we would go about

20  handling the scene.

21    Q    Was Doyle there when you got

22  there?

23    A    Not to my knowledge.  I don't

24  know where he was at that time.

25    Q    Okay.  When you said McCready

C. Kosciuk                62

1
2  went about his business, what do you mean by
3  that?
4         A     Well, I waited in my car.  I
5  don't know what he did after that.
6         Q     So you don't know if he then
7  walked through the crime scene?
8         A     No.
9         Q     Did you ever learn from him
10 that he had walked through the crime scene?
11        A     I assume -- Well, no, I did
12 not.
13        Q     When you say you assume, did he
14 ever -- Obviously, when you first arrived
15 there he told you what was inside, right?
16        A     Right.
17        Q     And did there come another time
18 when he told you or anyone else any
19 hypothesis or theories he had about what
20 might have happened?
21        A     No.
22        MR. SCHECK:  I'm told that
23        there is five minutes left on this
24        tape.
25        THE VIDEOGRAPHER:  Yes.

```
1                    C. Kosciuk          63

2            MR. SCHECK:  And then right

3       after that we'll take a short break.

4       Q    So you were saying before that

5  you had worked cases before the Tankleff

6  matter with Detective McCready?

7            A    I know I've worked cases with

8  Detective McCready.  I don't know if they

9  were before or after.  I don't even remember

10 when he came into Homicide.  But if he was

11 in Homicide and he had a homicide and called

12 the laboratory and I was on call, yes, I

13 did.

14           Q    Other than this case, do you

15 remember any particular case that you worked

16 with McCready?

17           A    No.  I can't recall.

18           Q    Are you familiar with, as of

19 1988 and the time you arrived at the

20 Tankleff crime scene, Detective McCready's

21 reputation as a homicide detective?

22           MR. MITCHELL:  I object to the

23       form.  You answer.

24       A    Can you repeat.

25       Q    Were you familiar with his
```

1

2    reputation, let's say, among your colleagues

3    at the crime lab as a homicide detective?

4          A     Not really.

5          Q     Was he regarded as a

6    knowledgeable homicide detective?

7          A     In my book, yes.

8          Q     Somebody that -- A

9    knowledgeable homicide detective would have

10   a working knowledge of blood spatter?

11               MR. MITCHELL:  I object to the

12         form.

13         A     That would depend on the

14   individual.

15         Q     Well, what about McCready?

16               MR. MITCHELL:  I object to the

17         form.

18         A     I don't know.

19         Q     You never discussed blood

20   spatter to the best of your recollection

21   with McCready?

22         A     No.

23         Q     In this case or any other case?

24         A     McCready or anybody, any other

25   detective?

C. Kosciuk                    65

1

2        Q      Yeah.

3        A      At any time?

4        Q      Yeah.

5        A      I guess I must have, sure.

6        Q      Well, I think you told us

7   before that at this crime scene and at other

8   crime scenes what would happen is that the

9   people from the crime lab and the homicide

10  detectives would get together and discuss

11  what should be photographed and discuss how

12  the crime scene should be handled, correct?

13       A      No, I never said that.

14       Q      Didn't you say before that

15  there was some discussion that people had as

16  to what should be photographed and to try

17  and come up with a reconstruction of what

18  happened?

19       A      No.  Each individual at the

20  scene would request ID to take the

21  photographs that they need.  If a homicide

22  detective wanted a photograph of this, I

23  would say take this, take that.  I would

24  tell them I want the ceiling shot, I want

25  this shot, I want that shot.

C. Kosciuk                66

1

2          Q     But when discussion was had

3     about what shot should be taken, I think you

4     told us before, I may be wrong, that there

5     would be interchange between the homicide

6     detectives and yourself as the blood spatter

7     expert from the lab about why certain shots

8     should be taken.  There would be an

9     interchange, a discussion about why people

10    were asking that certain things be

11    documented at the scene?

12              MR. MITCHELL:  I object to the

13         form.  You can answer.

14         A     In my opinion, it's quite

15    obvious if I have a piece of evidence and I

16    have a tag there I want that evidence

17    documented with a photograph.

18              MR. SCHECK:  We'll take a break

19         now.

20              THE VIDEOGRAPHER:  Off the

21         record at 11:15 a.m.

22              (At this time, a brief recess

23         was taken.)

24              THE VIDEOGRAPHER:  We're back

25         on the record at 11:40 a.m.  This is

C. Kosciuk                    67

1

2         the beginning of Disk 2.  You may

3         proceed.

4         Q    So let's get back to

5    September 7, 1988.  I think where we left

6    off is that you had arrived at the crime

7    scene at about 8:00, you saw McCready but

8    you were waiting in your car for people from

9    the identification unit to arrive; is that

10   right?

11        A    My people and identification

12   people.

13        Q    And you said McCready had gone

14   off to do his business, correct?

15        A    Right.

16        Q    Mr. Tankleff is now in the room

17   at this point; do you see him?

18        A    I do recognize him.  I don't

19   have my long-distance glasses.

20        Q    Did you see him there that day

21   when you arrived?

22        A    Early in the morning at

23   one point, yes, I did.

24        Q    When you say McCready went off

25   to do his business, I could show you in his

C. Kosciuk                    68

1

2     deposition where he indicates that he made

3     two walk-throughs of the crime scene.

4             A     Okay.

5             Q     Does that refresh your

6     recollection, in any way, of McCready

7     telling you that he had walked through this

8     crime scene?

9                   MR. MITCHELL:  I object to the

10            form.  You can answer.

11            Q     Any recollection of that?

12            A     I don't know.  Did he do it by

13    himself?  Did he say I did it with him?

14            Q     No, no, he personally did it.

15            A     I don't know.

16            Q     That's the question I'm trying

17    to ask you.

18            A     I don't know what he's calling

19    the walk-through neither.  I know what I

20    call the walk-through.

21            Q     What do you call the

22    walk-through?

23            A     Where Sergeant Doyle, myself,

24    and Sergeant Fini from the Identification

25    Section led by me we entered through the

1                           C. Kosciuk              69

2    front door and I cleared a path first to

3    Mrs. Tankleff's room and then down across

4    the house through the office area so that

5    way ID can photograph and video of the

6    scene.

7           Q     Let's just take it in order as

8    best you recall.  So you don't know what

9    McCready did when he left to "do his

10   business" and you were waiting in the car;

11   is that correct?

12          A     That's correct.

13          Q     Okay.  So what's the next thing

14   that you remember doing?

15          A     With McCready?

16          Q     No, yourself.  I have you in

17   the car?

18          A     I waited in the car and prior

19   to Laboratory and Identification Section

20   walk and Homicide walking through prepping

21   the scene for the Identification Section

22   McCready and I walked the perimeter of the

23   backyard.

24                There was grass -- There was a

25   dewy situation so by walking the perimeter

C. Kosciuk                    70

1  of the backyard we eliminated any footwear

2  or tracks leading away from the house which

3  immediately would show in the dew as ours

4  did.

5          Q     All right.  And you did this

6  walk-through around when?

7                MR. MITCHELL:  The walk around

8          the house, you mean?

9                MR. SCHECK:  Yes.

10  A     That morning.

11  Q     But you arrived at 8:00?

12  A     I don't have a time.  I can't

13  recall what time that was.  I just remember

14  doing that.

15          Q     Okay.  But if it helps, you

16  began your walk through of the house at

17  around 9:30?

18          A     That's right it would be before

19  that.

20          Q     So about just a few minutes

21  before that you would say?

22          A     I don't remember exactly.

23          Q     So when you did this walk

24  around the house with McCready, did he share

C. Kosciuk                      71

1

2   with you at that time any of his

3   observations about what was inside the

4   house?

5          A      No.

6          Q      Did he talk with you about his

7   suspicions that Mr. Tankleff might have

8   killed his parents?

9          A      No.

10         Q      Did he ever share with you that

11  one of his suspects right away was Mr.

12  Tankleff?

13         A      No.

14         Q      He never said anything like

15  that to you?

16         A      No.

17         Q      So you did the walk-through and

18  McCready never expressed any suspicions to

19  you about Mr. Tankleff, correct?

20         A      That's correct.

21         Q      And he never told you anything

22  about what you were going to find inside the

23  house?

24         A      McCready, I don't believe so.

25  Sergeant Doyle advised us that Mrs. Tankleff

C. Kosciuk                              72

1

2    was still in the house.

3          Q    When did Doyle arrive at the

4    scene to the best of your recollection?

5          A    I don't remember.  You would

6    have to check the log.

7          Q    Okay.  So you remember doing

8    this walk around the house with McCready,

9    then what happened next?

10         A    Then I waited.

11         Q    Tell us everything you can

12   remember from that morning in the order in

13   which it happened.

14         A    I waited for the Identification

15   Section and the rest of the lab personnel.

16         Q    Just if you can name them that

17   would be helpful?

18         A    I thought we did that already.

19         Q    Keep on doing it.

20         A    Okay.  It was Robert Baumann,

21   the serologist, forensic scientist from the

22   crime lab and forensic scientist George Reif

23   from the crime lab.  That was the crime

24   scene team that day.  And then from ID was

25   Sergeant Fini, Detective Schaefer and

C. Kosciuk                73

1    Detective Mongan, I believe it is.

2             Q      So they all arrived?

3             A      Right.

4             Q      Then what happened?

5             A      And then at 9:30 with Sergeant

6    Doyle we entered through the front door.

7    I'm clearing the way into the bedroom.  I

8    told them don't go any further than about

9    four feet into the master bedroom.

10            Q      Now, when you are assembling

11   this team to do this, this is your

12   walk-through, right?

13            A      Yes.

14            Q      It's your walk-through,

15   correct?

16            A      Yes.

17            Q      What did Sergeant Doyle, at

18   this point, tell you, if anything, about

19   whether Mr. Tankleff was a suspect or

20   anything that he and/or McCready were

21   thinking about how this crime might have

22   occurred?

23            MR. TIPALDO:  Objection to

24       form.

25

C. Kosciuk                74

1    A    Not to my knowledge, never

2    discussed it.

3    Q    Nothing was ever discussed like

4    that?

5

6    A    No.

7    Q    Did you learn between the time

8    you arrived at 8 o'clock and the time you

9    were doing the first walk-through at 9:30

10   that Martin Tankleff himself had said that

11   he believed that Jerry Steuerman was

12   responsible for this murder?

13   A    I can't answer that.  I don't

14   remember if that ever came up.  I know the

15   name Steuerman came up sometime during the

16   day, but I don't know what time.

17   Q    Do you remember being told

18   before you made this walk-through that there

19   had been a card game the night before?

20   A    Yes, I think so.  Yes.

21   Q    That would be relevant to your

22   evaluation of the crime scene?

23   A    Yes, but exactly what time I'm

24   not sure.  My purpose at that time was to

25   clear a path for the Identification Section

C. Kosciuk                    75

1    so they would not trample any physical

2    evidence while they do the video of the

3    scene and then still of the scene to

4    document it as we find it at that time.

5         Q     Had Doyle, to your knowledge,

6    been through the scene before you were doing

7    this walk-through at 9:30?

8         A     I can't answer that.  I don't

9    know.

10        Q     Okay.  So tell us what you all

11   did.

12        A     That's what we did.

13        Q     You started by saying going

14   into the master bedroom.

15        A     Right.  We entered through the

16   foyer.  We went down the hall east.

17        Q     You're pointing here --

18        A     Well, I'm not pointing I was

19   just --

20        Q     I thought -- I'm sorry.

21   Exhibit 1 is the model, right?

22        A     Right.

23        Q     Now, can you show us on this

24   model.  I think it says Plaintiff's

C. Kosciuk                    76

1

2     Exhibit 1 the right-hand corner, right?

3          A     Yes.

4          Q     And in the far left of the

5     picture that is the master bedroom where

6     Arlene Tankleff's body was, correct?

7          A     Yes.

8          Q     All right.  So could you --

9          A     You want me to hold it up to

10    the camera?

11         Q     Yes, I'll try to --

12         A     I'll try to do it backwards.

13              MR. SCHECK:  Can you get him

14         tight on that?  I don't know.

15              THE VIDEOGRAPHER:  Yes.

16         A     We entered through the front

17    door.

18              MR. SCHECK:  Can you see that?

19              THE VIDEOGRAPHER:  You have to

20         hold it up.

21         A     Then I can't see.

22              THE VIDEOGRAPHER:  Just for a

23         couple of seconds.

24         A     We went through the front door.

25    We went down the hallway and we looked into

C. Kosciuk                    77

1

2      the master bedroom which is in white.  They

3      went up as far as approximately four feet in

4      and I said, stop there.  Don't go any

5      further into the room until we can clear a

6      path later on.  Then we pulled out, we went

7      through the dining room and over to the

8      office area which is way over here.  We cut

9      through here, the hallway (indicating).

10               Q     Did you go through the kitchen

11     at that time?

12               A     We might have gone through the

13     living room and the kitchen -- I can't

14     remember exactly now -- and came out -- We

15     were heading towards the office area.  It's

16     hard to see the hallways here, but I believe

17     we did do something like that.  Come down

18     this hallway and then you can cut through

19     here where the red carpet is and enter the

20     office area.

21               Q     And the office area is where

22     Mr. Tankleff's body was?

23               A     That is correct.

24               Q     Now, you had already been told

25     where the bodies were, correct?

C. Kosciuk                78

1

2      A     I believe Sergeant Doyle had

3   known that, yes.

4      Q     Because Sergeant Doyle was

5   telling you where to go first and where to

6   go second, correct?

7      A     Yes.  I guess we knew that.

8   Well, he did say that she was in the master

9   bedroom but we ended up going towards the

10  master bedroom and he would probably have

11  directed us that way.

12     Q     And you don't remember anything

13  that Doyle told you about whether he had

14  suspicions at that time that Mr. Tankleff

15  might have committed this crime?

16     A     No.

17           MR. TIPALDO:  Objection to

18           form.

19     Q     Were you aware that Mr.

20  Tankleff, Marty Tankleff, was going to be

21  taken in for questioning?

22           MR. MITCHELL:  I object to the

23           form.  You can answer.

24     A     No.

25     Q     But you did become aware at

C. Kosciuk                    79

1    some point in time that he had been brought

2    in for questioning and that he had given a

3    confession?

4                MR. MITCHELL:  I object to the

5           form.  You can answer.

6          A    I'm trying to think.  I think

7    late, late that evening I did find out that

8    they placed him under arrest.

9          Q    While we're getting these

10   notes, so you went through and did this

11   first walk-through, correct?

12         A    Yes.

13         Q    And you said you only went a

14   few feet into the master bedroom, correct?

15         A    Correct.

16         Q    But you were able to see the

17   body of Arlene Tankleff?

18         A    No.

19         Q    Were you able to see the bed?

20         A    I could see the bed and I

21   believe you could see her head.

22         Q    Okay.  And then, you took the

23   path you described and went into the office,

24   correct?

C. Kosciuk                80

1

2          A     Correct.

3          Q     What did you do next?

4          A     Then we all backed out of the

5    house and we allowed ID to do the video and

6    all the stills of the house which they did

7    and completed about 2 o'clock.

8          Q     Okay.  Now, at this point in

9    time, was Detective Doyle, to the best of

10   your understanding, the detective that was

11   in charge of this crime scene, homicide

12   detective?

13         A     He was the sergeant I was

14   dealing with, yes.

15         Q     All right.  And now I'm going

16   to mark as Exhibit 2 for identification

17   here, steno book notes from Detective Doyle

18   which would be SCDA 2699 through 2715.

19               (Whereupon, Plaintiff's Exhibit

20         2 was marked for identification.)

21               MR. MITCHELL:  Sure.

22         Q     Now, would it be fair to say

23   that while at the crime scene, as the

24   homicide detective on the scene, Doyle had

25   a -- it would be standard practice to have

                                   C. Kosciuk              81

1    the steno book and to write contemporaneous

2    notes about what was happening when it was

3    happening, correct?

4          A    Yes.

5          Q    That was the normal way it

6    worked, correct?

7          A    Yes.

8          Q    That would be the

9    responsibility of Doyle at this particular

10   crime scene as you understood it?

11         A    I don't know what his

12   responsibilities were at that crime scene.

13   He was the supervising sergeant.

14         Q    Right.  And as far as you know

15   on the homicide detective side, he was the

16   person that I think your termed you were

17   working with, correct?

18         A    Yes.

19         Q    Right.  And so --

20         A    One of the homicide personnel

21   present.

22         Q    Well, who else?

23         A    I stated that before.  There

24   was Detective Legazza, Detective Anderson,

C. Kosciuk                    82

1
2    Detective Pfalzgraf at that time, I believe,
3    and Detective Bonds.
4          Q     Right.  But as far as you knew
5    it was Doyle who was the person that seemed
6    to be in charge from the Homicide point of
7    view of the crime scene, the person you were
8    working with?
9               MR. MITCHELL:  I object to the
10          form.  You can answer.
11         Q     I think you just told us that;
12    didn't you?
13         A     We work with all of them but he
14    was the senior homicide detective.
15         Q     So it would be fair to say that
16    he was the person that you were taking
17    direction from in terms of homicide?
18         A     No, we take direction from all
19    the Homicide personnel.
20         Q     He was the senior guy on the
21    scene?
22         A     Yes.
23         Q     Now, I'll ask you to turn to
24    Page 2713.
25         A     (Complying.)

C. Kosciuk                83

1

2      Q     And you see that he has a note

3  at the top of this page.  "Per McCready

4  12:28."  Do you see that?

5      A     Yes.

6      Q     And it reads, "Martin Tankleff

7  confessed then cut (underlined) mother's

8  throat, cut father's throat with the knife

9  that's near the watermelon in the kitchen,"

10  (and knife is underlined and near the

11  watermelon in the kitchen is underlined)

12  right?

13      A     Yes.

14      Q     "Did mother first, hit him with

15  a," (and then it says, it appears to be a

16  barbell crossed out) and then it says, "the

17  bar part of a dumbbell (underlined), it is

18  in his room.  He was nude, (underlined.)

19  Said he took a shower in the --

20          MR. MITCHELL:  Bath.

21      Q     -- hall bath near his room."

22  You see that?

23      A     Got it.

24      Q     And then it has with an

25  asterisk and underlined "check the traps!"

1                          C. Kosciuk            84

2          A     Yes.

3          Q     And it says, "check the

4    toilets."  Toilets underlined.  "Says he

5    washed everything off in the shower."  And

6    then there is an arrow towards that line,

7    the shower, and then it says, "hall bath.

8    He called 911 from his mother's phone

9    (mother is underlined).  "Look for blood on

10   phone."  And then at the bottom it says, a

11   line going to mother's it says, "her

12   bedroom," correct?

13         A     Yes.

14         Q     And then if you go -- It's

15   double-sided and it says, "confessed as of

16   11:56.  Will start written after they get

17   photo," and then there is an asterisk, "has

18   blood on his shoulder."  Next it says, "Will

19   probably go on video."  And then it has,

20   "One.  Linen closet.  Two.  Marty's bedroom

21   for blood and dumbbell.  Talk to Jabo."  Who

22   is Jabo?

23         A     I don't know.

24         Q     You remember a district

25   attorney named Jabo being around there or

```
 1                          C. Kosciuk          85

 2   involved?  You ever hear of him?

 3            A     No.

 4            Q     "Garage doorknob" is number

 5   three.  Number four, "list on refrigerator"

 6   and number five, "knife near watermelon;"

 7   you see that?

 8            A     Yes.

 9            Q     Now, having looked at this --

10            MR. MITCHELL:  Barry, you did

11       misspeak regarding you said also

12       check you said the toilets.  It's my

13       impression that word says towels.

14            MR. SCHECK:  Towels.  I take

15       your correction.  Thank you very

16       much.

17            MR. MITCHELL:  Okay.

18            Q     Does this refresh your

19   recollection that sometime around 12:28 on

20   September 7, 1988 you were informed by

21   Detective Doyle or one of the other

22   detectives that Mr. Tankleff had confessed

23   and there were certain -- and these details

24   that I have gone over with you were part of

25   his confession?
```

C. Kosciuk                86

1
2          MR. MITCHELL:  I object to the
3       form.
4          MR. TIPALDO:  I join.
5    A     No.
6    Q     You don't remember?
7          MR. TIPALDO:  Objection.
8    A     First of all, I don't know
9 where Sergeant Doyle is when he's writing
10 these notes.  I don't even know if he's at
11 the scene.  I don't know where he is.
12   Q     Well, you see here that these
13 notes are at 12:28?  I'm asking you?
14   A     Yeah, but I know there was no
15 phones used in the house.
16          MR. MITCHELL:  Detective, he is
17       just asking if it refreshes your
18       recollection, his question.
19   A     Repeat the question.
20   Q     Does it refresh your
21 recollection that sometime around 12:28 you
22 heard from Sergeant Doyle or any other
23 detective at the crime scene that Mr.
24 Tankleff had given a confession and that
25 requests were being made to check certain

C. Kosciuk                87

2  evidentiary items in the house, right, given

3  what he said in his confession?

4          A    I don't remember any of that.

5  I don't remember finding out until later on

6  that day Friday evening that these items

7  were involved.  And I can't remember if Mr.

8  Tankleff or anybody told me that he

9  confessed.

10         Q    Well, so you're --

11         A    That would be dealing more with

12  Homicide and I don't know if they would

13  advise us of that as we're proceeding

14  through the scene processing it.

15         Q    Wouldn't it be part of the

16  ordinary course of business when

17  investigating a homicide case for you as the

18  person in the crime lab that was doing

19  reconstruction and blood spatter analysis in

20  1988 to be informed by the homicide

21  detectives as to their hypothesis about how

22  the crime might have happened?

23              MR. MITCHELL:  I object to the

24         form.  You can answer.

25              MR. TIPALDO:  I join.

C. Kosciuk                    88

A     I guess that would depend on
the detective.  A lot of homicides we're not
told everything, no.

Q     You know that Mr. Tankleff gave
a confession that was written down to
Sergeant McCready at around 11:00 that
morning?

A     No.

Q     Well, you recall that you were
directed during the day by Detective Barnes,
the scene detective, to check particular
areas within the house?

A     Yes.

Q     Tell us how and when that
happened?

A     That evening late after we are
finished and just before we responded back
to the lab, so it would have been somewhere
around 8:00 to 8:30 that evening we were
advised to pick up the items that you
discussed here.

Q     Which items, the ones that I
just recited as part of the confession?

A     Right, yes.

                              C. Kosciuk              89

          Q      Well, let's approach it this

way.  So you say that after 2 o'clock

Identification had finished photographs and

videotaping the crime scene; is that right?

          A      That's correct.

          Q      And then your work began?

          A      Yes.

          Q      So what did you do?

          A      At 2 o'clock we proceeded into

the master bedroom.

          Q      Who is we?

          A      We would be Detective Reich and

Detective Forensic Scientist -- not

Detective Reich.  Forensic Scientist Reich

and Forensic Scientist Bob Baumann.  We

proceeded into the master bedroom and

started to clear or collect items of

physical evidence that we felt were

pertinent to the scene.  We placed evidence

tapes on those items and we proceeded to

remove any physical evidence that might be

damaged if anyone moves the victim.

          Q      You said you were collecting

items of evidence that you thought were

C. Kosciuk                    90

1
2    relevent to the scene, correct?

3         A    Yes.

4         Q    And how were you determining

5    what was relevent to the scene?

6         A    Loose hairs, obviously anything

7    that we felt was not in place or out of

8    place at that scene.  Hairs, broken hairs,

9    anything that could be moved or destroyed

10   when Mrs. Tankleff was taken by the

11   medical -- or examined by the medical

12   examiner and then taken by the medical

13   examiner.

14        Q    And are you telling us that

15   prior to learning -- I think you said about

16   8 o'clock -- that there were certain items

17   that you should inspect and collect that no

18   homicide detective told you anything about

19   their theory that Mr. Tankleff, Martin

20   Tankleff, had committed this crime and the

21   way in which he committed?

22             MR. MITCHELL:  I object to the

23        form.  You can answer.

24        A    No.

25        Q    So you were deciding what was

C. Kosciuk                91

relevant at the crime scene for you to

identify and collect without any knowledge

of Martin Tankleff's confession?

A      That's true.  Yes.

Q      Okay.  So tell us what you did.

You first went where?

A      I thought we just did that.  We

went into the master bedroom.  We collected

items of physical evidence, hairs, and

anything that could be destroyed prior to

the medical examiner entering the room and

removing Mrs. Tankleff.

Q      Okay.  Now, let me just show

you a few photographs.  Let's start with of

the master bedroom.

MR. SCHECK:  Let's mark this

as -- Maybe the smart way to do this

so we can refer back to these things

is let's mark a series of

photographs and let's put an exhibit

number on them as Exhibit 3.

Let me mark this as Exhibit 3

and then I will number each

photograph, each of these copies of

C. Kosciuk                    92

1
2         photographs, and we'll try to --
3         I'll mark them in the bottom
4         right-hand corner.
5              THE VIDEOGRAPHER:  Going off
6         the record at 12:08 p.m.
7              (Whereupon, Plaintiff's
8         Exhibits 3 through 7 were marked for
9         identification.)
10             THE VIDEOGRAPHER:  Back on the
11        record at 12:25 p.m.  You may
12        proceed.
13        Q     Now, we've marked a series of
14   exhibits here that we're going to go
15   through, Detective.
16             Exhibit 3 were photographs of
17   the master bedroom, Exhibit 4 were three
18   photographs of the kitchen area and the
19   so-called watermelon knife, and Exhibit 5
20   were photographs of the office.  Exhibit 6
21   that we'll get to in a few minutes is a
22   supplemental report by James McCready.
23             And now, Exhibit 7, which may
24   help you, is a report from a Kenneth
25   Christopherson, a special agent, dated

C. Kosciuk                93

1   July 21st, 2008 concerning an interview that

2   was conducted with you at your home by

3   Special Agent Gerald Blavin and Special

4   Agent Christopherson on July 17, 2008.  I'll

5   given you that right now.

6

7              This is the interview that we

8   were talking about before when the State

9   Investigation Commission came and spoke to

10  you about this case in 2008, right?

11             A     Eight, yes.

12             Q     That was -- I think you told us

13  before, other than talking with Mr. Mitchell

14  in preparation for this deposition a few

15  days ago, that's the last time that you ever

16  discussed in any detail or reviewed this

17  case with anyone, correct?

18             A     He does not say where this took

19  place.

20             Q     Look at the very beginning.

21             A     At his home.  I got it.  Okay.

22             Q     That's your home, right?

23             A     Yes.

24             Q     We won't mention the address.

25  That's secret.

C. Kosciuk                94

1
2          Now, just calling your

3   attention now to Page 2 of Exhibit 7, and

4   it's right under crime scene, there's a

5   notation here that -- and I'm starting in

6   the middle of the second paragraph on the

7   page.  "Kosciuk stated that while he was

8   waiting for the identification unit

9   personnel to arrive he was approached by

10  Myron Fox who introduced himself as

11  Tankleff's family attorney and offered his

12  business card.  Kosciuk said that he did not

13  accept the card and referred Fox to speak to

14  Detective McCready."  Do you now recall that

15  happening?

16       A    Yeah, I do but I think he said

17  business attorney.

18       Q    Okay.  That was something that

19  when we were discussing what happened you

20  seemed to have forgotten here, correct?

21            MR. MITCHELL:  I object to the

22       form.  You can answer.

23       A    Yes.

24            MR. TIPALDO:  I join.

25       Q    And then you say here on

C. Kosciuk                    95

1    Exhibit 7, "Kosciuk did not recall the

2    particulars but he later learned through

3    "the grapevine" that Fox was caught "dumping

4    paperwork" in connection with this case."

5               Can you explain what that

6    means?

7               MR. MITCHELL:  I object to the

8          form.  You can answer.

9          Q    To the best of your knowledge?

10         A    I was called to court to

11   testify about Mr. Fox being there.  That was

12   in question and I don't know who I was

13   talking to but that was the reason that we

14   were there, that he denied being there and

15   something about he was caught destroying

16   files or something to that affect or dumping

17   paperwork.

18         Q    This was at or around the time

19   of trial?

20         A    Yeah, right before the trial.

21         Q    Okay.  Now --

22         A    This trial?

23         Q    This trial, the trial with Mr.

24   Tankleff.

C. Kosciuk                96

1

2          A    No, when ever I had that

3    hearing with Mr. Fox.

4          Q    I'm sorry.  In other words,

5    you're saying that this reference to Mr. Fox

6    "dumping paperwork" in connection with this

7    case had to do with the State

8    Investigation's Commissioner investigation

9    of 2008; is that what you're saying?

10              MR. TIPALDO:  Just note my

11              objection.  It could be a number of

12              different things.

13              MR. SCHECK:  I'm asking you.

14         A    I have no idea what paperwork

15   they were talking about.  I actually was

16   called into court to testify that Mr. Fox

17   was at the Tankleff scene and that he handed

18   a business card, which I told him that I'm

19   not the investigating officer, go up and see

20   Detective McCready.

21         Q    Was that testimony before the

22   criminal trial having to do with the motion

23   to suppress?

24         A    Yes.

25         Q    That's what I understood your

C. Kosciuk                97

1    answer to be.  That was okay.

2              Now, looking at the third

3    paragraph on this page, the report, you

4    said, "he stated --

5         A    Wait, I'm lost.  Page 3 or 2.

6         Q    Page 2.

7         A    Got it.

8         Q    All right.  After the

9    identification unit came to the scene, set

10   up their cameras and they took the first

11   videos of the crime scene, okay, included by

12   taking still photographs at 11:31 a.m. --

13   I'm reading exactly, "subsequently,

14   laboratory members photographed and assigned

15   tag numbers to each item of evidence

16   collected.  He added that all the evidence

17   was segregated throughout the crime scene

18   and laboratory tags were placed on items

19   numbered 1 to 44.  He added that Bob Genna,

20   the crime lab director was present at the

21   scene and "did forensics" on the interior

22   walls and all related matter."  Do you see

23   that?

24        A    Yes.

C. Kosciuk                    98

1
2       Q    Does that refresh your

3  recollection as to what happened on

4  September 7, 1988?

5       A    I do remember Genna there but I

6  don't know what time he got there or what.

7  At that time he was the deputy director of

8  the laboratory or maybe -- No, no, I don't

9  think he was in '88.  He was a trace

10 evidence person, trace evidence expert.

11      Q    Do you know what -- You're

12 quoted as saying "did forensics" on the

13 interior walls, what does that mean?

14      A    What we're looking at here is

15 just general.  I'm just talking to the

16 investigator.  It was just conversation.

17      Q    Okay.

18           MR. MITCHELL:  I just need to

19      clarify something.  I may be

20      nitpicking but you said he was

21      quoted here as "did forensics on the

22      interior walls," and I know the

23      document speaks for itself but that

24      the quote is only around the words

25      "did forensics."

C. Kosciuk                99

1

2       MR. SCHECK:  That's correct.

3       MR. MITCHELL:  And then, on the

4       interior walls and related matter is

5       not attributed to the quote to

6       Detective Kosciuk.

7       MR. SCHECK:  Yes, that's

8       correct.

9       Q    Let me see if I understand this

10  directly in terms of the chain of command at

11  the crime lab.  On September 7, 1988, did

12  you report to Bob Genna?

13      A    No.

14      Q    Who did you report to?

15      A    At that time in '88 it's either

16  Mr. Varinelli or Mr. Crispino was a

17  director.  I can't remember which.  I think

18  '88 Varinelli was but I'm not positive.

19      Q    And Vince Crispino was head of

20  the crime lab?

21      A    Yeah, also.  And I'm trying to

22  think what exactly year he took over and I

23  can't remember.

24      Q    In terms of eventually you

25  testified for the prosecution in the

C. Kosciuk                100

1
2    criminal case, correct?

3           A     Yes, I did.

4           Q     All right.  And you never

5    filled out any reports prior to your

6    testimony about your analysis of the blood

7    spatter, correct?

8                 MR. MITCHELL:  I object to the

9           form.  You can answer.

10          A     No, I never wrote a report.

11          Q     That wasn't the practice of the

12   crime lab that when you did a blood spatter

13   analysis you would write out a report about

14   what your findings were?  It did not work

15   that way, right?

16                MR. MITCHELL:  I object to the

17          form.  You can answer.

18          A     There was no report written

19   about the -- In the office area, the cast

20   off?

21          Q     Yes.

22          A     No.

23          Q     You only testified at the

24   criminal trial about your blood spatter

25   interpretation of blood spatter patterns in

C. Kosciuk                101

1
2    the office, correct?

3            A     Yes.

4            Q     You did not testify about any

5    blood spatter patterns or any reconstruction

6    of what went on in the master bedroom where

7    Arlene Tankleff was found; did you?

8            A     No.

9            Q     Okay.  Now, how did it come --

10   Can you describe for me how it came to pass

11   that you wound up offering your blood

12   spatter testimony at this trial?  How did

13   that evolve?

14                 MR. MITCHELL:  I object to the

15           form.  You can answer.

16           A     It evolved because I was the

17   senior investigator at that time from the

18   laboratory at the scene.  We knew, first of

19   all, that the desk and the chair were moved

20   by emergency services.

21           Q     When you say "we" --

22           A     Members of the laboratory, Mr.

23   Baumann and George Reich, were pushed aside

24   so to look to try to attempt to see what

25   happened, at that time, we moved the desk

C. Kosciuk                    102

back to its original position and lined the

chair up based on blood dripping from the

chair and the spatters on the chair and also

the impressions on the rug.

　　　　　　And then looking to the ceiling

it was quite obvious that there was one

stroke or bludgeon or castoff in a northerly

direction from south to north and then from

behind the chair about two casts at slightly

different directions but originating from

the chair onto the ceiling indicating that

that originated from the chair.

　　　Q    I understand you documented

that and you made that interpretation,

correct?

　　　A    Right.

　　　Q    Now, did you make that

interpretation that day or some subsequent

day after examining the photographs?

　　　A    No.  That would be the second

day we're there.  I believe that was -- You

know, I can't remember if that was that day

or the next day, Thursday.  We were also

back at the scene the next day.

C. Kosciuk                          103

1

2      Q     Who did you report that to if

3   that was your interpretation of the blood

4   spatter pattern in the office?

5      A     Well, the Homicide scene

6   officer was there and at that time I'm not

7   sure who it was.  It was either Detective

8   Pfalzgraf or Detective Bonds or one of them.

9   I can't remember who was doing their notes.

10     Q     But did somebody ask you to do

11  that reconstruction?

12     A     No, I did it on my own.

13     Q     Is there any -- Did you ever do

14  a reconstruction looking at blood spatter of

15  what you thought happened in the master

16  bedroom?

17     A     I'm sorry.  Repeat that.

18     Q     Did you ever do a

19  reconstruction of what you thought happened

20  in the master bedroom?

21     A     No.

22     Q     Why not?

23           MR. MITCHELL:  I object to the

24           form.  You can answer.

25     A     We didn't.

C. Kosciuk                    104

1

2      Q    Well, in the ordinary course of

3  your work at the Suffolk County Crime Lab

4  doing crime scenes, was it your practice to

5  look at the different crime scenes and

6  formulate as best you could an

7  interpretation of the blood spatter pattern

8  and then communicate it to the homicide

9  detectives?  Is that what the standard

10 practice was?

11     A    Looking into the bedroom on the

12 bed there was no castoff except there was

13 one stain on the --

14     Q    I'm asking a different

15 question.

16     A    Wait, wait.  I'm trying to

17 explain to you.

18     Q    No, no, no, I'm asking about

19 what the custom and practice was in 1988.

20 You see what I'm saying?

21     A    Oh.

22     Q    Ordinarily, when you respond to

23 a crime scene as the blood spatter expert,

24 was it your custom and practice to report to

25 a homicide detective or Vince Crispino or

C. Kosciuk                    105

1    anyone in the chain of command at the crime

2    lab what you're interpretation was?

3

4         A    No.  Along with us at the scene

5    is a homicide detective and the ID members

6    are all present while the laboratory is

7    there.

8         Q    So it was your custom --

9         A    The homicide detective, if

10   there are any notes, he would be taking

11   those notes down.

12        Q    But as far as -- So in the

13   ordinary course of practice you would arrive

14   at a homicide scene, you would document the

15   blood spatter, and then you would

16   communicate orally to the homicide detective

17   what your reconstruction was, your

18   interpretation of the scene based on the

19   blood spatter?

20             MR. MITCHELL:  I object to the

21        form.  You can answer.

22        Q    Is that the way it would work?

23        A    No, because not at every scene

24   we would do a blood spatter analysis.

25        Q    How would you decide whether or

1                           C. Kosciuk              106

2    not to do a blood spatter analysis?

3          A     In cases where there is no

4    known defendant or nobody about that --

5    Actually there was no rules.  There are no

6    rules.  We had no rules at that time.

7          Q     At that time.  But now, in this

8    case, when, for the first time, did you tell

9    anyone, to the best of your recollection,

10   what your interpretation or reconstruction

11   was of blood spatter in the office where

12   Seymour Tankleff had been found?

13         A     While we were putting the desk

14   and the chair and aligning it the lab

15   personnel, the Homicide and the ID people

16   were all present and by looking at the

17   ceiling it was quite obvious that you could

18   determine that the spatter originated from

19   the desk in a northerly direction and then

20   from an easterly direction about two times

21   because it was angular.

22         Q     But you testified at the

23   criminal trial that somebody was behind

24   Seymour Tankleff, right, and used a blunt

25   force instrument to strike a number of blows

C. Kosciuk                107

1  on his head from behind the chair, correct?

2       A       Consistently.

3              MR. MITCHELL:  I object to the

4              form.  Wait a second.  I object to

5              the form regarding his testimony at

6              the criminal trial and your

7              characterization of it.

8              I don't know if you have it,

9              but the proper way to ask is, were

10             you asked this question and did you

11             give this answer.

12      Q      We can go over the specifics of

13  it but let me just see if I -- Your

14  interpretation that you testified to at the

15  criminal trial as to how the blows were

16  inflicted to Seymour Tankleff and where they

17  were inflicted from, that was something that

18  you formulated the second day as you were

19  taking the measurements?

20      A       Whatever day the photographs

21  were taken of the ceiling of the blood

22  castoff that was the day that we formulated

23  that opinion.

24      Q      When you say "we," it would be

C. Kosciuk                          108

1  you and Bob Genna?

2       A     Bob Genna and George Reich and

3  myself, yes.  And not the homicide detective

4  they would just be standing around.

5       Q     Right.  So you, Genna, Reich,

6  and Barnes, and who else, I'm sorry?

7       A     Baumann.

8       Q     Right.  Would talk together to

9  do the reconstruction of the blood spatter

10 in the office and then when you reach your

11 conclusion you communicated that to the

12 homicide detectives; is that right?

13      A     I'm not sure if we communicated

14 or he was just there and was able to hear

15 it.

16      Q     You don't remember who that

17 homicide detective was?

18      A     No, I can't remember that day.

19      Q     Do you remember when you

20 were -- After formulating this at the scene

21 as you were taking the photographs and doing

22 the measurements, do you remember the next

23 time, as best you can recall, that you were

24 asked to discuss your reconstruction of what

C. Kosciuk                    109

1
2    happened in the office?

3           A       Probably prepping for trial.

4           Q       To the best of your

5    recollection, did the interpretation that

6    your team made when you were taking the

7    photographs and doing the measurements at

8    the crime scene about the blood spatter

9    reconstruction in the office, was that

10   communicated to Vince Crispino through the

11   chain of command; do you know?

12          MR. MITCHELL:   I object to the

13          form.   You can answer.

14          A       I doubt it.

15          Q       So to the best of your

16   recollection this was something that was

17   said to the homicide detectives at the scene

18   and then later prior to the trial you met

19   with the district attorney to explain your

20   interpretations; is that what happened?

21          MR. MITCHELL:   I object to the

22          form.   You can answer.

23          A       Yes.

24          Q       You knew that this was a pretty

25   big case from the time you arrived at the

1                           C. Kosciuk              110

2    crime scene, right?

3           A     All homicides are big cases.

4           Q     I understand, but you knew this

5    was a highly publicized case?

6           A     No, it was not publicized.

7    Nobody knew about it.

8           Q     Did you ever examine the

9    photographs and the measurements and the

10   serological results in the master bedroom to

11   formulate a blood spatter interpretation of

12   the homicide of Arlene Tankleff?

13          A     No.

14          Q     Why not?

15               MR. MITCHELL:   I object to the

16          form.   You can answer.

17          A     Because it was apparent that

18   there was a struggle.   There was no castoff

19   except for one little microdot on the east

20   wall of the bedroom on the opposite side of

21   the bed, and with all the struggling that

22   went on no attempt was made to -- it was

23   obvious that there was a tremendous struggle

24   on the bed and off to the floor and around

25   the north side of the bed so no attempt was

C. Kosciuk                111

1

2     made to reconstruct that.

3           Q    Are you telling us that at no

4     time in the two days that you were

5     processing this crime scene that a homicide

6     detective did not say to you, in substance,

7     here are the details of what Mr. Tankleff

8     confessed to and let's see if the blood

9     spatter pattern at the scene is consistent

10    or inconsistent with his confession?

11               MR. MITCHELL:  I object to the

12          form.  You can answer.

13          A    No.

14          Q    Well, wouldn't you agree that

15    one of the functions of a blood spatter

16    expert or crime scene reconstruction person

17    is to test a hypothesis about how the crime

18    occurred against the objective physical

19    evidence to see if the objective physical

20    evidence is consistent or inconsistent?

21               MR. TIPALDO:  Objection to

22          form.

23          A    No request was ever made.  You

24    mean after the scene using the photographs?

25          Q    I asked you -- My question

C. Kosciuk                112

1   is --

2        A     At the scene?

3        Q     -- isn't it the function --

4   Don't you ordinarily, as a blood spatter

5   expert, right, take a look at the evidence

6   of the crime scene, the photographs, the

7   measurements when you get them all in, any

8   results you get from the crime lab, and sit

9   down and take a look at all of that evidence

10  and see whether a hypothesis that is being

11  made by, let's say, police, the homicide

12  detectives, is consistent or inconsistent

13  with the objective physical evidence?  Isn't

14  that what a blood spatter expert does?

15       A     We had no hypothesis.  It was

16  an obvious struggle.

17       Q     I'm not asking in this case.

18  In general, isn't that what you do as a

19  blood spatter expert?

20            MR. MITCHELL:  I object to

21       form.  You can answer.

22            MR. TIPALDO:  I join.

23       A     If requested.

24       Q     So nobody ever requested that

C. Kosciuk                    113

1

2    you do a blood spatter analysis of what went

3    on in the master bedroom, correct?

4           A     That's correct.

5           Q     Nobody ever requested from the

6    homicide detectives that you take a look at

7    the confession made by Mr. Tankleff and see

8    whether it can be confirmed or not confirmed

9    by the objective physical evidence?  Nobody

10   ever asked you to do that?

11          A     No.

12          Q     No district attorney ever

13   discussed that with you?

14          A     No.

15                MR. MITCHELL:  I object to the

16          form.  You can answer.

17          Q     Is that right?

18          A     That's right, no.

19          Q     Okay.  Now, I think you said a

20   minute ago -- Why don't we turn now to the

21   pictures of the master bedroom for a minute,

22   okay.

23          A     (Complying.)

24          Q     And that, I think, we've marked

25   as Exhibit 3.  Let me call your attention

C. Kosciuk                    114

1

2       to -- You've looked through these, have you

3       not, just a few minutes ago?

4               A     Yes.

5               Q     Now, do you remember going

6       through these pictures, by the way, in 2008

7       with the representatives from the State

8       Investigation Commission?

9               A     No.

10              Q     Now, let's just turn to

11      photograph number 14.  Do you recognize that

12      to be the side of the bed?

13              A     Yes.

14              Q     All right.

15              A     Master bedroom.

16              Q     In the master bedroom.  Do you

17      see on the pillow here or anywhere in this

18      photograph medium velocity blood spatter?

19                    MR. MITCHELL:  I object to the

20              form.  You can answer.

21              A     Yes, I do.

22              Q     Where do you see that?

23              A     Some on the pillow and some on

24      the side of the bed.

25              Q     Why don't you just take your

C. Kosciuk                    115

pen and circle it or you can use this

Sharpie.

          A      (Complying.)  I missed some

there.

          Q      Anyplace you see it.

          A      Okay.  (Complying.)

          Q      Now, that would be medium

velocity blood spatter consistent with a --

          A      Medium and low.

          Q      Medium and low.  Why don't you

just indicate what you think is the medium.

I think you first circled --

          A      I can't because there is no

ruler on this photograph.

          Q      Okay.  So that's point number

one that there is no ruler in this

photograph, correct?

          A      That's right.

          Q      These photographs are not taken

at a 90-degree angle, correct?

          A      That's correct.

          Q      So there is a certain

limitation there in your ability to do a

blood spatter analysis, correct?

                                    C. Kosciuk            116

1

2          A     Yes.

3          Q     However, just from looking at

4    these photographs you feel comfortable in

5    saying that you do see some medium velocity

6    blood spatter on the pillow?

7          A     Well, if the picture is taken

8    one-to-one, yes.

9          Q     Why don't you just indicate

10   where -- The first circle you made that is

11   where you see medium velocity blood spatter?

12         A     I hesitate to do that.  I don't

13   know the sizes.  I mean, in this area here

14   they are quite small.

15         Q     Let's take that area there.

16   Call that area A.

17               MR. MITCHELL:  Put a letter A

18         there.

19         Q     Area A --

20         A     And B.

21         Q     In area A you said that you saw

22   some --

23         A     Small and there was a couple of

24   larger droplets.

25         Q     Okay.  Now, would what you see

C. Kosciuk                117

1  in area A be consistent with a blood force

2  instrument being used to hit a blood source?

3          MR. MITCHELL:  I object to the

4      form.  You can answer.

5          A    It's difficult.  How much blood

6  are we dealing with here, the blood source?

7  You have to tell me.  We're talking about

8  several little dots here.  I have to know

9  how much blood is on the person, the size of

10  the object striking her, and how fast the

11  object was.

12          Q    Just looking at these medium

13  velocity blood spatter on the pillow in

14  photograph 14, okay, area A at this crime

15  scene indicate to you just immediately

16  looking at it that some blunt force object

17  was used to strike the head of Arlene

18  Tankleff while she was in that bed?

19          MR. MITCHELL:  I object to the

20      form.  You can answer.

21          A    Based on this picture I would

22  say no.

23          Q    All right.  Based on any of the

24  pictures, do you see --

C. Kosciuk                    118

1

2      A      I don't believe any of these

3      are indicative of castoff from a blunt

4      object.

5      Q      Well, when you say castoff from

6      a blunt object, would they be consistent

7      with the object hitting the head of Arlene

8      Tankleff and blood spatter then resulting in

9      hitting the pillow in area A?

10            MR. MITCHELL:  I object to the

11            form.  You can answer.

12     A      These stains that we circled, A

13     and B, are possible or could originate from

14     the source of a blood source that's being

15     struck, yes.

16     Q      That's my question.

17     A      Right.  Not castoff but

18     projected blood.

19     Q      Okay.  So to use your

20     terminology then, just entering the crime

21     scene and taking a look at that pillow as it

22     is in Exhibit 14, you, as a blood spatter

23     expert, immediately could recognize that

24     this scene was consistent with a blunt

25     instrument being used to strike the head of

                              C. Kosciuk              119

1
2    Arlene Tankleff while she was in the bed
3    thereby causing projected blood in area A,
4    blood spatter in area A?
5                    MR. MITCHELL:  I object to the
6            form of the question.
7            A    No, I'm not going to answer
8    that question.  I can't see enough here.
9    Plus the fact that this stain looks like
10   dripping.  This looks like --
11           Q    You're pointing to a --
12           A    Larger drops.
13           Q    Larger drops in area A, but I'm
14   directing your attention to the smaller
15   droplets that you saw in area A on the
16   pillow that you identified as medium
17   velocity blood spatter.
18           A    Okay.  Repeat your question
19   again.
20           Q    My question is, wouldn't you
21   upon seeing those smaller spatter patterns
22   in area A on that pillow, as an experienced
23   blood spatter expert in 1988, just looking
24   at it wouldn't that be consistent with
25   Arlene Tankleff having been struck on the

C. Kosciuk                120

1    head and projected blood creating that kind

2    of spatter on a pillow?

3            MR. MITCHELL:  I object to the

4        form.

5            MR. TIPALDO:  I join.

6            MR. SCHECK:  You have to

7        answer.

8        A    It is consistent with blood

9    originating from a source and being

10   spattered.  It could be consistent with

11   that.

12           Q    From everything you see in all

13   the pictures from the master bedroom and

14   your recollection of the scene, that blood

15   source would be Arlene Tankleff's head?

16           MR. MITCHELL:  I object to the

17       form.  You can answer.

18           MR. TIPALDO:  Objection.

19       A    I don't know.

20           MR. SCHECK:  Off the record.

21           THE VIDEOGRAPHER:  End of Disk

22       2.  We're off record at 12:57 p.m.

23           (At this time, a brief recess

24       was taken.)

1                              C. Kosciuk          121

2                    THE VIDEOGRAPHER:  This is the

3           beginning of Disk 3.  We're back on

4           the record at 1:06 p.m.  You may

5           proceed.

6           Q      Just to be clear, do you have

7    any recollection at any time subsequent to

8    while you were at the crime scene or

9    subsequent to it, of Detective McCready,

10   Detective Doyle, Detective Fini or anybody

11   from Homicide discussing with you the blood

12   spatter patterns in the master bedroom?

13           A      No.

14           Q      And you have no recollection of

15   ever being asked by anyone in the crime lab

16   to review and try to interpret the blood

17   spatter patterns in the master bedroom?

18           A      No.

19           Q      Did that strike you as odd?

20                   MR. MITCHELL:  Objection to

21           form.  You can answer.

22           A      No.

23           Q      Is it your testimony that no

24   one in the district attorney's office, in

25   preparation for this trial or at any time

C. Kosciuk                    122

1    prior to the trial, ever ask you to review

2    the blood spatter patterns in the master

3    bedroom and give any kind of interpretation

4    of how the crime may have been committed?

5                MR. MITCHELL:  Objection to

6          form.

7          A    No.

8          Q    It's your testimony, just to be

9    clear, that in the two days that you

10   processed the crime scene or thereafter no

11   one from Homicide ever reviewed with you Mr.

12   Tankleff's confession to see whether or not

13   it was consistent with the blood spatter

14   patterns in the master bedroom?

15               MR. MITCHELL:  I object to

16         form.  You can answer.

17         A    No.

18         Q    But you do recall that at some

19   point in time when I was reading from

20   Detective Doyle's memo book starting at Page

21   2713, the confession of Mr. Tankleff, you do

22   remember that at some point you were asked

23   to go back and examine and retrieve certain

24   items of evidence?

C. Kosciuk                    123

1

2          A      Yes.

3          Q      All right.  Tell me as best you

4    recall how that happened and what you were

5    told?

6                 MR. MITCHELL:  I object to

7          form.  You can answer.

8          A      What happened?

9          Q      How you came to go back and

10   review certain items of evidence that --

11         A      We were told to pay particular

12   attention to certain items; is that what

13   you're asking?

14         Q      When did that happen and what

15   were you told?

16         A      I believe when Detective

17   Pfalzgraf -- I don't remember what day now.

18   Let me think.  It might have been on the

19   Friday.  I'm sorry, not the Friday.

20   Thursday, the next day, I can't remember

21   which day.  All I remember is being advised

22   late in the evening somewhere after

23   8 o'clock, 8:30 that certain items they

24   would like us to observe, photograph and

25   collect.

1                              C. Kosciuk          124

2          Q     And you were not told why?

3          A     No.

4          Q     You were not told that these

5    were items that they wanted to look at

6    because they were mentioned in a confession

7    they had taken from Mr. Tankleff?

8                MR. MITCHELL:  I object to

9          form.  You can answer.

10         A     I don't remember if I was told

11   or not.

12         Q     You might have been told that,

13   right?

14         A     Yeah, I might have been.

15         Q     Is there any reason why you

16   would not have been told in terms of your

17   customs and procedures that Mr. Tankleff had

18   given a confession the morning that you had

19   arrived at the crime scene and that you

20   should go back and look at certain items of

21   evidence to see whether or not they

22   corroborate or did not corroborate to his

23   confession?

24               MR. MITCHELL:  I object to

25         form.  You can answer.

C. Kosciuk                    125

1

2        A     No.

3        Q     Doesn't that make sense to you

4    in terms of investigative techniques that if

5    you got a confession from a suspect about

6    how a crime had been committed you had not

7    even finished processing the crime scene

8    that you would want to go back and look at

9    the crime scene to see if the confession

10   corroborated or didn't corroborate the

11   confession?

12              MR. MITCHELL:  I object to the

13         form.  You can answer.

14              MR. TIPALDO:  I join.

15       A     I was never advised of the

16   confession and what he stated.  All we were

17   advised of was items and that's what we did.

18       Q     Doesn't it make, in terms of

19   normal investigative methods at that time --

20       A     You mean to substantiate the

21   confession?

22       Q     Yes.

23       A     Yes, it does make sense.

24       Q     Have you ever heard of

25   something at that time called the read

C. Kosciuk                126

1

2      technique?

3              MR. MITCHELL:  I object to the

4          form.  You can answer.

5      A      No.

6      Q      In all your courses you never

7      heard of that technique?

8      A      No.

9      Q      By the time you were doing this

10     crime scene in 1988, you had read and heard

11     about a series in Newsday called the

12     Confession Takers?

13             MR. MITCHELL:  I object to the

14         form.  You can answer.

15     A      I have no idea, no.

16     Q      You don't remember that there

17     was a series of articles in Newsday about

18     the Suffolk County homicide detectives

19     taking confessions that were considered

20     improper by the courts?

21     A      I do remember that.  I don't

22     remember any of the articles in Newsday.

23     Q      Nobody ever discussed with you

24     any of the problems that Suffolk County

25     homicide detectives were having prior to

```
1                      C. Kosciuk          127

2    your arrival at the crime scene on

3    September 7, 1988 about taking confessions?

4              MR. MITCHELL:  I object to

5         form.  You can answer.

6              MR. TIPALDO:  Objection.

7         Q    Have you ever heard that in

8    particular Detective McCready --

9         A    No.

10        Q    -- had been accused of

11   misconduct in a case involving a Defendant

12   named Diaz?

13             MR. TIPALDO:  Objection.

14             MR. MITCHELL:  I object to the

15        form.  You can answer.

16        A    Yes, I did hear that through

17   the grapevine that he was in trouble in

18   reference to that case.

19        Q    And do you recall that that

20   case involved a confession about a knife

21   that the Defendant said that he had thrown

22   away in the woods and wiped the blood off

23   and then sometime later a bloody knife was

24   found at the crime scene?

25             MR. MITCHELL:  I object to the
```

C. Kosciuk                128

1    form.  You can answer.

2    A     I heard a little bit about

3    that, yes, through the grapevine.

4    Q     Did that trouble you?

5    MR. MITCHELL:  I object to the

6    form.  You can answer.

7    A     Did it trouble me?  Not really.

8    I know detectives and police officers are

9    accused of a lot of things.

10   Q     But as far as you were

11   concerned, you never had any problems with

12   McCready and you thought he was a straight

13   up honest cop?

14   A     Yeah, yes, sir.

15   Q     Prior to 1988, and at the time

16   of these articles appearing about the

17   Confession Takers, were there problems in

18   funding of the crime lab?

19   MR. MITCHELL:  I object to

20   form.  You can answer.

21   A     It's beyond my scope.  I have

22   no idea about the funding of the crime lab.

23   Q     But you, as somebody who worked

24   at the crime lab, didn't you have complaints

C. Kosciuk                129

1

2    or problems that you were not getting

3    adequate funding to document crime scenes?

4              MR. MITCHELL:  Objection to

5         form.

6              MR. TIPALDO:  Objection.

7    A     No.

8    Q     Any problems in terms of

9    getting adequate training to process crime

10   scenes?

11             MR. MITCHELL:  I object to

12        form.  You can answer.

13             MR. TIPALDO:  I join.

14   A     No.

15   Q     Now, okay, why don't we review

16   together Plaintiff's Exhibit 6, which is the

17   statement that was taken.  It's a typed-up

18   version of a confession by Mr. Tankleff,

19   Martin Tankleff, and you see the bottom of

20   this is a police report by Detectives

21   McCready and supervised by Detective Doyle;

22   you see that?

23   A     Yes, I do.

24   Q     Okay.  Are you familiar with

25   this kind of report?

C. Kosciuk                     130

1

2          A     No.

3          Q     What is it?  What kind of

4    report is it?

5          A     It says supplemental report.

6          Q     Is this a report that is --

7    It's not filled out contemporaneously; is

8    it?

9                MR. MITCHELL:  I object to the

10               form.  You can answer.

11         Q     To the best of your knowledge?

12         A     No, I really don't know what

13   forms they are required to fill out.

14         Q     Why don't you turn in Exhibit 6

15   to Page 7944, okay.  SCDA 007944.  I guess

16   it's at the top.  It's 11 of 14 pages.

17         A     (Complying.)

18         Q     Are you with me?

19         A     Yes, 7944.

20         Q     All right.  And you see at the

21   very top of the page in the second paragraph

22   it says, "Marty needed psychiatric help.  He

23   knew what happened, but he felt like it was

24   another person who was inside of him who did

25   it."  You see that?

C. Kosciuk                    131

1

2       A     Yes.

3             MR. MITCHELL:  I am just

4       objecting to the form of your

5       question as the document speaks for

6       itself.  I ask that you confirm

7       whether he has ever seen this

8       document before.

9       Q     Have you ever seen this

10      document before?

11      A     No.

12      Q     Thank you.

13            Now let's go to the bottom of

14      the page.  It says, "We then asked him what

15      time he did this.  He said he set his alarm

16      clock for 5:35."  You see that?

17      A     Yes, I do.

18      Q     Then it says it went off, he

19      woke up.  "I asked him what he was wearing,

20      he said he was naked because he did not want

21      to leave any blood on his clothing.  I asked

22      him who he killed first.  He said he killed

23      his mom first.  I asked him where his father

24      was, he said he saw that his father was in

25      his office sleeping in his chair.  Initially

C. Kosciuk                    132

he was surprised that he was not in bed with

his mother and that the lights were on.  I

asked him what he did to his mother.  He

said he hit his mother with a dumbbell then

he cut her throat.  I asked him how his

mother was laying in bed, he said she was in

bed on her back.  He was asked how many

times he stabbed her, he said he did not

know how many times he stabbed her, he

volunteered that he got to her quickly.  I

asked him how many times he hit her, he said

he hit her at least four to five times on

the head.  He was not sure.  He kept on

trying to hit her.  She fought with him.  He

said she was in pain calling for help

saying, "Why" and "help me."  The "why" and

the "help me" are in quotes.  He said he was

afraid his father would wake up and that

after she fell on the floor he ran and got a

knife from the kitchen and cut her throat.

I asked him where the knife was, he said the

knife was on the counter next to the

watermelon.  I asked him if she was dead

when he left the room, he said no , she was

C. Kosciuk                    133

1   
2   moving a little bit when he ran out of the

3   bedroom to kill his father."  Okay?

4        A    Yes.

5             MR. MITCHELL:  Is that a

6        question?  Are you asking him a

7        question?

8        Q    Did you follow that with me as

9   I've read it from Exhibit 6?

10             MR. MITCHELL:  I'm going to

11        object to the form.  Are you asking

12        if that refreshes his recollection

13        for anything because to the extent

14        that it doesn't then he has never

15        seen this document.

16             If you are formulating a

17        question from the document, it's

18        improper except to ask him if it

19        refreshes his recollection.  That's

20        my objection.

21             If you're trying to lay out the

22        theory of your case, that's

23        improper.  I don't mind you asking

24        him questions about what he did as a

25        fact witness, but he has never seen

C. Kosciuk                        134

the document and so if you're

formulation a question if it

refreshes his recollection, I don't

have an objection.

    Q    Let me first ask, have you seen
the document?

        MR. MITCHELL:  You asked that

already.  It's asked and answered.

    A    No.

    Q    I think what we've established,
Brian, let me just make sure.  You're
telling us that no one from Homicide or the
prosecutor's office had ever reviewed with
you Mr. Tankleff's confession and asked
whether or not it was consistent with the
crime scene evidence and the blood spatter
in the bedroom?

        MR. TIPALDO:  Objection.  If I

may be heard, and this is not my

witness, obviously, and I can't

direct him as to what to do, but I

have an objection with respect to

this whole line of inquiry based

upon the witness's testimony that,

C. Kosciuk                    135

number one, he has not seen this

document; number two, he's not

involved in the compilation or the

generation of this document.  For

you to ask him questions with regard

to this document is completely out

of line.

MR. SCHECK:  Let me make this

suggestion because I'm going to lay

out why I'm allowed to do this.

I'll put it on the record and you

can object.  Why don't we ask the

witness to leave the room for a

second.

MR. MITCHELL:  Sure.  And

honestly, just to move things along,

I appreciate it.  I'm not directing

him not to answer the question.  I

made my objection.  I know you think

there is a proper reason to ask it,

that's all.  I appreciate that.  I'm

not directing him not to answer.

I guess to save time that if

you were going to ask him something

C. Kosciuk                    136

1  other than to refresh his
2  recollection, I would object.  Let's
3  move along.
4
5       MR. SCHECK:  Just to be clear
6  so you understand, I think I laid
7  the foundation that blood spatter
8  experts are asked to confirm or
9  disconfirm based on objective crime
10  scene evidence any particular
11  hypothesis, and he told us that
12  nobody ever asked him to compare the
13  confession that Mr. Tankleff gave to
14  the evidence in the master bedroom.
15       MR. MITCHELL:  You're testing
16  his credibility again.
17       MR. SCHECK:  No.
18       MR. MITCHELL:  That's what I
19  think you're doing because then he's
20  asked and answered your question.
21       MR. SCHECK:  Just so you know,
22  I think it's a perfectly proper line
23  of inquiry for me to ask him about
24  this confession and how this relates
25  to what he observed at the crime

C. Kosciuk                    137

1

2    scene.

3         MR. MITCHELL:  You can do that,

4    but you don't have to recite the

5    entire document as part of your

6    question.  I don't get that.

7         MR. SCHECK:  I choose to do it

8    that way.

9         MR. MITCHELL:  I appreciate

10    that but it's going to take a long

11    time.

12    Q    I just read you that paragraph

13 in Exhibit 6 of what was recorded, as you

14 can see, a confession from Mr. Tankleff.  Do

15 you have that in mind?

16    A    Yes.

17    Q    Now I'd like to review with you

18 in terms of the blood spatter evidence and

19 the evidence recovered from the crime scene

20 his confession, okay; is that all right?

21    A    Sure.

22    Q    And that is the kind of thing

23 if asked you would have done at the request

24 of homicide detectives when you were

25 processing the scene; true?

1                    C. Kosciuk          138

2          A    I don't know.  What time was

3    this statement given?

4          Q    I think I reviewed with you

5    before the notes of Detective Doyle which

6    was Exhibit 2.  You recall that I read you

7    from Exhibit 2, the memo book of Detective

8    Doyle, starting at page SCDA 2713 per

9    McCready, 12:28, right?

10         A    Yes.

11         Q    And then I read to you the two

12   pages that start "Martin Tankleff

13   confessed."  You recall that?

14         A    Yes, I do now.

15         Q    Right.  And does any of this

16   refresh your recollection that you were told

17   that afternoon of September 7th that there

18   was a confession and some of the details of

19   it?

20         A    No.

21         Q    By Doyle or anybody else?

22         A    I didn't even know that Mrs.

23   Tankleff's head was a bludgeoning.  They had

24   not even gotten there yet.

25         Q    So just answer my question.

C. Kosciuk                139

2    A    I did.

3    Q    No.  My question is that to the

4  best of your recollection, even today, no

5  one has ever asked you to look at the

6  details of the confession and compare it to

7  the to crime scene evidence, right?

8              MR. TIPALDO:  Objection.  Asked

9         and answered repeatedly.

10             MR. MITCHELL:  You can answer

11        the question.

12   A    Yes.

13   Q    Now, you see that Mr. Tankleff

14  said he set his alarm for 5:35; you see

15  that?

16   A    What page are we on?

17   Q    On Page 7944 of Exhibit 6.

18   A    7944.  Right.

19   Q    Okay.  So you see --

20   A    He set his alarm.

21   Q    For 5:35, right?

22   A    Yes.

23   Q    And we know that the 911

24  operator was called at 6:11 a.m.

25             MR. MITCHELL:  I object to the

1                              C. Kosciuk            140

2              form.  Are you testifying as a

3              witness?  You're asking we know.

4              Ask him if he knows what time the

5              911 call was made.

6              Q     Do you know what time the 911

7    call was made?

8              A     No.

9              Q     I'm going to ask you to keep in

10   mind that the 911 call, and we can double

11   check this if you want, Brian, was 6:11.

12             MR. MITCHELL:  Is that a fact

13             that we could stipulate to?  I'm not

14             trying to be a pain in the behind

15             but if you ask questions like that

16             I'm going to object to them.

17             MR. SCHECK:  Brian, I'm going

18             to make a good record and satisfy

19             you on all the facts.

20             MR. MITCHELL:  Okay.

21             Q     So would it be fair to say that

22   in terms of all of this, we're talking about

23   a time frame about what he did that starts

24   at 5:35, according to the confession, right,

25   and has to end at least at the latest at

C. Kosciuk                    141

1    6:11 because that's a hard time when 911 was

2    called; fair enough?

3            MR. MITCHELL:  I object to the

4        form.  You can answer.  You're

5        asking him the time between 5:35 and

6        6:11?  That's what 26, 36 minutes.

7    Q    Ordinarily, when you're doing

8    crime scene reconstruction, if you have any

9    hard times to work with, that's important in

10   terms of trying to analyze the evidence at

11   the scene?

12           MR. MITCHELL:  I object to

13       form.  You can answer.

14   A    I guess.  I don't know.

15   Q    That's not something you've

16   ever done?  You look at how long blood

17   dries, when the spatter patterns were done.

18   Times can be useful and relevent, correct?

19   A    Yes, but that would be more in

20   the research area.

21   Q    Well, let's just go through

22   this.  And he says here he was naked because

23   he didn't want to leave any blood on his

24   clothes; you see that right?

C. Kosciuk                    142

1
2      A      Yes.

3             MR. MITCHELL:   I object to the

4      form.

5      Q      In your processing of the crime

6      scene you found no bloody clothes?

7      A      I don't know that.

8      Q      To the best of your knowledge,

9      you found no bloody clothes?  The people

10     that you were working with found no bloody

11     clothes, correct?

12     A      Clothing was gathered at the

13     scene.  I did not analyze or am I

14     serologist.  It was turned over to the

15     serology section.  I have no idea if there

16     were any blood on.

17     Q      You're talking about clothes

18     that were found at the scene that belonged

19     to Seymour Tankleff.

20     A      I don't know what clothes you

21     were talking about.

22     Q      Other than the clothes that

23     were found in the office that were worn by

24     Seymour Tankleff, do you recall that there

25     were any bloody clothes found at a crime

C. Kosciuk                    143

1

2   scene that would be consistent with somebody

3   having worn them during the course of the

4   commission of these two homicides?

5            MR. MITCHELL:  I object to the

6        form.  You can answer.

7        A    No.

8        Q    All right.  Would it be fair to

9   say just from looking at the crime scene

10  where Arlene Tankleff was murdered that

11  whoever bludgeoned her or stabbed her, or if

12  there was more than one person who

13  bludgeoned her or stabbed her, there is a

14  high likelihood that their clothing would be

15  covered with blood?

16           MR. MITCHELL:  I object to

17       form.  You can answer.

18       A    I would say yes.

19       Q    All right.  That was a pretty

20  bloody crime scene in that master bedroom?

21       A    Yes.

22       Q    With the number of blows

23  inflicted to her head and the slit in her

24  back and in her neck, that would create a

25  lot of blood that would splash on

C. Kosciuk                144

1
2    assailants?

3              MR. MITCHELL:  I object to the

4         form.  You can answer.

5         A     The cutting possibly not, but

6    the bludgeoning, yes.

7         Q     Now, you see in this confession

8    he said he killed his mom first, correct?

9    Do you see that?

10        A     Yes.  You read this.

11        Q     Next page.  And you see in this

12   confession that he said that he hit his

13   mother with a dumbbell, correct?

14        A     Yes.

15        Q     And then, after he struck her

16   with the dumbbell he went back and got the

17   watermelon knife from the kitchen and that's

18   when he came back and used the knife to

19   inflict injury on her, correct?

20        A     Wait a minute.  I don't see all

21   that here.

22              MR. TIPALDO:  Objection.

23        Q     Take a look at this.

24        A     I don't see anything about

25   watermelon knife.  Where do you see that?

1                            C. Kosciuk          145

2          Q    Look at the last line on this

3    paragraph on Page 12.  "I asked him where

4    the knife was, he said the knife was on the

5    counter next to the watermelon knife."

6          A    Okay.  Go ahead.

7          Q    Right?

8          A    Give me your question.

9          Q    Right.  So based on what I just

10   read you, right, according to this

11   confession, he woke up at 5:35 he first went

12   to attack his mother naked, right?  He had a

13   dumbbell with him, he used the dumbbell to

14   strike her when she was lying in the bed on

15   her back, right, and then he went back into

16   the kitchen to get the knife next to the

17   watermelon and then came back and used the

18   knife on her at that time.  That's what he

19   says, correct?

20         A    Sounds good.

21         Q    That's what this says, correct?

22         A    Yes, sounds good.

23              MR. MITCHELL:  I object to

24         form.

25         Q    Now, let's just be clear about

C. Kosciuk                146

1    what everything is.

2    A    Okay.

3    Q    We have this model, correct?

4    Exhibit 1, right?

5    A    Yes.

6    Q    And now, there was a dumbbell

7    that you found in Mr. Tankleff's bedroom,

8    correct?

9    A    Yes.

10   Q    That was an item that you were

11   asked specifically to check, correct?

12   A    Yes, a set of dumbbells.

13   Q    Set of dumbbells and you were

14   asked to check them because you knew that

15   that was potentially a blunt instrument that

16   was used on both Arlene Tankleff and Seymour

17   Tankleff, correct?

18   A    Yes.

19   MR. MITCHELL:  I object to

20   form.  You can answer.

21   Q    Where did you find those

22   dumbbells?

23   A    In the southwest bedroom.

24   Q    Mr. Martin Tankleff's bedroom?

C. Kosciuk                    147

1

2       A       That's right.   The blue square

3    on the southeast corner, southwest corner.

4       Q       Let me mark this as Plaintiff's

5    Exhibit 8.   It's two photographs.

6               (Whereupon, Plaintiff's Exhibit

7       8 was marked for identification.)

8       Q       And these were photographs

9    that -- These were the dumbbells that you

10   saw at the crime scene?

11      A       Yes, they are.

12      Q       On September 7th and 8th?

13      A       7th.

14      Q       7th?

15      A       Oh, gosh.   You know, I'm going

16   to say it was the evening of the 7th, yes.

17      Q       On the evening of the 7th, all

18   right.   And you went and inspected those

19   dumbbells and just visually looking at them

20   you did not see any blood, correct?

21      A       That is correct.

22      Q       And are you aware that those

23   dumbbells were subsequently taken back to

24   the crime lab, they were taken apart, and

25   they were examined with testing for the

C. Kosciuk                148

presence of blood?

             MR. MITCHELL:  I object to the

        form.  You can answer.

        Q    You understand that?

        A    I know they were returned to

the crime laboratory and they were submitted

to the serology section.

        Q    You're familiar with what

serology does, correct?

        A    Yes.

        Q    And they would take apart these

dumbbells and they would examine the bar and

the weights themselves for any presence of

blood, correct?

             MR. MITCHELL:  I object to

        form.  You can answer.

        A    I can't answer.  I don't know

what someone else would do.

        Q    Well, you're familiar with

presumptive tests for blood; aren't you?

        A    Yes, but I don't know how far

an individual would go.  We had cases where

someone forgot to take the grips off a

weapon that had blood on it and the weapon

C. Kosciuk                    149

went to property bureau.

          I don't know how far someone
would go to examine these items that were
submitted to the section.  I did not do it.

     Q     In the proper course of
examination of a crime scene, you would take
the dumbbells and you would do a presumptive
test on all parts of it, the weight itself,
the bar, for the presence of blood, correct?

          MR. MITCHELL:  Objection.  You
     can answer.

          MR. TIPALDO:  Objection.

     Q     That's how it works when you do
blood spatter analysis?

          MR. TIPALDO:  Objection.

          MR. MITCHELL:  I object to the
     form.  You can answer.

     A     Yes.  My answer is it depends
on the individual that's performing the
analysis.

     Q     You're saying that sometimes
people screw up and they don't do the
analysis correctly.  Is that what you're
telling us?

                                    C. Kosciuk            150

2        MR. MITCHELL:  Objection.

3        A    No, I'm saying you don't know

4   how far an individual would go to maybe

5   unscrew the bolt and check under the cuff of

6   the barbell, that's what I'm saying.  Or

7   maybe they might not take off this collar,

8   just check the outer surface and not check

9   inside the collar for blood.

10            I can't speak of what another

11  serologist or another person can do or would

12  do.

13       Q    In the point of view of

14  somebody involved in accident

15  reconstruction, would the proper course of

16  conduct be to take apart every part of that

17  barbell and swab all of it and do

18  presumptive testing for the purpose of

19  blood?

20       A    Yes.

21       Q    As far as you know, during the

22  course of this case, that was done?

23            MR. MITCHELL:  I object to the

24            form.  You can answer.

25       A    The only reason that I think it

1                          C. Kosciuk          151

2     was done is because no blood was found so

3     therefore, I assumed that it was done.

4          Q    Okay.

5               MR. MITCHELL:  I appreciate

6          your answer.  It's just for the

7          record, we ask you not to assume.  I

8          understand your answer that's all.

9          You should not guess or assume.

10              MR. SCHECK:  I can ask him to

11         assume.  He's an expert.

12              MR. MITCHELL:  He has not been

13         called as an expert for this

14         deposition.  I don't believe we

15         received Rule 26 for this and I'm

16         going to object if you're going to

17         start asking questions under Rule

18         26.

19              MR. SCHECK:  Let me do this.

20         Maybe this will help you, Brian.

21         Q    In the course of your work as a

22    blood spatter expert, right, in the normal

23    course of business, you would retrieve items

24    from a crime scene and you would ask

25    serology, which in this instance, I guess,

1                             C. Kosciuk          152

2    Mr. Baumann was running; is that correct?

3            A    Yes.

4            Q    You would rely on his expertise

5    to conduct a thorough set of presumptive

6    tests for the presence of blood?

7            A    Yes.

8            Q    Are you familiar -- Were you

9    trained on what those kinds of tests are?

10           A    Somewhat through prior studies.

11   I'm not at all do I deal with blood.

12           Q    But even --

13           A    Testing, I'm sorry.

14           Q    But even at the crime scene

15   itself sometimes you would have somebody

16   there in your presence, I take it, who would

17   do presumptive testing for the purpose of

18   presence of blood?

19           A    Yes.

20           Q    So this is a method that you're

21   familiar with?

22           A    Yes.

23           Q    And you know that the

24   presumptive tests for blood are extremely

25   sensitive, correct?

C. Kosciuk                153

1

2          A     Correct.

3          Q     And by sensitive we mean it has

4    a greater ability to detect the presence of

5    blood if it is in deed there?

6          A     True.

7          Q     Now, just looking at the crime

8    scene in the master bedroom, right, and Mr.

9    Tankleff's statement that he used these

10   barbells to hit his mother, right, in the

11   master bedroom, a number of times about the

12   head when she was in the bed, you remember

13   going over that, correct?

14         A     Yes.

15         Q     These barbells, as you saw them

16   at the time, are not consistent based on

17   your expertise as a blood spatter expert as

18   having been the instruments that could have

19   been used to inflict those injuries on

20   Arlene Tankleff --

21              MR. MITCHELL:  I object to the

22         form.

23         Q     -- are they?

24              MR. MITCHELL:  You can answer.

25         A     I can't rule that out.  I don't

C. Kosciuk                      154

1

2    know what the wounds look like.

3         Q    You don't?

4         A    No.

5         Q    You saw some of the -- You saw

6    her body, you saw the photographs --

7              MR. TIPALDO:  Objection.

8         Q    -- in Exhibit 3 of her on the

9    ground, correct, and her body at the scene?

10        A    Show me where you see that it's

11   consistent with the barbell.

12        Q    No, no, I'm just saying take a

13   look at the photograph of her head, right,

14   covered in blood and the bloody scene on the

15   bed.

16        A    Wait a minute.

17             MR. MITCHELL:  Let him ask his

18        question.

19        Q    If, as recited in this

20   confession, Mr. Tankleff had taken these

21   barbells and hit his mother a number of

22   times while she was lying on her back in the

23   bed about the head --

24        A    Right.

25        Q    -- right, would you not have

C. Kosciuk                    155

1

2    expected as a blood spatter expert to see

3    the barbells covered in blood?

4            MR. MITCHELL:  I object to

5        form.  You can answer.

6        A    To that question I would say

7    yes.

8        Q    Let's take a look at the

9    autopsy photos.

10           MR. SCHECK:  Let's mark as

11       Exhibit 9 a series of autopsy

12       photos.

13           (Whereupon, Plaintiff's Exhibit

14       9 was marked for identification.)

15       Q    Exhibit 9, seven pages.  Take a

16   look at those and you see from these autopsy

17   photos that there are a series of wounds to

18   Arlene Tankleff's skull, right?

19       A    Yes.

20       Q    On the left side of her head

21   including injury to her ear?

22       A    Yes.

23       Q    Now, by the way, do you have

24   the expertise from looking at that -- You've

25   attended autopsies before in homicide cases

1                          C. Kosciuk            156

2      as part of your analysis of blood spatter

3      and reconstruction; have you not?

4              A    I've attended all types, many

5      autopsies.

6              Q    Right, and you attend them to

7      examine the body as essentially a piece of

8      the crime scene in order to reach your

9      conclusions with respect to blood spatter

10     analysis?

11             A    Not really.

12             Q    You never do that?

13             A    No.

14             Q    You attended the autopsy in

15     this case of Seymour Tankleff; did you?

16             A    No, sir.

17             Q    Are you sure?

18             MR. MITCHELL:  I object to the

19             form.  You can answer again.

20             A    To the best of my knowledge, I

21     did not.

22             Q    We'll get back to that.  Now,

23     just looking at the head, would you not

24     agree with me that there are a series of

25     impressions from a blunt instrument on the

C. Kosciuk                    157

1

2      left side of the head and the ear of Arlene

3      Tankleff?

4                    MR. MITCHELL:  I object to the

5             form.  You can answer.

6             A    Yes.

7             Q    All right.  Now, in terms of

8      can you tell or would you know whether these

9      barbells are consistent or inconsistent with

10     having been the instruments that would have

11     caused those wounds?

12                   MR. MITCHELL:  I object to

13            form.  You can answer.

14            A    No, I can't answer that

15     question.

16            Q    But if Marty Tankleff's

17     confession, as printed here in Exhibit 6, is

18     reliable, he is saying that he used the

19     barbells that are depicted in Plaintiff's

20     Exhibit 8 and you saw on the crime scene to

21     inflict those wounds to the head of his

22     mother.

23                   MR. MITCHELL:  I object to the

24            form.  You can answer.

25            A    He does say that, yes.

C. Kosciuk                    158

2    Q    Now, based on your experience

3  as a blood spatter expert, if he had, in

4  fact, used those barbells that's in

5  Plaintiff's Exhibit 8, right, and inflicted

6  the injuries to his mother while she was

7  lying on her back in the bed, I think we've

8  already established you would expect to see

9  blood on the barbell itself and/or the bar,

10  correct?

11         MR. MITCHELL:  Objection.  It's

12       been asked and answered.

13         MR. TIPALDO:  Note my objection

14       to form.

15    A    Yes.

16    Q    And if Mr. Tankleff put the

17  barbell down on the bed or on the carpet in

18  the master bedroom, would not, based on your

19  expertise as a blood spatter expert, that

20  cause a transfer stain?

21         MR. MITCHELL:  I object to

22       form.  You can answer.

23         MR. TIPALDO:  I join.

24    A    I can't answer it because I

25  don't know if there was any blood

C. Kosciuk                    159

transferred from the head to the barbell.

Q     Well --

A     I don't know what end of the

barbell he used.  Did he separate them?  He

doesn't say.  Did he use with the weights

on?  Does he just use the center portion?

Does he take the collar off, take the nut

out?  There's two collars laying here.  I

don't know what he did.

Q     Any part of the barbell,

whether the weight or the barbell itself was

used to inflict the injuries that you have

seen now in Plaintiff's Exhibit 9 from the

autopsy photos and you saw at the crime

scene, whatever part of the barbell was

used, I think you've agreed there would be

blood on it, correct?

A     Yes, there would be some blood.

Q     And if the blood on that

instrument then was then put down somewhere

in the master bedroom, whether it was on the

bed or the carpet, right, based on your

expertise as a blood spatter expert, would

you not expect to see some kind of a

1                    C. Kosciuk          160

2    transfer stain?

3              MR. MITCHELL:  I object to

4         form.  You can answer.

5         A    No.

6         Q    You wouldn't?

7         A    No.

8         Q    Why not?

9         A    Because he could use the edge

10   of the barbell and cause this type of wound

11   with just using the edge.  They all appear

12   on the left side.  She could be laying this

13   side does he go on the bed so let's just

14   say.

15             MR. MITCHELL:  I appreciate

16        he's asking a question, but I ask

17        that you allow him to finish his

18        answer.  I appreciate that he's

19        asking you a question in his answer,

20        but I don't think he was done so

21        just finish your answer, Detective.

22        A    To me, these look like glancing

23   blows and they are from the left side so

24   what I say right now is she was probably

25   laying on her back and the left side was

C. Kosciuk                161

1   exposed.  The reason why I say that is by

2   looking at the bed there's chopped hairs all

3   about the top of the bed and nothing on the

4   floor so it indicated to me that the barbell

5   occurred on the bed and right here there was

6   slicing.  There was a scuffle down here on

7   the floor where she was sliced.

8        Q    Now, when you say that there

9   were -- You noticed in the pictures in

10  Exhibit 3 that there was a clump of hair on

11  the bed, correct?

12       A    Yes.

13       Q    Let's talk about that.  First

14  we see from a long view the clump of hair in

15  photograph 13?

16       A    Right.

17       Q    Correct?

18       A    Yes.

19       Q    And that is a clump of hair

20  that is on the left side of the bed where

21  there is a pooling of blood that you then

22  see goes down to the floor?

23       A    North side of the bed to the

24  floor.

1                          C. Kosciuk            162

2          Q      On Exhibit 14, which is the

3    exhibit that you marked up previously with

4    respect to the contents, the medium velocity

5    spatter in area A, you also see that hair,

6    correct?

7          A      Yes.

8          Q      And now let's look at

9    photograph 15 and this would be the close-up

10   shot, correct?

11         A      Yes.

12         Q      And it's clear that you would

13   not agree that somebody was trying to take a

14   close up picture of this pooling on the left

15   side of the bed and the hair, correct?

16         A      Well, actually, that was taking

17   the pooling.  They were trying to capture

18   both of these tags.  Item 19 and 23 that's a

19   hair in here.  They were trying to capture

20   both of those, not the pooling.

21         Q      So they were looking at the

22   hairs, correct?

23         A      Yes.

24         Q      And looking at this hair so

25   that would be this clump of hair would be

1                         C. Kosciuk              163

2     item 19?

3               A     I believe so, yes.

4               Q     And you can see on the top of

5     it, it appears to be a cut edge, correct?

6               A     Yes.

7               Q     Right.  And so that cut edge

8     would be consistent with a knife being used

9     on the head, wouldn't it?

10              MR. MITCHELL:  I object to

11         form.  You can answer.

12              A     That could be.

13              Q     Well, isn't that far more

14    likely based on your experience than using a

15    blunt instrument like a barbell to cause

16    that kind of clean edge on the hairs, that

17    clump of hairs, that we see in photograph 15

18    and you've identified as item 19 from the

19    crime scene?

20              MR. MITCHELL:  I object to

21         form.  You can answer.

22              MR. TIPALDO:  Objection.

23              A     Repeat the question.

24              Q     Sure.  Isn't it more likely

25    that that clump of hair, given the straight

C. Kosciuk                    164

1

2    edge on the top, correct, clean edge on the

3    top, is the result of a knife being used on

4    Arlene Tankleff's head as opposed to a blunt

5    instrument such as the barbell?

6                 MR. MITCHELL:  I object to

7           form.  You can answer.

8                 MR. TIPALDO:  Objection.

9           A     I can't answer that.  That

10   would be a question for the medical

11   examiner.

12          Q     You never analyzed hairs --

13          A     No.

14          Q     -- in the course of your

15   analysis of the crime scene?

16          A     No, narcotics firearms and

17   accidents reconstruction.

18          Q     All right.  You were saying

19   before and you were pointing to, let's just

20   be clear, Exhibit 8, and you were talking

21   about potentially the blood being on the

22   very top of the barbell; is that what you

23   said?

24          A     No, I said the very top of the

25   bar could be used; therefore, there would

1                              C. Kosciuk          165

2     not be that much transfer from the head to

3     the bar.   Therefore, I would not expect to

4     have an impression any other place.

5          Q    Let's just back up a second

6     because we used some terms a little quickly

7     here.

8               The term transfer stain, what

9     does that mean?

10         A    I didn't say stain.  I said

11    transfer of blood from the bar to the head.

12         Q    I asked you a different

13    question.  You were answering a question

14    before.  Let's define our terms.

15              What does the term transfer

16    stain mean?

17         A    A transfer stain would be a

18    stain that if you had a bloody instrument

19    and you laid it on something the blood from

20    the instrument would be transferred to

21    another surface.

22         Q    Let us assume now, based on

23    your expertise as a blood spatter expert,

24    that the weight of the barbell was actually

25    used to inflict injuries to Arlene

1                          C. Kosciuk              166

2        Tankleff's head in the master bedroom.  Do

3        you have that assumption in mind?

4                A    Not really.

5                Q    I'm just asking you to make it.

6        Can you do that?

7                A    You did not tell me that, yes.

8        I have it now.

9                Q    Okay.  I'd ask you to further

10       assume that the barbell was then placed down

11       either on the bed or on the carpet or in

12       some other place in the bedroom when,

13       according to Mr. Tankleff, he then goes to

14       the kitchen to get the watermelon knife and

15       then come back and stab his mother.  You

16       have that in mind?

17               A    No, wait.  Let's go over it

18       again.

19               Q    Sure.

20               A    We have the barbell and the

21       weight on the barbell or just the weight?

22               Q    I'm going to start by asking

23       you just about the weight?

24               A    Okay.  Go ahead.

25               Q    We agree that in this

1                           C. Kosciuk              167

2          confession he describes first hitting his

3          mother with the dumbbell, correct?

4                    A     Dumbbell, yes.

5                    Q     And then going back into the

6          kitchen, getting the watermelon knife,

7          coming back into the bedroom, and then

8          stabbing her, correct?

9                    A     Right.

10                   Q     Now, we were talking before and

11         you agreed with me that if the dumbbell had

12         been used as the blunt force instrument to

13         cause injuries to Arlene Tankleff's head

14         that it would be covered in blood whatever

15         part of it was used, correct?

16                   A     Yes.

17                   Q     Now, I was asking you questions

18         before about transfer stains, okay?

19                   A     Yes.

20                   Q     And the assumption of those

21         questions is that if, as this confession

22         indicates, he went to the kitchen, right,

23         with the bloody dumbbell, right, got the

24         watermelon knife and then came back to stab

25         his mother, okay, are you with me?

1                          C. Kosciuk                    168

2          A     Yes, he's carrying the

3    dumbbell.

4          Q     Either A, he could be carrying

5    the dumbbell, correct?

6          A     Yes.

7          Q     Then wouldn't you expect as he

8    was carrying the dumbbell from the master

9    bedroom to the kitchen, right, that that

10   could cause a blood trail; that blood could

11   come off the dumbbell and would be on the

12   ground?

13              MR. MITCHELL:  I object to

14         form.  You can answer.

15         A     Well, here's my --

16              MR. MITCHELL:  Just answer his

17         question.  Listen to his question

18         and answer his question.  He asked

19         you a specific question, just answer

20         the question.

21         A     Okay.  The lack of castoff, we

22   know she's bludgeoned at this time.  The

23   lack of castoff in the room indicates that

24   the weapon did not have that much blood on

25   it.  In other words, we know there's several

C. Kosciuk                    169

strikes here to the head.

         Q     You're looking at Exhibit A and
you see several strikes to the head,
correct?

         A     Yes.  And there's no castoff
anyplace except that one microdot up on the
northeast corner.  I'm sorry, east wall.
There's a number three microdot.

         Q     You don't think that there's
any medium velocity blood spatter on --

         A     That could be from impact.  You
said that yourself, that's impact.  In other
words, compression blood could cause that
blood.

         Q     On the bed?

         A     Okay, but how about the
castoff?  If you're saying the instrument is
that bloody, the father's room has it, it's
up on the ceiling.  Where is it in the
mother's room?

         Q     So you're saying you see no
evidence of medium velocity blood spatter
that could be consistent with using the
dumbbell on her head in the bed as described

C. Kosciuk          170

1

2    in this confession?

3          A     No, I didn't say that neither.

4    I said we don't know what portion of the

5    dumbbell was used to cause this.  It could

6    be the end of the dumbbell, the end of the

7    bar.  There's a poke more than a

8    bludgeoning.

9          Q     If the actual end of the

10   dumbbell --

11         A     Now you're pointing to the

12   weight.

13         Q     If the weight of the dumbbell

14   had been used, right --

15         A     No, I don't think the weight

16   can cause this type of an injury that cuts.

17   It would have to be a sharp edge.  So let's

18   say they left the collar on it, that's a

19   possibility.

20         Q     Let's just take it one step at

21   time.  Based on your expertise, you don't

22   believe that the dumbbell weight could have

23   been used here, correct?

24         A     That's correct.

25         Q     So you think it was the

1                          C. Kosciuk          171

2    dumbbell bar?

3          A    And possibly if the collar was

4    left on possibly.

5          Q    So if the dumbbell bar or the

6    tip had been used to inflict the injuries to

7    Arlene Tankleff's head, right, that would be

8    covered in blood; we agree on that, correct?

9                MR. MITCHELL:  I object to the

10               form.  He has not agreed to being

11               covered in blood.

12         Q    It would be bloody?

13         A    It would have some blood on it.

14               MR. SCHECK:  Off the record.

15               THE VIDEOGRAPHER:  Off the

16               record at 1:58 p.m.

17               (At this time, a brief recess

18               was taken.)

19               THE VIDEOGRAPHER:  This is the

20               beginning of Tape 4.  Back on the

21               record at 2:53 p.m.  You may

22               proceed.

23         Q    So where we left off Mr.

24    Kosciuk, we were talking about blood on the

25    barbell.  Assuming that what Mr. Tankleff

                              C. Kosciuk          172

1   said in his confession to Detective McCready

2   were true, are you with me?

3        A    Yes.

4        Q    And you were saying that if

5   there were -- You thought it likely that the

6   wounds were made by the end of the barbell

7   that you saw in terms of the autopsy

8   photographs of Arlene Tankleff?

9        A    Yes, Exhibit 9.

10       Q    Let's get back to this content

11  of the transfer stain.

12       A    I didn't say they were, I said

13  they were consistent with.

14       Q    I understand.  You said it was

15  more likely that it was the edge of the

16  barbell, assuming that that was actually the

17  instrument used, than it would have been the

18  round dumbbell itself, correct?

19       A    Yes.

20       Q    Okay.  Now, just so we're

21  clear, there was no evidence that you saw,

22  and let's go back here to the model for a

23  second, there was no blood that you saw from

24  the master bedroom to the kitchen where the

C. Kosciuk                     173

1

2    watermelon knife was, correct?

3              At that crime scene you did not

4    see any blood trail or blood drops at all?

5         A    No, I did not.

6         Q    If there were any blood on the

7    tip of the barbell, and if this confession

8    is accurate and reliable, and further, if

9    Mr. Tankleff, after first bludgeoning his

10   mother with the barbell, went to the kitchen

11   to pick up the watermelon knife and then

12   came back as the confession says --

13        A    Carrying the barbell?

14        Q    Yes, we're under the assumption

15   carrying the barbell.  There was no evidence

16   of any blood droplets between the master

17   bedroom, the kitchen area and back, right?

18        A    That's correct.

19             MR. TIPALDO:  Objection.

20        Q    In terms of transfer stains,

21   there is nothing that would even reflect the

22   tip of the barbell, assuming that was what

23   was used, and that was covered with blood

24   being placed on the bed and creating a

25   transfer stain, being placed on the carpet

C. Kosciuk                    174

1    in the master bedroom, or any other object

2    in the master bedroom that you saw that

3    would reflect a transfer stain of blood on

4    the tip of the barbell contacting some

5    surface?

6                MR. MITCHELL:  I object to the

7          form.  You can answer.

8        A    I never examined all the bed

9    clothing.  We recovered it and it was

10   transported to the serology section and what

11   you're saying is they would have been the

12   ones if they saw anything like that.

13       Q    In terms of blood spatter,

14   right, the examination of the sheets, right?

15       A    Right.

16       Q    You saw nothing that looked

17   like a transfer stain from the tip of a

18   barbell or from the cylindrical length of a

19   barbell?

20       A    I didn't look for that at the

21   scene.

22       Q    To your knowledge, nobody

23   identified anything like that?

24       A    To the best of my knowledge,

C. Kosciuk                    175

1   no.

2

3           Q     Right.  But from the point of

4   view of a blood spatter expert trying to

5   test the hypothesis reflected in this

6   confession if it happened as Mr. Tankleff

7   has reported to have confessed it happened,

8   right, and the bloody barbell, and I'll take

9   your assumption that it would be the tip of

10  the barbell, as far as you know, nobody

11  reported seeing any kind of transfer stain

12  on the bedding, on the carpet or any other

13  object in the master bedroom?

14          MR. MITCHELL:  I object to the

15          form.  You can answer.

16          MR. TIPALDO:  I join.

17          A     To my knowledge, I did not read

18  all the reports from the laboratory, but no,

19  as far as I'm concerned.

20          Q     Now, as far as the kitchen

21  itself is concerned, if the barbell had been

22  carried to the kitchen and even to stick

23  with your assumption that the end of it was

24  the instrumentality that was used for the

25  bludgeoning and there was blood on it, there

                              C. Kosciuk                 176

1

2     is no evidence that that barbell was put on

3     the counter while the knife was ceased or

4     anything like that, no transfer stains of

5     that nature were seen in the kitchen?

6                 MR. MITCHELL:  I object to

7           form.  You can answer.

8                 MR. TIPALDO:  I join.

9           A     That's correct, no blood was

10    found.

11          Q     Now, let's talk about following

12    the confession Mr. Tankleff says that, and

13    I'm directing your attention again to the

14    first paragraph on Page 12, he says, "he was

15    afraid his father would wake up and that

16    after she fell on the floor he ran and got a

17    knife from the kitchen and cut her throat."

18    Do you see that?

19          A     Yes.

20          Q     You have -- Take a look at

21    Exhibit 9 in terms of the autopsy photos and

22    you see pictures 5, 6, and 7 reflect --

23          A     Slicing.

24          Q     Slicing, you would call that.

25    That's what you would characterize it as?

C. Kosciuk                    177

1

2          A     Slicing.

3          Q     A pretty substantial slicing in

4    her upper back, correct?

5          A     Correct.

6          Q     And a slicing of her --

7          A     Neck.

8          Q     -- neck that extends from below

9    the ear, in this picture at least number 5

10   into behind her scalp, correct?

11         A     Yes.

12         Q     Now, if from a blood spatter

13   expert point of view if Arlene Tankleff is

14   on the ground, okay, and then naked now, you

15   recall that Mr. Tankleff's confession says

16   he is naked doing all this, correct?

17         A     Yes, he does.

18         Q     So coming back now and

19   inflicting these wounds when she's lying in

20   the ground, right, can you think of how he

21   would be able to get to her back and her

22   neck to inflict these wounds if she is lying

23   on the ground?

24              MR. MITCHELL:  I object to

25         form.  You can answer.

C. Kosciuk                  178

1
2          MR. TIPALDO:   I join.

3      A      How do we know that that

4  occurred on the ground?

5      Q      Well, I'm only going to -- The

6  confession says he got the knife from the

7  kitchen and cut her throat, correct?

8      A      Right.

9      Q      So there is no knife to inflict

10  either the wounds to the back or the wound

11  to the neck?

12      A      Oh, he's saying he only cut her

13  throat, is that what you're saying, and we

14  have wounds to the back that he does not

15  mention?

16      Q      No, I'm saying, if you look at

17  the confession, first he describes hitting

18  her with the barbell?

19      A      Yes.

20      Q      Then he returns into the

21  kitchen and when he comes back with the

22  knife to inflict the injuries from a knife,

23  right, he says that she had fallen on the

24  floor.

25      A      Right.

```
1                        C. Kosciuk          179
2           Q     Okay.
3           A     She could be next to the bed on
4     the north side with the head facing east and
5     still alive, possibly.
6           Q     He indicates that she was
7     alive.  In fact, he said in this confession,
8     no, she was even moving a little bit when he
9     ran out of the bedroom to kill the father.
10    You saw that, right?
11          A     Yeah, you just read it.
12          Q     Okay.  Yes, what we're doing is
13    trying to analyze.  Given your expertise as
14    a blood spatter expert, I understand nobody
15    ever asked you, homicide detectives or
16    district attorneys, to look at this
17    confession and compare it to the evidence at
18    the crime scene.
19          A     That's right.
20          Q     So I'm trying to go through
21    that exercise with you now based on your
22    expertise.  So why don't we take a look at
23    photo 23.
24          A     Well, let's look at.
25                MR. MITCHELL:  I'm sorry.
```

C. Kosciuk                    180

1

2      A     Let's look at 22.

3            MR. MITCHELL:  Wait.  Chuck, He

4      has not asked you a question.

5            THE WITNESS:  I thought he did.

6            MR. MITCHELL:  I don't know.

7      And if he did, I object to the form

8      of it.

9      Q     Well, I don't want to, in any

10     way -- You've been thinking about this over

11     lunch and looking at the pictures?

12     A     No, I'm trying to answer the

13     question that you said.  He says he comes

14     back and she's on the floor.

15     Q     That's correct?

16     A     I kind of agree with that.  Her

17     head is in an easterly direction because we

18     have quite a lot of pooling here and then

19     now all of a sudden she's facing in a

20     westerly direction so yes, she could still

21     be alive and fighting it.

22     Q     So you're now referring to

23     photograph 22, correct?

24     A     Right.

25     Q     And you're referring to pooling

                              C. Kosciuk                181

1

2     on the floor where her right leg is,

3     correct --

4              A     Right.

5              Q     -- in this photograph.  And now

6     let's turn to 23, okay, and that depicts

7     Arlene Tankleff where she was found dead on

8     the floor, right?

9              A     Yes.

10             Q     And you say what direction is

11    that?

12             A     That would be west.

13             Q     West.  All right.  Now --

14             A     Head west.

15             Q     Head west.  So looking at these

16    crime scene photos and assuming that Mr.

17    Tankleff's confession is true that she was

18    on the floor and then he was inflicting the

19    wounds with the knife to her back and her

20    throat.  Can you give us your interpretation

21    in terms of blood patter as to the mechanism

22    as to how those injuries would occur?

23                 MR. MITCHELL:  I object to

24            form.  You can answer.

25             A     First of all, I don't see one

                                    C. Kosciuk          182

1

2    to the throat.  Do you see a throat cut?

3              MR. MITCHELL:  Chuck, don't ask

4         him questions.  Answer his questions

5         if you can answer.

6         Q    You're pointing now to 23 which

7    is the photograph showing her lying on the

8    ground, correct?

9         A    That's correct.

10        Q    Right.  So my question to you

11   is, given this confession, right, and she

12   was lying on the ground after being hit with

13   a barbell on the bed, right, where she

14   started lying on her back that's what this

15   says, correct?

16        A    Right.

17        Q    Now, when he comes back with

18   the knife given that the cuts as we've

19   examined from the autopsy photos are to her

20   back and to her neck, looking at the crime

21   scene, by what mechanism would that occur?

22             MR. MITCHELL:  I object to the

23        form.

24             MR. TIPALDO:  I join.

25        A    Can you define mechanism for

C. Kosciuk                183

1

2    me?

3         Q     Would it be fair to say that

4    given where her final resting place is,

5    right, she would have to be sitting up or

6    she would have be to picked up in order to

7    have that injury to her back with the knife?

8              MR. TIPALDO:  Objection.

9              MR. MITCHELL:  I object to the

10        form.

11        A     I thought we just decided that

12   it's possible that she could have rolled off

13   the bed and ended up on her chest and

14   therefore, she's now having her back exposed

15   and he comes along and starts fighting her

16   with the knife.  I also see a stab wound

17   here on the back.

18        Q     Okay.

19        A     And she's still alive and she

20   ends up trying to turn around and maybe even

21   trying to get out of the room, I don't know.

22        Q     Okay.  So from looking at this

23   one scenario you think is consistent with

24   the blood spatter evidence is that she fell

25   off the bed, she was on her stomach?

C. Kosciuk                184

         A      Chest, stomach.

         Q      Then the injuries with the
knife were inflicted to her back and her
neck and you indicated also a stab wound to
the back, correct?

         A      Correct.

         Q      And those are consistent with
somebody having a knife and Arlene being on
her stomach, correct?

              MR. MITCHELL:  I object to the
         form.

         Q      That's what you're suggesting?

              MR. MITCHELL:  No, that's what
         you're suggesting.  I don't know
         that he's answered that.  I object
         to the form.

         Q      Are you suggesting that?

         A      It's consistent with that, yes.

         Q      By the way, given these stab
wounds it would also be consistent, would it
not, if somebody, right, not talking about
Mr. Tankleff now, but if somebody were to
have attacked Arlene Tankleff while she was
lying on her stomach on the bed, all right,

1                          C. Kosciuk          185

2     initially they could have inflicted the

3     wounds in the same fashion as you're

4     suggesting could have happened with her on

5     the floor, correct?

6               MR. MITCHELL:  I object to the

7          form.  You can answer.

8          A    I can't tell where those cuts

9     in the back.

10         Q    You can't tell where but what

11    you were just saying a second ago, if I

12    understood you correctly, consistent with

13    Mr. Tankleff's confession, then a likely

14    scenario is that she would have fallen off

15    the bed, she would have been on her stomach

16    and then attacked while she was on her

17    stomach with the knife wound, correct?

18         A    That's a possibility, sure.

19         Q    And that's because these knife

20    wounds given their configuration are

21    consistent with her having been on her

22    stomach and being attacked from above while

23    she's lying on her stomach?

24              MR. MITCHELL:  I object to

25         form.

1                              C. Kosciuk            186

2          Q     Is that correct?

3          A     Yes.

4                MR. MITCHELL:  For the record,

5          my objection is to form and that all

6          of these questions require the

7          witness to speculate.

8                He's answering about things

9          that -- He's answering based on this

10         is his testimony today.

11               MR. SCHECK:  Yes.

12               MR. MITCHELL:  I object to the

13         entire line of questioning as it's

14         entirely speculative.  You can keep

15         going.

16               MR. SCHECK:  I understand.

17         Q     Now, in following up on your

18    statement that in terms of reconstructing

19    the crime scene consistent with the

20    confession, if Mr. Tankleff came back, as

21    you're suggesting, with the knife and

22    inflicted these wounds that we see in the

23    autopsy photographs while Arlene Tankleff

24    was on her stomach having rolled off the

25    bed, would you expect that parts of his body

1                           C. Kosciuk          187

2      would be covered in blood after having

3      inflicted these knife wounds?

4              MR. TIPALDO:  Objection.  This

5              witness is not suggesting.  It's

6              what the confession states.  He is

7              not suggesting that he came back

8              with a knife, that's what the

9              confession states.

10             MR. SCHECK:  We understand

11             that.

12             MR. TIPALDO:  No, but.

13             MR. MITCHELL:  You have to

14             clarify it for the record.  It's

15             your question when you --

16             MR. TIPALDO:  Objection to

17             form.

18             MR. MITCHELL:  Objection to the

19             form and, right, I don't want to do

20             a speaking objection.  You can

21             answer.  Listen to his question,

22             answer his question.  Pause because

23             most likely I will be objecting.

24      Q     You understand my question?

25      A     No, give it to me again.

C. Kosciuk                    188

Q    Sure.  We went over together, right, the crime scene evidence and Mr. Tankleff's confession insofar as he came back when she had already "fallen on the floor," right, and then used the knife to inflict the wounds that we see on her back and on her throat, correct?

A    Yes.

Q    All right.  And as we discussed that, and I asked you consistent with the crime scene evidence how could that occur, right, you said that one way that it could have occurred is that she rolled off the bed, was on her stomach, and then he took the knife and inflicted the wounds to the neck and back while she was on her stomach, correct?

A    I did say that, yes.

Q    And then, in this scenario she would have gotten up, struggled, and then fallen to the ultimate resting place that we see her on the side of the bed?

MR. MITCHELL:  Objection to the form.  You can answer.

C. Kosciuk                    189

MR. TIPALDO:  Objection.

A       Or crawled or whatever, yes, to where she's found.

Q       Given that scenario, based on your expertise in blood spatter, would you not agree that if that's the way it occurred that Mr. Tankleff would be -- blood would has transferred to him from the infliction of these wounds and from being on the ground, you know, over her doing the cuttings?

MR. TIPALDO:  Objection.

MR. MITCHELL:  Objection to form.  You can answer.

A       I can answer?

Q       Yes.

A       Okay.  I would suspect that Mr. Tankleff would have blood on him if the bludgeoning took place on top of the bed and he used, let's say, the barbell.  I would expect blood to be splattered back onto him.

The knife wound, now, if that type of a beating, I don't know how her blood pressure is, okay, and if she's near

C. Kosciuk                    190

1   death then I would not expect not a

2   tremendous amount of blood to bleed out

3   about her.  You follow what I'm saying?  If

4   you're near death, you won't get the

5   pressure from the blood.

6              So the beating with the barbell

7   I would, yes, maybe not so much from the

8   cutting that he would get -- He does not

9   even have to be near her, he could stand

10  over her.  And how much alive she was, I

11  have no idea.

12       Q    To the extent that he was in

13  contact with her body when he did the

14  stabbing in this scenario, blood is likely?

15       A    He never said he was in

16  contact --

17              MR. MITCHELL:  Let him finish

18         his question.

19       Q    If it's unclear from this

20  confession how this happened, right, but

21  we're just looking at the crime scene

22  evidence and trying to do a reconstruction,

23  right, of blood patter given the statements

24  that he made, right, and would you not agree

1                            C. Kosciuk          191

2    in the reconstruction you're suggesting

3    looking at the crime scene evidence and the

4    confession that if he came into contact with

5    her body, right, when he was inflicting

6    these wounds with the knife, there would be

7    a transfer of blood from her back or where

8    she was bleeding to his body?

9              MR. MITCHELL:  I object to the

10             form.  It's been asked and answered.

11             You can answer again.

12             MR. TIPALDO:  Objection to

13             form.

14        A    If Mr. Tankleff ended up with

15   body contact with her and she was full of

16   blood, not so much from the cutting but the

17   fact that she was full of blood, I would

18   expect blood to transfer back to Mr.

19   Tankleff.

20        Q    And when you say transfer,

21   you're indicating to his torso and body?

22        A    Wherever, right.

23        Q    You know -- You're aware that

24   there were defensive wounds to Arlene

25   Tankleff, both contusions and cuts on her

C. Kosciuk                192

arms?

          A     Yes.

          Q     All right.  If there was a
struggle with defensive wounds where she was
being cut, right, and he had a knife in this
scenario, there would tend to be castoff or
blood spatter on him as the fighting took
place, that would be your expectation as a
blood spatter expert?

               MR. MITCHELL:  I object to the

          form.  You can answer.

          A     I would qualify that to the
point with how dead or how near to death she
is, how much transfer; in other words, how
much blood would be shooting out of her
based on those defensive wounds.

          Q     Well, if there are defensive
wounds with cuts, and she's already been
bludgeoned about the head, right, if there's
cuts that means he has already come back
with the knife, correct?

               MR. MITCHELL:  Objection to

          form.

          A     I think you misunderstood what

C. Kosciuk                    193

1    I said.  In other words, if she is near

2    death, I would expect less bleeding from

3    those wounds.  Is that -- Did I make myself

4    clear?

5           Q    So there would be blood spatter

6    but if she's near death it would be less of

7    it?

8           A    I did not say blood spatter,

9    you did.  Some type of transfer.

10          Q    Transfer.  And you say the

11   closer she would be to death the less

12   transfer you would expect?

13          A    Yes.

14          Q    But if there was a vigorous or

15   lengthy struggle, you would expect more

16   transfer?

17               MR. MITCHELL:  Objection to

18          form.  You can answer.

19          A    There again.  It depends on how

20   close or near she was to death.  If there

21   was a tremendous struggle and she's rolling

22   around with him on the floor, yes, I would

23   expect that there would be a tremendous

24   amount of transfer.

C. Kosciuk                194

1    Q    Now, let's move on in the

2    confession.

3

4    A    Sure.

5    Q    He next says, "I asked him if

6    his father was still in the office.  He

7    said, yes, his father was still in the

8    office.  He said he was sitting at his desk.

9    He said his father was awake now and asked,

10   "What are you doing?"  I asked him if he

11   went in there naked.  He said he was still

12   naked.  I asked him what he did with the

13   knife and the dumbbell.  He said he walked

14   in with the knife on the dumbbell behind his

15   back.  I asked him what he did first, cut

16   his throat or hit him, he said he got behind

17   his father and hit him with the barbell

18   first."  Okay?

19   A    Yes.

20   Q    Now, going back to the diagram,

21   Exhibit 1.

22   A    Okay, the master bedroom.

23   Q    The master bedroom is all the

24   way -- In what direction is the master

25   bedroom?  We're looking at Exhibit 1.

1

2          A     North is to the top of the

3    page.

4          Q     So this would be to the

5    northeast, correct?

6          A     Correct.

7          Q     So the master bedroom is all

8    the way on the northeast side of the house,

9    correct?

10         A     That's correct.

11         Q     And so according to this

12   confession, Marty Tankleff naked, correct?

13         A     Yes, as far as the confession,

14   yes.

15         Q     Right, and your expectation as

16   a blood spatter expert, he would have --

17   however this bludgeoning and stabbing

18   occurred -- would have blood on his person,

19   correct?

20               MR. MITCHELL:  I object to the

21         form.  In the first place, he is not

22         here as an expert Rule 26 and you're

23         asking hypotheticals that, I think,

24         go beyond what he is here for.

25               MR. SCHECK:  You made that

                    C. Kosciuk              196

1    objection.  So I'm going to direct

2    him to answer because I think he's a

3    blood spatter expert and he was

4    never asked to opine about this so

5    I'm asking him to opine now.

6         MR. MITCHELL:  It's not

7    relevent what his opinion is.

8    That's the point.  It's something

9    you're making up scenarios and we

10   could be here all day where you

11   could say, if the guy had blood on

12   his feet and the guy had blood on

13   his ears.

14        You're just making up facts and

15   asking him what's his opinion and

16   it's an improper way of doing it.

17        You know what, I object.  You

18   can answer the question.

19        MR. TIPALDO:  I object.

20   Q    Now, by the way --

21        MR. MITCHELL:  If you want to

22   just ask him was there any blood

23   between the bedroom and where he is,

24   that would make sense instead of the

C. Kosciuk                197

lead up by reading something that he

has not seen before and then you're

not even formulating a question

from.  You read from it and then

say, now, let me ask you something.

That's the point of my

objection.  The way you're asking

the questions are improper and

basically amount to nothing more

than pure -- and it's not even a

hypothetical expert response.  It's

entirely speculative.  Go ahead.

MR. SCHECK:  I don't think it

is.

MR. MITCHELL:  I know you

disagree with me.

Q    By the way, when you have

discussions with homicide detectives at

crime scenes and a discussion of blood

spatter and reconstruction, right, when they

talk to you about it, would they ask you a

question if a perpetrator did action A, B

and C, is that consistent with the blood

spatter you see at the scene, right?

1                          C. Kosciuk            198

2              MR. MITCHELL:  I object to the

3         form.  You can answer.

4         Q     They ask you questions like

5    that?

6         A     No.  They don't.

7         Q     No one ever asked you a

8    question like that?

9         A     No.  We usually tell them

10   what's going on.

11        Q     But sometimes they will propose

12   scenarios of what might have happened based

13   on other evidence they have, correct?

14             MR. MITCHELL:  Objection to the

15        form.  You can answer.

16        A     Not to my knowledge.  They have

17   not asked me.

18        Q     It's never happened?

19        A     No.

20        Q     What about district attorneys,

21   have they ever asked you questions like

22   that?

23             MR. MITCHELL:  I object to

24        form.  You can answer.

25        A     Different scenarios, yes, they

C. Kosciuk                    199

1

2    have.

3             Q     And you did that in this case

4    too, right?  You gave a whole scenario about

5    how you thought the murder occurred in the

6    office with the knife and the barbell and

7    Seymour Tankleff, right?

8                  MR. MITCHELL:  I object to the

9             form.  You can answer.

10                 MR. TIPALDO:  I join.

11            A     I don't think I ever mentioned

12   the barbell in the testimony.

13            Q     Well, a blunt force object and

14   a knife?

15            A     Right.  I don't think I

16   mentioned the knife in that testimony.

17            Q     You did not mention the knife?

18            A     Yeah.

19            Q     Well, you opined about

20   instruments that could have been used to

21   cause injuries in the office and castoff and

22   blood spatter patterns on the chair, on the

23   ceiling, all around, correct?

24                 MR. MITCHELL:  Objection.  Just

25            for clarification, during his trial

C. Kosciuk                    200

1
2      testimony, that's what you're
3      talking about?
4          Q    Yes, you did that during the
5      trial, right?
6              MR. MITCHELL:  Objection.
7          Q    You did that during the trial?
8              MR. MITCHELL:  Wait.  I'm going
9      to renew my objection.  If you want
10      to ask him about trial testimony,
11      ask him a question and answer.
12      That's the proper format.  To simply
13      ask a broad, you said this at the
14      trial, is improper.
15              MR. SCHECK:  How about this,
16      Brian -- I don't think it's
17      improper, but Ill try it this way.
18              MR. MITCHELL:  Don't patronize
19      me, sir, please.
20          Q    Before you testified at the
21      trial, you sat down with the prosecutor;
22      didn't you?
23          A    Yes.
24          Q    You went over your trial
25      testimony; didn't you?

C. Kosciuk                201

2     A    Yes.

3          Q    And in the preparation of your

4    trial testimony didn't he ask you questions

5    about if given the crime scene evidence if

6    Marty Tankleff came from behind and engaged

7    in this action or that action, would that

8    account for castoff for other blood spatter

9    patterns on the chair, on the phone, on the

10   desk, et cetera?  You had that kind of

11   discussion with the prosecutor; didn't you?

12              MR. MITCHELL:  I object to the

13         form.  You can answer.

14   A    No.

15        Q    You didn't?

16   A    No.

17        Q    You mean what happened was is

18   that you sat down with the prosecutor and

19   you said to him without any interchange of

20   question and answer, here's how it happened?

21              MR. MITCHELL:  I object to the

22         form.  You can answer.

23   A    Yes.

24        Q    Now, then humor me, okay --

25              MR. MITCHELL:  I object.  Wait.

C. Kosciuk                    202

1  I'm just objecting to the phrase

2  "humor me."

3      MR. SCHECK:  I will withdraw

4  that.

5      MR. MITCHELL:  I know it's

6  getting late and all that baloney

7  but ask him questions.

8      MR. SCHECK:  I withdraw that.

9  I mean you can continue objecting if

10  you want, Brian.  You have your

11  objections that this is an improper

12  use of him as an expert and I think

13  that I'm allowed to do this.

14      MR. MITCHELL:  Okay.

15      MR. TIPALDO:  In case the

16  record does not reflect my joining

17  in that same objection for the very

18  same reasons, please.

19      MR. SCHECK:  No problem guys.

20  Everybody is doing their job.

21      Q    Now, so would it be fair to say

22  given what we've reviewed so far about what

23  Mr. Tankleff says he did to first bludgeon

24  his mother, while was in the bed lying on

C. Kosciuk                    203

her back and then going to get the

watermelon knife from the kitchen, come back

and inflict the stab wounds that we found on

Mrs. Tankleff, all right, that when he

describes walking from the master bedroom in

the northeast section of the house all the

way to the office which is the northwest --

        MR. MITCHELL:   That's in

    reverse.

    Q    Which is the south?

    A    Yes, northwest, northeast.

    Q    Going from the northwest to the

northeast?

    A    Right.

    Q    That he would have to traverse

the whole expanse of the house, correct?

    A    Yes.

    Q    And he's carrying a dumbbell

that has -- I think you would you agree --

some blood on it and a knife that has some

blood on it, and there has been some

transfer of blood to his body, correct?

    A    There could have been some

blood transfer to his body if he was close

                                    C. Kosciuk                    204

1

2     to her, yes.

3              Q     And so but you found no

4     droplets of blood between the master bedroom

5     and the office, correct?

6              A     That is correct.

7              Q     And he then indicates when he

8     walked into the office and he saw his

9     father, his father was awake and asked him,

10    "What are you doing," correct, you see that

11    in the confession?

12             A     Oh, I thought you were asking.

13             Q     You see that?

14             A     Yes, I see that.

15             Q     And he is saying he has the

16    barbell and knife behind him, correct?

17             A     Yes.

18             Q     So would it be fair to say that

19    when Mr. Martin Tankleff is answering this

20    question, consistent with this confession,

21    he would have been naked with blood on his

22    person with the barbell and knife behind him

23    when his father asked him, "what are you

24    doing"?  That's consistent with this

25    confession, correct?

C. Kosciuk                    205

1

2        A     Yes, it's consistent with the

3   confession.

4        Q     All right.  And then, "I asked

5   him what he did first, cut his throat or hit

6   him.  He said he got behind his father and

7   hit him with the barbell first.  I asked him

8   if his father fought him like his mother

9   did.  He said his father asked him why he

10  was doing this.  He volunteered that he

11  knocked him silly."  Okay, you see that?

12       A     Yes.

13       Q     Now, from the entranceway to

14  the office, okay, which is --

15       A     That one square is the whole

16  office, the white square.

17       Q     How many entrances are there to

18  the office, if you know?

19       A     Well, I do know.  There's two

20  large sliding glass doors, a door from the

21  utility area to the house, and then a side

22  door.

23       Q     Where is Mr. Tankleff seated in

24  the office, if you could just draw that on

25  Exhibit 1, which corner?

C. Kosciuk                    206

    A    He would be in the northeast

corner.  The desk, you want me to draw the

desk in?  Is that what you want?

    Q    Yeah.

    A    Somewhere in this area

(indicating).  And the chair would be

somewhere like this (indicating).

    Q    Now, do you know how far the

doorway is from the desk?

    A    I don't remember those

dimensions.  We measured that distance, but

I don't know the distances offhand.

    Q    When you entered the crime

scene -- So whatever that distance is

between the desk and the doorway, right,

that would be certainly the distance between

Mr. Tankleff, Martin Tankleff, entering,

right, with the barbell and the knife behind

him naked and his father sitting behind the

desk, correct?  Is that right?

    A    It would not be a straight line

because there was a lot of furniture in that

particular room so he would have to walk

around furniture.  And then, when he's

C. Kosciuk                    207

1

2    talking to him we don't know where he is.

3         Q    So he would have to walk around

4    furniture?

5         A    A card table was set up here

6    (indicating).

7         Q    He would have to walk around

8    furniture naked with blood on his person

9    with a barbell and a knife behind him,

10   right, and then circle behind the chair

11   where Seymour Tankleff was; is that correct?

12        A    Yes.

13        Q    All the time without his father

14   moving out of the chair or moving the chair

15   back, right, in terms of how you

16   reconstructed this crime scene?

17        A    I'm not following you as far as

18   moving the chair back.

19        Q    Your reconstruction -- And you

20   did do a reconstruction of the crime scene

21   in the office, correct?

22        A    Are you talking about placing

23   the desk and the chair together again in the

24   original position?

25        Q    If I understand, your

C. Kosciuk                    208

1    reconstruction of what happened is that

2    you're saying that somebody was behind the

3    chair and inflicted injuries over the top of

4    the chair to the top of Seymour Tankleff's

5    head; is that right?

6    A      Yes.

7    Q      And how many blows?  At least

8    four?

9    A      Well, there was bloodstain

10   castoff to the northerly direction, which

11   would be towards the sliding doors, and then

12   there were two castoffs to the easterly

13   direction directly behind the chair, both of

14   them converging approximately over the

15   chair.

16   Q      Now, do you know how much room

17   there was between the chair and the wall?

18   A      Yes.

19   Q      How much?

20   A      I don't know.  I would have to

21   refresh my memory.  It was measured though.

22   Q      Was it a very large space?

23   A      You want me to guess

24   apparently.

<pre>
                          C. Kosciuk              209

 1

 2        Q    No, to the best of your -- You

 3   actually took a measurement of the distance

 4   between the chair and the wall --

 5        A    Yes.

 6        Q    -- is that right?

 7        A    Yes.

 8        Q    Where would you have that?

 9        A    It would have been in my notes.

10        Q    You took notes?

11        A    Well, the notes, the crime

12   scene notes that were turned in for trial.

13        Q    All right.  We're going to have

14   a motion to produce those notes because --

15             MR. MITCHELL:  If you did not

16        get them, I'll give them to you.

17        Q    When you say crime scene, to

18   help us lawyers here in the production, can

19   you describe what you mean by crime scene

20   notes?

21        A    In other words, items that were

22   collected, the times they were collected.

23        Q    No, but we're talking about the

24   measurements, the diagram --

25        A    Right.
</pre>

1                          C. Kosciuk              210

2          Q     -- between the chair and the

3     wall and the actual measurements.  You did

4     something like that?

5          A     Oh, sure, yes.

6          Q     Where would those have gone

7     after you did it?

8          A     Where would they go?

9          Q     Yes, what happens?

10         A     I assume they are still at the

11    laboratory but the DA's office must have

12    copies because they were in court.

13         Q     Just so I understand, I don't

14    want to put any words in your mouth, but

15    based on your answers earlier today that it

16    was your custom and practice when doing

17    crime scenes is that you would take the

18    measurements, right, you would photograph

19    the various items of evidence and the blood

20    spatter, and then you would orally report

21    any reconstruction or theories you had as to

22    how the crime occurred to the homicide

23    detectives orally, correct?

24              MR. MITCHELL:  He said they may

25         have been present when he said it.

C. Kosciuk                    211

1
2       Q     Right, whether it's orally in

3  their presence or sometime therefore, that's

4  how you would communicate, correct?

5       A     Except the order is a little

6  different.  First the item would be

7  photographed without being touched.  The

8  laboratory tag would be placed and

9  rephotographed, then the item would be

10  measured and documented as to its location

11  in the room, and then collected and placed

12  in a laboratory bag and sealed.

13       Q     But what I'm asking is about

14  the reconstruction itself.  That is

15  something that you would do orally, either

16  to the detective at the scene or sometime

17  subsequent, correct?

18       A     Yes.

19       Q     All right.  And there was not a

20  custom or practice in the Suffolk County

21  Crime Lab or in your work to actually write

22  a report that described your reconstruction

23  or your theory of how things occurred at a

24  crime scene given the items of evidence and

25  the blood spatter?

C. Kosciuk                212

         MR. MITCHELL:  I object to the

    form.  You can answer.

    A    There was no formal report

written.

         Q    It was not your practice to

write reports?

         A    No.

         MR. MITCHELL:  Objection to

    form.  You can answer.

         Q    Are you aware of whether or not

in the field of blood spatter analysis it

was a general practice after taking

measurements, photographing items and

looking at all the evidence, to write

reports about the reconstruction that an

expert might ultimately testify to?

              MR. MITCHELL:  I object to

    form.  You can answer.

              MR. TIPALDO:  I join.

         A    No.  What year did that come

into play?

              MR. MITCHELL:  Just answer his

    question.

         Q    I'm asking do you know.  I'm

C. Kosciuk                213

1   asking about your knowledge.

3         A     No.

4         Q     Now, so you agree that based on

5   the confession, that Martin Tankleff would

6   have to enter the office with a barbell and

7   the knife behind him with some blood on his

8   person, right, engage in this dialogue with

9   his father where his father says, "what are

10  you doing," right?

11        A     Yes.

12        Q     And then he would have to go

13  around some furniture and go behind the

14  chair, right?

15        A     Right.

16        Q     Okay.  And then according to

17  this confession, he then hits him on the top

18  of the head with a barbell, correct?

19              MR. MITCHELL:  I object to the

20        form.  You can answer.

21              MR. TIPALDO:  Objection.

22        A     First, I never said which blows

23  were first, and it could have been on the

24  side of Mr. Tankleff for the first blow and

25  the other two would follow.  So he could

C. Kosciuk                    214

1

2    have been to the left side first -- I'm

3    sorry, to the right side first or the north

4    side of Mr. Tankleff for the first blow --

5    in other words, the blow came from the

6    side -- and catch him off guard and then go

7    by in the chair and hit him twice more.

8              Q    Do you recall ever telling

9    anybody that the first blows could be from

10   the side?

11             MR. MITCHELL:  Objection to

12        form.  You can answer.

13             A    I think you just told me that

14   he is from behind, hit twice --

15             Q    I'm asking you about your

16   reconstruction.  In other words, if I

17   understand your testimony correctly, what

18   you did is you analyzed the crime scene

19   evidence, you formulated your

20   reconstruction, you went and you provided

21   that orally to homicide detectives, but

22   you're not sure who, and then when you went

23   to talk to the prosecutor before the trial

24   you just presented your reconstruction of

25   how you thought this happened based on the

1                          C. Kosciuk                215

2     blood spatter evidence without any real

3     interchange with the prosecute or am I

4     misstating anything?

5              MR. MITCHELL:  Objection to

6         form.  You can answer.

7              MR. TIPALDO:  I join.

8         A    Yes.

9         Q    Okay.  So in your presentation

10    to the homicide detective or the prosecutor

11    before the trial, did you ever tell them

12    that the initial blows could have been

13    inflicted from the side?

14             MR. MITCHELL:  Objection to

15        form.  You can answer.

16        A    I can't remember.

17        Q    Okay.  But as far as you're

18    concerned right now, based on your

19    recollection and your examination of the

20    evidence, you think that is consistent with

21    your interpretation of it that the initial

22    blows could have been inflicted from the

23    side?

24             MR. MITCHELL:  Objection to

25        form.  You can answer.

C. Kosciuk                216

1

2      A      No, I just said I don't know if

3   the blows came from the back or from the

4   side first.

5      Q      Well --

6      A      I don't know the sequence of

7   the blows.

8      Q      If the initial blows to Seymour

9   Tankleff's head came from the side and not

10  the back, would that have significance in

11  terms of the blood spatter evidence that you

12  observed at the scene?

13             MR. MITCHELL:  Objection to

14        form.  You can answer.

15     A      Can you repeat that.

16     Q      Yeah.  If the initial blows

17  came from the side and not from the back of

18  the chair, right, would that have any

19  significance in terms of the blood spatter

20  evidence that you observed at the scene?

21     A      No.

22     Q      Why not?

23     A      Because there was the evidence

24  that I observed was deposited on the ceiling

25  and that's what I interpreted.

C. Kosciuk                217

1    Q    There was also blood spatter on
2
3    the desk that you interpreted, right?
4    A    Yes.  Are you talking about the
5
6    number of blows and the castoff.  I thought
7
8    that was what we were talking.
9    Q    Not just talking about the
10
11   castoff.  In terms of the entire scene, if
12
13   there were two initial blows that, as you
14
15   suggested were possible here, were initially
16
17   inflicted from the side, would that have
18
19   any --
20   A    I never said two from the side
21
22   or one from the side.  One from the side,
23
24   right.
25
     There was bloodstain castoff in

the northerly direction.  One.  From the

back, two in two different angles converging

over the desk.

     Q    So you think there was one --

Based on the castoff you're saying that

there was one blow from the side?

     A    Well, that could be argued too

because it would take one blow to start the

head to bleed before you would get the cast

C. Kosciuk                    218

off.  So there would have to be a strike to

the head, allow the victim to bleed, hit him

again and now the instrument will become

bloody and therefore you would get castoff.

     Q    Now, as a matter of just common

sense, if this confession is true, right,

and Seymour Tankleff was in a position to

see Martin Tankleff naked with blood on him,

right, at the doorway, given the

configuration of the room, wouldn't that

provide Seymour Tankleff with some time to

pull away from the desk and start to get out

of the chair?

         MR. TIPALDO:  Objection.

         MR. MITCHELL:  I object to

    form.  You can answer.

     A    Well, do we know the father is

really awake?

     Q    Well, in this confession --

     A    You're taking that as gospel.

         MR. MITCHELL:  He's asking you

    to assume.

     Q    I'm asking you to assume that

the confession in the case is reliable.

                              C. Kosciuk              219

1

2        A     Give it to me again.

3              MR. MITCHELL:  I object to

4        that.

5              MR. SCHECK:  You're absolutely

6        right, Brian.

7        Q     I'm asking you to assume that

8   the confession as written and as recited is

9   true.

10             A     Go ahead.

11             MR. TIPALDO:  Objection.

12        That's not what you're asking.

13        You're throwing in information that

14        is not contained in that document.

15             MR. SCHECK:  Well, I'm sorry.

16             MR. TIPALDO:  No, I'm sorry.

17        There is nowhere in that document

18        that it indicates that his father

19        sees him in that doorway.  Nowhere.

20        We can stipulate to that.

21             MR. SCHECK:  No, not at all.

22        Let's see what the document says and

23        anybody can argue what is --

24             MR. MITCHELL:  I would ask him

25        the question again.  The document

C. Kosciuk                    220

1   speaks for itself.

2          MR. SCHECK:  We're getting a

3          little -- and I know it was not

4          ill-intentioned on your part, but

5          let me just backtrack a little bit

6          by reciting from what is or is not

7          in the document.  Is that okay with

8          you, Joe?

9          MR. TIPALDO:  That's fine.

10    Q    "I asked him if he went in

11   there naked.  He said he was still naked."

12   I'm sorry.  Let me start at the very

13   beginning of the first full paragraph on

14   Page 12.  "I asked him if his father was

15   still in the office.  He said yes, his

16   father was still in the office.  He said he

17   was sitting at his desk.  He said his father

18   was awake now and asked, "What are you

19   doing?"  I asked him if he went in there

20   naked.  He said he was still naked.  I asked

21   him what he did with the knife and the

22   dumbbell.  He said he walked in with the

23   knife and the dumbbell behind his back.  I

24   asked him what he did first, cut his throat

1                           C. Kosciuk          221

2      or hit him.  He said he got behind his

3      father and hit him with the barbell first.

4      I asked him if his father fought like his

5      mother did.  He said his father asked him

6      why he was doing this.  He volunteered that

7      he "knocked him silly."  I asked him how he

8      kept his father from getting out of the

9      chair, he said his father's feet were under

10     the desk so he could not get up."  You see

11     that?

12           A     Do I?  Yes.

13           Q     Okay.  So given that scenario,

14     what this confession is saying is that

15     Martin Tankleff walked through the door with

16     a dumbbell and knife behind him, and you've

17     agreed that given his description and the

18     confession of what happened at the crime

19     scene with his mother he would have blood on

20     him, true?

21           A     Yes.

22           MR. MITCHELL:  I object to the

23           form.  You can answer.

24           MR. TIPALDO:  I join.

25           Q     Then, based on what you told us

1                          C. Kosciuk          222

2    about the configuration of the room, the

3    office, Martin Tankleff, consistent with his

4    confession, would have this discussion with

5    his father that he recites and would be able

6    to move around the furniture and get behind

7    him, behind the chair, correct?

8              MR. TIPALDO:  Again, this is

9         not my witness.  I can't direct him

10        not to answer but the form of that

11        question is absolutely -- It's

12        inconsistent with what's written on

13        the page.  I mean you're adding to

14        the story.

15             MR. MITCHELL:  I'm objecting to

16        the form.  I'm not going to direct

17        him not to answer.  I'm just

18        objecting to the form.

19             If you understand the question,

20        answer the question.  You know, you

21        can answer the question but I object

22        to the form.

23        Q    Go ahead.

24        A    Okay.  First of all, I never

25    said that the first blows were from behind

C. Kosciuk                     223

the chair.  I don't know where the first

blows were.

            MR. MITCHELL:  And I don't

            mean -- Maybe this will help.  Mr.

            Kosciuk is saying if what's on the

            piece of paper here, if that's what

            happened.

            MR. SCHECK:  Marty says he is

            behind the chair --

            MR. MITCHELL:  First of all,

            you can't talk at the same time.

            This lady can't take it.

            MR. SCHECK:  I'm sorry.

            MR. MITCHELL:  I think what

            he's saying is if what's on the

            piece of paper, regardless of who

            said it, what he's reading off the

            piece of paper, if that's something

            that occurred, then that would -- I

            don't know if the word infer is

            correct -- that would mean this

            would happen.

            MR. SCHECK:  Right.

            MR. MITCHELL:  I think that's

C. Kosciuk                    224

1

2          what he's trying to ask you.  When

3          he asks you that, let me object and

4          then you answer that.

5              MR. SCHECK:  You have a

6          standing objection.

7              MR. MITCHELL:  I appreciate

8          that Barry and there is a couple of

9          times where I'm not sure if it

10         applies but I get it.

11    A     Is it my turn to answer?

12             MR. MITCHELL:  It is your turn

13         to answer if you can.

14    Q     Yes, sir.

15    A     You're saying that Marty walks

16    into the room and walks behind the chair?

17    Q     That is what he says here.

18    A     And hits him twice on the back

19    of the head.  Hits him from behind.

20    Q     Hits him from behind, that's

21    correct?

22    A     You want me to say if that's

23    possible?

24    Q     No, let's just agree that based

25    on your observations of the crime scene in

C. Kosciuk                      225

1

2      the office that would mean that he would

3      first be walking into the room with the

4      dumbbell and the knife behind him covered

5      with blood, correct?

6              A     Yes.

7              MR. MITCHELL:  Objection to

8              form.

9              Q     With blood on him, correct?

10             A     Yes.

11             Q     Then, following the confession

12     this dialogue would occur where the father

13     says -- father is awake and says, "what are

14     you doing," correct, that's what it says

15     here?

16             A     Yes.

17             Q     And then, Marty would have to

18     go around furniture in front of the desk and

19     move behind the chair in order to hit him

20     from behind the chair and force him from

21     getting out of the chair?

22             MR. TIPALDO:  Objection insofar

23             as the characterization of it

24             following the confession.  Over

25             objection.

C. Kosciuk                    226

1

2       Q     Let me stop you here.  Help you

3    here.  In order to get behind the chair,

4    based on your understanding of the office,

5    he would have to walk around furniture,

6    correct?

7       A     The card table intervenes

8    between the doorway and the desk.  It was

9    set up with chairs.

10      Q     It says here in the confession

11   that, "I asked him how he kept his father

12   from getting out of the chair.  He said his

13   father's feet were under the desk so he

14   could not get up."  You see that?

15      A     Yes.

16      Q     Okay.  So would you not agree,

17   based on the confession, he's saying he was

18   able to -- that Marty is saying he's able to

19   enter with the dumbbell and the knife behind

20   him with, you would agree, some blood on his

21   person.  When his father said, "what are you

22   doing," he would have to go -- if this

23   confession is true -- he would have to go

24   behind, go around the furniture to get to

25   the chair and be able to prevent his father

C. Kosciuk                    227

1   from getting out of the chair by keeping

2   him, the father, his legs under the desk

3   having the chair jammed under the desk.

4   That's what this statement is saying,

5   correct?

6                MR. TIPALDO:  I reiterate my

7        same objection.

8        Q    That's your understanding?

9        A    What's the question?

10       Q    My question is, is that your

11   understanding of this statement?

12       A    Yes.

13       Q    All right.  Now, it says here,

14   does that raise any doubts in your mind

15   about whether this confession makes common

16   sense?

17               MR. MITCHELL:  I object to the

18        form.  You can answer.

19               MR. TIPALDO:  I join.

20       A    You're taking the scenario of

21   this thing --

22       Q    I'm only taking what the

23   confession says.

24       A    Confession.  You created the

1                          C. Kosciuk            228

2     scenario now you're asking me does it make

3     sense.

4          Q    I'm hardly creating the

5     scenario.  I'm asking this confession as

6     recited, these set of events.

7          A    Does this confession make

8     sense?

9          Q    Yes, common sense to you?

10              MR. MITCHELL:  I object again.

11         You can answer.

12         A    I would say yes, it's possible.

13         Q    All right.  You said it's

14    possible.  I'm saying, does it make common

15    sense to you?

16              MR. MITCHELL:  I object to the

17         form.  You can answer.

18         A    Yes, why not?

19         Q    Is there a difference between

20    something being possible and probable from

21    your point of view as a blood spatter

22    expert?

23              MR. MITCHELL:  I object to the

24         form.

25         A    Blood spatter does not enter

C. Kosciuk                    229

1

2    into this picture here for Marty to get from

3    the doorway to behind the desk.

4         Q    As a forensic scientist when

5    you analyze crime scenes, is there a

6    distinction between something being

7    "possible" and something being likely or

8    probable?

9              MR. MITCHELL:  I object to the

10             form.  You can answer.

11        A    Yes, there is a difference.

12   But in this particular case, the scenario

13   you laid out here or the confession, is it

14   possible for him to walk from the doorway

15   around the desk to behind his father if the

16   father has trust in him?  Yes, why not?

17        Q    You said his father has trust

18   in him, but the father is asking him, "what

19   are you doing," and you agree that according

20   to the confession he has the dumbbell and

21   the knife behind him.  He is naked.  It is

22   sometime after 5:35 in the morning and he

23   has blood on his person, right?

24             MR. MITCHELL:  I object to the

25             form.  You can answer.  Go ahead.

1                              C. Kosciuk              230

2           A     How do you know the father sees

3      the blood?

4           Q     All right.  So, okay.

5                 MR. MITCHELL:  Let me ask --

6           Q     Let me ask you this.

7                 MR. MITCHELL:  His response to

8                 you, I think, underscores why these

9                 types of questions we can go on all

10                day with them.

11          Q     Let's go to something very

12     specific.  The next thing in this

13     confession -- and I realize we have two

14     minutes -- the next thing in this confession

15     is that he says, "I asked him what he did

16     next and he said he slashed his father's

17     neck."  Do you see that?

18          A     Yes.

19          Q     All right.  Now, you gave a

20     statement to the -- You have an Exhibit 7.

21                MR. SCHECK:  Let's stop here.

22                THE VIDEOGRAPHER:  Going off

23                record at 3:51 p.m. This is the end

24                of Tape 4.

25                     (At this time, a brief recess

C. Kosciuk                231

1

2      was taken.)

3            MR. SCHECK:  Please mark these.

4            (Whereupon, Plaintiff's

5      Exhibits 10 and 11 were marked for

6      identification.)

7            THE VIDEOGRAPHER:  This is the

8      beginning of Tape 5.  We're back on

9      the record at 3:59 p.m.  You may

10      proceed.

11      Q     Going back to where we left

12 off, I read you the part of the confession

13 where it says, "I asked him what he did next

14 and he said he slashed his father's neck."

15 You see that?

16      A     Yes.

17      Q     All right.  Now, based on this

18 confession, the slashing of the father's

19 neck would have been done by the watermelon

20 knife which Marty had retrieved from the

21 kitchen used to inflict injuries to his

22 mother and now was slashing his father's

23 neck, correct?

24            MR. TIPALDO:  Objection.

25      A     I don't follow you.  Is that

C. Kosciuk                232

1  what you're telling me?

2          Q     In reviewing this confession --

3  we can go over it again if you want, but I

4  think you've been following it pretty

5  well -- Marty says in this confession that

6  he first bludgeons his mother in the bed

7  with the barbell, correct, remember that?

8          A     Yes.

9          Q     That he goes into the kitchen

10 to get the watermelon knife, correct?

11         A     And uses that knife on his

12 father?

13         Q     Let's just take it a step at a

14 time.  He uses that watermelon -- He gets

15 the watermelon knife from the kitchen, he

16 comes back to the bedroom and uses that to

17 inflict wounds on his mother, right?

18         A     Yes.

19         Q     That's what the confession

20 says.  Are you with me?

21         A     Yes, yes.

22         Q     And then he says that he walks

23 into the father's office and he has the

24 dumbbell and the watermelon knife behind his

                                    C. Kosciuk          233

1    back, that's correct?

2         A    That's correct.

3         Q    That's what the confession

4    says, right?

5         A    Yes.

6         Q    And now we're at the point in

7    the confession where he says he uses the

8    watermelon knife to slash his father's neck,

9    correct?

10        A    Correct.

11        Q    Now, you're familiar with that

12   watermelon knife, correct?

13        A    Yes, the knife near the

14   watermelon, yes.

15        Q    And you were asked to focus on

16   that knife when you retrieved it from the

17   crime scene, correct?

18        A    Yes.

19        Q    And we have pictures of it here

20   that we've reviewed together, correct?

21        A    Yes.

22        Q    And you saw no blood on that

23   knife on September 7th, correct, and 8th

24   when you recovered it?

C. Kosciuk                234

1
2      A     Not microscopically, just a

3   quick physical exam.  It was placed into a

4   container to go back to the laboratory for

5   further examination.

6      Q     And you were aware that the

7   knife was examined, taken apart, and

8   presumptive testing was done, and there was

9   no traces of blood whatsoever found on that

10  knife, correct?

11     A     Yes.

12     Q     Now, I'm directing your

13  attention to your statement which is

14  Exhibit -- Where is the statement to the

15  State Investigation Commission?

16     A     This one?

17     Q     Yes, that's Exhibit 7.  And I'm

18  going to call your attention to Page 3.

19  Okay.  Why don't you take a look at the

20  third paragraph on the page and I'm going to

21  read this to you.  This was a statement you

22  made to the investigators from the State

23  Investigation Commission.

24          MR. MITCHELL:  Before you read

25          Barry, it's not -- It's a

1                                    C. Kosciuk              235

2        memorandum.  It's not a statement he

3        made.  It's not fact.  I appreciate

4        it seems to be a memorandum from

5        Anthony Helmer who is a chief

6        investigator that relates his

7        interview with the witness.

8             MR. SCHECK:  That's correct.

9             MR. MITCHELL:  This is a lawyer

10       thing.  It's not a statement to the

11       State of New York Commission.  That

12       would be entirely different.  I just

13       want to make sure it's identified

14       correctly.

15            MR. SCHECK:  Let's be clear.

16       This is a memorandum written by a

17       Kenneth F. Christopherson, special

18       agent, with respect to an interview

19       that he conducted with Mr. Kosciuk

20       on July 17, 2008 at Mr. Kosciuk's

21       home.

22       Q    Do you see that?

23       A    Yes.

24       Q    And you do recall, and I think

25       you mentioned before, that you were so

C. Kosciuk                  236

1

2      interviewed by agents from the State

3      Investigation Commission?

4               A      Yes, I was.

5               Q      And you did not remember their

6      names but you do remember making statements

7      to them, correct?

8               A      Yes.

9               Q      Now, I'm calling your attention

10     to this memorandum and I will just read what

11     is in that memorandum and ask if this is

12     what you said to them.  "Kosciuk said he did

13     not believe that a knife recovered on the

14     kitchen table was used to cause Seymour's

15     injuries.  He said that Tankleff admitted to

16     McCready that he used the knife that was on

17     top of the table next to the watermelon.  It

18     is Kosciuk's "gut feeling" after reviewing

19     Seymour's X-rays that a utility-type knife

20     was used to cause his wounds.  He bases his

21     opinion on the type of wounds which were

22     long, thin, narrow slashes that he believes

23     were likely caused by a razor-like blade.

24               Additionally, while he was at

25     the morgue, Kosciuk observed small marks

C. Kosciuk                    237

1    (dots) at the start of Seymour's slash

2    wounds that appeared to him to be indicative

3    of marks that could have been left by the

4    handle of a utility knife.  He stated that

5    he may have discussed this matter with

6    medical examiner, Dr. Dawson:  Okay, you see

7    that?

8         A    Yes.

9         Q    Did you make that statement to

10   the agent from the State Investigation

11   Commission?

12        A    Not exactly like this, no.

13        Q    Well, tell us what you think is

14   incorrect about how you were quoted in this

15   memorandum?

16        A    I stated to him that I believe

17   that it's a strong possibility that the

18   weapon could be a utility-type knife and

19   that at the start of the wound that I

20   observed it could be the knife, the utility

21   knife, being plunged into the victim and

22   where the knife blade sticks out the

23   encasement of the knife is making a mark

24   above the wound or at the start of the wound

C. Kosciuk                    238

1
2    and that's what I tried to explain to him.

3        Q    Okay.

4        A    Not the handle or any other

5    part of the knife, but part of the blade

6    structure.

7        Q    So you're saying that what he

8    got wrong here is that based on -- Now you

9    actually saw the wounds at the morgue?

10       A    No, I can't remember that at

11   all being even at the morgue.  I don't know

12   if it was photographs or being at the morgue

13   that I looked at those wounds.  I can't

14   remember.

15       Q    Well, you're quoted as saying

16   "while he was at the morgue."

17       A    Yeah.  I don't even remember

18   being at the morgue.

19       Q    But you gave this statement in

20   July of 2008, correct?

21       A    Yes.

22       Q    And your memory of what you did

23   in connection with this investigation was

24   better in July of 2008 than it is today;

25   fair enough?

```
 1                          C. Kosciuk          239

 2        A     Yes.  I would say yes.

 3        Q     So is there any reason to doubt

 4   that when you said in July of 2008 that you

 5   observed you were at the morgue and you

 6   observed slash wounds on Seymour Tankleff

 7   that you were correct in saying that you

 8   were there?

 9             MR. MITCHELL:  I object to

10        form.  I appreciate you did ask him

11        a little bit, but he has not

12        established that he said this to the

13        investigator.

14             MR. SCHECK:  I asked him what

15        he said.

16             MR. MITCHELL:  And if he said

17        yes that's what I said, I understand

18        your question.

19             MR. SCHECK:  He said yes,

20        that's what he said and he made one

21        small correction about these dots.

22             MR. MITCHELL:  Right, and then

23        as he was further correcting I think

24        he was still --

25        Q     If you're further correcting --
```

C. Kosciuk                    240

MR. MITCHELL:  Just clarify
that.

MR. SCHECK:  I understand about
a speaking objections.

Q    I'm not trying to trip you up
on whether or not you were at the morgue or
not.  I'm trying to get your best
recollection.

Whether you were at the morgue
or you saw photographs, you saw this slash
wound, correct?

A    I remember discussing this,
yes.

Q    You remember discussing it with
the medical examiner?

A    Yes.  Well, I brought it to
their attention.  That was my opinion of
what type of weapon could have been used.

Q    Was there any -- Did you call
it to the attention of anybody other than
Dr. Dawson at the medical examiner's office?

A    Again, I don't know if anybody
else was there.

Q    Right.

C. Kosciuk                    241

1
2        A     But I do remember talking to

3    the medical examiner.  I think while he was

4    doing the looking at the wounds.

5        Q     I think as you told us before

6    that there would be occasions when you would

7    attend autopsies in connection with your

8    duties at the crime lab, correct?

9        A     Oh, yes.

10       Q     And so it would be fair to say

11   that, you know, bodies are, in a sense, a

12   form of crime scene evidence themselves,

13   correct?

14       A     Yes.

15       Q     And so as part of your work as

16   a forensic scientist -- You call yourself a

17   forensic scientist?

18       A     Yes.

19       Q     That you would be looking at

20   wounds on the body, comparing them to murder

21   weapons to see whether it was likely or

22   unlikely that a particular knife or other

23   instrument could have been used to inflict

24   certain wounds, correct?

25       A     Actually, that's left up to the

C. Kosciuk                    242

medical examiner.

    Q    But you have participated in

that kind of discussion and analysis,

correct?

    A    Yes.

    Q    All right.  And now, have you

ever discussed whether or not the watermelon

knife was, in fact, the knife that was used

to cause Seymour's injuries with anyone else

from the Suffolk County Laboratory or any

other homicide detective?

    A    I don't know.  I can't

remember.  I don't know.

    Q    Well, let me see if I can --

What about let's look at Exhibit 10, okay.

This is another memorandum that was filled

out on July 30, 2008.  You guys have a copy.

            MR. MITCHELL:  I do now.

    Thanks.

    Q    This is another memorandum from

the State Investigation Commission from

Kenneth Christopherson reflecting an

interview on July 30, 2008 with Detective

Sergeant Robert Doyle?

C. Kosciuk                243

1

2      A     Oh, okay.

3      Q     You remember Doyle; don't you?

4      A     I remember Doyle.  I thought

5  you said it came to my house too.

6      Q     No.  I am just going to read

7  you from Page 5.

8      A     Go ahead.

9      Q     "Doyle stated that he felt that

10  some sort of knife and bludgeon were used to

11  inflict the injuries to the victim.  Doyle

12  did not believe that a life recovered on the

13  kitchen counter next to a watermelon was

14  used to inflict the injuries and that a

15  smaller knife, possibly a utility knife,

16  might have been used.  He based his belief

17  on the compression level of the wounds.  He

18  stated that the police were "stuck" with the

19  type of knife described by Tankleff in his

20  confession."  You see that?

21      A     Yes, but I don't think I

22  discussed that with Doyle.

23      Q     Would it be fair to say that

24  you agree with Doyle's opinion that the

25  watermelon knife was not the knife that was

1                              C. Kosciuk                244

2     used to inflict the wounds to Seymour

3     Tankleff?

4          A    I can't be a hundred percent

5     sure.  I can't eliminate that the watermelon

6     knife, although one of the reasons being

7     that there was substances on the knife next

8     to the watermelon when we examined it, so

9     that kind of -- we were in question of that

10    knife from day one.

11         Q    Right.  So when you say day

12    one, would you tell us a little bit more

13    when you say "we," were in question about

14    that knife from day one, what do you mean?

15         A    We looked at the knife --

16         Q    Who is the "we?"  You have to

17    tell us we.  That would be you?

18         A    If I remember, Sergeant Doyle

19    and Bob Baumann and myself -- I don't know

20    who else -- looked at the knife.  Bob

21    Baumann pointed out that there was a

22    substance that would appear to be the

23    watermelon still on the knife.

24         Q    Okay.

25         A    So I can't rule it out as being

C. Kosciuk                    245

the murder weapon because I'm not sure what

the murder weapon is.

Q    Well, but you're saying that

there was a discussion as you were

processing the crime scene with Doyle and

Baumann, right, about the watermelon knife

not being the murder weapon, you're saying,

because you actually saw what you thought to

be watermelon on the knife, correct?

A    Yes, a substance we believed to

be watermelon.

Q    Would it be fair to say by this

point, however, that Doyle was indicating to

you that the watermelon knife homicide

detectives were at least or at least

Detective McCready believed was used as the

murder weapon?

MR. MITCHELL:  I object to the

form.

A    Repeat that.  I lost you.

Q    Sure.  We reviewed before

Exhibit 2, which were the memo book entries

of Detective Doyle; you recall that?

A    Yes.

C. Kosciuk                    246

1

2          Q     And we reviewed together that

3     at 12:28 there is a notation here that

4     Martin Tankleff had confessed and that --

5     I'll read again from Page 2713.  "Martin

6     Tankleff confessed cut his mother's throat,

7     cut father's throat with a knife that is

8     near the watermelon in the kitchen."  You

9     see that?

10         A     Yeah.  I know that.

11         Q     You have told us in this

12    deposition that you do not recall, when you

13    were processing the crime scene, ever

14    finding out that Martin Tankleff, the

15    afternoon that you were processing the crime

16    scene, as early as 12:28, had confessed to

17    detectives and said that he used the

18    watermelon knife to attack both his mother

19    and his father.  You're saying that you

20    never knew that?

21         A     That's correct.

22         Q     But you did know, it would be

23    fair to say, that you were being directed to

24    look at the watermelon knife as potentially

25    a murder weapon that was used against Arlene

C. Kosciuk                    247

Tankleff or Seymour Tankleff?

             MR. TIPALDO:   Objection to

        form.

        A     Potentially, used?  Yes, it was

out in the open.

        Q     Well, you were being

directed --

        A     No.

        Q     Nobody was directing you to

look at that knife?

        A     No, I noticed that knife on

initial walk-through.

        Q     You're saying that you had a

discussion with Doyle and Baumann, who is

the serologist, and yourself, and you looked

at the knife and the discussion was that you

had doubts that that knife was used as the

murder weapon for either of these two

victims, correct?

        A     Yes.

        Q     You just told us that, right?

        A     Yes.

        Q     How did you know that anybody

thought that knife as opposed to any of the

C. Kosciuk                    248

1

2     other knives in the house was the one that

3     might have been used as the murder weapon?

4            A     We didn't.

5            MR. MITCHELL:  I object to the

6            form.  You can answer.

7            A     We didn't.

8            Q     You're telling us that Doyle

9     never indicated to you that they had a

10    confession that Marty Tankleff had said he

11    used that knife to attack both his mother

12    and father?

13           MR. MITCHELL:  Objection to

14           form.

15           MR. TIPALDO:  Asked and

16           answered.

17           Q     You did not know that that day?

18           A     No, I didn't say that neither.

19    I told you that evening we found out certain

20    things that had to be collected.

21           Q     So that evening you learned

22    that Martin Tankleff had made a confession

23    and that as part of that confession the

24    watermelon knife was supposed to be the

25    weapon that he used to both attack his

1                    C. Kosciuk          249

2    mother and his father?

3              MR. TIPALDO:  Objection to

4         form.

5         A    Yes.

6         Q    And that evening there was a

7    discussion then with Detective Doyle and Mr.

8    Baumann as to your doubts that that knife

9    could have been used as the murder weapon,

10   correct?

11             MR. MITCHELL:  I object to

12        form.  You can answer.

13        A    No, we had initial doubts when

14   we first observed the knife.  There was a

15   substance on it without any blood.

16             Without being examined, you

17   cannot rule it out.  It was right in the

18   open.  It was right on the chopping block.

19             MR. MITCHELL:  Just to clarify,

20        what time are you referring to in

21        what you just described?

22             THE WITNESS:  The walk-through

23        was early in the morning about -- It

24        was about, yeah, 9:30.  I would say

25        about 10 o'clock, somewhere in

                                    C. Kosciuk              250

1

2        there.  Well, between 9:30 and

3        10 o'clock when we did the initial

4        walk-through.

5             Q     That's when this conversation

6   happened?

7             A     What conversation?

8             Q     The conversation --

9             A     When I noticed the knife on the

10  end of the block, I observed that knife and

11  I knew right away we were going to take that

12  knife.  Does that answer your question?

13            Q     Right.

14            A     Right away.  It was out in the

15  open.

16            Q     Right, but you have told us

17  about a conversation that you had with Doyle

18  and Baumann where you expressed, and I take

19  it they also agreed, that it was unlikely

20  that the watermelon knife was the murder

21  weapon.  You just told us there was such a

22  conversation.

23            A     Wait a second.  Only because

24  there was a substance on the knife so

25  therefore we said, okay, we're taking it.

1                          C. Kosciuk          251

2          Q      I have to stop you for a second

3     because we have to be clear.

4               When did that conversation --

5     There was a conversation between you, Doyle

6     and Baumann about the watermelon knife not

7     being the knife that was used to inflict

8     injuries to Arlene and Seymour Tankleff,

9     correct?

10              MR. MITCHELL:  I object to the

11          form.  You can answer.

12         Q      There was such a conversation?

13         A      No, wait a minute.  I don't

14    know if Doyle was involved.  I know Baumann

15    and myself discussed it.  Was Doyle present?

16    I can't answer that.

17         Q      I thought you told us just a

18    few minutes ago -- the record will

19    reflect -- that Doyle was present at that

20    conversation?

21         A      He was the sergeant at the

22    scene.  He could have been present, yes.

23         Q      Let's just take it

24    step-by-step.  You're sure that you and

25    Baumann had a discussion?

C. Kosciuk                252

1    A    Yes.

2    Q    And that discussion, would it

3 be fair to say, took place that evening?

4    A    You know, I can't answer that.

5 I don't know exactly when we discussed that

6 knife in the kitchen.

7    Q    Okay.  And I just want to get

8 your best recollection.  You can't recall

9 whether Doyle was present or not when you

10 and Baumann had the discussion that you did

11 not think the watermelon knife could have

12 been the murder weapon; however, at some

13 point either that night or the next day is

14 it fair to say that that was communicated to

15 Doyle that that was your view?

16    A    Oh, did I tell him that?

17    Q    Or did either you or Baumann?

18    A    He might have observed that on

19 his own.  At the time we went through the

20 house there were many people in the house.

21 There was three --

22       MR. MITCHELL:  Chuck, he is

23       asking you, did either you or

24       Baumann ever tell that to Doyle.

                                    C. Kosciuk                253

1

2          A     No.

3          Q     Are you sure?

4          A     No.  If he heard me say it, but

5     I did not directly say it to him, no.

6          Q     So, in other words, he might

7     have been present when you and Baumann

8     discussed it, but you do not have a specific

9     recollection of telling him?

10         A     That's right.

11         Q     Now, just to go back, was there

12    any discussion on September 7th or 8th or

13    thereafter among people at the crime lab

14    about whether this watermelon knife was, in

15    fact, the murder weapon?

16         A     Other than what I suggested at

17    the morgue that time with the utility knife,

18    there was no other discussions.

19         Q     Who else besides Dr. Dawson did

20    you share your view that you did not believe

21    that the watermelon knife, just based on

22    your observations of Seymour Tankleff's

23    wounds and his X-rays, could have been the

24    murder weapon?

25         A     I did not base it on the wounds

1                         C. Kosciuk              254

2    the initial day because I didn't see the

3    wounds.  I based it on the fact that it's

4    out in the open.  It was adjacent to the

5    watermelon.  There was watermelon it and I

6    didn't see any blood.  I said, we're going

7    to take to the knife because it's out in the

8    open, but it does not feel to me like it's

9    the murder weapon.

10            Q    Right.  And then sometime

11   subsequent to that you went to the morgue,

12   correct?

13            A    When Mr. Tankleff passed away,

14   I guess, yeah.

15            Q    And he did not die for, I

16   think, 10 days, as many as 30 days?

17            A    I guess.

18            MR. MITCHELL:  Don't guess.  If

19        you know, you know.

20            A    Well, they're saying 30.

21            Q    Let's not guess on the number

22   of days.  It was some number of days past

23   between the time you processed the crime

24   scene and the time that you went to the

25   morgue and examined the wounds and expressed

C. Kosciuk                    255

1

2    a view to Dr. Dawson that you did not think

3    the watermelon knife was the knife?

4            A     I never asked the wound, first

5    of all.  I was a bystander.

6            Q     When you observed the wounds?

7            A     Can I have the question.

8            Q     When you observed the wounds.

9    You were at the morgue, you observed the

10   wounds?

11           A     Go ahead.

12           Q     And you expressed the opinion

13   to Dr. Dawson that you did not believe this

14   watermelon knife was the murder weapon,

15   instead you thought it was some kind of

16   utility knife?

17           A     Okay, yeah.

18           Q     You did say that?

19           A     Yes, yes.

20           Q     That was in addition to your

21   doubts that you had the date that you first

22   observed the watermelon knife because you

23   thought you saw a particulate of watermelon

24   on it, correct?

25           A     Yes.

C. Kosciuk                256

1

2         Q     Now, by the time you were at

3   the morgue, had you learned that at least

4   some homicide detectives believed that the

5   watermelon knife was the murder weapon?

6              MR. MITCHELL:  I object to the

7         form.  You can answer.

8         A     I have no idea.

9         Q     Well you knew that was an

10  issue; didn't you?

11        A     No.

12        Q     You didn't think that anybody

13  believed that the watermelon knife might

14  have been the murder weapon?

15             MR. MITCHELL:  Objection.

16        A     We took it as the murder

17  weapon.  We documented that number.  I

18  forgot what number it was now, and we

19  collected it, but we collected all the

20  knives in the house.

21        Q     But when you're at the morgue

22  and you're looking at that knife and you're

23  expressing to Dr. Dawson the view that the

24  watermelon knife is not the murder weapon --

25        A     I never said that neither.  I

C. Kosciuk                    257

1  said that it looks more like a utility knife

2  Based on that little dot before the cuts and

3  the depth of the cut.

4       Q    Well --

5       A    That was my opinion anyway.

6       Q    I understand but you expressed

7  the view that the watermelon knife was not

8  the murder weapon to Dawson at the morgue,

9  right?  You just told us you said that.

10      A    No.  I didn't.  I said it's

11 more consistent with a utility knife cut

12 than that particular watermelon knife or the

13 knife next the to the watermelon.

14      Q    In the days after you processed

15 the crime scene, didn't you become aware

16 that some homicide detectives believed that

17 the watermelon knife was, in fact, the

18 murder weapon?

19           MR. MITCHELL:  I object to the

20      form.  You can answer.

21      A    No, I have no idea.

22      Q    You had no idea?

23      A    No.

24      Q    Nobody ever told you?

C. Kosciuk                        258

2       A     No.

3       Q     So as we sit here today going

4  through the confession of Mr. Tankleff that

5  was given on September 7, 1988, you're

6  telling us this is the first time you ever

7  heard that it was the theory of the homicide

8  detectives and it was stated in Martin

9  Tankleff's confession that the watermelon

10 knife was the murder weapon?

11          MR. TIPALDO:  Objection to

12          form.

13          MR. MITCHELL:  Objection.  You

14          can answer.

15      A     You changed it around.  You

16 told me some of the detectives believed it

17 is.

18      Q     Did you ever hear from anyone

19 in law enforcement who was investigating

20 this state immediately subsequent to

21 processing the crime scene that they

22 believed that the watermelon knife was the

23 murder weapon?

24          MR. MITCHELL:  I object to the

25          form.  You can answer.

C. Kosciuk                    259

1

2      A     They believe it?  Yeah, that

3  night they believed it.  The night we were

4  there they believed that Marty confessed to

5  the watermelon knife being the knife so we

6  took it.  I don't understand your question.

7      Q     I'm asking did you know that

8  was the reason that you took the knife was

9  that the homicide detectives believed the

10 watermelon knife was the murder weapon?

11     A     Yes, he confessed to it that

12 night.  Sure, we'll take.

13     Q     You knew that?

14     A     I told you that there were

15 certain things that night that they directed

16 us towards.

17     Q     When they directed you to take

18 the watermelon knife, you knew they were

19 directing you to take it because they

20 thought it was the murder weapon?

21          MR. MITCHELL:  Objection to

22      form.

23          MR. TIPALDO:  Join.

24     Q     Are you telling us now that you

25 knew that they directed you take the

C. Kosciuk                    260

watermelon knife, at least certainly by the

second day, because Martin Tankleff had

confessed that he used the watermelon knife

as the murder weapon?

            MR. MITCHELL:  I object to the

      form.  You can answer.

      A    Yes.

      Q    And you felt from the

beginning, just to be clear about this, you

expressed the view to Baumann that may have

been overheard by Doyle that you did not

believe the watermelon knife was the murder

weapon just at the beginning because you saw

some particulate something on it, correct?

            MR. TIPALDO:  Objection.  Asked

      and answered.

      A    Yes.

      Q    And the reason that led you to

believe it was not the murder weapon is that

because if it had, in fact, been used to

attack Arlene Tankleff or Seymour Tankleff

the watermelon would have come off, the

watermelon particulate would have come off

somewhere in the attack?

C. Kosciuk                    261

1
2          MR. TIPALDO:  Objection to

3     form.

4          A    Yes.

5          Q    And then, subsequently when you

6     went to the morgue, you told Dr. Dawson the

7     medical examiner, that you did not think the

8     watermelon knife was the murder weapon, you

9     thought it was a utility knife?

10         A    After looking at the wounds,

11    that's correct.

12         Q    And you also made a statement

13    here that there were X-rays, right?

14         A    I don't know about the X-rays.

15    I don't remember that part at all.

16         Q    How would X-rays be relevant?

17         A    I don't know.  I don't

18    understand.

19         Q    And let's continue going

20    through the confession here.

21         A    Sure.

22         Q    So in your opinion, this

23    confession is not consistent with the

24    objective forensic evidence, at least in

25    your judgement, insofar as the confession

C. Kosciuk                    262

1

2   says that the watermelon knife was used to

3   attack both Arlene and Seymour Tankleff, and

4   you believe that the objective crime scene

5   evidence is inconsistent with that version

6   of events?

7          MR. TIPALDO:  Objection.

8          MR. MITCHELL:  Objection to the

9       form.  You can answer.

10         A    No, I don't.  I never said

11  that.

12         Q    You didn't just say that to us?

13         A    No, because I think that the

14  utility knife -- a utility knife might be

15  the weapon?  I just told you before that the

16  watermelon knife, I can't rule out the

17  watermelon knife as not being the weapon.  I

18  have no reason to rule it out.

19         Q    Okay.  Well, I think you did

20  give us some reason why you thought it was

21  reasons to rule out the watermelon.  One, is

22  that you saw a particulate on it at the time

23  you processed the crime scene, right?

24         A    Yeah, but we don't know what

25  happened to that knife between the time of

C. Kosciuk                    263

1    the murders and when it was placed on that

2    block.

3         Q    That would be one reason to

4    rule it out that there was a particulate on

5    it, yes?

6         A    Yes.

7         Q    And you expressed that to Mr.

8    Baumann, correct?

9         A    Yes.

10        Q    And another reason to rule it

11   out if there was no blood on that knife with

12   subsequent serological testing that would be

13   a reason to rule it out, correct?

14        A    You're using the term "rule it

15   out."

16        Q    You used the term rule it out.

17        A    No, I would never use the term

18   rule it out.  It's still the murder weapon

19   as far as we're concerned.  We can't prove

20   it's the murder weapon.

21        Q    As part of doing crime scene

22   reconstruction you examine evidence at a

23   crime scene, which includes blood spatter

24   and blood on weapons, and impressions that

1                         C. Kosciuk              264

2    weapons make, correct?

3          A     Yes.

4          Q     That's part of your job?

5          MR. MITCHELL:  Right?

6          A     Yes.

7          Q     And as part of doing

8    reconstruction you try to test a hypothesis

9    as to whether a particular instrument was

10   used to commit a homicide?  That's part of

11   your blood spatter and crime scene

12   reconstruction expertise, correct?

13         A     Yes.

14         Q     And would you not agree with me

15   that when you first arrived at the crime

16   scene you took a look at the watermelon

17   knife, you found it to be unlikely that that

18   was used as the murder weapon because you

19   saw watermelon particulates on it, correct?

20         MR. MITCHELL:  I object to the

21         form.  You can answer.

22         A     It brought a question to mind

23   that it possibly wasn't the murder weapon.

24         Q     And one of the reasons you

25   thought it wasn't the murder weapon is that

C. Kosciuk                265

1    if it had been used to attack Arlene and

2    Seymour Tankleff it would have to be washed

3    off and then somebody would have to cut the

4    watermelon and put the particulates on it,

5    clean off the knife, and put it in the

6    position that you found it in the crime

7    scene, correct?

8    

9           MR. MITCHELL:  Objection to

10          form.  You can answer.

11          A    Well, you can wash it and just

12   cut a piece of watermelon, take the water

13   and leave the knife.

14          Q    But that would be the chain of

15   events that would have to occur for that to

16   be the murder weapon, correct?

17          MR. MITCHELL:  I object to the

18          form.  You can answer.

19          A    I will say yes to that.

20          Q    That was the concern you had at

21   the time, correct?

22          A    Yes.

23          Q    And that was the concern you

24   expressed to Baumann, correct?

25          A    Yes.

C. Kosciuk                    266

1
2       Q     And then subsequently you

3  learned that this watermelon knife, when it

4  was tested for the presence of blood, there

5  wasn't any on it, correct?

6       A     That's correct.  No blood.

7       Q     And that, wouldn't it be fair

8  to say that that increased your doubts as to

9  whether or not the watermelon knife could be

10  the murder weapon when you discovered there

11  was no blood on it when it was disassembled

12  and tested?

13       MR. MITCHELL:  Objection to

14       form.  You can answer.

15       A     As far as it being the murder

16  weapon, I leave that up to the medical

17  examiner and I don't think that --

18       Q     I asked you a different

19  question.  Just answer my question.  My

20  question is that when you found out there

21  was no -- the serological testing, the

22  presumptive testing had discovered no blood

23  on the watermelon knife, did that increase

24  your doubts that the watermelon could have

25  been the murder weapon?

C. Kosciuk                267

1

2          A     Yes.

3          Q     And then, when you went to the

4    morgue and you saw the wounds on Seymour

5    Tankleff, you then expressed to the medical

6    examiner another reason that you thought the

7    watermelon knife could not have been the

8    murder weapon; that is, that you thought

9    that the kinds of wounds that Seymour

10   Tankleff suffered, long, thin, narrow

11   slashes, were likely to be caused by a

12   razor-like blade, not a knife like the

13   watermelon knife?

14         A     That was my opinion, yes.

15         Q     So that's at least three

16   factors now which, based on the crime scene

17   evidence, led you to have doubts, at least

18   by the time of the autopsy, that the

19   watermelon knife wasn't the murder weapon,

20   right?

21              MR. MITCHELL:  I object to the

22         form.  You can answer.

23         Q     Yes?

24         A     I doubted that, I told you, the

25   first day but we took it because it was in

C. Kosciuk                    268

1
2    the confession.

3         Q    I understand, but I'm now

4    pointing out that there were at least three

5    factors now that, in your mind, based on

6    forensic evidence, made it unlikely that the

7    watermelon knife was the murder weapon,

8    correct?

9              MR. MITCHELL:  I object to the

10             form.  You can answer.

11             MR. TIPALDO:  I join.

12        A    What's the forensic evidence

13   again?  The fact that there was no blood on

14   it?

15        Q    Yes, the fact that you saw a

16   particulate --

17        A    It could still remain as the

18   murder weapon.  If the weapon was washed, it

19   could remain the murder weapon.  If after

20   that he took a piece of the watermelon late,

21   it's still a murder weapon.  And what's the

22   third thing?  The cuts, that knife is

23   capable of making deep cuts into a human

24   being.  So as far as I'm concerned, yes, it

25   still could have been the murder weapon.

C. Kosciuk                    269

1

2      Q      But you expressed the view --

3      A      What I was saying at the morgue

4   was when I looked at the wound on one of the

5   cuts on Mr. Tankleff there was a dot before

6   the cut.  In other words, it looked like a

7   jab and it looked more consistent with a

8   utility knife jabbing in.

9              And, you know how a utility

10  knife the blade extends and there's a

11  shielding around the knife.  Well, it looked

12  like the tip of the shielding touched and

13  then the knife was drawn.  That's totally my

14  opinion and I expressed it at the morgue.

15     Q      But that was in addition to the

16  watermelon being on the knife at the crime

17  scene; meaning that it would have to be

18  washed and then used to caught the

19  watermelon again, yes?

20     A      Or wiped or whatever, yes.

21     Q      That there was no blood

22  recovered on the knife, correct?

23     A      Yes.

24     Q      And that you thought the wounds

25  were more consistent with a utility knife

                              C. Kosciuk          270

1

2    than a watermelon knife when you saw it at

3    the morgue, correct?

4         A    More consistent with a utility

5    knife?  I said it's a possibility that a

6    utility knife could have been used.

7         Q    Those are three factors,

8    correct?

9         A    Yes.

10        Q    Based on objective evidence,

11   correct?

12        A    Yes.

13        Q    And you did tell the State

14   Investigation Commission in July of 2008

15   that, "Kosciuk said he did not believe that

16   the knife recovered on the kitchen table was

17   used to cause Seymour's injuries."

18        A    That's right.  Kosciuk said.

19   That's me.  That's my opinion.

20        Q    I'm only asking about your

21   opinion.  And in your opinion what you can

22   rule in and rule out, okay?  Are you with

23   me?

24        A    Yes.

25        Q    And I'm only asking about what

C. Kosciuk                    271

1
2      you think is probable or improbable, okay?
3      Are you with me, yes?
4              A     Yes, go ahead.
5              Q     I think we talked about before
6      that that's part of your job to decide what
7      is probably and likely or not likely given
8      the crime scene evidence?
9              A     Yes.
10             Q     Now, let's go back to the
11     confession.  And just to be clear, I don't
12     want to be unfair with you.
13                   It makes you uncomfortable to
14     even say aloud that you don't believe that
15     the murder weapon is the murder weapon,
16     right?
17                   MR. MITCHELL:  I object to the
18             form.  I'm going to direct him not
19             to answer that question.
20                   MR. SCHECK:  Why?
21                   MR. TIPALDO:  I join.
22                   MR. MITCHELL:  Whether it
23             makes --
24                   MR. SCHECK:  I can ask him --
25             Let me ask him this way, Brian, see

C. Kosciuk                    272

1      if you have a problem with it.

2           MR. MITCHELL:  I don't have a

3      problem with anything.  We disagree.

4      In fact, I withdraw my instruction

5      for him not to answer the question.

6      I renew my objection.  You can

7      answer.

8           Q    Does it make you uncomfortable

9 to state out loud in this deposition that in

10 your opinion you do not believe the

11 watermelon knife was the murder weapon?

12           MR. MITCHELL:  Objection to

13      form.

14           MR. TIPALDO:  Objection.

15           A    I don't have an opinion.  I

16 said to you that the watermelon knife can

17 very well be the murder weapon.  I never

18 said it wasn't the murder weapon.

19           I said when I looked at the

20 wound in the morgue it looked, based on what

21 I saw, it looked like it could be a utility

22 knife.  Period.

23           Q    Now, let's go on in this

24 confession.  We're in the second paragraph.

C. Kosciuk                    273

"I asked him if he knew how many times he

hit or cut his father.  He said he did not

know how many times he hit or cut him.

Again, he volunteered he couldn't believe

all the blood.  I asked him what he did with

the knife and the barbell.  He said he

washed off the knife and barbell in the

shower.  I asked him what he did with the

barbell and the knife after he washed them

off.  He said he put the barbell back in the

bedroom and he put the knife on the counter

by the watermelon."  Do you see that?

  A Yes.

  Q Okay.  Now, based on this

confession, would you not agree, just

looking at the confession, that Mr. Tankleff

says that he got up based on his alarm at

5:35 in the morning; you remember that?

  A Mr. Tankleff.

  Q Marty Tankleff.  You remember

that, yes?

  A Yes.

  Q And we reviewed that he used

the barbell in his room to attack his

C. Kosciuk                    274

mother, correct?

A     Yes.

Q     Then he went into the kitchen,
got the watermelon knife from the counter,
went back to the bedroom, slashed his mother
on the back and on the neck, correct; is
that right?

A     Right.

Q     Then he took the barbell and
the knife -- and he's doing all this naked,
correct?

A     Yes.

Q     And he put them behind his back
and he went to his father's office, correct?

A     That's according to his
confession, yes.

Q     And we agreed that assuming
that what he said in the confession is true,
based on your expertise as a blood spatter
expert, right, there would be some blood on
him when he entered his father's office,
correct?

A     Yes.

Q     And that he went around the

C. Kosciuk                   275

1

2      card table and some furniture, and the

3      confession says he then struck his father in

4      the head with the barbell, correct?

5              A     Correct.

6              Q     And then he slashed his

7      father's throat with the watermelon knife,

8      correct?

9              A     Right.

10             Q     And then he went into the

11     shower and washed off the watermelon knife

12     and the barbell, correct?

13             A     Right.

14             Q     That's what the confession

15     says, yes?

16             A     Yes.

17             Q     And that he then took the

18     watermelon knife and placed it back on the

19     table in exactly the position that you saw

20     it when you came back -- when you processed

21     the crime scene; is that correct?

22             A     Yes.

23             Q     And he returned the barbell to

24     his bedroom in the position that you

25     photographed it as depicted in Exhibit 8,

C. Kosciuk                    276

1
2    correct?

3           A     Yes.

4           Q     And if the 911 call-- Let's

5    look back at the confession here.  He says,

6    "He put the barbell back in his bedroom.  He

7    put the knife on the counter by the

8    watermelon.  I then asked him what he did

9    next.  He said he went and laid down in his

10   bed.  He thought about what to do next and

11   he got up at 6:10:00 a.m.  I asked him what

12   happened when he got up.  He said he went

13   back to the office, saw his father was still

14   alive.  He went to his mother's room to see

15   if she was dead.  He said he called 911 from

16   his mother's room."  You see that?

17          A     Yes.

18          Q     Now, we know that the 911 call

19   was recorded at 6:11, correct?

20          A     Yes.

21          MR. MITCHELL:  We've stipulated

22          to that.  Does he know?

23          MR. SCHECK.  Yes.

24          Q     I'm telling him that the 911

25   call was at 6:11.

C. Kosciuk                277

1

2          A      All right.

3          Q      Assuming his confession to be

4    true that between 5:35 a.m. and 6:11 he

5    would have to have had to engage in all

6    these activities including washing off the

7    watermelon knife and the barbell and

8    returning them to the place where you saw

9    them when you processed the crime scene,

10   correct?

11         A      Correct.

12         Q      And I think your added detail

13   to this is that in terms of the watermelon

14   knife itself, he would have to, in addition,

15   do a little cutting of the watermelon so

16   that there could be a little particulate of

17   watermelon on the knife, correct?

18         A      Yes.

19         Q      Now, when cleaning off the

20   knife, the watermelon knife, assuming that

21   it was the knife that was used to inflict

22   the injuries on Arlene Tankleff and Seymour

23   Tankleff, and it was being washed in the

24   shower, wouldn't you agree, based on your

25   knowledge of knives and even looking at this

```
                              C. Kosciuk              278
 1
 2     particular knife, that in order to get all
 3     the blood off the knife one would have to be
 4     very careful to wash the crevices of the
 5     knife?
 6               A      What crevices?
 7               Q      In other words, take a look at
 8     the knife.
 9               A      The handle?  First of all,
10     blood is highly soluble in water and there
11     would be no problem with hot water -- Fresh
12     blood?  There would hardly be any traces on
13     it.
14               Q      So you're saying that you
15     believe that hot water in the shower
16     would --
17               A      Just water alone.
18               Q      -- would eliminate any trace of
19     blood?
20               A      Yes.
21               Q      Even within the handle of the
22     knife?
23               A      How do you know there is blood
24     in the handle?
25               Q      Well, let me ask you.  If one
```

1                    C. Kosciuk          279

2       were to inflict the kind of deep wounds that

3       you saw on Arlene Tankleff's neck and back

4       and the wounds that you saw on Seymour

5       Tankleff, are you, based on your knowledge

6       of blood spatter and crime scenes, do you

7       not think that there is a likelihood that

8       blood would get within the crevice of the

9       handle of the knife?

10                  MR. MITCHELL:  I object to

11             form.  You can answer.

12             A     Can I see the length of the

13      knife?

14             Q     Let's take a look at it.

15             A     Did you ever see a butcher cut

16      a big chunk of meat?

17                  MR. MITCHELL:  Detective, he

18             has not asked a question.

19                  MR. SCHECK:  I did ask him a

20             question.

21             A     You can make those wounds

22      without getting blood on the handle, yes.

23             Q     So you believe that in the

24      course of committing the homicides, as

25      described in this confession, that it is

C. Kosciuk                    280

1

2    unlikely that blood would, in any small

3    amounts, would be lodged in any of the

4    crevices of this knife?

5              MR. TIPALDO:  Objection.  Asked

6         and answered.

7              MR. MITCHELL:  Objection.

8    A    Yes.

9    Q    Would it be fair to say that in

10   order to be sure, these tests for blood, the

11   presence of blood, I think we agreed before

12   are very sensitive; are they not?

13   A    Yes, they were.

14   Q    So the smallest amount of blood

15   lodged in the crevice of the knife when a

16   presumptive test was done would detect its

17   presence, correct?

18             MR. MITCHELL:  Objection to the

19        form.  You can answer.

20             MR. TIPALDO:  Objection.

21   A    Depending on the test used,

22   yes, it should detect blood.

23   Q    In order to be certain that no

24   blood would be detected on this knife, one

25   would have to disassemble the knife and

C. Kosciuk                    281

1

2    clean the handle area separately and then

3    put it back together.

4              MR. TIPALDO:  Objection.

5              MR. MITCHELL:  Objection to the

6         form.  You can answer.

7         A    No.

8         Q    Have you ever examined knives

9    of this nature that were used in the course

10   of stabbings to detect the presence of blood

11   in the crevices?

12             MR. MITCHELL:  I object to the

13        form.  You can answer.

14        A    No, I'm not a serologist.

15        Q    But you recover the knives and

16   then you submit them to the serology section

17   for analysis, correct?

18        A    Yes.

19        Q    And in the course of that work

20   over the years, with some frequency,

21   wouldn't it be fair to say that the

22   serologists are able to disassemble knives

23   and in the crevices perform presumptive

24   tests and discover blood?

25             MR. MITCHELL:  Objection to

1                          C. Kosciuk              282

2          form.

3          Q     Isn't that true?

4                MR. TIPALDO:   I object.

5                MR. MITCHELL:   I object to the

6          form.   You can answer.

7          A     It depends on how well

8    constructed the knife is.   This particular

9    knife is a well-constructed knife.

10         Q     In your experience in crime

11   scenes, you have had occasion where knives

12   are used in the course of stabbings, you

13   recover the knife, there's no apparent blood

14   on the knife, you send it to serology, they

15   disassemble the knife and they detect using

16   presumptive tests blood in the crevices of

17   the knife?

18         A     Yes.

19         Q     In your experience that

20   happens?

21         A     Yes.

22         Q     It happens with some frequency,

23   correct?

24         A     Yes.

25                MR. MITCHELL:   Objection.

C. Kosciuk                283

1

2      A     Frequency I can't testify to.

3      Q     It happens often in the crime

4   scene?

5      A     I can't testify to that.

6      Q     How many times do you think

7   that's happened?

8      A     I don't know what happens at

9   the crime scene and what the report is in

10  the lab.  We don't follow that through.

11     Q     So the reason you can't testify

12  with any frequency is that you don't always

13  know what serology finds; is that right?

14     A     Correct.

15     Q     But based on some cases, to

16  your knowledge, you collect the knives, it's

17  sent to serology, they disassemble them and

18  they perform presumptive tests on the knife

19  and they detect the presence of blood, even

20  if you're looking at the knife you don't see

21  it, right?

22          MR. MITCHELL:  Objection to

23          form.

24     A     Yes.

25     Q     By the way, just take a look

C. Kosciuk                284

1

2      at --

3                  MR. SCHECK:  I guess we'll mark

4            this.

5                  (Whereupon, Plaintiff's Exhibit

6            12 was marked for identification.)

7            Q    Plaintiff's Exhibit 12 is a

8      supplemental report and there's a

9      highlighted version and you can take a look

10     at it, and it indicates that Mr. Baumann did

11     not arrive at the crime scene until what?

12                 MR. MITCHELL:  Wait a second.

13           I thought you were just describing

14           what the report was.

15                 MR. SCHECK:  I'll show it to

16           you.

17           A    I did not finish reading that

18     either.

19                 MR. MITCHELL:  Wait.  Wait.

20           Q    These kinds of supplemental

21     reports are made out contemporaneously in

22     order to determine when people log into the

23     crime scene; fair enough?

24           A    Okay, right.

25           Q    Take a look at that and verify

C. Kosciuk                285

1    that for yourself.

2              MR. MITCHELL:  You're asking

3         what the supplemental report says.

4    Q    I'm asking what it is

5    generally, what's its function, and taking a

6    look at that would you not agree that at

7    least according to this report it gives a

8    time for when Baumann arrived at the crime

9    scene?

10   A    I can't read the first numbers.

11   Q    I know, but take a look at the

12   numbers above and below.

13   A    I'm looking at them too.  Can

14   anybody read them?

15   Q    Well, we believe that says --

16   When you look, there's a cutoff here but we

17   believe it says 11:31.  Just in fairness to

18   you I just want to call your attention to

19   that.

20   A    But that would be all right.

21   Q    I just wanted you to know that

22   that's when Baumann got there.

23             MR. MITCHELL:  I'm going to

24        object to the form of the question.

C. Kosciuk                          286

1    This is a document that I think

2    speaks for itself, that says,

3    although mine is cut off, Barry, I

4    think you said 11:31 --

5          MR. SCHECK:   Yeah.

6          MR. MITCHELL:   -- that Robert

7    Baumann, crime lab 1036, which I'm

8    not going to testify, but are you

9    aware that 1036 means when he

10   arrives at the scene?   That's police

11   codes for when he arrives.

12         I don't object to you saying

13   that this document indicates that,

14   but the way you said it is that

15   means he was there.   We all can

16   understand that that could be an

17   error.   I'm not saying it is an

18   error, it's just the form of your

19   question says that this establishes

20   that he was there.

21         MR. SCHECK:   I thought my

22   question was -- In fairness, I was

23   showing him that to see if it

24   refreshes his recollection.

C. Kosciuk                287

1

2          MR. MITCHELL:  Ask him that

3      question.  You know what time

4      Baumann got there?  Does this

5      refresh your recollection?

6          Q     Does this refresh your

7  recollection of when Baumann got there and

8  you had a conversation with him about the

9  watermelon knife, in your judgement, not

10 being the murder weapon?

11         A     But that's way before we go

12 into the scene.  We don't go into the scene

13 until 2 o'clock.

14         MR. MITCHELL:  Just listen to

15     his question and answer his

16     question.

17         Q     So the answer to the question

18 is no, it does not refresh your

19 recollection.

20              Looking again at Plaintiff's

21 Exhibit 10 which is the investigation report

22 of Doyle that I called your attention to,

23 okay, you see that he says that he does

24 not -- I'll read it again just so we're

25 clear.  "Doyle stated that he felt some sort

C. Kosciuk                    288

1  of knife and bludgeon were used to inflict

2  the injuries to the victims.  Doyle did not

3  believe that a knife recovered on the

4  kitchen counter next to the watermelon was

5  used to inflict the injuries and that a

6  smaller knife, possibly a utility knife,

7  might have been used.  He based his belief

8  on the compression level of the wounds.  He

9  stated that the police were "stuck" with the

10 type of knife described by Tankleff in his

11 confession."  You see that?

12 A     Yes.

13 Q     I take it that you would agree

14 with what Doyle is quoted as saying here

15 about the type of knife that was used to

16 inflict the wounds at least to Seymour

17 Tankleff, correct?

18           MR. MITCHELL:  I object to the

19           form.  It's asked and answered.

20           Barry, I think you asked that exact

21           question about half hour ago.

22           MR. TIPALDO:  I join.

23           MR. MITCHELL:  You asked this

24           entire series of questions already.

C. Kosciuk                289

1   I'm going to object.  I'm not going

2   to tell him not to answer.  You

3   already asked this entire series of

4   questions.

5           MR. SCHECK:  I'm backtracking

6   just for a second because I'm trying

7   to get in a different point.

8           MR. MITCHELL:  Okay, I

9   appreciate that.

10          A     I don't know who he is talking

11  about?  Which victim?  I don't know which

12  victim he's talking about.

13          Q     Just to refresh -- Just to look

14  at it again, "Doyle stated that he felt some

15  sort of knife and bludgeon were used to

16  inflict the injuries to the victims.  He did

17  not believe that a knife recovered on the

18  kitchen counter next to the watermelon was

19  used to inflict the injuries and that a

20  smaller knife, possibly a utility knife,

21  might have been used.  He based his belief

22  on the compression level of the wounds.  He

23  stated that the police were "stuck" with the

24  type of knife described by Tankleff in his

C. Kosciuk                    290

1

2    confession."

3              You see that.

4        A    Give me the date and time he

5    says this.

6        Q    He says this on July 30, 2008

7    to the State Investigation Commission.

8        A    Okay.  That's possible, sure.

9        Q    Okay.  Now, but what I'm really

10   probing here is discussions between you and

11   other police officers and other members of

12   the crime lab about your opinions with

13   respect to the watermelon knife, okay?

14       A    Yes.

15       Q    Now, you've told us that you

16   had one conversation with Baumann where

17   Doyle might have been present, correct?

18       A    In relation to the watermelon

19   knife?

20       Q    Yes, at the crime scene.

21       A    Yes.

22       Q    Where you expressed doubts that

23   that could be the murder weapon, correct?

24       A    Yes.

25       Q    And you admitted, finally, I

C. Kosciuk                     291

1  think, that you knew at the crime scene that

2  you were collecting the watermelon knife

3  because Tankleff had confessed that that was

4  the murder weapon.  You told us that?

5  A      Friday evening, correct.

6         MR. MITCHELL:  Let him finish.

7  I object to the form.  You can

8  answer.

9  A      Yes.

10 Q      He said Friday evening.  Okay.

11        And then now, do you recall

12 between the time that you collected the

13 knife and expressed these views on Friday

14 evening, all right, to Baumann, probably the

15 presence of Doyle, expressing that view to

16 anyone else?

17 A      Wait.  Friday evening?

18 Q      When, to the best of your

19 recollection, did you have this conversation

20 with Baumann potentially in the presence of

21 Doyle as to your viewing that the watermelon

22 knife, which you knew had been identified by

23 Marty Tankleff in his confession as the

24 murder weapon, that you had doubts that it

C. Kosciuk                    292

1

2    was the murder weapon?

3              MR. MITCHELL:  When did that

4         happen?  When did you have that

5         conversation?

6              I object to the form of your

7         question, but just answer his

8         question if you can timewise.  I

9         think we've done this already.

10             When did you have the

11        conversation about the knife with

12        Baumann and Doyle might have been

13        there or not?  When did that happen?

14             THE WITNESS:  Sometime on

15        Wednesday, the day of the homicide.

16             MR. SCHECK:  Off the record.

17             THE VIDEOGRAPHER:  The time is

18        4:59 p.m.  This is the end of Tape

19        5.

20             (Whereupon, a recess was

21        taken.)

22             THE VIDEOGRAPHER:  This the

23        beginning of Tape 6.  We're back on

24        the record at 5:02 p.m.  You may

25        proceed.

C. Kosciuk                293

MR. SCHECK:  I believe that we have about two hours and 10 minutes left in permissible time to depose the witness and we're going to find a mutually convenient date with counsel.

And there was one item having to do with notes from the crime scene which Mr. Mitchell says he's seen and for some reason we don't think we've seen it, but we're going to work that out and try to make that production by the time we get back the next time.

Have I got it all right, Counsel?

MR. MITCHELL:  That's correct. And we'll try and come up with a date convenient for all.

MR. TIPALDO:  I appreciate the copies of the exhibits although I don't have all of them but I understand why.  I'm new to the table and I understand sometimes you

C. Kosciuk                294

may not remember that there is

another party here.

        In the event that we conduct a

further deposition of this witness

before we get the transcript with

exhibits attached to the back, I

would appreciate it if you furnish

me with an extra copy.

        (Continued on next page to

include jurat.)

```
 1                          C. Kosciuk              295

 2           MR. MITCHELL:  Not a problem.

 3           MR. TIPALDO:  Thank you.

 4           THE VIDEOGRAPHER:  This is the

 5      end of Tape 6.  We're off record at

 6      5:03 p.m. with a videotaped

 7      deposition of Detective Charles

 8      Kosciuk.  We're off record at 5:03.

 9           (Time noted:  5:03 p.m.)

10

11

12

13           _____
                    CHARLES KOSCIUK
14

15      Subscribed and sworn to before me

16      this ___ day of _____, 2013.

17

18

19

20      _____
        NOTARY PUBLIC

21

22

23

24

25
```

296

**INDEX**

**INDEX TO TESTIMONY**

**Page**

Examination by Mr. Scheck          4


**INDEX TO REQUESTS**

Notes from crime scene          209


**EXHIBITS**

| **Plaintiff's** | **Description** | **Page** |
|---|---|---|
| Exhibit 1 | Photograph | 8 |
| Exhibit 2 | Memo Book Notes | 80 |
| Exhibits 3-5 | Photographs | 92 |
| Exhibit 6 | Sup Report | 92 |
| Exhibit 7 | Memorandum | 92 |
| Exhibit 8 | Photographs | 147 |
| Exhibit 9 | Photographs | 155 |
| Exhibit 10 | Memorandum | 231 |
| Exhibit 11 | Memorandum | 231 |
| Exhibit 12 | Sup Report | 284 |

297

ERRATA SHEET FOR THE TRANSCRIPT OF:

Case Name:  Martin Tankleff vs The County of
Suffolk, K. James McCready, Et Al
Deposition Date:  October 2, 2013
Witness:  Charles Kosciuk

                        CORRECTIONS

PG    LN    NOW READS    SHOULD READ   REASON FOR
___   ___   _____   _____   _____

___   ___   _____   _____   _____

___   ___   _____   _____   _____

___   ___   _____   _____   _____

___   ___   _____   _____   _____

___   ___   _____   _____   _____

___   ___   _____   _____   _____

___   ___   _____   _____   _____

___   ___   _____   _____   _____

___   ___   _____   _____   _____

___   ___   _____   _____   _____

___   ___   _____   _____   _____

___   ___   _____   _____   _____

                  _____
                           Signature


Subscribed and sworn to before me
this_____ day of _____, 2013.

_____
          (NOTARY PUBLIC)



                          .

1                                                    298

2                          CERTIFICATION

3              I, DOLLY FEVOLA, a Notary Public in

4     and for the State of New York, do hereby certify:

5              THAT the witness whose testimony is herein

6     before set forth, was duly sworn by me; and

7              THAT the within transcript is a true record

8     of the testimony given by said witness.

9              I further certify that I am not related,

10    either by blood or marriage, to any of the parties

11    to this action; and

12             THAT I am in no way interested in

13    the outcome of this matter.

14             IN WITNESS WHEREOF, I have hereunto

15    set my hand this 26th day of October, 2013.

16

17

18    _____

19                DOLLY FEVOLA

20

21

22

23

24

25

1

# #

**#1-10** [2] - 1:8, 1:9

# $

**$1500** [1] - 14:3
**$30,000** [1] - 13:13

# '

**'67** [3] - 21:15, 22:24, 23:3
**'71** [3] - 21:24, 22:23, 23:3
**'73** [1] - 31:2
**'74** [2] - 30:21, 31:2
**'83** [2] - 22:12, 48:10
**'88** [4] - 48:7, 98:9, 99:15, 99:18

# 0

**007944** [1] - 130:15

# 1

**1** [11] - 4:3, 8:13, 8:15, 75:22, 76:2, 97:20, 146:5, 194:21, 194:25, 205:25, 296:15
**10** [8] - 231:5, 242:16, 249:25, 250:3, 254:16, 287:21, 293:3, 296:22
**100** [1] - 57:8
**10271-0332** [1] - 2:14
**1036** [2] - 286:8, 286:10
**10:00** [1] - 1:15
**10:14** [1] - 4:12
**11** [3] - 130:16, 231:5, 296:23
**11530** [1] - 2:5
**11780** [1] - 5:20
**11:00** [1] - 88:7
**11:15** [1] - 66:21
**11:31** [3] - 97:13, 285:18, 286:5
**11:40** [1] - 66:25
**11:56** [1] - 84:16
**12** [6] - 145:3, 176:14, 220:15, 284:6, 284:7, 296:24
**120** [1] - 2:14

**12:08** [1] - 92:6
**12:25** [1] - 92:11
**12:28** [7] - 83:4, 85:19, 86:13, 86:21, 138:9, 246:3, 246:16
**12:57** [1] - 120:23
**13** [1] - 161:16
**14** [6] - 58:18, 114:11, 117:15, 118:22, 130:16, 162:2
**147** [1] - 296:20
**15** [2] - 162:9, 163:17
**155** [1] - 296:21
**1651** [1] - 58:17
**17** [2] - 93:5, 235:20
**19** [3] - 162:18, 163:2, 163:18
**1967** [1] - 21:24
**1971** [4] - 21:20, 22:4, 25:3, 25:23
**1973** [2] - 30:21, 32:24
**1974-and-a-half** [1] - 48:10
**1975** [1] - 51:22
**1983** [4] - 15:16, 15:19, 22:8, 29:18
**1988** [19] - 36:20, 40:18, 45:2, 48:23, 50:16, 57:22, 59:17, 63:19, 67:5, 85:20, 87:20, 98:4, 99:11, 104:19, 119:23, 126:10, 127:3, 128:16, 258:5
**1997** [1] - 51:2
**1:06** [1] - 121:4
**1:58** [1] - 171:16

# 2

**2** [17] - 1:14, 67:2, 80:7, 80:16, 80:20, 89:3, 89:10, 94:3, 97:6, 97:7, 120:23, 138:6, 138:7, 245:23, 287:13, 296:16, 297:4
**2002** [5] - 10:11, 15:18, 15:20, 16:14
**2008** [13] - 93:2, 93:5, 93:10, 96:9, 114:6, 235:20, 238:20, 238:24, 239:4, 242:18, 242:24, 270:14, 290:6
**2013** [6] - 1:14, 4:11, 295:16, 297:4, 297:23, 298:15
**207** [1] - 23:16

**209** [1] - 296:10
**21st** [1] - 93:2
**22** [2] - 180:2, 180:23
**23** [4] - 162:18, 179:23, 181:6, 182:6
**231** [2] - 296:22, 296:23
**25** [1] - 57:6
**26** [4] - 141:7, 151:15, 151:18, 195:22
**2699** [1] - 80:18
**26th** [1] - 298:15
**2713** [4] - 82:24, 122:22, 138:8, 246:5
**2715** [1] - 80:18
**284** [1] - 296:24
**2:53** [1] - 171:21
**2nd** [1] - 4:11

# 3

**3** [10] - 91:22, 91:23, 92:8, 92:16, 97:6, 113:25, 121:3, 154:8, 161:11, 234:18
**3-5** [1] - 296:17
**30** [5] - 242:18, 242:24, 254:16, 254:20, 290:6
**36** [1] - 141:7
**3:51** [1] - 230:23
**3:59** [1] - 231:9

# 4

**4** [5] - 59:14, 92:17, 171:20, 230:24, 296:6
**44** [1] - 97:20
**4:59** [1] - 292:18

# 5

**5** [8] - 57:4, 57:6, 92:19, 176:22, 177:9, 231:8, 243:7, 292:19
**5:02** [1] - 292:24
**5:03** [3] - 295:6, 295:8, 295:9
**5:35** [9] - 131:16, 139:14, 139:21, 140:24, 141:6, 145:11, 229:22, 273:19, 277:4

# 6

**6** [11] - 92:20, 129:16, 130:14, 133:9, 137:13, 139:17, 157:17, 176:22, 292:23, 295:5, 296:18
**666** [3] - 1:12, 2:4, 4:10
**6:10:00** [1] - 276:11
**6:11** [7] - 139:24, 140:11, 141:2, 141:7, 276:19, 276:25, 277:4

# 7

**7** [14] - 67:5, 85:20, 92:8, 92:23, 94:3, 95:2, 98:4, 99:11, 127:3, 176:22, 230:20, 234:17, 258:5, 296:19
**7944** [4] - 130:15, 130:19, 139:17, 139:18
**7th** [8] - 138:17, 147:12, 147:13, 147:14, 147:16, 147:17, 233:24, 253:12

# 8

**8** [13] - 59:21, 60:8, 74:8, 90:16, 123:23, 147:5, 147:7, 157:20, 158:5, 164:20, 275:25, 296:15, 296:20
**80** [1] - 296:16
**8:00** [3] - 67:7, 70:12, 88:20
**8:30** [2] - 88:20, 123:23
**8th** [3] - 147:12, 233:24, 253:12

# 9

**9** [7] - 155:11, 155:14, 155:15, 159:14, 172:10, 176:21, 296:21
**90-degree** [7] - 38:14, 39:5, 39:25, 40:22,

**41:9, 42:15, 115:21**
**911** [10] - 84:8, 139:23, 140:5, 140:6, 140:10, 141:2, 276:4, 276:15, 276:18, 276:24
**92** [3] - 296:17, 296:18, 296:19
**9:30** [6] - 70:18, 73:6, 74:9, 75:8, 249:24, 250:2

# A

**a.m** [8] - 1:15, 4:12, 66:21, 66:25, 97:13, 139:24, 276:11, 277:4
**ability** [2] - 115:24, 153:4
**able** [9] - 79:17, 79:20, 108:15, 177:21, 222:5, 226:18, 226:25, 281:22
**above-mentioned** [1] - 1:19
**abreast** [1] - 16:23
**absolutely** [2] - 219:5, 222:11
**academy** [1] - 21:19
**Academy** [1] - 43:16
**accept** [1] - 94:13
**accepted** [1] - 21:19
**accident** [16] - 6:13, 6:16, 10:15, 12:16, 14:5, 14:17, 15:6, 22:10, 22:13, 29:24, 30:17, 30:18, 30:23, 48:7, 150:14
**accidents** [1] - 164:17
**according** [8] - 140:24, 145:10, 166:13, 195:11, 213:16, 229:19, 274:16, 285:8
**account** [1] - 201:8
**accurate** [1] - 173:8
**accused** [2] - 127:10, 128:10
**action** [4] - 197:23, 201:7, 298:11
**activities** [1] - 277:6
**actual** [2] - 170:9, 210:3
**added** [3] - 97:17, 97:20, 277:12
**adding** [1] - 222:13
**addition** [3] - 255:20, 269:15, 277:14

**additionally** [1] - 236:24

**address** [2] - 6:4, 93:24

**adequate** [2] - 129:3, 129:9

**adjacent** [1] - 254:4

**admitted** [2] - 236:15, 290:25

**advertise** [1] - 12:21

**advise** [1] - 87:13

**advised** [5] - 71:25, 88:21, 123:21, 125:15, 125:17

**affect** [3] - 57:12, 57:18, 95:17

**affiliated** [2] - 10:17, 28:20

**afraid** [2] - 132:19, 176:15

**afternoon** [2] - 138:17, 246:15

**agent** [4] - 53:12, 92:25, 235:18, 237:11

**Agent** [2] - 93:4, 93:5

**agents** [1] - 236:2

**ago** [9] - 9:13, 17:11, 93:15, 113:20, 114:3, 185:11, 251:18, 288:22

**agree** [23] - 31:14, 36:22, 41:6, 111:14, 156:24, 162:13, 166:25, 171:8, 180:16, 189:7, 190:25, 203:20, 213:4, 224:24, 226:16, 226:20, 229:19, 243:24, 264:14, 273:16, 277:24, 285:7, 288:14

**AGREED** [3] - 3:3, 3:8, 3:12

**agreed** [7] - 159:17, 167:11, 171:10, 221:17, 250:19, 274:18, 280:11

**ahead** [11] - 24:16, 39:17, 145:6, 166:24, 197:13, 219:10, 222:23, 229:25, 243:8, 255:11, 271:4

**AI** [1] - 297:3

**alarm** [4] - 131:15, 139:14, 139:20, 273:18

**aligning** [1] - 106:14

**alive** [6] - 179:5, 179:7, 180:21, 183:19, 190:11, 276:14

**allow** [2] - 160:17, 218:3

**allowed** [3] - 80:5, 135:11, 202:14

**alone** [1] - 278:17

**aloud** [1] - 271:14

**ALSO** [1] - 2:17

**alternative** [1] - 46:18

**amount** [4] - 190:3, 193:25, 197:10, 280:14

**amounts** [1] - 280:3

**analysis** [35] - 22:6, 22:20, 28:16, 29:17, 30:10, 37:11, 48:8, 48:25, 49:6, 49:10, 50:8, 50:9, 50:13, 50:17, 51:3, 52:9, 55:20, 55:24, 56:12, 87:19, 100:6, 100:13, 105:24, 106:2, 113:2, 115:25, 149:15, 149:21, 149:24, 156:2, 156:10, 164:15, 212:12, 242:4, 281:17

**analyst** [1] - 54:7

**analyze** [4] - 141:11, 142:13, 179:13, 229:5

**analyzed** [3] - 48:19, 164:12, 214:18

**analyzing** [1] - 57:22

**AND** [3] - 3:3, 3:8, 3:12

**Anderson** [1] - 81:25

**angle** [7] - 38:14, 39:5, 39:25, 40:22, 41:9, 42:15, 115:21

**angles** [2] - 50:10, 217:18

**angular** [1] - 106:21

**animals** [2] - 53:7, 53:11

**answer** [200] - 7:3, 7:4, 11:21, 13:10, 16:12, 23:24, 23:25, 24:10, 24:11, 27:10, 27:14, 27:18, 31:12, 31:20, 34:4, 34:10, 35:2, 37:3, 38:2, 38:16, 38:21, 39:7, 39:14, 44:19, 48:2, 55:7, 55:23, 57:14, 58:18, 60:15, 63:23, 66:13,

68:10, 74:13, 75:9, 78:23, 79:6, 82:10, 87:24, 90:23, 94:22, 95:9, 97:2, 100:9, 100:17, 101:15, 103:24, 105:21, 107:12, 109:13, 109:22, 110:16, 111:12, 112:22, 113:16, 114:20, 117:5, 117:21, 118:11, 119:7, 120:8, 120:18, 121:21, 122:17, 123:7, 124:9, 124:25, 125:13, 126:4, 126:14, 127:5, 127:15, 128:2, 128:7, 128:21, 129:12, 130:10, 135:19, 135:23, 138:25, 139:10, 141:5, 141:14, 143:6, 143:17, 144:4, 146:21, 148:4, 148:17, 148:18, 149:12, 149:18, 149:19, 150:24, 151:6, 151:8, 153:24, 155:5, 156:19, 157:5, 157:13, 157:14, 157:24, 158:22, 158:24, 160:4, 160:18, 160:19, 160:21, 163:11, 163:21, 164:7, 164:9, 168:14, 168:16, 168:18, 168:19, 174:8, 175:15, 176:7, 177:25, 180:12, 181:24, 182:4, 182:5, 185:7, 187:21, 187:22, 188:25, 189:15, 189:16, 191:11, 192:12, 193:19, 196:3, 196:19, 198:3, 198:15, 198:24, 199:9, 200:11, 201:13, 201:20, 201:22, 212:3, 212:10, 212:19, 212:23, 213:20, 214:12, 215:6, 215:15, 215:25, 216:14, 218:17, 221:23, 222:10, 222:17,

222:20, 222:21, 224:4, 224:11, 224:13, 227:19, 228:11, 228:17, 229:10, 229:25, 248:6, 249:12, 250:12, 251:11, 251:16, 252:5, 256:7, 257:21, 258:14, 258:25, 260:7, 262:9, 264:21, 265:10, 265:18, 266:14, 266:19, 267:22, 268:10, 271:19, 272:6, 272:8, 279:11, 280:19, 281:6, 281:13, 282:6, 287:15, 287:17, 289:3, 291:9, 292:7

**answered** [11] - 45:14, 134:9, 136:20, 139:9, 158:12, 184:16, 191:10, 248:16, 260:17, 280:6, 288:20

**answering** [4] - 165:13, 186:8, 186:9, 204:19

**answers** [1] - 210:15

**Anthony** [1] - 235:5

**anyplace** [2] - 115:6, 169:7

**anyway** [2] - 20:4, 257:6

**apart** [6] - 46:4, 46:13, 147:24, 148:12, 150:16, 234:7

**apparent** [2] - 110:17, 282:13

**appear** [2] - 160:11, 244:22

**appeared** [1] - 237:3

**appearing** [1] - 128:17

**applies** [1] - 224:10

**appreciate** [12] - 135:18, 135:22, 137:9, 151:5, 160:15, 160:18, 224:7, 235:3, 239:10, 289:10, 293:21, 294:8

**approach** [1] - 89:2

**approached** [1] - 94:9

**area** [30] - 28:19, 50:25, 57:8, 59:9, 69:4, 77:8, 77:15, 77:20, 77:21, 92:18, 100:19, 116:13,

116:15, 116:16, 116:19, 116:21, 117:2, 117:15, 118:9, 119:3, 119:4, 119:13, 119:15, 119:22, 141:21, 162:5, 173:17, 205:21, 206:6, 281:2

**areas** [1] - 88:13

**argue** [1] - 219:23

**argued** [1] - 217:23

**Arlene** [35] - 8:3, 18:24, 42:20, 76:6, 79:18, 101:7, 110:12, 117:18, 118:7, 119:2, 119:25, 120:16, 143:10, 146:17, 153:20, 155:18, 157:2, 164:4, 165:25, 167:13, 171:7, 172:9, 177:13, 181:7, 184:9, 184:24, 186:23, 191:24, 246:25, 251:8, 260:22, 262:3, 265:2, 277:22, 279:3

**arms** [1] - 192:2

**arrest** [1] - 79:9

**arrival** [1] - 127:2

**arrive** [5] - 67:9, 72:3, 94:9, 105:13, 284:11

**arrived** [12] - 34:2, 62:14, 63:19, 67:6, 67:21, 70:12, 73:3, 74:8, 109:25, 124:19, 264:15, 285:9

**arrives** [2] - 286:11, 286:12

**arrow** [1] - 84:6

**articles** [4] - 20:7, 126:17, 126:22, 128:17

**aside** [1] - 101:23

**assailants** [1] - 144:2

**assembling** [1] - 73:11

**assigned** [7] - 22:5, 22:7, 22:15, 22:18, 23:15, 26:21, 97:15

**assistant** [1] - 5:4

**Assistant** [1] - 5:6

**Association** [3] - 28:22, 43:13, 43:18

**association** [2] - 4:17, 43:20

**assume** [14] - 12:20, 29:13, 34:6, 62:11,

62:13, 151:7, 151:9, 151:11, 165:22, 166:10, 210:10, 218:23, 218:24, 219:7
**assumed** [2] - 41:19, 151:3
**assuming** [9] - 39:8, 42:9, 171:25, 172:17, 173:22, 181:16, 274:18, 277:3, 277:20
**assumption** [5] - 166:3, 167:20, 173:14, 175:9, 175:23
**asterisk** [2] - 83:25, 84:17
**attached** [1] - 294:7
**attack** [9] - 145:12, 246:18, 248:11, 248:25, 260:22, 260:25, 262:3, 265:2, 273:25
**attacked** [3] - 184:24, 185:16, 185:22
**attempt** [4] - 31:17, 101:24, 110:22, 110:25
**attend** [3] - 28:25, 156:6, 241:7
**attended** [7] - 19:20, 44:3, 44:10, 44:16, 155:25, 156:4, 156:14
**attending** [1] - 52:22
**attention** [12] - 94:3, 113:25, 119:14, 123:12, 176:13, 234:13, 234:18, 236:9, 240:18, 240:21, 285:19, 287:22
**ATTORNEY** [1] - 2:12
**attorney** [11] - 5:5, 17:13, 17:15, 17:19, 17:22, 18:3, 84:25, 94:11, 94:17, 109:19, 113:12
**Attorney** [1] - 5:7
**attorney's** [1] - 121:24
**Attorneys** [2] - 2:4, 2:9
**attorneys** [5] - 2:13, 12:8, 12:15, 179:16, 198:20
**attributed** [1] - 99:5
**automobile** [1] - 12:16
**autopsies** [3] - 155:25, 156:5, 241:7

**autopsy** [11] - 47:16, 155:9, 155:11, 155:16, 156:14, 159:15, 172:8, 176:21, 182:19, 186:23, 267:18
**awake** [5] - 194:9, 204:9, 218:19, 220:19, 225:13
**aware** [9] - 40:18, 78:19, 78:25, 147:22, 191:23, 212:11, 234:6, 257:16, 286:10

### B

**backed** [1] - 80:4
**backtrack** [1] - 220:6
**backtracking** [1] - 289:6
**backwards** [1] - 76:12
**backyard** [2] - 69:23, 70:2
**bad** [1] - 6:6
**bag** [1] - 211:12
**Balanski** [1] - 26:9
**baloney** [1] - 202:7
**bar** [10] - 83:17, 148:13, 149:10, 158:9, 164:25, 165:3, 165:11, 170:7, 171:2, 171:5
**barbell** [62] - 83:16, 150:6, 150:17, 154:11, 158:9, 158:17, 159:2, 159:5, 159:11, 159:12, 159:16, 160:10, 161:5, 163:15, 164:5, 164:22, 165:24, 166:10, 166:20, 166:21, 171:25, 172:7, 172:17, 173:7, 173:10, 173:13, 173:15, 173:22, 174:5, 174:17, 174:20, 175:8, 175:10, 175:21, 176:2, 178:18, 182:13, 189:21, 190:7, 194:9, 199:6, 199:12, 204:16, 204:22, 205:7, 206:19, 207:9, 213:6, 213:18, 221:3, 232:8, 273:7, 273:8, 273:10,

273:11, 273:25, 274:10, 275:4, 275:12, 275:23, 276:6, 277:7
**barbells** [7] - 153:10, 153:15, 154:21, 155:3, 157:9, 157:19, 158:4
**BARKET** [1] - 2:6
**Barnes** [2] - 88:11, 108:7
**BARRY** [1] - 2:5
**Barry** [8] - 4:22, 6:2, 19:5, 85:10, 224:8, 234:25, 286:4, 288:21
**base** [1] - 253:25
**based** [49] - 37:8, 46:2, 50:5, 50:11, 102:3, 105:18, 117:22, 117:24, 134:24, 136:9, 145:9, 153:16, 158:2, 158:18, 159:23, 163:14, 165:22, 170:21, 179:21, 186:9, 189:5, 192:17, 198:12, 210:15, 213:4, 214:25, 215:18, 221:25, 224:24, 226:4, 226:17, 231:17, 238:8, 243:16, 253:21, 254:3, 257:3, 267:16, 268:5, 270:10, 272:21, 273:15, 273:18, 274:20, 277:24, 279:5, 283:15, 288:8, 289:22
**Based** [1] - 217:21
**bases** [1] - 236:20
**bath** [3] - 83:20, 83:21, 84:7
**Baumann** [31] - 72:20, 89:16, 101:23, 108:8, 152:2, 244:19, 244:21, 245:7, 247:15, 249:8, 250:18, 251:6, 251:14, 251:25, 252:11, 252:18, 252:25, 253:7, 260:11, 263:9, 265:24, 284:10, 285:9, 285:23, 286:8, 287:4, 287:7,

290:16, 291:15, 291:21, 292:12
**beating** [2] - 189:24, 190:7
**become** [3] - 78:25, 218:4, 257:16
**bed** [46] - 79:20, 79:21, 104:12, 110:21, 110:24, 110:25, 114:12, 114:24, 117:19, 119:2, 132:2, 132:7, 132:8, 145:14, 153:12, 154:15, 154:23, 158:7, 158:17, 159:23, 160:13, 161:3, 161:4, 161:6, 161:12, 161:21, 161:24, 162:15, 166:11, 169:16, 169:25, 173:24, 174:9, 179:3, 182:13, 183:13, 183:25, 184:25, 185:15, 186:25, 188:15, 188:23, 189:20, 202:25, 232:7, 276:10
**bedding** [1] - 175:12
**bedroom** [64] - 61:12, 73:8, 73:10, 75:15, 76:5, 77:2, 78:9, 78:10, 79:15, 84:12, 84:20, 89:11, 89:17, 91:9, 91:16, 92:17, 101:6, 103:16, 103:20, 104:11, 110:10, 110:20, 113:3, 113:21, 114:15, 114:16, 120:14, 121:12, 121:17, 122:4, 122:15, 133:3, 134:18, 136:14, 143:20, 146:8, 146:24, 146:25, 153:8, 153:11, 158:18, 159:22, 166:2, 166:12, 167:7, 168:9, 172:25, 173:17, 174:2, 174:3, 175:13, 179:9, 194:22, 194:23, 194:25, 195:7, 196:24, 203:6, 204:4, 232:17, 273:12, 274:6, 275:24, 276:6

**bedrooms** [1] - 61:7
**began** [5] - 24:20, 25:2, 25:3, 70:17, 89:7
**begin** [1] - 25:22
**beginning** [6] - 67:2, 93:20, 121:3, 171:20, 220:14, 231:8, 260:10, 260:14, 292:23
**behavior** [1] - 54:21
**behind** [41] - 102:10, 106:23, 107:2, 140:14, 177:10, 194:14, 194:16, 201:6, 204:16, 204:22, 205:6, 206:19, 206:20, 207:9, 207:10, 208:3, 208:14, 213:7, 213:13, 214:14, 220:24, 221:2, 221:16, 222:6, 222:7, 222:25, 223:10, 224:16, 224:19, 224:20, 225:4, 225:19, 225:20, 226:3, 226:19, 226:24, 229:3, 229:15, 229:21, 232:25, 274:14
**belief** [3] - 243:16, 288:8, 289:22
**believes** [1] - 236:22
**bell** [1] - 17:20
**belonged** [1] - 142:18
**below** [3] - 57:4, 177:8, 285:13
**best** [34] - 23:10, 24:6, 27:23, 37:7, 38:12, 39:23, 40:12, 40:20, 42:25, 44:21, 50:17, 60:3, 61:4, 61:8, 64:20, 69:8, 72:4, 80:9, 95:10, 104:6, 106:9, 108:24, 109:4, 109:15, 123:3, 130:11, 139:4, 142:8, 156:20, 174:25, 209:2, 240:8, 252:9, 291:19
**better** [1] - 238:24
**between** [26] - 21:23, 33:15, 34:15, 35:15, 56:8, 66:5, 74:7, 141:6, 173:16, 196:24, 204:4, 206:16, 206:17,

208:18, 209:4, 210:2, 226:8, 228:19, 229:6, 250:2, 251:5, 254:23, 262:25, 277:4, 290:10, 291:13

**beyond** [2] - 128:22, 195:24

**big** [3] - 109:25, 110:3, 279:16

**Billy** [1] - 19:14

**bit** [10] - 6:24, 20:6, 20:21, 39:19, 128:3, 133:2, 179:8, 220:6, 239:11, 244:12

**blade** [5] - 236:23, 237:23, 238:5, 267:12, 269:10

**Blavin** [1] - 93:4

**bleed** [3] - 190:3, 217:25, 218:3

**bleeding** [2] - 191:8, 193:3

**block** [3] - 249:18, 250:10, 263:3

**blocked** [1] - 60:11

**blocked-off** [1] - 60:11

**blood** [277] - 28:10, 28:16, 30:10, 32:9, 36:23, 37:8, 37:12, 40:21, 46:6, 46:14, 46:19, 47:20, 47:22, 48:20, 48:24, 49:5, 49:10, 49:12, 49:20, 50:7, 50:13, 50:16, 50:22, 51:25, 52:5, 52:6, 52:9, 52:10, 53:5, 53:11, 53:20, 54:6, 54:7, 54:12, 54:13, 54:20, 54:21, 55:3, 55:10, 55:15, 55:18, 55:19, 55:21, 55:24, 56:12, 56:20, 56:21, 57:2, 57:11, 57:17, 57:19, 58:2, 58:8, 58:12, 64:10, 64:19, 66:6, 84:9, 84:18, 84:21, 87:19, 100:6, 100:12, 100:24, 100:25, 101:5, 101:11, 102:3, 103:3, 103:14, 104:7, 104:23, 105:15, 105:19, 105:24, 106:2, 106:11, 107:22, 108:10, 109:8, 110:11, 111:8, 111:15,

112:5, 112:15, 112:20, 113:2, 114:18, 115:9, 115:25, 116:6, 116:11, 117:2, 117:3, 117:6, 117:7, 117:10, 117:14, 118:8, 118:14, 118:18, 118:22, 119:3, 119:4, 119:17, 119:23, 120:2, 120:9, 120:15, 121:11, 121:16, 122:3, 122:14, 127:22, 131:21, 134:17, 136:7, 137:18, 141:17, 141:24, 142:16, 143:15, 143:25, 147:20, 148:2, 148:15, 148:21, 148:25, 149:10, 149:15, 150:9, 150:19, 151:2, 151:22, 152:6, 152:11, 152:18, 152:24, 153:5, 153:17, 154:14, 155:2, 155:3, 156:2, 156:9, 158:3, 158:9, 158:19, 158:25, 159:18, 159:19, 159:20, 159:24, 161:22, 164:21, 165:11, 165:19, 165:23, 167:14, 168:10, 168:24, 169:11, 169:14, 169:15, 169:23, 171:8, 171:11, 171:13, 171:24, 172:24, 173:4, 173:6, 173:16, 173:23, 174:4, 174:14, 175:4, 175:25, 176:9, 177:12, 179:14, 181:21, 183:24, 187:2, 189:6, 189:8, 189:19, 189:22, 189:25, 190:3, 190:6, 190:15, 190:24, 191:7, 191:16, 191:17, 191:18, 192:8, 192:10, 192:16, 193:6, 193:9, 195:16, 195:18, 196:4, 196:12, 196:13, 196:23,

197:20, 197:24, 199:22, 201:8, 203:21, 203:22, 203:23, 203:25, 204:4, 204:21, 207:8, 210:19, 211:25, 212:12, 213:7, 215:2, 216:11, 216:19, 217:2, 218:9, 221:19, 225:5, 225:9, 226:20, 228:21, 228:25, 229:23, 230:3, 233:23, 234:9, 249:15, 254:6, 263:12, 263:24, 263:25, 264:11, 266:4, 266:6, 266:11, 266:22, 268:13, 269:21, 273:6, 274:20, 274:21, 278:3, 278:10, 278:12, 278:19, 278:23, 279:6, 279:8, 279:22, 280:2, 280:10, 280:11, 280:14, 280:22, 280:24, 281:10, 281:24, 282:13, 282:16, 283:19, 298:10

**Bloodstain** [1] - 51:10

**bloodstain** [10] - 29:17, 38:11, 39:24, 42:14, 51:3, 51:17, 59:11, 59:12, 208:10, 217:16

**bloodstains** [4] - 37:20, 39:3, 41:8, 41:22

**bloody** [13] - 127:23, 142:6, 142:9, 142:10, 142:25, 143:20, 154:14, 165:18, 167:23, 169:19, 171:12, 175:8, 218:5

**blow** [7] - 52:6, 52:10, 213:24, 214:4, 214:5, 217:22, 217:24

**blows** [18] - 50:5, 106:25, 107:16, 143:22, 160:23, 208:8, 213:22, 214:9, 215:12, 215:22, 216:3, 216:7, 216:8,

216:16, 217:5, 217:9, 222:25, 223:3

**bludgeon** [5] - 102:8, 202:24, 243:10, 288:2, 289:16

**bludgeoned** [4] - 143:11, 143:13, 168:22, 192:20

**bludgeoning** [7] - 138:23, 144:6, 170:8, 173:9, 175:25, 189:20, 195:17

**bludgeons** [1] - 232:7

**blue** [1] - 147:2

**blunt** [17] - 57:12, 57:18, 58:7, 58:14, 59:4, 59:7, 106:24, 117:17, 118:3, 118:6, 118:24, 146:16, 156:25, 163:15, 164:4, 167:12, 199:13

**Bob** [19] - 10:22, 16:21, 16:22, 17:18, 22:10, 29:20, 44:21, 49:2, 53:14, 53:15, 53:18, 53:23, 89:16, 97:20, 99:12, 108:2, 108:3, 244:19, 244:20

**bodies** [2] - 77:25, 241:11

**body** [17] - 42:21, 42:23, 76:6, 77:22, 79:18, 154:6, 154:9, 156:7, 186:25, 190:14, 191:5, 191:8, 191:15, 191:21, 203:23, 203:25, 241:20

**bolt** [1] - 150:5

**Bonds** [2] - 82:3, 103:8

**book** [10] - 51:9, 51:13, 51:15, 51:21, 64:7, 80:17, 81:2, 122:21, 138:7, 245:23

**Book** [1] - 296:16

**books** [1] - 20:7

**bottom** [4] - 84:10, 92:3, 129:19, 131:13

**break** [2] - 63:3, 66:18

**brian** [1] - 140:17

**BRIAN** [1] - 2:10

**Brian** [9] - 5:4, 7:5, 134:12, 140:11, 151:20, 200:16, 202:11, 219:6,

271:25

**brief** [4] - 66:22, 120:24, 171:17, 230:25

**bringing** [1] - 48:15

**broad** [1] - 200:13

**Broadway** [1] - 2:14

**broken** [1] - 90:8

**brother** [1] - 21:9

**brother-in-law** [1] - 21:9

**brought** [3] - 79:2, 240:17, 264:22

**brown** [1] - 5:3

**BRUCE** [1] - 2:6

**Brustin** [1] - 4:23

**BRUSTIN** [1] - 2:3

**Building** [1] - 2:9

**bureau** [1] - 149:2

**business** [10] - 61:14, 62:2, 67:14, 67:25, 69:10, 87:16, 94:12, 94:17, 96:18, 151:23

**butcher** [1] - 279:15

**buying** [1] - 21:8

**BY** [4] - 2:5, 2:10, 2:15, 5:21

**bystander** [1] - 255:5

### C

**caliber** [1] - 52:8

**camera** [1] - 76:10

**cameras** [1] - 97:11

**can..** [1] - 27:24

**cannot** [1] - 249:17

**capable** [1] - 268:23

**capture** [2] - 162:17, 162:19

**capturing** [1] - 38:8

**car** [6] - 61:14, 62:4, 67:8, 69:10, 69:17, 69:18

**card** [8] - 19:20, 74:19, 94:12, 94:13, 96:18, 207:5, 226:7, 275:2

**care** [3] - 9:15, 12:7, 13:20

**career** [1] - 23:6

**careful** [1] - 278:4

**carpet** [6] - 77:19, 158:17, 159:23, 166:11, 173:25, 175:12

**carried** [1] - 175:22

**carrying** [6] - 168:2, 168:4, 168:8, 173:13, 173:15,

4

5

203:19
**case** [44] - 6:8, 6:9, 6:21, 9:6, 10:6, 13:20, 13:24, 14:2, 16:24, 17:2, 17:10, 17:23, 19:19, 20:7, 20:20, 25:8, 33:22, 34:17, 37:6, 49:9, 63:14, 63:15, 64:23, 87:17, 93:10, 93:17, 95:5, 96:7, 100:2, 106:8, 109:25, 110:5, 112:18, 127:11, 127:18, 127:20, 133:22, 150:22, 156:15, 199:3, 202:16, 218:25, 229:12
**Case** [1] - 297:3
**cases** [11] - 11:11, 12:16, 23:20, 24:21, 63:5, 63:7, 106:3, 110:3, 148:23, 155:25, 283:15
**cast** [2] - 100:19, 217:25
**Castelnetto** [1] - 23:12
**castoff** [22] - 49:24, 50:10, 102:8, 104:12, 107:23, 110:18, 118:3, 118:5, 118:17, 168:21, 168:23, 169:6, 169:18, 192:7, 199:21, 201:8, 208:11, 217:5, 217:8, 217:16, 217:21, 218:5
**castoffs** [1] - 208:13
**casts** [1] - 102:10
**catch** [1] - 214:6
**caught** [3] - 95:4, 95:16, 269:18
**caused** [6] - 57:11, 57:18, 59:4, 157:11, 236:23, 267:11
**causing** [1] - 119:3
**ceased** [1] - 176:3
**ceiling** [21] - 37:13, 37:20, 38:5, 38:6, 38:19, 39:4, 40:7, 40:8, 41:8, 41:18, 41:22, 42:14, 50:6, 65:24, 102:6, 102:12, 106:17, 107:22, 169:20, 199:23, 216:24
**center** [1] - 159:7

**certain** [16] - 32:5, 66:7, 66:10, 85:23, 86:25, 90:16, 115:23, 122:24, 123:10, 123:12, 123:23, 124:20, 241:24, 248:19, 259:15, 280:23
**certainly** [3] - 45:2, 206:17, 260:2
**certification** [1] - 3:6
**CERTIFICATION** [1] - 298:2
**certify** [2] - 298:4, 298:9
**cetera** [1] - 201:10
**chain** [4] - 99:10, 105:2, 109:11, 265:14
**chair** [42] - 101:19, 102:3, 102:4, 102:10, 102:12, 102:13, 106:14, 107:2, 131:25, 199:22, 201:9, 206:7, 207:10, 207:14, 207:18, 207:23, 208:4, 208:5, 208:14, 208:16, 208:18, 209:4, 210:2, 213:14, 214:7, 216:18, 218:14, 221:9, 222:7, 223:2, 223:10, 224:16, 225:19, 225:20, 225:21, 226:3, 226:12, 226:25, 227:2, 227:4
**chairs** [1] - 226:9
**change** [2] - 47:4, 47:23
**changed** [1] - 258:15
**changes** [1] - 56:5
**Characteristics** [1] - 51:10
**characterization** [2] - 107:8, 225:23
**characterize** [1] - 176:25
**charge** [12] - 33:15, 34:2, 34:9, 34:12, 34:16, 34:20, 34:23, 35:16, 35:18, 37:22, 80:11, 82:6
**charged** [1] - 49:10
**Charles** [4] - 4:4, 5:19, 295:7, 297:4
**CHARLES** [3] - 1:7, 1:16, 295:13

**check** [12] - 72:6, 83:25, 84:3, 85:12, 86:25, 88:12, 140:11, 146:12, 146:15, 150:5, 150:8
**checked** [1] - 60:10
**chest** [2] - 183:13, 184:2
**chief** [1] - 235:5
**choose** [1] - 137:7
**chopped** [1] - 161:3
**chopping** [1] - 249:18
**Christopherson** [3] - 92:25, 93:5, 242:23
**christopherson** [1] - 235:17
**chuck** [3] - 180:3, 182:3, 252:23
**chunk** [1] - 279:16
**circle** [3] - 115:2, 116:10, 207:10
**circled** [2] - 115:13, 118:12
**City** [3] - 1:13, 2:5, 4:10
**civil** [4] - 6:8, 6:9, 11:11, 17:2
**Civil** [1] - 1:18
**clarification** [1] - 199:25
**clarify** [4] - 98:19, 187:14, 240:2, 249:19
**classes** [1] - 28:25
**clean** [4] - 163:16, 164:2, 265:6, 281:2
**cleaning** [1] - 277:19
**clear** [16] - 74:25, 77:5, 89:18, 121:6, 122:10, 136:5, 145:25, 162:12, 164:20, 172:22, 193:5, 235:15, 251:3, 260:10, 271:11, 287:25
**cleared** [1] - 69:2
**clearing** [1] - 73:8
**clock** [1] - 131:16
**close** [4] - 162:9, 162:14, 193:21, 203:25
**close-up** [1] - 162:9
**closer** [1] - 193:12
**closet** [1] - 84:20
**clothes** [8] - 141:25, 142:6, 142:9, 142:11, 142:17, 142:20, 142:22, 142:25
**clothing** [4] - 131:21,

142:12, 143:14, 174:10
**clump** [6] - 161:11, 161:15, 161:20, 162:25, 163:17, 163:25
**coagulation** [1] - 55:20
**codes** [1] - 286:12
**collar** [5] - 150:7, 150:9, 159:8, 170:18, 171:3
**collars** [1] - 159:9
**colleagues** [2] - 10:5, 64:2
**collect** [7] - 12:4, 45:22, 89:18, 90:17, 91:3, 123:25, 283:16
**collected** [9] - 91:9, 97:17, 209:22, 211:11, 248:20, 256:19, 291:13
**collecting** [2] - 89:24, 291:3
**College** [1] - 28:21
**comfortable** [1] - 116:4
**coming** [6] - 14:13, 17:8, 17:25, 58:11, 167:7, 177:18
**command** [3] - 99:10, 105:2, 109:11
**Commission** [11] - 17:5, 93:9, 114:8, 234:15, 234:23, 235:11, 236:3, 237:12, 242:22, 270:14, 290:7
**commission** [1] - 143:4
**Commissioner** [1] - 96:8
**commit** [1] - 264:10
**committed** [5] - 78:15, 90:20, 90:21, 122:5, 125:6
**committing** [1] - 279:24
**common** [4] - 218:6, 227:16, 228:9, 228:14
**communicate** [3] - 104:8, 105:16, 211:4
**communicated** [4] - 108:12, 108:14, 109:10, 252:15
**compare** [3] - 136:12, 139:6, 179:17
**compared** [1] - 55:18
**comparing** [1] -

241:20
**competent** [1] - 28:2
**compilation** [1] - 135:4
**complaints** [1] - 128:25
**completed** [1] - 80:7
**completely** [2] - 29:16, 135:7
**Complying** [2] - 115:4, 115:7
**complying** [3] - 82:25, 113:23, 130:17
**composed** [1] - 48:5
**compression** [4] - 169:14, 243:17, 288:9, 289:23
**concern** [2] - 20:14, 265:20, 265:23
**concerned** [8] - 51:5, 51:7, 128:12, 175:19, 175:21, 215:18, 263:20, 268:24
**concerning** [1] - 93:2
**conclusion** [1] - 108:12
**conclusions** [1] - 156:9
**conduct** [3] - 150:16, 152:5, 294:4
**conducted** [2] - 93:3, 235:19
**confessed** [14] - 83:7, 84:15, 85:22, 87:9, 111:8, 138:13, 175:7, 246:4, 246:6, 246:16, 259:4, 259:11, 260:4, 291:4
**Confession** [2] - 126:12, 128:18
**confession** [117] - 79:4, 85:25, 86:24, 87:3, 88:6, 88:24, 91:4, 111:10, 113:7, 122:13, 122:22, 124:6, 124:18, 124:23, 125:5, 125:9, 125:11, 125:16, 125:21, 127:20, 129:18, 134:15, 136:13, 136:24, 137:14, 137:20, 138:18, 139:6, 140:24, 144:7, 144:12, 145:11, 154:20, 157:17, 167:2, 167:21, 170:2, 172:2, 173:7,

173:12, 175:6, 176:12, 177:15, 178:6, 178:17, 179:7, 179:17, 181:17, 182:11, 185:13, 186:20, 187:6, 187:9, 188:4, 190:21, 191:4, 194:3, 195:12, 195:13, 204:11, 204:20, 204:25, 205:3, 213:5, 213:17, 218:7, 218:20, 218:25, 219:8, 221:14, 221:18, 222:4, 225:11, 225:24, 226:10, 226:17, 226:23, 227:16, 227:24, 227:25, 228:5, 228:7, 229:13, 229:20, 230:13, 230:14, 231:12, 231:18, 232:3, 232:6, 232:20, 233:4, 233:8, 243:20, 248:10, 248:22, 248:23, 258:4, 258:9, 261:20, 261:23, 261:25, 268:2, 271:11, 272:25, 273:16, 273:17, 274:17, 274:19, 275:3, 275:14, 276:5, 277:3, 279:25, 288:12, 290:2, 291:24

**confessions** [2] - 126:19, 127:3
**confidential** [1] - 6:4
**configuration** [3] - 185:20, 218:11, 222:2
**confirm** [3] - 47:2, 131:6, 136:8
**confirmed** [4] - 45:20, 113:8
**confirming** [2] - 46:9, 46:10
**confused** [1] - 39:18
**confusing** [1] - 58:9
**Connecticut** [1] - 50:24
**connection** [4] - 95:5, 96:6, 238:23, 241:7
**considered** [1] - 126:19
**consistent** [39] -

58:21, 111:9, 111:20, 112:13, 115:9, 117:2, 118:6, 118:24, 119:24, 120:9, 120:11, 122:14, 134:16, 143:2, 153:16, 154:11, 157:9, 163:8, 169:24, 172:14, 183:23, 184:8, 184:19, 184:21, 185:12, 185:21, 186:19, 188:11, 197:24, 204:20, 204:24, 205:2, 215:20, 222:3, 257:12, 261:23, 269:7, 269:25, 270:4
**consistently** [1] - 107:3
**constructed** [2] - 282:8, 282:9
**consultants** [1] - 15:23
**contact** [5] - 12:9, 190:14, 190:17, 191:4, 191:15
**contacting** [1] - 174:5
**contained** [1] - 219:14
**container** [1] - 234:4
**contemporaneous** [1] - 81:2
**contemporaneously** [2] - 130:7, 284:21
**content** [1] - 172:11
**contents** [1] - 162:4
**continue** [2] - 202:10, 261:19
**continued** [2] - 11:10, 294:10
**contusions** [1] - 191:25
**convenient** [2] - 293:6, 293:20
**converging** [2] - 208:15, 217:18
**conversation** [15] - 98:16, 250:5, 250:7, 250:8, 250:17, 250:22, 251:4, 251:5, 251:12, 251:20, 287:8, 290:16, 291:20, 292:5, 292:11
**conviction** [4] - 9:25, 10:2, 10:7, 16:25
**coordinating** [1] - 61:18
**cop** [1] - 128:14

**copies** [3] - 91:25, 210:12, 293:22
**copy** [2] - 242:18, 294:9
**corner** [7] - 76:2, 92:4, 147:3, 169:8, 205:25, 206:3
**corporation** [1] - 16:4
**correct** [221] - 7:25, 12:17, 15:24, 16:15, 16:20, 21:22, 25:20, 32:6, 32:11, 32:21, 35:12, 35:13, 36:14, 37:9, 37:10, 39:8, 39:10, 40:15, 43:21, 45:24, 46:6, 65:12, 67:14, 69:11, 69:12, 71:19, 71:20, 73:16, 76:6, 77:23, 77:25, 78:6, 79:12, 79:15, 79:16, 79:25, 80:2, 81:4, 81:7, 81:18, 84:12, 89:6, 90:2, 93:17, 94:20, 99:2, 99:8, 100:2, 100:7, 101:2, 102:16, 107:2, 113:3, 113:4, 115:18, 115:21, 115:22, 115:25, 141:19, 142:11, 144:8, 144:13, 144:19, 145:19, 145:21, 146:4, 146:9, 146:12, 146:18, 147:20, 147:21, 148:10, 148:15, 149:10, 152:2, 152:25, 153:2, 153:13, 154:9, 158:10, 159:18, 161:12, 161:18, 162:6, 162:10, 162:15, 162:22, 163:5, 164:2, 167:3, 167:8, 167:15, 168:5, 169:5, 170:23, 170:24, 171:8, 172:19, 173:2, 173:18, 176:9, 177:4, 177:5, 177:10, 177:16, 178:7, 180:15, 180:23, 181:3, 182:8, 182:9, 182:15, 184:6, 184:7, 184:10, 185:5, 185:17, 186:2, 188:8, 188:18, 192:22,

195:5, 195:6, 195:9, 195:10, 195:12, 195:19, 198:13, 199:23, 203:17, 203:23, 204:5, 204:6, 204:10, 204:16, 204:25, 206:21, 207:11, 207:21, 210:23, 211:4, 211:17, 213:18, 222:7, 223:22, 224:21, 225:5, 225:9, 225:14, 226:6, 227:6, 231:23, 232:8, 232:11, 233:2, 233:3, 233:10, 233:11, 233:13, 233:18, 233:21, 233:24, 234:10, 235:8, 236:7, 238:20, 239:7, 240:12, 241:8, 241:13, 241:24, 242:5, 245:10, 246:21, 247:20, 249:10, 251:9, 254:12, 255:24, 260:15, 261:11, 263:9, 263:14, 264:2, 264:12, 264:19, 265:8, 265:16, 265:21, 265:24, 266:5, 266:6, 268:8, 269:22, 270:3, 270:8, 270:11, 274:2, 274:7, 274:12, 274:15, 274:23, 275:4, 275:5, 275:8, 275:12, 275:21, 276:2, 276:19, 277:10, 277:11, 277:17, 280:17, 281:17, 282:23, 283:14, 288:18, 290:17, 290:23, 291:6, 293:18
**corrected** [1] - 27:22
**correcting** [2] - 239:23, 239:25
**correction** [2] - 85:15, 239:21
**CORRECTIONS** [1] - 297:6
**correctly** [5] - 57:4, 149:24, 185:12, 214:17, 235:14
**corroborate** [3] -

124:22, 125:10
**corroborated** [1] - 125:10
**counsel** [3] - 3:4, 4:19, 293:7
**Counsel** [1] - 293:17
**counter** [9] - 132:23, 145:5, 176:3, 243:13, 273:12, 274:5, 276:7, 288:5, 289:19
**Country** [1] - 1:12, 2:4, 4:10
**County** [22] - 4:5, 5:2, 5:4, 6:20, 9:13, 9:15, 10:5, 11:2, 11:15, 12:11, 16:15, 29:8, 30:15, 33:8, 48:4, 48:24, 104:3, 126:18, 126:24, 211:20, 242:11, 297:3
**COUNTY** [3] - 1:7, 1:8, 2:8
**couple** [4] - 23:11, 76:23, 116:23, 224:8
**course** [15] - 16:13, 87:16, 104:2, 105:13, 143:3, 149:6, 150:15, 150:22, 151:21, 151:23, 164:14, 279:24, 281:9, 281:19, 282:12
**courses** [3] - 28:24, 52:22, 126:6
**Court** [2] - 3:16, 4:7
**COURT** [1] - 1:2
**court** [8] - 4:16, 5:10, 7:8, 7:9, 7:10, 95:11, 96:16, 210:12
**courts** [1] - 126:20
**covered** [9] - 143:15, 154:14, 155:3, 167:14, 171:8, 171:11, 173:23, 187:2, 225:4
**crawled** [1] - 189:3
**create** [5] - 31:17, 31:23, 45:5, 53:5, 143:24
**created** [3] - 8:17, 51:25, 227:25
**creating** [5] - 32:17, 58:5, 120:2, 173:24, 228:4
**credibility** [1] - 136:16
**Creedon** [1] - 19:12
**crevice** [2] - 279:8, 280:15

**crevices** [6] - 278:4, 278:6, 280:4, 281:11, 281:23, 282:16
**Crime** [4] - 30:15, 48:4, 104:3, 211:21
**crime** [208] - 8:2, 10:22, 11:2, 16:19, 19:19, 20:4, 22:15, 22:16, 22:19, 24:22, 25:8, 26:11, 26:16, 26:22, 28:9, 28:17, 28:23, 29:20, 30:4, 30:20, 30:24, 31:9, 31:15, 31:18, 32:3, 32:10, 32:14, 32:18, 32:24, 33:8, 33:17, 33:21, 33:24, 34:24, 35:17, 35:25, 36:3, 36:4, 36:10, 40:19, 42:20, 43:11, 44:25, 45:6, 45:23, 46:3, 46:11, 47:19, 48:3, 48:12, 48:13, 49:8, 50:14, 50:19, 52:4, 52:15, 57:23, 59:17, 60:10, 60:21, 60:24, 61:3, 61:15, 62:7, 62:10, 63:20, 64:3, 65:7, 65:8, 65:9, 65:12, 67:6, 68:3, 68:8, 72:22, 72:23, 73:22, 74:22, 78:15, 80:11, 80:23, 81:11, 81:13, 82:7, 86:23, 87:18, 87:22, 89:5, 90:20, 91:2, 94:4, 97:12, 97:18, 97:21, 99:11, 99:20, 100:12, 104:4, 104:5, 104:23, 105:2, 109:8, 110:2, 111:5, 111:16, 111:17, 112:7, 112:9, 117:15, 118:20, 121:8, 121:15, 122:5, 122:11, 124:19, 125:6, 125:7, 125:9, 126:10, 127:2, 127:24, 128:19, 128:23, 128:25, 129:3, 129:9, 134:17, 136:9, 136:25, 137:19, 139:7, 141:9, 142:5, 142:25, 143:9, 143:20, 147:10, 147:24, 148:7, 149:7, 151:24, 152:14, 153:7,

156:8, 157:20, 159:15, 163:19, 164:15, 173:3, 179:18, 181:16, 182:20, 186:19, 188:3, 188:12, 190:22, 191:3, 197:20, 201:5, 206:14, 207:16, 207:20, 209:11, 209:17, 209:19, 210:17, 210:22, 211:24, 214:18, 221:18, 224:25, 229:5, 233:18, 241:8, 241:12, 245:6, 246:13, 246:15, 253:13, 254:23, 257:16, 258:21, 262:4, 262:23, 263:22, 263:24, 264:11, 264:15, 265:7, 267:16, 269:16, 271:8, 275:21, 277:9, 279:6, 282:10, 283:3, 283:9, 284:11, 284:23, 285:9, 286:8, 290:12, 290:20, 291:2, 293:9, 296:10
**criminal** [7] - 16:25, 96:22, 100:2, 100:24, 106:23, 107:7, 107:16
**Criminal** [1] - 28:21
**criminalists** [1] - 43:22
**Crispino** [4] - 99:16, 99:19, 104:25, 109:10
**crossed** [1] - 83:16
**crush** [1] - 14:11
**cuff** [1] - 150:5
**curiosity** [2] - 19:4, 38:25
**custom** [5] - 104:19, 104:24, 105:8, 210:16, 211:20
**customs** [1] - 124:17
**cut** [27] - 77:8, 77:18, 83:7, 83:8, 132:6, 132:21, 163:5, 163:7, 176:17, 178:7, 178:12, 182:2, 192:6, 194:15, 205:5, 220:25, 246:6, 246:7, 257:4,

257:12, 265:4, 265:12, 269:6, 273:3, 273:4, 279:15, 286:4
**cutoff** [1] - 285:17
**cuts** [10] - 170:16, 182:18, 185:8, 191:25, 192:19, 192:21, 257:3, 268:22, 268:23, 269:5
**cutting** [4] - 144:5, 190:9, 191:16, 277:15
**cuttings** [1] - 189:12
**cylindrical** [1] - 174:19

## D

**DA's** [2] - 22:9, 210:11
**damaged** [1] - 89:23
**Daniel** [1] - 4:25
**DANIEL** [1] - 2:6
**darcy** [1] - 19:5
**date** [7] - 50:15, 51:20, 52:18, 255:21, 290:4, 293:6, 293:20
**Date** [1] - 297:4
**dated** [1] - 92:25
**Dawson** [8] - 237:7, 240:22, 253:19, 255:2, 255:13, 256:23, 257:9, 261:6
**days** [8] - 93:15, 111:4, 122:10, 254:16, 254:22, 257:15
**dead** [4] - 132:24, 181:7, 192:14, 276:15
**deal** [2] - 47:12, 152:11
**dealing** [4] - 24:7, 80:14, 87:11, 117:7
**dealings** [1] - 48:11
**deals** [1] - 47:8
**dealt** [1] - 53:17
**death** [7] - 190:2, 190:5, 192:14, 193:3, 193:7, 193:12, 193:21
**decide** [2] - 105:25, 271:6
**decided** [1] - 183:11
**deciding** [1] - 90:25
**dedicated** [1] - 29:16
**deed** [1] - 153:5
**deep** [2] - 268:23,

279:2
**Defendant** [4] - 1:16, 6:19, 127:11, 127:21
**defendant** [1] - 106:4
**Defendants** [3] - 1:10, 2:9, 12:19
**defense** [1] - 27:21
**defensive** [4] - 191:24, 192:5, 192:17, 192:18
**define** [6] - 30:8, 54:6, 54:12, 56:25, 165:14, 182:25
**definitely** [1] - 26:18
**definition** [1] - 54:16
**DeForest** [3] - 28:20, 29:6, 43:9
**deli** [4] - 21:8, 21:10, 21:11
**denied** [1] - 95:15
**Dennis** [1] - 5:3
**Dennison** [1] - 2:9
**density** [1] - 55:17
**Department** [2] - 10:6, 20:23
**DEPARTMENT** [1] - 2:8
**department** [1] - 33:12
**depicted** [2] - 157:19, 275:25
**depicts** [1] - 181:6
**depose** [1] - 293:4
**deposed** [1] - 6:8
**deposited** [1] - 216:24
**deposition** [12] - 3:6, 3:13, 4:3, 4:9, 6:25, 68:2, 93:14, 151:14, 246:12, 272:10, 294:5, 295:7
**Deposition** [1] - 297:4
**DEPOSITION** [1] - 1:16
**depth** [1] - 257:4
**deputy** [1] - 98:7
**derived** [1] - 45:17
**describe** [3] - 57:16, 101:10, 209:19
**described** [8] - 79:24, 169:25, 211:22, 243:19, 249:21, 279:25, 288:11, 289:25
**describes** [3] - 167:2, 178:17, 203:6
**describing** [1] - 284:13
**description** [1] - 221:17
**Description** [1] - 296:14

**desk** [24] - 101:19, 101:25, 106:13, 106:19, 194:8, 201:10, 206:3, 206:4, 206:10, 206:16, 206:21, 207:23, 217:3, 217:19, 218:13, 220:18, 221:10, 225:18, 226:8, 226:13, 227:3, 227:4, 229:3, 229:15
**destroyed** [2] - 90:9, 91:11
**destroying** [1] - 95:16
**detail** [2] - 93:16, 277:12
**details** [4] - 85:23, 111:7, 138:18, 139:6
**detect** [6] - 153:4, 280:16, 280:22, 281:10, 282:15, 283:19
**detected** [1] - 280:24
**detective** [33] - 21:20, 24:20, 25:16, 26:9, 34:20, 34:23, 63:21, 64:3, 64:6, 64:9, 64:25, 65:22, 80:10, 80:12, 80:24, 81:16, 82:14, 86:16, 86:23, 88:3, 88:12, 90:18, 104:25, 105:5, 105:9, 105:16, 108:4, 108:18, 111:6, 211:16, 215:10, 242:12, 279:17
**Detective** [51] - 23:21, 24:7, 24:19, 24:25, 25:10, 25:14, 26:9, 34:5, 34:8, 60:8, 60:13, 61:10, 61:18, 63:6, 63:8, 63:20, 72:25, 73:2, 80:9, 80:17, 81:25, 82:2, 82:3, 85:21, 88:11, 89:13, 89:14, 89:15, 92:15, 94:14, 96:20, 99:6, 103:7, 103:8, 121:9, 121:10, 122:21, 123:16, 127:8, 129:21, 138:5, 138:7, 160:21, 172:2, 242:24, 245:17, 245:24, 249:7, 295:7
**Detectives** [1] - 129:20
**detectives** [28] -

25:19, 33:16, 35:16, 35:25, 65:10, 66:6, 85:22, 87:21, 104:9, 108:13, 109:17, 112:13, 113:6, 126:18, 126:25, 128:9, 137:24, 179:15, 197:19, 210:23, 214:21, 245:16, 246:17, 256:4, 257:17, 258:8, 258:16, 259:19

**determination** [1] - 52:8

**determine** [6] - 14:12, 14:16, 50:4, 50:10, 106:18, 284:22

**determined** [1] - 49:23

**determining** [1] - 90:4

**develop** [1] - 51:4

**developed** [1] - 40:3

**dew** [1] - 70:4

**dewy** [1] - 69:25

**diagram** [3] - 14:14, 194:20, 209:24

**diagramming** [1] - 15:2

**diagrams** [1] - 14:19

**dialogue** [2] - 213:8, 225:12

**Diaz** [1] - 127:12

**die** [1] - 254:15

**difference** [2] - 228:19, 229:11

**different** [21] - 36:9, 42:22, 43:16, 44:2, 44:10, 44:15, 48:5, 48:21, 48:22, 54:22, 96:12, 102:11, 104:5, 104:14, 165:12, 198:25, 211:6, 217:18, 235:12, 266:18, 289:8

**difficult** [1] - 117:6

**dimensions** [1] - 206:12

**dining** [1] - 77:7

**direct** [6] - 38:4, 134:22, 196:2, 222:9, 222:16, 271:18

**directed** [7] - 78:11, 88:11, 246:23, 247:8, 259:15, 259:17, 259:25

**directing** [7] - 119:14, 135:18, 135:23, 176:13, 234:12, 247:10, 259:19

**direction** [13] - 40:14, 82:17, 82:18, 102:9, 106:19, 106:20, 180:17, 180:20, 181:10, 194:24, 208:11, 208:14, 217:17

**directionality** [3] - 30:12, 49:23, 50:5

**directions** [1] - 102:11

**directly** [4] - 38:9, 99:10, 208:14, 253:5

**director** [6] - 11:5, 16:18, 16:19, 97:21, 98:7, 99:17

**disagree** [2] - 197:17, 272:4

**disassemble** [4] - 280:25, 281:22, 282:15, 283:17

**disassembled** [1] - 266:11

**disconfirm** [1] - 136:9

**discover** [1] - 281:24

**discovered** [3] - 27:4, 266:10, 266:22

**discuss** [6] - 10:4, 34:22, 36:8, 65:10, 65:11, 108:25

**discussed** [6] - 9:6, 20:2, 64:19, 74:3, 74:4, 88:22, 93:16, 113:13, 126:23, 188:10, 237:6, 242:8, 243:22, 251:15, 252:6, 253:8

**discussing** [4] - 94:19, 121:11, 240:13, 240:15

**discussion** [15] - 65:15, 66:2, 66:9, 197:20, 201:11, 222:4, 242:4, 245:5, 247:15, 247:17, 249:7, 251:25, 252:3, 252:11, 253:12

**discussions** [3] - 197:19, 253:18, 290:10

**Disk** [3] - 67:2, 120:22, 121:3

**distance** [6] - 52:7, 67:19, 206:12, 206:15, 206:17, 209:3

**distances** [1] - 206:13

**distinction** [1] - 229:6

**distinguish** [1] - 56:7

**DISTRICT** [2] - 1:2, 1:2

**District** [2] - 4:7, 4:8

**district** [7] - 5:5, 84:24, 109:19, 113:12, 121:24, 179:16, 198:20

**doctor** [1] - 50:23

**Doctor** [1] - 27:21

**document** [23] - 33:4, 75:5, 98:23, 105:14, 129:3, 131:5, 131:8, 131:10, 133:15, 133:17, 134:2, 134:7, 135:3, 135:5, 135:7, 137:5, 219:14, 219:17, 219:22, 219:25, 220:8, 286:2, 286:14

**documentation** [1] - 30:10

**documented** [6] - 47:15, 66:11, 66:17, 102:14, 211:10, 256:17

**documenting** [5] - 14:9, 31:4, 31:6, 45:4, 49:18

**DOE** [1] - 1:8

**Dolan** [1] - 54:4

**DOLLY** [2] - 298:3, 298:19

**Dolly** [2] - 1:20, 4:17

**Don** [1] - 54:4

**done** [16] - 36:20, 38:18, 52:4, 60:20, 60:23, 137:23, 141:17, 141:18, 150:22, 151:2, 151:3, 160:20, 231:19, 234:8, 280:16, 292:9

**door** [7] - 69:2, 73:7, 76:17, 76:24, 205:20, 205:22, 221:15

**doorknob** [1] - 85:4

**doors** [2] - 205:20, 208:12

**doorway** [7] - 206:10, 206:16, 218:10, 219:19, 226:8, 229:3, 229:14

**dot** [2] - 257:3, 269:5

**dots** [3] - 117:9, 237:2, 239:21

**double** [2] - 84:15, 140:10

**double-sided** [1] - 84:15

**doubt** [2] - 109:14, 239:3

**doubted** [1] - 267:24

**doubts** [10] - 227:15, 247:18, 249:8, 249:13, 255:21, 266:8, 266:24, 267:17, 290:22, 291:25

**down** [16] - 40:11, 69:3, 75:17, 76:25, 77:17, 88:6, 105:11, 112:10, 158:17, 159:21, 161:7, 161:23, 166:10, 200:21, 201:18, 276:9

**Doyle** [59] - 25:14, 34:5, 34:11, 34:15, 61:19, 61:21, 68:23, 71:25, 72:3, 73:7, 73:18, 75:6, 78:2, 78:4, 78:13, 80:9, 80:17, 80:24, 81:10, 82:5, 85:21, 86:9, 86:22, 121:10, 129:21, 138:5, 138:8, 138:21, 242:25, 243:3, 243:4, 243:9, 243:11, 243:22, 244:18, 245:6, 245:14, 245:24, 247:15, 248:8, 249:7, 250:17, 251:5, 251:14, 251:15, 251:19, 252:10, 252:16, 252:25, 260:12, 287:22, 287:25, 288:3, 288:15, 289:15, 290:17, 291:16, 291:22, 292:12

**DOYLE** [1] - 1:7

**Doyle's** [2] - 122:21, 243:24

**Dr** [12] - 28:19, 28:20, 50:20, 50:24, 51:8, 237:7, 240:22, 253:19, 255:2, 255:13, 256:23, 261:6

**draw** [2] - 205:24, 206:3

**drawing** [3] - 14:14, 31:4, 31:7

**drawn** [1] - 269:13

**dries** [1] - 141:18

**dripping** [2] - 102:3, 119:10

**driveway** [1] - 60:12

**drop** [3] - 55:2, 55:12

**droplets** [4] - 116:24, 119:15, 173:16, 204:4

**drops** [3] - 119:12, 119:13, 173:4

**drug** [1] - 22:6

**drugs** [1] - 48:9

**drying** [1] - 56:3

**Dubey** [2] - 26:15, 27:4

**duly** [2] - 5:13, 298:6

**dumbbell** [35] - 83:17, 84:21, 132:5, 144:13, 144:16, 145:13, 146:7, 167:3, 167:4, 167:11, 167:23, 168:3, 168:5, 168:8, 168:11, 169:25, 170:5, 170:6, 170:10, 170:13, 170:22, 171:2, 171:5, 172:19, 194:13, 194:14, 203:19, 220:23, 220:24, 221:16, 225:4, 226:19, 229:20, 232:25

**dumbbells** [8] - 146:13, 146:14, 146:23, 147:9, 147:19, 147:23, 148:13, 149:8

**dumping** [3] - 95:4, 95:17, 96:6

**during** [8] - 16:13, 74:15, 88:11, 143:3, 150:21, 199:25, 200:4, 200:7

**dust** [1] - 33:12

**dusting** [1] - 35:12

**duties** [1] - 241:8

**dynamics** [1] - 50:23

## E

**ear** [3] - 155:21, 157:2, 177:9

**early** [6] - 52:24, 52:25, 67:22, 246:16, 249:23

**ears** [1] - 196:14

**east** [4] - 75:17, 110:19, 169:8, 179:4

**easterly** [3] - 106:20, 180:17, 208:13

**EASTERN** [1] - 1:2

**Eastern** [1] - 4:8

**edge** [9] - 160:9, 160:11, 163:5, 163:7, 163:16, 164:2, 170:17, 172:16
**education** [2] - 28:18, 40:2
**effect** [1] - 3:15
**eight** [2] - 5:19, 93:11
**eighties** [1] - 52:25
**either** [15] - 12:20, 12:21, 40:6, 99:15, 103:7, 116:11, 168:4, 178:10, 211:15, 247:19, 252:14, 252:18, 252:24, 284:18, 298:10
**elected** [1] - 21:10
**eliminate** [2] - 244:5, 278:18
**eliminated** [1] - 70:2
**ELIZABETH** [1] - 2:6
**Elizabeth** [1] - 4:25
**emergency** [1] - 101:20
**EMPLOYEES** [1] - 1:8
**encasement** [1] - 237:24
**encountered** [1] - 60:19
**end** [15] - 10:11, 22:4, 23:3, 120:22, 140:25, 159:4, 170:6, 170:9, 172:7, 175:23, 230:23, 250:10, 292:18, 295:5
**ended** [5] - 21:8, 21:14, 78:9, 183:13, 191:14
**ends** [1] - 183:20
**energy** [4] - 55:2, 55:4, 55:12, 55:15
**enforcement** [1] - 258:19
**engage** [2] - 213:8, 277:5
**engaged** [1] - 201:6
**enter** [4] - 77:19, 213:6, 226:19, 228:25
**entered** [6] - 68:25, 73:7, 75:16, 76:16, 206:14, 274:22
**entering** [3] - 91:12, 118:20, 206:18
**entire** [6] - 8:8, 137:5, 186:13, 217:8, 288:25, 289:4

**entirely** [3] - 186:14, 197:13, 235:12
**entity** [4] - 11:18, 13:9, 16:3, 16:9
**entrances** [1] - 205:17
**entranceway** [1] - 205:13
**entries** [1] - 245:23
**ERRATA** [1] - 297:2
**error** [2] - 286:18, 286:19
**ESQ** [5] - 2:5, 2:6, 2:6, 2:10, 2:15
**essentially** [1] - 156:7
**established** [3] - 134:11, 158:8, 239:12
**establishes** [1] - 286:20
**Et** [1] - 297:3
**et** [1] - 201:10
**evaluation** [1] - 74:22
**evening** [5] - 79:8, 87:6, 88:17, 88:20, 123:22, 147:16, 147:17, 248:19, 248:21, 249:6, 252:4, 291:6, 291:11, 291:15, 291:18
**event** [1] - 294:4
**events** [3] - 228:6, 262:6, 265:15
**eventually** [1] - 99:24
**Evidence** [1] - 51:11
**evidence** [75] - 12:5, 31:3, 31:4, 31:5, 31:7, 32:5, 33:9, 45:3, 45:17, 46:9, 46:15, 46:25, 48:15, 48:16, 48:20, 49:19, 53:25, 66:15, 66:16, 75:3, 89:19, 89:20, 89:22, 89:25, 91:10, 97:16, 97:17, 98:10, 111:19, 111:20, 112:6, 112:10, 112:14, 113:9, 122:25, 123:10, 124:21, 134:17, 136:10, 136:14, 137:18, 137:19, 139:7, 141:11, 169:23, 172:22, 173:15, 176:2, 179:17, 183:24, 188:3, 188:12, 190:23, 191:3, 198:13, 201:5, 210:19, 211:24,

212:15, 214:19, 215:2, 215:20, 216:11, 216:20, 216:23, 241:12, 261:24, 262:5, 263:23, 267:17, 268:6, 268:12, 270:10, 271:8
**evidentiary** [1] - 87:2
**evolve** [1] - 101:13
**evolved** [1] - 101:16
**exact** [1] - 288:21
**exactly** [12] - 20:19, 53:2, 60:14, 60:16, 70:23, 74:23, 77:14, 97:14, 99:22, 237:13, 252:6, 275:19
**exam** [1] - 234:3
**EXAMINATION** [1] - 5:21
**Examination** [1] - 296:6
**examination** [4] - 149:7, 174:15, 215:19, 234:5
**examine** [6] - 110:8, 122:24, 148:13, 149:4, 156:7, 263:23
**examined** [10] - 5:14, 90:11, 147:25, 174:9, 182:19, 234:7, 244:8, 249:16, 254:25, 281:8
**examiner** [11] - 90:12, 90:13, 91:12, 164:11, 237:7, 240:16, 241:3, 242:2, 261:7, 266:17, 267:6
**examiner's** [1] - 240:22
**examining** [1] - 102:20
**example** [1] - 45:21
**except** [6] - 3:9, 104:12, 110:19, 133:18, 169:7, 211:5
**exercise** [1] - 179:21
**Exhibit** [62] - 8:12, 8:15, 75:22, 76:2, 80:16, 80:19, 91:22, 91:23, 92:16, 92:17, 92:19, 92:20, 92:23, 94:3, 95:2, 113:25, 118:22, 129:16, 130:14, 133:9, 137:13, 138:6, 138:7, 139:17,

146:5, 147:5, 147:6, 154:8, 155:11, 155:13, 155:15, 157:17, 157:20, 158:5, 159:14, 161:11, 162:2, 164:20, 169:3, 172:10, 176:21, 194:21, 194:25, 205:25, 230:20, 234:14, 234:17, 242:16, 245:23, 275:25, 284:5, 284:7, 287:21, 296:15, 296:16, 296:18, 296:19, 296:20, 296:21, 296:22, 296:23, 296:24
**exhibit** [2] - 91:21, 162:3
**EXHIBITS** [1] - 296:12
**Exhibits** [3] - 92:8, 231:5, 296:17
**exhibits** [3] - 92:14, 293:22, 294:7
**expanse** [1] - 203:17
**expect** [13] - 57:17, 158:8, 159:25, 165:3, 168:7, 186:25, 189:22, 190:2, 191:18, 193:3, 193:13, 193:16, 193:24
**expectation** [2] - 192:9, 195:15
**expected** [1] - 155:2
**experience** [4] - 158:2, 163:14, 282:10, 282:19
**experienced** [1] - 119:22
**expert** [34] - 6:17, 6:18, 48:11, 48:24, 66:7, 98:10, 104:23, 111:16, 112:6, 112:15, 112:20, 118:23, 119:23, 151:11, 151:13, 151:22, 153:17, 155:2, 158:3, 158:19, 159:24, 165:23, 175:4, 177:13, 179:14, 192:10, 195:16, 195:22, 196:4, 197:12, 202:13, 212:17, 228:22, 274:21
**expertise** [13] - 48:8,

152:4, 153:17, 155:24, 158:19, 159:24, 165:23, 170:21, 179:13, 179:22, 189:6, 264:12, 274:20
**experts** [3] - 48:22, 54:12, 136:8
**explain** [4] - 95:6, 104:17, 109:19, 238:2
**exposed** [2] - 161:2, 183:14
**expressed** [13] - 71:18, 250:18, 254:25, 255:12, 257:7, 260:11, 263:8, 265:24, 267:5, 269:2, 269:14, 290:22, 291:14
**expressing** [2] - 256:23, 291:16
**extends** [2] - 177:8, 269:10
**extent** [2] - 133:13, 190:13
**extra** [1] - 294:9
**extremely** [1] - 152:24

**F**

**facing** [2] - 179:4, 180:19
**fact** [15] - 119:9, 133:25, 140:12, 158:4, 179:7, 191:17, 235:3, 242:9, 253:15, 254:3, 257:18, 260:21, 268:13, 268:15, 272:5
**factors** [3] - 267:16, 268:5, 270:7
**facts** [3] - 31:25, 140:19, 196:15
**fair** [30] - 24:18, 24:24, 31:25, 38:10, 42:16, 45:6, 45:20, 47:4, 50:12, 54:23, 57:10, 80:22, 82:15, 140:21, 141:3, 143:8, 183:3, 202:22, 204:18, 238:25, 241:10, 243:23, 245:13, 246:23, 252:4, 252:15, 266:7, 280:9, 281:21, 284:23

fairly [1] - 50:23
fairness [2] - 285:18, 286:23
fall [2] - 59:10, 59:14
fallen [4] - 178:23, 185:14, 188:5, 188:22
falsifiable [1] - 45:10
familiar [11] - 43:17, 51:9, 54:11, 63:18, 63:25, 129:24, 148:9, 148:20, 152:8, 152:21, 233:12
family [1] - 94:11
far [28] - 9:8, 20:3, 34:11, 50:21, 51:5, 51:6, 76:4, 77:3, 81:15, 82:4, 105:12, 128:11, 148:22, 149:3, 150:4, 150:21, 163:13, 175:10, 175:19, 175:20, 195:13, 202:23, 206:9, 207:17, 215:17, 263:20, 266:15, 268:24
fashion [1] - 185:3
fast [1] - 117:11
father [49] - 21:8, 131:23, 131:24, 132:19, 133:3, 176:15, 179:9, 194:6, 194:7, 194:9, 194:17, 204:9, 204:23, 205:6, 205:8, 205:9, 206:20, 207:13, 213:9, 218:18, 219:18, 220:15, 220:17, 220:18, 221:3, 221:4, 221:5, 221:8, 222:5, 225:12, 225:13, 226:11, 226:21, 226:25, 227:3, 229:15, 229:16, 229:17, 229:18, 230:2, 232:13, 246:19, 248:12, 249:2, 273:3, 275:3, 276:13
father's [14] - 83:8, 169:19, 221:9, 226:13, 230:16, 231:14, 231:18, 231:22, 232:24, 233:9, 246:7, 274:15, 274:22,

275:7
father-in-law [1] - 21:8
Federal [1] - 1:18
feet [9] - 57:4, 57:6, 57:8, 73:10, 77:3, 79:15, 196:13, 221:9, 226:13
fell [3] - 132:20, 176:16, 183:24
felt [7] - 89:19, 90:7, 130:23, 243:9, 260:9, 287:25, 289:15
FEVOLA [2] - 298:3, 298:19
Fevola [3] - 1:20, 4:17, 4:18
few [8] - 18:16, 70:21, 79:15, 91:15, 92:21, 93:14, 114:3, 251:18
field [4] - 50:12, 50:25, 51:3, 212:12
fifty/fifty [1] - 13:16
fighting [3] - 180:21, 183:15, 192:8
file [4] - 43:25, 44:9, 44:13, 44:20
files [1] - 95:17
filing [1] - 3:5
fill [1] - 130:13
filled [3] - 100:5, 130:7, 242:17
final [2] - 14:12, 183:4
finally [1] - 290:25
findings [1] - 100:14
fine [1] - 220:10
Fini [3] - 68:24, 72:25, 121:10
finish [5] - 160:17, 160:21, 190:18, 284:17, 291:7
finished [4] - 20:17, 88:18, 89:4, 125:7
FINKELSTEIN [1] - 2:19
fire [1] - 53:4
firearm [1] - 22:8
firearms [5] - 48:9, 48:10, 48:17, 53:17, 164:16
firm [1] - 10:16
first [64] - 5:13, 20:22, 22:14, 24:6, 25:21, 29:19, 30:22, 52:17, 62:14, 69:2, 74:9, 78:5, 79:12, 83:14, 86:8, 91:7, 97:11, 101:18, 106:8, 115:13, 116:10, 131:22, 131:23,

134:6, 144:8, 145:11, 161:14, 167:2, 173:9, 176:14, 178:17, 181:25, 194:15, 194:18, 195:21, 202:24, 205:5, 205:7, 211:6, 213:22, 213:23, 213:24, 214:2, 214:3, 214:4, 214:9, 216:4, 220:14, 220:25, 221:3, 222:24, 222:25, 223:2, 223:11, 225:3, 232:7, 249:14, 255:4, 255:21, 258:6, 264:15, 267:25, 278:9, 285:11
First [1] - 33:25
five [3] - 62:23, 85:6, 132:13
Flight [1] - 51:10
floor [15] - 110:24, 132:20, 161:5, 161:8, 161:23, 161:25, 176:16, 178:24, 180:14, 181:2, 181:8, 181:18, 185:5, 188:6, 193:23
fluid [2] - 54:17, 54:22
focus [1] - 233:16
follow [6] - 20:17, 133:8, 190:4, 213:25, 231:25, 283:10
following [7] - 9:24, 176:11, 186:17, 207:17, 225:11, 225:24, 232:5
follows [1] - 5:15
footprints [1] - 30:11
footwear [1] - 70:2
FOR [3] - 1:2, 297:2, 297:7
force [8] - 3:14, 57:5, 106:25, 117:2, 117:17, 167:12, 199:13, 225:20
forces [1] - 54:22
Forensic [5] - 28:23, 43:13, 43:19, 89:14, 89:16
forensic [9] - 72:21, 72:22, 89:15, 229:4, 241:16, 241:17, 261:24, 268:6, 268:12

forensics [4] - 97:22, 98:12, 98:21, 98:25
forgot [2] - 148:24, 256:18
forgotten [1] - 94:20
form [192] - 3:9, 7:3, 11:21, 19:23, 24:10, 27:8, 27:14, 27:18, 31:12, 31:20, 34:4, 35:2, 37:3, 38:2, 38:16, 38:21, 39:7, 41:13, 45:14, 48:2, 55:23, 56:23, 57:14, 63:23, 64:12, 64:17, 66:13, 68:10, 73:25, 78:18, 78:23, 79:6, 82:10, 86:3, 87:24, 90:23, 94:22, 95:9, 100:9, 100:17, 101:15, 103:24, 105:21, 107:5, 107:6, 109:13, 109:22, 110:16, 111:12, 111:22, 112:22, 113:16, 114:20, 117:5, 117:21, 118:11, 119:6, 120:5, 120:18, 121:21, 122:7, 122:17, 123:7, 124:9, 124:25, 125:13, 126:4, 126:14, 127:5, 127:15, 128:2, 128:7, 128:21, 129:5, 129:12, 130:10, 131:4, 133:11, 140:2, 141:5, 141:14, 142:4, 143:6, 143:17, 144:4, 145:24, 146:21, 148:4, 148:17, 149:18, 150:24, 153:22, 155:5, 156:19, 157:5, 157:13, 157:24, 158:14, 158:22, 160:4, 163:11, 163:21, 164:7, 168:14, 171:10, 174:8, 175:15, 176:7, 177:25, 180:7, 181:24, 182:23, 183:10, 184:12, 184:17, 185:7, 185:25, 186:5, 187:17, 187:19, 188:25, 189:15, 191:10, 191:13,

192:12, 192:24, 193:19, 195:21, 198:3, 198:15, 198:24, 199:9, 201:13, 201:22, 212:3, 212:10, 212:19, 213:20, 214:12, 215:6, 215:15, 215:25, 216:14, 218:17, 221:23, 222:10, 222:16, 222:18, 222:22, 225:8, 227:19, 228:17, 228:24, 229:10, 229:25, 239:10, 241:12, 245:20, 247:4, 248:6, 248:14, 249:4, 249:12, 251:11, 256:7, 257:21, 258:12, 258:25, 259:22, 260:7, 261:3, 262:9, 264:21, 265:10, 265:18, 266:14, 267:22, 268:10, 271:18, 272:14, 279:11, 280:19, 281:6, 281:13, 282:2, 282:6, 283:23, 285:25, 286:19, 288:20, 291:8, 292:6
formal [1] - 212:4
format [1] - 200:12
forms [1] - 130:13
formulate [2] - 104:6, 110:11
formulated [3] - 107:19, 107:23, 214:19
formulating [3] - 108:21, 133:16, 197:4
formulation [1] - 134:3
forte [1] - 48:6
forth [1] - 298:6
fought [3] - 132:15, 205:8, 221:4
foundation [1] - 136:7
four [6] - 22:7, 73:10, 77:3, 85:5, 132:13, 208:9
four-and-a-half [1] - 22:7
Fox [3] - 94:10, 94:13, 95:4
fox [4] - 95:12, 96:3,

96:5, 96:16
**foyer** [1] - 75:17
**frame** [1] - 140:23
**frequency** [4] -
281:20, 282:22,
283:2, 283:12
**Fresh** [1] - 278:11
**Friday** [7] - 87:6,
123:19, 291:6,
291:11, 291:14,
291:18
**front** [5] - 69:2, 73:7,
76:16, 76:24, 225:18
**full** [3] - 191:15,
191:17, 220:14
**function** [3] - 11:9,
112:4, 285:6
**functions** [1] - 111:15
**funding** [3] - 128:19,
128:23, 129:3
**furnish** [1] - 294:8
**furniture** [10] - 206:23,
206:25, 207:4,
207:8, 213:13,
222:6, 225:18,
226:5, 226:24, 275:2
**FURTHER** [2] - 3:8,
3:12

# G

**game** [2] - 19:20,
74:19
**garage** [1] - 85:4
**Garden** [3] - 1:13, 2:5,
4:10
**garment** [1] - 52:7
**gathered** [1] - 142:12
**GENERAL** [1] - 2:12
**general** [3] - 98:15,
112:19, 212:13
**General** [1] - 5:7
**general's** [4] - 17:13,
17:19, 17:22, 18:3
**generally** [1] - 285:6
**generation** [1] - 135:5
**Genna** [21] - 10:22,
10:23, 11:17, 12:15,
13:16, 15:12, 15:20,
16:14, 16:22, 22:11,
29:21, 44:21, 49:2,
53:14, 53:23, 97:20,
98:5, 99:12, 108:2,
108:3, 108:6
**gentlemen** [1] - 17:24
**George** [3] - 72:22,
101:23, 108:3
**Gerald** [1] - 93:4
**given** [24] - 79:3,

86:24, 87:2, 93:6,
124:18, 138:3,
163:25, 179:13,
182:11, 182:18,
183:4, 184:20,
185:20, 189:5,
190:24, 201:5,
202:23, 211:24,
218:10, 221:13,
221:17, 258:5,
271:7, 298:8
**glancing** [1] - 160:22
**Glass** [2] - 19:14,
19:16
**glass** [1] - 205:20
**glasses** [1] - 67:19
**Glen** [1] - 19:7
**gosh** [2] - 23:12,
147:15
**gospel** [1] - 218:21
**grapevine** [3] - 95:4,
127:17, 128:4
**grass** [1] - 69:24
**gravity** [1] - 57:5
**greater** [1] - 153:4
**grips** [1] - 148:24
**ground** [9] - 154:9,
168:12, 177:14,
177:20, 177:23,
178:4, 182:8,
182:12, 189:11
**guard** [1] - 214:6
**guess** [6] - 6:14,
16:3, 20:13, 42:8,
49:2, 52:24, 61:18,
65:5, 78:7, 88:2,
130:15, 135:24,
141:15, 151:9,
151:25, 208:24,
254:14, 254:17,
254:18, 254:21,
284:3
**guessing** [1] - 56:10
**guns** [1] - 53:8
**gunshots** [1] - 58:22
**gut** [1] - 236:18
**guy** [4] - 28:3, 82:20,
196:12, 196:13
**guys** [3] - 12:25,
202:20, 242:18

# H

**hair** [9] - 161:11,
161:15, 161:20,
162:5, 162:15,
162:19, 162:24,
162:25, 163:25
**hairs** [9] - 90:6, 90:8,

91:10, 161:3,
162:22, 163:16,
163:17, 164:12
**half** [2] - 22:7, 288:22
**hall** [3] - 75:17, 83:21,
84:7
**hallway** [3] - 76:25,
77:9, 77:18
**hallways** [1] - 77:16
**hand** [4] - 53:8, 76:2,
92:4, 298:15
**handed** [1] - 96:17
**handle** [10] - 11:11,
33:9, 237:5, 238:4,
278:9, 278:21,
278:24, 279:9,
279:22, 281:2
**handled** [1] - 65:12
**handling** [1] - 61:20
**hard** [4] - 20:17,
77:16, 141:2, 141:10
**hardly** [2] - 228:4,
278:12
**Harris** [1] - 19:8
**Hauppauge** [1] - 2:10
**Hazeltien** [1] - 21:4
**head** [41] - 79:22,
99:19, 107:2,
117:18, 118:7,
118:25, 120:2,
120:16, 132:14,
138:23, 143:23,
153:12, 154:13,
154:23, 155:20,
156:23, 157:2,
157:21, 159:2,
163:9, 164:4, 165:2,
165:11, 166:2,
167:13, 169:2,
169:4, 169:25,
171:7, 179:4,
180:17, 181:14,
181:15, 192:20,
208:6, 213:18,
216:9, 217:25,
218:3, 224:19, 275:4
**heading** [1] - 77:15
**hear** [4] - 85:2,
108:15, 127:16,
258:18
**heard** [12] - 45:11,
54:15, 54:17, 86:22,
125:24, 126:7,
126:10, 127:7,
128:3, 134:20,
253:4, 258:7
**hearing** [1] - 96:3
**held** [2] - 1:19, 4:9
**Helmer** [1] - 235:5
**help** [9] - 92:24,

130:22, 132:16,
132:17, 132:18,
151:20, 209:18,
223:5, 226:2
**helped** [1] - 28:15
**helpful** [1] - 72:17
**helps** [2] - 58:19,
70:16
**Herbert** [1] - 51:8
**HEREBY** [1] - 3:3
**hereby** [2] - 3:7, 298:4
**herein** [2] - 1:17,
298:5
**hereto** [1] - 3:5
**hereunto** [1] - 298:14
**hesitate** [1] - 116:12
**high** [6] - 52:4, 53:5,
56:21, 57:7, 58:20,
143:14
**higher** [1] - 59:9
**highlighted** [1] - 284:9
**highly** [2] - 110:5,
278:10
**himself** [3] - 68:13,
74:10, 94:10
**hired** [1] - 12:18
**hiring** [1] - 11:7
**history** [1] - 20:24
**hit** [22] - 83:14, 117:3,
132:5, 132:12,
132:13, 132:15,
144:12, 153:10,
154:21, 182:12,
194:16, 194:17,
205:5, 205:7, 214:7,
214:14, 218:3,
221:2, 221:3,
225:19, 273:3, 273:4
**hits** [4] - 213:17,
224:18, 224:19,
224:20
**hitting** [4] - 118:7,
118:9, 167:2, 178:17
**hold** [2] - 76:9, 76:20
**holding** [1] - 24:5
**home** [5] - 59:25,
93:3, 93:21, 93:22,
235:21
**Homicide** [17] - 22:21,
24:15, 24:17, 43:15,
63:10, 63:11, 69:20,
87:12, 106:15,
121:11, 122:12,
126:18, 126:25,
134:13, 137:24,
179:15
**homicide** [58] - 24:21,
25:7, 25:12, 25:18,
26:3, 33:16, 34:6,
34:19, 35:15, 35:24,

47:10, 63:11, 63:21,
64:3, 64:6, 64:9,
65:9, 65:21, 66:5,
80:11, 80:24, 81:16,
81:21, 82:6, 82:14,
82:17, 82:19, 87:17,
87:20, 90:18, 103:5,
104:8, 104:25,
105:5, 105:9,
105:14, 105:16,
108:4, 108:13,
108:18, 109:17,
110:12, 111:5,
112:12, 113:6,
155:25, 197:19,
210:22, 214:21,
215:10, 242:12,
245:15, 256:4,
257:17, 258:7,
259:9, 264:10,
292:15
**homicides** [6] - 25:4,
25:22, 88:3, 110:3,
143:4, 279:24
**honest** [1] - 128:14
**honestly** [1] - 135:17
**horse** [1] - 53:11
**hot** [2] - 278:11,
278:15
**hour** [2] - 13:23,
288:22
**hours** [1] - 293:3
**house** [26] - 17:9,
17:25, 20:3, 69:4,
70:3, 70:9, 70:17,
70:25, 71:4, 71:23,
72:2, 72:8, 80:5,
80:6, 86:15, 87:2,
88:13, 195:8, 203:7,
203:17, 205:21,
243:5, 248:2,
252:21, 256:20
**human** [1] - 268:23
**humor** [2] - 201:24,
202:3
**hundred** [1] - 244:4
**Huntington** [1] - 22:2
**hypotheses** [3] - 45:5,
45:19, 58:5
**hypothesis** [20] -
31:17, 31:23, 32:17,
45:9, 45:10, 45:16,
46:10, 46:18, 47:2,
47:3, 47:4, 47:23,
62:19, 87:21,
111:17, 112:11,
112:16, 136:11,
175:5, 264:8
**hypothetical** [1] -
197:12

11

**hypotheticals** [1] - 195:23

## I

**ID** [6] - 65:20, 69:5, 72:24, 80:5, 105:5, 106:15
**idea** [10] - 11:24, 44:12, 96:14, 126:15, 128:23, 142:15, 190:12, 256:8, 257:22, 257:23
**identification** [19] - 8:13, 8:15, 33:10, 33:18, 35:10, 35:24, 37:23, 61:17, 67:9, 67:11, 80:16, 80:20, 92:9, 94:8, 97:10, 147:7, 155:14, 231:6, 284:6
**Identification** [6] - 68:24, 69:19, 69:21, 72:14, 74:25, 89:4
**identified** [5] - 119:16, 163:18, 174:24, 235:13, 291:23
**identify** [2] - 32:9, 91:3
**identifying** [1] - 31:3
**ill** [2] - 39:22, 220:5
**Ill** [1] - 200:17
**ill-intentioned** [2] - 39:22, 220:5
**immediately** [4] - 70:4, 117:16, 118:23, 258:20
**impact** [2] - 169:12, 169:13
**important** [2] - 36:24, 141:10
**impression** [3] - 41:25, 85:13, 165:4
**impressions** [3] - 102:5, 156:25, 263:25
**improbable** [1] - 271:2
**improper** [8] - 126:20, 133:18, 133:23, 196:17, 197:9, 200:14, 200:17, 202:12
**IN** [1] - 298:14
**include** [1] - 294:11
**included** [1] - 97:12
**includes** [1] - 263:24
**including** [2] - 155:21, 277:6

**inconsistent** [6] - 111:10, 111:20, 112:13, 157:9, 222:12, 262:5
**incorporated** [2] - 11:23, 13:9
**incorrect** [1] - 237:15
**increase** [1] - 266:23
**increased** [1] - 266:8
**indeed** [1] - 40:20
**INDEX** [3] - 296:2, 296:3, 296:8
**indicate** [3] - 115:12, 116:9, 117:16
**indicated** [4] - 42:5, 161:5, 184:5, 248:9
**indicates** [8] - 68:2, 167:22, 168:23, 179:6, 204:7, 219:18, 284:10, 286:14
**indicating** [3] - 102:12, 191:21, 245:14
**indicating)** [4] - 77:9, 206:7, 206:8, 207:6
**indicative** [2] - 118:3, 237:3
**individual** [7] - 19:7, 59:13, 64:14, 65:19, 148:23, 149:20, 150:4
**infer** [1] - 223:21
**inflict** [25] - 144:19, 153:19, 157:21, 159:13, 165:25, 171:6, 177:22, 178:9, 178:22, 188:7, 203:4, 231:21, 232:18, 241:23, 243:11, 243:14, 244:2, 251:7, 277:21, 279:2, 288:2, 288:6, 288:17, 289:17, 289:20
**inflicted** [13] - 107:17, 107:18, 143:23, 158:5, 184:4, 185:2, 186:22, 187:3, 188:16, 208:4, 215:13, 215:22, 217:11
**inflicting** [3] - 177:19, 181:18, 191:5
**infliction** [1] - 189:9
**information** [1] - 219:13
**informed** [2] - 85:20, 87:20

**initial** [9] - 215:12, 215:21, 216:8, 216:16, 217:9, 247:13, 249:13, 250:3, 254:2
**injuries** [24] - 58:25, 153:19, 158:6, 159:13, 165:25, 167:13, 171:6, 178:22, 181:22, 184:3, 199:21, 208:4, 231:21, 236:15, 242:10, 243:11, 243:14, 251:8, 270:17, 277:22, 288:3, 288:6, 289:17, 289:20
**injury** [4] - 144:19, 155:21, 170:16, 183:7
**input** [1] - 35:21, 36:17, 36:19
**inquiry** [2] - 134:24, 136:23
**inside** [6] - 28:14, 62:15, 71:3, 71:22, 130:24, 150:9
**insofar** [3] - 188:4, 225:22, 261:25
**inspect** [1] - 90:17
**inspected** [1] - 147:18
**instance** [1] - 151:25
**instead** [2] - 196:25, 255:15
**instruction** [1] - 272:5
**instrument** [20] - 58:7, 58:13, 58:14, 59:8, 106:25, 117:3, 118:25, 146:16, 156:25, 159:21, 163:15, 164:5, 165:18, 165:20, 167:12, 169:18, 172:18, 218:4, 241:23, 264:9
**instrumentality** [1] - 175:24
**instruments** [6] - 57:12, 57:19, 59:4, 153:18, 157:10, 199:20
**intentioned** [2] - 39:22, 220:5
**interacting** [1] - 27:25
**interaction** [2] - 33:14, 35:15
**interactions** [1] - 24:19
**interchange** [4] - 66:5,

66:9, 201:19, 215:3
**interested** [1] - 298:12
**interior** [4] - 97:22, 98:13, 98:22, 99:4
**interpret** [1] - 121:16
**interpretation** [14] - 100:25, 102:15, 102:19, 103:3, 104:7, 105:3, 105:18, 106:10, 107:15, 109:5, 110:11, 122:4, 181:20, 215:21
**interpretations** [1] - 109:20
**interpreted** [2] - 216:25, 217:3
**intervenes** [1] - 226:7
**interview** [6] - 18:10, 93:2, 93:7, 235:7, 235:18, 242:24
**interviewed** [1] - 236:2
**introduce** [1] - 4:19
**introduced** [1] - 94:10
**investigating** [3] - 87:17, 96:19, 258:19
**investigation** [8] - 22:10, 23:21, 29:25, 30:5, 34:21, 96:8, 238:23, 287:21
**Investigation** [11] - 17:5, 18:4, 93:9, 114:8, 234:15, 234:23, 236:3, 237:11, 242:22, 270:14, 290:7
**Investigation's** [1] - 96:8
**investigative** [2] - 125:4, 125:19
**investigator** [4] - 98:16, 101:17, 235:6, 239:13
**investigators** [2] - 9:22, 234:22
**involve** [1] - 14:4
**involved** [16] - 6:15, 12:8, 16:6, 17:23, 28:5, 28:8, 31:9, 48:17, 51:17, 53:15, 85:2, 87:7, 127:20, 135:4, 150:14, 251:14
**involving** [1] - 127:11
**Ira** [1] - 26:15
**IS** [3] - 3:3, 3:8, 3:12
**issue** [1] - 256:10
**IT** [3] - 3:3, 3:8, 3:12
**item** [9] - 45:22, 97:16,

146:11, 162:18, 163:2, 163:18, 211:6, 211:9, 293:8
**items** [28] - 32:5, 32:10, 33:5, 36:9, 45:18, 87:2, 87:6, 88:21, 88:23, 89:18, 89:21, 89:25, 90:16, 91:10, 97:19, 122:25, 123:10, 123:12, 123:23, 124:5, 124:20, 125:17, 149:4, 151:23, 209:21, 210:19, 211:24, 212:14
**itself** [13] - 12:10, 98:23, 131:6, 149:9, 152:15, 158:9, 159:12, 172:19, 175:21, 211:14, 220:2, 277:14, 286:3

## J

**jab** [1] - 269:7
**jabbing** [1] - 269:8
**Jabo** [3] - 84:21, 84:22, 84:25
**James** [3] - 5:20, 92:22, 297:3
**JAMES** [1] - 1:7
**jammed** [1] - 227:4
**Jay** [2] - 28:21, 29:2
**Jerry** [3] - 18:18, 23:12, 74:11
**job** [8] - 21:9, 21:15, 21:17, 31:16, 32:23, 202:21, 264:4, 271:6
**Joe** [2] - 17:14, 220:9
**Joey** [1] - 19:12
**JOHN** [2] - 1:8
**John** [2] - 28:21, 28:25
**Johs** [1] - 23:13
**join** [21] - 86:4, 87:25, 94:24, 112:3, 120:6, 125:14, 129:13, 158:23, 175:16, 176:8, 178:2, 182:24, 199:10, 212:20, 215:7, 221:24, 227:20, 259:23, 268:11, 271:21, 288:23
**joining** [1] - 202:17
**Joseph** [1] - 5:7
**JOSEPH** [1] - 2:15

judgement [4] - 15:5, 40:13, 261:25, 287:9
judgments [1] - 36:9
July [12] - 10:11, 15:18, 93:2, 93:5, 235:20, 238:20, 238:24, 239:4, 242:18, 242:24, 270:14, 290:6
jurat [1] - 294:11
Justice [1] - 28:21

**K**

Kathy [1] - 4:13
keep [4] - 44:18, 72:19, 140:9, 186:14
keeping [1] - 227:2
Kenneth [3] - 92:24, 235:17, 242:23
Kent [1] - 19:10
kept [6] - 16:23, 44:11, 44:15, 132:14, 221:8, 226:11
kill [2] - 133:3, 179:9
killed [4] - 71:8, 131:22, 144:8
kind [17] - 30:18, 54:17, 57:21, 120:2, 122:4, 129:25, 130:3, 137:22, 159:25, 163:16, 175:11, 180:16, 201:10, 242:4, 244:9, 255:15, 279:2
kinds [3] - 152:9, 267:9, 284:20
kitchen [33] - 77:10, 77:13, 83:9, 83:11, 92:18, 132:21, 144:17, 145:16, 166:14, 167:6, 167:22, 168:9, 172:25, 173:10, 173:17, 175:20, 175:22, 176:5, 176:17, 178:7, 178:21, 203:3, 231:21, 232:10, 232:16, 236:14, 243:13, 246:8, 252:7, 270:16, 274:4, 288:5, 289:19
knife [248] - 46:4, 46:12, 83:8, 83:10, 85:6, 92:19, 127:20, 127:23, 132:21, 132:22, 132:23, 144:17, 144:18,

144:25, 145:4, 145:5, 145:16, 145:18, 163:8, 164:3, 166:14, 167:6, 167:24, 173:2, 173:11, 176:3, 176:17, 178:6, 178:9, 178:22, 181:19, 182:18, 183:7, 183:16, 184:4, 184:9, 185:17, 185:19, 186:21, 187:3, 187:8, 188:6, 188:16, 189:23, 191:6, 192:6, 192:22, 194:13, 194:14, 199:6, 199:14, 199:16, 199:17, 203:3, 203:21, 204:16, 204:22, 206:19, 207:9, 213:7, 220:22, 220:24, 221:16, 225:4, 226:19, 229:21, 231:20, 232:11, 232:12, 232:16, 232:25, 233:9, 233:13, 233:14, 233:17, 233:24, 234:7, 234:10, 236:13, 236:16, 236:19, 237:5, 237:19, 237:21, 237:22, 237:23, 237:24, 238:5, 241:22, 242:9, 243:10, 243:15, 243:19, 243:25, 244:6, 244:7, 244:10, 244:14, 244:15, 244:20, 244:23, 245:7, 245:10, 245:15, 246:7, 246:18, 246:24, 247:11, 247:12, 247:17, 247:18, 247:25, 248:11, 248:24, 249:8, 249:14, 250:9, 250:10, 250:12, 250:20, 250:24, 251:6, 251:7, 252:7, 252:12, 253:14, 253:17, 253:21, 254:7, 255:3, 255:14, 255:16, 255:22, 256:5, 256:13, 256:22,

256:24, 257:2, 257:8, 257:12, 257:13, 257:14, 257:18, 258:10, 258:22, 259:5, 259:8, 259:10, 259:18, 260:2, 260:4, 260:13, 261:8, 261:9, 262:2, 262:14, 262:16, 262:17, 262:25, 263:12, 264:17, 265:6, 265:13, 266:3, 266:9, 266:23, 267:7, 267:12, 267:13, 267:19, 268:7, 268:22, 269:8, 269:10, 269:11, 269:13, 269:16, 269:22, 269:25, 270:2, 270:5, 270:6, 270:16, 272:12, 272:17, 272:23, 273:7, 273:8, 273:10, 273:12, 274:5, 274:11, 275:7, 275:11, 275:18, 276:7, 277:7, 277:14, 277:17, 277:20, 277:21, 278:2, 278:3, 278:5, 278:8, 278:22, 279:9, 279:13, 280:4, 280:15, 280:24, 280:25, 282:8, 282:9, 282:13, 282:14, 282:15, 282:17, 283:18, 283:20, 287:9, 288:2, 288:4, 288:7, 288:11, 288:16, 289:16, 289:18, 289:21, 289:25, 290:13, 290:19, 291:3, 291:14, 291:23, 292:11
knives [8] - 248:2, 256:20, 277:25, 281:8, 281:15, 281:22, 282:11, 283:16
knocked [2] - 205:11, 221:7
knowledge [20] - 49:14, 49:16, 50:18, 61:23, 64:10, 74:2, 75:6, 91:3, 95:10, 130:11, 142:8, 156:20, 174:23,

174:25, 175:17, 198:16, 213:2, 277:25, 279:5, 283:16
knowledgeable [3] - 28:3, 64:6, 64:9
known [4] - 31:15, 50:13, 50:17, 50:19, 78:3, 106:4
knows [1] - 140:4
KOSCIUK [3] - 1:7, 1:16, 295:13
Kosciuk [18] - 4:4, 5:19, 5:24, 5:25, 6:7, 94:7, 94:12, 95:2, 99:6, 171:24, 223:6, 235:19, 236:12, 236:25, 270:15, 270:18, 295:8, 297:4
Kosciuk's [2] - 235:20, 236:18

**L**

Lab [3] - 30:16, 104:3, 211:21
lab [48] - 10:22, 11:2, 16:19, 20:4, 22:15, 22:22, 23:2, 23:3, 24:16, 24:22, 25:3, 25:23, 28:13, 35:17, 36:3, 36:4, 44:14, 46:3, 48:4, 51:24, 52:4, 53:4, 53:19, 64:3, 65:9, 66:7, 72:15, 72:22, 72:23, 87:18, 88:19, 97:21, 99:11, 99:20, 100:12, 105:3, 106:14, 112:9, 121:15, 128:19, 128:23, 128:25, 147:24, 241:8, 253:13, 283:10, 286:8, 290:12
Laboratory [4] - 48:4, 48:24, 69:19, 242:11
laboratory [32] - 11:8, 20:16, 22:5, 22:17, 22:18, 25:25, 26:5, 26:21, 26:22, 28:12, 30:5, 30:6, 33:9, 44:20, 48:12, 48:16, 48:21, 52:15, 61:15, 63:12, 97:15, 97:19, 98:8, 101:18, 101:22, 105:6, 148:7, 175:18, 210:11, 211:8, 211:12, 234:4

lack [2] - 168:21, 168:23
lady [1] - 223:13
laid [4] - 136:6, 165:19, 229:13, 276:9
large [2] - 205:20, 208:23
larger [3] - 116:24, 119:12, 119:13
last [5] - 9:5, 93:15, 145:2
late [6] - 79:8, 88:17, 123:22, 202:7, 268:20
latest [1] - 140:25
LAW [1] - 2:8
law [3] - 21:8, 21:9, 258:19
lawyer [1] - 235:9
lawyers [1] - 209:18
lay [2] - 133:21, 135:10
laying [4] - 132:7, 159:9, 160:12, 160:25
lead [1] - 197:2
leading [1] - 70:3
learn [3] - 31:25, 62:9, 74:7
learned [4] - 95:3, 248:21, 256:3, 266:3
learning [2] - 26:14, 90:15
learnings [1] - 50:11
least [14] - 132:13, 140:25, 177:9, 208:8, 245:16, 256:3, 260:2, 261:24, 267:15, 267:17, 268:4, 285:8, 288:17
leave [5] - 131:21, 135:14, 141:24, 265:13, 266:16
led [4] - 9:25, 68:25, 260:19, 267:17
Lee [1] - 2:9
left [20] - 62:23, 67:5, 69:9, 76:4, 132:25, 155:20, 157:2, 160:12, 160:23, 160:25, 161:21, 162:14, 170:18, 171:4, 171:23, 214:2, 231:11, 237:4, 241:25, 293:4
leg [1] - 181:2
legal [1] - 9:8
Legazza [1] - 81:25

**legs** [1] - 227:3
**length** [2] - 174:19, 279:12
**lengthy** [1] - 193:16
**lens** [1] - 38:7
**less** [7] - 14:8, 54:25, 55:4, 55:12, 193:3, 193:7, 193:12
**letter** [1] - 116:17
**level** [3] - 243:17, 288:9, 289:23
**Lieutenant** [1] - 26:7
**life** [1] - 243:12
**lights** [1] - 132:3
**likelihood** [2] - 143:14, 279:7
**likely** [13] - 163:14, 163:24, 172:6, 172:16, 185:13, 187:23, 190:15, 229:7, 236:23, 241:21, 267:11, 271:7
**limitation** [1] - 115:24
**line** [9] - 58:17, 84:6, 84:11, 134:24, 135:8, 136:22, 145:2, 186:13, 206:22
**lined** [1] - 102:2
**linen** [1] - 84:20
**liquid** [1] - 53:12
**list** [4] - 44:2, 44:11, 44:14, 85:5
**listen** [3] - 168:17, 187:21, 287:14
**live** [1] - 53:10
**living** [1] - 77:13
**LLP** [2] - 2:3, 4:23
**LN** [1] - 297:7
**located** [1] - 4:15
**location** [1] - 211:10
**lodged** [2] - 280:3, 280:15
**log** [2] - 72:6, 284:22
**long-distance** [1] - 67:19
**look** [49] - 41:10, 43:4, 45:3, 45:16, 49:19, 58:17, 84:9, 93:20, 101:24, 104:5, 112:6, 112:10, 113:6, 118:21, 124:5, 124:20, 125:8, 139:5, 141:17, 144:23, 145:2, 154:2, 154:13, 155:8, 155:16, 160:22, 162:8, 174:21,

176:20, 178:16, 179:16, 179:22, 179:24, 180:2, 234:19, 242:16, 246:24, 247:11, 264:16, 276:5, 278:7, 279:14, 283:25, 284:9, 284:25, 285:7, 285:12, 285:17, 289:14
**looked** [22] - 41:5, 41:14, 41:16, 41:20, 42:5, 46:5, 49:21, 76:25, 85:9, 114:2, 174:17, 238:13, 244:15, 244:20, 247:16, 269:4, 269:6, 269:7, 269:11, 272:20, 272:21, 272:22
**looking** [43] - 8:14, 37:12, 38:7, 41:4, 47:12, 52:5, 57:25, 97:3, 98:14, 102:6, 103:14, 104:11, 106:16, 116:3, 117:13, 117:17, 119:23, 143:9, 147:19, 153:7, 155:24, 156:23, 161:3, 162:21, 162:24, 169:3, 180:11, 181:15, 182:20, 183:22, 190:22, 191:3, 194:25, 212:15, 241:4, 241:19, 256:22, 261:10, 273:17, 277:25, 283:20, 285:14, 287:20
**looks** [3] - 119:9, 119:10, 257:2
**loose** [1] - 90:6
**lost** [2] - 97:6, 245:21
**loud** [1] - 272:10
**low** [6] - 56:19, 56:25, 57:5, 59:5, 115:10, 115:11
**lower** [1] - 58:23
**lunch** [1] - 180:11
**lying** [1] - 145:14, 154:22, 158:7, 177:19, 177:22, 182:7, 182:12, 182:14, 184:25, 185:23, 202:25

### M

**MacDonell** [2] - 50:24, 51:9
**Mahoney** [1] - 26:10
**manner** [1] - 39:10
**Manufacturing** [1] - 21:4
**mark** [11] - 6:3, 80:16, 91:17, 91:20, 91:23, 92:3, 147:4, 155:10, 231:3, 237:24, 284:3
**marked** [10] - 8:13, 80:20, 92:8, 92:13, 113:24, 147:7, 155:14, 162:3, 231:5, 284:6
**marks** [2] - 236:25, 237:4
**marriage** [1] - 298:10
**Martin** [22] - 4:5, 4:24, 74:10, 83:6, 90:19, 91:4, 129:19, 138:12, 146:25, 204:19, 206:18, 213:5, 218:9, 221:15, 222:3, 246:4, 246:5, 246:14, 248:22, 258:8, 260:3, 297:3
**MARTIN** [2] - 1:4, 2:18
**Marty** [18] - 19:2, 23:13, 78:20, 130:22, 157:16, 195:12, 201:6, 223:9, 224:15, 225:17, 226:18, 229:2, 231:20, 232:6, 248:10, 259:4, 273:21, 291:24
**Marty's** [1] - 84:20
**master** [44] - 73:10, 75:15, 76:5, 77:2, 78:8, 78:10, 79:15, 89:11, 89:17, 91:9, 91:16, 92:17, 101:6, 103:15, 103:20, 110:10, 113:3, 113:21, 114:15, 114:16, 120:14, 121:12, 121:17, 122:3, 122:15, 136:14, 143:20, 153:8, 153:11, 158:18, 159:22, 166:2, 168:8, 172:25, 173:16, 174:2, 174:3,

175:13, 194:22, 194:23, 194:24, 195:7, 203:6, 204:4
**mathematical** [1] - 14:25
**mathematics** [1] - 14:18
**matter** [10] - 2:13, 4:4, 20:13, 42:12, 63:6, 97:23, 99:4, 218:6, 237:6, 298:13
**matters** [1] - 34:22
**McCready** [43] - 1:7, 23:21, 24:8, 24:20, 25:2, 34:8, 34:15, 60:8, 60:13, 61:10, 61:25, 63:6, 63:8, 63:16, 64:15, 64:21, 64:24, 67:7, 67:13, 67:24, 68:6, 69:9, 69:15, 69:22, 70:25, 71:18, 71:24, 72:8, 73:21, 83:3, 88:7, 92:22, 94:14, 96:20, 121:9, 127:8, 128:13, 129:21, 138:9, 172:2, 236:16, 245:17, 297:3
**McCready's** [1] - 63:20
**McLELHONE** [1] - 1:8
**mean** [20] - 11:12, 39:21, 54:11, 62:2, 70:9, 98:13, 111:24, 116:13, 125:20, 153:3, 165:9, 165:16, 201:17, 202:10, 209:19, 222:13, 223:5, 223:22, 225:2, 244:14
**meaning** [1] - 269:17
**means** [4] - 95:7, 192:21, 286:10, 286:16
**measured** [3] - 206:12, 208:22, 211:10
**measurement** [1] - 209:3
**measurements** [14] - 12:5, 14:6, 14:11, 32:4, 33:5, 107:20, 108:23, 109:7, 110:9, 112:8, 209:24, 210:3, 210:18, 212:14
**measuring** [1] - 14:11
**meat** [1] - 279:16

**mechanical** [1] - 21:6
**mechanism** [3] - 181:21, 182:21, 182:25
**medical** [13] - 90:11, 90:12, 91:12, 164:10, 237:7, 240:16, 240:22, 241:3, 242:2, 261:7, 266:16, 267:5
**medium** [23] - 56:20, 57:6, 57:11, 57:17, 57:25, 58:12, 58:22, 59:5, 59:6, 59:10, 59:15, 114:18, 115:8, 115:10, 115:11, 115:12, 116:5, 116:11, 117:13, 119:16, 162:4, 169:11, 169:23
**meet** [2] - 17:4, 60:14
**members** [6] - 22:17, 26:10, 97:15, 101:22, 105:5, 290:11
**Memo** [1] - 296:16
**memo** [3] - 122:21, 138:7, 245:23
**memorandum** [8] - 235:2, 235:4, 235:16, 236:10, 236:11, 237:16, 242:17, 242:21
**Memorandum** [3] - 296:19, 296:22, 296:23
**memory** [1] - 57:3, 208:22, 238:22
**mention** [3] - 93:24, 178:15, 199:17
**mentioned** [8] - 1:19, 28:11, 29:18, 51:8, 124:6, 199:11, 199:16, 235:25
**mentor** [1] - 28:16
**mentoring** [2] - 28:6, 28:8
**met** [4] - 7:5, 17:17, 60:16, 109:18
**method** [1] - 152:20
**methods** [1] - 125:19
**microdot** [3] - 110:19, 169:7, 169:9
**microscopically** [1] - 234:2
**middle** [1] - 94:6
**might** [31] - 15:7, 31:18, 32:18, 45:6, 46:13, 47:23, 54:2,

62:20, 71:7, 73:22, 77:12, 78:15, 87:22, 89:22, 123:18, 124:12, 124:14, 150:7, 198:12, 212:17, 243:16, 248:3, 252:19, 253:6, 256:13, 262:14, 288:8, 289:22, 290:17, 292:12

**Mike** [1] - 26:10

**milk** [3] - 55:3, 55:16, 55:18

**millimeters** [1] - 59:14

**mind** [10] - 40:25, 58:12, 133:23, 137:15, 140:10, 166:3, 166:16, 227:15, 264:22, 268:5

**mine** [1] - 286:4

**minute** [5] - 113:20, 113:21, 144:20, 154:16, 251:13

**minutes** [9] - 18:16, 62:23, 70:21, 92:21, 114:3, 141:7, 230:14, 251:18, 293:3

**misconduct** [1] - 127:11

**missed** [1] - 115:4

**misspeak** [1] - 85:11

**misstating** [1] - 215:4

**misunderstood** [2] - 30:3, 192:25

**MITCHELL** [271] - 2:10, 5:2, 6:2, 7:2, 11:20, 19:22, 24:9, 27:7, 27:10, 27:13, 27:17, 31:11, 31:19, 34:3, 34:25, 37:2, 37:25, 38:15, 38:20, 39:6, 39:13, 39:17, 41:12, 42:2, 42:8, 45:13, 47:25, 55:22, 56:22, 57:13, 63:22, 64:11, 64:16, 66:12, 68:9, 70:8, 78:22, 79:5, 80:21, 82:9, 83:20, 85:10, 85:17, 86:2, 86:16, 87:23, 90:22, 94:21, 95:8, 98:18, 99:3, 100:8, 100:16, 101:14, 103:23, 105:20, 107:4, 109:12, 109:21, 110:15, 111:11, 112:21,

113:15, 114:19, 116:17, 117:4, 117:20, 118:10, 119:5, 120:4, 120:17, 121:20, 122:6, 122:16, 123:6, 124:8, 124:24, 125:12, 126:3, 126:13, 127:4, 127:14, 127:25, 128:6, 128:20, 129:4, 129:11, 130:9, 131:3, 133:5, 133:10, 134:8, 135:16, 136:15, 136:18, 137:3, 137:9, 139:10, 139:25, 140:12, 140:20, 141:4, 141:13, 142:3, 143:5, 143:16, 144:3, 145:23, 146:20, 148:3, 148:16, 149:11, 149:17, 150:2, 150:23, 151:5, 151:12, 153:21, 153:24, 154:17, 155:4, 156:18, 157:4, 157:12, 157:23, 158:11, 158:21, 160:3, 160:15, 163:10, 163:20, 164:6, 168:13, 168:16, 171:9, 174:7, 175:14, 176:6, 177:24, 179:25, 180:3, 180:6, 181:23, 182:3, 182:22, 183:9, 184:11, 184:14, 185:6, 185:24, 186:4, 186:12, 187:13, 187:18, 188:24, 189:14, 190:18, 191:9, 192:11, 192:23, 193:18, 195:20, 196:7, 196:22, 197:16, 198:2, 198:14, 198:23, 199:8, 199:24, 200:6, 200:8, 200:18, 201:12, 201:21, 201:25, 202:6, 202:15, 203:9, 209:15, 210:24, 212:2, 212:9, 212:18,

212:23, 213:19, 214:11, 215:5, 215:14, 215:24, 216:13, 218:16, 218:22, 219:3, 219:24, 221:22, 222:15, 223:4, 223:11, 223:15, 223:25, 224:7, 224:12, 225:7, 227:18, 228:10, 228:16, 228:23, 229:9, 229:24, 230:5, 230:7, 234:24, 235:9, 239:9, 239:16, 239:22, 240:2, 242:19, 245:19, 248:5, 248:13, 249:11, 249:19, 251:10, 252:23, 254:18, 256:6, 256:15, 257:20, 258:13, 258:24, 259:21, 260:6, 262:8, 264:5, 264:20, 265:9, 265:17, 266:13, 267:21, 268:9, 271:17, 271:22, 272:3, 272:13, 276:21, 279:10, 279:17, 280:7, 280:18, 281:5, 281:12, 281:25, 282:5, 282:25, 283:22, 284:12, 284:19, 285:3, 285:24, 286:7, 287:2, 287:14, 288:19, 288:24, 289:9, 291:7, 292:3, 293:18, 295:2

**Mitchell** [7] - 5:4, 7:5, 8:25, 18:13, 39:21, 93:13, 293:10

**model** [6] - 8:7, 8:16, 75:22, 75:25, 146:4, 172:23

**mom** [2] - 131:23, 144:8

**Monday** [1] - 7:5

**money** [1] - 13:11

**Mongan** [1] - 73:2

**months** [1] - 25:24

**morgue** [22] - 236:25, 238:9, 238:11, 238:12, 238:16, 238:18, 239:5, 240:7, 240:10,

253:17, 254:11, 254:25, 255:9, 256:3, 256:21, 257:9, 261:6, 267:4, 269:3, 269:14, 270:3, 272:21

**morning** [10] - 5:23, 59:19, 67:22, 70:11, 72:12, 88:8, 124:18, 229:22, 249:23, 273:19

**most** [2] - 12:16, 187:23

**mostly** [3] - 12:3, 13:20

**mother** [28] - 83:14, 84:9, 132:3, 132:4, 132:5, 132:7, 144:13, 145:12, 153:10, 154:21, 157:22, 158:6, 166:15, 167:3, 167:25, 173:10, 202:25, 205:8, 221:5, 221:19, 231:22, 232:7, 232:18, 246:18, 248:11, 249:2, 274:2, 274:6

**mother's** [7] - 83:7, 84:8, 84:11, 169:21, 246:6, 276:14, 276:16

**motion** [3] - 58:25, 96:22, 209:14

**motions** [2] - 9:25, 10:7

**motor** [2] - 6:13, 10:14

**mouth** [3] - 13:2, 13:3, 210:14

**move** [7] - 20:18, 20:19, 135:17, 136:4, 194:2, 222:6, 225:19

**moved** [3] - 90:9, 101:19, 101:25

**movement** [1] - 30:12

**moves** [1] - 89:23

**moving** [5] - 133:2, 179:8, 207:14, 207:18

**MR** [412] - 4:22, 5:2, 5:6, 5:22, 5:23, 6:2, 6:5, 7:2, 7:4, 11:20, 17:16, 19:22, 24:9, 27:7, 27:9, 27:10, 27:13, 27:17, 31:11, 31:19, 34:3, 34:25, 37:2, 37:25, 38:15, 38:20, 39:6, 39:11,

39:13, 39:16, 39:17, 15 41:12, 41:24, 42:2, 42:4, 42:8, 42:10, 45:13, 47:25, 55:22, 56:22, 57:13, 62:22, 63:2, 63:22, 64:11, 64:16, 66:12, 66:18, 68:9, 70:8, 70:10, 73:24, 76:13, 76:18, 78:17, 78:22, 79:5, 80:21, 82:9, 83:20, 85:10, 85:14, 85:17, 86:2, 86:4, 86:7, 86:16, 87:23, 87:25, 90:22, 91:17, 94:21, 94:24, 95:8, 96:10, 96:13, 98:18, 99:2, 99:3, 99:7, 100:8, 100:16, 101:14, 103:23, 105:20, 107:4, 109:12, 109:21, 110:15, 111:11, 111:21, 112:21, 112:23, 113:15, 114:19, 116:17, 117:4, 117:20, 118:10, 119:5, 120:4, 120:6, 120:7, 120:17, 120:19, 120:21, 121:20, 122:6, 122:16, 123:6, 124:8, 124:24, 125:12, 125:14, 126:3, 126:13, 127:4, 127:6, 127:13, 127:14, 127:25, 128:6, 128:20, 129:4, 129:6, 129:11, 129:13, 130:9, 131:3, 133:5, 133:10, 134:8, 134:19, 135:9, 135:16, 136:5, 136:15, 136:17, 136:18, 136:21, 137:3, 137:7, 137:9, 139:8, 139:10, 139:25, 140:12, 140:17, 140:20, 141:4, 141:13, 142:3, 143:5, 143:16, 144:3, 144:22, 145:23, 146:20, 148:3, 148:16, 149:11, 149:13, 149:16, 149:17, 150:2, 150:23, 151:5, 151:10, 151:12,

151:19, 153:21, 153:24, 154:7, 154:17, 155:4, 155:10, 156:18, 157:4, 157:12, 157:23, 158:11, 158:13, 158:21, 158:23, 160:3, 160:15, 163:10, 163:20, 163:22, 164:6, 164:8, 168:13, 168:16, 171:9, 171:14, 173:19, 174:7, 175:14, 175:16, 176:6, 176:8, 177:24, 178:2, 179:25, 180:3, 180:6, 181:23, 182:3, 182:22, 182:24, 183:8, 183:9, 184:11, 184:14, 185:6, 185:24, 186:4, 186:11, 186:12, 186:16, 187:4, 187:10, 187:12, 187:13, 187:16, 187:18, 188:24, 189:2, 189:13, 189:14, 190:18, 191:9, 191:12, 192:11, 192:23, 193:18, 195:20, 195:25, 196:7, 196:20, 196:22, 197:14, 197:16, 198:2, 198:14, 198:23, 199:8, 199:10, 199:24, 200:6, 200:8, 200:15, 200:18, 201:12, 201:21, 201:25, 202:4, 202:6, 202:9, 202:15, 202:16, 202:20, 203:9, 209:15, 210:24, 212:2, 212:9, 212:18, 212:20, 212:23, 213:19, 213:21, 214:11, 215:5, 215:7, 215:14, 215:24, 216:13, 218:15, 218:16, 218:22, 219:3, 219:5, 219:11, 219:15, 219:16, 219:21, 219:24, 220:3, 220:10, 221:24,

222:8, 222:15, 223:4, 223:9, 223:11, 223:14, 223:15, 223:24, 223:25, 224:5, 224:7, 224:12, 225:7, 225:22, 227:7, 227:18, 227:20, 228:10, 228:16, 228:23, 229:9, 229:24, 230:5, 230:7, 230:21, 231:3, 231:24, 234:24, 235:8, 235:9, 235:15, 239:9, 239:14, 239:16, 239:19, 239:22, 240:2, 240:4, 242:19, 245:19, 247:3, 248:5, 248:13, 248:15, 249:3, 249:11, 249:19, 251:10, 252:23, 254:18, 256:6, 256:15, 257:20, 258:11, 258:13, 258:24, 259:21, 259:23, 260:6, 260:16, 261:2, 262:7, 262:8, 264:5, 264:20, 265:9, 265:17, 266:13, 267:21, 268:9, 268:11, 271:17, 271:20, 271:21, 271:22, 271:24, 272:3, 272:13, 272:15, 276:21, 276:23, 279:10, 279:17, 279:19, 280:5, 280:7, 280:18, 280:20, 281:4, 281:5, 281:12, 281:25, 282:4, 282:5, 282:25, 283:22, 284:3, 284:12, 284:15, 284:19, 285:3, 285:24, 286:6, 286:7, 286:22, 287:2, 287:14, 288:19, 288:23, 288:24, 289:6, 289:9, 291:7, 292:3, 292:16, 293:2, 293:18, 293:21, 295:2, 295:3
**murder** [59] - 45:24, 46:16, 74:12, 199:5,

241:20, 245:2, 245:3, 245:8, 245:18, 246:25, 247:19, 248:3, 249:9, 250:20, 252:13, 253:15, 253:24, 254:9, 254:14, 256:5, 256:14, 256:16, 256:24, 257:9, 257:19, 258:10, 258:23, 259:10, 259:20, 260:5, 260:13, 260:20, 261:8, 263:19, 263:21, 264:18, 264:23, 264:25, 265:16, 266:10, 266:15, 266:25, 267:8, 267:19, 268:7, 268:18, 268:19, 268:21, 268:25, 271:15, 272:12, 272:18, 272:19, 287:10, 290:23, 291:5, 291:25, 292:2
**murdered** [1] - 143:10
**murders** [4] - 8:19, 19:21, 19:24, 263:2
**must** [2] - 65:5, 210:11
**mutually** [1] - 293:6
**muzzle** [2] - 52:7
**Myron** [1] - 94:10

## N

**naked** [18] - 131:20, 141:23, 145:12, 177:14, 177:16, 194:11, 194:12, 195:12, 204:21, 206:20, 207:8, 218:9, 220:12, 220:21, 229:21, 274:11
**name** [4] - 4:13, 5:17, 11:22, 11:25, 12:22, 16:9, 17:20, 72:16, 74:15
**Name** [1] - 297:3
**named** [4] - 9:14, 19:7, 84:25, 127:12
**names** [2] - 6:6, 236:6
**narcotics** [1] - 164:16
**narrow** [2] - 236:22, 267:10
**nature** [2] - 176:5, 281:9

**near** [14] - 42:23, 83:9, 83:10, 83:21, 85:6, 189:25, 190:5, 190:10, 192:14, 193:2, 193:7, 193:21, 233:14, 246:8
**neck** [15] - 143:24, 177:7, 177:8, 177:22, 178:11, 182:20, 184:5, 188:17, 230:17, 231:14, 231:19, 231:23, 233:9, 274:7, 279:3
**need** [2] - 65:21, 98:18
**needed** [1] - 130:22
**Nesconset** [1] - 4:15
**NEUFELD** [1] - 2:3
**Neufeld** [1] - 4:23
**never** [31] - 17:17, 27:22, 64:19, 65:13, 71:14, 71:18, 71:21, 74:2, 100:4, 100:10, 125:15, 126:6, 128:12, 133:14, 133:25, 156:12, 164:12, 174:9, 190:16, 196:5, 198:18, 213:22, 217:13, 222:24, 246:20, 248:9, 255:4, 256:25, 262:10, 263:18, 272:18
**NEW** [3] - 1:2, 1:2, 2:12
**new** [4] - 46:25, 50:23, 50:25, 293:24
**New** [15] - 1:13, 1:21, 2:5, 2:10, 2:13, 2:14, 4:8, 4:11, 4:16, 5:8, 5:14, 5:20, 235:11, 298:4
**Newsday** [4] - 20:10, 126:11, 126:17, 126:22
**Newtonian** [1] - 54:16
**next** [32] - 20:18, 20:20, 61:9, 69:13, 72:9, 80:3, 84:18, 102:24, 102:25, 108:23, 123:20, 132:23, 144:11, 145:5, 145:16, 179:3, 194:5, 230:12, 230:14, 230:16, 231:13, 236:17, 243:13, 244:7, 252:14,

257:14, 276:9, 276:10, 288:5, 289:19, 293:15, 294:10
**night** [9] - 19:21, 19:24, 20:4, 74:19, 252:14, 259:3, 259:12, 259:15
**nitpicking** [1] - 98:20
**nobody** [14] - 9:23, 21:9, 106:4, 110:7, 112:25, 113:5, 113:9, 126:23, 136:12, 174:23, 175:10, 179:14, 247:10, 257:25
**non** [1] - 54:16
**non-Newtonian** [1] - 54:16
**normal** [5] - 40:9, 40:10, 81:6, 125:19, 151:22
**NORMAN** [1] - 1:7
**north** [6] - 102:9, 110:25, 161:24, 179:4, 195:2, 214:3
**Northeast** [3] - 28:22, 43:13, 43:18
**northeast** [9] - 43:23, 43:24, 169:8, 195:5, 195:8, 203:7, 203:12, 203:14, 206:2
**northerly** [4] - 102:8, 106:19, 208:11, 217:17
**northwest** [3] - 203:8, 203:12, 203:13
**NOTARY** [2] - 295:20, 297:24
**Notary** [4] - 1:20, 3:14, 5:13, 298:3
**notation** [2] - 94:5, 246:3
**note** [3] - 83:2, 96:10, 158:13
**noted** [1] - 295:9
**notes** [16] - 79:11, 80:17, 81:3, 86:10, 86:13, 103:9, 105:10, 105:11, 138:5, 209:9, 209:10, 209:11, 209:12, 209:14, 209:20, 293:9
**Notes** [2] - 296:10, 296:16
**nothing** [5] - 74:4, 161:4, 173:21, 174:17, 197:10

**Notice** [1] - 1:18
**noticed** [3] - 161:10, 247:12, 250:9
**NOW** [1] - 297:7
**nowhere** [2] - 219:17, 219:19
**nude** [1] - 83:18
**Number** [1] - 4:3
**number** [26] - 23:23, 23:24, 24:3, 24:6, 44:15, 85:4, 85:5, 85:6, 91:22, 91:24, 96:11, 106:25, 114:11, 115:16, 135:2, 135:3, 143:22, 153:11, 154:21, 169:9, 177:9, 217:5, 254:21, 254:22, 256:17, 256:18
**numbered** [1] - 97:20
**numbers** [3] - 97:16, 285:11, 285:13
**nut** [1] - 159:8

## O

**o'clock** [11] - 59:21, 60:8, 74:8, 80:7, 89:3, 89:10, 90:16, 123:23, 249:25, 250:3, 287:13
**O'Hara** [1] - 23:12
**object** [172] - 7:2, 11:20, 19:22, 24:9, 27:7, 27:9, 27:13, 27:17, 31:11, 31:19, 34:3, 34:25, 37:2, 37:25, 38:15, 38:20, 39:6, 41:12, 45:13, 47:25, 55:22, 56:22, 57:13, 63:22, 64:11, 64:16, 66:12, 68:9, 78:22, 79:5, 82:9, 86:2, 87:23, 90:22, 94:21, 95:8, 100:8, 100:16, 101:14, 103:23, 105:20, 107:4, 107:5, 109:12, 109:21, 110:15, 111:11, 112:21, 113:15, 114:19, 117:4, 117:11, 117:12, 117:17, 117:20, 118:4, 118:6, 118:7, 118:10, 119:5, 120:4, 120:17, 122:16, 123:6, 124:8, 124:24,
125:12, 126:3, 126:13, 127:4, 127:14, 127:25, 128:6, 128:20, 129:11, 130:9, 133:11, 135:13, 136:3, 139:25, 140:16, 141:4, 141:13, 142:3, 143:5, 143:16, 144:3, 145:23, 146:20, 148:3, 148:16, 149:17, 150:23, 151:16, 153:21, 155:4, 156:18, 157:4, 157:12, 157:23, 158:21, 160:3, 163:10, 163:20, 164:6, 168:13, 171:9, 174:2, 174:7, 175:13, 175:14, 176:6, 177:24, 180:7, 181:23, 182:22, 183:9, 184:11, 184:16, 185:6, 185:24, 186:12, 191:9, 192:11, 195:20, 196:18, 196:20, 198:2, 198:23, 199:8, 199:13, 201:12, 201:21, 201:25, 212:2, 212:18, 213:19, 218:16, 219:3, 221:22, 222:21, 224:3, 227:18, 228:10, 228:16, 228:23, 229:9, 229:24, 239:9, 245:19, 248:5, 249:11, 251:10, 256:6, 257:20, 258:24, 260:6, 264:20, 265:17, 267:21, 268:9, 271:17, 279:10, 281:12, 282:4, 282:5, 285:25, 286:13, 288:19, 289:2, 291:8, 292:6
**objecting** [6] - 131:4, 187:23, 202:2, 202:10, 222:15, 222:18
**objection** [89] - 41:23, 73:24, 78:17, 86:7, 96:11, 111:21, 120:19, 121:20, 122:6, 127:6,
127:13, 129:4, 129:6, 133:20, 134:5, 134:19, 134:23, 135:20, 139:8, 144:22, 149:11, 149:13, 149:16, 150:2, 154:7, 158:11, 158:13, 163:22, 164:8, 173:19, 183:8, 186:5, 187:4, 187:16, 187:18, 187:20, 188:24, 189:2, 189:13, 189:14, 191:12, 192:23, 193:18, 196:2, 197:8, 198:14, 199:24, 200:6, 200:9, 202:18, 212:9, 213:21, 214:11, 215:5, 215:14, 215:24, 216:13, 218:15, 219:11, 224:6, 225:7, 225:22, 225:25, 227:8, 231:24, 247:3, 248:13, 249:3, 256:15, 258:11, 258:13, 259:21, 260:16, 261:2, 262:7, 262:8, 265:9, 266:13, 272:7, 272:13, 280:5, 280:7, 280:18, 280:20, 281:4, 281:5, 281:25, 282:25, 283:22
**Objection** [1] - 272:15
**objections** [3] - 3:9, 202:12, 240:5
**objective** [11] - 31:24, 45:17, 46:8, 111:18, 111:19, 112:14, 113:9, 136:9, 261:24, 262:4, 270:10
**observations** [3] - 71:3, 224:25, 253:22
**observe** [1] - 123:24
**observed** [15] - 136:25, 216:12, 216:20, 216:24, 236:25, 237:21, 239:5, 239:6, 249:14, 250:10, 252:19, 255:6, 255:8, 255:9, 255:22
**obvious** [6] - 42:17,
66:15, 102:7, 106:17, 110:23, 112:17
**obviously** [2] - 90:6, 134:21
**Obviously** [1] - 62:14
**occasion** [1] - 282:11
**occasions** [1] - 241:6
**occur** [5] - 181:22, 182:21, 188:12, 225:12, 265:15
**occurred** [15] - 31:18, 32:18, 45:6, 46:11, 73:23, 111:18, 161:6, 178:4, 188:14, 189:7, 195:18, 199:5, 210:22, 211:23, 223:20
**October** [4] - 1:14, 4:11, 297:4, 298:15
**odd** [1] - 121:19
**OF** [6] - 1:2, 1:7, 2:8, 2:12, 2:12, 297:2
**offered** [1] - 94:11
**offering** [1] - 101:11
**offhand** [1] - 206:13
**OFFICE** [1] - 2:12
**office** [54] - 7:6, 7:20, 7:21, 7:22, 7:24, 17:13, 17:19, 17:22, 18:3, 22:9, 37:13, 49:22, 69:4, 77:8, 77:15, 77:20, 77:21, 79:24, 92:20, 100:19, 101:2, 103:4, 106:11, 108:11, 109:2, 109:9, 121:24, 131:25, 134:14, 142:23, 194:6, 194:8, 199:6, 199:21, 203:8, 204:5, 204:8, 205:14, 205:16, 205:18, 205:24, 207:21, 210:11, 213:6, 220:16, 220:17, 222:3, 225:2, 226:4, 232:24, 240:22, 274:15, 274:22, 276:13
**officer** [4] - 34:13, 60:11, 96:19, 103:6
**officers** [3] - 21:12, 128:9, 290:11
**OFFICERS** [1] - 1:8
**often** [1] - 283:3
**old** [1] - 10:5
**Old** [3] - 1:12, 2:4, 4:10
**once** [1] - 20:17
**one** [52] - 20:14, 35:10, 37:5, 42:11, 61:6, 67:23, 71:11, 81:21, 85:21, 102:7, 103:8, 104:13, 110:19, 111:15, 115:17, 116:8, 121:24, 122:12, 134:13, 135:2, 139:5, 143:12, 169:7, 170:20, 181:25, 183:23, 188:13, 198:7, 205:15, 217:14, 217:17, 217:20, 217:22, 217:24, 234:16, 239:20, 244:6, 244:10, 244:12, 244:14, 248:2, 262:21, 263:4, 264:24, 269:4, 278:3, 278:25, 280:24, 290:16, 293:8
**One** [1] - 84:20
**one-to-one** [1] - 116:8
**ones** [2] - 88:23, 174:13
**ongoing** [1] - 32:19
**open** [5] - 247:6, 249:18, 250:15, 254:4, 254:8
**operate** [1] - 23:16
**operator** [1] - 139:24
**opine** [2] - 196:5, 196:6
**opined** [1] - 199:19
**opinion** [18] - 38:17, 66:14, 107:24, 196:8, 196:16, 236:21, 240:18, 243:24, 255:12, 257:6, 261:22, 267:14, 269:14, 270:19, 270:21, 272:11, 272:16
**opinions** [1] - 290:12
**opportunity** [1] - 40:13
**opposed** [2] - 164:4, 247:25
**opposite** [1] - 110:20
**orally** [6] - 105:16, 210:20, 210:23, 211:2, 211:15, 214:21
**order** [12] - 37:19,

69:7, 72:12, 156:8, 183:6, 211:5, 225:19, 226:3, 278:2, 280:10, 280:23, 284:22
**ordinarily** [4] - 36:7, 104:22, 112:5, 141:8
**ordinary** [3] - 87:16, 104:2, 105:13
**original** [2] - 102:2, 207:24
**originally** [1] - 11:8
**originate** [1] - 118:13
**originated** [2] - 102:13, 106:18
**originating** [2] - 102:11, 120:10
**ought** [1] - 36:10
**outcome** [1] - 298:13
**outer** [1] - 150:8
**outside** [4] - 12:9, 28:12, 28:14, 28:18
**overall** [2] - 34:17, 34:20
**overheard** [1] - 260:12
**own** [3] - 10:16, 103:12, 252:20

# P

**p.m** [12] - 92:6, 92:11, 120:23, 121:4, 171:16, 171:21, 230:23, 231:9, 292:18, 292:24, 295:6, 295:9
**Page** [15] - 82:24, 94:3, 97:6, 97:7, 122:21, 130:15, 139:17, 145:3, 176:14, 220:15, 234:18, 243:7, 246:5, 296:4, 296:14
**page** [12] - 83:3, 94:7, 97:4, 130:21, 131:14, 138:8, 139:16, 144:11, 195:3, 222:13, 234:20, 294:10
**pages** [3] - 130:16, 138:12, 155:15
**Pages** [1] - 13:6
**paid** [3] - 12:11, 13:20, 13:22
**pain** [2] - 132:16, 140:14
**paper** [3] - 223:7, 223:17, 223:19
**paperwork** [4] - 95:5,

95:18, 96:6, 96:14
**paragraph** [9] - 94:6, 97:4, 130:21, 137:12, 145:3, 176:14, 220:14, 234:20, 272:25
**parents** [1] - 71:8
**part** [33] - 12:16, 31:16, 33:3, 33:5, 34:21, 37:11, 45:15, 47:11, 50:18, 55:19, 56:18, 83:17, 85:24, 87:15, 88:24, 137:5, 150:16, 156:2, 159:11, 159:16, 167:15, 220:5, 231:12, 238:5, 241:15, 248:23, 261:15, 263:22, 264:4, 264:7, 264:10, 271:6
**participated** [1] - 242:3
**particular** [16] - 12:22, 24:5, 42:11, 63:15, 81:10, 88:12, 123:11, 127:8, 136:10, 206:24, 229:12, 241:22, 257:13, 264:9, 278:2, 282:8
**particulars** [1] - 95:3
**particulate** [7] - 255:23, 260:15, 260:24, 262:22, 263:5, 268:16, 277:16
**particulates** [2] - 264:19, 265:5
**parties** [3] - 3:4, 4:20, 298:10
**partners** [3] - 13:16, 23:6, 23:10
**partnership** [3] - 12:2, 13:9, 16:5
**parts** [3] - 56:17, 149:9, 186:25
**party** [1] - 294:3
**pass** [1] - 101:10
**passed** [2] - 21:18, 254:13
**past** [1] - 254:22
**path** [4] - 69:2, 74:25, 77:6, 79:24
**Path** [1] - 5:20
**patrol** [1] - 21:25
**patrolman** [2] - 23:5, 23:8
**patronize** [1] - 200:18
**patter** [2] - 181:21,

190:24
**pattern** [7] - 29:17, 51:3, 54:7, 59:12, 103:4, 104:7, 111:9
**patterning** [1] - 51:17
**patterns** [11] - 59:13, 100:25, 101:5, 119:21, 121:12, 121:17, 122:3, 122:15, 141:18, 199:22, 201:9
**pause** [1] - 187:22
**pay** [1] - 123:11
**pays** [1] - 13:21
**PD** [1] - 23:2
**pen** [1] - 115:2
**people** [23] - 12:24, 17:21, 19:19, 28:12, 28:15, 33:15, 33:17, 35:16, 35:23, 37:23, 53:24, 65:9, 65:15, 66:9, 67:8, 67:11, 67:12, 106:15, 142:9, 149:23, 252:21, 253:13, 284:22
**per** [9] - 13:11, 13:20, 13:24, 14:2, 57:4, 57:6, 57:8, 83:3, 138:8
**percent** [1] - 244:4
**percentage** [2] - 13:18, 13:19
**perfectly** [1] - 136:22
**perform** [2] - 281:23, 283:18
**performed** [1] - 22:6
**performing** [2] - 14:15, 149:20
**perimeter** [2] - 69:22, 69:25
**period** [2] - 52:19, 272:23
**permissible** [1] - 293:4
**perpetrator** [1] - 197:23
**PERRY** [1] - 2:19
**person** [25] - 9:9, 10:18, 10:20, 26:12, 26:13, 36:5, 44:22, 49:9, 81:17, 82:5, 82:7, 82:16, 87:18, 98:10, 111:16, 117:10, 130:24, 143:12, 150:11, 195:18, 204:22, 207:8, 213:8, 226:21, 229:23
**personally** [1] - 68:14

**personnel** [9] - 26:5, 43:25, 44:9, 44:13, 72:15, 81:21, 82:19, 94:9, 106:15
**perspective** [1] - 54:7
**pertinent** [1] - 89:20
**Perzola** [1] - 50:21
**Pete** [2] - 28:19, 29:5
**Peter** [4] - 19:10, 29:6, 43:8
**Pfalzgraf** [4] - 25:16, 82:2, 103:8, 123:17
**PG** [1] - 297:7
**phone** [3] - 84:8, 84:10, 201:9
**phones** [1] - 86:15
**photo** [2] - 84:17, 179:23
**photograph** [26] - 8:7, 8:16, 33:5, 33:13, 36:23, 38:13, 39:24, 42:13, 65:22, 66:17, 69:5, 91:25, 114:11, 114:18, 115:15, 115:18, 117:15, 123:24, 154:13, 161:16, 162:9, 163:17, 180:23, 181:5, 182:7, 210:18
**Photograph** [1] - 296:15
**photographed** [9] - 36:10, 36:14, 36:18, 47:14, 65:11, 65:16, 97:15, 211:7, 275:25
**photographer** [1] - 40:24
**photographing** [2] - 14:10, 212:14
**photographs** [44] - 7:7, 7:16, 7:17, 7:19, 9:4, 14:7, 35:11, 37:23, 38:5, 38:11, 39:3, 40:21, 41:5, 41:7, 41:15, 41:17, 41:21, 42:6, 42:20, 65:21, 89:4, 91:15, 91:21, 92:2, 92:16, 92:18, 92:20, 97:13, 102:20, 107:21, 108:22, 109:7, 110:9, 111:24, 112:7, 115:20, 116:4, 147:5, 147:8, 154:6, 172:9, 186:23, 238:12, 240:11
**Photographs** [3] - 296:17, 296:20, 296:21

**photos** [9] - 8:3, 43:3, 155:9, 155:12, 155:17, 159:15, 176:21, 181:16, 182:19
**phrase** [2] - 54:18, 202:2
**physical** [10] - 12:5, 75:2, 89:19, 89:22, 91:10, 111:18, 111:19, 112:14, 113:9, 234:3
**pick** [2] - 88:21, 173:11
**picked** [1] - 183:6
**picture** [7] - 40:25, 76:5, 116:7, 117:22, 162:14, 177:9, 229:2
**pictures** [12] - 35:19, 35:21, 37:19, 42:24, 113:21, 114:6, 117:25, 120:14, 161:10, 176:22, 180:11, 233:20
**piece** [7] - 66:15, 156:7, 223:7, 223:17, 223:19, 265:12, 268:20
**pigs** [1] - 53:9
**pillow** [9] - 114:17, 114:23, 116:6, 117:14, 118:9, 118:21, 119:16, 119:22, 120:3
**Pizzola** [3] - 28:20, 29:5, 43:8
**place** [13] - 1:19, 90:7, 90:8, 93:19, 165:4, 166:12, 183:4, 188:22, 189:20, 192:9, 195:21, 252:4, 277:8
**placed** [13] - 38:5, 42:22, 79:9, 89:20, 97:19, 166:10, 173:24, 173:25, 211:8, 211:11, 234:3, 263:2, 275:18
**places** [1] - 42:23
**placing** [1] - 207:22
**Plaintiff** [5] - 1:5, 1:17, 2:4, 4:24, 6:19
**Plaintiff's** [17] - 8:12, 8:14, 75:25, 80:19, 92:7, 129:16, 147:4, 147:6, 155:13, 157:19, 158:5, 159:14, 231:4, 284:5, 284:7, 287:20, 296:14

**Plaintiffs** [1] - 12:19
**play** [1] - 212:22
**plunged** [1] - 237:22
**plus** [3] - 40:23, 48:12, 119:9
**point** [22] - 39:18, 59:7, 67:17, 67:23, 73:19, 79:2, 80:8, 82:6, 115:16, 122:20, 122:23, 150:13, 175:3, 177:13, 192:14, 196:9, 197:7, 228:21, 233:7, 245:14, 252:14, 289:8
**pointed** [1] - 244:21
**pointing** [8] - 40:6, 75:18, 75:19, 119:11, 164:19, 170:11, 182:6, 268:4
**poke** [1] - 170:7
**POLICE** [1] - 1:8
**police** [11] - 21:11, 23:15, 33:11, 112:12, 128:9, 129:20, 243:18, 286:11, 288:10, 289:24, 290:11
**Police** [2] - 10:6, 20:23
**pooling** [6] - 161:22, 162:14, 162:17, 162:20, 180:18, 180:25
**portion** [3] - 14:25, 159:7, 170:4
**position** [8] - 11:4, 16:17, 102:2, 207:24, 218:8, 265:7, 275:19, 275:24
**positive** [1] - 99:18
**possibility** [5] - 58:7, 170:19, 185:18, 237:18, 270:5
**possible** [10] - 118:13, 183:12, 217:10, 224:23, 228:12, 228:14, 228:20, 229:7, 229:14, 290:8
**possibly** [8] - 144:5, 171:3, 171:4, 179:5, 243:15, 264:23, 288:7, 289:21
**post** [3] - 9:25, 10:7, 16:25
**potentially** [5] - 146:16, 164:21, 246:24, 247:5,

291:21
**practice** [14] - 38:12, 39:23, 40:20, 80:25, 100:11, 104:4, 104:10, 104:19, 104:24, 105:13, 210:16, 211:20, 212:6, 212:13
**precinct** [1] - 23:14
**Precinct** [1] - 22:2
**preparation** [4] - 42:6, 93:14, 121:25, 201:3
**prepared** [1] - 6:24
**prepping** [2] - 69:20, 109:3
**presence** [16] - 46:5, 148:2, 148:14, 149:10, 152:6, 152:16, 152:18, 153:4, 211:3, 266:4, 280:11, 280:17, 281:10, 283:19, 291:16, 291:21
**PRESENT** [1] - 2:17
**present** [12] - 47:22, 81:22, 97:21, 105:6, 106:16, 210:25, 251:15, 251:19, 251:22, 252:10, 253:7, 290:17
**presentation** [1] - 215:9
**presented** [1] - 214:24
**pressure** [2] - 189:25, 190:6
**presumptive** [12] - 148:21, 149:8, 150:18, 152:5, 152:17, 152:24, 234:8, 266:22, 280:16, 281:23, 282:16, 283:18
**pretty** [4] - 109:24, 143:19, 177:3, 232:5
**prevent** [1] - 226:25
**previously** [1] - 162:3
**printed** [1] - 157:17
**prints** [2] - 35:12, 53:19
**private** [2] - 12:15, 15:23
**privately** [1] - 10:15
**Pro** [1] - 4:14
**probable** [3] - 228:20, 229:8, 271:2
**probing** [1] - 290:10
**problem** [6] - 6:5, 202:20, 272:2, 272:4, 278:11, 295:2
**problems** [5] - 126:24,

128:12, 128:18, 129:2, 129:8
**Procedure** [1] - 1:18
**procedures** [1] - 124:17
**proceed** [6] - 67:3, 92:12, 121:5, 171:22, 231:10, 292:25
**proceeded** [3] - 89:10, 89:17, 89:21
**proceeding** [2] - 17:2, 87:13
**process** [5] - 32:16, 32:19, 34:22, 35:6, 129:9
**processed** [6] - 122:11, 254:23, 257:15, 262:23, 275:20, 277:9
**processing** [9] - 87:14, 111:5, 125:7, 137:25, 142:5, 245:6, 246:13, 246:15, 258:21
**produce** [1] - 209:14
**produced** [1] - 38:23
**production** [2] - 209:18, 293:14
**Productions** [1] - 4:15
**professional** [2] - 20:24, 43:20
**profit** [1] - 11:18
**profit-making** [1] - 11:18
**projected** [5] - 52:6, 52:10, 118:18, 119:3, 120:2
**projection** [1] - 50:22
**propelled** [2] - 55:6, 55:11
**proper** [7] - 39:2, 107:10, 135:21, 136:22, 149:6, 150:15, 200:12
**properties** [1] - 55:10
**property** [1] - 149:2
**propose** [1] - 197:11
**prosecute** [1] - 215:3
**prosecution** [1] - 99:25
**prosecutor** [5] - 200:21, 201:11, 201:18, 214:23, 215:10
**prosecutor's** [1] - 134:14
**prove** [1] - 263:20
**provide** [1] - 218:12
**provided** [1] - 214:20

**psychiatric** [1] - 130:22
**PUBLIC** [2] - 295:20, 297:24
**public** [1] - 16:4
**Public** [4] - 1:20, 3:14, 5:13, 298:3
**publicized** [2] - 110:5, 110:6
**published** [1] - 51:21
**pull** [1] - 218:13
**pulled** [1] - 77:6
**pure** [1] - 197:11
**purpose** [4] - 47:24, 74:24, 150:18, 152:17
**purposes** [4] - 8:9, 8:17, 36:24, 58:6
**pursuant** [1] - 1:17
**pushed** [1] - 101:23
**put** [15] - 91:21, 116:17, 135:12, 158:16, 159:21, 176:2, 210:14, 265:5, 265:6, 273:11, 273:12, 274:14, 276:6, 276:7, 281:3
**putting** [2] - 29:19, 106:13

**Q**

**qualifications** [1] - 27:5
**qualify** [1] - 192:13
**questioning** [3] - 78:21, 79:3, 186:13
**questions** [20] - 17:9, 18:6, 58:11, 133:24, 135:6, 140:15, 151:17, 167:17, 167:21, 182:4, 186:6, 197:9, 198:4, 198:21, 201:4, 202:8, 230:9, 288:25, 289:5
**quick** [1] - 234:3
**quickly** [2] - 132:11, 165:6
**quite** [8] - 23:23, 39:14, 42:17, 66:14, 102:7, 106:17, 116:14, 180:18
**quote** [2] - 98:24, 99:5
**quoted** [5] - 98:12, 98:21, 237:15, 238:15, 288:15
**quotes** [1] - 132:18

**R**                      19

**raise** [1] - 227:15
**ran** [4] - 132:20, 133:2, 176:16, 179:9
**range** [1] - 59:15
**rays** [5] - 236:19, 253:23, 261:13, 261:14, 261:16
**razor** [2] - 236:23, 267:12
**razor-like** [2] - 236:23, 267:12
**reach** [2] - 108:11, 156:8
**READ** [1] - 297:7
**read** [24] - 20:6, 51:13, 51:15, 58:18, 125:25, 126:10, 133:9, 137:12, 138:6, 138:11, 144:10, 145:10, 175:17, 179:11, 197:5, 231:12, 234:21, 234:24, 236:10, 243:6, 246:5, 285:11, 285:15, 287:24
**reading** [5] - 97:14, 122:20, 197:2, 223:18, 284:17
**READS** [1] - 297:7
**reads** [1] - 83:6
**real** [1] - 215:2
**realize** [2] - 38:22, 230:13
**really** [14] - 6:6, 10:9, 17:3, 46:12, 47:9, 50:20, 54:14, 64:4, 128:8, 130:12, 156:11, 166:4, 218:19, 290:9
**reason** [17] - 40:5, 95:14, 124:15, 135:21, 150:25, 161:2, 239:3, 259:8, 260:19, 262:18, 262:20, 263:4, 263:11, 263:14, 267:6, 283:11, 293:11
**REASON** [1] - 297:7
**reasons** [4] - 202:19, 244:6, 262:21, 264:24
**receive** [1] - 9:12
**received** [1] - 151:15
**recess** [5] - 66:22, 120:24, 171:17,

230:25, 292:20
recite [1] - 137:4
recited [4] - 88:24, 154:19, 219:8, 228:6
recites [1] - 222:5
reciting [1] - 220:7
recognize [4] - 56:11, 67:18, 114:11, 118:23
recollection [32] - 42:13, 42:25, 61:9, 64:20, 68:6, 68:11, 72:4, 85:19, 86:18, 86:21, 98:3, 106:9, 109:5, 109:16, 120:15, 121:7, 121:14, 133:12, 133:19, 134:4, 136:3, 138:16, 139:4, 215:19, 240:9, 252:9, 253:9, 286:25, 287:5, 287:7, 287:19, 291:20
reconstruct [2] - 37:7, 111:2
reconstructed [2] - 6:21, 207:16
reconstructing [3] - 14:14, 58:6, 186:18
reconstruction [79] - 10:15, 11:7, 12:6, 12:7, 14:16, 15:21, 22:13, 22:20, 28:10, 28:17, 28:24, 29:20, 29:23, 30:7, 30:8, 30:9, 30:15, 30:17, 30:19, 30:23, 31:10, 31:16, 32:17, 32:25, 33:16, 35:7, 35:18, 36:4, 36:25, 43:11, 44:25, 45:15, 46:24, 47:7, 47:9, 47:12, 47:24, 48:12, 48:14, 49:12, 49:20, 49:25, 50:3, 50:14, 50:19, 51:2, 65:17, 87:19, 101:5, 103:11, 103:14, 103:19, 105:17, 106:10, 108:10, 108:25, 109:9, 111:16, 141:9, 150:15, 156:3, 164:17, 190:23, 191:2, 197:21, 207:19, 207:20, 208:2, 210:21, 211:14, 211:22, 212:16, 214:16, 214:20,

214:24, 263:23, 264:8, 264:12
reconstructionist [1] - 48:7
record [25] - 5:18, 66:21, 66:25, 92:6, 92:11, 120:21, 120:23, 121:4, 135:12, 140:18, 151:7, 171:14, 171:16, 171:21, 186:4, 187:14, 202:17, 230:23, 231:9, 251:18, 292:16, 292:24, 295:5, 295:8, 298:7
recorded [2] - 137:13, 276:19
recover [4] - 32:10, 47:19, 281:15, 282:13
recovered [11] - 32:13, 47:13, 137:19, 174:10, 233:25, 236:13, 243:12, 269:22, 270:16, 288:4, 289:18
recovering [3] - 31:5, 31:7, 48:15
red [1] - 77:19
Reel [1] - 4:2
refer [1] - 91:19
reference [2] - 96:5, 127:18
referred [1] - 94:13
referring [4] - 58:24, 180:22, 180:25, 249:20
reflect [5] - 173:21, 174:4, 176:22, 202:17, 251:19
reflected [1] - 175:5
reflecting [1] - 242:23
refresh [11] - 68:5, 85:18, 86:20, 98:2, 136:2, 138:16, 208:22, 287:5, 287:6, 287:18, 289:14
refreshes [5] - 86:17, 133:12, 133:19, 134:4, 286:25
refrigerator [1] - 85:5
refute [1] - 47:2
regard [1] - 135:6
regarded [1] - 64:5
regarding [2] - 85:11, 107:6
regardless [1] -

223:17
Reich [6] - 89:13, 89:15, 101:23, 108:3, 108:6
Reif [1] - 72:22
Rein [1] - 25:10
REIN [1] - 1:7
reiterate [1] - 227:7
related [3] - 97:23, 99:4, 298:9
relates [2] - 136:24, 235:6
relation [1] - 290:18
relationship [3] - 24:25, 25:13, 34:15
relevant [3] - 74:21, 91:2, 261:16
relevent [1] - 90:2, 90:5, 141:19, 196:8
reliable [3] - 157:18, 173:8, 218:25
rely [1] - 152:4
remain [2] - 268:17, 268:19
remember [77] - 6:14, 8:16, 9:20, 17:8, 17:10, 17:12, 17:24, 18:2, 23:9, 23:10, 23:11, 23:13, 25:6, 40:18, 43:12, 51:20, 52:17, 53:2, 54:2, 56:24, 60:16, 60:18, 63:9, 63:15, 69:14, 70:14, 70:23, 72:5, 72:7, 72:12, 74:14, 74:17, 77:14, 78:12, 84:24, 86:6, 87:4, 87:5, 87:7, 98:5, 99:17, 99:23, 102:23, 103:9, 108:17, 108:19, 108:20, 108:23, 114:5, 122:23, 123:17, 123:20, 123:21, 124:10, 126:16, 126:21, 126:22, 153:12, 206:11, 215:16, 232:8, 236:5, 236:6, 238:10, 238:14, 238:17, 240:13, 240:15, 241:2, 242:14, 243:3, 243:4, 244:18, 261:15, 273:19, 273:21, 294:2
remembered [2] - 8:23, 59:24
remove [1] - 89:22
removed [2] - 61:6,

61:11
removing [1] - 91:13
renew [2] - 200:9, 272:7
repeat [8] - 24:23, 63:24, 86:19, 103:17, 119:18, 163:23, 216:15, 245:21
repeatedly [1] - 139:9
rephotographed [1] - 211:9
rephrase [4] - 31:13, 32:15, 54:10, 57:15
Report [2] - 296:18, 296:24
report [25] - 15:5, 92:22, 92:24, 97:4, 99:12, 99:14, 100:10, 100:13, 100:18, 103:2, 104:24, 129:20, 129:25, 130:4, 130:5, 130:6, 210:20, 211:22, 212:4, 283:9, 284:8, 284:14, 285:4, 285:8, 287:21
reported [2] - 175:7, 175:11
reporter [2] - 4:16, 5:10
Reporter [1] - 5:16
reporters [1] - 9:20
Reporting [1] - 4:18
reports [6] - 14:21, 100:5, 175:18, 212:7, 212:16, 284:21
represent [1] - 4:21
representatives [1] - 114:7
reputation [2] - 63:21, 64:2
request [4] - 22:9, 65:20, 111:23, 137:23
requested [3] - 112:24, 112:25, 113:5
requests [1] - 86:25
REQUESTS [1] - 296:8
require [1] - 186:6
required [1] - 130:13
research [3] - 50:21, 50:25, 141:21
reserved [1] - 3:10
residence [2] - 8:8, 8:18

respect [7] - 28:9, 34:16, 134:23, 156:9, 162:4, 235:18, 290:13
respective [1] - 3:4
respond [2] - 12:4, 14:9, 60:10, 61:16, 61:17, 104:22
responded [3] - 26:3, 59:25, 88:18
responding [4] - 14:5, 26:12, 26:13, 33:21
responds [1] - 54:22
response [2] - 197:12, 230:7
responsibilities [1] - 81:13
responsibility [2] - 33:8, 81:10
responsible [2] - 33:10, 74:12
rest [3] - 14:12, 60:9, 72:15
restate [1] - 35:3
resting [2] - 183:4, 188:22
result [1] - 164:3
resulting [1] - 118:8
results [3] - 41:2, 110:10, 112:9
retire [1] - 10:10
retired [7] - 10:13, 11:9, 11:10, 15:13, 15:17, 16:14, 22:12
retrieve [2] - 122:24, 151:23
retrieved [2] - 231:20, 233:17
returned [2] - 148:6, 275:23
returning [1] - 277:8
returns [1] - 178:20
reverse [1] - 203:10
review [7] - 7:16, 8:6, 8:22, 18:9, 18:12, 18:15, 42:19, 56:18, 121:16, 122:2, 123:10, 129:15, 137:17
reviewed [11] - 7:6, 56:15, 93:16, 122:12, 134:14, 138:4, 202:3, 233:21, 245:22, 246:2, 273:24
reviewing [4] - 8:25, 56:24, 232:3, 236:18
RICHARD [1] - 1:8
right-hand [2] - 76:2, 92:4

ring [1] - 17:20
Road [3] - 1:12, 2:4, 4:10
Robert [3] - 72:20, 242:25, 286:7
ROBERT [1] - 1:7
ROE [1] - 1:8
rolled [3] - 183:12, 186:24, 188:14
rolling [1] - 193:22
room [24] - 67:16, 69:3, 77:5, 77:7, 77:13, 83:18, 83:21, 91:12, 132:25, 135:14, 168:23, 169:19, 169:21, 183:21, 206:24, 208:17, 211:11, 218:11, 222:2, 224:16, 225:3, 273:25, 276:14, 276:16
round [1] - 172:19
rug [1] - 102:5
rule [15] - 58:13, 153:25, 244:25, 249:17, 262:16, 262:18, 262:21, 263:5, 263:11, 263:14, 263:15, 263:17, 263:19, 270:22
Rule [3] - 151:15, 151:17, 195:22
ruler [6] - 38:6, 38:12, 43:2, 115:15, 115:17
rulers [1] - 42:22
Rules [1] - 1:18
rules [3] - 106:5, 106:6
run [3] - 21:10, 33:11
running [2] - 21:11, 152:2

**S**

sat [4] - 60:9, 61:14, 200:21, 201:18
satisfy [1] - 140:18
save [1] - 135:24
saw [39] - 58:5, 58:12, 67:7, 116:21, 119:15, 131:24, 147:10, 153:15, 154:5, 154:6, 157:20, 159:15, 172:8, 172:22, 172:24, 174:3, 174:13, 174:17,

179:10, 204:8, 233:23, 238:9, 240:11, 245:9, 255:23, 260:14, 262:22, 264:19, 267:4, 268:15, 270:2, 272:22, 275:19, 276:13, 277:8, 279:3, 279:4
scale [1] - 14:14
scalp [1] - 177:10
SCDA [3] - 80:18, 130:15, 138:8
scenario [12] - 183:23, 185:14, 188:20, 189:5, 190:15, 192:7, 199:4, 221:13, 227:21, 228:2, 228:5, 229:12
scenarios [3] - 196:10, 198:12, 198:25
scene [227] - 7:17, 8:2, 12:4, 12:10, 14:5, 14:9, 14:10, 14:15, 19:19, 22:20, 25:8, 26:11, 26:16, 28:9, 28:17, 28:24, 29:20, 30:4, 30:20, 31:4, 31:7, 31:9, 31:16, 32:4, 32:11, 32:12, 32:14, 32:25, 33:4, 33:13, 33:17, 33:22, 33:25, 34:12, 34:24, 35:11, 35:16, 35:21, 35:25, 36:10, 36:24, 37:9, 40:19, 42:21, 43:11, 44:25, 45:5, 45:19, 45:23, 47:8, 47:13, 47:19, 48:12, 48:13, 48:14, 48:18, 49:8, 49:12, 49:18, 49:22, 50:14, 50:19, 58:8, 59:17, 60:7, 60:10, 60:21, 60:24, 61:4, 61:20, 62:7, 62:10, 63:20, 65:7, 65:12, 65:20, 66:11, 67:7, 68:3, 68:8, 69:6, 69:21, 72:4, 72:24, 74:22, 75:4, 75:7, 80:11, 80:23, 80:24, 81:11, 81:13, 82:7, 82:21, 86:11, 86:23, 87:14, 88:12, 89:5, 89:20, 90:2, 90:5, 90:8, 91:2, 94:4, 96:17, 97:10, 97:12, 97:18, 97:22, 101:18, 102:25,

103:5, 104:23, 105:4, 105:14, 105:18, 105:23, 108:21, 109:8, 109:17, 110:2, 111:5, 111:9, 111:16, 111:24, 112:3, 112:7, 117:16, 118:21, 118:24, 120:15, 121:8, 122:11, 124:19, 125:7, 125:9, 126:10, 127:2, 127:24, 134:17, 136:10, 137:2, 137:19, 137:25, 139:7, 141:9, 141:12, 142:6, 142:13, 142:18, 143:2, 143:9, 143:20, 147:10, 149:7, 151:24, 152:14, 153:8, 154:9, 154:14, 156:8, 157:20, 159:16, 163:19, 164:15, 173:3, 174:22, 179:18, 181:16, 182:21, 186:19, 188:3, 188:12, 190:22, 191:3, 197:25, 201:5, 206:15, 207:16, 207:20, 209:12, 209:17, 209:19, 211:16, 211:24, 214:18, 216:12, 216:20, 217:8, 221:19, 224:25, 233:18, 241:12, 245:6, 246:13, 246:16, 251:22, 254:24, 257:16, 258:21, 262:4, 262:23, 263:22, 263:24, 264:11, 264:16, 265:8, 267:16, 269:17, 271:8, 275:21, 277:9, 283:4, 283:9, 284:11, 284:23, 285:10, 286:11, 287:12, 290:20, 291:2, 293:10, 296:10
scenes [16] - 22:16, 24:22, 25:12, 26:23, 30:24, 57:23, 65:8, 104:4, 104:5, 129:3, 129:10, 197:20,

210:17, 229:5, 279:6, 282:11
Schaefer [1] - 72:25
Scheck [3] - 4:22, 4:23, 296:6
SCHECK [70] - 2:3, 2:5, 4:22, 5:22, 5:23, 6:5, 7:4, 39:11, 39:16, 41:24, 42:4, 42:10, 62:22, 63:2, 66:18, 70:10, 76:13, 76:18, 85:14, 91:17, 96:13, 99:2, 99:7, 120:7, 120:21, 135:9, 136:5, 136:17, 136:21, 137:7, 140:17, 151:10, 151:19, 155:10, 171:14, 186:11, 186:16, 187:10, 195:25, 197:14, 200:15, 202:4, 202:9, 202:20, 219:5, 219:15, 219:21, 220:3, 223:9, 223:14, 223:24, 224:5, 230:21, 231:3, 235:8, 235:15, 239:14, 239:19, 240:4, 271:20, 271:24, 276:23, 279:19, 284:3, 284:15, 286:6, 286:22, 289:6, 292:16, 293:2
school [1] - 21:3
Schwerdt [1] - 17:18
scientist [5] - 72:21, 72:22, 229:4, 241:16, 241:17
Scientist [3] - 89:14, 89:15, 89:16
Scientists [3] - 28:23, 43:14, 43:19
scope [1] - 128:22
screw [1] - 149:23
scuffle [1] - 161:7
sealed [1] - 211:12
sealing [1] - 3:5
seated [1] - 205:23
second [20] - 42:19, 57:4, 57:7, 57:9, 78:6, 94:6, 102:21, 107:5, 107:19, 130:21, 135:15, 165:5, 172:24, 185:11, 250:23, 251:2, 260:3, 272:25, 284:12,

289:7
Second [1] - 21:25
seconds [1] - 76:23
secret [1] - 93:25
Section [5] - 68:25, 69:19, 69:21, 72:15, 74:25
section [12] - 22:8, 22:16, 22:18, 33:10, 53:25, 61:17, 142:15, 148:8, 149:5, 174:11, 203:7, 281:16
sections [1] - 48:21
sector [1] - 23:16
see [116] - 6:18, 13:22, 14:4, 15:4, 15:19, 24:4, 32:8, 37:9, 45:19, 47:21, 57:17, 58:19, 67:17, 67:20, 76:18, 76:21, 77:16, 79:17, 79:20, 79:21, 79:22, 83:2, 83:4, 83:22, 85:7, 86:12, 96:19, 97:23, 99:9, 101:24, 104:20, 107:14, 111:8, 111:19, 112:11, 113:7, 114:17, 114:22, 115:6, 116:5, 116:11, 116:25, 117:25, 119:8, 120:13, 122:13, 124:21, 125:9, 129:19, 129:22, 130:20, 130:25, 131:16, 137:14, 139:13, 139:14, 139:19, 141:25, 144:7, 144:9, 144:11, 144:20, 144:24, 144:25, 147:20, 154:10, 155:2, 155:16, 158:8, 159:25, 161:15, 161:23, 162:5, 163:4, 163:17, 169:4, 169:22, 173:4, 176:18, 176:22, 181:25, 182:2, 183:16, 186:22, 188:7, 188:23, 197:25, 204:10, 204:13, 204:14, 205:11, 218:9, 219:22, 221:10, 226:14, 230:17, 231:15, 235:22, 237:7,

21

241:21, 242:15, 243:20, 246:9, 254:2, 254:6, 271:25, 273:13, 276:14, 276:16, 279:12, 279:15, 283:20, 286:24, 287:23, 288:12, 290:3
**seeing** [3] - 60:6, 119:21, 175:11
**sees** [2] - 219:19, 230:2
**segregated** [1] - 97:18
**seminar** [2] - 29:15, 43:11
**seminars** [7] - 29:3, 29:4, 29:9, 43:7, 44:2, 44:10, 44:15
**send** [2] - 29:9, 282:14
**senior** [4] - 34:13, 82:14, 82:20, 101:17
**sense** [11] - 54:9, 125:3, 125:23, 196:25, 218:7, 227:17, 228:3, 228:8, 228:9, 228:15, 241:11
**sensitive** [3] - 152:25, 153:3, 280:12
**sent** [2] - 32:5, 283:17
**separate** [2] - 22:16, 159:5
**separately** [1] - 281:2
**September** [10] - 67:5, 85:20, 98:4, 99:11, 127:3, 138:17, 147:12, 233:24, 253:12, 258:5
**sequence** [1] - 216:6
**sergeant** [6] - 26:9, 34:6, 71:25, 80:13, 81:14, 251:21
**Sergeant** [14] - 34:5, 61:19, 68:23, 68:24, 72:25, 73:6, 73:18, 78:2, 78:4, 86:9, 86:22, 88:7, 242:25, 244:18
**series** [9] - 91:20, 92:13, 126:11, 126:17, 155:11, 155:17, 156:24, 288:25, 289:4
**serological** [3] - 110:10, 263:13, 266:21
**serologist** [5] - 72:21, 142:14, 150:11, 247:16, 281:14

**serologists** [1] - 281:22
**serology** [10] - 47:21, 142:15, 148:8, 148:10, 151:25, 174:11, 281:16, 282:14, 283:13, 283:17
**serves** [1] - 57:3
**services** [1] - 101:20
**set** [12] - 97:10, 131:15, 139:14, 139:20, 146:13, 146:14, 152:5, 207:5, 226:9, 228:6, 298:6, 298:15
**seven** [2] - 48:5, 155:15
**seventies** [1] - 51:19, 52:25
**several** [5] - 17:11, 28:11, 117:9, 168:25, 169:4
**Seymour** [30] - 7:19, 18:22, 37:13, 61:11, 106:12, 106:24, 107:17, 142:19, 142:24, 146:17, 156:15, 199:7, 207:11, 208:5, 216:8, 218:8, 218:12, 239:6, 244:2, 247:2, 251:8, 253:22, 260:22, 262:3, 265:3, 267:4, 267:9, 277:22, 279:4, 288:17
**Seymour's** [5] - 236:14, 236:19, 237:2, 242:10, 270:17
**shall** [2] - 3:6, 3:10
**share** [3] - 70:25, 71:10, 253:20
**sharp** [1] - 170:17
**Sharpie** [1] - 115:3
**sheer** [1] - 19:4
**SHEET** [1] - 297:2
**sheets** [2] - 42:23, 174:15
**shielding** [2] - 269:11, 269:12
**shoe** [1] - 53:19
**shooting** [1] - 192:16
**short** [2] - 23:14, 63:3
**shortly** [1] - 59:21
**shot** [6] - 40:12, 65:24, 65:25, 66:3, 162:10
**shots** [1] - 66:7

**SHOULD** [1] - 297:7
**shoulder** [1] - 84:18
**show** [6] - 67:25, 70:4, 75:24, 91:14, 154:10, 284:15
**shower** [7] - 83:19, 84:5, 84:7, 273:9, 275:11, 277:24, 278:15
**showing** [2] - 182:7, 286:24
**side** [36] - 12:20, 12:21, 81:16, 110:20, 110:25, 114:12, 114:24, 155:20, 157:2, 160:12, 160:13, 160:23, 160:25, 161:21, 161:24, 162:15, 179:4, 188:23, 195:8, 205:21, 213:24, 214:2, 214:3, 214:4, 214:6, 214:10, 215:13, 215:23, 216:4, 216:9, 216:17, 217:11, 217:13, 217:14, 217:22
**sided** [1] - 84:15
**Signature** [1] - 297:20
**signed** [2] - 3:13, 3:15
**significance** [2] - 216:10, 216:19
**silly** [2] - 205:11, 221:7
**simply** [1] - 200:12
**sit** [2] - 112:9, 258:3
**sitting** [5] - 17:15, 183:5, 194:8, 206:20, 220:18
**situation** [1] - 69:25
**six** [2] - 25:24, 48:5
**size** [2] - 52:8, 117:10
**sizes** [1] - 116:13
**skull** [1] - 155:18
**slash** [4] - 233:9, 237:2, 239:6, 240:11
**slashed** [4] - 230:16, 231:14, 274:6, 275:6
**slashes** [2] - 236:22, 267:11
**slashing** [2] - 231:18, 231:22
**sleeping** [1] - 131:25
**sliced** [1] - 161:8
**slicing** [6] - 161:7, 176:23, 176:24, 177:2, 177:3, 177:6
**slide** [1] - 59:9

**sliding** [2] - 205:20, 208:12
**slightly** [1] - 102:10
**slit** [1] - 143:23
**small** [5] - 116:14, 116:23, 236:25, 239:21, 280:2
**smaller** [6] - 59:13, 119:14, 119:21, 243:15, 288:7, 289:21
**smallest** [1] - 280:14
**smart** [1] - 91:18
**smear** [1] - 56:8
**so-called** [1] - 92:19
**soluble** [1] - 278:10
**someone** [4] - 44:19, 148:19, 148:24, 149:3
**sometime** [11] - 25:3, 51:19, 74:15, 85:19, 86:21, 127:23, 211:3, 211:16, 229:22, 254:10, 292:14
**sometimes** [7] - 43:19, 47:3, 53:11, 149:22, 152:15, 198:11, 293:25
**somewhat** [1] - 152:10
**somewhere** [9] - 52:25, 57:8, 88:19, 123:22, 159:21, 206:6, 206:8, 249:25, 260:25
**sorry** [16] - 6:3, 30:2, 35:3, 75:21, 96:4, 103:17, 108:7, 123:19, 152:13, 169:8, 179:25, 214:3, 219:15, 219:16, 220:13, 223:14
**sort** [3] - 243:10, 287:25, 289:16
**sought** [1] - 28:18
**sounds** [2] - 145:20, 145:22
**source** [8] - 57:19, 58:8, 117:3, 117:7, 118:14, 120:10, 120:16
**south** [2] - 102:9, 203:11
**southeast** [1] - 147:3
**southwest** [2] - 146:24, 147:3
**space** [1] - 208:23
**spatter** [128] - 28:10,

28:16, 30:10, 36:24, 37:8, 37:12, 40:21, 48:25, 49:5, 49:10, 49:13, 49:20, 49:21, 50:8, 50:13, 50:16, 51:25, 52:5, 52:9, 53:5, 54:12, 55:19, 55:24, 56:12, 56:20, 56:21, 57:2, 57:11, 57:18, 58:2, 58:12, 58:21, 58:23, 59:2, 59:3, 64:10, 64:20, 66:6, 87:19, 100:7, 100:12, 100:24, 100:25, 101:5, 101:12, 103:4, 103:14, 104:7, 104:23, 105:15, 105:19, 105:24, 106:2, 106:11, 106:18, 108:10, 109:8, 110:11, 111:9, 111:15, 112:5, 112:15, 112:20, 113:2, 114:18, 115:9, 115:25, 116:6, 116:11, 117:14, 118:8, 118:22, 119:4, 119:17, 119:21, 119:23, 120:3, 121:12, 121:17, 122:3, 122:14, 134:17, 136:7, 137:18, 141:18, 149:15, 151:22, 153:17, 155:2, 156:2, 156:9, 158:3, 158:19, 159:24, 162:5, 165:23, 169:11, 169:23, 174:14, 175:4, 177:12, 179:14, 183:24, 189:6, 192:8, 192:10, 193:6, 193:9, 195:16, 196:4, 197:21, 197:25, 199:22, 201:8, 210:20, 211:25, 212:12, 215:2, 216:11, 216:19, 217:2, 228:21, 228:25, 263:24, 264:11, 274:20, 279:6
**spattered** [1] - 120:11
**spatters** [1] - 102:4
**speaking** [4] - 48:6, 61:13, 187:20, 240:5
**speaks** [4] - 98:23,

23

131:5, 220:2, 286:3
**special** [2] - 92:25, 235:17
**Special** [2] - 93:4
**specific** [3] - 168:19, 230:12, 253:8
**specifically** [1] - 146:12
**specifics** [1] - 107:13
**speculate** [1] - 186:7
**speculative** [2] - 186:14, 197:13
**speeds** [1] - 14:17
**splash** [1] - 143:25
**splattered** [1] - 189:22
**sponges** [1] - 53:10
**square** [3] - 147:2, 205:15, 205:16
**St** [1] - 5:20
**stab** [6] - 166:15, 167:24, 183:16, 184:5, 184:20, 203:4
**stabbed** [4] - 132:9, 132:10, 143:11, 143:13
**stabbing** [3] - 167:8, 190:15, 195:17
**stabbings** [2] - 281:10, 282:12
**stain** [18] - 38:13, 40:8, 40:15, 50:6, 104:13, 119:9, 158:20, 160:2, 165:8, 165:10, 165:16, 165:17, 165:18, 172:12, 173:25, 174:4, 174:18, 175:11
**stains** [5] - 38:19, 118:12, 167:18, 173:20, 176:4
**stand** [1] - 190:10
**standard** [2] - 80:25, 104:9
**standby** [1] - 22:19
**standing** [2] - 108:5, 224:6
**start** [18] - 9:10, 22:10, 22:11, 24:7, 28:14, 30:14, 30:25, 84:16, 91:15, 138:12, 151:17, 166:22, 217:24, 218:13, 220:13, 237:2, 237:20, 237:25
**started** [9] - 22:22, 24:15, 29:19, 30:22, 32:24, 51:16, 75:14, 89:18, 182:14
**starting** [4] - 32:23,

94:5, 122:21, 138:8
**starts** [2] - 140:23, 183:15
**State** [18] - 1:21, 2:13, 5:8, 5:14, 17:5, 18:4, 93:8, 96:7, 114:7, 234:15, 234:22, 235:11, 236:2, 237:11, 242:22, 270:13, 290:7, 298:4
**STATE** [1] - 2:12
**state** [4] - 4:20, 5:17, 258:20, 272:10
**statement** [15] - 129:17, 138:3, 153:9, 186:18, 227:5, 227:12, 230:20, 234:13, 234:14, 234:21, 235:2, 235:10, 237:10, 238:19, 261:12
**statements** [2] - 190:24, 236:6
**STATES** [1] - 1:2
**States** [1] - 4:7
**states** [2] - 187:6, 187:9
**steno** [2] - 80:17, 81:2
**step** [4] - 170:20, 232:14, 251:24
**step-by-step** [1] - 251:24
**Steuerman** [5] - 18:18, 18:20, 19:5, 74:11, 74:15
**stick** [1] - 175:22
**sticks** [1] - 237:23
**still** [24] - 10:14, 10:25, 16:15, 72:2, 75:4, 97:13, 179:5, 180:20, 183:19, 194:6, 194:7, 194:11, 210:10, 220:12, 220:16, 220:17, 220:21, 239:24, 244:23, 263:19, 268:17, 268:21, 268:25, 276:13
**stills** [1] - 80:6
**stipulate** [3] - 17:16, 140:13, 219:20
**stipulated** [1] - 276:21
**STIPULATED** [3] - 3:3, 3:8, 3:12
**STIPULATIONS** [1] - 3:2
**stomach** [11] - 183:25, 184:2, 184:10,

184:25, 185:15, 185:17, 185:22, 185:23, 186:24, 188:15, 188:17
**stop** [4] - 77:4, 226:2, 230:21, 251:2
**story** [2] - 21:7, 222:14
**straight** [4] - 40:11, 128:13, 163:25, 206:22
**strike** [6] - 106:25, 117:18, 118:25, 121:19, 145:14, 218:2
**strikes** [2] - 169:2, 169:4
**striking** [1] - 117:11
**stroke** [1] - 102:8
**strong** [1] - 237:18
**struck** [4] - 118:15, 119:25, 144:15, 275:3
**structure** [1] - 238:6
**struggle** [6] - 110:18, 110:23, 112:17, 192:5, 193:16, 193:22
**struggled** [1] - 188:21
**struggling** [1] - 110:21
**stuck** [3] - 243:18, 288:10, 289:24
**studies** [1] - 152:10
**studying** [3] - 21:5, 54:21
**stuff** [1] - 30:13
**submit** [1] - 281:16
**submitted** [2] - 148:7, 149:5
**subpoena** [2] - 9:15, 9:16
**Subscribed** [2] - 295:15, 297:22
**subsequent** [10] - 47:21, 49:17, 61:2, 102:19, 121:7, 121:9, 211:17, 254:11, 258:20, 263:13
**subsequently** [4] - 97:14, 147:23, 261:5, 266:2
**substance** [5] - 111:6, 244:22, 245:11, 249:15, 250:24
**substances** [1] - 244:7
**substantial** [1] - 177:3
**substantiate** [1] -

125:20
**sudden** [1] - 180:19
**sued** [1] - 9:13
**suffered** [1] - 267:10
**Suffolk** [21] - 4:6, 5:3, 6:20, 10:5, 11:2, 11:15, 12:12, 16:15, 20:23, 29:8, 30:15, 33:7, 48:4, 48:23, 104:3, 126:18, 126:24, 211:20, 242:11, 297:3
**SUFFOLK** [3] - 1:7, 1:8, 2:8
**suggested** [2] - 217:10, 253:16
**suggesting** [8] - 184:13, 184:15, 184:18, 185:4, 186:21, 187:5, 187:7, 191:2
**suggestion** [1] - 135:10
**suit** [1] - 9:14
**Sullivan** [1] - 26:8
**Sup** [2] - 296:18, 296:24
**supervised** [1] - 129:21
**supervising** [1] - 81:14
**supplemental** [5] - 92:22, 130:5, 284:8, 284:20, 285:4
**supposed** [1] - 248:24
**suppress** [1] - 96:23
**surface** [5] - 40:9, 40:10, 150:8, 165:21, 174:6
**surprise** [1] - 27:12
**surprised** [1] - 132:2
**suspect** [3] - 73:20, 125:5, 189:18
**suspects** [1] - 71:11
**suspicions** [3] - 71:7, 71:18, 78:14
**swab** [1] - 150:17
**swear** [1] - 5:10
**swipe** [1] - 56:8
**sworn** [5] - 3:15, 5:13, 295:15, 297:22, 298:6

293:25
**tag** [4] - 43:2, 66:16, 97:16, 211:8
**tags** [2] - 97:19, 162:18
**tails** [1] - 40:14
**Takers** [2] - 126:12, 128:18
**TANKLEFF** [1] - 1:4, 2:18
**Tankleff** [144] - 4:5, 4:24, 7:19, 8:3, 8:8, 8:18, 16:24, 18:22, 18:24, 19:2, 23:20, 37:14, 37:21, 42:20, 49:5, 49:22, 59:17, 60:11, 61:5, 61:11, 63:5, 63:20, 67:16, 71:7, 71:12, 71:19, 71:25, 73:20, 74:10, 78:14, 78:20, 79:18, 83:6, 85:22, 86:24, 87:8, 88:5, 90:10, 90:19, 90:20, 91:13, 95:25, 96:17, 101:7, 106:12, 106:24, 107:17, 110:12, 111:7, 113:7, 117:19, 118:8, 119:2, 119:25, 122:22, 124:7, 124:17, 129:18, 129:19, 136:13, 137:14, 138:12, 139:13, 142:19, 142:24, 143:10, 146:17, 146:18, 153:20, 154:20, 156:15, 157:3, 158:16, 166:13, 171:25, 172:9, 173:9, 175:6, 176:12, 177:13, 181:7, 184:23, 184:24, 186:20, 186:23, 189:8, 189:19, 191:14, 191:19, 191:25, 195:12, 199:7, 201:6, 202:24, 203:5, 204:19, 205:23, 206:18, 207:11, 213:5, 213:24, 214:4, 218:8, 218:9, 218:12, 221:15, 222:3, 236:15, 239:6, 243:19, 244:3, 246:4, 246:6, 246:14, 247:2,

## T

**table** [8] - 207:5, 226:7, 236:14, 236:17, 270:16, 275:2, 275:19,

248:10, 248:22, 251:8, 254:13, 258:4, 260:3, 260:22, 262:3, 265:3, 267:5, 267:10, 269:5, 273:17, 273:20, 273:21, 277:22, 277:23, 279:5, 288:11, 288:18, 289:25, 291:4, 291:24, 297:3

**Tankleff's** [28] - 9:25, 69:3, 76:6, 77:22, 91:4, 94:11, 120:16, 122:13, 134:15, 138:23, 146:8, 146:25, 153:9, 155:18, 157:16, 164:4, 166:2, 167:13, 171:7, 177:15, 181:17, 185:13, 188:4, 208:5, 216:9, 253:22, 258:9, 279:3

**Tape** [1] - 171:20, 230:24, 231:8, 292:18, 292:23, 295:5

**tape** [1] - 62:24

**tapes** [1] - 89:21

**taught** [1] - 29:5

**teacher** [2] - 21:6, 21:14

**team** [4] - 33:19, 72:24, 73:12, 109:6

**technique** [2] - 126:2, 126:7

**techniques** [1] - 125:4

**technology** [1] - 21:6

**tend** [1] - 192:7

**term** [6] - 45:11, 165:8, 165:15, 263:15, 263:17, 263:18

**termed** [1] - 81:17

**terminology** [1] - 118:20

**terms** [31] - 27:25, 31:15, 32:22, 33:24, 46:24, 55:9, 56:11, 82:17, 99:10, 99:24, 124:16, 125:4, 125:18, 129:8, 137:18, 140:22, 141:11, 157:7, 165:6, 165:14, 172:8, 173:20, 174:14, 176:21, 181:21, 186:18,

207:15, 216:11, 216:19, 217:8, 277:13

**terribly** [1] - 6:3

**test** [11] - 21:13, 21:14, 21:18, 31:24, 111:17, 149:9, 175:5, 264:8, 280:16, 280:21

**tested** [3] - 46:5, 266:4, 266:12

**testified** [9] - 5:15, 37:17, 41:20, 49:4, 99:25, 100:23, 106:22, 107:15, 200:20

**testify** [10] - 6:22, 18:13, 95:12, 96:16, 101:4, 212:17, 283:2, 283:5, 283:11, 286:9

**testifying** [4] - 15:21, 20:11, 27:20, 140:2

**TESTIMONY** [1] - 296:3

**testimony** [27] - 7:8, 7:9, 7:10, 7:12, 8:25, 12:8, 41:16, 42:7, 56:15, 58:17, 96:21, 100:6, 101:12, 107:6, 121:23, 122:9, 134:25, 186:10, 199:12, 199:16, 200:2, 200:10, 200:25, 201:4, 214:17, 298:5, 298:8

**testing** [14] - 32:6, 45:18, 47:21, 53:16, 53:19, 136:15, 147:25, 150:18, 152:13, 152:17, 234:8, 263:13, 266:21, 266:22

**tests** [8] - 148:21, 152:6, 152:9, 152:24, 280:10, 281:24, 282:16, 283:18

**THAT** [3] - 298:5, 298:7, 298:12

**THE** [27] - 1:2, 1:7, 2:12, 4:2, 5:9, 5:25, 62:25, 66:20, 66:24, 76:15, 76:19, 76:22, 92:5, 92:10, 120:22, 121:2, 171:15, 171:19, 180:5, 230:22, 231:7, 249:22, 292:14,

292:17, 292:22, 295:4, 297:2

**themselves** [3] - 4:20, 148:14, 241:12

**theories** [2] - 62:19, 210:21

**theory** [4] - 90:19, 133:22, 211:23, 258:7

**thereafter** [2] - 122:11, 253:13

**thereby** [1] - 119:3

**therefore** [7] - 151:3, 164:25, 165:3, 183:14, 211:3, 218:5, 250:25

**thin** [2] - 236:22, 267:10

**thinking** [3] - 45:23, 73:22, 180:10

**third** [5] - 26:12, 26:13, 97:3, 234:20, 268:22

**thorough** [1] - 152:5

**three** [7] - 85:5, 92:17, 169:9, 252:22, 267:15, 268:4, 270:7

**throat** [7] - 83:8, 132:6, 132:21, 176:17, 178:7, 178:13, 181:20, 182:2, 188:8, 194:16, 205:5, 220:25, 246:6, 246:7, 275:7

**throughout** [1] - 97:18

**throughs** [1] - 68:3

**throwing** [1] - 219:13

**thrown** [1] - 127:21

**Thursday** [2] - 102:24, 123:20

**tight** [2] - 39:14, 76:14

**timewise** [1] - 292:8

**tip** [7] - 171:6, 173:7, 173:22, 174:5, 174:18, 175:9, 269:12

**TIPALDO** [76] - 2:15, 5:6, 17:16, 27:9, 73:24, 78:17, 86:4, 86:7, 87:25, 94:24, 96:10, 111:21, 112:23, 120:6, 120:19, 125:14, 127:6, 127:13, 129:6, 129:13, 134:19, 139:8, 144:22, 149:13, 149:16, 154:7, 158:13, 158:23,

163:22, 164:8, 173:19, 175:16, 176:8, 178:2, 182:24, 183:8, 187:4, 187:12, 187:16, 189:2, 189:13, 191:12, 196:20, 199:10, 202:16, 212:20, 213:21, 215:7, 218:15, 219:11, 219:16, 220:10, 221:24, 222:8, 225:22, 227:7, 227:20, 231:24, 247:3, 248:15, 249:3, 258:11, 259:23, 260:16, 261:2, 262:7, 268:11, 271:21, 272:15, 280:5, 280:20, 281:4, 282:4, 288:23, 293:21, 295:3

**Tipaldo** [3] - 5:7, 17:14, 17:15

**tire** [1] - 30:11

**TO** [2] - 296:3, 296:8

**Tod** [1] - 18:20

**today** [6] - 41:20, 139:4, 186:10, 210:15, 238:24, 258:3

**together** [12] - 15:21, 29:19, 33:18, 36:8, 65:10, 108:9, 129:16, 188:2, 207:23, 233:21, 246:2, 281:3

**toilets** [3] - 84:4, 85:12

**took** [20] - 9:15, 79:23, 83:19, 93:18, 97:11, 99:22, 188:15, 189:20, 192:8, 209:3, 209:10, 252:4, 256:16, 259:6, 259:8, 264:16, 267:25, 268:20, 274:10, 275:17

**top** [15] - 83:3, 130:16, 130:21, 161:4, 163:4, 164:2, 164:3, 164:22, 164:24, 189:20, 195:2, 208:4, 208:5, 213:17, 236:17

**torso** [1] - 191:21

**total** [1] - 47:9

**totally** [1] - 269:13

**touched** [2] - 211:7, 269:12

**towards** [6] - 46:9, 77:15, 78:9, 84:6, 208:12, 259:16

**towels** [2] - 85:13, 85:14

**Town** [1] - 22:2

**trace** [5] - 48:20, 53:24, 98:9, 98:10, 278:18

**traces** [2] - 234:9, 278:12

**tracks** [2] - 30:11, 70:3

**trail** [2] - 168:10, 173:4

**train** [1] - 28:15

**trained** [3] - 26:4, 26:6, 152:9

**training** [3] - 28:6, 28:9, 129:9

**trample** [1] - 75:2

**transcript** [2] - 294:6, 298:7

**TRANSCRIPT** [1] - 297:2

**Transcription** [1] - 4:18

**transfer** [26] - 158:20, 160:2, 165:2, 165:8, 165:11, 165:15, 165:17, 167:18, 172:12, 173:20, 173:25, 174:4, 174:18, 175:11, 176:4, 191:7, 191:18, 191:20, 192:15, 193:10, 193:11, 193:13, 193:17, 193:25, 203:23, 203:25

**transferred** [3] - 159:2, 165:20, 189:9

**transported** [1] - 174:11

**traps** [1] - 83:25

**traverse** [1] - 203:16

**tremendous** [4] - 110:23, 190:3, 193:22, 193:24

**trial** [32] - 3:11, 8:9, 8:17, 8:25, 49:5, 56:15, 95:20, 95:21, 95:23, 95:24, 96:22, 100:24, 101:12, 106:23, 107:7, 107:16, 109:3, 109:18, 121:25, 122:2, 199:25,

25

200:5, 200:7,
200:10, 200:14,
200:21, 200:24,
201:4, 209:12,
214:23, 215:11
**tried** [1] - 238:2
**trip** [1] - 240:6
**trouble** [4] - 27:23,
127:17, 128:5, 128:8
**true** [18] - 31:21, 32:2,
36:11, 45:2, 45:11,
91:5, 137:25, 153:6,
172:3, 181:17,
218:7, 219:9,
221:20, 226:23,
274:19, 277:4,
282:3, 298:7
**trust** [2] - 229:16,
229:17
**truthful** [1] - 27:5
**try** [14] - 14:16, 31:24,
45:5, 49:19, 65:16,
76:11, 76:12, 92:2,
101:24, 121:16,
200:17, 264:8,
293:13, 293:19
**trying** [25] - 14:12,
35:5, 37:7, 68:16,
79:7, 99:21, 104:16,
132:15, 133:21,
140:14, 141:11,
162:13, 162:17,
162:19, 175:4,
179:13, 179:20,
180:12, 183:20,
183:21, 190:23,
224:2, 240:6, 240:8,
289:7
**turn** [10] - 14:18, 15:2,
82:23, 113:20,
114:10, 130:14,
181:6, 183:20,
224:11, 224:12
**turned** [2] - 142:14,
209:12
**twice** [3] - 214:7,
214:14, 224:18
**two** [24] - 13:15, 16:8,
17:24, 68:3, 84:20,
102:10, 106:20,
111:4, 122:10,
135:3, 138:11,
143:4, 147:5, 159:9,
205:19, 208:13,
213:25, 217:9,
217:13, 217:18,
230:13, 247:19,
293:3
**type** [15] - 58:24,
58:25, 59:3, 160:10,

170:16, 189:24,
193:10, 236:19,
236:21, 237:19,
240:19, 243:19,
288:11, 288:16,
289:25
**typed** [1] - 129:17
**typed-up** [1] - 129:17
**types** [2] - 156:4,
230:9

## U

**ultimate** [1] - 188:22
**ultimately** [1] - 212:17
**unclear** [1] - 190:20
**uncomfortable** [2] -
271:13, 272:9
**under** [11] - 12:22,
41:24, 79:9, 94:4,
150:5, 151:17,
173:14, 221:9,
226:13, 227:3, 227:4
**underlined** [7] - 83:7,
83:10, 83:11, 83:17,
83:18, 83:25, 84:4
**underlined)** [1] - 84:9
**underscores** [1] -
230:8
**understood** [3] -
81:11, 96:25, 185:12
**unfair** [1] - 271:12
**unit** [11] - 22:10,
22:11, 29:20, 30:5,
33:11, 33:18, 35:10,
35:24, 67:9, 94:8,
97:10
**United** [1] - 4:6
**UNITED** [1] - 1:2
**unlikely** [5] - 241:22,
250:19, 264:17,
268:6, 280:2
**unrelated** [1] - 2:13
**unscrew** [1] - 150:5
**up** [51] - 11:7, 21:8,
21:14, 40:11, 65:17,
74:14, 74:15, 76:9,
76:20, 77:3, 78:9,
88:21, 96:19, 97:11,
101:11, 102:3,
128:14, 129:17,
131:19, 132:19,
145:11, 149:23,
162:3, 162:9,
162:14, 165:5,
169:7, 169:20,
173:11, 176:15,
183:5, 183:6,
183:13, 183:20,

186:17, 188:21,
191:14, 196:10,
196:15, 197:2,
207:5, 221:10,
226:9, 226:14,
240:6, 241:25,
266:16, 273:18,
276:11, 276:12,
293:19
**upper** [1] - 177:4
**useful** [1] - 141:19
**uses** [4] - 232:12,
232:15, 232:17,
233:8
**utility** [21] - 205:21,
236:19, 237:5,
237:19, 237:21,
243:15, 253:17,
255:16, 257:2,
257:12, 261:9,
262:14, 269:8,
269:9, 269:25,
270:4, 270:6,
272:22, 288:7,
289:21
**utility-type** [2] -
236:19, 237:19

## V

**vacated** [1] - 10:2
**Varinelli** [2] - 99:16,
99:18
**various** [2] - 32:10,
210:19
**VASQUEZ** [1] - 2:6
**Vasquez** [1] - 4:25
**vehicle** [3] - 6:13,
10:14, 23:16
**vehicles** [3] - 14:12,
14:13, 30:12
**velocity** [27] - 52:5,
52:12, 53:5, 56:19,
56:20, 56:21, 57:2,
57:5, 57:7, 57:11,
57:17, 58:2, 58:21,
58:22, 58:23, 59:9,
59:10, 59:15,
114:18, 115:9,
116:5, 116:11,
117:14, 119:17,
162:4, 169:11,
169:23
**verbally** [2] - 14:24,
15:8
**verify** [1] - 284:25
**version** [3] - 129:18,
262:5, 284:9
**versus** [1] - 4:5

**victim** [8] - 61:6,
61:12, 89:23, 218:3,
237:22, 243:11,
289:12, 289:13
**victims** [3] - 247:20,
288:3, 289:17
**Video** [1] - 4:14
**video** [4] - 69:5, 75:3,
80:5, 84:19
**Videographer** [1] -
2:19
**VIDEOGRAPHER** [19]
- 4:2, 5:9, 62:25,
66:20, 66:24, 76:15,
76:19, 76:22, 92:5,
92:10, 120:22,
121:2, 171:15,
171:19, 230:22,
231:7, 292:17,
292:22, 295:4
**videographer** [1] -
4:14
**videos** [1] - 97:12
**videotape** [1] - 33:13
**videotaped** [1] - 295:6
**videotapes** [1] - 35:11
**videotaping** [1] - 89:5
**view** [14] - 82:7,
150:13, 161:15,
175:4, 177:13,
228:21, 252:16,
253:20, 255:2,
256:23, 257:8,
260:11, 269:2,
291:16
**viewing** [1] - 291:22
**views** [1] - 291:14
**vigorous** [1] - 193:15
**Vince** [3] - 99:19,
104:25, 109:10
**viscoelastic** [1] -
54:16
**visually** [1] - 147:19
**vocational** [1] - 21:6
**volume** [1] - 55:14
**voluntary** [1] - 43:20
**volunteered** [4] -
132:11, 205:10,
221:6, 273:5
**vs** [1] - 297:3

## W

**wait** [17] - 61:16, 97:6,
104:16, 107:5,
144:20, 154:16,
166:17, 180:3,
200:8, 201:25,
250:23, 251:13,

284:12, 284:19,
291:18
**waited** [6] - 60:9,
61:15, 62:4, 69:18,
72:10, 72:14
**waiting** [3] - 67:8,
69:10, 94:8
**waived** [1] - 3:7
**wake** [2] - 132:19,
176:15
**walk** [27] - 60:20,
60:24, 68:3, 68:19,
68:20, 68:22, 69:20,
70:7, 70:8, 70:17,
70:24, 71:17, 72:8,
73:13, 73:15, 74:9,
74:18, 75:8, 79:12,
206:24, 207:3,
207:7, 226:5,
229:14, 247:13,
249:22, 250:4
**walk-through** [16] -
60:20, 60:24, 68:19,
68:20, 68:22, 70:7,
71:17, 73:13, 73:15,
74:9, 74:18, 75:8,
79:12, 247:13,
249:22, 250:4
**walk-throughs** [1] -
68:3
**walked** [8] - 62:7,
62:10, 68:7, 69:22,
194:13, 204:8,
220:23, 221:15
**walking** [4] - 69:20,
69:25, 203:6, 225:3
**walks** [3] - 224:15,
224:16, 232:23
**wall** [5] - 110:20,
169:8, 208:18,
209:4, 210:3
**walls** [4] - 97:23,
98:13, 98:22, 99:4
**wash** [2] - 265:11,
278:4
**washed** [8] - 84:5,
265:3, 268:18,
269:18, 273:8,
273:10, 275:11,
277:23
**washing** [1] - 277:6
**water** [7] - 55:2, 55:12,
265:12, 278:10,
278:11, 278:15,
278:17
**watermelon** [107] -
83:9, 83:11, 85:6,
92:19, 132:24,
144:17, 144:25,
145:5, 145:17,

166:14, 167:6, 167:24, 173:2, 173:11, 203:3, 231:19, 232:11, 232:15, 232:16, 232:25, 233:9, 233:13, 233:15, 236:17, 242:8, 243:13, 243:25, 244:5, 244:8, 244:23, 245:7, 245:10, 245:12, 245:15, 246:8, 246:18, 246:24, 248:24, 250:20, 251:6, 252:12, 253:14, 253:21, 254:5, 255:3, 255:14, 255:22, 255:23, 256:5, 256:13, 256:24, 257:8, 257:13, 257:14, 257:18, 258:9, 258:22, 259:5, 259:10, 259:18, 260:2, 260:4, 260:13, 260:23, 260:24, 261:8, 262:2, 262:16, 262:17, 262:21, 264:16, 264:19, 265:5, 265:12, 266:3, 266:9, 266:23, 266:24, 267:7, 267:13, 267:19, 268:7, 268:20, 269:16, 269:19, 270:2, 272:12, 272:17, 273:13, 274:5, 275:7, 275:11, 275:18, 276:8, 277:7, 277:13, 277:15, 277:17, 277:20, 287:9, 288:5, 289:19, 290:13, 290:18, 291:3, 291:22
**weapon** [68] - 45:24, 46:16, 46:20, 48:19, 48:20, 148:25, 168:24, 237:19, 240:19, 245:2, 245:3, 245:8, 245:18, 246:25, 247:19, 248:3, 248:25, 249:9, 250:21, 252:13, 253:15, 253:24, 254:9, 255:14,

256:5, 256:14, 256:17, 256:24, 257:9, 257:19, 258:10, 258:23, 259:10, 259:20, 260:5, 260:14, 260:20, 261:8, 262:15, 262:17, 263:19, 263:21, 264:18, 264:23, 264:25, 265:16, 266:10, 266:16, 266:25, 267:8, 267:19, 268:7, 268:18, 268:19, 268:21, 268:25, 271:15, 272:12, 272:18, 272:19, 287:10, 290:23, 291:5, 291:25, 292:2
**weapons** [5] - 47:13, 53:4, 241:21, 263:25, 264:2
**wearing** [1] - 131:19
**Wednesday** [1] - 292:15
**weekend** [1] - 29:15
**weight** [10] - 149:9, 159:12, 165:24, 166:21, 166:23, 170:12, 170:13, 170:15, 170:22
**weights** [2] - 148:14, 159:6
**well-constructed** [1] - 282:9
**west** [4] - 181:12, 181:13, 181:14, 181:15
**westerly** [1] - 180:20
**whatsoever** [1] - 234:9
**WHEREOF** [1] - 298:14
**white** [2] - 77:2, 205:16
**whole** [4] - 134:24, 199:4, 203:17, 205:15
**William** [1] - 19:16
**Williams** [1] - 43:15
**wind** [1] - 11:7
**wipe** [1] - 56:8
**wiped** [2] - 127:22, 269:20
**withdraw** [3] - 202:4, 202:9, 272:5
**WITNESS** [5] - 5:25, 180:5, 249:22, 292:14, 298:14

**witness** [13] - 5:11, 133:25, 134:21, 135:14, 140:3, 186:7, 187:5, 222:9, 235:7, 293:5, 294:5, 298:5, 298:8
**Witness** [1] - 297:4
**witness's** [1] - 134:25
**woke** [2] - 131:19, 145:11
**Woodcutters** [1] - 5:20
**woods** [1] - 127:22
**word** [4] - 13:2, 13:3, 85:13, 223:21
**words** [15] - 53:3, 59:11, 96:4, 98:24, 168:25, 169:14, 192:15, 193:2, 209:21, 210:14, 214:5, 214:16, 253:6, 269:6, 278:7
**works** [1] - 149:14
**worn** [2] - 142:23, 143:3
**wound** [14] - 101:11, 160:10, 178:10, 183:16, 184:5, 185:17, 189:23, 237:20, 237:25, 240:12, 255:4, 269:4, 272:21
**wounds** [55] - 47:14, 154:2, 155:17, 157:11, 157:21, 172:7, 177:19, 177:22, 178:10, 178:14, 181:19, 184:21, 185:3, 185:20, 186:22, 187:3, 188:7, 188:16, 189:10, 191:6, 191:24, 192:5, 192:17, 192:19, 193:4, 203:4, 232:18, 236:20, 236:21, 237:3, 238:9, 238:13, 239:6, 241:4, 241:20, 241:24, 243:17, 244:2, 253:23, 253:25, 254:3, 254:25, 255:6, 255:8, 255:10, 261:10, 267:4, 267:9, 269:24, 279:2, 279:4, 279:21, 288:9, 288:17, 289:23

**write** [8] - 14:20, 15:4, 15:7, 81:2, 100:13, 211:21, 212:7, 212:15
**writing** [1] - 86:9
**written** [7] - 84:16, 88:6, 100:18, 212:5, 219:8, 222:12, 235:16
**wrote** [1] - 100:10

## X



**X-rays** [5] - 236:19, 253:23, 261:13, 261:14, 261:16

## Y



**year** [8] - 6:13, 9:13, 13:12, 13:14, 29:11, 29:14, 99:22, 212:21
**yearly** [1] - 29:12
**years** [6] - 17:10, 17:11, 22:7, 26:24, 27:2, 281:20
**Yellow** [1] - 13:5
**YORK** [3] - 1:2, 1:2, 2:12
**York** [15] - 1:13, 1:21, 2:5, 2:10, 2:13, 2:14, 4:8, 4:11, 4:16, 5:8, 5:14, 5:20, 235:11, 298:4
**yourself** [14] - 23:17, 35:17, 35:25, 51:25, 52:14, 53:4, 53:14, 53:22, 66:6, 69:16, 169:13, 241:16, 247:16, 285:2