# Exhibit 49-2

AG011529



PLAINTIFF'S
EXHIBIT
1
PJC 10/9/13



Wed 9/7/88

I/L 33 Seaside Drive
Belleterre
off Crooked Oak Rd.

0705 - Carmody got call
from DO @ 0700. 2 victims
@ Above. 1 male / 1 female
1 victim to Mather Hosp
Pt Jeff. Teenager son @
Above I/L - not injured.
1 victim is apparent DOA
Carmody + Pfatzgraf to go
to Hosp. Will check on
condition of victim.

0710 - Anderson + Lagheezos
notified will respond to
the scene.

0715- Rein notified - will
Respond to Scene. McCready
Paged.

PLAINTIFF'S EXHIBIT 2 DF 10/2/13



Spoke to Georgty Tschimber
@ 0718. Cannot go - she has
other case. Wants me to
call Jasso.

McCready called - 7:20 He
is responding to scene

0726
    McElhone notified
Will call Jasso +
Respond to Scene.

SCDA002700



0800 @ Scene
w/ Det Olson 6 in Squad

CC# 88-461,048

1st Officers:

PO CRAyne # 3273 (603F)
PO Gallagher # 3610 (603)

2 victims - 1 male + 1 female

TAnkleff, Seymore
w/m 60's
To mother via Pt Jeff.
unconscious @ time of trans.
Throat cut - Bleeding

TAnkleff, Arlene
w/F
DOA w/s Bedroom

SCDA002701

McCready is 36

Rescue + PO's have been in
the house.

MARTIN TANKLEFF, vitelling
son loused substance
After he found parents —
Apparently was @ home when
murder occurred.

_____

Clean Day — Sunny
60's                      +
                       Crisp.

_____

Sgt Lesley — Patrol Sup.

_____

Front door of house is opened
+ Screen door is locked
open.

0805 - enter scene.
N/west bedroom —
DOA female

Head west, lying along
side of bed on floor
* body is on w/side of
bed.

TV is on
Drapes are partially opened
 - Blood on floor near
 victims head
 - Eyes opened.
Appears to have been a struggle

SCDA002703



Tankleff, Martin (marty)
8/29/71   17 yrs
Victims Son
Has Sister Shary - lives in PJS,
married. Marty lives @ home
+ goes to P.J.  HS
        w/ Jim McCready
* Has blood on (R) foot
Barefoot. Sand on feet.


Got home @ 9:10 pm. my mother
was Reading a paper in Re-
clining chair in den - was 3
light bulbs. mother + I talked
from 10:15 to 11 pm. After that
I was putting clothes away in
my Room. @ 11:15 pm I went
into her bedroom to say goodnight
- but she was already asleep.
She was lying on her bed.
Got up this morning @ 5:35 am

SCDA002704



shut off my ~~clock~~ alarm in my
BR. I came out of my room
@ 6:16 am. I looked @
the clock - it was exactly
6:16 am. On the lights ~~were~~
~~on~~ ON in the house. They were
off in my parents BR.

My mother usually gets
up @ 6:30 am. I was
surprised that she wasn't
already up on my first
day of school. She usually
takes pictures of me. The
lights were off in their BR
+ the drapes were shut.
I walked into my fathers
office + saw him sitting
in his chair ——— w/ lots
of blood. I got very
upset. Ran to my room
to get a pillow + towel

SCDA002705

after I called 911. — they told me to do that (911 Operator)

After that I saw my mom on the ground. Didn't go into her bedroom. I could see from the hallway that she was dead. She wasn't moving — I could see that her throat was cut. I then called Stacey (sister) to get over here. Told her — just get over here. I told her that my parents were murdered. I called my friend MARK Pearsone next. He lives on Verdone Dr., not Stacey. — Hung up the phone & he called back. Told him I wouldn't be in school

SCDA002706

Today — that my parents
were murdered. marks
mother called back.

I think Gerry Steverman
did it. He's my father
business partner. Owed my
father a lot of money. They
are partners in Bagel stores
+ horses. ← Trotters.
Steverman own Stratmore
Bagels on Rt 347, Setauket.
Steverman was @ house
last night for card game

Det Retn @ 0815 w/
mary Trunkhoff.

Didn't say goodnight to father!
he does not like to be bothered


10³⁰/10⁴⁵ pm, mother showered.

Showered 11 - 11⁵ pm - marty

Saw mothers pull drapes completely shut.

Marty saw sliding glass door in mothers BR was locked.

Mother got into bed — was awake — Her TV was on

I set my alarm for 5:35 am.

Woke up last night - saw outside driveway lights were on.

SCDA002708

Alarm went off @ 5:35 am
shut it off. — got out of
bed @ 6:10 Am. Then
went to Bathroom.

All lights were on in house

Parents lights were off
Parents not in bed.
House alarm in BR is
off.

_____

MYRON FOX
700 GARDEN City PLAZA
GARDEN City
                741-1760

Seymore TANKleff's
business attorney.

SCDA002709



0840 - McCready to Yaphank
w/ Marty Tomklett.

0845 - Anderson/Laykezza to
interview word players

8. Photograst/Conwcely (1100)
Per Hosp: Dr. Retri
Tomklett, Sey more deep.
Laceration of neck front to
back. Deep + around.
Depressed skull fracture to
back of head. Brown matter
from head — v. serious inj.
Pessimistic that victim will
live. Dr. knows victim 15
years. Thinks we should
look for a <u>hammer</u> type
instrument. Blood samples
from victim were taken.

SCDA002710

Attorney - myron fox was @
Hosp. Represented Seymore
Tawkheff on a # of business
deals. He suspects this
incident may be the Result
of monies owed to him by (Tawkheff)
Stevenson. He owes alot
of money to Tawkheff & it
is due shortly. Fox will
get us copies of business
papers.

Ronald J. Rutter @ hosp.
8/12/44
21 Fitness St. PJS
331-2035
Son in law. married to
Sharon - marty's sister. She
was also @ hosp. unable to
speak to, V. upset

Tanklett Seymore turns to
Suny @ 0912 w/ PO
Aimes. will stay w/ victim

1145  Barnes on scene.
Will be scene Det.

SCDA002712



Per McCready — (12:38)

Marty Tankleff confessed. Cut mothers throat — cut fathers throat w/ the knife that 3 near the watermelon — in the kitchen. Did mother 1st. Hit her w/ ~~dumbbell~~ the bare part of a dumbbell It is in his room. He was nude — Said he took a shower in the hall bath near his room.

* Check the traps! Also check the toilets. Says he washed everything off in the shower ← Hose Bath

He called 911 from his mothers phone — look for blood on phone Her B.R.

SCDA002713

Confessed as of 1156 —
will start written after
they get photos.
   * Has blood on his
shoulder.

Will probably go on video

① linen closet
② marlys BR Pac blood +
   dumbser * talk to father
③ Garage door knob.
④ list on Refrig.
⑤ knife near watermelon

SCDA002714



1331 — On notice per
McCready w/ Myron Fox
As of 1322 hrs. Had to
stop written — not signed.

ID did stand ups

— Tim Mazzei informed
of the above.

Leave Scene @ 1430 w/ McElrone
Month to supervise Scene.

1505 at HQ.

SCDA002715

1930 leave HQ w/ D/nt
McElhone, Return to Scene

2000 Search warrant signed
per McCready.

2005 - @ Scene

Scene Secured @ 2225
Doors locked — windows locked
6th put to provide security

SCDA002716

PLAINTIFF'S
EXHIBIT
3
DF 10/2/13



















































12



13





15



16





18



19



20



21

| 46" 042 | 6 | 3310 | 602 | 39-150 | | **SUPPLEMENTARY REPORT** |
|---|---|---|---|---|---|---|
| 9/14/88 | | 9/7/88 - Approx. 0535 | | | | FCGS-1088c |

| MURDER, Second Degree 125.25-1 P.L. | 33 Seaside Drive, Belle Terre, NY |
| ATT. MURDER 2nd Deg. 110+125.25-1 P.L. | |
| TANKLEFF, ARLENE A. (Deceased) | Same as above |
| TANKLEFF, SEYMOUR M. (Victim) | |

At approximately 0720 hours, September 7, 1988, this writer was notified by D/SGT. ROBERT DOYLE #463, of this Command, that a homicide had occurred at 33 Seaside Drive, Belle Terre. At SGT. DOYLE'S direction, I responded to the incident location, arriving at approximately 0739 hours. At this time I met with POLICE OFFICER DANIEL GALLAGHER, Shield #3610, Command 610, Squad 8, POLICE OFFICER EDWARD AKI, Shield #3705, Command 610, Squad 8, POLICE OFFICER JAMES CRAYNE, Shield #3723, Command 610, Squad 8, and SGT. JOHN LEAHY, Shield #599, Command 610, Squad 8. At this time, I was informed by SGT. LEAHY that a female victim, now known as ARLENE A. TANKLEFF, dob 10/1/34, of the above address, was D.O.A. in the west side master bedroom. SGT. LEAHY further advised that a male victim, now known as SEYMOUR M. TANKLEFF, dob 6/17/26, of the above address, had been transported to Mather Memorial Hospital via Port Jefferson Rescue Squad at approximately 0643 hours.

In addition to the above information, POLICE OFFICER GALLAGHER related that as his unit and Unit 602 foot pulled into the driveway, a subject known to him as MARTY TANKLEFF approached and stated, "Somebody murdered my parents". MARTIN TANKLEFF than led the two Police Officers GALLAGHER, and CRAYNE, into the house through the front door. Once inside the house, MARTY TANKLEFF stated to POLICE OFFICER CRAYNE, "Follow me", and led POLICE OFFICER CRAYNE to the room on the east side of the house where his father was lying on the floor, breathing and unresponsive. A few minutes later, POLICE OFFICER GALLAGHER entered the room where SEYMOUR TANKLEFF was laying and related to CRAYNE that he, GALLAGHER, had an apparent D.O.A. in the other room.

After interviewing POLICE OFFICERS CRAYNE, and GALLAGHER, I interviewed POLICE OFFICER EDWARD AKI. AKI related that at approximately 0617 hours, he overheard the call assigned to Unit 602. Being in the area, he responded and arrived with Rescue at approximately 0625 hours. Upon his arrival, he was met in the driveway by MARTIN TANKLEFF, who was waving and pointing him in the direction of the house. He observed TANKLEFF was wearing shorts, a zip-up sweatshirt, and no shoes. TANKLEFF accompanied him and Rescue personnel to the east side front door. TANKLEFF opened the door with a tissue he had in his left hand. At this time, POLICE OFFICER AKI noticed that TANKLEFF had blood on his left forearm, and both hands. At approximately 0635 hours, he met RONALD ROTHER who had just arrived at the house. As he arrived, POLICE OFFICER AKI heard the telephone ringing

| FOUNDED | CASE STATUS | WHEN APPLICABLE CHECK AND ENTER ON REVERSE |
|---|---|---|
| [X]YES [ ]NO | | |

NOTE: ...

Det. K. James McCready 563          D/Sgt. Robert P. Doyle #463          BC



PLAINTIFF'S
EXHIBIT
6
DF 10/2/13

SCDA007934

Case 2:09-cv-01207-JS-AYS   Document 184-56   Filed 08/17/16   Page 70 of 112 PageID #: 5586

and allowed MARTIN TANKLEFF to answer the phone. When TANKLEFF answered the phone, he did so by picking up the receiver with a tissue. Upon completion of the phone call, POLICE OFFICER AKI, directed TANKLEFF and ROTHER to the street, at which time he began securing the scene. It was ascertained from RONALD ROTHER that TANKLEFF had phoned his house at 21 Ficus Street, Port Jefferson, earlier. POLICE OFFICER AKI had asked TANKLEFF to have a seat in the patrol car to await the arrival of the Detectives. Just before leaving the house, and while outside, TANKLEFF repeatedly stated that a JERRY STEUERMAN did this. At approximately 0640 hours, while AKI was setting up the crime scene tape, he turned around and observed TANKLEFF standing in a puddle in the front of his patrol car. TANKLEFF was washing his hands in the puddle. Immediately following this TANKLEFF had a seat in the Belle Terre Constable's car, who had now arrived on the scene.

After speaking with the above officers, I entered the crime scene via the west side front door. Upon entering, it should be noted that I placed the outer storm door in the open position so as not to have anyone touch the door unnecessarily. After entering, I responded to the east side of the house office area. Upon entering the office area, I made notes as to blood spatterings that I observed in and about the room. After viewing this room, I worked my way down through the kitchen to the west end of the house to the master bedroom, where the female victim was laying. Upon entering the master bedroom, I made notes of blood spatterings and the position of her body within the room. Upon exiting the room, I observed the linen closet to the west of the master bedroom with the door open and the light on. I then looked into the now known bedroom of MARTIN TANKLEFF and observed that his light switch was in an on position, and there was blood on the north wall at the light switch and sheetrock. I then exited his room, checked a bedroom next to his room, and worked my way back to the east side of the house to the gym/office area. I then exited the house through the east side front door.

Upon exiting the scene, I observed MARTY TANKLEFF sitting on a railroad tie wall on the east side of his driveway. I then introduced myself to him and asked him to accompany me to my Police vehicle. We then walked over to the Police vehicle. As I was doing this, I met with CHIEF DONALD HINES, Chief Constable of the Belle Terre Constables. CHIEF HINES related that he had been at home and heard the call at 33 Seaside Drive. He said he responded and arrived at approximately 6:40 in the morning. Upon his arrival at the scene, he observed MARTY TANKLEFF standing in a puddle, bending over and washing his hands. Following this, TANKLEFF had a seat in the Belle Terre Police vehicle. TANKLEFF blamed JERRY STEUERMAN as being the murderer. TANKLEFF said that some two weeks earlier his mother had told him that JERRY STEUERMAN was going to do something like this. TANKLEFF told CHIEF HINES that his father, SEYMOUR, was present when his mother made this statement. TANKLEFF further stated that JERRY STEUERMAN was the last one to leave the card game the night before. CHIEF HINES related that TANKLEFF kept saying his parents had been murdered. When told by CHIEF HINES that his father was still alive, TANKLEFF appeared

| REPORTING OFFICER | SUPERVISOR | DATE |
|---|---|---|
| Det. K. James McCready #563 | D/Sgt. Robert P. Doyle #463 | BC |

SCDA007935

| | | | | | CONTINUATION REPORT |
|---|---|---|---|---|---|
| PAGE NO.   3 | OF   14 | PAGES | | | PDCS - 1083a |

DISTRIBUTION: Same as Initial Report

to be shocked at this news. At the suggestion of CHIEF HINES, I requested
that he go down and check the beach area below the TANKLEFF house. I then
got in my unmarked unit with MARTY TANKLEFF, and had a conversation with
him about what had transpired up until this point.

      I asked him for his name, date of birth, address and telephone
number. He stated that he got home at approximately 9:10 p.m. He gave me
the names of the male known card players who were present that night, who
are the subject of another report, dated September 8, 1988, by DET. ROBERT
ANDERSON #672, of the Homicide Squad. TANKLEFF then proceeded to tell me
that JERRY STEUERMAN, his father's business partner, was responsible for
the murder of his parents. He said that they had been fighting for approxi-
mately ten weeks, and that a girl named JULIE at the South Setauke ba__l
store knew all about the fighting. JULIE has been identified as JULIE
MUTSCHLER, dob 8/31/45, of 3 Erie Street, Port Jefferson, telephone number
331-3784 (See report of DET. NORMAN REIN #403, this Command, for interview
of JULIE MUTSCHLER). He said the store was located on Route 347, by
Cheap John's and that the argument was over a chattel on equipment in the
store. After hearing this I asked him to start again and tell me what
happened when he got home. He said that his mother was in the den when
he came into the house. He talked to his mother, and sat down with his
mother and he ate. He said that he had a champagne turkey which is a
chicken and pasta dish that his father made. He said that at approxi-
mately 10:15 p.m., he went to his bedroom to put clothes away that he had
bought over in the Mall where he had been earlier in the evening. He then
gave me the names of people who went to the Mall with him. He identified
ZACHARY SWIMOSEY, of 66 Chestnut Street in Mount Sinai, telephone number
928-6442. He had gone to Pants Plus and Radio Shack with ZACK and ZACK'S
girlfriend, MARGARET, identified as MARGARET BARRY. He said that he
dropped ZACK off at approximately 8:50 p.m., and he dropped MARGARET off
at approximately 9:05 p.m. He arrived home at about 9:10 - 9:20, entered
the card room and asked CAPPY for his car keys so he could move CAPPY'S
car. He said that when he got outside to move CAPPY'S car, he learned
that it wasn't CAPPY'S car. He then moved the vehicle and put his car in
the garage. He returned to the card game, gave CAPPY his keys back, but
never told anyone that it really wasn't CAPPY'S car that he had to move.
At approximately 11 p.m., he went in and took a shower, came out at
approximately 11:15, told his mother goodnight and went to bed. He said
that he woke up at 5:35 a.m., and laid in bed until about 6:10 a.m.  He
said that when he got up at 6:10 a.m., he observed all the lights on
except in his mother's bedroom. He said her drapes were drawn and that it
was dark in the bedroom. He said he noticed that the burglar alarm was
not on and he was curious about all the lights being on. He started to
walk towards the gym/office area and he observed that the front door was
open; that the lights were on in the gym/office area, and upon entering,
he saw his father covered with blood and gagging. He said that he immedi-
ately called 911 from the phone in the office. He was instructed by the
911 operator to get a clean towel, apply pressure to the wound area, to
lay his father down and elevate his feet. He said that he went to the
linen closet by his bedroom, got a clean towel, got a pillow from his bedroom

| REPORTING OFFICER | SUPERVISOR | | DATE |
|---|---|---|---|
| Det. K. James McCready #563 | D/Sgt. Robert P. Doyle #63 | | BC |

SCDA007936

| DD 401042 | 9/14/88 | 3310 | | CONTINUATION REPORT |
| PAGE NO.   4   OF   14   PAGES | | | | PDCS - 1083a |

DISTRIBUTION: Same as Initial Report

and returned to his father. I asked him if he touched anything other than the phone prior to getting the towel from the linen closet, and the pillow from his bedroom. He said no, he got the towel and pillow and then moved his father from the chair, putting him on the floor. He said after doing this, he then went to look for his mother. He said he first went to the garage because he had not seen his mother when he first woke up, nor when he went to get the towel or the pillow. He had assumed that his mother had gone out for milk. He said that when he went to the garage, he opened the garage door and saw that his mother's car was, in fact, in the garage. He said that he then went back to his mother's bedroom and saw her laying on the floor.

I asked him why he didn't call the Police again after he discovered his mother. He said that the Police were already on their way so he felt there was no need to call again. I asked him if he entered his mother's bedroom. He said yes, but he only had gone in as far as the alarm wall when he first got up in the morning. He didn't see her or anyone in the room and just noticed that the alarm lights were on, meaning that the alarm was not set. He then exited the room and went to the gym/office area where his father was. I asked him what he did next after finding his mother, and he said that he called his sister at 331-2035. She resides at 21 Fice Street, Port Jefferson Station, off Canal Road. His sister has been identified as SHARI ROTHER. He said that he told his sister that he thought MOM and DAD had been murdered. He remembered also that he was to pick up MARK PERRONE for school. He said he then telephoned MARK PERRONE within ten to fifteen minutes of finding his parents. He said he spoke with MARK'S mother and told her the same thing that he told his sister about his parents being murdered. He said that MARK called back a short while later. When MARK called back he told MARK to tell no one except MR. NOONAN, the Principal of Port Jefferson High School, about what happened.

Having been made aware of the fact that TANKLEFF had washed his hands in a puddle, I made a careful examination of TANKLEFF while he was seated in my car. I observed a spot of blood on his right calf muscle and on the instep of his right foot. I asked the defendant how much blood he had on his hands after administering fist aid to his father. He said that his hands were covered with blood, but that he had washed them in the puddle behind the Police car. Upon completion of this interview, I asked TANKLEFF to remain in the Police car and I went back into the crime scene. I went to the office where SEYMOUR TANKLEFF had been and checked the telephone. I observed that there were blood spatterings on the telephone, however, they had not been smeared, and there were no apparent blood prints left by TANKLEFF when he used the telephone. I then went to the garage door and observed that there was no blood on the door handle to the garage, and further observed a key in the dead bolt of the garage door. After carefully examining the handle and the dead bolt, I found the garage door to be in a locked position. In addition, I made note of the fact that there were two bathrooms that TANKLEFF had to go past that had towels in them before going to the linen closet at the other end of the house. Furthermore, I checked the two telephones in the kitchen area and observed that neither had blood

| REPORTING OFFICER | SUPERVISOR | DATE |
| Det. K. James McCready #563 | D/Sgt. Robert P. Doyle #453 | BC |

Case 2:09-cv-01207-JS-AYS Document 184-56 Filed 08/17/16 Page 73 of 112 PageID #: 5589



**CONTINUATION REPORT**
PDCS - 1083a

DISTRIBUTION: Same as Initial Report

or blood prints on them. After checking these telephones I responded to the master bedroom again and observed that the drapes to the master bedroom were in an open position, approximately three feet wide; that the TV was on in the bedroom, and that the mother would have had to have been seen by someone standing in the doorway or at least at the alarm wall, had they entered the bedroom. Furthermore, after re-checking the scene, and in the presence of D/SGT. DOYLE, TANKLEFF stated that he was able to observe the fact that his mother's throat had been cut. It should be noted that a person had to enter the room completely and stand over her body in order to observe the fact that her throat had been cut. After re-checking the master bedroom, I checked the linen closet and a towel or something did, in fact, appear to have been removed from the closet shelf. After checking the linen closet, I checked the bedroom of MARTY TANKLEFF, and observed that the blood on the light switch plate cover and sheetrock wall appeared to have been put there when someone turned the light on. Of special note was the fact that MARTIN TANKLEFF had told me that when he got up in the morning, he turned his bedroom light on, got dressed in the shorts and sweatshirt, and then discovered his father's body. After making these observations I returned to the Police vehicle and MARTIN TANKLEFF outside.

As I approached the vehicle, MARTIN TANKLEFF exited, and SGT. DOYLE walked up at about the same time. Inasmuch as SGT. DOYLE was now present, I asked MARTY TANKLEFF to repeat what he had been telling me. During the course of him repeating the story, he was at a point where he was telling us that his UNCLE MIKE, one MYRON FOX, knew all about the business dealings between JERRY STEUERMAN and his father. As he was talking he said, "There's UNCLE MIKE now" and pointed to a man walking up the street towards the Police vehicle. I walked over to MYRON FOX. I introduced myself to MYRON FOX. He introduced himself, stating that he was SEYMOUR'S business attorney for thirty years. I told him that I knew that, MARTY had told me. He then asked, "How's it going?" I told him that MARTY was telling us all he knows. At that point, TANKLEFF waved and said, "Hi, UNCLE MIKE". FOX then said, "MARTY, are you okay?" MARTIN TANKLEFF then said, "Yeah, I'm okay". He then asked what I was going to do with MARTY, and I asked him, "What do you want me to do?" He then told me that his sister and brother-in-law were at the hospital. I told him that we knew and he asked if I would bring him there when I was finished. I told him, "Sure, when we're done". He said, "Okay, if you need me, I'll be at this number all day", and he handed me a business card with his phone number on it. I asked, "You'll be at this number". He said "Yes". I said, "Thank you very much", and he walked away.

After this conversation, I met with DET. CHARLES KOSCIUK #527, of the Criminalistics Laboratory, and explained to him that someone would be with him shortly to explain exactly what we had.

I then returned to my Police vehicle where TANKLEFF was speaking with SGT. DOYLE, and DET. REIN, who had arrived on the scene a few minutes earlier. TANKLEFF continued to repeat the story for SGT. DOYLE, and DET. REIN.

| REPORTING OFFICER | SUPERVISOR | DATE |
|---|---|---|
| Det. K. James McCready #563 | D.Sgt. Robert P. Doyle #463 | BC |

SCDA007938

Case 2:09-cv-01207-JS-AYS   Document 184-56   Filed 08/17/16   Page 74 of 112 PageID #: 5590

| PAGE NO. 6 | OF | 14 | PAGES | | CONTINUATION REPORT |
| --- | --- | --- | --- | --- | --- |
| | | | | | PDCS - 1083e |

DISTRIBUTION: Same as Initial Report

At about 0835 hours, this writer and DET. REIN, had a conversation with SGT. DOYLE, and as a result of the conversation, I asked MARTY TANKLEFF if he would accompany us out to Police Headquarters so that we could interview him further. He agreed, and we left the scene at approximately 0840 hours, for Headquarters. While en route, I received a radio transmission to make a 10-13 to Mather Hospital. I stopped at a pay phone, made the phone call and spoke with DET. JOHN PFALZGRAF #682. Based on the information I received from DET. PFALZGRAF, I told MARTY TANKLEFF that his father was being transferred from Mather Hospital to Stony Brook Hospital. I told him I knew about his father's neck injury and asked him about his father's head injuries. He said, "Yeah, it looked like someone had taken the handle of the knife and hit the back of his head." I asked, "How do you mean?" and he demonstrated using his right hand. At this point in time, TANKLEFF asked me if it would be possible to have an autopsy done on his mother. I asked him why he wanted an autopsy, and he said, "So that the time of death could be established". While en route to the Homicide Squad Office, I asked TANKLEFF to tell me more about his father's business involvements with JERRY STEUERMAN. We arrived at the Homicide Squad Office at 0920 hours. I brought TANKLEFF upstairs into the Homicide Squad Office and had him seated in the interview room. While awaiting the arrival of DET. REIN, I gave TANKLEFF a cup of coffee. DET. REIN arrived at the Homicide Squad Office at approximately 0940 hours. Immediately following this, we began to interview MARTIN TANKLEFF.

The interview of MARTIN TANKLEFF began with small talk between MARTIN, myself, and DET. REIN. He explained to us that he had surgery two weeks ago in Hempstead, performed by a DR. STUART ARNOLD, Rockville Centre. He said that he normally wears contacts, but since the plastic surgery he has had to wear glasses. We talked to him about different girls that he knew. He said that he was friendly with a CHRISTINE ENGLE, who was his favorite; that he threw a party for her this summer. He said that two girls that he knew from Ward Melville High School were also friends of his, namely, STACEY, and AUDRA. He said that on Tuesday, September 6, he had called them at about 10:30 p.m, from his home, but their phone was busy. He said that another friend of his is DARA SCHAEFFER. He also said he never had very much luck with girls. He said that he loved to cook and he would sometimes cook for the poker players.

I asked him about what kind of car he had. He said that he had a Lincoln Town Car, dark blue. He said that after parking his car he went into the house and he ate, and after eating the turkey and pasta he put the plate and fork in the dishwasher, and the glass in the sink. He said that he took a shower before going to bed and wrapped a towel around his waist, and put another towel on his bed pillow so it wouldn't get wet. He was asked if he took a shower both at night and in the morning. He said that he did. I then told him that I know in some families everybody has their own towels. He said, yes, he did; his were red in color. He was asked how he was dressed when he went to bed and he stated that he sleeps either naked or with shorts. He interjected that he was adopted at the age of two days and expressed some concern about his niece and nephew,

| REPORTING OFFICER | SUPERVISOR | DATE |
| --- | --- | --- |
| Det. K. James McCready #563 | D/Sgt. Robert P. Doyle #463 | BC |

SCDA007939

explaining that his niece was the apple of his father's eye. He discussed his mother and father's love affair before their marriage, explaining that his mother was his father's secretary at one time. He talked about his stepsister, SHARI, and how he enjoyed a good relationship with her. He also talked about an aunt from Nassau County, and about some vacations that his parents took him on. He told us how he was recently in Europe with his parents, his cousins, and a friend. He told us about how his parents recently purchased a condo in Florida. That his father was going to stay all winter, and his mother would commute. We then got into a short discussion about money and the security of his house. He told us that there was a safe in the linen closet, and that his parents always locked the bedroom sliders and screens. I told him that I would be a little paranoid about living in that neighborhood, if everybody was so concerned about security, and he said that it was funny I said that because the family had been undergoing psychiatric counseling with a psychiatrist who was a woman; her first name was ROZ, from Rockville Centre. He then talked about the fact that he was now an orphan. He would either stay with SHARI or his aunt.

We asked him about his relationship with his mother. He said that he had a very loving relationship with his mother. That they spent much time together taking walks, having long discussions, and cooking together. He had told me earlier that his father had made the champagne/turkey and pasta, and said that his mother ate turkey and pasta probably around 7 or 7:30 p.m., before the card players started to arrive. He had told us earlier what time his mother had gone to bed and I asked him how his mother slept. He said that she would either sleep naked, or with a gown. He told us that she would sleep on the side of the bed closest to the sliding doors. He said the last time he saw her was the night before the murder. He went into her bedroom after she showered.

We then got into a discussion about his father. He said that he and his father were Jewish, that his mother was Christian. He said he could always talk with his father anytime, anywhere, about anything, whether it was sex, business, family, anything that he wanted to talk to him about. He said he always admired a gold bracelet that his father wore on his right wrist. We asked about his father's health. He said that two or three years ago, his father had open heart surgery. He said that he spent a lot of time with his father in the hospital. He said that he was repulsed by blood, and that he had observed an open incision on his father's leg when he was in the hospital and that he has never forgotten that, and gets sick even to this day at the sight of blood. He was asked if his parents slept in separate bedrooms. He said no, his father slept on the side of the bed nearest to the door, but it was not unusual for his father to stay in his office after the poker game, and stay up all night and watch the sun rise.

We asked him if he had a maid, and he said yes, that her name was MARIA, and that she was Portuguese. We asked what days she came in. He said Tuesdays, and Fridays.

| REPORTING OFFICER | SUPERVISOR | DATE |
|---|---|---|
| Det. K. James McCready #563 | D/Sgt. Robert P. Doyle #463 | BC |

SCDA007940

| PAGE NO. | 8 | OF | 14 | PAGES | | CONTINUATION REPORT |
| --- | --- | --- | --- | --- | --- | --- |
| | | | | | | PDCS - 10B3a |

DISTRIBUTION: Same as Initial Report

I told him that I saw that the phones in the house had two lines to them. He said yes, that there were two telephone lines in the house. He was asked about the New York Times on the driveway. He didn't know anything about it, except the New York Times was delivered to the house and left on the driveway.

We then asked him about his regular routine if there was a card game at his house. He said that when the poker game was at his house, he would come into the office where the game was being played. He would go and kiss his father both when he came to the card game and when he left. He would usually stay about a half an hour or so and watch the players. He asked his father if he could play one time, but was not permitted to play. When the poker game was at their home, he said he slept lightly. I asked him about the amount of money involved, and he said that you could win or lose thousands of dollars in each weekly game. He volunteered that his father kept his poker money, usually no more than a thousand dollars, in a hidden drawer in his bedroom bureau. I asked him to review the names of the poker players at the poker game with us, and asked him if they were aware of the problem between STEUERMAN and his father. He said that his father and JERRY STEUERMAN put on a big act at the poker games. They pretended to be good friends and business associates, but, in fact, they hated each other.

He was asked about JERRY STEUERMAN and said that STEUERMAN lives with his daughter, BARI STEUERMAN CROWE, and STEUERMAN'S grandchild. I asked him what kind of car STEUERMAN had, and he said a 1987 Lincoln, dark blue.

We had a discussion about money. He said that he knew that his father and mother were extremely wealthy. He said that his father's business relationships were very good, and that his father involved him in all facets of his business dealings; that he was grooming him, MARTY, for the business world. He said he was aware of the contents of his parents' will, and knew that he would be the primary beneficiary when they both died. He said that he would get the house and all the business interests, and his sister would only get a small amount. When asked why his sister would only get a small amount, he said because his mother wanted it that way. When asked if there was a large amount of insurance. He said, yes, his father was a retired insurance broker. In addition, his father had numerous other business and investment interests. He was asked to tell us about some of these, and he said that his father was a partner with DAN HAYES in the Fundamental Health and Fitness Center. His father, MIKE FOX, and JOE (unknown last name) were partners in Pulse Signal Company. His father and RON ROTHER were partners in a Sun Tanning Firm, dealing with sun tanning machines. His father was going to buy a marina for MARTY'S cousin, and if he wasn't college material, he would become part of the marina business.

His father and JERRY STEUERMAN were partners in horses. His father and mother each had twenty-five percent, and JERRY STEUERMAN had fifty

| REPORTING OFFICER | | SUPERVISOR | DATE | |
| --- | --- | --- | --- | --- |
| Det. K. James McCready #563 | | D/Sgt. Robert P. Doyle #463 | | BC |

SCDA007941

**CONTINUATION REPORT**

PDCS - 1083a

DISTRIBUTION: Same as Initial Report

percent.  His father was a business partner in bagel stores with JERRY
STEUERMAN.  JERRY STEUERMAN and his father had an ongoing dispute about
JERRY buying into the business.  When asked about JERRY buying into the
business, he said that his father put up the initial money, and JERRY
STEUERMAN was paying off the loan.  I asked him what would happen if JERRY
was out of the picture.  He said with his parents both dead, he would own
it all.

At this point, I asked him about an earlier comment he had made to
DET. REIN, that he woke up in the middle of the night and saw that the
driveway lights were on.  He commented that they were bright, and that they
were powered by 60 watt bulbs.  I then asked him if after finding his
father, how come he didn't search further for his mother once he realized
that her car was there.  He said that he was always instructed that when
there was a serious problem, he was to first call 911, and then notify
family members.  I told him that I didn't think that he was very upset
about the death of his parents, and he said that he was all cried out by
the time the Police arrived at his house.

I then asked MARTY to demonstrate to us how he administered first
aid to his father.  DET. REIN then sat in the chair and we asked MARTY to
show us exactly how he moved his father.  He placed his right arm around
DET. REIN'S shoulder and his left arm on DET. REIN'S left arm.  He moved
DET. REIN slightly forward.  He then asked DET. REIN to turn his chair to
the side.  DET. REIN asked, "turning the chair like this".  He then
grabbed DET. REIN by the waist and then pulled at DET. REIN'S legs, stating
that he had to slide him down the chair and on to the floor.  He was asked
if the sweatshirt he was wearing was one of the new sweatshirts he had
bought the night before.  He said no, his sweatshirts were organized in
his closet.

It was at this point that we then questioned him again with regard
to when he took a shower.  He said he showered in his bathroom before going
to bed, and never used the shower or tub again.  I asked him about the
light switch in his bedroom.  He said he turned on the light switch in his
bedroom when he woke up.  I told him that his mother's bedroom was not dark
as he had indicated earlier.  He said his mother's room was totally dark
when he woke up and he did not see his parents in bed.  He said he did not
see anyone in the room.  I told him that I knew no one would have touched
the drapes or the television in his mother's bedroom, and that the drapes
were open and his mother's TV was on.  He had told us earlier that he was
scared that someone might be in the room.  I then asked him if he looked
for somebody in the room, and that if he looked he would have been able to
see something.  He then said it was light enough in the bedroom that if
someone was there he would have seen them.  I asked him after he did see
his mother, did he ever go in and touch his mother.  He said he never
touched his mother.  I asked him what he put on after he woke up.  He said
he put on a towel after he woke up.  I asked him when he got dressed.  He
said he got dressed at 6:10 a.m., when he woke up.  I then told him that
he told me he woke up at 5:35.  He then said he got dressed in shorts after

| REPORTING OFFICER | SUPERVISOR | DATE |
|---|---|---|
| Det. K. James McCready #563 | D/Sgt. Robert P. Doyle #463 | BC |

SCDA007942

**CONTINUATION REPORT**

PDCS - 1083a

PAGE-NO. 10 OF 14 PAGES

DISTRIBUTION: Same as Initial Report

he woke up. I asked what else he put on when he woke up. He said he put
on a sweatshirt when he woke up. I then asked him, when he administered
first aid to his father, how he didn't manage to get blood on the sleeves
of the sweatshirt. He said he rolled up the sleeves of the sweatshirt
when he administered first aid to his father. During the demonstration on
DET. REIN, I observed blood on his right shoulder. He was asked, if that
were the case then how come he's got blood on his right shoulder now. He
looked surprised and shocked, and quickly lowered the sweatshirt off his
shoulders saying, he lowered it when he administered first aid to his
father. I asked him if he was sure because what he had just demonstrated
to us was ridiculous. He then said he put on the sweatshirt after adminis-
tering to his father. I asked him if he put it on before or after the
Police arrived. He said he put on the sweatshirt after the Police arrived.
I asked him where he got the pillow from, and he said he got the pillow
from his bedroom. I asked if he had blood on his hands. He said no, he
did not have blood on his hands when he got the pillow and towel. I asked
him if he was sure about being dressed, and told him that maybe that was
why there was no blood on his clothing; that maybe he was wearing a towel.
He was nodding in agreement. I then asked him if that were the case why
didn't he put the towel he was wearing on his father's neck. He said he
didn't put the towel he was wearing on his father's neck because he was
instructed by the 911 operator to use a clean towel. I told him that
that was very good, but he didn't do the most important thing the 911
operator told him. I asked him if he applied pressure to the wound, and
he said he did't apply pressure to the wound. He had said earlier that he
went immediately to the garage to check for his mother. He was asked if
he had blood on his hands when he checked the garage for his mother's car.
He said he had. He was asked when he went to the kitchen and used the
phone to call his sister and MARK PERRONE if he had blood on his hands. He
said he had blood on his hands when he did this. I asked him if he called
911 again to report his mother's death. He said he didn't phone 911 again.
He was asked where he went after the Poli·  ·rived. He said he only went
into the kitchen and hallway after the Police arrived.

     At this point in time I stepped out of the room for a moment and
caused one of the other extensions in the office to ring. I then answered
the telephone in a loud clear voice. I then re-entered the room and told
MARTY that his father had come out of his comatose state due to the fact
that he was given adrenaline, and that once out of his comatose state, he
said that he, MARTY, had beaten and stabbed him. MARTY said if his father
said he beat and stabbed him, he said it was because he was the last person
his father saw. He said he would take a lie detector test. We then asked
him what should we do to the person who did this to his parents. He said
whoever did this needs psychiatric help. We then asked him if he thought
he needed psychiatric help. He then asked if he could have blacked out and
done it. We asked him if he thought that's what had happened. He said
that maybe that wasn't him, but another MARTY TANKLEFF that killed them.
We asked him what he meant. He said, could he have been possessed. We
told him we didn't know and asked him what he thought. He said it was
starting to come to him.

REPORTING OFFICER

Det. K. James McCready #563

SUPERVISOR

D/Sgt. Robert P. Doyle #463

DATE

BC

SCDA007943

Case 2:09-cv-01207-JS-AYS   Document 184-56   Filed 08/17/16   Page 79 of 112 PageID #: 5595

DISTRIBUTION: Same as initial Report

I asked him if he knew that he was in Police Headquarters; that he was talking to two Homicide Detectives. He nodded, indicating yes. I then advised him of his Constitutional Rights, which he indicated that he understood and waived. He was then asked to tell us what happened.

MARTY said he needed psychiatric help. He knew what happened, but felt like it was another person who was inside of him who did it. He then told us how his mother, father, and he once had a loving relationship, but he got caught up in their fighting. He said it changed everything in his life, and that he hasn't been able to be himself. I asked him just to tell us what happened, and he said he would tell, and asked what we wanted to know. I asked him if he murdered his mother, and hurt his father. He said "Yeah, I did it". I asked him "Why?". He said he wanted to go away to college, but his mother wanted him near home where she could keep him under her thumb. He wanted to attend a junior college in Florida for two years, live in their condo, and then attend the University of Pennsylvania. His mother said no. We asked him why she said no, what seemed to be the problem. He said his grades in school were C's, and then he quickly changed it to B's, but she still would not let him go away to school. I then asked if that was why he killed her.

He then explained, his mother and father had separated about five years ago. He said since that time they had not been getting along very well. He was confused about the future because of the fact he was adopted and his parents might break up. I told him that earlier he had said that they had a good relationship. He said he had lied earlier about their relationship; that there were daily arguments and fighting between his parents. He said that in the past, his mother would tend to side with him more often than his father over rules, jobs, and punishments, but lately his mother was siding with his father against him. They were angry because he hadn't done the list of jobs on the refrigerator. The last straw was the card table business. Due to his parents arguing, they were looking to him for more attention, and they were smothering him. He said this relationship was a nightmare to him.

We asked him what else was bothering him. He said he resented that he had to ride around in a crummy old Lincoln. He wanted something more sporty. He said his parents felt the Lincoln was safer. He also resented that DAN HAYES, his father's partner in the Health & Fitness Center was going to move into their house to babysit when his parents were away on vacation.

He discussed with us that he was never allowed to play any contact sports. He was restricted this summer in his use of the family boat and all-terrain vehicles.

We then asked him what time he did this. He said he set his alarm clock for 5:35. When it went off, he woke up. I asked him what he was wearing. He said he was naked because he didn't want to leave any blood on his clothing. I asked him who he killed first. He said he killed his

| REPORTING OFFICER | SUPERVISOR | DATE |
|---|---|---|
| Det. K. James McCready #563 | D/Sgt. Robert P. Doyle #463 | BC |

SCDA007944

MOM first. I asked him where his father was. He said he saw that his father was in his office sleeping in his chair. Initially, he was sur- prised that he wasn't in bed with his mother, and that the lights were on. I asked him what he did to his mother. He said he hit his mother with a dumbbell, then he cut her throat. I asked him how his mother was laying in bed. He said she was in bed on her back. He was asked how many times he stabbed her. He said he didn't know how many times he stabbed her. He volunteered that he got to her quickkly. I asked him how many times he hit her. He said he hit her at least four to five times on the head. He wasn't sure. He kept on trying to hit her. She fought with him. He said she was in pain, calling for help, saying "Why?" and "Help me". He said he was afraid his father would wake up, and that after she fell on the floor, he ran and got a knife from the kitchen and cut her throat. I asked him where the knife was. He said the knife was on the counter next to the watermelon. I asked him if she was dead when he left the room. He said, no, she was moving a little bit when he ran out of the bedroom to kill his father.

I asked him if his father was still in the office. He said yes, his father was still in the office. He said he was sitting at his desk. He said his father was awake now and asked, "what are you doing?" I asked him if he went in there naked. He said he was still naked. I asked him what he did with the knife, and the dumbbell. He said he walked in with the knife and dumbbell behind his back. I asked him what he did first, cut his throat, or hit him. He said he got behind his father and hit him with the barbell first. I asked him if his father fought him like his mother did. He said his father asked him why he was doing this. He volunteered that he "knocked him silly". I asked him how he kept his father from getting out of the chair. He said his father's feet were under the desk so he couldn't get up. I asked him what he did next and he said he slashed his father's neck. I asked him if he knew how many times he hit, or cut his father. He said he didn't know how many times he hit or cut him. Again, he volunteered that he couldn't believe all the blood. I asked him what he did with the knife and the barbell. He said he washed off the knife and the barbell in the shower. I asked him what he did with the barbell and the knife after he washed them off. He said he put the barbell back in his bedroom, and he put the knife on the counter by the watermelon. I then asked him what he did next. He said tht he went in and laid down on his bed. He said he thought about what to do next, and got up again at 6:10 a.m. I asked him what happened when he got up. He said he went back to the office, and saw that his father was still alive. He then went into his mother's room to see if she was dead. He said he called 911 from his mother's room. I then asked him why he would call the Police knowing that his father was still alive. He said he thought his father would die before they got there.

There was a short discussion about what he did to cover up, or attempt to cover up what he had done. During the course of that conver- sation, he said that he got a towel from the linen closet, and a pillow from his room, and pretended to follow the 911 operator's instructions,

| REPORTING OFFICER | SUPERVISOR | DATE |
|---|---|---|
| Det. K. James McCready #563 | D/Sgt. Robert P. Doyle #463 | BC |

SCDA007945



PAGE NO.  13  OF  14  PAGES

DISTRIBUTION: Same as Initial Report

but really didn't apply pressure. He said he made sure that he got his father's blood on his hands to show that he tried to help his father. We questioned him about the blood on his shoulder, and he said he missed the blood on his shoulder when he showered. He said he screwed up.

At this point in time I asked him if he would be willing to give us a written statement as to what he had just told us. I informed him that after the written statement, if he agreed, we would like to take a videotaped statement also. He said that he would give us both.

At about 1230 hours, I contacted the Identification Section and requested that a technician come over and take photographs of MARTIN TANKLEFF and the blood on his shoulder. While awaiting the arrival of the Identification technician, I began the written statement with the pedigree portion, and wrote out each one of the rights and waivers. At about 1252 hours, Evidence Technician KAREN KEALEY came into the Homicide Squad for the purpose of taking the photographs. Upon completion of the photographing, I began taking MARTIN TANKLEFF'S written statement. The statement was based on questions by us, and his responses to those questions. It was put down in narrative form.

At 1322 hours, D/SGT. GEORGE HORVATH #469, knocked on the door, and entered, stating that the questioning of MARTIN TANKLEFF had to end because we were put on notice by Attorney MYRON FOX.

It should be noted that in going over some of the things he told us, we requested him to make a sketch of several different things. One sketch dealt with the driveway and the moving of the cars in the driveway. This occurred at the time we were speaking to him about the various card players that were at the game. Furthermore, DET. REIN, not having been familiar with the scene, asked him to draw a sketch or a layout of the house, which he did right after the sketch of the cars and driveway. Additionally, he made a sketch of his mother, and how her body was laying in the room, indicating where he was when he looked at the injury to his mother.

At approximately 1400 hours, this writer asked TANKLEFF if he wanted some food or something to eat. He declined at that time. At about 1530 hours, I was notified that he wanted to make a telephone call, and DET. REIN placed a call to his sister's house, at 331-2035. At 1837 hours, after contacting Stony Brook University Hospital, TANKLEFF'S sister, SHARI ROTHER called and spoke to TANKLEFF. A copy of the conversation as over-heard by this writer is made part of this case folder.

At 2033 hours, after obtaining a Search Warrant from JUDGE KENT in First District Court, Forensic Scientist CHARLES WAGNER took dried blood scrapings from the right shoulder area of MARTIN TANKLEFF, saliva, hair combings, and fingernail scrapings.

At 2100 hours, Physicians Assistant JACK STURIANO took blood from TANKLEFF.

| REPORTING OFFICER | SUPERVISOR | DATE |
|---|---|---|
| Det. K. James McCready #563 | D/Sgt. Robert P. Doyle #463 | BC |

| 8v-461042 | 9/14/88 | 3310 | | **CONTINUATION REPORT** |
|---|---|---|---|---|
| PAGE NO.   14   OF   14   PAGES | | | | PDCS - 1083a |

DISTRIBUTION: Same as Initial Report

Immediately following this TANKLEFF'S clothing was taken from him. He was provided with a white jumpsuit. Three white tissues that were observed by the undersigned and DET. REIN, in the course of the interview, at approximately 0945 hours, were removed from the right front pocket of his sweatshirt. It should be noted that in between this writer returning into the scene, and D/SGT. DOYLE'S arrival at the scene, the blood that was observed on TANKLEFF'S right calf muscle was removed. While entering Police Headquarters, TANKLEFF was observed dragging his right foot through wet grass. These items will be forwarded to the Lab for analysis.

At 2215 hours, the defendant was turned over to the Sixth Precinct for lodging purposes.

Based on the aforementioned, the status of this case shall be carried as Cleared by Arrest.

| REPORTING OFFICER | SUPERVISOR | DATE |
|---|---|---|
| Det. K. James McCready #563 | D/Sgt. Robert P. Doyle #463 | BC |



PLAINTIFF'S EXHIBIT


## STATE OF NEW YORK
## COMMISSION OF INVESTIGATION



# MEMORANDUM    July 21, 2008

To :        **Anthony Hellmer, Chief Investigator**

From :      **Kenneth F. Christophersen, Special Agent**

File Number :

Subject :   **C – 118-06 Martin Tankleff Investigation**

**Interview of Charles Kosciuk**

On Thursday, July 17, 2008, S/A Gerald Lavin and I interviewed Suffolk County Police Department ("SCPD") retired Detective Charles Kosciuk at his home, 8 Woodcutters Path, St. James, New York, relative to the Tankleff Investigation.

### BACKGROUND

Kosciuk began his career with the SCPD in 1967. He previously served in the United States Army and because of his military experience and because the department was short on chemists, he was assigned to the SCPD Crime Laboratory (Chemistry Section) handling controlled substances. According to Kosciuk, during that period drugs were readily available and the drug problem in Suffolk County had escalated. In 1974, he was assigned to the laboratory's Firearms Section. He added that he has received extensive training and attended numerous training classes throughout his career both in firearms and crime scene investigations and although his salary was paid by the SCPD, he worked under the Medical Examiner's Office which had a separate budget.

Kosciuk stated that on September 7, 1988, he received a telephone call at his Port Jefferson home to respond directly to the Tankleff residence in Belle Terre for a homicide investigation. He said case numbers CC#88461-042 and Lab #998-57483 were assigned to this investigation. Kosciuk referred to copies of his reports that indicated that he arrived at the crime scene at 9:22 a.m., and was logged in by Police Officer Aki, shield # 3705.

Number of Copies :

Distribution :

**C-118-06 (I) Complaint of Martin Tankleff**

| | |
|---|---|
| 2-Chair/Comm. | 1-A/C Nowicki |
| 1-C/C Colligan | 1-S/A Christophersen |
| 1-C/I Hellmer | 1-S/A Sheehan |
| 1-D/C/I Lightfoot | 1-LA Rodriguez |
| 1-S/A Lavin | 1- Duplicate file |

C - 118-06 #49 (I)

1

numbered tags on everything found. Additionally, Kosciuk said that he used "Auto Sketch," a computerized drafting program, to prepare diagrams and sketches of the crime scene. The diagrams identified the items recovered and the location where they were found. Kosciuk stated that architectural plans for the Tankleff residence were found inside the home and those plans were used to make a model. Kosciuk explained that recovered items were brought to the Lab for trace evidence analysis before being returned to the Identification Unit. All items were logged, packaged and when necessary refrigerated. According to Kosciuk, Lab personnel checked every window and door including the rear sliding doors and discovered that they were locked and there and no visible breaks. He thought that the garage doors were closed and possibly power operated. Kosciuk used the front door only to enter and exit the crime scene.

Kosciuk stated that he took into consideration that Seymour's desk and chair had been moved, possibly by medical personnel, prior to his arrival at the scene. He stated that he spent a lot of time examining Seymour's office area. He observed blood spatter on the desk and on the ceiling above the desk consistent with blows originating from behind the chair area. He stated that it was obvious from the blood staining on the desk and chair that the attack occurred from behind the chair. He added that although there was blood spatter on the ceiling, it was insufficient to do a "string indicator" to determine the direction and range of the blows. He explained that when determining the number of blows administered, "you would always have to add one since the first blow would not produce any blood spatter." Additionally, if the victim was moving during the attack, then a crisscross spatter of blood might be observed on the ceiling. Kosciuk recalled finding lose hairs on top of Seymour's desk.

Kosciuk said he did not believe that a knife recovered on the kitchen table was used to cause Seymour's injuries. He said Tankleff admitted to McCready that he used the knife that was on top of a table next to the watermelon. It is Kosciuk's "gut feeling," after reviewing Seymour's x-rays, that a "utility type knife" was used to cause his wounds. He bases his opinion on the type of wounds which were long, thin, narrow slashes that he believes were likely caused by a razor-like blade. Additionally, while he was at the morgue, Kosciuk observed small marks (dots) at the start of Seymour's slash wounds that appeared to him to be indicative of marks that could have been left by the handle of a utility-type knife. He stated that he may have discussed this matter with the Medical Examiner, Dr. Dawson. Kosciuk also observed two nicks on the upper right and left side of Seymour's high back desk chair. Kosciuk further believes that the high back chair would have blocked any blood from getting onto the assailant. He also believes that Seymour was able to survive because his head dropped down, pressing against his neck which helped to close his wounds.

Kosciuk said, he recalled seeing blood stains on the east wall in the master bedroom and on the bedsheets and the pillowcases. Blood stains were also observed at the foot of Arlene and Seymour's bed and on a magazine on top of a

3

Kosciuk referred to blood found on a light switchplate located in Martin Tankleff's bedroom. He stated that this item was photographed and a nearby section of the wall was cut out for further examination. He added that Genna said that there was a pattern imprinted on the switch plate which was taken for further analysis. Kosciuk recalled seeing a dumbbell set of free weights on the floor in Tankleff's bedroom. He stated that the dumbells were separated on the floor and he could not recall if their inner collars were attached to the bars. No blood was found on these items.

Kosciuk conducted his investigation at the crime scene from September 7th through September 9th when his examination was completed. He stated that he testified for three days during the trial and accounted for every item that was taken from the crime scene.

5



PLAINTIFF'S EXHIBIT
8
DF 10/2/13





















**STATE OF NEW YORK**
**COMMISSION OF INVESTIGATION**

# MEMORANDUM

July 30, 2008

To :  Anthony Hellmer, Chief Investigator

From :  Kenneth F. Christophersen, Special Agent

File Number :

Subject :  **C – 118-06 Martin Tankleff Investigation**

**Interview of Detective Sergeant Robert Doyle**

On Tuesday, July 29, 2008, Deputy Chief Investigator Jerome Lightfoot and I interviewed Suffolk County Police Department ("SCPD") Detective Sergeant Robert Doyle relative to SCPD's investigation into the murders of Seymour and Arlene Tankleff.

### BACKGROUND

Doyle stated that he began his career with SCPD in 1977, and was assigned to uniform patrol in the fourth precinct. In 1978, he was transferred to the Highway Patrol Unit. He was subsequently promoted to sergeant while assigned to the Narcotics Bureau and later became a patrol supervisor in the sixth precinct. He also worked in the Internal Affairs Unit, Crime Control Unit, Third Squad detectives and was the Commanding Officer of the Electronic Training Unit. In 1987, he was assigned to the Homicide Squad and he is currently the Commanding Officer of the Major Case Investigation Unit.

### NOTIFICATION

According to Doyle, on September 7, 1998, he was notified at home by Homicide Squad Detective Mike Carmody, who was on standby, of a report of a homicide that occurred inside the Tankleff residence in Belle Terre, New York. Doyle explained that as the supervising homicide sergeant, he would not be notified for suicide cases, accidental deaths, etc., unless they involved someone of importance. Typically, these types of investigations were handled by the detective on standby. However, he said that he would be notified whenever a murder or

Number of Copies :

**COMPLAINTS**
1-Chair./Comm.
1-C/C Colligan
1-C/I Hellmer
1-D/C/I Lightfoot
9-Extra's

1 S/A Lawin
1 S/A Shechan
1-A/C Nowicki
1-S/A Christophersen
1-L/A Rodriguez
1-Duplicate File



C.118.06.50(I)

arson death occurred. He added that "some people are under the misimpression that the "squeal detective" was supposed to be the lead detective."[1] Doyle stated that he tried to balance the manner in which homicide cases were assigned and who would be designated the lead detective. Doyle stated that based on the upscale location of this homicide, he knew that this case would attract a lot of attention. After notifying Detective K James McCready, Doyle contacted Detective Norman Rein at his home. He stated that McCready was the first homicide detective to arrive at the scene, followed shortly thereafter by Rein and he considered both to be excellent detectives. According to Doyle, McCready saved a cop's life who was wounded during a shooting involving a bank robbery. McCready shot and killed the perpetrator during a firefight. Doyle had high praise for Detective Rein who he considered to be the best detective that he has worked with during his entire law enforcement career and he wanted Rein assigned to this investigation. Ultimately, he decided how homicide cases were assigned.

## CRIME SCENE

According to Doyle, he recalled that on the day of this investigation, the sky was clear and the weather conditions were perfect, "similar to September 11, 2001." After being notified, Doyle said that he began calling detectives and supervisors from the various units to respond to the crime scene. He stated that McCready, who personally owned a construction business in Flower Field Industrial Center in Suffolk County, would meet early each morning with his workers to discuss the day's job assignments. Consequently, McCready's close proximity enabled him to be the first detective to arrive at the scene, followed by Doyle and Detective Norman Rein. According to Doyle, upon arriving at the scene he saw McCready talking to Martin Tankleff outside the residence which he described as an extended "L shaped ranch with a million dollar view overlooking the Long Island Sound." Doyle said, at the rear of the residence was a steep cliff that descended down to the water.

Doyle said that he spoke to McCready who advised that there were two victims involved, Seymour Tankleff who had been transported to a hospital, and his wife Arlene who was found dead inside the master bedroom. Doyle said that he and McCready did a "walk through" and viewed the entire house. He stated that there was a lot of blood in the office area and on Seymour's chair. Doyle added that Detective Rein also did a complete examination of the crime scene. Doyle did not recall seeing any mud on the floor inside the house. He added that a crime scene **perimeter was established** and yellow tape was placed from the street in front of the scene to around the back of the house bordering the Long Island Sound.

Doyle stated that he had no prior knowledge or dealings with any of the Tankleffs and his first impression of Martin Tankleff was that of "a seventeen

---

[1] Squeal detective – a term commonly referred to the assigned case detective.

2

year old kid who appeared to be stoic and never shed a tear or asked about his father's condition." Doyle stated that Tankleff spoke very exactingly and "matter of fact" about his father's business partner, Jerry Steuerman, and their relationship. Tankleff accused Steuerman of committing the murders. When Doyle asked Tankleff why he did not wake-up his mother to assist his father, Tankleff replied that he thought that she went out to buy a container of milk. Doyle mused over Tankleff's reply and thought it highly unlikely, at that early morning hour, that his mother would travel to buy milk.

According to Doyle, after viewing the crime scene, it became clear to him that Martin Tankfeff's bedroom was in close proximity to the master bedroom where Arlene could be clearly seen from the doorway. He questioned why Tankleff was the only uninjured person in the household and it was obvious to him that this was not a burglary and the house had not been ransacked. Martin seemed to be focusing on Steuerman only and Doyle found his behavior to be odd for someone whose parents were viciously beaten. After comparing notes with what Tankleff had told McCready and Rein, and finding some differences in his story, he requested that Tankleff be taken to police headquarters for further questioning.

Doyle stated that while he was at the scene, Myron Fox, Seymour's business attorney, introduced himself and said that he took care of Seymour's business. Fox asked Tankleff, "Marty are you ok?" Tankleff responded by saying, "yeah Uncle Mike" after which Fox left the area.

According to Doyle, he felt that Seymour wanted Marty to realize that he had to work for his money. Doyle stated that there was a long list of chores that Marty had to do around the house. Doyle said that he even had to clean the gunite swimming pool walls. Additionally, many of the high school students, from the Belle Terre area, drove new cars while Marty was angry because he was stuck with having to drive an old Lincoln to school. Doyle stated that Tankleff was questioned in the interview room which was located inside the general homicide squad area. He added that Lt. John McElhone was the commanding officer of the Homicide Squad and although he is now retired, Doyle suggested that he could be helpful in providing information regarding this case.

With respect to communications, Doyle said, at that time  the detectives only had pagers and communicated via police radios from outside the Tankleff house. He added that they did not have a command bus at that time and a command post was not established. He further explained that non-sensitive telephone calls were made from neighbor's telephones while public pay telephones, which were located a distance from the scene, were used to make sensitive calls. Doyle further stated that police chiefs were disturbed with the communications system and as a result of this investigation; he was the first SCPD supervisor to be issued a cell phone. He added that within weeks of this investigation, all SCPD supervisors were equipped with cell phones.

3

SIC 398304-0271

Doyle stated that prior to doing a detailed examination of the scene, personnel from the Identification Section first took **videos** of the entire crime scene. Subsequently, **still photos** were also taken. Doyle added that this investigation occurred prior to DNA technology and he conferred with supervisors from the Crime Laboratory and the Identification Section, who responded to the scene, and discussed how to systematically search and collect all trace evidence. All evidence collected was photographed, bagged, tagged, and logged as to how it was collected. Doyle praised the lab personnel for their professionalism. He added that the Identification Unit personnel had the expertise **to photograph** and examine the scene for **latent fingerprints** and they only handled cases involving homicides and bank robberies. Doyle stated that he also had **latent fingerprint examiners** respond to the scene. Doyle stated that he held an initial meeting with the supervisors and detectives to discuss their investigative goals. Doyle also assigned Detective James Barnes to coordinate activities at the crime scene and to report directly to him. He added that he did not conduct many interviews because he felt that it would impede on his supervisory duties. Additionally, Doyle said that he dispatched teams of detectives to do an extensive **door to door canvass** of the surrounding area. A **crime scene log** was established, identifying the date, time of arrival and departure of every individual at the scene. Doyle was unsure if Polaroid pictures were taken at the scene. Meetings were held every morning and evening to discuss the case's progress and uniform personnel were used to maintain the crime scene at the end of each day. He stated that every technique was employed and he thought that **luminol** was also used.

According to Doyle, **metal detectors and K-9 dogs** were used to search for weapons and other evidence. Doyle believes that **divers** were also used to search the Long Island Sound for any weapons and a "throwing distance" was calculated, from the rear of the Tankleff residence to the water below, to determine the water area to be searched. A department helicopter was used to take extensive **aerial photos** of the scene. Doyle stated that personnel from the Emergency Service Unit (ESU) rappelled down the steep incline behind the residence to setup a grid search for any evidence, weapons, etc. This process was done over a period of two days after which a second independent search team was used to conduct a grid search of the incline. According to Doyle, the police department used every available resource during this investigation and money was no object. He added that the district attorney's office paid $5,000 to create a **model** of the Tankleff residence. He added that the model, which was used, as an exhibit during the trial, was equipped with a removable roof that enabled the jury to visualize the location of every room.

Doyle stated that he conferred with Suffolk County Assistant District Attorney (ADA) Edward Jablonski, Chief of the Homicide Bureau and ADA Tim Mazzei and informed them of the details of the case.

4

Doyle stated that he felt that some sort of knife and bludgeon were used to inflict the injuries to the victims. Doyle did not believe that a knife, recovered on a kitchen counter next to a watermelon, was used to inflict the injuries and that a smaller knife, possibly a utility knife, might have been used. He based his belief on the compression level of the wounds. He stated that the police were "stuck" with the type of knife described by Tankleff in his confession.

## MEDICAL EXAMINER

Doyle stated that he thought Dr. Dawson, from the Suffolk County Medical Examiner's Office, may have pronounced Arlene Tankleff dead later in the afternoon. He said that they had to clear the area around her before the medical examiner ("ME")could conduct his examination. He explained that the ME examined Arlene's fingernails for trace evidence and inspected her body for wounds. Her body temperature and the ambient room temperature were taken. Doyle stated that it appeared that she received blows to the head and sharp knife wounds to the neck and she probably "bled out." Defensive wounds were visible on both of her arms. Doyle believed that the television in the master bedroom was on when she was found and the drapes were open. Doyle stated that he did not revisit the crime scene on the following day, to ascertain the natural light in the master bedroom. Marty claimed that it was too dark to see his mother in the master bedroom when he awoke. Doyle stated that sunrise came early and a reexamination of the photos showed that Arlene's head was visible from the doorway leading into the master bedroom.

## JERRY STEUERMAN

After Doyle learned that a card game was held at Tankleff's home on the evening prior to the murders, he assigned teams of detectives to interview the participants. Doyle stated that he assigned Detectives Anderson and Laghezza to interview Jerry Steuerman, one of the card players. According to Doyle both detectives interviewed Steuerman extensively and were confident that he was not involved with the murders. Subsequently, Steuerman disappeared and his car was found unoccupied with the engine running behind a restaurant in Hauppauge, New York. Doyle added that Steuerman's son Glenn later filed a missing person's report with SCPD and hired Private Investigator Bo Dietl to find his father. According to Doyle, Steuerman's disappearance turned into a "red herring" and damaged the case. Doyle stated that the homicide squad assumed the responsibility for the missing person's investigation because Steuerman was an important witness. He stated that a number of pen registers were setup on several telephones which subsequently proved helpful in identifying Steuerman's whereabouts. Doyle was subsequently notified by Steuerman's girlfriend who advised him that Steuerman had called her and identified himself by using the code word "Pistachio" which was their favorite flavor ice cream. Doyle stated that by using the telephone numbers obtained from the pen registers, they were able to trace Steuerman to the Gallery Hotel in California. Doyle contacted the Hotel and

5

confirmed that Steuerman was a registrant. According to Doyle, he, accompanied by McCready and Jablonski flew to California to locate and return Steuerman to New York. After interviewing the hotel manager, Doyle learned that Steuerman had "skipped out" and did not pay for two day's lodging. Doyle was able to obtain the telephone numbers of telephone calls made by Steuerman from the hotel which ultimately led them to his whereabouts. According to Doyle, the fact that Jablonski accompanied them to California was not unusual, as ADA's would often go along to conduct interviews and handle legal matters.

Upon locating Steuerman, Doyle said that he and McCready interviewed him thoroughly about his sudden disappearance. Doyle stated that Steuerman explained why he left New York, and flew to California. He stated that he was depressed after the death of his wife and the fact that he was cheating on her while she was sick. According to Doyle, Steuerman was also under a lot of pressure, from his girlfriend, to marry her. Steuerman was also upset with the loss of his friend Seymour and the fact that some of his friends were beginning to think that he was involved with the murders. Steuerman felt that the negative news coverage of him was hurting his business.

According to Doyle, Steuerman did not conceal his identity, as was previously believed and he openly talked to passengers on his flight to California and to others in California about how he was being tortured by the media and how he was being falsely accused of murdering his business partner. Doyle stated that they were able to locate passengers and others who Steuerman had spoken to explaining his situation. Doyle did not agree that Seymour and Steuerman were considered to be arch enemies as described by the defense and questioned, if that were the case, why would Seymour invite Steuerman into his house to play cards. Doyle reminded us that Steuerman had testified during the trial and was cross-examined by the defense for "three solid days" and his testimony was found to be believable.

Doyle said, he knew that Tankleff's defense team had hired Private Investigator Jay Salpeter for their investigation. He said, he previously had contact with Salpeter on another case but he could not recall the particulars. Doyle stated that he knew Joe Creedon whose name came up when he worked cases in the sixth precinct squad. He stated that Creedon was a street thug who was a "big man" as long as he had a gun. Doyle found it hard to believe that "Joey Guns Creedon" would commit the Tankleff murders "by using knives and blunt instruments instead of a gun." Doyle spoke about a case when Steuerman's son Todd shot Creedon in the arm over a drug deal. He mused over the fact that Creedon, who was supposed to be such a tough guy, would not retaliate. Doyle does not know Glenn Harris or Peter Kent, the others alleged by the defense to have committed the murders.

Doyle was unaware of any listening devices being recovered from the crime scene. He said that they did not tear down the walls to search for any

6

devices, as alleged by Salpeter to have been placed in the Tankleff home. He said he does not know Private Investigator Laura Donaghy who allegedly "planted" the listening devices. He added, that based on the thoroughness of the investigation conducted at the scene, he believes that the crime scene search unit would have discovered any listening devices.

Doyle stated that after the State Investigation Commission's report in the 1980's, that was critical of the SCPD, there was a mass exodus of detectives from the homicide squad. He stated that he was assigned to the homicide squad to help restructure the system. He added that he attended the New York City Police Department's Homicide course and other courses given regarding the "Reid Technique" for conducting interviews and interrogations. He stated that other changes were instituted and every new homicide detective has to attend courses on homicide investigations. Additionally, homicide detectives learned techniques by attending ongoing monthly seminars that were held by Dr. Hirsh from the Medical Examiner's Office.

Doyle does not think that he would have done anything different regarding this investigation. He explained that the detectives were under time restraints and because Tankleff's attorney put them on notice to cease questioning Martin Tankleff they were precluded from probing further with respect to the weapons used and their possible location. He added that the police had to proceed with the information that was offered by Tankleff. Doyle firmly believes that Martin Tankleff was responsible for the murders of his parents and it was unfortunate that his interrogation was cut short.

7



## STATE OF NEW YORK
## COMMISSION OF INVESTIGATION

# MEMORANDUM

July 22, 2008

To :            Anthony Hellmer, Chief Investigator

From :          Gerald Lavin, Special Agent

File Number :   C- 118-06 Tankleff

Subject :       Interview Detective John Pfalzgraf S.C.P.D. (Retired)

On Friday, July 18, 2008, Special Agent Kenneth Christophersen and l were present at the residence of retired Suffolk County Police Department Detective John Pfalzgraf, 33 Roosevelt Boulevard, Massapequa, N.Y. Pfalzgraf was interviewed regarding his knowledge of the investigation of the murders of Arlene and Seymour Tankleff, in 1988.

Det. Pfalzgraf became a Suffolk County Police Department (SCPD) Police Officer on 10/24/1968; upon graduation from the Police Academy he was assigned to Patrol duties in the 1st Precinct. In 1973, Pfalzgraf was assigned to investigative duties as a police officer. In 1981 he was promoted to detective, assigned to the 1st Precinct Detective Squad. He was assigned to the Homicide Squad in 1983 where he remained until his retirement in 1991. Presently he works for G.E.I.C.O. insurance as a fraud investigator.

When interviewed, Pfalzgraf, from memory, without his investigative reports, said the following:

On the morning of 9/7/88, he was called and told to respond to a home in Belle Terre, Suffolk County, to assist with a homicide investigation. Upon arrival at the crime scene, the home of Seymour and Arlene Tankleff home, 33 Seaside Lane, Belle Terre, he observed a young man, later identified to him to be Martin Tankleff, sitting on a car. He saw that other SCPD detectives were present. He believes that Detective Sgt. Doyle and Detectives Jim McCready and Norman Rein were those already at the scene. As per SCPD protocol, he did not enter the crime scene at this time and remained outside.

Number of Copies :

Distribution :

**C-118-06 (I) Complaint of Martin Tankleff**

2-Chair/Comm.            1-A/C Nowicki
1-C/C Colligan           1-S/A  Christophersen
1-C/I Hellmer            1-S/A Sheehan
1-D/C/I Lightfoot        1-LA Rodriguez
1-S/A Lavin              1- Duplicate file

PLAINTIFF'S EXHIBIT
//
PF 10/2/13

C-118-06 #48 (I)

1

Mather Hospital – Myron Fox:

D/Sgt. Doyle informed Pfalzgraf that the severely injured male victim, Seymour Tankleff, had been removed to Mather Hospital by the rescue squad. Doyle told Pfalzgraf to respond to the hospital to further the investigation. When he arrived at Mather Hospital he discovered that several family members were present. One of them, Myron Fox approached Pfalzgraf and introduced himself as Marty's uncle and "Tankleff family attorney." Pfalzgraf, aware that Marty was a potential suspect talked to Fox, to "soothe him," to make him comfortable with the situation. He informed Fox that Marty had gone to police headquarters to help with the investigation. He said that, at this time, Fox did "not put us on notice," thus permitting the investigators to interview Marty about the incident.

During an earlier interview, Crime Lab Det. Kosciuk informed Commission investigators that, while processing the crime scene, he had received vials of blood from Det. Pfalzgraf. Kosciuk could not recall the circumstances surrounding the collection of the blood in the vials. Pfalzgraf was asked if he came into possession of any vials of blood while at the hospital. He apologized and said he was unable to recall everything he did almost twenty years ago. He said that the reports he prepared should contain this information.

The Crime Scene:

*Crime Scene Procedures*: Pfalzgraf said, in 1988 the SCPD had already instituted "very thorough crime scene procedures." He said that if you were not in charge of the scene you didn't go in unless assigned. He said that the SCPD Identification section would process the scene in a very methodical manner, room by room. First, the ID section went in and video-taped the scene. Second, the ID section took still photos of the scene and then the scene would be processed further.

*Arelene Tankleff*: Pfalzgraf said that he later returned to the crime scene. Though uncertain, he said he "may have seen" Arlene next to a bed, with multiple stab wounds.

*Emergency Service Search*: Pfalzgraf said he was involved in the search conducted by officers from SCPD Emergency Services (ESU). At the rear of the Tankleff backyard was a steep cliff-like embankment, too steep for persons to walk up or down. It was necessary to call upon emergency services officers to search for any evidence that might have been hidden or thrown over the cliff. The ESU officers rappelled down the cliff to conduct a search for evidence. Pfalzgraf was present to witness this search. No evidence was discovered as a result of this search. Officers also searched the beach and waters below the cliff. Additionally, in an effort to find a murder weapon or other evidence, ESU conducted a search on the east side of the house which was overgrown with ivy or pachysandra vines. No evidence was discovered in this area.

2

*Blood Evidence in Plumbing*: Pfalzgraf was present and watched while Suffolk crime lab personnel checked all the plumbing fixture traps and pipes for blood evidence. Samples were taken for analysis.

*Morgue:* Pfalzgraf did not recall visiting the morgue to view Arlene's body or autopsy.

*Canvasses:* Though he believed canvasses were conducted, Pfalzgraf did not recall personally conducting any of them.

*Movie Recording*: Pfalzgraf was asked if he participated in a canvass of video rental stores for a film that portrayed a male who killed girls while naked to avoid contaminating himself with blood evidence. He said he recalled that detectives had done a canvass for this video, but he didn't recall being involved in this step of the investigation.

Interrogation Procedures:

Pfalzgraf said that by 1988, because of a prior Commission investigation, the SCPD established interrogation operating guidelines/procedures.

*Two Hour Rule*: Prior to 1988, some SCPD interrogations had been criticized. There had been allegations of the mistreatment of suspects in order to elicit confessions. By 1988, the SCPD instituted a two hour rule, a guideline to be followed when interrogating suspects. If a team of detectives did not elicit a confession within two hours, another team of detectives would continue the interrogation.

*Video Taping:* as a result of the above mentioned allegations, the SCPD obtained video cameras and equipment and began making video recordings of confessions.

*General Interrogation Procedures:* Pfalzgraf said that by 1988 the Homicide Squad conducted "very professional" interrogations. Detectives received training in interrogation methods and many read additional material on their own.  He described the basic procedures in use by the Homicide Squad in 1988:

A. Members of the Homicide had discussed and used the Reid Technique to interrogate their subjects in which the interrogator has to find a reason for the defendant to confess. The interrogator had to find a religious, moral, or other reason he believed would overcome the suspect's resistance to confess.

B. Elicit a verbal confession from the suspect. Pfalzgraf explained that, at this stage, the suspect's confession usually contained inconsistencies, and misinformation.

3

SIC 398304-0283

C. First written confession. He said this first written confession often contained inconsistencies, misinformation and the suspect often held back information from the interrogators.

D. Interrogators review and refine the written confession with the suspect until he gives them a full, truthful and accurate account of the facts.

E. The suspect gives a video-taped confession.

Pfalzgraf said Homicide Squad Detectives received much in-service training and regularly attended schools and courses related to their investigative duties.


Persons Related to the Tankleff Investigation:

Pfalzgraf was asked about a number of persons associated with the investigation into the Tankleff case; he said the following:

*Shari Rother*- Pfalzgraf did not recall if he saw Shari Rother or her husband Ron Rother at Mather hospital. However, he said that he could identify her; he knew he had seen her at either the crime scene, the hospital or had seen news photos of her. He came to know that Shari wished Marty to be guilty, she wanted the proceeds from the estate.

*Joseph Creedon*- He said he did not know or know of Creedon in 1988.

*Peter Kent*- Pfalzgraf said he did not know or know of Kent in 1988.

*Glen Harris*- He said he did not know or know of Harris in 1988.

*Jay Salpeter*- Pfalzgraf said he does not know private investigator Salpeter nor has Salpeter ever contacted him.


Miscellaneous:

*Murder Weapon:* Pfalzgraf is of the opinion that the cutting instrument used to slash Arlene and Seymour was never recovered. He said he saw Arlene Tankleff's body at the scene or viewed photos of her body and recalls that her wounds appeared to be cuts from a very sharp knife like an Exacto knife or razor knife, such as one uses to make fine cuts on wallpaper.

*Dets. Rein & McCready:* Pfalzgraf said he saw Marty in police headquarters after he had been brought there to be interrogated. He was asked if Marty was abused during the interrogation. He said Det. Norman Rein, who was on the interrogation team with McCready "would never do anything wrong" or allow any improper conduct by others working with him.

4

*Letter to Court TV:* Pfalzgraf wrote a letter to court TV in which he complained that they misrepresented the facts in the Tankleff case. He said many of his former homicide detectives are sickened by the way the media portrayed the events surrounding the Tankleff case.

5

SIC 398304-0285

| CC NUMBER | PCT. | COMMAND | SECTOR | GRID | |
|---|---|---|---|---|---|
| 88-461042 | 6 | 610 | 602 | 40·151 | POLICE DEPARTMENT, COUNTY OF SUFFOLK, N.Y. |

**SUPPLEMENTARY REPORT**

PDCS-1084c

| DATE OF REPORT | DATE AND TIME OF OCCURRENCE | PLACE OF OCCURRENCE | ☒ INSIDE ☐ OUTSIDE |
|---|---|---|---|
| 1-7-88 | 9-7-88 | 33 SEASIDE LA BELLE TERRE | |

INCIDENT: DEATH INVESTIGATION   STATUTE

COMPLAINANT: SCPD   PHONE   ADDRESS: YAPHANK AVE YAPHANK

DETAILS

```
0614  TIME OUT
0617  602 10·36 PO GALLAGER
0617  602F 10·36 PO CRAYNE
0625  P.S. RESCUE 10·36 E.M.T., CURLEY, HARDWICK, MILANO
0626  612 10·36 PO AKI
0630  614 10·36 PO AIMES
0638  636 10·36 SGT LEAHY
0643  PS RESCUE LEFT WITH MALE VICTIM
0739  DET MCCREADY 10·36
0747  CRIME SCENE #7 10·36 PO ACUNTO #2726
1800  DET SGT DOYLE HOMICIDE 10·36
1900  DET OLINO 6PCT DET 10·36
1808  DET KOSCIUK LAB 10·36
1816  DET ZEIU HOMICIDE 10·36
1831  DET LAGHEZZA HOMICIDE 10·36
1831  DET ANDERSON HOMICIDE 10·36
1865  LT MCELHONE HOMICIDE 10·36
1840  SGT SYLVANUS MEDIA 10·36
1840  PO SARET MEDIA 10·36
1843  PO MONGIN I.D. SECTION 10·36
1850  INSPECTOR BROWN IN SCENE
1855  CHIEF STEWART 10·36
 58   DET SCHAFFER I.D. SECTION 10·36
 11   ED JABLONSKI D.A. OFFICE 10·36
0920  DET. SGT FEENEY I.D. SECTION 10·36
 922  GEORGE REICH CRIME LAB 10·36
 922  DANIEL BERINGAS CRIME LAB 10·36
 51   DET FALZGRAF 10·36 HOMICIDE
 51   DET CARMODY 10·36 HOMICIDE
 51   PO CONRAD    10·36
 02   CRIME LAB VAN - DET UNIT DROVE INTO SCENE
 0    K9 REC INTO SCENE
 03   2ND OUT UNIT INTO SCENE
 51   ROBERT BROMANG CRIME LAB 10·36
 51   ROGER GENNA CRIME LAB 10·36
 43   DET DARNES HOMICIDE 10·36
 35   BILL MAZZI D.A. OFFICE 10·36
 47   SGT CRONIN 10·36 HOMICIDE
 47   DET ROTONA HOMICIDE 10·36
 50   REC AT SCENE BY PO REYER #2479
```



PLAINTIFF'S EXHIBIT
12
AF  10/2/13

| FOUNDED | CASE STATUS | WHEN APPLICABLE CHECK AND ENTER ON REVERSE |
|---|---|---|
| ☐ YES ☐ NO | ☐ ACTIVE ☐ CLEARED BY ARREST ☐ CLOSED<br>☐ PENDING ☐ EXCEPTIONALLY CLEARED NON-CRIMINAL | ☐ RECLASSIFICATION OF INCIDENT<br>☐ STOLEN OR RECOVERED PROPERTY |

NOTE: BOTH T.T. MESS. NO'S WITH DATES MUST BE OBTAINED & ENTERED BY COMMAND REPORTING THE RECOVERY OF STOLEN AND/OR LOST PROPERTY.

| T. MESS. NO. REPORTING<br>& STOLEN AND OR LOST PROPERTY | DATE SENT | T.T. MESS. NO. CANCELLING<br>ABOVE T.T. MESS. NO. | DATE CANCELLED |
|---|---|---|---|

REPORT OFFICER'S SIGNATURE:   PO 3705/010/6   SUPERVISOR'S SIGNATURE

SCDA007906

POLICE DEPARTMENT, COUNTY OF SUFFOLK, N.Y.

**SUPPLEMENTARY REPORT**

PDCS-1084c

| NUMBER | P/T | DWG NO | SECTOR | BEAT |
|---|---|---|---|---|
| 3-461042 | 6 | 610 | 602 | 38-149 |

| IT OF REPORT | DATE AND TIME OF OCCURRENCE |
|---|---|
| 7-7-88 | 9-7-88   1250 |

SUBJECT: DEATH INVESTIGATION

SCENE: 33 SEASIDE LA   BELLE TERRE

COMPLAINANT: SCPD

YAPHANK AVE   YAPHANK

250- PO REYER 2979/21   RELIEVED PO AKI 3705 AT SCENE

304- DET SGT Muller ID SECTION, MAGGIE BOKINZ ID SECTION ARRIVED

320- ADA - HINRICHS - HOMICIDE BUREAU ARRIVED

400- PO AIMES 2211 12/8 614 OPERATOR RETURNED TO SCENE WITH SGT McGARVEY 638 - WHO left SHORTLY AFTER

1547- DR BOLESTA - ME  ARRIVED, ROBERT WINWOOD PHOTOG - DR ADAMS - ME   ARRIVED.

1604- B.ll THOMPSON, ME OFFICE ARRIVED

1610- Relieved By PO KALAN

1655  BODY TAKEN FROM HOUSE TO ME VAN #84298- Y-ME VAN LEFT SCENE
1645  BE  T TWACHTMAN ARRIVED AT SCENE
1755  SGT TWACHTMAN AT SCENE REFERENCE DETECTIVE'S RECONTACT
1812  SGT PAPANELO AT SCENE
1855  LT WOODS EMERGENCY SERVICE AT SCENE
1945  DET ANDERSON & DET CASHIEZZA AT SCENE
1950  DET CARMODY & DET PFALZGRAF AT SCENE

2145  PO McGIVIN RELIEVED PO KALAN
2205  FORENSIC SCIENTIST CHARLIE VAGNER AT SCENE
2225  CRIME SCENE AND ALL DET'S LEFT SCENE. HOUSE SECURED BY DET'S

| FOUNDED | CASE STATUS | WHEN APPLICABLE CHECK AND ENTER ON REVERSE |
|---|---|---|
| X | X | |

NOTE.

POLICE DEPARTMENT, COUNTY OF SUFFOLK, N.Y

**SUPPLEMENTARY REPORT**

PDCS-1084c

| 3846.1042 | 6 1/0 | 402 | 38-1-9 |
| 2-07-88 | 9-07-58 | | |

DEATH INVESTIGATION

SCPD

33 SEASIDE LA BELLE TERRE

YAPHANK AVE YAPHANK

2350   P.O. ............ ..........   .... .... .....
0855   Det ........... on scene   Homicide
0930   N.. ........   ...... .   F ..
.....   S... D..e   on scene   ........
.....   P.O. mangan on scene   TA
..
.928   Det PFALEGRAF + DET CARMODY - HOMICIDE AT SCENE.
042    DET KOSCIUK + PS. BAUMANN - CANIS LAB.
100    DET. PFALGRAF + DET. CARMODY LEFT SCENE
1112   DET/LT. CAINE, DET/sgt. Rooney, Muller, Sweeney at SCENE-
1125   G37 Sgt. TRETICA Bll at scene
1155   D/LT. CAINE, D/sgt. Rooney, Det/sgt. muller, D/sgt. Sweeny, LEFT Scene
1210   EMERGENCY SERVICES AT SCENE — LT. Woods, Sgt. Sullivan
       Po. KERWIN, Po. FUCHS, Po. GESKIE, Po. PAUL, Po. EMMANUEL-
1220   DET. LESHEZZA and DET. ANDERSON - HOMICIDE AT SCENE.
1450   DET. PFALGRAF + Det. Carmody AT Scene
1305   Det. LESHEZZA + DET. ANDERSON LEFT SCENE
1330   LT. McELHONE-HOMICIDE at scene.
1450   ......... By Goz Po KRAHM - REF 10-18
15..   ......... ... .. .... .... ... ...
1520   ........ for KRAH... - .....GG Hoffman
1545   P.O M-GINN Relieved P.O. HOFFMAN
1600   LT MCELHONE-LEFTSCENE
600    DOUBLE W/PC MOSBY
655    LT WOODS AT SCENE (EMERGENCY SERVICE)
55     Sgt SCIORTINO AT SCENE (EMERGENCY SERVICE)

| FOUNDED | CASE STATUS | WHEN APPLICABLE CHECK AND ENTER ON REVERSE |
|---|---|---|
| X | X ..... | ..... |

**POLICE DEPARTMENT, COUNTY OF SUFFOLK, N.Y.**

**SUPPLEMENTARY REPORT**

PDCS - 1084c

| NUMBER | PCT. | COMMAND | SECTOR | GRID |
|---|---|---|---|---|
| 8846/042 | 6 | 610 | 602 | 58-149 |

DATE OF REPORT: -07-88
DATE AND TIME OF OCCURRENCE: 9-07-88

INCIDENT: DEATH INVESTIGATION   STATUTE:
PLACE OF OCCURRENCE: 33 SEASIDE LA BELLE TERRE   ☒ INSIDE ☐ OUTSIDE

COMPLAINANT: SCPD   PHONE:
ADDRESS: YAPHANK AVE YAPHANK

DETAILS:

715 DET LAGHEZZA = DET ANDERSON AT Scene (HOMICIDE)
720 PO MOSBY LEFT FOR BEACH SIDE (SECURE)
725 LT WOODS LEFT SCENE
35 SGT McCARTHY AT SCENE
35 PO. McGINNIS AT SCENE
45 PO. LEUCI AT SCENE
45 SGT McCARTHY LEFT SCENE
45 PO McGINNIS LEFT SCENE
48 PO LEUCI LEFT SCENE
55 DET. McCREADY AND DET REIN (HOMICIDE) AT SCENE *DET McCREADY HAS PRIOR PAGES TO LOG
35 ALL EMERGENCY UNITS LEFT SCENE (EMS)
35 DET KOSCIUK #527 F.S. BAUMANN CRIMELAB LEFT SCENE
35 CRIME SCENE #4 CARBONE LEFT SCENE
15 DET MONGON ID SECTION LEFT SCENE
20 FAMILY MEMBERS: FALK BEE MAROCCIA McCLURE MICHAEL, McCLURE MARIANNE, ADNER LAURIE ADMITTED
HOUSE VIA DET SGT DOYLE ALSO JOHNSON, JENNIFER WITH OTHER FAMILY MEMBERS, BUT DID NOT ENTER
ME SCENE REMAINED OUTSIDE
43 CRIME SCENE #4 CARBONE = DONAVAN LEFT SCENE
00 DET BARNES LEFT SCENE
02 FAMILY MEMBERS LEFT SCENE VIA SGT DOYLE
41 DET CARMODY = DET PFALZGRAF LEFT SCENE
45 ALL DETECTIVES LEFT SCENE HOUSE SECURED BY DETECTIVES
350 P.O. LANGDON #3915 AT SCENE, RELIEVED P.O. McGINN.
310 SGT. LEAHY #599 AT SCENE
314 SGT LEAHY #599 LEFT SCENE
900 P.C. LANGDON LEFT SCENE, RELIEVED BY P.C. HOFFMAN
910 Sgt JMK 581

| FOUNDED | CASE STATUS | WHEN APPLICABLE CHECK AND ENTER ON REVERSE |
|---|---|---|
| ☐ YES ☐ NO | ☐ ACTIVE ☐ CLEARED BY ARREST ☐ CLOSED ☐ PENDING ☐ EXCEPTIONALLY CLEARED NON-CRIMINAL | ☐ RECLASSIFICATION OF INCIDENT ☐ STOLEN OR RECOVERED PROPERTY |

NOTE: BOTH T.T. MESS. NO'S WITH DATES MUST BE OBTAINED & ENTERED BY COMMAND REPORTING THE RECOVERY OF STOLEN AND/OR LOST PROPERTY.

| T.T. MESS. NO. REPORTING STOLEN AND OR LOST PROPERTY | DATE SENT | T.T. MESS. NO. CANCELLING ABOVE T.T. MESS. NO. | DATE CANCELLED |
|---|---|---|---|

REPORTING OFFICER'S SIGNATURE | SUPERVISOR'S SIGNATURE

SCDA007909

POLICE DEPARTMENT, COUNTY OF SUFFOLK, N.Y.

**CONTINUATION REPORT**

PDCS – 1083a

PAGE NO.    1    OF    2    PAGES

TRIBUTION: Same as Initial Report

1215 PO Hoffman left Scene, Relieved by PO Roell #400

1255 Det. Rotondo at scene

1259 Const Jeff Schuler stepped momentarily

1300 Det. Rotondo left Scene (Homicide)

1302 " " Returned.

1410 Det/Sgt Doyle at Scene

1415 Relieved PO Roell     PO 2466

1430 Det. Pfalzgraf + Det. Carmody at Scene

1435 636-Sgt Meehan at Scene

1450 636- Sgt Meehan left Scene

1455 Det. Barnes at Scene

1525 Belle Terre Constable - Jeff Schuler at Scene.

1528 Constable Schuler left Scene

1615 P.O Young + P.O McGuiness Relieved PO Hoffman

1618 Det. Kosciuk #527 At Scene.

1649 V.B.T. Const Schuler at Scene

1656 VBT Const Schuler left Scene

1656 Chris Napoli 10-13-65 and Gary Marton 12-11-67 of SAFES Incorporated At Scene.

1702 P.O. Buschor Relieved P.O. Young and P.O. McGuinness

1715 Det McCready + Det Reign @ scene.

1735 Chris Napoli (10-13-65) + Gary Marton (12-11-67) Safes incorporated left Scene

1740 Det Kosciuk # 527 Left Scene.

1745 Det Royse (I.D. Section) Left Scene

1940 Det Carmody + Det Pfalzgraf left scene

1950 Sgt Meehan / P.O. Lehemann #1399 / P.O. Bores #2508 @ Scene

2000 P.O. Niebert Relieved P.O. Buschor 10-18

2022 Det McCready + Det Reign Left Scene

2035 P.O. Donovan C55 @ scene

2300  P.O. Boucher Relieving P.O. Neidert
2105  P.O. Donovan LS-5 Left Scene
2145  Det Rotondo Left Scene (Homicide)
2306  Sgt Meehan / P.O. Lehemann #1399 / P.O. Bores #2508 Left Scene
2320  Det Barnes + Det Sgt Doyle (Homicide Sgt) left Scene
      Scene secured by above.

SCDA007911