UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------X
MARTIN TANKLEFF,

                            Plaintiff,        <u>MEMORANDUM & ORDER</u>
                                              09-CV-1207(JS)(AYS)

            -against-

THE COUNTY OF SUFFOLK, THERESA and
BRETT MCCREADY, as legal successors
of K. JAMES MCCREADY, NORMAN REIN,
CHARLES KOSCIUK, ROBERT DOYLE, JOHN
MCELHONE, JOHN DOE POLICE OFFICERS
1-10, and RICHARD ROE SUFFOLK COUNTY
EMPLOYEES 1-10,

                            Defendants.
------------------------------------X
APPEARANCES
For Plaintiff:      Anna B. Hoffman, Esq.
                    Barry C. Scheck, Esq.
                    Emma Kate Freudenberger, Esq.
                    Nick Joel Brustin, Esq.
                    Amelia Green, Esq.
                    Vanessa Michelle Buch, Esq.
                    Neufeld Scheck & Brustin, LLP
                    99 Hudson Street, 8th Floor
                    New York, NY 10013

                    Bruce A. Barket, Esq.
                    Amy Beth Marion, Esq.
                    Barket Marion Epstein & Kearon LLP
                    666 Old County Road, Suite 700
                    Garden City, NY 11530

                    Barry J. Pollack, Esq.
                    Miller & Chevalier Chartered
                    900 Sixteenth Street NW
                    Washington, DC 20006

For Defendants:     Brian C. Mitchell, Esq.
                    Susan A. Flynn, Esq.
                    Suffolk County Attorney's Office
                    100 Veterans Memorial Highway
                    H. Lee Dennison Building
                    Hauppauge, NY 11788

SEYBERT, District Judge:

In 1990, Plaintiff Martin Tankleff ("Plaintiff") was convicted of murdering his parents in the family home in Belle Terre, New York.  After his conviction was vacated and the charges were dismissed, he commenced this action against the County of Suffolk (the "County"), Detective K. James McCready[1], Detective Norman Rein, Detective Charles Kosciuk, Sergeant Robert Doyle, Lieutenant John McElhone[2] and unknown police officers and county employees (collectively "Defendants") alleging that Defendants violated his constitutional rights under the United States and New York State Constitutions.  Currently pending before the Court is Defendants' motion for partial summary judgment.  (Defs.' Mot., Docket Entry 180.)  For the following reasons, Defendants' motion is DENIED.

---

[1] Detective McCready died while this action was pending.  On June 2, 2016, Theresa and Brett McCready were substituted in their capacity as the legal successors of Detective McCready. (Substitution Order, Docket Entry 178.)

[2] The Court agrees with Defendants that no claims remain against Lieutenant McElhone.  (Defs.' Reply, Docket Entry 186, at 2-3.) Therefore, the Clerk of the Court is directed to TERMINATE Lieutenant McElhone as a defendant in this action.

<u>BACKGROUND</u>

I.  <u>Factual Background</u>[3]

    A.  <u>The Crime and Preliminary Investigation</u>

At approximately 6:11 a.m. on September 7, 1988, Plaintiff called 911 from his father's office to report that he had found his father, Seymour Tankleff ("Seymour"), with blood "gushing" from his neck. (Defs.' 56.1 Stmt., ¶¶ 1, 3; Pl.'s 56.1 Resp., ¶¶ 1, 3.) While he waited for assistance, the 911 operator instructed Plaintiff to apply pressure to the wound with a clean towel, lay him down and elevate his feet. (Defs.' 56.1 Stmt. ¶ 1; Pl.'s 56.1 Resp. ¶ 1.) In subsequent statements, Plaintiff said that after he used the office phone to call 911, he placed a pillow under Seymour's feet and a towel around his throat. (Defs.' 56.1 Stmt. ¶¶ 4, 6; Pl.'s 56.1 Resp. ¶¶ 4, 6.) He testified that while assisting his father, he got blood on his hands, arms, shoulders, upper body, legs, and feet. (Defs.' 56.1 Stmt. ¶¶ 197-98; Pl.'s 56.1 Resp. ¶¶ 197-98.) Plaintiff said that after doing this, he began looking for his mother, Arlene Tankleff ("Arlene"), and

_____

[3] The following material facts are drawn from Defendants' Local Civil Rule 56.1 Statement ("Defs.' 56.1 Stmt.," Docket Entry 180-2), Plaintiff's Local Civil Rule 56.1 Response ("Pl.'s 56.1 Resp.," Docket Entry 183-2) and Plaintiff's Local Rule 56.1 Counterstatement ("Pl.'s 56.1 Counterstmt.," Docket Entry 183-1). Any relevant factual disputes are noted. All internal quotation marks and citations have been omitted.

opened the door to the garage to see if her car was there.[4]  (Defs.'
56.1 Stmt. ¶ 8; Pl.'s 56.1 Resp. ¶ 8.)  After seeing his mother's
car in the garage, he said he continued to look for her and
eventually saw her body in the bedroom.  (Pl.'s 56.1 Resp. ¶ 8;
Trial Tr. (Tankleff), Defs.' Ex. B, 4119:21-4120:19.)[5]  He said he
saw her body from the doorway of the master bedroom but did not go
past the alarm wall, a short wall near the entrance of the bedroom.
(Defs.' 56.1 Stmt. ¶ 204; Pl.'s Ex. 42, Docket Entry 184-48.)  He
testified that after seeing her body, he ran into the kitchen and
called his sister.  (Pl.'s 56.1 Resp. ¶ 8; Trial Tr. (Tankleff)
4120:25-4121:4.)  After talking to her, he testified that he
checked on his father, who was "still breathing or gagging," ran
back to the kitchen to answer a call from his sister and called
his best friend to tell him he would not be picking him up on the
way to school that morning.[6]  (Defs.' 56.1 Stmt. ¶¶ 26-27; Pl.'s
56.1 Resp. ¶¶ 26-27; Trial Tr. (Tankleff) 4121:17-4123:23.)

---

[4] At trial, he testified that when he got up that morning, he
walked by his parents' bedroom but did not see anyone.  (Defs.'
56.1 Stmt. ¶ 200.)

[5] Citations to the trial transcript ("Trial Tr.") will include
the name of the testifying witness for ease of reference.
Additionally, Defendants' exhibits were separately filed with
the Court and are not available on the Electronic Case File
system.

[6] Plaintiff admitted at trial that a photograph of the kitchen
phone showed no blood on the phone.  (Defs.' 56.1 Stmt. ¶ 219.)

After making those calls, Plaintiff alleges that he went into his bedroom, wiped his hands on a towel and put on a sweatshirt before running next door to his neighbor's house.[7]  (Defs.' 56.1 Stmt. ¶ 29; Pl.'s 56.1 Resp. ¶¶ 29-30.)  His neighbor, Martin Hova ("Hova"), testified that he heard screaming and when he answered the door, he saw Plaintiff barefoot and wearing shorts and a sweatshirt.[8]  (Defs.' 56.1 Stmt. ¶ 30.)  Hova testified that he accompanied Plaintiff back to his house and encountered Officers James Crayne ("Officer Crayne") and Daniel Gallagher ("Officer Gallagher"), who were responding to the 911 call.  (Defs.' 56.1 Stmt. ¶ 31.)  Officers Crayne and Gallagher testified that when they arrived Plaintiff yelled "somebody murdered my parents." (Defs.' 56.1 Stmt. ¶ 31.)  Officer Crayne later described Plaintiff as "agitated," and both officers observed blood on Plaintiff's "palms, the right side of his face, on his right calf and on his right foot."  (Defs.' 56.1 Stmt. ¶ 32; Pl.'s 56.1 Resp. ¶ 32.)

Hova testified that when they were in the office, he asked Plaintiff who had done this, and Plaintiff responded "my father's business partner, Jerry."  (Defs.' 56.1 Stmt. ¶ 33.)

---

[7] Defendants emphasize that Plaintiff testified to only wiping his hands on the towel in his room.  (Defs.' 56.1 Stmt. ¶ 208.) Plaintiff denies that he "specifically excluded the possibility that he wiped another part of his body on the towel on his bed." (Pl.'s 56.1 Resp. ¶ 208.)

[8] Plaintiff admits that he was barefoot and wearing shorts and a sweatshirt at that time.  (Pl.'s 56.1 Resp. ¶ 32.)

Plaintiff was referring to Jerry Steuerman ("Steuerman"), a business associate of Seymour's who had been at the Tankleff home the previous night for a poker game. (Defs.' 56.1 Stmt. ¶¶ 66, 173.) Officer Crayne noticed that there was a towel over Seymour's neck and asked Seymour who was responsible. (Defs.' 56.1 Stmt. ¶ 36; Pl.'s 56.1 Resp. ¶ 36.) Officer Crayne testified that Seymour did not respond, but Plaintiff said "it was Jerry Steuerman." (Defs.' 56.1 Stmt. ¶ 36; Pl.'s 56.1 Resp. ¶ 36.)

Officer Gallagher testified that he asked Plaintiff to come into the kitchen and tell him what happened. (Pl.'s 56.1 Resp. ¶ 36.) According to Officer Gallagher, Plaintiff told him that "he woke up that morning, the lights were on in the house, the alarm was turned off and he found his father," and further stated that "the only person who had motive to do this was Jerry Steuerman."[9] (Defs.' 56.1 Stmt. ¶ 36; Pl.'s 56.1 Resp. ¶ 36; Trial Tr. (Gallagher) 275:17-21.) Officer Gallagher testified that when he stood at the threshold of the bedroom, he saw Arlene's head on the floor "partially sticking out from the end of the bed," but it was not until he was standing directly over her that he was able to observe the extent of her injuries. (Defs.' 56.1 Stmt. ¶ 35; Trial Tr. (Gallagher) 260:7-10.)

_____

[9] When asked by the prosecutor whether he observed "any tearing on [Plaintiff's] eyes," Officer Gallagher indicated that he did not and described Plaintiff as "composed." (Defs.' 56.1 Stmt. ¶ 36; Pl.'s 56.1 Resp. ¶ 36; Trial Tr. (Gallagher) at 276:5-7.)

Emergency medical personnel arrived at the Tankleff home at approximately 6:27 a.m. (Pl.'s 56.1 Resp. ¶ 3.) They found Seymour unresponsive and lying on the floor of his office "covered with dried blood." (Seymour Prehospital Care Report, Pl.'s Ex. 32, Docket Entry 184-38, at 2.) He was transported to Mather Hospital immediately. (Seymour Prehospital Care Report at 2.) When they entered the bedroom, they found Arlene's body on the floor with her head near the foot of the bed, and medical personnel observed dried blood on her scalp and forehead. (Arlene Prehospital Care Report, Pl.'s Ex. 33, Docket Entry 184-39, at 2.)

Around the time that emergency medical personnel arrived, Officer Edward Aki ("Officer Aki"), Belle Terre Chief Constable Donald Hines ("Hines"), and Plaintiff's brother-in-law, Ron Rother ("Rother"), arrived at the residence. (Defs.' 56.1 Stmt. ¶ 37.) Shortly thereafter, Plaintiff was separated from Rother by officers and escorted to Officer Aki's police car. (Defs.' 56.1 Stmt. ¶ 38; Pl.'s 56.1 Resp. ¶ 38.) Officer Aki later testified that he separated Plaintiff and Rother because they were both witnesses and separating them would prevent them from "contaminat[ing] each other's stor[ies]."[10] (Trial Tr. (Aki) 386:11-17.) Plaintiff alleges that when he was sitting in the

_____

[10] Plaintiff alleges that he was only permitted to spend five minutes with Rother and that separating him from his brother-in-law left him "completely isolated from his family." (Pl.'s 56.1 Counterstmt. ¶ 20.)

back of Officer Aki's car, he became sick and began "gagging and spitting up because [he] had blood on [him]."  (Pl.'s 56.1 Resp. ¶ 38 (alteration in original).)  Plaintiff asked Officer Aki if he could go in the house or use the spigot on the side of the house to clean his hands, but Officer Aki said no.  (Defs.' 56.1 Stmt. ¶ 38; Pl.'s 56.1 Resp. ¶ 38.)  Defendants allege that, a short time later, Officer Aki and Hines observed Plaintiff washing his hands in a puddle in front of Officer Aki's police car.  (Defs.' 56.1 Stmt. ¶ 39.)  Plaintiff alleges that Officer Aki gave him permission to clean his hands in the puddle and provided him with a tissue or a paper towel from his glove compartment.  (Pl.'s 56.1 Resp. ¶ 39.)

Hines, who was also a family friend, testified that he had a series of conversations with Plaintiff after Plaintiff washed his hands.  (Defs.' 56.1 Stmt. ¶¶ 37, 40.)  Hines testified that during those conversations, Plaintiff reiterated his suspicions regarding Steuerman's involvement, said that his mother had discussed the possibility that Steuerman would do something terrible, and said that Steuerman was the last person to leave the card game the previous night.  (Defs.' 56.1 Stmt. ¶ 40; Pl.'s 56.1 Resp. ¶ 40.)  Hines testified that he told Plaintiff that Seymour was still alive, and if he recovered, he may be able to identify the perpetrator.  (Defs.' 56.1 Stmt. ¶ 40; Pl.'s 56.1 Resp. ¶ 40; Trial Tr. (Hines) 506:22-507:2.)  He testified that when he said

this to Plaintiff, Plaintiff "picked his head up and looked directly at [him]" and "[h]is eyes widened, he stopped talking and didn't say a word." (Defs.' 56.1 Stmt. ¶ 41; Trial Tr. (Hines) 507:15-17.) Plaintiff does not recall speaking with Hines. (Defs.' 56.1 Stmt. ¶ 42.)

John McNamara ("McNamara"), a friend of Seymour's, testified that he also had a series of conversations with Plaintiff that morning. (Defs.' 56.1 Stmt. ¶¶ 43-45.) McNamara testified that when he walked by the Tankleff residence, Plaintiff approached him and explained what happened when he woke up that morning. (Defs.' 56.1 Stmt. ¶ 43.) McNamara said that he asked Plaintiff why he did not have more blood on him, if he had, in fact, lifted his father from the chair to the floor. (Defs.' 56.1 Stmt. ¶ 43.) McNamara testified that Plaintiff looked at him and walked away without responding. (Defs.' 56.1 Stmt. ¶ 43.) During the second alleged conversation, McNamara testified that the sequence of events changed, and this time, Plaintiff allegedly said he was naked when he woke up that morning and put on shorts and a sweatshirt before finding his parents. (Defs.' 56.1 Stmt. ¶ 44.) McNamara also testified that during the second conversation, Plaintiff did not mention seeing his mother in the bedroom, but said that he checked the garage and then ran out of the house. (Defs.' 56.1 Stmt. ¶ 44.) McNamara also described a third conversation with Plaintiff and testified that during that

conversation, Plaintiff said that after checking the garage, he did go into the bedroom, saw his mother, realized she was dead and then ran out of the house. (Defs.' 56.1 Stmt. ¶ 45.) Plaintiff denies that these conversations took place, and testified during his deposition and at trial that he did not remember having any conversations with McNamara or even seeing him at his home that morning. (Defs.' 56.1 Stmt. ¶ 46; Pl.'s 56.1 Resp. ¶¶ 43-46.)

The Mayor of Belle Terre, Vincent Bove ("Bove"), who was at the card game the previous night, also testified that he had a conversation with Plaintiff that morning. (Defs.' 56.1 Stmt. ¶ 47.) He testified that when he arrived at the scene, Plaintiff approached him and told him that "somebody murdered my mother and father" and that he suspected that Steuerman was responsible. (Defs.' 56.1 Stmt. ¶ 47.) Additionally, Bove testified that when he asked if Plaintiff saw Steuerman harm his parents, Plaintiff told him that he did not see Steuerman do it, but that Steuerman and his parents had been arguing. (Defs.' 56.1 Stmt. ¶ 47.) At his deposition, Plaintiff admitted that he had a conversation with Bove but did not recall the specifics of that conversation.[11] (Defs.' 56.1 Stmt. ¶ 48; Pl.'s 56.1 Resp. ¶ 48.) Finally, Dara Schaeffer ("Schaeffer"), a neighbor and classmate, testified that she drove by Plaintiff's home that morning and asked him what

---

[11] At trial, Plaintiff testified that he did not recall speaking with Bove. (Defs.' 56.1 Stmt. ¶ 210.)

happened. (Defs.' 56.1 Stmt. ¶ 49.) She testified that Plaintiff said "last night someone killed my mother and tried to kill my father and molested me." (Defs.' 56.1 Stmt. ¶ 49.) Plaintiff denies that he said this and maintains that he said "last night they murdered my mother, they murdered my father, and they must have missed me." (Pl.'s 56.1 Resp. ¶ 50.) Although Schaeffer testified that Plaintiff did not express "any emotions" and "just told [her] how it happened," in another conversation with Plaintiff's investigator, she stated that Plaintiff "appeared to be in shock." (Trial Tr. (Schaeffer) 553:8-10, 573:17-19; Defs.' 56.1 Stmt. ¶ 49; Pl.'s 56.1 Resp. ¶ 49.)

At approximately 7:20 a.m., Sergeant Robert Doyle ("Sergeant Doyle") of the Suffolk County Police Department's Homicide Bureau ordered Detectives Robert Anderson ("Detective Anderson"), Anthony Lahgezza ("Detective Lahgezza"), Michael Carmody ("Detective Carmody"), John Pfalzgraf ("Detective Pfalzgraf"), K. James McCready ("Detective McCready") and Norman Rein ("Detective Rein") to begin the investigation at the Tankleff home. (Defs.' 56.1 Stmt. ¶ 51.) Detective McCready arrived at the scene at 7:39 a.m. and walked through the home for approximately ten minutes. (Defs.' 56.1 Stmt. ¶ 52.) Thereafter, he talked to Plaintiff in his police car.[12] (Defs.' 56.1 Stmt.

---

[12] Detective McCready testified at his deposition that he was suspicious of Plaintiff immediately after speaking with him, due

¶ 52.)  He testified that Plaintiff appeared "excited" and said that Steuerman was responsible because Steuerman and his father had been fighting.  (Defs.' 56.1 Stmt. ¶ 52.)  Thereafter, Detective McCready and Plaintiff discussed the events of that morning.  (See Defs.' 56.1 Stmt. ¶ 53; Pl.'s 56.1 Resp. ¶ 53.) Detective McCready testified that Plaintiff told him he woke up at 5:35 a.m. when his alarm went off, but that he stayed in bed until 6:10 a.m.  (Defs.' 56.1 Stmt. ¶ 53.)  Detective McCready further testified that Plaintiff told him that he got out of bed at 6:10 a.m., put on a sweatshirt and shorts, looked into his parents' room, which was dark, and did not see anyone.  (Defs.' 56.1 Stmt. ¶ 53.)  Detective McCready said that at that point, Plaintiff told him that he walked to the office, saw his father and called 911 from the phone in the office.  (Defs.' 56.1 Stmt. ¶ 53.)  Detective McCready said that Plaintiff told him that after the call, he looked for his mother's car in the garage and eventually looked in the bedroom, saw his mother and ran into the kitchen to call his sister.  (Defs.' 56.1 Stmt. ¶ 53.)

Plaintiff alleges that, consistent with his trial testimony, he got out of bed at 6:05 a.m. and put on underwear and shorts but was not wearing a sweatshirt.  (Pl.'s 56.1 Resp. ¶ 53.)  Other than this, Plaintiff's account of the events

at least in part to Plaintiff's demeanor that morning.  (Pl.'s 56.1 Counterstmt. ¶ 17.)

of that morning and Detective McCready's recollection of Plaintiff's initial statements are largely consistent.[13] (Compare Defs.' 56.1 Stmt. ¶ 53 with Pl.'s 56.1 Resp. ¶ 53.) During their conversation, Detective McCready observed blood on Plaintiff's right calf and right foot. (Defs.' 56.1 Stmt. ¶ 54.) He asked if Plaintiff got blood on him when he helped his father and testified that Plaintiff responded that "[his] hands were covered with blood" and that "[he] washed them in a puddle."[14] (Defs.' 56.1 Stmt. ¶ 54.)

After his initial conversation with Plaintiff, Detective McCready re-entered the home and made several observations. (Defs.' 56.1 Stmt. ¶ 54.) At trial, Detective McCready testified that he noticed that there was no blood on the three telephones in or near the kitchen, no blood on the garage door handle or dead bolt lock, and that the drapes in the bedroom were open.[15] (Defs.'

---

[13] Plaintiff offers several additional facts to bolster his account. For example, he alleges that he was not wearing glasses or contacts that morning and that sunrise on September 7, 1988 was at 6:25 a.m. (Pl.'s 56.1 Resp. ¶ 53.)

[14] Plaintiff admits that this was Detective McCready's testimony at trial but notes that Detective McCready testified during his deposition that the location of the blood observed on Plaintiff's body by the first officers on the scene was consistent with Plaintiff's account of pulling his father from the chair by his feet. (Defs.' 56.1 Stmt. ¶¶ 32, 54; Pl.'s 56.1 Resp. ¶¶ 32, 54; McCready Dep. Tr., Pl.'s Ex. 9-1, Docket Entry 184-13, 121:7-122:13.)

[15] Plaintiff denies that these are incriminating facts and refers to Detective McCready's testimony at his deposition that

56.1 Stmt. ¶ 54.)  Detective McCready also testified at trial that he observed unsmeared blood spatters on the telephone in the office from which Plaintiff said he called 911.  (Defs.' 56.1 Stmt. ¶ 54.) However, at his deposition, when Detective McCready was asked to examine a photograph of the office phone, he testified that there was something that could have been smeared blood.  (Pl.'s 56.1 Resp. ¶ 54.)

At approximately 8:00 a.m., Sergeant Doyle arrived at the scene.  (Defs.' 56.1 Stmt. ¶ 55.)  He walked through the house and concluded that it was likely that there was a struggle in the bedroom.  (Defs.' 56.1 Stmt. ¶ 55.)  Later that morning, he also noticed that in the bathroom closest to Plaintiff's bedroom, the bathtub contained water droplets and there was a wet loofah sponge. (Defs.' 56.1 Stmt. ¶ 64.)  Sergeant Doyle testified at trial that Plaintiff did not appear "upset" or "emotional" when he met with him shortly after exiting the home, but Plaintiff disputes his characterization.  (Defs.' 56.1 Stmt. ¶ 55; Pl.'s 56.1 Resp. ¶ 55.) When Sergeant Doyle recounted his conversation with Plaintiff during his testimony at trial, he said that Plaintiff did not mention looking for his mother's car in the garage, but did say that, from the hallway outside the bedroom, he saw his mother's body and knew she was dead.  (Defs.' 56.1 Stmt. ¶ 56.)  Plaintiff

---

Plaintiff could have opened the garage door without getting blood on the handle or the lock.  (Pl.'s 56.1 Resp. ¶ 54.)

disputes that Sergeant Doyle's account is accurate. (Pl.'s 56.1 Resp. ¶ 56.) Detective Rein arrived at the scene a short time later. (Defs.' 56.1 Stmt. ¶ 59.) He testified that when Plaintiff spoke to him, Plaintiff said that when he got up, he looked in the bedroom but did not see anyone, walked to the office and found his father, dialed 911 from the office, administered aid to his father per the 911 operator's instructions, looked for his mother's car in the garage, went into the bedroom and saw his mother, called his sister from the kitchen, and went back to the office and then back to the kitchen again to answer his sister's return call. (Defs.' 56.1 Stmt. ¶¶ 60-61.)

B.    Plaintiff's Interview

After Detective Rein's conversation with Plaintiff, he spoke with Detective McCready and Sergeant Doyle regarding alleged discrepancies in Plaintiff's statements and his demeanor. (Defs.' 56.1 Stmt. ¶ 62.) Sergeant Doyle directed Detective McCready to ask Plaintiff to come to police headquarters. (Defs.' 56.1 Stmt. ¶ 62.) Plaintiff denies that his accounts were inconsistent and alleges that the Detectives become suspicious because they "believed that [his] emotional response was not appropriate."[16] (Pl.'s 56.1 Resp. ¶ 62.)

_____

[16] Plaintiff further denies that his demeanor was inappropriate or that he was "emotionless." Plaintiff alleges that he "felt out of it," "like he was having a nightmare," was "in a state of shock and disbelief," and "lacked awareness of his

15

Defendants allege that, around 8:40 a.m., Detective McCready asked Plaintiff to come to Police Headquarters and Plaintiff responded "fine" and got into Detective McCready's vehicle. (Defs.' 56.1 Stmt. ¶ 63.) Plaintiff alleges that he repeatedly requested to go to Mather Hospital to see his father, but Detective McCready refused to take him there until after he accompanied him to Police Headquarters. (Pl.'s 56.1 Counterstmt. ¶ 22.) Plaintiff also alleges that he "didn't think he had a choice about going with Detective McCready and believed that only by going with Detective McCready to the station would he be able to get to the hospital."[17] (Pl.'s 56.1 Counterstmt. ¶ 22.) During the drive to Headquarters, Detective McCready spoke with Detective Pfalzgraf, who was at Mather Hospital, and learned that Seymour had suffered serious head injuries and was being transferred to Stony Brook Hospital. (Defs.' 56.1 Stmt. ¶ 65.)

Detective McCready and Plaintiff arrived at Police Headquarters at approximately 9:20 a.m., and Detective McCready gave Plaintiff a cup of coffee while he waited. (Defs.' 56.1 Stmt.

_____

surroundings." (Pl.'s 56.1 Counterstmt. ¶ 18.) He points to the 911 call, Dara Schaeffer's testimony that he appeared to be in shock and his testimony that the morning was a "nightmare" as indicators of his emotional state that morning. (Pl.'s 56.1 Resp. ¶ 62.)

[17] Detectives Rein and McCready testified at their depositions that Plaintiff never asked to go the hospital. (Pl.'s 56.1 Counterstmt. ¶ 22.)

16

¶ 67.) Plaintiff alleges that the coffee was the only thing he had to eat since he woke up that morning. (Pl.'s 56.1 Resp. ¶ 67.) At approximately 9:40 a.m., Detectives Rein and McCready (the "Detectives") entered the interview room and began making small talk with Plaintiff, and Plaintiff removed three tissues from his pockets and put them on a desk. (Defs.' 56.1 Stmt. ¶ 68.) The nature of the interview and the methods used by the Detectives are vigorously disputed. For example, the parties dispute whether Plaintiff volunteered information or whether he supplied information in response to questioning by the Detectives. (See, e.g., Defs.' 56.1 Stmt. ¶¶ 69-71; Pl.'s 56.1 Resp. ¶¶ 69-71.) The order in which the topics were discussed is also unclear.[18]

Plaintiff alleges that the questions "never seemed to stop" and that he was "questioned almost continuously until he broke." (Pl.'s 56.1 Counterstmt. ¶ 24.) Additionally, Plaintiff alleges that he maintained his innocence throughout the Detectives' questioning and repeated his account of the events of that morning between six and twelve times, but they "refused to accept his truthful account." (Pl.'s 56.1 Counterstmt. ¶ 25.) Plaintiff further alleges that he asked to speak to Myron Fox, the family's attorney ("Fox"), approximately six times during the interview, and Detective McCready's response was "[i]f you want to

---

[18] There is no audio or video recording of the interview.

speak with your Uncle Mike, you're a criminal, we're going to lock you up."[19]  (Pl.'s 56.1 Counterstmt. ¶¶ 27-28.)  Plaintiff also claims that Detective McCready prevented him from speaking with Fox that morning at the crime scene, although Detective McCready denied during his deposition that he was attempting to prevent Plaintiff from "lawyering up."  (Pl.'s 56.1 Counterstmt. ¶ 28.) Detective McCready further denied that Plaintiff ever asked to speak with Fox.  (Pl.'s 56.1 Counterstmt. ¶ 28.)

The parties appear to be in agreement regarding the topics discussed during the interview.  They discussed Seymour's business dealings, the horses Seymour owned with Steuerman, the fact that Steuerman and his parents were partners in a bagel store, and that there was a dispute regarding Seymour buying into one of Steuerman's bagel stores.  (Defs.' 56.1 Stmt. ¶¶ 69-71; Pl.'s 56.1 Resp. ¶¶ 69-71.)  Plaintiff also mentioned that Seymour had loaned Steuerman $400,000, and that the two men had a dispute over certain equipment.  (Defs.' 56.1 Stmt. ¶ 221.)  Plaintiff talked about his knowledge of Seymour's businesses and explained that Seymour was "grooming" him for a career in business.  (Defs.' 56.1 Stmt. ¶ 83.) Plaintiff and the Detectives discussed his recent surgery and the fact that he had to wear glasses during his recovery, girls, his

_____

[19] Plaintiff alleges that Detective McCready knew that Fox was an attorney for the Tankleff family and that if Fox indicated that he was Plaintiff's lawyer, he could not continue to question him.  (Pl.'s 56.1 Counterstmt. ¶ 27.)

car, and that he loved to cook.  (Defs.' 56.1 Stmt. ¶¶ 74-76.)
Plaintiff said that he was adopted and talked about his family,
including his parents' relationship, indicated that he had a good
relationship with his mother and his father, and said that the
family had a maid.  (Defs.' 56.1 Stmt. ¶¶ 77-81.)  He mentioned
that he had an aversion to blood.  (Defs.' 56.1 Stmt. ¶ 80.)
Plaintiff further explained that his parents' will specified that
he would not receive anything until he has 25 and that under the
will, he would get more than his sister.  (Defs.' 56.1 Stmt. ¶ 84.)
Plaintiff told the Detectives that the will provided that he would
manage Seymour's business interests, including the deals Seymour
had with Steuerman, and that he would inherit the family home.
(Defs.' 56.1 Stmt. ¶ 222.)

Plaintiff and the Detectives discussed what occurred the
night before the attacks.  (Defs.' 56.1 Stmt. ¶ 72.)  Plaintiff
said that he took a shower before bed, and when he went into the
master bedroom to say good night to his mother, she was sleeping
on the side of the bed closest to a set of sliding glass doors.
(Defs.' 56.1 Stmt. ¶¶ 72-73.)  He said he could not recall if the
sliding glass doors were usually locked.  (Defs.' 56.1 Stmt. ¶ 78.)
Plaintiff and the Detectives discussed the poker game, and
Plaintiff told the Detectives the names of the players at the game
that night.  (Defs.' 56.1 Stmt. ¶ 81.)  He also mentioned that

Seymour and Steuerman "pretended to be good buddies" but "did not like each other anymore." (Defs.' 56.1 Stmt. ¶ 82.)

Plaintiff alleges that the Detectives told him that they did not believe his account of rendering aid to his father, and called Plaintiff's version of events "absurd" and "ridiculous." (Pl.'s 56.1 Counterstmt. ¶ 26.) The Detectives asked Plaintiff to demonstrate how he helped Seymour after calling 911, and Plaintiff demonstrated on Detective Rein while he sat in a chair.[20] (Defs.' 56.1 Stmt. ¶¶ 85, 92, 225.) Defendants point out that there was no blood on Plaintiff's shorts in the photograph taken of Plaintiff at headquarters, despite the fact that he made contact with Detective Rein during the demonstration. (Defs.' 56.1 Stmt. ¶¶ 93, 96.) Additionally, during the demonstration, Detective McCready noticed blood on Plaintiff's shoulder underneath his sweatshirt.[21] (Defs.' 56.1 Stmt. ¶ 91.)

At some point during the questioning, Plaintiff drew sketches of: (1) the cars of the card players in the driveway; (2)

---

[20] Although Defendants allege that Plaintiff was not threatened with any physical harm during the interview up to this point, Plaintiff testified during his deposition that "nobody put a gun to my head . . . but they took me away from my house [and] from my family." (Defs.' 56.1 Stmt. ¶ 87; Pl.'s 56.1 Resp. ¶ 87.)

[21] Detective Rein further noted that Plaintiff's demeanor appeared to be "calm" and he did not appear to be in shock. (Defs.' 56.1 Stmt. ¶ 97.) Plaintiff disputes that characterization. (Pl.'s 56.1 Resp. ¶ 97.)

the general layout of the Tankleff home; and (3) his parents'
bedroom. (Defs.' 56.1 Stmt. ¶¶ 88-90.) The sketch of his parents'
bedroom showed the location of Arlene's body and indicated that he
was standing near the alarm wall when he saw her. (Defs.' 56.1
Stmt. ¶¶ 88, 223.) Plaintiff testified during his deposition that
because he was sleeping, he did not hear any screams or cries for
help during the attacks. (Defs.' 56.1 Stmt. ¶ 58; Pl.'s 56.1 Resp.
¶ 58.)

The Detectives testified that they became accusatory
around 11:15 a.m.[22] and confronted Plaintiff with alleged
inconsistencies between his statements and their observations at
the scene.[23] (Defs.' 56.1 Stmt. ¶¶ 98, 100; Pl.'s 56.1 Resp. ¶¶ 98,
100.) During the questioning, both Detectives raised their voices,
and Detective McCready poked his fingers into Plaintiff's chest.
(Defs.' 56.1 Stmt. ¶¶ 101, 132.) Plaintiff alleges that Detective
McCready lied to him and told him that they found his hair in
Arlene's hand. (Pl.'s 56.1 Counterstmt. ¶ 30.) However, Detective
McCready later denied making this statement. (Pl.'s 56.1
Counterstmt. ¶ 30.) Plaintiff alleges that Detective McCready
also told him that they did not believe that he did not shower

---

[22] Although he is unsure of the time, Plaintiff admitted at trial
that the interview did not become confrontational until after
the demonstration. (Defs.' 56.1 Stmt. ¶ 226.)

[23] Plaintiff denies that there were any inconsistencies. (Pl.'s
56.1 Resp. ¶ 100.)

that morning because a humidity test indicated that he had showered. (Pl.'s 56.1 Counterstmt. ¶ 32.) As Detective McCready admitted at his deposition, there was no humidity test. (Pl.'s 56.1 Counterstmt. ¶ 32.) Plaintiff alleges that he "believed what Detective McCready was telling him . . . because [Plaintiff] was brought up to always believe in trusting cops." (Pl.'s 56.1 Counterstmt. ¶ 33.) Detective McCready testified at his deposition that he did not recall specifically making the statement about the humidity test, but said that he may have. (Pl.'s 56.1 Counterstmt. ¶ 34.)

At some point, Detective McCready left the interview room and pretended to take a phone call. (Defs.' 56.1 Stmt. ¶ 102; Pl.'s 56.1 Counterstmt. ¶ 36.) While Detective Rein was alone with Plaintiff, he pulled his chair "very close" to Plaintiff, "put his hands on his knees" and told him "[he] [couldn't] accept that [Plaintiff] didn't have blood on [his] clothes" as a result of helping his father. (Defs.' 56.1 Stmt. ¶ 132; Pl.'s 56.1 Resp. ¶ 132; Trial Tr. (Rein) 3245:6-3247:13.) When Detective McCready came back, he told Plaintiff that Seymour was conscious and identified him as the perpetrator.[24] (Defs.' 56.1 Stmt. ¶ 102; Pl.'s 56.1 Counterstmt. ¶ 36.) In fact, Seymour never regained

---

[24] Defendants allege that the ruse occurred at approximately 11:54 a.m. Plaintiff disputes that it occurred at that time. (Defs.' 56.1 Stmt. ¶ 102; Pl.'s 56.1 Resp. ¶ 102.)

consciousness. (Defs.' 56.1 Stmt. ¶ 195; Pl.'s 56.1 Counterstmt. ¶ 37.) Plaintiff alleges that Detective McCready pointed his finger at him and said "they shot your father full of Adrenalin" and "[y]ou beat and stabbed him, Marty." (Pl.'s 56.1 Counterstmt. ¶ 36.) Plaintiff alleges that Detective McCready also said "[y]ou did it Marty" and "your father said just tell us what we want to hear and help us."[25] (Pl.'s 56.1 Counterstmt. ¶ 36.) Plaintiff responded that Seymour must have identified him because he saw him that morning when Plaintiff was administering first aid. Plaintiff volunteered to a take a polygraph exam. (Defs.' 56.1 Stmt. ¶ 102.) Plaintiff alleges that the Detectives "repeatedly told [him] that his father would not lie about this," and Plaintiff recalls being in shock and disbelief that his father would accuse him. (Pl.'s 56.1 Counterstmt. ¶ 39.) At his deposition, Detective McCready admitted to lying to Plaintiff about his father and acknowledged that the goal was to get Plaintiff to confess.[26] (Pl.'s 56.1 Counterstmt. ¶ 37.)

Plaintiff alleges that he began to believe he might have done it because his father never lied to him. (Defs.' 56.1 Stmt.

---

[25] According to Plaintiff, Detective McCready also indicated that the conversation with Seymour had been recorded and they would play it for him later. (Pl.'s 56.1 Counterstmt. ¶ 36.)

[26] Detective Rein testified at trial that initially, McCready's ruse seemed real to him. (Pl.'s 56.1 Counterstmt. ¶ 37.)

¶ 107; Pl.'s 56.1 Resp. ¶ 107.)  Detective McCready testified that
Plaintiff said that "whoever did this needs psychiatric help,"
"[m]aybe it wasn't him but another Marty Tankleff that killed
them," and "could I have blacked out and done it?"[27]  (Defs.' 56.1
Stmt. ¶ 103.)  Plaintiff alleges that the Detectives encouraged
him by saying "there's a Marty inside of you that knows what
happened" and that he should make "that Marty tell us what
happened."  (Pl.'s 56.1 Counterstmt. ¶ 43.)  Then, Detective
McCready asked Plaintiff "[d]id you kill your mother and did you
hurt your father?" and Plaintiff said "Yeah I did it."[28]  (Defs.'
56.1 Stmt. ¶ 108.)  Plaintiff alleges that he "broke down and told
the [D]etectives what they wanted to hear . . . without considering
what the consequences of this false confession would be because,
in his shock and trauma, he 'thought it was all a nightmare and he
was going to wake up and it would be all over.'"  (Pl.'s 56.1
Counterstmt. ¶ 43.)

---

[27] Defendants allege and Plaintiff admits that the possibility
that Plaintiff could have blacked out was not suggested to him
by the Detectives.  (Defs.' 56.1 Stmt. ¶ 106; Pl.'s 56.1 Resp.
¶ 106.)  Additionally, at trial, Plaintiff admitted to asking if
he could have blacked out.  (Defs.' 56.1 Stmt. ¶ 229.)

[28] Defendants allege that after this admission, Plaintiff began
to discuss his plans for college, traveling to Florida, and that
he was annoyed that a family friend was coming to stay with him
while his parents went on vacation.  (Defs.' 56.1 Stmt. ¶¶ 109-
110.)  Plaintiff admits that he made such statements, but
disputes that he did so at this point in the interview.  (Pl.'s
56.1 Resp. ¶¶ 109-110.)

Plaintiff and the Detectives discussed how the crime occurred. The parties appear to agree that the Detectives made numerous suggestions to Plaintiff regarding the commission of the crime and that Plaintiff ultimately agreed with those suggestions.[29] (Defs.' 56.1 Stmt. ¶¶ 113, 118; Pl.'s 56.1 Resp. ¶¶ 113, 118.) However, there is some dispute whether Plaintiff initially denied the Detectives' suggestions before acquiescing. (Defs.' 56.1 Stmt. ¶¶ 114-17; Pl.'s 56.1 Resp. ¶¶ 114-17.) Plaintiff testified at his deposition that during the interview, he repeatedly told the Detectives that he was innocent. (Defs.' 56.1 Stmt. ¶¶ 124-125; Pl.'s 56.1 Resp. ¶¶ 124-25.) He also alleges that he "repeatedly told [the] [D]etectives that he could not provide details of his parents' murders by stating, for example, 'I don't know. I didn't do this.'" (Pl.'s 56.1 Counterstmt. ¶ 45.) Plaintiff explained that "the detectives would ask a question, and I would say, I don't know what you are talking about; I didn't do anything. And they would once again re-ask the question or make a statement to me, and I would say, well, you know, I don't remember doing anything. I didn't do anything. If

_____

[29] For purposes of this motion, Defendants do not dispute the veracity of certain portions of Plaintiff's deposition and trial testimony, including that he acquiesced to suggestions by the Detectives. (Defs.' 56.1 Stmt., at 1 n.1.) However, Defendants have previously maintained that Plaintiff "respond[ed] to open-ended questions" and "volunteered a detailed narrative confession." (Pl.'s 56.1 Counterstmt. ¶ 52.)

you're saying I did something, then I would just acquiesce to what they were saying."  (Pl.'s 56.1 Resp. ¶ 125.)  Plaintiff alleges that the details in the alleged confession "conveniently matched the observations" the Detectives made at the scene and "the theory they had formulated . . . during and after the walk-throughs," including the sequence of the attacks and the weapons.[30]  (Pl.'s 56.1 Counterstmt. ¶ 54.)

Plaintiff agreed with the Detectives' suggestion that he was naked during the attacks and began by hitting his mother with a dumbbell.  (Defs.' 56.1 Stmt. ¶¶ 112, 120.)  The Detectives suggested and Plaintiff agreed that after he hit her, he grabbed a knife from the kitchen that was lying on the counter next to watermelon rinds and cut her throat with it.  (Defs.' 56.1 Stmt. ¶ 112.)  The Detectives suggested and Plaintiff agreed that then his mother was on her back, and he continued to stab her, but could not remember how many times.  (Defs.' 56.1 Stmt. ¶ 112.)  He also agreed that he hit her four to five times on the head.  (Defs.' 56.1 Stmt. ¶ 112.)  Next, he agreed that "she was moving a little bit when he ran out of the bedroom to kill his father."  (Defs.' 56.1 Stmt. ¶ 119.)  Plaintiff acquiesced and agreed that he entered the office with a dumbbell and the knife behind his back, saw his

_____

[30] Plaintiff alleges that the prosecution relied heavily on the alleged confession at trial, and pointed to the correlation between Plaintiff's statements and the crime scene as an indication of its reliability.  (Pl.'s 56.1 Counterstmt. ¶ 78.)

father in his chair and hit him from behind with the dumbbell first. (Defs.' 56.1 Stmt. ¶¶ 120-21.) He agreed that, after his father asked him what he was doing, he "knocked him silly" and cut his neck. (Defs.' 56.1 Stmt. ¶¶ 121-22.) The Detectives suggested and Plaintiff agreed that he was not sure how many times he hit or stabbed his father and that he was shocked by the amount of blood. (Defs.' 56.1 Stmt. ¶ 122.) He further agreed that, afterward, he cleaned the dumbbell and the knife in the shower, returned the dumbbell to his bedroom, and laid in bed before getting up at 6:10 a.m. (Defs.' 56.1 Stmt. ¶ 123.)

Plaintiff alleges that he never received <u>Miranda</u> warnings, but admits that he signed a waiver of rights card (the "Waiver Card") after the alleged confession. (Defs.' 56.1 Stmt. ¶ 126; Pl.'s 56.1 Resp. ¶ 126; Pl.'s 56.1 Counterstmt. ¶ 29.) The Detectives testified at their depositions that Plaintiff was not advised of his rights or told he was a suspect when he was first brought to the station. (Pl.'s 56.1 Counterstmt. ¶ 29.) However, they claimed that Detective McCready provided Plaintiff with the "Waiver Card" and advised him of his rights just minutes before he said that he had done it. (Pl.'s 56.1 Counterstmt. ¶ 29.)

Plaintiff signed a consent form to allow them to take samples of his fingernail scrapings and any dried blood on his body, and investigators took several photographs of Plaintiff. (Defs.' 56.1 Stmt. ¶¶ 128-29.) Defendants note that in the

photographs, there is no blood on Plaintiff's shorts or sweatshirt, and Plaintiff acknowledged this fact at trial. (Defs.' 56.1 Stmt. ¶ 224.) At approximately 1:22 p.m., Fox called and directed the Detectives to stop their questioning. (Defs.' 56.1 Stmt. ¶ 130.) Plaintiff alleges that beginning with his first conversation with Detective McCready around 7:55 a.m., he "was effectively confined for five-and-a-half hours." (Pl.'s 56.1 Counterstmt. ¶ 21.) Plaintiff testified on cross-examination during the trial that, sometime after the alleged confession, he was in a room with Detective Rein, Detective McCready, and Sergeant Doyle, and Detective McCready choked him. (Defs.' 56.1 Stmt. ¶ 232.) This was the first time Plaintiff made such an allegation. (Defs.' 56.1 Stmt. ¶ 233.)

Plaintiff remained in the interview room while his arrest was processed, and later that day, he asked to speak with his sister, Shari Rother ("Shari").[31] (Defs.' 56.1 Stmt. ¶ 135.) During the call with Shari, Plaintiff told her he was sorry, and when Shari asked if Plaintiff told the police that he was responsible, Plaintiff responded "yes, they made me." (Defs.' 56.1 Stmt. ¶ 136; Tankleff 50-h Examination, Defs.' Ex. KK, 63:23-24.) Additionally, at trial, Plaintiff admitted that during that

---

[31] Plaintiff alleges that he asked the Detectives if he could talk to Shari numerous times that day. (Pl.'s 56.1 Resp. ¶ 135.)

conversation, he also said that he needed psychiatric help and told Shari he needed to see her. (Defs.' 56.1 Stmt. ¶ 231.)

Detective McCready subsequently drafted a report summarizing Plaintiff's alleged confession, which Plaintiff alleges is more detailed than the Detectives' handwritten notes from the interview itself. (Pl.'s 56.1 Counterstmt. ¶ 66.) Plaintiff alleges that the purported confession only contained the information known to Detectives at the time they questioned Plaintiff and did not include details that would come to light later in the investigation, including that Arlene had wounds on her back indicating she may have been attacked from behind and that the perpetrator(s) wore gloves. (Pl.'s 56.1 Counterstmt. ¶ 69-70.)

C.   The Evidence

Several detectives remained at the home after Detectives McCready and Rein transported Plaintiff to Police Headquarters. Detective James Barnes ("Detective Barnes") examined all of the doors and windows and found no sign of forced entry, although Plaintiff alleges that the front door was open when he woke up that morning. (Defs.' 56.1 Stmt. ¶ 137; Pl.'s 56.1 Resp. ¶ 137.) Detective Chuck Kosciuk ("Detective Kosciuk") also made several observations. In Plaintiff's bathroom, Detective Kosciuk testified that he observed water in the bathtub, including near the drain, along one side of the tub, and under a wet loofah

sponge. (Defs.' 56.1 Stmt. ¶ 138.) In Plaintiff's bedroom, Detective Kosciuk testified that he saw blood on the door knob, the light switch, and the wall next to the light switch.[32] (Defs.' 56.1 Stmt. ¶ 138.) He testified that he also observed a "slightly damp" towel and a set of dumbbells in Plaintiff's room. (Defs.' 56.1 Stmt. ¶ 138.) Plaintiff notes that a red substance was observed on the dumbbells, and alleges that this fact, in combination with the water in the bathtub led detectives to surmise that the dumbbells were used in the murders and that Plaintiff washed them off in the shower. (Pl.'s 56.1 Resp. ¶ 138.) Detective Kosciuk also saw a knife on the kitchen counter next to watermelon rinds, which according to one witness, appeared to be in a different position than it was during the poker game. (Defs.' 56.1 Stmt. ¶ 139.) Plaintiff alleges that this observation led detectives to believe that the knife, referred to as the "Watermelon Knife," was used by the perpetrator. (Pl.'s 56.1 Resp. ¶ 139.)

1. Arlene and Seymour's Injuries

Dr. Vernard Adams, Deputy Medical Examiner for Suffolk County ("Dr. Adams"), arrived at the home at around 4:00 p.m. and examined Arlene's injuries. (Defs.' 56.1 Stmt. ¶ 140.) Based on

---

[32] During the trial, Plaintiff testified that he did not recall if he turned on the light in his bedroom. (Defs.' 56.1 Stmt. ¶ 209.)

his preliminary examination of her body and the blood stains, he concluded that she sustained head injuries, had moved, and then the perpetrator inflicted stab wounds.[33] (Defs.' 56.1 Stmt. ¶ 140.) Dr. Adams performed Arlene's autopsy and testified at trial that Arlene sustained five depressed skull fractures, cuts to her hands and forearms, four slash wounds to her back and stab wounds to her neck caused by a sharp blade.[34] (Defs.' 56.1 Stmt. ¶ 142; Pl.'s 56.1 Counterstmt. ¶ 96.) He further testified that the skull fractures were consistent with having been caused by the dumbbell from Plaintiff's room.[35] (Defs.' 56.1 Stmt. ¶ 142.)

A surgeon at Stony Brook Hospital who operated on Seymour testified at trial that Seymour suffered "several depressed [skull] fractures," including "fracture[s] in which pieces of the bone [were] . . . driven inward" which "appeared to [have been] produced by a small pointed blunt object of which a hammer would be a good example." (Defs.' 56.1 Stmt. ¶ 141.) The surgeon testified that Seymour's neck wound was "unusual and extensive,"

---

[33] Plaintiff acknowledges that "the position of Arlene's body suggested [this] to an initial observer" but denies that Dr. Adams' observations were accurate. (Pl.'s 56.1 Resp. ¶ 140.)

[34] Defendants characterize the wounds to her hands and forearms as "defensive wounds," but Plaintiff disputes that description. (Defs.' 56.1 Stmt. ¶ 142; Pl.'s 56.1 Resp. ¶ 142.)

[35] Plaintiff admits that this was Dr. Adams' testimony, but disputes that the skull fractures were caused by the dumbbell. (Pl.'s 56.1 Resp. ¶ 142.)

and believed that "it would have taken a great deal of energy and determination to produce a wound [that] deep and extensive."[36] (Trial Tr. (Tyson) 4349:2-22.)  On October 6, 1988, Seymour succumbed to his injuries. (Defs.' 56.1 Stmt. ¶ 195.)  Dr. Adams' autopsy revealed that the perpetrator inflicted several blows to Seymour's head and that the cause of death was "head trauma and incised wounds of the neck."  (Defs.' 56.1 Stmt. ¶ 195.)

### 2. Investigation of the Poker Players and Steuerman

As discussed, Detective Robert Anderson ("Detective Anderson") and Detective Anthony Laghezza ("Detective Laghezza") were assigned to interview the card players, including those that attended the poker game at the Tankleff home on September 6th. (Defs.' 56.1 Stmt. ¶ 167.)  Bove, the Mayor of Belle Terre, told Detectives Anderson and Laghezza that nothing unusual occurred at the game and that he was not aware of a conflict between Steuerman and Seymour, although he admitted that he had no personal knowledge of their business dealings.  (Defs.' 56.1 Stmt. ¶ 168.)  Other players at the game, including Robert Montefusco ("Montefusco"), Albert Raskin ("Raskin"), Peter Capobianco ("Capobianco"), and Joseph Cecere ("Cecere"), also reported that they did not recall

---

[36] In response to questions from the prosecutor at trial, Dr. Tyson agreed that Seymour's neck wound was consistent with having been caused by a knife, the perpetrator was likely "very angry," and an individual who was able to lift Seymour from that chair would have the physical strength to cause Seymour's injuries.  (Defs.' 56.1 Stmt. ¶ 141.)

tension between Steuerman and Seymour. (Defs.' 56.1 Stmt. ¶¶ 169-172.) Plaintiff alleges that two of the players, Montefusco and Cecere, told detectives that they believed that Steuerman was the last one to leave the game.[37] (Pl.'s 56.1 Resp. ¶¶ 169, 172.) Detectives Anderson and Laghezza interviewed Steuerman on September 7th. (Defs.' 56.1 Stmt. ¶ 173; Anderson Supp. Rep., Defs.' Ex. V.) At the time of the interview, Steuerman knew that Plaintiff had accused him of being responsible for the attacks.[38] (Defs.' 56.1 Stmt. ¶ 173.) Steuerman told them that he had been a player in the poker game for about two years and did not recall anything out of the ordinary during the game on September 6th. (Defs.' 56.1 Stmt. ¶ 173.) He described his business dealings with Seymour. (Defs.' 56.1 Stmt. ¶ 173.) Additionally, Steuerman said that he left the card game and arrived at his daughter's house, where he was living at the time, at approximately 3:15

---

[37] Montefusco said that when the other players were leaving, Steuerman remained inside to talk to Seymour, and Cecere said that when he left, Steuerman was sitting in his car and was still sitting there when Cecere drove away. (Pl.'s 56.1 Resp. ¶¶ 169, 172; Pl.'s 56.1 Counterstmt. ¶ 134.)

[38] Plaintiff alleges that he was not the only individual to accuse Steuerman. (Pl.'s 56.1 Counterstmt. ¶ 129.) For example, he alleges that his brother-in-law, the family attorney and a cousin all told detectives that Steuerman could be involved or referred to tension between Steuerman and Seymour. (Pl.'s 56.1 Counterstmt. ¶¶ 129-31.)

a.m.[39] and found out about the attacks the next morning. (Defs.'
56.1 Stmt. ¶ 173.) After speaking with Steuerman, Detectives
Anderson and Laghezza concluded that Steuerman should not be
considered a suspect. (Defs.' 56.1 Stmt. ¶ 173.)

Detectives Rein and McCready conducted a second
interview of Steuerman on September 10th. (Defs.' 56.1 Stmt.
¶ 174.) Steuerman discussed the card game and his relationship
with the Tankleff family. (Defs.' 56.1 Stmt. ¶ 174.) At trial,
Steuerman's daughter testified that he arrived at her house around
3:16 a.m. (Defs.' 56.1 Stmt. ¶ 175.) His daughter testified that
she remembered the time because she had to get up and let her
father in because he had forgotten his keys. (Defs.' 56.1 Stmt.
¶ 175.) She also said that the drive from Belle Terre to her home
takes about fifteen minutes. (Defs.' 56.1 Stmt. ¶ 175.)

On September 14, 1988, Steuerman withdrew $15,000 from
an account he shared with Seymour, faked his own death, and
traveled under a fictitious name to Los Angeles, California.
(Defs.' 56.1 Stmt. ¶ 177; Pl.'s 56.1 Resp. ¶ 177.) During three
days of testimony at Plaintiff's trial, Steuerman explained that
he fled to California due to various personal and financial
problems and the accusations against him in connection with the

_____

[39] Plaintiff alleges that Steuerman's account of when he left the
card game is inconsistent with the testimony of the other card
players and that the inconsistency was overlooked. (Pl.'s 56.1
Counterstmt. ¶ 136.)

attacks on the Tankleffs. (Defs.' 56.1 Stmt. ¶ 178.) The homicide department ultimately investigated Steuerman's disappearance, presumably given the connection to the ongoing investigation. (Pl.'s 56.1 Counterstmt. ¶ 139; Missing Person Report, Pl.'s Ex. 24, Docket Entry 184-30.) The Missing Person Report refers to an anonymous call authorities received indicating that Steuerman "finance[d] his son . . . in major cocaine dealings." (Pl.'s 56.1 Counterstmt. ¶ 142; Missing Person Report at 5.) On September 26th, Detective McCready, Sergeant Doyle, and Assistant District Attorney Edward Jablonski ("ADA Jablonski") traveled to California, and Steuerman returned to Suffolk County with them on September 30th. (Pl.'s 56.1 Counterstmt. ¶¶ 152, 155; Missing Person Report at 26-28.) Plaintiff alleges that the purpose of the trip was not to further investigate Steuerman, but to convince him to return to Suffolk County. (Pl.'s 56.1 Counterstmt. ¶ 154.)

During the investigation and trial, authorities learned more about Steuerman and Seymour's business relationship.[40] Steuerman testified at trial that his relationship with Seymour deteriorated beginning in July and August 1988. (Trial Tr. (Steuerman) 1080:17-23.) Although Steuerman maintained that his financial obligations to Seymour continued after Seymour's death,

---

[40] For example, Plaintiff alleges that certain detectives, including Detective McCready and Sergeant Doyle, were aware that Steuerman owed money to Seymour. (Pl.'s 56.1 Counterstmt. ¶ 140.)

he also testified that he needed Seymour's approval to pursue new ventures and would have had to split the profits with Seymour while Seymour was alive.  (Defs.' 56.1 Stmt. ¶ 176; Pl.'s 56.1 Resp. ¶ 176; Trial Tr. (Steuerman) 1080:24-1081:25.)

Plaintiff alleges that the fact that Steuerman was ruled out as a suspect based on "two brief interviews in public places" and alibi testimony from his daughter illustrates that the investigation of Steuerman was "wholly inadequate."  (Pl.'s 56.1 Resp. ¶ 175; Pl.'s 56.1 Counterstmt. ¶¶ 148-49.)  Plaintiff further alleges that Defendants failed to adequately investigate Steuerman's finances or his connection to his son's alleged drug dealing.[41]  (Pl.'s 56.1 Counterstmt. ¶¶ 148-149.)  Defendants point out that Steuerman was questioned extensively during his trial testimony about his alleged involvement in the crime, and Detective McCready was subject to lengthy cross-examination regarding the adequacy of the investigation into Steuerman.  (Defs.' 56.1 Stmt. ¶¶ 179-80.)

### 3. Blood Stain Analysis

Robert Baumann ("Baumann"), a forensic serologist for Suffolk County, analyzed blood stains from several locations in the Tankleff home.  (Defs.' 56.1 Stmt. ¶ 188.)  Other than a smudge

_____

[41] Plaintiff alleges that detectives falsely represented in the Missing Persons Report and to Lieutenant McElhone that the investigation into Steuerman had been thorough.  (Pl.'s 56.1 Counterstmt. ¶¶ 150-51.)

on the exterior doorknob of Plaintiff's bedroom, Baumann noted that there was no blood near the entrance of any room in the home. (Defs.' 56.1 Stmt. ¶ 188; Pl.'s Resp. ¶ 188.) Testing of that smudge did indicate the presence of blood, but no further tests, including to identify the source of the blood, were ever performed. (Defs.' 56.1 Stmt. ¶ 188; Pl.'s Resp. ¶ 188; Baumann Dep. Tr., Pl.'s Ex. 12, Docket Entry 184-18, 201:17-202:11.) In the master bedroom, a bloodstain on the wall was found to be consistent with Seymour's blood. (Defs.' 56.1 Stmt. ¶ 189.) Blood detected on Arlene's fingernails was consistent only with Arlene's blood. (Defs.' 56.1 Stmt. ¶ 189; Trial Tr. (Baumann) 2213:3-11.) Baumann also analyzed the bedsheets, pillowcases, and shams from the master bedroom. (Defs.' 56.1 Stmt. ¶ 189.) On those items, one bloodstain was consistent with Seymour's blood, some bloodstains were consistent only with Arlene's blood, and others were consistent with either Arlene or Plaintiff's blood. (Defs.' 56.1 Stmt. ¶ 189; Trial Tr. (Baumann) 2178:4-2199:17.) The bloodstains in the office were consistent only with Seymour's blood, and the bloodstains on a towel in Plaintiff's bedroom were consistent only with Seymour's blood. (Defs.' 56.1 Stmt. ¶¶ 189-90.) The bloodstain on the light switch and the adjacent wall in Plaintiff's bedroom was consistent with either Arlene's blood or Plaintiff's blood. (Trial Tr. (Baumann) 2272:18-2275:17.) Analysts also noticed that a "chain link" or "honeycomb" pattern consistent with

latex, fabric or rubber gloves appeared in several of the bloodstains, including bloodstains on the bedding in the master bedroom and next to the light switch in Plaintiff's bedroom. (Defs.' 56.1 Stmt. ¶¶ 190-91; Pl.'s 56.1 Resp. ¶¶ 190-91.)

No blood was detected on Plaintiff's shorts or underwear. (Defs.' 56.1 Stmt. ¶ 192.) However, there was a stain on the inside right shoulder of Plaintiff's sweatshirt that tested positive for the presence of blood. (Defs' 56.1 Stmt. ¶ 192.) Due to the size of stain, no further testing could be conducted. (Defs.' 56.1 Stmt. ¶ 192.) As discussed, Detectives McCready and Rein noticed a bloodstain on Plaintiff's right shoulder during the interview, and that stain was tested and determined to be consistent only with Seymour's blood. (Defs.' 56.1 Stmt. ¶ 192; Trial Tr. (Baumann) 2266:23-2268:9.) No blood was detected on the dumbbells, kitchen knives, traps, drains, or on a loofah sponge in the bathroom, although the loofah sponge did have a "five inch slit" of unknown origin. (Defs.' 56.1 Stmt. ¶ 193; Pl.'s 56.1 Resp. ¶ 193.) Nor was any blood detected on the Watermelon Knife. (Baumann Dep. Tr. 142:18-145:20.) Finally, two of the tissues Plaintiff removed from his pocket at Police Headquarters tested positive for the presence of blood; the stains on one were consistent only with Plaintiff's blood, and the stains on the second tissue were consistent only with Arlene's blood. (Defs.' 56.1 Stmt. ¶ 193; Trial Tr. (Baumann) 2277:5-23.) Plaintiff

alleges that he could have gotten Arlene's blood on his hand when he turned on the light in his bedroom that morning, and Detective McCready agreed during his deposition that this was a possible explanation for her blood being on the tissue. (Pl.'s 56.1 Resp. ¶ 193.)

### 4. The Watermelon Knife

As discussed, Dr. Adams conducted both Arlene and Seymour's autopsies. (Pl.'s 56.1 Counterstmt. ¶ 93.) During Arlene's autopsy, Dr. Adams observed four sharp impact stab wounds on her back. (Pl.'s 56.1 Counterstmt. ¶ 96; Arlene Autopsy Diagram, Pl.'s Ex. 13, Docket Entry 184-19, at 10.) Dr. Adams' autopsy report described them as "four stab wounds . . . with a small abrasion to the left of [each] stab wound" measuring "from one-quarter of an inch to five-eighths of an inch." (Adams Dep. Tr., Defs.' Ex. BBB, 183:6-13.) In connection with the autopsies, Dr. Adams was provided with the Watermelon Knife. (Pl.'s 56.1 Counterstmt. ¶ 97; Adams. Dep. Tr. 179:24-180:15.)

During his deposition in 2014, Dr. Adams testified that there was no "reasonable possibility" that the Watermelon Knife caused the stab wounds on Arlene's back. (Adams Dep. Tr. 191:12-192:8; see also Pl.'s 56.1 Counterstmt. ¶ 98.) He further testified that he believed those wounds were inflicted by a short knife that "had some kind of projection that could cause an abrasion," such as a utility knife. (Adams. Dep. Tr. 193:22-

194:10.) Although the parties agree that Dr. Adams did not communicate his conclusion to the prosecutors either before or during Plaintiff's trial, they dispute whether Dr. Adams ever shared his conclusion with any of the detectives. (Defs.' 56.1 Stmt. ¶ 144; Pl.'s 56.1 Resp. ¶ 144; Pl.'s 56.1 Counterstmt. ¶¶ 114-15.) Defendants deny that Dr. Adams ever communicated his opinion to detectives. (Defs.' 56.1 Stmt. ¶ 144.) Plaintiff alleges that Dr. Adams discussed this information with detectives based on his deposition testimony and testimony from other witnesses indicating that it was an established practice in the Suffolk County Police Department to have a detective present at an autopsy.[42] (Pl.'s 56.1 Counterstmt. ¶¶ 93, 101.) It is undisputed that Plaintiff's defense attorney, Robert Gottlieb, never learned this information. (Pl.'s 56.1 Counterstmt. ¶ 116; Gottlieb Dep. Tr., Defs.' Ex. JJJ, 88:5-13.)

---

[42] Dr. Adams testified that it was "usual and customary" for the detectives to attend the autopsy. (Adams Dep. Tr. 40:22-8.) Lieutenant John McElhone testified that autopsies would be "covered" by a detective. (McElhone Dep. Tr., Pl.'s Ex. 8, Docket Entry 184-12, 91:20-23.) Assistant District Attorneys Collins and Jablonski gave similar testimony. (See Collins Dep. Tr., Defs.' Ex. HHH, 97:18-98:7 (agreeing that it was "the practice of the Homicide Squad to attend autopsies . . . and they would generally assign a detective, if not more than one, to attend the autopsy" and "most of the time" they would take notes); Jablonski Dep. Tr., Defs.' Ex. III, 51:16-24 (testifying that "a lot of times" a detective attended the autopsy).)

Detective McCready, Detective Carmody, Detective Kosciuk, and Detective Rein have all denied being present at Arlene's autopsy; Sergeant Doyle does not recall if he was at Arlene's autopsy but admitted to being at the medical examiner's office on the day of her autopsy.[43] (Pl.'s 56.1 Counterstmt. ¶ 102; McCready Aff., Defs.' Ex. FFF, ¶ 9; Doyle Aff., Defs.' Ex. DDD, ¶ 9; Carmody Aff., Defs.' Ex. CCC, at ¶ 9; Kosciuk Aff., Defs.' Ex. EEE, ¶ 10; Rein Aff., Defs.' Ex. GGG, at ¶ 9.) Detective Carmody admitted that he had a meeting with Dr. Adams the day after Arlene's autopsy. (Pl.'s 56.1 Counterstmt. ¶ 102.) That meeting appears to be documented in Detective Carmody's handwritten notes, which refer to a meeting with Dr. Adams on September 9, 1988. (Pl.'s 56.1 Counterstmt. ¶ 123; Carmody Notes, Pl.'s Ex. 19, Docket Entry 184-25, at 27.) In those notes, Detective Carmody wrote "clear knife issue," and there is a drawing of what appears to be a shorter knife blade and a longer knife blade. (Pl.'s 56.1 Counterstmt. ¶ 123; Carmody Notes at 27; Carmody Dep. Tr., Pl.'s Ex. 20, Docket Entry 184-26, 68:20-23 (responding that the drawings "appear to be" knife shapes).) At his deposition, Detective Carmody testified that he did not know what he meant by "clear knife issue" and that he did not "remember why [he] even drew those shapes." (Carmody Dep. Tr. 68:15-69:11.)

---

[43] Detective Rein admitted to being at Seymour's autopsy. (Pl.'s 56.1 Counterstmt. ¶ 102; Rein Aff. ¶ 10.)

Dr. Adams testified at his deposition that he "must have communicated" that he did not believe that the Watermelon Knife was the weapon "in some sense, if not those words." (Adams Dep. Tr. 193:9-21.) When asked if he would have communicated this at Arlene's autopsy, he testified that he did not "have any recollection of what we actually communicated" but it "seems reasonable" that he would have communicated his opinion during the autopsy. (Adams Dep. Tr. 192:22-193:8.) Plaintiff alleges that Detective Rein was most likely present at Arlene's autopsy, based in part on several pages of handwritten notes and a drawing of the wounds on Arlene's back, which have been identified as belonging to Detective Rein by one witness.[44] (Pl.'s 56.1 Counterstmt. ¶ 103.) The notes include several pages of diagrams from Seymour's autopsy, and both Dr. Adams' and Detective Rein's name appear on the first diagram. (Seymour Autopsy Diagram, Pl.'s Ex. 17, Docket Entry 184-23, at 1.) After the diagrams, there is what appears to be a drawing of the wounds on Arlene's back, including measurements of each cut and a sketch of a knife with a short blade. (Seymour Autopsy Diagram, at 5.) When Dr. Adams was asked about the document, he testified that the handwriting did not look like his, but he believed the drawing was made by "someone who was at the

_____

[44] When Assistant District Attorney Collins ("ADA Collins") was shown the document, he identified the handwriting on the diagrams as Detective Rein's. (Pl.'s 56.1 Counterstmt. ¶ 103; Collins Dep. Tr. 99:9-19.)

autopsy and making a diagram of their own at the same time I was making my notes." (Pl.'s 56.1 Counterstmt. ¶ 104; Adams. Dep. Tr. 189:21-190:3.) Plaintiff alleges that the wound measurements on that drawing match the measurements documented by Dr. Adams in his notes. (Pl.'s 56.1 Counterstmt. ¶ 105.)

Since Plaintiff's conviction, several detectives have stated that they came to the conclusion that the Watermelon Knife was not the weapon used in the attacks. (See Pl.'s 56.1 Counterstmt. ¶¶ 122-27.) At his deposition, Detective Rein testified that he came to the conclusion that the Watermelon Knife was not the murder weapon and that "it would have been a shorter knife [or] a different kind of knife," although he was unsure when he came to believe that. (Pl.'s 56.1 Counterstmt. ¶ 122; Rein Dep. Tr., Defs.' Ex. XX, 197:17-198:4.) Detective Rein testified that Sergeant Doyle also believed that the Watermelon Knife was not the murder weapon and that they discussed it. (Rein Dep. Tr. 197:11-198:4.) During subsequent interviews, Detectives Kosciuk, Detective Pfalzgraf, and Sergeant Doyle all stated that they did not believe the Watermelon Knife caused Arlene and Seymour's injuries. (Pl.'s 56.1 Counterstmt. ¶¶ 125-27; Kosciuk Interview Summary, Pl.'s Ex. 21, Docket Entry 184-27, at 3; Pfalzgraf Interview Summary, Pl.'s Ex. 22, Docket Entry 184-28, at 4; Doyle Interview Summary, Pl.'s Ex. 23, Docket Entry 184-29, at 5.) Detective Kosciuk said he thought a "utility-type knife" caused

the wounds, Detective Pfalzgraf said he thought he was a "Exacto knife or razor knife," and Sergeant Doyle stated that he believed it was a "utility knife." (Kosciuk Interview Summary at 3; Pfalzgraf Interview Summary at 4; Doyle Interview Summary at 5.)

D. Indictments, Conviction, and Post-Conviction Proceedings

On September 9, 1988, Plaintiff was indicted for the murder of his mother and the assault on his father. (Defs.' 56.1 Stmt. ¶ 181; First Am. Compl., Docket Entry 145-1, ¶ 113.) On October 27, 1988, Plaintiff was indicted for the murder of his father. (Defs.' 56.1 Stmt. ¶ 182; First Am. Compl. ¶ 115.) Plaintiff moved to suppress his alleged confession, and the trial judge conducted a Huntley hearing in March 1989. The trial judge denied the suppression motion, and Plaintiff's confession was introduced as evidence. (First Am. Compl. ¶ 119.) The trial began on April 23, 1990 and ended on June 20, 1990. (First Am. Compl. ¶ 120.) The jury found Plaintiff guilty of the first-degree murder of Seymour and the second-degree murder of Arlene, and he was sentenced to two consecutive terms of twenty-five years to life. (First Am. Compl. ¶ 128.)

Plaintiff appealed his conviction to the Appellate Division, Second Department and challenged the voluntariness of his confession, the administration of Miranda warnings, and other tactics employed the Detectives during the interview. (Defs.'

56.1 Stmt. ¶ 235.)  Based on the determinations by the trial judge at the Huntley hearing, the Appellate Division affirmed Plaintiff's conviction.  (Defs. 56.1 Stmt. ¶ 235; Pl.'s 56.1 Resp. ¶ 235.)  He appealed that decision to the Court of Appeals, which affirmed the Appellate Division's decision and, based on the determinations of the trial judge at the Huntley hearing, held that the confession was voluntary.  (Defs.' 56.1 Stmt. ¶ 236; Pl.'s 56.1 Resp. ¶ 236.)  Plaintiff subsequently filed a Writ of Habeas Corpus in this district, which was denied.  (Defs.' 56.1 Stmt. ¶ 237.)  He appealed that denial to the Second Circuit Court of Appeals, and the Second Circuit held that while the Detectives should have administered Miranda warnings earlier and statements made before the warnings were given should have been suppressed, the statements given by Plaintiff subsequent to the waiver of rights were properly admitted.  (Defs.' 56.1 Stmt. ¶ 238; Pl.'s 56.1 Resp. ¶ 238.)

On October 3, 2003, Plaintiff filed a motion for a new trial pursuant to New York State Criminal Procedure Law § 440.10 in Suffolk County Court and the judge conducted a hearing (the "440.10 Hearing") to consider new evidence presented by Plaintiff. People v. Tankleff, 49 A.D.3d 160, 164, 848 N.Y.S.2d 286, 290 (2d Dep't 2007).  Plaintiff presented evidence that the attacks on his parents were committed by Joseph Creedon, Peter Kent, and Glen Harris, three men who were allegedly hired by Steuerman.  (Defs.'

56.1 Stmt. ¶ 240; Pl.'s 56.1 Counterstmt. ¶¶ 157-60.)   After a
lengthy hearing, the trial judge denied Plaintiff's motion for new
trial.  Tankleff, 49 A.D.3d at 176, 848 N.Y.S.2d at 298.  Plaintiff
appealed the decision, and on December 18, 2007, the Appellate
Division vacated the convictions and held that the newly discovered
evidence warranted a new trial.   (Defs.' 56.1 Stmt. ¶ 239.)
However, the Appellate Division held that Plaintiff "did not
establish entitlement to . . . relief" on the grounds of actual
innocence.   (Defs.' 56.1 Stmt. ¶ 239; Pl.'s 56.1 Resp. ¶ 239.)
The Appellate Division ultimately declined to address the
admissibility of the confession, but held that "when the evidence
presented at the CPL article 440 hearing is evaluated against the
backdrop of the trial evidence, including the defendant's
confession, how the confession was obtained, and the fact that the
defendant almost immediately recanted the confession," a new trial
was warranted.   Tankleff, 49 A.D.3d at 182, 848 N.Y.S.2d at 302.

        In January 2008, the Suffolk County District Attorney
announced that he would drop the charges against Plaintiff and ask
Governor Eliot Spitzer to appoint a special prosecutor to review
the case.   (Defs.' 56.1 Stmt. ¶ 246; Pl.'s 56.1 Resp. ¶ 246;
Jan. 2, 2008 Article, Pl.'s Ex. 48, Docket Entry 184-54.)  A short
time later, Governor Spitzer appointed Attorney General Andrew
Cuomo (the "Attorney General") to investigate the case.   (Defs.'
56.1 Stmt. ¶ 246; Pl.'s 56.1 Resp. ¶ 246; Press Release, Pl.'s Ex.

47, Docket Entry 184-53.)  At the conclusion of the investigation, the Attorney General moved to dismiss the indictments against Plaintiff in the interests of justice pursuant to New York Criminal Procedure Law § 210.40, and that motion was granted on July 22, 2008.  (Defs.' 56.1 Stmt. ¶ 247.)

Later that year, in December 2008, the New York State Commission of Investigation (the "Commission") released its report examining the Suffolk County Police Department's investigation of the case.  (Defs.' 56.1 Stmt. ¶ 250.)  The Commission concluded, among other things, that the investigation was "comprehensive, extensive and methodical," the procedures used during Plaintiff's interview were "proper in all respects" and "within the confines of the law," and the alleged confession was not the result of "force or coercion."  (Defs.' 56.1 Stmt. ¶ 250.)  Plaintiff admits that these were the Commission's conclusions but denies that the conclusions are true.  (Pl.'s 56.1 Resp. ¶ 250.)  Plaintiff also disputes that the Commission relied on "a complete and accurate account of the process used to obtain the confession."  (Pl.'s 56.1 Resp. ¶ 250.)

II.  Procedural History

Plaintiff commenced this lawsuit on March 24, 2009. (Compl., Docket Entry 1.)  The Complaint alleged the following causes of action under 42 U.S.C. § 1983: (1) malicious prosecution against Detective McCready, Detective Rein, and John Doe police

officers; (2) fabrication of evidence against Detective McCready and Detective Rein; (3) failure to investigate against Detective McCready and Detective Rein; (4) suppression of evidence against Detective McCready, Detective Rein, and Detective Kosciuk; (5) coercion and violation of Plaintiff's right to counsel against Detective McCready, Detective Rein, and John Doe police officers; (6) civil rights conspiracy against Detective McCready, Detective Rein, Sergeant Doyle, Lieutenant McElhone, John Doe police officers, and Richard Roe county employees; (7) supervisory liability against Sergeant Doyle, Lieutenant McElhone, and Richard Roe county employees; and (8) an unconstitutional custom or policy and a failure to supervise and train pursuant to Monell v. Department of Social Services, 436 U.S. 658 (1978), against the County of Suffolk. (Compl. ¶¶ 147-182.) Additionally, the Complaint alleged the following state law causes of action: (1) malicious prosecution against Detective McCready, Detective Rein, Sergeant Doyle, John Doe police officers, and Richard Roe county employees; (2) false imprisonment against Detective McCready, Detective Rein, Sergeant Doyle, John Doe police officers, and Richard Roe county employees; and (3) intentional or negligent infliction of emotional distress against Detective McCready and Detective Rein. (Compl. ¶¶ 183-194.) Defendants filed their Answer on July 24, 2009. (Answer, Docket Entry 22.)

On April 6, 2010, Defendants filed a motion for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c). (Defs.' 12(c) Mot., Docket Entry 38.) On December 21, 2010, the Court granted Defendants' motion in part and denied it in part. Tankleff v. County of Suffolk, No. 09-CV-1207, 2010 WL 5341929 (E.D.N.Y. Dec. 21, 2010). Specifically, the Court dismissed Plaintiff's conspiracy, supervisory liability, false imprisonment, suppression of evidence, failure to investigate, and intentional or negligent infliction of emotional distress claims. Tankleff, 2010 WL 5341929, at *1. The Court permitted Plaintiff's Section 1983 malicious prosecution, state law malicious prosecution, fabrication of evidence, coercion, and Monell claims to proceed. Id. at *5-10, 12. Thereafter, the parties engaged in extensive discovery and argued numerous discovery motions.

On December 9, 2014, Plaintiff filed a motion to amend the Complaint, which this Court referred to Magistrate Judge Steven I. Locke. (Pl.'s Mot. to Amend, Docket Entry 145; Referral Order, Docket Entry 151.) Plaintiff sought leave to add a suppression of evidence claim against Detective McCready, Detective Rein, Sergeant Doyle, and Detective Kosciuk. (Pl.'s Mot. to Amend at 1.) Plaintiff alleged that Detective McCready, Detective Rein, Sergeant Doyle, and Detective Kosciuk withheld exculpatory evidence by failing to disclose the medical examiner's conclusion that the Watermelon Knife could not have been the murder

weapon. (Pl.'s Mot. to Amend at 1.) By Order dated May 5, 2015,

Magistrate Judge Anne Y. Shields granted Plaintiff's motion to

amend.[45] (Mot. to Amend Order, Docket Entry 157.) As a result,

the Court considers the First Amended Complaint at Docket Entry

145-1 to be the operative complaint in this action. (First Am.

Compl., Docket Entry 145-1.) The Court subsequently allowed

discovery to be re-opened on a limited basis to gather evidence

related to the suppression claim. (Electronic Discovery Order,

May 14, 2015.)

On January 14, 2016, Defendants notified the Court that

Detective McCready died. (Suggestion of Death, Docket Entry 167.)

Theresa McCready and Brett McCready were substituted as Detective

McCready's legal successors on June 2, 2016. (Substitution Order,

Docket Entry 178.)

On June 10, 2016, Defendants filed a motion for partial

summary judgment on the Section 1983 and state law malicious

prosecution claims, the coercion claim, and the recently added

suppression claim. (Defs.' Mot., Docket Entry 180.) Defendants

are not moving for summary judgment on Plaintiff's fabrication of

evidence or Monell claims. (Defs.' Mem., Docket Entry 180-3, at

1 n.1.) Plaintiff filed his opposition on August 17, 2016, and

_____

[45] After the Court referred the motion to Judge Locke, the matter
was reassigned to Judge Shields. (Reassignment Order, Docket
Entry 155.)

Defendants filed their reply on September 23, 2016. (Pl.'s Opp.,
Docket Entry 183; Defs.' Reply, Docket Entry 186.)

DISCUSSION

I.  <u>Legal Standard</u>

Summary judgment will be granted where the movant
demonstrates that there is "no genuine dispute as to any material
fact and the movant is entitled to judgment as a matter of law."
Fᴇᴅ. R. Cɪᴠ. P. 56(a).  A genuine factual issue exists where "the
evidence is such that a reasonable jury could return a verdict for
the nonmoving party."  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S.
242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed 2d 202 (1986).  In
determining whether an award of summary judgment is appropriate,
the Court considers the "pleadings, deposition testimony, answers
to interrogatories and admissions on file, together with any other
firsthand information including but not limited to affidavits.
<u>Nnebe v. Daus</u>, 644 F.3d 147, 156 (2d Cir. 2011).

The movant bears the burden of establishing that there
are no genuine issues of material fact.  <u>Gallo v. Prudential
Residential Servs., L.P.</u>, 22 F.3d 1219, 1223 (2d Cir. 1994).  Once
the movant makes such a showing, the non-movant must proffer
specific facts demonstrating "a genuine issue for trial."  <u>Giglio
v. Buonnadonna Shoprite LLC</u>, No. 06-CV-5191, 2009 WL 3150431, at
*4 (E.D.N.Y. Sept. 25, 2009) (internal quotation marks and citation
omitted).  Conclusory allegations or denials will not defeat

summary judgment.  Id.  However, in reviewing the summary judgment record, "'the court is required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought.'" Sheet Metal Workers' Nat'l Pension Fund v. Vadaris Tech. Inc., No. 13-CV-5286, 2015 WL 6449420, at *2 (E.D.N.Y. Oct. 23, 2015) (quoting McLee v. Chrysler Corp., 109 F.3d 130, 134 (2d Cir. 1997)).

## II.  Coercion Claim

Defendants argue that the Court should grant summary judgment on Plaintiff's coercion claim because the confession was not coerced as a matter of law.  (Defs.' Mem. at 4.)  Without citing to the parties' 56.1 Statements, Defendants describe the events surrounding Plaintiff's interview and point out that, for example, there is no "evidence that [Plaintiff] was subjected to any kind of physical or verbal threats by Detective McCready on the way to Headquarters," and at the beginning of the interview, "the questions and answers . . . were conversational and the [P]laintiff answered the questions in a completely narrative fashion."  (Defs.' Mem. at 5-6.)  Defendants argue that Plaintiff admits that he and the Detectives discussed a variety of topics including his father's businesses, his family and his personal life, and that he provided information on these topics.  (Defs.' Mem. at 6.)  Defendants also contend that Plaintiff was "not threatened with any physical harm" other than Detective McCready

allegedly screaming at him and "jamming his finger into [his] chest" after the questioning became accusatory. (Defs.' Mem. at 6, 8.) Defendants maintain that at some point during the interview, Plaintiff volunteered to draw sketches of the house, his parents' bedroom, and the card player's cars in the driveway. (Defs.' Mem. at 7.) They also argue that "[P]laintiff has produced no evidence that he exhibited any outward signs of being in shock." (Defs.' Mem. at 7.)

Defendants contend that Plaintiff's ultimate admission, "Yeah I did it," was "the result of a non-accusatory question" and "in the wake of the [P]laintiff having been told that his father had regained consciousness, thereby enhancing its reliability." (Defs.' Mem. at 9.) Defendants acknowledge that there is a genuine issue of fact whether, during the discussion of the crime, Plaintiff acquiesced to the Detectives' suggestions or spoke in a narrative fashion. (Defs.' Mem. at 9.) However, they argue that Plaintiff's testimony--that when the Detectives made a suggestion, he would initially deny the suggestion--reflects that "[Plaintiff] knew what he was doing, and what he was saying, and voluntarily chose to go along with their suggestions." (Defs.' Mem. at 12-13.) They argue that given the length and nature of the interrogation, it "can hardly be viewed as an interrogation that was repetitive, prolonged or relentless." (Defs.' Mem. at 11.) Moreover, Defendants point out that the courts that previously

reviewed Plaintiff's conviction found the confession to be voluntary and the tactics used by the Detectives to be permissible. (Defs.' Mem. at 12-13.)  Regarding the Waiver Card, Defendants argue that there is no "evidence that [Plaintiff] did not understand his <u>Miranda</u> rights . . . or that he lacked the requisite level of comprehension to make an effective waiver . . . ." (Defs.' Reply at 11.)  Finally, Defendants argue that they are entitled to qualified immunity.  (Defs.' Mem. at 14-17.)

Plaintiff argues that there are issues of material fact as to whether the confession was coerced.  (Pl.'s Opp. at 9-19.) Plaintiff contends that he was only seventeen years old and "just experienced the profound trauma of finding his parents the victims of gruesome deadly attacks."[46]  (Pl.'s Opp. at 10.)  He alleges that he was in shock that morning and "believed . . . that he was in some sort of nightmare."  (Pl.'s Opp. at 10.)  Plaintiff maintains that he was "interrogated in a coercive environment under coercive conditions" and that he was particularly susceptible to coercion due to his "youth, psychological and emotional fragility, and inexperience with law enforcement."  (Pl.'s Opp. at 11.)  For example, Plaintiff alleges that the Detectives intentionally

---

[46] Defendants argue that at seventeen, Plaintiff was considered an adult pursuant to New York Penal Law, and the District Court that considered his habeas petition described him as "sophisticated" and an "above average high school student." (Defs.' Reply at 7.)

isolated him from family members and his family's attorney, despite multiple requests to speak to the attorney at his home that morning and during the interview. (Pl.'s Opp. at 11-12.) Further, he maintains that during the five-and-a-half hours that he was interrogated, he was not offered anything to eat besides a cup of coffee when he arrived.[47] (Pl.'s Opp. at 12.) He also argues that he was not advised of his <u>Miranda</u> rights when the questioning began.[48] (Pl.'s Opp. at 12.)

Plaintiff also alleges that the Detectives screamed and cursed at him, and Detective McCready jammed his finger into Plaintiff's chest. (Pl.'s Opp. at 13.) Further, Plaintiff contends that the Detectives made him repeat "his story 6 to 12 times," "refused to accept his truthful account" and then lied to him about his hair being found in his mother's hand, a humidity test the police purportedly conducted, and that Plaintiff's father had implicated him. (Pl.'s Opp. at 13-14.) After the Detectives allegedly had Plaintiff believing that he committed the crime, Plaintiff alleges that the Detectives "fed him gruesome, nonpublic

---

[47] Defendants contend that he was "only subjected to questions of an accusatory nature for approximately 40 minutes." (Defs.' Reply at 8.) Additionally, they argue that there is no evidence in the record that Plaintiff requested and was denied food. (Defs.' Reply at 9.)

[48] Plaintiff points out that he has not alleged separate claims for violations of his <u>Miranda</u> rights or his right to counsel, but has proffered evidence of these alleged violations to demonstrate coercion. (Pl.'s Opp. at 9, n.5.)

details about how his parents had been murdered [and] . . . coerced the traumatized teen into adopting these statements as his own." (Pl.'s Opp. at 14-15.)    Finally, Plaintiff argues that the Detectives are not entitled to qualified immunity.

A plaintiff may bring a Section 1983 coercion claim "if coercion was applied to obtain a waiver of the plaintiff's rights against self-incrimination and/or to obtain inculpatory statements, and the statements thereby obtained were used against the plaintiff in a criminal proceeding." Deshawn E. by Charlotte E. v. Safir, 156 F.3d 340, 346 (2d Cir. 1998).    To establish a violation of the accused's Fifth Amendment right against self-incrimination, "[a] plaintiff must point to circumstances indicating that []he could not make a knowing and voluntary decision." Sedunova v. City of N.Y., 652 F. App'x 29, 31 (2d Cir. 2016).    "The test for whether a statement was improperly obtained by coercion is determined by the totality of the circumstances." Higazy v. Templeton, 505 F.3d 161, 170 (2d Cir. 2007) (internal quotation marks and citation omitted); see also Safir, 156 F.3d at 347-48 (explaining that factors to consider include, "whether Miranda warnings were properly administered or waived, whether counsel was present, whether the defendant knew the nature of the offense with which he was charged, . . . the time elapsing between arrest and the confession, . . . the characteristics of the accused[,] the conditions of interrogation and[,] the conduct of

the law enforcement officials."). The assessment of voluntariness is a "fact-intensive inquiry" during which the court should consider "'the accused's characteristics, the conditions of [the] interrogation, and the conduct of law enforcement officials.'" Thomsen v. City of N.Y., No. 15-CV-2668, 2016 WL 590235, at *9 (S.D.N.Y. Feb. 11, 2016) (quoting United States v. Taylor, 745 F.3d 15, 24 (2d Cir. 2014)). When a confession is "obtained under circumstances that overbear the defendant's will at the time it is given," it is not voluntary. Thomsen, 2016 WL 590235, at *9.

"Qualified immunity shields government officials from civil suits for damages" if "'their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Higazy, 505 F.3d at 169 (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S. Ct. 2727, 2738, 73 L. Ed. 2d 396 (1982)). To determine whether qualified immunity applies, courts consider "whether the facts shown make out a violation of a constitutional right and whether the right at issue was clearly established at the time of the defendant's alleged misconduct." Estate of Devine v. Fusaro, --- F. App'x ----, at *1 (2d Cir. 2017) (internal quotation marks and citation omitted). Whether a right was clearly established should be analyzed from the perspective of a reasonable law enforcement officer, and the relevant inquiry is whether "it would be clear to a reasonable officer that his conduct was unlawful in the situation

he confronted." <u>Devine</u>, 2017 WL 362685, at *1.  When there are issues of fact that bear on the issue of qualified immunity, summary judgment on qualified immunity grounds must be denied. See <u>Clark v. City of N.Y.</u>, No. 09-CV-2533, 2015 WL 5719612, at *7 (E.D.N.Y. Sept. 29, 2015).

The Court finds that there are issues of material fact that preclude summary judgment on Plaintiff's coercion claim.  For example, Plaintiff alleges that during the interview, the questions "never seemed to stop" and that he was "questioned almost continuously until he broke," while Defendants maintain that the interview was conversational and Plaintiff spoke in a narrative fashion.  (Pl.'s 56.1 Counterstmt. ¶ 24; Defs.' 56.1 Stmt. ¶ 99.) Additionally, Plaintiff claims that the Detectives prevented him from talking to Fox, the family attorney, at the crime scene that morning and denied his requests to speak to Fox during the interview.  (Pl.'s 56.1 Counterstmt. ¶¶ 27-28.)  In contrast, Detective McCready denied that Plaintiff ever asked to speak to Fox.  (Pl.'s 56.1 Counterstmt. ¶ 28.)  Examining the facts in the light most favorable to Plaintiff, including his age and the events of that morning, a reasonable jury could find that the Detectives obtained the confession by coercion and violated Plaintiff's constitutional rights.[49]  See <u>Weaver v. Brenner</u>, 40 F.3d 527, 537

---

[49] Defendants argue that this Court should adopt the reasoning of the state and federal courts that held that Plaintiff's

(2d Cir. 1994) (holding that there were issues of fact on coercion claim when officers allegedly told the accused that if he told them what he did they would "keep [it] out of the newspapers" and that if he did not cooperate it would be difficult on his family and lied regarding statements from others implicating him) (internal quotation marks omitted); Thomsen, 2016 WL 590235, at *9 (holding that plaintiff stated a coercion claim at motion to dismiss stage when officer allegedly promised him leniency, lied to him about the existence of video tapes depicting him committing the crime, and manipulated him).

Nonetheless, the Court may still grant summary judgment for Defendants if "[they] can demonstrate that they are entitled to qualified immunity." Clark, 2015 WL 5719612, at *7 (citation omitted); see also Deskovic v. City of Peekskill, 894 F. Supp. 2d 443, 451 (S.D.N.Y. 2012) ("Summary judgment may be granted on the basis of a qualified immunity defense premised on an assertion of objective reasonableness [if] the defendant show[s] that no reasonable jury, viewing the evidence in the light most favorable to the [p]laintiff, could conclude that the defendant's actions were objectively unreasonable in light of clearly established

---

confession was admissible, because "the reasoning and analysis of these Courts is beyond challenge." (Defs.' Mem. at 13.) However, those prior decisions, which are not binding, evaluated whether Plaintiff's confession was voluntary based on the evidence presented during a pre-trial hearing--not on the record before this Court.

law.") (quoting O'Bert v. Vargo, 331 F.3d 29, 37 (2d Cir. 2003)
(internal quotation marks omitted) (alteration in original).  The
Second Circuit has held that in 1989, shortly after the events at
issue here, "it was clearly established . . . that criminal
suspects had a due process right to be free from official conduct
designed to overcome the accused's will and produce an involuntary
incriminating statement."  Weaver, 40 F.3d at 536.  Thus, this
right was clearly established when Plaintiff was questioned by the
Detectives.[50]  The more complex question is whether a reasonable
officer would understand the conduct to be a violation of
Plaintiff's rights.  If the interview proceeded as Plaintiff
described--particularly, if the Detectives denied his repeated
requests for counsel--the factfinder could determine that a
reasonable officer would understand that conduct to be unlawful.
Therefore, at this juncture, Defendants are not entitled to
qualified immunity.  See Weaver, 40 F.3d at 537 ("Review of this
record leads us to conclude that there are genuine issues of
material fact as to whether defendants engaged in the alleged

---

[50] Defendants again point to the decisions of prior state and
federal courts to support their argument that "it cannot be said
that at the time of the claim it was clearly established that such
conduct would be violative of a plaintiff's constitutional
rights."  (Defs.' Mem. at 16.)  This argument is belied by the
Second Circuit's holding in Weaver.  Further, the decisions
referred to by Defendants were based on the record in the criminal
proceeding.  See supra note 49.  The Court finds that there are
genuine issues of material fact in this record that preclude
dismissal of this claim on qualified immunity grounds.

coercive conduct. Since defendants hotly dispute plaintiff's allegations, a factual determination of their conduct is needed to resolve the issue of qualified immunity."); Higazy, 505 F.3d at 174 ("Where there is a dispute about the material facts, th[e] question [of whether the officer's conduct was objectively reasonable] must be resolved by the factfinder.").

Therefore, Defendants' motion for summary judgment on the coercion claim is DENIED.

## III. Malicious Prosecution Claims

Defendants argue that Plaintiff's malicious prosecution claim under Section 1983 and New York law must be dismissed for several reasons. (Defs.' Mem. at 17-27.) First, they argue that there was probable cause to commence and continue the prosecution against Plaintiff. (Defs.' Mem. at 19-24.) Defendants acknowledge that there is a dispute regarding the manner in which Plaintiff's alleged confession was obtained but contend that "the existence of probable cause independent of the allegedly falsified evidence is a defense" to a malicious prosecution claim. (Defs.' Mem. at 20.) Defendants point to the Court's prior Order, which dismissed Plaintiff's false arrest claim based on the existence of probable cause, as support for their argument.[51] See Tankleff, 2010 WL

---

[51] Defendants also argue that if the Court grants summary judgment on Plaintiff's coercion claim, it should consider Plaintiff's admissions in the probable cause analysis, and that those admissions further support the existence of probable

5341929, at *13-14 (describing evidence independent of the confession that provided probable cause for Plaintiff's arrest). <u>Second</u>, Defendants maintain that Plaintiff cannot establish that the charges against him terminated in a favorable manner. (Defs.' Mem. at 25-27.) Defendants appear to argue that Plaintiff's Section 1983 malicious prosecution claim is barred by <u>Heck v. Humphrey</u>, 512 U.S. 477 (1994), because Plaintiff has not "produce[d] any evidence beyond that alleged in the complaint which would more strongly establish his actual innocence." (Defs.' Mem. at 26.) <u>Third</u>, Defendants argue that they are entitled to qualified immunity because there was "arguable probable cause" to initiate and continue the prosecution. (Defs.' Mem. at 27.)

Plaintiff argues that whether there was probable cause to initiate or continue the prosecution against Plaintiff should be decided by a jury, particularly in light of the "factual dispute as to whether Defendants fabricated Plaintiff's confession, . . . misrepresented to prosecutors that the narrative of the crime originated with Plaintiff [and] taint[ed] the grand jury process." (Pl.'s Opp. at 20.) Regarding Defendants' argument that the Court's prior Order supports a dismissal of the malicious prosecution claim on similar grounds, Plaintiff argues that

cause. (Defs.' Mem. at 24-25.) Because the Court has denied summary judgment on the coercion claim, <u>see</u> <u>supra</u> section II, it declines to consider this argument.

"probable cause to arrest is different than probable cause to prosecute." (Pl.'s Opp. at 21.) While an indictment creates a presumption of probable cause, Plaintiff contends that he has presented sufficient evidence to rebut that presumption. (Pl.'s Opp. at 22-23.) Plaintiff further argues that even if the Court were to find that there was probable cause to initiate the prosecution, probable cause dissipated after Plaintiff's indictment, including because of "powerful later evidence that [Plaintiff's] statement was not true, and that another perpetrator was likely involved." (Pl.'s Opp. at 24.) Finally, Plaintiff maintains that he has established the favorable termination element of his claim because the indictments were dismissed based largely on evidence of his innocence. (Pl.'s Opp. at 29-31.)

To sustain a section 1983 malicious prosecution claim, plaintiff must show "a violation of his rights under the Fourth Amendment" and establish "the elements of a malicious prosecution claim under state law." Manganiello v. City of N.Y., 612 F.3d 149, 161 (2d Cir. 2010) (internal citations omitted). "[U]nder New York law, a plaintiff must prove: (1) the initiation or continuation of a criminal proceeding against plaintiff; (2) termination of the proceeding in plaintiff's favor; (3) lack of probable cause for commencing the proceeding; and (4) actual malice as a motivation for defendant's actions." Id. (internal quotation marks and citations omitted); see also Colon v. City of N.Y.,

60 N.Y.2d 78, 82, 455 N.E.2d 1248, 1250, 468 N.Y.S.2d 453 (1983).

Setting aside the requirement that Plaintiff demonstrate a violation of his Fourth Amendment rights, the elements of Plaintiff's Section 1983 and state law malicious prosecution claims are identical. See Genovese v. Cty. of Suffolk, 128 F. Supp. 3d 661, 668 (E.D.N.Y. Sept. 8, 2015) ("[T]he distinction between state and federal claims of malicious prosecution does not affect the Court's analysis, because the elements of a malicious prosecution claim are identical under Section 1983 and New York law."). As a result, the Court will analyze Plaintiff's malicious prosecution claims together.[52]

A. Heck and Favorable Termination[53]

In Heck, the Supreme Court held that "in order to recover damages for allegedly unconstitutional conviction or

_____

[52] Because Defendants do not address the initiation or malice elements, the Court presumes that they have conceded those elements and declines to address them.

[53] Analyzing whether Plaintiff's claims are barred by Heck and whether he obtained a favorable termination of the charges under state law requires an examination of the same underlying facts. However, the two analyses are distinct. See Spak v. Phillips, 857 F.3d 458, 462 (2d Cir. 2017) ("While the same phrase-- 'favorable termination'--is used in both the accrual analysis and the merits analysis of a Section 1983 suit, it is analyzed under a different legal standard in each context. When the question before a federal court is at what point a malicious prosecution claim accrued, 'favorable termination' is analyzed under federal common law . . . . When, by contrast, a federal court is analyzing the merits of a plaintiff's claim, the definition of 'favorable termination' is analyzed under state law.") (internal citations omitted).

imprisonment, . . . a § 1983 plaintiff must prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus, 28 U.S.C. § 2254." Heck, 512 U.S. at 486-87, 114 S. Ct. 2364, 2372, 129 L. Ed. 2d 383. Relying on an analogy to malicious prosecution's favorable termination requirement, the Supreme Court explained that if a claim requires that the Plaintiff prove "the unlawfulness of his conviction or confinement . . . the complaint must be dismissed unless the plaintiff can demonstrate that the conviction or sentence has already been invalidated." Id. Thus, Heck operates as a bar to section 1983 malicious prosecution claims unless the conviction or sentence has been invalidated by one of the four methods specified by the Supreme Court. The Second Circuit recently clarified the application of Heck to malicious prosecution and other Section 1983 claims in Poventud v. City of N.Y., 750 F.3d 121 (2d Cir. 2014) (en banc). The Court explained that "[i]n the context of § 1983 malicious prosecution cases, Heck's bar is coextensive with the favorable termination requirement," and "the tort cannot stand unless the underlying criminal case[ ] 'finally end[s] in failure.'" Poventud, 750 F.3d

at 131 (quoting DeBlasio v. City of N.Y., 102 F.3d 654, 657 (2d Cir. 1996)) (internal citations omitted).

To determine whether Plaintiff has established the favorable termination element of his claim, the Court must look to New York law. Clark, 2015 WL 5719612, at *10; see also Negron v. Wesolowski, 536 F. App'x 151, 152 (2d Cir. 2013) ("'Because there are no federal rules of decision for adjudicating § 1983 actions that are based upon claims of malicious prosecution, [courts] are required by 42 U.S.C. § 1988 to turn to state law--in this case New York state law--for such rules.'") (quoting Conway v. Vill. of Mount Kisco, 750 F.2d 205, 214 (2d Cir. 1984)) (alteration in original). Under New York law, a plaintiff is not "require[d] to prove [his] innocence," but rather to "demonstrate a final termination that is not inconsistent with innocence." Clark, 2015 WL 5719612, at *9 (alteration in original) (internal quotation marks and citation omitted); see also Smalls v. City of N.Y., 181 F. Supp. 3d 178, 188 (E.D.N.Y. 2016) ("[T]he reversal need not affirmatively demonstrate the accused's innocence."). Further, "any final termination of a criminal proceeding in favor of the accused, such that the proceeding cannot be brought again, qualifies as a favorable termination . . . ." Poventud, 750 F.3d at 131 (quoting Smith-Hunter v. Harvey, 95 N.Y.2d 191, 195, 734 N.E.2d 750, 753, 712 N.Y.S.2d 438 (2002)). When charges are dismissed in the interests of justice, the New York Court of

Appeals has declined to establish a per se rule, but rather directed courts to consider "'whether, under the circumstances of each case, the disposition was inconsistent with the innocence of the accused.'" Genovese, 128 F. Supp. 3d at 672 (quoting Cantalino v. Danner, 96 N.Y.2d 391, 396, 754 N.E.2d 164, 168, 729 N.Y.S.2d 405 (2001)). Moreover, when a prosecutor formally or voluntarily abandons the charges, the abandonment "can constitute a favorable termination, as long as the abandonment did not result from a compromise, an act of mercy requested by or accepted by the accused, or misconduct by the accused." Clark, 2015 WL 5719612, at *10.

In light of the particular circumstances in this case, the Court finds that the disposition of the charges against Plaintiff constitute a favorable termination. Plaintiff's convictions were vacated by the Appellate Division based upon newly discovered evidence presented by Plaintiff at the 440.10 Hearing. Tankleff, 49 A.D.3d at 162, 848 N.Y.S.2d at 288. Subsequently, the Attorney General moved to dismiss the indictments in the interests of justice. (N.Y.S. Mot. to Dismiss, Pl.'s Ex. 40, Docket Entry 184-46.) The Attorney General moved to dismiss the indictments for several reasons, including changes in the law, the passage of time, and "evidence of problematic conduct" by Detective McCready. (N.Y.S. Mot. to Dismiss at 5.) However, relevant to this inquiry, the Attorney General also moved to dismiss because

"there is no biological or physical evidence strongly linking the defendant to the crimes, even after a renewed set of forensic tests using the most up-to-date technology," and "there is some evidence that others may have committed the killings." (N.Y.S. Mot. to Dismiss at 5.) The Attorney General's investigation also led to the discovery of a "previously unnoticed bloody imprint" of a knife on the bed sheets in the master bedroom which did not match the Watermelon Knife or any other knife in the home. (N.Y.S. Mot. to Dismiss at 5-6.) Because the indictments were dismissed in part based on evidence that tends to show that another individual was responsible, the disposition is not inconsistent with Plaintiff's innocence. See Genovese, 128 F. Supp. 3d at 672. Moreover, the charges cannot be brought again and the abandonment of the charges was not the result of a compromise with Plaintiff. See Poventud, 750 F.3d at 131; Clark, 2015 WL 5719612, at *10. The favorable termination element of Plaintiff's malicious prosecution claims is satisfied. See Clark, 2015 WL 5719612, at *10 (holding that the prosecutor's abandonment of the charges based on "evidence that could or would be elicited and explored at trial" was a favorable termination); Smalls, 181 F. Supp. 3d 178, 188 (holding that criminal proceedings terminated favorably based on reversal of conviction by Appellate Division).

Further, because the charges against Plaintiff terminated in his favor, Plaintiff's Section 1983 malicious

prosecution claim is not barred by Heck. As discussed, Plaintiff's

conviction was vacated by "a state tribunal authorized to make

such determination." See Heck, 512 U.S. at 486-87, 114 S. Ct.

2364, 2372, 129 L. Ed. 2d 383. Additionally, the proceedings

ultimately terminated in Plaintiff's favor when the indictments

were dismissed.[54] See Spak, 857 F.3d at 464 ("So long as a

particular prosecution has been 'conclusively' terminated in favor

of the accused, such that the underlying indictment or criminal

information has been vacated and cannot be revived, then the

plaintiff has a justiciable claim for malicious prosecution.").

B.  Probable Cause

"Although the existence of probable cause must be

determined with reference to the facts of each case," Manganiello,

612 F.3d at 161, generally, there is probable cause when "knowledge

---

[54] Relying on DeBlasio v. City of N.Y., 102 F.3d 654 (2d Cir.
1996), the Court previously suggested that Plaintiff may be
required to make a stronger showing of his innocence to overcome
Heck's bar.  In DeBlasio, the Second Circuit held that
DeBlasio's malicious prosecution claim was barred by Heck
because while his original conviction was vacated pursuant to a
writ of habeas corpus, he was retried and convicted on a lesser
charge.  DeBlasio, 102 F.3d at 655.  The Second Circuit further
held that the proceeding terminated when he was convicted on the
lesser charge and not when the writ of habeas corpus was issued,
because the writ could not be considered an "indication of
innocence."  Id. at 658.  To the extent that federal common law
requires a plaintiff alleging malicious prosecution to
"demonstrate that the outstanding conviction has been
conclusively invalidated in a manner that demonstrates his
innocence," the Court finds that, based on its review of the
record, Plaintiff has made such a showing.  Spak, 857 F.3d at
465.

of facts, actual or apparent, [is] strong enough to justify a reasonable man in the belief that he has lawful grounds for prosecuting the defendant in the manner complained of." Riccio v. New York, 859 F. Supp. 2d 480, 486 (E.D.N.Y. 2012) (quoting Genia v. N.Y. State Troopers, No. 03-CV-0870, 2007 WL 869594, at *12 (E.D.N.Y. Mar. 20, 2007)); see also Thomsen, 2016 WL 590235, at *7 ("The probable cause standard in the malicious prosecution context is slightly higher than the standard for false arrest cases . . . Probable cause, in the context of malicious prosecution, has . . . been described as such facts and circumstances as would lead a reasonably prudent person to believe the plaintiff guilty.") (internal quotation marks and citation omitted) (alteration in original). In New York, "the existence of probable cause is a complete defense to a claim of malicious prosecution . . . ." Savino v. City of N.Y., 331 F.3d 63, 72 (2d Cir. 2003). Moreover, "indictment by a grand jury creates a presumption of probable cause that may only be rebutted by evidence that the indictment was procured by 'fraud, perjury, the suppression of evidence or other police conduct undertaken in bad faith.'" Savino, 331 F.3d at 72 (quoting Colon, 60 N.Y.2d at 83, 455 N.E.2d at 1251) (emphasis in original)). See also Bernard v. United States, 25 F.3d 98, 104 (2d Cir. 1994). Plaintiff "bears the burden of proof in rebutting the presumption, and he must do so with more than mere conjecture and surmise that his indictment

was procured as a result of conduct undertaken by the defendants in bad faith." Reid v. City of N.Y., No. 00-CV-5164, 2004 WL 626228, at *7 (S.D.N.Y. Mar. 29, 2004), R&R adopted by, 2004 WL 1488194 (S.D.N.Y. July 1, 2004)) (quoting Savino, 331 F.3d at 73) (internal quotation marks omitted). Further, the failure to take certain investigative steps is "not the equivalent of fraud or the suppression of evidence." Colon, 60 N.Y. 2d at 78, 455 N.E.2d at 1251, 468 N.Y.S.2d at 456.

The Second Circuit has held that "'even when probable cause is present at the time of the arrest, evidence could later surface which would eliminate that probable cause.'" Lowth v. Town of Cheektowaga, 82 F.3d 563, 571 (2d Cir. 1996) (quoting Cox v. Cty. of Suffolk, 780 F. Supp. 103, 108 (E.D.N.Y. 1991)). However, "'[i]n order for probable cause to dissipate, the groundless nature of the charges must be made apparent by the discovery of some intervening fact.'" Fappiano v. City of N.Y., No. 01-CV-2476, 2015 WL 94190, at *13 (E.D.N.Y. Jan. 7, 2015), aff'd 640 F. App'x 115 (2d Cir. 2016) (quoting Lowth, 82 F.3d at 571).

The Court finds that the record is rife with factual disputes related to whether there was probable cause to initiate or continue the prosecution of Plaintiff. In particular, Defendants conceded for the purposes of this motion that there are issues of fact as to whether the confession was fabricated.

(Defs.' Mem. at 1 n.1.)   If the confession was fabricated, that alone could be sufficient to rebut the presumption of probable cause.   Morel v. Reed, Nos. 11-CV-1808, 12-CV-5145, 2015 WL 3755976, at *4 (E.D.N.Y. June 16, 2015) ("When law enforcement officers fabricate evidence . . . the presumption of probable cause created by the indictment [is] overcome . . . .").   Further, a reasonable jury could find that probable cause dissipated after Plaintiff was indicted, based on, inter alia, forensic analysis which showed that there was no blood on the purported murder weapons or in the shower, traps, and drains, as well as Steuerman's suspicious behavior.[55]

Defendants are also not entitled to summary judgment based on qualified immunity.   If, as Plaintiff maintains, Plaintiff's statements were coerced and the prosecution was initiated based on a confession fabricated by Defendants, the factfinder could conclude that no reasonable officer would believe that there was probable cause to prosecute.   See Smalls, 181 F. Supp. 3d at 189 ("Officers who knowingly lie are not protected by qualified immunity."); Clark, 2015 WL 5719612, at *7 (denying

_____

[55] Defendants argue that these claims should be dismissed based on the Court's prior determination that there was probable cause to arrest Plaintiff.  (Defs.' Mem. at 21-23.)   However, this argument fails to consider that probable cause to arrest and probable cause to initiate and continue a prosecution are different standards and analyzing whether each standard is met can involve examining different facts.   See Thomsen, 2016 WL 590235, at *7.

summary judgment on qualified immunity grounds due to factual dispute as to the existence of probable cause). Dismissal on qualified immunity grounds is not appropriate at this time. See Deskovic, 894 F. Supp. 2d at 461-62 (denying motion for summary judgment on qualified immunity grounds in light of allegations of fabrication and coercion when "a reasonable jury could find that officers of reasonable competence would agree that there was not probable cause to prosecute [plaintiff], given the exculpatory DNA results and general lack of other evidence").

Therefore, Defendants' motion for summary judgment on the Section 1983 and state law malicious prosecution claims is DENIED.

IV. Suppression Claim

Defendants argue that they are entitled to summary judgment on the suppression claim because there is no evidence that Dr. Adams told any detective that he believed the Watermelon Knife was not the murder weapon. (Defs.' Mem. at 28.) Defendants also contend that Plaintiff cannot establish that any detective learned this information, or identify which detective learned it and allegedly withheld it from prosecutors.[56] (Defs.' Mem. at 29.)

---

[56] Defendants have submitted affidavits in which Detective McCready, Detective Carmody, Detective Kosciuk, and Detective Rein deny being present at Arlene's autopsy. Sergeant Doyle does not recall if he was at Arlene's autopsy. (Pl.'s 56.1 Counterstmt. ¶ 102; McCready Aff., Defs.' Ex. FFF, ¶ 9; Doyle Aff., Defs.' Ex. DDD, ¶ 9; Carmody Aff., Defs.' Ex. CCC, at ¶ 9;

Further, Defendants argue that even if one of the detectives did become aware of Dr. Adams' conclusion, the failure to disclose did not violate Brady because defense counsel "either knew, or should have known, of the essential facts permitting him to take advantage of that exculpatory evidence." (Defs.' Mem. at 32.) Finally, Defendants maintain that this claim is barred by the statute of limitations. (Defs.' Mem. at 32-33.)

Plaintiff responds that there is an issue of material fact as to whether Dr. Adams communicated his conclusion to detectives. (Pl.'s Opp. at 32.) He argues that the evidence in the record establishes that it was the department's practice to have a detective present at the autopsy, and handwriting on what appears to be a diagram of the wounds on Arlene's back has been attributed to Detective Rein. (Pl.'s Opp. at 32.) Plaintiff points out that when Dr. Adams was shown that diagram during his deposition, he stated that it appeared to be drawn by an individual who was present at the autopsy. (Pl.'s Opp. at 32.) Moreover, Plaintiff contends that "many Defendants themselves confirmed that they knew that the [W]atermelon [K]nife was not used in the crime" during the reinvestigation by the Attorney General's Office. (Pl.'s Opp. at 33.) Plaintiff also disputes that his defense counsel could have obtained this information and argues that his

Kosciuk Aff., Defs.' Ex. EEE, ¶ 10; Rein Aff., Defs.' Ex. GGG, at ¶ 9.)

defense counsel should not be faulted for relying on the representation of prosecutors that all exculpatory evidence had been disclosed.  (Pl.'s Opp. at 34-35.)  Further, he argues that the Court should not permit Defendants' "blame the defense rationale to absolve the government of its Brady obligations." (Pl.'s Opp. at 35 (internal quotation marks omitted).)  Plaintiff contends that based on the evidence in the record, "a jury could conclude that Defendants knew of, and withheld, Brady evidence." (Pl.'s Opp. at 38.)  Finally, Plaintiff argues that this claim is timely under the relation back doctrine and claims that Defendants had adequate notice because the original Complaint included a suppression of evidence claim.  (Pl.'s Opp. at 38-39.)

In Brady v. Maryland, the Supreme Court held that "suppression by the prosecution of evidence favorable to the accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."  373 U.S. 83, 87, 83 S. Ct. 1194, 1196-97, 10 L. Ed. 2d 215 (1963).  Because withholding exculpatory evidence violates the accused's right to a fair trial, a Brady violation may form the basis for a Section 1983 claim. See Fappiano, 640 F. App'x at 118.  To prevail on a Section 1983 claim on a Brady theory, (1) "[t]he evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching" (2) "th[e] evidence must have been

75

suppressed by the State, either willfully or inadvertently," and (3) "prejudice must have ensued." <u>Poventud</u>, 750 F.3d at 133 (quoting <u>United States v. Rivas</u>, 377 F.3d 195, 199 (2d Cir. 2004)) (internal quotation marks omitted). To evaluate prejudice, the courts should consider materiality, that is, whether there is a "reasonable probability of a different result" based on the allegedly suppressed evidence and "whether in its absence [the plaintiff] received a fair trial." <u>Id.</u> (quoting <u>Leka v. Portuondo</u>, 257 F.3d 89, 104 (2d Cir. 2001)). Officers may be liable on a <u>Brady</u> theory only when they commit such violations intentionally. See <u>Fappiano</u>, 640 F. App'x at 118. Moreover, "[e]vidence is not suppressed if the defendant either knew, or should have known, of the essential facts permitting him to take advantage of the exculpatory evidence." <u>United States v. Taylor</u>, 17 F. Supp. 3d 162, 177 (E.D.N.Y. 2014) (quoting <u>United States v. Guerrero</u>, 959 F. Supp. 2d 523, 531 (S.D.N.Y. 2013) (internal quotation marks omitted).

The Court finds that there are issues of material fact that preclude summary judgment on this claim. At a minimum, whether Dr. Adams ever disclosed his opinion to Defendants is an issue of material fact. Dr. Adams testified during his deposition that he "must have communicated" his conclusion in "some sense" and it was a "reasonable supposition" that he did so during the

autopsy.[57]   (Adams. Dep. Tr. 192:22-193:21.)   Combined with the
testimony from several witnesses regarding the department's custom
of having a detective present at all autopsies, the diagram
allegedly drawn by Detective Rein, Detective Carmody's notes from
a meeting with Dr. Adams indicating a "clear knife issue," and the
subsequent statements of Detective Rein, Sergeant Doyle, Detective
Kosciuk, and Detective Pfalzgraf that they did not believe the
Watermelon Knife was the weapon, Plaintiff has presented enough
evidence to defeat summary judgment.   (Pl.'s 56.1 Counterstmt.
¶¶ 93-95, 122, 123-27.)

        Wisely, Defendants do not dispute that Dr. Adams'
conclusion is material, but instead argue that Plaintiff's defense
counsel could have or should have discovered this information
independently.   The Court is not persuaded.   Defense counsel had
no reason to believe that there was exculpatory information
regarding the murder weapon beyond what was documented in the
autopsy and forensic reports received from the prosecutor.   See
United States v. Payne, 63 F.3d 1200, 1209 (2d Cir. 1995) (holding

---

[57] Defendants claim that Dr. Adams testified that "he could have
said something about the knife, or he could have said nothing,"
but this characterization is misleading.   (Defs.' Mem. at 29
(internal quotation marks omitted).)   In response to a question
regarding what he would have said to detectives, he testified:
"I could have said that or I could have said nothing, and then
they bring in the [W]atermelon [K]nife and I could have said, I
don't like that very much for these wounds."   (Adams. Dep. Tr.
191:18-21.)

that failure to disclose affidavit that was available in a public court records was suppressed within the meaning of Brady because there was "no indication that Payne's counsel was aware of facts that would have required him to discover the affidavit through his own diligent investigation"). In his opening statement, the prosecutor himself said that the Tankleffs' injuries were not inconsistent with having been caused by the Watermelon Knife. (Trial Tr. (Opening), Defs.' Ex. B, 27:20-28:9.) To expect defense counsel to infer that there was information contrary to that representation before trial, or to cross-examine Dr. Adams on this issue during trial, would be inconsistent with Brady's mandate. Accordingly, the Court declines to dismiss the claim on these grounds.

Finally, Plaintiff's suppression claim is timely under the relation back doctrine. Federal Rule of Civil Procedure 15 provides that "[a]n amendment to a pleading relates back to the date of the original pleading when . . . the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out--or attempted to be set out--in the original pleading." See FED. R. CIV. P. 15(c)(1)(B); see also Slayton v. Am. Express Co., 460 F.3d 215, 228 (2d Cir. 2006). Further, "the 'central inquiry is whether adequate notice of the matters raised in the amended pleading has been given to the opposing party within the statute of limitations by the general fact situation alleged

in the original pleading.'" Slayton, 460 F.3d at 228 (quoting Stevelman v. Alias Research Inc., 174 F.3d 79, 86 (2d Cir. 1999)).

In the Complaint, Plaintiff asserted a claim for suppression of evidence, alleging that "Defendants McCready and Rein knowingly and deliberately chose not to document or disclose to the prosecutors information that was favorable and material to Mr. Tankleff's defense, including, without limitation, the truth about how they elicited the so-called confession . . . ." (Compl. ¶ 160 (emphasis supplied).) The Brady claim in the Amended Complaint alleges that Defendants withheld information regarding one piece of evidence--the Watermelon Knife--with greater specificity, but the nature of the conduct is similar to the conduct alleged in Count IV of the original Complaint. See Triano v. Town of Harrison, N.Y., 895 F. Supp. 2d 526, 530 n.3 (S.D.N.Y. 2012) (holding that Monell claim related back to claim against officer in original complaint because both claims arose "from the alleged violations of [plaintiff's] constitutional rights by [officer] during [p]laintiff's arrest"). Thus, Defendants were on notice of alleged Brady violations when the original Complaint was filed. That this claim was dismissed in a subsequent order does not change the result because Defendants were given notice of similar allegations during the statute of limitations period. Slayton, 460 F.3d at 228.

Therefore, Defendants' motion for summary judgment on the suppression claim is DENIED.

<u>CONCLUSION</u>

Defendants' motion for summary judgment (Docket Entry 180) is DENIED, and the case will proceed to trial. Because no claims remain against Lieutenant McElhone, the Clerk of the Court is directed to TERMINATE Lieutenant McElhone as a defendant in this action. <u>See</u> <u>supra</u> note 2. As to Plaintiff's request for a pre-trial conference (Docket Entry 190), the parties are directed to file a joint proposed pre-trial order on or before September 8, 2017. The parties are further directed to appear for a pre-trial conference with Judge Shields on September 11, 2017 at 10:30 a.m.


SO ORDERED.


/s/ JOANNA SEYBERT
Joanna Seybert, U.S.D.J.


Dated:  June  23 , 2017
        Central Islip, New York


80